Deryck A. Palmer, Esq.
John J. Rapisardi, Esq.
George A. Davis, Esq.
Andrew M. Troop, Esq.
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York  10281
Telephone:  (212) 504-6000
Facsimile:  (212) 504-6666

Proposed Attorneys for Lyondell Chemical Company, et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                            :
**In re:**                                  :
                                            :        **Chapter 11**
                                            :
**LYONDELL CHEMICAL COMPANY, et al.,**      :        **Case No. 09-[_____]**
                                            :
                                            :        **Jointly Administered**
                            **Debtors.**     :
                                            :
-------------------------------------------------------------x

## DEBTORS' MOTION FOR AUTHORIZATION TO (I) PAY CERTAIN PREPETITION CLAIMS OF CRITICAL VENDORS AND CERTAIN ADMINISTRATIVE CLAIMHOLDERS, AND (II) AUTHORIZE FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS

Lyondell Chemical Company and certain of its subsidiaries and affiliates, as

debtors and debtors-in-possession (collectively, the "Debtors" and each a "Debtor"),[1] hereby

move for an order, pursuant to sections 105(a), 363(b) and 503(b)(9) of title 11 of the United

States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), authorizing, but not

directing, the Debtors to: (i) pay all or a portion of the prepetition obligations of certain Critical

Vendors (as defined below); (ii) pay claims for the value of goods received by the Debtors in the

ordinary course of business during the 20-day period immediately preceding the Petition Date (as

---

[1] A list setting forth each of the Debtors is attached hereto as Schedule 1.

defined below); and (iii) authorize banks to receive, process, honor and pay checks or electronic transfers used by the Debtors to pay the foregoing to the extent the Debtors have sufficient funds standing to their credit with such bank, and to rely on the representations of such Debtors as to which checks are issued and authorized to be paid in accordance with this Motion, without any duty of further inquiry and without liability for following the Debtors' instructions, and in support thereof, the Debtors respectfully represent as follows:

### Background

1.    On the date hereof (the "<u>Petition Date</u>"), each of the Debtors filed with the Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Contemporaneously with the filing of this motion (the "<u>Motion</u>"), the Debtors have filed a motion with the Court seeking joint administration of their cases pursuant to rule 1015 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").  No creditors' committee, trustee or examiner has been appointed in these cases.

2.    The Debtors are among the world's largest refiners of heavy high-sulfur crude oil and producers of petrochemicals and plastics.  In the past few months these enterprises have found themselves seriously challenged by changing consumer demand for oil products and plastics, volatile commodity markets and prices, the deterioration of the credit markets, and the substantial retrenchment of some of their largest direct and indirect customers, including customers in the automotive industry.  The Debtors have sought protection under chapter 11 to provide them with the opportunity and the tools to restructure both their operations and their balance sheets and emerge from chapter 11 better equipped to survive in this changed and changing economic environment.

3.       Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to these chapter 11 cases is contained in the Affidavit of Alan S. Bigman Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York, sworn to on January 6, 2009.

### Jurisdiction and Venue

4.       This Court has jurisdiction to consider this Motion and the relief requested herein pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

5.       The Debtors operate complex, highly competitive, international businesses in the fuels, chemicals, polymers and technology industries.  The successful operation of these businesses requires the Debtors to purchase goods and services from third party vendors and independent contractors, many of whom are sole-source or limited-source suppliers, without which the Debtors could not continue to operate their businesses (collectively, the "Critical Vendors").  Many of the Critical Vendors that are limited-source suppliers hold a virtual monopoly over the goods or services they provide.  Finding replacement vendors for these suppliers, assuming any are available, would likely result in higher costs for the Debtors.

6.       Furthermore, given the type of goods and the complexity of services required to maintain the Debtors' operations, the Debtors could not replace the Critical Vendors within a reasonable time, and on terms as beneficial to the Debtors as those already in place.  The resulting disruption in supply would ripple through the Debtors' businesses, idling their facilities and damaging their ability to create final products (and generate the resulting revenue), to the detriment of their estates and their creditors.  To the extent the Debtors can maintain their current

supply of goods and services at existing lower costs during the postpetition period and avoid the severe disruptions to their businesses that likely would arise from the cessation of the delivery of such goods or the performance of such services, it is prudent for the Debtors to pay selected Critical Vendors some or all of their prepetition claims for the overall benefit of their estates and their reorganizations.

7.      In addition, certain vendors may have delivered goods to the Debtors during the 20-day period prior to the Petition Date, and, therefore, are entitled to administrative claim status pursuant to section 503(b)(9) of the Bankruptcy Code (collectively, the "Twenty-Day Administrative Claims").  Authorizing, but not obligating, the Debtors to pay the Twenty-Day Administrative Claims would assist the Debtors in negotiating with the vendors holding such claims, thereby increasing the likelihood that such vendors will continue to supply the goods and services necessary to operate the Debtors' businesses.

8.      Pursuant to sections 105(a), 363(b) and 503(b)(9) of the Bankruptcy Code, the Debtors seek an order granting them the authority, in their sole discretion (but not the obligation), to: (i) pay all or a portion of the prepetition obligations of certain Critical Vendors; (ii) pay the Twenty-Day Administrative Claims; and (iii) authorize banks to receive, process, honor and pay checks or electronic transfers used by the Debtors to pay the foregoing to the extent the Debtors have sufficient funds standing to their credit with such bank, and to rely on the representations of such Debtors as to which checks are issued and authorized to be paid in accordance with this Motion without any duty of further inquiry and without liability for following the Debtors' instructions.

9.      If the requested relief is not granted and the Critical Vendors refuse to continue to supply goods and services to the Debtors postpetition, the Debtors may be unable to continue some or all of their operations.  Similarly, if the relief is not granted and the Debtors are

unable to address the Twenty-Day Administrative Claims strategically at this early stage of the cases, the Debtors may be unable to continue some or all of their operations. In either case, the failure to obtain the requested relief could have the unwanted effect of endangering the Debtors' successful reorganization and substantially harming their creditors.

## **The Debtors' Critical Vendors**

10.     The Debtors are mindful of their fiduciary obligations to seek to preserve and maximize the value of their estates. They have reviewed their business relationships and identified Critical Vendors that are so essential that the loss of their particular goods or services would cause immediate and irreparable harm to the Debtors' businesses and market share. These Critical Vendors fall into two general categories: (i) suppliers of goods, such as the raw materials that the Debtors process and convert into the final products they sell to their customers; and (ii) suppliers of services that are integral to the daily operation and maintenance of the Debtors' businesses.

11.     Raw materials (known as "feedstock") are the lifeblood of the Debtors' businesses. Even a short delay in their delivery could damage the health of the Debtors' operations. The Debtors purchase certain feedstock from a specific Critical Vendor because either: (i) the Critical Vendor is a limited-source supplier that holds a virtual monopoly over the feedstock; (ii) the Critical Vendor provides such feedstock at a price that would be prohibitively expensive for the Debtors to replace; or (iii) the Debtors are obligated by their customers to use a specific vendor. For example, as part of their operations the Debtors convert certain feedstock into ethylene and propylene, some of which they further convert to polypropylene, which is used to manufacture certain automotive parts. To assure quality control, the automotive

manufacturers require the Debtors to purchase their feedstock from a small group of specified vendors whom the Debtors could not easily replace.

12.    As operators of complex chemical manufacturing and technology businesses, the Debtors must purchase certain services from vendors that have the specific qualifications and expertise necessary to operate potentially dangerous facilities, handle hazardous materials and navigate just-in-time logistics. Given the paucity of qualified providers of these services and the deleterious impact upon the Debtors if certain vendors stop performing, even briefly, certain of such vendors are Critical Vendors.

13.    The Debtors purchase goods and services on a massive scale, requiring approximately $62.7 million worth of them, on average, every day just to maintain operations. By this Motion, the Debtors are asking the Court to preserve their long-term viability by allowing them to expend less than half a day's worth of payables, which they will direct to only the most critical of their vendors. It is essential to the reorganization efforts that the Debtors be permitted to pay selected Critical Vendors to continue their businesses and to honor their contractual commitments to their customers.

### Payment of Critical Vendors is in the Best
### Interests of the Debtors' Estates and Their Creditors

14.    Although the Debtors hope and expect to be able to assure a continuing postpetition supply of goods and services by consensual negotiation with the Critical Vendors, the Debtors recognize that their fiduciary duties bind them to consider and plan for the many vendors that may refuse to provide future goods or services unless their prepetition claims are paid. The Critical Vendors are so essential to the Debtors' businesses that the lack of any of their particular goods and services, even for a short time will outweigh the cost of payment of the prepetition claims of the Critical Vendors.

15.     The Debtors therefore seek the authority to pay, in their sole discretion and business judgment, some or all of the prepetition obligations of certain Critical Vendors (the "Vendor Claims") to maintain their operations.  Without this authority, these Critical Vendors may refuse to continue to supply goods and services to the Debtors postpetition.  As set forth above, the Critical Vendors are an essential component of the Debtors' continuing operations. The Debtors estimate the maximum amount needed to pay the prepetition claims (excluding those prepetition claims secured by trade liens) of Critical Vendors is approximately $30 million (the "Vendor Claims Cap").[2]

16.     In determining the amount of the Vendor Claims Cap, the Debtors have carefully reviewed all of their suppliers to determine, among other things: (i) which suppliers were sole source or limited source suppliers, without whom the Debtors could not continue to operate without disruption; (ii) which suppliers would be prohibitively expensive to replace; and (iii) which suppliers present an unacceptable risk should they cease the provision of truly essential services or supplies.  After compiling this information, the Debtors estimated the amount they believe they would be required to pay to ensure the continued supply of critical goods and services.  The Vendor Claims Cap represents this estimated amount.

17.     The Vendor Claims Cap represents only about three percent of the total amount of the prepetition vendor claims in these cases.  It represents the Debtors' best estimate as to how much must be paid to such creditors to continue the supply of critical goods and services.  The Debtors hope to pay far less than the requested amount.  The Debtors' proposed Vendor Claims Cap is within the range of amounts awarded by the courts in other cases.  See e.g., In re Calpine Corp., Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 21, 2005) [Docket

---

[2] The Vendor Claims Cap does not include any amounts for Twenty-Day Administrative Claims or any prepetition claims the Debtors have authority to pay under other orders entered by the Court in these cases.

No. 30] (court granted the debtor authority to pay $20,000,000 in critical vendor claims); <u>In re</u>
<u>Delphi Corp.</u>, Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Oct. 13, 2005) [Docket No. 197]
(court granted debtor authority to pay $90,000,000 in the debtors' vendor rescue program); <u>In re</u>
<u>UAL Corp.</u>, Case No. 02-48191 (ERW) (Bankr. N.D. Ill. Dec. 11, 2002) [Docket No. 244] (court
approved similar motion seeking to pay up to approximately $34,900,000 or 13.7% of the total
trade debt); <u>In re WorldCom, Inc.</u>, Case No. 02-13533 (AJG) (Bankr. S.D.N.Y. Jul. 22, 2002)
[Docket No. 64] (court granted debtor authority to pay $70,000,000 in critical vendor claims); <u>In</u>
<u>re U.S. Airways Group</u>, Case No. 02-83984 (SSM) (Bankr. E.D. Va. Aug. 12, 2002) [Docket No.
77] (court approved $10,000,000 in critical vendor claims for the 14th largest carrier in the
world); <u>In re Exide Techs.</u>, Case No. 02-11125 (JCA) (Bankr. D. Del. Apr. 18, 2002) [Docket
No. 57] (approved essential trade amount was 20% of the debtors total trade debt); <u>In re Enron</u>
<u>Corp.</u>, Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. Dec. 13, 2001) [Docket No. 35] (court
approved $48,000,000 in critical vendor claims); <u>In re Trans World Airlines, Inc.</u>, Case No. 01-
0056 (PJW) (Bankr. D. Del. Jan. 10, 2001) [Docket No. 32] (approved essential trade amount
that was 19% of the debtor's total trade debt).

     18.    To minimize the amount of payments required, the Debtors request
authority to identify Critical Vendors in the ordinary course of their businesses. Identifying the
Critical Vendors now would likely cause all such vendors to demand payment in full. The
Debtors propose to pay the Vendor Claims of each Critical Vendor that agrees, in the Debtors'
sole discretion, to continue to supply goods or services to the Debtors on such Critical Vendor's
"<u>Customary Trade Terms</u>" for a period of time and on other such terms and conditions as are
acceptable to the Debtors. As used herein, "<u>Customary Trade Terms</u>" means, with respect to a
Critical Vendor: (i) the normal and customary trade terms, practices and programs (including,
but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates,

coupon reconciliation, normal product mix and availability and other applicable terms and programs) that were most favorable to the Debtors and in effect between such Critical Vendor and the Debtors prior to the Petition Date; or (ii) such other trade terms as agreed by the Debtors and such Critical Vendor; provided, that the Critical Vendor extends trade credit to the Debtors. However, as noted above, in determining the Vendor Claims Cap, the Debtors were careful to include only such payments the Debtors, in their best estimate, determined would be required to continue the supply of critical goods and services as a condition of continued sales.  Therefore, it may be necessary to pay certain Critical Vendors only a portion of such vendors' claim in return for the continued supply of critical goods and supplies even if not on the Critical Vendor's Customary Trade Terms.  Furthermore, to avoid a scenario where a Critical Vendor refuses to provide services to the Debtors on the Critical Vendor's Customary Trade Terms after payment of such Critical Vendor's claim, the Debtors seek approval to enter into separate agreements, at the Debtors' discretion, with each such Critical Vendor on a case-by-case basis.

19.     The Debtors further propose that if a Critical Vendor later refuses to continue to supply goods or services to the Debtors on the Customary Trade Terms for the applicable period, or on such other credit terms as were individually agreed to between the Debtors and such Critical Vendor, then the Debtors may, in their discretion, and without further order of the Court: (i) declare the payment of the applicable Vendor Claim a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover from such Critical Vendor in cash or in goods; and (ii) demand that the creditor immediately return such payments in respect of the Vendor Claim to the extent the aggregate amount of such payments exceeds the postpetition obligations then outstanding without giving effect to alleged setoff rights, recoupment rights, adjustments, or setoffs of any type whatsoever, and the creditor's Vendor Claim shall be reinstated in such an amount as to restore the Debtors

and the Critical Vendor to their original positions, as if the agreement had never been entered into and the payment of the Vendor Claim had not been made. In sum, the Debtors will return the parties to their positions immediately prior to the entry of the order approving the relief sought herein.

20.     To ensure Critical Vendors transact business with the Debtors on Customary Trade Terms, the Debtors propose the following procedures as a condition to paying any Critical Vendor: (i) a letter or contract including provisions substantially in the form of the letter attached hereto as Exhibit A (a "Vendor Agreement") be delivered to, and executed by, the Critical Vendors, together with a copy of the order granting the relief sought herein; and (ii) payment of Vendor Claims include a communication of the following statement:

> By accepting this payment, the payee agrees to the terms of the Order of the U.S. Bankruptcy Court for the Southern District of New York, dated _____, 2009, in the chapter 11 cases of Lyondel Chemical Company, et al. (Cases No. 09-_____(_) through 09-_____(_), entitled "Order Authorizing Debtors to (I) Pay Prepetition Claims Of Critical Vendors and Certain Administrative Claimholders, and (II) Authorize Financial Institutions to Honor and Process Related Checks and Transfers" and submits to the jurisdiction of that Court for enforcement thereof.

21.     As a further condition of receiving payment on a Vendor Claim, the Debtors propose that a Critical Vendor must agree to take whatever action is necessary to remove any existing trade liens against any of the property of any Debtor or affiliate thereof at such Critical Vendor's sole cost and expense, and waive any right to assert a trade lien on account of the paid Vendor Claim.

22.     The Debtors shall maintain a matrix summarizing: (i) the name of each Critical Vendor paid on account of Vendor Claims; (ii) the amount paid to each Critical Vendor on account of its Vendor Claim; and (iii) a brief description of the goods or services provided by

such Critical Vendor.  This matrix will periodically be provided to: (a) the United States Trustee for the Southern District of New York (the "U.S. Trustee"); (b) counsel for the official committee of unsecured creditors (the "Committee"); (c) Davis, Polk & Wardwell, Attorneys for Citicorp USA, Inc. as ABL DIP Agent (Attn: Marshall S. Huebner and Timothy E. Graulich) (the "ABL DIP Agent"); and (d) Mayer Brown LLP, Attorneys for Merrill Lynch, Pierce, Fenner & Smith, Inc. as Term DIP Agent (Attn: Brian Trust) (the "Term DIP Agent"); provided, however, that counsel for the Committee, the ABL DIP Agent, and the Term DIP Agent shall keep the matrix confidential in accordance with the confidentiality provisions of the applicable credit agreements to which the Debtors are party.

23.     The Debtors believe that payment of some or all Vendor Claims owed to Critical Vendors will be necessary to preserve operations and successfully reorganize.  The need for the flexibility to pay such claims is particularly acute in the period immediately following the Petition Date.  During this period, the Debtors, their attorneys and financial advisors, and their other professionals will be focusing on stabilizing operations and developing a long-term business plan.  At the same time, while the Debtors are distracted with stabilization of the business and long-term planning, Critical Vendors may attempt to assert their considerable leverage and deny provision of goods and services going forward, suddenly and without notice, in an effort to cripple operations and coerce payment.

24.     Furthermore, if the relief sought herein is not granted, Critical Vendors will have no incentive to continue to finance the Debtors on customary trade terms.  Indeed, over the past few weeks certain vendors that became concerned about the Debtors' financial condition have demanded that the Debtors pay for their goods on accelerated payment terms, cash in advance and cash on delivery basis.  Any further expansion of these activities by other Critical Vendors would be detrimental to the Debtors, their estates and their creditors.

25.    The continued availability of trade credit, in amounts and on terms consistent with those the Debtors struggled to obtain over the years, is clearly advantageous to the Debtors.  It allows the Debtors to maintain and enhance necessary liquidity and focus on returning to profitability.  The Debtors believe that preserving working capital through the retention or reinstatement of their normally advantageous trade credit terms will enable them to stabilize business operations at this critical time, to maintain their competitiveness and to maximize the value of their businesses for the benefit of all interested parties.  Conversely, any deterioration of trade credit, or disruption or cancellation of deliveries of goods or provision of essential services, could spell disaster for the restructuring efforts.  Finally, the relief requested herein also may help to avert the institution of numerous reclamation claims, suits and motions. Avoiding the time and expense of evaluating and litigating such claims will provide another incremental benefit for the Debtors, their estates and their creditors.  Any occurrence affecting operations could prolong the Debtors' chapter 11 cases, increase administrative expenses and jeopardize their reorganization.

## Request for Authority to Pay Claims Under Section 503(b)(9)

26.    Under section 503(b)(9) of the Bankruptcy Code, the Twenty-Day Administrative Claims are entitled to administrative claim status.  As administrative claims incurred in the ordinary course of the Debtors' businesses, the Debtors believe they are authorized to pay the Twenty-Day Administrative Claims pursuant to section 363(c)(1) of the Bankruptcy Code (even if such payments are made to Critical Vendors); however, the Debtors also believe they are not required to reconcile or pay the Twenty-Day Administrative Claims prior to the conclusion of these cases.  Accordingly, for the avoidance of doubt, the Debtors request that the Court enter an order stating the Debtors are authorized, but not required, to pay

the Twenty-Day Administrative Claims, or any portion thereof, of any claimant in the ordinary

course of the Debtors' businesses, and on such terms and conditions as the Debtors deem

appropriate.  Payments of Twenty-Day Administrative Claims, even if made to Critical Vendors,

shall not count against the Vendor Claims Cap.

### Request for Authority for Financial Institutions to Honor and Process Related Checks and Transfers

27.    The Debtors also request that all applicable banks and other financial

institutions be authorized to receive, process, honor and pay all checks presented for payment of,

and to honor all fund transfer requests made by the Debtors related to, the claims the Debtors

request authority to pay in this motion, regardless of whether the checks were presented, or fund

transfer requests were submitted, before or after the Petition Date; provided, however, that:

(i) sufficient funds are available in the Debtors' accounts to pay the checks and fund transfers;

and (ii) all banks and other financial institutions are authorized to rely on the Debtors'

designation of any particular check as approved by the attached proposed order without any duty

of further inquiry and without liability for following the Debtors' instructions.

### Basis for Relief Requested

28.    Section 105(a) of the Bankruptcy Code empowers the Court to "issue any

order, process, or judgment that is necessary or appropriate to carry out the provisions of this

title." 11 U.S.C. § 105(a).  A bankruptcy court's use of its equitable powers to authorize the

payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the

debtor is not a novel concept.  In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y.

1989).  Under section 105, the court can permit pre-plan payment of a prepetition obligation

when essential to the continued operation of the debtor.  In re NVR L.P., 147 B.R. 126, 127

(Bankr. E.D. Va. 1992) (citing Ionosphere Clubs, 98 B.R. at 177).  The Debtors strongly believe

that the uninterrupted supply of goods and services, on customary trade terms, and the continuing support of their customers are imperative to their ongoing operations and viability.

29.     The "necessity of payment" doctrine further supports the relief requested herein.  This doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor."  Ionosphere Clubs, 98 B.R. at 176; see also Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.), 80 B.R. 279, 285-86 (S.D.N.Y. 1987).  The rationale for the necessity of payment rule is consistent with the paramount goal of chapter 11 – "facilitating the continued operation and rehabilitation of the debtor."  Ionosphere Clubs, 98 B.R. at 176.

30.     Similar relief has been granted repeatedly in other chapter 11 cases in this district.  See, e.g., In re Frontier Airlines Holdings, Inc., Case No. 08-11298 (RDD) (Bankr. S.D.N.Y. May 15, 2008) [Docket No. 239]; In re Calpine Corp., Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 21, 2005) [Docket No. 30]; In re Delphi Corp., Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Oct. 13, 2005) [Docket No. 197]; In re Delta Air Lines, Inc., Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Sept. 16, 2005) [Docket No. 155]; In re Worldcom, Inc., Case No. 02-13533 (ALG) (Bankr. S.D.N.Y. 2002) [Docket No. 64]; In re Enron Corp., Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. Dec., 3, 2001) [Docket No. 35]; In re AI Realty Mktg. of N.Y., Inc., Case No. 01-40252 (AJG) (Bankr. S.D.N.Y. Feb. 6, 2001) [Docket No. 17].

31.     In addition, section 363(b)(1) of the Bankruptcy Code empowers the Court to allow the debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  Debtors' decisions to use, sell or lease assets outside the ordinary course of business must be based upon their sound business judgment.  See Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141,

143 (2d Cir. 1992) (holding that a judge determining a section 363(b) application must find from the evidence presented before him a good business reason to grant such application); see also Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983) (same); In re Global Crossing Ltd., 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); In re Ionosphere Clubs, Inc., 100 B.R. 670, 674 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a section 363(b) motion is "good business reason").

32.    The business judgment rule is satisfied where "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). In fact, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct. Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Courts in this district have consistently and appropriately been loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence and will uphold board decisions as long as they are attributable to any "rational business purpose." In re Integrated Res. Inc., 147 B.R. at 656.

33.    Here the requested relief represents a sound exercise of the Debtors' business judgment and is justified under section 363(b), as well as under section 105(a) of the Bankruptcy Code. The Debtors strongly believe that the uninterrupted supply of goods and services, on customary trade terms, and the continuing support of their customers are imperative to the ongoing operations and viability of the Debtors. Authority to pay the Critical Vendors and

Twenty-Day Administrative Claims in the ordinary course of the Debtors' businesses is in the best interest of the Debtors' estates and creditors. Absent such payment, the operations and value of the Debtors' estates will suffer, possibly precipitously, and the requested relief is necessary to avoid immediate and irreparable harm. This irreparable harm to the Debtors and to the recovery of all creditors will far outweigh the cost of payment.

### Immediate Relief is Necessary to Avoid Immediate and Irreparable Harm

34.    Bankruptcy Rule 6003 provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 20 days after the filing of the petition, grant . . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition . . ." Fed. R. Bankr. P. 6003(b). Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As described herein, the Debtors will suffer immediate and irreparable harm absent the Court's entry of an order granting the relief requested herein. Consequently, the relief requested herein is consistent with Bankruptcy Rule 6003. Accordingly, the order granting the relief requested herein should become effective and enforceable immediately notwithstanding Bankruptcy Rule 6004(h).

### Notice

35.    No trustee, examiner or creditors' committee has been appointed in these cases. Notice of this Motion has been given to: (i) the Debtors' fifty (50) largest unsecured creditors; (ii) the administrative agent or indenture trustee for each of the Debtors' funded debt facilities or its counsel, if known; (iii) counsel to the Debtors' proposed postpetition lenders; (iv) the United States Trustee for the Southern District of New York; (v) the Internal Revenue

Service; and (vi) the Securities and Exchange Commission. In light of the relief requested, the Debtors submit that no other or further notice need be provided.

### No Prior Application

36.    No previous request for the relief sought herein has been made to this or to any other court.

**WHEREFORE**, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit B: (i) authorizing them, but not directing them, to (a) pay all or a portion of the prepetition obligations of certain Critical Vendors, (b) pay certain claims for the value of goods received by the Debtors in the ordinary course of business during the 20-day period immediately preceding the Petition Date, (c) authorize banks to receive, process, honor and pay checks or electronic transfers used by the Debtors to pay the foregoing to the extent the Debtors have sufficient funds standing to their credit with such bank, and to rely

on the representations of such Debtors as to which checks are issued and authorized to be paid in accordance with this Motion without any duty of further inquiry and without liability for following the Debtors' instructions; and (ii) granting such other and further relief as is just and proper.

Dated: New York, New York
      January 6, 2009

                    CADWALADER, WICKERSHAM & TAFT LLP

                    */s/ Deryck A. Palmer*
                    Deryck A. Palmer, Esq.
                    John J. Rapisardi, Esq.
                    George A. Davis, Esq.
                    Andrew M. Troop, Esq.
                    One World Financial Center
                    New York, New York  10281
                    Telephone:  (212) 504-6000
                    Facsimile:  (212) 504-6666
                    deryck.palmer@cwt.com
                    john.rapisardi@cwt.com
                    george.davis@cwt.com
                    andrew.troop@cwt.com

                    Proposed Attorneys for Lyondell Chemical Company, et al.

# SCHEDULE 1

## List of Debtors

Basell Finance USA Inc.
Basell Germany Holdings GmbH
Basell North America Inc.
Basell USA Inc.
Circle Steel Corporation
Duke City Lumber Company, Inc.
Equistar Chemicals, LP
Equistar Transportation Company, LLC
Glidco Leasing, Inc.
Glidden Latin America Holdings Inc.
HOISU Ltd.
Houston Refining LP
HPT 28 Inc.
HPT 29 Inc.
H.W. Loud Co.
IMWA Equities II, Co., L.P.
ISB Liquidating Company
LBI Acquisition LLC
LBIH LLC
LeMean Property Holdings Corporation
Lyondell (Pelican) Petrochemical L.P. 1, Inc.
Lyondell Asia Pacific, Ltd.
Lyondell Chemical Company
Lyondell Chemical Delaware Company
Lyondell Chemical Espana Co.
Lyondell Chemical Europe, Inc.
Lyondell Chemical International Co.
Lyondell Chemical Nederland, Ltd.
Lyondell Chemical Products Europe, LLC
Lyondell Chemical Properties, L.P.
Lyondell Chemical Technology Management, Inc.
Lyondell Chemical Technology 1 Inc.
Lyondell Chemical Technology, L.P.
Lyondell Chimie France LLC
Lyondell-Equistar Holdings Partners
Lyondell Europe Holdings Inc.
Lyondell Greater China, Ltd.
Lyondell Houston Refinery Inc.
Lyondell LP3 GP, LLC
Lyondell LP3 Partners, LP

Lyondell LP4 Inc.
Lyondell Petrochemical L.P. Inc.
Lyondell Refining Company LLC
Lyondell Refining I LLC
LyondellBasell Advanced Polyolefins USA Inc.
LyondellBasell Finance Company
MHC Inc.
Millennium America Holdings Inc.
Millennium America Inc.
Millennium Chemicals Inc.
Millennium Holdings, LLC
Millennium Petrochemicals GP LLC
Millennium Petrochemicals Inc.
Millennium Petrochemicals LP LLC
Millennium Petrochemicals Partners, LP
Millennium Realty Inc.
Millennium Specialty Chemicals Inc.
Millennium US Op Co LLC
Millennium Worldwide Holdings I Inc.
MWH South America LLC
National Distillers & Chemical Corporation
NDCC International II Inc.
Nell Acquisition (US) LLC
Penn Export Company, Inc.
Penn Navigation Company
Penn Shipping Company, Inc.
Penntrans Company
PH Burbank Holdings, Inc.
Power Liquidating Company, Inc.
Quantum Acceptance Corporation
SCM Plants, Inc.
Suburban Propane GP, Inc.
Tiona, Ltd.
UAR Liquidating Inc.
USI Chemicals International, Inc.
USI Credit Corp.
USI Puerto Rico Properties, Inc.
Walter Kidde & Company, Inc.
Wyatt Industries, Inc.

**Exhibit A**

USActive 14785439.7

**[LETTERHEAD OF DEBTOR]**

_____, 20__

TO:    [Critical Vendors]
       [Name]
       [Address]

Dear Valued Supplier:

As you are aware, Lyondell Chemical Company and certain of its affiliates (collectively, the "Company") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Case" and the "Bankruptcy Court," respectively) on January ___, 2009 (the "Petition Date").  On the Petition Date, the Company requested the Bankruptcy Court's authority to pay pre-bankruptcy claims of certain suppliers in recognition of the importance of the Company's relationship with such suppliers and its desire that the Bankruptcy Cases have as little effect on the Company's ongoing business operations as possible.  On [_____, 2009], the Bankruptcy Court entered an order (the "Order") authorizing the Company, under certain conditions, to pay the prepetition claims of certain trade creditors that agree to the terms set forth below and to be bound by the terms of the Order.  A copy of the Order is enclosed.

To receive payment on account of prepetition claims, you must agree to continue to supply goods and services to the Company based on "Customary Trade Terms."  In the Order, Customary Trade Terms are defined as the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability and other applicable terms and programs), that were most favorable to the Company and in effect between you and the Company prior to the Petition Date, or such other trade terms as you and the Company agree.

For purposes of administration of this trade program as authorized by the Bankruptcy Court, you and the Company both agree that:

The estimated balance of the prepetition claim (net of any setoffs, credits or discounts) (the "Vendor Claim") that you will receive from the Company is $_____.

You waive any general unsecured claim against the Company.

You will provide an open trade balance or credit line to the Company for shipment of postpetition goods in the amount of $_____ (which shall not be less than the greater of the open trade balance outstanding on: (i) _____; or (ii) normal and customary terms on a historical basis before and up to the Petition Date).

The terms of such open trade balance or credit line are as follows (if more space is required, attach continuation pages):

_____
_____
_____
_____
_____
_____
_____

During the pendency of the Bankruptcy Case you will continue to extend to the Company all Customary Trade Terms (as defined in the Order).

You will not demand a lump sum payment upon consummation of a plan of reorganization in these chapter 11 cases on account of any administrative expense priority claim you assert, but instead agree that such claims will be paid in the ordinary course of business after consummation of a plan under applicable Customary Trade Terms, if the plan provides for the ongoing operations of the Company.

The undersigned, a duly authorized representative of [Critical Vendor], has reviewed the terms and provisions of the Order and agrees that [Critical Vendor] is bound by such terms.

You will not separately seek payment for reclamation and similar claims outside of the terms of the Order unless your participation in the Critical Vendor payment program authorized by the Order (the "Critical Vendor Payment Program") is terminated.

You will not file or otherwise assert against the Company, the estates or any other person or entity or any of their respective assets or property (real or personal) any lien (regardless of the statute or other legal authority upon which such lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to you by the Company arising from agreements entered into prior to the Petition Date.  Furthermore, you agree to take (at your own expense) all necessary steps to remove any such lien as soon as possible.

If either the Critical Vendor Payment Program or your participation therein terminates as provided in the Order, or you later refuse to continue to supply goods to the Company on Customary Trade Terms during the pendency of the Bankruptcy Case, any payments you receive on account of your Vendor Claim will be deemed voidable postpetition transfers pursuant to section 549(a) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  You will immediately repay to the Company any payments made to you on account of your Vendor Claim to the extent that the aggregate amount of such payments exceeds the postpetition obligations then outstanding without giving effect to

alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever. Your Vendor Claim shall be reinstated in such an amount so as to restore the Company and you to the same positions as would have existed if payment of the Vendor Claim had not been made.

Any dispute with respect to this letter agreement, the Order and/or your participation in the Critical Vendor Payment Program shall be determined by the Bankruptcy Court.

If you have any questions about this Agreement or our financial restructuring, please do not hesitate to call.

Sincerely,

[NAME OF DEBTOR]

By: _____
    Name:
    Title:

ACCEPTED AND AGREED BY:
[NAME OF CRITICAL VENDOR]

By: _____

Its: _____

Dated: _____, 20__

**Exhibit B**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
:
In re:                                                    :
:                    **Chapter 11**
:
**LYONDELL CHEMICAL COMPANY, et al.,**  :        **Case No. 09-[_____]**
:
:                    **Jointly Administered**
**Debtors.**              :
:
-------------------------------------------------------------x

## ORDER AUTHORIZING DEBTORS TO (I) PAY PREPETITION CLAIMS OF CRITICAL VENDORS AND CERTAIN ADMINISTRATIVE CLAIMHOLDERS AND (II) AUTHORIZE FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS

Upon consideration of the motion (the "Motion") of Lyondell Chemical Company and certain of its subsidiaries and affiliates, as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors" and each, a "Debtor"), seeking entry of an order pursuant to sections 105(a) and 363(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), for authority to pay in the ordinary course of business prepetition claims of critical vendors (the "Critical Vendors"), as more fully described in the Motion; and upon consideration of the Affidavit of Alan S. Bigman Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York, sworn to on January 6, 2009; and the Court having jurisdiction to consider the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and it appearing that no other or further notice need be provided; and the relief requested in the Motion being in the best interests of the Debtors and their estates and creditors; and the Court having reviewed the Motion and having heard the

statement in support of the relief requested therein at the hearing before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted as set forth herein; and it is further

ORDERED that pursuant to sections 105(a), 363(b) and 503(b)(9) of the Bankruptcy Code, the Debtors are authorized to the extent consistent with the DIP Documents (as defined in the final order approving postpetition financing (the "Final DIP Order")), but not directed, in the reasonable exercise of their business judgment, to pay some or all of the prepetition claims of those Critical Vendors (the "Vendor Claims"), who agree to continue to supply goods or services to the Debtors on such Critical Vendor's "Customary Trade Terms" for a period following the date of the agreement and on other such terms and conditions as are acceptable to the Debtors.  As used herein, "Customary Trade Terms" means, with respect to a Critical Vendor: (i) the normal and customary trade terms, practices and programs (including, but not limited to, credit limits, pricing, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, normal product mix and availability and other applicable terms and programs), that were most favorable to the Debtors and in effect between such Critical Vendor and the Debtors prior to the Petition Date; or (ii) such other trade terms as agreed by the Debtors and such Critical Vendor; provided, that the Critical Vendor extends trade credit to the Debtors; and it is further

ORDERED that after the date hereof, the Debtors shall determine, in the ordinary course of business, who is a Critical Vendor by considering, among other things: (i) which suppliers were sole source or limited source suppliers, without whom the Debtors could not

continue to operate without disruption; (ii) which suppliers would be prohibitively expensive to replace; (iii) which suppliers present an unacceptable risk should they cease the provision of truly essential services or supplies; and (iv) which suppliers are obligated by contract to continue performance; and it is further

      **ORDERED** that the Debtors shall maintain a matrix summarizing: (i) the name of each Critical Vendor paid on account of Vendor Claims; (ii) the amount paid to each Critical Vendor on account of its Vendor Claim; and (iii) the goods or services provided by such Critical Vendor.  This matrix will be provided to: (a) the U.S. Trustee; (b) counsel for the official committee of unsecured creditors (the "Committee"); (c) Davis, Polk & Wardwell, Attorneys for Citicorp USA, Inc. as ABL DIP Agent (Attn: Marshall S. Huebner and Timothy E. Graulich) (the "ABL DIP Agent"); and (d) Mayer Brown LLP, Attorneys for Merrill Lynch, Pierce, Fenner & Smith, Inc. as Term DIP Agent (Attn: Brian Trust) (the "Term DIP Agent"), provided, however, that counsel for the Committee, the ABL DIP Agent, and the Term DIP Agent shall keep the matrix confidential in accordance with the confidentiality provisions of the applicable credit agreements to which the Debtors are party; and it is further

      **ORDERED** that the Debtors shall provide to counsel for the Committee, the ABL DIP Agent and the Term DIP Agent bi-weekly written reports of all payments made hereunder, and reasonable and timely access to information sufficient to enable such parties to monitor payments made, obligations satisfied, and other actions taken pursuant to this Order; and it is further

      **ORDERED** that the Debtors shall undertake all appropriate efforts to cause Critical Vendors to enter into an agreement (the "Vendor Agreement") including provisions substantially in the form attached to the Motion as Exhibit A; and it is further

**ORDERED** that the Debtors are authorized, but not required, to enter into Vendor Agreements when the Debtors determine, in the exercise of their reasonable business judgment, that it is appropriate to do so. However, the Debtors inability to enter into a Vendor Agreement shall not preclude them from paying a Vendor Claim when, in the exercise of their reasonable business judgment, such payment is necessary to the Debtors operations; and it is further

**ORDERED** that if the Debtors, in their discretion, determine that a Critical Vendor has not complied with the terms and provisions of the Vendor Agreement or has failed to continue to provide Customary Trade Terms following the date of the agreement, or on such terms as were individually agreed to between the Debtors and such Critical Vendor, the Debtors may terminate a Vendor Agreement, together with the other benefits to the Critical Vendor as contained in this Order, provided, however, that the Vendor Agreement may be reinstated if: (i) such determination is subsequently reversed by the Court for good cause after it is shown that the determination was materially incorrect after notice and a hearing following a motion from the Critical Vendor; (ii) the underlying default under the Vendor Agreement is fully cured by the Critical Vendor not later than five business days after the date the initial default occurred; or (iii) the Debtors, in their sole and absolute discretion, reach a subsequent agreement with the Critical Vendor; and it is further

**ORDERED** that if a Vendor Agreement is terminated as set forth above, or if a Critical Vendor that has received payment of a prepetition claim later refuses to continue to supply goods or services for the applicable period in compliance with the Vendor Agreement or this Order, then: (i) the Debtors may, in their discretion, declare the payment of the creditor's Vendor Claim a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover in cash or in goods from such Critical Vendor; (ii) the creditor shall

immediately return such payments in respect of a Vendor Claim to the extent the aggregate amount of such payments exceeds the postpetition obligations then outstanding without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever; and (iii) the applicable Vendor Claim shall be reinstated in such an amount so as to restore the Debtors and the Critical Vendor to their original positions as if the Vendor Agreement had never been entered into and no payment of Vendor Claim had been made; and it is further

**ORDERED** that all Vendor Agreements shall be deemed to have terminated, together with the other benefits to Critical Vendors as contained in this Order, upon entry of an order converting the Debtors' chapter 11 cases to cases under chapter 7 of the Bankruptcy Code; and it is further

**ORDERED** that the Debtors are authorized to the extent consistent with the DIP documents (as defined in the DIP Final Order), but not required, in the exercise of their business judgment, to pay claims of any creditors or claimants entitled to administrative priority pursuant to section 503(b)(9) of the Bankruptcy Code (the "Twenty-Day Administrative Claims") in the ordinary course of the Debtors' businesses and on such terms as the Debtors deem appropriate; and it is further

**ORDERED** that payments on account of any Twenty-Day Administrative Claims shall not count against the Vendor Claims Cap; and it is further

**ORDERED** that the Debtors' payment of the Vendors Claims shall not exceed the Vendors Claims Cap unless otherwise: (i) ordered by the Court, after notice and a hearing, or (ii) upon prior written approval of the DIP lenders; and it is further

**ORDERED** that each of the banks and financial institutions at which the Debtors maintain their accounts relating to the payment of the claims the Debtors request authority to pay in the Motion are authorized to: (i) receive, process, honor and pay all checks presented for

payment and to honor all fund transfer requests made by the Debtors related thereto, to the extent

sufficient funds are on deposit in those accounts; and (ii) rely on the Debtors' designation of any

particular check as approved by this Order without any duty of further inquiry and without

liability for following the Debtors' instructions; and it is further

        **ORDERED** that nothing contained in this Order shall be deemed to constitute an

assumption of any executory contract or to require the Debtors to make any of the payments or to

post any of the deposits authorized herein; and it is further

        **ORDERED** that to the extent there may be any inconsistency between the terms

of the interim order approving postpetition financing (the "Interim DIP Order") or the Final DIP

Order, if and when entered, and this Order, the terms of the Interim DIP Order or Final DIP

Order, as applicable, shall govern; and it is further

        **ORDERED** that notwithstanding Bankruptcy Rule 6003 and the possible

applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be

immediately effective and enforceable upon its entry.

Dated:      New York, New York
            _____, 2009

                    _____
                    UNITED STATES BANKRUPTCY JUDGE