UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
In re:                                              :
                                                    :   Chapter 11 Case No.
                                                    :
LYONDELL CHEMICAL COMPANY, *et al.*,                :   09-10023 (REG)
                                                    :
                                                    :   (Jointly Administered)
          Debtors.                                  :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**INTERIM ORDER (I) AUTHORIZING DEBTORS (A) TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e), (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 AND (C) TO PURCHASE CERTAIN ASSETS PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364 AND (III) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)**

Upon the motion (the "**Motion**"), dated January 6, 2009, of Lyondell Chemical Company and certain of its affiliates (collectively, the "**Borrowers**") and each of their affiliated debtors, each as debtor and debtor-in-possession (collectively, the "**Debtors**"), in the above-captioned cases (the "**Cases**") pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and the Local Bankruptcy Rules, seeking, among other things:

        (a)      authorization for each Borrower to obtain post-petition financing (the "**Financing**") and to guaranty the obligations of each other Borrower in connection with the Financing, and for each of the other Debtors (the

"**Guarantors**") to guaranty the Borrowers' obligations in connection with the Financing, consisting of:

(i)        a super priority non-amortizing revolving credit facility made available to the Borrowers in an aggregate principal amount of up to $1,515,000,000 (the "**ABL DIP Facility**") that may, at the option of the Borrowers, and with no obligation or commitment on the part of the then existing ABL DIP Lenders (as defined below) be increased (through the addition of new lenders acceptable to the Arrangers (as defined below)) to up to $2,000,000,000 in aggregate principal amount, subject to the terms and conditions thereof, with Citicorp USA, Inc. ("**Citi**") or an affiliate acting as Administrative Agent (in such capacity, the "**ABL DIP Agent**") for itself and a syndicate of financial institutions (together with Citi, and including the fronting and issuing banks for the letters of credit thereunder, the "**ABL DIP Lenders**") to be arranged by Citigroup Global Markets Inc., Goldman Sachs Lending Partners LLC, Merrill Lynch Capital Corporation, ABN AMRO Bank N.V. and UBS Securities LLC (collectively, the "**Arrangers**"); and

(ii)        a super priority multiple draw term loan facility made available to the Borrowers in an aggregate principal amount of up to $6,500,000,000 (the "**Term DIP Facility**") consisting of $3,250,000,000 in respect of new money funding (the "**New Money DIP Loans**") and a dollar-for-dollar roll up of $3,250,000,000 in respect of Senior Facility Pre-Petition Debt (as defined below) beneficially owned (as contemplated

in the DIP Term Sheet and as further set forth in the DIP Documents, "**Beneficially Owned**") by the applicable DIP Lenders at 11:59 p.m. (prevailing Eastern time) on January 7, 2009 (the "**Roll Up DIP Loans**"), on a dollar of New Money DIP Loans for a dollar of Roll Up DIP Loans basis, subject to the terms and conditions thereof, with UBS AG, Stamford Branch, as Administrative Agent (in such capacity, the "**Term DIP Agent**" and, together with the ABL DIP Agent, the "**DIP Agents**"), for itself and a syndicate of financial institutions (together with the Term DIP Agent, the "**Term DIP Lenders**" and, together with the ABL DIP Lenders, the "**DIP Lenders**");

(b)      authorization for the Debtors to execute and deliver final documentation consistent with the terms of the term sheet attached as Exhibit A to this Interim Order (the "**DIP Term Sheet**" and, collectively with such final documentation, the "**DIP Documents**"), which final documents shall be in form and substance acceptable to the Instructing Group (as defined in the DIP Term Sheet) and filed with the Bankruptcy Court no later than twenty-one days after entry of this Interim Order or such later date as may be agreed by the Instructing Group and the Borrowers, and to perform such other and further acts as may be required in connection with the DIP Term Sheet or the other DIP Documents;

(c)      authorization for the Debtors to use proceeds of the Financing and Cash Collateral (as defined below) to discharge irrevocably, at the closing of the Financing, any amounts outstanding under the Emergency DIP Financing approved by this Court on January 7, 2009 (the "**Emergency DIP Financing**")

and all ABL Pre-Petition Lender Debt (as defined below) arising under or in connection with the Credit Agreement dated as of December 20, 2007 (as amended, supplemented or otherwise modified from time to time, the "**ABL Pre-Petition Credit Agreement**") among Lyondell Chemical Company, Equistar Chemicals, LP, Houston Refining LP, Basell USA Inc. and the subsidiaries of LyondellBasell Industries AF S.C.A. from time to time party thereto, each lender party thereto (collectively, the "**ABL Pre-Petition Secured Lenders**") and Citibank, N.A., as administrative agent and collateral agent (in such capacities, the "**ABL Pre-Petition Agent**"), and each loan document executed in connection with the ABL Pre-Petition Credit Agreement (collectively with the ABL Pre-Petition Credit Agreement, the "**ABL Pre-Petition Loan Documents**");

(d)     authorization for the Debtors to use proceeds of the Financing and Cash Collateral (as defined below) to repurchase:

(i)     from LyondellBasell Receivables I, LLC (the "**RP SPV**"), a non-debtor affiliate of the Debtors, the "**Seller Receivables**" (as defined in the RP Receivables Purchase Agreement) previously sold or contributed to the RP SPV pursuant to the Receivables Sale Agreement dated as of December 20, 2007 among Lyondell and the other Sellers party thereto, as sellers, RPA Seller as buyer, and Lyondell, as buyer's servicer (the "**Receivables Sale Agreement**"), for the purchase price of approximately $500 million, contemporaneously with the RP SPV repurchasing from Citi, in its capacity as Administrative Agent and Asset Agent (the "**RPA Agent**") for the purchasers (the "**RPA Purchasers**") under that certain

pre-petition $1,150,000,000 Receivables Purchase Agreement dated as of December 20, 2007 (as amended, supplemented or otherwise modified from time to time, the "**RP Receivables Purchase Agreement**"), the Receivable Interests (as defined in the RP Receivables Purchase Agreement) previously sold to the RPA Agent for the benefit of the RPA Purchasers pursuant to the RP Receivables Purchase Agreement; and

(ii)　　from Basell Capital Corporation (the "**Basell SPV**", and together with the RP SPV, the "**Receivables SPVs**"), a non-debtor affiliate of the Debtors, the "**Receivables**" (as defined in the Receivables Purchase Agreement and, together with the Seller Receivables, the "**Receivables Assets**") previously sold to the Basell SPV pursuant to the Purchase and Contribution Agreement dated as of July 29, 2005 among the Debtor Basell USA Inc. ("**Basell USA**") and Basell Canada Inc., as sellers, and Basell Capital Corporation, as purchaser (the "**Purchase and Contribution Agreement**") for the purchase price of approximately $114,650,299.20 (plus per diem interest of $15,732.59 to the extent payment is made after January 6, 2009), contemporaneously with the Basell SPV repurchasing from Citicorp North America, Inc. (the "**Basell Agent**", and together with the RPA Agent, the "**Receivables Agents**"), in its capacity as Program Agent and the sole Investor Agent for the investors (the "**Basell Purchasers**", and together with the RPA Purchasers, the "**Receivables Purchasers**") under that certain pre-petition Receivables Purchase Agreement dated as of July 29, 2005 among the Basell SPV,

CAFCO, LLC, Citibank, N.A., Citicorp North America, Inc. ("**CNAI**"), as Program Agent and Investor Agent, Basell Canada Inc. and Basell USA (as heretofore amended, the "**Basell Receivables Purchase Agreement**", and together with the RP Receivables Purchase Agreement, the "**Receivables Facilities**") the Receivable Interests (as defined in the Basell Receivables Purchase Agreement) previously sold to CNAI for the benefit of the Basell Purchasers pursuant to the Basell Receivables Purchase Agreement;

(e)      the granting of adequate protection to the secured parties whose liens and security interests under the following documents are being primed by the Financing:

(i)      the Senior Credit Agreement dated as of December 20, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "**Senior Facility Pre-Petition Credit Agreement**") among the Debtors and their affiliates party thereto, the lenders party thereto (collectively, the "**Senior Facility Pre-Petition Secured Lenders**"), Citibank, N.A., as primary administrative agent and collateral agent and Citibank International plc, as European administrative agent (collectively, in such capacities, the "**Senior Facility Pre-Petition Agent**"), and each arranger and bookrunner party thereto, and each Loan Document (as defined in the Senior Facility Pre-Petition Credit Agreement) and each other document executed in connection with the Senior Facility Pre-Petition Credit Agreement, including, for the

avoidance of doubt, any Secured Hedge Agreements, Treasury Services Agreements and Letters of Credit and Existing Letters of Credit (as defined in the Senior Pre-Petition Facility Credit Agreement) (collectively with the Senior Facility Pre-Petition Credit Agreement, the "**Senior Facility Pre-Petition Loan Documents**");

(ii)    the Bridge Loan Agreement dated as of December 20, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "**Bridge Pre-Petition Loan Agreement**") among LyondellBasell Finance Company, as borrower, the subsidiaries and affiliates of Lyondell party thereto, the lenders party thereto (collectively, the "**Bridge Pre-Petition Secured Lenders**" and, together with the ABL Pre-Petition Secured Lenders and the Senior Facility Pre-Petition Secured Lenders, the "**Pre-Petition Secured Lenders**"), Merrill Lynch Capital Corporation, as administrative agent (in such capacity, the "**Bridge Pre-Petition Agent**" and, together with the ABL Pre-Petition Agent and the Senior Facility Pre-Petition Agent, the "**Pre-Petition Agents**"), Citibank, N.A., as collateral agent, and each arranger and bookrunner party thereto, and each document executed in connection with the Bridge Pre-Petition Loan Agreement, including, for the avoidance of doubt, any Hedge Agreements as defined in the Bridge Pre-Petition Loan Agreement (collectively with the Bridge Pre-Petition Loan Agreement, the "**Bridge Pre-Petition Loan Documents**" and, together with the ABL Pre-Petition

Loan Documents and the Senior Facility Pre-Petition Loan Documents,
the "**Pre-Petition Loan Documents**");

(iii)     the Indenture (the "**Arco Indenture**") dated as of June 15,
1988, as supplemented by a Supplemental Indenture dated January 5, 2000
with The Bank of New York as Indenture Trustee (in such capacity, the
"**Arco Trustee**"), governing the 10 1/4% Debentures due 2010 and the
9.8% Debentures due 2020 issued by the Arco Chemical Company (as
predecessor to Lyondell Chemical Company) (the "**Arco Notes**" and the
holders of the Arco Notes, the "**Arco Noteholders**") and each document
executed in connection with the Arco Indenture (collectively with the
Arco Indenture, the "**Arco Note Documents**"); and

(iv)     the Indenture (the "**Equistar Indenture**") dated as of
January 29, 1996, as supplemented by Supplemental Indentures dated
February 15, 1996, December 1, 1997, November 3, 2000 and November
17, 2000, with Texas Commerce Bank National Association as Indenture
Trustee (in such capacity, including its successors and assigns, the
"**Equistar Trustee**" and, together with the Arco Trustee, the "**Indenture
Trustees**") governing the 7.55% Senior Notes due 2026 issued by the
Lyondell Petrochemical Company (the "**Equistar Notes**" and the holders
of the Equistar Notes, the "**Equistar Noteholders**" and, together with the
Arco Noteholders, the "**Noteholders**") and each document executed in
connection with the Equistar Indenture (collectively with the Equistar

Indenture, the "**Equistar Note Documents**" and, together with the Arco Note Documents, the "**Pre-Petition Note Documents**");

(f)      authorization for the Debtors to use any Cash Collateral (as defined below) in which the Senior Facility Pre-Petition Agent, any Senior Facility Pre-Petition Secured Lender, the Bridge Pre-Petition Agent, any Bridge Pre-Petition Secured Lender, any Indenture Trustee or any Noteholder (together, the "**Adequate Protection Parties**") may have an interest and the granting of adequate protection to the Adequate Protection Parties with respect to, *inter alia*, such use of their Cash Collateral (as defined below) and all use and diminution in the value of their collateral;

(g)      pursuant to Bankruptcy Rule 4001, that an interim hearing (the "**Interim Hearing**") on the Motion be held before this Court to consider entry of the proposed interim order annexed to the Motion (the "**Interim Order**"), among other things, (i) authorizing each Borrower, on an interim basis, to forthwith borrow or obtain letters of credit from the DIP Lenders under the DIP Documents up to an aggregate principal or face amount not to exceed $1,515,000,000 pursuant to the ABL DIP Facility, $2,167,000,000 in New Money DIP Loans and $2,167,000,000 in Roll Up DIP Loans (subject to any limitations of borrowings under the DIP Documents), (ii) authorizing each Borrower to guaranty the DIP Obligations (as defined below) of each other Borrower and the Guarantors to guaranty the DIP Obligations of each Borrower, (iii) authorizing the Debtors' use of Cash Collateral (as defined below), and (iv) granting the adequate protection described herein; and

(h)     that this Court schedule a final hearing (the "**Final Hearing**") to be held within 30 days of the entry of the Interim Order to consider entry of a final order (the "**Final Order**") authorizing the balance of the borrowings and letter of credit issuances under the DIP Documents on a final basis, as set forth in the Motion and the DIP Documents filed with this Court.

Due and appropriate notice of the Motion, the relief requested therein and the Interim Hearing having been served by the Debtors on the fifty largest unsecured creditors of the Debtors, on the DIP Agents, the DIP Lenders, the Emergency DIP Lender (as defined below), the Pre-Petition Agents, the Receivables Agents, the Indenture Trustees, the other administrative agents or indenture trustees for each of the Debtors' funded debt facilities or their counsel, if known, the Pre-Petition Secured Lenders, the Office of the United States Trustee for the Southern District of New York, the Internal Revenue Service and the Securities and Exchange Commission in compliance with Bankruptcy Rule 4001(b) and (c) and the Local Bankruptcy Rules.

The Interim Hearing having been held by this Court on January 7 and 8, 2009.

Upon the record made by the Debtors at the Interim Hearing and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.     *Disposition.*  The Motion is granted on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.

2.      *Jurisdiction*.  This Court has core jurisdiction over the Cases, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004 and 9014 and the Local Bankruptcy Rules.

3.      *Notice*.  Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein and the Interim Hearing constitutes appropriate, due and sufficient notice thereof and complies with Bankruptcy Rule 4001(b) and (c) and the Local Bankruptcy Rules, and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

4.      *Debtors' Stipulations*.  Without prejudice to the rights of any other party (but which are subject to the limitations thereon contained in paragraph 22), the Debtors admit, stipulate and agree that:

(a)      As of the date of the commencement of the Cases (the "**Petition Date**"):

(i)      the Debtors party to or otherwise obligated under the ABL Pre-Petition Loan Documents, without defense, counterclaim or offset of any kind, were jointly and severally indebted and liable to the ABL Pre-Petition Secured Lenders in the aggregate principal amount of approximately $765,945,222.00 in respect of loans made and in the aggregate face amount of $262,283,245.65 in respect of letters of credit issued by the ABL Pre-Petition Secured Lenders, *plus* interest thereon and

fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the ABL Pre-Petition Loan Documents), charges and all other obligations incurred in connection therewith as provided in the ABL Pre-Petition Loan Documents (collectively, the "**ABL Pre-Petition Debt**"), secured by liens on and security interests in (the "**ABL Pre-Petition Security Interests**") certain personal property of the Debtors and their affiliates (the "**ABL Pre-Petition Collateral**");

(ii)       the Debtors party to or otherwise obligated under the Senior Facility Pre-Petition Loan Documents, without defense, counterclaim or offset of any kind, were jointly and severally indebted and liable to the Senior Facility Pre-Petition Secured Lenders in the aggregate principal amount of approximately $10,360,255,198.50 and €1,287,016,252.02 in respect of loans made and in the aggregate face amount of $30,238,614.89 in respect of letters of credit issued by the Senior Facility Pre-Petition Secured Lenders, *plus* interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the Senior Facility Pre-Petition Loan Documents), charges, Obligations (as defined in the Senior Pre-Petition Credit Agreement) and all other obligations incurred in connection therewith as provided in the Senior Facility Pre-Petition Loan Documents (collectively, the "**Senior Facility Pre-Petition Debt**"), which Senior Facility Pre-Petition Debt is secured

by liens on and security interests in (the "**Senior Facility Pre-Petition Security Interests**") certain real and personal property of the Debtors and their affiliates (the "**Senior Facility Pre-Petition Collateral**"); and

(iii)     the Debtors party to or otherwise obligated under the Bridge Pre-Petition Loan Documents, without defense, counterclaim or offset of any kind, were jointly and severally indebted and liable to the Bridge Pre-Petition Secured Lenders in the aggregate principal amount of approximately $8,000,000,000 in respect of loans made by the Bridge Pre-Petition Secured Lenders, *plus* interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the Bridge Pre-Petition Loan Documents), charges and all other obligations incurred in connection therewith as provided in the Bridge Pre-Petition Loan Documents (collectively, the "**Bridge Pre-Petition Debt**" and, together with the ABL Pre-Petition Debt and the Senior Facility Pre-Petition Debt, the "**Pre-Petition Lender Debt**"), secured by liens on and security interests in (the "**Bridge Pre-Petition Security Interests**" and, together with the ABL Pre-Petition Security Interests and the Senior Facility Pre-Petition Security Interests, the "**Pre-Petition Lender Security Interests**") certain real and personal property of the Debtors and their affiliates (the "**Bridge Pre-Petition Collateral**" and, together with the ABL Pre-Petition Collateral and the Senior Facility Pre-Petition Collateral, the "**Pre-Petition Lender Collateral**").

(b)     The Pre-Petition Lender Debt constitutes the legal, valid and binding obligation of the respective Debtors named in the Pre-Petition Loan Documents, enforceable in accordance with its terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code).

(c)     No portion of the Pre-Petition Lender Debt or any payments made to the Pre-Petition Agents or the Pre-Petition Secured Lenders or applied to the obligations owing under the Pre-Petition Loan Documents prior to the Petition Date is subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as such term is defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or other applicable law.

(d)     Each Debtor hereby forever waives and releases any and all "claims" (as such term is defined in the Bankruptcy Code), counterclaims, causes of action, defenses or setoff rights against each of the Pre-Petition Agents and each of the Pre-Petition Secured Lenders, whether arising at law or in equity, including any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law; *provided*, *however*, that nothing herein or in any of the DIP Documents shall operate as a release or waiver of any claims or causes of action held by any party (including, without limitation, any of the Debtors) against any Debtor, any "affiliate" of any Debtor (as such term is defined in the Bankruptcy Code) or any officer, director or direct or indirect shareholder (or affiliate thereof) of any Debtor.

(e)     The Pre-Petition Lender Security Interests granted to the Pre-Petition Agents on the Pre-Petition Lender Collateral pursuant to and in connection with the Pre-Petition Loan Documents, including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of any Pre-Petition Agent, for its benefit and for the benefit of the applicable Pre-Petition Secured Lenders, are (i) valid, binding, perfected and enforceable liens and security interests in the real and personal property described in the Pre-Petition Loan Documents, (ii) not, pursuant to the Bankruptcy Code or other applicable law, subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as such term is defined in the Bankruptcy Code) of any kind and (iii) subject and subordinate only to (A) the DIP Liens (as defined below), (B) the Carve-Out (as defined below) to which the DIP Liens are subject and (C) valid, perfected and unavoidable liens and security interests permitted under the applicable Pre-Petition Loan Documents, but only to the extent that such liens and security interests are permitted by the applicable Pre-Petition Loan Documents to be senior to or *pari passu* with the applicable Pre-Petition Lender Security Interests.

(f)     The aggregate value of the ABL Pre-Petition Collateral exceeds the aggregate amount of the ABL Pre-Petition Debt.

(g)     The aggregate value of the Senior Facility Pre-Petition Collateral exceeds the aggregate amount of pre-petition debt secured by such collateral, including the Senior Facility Pre-Petition Debt.

(h)     The aggregate value of the Seller Receivables exceeds the aggregate amount payable by the RP SPV to the RPA Agent pursuant to the RP Receivables Purchase Agreement, and the aggregate value of the Receivables exceeds the aggregate amount payable by the Basell SPV to the Basell Agent pursuant to the Basell Receivables Purchase Agreement.

(i)     Each sale of any Receivables Asset to any Receivables SPV was a "true sale" and was for fair consideration and is not otherwise voidable or avoidable.  The RP SPV is the valid, legal and beneficial owner of the Seller Receivables and the Basell SPV is the valid, legal and beneficial owner of the Receivables.  The Debtors have no knowledge of any basis on which the assets and liabilities of either of the Receivables SPVs could be substantively consolidated with any of the Debtors or with each other.  As of the Petition Date, each of the Receivables SPVs was validly obligated to the Receivables Purchasers for their respective obligations under the Receivables Facilities, and neither Receivables SPV has any counterclaim, setoff, defense or objection against or relating to such obligations.

(j)     The RPA Purchasers have a first claim to collections on the Seller Receivables and the Basell Purchasers have a first claim to collections on the Receivables, each by virtue of their valid, perfected, first priority security interest thereon.  No action has been taken by the either of the Receivables SPVs which would result in the avoidance, recharacterization, postponement or subordination of the Receivables SPVs' respective obligations under the Receivables Facilities.

5.     *Findings Regarding the Financing.*

(a)     Good cause has been shown for the entry of this Interim Order.

(b)     The Debtors have an immediate need to obtain the Financing and use Cash Collateral (as defined below) to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures, to pay the ABL Pre-Petition Debt and the Emergency DIP Financing, to repurchase the Receivables Assets and to satisfy other working capital and operational needs. The access of the Debtors to sufficient working capital and liquidity through the use of Cash Collateral, incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

(c)     The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Term Sheet without the Debtors (i) granting to the DIP Agents and the DIP Lenders, subject to the Carve-Out as provided for herein, the DIP Liens and the Superpriority Claims (as defined below) under the terms and conditions set forth in this Interim Order and in the DIP Documents and (ii) allowing any Term Loan DIP Lender to provide Roll Up DIP Loans on a dollar-for-dollar basis with such

Term Loan DIP Lender's Commitment (as defined in the DIP Term Sheet) to provide New Money DIP Loans.

(d)     The terms of the Financing, including the Roll Up DIP Loans, and the use of Cash Collateral (as defined below) are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)     The Financing has been negotiated in good faith and at arm's length among the Debtors, the DIP Agents and the DIP Lenders, and all of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the Financing and the DIP Documents, including without limitation, all loans, including the Roll Up DIP Loans, made to, guarantees issued by, and all letters of credit issued for the account of, the Debtors pursuant to the DIP Documents, and any other obligations under the DIP Documents, including credit extended in respect of overdrafts and related liabilities and other depository, treasury, and cash management services and other clearing services provided by any Agent or its affiliates (all of the foregoing collectively, the "**DIP Obligations**"), shall be deemed to have been extended by the DIP Agents and the DIP Lenders and their affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Obligations, the DIP Liens (as defined below) and the Superpriority Claims (as defined below) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in

the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(f)     The Receivables Purchasers have a first claim to post-petition collections on the Receivables Assets by virtue of their valid, perfected, first priority security interest thereon.  The repurchase of the Receivable Assets by the Debtors from the respective Receivables SPVs will afford the Debtors enhanced liquidity in the near term as pre-petition Receivables Assets are collected.

(g)     Payment of the ABL Pre-Petition Debt and the Emergency DIP Financing and the repurchase of the Receivables Assets reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

(h)     The Debtors have requested entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules. Absent granting the relief sought by this Interim Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the Financing and authorization of the use of Cash Collateral in accordance with this Interim Order and the DIP Documents is therefore in the best interests of the Debtors' estates consistent with their fiduciary duties.

6.     *Authorization of the Financing and the DIP Term Sheet.*

(a)     The Debtors are hereby authorized to execute and enter into the DIP Documents, including the DIP Term Sheet and the DIP Credit Agreements (as defined below), and the DIP Term Sheet is hereby approved and incorporated herein by reference.  Pending the execution of the DIP Credit Agreements and the other DIP Documents, the DIP Term Sheet and this Interim Order shall govern the

financial and credit accommodations to be provided to the Debtors by the DIP Lenders; *provided* that in the event of a conflict between the DIP Term Sheet and this Interim Order, this Interim Order shall control.

(b)     The Borrowers are hereby authorized to borrow money and obtain letters of credit pursuant to the DIP Term Sheet and any related promissory notes, and the Borrowers and the Guarantors are hereby authorized to guaranty such borrowings and the Borrowers' obligations with respect to such letters of credit, up to an aggregate principal or face amount of $1,515,000,000 pursuant to the ABL DIP Facility, $2,167,000,000 in New Money DIP Loans and $2,167,000,000 in Roll Up DIP Loans (plus interest, fees and other expenses and amounts provided for in the DIP Term Sheet), in accordance with the terms of this Interim Order and the DIP Term Sheet, which shall be used solely for the purposes permitted under the DIP Term Sheet and in accordance with the Budget (as defined in the DIP Term Sheet), including, without limitation, to provide working capital for the Borrowers and the Guarantors (including, without limitation, foreign affiliates guaranteeing the DIP Obligations), to, at the closing of the Financing, discharge in full and irrevocably the ABL Pre-Petition Debt and the Emergency DIP Financing, and to repurchase the Receivables Assets and to enter into any and all other and further agreements and arrangements in connection therewith and to pay interest, fees and expenses in accordance with this Interim Order and the DIP Documents.  In addition to such loans and obligations, the Debtors are authorized to incur overdrafts and related liabilities arising from treasury, depository and cash management services including any automated

clearing house fund transfers provided to or for the benefit of the Debtors by the DIP Agents or any of their affiliates, *provided, however*, that nothing herein shall require any DIP Agent or any other party to incur overdrafts or to provide any such services or functions to the Debtors.

(c)     In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the Financing, including, without limitation:

(i)     the execution, delivery and performance of the DIP Documents, including, without limitation, the credit agreements contemplated therein (the "**DIP Credit Agreements**"), any security and pledge agreements, any mortgages contemplated thereby and the letter agreements referred to in clause (iii) below,

(ii)     the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents for, among other things, the purpose of adding additional financial institutions as DIP Lenders and reallocating the commitments for the Financing among the DIP Lenders, in each case in such form as the Debtors, the DIP Agents and the Instructing Group may agree (it being understood that no further approval of the Court shall be required for

amendments, waivers, consents or other modifications to and under the DIP Documents (or any material fees paid in connection therewith) (x) to increase the aggregate commitments under the ABL DIP Facility to up to $2,000,000,000 in connection with the incurrence by the Borrowers of the ABL Accordion (as defined in the DIP Term Sheet) or (y) that do not shorten the maturity of the extensions of credit thereunder or increase the commitments, the rate of interest or the letter of credit fees payable thereunder),

(iii)    the non-refundable payment to each member of the Instructing Group (as defined in the DIP Term Sheet), the DIP Agents or the DIP Lenders, as the case may be, of the fees referred to in the DIP Term Sheet (and in the separate letter agreements between them in connection with the Financing) and reasonable costs and expenses as may be due from time to time, including, without limitation, fees and expenses of the professionals retained as provided for in the DIP Documents,

(iv)    the conversion of a portion of the Senior Facility Pre-Petition Debt Beneficially Owned by the applicable DIP Lenders at 11:59 p.m. (prevailing Eastern time) on January 7, 2009 to Roll Up DIP Loans, and

(v)    the performance of all other acts required under or in connection with the DIP Documents.

(d)    Upon execution and delivery of the DIP Term Sheet, the DIP Credit Agreements and the other DIP Documents, such DIP Documents shall

constitute valid, binding and non-avoidable obligations of the Debtors enforceable against each Debtor party thereto in accordance with their respective terms and the terms of this Interim Order for all purposes during the Cases, any subsequently converted case of any Debtor under chapter 7 of the Bankruptcy Code or after the dismissal of any Case. No obligation, payment, transfer or grant of security under the DIP Term Sheet, the DIP Credit Agreements, the other DIP Documents or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

(e)     If the Debtors fail to timely execute and deliver the DIP Credit Agreements and the other DIP Documents as required by the DIP Term Sheet, then all DIP Obligations, including borrowings and accrued and unpaid interest and fees, incurred by the Debtors pursuant to the DIP Term Sheet and this Interim Order shall mature and become immediately due and payable, in which event the DIP Lenders shall have the rights provided for in paragraph 12(c) of this Interim Order.

7.     *Payment of the ABL Pre-Petition Debt, the Emergency DIP Financing and Repurchase of the Receivables Assets.*  The Debtors are authorized and directed to use proceeds of the Financing and Cash Collateral to, at the closing of the Financing, discharge the ABL Pre-Petition Debt and the Emergency DIP Financing, and repurchase

the Receivables Assets and to enter into, and perform under, any and all other and further agreements and arrangements in connection therewith. Any such discharge or purchase shall be irrevocable and shall not be subject to challenge, rescission, disgorgement or any other challenge under any circumstances, including, without limitation, pursuant to any Lender Claim (as defined below).

8. *Superpriority Claims.* Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed senior administrative expense claims against each of the Debtors (the "**Superpriority Claims**") with priority over any and all administrative expenses, adequate protection claims, diminution claims (including all Adequate Protection Obligations (as defined below)) and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which shall be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof, including, without limitation (subject to entry of the Final Order) all Avoidance Actions (as defined below), subject only to the payment of the Carve-Out to the extent specifically provided for herein. The Superpriority Claims granted hereunder to the ABL DIP Lenders shall be *pari passu* with

the Superpriority Claims granted hereunder to the holders of the New Money DIP Loans (the "**New Money DIP Lenders**").  The Superpriority Claims granted hereunder to the holders of the Roll Up DIP Loans (the "**Roll Up DIP Lenders**") shall be immediately junior in priority and subject to the Superpriority Claims of the New Money DIP Lenders and ABL DIP Lenders.

9.     *Carve-Out*.  The "**Carve-Out**" means (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a), (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an amount not exceeding $10,000,000, and (iii) after the occurrence and during the continuance of an Event of Default (as defined in the DIP Term Sheet) an amount not exceeding $25,000,000 in the aggregate, which amount may be used subject to the terms of this Interim Order, to pay any fees or expenses incurred by the Debtors and any statutory committees appointed in the Cases (each, a "**Committee**") that remain unpaid subsequent to the payment of such fees and expenses from available funds remaining in the Debtors' estates for such creditors, in respect of (A) allowances of compensation for services rendered or reimbursement of expenses awarded by the Bankruptcy Court to the Debtors' or any Committee's professionals and (B) the reimbursement of expenses allowed by the Bankruptcy Court incurred by the Committee members in the performance of their duties (but excluding fees and expenses of third party professionals employed by such members), *provided* that (x) the dollar limitation in this clause (iii) on fees and expenses shall neither be reduced nor increased by the amount of any compensation or reimbursement of expenses incurred, awarded or paid prior to the occurrence of an Event of Default in respect of

which the Carve-Out is invoked or by any fees, expenses, indemnities or other amounts paid to any Pre-Petition Agent or Pre-Petition Secured Lender and (y) nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (A) and (B) above.  As among the DIP Collateral (as defined below), the Carve-Out, if and to the extent invoked pursuant to this Interim Order, shall be allocated one-third against the ABL DIP Collateral (as defined below) and two-thirds against the Term DIP Collateral (as defined below).

10.    *DIP Liens.*  As security for the DIP Obligations, effective and perfected upon the date of this Interim Order and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by any DIP Agent or DIP Lender of, or over, any DIP Collateral (as defined below), the following security interests and liens are hereby granted by the Debtors to the DIP Agents for their own benefit and the respective benefit of the applicable DIP Lenders (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "**DIP Collateral**"), subject, only in the event of the occurrence and during the continuance of an Event of Default (as defined in the DIP Term Sheet), to the payment of the Carve-Out (all such liens and security interests granted to the DIP Agents, for their own benefit and the respective benefit of the applicable DIP Lenders, pursuant to this Interim Order and the DIP Documents, the "**DIP Liens**"):

(a)    <u>First Lien on Cash Balances and Unencumbered Property</u>.

Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding,

continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all pre- and post-petition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (collectively, "**Unencumbered Property**"), including without limitation, any such unencumbered cash of the Debtors (whether maintained with a DIP Agent or otherwise) and any investment of such cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, equity interests, and the proceeds of all the foregoing. Subject only to and effective upon entry of the Final Order, Unencumbered Property shall also include the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code and the proceeds thereof and property received thereby whether by judgment, settlement or otherwise (collectively, "**Avoidance Actions**").

(b)     <u>Liens Priming Pre-Petition Secured Parties' Liens</u>.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all pre- and post-petition property of the Debtors (including, without limitation, Cash Collateral (as defined below), inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date,

contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, equity interests, and the proceeds of all the foregoing), whether now existing or hereafter acquired, that is subject to any existing lien presently securing the Arco Notes, the Equistar Notes or the Pre-Petition Lender Debt (including in respect of issued but undrawn letters of credit). Such security interests and liens shall be senior in all respects to the interests in such property of the Adequate Protection Parties arising from current and future liens of the Adequate Protection Parties (including, without limitation, adequate protection liens granted hereunder), but shall be junior to any valid, perfected, enforceable and unavoidable security interests and liens of other parties, if any, on such property existing immediately prior to the Petition Date, or to any valid, perfected and unavoidable interests in such property arising out of liens to which the liens of the Adequate Protection Parties may become subject subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.

(c) <u>Liens Junior to Certain Other Liens</u>. Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all pre- and post-petition property of the Debtors (other than the property described in clauses (a) or (b) of this paragraph 10, as to which the liens and security interests in favor of the DIP Agents will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to

the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which security interests and liens in favor of the DIP Agents are junior to such valid, perfected and unavoidable liens.

(d)     <u>Liens Senior to Certain Other Liens</u>.  The DIP Liens and the Adequate Protection Liens (as defined below) shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code (ii) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors or (iii) any intercompany or affiliate liens of the Debtors.

11.     *Priority of DIP Liens*.  Notwithstanding anything to the contrary herein, the DIP Liens granted hereunder to the New Money DIP Lenders (the "**New Money DIP Liens**") shall be immediately junior in priority and subject to the DIP Liens granted to the ABL DIP Lenders (the "**ABL DIP Liens**" and together with the New Money DIP Liens, the "**Senior DIP Liens**") in respect of the ABL DIP Collateral (as defined below) and the ABL DIP Liens shall be immediately junior in priority and subject to the New Money DIP Liens in respect of the Term DIP Collateral (as defined below) (it being understood that the Senior DIP Liens granted hereunder in respect of Avoidance Actions shall be *pari passu*).  The DIP Liens granted hereunder to the Roll Up DIP Lenders (the "**Roll Up DIP Liens**") shall be immediately junior in priority and subject to the Senior DIP Liens in respect of the DIP Collateral.  The "**ABL DIP Collateral**" shall consist of all pre- and

post-petition cash and Cash Collateral (other than cash proceeds of property that was Term DIP Collateral when such proceeds arose), and any investment of such cash and Cash Collateral, inventory, accounts receivable, other rights to payment, contracts and related assets of the Debtors, whether existing on the Petition Date or acquired thereafter, and the proceeds of all of the foregoing. The "**Term DIP Collateral**" shall consist of all DIP Collateral except for the ABL DIP Collateral (it being understood that, subject to and effective upon entry of the Final Order, the ABL DIP Collateral and the Term DIP Collateral shall include Avoidance Actions on an equal and ratable basis).

12. *Protection of DIP Lenders' Rights.*

(a) All DIP Collateral shall be free and clear of all liens, claims and encumbrances, except for those liens, claims and encumbrances expressly permitted under the DIP Documents or this Interim Order.

(b) So long as there are any borrowings or letters of credit or other amounts (other than contingent indemnity obligations as to which no claim has been asserted when all other amounts have been paid and no letters of credit are outstanding) outstanding, or the DIP Lenders have any Commitment (as defined in the DIP Term Sheet), the Pre-Petition Agents, the Indenture Trustees, the Roll Up DIP Lenders and the Adequate Protection Parties shall (i) take no action to foreclose upon or recover in connection with the liens granted thereto pursuant to the Pre-Petition Loan Documents, the Pre-Petition Note Documents or this Interim Order, or otherwise exercise remedies against any DIP Collateral, except to the extent authorized by an order of this Court, (ii) be deemed to have consented to any release of DIP Collateral authorized under the DIP Documents

and (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral unless, solely as to this clause (iii), the DIP Lenders file financing statements or other documents to perfect the liens granted pursuant to this Interim Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the Petition Date.

(c) The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Agents and the DIP Lenders to exercise (i) immediately upon the occurrence of an Event of Default (as defined in the DIP Term Sheet), all rights and remedies under the DIP Documents other than those rights and remedies against the DIP Collateral as provided in clause (ii) below and (ii) upon the occurrence and during the continuance of an Event of Default and the giving of five business days' prior written notice to the Debtors (with a copy to counsel to any Committee and to the United States Trustee) to the extent provided for in any DIP Document, all rights and remedies against the DIP Collateral provided for in any DIP Document (including, without limitation, the right to set off against accounts maintained by the Debtors with any DIP Agent or DIP Lender or any affiliate thereof). In any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors and the Pre-Petition Agents, the Indenture Trustees, the Roll Up DIP Lenders and the Adequate

Protection Parties hereby each waive their right to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of either DIP Agent or the DIP Lenders set forth in this Interim Order or the DIP Documents. In no event shall the DIP Agents, the DIP Lenders, the Pre-Petition Agents or the Pre-Petition Secured Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral. The delay or failure to exercise rights and remedies under the DIP Documents or this Interim Order by any of the DIP Agents or DIP Lenders shall not constitute a waiver of such DIP Agent's or such DIP Lender's rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Documents.

13. *Limitation on Charging Expenses Against Collateral*. Subject only to and effective upon entry of the Final Order, except to the extent of the Carve-Out, no costs or expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral, the Pre-Petition Lender Collateral or the Cash Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law without the prior written consent of the DIP Agents or the Pre-Petition Agents, as the case may be, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agents, the DIP Lenders, the Pre-Petition Agents or the Pre-Petition Secured Lenders.

14.    *Cash Collateral*.  With the exception of any funds in a blocked account pursuant to the ABL Loan Documents, to the extent any funds of the Debtors were on deposit with any Adequate Protection Party as of the Petition Date, including, without limitation, all funds deposited in, or credited to, an account of any Debtor with any Adequate Protection Party immediately prior to the filing of the Debtors' chapter 11 petitions (regardless of whether, as of the time of filing, such funds had been collected or made available for withdrawal by any such Debtor), such funds (the "**Deposited Funds**") are subject to rights of setoff.  By virtue of such setoff rights, the Deposited Funds are subject to a lien in favor of such Adequate Protection Party, giving rise to a secured claim pursuant to sections 506(a) and 553 of the Bankruptcy Code.  The Adequate Protection Parties are obligated, to the extent provided in the Pre-Petition Loan Documents or the Pre-Petition Note Documents (together, the "**Existing Documents**"), as the case may be, to share the benefit of such liens and setoff rights with the other Adequate Protection Parties that are party to or are otherwise beneficiaries of such documents.  Pursuant to section 552 of the Bankruptcy Code, any proceeds of the Pre-Petition Collateral (as defined below) of the Adequate Protection Parties (including, without limitation, the Deposited Funds or any other funds on deposit at the Adequate Protection Parties or at any other institution as of the Petition Date) are cash collateral of the applicable Adequate Protection Parties within the meaning of section 363(a) of the Bankruptcy Code.  The Deposited Funds, all cash proceeds of the Pre-Petition Collateral of the Adequate Protection Parties and all other cash collateral (as defined in the Bankruptcy Code) of the Adequate Protection Parties is referred to herein as "**Cash Collateral**."

15.	*Use of Cash Collateral*.  The Debtors are hereby authorized to use all Cash Collateral of the Adequate Protection Parties, and the Adequate Protection Parties are directed promptly to turn over to the Debtors all Cash Collateral received or held by them, *provided* that the Adequate Protection Parties are granted adequate protection as hereinafter set forth and, except on the terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any time using the Cash Collateral.  The Debtors' right to use Cash Collateral, and the Adequate Protection Parties' consent to use of Cash Collateral, shall terminate automatically on the Maturity Date (as defined in the DIP Term Sheet).

16.	*Adequate Protection*.  The Adequate Protection Parties are entitled, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interest in their respective pre-petition collateral (collectively, the "**Pre-Petition Collateral**"), including the Cash Collateral, for and equal in amount to the aggregate diminution in the value of the Adequate Protection Parties' interest in the Pre-Petition Collateral, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of Cash Collateral and any other Pre-Petition Collateral, the priming of the Adequate Protection Parties' security interests and liens in the Pre-Petition Collateral by the DIP Agents and the DIP Lenders pursuant to the DIP Documents and this Interim Order, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.  As adequate protection, the applicable Pre-Petition Agents, the Indenture Trustees and the Adequate Protection Parties are hereby granted the following (collectively, the "**Adequate Protection Obligations**"):

(a)    Adequate Protection Liens.  The Pre-Petition Agents and Indenture Trustees (for themselves and for the respective benefit of the applicable Adequate Protection Parties) are hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or other agreements) a replacement security interest in and lien upon all the DIP Collateral, subject and subordinate only to (i) the DIP Liens and any liens on the DIP Collateral that are senior to, or *pari passu* with, the DIP Liens and (ii) the Carve-Out (the "**Adequate Protection Liens**").  The Adequate Protection Liens granted hereunder to the Bridge Pre-Petition Secured Lenders shall be immediately junior in priority and subject to the Adequate Protection Liens granted to the Senior Facility Pre-Petition Secured Lenders, the Arco Noteholders and the Equitstar Noteholders (collectively, the "**Senior Adequate Protection Parties**"), and the Adequate Protection Liens granted hereunder to the Adequate Protection Parties shall otherwise rank in the same relative priority and right both as among the Senior Adequate Protection Parties vis-à-vis the Bridge Pre-Petition Secured Lenders as such parties' respective pre-petition liens and security interests do with respect to the Pre-Petition Collateral as of the Petition Date under the Existing Documents.

(b)    Section 507(b) Claims.  The Pre-Petition Agents and Indenture Trustees (for themselves and for the respective benefit of the applicable Adequate Protection Parties) are hereby granted, subject to the payment of the Carve-Out, allowed superpriority claims as provided for in section 507(b) of the Bankruptcy

Code, immediately junior to the claims under section 364(c)(1) of the Bankruptcy Code held by the DIP Agents and the DIP Lenders; *provided, however*, that the superpriority claims granted hereunder (i) to the Bridge Pre-Petition Secured Lenders shall be immediately junior in priority and subject to the superpriority claims granted hereunder to the Senior Adequate Protection Parties and (ii) to the Adequate Protection Parties shall, among both the Senior Adequate Protection Parties and with respect to the Bridge Pre-Petition Secured Lenders, rank in the same right and priority as do the respective claims of such parties as of the Petition Date under the Existing Documents, and *provided further* that none of the Pre-Petition Agents, the Indenture Trustees or the Adequate Protection Parties shall receive or retain any payments, property or other amounts in respect of the superpriority claims under section 507(b) of the Bankruptcy Code granted hereunder or under the Existing Documents unless and until the DIP Obligations have indefeasibly been paid in cash in full or as otherwise agreed by the DIP Lenders or as provided in the DIP Documents.

(c)     <u>Fees and Expenses</u>.  The Pre-Petition Agents and the Indenture Trustees shall receive from the Debtors current cash payments of all fees and expenses payable to the Pre-Petition Agents and/or the Indenture Trustees under the Existing Documents, including, but not limited to, the reasonable fees and disbursements of counsel, financial and other consultants for the Pre-Petition Agents and/or the Indenture Trustees promptly upon receipt of invoices therefor (subject in all respects to applicable privilege or work product doctrines) and

without the necessity of filing motions or fee applications, including such amounts arising before and after the Petition Date.

(d)     <u>Monitoring of Collateral</u>.  The Pre-Petition Agents shall be permitted to retain expert consultants and financial advisors at the expense of the Debtors, which consultants and advisors shall be given reasonable access for purposes of monitoring the business of the Debtors and the value of the DIP Collateral.

(e)     <u>Financial Reporting</u>.  The Debtors shall provide the Pre-Petition Agents and the Indenture Trustees with financial and other reporting as described in the DIP Term Sheet and DIP Documents.

17.     *Post-Petition Interest to Senior Facility Pre-Petition Secured Lenders*.  In connection with the applicable Existing Documents, the Senior Facility Pre-Petition Agent shall receive from the Debtors (i) immediate cash payment of all accrued and unpaid interest and letter of credit fees at the non-default rates provided for in the Senior Facility Pre-Petition Loan Documents and all other accrued and unpaid fees and disbursements owing to the Senior Facility Pre-Petition Secured Lenders under the Senior Facility Pre-Petition Loan Documents and incurred prior to the Petition Date and (ii) on the first business day of each month, subject to the satisfaction of any excess cash flow or similar test provided for in the DIP Documents, all accrued but unpaid interest and letter of credit and other fees at the non-default contract rate applicable on the Petition Date (including LIBOR pricing options available in accordance with the Senior Facility Pre-Petition Credit Agreement) under the Senior Facility Pre-Petition Loan Documents, *provided* that the Senior Facility Pre-Petition Agent reserves the right to assert claims for

the payment of additional interest calculated at any other applicable rate of interest (including, without limitation, default rates), or on any other basis, provided for in the Senior Facility Pre-Petition Loan Documents, and for the payment of any other amounts provided for in the Senior Facility Pre-Petition Loan Documents, and *provided further* that if, in accordance with applicable law, the Court allows any claim by the Senior Credit Facility Pre-Petition Agent for the payment of additional interest calculated at any other applicable rate of interest (including, without limitation, default rates), or on any other basis, provided for in the Senior Facility Pre-Petition Loan Documents, or for the payment of any other amounts provided for in the Senior Facility Pre-Petition Loan Documents, such claim shall constitute an administrative expense and shall be paid in full in cash upon the effective date of any confirmed chapter 11 plan with respect to any Debtor.

18. *Reservation of Rights of Adequate Protection Parties.* Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Adequate Protection Parties. However, any Adequate Protection Party may request further or different adequate protection, and the Debtors or any other party may contest any such request; *provided* that any such further or different adequate protection shall at all times be subordinate and junior to the claims and liens of the DIP Agents and the DIP Lenders granted under this Interim Order and the DIP Documents. Except as expressly provided herein, nothing contained in this Interim Order (including, without limitation, the authorization of the use of any Cash Collateral) shall impair or modify any rights,

claims or defenses available in law or equity to any Pre-Petition Agent, Pre-Petition Secured Lender, Adequate Protection Party, DIP Agent or DIP Lender including, without limitation, rights of a party to a swap agreement, securities contract, commodity contract, forward contract or repurchase agreement with a Debtor to assert rights of setoff or other rights with respect thereto as permitted by law (or the right of a Debtor to contest such assertion).

19.     *Perfection of DIP Liens and Adequate Protection Liens.*

(a)     Subject to the provisions of paragraph 12(b) above, the Debtors, the DIP Agents, the Pre-Petition Agents, the Indenture Trustees, the DIP Lenders and the Adequate Protection Parties are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Agents on behalf of the DIP Lenders or the Pre-Petition Agents and/or the Indenture Trustees on behalf of the Adequate Protection Parties shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge dispute or subordination, at the time and on the date of entry of this Interim Order. Upon the request of a DIP Agent, each of the Pre-Petition Agents, the Indenture

Trustees and the Adequate Protection Parties, without any further consent of any party, is authorized to take, execute, deliver and file such instruments (in each case without representation or warranty of any kind) to enable the DIP Agents to further validate, perfect, preserve and enforce DIP Liens. The Debtors shall execute and deliver to the DIP Agents, the Pre-Petition Agents and the Indenture Trustees all such agreements, financing statements, instruments and other documents as the DIP Agents, the Pre-Petition Agents and the Indenture Trustees may reasonably request to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens and the Adequate Protection Liens. All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)      A certified copy of this Interim Order may, in the discretion of the DIP Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

(c)      Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign or otherwise transfer any such leasehold interest, or the proceeds thereof, or other post-petition collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Any such provision shall have no force and effect with respect to the transactions granting post-petition liens, in such

leasehold interest or the proceeds of any assignment and/or sale thereof by any

Debtor, in favor of the DIP Lenders in accordance with the terms of the DIP

Documents or this Interim Order.

20.      *Preservation of Rights Granted Under the Order.*

(a)      No claim or lien having a priority superior to or *pari passu* with

those granted by this Interim Order to the DIP Agents, the DIP Lenders or  the

Adequate Protection Parties shall be granted or allowed while any portion of the

Financing (or any refinancing thereof) or the Commitments thereunder or the DIP

Obligations or the Adequate Protection Obligations remain outstanding, and the

DIP Liens and the Adequate Protection Liens shall not be (i) subject or junior to

any lien or security interest that is avoided and preserved for the benefit of the

Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to

or made *pari passu* with any other lien or security interest, whether under section

364(d) of the Bankruptcy Code or otherwise.

(b)      Unless all DIP Obligations shall have indefeasibly been paid in

cash in full (and, with respect to outstanding letters of credit issued pursuant to

the DIP Credit Agreements, cash collateralized in accordance with the provisions

of the DIP Credit Agreements) and the Adequate Protection Obligations shall

have been indefeasibly paid in cash in full, the Debtors shall not seek, and it shall

constitute an Event of Default (as defined in the DIP Term Sheet) and terminate

the right of the Debtors to use Cash Collateral if any of the Debtors seeks, or if

there is entered, (i) any modification or extension of this Interim Order without

the prior written consent of the ABL DIP Agent, in the case of the ABL DIP

Facility, and the Instructing Group, in the case of the Term DIP Facility (or, to the extent the DIP Obligations shall have been indefeasibly paid in cash in full, the Pre-Petition Agents and Indenture Trustees), and no such consent shall be implied by any other action, inaction or acquiescence, or (ii) an order converting or dismissing any of the Cases.

(c)     If an order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the Superpriority Claims, priming liens, security interests and replacement security interests granted to the DIP Agents and the DIP Lenders and, as applicable, the Adequate Protection Parties pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations shall have been indefeasibly paid in cash in full (and that such Superpriority Claims, priming liens and replacement security interests, shall, notwithstanding such dismissal, remain binding on all parties in interest) and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in (i) above.

(d)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agents, the Pre-Petition Agents or the Indenture

Trustees, as applicable, of the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Credit Agreement with respect to any DIP Obligations or Adequate Protection Obligations. Notwithstanding any such reversal, stay, modification or vacation, any use of Cash Collateral, or DIP Obligations or Adequate Protection Obligations incurred by the Debtors to the DIP Agents, the DIP Lenders (including the Roll Up DIP Lenders), the Pre-Petition Agents, the Indenture Trustees or the Adequate Protection Parties prior to the actual receipt of written notice by the DIP Agents, the Pre-Petition Agents or the Indenture Trustees, as applicable, of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Interim Order, and the DIP Agents, the DIP Lenders, the Pre-Petition Agents, the Indenture Trustees and the Adequate Protection Parties shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and pursuant to the DIP Documents with respect to all uses of Cash Collateral, DIP Obligations and Adequate Protection Obligations.

(e) Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the Superpriority Claims, the Adequate Protection Obligations, the Adequate Protection Liens and all other rights and remedies of the DIP Agents, the Pre-Petition Agents, the Indenture Trustees, the DIP Lenders, the Pre-Petition Secured Lenders and the Adequate Protection Parties granted by the provisions of this Interim Order and the DIP Documents shall survive, and

shall not be modified, impaired or discharged by (i) the entry of an order

converting any of the Cases to a case under chapter 7, dismissing any of the

Cases, terminating the joint administration of these Cases or by any other act or

omission or (ii) the entry of an order confirming a plan of reorganization in any of

the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the

Debtors have waived any discharge as to any remaining DIP Obligations pursuant

to the ABL DIP Facility or the New Money Loans.  The terms and provisions of

this Interim Order and the DIP Documents shall continue in these Cases, in any

successor cases if these Cases cease to be jointly administered, or in any

superseding chapter 7 cases under the Bankruptcy Code, the DIP Liens, the

Superpriority Claims and the Adequate Protection Obligations and all other rights

and remedies of the DIP Agents, the Pre-Petition Agents, the Indenture Trustees,

the DIP Lenders, the Pre-Petition Secured Lenders and the Adequate Protection

Parties granted by the provisions of this Interim Order and the DIP Documents

shall continue in full force and effect until the DIP Obligations and the Adequate

Protection Obligations are indefeasibly paid in cash in full.

21.     *Limitation on Use of Financing Proceeds and Collateral.*

Notwithstanding anything herein or in any other order by this Court to the contrary, no

borrowings, proceeds of letters of credit, Cash Collateral, Pre-Petition Lender Collateral,

DIP Collateral, portion of the proceeds of the Financing or part of the Carve-Out may be

used for any of the following (each, a "**Lender Claim**") without the prior written consent

of each affected party: (a) to object, contest or raise any defense to the validity,

perfection, priority, extent or enforceability of (i) any amount due under any DIP

Document or Pre-Petition Loan Document, or the liens or claims granted under this Interim Order, any DIP Document or any Pre-Petition Loan Document or (ii) the "true sale" nature of the sale of the Receivables Assets by the Debtors to the Receivables SPVs, any amounts due under the Receivables Facilities or the liens and security interests of the Receivables Purchasers against the Receivables Assets, (b) to assert any claim or cause of action against any DIP Agent, DIP Lender, Pre-Petition Agent, Receivables Agent, Pre-Petition Secured Lender or Receivables Purchaser or their respective agents, affiliates, representatives, attorneys or advisors, (c) except to contest the occurrence or continuation of an Event of Default as forth in paragraph 12(c)(ii), to prevent, hinder or otherwise delay the DIP Agents' or the Pre-Petition Agents' assertion, enforcement or realization on the Cash Collateral or the DIP Collateral in accordance with the DIP Documents, the Pre-Petition Loan Documents or this Interim Order, (d) to assert or prosecute any action for preferences, fraudulent conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses against any Pre-Petition Agent, Receivables Agent, Pre-Petition Secured Lender or Receivables Purchaser or their respective affiliates, representatives, attorneys or advisors in connection with matters related to the Pre-Petition Loan Documents, the Pre-Petition Lender Debt, the Pre-Petition Lender Security Interests, the Pre-Petition Collateral, the Receivables Assets or the Receivables Facilities (including the obligations thereunder), (e) to assert or prosecute any claim that the assets and liabilities of either of the Receivables SPVs should be substantively consolidated with any of the Debtors or with each other or (f) to seek to modify any of the rights granted to the DIP Agents, the DIP Lenders, the Pre-Petition Agents or the Pre-Petition Lender Secured Lenders

hereunder or under the DIP Documents or the Pre-Petition Loan Documents, *provided* that advisors to the statutory committee of unsecured creditors (the "**Creditors' Committee**") may investigate the Pre-Petition Lender Security Interests and, subject to any applicable law with respect to standing, commence any related proceedings as a representative of the Debtors' estates at an expense not to exceed $25,000.

22.     *Effect of Stipulations on Third Parties.*

(a)     Each stipulation, admission and agreement contained in this Interim Order, including, without limitation, in paragraph 4 of this Interim Order, shall be binding upon the Debtors and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) under all circumstances and for all purposes, and the Debtors are deemed to have irrevocably waived and relinquished all Lender Claims as of the date of entry of this Interim Order.  Each stipulation, admission and agreement contained in this Interim Order, including, without limitation, in paragraph 4 of this Interim Order, shall also be binding upon all other parties in interest, including, without limitation, each Committee, under all circumstances and for all purposes, except to the extent that (i) a party in interest has, subject to the limitations contained herein, including, *inter alia*, in paragraph 21, timely and properly filed an adversary proceeding or contested matter asserting a Lender Claim with respect to any of the stipulations or admissions set forth in paragraph 4 by no later than the date that is 60 days (or such later date as has been agreed to, in writing, by the applicable Pre-Petition Agent or Indenture Trustee in

their sole discretion) after the appointment of the Creditors' Committee, and (ii) there is a final order in favor of the plaintiff sustaining such Lender Claim.

(b)     The success of any particular Lender Claim shall not alter the binding effect on each party in interest of any stipulation or admission not subject to such Lender Claim.  Except to the extent (but only to the extent) a timely and properly filed adversary proceeding or contested matter asserting a Lender Claim is successful, (i) the Pre-Petition Lender Debt shall constitute allowed claims, not subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaims, defense or "claim" (as such term is defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or other applicable law, for all purposes in the Cases and any subsequent chapter 7 cases, (ii) the Pre-Petition Lender Security Interests shall be deemed to have been, as of the Petition Date, legal, valid, binding perfected and enforceable liens and security interests not subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaims, defense or "claim" (as such term is defined in the Bankruptcy Code) of any kind, (iii) the Pre-Petition Lender Debt and the Pre-Petition Lender Security Interests shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors), (iv) the obligations under the Receivables Facilities shall not be subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaims, defense or "claim" (as such term is defined in the Bankruptcy

Code) of any kind pursuant to the Bankruptcy Code or other applicable law, for all purposes in the Cases and any subsequent chapter 7 cases and (v) the obligations under the Receivables Facilities and the "true sale" nature of the sale of the Receivables Assets to the Receivables SPVs shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors).

(c)     Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including the Creditors' Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, Lender Claims with respect to the Pre-Petition Loan Documents or the Pre-Petition Lender Debt.

23.     *Priorities Among Adequate Protection Parties*. Notwithstanding anything to the contrary herein or in any other order of this Court, in determining the relative priorities and rights of the Adequate Protection Parties (including, without limitation, the relative priorities and rights of the Adequate Protection Parties with respect to the adequate protection granted hereunder), such relative priorities and rights shall continue to be governed by the Existing Documents, and the adequate protection rights granted hereunder to each Adequate Protection Party shall have the same relative seniority and priority vis-à-vis the adequate protection rights granted to each other Adequate Protection Party as the pre-petition claims of such Adequate Protection Party have relative to the pre-petition claims of such other Adequate Protection Party (taking into consideration

whether such claims are secured and the entity against which such claims are held or not held).

24.     *Limitations in Respect of the Roll Up DIP Loans.*  The Roll-Up DIP Loans will not be required to be repaid in cash on the Maturity Date (as defined in the DIP Term Sheet), provided that the Debtors shall use reasonable endeavors to procure the same. Upon the vote of the Roll-Up DIP Loan class to accept a chapter 11 plan in accordance with section 1126 of the Bankruptcy Code or, failing to obtain same, pursuant to section 1129(b) of the Bankruptcy Code, the Debtors' chapter 11 plan of reorganization may require that Roll-Up DIP Loans be refinanced or otherwise replaced with other securities or financial instruments with a present value equal to the accrued principal and interest due in respect of the Roll-Up DIP Loans as of the effective date of the plan and a maturity not exceeding five years therefrom; *provided* that the relative lien position of the lenders under the Term DIP Facility in respect of the Roll Up DIP Loans is maintained, and *provided further* that (i) the principal amount of first lien secured debt of Lyondell AF and its subsidiaries may not exceed $4,515,000,000 plus the amount of the ABL Accordion (as defined in the DIP Term Sheet), to the extent exercised, less repayments of New Money Loans or repayments of loans under the ABL DIP Facility coupled with permanent reductions of ABL Commitments (as defined in the DIP Term Sheet) and (ii) the Roll Up DIP Loans, together with secured debt that is *pari passu* with the Roll Up DIP Loans may not exceed (x) $3,250,000,000 minus (y) the principal amount of Roll Up DIP Loans repaid or consensually converted into equity or other securities of Lyondell AF or its subsidiaries.

25.    *Collateral Agent*.  To the extent that any Pre-Petition Agent or

Receivables Agent is the secured party under any account control agreements, listed as

loss payee under the Debtors' insurance policies or is the secured party under any Pre-

Petition Loan Document or Receivables Facility, the DIP Agents are also deemed to be

the secured party under such account control agreements, loss payee under the Debtors'

insurance policies and the secured party under each such Pre-Petition Loan Document

and Receivables Facility, shall have all rights and powers attendant to that position

(including, without limitation, rights of enforcement) and shall act in that capacity and

distribute any proceeds recovered or received *first*, for the benefit of the DIP Lenders in

accordance with the DIP Credit Agreement and *second*, subsequent to indefeasible

payment in full of all DIP Obligations, for the benefit of the Adequate Protection Parties.

Each Pre-Petition Agent and Receivables Agent shall serve as agent for the DIP Agents

for purposes of perfecting their respective security interests and liens on all DIP

Collateral that is of a type such that perfection of a security interest therein may be

accomplished only by possession or control by a secured party.

26.    *Order Governs*.  In the event of any inconsistency between the provisions

of this Interim Order and the DIP Documents, the provisions of this Interim Order shall

govern.

27.    *Binding Effect; Successors and Assigns*.  The DIP Documents and the

provisions of this Interim Order, including all findings herein, shall be binding upon all

parties in interest in these Cases, including, without limitation, the DIP Agents, the DIP

Lenders, the Pre-Petition Agents, the Indenture Trustees, the Pre-Petition Secured

Lenders, the Adequate Protection Parties, any Committee appointed in these Cases, and

the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agents, the DIP Lenders, the Pre-Petition Agents, the Indenture Trustees, the Pre-Petition Secured Lenders, the Adequate Protection Parties, the Receivables SPVs, the Receivables Agents, the Receivables Purchasers and the Debtors and their respective successors and assigns, *provided*, *however*, that the DIP Agents, the DIP Lenders, the Pre-Petition Agents and the Pre-Petition Secured Lenders shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.  In determining to make any loan (whether under the DIP Credit Agreements, a promissory notes or otherwise), to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Agent, the DIP Lenders the Pre-Petition Agents, the Indenture Trustees, the Pre-Petition Secured Lenders and the Adequate Protection Parties shall not (i) be deemed to be in control of the operations of the Debtors, (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates or (iii) subject only to the right of the Environmental Protection Agency to be heard at the Final Hearing, and effective upon entry of the Final Order, be deemed to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in

the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, *et seq.*, as amended, or any similar federal or state statute).

28.     *No Impact on Certain Contracts or Transactions.*   No rights of any entity in connection with a contract or transaction of the kind listed in sections 555, 556, 559, 560 or 561 of the Bankruptcy Code, whatever they might or might not be, are affected by the provisions of this Interim Order.

29.     *Exclusions.*   For the avoidance of doubt, nothing herein or in any of the DIP Documents shall operate as a release or waiver of, or a limit on expenditures in pursuit of, any claims or causes of action held or assertable by any party (including, without limitation, any of the Debtors or any other party in interest) against any Debtor, any "affiliate" of any Debtor (as such term is defined in the Bankruptcy Code) or any officer, director or direct or indirect shareholder (or affiliate thereof) of any Debtor.

30.     *Emergency DIP Order.*   Upon the irrevocable repayment in full of the Emergency DIP Financing, the terms of this Interim Order shall supersede and replace the provisions of the Emergency DIP Order with respect to the adequate protection of pre-petition secured parties.

31.     *Effectiveness.*   This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

32.     *Headings.*  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

33.     *Final Hearing.*  The Final Hearing will be held by this Court on February 4, 2009 at 9:45 a.m. (prevailing Eastern time).  The Debtors shall promptly transmit copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, to any party that has filed a request for notices with this Court and to the Creditors' Committee.  Any party in interest objecting to the relief sought at the Final Hearing shall file a written objection, which shall be served upon (a) Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, New York 10281, Attn: Deryck A. Palmer and John J. Rapisardi, attorneys for the Debtors; (b) Mayer Brown LLP, 1675 Broadway, New York, New York 10019, Attn: Brian Trust, attorneys for the Bridge Facility Pre-Petition Agent, (c) Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017, Attn: Marshall S. Huebner and Timothy E. Graulich, attorneys for the ABL Pre-Petition Agent, (d) Cahill Gordon & Reindel, LLP, 80 Pine Street, New York, New York 10005, Attn. Joel H. Levitin and Ann Makich, attorneys for the Senior Facility Pre-Petition Agent and (e) the Office of the United States Trustee for the Southern District of New York, and shall be filed with the Clerk of the United States Bankruptcy Court, Southern District of New York, in each case to allow actual receipt by the foregoing no later than January 27, 2009 at 4:00 p.m. (prevailing Eastern time).

Dated:   January 8, 2009
         New York, New York

                                        _**S/ Robert E.  Gerber**_
                                        UNITED STATES BANKRUPTCY JUDGE