Hearing Date: February 25, 2009 at 10:30 a.m.
Objection Deadline: February 22, 2009 at 5:00 p.m.
(by agreement)

Stephan J. Feder
Linda H. Martin
Kathrine A. McLendon
Anne L. Knight
Natalie Shimmel Drucker
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Ph: 212-455-2000
Fax: 212-455-2502

*Counsel to UBS AG, Stamford Branch and Certain of its Affiliates*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| LYONDELL CHEMICAL COMPANY, et al., | : | |
| | : | Case No. 09-10023 |
| Debtors. | : | |

---------------------------------------------------------------x

**REPLY MEMORANDUM OF UBS AG, STAMFORD BRANCH TO CERTAIN
OBJECTIONS TO DEBTORS' MOTION FOR AN ORDER (I) AUTHORIZING
DEBTORS (A) TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C.
§§105, 361, 362, 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) AND 364(E), (B) TO UTILIZE
CASH COLLATERAL PURSUANT TO 11 U.S.C. §363 (II) GRANTING ADEQUATE
PROTECTION TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C.
§§361, 362, 363, AND 364 AND (III) SCHEDULING FINAL
HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C)**

## Table of Contents

**Page**

**PRELIMINARY STATEMENT** ..................................................................................1

**ARGUMENT** ...........................................................................................................4

**I.    THE COMMITTEE'S OBJECTIONS ARE MERITLESS** ...........................4

    **A.    The Proposed DIP Facility Was Unquestionably Negotiated In Good Faith And Is In the Best Interests of the Estate** ..................................................4

    **B.    The December 15, 2009 Maturity Date Is Both Necessary And Reasonable**....6

    **C.    The Covenants In the DIP Financing Agreement Are The Product Of A Negotiated Deal and the Court Should Defer to the Debtors' Exercise of Its Reasonable Business Judgment** .......................................................9

        1.    The Financial Covenants Protect the DIP Lenders' Ability to Be Repaid ...............................................................................11

        2.    The Liquidity Threshold That Must Be Met Before Pre-Petition Adequate Protection Payments Are Made Is Reasonable Under the Circumstances .....................................................................12

        3.    The Management Review Provision Is Reasonable.................................13

    **D.    The Court Should Permit Adequate Protection Payments to the Senior Secured Pre-Petition Lenders** ...........................................................14

    **E.    The Terms of the Roll Up Are Clear and Appropriate** .....................................16

    **F.    The DIP Facility Fees Are Reasonable And In Line With The Market.** ........17

**II.    THE ARCO AND EQUISTAR NOTEHOLDERS' OBJECTION SHOULD BE OVERRULED** ....................................................................................18

    **A.    The Noteholders Are Not Entitled To Identical Adequate Protection As The Pre-Petition Senior Secured Lenders** ........................................................18

    **B.    The Noteholders Are Sufficiently Adequately Protected** ................................19

    **C.    The Noteholders' Additional Requested Modifications to the DIP Order Are Inappropriate** ...........................................................................21

**CONCLUSION** .......................................................................................................24

# Table of Authorities

## Federal Cases

*Evergreen Int'l v. Pan Am Corp. (In re Pan Am Corp.)*, 1992 WL 154200 (S.D.N.Y. Jun. 18, 1992) ................................................................ 5

*In re 495 Central Park Ave. Corp.*, 136 B.R. 626 (Bankr. S.D.N.Y. 1992) .......................................... 21

*In re Adelphia Commc'ns Corp.*, 2004 WL 1634538 (Bankr. S.D.N.Y. June 22, 2004) ....................... 9, 11

*In re Adelphia Commc'ns Corp.*, Case No. 02-41729 (REG) (Bankr. S.D.N.Y. Aug. 23, 2002) ........... 15, 17

*In re Ames Dept. Stores, Inc.*, 115 B.R. 34 (Bankr. S.D.N.Y. 1990) ................................................... 10, 16

*In re Berry Good, LLC*, 2008 WL 519174 (Bankr. D. Ariz., Dec. 10, 2008) ....................................... 20

*In re Calpine Corp.*, Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. Jan. 30, 2006) ............................ 14

*In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877 (Bankr. S.D.N.Y. 1990) .................................. 10

*In re Delphi Corp.*, Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Oct. 28, 2005) ............................ 15

*In re Delta Res., Inc.*, 54 F.3d 722 (11th Cir. 1995) ................................................................. 15

*In re EDC Holding Co.*, 676 F.2d 945 (7th Cir. 1982) ........................................................................ 5

*In re Ellingsen MacLean Oil Co.*, 834 F.2d 599 (6th Cir. 1987) ................................................... 5

*In re Farmland Indus. Inc.*, 294 B.R. 855 (Bankr. W.D. Mo. 2003) ............................................... 4

*In re Gen. Oil Distrib., Inc.*, 20 B.R. 873 (Bankr. E.D.N.Y. 1982) .................................................. 17

*In re Hilex Poly Co. LLC*, 08-10890 (KJC), DIP Motion at 19, (Bankr. D. Del. May 6, 2008) ......... 17

*In re Hilex Poly Co. LLC*, Case No. 08-10890
(KJC) (Bankr. D. Del. May 30, 2008) ................................................ 7

*In re Key3Media Group, Inc*., 336 B.R. 87 (Bankr.
D. Del. 2005) ................................................................................... 11

*In re Murphy*, 331 B.R. 107 (Bankr. S.D.N.Y. 2005) .................................. 22

*In re Pilgrim's Pride Corp.*, Case No. 08-45664
(DML) (Bankr. N.D. Tex. Dec. 1, 2008) ....................................... 17

*In re Saypol*, 31 B.R. 796 (Bankr. S.D.N.Y. 1983) .................................... 21

*In re Smurfit-Container Corp.*, Case No. 09-10235
(Bankr. D. Del. Jan. 27, 2009) ....................................................... 8

*In re STN Enters*, 779 F.2d 901 (2d Cir. 1985) ........................................ 17

*In re Suchy*, 786 F.2d 900 (9th Cir. 1985) ................................................ 5

*In re the Colad Group, Inc.*, 324 B.R. 208 (Bankr.
W.D.N.Y. 2005) ................................................................................ 5

*In re Timbers of Inwood Forest Assoc., Ltd.*, 793
F.2d 1380 (5th Cir. 1986) ............................................................. 20

*In re Tronox Inc.*, Case No. 09-10156 (ALG)
(Bankr. S.D.N.Y. Feb. 6, 2009) ......................................... 14, 15, 17

*In re Tropicana Entertainment, LLC*, Case No. 08-
10856 (KJC) (Bankr. D. Del. May 30, 2008) ................................ 8

*In re Vanguard Diversified, Inc.*, 31 B.R. 364
(Bankr. E.D.N.Y. 1983) ................................................................ 16

*In re VeraSun Energy Corp.,* Case No. 08-12606
(BLS) (Bankr. D. Del. Dec. 4, 2008) ............................................ 8

*Meyer v. United States*, 375 U.S. 233 (1963) ............................................ 22

**Statutes**

11 U.S.C. § 361 ......................................................................................... 15, 19

11 U.S.C. § 363 ............................................................................................... 27

11 U.S.C § 364 ........................................................................ 18, 25, 28, 29, 30

11 U.S.C § 365 ................................................................................ 27, 28, 29, 30

**Rules**

Local Rule 4001-2(k)(3) ............................................................................................................. 17

UBS AG, Stamford Branch ("UBS") in its capacity as administrative agent (the "DIP Term Loan Agent") under that certain Debtor in Possession Term Loan Agreement, to be entered into among the Debtors, the Guarantors party thereto from time to time, the Lenders party thereto from time to time, the DIP Term Loan Agent, and the other parties thereto (the "DIP Term Loan Agreement"), respectfully submit this reply memorandum (the "Reply Memorandum") to the Objections of the Official Committee of Unsecured Creditor and Bank of New York Mellon, to Debtors' Motion For An Order (I) Authorizing Debtors To Obtain Postpetition Financing Pursuant to 11 U.S.C. §§105, 361, 362, 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) and 364(E), (B) To Utilize Cash Collateral Pursuant to 11 U.S.C. §363 (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§361, 362, 363, and 364 and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C), dated January 6, 2009 [Docket No. 7] (the "Motion").[1]  In support of this Reply Memorandum, UBS respectfully states as follows:

## PRELIMINARY STATEMENT

1.    In mid-December 2008, the Debtors[2] suffered a sudden liquidity crisis that necessitated an abrupt bankruptcy filing and the immediate need for significant debtor-in-possession financing.  The Debtors approached certain of its pre-petition lenders for credit, but, given the frozen credit markets, the risk of lending to a distressed company and the speed with which the Debtors' business had declined, no lender was willing to provide the necessary financing.  After extensive, round-the-clock negotiations, the log jam was finally broken when a

---

[1]    A separate reply to the Objections of the GIM Channelview Cogeneration, LLC and GIM Retail Energy, LLC is being filed under seal.

[2]    Unless otherwise noted, capitalized terms have the meanings ascribed to them in the Proposed Final DIP Order.

compromise was reached: in exchange for providing $3.25B of "new money" loans, the

participating lenders would also be permitted to roll up $3.25B of their pre-petition debt on a

dollar-for-dollar basis. This proposed financing package is essential to the Debtors' survival as a

going concern and its ability to complete a successful restructuring. The only other apparent

alternative is imminent liquidation, which would harm the interests of all creditors, secured and

unsecured alike.

    2.  Various parties have raised objections to the proposed Financing. These

objectors include the Official Committee of Unsecured Creditors (the "Committee"), which

contends that the inclusion of certain terms in the Term DIP Credit Agreement demonstrates that

credit "may not have been extended in good faith;" that certain terms of the proposed DIP

Financing, including the maturity date and various covenants, "effectively cede control" of the

reorganization process to the DIP Lenders; that certain pre-petition lenders are oversecured and

therefore not entitled to receive adequate protection payments; and that the terms of the Roll Up

DIP Loans are "vague and ambiguous."[3] Another objector, the Bank of New York Mellon

("BNY"), contends that certain pre-petition noteholders are entitled to identical—if not

additional—adequate protection as other secured lenders and that various modifications should

be made to the Proposed Final DIP Order, including providing the noteholders with unlimited

time and money to investigate claims against other lenders, eliminating a negotiated waiver of

---

[3]  In addition the objections addressed in this Reply Memorandum, the Committee raises
additional objections to the DIP Facility, including objections to the DIP Facility's
proposed budget and deadline for the Committee to investigate claims against lenders,
granting of a lien on unencumbered estate property, including avoidance actions, to
lenders, and the waiver of certain statutory rights. UBS hereby adopts and incorporates
by reference the Reply of the Agent for the Post-Petition ABL Lenders to the Objection
of the Official Committee of Unsecured Creditors . . . to the Motion, which addresses
those objections.

marshaling, and allowing the noteholders to participate in the Roll Up.  These objections are all meritless.

3.      With respect to the Committee's objections, the undeniable weight of the evidence shows that the terms of the proposed Financing are both reasonable and necessary to allow the Debtor to obtain post-petition financing.  Moreover, the extensive, arms-length negotiation and compromises reached between the DIP Lenders and the Debtors on material terms demonstrate that the DIP Lenders are extending credit in good faith.  Nor does the court have any basis to disturb the Debtors' reasonable business judgment with respect to their agreement to provide adequate protection payments to certain senior secured creditors and to allow certain lenders to roll up their pre-petition debt.

4.      With respect to the BNY's objections, the pre-petition noteholders are plainly adequately protected for the priming of their liens, through the receipt of a substantially broader collateral base, the existence of an "equity cushion," and additional forms of relief that will result in the realization of the "indubitable equivalent" of the noteholders' pre-petition lien. Nothing in the Bankruptcy Code requires that all secured lenders receive identical forms of adequate protection, as long as each is in fact adequately protected.  BNY's attempt to alter individual terms of a deal resulting from extensive negotiations and compromises is equally misguided.

5.      For these reasons, the Court should overrule the Objections and approve the proposed Financing.

## ARGUMENT

### I.    THE COMMITTEE'S OBJECTIONS ARE MERITLESS

#### A.    The Proposed DIP Facility Was Unquestionably Negotiated In Good Faith And Is In the Best Interests of the Estate

6.    A motion to obtain post-petition financing should be granted where the proposed financing: (1) "is an exercise of sound and reasonable business judgment;" (2) "is in the best interests of the estate and its creditors;" (3) "is necessary to preserve the assets of the estate, and is necessary, essential, and appropriate for the continued operation of the Debtors' businesses;" (4) contains terms that are "fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender; and" (5) "was negotiated in good faith and at arm's length between the Debtors, on the one hand, and the Agents and the Lenders, on the other hand." *In re Farmland Indus. Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003). The Committee effectively concedes, as they must, that the first four prongs of the *Farmland* test are met. The Committee is thus left to complain that credit under the DIP Financing "may not have been extended in good faith." Objection of the Official Committee of Unsecured Creditors to the Motion ("UCC Obj.") at 12. This argument must fail in the face of the overwhelming weight of the evidence.

7.    The Bankruptcy Code does not define "good faith." *In re Suchy*, 786 F.2d 900, 902 (9th Cir. 1985). Some courts have held that good faith is defined as "honesty in fact in the conduct or transaction concerned." *See In re Ellingsen MacLean Oil Co.*, 834 F.2d 599, 605 (6th Cir. 1987) (quoting the Uniform Commercial Code at section 1-201(19)). Others find good faith were there is no evidence of egregious conduct on the part of lenders. *See Evergreen Int'l v. Pan Am Corp. (In re Pan Am Corp.),* 1992 WL 154200, at *1 (S.D.N.Y June 18, 1992) (refusing to find bad faith on the part of the post-petition lender where the record failed

to indicate a contrived basis for the loans, collusion among the debtor and the lender, fraud, gross exploitation of a party to the financing, dissembling of loan information and terms, or an improper ulterior motive for the financing). Moreover, it is well-established that a lender may act in its own self-interest and in good faith at the same time. *Id.* at *5-6.[4]

8.     First, the evidence before the Court unequivocally demonstrates that the Term DIP Facility was the result of complex and extensive arms-length negotiations. Declaration of John C. Duggan ("Duggan Dec.") at ¶¶ 4-7, 10 ("for over fourteen hours a day, for seven consecutive days—including the New Year's holiday and up to and through the Debtors' filing of a Chapter 11 petition on January 6, 2009, as well as during the First Day Hearing held on January 7-8, 2009—negotiations proceeded among at least ten prospective lenders, eight law firms, the Debtors and the Debtors' advisors with respect to the material terms of the post-petition financing the lenders would provide"); Supplemental Declaration of Alan Bigman ("Supp. Bigman Dec."), at ¶¶ 9-10; Declaration of Daniel A. Celentano ("Celentano Dec.") ¶¶ 12-13; Declaration of David Ying ("Ying Dec.") ¶¶ 14-17, 20.[5]

9.     Second, there is not an iota of evidence suggesting that the Term DIP Facility reflects anything *other* than good faith negotiations. The Term DIP Loan agent has "categorically reject[ed] the assertion of the Committee that certain terms were included in the

---

[4]     The Committee's cases all deal with extreme instances of bad faith lender conduct that are wholly inapposite to the situation at hand. *See In re EDC Holding Co.*, 676 F.2d 945, 948 (7th Cir. 1982) (lender extended credit in exchange for the payment of claims of lawyers that "were not allowable under bankruptcy law"); *In re the Colad Group, Inc.*, 324 B.R. 208, 221, 225 (Bankr. W.D.N.Y. 2005) (declining to reach a conclusion on whether credit was extended in good faith where the DIP financing agreement "would violate the criminal usury provisions of New York law").

[5]     The Supplemental Declaration of Alan Bigman and the Declarations of Daniel A. Celentano and David Ying are attached as exhibits to the Declaration of Howard R. Hawkins.

Credit Agreement to ensure that the Debtors would default."  Duggan Dec. at ¶ 25.  *See also*

Declaration of David Jaffe ("Jaffe Dec.") at ¶ 13.  The Committee's contentions to the contrary

fly in the face of the evidence.  Rather, the evidence overwhelmingly shows that the provisions

in the Term DIP Facility were designed to protect the DIP Lenders' ability to be repaid, and not

as a "tripwire" to ensure the Debtors' inevitable default.  *See, e.g.*, Duggan Dec. at ¶ 25 ("At no

time did we seek to design any financial covenant that I believed the Debtors would be unable to

comply with.  I am not aware that any of the covenants in the DIP Term Loan were designed

with the intention of causing a default by the Debtors."); Jaffe Dep. 85:19-24 (Feb. 20, 2009)

("Q. [H]ave you been told by any other lenders that any provision of the credit agreement is

designed to force a default by the Debtors? . . . THE WITNESS: No, I have not been told by

anyone.").  The Committee offers no contrary evidence other than their expert's speculation

regarding the company's future operating performance.  *See* Declaration of Anders J. Maxwell,

at ¶ 26.  Nor does the Committee even attempt to explain why the Debtors would agree to

covenants they did not believe they could not perform.  *See* Supp. Bigman Dec. at ¶ 17 ("The

Debtors negotiated extensively over these financial covenants to achieve maximum flexibility,

and believe based on historical results and future projections that they will not be in default

under any of these financial covenants.").  At any rate, the Committee's expert's disagreement

with the Debtors cannot single-handedly overcome the deference due to the Debtors' exercise of

their reasonable business judgment and the entire factual record.

**B.      The December 15, 2009 Maturity Date Is Both Necessary And Reasonable**

10.      The Term DIP Facility matures on December 15, 2009.  The Committee

argues that this date is "not justified on any reasoned economic, credit, risk or other basis."  UCC

Obj. at 2.  The Committee also contends that the "early maturity provisions are inconsistent with

the '"market,'" as measured by "other recent debtor-in-possession facilities." UCC Obj. at 14. The Committee is wrong on both counts.

11.     First, there are legitimate business concerns underlying the choice of the December 15, 2009 maturity date that render it an essential part of the Term DIP Facility. The maturity date was agreed to early in the negotiation process, and was a material term included in the DIP Term Sheet agreed to by all of the lenders on January 8, 2009. Duggan Dec. at ¶ 12. Extending the term of the Term DIP Facility would increase the risk that the DIP Lenders would not be repaid, especially in the current credit environment. *Id.* at ¶ 16; *see also* Jaffe Dec. at ¶ 8. Moreover, at the time the December 15, 2009 maturity date was agreed to (and, even today), the Debtors were able to provide only very limited cash flow projections, making it difficult for lenders to judge the likelihood that the Debtors would be able to repay the Term DIP Facility. *Id.*; *see also* Jaffe Dec. ¶¶ 6-8 (describing the "very little long-term visibility" with respect to the company's financial performance). Thus, once the maturity date was selected, it became a foundational part of the package that all DIP Lenders had negotiated and agreed upon, and upon which they obtained approval for and committed to their participation in the facility.[6]

12.     Second, courts have recently approved a number of one-year DIP financing agreements, even where those agreements did not contain any mechanism for extending the term of the loan. *See, e.g., In re Hilex Poly Co. LLC,* Case No. 08-10890 (KJC),

---

[6]     In addition, the Debtors sought and received through negotiation a provision in the DIP Term Loan Agreement that permits an amendment of the maturity date without the necessity of all DIP Lenders' consent in certain circumstances. The Debtors also negotiated concessions from the DIP Lenders regarding the manner in which Debtors would be able to refinance the DIP Term Facility. Duggan Dec. at ¶ 15. These provisions demonstrate that the Debtors do have a certain degree of flexibility with respect to these issues.

Final Order at 18 (Bankr. D. Del. May 30, 2008) [Docket No. 139] (Ex. 1)[7]; *In re Tropicana Entertainment, LLC,* Case No. 08-10856 (KJC), Final Order at 13-14 (Bankr. D. Del. May 30, 2008) [Docket No. 219] (Ex. 2); *In re VeraSun Energy Corp.,* Case No. 08-12606 (BLS), Final Order at 35 (Bankr. D. Del. Dec. 4, 2008) [Docket No. 297] (Ex. 3). The prevalence of other one-year DIPs demonstrates that the length of the Term DIP Facility is perfectly in line with today's challenged DIP market. *See* Jaffe Dec. at ¶ 4 (stating that "in today's market, . . . one year was sort of the market norm").[8]

13.    The Committee contends that the Term DIP Credit Agreement should contain a provision allowing the Debtors to extend the maturity date. UCC Obj. at 13-15.[9] The

---

[7]    Citations to "Ex. __" reference Exhibits to this Reply Memorandum. Pursuant to ¶ 27 of the Case Management Order, further discussion of these Exhibits can be found in the Appendix to this Reply Memorandum. Pages specifically cited in this Reply Memorandum were uploaded electronically and a complete copy of the Exhibit will be available upon request.

[8]    The Committee also objects to the inclusion of certain milestone dates that the Debtors must reach in connection with the bankruptcy process in Section 6.18 of the Term DIP Credit Agreement. *See* UCC Obj. at 12-13. The milestones are designed to ensure that the Debtors are making progress towards an exit from bankruptcy. Duggan Dec. at ¶ 19. This is obviously important for the Lenders so that they can be repaid on the loans they are currently extending to the debtors. *See id.* This term, however, is not only beneficial to the Lenders, but to all stakeholders, many of whom will not be paid until the debtors exit bankruptcy. The reasonableness of the term is evidenced in part by the fact that it represents a negotiated compromise between the Lenders, who initially proposed earlier dates, and the Debtors. *See id.*

[9]    The Committee suggests the Term DIP Facility should contain an extension mechanism analogous to the one approved in the interim DIP order in *In re Smurfit-Container Corp.*, Case No. 09-10235 (BLS) (Bankr. D. Del. Jan. 27, 2009). UCC Obj. at 14. *Smurfit*, however, involved an ABL facility, which provides lenders with far greater protection than that available to lenders extending credit under a term loan facility. Jaffe Dec. at ¶ 11 ("the ABL is protected by its borrowing base. . . . [W]e have our collateral, excess collateral availability covenant, whereas the term loan is secured against the fixed assets, and so they, arguably, you know, have more risk and also they get a higher coupon."). The *Smurfit* extension, while acceptable in the context of an ABL facility, is thus a far riskier provision in the context of a term loan.

Committee concedes, however, that the Term DIP Credit Agreement *does* contain a provision

allowing the Debtors to extend the maturity date, but criticizes the extension mechanism for

requiring "100% consent of the lenders providing the new money loans in their sole discretion."

UCC Obj. at 13, n. 3 (citing Term DIP Credit Agreement § 2.05).  The Committee fails to note,

however, that the Term DIP Credit Agreement also enables the Debtors, in their sole discretion,

to replace any non-consenting DIP Lenders.  Because no minimum vote is required under

Section 3.07 to replace non-consenting DIP Lenders in connection with an amendment to extend

the maturity date, the Debtors could rely on this provision to entirely refinance the loans even in

the event no existing DIP Lenders consent to the amendment.  Thus, the Debtors do have a

"commercially realistic provision" that would enable them to avoid default even if they are

unable to repay the loans in full on the maturity date.

        C.      **The Covenants In the DIP Financing Agreement Are The Product Of A Negotiated Deal and the Court Should Defer to the Debtors' Exercise of Its Reasonable Business Judgment**

        14.      The Committee objects to certain of the "covenants" in the DIP Facility,

including (1) the minimum cumulative EBITDAR requirement (Proposed Term DIP Credit

Agreement § 7.11(a)), (2) the requirement for payment of current interest on the pre-petition

Senior Secured Credit Facility (as defined in the Motion) based upon a liquidity test (Prop. Final

DIP Order ¶ 18) and (3) the management review process (Term DIP Credit Agreement § 6.19).

*See* UCC Obj. at 15-18.

        15.      The Committee's attempts to cherry-pick particular clauses of the

agreement that it finds objectionable must be rejected.  The Term DIP Facility was the product of

extensive negotiation and compromise between the Debtors and the DIP Lenders.  *See, e.g.,*

Duggan Dec. at ¶¶ 4-7, 10; Supp. Bigman Dec., at ¶¶ 9-10.  Bankruptcy court approval of an

agreement does not require that each and every provision of the agreement favor the debtor and

its stakeholders.  Rather, it requires a debtor to conclude in the exercise of its business judgment

that the agreement as a whole is in the best interests of the estate.  *See In re Adelphia Commc'ns*

*Corp.*, 2004 WL 1634538, at *2 (Bankr. S.D.N.Y. June 22, 2004) (Gerber, J.) ("Determining

whether proceeding with a financing which is subject to conditions makes sense is likewise a

classic business decision.  No one could, or does, argue otherwise."); *In re Crowthers McCall*

*Pattern, Inc.*, 114 B.R. 877, 888 (Bankr. S.D.N.Y. 1990) ("But [the objecting creditor] did not

negotiate the Agreement and the Court is not to second guess the inclusion of some provisions as

long as the Agreement as a whole is within reasonable business judgment, and the subject

provisions do not distort the balance Congress struck in Chapter 11.").

        16.     In addition, courts grant substantial deference to a debtor-in-possession's

business decisions, including decisions regarding post-petition financing, where the financing is

designed to benefit the estate and the terms of the financing do not improperly advantage the

lenders.  *In re Ames Dept. Stores, Inc*., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[T]he court's

discretion [to approve post-petition financing] under section 364 is to be utilized on grounds that

permit reasonable business judgment to be exercised so long as the financing agreement does not

contain terms that leverage the bankruptcy process and powers or its purpose is not so much to

benefit the estate as it is to benefit a party-in-interest.").  The covenants here are objectively

reasonable and necessary, and these types of covenants are customary in both debtor-in-

possession financing agreements and credit agreements generally.  *See* Celantano Dec. at ¶ 15

("Lenders generally insist on financial covenants in leveraged transactions and DIP loans in

order to provide themselves protection against deterioration in the borrower's financial

performance."); Duggan Dec. at ¶ 20 ("It is common in credit agreements to include performance

covenants to ensure that a borrower is operating successfully enough so that lenders can be

repaid."); Jaffe Dec. at ¶ 11.  Moreover, as discussed above, the Committee's argument that these

were "tripwires" flies in the face of the evidence and should be rejected outright.  *See* ¶ __,

*supra.*  The Debtors were therefore well within the bounds of their reasonable business judgment

in agreeing to them and the Committee's claim that the DIP Facility "effectively cedes control"

of the reorganization to the DIP Lenders is baseless.  UCC Obj. at 13.

        1.      <u>The Financial Covenants Protect the DIP Lenders' Ability to Be Repaid</u>

        17.      The Committee objects to certain financial covenants in the Term DIP

Credit Agreement on the grounds that they "hold the Debtors hostage to highly volatile

commodity markets beyond the control of Debtors' management and to which the Debtors'

financial performance is highly sensitive."  UCC Obj. at 15.  The Committee contends that,

given the "highly volatile nature of the Debtors' business . . . it is virtually impossible for [the

Debtors] to develop accurate forecasts."  *Id.*  However, judicial deference to a Debtors'

reasonable business judgment is particularly appropriate where, as here, the challenge is

premised on the argument that the debtor is inaccurately forecasting future business prospects.

*See In re Key3Media Group, Inc*., 336 B.R. 87, 95-96 (Bankr. D. Del. 2005) ("Predicting the

operating performance . . . was an exercise of the business judgment of the Debtors."); *see also*

*In re Adelphia Commc'ns Corp.*, 2004 WL 1634538, at *3 (debtor's weighing of risk "is exactly

the kind of business decision that the business judgment rule respects").

        18.      In particular, the Committee objects to the provision of a "minimum

cumulative EBITDAR requirement as set forth in Section 7.11(a) of the Term DIP Credit

Agreement.  Performance covenants are common in credit agreements, whether or not to

debtors-in-possession, because of their importance in ensuring repayment.  Duggan Dec. ¶ 20.

Here, the DIP Lenders required a performance covenant to protect their interests, because if the

company performs poorly going forward, it risks being unable to repay the Term DIP Credit
Agreement.

19.     In early negotiations with the Debtors, the DIP Lenders proposed a cash
flow test for this performance covenant.   The Debtors, however, resisted the use of a cash flow
test for the very concern that the Committee raises: the danger of tying a covenant too closely to
volatility in the Debtors' business.  *See* Duggan Dec. ¶ 24.  Ultimately, the Lenders agreed to the
Debtors' request to use the EBITDAR test instead (Earnings Before Interest, Taxes,
Depreciation, Amortization and Restructuring), which is a widely-used measure of a company's
operating performance.  Duggan Dec. at ¶ 20.  The precise terms of the performance test here,
are thus the result of concessions by the DIP Lenders to the Debtors.  *Id.*  In addition, the dollar
amount of the test was set in discussions between the financial advisors for the Debtors and DIP
Lenders.  *Id.*  Not only is this test reasonable, necessary and standard, but ensuring a minimum
operating performance of the company will only serve to increase the value of the estate for all
stakeholders.[10]

2.     <u>The Liquidity Threshold That Must Be Met Before Pre-Petition Adequate
       Protection Payments Are Made Is Reasonable Under the Circumstances</u>

20.     The Proposed Final DIP Order provides that the Debtors will pay monthly
current interest under the Senior Secured Credit Facility provided the Debtors' liquidity, as
defined in the Proposed Final DIP Order, "is greater than $1,015,000,000."  Prop. Final Dip
Order ¶ 18.  While referred to as such by the Committee, this provision is not, in fact, a financial

---

[10]     In its Objection, the Committee raised for the first time an objection to the cap on the
funding of the Debtors' European operations, but fails to explain its concern.  The DIP
Lenders' agreement to permit funding to go to the European entities was critical to the
ongoing operations of the Debtors and maintenance of the value of the integrated
enterprise.  Supp. Bigman Dec. at ¶ 4.  The Lender's concession in allowing European
funding will preserve value for all creditors, whether secured or unsecured.

covenant, but rather is a liquidity level which must be met before adequate protections payments

of interest on pre-petition debt can be paid. While the payments are appropriate, as discussed

further in Section I.D. *supra,* here the provision was carefully structured to allow for such

payments *only* when the Debtors have sufficient liquidity.

21.    Moreover, both the nature and the dollar amounts of the test were the

result of negotiations and compromise between the DIP Lenders and the Debtors. While the DIP

Lenders originally sought an excess cash flow ("ECF") test, the Debtors, as discussed above,

were concerned that an ECF test would be overly impacted by swings in the price of crude oil.

Duggan Dec. at ¶ 24. The Debtors instead requested that the DIP Lenders accept a liquidity test,

and then pushed the DIP Lenders to accept a higher liquidity level than the one originally sought

by the DIP Lenders. *Id.* The $1,015,000,000.00 which was ultimately agreed to is based on

financial analysis performed by the Debtors' and lenders' financial advisors, and represents a

compromise between the positions of the DIP Lenders and the Debtors. *Id.*

### 3.    The Management Review Provision Is Reasonable

22.    The Committee also objects to the management review provision, which

requires that the Lyondell Board of Directors conduct a review of management in consultation

with advisors to the Debtors and advisors to the lenders. Term DIP Credit Agreement at § 6.19.

Because of the direct effect the management team has on the company's operating performance

and the ability of the Lenders to be repaid, the Lenders negotiated for the right to have good faith

input regarding the review of current management and recommendations regarding possible

management changes. *See* Duggan Dec. at ¶ 22; Supp. Bigman Dec. at ¶ 19 ("The Debtors

believe that the final provision strikes a reasonable balance between the Debtors' need to operate

our business, the supervisory board's exercise of reasonable business judgment, and the Lenders'

desire to ensure it has input in the process."). The purpose of the provision "is to ensure that the

13

Debtors have the best possible management in place to lead the through and out of bankruptcy."
Celentano Dec. at ¶ 18.  Like the rest of the covenants, the management review provision was the
result of extensive negotiation, and the final language was the result of compromises between the
Debtors and the DIP lenders.

23.     The agreed-upon provision allows the LyondellBasell Board of Directors
to choose the management team, provided such team is reasonably acceptable to the lenders
holding a majority of new money loans acting in good faith.  Term DIP Credit Agreement at §
6.19.  As DIP Term Loan and ABL Agents testified, this provision was uniformly requested
across the lending group, because the lenders questioned the competence of the current
management due to the sudden liquidity crisis that happened on their watch.  Duggan Decl. at
¶ 22; Jaffe Dep. 63:17-19 (Feb. 20, 2009) ("I think it was a very overwhelming consensus that
people had concerns about management").  The importance of the competence of the
management for the operations of the debtors is clear, as is the importance of the operations on
the ability of the Lenders to be repaid.  The management review provision gives DIP Lenders a
reasonable voice in the process of evaluating management without usurping the role of the
debtors' Board of Directors.

**D.      The Court Should Permit Adequate Protection Payments to the Senior
         Secured Pre-Petition Lenders**

24.     The Committee contends that the payment of current interest on the non-
rolled up portion of the pre-petition secured debt is inappropriate because the Senior Secured
Lenders are already adequately protected through the existence of an equity cushion.  This is
nonsense.  The Bankruptcy Code does not mandate that adequate protection take any specific
form and in no way limits a Debtor to providing only one type of adequate protection.  *See* 11
U.S.C. § 361.  First, it is a customary market practice to provide for the payment of interest on

senior secured pre-petition debt that is primed in debtor-in-possession financing agreements.  *Id;
see, e.g., In re Tronox Inc.*, Case No. 09-10156 (ALG), Final Order at 31-32 (Bankr. S.D.N.Y.
Feb. 6, 2009) [Docket No. 148] (Ex. 4); *In re Calpine Corp.*, Case No. 05-60200 (BRL), Final
Cash Collateral Order at 21 (Bankr. S.D.N.Y. Jan. 30, 2006) [Docket No. 664] (Ex. 5), Final DIP
Order at 23 (Bankr. S.D.N.Y. Jan. 26, 2006) [Docket No. 635] (Ex. 6); *In re Delphi Corp.*, Case
No. 05-44481 (RDD), Final Order at 31 (Bankr. S.D.N.Y. Oct. 28, 2005) [Docket No. 797] (Ex.
7); *In re Adelphia Commc'ns Corp.*, Case No. 02-41729 (REG), Final Order at 20-21 (Bankr.
S.D.N.Y. Aug. 23, 2002) [Docket No. 525] (Ex. 8).

            25.      In addition, Bankruptcy Courts in this District regularly approve post-
petition financing arrangements that provide for adequate protection payments even where pre-
petition secured creditors are oversecured.  *See, e.g., In re Tronox Inc.*, Case No. 09-10156
(ALG), Final Order at 10 (Bankr. S.D.N.Y. Feb. 6, 2009) [Docket No. 148] (Ex. 4); *In re Delphi
Corp.*, Case No. 05-44481 (RDD), Final Order at 10 (Bankr. S.D.N.Y. Oct. 28, 2005) [Docket
No. 797] (Ex. 7); *In re Adelphia Commc'ns Corp.*, Case No. 02-41729 (REG), Final Order at 5-6
(Bankr. S.D.N.Y. Aug. 23, 2002) [Docket No. 525] (Ex. 8).  The cases cited by the Committee
cases stand merely for the proposition that courts have found that an equity cushion alone *may*
constitute adequate protection in certain circumstances, and do not hold that adequate protection
payments coupled with an equity cushion are *per se* inappropriate.  *See* UCC Obj. at 20.[11]

---

[11]        The Committee also argues that "an oversecured creditor is nevertheless not entitled to
            receive period postpetition interest payments in order to preserve the value of this
            [equity] cushion."  UCC Obj. at 21.  This is irrelevant, as the adequate protection
            payments here are provided to preserve the value of the Senior Secured Pre-Petition
            Lenders' *collateral* – not the equity cushion – which the Committee's cases expressly
            concede is proper.  *See In re Delta Res., Inc.*, 54 F.3d 722, 730 (11th Cir. 1995) ("we
            hold that an oversecured creditor's interest in property which must be adequately
            protected encompasses the decline in the value of the collateral").

26. Finally, this is a necessary form of adequate protection payments to the Senior Secured Lenders (as defined in the motion) for that portion of their pre-petition debt that is not being rolled up in consideration of the New Money Loans. Celentano Dec. at ¶ 21 (stating that the monthly interest payments "is a component of the adequate protection for the prepetition secured lenders, and that without these payments, the Debtors would not have secured the DIP Financing"). Where, as here, adequate protection payments are a reasonable and necessary part of a thoroughly negotiated post-petition financing arrangement, the Court should permit the Debtors to exercise their reasonable business judgment and approve the adequate protection payments.

**E.    The Terms of the Roll Up Are Clear and Appropriate**

27. The Committee argues that the terms of the Roll Up Loans are "vague and ambiguous." UCC Obj. at 31. To the extent UBS can ascertain the nature of the Committee's complaint, it appears that the Committee objects to the provision requiring the Debtors to use "reasonable endeavors" to repay the Roll Up Loans in cash at confirmation, but allowing the Debtors to convert the Roll Up Loans into a five year note in the event they are unable to do so. Prop. Final DIP Order at ¶ 26. Far from being "vague" or "ambiguous," the Term DIP Credit Agreement provides extensive details about the mechanics of a repayment or conversion of the Roll Up debt at the time of confirmation. Term DIP Credit Agreement at § 2.12. This language, along with the language in the Proposed Final DIP Order, is the product of extensive negotiations and represents a compromise on behalf of all parties involved. The Court should therefore approve the Proposed Final DIP Order without changing the terms of the Roll Up Loans.[12]

---

[12]    To the extent the Committee is challenging the Roll Up itself as a form of cross-collateralization, this objection is equally baseless. Courts routinely approve cross-collateralization clauses where such protection was necessary to obtain vital postpetition financing and the proposed financing inures to the best interests of the creditors as a

16

**F.    The DIP Facility Fees Are Reasonable And In Line With The Market.**

28.    The Committee argues that the pricing of the Term DIP Facility is

prohibitively "expensive and confiscatory."  UCC Obj. at 18.  A brief survey of recently

approved DIP facilities shows this is anything but the case.  The Term DIP Facility provides for

a 10% margin above LIBOR.   DIP Term Sheet, Annex III.  Notwithstanding the fact that other

DIP facilities involved loans of varying size, the pricing of other major DIP facilities in 2008 and

2009 demonstrates that the pricing of the DIP is hardly excessive.  *See e.g., In re Tronox Inc.*,

Case No. 09-10156 (ALG), DIP Motion at 21 (Bankr. S.D.N.Y. Jan. 12, 2009) [Docket No. 4]

(9.50% margin); *In re Pilgrim's Pride Corp.*, Case No. 08-45664 (DML), DIP Motion at 4

(Bankr. N.D. Tex. Dec. 1, 2008) [Docket No. 24] (8% margin); *In re Hilex Poly Co. LLC*, 08-

10890 (KJC), DIP Motion at 19, (Bankr. D. Del. May 6, 2008) [Docket No. 11] (8% margin).

---

whole.  *See In re Ames*, 115 B.R. at 40-41; *In re Vanguard Diversified, Inc.*, 31 B.R. 364,
366 (Bankr. E.D.N.Y. 1983) ("In seeking to grant cross-collateralization, the debtor-in-
possession must demonstrate that: (1) Absent the proposed financing, its business
operations will not survive; (2) It is unable to obtain alternative financing on acceptable
terms; (3) The proposed lender will not accede to less preferential terms; and (4) The
proposed financing is in the best interests of the general creditor body.") (citations
omitted); *In re Gen. Oil Distrib., Inc.*, 20 B.R. 873, 877 (Bankr. E.D.N.Y. 1982) (cross-
collateralization appropriate where "necessary for the debtor-in-possession to obtain
financing").  Moreover, the Roll Up is structured in accordance with Local Rule 4001-
2(k)(3), which specifically contemplates the approval of roll ups that meet certain
requirements.  The Proposed Final DIP Order preserves the Committee's right to
investigate and challenge the Roll Up Loan, subject to the Committee seeking standing to
do so through an *STN* motion.  Prop. Final Dip Order ¶ 6(f); *see In re STN Enters*, 779
F.2d 901, 904 (2d Cir. 1985) (the Committee must request and receive standing from the
Court in order to prosecute an action to conserve assets of a Chapter 11 debtor).  Any
substantive challenge to the Roll Up is therefore "premature."  *In re Adelphia Commc'ns.
Corp.*, Case No. 02-41729, Transcript from Aug. 22, 2002 Hearing at 377:25- 378:11
(S.D.N.Y. 2002) ("I believe that if and when the Creditors' Committee concludes that
litigation is warranted, it should comply with STN and then if the Creditors' Committee
then believes that it should prosecute any litigation in place of the debtors, the Creditors'
Committee can bring the issue up before me at that time.").

## II.    THE ARCO AND EQUISTAR NOTEHOLDERS' OBJECTION SHOULD BE OVERRULED

### A.    The Noteholders Are Not Entitled To Identical Adequate Protection As The Pre-Petition Senior Secured Lenders

29.    The Bankruptcy Code provides that a court may authorize the post-petition obtaining of credit that primes a pre-petition lien where (1) "the trustee is unable to obtain such credit otherwise" and (2) "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  BNY, in its capacity as Indenture Trustee under the Arco and Equistar Indentures, and certain noteholders under the Equistar Indenture (collectively, "the Noteholders"), who hold first-priority pre-petition liens in two separate pools of collateral, do not contest that the Debtors are unable to obtain DIP financing that does not grant a priming lien to the DIP Lenders.  The Noteholders do, however, object to the Term DIP Facility on the grounds that they are not receiving the same adequate protection as the Senior Secured Pre-Petition Lenders.  Objection of Bank of New York Mellon As Indenture Trustee, to the Motion ("BNY Obj.") at 7.

30.    Nothing in the Bankruptcy Code provides any support for the Noteholders' position.  Section 364(d)(1)(B) mandates only that secured lenders receive "adequate protection," and does not insist that that adequate protection take any specific form.  There is simply no requirement that different groups of secured creditors, who hold liens in different collateral under different financing arrangement, receive the exact same adequate protection package.   The Noteholders are unable to point to any authority that mandates such a result.

### B.    The Noteholders Are Sufficiently Adequately Protected

31.    There is no need to grant the Noteholders interest payments on their pre-petition debt because the Noteholders are already adequately protected.  The Bankruptcy Code does not define adequate protection, but sets forth several nonexclusive examples of what might constitute adequate protection, including (1) "a cash payment or periodic cash payments to such an entity"; (2) "providing to such entity an additional or replacement lien"; and (3) "granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property."  11 U.S.C. § 361.  Given that the Proposed Final DIP Order grants the Noteholders multiple types of approved adequate protection, the Noteholders cannot seriously contest that they are receiving anything other than a sufficient adequate protection package.

32.    First, the Proposed Final DIP Order offers the Noteholders replacement liens in a broader collateral base than they were provided pre-petition, as contemplated by Section 361(2) of the Bankruptcy Code.  Pre-petition, the Noteholders held limited liens in the assets of two of Debtors' subsidiaries, Lyondell Chemical Company and Equistar Chemicals.  Supp. Bigman Dec. at ¶ 21.  In contrast, the Proposed Final DIP Order grants Noteholders "a replacement security interest in and lien . . . upon all the DIP Collateral," subordinate only to the DIP Liens.  Prop. Final DIP Order ¶ 17(a).  This replacement security interest consists of a lien upon all the DIP Collateral, junior to the DIP Liens, the Carve-Out and the liens securing Debtor Intercompany Transfers and Non-Debtor Intercompany Transfers.  Prop. Final Dip Order ¶¶ 10(a)-(b), 12, 17(a).  Thus, "the Debtors have substantially expanded the collateral available to satisfy the [N]oteholders' claims."  Supp. Bigman Dec. at ¶ 26.

33.    Second, according to Duff & Phelps, an investment banking and financial advisory firm retained to provide expert services to the Debtors in connect with these

proceedings, the Noteholders are adequately protected through the existence of an equity cushion

in their collateral. Declaration of Robert A. Bartell at ¶ 17.[13] While an equity cushion alone, has

in some situations been found to be sufficient adequate protection, *see, e.g*, *In re Berry Good,*

*LLC*, 2008 WL 519174, at *1 (Bankr. D. Ariz., Dec. 10, 2008) (refusing to order additional

forms of adequate protection where creditor "is protected by an equity cushion"), here the

Noteholders are protected by liens on additional collateral in addition to the equity cushion.

Here, the Noteholders concede the claims of both the Senior Secured Lenders and the

Noteholders are oversecured. BNY Obj. at 20.

       34.     Finally, the Proposed Final DIP Order will provide the Noteholders with

multiple additional forms of relief "as will result in the realization by such entity of the

indubitable equivalent of such entity's interest in the property" pursuant to the "catch-all

provision" of Section 361(3). *In re Timbers of Inwood Forest Assoc., Ltd.*, 793 F.2d 1380, 1388

(5th Cir. 1986). In addition to the replacement liens and equity cushion, the Noteholders will

receive superpriority claims pursuant to Section 507(b) of the Bankruptcy Code, immediately

junior to those of the DIP Agents and the DIP Lenders, the "current cash payments of all fees

and expenses payable to them under the Existing Documents" and access to "financial and other

reporting as described in the DIP Credit Agreements and DIP Documents." Prop. Final DIP

Order ¶¶ 17(b), (c), (e).

       35.     Considering the Debtor's package as a whole, it is evident that the

Noteholders are substantially more than adequately protected. "The goal of adequate protection

is to safeguard the secured creditor from diminution in the value of its interest during the Chapter

11 reorganization." *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y.

---

[13]    The Declaration of Robert A. Bartell is attached as an exhibit to the Declaration of
Howard R. Hawkins.

1992); *In re Saypol*, 31 B.R. 796, 800 (Bankr. S.D.N.Y. 1983) ("The language of [Section 361]

thus persuasively indicates that the concept of adequate protection is delineated by concern for

protection of the secured creditor from decrease in the value of the collateral securing its

claim."). Thus, in determining whether prepetition secured creditors are adequately protected,

"the court must consider whether the value of the debtor's property will increase as a result of

. . . the proposed financing." *495 Central Park*, 136 B.R. at 631. Here, in addition to the robust

adequate protections being offered to the Noteholders, the provision of the DIP financing itself

will protect the value of the Noteholder's collateral from diminution by ensuring the ongoing

viability of the Debtors' business. *See* Supp. Bigman Dec. at ¶ 26 ("The collective health of the

Debtors' enterprise depends upon approval of the DIP Facility").[14] If Debtors are unable to

secure the proposed DIP financing, the value of the Noteholders' pre-petition collateral will

certainly decrease. Thus, the Final DIP Order offers further adequate protection to the

Noteholders by increasing the value of the Debtors' property.

C. **The Noteholders' Additional Requested Modifications to the DIP Order Are Inappropriate**

36.     The Noteholders argue that the Court should not grant the Final DIP Order

unless several additional modifications are made.   None of the Noteholders' requests should be

granted.

37.     First, the Noteholders argue that there should be "no limitation upon

current payment of [Bank of New York's] fees and expenses based upon any efforts to

---

[14]     The Noteholders contend that the Debtors have made no showing that the DIP financing
would specifically benefit the collateralized assets of the noteholders, as opposed to the
Debtors' company as a whole.  BNY Obj. at 10.  However, the Debtors' company
"operat[es] as a coordinated and vertically integrated whole,"  and thus the effect of the
DIP financing on individual assets is meaningless to a determination of whether the
Noteholders are adequately protected.  Supp. Bigman Dec. at ¶ 24.

investigate the granting of liens to the new lenders under the 2007 Transaction and no deadline upon the completion of such investigation." BNY Obj. at 7. In essence, they are arguing they should be allowed to investigate claims against other lenders, and the estate should pay them to do so. Nothing in the Bankruptcy Code or the Proposed Final DIP Order authorizes secured creditors to pursue an investigation of claims that properly belong to the Debtors' estate. Moreover, the Proposed Final DIP Order explicitly permits the Committee to "investigate the Pre-Petition Lender Security Interests and, subject to any applicable law with respect to standing, commence and prosecute any related proceedings as a representative of the Debtors' estates." Prop. Final DIP Order, ¶ 23. The Committee, which is a fiduciary to unsecured creditors, has already indicated it intends to investigate this and other issues and it will be for the Court to decide at the appropriate time whether that investigation is appropriate. It is certainly not for BNY – on a budget they argue should be paid by the Debtors – to investigate this issue for its sole benefit.

38.    Second, the Noteholders contend that the Proposed Final DIP Order requires them to waive "their equitable rights to marshaling." BNY Obj. at 7. However, there is no such thing as a "right" to marshaling. Rather, courts are required to "weigh[] the equities between parties to determine the applicability of the marshaling doctrine" in any given case. *Meyer v. United States*, 375 U.S. 233, 238 (1963); *In re Murphy*, 331 B.R. 107, 132 (Bankr. S.D.N.Y. 2005) (the marshaling "doctrine can only be applied when it can be equitably fashioned as to all of the parties") (citation omitted). As discussed in Section II.B, *infra*, the Noteholders already are receiving adequate protection against the diminution in value to their pre-petition collateral through an expanded lien on the entire estate. Because the Noteholders are adequately protected, there is no reason for this Court to order the DIP Lenders to marshal at this time.

Moreover, the marshaling waiver is the result of the arms-length negotiation between the Debtors and the DIP Lenders, and is a necessary requirement to allow the Debtors to obtain credit under the DIP Facility.

39.    Finally, the Noteholders argue that they are entitled to "adequate protection . . . for the effect of the Roll Up DIP Loans, including but not limited to rolling up a portion of their claims on equivalent terms."  BNY Obj. at 7.[15]  However, the Term DIP Facility offered the Roll Up Loans as consideration on a dollar-for-dollar basis for the New Money Loans provided by the Senior Secured Lenders.  The Noteholders have not provided any new money to the Debtors, and are therefore ineligible to participate in the Roll Up Loans.[16]  In addition, the Noteholders had a narrow pre-petition collateral package.  If the Noteholders are permitted to participate in the Roll Up, their rolled up pre-petition debt would suddenly received a first priority lien secured by all the DIP Collateral, instead of a second-priority lien on the DIP Collateral as a form of adequate protection.  Participation in the Roll Up would therefore provide the Noteholders with an unwarranted and disproportionate benefit vis-à-vis the Senior Secured Lenders.  Thus, allowing the Noteholders to participate in the Roll Up Loans would essentially afford them a windfall without requiring them to assume any new liability or obligations.

---

[15]    The Committee appears to be under the mistaken impression that the Roll Up is a form of adequate protection offered to the Senior Secured Pre-Petition Lenders.  Not so.  Rather, the Term DIP Facility includes a Roll Up because it was the only way to induce the Senior Secured Lenders to provide New Money Loans.  Transcript of the Celentano Dep. 164:16-19 ("Before the roll-up was introduced we were extremely concerned that we wouldn't be able to raise the amount of financing that we though was appropriate for the company.").

[16]    Even if the Noteholders were willing to contribute new money, it would not have been feasible in the short time frame available to the Debtors to offer an opportunity to all potentially interested parties to participate in the DIP financing.

## <u>CONCLUSION</u>

40.    WHEREFORE, for these reasons, as well as those set forth in the Motion and the arguments to be presented at the hearing on this matter, UBS respectfully requests that the Objections of the Committee and the Noteholders be overruled, and that the Motion be granted.

Dated: New York, New York
          February 24, 2009

SIMPSON THACHER & BARTLETT LLP

By: s/  Linda H. Martin

Stephan J. Feder
Linda H. Martin
Kathrine A. McLendon
Anne L. Knight
Natalie Shimmel Drucker
425 Lexington Avenue
New York, NY 10017
Ph: 212-455-2000
Fax: 212-455-2502
sfeder@stblaw.com
lmartin@stblaw.com
kmclendon@stblaw.com
aknight@stblaw.com
ndrucker@stblaw.com

*Attorneys for UBS AG, Stamford Branch and
Certain of its Affiliates*