**Hearing Date and Time: February 25, 2009 at 10:30 a.m. (prevailing New York time)**
**Objection Deadline: January 27, 2009 at 4:00 (prevailing New York time)[1]**

Deryck A. Palmer, Esq.
John J. Rapisardi, Esq.
George A. Davis, Esq.
Andrew M. Troop, Esq.
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York  10281
Telephone:  (212) 504-6000
Facsimile:  (212) 504-6666

and

Mark C. Ellenberg, Esq. (to be argued by)
CADWALADER, WICKERSHAM & TAFT LLP
1201 F Street NW
Washington, D.C. 20004
Telephone:  (202) 862-2200
Facsimile:  (202) 862-2400

Proposed Attorneys for Lyondell Chemical Company, et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x

| | | |
|---|---|---|
| **In re:** | :: | |
| | : | **Chapter 11** |
| | : | |
| **LYONDELL CHEMICAL COMPANY, et al.,** | : | **Case No. 09-10023 (REG)** |
| | : | |
| | : | **Jointly Administered** |
| | : | |
| **Debtors.** | : | |

-----------------------------------------------------------x

**OMNIBUS RESPONSE TO OBJECTIONS TO MOTION FOR AN ORDER (I)**
**AUTHORIZING DEBTORS (A) TO OBTAIN POST-PETITION FINANCING**
**PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2),  364(c)(3), 364(d)(1) AND**
**364(e), (B) TO UTILIZE CASH COLLATERAL  PURSUANT TO 11 U.S.C. § 363 AND**
**(C) TO PURCHASE CERTAIN ASSETS PURSUANT TO 11 U.S.C. § 363, (II)**
**GRANTING ADEQUATE PROTECTION  TO PRE-PETITION SECURED**
**PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364, AND (III) SCHEDULING**
**FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C)**

---

[1] The Debtors agreed to extend this deadline with respect to certain creditors.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ I

INTRODUCTION ............................................................................................... 2

RESPONSE ......................................................................................................... 6

I.        THE DEBTORS HAVE SATISFIED THE REQUIREMENTS FOR
          APPROVAL OF DIP FINANCING ........................................................ 6

II.       THE OBJECTIONS LACK MERIT ....................................................... 8

          A.    The Committee's Objection. ........................................................ 9

                i.      The DIP Financing Terms Are The Best (And Only) Terms
                        Available. ........................................................................... 9

                ii.     The Committee Misstates And Misunderstands The Law Of
                        Adequate Protection. ......................................................... 12

                iii.    The Roll-up Loan Is Permissible........................................ 15

          B.    BONY's Objection. ................................................................... 16

                i.      The Noteholders Are Not Entitled To Be Treated The Same
                        As The Prepetition Secured Lenders. ............................... 17

                ii.     The DIP Financing Does Not Amount To De Facto
                        Substantive Consolidation And LCC and Equistar Need
                        The DIP Financing. ........................................................... 20

                iii.    BONY's Marshaling Argument Ignores The Terms Of The
                        DIP Financing. .................................................................. 22

          C.    LDTC's Objection. .................................................................... 23

          D.    ABN AMRO's Objection............................................................ 24

NOTICE............................................................................................................ 25

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                    Page(s)

<u>In re 495 Cent. Park Ave. Corp.</u>, 136 B.R. 626 (Bankr. S.D.N.Y. 1992)..............................17, 19

<u>In re Adelphia Commc'ns Corp.</u>, 544 F.3d 520 (2d Cir. 2008)................................... 21

<u>In re Aleris Int'l Inc.</u>, No. 09-10478 (BLS) (Bankr. D. Del. Feb. 13, 2009) [Docket

   No. 46] ........................................................................................................... 7, 11

<u>In re Allegheny Int'l, Inc.</u>, 93 B.R. 907 (Bankr. W.D. Pa. 1988) ............................... 24

<u>Am. United Mut. Life Ins. Co. v. Avon Park</u>, 311 U.S. 138 (1940) ........................... 18

<u>In re Ames Dep't Stores, Inc.</u>, 115 B.R. 34 (Bankr. S.D.N.Y. 1990) ......................... 7

<u>In re Aqua Assocs.</u>, 123 B.R. 192 (Bankr. E.D. Pa. 1991)............................................

<u>In re Automatic Voting Mach. Corp.</u>, 26 B.R. 970 (Bankr. W.D.N.Y. 1983)............... 13

<u>Bankers Life Ins. Co. of Neb. v. Alyucan Interstate Corp. (In re Alyucan Interstate Corp.)</u>,

   12 B.R. 803 (Bankr D. Utah 1981) ......................................................................... 19

<u>Beiger v. IRS</u>, 496 U.S. 53 (1990) ...................................................................... 18

<u>Bergemann v. Babcock & Wilcox Co. (In re Babcock & Wilcox Co.)</u>, 250 F.3d 955

   (5th Cir. 2001) .............................................................................................. 21

<u>Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)</u>, 789 F.2d 1085

   (4th Cir. 1986) .............................................................................................. 20

<u>In re Continental Airlines, Inc.</u>, 146 B.R. 536 (Bankr. D. Del. 1992) ....................... 13

<u>In re Donato</u>, 170 B.R. 247 (Bankr. D.N.J. 1994)................................................. 13

<u>In re Dunes Casino Hotel</u>, 69 B.R. 784 (Bankr. D.N.J. 1986)................................. 13

<u>In re Ellingsen MacLean Oil Co.</u>, 65 B.R. 358 (W.D. Mich. 1986) ...................... 9, 10

<u>In re Elmira Litho, Inc.</u>, 174 B.R. 892 (Bankr. S.D.N.Y. 1994 .............................. 13

<u>In re FCX, Inc.</u>, 54 B.R. 833 (Bankr. E.D.N.C. 1985) ........................................... 11

In re Farmland Indus., Inc., 294 B.R. 855 (Bankr. W.D. Mo. 2003) ...................................... 6, 10

In re Landsource Communities Dev. LLC, Case No. 08-11111 (KJC) (Bankr. D.

  Del. July 19, 2008) [Docket No. 306] ................................................................. 11

Liona Corp. v. PCH Assocs. (In re PCH Assocs.), 949 F.2d 585 (2d Cir. 1991) ....................... 18

Lyon v. Contech Constr. Prods., Inc. (In re Computrex, Inc.), 403 F.3d 807 (6th Cir. 2005) ...... 18

In re Reading Tube Indus., 72 B.R. 329 (Bankr. E.D. Pa. 1987).........................................13, 20

In re Sharon Steel Corp., 159 B.R. 165 (Bankr. W.D. Pa. 1993).......................................... 13

In re Shaw Indus., Inc., 300 B.R. 861 (Bankr. W.D. Pa. 2003)................................... 13

In re Tampa Chain Co., 53 B.R. 772 (Bankr. S.D.N.Y. 1985) ................................... 23

In re Tucker, 5 B.R. 180 (Bankr. S.D.N.Y. 1980) ...................................................... 13

Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean

  Oil Co.), 834 F.2d 599 (6th Cir. 1987) ............................................................. 7

In re Utah 7000, L.L.C., No. 08-21869, 2008 WL 2654919 (Bankr. D. Utah July 3, 2008) ....... 20

In re VeraSun Energy Corp., Case No. 08-12606 (BLS) (Bankr. D. Del. Dec. 4, 2008)

  [Docket No. 305] ........................................................................................ 11

Statutes

11 U.S.C. §105(a).............................................................................................. 1

11 U.S.C. § 361 .............................................................................................. 1

11 U.S.C. § 361(1)............................................................................................ 14

11 U.S.C. § 361(2)............................................................................................ 15

11 U.S.C. § 362 ........................................................................................... 1, 24

11 U.S.C. § 363 ........................................................................................... 1, 24

11 U.S.C. § 364 ....................................................................................... 1, 3-6, 25

11 U.S.C. § 364(c)............................................................................................ 6

11 U.S.C. § 364(d)...................................................................................................................... 6

11 U.S.C. § 365 .......................................................................................................................... 18

11 U.S.C. § 506(b)...................................................................................................................... 14

<u>Rules</u>

Fed. R. Bankr. P. 4001................................................................................................................ 1

Lyondell Chemical Company and certain of its subsidiaries and affiliates, (collectively, the "Debtors" or "Lyondell"), file this memorandum in further support of the motion for a final order (the "Motion"), pursuant to sections 105(a), 361, 362, 363, and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), approving the Debtors' proposed debtor-in-possession financing facility (the "DIP Financing"). The motion, coupled with a request for interim relief, was filed on January 6, 2009. The motion was supported by a term sheet and by the declarations of Alan S. Bigman, David Ying, Robert A. Bartell, Edward J. Dineen, and Douglas Pike [Docket Nos. 21, 14, 16, 26 & 13]. The record was further enhanced at the January 7-8 interim hearing, through cross-examinations of Mr. Bigman, Mr. Bartell and Mr. Ying, through a consensual modification of the term sheet announced in open court, and through statements of the lenders agreeing to be bound by the term sheet. The Court entered an interim order (the "Interim Order") on January 8, 2009 [Docket No. 79].

In further support of the motion, the Debtors have supplemented the record by filing with the Court (1) the final credit agreements, (2) a proposed form of final order (the "Final Order"), and (3) the supplemental declarations of Alan S. Bigman, Robert A. Bartell and Daniel A. Celentano [Docket Nos. 882 & 901]. In addition, putative objectors and parties in interest have had a full opportunity to conduct discovery, including depositions of the Debtors' witnesses, and Lyondell has taken discovery of the putative objectors.

Certain parties (the "Objectors") have filed objections (the "Objections") to the Motion. These Objections, and their current status, are summarized on Exhibit A to this memorandum. The Debtors and their lenders have been working diligently to resolve the

Objections.  As indicated on Exhibit A, many of the Objections have been resolved or narrowed, and the Debtors will continue to work at resolving Objections prior to the hearing.  Any further agreements with Objectors will be promptly reported to the Court.

### Introduction

The Debtors seek final approval of DIP Financing totaling approximately $8.0 billion.  The facility consists of:

- $1.54 billion (expandable to $2.0 billion) of revolving credit, secured by liens on receivables and inventory ("the ABL Facility);

- $3.25 billion of available term loans, secured by priming liens ("the Term Loan Facility"); and

- a modified dollar-for-dollar roll-up of $3.25 billion (the "Roll-Up Loan") in existing senior secured debt, which will be secured by a priming lien junior to the liens granted to lenders under the new revolving and term loans and which will be subject to restructuring pursuant to a plan of reorganization.

As recently as December 15, 2008, the Debtors and their affiliates, a $45 billion international enterprise employing more than 20,000 people, stood on the precipice of disaster. Liquidity had evaporated in a breathtakingly short period of time, short term business prospects appeared weak, and the credit markets, particularly the DIP lending market, were not functioning.  Over a frantic two-week stretch, that encompassed both the Christmas and New Year holidays, Lyondell hired professionals, assessed its borrowing needs, organized a lending group composed of prepetition secured lenders, and hammered out the terms for an $8.0 billion financing.  As late as January 3, 2009, the Debtors were still uncertain as to whether it had raised adequate commitments.

To be sure, the results of this process are not perfect.  There are many aspects of the DIP Financing the Debtors would wish to be better.  But there can be no doubt that the Debtors fought as hard as they could to obtain the best terms that they could, under very difficult

circumstances. There also can be no doubt that better terms were on January 6, and are today, not available. And there can be no doubt that the only alternative to the financing package before the Court was immediate liquidation.

The record established at the interim hearing and through the supplemental submissions demonstrates beyond peradventure that the DIP Financing meets the requirements of section 364 of the Bankruptcy Code. There can be no serious doubt that: the Debtors have reasonably exercised their sound business judgment, there is no alternative or better financing available to the Debtors, and the DIP Financing is in the Debtors' best interests and necessary to preserve the Debtors' estates. The Debtors have also demonstrated that the DIP Financing terms are fair and reasonable, given the circumstances of these chapter 11 cases, and were negotiated in good faith.

Despite the fact that the proposed DIP Financing clearly meets the requirements of section 364 of the Bankruptcy Code and applicable law, subsequent to approval of the Interim Order, 16 parties objected to the Motion. The vast majority of the Objections have been resolved or narrowed. The remaining Objections should be overruled.

The Objections fall into five basic categories. The first category consists of miscellaneous Objectors who purport to have statutory lien rights. To the extent these Objections have not been withdrawn by agreement, it is clear that the DIP Financing does not purport to prime prepetition statutory liens. The only prepetition liens being primed are those of the Senior Secured Lenders, the Arco and Equistar noteholders, and the Bridge Lenders. To the extent statutory liens arise after the petition date, they clearly are subordinate to the prior liens granted pursuant to the DIP Financing.

The second category consists of the Objections of the Official Unsecured Creditors' Committee. The Committee does not identify a single feature of the DIP Financing that is prohibited by section 364. Rather, the Committee essentially asserts that it knows the Debtors' business better than the Debtors themselves (e.g., borrowing could be reduced by idling more plants) or that the Committee could have negotiated a better deal (e.g., should be less expensive and should have a longer term). As to the first type of objection, the Committee's broad claims are unsupported by the record. The Committee does not point to a single action the Debtors could have taken to reduce their borrowing. Further, the record demonstrates that in sizing the DIP, the Debtors evaluated their operations and borrowing needs and could not, at this time, make material changes. As to the second type of objection, the Debtors, of course, would gladly accept better terms. However, such terms simply are not available.

The third category consists of Bank of New York ("BONY"), as agent on behalf of noteholders secured by the assets of Lyondell Chemical Company (the "Arco Noteholders") and Equistar Chemical (the "Equistar Noteholders" and, together with the Arco Noteholders, the "Noteholders"). The liens of the Noteholders are being primed. As adequate protection, they are receiving liens (subordinate to the DIP Financing) on all of the Debtors' assets. BONY contends, first, that the DIP Financing effects a de facto substantive consolidation because Lyondell Chemical and Equistar do not have separate DIP facilities. It is undisputed, however, that Lyondell Chemical and Equistar have substantial borrowing needs and that these needs can be met only through the proposed financing. Further, there is no substantive consolidation. The Debtors remain separate and their assets and liabilities will be tracked. Second, BONY contends that the Noteholders must also be paid interest and be entitled to participate in the Roll-up Loan as adequate protection, because certain senior secured lenders are receiving interest and

participating in the Roll-up Loan.  However, no applicable law requires that different creditors receive the same adequate protection.  Courts expressly allow debtors to provide varying adequate protection based on the creditor's position prior to the petition date, as long as the standards of section 364 of the Bankruptcy Code are met.  Here, BONY concedes that the noteholders will benefit from a substantial equity cushion.  That provides an independent basis under section 364 Bankruptcy Code for priming.  What other secured creditors may or may not receive is immaterial.  Further, the Roll-up Loan is not adequate protection.  It is part of the inducement given to parties willing to participate in lending new money to the Debtors.  The law is clear that the opportunity to provide DIP Financing does not have to be extended to all interested parties, as long as the financing otherwise meets the standards of section 364.  Finally, <u>BONY</u> complains that the DIP Financing order will take away the Noteholders' right to marshal assets.  This argument is mooted completely by giving the Noteholders adequate protection liens on all of the Debtors' assets.

The fourth category is the objection of Law Debenture Trust Company ("<u>LDTC</u>"), on behalf certain notes issued by Millennium America (the "<u>Millennium Noteholders</u>").  The Millennium Noteholders are unsecured.  They complain that the DIP Financing overrides a negative pledge in their indenture.  As many courts have stated, the negative pledge is, at best, an unperfected lien.  It provides no obstacle to DIP financing that otherwise satisfies the requirements of section 364 of the Code.

The fifth and final category is the last minute objection of ABN AMRO Bank N.V. ("<u>ABN</u>").  ABN was a member of both the ABL and Term Facilities.  It has determined to drop out of the Term Facility because it disagrees with the manner in which the other 13 lenders have decided to document the Roll-up Loan.  This is an entirely intercreditor dispute.  The

objection raises no question whatsoever about compliance with section 364 of the Bankruptcy Code. And the other 13 lenders have agreed to fill the funding commitments from which ABN is walking away. Accordingly, this objection presents nothing for the Court to decide.

## RESPONSE

**I.    The Debtors Have Satisfied The Requirements For Approval Of DIP Financing**

1.    As detailed in the Motion, the Debtors must obtain approval of the DIP Financing pursuant to subsections 364(c) and (d) of the Bankruptcy Code, which permit a debtor to grant, in return for postpetition financing, superpriority administrative status, junior liens on its property and liens senior in priority to existing liens (i.e., "priming" liens), respectively in certain cases. (Motion ¶ 24-32.)

2.    Courts have held that approval of postpetition financing requires evidence that: (1) the proposed financing is an exercise of sound and reasonable business judgment; (2) alternative financing is not available on any other basis and no better offers or timely proposals are pending before the Court; (3) the proposed financing is in the best interests of the Debtors' creditors and estates and is necessary, essential and appropriate for the continued operations of the Debtors' businesses; (4) the terms of the DIP Financing are fair, reasonable and adequate given the circumstances of the Debtors and the proposed lenders; and (5) the DIP Financing was negotiated in good faith and at arm's length. See, In re Farmland Indus., Inc., 294 B.R. 855, 862-79 (Bankr. W.D. Mo. 2003) (enumerating factors relevant when evaluating postpetition financing, and applying those factors (except availability of alternate financing) to modifications of postpetition financing).

3.    At the Interim DIP Hearing, the Debtors presented extensive evidence and created a record sufficient to support approval of the DIP Financing under section 364 of the

Bankruptcy Code.    The record before the Court demonstrates that the Debtors have met the

requirements of section 364 of the Bankruptcy Code as follows:

- There is no reasonable dispute that (i) the Debtors have exercised sound business judgment in entering into the DIP Financing, (ii) no better or alternative financing is available or pending before the Court and (iii) the proposed DIP Financing is necessary and essential to the Debtors' continued operations.    Even the Committee's own witness, Anders Maxwell, does not dispute this.    (See Transcript of Deposition of Anders Maxwell dated February 19, 2009 ("Maxwell Dep. Tr."), 155:22-157:4 (relevant portions attached as Exhibit B).)

- The terms of the DIP Financing are fair and reasonable in light of the current market.  (Motion ¶¶ 25-26, 32.)  While courts must assess the circumstances of each case to determine whether the proposed DIP financing terms are fair and reasonable, "courts have focused their attention on proposed terms that would tilt the conduct of the bankruptcy case; prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors; or leverage the Chapter 11 process by preventing motions by parties-in-interest from being decided on their merits."  In re Ames Dept. Stores, Inc., 115 B.R 34, 37-38 (Bankr. S.D.N.Y. 1990).

  As Mr. Celentano, the Debtors' financial advisor, states in his declaration, the terms that the Debtors procured through their extensive negotiations with the DIP Lenders are fair and reasonable in light of the current atrophied DIP financing market.  (Declaration of Daniel Celentano, dated February 22, 2009 ("Celentano Decl.") ¶¶ 12-28.)  Moreover, no party offers any evidence that the terms are not fair and reasonable.  At the First-Day Hearing, the Court stated that based on the evidence presented, and subject to parties convincing it to the contrary by oral argument that "the terms of the DIP Financing, while not as good as the terms I'm used to seeing back in the days when people used to be able to get DIP facilities, are reasonable under the circumstances."  Transcript of First-Day Motions, Jan. 7, 2009, 164:9-16 [Docket No. 134].  Indeed, the Bankruptcy Court for the District of Delaware recently approved DIP financing on terms similar to those approved in the instant case.  Interim DIP Order, In re Aleris, Int'l Inc., 09-10478 (BLS) (Bankr. D. Del. Feb. 13, 2009) [Docket No. 46] (attached in Appendix).)  More critically, these are the best and only terms available to the Debtors.  Accordingly, the Court should find that the DIP Financing terms are fair and reasonable.

- There can be no doubt, after two months of ongoing negotiations, that the Debtors negotiated the DIP Financing in good faith and at arm's length. The Committee now argues that the Debtors cannot show good faith because of the economic terms of the DIP Financing.  (Comm. Obj. ¶¶ 29-

31.)  This argument is insufficient.  Although the Bankruptcy Code does not define "good faith" in the context of DIP financing, courts have interpreted it consistently with the definition in the Uniform Commercial Code, which specifies that good faith entails "honesty in fact in the conduct or transaction concerned."  See Unsecured Creditors' Committee v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.), 834 F.2d 599, 605 (6th Cir. 1987) (citing U.C.C. § 1-201(19), cert. denied, 488 U.S. 817 (1988).  The Committee presents no evidence of dishonest behavior by the Debtors (nor even implies any).  The Committee instead proposes a different standard, arguing that "'Where it is evident from the loan agreement itself that the transaction has an intended effect that is improper under the Bankruptcy Code,' credit is not being extended in good faith." (Comm. Obj. ¶ 29 (quoting In re EDC Holding Co., 676 F.2d 945, 948 (7th Cir. 1982).  Not only is this an inaccurate description of the "good faith" standard, but the Committee makes no effort to show that the loan agreement has an effect that is "improper under the Bankruptcy Code."  Instead the Committee merely reiterates that the DIP Financing includes "economically draconian and outcome determinative provisions [that] represent lender overreaching at its most egregious." (Committee Obj. ¶ 31.)  This is not a "good faith" argument, but rather, a rehashing of the Committee's argument that the terms of the DIP Financing are not fair and reasonable.

The Committee also states that good faith requires that the lender not enter into the transaction for an "ulterior purpose," a closer approximation to the standard.  (Id. at ¶ 29 (quoting In re EDC Holding Co., 676 F.2d at 949).)  The Committee argues that the DIP Lenders did not enter into the DIP Financing in good faith.  (Comm. Obj. ¶ 54 (arguing that the DIP Lenders are using the DIP Financing "to ensure what appear to be colorable claims . . . against them are not fully investigated and pursued").)  However, the Committee provides no evidence in support of this unfounded assertion.

4.    For these reasons, the Debtors have met the applicable standards and the Court should approve the DIP Financing.

## II.    The Objections Lack Merit

5.    As detailed on Exhibit A, the Debtors received 16 Objections to the Final Order.  Twelve individual creditors have objected on the grounds that the proposed DIP Financing primes certain alleged senior prepetition and postpetition liens.  The Debtors have resolved these Objections by the provisions of paragraph 10(c) of the Final Order, which state that any liens of the "DIP Agents shall be junior to any valid, perfected and unavoidable"

prepetition senior liens and paragraph 10(d) of the Final Order which addresses the treatment of postpetition liens as appropriate under applicable law. Each of these creditors has either consented to approval of the Final Order or the Final Order renders moot (or otherwise properly addresses) issues raised in their objections. Only four Objections remain otherwise unresolved: the objections of the Committee, BONY, LDTC and ABN, a DIP Lender. These Objections should be overruled for the reasons set forth herein.

A.    *The Committee's Objection.*

6.    The Committee's Objection boils down to three major issues: the terms of the DIP Financing are too favorable to the DIP Lenders; the Debtors provide too much adequate protection to the secured lenders; and the Roll-up Loan is improper. None of these arguments has merit.

   i.    *The DIP Financing Terms Are The Best (And Only) Terms Available.*

7.    The Committee objects on the grounds that certain terms of the DIP Financing are "egregious and unduly benefit the Debtors' DIP Lenders at the expense of unsecured creditors . . . ." (Comm. Obj. ¶ 28.) The Committee simply ignores that in the absence of this DIP Financing, the Debtors would be in a liquidation. While the ultimate recovery for unsecured creditors remains to be seen, clearly the unsecured creditors would receive nothing in a liquidation. Even the Committee's expert, Anders Maxwell, concedes that the DIP Financing is superior to a liquidation. (Maxwell Dep. Tr. 155:22-157:4.)

8.    The relevant standard is whether the terms are fair and reasonable, not whether they are optimal.[2]   Courts have held that unfavorable terms can still be fair and reasonable.   Commenting on this point, the court in In re Ellingsen MacLean Oil Co., noted that:

> Some of the terms of the bargain reached between debtor and creditor may reach beyond the usual terms of a loan agreement. However, such terms are perfectly normal considering the 'unusual' situation of a bankrupt firm.   In such situations the bankruptcy court would rightfully be more interested by the requirements and provisions of section 364 of the Code, than it would be by a picayune examination of every legal argument that could be brought against separate provisions of the proposed agreement.

65 B.R. 358, 365 (W.D. Mich. 1986), aff'd, 834 F.2d 599 (6th Cir. 1987).   See also, In re Farmland Indus., Inc., 294 B.R. at 885-86 ("Chapter 11 post-petition financing is fraught with danger for creditors, and debtors may have to enter into hard bargains to acquire . . . the funds needed for reorganization") (internal quotation and citation omitted).   Furthermore, "it is not impermissible for a bank to use its superior bargaining power to obtain creditor-favorable terms in a financing agreement."   Id. at 294 B.R. at 886 (citations omitted).   The Committee states that the Court should not "allow the Debtors to unfairly hand over all of their enterprise value and cede control to the Lenders." (Committee Obj. ¶ 27).[3]   The Debtors have not done so.

---

[2] See discussion supra at p. 7.

[3]   In support of this argument, the Debtors cite to outdated distinguishable cases (or cases that support the Debtors' arguments).   In In re Tenney Village, the Debtor would have granted the lender the right to, among other things, approve a new CEO and marketing firm, set prices for sales of condominiums, and remit all sales of condominiums to the lenders. 104 B.R. 562, 567 (Bankr. D.N.H. 1989).   In In re FCX, Inc., the Court approved the DIP Financing. 54 B.R. 833-34 (Bankr. E.D.N.C. 1985).   In In re Midstate Raceway, Inc., the Court approved the DIP Financing in part, while denying approval to the extent the DIP financing was a sub rosa plan of reorganization. 323 B.R. 40, 62 (Bankr. N.D.N.Y. 2005) (approving working capital loan, but holding that the "balance of the Gural Offer is deemed beyond the scope of" section 364 of the Bankruptcy Code "and therefore void" because "it is important that all interested parties be permitted to consider a disclosure statement and a plan as part of a formal confirmation process.").

9.      In this case, the Debtors and the DIP Lenders heavily negotiated the terms of the DIP Financing.  To the extent the DIP Financing terms benefit the DIP Lenders, this is the result of the DIP Lenders' "superior bargaining power" and does not require that the Court deny approval of the DIP Financing.  The DIP Financing meets the requirements of section 364 of the Bankruptcy Code, and that suffices.

10.     Moreover, the DIP Lenders here are also prepetition secured lenders, who already had a stake in the enterprise.  They entered into the DIP Financing not as an ordinary course lending transaction, but to protect their preexisting secured positions.  This is entirely appropriate.

11.     While the Committee asserts that certain of the DIP Financing terms are not fair and reasonable, the Committee fails to present any evidence in support of this conclusion.  In fact, the Committee's own expert, Mr. Maxwell, repeatedly stated that, in the course of his review of the DIP Financing terms, he had not conducted any specific analyses in support of the Committee's objections to the business terms.  (See Maxwell Dep. Tr., 147:4-148:8; 148:24-149:23; 150:9-23; 152:13-18; 153:14-24; 154:8-17).  Indeed, the Committee merely speculates as to how the proposed DIP Financing terms could be improved.  In particular,

- The Committee argues that the term of the DIP Financing is too short and the maturity date is "arbitrary and premature".  (Comm. Obj. ¶ 32-34.) However, as Mr. Bigman states in his supplemental declaration, the Debtors pushed as hard as possible for the latest possible maturity date. (Bigman Supp. Decl. ¶ 14.)  Mr. Bigman also states that the Debtors can effectively reorganize prior to the proposed maturity date.  (Id. at ¶ 15.) Mr. Celentano will likewise testify that he believes the Debtors can reorganize prior to the proposed maturity date.  (See Celentano Decl. ¶ 26.)  This is a reasonable proposition, as the Debtors' chapter 11 cases are primarily a financial, rather than business restructuring.  While the Debtors will use bankruptcy to optimize their operations by rejecting contracts and making other improvements, the Debtors will primarily use it to restructure their balance sheet.  Other courts have recently approved

DIP financings with similar maturity dates.[4] Moreover, the DIP Financing permits extension under certain circumstances and allows the Debtors to find replacement lenders if necessary to extend the financing, thus enabling the Debtors to potentially extend the term of the DIP Financing. (See Bigman Supp. Decl. ¶ 16).

▪ The Committee argues that the financial covenants are improper "tripwires" designed to prematurely terminate the bankruptcy. (Comm. Obj. ¶ 35.) However, Mr. Maxwell has not conducted any analysis to substantiate the Committee's assertion that the DIP Financing's financial covenants are "tripwires" for early events of default. (Maxwell Dep. Tr. 147:10-148:2. See also Celentano Decl. ¶¶ 14-17 (stating that financial covenants are typical in DIP financings).)

▪ The Committee argues that DIP Financing includes provisions that "may be subterfuge for installation of captive management" (Comm. Obj. ¶ 40.) As Mr. Bigman will testify, section 6.19 of the DIP Credit Agreement reasonably accommodates the needs of both the Debtors and the Lenders. (See Supplemental Declaration of Alan Bigman ("Bigman Supp. Decl."), dated February 22 2009, ¶ 19.)

▪ The Committee argues that the pricing of the DIP Financing is "prohibitively expensive and confiscatory." (Comm. Obj. ¶ 42.) However, Mr. Bigman will testify that these are the best terms available. (Bigman Supp. Decl. ¶ 10; see also, Celentano Decl. ¶ 13 (stating terms are the best available.)) Moreover, the Committee has put forth no evidence of better financing terms and has not worked to procure them. (See Maxwell Dep. Tr., 19:17-25:3.)

▪ The Committee argues that the Debtors have failed to "demonstrate that they have done everything possible to cut costs and minimize their borrowing needs." (Comm. Obj. ¶ 43.) However, in his deposition, Mr. Maxwell acknowledged that he had no proposals for how the Debtors could further reduce costs. For example, although Mr. Maxwell suggests the Debtors cut costs by temporarily closing or idling plants, he testified that he had no opinion as to which plants should be closed, and that he had

---

[4] See, e.g., In re Aleris Int'l, Inc., et al., Case No. 09-10478 (BLS) (Bankr. D. Del. Feb. 13, 2009) [Docket No. 46] (interim order authorizing debtors to obtain postpetition financing with a one year maturity as set forth on page 24 of the credit agreement attached thereto as Exhibit B-1); In re LandSource Communities Development LLC, et al., Case No. 08-11111 (KJC) (Bankr. D. Del. July 19, 2008) [Docket No. 306] (final order authorizing debtors to obtain postpetition financing with a one year maturity as set forth on page 16 of the credit agreement attached to the corresponding motion as Exhibit A (and attached to the order for the Court's convenience)); In re VeraSun Energy Corp., et al., Case No. 08-12606 (BLS) (Bankr. D. Del. Dec. 4, 2008) [Docket No. 305] (final order authorizing debtors to obtain postpetition financing with a one year maturity as set forth on page 15 of the credit agreement attached thereto as Exhibit A) (each attached in Appendix). See also In re FCX, Inc., 54 B.R. 833, 837, 843-44 (Bankr. E.D.N.C. 1985) (approving DIP financing with 60-day term).

not conducted any analysis into the costs associated with plant closures. Indeed, Mr. Maxwell admitted that he had no knowledge of the costs associated with closing the plants. (See Maxwell Dep. Tr. 131:2-132:15). As Mr. Bigman states in his supplemental declaration, the Committee's assertion is flawed for multiple reasons, including the fact that while idling plants should result in long term cost savings for the Debtors, in the short term, doing so will result in increased expenses. (Bigman Supp. Decl. ¶ 13.)

12.     In light of these facts, each of the terms challenged by the Committee is fair and reasonable. Moreover, these are the best (and only) terms available to the Debtors. Accordingly, the Court should overrule the Committee's objections to the DIP Financing terms.

13.     The Debtors' management and board – with the advice of its outside professionals – carefully considered the benefits of entering into the DIP Financing. As such, the DIP Financing reflects the Debtors' considered business judgment. The Committee's wish list for different terms cannot supplant that exercise of business judgment, and the fact that there may be certain terms in the DIP Financing that the Debtors wish were otherwise is of no moment. Farmland, 294 B.R. at 882 ("the Debtors' officers believed that the prudent decision was to negotiate changes to the DIP Credit Agreement, even if it meant being saddled with some things they would not like.") As the court held in Farmland:

> Under the "business judgment" rule, the management of a corporation's affairs is placed in the hands of its board of directors and officers, and the Court should interfere with their decisions only if it is made clear that those decisions are, inter alia, clearly erroneous, made arbitrarily, are in breach of the officers' and directors' fiduciary duty to the corporation, are made on the basis of inadequate information or study, are made in bad faith, or are in violation of the Bankruptcy Code.

Id. at 881 (citations omitted).

14.    <u>Farmland</u> is also highly instructive here with respect to the Committee's objections to the maturity date and milestones in the DIP Financing.   There, the court observed that creditor's committee's arguments:

> seem to suggest that, because the DIP Lenders are so far oversecured, they are not entitled to insist on a specific plan for the sale of assets, to insist on deadlines or timelines for the sale of assets, or to insist that their very substantial loans be paid down on a tightly circumscribed schedule . . . [under the relevant circumstances] it was not unfair or unreasonable for the DIP Lenders to insist on the protections in the First Amendment, regardless of how much oversecured they were.

294 B.R. at 887.   This analysis is directly applicable here given the factual record.   Accordingly, the Court should overrule the Committee's objections to the DIP Financing terms.

ii.    *The Committee Misstates And Misunderstands The Law Of Adequate Protection.*

15.    The Committee argues that when a "creditor is oversecured, courts commonly hold that the creditor's equity cushion alone provides adequate protection – thereby obviating the need for periodic payments to the secured creditor." (Comm. Obj., ¶47.)   This argument mischaracterizes the law.   The Bankruptcy Code does not prohibit additional adequate protection in cases where a creditor is oversecured.   Moreover, the Committee cites no case that prohibits an oversecured creditor from receiving additional adequate protection.

16.    The Committee cites one case stating that "[o]versecured creditors <u>may</u> not be entitled to cash payments or postepetition liens because they are adequately protected though the existence of a value cushion."   (Committee Obj. ¶ 48 (<u>quoting</u> <u>In re Gallegos Research Group, Corp.</u>, 193 B.R. 577, 584 (Bankr. D. Colo. 1995) (emphasis added).)   This statement is unexceptional.   The court does not say that an oversecured creditor cannot receive

cash payments.  In <u>Gallegos</u>, the court refused to approve adequate protection in the form of a postpetition lien to a creditor that was undersecured.  <u>Id.</u> at 193 B.R. 585-86.[5]  By contrast, in the instant case it is undisputed that the secured creditors are oversecured.

17.    The Committee also ignores the relevant facts of this case.  In asserting that the Debtors have underestimated the equity cushion, the Committee claims it cannot understand how the Debtors' value could have declined from $29-33 billion one year ago to between $17.6 and $20.8 billion today (Comm. Obj. ¶ 50).  This view ignores current market conditions.  (<u>See</u>, Supplemental Declaration of Robert Bartell, dated February 22, 2009, ¶¶ 4-14 (responding to Mr. Maxwell's criticism's of valuation.  <u>See also</u>, Analysis of Equity Cushion, attached as Exhibit J to Declaration of Howard R. Hawkins, Jr., dated February 22, 2009)).

18.    Finally, and most importantly, had the Debtors not provided additional adequate protection, the DIP Lenders would not have extended the DIP Financing.

---

[5] The other cases cited also do not support the Committee's argument and in some cases, support the Debtors' arguments.  <u>See</u> <u>In re Shaw Indus., Inc</u>, 300 B.R. 861, 865 (Bankr W.D. Pa. 2003) (concluding that "[w]here an equity cushion is insufficient in size or likely to erode, it cannot, standing alone, constitute adequate protection"); <u>In re Donato</u>, 170 B.R. 247, 254-55 (Bankr. D.N.J. 1994) (holding that Debtor showed creditor was adequately protected before permitting Debtor to use property); <u>In re Sharon Steel Corp.</u>, 159 B.R. 165, 169 (Bankr. W.D. Pa. 1993) (stating that "existence of equity cushion alone <u>may</u> constitute adequate protection") (emphasis added); <u>In re Continental Airlines, Inc.</u>, 146 B.R. 536, 539 (Bankr. D. Del. 1992) (ruling on the proper timing and need for adequate protection); <u>In re Tucker</u>, 5 B.R. 180, 182 (Bankr. S.D.N.Y. 1980) (allowing foreclosure where the equity cushion was insufficient and no other forms of adequate protection were provided); <u>In re Reading Tube Indus.</u>, 72 B.R. 329, 333 (Bankr. E.D. Pa. 1987) (finding that debtor "<u>may</u> demonstrate adequate protection" through an equity cushion) (emphasis added); <u>In re Automatic Voting Machine Corp.</u>, 26 B.R. 970, 972 (Bankr. W.D.N.Y. 1983) (noting that an equity cushion was merely one basis for finding adequate protection); <u>In re Elmira Litho, Inc.</u>, 174 B.R. 892, 904 (Bankr. S.D.N.Y. 1994) (finding that although an equity cushion may provide adequate protection, the existence of absence of equity is not the sole consideration in an adequate protection analysis); <u>In re Dunes Casino Hotel</u>, 69 B.R. 784, 793-95 (Bankr. D.N.J. 1986) (citing caselaw for the point that no one form of adequate protection is determinative, and "the debtor should be permitted maximum flexibility in structuring a proposal for adequate protection").  The Debtors do not dispute that the equity cushion <u>may</u> provide sufficient adequate protection, they merely assert it does not do so in this case.

Accordingly, the proposed adequate protection is permissible under section 361 and 364 of the Bankruptcy Code.

  ▪    *The payment of postpetition interest is appropriate.*

19.    The Committee further argues that the Debtors cannot pay postpetition interest "in order to preserve the value of" the equity cushion.  (Comm. Obj., ¶ 48.)  This argument makes no sense.  The Committee acknowledges that the prepetition secured lenders are oversecured (Comm. Obj. ¶¶ 49-50), and section 506(b) of the Bankruptcy Code expressly permits the payment of postpetition interest to an oversecured creditor.  It is difficult to square this plain statement of law with the Committee's assertion.

20.    Furthermore, section 361(1) of the Bankruptcy Code expressly permits cash payments as a form of adequate protection.   The proposed interest payments are subject to a liquidity "test" which ensures that the Debtors will make no interest payments in months where it does not have significant excess liquidity beyond its operating needs.  (See Celentano Decl. ¶¶ 20-21.)  While the Debtors do not dispute that adequate protection is not paid to preserve the extent of the equity cushion, the adequate protection in this case does not serve that purpose. Accordingly, the Court should permit the payment of interest.

  ▪    *The Noteholders are entitled to new liens.*

21.    The Committee also argues that the Noteholders are not entitled to receive new liens as adequate protection, citing again to the sufficiency of the equity cushion.  (Comm. Obj. ¶¶ 67-69.)  The Committee states that the Bankruptcy Code does not permit a debtor to "grant a secured lender an adequate protection lien against the assets of a debtor entity if the secured lender did not possess any security interest in the property of such debtor entity prepetition."  (Comm. Obj. ¶ 68.)

22.     This is a complete misreading of the Bankruptcy Code.  Section 361(2) of the Bankruptcy Code expressly permits the provision of adequate protection by providing a creditor with "an additional or replacement lien."  In this case, the Debtors have provided the Noteholders with "additional" liens of the nature contemplated by the Bankruptcy Code.  These new liens are a permitted form of adequate protection expressly authorized by section 361(2) of the Bankruptcy Code and should be permitted.

### iii.     The Roll-up Loan Is Permissible.

23.     The Committee argues that the Roll-up Loan is not properly structured.  (Comm. Obj. ¶¶ 65-66.)[6]  The Committee cites to a handful of cases from outside this jurisdiction to support the notion that the Roll-up Loan "circumvents the Bankruptcy Code's priorities and distribution framework."  (Id. ¶ 65.)  However, as the Debtors stated in the Motion, "a roll-up should not be 'controversial from the technical perspective of the priority or satisfaction of liens if the prepetition lender is fully secured on the Petition Date . . . .'"  (Motion ¶ 52 (quoting 3 Collier on Bankruptcy ¶ 364.04[2][e] (15th ed. rev. 2008)).)  As just discussed above, the Committee clearly concedes that the Senior Secured Lenders are oversecured.  Moreover, as previously stated by Mr. Bigman, the Debtors "were not able to obtain anything approaching the needed $3.25 billion provided under the NM Commitments until the Roll-Up Loan concept was included in negotiations."  (Bigman Decl. ¶ 15.)  Accordingly, the Court should permit the Roll-up Loan.

### B.     BONY's Objection.

24.     The Bank of New York Mellon is indenture trustee under the indenture dated June 15, 1988, between Lyondell Chemical Company (formerly Arco Chemical Company,

---

[6] BONY's objection to the roll-up is detailed at ¶ 29 below.

"LCC"), as issuer, and The Bank of New York Mellon, as indenture trustee, with respect to 10.25% Debentures due 2010 and 9.8% Debentures due 2020 (the "Arco Notes"). As of the Petition Date, the Arco Notes had an aggregate face value of $325,000,000. The Bank of New York Mellon Trust Company, N.A., is indenture trustee under the Equistar Indenture dated as of January 29, 1996, as supplemented on February 15, 1996, December 1, 1997, November 3, 2000, and November 17, 2000 between Equistar Chemicals L.P. ("Equistar"), as issuer, and The Bank of New York Mellon Trust Company, N.A., as successor indenture trustee, with respect to 7.55% Debentures due 2026 (the "Equistar Notes"). As of the Petition Date the Equistar Notes had an aggregate face value of $150,000,000.

25. Both the Equistar Notes and the Arco Notes were unsecured, but the relevant indentures contain equal and ratable clauses to protect the Noteholders against dilution of their interests. Pursuant to the December 2007 acquisition of LCC and its subsidiaries by the entity now known as LyondellBasell Industries AF S.C.A., LCC and Equistar, among others, became guarantors of certain secured credit obligations. As a result, The Bank of New York Mellon, as indenture trustee for the Arco Notes, was granted a security interest in the Arco Collateral, and The Bank of New York Mellon Trust Company, N.A., was granted a security interest in the Equistar Collateral.

26. BONY raises a host of objections on behalf of the Noteholders. BONY generally argues that: the Noteholders are entitled to the same adequate protection as other prepetition lenders; the DIP Financing amounts to a de facto substantive consolidation; and the DIP Financing improperly waives the Noteholders' alleged marshaling defense. The Court should also overrule BONY's objections.

i. *The Noteholders Are Not Entitled To Be Treated The Same As The Prepetition Secured Lenders.*

27.      In addition to the equity cushion and additional liens described in the Final DIP Order, BONY seeks additional protection, including, <u>inter alia</u>:

- payment of past due interest to the Noteholders;

- no limitation on payment of BONY's fees and expenses for lien investigation;

- no forced waiver by the Noteholders of their rights to marshaling;

- participation in the proposed Roll-up Loan; and

- monitoring of collateral.

(BONY Obj. ¶ 13.)  In sum, BONY wants to be treated the same as the other prepetition secured lenders.  BONY is not entitled to any of this additional protection.

28.      The key consideration for adequate protection is whether it "'will result in the realization by the protected entity of the value of its interest in the property involved.'"  <u>In re 495 Cent. Park Ave. Corp.</u>, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (<u>quoting</u> H.R. No. 95-595, 95th Cong., 1st Sess. 1978, <u>reprinted in</u> 1978 U.S.C.C.A.N. 5787, 6296).  In this case, not only are the Noteholders receiving the same level of protection as they had prior to the Petition Date, the Final Order provides the Noteholders with a significantly expanded collateral package. (Final Order ¶¶ 17, 19; <u>see also</u> Bigman Supp. Decl. ¶ 21 (stating that "the Debtors have substantially expanded the collateral available to satisfy the noteholders' claims to the extent the noteholders' original collateral loses value as a result of being primed by the DIP Facility").)  These new liens, along with the equity cushion, suffice to protect the Noteholders from any diminution in the value of their collateral and no additional protection is required.  (Motion ¶ 47.)

29.    In support of its request for additional protection, BONY states that the "fundamental guiding principal embodied in the Bankruptcy Code is that similarly situated creditors should be treated similarly." (BONY Obj. ¶ 30.) BONY asserts that this "equal treatment" concept must be read into section 364(d) and thus "protection cannot be considered 'adequate' where [lenders] whose prepetition liens are equal and ratable . . . receive" different protection. (BONY Obj. ¶ 32.) BONY proposes a radical rewriting of the Bankruptcy Code. Neither section 364(d) nor section 361 of the Bankruptcy Code require that protection be the same for similarly situated creditors (much less differently situated creditors). The cases on which BONY relies require equal treatment of creditors in the context of avoidance actions and plan voting, not adequate protection.[7]

30.    As noted by one court:

> [A]dequate protection depends on the interest and property involved. Protection afforded a lessor, for example, may be different from that afforded a secured creditor. Treatment of a secured creditor who faces turnover may be different from treatment of a secured creditor who has not repossessed. Treatment of a senior lienholder may be different from treatment of a junior lienholder.

Bankers Life Ins. Co. of Neb. v. Alyucan Interstate Corp. (In re Alyucan Interstate Corp.), 12 B.R. 803, 806-07 (Bankr. D. Utah 1981) (addressing adequate protection in the context of a lift stay motion). In this case, as detailed above, each group of creditors receives a different adequate protection package, which appropriately reflects the fact that each group of creditors

---

[7] In support of its argument, BONY cites to: Begier v. IRS, 496 U.S. 53, 58 (1990) (noting that preferential transfers may be recovered to ensure equal distribution of a debtor's property); Am. United Mut. Life Ins. Co. v. Avon Park, 311 U.S. 138, 147 (1940) (addressing creditor votes on a plan of reorganization and commenting that the policy of equal treatment of creditors is embedded in the express provision against unfair discrimination); Lyon v. Contech Constr. Prods., Inc. (In re Computrex, Inc.), 403 F.3d 807, 809 (6th Cir. 2005) (pointing out that one goal of preference recovery is equality of distribution); Liona Corp., v. PCH Assocs. (In re PCH Assocs.), 949 F.2d 585, 598 (2d Cir. 1991) (considering whether an economic relationship was a true lease or a financing agreement, for purposes of section 365 of the Bankruptcy Code).

had different prepetition collateral packages.   Accordingly, the Court should overrule this objection.

> ■    *The Debtors need not permit all parties to participate in the Roll-up Loan.*

31.    BONY also objects that the Noteholders, unlike the other prepetition secured lenders, were not afforded an opportunity to participate in the Roll-up Loan. (BONY Obj. ¶¶ 46-48).   BONY argues that the Roll-up Loan constitutes adequate protection and thus the Noteholders should be entitled to participate "irrespective of their participation in the DIP Financing." (BONY Obj. ¶ 46.)   BONY's factual predicate is wrong.   The Roll-Up Loan is lending.   Moreover, the objection has no legal basis and the Debtors have no obligation to permit the Noteholders (or anyone) to participate in the Roll-up Loam or any aspect of the DIP Financing.

32.    The Roll-up Loan is not adequate protection.   As noted above, Mr. Bigman has testified that without the Roll-up Loan, the Debtors would not have secured the necessary financing.   (Bigman Decl. ¶ 15.)   The Roll-up Loan is DIP lending and the Debtors need not permit any specific party to participate in the any aspect of the lending.   The Bankruptcy Code "does not require the debtor to seek alternate financing from every possible lender." In re 495 Cent. Park Ave. Corp., 136 B.R. at 630.   This is true especially when time is of the essence. In re Reading Tube Indus., 72 B.R. at 332.   Rather, it is sufficient for a debtor to demonstrate that it made a good faith effort to seek credit from other sources without providing super-priority status or priming liens. See Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); In re Utah 7000, L.L.C., No. 08-21869, 2008 WL 2654919, at *2 (Bankr. D. Utah July 3, 2008).

33.    In this case, the Debtors, with their advisors, evaluated all options for obtaining the necessary financing, including approaching a number of financial institutions and other sources to provide the financing, with logical focus on the Debtors' largest prepetition secured lenders and the Debtors' equity sponsor. (Bigman Decl. ¶ 10.)  After considering all of their options, the Debtors, with guidance from their professional advisors, chose the proposed DIP Financing, including the modified Roll-up Loan.  The Noteholders did not participate in the DIP Financing, and the Debtors need not permit the Noteholders to participate in the Roll-up Loan.

34.    Even if the Roll-up Loan could be construed as adequate protection, as discussed above, different creditors need not receive the same adequate protection.  Accordingly, the Noteholders have no right to participate in the Roll-up Loan.

ii.    *The DIP Financing Does Not Amount To De Facto Substantive Consolidation And LCC and Equistar Need The DIP Financing.*

35.    BONY argues that the DIP Financing "effects a de facto substantive consolidation" because each Debtor would be jointly and severally liable for the borrowings of the other Debtors, regardless of whether the Debtors receive any benefit under the Loan. (BONY Obj. ¶ 15.)[8]  BONY states that this is particularly impermissible where "the [Noteholders] held debt of LCC and Equistar, respectively, long before their incorporation into the Lyondell/Basell conglomerate and before" the  advent of the prepetition first lien secured facility.  (Id.)  BONY misunderstands the law and applicable facts.

36.    Substantive consolidation is the "'pooling the assets of, and claims against, [ ] two entities; satisfying liabilities from the resultant common fund; eliminating inter-

---

[8] Similarly, the Committee argues that "aggregating the assets of technically distinct entities into one collateral pool" is "tantamount to a ruling in favor of substantive consolidation" without the necessary showing therefor."  (Comm. Obj. ¶ 66.)

company claims; and combining the creditors of the two companies for purposes of voting on reorganization plans.'" In re Adelphia Commc'ns Corp., 544 F.3d 420, 426 n.4 (2d Cir. 2008) (quoting In re Augie/Restivo Baking Co., 860 F.2d 515, 518 (2d Cir. 1988)).  This result cannot be effected by a DIP financing.

37.    In Bergemann v. Babcock & Wilcox Co. (In re Babcock & Wilcox Co.), 250 F.3d 955 (5th Cir. 2001), the court considered facts similar to the instant case.  The proposed DIP financing in Bergemann granted the lender a security interest in the assets of all debtors.  Id. at 957.  The court found that the pooling of the debtors' assets to secure the DIP financing did not constitute de facto substantive consolidation.  Id. at 958-59.  The key consideration was that the DIP financing did "not combine the assets or liabilities of the debtors and does not establish a common pool of funds to pay claims."  Id. at 959.    In this case, as in Bergemann, the DIP Financing does not pool the Debtors' assets or claims, or otherwise mix separate Debtors' estates.  The Debtors consist of distinct corporate entities within a single business enterprise.  Accordingly, the substantive consolidation arguments of the Committee and BONY lack legal support.

38.    BONY further argues that the Debtors have not made any "showing as to the benefits accorded to each of the Debtors" by the DIP Financing. (BONY Obj., ¶ 18).  However, as detailed in the declaration of Alan Bigman, LCC and Equistar each have substantial unmet cash needs and thus receive significant benefit from borrowings under the DIP Financing.  (Bigman Supp. Decl. ¶ 22.)[9]  These entities also benefitted substantially from the Debtors' repayment under of their prepetition asset-based lending facility, which was accomplished using

---

[9] BONY asserts it has not received cash flow forecasts detailing this need.  (BONY Obj. ¶¶ 20, 35.)  This is false.  The Debtors provided counsel for BONY with updated 13-week cash flows, on an entity by entity basis, on February 9, 2009.  (See Exhibit 1 to Bigman Supp. Decl.) (filed under deal with the Court [Docket No. ___].)

proceeds under the DIP Term Loan. And, like all of the Debtors, LCC and Equistar benefit from borrowings that permit them to obtain necessary liquidity and flexibility to deal with unanticipated events, as this DIP Facility does.  Given that LCC and Equistar are among the Debtors' largest operating entities, the notion that they do not benefit from the DIP Financing is patently absurd.  The DIP Financing is critical to the Debtors' survival, and supports the business enterprise value of all the Debtors. Indeed, the Debtors' entities operate as an integrated whole and the DIP Financing will benefit all of the Debtors entities. (Bigman Supp. Decl. ¶ 26.). Moreover, for this reason, the Debtors would not have been able to secure the DIP Financing without the collateral found in LCC and Equistar. None of these factual points are disputed by <u>BONY</u>.

39.    Finally, <u>BONY</u> argues that the DIP Financing should permit LCC and Equistar to seek separate financing if available, to maintain their separate corporate identities. (<u>BONY</u> Obj., ¶ 21).  However, BONY has presented no evidence that such financing is available – the Debtors believe it is not.

> ### *iii.    BONY's Marshaling Argument Ignores The Terms Of The DIP Financing.*

40.    BONY also argues that the elimination of the DIP Lenders' obligation to marshal renders their secured claims "effectively valueless."  (BONY Obj. at ¶ 9.)  This argument ignores the terms of the DIP Financing.

41.    Marshaling is the doctrine whereby a creditor claiming a lien against two or more funds of the debtor, one of which is also subject to a junior creditor, will be required to exact satisfaction from the fund not subject to the junior creditor.  <u>In re Tampa Chain Co.</u>, 53 B.R. 772, 777 (Bankr. S.D.N.Y. 1985).

42.    BONY argues that without the protections marshaling allegedly provides to the Noteholders, the DIP Lenders could exhaust the proceeds of the Arco and Equistar

collateral before the Noteholders receive any distribution.  (BONY Obj. ¶¶ 25, 27.)   This argument makes no sense given that the Noteholders' have received liens in all of the Debtors' assets.  Even if the Debtors first "drew" on the Arco and Equistar collateral, the Noteholders are sufficiently oversecured that they would be paid in full.  The equity cushion and other adequate protection ensure this.

C.    *LDTC's Objection.*

43.    Law Debenture Trust Co. ("LDTC") is successor indenture trustee to the Bank of New York with respect to $250,000,000 in 7 5/8% senior unsecured debentures due November 25, 2026 (the "Millennium Notes") issued by Millennium America and guaranteed by Millennium Chemicals.

44.    LDTC argues that because Millennium America will incur significant debt obligations as a result of the DIP Financing, the unsecured Millennium Noteholders should be entitled to the benefit of an equal and ratable clause in the Millennium Indenture.  (LDTC Obj. ¶¶ 8-14.)  This argument lacks merit.  An equal and ratable clause is a form of negative pledge, and as such does not give rise to a postpetition claim.  In re Allegheny International, Inc., 93 B.R. 907, 909 (Bankr. W.D. Pa. 1988).

45.    In In re Allegheny International, Inc., as in this case, the debtor had issued a number of unsecured prepetition notes containing equal and ratable clauses.  Id.  When the debtor granted security interests and super-priority security interests to its postpetition lenders, the indenture trustees asked for equal and ratable treatment as a form of adequate protection.  Id.  The court refused to enforce the provisions in the relevant indentures, concluding that, "at best [the trustees had] unperfected security interests" and were barred from perfecting those security interests by the automatic stay.  Id.  Accordingly, the debtor in possession could avoid those interests.  Id.

46.     In this case, the Millennium Noteholders' negative pledge is similarly unenforceable.  The Noteholders are not secured and thus not entitled to the benefit of any pledge of this nature.  Accordingly, the Court should overrule their objection.[10]

D.     ABN's Objection.

47.     ABN, one of the DIP Lenders, filed an objection on February 23, 2009, objecting to the Roll-up Loan with respect to the prepetition term loan lenders.  (ABN Obj. ¶¶ 5-11.  Of the fourteen DIP Lenders, only ABN considers the provisions concerning the Roll-up Loan to be unsatisfactory.  Not only does this undermine completely ABN's assertions on what is entirely an intercreditor issue, but the objection does not even purport to raise an issue under section 364 of the Code.  Accordingly, the ABN Objection does not address the single legal issue before the Court — whether the DIP Financing meets the criteria of the Bankruptcy Code, particularly section 364.  In addition, the Debtors understand that the remaining DIP Lenders will absorb ABN AMRO's share of the Term Loan.  (See Supplemental Declaration of John C. Duggan, February 24, 2009, ¶ 11  (attached as Exhibit C).)  Thus, there is no impact on the Debtors, and no issue for the Court to decide.[11]

**Notice**

48.     Notice of this Motion has been given to all parties included on the Master Service List, as defined in the Order Establishing Notice Procedures and A Master Service List

---

[10] LDTC states that the Debtors "reaffirmed their commitment to the Millennium Noteholders" on January 15, 2009.  (LDTC Obj. ¶ 5.).  LDTC has provided no evidence in support of this.  In any event, such agreement would require Court approval under section 363 of the Bankruptcy Code and any effort to obtain reaffirmation would violate the automatic stay under section 362 of the Bankruptcy Code.

[11] However, to the extent a funding shortfall exists, ABN AMRO remains legally obligated to fund pursuant to both the Term Sheet and ABN Amro's representations to the Court at the First-Day Hearing.  The Debtors will enforce those obligations against ABN AMRO, should it become necessary.

[Docket No. 56], entered on January 7, 2009.  In light of the relief requested, the Debtors submit that no other or further notice need be provided.

WHEREFORE, the Debtors respectfully request that the Court enter an order, granting the relief requested herein and such other and further relief as may be just and proper.

Dated: New York, New York
February 24, 2009

CADWALADER, WICKERSHAM & TAFT LLP

*/s/ George A. Davis*
Deryck A. Palmer, Esq.
John J. Rapisardi, Esq.
George A. Davis, Esq.
Andrew M. Troop, Esq.
One World Financial Center
New York, New York  10281
Telephone:  (212) 504-6000
Facsimile:  (212) 504-6666
deryck.palmer@cwt.com
john.rapisardi@cwt.com
george.davis@cwt.com
andrew.troop@cwt.com

and

Mark C. Ellenberg, Esq.
1201 F Street NW
Washington, D.C. 20004
Telephone:  (202) 862-2200
Facsimile:  (202) 862-2400
mark.ellenberg@cwt.com

Proposed Attorneys for Lyondell Chemical Company, et al.

EXHIBIT A

# EXHIBIT A

## Objections to the Motion

| OBJECTING PARTY | NO. | OBJECTION | DEBTORS' RESPONSE/RESOLUTION |
|---|---|---|---|
| Altech Inspections, Inc. ("Altech") | 469 | Altech objects to the Motion to the extent that the Debtors seek to grant the DIP Lenders senior liens that would prime certain valid and perfected mechanic's, contractor's or materialmen's liens on real and personal property without providing adequate protection pursuant to section 361 of the Bankruptcy Code.  (¶¶ 10-13.)  These liens were allegedly made against Houston Refining LP in connection with worked performed at 12000 Lawndale, Houston, Texas.  (¶ 2.) | Paragraph 10(c) of the Final Order moots Altech's Objection.  The Debtors believe Altech will consent to the Final Order. |
| J.V. Industrials, Ltd. ("J.V. Industrials") | 470 | J.V. Industrials objects to the Motion to the extent that the Debtors would grant the DIP Lenders senior liens priming certain valid and perfected mechanic's, contractor's or materialmen's liens on real and personal property, without providing adequate protection pursuant to section 361 of the Bankruptcy Code.  (¶¶ 14-16.)  These liens were allegedly made against Equistar Chemical, Houston Refining LP and Lyondell Chemical Company in connection with worked performed in 2008 at various locations in Texas.  (¶ 2.) | Paragraph 10(c) of the Final Order moots J.V. Industrials' objection.  The Debtors believe J.V. Industrials will consent to the Final Order. |
| Shaw Group, Inc., Shaw Maintenance, Inc., and affiliates (collectively, "Shaw Group") | 482 | Shaw Group objects to the Motion to the extent that the Debtors would prime certain valid mechanic's, materialmen's constitutional or other liens in and to real and personal property of the Debtors, in connection with work performed at the Debtors' plants in various states, including Texas and Louisiana, absent the Debtors providing adequate protection to the Shaw Group as the holder of these liens.  (¶¶ 3-5.) | Paragraph 10(c) of the Final Order moots Shaw Group's Objection.  The Debtors believe Shaw Group will consent to the Final Order. |

| City of Mansfield, Dallas County, Galveston County, Harris County, Houston Independent School District, Liberty County, Matagorda County, Neuces County, Polk County, Refugio County and San Patricio County, Ad Valorem Tax Jurisdictions in the State of Texas (collectively, the "Taxing Authorities") | 490 | The Taxing Authorities assert secured tax claims for the 2008 tax year on real and personal property owned by the Debtors. Paragraphs 10(b) and 16(a) of the Interim Order exempted the ad valorem tax liens of these claimants from being primed by the liens of the DIP Lenders. (¶¶ II, IV.) In an abundance of caution, the claimants filed a joint limited conditional objection to ensure that this exemption is included in the Final Order to the Motion. (¶ V.) | The Taxing Authorities' objection is mooted by the Final Order. The Debtors believe the Taxing Authorities will consent to the Final Order. |
| Oiltanking Houston, L.P. | 514 | Oiltanking Houston, L.P. objects to the Motion to the extent that the Motion permits the Debtors to provide priming liens to the DIP Lenders with respect to property that is already subject to Oiltanking Houston, L.P.'s security interests. (¶¶ 7.) Oiltanking Houston, L.P. asserts security interests in products owned by Houston Refining L.P. and Equistar Chemicals, L.P. pursuant to storage agreements between the parties, and asserts that such security interests may not be primed unless Oiltanking Houston, L.P. is given adequate protection. (¶¶ 4, 8.) | The parties are working to resolve this objection prior to the hearing. To the extent not resolved, the objection is addressed by ¶ 10(c) of the Final Order. |
| Galena Park Indep. School District, Spring | 538 | The School Districts assert secured tax claims on real and personal property owned by the Debtors. (¶ 1.) Paragraph 16(a) of the Interim Order to the Motion exempted the ad | The School Districts' Objection is mooted by the Final Order. The Debtors believe the School Districts will consent to the Final Order. |

| | | | |
|---|---|---|---|
| Branch Indep. School District, Sheldon Indep. School District, La Porte Indep. School District, City of La Porte, Clear Creek Indep. School District, Alief Indep. School District, Channelview Indep. School District, Crosby Indep. School District, Spring Indep. School District, Chambers County, Barbers Hill Indep. School District, Brazoria County, Liberty Indep. School District, Woodlands Metro MUD, Woodlands RUD #2, Ad Valorem Tax Jurisdictions in the State of Texas (collectively, the "School Districts") | | valorem tax liens of these claimants from being primed by the liens of the DIP Lenders. (¶ 4.) However, the DIP Motion does not expressly state that these exceptions from priming will be included in the Final Order; therefore, the claimants file a joint limited conditional objection to ensure that this exemption is included in the Final Order to the Motion. (¶ 5.)

The School Districts subsequently suggested by phone call that they also will object to the extent the DIP Financing primes their postpetition statutory lien. | To the extent the School Districts raise this objection, this issue is addressed properly by paragraph 10(d) of the Final Order. |
| Elgin, Joliet and Eastern Railway Company | 556 | EJ&E objects to the DIP Motion to the extent that the Debtors seek to prime EJ&E's alleged liens without providing adequate protection. (¶¶ 38-40.) EJ&E argues that | The parties are working to resolve this objection prior to the hearing. To the extent not resolved, the EJ&E objection is addressed by ¶ 10(d) of the Final Order. |

| | | | |
|---|---|---|---|
| ("EJ&E") | | in the absence of adequate protection or the recognition of first priority of EJ&E's post-petition liens that automatically arise when goods are transported, neither the Debtors nor EJ&E can continue to engage in transactions for the transportation and storage of the Debtors' goods. (¶¶ 25-28.) EJ&E is an alleged common carrier and warehouseman for Equistar Chemicals, LP, and asserts first priority statutory liens that arise automatically when EJ&E accepts goods for transportation and services. (¶¶ 1, 3.) | |
| GIM Channelview Cogeneration, LLC and GIM Retail Energy, LLC (collectively, "GIM") | 563 | GIM objects to the DIP Motion on the grounds that the Debtors seek to grant the DIP Lenders a first priority lien in the Facility operated by GIM, which would be in breach of the parties' lease agreement. (¶ 19.) GIM also objects to the DIP Motion to the extent that the Debtors seek to alter the supply agreements by granting the DIP Lenders a priming or equal lien in GIM's netting rights. (¶¶24-25.) GIM and Equistar are parties to (i) certain supply agreements, whereby Equistar contracts to purchase all of its steam and electricity needs at a fixed price; and (ii) a certain lease agreement, whereby GIM leases from Equistar the land upon which the Facility is located. (¶¶ 7-8.) GIM operates a cogeneration facility in Channelview Texas and supplies all of the steam and electricity required for the petrochemical plant next to the facility operated by Equistar Chemicals, L.P. | The parties are working to resolve this objection prior to the hearing.<br><br>Paragraph 10(c) of the Final Order moots the first portion of GIM's objection.<br><br>The lenders will address the remainder of GIM's argument. |
| Veolia ES Industrial Services, Inc. ("VES-IS") | 634 | VES-IS objects to the DIP Motion insofar as it seeks to prime any statutory mechanic's liens VES-IS might have without providing adequate protection. (¶ 10.) If the final DIP order includes language protecting VES-IS's rights, VES-IS does not otherwise object. Pursuant to a Field Services Contract, VES-IS services Lyondell-Citgo Refining's capital machinery and equipment in the state of Texas. (¶ 2.) VES-IS claims it is entitled to mechanic's liens for its services pursuant to Chapter 53 of the Texas Property Code, which provides such liens to certain construction service providers. | Paragraph 10(c) of the Final Order moots VES-IS' Objection. The Debtors believe VES-IS will consent to the Final Order. |

| | | (¶¶ 5-9.) | |
|---|---|---|---|
| Greif, Inc. ("Greif") | 819 | Greif has certain executory contracts with the Debtors pursuant to which it asserts various warehousemen's and artisans liens.  Greif asserts the Debtors have not provided them with adequate protection necessary to justify a priming lien, and point out a discrepancy between the Term Sheet and the Order (which does not authorize the priming lien), and asks that such lien be eliminated from the Term Sheet. (¶¶ 4-6.) | Paragraph 10(c) of the Final Order moots Greif's Objection.  The Debtors believe Greif will consent to the Final Order.<br><br>Additionally, the discrepancy between the Term Sheet and the Order has been corrected so that both provide for priming liens. |
| Law Debenture Trust Company of New York ("LDTC") | 858 | LDTC objects to the Motion on behalf of the holders of over $241 million in unsecured notes issued by Millennium America, Inc. ("Millennium").   The Millennium Indenture contains a standard "equal and ratable" clause, pursuant to which Millennium promises to either limit its secured debt to 15% of tangible assets or to provide the Millennium noteholders with *pari passu* treatment with any additional secured debt they issue.  (¶¶ 4, 8.) LDTC claims that on January 15, 2009, Millennium reaffirmed its covenants and obligations under the Indenture. (¶ 5.) LDTC claims the DIP Financing improperly ignores the "equal and ratable" restriction and grants the DIP Lenders numerous priority liens on Millennium assets. (¶¶ 9-11.) The Senior Secured Credit Facility and the Bridge Facility were made subject to the restrictions in the Millennium Indenture, and LDTC asserts that the same lenders are now participating in the DIP Financing and attempting to escape these restrictions. (¶ 11.) Furthermore, LDTC objects to cross-collateralization of the Debtors' assets (despite the fact that the Debtors have | This Objection remains unresolved.<br><br>An equal and ratable clause is a form of negative pledge, is not enforceable in bankruptcy, and does not give rise to a postpetition claim.  (¶¶ 41-43.)<br><br>Furthermore, LDTC has provided no evidence in support of its claim that the Debtors reaffirmed their commitment to the Millennium Noteholders on January 15, 2009.  Such agreement would require Court approval under section 363 of the Bankruptcy Code and LDTC's efforts to obtain reaffirmation would violate the automatic stay under section 362 of the Bankruptcy Code. (¶ 44 n.10.) |

| | | | |
|---|---|---|---|
| | | not been substantively consolidated), where that cross-collateralization does not specifically benefit Millennium or its subsidiaries. (p. 3.)<br><br>To limit the purported overreaching in the DIP Financing, LDTC proposes that: (1) the Roll-up Loans and Adequate Protection granted to Existing Primed Secured Facilities provide an equal and ratable lien for the benefit of the Millennium Noteholders (a carve-out); and (2) Millennium America and its subsidiaries may provide guarantees or incur additional secured debt in a dollar-for-dollar exchange for any New Money Loans actually received by Millennium and its subsidiaries, notwithstanding the terms of the Indenture. (¶¶ 6, 12-13.)<br><br>Millennium joins in the Committee Cash Management Objection. (¶ 7.) | |
| Shrieve Chemical Company ("Shrieve") | 866 | Shrieve supplies chemicals to Basell USA, Inc. and Equistar Chemicals, LP, asserts materialmen's liens in certain property at plants in Louisiana and Texas, and has made reclamation demands pursuant to section 546(c) of the Bankruptcy Code. (¶¶ 5-6.) Shrieve objects to the DIP Financing to the extent it would prime Shrieve's liens and/or reclamation rights without providing adequate protection. (¶¶ 7-9.) | Shrieve filed its objection after the deadline with no consent. Paragraph 10(c) of the Final Order moots Shreive's Objection. |
| Texas Sampling, Inc. ("TSI") | 867 | TSI supplies sampling equipment to Millennium Chemicals, Inc., asserters materialmen's liens in certain property at its plant in LaPorte Texas, and has submitted reclamation demands pursuant to section 546(c) of the Bankruptcy Code. (¶¶ 5-6.) TSI objects to the DIP financing to the extent it would prime TSI's liens and/or reclamation rights without | TSI filed its objection after the deadline with no consent. Paragraph 10(c) of the Final Order moots TSI's Objection. |

| | | providing adequate protection.  (¶¶ 7-8.) | |
|---|---|---|---|
| The Bank of New York Mellon as indenture trustee under the Arco Indenture, and the Bank of New York Mellon Trust Company, N.A., as indenture trustee under the Equistar Indenture (collectively, "<u>BNY</u>") | 870 | BNY raises the following objections to the DIP Financing:<br><br>(1)  <u>No Proven Benefit to Individual Entities</u>.  BNY argues that the DIP Facility would obligate LCC, Equistar, Millennium, and Houston Refining, but the Debtors have not proven that any of these facilities would be benefited by the financing. (¶ 6.)   To show the DIP Financing is an appropriate exercise of business judgment, BNY asks the Debtors to prove there is a direct benefit to each individual entity (including providing cash flow analyses at an entity level). (¶¶ 18-20.)<br><br>(2)   <u>Unequal Treatment of Creditors</u>.   BNY claims the Noteholders are entitled to the same adequate protection as other prepetition lenders. (¶ 30.)  In addition to the equity cushion and additional liens described in the Final DIP Order, BNY seeks additional protection, including, inter alia: payment of past due interest to the Noteholders; no limitation on payment of BNY's fees and expenses for lien investigation; no forced waiver by the Noteholders of their rights to marshaling; participation in the proposed roll-up; and monitoring of collateral. (¶ 13.)<br><br>(3)  <u>De Facto Substantive Consolidation</u>.  BNY argues that the DIP Financing "effects a <u>de facto</u> substantive consolidation" because each Debtor would be jointly and severally liable for the borrowings of the other Debtors, regardless of whether the Debtors receive any benefit under the Loan. (¶ 15.) | These Objections remain unresolved.   The Debtors respond to the relevant objections as follows:<br><br>(1) The Debtors have provided information regarding each Debtors' need for financing. (¶ 36 n.8.)  LCC and Equistar have substantial cash needs.   (¶ 36.) Furthermore, the Debtors function as an integrated group of affiliated companies, and need not prove direct benefit to each individual entity where indirect benefits can be demonstrated by the survival of the enterprise as a whole. (<u>Id.</u>)<br><br>(2)  No applicable law requires different creditors to receive the same adequate protection.   Courts specifically allow debtors to provide varying adequate protection based on the creditors' position prior to the petition date. (¶¶ 25.)<br><br>(3)  The Debtors are not requesting <u>de facto</u> substantive consolidation.  The Debtors remain separate corporate entities pursuant to the DIP Financing, are not pooling their assets for the purpose of voting on a plan of reorganization, have not eliminated intercompany claims, and are not creating a common fund from which to satisfy liabilities. (¶¶ 33-35.) |

| | |
|---|---|
| (4) Improper Marshaling Waiver. BNY argues that the DIP Financing improperly waives the Noteholders' alleged marshaling defense. BNY argues that without the protections marshaling allegedly provides to the Noteholders, the DIP Lenders could exhaust the proceeds of the Arco and Equistar collateral before the Noteholders receive any distribution. (¶¶ 25, 27.) | (4) Marshaling is unnecessary when a creditor is oversecured and has recourse to all of a debtor's collateral. (¶¶ 38-40.) The hypothetical situation posed by BNY cannot occur. |
| (5) Unequal Roll-Up Participation. BNY objects that the Noteholders, unlike the other prepetition secured lenders, were not afforded an opportunity to participate in the roll-up (BNY Obj. ¶¶ 45-47), and argues that the Debtors must allow the Noteholders to participate in the roll-up "on the same aggregate percentage basis" as other prepetition secured lenders, because it is essentially a form of adequate protection. (¶¶ 46, 50.) | (5) The Debtors are not legally obligated to allow the Noteholders (or anyone) to participate in the roll-up or any other aspect of the DIP Financing, so long as the Debtors have proven that they pursued multiple sources of funding before agreeing to terms that primed prepetition secured lender interests in the Debtors' collateral. (¶ 29-32.) |
| (6) Separate Accounting Required. BNY requests: (a) separate and several liability of the DIP Obligations incurred by each of the individual Debtors; (b) separate accounting for each entity's draws on the facility; and (c) prepayment and refinancing of any amounts owed by LCC, Millennium, and Houston Refining, if those entities are able to obtain better financing elsewhere. In short, BNY asks that the entities originally obligated on the Notes be permitted to opt out of the DIP Facility. (¶ 10.) | (6) The Debtors function as an integrated enterprise, in which each individual corporate component will benefit from the successful reorganization of the whole. The Debtors would not have been able to obtain the DIP Financing without the participation of Lyondell Chemical Company and Equistar Chemical, and without recourse to the collateral found in those entities. (¶ 36-37.) They cannot be allowed to opt-out of the DIP Financing without jeopardizing the survival of the Debtors' business enterprise. |
| (7) Overly-Broad Collateral Use Prohibition. BNY asserts that, as an oversecured creditor, it is exempt from the prohibition contained in paragraph 21 of the Interim Order and may use its own collateral to investigate and prosecute claims or causes of action in the interests of the Noteholders. (¶ 52.) | (7) To be addressed by Lenders. |
| (8) Modifications Required to Cash Management Order. | (8) To be addressed by Lenders. |

| | | | |
|---|---|---|---|
| | | Finally, BNY requests certain modifications to the Cash Management Order regarding intercompany transfers to non-Debtor affiliates, to allow for removal of liens if the claims are successfully avoided. (¶¶ 53-55.) | |
| The Official Committee of Unsecured Creditors (the "Committee") | 879 | In general, the Committee objects to the DIP Financing on the grounds that the terms of the DIP Financing are not fair and reasonable. (¶¶ 26-28.) The Committee also argues that the terms of the DIP Financing "unfairly hand over all of [the Debtors]' enterprise value and cede control to the Postpetition Lenders to the detriment of unsecured creditors." (¶ 27.) More specifically, the Committee objects to the following provisions of the DIP Financing: | These objections remain unresolved. The Debtors assert that the Committee's Objection is, in essence, an unsubstantiated claim that the Committee could have negotiated a better deal and not a substantive claim that the terms of the DIP Financing are legally insufficient. (p. 3-4.) |
| | | (1) Early Maturity. The Committee states that the DIP Financing terminates prematurely. (¶ 32.) The Committee argues that the proposed December 15, 2009 maturity date would require the Debtors to emerge from chapter 11 while their enterprise value was artificially deflated, given the volatility of commodity prices. (¶ 34.) | (1) This is a business point that has been extensively negotiated between the parties and is a condition of receiving the DIP Financing. The Debtors attempted to obtain a later maturity date, and will introduce testimony that it is feasible for the Debtors to reorganize before the proposed maturity date. (¶ 11.) |
| | | (2) Prohibitively Restrictive Financial Covenants. The Committee argues that DIP Facility contemplates four financial covenants and a related provision on excess liquidity that may be difficult for the Debtors to meet given the volatility of their industry, and are unnecessary given the Debtors' enterprise value. (¶¶ 35-39.) | (2) Financial covenants are standard. (¶ 11.) Better terms are not available. The Committee submits no evidence in support of its assertion that these provisions are "tripwires" for early events of default. (Id.) |
| | | (3) Captive Management. The Committee states that the Debtors intend to effect changes in senior management and install a chief restructuring officer based upon joint recommendations from the Debtors' and Prepetition Lenders' financial advisors, and the Committee has been improperly excluded from this process. (¶ 40.) The Committee "fears that these are thinly disguised mechanisms by which the DIP Lenders may soon install captive management and wrest | (3) These provisions represent a reasonable balance between the Debtors' need to operate their businesses and the Lenders' desire for oversight. (¶ 11.) |

| | | operational control away from the Debtors." (¶ 5.)  The Committee requests that it be included in any decisions regarding the Debtors' future management.  (¶ 47.) | |
| | | (4)  Pricing.  The Committee asserts that the pricing on the DIP Financing is "confiscatory."  (¶ 42.)  The Committee argues that the effective interest and fees on the "new money" is approximately 20% "all-in."  (¶ 7.)  The Committee asserts that it does not make "economic sense" to borrow money at 20% all-in cost to pay interest on the $3.25 billion Roll-Up of the Senior Secured Credit Facility, which would otherwise accrue interest at 6 to 7%.  (¶¶ 7, 44.) | (4)  These are the best terms available to the Debtors at this time.  The Committee has put forth no evidence of better financing terms and has not worked to procure them. (¶ 11.) |
| | | (5)  Failure to Cut Costs.  The Committee argues that the Debtors have not adequately demonstrated that they have cut costs to reduce their borrowing needs.  (¶¶ 6, 43.) | (5)  The Committee has no suggestions as how the Debtors are to cut costs, and has put forth no analysis in support of particular plant closures.  While idling plants may result in long-term cost savings for the Debtors, in the short term, doing so will result in increased expenses. (¶ 11.) |
| | | (6)  Excessive Adequate Protection.  The Committee argues that the Prepetition Lenders are substantially oversecured, and therefore the lenders are not entitled to adequate protection beyond the equity cushion.  The Committee asserts that the Debtors should not be authorized to make payments in the form of current interest on the non-rolled-up portion of the prepetition Senior Secured Credit Facility and other costs (including postpetition interest on the Arco and Equistar bonds).  (¶ 45.) The Committee asserts that the Court found at the initial hearing that there was a significant equity cushion based on the Duff & Phelps valuation and that this cushion alone provides adequate protection.  (¶ 8.)  Moreover, the Committee argues that the Debtors' valuation undervalues the assets of the Company. (¶¶ 8, 50.) | (6)  The Committee misstates the relevant law.  Although an equity cushion may provide adequate protection, it does not do so in all cases.  The presence of an equity cushion is not determinative of whether secured lenders may be entitled to additional adequate protection.  The Bankruptcy Code does not prohibit multiple forms of adequate protection, and specifically authorizes both providing of replacement liens and payment of postpetition interest to oversecured creditors.  (¶¶ 13-20.) |
| | | (7)  Self-Serving Restrictions on Claim Investigation & | (7)  To be addressed by lenders. |

| | | | |
|---|---|---|---|
| | | <u>Inappropriate Liens on Recoveries</u>.  The Committee argues that the DIP Financing improperly restricts the Committee's ability to challenge prepetition transactions.  (¶ 9.)  The DIP Financing would impose a deadline (which cannot easily be extended) and $250,000 budget cap on investigation of claims against the Prepetition Lenders.  (¶¶ 54-58.)  The Committee states that these provisions effectively amount to the Prepetition Lenders' use of the DIP Facility to shield themselves from inquiry into, and liability on, potential fraudulent transfers related to the December 2007 merger. (¶¶ 9, 55.)  The Committee also argues that it has been denied standing to pursue such claims. (¶ ¶ 54, 56.)  The Committee argues that these provisions are improper under applicable law.  The Committee states that courts in multiple other cases have permitted extensions of investigation periods and uncapped budgets. (¶¶ 55, 57.)  The Committee requests (1) the deadline be subject to further extension on showing of good cause, (2) that the requirement for the Committee to move for standing be eliminated, and (3) that the cap on fees and expenses be eliminated. (¶ 58.) | |
| | | (8)    <u>The DIP Financing Improperly Encumbers Previously Unencumbered Assets</u>.    The Committee argues that the Prepetition Lenders improperly seek liens and superpriority claims on all Chapter 5 avoidance actions, rather than allowing such recoveries to benefit the estate.  (¶¶ 59-62.) | (8)  To be addressed by lenders. |
| | | (9)    <u>Other Unacceptable & Unfair Terms</u>. The Committee also objects to the DIP Financing with respect to: (i) the proposed section 506(c) waiver (¶¶ 63-64); (ii) the "vague" nature of the Roll-Up provisions, including (1) an absence of a provision permitting disgorgement of interest and other payments if the Roll-Up is challenged, (2) the failure to treat the Roll-Up as a fully secured claim on which the Debtor must make current payments of interest and (3) the lack of a statement requiring the Debtors to use "reasonable | (9) The roll-up is not controversial. (¶ 21.) The DIP Financing does not effect a <u>de</u> <u>facto</u> substantive consolidation. (¶ 33-35.) |

| | | | |
|---|---|---|---|
| | | endeavors" to repay the Roll-Up in cash at confirmation or, failing that, over no more than five years (¶¶ 65-66); and (iii) the expansion of the scope of collateral for the Arco/Equistar Notes, to grant the Noteholders postpetition security interests in assets of debtor entities against which they did not hold prepetition security interests (¶¶ 67-69).    The Committee asserts that this amounts to a pooling of collateral "tantamount to a ruling in favor of substantive consolidation."    (¶ 69.)  Finally, the Committee requests participation in management review, a copy of the Blavatnik family sponsor letter agreement and information on consideration paid to Mr. Blavatnik for such agreement, provision for DIP lenders to disgorge attorneys' fees used to unsuccessfully defend avoidance actions, and modification to the Citibank release provision. (¶ 70.) | |
| ABN AMRO Bank N.V. ("ABN") | 887 | ABN holds approximately $3.4 billion in outstanding claims against the Debtors and their affiliates, including approximately $1.4 billion extended under the Senior Facility Prepetition Credit Agreement.  ABN is a Term DIP Lender and an ABL DIP Lender, and funded a substantial portion of the interim DIP financing.  (¶¶ 1-3.)<br><br>ABN argues that, as currently drafted, the Term DIP Credit Agreement and the Proposed Pre-Petition Amendment could jeopardize the Roll Up DIP Lenders' existing lien rights in collateral outside the United States. (¶¶ 4, 6.)  ABN points out that the Roll Up DIP Loans are being treated as a separate tranche of DIP Lender with full voting rights and are receiving new notes on account of the Roll Up DIP Loans, rather than remaining debt outstanding under the Senior Facility Prepetition Credit Agreement. (¶ 5.)  According to ABN, this structure inappropriately gives the holders of Roll Up DIP Loans significant control over the DIP Financing and poses risks to the Roll Up Lenders' liens in Non-US Collateral. (¶ 6.) | Of the fourteen DIP Lenders, only ABN considers the provisions concerning the roll-up loans to be unsatisfactory.  The ABN Objection does not address the single legal issue before the Court — whether the DIP Financing meets the criteria of the Bankruptcy Code, particularly section 364.    In addition, we understand that the remaining lenders will absorb ABN's share of the Term Loan. (¶ 45.) |

|  |  | Specifically, the Proposed Prepetition Amendment modifies the sharing provision in the credit agreement, such that payments to the Roll Up DIP Lenders will not be shared with the "non-rolled up" lenders.  However, if liens on the Non-US Collateral are compromised as a result of this structure, the non-roll-up lenders must nonetheless share the remaining Non-US Collateral pro rata with the DIP Lenders.   This structure is unfair to the non-rollup lenders.  (¶¶ 7-8.)

The DIP Term Agent has refused to modify these provisions, and has included a provision exculpating its own actions regarding the Roll Up DIP Loans.  (¶ 9.)

The DIP Term Sheet provides the DIP Documentation must be satisfactory to each member of the Instructing Group. ABN refuses to approve the Term DIP Credit Agreement, the Proposed Pre-Petition Amendment, and the Proposed Final Order until they are modified to correct these claimed inequities.  ABN is also willing to assign its loan commitments to another lender subject to the same modifications (¶¶ 10-11.) |  |