Edward S. Weisfelner (EW-5581)
Sigmund S. Wissner-Gross (SW-0001)
May Orenstein (MO-2948)
BROWN RUDNICK LLP
Seven Times Square
New York, NY  10036
(212) 209-4800

Steven D. Pohl (SP-0435)
BROWN RUDNICK LLP
One Financial Center
Boston, MA  02111
(617) 856-8200

Counsel for the Official Committee
of Unsecured Creditors


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No.  09-10023 (REG) |
| LYONDELL CHEMICAL COMPANY, et al., | |
| | Chapter 11 |
| Debtors. | |
| | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, on behalf of The Debtors' Estates | (Jointly Administered) |
| | |
| Plaintiff, | |
| | Adv. Pro. No. _____ |
| v. | |
| | |
| CITIBANK, N.A., LONDON BRANCH, CITIBANK INTERNATIONAL PLC, CITIGROUP GLOBAL MARKETS INC., DEUTSCHE BANK TRUST COMPANY AMERICAS, GOLDMAN SACHS CREDIT PARTNERS, L.P., GOLDMAN SACHS INTERNATIONAL, MERRILL, LYNCH, PIERCE, FENNER & SMITH INC., MERRILL LYNCH CAPITAL CORPORATION, ABN AMRO INCORPORATED, ABN AMRO BANK N.V., UBS SECURITIES LLC, LEONARD BLAVATNIK, AI CHEMICAL INVESTMENTS LLC, NELL LIMITED, ACCESS INDUSTRIES, INC., ACCESS INDUSTRIES HOLDINGS LLC, AI | **JURY TRIAL DEMANDED ON ALL ISSUES SO TRIABLE** |

INTERNATIONAL, S.À.R.L., DEUTSCHE BANK SECURITIES, INC., PERELLA WEINBERG PARTNERS LP, DAN F. SMITH, CAROL A. ANDERSON, SUSAN K. CARTER, STEPHEN I. CHAZEN, TRAVIS ENGEN, PAUL S. HALATA, DANNY W. HUFF, DAVID J. LESAR, DAVID J.P. MEACHIN, DANIEL J. MURPHY, WILLIAM R. SPIVEY, MORRIS GELB, T. KEVIN DeNICOLA, EDWARD J. DINEEN, KERRY A. GALVIN, JOHN A. HOLLINSHEAD, JAMES W. BAYER, W. NORMAN PHILLIPS, C. BART de JONG, RICHARD FLOOR, R. KENT POTTER, LINCOLN BENET, LYNN COLEMAN, PHILIP KASSIN, ALAN S. BIGMAN, KEVIN R. CADENHEAD, CHARLES L. HALL, FRANCIS P. MCGRAIL, RICK FONTENOT, MICHAEL P. MULROONEY, KEVIN E. WALSH, JOHN FISHER GRAY, GARY L. KOEHLER, SIMON BAKER, DAWN SHAND, BERTRAND DUC, LEVERAGESOURCE III S.À.R.L., individually as a holder through purchase of obligations under that certain Senior Credit Agreement dated as of December 20, 2007 between, *inter alia*, Citibank, N.A., administrative agent and certain Debtors (the "Senior Credit Facility"), and as Class Representative for all other holders through purchase of obligations under the Senior Credit Facility, and BARCLAYS GLOBAL INVESTORS, N.A., individually and as Class Representative for all of the holders of Lyondell Common Stock who received proceeds from the consideration in payment for the purchase of their respective shares in connection with the acquisition of Lyondell Chemical Company by Basell AF S.C.A.

Defendants.

# TABLE OF CONTENTS

NATURE OF THE ACTION ............................................................................................... 1

JURISDICTION AND VENUE ......................................................................................... 9

PARTIES ............................................................................................................................ 9

   I.    The Plaintiff ........................................................................................................ 9

   II.   The Defendants ................................................................................................ 10

     A.  Financing Party Defendants ......................................................................... 10

     B.  Other Transferee Defendants ....................................................................... 11

     C.  Fiduciary Defendants ................................................................................... 13

        (i)       Former Members of the Board of Directors of Lyondell Chemical Company 13

        (ii)     Fiduciaries of LBI ................................................................................. 14

        (iii)    Fiduciaries of LBI Subsidiaries at the time of the Merger: ........................... 15

     D.  Preference Defendants .................................................................................. 16

     E.  Breach of Contract Defendants .................................................................... 16

FACTUAL BACKGROUND ............................................................................................ 16

   I.    Lyondell Shareholders Are Cashed Out in a Highly Leveraged Acquisition .............. 16

     A.  Blavatnik Seeks to Acquire a Major Petrochemicals Producer ..................... 16

     B.  Access Targets Lyondell for Acquisition ..................................................... 21

     C.  Blavatnik Acquires the Toe Hold Position in Lyondell ................................. 35

   II.   The Merger Occurs Amid Signs of Deteriorating Economic and Industry Conditions 50

   III.  The Merger Closes ........................................................................................... 68

   IV.  As a Result of the Merger, the Debtors Were Left with Unreasonably Small Capital . 81

   V.   Upon the Merger, the Resulting Combined "LBI Group" of Companies Was Insolvent ........................................................................................................... 90

VI.    Upon the Merger, the Debtors Incurred Debts that Were Beyond Their Ability to Repay ................................................................................................................... 92

VII.   Class Action Allegations ................................................................................. 93

COUNT I - FRAUDULENT TRANSFER
       (11 U.S.C. §§ 544, 548(a), and 550 and Applicable State Fraudulent Transfer Law)
(By the Senior Credit Facility Obligors against Senior Credit Facility Lender Parties and
       LeverageSource III S.à.r.l., individually and as Class Representative of the Senior Credit
       Facility Class) ................................................................................................. 97

COUNT II - FRAUDULENT TRANSFER
       (11 U.S.C. §§ 544, 548(a), and 550 and Applicable State Fraudulent Transfer Law)
(By the Bridge Loan Obligors against Bridge Loan Lender Parties) ........................................... 98

COUNT III - FRAUDULENT TRANSFER
       (11 U.S.C . §§ 544, 548, and 550 and Applicable State Fraudulent Transfer Law)
(By the Debtors Against Nell Limited and AI Chemical Investments LLC) ............................ 100

COUNT IV - FRAUDULENT TRANSFER
       (11 U.S.C . §§ 544, 548 and 550 and Applicable State Fraudulent Transfer Law)
(By the Debtors Against Barclays Global Investors, N.A., individually and as Class
       Representative of the Shareholder Class) ....................................................... 101

COUNT V - FRAUDULENT TRANSFER
       (11 U.S.C . §§ 544, 548, and 550 and Applicable State Fraudulent Transfer Law)
(By the Debtors Against Lyondell Officers and Directors) ........................................... 102

COUNT VI - EQUITABLE SUBORDINATION
       (11 U.S.C. § 510)
(By the Senior Credit Facility Obligors Against the Senior Credit Facility Lender Parties, and
       Leverage Source III S.à.r.l., individually and as Class Representative of the Senior Credit
       Facility Class) ................................................................................................. 103

COUNT VII - EQUITABLE SUBORDINATION
       (11 U.S.C. § 510)
(By the Bridge Loan Obligors Against the Bridge Loan Lender Parties) .................................. 104

COUNT VIII - BREACH OF FIDUCIARY DUTY
(By the Debtors Against Lyondell Directors) .......................................................... 105

COUNT IX - MISMANAGEMENT CLAIM UNDER LUXEMBOURG LAW
       (article 51bis, 59 § 1, 60bis-16 § 1, 62 and 191 of the Luxembourg Company Law)
       (By the Debtors Against Leonard Blavatnik, Simon Baker, Dawn Shand, Bertrand Duc,
Alan Bigman, Richard Floor, Philip Kassin, and Kent Potter) ................................................ 106

COUNT X - TORT CLAIM UNDER LUXEMBOURG LAW
(article 59 § 2, 60bis-16 § 2, 62, 72-2 and 69 of the Luxembourg Company Law and article 1382 and 1383 of the Luxembourg Civil Code)

(By the Debtors Against Blavatnik, the GP Managers, the Nominees and the Successors)....... 108

COUNT XI - TORT CLAIM UNDER LUXEMBOURG LAW
(article 59 § 2, 60bis-16 § 2, 62, 72-2 and 69 of the Luxembourg Company Law and article 1382, 1383 and 1384 § 5 of the Luxembourg Civil Code and the provision of the Law of 5 April 1993 on the financial sector, as amended)
(By the Debtors Against the Lead Arrangers) ............................................................. 109

COUNT XII - AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
(By Debtors Against Merrill Lynch)........................................................................... 110

COUNT XIII - BREACH OF FIDUCIARY DUTY
(By Debtors Against Subsidiary Directors) ................................................................ 111

COUNT XIV - AVOIDABLE PREFERENCE
(11 U.S.C. §§ 544, 547 and 550, and Applicable State Fraudulent Transfer Law)
(By the Debtors Against Access Industries Holdings LLC)....................................... 111

COUNT XV - EQUITABLE SUBORDINATION
(11 U.S.C. § 510)
(By the Debtors Against AI International S.à.r.l., as assignee under the Access Revolver) ...... 113

COUNT XVI - FRAUDULENT TRANSFER
(11 U.S.C. §§ 544, 548, and 550 and Applicable State Fraudulent Transfer Law)
(By the Debtors Against Nell Limited, Goldman Sachs, Merrill Lynch, Deutsche Bank, Citibank M&A, Citibank, and Perella Weinberg) ......................................................... 114

COUNT XVII - BREACH OF CONTRACT
(By LBI and Lyondell Against Access Industries Holdings LLC and AI International S.à.r.l.) 115

COUNT XVIII - AVOIDANCE OF UNPERFECTED SENIOR LIENS
(11 U.S.C. § 544)
(By the Debtors against Citibank, N.A., as Senior Collateral Agent) ........................ 115

COUNT XIX - AVOIDANCE OF UNPERFECTED BRIDGE LIENS
(11 U.S.C. § 544)
(By the Debtors against Citibank, N.A., as Bridge Collateral Agent)........................ 120

COUNT XX - FRAUDULENT TRANSFER
(11 U.S.C. §§ 544, 548(a), 550, and Applicable State Fraudulent Transfer Law)
(By the Pre-Merger Debt Subsidiary Guarantors Against Senior Credit Facility Lender Parties, LeverageSource III S.à.r.l., individually and as Class Representative of the Senior Credit Facility Class, and Bridge Loan Lender Parties) ......................................................... 123

COUNT XXI - FRAUDULENT TRANSFER
     (11 U.S.C. §§ 544, 548(a), 550, and Applicable State Fraudulent Transfer Law)
(By the Previously Unobligated Subsidiary Guarantors Against Senior Credit Facility Lender
     Parties, LeverageSource III S.à.r.l., individually and as Class Representative of the Senior
     Credit Facility Class, and Bridge Loan Lender Parties) ................................................ 125

PRAYER FOR RELIEF………………………………………………………………………..126

EXHIBIT A…………………………………………………………………………………….132

EXHIBIT B…………………………………………………………………………………….136

# COMPLAINT

Plaintiff, the Official Committee of Unsecured Creditors of Lyondell Chemical Company (the "Committee" or "Plaintiff") and its affiliated debtors and debtors-in-possession, through its undersigned counsel, as and for its complaint brought on behalf of the Debtors' estates, alleges as follows:

## NATURE OF THE ACTION

1.    This action arises from the December 2007 acquisition of Lyondell Chemical Company ("Lyondell"), formerly North America's third-largest independent, publicly-traded chemical company, by Basell AF S.C.A., a Luxembourg entity, since renamed LyondellBasell Industries AF S.C.A. (prior to its acquisition of Lyondell, "Basell," and, thereafter, "LBI"). LBI operates under the ultimate control of billionaire industrialist Leonard Blavatnik. Blavatnik, in his personal quest to amass a global petrochemical giant with other people's money, used Basell, already highly leveraged, as a platform to acquire Lyondell in a cash out merger of Lyondell shareholders (the "Merger") funded entirely with debt: every dollar of the $22 billion used to acquire Lyondell and to fund the approximately $1 billion in transaction fees, paid out to affiliates, advisors, and professionals in connection with the acquisition, was borrowed money.

2.    Approximately one year after the Merger, Lyondell's corporate parent, LyondellBasell Finance Company, Lyondell, its major operating subsidiaries, and other of its direct and indirect subsidiaries and affiliates (the "Debtors") wound up in bankruptcy.[1] On April 24, 2009, LBI was voluntarily added to the Debtors' Chapter 11 bankruptcy proceedings.

---

[1] The Debtors are LyondellBasell AF S.C.A., LyondellBasell Industries AF GP S.à.r.l., Basell Finance USA Inc., Basell Germany Holdings GmbH, Basell North America Inc., Basell USA Inc., Circle Steel Corporation, Duke City Lumber Company, Inc., Equistar Chemicals, LP, Equistar Transportation Company, LLC, Glidco Leasing, Inc., Glidden Latin America Holdings Inc., HOISU Ltd., Houston Refining LP, HPT 28 Inc., HPT 29 Inc., H.W. Loud Co., IMWA Equities II, Co., L.P., ISB Liquidating Company, LBI Acquisition LLC, LBIH LLC, LeMean Property Holdings Corporation, Lyondell Asia Pacific, Ltd., Lyondell Chemical Company, Lyondell Chemical Delaware Company, Lyondell Chemical Espana Co., Lyondell Chemical Europe, Inc., Lyondell Chemical International Co.,

3.       The Debtors' inability to fund their operations, which led to the Debtors' Chapter 11 filing on January 6, 2009, was the entirely foreseeable and direct consequence of the Merger having left the Debtors with unreasonably small capital for the continuation of their businesses, insolvent, and unable to pay their debts as they became due.

4.       The $48 per share price paid to Lyondell shareholders pursuant to the Merger was understood, both within and without Blavatnik's inner circle of industry and finance mavens, to be a "blowout price" – an excessive price so far beyond what anyone would reasonably think Lyondell was worth so as to all but foreclose the possibility of a competitive bid.  Blavatnik was willing to pay this exorbitant price only because he had so little of his own money at stake. Moreover, Blavatnik himself was a very major beneficiary of this "blowout price" since, at the urging of Merrill, Lynch, Pierce, Fenner & Smith Incorporated ("Merrill" or "Merrill Lynch") and through a Delaware entity controlled by Blavatnik, he had acquired rights to nearly 10% of Lyondell's stock (the "Toe-Hold Position") shortly before Basell entered into an agreement to acquire Lyondell.  Upon the Merger, using the proceeds of the acquisition financing with which he was saddling the Debtors, Blavatnik, through a complex series of transfers of the Toe-Hold Position (designed to attempt to avoid payment of taxes on his gains), netted a windfall profit in excess of $333 million, through a Blavatnik entity named Nell Limited, organized under the laws

Lyondell Chemical Nederland, Ltd., Lyondell Chemical Products Europe, LLC, Lyondell Chemical Properties, L.P., Lyondell Chemical Technology Management, Inc., Lyondell Chemical Technology 1 Inc., Lyondell Chemical Technology, L.P., Lyondell Chimie France LLC, Lyondell-Equistar Holdings Partners, Lyondell Europe Holdings Inc., Lyondell Greater China, Ltd., Lyondell Houston Refinery Inc., Lyondell LP3 GP, LLC, Lyondell LP3 Partners, LP, Lyondell LP4 Inc., Lyondell (Pelican) Petrochemical L.P.  1, Inc., Lyondell Petrochemical L.P.  Inc., Lyondell Refining Company LLC, Lyondell Refining I LLC, LyondellBasell Advanced Polyolefins USA Inc., LyondellBasell Finance Company, MHC Inc., Millennium America Holdings Inc., Millennium America Inc., Millennium Chemicals Inc., Millennium Holdings, LLC, Millennium Petrochemicals GP LLC, Millennium Petrochemicals Inc., Millennium Petrochemicals LP LLC, Millennium Petrochemicals Partners, LP, Millennium Realty Inc., Millennium Specialty Chemicals Inc., Millennium US Op Co LLC, Millennium Worldwide Holdings I Inc., MWH South America LLC, National Distillers & Chemical Corporation, NDCC International II Inc., Nell Acquisition (US) LLC, Penn Export Company, Inc., Penn Navigation Company, Penn Shipping Company, Inc., Penntrans Company, PH Burbank Holdings, Inc., Power Liquidating Company, Inc., Quantum Acceptance Corporation, SCM Plants, Inc., and Suburban Propane GP, Inc.

of Gibraltar, a tax haven.  The same entity, Nell Limited, also received a $100 million "one time" transaction advisory fee upon the Merger plus a $25 million "management" fee – all purportedly tax-free.  Thus, as a result of Basell's acquisition of Lyondell, Blavatnik was over $458 million ahead on day one.

5.      The extremely leveraged capital structure created as a result of the Merger was flagrantly unreasonable for a company such as LBI, which is both a manufacturer of petrochemicals and a refiner of petroleum.  One salient characteristic of both industries is their extreme capital intensiveness.  The maintenance and operation of the enormous and enormously complex major assets of these industries, *i.e.*, the petroleum refineries and the "crackers" that break hydrocarbons into commercially useable petrochemicals, carry with them correspondingly enormous fixed costs.

6.      Complicating the capital demands imposed by high fixed costs is the extreme cyclicality of both the petrochemical and refining industries, driven both by macroeconomic and other industry and non-industry factors.  During the cycle "peaks," participants in these industries invest excess earnings in increasing capacity.  Then, as inevitably occurs, when capacity exceeds demand, margins and profits are squeezed and the industry heads towards a "trough." When industry overcapacity coincides with declining demand, as in a recessionary economic environment, the industry downturn will be deeper and last longer.  During a downturn, earnings and margins decline.  The combination of high fixed costs and extreme cyclicality means that companies in these industries, if they hope to survive a cycle downturn, must be adequately capitalized to enable continued operations through a downturn.  LBI was not. Its highly leveraged balance sheet and massive interest burdens left it unable to make it through an industry cycle.

7.    LBI's highly leveraged capital structure also was unreasonable from the perspective of liquidity.  The working capital requirements of petrochemical producers and refining companies are subject to extreme changes due to the volatility of the market for crude oil and the other "feedstocks" that constitute the raw materials of the industry.  A single dollar upswing in the price of crude oil translates into the immediate need for additional millions of dollars of working capital.  A petrochemical producer must have a sufficient liquidity cushion to fund volatile cash needs and to do so even as margins are squeezed by declining demand.  Even in a relatively robust environment, a petrochemicals producer whose capital structure and credit rating leaves it unable to fund its working capital needs may just find itself out of money and out of luck.

8.    LBI's capital structure was additionally unreasonable because long before the Merger, all leading industry analysts were forecasting that the ongoing petrochemical cycle peak and the high margins being enjoyed by refining would end sometime in 2008 or 2009 and these industries would then experience a downturn.  Any divergence of opinion on the coming downturn was only with regard to exactly when the peaks in refining and petrochemicals would end, how long the downturn would last, and how deep the troughs would be.  As explained herein, Lyondell and its operating subsidiaries, as well as Basell (and its subsidiaries), due to a variety of factors, were particularly disadvantaged, as compared with their competitors, to withstand the stress of a downturn.  Yet, ignoring all reason, the highly leveraged capital structure created pursuant to the Merger was imposed on LBI even as all indicators showed that both industries were past the peak and were heading into the downturn.

9.    As had been entirely foreseeable at the time of the Merger and indeed, while the transaction was being negotiated, LBI was insufficiently capitalized to continue operations

through a downturn and had insufficient liquidity to manage its volatile operating expenses. Within three months of the closing of the Merger, LBI was in a full-blown liquidity crisis and was running out of money to fund its operations. To avoid a complete collapse, it put in place an emergency credit facility (the "Access Revolver") from a Blavatnik-controlled affiliate to cover expenses while it scrambled to "upsize" its third party credit facilities to the maximum extent possible. These efforts were not enough. By November 2008, less than a year after the Merger was consummated, LBI collapsed under the weight of the debt foisted upon it by the Merger. Due to its overleveraged balance sheet and financial impairment, LBI was unable to fund its operations, to pay its creditors when due, and had no access to further borrowings. Blavatnik, having made sure that Access Industries had been repaid by the insolvent Lyondell for draw downs under the Access Revolver in October 2008 (thereby cutting his own losses), began to plan for this bankruptcy (including commencement of negotiations for DIP Financing with the Debtors' existing Lenders), decided not to come to the aid of ailing LBI, and blocked any further funding from the Access Revolver.

10. The investment banks that initially committed to provide the approximately $22 billion used to fund the acquisition did so with the expectation that, after being paid approximately $260 million in transaction fees (in addition to other substantial fees), they could, in accordance with the then prevailing practice, quickly syndicate virtually all of the "junk" obligations being incurred and unload them off their own books. This deal, however, turned out to be different. Within weeks of having signed loan commitments, the investment banks learned that Lyondell was materially off its projections for 2007, and it became clear that the syndication effort was in trouble. By mid-September 2007, the rosy projections of Lyondell and Basell earnings that had been reverse engineered to attempt to sell the loans already looked like a

pipedream. The financing package was drastically re-priced, restructured, and re-sized in an effort to spruce it up for the syndication market. Notwithstanding these efforts and contrary to the plans of their internal credit committees, at the closing of the Merger, the banks who had originated the loans and undertaken to act as lead arrangers for their syndication were left holding most of the "junk." And while the re-pricing and restructuring of the financing package did not avail the arranging banks in their efforts to syndicate, it substantially increased the leverage and therefore the risk associated with the transaction.

11.     Obligors on the debt incurred to finance Lyondell's acquisition included LBI, Lyondell, its operating companies, and certain LBI affiliates. Obligations to repay the acquisition financing were secured by, *inter alia*, first and second liens on substantially all of the assets of the obligors in favor of the lenders providing the merger financing. Although the obligor entities became liable for the repayment of the merger financing, to the extent that the proceeds were paid to Lyondell shareholders or to refinance the debt of affiliates, these entities did not receive reasonably equivalent value in consideration for the obligations incurred. Nor, to such extent, did these obligors receive value for the liens that they granted to secure the repayment of these obligations.

12.     The Committee, on behalf of the Debtors, hereby seeks relief pursuant to 11 U.S.C. §§ 544, 548, and 550, and applicable state fraudulent transfer law, from the fraudulent transfer of Lyondell's assets and property to shareholders and financing parties that occurred upon the Merger and resulted in LBI being rendered insolvent, left with unreasonably small capital, and unable to pay its debts when they became due.

13.     The relief sought hereby includes, *inter alia*, (i) under 11 U.S.C. §§ 544 and 548 and under applicable state fraudulent transfer law, avoidance of the obligations incurred by the

Debtors, as borrowers and guarantors, to both the banks that financed the Merger and to a class of subsequent purchasers of such obligations, to the extent that the Debtors did not receive reasonably equivalent value therefore, including obligations incurred to fund the approximately $12 billion of merger consideration paid to Lyondell shareholders upon the consummation of the Merger in respect of their shares of Lyondell common stock outstanding at the effective time of the Merger (the "Merger Consideration"), associated transactional, advisory, and other fees (the "Transactional Fees") paid to third parties, and obligations incurred to fund the repayment of certain pre-Merger debt (the "Pre-Merger Debt Obligations") (the obligations incurred to fund the Merger Consideration, the Transactional Fees, and the Pre-Merger Debt Obligations, collectively referred to as the "Merger Financing Obligations"); (ii) under 11 U.S.C. §§ 544, 548, and 550, and under applicable state fraudulent transfer law, avoidance of the liens or pledges granted to the Defendants to secure repayment of the Merger Financing Obligations; (iii) under 11 U.S.C. §§ 544, 548, and 550, and applicable state fraudulent transfer law, the recovery by the Debtors' estates of all interest and fees paid on or in respect of the Merger Financing Obligations at any time since the effective time of the Merger; (iv) under 11 U.S.C. §§ 544, 548, and 550, and applicable state fraudulent transfer law, the recovery by the Debtors' estates of all Merger Consideration paid to former Lyondell shareholders, including the Blavatnik-controlled entities that were involved with acquisition and disposition of the Toe-Hold shares; (v) under 11 U.S.C. §§ 544, 548, and 550, and applicable state fraudulent transfer law, recovery by the Debtors of management fees paid to Nell Limited; (vi) under 11 U.S.C. §§ 544, 548, and 550, and applicable state fraudulent transfer law, recovery of all payments made to Lyondell's former officers and directors arising out of the Merger; and (vii) under 11 U.S.C. §§ 544, 548, and 550,

and applicable state fraudulent transfer law, avoidance and recovery of the Transactional Fees that the Debtors paid in connection with the Merger.

14.     In addition to the relief sought based on the fraudulent conveyance of the Debtors' assets and properties, the Debtors assert claims (i) for avoidance of $300 million in preferential transfers that Lyondell made to Access Industries Holdings LLC within ninety days prior to the Petition Date; (ii) for breach of fiduciary duty against the members of the pre-Merger board of directors of Lyondell (the "Directors") and against the members of the pre-Merger boards of directors of the Subsidiary Guarantors, as defined below; (iii) for aiding and abetting breach of fiduciary duty against Merrill Lynch; (iv) under Articles 59 § 1, 60bis-16 §§ 1 and 2, 62, 72-2, 69 and 191 of the Company Law of the Grand Duchy of Luxembourg (the "Company Law"), where applicable, against present and former members of the Supervisory Board of LBI (the "Supervisory Board") and representatives (the "GP Managers") of  LyondellBasell Industries AF GP S.à.r.l., the general partner of LBI (prior to the Merger, known as "Basell AF GP S.à.r.l.," hereinafter, the "GP") for mismanagement of LBI, including, *inter alia*, the authorization and approval of the Merger and the associated financing and other transactions that resulted in the Debtors' financial impairment and insolvency; (v) under Articles 59 § 2, 60bis-16 § 2, 62, 72-2 and 69 of the Luxembourg Company Law, Articles 1382, 1383, and 1384 § 5 of the Civil Code of the Grand Duchy of Luxembourg (the "Civil Code"), and the provision of the Law of 5 April 1993 on the financial sector, as amended, against the Supervisory Board, the GP Managers and the Lead Arrangers for tortious misconduct; (vi) for the equitable subordination under 11 U.S.C. § 510, *inter alia*, of all claims of the financing parties against the Debtors for the repayment of the Merger Financing Obligations based on, *inter alia*, the gross and egregious conduct of the parties who were responsible for the financing of the Merger; (vii) for breach of

contract against Access Industries Holdings LLC and AI International S.à.r.l. for failing to fund on the Access Revolver; (viii) for the equitable subordination under 11 U.S.C. § 510 of all claims of AI International S.à.r.l. based on it gross and egregious conduct in connection with the Access Revolver; and (ix) under 11 U.S.C. §§ 544(a)(1), (2), or (3), and applicable state fraudulent transfer laws, avoidance of certain improperly perfected liens in favor of Citibank, N.A., as collateral agent on behalf of the banks that financed the Merger and any subsequent purchasers, and, under 11 U.S.C. § 551, the preservation of such liens for the benefit of the Debtors' estates.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1409(a).  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

16.     This adversary proceeding is commenced pursuant to 11 U.S.C. §§ 510, 544, 547, 548, and 550, and applicable state fraudulent transfer laws, to recover fraudulent transfers, to equitably subordinate certain secured claims, to avoid preferential transfers, and to recover damages for breach of fiduciary duty and breach of contract from the Defendants.

## PARTIES

### I.     The Plaintiff

17.     Plaintiff is the Official Committee of Unsecured Creditors duly appointed on January 16, 2009 in these Chapter 11 cases by the Office of the United States Trustee for the Southern District of New York.  The Committee has been authorized to bring this action on behalf of the Debtors' estates.

## II.     The Defendants

### A.     Financing Party Defendants

18.     Defendant Citibank, N.A. ("Citibank"), is named in its capacity as (i) predecessor administrative agent under the Senior Credit Facility (as hereinafter defined), and individually as lender thereunder; (ii) collateral agent under the Bridge Loan Facility (as hereinafter defined); and (iii) in such other capacities as it has acted under the Senior Credit Facility or the Bridge Loan Facility.

19.     Defendant Citibank International plc, is named in its capacity as predecessor European administrative agent under the Senior Credit Facility and individually as lender thereunder.

20.     Defendant Citigroup Global Markets Inc. is named in its capacity as a joint lead arranger under the Senior Credit Facility and individually as lender thereunder.

21.     Defendant Deutsche Bank Trust Company Americas is named in its capacity as successor to Citibank, N.A., and Citibank International plc as administrative agent and European administrative agent, respectively, under the Senior Credit Facility.

22.     Defendant Goldman Sachs Credit Partners, L.P. ("Goldman"), is named in its capacity as (i) a joint lead arranger under the Senior Credit Facility and individually as lender thereunder and (ii) a joint lead arranger under the Bridge Loan Facility and individually as lender thereunder.

23.     Defendant Goldman Sachs International is named in its capacity as a joint lead arranger under the Senior Credit Facility and individually as lender thereunder.

24.     Defendant Merrill Lynch is named in its capacity as (i) a joint lead arranger under the Senior Credit Facility and individually as lender thereunder and (ii) a joint lead arranger under the Bridge Loan Facility and individually as lender thereunder.

25.     Defendant Merrill Capital Corporation is named in its capacity as (i) a joint lead arranger under the Senior Credit Facility and individually as lender thereunder and (ii) administrative agent under the Bridge Loan Facility.

26.     Defendant ABN AMRO Inc. ("ABN AMRO") is named in its capacity as (i) a joint lead arranger under the Senior Credit Facility and individually as lender thereunder and (ii) a joint lead arranger under the Bridge Loan Facility and individually as lender thereunder.

27.     Defendant ABN AMRO Bank N.V. is named in its capacity as a joint lead arranger under the Senior Credit Facility and individually as lender thereunder.

28.     Defendant UBS Securities, LLC ("UBS"), is named in its capacity as (i) a joint lead arranger under the Senior Credit Facility and individually as lender thereunder and (ii) a joint lead arranger under the Bridge Loan Facility and individually as lender thereunder.

29.     Defendant LeverageSource III S.à.r.l., upon information and belief, an entity controlled by Apollo Management, L.P., is named individually as a holder through purchase of an obligation incurred under the Senior Credit Facility and in its capacity as Class Representative for all other holders through purchase of obligations incurred under the Senior Credit Facility.

**B.      Other Transferee Defendants**

30.     Defendant Barclays Global Investors, N.A., is named individually and in its capacity as a Class Representative for all persons who received Merger Consideration in respect of their beneficial ownership of shares of the Common Stock of Lyondell Chemical Corporation outstanding on December 20, 2007, immediately prior to the effective time of the Merger.

31.     Defendant Deutsche Bank Securities, Inc. is a Delaware corporation with a principal place of business in New York, New York.

32.     Defendant Nell Limited is a corporation organized under the laws of Gibraltar.

33.     Defendant AI Chemical Investments LLC is a Delaware limited liability company.

34.     Defendant Perella Weinberg Partners LP is a Delaware limited partnership, with a principal place of business in New York, New York.

35.     Defendant Morris Gelb is a former Executive Vice President and Chief Operating Officer of Lyondell, and a former Director of Millennium America Inc., Millennium Chemicals Inc., Millennium Petrochemicals Inc., and Millennium Specialty Chemicals Inc., all Delaware corporations.

36.     Defendant T. Kevin DeNicola is a former Chief Financial Officer of Lyondell, and a former Director of Millennium America Inc., Millennium Petrochemicals Inc., and Millennium Specialty Chemicals Inc., all Delaware corporations.

37.     Defendant Edward J. Dineen is a former Senior Vice President of the Chemicals and Polymers segment of Lyondell, and a former Director of Millennium America Inc., Millennium Chemicals Inc., and Millennium Petrochemicals Inc., all Delaware corporations.

38.     Defendant Kerry A. Galvin is the former General Counsel of Lyondell.

39.     Defendant John A. Hollinshead is the former Senior Vice President of Human Resources of Lyondell.

40.     Defendant James W. Bayer is the former Senior Vice President of Manufacturing and Health, Safety, and Environment of Lyondell.

41.     Defendant W. Norman Phillips is the former Senior Vice President of the Fuels and Pipelines segment of Lyondell.

42.     Defendant C. Bart de Jong is the former Senior Vice President of the Technology segment of Lyondell (all former executive officers of Lyondell collectively, the "Officers").  Mr.

de Jong also was a Director of Millennium Chemicals Inc. and Millennium Specialty Chemicals Inc., both Delaware corporations.

### C. Fiduciary Defendants

(i) Former Members of the Board of Directors of Lyondell Chemical Company

43. Defendant Dan F. Smith served as the Chief Executive Officer and a Director of Lyondell prior to the Merger. As alleged below, Smith received approximately $57 million as compensation under various change of control provisions as a result of the Merger.

44. Defendant Carol A. Anderson is a former member of the board of directors of Lyondell.

45. Defendant Susan K. Carter is a former member of the board of directors of Lyondell.

46. Defendant Stephen I. Chazen is a former member of the board of directors of Lyondell.

47. Defendant Travis Engen is a former member of the board of directors of Lyondell.

48. Defendant Danny W. Huff is a former member of the board of directors of Lyondell.

49. Defendant Paul S. Halata is a former member of the board of directors of Lyondell.

50. Defendant David J. Lesar is a former member of the board of directors of Lyondell.

51. Defendant David J.P. Meachin is a former member of the board of directors of Lyondell.

52.     Defendant Daniel J. Murphy is a former member of the board of directors of Lyondell.

53.     Defendant William R. Spivey is a former member of the board of directors of Lyondell (all former members of the board of directors of Lyondell collectively, the "Directors").

(ii)     Fiduciaries of LBI

54.     Defendant Leonard Blavatnik is either an actual or a de facto member of the Supervisory Board of LBI.

55.     Defendant Richard Floor is a member of the Supervisory Board of LBI and a representative of the GP.

56.     Defendant Alan Bigman is a representative of the GP.

57.     Defendant R. Kent Potter is a member of the Supervisory Board of LBI and a representative of the GP

58.     Defendant Lincoln Benet is a member of the Supervisory Board of LBI.

59.     Defendant Lynn Coleman is a member of the Supervisory Board of LBI.

60.     Defendant Simon Baker was a member of the Supervisory Board of LBI as of December 20, 2007.

61.     Defendant Dawn Shand was a member of the Supervisory Board of LBI as of December 20, 2007.

62.     Defendant Bertrand Duc was a member of the Supervisory Board of LBI as of December 20, 2007.

63.     Defendant Philip Kassin is a member of the Supervisory Board of LBI (all members of the Supervisory Board of LBI collectively, the "Supervisory Board Members") and a representative of the GP (all representatives of the GP, the "GP Managers").

(iii)     Fiduciaries of LBI Subsidiaries at the time of the Merger:

64.     Defendant Kevin R. Cadenhead was a Director of Lyondell Chemical Nederland Ltd., Lyondell Chemical Technology 1 Inc., Lyondell Chemical Technology Management Inc., Lyondell Europe Holdings Inc., Lyondell Houston Refinery Inc., Lyondell LP4 Inc., Lyondell (Pelican) Petrochemical L.P. 1, Inc., Lyondell Petrochemical L.P. Inc., Millennium America Holdings, Inc., and Millennium Worldwide Holdings I Inc.

65.     Defendant Charles L. Hall was a Director of Lyondell Chemical Nederland Ltd., Lyondell Chemical Technology 1 Inc., Lyondell Chemical Technology Management Inc., Lyondell Europe Holdings Inc., Lyondell Houston Refinery Inc., Lyondell LP4 Inc., Lyondell (Pelican) Petrochemical L.P. 1, Inc., Lyondell Petrochemical L.P. Inc., Millennium America Holdings Inc., and Millennium Worldwide Holdings I Inc.

66.     Defendant Francis P. McGrail was a Director of Lyondell Chemical Nederland Ltd., Lyondell Chemical Technology Management Inc., Lyondell Europe Holdings Inc., Lyondell Houston Refinery Inc., Lyondell LP4 Inc., Lyondell (Pelican) Petrochemical L.P. 1, Inc., Lyondell Petrochemical L.P. Inc., Millennium America Holdings Inc., and Millennium Worldwide Holdings I Inc.

67.     Defendant Rick Fontenot was a Director of Lyondell Chemical Technology 1 Inc. and Lyondell Chemical Technology Management Inc.

68.     Defendant Michael P. Mulrooney was a Director of Basell Finance USA Inc., Basell North America Inc., and Basell USA Inc.

69.     Defendant Kevin E. Walsh was a Director of Basell Finance USA Inc., Basell North America Inc., and Basell USA Inc.

70.     Defendant John Fisher Gray was a Director of Basell Finance USA Inc., Basell North America Inc., and Basell USA Inc.

71.     Defendant Gary L. Koehler was a Director of Lyondell Chemical Technology 1 Inc. and Lyondell Chemical Technology Management Inc (all directors of such subsidiaries, collectively referred to as the "Subsidiary Directors").

### D.     Preference Defendants

72.     Defendant Access Industries Holdings, LLC, upon information and belief, is an entity organized under the laws of Delaware under the control of Blavatnik.

### E.     Breach of Contract Defendants

73.     Defendant Access Industries Holdings, LLC, upon information and belief, is an entity organized under the laws of Delaware under the control of Blavatnik.

74.     Defendant AI International S.à.r.l. upon information and belief, is an entity organized under the laws of Luxembourg under the control of Blavatnik.

## FACTUAL BACKGROUND

### I.     Lyondell Shareholders Are Cashed Out in a Highly Leveraged Acquisition

### A.     Blavatnik Seeks to Acquire a Major Petrochemicals Producer

75.     In 1986, Leonard Blavatnik founded Access Industries ("Access"), an international industrial group based in New York, of which he remains Chairman and President.

76.     Blavatnik, a self-described "strategic investor," became a public figure in connection with his role in the Soviet privatization auctions of the 1990's. The privatization process resulted in the transfer of much of the vast industrial wealth of the former Soviet Union to an oligarchy of new multi-billionaire industrialists. Blavatnik, whose net worth reportedly exceeds $11 billion, is frequently identified on lists of the world's wealthiest individuals. The full extent of his holdings, much of which is held by or through private companies, is not a matter of public record.

77.     Through Access and its affiliates and in conjunction with joint venturers, Blavatnik accumulated a portfolio of investments in a broad range of basic and advanced industries.  After acquiring substantial assets in Russia, Blavatnik expanded his business interests to Europe and the United States.  His investment portfolio, much of which has been acquired through highly-leveraged transactions, includes stakes in oil, coal, aluminum, petrochemicals and plastics, telecommunications, media, and real estate.

78.     By 2004-2005, low interest rates, loosening lending standards, and the post-Enron/WorldCom regulatory tightening on publicly held companies had given rise to the largest private equity boom the world had ever seen.  Equity sponsors, funds, and "strategic" investors alike were on the lookout for acquisition targets that could be bought with borrowed money, would generate cash flows to pay for themselves, and could then be drained of their cash and/or sold at a profit.

79.     Whereas the conventional wisdom had been that only certain industries and only selected targets with low debt loads and stable cash flows were suitable candidates for highly-leveraged acquisition, by 2005, these suitability criteria had been cast aside and almost any company with EBITDA (*i.e.*, earnings before interest, taxes, depreciation, and amortization) could become the subject of a leveraged acquisition strategy.  Investment bankers eager to generate their "deal" fees and confident that the non-investment grade or "junk" markets would buy whatever they were selling, competed in an overheated private equity market to sell "financing packages" for leveraged acquisitions.  The rewards for the investment bankers and their institutions that originated these loans were great.  Once securing a leveraged financing transaction and earning multi-million dollar fees for investment banking services, the financing parties earned additional fees through the syndication and in their roles as administrative and

collateral agents for the banks, institutions, and funds that held the loans. Generally, the financing parties who originated the loans would then sell some or all of the commitment through syndication, keeping for themselves only the highest quality (most secure, best priced) piece of the loan and freeing up their own balance sheets to do the next deal, earn the next round of fees, and on and on.

80.     Blavatnik was an active and eager participant in the investment market. On May 5, 2005, Access, through its affiliate Nell Acquisition S.à.r.l. ("Nell") (yet another Blavatnik-controlled entity) acquired Netherlands-based Basell from Royal Dutch Shell plc and the BASF Group in a highly-leveraged transaction. Access made this acquisition after several months of detailed due diligence after entering into a confidentiality agreement with Basell. Basell, a Luxembourg limited partnership, is an international chemicals company, self-described as the world's largest manufacturer and marketer of polypropylene and advanced polyolefins, and a major European manufacturer and marketer of polyethylene. Eighty percent of the financing for the €4.5 billion price paid for by Access for Basell was debt. Access's only contribution to Basell's equity was approximately €860 million in cash.

81.     At all times relevant hereto, the approval of the Supervisory Board of the GP, which is controlled by Blavatnik and his appointees, Defendants Richard Floor, Kent Potter, Philip Kassin, Lincoln Benet, and Lynn Colemen, was required for LBI to engage in any transaction of material or strategic significance.

82.     Once having acquired Basell, Blavatnik and his team at Access, including Philip Kassin, Senior Vice President and head of Mergers and Acquisitions and Financing, were on the lookout to leverage the investment in Basell by using it as an equity stake for much larger leveraged transactions. Blavatnik's strategy was to capitalize on the cheap money available in

the non-investment grade credit markets to acquire, using maximum leverage and minimum equity, one or more major petrochemicals producers, thereby amassing a global petrochemical conglomerate. Counting on the spread between cheap long term money and return on assets acquired, Blavatnik's strategy was to be able to use earnings to reduce the debt load, freeing up cash to be distributed to him in the form of dividends or management fees. Blavatnik also made sure to try to avoid any tax liability and arranged whenever possible to have payments to him made on his behalf to Nell Limited, his Gibraltar entity, and through other means. During the period from its acquisition by Blavatnik until December 20, 2007 when Basell was used as the platform for the acquisition of Lyondell, Blavatnik-controlled Access affiliates took out approximately €340.5 million, or $463 million, of cash from Basell in the form of dividends and management fees.

83.     While the overall strategy was simple, the pronounced cyclicality of the petrochemical industry and the refinery industry heightened the risk involved in a highly leveraged acquisition. Rather than enjoying stable cash flows that can be counted upon to cover fixed costs and charges (such as the costs of plant operation and maintenance as well as interest payments on mountains of acquisition financing), petrochemicals and refining had long been defined by its peaks and troughs in earnings.

84.     During the peak of a petrochemical cycle, the industry enjoys high margins as a result of limits on the capacity of existing plants to convert petrochemical "feedstocks" (most importantly crude oil and naphtha, a natural gas) into ethylene, propylene, and other products used in a wide range of industrial applications. Excess profits are reinvested in new capacity until, at some point, overcapacity results and the peak heads into the next trough. Additional earnings volatility results from macroeconomic forces and changes in the prices of feedstocks.

During 1993, the deepest trough in recent petrochemicals history, cash margins on ethylene, a major primary petrochemical commodity, dropped to approximately 13% of margins seen three years before, a reduction of 87%. In the subsequent peak in the ethylene cycle, margins shot up almost 1100% from 1993 levels (from 1.4 cents per pound to 16.8 cents per pound) only to drop again to 2.9 cents a pound in 2002. And during the more recent petrochemical industry trough of 2002, the drop in certain industry commodity spreads was even worse than in 1993.

85.     The petroleum refining industry is also subject to pronounced business cycles, experienced by industry participants in the form of extreme changes in the "crack spread" – the price differential between refined petroleum products (such as gasoline) and the crude oil from which they are derived. The refinery industry is also subject to disruptions in the market due to geopolitical developments and natural disasters. For example, in August and September 2005, back to back hurricanes rocked the energy infrastructure of Louisiana and Texas, disrupting as much as 30% of U.S. refining capacity.

86.     A company that has both petrochemical assets and refinery assets is subject to both cycles. Historically, petrochemical cycles occur over a five to seven-year period; petroleum refining cycles have been longer. If both industries are in a downturn at the same time, the financial performance of a company with both petrochemical and refining assets will be doubly devastated. Although decision-making by companies in these industries would be enhanced by advance knowledge of what is to come, the reality has been that long-term forecasting has not been successful in predicting the length, severity, and particular characteristics of industry cycles. Industry forecasts are constantly revised, often materially, even with respect to the relative short-term.

87.     Notwithstanding that cash flows from a petrochemicals company could not reasonably be expected to be stable or predictable, Blavatnik was intent on acquiring major petrochemical assets in one or more highly leveraged transactions.  This is essentially a gamble on the chance that earnings of the acquired company will be sufficient to fund operations and allow debt to be paid down.  If successful in maintaining ownership of assets through the turn of the petrochemical cycle, Blavatnik's upside would be great.  Blavatnik could emerge on the other side of a trough with substantial equity in a major global petrochemical company poised to generate robust earnings as the industry heads toward the next peak.  If, as it turned out, he overleveraged and could not finance his business through a downturn, because of his minimal equity investment, the pain would largely be felt by others, namely the creditors of the Debtors' Estates.

**B.     Access Targets Lyondell for Acquisition**

88.     Based on Blavatnik's reputation, his active acquisition history, and his ownership of Basell, Blavatnik and his Access team were frequently the object of unsolicited pitches from investment bankers with acquisition strategies and proposals for financing packages to acquire targets with little if any equity investment.  If an investment banker was viewed as bringing an opportunity to Access or facilitating a transaction, it would be well-positioned to snag the investment banking engagement and other multi-million dollar fees that would be generated through the transaction.  Not surprisingly, several of the investment bankers who became involved in financing the Merger, including Merrill Lynch and Citibank (both of which were accustomed to receiving multi-million dollar transaction fees on Blavatnik deals), routinely approached Blavatnik hoping to play a lucrative leading role in arranging financing for the next transaction.

89.     By the spring of 2006, Access had identified Lyondell among several other possible acquisition targets, including Huntsman International, LLC ("Huntsman"), a Houston based petrochemical company.

90.     Lyondell, a widely-held public company traded on the New York Stock Exchange, was much larger than Basell, with revenues for fiscal year 2005 of approximately $18.6 billion, compared to Basell's approximately €8.6 billion in revenues.

91.     Lyondell was hardly the most obvious or attractive candidate for a leveraged acquisition.  Incorporated in 1985 as a subsidiary of the Atlantic Richfield Company ("ARCO"), Lyondell initially consisted of an aggregation of assets that no longer fit within ARCO's business plan and for which it had been unsuccessful in finding a buyer.  Hoping to create a viable company, Lyondell managers deployed a strategy of opportunistic acquisitions, picking up assets being cast off by the major petrochemical companies who were exiting intermediate petrochemical manufacturing.  After going public in 1989, the strategy continued, and during the ten year period from 1996 through 2006, Lyondell management grew revenues from $5.1 billion to $22.2 billion.  By 2006, Lyondell was the third largest independent chemical company in the United States with facilities in several states, and a minor presence in Japan and France, although as discussed below, its high cost structure, older facilities, and strategically poorly located operations put it at a competitive disadvantage to its global competitors.  All this growth came at a cost.   As a result of these acquisitions, by 1999, Lyondell had become materially overleveraged, a condition that continued to impede it through the coming years.  Lyondell's profits and earnings had historically been very volatile.  Heavily concentrated in commodity petrochemicals, Lyondell's EBITDA for 2003, a "trough" year, was only approximately 24% of what it had been in 1995, a "peak" year.

92. Lyondell's historical stock prices reflected the company's volatility and other problems. Offered to the public at $30 per share in 1989, Lyondell stock was an aftermarket disaster. It peaked at approximately $36 per share in 1998 only to fall back to much lower levels and thereafter languished for years. When squeezed for cash, Lyondell, under pressure from bondholders and credit rating agencies, had diluted its stockholders by issuing stock dividends or by raising equity to fund the issuance of cash dividends. Attempting to break from this history, since 2000, Lyondell management had included de-levering as a keystone of their business strategy. Consistent with this objective, Lyondell used cash flow from operations to repay more than $2.5 billion of debt from September 2004 to December 2006.

93. Nonetheless, Lyondell continued to be highly levered for a commodities petrochemical producer.

94. In 2006, industry analysts were consistently forecasting that the current "peak" in the petrochemicals cycle would occur by the end of 2007, whereupon analysts predicted the industry would head into a downturn, bottoming out to a "trough" during 2010-2011, with earnings then heading back up for the next peak. Lyondell was by no means ideally positioned to withstand a squeeze on its earnings: its balance sheet for the year ended December 31, 2006 included approximately $8 billion of long-term debt, and Lyondell's debt to EBITDA ratio, a key credit metric, was at 3.4x for the year-end, one of the highest among its peers (with the exception of a handful that had already become targets of the buy-out boom). Understandably, Lyondell's publicly stated financial goal for 2007 was "to enhance its financial flexibility by improving its balance sheet through debt reduction and by maintaining a strong liquidity position, with an ultimate goal of achieving an investment-grade credit rating." An investment grade credit rating

would further enhance Lyondell's flexibility and liquidity, critical to maintaining a sound financial condition through a downturn.

95.     Lyondell management's objectives of "improving its balance sheet," "maintaining a strong liquidity position," and "achieving an investment grade credit rating" were not to be realized.  Instead, Lyondell's destiny was to be acquired by Basell and, by the end of 2008, to become the most highly leveraged petrochemical chemical producer, by far and bar none, with a total debt to EBITDA ratio of 7x.  In contrast, the median 2008 debt to EBITDA ratio for major petrochemical producers was 2.3x.

96.     Although Blavatnik may have targeted Lyondell even earlier, the origins of the acquisition of Lyondell by Basell can be traced to April 2006 when Lyondell was exploring the alternatives of either selling its 58.7% interest in Lyondell-Citgo Refining LP, an operator of a major petroleum refinery in Houston, Texas (the "Houston Refinery"), or buying out its joint venture partner, CITGO Petroleum Corporation, an indirect subsidiary of the national oil company of Venezuela.  Blavatnik, guided by Merrill Lynch, which was eager to be the investment banking advisor for Blavatnik on any acquisition of Lyondell, saw the auction process for the Houston Refinery as a means to learn more about Lyondell and place Access in a better position to potentially acquire the whole company.

97.     On April 10, 2006, Blavatnik and Kassin arranged an introductory meeting in New York with Dan F. Smith, Lyondell's President and Chief Executive Officer.  Signaling Access' interests in acquiring Lyondell, Kassin also informed Smith that he had plans to meet with Stephen I. Chazen, Senior Executive Vice President and Chief Financial Officer of Occidental Petroleum Corporation and a Director of Lyondell.  Occidental Petroleum held, at the time, a significant percentage of Lyondell's outstanding stock.

98.     After the meeting, Blavatnik e-mailed Kassin and Ross Lukatsevich, a Director at Access, asking them to prepare leveraged buyout models for Lyondell "with non-stupid prices (*i.e.* not 30 [per share])."

99.     Kassin called Smith on April 19, 2006 to follow up on the initial meeting and to request a further meeting in Houston to discuss the interest of Access in exploring a potential acquisition of Lyondell by Basell.  Smith, who had headed Lyondell while it pursued its strategy of growth through acquisitions, indicated that Lyondell was not for sale.

100.    Undeterred, on April 24, 2006, Kassin, acting on Blavatnik's instructions, contacted Smith to make an offer to purchase Lyondell for $24 to $27 per share.  Smith duly brought Blavatnik's offer to the attention of the Lyondell board at a regular meeting held on May 4, 2006.  At the same meeting, Chazen informed the board that representatives of Access had approached him in his capacity as Chief Financial Officer of Occidental Petroleum regarding an interest in Lyondell.  The board discussed the indication of interest and determined that the proposed price range, which was approximately 10% above the range at which shares of Lyondell shares had recently been trading, was insufficient.

101.    Weeks later, in early June 2006, Kassin was advised by Smith that Access' offer was deemed by the board to have been too low to warrant a formal response.  According to Smith, if Access wanted to negotiate, it would have to offer at least a 20% premium over the most recent closing price of its stock.  As of that time, the price of Lyondell stock had actually fallen a bit – back to approximately $24 per share.  Taking its cue from Smith's suggestion regarding a 20% premium, Access decided to analyze a possible acquisition of Lyondell for $28 per share.   Access asked an investment banking group at Merrill, which had previously

forwarded to Access an analysis of a Lyondell acquisition, to model various alternative structures for acquiring Lyondell at $28 per share.

102.     Merrill prepared "discussion materials" for the acquisition of Lyondell, including financial models of three variations of a leveraged acquisition of Lyondell at $28 per share: an all cash acquisition of Lyondell assuming Lyondell had sold the Houston Refinery; an all cash acquisition assuming Lyondell's full ownership of the Houston Refinery; and, finally, a part stock, part cash acquisition.  Projections used in this modeling were based, purportedly, on data from industry analyst Chemical Market Associates, Inc. ("CMAI") and what was characterized as a "Wall Street Consensus." In a summary to the materials headed "Why This Transaction Makes Sense," Merrill, which stood to be paid millions of dollars of fees from this transaction, claimed the "timing was right" given the stage in the industry cycle and the "strength in the leveraged finance market."

103.     On July 17, 2006, Merrill submitted an analysis to Access in which it urged Access to move immediately with an all cash offer to purchase Lyondell, which it referred to by its code name "Hugo." The report stated that the "valuation is attractive now for Access and other critical deal factors appear aligned (*i.e.* Hugo CEO, key Hugo shareholders, constructive Hugo board, strong leveraged finance market); that may not be the case and a deal may no longer be possible if we wait 6-12 months to try to further 'optimize' the acquisition price."

104.     On July 18, 2006, Lincoln Benet, the CEO of Access, emailed Blavatnik his "current thoughts" on an acquisition by Basell of Lyondell, based on an acquisition price in the $28 range.  Benet assessed the gamble involved in the proposed acquisition: Would Lyondell's earnings be sufficient to fund its operations and service a full load of acquisition financing through the next trough in the petrochemical and petroleum refining industries? According to

Benet, the bet was risky since it could be won only if earnings held up for three years before the trough deepened: "If we can make it through the next 3 years making $3bn+ net cash, I think we can structure the financing to ride through the expected trough…." In his email, Benet claimed he was getting "more comfortable on the default/downside risk" – the risk that when the industry moved into the next trough, Lyondell would default on its obligations to its creditors. Benet noted however that the merged entities would be "very leveraged."

105.     On July 24, 2006, Benet emailed Kassin and others expressing his concern that while the latest Merrill Lynch financial models for a leveraged acquisition of Lyondell seemed to show that the two companies could survive the coming downturn, Wall Street was not buying that scenario.     Specifically, accordingly to Benet, the equity option market reflected the assessment that there was "some overriding risk out there that we're not considering.  Litigation? Earnings? Plant failure? I don't know—but the point just highlight[s] that it is no[t] just academic—our 'Extreme Downside' case doesn't even start to capture at least what the market implies is over 30% probability within 18 months."

106.     On August 4, 2006, Benet emailed Nancy Zimmerman, a hedge fund manager and a close advisor to Blavatnik, and a member of the Investment Committee of Access, to express his suspicions about the Merrill Lynch financial models of the proposed acquisition.  Although these models were supposed to illustrate how the merged company would hold up under the stress of an industry downturn, even the downside models optimistically showed the company sailing through unscathed.  Benet was concerned that the modeling was failing to realistically take into account the full range of adverse possibilities.  He remarked to Zimmerman: "As another sceptic [*sic*], you'll also find this scenario analysis frustrating—given that it is supposed

to help us understand our key risk areas." Benet observed that based on the financial modeling done, "[b]asically, no matter what scenario we run, we somehow always have plenty of room."

107.    On August 5, 2006, Benet sent an email to Blavatnik and Kassin warning of the risks to Access from a leveraged acquisition of Lyondell.  Reacting to the financing strategies then under consideration, he explained: "My worry is if we have to put in so much cash as currently proposed, it is (1) clearly less attractive; (2) a big single exposure for us; (3) I still fear we don't really see where the big problems in the biz may arise; (4) it significantly hampers our financial flexibility."

108.    Despite Benet's reservations that the potential downside to the transaction had not been realistically assessed and that Access was not grasping the full picture, on August 10, 2006, Access made its first formal bid to purchase Lyondell, proposing in a written offer to acquire all of the outstanding shares of Lyondell for a cash price of $26.50 to $28.50 per share.  The letter attached a "highly confident letter" in which Merrill expressed its opinion that it could procure adequate financing to finance the Merger and indicated that Access itself would provide up to $1 billion of cash as part of the financing of the proposed transaction.  Access' offer letter, which was signed by Trautz (on behalf of Basell) and Blavatnik (on behalf of Access) indicated that Access and Basell would need 30-45 days of due diligence "[w]ith the cooperation of Lyondell's management team" before signing a definite merger agreement.

109.    On August 14, 2006, a special meeting of the Lyondell board of directors was held to discuss the Access offer.  After discussion, the board instructed Smith to advise Access and Basell that the proposal was not in the best interests of Lyondell's shareholders and that it did not wish to explore the proposal further.  The rejection was duly communicated in writing to Access.

110.    After rejecting Access' offer, Lyondell announced that it would not be selling the Houston Refinery but would instead be acquiring CITGO's joint venture interest.  Lyondell management, looking toward a possible economic/industry downturn and tightening of the credit markets, planned to use Lyondell's increased share of the earnings from the Houston Refinery (which it would now own 100%) to continue its long-term de-levering strategy to pay down "as quickly as possible" another $2 billion of debt.  Meanwhile, the stock price for Lyondell began to edge upwards slightly.  Responding to these developments, Access, while continuing to monitor Lyondell, turned its acquisition efforts elsewhere for the next several months.

111.    In February 2007, the price of Lyondell shares climbed past $30 per share and began trading in ranges not seen since mid-2005.  Rather than discouraging Blavatnik's interest in Lyondell, its rising stock price apparently resulted in a concern that an opportunity was being lost.  Abandoning his previous position that a $30 per share offering price for Lyondell would be "stupid," on February 28, 2007, Blavatnik emailed Kassin and Patel asking them to prepare models based on an acquisition of Lyondell at $35 to $38 per share.  Kassin responded, "[a]ny magic in the 35-38? Everybody screamed at me when I wanted to go above 28…is there new info I don't know about??"

112.    Merrill, ever eager to serve as investment advisor on another Blavatnik deal, was requested to assist Access by updating its June 2006 financial models for the proposed acquisition, which had assumed a price per share for Lyondell of $28, with revised models based on a price per share of $38.  Presentation materials, dated March 27, 2007, were prepared by Merrill Global Markets.  The March 27, 2007 presentation materials included "Base Case" projections and valuations for the combined Lyondell/Basell enterprise.  Data used was identified as having been developed from market sources and industry analyst CMAI.  With

respect to Basell, Merrill drew from Basell management forecasts. The materials also included a "Downside Case," which, without explanation, was calculated by decreasing "Base Case" assumptions by 15% with respect to Basell. Merrill stated a "Base Case" valuation at between $23.2 billion and $29.3 billion compared to the "Base Case" valuation that it had included in its June 2006 presentation of between $21.3 billion and $27.7 billion. Embodied in this combined enterprise valuation was a "mark to market" value of Basell between $3.9 and $4.6 billion, purportedly based upon the public trading multiples of its peer group. Access and Blavatnik knew that Merrill's valuation of Basell was without credible basis.

113. In its "Executive Summary," Merrill laid out the various claimed rationales for the deal. One deal driver was cheap, easy money available through "covenant lite" credit arrangements. Quite simply, according to the Executive Summary, the main deal driver was the fact that the debt could be sold to the credit markets: "given…[t]he historically high aggressiveness in the financing markets at the current time, we believe an acquisition of Hugo could be accomplished with no incremental cash equity from [Access] at prices in the upper $30s." The other deal driver was simple greed. According to Merrill, without any "incremental cash equity" from Access other than its investment in Basell, five years out from an acquisition of Lyondell, Access' incremental equity "would be in the range of $4 billion to $8 billion." Thus, according to Merrill, while the transaction would result in "a meaningfully higher equity risk," the upside potential was enormous. Furthermore, acknowledging that "any strategic benefits" of the merger would be "more than offset" by the higher level of risk to equity, Merrill, pointing to other recent transactions, none of which had been tested through a petrochemical industry downturn, claimed, inaccurately, that the combined company would be "generally in line with leveraged chemicals peers."

114.     Notwithstanding that the time horizon for the forecasted industry/economic downturn was closer (and that there was, therefore, less remaining time to benefit from earnings at peak levels) and that Lyondell at $38 per share would cost approximately $2.5 billion, or 36%, more than Lyondell at $28 per share nine months prior, Merrill's updated analysis, dated March 27, 2007, remained strongly bullish.  According to the Merrill pitch, Lyondell, a company which had yet to attract other potential suitors, purportedly was "the single most attractive transformation acquisition opportunity for [Basell]."  The increase in Lyondell's stock price, according to Merrill, was "explained" by Lyondell's acquisition of CITGO's interest in the Houston Refinery, the recent sale of Lyondell's titanium dioxide (Ti02) assets for $1.2 billion, analysts' projections, and increases in the stock prices of Lyondell's publicly traded peers.  Echoing Benet's approach, Merrill looked at an acquisition of Lyondell as a gamble that offered a big pay out if Lyondell could survive a "downside scenario."  According to Merrill, in terms that Merrill knew would resonate with Access and Blavatnik, the transaction could be financed "with 100% debt."

115.     A related Merrill Lynch "Executive Summary," dated April 10, 2007, shamelessly touted the deal, purporting to answer the questions "Why Hugo?" and "Why Now?" Succinctly stated, the answer was, "Because you can."  In this document, Access was urged by Merrill Lynch to capitalize on "[h]igh levels of leverage at historically low spreads," "covenant lite structures" and "acceptance of aggressive rollover of equity."  Access, using privately held Basell as equity (which was given a preposterously high and artificial valuation), had the ability to exploit the current credit market conditions to acquire billions of dollars of equity for itself without risking any substantial capital of its own.  Merrill and other lead arrangers could then off-load the junk into the market and earn huge fees.

116.     Inside Access, the Merrill models for acquisition of Lyondell at $38 a share were met with a chorus of concern and skepticism.  Ajay Patel, a Vice President of Mergers & Acquisitions at Access, commented regarding the proposed acquisition: "[W]e are putting a lot of debt on to the combined entity just because the financial markets will let us.  This may not be prudent in the long term." Alan Bigman, Chief Financial Officer of Basell, confessed he could not understand how the transaction models showed that, notwithstanding the increase in the acquisition price, the combined entity would not only have cash to service its debt but to pay it down.  Bigman observed, "*[T]he leverage is aggressive.  In the downside case, we would barely have cash to cover interest in the trough, and if working capital needs went up (e.g. because of an increase in oil prices) we would be in financial distress*." (Emphasis added).

117.     Seeking to gain insight on Blavatnik's apparent reinvigorated interest in Lyondell, Kassin sought out Volker Trautz: "…sorry to bug you with this…I am puzzled why Len likes [Lyondell] at $38??" Trautz had, however, nothing to contribute to Kassin's understanding, responding: "it is not easy to explain Len's love for Hugo."

118.     Trautz, like other Basell and Access insiders, analyzed the acquisition of Lyondell as a bet on the timing and severity of the forecasted petrochemical and refining downturns.  He noted that Lyondell, which had both petrochemical and refinery operations, was subject to both the both industries' cycles.  If the peak in one cycle would continue while the other headed into the trough, the combined company would be in a better position to survive the downside scenario.  But if the troughs for both company segments coincided?  Disaster.  Trautz bluntly laid it out for Blavatnik in a March 26, 2007 email:

> In my opinion, it comes down to the following.  Will the peak in the refining cycle coincide with the peak in petrochemicals or with the trough in petrochemicals?  Remember, we expect now the petrochemical cycle to turn by the end of 2008 and be in a trough

during 2009-2011. If you assume Hugo is worth $38/share you "bet" that the refining cycle will smoothen the trough in petrochemicals, or in other words when petrochemicals does not generate enough Ebitda, refining does and vice versa. If both petrochemicals and refining generate good Ebitda (as they do at the moment), great. If the trough in both markets coincides (which according to current forecasts could be in 2011-2012), we will be against the wall….

Len, this is my conviction and of course I can be wrong, but this is something I would like you to consider.

119. Trautz concluded with a plea to Blavatnik. If Blavatnik was intent on risking his equity in Basell to acquire Lyondell, would he at least please give others with equity in Basell the opportunity to bail out before going forward? Trautz wrote:

Plea: if we buy Hugo for $38-40, give my Basell team the chance to reduce our exposure because most of them have many of their eggs in this one basket.

120. Patel mocked Merrill's inflated valuation of Basell, stating in an email to Kassin and others at Access, that if Access "were asked to put in $4 billion to buy Basell today, we would roll over in laughter." Kassin in an email response, agreed. Patel understood, as did other Access insiders, that Merrill was showing that it was willing, as Access' investment banker on the deal, to overstate the value of Basell in order to manipulate the valuation of the combined company to where it should be to support the proposed highly leveraged structure.

121. After receiving the March 27, 2007 presentation materials, Merrill was asked to provide Access with an analysis of whether, if the forecasted industry downturn turned out to be more severe than analysts were currently projecting, the combined companies would be able to cover their debt expenses and meet their other financial obligations. In response to this request, Merrill supplemented the presentation materials with a "Credit Stress Test" that illustrated, according to Merrill, "the resilience of the proposed capital structure."

122.     Merrill's Credit Stress Test was based on a purchase price for Lyondell common stock of $38 per share and total funded acquisition debt in the amount of $19.6 billion, a significant feature of which was "Pay in Kind" or "PIK" notes, which would allow the company to meet its obligation to pay interest through the issuance of additional notes in lieu of cash.  As an analytical tool for purpose of testing the credit, the Credit Stress Test modified forecasts for years 2007 through 2013 to replicate historical trough conditions seen in 1993, described as the deepest trough in recent history.

123.     The Credit Stress Test analysis showed that on the assumption of a $38 purchase price and the use of PIK notes, the combined enterprise could satisfy its interest payments under the assumed capital structure.  However, the basis upon which the transaction was actually done in December 2007, did not conform to the assumptions used for the Credit Stress Test.  Had a "Credit Stress Test" been applied to the transaction as it actually occurred, *i.e.*, with a $48 per share purchase price, the capital structure that was actually put into place upon the Merger (which did not include PIK notes), and incorporating the capital expenditures and capital requirements projected or anticipated as of the closing date of the Merger, LBI would have failed the Credit Stress Test.  Such a Credit Stress Test would have shown a company insolvent, or, at a minimum, shortly becoming insolvent, as a result of the Merger.

124.     As explained below, the deal terms materially changed after March 27, 2007, with the purchase price escalating from $38 per share to $48 per share, after Blavatnik lost out to an entity controlled by Apollo Management, L.P. ("Apollo") in bidding for Huntsman (another major petrochemical company).  With Blavatnik determined to do the deal at any price provided only that he was not required to invest any "incremental equity," Merrill did not provide to Access any further similar "Credit Stress Test."

**C.  Blavatnik Acquires the Toe Hold Position in Lyondell**

125.  Merrill's March 27, 2007 materials and their supplements also included tactical advice on the acquisition, including the suggestion that Access proceed with the acquisition of Lyondell by first establishing a toe-hold of up to 14.9% in Lyondell.  In this connection, Merrill brought to Access' attention the fact that Occidental Petroleum, which had acquired a block of Lyondell shares in connection with a sale of assets, was in the process of disposing of its Lyondell holdings.

126.  Shortly thereafter, Access followed this advice, arranging, through Merrill's assistance as intermediary, for the acquisition of an Occidental Petroleum block.  On May 11, 2007, Blavatnik and AI Chemical Investments LLC ("AI Chemical"), a Delaware limited liability company, controlled by Blavatnik, filed a Schedule 13D reporting having entered into a transaction to acquire 20,990,070 shares of Lyondell through an agreement with Merrill.  The agreement with Merrill allowed AI Chemical to elect either to take delivery of the underlying shares for a price of $32.1130 per share, or settle the transaction (*i.e.*, to receive or pay the change in the value of the underlying shares).  Merrill and Access utilized the Toe-Hold Position to leverage Blavatnik's move to acquire Lyondell.

127.  The day Blavatnik and AI Chemical filed the Schedule 13D, Lyondell's stock closed at $36.75 per share, up 11% from the day before.

128.  When Blavatnik's acquisition of the Toe-Hold Position was made public, Smith, speaking at a conference in Las Vegas, spoke about the implications of a leveraged buy out of Lyondell by an equity sponsor, such as Access, as the markets had anticipated in light of the Schedule 13D filing.  Smith admitted that such a transaction could "enrich the shareholders" but observed the very different impact on Lyondell creditors.  Smith continued: "If you're a bondholder, I am not sure you get enriched in that situation.  If you think you are going to have a

35

down cycle in the chemical markets, I don't think you want to add $8 billion, $10 billion debt to this and live through that."

129.     Blavatnik's acquisition of rights to the Occidental Petroleum block of stock soon led to direct discussions between Access representatives and Lyondell.  Blavatnik directed Trautz to arrange a private meeting with Smith, who was scheduled to be in London for a conference in early June 2007.  Smith thereafter met privately with Trautz in London for dinner on or about June 7, 2007.  At the meeting, Smith (who had known Trautz for a number of years) used Trautz as a messenger to communicate Smith's "asking" price to Blavatnik.  In an email to Blavatnik dated June 11, 2007, Trautz summarized their meeting.  Smith stated that Blavatnik could use Lyondell as a platform to effectuate a merger, and suggested that a price of $48 per share would be appropriate.   According to Trautz, Smith appeared to be warming to the transaction, sharing with Trautz his rosy (but incorrect) forecast that the refining market would remain strong through 2012 and perhaps beyond, but that the petrochemicals market would enter a downturn in 2009-2010.[2]  This time frame was presented with a view to pitching the transaction.  If petrochemicals remained robust through 2009, Access would benefit from two fiscal years of strong earnings before heading into a downturn, which scenario (if it bore out) would maximize the amount of leverage that could be used for the deal.  Blavatnik, who was internally known at Access as the "King of Optionality"—Benet had a shorter name for Blavatnik: the "King"—kept his new "options" regarding Lyondell in reserve over the next several weeks while his Access deal team moved forward on another front with a potential acquisition of Huntsman.

---

[2] In its proxy announcing the proposed Merger, Lyondell failed to disclose that Smith was the one who first suggested the $48 per share price.  Instead, Lyondell stated that it was Blavatnik who first raised the $48 per share price during a July 9, 2007 telephone call.

130.     Blavatnik had, as among potential acquisition targets, for some time also been actively pursuing Huntsman.  Although Trautz, who knew the owners of Huntsman quite well, had warned Blavatnik against purchasing Huntsman and overpaying for Huntsman, Blavatnik ignored Trautz's advice and proceeded with an offer for Huntsman.  On June 1, 2007, Basell entered into a confidentiality agreement with Huntsman and began to receive internal non-public information from Huntsman.  Citibank served as Basell's financial advisor in the Huntsman transaction, while Merrill served as financial advisor to Huntsman.  On June 26, 2007, after extensive negotiations and due diligence by Basell, Basell and Huntsman entered into a definitive agreement pursuant to which Basell committed to acquire Huntsman in a transaction valued at approximately $9.6 billion.  With Huntsman seemingly within his grasp, Blavatnik learned in early July 2007 that the acquisition would not occur.  On July 4, 2007, Huntsman advised Access and Basell that Hexion Specialty Chemicals, Inc. ("Hexion"), an Apollo-controlled entity, had made a superior bid, something that Trautz had warned Blavatnik likely would occur.  After Basell failed to convince Huntsman that Basell's offer was in fact superior to the Apollo bid, Basell on July 11, 2007 notified Huntsman that it would not submit a revised or improved offer for Huntsman.  Thereafter, on July 12, 2007, Huntsman incurred a $200 million contractual break up fee (payable to Basell) in order to enable it to accept the higher offer from Hexion.  Huntsman was not the only petrochemicals target to elude Blavatnik.  He also had failed in his efforts earlier in 2007 to acquire General Electric's plastics division, which Basell's competitor, Saudi Arabian Basic Industries (or SABIC), snatched up.  In short, he was on a "losing" streak.  By early July 2007, there were already indications that the credit markets could be tightening.  The "King of Optionality," sensing his options were slipping away, resolved that he would close the deal to acquire Lyondell, whatever it took.

131. On July 4, 2007, the very day that Access learned it was out-bid on the Huntsman deal by Apollo, Blavatnik contacted Smith to request a meeting about the Lyondell acquisition. The two men met privately in New York at Access' offices in Manhattan on July 9, 2007, right before Smith flew to The Netherlands for a regularly scheduled Lyondell board meeting. According to Lyondell's proxy statement soliciting shareholder consent to the Merger, on this occasion, Blavatnik initially suggested a price of $40 per share for Lyondell, which was then trading at $39.21 per share. Smith suggested that if Blavatnik was serious, he needed to make his best offer. Smith had on a previous occasion indicated that the Lyondell board would be looking for a 20% premium over market price, and had already privately told Trautz in London on June 9, 2007 that $48 per share was an appropriate price to purchase Lyondell. Blavatnik requested that Smith contact him later that same day to further discuss the matter.

132. Later that same day, Smith called Blavatnik from the airport. After some discussion, Blavatnik indicated to Smith that Basell could pay $48 per share if Lyondell could sign an agreement by Monday, July 16, 2007 and agree to a $400 million break up fee. Blavatnik said the transaction would have fully committed financing and that consummation of the transaction would not be conditioned on obtaining financing. He gave Smith until July 11, 2007 to respond.

133. When word of Blavatnik's offer to acquire Lyondell at $48 per share reached his top executives, they were both incredulous and frightened. On July 9, 2007, Kassin informed Patel by email that Blavatnik intended to sign an agreement with Lyondell by July 16. Patel asked if Kassin was joking. Kassin responded by email: "No I aint [*sic*] – last hour most bizarre in my carrer [*sic*]."

134. In an email dated July 10, 2007, Kassin commented on the transaction to Bigman, "Not my idea. I can't sleep thinking of this at $48." Bigman replied: "Me neither, woke up at 4:30." Bigman emailed his concerns to Blavatnik, even knowing it would be no use: "I know you've already made up your mind, but I am uncomfortable with the valuation—it's almost $5 billion more than we were offering a year ago and over $2 billion more than we were discussing just a few weeks ago."

135. Merrill, which stood, as advisor to Huntsman, to make a $25 million transaction fee on the Hexion acquisition and sensing it was on the verge of snagging a second major transaction fee, was requested to update its June 12, 2007 analysis (which had assumed a per share price of between $38 and $42) to reflect an acquisition at between $45 and $50 per share. Modeling the deal at these price ranges, based on its prior projections for earnings, showed the combined enterprise with ratios of debt to EBITDA in excess of 5x as it headed into the trough years.[3]

136. As eager as it was to do the deal, Merrill was concerned that this level of leverage would interfere with the syndication of the loans. On July 10, 2007, Merrill raised the idea of including a "market flex" provision into the financing commitment that would permit Merrill to require that Access provide an incremental equity contribution to the merged entities of $1 to $2 billion if such a feature was necessary to syndicate the loan. Merrill also proposed issuance of PIK financing at the holding company level in order to lower the debt levels at the operating company level. Although Access had proposed including up to $1 billion of cash as part of its unsuccessful August 2006 offer for Lyondell, Patel promptly informed Merrill that such

---

[3] Merrill would ultimately receive over $31 million in fees for its "mergers and acquisitions" role on behalf of Access and Basell in the Lyondell merger.

proposed financial structures were unnecessary and "wholly unacceptable." Access and Blavatnik no longer had any intention of putting their own cash or capital at risk in the deal.

137.    Writing to Blavatnik, Bigman acknowledged that Merrill having raised the need for a market flex provision was "another indication that we're on the edge here." In fact, the "all debt" financing of an acquisition of Lyondell was not "on the edge," but well over it.  The extreme leverage being proposed would, upon the Merger, result in LBI being undercapitalized for the purposes of its combined businesses to the extent of at least $2 to $3 billion, if not even more.

138.    On July 11, 2007, Benet emailed Blavatnik, Trautz, Bigman, Kassin, and Patel with his analysis of the proposed capital structure.  According to Benet, if Lyondell, considered on a standalone basis, performed as forecasted by the "Base Case" projections that had been developed by Merrill using CMAI and other data, the combined enterprise would likely meet its debt service but its equity owners would essentially be "working for the banks." As Benet crunched the numbers, only if Lyondell materially outperformed the projections would the transaction make any sense.  He showed this by curiously adjusting the Base Case to increase EBITDA by 15%, calling this the "Sensitivity Case." Under this Sensitivity Case, Lyondell EBITDA would be $3.5 billion in 2007, as opposed to a "Base Case" EBITDA projection of approximately $3.1 billion.  As explained by Benet, the acquisition was a bet on the chance that Lyondell would materially overshoot expectations, even though Access had no evidence that would occur and knew that the petrochemical industry was poised to enter its next trough.   He explained: "[T]he rationale at this price [$48 per share] would be that we actually are buying the option on (a) the upside case equal to or greater than the Sensitivity, and (2) owning an enormous asset base into the next upswing."

139.    In reviewing Benet's analysis, Trautz asked Benet if he was correct "that we basicly [*sic*] at 48 per share can only justify the deal via synergies and the belief in the upside over the base case?" Benet confirmed that this was indeed his view:

> Correct.  For the next three years, the Base Case assumed average EBITDA of $2.3bn.  That's not enough for $48/share.
>
> We need to be expecting > $2.7bn to start paying down debt in the 'good times'.  And if we get $3bn it makes a real dent, which also provides cushion against a sharper downfall in the 'bad times'.
>
> If they were to make $3.5bn [for 2007], is > $2.7bn average for the next 3 years realistic or a pipedream?

140.    Meanwhile, although no one at Access was able to come up with reasonable, rational answers to the questions posed by Merrill: "Why Hugo?" and "Why Now?" and, most pressingly, "How can we service that much debt?," the transactional wheels, driven by Blavatnik's fixed determination to make it happen and by Merrill's eagerness for its anticipated fees, were moving inexorably forward.  Smith called a special meeting of the Lyondell Board on July 11, 2007 in The Hague to report his discussions with Blavatnik.  Predictably, given the "blowout price" being offered, the Lyondell board authorized Smith to continue discussions with Access.

141.    On July 12, 2007, in anticipation of Lyondell's board accepting the $48 per share price, Access quickly lined up the lead bankers – in addition to Merrill, that would include Citibank and Goldman.

142.    On or about July 12, 2007, Lyondell commenced providing materials to Basell and Access in response to the preliminary due diligence request of Basell and Access.  Meetings between representatives of Lyondell and representatives of Basell and Access took place on July 13, 2007 through July 15, 2007 in New York and Houston to enable Basell and Access to conduct a due diligence review of certain business, financial and legal matters.  The sole due

diligence meeting between Lyondell's management and the banks (*i.e.*, Merrill, Citibank, and Goldman) occurred at the offices of Skadden Arps in New York on Saturday, July 14, 2007. Either at or just prior to such due diligence meeting, Lyondell's management provided for the first time its internal EBITDA projections for 2007 and for succeeding years through 2011. Lyondell's internal projections were rosier than Merrill Lynch's base case. Trautz, who attended the July 14, 2007 presentation by Lyondell management at Skadden Arps, and was the most experienced and expert senior Basell representative present, did not find the internal Lyondell management projections at all credible. He understood that Lyondell management, who would enrich themselves and their shareholders if the deal went forward, was highly motivated to pitch Lyondell as worth the $48 per share price. For his part, Blavatnik did not attend these meetings, but received reports from members of his team who attended, including Trautz.

143.     Due diligence done here by Access and the lead bankers was perfunctory at best.[4] Blavatnik had made up his mind—he wanted the deal. And Lyondell management, having been offered a "blowout" price at $48 per share, was willing to oblige. Smith, who a year earlier had sold some of his Lyondell stock at approximately $25 per share, stood to receive, if the Merger was consummated, approximately $57 million pursuant to "change of control" provisions in various executive incentive plans. And the three lead banks (Merrill Lynch, Citibank, and Goldman), which stood to collectively make approximately $281 million in syndication fees along with hefty merger and acquisition fees, were so eager to do business with Blavatnik that they elected not to do any basic due diligence on Lyondell's internal management projections, which they had essentially one day to digest.

144.     By July 12, 2007, even Kassin, who remained opposed to the deal, was resigned to the inevitability of the transaction going forward.

---

[4] By contrast, in August 2006 Access/Basell advised Lyondell that it would require 30-45 days of due diligence.

My job is to sign this up…I will make it happen if I have to kill myself…the real problem is – I hate the deal at $48 and am scared to death that the banks will ALL want new cash equity…I am trying to separate my two roles – one deal weasel who will get this signed up in record time…vs. Board member with fiduciary role for the shareholder…this one will be tough.

145.    From July 12, 2007 through July 15, 2007, the parties and their external and internal legal counsel prepared and negotiated the form of a definitive agreement for the transaction and related documentation.

146.    By Sunday, July 15, 2007, Merrill Lynch, armed with Lyondell's own internal projections, had crunched the numbers yet again, this time apparently incorporating the Lyondell management projections, received by Merrill Lynch just the day before, into its projections. Merrill's new "Base Case" EBITDA projections (the "July 15 Base Case"), set forth in the table below side by side with Merrill's "Base Case" EBITDA projections of only a few days before (the "July 10 Base Case"), were markedly higher.

| Fiscal Year | July 10, 2007 "Base Case" | July 15, 2007 "Base Case" | Percentage Change from July 10 to July 15 |
|---|---|---|---|
| 2007 | $4,839 | $5,375 | +11.1% |
| 2008 | $4,435 | $5,222 | +17.7% |
| 2009 | $3,878 | $4,281 | +10.4% |
| 2010 | $3,435 | $4,005 | +16.6% |
| 2011 | $3,538 | $3,906 | +10.4% |
| 2012 | $3,878 | $3,928 | +1.3% |
| 2013 | $4,144 | $4,090 | -1.3% |

147.    All too conveniently, the new July 15, 2007 projections, unlike the *old* July 10, 2007 projections, showed the enterprise's combined EBITDA/debt ratios would stay comfortably below the "too risky" 5x levels which had prompted Merrill to raise the issue of requiring additional equity from Access.  Moreover, Lyondell's "Management Case" was materially inaccurate, as Access would discover very shortly and as Trautz already understood.  But there was no time for Access to engage in further due diligence or reasoned analysis, since Blavatnik

had committed to signing the Merger agreement by Monday, July 16, 2007. Instead, Access and Merrill recklessly accepted Lyondell's internal "management projections" and used them to pump up the purported valuation of Lyondell. Greased in this way, the transactional wheels continued to move forward. The idea of obtaining a commitment from Access to support the merged entities with additional equity was apparently abandoned by Merrill.

148. The same day, Merrill's Debt Markets Commitment Committee (or, credit committee) met at noon to "evaluate" its role in co-financing the transaction. In an internal presentation that read more like a sales or marketing pitch than an attempt to carefully analyze the deal, it was noted that Merrill Lynch stood to make at least $86.2 million in net financing fees on the deal, assuming syndication of the loans. When combined with Merrill's anticipated fee as lead advisor on the deal (which in the end was over $31 million), Merrill stood to make well over $100 million on this deal. Merrill Lynch assumed, in its internal July 15 report, that it would be able to quickly "dump" virtually all its exposure through syndication, and planned to keep only $100 million of debt.

149. The other committing banks' abdication of their due diligence obligations was no less heedless of the obvious risks. Citibank, which had been first contacted by Access no earlier than July 12, 2007 to co-finance the transaction at $48 per share, approved its participation in the financing on Sunday evening, July 15, 2007, noting in its Commitment Committee Approval Memorandum the risks, (*i.e.*, "industry cyclicality," "rising raw materials and energy prices," and "lack of full backward integration") that made the extreme leverage so inappropriate to the needs of the combined entities. Citibank's credit committee memo also modeled a potential downside scenario, which in fact closely tracked what actually occurred for Lyondell during the balance of 2007. Instead of reflecting any deliberation concerning the viability of the resulting obligors,

Citibank's Commitment Committee Approval Memorandum underscored the huge fees Citibank had made and was scheduled to make on other Access/Basell deals, including fees made by Citibank relating to Access' 2005 acquisition of Basell (€85 million), a subsequent Basell financing ($5 million), and potential fees upwards of $15 million for the acquisition by Basell of three refineries in France. When a Citibank team member commented, in an internal email late Sunday evening on July 15, 2007, that Lyondell's "EBITDA numbers are pretty frothy" and questioned the Lyondell management projections and assumptions, Robert Jefferies, one of the lead Citibank team members responded: "Understand. Its [*sic*] Basell management that really bought off on it." In other words, Citibank's investment banking team was prepared to do the deal simply because Blavatnik wanted to do the deal, Citibank wanted to maintain its valued relationship with Access (a relationship that had served it well in the past), and, Citibank assumed, as did the other arranging banks, that it could off load the loans (and the risk) through syndication.

150.     Goldman's approach was similar. Goldman had served as financial advisor to Access and Basell in May 2007 in Basell's failed bid for GE's plastics division, and the structure for financing the Lyondell acquisition was to be the same or similar to the structure developed by Goldman for that offer. Eager to get a role in financing the Lyondell transaction, Goldman Capital Credit Committee approved Goldman's participation in financing the Lyondell transaction even though Goldman's initial July 16, 2007 Credit Committee memorandum noted that the Goldman team had only a single day to meet with Lyondell management with the "updated business plan and access to legal and full business diligence." Even in its haste, the Goldman Credit Committee described the very same risk factors that management would later falsely assert unforeseeably converged to drive the combined companies aground only months

later: *i.e.*, an anticipated industry downturn, dependence on volatile commodities markets, declining demand, and the exposure of the Houston Refinery to disruption. As explained by the Goldman Credit Committee:

> Basell's high (and sometimes severe) cyclicality, an expected downturn-to-trough from 2009 to 2011, limited backward integration with exposure to raw material volatility (64% of costs), supply concentrations,…high production costs in Europe and North America, competitive end-markets, emergence of significant Middle Eastern capacity…and some dependence on continued high demand from Asia (China, specifically). Further, Lyondell's non-refining business is also highly cyclical and exposed to volatile input costs with downturn expected at the same time as for Basell, thus making pro-forma trough even more pronounced. Also, [Lyondell's] refinery business's diversification benefits are limited by the risk of reliance on a single large asset, exposure to the cycles inherent in the refining business, and potential disruptions in crude availability due to political instability in Venezuela.

(Brackets added). Goldman Credit Committee also had reservations concerning, *inter alia*, Lyondell's low EBITDA margins relative to its other chemical peers and the concentration of Lyondell and Basell in North America and Europe respectively.

151. Goldman's analysts foresaw that the acquisition would result in Basell's credit rating being downgraded at least one, if not two "notches," reflecting the very palpable risks associated with the financing structure. Goldman nonetheless leaped at the opportunity to be one of the three original lead banks on the deal committed to raising approximately $7 billion. Like the other lead banks, Goldman thought that its participation would generate enormous fees at little risk. This notion was based on Goldman's belief that it could offload substantially all of its $7 billion funding commitment either through syndication prior to the closing of the Merger or shortly afterwards. Assessing whether Goldman should hold onto to any part of the debt obligations of LBI, the verdict of the Credit Committee was clear: based on "fundamental credit considerations," Goldman should retain only a "strategic hold" of "up to" €10 million in

principal amount of the most secure part of the loans (*i.e.*, the first lien loans) and should eliminate all other holdings "to zero within six months."

152.     On July 16, 2007, Lyondell received a letter from Access, along with a financing commitment letter from the banks (the "Commitment Letter"), that set forth a proposal to acquire all of the common stock of Lyondell for a cash purchase price of $48 per share and outlined the other terms of Basell's offer, as reflected in the proposed form of merger agreement and the Commitment Letter.   The proposed transaction was structured as a reverse triangular merger pursuant to which a Basell subsidiary newly formed for the purposes of the Merger would be merged into Lyondell with Lyondell as the surviving entity.   Upon the Merger, each outstanding share of Lyondell Common Stock would be converted into the right to receive $48 in cash.   Later in the day on July 16, 2007, at special meeting of the Lyondell board, the proposed transaction was unanimously approved.

153.     Funds necessary to complete the transaction were estimated by Access to be approximately $21 billion, which amount included approximately $12.2 billion to be paid to holders of outstanding shares of Lyondell's common stock (of which Blavatnik-controlled AI Chemical now owned nearly 10%), with the remaining funds being used to pay amounts pursuant to change in control arrangements and to refinance certain existing indebtedness of both the Basell group of companies and the Lyondell group of companies, to pay fees and expenses in connection with the transaction and the financing arrangements, and to fund ongoing working capital requirements of the combined group.

154.     As negotiated between Basell and Lyondell, the Merger Agreement had no "financing out" – Basell's obligation to close the transaction was not conditioned on its ability to find the money to pay for it.   On the same day as it entered into the Merger Agreement, Basell

obtained a commitment letter (the "Commitment Letter") from Merrill, Citibank, and Goldman. Pursuant to the Commitment Letter, the three co-lead banks committed to fund up to $14 billion of first lien secured credit facilities, including a $13 billion Term Loan, and up to $7 billion of second lien loans pursuant to a bridge facility. Basell, at its option and in lieu of the bridge facility could issue up to $7 billion in principal amount of second lien notes and/or senior unsecured notes (at the option of the banks) in a private debt offering. Merrill, Citibank, and Goldman were appointed as joint lead arrangers, bookrunners, and global coordinators for the first lien credit facilities. ABN AMRO joined as a fourth lead arranger in early August.

155.    On the same day as the three banks agreed to provide $21 billion of financing to enable Blavatnik to amass his global petrochemical company, Blavatnik caused Basell to issue a shareholder dividend in the amount of €75 million, draining Basell of the capital that it shortly would desperately need. This was the second Basell cash dividend of 2007, the prior being a dividend on or about May 29, 2007 for €140 million.

156.    On or about July 16, 2007, the Supervisory Board of Basell (the equivalent to a board of directors) voted to approve the proposed acquisition. At a deposition conducted in a Lyondell shareholder litigation following the signing of the Merger, Kassin, who served on Basell's Supervisory Board, claimed he voted against the transaction, later explaining that he found the $48 per share price "ludicrous," and could not, consistent with his fiduciary responsibility as a member of Basell's Supervisory Board, vote in favor of it. According to Kassin, Trautz, Basell's Chief Executive Officer, was also opposed to acquiring Lyondell at $48 per share.

157. On or as of July 16, 2007, the parties executed and delivered the Agreement and Plan of Merger, dated as of July 16, 2007 among Basell, BIL Acquisition Holdings Limited, a wholly owned Delaware subsidiary of Basell, and Lyondell (the "Merger Agreement").

158. On July 17, 2007, prior to the opening of trading on the New York Stock Exchange, Lyondell and Basell issued a joint press release announcing the proposed transaction.

159. On or about August 20, 2007, through AI Chemical, Blavatnik exercised his rights to acquire the 20,990,070 Lyondell shares from Merrill Lynch and increased his personal holdings of Lyondell stock by purchasing an additional 3,971,900 shares of Lyondell on the open market. Merrill, which stood to make a multi-million dollar transaction fee for the Merger, allowed Blavatnik to use the 25% "downpayment" on the 20,990,070 shares originally held by Occidental Petroleum to purchase these additional Lyondell shares. Together with the 20,990,070 shares subject to AI Chemical's agreement with Merrill, Blavatnik thus now held beneficial ownership of 24,961,970 shares representing 9.857% of all shares of Lyondell outstanding. Upon the closing of the Merger, such shares would convert into the right to receive approximately $1.2 billion of merger consideration, netting Blavatnik a profit of in excess of $333 million.

160. On or about August 25, 2007, Basell made an irrevocable offer to purchase the Berre L'Etang Refinery ("Berre") from Royal Dutch Shell plc for a purchase price of approximately $947 million. Basell made the commitment, which like the Merger, had no financing contingency, without funding in place to pay for this billion dollar asset and without a plan on how to finance the purchase. Of course, Basell intended to fund the purchase of Berre with further borrowings. In October, when UBS agreed to join Merrill, Citibank, Goldman, and ABN AMRO (collectively, the "Lead Arrangers"), they agreed to increase the size of the

commitment from $21 billion to $22 billion in exchange for various pricing concessions. As the Lead Arrangers duly noted at the time, the additional $1 billion of funding, earmarked to pay for Berre and other assets Basell hoped to snap up, further increased the leverage at which the company would be forced to operate.

## II. The Merger Occurs Amid Signs of Deteriorating Economic and Industry Conditions

161.    In mid-July 2007, when Basell entered into the Merger Agreement and contractually bound itself to buy Lyondell for $48 a share and when, at the same time, Merrill, Citibank, and Goldman legally bound themselves to fund the transaction, Access, the parties to the Merger Agreement, and the Lead Arrangers knew the Merger was a gamble whether the combined companies would be able to generate sufficient earnings through a downturn in the industry cycle to fund operations and service the mountain of debt it was taking on. They also knew that the highly-leveraged company would face significant barriers in obtaining additional financing in the highly foreseeable event that the liquidity available through the financing put in place upon the Merger was insufficient. Lyondell's Quarterly Report on Form 10-Q for the quarter ended June 30, 2007 (the "June 30, 2007 10-Q") contained the following disclosure regarding the impact of the planned Merger on Lyondell's financial condition and, inferentially, on its future access to the credit markets:

> Basell intends to finance the merger consideration with borrowings and, as a result, Lyondell would have become more levered, which would exacerbate the risks relating to Lyondell's level of debt. In July 2007, Standard and Poor's Rating Services placed its credit rating for Lyondell, Equistar and Millenium debt on Credit Watch with negative implications and Moody's Investor Service placed the rating of Lyondell, Equistar and Millenium under review for possible down grade, *each as a result of the anticipated post-merger capital structure.*

(Emphasis added).

162. Lyondell's June 30, 2007 10-Q presented the leveraging of Lyondell pursuant to the Merger as a risk factor: "Lyondell's consolidated balance sheet is highly levered and, if the merger is completed, Lyondell may become more levered which would exacerbate the risks described herein."

163. These risks were more specifically described to include the following:

> *Lyondell may not be able to obtain financing in the future for working capital, capital expenditures, acquisitions, debt service requirements or other purposes;* less levered competitors could have a competitive advantage because they have lower debt service requirements; and in the event of poor business conditions, Lyondell may be less able to take advantage of significant business opportunities and to react to changes in market or industry conditions than its competitors.

(Emphasis added).

164. Thus it was clear, at the time of the signing of the Merger Agreement, that the economic enterprise created by combining Basell and Lyondell was severely disadvantaged by its proposed capital structure. To the extent that, in mid-July 2007, it was possible, *arguendo*, for a business person to believe that Basell's acquisition of Lyondell using 100% debt financing would leave LBI with sufficient capital to operate its businesses through the projected period (2008 through 2011), such a belief depended upon the combined companies meeting the July 15, 2007 "Base Case" EBITDA projections. This Base Case projected the robust earnings that the industry (including Lyondell and Basell) had enjoyed in the first quarter of 2007 would continue through 2007 and beyond. Only if the Base Case turned out to be an accurate forecast would the combined company – LBI – have sufficient liquidity to have even a chance to survive the downturn.

165. Any basis for believing in the Base Case projections for 2008 and beyond vanished in the months intervening between the signing of the Merger Agreement on July 16,

2007 and the closing of the Merger on December 20, 2007. As emerging operating results for Lyondell and other information would unmistakably indicate long prior to the closing of the Merger, the petrochemical cycle peak ended by mid-2007. Data available to the capital markets and to the managements of Lyondell, Access, and Basell, pointed forcefully to the conclusion that the cycle peak had occurred, and passed, and that the industry was headed into the downturn. This sobering reality was repeatedly confirmed and reconfirmed in the weeks and months leading to the December 20, 2007 closing. Lyondell's final numbers for the second quarter were somewhat below its projections. Lyondell's performance for the third quarter of 2007, however, rather than tracking the management's "Base Case," looked remarkably like the "Downside Case" that analysts at Merrill and Citibank had included in their reports to their credit committees. As the year moved into the fourth quarter, even the "Downside Case" was looking unduly optimistic. Clouding the picture, crude oil prices, which had been rising steadily all year, were continuing to rise and there were growing concerns that increasing energy costs, among other factors, would trigger a recession. For his part, Trautz was not surprised in the least that oil prices would continue to rise, and suspected, even before the Merger agreement was signed, that the trend of increasing oil prices alone was likely to ensure that Lyondell would not meet its rosy projections for the second, third, and fourth fiscal quarters of 2007. If this spike in oil prices occurred, the impact on performance could result in earnings in line with the Credit Stress Test scenario that had been run by Merrill in April 2007, which showed Lyondell's EBITDA for 2008 dropping to approximately $2.1 billion.

166. With so much at stake in the continuation of robust earnings through 2007, once the Merger Agreement had been inked, Lyondell's operating results, including its final, adjusted EBITDA balances for the second quarter of 2007, emerging results of the third quarter and its

revised earnings projections for the balance of the year, were eagerly awaited by Access and the Lead Arrangers. This data would be a centerpiece of the presentations to prospective lenders being prepared by the Lead Arrangers to syndicate the $21 billion in debt that they had committed themselves to fund. The data was slow in coming, and when it began to become available during the second week of September (Smith shared the preliminary results with Blavatnik in a September 11, 2007 email that stirred shock waves within Access), it was chilling: the relatively small but significant "miss" of the second quarter results versus projections would be widened, materially, in the third quarter. Revised projections for the fourth quarter were sharply down as well. It now appeared that EBITDA for the second half of the year would miss projected EBITDA for that period by 20%.

167. The reaction of Access was alarm – Lyondell was materially missing projections that had been provided by Lyondell's management on July 14, 2007, merely two months earlier, and just prior to execution of the Merger Agreement. The assumption embedded in Lyondell management projections that had been used by Merrill for its July 15, 2007 "Base Case," that the strong performance of the first quarter of the year would be sustained and that the petrochemicals industry peak and the refining peak would continue, had been exposed as completely wrong. Patel, emailing Alan Bigman and others, raised the possibility that Basell consult with its attorneys to consider its "options." To Kassin, Patel ticked off a list of recent leveraged transactions that had been renegotiated or from which one party had sought to back away based on purported changes in circumstances.

168. As the management teams for Lyondell, Basell, and Access prepared in late September 2007 to present updated pro forma financials to the banks financing the Merger, Bigman was gravely concerned. Emailing Kassin and Patel on September 24, Bigman stated that

"Lyondell's shortfall is the number one problem we face—by a big margin." Patel responded, "the banks will be very, very troubled by the updated projections when they hear them on Wed." Lyondell management struggled to explain and minimize the significance of the earnings shortfall. Adjustments were made to the EBITDA balances to add back over $237 million to the EBITDA for the first two quarters, supposedly for "non-recurring costs." Watching the process of Lyondell scurrying to get ready to explain the status of the deal to the banks, commented Patel, was "like witnessing a slow motion train wreck." Kassin anticipated that banks who were planning to participate in the syndication would be "screaming bloody murder" and " requesting backup on Q3 and Q4 data for their credit comms."

169.    Having legally bound themselves to do the deal and with no "financing out" or other means to break the deal, Access and Basell had no choice but to forge ahead and do whatever it had to assist the Lead Arrangers in their efforts to shift the risk of the credit to third party banks and institutions through syndication. This meant, notwithstanding that the "Base Case" could no longer be accepted as realistic, nonetheless presenting projections showing earnings would be sufficient for LBI to finance its businesses though the expected earnings downturn. Writing to Blavatnik on September 14, 2008, Kassin made clear that he understood that the objective for the upcoming presentation to be made to the Lead Arrangers was "to sell 20b in debt." He also set out his roadmap of how to goose the projections to get to the necessary magic numbers. First of all, Trautz and Bigman had to abandon the practice of making Basell management look good by forecasting low and then meeting projections. Second, Basell management needed to layer optimistic projections with purported "synergies" that would boost the projections. "Synergies" – reduced costs of operations (either through the elimination of redundancy, greater efficiency, or other means) anticipated in connection with a business

combination – are notoriously "soft" numbers, and here, for a number of reasons, Lyondell and Basell were ill suited to cost reductions due to claimed "synergies." Even if synergies were available as a tool to reduce operational costs, management may or may not implement the strategies necessary to exploit potential synergies. As pointed out by Trautz, "As an old M+A fox you know as well as I do the statistics. Out of 100 mergers about 90 deliver the promised synergiies [*sic*] and even so about 50 fail. Why? "wrong financing, [wrong] people," and the inability "to generate promised [*sic*] EBITDA" and to "master the cultural" shock. Kassin acknowledged that this was all true but explained that in order "to achieve good execution on the financing and give the NewCo a better financial footing we need to 'sell' a realistic synergy scenario to the market…applying leverage to this number will be very helpful…erring on the side of being not too conservative helps here greatly."

170. The financial projections of the combined companies developed for the September 26, 2007 presentation to lenders were a feat of reverse engineering. Rather than meeting the July 15 Base Case of $3.4 billion of EBITDA for 2007, Lyondell's 2007 EBITDA would come in at no more than $2.7 billion. The problem to overcome: sustaining the believability of the July 15 Base Case in the face of the emerging reality of Lyondell's poor performance for 2007. All of the prior projections of Lyondell's performance submitted by Merrill, showed earnings peaking in 2007 and then plateauing or declining in 2008 and thereafter beginning a steeper descent into the anticipated trough in 2011. However, if actual 2007 EBITDA for Lyondell were used as the starting point for this downward descent, projected earnings for each subsequent year would be materially and adversely impacted. Such revised projections would clearly demonstrate that the combined companies were severely undercapitalized and would be unable to cover debt charges through the downturn. Moreover,

the reduced earnings projections would also impact the discounted cash flow analysis of LBI and show a company that was either insolvent or, at best, verging on insolvency.

171.     The solution to declining earnings? First, ignore all available economic, industry and company indicators pointing to a continued decline in earnings and project an earnings spike for 2008.   Second, make up lost 2007 earnings in later years by adding "synergies," thus reducing the slope of the downward descent.   This fraudulent manipulation of projections is exactly what the parties to the transaction did.

172.     Below are (i) the EBITDA projections developed by Merrill dated July 10, 2007; (ii) Merrill projections dated July 15, 2007, incorporating Lyondell management projections supplied by Lyondell management on July 14, 2007 immediately prior to the signing of the Merger Agreement (which by September 11, 2007 were known to be materially inaccurate); and (iii) the "reverse engineered" projections developed in early September 2007 for a presentation to lenders on September 26, 2007 (the "September Projections").

173.     Strikingly apparent is the pronounced spike in earnings (not featured in the prior projections) that now was being projected to occur during 2008.   Lyondell thus projected a 23% increase in 2008 EBITDA versus 2007.   Notable also is the (i) impact of the projected 2008 spike on revenue projections for each successive year and (ii) the slower descent of the slope. Whereas the July 15 Base Case had shown EBITDA declining 31% from 2007, a "peak" year, to 2011, a "trough" year, the September Projections now showed a peak to trough decline of less than 10%.



**Lyondell EBITDA Projections**

····◆···· ML July 10 Projections    – –▲– – ML July 15 Projections    ——■—— September 26 Projections

174.    The 2008 earnings spike seen in the September Projections was achieved by, among other means, disregarding industry forecasts. The September Projections baselessly ignored industry forecasts that the decline from the 2005 peak in the margins (the "crack spread") for refined petroleum products generally and particularly for the type of crude processed at the Houston Refinery, *i.e.*, "heavy sour," would continue during 2008 and thereafter. This pressure on margins was no fluke but was driven by factors that were fully known by the third quarter of 2007 and that would only continue to depress margins over time. First, gasoline demand was down due to high prices and the beginning of a weakening in the economy. Second, and longer term, substantial new capacity to convert "heavy sour" was scheduled to come on line in 2009 and beyond. Third, due to local conditions in Mexico and Venezuela, the production of "heavy sour" had declined, driving up its price and reducing the relative discount seen between heavy sour (which is more expensive to refine) and the higher priced "light sweet" crudes. Unaccountably and baselessly, the assumption underlying the

September Projections was that the crack spread for heavy sour would increase materially (by 15%) in 2008 and remain, in subsequent years, at much higher levels than were being forecasted by CMAI. Thus, whereas CMAI's third quarter projection for the crack spread on a benchmark heavy crude (known as "Maya") was $24.23 a barrel, LBI goosed its 2008 EBITDA projection by forecasting a margin of $30.41 a barrel for this type of crude. Reflecting the market's understanding that due to declining demand and increased capacity, the refining cycle was heading toward a downturn, by the end of August 2007, the stock prices for publicly traded oil refining companies had declined by 20% to 25%, with both stock prices and margins projected to slide even further in the fourth quarter.

175. Another unfounded assumption of the September Projections was that 2008 EBITDA for Lyondell's commodities chemicals business (Ethylene Co-Products and Derivatives) would increase by almost 50% over 2007 EBITDA from such business sector. Industry analysts were not forecasting that earnings for this industry segment would increase at this rate in 2008. Moreover, such forecasts unreasonably overlooked Lyondell's disadvantages, relative to its competitors, in this business segment, including, without limitation, its dependence on liquid feedstocks (the prices of which were increasing) as opposed to natural gas feedstocks (which had remained relatively stable). Rather than forecasting such a surge in profitability for 2008, analysts, including CMAI had, during the course of 2007, grown increasingly bearish on basic petrochemicals, repeatedly adjusting downward projections on margins for leading petrochemical products such as ethylene and polyethylene. Broader indications of industry prospects also pointed to 2007 being the end of the peak. In July 2007, Standard & Poor's announced that the entire industry's average credit rating was deteriorating and cut the credit ratings of two-thirds of the chemicals companies it covered to speculative status.

176. For anyone to have projected future performance based on Lyondell materially outperforming its industry peers in 2008, as is implied by the 23% spike, was manifestly unreasonable, if not fraudulent. In fact, in addition to the reasons stated above relating to the compressed margins on the production of the Houston Refinery, for the additional reasons summarized below, all of which were known to Lyondell and Basell management, and to the Lead Arrangers prior to the Merger and/or to industry experts to which management had access, following the Merger, both historical Lyondell and the combined Lyondell and Basell companies were far more likely to underperform relative to their peers and be less able to compete in a downturn:

a. Lyondell's Houston Refinery. Lyondell's Houston Refinery, one of Lyondell's most important assets, had a significantly higher cost of production than its competitors and its profitability was dependent on, among other factors, the discount at which "heavy sour" crude could be purchased relative to lighter, sweeter grades. As explained above, by 2007 it was known that any competitive advantage derived from the Houston Refinery's ability to refine "heavy sour" crude was diminishing due to the narrowing of this differential, a trend that was expected to continue.[5]

b. Olefins (Ethylene, Propylene Butadienne, and Isobutylene). Both Lyondell and Basell's Olefin business were heavily exposed to the slower growing markets in North America and Western Europe, where their facilities were primarily based, and both lacked a significant low-cost business presence in the Middle East, exposing the

---

[5] As noted above, Basell, prior to the Merger, had entered into a contract to purchase Berre. Although Berre used a lighter grade of crude than the Houston Refinery, its suffered from some of the same disadvantages of the Houston Refinery and its margins were also being compressed by declining demand and other factors. The closing of the acquisition of Berre occurred in April 2008, but the risks associated with such acquisition were known before the Merger. Moreover, as discussed below, Goldman told Access, before the closing of Berre, that it was "morally wrong" for Basell to acquire Berre and that Basell should "break" the deal. Basell spurned Goldman's request and acquired the refinery, further exacerbating Basell's liquidity problems.

combined company to substantial risk in the Olefin business during the next industry down-cycle. Lyondell's and Basell's Olefin assets were also older (relative to their competitors) and smaller (relative to their competitors). They also were particularly economically vulnerable to shutdowns (e.g., Basell's steam crackers). Unlike its domestic competitors, moreover, Lyondell's olefin facilities, which are based in the United States, rely on "heavy liquid feed" (*i.e.*, distillates from the Houston Refinery), which puts Lyondell's olefin business at a competitive disadvantage in the United States.

c.      Polyethylene (High and Low Density). Both Lyondell and Basell, due to their primary presence in North America and Western Europe, were heavily exposed to slower growing markets in these regions and additional pressures due to environmental regulation and were not positioned to participate in developing higher margin industrial piping manufacture with their existing facilities. Due to their relatively uncompetitive cost structure and their geographical footprint focused on North America and Europe, Lyondell and Basell were exposed to be harder hit by the next high density polyethylene industry downturn. Lyondell's low density polyethylene business focused on lower margin products, which would be particularly vulnerable in the next downturn. Both Lyondell and Basell had older, smaller scale facilities than their competitors. In Lyondell's case, its facilities carried overhead higher relative to its competitors due to inefficiently operated facilities with high maintenance costs. Basell suffered from the same infirmities (*i.e.*, its Frankfurt, Germany facility was old, small, and had a higher cost of production relative to its competitors).

d.      Propylene Oxide and Derivatives, Acetyls, and Aromatics. Lyondell's presence in each business sector had a competitive disadvantage. For example, in Propylene

Oxide, Lyondell was heavily dependent on co-product technology, which was facing pressure both from significant competition and legislation at the time (*i.e.*, MTBE, which was being phased out as an oxygen aid for gasoline and is now banned in the United States, and co-product styrene, which was a poor industry performer). In Acetyls, Lyondell had only a single production site compared to a global and growing presence for its key competitors (BP and Celanese Corporation). And in Aromatics, Lyondell's business carried high unit costs due to its lack of scale compared to its competitors.

e.     Technology. Basell's technology revenue was likely to slow considerably due to the impending petrochemical industry trough.

177.   The September Projections for the combined Lyondell and Basell entities were even more fanciful than the standalone projections for Lyondell. In addition to the baseless spike in earnings for both its petrochemicals and refinery operations that Lyondell would supposedly enjoy in 2008, the September Projections for the combined companies (graphed below together with the July 10 Base Case and the July 15 Base Case) likewise ignored currently available information indicating the onset of a downturn and were inflated by incorporation of billions of dollars of projected earnings over the five-year projection period based on purported "synergies." Combined projected earnings for 2008 included $75 million of "synergies." Projected earnings for 2009 included $280 million in "synergies." Each subsequent year included $420 million in "synergies."

178.   Remarkably, the new projections actually showed combined EBITDA for 2008 to be 13.2% higher than for 2007, even though, as reflected by all prior projections, Wall Street and industry analysts were all projecting that earnings for petrochemicals and refining would trend downwards or remain flat during this period. Even the highly optimistic management

projections incorporated into the July 15 Base Case showed a 3% decrease during this same period.

**Consolidated EBITDA Projections**



179. The projected spike in Lyondell earnings for 2008 and inflated earnings for years 2009 through 2011, were entirely unreasonable, if not fraudulent, and were unsupported by factors intrinsic to Lyondell or Basell, conditions with respect to the industries in which they operated, or the overall economic outlook as forecasted at the time. The synergies were pure speculation, added to bring earnings to where they needed to be rather than based on any expected cost-savings from the merger. According to Francesco Zerega of Basell, even $250 million (as opposed to $400 million) was a stretch. In an email sent to Trautz and Bigman, Zerega wrote: "given the very limited market/product overlap between Basell and Hugo, a 400 m USD longer term target is in my view very unlikely. A number closer to the 250 m USD ballpark would be in my view a more logical, challenging and stretching (but not unrealistic)

target for the transition teams…if we talk about higher long term targets, we should also talk about higher implementation costs."

180.    Lyondell's official third quarter results confirmed a material downward earnings trend, which Smith had first disclosed to Access on September 11, 2007.  As disclosed to the public in its report of third quarter earnings on Form 8-K dated October 25, 2007 (the "October 25, 2007 Form 8-K"), EBITDA was $684 million.  In order to have remained on target to meet the 2007 "Base Case" EBITDA projections of $3.4 billion prepared by Merrill on July 15, 2007, EBITDA for the third quarter of 2007 should have been at least as high as for the preceding quarter.  Instead, the third quarter's $684 million EBITDA was a 23% drop from second quarter EBITDA.  In Lyondell's third quarter earnings press release, Smith expressed concern for Lyondell's financial performance:

> Entering the quarter, we and many others in the industry expected that crude oil and ethane costs would plateau at then-current levels; however, they continued to escalate.  As a result, significant price increases were required just to offset the cost increases, and margins did not expand to levels that we believe reflect the supply/demand balance.  Refining results, while solid, reflected the fact that industry spreads declined from very strong early-summer levels earlier than usual.  This occurred despite record low gasoline and distillate inventories as measured by days of inventory. Unfortunately, crude oil and ethane prices have increased steadily throughout the year, and a certain amount of time is needed to pass increases of this magnitude through the chemical and polymer markets.  As a consequence, year-to-date results have not fully reflected existing industry operating rates.

181.    The outlook for the fourth quarter of 2007 was equally grim.  Lyondell's Form 8-K warned: "Thus far in the fourth quarter, both crude oil and ethane price increases have accelerated, setting new highs.  Quarter to date, our refining spreads are slightly less than the third-quarter average as our heavy crude advantage has partially offset declines in base refining margins.  In the ethylene, co-products and derivatives segment, record high raw material costs

are offsetting the benefit of recent price increases, necessitating further pricing initiatives. In our propylene oxide and related products segment, oxygenated fuel (MTBE/ETBE) margins have declined following typical seasonal patterns."

182.    At the presentation to lenders that took place on or around September 26, 2007, mid-year operating results for Lyondell and Lyondell management's projections for the second half of the year were disclosed to the Lead Arrangers. According to Kassin, when Citibank and Merrill learned of Lyondell's mid-year results, they were shocked over how much Lyondell "missed [its] numbers." Not surprisingly, despite the parties' efforts to market the loan syndication, the banks that had been counted upon to participate in the first phase of the syndication, were backing away. In an email from Patel to Bigman and others, Patel recalls that several banks whom they had counted on to significantly participate in the loan syndication, including HSBC, JP Morgan, Credit Suisse, and Morgan Stanley, "ran for the hills." Access' efforts to secure participation by threatening to retaliate against banks who were not willing to participate materially in the loan syndication (*i.e.*, by either not allowing them into future Access deals or otherwise terminating business relationships) were not successful.

183.    Responding to the failed syndication effort, the Lead Arrangers presented Access with proposed modifications to the terms of the financing as it had been outlined in the Commitment Letter. Whereas the Commitment Letter had consisted entirely of term loans and revolving loans, the Lead Arrangers now proposed to substitute $2.15 billion of receivables and inventory asset based financing in lieu of the senior lien financing that had originally comprised $13 billion of the commitment. Such asset based financing provides a less flexible source of liquidity for the borrower than a committed term loan since borrowings thereunder are tied to a borrowing base of inventory and receivables. If orders slow or the value of inventory declines,

the borrower is unable to draw down additional liquidity because there are insufficient current receivables and inventory to provide the borrowing base to support it. An inventory based facility is particularly problematic for a petrochemical company such as Lyondell due to the volatility of the commodities market. When prices rise sharply, the size of the facility may quickly become inadequate to finance working capital needs. Then, if prices decline, the "mark to market" feature of such a facility will force repayment of amounts previously drawn under the facility, regardless of whether there is cash available for such purpose.

184.    In September 2007, the Lead Arrangers, Lyondell, and Basell knew that the $2.15 billion nominal size of the asset based facilities being implemented was not functionally equal to the liquidity that would have been available to LBI had such amount been included in a conventional senior term loan facility, such as contemplated by the initial Commitment Letter. Crude oil prices, which had been approximately $50 a barrel in January 2007, had risen steadily all during 2007, reaching $75 a barrel in September 2007. From and after September 2007 through the December 20, 2007 closing of the Merger, crude oil prices rose at an accelerated rate. From the perspective of this pre-Merger period, and more so as the year approached its end, it was unreasonable to rely on a short-term abatement of price escalation. The critical need for LBI to have more liquidity to address these rising prices could not have been clearer. The increased liquidity needs of LBI were ignored when the asset based facilities were substituted for the term loan financing, a substitution motivated not by the projected liquidity needs of LBI but by the fact that such asset based financing limited lender exposure and would be easier for the Lead Arrangers to syndicate. In the months to come, much of the incremental liquidity supposedly available under these asset based facilities would prove illusory and would vanish precisely when needed, leaving the company with a liquidity shortfall in the range of $2 to $3

billion.  This liquidity shortfall was entirely foreseeable to the Lead Arrangers, Access, Lyondell and Basell management.

185.    In addition to structural changes made to the financing package, pricing modifications were also made to enhance the potential salability of the loans.

186.    Notwithstanding these modifications and efforts to syndicate the loans, most of the $22 billion commitment was not "launched" for syndication, and the Lead Arrangers were forced to hold onto most of the loans.  Only the $2.15 billion asset based financing facility was actually sold in syndication prior to closing of the Merger.  According to Citibank's closing memorandum, "[t]he deal was mostly funded by underwriters at close with a handful of banks (5) coming in with small commitments." There were contemporaneous, but unconfirmed, reports that syndication efforts would resume in the spring.

187.    Indeed, it was not until April 2008 that Citibank succeeded in syndicating its positions in the Senior Credit Facility, totaling $1.9 billion, to none other than Apollo.

188.    In the midst of the Lead Arrangers' failed efforts to syndicate their loans, on December 7, 2007, Blavatnik caused Basell to issue its third dividend of 2007, for €100 million, bringing the total amount of cash taken out of Basell in 2007 in the form of dividends to €315 (or approximately $430 million).

189.    Margins continued to tighten during the fourth quarter.  Rather than making up for prior lost earnings, Lyondell operated at a loss during the last quarter of 2007 and had unadjusted EBITDA for that period of approximately $613 million.  Actual EBITDA for Lyondell for all of 2007 was $2.7 billion, off  20% from the July 15 Base Case.

190.    Against the background of Lyondell's deteriorating third and fourth quarter performance and industry forecasts of a more severe downturn, it became more and more

obvious as the scheduled date for the Merger approached that the earnings projections prepared for use in connection with the Merger financing were unreasonable.

191.    The unreasonableness of management's projections for 2008 is strikingly apparent from the comparison, graphed below, of actual Lyondell adjusted EBITDA versus management projections for the three quarters preceding the Merger.   Ignoring a pattern of repeated, widening "misses" for each of three successive quarters in 2007, management's quarterly projections for 2008, prepared on or around November 2007 for "legacy" Lyondell following the Merger, were completely unreasonable.[6]



192.    During 2007 prior to the closing of the Merger, including during the period after the Merger Agreement was signed until the Merger Closing, the petrochemical industry forecasts weakened progressively, due, *inter alia*, to the slowing economy, rising energy costs (which led to compressing of margins), weakening demand for chemicals, and announcements of increased

---

[6] Actual results presented below for 2008 adjusted EBITDA are based on publicly available data reported for Lyondell Chemical Company.  Estimated 2008 EBITDA represents estimated EBITDA generated from assets of certain former non-U.S. subsidiaries of Lyondell Chemical Company that were transferred following the Merger to non-U.S. subsidiaries of LBI. Actual EBITDA from these transferred entities is not available at the present time.

capacity within the industry (by competitors of Lyondell and Basell). Deteriorating industry and related business developments suggested that the next trough in the petrochemical industry would be longer and considerably deeper than anticipated at the beginning of 2007. Moreover, given the disadvantaged position of Lyondell and Basell compared to their competitors and their particular vulnerability to the next petrochemical industry trough, they knew or should have known that the next petrochemical industry trough would much more severely and negatively impact the income and profitability of Lyondell and Basell than their competitors.

## III.    The Merger Closes

193.    On December 20, 2007, pursuant to the Merger Agreement, an indirect merger subsidiary of Basell was merged into Lyondell, all of Lyondell's 253,535,778 outstanding shares of common stock, including restricted stock, were converted into the right to receive $48 in cash and Basell, which thereupon changed its name to LyondellBasell Industries A.F. S.C.A., which became, through an intermediate holding company, the corporate parent of Lyondell.

194.    Also on December 20, 2007, Lyondell and certain affiliates entered into debt facilities (the "Facilities") representing a maximum of $22.6 billion of borrowings of which approximately $2 billion was unfunded at the closing.

195.    The Facilities included:

a.      The Senior Credit Facility among Citibank, N.A., as administrative agent, Citibank International plc, as European administrative agent, and Citigroup Global Markets Inc., Goldman Sachs Credit Partners, L.P., Goldman Sachs International, Merrill Lynch, Pierce, Fenner & Smith Inc., Merrill Lynch Capital Corporation, ABN AMRO Inc., ABN AMRO Bank N.V., and UBS Securities LLC as joint lead arrangers (such parties to the Senior Credit Facility, including Deutsche Bank Trust Company Americas as successor to Citibank, N.A., as

administrative agent, and Citibank International plc, as European administrative agent, the ("Senior Credit Facility Lender Parties")), and Lyondell, Basell Holdings B.V. ("Basell Holdings"), Basell Finance Company B.V. ("Basell Finance") and Basell Germany Holdings GmbH ("Basell Germany") as borrowers (the "Borrowers"), and certain direct and indirect subsidiaries of Borrowers as guarantors (the "Subsidiary Guarantors," and the Borrowers and the Subsidiary Guarantors, collectively, the "Senior Credit Facility Obligors"),[7] providing for:

(i)     an $800 million, 6-7 year U.S. Revolving Credit Facility, $130 million of which was funded at closing;

(ii)     a $500 million, 6-year Dutch Revolving Credit Facility;

(iii)     a $1.5 billion, 6-year Senior Secured U.S. Term Loan A;

(iv)     a $200 million, 6-year Senior Secured Dutch Term Loan A;

(v)     a $7.550 million 7-year Senior Secured U.S. Term Loan B; and

(vi)     a €1.3 billion, 7-year Senior Secured German Term Loan B.

Each of the Subsidiary Guarantors irrevocably and unconditionally guaranteed the prompt payment in full when due of all the obligations under the Senior Credit Facility (the "Senior Guarantee").

---

[7] The Subsidiary Guarantors are: Basell Finance USA Inc., Basell North America Inc., Basell USA Inc., Equistar Chemicals, LP, Houston Refining LP, LBI Acquisition LLC, LBIH LLC, Lyondell (Pelican) Petrochemical L.P. 1, Inc., Lyondell Chemical Company, Lyondell Chemical Nederland Ltd., Lyondell Chemical Products Europe LLC, Lyondell Chemical Technology 1 Inc., Lyondell Chemical Technology Management, Inc., Lyondell Chemical Technology, L.P., Lyondell Chemical Delaware Company, Lyondell Chemical Europe Inc., Lyondell Chemical Espana Co., Lyondell Chimie France LLC, Lyondell Equistar Holdings Partners, Lyondell Europe Holdings Inc., Lyondell Houston Refinery, Inc., Lyondell LP3 GP, LLC, Lyondell LP3 Partners, LP, Lyondell LP4 Inc., Lyondell Petrochemical LP, Inc., Lyondell Refining Company LLC, Lyondell Refining I, LLC, LyondellBasell Finance Company, Millennium America Holdings Inc., Millennium America Inc., Millennium Chemicals Inc., Millennium Petrochemicals Inc., Millennium Petrochemicals GP LLC, Millennium Petrochemicals Partners LP, Millennium Specialty Chemicals Inc., Millennium US Op Co LLC, Millennium Worldwide Holdings I Inc., Nell Acquisitions (US) LLC, Basell Asia Pacific Ltd. Basell Bayreuth Chemie GmbH, Basell Benelux B.V., Basell Canada Inc., Basell Europe Holdings B.V., Basell Finance & Trading Company B.V., Basell Finance Company B.V., Basell Funding S.A.R.L., Basell Germany Holdings GmbH, Basell Holdings B.V., Basell International Holdings B.V., Basell Polyolefine GmbH, Basell Polyolefins UK Limited, Basell Sales & Marketing Company B.V., Basell UK Holdings Limited, Lyondell Chemie International B.V., Lyondell Chemie Nederland B.V., LyondellBasell Industries AF S.C.A.,and LyondellBasell Netherlands Holdings B.V.

b.      The Bridge Loan Facility with Merrill Lynch Capital Corporation, as administrative agent, Citibank, N.A., as collateral agent, and Merrill Lynch, Pierce, Fenner & Smith Inc., Goldman Sachs Credit Partners, L.P., Citigroup Global Markets Inc., ABN AMRO Inc., and UBS Securities LLC as joint lead arrangers (such parties, the "Bridge Loan Lender Parties"), LyondellBasell Finance Company, as borrower (the "Bridge Borrower"), and the Subsidiary Guarantors that guaranteed the Senior Credit Facility Obligations, as guarantors thereunder (the "Bridge Guarantors", and together with the Bridge Borrower, the "Bridge Loan Obligors"), providing for an $8 billion, 1-year Second Lien Bridge Loan (the "Bridge Loan"). Each of the Subsidiary Guarantors irrevocably and unconditionally guaranteed the prompt payment in full when due of all the obligations under the Bridge Loan (the "Bridge Guarantee," and together with the Senior Guarantee, the "Subsidiary Guarantees").

c.      An Asset Backed Credit Agreement (the "ABL Inventory Facility") with Citibank, N.A., Citigroup Global Markets Inc., Goldman Sachs Credit Partners L.P., Merrill Lynch Capital Corporation, ABN AMRO Inc., and UBS Securities LLC, as arrangers; Citibank, N.A., JPMorgan Chase Bank, N.A., and other banks, as issuers of letters of credit; Citibank, N.A. and General Electric Capital Corporation, as co-collateral agents (in such capacities, the "ABL Collateral Agents"); and Lyondell, Houston Refining, Equistar, and Basell USA Inc., as borrowers thereunder, providing for a $1 billion, 5-year Asset Based Inventory Revolving Credit Facility, $175 million of which was funded at closing.

d.      A receivables securitization facility (the "ABL Receivables Facility" and, together with the ABL Inventory Facility, the "Asset-Based Facilities" or the "ABL") established pursuant to a receivables purchase agreement by and among LyondellBasell Receivables I, LLC ("LB Receivables I"), Lyondell, as servicer, Citigroup Global Markets Inc., Goldman Sachs

Credit Partners L.P., Merrill Lynch Capital Corporation, ABN AMRO Incorporated, UBS Securities LLC, Citicorp USA, Inc. or an affiliate, and certain other purchasers party thereto, and accompanying receivables sale and undertaking documents entered into by Lyondell, Equistar, Houston Refining, and any other subsidiary of Lyondell or LBI designated from time to time thereunder, providing for a $1.15 billion, 5-year Receivables Securitization Facility. In connection with the Merger, approximately $1 billion of receivables interests were sold under the ABL Receivables Facility, a portion of the proceeds of which sale were applied to terminate obligations under pre-Merger receivables securitization facilities of Lyondell, Equistar, Basell USA Inc. and Basell Canada Inc.

196. The repayment of obligations incurred under the Senior Credit Facility, including the Senior Guaranty obligations (the "Senior Credit Facility Obligations") are secured by the grant of security interests by the Senior Credit Facility Obligors to Citibank, N.A., as collateral agent (in such capacity, the "Senior Collateral Agent"), in certain of their real and personal property. The Senior Credit Facility Obligors that are U.S. entities granted security interests in certain of the real and personal property, including: (a) all stock owned by each such Senior Credit Facility Obligor in any wholly owned subsidiary of LBI; (b) all debt securities held by each such Senior Credit Facility Obligor; (c) all payments, rights, privileges and proceeds of (a) and (b); and (d) substantially all of each such Senior Credit Facility Obligor's personal property, including equipment but not including accounts receivable, inventory and interests in any joint ventures. LBI, Basell Holdings, Basell Finance, Basell Germany and certain affiliates (the "European Obligors"), granted security interests to Citibank, N.A., as Senior Collateral Agent, in certain equity and debt securities owned by the European Obligors and all rights related thereto,

and in certain other personal property (all of the foregoing described security interests and liens, the "Senior Liens").

197. To secure the repayment of all obligations incurred under the Bridge Loan Facility, including the Bridge Guaranty obligations (the "Bridge Loan Obligations"), LyondellBasell Finance Company and each of the Bridge Guarantors, including the European Obligors, granted to Citibank, N.A., as collateral agent (in such capacity, the "Bridge Collateral Agent"), a second priority (or third priority) security interest in substantially the same real and personal property that secured the Senior Credit Facility Obligations (the "Bridge Loan Liens").

198. To secure obligations under the ABL, the ABL Obligors granted to the ABL Collateral Agents for the benefit of the ABL Lenders, (i) a first priority pledge of all equity interests owned by each ABL Obligor in, and all indebtedness owed to each ABL Obligor by LB Receivables I and Basell Capital Corporation and (ii) a first priority security interest in certain deposit accounts, all receivables and inventory, and related assets owned by each ABL Obligor (together, the "ABL Lien Transfers"). Further, the ABL was guaranteed on an unsecured basis by each U.S. subsidiary (the "ABL Guarantors") of each ABL Obligor (the "ABL Obligations").

199. On the closing of the Merger Agreement, a total of approximately $20.2 billion of the proceeds from the funding of the Facilities was transferred to the designated paying agent for the Merger (the "Paying Agent"). Of such amount, approximately $11.3 billion received by the paying agent was held by it for payment of the Merger Consideration to former shareholders of Lyondell who, in accordance with the Merger Agreement, surrendered their shares and approximately $7.1 billion was used to refinance pre-existing debt of Lyondell, Basell, and certain of their respective consolidated subsidiaries.

200. The proceeds of the Facilities were also used to fund approximately $337.3 million of payments under various Lyondell benefit and incentive plans, stock option plans, and other equity based incentive programs.

201. Of such amounts, a total of approximately $133.2 million was paid out to officers and directors as a group (the "Change of Control Payments") and approximately $70 million was paid out to members of the board of directors[8] who approved the Merger as follows:

| | |
|---|---|
| Dan F. Smith: | $56,815,081 |
| Carol A. Anderson: | $2,336,059 |
| Susan K. Carter: | $234,438 |
| Stephen I. Chazen: | $963,474 |
| Travis Engen: | $3,473,695 |
| Paul S. Halata: | $344,584 |
| Danny W. Huff: | $1,009,953 |
| David J. Lesar: | $2,478,066 |
| David J.P. Meachin: | $527,712 |
| Daniel J. Murphy: | $355,584 |
| William R. Spivey: | $1,861,472 |

202. At the Merger Closing, the proceeds of the Financings were used to fund the following additional Transactional Fees:

(i) $127,608,860 to Nell Limited by Basell AF S.C.A. as payment for (a) a purported one time transaction advisory fee ($100 million), (b) an annual management fee of $25 million, and (c) $2.6 million for reimbursement of claimed expenses;

(ii) $31,154,961 to Merrill Lynch for its "fees" for the Merger;

---

[8] The amount paid out to both groups includes the amount paid to Mr. Smith as both a Director and an Officer.

(iii)     $6 million to Citibank for its "fee" for the Merger;

(iv)     $3,020,970 to Citibank for the "underwriters expenses";

(v)     $35 million to Deutsche Bank for the Merger and the preparation of a "fairness opinion"; and

(vi)     $500,000 to Perella Weinberg for its "fee" for the Merger.

203.     Deutsche Bank's fee of $35 million was grossly unreasonable given that it devised its fairness opinion in an extremely short time period, relied exclusively on financial data provided to it by Lyondell management, and failed to verify the financial data underlying its fairness opinion or to conduct an independent analysis of such financial data.

204.     The proceeds of the Facilities were also used to pay the approximately $1.2 billion of merger consideration due in respect of Blavatnik's Toe-Hold Position in Lyondell stock.  Yet, unlike the merger compensation due to other holders of Lyondell shares, the merger compensation for Blavatnik's Toe-Hold Position was not funded through the Paying Agent and disbursed in accordance with the procedures established for other shareholders, as described in the Proxy for the Merger.  Rather, pursuant to an elaborate tax scheme devised by an army of lawyers and involving several Blavatnik-controlled entities, including Basell Funding, $523,803,305 of the merger consideration due in respect of the Toe-Hold Position was transferred from other Basell affiliates to Nell Limited, an entity incorporated in Gibraltar, in order to avoid tax liability on the in excess of $333 million of capital gains realized by Blavatnik upon the Merger. The balance of the merger consideration payable in respect of Blavatnik's position was paid by LyondellBasell Finance Company, another Blavatnik affiliate, to Merrill Lynch Equity Derivatives in satisfaction of a loan that had been incurred by a Blavatnik affiliate to fund the acquisition of the Toe-Hold Position.

205.     Blavatnik's efforts to attempt to avoid tax liability extended to a "consulting" fee for the Merger.  In an attempt to further avoid United States tax liability, Nell Limited (not Access) was paid a $100 million transaction fee for the Merger.  Moreover, to further avoid tax liability, Basell AF S.C.A. entered into a so-called tax Sharing Agreement with Nell Limited (entered into shortly before the Merger) to pay Nell Limited 17.5% of certain net operating loss carryovers used by Basell to offset future income, which, upon information and belief, has resulted in the secretion of additional assets of the Estate to Nell Limited (and therefore, to Blavatnik).

206.     As Patel observed in a July 17, 2007 email on "marketing $20 billion of B-rated debt," "the last thing you want the market to think/see that we're taking 'out' $333 million.  It's the optics that we need to control." Thus, Blavatnik and his cadre of advisors were well aware of how inappropriate, grasping, and rapacious it was for Blavatnik to take money out of LBI and personally profit from the Toe Hold Position, which, at least ostensibly, was acquired to advance the corporate opportunities of Basell (rather than Blavatnik personally).  He did it anyway, the only compunction apparently being "the optics."

207.     Also upon the Merger, the Subsidiary Guarantors, which are direct and indirect subsidiaries of the Borrowers[9] under the Senior Credit Facility and the Bridge Loan Facility, became jointly and severally liable as guarantors of the repayment of all of the obligations (the "Merger Financing Obligations") incurred or to be incurred by the Borrowers under the Senior Credit Facility and the Bridge Loan Facility.  As alleged above, of the approximately $22 billion amount of Merger Financing Obligations incurred at the time of the Merger, approximately $12.2 billion was paid out as Merger Consideration and approximately $7.1 billion was used to

---

[9] The Borrowers on the Senior Credit Facility are Lyondell Chemical Company, Basell Holdings B.V., Basell Finance Company B.V. and Basell Germany Holdings GmbH. The Borrower on the Bridge Loan Facility is LyondellBasell Finance Company.

refine the Pre-Merger Debt Obligations of direct and indirect subsidiaries of Basell and Lyondell.

208. Except to the extent that, upon the closing of the Merger, a portion of the proceeds of the Senior Credit Facility or the Bridge Loan Facility was applied to the refinancing of the Pre-Merger Debt Obligations of any Borrower or Subsidiary Guarantor obligated under such obligations, such Borrower or Subsidiary Guarantor did not receive reasonably equivalent value or fair consideration for the (i) incurrence by it of the Obligations or Subsidiary Guarantees, as applicable, under the Senior Credit Facility or the Bridge Loan Facility or (ii) the grant by it of security interests, pledges and liens to secure such Obligations or Subsidiary Guarantees, as applicable.

209. Specifically, upon the Merger, the 2014 and 2016 Note Guarantors,[10] as defined in *Exhibit A* hereto,[11] each of whom had been jointly obligated under the Lyondell 8% Senior Unsecured Notes Due 2014 ("2014 Notes") and the Lyondell 8¼% Senior Unsecured Notes Due 2016 ("2016 Notes") in the aggregate amount of approximately $1.775 billion, received the benefit of only $1.775 billion of the proceeds of the Senior Loan Facility and/or the Bridge Loan Facility on account of such proceeds having been applied to repay the 2014 and 2016 Notes. Apart from the receipt of such amount, the 2014 and 2016 Note Guarantors did not receive (or benefit from) any other proceeds of the Merger Financing or any other benefit, consideration or value from the Merger. Although they received the benefit of only $1.775 billion of the proceeds from the Merger Financing and no other benefit, upon the Merger, each of the 2014 and 2016

---

[10] The Subsidiary Guarantors identified in *Exhibit A* to the Complaint include primary obligors on the Pre-Merger Debt Obligations that were refinanced with proceeds from the Facilities. They are included because, like the guarantors on such debt obligations, apart from the receipt of proceeds from the Senior Loan Facility and the Bridge Loan Facility that were applied to the refinancing of such Pre-Merger Debt Obligations, they received no other value from such proceeds.

[11] All exhibits referenced herein are to those annexed to the Complaint.

Note Guarantors became jointly and severally liable as guarantors of the repayment of a substantial portion of the Merger Financing Obligations,. Pursuant to the terms of the Merger Financing, such 2014 and 2016 Note Guarantors also granted to Citibank, N.A., as collateral agent, first and second priority security interests, as applicable, in substantially all their real and personal property to secure the repayment and performance of the Merger Financing Obligations.

210. Upon the Merger, the 2013 Term Loan Guarantors, as defined in *Exhibit A*, which had been obligated under the Lyondell Term Loan Due 2013 ("2013 Term Loan") in the amount of approximately $1.76 billion, received the benefit of approximately $1.76 billion of the proceeds of the Senior Loan Facility and/or Bridge Loan Facility, which was applied to the repayment of the 2013 Term Loan. Apart from the receipt of such amount, the 2013 Term Loan Guarantors did not receive any other proceeds of the Merger Financing or any other benefit, consideration or value from the Merger. Although they received only $1.76 billion of the proceeds from the Merger Financing and no other benefit, upon the Merger, the 2013 Term Loan Guarantors became jointly and severally liable as guarantors of the repayment of all of the Merger Financing Obligations, in the approximate amount of $22 billion. Pursuant to the terms of the Merger Financing, the 2013 Term Loan Guarantors also granted to Citibank, N.A., as collateral agent, first and second priority security interests, as applicable, in substantially all their real and personal property to secure the repayment and performance of the Merger Financing Obligations.

211. Upon the Merger, the 2013 Note Guarantors, defined in *Exhibit A*, which had been obligated under the Lyondell 10½% Senior Secured Notes Due 2013 ("2013 Notes") in the amount of approximately $325 million, received the benefit of approximately $325 million of the proceeds of the Senior Loan Facility and/or the Bridge Loan Facility, which was applied to the

repayment of the 2013 Notes. Apart from the receipt of such amount, the 2013 Note Guarantors did not receive any other proceeds of the Merger Financing or any other benefit, consideration or value from the Merger. Although they received only $325 million of the proceeds from the Merger Financing and no other benefit, upon the Merger, the 2013 Note Guarantors became jointly and severally liable as guarantors of the repayment of all of the Merger Financing Obligations, in the approximate amount of $22 billion. Pursuant to the terms of the Merger Financing, the 2013 Note Guarantors also granted to Citibank, N.A., as collateral agent, first and second priority security interests, as applicable, in substantially all their real and personal property to secure the repayment and performance of the Merger Financing Obligations.

212. On or about the closing of the Merger, the Millennium Guarantors, as defined in *Exhibit A*, each of whom had been jointly obligated under the Lyondell 4% Convertible Senior Debentures Due 2023 ("2023 Debentures") in the amount of approximately $160 million, received the benefit of approximately $160 million of the proceeds of the Senior Loan Facility and/or the Bridge Loan Facility, which was applied to the repayment of the 2023 Debentures. Apart from the receipt of such amount, the Millennium Guarantors did not receive any other proceeds of the Merger Financing or any other benefit, consideration or value from the Merger. Although they received only $160 million of the proceeds from the Merger Financing and no other benefit, upon the Merger, each of the Millennium Guarantors became jointly and severally liable as guarantors of the repayment of all of the Merger Financing Obligations, in the approximate amount of $22 billion. Pursuant to the terms of the Merger Financing, the Millennium Guarantors also granted to Citibank, N.A., as collateral agent, first and second priority security interests, as applicable, in substantially all their real and personal property to secure the repayment and performance of the Merger Financing Obligations.

213.     Upon the Merger, the 2017 Note Guarantors, as defined in *Exhibit A*, each of whom had been jointly obligated under the Lyondell 6.875% Senior Unsecured Notes Due 2017 ("2017 Notes") in the amount of approximately $510 million, received the benefit of approximately $510 million of the proceeds of the Senior Loan Facility and/or the Bridge Loan Facility, which was applied to the repayment of the 2017 Notes.  Apart from the receipt of such amount, the 2017 Note Guarantors did not receive any other proceeds of the Merger Financing or any other benefit, consideration or value from the Merger.  Although they received only $510 million of the proceeds from the Merger Financing and no other benefit, upon the Merger, each of the 2017 Note Guarantors became jointly and severally liable as guarantors of the repayment of all of the Merger Financing Obligations, in the approximate amount of $22 billion.  Pursuant to the terms of the Merger Financing, the 2017 Note Guarantors also granted to Citibank, N.A., as collateral agent, first and second priority security interests, as applicable, in substantially all their real and personal property to secure the repayment and performance of the Merger Financing Obligations.

214.     Upon the Merger, the 2008, 2009, and 2011 Note Borrowers, as defined in *Exhibit A*, each of whom had been jointly obligated under the Equistar 10.125% Senior Unsecured Notes Due 2008 ("2008 Notes"), the Equistar 10.625% Senior Unsecured Notes Due 2009 ("2009 Notes"), and the Equistar 8.75% Senior Unsecured Notes Due 2011 ("2011 Notes") in the aggregate amount of approximately $1.417 billion, received the benefit of only $1.417 billion of the proceeds of the Senior Loan Facility and/or the Bridge Loan Facility on account of such proceeds having been applied to repay the 2008, 2009 and 2011 Notes.  Apart from the receipt of such amount, the 2008, 2009 and 2011 Note Borrowers did not receive (or benefit from) any other proceeds of the Merger Financing or any other benefit, consideration or value from the

Merger.  Although they received the benefit of only $1.417 billion of the proceeds from the Merger Financing and no other benefit, upon the Merger, each of the 2008, 2009, and 2011 Note Borrowers became jointly and severally liable as guarantors of the repayment of all of the Merger Financing Obligations, in the approximate amount of $22 billion.  Pursuant to the terms of the Merger Financing, such 2008, 2009, and 2011 Note Borrowers also granted to Citibank, N.A., as collateral agent, first and second priority security interests, as applicable, in substantially all their real and personal property to secure the repayment and performance of the Merger Financing Obligations.

215.    Upon the Merger, the Basell Senior Facility Guarantors, as defined in *Exhibit A*,[12] each of whom had been jointly obligated under the Basell Multicurrency Revolving Senior Facility (the "Basell Senior Facility") in the amount of approximately €310 million, received approximately €310 million of the proceeds of the Senior Loan Facility and/or the Bridge Loan Facility, a portion of which was applied to the refinancing of the Basell Senior Facility.  Apart from the receipt of such amount, the Basell Senior Facility Guarantors did not receive any other proceeds of the Merger Financing or any other benefit, consideration or value from the Merger.  Although they received only €310 million of the proceeds from the Merger Financing and no other benefit, upon the Merger, each of the Basell Senior Facility Guarantors became jointly and severally liable as guarantors of the repayment of all of the Merger Financing Obligations, in the approximate amount of $22 billion.  Pursuant to the terms of the Merger Financing, the Basell Senior Facility Guarantors also granted to Citibank, N.A., as collateral agent, first and second

---

[12] The Basell Senior Facility Guarantors, the 2014 and 2016 Note Guarantors, the 2013 Term Loan Guarantors, the 2013 Note Guarantors, the Millennium Guarantors, the 2017 Note Guarantors, and the 2008, 2009, and 2011 Note Borrowers, collectively the "Pre-Merger Debt Subsidiary Guarantors."

priority security interests, as applicable, in substantially all their real and personal property to secure the repayment and performance of the Merger Financing Obligations.[13]

216. Dozens of additional Subsidiary Guarantors under the Senior Credit Facility and Bridge Loan Facility were not guarantors of the Pre-Merger Debt Obligations. These Subsidiary Guarantors did not receive any value, never mind reasonably equivalent value or fair consideration, for the (i) incurrence by them of the Subsidiary Guarantees under the Senior Credit Facility or the Bridge Loan Facility or (ii) the grant by them of security interests, pledges and liens to secure such Subsidiary Guarantees.

217. Specifically, upon the Merger, the Subsidiary Guarantors identified in Schedules A through G of *Exhibit A* (collectively, the "Previously Unobligated Subsidiary Guarantors"), which had no guarantee obligations with respect to certain of the Pre-Merger Debt Obligations, received no benefit from the receipt of any of the proceeds under the Senior Credit Facility or the Bridge Loan Facility. Nevertheless, the Previously Unobligated Subsidiary Guarantors each became jointly and severally liable as guarantors of the repayment of all of the Merger Financing Obligations, in the approximate amount of $22 billion. In addition, pursuant to the terms of the Merger Financing, the Previously Unobligated Subsidiary Guarantors also granted to Citibank, N.A., as collateral agent, first and second priority security interests, as applicable, in substantially all their real and personal property to secure the repayment and performance of the Merger Financing Obligations.

## IV.    As a Result of the Merger, the Debtors Were Left with Unreasonably Small Capital

218. Even in the midst of the buy-out mania, Dan Smith, Lyondell Chief Executive Officer from 1996 to 2008 and Chairman of its board of directors from May 2007 to December

---

[13] Other Subsidiary Guarantors or group of Subsidiary Guarantors, not specifically known to the Committee, are likewise believed to have incurred guaranty obligations in excess of any value/consideration received from the Merger or Merger Financing.

2007 never even considered a management LBO of Lyondell. Given the cyclicality of Lyondell's business, Lyondell's fixed costs and working capital requirements, the business could not be reliably funded from earnings. Lyondell needed a capital structure that would provide the necessary flexibility, including access to the credit markets, to keep the company afloat during a downturn. In addition, according to Smith, Lyondell needed between $2 and $2.5 billion of "room" just to meet its working capital needs. Testifying at a deposition held on October 25, 2007, a little less than two months before the Merger would be consummated on December 20, 2007, Smith explained Lyondell's need for over $2 billion in available liquidity as a simple lesson learned from the commodities markets over the prior two years:

> That's about how much room you need with the crazy market that we deal in with crude oil and natural gas, et cetera, that we literally have seen cost of inputs rise more than $2 billion in each of the last two years. So our working capital has gone way higher. You've got to be able to finance the business. And then suddenly, if the earnings fall off, you're just stuck.

219. "You've got to be able to finance the business." In failing to adequately capitalize LBI while incurring $22 billion of indebtedness to fund the Merger, $12.2 billion of which would flow out to Lyondell stockholders (including $1.1 billion to Blavatnik and $56 million to Smith), the parties to the Merger and the Lead Arrangers recklessly or willfully overlooked this simple truth. Taking into appropriate account actual performance of Lyondell and Basell for 2007 and all available data which was known or should have been known by LBI management, Access and the Lead Arrangers, LBI was insufficiently capitalized to provide it with the necessary liquidity to fund its operations through a downturn. When the cost of hydrocarbon inputs continued to rise after the Merger, as they had for the prior two years, LBI had to exhaust all available sources of liquidity to finance its working capital needs. And, when as had been

widely forecasted, earnings did indeed fall off, LBI, unable to fund its operations or meet its obligations as they became due, was forced into bankruptcy.

220. LBI's collapse started early. Very predictably, the spike in 2008 EBITDA, forecasted in response to Lyondell's disappointing results for 2007, did not materialize. Instead, predictably, the same factors that had adversely impacted Lyondell's earnings in each of the last three quarters of 2007, continued to squeeze the margins of LBI's chemicals business. Similarly, LBI's forecasts (unsupported by industry analysts) of improved refining margins proved to be unfounded: margins on refining, a key profit driver for LBI, remained at the rates seen in 2007. Earnings through the first four months of 2008, including income from joint ventures, fell behind the projections by $326 million. By April 2008, LBI was forced to materially revise its pre-Merger forecasts downward to reflect it actual business performance. Under these revised forecasts, the new "Base Case" was for $4.6 billion of EBITDA for 2008 versus $5.4 billion[14] of EBITDA for the September Projections used for syndication purposes. Looking forward to future revisions to the business plan, management formulated an April 2008 "downside" case for the year projecting 2008 EBIDTA at $4.3 billion – almost a full billion dollars below the July 15 Base Case.

221. Moreover, from the effective time of the Merger until filing for Chapter 11, LBI was in an ongoing liquidity crisis from which it was unable to emerge. While as of the Merger closing, LBI's cash balances combined with the unfunded portions of its facilities was $2.3 billion, within 60 days of the closing of the Merger, liquidity was down to approximately $1 billion. And while a billion dollars may seem like a lot of money, for an operation of the size, complexity and volatility of LBI, a company materially larger even than Lyondell, $1 billion of liquidity was completely inadequate. In a single day, cash outflows could reach $500 million, a

---

[14] Including Berre, and Solvay Engineered Polymers, Inc., which LBI purchased in February 2008.

reality that Karen Twitchell, LBI's treasurer had to deal with on a day by day basis. Twitchell's concerns regarding LBI's liquidity, however, fell on deaf ears. This reality was known to Access and the banks as well prior to the Merger.

222.     Within weeks after the Merger, LBI management was involved in negotiating with lenders to "upsize" its borrowing capacity by $600 million by finding funding for the "accordion" feature included in the ABL Facility. Also near the end of March 2008, the company sought to upsize its European accounts receivable asset-backed facility by $170 million. With LBI's daily liquidity hovering around $1 billion at the end of February 2008, it was fighting for its life, according to Kassin. Conditions worsened in March 2008; by March 13, 2008, there were concerns at LBI that by the end of March 2008, LBI's projected liquidity would be $153 million, well below the minimum liquidity needed to fund LBI's daily operations. While waiting for additional funds to become available through the upsizing of the revolvers, Access, battling with LBI's lenders, was forced to make a credit line available to meet LBI's immediate needs for liquidity. So desperate was LBI for the additional $600 million in ABL financing that it agreed to a "LIBOR floor" with an estimated incremental cost of $150 million and agreed to the elimination of $750 million of the uncommitted "accordion" feature of the Term Loan Facility. It knew, in any case, that due to its highly overleveraged position, it would have been unable to find a third party willing to fund the accordion.

223.     In late March 2008, Goldman pressed Access to "put in $500-$1,000 million of equity" into Basell, and advised Patel that the "level of angst in their shop is rising to high levels." Patel reported to Blavatnik and others in a March 19, 2008 email that Goldman was consumed with Lyondell's liquidity crisis, stating that Goldman believed that "It's 'morally wrong for LBI to buy [the] Berre [refinery] and they [*i.e.*, Basell] should just break' the deal [to

purchase Berre].” Access and Basell rejected Goldman's request regarding Berre and closed that transaction the following month, using approximately $600 million in borrowed funds from the banks that further depleted LBI's liquidity.

224. On March 27, 2008, LBI, Basell Finance Company, and Lyondell agreed to the terms of the Access Revolver with Access Industries Holdings LLC, which provided the Company with $750 million in revolving credit. Even as it was being put into place, the intention was to use the Access Revolver only as a last resort. Blavatnik had no interest in being a lender to LBI and from the perspective of the Lead Arrangers, who were still hoping to syndicate in a delayed launch, LBI's need to obtain emergency funding from an affiliate looked bad. The plan, however, was to delay a draw on the Access Revolver until the Lead Arrangers had succeeded in syndicating their loans.

225. From January to April 2008, LBI's free cash flow was negative $1.3 billion, representing a $1.6 billion decline from the projected positive free cash flow of $300 million.

226. In an April 10, 2008 email to Kassin, Twitchell wrote: “No one is truly listening. This company needs more liquidity. The company's daily/monthly/quarterly cash flows are VERY volatile…bottom line is that this company needs more liquidity.”

227. LBI's persistent problems forced it to revise its debt reduction plan for 2008 from a $1.3 billion to $300 million. With an industry-wide trough already underway, LBI's inability to paydown debt caused both Standard & Poors and Moody's to downgrade their outlooks on all ratings of LBI from stable to negative.

228. LBI's available cash plummeted $1 billion in just two months from June to August 2008, and fell another $500 million by the middle of October. Without the Access

Revolver or the upsizing of the ABL Facility, by mid-October 2008, LBI's available cash was near $0.

229.     In the second half of 2008, EBITDA in LBI's chemicals businesses continued to decline, and its fuels business plunged over the precipice, off $780 million by October 2008, and off $1.4 billion by December 2008.

230.     By October 2008, the blame game between the Access teams (Kassin and Patel) and the LBI team (Trautz and Bigman) was in full swing.  Patel and Kassin, worried about their reputations, exchanged frantic emails as they watched LBI management fail to avoid the impending collapse.

231.     In the last quarter of 2008, the punishingly high prices of raw materials began to drop.  In accordance with the terms of the ABL Inventory Facility, the inventory was continually required to be "marked to market." And, because the ABL Inventory Facility generally permitted LBI to borrow only up to 75% of the inventory's value, eroding inventory values resulted in a severely diminished borrowing base and triggered LBI's obligation to repay the ABL Lenders. The timing of this contraction in the borrowing base coincided with a steep decline in earnings during the second half of 2008.  As receivables dried up, so too did the borrowing base under the ABL Receivables Facility.

232.     On October 15, 2008, LBI, unable to otherwise satisfy obligations then becoming due, drew $300 million from the Access Revolver.  The drawdowns were permitted only based upon assurances that LBI would be able to repay them almost immediately.  Although LBI was clearly insolvent at the time, and had insufficient capital to continue operating, on October 16, 17, and 20, it repaid the $300 million in three installments of $100 million each.  Even as the

cash starved company commenced its death dive, the priority remained to assure that risk to Blavatnik be minimized.

233. By the end of November 2008, LBI's earnings were significantly off in every division except Technology. Its EBITDA was only approximately $2 billion, off 53% versus projected November year-to-date EBITDA in the LBI business plan.

234. LBI began negotiating forbearance agreements with its lenders, eventually obtaining a forbearance of $281 million in principal, interest, and fees.

235. On December 12, 2008, Twitchell e-mailed Richard Storey, Finance Director of Access, informing him that LBI would require funding under the Access Revolver in the amount of $100 million on December 29, and in the amount of $300 to $350 million on December 30 or 31 early in the morning. She stated that LBI would be unable to repay the $300 million draw for several months. Storey forwarded the e-mail to Benet and wrote, "This is a problem."

236. On December 17, 2008, Access assigned the Access Revolver to AI International S.à.r.l., a Luxembourg entity, so that it could fund any draws on the Access Revolver with offshore funds. By this point in time, however, Blavatnik had already consulted with restructuring advisors and been told a far greater infusion of funds than was potentially available under the Access Revolver was necessary to fund LBI's operations and allow it to meet its obligations in 2010.

237. On December 17, 2008, a Managing Director at Lazard Ltd., who had been seeking to be retained for the restructuring of LBI, gave Blavatnik some personal advice. The Manager Director told Blavatnik not to "put any more money into LBI until you know that you (possibly with a partner) are able to invest more than what is required. In this case, we calculate that you need more than $3 billion." The Managing Director advised Blavatnik that if he only

invested $1 billion in LBI, "based on the numbers we see, you won't save the existing equity and you probably won't get much of your $1 billion back."

238.    By mid-December 2008, LBI management was involved in emergency discussions with its lenders to prepare for a Chapter 11 filing and prepare for DIP financing, in which Blavatnik, through Access or another Blavatnik-controlled entity, would contribute part of the DIP financing in an amount equal to the Access Revolver to secure a more favorable secured position than if Access permitted a draw down under the Access Revolver.

239.    By December 20, 2008, Access was considering the tax benefits of waiting to abandon LBI in 2009 versus 2008.

240.    On December 29, 2008, Kassin informed Blavatnik that LBI was unraveling at a very rapid pace and would likely not last until January 5, 2009.

241.    On December 30, 2008, even though LBI managers knew that AI International S.à.r.l. would reject the request, they went through the charade of requesting a draw down of the entire $750 million balance of the Access Revolver.  AI International S.à.r.l. promptly denied the request, and the Debtors thereafter filed a Chapter 11 proceeding.

242.    None of the difficulties that LBI faced in its first year should have been unanticipated.  Each should and could have been dealt with had LBI been adequately capitalized with a capital structure that reasonably provided for LBI's foreseeable needs to finance its businesses through a downturn.  Economists and industry analysts had been handicapping the possibility of an economic recession which foreseeably would depress demand and exacerbate the forecasted chemicals industry downturn.  As put by Alan Bigman in his First Day Affidavit, "[t]he petrochemical industry historically *has been defined* by its cyclical nature." Before Lyondell became an acquisition target, Lyondell's strategy was to leverage down in anticipation

of the downturn.  Instead, indifferent to anything but taking the gamble on surviving a trough to benefit on the upside, Access chose to leverage up, imposing a staggering debt burden just as the peaks in both industries had past.  It was clear, moreover, by the fall of 2007, the fact that LBI was operating in two major industries, petrochemicals and refining, would not operate as a hedge on risk.  Both industries would head into the downturn at the same time.  By the time the Merger closed, and indeed well before, it was known that the LBI was on a highwire without a net.

243.    The consequences to LBI of insufficient liquidity were also a known risk, long before the Merger closed.  After two years of steady increases in the commodities markets and a marked increase in heightening of volatility, no petrochemicals manager should even be seriously heard to claim surprise at the trend continuing.  Crude oil prices had already reached $90 a barrel by the time the Merger closed in late December, up almost $40 a barrel from where it had been less than twelve months before.  As characterized by Dan Smith, oil and gas commodities was a "crazy market" and an additional $40 rise may have seemed unlikely to some but was far from outside the realm of possibility.

244.    In short, LBI did not fail because of a unique or unforeseeable convergence of bad luck.  Levered within an inch of its life, it was absolutely barred from accessing financing needed to survive even a short term drop off in earnings.  As the capital markets that recoiled from holding its debt understood even before the Merger closed, LBI's capital structure made its failure during the downturn inevitable.  Once the Merger closed, the only question remaining was the precise point along the path to the trough at which complete and irretrievable failure would occur.  LBI failed because it was inadequately capitalized and grossly overleveraged and, accordingly, unable to deal with the stresses inherent in the industries in which it was operating.

## V.     Upon the Merger, the Resulting Combined "LBI Group" of Companies Was Insolvent

245.     Upon the closing of the Merger, LBI, considered on a consolidated basis with its subsidiaries ("LBI Group"), had liabilities in the amount of approximately $26 billion.  Of such amount, approximately $22 billion represented obligations under the Facilities and the balance was other debt.  On and as of the date of the Merger, December 20, 2007, the fair value of the assets of LBI Group ranged from no more than $22 billion to at most $25 billion and most likely even materially less than this range of fair value.  Accordingly, from and after the closing of the Merger, the LBI Group was insolvent.  This insolvency deepened over the course of the 2008.

246.     The insolvency of LBI Group as of the date of the Merger is strongly indicated by using the very same methodology repeatedly used by Merrill in its role as advisor to Blavatnik and Access for the Lyondell acquisition.  As investment advisor to Access, to value the pro forma combined Lyondell-Basell companies, Merrill customarily performed what it referred to as a "Mid-Cycle EBITDA-based valuation." To perform such a valuation of the pro forma company, Merrill would first compute "Mid-Cycle EBITDA," which was the average of five years of projected pro forma combined EBITDA.  Merrill would then multiply the resulting Mid-Cycle EBITDA by a range of "Exit Multiples," (5.75x, 6.50x, 7.25x) selected by it as appropriate, thereby arriving at a range of "enterprise values" for LBI Group.

247.     Using this methodology, over the course of its involvement, Merrill provided Access with a variety of different valuations, based on different projections developed at different times.  Until July 15, 2007, all such projections were based on industry analysts such as CMAI and other publicly available company specific and industry sources.  For example, on or about July 10, 2007, before having received non-public projections from Lyondell management, Merrill, relying on such sources, provided Access with a valuation based on its "Downside Case

Projections" for the combined entity. Using its "Downside Case" projections, Merrill calculated a Mid-Cycle EBITDA of $3.8 billion. Then, applying its selected Exit Multiples to Mid-Cycle EBITDA, it provided a range of values from between $22 billion (using the 5.75x multiple) to $27.7 billion (using the 7.25x multiple), with $24.8 billion as its mid-point valuation (using the 6.50x multiple) for the combined companies.

248. A few days after providing Access with this "Downside Case," Merrill applied this same Mid-Cycle EBITDA-based valuation methodology using the earnings projections provided to Access and Basell by Lyondell management. Based on Lyondell management earnings projections as of July 15, 2007, Merrill calculated a Mid-Cycle EBITDA of $4.8 billion. Then, applying its selected Exit Multiples to this amount, it generated a range of posited values, with the mid-point value, based on the mid-point 6.50 Exit Multiple, being $31.5 billion.

249. As explained above, by December 20, 2007, and indeed by the time Lyondell's dismal performance for the third quarter of 2007 was known, a variety of indicators—macroeconomic, market, industry, and company specific—relevant to the formulation of reasonable earnings projection for the Lyondell-Basell combination (all of which indicators were available to Basell, Lyondell, and the Lead Arrangers) compellingly refuted the rosy assumptions embedded in the Lyondell July 15 Base Case. It was clear, in fact, that by the third quarter of 2007, rather than tracking the July 15 Base Case, the performance of Lyondell and Basell, considered on a pro forma combined basis, was tracking the July 10, 2007 "Downside Case," and was even beginning to show characteristics of the scenario used by Merrill in its April 10, 2007 "Credit Stress Test Case."

250. As shown below, using the same Mid-Cycle EBITDA-based valuation methodology used by Merrill to value the companies on a combined pro forma basis, but using

the Mid-Cycle EBITDA derived from the July 10, 2007 "Downside Case" or the April 10, 2007 "Credit Test Case," each of which more realistically projected the future performance of the companies, the liabilities of the combined LBI Group exceeded the fair value of its assets on and as of the date of the Merger.



## VI. Upon the Merger, the Debtors Incurred Debts that Were Beyond Their Ability to Repay

251.    Upon the Merger, LBI incurred obligations which, combined with its pre-existing obligations, constrained its further access to the capital markets. As financed pursuant to the Merger, LBI was left with insufficient funds available to meet short and medium term needs, including: (i) funding the post-Merger payment of the purchase price for Berre that it had committed to purchase prior to the Merger, as well as other planned acquisitions and capital expenditures; (ii) the payment of millions of dollars of interests and fees due to the Lead Arrangers, including approximately $250 million of incremental fees due as a result of the exercise by the Lead Arrangers of the "flex provisions" included in the Merger financing; and

(iii) other costs, expenses and obligations that foreseeably would become due and payable within the weeks and months following the Merger. As a means to extricate itself from the resulting liquidity crisis that arose shortly after the closing of the Merger, LBI "upsized" its existing working capital facilities, effectively exhausting all remaining available sources of liquidity.

252. Thereafter, when, as had been fully foreseeable, under the stress of a forecasted industry downturn that reduced its earnings and margins, the borrowing bases of LBI's asset based facilities contracted, and LBI was required to pay down these facilities, it was left with insufficient funds to operate, fell into financial distress and was unable to pay other obligations as they became due, including payment of principal and interest due on the Facilities.

253. Upon the Merger, LBI knew, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

## VII. Class Action Allegations

254. Upon information and belief, portions of the Senior Credit Facility Obligations have been syndicated, sold, or otherwise transferred to numerous parties, and continue to be syndicated, sold, or otherwise transferred. Pursuant to security agreements, pledge agreements, mortgages, and other instruments entered into in connection with the Senior Credit Facility, each party who acquires an interest in the Senior Credit Facility Obligations obtains a beneficial interest in the liens granted to Citibank, N.A., as Collateral Agent, to secure the repayment of the Senior Obligations.

255. As of April 27, 2009, there were approximately 800 parties, including Defendant and Class Representative LeverageSource III S.à.r.l., which had purchased or otherwise obtained portions of the Obligations due under the Senior Credit Facility and who may claim a beneficial interest in the liens granted in favor of Citibank, N.A., as Collateral Agent.

256.     Similarly, in connection with the closing of the Merger on December 20, 2007, numerous holders of Lyondell common stock, including Defendant and Class Representative Barclays Global Investors, N.A., received proceeds from the Facilities in the amount of $48 per each share that they held.  As of October 9, 2007, the record date for the special meeting of Lyondell's shareholders in connection with the Merger, there were 253,625,523 shares of Lyondell common stock outstanding, and more than 79% of those shares were widely held by shareholders holding less than 5% of the outstanding stock.

257.     Pursuant to Rule 7023 of the Federal Rules of Bankruptcy Procedure, and Rule 23 of the Federal Rules of Civil Procedure, the Committee seeks the certification of two defendant classes (collectively, the "Classes") defined as follows:

   a.     All those who have purchased or otherwise obtained an interest in any portion of the Obligations due under the Senior Credit Facility (the "Senior Credit Facility Class"); and

   b.     All of the holders of Lyondell Common Stock who received proceeds from the Merger Consideration in payment for the purchase of their respective shares in connection with the Merger (the "Shareholder Class").

258.     The proposed Classes are sufficiently large to satisfy the numerosity requirement of Federal Rule of Civil Procedure 23(a).  Because of the large number of potential class members, the certification of the proposed defendant Classes is superior to all other available methods for the fair and efficient adjudication of this adversary proceeding.

259.     There are questions of law and fact that are common to the unnamed members of the Classes, and that predominate over the claims and defenses of any individual members of the Classes, including, but not limited to:

   a.     Whether the Senior Credit Facility Obligors received reasonably equivalent value or fair consideration in exchange for the incurrence of the Senior Credit Facility Obligations, a substantial portion of the proceeds of which were immediately

funneled out as Merger Consideration to Lyondell shareholders, as transaction and financing fees, and as payment on certain pre-merger debt obligations;

b.    Whether the Senior Credit Facility Obligors were insolvent, or became insolvent as a result of the "Voidable Senior Credit Facility Obligations," as defined below, and/or whether the Senior Credit Facility Obligors were engaged or were about to engage in a business or transaction for which the remaining assets were unreasonably small in relation to the business or transaction, and/or whether the Senior Credit Facility Obligors intended, believed, or reasonably should have believed that they would incur debts beyond their ability to pay such debts as they became due;

c.    Whether the Debtors received reasonably equivalent value in exchange for the payment of the Merger Consideration to the Shareholders;

d.    Whether, at the time of the Merger Consideration paid to the Lyondell Shareholders, the Debtors were insolvent, or became insolvent as a result of the Shareholder Transfer, and/or whether the Debtors were engaged or were about to engage in a business or transaction for which the remaining assets were unreasonably small in relation to the business or transaction, and/or whether the Debtors intended, believed, or reasonably should have believed that they would incur debts beyond their ability to pay such debts as they became due; and

e.    Whether in the event the claims of the Senior Credit Facility Lenders or Lead Arrangers are equitably subordinated to the claims of the general creditors of the Debtors, claims of any subsequent holder of any obligation under the Senior Credit Facility are similarly subordinated.

260. Any claims against and claimed defenses of the Class Representatives are typical of the claims against and claimed defenses of the unnamed members of the Classes. The claims against and claimed defenses of each member of the Classes arise out of the same factual circumstances involving the Merger, the financing of the Merger, and the transfer of certain property of the Debtors in connection with the Merger.

261. The Class Representatives will fairly and adequately protect and represent the interests of the unnamed members of the Classes and have as much incentive to vigorously defend against the Committee's claims as any unnamed class member would.

262. Class action status is warranted for each of the proposed Classes under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, as application of the law to the underlying facts might be inconsistent.

263. Class action status is warranted for each of the proposed Classes under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Classes would create a risk of adjudications with respect to individual members of the Classes which would, as a practical and legal matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

# COUNT I

## FRAUDULENT TRANSFER
### (11 U.S.C. §§ 544, 548(a), and 550 and Applicable State Fraudulent Transfer Law)

### (By the Senior Credit Facility Obligors against Senior Credit Facility Lender Parties and LeverageSource III S.à.r.l., individually and as Class Representative of the Senior Credit Facility Class)

264.     The Committee repeats and realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

265.     On or about December 20, 2007, the Senior Credit Facility Obligors incurred the Senior Credit Facility Obligations under the Senior Credit Facility for the repayment of $9.55 billion and €1.3 billion in principal amount of indebtedness and for interest, fees, and penalties to accrue or to be incurred thereon.

266.     On or about December 20, 2007, the Senior Credit Facility Obligors granted the Senior Liens to Citibank, N.A., as Collateral Agent under the Senior Credit Facility, to secure the repayment of the Senior Obligations.

267.     To the extent that the Senior Credit Facility Obligations were incurred to fund the payment of: (i) the Merger Consideration, (ii) the Change of Control Payments, and (iii) the Transactional Fees (collectively, the "Merger Related Payments"), the Senior Credit Facility Obligors did not receive reasonably equivalent value or fair consideration in exchange for the incurrence of such obligations (that portion of the Senior Credit Facility Obligations representing the obligation to repay the amounts used to fund the Merger Related Payments, the "Voidable Senior Credit Facility Obligations").

268.     At the time of the Merger, each of the Senior Credit Facility Obligors: (i) was insolvent, or became insolvent as a result of the incurrence of the Voidable Senior Obligations; (ii) was engaged or was about to engage in a business or transaction for which the remaining

assets were unreasonably small in relation to the business or transaction; and/or (iii) intended, believed, or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due.

269.     Upon information and belief, at all times relevant hereto, there were actual creditors of each of the Senior Credit Facility Obligors holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b).

270.     The Senior Credit Facility Obligations, to the extent of the Voidable Senior Credit Facility Obligations, were fraudulent as to creditors and should be avoided pursuant to 11 U.S.C. § 548(a) and under applicable state law fraudulent transfer law.

271.     The Senior Liens, to the extent of securing the Voidable Senior Credit Facility Obligations, were fraudulent as to creditors and should be avoided pursuant to 11 U.S.C. §§ 544(b), 548(a), and 550(a), and under applicable state fraudulent transfer law.

272.     Any payments made, whether payments of principal, interest, penalties, or fees, in respect of the Voidable Senior Credit Facility Obligations incurred under the Senior Credit Facility should be avoided and recovered pursuant to 11 U.S.C. §§ 548(a) and 550(a) and under applicable state fraudulent transfer law.

## COUNT II
## FRAUDULENT TRANSFER
## (11 U.S.C. §§ 544, 548(a), and 550 and Applicable State Fraudulent Transfer Law)

### (By the Bridge Loan Obligors against Bridge Loan Lender Parties)

273.     On or about December 20, 2007 the Bridge Loan Obligors incurred the Bridge Loan Obligations under the Bridge Loan Agreement for the repayment of $8 billion in principal amount of indebtedness and for interest, fees, and penalties to accrue or to be incurred thereon.

274.     On or about December 20, 2007 the Bridge Loan Obligors granted the Bridge Loan Liens to secure the repayment of the Bridge Loan Obligations.

275.     To the extent that the Bridge Loan Obligations were incurred to fund the Merger Related Payments, the Bridge Loan Obligors did not receive reasonably equivalent value or fair consideration in exchange for the incurrence of such obligations (that portion of the Bridge Loan Obligations representing the obligation to repay the amounts used to fund the Merger Related Payments, the "Voidable Bridge Loan Obligations").

276.     At the time of the Merger, each of the Bridge Loan Obligors: (i) was insolvent, or became insolvent as a result of the incurrence of the Voidable Bridge Loan Obligations; (ii) was engaged or was about to engage in a business or transaction for which the remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended, believed, or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due.[15]

277.     Upon information and belief, at all times relevant hereto, there were actual creditors of each of the Bridge Loan Obligors holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b).

278.     The Bridge Loan Obligations, to the extent of the Voidable Bridge Loan Obligations, were fraudulent as to creditors and should be avoided pursuant to 11 U.S.C. § 548(a) and under applicable state law fraudulent transfer law.

279.     The Bridge Loan Liens, to the extent of securing the Voidable Bridge Loan Obligations, were fraudulent as to creditors and should be avoided pursuant to 11 U.S.C. §§ 544(b), 548(a), and 550(a) and under applicable state law fraudulent transfer law.

---

[15] This Count is brought on behalf of all the Bridge Loan Obligors collectively and on behalf of each Bridge Loan Obligor individually. Thus, the term "Bridge Loan Obligors" as used in this Count is intended to encompass the Bridge Loan Obligors as an aggregate group and each Bridge Loan Obligor individually.

280. Any payments made, whether payments of principal, interest, penalties, or fees, in respect of the Voidable Bridge Loan Obligations incurred under the Bridge Loan, should be avoided and recovered pursuant to 11 U.S.C. §§ 544(b), 548(a), and 550(a) and under applicable state fraudulent transfer law.

## COUNT III
## FRAUDULENT TRANSFER
### (11 U.S.C . §§ 544, 548, and 550 and Applicable State Fraudulent Transfer Law)

### (By the Debtors Against Nell Limited and AI Chemical Investments LLC)

281. The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

282. Concurrently with the closing of the Merger, one or more of the Debtors transferred $523,803,305 of Merger Consideration ("Toe Hold Payment I") to Basell Funding for ultimate receipt by Nell Limited.

283. Concurrently with the closing of the Merger, to satisfy the obligation of a Blavatnik affiliate, LyondellBasell Finance transferred $674,328,055 of Merger Consideration ("Toe Hold Payment II" and together with Toe Hold Payment I, the "Toe Hold Payments") to Merrill Lynch Equity Derivatives.

284. The Debtors did not receive reasonably equivalent value or fair consideration in exchange for the Toe Hold Payments.

285. At the time of the Toe Hold Payments, the Debtors (i) were insolvent or became insolvent as a result of the Toe Hold Payments; (ii) were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with

Debtors was an unreasonably small capital; and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.[16]

286.     Upon information and belief, at all times relevant hereto, there were actual creditors of each of the Debtors holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b).

287.     The Toe Hold Payments should be avoided and recovered pursuant to 11 U.S.C. §§ 544, 548, and 550(a) and under applicable state fraudulent transfer law.

**COUNT IV**
**FRAUDULENT TRANSFER**
**(11 U.S.C . §§  544, 548 and 550 and Applicable State Fraudulent Transfer Law)**

**(By the Debtors Against Barclays Global Investors, N.A., individually and as Class Representative of the Shareholder Class)**

288.     The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

289.     On December 20, 2007, one or more of the Debtors transferred approximately $11.3 billion of the proceeds of the Facilities to fund the payment of the Merger Consideration to shareholders of Lyondell.

290.     The Debtors did not receive reasonably equivalent value or fair consideration in payment of the Merger Consideration.

291.     At the time of the payment of the Merger Consideration to Lyondell Shareholders, the Debtors (i) were insolvent or became insolvent as a result of the Shareholder Transfer; (ii) were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with Debtors was an unreasonably small capital; and/or (iii)

---

[16] This Count is brought on behalf of all the Debtors collectively and on behalf of each Debtor individually. Thus, the term "Debtors" as used in this Count is intended to encompass the Debtors as an aggregate group and each Debtor individually.

intended to incur, or believed that they would incur, debts that would be beyond its ability to pay as such debts matured.[17]

292.    Upon information and belief, at all times relevant hereto, there were actual creditors of each of the Debtors holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b).

293.    The transfers of the Merger Consideration to Lyondell shareholders should be recovered pursuant to 11 U.S.C. §§ 544 (b), 548, and 550(a) and under applicable state fraudulent transfer law.

## COUNT V
## FRAUDULENT TRANSFER
### (11 U.S.C . §§  544, 548, and 550 and Applicable State Fraudulent Transfer Law)

### (By the Debtors Against Lyondell Officers and Directors)

294.    The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

295.    On or about December 20, 2007, one or more of the Debtors transferred to the Directors and Officers approximately $133 million of the proceeds of the Facilities to fund the Change of Control Payments.

296.    The Change of Control Payments were made within two years of the Petition Date.

297.    The Debtors did not receive reasonably equivalent value or fair consideration in exchange for the Change of Control Payments.

298.    At the time of the Change of Control Payments, the Debtors (i) were insolvent or became insolvent as a result of the Change of Control Payments; (ii) were engaged in business or

---

[17] This Count is brought on behalf of all the Debtors collectively and on behalf of each Debtor individually. Thus, the term "Debtors" as used in this Count is intended to encompass the Debtors as an aggregate group and each Debtor individually.

a transaction, or were about to engage in business or a transaction, for which any property remaining with Debtors was an unreasonably small capital; and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.[18]

299.     Upon information and belief, at all times relevant hereto, there were actual creditors of each of the Debtors holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b).

300.     The Change of Control Payments should recovered pursuant to 11 U.S.C. §§ 544(b), 548, and 550(a) and under applicable state fraudulent transfer law.

## COUNT VI
## EQUITABLE SUBORDINATION
## (11 U.S.C. § 510)

**(By the Senior Credit Facility Obligors Against the Senior Credit Facility Lender Parties, and Leverage Source III S.à.r.l., individually and as Class Representative of the Senior Credit Facility Class)**

301.     The Committee repeats and realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

302.     The conduct of the Senior Credit Facility Lender Parties, as alleged above, constitutes inequitable conduct.

303.     By reason of the conduct of the Senior Credit Facility Lender Parties, the Debtors became insolvent, undercapitalized, and were unable to satisfy their obligations to their general creditors, thereby harming the Debtors' general unsecured creditors.

---

[18] This Count is brought on behalf of all the Debtors collectively and on behalf of each Debtor individually. Thus, the term "Debtors" as used in this Count is intended to encompass the Debtors as an aggregate group and each Debtor individually.

304.     Allowing the Senior Credit Facility Lender Parties to receive payment on their claims or any claims which they purported to assert prior to the general unsecured creditors would be unfair and inequitable.

305.     Equitable subordination of the claims of the Senior Credit Facility Lender Parties and the claims of LeverageSource III S.à.r.l., individually and as Class Representative of the Senior Credit Facility Class, is consistent with the Bankruptcy Code.

306.     Because of the transactions and actions described herein, the claims of the Lead Arrangers and LeverageSource III S.à.r.l., individually and as Class Representative of the Senior Credit Facility Class, should be equitably subordinated to all general unsecured claims pursuant to section 11 U.S.C. § 510.

307.     In addition, because the Senior Credit Facility Lender Parties' claims and the claims of LeverageSource III S.à.r.l., individually and as Class Representative of the Senior Credit Facility Class, should be equitably subordinated, all of the consideration paid to the Senior Credit Facility Lender Parties and their agents on account of such claims, or the value of such consideration, should be recovered for the benefit of the Estate and its creditors.

## COUNT VII
## EQUITABLE SUBORDINATION
### (11 U.S.C. § 510)

**(By the Bridge Loan Obligors Against the Bridge Loan Lender Parties)**

308.     The Committee repeats and realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

309.     The conduct of the Bridge Loan Lender Parties, as alleged above, constitutes inequitable conduct.

310. By reason of the conduct of the Bridge Loan Lender Parties, the Debtors became insolvent, undercapitalized, and were unable to satisfy their obligations to their general creditors, thereby harming the Debtors' general unsecured creditors.

311. Allowing the Bridge Loan Lender Parties to receive payment on their claims or any claims which they purported to assert prior to the general unsecured creditors would be unfair and inequitable.

312. Equitable subordination of the claims of the Bridge Loan Lender Parties is consistent with the Bankruptcy Code.

313. Because of the transactions and actions described herein, the claims of the Bridge Loan Lender Parties should be equitably subordinated to all general unsecured claims pursuant to section 11 U.S.C. § 510.

314. In addition, because the Bridge Loan Lender Parties' claims should be equitably subordinated, all of the consideration paid to the Bridge Loan Lender Parties and their agents on account of such claims, or the value of such consideration, should be recovered for the benefit of the Estate and its creditors.

## COUNT VIII
## BREACH OF FIDUCIARY DUTY

### (By the Debtors Against Lyondell Directors)

315. The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

316. The Directors owed duties of good faith, loyalty and due care to Lyondell. In approving the terms of the Merger, knowing that it would leave Lyondell and it subsidiaries insolvent, undercapitalized and unable to pay its obligations when they came due, the Directors

breached their fiduciary duties to Lyondell, including, without limitation, their duties of good faith, loyalty, and due care.

317.    The Directors were interested in the Merger and received personal financial benefits from the change-of-control payments that the Shareholders did not receive. Specifically, the Directors received change-of-control payments totaling approximately $70.4 million.

318.    The Directors' breach of fiduciary duty resulted in damages to Lyondell, its business and prospects.

**COUNT IX**
**MISMANAGEMENT CLAIM UNDER LUXEMBOURG LAW**
**(article 51bis, 59 § 1, 60bis-16 § 1, 62 and 191 of the Luxembourg Company Law)**

**(By the Debtors Against Leonard Blavatnik, Simon Baker, Dawn Shand, Bertrand Duc, Alan Bigman, Richard Floor, Philip Kassin, and Kent Potter)**

319.    The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

320.    Under the law of the Grand Duchy of Luxembourg, the jurisdiction of organization of LBI, the GP, and the Members of the Supervisory Board of LBI were obligated to exercise reasonable prudence, honesty, and good faith in the management and the supervision of the business and affairs of LBI.

321.    At all relevant times prior to December 20, 2007, including the period prior to the execution of the Merger Agreement on or about July 15, 2007 through the closing of the Merger on December 20, 2007, the representatives of the GP included Bigman, Richard Floor, Kassin and Kent Potter (the "GP Managers"). In such capacity, each of the GP Managers was obligated to exercise reasonable prudence, honesty, and good faith in the management and the supervision of the business and affairs of LBI.

322. At all relevant times prior to December 20, 2007, including the period prior to the execution of the Merger Agreement on or about July 15, 2007 through the closing of the Merger on December 20, 2007, the members of the Supervisory Board included Simon Baker, Dawn Shand, and Bertrand Duc (the "Nominees").

323. Upon information and belief, effective December 20, 2007, each of the Nominees resigned or were removed from the Supervisory Board of LBI and were succeeded by individuals including Kassin, Benet, Lynn Coleman, Richard Floor, and Kent Potter (the "Successors"). Alternatively, upon information and belief, the Successors also included Blavatnik, who purported at all relevant times thereafter to have served as Chairman of the Supervisory Board.

324. At all relevant times, Blavatnik exercised control over LBI and the Supervisory Board pursuant to arrangements, agreements or understandings based upon (i) his ownership and control, direct or indirect, of Nell Limited, upon information and belief, LBI's ultimate corporate parent; and/or (ii) his ownership or control, direct or indirect, of B.I. S.á.r.l., the GP's immediate corporate parent; and/or (iii) his directorship in B.I. S.á.r.l.; and/or (iv) directly or indirectly, through his control over other entities or pursuant to other means or arrangements.

325. By virtue of Blavatnik's control over the Supervisory Board, if it is determined that Blavatnik was not formally or legally appointed to the Supervisory Board, effective December 20, 2007, Blavatnik nonetheless functioned, at all relevant times, as a *de facto* member of the Supervisory Board.[19]

---

[19] As alleged above, prior to December 20, 2007, Messrs. Blavatnik, Kassin, and Benet purported to act as members of the Supervisory Board of Basell, and Blavatnik, Kassin, and Benet, as Supervisory Board members, claimed to have voted with respect to whether to enter into the Merger Agreement in mid-July 2007. As a result they, along with Messrs. Floor and Potter, acted as *de facto* members of the Supervisory Board prior to December 20, 2007 as well.

326.     Upon information and belief, during their tenure as members of the Supervisory Board, each of the Nominees cast their votes and took any other action in their capacities as members of the Supervisory Board in accordance with the directives of Blavatnik.

327.     Upon information and belief, the Nominees and or the Successors approved or ratified the Merger Agreement and the related transactions including the agreements and other loan documents pursuant to which approximately $22 billion in obligations were incurred by LBI and/or its subsidiaries and affiliates in connection with the acquisition of Lyondell.

328.     As alleged herein, Blavatnik, the GP Managers, the Nominees, and the Successors mismanaged the business and affairs of LBI, causing LBI and its subsidiaries to become insolvent, undercapitalized and to incur debt beyond their ability to pay when due and otherwise adversely affected the business and prospects of LBI.

329.     As a result of the imprudent, dishonest and reckless conduct authorized, directed, approved or acquiesced in by Blavatnik, the GP Managers, the Nominees, and the Successors, LBI was injured.  Injuries and prejudice to the business and affairs of LBI were the result of mismanagement by Blavatnik, the GP Managers, the Nominees, and the Successors.

## COUNT X
## TORT CLAIM UNDER LUXEMBOURG LAW
### (article 59 § 2, 60bis-16 § 2, 62, 72-2 and 69 of the Luxembourg Company Law and article 1382 and 1383 of the Luxembourg Civil Code)

### (By the Debtors Against Blavatnik, the GP Managers, the Nominees and the Successors)

330.     The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

331.     Under the law of the Grand Duchy of Luxembourg, the jurisdiction of organization of LBI, Blavatnik, the GP Managers, the Nominees, and the Successors were obligated to exercise reasonable care and diligence in the direction and supervision of the

business and affairs of LBI, in accordance with legal (being Luxembourg Company Law) and statutory provisions (being the provisions of the articles of incorporation of LBI).

332.     In approving the terms of the Merger and the Merger financing, and the other conduct alleged herein, Blavatnik, the GP Managers, the Nominees, and the Successors failed to exercise the duties imposed on them by Luxembourg law in their capacities as such, and in fact, engaged in imprudent, dishonest, and reckless conduct.

333.     The conduct authorized, directed, approved or acquiesced in by the GP Managers the Nominees, and the Successors, resulted in the insolvency of LBI, the insufficiency of its capitalization and its inability to pay its debts when they became due.

334.     As a result of the tortious misconduct of Blavatnik, the GP Managers, the Nominees and the Successors, LBI has been injured in that, *inter alia*, LBI has been rendered insolvent.

**COUNT XI**
**TORT CLAIM UNDER LUXEMBOURG LAW**
**(article 59 § 2, 60bis-16 § 2, 62, 72-2 and 69 of the Luxembourg Company Law and article 1382, 1383 and 1384 § 5 of the Luxembourg Civil Code and the provision of the Law of 5 April 1993 on the financial sector, as amended)**

**(By the Debtors Against the Lead Arrangers)**

335.     The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

336.     Under the law of the Grand Duchy of Luxembourg, the jurisdiction of organization of LBI, the Lead Arrangers owed a duty to LBI to exercise reasonable care and diligence in connection with funding arrangements of LBI and to refrain from such arrangements to the extent that they would result in the insolvency of LBI, the insufficiency of its capitalization and its inability to pay its debts when they became due.

337.    In agreeing to participate in the Merger financing and engaging in the other conduct alleged herein, the Lead Arrangers failed to exercise the duties imposed on them by Luxembourg law.

338.    The conduct authorized, directed, approved or acquiesced in by the Lead Arrangers resulted in the insolvency of LBI, the insufficiency of its capitalization and its inability to pay its debts when they became due.

339.    As a result of the tortious misconduct of the Lead Arrangers, LBI has been injured in that, *inter alia*, LBI has been rendered insolvent.

## COUNT XII
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (By Debtors Against Merrill Lynch)

340.    The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

341.    The Supervisory Board and the GP Managers owned duties of due care, good faith, and diligence to LBI.

342.    The Supervisory Board and the GP Managers breached their duties to LBI by approving the Merger and the Merger Financing.

343.    Merrill Lynch provided substantial assistance to the Supervisory Board and the GP Managers in furtherance of their breaches of their fiduciary duties to LBI by inducing the Supervisory Board and the GP Managers to approve the Merger and the merger financing and to approve the Subsidiary Guarantees.

344.    Merrill Lynch provided such substantial assistance to the Supervisory Board and the GP Managers with full knowledge that the effect thereof would be to cause the them   to breach their duties.

345.	Accordingly, Merrill Lynch aided and abetted the Supervisory Board's and the GP Managers's breaches of their duties and are liable for damages in an amount to be determined at trial.

## COUNT XIII
## BREACH OF FIDUCIARY DUTY

### (By Debtors Against Subsidiary Directors)

346.	The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

347.	The Subsidiary Directors owed duties of good faith, loyalty and due care to the Subsidiary Guarantors.

348.	On or about December 20, 2007, the Subsidiary Directors of the Subsidiary Guarantors approved the Subsidiary Guarantees and liens given by such corporations guaranteeing the obligations incurred under the Facilities.

349.	In approving the terms of Subsidiary Guarantees, the Subsidiary Directors breached their fiduciary duties to the Subsidiary Guarantors. The Subsidiary Directors were interested in the Merger and, upon information and belief, received personal financial benefits from the change-of-control payments that the Shareholders did not receive.

350.	The Subsidiary Directors' breach of fiduciary duty resulted in damages to the Subsidiary Guarantors, their business and their prospects.

## COUNT XIV
## AVOIDABLE PREFERENCE
## (11 U.S.C. §§ 544, 547 and 550, and Applicable State Fraudulent Transfer Law)

### (By the Debtors Against Access Industries Holdings LLC)

351.	The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

352.	On October 15, 2008, Lyondell drew $300 million from the Access Revolver.

353.	On October 16, 17, and 20, 2008, Lyondell repaid the $300 million to Access Industries Holdings LLC ("Access Holdings") in three installments of $100 million each (the "Access Revolver Transfers").

354.	On and as of October 16 through October 20, 2008, the liabilities of Lyondell exceeded the fair value of its assets and it was insolvent.

355.	Lyondell made the Access Revolver Transfers for the benefit of a creditor, Access Holdings, an insider of Lyondell.

356.	Lyondell made the Access Revolver Transfers on account of an antecedent debt Lyondell owed to Access Holdings before it made such Transfers.

357.	The Access Revolver Transfers occurred within 90 days of the Petition Date.

358.	The Access Revolver Transfers allowed Access Holdings to receive more than it would in a Chapter 7 case had the Access Revolver Transfers not occurred.

359.	The Access Revolver Transfers should be avoided and/or recovered pursuant to 11 U.S.C. §§ 544, 547 and 550, and under applicable state fraudulent transfer law.

360.	In addition to the Access Revolver Transfers, any and all payments made by the Debtors to Access Holdings, its successors and assigns, on account of antecedent debt in the one year prior to the Debtors' Chapter 11 petitions in this case (the "Antecedent Debt Transfers") should be avoided and recovered pursuant to applicable state fraudulent transfer law.

## COUNT XV
## EQUITABLE SUBORDINATION
## (11 U.S.C. § 510)

**(By the Debtors Against AI International S.à.r.l., as assignee under the Access Revolver)**

361.     The Committee repeats and realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

362.     The conduct of Access Holdings and AI International S.à.r.l. ("AI International"), as assignee to Access Holdings under the Access Revolver, as alleged above, constitutes inequitable conduct.

363.     By reason of the conduct of Access Holdings and AI International, as assignee to Access Holdings under the Access Revolver, the Debtors became insolvent, undercapitalized, and were unable to satisfy their obligations to their general creditors, thereby harming the Debtors' general unsecured creditors.

364.     Allowing AI International to receive payment on its claims or any claims which it purported to assert prior to or with the general unsecured creditors would be unfair and inequitable.

365.     Equitable subordination of the claims of AI International is consistent with the Bankruptcy Code.

366.     Because of the transactions and actions described herein, the claims of the AI International should be equitably subordinated to all general unsecured claims pursuant to section 11 U.S.C. § 510.

367.     In addition, because AI International's claims should be equitably subordinated, all of the consideration paid to AI International, and/or to Access Holdings as assignor under the

Access Revolver, or the value of such consideration, should be recovered for the benefit of the Estate and its creditors.

## COUNT XVI
## FRAUDULENT TRANSFER
### (11 U.S.C. §§ 544, 548, and 550 and Applicable State Fraudulent Transfer Law)

### (By the Debtors Against Nell Limited, Goldman Sachs, Merrill Lynch, Deutsche Bank, Citibank M&A, Citibank, and Perella Weinberg)

368. The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

369. On or about December 20, 2007, one or more of the Debtors funded payment of the Transactional Fees in an aggregate amount of $242,365,618.61.

370. The Debtors did not receive reasonably equivalent value or fair consideration in exchange for the Transactional Fees.

371. Upon information and belief, at the time of the transfer of the Transactional Fees, there were actual creditors of the Debtors holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b).

372. At the time of the payment of the Transactional Fees each of the Debtors (i) was insolvent or became insolvent as a result of the payment of the Transactional Fees; (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Debtors was an unreasonably small capital; and/or (iii) intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured.[20]

---

[20] This Count is brought on behalf of all the Debtors collectively and on behalf of each Debtor individually. Thus, the term "Debtors" as used in this Count is intended to encompass the Debtors as an aggregate group and each Debtor individually.

373. The Transactional Fees should be avoided and/or recovered pursuant to 11 U.S.C. §§ 544, 548, and 550(a), and under applicable state fraudulent transfer law.

## COUNT XVII
## BREACH OF CONTRACT

**(By LBI and Lyondell Against Access Industries Holdings LLC and AI International S.à.r.l.)**

374. The Committee restates and realleges the foregoing paragraphs, which are incorporated by reference as if set forth fully herein.

375. The Access Revolver constituted a contract between LBI, Basell Finance Company, and Lyondell, on the one hand, and Access Industries Holdings LLC and AI International S.à.r.l. on the other.

376. Access Industries Holdings LLC and AI International S.à.r.l. breached the contract when, in bad faith, they refused in December 2008 to fund the Access Revolver at LBI's request.

377. As a result of such breach, LBI has suffered damages.

## COUNT XVIII
## AVOIDANCE OF UNPERFECTED SENIOR LIENS
## (11 U.S.C. § 544)

**(By the Debtors against Citibank, N.A., as Senior Collateral Agent)**

378. The Committee repeats and realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

379. Lyondell, as successor by merger to the obligations of ARCO under an indenture (the "ARCO Indenture") dated as of June 15, 1988 between ARCO and The Bank of New York, as trustee (in such capacity, the "ARCO Trustee"), as heretofore supplemented, incurred obligations under the ARCO Indenture for the repayment of $100 million in aggregate principal

amount of 10¼% debentures due 2010 and $225 million in aggregate principal amount of 9.8% debentures due 2020 (collectively, the "ARCO Debentures", the holders thereof, the "ARCO Noteholders", the ARCO Trustee and the ARCO Noteholders, collectively, the "ARCO Secured Parties") and for interest, fees, and penalties to accrue or to be incurred thereon.

380. 378. Pursuant to Section 5.03 of the ARCO Indenture, Lyondell was not permitted to incur any additional indebtedness that was secured with certain property of Lyondell (the "Restricted Property") "without effectively providing that the Securities [ARCO Debentures] of each series then outstanding and thereafter created…shall be secured equally and ratably with (or prior to) such Debt so long as such Debt shall be so secured…" Restricted Property included (i) any manufacturing plant for the production of oxygenated chemicals or styrene-based polymers located in the United States and owned by Lyondell or any of its subsidiaries and (ii) shares of capital stock or indebtedness of a subsidiary of Lyondell which owns property described in the foregoing clause (i).

381. On or about December 20, 2007, the Senior Credit Facility Obligors, including the Subsidiary Guarantors, granted the Senior Liens to Citibank, N.A., as Senior Collateral Agent, to secure the repayment of the Senior Credit Facility Obligations under various security agreements entered into between the Senior Credit Facility Obligors and Citibank, N.A., as Senior Collateral Agent, on such date.

382. In connection with the Senior Credit Facility Obligations, Lyondell was required to grant Senior Liens in certain of its real and personal property, including at least some Restricted Property. Consequently, and in order to comply with Section 5.03 of the ARCO Indenture, Lyondell entered into a security agreement with Citibank, N.A., as Senior Collateral Agent, whereby it granted to Citibank, N.A., as Senior Collateral Agent, security interests in

certain of its real and personal property, including some Restricted Property, for the equal and ratable benefit of the Senior Credit Facility Lender Parties and the ARCO Secured Parties. As a result, such assets of Lyondell secure the Senior Credit Facility Obligations and the ARCO Debentures on a *pari passu* basis.[21]

383.     Upon information and belief, Citibank, N.A., as Senior Collateral Agent, failed to take the appropriate actions required under the Uniform Commercial Code as enacted in the State of New York (the "UCC"),[22] or other applicable law to perfect the Senior Liens granted to it for the benefit of the Senior Credit Facility Lender Parties and the ARCO Secured Parties, as applicable, in certain assets of the Debtors' estates in which it was granted a security interest (collectively, the "Avoidable Property"),[23] including, without limitation, the following types of collateral with respect to which the Senior Collateral Agent failed to:

  a.  execute control agreements with respect of or otherwise obtain control of any deposit, savings, securities and other financial accounts of any of the Debtors, with the exception of those deposit accounts listed on *Exhibit B*, as required under §§ 9-104 and 9-314, and other applicable provisions of the UCC to perfect its security interests in any such accounts;

---

[21] The ARCO Secured Parties have no claim on the assets of any Debtor other than Lyondell.

[22] For present purposes, it is assumed that the Uniform Commercial Code as enacted in the State of New York is the applicable law as to perfection because the underlying security documents are governed by the law of the State of New York. The provisions of the UCC which would be applicable to the perfection of security interests in the jurisdictions where the Debtors or the property of the Debtors are located, are, in any event, substantially similar to those in effect in the State of New York.

[23] In order to minimize the cost to the Debtors' estates, the Committee agreed with the Debtors that it would not conduct an independent analysis of the perfection of the Senior Liens granted to the Senior Collateral Agent with respect to the property of LyondellBasell Industries AF S.C.A. and Basell Germany Holdings GmbH (collectively, the "Foreign Debtors") over which a security interest was granted to the Senior Collateral Agent, and would instead cooperate with the Debtors in such review. The Committee has not yet received sufficient evidence to make a conclusive determination as to the perfection of such Senior Liens. Accordingly, the Committee reserves the right, *inter alia*, to amend this claim, to the extent the Committee determines that any Senior Lien with respect of such property has not been properly perfected under applicable law.

b.      execute and record mortgages with respect to all real property owned by the Debtors they estimate to have a fair market value of less than $25 million, including, but not limited to, the real property identified in *Exhibit B*;

c.      record real estate mortgages or file UCC fixture filings in respect of the fixtures located in the properties listed on *Exhibit B*;

d.      file preferred ship mortgages, as required by 46 U.S.C. § 31321, the Ship Mortgage Act, with respect to the vessels listed on *Exhibit B*;

e.      register its security interest in the Debtors' railcars with the Surface Transportation Board; and

f.      register its security interest in and be noted as a lien holder on the certificate of title of any vehicle subject to a certificate of title statute under the laws of the jurisdiction where such vehicle is registered, including, but not limited to, any trucks, cars and other motor vehicles of the Debtors.

384.    Pursuant to Section 544(a)(1), (2), and (3) of the Bankruptcy Code, the Debtors, the trustee, or another authorized representative of the Debtors' estates have, as of the commencement of these Chapter 11 cases and without regard to any knowledge of the Debtors, the trustee, or any other creditors, the rights and powers of, and may avoid any transfer of property of the Debtors or any obligations incurred by the Debtors that is avoidable by:

a.      A creditor that extends credit to the Debtors at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists,

b.  A creditor that extends credit to the Debtors at the time of the commencement of the case, and obtains, at such time and with respect to such credit, and execution against the Debtors that is returned unsatisfied at such time, whether or not such a creditor exists, and

c.  A bona fide purchaser of real property, other than fixtures, from the Debtors, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such purchaser exists.

385. Accordingly, the Senior Liens with respect to each item of Avoidable Property owned by the Debtors should be avoided pursuant to 11 U.S.C. §§ 544(a)(1), (2), or (3),[24] as applicable, and such avoided Senior Liens should be reserved for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 551.

---

[24] In addition to the liens or security interests in the Avoidable Property which are subject to avoidance, it appears that the Debtors never granted liens or security interests to secure the Senior Credit Facility Obligations or Bridge Loan Obligations with respect to the following assets of the Debtors (collectively, the "Excluded Property"):

1.  All assets of Millennium Petrochemicals Inc., Millennium Specialty Chemicals Inc., and Millennium US Op Co LLC;

2.  The stock in or the assets of any joint venture owned by any Debtor;

3.  Any equity interests owned by any Debtor in any entity that is not a subsidiary of LyondellBasell;

4.  The assets of LyondellBasell Industries AF S.C.A. other than (i) its stock in Basell Funding S.a.r.l. and (ii) account # IBAN LU54 0141 4368 4960 0000 held at ING Luxembourg S.A., which were pledged to Citibank, N.A., as collateral agent, and seemingly properly perfected under the laws of Luxembourg; and

5.  The assets of Basell Germany Holdings GmbH other than (i) its stock in Basell Polyolefine GmbH and Basell Iberica Poliolefinas Holdings S.L.U, (ii) bank account # 666559355 held at Bayerische Hypo and Vereinsbank, AG, (iii) securities account # 23bis held at Basell Polyethylene S.A.S., and (iv) all receivables owing to it and governed under German Law, which were pledged to Citibank, N.A., as collateral agent, and seemingly properly perfected under the laws of Germany, France and Spain, as applicable.

Since liens or security interests in the Excluded Property were never granted as security for the Senior Credit Facility Obligations or the Bridge Loan Obligations as of the Petition Date, the Excluded Property did not secure such obligations and the Senior Credit Facility Lender Parties and the Bridge Loan Lender Parties cannot claim to have a lien on the Excluded Property. To the extent the Senior Credit Facility Lender Parties or the Bridge Loan Lender Parties contend otherwise, the Committee reserves the right to amend this claim to seek declaratory relief with respect to this issue.

## COUNT XIX
## AVOIDANCE OF UNPERFECTED BRIDGE LIENS
## (11 U.S.C. § 544)

**(By the Debtors against Citibank, N.A., as Bridge Collateral Agent)**

386.    The Committee repeats and realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

387.    On or about December 20, 2007, the Bridge Loan Obligors, including the Subsidiary Guarantors, granted the Bridge Loan Liens to Citibank, N.A., as Bridge Collateral Agent, to secure the repayment of the Bridge Loan Obligations under various security agreements entered into between the Bridge Loan Obligors and Citibank, N.A., as Bridge Collateral Agent, on such date.

388.    In connection with the Bridge Loan Obligations, Lyondell was required to grant Bridge Loan Liens in certain of its real and personal property, including at least some Restricted Property.  Consequently, and in order to comply with Section 5.03 of the ARCO Indenture, Lyondell entered into a security agreement with Citibank, N.A., as Bridge Collateral Agent, whereby it granted to Citibank, N.A., as Bridge Collateral Agent, security interests in certain of its real and personal property, including some Restricted Property, for the equal and ratable benefit of the Bridge Loan Lender Parties and the ARCO Secured Parties.  As a result, such assets of Lyondell secure the Bridge Loan Obligations and the ARCO Debentures on a pari passu basis.[25]

389.    Upon information and belief, Citibank, N.A., as Bridge Collateral Agent, failed to take the appropriate actions required under the UCC or other applicable law to perfect the Bridge Loan Liens granted to it for the benefit of the Bridge Loan Lender Parties and the ARCO

---

[25] The ARCO Secured Parties have no claim on the assets of any Debtor other than Lyondell.

Secured Parties, as applicable, in the Avoidable Property,[26] including, without limitation, the following types of collateral with respect to which the Bridge Collateral Agent failed to:

a. execute control agreements with respect of or otherwise obtain control of any deposit, savings, securities and other financial accounts of any of the Debtors, with the exception of those deposit accounts listed on *Exhibit B*, as required under §§ 9-104 and 9-314, and other applicable provisions of the UCC to perfect its security interests in any such accounts;

b. execute and record mortgages with respect to all real property owned by the Debtors which they estimated to have a fair market value of less than $25 million, including, but not limited to, the real property identified in *Exhibit B*;

c. record real estate mortgages or file UCC fixture filings in respect of the fixtures located in the properties listed on *Exhibit B*;

d. file preferred ship mortgages, as required by 46 U.S.C. § 31321, the Ship Mortgage Act, with respect to the vessels listed on *Exhibit B*;

e. register its security interest in any of the Debtors' railcars with the Surface Transportation Board; and

f. register its security interest in and be noted as a lien holder on the certificate of title of any vehicle subject to a certificate of title statute under the laws of the jurisdiction where such vehicle is registered, including, but not limited to, any trucks, cars and other motor vehicles of the Debtors.

---

[26] In order to minimize the cost to the Debtors' estates, the Committee agreed with the Debtors that it would not conduct an independent analysis of the perfection of the Bridge Loan Liens granted to the Bridge Collateral Agent with respect to the property of the Foreign Debtors over which a security interest was granted to the Bridge Collateral Agent, and would instead cooperate with the Debtors in such review. The Committee has not yet received sufficient evidence to make a conclusive determination as to the perfection of such Bridge Loan Liens. Accordingly, the Committee reserves the right, *inter alia*, to amend this claim, to the extent the Committee determines that any Bridge Loan Lien with respect of such property has not been properly perfected under applicable law.

390.     Pursuant to Section 544(a)(1), (2) and (3) of the Bankruptcy Code, the Debtors, the trustee, or another authorized representative of the Debtors' estates have, as of the commencement of these Chapter 11 cases and without regard to any knowledge of the Debtors, the trustee, or any other creditors, the rights and powers of, and may avoid any transfer of property of the Debtors or any obligations incurred by the Debtors that is avoidable by:

a.     A creditor that extends credit to the Debtors at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

b.     A creditor that extends credit to the Debtors at the time of the commencement of the case, and obtains, at such time and with respect to such credit, and execution against the Debtors that is returned unsatisfied at such time, whether or not such a creditor exists; and

c.     A *bona fide* purchaser of real property, other than fixtures, from the Debtors, against whom applicable law permits such transfer to be perfected, that obtains the status of a *bona fide* purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such purchaser exists.

391.     Accordingly, the Bridge Loan Liens with respect to each item of Avoidable Property owned by the Debtors should be avoided pursuant to 11 U.S.C. §§ 544(a)(1), (2), or (3), as applicable, and such avoided Bridge Loan Liens should be reserved for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 551.

**COUNT XX**
**FRAUDULENT TRANSFER**
**(11 U.S.C. §§ 544, 548(a), 550, and Applicable State Fraudulent Transfer Law)**

**(By the Pre-Merger Debt Subsidiary Guarantors Against Senior Credit Facility Lender Parties, LeverageSource III S.à.r.l., individually and as Class Representative of the Senior Credit Facility Class, and Bridge Loan Lender Parties)**

392.    The Committee repeats and realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

393.    On or about December 20, 2007, the Pre-Merger Debt Subsidiary Guarantors guaranteed the Senior Credit Facility Obligations under the Senior Credit Facility for the repayment of $9.55 billion and €1.3 billion in principal amount of indebtedness and for interest, fees, and penalties to accrue or to be incurred thereon.

394.    On or about December 20, 2007, the Pre-Merger Debt Subsidiary Guarantors also guaranteed the Bridge Loan Obligations under the Bridge Loan Facility for the repayment of $8 billion in principal amount of indebtedness and for interest, fees, and penalties to accrue or to be incurred thereon.

395.    Except to the extent that the Senior Credit Facility Obligations and/or Bridge Loan Obligations were incurred to fund the repayment of the Pre-Merger Debt Obligations (for which a particular Pre-Merger Debt Guarantor was obligated), the Pre-Merger Debt Guarantors did not receive reasonably equivalent value or fair consideration in exchange for the incurrence of the Subsidiary Guarantees.

396.    At the time of the Merger, each of the Pre-Merger Debt Subsidiary Guarantors: (i) was insolvent, or became insolvent as a result of the incurrence of the Subsidiary Guarantees; (ii) was engaged or was about to engage in a business or transaction for which the remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended, believed,

or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due.[27]

397.   Upon information and belief, at all times relevant hereto, there were actual creditors of each of the Pre-Merger Debt Subsidiary Guarantors holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b).

398.   The Subsidiary Guarantees, except to the extent that the proceeds of the Senior Credit Facility and/or the Bridge Loan Facility were used to repay the Pre-Merger Debt Obligations, were fraudulent as to creditors and should be avoided pursuant to 11 U.S.C. §§ 544(b), 548(a), and under applicable state fraudulent transfer law.

399.   Any and all security interests, pledges, liens or other property of the Pre-Merger Debt Subsidiary Guarantors transferred to or for the benefit of the Senior Credit Facility Lender Parties and/or LeverageSource III S.à.r.l., individually and as Class Representative of the Senior Credit Facility Class, and/or the Bridge Loan Lender Parties to secure the Subsidiary Guarantees should be avoided and recovered pursuant to 11 U.S.C. § 544(b), 548(a), 550 and under applicable state fraudulent transfer law to the extent that the obligations under the Subsidiary Guarantees are avoided.

---

[27] This Count is brought on behalf of all the Pre-Merger Debt Subsidiary Guarantors collectively and on behalf of each Pre-Merger Debt Subsidiary Guarantor individually. Thus, the term "Pre-Merger Debt Subsidiary Guarantor" as used in this Count is intended to encompass the Pre-Merger Debt Subsidiary Guarantors as an aggregate group and each Pre-Merger Debt Subsidiary Guarantor individually.

**COUNT XXI**
**FRAUDULENT TRANSFER**
**(11 U.S.C. §§ 544, 548(a), 550, and Applicable State Fraudulent Transfer Law)**

**(By the Previously Unobligated Subsidiary Guarantors Against Senior Credit Facility Lender Parties, LeverageSource III S.à.r.l., individually and as Class Representative of the Senior Credit Facility Class, and Bridge Loan Lender Parties)**

400.     The Committee repeats and realleges the allegations contained in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

401.     On or about December 20, 2007, the Previously Unobligated Subsidiary Guarantors guaranteed the Senior Credit Facility Obligations under the Senior Credit Facility for the repayment of $9.55 billion and €1.3 billion in principal amount of indebtedness and for interest, fees, and penalties to accrue or to be incurred thereon.

402.     On or about December 20, 2007, the Previously Unobligated Subsidiary Guarantors also guaranteed the Bridge Loan Obligations under the Bridge Loan Facility for the repayment of $8 billion in principal amount of indebtedness and for interest, fees, and penalties to accrue or to be incurred thereon.

403.     The Previously Unobligated Subsidiary Guarantors did not receive any value, never mind reasonably equivalent value or fair consideration, in exchange for the incurrence of the Subsidiary Guarantees.

404.     At the time of the Merger, each of the Previously Unobligated Subsidiary Guarantors: (i) was insolvent, or became insolvent as a result of the incurrence of the Subsidiary Guarantees; (ii) was engaged or was about to engage in a business or transaction for which the remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended, believed, or reasonably should have believed that it would incur debts beyond its ability to pay such debts as they became due.

405.     Upon information and belief, at all times relevant hereto, there were actual creditors of each of the Previously Unobligated Subsidiary Guarantors holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b).

406.     The Subsidiary Guarantees, to the extent that they obligated the Previously Unobligated Subsidiary Guarantors under the Senior Credit Facility and/or the Bridge Loan Facility, were fraudulent as to creditors and should be avoided pursuant to 11 U.S.C. §§ 544(b), 548(a), and under applicable state fraudulent transfer law.

407.     Any and all security interests, pledges, liens or other property of the Previously Unobligated Subsidiary Guarantors transferred to or for the benefit of the Senior Credit Facility Lender Parties and/or LeverageSource III S.à.r.l., individually and as Class Representative of the Senior Credit Facility Class, and/or the Bridge Loan Lender Parties to secure the Subsidiary Guarantees should be avoided and recovered pursuant to 11 U.S.C. § 544(b), 548(a), and 550 and under applicable state fraudulent transfer law to the extent that the obligations under the Subsidiary Guarantees are avoided.

## PRAYER FOR RELIEF

**WHEREFORE**, by reason of the foregoing, Plaintiff requests that the Court grant the following relief:

(1)     On Count I:

a.     entering a judgment against the Senior Credit Facility Lender Parties, and LeverageSource III S.à.r.l., individually and as Class Representative of the Senior Credit Facility Class, finding that the Voidable Senior Credit Facility Obligations and the Senior Liens constitute fraudulent transfers pursuant to 11 U.S.C. §§ 544 and 548, and under applicable state fraudulent transfer law;

b.     pursuant to 11 U.S.C. §§ 544 and 548 and under applicable state fraudulent transfer law, avoiding the Voidable Senior Credit Facility Obligations, or, in the alternative, subordinating such Obligations to the claims of the Plaintiff;

        c.      pursuant to 11 U.S.C. §§ 544 and 548, avoiding the Senior Liens; and

        d.      pursuant to 11 U.S.C. § 550 and under applicable state fraudulent transfer law, allowing the recovery of any payments made by the Debtors on account of the Voidable Senior Credit Facility Obligations.

(2)     On Count II:

        a.      entering a judgment against the Bridge Loan Lender Parties, finding that the Voidable Bridge Loan Obligations and the Bridge Loan Liens constitute fraudulent transfers pursuant to 11 U.S.C. §§ 544 and 548 and under applicable state fraudulent transfer law;

        b.      pursuant to 11 U.S.C. §§ 544 and 548 and under applicable state fraudulent transfer law, avoiding the Voidable Bridge Loan Obligations and the Bridge Loan Liens; and

        c.      pursuant to 11 U.S.C. § 550 and under applicable state fraudulent transfer law, allowing the recovery of any payments made by the Debtors on account of the Voidable Bridge Loan Obligations.

(3)     On Count III:

        a.      entering a judgment against Nell Limited and AI Chemical Investments, LLC, finding that the Toe Hold Payments constitute fraudulent transfers pursuant to 11 U.S.C. §§ 544 and 548 and under applicable state fraudulent transfer law;

        b.      pursuant to 11 U.S.C. §§ 544 and 548 and applicable under state fraudulent transfer law, avoiding the Toe Hold Payments; and

        c.      pursuant to 11 U.S.C. § 550 and under applicable state fraudulent transfer law, allowing the recovery of the Toe Hold Payments.

(4)     On Count IV:

        a.      entering a judgment against Barclays Global Investors, N.A., individually and as Class Representative of the Shareholder Class, finding that the transfers of the Merger Consideration to Lyondell shareholders constitute fraudulent transfers pursuant to 11 U.S.C. §§ 544 and 548 and under applicable state fraudulent transfer law;

        b.      pursuant to 11 U.S.C. §§ 544 and 548 and under applicable state fraudulent transfer law, avoiding the transfers of the Merger Consideration to Barclays and to the members of the Shareholder Class; and

c.    pursuant to 11 U.S.C. § 550 and under applicable state fraudulent transfer law, allowing the recovery of any and all payments of the Merger Consideration to Barclays and to the members of the Shareholder Class.

(5)    On Count V:

a.    entering a judgment against Lyondell's Officers and Directors, finding that the Change of Control Payments constitute fraudulent transfers pursuant to 11 U.S.C. §§ 544 and 548 and under applicable state fraudulent transfer law;

b.    pursuant to 11 U.S.C. §§ 544 and 548 and under applicable state fraudulent transfer law, avoiding the Change of Control Payments; and

c.    pursuant to 11 U.S.C. § 550 and under applicable state fraudulent transfer law, allowing the recovery of the Change of Control Payments.

(6)    On Count VI:

a.    entering a judgment against the Senior Credit Facility Lender Parties, and LeverageSource III S.à.r.l., individually and as Class Representative of the Senior Credit Facility Class, finding that they engaged in inequitable conduct pursuant to 11 U.S.C. § 510;

b.    subordinating the claims of the Senior Credit Facility Lender Parties and LeverageSource III S.à.r.l., individually and as Class Representative of the Senior Credit Facility Class, arising out of the Senior Credit Facility Obligations; and

c.    pursuant to 11 U.S.C. § 550 allowing the recovery of any payments made by the Senior Credit Facility Obligors on account of the Voidable Senior Credit Facility Obligations.

(7)    On Count VII:

a.    entering a judgment against the Bridge Loan Lender Parties finding that they engaged in inequitable conduct pursuant to 11 U.S.C. § 510;

b.    subordinating the claims of the Bridge Loan Lender Parties arising out of the Bridge Loan Obligations; and

c.    pursuant to 11 U.S.C. § 550 allowing the recovery of any payments made by the Bridge Loan Obligors on account of the Voidable Bridge Loan Obligations.

(8)     On Count VIII, entering a judgment against the Directors of Lyondell finding that they breached their fiduciary duties to the company in approving the Merger, and awarding damages to the Debtors for the benefit of the Debtors' Estates as a result of such breaches.

(9)     On Count IX, entering a judgment against the Members of the Supervisory Board finding that they mismanaged the business and affairs of LBI and awarding damages to the Debtors for the benefit of the Debtors' Estates as a result of such mismanagement.

(10)    On Count X, entering a judgment against the Members of the Supervisory Board finding them liable in tort for breach of their duties to LBI and awarding damages to the Debtors for the benefit of the Debtors' Estates as a result of such tortious conduct.

(11)    On Count XI, entering a judgment against the Lead Arrangers finding them liable in tort for breach of their duties under Luxembourg law to LBI and awarding damages to the Debtors for the benefit of the Debtors' Estates as a result of such tortious conduct.

(12)    On Count XII, entering judgment against Merrill Lynch finding it aided and abetted the breaches of fiduciary duty by the members of the Supervisory Board and Management Board, and awarding damages to the Debtors for the benefit of the Debtors' Estates as a result of such breaches.

(13)    On Count XIII, entering a judgment against the Directors of the Subsidiary Guarantors finding that they breached their fiduciary duties to the Subsidiary Guarantors by approving of the Subsidiary Guarantees, and awarding damages to the Debtors for the benefit of the Debtors' Estates as a result of such breaches.

(14)    On Count XIV:

   a.     entering a judgment against Access Holdings finding that the Access Revolver Transfers constitute preferential transfers pursuant to 11 U.S.C. § 547 and under applicable state fraudulent transfer law;

   b.     avoiding the Access Revolver Transfers pursuant to 11 U.S.C. § 547;

   c.     In addition to avoiding the Access Revolver Transfers, avoiding the Antecedent Debt Transfers pursuant to applicable state fraudulent transfer law; and

   d.     allowing the recovery of the Access Revolver Transfers and the Antecedent Debt Transfers pursuant to 11 U.S.C. §§ 547 and 550 and under applicable state fraudulent transfer law.

(15)    On Count XV:

        a.    entering a judgment against the AI International S.à.r.l. finding that it engaged in inequitable conduct pursuant to 11 U.S.C. § 510;

        b.    subordinating the claims of the AI International S.à.r.l. arising out of the Access Revolver; and

        c.    pursuant to 11 U.S.C. § 550 allow the recovery of any payments made by the Debtors on account of the Access Revolver.

(16)    On Count XVI:

        a.    entering a judgment against Nell Limited, Goldman Sachs, Merrill Lynch, Deutsche Bank, Citibank M&A, Citibank, and Perella Weinberg, finding that the transfer of the Transactional Fees constitute fraudulent transfers pursuant to 11 U.S.C. §§ 544 and 548 and under applicable state fraudulent transfer law;

        b.    pursuant to 11 U.S.C. §§ 544 and 548 and under applicable state fraudulent transfer law, avoiding the transfers of the Transactional Fees; and

        c.    pursuant to 11 U.S.C. § 550 and under applicable state fraudulent transfer law, allowing the recovery of any and all transfers of the Transactional Fees.

(17)    On Count XVII, entering a judgment finding that Access Industries Holdings LLC and AI International S.à.r.l. breached the Access Revolver by refusing to fund LBI's request to draw on the Access Revolver, and awarding damages to the Debtors for the benefit of the Debtors' Estates as a result of such breach.

(18)    On Count XVIII, entering a judgment against Citibank, N.A., as Senior Collateral Agent, pursuant to 11 U.S.C. §§ 544(a)(1), (2) or (3) and applicable state law avoiding the Senior Liens on the Avoidable Property granted to the Senior Collateral Agent for the benefit of the Senior Credit Facility Lender Parties and the ARCO Secured Parties, and preserving such avoided Senior Liens for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 551.

(19)    On Count XIX, entering a judgment against Citibank, N.A., as Bridge Collateral Agent, pursuant to 11 U.S.C. §§ 544(a)(1), (2), or (3) and applicable state law avoiding the Bridge Loan Liens on the Avoidable Property granted to the Bridge Collateral Agent for the benefit of the Bridge Loan Lender Parties and the ARCO Secured Parties, and preserving such avoided Bridge Loan Liens for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 551.

(20)    On Count XX:

    a.      entering a judgment against the Senior Credit Facility Lender Parties, LeverageSource III S.à.r.l., individually and as Class Representative of the Senior Credit Facility Class, and against the Bridge Loan Lender Parties, finding that the transfers of the Subsidiary Guarantees by the Pre-Merger Debt Subsidiary Guarantors constitute fraudulent transfers pursuant to 11 U.S.C. §§ 544 and 548 and under applicable state fraudulent transfer law;

    b.      pursuant to 11 U.S.C. §§ 544 and 548 and under applicable state fraudulent transfer law, avoiding the transfers of the Subsidiary Guarantees by the Pre-Merger Debt Subsidiary Guarantors; and

    c.      pursuant to 11 U.S.C. § 550 and under applicable state fraudulent transfer law, allowing the recovery of any and all security interests, pledges, liens or other property transferred by the Pre-Merger Debt Subsidiary Guarantors to secure the Subsidiary Guarantees.

(21)    On Count XXI:

    a.      entering a judgment against the Senior Credit Facility Lender Parties, LeverageSource III S.à.r.l., individually and as Class Representative of the Senior Credit Facility Class, and against the Bridge Loan Lender Parties, finding that the transfers of the Subsidiary Guarantees by the Previously Unobligated Subsidiary Guarantors constitute fraudulent transfers pursuant to 11 U.S.C. §§ 544 and 548 and under applicable state fraudulent transfer law;

    b.      pursuant to 11 U.S.C. §§ 544 and 548 and under applicable state fraudulent transfer law, avoiding the transfers of the Subsidiary Guarantees by the Previously Unobligated Subsidiary Guarantors; and

    c.      pursuant to 11 U.S.C. § 550, and applicable state fraudulent transfer law, allowing the recovery of any and all security interests, pledges, liens or other property transferred by the Previously Unobligated Subsidiary Debt Guarantors to secure the Subsidiary Guarantees.

**THE COMMITTEE DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated: July 22, 2009
      New York, New York       Respectfully submitted,

                             THE OFFICIAL COMMITTEE OF
                             UNSECURED CREDITORS


By: /s/ Edward S. Weisfelner
     Edward S. Weisfelner, Esquire (EW-5581)
     Sigmund S. Wissner-Gross, Esquire (SW-0001)
     May Orenstein, Esquire (MO-2948)
     BROWN RUDNICK LLP
     Seven Times Square
     New York, NY 10036
     (212) 209-4800

     Steven D. Pohl, Esquire (SP-0435)
     BROWN RUDNICK LLP
     One Financial Center
     Boston, MA 02111
     (617) 856-8200

     *Counsel for the Official*
     *Committee of Unsecured Creditors*

**2014 and 2016 Note Guarantors**

Lyondell (Pelican) Petrochemical L.P. 1, Inc., Lyondell Chemical Company, Lyondell Chemical Nederland Ltd., Lyondell Chemical Technology 1 Inc., Lyondell Chemical Technology Management Inc., Lyondell Chemical Technology L.P., Lyondell Chemical Delaware Company, Lyondell Chimie France LLC, Lyondell Houston Refinery, Inc., Lyondell LP3 GP, LLC, Lyondell LP3 Partners, LP, Lyondell LP4, Inc., and Lyondell Petrochemical LP, Inc.

**2013 Term Loan Guarantors**

Lyondell Chemical Company, Lyondell Chemical Technology 1, Inc., Lyondell Chemical Technology 2, Inc., Lyondell Chemical Technology 3, Inc., Lyondell Chemical Technology 4, Inc., Lyondell Chemical Technology 5, Inc., Lyondell Chemical Technology 6, Inc., Lyondell Chemical Technology 7, Inc., Lyondell Chemical Technology 8, Inc., Lyondell LP3 GP, LLC, Lyondell LP4 Inc., Lyondell Refining GP, LLC, LRC Holdings LP LLC, LRP Holdings LP LLC, Lyondell (Pelican) Petrochemical L.P. 1, Inc., Lyondell Chemical Nederland, Ltd., Lyondell Chimie France Corporation, Lyondell France, Inc., Lyondell Petrochemical L.P. Inc., POSM Delaware, Inc., Lyondell Houston Refinery Inc., Lyondell Houston Refinery A Inc., Lyondell Refining LP, LLC, Lyondell Chemical Properties, L.P., Lyondell Chemical Technology, L.P., Lyondell LP3 Partners, LP, Lyondell Refining Company LP, Lyondell Refining Partners, LP, POSM II Properties Partnership, L.P., Lyondell-Citgo Refining LP, LRC Holdings GP LLC, Lyondell Chemical Delaware Company, Lyondell Chemical Technology Management Inc., Lyondell Europe Holdings, Inc.

**2013 Note Guarantors**

Lyondell Chemical Company and Lyondell Chemical Company Nederland Ltd.

**Millennium Guarantors**

Millennium America Inc. and Millennium Chemicals Inc.

**2017 Note Guarantors**

Houston Refining LP, Lyondell (Pelican) Petrochemical L.P. 1, Inc., Lyondell Chemical Company, Lyondell Chemical Nederland Ltd., Lyondell Chemical Technology 1 Inc., Lyondell Chemical Technology Management Inc., Lyondell Chemical Technology L.P., Lyondell Chemical Delaware Company, Lyondell Houston Refinery, Inc., Lyondell LP3 GP, LLC, Lyondell LP3 Partners, LP, Lyondell LP4, Inc., Lyondell Refining I, LLC, Lyondell Refining Company LLC, and Lyondell Petrochemical LP, Inc.

**2008, 2009, and 2011 Note Borrowers**

Equistar Chemicals LP

**Basell Senior Facility Guarantors**

Basell Germany Holdings GmbH, Basell Finance USA Inc., Basell North America, Inc., and Basell USA Inc.

# SCHEDULE A[28]

Basell Finance USA Inc., Basell North America Inc., Basell USA Inc., Equistar Chemicals, LP, Houston Refining LP, LBI Acquisition LLC, LBIH LLC, Lyondell Chemical Products Europe LLC, Lyondell Chemical Europe Inc., Lyondell Chemical Espana Co., Lyondell Chimie France LLC, Lyondell Equistar Holdings Partners, Lyondell Europe Holdings Inc., Lyondell Refining Company LLC, Lyondell Refining I, LLC, LyondellBasell Finance Company, Millennium America Holdings Inc., Millennium America Inc., Millennium Chemicals Inc., Millennium Petrochemicals Inc., Millennium Petrochemicals GP LLC, Millennium Petrochemicals Partners LP, Millennium Specialty Chemicals Inc., Millennium US Op Co LLC, Millennium Worldwide Holdings I Inc., Nell Acquisitions (US) LLC, Basell Germany Holdings GmbH, and LyondellBasell Industries AF S.C.A.

# SCHEDULE B

Basell Finance USA Inc., Basell North America Inc., Basell USA Inc., Equistar Chemicals, LP, Houston Refining LP, LBI Acquisition LLC, LBIH LLC, Lyondell Chemical Products Europe LLC, Lyondell Chemical Europe Inc., Lyondell Chemical Espana Co., Lyondell Chimie France LLC, Lyondell Equistar Holdings Partners, Lyondell Refining Company LLC, Lyondell Refining I, LLC, LyondellBasell Finance Company, Millennium America Holdings Inc., Millennium America Inc., Millennium Chemicals Inc., Millennium Petrochemicals Inc., Millennium Petrochemicals GP LLC, Millennium Petrochemicals Partners LP, Millennium Specialty Chemicals Inc., Millennium US Op Co LLC, Millennium Worldwide Holdings I Inc., Nell Acquisitions (US) LLC, Basell Germany Holdings GmbH, and LyondellBasell Industries AF S.C.A.

# SCHEDULE C

Basell Finance USA Inc., Basell North America Inc., Basell USA Inc., Equistar Chemicals, LP, Houston Refining LP, LBI Acquisition LLC, LBIH LLC, Lyondell (Pelican) Petrochemical L.P. 1, Inc., Lyondell Chemical Products Europe LLC, Lyondell Chemical Technology 1 Inc., Lyondell Chemical Technology Management, Inc., Lyondell Chemical Technology, L.P., Lyondell Chemical Delaware Company, Lyondell Chemical Europe Inc., Lyondell Chemical Espana Co., Lyondell Chimie France LLC, Lyondell Equistar Holdings Partners, Lyondell

---

[28] The Subsidiary Guarantors identified in Schedules A through G of Exhibit A are those Subsidiary Guarantors that were not obligated under the 2014 and 2016 Notes, the 2013 Term Loan, the 2013 Notes, the 2023 Debentures, the 2017 Notes, the 2008, 2009, or 2011 Notes, or the Basell Senior Facility, respectively.

Europe Holdings Inc., Lyondell Houston Refinery, Inc., Lyondell LP3 GP, LLC, Lyondell LP3 Partners, LP, Lyondell LP4 Inc., Lyondell Petrochemical LP, Inc., Lyondell Refining Company LLC, Lyondell Refining I, LLC, LyondellBasell Finance Company, Millennium America Holdings Inc., Millennium America Inc., Millennium Chemicals Inc., Millennium Petrochemicals Inc., Millennium Petrochemicals GP LLC, Millennium Petrochemicals Partners LP, Millennium Specialty Chemicals Inc., Millennium US Op Co LLC, Millennium Worldwide Holdings I Inc., Nell Acquisitions (US) LLC, Basell Germany Holdings GmbH, and LyondellBasell Industries AF S.C.A.

## SCHEDULE D

Basell Finance USA Inc., Basell North America Inc., Basell USA Inc., Equistar Chemicals, LP, Houston Refining LP, LBI Acquisition LLC, LBIH LLC, Lyondell (Pelican) Petrochemical L.P. 1, Inc., Lyondell Chemical Company, Lyondell Chemical Nederland Ltd., Lyondell Chemical Products Europe LLC, Lyondell Chemical Technology 1 Inc., Lyondell Chemical Technology Management, Inc., Lyondell Chemical Technology, L.P., Lyondell Chemical Delaware Company, Lyondell Chemical Europe Inc., Lyondell Chemical Espana Co., Lyondell Chimie France LLC, Lyondell Equistar Holdings Partners, Lyondell Europe Holdings Inc., Lyondell Houston Refinery, Inc., Lyondell LP3 GP, LLC, Lyondell LP3 Partners, LP, Lyondell LP4 Inc., Lyondell Petrochemical LP, Inc., Lyondell Refining Company LLC, Lyondell Refining I, LLC, LyondellBasell Finance Company, Millennium America Holdings Inc., Millennium Petrochemicals Inc., Millennium Petrochemicals GP LLC, Millennium Petrochemicals Partners LP, Millennium Specialty Chemicals Inc., Millennium US Op Co LLC, Millennium Worldwide Holdings I Inc., Nell Acquisitions (US) LLC, Basell Germany Holdings GmbH, and LyondellBasell Industries AF S.C.A.

## SCHEDULE E

Basell Finance USA Inc., Basell North America Inc., Basell USA Inc., Equistar Chemicals, LP, LBI Acquisition LLC, LBIH LLC, Lyondell Chemical Products Europe LLC, Lyondell Chemical Europe Inc., Lyondell Chemical Espana Co., Lyondell Chimie France LLC, Lyondell Equistar Holdings Partners, Lyondell Europe Holdings Inc., LyondellBasell Finance Company, Millennium America Holdings Inc., Millennium America Inc., Millennium Chemicals Inc., Millennium Petrochemicals Inc., Millennium Petrochemicals GP LLC, Millennium Petrochemicals Partners LP, Millennium Specialty Chemicals Inc., Millennium US Op Co LLC, Millennium Worldwide Holdings I Inc., Nell Acquisitions (US) LLC, Basell Germany Holdings GmbH, and LyondellBasell Industries AF S.C.A.

## SCHEDULE F

Basell Finance USA Inc., Basell North America Inc., Basell USA Inc., Houston Refining LP, LBI Acquisition LLC, LBIH LLC, Lyondell (Pelican) Petrochemical L.P. 1, Inc., Lyondell Chemical Company, Lyondell Chemical Nederland Ltd., Lyondell Chemical Products Europe LLC, Lyondell Chemical Technology 1 Inc., Lyondell Chemical Technology Management, Inc., Lyondell Chemical Technology, L.P., Lyondell Chemical Delaware Company, Lyondell Chemical Europe Inc., Lyondell Chemical Espana Co., Lyondell Chimie France LLC, Lyondell

Equistar Holdings Partners, Lyondell Europe Holdings Inc., Lyondell Houston Refinery, Inc., Lyondell LP3 GP, LLC, Lyondell LP3 Partners, LP, Lyondell LP4 Inc., Lyondell Petrochemical LP, Inc., Lyondell Refining Company LLC, Lyondell Refining I, LLC, LyondellBasell Finance Company, Millennium America Holdings Inc., Millennium America Inc., Millennium Chemicals Inc., Millennium Petrochemicals Inc., Millennium Petrochemicals GP LLC, Millennium Petrochemicals Partners LP, Millennium Specialty Chemicals Inc., Millennium US Op Co LLC, Millennium Worldwide Holdings I Inc., Nell Acquisitions (US) LLC, Basell Germany Holdings GmbH, and LyondellBasell Industries AF S.C.A.

## SCHEDULE G

Basell Finance USA Inc., Basell North America Inc., Basell USA Inc., Equistar Chemicals, LP, Houston Refining LP, LBI Acquisition LLC, LBIH LLC, Lyondell (Pelican) Petrochemical L.P. 1, Inc., Lyondell Chemical Company, Lyondell Chemical Nederland Ltd., Lyondell Chemical Products Europe LLC, Lyondell Chemical Technology 1 Inc., Lyondell Chemical Technology Management, Inc., Lyondell Chemical Technology, L.P., Lyondell Chemical Delaware Company, Lyondell Chemical Europe Inc., Lyondell Chemical Espana Co., Lyondell Chimie France LLC, Lyondell Equistar Holdings Partners, Lyondell Europe Holdings Inc., Lyondell Houston Refinery, Inc., Lyondell LP3 GP, LLC, Lyondell LP3 Partners, LP, Lyondell LP4 Inc., Lyondell Petrochemical LP, Inc., Lyondell Refining Company LLC, Lyondell Refining I, LLC, LyondellBasell Finance Company, Millennium America Holdings Inc., Millennium America Inc., Millennium Chemicals Inc., Millennium Petrochemicals Inc., Millennium Petrochemicals GP LLC, Millennium Petrochemicals Partners LP, Millennium Specialty Chemicals Inc., Millennium US Op Co LLC, Millennium Worldwide Holdings I Inc., Nell Acquisitions (US) LLC, and LyondellBasell Industries AF S.C.A.

## EXHIBIT B

<u>Perfected Accounts</u>

| Bank Name | Account Name | Account Number | Account Description | ABA | Bank Address |
|-----------|-------------|----------------|--------------------|-----|--------------|
| Citibank | Equistar Chemicals, LP | 30557651 | Sweep Account | 021000089 | One Penn's Way, Ops 2, 2nd Floor, New Castle, DE 19720 |
| Citibank | Equistar Chemicals, LP | 30557475 | Cash Collateral | 021000089 | One Penn's Way, Ops 2, 2nd Floor, New Castle, DE 19720 |
| Bank of America | Equistar Chemicals, LP | 3756308228 | Inventory Concentration | 026009593 | 901 Main Street, 10th Floor Dallas, TX 75202 |
| JP Morgan Chase | Houston Refining LP | 771060118 | Inventory Concentration | 111000614 | JPMorgan Chase Bank, Treasury Services, 7th Floor, NY1-A150, 1 Chase Manhattan Plaza, New York, NY 10005 |
| Citibank | Basell USA Inc. | 3053-5719 | Inventory Concentration | 021000089 | 399 Park Avenue, New York, NY 10043 |
| Bank of America | Lyondell Chemical Company | 4426332811 | Inventory Concentration | 026009593 | 901 Main Street, 10th Floor, Dallas, TX 75202 |
| Citibank | Basell USA Inc. | 3074-5804 | Inventory Concentration | 021000089 | 399 Park Avenue, New York, NY 10043 |

<u>Unencumbered Real Property</u>

| | Owner | Property Address |
|---|-------|------------------|
| 1. | Equistar Chemicals, LP | 300 Doremus Ave., Newark, Essex County, NJ |
| 2. | Equistar Chemicals, LP | Port Arthur, Jefferson County, TX |
| 3. | Equistar Chemicals, LP | 4833 CR 417, Markham, TX |
| 4. | Equistar Chemicals, LP | 3510 Gulf States Road, Beaumont, TX |
| 5. | Equistar Chemicals, LP | Highway 73 West, Port Arthur, TX |
| 6. | Equistar Chemicals, LP | 1330 Lake Robbins Drive, The Woodlands, TX |
| 7. | Lyondell Chemical Company | 3801 Westchester Pike, Newton Square, PA |
| 8. | Lyondell Chemical Company | 1221 & 1331 Lamar, Houston, TX |
| 9. | Basell USA, Inc. | 912 Appleton Road, Elkton, Cecil County, MD |

<u>Unencumbered Fixtures</u>

| | Owner/Debtor | Property Address |
|---|-------------|------------------|
| 1. | Equistar Chemicals, LP | 625 East U.S. Highway 36, Tuscola, Douglas County, IL |
| 2. | Equistar Chemicals, LP | 4300 Highway 108 South, Sulphur, Calcasieu Parish, LA |
| 3. | Equistar Chemicals, LP | 110 Third Street, Fairport Harbor, Lake County, OH |
| 4. | Equistar Chemicals, LP | 300 Doremus Ave., Newark, Essex County, NJ |
| 5. | Basell USA, Inc. | 912 Appleton Road, Elkton, Cecil County, MD |

| | Owner/Debtor | Property Address |
|---|---|---|
| 6. | Basell USA, Inc. | 12801 Bay Area Blvd., Pasadena, Harris County, TX |
| 7. | Equistar Chemicals, LP | 4833 CR 417, Markham, Matagorda County, TX |
| 8. | Equistar Chemicals, LP | 3510 Gulf States Road, Beaumont, Jefferson County, TX |
| 9. | Equistar Chemicals, LP | Highway 73 West, Port Arthur, Jefferson County, TX |
| 10. | Lyondell Chemical Company | 3801 Westchester Pike, Newton Square, Delaware County, PA |
| 11. | Lyondell Chemical Company | 1221 & 1331 Lamar, Houston, Harris County, TX |

Unencumbered Vessels

| Description of Vessel | Coast Guard Information | Date of filing |
|---|---|---|
| Barge #CC132 | | |
| Barge #CC133 | | |
| Barge #CC134 | | |
| Barge #USA 140 O.N. #590225 | Abstract of Title | 1/21/99 |
| Barge #USA 145 O.N. #583855 | Abstract of Title | 1/21/99 |
| Barge #USA 146 O.N. #584898 | Abstract of Title | 1/21/99 |
| Barge #USA 147 O.N. #592542 | Abstract of Title | 1/21/99 |
| Barge #USA 148 O.N. #594040 | Abstract of Title | 1/21/99 |

# 1662030 v2

138