UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| LYONDELL CHEMICAL COMPANY, *et al.*, | ) |  |
|  | ) | Case No. 09-10023 (REG) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

BENCH DECISION[1] ON MOTION TO ENFORCE
AND CLARIFY THE COURT'S MARCH 13, 2009
ORDER AUTHORIZING THE (I) LONG-TERM
IDLING OF THE CHOCOLATE BAYOU
OLEFINS FACILITY; (II) REDUCTION OF THE
WORKFORCE AT THE FACILITY; AND (III)
REJECTION OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES RELATING TO THE
FACILITY

APPEARANCES:

CADWALADER, WICKERSHAM & TAFT LLP
Attorneys for Debtors
One World Financial Center
New York, NY 10281
By:   Deryck A. Palmer, Esq.
      John J. Rapisardi, Esq.
      George A. Davis, Esq.
      Christopher R. Mirick, Esq.


700 Sixth Street, N.W.
Washington, DC 20001
By:   David F. Williams, Esq. (argued)

---

[1] I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate in open court, but where the circumstances do not permit more leisurely drafting or more extensive or polished discussion. Because they often start as scripts for decisions to be dictated in open court, they typically have less in the way of citations and footnotes, and have a more conversational tone.

-1-

KIRKLAND & ELLIS LLP
Counsel for Solutia Inc.
601 Lexington Avenue
New York, NY 10022
By:  Richard M. Cieri, Esq.
  M. Natasha Labovitz, Esq. (argued)
  Ashleigh L. Blaylock, Esq.

MORGAN, LEWIS & BOCKIUS LLP
Counsel for Ascend Performance Materials, LLC
101 Park Avenue
New York, NY 10128
By:  Neil E. Herman, Esq. (argued)

TEXAS ATTORNEY GENERAL'S OFFICE
Attorneys for the Texas Commission on Environmental Quality
P.O. Box 12548   MC-008
Austin, TX 78711
By:  Hal F. Morris, Esq. (argued)
  Ashley F. Bartram, Esq.

LEV L. DASSIN
Acting United States Attorney for the Southern District of New York
86 Chambers Street
New York, NY 10007
By:  Pierre G. Armand, Esq. (argued)
  Brandon Cowart, Esq.


BEFORE:   ROBERT E. GERBER
          UNITED STATES BANKRUPTCY JUDGE


In this contested matter under the umbrella of the jointly administered chapter 11 cases of Lyondell Chemical Co. (**"Lyondell Chemical"**) and its affiliates, Solutia Inc. ("**Solutia**") and Ascend Performance Materials, LLC ("**Ascend**") move for an order "enforcing and clarifying" my order dated March 13 of this year (the "**March 13 Order**"), which had authorized rejection of a ground lease, described more fully below. Enforcement of the March 13 order is neither necessary or appropriate. But the movants'

request for clarification of the March 13 Order is granted. As described more fully below:

  (1) The Debtors did not give notice of abandonment when they sought the March 13 Order, and the March 13 Order did not speak to the extent to which personal property on the premises of the ground lease could be abandoned;

  (2) The rejected ground lease did not provide for a "put" in favor of the lessee with respect to any personal property on the premises, and even if it did, the lessee could not exercise such a put upon rejecting the ground lease; and

  (3) What is proposed here is an "abandonment" of property, as that word is used in ordinary English usage and in the Bankruptcy Code and Rules. Especially where, as here, personal property left behind upon a lease rejection raises potential environmental issues, the requirements of the Code and Rules for notice and opportunity to object must be complied with before that property can be abandoned.

My Findings of Fact and Conclusions of Law in connection with these determinations follow.

Findings of Fact[2]

*1. Background*

  Debtor Equistar Chemicals, L.P. ("**Equistar**") owns and until recently operated the Chocolate Bayou Olefins Facility (the "**Facility**"), located on part of the site of the Chocolate Bayou plant, in Alvin, Texas (the "**Chocolate Bayou Plant**"). The Chocolate Bayou Plant was owned and operated by Solutia until June 1, 2009, when Ascend

---

[2]   Pursuant to the parties' agreement and the provisions of Case Management Order #1, all of the facts (but not necessarily arguments and conclusions) in the declarations submitted to me have been taken as true.

-3-

purchased substantially all of the assets of Solutia's nylon business (the "**Nylon Business**"), including the Chocolate Bayou Plant.

In March of this year, Equistar moved before me for authorization for (a) the "long-term idling" for the Facility; (b) reduction of the workforce there; and (c) rejection of executory contracts relating to the Facility—one of which was a ground lease (the "**Ground Lease**")[3] upon which Equistar occupied the Facility, with tanks, piping and other equipment (the "**Personal Property**") owned by Equistar that had been used in production. I granted the motion, by order dated March 13, 2009.

Equistar now seeks to implement a "transition plan" (the "**Transition Plan**"), which, as originally proposed, would have provided for Equistar's exit from the Equistar Facility and the Chocolate Bayou Plant by August 4, 2009[4]—leaving possible environmental cleanup or maintenance obligations associated with the Personal Property with Solutia or Ascend, or both. The cost for anyone to address those obligations may amount to many millions of dollars.

The parties debate whether my earlier approval of the rejection of the Ground Lease authorized Equistar to saddle Solutia and Ascend with those expenses, and whether the Ground Lease itself, or the Ground Lease rejection process, authorized such a result. Solutia and Ascend contend that leaving the Personal Property behind amounts to an abandonment of the Personal Property, and that Equistar must thus give notice of abandonment—at which time they can raise objections to the abandonment based on

---

[3] Technically speaking, Equistar operated its facility pursuant to a sublease on a portion of the Chocolate Bayou property (the "**Sublease**"), which granted Equistar rights to enforce compliance under a related lease agreement (the "**Primary Lease**"). Debtors' Response, at 3, fn. 2. They are referred to together as the Ground Lease.

[4] Equistar, Solutia, and Ascend agreed to take steps to ensure that the transition would not pose a danger to public health and safety, and Equistar's full exit was postponed past August 4 to give me time to determine the parties' pending disputes.

caselaw placing limits on a debtor's ability to abandon property when that would be in contravention of applicable environmental laws.[5] Equistar argues that it has a contractual right to "yield up" the Equistar Facility to Solutia or Ascend or both, under the Ground Lease, and that it achieved such a result through the previously approved rejection.

*2. The March 13 Order*

On December 18, 2008, Equistar announced that it would temporarily idle the Equistar Facility due to declining market conditions. Equistar engaged in cleanup and maintenance activities in order to preserve the Equistar Facility, while keeping open the option that the operations might later restart.

On January 29, 2009, approximately three weeks after the Debtors filed for chapter 11 protection, Solutia filed a motion seeking, among other things, an order compelling the Debtors to assume or reject leases and contracts relating to the Chocolate Bayou Plant. Before the hearing on Solutia's motion, the Debtors filed their own motion (the "**Idling and Rejection Motion**"), seeking an order authorizing the long-term idling of the Equistar Facility, a reduction of the workforce at the Facility, and the rejection of leases and executory contracts related to the Facility (the "**Chocolate Bayou Contracts and Leases**"), including the Sublease. Solutia then filed a limited objection to that motion (the "**Idling Limited Objection**") which, among other things, sought additional information from Equistar as to the plans to reject the Chocolate Bayou Contracts and Leases.

Some additional information was furnished, but the Debtors did not commit themselves as to their ultimate intentions with respect to the Personal Property. For

---

[5]  *See, e.g., Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection.*, 474 U.S. 494 (1986) ("***Midlantic***").

instance, a proposed form of order attached to the Debtors' reply, reflecting discussions with the federal Environmental Protection Agency ("**EPA**") and Texas Commission on Environmental Quality ("**TCEQ**") with respect to environmental compliance and compliance with a consent decree, provided, in part:

> From and after the date hereof and to the extent otherwise required by applicable permits, the Consent Decree … and applicable environmental statutes and regulations, the Debtors shall coordinate the *long-term idling and any re-start of the Facility* with the United States Environmental Protection Agency and the Texas Commission on Environmental Quality to Ensure that any ongoing and outstanding environmental obligations are managed in compliance with such applicable permits, the Consent Decree, and otherwise applicable environmental statutes and regulations…[6]

The Debtors' use of the term "long-term idling" did not convey notice of a permanent abandonment. To the contrary, it implied some kind of continued operation at a very low level, or a mothballing, with a very real possibility of a "re-start of the Facility," as their proposed order described. I find as facts that the Debtors did not then provide notice of abandonment, and that I did not rule on a permanent abandonment or disposition of the Personal Property at the hearing that led to the March 13 Order.

*3. The Transition Plan*

After the March 13 Order was entered, Equistar's remaining on-site staff began preparing to vacate by August 4. The Transition Plan included steps that the Debtors have taken, or will take, to decontaminate and idle the equipment and materials associated with the Equistar Facility. Equistar has worked with the EPA and the TCEQ

---

[6] Exh. A to the Idling Response, at 3 (emphasis added).

-6-

to ensure compliance with applicable environmental laws as it prepares to vacate the Equistar Facility, and neither agency has expressed any formal opposition to the Transition Plan. But the Transition Plan requires ongoing maintenance of the Equistar Facility, even after the Debtors have vacated the Chocolate Bayou Plant. If the Debtors vacate the Equistar Facility, someone—Solutia or Ascend—must maintain the property left behind. So far as the record reflects, the Personal Property is not now an environmental hazard, but in the absence of appropriate maintenance, very well could be.

On June 26, 2009, and June 30, 2009, respectively, Ascend and Solutia filed proofs of claim against Equistar for damages arising from the lease rejection and Equistar's failure to remove the Personal Property from the leased premises.[7] Then, on July 6, 2009, Solutia and Ascend filed the Motion before me, claiming that Equistar bears primary responsibility for the decontamination of the Equistar Facility prior to vacating the Chocolate Bayou Plant. Granting their motion would require, at the least, delay in implementation of the Transition Plan.

*4. The Ground Lease*

Equistar is the successor to the Sublease, which provides that "[Equistar] shall have the right to exercise in its own name and that of the Sublessor all of the rights to enforce compliance with the terms of the Primary Lease on the part of Lessor as are available to Sublessor."[8]

---

[7] They did so with appropriate reservations of rights, including with respect to whether their claims would be entitled to administrative expense treatment. As I noted at oral argument, I don't believe that it can be seriously argued that they waived any rights they had in this regard.

[8] Sublease, at 6.

The portion of the Lease that is relevant to the current dispute is a provision allowing the "yielding up" of the Leased Premises—the Equistar Facility. Section 9 of the Primary Lease reads as follows:

> 9. Yielding Up. Upon the expiration or termination of the term of this Lease, Lessee shall peaceably yield up and surrender possession of the Leased Premises to the Lessor in as good order, repair, and condition as they were in at the commencement of the term of this Lease. In this connection, Lessee, at its own expense and within three hundred sixty-five (365) days after the expiration or termination of this Lease, [a] *shall remove Lessee's Facilities or any other property of the Lessee from the Leased Premises, restore the Leased Premises to a condition suitable for industrial use, and leave in good working order all of the utility systems and other improvements of Lessor now on the Leased Premises or as may be installed by the Lessor.* During such removal period all obligations of Lessee under this Lease shall continue including without limitation, the payment of rentals. [b] *Any of Lessee's Facilities or other property of the Lessee not so removed by Lessee within three hundred sixty-five (365) days after the expiration or termination of this Lease shall, at Lessor's option, be forfeited to and become the absolute property of Lessor, or may be removed by Lessor and the Leased Premises restored as above set forth and the cost of such removal and restoration shall be paid by Lessee to Lessor on demand*, and no claim against Lessor shall be created by or made on account of such removal or restoration.[9]

Discussion

Based on the quoted language (and the italicized language in particular), the Debtors contend that Equistar has a contractual right to pass the Facility on to Solutia and Ascend, along with any attendant obligations. The Debtors further contend that while

---

[9] Primary Lease, § 9 (Debtors' Response, Exh. 2) (emphasis added; bracketed letters "[a]" and "[b]" added for the discussion to follow).

-8-

any costs incurred in maintaining the Equistar Facility could give rise to a claim by Solutia or Ascend against Equistar, any such claim would not be an administrative expense claim, but would instead simply give rise to unsecured pre-petition claims against the Equistar estate, along with any other rejection damages.

Solutia and Ascend contend, by contrast, that the March 13 Order covers only rejection of the Ground Lease, and that the Ground Lease can't be affirmatively invoked to give rise to a "put" in Equistar's favor, requiring Solutia or Ascend to accept the Personal Property, with its substantial actual or prospective environmental liabilities. That, Solutia and Ascend contend, amounts to an abandonment, and can be authorized only upon an abandonment motion, at which they can be heard with respect to limitations on debtor abandonment rights imposed under *Midlantic* and its progeny.

I agree with Solutia and Ascend. I can't read the language in Section 9 of the Primary Lease as creating a put. And even if it did, any such put couldn't be enforced while rejecting the agreement in which such a put were contained. And while I don't decide today the extent, if any, to which *Midlantic* or its progeny would preclude or impair abandonment of the Person Property—a debatable question, since the Personal Property is not, in its present condition, hazardous, but without substantial expenditures of funds, could be—I conclude that reliance on terms in the rejected Ground Lease is insufficient to justify avoidance of *Midlantic*-type scrutiny.

1. *Rights Under Ground Lease and as a Result of Its Rejection*

The Debtors argue that Equistar is contractually permitted to vacate the Equistar Facility (which Equistar plainly can), and then pass on any ongoing responsibilities vis-à-vis the Facility to the owner of the Chocolate Bayou Plant—which is more debatable. The Debtors rely on the "Yielding Up" section of the Lease, Section 9, quoted in full

-9-

above.[10] I first must decide, as a matter of contract and bankruptcy law, whether the Yielding Up section creates a substantive right on the part of Equistar to require Solutia and Equistar to accept the Personal Property against their will—by what amounts to a put—and, if so, whether any such substantive right can be invoked as part of a lease rejection.[11]

The Ground Lease contains potentially relevant language in two separate portions of Section 9. The first, which I've marked with the bracketed reference "[a]" ("**Clause A**"), provides that the lessee Equistar:

> shall remove Lessee's Facilities or any other
> property of the Lessee from the Leased Premises,
> restore the Leased Premises to a condition suitable
> for industrial use, and leave in good working order
> all of the utility systems and other improvements of
> Lessor now on the Leased Premises or as may be
> installed by the Lessor.

Clause A provides for a duty on the part of lessee Equistar that's common in real property leases. It provides in substance for a contractual covenant on the part of the lessee to remove the Personal Property—not unlike the provision we often see requiring leased premises to be delivered back to a landlord in "broom-clean" condition. Performance of covenants of that character is frequently burdensome, and landlords have sometimes contended that performance of that covenant must be a condition precedent to rejection.

---

[10] Primary Lease, § 9, quoted above.

[11] In either event, Equistar does not contend that it could do so at zero price. But Equistar contends that the price would be in the form of an unsecured claim, which could result in recompense in amounts considerably less than the full resulting damages.

-10-

But I, like other courts before me,[12] have previously rejected contentions of that character.[13] As I explained in *Ames*, rejection of an executory contract can't be conditioned upon compliance with a covenant in the contract to be rejected.[14] As I there stated:

> It would frustrate the entire purpose of rejection if, in order to reject and thereby be relieved of a burdensome executory contract, the debtor were required, as a condition to doing so, to comply with one of the very aspects of the agreement that is burdensome. And Ames is correct when it argues that acceptance of the Landlords' position would amount to acceptance of the notion that a cure of defaults-which is required to *assume* a lease-is likewise a condition to *reject* a lease, and when it argues that any such holding would eviscerate the important benefits provided under the Code to reject burdensome lease obligations.[15]

For that reason, I authorized rejection of the Ground Lease under the March 13 Order, even though Equistar hadn't yet complied with the requirements of Clause A, and it was at least possible that Equistar never would. Similarly, Solutia and Ascend can't now rely on the language in Clause A to create contractual restraints on Equistar's leaving the Personal Property behind.

But to say that Solutia and Ascend can't *prohibit* Equistar from leaving the Personal Property behind—either by contract or by conditioning rejection upon such—is not the same thing as saying that Equistar can *require* Solutia or Ascend to *take* the

---

[12] *See In re Unidigital*, Inc., 262 B.R. 283 (Bankr. D. Del. 2001) (Walrath, J.); *In re National Refractories & Minerals Corp.*, 297 B.R. 614 (Bankr. N.D. Cal. 2003) (Tchaikovsky, J.).

[13] *See In re Ames Department Stores, Inc.,* 306 B.R. 43 (Bankr. S.D.N.Y. 2004).

[14] *See id.* at 51 ("The Court necessarily must reject the Landlords' implicit contention that the Debtors' statutory right to reject can be qualified by requirements not in the Bankruptcy Code itself, and especially by an implied requirement of compliance with lease covenants that are burdensome to the debtor, and that may form part of the rationale for rejection in the first place.")

[15] *Id.* at 52.

Personal Property when they don't want to do so.  The latter is what Equistar wants, and to achieve this, Equistar relies not on Clause A (which plainly does not embody a put), but on the second italicized clause, preceded by a bracketed "[b]" ("**Clause B**").

Clause B, it will be remembered, provides:

> Any of Lessee's Facilities or other property of the Lessee not so removed by Lessee within three hundred sixty-five (365) days after the expiration or termination of this Lease shall, at Lessor's option, be forfeited to and become the absolute property of Lessor, or may be removed by Lessor and the Leased Premises restored as above set forth and the cost of such removal and restoration shall be paid by Lessee to Lessor on demand…

In substance, Clause B describes remedies for the failure to comply with Clause A.  But I can't read the quoted language in Clause B to grant Equistar an option or other contractual right to *require* the Lessor to take any of the Lessee's property.  It grants the *Lessor* rights if any property is not removed.  And while the "shall" in Clause B is subject to multiple constructions—as denoting future tense or something mandatory—the better reading (especially since it is followed by a "may" later in the same sentence) is that Clause B does not say that the Lessor *must* avail itself of those rights, or choose one or another of the options, if it prefers not to avail itself of any remedies whatever.  Clause B rather conveys rights to, rather than burdens upon, the Lessor.  Clause B is not structured, in words or substance, to grant a put, and if it had been intended to achieve such a result, it would have been drafted in a materially different way.  Clause B may (and probably does) set forth the measure of damages that the Lessor may claim for a failure to comply—a matter not now before me—but it does not embody a contractual duty on the part of the Lessor to accept any property it does not want.

-12-

Additionally, even if Clause B did embody a put, I can't see how it could be enforced by the debtor Equistar when the agreement containing the put had been rejected. "[T]he rejection of an executory contract … constitutes a breach of such contract."[16] And rejection excuses future performance under that contract by the contract counter-party, and deprives the debtor from securing the contract's future benefits.[17] Because that is so, even if Section 9 of the rejected contract contained a put, Equistar could not enforce the contract to require Solutia or Ascend to accept the Personal Property against its will.

*2. Abandonment*

But I further need to consider whether what Equistar proposes is, as Solutia and Ascend contend, a "de-facto" abandonment—*i.e.*, an abandonment in substance—and if so, whether that can be done only with notice and opportunity to object. I agree that it is. When leaving the Personal Property behind, Equistar "abandoned" it in accordance with that word's everyday meaning, and when we consider the Code and Rules, we come to the same result.

Section 554(a) of the Code provides that "[a]fter notice and a hearing,"[18] a debtor "may abandon any property of the estate that is burdensome to the estate or that is of

---

[16] Code section 365(g).

[17] *See*, *e.g.*, *Pacific Express, Inc. v. Teknekron Infoswitch Corp. (In re Pacific Express, Inc.),* 780 F.2d 1482, 1486 n.3 (9th Cir. 1986) ("After rejection, the performance of the non-bankruptcy obligee is excused."); *In re Crippin*, 877 F.2d 594, 597 (7th Cir. 1989) ("since rejection constitutes a breach, it also excuses performance by the nonbankrupt party. … Thus, rejecting a contract allows a debtor to escape a contract's burdens; but, at the same time, the debtor must also give up any future benefit he might receive from the contract."); *In re Executive Technology Data Systems,* 79 B.R. 276, 282 (Bankr. E.D. Mich. 1987) ("if a debtor elects to reject an executory contract, he rejects the benefits as well as the burdens").

[18] "Notice and a hearing" requires a hearing if, but only if, there is an objection. *See* Bankruptcy Code section 102.

-13-

inconsequential value and benefit to the estate."[19] In this case, the very existence of this controversy underscores how *nobody* wants the Personal Property; it will be burdensome to whomever is saddled with it. And implicit in the controversy is the further reality that, especially in light of the costs of maintaining it, the Personal Property is of inconsequential value as well.

Solutia argues that there are only a limited number of ways by which property can leave a chapter 11 estate—by use, transfer (normally by sale), or abandonment. Equistar doesn't dispute, much less refute, this point. And Solutia further observes, properly, that in the absence of a put right, only the last of those could be applicable here. At least as a general matter,[20] all of these means, except where transfer takes place in the ordinary course of business,[21] require notice, and approval of the court if there is objection. Equistar's desire to leave its Personal Property behind—because continued ownership is burdensome, because it's of inconsequential value, or both—is the paradigmatic "abandonment" as that concept is used under the Code, just as it is under common English usage and common sense.

Whether abandonment of the Personal Property here is or isn't appropriate is not yet before me. Under the Code and Rules, a proposed abandonment must be achieved

---

[19] 11 U.S.C. § 554(a). Then, Fed R. Bankr. Proc. 6007(a) provides that a debtor must provide notice of a proposed abandonment to the United States Trustee, all creditors, indenture trustees, and committees appointed or elected under the Code, and Local Bankruptcy Rule 6007-1 further provides that such notice must describe the property to be abandoned, the reason for the abandonment, and the entity to which the property is to be abandoned.

[20] Sometimes, particularly in our larger chapter 11 cases, we enter orders providing general authority to effect sales or abandonment of property that is of minimal value in the context of the case, without further notice when the value of the property does not exceed a specified amount.

[21] *See* Code section 363(a).

only after notice, and if there are then objections, as there may well be here,[22] any objections can (and should) be considered at that time. At this juncture, I express no view as to whether I'll ultimately determine that abandonment is permissible at such time as any abandonment motion is made. In fact, other than noting a few issues that counsel should be prepared to address if and when any such motion is made,[23] I express no views whatever concerning the subject. Of course, until notice of abandonment is given and any objections can be considered, the Transition Plan must be put on hold.

---

[22] Underlying all of this, of course, are the issues as to whether the Personal Property may be abandoned under *Midlantic* and its progeny, as under *Midlantic*, abandonment may not occur "in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards." 474 U.S. at 507. My decision in *Ames*, wherein the property left behind was racks, shelving and similar trade fixtures, did not involve environmental issues, and the lessor agreed that Ames could abandon it. *See* 306 B.R. at 50-51. I had no occasion there to address any issues that might arise when the abandonment might involve environmental remediation costs.

[23] Without foreclosing counsel from making any other points they would wish to make, parties should be prepared to address, as factual matters, whether the Personal Property now presents a situation in contravention of applicable statutes or regulations protecting the public health or safety, and, if not, what would happen in the absence of further action. Parties should also be prepared to address as a legal matter, how bankruptcy courts consider situations where the status quo is presently benign but where, in the absence of material efforts or expenditures, hazards to the public would be expected to result, or at least would be foreseeable (which might be a different question or imply a different legal standard). Parties should also be prepared to address, either on an abandonment motion or in connection with any request for administrative expense claim status (as contrasted to unsecured claim), in addition to *Midlantic* and its progeny, the decisions by Judges Walrath and Tchaikovsky, respectively, in *Unidigital* and *National Refractories & Minerals,* and decisions by Judges Winfield and Blackshear, respectively, in *In re Mahoney-Troast Constr. Corp.,* 189 B.R. 57 (Bankr. D.N.J. 1995), and *In re McCrory* Corp., 188 B.R. 763 (Bankr. S.D.N.Y. 1995).

<u>Conclusion</u>

For the foregoing reasons, I rule that that notice of abandonment was not previously given; my order approving rejection of the Ground Lease did not address Equistar's ability to abandon the Personal Property, one way or another; Equistar cannot rely on contractual provisions in the Ground Lease to require Solutia or Ascend to accept the Personal Property; and that if Equistar wishes to leave the Personal Property behind, it must do so by abandonment, providing notice and an opportunity to object. While Debtors generally may leave personal property behind when rejecting leases for premises and may be subject only to unsecured claims for their failures to comply with contractual covenants to leave the premises in "broom-clean" or similar condition, limits on their right to abandon their property may apply when Debtors leave environmentally hazardous property behind. I now express no view as to how I would decide any disputed matters if and when notice of abandonment was made.

SO ORDERED.

Dated: New York, New York                     *s/Robert E. Gerber*
      September **9**, 2009                     United States Bankruptcy Judge