PREET BHARARA                    **HEARING DATE: October 7, 2009, at 9:45 a.m.**
United States Attorney for the
Southern District of New York
JEANNETTE A. VARGAS
BRANDON COWART
ALICIA SIMMONS
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York  10007
Telephone:  (212) 637-2678
Facsimile:  (212) 637-2702

Attorney for the United States of America

EDMUND G. BROWN JR,
Attorney General of the State of California
RICHARD MAGASIN, Supervising Deputy Attorney General
MARILYN H. LEVIN  (admitted Pro Hac Vice)
NOAH GOLDEN-KRASNER  (admitted Pro Hac Vice)
Deputy Attorneys General
300 South Spring Street, 11th Floor
Los Angeles, California  90013
Telephone:     (213) 897-2614
Facsimile:     (213) 897-2802

Attorneys for California State Water Resources Control Board and California Regional Water
Quality Control Board, Los Angeles Region

KEN ALEX
Senior Assistant Attorney General
MARGARITA PADILLA (admitted Pro Hac Vice)
Supervising Deputy Attorney General
1515 Clay Street, 20th Floor P.O. Box 70550
Oakland, California  94612
Telephone:     (510) 622-2135
Facsimile:     (510) 622-2270

Attorneys for the California Department of Toxic Substances Control

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
 --------------------------------------------------------x

In re:                                           CHAPTER 11

LYONDELL CHEMICAL COMPANY, et al.,               Case No. 09-10023 (REG)

                                                 Jointly Administered

               Debtors.

 --------------------------------------------------------x

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.......................................................................................... 1

BACKGROUND. ........................................................................................................... 3

    I.      THE PROOFS OF CLAIM................................................................... 3

    II.     THE ENVIRONMENTAL STATUTES. ............................................. 6

        A.      CERCLA. ................................................................................ 6

        B.      California's Hazardous Substances Account Act . ..................... 8

        C.      California's Porter-Cologne Water Quality Control Act. ......... 10

    III.    THE FEDERAL SITES. ...................................................................... 12

        A.      The Kalamazoo Site. .............................................................. 12

        B.      The French Limited Site. ....................................................... 14

    IV.    THE CALIFORNIA SITES. ............................................................... 15

        A.      The Jefferson New Middle School No.1 Site . ....................... 16

        B.      The Syntex Site . .................................................................... 17

        C.      Hillview Porter Site................................................................ 18

        D.      Former Weber Aircraft Site. .................................................. 19

    V.      THE PENDING OBJECTIONS. ........................................................ 21

ARGUMENT. ............................................................................................................... 22

POINT I      THE OBJECTIONS SHOULD BE DENIED AS THE ISSUES RAISED
             ARE NOT RIPE FOR RESOLUTION . ............................................. 21

POINT II     THE SCHEDULE III DEBTORS INTEND TO LIQUIDATE AND
             THEREFORE WOULD NOT BE ENTITLED TO A DISCHARGE
             OF CLAIMS. ..................................................................................... 24

POINT III    DEBTORS ARE PRECLUDED FROM CHALLENGING THE EPA'S POSSIBLE
             ENFORCEMENT DECISIONS BY SECTION 113(H) OF
             CERCLA.............................................................................................. 26

POINT IV    DEBTORS CANNOT EVADE THE REQUIREMENT THAT DISCHARGEABILITY DETERMINATIONS PROCEED BY ADVERSARY PROCEEDING BY STYLING THEIR PAPERS AS OBJECTIONS TO PROOFS OF CLAIM. .................................................................................. 30

POINT V    DEBTORS' OBLIGATIONS UNDER FEDERAL AND STATE ENVIRONMENTAL LAWS TO AMELIORATE ONGOING POLLUTION ARE NOT DISCHARGEABLE "CLAIMS" UNDER THE BANKRUPTCY CODE. .............................................................. 31

      A.    Environmental Orders That Require Debtors to Ameliorate Ongoing Pollution Are Not Dischargeable In Bankruptcy. .................................................. 32

      B.    The "Ongoing Pollution" Standard for Cleanup Orders Issued Under CERCLA Applies to Both Debtor-Owned and Third Party Properties. .............. 35

      C.    The "Ongoing Pollution" CERCLA Standard Applies Both to Debtors Who Are Engaged in Postpetition Activities that Contribute to Pollution and to the Cleanup of Accumulated Waste that Is a Source of Ongoing Pollution. ....................................................................................................... 40

      D.    The Expenditure of Funds to Satisfy Injunctive Obligations Does Not Equate to a "Right to Payment" Under Section 101(5) of the Bankruptcy Code. ............................................................................................................. 43

CONCLUSION. ............................................................................................................. 50

# TABLE OF AUTHORITIES

**Cases**                                                                                               **Page**

AM International, Inc. v. Datacard Corp.,
    106 F.3d 1342 (7th Cir. 1997). ........................................................................ 44

Abbott Laboratories v. Gardner,
    387 U.S. 136 (1967)................................................................................ 22

B.F. Goodrich Co. v. Murtha,
    958 F.2d 1192 (2d Cir. 1992)...................................................................... 8

In re Basinger,
    2002 WL 33939736 (Bankr. D. Idaho Jan. 31, 2002)................................ 41, 42

In re Ben Franklin Hotel Associates,
    186 F.3d 301 (3d Cir. 1999)..................................................................... 48

In re Best Payphones, Inc.,
    No. 01-15472 (SMB), 2007 WL 203980 (Bankr. S.D.N.Y. Jan. 24, 2007). ................... 31

Brooklyn Legal Services Corp. v. Legal Services Corp.,
    462 F.3d 219 (2d Cir. 2006)..................................................................... 22

Broward Gardens Tenants Association v. EPA,
    311 F.3d 1066 (11th Cir. 2002). ................................................................. 28

Caterpillar Inc. v. Williams,
    482 U.S. 386 (1987)............................................................................. 38

In re Chateaugay,
    112 B.R. 513 (S.D.N.Y. 1990).................................................................... 47

In re Chateaugay Corp.,
    944 F.2d 997 (2d Cir. 1991)......................................................... 3, 32, 33, 43

City of New York v. Exxon Corp.,
    932 F.2d 1020 (2d Cir. 1991).................................................................... 32

Clearing House Association, LLC v. Cuomo,
    510 F.3d 105 (2d Cir. 2007)..................................................................... 23

Clinton County Comm'rs v. EPA,
    116 F.3d 1018 (3d Cir. 1997).................................................................... 28

In re Combustion Equipment Associate,
838 F.2d 35 (2d Cir. 1988)............................................................... 22

In re Commonwealth Oil Refining Co.,
805 F.2d 1175 (5th Cir. 1986). ............................................... 45, 48

In re Cottonwood Canyon Land Co.,
146 B.R. 992 (Bankr. D. Colo. 1992). ....................................... 41, 42

Costner v. URS Consultants, Inc.,
153 F.3d 667 (8th Cir. 1998). ...................................................... 28

Cournoyer v. Town of Lincoln,
790 F.2d 971 (1st Cir. 1986). ....................................................... 48

In re Danbury Square Associates, Ltd. Partnership,
153 B.R. 657 (Bankr. S.D.N.Y. 1993). ........................................ 31

In re Davis,
3 F.3d 113 (5th Cir. 1993). ..................................................... 32, 47

FV Steel and Wire Co.,
324 B.R. 701 (Bankr. E.D. Wis. 2005). ...................................... 37

Garbie v. DaimlerChrysler Corp.,
211 F.3d 407 (7th Cir. 2000). ...................................................... 38

In re Goodwin,
163 B.R. 825 (Bankr. D. Idaho 1993) ...................................... 41, 42

Johnson v. Home State Bank,
501 U.S. 78 (1991).......................................................................... 33

Key Tronic Corp. v. United States,
511 U.S. 809 (1994)........................................................................ 7

In re MCorp Finance, Inc.,
137 B.R. 219 (Bankr. S.D. Tex. 1992). ...................................... 26

Marchi v. Board of Cooperative  Education Services,
173 F.3d 469 (2d Cir. 1999)......................................................... 23

Matter of Village Mobile Homes, Inc.,
947 F.2d 1282 (5th Cir. 1991). ................................................... 31

Midlantic National Bank v. N.J. Department of Environmental Prot.,
    474 U.S. 494 (1986). ................................................................................................ 41

New York v. Mirant New York, Inc.,
    300 B.R. 174 (S.D.N.Y. 2003) ................................................................................ 44

North Shore Gas Co. v. EPA,
    930 F.2d 1239 (7th Cir. 1991). .............................................................................. 28

Ohio v. Kovacs,
    469 U.S. 274 (1985). ........................................................................... 41, 47, 48, 49

Oil, Chemical & Atomic Workers International Union v. Pena,
    62 F. Supp. 2d 1 (D.D.C.1999) ............................................................................. 29

Oil, Chemical & Atomic Workers International Union v. Richardson,
    214 F.3d 1379 (D.C. Cir. 2000). ............................................................................ 28

Penn Terra, Ltd. v. Department of Environmental Resource,
    733 F.2d 267 (3d Cir. 1984). ................................................................................. 45

Reardon v. United States,
    947 F.2d 1509 (1st Cir. 1991). .............................................................................. 27

Safety-Kleen, Inc. (Pinewood) v. Wyche,
    274 F.3d 846 (4th Cir. 2001). ............................................................................... 45

Schalk v. Reilly,
    900 F.2d 1091 (7th Cir. 1990). .............................................................................. 28

State of New York v. Shore Realty Corp.,
    759 F.2d 1032 (2d Cir. 1985). ................................................................................. 8

In re Torwico Electronics, Inc.,
    8 F.3d 146 (3d Cir. 1993). ................................................................... 37, 38, 39, 44

In re Udell,
    18 F.3d 403 (7th Cir. 1994). ............................................................................ 32, 48

United States v. ACC Chemical Company et al.,
    Civil Action No. 91-10096 (S.D. Iowa Feb. 6, 1995). ......................................... 12

United States v. Apex Oil Co.,
    – F.3d –, 2009 WL 2591545 (7th Cir. Aug. 25, 2009). .... 32, 35, 37, 38, 39, 44, 45, 46, 48

United States v. Bestfoods,
    524 U.S. 51 (1998) ........................................................................................ 7, 8

United States v. Fell,
    360 F.3d 135 (2d Cir. 2004) ........................................................................... 22

United States v. French Ltd., Inc., et al.,
    Case No. H-89-2544 (S.D. Tex. Mar. 1, 1990) ............................................... 15

United States v. Hubler,
    117 B.R. 160 (W.D. Pa. 1990) ........................................................................ 47

United States v. ILCO, Inc.,
    48 B.R. 1016 (N.D. Ala. 1985) ....................................................................... 47

United States v. Whizco, Inc.,
    841 F.2d 147 (6th Cir. 1988) .......................................................................... 46

## Statutes

11 U.S.C. §§ 101 *et seq* ............................................................ 3, 4, 5, 32, 33, 43, 49

11 U.S.C. § 362 ...................................................................................................... 45

11 U.S.C. § 502 ...................................................................................................... 30

11 U.S.C. § 727 ...................................................................................................... 25

11 U.S.C. § 1107 ................................................................................................. 3, 4

11 U.S.C. § 1108 ................................................................................................. 3, 4

11 U.S.C. § 1141 ................................................................................... 25, 32, 33

28 U.S.C. § 959 ...................................................................................................... 39

42 U.S.C. § 9601 *et seq* ...................................................................................... 7, 9

42 U.S.C. § 9604 ................................................................................................... 8

42 U.S.C. § 9605 ................................................................................................... 7

42 U.S.C. § 9606 ................................................................................................... 8

42 U.S.C. § 9607 ............................................................................................... 8, 10

42 U.S.C. § 9613 ............................................................................................. 27, 28

42 U.S.C. § 9617. ........................................................................................................ 7

Cal. Health & Safety Code §§ 25300 *et seq.* ............................................................ 9

Cal. Health & Safety Code § 25310. ......................................................................... 9

Cal. Health & Safety Code §§ 25355.5. ..................................................................... 10

Cal. Health & Safety Code § 25360. ......................................................................... 10

Cal. Health & Safety Code §25358.3. ....................................................................... 10

Cal. Wat. Code §§ 13000 *et seq.* .............................................................................. 10

Cal. Wat. Code § 13267. ............................................................................................ 11

## Legislative History

H.R. Conf. Rep. No 99-962, at 224 (1986), reprinted in 1986 U.S.C.C.A.N.3276, 3317. ........... 29

H.R. Rep. No. 99-253(V), at 25-26 (1985), reprinted in 1986 U.S.C.C.A.N.3124, 3148-49. ................................................................................................................... 29

132 Cong. Rec. 28,441 (1986). .................................................................................. 29

## Rules & Regulations

40 C.F.R. 300.430. ..................................................................................................... 7

40 C.F.R. Pt. 30. ..................................................................................................... 7, 9

55 Fed. Reg. 866 . ...................................................................................................... 7

55 Fed. Reg. 35502. ...................................................................................... 13, 14, 15

Fed. R. Bankr. P. 7001(6). ......................................................................................... 31

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA AND THE CALIFORNIA ENVIRONMENTAL AGENCIES IN OPPOSITION TO DEBTORS' OBJECTIONS TO PROOFS OF CLAIM ON ISSUE OF CLASSIFICATION OF ENVIRONMENTAL INJUNCTIVE RELIEF OBLIGATIONS AS DISCHARGEABLE "CLAIMS" UNDER THE BANKRUPTCY CODE**

The United States of America ("United States"), acting on behalf of the Environmental Protection Agency (the "EPA"), by its attorney Preet Bharara, United States Attorney for the Southern District of New York, and the California State Water Resources Control Board (the "State Board"), the California Regional Water Quality Control Board, Los Angeles Region ("Los Angeles Regional Board") (collectively, the "Water Boards"), and the California Department of Toxic Substances Control ("DTSC") (collectively, the "California Environmental Agencies"), respectfully submit this memorandum of law in opposition to the Debtors' Objection Pursuant to Rule 502 of the Bankruptcy Code to Certain Claims of the United States of America, Debtors' Objection Pursuant to Rule 502 of the Bankruptcy Code to Certain Claims of the California State Water Resources Control Board, Debtors' Objection Pursuant to Rule 502 of the Bankruptcy Code to Certain Claims of the California Regional Water Quality Board, and Debtors' Objection Pursuant to Rule 502 of the Bankruptcy Code to Certain Claims of the California Department of Toxic Substances Control Board (collectively, "Debtors' Objections").[1]

## PRELIMINARY STATEMENT

Debtors' Objections are an improper effort to preemptively impair the enforcement authority of the United States and the California Environmental Agencies under federal and state environmental laws designed to protect human health and safety. Debtors may not, in the guise of these self-styled "objections" to proofs of claim, obtain an order effectively enjoining the

---

[1] The following have authorized the United States and the California Environmental Agencies to inform the Court that they share in the views set forth in this response to Debtors' Objections: the Florida Department of Environmental Protection, Illinois, the Commonwealth of Massachusetts, Michigan, the New Jersey Department of Environmental Protection, New York and the Texas Commission on Environmental Quality.

United States and the California Environmental Agencies from requiring debtors to comply with their legal obligation to clean up hazardous waste which they, or their corporate predecessors, released into the environment and which currently poses a threat to human health and safety. Such injunctive obligations are not subject to discharge in bankruptcy.

As an initial matter, Debtors' Objections are not yet ripe for adjudication, and likely never will become ripe. According to the Debtors' Disclosure Statement, almost all of the Debtors that are the subject of these Objections will be liquidating, with their properties and assets placed into a disbursement trust that will be liquidated for the benefit of general unsecured creditors. Liquidating entities are not entitled to discharge under section 1141 of the Bankruptcy Code, however. Accordingly, as to these Debtors, any decision on their Objections would constitute nothing more than an advisory opinion.

Moreover, the United States and the California Environmental have not yet taken any enforcement action against these debtors — or, for that matter, taken any steps to secure Debtors' compliance with their injunctive obligations — nor is it a foregone conclusion that such actions will be taken. Indeed, Debtors' sweeping "Objections" would encompass third party sites that are not included on any of the challenged proofs of claim, for which liability determinations have not been made, nor the necessary relief selected. In such circumstances, CERCLA jurisdictionally bars this Court from conducting the type of preenforcement review sought by the Debtors. And as the Court may never be called upon to resolve the dischargeability of these unknown and speculative injunctive obligations, the issues presented in the Objections are not ripe for judicial resolution.

As to the merits of Debtors' Objections, Debtors incorrectly assert that the injunctive obligations imposed by these sovereigns in furtherance of the protection of human health and safety can be transformed into monetary claims at the discretion of debtors and discharged in

bankruptcy. That is not the law. Debtors' equation of monetary claims with injunctive

obligations directly conflicts with the Second Circuit's decision in *In re Chateaugay Corp.*, 944

F.2d 997 (2d Cir. 1991), which draws a clear distinction between monetary claims, which are

dischargeable, and injunctive obligations to address ongoing pollution, which are not. Debtors'

argument that its liability for injunctive obligations should be limited solely to property that it

owns and operates is utterly unsupportable. Polluters cannot evade their legal obligations merely

by hanging a price tag on compliance with administrative orders and judicial decrees. Such a

contention has been rejected by the Second Circuit in *Chateaugay*, as well as by the Third,

Fourth, Fifth and Seventh Circuits. In sum, the law is clear that injunctive obligations to remedy

ongoing pollution are not "claims" dischargeable in bankruptcy.

## BACKGROUND

On January 6, 2009, Debtors commenced these Chapter 11 cases by filing voluntary

petitions for relief under 11 U.S.C. § 101 *et seq.* (the "Code"). Debtors continue to manage their

properties and operate their businesses as debtors-in-possession pursuant to Sections 1107(a) and

1108 of the Bankruptcy Code, 11 U.S.C. §§ 1107(a), 1108.

## I.      THE PROOFS OF CLAIM

On or around July 6, 2009, the United States filed proofs of claim concerning

environmental liabilities of nine Debtors in this jointly administered case: Debtors Equistar

Chemicals, LP ("Equistar"); Houston Refining, LP; PH Burbank Holdings, Inc. ("PH Burbank");

Walter Kidde & Company, Inc. ("Walter Kidde"); Millenium Specialty Chemicals, Inc.;

Millenium Petrochemicals, Inc.; Millenium Holdings, LLC ("Millenium Holdings"); MHC, Inc.

("MHC"); and Lyondell Chemical Company ("Lyondell"). *See* Affidavit of Deborah W. Kryak,

dated September 3, 2009 ("Kryak Aff."), Exs. 1-10.[2]  In these proofs of claim, the United States asserted general unsecured claims for, *inter alia*, unreimbursed response costs incurred by the EPA pursuant to section 107(a) of CERCLA, civil penalties, and natural resources damages and assessment costs.

On July 6, 2009, the DTSC filed a proof of claim against Debtor MHC, and two proofs of claim against Debtor Millenium Holdings, with respect to their respective environmental liabilities at three sites: the Jefferson New Middle School No. 1 Site, the Syntex Site and the Hillview Porter Site.  *See* Kryak Aff., Exs. 11-13.  And on or around July 2, 2009, the Water Boards each filed separate protective proofs of claim against the following eight Debtors with respect to the Former Weber Aircraft facility located in Burbank, California: Lyondell; Millenium Holdings; Millennium American Holdings; Millennium Chemicals, Inc.; PH Burbank; Walter Kidde; MHC; and Lyondell-Equistar Holding Partners.  *See id.* at ¶ 12 (citing Exs. 14-29).[3]

Each of the proofs of claims filed by the United States and the California Environmental Agencies contains an explicit reservation of rights with respect to Debtors' injunctive obligations.  For example, the United States included the following language in each proof of claim:

> The United States is not required to file a proof of claim with respect to [the debtor's] injunctive obligation to comply with work requirements imposed by environmental statutes, regulations, court orders, administrative orders, or permits, because such obligations are not claims under 11 U.S.C. § 101(5). [Debtor] and any reorganized debtor must comply with such mandatory

---

[2]  The United States filed an amended proof of claim for Millennium Petrochemicals, Inc. on August 28, 2009.

[3]  Exhibit 14 is incorrectly listed in the Kryak Affidavit as a Proof of Claim of the Los Angeles Regional Board.

requirements.  The United States reserves the right to take future actions to enforce any such obligations of [Debtor].  While the United States believes that its position will be upheld by the Court, the United States has included the aforementioned obligations and requirements in this Proof of Claim in a protective fashion, to safeguard against the possibility that [Debtor] will contend that it does not need to comply with such obligations and requirements, and the Court finds that it is not required to do so.

Therefore, a protective contingent claim is filed in the alternative for such obligations and requirements but only in the event that the Court finds that such obligations and requirements are dischargeable claims under 11 U.S.C. § 101(5), rather than obligations and requirements that any reorganized debtor must comply with.  Nothing in this Proof of Claim constitutes a waiver of any rights of the United States or an election of remedies with respect to such rights and obligations.

Similarly, the DTSC's proofs of claim each state: "DTSC [] contends that Debtor's obligations under a [Consent Order entered into by the Debtor with DTSC or enforcement orders] are not claims subject to discharge in bankruptcy."[4]

The Water Boards likewise included a reservation of rights in their proofs of claim:

The filing of these Proofs of Claim and Supplemental Statement is intended to cover any and all "claims" as defined in 11 U.S.C. § 101(5) arising from the Lyondell Debtors' activities, as a protective measure related to the obligations of the Lyondell Debtors and is also intended to cover other obligations, including injunctive obligations and administrative priority expenses which are not "claims" as defined in the Bankruptcy Code . . . As such, the Los Angeles Regional Board [and State Board] reserves the right to take future actions to enforce obligations of the Lyondell Debtors pursuant to state and federal laws, including Water Code sections 13304, 13385 and 13386.  While the Los Angeles Regional Board [and State Board] believes that this position will be upheld by a court of competent jurisdiction, the Los Angeles Regional Board [and State Board] files these Proofs of Claim with respect to the Lyondell Debtors' obligations in a protective fashion with respect to such obligations and requirements should the

_____

[4]  With respect to the Jefferson New Middle School Site, the DTSC also filed a proof of claim against Debtor Walter Kidde & Company, Inc., notwithstanding that this Debtor was not named in the administrative order for the Jefferson School Site.

Debtor[s] contend that such obligations are claims under section 101 § 101(5)(A) of the Bankruptcy Code and there is a final court order upholding that position.

Debtors have ceased performing under existing consent decrees and enforcement orders at sites they neither own nor operate ("third party sites"), and have indicated they would not comply with future orders. Since the commencement of these Chapter 11 proceedings, neither the United States nor the California Environmental Agencies have initiated any civil suits or other enforcement actions with respect to the obligations of any Debtor to comply with federal or state environmental laws at any third party site.

## II.    THE ENVIRONMENTAL STATUTES

Although Debtors' papers are styled as Objections to proofs of claim, the Objections seek broad-ranging declaratory relief that has the potential to implicate an unknown number of third party sites, including sites that are not included in any of the proofs of claim. Each of these third party sites present a unique set of facts, including the extent of contamination at the site, the status of cleanup efforts, the respective Debtors' history with respect to such site, the federal or state involvement in such site, and the statutory regime pursuant to which any administrative orders, consent decrees or injunctive relief has been, or could be, issued. With respect to the latter, Debtors may well be responsible for performing injunctive obligations at third party sites pursuant to a variety of different statutory and regulatory regimes, including but not limited to the Resources Conservation and Recovery Act, the Clean Water Act, the Clean Air Act, the California Hazardous Waste Control Law, the California Porter Cologne Water Quality Act and other federal and state environmental laws. It would be impossible to do any kind of in depth analysis of each of these statutes as they pertain to each third party site potentially effected by the Objection. Accordingly, this background section limits its discussion to the specific sites and

statutes that are explicitly referenced in the challenged proofs of claim.

### A.    CERCLA

Congress enacted the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, as a response to the serious environmental and health dangers posed by property contaminated by hazardous substances. *United States v. Bestfoods*, 524 U.S. 51, 55 (1998).  CERCLA "grants the President broad power to command government agencies and private parties to clean up hazardous-waste sites." *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994).  Pursuant to CERCLA section 105(a), 42 U.S.C. § 9605(a), the EPA promulgates the National Priorities List ("NPL"), which identifies the most serious hazardous waste sites identified for possible long-term remedial action.  *See* 40 C.F.R. Pt. 300, app. B.  For sites on the NPL, the EPA performs detailed studies — each of which is called a remedial investigation and feasibility study ("RI/FS") — to ascertain the full extent of the contamination and to explore and evaluate remedial alternatives.  *See* 40 C.F.R. 300.430(f).  Following the conclusion of these studies, and a public input process, the EPA selects a remedial action to be implemented at the site, as documented in a Record of Decision ("ROD").  *See* 42 U.S.C. § 9617; 40 C.F.R. 300.430(a)(2).

Hazardous sites may be divided into phases or "Operable Units," with certain remedial actions selected for each Operable Unit as an incremental step toward comprehensively addressing the site problems.  *See* 40 C.F.R. 300.430(a)(ii)(A)-(B).  The EPA may also approve "interim" remedial action consisting of initial measures that are expected to advance the cleanup process and can be implemented while the remedial investigation and feasibility study is being completed and a final ROD issued, in which case the interim measure may become part of the final remedial action at the site.  *Id.*; *see also* 55 Fed. Reg. 866, 8703 (1990) (preamble to the National Oil and Hazardous Substance Pollution Contingency Plan).

In addition to broad response authority, CERCLA creates broad liability, reflecting the principle that those responsible for creating hazardous conditions should bear the burden of cleanup. *See B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1198 (2d Cir. 1992). CERCLA identifies four categories of liable parties or "covered persons"— sometimes referred to as "potentially responsible parties" or "PRPs" — associated with the release or threatened release of hazardous substances. 42 U.S.C. § 9607(a). Those entities are: (1) owners and operators of facilities at which hazardous substances are located; (2) past owners and operators of such facilities at the time hazardous substances were disposed; (3) persons who arranged for disposal or treatment of hazardous substances; and (4) certain transporters of hazardous substances to the site. 42 U.S.C. § 9607(a)(1)-(4).

CERCLA contains several distinct enforcement provisions. For instance, section 106 of CERCLA authorizes the EPA to seek injunctive relief or issue administrative orders to abate "an actual or threatened release of a hazardous substance from a facility" where there "may be an imminent and substantial endangerment to the public health or welfare or the environment." 42 U.S.C. § 9606(a). Separate provisions of CERCLA authorize the EPA itself to undertake response actions designed to remove hazardous substances and provide appropriate remediation, using the Hazardous Substance Superfund. *See* 42 U.S.C. 9604; *see also Bestfoods*, 524 U.S. at 55. The United States is authorized to recover its response costs from PRPs through a cost recovery action under section 107(a) of CERCLA. *See* 42 U.S.C. 9607(a). The injunctive relief and monetary recovery provisions of CERCLA are distinct remedies. *Cf. State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1049 (2d Cir. 1985) ("The standard for seeking abatement under section [106] is more narrow than the standard of liability under section [107].").

### B.    California's Hazardous Substances Account Act

California's counterpart to CERCLA is the Hazardous Substances Account Act

("HSAA"), Cal. Health & Safety Code §§ 25300 *et seq.* Like its federal counterpart, the HSAA establishes a comprehensive program for the cleanup of hazardous substances that have been released or threatened to be released into the environment. The HSAA expressly adopts the same definitions as used in CERCLA, including its definition of "liable parties." *See* Cal. Health & Safety Code § 25310 (provides that with certain exceptions, the definitions contained in 42 U.S.C. § 9601 shall apply to the HSAA); *id.* § 25323.5.

Just as CERCLA provides the federal EPA with distinct enforcement provisions, the HSAA does the same for the DTSC. For example, under the HSAA, the DTSC has the authority to issue administrative cleanup orders to responsible parties under sections 25355.5(a)(1)(B)[5] and (C)[6], as well as under section 25358.3(a)(1).[7] Indeed, administrative cleanup orders issued by the DTSC require that the named respondents undertake the injunctive measures consistent with the requirements of CERCLA and the National Contingency Plan, 40 C.F.R. Part 300.

Like CERCLA, the HSAA also authorizes the DTSC to undertake response actions designed to remove hazardous substances and provide appropriate remediation, using the state

---

[5] California Health and Safety Code section 25355.5(a)(1)(B) authorizes the DTSC to issue administrative orders establishing a schedule for removing or remediating a release of a hazardous substance at a site, or for correcting the conditions that threaten the release of a hazardous substance. An order under this section of the California Health and Safety Code includes dates by which necessary corrective measures are to be taken to remove the threat of a release, or the dates by which the nature and extent of a release shall be determined, the site adequately characterized, a remedial action plan prepared and submitted to the DTSC for approval, and a removal or remedial action plan completed.

[6] California Health and Safety Code section 25355.5(a)(1)(C) authorizes the DTSC to enter into an enforceable agreement with a PRP for a site that requires the party to take necessary corrective action to remove the threat of the release, or to determine the nature and extent of the release and adequately characterize the site, prepare a remedial action plan, and complete the necessary removal or remedial actions, as required under the approved remedial action plan.

[7] California Health and Safety Code section 25358.3(a) authorizes the DTSC to issue orders when it determines that there may be an imminent or substantial endangerment to the public health or welfare or to the environment because of the release, or threatened release, of a hazardous substance.

funds appropriated by the Legislature. *See, e.g.*, Cal. Health & Safety Code §§ 25355.5(b) and 25358.3 (a)(2). And, like the regulatory scheme available to the federal EPA, the DTSC is authorized under the HSAA to recover its response costs from PRPs. Cal. Health & Safety Code § 25360. In addition, the DTSC may seek cost recovery under Section 107(a) of CERCLA. *See* 42 U.S.C. § 9607(a).

Further, the HSAA give the DTSC authority to pursue injunctive relief against responsible parties through judicial proceedings. *See e.g.*, Cal. Health & Safety Code § 25358.3(a)(3) (injunctive relief where imminent or substantial endangerment to the public health and safety or to the environment from release or threatened release of a hazardous substance) and § 25358.3(f) (failure to comply with order under HSC §§ 253555.5 or 25358.3(a)(1)). As with CERCLA, the injunctive relief and the monetary recovery provisions of the HSAA are distinct remedies. Polluters do not get to select which remedy they prefer.

### C.    California's Porter-Cologne Water Quality Control Act

The Los Angeles Regional Board is one of nine regional boards established by California's Porter-Cologne Water Quality Control Act ("Porter-Cologne Act"), Cal. Wat. Code §§ 13000 *et seq.*, to regulate water quality. Along with the California State Water Resources Control Board ("State Board"), the Los Angeles Regional Board is the principal state agency with primary responsibility for the coordination and control of water quality within the Los Angeles region.

Pursuant to its authority under the Porter-Cologne Act, the Los Angeles Regional Board can seek injunctive relief by requiring investigation, assessment, cleanup, and monitoring of sites with unauthorized releases of pollutants to soils, surface water, and groundwater. Such sites include sites with pollution from recent or historical surface spills, subsurface releases, and all other unauthorized discharges that pollute or threaten to pollute surface or groundwater. The

Porter-Cologne Act echoes CERCLA's broad liability principle that those responsible for causing or contributing to hazardous conditions should bear the burden of investigation and cleanup.

Pursuant to California Water Code section 13267(a), the Los Angeles Regional Board may investigate the quality of any waters of the state within its region. In doing so, the Los Angeles Regional Board may require technical or monitoring reports from any person who has discharged, discharges, or is suspected of having discharged or discharging, or who proposes to discharge waste (hereafter "discharger"). Cal. Wat. Code § 13267(b)(1). Responsible dischargers may include past and current owners and operators. Similar to the EPA's RI/FS studies, the primary purpose of requiring technical reports is to gather information about the site and the discharger in order to ascertain the full extent of the contamination and to explore and evaluate cleanup alternatives. Technical reports can include, but are not limited to, preliminary site assessments and soil and water investigations.

Once the Los Angeles Regional Board has concluded that a discharge or threatened discharge of waste has occurred, it may issue a "cleanup and abatement" order ("CAO") pursuant to California Water Code section 13304. Section 13304(a) states in regards to the issuance of CAOs, "any person who has . . . discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance . . . shall upon order of the regional board, cleanup the waste or abate the effects of the waste . . . ." This section authorizes the Los Angeles Regional Board to require complete cleanup of all waste discharged and restoration of affected water to background conditions. A CAO may be issued to past and current owners and operators. Similar to other environmental agencies, however, the Los Angeles Regional Board has prosecutorial discretion to decide whether and when to issue a CAO in the first instance. Therefore, while California Water Code section 13304(b)(1), like CERCLA, does allow the Los

Angeles Regional Board to perform cleanup, abatement, or remedial work itself and seek reimbursement from a responsible discharger, such a provision only applies if the Los Angeles Regional Board elects to and actually performs the remedial work instead of relying on its police powers under section 13304(a) to require the present or past owner or operator to perform the cleanup.

## III.  THE FEDERAL SITES

In two of its eight proofs of claim — the proofs of claim filed with respect to Millennium Holdings and Lyondell — the United States specifically invokes its reservation of rights with respect to two sites that are not currently owned or operated by Debtors — the Kalamazoo Site, the majority of which is not owned or operated by the Debtors, and the French Limited Site.[8]

### A.  The Kalamazoo Site

The United States Proof of Claim filed against Millennium Holdings states that the Allied Paper, Inc./Portage Creek/Kalamazoo River Superfund Site (the "Kalamazoo Site") is located in Kalamazoo and Allegan Counties, Michigan.  *See* Kryak Aff., Ex. 7 ("Millennium Holdings POC") at ¶ 26.  The Kalamazoo Site is included on the National Priorities List, which, as noted

---

[8]  In their Objections, Debtors also cite to the Chemplex Site as a third party site for which the United States has reserved its rights to seek enforcement of Debtors' injunctive obligations.  *See* Memorandum in Support of Debtors' Objection to Proofs of Claim Filed by the United States of America and California Government Agencies on Issue of Classification of Environmental Injunctive Relief Obligations as Dischargeable "Claims" Under the Bankruptcy Code ("Mem. of Law") at 11, 13.  Yet Equistar currently operates a polyethylene plant and surrounding property at that site.  *See* Kryak Aff., Ex. 1.  On February 6, 1995, United States District Court for the Southern District of Iowa in *United States v. ACC Chemical Company et al.,* Civil Action No. 91-10096, entered two consent decrees which provide, *inter alia*, for access to that portion of the Chemplex Site for purposes of implementing the terms of the consent decrees.  *Id.*  As operator of the polyethylene plant and surrounding property, Equistar is bound by the access easement, land use restrictions, and restrictive covenant provisions in the consent decrees.  *Id.*  Debtors do not currently have any remediation obligations at this site, and Debtors have made no showing as to how complying with the easement or land use provisions of these Consent Decrees has in any way burdened the estate.  In any event, since Equistar's obligations at the Chemplex Site relate to property that it operates, it falls outside the scope of the Objections.

above, is the EPA's list of the most serious hazardous waste sites identified for possible long-term remedial action. *See* 55 Fed. Reg. 35502. The Kalamazoo Site includes former paper mills and landfills, as well as portions of the Kalamazoo River and Portage Creek, a tributary of the Kalamazoo River. Millennium Holdings POC at ¶ 26. These areas are divided into five "operable units" (or "OUs"), known collectively as operable units ("OUs") and individually as "OU1" through "OU5:" (a) OU1, the Allied Paper Landfill; (b) OU2, the Willow Boulevard/A-Site Landfill; (c) OU3, the King Highway Landfill; (d) OU4, the 12th Street Landfill; and (e) OU5, the Kalamazoo River and Portage Creek sediments, banks and impoundments. In addition, a number of former Allied Paper mills exist along the Kalamazoo River (the "Associated Mill Properties"). *Id.* at ¶ 27.

Millennium Holdings is a corporate successor of Allied Paper Corporation ("Allied"), which owned and operated a number of paper mills at and in the vicinity of the Kalamazoo Site. *Id.* at ¶ 28. During its operations, Allied disposed of PCB-contaminated wastes in lagoons, landfills, and other disposal areas located at OU1, which is currently Debtor-owned, and at OU2, which Allied sold to Georgia Pacific, LLC ("GP") in 1975. *Id.* at ¶ 29. Allied also discharged PCB-contaminated wastes directly into Portage Creek and the City of Kalamazoo wastewater treatment facility. *Id.*

During its operations, Allied disposed of PCB-contaminated wastes in lagoons, landfills, and other disposal areas located at OU1, which Millennium Holdings still owns, and at OU2, which Allied sold to Georgia Pacific, LLC in 1975. *Id.* at ¶ 29. Allied also discharged PCB-contaminated wastes directly into Portage Creek and the City of Kalamazoo wastewater treatment facility. *Id.*

PCBs have been, and continue to be, released into waterways, surface water, soils, and sediments at the Kalamazoo Site. *Id.* at ¶ 30. The EPA estimates that PCB disposal areas at the

Kalamazoo Site, which are located along river banks, contain roughly 8 million cubic yards of PCB-contaminated waste. *Id.* There are more than 300,000 pounds of PCBs in the sediments and soils in, or adjacent to, Portage Creek and the Kalamazoo River. *Id.* Data indicate ongoing contamination to the Kalamazoo River and Portage Creek from surface runoff and seeps in OU2. *Id.*[9] The EPA is currently investigating whether the Associated Mill Properties are also a source of PCB contamination into the Kalamazoo River. *Id.* at ¶ 27.

In response to this release and the threat of further releases of hazardous substances at or from the Kalamazoo Site, the EPA entered into two Administrative Orders on Consent ("AOCs") with Millennium Holdings and GP on February 21, 2007. *Id.* at ¶ 32. The AOCs require Millennium Holdings and GP to perform investigative and cleanup work at OU1, OU5, and the Associated Mill Properties. *Id.* at ¶ 32.

The first AOC, *In re Allied Paper/Portage Creek/Kalamazoo River Superfund Site* (EPA CERCLA Docket No. V-W-07-c-863), requires Millennium Holdings to complete a time-critical removal action at OU5 involving excavation of sediment in the Kalamazoo River. *Id.* at ¶ 34. The second AOC, *In re Allied Paper/Portage Creek/Kalamazoo River Superfund Site* (EPA CERCLA Docket No. V-W-07-c-864), requires Millennium Holdings and GP to conduct, *inter alia*, a supplemental RI/FS of the Kalamazoo River and a source investigations of the Associated Mill Properties. *Id.* at ¶ 34.

**B.  The French Limited Site**

The United States Proof of Claim filed against Lyondell states that the French Limited Superfund Site (the "French Limited Site") is a former petrochemical waste disposal facility near Houston, Texas. Kryak Aff., Ex. 9 ("Lyondell POC") at ¶ 5. During and after the Site's

---

[9] EPA contends that discovery would also reveal that there has been post-petition releases of PCBs from seeps and surface water runoff at OU1, a Debtor-owned property, that is currently leading to further contamination of OU5.

operation from 1965 to 1972, waste oils and chemicals leaked from several unlined pits at the Site and contaminated groundwater, surface water, and soil. *Id.*

On March 1, 1990, a Consent Decree related to the French Limited Site was entered in *United States v. French Ltd., Inc., et al.,* Case No. H-89-2544 (S.D. Tex.). *Id.* at ¶ 6. ARCO Chemical Company ("ARCO") was a Settling Defendant under the Consent Decree as a contributor of waste to the site. *Id.* Lyondell is a successor to ARCO, but does not currently own property at the French Limited Site. *Id.* at ¶ 7.

ARCO had previously arranged for disposal of hazardous substances at the Site, or arranged for transport of hazardous substances for disposal at the Site. *Id.* at ¶ 6. Accordingly, pursuant to the Consent Decree, ARCO (now Lyondell) is obligated to perform a remedial action selected by the EPA in a Record of Decision ("ROD") issued on March 24, 1988. *Id.* at ¶ 8. The selected remedy includes recovery and treatment of contaminated groundwater. *Id.* at ¶ 8. ARCO, along with the other PRPs, are also required to develop and perform additional remedial actions, subject to the EPA's approval, in the event the initial remedial action fails to achieve the remedial action objectives set forth in the ROD. *Id.* at ¶ 8.

In approximately 2002, the EPA determined that contaminated groundwater plumes at the French Limited Site had grown in size, and in approximately 2007, the EPA determined that natural attenuation would not be effective in achieving remedial action objectives for groundwater at the Site. *Id.* at ¶ 9. In addition, the EPA identified new contaminants of concern at the Site. *Id.* In response to the new information, a Supplemental Feasibility Study and a Constructed Combination Surface/Subsurface Flow Wetlands Treatability Study have begun. *Id.* An amended ROD is expected later this year. *Id.*

## IV.  THE CALIFORNIA SITES

Pursuant to its authority under the HSAA, the DTSC issued separate administrative

cleanup orders to Debtor MHC for a site in Los Angeles, California, referred to as the Jefferson New Middle School No. 1 Site, and to HM Holdings, Inc., a predecessor of Millennium Holdings, for the Syntex Site and Hillview Porter Site, both of which are in Palo Alto, California.

Pursuant to its authority under the Porter-Cologne Act, the Los Angeles Regional Board has issued at least two separate orders to Debtors, including Debtors PH Burbank and Lyondell, requiring investigation and remediation of ongoing contamination at the Former Weber Aircraft facility in Burbank, California.

A.      The Jefferson New Middle School No.1 Site

The Jefferson New Middle School No. 1 Site (the "School Site") consists of approximately 15 acres of contaminated property that resulted from almost fifty years of furniture and refrigeration manufacturing operations by Weber Showcase & Fixture Company and Debtor Walter Kidde, predecessors to Debtor MHC. *See* Kryak Aff., Ex. 11 ("DTSC MHC, POC") at 4-5.

The commercial structures were demolished in 1995 in preparation for construction of the school. During the demolition phase underground storage tanks ("USTs") were discovered and removed. *Id.* at 5. Several investigations conducted at the Site have confirmed the presence of soil and/or groundwater contamination above regulatory levels. Contaminants detected in the soil and/or groundwater include, but are not limited to, trichloroethylene ("TCE") and other industrial solvents, which were historically released from the property to soil and groundwater from the operations conducted by Weber, Walter Kidde and their lessees. *Id.*

In January 2001, the DTSC issued an administrative Consent Order to, *inter alia*, MHC, Inc., pursuant to its authority under California Health and Safety Code sections 25355.5(a)(1)(B), (C) and 58009, for the Jefferson New Middle School Site. *See In the Matter*

*of Jefferson New Middle School No. 1*, Consent Order 00-01/02 ("School Site Consent Order"),
attached to DTSC MHC, POC at Attachment A.  The School Site Consent Order requires the
parties to that order to, *inter alia*, implement any appropriate removal actions and complete and
implement a Remedial Action Plan ("RAP").  *See id.*

The DTSC has determined that further action to address the volatile organic compounds
in OU-2 should be included as part of the final Feasibility Study and Remedial Action Plan
("FS/RAP") for the Site, which will also include OU-3.  Currently under review by the DTSC is
a remedial investigation conducted by Debtor MHC, Inc., and other responsible parties with
respect to OU-3.  The data reviewed by the DTSC with respect to OU-3 confirms that the
historical releases of TCE at the School Site has impacted the groundwater within OU-3 and that
the TCE contaminated groundwater, has migrated, and continues to migrate, off-site.

The investigation of the contamination at the School Site continues and a full remedy has
not been selected.  Contaminated groundwater from the property continues to migrate off-site.

B.      **The Syntex Site**

The Syntex Site is located in Palo Alto, California, within the Stanford Research Park.
Debtor Millennium Holdings' predecessor corporations leased a portion of the Syntex Site and
conducted manufacturing operations there for several years, during which they manufactured
microwave components.  The Syntex Site covers approximately three acres and includes a
27,000-square-foot building, a former chemical storage area, and a former acid neutralization
system which was connected to the sanitary sewer system, as well as the contaminated
groundwater that has migrated off-site.  Residential areas are located approximately 2000 feet
northeast of the Syntex Site.

On October 2, 1990, pursuant to its regulatory authority under the HSAA, the DTSC
unilaterally issued an Imminent or Substantial Endangerment and Remedial Action Order HSA

90/91-003 for the Syntex Site under the Health and Safety Code sections 25355.(a)(1)(B) and 25358.3 (a).  *In the Matter of Syntex Site*, Docket No. HSA 90/91-003 ("Syntex Site 1990 IS&E Order"), attached to Kryak Aff., Ex. 12 ("DTSC MHLLC POC") at Attachment A.  The DTSC determined that the actual and/or threatened release of hazardous substances at the Syntex Site presented an imminent or substantial endangerment to the public health or welfare or to the environment.  *See* Syntex Site 1990 IS&E Order, ¶¶ 11-15.  Thus, the DTSC ordered the named parties to, *inter alia*, prepare and submit a RI/FS, and develop and implement an approved RAP. *Id.* at ¶¶ 16.1-16.5.4.

In September 1993, the DTSC approved a RAP that requires groundwater extraction from two wells and treatment with granular activated carbon at a nearby, offsite facility.  *See* DTSC MHLLC POC at 5.  On September 21, 1995, the DTSC amended the Syntex Site 1990 IS&E Order to require the named parties, including Debtor Millennium Holdings' predecessor HM Holdings, Inc., to undertake the operation and maintenance of the DTSC approved groundwater remedy.  *Id.* at Attachment B.  The most recent reports submitted to the DTSC substantiate that TCE, the contaminant of concern which continues to be detected most frequently and at highest concentrations at the Syntex Site, still ranges up to 150 micrograms per liter, well above the site cleanup goal of 5 micrograms per liter.

### C.     Hillview Porter Site

The Hillview Porter Site in Palo Alto, California is a regional groundwater plume within the Stanford Research Park and includes nine (9) sites within the Stanford Research Park (including the Syntex Site).  The DTSC assumed regulatory oversight for the Hillview Porter Region Plume in 1985 and began a preliminary investigation to assess the distribution of volatile organic compounds ("VOCs") in the groundwater and surface water.  See Kryak Aff., Ex. 12 ("DTSC MHLLC POC") at 6.  TCE and traces of other VOCs were identified in samples taken

from the private wells in the Barron Park Neighborhood and Matadero Creek. In December 1988, the DTSC issued the initial Remedial Action Order ("RAO") for the Hillview Porter Site pursuant to its authority under California Health and Safety Code sections 25355.5(a)(1)(B) and 25358.3(a). The RAO was amended in 1990 to add the responsible parties for the Syntex Site as parties for the Hillview Porter Site, including Debtor Millennium Holdings. *See* DTSC MHLLC POC at Attachment C.

In December 1994, the DTSC approved a RAP for the Hillview Porter Site. *See* DTSC MHLLC POC at 6. The RAP included continuation, and supplementation, of groundwater extraction and treatment systems designed to remove groundwater containing the highest VOC concentrations from the deeper zones and to control the movement of the groundwater within the affected zones. On June 30, 1997, the DTSC further amended the order for the Hillview Porter Site to require the named parties, including the predecessor of Debtor Millennium Holdings, to conduct the operation and maintenance of the approved groundwater remedy.

As with the Syntex Site, the Hillview Porter Site is currently in the operation and maintenance phase. Based on the most recent sampling report submitted to the DTSC in January 2009, TCE concentrations at the Hillview Porter Site ranged up to 320 micrograms per liter, well above the site cleanup goal of 5 micrograms per liter. And, as with the Syntex Site, failure to continue the groundwater extraction and treatment system at the Hillview Porter Site will result in spread of contaminated groundwater and undo the cleanup completed to date.

### D. Former Weber Aircraft Site

The Former Weber Aircraft Site is part of an industrialized complex located northeast of the Bob Hope Airport in Burbank, California. See Kryak Aff., Ex. 3 ("PH Burbank POC") at 3. The site is located within the boundaries of the EPA's San Fernando Valley Superfund Site. *Id*. From 1951 to 1989, Weber Aircraft Corp. ("Weber"), a division of Debtor Walter Kidde,

manufactured parts for commercial and military aircrafts on the site. Manufacturing operations conducted by Weber included metal plating, machining, metal stripping, painting, degreasing, and panel assembly work. *See* Kryak Aff., Ex. 25 at 2. In these operations, Weber utilized various hazardous substances for its metal plating operations and solvents containing VOCs for metal parts and surface cleaning. *Id.* Several of the solvents used include TCE and perchloroethylene ("PCE"). *See* PH Burbank POC at ¶ 9.

The groundwater basin underlying the San Fernando Valley (the "San Fernando Basin") is an important source of drinking water to more than 800,000 residents in the Los Angeles region. VOCs were first discovered in a San Fernando Basin drinking water well in or around 1980.[10] Since then, domestic supply wells operated by the City of Los Angeles, and Burbank and Glendale Operable Unit wells pumping groundwater for drinking water purposes have been impaired by VOC contamination. Some of the drinking water supply wells in the San Fernando Basin have also been impacted by heavy metals, such as chromium, which exceed current safe drinking water standards.

In two separate orders dated April 9, 2004 and October 2, 2006, the Los Angeles Regional Board, pursuant to its authority under California Water Code section 13267, required Debtors PH Burbank and Lyondell to complete subsurface soil and groundwater assessments, remove or remediate source areas, and monitor groundwater. *See* Kryak Aff., Ex. 21 and 22 at 8-9. Resultant subsurface investigations indicate that the soil and/or groundwater are contaminated with, among other constituents, highly elevated levels of VOCs, chromium,

---

[10]    Background information regarding the San Fernando Valley Superfund Site and the Former Weber Aircraft Site can be found at the EPA's website: http://yosemite.epa.gov/r9/sfdocw/r9sfdocw.nsf/ce6c60ee7382a473882571af007af70d/a7dbbd3ed aaf5cd788257007005e945f!OpenDocument#threats.

hexavalent chromium, PCE, and TCE.[11]

The Los Angeles Regional Board believes that groundwater contamination has migrated offsite and has co-mingled with other offsite plumes. The lateral and vertical extent of the offsite plume will be unknown until additional offsite groundwater assessments are done, including the installation of additional groundwater monitoring wells.

Site remediation activities by Debtors to date have consisted of some source removal, excavation, and removal of VOC contaminated shallow soil, and soil vapor extraction of VOCs. However, these activities have not fully remediated the site and therefore further remediation activities are needed to abate the ongoing pollution at the site.

## V.    THE PENDING OBJECTIONS

On September 4, 2009, Debtors filed the instant Objections to the United States and the California Environmental Agencies' Proofs of Claim. Debtors' Objections are focused on the reservations of right language. Debtors do not seek an order from this Court disallowing the protective contingent claims asserted in the Proofs of Claim. Indeed, the Objections do not seek to disallow any of the claims asserted in the Proofs of Claim. Rather, Debtors object to the fact that the United States and the California Environmental Agencies have asserted that injunctive obligations under environmental law are non-dischargeable, and that the Government parties have expressly reserved the right to "take future actions to enforce the obligations of the Debtors." Mem. of Law at 14-15.

---

[11]   In 1992, Weber Aircraft transferred the site to PH Burbank. As part of that transfer, PH Burbank assumed all of Weber's environmental liabilities in connection with the site. *See* PH Burbank POC at ¶ 8. In addition, Debtors indicate that Millenium Holdings additionally assumed responsibility with respect to the Order dated April 9, 2004. <u>See</u> Kryak Aff. ¶ 12; Ex. 20 at 8-9; Ex. 33.

## ARGUMENT

## POINT I

## THE OBJECTIONS SHOULD BE DENIED AS THE ISSUES RAISED ARE NOT RIPE FOR RESOLUTION

The ripeness doctrine serves "to ensure that a dispute has generated injury significant enough to satisfy the case or controversy requirement of Article III." *United States v. Fell*, 360 F.3d 135, 139 (2d Cir. 2004). The ripeness doctrine takes into account "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). The ripeness and standing doctrines have a "shared requirement that the injury be imminent rather than conjectural or hypothetical." *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 225 (2d Cir. 2006).

Applying these standards, the Second Circuit has previously held that an action seeking a declaratory judgment that CERCLA liability had been discharged in bankruptcy was not ripe for adjudication where the regulatory agency had yet to take any enforcement action against the debtor. *In re Combustion Equipment Assoc.*, 838 F.2d 35, 37-39 (2d Cir. 1988). In *Combustion Equipment*, the Second Circuit concluded that, given the "tentative" posture of any EPA enforcement action, it would be premature to render a decision as to the discharge of future injunctive obligations that the agency may never even seek to impose. *Id.* at 38. The Second Circuit further found insufficient hardship in the mere possibility of future CERCLA liability impeding the debtor's fresh start. *Id.* at 39-40. Finally, the Court concluded that any hardship suffered by the debtor should be balanced against "the hardship to the EPA and to the Superfund system if PRPs can challenge the EPA at so preliminary a stage of investigation into a particular site." *Id.*; *see also id.* ("If the EPA is forced to expend its resources on preserving its rights . . . against any PRP that has recently emerged from bankruptcy, the EPA will have less ability to pursue its primary mission of cleaning the sites."). The Second Circuit took particular note of

the fact that "Congress has directed the courts to be especially wary of interfering with CERCLA work . . . in part because toxic waste sites threaten the public health and must be eradicated quickly." *Id.*

The issue as to whether any of Debtors' injunctive obligations are subject to discharge is similarly too speculative for ripeness purposes. Neither the United States nor the California Environmental Agencies have made any efforts to enforce any of the consent decrees or enforcement orders described in the proofs of claim. *See Clearing House Ass'n, LLC v. Cuomo*, 510 F.3d 105, 122-23 (2d Cir. 2007) (holding case not ripe where state attorney general had threatened, but not yet initiated, an enforcement action), *aff'd in part and rev'd in part on other grounds*, *Cuomo v. Clearing House Ass'n*, 129 S. Ct. 2710 (2009); *Marchi v. Bd. of Coop. Educ. Servs.*, 173 F.3d 469, 478-79 (2d Cir. 1999) (holding that plaintiff could not show "a sufficiently real and immediate threat of prosecution exists" where school board had not shown any indication that it would apply a policy to the conduct in question). To the contrary, all the United States and the California Environmental Agencies have done so far is reserve their right to perhaps bring an enforcement action at some unspecified point in the future. Yet if neither the United States nor the California Environmental Agencies decide to pursue an enforcement action, then there will have been no need for the Court to resolve the issues presented in the Objections.

Indeed, for the sites that are not mentioned in the Proofs of Claim, it is not clear whether there are administrative orders or consent decrees in place, or that the EPA or the California Environmental Agencies have taken any steps to impose such injunctive obligations upon the Debtors. To the contrary, a plain reading of the Objections indicates that it would sweep within its ambit third party sites for which the EPA and the California Environmental Agencies have yet to decide whether to take any remediation or removal action, or what such action should be.

Moreover, as the Second Circuit emphasized, the burden upon the EPA and the California Environmental Agencies of defending its rights to bring an enforcement action with respect to every PRP that files for bankruptcy — even where the EPA and the California Environmental Agencies have not yet decided to take any enforcement action — would deplete resources that could be better spent performing their primary functions of protecting the environment from hazardous wastes. Accordingly, the Court should deny the Objections as unripe for adjudication.

**POINT II**

**THE SCHEDULE III DEBTORS INTEND TO LIQUIDATE AND THEREFORE WOULD NOT BE ENTITLED TO A DISCHARGE OF CLAIMS**

Additionally, Debtors' Objections are a request for an advisory opinion to the extent they pertain to the so-called "Schedule III Debtors." The Schedule III Debtors are identified in Exhibit C to Debtors' proposed Plan of Reorganization, which was filed with the Court on September 11, 2009. They include six of the nine Debtors against whom the United States has filed proofs of claim, including Millennium Holdings, the Debtor with respect to which the Kalamazoo Proof of Claim was filed; six of the eight Debtors against whom the Water Boards have filed claims; and both of Debtors against whom the DTSC has filed claims — MHC, Inc. and Millennium Holdings. As explained below, the Schedule III Debtors are liquidating and are therefore not entitled to a discharge of any liability, injunctive or otherwise. So, the question of whether the Schedule III Debtors' injunctive obligations at third party sites are "claims" that could otherwise be discharged in bankruptcy is irrelevant here, since the Schedule III Debtors are not entitled to any discharge at all. There is no actual case or controversy before this Court as to the Schedule III Debtors' injunctive liability.

Debtors suggest that the Schedule III Debtors are reorganizing. Debtors have proposed a "Joint Chapter 11 Plan of Reorganization," which they say constitutes "94 distinct chapter 11

-24-

plans, one for each Debtor," including the Schedule III Debtors. Disclosure Statement

Accompanying Joint Chapter 11 Plan of Reorganization for the LyondellBasell Debtors, dated

September 11, 2009 [Docket No. 2740] ("Discl. St."), at 3. Notwithstanding Debtors'

suggestion that each of Debtors will be reorganizing, the Schedule III Debtors are in fact

liquidating, as referenced in the Disclosure Statement and the proposed Plan of Reorganization.

For instance, Section 4.17(b) of the proposed Plan states: "Equity Interests in the Schedule III

Debtors shall be transferred . . . to [a] Disbursement Trust and cancelled after the sale of assets

and distribution of proceeds by the Disbursement Trust." *See* Joint Chapter 11 Plan of

Reorganization for the LyondellBasell Debtors, dated September 11, 2009 [Docket No. 2741]

("Proposed Plan"). Even more clearly, the Disclosure Statement provides: "The Disbursement

Trust will be established for the sole purpose of liquidating and distributing the assets of the

Schedule III Debtors . . . , *with no objective to continue or engage in the conduct of a trade or

business*." Discl. St. at 64 (emphasis added); *see also* Proposed Plan § 5.7(c) (same).

Section 1143(d)(3) of the Bankruptcy Code provides:

The confirmation of a plan does not discharge a debtor if--

(A) the plan provides for the liquidation of all or substantially all of the property of the estate;

(B) the debtor does not engage in business after consummation of the plan; and

(C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

11 U.S.C.A. § 1141(d)(3). Section 727(a), in turn, provides: "The court shall grant the debtor a

discharge, unless . . . the debtor is not an individual." 11 U.S.C. § 727(a).

All three of the criteria specified in section 1143(d)(3) are satisfied here: the Proposed

Plans would liquidate all or substantially all of the Schedule III Debtors' estates, the Schedule III

Debtors will not engage in business after consummation of the Plan, and the Schedule III Debtors would be denied a discharge under section 727(a) because they are not individuals. Accordingly, the Schedule III Debtors are not entitled to a discharge. *See, e.g.*, *In re MCorp Fin., Inc.*, 137 B.R. 219, 228 (Bankr. S.D. Tex.) (liquidating corporate debtor is not entitled to a Chapter 11 discharge), *appeal dismissed and remanded on other grounds*, 139 B.R. 820 (S.D. Tex. 1992).

Fundamentally, the issue presented by Debtors' Objections is one of discharge: The issue is whether certain injunctive obligations are "claims" and are therefore subject to discharge in bankruptcy. See *infra* at Point II. Even if the Court's answer to that question might be yes, it could have no bearing on the Schedule III Debtors, since they have no right to a discharge in the first place. Debtors are merely seeking an advisory opinion — a determination of whether, in another, hypothetical case (for example, where the Schedule III Debtors were reorganizing to engage in business after confirmation of the Plan), the Schedule III Debtors' injunctive liabilities at third party sites would qualify as "claims" and be eligible for discharge. As this Court should decline to issue advisory rulings, it should therefore refrain from opining on whether the Schedule III Debtors' injunctive liabilities at third party sites are "claims."

## POINT III

### DEBTORS ARE PRECLUDED FROM CHALLENGING THE EPA'S POSSIBLE ENFORCEMENT DECISIONS BY SECTION 113(H) OF CERCLA

The Debtors' Objection seeks to discharge injunctive liability with respect to sites for which the EPA has yet to initiate an enforcement action pursuant to section 106(a) of CERCLA. In addition to the sites listed on the United States Proofs of Claim for which the EPA has issued administrative orders or has entered into consent decrees with the Debtors, there are potentially numerous other sites for which the EPA has yet to make any enforcement decisions. Debtors'

Objections would encompass sites for which the EPA has yet to have made a determination of liability, has yet to have chosen a remedy, has yet to issue an administrative order, and has yet to bring an enforcement action.  The relief sought by the Debtors' Objections — a determination that the Debtors' injunctive obligations for these unknown sites are dischargeable "claims" under the Bankruptcy Code — creates a direct conflict with section 113(h) of CERCLA.  *See* 42 U.S.C. § 9613(h).

Section 113(h) provides:

> No Federal court shall have jurisdiction . . .  to review any challenges to removal or remedial action selected under section 9604 of this title, or to review any order issued under section 9606(a) of this title, in any action except one of the following:

> > (1) An action under section 9607 of this title to recover response costs or damages or for contribution.

> > (2) An action to enforce an order issued under section 9606(a) of this title or to recover a penalty for violation of such order.

> > (3) An action for reimbursement under section 9606(b)(2) of this title.

> > (4) An action under section 9659 of this title (relating to citizens suits) alleging that the removal or remedial action taken under section 9604 of this title or secured under section 9606 of this title was in violation of any requirement of this chapter. Such an action may not be brought with regard to a removal where a remedial action is to be undertaken at the site.

> > (5) An action under section 9606 of this title in which the United States has moved to compel a remedial action.

42 U.S.C. § 9613(h).

The five enumerated exceptions all involve efforts to enforce or to recover costs for the enforcement of CERCLA, and thus Section 113(h) is often termed a ban on "pre-enforcement review."  *See, e.g.*, *Reardon v. United States*, 947 F.2d 1509, 1512 (1st Cir. 1991) (en banc).  For

actions that fall within its scope but not within one of these exceptions, Section 113(h) "effectuates a 'blunt withdrawal of federal jurisdiction.'" *Oil, Chem. & Atomic Workers Int'l Union v. Richardson*, 214 F.3d 1379, 1382 (D.C. Cir. 2000) (quoting *North Shore Gas Co. v. EPA*, 930 F.2d 1239, 1244 (7th Cir. 1991)).

In Section 113(h), Congress carefully constrained the timing of review to allow EPA to proceed with the selection and implementation of clean-up actions without interference until such actions are complete or the EPA pursues enforcement action. Because Debtors seek relief here that would have the purpose and the effect of interfering with ongoing response actions, the Court is deprived of jurisdiction over the Objections pursuant to Section 113(h).

As the plain meaning of the expansive phrase "*any* challenge to removal or remedial action selected under [Section 104]" suggests, Section 113(h) applies to any action where the relief sought would interfere with EPA's implementation of a CERCLA cleanup. 42 U.S.C. § 9613(h) (emphasis added). This straightforward interpretation represents the prevailing judicial reading of this provision. *See, e.g.*, *Broward Gardens Tenants Ass'n v. EPA*, 311 F.3d 1066, 1072 (11th Cir. 2002) ("A suit challenges a remedial action within the meaning of 113(h) if it interferes with the implementation of a CERCLA remedy."); *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 675 (8th Cir. 1998) ("A lawsuit may . . . be considered a 'challenge' under section 113(h) when the relief sought 'would constitute the kind of interference with the cleanup plan that Congress sought to avoid or delay by the enactment of Section 113(h).'"); *Clinton County Comm'rs v. EPA*, 116 F.3d 1018, 1023 (3d Cir. 1997) (en banc) ("Congress intended to preclude any judicial involvement in EPA removal and remedial actions until after such actions are complete.") *cert denied*, 522 U.S. 1045 (1998); *Schalk v. Reilly*, 900 F.2d 1091, 1097 (7th Cir. 1990) ("[C]hallenges to the procedure employed in selecting a remedy nevertheless impact the implementation of the remedy and result in the same delays Congress sought to avoid by

passage of the statute; the statute necessarily bars these challenges.") *cert denied*, 498 U.S. 981 (1990).

Indeed, the legislative history demonstrates that Congress intended to prevent litigation from interfering with the prompt cleanup of hazardous waste sites when it added Section 113(h) to CERCLA in 1986. *See Oil, Chem. & Atomic Workers Int'l Union v. Pena*, 62 F. Supp. 2d 1, 5 (D.D.C.1999) ("It simply cannot be denied that Congress intended to preclude all litigation which would delay, or worse, halt governmental efforts to clean up hazardous waste sites."), *aff'd*, 214 F.3d 1379 (D.C. Cir. 2000). For example, while discussing whether the provision should "preclude judicial review until the total response action is finished if the response action proceeds in distinct and separate stages," the Conference Report emphasized: "Any challenge under this provision to a completed stage of a response action shall not interfere with those stages of the response action which have not been completed." H.R. Conf. Rep. No 99-962, at 224 (1986) (emphasis added), reprinted in 1986 U.S.C.C.A.N. 3276, 3317; *cf.* H.R. Rep. No. 99-253(V), at 25-26 (1985) ("Without such a provision, responses to releases or threatened releases of hazardous substances could be unduly delayed, thereby exacerbating the threat of damage to human health or the environment."), reprinted in 1986 U.S.C.C.A.N. 3124, 3148-49. Similarly, Senator Thurmond, the chairman of the Senate Judiciary Committee, which drafted Section 113(h), explained:

> The timing of review section is intended to be comprehensive. It covers all lawsuits, under any authority, concerning the actions that are performed by EPA . . . . . The section also covers all issues that could be construed as a challenge to the response, and limits those challenges to the opportunities specifically set forth in the section.

132 Cong. Rec. 28,441 (1986).

Debtors' Objections are a challenge to the EPA's enforcement activities within the meaning of section 113(h). If the Debtors' Objection succeeds, the resulting discharge of

"claims" would effectively enjoin the United States from exercising its police and regulatory authority to issue administrative abatement orders or to bring an enforcement action against any Debtor under section 106 of CERCLA, potentially before any enforcement action would have been considered or a remedy selected. Section 113(h) prohibits just this kind of debtor interference with EPA's pre-enforcement activity.

**POINT IV**

**DEBTORS CANNOT EVADE THE REQUIREMENT THAT DISCHARGEABILITY DETERMINATIONS PROCEED BY ADVERSARY PROCEEDING BY STYLING THEIR PAPERS AS OBJECTIONS TO PROOFS OF CLAIM**

As noted above, it is evident from Debtors' papers that the relief they seek is a determination of the dischargeability of their environmental injunctive obligations with respect to third party sites. Yet rather than initiating an adversary proceeding, as they are required to do by the Bankruptcy Code, Debtors clumsily package their request for relief as an "Objection" to the United States and California Proofs of Claim. Debtors cannot circumvent the procedural protections of an adversary proceeding simply by styling their adversary proceeding as an "Objection."

A cursory examination of the papers filed by Debtors reveals that this is not properly viewed as an objection to a proof of claim as contemplated by section 502 of the Bankruptcy Code. Section 502 permits debtors to object to the amount asserted in a proof of claim, and seek adjudication thereof. *See* 11 U.S.C. § 502(b). Yet the Objections filed in the instant case do not seek to disallow any portion of the claims filed by the United States or the California Environmental Agencies. Rather, Debtors seek a determination by this Court that any environmental injunctive obligations they may have with respect to third party sites will be subject to discharge under section 1141 of the Bankruptcy Code.

Rule 7001 of the Federal Rules of Bankruptcy Procedure, however, establishes that

proceedings to determine the dischargeability of a debt must proceed by adversary proceeding. *See* Fed. R. Bankr. P. 7001(6). Objections to proofs of claim, in contrast, are contested matters that are governed by Rule 9014. *See, e.g.*, *In re Best Payphones, Inc.*, 2007 WL 203980 (Bankr. S.D.N.Y. 2007). The Bankruptcy Code does not give Debtors the option of simply styling their papers as an objection to a proof of claim in order to evade the procedural protections that are offered in an adversary proceeding.

Nor can Debtors rely upon Rule 3007 of the Bankruptcy Code to evade the requirement that they initiate an adversary proceeding through a complaint. *See* Mem. of Law at 2. Rule 3007 establishes that where "an objection to a claim is joined with a demand for relief of the kind specified in Rule 7001, it becomes an adversary proceeding." Fed. R. Bankr. P. 3007. By definition, then, where the ONLY relief debtors seek from the Objections is the relief specified in Rule 7001(6), the instant proceeding should have been initiated as an adversary proceeding. *See, e.g.*, *In re Danbury Square Assocs., Ltd. P'ship*, 153 B.R. 657, 661 (Bankr. S.D.N.Y. 1993) (ruling that trustee must file a complaint, rather than an objection to a claim, to assert a claim for equitable subordination); *cf. Matter of Village Mobile Homes, Inc.*, 947 F.2d 1282, 1283 (5th Cir. 1991) (setting aside judgment where the matter was required to be adjudicated as an adversary proceeding and was initiated by motion rather than complaint).

## POINT V

### DEBTORS' OBLIGATIONS UNDER FEDERAL AND STATE ENVIRONMENTAL LAWS TO AMELIORATE ONGOING POLLUTION ARE NOT DISCHARGEABLE "CLAIMS" UNDER THE BANKRUPTCY CODE

Even if Debtors' Objections were properly before this Court, Debtors would not be entitled to the relief they seek. They mischaracterize injunctive obligations at third party sites as dischargeable monetary claims. Debtors seek to repudiate express statutory language and replace it with a formulation more to their liking — an alleged distinction between on-site versus

off-site threats to the public health, safety, and the environment.  Debtors' effort to rewrite the Bankruptcy Code and environmental laws should be rejected.

## A.  Environmental Orders That Require Debtors to Ameliorate Ongoing Pollution Are Not Dischargeable In Bankruptcy

When Congress enacted the current version of the Bankruptcy Code in 1978, it specifically provided that the concepts of discharge and fresh start, while broad and important, did have some limitations that were equally important.  One of those limitations was the proviso that the Code's concepts of claim and discharge would not apply to certain kinds of equitable remedies.  More specifically, Congress dictated that, where non-bankruptcy law provides an equitable remedy for performance and recognizes no alternative right to payment for breach of performance, the equitable remedy survives bankruptcy.  *See* 11 U.S.C. § 101(5)(B); *In re Chateaugay Corp.*, 944 F.2d 997, 1007 (2d Cir. 1991); *see also United States v. Apex Oil Co., Inc.*, – F.3d –, 2009 WL 2591545, at *1-2 (7th Cir. Aug. 25, 2009).  Congress thus protected those with a right to such an equitable remedy by decreeing that they would not be forced to accept less desirable monetary recoveries.  *See In re Udell*, 18 F.3d 403, 405, 408-10 (7th Cir. 1994); *In re Davis*, 3 F.3d 113, 116 (5th Cir. 1993).  Such a protection was necessary lest it be too easy for parties to evade their equitable obligations under laws passed by Congress and states, and bankruptcy would become a sanctuary for wrongdoers.  *See, e.g.*, *City of New York v. Exxon Corp.,* 932 F.2d 1020, 1024 (2d Cir. 1991) (noting the need "to avoid frustrating 'necessary governmental functions by seeking refuge in bankruptcy court'") (citation omitted).

A Chapter 11 bankruptcy confirmation order "discharges the debtor from any *debt* that arose before the date of such confirmation," subject to certain exceptions not relevant here. 11 U.S.C. § 1141(d)(1)(A) (emphasis added).  The resulting discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such *debt* as a personal liability of the debtor." *Id.* at § 524(a)(2)

(emphasis added). A "debt" means "liability on a claim." *Id.* at § 101(12). The terms "debt" and "claim" are coextensive; "[h]ence, a discharge under the Code extinguishes a debtor's personal liability on his creditor's claims." *Johnson v. Home State Bank*, 501 U.S. 78, 84 n.5 (1991).

In turn, section 101(5) defines "claim" as:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

> (B) right to an equitable remedy for breach or performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured . . . .

11 U.S.C. § 101(5).

Debtors' Objections incorrectly seek to invoke the protection of the second prong of this definition, which addresses when a "right to an equitable remedy" falls within the Code's definition of "claim." The statute provides no definition of terms such as "equitable remedy," "breach of performance," or "right to payment." However, in the seminal decision of *In re Chateaugay Corp.*, 944 F.2d 997 (2d Cir. 1991), the Second Circuit framed the relevant inquiry as whether "the injunctions, alleged to give rise to dischargeable 'claims,' impose a remedy for performance breach that gives rise to a right of payment." *Id.* at 1007. Accordingly, the Second Circuit, in analyzing whether a cleanup injunction issued under CERCLA was dischargeable under section 101(5), considered whether CERCLA provides the EPA with an alternate right to payment:

> These injunctions . . . frequently combine an obligation as to which the enforcing agency has an alternative right to payment with an obligation as to which no such alternative exists. An injunction that does no more than impose an obligation entirely as an alternative to a payment right is dischargeable. . . . On the other hand, if the order, no matter how phrased, requires [the debtor] to take any action that ends or ameliorates current pollution, such an

-33-

order is not a 'claim.'

> . . . [I]t is the distinction we believe is made by the "claim" definition of the Code. EPA is entitled to seek payment if it elects to incur cleanup costs itself, but it has no authority to accept a payment from a responsible party as an alternative to continued pollution. . . .

> It is true that, if in lieu of such an order, EPA had undertaken the removal itself and sued for the response costs, its action would have both removed the accumulated waste and prevented continued pollution. But it is only the first attribute of the order that can be said to remedy a breach that gives rise to a right to payment. *Since there is no option to accept payment in lieu of continued pollution, any order that to any extent ends or ameliorates continued pollution is not an order for breach of an obligation that gives rise to a right of payment and is for that reason not a 'claim.'*

*Id.* at 1008 (emphasis added). The Second Circuit therefore concluded that a cleanup order issued under CERCLA "that accomplishes the dual objectives of removing accumulated wastes and stopping or ameliorating ongoing pollution emanating from such wastes is not a dischargeable claim." *Id.* The Second Circuit noted that "most environmental injunctions will fall on the non-'claim' side of the line." *Id.*

The analysis in *Chateaugay* should apply with equal force to cleanup orders issued pursuant to the HSAA and the Water Code, as those statutory schemes are similar to CERCLA.

Whether a particular injunction seeks to ameliorate on-going pollution is a fact-intensive inquiry. The fact-intensive nature of the inquiry means that dischargeability cannot be determined on a categorical basis; rather, the Court must consider each site that could potentially be affected by Debtors' Objections individually. Moreover, these issues certainly cannot be resolved on the scant record currently before the Court. Rather, as to those few matters that might be ripe for adjudication, the parties will require discovery on the extent to which there is ongoing pollution at various sites.

For instance, Debtors note that they have paid contractors to perform their injunctive obligations at third party sites, including required investigations into contamination at sites such as Kalamazoo River and the former Weber Aircraft facility.  *See* Mem. of Law at 6-7; Kryak Decl. at ¶¶ 9-11.  The EPA and California Environmental Agencies are entitled to discover the information that Debtors and their contractors possess on contamination at the various sites included in Debtors' Objections.

Moreover, while the Second Circuit concluded that CERCLA sometimes (but not most of the time) may involve breaches of obligations that give rise to a right to payment, orders under many other environmental statutes can never meet this test because the statutes involved do not provide for any right to payment at all.  *See, e.g.*, *Apex*, 2009 WL 2591545, at *1-2 (section 7003 of the Resource Conservation and Recovery Act, 42 U.S.C. § 6973 ("RCRA"), does not provide an alternate right to payment).  Yet, Debtors would have this Court determine that all environmental injunctive obligations at third party sites are claims, even those under statutes that do not provide any right to payment.  *See, e.g.*, Kryak Aff., Exs 1-10 (EPA explicitly reserves rights to take actions under RCRA).  Such an argument must be rejected.

Here, Debtors are trying to skirt environmental obligations, such as the Administrative Order requiring Millennium Holdings to conduct a supplemental RI/FS of the Kalamazoo River and a source investigation as to the pollution of the Associated Mill Properties.  The EPA and the California Environmental Agencies are not insisting on a right of payment for these performances, but that Debtors comply with environmental laws and regulations.

**B.**     **The "Ongoing Pollution" Standard for Cleanup Orders Issued Under CERCLA Applies to Both Debtor-Owned and Third Party Properties**

Debtors concede, as they must, that they must meet their obligations under both federal and state environmental laws on property owned by Debtors.  Notwithstanding the decision in *Chateaugay*, however, Debtors contend that environmental orders and injunctions that require

-35-

remediation at *third party sites* are categorically dischargeable under section 101(5). *See* Mem. of Law at 2, 5. In support of this far-reaching and unsupportable proposition, Debtors argue that *Chateaugay*'s reading of section 101(5) of the Bankruptcy Code applies only in the context of debtor-owned property. Mem. of Law at 27-31. However, neither *Chateaugay* itself nor the plain language of section 101(5)'s definition of claim — nor, for that matter, anything in the language of the environmental statutes at issue — would lead to the application of different standards depending upon the situs of the ongoing pollution.

Contrary to Debtors' assertions, nowhere in *Chateaugay* does the Second Circuit restrict the scope of its injunctive analysis to property owned by a debtor. While Debtors cite certain statements in *Chateaugay* that make reference to the fact that the property at issue was owned by the debtor, *see* Mem. of Law at 29, nothing in the Second Circuit's rationale for its decision turns on this fact.[12] The Second Circuit's holding was based upon its readings of section 101(5) and CERCLA. Nothing in those provisions distinguishes between debtor-owned and non-debtor owned property. The Second Circuit never cites to anything in the Bankruptcy Code or the environmental laws that would suggest that its analysis would have been different had the property in question been owned by a third party. Nor did the Court at any time explicitly limit its holding to debtor-owned property. Had the Second Circuit intended to limit the reach of its holding in the manner that Debtors suggest, it certainly could have done so.[13]

---

[12] Numerous other statements in the decision are of broad reach, and apply equally to debtor- and non-debtor-owned sites. *See, e.g.*, *Chateaugay*, 944 F.2d at 1008 ("[I]f the order, no matter how phrased, requires LTV to take any action that ends or ameliorates current pollution, such an order is not a 'claim.'"); *id.* ("Since there is no option to accept payment in lieu of continued pollution, any order that to any extent ends or ameliorates continued pollution is not an order for breach of an obligation that gives rise to a right of payment and is for that reason not a 'claim.'").

[13] And, while Debtors contend that the United States' reply brief in *Chateaugay* somehow serves to limit the decision to debtor-owned sites, *see id.* at 28, the law in this Circuit is not the United States' brief, but rather the Court's decision.

Notably, Debtors are unable to point to a single case, in the eighteen years since *Chateaugay* was decided, in which any court has interpreted *Chateaugay*'s holding as limited to debtor-owned property. To the contrary, both the Third and Seventh Circuit have cited approvingly to *Chateaugay* in holding that environmental injunctions that require cleanup of hazardous wastes on non-debtor-owned property do not constitute dischargeable "claims." *Apex*, 2009 WL 2591545, at *3; *In re Torwico Electronics, Inc.*, 8 F.3d 146, 151 (3d Cir. 1993).[14] In *Apex*, Judge Posner, writing for a unanimous panel in the Seventh Circuit, held that a Chapter 11 debtor could not discharge its obligation to abate a hydrocarbon plume that had been created by an oil refinery that had been owned decades earlier by the debtor's corporate predecessor. 2009 WL 2591545, at *1-33.

Similarly, in *Torwico*, the Third Circuit concluded that the debtor's obligation under state law to clean up a seepage pit that was leaking hazardous material into the surrounding environment was not a dischargeable claim, notwithstanding that the pit was not located on debtor's property. 8 F.3d at 150. "Torwico is a generator of hazardous waste and as such has an ongoing responsibility for the wastes it disposes. Even though Torwico no longer possesses the property, it is still, allegedly, Torwico's wastes that are presenting a continuing environmental

---

[14] Debtors cite to *FV Steel and Wire Co.*, 324 B.R. 701 (Bankr. E.D. Wis. 2005), a decision in which a bankruptcy court outside the Circuit, and without citing to *Chateaugay*, drew a distinction between debtor-owned and non-debtor owned property in deciding whether the EPA's enforcement of a consent decree was an attempt to seek enforcement of a money judgment within the meaning of section 362(b)(4) of the Bankruptcy Code. Yet the decision didn't turn on the fact that the property was not owned by the debtor. Rather, the court relied upon the fact that "to the extent that the terms of the Consent Decree were aimed at the prevention of future harm, *i.e.*, requiring the cleanup of the contaminated soil to prevent further pollution of the groundwater, it is undisputed that the soil cleanup was completed years, if not decades, ago." *Id.* at 705; *see also id.* ("Although it is possible that a Court faced with the Consent Decree when it was first issued in 1992 may not have construed enforcement as collection of a money judgment, when the activities needed to protect public health and safety have been completed years before . . . , and the remaining requirements consist of paying money to maintain the monitoring wells and landfill cap, this court is compelled to rule otherwise.").

hazard." *Id.* at 151.  Thus, the Third Circuit applied *Chateaugay*'s ongoing pollution standard to

hold that, "to the extent that Torwico's waste poses a continuing hazard, Torwico is responsible

for remedying the problem regardless of where the waste might be." *Id.*  "Torwico's obligations

do not run with the land . . . they run with the waste." *Id.*

Debtors attempt to distinguish *Apex* and *Torwico* on the ground that they involved

environmental statutes that do not allow the government to recover its cleanup costs from

responsible parties, as does CERCLA.  *See* Mem. of Law at 32; *see also* Mem. of Law at 19-20

(arguing that CERCLA's cost recovery provisions constitute an "alternate payment right").

However, the Second Circuit has plainly recognized that, notwithstanding CERCLA's separate

cost recovery provision, CERCLA does not permit the EPA to accept payment in lieu of

compliance with injunctive relief obtained under section 106 to address ongoing pollution.  *See*

*Chateaugay*, 944 F.2d at 1008 ("[EPA] has no authority to accept a payment from a responsible

party as an alternative to continued pollution.").[15]  Debtors have not pointed to any language in

CERCLA or the state environmental statutes at issue here that would allow the EPA or the

---

[15]  In any event, the separate cost recovery provisions of CERCLA (or analogous state
environmental statutes) are not determinative as to whether a breach of an injunctive obligation
under section 106 would give rise to a "right to payment."  *Chateaugay* instructs:

> EPA is entitled to seek payment *if it elects* to incur cleanup costs itself, but it has
> no authority to accept a payment from a responsible party as an alternative to
> continued pollution. Thus, a cleanup order that accomplishes the dual objectives
> of removing accumulated wastes and stopping or ameliorating ongoing pollution
> emanating from such wastes *is not a dischargeable claim*.

*Chateaugay*, 944 F.2d at 1008 (emphasis added).  This passage squarely indicates that the EPA
would solely have a dischargeable money claim "if it elects" to conduct a cleanup itself, not if it
"could have" elected to do so.  The proper inquiry is not what the EPA "could have" done, but
the cause of action it actually does assert.  It is a basic principle of American jurisprudence that
the plaintiff is master of its complaint. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 394-95,
398-99 (1987); *Garbie v. DaimlerChrysler Corp.*, 211 F.3d 407, 410 (7th Cir. 2000).  Simply
because a plaintiff has an option to pursue relief under a variety of causes of action does not
require the plaintiff to do so.  Nor does the theorized availability of another cause of action
impact the court's analysis of the claims actually pled.

California Environmental Agencies to accept payment from responsible parties as an alternative to the abatement of continued pollution on third party sites. As the Second Circuit has already answered in the negative the question of whether CERCLA allows the EPA to accept payment from responsible parties as an alternative to ending ongoing pollution, Debtors cannot relitigate that issue in this Court.[16]

In further support of their argument that *Chateaugay* is limited to debtor-owned property, Debtors contend that the decision there was premised on 28 U.S.C. § 959(b), which requires a debtor-in-possession to "manage and operate the property in his possession . . . according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof." Yet section 959 has no bearing on the analysis of whether a "claim" is subject to discharge in bankruptcy. Section 959 sets forth a debtor-in-possession's obligations during the pendency of bankruptcy proceedings. In contrast, a discharge under section 1141 of the Code pertains to rights and obligations subsequent to confirmation.

In light of this distinction, it is hardly surprising that *Chateaugay* makes no mention of section 959(b). As discussed *supra*, the Second Circuit's analysis turned instead on the definition of "claim." *See* 944 F.2d at 1008 (the distinction between past and ongoing pollution "is the distinction we believe is made by the 'claim' definition of the Code"); *see also id.* at 1007 ("[W]e must endeavor to apply the 'claim' definition as written . . . ."). That definition is devoid of any distinctions based on property of a debtor or its ongoing operations. Congress knew how to limit the scope of laws applicable to property of the estate when it wanted to, as in section

---

[16] In arguing that the Third and Seventh Circuit decisions are distinguishable because they involve different environmental statutes, *see* Mem. of Law at 32, Debtors implicitly acknowledge that obligations at third party sites issued under statutes like those at issue in *Apex* and *Torwico* are non-dischargeable.

959(b), and conspicuously did not do so in section 101(5). Accordingly, Debtors' insistence that *Chateaugay*'s interpretation of "claim" is limited to debtor-owned sites is without merit.

**C.     The "Ongoing Pollution" CERCLA Standard Applies Both to Debtors Who Are Engaged in Postpetition Activities that Contribute to Pollution and to the Cleanup of Accumulated Waste that Is a Source of Ongoing Pollution**

With nothing to point to in the text of either the Bankruptcy Code or the environmental laws to support differential treatment for injunctions concerning debtor-owned and third party properties, Debtors resort to policy arguments regarding the desirability of adhering to the Second Circuit's decision in this case. Debtors contend that

> applying the *Chateaugay* court's 'ongoing pollution' standard to injunctive orders directed at debtors that do not own or operate the contaminated property . . . makes no sense and would erect a wholly unworkable standard. Only at debtor-owned property can an injunctive relief order imposed on a debtor address and affect ongoing *conduct* by the debtor to do something other than merely paying money to others to come into compliance with environmental laws.

Mem. of Law at 30-31.

This argument, which wrongly suggests a distinction between debtor- and non-debtor-owned sites for purposes of dischargeability, is an attack against the core holding of *Chateaugay* itself.

Debtors attempt to cast the *Chateaugay* decision as limited to injunctions that would require a cessation of activities and conduct that would contribute to ongoing pollution. According to Debtors, it would be "unworkable" to apply *Chateaugay* to third party sites because Debtors are not, and could not be, engaged in affirmative conduct on third party sites that would result in ongoing pollution. Yet in *Chateaugay*, the Second Circuit considered precisely the argument Debtors now make, and explicitly rejected it:

> We recognize that in the context of environmental remedies the line between "claim" injunctions and non-"claim" injunctions could arguably be drawn somewhat differently, for example, by placing on the non-

"claim" side only those injunctions ordering a defendant to stop current activities that add to pollution (e.g., depositing new hazardous substances), while leaving on the "claim" side all other injunctions, including those that direct the cleanup of sites from which hazardous substances, previously deposited, are currently contributing to pollution.

But we believe that placing on the non-"claim" side all injunctions that seek to remedy on-going pollution is more faithful to the Supreme Court's teachings in both *Kovacs* and *Midlantic* . . . .

*Chateaugay*, 944 F.2d at 1009 (citing *Ohio v. Kovacs*, 469 U.S. 274 (1985), and *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494 (1986)) (additional citations omitted).

Accordingly, *Chateaugay* requires a debtor not just to cease actively polluting, but also to "stop[] or ameliorat[e] ongoing pollution emanating from [accumulated wastes]." *Id.* at 1008. As an example of such, the Second Circuit posited a situation in which a debtor was required "to cleanup a toxic waste site from which hazardous substances are leaching into nearby water supplies," as such an order also "requires the defendant to 'stop polluting,' *i.e.*, to stop the current run-off of hazardous substances from its property." *Id.* at 1007. As efforts to stop ongoing releases from accumulated waste can be performed at both debtor-owned and third party sites, Debtors are wrong that applying the *Chateaugay* standard to third-party sites is "unworkable."

Given the inconsistency between Debtors' position before this Court and the standard established by the Second Circuit, it is unsurprising that the three cases on which Debtors principally rely in support of their argument — *In re Goodwin*, 163 B.R. 825 (Bankr. D. Idaho 1993), *In re Basinger*, 2002 WL 33939736 (Bankr. D. Idaho Jan. 31, 2002), and *In re Cottonwood Canyon Land Co.*, 146 B.R. 992 (Bankr. D. Colo. 1992) — not only originate from outside this Circuit, but explicitly consider and reject the Second Circuit's holding in *Chateaugay*. The *Goodwin* court spends a number of pages describing why it finds "unpersuasive" the *Chateaugay* Court's rejection of a test that relies upon whether the pollution

is a result of completed prepetition conduct or continuing violations of the environmental laws. 163 B.R. at 831-33.[17] The *Basinger* court, in turn, simply adopts the reasoning in *Goodwin*. 2002 WL 33939736 at *8-*9. And the *Cottonwood* court found that "a misunderstanding of the nature of the liabilities imposed by CERCLA and the effect of the order of confirmation . . . plagued the circuit court in the *Chateaugay* opinion . . . when it engaged in its analysis concerning the discharge of certain injunctive orders." 146 B.R. at 999.

While the bankruptcy courts of Idaho and Colorado are free to disregard *Chateaugay*, however, that decision is binding upon this Court. Accordingly, this Court should reject Debtors' attempt to rewrite *Chateaugay* and replace it with a standard more to their liking.

Debtors also cite to statements made by this Court in ruling on whether the automatic stay precluded the County of Santa Clara from filing public nuisance litigation against Debtors, implying that this Court had previously held that injunctive relief obligations at third party sites are subject to discharge as "claims." *See* Mem. of Law at 17. As an initial matter, the issue presented to the Court in that motion did not concern the discharge of a claim, but the police and regulatory power exception to the automatic stay. *See* Motion of Debtors to Enforce Automatic Stay Against the County of Santa Clara and for Injunctive Relief, dated March 9, 2009 [Docket No. 1131] ("Santa Clara Motion").[18] Second, the Court did not ultimately rule on whether the police and regulatory powers exception to the automatic stay precluded the Santa Clara lawsuit, as it held that the matter was not ripe for resolution. *See* Transcript of April 16, 2009, Hearing

---

[17] *Goodwin* was legislatively overruled in 1998 by amendments which clarified that the police and regulatory exception to the automatic stay extends to the type of actions at issue in *Goodwin*. Moreover, Goodwin involved an individual chapter 7 debtor, and the court noted that chapter 11 corporate cases would be "distinguishable." 163 B.R. at 831.

[18] Of course, the automatic stay would not prevent a governmental unit from litigating a police or regulatory action to judgment, even a money judgment, so long as it did not seek to enforce such money judgment. *See* 11 U.S.C. § 362(b)(4); *see, e.g.*, *SEC v. Brennan*, 230 F.3d 65, 71 (2d Cir. 2000).

("Tr.") (attached as Exhibit 1 to Mem. of Law) at 48-50. Finally, and more fundamentally, however, the facts of that case were entirely different than the ones presented here. As this Court recognized, the plaintiffs in the Santa Clara litigation were "seeking a monetary award for torts allegedly occurring long ago and to compensate the governmental entities for the costs associated with the adverse effects of lead products. The lawsuit mainly seeks to compensate them for those expenses." *See* Tr. at 47. As discussed *supra*, an action seeking a monetary award is inarguably a "claim" within the meaning of section 101(5). Accordingly, the standard set forth in *Chateaugay* was never implicated in the Santa Clara Motion. Indeed, *Chateaugay* was never even cited in any of the briefs submitted with respect to that motion.

 Debtors' Objections are not seeking to disallow any attempt by the United States or the California Environmental Agencies to obtain reimbursement for cleanup costs they have incurred. Nor do Debtors' Objections seek to disallow any effort by the United States or the California Environmental Agencies to obtain money from Debtors. The Government parties are simply seeking to reserve their rights to ensure that Debtors comply with their injunctive obligations. Under *Chateaugay*, these injunctive obligations are not dischargeable in bankruptcy.

**D.      The Expenditure of Funds to Satisfy Injunctive Obligations Does Not Equate to a "Right to Payment" Under Section 101(5) of the Bankruptcy Code**

Debtors mistakenly equate the expenditure of money to satisfy their injunctive obligations at third party sites with a breach giving rise to a "right to payment" in lieu of compliance with the injunctive obligations. These concepts are entirely distinct, however. A right to an equitable remedy is only a "claim" under the Bankruptcy Code "*if . . . breach* gives rise to a right to *payment*," 11 U.S.C. § 101(5)(B) (emphasis added), not "*if compliance* would require *expenditures*." Neither the EPA nor the California Environmental Agencies are seeking money from any Debtor in lieu of the performance of that Debtor's injunctive obligations. Nor

would the money expended by the respective Debtors to perform cleanup operations at third party sites flow to the EPA or the California Environmental Agencies as a remedy for a breach of Debtors' injunctive obligations. *In re Chateaugay Corp.*, 944 F.2d at 1007. In such circumstances, funds expended by debtors to comply with their injunctive obligations do not constitute a "right of payment." *Apex*, 2009 WL 2591545, at *2 (the cost to a debtor or reorganized debtor is not a "'right [of the plaintiff] to payment" and therefore is irrelevant "under the language of the Bankruptcy Code" for determining whether an injunctive obligation is a dischargeable claim) (quoting *AM Int'l, Inc. v. Datacard Corp.*, 106 F.3d 1342, 1348 (7th Cir. 1997))

It was for this reason that Judge Koetl rejected an analogous argument in *New York v. Mirant New York, Inc.*, 300 B.R. 174, 180 (S.D.N.Y. 2003). In *Mirant*, Judge Koetl considered whether a Consent Decree was an executory contract that could be rejected under section 365 by the Debtor and, thus, whether an action to compel compliance with the Consent Decree constituted enforcement of a judgment for money under section 362(b)(4). In holding that the action did not seek enforcement of a money judgment, Judge Koetl reasoned that "any money expended by Mirant will go toward complying with state and federal law, and will not be deposited in the State treasury." *Id.*

Both the Seventh Circuit and the Third Circuit have exposed the flaws inherent in the notion that financial expenditures by debtors can transform an injunctive obligation into a "right of payment" within the meaning of section 101(5). First, because compliance with regulatory requirements or court-imposed obligations almost always costs money, an improper focus on compliance expenditures would virtually negate the statute's "if . . ." qualifier and make most injunctions subject to discharge. *Apex*, 2009 WL 2591545, at *3 ("Almost every equitable decree imposes a cost on the defendant, whether the decree requires him to do something, as in

this case, or, as is more common, to refrain from doing something. The logic of Apex's position is thus that every equitable claim is dischargeable in bankruptcy unless there is a specific exception in the Code. That is inconsistent with the Code's creation . . . of only a limited right to the discharge of equitable claims."); *Torwico*, 8 F.3d at 150 & n.4 ("The state can exercise its regulatory powers and force compliance with its laws, even if the debtor must expend money to comply. . . . Were we to adopt the . . . position that any order requiring the debtor to expend money creates a dischargeable claim, it is unlikely that the state could effectively enforce its laws: virtually all enforcement actions impose some costs on the violator."). Debtors cannot merely hang a price tag on an injunctive obligation and call it a monetary claim.

The second fallacy in Debtors' argument is that the expenditure of money to pay third party contractors to perform the work necessary to satisfy their injunctive obligations is not qualitatively different than the expenditure of money to perform the cleanup work using in-house specialists. The Seventh Circuit roundly rejected Debtor's position in *Apex*:

> The root arbitrariness of Apex's position is that whether a polluter can clean up his pollution himself or has to hire someone to do it has no relevance to the policy of either the Bankruptcy Code or the Resource Conservation and Recovery Act. . . . . [T]he cost of cleaning up pollution when the polluter does the cleaning up himself is as real a cost as the price paid to an outsider to clean it up. Why distinguish a check written to an employee from a check written to an independent contractor?

2009 WL 2591545, at *4.[19] The Seventh Circuit further stated: "If adopted by the courts, Apex's position would discourage polluters from developing an internal capability of cleaning

_____

[19] In the context of the "police and regulatory power" exception to the Bankruptcy Code's automatic stay provision, 11 U.S.C. § 362(b)(4), the Third, Fourth, and Fifth Circuits have all found that governmental actions to enforce compliance with environmental requirements do not amount to "enforcement of a . . . money judgment" within the meaning of the statute, even if compliance would require the expenditure of money. *Safety-Kleen, Inc. (Pinewood) v. Wyche*, 274 F.3d 846, 865 (4th Cir. 2001); *In re Commonwealth Oil Refining Co.*, 805 F.2d 1175, 1183, 1186-87 (5th Cir. 1986); *Penn Terra, Ltd. v. Dept. of Envtl. Res.*, 733 F.2d 267, 278 (3d Cir. 1984) ("[I]n contemporary times, almost everything costs something. An injunction which does not compel some expenditure or loss of monies may often be an effective nullity.").

up their pollution, even if hiring third parties to do it would be more expensive." *Id.* And the court concluded: "[There is] a general understanding that discharge must be limited to cases in which the claim gives rise to a right to payment because the equitable decree cannot be executed, rather than merely imposing a cost on the defendant, as virtually all equitable decrees do." *Id.*

In making their financial expenditures argument, Debtors primarily rely on the Sixth Circuit's decision in *Whizco,* the only Circuit Court case to have classified an injunctive obligation as a dischargeable "claim" when compliance "would require the expenditure of money." *United States v. Whizco, Inc.*, 841 F.2d 147, 150 (6th Cir. 1988). Mem. of Law at 23-24. Yet *Whizco* is both distinguishable from the present case, and badly reasoned.

*Whizco* involved coal mine reclamation orders and a corresponding injunction that the United States obtained against an individual after a bankruptcy trustee took all of his assets and after his debts had been discharged in a Chapter 7 liquidation proceeding. *Id.* at 147-48. Compliance with the injunction would have required the individual debtor "to hire others to perform the work for him" because he had surrendered all of his mining equipment and coal leases in his bankruptcy and he was 63 years old and physically incapable of completing the work on his own. *Id.* at 149-50. Under those unique circumstances, the court held that the injunction was a dischargeable "claim" "to the extent that fulfilling his obligation to reclaim the site would force the defendant to spend money." *Id.* at 150. On the other hand, the court said: "To the extent that the defendant can comply with the . . . orders without spending money, his bankruptcy did not discharge his obligation to comply with the orders . . . . The defendant may in the future own equipment which would permit him to personally reclaim some portion of the site." *Id.* at 151.

Whatever *Whizco* may dictate for individual Chapter 7 debtor cases in the Sixth Circuit, it has no applicability to corporate cases. A corporation acts only through its paid employees

and agents, so any action that it might take to comply with an injunction "costs money." Any injunction that limits the company's operations or distracts it from its core business may also cost the company money-making opportunities. Those inevitable costs of corporate compliance do not make such injunctions dischargeable. *See Apex*, 2009 WL 2591545, at *5 (rejecting reasoning of *Whizco* as "untenable"); *In re Chateaugay*, 112 B.R. 513, 523 & n.19 (S.D.N.Y. 1990) (rejecting *Whizco* and holding that the Supreme Court's decision in *Kovacs* "clearly does not support the broad contention made here that a debtor still capable of complying with an injunction may seek discharge merely because it may have to spend money to do it"), *aff'd*, 944 F.2d at 1008; *United States v. Hubler*, 117 B.R. 160, 164 & n.1 (W.D. Pa. 1990) (rejecting *Whizco* as contrary to the rationale expressed in *Kovacs*), *aff'd without opinion,* 928 F.2d 1131 (3d Cir. 1991); *United States v. ILCO, Inc.*, 48 B.R. 1016, 1022-23 (N.D. Ala. 1985) (fact that compliance with order costs money does not equate to money judgment); *see generally Davis*, 3 F.3d at 116 (noting, in a non-environmental case, that the mere existence of potential monetary remedies does not transform an injunction into a monetary claim).

Debtors further attempt to draw support for their dubious financial expenditures test from the Supreme Court's decision in *Ohio v. Kovacs*. Mem. of Law at 21-23. As Debtors read *Kovacs,* a cleanup injunction is a "claim" within the meaning of the Code whenever the cleanup order effectively requires the debtor to pay money to third parties. *Id.* But that "test" stretches *Kovacs* well beyond the bounds established by the Supreme Court's opinion.

In *Kovacs*, the Court of Appeals had held that the State of Ohio effectively converted a cleanup injunction into an obligation to pay money when the State sought and obtained the appointment of a receiver who was supposed to take possession of Kovacs' assets — including at least a portion of his post-bankruptcy income — and then use the assets to defray the cost of performing the cleanup. 469 U.S. at 276, 282-83. In the concluding paragraph of its opinion,

the Court felt the need "to emphasize what we have not decided." That included addressing "what the legal consequences would have been had Kovacs taken bankruptcy before a receiver had been appointed." *Id.* at 284.

Kovacs was "disabled by the receivership from personally taking charge of and carrying out the removal of wastes from the property." *Kovacs*, 469 U.S. at 283. Thus, "after the receiver was appointed, the only performance sought from Kovacs was the payment of money." *Id.* At that point, the State was no longer seeking Kovacs' compliance with injunctive obligations; it was pursuing an alternative right of payment to its own court-appointed agent. It was that unique factual posture that made it a "claim."

In sum, "what seems to have been decisive was the fact that Ohio obtained the appointment of a receiver, precluded Kovacs from taking any steps to comply with the injunction, and was seeking from Kovacs only the payment of money." *Chateaugay*, 944 F.2d at 1008; *see also Apex*, 2009 WL 2591545, at *3 ("[T]he receiver thus was seeking money rather than an order that the debtor clean up the contaminated site. That was a claim to a 'right to payment.' The plaintiff in our case (the government) is not seeking a payment of money and the injunction that it has obtained does not entitle it to payment."); *Udell*, 18 F.3d at 406 ("*Kovacs* . . . turned on the fact that Ohio itself elected to convert its equitable right into a demand for a money judgment"); *In re Ben Franklin Hotel Assocs.*, 186 F.3d 301, 304 (3d Cir. 1999); *In re Commonwealth Oil Ref. Co.*, 805 F.2d 1175, 1187 n.14 (5th Cir. 1986), *cert denied*, 483 U.S. 1005 (1987); *Cournoyer v. Town of Lincoln*, 790 F.2d 971, 975 (1st Cir. 1986). In this case, neither the United States nor the California Environmental Agencies have taken any action to convert their rights to performance under existing injunctive obligations into any sort of monetary claim.

Finally, Debtors' argument also fails by its own logic, as it proves too much. The core of

Debtors' argument is that, because they would be required to expend money hiring contractors to perform the cleanup operations at a third party site, their injunctive obligations at third party sites reduces to a "right to payment." *See* Mem. of Law at 30-31. Debtors fail to explain how this argument supports the distinction they seek to draw between debtor-owned and third party property. Debtors concede that, if injunctions and orders identical to those at issue here were issued with respect to debtor-owned property, those injunctions would not be dischargeable "claims." Yet presumably, as Debtors do not have in-house expertise on hazardous removal, Debtors would also have contracted a third party to perform any cleanup work on debtor-owned property, resulting in a similar outlay of money to third parties. *See* Kryak Decl. at ¶ 2 ("Debtors are not in the business of removal and remediation of hazardous wastes and do not perform any such environmental cleanup work personally."). Debtors have singularly failed to explain why financial expenditures to a third party contractor constitute dischargeable "claims" when made with respect to third party sites, yet identical payments to the very same third party contractors constitute nondischargeable equitable obligations when made with respect to cleanup of debtor-owned property. If financial expenditure by debtors was the standard in the Second Circuit, the outcome of *Chateaugay* would have been quite different.

As the Second, Third and Seventh Circuits have all recognized, the crucial question under the law is not whether an injunctive obligation could conceivably be expressed in monetary terms, or even whether the EPA or state environmental agency had the option to so characterize the injunctive obligation. The real question under the language of the statute, 11 U.S.C. § 101(5), is whether a breach of an order gives rise to a right to pay money instead of compliance with the order. As the Second Circuit held in *Chateaugay*, there is nothing in CERCLA that allows a recipient of a judicial cleanup order dealing with ongoing pollution to pay money instead of complying. In the absence of any action by the Government to convert the

injunctive obligation to a monetary claim, *see, e.g.*, *Kovacs*, 469 U.S. at 281-82, there is no

monetary claim dischargeable in bankruptcy. Debtors cannot convert every court order to deal

with ongoing pollution into a dischargeable monetary claim merely by arguing that injunctive

obligations impose costs (or that they do not relate to property it owns), any more than the EPA

can convert every obligation of Debtors into a nondischargeable injunctive obligation by arguing

that even purely monetary judgments involve some element of compulsion.

## CONCLUSION

For the reasons stated above, Debtors' Objections should be denied.

Dated:  New York, New York
        September 30, 2009

PREET BHARARA
United States Attorney for the
Southern District of New York

By:    /s/ Jeannette Vargas
JEANNETTE A. VARGAS
BRANDON COWART
ALICIA SIMMONS
Assistant United States Attorney
Attorneys for the United States of America

EDMUND G. BROWN JR.
Attorney General of California
RICHARD J. MAGASIN
Supervising Deputy Attorney General
MARILYN H. LEVIN
NOAH GOLDEN-KRASNER
Deputy Attorneys General

By:    /s/ Noah Golden-Krasner
NOAH GOLDEN-KRASNER
Deputy Attorney General
Attorneys for California State Water Resources
Control Board and California Regional Water
Quality Control Board, Los Angeles Region

EDMUND G. BROWN JR.
Attorney General of California
KEN ALEX
Senior Assistant Attorney General
MARGARITA PADILLA
Supervising Deputy Attorney General


By:     __/s/ Margarita Padilla_____
MARGARITA PADILLA
Supervising Deputy Attorney General
Attorneys for California Department of Toxic
Substances Control