**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LYONDELL CHEMICAL COMPANY, *et al.*, | Case No. 09-10023 (REG) |
| Debtors. | (Jointly Administered) |

## FIRST AMENDED DISCLOSURE STATEMENT ACCOMPANYING FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR THE LYONDELLBASELL DEBTORS

**NOTE:** THE DEBTORS BELIEVE THAT ACCEPTANCE OF THE PLAN DESCRIBED IN THIS DOCUMENT IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES, THEIR CREDITORS AND ALL OTHER PARTIES IN INTEREST. ACCORDINGLY, THE DEBTORS RECOMMEND THAT YOU **VOTE** **IN** **FAVOR** OF THE PLAN.

Dated:          December 11, 2009

CADWALADER, WICKERSHAM & TAFT LLP
Deryck A. Palmer, Esq.
George A. Davis, Esq.
Andrew M. Troop, Esq.
Christopher R. Mirick, Esq.
Jessica L. Fink, Esq.
One World Financial Center
New York, New York 10281
(212) 504-6000

Mark C. Ellenberg, Esq.
700 Sixth Street, N.W.
Washington, DC 20001
(202) 862-2200

Attorneys for the Debtors and Debtors in Possession

THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE FOR USE IN THE SOLICITATION OF ACCEPTANCES OF THE PLAN DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISTRIBUTION OF THIS PROPOSED DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OF SUCH PLAN. THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT INCORPORATES THE TERMS OF THE LENDER LITIGATION SETTLEMENT

DESCRIBED HEREIN, WHICH IS SUBJECT TO BANKRUPTCY COURT APPROVAL, AND THERE IS NO ASSURANCE THAT THIS SETTLEMENT WILL BE APPROVED.[1]

---

[1] Legend to be removed upon approval of the Disclosure Statement and the Lender Litigation Settlement by the Bankruptcy Court.

PURSUANT TO SECTION 1128 OF THE BANKRUPTCY CODE, A CONFIRMATION HEARING WILL BE HELD WITH RESPECT TO THE JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR LYONDELLBASELL INDUSTRIES AF S.C.A. AND ITS AFFILIATED DEBTORS (THE "PLAN") ON [_____], 2010, AT [_____] [A.M.][P.M.] (PREVAILING EASTERN TIME), BEFORE THE HONORABLE ROBERT E. GERBER, IN ROOM 621 OF THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, ONE BOWLING GREEN, NEW YORK, NEW YORK 10004 (THE "CONFIRMATION HEARING"). OBJECTIONS, IF ANY, TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED ON OR BEFORE [_____], 2010 AT 4:00 P.M. (PREVAILING EASTERN TIME). THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT MADE AT THE CONFIRMATION HEARING OR AT ANY SUBSEQUENT ADJOURNED DATE OF THE CONFIRMATION HEARING.

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") IS BEING DISTRIBUTED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN.

THE DEBTORS INTEND TO SEEK TO CONFIRM THE PLAN AND TO CAUSE THE EFFECTIVE DATE OF THE PLAN TO OCCUR PROMPTLY AFTER CONFIRMATION OF THE PLAN. HOWEVER, THERE CAN BE NO ASSURANCE AS TO WHETHER OR WHEN THE CONFIRMATION OR THE EFFECTIVE DATE OF THE PLAN ACTUALLY WILL OCCUR.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NONBANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER REVIEWED NOR APPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. THE INFORMATION IN THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO SOLICITATION OF VOTES TO ACCEPT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

A COPY OF THE PLAN IS ATTACHED AS EXHIBIT A HERETO. ALL HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. UNLESS OTHERWISE SPECIFIED HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT WILL BE CORRECT AT ANY LATER DATE. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, OR AS A STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY BANKRUPTCY OR NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY (OTHER THAN IN CONNECTION WITH APPROVAL OF THIS DISCLOSURE STATEMENT OR CONFIRMATION OF THE PLAN), NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS. YOU ARE ADVISED TO OBTAIN INDEPENDENT EXPERT ADVICE ON SUCH SUBJECTS.

NEITHER THE OFFER OF NEW COMMON STOCK NOR THE RIGHTS OFFERING TO HOLDERS OF CERTAIN CLASSES OF CLAIMS HAS BEEN REGISTERED UNDER THE

SECURITIES ACT OF 1933 (AS AMENDED, THE "SECURITIES ACT") OR SIMILAR STATE SECURITIES OR "BLUE SKY" LAWS. THE OFFERS AND ISSUANCES ARE BEING MADE IN RELIANCE ON THE EXEMPTION FROM REGISTRATION SPECIFIED IN SECTION 1145 OF THE BANKRUPTCY CODE OR OTHER EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT. NONE OF THE NEW COMMON STOCK TO BE ISSUED ON THE EFFECTIVE DATE OR PURSUANT TO THE RIGHTS OFFERING HAS BEEN APPROVED OR DISAPPROVED BY THE SEC OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995: ALL FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE DEBTORS INVOLVE MATERIAL RISKS AND UNCERTAINTIES AND ARE SUBJECT TO CHANGE BASED ON NUMEROUS FACTORS, INCLUDING FACTORS THAT ARE BEYOND THE DEBTORS' CONTROL. ACCORDINGLY, THE DEBTORS' FUTURE PERFORMANCE AND FINANCIAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED IN ANY SUCH FORWARD-LOOKING STATEMENTS. SUCH FACTORS INCLUDE, BUT ARE NOT LIMITED TO, THOSE DESCRIBED IN THIS DISCLOSURE STATEMENT. THE DEBTORS DO NOT UNDERTAKE TO PUBLICLY UPDATE OR REVISE FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED HEREIN OR THEREIN WILL NOT BE REALIZED.

EXCEPT AS OTHERWISE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**DISCLOSURE STATEMENT ACCOMPANYING JOINT**
**CHAPTER 11 PLANS FOR THE LYONDELLBASELL DEBTORS**

## TABLE OF CONTENTS

Page

I.     **INTRODUCTION**.................................................................................................1
    A.     **Purpose, Limitations and Structure of this Disclosure Statement**...............2
    B.     **Summary of the Plan** ...........................................................................................3
    C.     **Voting on the Plan and Subscribing to the Rights Offering** ........................14
        1.     **Classes Entitled to Vote or Subscribe**...............................................14
        2.     **Votes Required for Acceptance of the Plan by a Class**.....................15
        3.     **Tabulation of Votes** .............................................................................15
        4.     **Voting Instructions** ..............................................................................15
        5.     **Inquiries** ...............................................................................................17
    D.     **Confirmation Hearing**......................................................................................17
    E.     **Overview of Chapter 11 Process** .....................................................................17

II.     **GENERAL INFORMATION ABOUT LYONDELLBASELL**............................18
    A.     **Description and History of LyondellBasell's Businesses**...............................18
        1.     **Corporate History**...............................................................................18
        2.     **Scale and Scope of Business** ...............................................................19
        3.     **Corporate Governance** ........................................................................25
        4.     **Employees** ............................................................................................26
    B.     **The Debtors' Prepetition Financing Arrangements**......................................27
        1.     **Senior Secured Credit Facility**...........................................................27
        2.     **Bridge Loan Facility** ...........................................................................27
        3.     **Senior Secured Inventory-Based Credit Facility**.............................28
        4.     **Asset-Based Receivables Facility** .......................................................28
        5.     **Access Facility** .....................................................................................28
        6.     **Receivables Securitization Programs** ................................................29
            a.     **European Receivables Securitization Program** ...................29
            b.     **North American Receivables Securitization Program**........29
        7.     **Various Notes and Debentures** ...........................................................29
            a.     **ARCO 2010 and 2020 Debentures** ......................................29
            b.     **Equistar 2026 Notes** .............................................................29
            c.     **Millennium 2026 Notes** ........................................................30
            d.     **2015 Notes** .............................................................................30
            e.     **2027 Notes** .............................................................................30
            f.     **Intercreditor Agreement**......................................................30
            g.     **ABL Intercreditor Agreement**.............................................31
    C.     **Events Leading to the Commencement of the Chapter 11 Cases** .................31
        1.     **Overview** ..............................................................................................31
        2.     **Constrained Liquidity and Operational Setback** .............................31
        3.     **Restructuring Efforts**..........................................................................32
        4.     **Decision to Commence the Debtors' Chapter 11 Cases**....................33
    D.     **Pending Litigation and Other Legal Matters**.................................................33
        1.     **Houston Refinery** ................................................................................33
        2.     **BASF** ....................................................................................................33
        3.     **Antitrust Allegations**...........................................................................33
        4.     **Lead Paint** ............................................................................................34
        5.     **Environmental** ....................................................................................34

III.     **EVENTS DURING CHAPTER 11 CASES** ........................................................35

| | | |
|---|---|---|
| A. | Commencement of Chapter 11 Cases | 35 |
| B. | First Day Orders | 35 |
| | 1. Orders Regarding Case Administration | 35 |
| | 2. Orders Regarding Prepetition Obligations | 35 |
| | 3. Orders Regarding Business Operations | 36 |
| C. | Extensions of Exclusivity | 36 |
| D. | The Debtors' Professionals and Chief Restructuring Officer | 36 |
| E. | The Creditors' Committee | 36 |
| | 1. Appointment of the Creditors' Committee | 36 |
| | 2. Creditors' Committee's Professionals | 37 |
| | 3. Motion to Appoint an Examiner | 37 |
| F. | Postpetition Financing and Use of Cash Collateral | 38 |
| G. | Factoring Facility | 40 |
| H. | 105 Injunction | 40 |
| I. | Preservation of NOLs | 41 |
| J. | Adversary Proceedings | 41 |
| | 1. Lyondell Chemical Company, et al. v. Wilmington Trust Company, as Trustee, Adversary No. 09-01459 | 41 |
| | 2. Wilmington Trust Company, as Trustee v. LyondellBasell Industries AF S.C.A., et al., Adversary No. 09-01501 | 42 |
| | 3. Equistar Chemicals, LP v. Solutia, Inc., Adversary No. 09-01014/ Millennium Petrochemicals Inc. v. Solutia, Inc., Solutia Europe SPRL/BVBA, Adversary No. 09-01121 | 43 |
| | 4. Houston Refining, LP v. Koch Supply & Trading, LP, Adversary No. 09-01037 | 43 |
| | 5. Lyondell Chemical Company v. Air Products L.P., Air Products LLC, Air Products Chemicals Europe, B.V. and Air Products and Chemicals, Inc., Adversary No. 09-01072 | 43 |
| | 6. United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International and Service Workers International Union v. Equistar Chemicals LP, Adversary No. 09-01362 | 44 |
| K. | The Committee Litigation and Settlement | 44 |
| L. | Bank of New York Mellon Third Party Complaint in Intervention | 47 |
| M. | Law Debenture Third Party Complaint | 48 |
| N. | Bar Date and Summary of Claims | 48 |
| | 1. Schedules and Statements | 48 |
| | 2. Bar Date | 48 |
| | 3. Summary of Claims | 49 |
| | a. Withdrawal of Certain Personal Injury Claims | 49 |
| | b. Claims Objections | 49 |
| O. | Idling of Certain Plants and Exit of Certain Businesses | 50 |
| | 1. Chocolate Bayou Olefins Facility | 50 |
| | 2. Chocolate Bayou Polymers Facility | 51 |
| | 3. Lake Charles Occidental Facility | 51 |
| | 4. Lake Charles Lyondell Facility | 51 |
| | 5. Aircraft Deicer Business | 52 |
| | 6. PD Glycol, LP - Beaumont Facility | 52 |
| P. | Economic Benefits Achieved Through Assumption, Assignment, Rejection and Renegotiation of Certain Contracts | 53 |
| Q. | Employee Issues | 53 |
| | 1. Short Term Incentive Payments | 53 |
| | 2. Management Incentive Plan, Retention Plan, Discretionary Bonus Plan and Hardship Plan | 53 |
| | 3. Termination of Benefits | 54 |
| R. | Management, Ownership and Board Changes | 54 |
| | 1. Search for and Appointment of a New CEO | 54 |

| | 2. | Other Senior Management Changes | 55 |
|---|---|---|---|
| | | a. Chief Financial Officer | 55 |
| | | b. Chief Legal Officer | 55 |
| | 3. | Ownership Changes | 56 |
| S. | | Compliance Issues Under U.S. Laws | 56 |
| T. | | Receipt of Preliminary Non-Binding Offer | 56 |
| | | | |
| IV. | THE PLAN | | 56 |
| A. | | Classification and Treatment of Holders of Claims and Equity Interests | 57 |
| | 1. | Administrative Expenses | 57 |
| | 2. | Professional Compensation and Reimbursement Claims | 58 |
| | 3. | DIP New Money Claims and DIP ABL Claims | 59 |
| | 4. | Priority Tax Claims | 59 |
| | 5. | Class 1 – Priority Non-Tax Claims | 59 |
| | 6. | Class 2 – Secured Tax Claims | 60 |
| | 7. | Class 3 – DIP Roll-Up Claims | 60 |
| | 8. | Class 4 – Senior Secured Claims | 61 |
| | 9. | Class 5 – Bridge Loan Claims | 61 |
| | 10. | Class 6 – Other Secured Claims | 62 |
| | 11. | Class 7-A – General Unsecured Claims Against Obligor Debtors | 62 |
| | 12. | Class 7-B – General Unsecured Claims Against Non-Obligor Debtors (other than Schedule III Debtors) | 62 |
| | 13. | Class 7-C – General Unsecured Claims Against Schedule III Debtors | 63 |
| | 14. | Class 8 – 2015 Notes Claims | 64 |
| | 15. | Class 9 – Securities Claims | 64 |
| | 16. | Class 10 – Subordinated Claims | 64 |
| | 17. | Class 11 – Equity Interests in LBFC | 65 |
| | 18. | Class 12 – Equity Interests in LBAFGP and LBIAF | 65 |
| | 19. | Class 13 – Equity Interests in MCI and the Schedule III Debtors | 65 |
| | 20. | Class 14 – Equity Interests in the Debtors (other than LBFC, LBAFGP, LBIAF and the Schedule III Debtors) | 66 |
| B. | | Means for Implementation | 66 |
| | 1. | Settlement | 66 |
| | 2. | Exit Facility | 66 |
| | 3. | Securities to be Issued | 66 |
| | | a. New Third Lien Notes | 66 |
| | | b. Cram Down Notes | 66 |
| | | c. New Common Stock | 66 |
| | | d. Authorization and Issuance of New Securities. | 68 |
| | 4. | Rights Offering | 68 |
| | | a. Subscription Rights | 69 |
| | | b. Subscription Period | 69 |
| | | c. Exercise of Subscription Rights | 69 |
| | | d. Undersubscription | 70 |
| | | e. Equity Commitment Agreement | 71 |
| | | f. Registration Rights Agreement | 71 |
| | | g. Transfer of Subscription Rights; Revocation | 71 |
| | | h. Withdrawal of Rights Offering | 72 |
| | | i. Distribution of Class B Shares | 72 |
| | | j. Fractional Rights | 72 |
| | | k. Validity of Exercise of Subscription Rights | 72 |
| | | l. Rights Offering Procedures | 72 |
| | | m. Indemnification of Rights Offering Sponsors | 72 |
| | | n. Use of Proceeds | 73 |
| | 5. | Restructuring Transactions | 73 |

|   |   | a. | Global Restructuring/Release of Bridge Guarantee Claims and 2015 Notes Guarantee Claims | 74 |
| C. | North American Restructuring | | | 75 |
|   | 1. | The Trusts | | 78 |
|   |   | a. | The Millennium Custodial Trust | 78 |
|   |   | b. | The Environmental Custodial Trust | 83 |
|   | 2. | The Litigation Trust | | 86 |
|   | 3. | Intercompany Claims | | 86 |
|   | 4. | Closing of the Chapter 11 Cases | | 86 |
|   | 5. | Early Payment | | 87 |
| D. | Provisions Governing Distributions | | | 87 |
|   | 1. | Disbursing Agent | | 87 |
|   |   | a. | Powers of the Disbursing Agent | 87 |
|   |   | b. | Expenses Incurred on or after Effective Date | 87 |
|   | 2. | Distributions of Cash | | 87 |
|   | 3. | Distributions Free and Clear | | 87 |
|   | 4. | Timing of Distributions | | 88 |
|   | 5. | Distributions after Effective Date | | 88 |
|   | 6. | Delivery of Distributions | | 88 |
|   | 7. | Fractional Interests | | 88 |
|   | 8. | Distributions to Holders as of Record Date | | 89 |
|   | 9. | Undeliverable and Unclaimed Distributions | | 89 |
|   | 10. | Setoffs | | 89 |
|   | 11. | Nonconsensual Confirmation | | 89 |
|   | 12. | Hart-Scott-Rodino Compliance | | 90 |
|   | 13. | Application of Distributions | | 90 |
|   | 14. | Cancellation of Existing Securities and Agreements | | 90 |
|   | 15. | Surrender of Securities | | 90 |
|   | 16. | Postpetition Interest on Claims | | 90 |
|   | 17. | Withholding and Reporting Requirements | | 91 |
| E. | Provisions for Resolving and Treating Disputed Claims | | | 91 |
|   | 1. | Objections | | 91 |
|   | 2. | Estimation of Claims | | 91 |
|   | 3. | Other Provisions Relating to Disputed Claims | | 92 |
| F. | Treatment of Executory Contracts and Unexpired Leases | | | 92 |
| G. | Effect of Confirmation of the Plan on the Debtors | | | 94 |
|   | 1. | Vesting of Assets | | 94 |
|   | 2. | Compromise of Controversies | | 94 |
|   | 3. | Binding Effect | | 95 |
|   | 4. | Discharge | | 95 |
|   | 5. | Injunctions | | 95 |
|   | 6. | Indemnification Obligations | | 96 |
|   | 7. | Exculpation | | 96 |
|   | 8. | Releases | | 96 |
|   | 9. | Retention of Causes of Action/Reservation of Rights | | 98 |
|   | 10. | Section 506(c) Reservation | | 99 |
|   | 11. | Chapter 5 Reservation | | 99 |
| H. | Summary of Other Provisions of the Plan | | | 99 |
|   | 1. | Plan Supplement | | 99 |
|   | 2. | Effectuating Documents and Further Transactions | | 99 |
|   | 3. | Modification of Plan | | 99 |
|   | 4. | Payment of Statutory Fees | | 100 |
|   | 5. | Withdrawal or Revocation of Plan | | 100 |
|   | 6. | Dissolution of the Creditors' Committee | | 100 |
|   | 7. | Exemption from Securities Laws | | 100 |
|   | 8. | Exemption from Transfer Taxes | | 100 |

9.       Expedited Determination of Postpetition Taxes ..................................................... 100
10.     Severability ............................................................................................................. 101
11.     Governing Law ........................................................................................................ 101
12.     Courts of Competent Jurisdiction ............................................................................ 101
13.     Headings .................................................................................................................. 101
14.     Exhibits/Schedules .................................................................................................. 101
15.     Plan Controls Disclosure Statement; Confirmation Order Controls Plan ............ 101
16.     Successors and Assigns ........................................................................................... 101
17.     Retention of Jurisdiction ......................................................................................... 102
18.     Equity Compensation Plan ...................................................................................... 102
19.     Reservation of Right to Convert .............................................................................. 102

V.      CONFIRMATION AND CONSUMMATION PROCEDURE ............................................. 102
    A.      Voting Procedures and Solicitation of Votes ..................................................... 102
    B.      Confirmation Hearing ........................................................................................ 102
    C.      Confirmation of the Plan ................................................................................... 103
         1.     Acceptance ................................................................................................. 104
         2.     Feasibility .................................................................................................. 104
         3.     Best Interests Test ...................................................................................... 105
         4.     "Cramdown" ............................................................................................. 105
            a.    Fair and Equitable Test ....................................................................... 106
            b.    No Unfair Discrimination ................................................................... 106
    D.      Consummation ..................................................................................................... 106
         1.     Conditions Precedent to Occurrence of the Effective Date of the Plan .................. 106
         2.     Effect of Failure of Conditions Precedent ................................................. 107

VI.     SECURITIES LAW MATTERS ......................................................................................... 108
    A.      U.S. Securities Law Matters ............................................................................... 108
         1.     Issuance and Resale of New Common Stock Under the Plan ..................... 108
         2.     Listing of New Common Stock ................................................................. 109
    B.      Dutch Securities Law Matters ............................................................................ 109

VII.    CORPORATE GOVERNANCE AND MANAGEMENT OF NEW TOPCO ................... 110
    A.      Boards of Directors ............................................................................................. 110
    B.      Senior Management ............................................................................................. 110
    C.      Corporate Governance ........................................................................................ 111
         1.     Board Composition, Election and Term .................................................... 111
         2.     Removal of Members; Vacancies .............................................................. 111
         3.     Limitation on Calling Special Meetings of Stockholders .......................... 111
         4.     Advance Notice Requirements for Stockholder Proposals and Member
               Nominations ............................................................................................... 112
         5.     Shareholder Approval ................................................................................ 112

VIII.   FINANCIAL INFORMATION, PROJECTIONS AND VALUATION ANALYSIS .......... 112
    A.      Overview of Business Strategy ........................................................................... 112
    B.      Projections .......................................................................................................... 113

IX.     REORGANIZATION VALUATION ANALYSIS ........................................................... 115

X.      RISK FACTORS .............................................................................................................. 118
    A.      Certain Bankruptcy Considerations .................................................................... 118
         1.     Risk of Non-Confirmation of the Plan ...................................................... 118
         2.     Risk of Non-Occurrence of Effective Date ............................................... 119
         3.     Risk that Claims Will Be Higher Than Estimated ..................................... 119
         4.     Liquidity Risks Prior to Consummation of the Plan .................................. 119

|  |  | a. | The DIP Financing May Be Insufficient to Fund the Debtors' Business Operations.................................................................................................119 |
|  |  | b. | The Debtors May Not Be Able to Comply with the Terms of the DIP Financing......................................................................................................119 |
|  |  | c. | Reduction in Availability of Trade Credit...............................................120 |
|  | 5. | Risk that the Debtors May Not Obtain or Maintain Exit Financing .....................120 |
|  | 6. | The Debtors' Management Team May Allocate Less Time to the Operation of the Debtors' Business Operations................................................................120 |
|  | 7. | New Topco, U.S. Debtors and Holders of Allowed Claims May Suffer Adverse U.S. Federal Income Tax Consequences as a Result of the Implementation of the Plan ......................................................................121 |
| B. | Risks Related to the Reorganized Debtors' Significant Indebtedness.............................121 |
|  | 1. | Continuing Leverage and Ability to Service Debt .............................................121 |
|  | 2. | Restrictive Financial and Operating Covenants under the Exit Facility ...............122 |
| C. | Risks Relating to New Common Stock and New Third Lien Notes...............................122 |
|  | 1. | Lack of Trading Market for New Common Stock and New Third Lien Notes........................................................................................122 |
|  | 2. | Dividend Policies of Reorganized Debtor .........................................................122 |
|  | 3. | Significant Holders of New Common Stock .......................................................122 |
| D. | Business Risks.................................................................................................122 |
|  | 1. | Inherent Uncertainty of Financial Projections....................................................122 |
|  | 2. | General Economic Conditions ..........................................................................123 |
|  | 3. | Increased Competition.....................................................................................123 |
|  | 4. | The Chapter 11 Cases May Affect Reorganized LyondellBasell's Relationship with Key Employees, Suppliers and Customers................................124 |
|  | 5. | The Cyclicality and Volatility of the Industries in Which Reorganized LyondellBasell Will Participate May Cause Significant Fluctuations in Their Operating Results ....................................................................124 |
|  | 6. | Costs and Limitations on Supply of Raw Materials and Energy May Result in Increased Operating Expenses .....................................................125 |
|  | 7. | External Factors Beyond Reorganized LyondellBasell's Control May Cause Fluctuations in Demand for Their Products and in Reorganized LyondellBasell's Prices and Profit Margins .........................................126 |
|  | 8. | Interruptions of Operations at the Reorganized LyondellBasell's Facilities May Result in Liabilities or Lower Operating Results..........................126 |
|  | 9. | Certain Hazards of Chemical Manufacturing......................................................127 |
|  | 10. | The Debtors' Crude Oil Contract with PDVSA-Petròleos S.A. is Subject to the Risk of Enforcing Contracts Against Non-U.S. Affiliates of a Sovereign Nation and Political, Force Majeure and Other Risks ...........................128 |
|  | 11. | The Debtors' Emergence from these Chapter 11 Cases May Trigger Consent Rights or Termination Rights in Certain Material Contracts .................128 |
|  | 12. | The Reorganized Debtors' Operations and Assets are Subject to Extensive Environmental, Health and Safety and Other Laws and Regulations ................128 |
|  |  | a. | Claims Related to Chemical Exposure .....................................................128 |
|  |  | b. | Regulatory Overview ............................................................................128 |
|  |  | c. | IPPC .....................................................................................................129 |
|  |  | d. | Environmental Cleanup .........................................................................129 |
|  |  | e. | Kalamazoo River Superfund Site ...........................................................130 |
|  |  | f. | Other Regulatory Requirements.............................................................131 |
|  | 13. | Legislative and Other Actions Have Eliminated Substantially All U.S. Demand for MTBE ...............................................................................131 |
|  | 14. | Reorganized LyondellBasell's International Operations Are Subject to Exchange Rate Fluctuations, Exchange Controls, Political Risks and Other Risks Relating to International Operations.............................................131 |
|  |  | a. | International Events................................................................................131 |
|  |  | b. | International Enforcement of Agreements ...............................................132 |

|  |  | c. | Exchange Rate Fluctuation | 132 |
|  | 15. |  | Significant Changes in Pension Fund Investment Performance or Assumptions Relating to Pension Costs May Adversely Affect the Valuation of Pension Obligations, the Funded Status of Pension Plans, and the Reorganized Debtors' Pension Cost | 132 |
|  | 16. |  | Reorganized LyondellBasell's Future Success Will Depend in Part on Its Ability to Protect Its Intellectual Property Rights, and Reorganized LyondellBasell's Inability to Do So May Reduce Reorganized Debtors' Ability to Maintain Their Competitiveness | 133 |
|  | 17. |  | The Continued Integration of Historical Lyondell Chemical Businesses with Historical Basell Businesses May Be Extremely Time-Consuming | 133 |
|  | 18. |  | Shared Control of Joint Ventures May Delay Decisions or Actions | 134 |
|  | 19. |  | The Current Instability and Uncertainty in the Global Financial Markets May Create Increased Counterparty Risk | 134 |
| E. |  |  | Material U.S. Federal Income Tax Considerations | 134 |

| XI. | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 134 |
| A. | Liquidation Under Chapter 7 | 134 |
| B. | Alternative Plans of Reorganization | 135 |

| XII. | CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 135 |
| A. | Certain Consequences to U.S. Debtors | 136 |
|  | 1. | COD Income and Attribute Reduction | 137 |
|  | 2. | New Topco's Status as a Non-U.S. Corporation | 138 |
| B. | Certain Consequences to Non-U.S. Debtors | 141 |
| C. | Certain Consequences to Holders of Allowed Claims | 141 |
|  | 1. | General Considerations | 141 |
|  |  | a. | Accrued but Unpaid Interest | 141 |
|  |  | b. | Bad Debt Deduction and Worthless Securities Deduction | 141 |
|  |  | c. | Market Discount | 142 |
|  |  | d. | Effect of Potential Future Distributions | 142 |
|  |  | e. | Recapture of Gain on Disposition of New Common Stock | 142 |
|  | 2. | Holders of Allowed Claims | 143 |
|  |  | a. | Certain Consequences to Holders of Senior Secured Claims and Bridge Loan Claims | 143 |
|  |  | b. | Certain Consequences to Holders of DIP Roll-Up Claims | 145 |
|  |  | c. | Certain Consequences to Holders of General Unsecured Claims Against Schedule III Debtors | 146 |
|  |  | d. | Certain Consequences to Litigation Trust Beneficiaries | 149 |
| D. | Certain Consequences Relating to the Environmental Custodial Trust | 150 |
| E. | Certain Consequences of Ownership and Disposition of New Common Stock and Notes | 151 |
|  | 1. | Ownership of New Common Stock | 151 |
|  | 2. | Ownership of Notes | 153 |
| F. | Certain Information Reporting and Backup Withholding Requirements | 154 |

| XIII. | CERTAIN DUTCH TAX CONSEQUENCES OF THE PLAN | 154 |
| A. | Dutch Income Tax Consequences to LBIH and other members of the Dutch group | 155 |
|  | 1. | Dutch Tax Consequences of Loan Restructuring (Both External Loans and Intercompany Loans) | 155 |
|  |  | a. | Full or partial waiver of debt | 155 |
|  |  | b. | Conversion of an Allowed Claim into Class A Shares | 156 |
|  |  | c. | Conversion of a debt into another debt | 156 |
|  |  | d. | Ruling from the Dutch tax authorities | 156 |
| B. | Dutch Income Tax Consequences to Holders of Allowed Claims Upon Conversion | 156 |
|  | 1. | Dutch Resident Entities | 156 |

       2.       Dutch Resident Individuals..................................................................156
       3.       Non-Residents Entities.......................................................................157
       4.       Non-Residents Individuals ..................................................................157
  C.       Dutch Income Tax Consequences of Ownership of New Common Stock or New
        Third Lien Notes................................................................................157
       1.       Withholding Tax.................................................................................157
           a.   Holders of New Common Stock ......................................................157
           b.   Holders of Notes ...........................................................................158
       2.       Taxes on income and capital gains .....................................................158
           a.   Resident Entities ..........................................................................158
           b.   Resident Individuals......................................................................158
           c.   Non-Residents Entities ..................................................................159
           d.   Non-Resident Individuals ..............................................................159
       3.       Value added tax .................................................................................159
       4.       Other taxes and duties .......................................................................159
       5.       Residence..........................................................................................159
       6.       EU Council Directive on Taxation of Savings Income ...........................160

**XIV.**     **CONCLUSION AND RECOMMENDATION**....................................................160

<u>**SCHEDULES AND EXHIBITS**</u>

List of Debtors ...................................................................................................Schedule I

List of Non-Debtor Affiliates .............................................................................. Schedule II

List of Schedule III Debtors.................................................................................Schedule III

List of Real Property Transferred to the Environmental Custodial Trust .......................Schedule IV

Non-Exclusive List of Discharged Prepetition Intercompany Claims .............................. Schedule V

The Plan............................................................................................................Exhibit A

Liquidation Analysis............................................................................................ Exhibit B

Projected Financial Information ............................................................................Exhibit C

Disclosure Statement Order ..................................................................................Exhibit D

North American Restructuring Transactions ........................................................... Exhibit E

Millennium Custodial Trust and Environmental Custodial Trust Diagram........................ Exhibit F

# I.    INTRODUCTION

LyondellBasell Industries AF S.C.A. ("**LBIAF**") and certain of its subsidiaries and affiliates, as debtors and debtors in possession (each, a "**Debtor**," and collectively, the "**Debtors**"), submit this disclosure statement (the "**Disclosure Statement**") pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**") to holders of Claims against and Equity Interests in the Debtors in connection with (i) the solicitation of acceptances of the First Amended Joint Chapter 11 Plan of Reorganization for the LyondellBasell Debtors, dated December 11, 2009, as the same may be amended (the "**Plan**"),[2] filed with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"); and (ii) the hearing to consider confirmation of the Plan (the "**Confirmation Hearing**"), scheduled for [_____], 2010 at [____] (prevailing Eastern time).  **Unless otherwise defined herein, all capitalized terms contained in this Disclosure Statement shall have the meanings ascribed to them in the Plan.  The definition section of the Plan is attached hereto.  Headings are for convenience of reference and will not affect the meaning or interpretation of the Disclosure Statement.**

Solicitation is being conducted at this time in order to obtain sufficient votes to enable the Plan to be confirmed by the Bankruptcy Court.

The Plan sets forth how Administrative Expenses, Claims against and Equity Interests in the Debtors will be treated upon the Debtors' emergence from chapter 11 if the Plan is confirmed by the Bankruptcy Court and is thereafter consummated.  This Disclosure Statement describes certain aspects of the Plan, the Debtors' business operations, significant events leading to the Chapter 11 Cases, and related matters.  **FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND ALL OF THEIR RELATED EXHIBITS AND SCHEDULES IN THEIR ENTIRETY.**

Attached as Schedules and Exhibits to this Disclosure Statement are copies of the following documents:

| | |
|---|---|
| Schedule I | List of Debtors |
| Schedule II | List of Non-Debtor Affiliates |
| Schedule III | List of Schedule III Debtors |
| Schedule IV | List of Real Property Transferred to the Environmental Custodial Trust |
| Schedule V | Non-Exclusive List of Discharged Prepetition Intercompany Claims |
| Exhibit A | The Plan |
| Exhibit B | Liquidation Analysis |
| Exhibit C | Projected Financial Information |
| Exhibit D | Disclosure Statement Order |
| Exhibit E | North American Restructuring Transactions |
| Exhibit F | Millennium Custodial Trust and Environmental Custodial Trust Diagram |

**THE DEBTORS BELIEVE THAT THE PLAN COMPLIES WITH ALL PROVISIONS OF THE BANKRUPTCY CODE AND WILL ENABLE THEM TO RESTRUCTURE THEIR DEBT SUCCESSFULLY AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11, AND THEREFORE THAT**

---

[2] Notwithstanding the convention of filing one plan document for all Debtors, the Plan is and is tracked as separate chapter 11 plans, one for each of the 94 Debtors.

**ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, THE NON-DEBTOR AFFILIATES, THE DEBTORS' ESTATES, AND CREDITORS.**

A.  **Purpose, Limitations and Structure of this Disclosure Statement**

The purpose of this Disclosure Statement is to provide the holders of Claims against the Debtors with adequate information to make an informed decision as to whether to accept or reject the Plan and, if applicable, whether to exercise Subscription Rights in connection with the Rights Offering.  The information in this Disclosure Statement may not be relied upon for any other purpose, and nothing contained in this Disclosure Statement shall constitute an admission of any fact or liability or as a stipulation or waiver by any party, or be admissible in any other case or any bankruptcy or nonbankruptcy proceeding involving any of the Debtors or any other party, or be deemed conclusive advice on the tax, securities or other legal effects of the Plan.

On [__], 2010, after notice and a hearing, the Bankruptcy Court issued an order (the "**Disclosure Statement Order**") approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical, reasonable investor typical in each Class of Claims being solicited to make an informed judgment whether to accept or reject the Plan.  The Disclosure Statement Order is attached as Exhibit D hereto and should be referred to for details regarding the procedures for the solicitation of votes on the Plan.  **APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

Unless otherwise specified herein, the statements contained in this Disclosure Statement are made only as of December 11, 2009.  Delivery of this Disclosure Statement after December 11, 2009 does not mean that the information set forth in this Disclosure Statement remains unchanged since such date or the date of the materials relied upon in preparing this Disclosure Statement, and, except to the extent required by the Bankruptcy Code or Bankruptcy Rules, the Debtors have no duty to update any information herein.  The Debtors have prepared the information contained in this Disclosure Statement in good faith, based upon the information then available to them.  Moreover, certain of the statements contained in this Disclosure Statement, by their nature, are forward-looking and contain estimates, assumptions and projections, and there can be no assurance that these forward-looking statements will be correct at any later date.  Except as otherwise expressly stated, no audit of the financial information contained in this Disclosure Statement has been conducted.  Except as otherwise expressly provided herein, all references to "$" or "dollars" are deemed references to the lawful money of the United States of America.

The description of the Plan contained in this Disclosure Statement is intended only as a summary, and is qualified in its entirety by reference to the Plan itself.  If any inconsistency exists between the Plan and this Disclosure Statement, the terms of the Plan shall govern.  The Plan is a legally binding agreement and should be read in its entirety.  Each holder of a Claim that is classified in an Impaired Class should read, consider and carefully analyze the terms and provisions of the Plan as well as the information contained in this Disclosure Statement and the other documents provided herewith.  This Disclosure Statement includes ranges of potential recoveries for each class of creditors and different options for treatment of such creditors, and, accordingly, any modification of the Plan that falls within these ranges and provides one of the treatment options outlined in the Disclosure Statement or Plan, or a substantially similar treatment option, will not constitute an adverse change of the treatment of the claim of any creditor or the interest of any equity security holder pursuant to Bankruptcy Rule 3019.

If you are eligible to vote on the Plan or to subscribe to the Rights Offering, this Disclosure Statement and all of its schedules and exhibits should have been delivered to you.  There are certain documents and other materials identified in this Disclosure Statement and the Plan that are not attached to this Disclosure Statement or the Plan (such documents and materials, the "**Plan Supplement**").  The Plan Supplement will be filed with the Bankruptcy Court on or before the date that is at least ten (10) days prior to the deadline to vote to accept or reject the Plan.  Once it is filed, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  You may obtain a copy of the Plan Supplement once it is filed, or any of the schedules and exhibits to this Disclosure Statement, by accessing the website of the claims agent appointed in these chapter 11 cases (the "**Chapter 11 Cases**"), at *www.epiqbankruptcysolutions.com*, or by sending a written request to the Debtors' counsel, Cadwalader, Wickersham & Taft LLP, at One World Financial Center, New York, New York 10281, Attn:  George A. Davis, Esq. and Andrew M.  Troop, Esq.

If you have any questions about the packet of materials you have received, you may contact the Debtors' counsel by mail at the address listed above, or by phone at (212) 504-6000.

### B. Summary of the Plan

Although the Chapter 11 Cases are jointly administered pursuant to an order of the Bankruptcy Court, the Debtors are not proposing the substantive consolidation of their respective bankruptcy estates. Thus, although the Plan generally applies to all the Debtors, except where otherwise indicated, (i) the Plan constitutes 94 distinct chapter 11 plans, one for each Debtor; (ii) for voting purposes, each holder of a Claim in a Class will vote its Claims in such Class by individual Debtor; and (iii) the classification scheme set forth in Article IV hereof applies to each Debtor, but to the extent there are no Claims in a certain Class against a particular Debtor, that Class will be deemed not to exist for any purpose whatsoever in respect of that Debtor. The Debtors are submitting a Joint Plan, covered by a single Disclosure Statement, to simplify drafting and to avoid duplicative costs relating to the preparation and distribution of multiple plans and disclosure statements.

The following tables summarize the classification and treatment of Administrative Expenses, Claims and Equity Interests under the Plan.[3] For the purpose of providing a full picture of the Debtors' obligations with respect to the payments to be made in connection with confirmation of the Plan, descriptions of Claims are included even if they are not separately classified under the Plan. *For a more detailed description of the classification and treatment of Claims and Equity Interests under the Plan, please see Article IV below.*

| Class | Description | Treatment Under The Plan | Estimated Recovery* | Voting Status |
|---|---|---|---|---|
| -- | Administrative Expenses (estimated $311 million – $391 million, plus Postpetition Intercompany Claims) | Each holder of an Allowed Administrative Expense will receive, in full and complete satisfaction, settlement and release of such Administrative Expense, an amount in Cash equal to the Allowed amount of such Administrative Expense on, or as soon as is reasonably practicable after, the later of (i) the Effective Date, (ii) the date such Administrative Expense otherwise would become due in the ordinary course of business, and (iii) the last Business Day of the month in which such Administrative Expense becomes Allowed, provided such Administrative Expense becomes Allowed at least ten (10) days prior to the last Business Day of the month, otherwise the last Business Day of the following month. | 100% | N/A |
| -- | DIP New Money Claims and DIP ABL Claims (estimated $2.167 billion – $4.9 billion)[4] | Each holder of a DIP New Money Claim or DIP ABL Claim will receive, in full and complete satisfaction, settlement and release of such Claim (except for the Excluded DIP Obligations), an amount in Cash equal to the Allowed amount of such Claim on the Effective Date. | 100% | N/A |

---

\*     N/A indicates that no Claims have been scheduled or filed, or if filed, are expected to be Allowed.

[3] These tables provide only a summary of the classification, impairment and entitlement to vote of Administrative Expenses, Claims, and Equity Interests under the Plan. For a complete description of the classification and treatment of Claims and Equity Interests, reference should be made to the entire Disclosure Statement and the Plan and all exhibits thereto, to which this summary is qualified in its entirety by reference. All figures are approximate and aggregated for all Debtors.

[4] Low estimate is based on actual draw amount of $2.167 billion as of December 9, 2009. High estimate is based on potential maximum availability under the DIP Financing. The Debtors estimate that the amount outstanding for DIP New Money Claims and DIP ABL Claims (including letters of credit, accrued interest and other fees) will be approximately $3.04 billion as of the Effective Date.

| Class | Description | Treatment Under The Plan | Estimated Recovery* | Voting Status |
|---|---|---|---|---|
| -- | Priority Tax Claims (estimated $14 million – $23 million) | Each holder of an Allowed Priority Tax Claim will receive, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim, at the sole option of the Debtor primarily obligated for the payment of such Allowed Priority Tax Claim, (i) on the Effective Date, an amount in Cash equal to the Allowed amount of such Claim, or (ii) on the Effective Date and each year on the Effective Date Anniversary, or on any earlier date at the sole option of the applicable Debtor, equal annual Cash payments, in an aggregate amount equal to such Allowed Priority Tax Claim, together with a rate of interest determined under applicable nonbankruptcy law pursuant to section 511 of the Bankruptcy Code or such other amount as determined by the Bankruptcy Court in the Confirmation Order, over a period not exceeding five (5) years after the later of (a) the Commencement Date and (b) the date of assessment of such Allowed Priority Tax Claim; *provided, however*, that no holder of an Allowed Priority Tax Claim will be entitled to any payments on account of any pre-Effective Date interest or penalty accrued on or after the Commencement Date with respect to or in connection with such Allowed Priority Tax Claim.  All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date will be paid in the ordinary course of business by the applicable Debtor as such obligations become due. | 100% | N/A |
| 1 | Priority Non-Tax Claims (estimated $0.4 million – $2 million) | Except to the extent that the holder has been paid by or on behalf of the Debtors prior to the Effective Date, each holder of an Allowed Priority Non-Tax Claim against any Debtor will receive, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim, an amount in Cash equal to the Allowed amount of such Priority Non-Tax Claim on the later of (i) the Effective Date and (ii) the last Business Day of the month in which such Priority Non-Tax Claim becomes Allowed, provided such Priority Non-Tax Claim becomes Allowed at least ten (10) days prior to the last Business Day of the month, otherwise the last Business Day of the following month. | 100% | Unimpaired; Not entitled to vote (deemed to accept) |
| 2 | Secured Tax Claims (estimated $10 million – $12 million) | Each holder of an Allowed Secured Tax Claim against any Debtor, at the sole option of the Debtor obligated for the payment of such Allowed Secured Tax Claim, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim, will either (i) receive on the Effective Date, Cash equal to the Allowed amount of such claim, or (ii) retain its lien securing such Allowed Secured Tax Claim and on the Effective Date and each year on the Effective Date Anniversary, or on any earlier date at the sole option of the applicable Debtor, receive from such Debtor equal annual Cash payments, in an aggregate amount equal to such Allowed Secured Tax Claim, together with a rate of interest determined under applicable nonbankruptcy law pursuant to section 511 of the Bankruptcy Code or such other amount as determined by the Bankruptcy Court in the Confirmation Order, over a period not exceeding five (5) years after the date of assessment of such claim. | 100% | Unimpaired; Not entitled to vote (deemed to accept) |

| Class | Description | Treatment Under The Plan | Estimated Recovery* | Voting Status |
|---|---|---|---|---|
| 3 | DIP Roll-Up Claims ($3.25 billion) | Each holder of an Allowed DIP Roll-Up Claim will receive on the Effective Date, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim against the Debtors and the Obligor Non-Debtors, New Third Lien Notes in the same principal amount as such Allowed Claim; *provided, however*, that if Class 3 votes to reject the Plan, (a) each holder of an Allowed DIP Roll-Up Claim that votes to reject the Plan will receive on the Effective Date, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim against the Debtors and the Obligor Non-Debtors, Cram Down Notes in the same principal amount as such Allowed Claim, and (b) each holder of an Allowed DIP Roll-Up Claim that does not vote to reject the Plan will receive on the Effective Date, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim against the Debtors and the Obligor Non-Debtors, New Third Lien Notes in the same principal amount as such Allowed Claim. Following the Voting Deadline, holders of Allowed DIP Roll-Up Claims will not be able to change their vote on the Plan without the written consent of the Debtors.<br><br>To the extent that the requisite majority of holders (in both number and amount of claims) of Allowed DIP Roll Up Claims cause Class 3 to accept the Plan, all holders of Allowed DIP Roll-Up Claims will receive on the Effective Date, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim against the Debtors and the Obligor Non-Debtors, New Third Lien Notes in the same principal amount as such Allowed Claims, no holder of an Allowed DIP Roll Up Claim will receive any Cram Down Notes, and the Debtors will not issue the Cram Down Notes. In that event, on the Effective Date, the 3% exit fee under the DIP Term Loan Agreement shall be paid to the DIP Roll Up Lenders. The principal terms of the New Third Lien Notes and the Cram Down Notes are set forth in Exhibit D and Exhibit E to the Plan, respectively.<br><br>In addition, if a majority in the aggregate amount of Claims in Class 3 and Class 4 together vote in favor of the Plan, the guarantees made by, and liens on account of the DIP Roll-Up Claims and Senior Secured Claims against, the Obligor Non-Debtors will be released pursuant to the terms of the Senior Secured Credit Agreement. | 100% | Impaired; Entitled to vote |

| Class | Description | Treatment Under The Plan | Estimated Recovery* | Voting Status |
|---|---|---|---|---|
| 4 | Senior Secured Claims ($9.51 billion) | Each holder of an Allowed Senior Secured Claim will receive on the Effective Date, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim against the Debtors (i) its Pro Rata Share of 100% of Class A Shares based on net value allocable to LBFC and its direct and indirect subsidiaries, less the number of Class A Shares provided to holders of Allowed Claims who receive a distribution in Classes 5 and 7-C, subject to dilution on account of the Equity Compensation Plan and the New Warrants; *provided, however*, that each holder of a Senior Secured Facility Claim will also receive on account of Claims against Obligor Non-Debtors distributions as set forth in Section 5.4(a) of the Plan, (ii) the right to purchase its Rights Offering Pro Rata Share of Class B Shares, *provided, however*, that the right of any holder of a Class 4 Claim to purchase its Rights Offering Pro Rata Share of Class B Shares will be limited to the amount corresponding to the number of Class A Shares to be distributed on the Effective Date pursuant to (i) of Section 4.4(b) of the Plan (other than the proviso thereto), and (iii) an Allowed Claim in Class 7-C in an amount up to $8.96 billion against each of Millennium US Op Co, LLC ("**MPCO**"), Millennium Petrochemicals Inc. ("**MPI**") and Millennium Specialty Chemicals Inc ("**MSC**"). In addition, all holders of Allowed Senior Secured Claims will waive all Deficiency Claims they may have against Obligor Debtors. Additionally, as required by the Lender Litigation Settlement, on the Effective Date, the Senior Secured Lenders will assign to the Debtors all of their rights and remedies under the Intercreditor Agreement with respect to the holders of 2015 Notes.<br><br>If a majority in the aggregate amount of Claims in Class 3 and Class 4 together vote in favor of the Plan, the guarantees made by, and liens on account of the DIP Roll-Up Claims and Senior Secured Claims against, the Obligor Non-Debtors will be released pursuant to the terms of the Senior Secured Credit Agreement.<br><br>On the Effective Date, all outstanding Senior Secured Facility Letters of Credit shall be terminated and replaced by letters of credit issued under the Exit Facility on terms satisfactory to the Senior Secured LC Issuer. | [__]%[5] | Impaired; Entitled to vote |
| 5 | Bridge Loan Claims ($8.297 billion) | Each Allowed Bridge Loan Claim will receive on the Effective Date, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim against the Debtors (i) an Allowed Claim in Class 7-C against MPCO, MPI and MSC, (ii) its Pro Rata Share of 26,785,344 Class A Shares (which is the equivalent of 4.75% of the Class A and Class B Shares), subject to dilution on account of the Equity Compensation Plan and the New Warrants, and (iii) its Pro Rata Share of the New Warrants.<br><br>On the Effective Date, the rights and claims (including any guarantee claims) of holders of Bridge Claims against Obligor Non-Debtors shall be extinguished. | 6.3% | Impaired; Entitled to vote |

---

[5] Recoveries were determined on a post-Rights Offering basis. Holders of Senior Secured Claims will receive a [__]% recovery on account of their Claims against Debtors based on the net allocable value of LBFC and its direct and indirect subsidiaries. Holders of Senior Secured Facility Claims will receive an additional recovery on account of their Claims against LBIH and LBIAF and their direct and indirect subsidiaries (other than LBFC and its direct and indirect subsidiaries).

| Class | Description | Treatment Under The Plan | Estimated Recovery* | Voting Status |
|---|---|---|---|---|
| 6 | Other Secured Claims (estimated $256 million – $262 million) | Each Allowed Other Secured Claim against a Debtor will be, on the Effective Date, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim, at the sole discretion of the Debtor obligated for the payment of such Allowed Claim, either (i) reinstated or rendered unimpaired in accordance with section 1124 of the Bankruptcy Code (only if not due and payable on or before the Effective Date), notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Other Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of a default; (ii) paid in the ordinary course of business in accordance with the course of practice between the Obligor Debtors and such holder with respect to such Allowed Claim; or (iii) paid by transfer of the Collateral securing such Allowed Claim to the holder of such Allowed Claim. Mechanic's and materialman's liens which were properly asserted and perfected under applicable law will be Allowed Claims and will be paid in full. | 100% | Unimpaired; Not entitled to vote (deemed to accept) |
| 7-A | General Unsecured Claims Against the Obligor Debtors[6] (estimated $944 million – $1.22 billion) | Each holder of an Allowed General Unsecured Claim against an Obligor Debtor will receive on the Effective Date, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim, (i) its Pro Rata Share of Cash totaling $300 million, less an amount of Cash distributed to holders of Allowed Class 8 Claims on a pro rata basis as if the amount of such claimant's Allowed Class 8 Claims were included in Class 7-A, and (ii) its Pro Rata Share of the Litigation Trust, less the amount distributed to holders of Allowed Class 8 Claims on a pro rata basis as if the amount of such claimant's Allowed Class 8 Claims were included in Class 7-A.[7] | 10.7% plus any recovery from the Litigation Trust | Impaired; Entitled to vote |
| 7-B | General Unsecured Claims Against Non-Obligor Debtors (estimated $8 million – $9 million) | Each holder of an Allowed General Unsecured Claim against a Non-Obligor Debtor will receive on the Effective Date, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim, its Pro Rata Share of Cash totaling the net value of its applicable Debtor after allocation of Allowed Administrative Expenses, Other Secured Claims, Priority Tax Claims and Priority Non-Tax Claims against the applicable Non-Obligor Debtor. See Exhibit G to the Plan for the estimated recovery percentages for each Non-Obligor Debtor, estimated General Unsecured Claims against each Non-Obligor Debtor and the estimated value attributable to each Non-Obligor Debtor. | 0-100% | Impaired/ Unimpaired; Not entitled to vote (deemed either to accept or reject)[8] |

---

[6] Although there are unencumbered assets at Lyondell Chemical and Basell USA Inc., there is no value available to General Unsecured Claims against these Debtors after allocating among the Debtors Administrative Expenses (including professional fees), amounts owed under or in respect of the DIP ABL Claims and DIP New Money Claims, and amounts owed on or in respect of any adequate protection liens and claims of prepetition secured creditors as a result of those adequate protection liens.

[7] Holders of Allowed General Unsecured Claims against MSC, MPI and MPCO, other than Senior Secured Lenders and Bridge Lenders, will also be entitled to share in recoveries as holders in Class 7-A.

[8] As set forth on Exhibit G to the Plan, depending on the applicable Non-Obligor Debtor, holders of Claims in this Class will recover either 100% of their Claims or 0% of their Claims. Holders of Allowed General Unsecured Claims that will recover 100% will be deemed to accept the Plan. Holders of Allowed General Unsecured Claims that will recover 0% will be deemed to reject the Plan.

| Class | Description | Treatment Under The Plan | Estimated Recovery* | Voting Status |
|---|---|---|---|---|
| | | Basell Capital Corporation | N/A | Impaired; Not entitled to vote (deemed to reject) |
| | | Basell Impact Holding Company | N/A | Impaired; Not entitled to vote (deemed to reject) |
| | | Equistar Bayport, LLC | 0% | Impaired; Not entitled to vote (deemed to reject) |
| | | Lyondell Asia Pacific, Ltd. | 100% | Unimpaired; Not entitled to vote (deemed to accept) |
| | | LyondellBasell Advanced Polyolefins USA Inc. | 100% | Unimpaired; Not entitled to vote (deemed to accept) |
| | | LyondellBasell AF GP S.à.r.l. | 100% | Unimpaired; Not entitled to vote (deemed to accept) |
| | | Lyondell Bayport, LLC | N/A | N/A |
| | | Lyondell Chemical Holding Company | N/A | N/A |
| | | Lyondell Chemical International Company | N/A | N/A |
| | | Lyondell Chemical Properties, L.P. | N/A | N/A |
| | | Lyondell Chemical Wilmington, Inc. | N/A | N/A |
| | | Lyondell General Methanol Company | N/A | N/A |
| | | Lyondell Greater China, Ltd. | 100% | Unimpaired; Not entitled to vote (deemed to accept) |

| Class | Description | Treatment Under The Plan | Estimated Recovery* | Voting Status |
|-------|-------------|------------------------|---------------------|---------------|
| | | Lyondell Intermediate Holding Company | N/A | N/A |
| 7-C | General Unsecured Claims Against Schedule III Debtors (estimated $1.15 billion – $1.78 billion plus Senior Secured Lender and Bridge Lender general unsecured Claims against MPI, MSC and MPCO) | Each holder of an Allowed General Unsecured Claim against MCI will receive, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim, beneficial trust interests in the Millennium Custodial Trust, which will entitle such holder to its Pro Rata Share of recoveries with respect to the assets of the Millennium Custodial Trust, including any recovery by MCI as a result of its direct or indirect ownership interest in its direct and indirect subsidiaries. Each holder of an Allowed General Unsecured Claim against an MCI Subsidiary will receive, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim, a contractual right under the Plan from the applicable MCI Subsidiary entitling the holder to a potential payment up to the amount of such holder's Allowed Claims against the MCI Subsidiary on the Effective Date; *provided, however,* that to the extent holders of Claims in Class 5 are granted a Claim in Class 7-C by virtue of Section 4.5(b)(i) of the Plan, the total aggregate recovery available to each holder on account of such Class 7-C Claim will be its Pro Rata Share of 1,409,755 Class A Shares (which is the equivalent of 0.25% of the Class A and Class B Shares), subject to dilution on account of the Employee Compensation Plan and New Warrants (the "Maximum Recovery"). To the extent any contractual right described in the preceding sentence receives a distribution, for every $1 of value (which may be in the currency of Class A Shares) distributed to the aggregate amount of Claims held by the Senior Secured Lenders and the Bridge Lenders in this Class 7-C, the Senior Secured Lenders will receive 95% of such value and the Bridge Lenders will receive 5% of such value until the Bridge Lenders receive their Maximum Recovery, after which the Senior Secured Lenders will receive 100% of every such $1 of value. To the extent that holders of Claims in Class 5 that have been granted a Claim in Class 7-C by virtue of Section 4.5(b)(i) of the Plan do not receive their Maximum Recovery prior to the first Effective Date Anniversary, such holders will receive 100% of every $1 of value distributed to the combined Claims as described in the previous sentence until they receive their Maximum Recovery after which the Senior Secured Lenders will receive 100% of every such $1 of value. See Exhibit H to the Plan for the estimated recovery percentages for each Schedule III Debtor, estimated General Unsecured Claims against each Schedule III Debtor, and the estimated value attributable to each Schedule III Debtor.[9] Holders of General Unsecured Claims against MCI, MSC, MPI, Millennium America, Inc. and MPCO, other than Senior Secured Lenders and Bridge Lenders, will also be entitled to share in recoveries as holders in Class 7-A. See Section IV.C.1 herein for a detailed description of the Millennium Custodial Trust. | 0-100% | Impaired; Entitled to vote |
| | | Circle Steel Corporation | N/A | N/A |
| | | Duke City Lumber Company, Inc. | 0.00% | Impaired; Entitled to vote |

---

[9] Although certain of the Schedule III Debtors have Allowed Administrative Expenses (including professional fees), Other Secured Claims, Priority Tax Claims and Priority Non-Tax Claims allocable to such Schedule III Debtor, such Claims shall be paid or otherwise afforded the treatment set forth above by the non-Schedule III Debtors as part of the consideration for the releases that the Schedule III Debtors are granting to the non-Schedule III Debtors pursuant to the Plan.

| Class | Description | Treatment Under The Plan | Estimated Recovery* | Voting Status |
|-------|-------------|--------------------------|---------------------|---------------|
| | | Equistar Funding Corporation | N/A | N/A |
| | | Equistar Polypropylen, LLC | N/A | N/A |
| | | Equistar Transportation Company, LLC | N/A | N/A |
| | | Glidco Leasing, Inc. | N/A | N/A |
| | | Glidden Latin America Holdings Inc. | N/A | N/A |
| | | HOISU Ltd. | 0.00% | Impaired; Entitled to vote |
| | | HPT 28 Inc. | N/A | N/A |
| | | HPT 29 Inc. | N/A | N/A |
| | | HW Loud Company | N/A | N/A |
| | | IMWA Equities II, Co., L.P. | N/A | N/A |
| | | ISB Liquidating Company | N/A | N/A |
| | | LeMean Property Holdings Corporation | N/A | N/A |
| | | LPC Partners Inc. | N/A | N/A |
| | | MHC Inc. | 0.00% | Impaired; Entitled to vote |
| | | Millennium America Holdings Inc. | 10.7% * | Impaired; Entitled to vote |
| | | Millennium America Inc. | 10.7%** | Impaired; Entitled to vote |
| | | Millennium Chemicals Inc. | 10.8%** | Impaired; Entitled to vote |
| | | Millennium Holdings, LLC | 0.00% | Impaired; Entitled to vote |
| | | Millennium Petrochemicals GP LLC | 10.8%** | Impaired; Entitled to vote |

* 10.7 percentage points of this recovery is on account of the Committee Litigation Settlement, and accordingly, holders of unsecured guarantee or Deficiency Claims by the Senior Secured Lenders and Bridge Lenders at this Class do not participate in that portion of the recovery, but share in any recovery in excess of 10.7%.

| Class | Description | Treatment Under The Plan | Estimated Recovery* | Voting Status |
|---|---|---|---|---|
| | | Millennium Petrochemicals Inc. | 12.3%** | Impaired; Entitled to vote |
| | | Millennium Petrochemicals LP LLC | N/A | N/A |
| | | Millennium Petrochemicals Partners, LP | 10.7%** | Impaired; Entitled to vote |
| | | Millennium Realty Inc. | N/A | N/A |
| | | Millennium Specialty Chemicals Inc. | 11.3%** | Impaired; Entitled to vote |
| | | Millennium US Op Co LLC | 10.7% | Impaired; Entitled to vote |
| | | Millennium Worldwide Holdings I Inc. | 0.00% | Impaired; Entitled to vote |
| | | MWH South America LLC | N/A | N/A |
| | | National Distillers & Chemical Corporation | 0.00% | Impaired; Entitled to vote |
| | | NDCC International II | N/A | N/A |
| | | Penn Export Company, Inc. | N/A | N/A |
| | | Penn Navigation Company | N/A | N/A |
| | | Penn Shipping Company, Inc. | 0.00% | Impaired; Entitled to vote |
| | | Penntrans Company | N/A | N/A |
| | | PH Burbank Holdings, Inc. | 0.00% | Impaired; Entitled to vote |
| | | Power Liquidating Company, Inc. | N/A | N/A |
| | | Quantum Acceptance Corp. | N/A | N/A |
| | | Quantum Pipeline Company | 0.00% | Impaired; Entitled to vote |
| | | SCM Chemicals Inc. | N/A | N/A |

| Class | Description | Treatment Under The Plan | Estimated Recovery* | Voting Status |
|-------|-------------|--------------------------|---------------------|---------------|
| | | SCM Plants, Inc. | 0.00% | Impaired; Entitled to vote |
| | | Suburban Propane GP, Inc. | 100% | Unimpaired; Not entitled to vote |
| | | Tiona, Ltd. | N/A | N/A |
| | | UAR Liquidating Inc. | N/A | N/A |
| | | USI Chemicals International Inc. | 0.00% | Impaired; Entitled to vote |
| | | USI Credit Corp. | N/A | N/A |
| | | USI Puerto Rico Properties, Inc. | N/A | N/A |
| | | Walter Kidde & Company, Inc. | N/A | N/A |

| Class | Description | Treatment Under The Plan | Estimated Recovery* | Voting Status |
|---|---|---|---|---|
| | | Wyatt Industries, Inc. | 0.00% | Impaired; Entitled to vote |
| 8 | 2015 Notes Claims ($1.351 billion) | If Class 8 votes to accept the Plan, the Debtors, as assignees as of the Effective Date of the rights and remedies of the Senior Secured Lenders and Bridge Lenders under the Intercreditor Agreement, will waive the contractual subordination and turnover provisions of the Intercreditor Agreement so that the holders of Allowed 2015 Notes Claims will receive on the Effective Date, and subject to dismissal with prejudice of the 2015 Note Adversary Proceeding, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim, their Pro Rata Share as holders of Class 7-A Claims.[3]  In addition, such vote will be deemed a direction to the 2015 Notes Trustee to dismiss with prejudice the 2015 Adversary Proceeding, as described in Section III.J.2 herein.  If Class 8 rejects the Plan, or the 2015 Note Adversary Proceeding will not be dismissed with prejudice, holders of Allowed 2015 Notes Claims will not receive any distribution under the Plan by reason of enforcement by the Debtors of the subordination and turnover provisions of the Intercreditor Agreement and the recovery of the holders of 2015 Notes Claims as holders of Claims in Class 7-A will be deemed turned over to the Reorganized Debtors.<br><br>Regardless of whether Class 8 votes to accept or reject the Plan, on the Effective Date, (i) the rights and claims of holders of 2015 Note Claims against Obligor Non-Debtors will be extinguished pursuant to Section 5.4 of the Plan and the Enforcement Action in accordance with the terms of the Intercreditor Agreement and the 2015 Notes Indenture, (ii) the holders thereof will, subject to the first paragraph of the Section 4.10(b) of the Plan, be entitled to no recovery against Obligor Debtors or Obligor Non-Debtors by reason of the turnover provisions of the Intercreditor Agreement, and (iii) the holders thereof will be enjoined from taking any action against any Debtor or Non-Debtor Affiliate on account of any 2015 Notes Claim. | 0-10.7% plus any recovery from the Litigation Trust | Impaired; Entitled to vote |
| 9 | Securities Claims (estimated $0) | Holders of Securities Claims will not receive or retain any interest or property under the Plan on account of such Claims. | N/A | Impaired; Not entitled to vote (deemed to reject) |
| 10 | Subordinated Claims estimated ($0) | Holders of Subordinated Claims will not receive or retain any interest or property under the Plan on account of such Claims. | N/A | Impaired; Not entitled to vote (deemed to reject) |
| 11 | Equity Interests in LBFC ($0) | Equity Interests in LBFC will be cancelled on the Effective Date.  No distribution of any kind will be made on account of Equity Interests in LBFC. | N/A | Impaired; Not entitled to vote (deemed to reject) |

---

[3] In the event that holders of 2015 Notes Claims receive Litigation Trust Interests and the Debtors exercise their turnover rights, such Litigation Trust Interests will be extinguished rather than held by the Debtors.

| Class | Description | Treatment Under The Plan | Estimated Recovery* | Voting Status |
|---|---|---|---|---|
| 12 | Equity Interests in LyondellBasell AF GP S.à.r.l. ("**LBAFGP**") and LBIAF ($0) | As a result of the restructuring transactions, LBIAF's interests in its indirect subsidiaries will be terminated in recognition of the fact that there is no net equity value to LBIAF in any of those interests. *See* Section IV.B.5 herein.  Accordingly, because LBAFGP and LBIAF (and LBIAF's sole direct subsidiary, Basell Funding S.à.r.l.) have no value, and no distribution of any kind will be made on account of Equity Interests in either LBAFGP or LBIAF.  LBAFGP, LBIAF and Basell Funding S.à.r.l. will be dissolved post-emergence in accordance with applicable law. | N/A | Impaired; Not entitled to vote (deemed to reject) |
| 13 | Equity Interests in MCI and the Schedule III Debtors ($0) | Equity Interests in MCI will be transferred on the Effective Date to the Millennium Custodial Trust and cancelled after the sale of assets and distribution of proceeds by the Millennium Custodial Trust.  No distribution of any kind will be made on account of Equity Interests in a Schedule III Debtor unless and until creditors of that Schedule III Debtor have been paid in full. | N/A | Impaired; Not entitled to vote (deemed to reject) |
| 14 | Equity Interests in Debtors (other than LBFC, LBAFGP, LBIAF and Schedule III Debtors) ($1.5 million - $1.7 million) | At the election of New Topco, all Equity Interests in a Debtor held by a Debtor (i) will be unaffected by the Plan, in which case the entity holding an Equity Interest in such Debtor-subsidiary will continue to hold such Equity Interest in the applicable reorganized Debtor-subsidiary following the Effective Date, (ii) will be cancelled and new equity in the applicable reorganized Debtor will be issued pursuant to the Plan, or (iii) will be transferred pursuant to the Plan.  In the case of Equity Interests in Basell Germany, which are held by LBIH, such Equity Interests will be unaffected by the Plan and LBIH will continue to hold such Equity Interest following the Effective Date. | N/A | Unimpaired; Not entitled to vote (deemed to accept) |

**C.**     **Voting on the Plan and Subscribing to the Rights Offering**

    The Disclosure Statement Order approved certain procedures governing the solicitation of votes on the Plan from holders of Claims against and Equity Interests in the Debtors and subscription to the Rights Offering by Eligible Holders, which procedures are described below.

    1.     *Classes Entitled to Vote or Subscribe*

    Pursuant to the provisions of the Bankruptcy Code, only holders of claims or interests that are members of a class that (a) is "impaired" within the meaning of section 1124 of the Bankruptcy Code (an "**Impaired Class**") and (b) is not deemed to have rejected a plan under section 1126(g) of the Bankruptcy Code, are entitled to vote to accept or reject a plan of reorganization.  Classes of claims or interests that are not impaired under section 1124 of the Bankruptcy Code are conclusively presumed to have accepted a plan and are not entitled to vote to accept or reject the plan.  Impaired Classes of which the members will receive no recovery under a plan are deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the plan.

    Only holders of record of Claims or Equity Interests as of the date of the Disclosure Statement Order (*i.e.* [_____], 2010) that otherwise are entitled to vote to accept or reject the Plan have been sent a copy of this Disclosure Statement and an appropriately customized Ballot.  Only Eligible Holders who are holders of record as of the Record Date have been sent a Subscription Form.

    As discussed above, under the Bankruptcy Code, holders of claims or interests whose claims or interests are not impaired are conclusively presumed to have accepted a proposed plan of reorganization. Conversely, any class whose claims or interests do not entitle the holders thereof to receive or retain property under a plan is deemed not to have accepted the plan.  Only holders of Claims or Equity Interests in Classes that are

classified in an Impaired Class and are entitled to receive or retain property under the Plan are permitted to vote to accept or reject the Plan. Under the Plan, Classes 3, 4, 5, 7-A, 7-C and 8 are each an Impaired Class and, to the extent Claims and Equity Interests in those Classes are Allowed, the holders of those Claims or Equity Interests may be entitled to receive distributions under the Plan. As a result, those holders of Claims and Equity Interests are entitled to vote to accept or reject the Plan. In contrast, each of Classes 1, 2, 6, and 14 and certain of the sub-classes in Classes 7-B under the Plan are not an Impaired Class; consequently, holders of Claims in those Classes are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan. Classes 9, 10, 11, 12 and 13 under the Plan are each an Impaired Class, and certain of the sub-classes in Classes 7-B are an Impaired Class, but the holders of the Claims or Equity Interests in such Classes are <u>not</u> entitled to receive distributions under the Plan; consequently, those Classes are deemed to have rejected the Plan and the members of those Classes are not entitled to vote to accept or reject the Plan.

2.      *Votes Required for Acceptance of the Plan by a Class*

Pursuant to the Bankruptcy Code, a class of claims is considered to have accepted a proposed plan of reorganization if the plan is accepted by more than one-half of the class members that actually voted on the plan, holding at least two-thirds in dollar amount of the claims in that class for which a valid ballot was submitted. Thus, for each of Classes 3, 4, 5, 7-A, 7-C and 8 under the Plan, the Class will have accepted the Plan if, of the total number of Class members that vote, more than one-half vote to accept the Plan, and such majority of voters holds at least two-thirds of the total dollar amount of the Claims in that Class for which a Ballot was properly submitted.

Pursuant to the Bankruptcy Code, a class of equity interests is considered to have accepted a proposed plan of reorganization if the plan is accepted by holders of at least two-thirds in terms of dollar amount of the interests in that class for which a ballot was actually submitted.

3.      *Tabulation of Votes*

A vote to accept or reject the Plan may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not cast in good faith or was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. A Ballot that does not indicate the acceptance or rejection of the Plan or that indicates both acceptance and rejection of the Plan will be counted as a vote for acceptance of the Plan. If the holder of a Claim or Equity Interest otherwise does not properly submit its Ballot, or that holder's vote is disregarded, that holder and that holder's Claim or Equity Interest will not be included in deciding whether the requisite number of Class members and amount of Claims or Equity Interests voted to accept or reject the Plan. If a Class is entitled to vote and no properly submitted Ballots are returned from such Class, the Class will be deemed to have accepted the Plan. *For a more detailed description of the requirements for confirmation of the Plan, please see Section V.C of this Disclosure Statement.*

If one or more of the Classes of Claims or Equity Interests entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code, or both, without providing further notice to the holders of any Claim or Equity Interest. Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan of reorganization notwithstanding the non-acceptance of the plan by one or more Impaired Classes of claims or interests. Under that section, a plan may be confirmed if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class. Holders of Claims and Equity Interests should assume that, if one or more of the Classes of Claims or Equity Interests entitled to vote on the Plan reject the Plan, the Debtors will amend the Plan, as required, and request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code, or both, at the currently scheduled Confirmation Hearing (as defined herein). *For a more detailed description of the requirements for confirmation of a plan that has been rejected by one or more classes, please see Section V.C.4 of this Disclosure Statement.*

4.      *Voting Instructions*

If you are entitled to vote on the Plan, a Ballot is enclosed with this Disclosure Statement. If you are entitled to vote in more than one Class, you will receive separate Ballots for each Claim or Equity Interest entitled to vote, which must be used for each separate Claim and Equity Interest. Please refer to the Disclosure Statement Order for more specific instructions on voting on the Plan.

The Debtors recommend that you **vote in favor** of the Plan.

If you are an Eligible Holder entitled to subscribe in the Rights Offering, a Subscription Form will also be enclosed with the Disclosure Statement. If a Subscription Form is not included, you are not an Eligible Holder entitled to subscribe.

**If you are a holder of record of a Claim entitled to vote:**

Please vote and return your Ballot(s) and Subscription Form, if applicable, in accordance with the instructions set forth herein and in the instructions accompanying your Ballot(s) and Subscription Form, if applicable, to:

Lyondell Ballot Processing Center
c/o Financial Balloting Group
757 Third Avenue, 3rd Floor
New York, NY 10017

**TO BE COUNTED, YOUR EXECUTED BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED AT THE ADDRESS ABOVE NO LATER THAN 4:00 P.M. (PREVAILING EASTERN TIME) ON [_____], 2010 (THE "VOTING DEADLINE"). ANY BALLOT RECEIVED THAT IS NOT EXECUTED, DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, OR INDICATES BOTH ACCEPTANCE AND REJECTION OF THE PLAN WILL BE COUNTED AS A VOTE FOR ACCEPTANCE OF THE PLAN. DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT. FACSIMILE BALLOTS WILL NOT BE ACCEPTED.**

**IF YOU ARE ENTITLED TO SUBSCRIBE, THE LAST DAY TO EXERCISE YOUR SUBSCRIPTION RIGHTS, IF APPLICABLE, IS [_____] (THE "RIGHTS OFFERING EXPIRATION DATE"). TO EXERCISE THE SUBSCRIPTION RIGHTS, YOU MUST (A) RETURN A DULY COMPLETED SUBSCRIPTION FORM TO THE SUBSCRIPTION AGENT SO THAT SUCH FORM IS RECEIVED BY THE SUBSCRIPTION AGENT ON OR BEFORE THE RIGHTS OFFERING EXPIRATION DATE; AND (B) PAY IN CASH, BY WIRE TRANSFER IN IMMEDIATELY AVAILABLE FUNDS OR OTHERWISE, AN AMOUNT EQUAL TO THE FULL SUBSCRIPTION PURCHASE PRICE FOR THE NUMBER OF CLASS B SHARES ELECTED TO BE PURCHASED BY SUCH ELIGIBLE HOLDER, OR, IN THE CASE OF SECURITIES HELD THROUGH A BANK OR BROKERAGE FIRM, SEND THE SUBSCRIPTION FORM TO THE BANK OR BROKERAGE FIRM (OR FOLLOW SUCH FIRM'S DIRECTIONS WITH RESPECT TO SUBMITTING SUBSCRIPTION INSTRUCTIONS TO THE FIRM) WITH SUFFICIENT TIME FOR THE BANK OR BROKERAGE FIRM TO EFFECT THE SUBSCRIPTION THROUGH DTC ON OR PRIOR TO 5:00 P.M. (PREVAILING EASTERN TIME) ON THE RIGHTS OFFERING EXPIRATION DATE. IF THE SUBSCRIPTION AGENT FOR ANY REASON DOES NOT RECEIVE FROM A GIVEN ELIGIBLE HOLDER BOTH A TIMELY AND DULY COMPLETED SUBSCRIPTION FORM AND TIMELY PAYMENT OF SUCH HOLDER'S SUBSCRIPTION PURCHASE PRICE, SUCH ELIGIBLE HOLDER WILL BE DEEMED TO HAVE IRREVOCABLY RELINQUISHED AND WAIVED ITS RIGHT TO PARTICIPATE IN THE RIGHTS OFFERING.**

**If you hold your Claim through a nominee:**

Holders of Senior Secured Claims, Bridge Loan Claims or 2015 Notes Claims who are the beneficial owners of the Senior Secured Claims, Bridge Loan Claims or 2015 Notes Claims, as applicable, but hold those securities through a nominee who is the record holder of such security, must submit their votes as directed by the record holder or nominee. Record holders have two options for soliciting votes from their beneficial holders: (i) record holders may pre-validate a ballot by completing the first item in the ballot, executing the ballot and sending that pre-validated ballot to the beneficial holder with instructions for the beneficial holder to complete the remaining portions of the ballot and deliver it to the Voting Agent prior to the Voting Deadline, or (ii) record holders may send a ballot that is not pre-validated to the beneficial holder with instructions to complete all items in the ballot, execute the ballot and return the executed ballot to the record holder. In the case of clause (ii), the record holder will then

tabulate on a master ballot all of the information contained in all of the ballots submitted to it by its beneficial holders, execute the master ballot and deliver the executed master ballot to the Voting Agent prior to the Voting Deadline. In the case of clause (ii), it is important that beneficial holders return their ballots to their record holder sufficiently in advance of the Voting Deadline to allow the record holder to prepare and submit its master ballot prior to the Voting Deadline. For more detailed instructions on the balloting procedures, see the voting instructions attached to the ballot enclosed with this Disclosure Statement.

5. _Inquiries_

If you are a holder of a Claim or Equity Interest entitled to vote on the Plan and either did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you believe you are an Eligible Holder entitled to exercise Subscription Rights and you either did not receive a Subscription Form, received a damaged Subscription Form or lost your Subscription Form, or if you have questions about the procedures for voting your Claim or Equity Interest or about exercising Subscription Rights, or about the packet of materials that you received, please contact Financial Balloting Group LLC (the "**Voting Agent**"), at 757 Third Avenue, 3rd Floor, New York, NY 10017, Attention: Lyondell Ballot Processing, or by telephone at (866) 329-9971.

If you wish to obtain additional copies of the Plan, this Disclosure Statement, or the exhibits to those documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact Cadwalader, Wickersham & Taft LLP, at One World Financial Center, New York, New York 10281, Attn: George A. Davis, Esq. and Andrew M. Troop, Esq., by telephone at (212) 504-6000 or by electronic mail at george.davis@cwt.com and andrew.troop@cwt.com.

**D.    Confirmation Hearing**

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will commence on [_____], 2010, beginning at [9:45 a.m.] (prevailing Eastern time), before the Honorable Robert E. Gerber, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Courtroom 621, One Bowling Green, New York, New York 10004. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before [_____], 2010, at 4:00 p.m. (prevailing Eastern time). The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing. Subsequent to the Confirmation Hearing, the Bankruptcy Court may issue an Order confirming the Plan (the "**Confirmation Order**").

**E.    Overview of Chapter 11 Process**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business for the benefit of itself, its creditors, and its equity interest holders. In addition to permitting rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of the debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor in property as of the commencement date. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the terms for satisfying claims against and equity interests in a debtor. Upon confirmation of a plan of reorganization, it is binding on the debtor, any issuer of securities under the plan, and any creditor or equity interest holder of the debtor. Subject to certain limited exceptions, the confirmation order discharges the reorganizing debtor from any debts that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

After a chapter 11 plan has been filed, holders of certain claims against and equity interests in a debtor are permitted to vote to accept or reject such plan. Before soliciting acceptances of the proposed plan, however, a debtor is required under section 1125 of the Bankruptcy Code to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.

The Debtors are submitting this Disclosure Statement to holders of Claims against and Equity Interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code. This Disclosure Statement sets forth specific information regarding the pre-bankruptcy history of the Debtors (within the context of the greater LyondellBasell enterprise), the nature and progress of the Chapter 11 Cases, and the anticipated organizational and capital structure and operations of the Reorganized Debtors after confirmation of the Plan and emergence from chapter 11. This Disclosure Statement also describes the Plan, alternatives to the Plan, effects of confirmation of the Plan, certain risk factors associated with the debt and equity securities that the Reorganized Debtors will issue to holders of certain Claims and Equity Interests, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process, the voting procedures that holders of Claims and Equity Interests entitled to vote must follow in order for their votes to be counted, and the subscription process and procedures that Eligible Holders entitled to exercise Subscription Rights must follow in order to exercise Subscription Rights.

## II. GENERAL INFORMATION ABOUT LYONDELLBASELL

The Debtors and each of their Non-Debtor Affiliates (listed in Schedule II hereto) form a consolidated business enterprise with operations around the world (such consolidated enterprise, "**LyondellBasell**").

### A. Description and History of LyondellBasell's Businesses

#### 1. *Corporate History*

LyondellBasell was created on December 20, 2007 when Basell AF S.C.A. ("**Basell AF**") indirectly acquired all of the then-outstanding common shares of Lyondell Chemical Company ("**Lyondell Chemical**") in an all-cash transaction pursuant to an agreement and plan of merger (the "**2007 Merger**"). As a result, Lyondell Chemical became a wholly-owned indirect subsidiary of Basell AF, which was renamed LyondellBasell Industries AF S.C.A. The merger created one of the world's largest petrochemical companies, with significant global scale and leading product positions. Concurrently with the 2007 Merger, Lyondell Chemical sold certain of its non-U.S. subsidiaries to certain European subsidiaries of LBIAF. The purchase of Lyondell Chemical's outstanding common stock and the assumption of debt and payment of related transaction costs resulted in a total purchase price of $20.873 billion, consisting of $12.371 billion in cash, $7.506 billion in retained and refinanced debt and $996 million in other costs. Certain aspects of the 2007 Merger are currently the subject of the Committee Litigation, which is discussed in more detail in Section III.K of this Disclosure Statement.

Prior to the merger, Lyondell Chemical was the third-largest independent, publicly-traded chemical company in North America. It was a large global manufacturer of chemicals and plastics, a refiner of heavy crude oil and producer of fuel products. Since its spin-off from Atlantic Richfield Company ("**ARCO**") in 1989, the company had grown by strategic acquisitions of, among other assets, the chemicals and polymers businesses and/or subsidiaries of Arco, Millennium Chemicals Inc. ("**MCI**"), and Occidental Petroleum Corp., as well as the non-Lyondell Chemical shares of joint ventures such as Lyondell-CITGO Refining LP (which became Houston Refining LP ("**Houston Refining**")).

Prior to the merger, the group of companies owned by Basell AF was the largest producer of polypropylene and advanced polyolefin products, a leading supplier of polyethylene and catalysts, and an industry leader in licensing polypropylene and polyethylene process technologies. The Basell group of companies was formed in September 2000 when BASF and Shell Chemicals combined their respective polypropylene businesses with their existing polyethylene joint venture. Access Industries, a privately-held, U.S.-based industrial group, subsequently acquired Basell AF in August 2005.

Throughout 2005 and 2006, Basell AF made a number of small acquisitions and divestitures, including the acquisition of (i) the remaining 50% interest it did not previously hold in its former joint venture Société du Craqueur de l'Aubette S.A. of France and of a naphtha cracker located at the Münchsmünster, Germany petrochemical site and (ii) the catalyst business of Akzo Nobel in Edison, New Jersey, which was later partially sold to W.R. Grace & Co. Additionally, Basell AF expanded its network of joint ventures across the Middle East and Central Europe.

2.       *Scale and Scope of Business*

The 2007 Merger created the third largest independent chemicals company in the world (based on 2007 revenues on a pro forma basis after giving effect to the 2007 Merger). For the year ended December 31, 2008, LyondellBasell's revenues were $50.7 billion, with 55% of revenues attributable to North American operations, 38% to European operations, and 7% to operations in the rest of the world. As of December 31, 2008, total assets were $28.7 billion.

LyondellBasell is geographically diverse and has extensive global manufacturing, supply, technical, and commercial infrastructures. As of the Commencement Date, LyondellBasell (including its joint ventures) operated more than sixty facilities in nineteen countries, selling products in more than one hundred countries, and, at the close of the 2007 Merger, employed approximately 17,000 people worldwide. With the exception of Basell Germany Holdings GmbH ("**Basell Germany**"), LBIAF and LyondellBasell AF GP S.à.r.l. ("**LBAFGP**"), the Debtors comprise what is essentially the U.S. operations of LyondellBasell's global, vertically integrated industrial business.

LyondellBasell operates in four reportable business segments: (i) fuels; (ii) chemicals; (iii) polymers; and (iv) technology and R&D. Each is described briefly below.

a.     Fuels

LyondellBasell's fuels segment refines heavy, high-sulfur crude oil in the U.S. Gulf Coast, refines light and medium weight crude oil in southern France, and produces gasoline blending components at several of its olefins units and propylene oxide units in the U.S. and Europe. In 2008, LyondellBasell's fuels segment generated operating revenues (excluding inter-company revenues) of $17 billion.

LyondellBasell's oil refinery in Houston, Texas, operated by Debtor Houston Refining, is one of North America's largest full conversion refineries capable of processing significant quantities of heavy, high-sulfur crude oil. This crude oil is more viscous and dense than traditional crude oil and contains higher concentrations of sulfur and heavy metals, making it more difficult to refine into gasoline and other high-value fuel products. However, it has historically been less costly to purchase than light, low-sulfur crude oil. Processing heavy, high-sulfur crude oil in significant quantities requires a refinery with extensive coking, catalytic cracking, hydrotreating and desulfurization capabilities, *i.e.*, a "complex refinery." The Houston refinery's complexity enables it to operate in full conversion mode, processing approximately 268,000 barrels per day on a calendar day basis (normal operating basis), producing a slate of products that consists primarily of high-value, clean products, including gasoline, jet fuel and ultra low-sulfur diesel fuel. The Houston refinery's products also include heating oil, lube oils (industrial lubricants, white oils and process oils), carbon black oil, refinery-grade propylene, petrochemical raw materials, sulfur, residual fuel, and petroleum coke. The Houston refinery has a Nelson Complexity Index of 11.4.

The products of the Houston refinery are marketed and sold in large commodity markets primarily in bulk on the U.S. Gulf Coast to other refiners, marketers, distributors and wholesalers at market-related prices, mostly under contracts with a term of one year or less, or else in the spot market. LyondellBasell also sells refined products purchased or received on exchange from other parties, which helps to optimize refinery supply operations and lower transportation costs. To meet market demands, LyondellBasell from time to time purchases refined products manufactured by others for resale to LyondellBasell's customers; however, purchased volumes have not historically had a significant impact on profitability.

Most of the crude oil used as a raw material for the Houston refinery is purchased under a supply agreement with PDVSA-Petróleo, S.A. ("**PDVSA Oil**"), an affiliate of Petróleos de Venezuela S.A. ("**PDVSA**"), the national oil company of Venezuela. The contract with PDVSA Oil provides for the purchase and supply of 215,000 barrels per day of heavy, high-sulfur crude oil through July 31, 2011 and automatically renews annually subject to either party's right to terminate at the end of a term by giving 12 months' notice. The contract incorporates pricing determined by a formula reflecting published market indices, which is designed to be consistent with published prices for similar grades of crude oil.

In April 2008, LyondellBasell acquired the refinery and related business in Berre, France from Société des Pétroles Shell. The Berre refinery is designed to process light to medium weight crude oil and has a throughput of approximately 105,000 barrels per day. This refinery produces naphtha, vacuum gas oil, liquefied petroleum gas, gasoline, diesel, bitumen, heating oil, and other products, and also provides LyondellBasell with access to significant logistics assets, including pipeline access, storage terminals and harbor access to the Mediterranean Sea. The Berre refinery has a Nelson Complexity Index of 6.7.

The Berre refinery also provides raw material and site integration benefits for LyondellBasell's olefins and polyolefins businesses in France, including the materials required for LyondellBasell's nearby olefins cracker. Its remaining products are sold into local markets at market-related prices under contracts or in the spot market. Key customers of the Berre refinery include other refiners, marketers and distributors, and its products are primarily transported via pipelines and other infrastructure assets owned by LyondellBasell. Most of the crude oil used as a raw material for the Berre refinery is sourced from North Africa, Russia, the Caspian Sea region and West Africa.

LyondellBasell's fuels segment also produces methyl tertiary butyl ether (MTBE) and alkylate,[10] and ethyl tertiary butyl ether (ETBE).[11] All three are derivatives of co-products of the propylene oxide and/or ethylene produced by LyondellBasell's chemicals segment. In North America, LyondellBasell produces MTBE at two facilities in Texas and alkylate at one of those facilities. During early 2009, a third MTBE unit located at Chocolate Bayou, Texas was shut down indefinitely. In Europe, LyondellBasell produces MTBE and ETBE at facilities in Fos-sur-Mer, France and Botlek, The Netherlands. LyondellBasell sells its MTBE and ETBE under market-based sales agreements and in the spot market. LyondellBasell blends its alkylate into gasoline and also sells it under short-term contracts and in the spot market.

Substantially all refiners and blenders have discontinued the use of MTBE in the U.S., partly as a result of U.S. federal governmental initiatives to increase use of bio-ethanol in gasoline as well as some state legislation to reduce or ban the use of MTBE. However, MTBE/ETBE demand for use in gasoline blending remains strong in the remaining global market. Accordingly, LyondellBasell markets MTBE produced in the U.S. for use elsewhere. LyondellBasell's U.S.-based and European-based MTBE/ETBE plants generally have the flexibility to produce either MTBE or ETBE to accommodate market needs. LyondellBasell produces ETBE in Europe to address Europe's growing demand for bio-based fuels. Since the discontinuation of MTBE use in the United States, LyondellBasell completed a project to convert its MTBE unit at Channelview, Texas to ETBE production. A substantial portion of the ETBE production from that unit has been committed for sale to the Asian Market.

b. Chemicals

LyondellBasell is a leading manufacturer of chemicals that serve as the key building blocks for the petrochemicals industry, as well as the raw materials for its own polymers business segment and other chemicals products. Products of LyondellBasell's chemicals segment include (i) ethylene[12] and its co-products, including

---

[10] Both are high octane gasoline blending components.

[11] ETBE is an ethanol-based alternative gasoline blending component.

[12] Ethylene is used as a raw material to manufacture polyethylene, EO, ethanol, ethylene dichloride, styrene, and VAM. LyondellBasell produces ethylene at six facilities in the U.S., four facilities in Europe and a joint venture facility in Saudi Arabia; in the U.S. it is generally consumed internally as a raw material in the production of derivatives and polymers, or is shipped by pipeline to customers, while in Europe it is generally consumed internally as a raw material in the production of polymers.

propylene,[13] butadiene,[14] benzene,[15] and toluene;[16] (ii) ethylene derivatives, such as ethylene oxide (EO),[17] ethylene glycol (EG),[18] EO derivatives,[19] and ethanol;[20] (iii) propylene oxide (PO)[21] and derivatives and co-products, such as styrene monomer (SM),[22] tertiary butyl alcohol (TBA), TBA derivative isobutylene,[23] propylene glycol (PG),[24] propylene glycol ethers (PGE),[25] and butanediol (BDO);[26] (iv) acetyls and related products, such as vinyl acetate monomer (VAM),[27] acetic acid,[28] and methanol;[29] and (v) flavors and fragrances.[30] In 2008, LyondellBasell's chemicals segment generated operating revenues (excluding inter-company revenues) of $15 billion.

[13] Propylene is used to produce polypropylene, acrylonitrile, and PO. LyondellBasell produces propylene at seven sites in the U.S. and three sites in Europe. In addition, a LyondellBasell joint venture, SPC, produces propylene at a propane dehydrogenation (PDH) plant in the Middle East. LyondellBasell uses propylene internally as a raw material for production of PO and polypropylene; excess volume is sold under multi-year contracts. In addition, pursuant to a 15-year propylene supply arrangement entered into by Equistar in 2003 with a subsidiary of Sunoco, Inc., LyondellBasell supplies 700 million pounds of propylene annually to Sunoco.

[14] Butadiene is used to manufacture styrene-butadiene rubber and polybutadiene rubber, which are used in the manufacture of tires, hoses, gaskets, and other rubber products. Butadiene is also used in the production of paints, adhesives, nylon clothing, carpets, paper coatings, and engineered plastics. LyondellBasell produces butadiene and aromatics (benzene and toluene) at three sites in the U.S. and two sites in Europe. LyondellBasell generally sells its butadiene under multi-year contracts.

[15] Benzene is used to produce styrene, phenol and cyclohexane, which are used in the production of nylon, plastics, synthetic rubber, and polystyrene (used in insulation, packaging and drink cups). LyondellBasell generally uses its benzene internally as a raw material for production of styrene.

[16] Toluene is used as an octane enhancer in gasoline, as a chemical raw material for benzene and/or paraxylene production, and as a core ingredient in toluene diisocyanate, a compound used in urethane production. LyondellBasell generally blends its toluene into gasoline. Of the toluene production that is not consumed internally, most is sold under annual contracts.

[17] EO is used to produce surfactants, industrial cleaners, cosmetics, emulsifiers, paints, heat transfer fluids, and EG. EO and EG typically are sold under multi-year contracts, with market-based pricing. EO or EO equivalents, and EO's primary derivative, EG, are produced at a facility located in Bayport, Texas. In addition, PD Glygol, a partnership between E.I. DuPont de Nemours and Company, and one of its subsidiaries (collectively, "**DuPont**"), and Equistar, holds an idled EO/EG facility in Beaumont, Texas. The Beaumont facility was damaged by Hurricane Ike in September 2008 and has not operated since. Due to the significant capital that would be required to repair this facility, the management of Equistar and DuPont agreed to initiate the dissolution of the PD Glycol partnership. By order dated August 11, 2009, the Bankruptcy Court approved an agreement between Equistar, DuPont and PD Glycol, which provided, among other things, that (i) certain agreements between Equistar, DuPont and PD Glycol are rejected; (ii) Equistar's general partnership interest in PD Glycol is converted into a limited partnership interest; and (iii) PD Glycol shall be dissolved as expeditiously as commercially practicable.

[18] EG is used to produce polyester fibers and film, polyethylene terephthalate (PET) resin, heat transfer fluids, and automobile antifreeze.

[19] EO derivatives include ethylene glycol ethers and ethanolamines, and are used to produce paints and coatings, polishes, solvents, and chemical intermediates. LyondellBasell's facility in Bayport, Texas produces EO derivatives, principally EG ethers and ethanolamines, which are sold primarily into the solvent and distributor markets at market prices.

[20] The ethanol produced by LyondellBasell is used in the production of solvents as well as household, medicinal, and personal care products.

[21] PO is a key component of polyols, PG, PGE, and BDO.

[22] SM is used to produce plastics, such as expandable polystyrene for packaging, foam cups and containers, insulation products and durables, and engineering resins.

[23] Isobutylene is used in manufacturing synthetic rubber and fuel and lubricant additives, such as MTBE and ETBE.

[24] PG is used to produce unsaturated polyester resins for bathroom fixtures and boat hulls, lower toxicity antifreeze, coolants and aircraft deicers, and cosmetics, and cleaners.

[25] PGE are used as solvents for paints, coatings, cleaners, and a variety of electronics applications.

[26] BDO is used in manufacturing engineering resins, films, personal care products, pharmaceuticals, coatings, solvents, and adhesives.

[27] VAM is a petrochemical product used in producing polymers products used in adhesives, water-based paint, textile coatings, and paper coatings. It is manufactured by LyondellBasell at a facility in La Porte, Texas, and consumed internally, sold worldwide generally under multi-year contracts, and sold on a spot basis.

Ethylene is the most significant petrochemical in terms of worldwide production volume, and is the key building block for polyethylene and a large number of other chemicals, plastics and synthetics. Ethylene and its co-products and derivatives are fundamental to many segments of the economy, including the production of consumer products, packaging, housing and automotive components and other durable and nondurable goods. LyondellBasell at times purchases ethylene, propylene, benzene and butadiene for consumption or resale, when necessary, to satisfy internal and/or customer demand for these products above production levels. Volumes of ethylene, propylene, benzene and butadiene purchased for resale can vary significantly from period to period; however, purchased volumes have not historically had a significant impact on profits.

In the U.S., most of the ethylene and propylene production of LyondellBasell's facilities in Channelview, Corpus Christi and La Porte is shipped via pipeline to numerous U.S. Gulf Coast consumers. The pipeline system, which is partially owned by LyondellBasell and partially leased, extends from Corpus Christi to Mont Belvieu to Port Arthur, Texas as well as into the Lake Charles, Louisiana area. In addition, exchange agreements with other producers of ethylene and its co-products allow access to customers who are not directly connected to this pipeline system. Some ethylene is shipped by rail car from Clinton, Iowa to Morris, Illinois and also to customers. A pipeline owned and operated by an unrelated party is used to transport ethylene from Morris, Illinois to Tuscola, Illinois. Butadiene, benzene, toluene and other products are distributed by pipeline, rail car, truck, barge or ocean-going vessel.

European ethylene and propylene production is generally either fully integrated with, or is transported via pipeline to, LyondellBasell's polyethylene and polypropylene facilities in Europe.

Raw material cost is the largest component of the total cost for the production of ethylene and its co-products. The primary raw materials used are "heavy liquids," including crude oil-based naphtha, gas oil, and condensate (a very light crude oil resulting from natural gas production), and natural gas liquids (NGLs) such as ethane, propane and butane. Heavy liquids requirements for LyondellBasell's chemicals segment are sourced via a mix of contractual and spot arrangements (a portion also is obtained from the fuels segment). A large portion of the NGLs requirements is purchased via contractual arrangements from a variety of sources, but NGLs also are purchased on the spot market. The raw materials for ethylene and its co-products and derivatives are, in general, commodities with numerous bulk suppliers and ready availability at competitive prices. Historically, raw material availability for ethylene and its co-products and derivatives has not been an issue. In addition, in North America, LyondellBasell obtains its entire requirements for raw materials (acetic acid and ethylene) used to produce VAM from its internal production. LyondellBasell's ethylene derivatives facilities also generally receive ethylene as raw material from LyondellBasell's ethylene facilities via its pipeline system, pipelines owned by unrelated parties, or on-site production.

In addition to ethylene and its co-products, LyondellBasell produces large quantities of propylene oxide (PO) and its co-products and derivatives, chiefly SM, TBA, and TBA derivatives (including isobutylene, which is reported in the chemicals segment, and MTBE and ETBE, which are reported in the fuels segment). Production occurs principally at five facilities in Texas, two facilities in The Netherlands, one facility in Japan, and one facility in France.[31] LyondellBasell produces and delivers its PO and co-products through sales agreements, processing agreements, spot sales, and product exchanges, and its PO derivatives through market-based sales

---

[28] Acetic acid is a raw material used to produce VAM, terephthalic acid (used to produce polyester for textiles and plastic bottles), industrial solvents, and a variety of other chemicals. Manufactured at LyondellBasell's facility in La Porte, Texas, it is consumed internally, sold worldwide generally under multi-year contracts, and sold on a spot basis.

[29] Methanol is a raw material used to produce acetic acid, MTBE, formaldehyde, and several other products. It is produced at a La Porte, Texas facility owned by La Porte Methanol Company, LyondellBasell's 85%-owned joint venture with Linde. Each party to the joint venture receives its respective share of the methanol production. LyondellBasell's acetyls business uses the methanol as a raw material for acetic acid, but also sells methanol under annual contracts and on a spot basis to large U.S. customers.

[30] Flavors and fragrance chemicals include terpene-based fragrance ingredients and flavor ingredients, primarily for the oral care markets, and also include products used in applications such as chemical reaction agents, or initiators, for the rubber industry, and solvents and cleaners, such as pine oil, for the hard surface cleaner markets.

[31] Certain of these facilities are owned and/or operated by joint ventures of a LyondellBasell entity with third parties.

contracts and spot sales. LyondellBasell consumes a significant portion of its internally-produced PO in the production of PO derivatives.

LyondellBasell sells most of its SM production into the North American and European merchant markets and to European, Asian and South American export markets through long-term sales contracts and processing agreements. LyondellBasell also purchases SM for resale, when necessary, to satisfy customer demand; however, purchased SM volumes have not historically had a significant impact on profits. LyondellBasell converts most of its TBA to isobutylene and also sells some of its TBA into the market. LyondellBasell's chemicals business generally sells the isobutylene to third parties under market-based sales agreements and in the spot market or uses the isobutylene internally as a raw material in the fuels business.

The primary raw materials used for the production of PO and its co-products and derivatives are propylene, isobutane, ethylene and benzene. In the U.S., LyondellBasell obtains a large portion of its requirements internally from its own ethylene and ethylene co-products facilities. Raw materials for the non-U.S. production of PO and its co-products and derivatives primarily are obtained from unrelated parties. LyondellBasell also has invested in facilities, or entered into processing agreements with unrelated parties, to convert normal butane, a widely available commodity, to isobutane.

The cost of these raw materials generally is the largest component of total production cost for PO and its co-products and derivatives. Generally, the raw material requirements for these businesses are purchased at market-based prices from numerous suppliers in the U.S. and Europe with which LyondellBasell has established contractual relationships, as well as in the spot market. The market prices of these raw materials historically have been related to the price of crude oil and its principal refinery derivatives, as well as market conditions. These raw materials are, in general, commodity chemicals with ready availability at competitive prices. Historically, raw material availability has not been an issue.

c.   Polymers

LyondellBasell is the world's largest producer and marketer of polypropylene[32] (approximately 15% of global capacity as of December 31, 2008) and a leading producer and marketer of polyethylene, including high density polyethylene (HDPE),[33] low density polyethylene (LDPE)[34] and linear low density polyethylene (LLDPE)[35] and metallocene linear low density polyethylene (mLL). LyondellBasell also produces and markets other polyolefins[36] and high-value specialty and advanced polyolefins products, such as propylene-based

---

[32] Polypropylene is primarily used to manufacture fibers for carpets, rugs and upholstery; housewares; medical products; automotive interior trim, fascia, battery cases, running boards and bumpers; toys and sporting goods, technical clothing and performance fabrics; food packaging and bottle caps and closures.

[33] HDPE is primarily used to manufacture grocery, merchandise and trash bags; food containers; plastic caps and closures; liners for boxes of cereal and crackers; plastic drink cups and toys; dairy crates; bread trays; pails for items from paint to fresh fruits and vegetables; safety equipment such as hard hats; house wrap for insulation; bottles for household and industrial chemicals and motor oil; milk, water, and juice bottles; large (rotomolded) tanks for storing liquids such as agricultural and lawn care chemicals; and pipe.

[34] LDPE is primarily used to manufacture food packaging films; plastic bottles for packaging food and personal care items; dry cleaning bags; ice bags; pallet shrink wrap; heavy-duty bags for mulch and potting soil; boil-in-bag bags; coatings on flexible packaging products; and coatings on paper board used for drink cartons. Ethylene vinyl acetate is used to make a specialized form of LDPE used in foamed sheets, bag-in-box bags, vacuum cleaner hoses, medical tubing, clear sheet protectors and flexible binders.

[35] LLDPE is primarily used to manufacture garbage and lawn-leaf bags; industrial can liners; housewares; lids for coffee cans and margarine tubs, dishpans, home plastic storage containers, kitchen trash containers; large (rotomolded) toys such as outdoor gym sets; drip irrigation tubing; wire and cable insulating resins and compounds used to insulate copper and fiber optic wiring, and film; shrink wrap for multi-packaging canned food; bag-in-box bags; produce bags; and pallet stretch wrap.

[36] Polyolefins are a form of thermoplastics accounting for approximately two-thirds of worldwide demand for thermoplastics. Since their industrial commercialization, thermoplastics have found wide-ranging applications and continue to replace traditional materials such as metal, glass, paper and wood. LyondellBasell's products are used in consumer, automotive and industrial

compounds, materials and alloys (PP compounds),[37] *Catalloy* process resins,[38] polybutene-1 (PB-1),[39] thermoplastic elastomers, polyolefin tie layer resins, polyethylene wire and cable compounds, and polyolefin powder grades to meet global demand in consumer and industrial applications ranging from food and beverage packaging to housewares and construction materials. In 2008, LyondellBasell's polymers segment generated operating revenues (excluding inter-company revenues) of $18 billion.

LyondellBasell produces polypropylene and polyethylene at 29 facilities worldwide, consisting of nine facilities in North America, 11 facilities in Europe, four facilities in Asia, two facilities in the Middle East (one of which started operations earlier this year), two facilities in Australia and one facility in South America.[40] In addition, LyondellBasell owns a polyethylene facility in Münchsmünster, Germany that is currently being rebuilt following a fire in 2005. LyondellBasell's Al-Waha Petrochemicals Ltd. ("**Al-Waha**") joint venture commenced production at the new facilities in the Middle East in the third quarter of 2009. LyondellBasell also has a facility in Ohio that produces performance polymer compounds, which include enhanced grades of polypropylene and polyethylene.

LyondellBasell's polypropylene and polyethylene are typically sold to an extensive base of established customers, under annual or multi-year contracts or else under customary terms and conditions without formal contracts. In North America, LyondellBasell has an exclusive marketing agreement with ConocoPhillips, pursuant to which LyondellBasell sells and markets the polypropylene production from ConocoPhillips' 775 million pound per annum facility at Bayway, New Jersey. This contract will be terminated at the end of 2009. On a worldwide basis, LyondellBasell typically has exclusive marketing arrangements with its joint ventures to sell and market polypropylene and polyethylene outside the country where such joint venture facility is located.

The vast majority of LyondellBasell's polyolefins products sold in North America and Europe are sold through LyondellBasell's three sales channels, which distinguish between commodity and specialty business models and allow a focused approach to meet customers' needs by offering (i) a "no-frills" relationship for a limited range of commoditized products, (ii) standard services via a direct local sales presence for a broad range of commoditized products, for customers who value a traditional relationship and sales support, and (iii) a full-service relationship, including security of supply and a dedicated innovation project team that draws on the expertise and strength of LyondellBasell's research and development organization for the high-growth and high-value application segments of the polyolefins market.

The principal raw materials used by LyondellBasell's polyolefins business are propylene and ethylene. In Europe, LyondellBasell has the capacity, through its chemicals segment, to produce approximately 40% of the propylene requirements of its polypropylene business and in excess of 75% of the ethylene requirements of its polyethylene business. The remaining European propylene and ethylene requirements are purchased under long-term contracts with third-party suppliers at prices that are set monthly and are generally based on published market indicators, normally with discounts. In North America, LyondellBasell's propylene and ethylene

---

[37] PP compounds are specialty products produced from polypropylene products reinforced with additives. They are used to manufacture automotive interior and exterior trims, dashboards, bumpers and under-hood applications; base material for products and parts used in appliances; and anti-corrosion coatings for steel piping, wire and cable.

applications ranging from food and beverage packaging to housewares and construction materials. Polyethylene is the most widely used thermoplastic, measured on a production capacity basis.

[38] *Catalloy* process resins are superior resins produced using a unique technology and process allowing for very specific tailoring of the product properties. The patented process is proprietary LyondellBasell technology that is not licensed to third parties; as a result, LyondellBasell is the only manufacturer of *Catalloy* process resins. They are used primarily in specialty film applications and molded products; geomembranes and roofing materials; bitumen modification for roofing and asphalt applications; and automotive bumpers.

[39] PB-1 resins are a unique family of highly flexible, strong and durable butene based polymers. LyondellBasell believes that it is the largest global producer of PB-1, a majority of which is used in pipe applications and for under-floor heating and thermo sanitary systems. PB-1 is not sold for use in these applications in North America. PB-1 is also used for seal-peel film; film modification; hot melt and polyolefin modification applications; consumer packaging; and adhesives.

[40] Certain of these facilities are owned and/or operated by joint ventures of a LyondellBasell entity with third parties.

requirements are generally produced internally by LyondellBasell's chemicals business segment, supplemented, in the case of propylene, by a few long-term contracts with third party suppliers.

LyondellBasell manufactures PP compounds at five sites in Asia, four sites in Europe, three sites in the North America, two sites in South America, and one site in Australia.[41]  Among its Asian plants is a compounding plant near Guangzhou, China that commenced operations in 2008 and complements an existing plant in Suzhou, near Shanghai.  LyondellBasell manufactures *Catalloy* process resins at two facilities in the U.S., one facility in Italy and one facility in The Netherlands.  LyondellBasell also manufactures PB-1 at the same site in The Netherlands.  LyondellBasell sells its advanced polyolefins, which often are tailored for specific customer applications, under annual and multi-year contracts.

Approximately 75% of the raw materials for LyondellBasell's PP compounds are polypropylene and other polymers (primarily *Catalloy* process resins).  Most monomers used as raw materials for *Catalloy* process resins and PB-1 are sourced from third parties.

### d. Technology and Research & Development

LyondellBasell's technology and R&D business segment (i) develops and licenses leading polyolefins process technologies, including polypropylene process technologies relating to *Spheripol* (the most widely used polypropylene production process in the world*), Spherizone,* and *Metocene*, and polyethylene process technologies relating to *Lupotech, Spherilene,* and *Hostalen*; (ii) develops, manufactures and sells polyolefins catalysts, such as the *Avant* brand of catalysts; and (iii) licenses other selected chemical process technologies in the fields of olefins recovery, olefins conversion, aromatics extraction, and acetyls.  Licensing of technologies has also enabled investment in joint ventures in high growth regions to broaden LyondellBasell's global reach.  LyondellBasell also uses its process technologies and catalysts, however, for its own polyolefin manufacturing operations.  In 2008, LyondellBasell's  technology and R&D segment generated operating revenues of $434 million (excluding inter-company revenues).

Access to appropriate production process technology and catalysts is a key requirement for polyolefins producers.  LyondellBasell's ability to offer a complete polyethylene and polypropylene technology portfolio enables polyolefins manufacturers to have a single provider for polyolefins processes technologies and catalyst systems.  For licenses involving these proven technologies, LyondellBasell typically receives the majority of its license fees in cash at or before the date of start-up of the licensed facility.  Each license agreement includes long-term confidentiality provisions to protect the technology.  A range of services can also be provided in addition to the basic license agreement, which may include project assistance, training, plant start-up assistance, and supply of resins produced by LyondellBasell for pre-marketing by the licensee.  LyondellBasell also offers marketing and sales services.

LyondellBasell conducts research and development principally at its locations in Ferrara, Italy; Frankfurt, Germany; Newtown Square, Pennsylvania; and Cincinnati, Ohio.  As of December 31, 2008, approximately 1,100 employees were directly engaged in research and development activities.

### 3. *Corporate Governance*

LBIAF is a corporate partnership limited by shares organized under the laws of the Grand Duchy of Luxembourg.  LBAFGP, its general partner, is a limited liability company organized under the laws of Luxembourg.  Under Luxembourg law, LBAFGP is managed (and thus LBIAF is effectively managed) by a board of managers (the "**Management Board**"), which as of the Commencement Date consisted of seven persons.[42]

---

[41] Certain of these facilities are owned and operated by joint ventures of a LyondellBasell entity with third parties.

[42] As of the Commencement Date, the seven members of the Management Board were: Volker Trautz, Ian Dunn, Edward Dineen, Anton de Vries, Cees Los, Bart de Jong, and Alan Bigman.

Under Luxembourg law, LBIAF is also supervised by a supervisory board (the "**Supervisory Board**"), which as of the Commencement Date consisted of six persons.[43]

Debtors organized under the laws of certain states in the United States are each managed by its own board of directors or general partner, as applicable. In some cases, persons currently serving on the managing body of a Debtor have also served on the Management Board. For purposes of efficiency and logistics in preparing for and commencing the Chapter 11 Cases, the managing bodies of most Debtors were modified to consist of, generally, the same few individuals.[44]

For a discussion of management and board changes that have occurred during the Chapter 11 Cases, see Section III.R below. For a description of the corporate governance structure(s) of Reorganized LyondellBasell, see Article VII below.

4.        *Employees*

As of June 30, 2009, LyondellBasell had approximately 15,982 full-time and part-time employees. Of these, approximately 6,928 (44%) were located in North America, approximately 8,046 (50%) were located in Europe and approximately 1,008 (6%) were in other locations.

As of September 11, 2009, approximately 1,000 of LyondellBasell's employees located in North America were represented by labor unions. Of these union employees, approximately 50% are covered by a collective bargaining agreement between Houston Refining and the United Steelworkers Union, which was due to expire in January 2009. Houston Refining believes it successfully negotiated an extension of the contract through January 30, 2012, but there is a dispute as to the precise terms of the no strike provision, and the union has refused to sign the agreement despite ratification by 87% of its membership. Houston Refining filed an unfair labor practice charge with the National Labor Relations Board seeking to compel union signature. The NLRB Regional Director dismissed the charge, ruling that the union and Houston Refining did not achieve "a meeting of the minds." The company appealed to the NLRB General Counsel, who affirmed there was "no meeting of the minds" and further ruled that, as a consequence, there is no 2009-2012 CBA. This ruling is final and not appealable. Currently, union workers continue to work at Houston Refining and to be compensated in accordance with the terms of the 2006-2009 collective bargaining agreement.

Equistar Chemicals LP and the United Steelworkers Union are parties to a collective bargaining agreement effective through May 31, 2011 governing the facility in Beaumont, Texas. All employees covered by the agreement were laid-off in April 2006, and there is currently a dispute as to whether Equistar Chemicals LP must arbitrate a grievance seeking severance benefits for the employees. See Section III.J.6 herein. The union filed a lawsuit in Bankruptcy Court to compel Equistar to arbitrate the grievance and Equistar filed a motion to dismiss. The Bankruptcy Court directed the parties to engage in settlement discussions; non-binding mediation may be ordered. If neither approach produces a resolution, the Court will rule on Equistar's motion.

The vast majority of LyondellBasell's employees in Europe are subject to staff council or works council coverage or collective bargaining agreements.

In addition to its own employees, LyondellBasell uses the services of independent contractors in the routine conduct of its businesses. LyondellBasell believes its relations with its employees are good.

---

[43] As of the Commencement Date, the six members of the Supervisory Board were: Len Blavatnik, Richard Floor, Kent Potter, Philip Kassin, Lincoln Benet, and Lynn Coleman.

[44] Generally, as of the Commencement Date, the individuals were Edward Dineen, Bart de Jong, and Alan Bigman. Further modifications have been made and are anticipated in connection with the Debtors' reorganization.

### B.    The Debtors' Prepetition Financing Arrangements

In connection with the 2007 Merger, certain of the Debtors and Non-Debtor Affiliates became obligated under several credit facilities, as borrowers and/or guarantors, as described below. Certain of the credit facilities are subject to various intercreditor agreements, some of which subordinate intercompany debt to debt incurred under the credit facilities, while others regulate the relationship between lenders (where they share collateral) and/or between direct and indirect obligors within the United States, Europe and the rest of the world.

#### 1.    *Senior Secured Credit Facility*[45]

On December 20, 2007, BIL Acquisition Holdings Limited (which merged with and into Lyondell Chemical as part of the 2007 Merger), Debtor Basell Germany, and non-Debtors LyondellBasell Industries Holdings B.V. ("**LBIH**") and Basell Finance Company B.V. ("**Basell Finance**") became borrowers under a senior secured credit facility (as amended and restated, the "**Senior Secured Credit Facility**" and the governing credit agreement, the "**Senior Secured Loan Agreement**") consisting of (i) a $2.0 billion Term Loan A facility due 2013, (ii) a $7.55 billion and €1.3 billion Term Loan B facility due 2014, and (iii) a $1.0 billion multicurrency revolving credit facility due 2013. The facility is guaranteed by LBIAF and certain Debtors and certain Non-Debtor Affiliates located throughout the world, and is secured by first priority interests, subject to the DIP Facilities' priming first priority senior security interests, in substantially all present and after-acquired material assets of the Obligor Debtors and Obligor Non-Debtors, as well as first priority interests in the equity of certain Debtors and certain Non-Debtor Affiliates. The Debtors that are obligated under the Senior Secured Credit Facility, either as obligors or guarantors, but excluding Schedule III Debtors, are referred to herein as the "**Obligor Debtors**," and the Non-Debtor Affiliates that are obligated under the Senior Secured Credit Facility, either as obligors or guarantors, but excluding Schedule III Debtors, are referred to herein as the "**Obligor Non-Debtors**."

Other parties to the Senior Secured Credit Facility include Deutsche Bank Trust Company Americas (successor to Citibank, N.A.), as primary administrative agent; Deutsche Bank Trust Company Americas (successor to Citibank International plc), as European administrative agent; Citibank, N.A., as collateral agent; Citigroup Global Markets Inc., Goldman Sachs Credit Partners, L.P., Merrill Lynch, Pierce, Fenner & Smith Inc., ABN AMRO Inc., and UBS Securities LLC, as joint lead arrangers; and other lenders party thereto from time to time (collectively, the "**Senior Secured Lenders**").

As of the Commencement Date, outstanding amounts due under the Senior Secured Credit Facility (including letters of credit and unpaid interest) aggregated approximately $12.1 billion, consisting of approximately $1.91 billion for amounts due under Term Loan A, approximately $9.23 billion for amounts due under Term Loan B, and approximately $994 million for amounts due under the revolving credit facility (including letters of credit and unpaid interest).

#### 2.    *Bridge Loan Facility*

On December 20, 2007, Debtor LyondellBasell Finance Company ("**LBFC**") became a borrower under an $8.0 billion interim loan facility (as amended and restated, the "**Bridge Loan Facility**," and the governing credit agreement, the "**Bridge Loan Agreement**") ranking *pari passu* with all of LBFC's existing and future senior indebtedness and senior to all current and future subordinated indebtedness. On October 17, 2008, the Bridge Loan Facility was retranched into (i) $3.5 billion of fixed rate second lien loans, bearing interest at 12.0% (12.5% if a rate increasing event were to occur), (ii) $2.0 billion of floating rate second lien loans, and (iii) $2.5 billion of floating rate third lien loans. The Bridge Loan Facility is guaranteed by the Obligor Debtors and the Obligor Non-Debtors, and, subject to certain exceptions, is secured by second priority interests in the same collateral securing the Senior Secured Credit Facility.

Other parties to the Bridge Loan Facility include Merrill Lynch Capital Corporation, as administrative agent; Citibank, N.A., as collateral agent; Merrill Lynch, Pierce, Fenner & Smith Inc., Goldman

---

[45] Various aspects of the Senior Secured Credit Facility are being challenged by the Creditors' Committee.

Sachs Credit Partners, L.P., Citigroup Global Markets Inc., ABN AMRO Inc., and UBS Securities LLC, as joint lead arrangers; and the lenders party thereto (collectively, the "**Bridge Lenders**").

As of the Commencement Date, approximately $8.3 billion was outstanding under the Bridge Loan Facility (including unpaid interest and fees).

3. *Senior Secured Inventory-Based Credit Facility*

On December 20, 2007, Debtors Lyondell Chemical, Houston Refining, Equistar, and Basell USA Inc. entered into a senior secured inventory-based credit facility maturing in December 2012 (as amended, the "**Senior Secured Inventory-Based Credit Facility**"). The facility was a revolving credit facility in a principal amount of the lesser of $1.0 billion (subsequently increased to $1.6 billion) or a borrowing base. The borrowers were jointly and severally liable for all obligations under the facility, which was secured by (i) first priority security interests in all accounts, inventory and related assets owned by each borrower that has granted a security interest to the lenders and other secured parties (subject to customary exceptions), and (ii) first priority pledges of all equity interests owned by each borrower that has granted a security interest to the lenders and other secured parties and all indebtedness owed to such borrower by non-Debtor LyondellBasell Receivables I, LLC and Debtor Basell Capital Corporation. The facility is also guaranteed (on an unsecured basis) by each U.S. subsidiary of each borrower under the facility that guarantees the obligations under the Senior Secured Credit Facility.

Other parties to the Senior Secured Inventory-Based Credit Facility included Citibank, N.A. as administrative agent and co-collateral agent; General Electric Capital Corporation as co-collateral agent; Citigroup Global Markets Inc., Goldman Sachs Credit Partners L.P., Merrill Lynch Capital Corporation, ABN AMRO Inc., and UBS Securities LLC, as arrangers; Citibank, N.A., JPMorgan Chase Bank N.A., and other banks, as issuers of letters of credit; Citibank, N.A., as inventory administrative agent; and certain lenders party thereto.

As of the Commencement Date, approximately $1.03 billion was outstanding under the Senior Secured Inventory-Based Credit Facility (including letters of credit and unpaid interest). In January 2009, the Senior Secured Inventory-Based Credit Facility was terminated and all amounts outstanding thereunder were repaid from the proceeds of the Bankruptcy Court approved postpetition financing (the "**DIP Financing**") (other than the letters of credit, which were either backstopped with a new letter of credit issued under the DIP ABL Facility (described below) or deemed issued under the DIP ABL Facility).

4. *Asset-Based Receivables Facility*

On December 20, 2007, Lyondell Chemical, as servicer, and non-Debtor LyondellBasell Receivables I, LLC, as seller, entered into a $1.15 billion accounts receivable securitization facility maturing in December 2012 (as amended, the "**Asset-Based Receivables Facility**"), with respect to substantially all of the receivables of Lyondell Chemical, Equistar and Houston Refining.

Other parties to the Asset-Based Receivables Facility included Citigroup Global Markets Inc., Goldman Sachs Credit Partners L.P., Merrill Lynch Capital Corporation, ABN AMRO Inc. and UBS Securities LLC, as arrangers, Citibank, N.A. or an affiliate, as administrative agent and asset agent; and certain purchasers party thereto.

As of the Commencement Date, approximately $505 million (including accrued yield) of receivables under the Asset-Based Receivables Facility were outstanding. In January 2009, the facility was refinanced in full from the proceeds of the DIP Financing.

5. *Access Facility*

On March 27, 2008, Lyondell Chemical and non-Debtor Basell Finance entered into a $750 million Access Revolving Credit Facility with AI International S.à.r.l. (successor to Access Industries Holdings LLC), an affiliate of Access Industries. Access Industries Holdings LLC honored the first request to borrow under the facility for $300 million when made on October 15, 2008, and this amount was repaid in three installments on

October 16, 17, and 20, 2008. AI International refused the Debtors' second request to borrow the entire amount available under the facility when a request was made on December 30, 2008.

6. *Receivables Securitization Programs*

a. European Receivables Securitization Program

Basell Sales & Marketing Company BV ("**BS&M**") and Lyondell Chemie Nederland BV ("**Lyondell Chemie**") have a joint receivables securitization program which provides funding of up to €450 million to certain of LBIAF's European subsidiaries (the "**European Securitization Program**"). Receivables generated by certain of LBIAF's operating companies in Europe are transferred on a daily basis to a bankruptcy remote special purpose entity to support the funding provided by various commercial lenders. The transactions cover most of LBIAF's eligible receivables generated in Europe from European customers. BS&M and Lyondell Chemie each acts as servicer for the collection and administration of receivables and at the same time receive a price for the newly generated receivables sold to the special purpose entity. Each of BS&M and Lyondell Chemie is required to comply with covenants related to the conduct of its business and the nature of the receivables sold under the program. Non-compliance with any of these or other covenants could constitute a default potentially resulting in a termination of the program.

On December 1, 2009, the Bankruptcy Court entered an order, among other things, authorizing LBIAF to execute a deed of amendment to extend the maturity date of the European Securitization Program from December 15, 2009 to February 3, 2010 (or up to a maximum of 21 days thereafter, subject to the terms and conditions of the DIP Financing). On December 8, 2009, the deed of amendment became effective.

As of September 30, 2009, approximately $293 million was funded under the European receivables securitization program.

b. North American Receivables Securitization Program

In January 2009, Basell USA Inc.'s $200 million North American accounts receivable securitization program was terminated and all outstanding amounts thereunder were repaid from proceeds of the DIP Financing. On January 6, 2009, approximately $115 million of receivables were outstanding (including accrued yield).

7. *Various Notes and Debentures*

a. ARCO 2010 and 2020 Debentures

Lyondell Chemical is obligated under certain 10.25% debentures due 2010 (the "**ARCO Notes Indenture**"), in the principal amount of $100 million, and 9.8% debentures due 2020, in the principal amount of $225 million, as these obligations were assumed by Lyondell Chemical in connection with the acquisition of ARCO Chemical Company in January 2000 (the "**ARCO Notes**"). The ARCO Notes were initially unsecured, but were entitled to equal and ratable treatment if Lyondell Chemical incurred secured debt. Accordingly, as a consequence of the financing put in place in conjunction with the 2007 Merger, the ARCO Notes are now equally and ratably secured by property held directly by Lyondell Chemical that also secures the Senior Secured Credit Facility and the Bridge Loan Facility. On January 6, 2009, approximately $336 million of ARCO Notes were outstanding (including accrued interest).

b. Equistar 2026 Notes

Equistar is obligated under certain 7.55% senior notes due 2026 (the "**Equistar Notes Indenture**") in the principal amount of $150 million (the "**Equistar Notes**"). The Equistar Notes were initially unsecured, but were entitled to equal and ratable treatment if Lyondell Chemical incurred secured debt. Accordingly, as a consequence of the financing put in place in conjunction with the 2007 Merger, the Equistar Notes are now secured by certain property of Equistar that also secures the Senior Secured Credit Facility and the Bridge

Loan Facility. Lyondell Chemical is obligated under these notes as a guarantor (on an unsecured basis). On January 6, 2009, approximately $154 million of Equistar Notes were outstanding (including accrued interest).

c.      <u>Millennium 2026 Notes</u>

Debtor Millennium America Inc. is obligated under certain 7.625% senior unsecured notes due 2026 in the principal amount of $241 million (the "**Millennium Notes**"). Debtor Millennium Chemicals Inc. is obligated under these notes as a guarantor (on an unsecured basis). On January 6, 2009, approximately $244 million of Millennium Notes were outstanding (including accrued interest).

d.      <u>2015 Notes</u>

LBIAF is obligated under certain 8.375% senior notes due 2015 in the principal amounts of $615 million and €500 million (the "**2015 Notes**"). The 2015 Notes are unsecured and initially were not guaranteed, but if LBIAF incurred secured debt at any entity that guaranteed such debt, were entitled to guarantees. Accordingly, as a consequence of the financing put in place in conjunction with the 2007 Merger, the 2015 Notes are now guaranteed (on an unsecured and subordinated basis) by the Obligor Debtors and the Obligor Non-Debtors.[46] The proceeds of the 2015 Notes were subsequently loaned (the "**2015 High Yield Proceeds Loan**") to LBIH, which secured its repayment obligations thereunder with a second priority pledge of the proceeds of the 2015 Notes and 100% of the shares of non-Debtor Basell Funding S.à.r.l. As of April 24, 2009, approximately $651 million and €529 million of 2015 Notes were outstanding.

e.      <u>2027 Notes</u>

Basell Finance is obligated under certain fixed rate guaranteed notes due March 15, 2027 in the principal amount of $300 million, bearing interest at 8.1% (the "**2027 Notes**"). The 2027 Notes are guaranteed by LBIH. As of September 30, 2009, $301 million of 2027 Notes were outstanding (including accrued interest).

f.      <u>Intercreditor Agreement</u>

In connection with the closing of the 2007 Merger, the Obligor Debtors and Obligor Non-Debtors, as borrowers and guarantors under the Senior Secured Credit Facility, the Bridge Loan Facility and the 2015 Notes, entered into an intercreditor agreement dated as of December 20, 2007 (the "**Intercreditor Agreement**") with, among others, the various agents and indenture trustees under such facilities and notes (as well as the ARCO Notes Trustee and the Equistar Notes Trustee).

The Intercreditor Agreement provides that outstanding indebtedness under the Senior Secured Credit Facility, the Senior Secured Inventory-Based Credit Facility, certain issuances of the notes described above and other debt will rank in right and priority of payment in the following order:

At LBIAF:

first, the guarantee by LBIAF of indebtedness under the (a) Senior Secured Credit Facility, (b) the Bridge Loan Facility (including any extended loans), (c) the Hedging Debt (as defined in the Intercreditor Agreement), (d) second lien notes and unsecured notes, as applicable, and LBIAF's obligations under the 2015 Notes and the Hedging Debt; and

second, certain indebtedness to LBIAF's shareholders and intercompany debt owed by LBIAF.

---

[46] The guarantees of the 2015 Notes generally contain limitation language with respect to, among other things, financial assistance. As a matter of law in various non-U.S. jurisdictions, including specifically The Netherlands, the financial assistance carve out could result in the guarantees given by any Obligor Non-Debtor of that jurisdiction effectively not guaranteeing any amount due under the 2015 Notes.

At the subsidiaries of LBIAF:

first, the indebtedness under the Senior Secured Credit Facility, the Bridge Loan Facility (including any extended loans), the Hedging Debt, the Senior Inventory-Based Credit Facility, second lien notes and unsecured notes, as applicable, *pari passu*;

second, the guarantees of the 2015 Notes and indebtedness under the 2015 High Yield Proceeds Loan; and

third, intercompany debt (other than any such debt incurred or owed by LBIAF).

The Intercreditor Agreement also sets forth lien subordination of the liens granted under the Bridge Loan Facility to the liens granted under the Senior Secured Credit Facility and includes turnover provisions limiting recoveries by certain parties to the agreement until amounts owed to senior parties under the Senior Secured Credit Facility, the Bridge Loan Facility, the second lien notes and the unsecured notes are discharged. Further, upon the occurrence of certain events described in the Intercreditor Agreement, the guarantees under the 2015 Notes, the 2015 High Yield Proceeds Loan and certain intercompany debt become subordinated in right of payment to other outstanding debt of LBIAF and its subsidiaries.

g.      ABL Intercreditor Agreement

In connection with the closing of the 2007 Merger, the parties to the Asset-Based Receivables Facility entered into an intercreditor agreement dated as of December 20, 2007 (the "**ABL Intercreditor Agreement**"), addressing the priorities and related rights as among (i) the Senior Secured Inventory-Based Credit Facility, (ii) the Asset-Based Receivables Facility with respect to receivables, assets and the collateral pledged to lenders under those facilities, and (iii) the other indebtedness that is subject to the Intercreditor Agreement.

C.      **Events Leading to the Commencement of the Chapter 11 Cases**

1.      *Overview*

The immediate cause of the filing of the Chapter 11 Cases on January 6, 2009 was a sudden loss of liquidity. In particular, the Debtors suffered a noticeable tightening in liquidity beginning in November 2008, which continued through mid-December 2008. This lack of liquidity resulted from a marked increase in the price of oil before the third quarter of 2008, which increased the costs of raw materials purchased by the Debtors, followed by a sharp reduction in the price of oil in the fourth quarter of 2008, which sharply reduced the Debtors' borrowing base and, therefore, the amounts available under the Debtors' working capital facilities. The liquidity squeeze was further amplified by a sharp decline in demand for the Debtors' products due to the global economic crisis and by rapid deterioration of margins. In short, as 2008 ended, the Debtors had virtually run out of cash. Various longer-term economic and structural conditions, discussed below, also influenced the Debtors' financial condition.

2.      *Constrained Liquidity and Operational Setback*

a.      Significant Debt

The Debtors incurred significant debt in the 2007 Merger. As a result, prior to the commencement of the Chapter 11 Cases, the Debtors required a significant amount of cash to service their indebtedness. In addition, available cash, access to additional capital and future business prospects were limited by the Debtors' significant levels of debt and other financial obligations, restrictive loan covenants and the virtually unprecedented condition of the capital markets at the time. Ratings downgrades and the overall economic environment negatively impacted the availability of trade credit to the Debtors, further reducing the Debtors' available liquidity. In part, the Debtors' declining financial condition itself led to a tightening of trade credit.

b.      Volatile Commodity Prices

In the period leading up to the commencement of the Chapter 11 Cases, the Debtors faced highly volatile commodity prices for crude oil and other petroleum products, which are major inputs into the Debtors' businesses.  The price of crude oil rose dramatically over the first half of 2008, increasing the Debtors' cash and working capital needs substantially (while simultaneously increasing the Debtors' borrowing base).  Due to intense competition, customer consolidation, and the weakening economic climate, however, the Debtors were frequently unable to pass these raw material cost increases along to customers.  The extreme drop in oil and gas prices beginning in November 2008 conversely caused the Debtors' securitized borrowing base to shrink, requiring major repayments in order for the Debtors to remain in compliance with the terms of their financings.  Margins were further squeezed as higher priced inventories were expensed and pricing decreased.

### c.   Global Recession

Macroeconomic factors, including a global recession and crisis in the credit markets, created severe hardships in 2008 for many businesses, including the Debtors.  The petrochemicals industry historically has been cyclical, characterized by periods of capacity shortages and high margins, alternating with periods of excess capacity and low margins.  In 2008, demand for most of the Debtors' products weakened considerably due to the overall global economic slowdown.  November and December 2008 were especially difficult for the Debtors, as many of their customers postponed orders while trying to reduce inventories.  In part, this reflected reduced demand for final products, such as automobiles and construction supplies, for which the Debtors' products are inputs.  In addition, the global financial crisis reduced the ability of some customers of the Debtors to finance their businesses.  As a result, notwithstanding declines in the price of crude oil, the Debtors' margins on many of their products deteriorated.  Moreover, additional global capacity for several of the Debtors' products continued to come on line as a result of long-term projects by competitors.

### d.   Natural Disasters

Downtime for maintenance at certain units of the Debtors' oil refinery in Houston, Texas had to be extended due to the severe 2008 hurricane season, as well as a contractor accident in July 2008.  During the maintenance period, the Houston refinery was forced to operate at substantially reduced rates and a suboptimized feedstock mix until the maintenance could be completed, which significantly reduced profitability.  In September 2008, Hurricane Gustav and Hurricane Ike forced the Debtors temporarily to close their Houston refinery and most of their chemical plants along the Gulf Coast, costing the Debtors hundreds of millions of dollars in lost production and property damage.

### 3.   *Restructuring Efforts*

During 2008, the Debtors engaged in various efforts to reduce costs, working capital needs and discretionary spending, while maximizing liquidity and exploring ways to control costs in a difficult global economic environment.

In particular, the Debtors temporarily idled three Gulf Coast chemicals plants (representing 30% of the Debtors' U.S. ethylene capacity and 25% of the Debtors' U.S. propylene oxide capacity) and idled or reduced substantial polymers capacity and chemical derivatives capacity.  In addition to similarly adjusting operating rates at other facilities globally to optimize working capital requirements, the Debtors evaluated strategic options with respect to asset utilization, including possible sales or other monetization of some assets.  In September 2008, the Debtors completed the sale of their toluene diisocyanate business, including production assets in Pont de Claix, France, related inventories, contracts, customer lists and intellectual property, to specialty chemicals producer Perstorp Group for approximately $113 million.  In addition, the Debtors accepted settlements of certain contracts and commercial disputes, resulting in monetizing approximately $300 million of contingent assets.

Furthermore, as part of general cost reduction efforts, the Debtors made reductions in the use of contractors and announced reductions in workforce.  As of the Commencement Date, the Debtors and their Non-Debtor Affiliates employed approximately 17,000 people on a full-time or part-time basis worldwide, including more than 8,000 persons in the United States.  During the pendency of the Chapter 11 Cases, the Debtors have made significant further reductions in their workforce and use of contractors.

4. *Decision to Commence the Debtors' Chapter 11 Cases*

Despite the steps taken by the Debtors, the combination of conditions prevailing in December 2008 overwhelmed the Debtors' ability to operate under their existing credit facilities. Accordingly, the Debtors commenced chapter 11 proceedings beginning on January 6, 2009 to avail themselves of the opportunity to achieve both a financial restructuring and an operational restructuring, and thereby preserve the value of their businesses.

**D.     Pending Litigation and Other Legal Matters**

1. *Houston Refinery*

On July 18, 2008, a crane installed at the Debtors' oil refinery in Houston, Texas in connection with a planned maintenance project collapsed, killing four contractors, injuring seven others, and damaging some property at the refinery. A lawsuit, filed on July 23, 2008 by persons who were injured or died as a result of the accident (the "**Crane Accident Victims**") against Lyondell Chemical and Houston Refining was automatically stayed under section 362 of the Bankruptcy Code upon the commencement of the Debtors' Chapter 11 Cases.

On February 19, 2009, the Crane Accident Victims moved the Bankruptcy Court to lift the stay in order to liquidate their personal injury tort claims in the litigation. Thereafter, the Debtors and the Crane Accident Victims entered into a stipulation, which was so ordered by the Bankruptcy Court on March 10, 2009, that, *inter alia*, allowed the Crane Accident Victims to dismiss without prejudice Lyondell Chemical as a defendant from the litigation. The stipulation and order also modified the automatic stay to allow the Crane Accident Victims, starting on June 8, 2009, to continue to liquidate any claims against Houston Refining and other defendants in the litigation. The stipulation and order also provided that the automatic stay is still in effect with respect to any effort to enforce or collect any such liquidated claims from Houston Refining or other Debtors.

2. *BASF*

On April 12, 2005, BASF Corporation ("**BASF**") filed a lawsuit against Lyondell Chemical in the Superior Court of New Jersey, Morris County, asserting various claims relating to alleged breaches of a propylene oxide sales contract and seeking damages in excess of $100 million. Lyondell Chemical denied breaching the contract and argued that at most it owed BASF nothing more than a refund of $22.5 million, which it has paid. On August 13, 2007, a jury returned a verdict in favor of BASF in the amount of approximately $170 million (inclusive of the $22.5 million refund). On October 3, 2007, the judge in the state court case determined that prejudgment interest on the verdict amounted to $36 million and issued a final judgment. Lyondell Chemical appealed the judgment and has posted an appeal bond, which is collateralized by a $200 million letter of credit. Upon the filing of Lyondell Chemical's chapter 11 petition, the appeal was automatically stayed under section 362 of the Bankruptcy Code.

On July 29, 2009, Lyondell Chemical and BASF entered into a stipulation that was so ordered by the Bankruptcy Court on August 14, 2009, that modified the automatic stay to allow the appeal to proceed to a final disposition. The Order further provided that the automatic stay remained in full force and effect with respect to any effort to enforce or collect any claim from Lyondell Chemical or any other Debtor except for actions taken in the Bankruptcy Court.

3. *Antitrust Allegations*

Beginning in November 2004, several class action lawsuits were filed in federal court against Lyondell Chemical and certain other chemical companies, alleging violations of U.S. antitrust law in connection with the manufacture and sale of polyether polyols, methylene diphenyl diisocyanate (MDI), and toluene diisocyanate (TDI), and seeking treble damages in an unspecified amount on behalf of U.S. purchasers of such products. The lawsuits have been consolidated by the Judicial Panel for Multidistrict Litigation in the United States District Court for the District of Kansas (the "**Multidistrict Litigation**"). In addition, in May 2006, two class action lawsuits were filed in the Ontario Superior Court of Justice, London, Ontario, Canada and the Superior Court,

Province of Quebec, District of Quebec, Canada, both alleging claims and seeking relief similar to those in the Multidistrict Litigation.

In June 2007, Lyondell Chemical was named as an additional defendant in a case previously filed in the Superior Court for the State of California, County of San Francisco, on behalf of indirect purchasers of polyether polyols, MDI and TDI and other products, alleging claims and seeking relief similar to that in the Multidistrict Litigation. The California case has been stayed pending further order of the California court.

In May 2008, the plaintiffs in a previously filed class action suit in the U.S. federal court in Boston, Massachusetts, seeking relief similar to that in the Multidistrict Litigation in Kansas, filed a motion to add Lyondell Chemical and certain other parties as additional defendants, making essentially the same complaints as in the Multidistrict Litigation.

In October 2008, a claim was filed against Lyondell Chemical in the U.S. District Court for the District of New Jersey by approximately 48 direct purchasers of polyurethane products. These plaintiffs, who had opted out of the class in the Multidistrict Litigation, asserted essentially the same complaints as in the Multidistrict Litigation based upon the same underlying facts. The foregoing actions in the United States have been stayed pursuant to section 362 of the Bankruptcy Code.

### 4. *Lead Paint*

Lyondell Chemical acquired Millennium Chemicals Inc. (together with its consolidated subsidiaries, "**Millennium**") on November 30, 2004. Millennium is currently named as a defendant in 13 cases arising from its former ownership of the Glidden Paints business and Glidden's manufacture of lead-based pigments. Most of these cases were commenced by individuals seeking damages for personal injury, while others were filed by state, county and municipal governments asserting various claims based on theories of product liability and public nuisance, and seeking to establish abatement funds for the removal of lead paint from house and buildings. These cases are in various stages of the litigation process.

In March 2000, several cities and counties in California filed suit in California state court (*County of Santa Clara, et al. v. Atlantic Richfield Co., et al.*) against several former lead pigment and paint manufacturers, asserting that lead pigment in paint used on private and public buildings in California constituted a public nuisance and seeking an order requiring defendants to contribute to an abatement fund to remove the lead paint from those structures. The complaint named Millennium Inorganics Chemicals Inc. ("**Inorganics**," a former affiliate of the Debtors) as a defendant. In April 2007, plaintiffs received leave to amend their complaint to substitute Millennium as a defendant in place of Inorganics. In May 2007, shortly before plaintiffs were due to file their amended complaint, the California trial court stayed the trial court action pending appeal by the plaintiffs of a collateral issue regarding their ability to be represented by trial counsel on a contingency fee basis, which is still pending. In March 2009, the Debtors filed a motion in the Bankruptcy Court to enforce the automatic stay against service of the amended complaint or other proceedings against Millennium. By order dated April 23, 2009, the Bankruptcy Court conditionally granted that motion and ordered the Santa Clara government parties to agree in writing not to attempt to take any further action against Millennium without first obtaining leave to do so from the Bankruptcy Court. The Santa Clara government parties subsequently filed those agreements with the Bankruptcy Court.

### 5. *Environmental*

From time to time LyondellBasell operating entities receive notices or inquiries from federal, state or local governmental entities regarding alleged violations of environmental laws and regulations pertaining to, among other things, the disposal, emission and storage of chemical and petroleum substances, including hazardous wastes.

A Millennium subsidiary has been identified as a potentially responsible party ("**PRP**") with respect to the Kalamazoo River Superfund Site in Michigan. The site involves cleanup of river sediments and floodplain soils contaminated with polychlorinated biphenyls, cleanup of former paper mill operations, and cleanup and closure of landfills associated with the former paper mill operations. Litigation concerning the matter

commenced by the State of Michigan in December 1987 was recently dismissed, although the state reserved its right to bring certain claims in the future if the issues are not resolved in the CERCLA process. As of the Commencement Date, Millennium was performing investigatory and remedial activity at certain property owned by its subsidiary LeMean Properties Holdings Corporation (Allied Mill, or OU#1) as well as at parts of the site it does not own. By letter from LyondellBasell's counsel dated February 5, 2009, Millennium informed the EPA that it would continue to perform work at the OU#1 property it owns, but that its entry into bankruptcy precluded it from continuing to perform or pay for work costs or damages at any portion of the site not owned by the Debtor. Millennium's ultimate liability for the Kalamazoo River Superfund Site will depend on a combination of many factors that have not yet been determined, including the resolution of Millennium's legal position in the Bankruptcy Court, the ultimate remedy selected, the determination of natural resource damages, the number and financial viability of the other PRPs, and the determination of the final allocation among the PRPs. The United States filed proofs of claims asserting liability related to the Kalamazoo superfund site, among others.

## III.    EVENTS DURING CHAPTER 11 CASES

### A.    Commencement of Chapter 11 Cases

On January 6, 2009 (the "**Commencement Date**"), Lyondell Chemical and certain of its subsidiaries and affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Subsequently, LBIAF and its general partner, LBAFGP, filed voluntary petitions for relief under chapter 11 on April 24, 2009. Thirteen additional U.S. subsidiaries of LBIAF filed voluntary petitions on May 8, 2009. All 94 of these Chapter 11 Cases are jointly administered in the Bankruptcy Court. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

### B.    First Day Orders

On January 7, 2009, the Bankruptcy Court approved certain "first day" orders designed to minimize the disruption of the Debtors' business operations and to facilitate their reorganization (certain of the orders were entered on an interim basis at the time and entered as final relief on later dates). By interim order dated April 30, 2009, substantially all "first day" orders entered to date were made applicable to the Debtors that filed petitions in April, and by final order dated July 8, 2009, substantially all "first day" orders entered to date were made applicable to the Debtors that filed petitions in May.

#### 1.    *Orders Regarding Case Administration*

The Bankruptcy Court issued a series of orders on January 7, 2009, that, among other things, (i) authorized the joint administration of the Chapter 11 Cases; (ii) authorized the Debtors to continue operation of their businesses under sections 1107 and 1108 of the Bankruptcy Code and implement the automatic stay under section 362 of the Bankruptcy Code; (iii) established specific notice procedures, including a Master Service List; (iv) authorized the retention of Epiq Bankruptcy Solutions, LLC as noticing and claims agent (the "**Claims Agent**"); (v) authorized the Debtors to file a consolidated list of creditors; and (vi) granted an extension of time for the Debtors to file their schedules of assets and liabilities and statements of financial affairs. Subsequently, the Bankruptcy Court entered orders that authorized the Debtors to: (i) establish procedures for the interim compensation and reimbursement of professionals (order entered January 23, 2009); and (ii) establish procedures for the treatment of valid reclamation claims (order entered February 26, 2009).

#### 2.    *Orders Regarding Prepetition Obligations*

The Bankruptcy Court issued a series of orders on January 7, 2009, that, among other things, authorized the Debtors to satisfy or otherwise address certain prepetition obligations, including those related to: (i) common carriers, contractors and service providers, and warehousemen; and (ii) postpetition delivery of goods ordered prepetition; and interim orders related to (iii) wages, compensation and employee benefits (final order entered January 26, 2009); (iv) insurance programs (final order entered January 23, 2009); (v) critical vendors and

foreign vendors (final orders entered January 23, 2009); and (vi) taxes and regulatory fees (final order entered January 23, 2009).

3.   <i>Orders Regarding Business Operations</i>

The Bankruptcy Court issued a series of interim orders on January 7, 2009, that, among other things, authorized the Debtors to: (i) obtain postpetition financing (discussed more fully below) (final order entered March 1, 2009); (ii) maintain their existing bank accounts and operate their cash management system substantially as they existed prior to the Commencement Date (final order entered March 12, 2009); and (iii) continue utilizing their prepetition investment guidelines (final order entered March 12, 2009). Subsequently, the Bankruptcy Court entered orders that authorized the Debtors to: (iv) provide adequate assurance to utility companies and establish procedures for determining requests for additional adequate assurance (order entered January 28, 2009); (v) honor prepetition customer service programs (order entered February 24, 2009); and (vi) retain certain professionals in the ordinary course of business (order entered February 4, 2009).

**C.    Extensions of Exclusivity**

On April 30, 2009, the Bankruptcy Court extended the Debtors' exclusive periods to file a plan of reorganization and solicit acceptances with respect to a plan of reorganization under section 1121 of the Bankruptcy Code to September 15, 2009 and December 15, 2009, respectively. The Plan associated with this Disclosure Statement was filed within the Debtors' exclusive period to file a plan of reorganization. On November 23, 2009, the Debtors filed a motion to extend the exclusive period to solicit votes on the Plan to September 6, 2010. The Bankruptcy Court is scheduled to hear this motion on December 15, 2009.

**D.    The Debtors' Professionals and Chief Restructuring Officer**

Shortly after the Commencement Date, the Debtors sought and obtained authority to retain and employ several professionals to assist in the prosecution of the Chapter 11 Cases, including Cadwalader, Wickersham & Taft LLP ("**Cadwalader**"), as bankruptcy counsel (order entered February 25, 2009); Evercore Group L.L.C. ("**Evercore**") as investment banker and financial advisor (order entered February 25, 2009); Susman Godfrey LLP, as conflicts counsel (order entered April 17, 2009); and Clifford Chance LLP, as European counsel (order entered April 17, 2009). The Debtors also sought and obtained authority to retain and employ Deloitte Tax LLP, as tax consultants (order entered May 19, 2009); Nexant Inc., as strategic and financial advisors (order entered May 27, 2009); PricewaterhouseCoopers LLP, as independent auditors and accountants (order entered on June 3, 2009); McKinsey & Company, Inc., as management consultants (order entered on July 23, 2009); American Appraisal Associates, Inc., as valuation consultants (order entered on October 7, 2009); and Solomon Edwards Group, LLC, as accounting consultants (order entered on October 8, 2009).

On March 10, 2009, the Bankruptcy Court issued an order approving (i) the Debtors' retention of AP Services, LLC ("**APS**"), as crisis managers to the Debtors, to provide certain interim management and restructuring services; and (ii) the designation of Kevin McShea as Chief Restructuring Officer ("**CRO**") of the Debtors. Mr. McShea, a managing director of AlixPartners, LLP (an APS affiliate), has worked for over 30 years as a restructuring and financial consultant in numerous industries.

**E.    The Creditors' Committee**

1.   <i>Appointment of the Creditors' Committee</i>

On January 16, 2009, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed a seven-member Creditors' Committee to represent the interests of unsecured creditors of the Debtors pursuant to section 1102(a)(1) of the Bankruptcy Code (the "**Creditors' Committee**"). The persons or entities initially appointed to the Creditors' Committee were the following:

| | |
|---|---|
| Wilmington Trust FSB, as Successor Trustee | Air Liquide Large Industries U.S. LP |
| Rodney Square North | c/o Air Liquide USA, LLC |
| 1100 North Market Street | 2700 Post Oak Blvd. |
| Wilmington, DE 19890-1600 | Houston, TX 77056 |
| | |
| Law Debenture Trust of New York | BASF Corporation |
| 400 Madison Avenue | 100 Campus Drive |
| New York, NY 10017 | Florham Park, NJ 07932 |
| | |
| Pension Benefit Guaranty Corporation | United Steel Workers |
| 1200 K Street, NW, Suite 2000 | Five Gateway Center – Room 807 |
| Washington, DC 20005-4026 | Pittsburgh, PA 15222 |
| | |
| Veolia ES Industrial Services | |
| 2525 South Shore, Suite 410 | |
| League City, TX 72573 | |

Veolia ES Industrial Services thereafter resigned from the Creditors' Committee. On March 16, 2009, the U.S. Trustee appointed the following two additional creditors to the Creditors' Committee:

| | |
|---|---|
| James Schorr | Bernard Sander |
| 8781 La Palma Ln | 14818 Sparkling Bay |
| Naples, FL 34108 | Houston, TX 77062 |

Since formation of the Creditors' Committee, the Debtors have kept the Creditors' Committee informed with respect to their operations and have consulted with the Creditors' Committee concerning the administration of the Chapter 11 Cases and sought the concurrence of the Creditors' Committee with respect to certain actions and transactions outside the ordinary course of the Debtors' business.

### 2.  *Creditors' Committee's Professionals*

In connection with the Chapter 11 Cases, the Creditors' Committee sought and obtained approval to retain Brown Rudnick LLP as its legal counsel (order entered February 26, 2009); Mesirow Financial Consulting, LLC as its financial advisors (order entered February 26, 2009); Peter J. Solomon Company as its investment banker (order entered February 26, 2009; Chemical Market Associates, Inc. as its industry expert (order entered March 10, 2009); Wildgen Partners in Law as special counsel (order entered June 9, 2009); and Kurtzman Carson Consultants, LLC as communications agent (order entered June 9, 2009).

### 3.  *Motion to Appoint an Examiner*

On October 2, 2009, the Committee filed a motion seeking the appointment of an examiner pursuant to section 1104(c) of the Bankruptcy Code. On October 26, 2009, the U.S. Bankruptcy Court appointed an examiner solely to determine, in the examiner's own view, whether the Debtors have done anything out of the ordinary in connection with their decisions regarding: (i) the selection of a Rights Offering Sponsor; (ii) whether or not to obtain new DIP facility financing; and (iii) the establishment of a litigation reserve in the Plan, in each case by reason of a conflict of interest or other breach of fiduciary duty or by acting in bad faith. The examiner was not to report his or her views on the Debtors' business judgment or merits of any party's plan proposal in these areas, but was authorized to comment on, but not to affirmatively investigate, whether and to what extent any party has used leverage in the case to put pressure on the Debtors in connection with any plan proposal. On October 30, 2009, the Bankruptcy Court approved the appointment of Prof. Jack F. Williams as examiner in these Chapter 11 Cases. On December 1, 2009, the Examiner issued his report and the report is currently filed under seal with the Bankruptcy Court.

### F.    Postpetition Financing and Use of Cash Collateral

Pursuant to an order of the Bankruptcy Court dated March 1, 2009 (the "**Final DIP Financing Order**"), the Bankruptcy Court approved DIP Financing on a final basis in an aggregate amount not to exceed $8.5 billion.  The DIP Financing consists of (i) a $6.5 billion term loan facility (the "**DIP Term Loan Facility**"), and (ii) an asset-based facility with a revolving credit line of up to $2.0 billion (the "**DIP ABL Facility**" and together with the DIP Term Loan Facility, the "**DIP Facilities**"), each described in further detail below.  In addition, the Final DIP Financing Order authorized the Debtors to use cash collateral of the lenders under the Senior Secured Credit Facility and Bridge Facility.  Each lender under the DIP Financing (then representing a majority of the Senior Secured Lenders and the Bridge Lenders) also entered into forbearance agreements with respect to the exercise of certain remedies under the Senior Secured Credit Facility and Bridge Loan Facility, as applicable, until, inter alia, the DIP Financing maturity date, as the same may be extended from time to time.

The DIP Financing matures on, and requires the Debtors to emerge from the Chapter 11 Cases by, February 3, 2010, provided that if the confirmation date of the Plan (the "**Confirmation Date**") is extended due to the lack of the Bankruptcy Court's availability, the maturity date of the DIP Financing will be extended by up to twenty-one (21) days.  On November 30, 2009, the Debtors requested a two-month extension of the DIP Financing maturity date to April 6, 2010 with an option to extend the maturity date for an additional two-month period at the Debtors' sole election subject to the delivery of notice and the payment of extension fees.

DIP Term Loan Facility.  The DIP Term Loan Facility consists of: (a) $3.25 billion of new funding (the "**DIP New Money Loans**"); and (b) $3.25 billion of a dollar-for-dollar "roll-up" of outstanding loans owed under the Senior Secured Credit Facility (the "**DIP Roll-Up Loans**").  All obligations of the Debtors under the DIP Term Loan Facility constitute superpriority administrative expenses that, subject to certain exceptions, are secured by: (i) a first priority senior security interest in all unencumbered cash or other property of the Debtors existing on or after the Commencement Date (other than the DIP ABL Collateral (as defined below)); (ii) a priming first priority senior security interest in all property of the Debtors that is subject to an existing lien securing certain prepetition indebtedness of the Debtors; (iii) a second lien on the DIP ABL Collateral; and (iv) a junior security interest in all other property of the Debtors subject to a valid, perfected lien (property referenced in clauses (i), (ii), and (iv), the "**DIP TL Collateral**").  Amounts owed by the Debtors with respect to the DIP New Money Loans rank *pari passu* with amounts owed under the DIP ABL Facility.  All amounts owed by the Debtors with respect to the DIP Roll-Up Loans will rank junior in priority to the DIP New Money Loans and may, subject to the terms and conditions of the DIP Term Loan Facility and the Final DIP Financing Order, be paid over time after the Effective Date.

On March 3, 2009, the designation of $3.25 billion of senior secured prepetition loans as DIP Roll-Up Loans became effective.  As of September 30, 2009, the total outstanding balance owed under the DIP Term Loan Facility (including accrued interest and other fees) is $5.421 billion.

DIP ABL Facility.  Pursuant to the Final DIP Financing Order, the Debtors are authorized to borrow up to $2.0 billion under the DIP ABL Facility.  The aggregate amount that may be borrowed by the Debtors at any particular time is equal to the lesser of (i) the aggregate amount of commitments made by lenders under the DIP ABL Facility (the "**DIP ABL Commitment**"), and (ii) a borrowing base (the "**DIP ABL Borrowing Base**") which is approximately equal to (a) a fixed percentage of the Debtors' eligible accounts receivable and inventory balances, minus (b) a reserve amount determined by the administrative agent under the DIP ABL Facility.

As discussed above, amounts owed by the Debtors under the DIP ABL Facility constitute superpriority administrative expenses that ranks *pari passu* with amounts owed with respect to the DIP New Money Loans, senior to any amounts owed by the Debtors with respect to the DIP Roll-Up Loans.  In addition, the DIP ABL Facility is secured by: (i) a first priority perfected lien on all accounts receivable, inventory and cash (other than cash proceeds of the DIP TL Collateral) (the "**DIP ABL Collateral**"); (ii) a second priority senior security interest in all unencumbered property of the Debtors existing on or after the Commencement Date (other than the DIP ABL Collateral); (iii) a priming second priority senior security interest in all property of the Debtors that is subject to an existing lien securing certain prepetition indebtedness of the Debtors; and (iv) a junior security interest in all other property of the Debtors subject to a valid, perfected lien (other than DIP ABL Collateral).

On March 12, 2009 and July 15, 2009, the Debtors exercised the option to add new lenders to the DIP ABL Facility. The addition of such new lenders increased the DIP ABL Commitment from $1.54 billion to $1.62 billion. As of September 30, 2009, the DIP ABL Borrowing Base is $1.602 billion and the total outstanding balance owed under the DIP ABL Facility (including letters of credit, accrued interest and other fees) is $641.8 million.

Use of DIP Financing. The initial proceeds of the DIP Financing were used: (i) to refinance, in full, (a) the Senior Secured Inventory-Based Credit Facility, (b) the Asset-Based Receivables Facility, and (c) the $200 million North American accounts receivable securitization program; (ii) to pay related transaction costs, fees and expenses; (iii) to provide working capital; and (iv) for other general corporate purposes of the Debtors as well as the Non-Debtor Affiliates.[47]

Adequate Protection. The Final DIP Financing Order granted security interests to the DIP Lenders that are senior to the preexisting security interests of the Senior Secured Credit Facility, the Bridge Loan Agreement, the ARCO Notes and the Equistar Notes (the prepetition secured debts hereinafter collectively, the "**Primed Debt**," and the prepetition secured lenders hereinafter collectively, "**Primed Parties**"). As "adequate protection" for the Primed Parties, the Bankruptcy Court granted them (i) replacement liens, consisting of a junior security interest (the "**Adequate Protection Lien**") in the DIP TL Collateral, (ii) payment of certain legal and professional fees, (iii) with respect to certain Senior Secured Lenders, monthly payments of all accrued and unpaid interest, subject to compliance with certain liquidity standards set forth in the Final DIP Financing Order, and (iv) certain other benefits.[48] The Bankruptcy Court reserved the rights of the Primed Parties to request additional adequate protection if necessary.

Amendments. The Debtors have executed seven amendments to the DIP Term Loan Facility. The first amendment (the "**First DIP Amendment**") contains non-material changes to the DIP Term Loan Facility and did not require approval from the Bankruptcy Court. The First DIP Amendment modified the DIP Term Loan Facility by, *inter alia*, altering certain definitions, extending delivery requirements for certain recommendations, and permitting the Debtors to engage in certain business activities. A substantially similar amendment was executed for the DIP ABL Facility.

The second amendment to the DIP Term Loan Facility (the "**Second DIP Amendment**") corrected a scrivener's error in the definition of "Base Rate," so that it conformed (for that portion of the Base Rate Loans that are Roll-Up Loans) to the "Base Rate" calculation under the Senior Secured Credit Facility.

Because the change contained in the Second DIP Amendment had the effect of increasing the interest rate payable to the lenders with respect to the DIP Roll-Up Loans, and a catch-up payment of approximately $5 million was required to be paid to give retroactive effect to the corrected definition, it constituted a "Material Amendment" to the DIP Term Loan Facility, and the Debtors were required to provide parties in interest with notice and an opportunity to object. On July 14, 2009, the Debtors filed with the Bankruptcy Court their motion for authorization to execute the Second DIP Amendment and the Bankruptcy Court granted the Debtors' motion after oral argument on August 11, 2009.

Pursuant to five additional amendments to the DIP Term Loan Facility, the Debtors extended certain milestones related to (i) approval of the Disclosure Statement, (ii) confirmation of the Plan and (iii) maturity

---

[47] The DIP Financing does not permit more than €700 million of the proceeds under the DIP Financing to be outstanding under an intercompany loan facility to fund Basell Germany and the non-North American affiliates of the Debtors. As of September 30, 2009, net advances of $389 million (€299 million) have been made to LyondellBasell's non-North American subsidiaries. Total cash held by non-North American affiliates may not exceed €200 million, after excluding certain items, including cash deemed restricted under the DIP Financing Agreements due to bi-monthly settlement procedures under the European receivables securitization program, tax and legal considerations in certain countries, and pursuant to letters of credit and guarantees. On a weekly basis, cash in excess of the €200 million limit must be transferred to Lyondell Chemical, provided that the excess is at least €5 million.

[48] The Adequate Protection Lien granted to the Senior Secured Lenders and the holders of the ARCO Notes and the Equistar Notes is senior to the Adequate Protection Lien granted to the Bridge Lenders.

of the DIP Term Loan Facility, and modified certain exceptions to the negative covenants to permit the Debtors to continue certain beneficial operations and transactions. As currently amended, the DIP Term Loan Facility includes the following milestones (i) the Disclosure Statement must be approved by January 5, 2010, (ii) the Plan must be confirmed by February 3, 2010 and (iii) maturity on February 3, 2010. Substantially similar amendments were executed for the DIP ABL Facility.

On November 30, 2009, the Debtors requested an amendment to the DIP Term Loan Facility and the DIP ABL Facility that would extend the maturity date to April 6, 2010, with an option to further extend the maturity date at the Debtors' sole election, subject to the delivery of notice and the payment of extension fees, and would amend the milestones so that (i) the Disclosure Statement must be approved by April 6, 2010 and (ii) the Plan must be confirmed by May 20, 2010. A substantially similar amendment was requested for the DIP ABL Facility.

### G. Factoring Facility

On October 8, 2009, a non-Debtor subsidiary of LyondellBasell entered into an accounts receivable factoring facility for up to €100 million. The factoring facility is for an indefinite period, non-recourse, unsecured and terminable by either party subject to notice.

### H. 105 Injunction

Following the commencement of the initial Chapter 11 Cases on January 6, 2009, several trade creditors – barred by the automatic stay under section 362 of the Bankruptcy Code from asserting claims against those initial Debtors – began to assert guaranty claims, where available, against certain non-Debtor affiliates (including LBIAF, which had not yet sought chapter 11 protection at the time). By the beginning of February 2009, guaranty demands against such non-Debtor affiliates totaled in excess of $131 million, and raised the possibility that involuntary insolvency proceedings could be initiated against such guarantors in European jurisdictions. Commencement of such proceedings would have jeopardized a significant portion of the value of the LyondellBasell enterprise and effectively divested control of the Chapter 11 Cases from the Debtors, to the great detriment of all creditors and parties in interest. In fact, on February 6, 2009, one creditor, ConocoPhillips, obtained a conservatory attachment order in The Netherlands against LBIAF. Among other things, the attachment order froze any receivables owed by twenty-one affiliated companies of the Debtors to LBIAF, up to the amount of the purported prepetition debt. ConocoPhillips also sought to freeze five bank accounts of LBIAF in The Netherlands, three of which handled funds for the Debtors.

In addition, by early February 2009, the Debtors received information that certain holders of the 2015 Notes – who also held certain credit default swaps referencing those notes – were attempting to amass a 25% position in the notes. Under the terms of the 2015 Notes Indenture, achieving that threshold would enable those noteholders to accelerate payment of all unpaid principal and accrued interest, which in turn would result in the occurrence of a "Credit Event" under the terms of the credit default swap transactions, yielding a windfall for such creditors. Given the inability of LBIAF and the non-Debtor guarantors of the 2015 Notes to satisfy accelerated claims, permitting noteholders to take these actions raised the possibility of involuntary European insolvency proceedings that could jeopardize the Chapter 11 Cases and recoveries for all creditors and parties in interest.

On February 26, 2009, upon the Debtors' motion and after several days of hearings, the Bankruptcy Court granted a preliminary injunction pursuant to section 105 of the Bankruptcy Code (the "**105 Injunction**") for a period of sixty (60) days, staying, restraining and enjoining holders of the 2015 Notes and any creditor holding a guaranty claim against Non-Debtor Affiliates (including LBIAF) based on an obligation of the Debtors from: (i) taking any act or action to (a) accelerate the maturity of or otherwise enforce any rights in respect of the 2015 Notes or any guaranty claims against LBIAF or any other Non-Debtor Affiliate, (b) obtain possession of or exercise control over property, or the proceeds of property, of LBIAF or other Non-Debtor Affiliates; (ii) taking any act or action to create, perfect or enforce any lien against Non-Debtor Affiliates or their property, or the proceeds of such property; (iii) commencing or continuing any action or legal proceeding against LBIAF or other Non-Debtor Affiliates, or any of their property, or the proceeds of such property, including, without limitation, the commencement of insolvency or similar proceedings against LBIAF or the Non-Debtor Affiliates in any jurisdiction whatsoever; and (iv) enforcing any judicial, quasi-judicial, administrative or regulatory judgment, assessment or order against LBIAF and the other Non-Debtor Affiliates.

LBIAF filed a voluntary petition for chapter 11 relief on April 24, 2009, thereby obtaining the protection afforded by the automatic stay under section 362 of the Bankruptcy Code and reducing the need for a further injunction by the Bankruptcy Court. In addition, the ConocoPhillips attachments have been cancelled by operation of law due to ConocoPhillips' failure to initiate further proceedings within the time provided by the Dutch court.

## I.  Preservation of NOLs

On April 27, 2009, Access Industries Holdings, LLC and certain of its affiliates (together, the "**Access Group**") entered into a stipulation (the "**Stipulation**") with the Debtors, pursuant to which the Access Group agreed to limit its ability to engage in certain types of transactions involving the Debtors' equity and debt, in order to protect and preserve the value of the Debtors' substantial net operating loss carryforward and other valuable tax attributes. Specifically, the Access Group agreed that it would not (i) directly or indirectly dispose of its equity interests in certain of the Debtors to the extent such disposition would result in it owning directly or indirectly less than 50% of LBIAF's outstanding voting stock; (ii) prior to making a transfer that would result in the Access Group owning a direct or indirect interest of no more than 50% of LBIAF, acquire prepetition debt claims against, or DIP Roll-Up Loans owed by, the Debtors; (iii) report a worthless stock deduction with respect to equity of LBFC or any member of the consolidated group of which LBFC is the common parent; or (iv) undertake any other transaction that could result in the Debtors losing the benefit of their net operating losses and other valuable tax attributes. In addition, the Access Group agreed to indemnify the Debtors for certain taxes and professional fees arising out of certain breaches of the Stipulation. The parties subsequently amended the Stipulation, primarily to clarify and expand upon the terms of the indemnity. The Stipulation was approved by the Bankruptcy Court on May 21, 2009.

## J.  Adversary Proceedings

1. *Lyondell Chemical Company, et al. v. Wilmington Trust Company, as Trustee, Adversary No.  09-01459*

On August 28, 2009, the Debtors initiated an adversary proceeding against Wilmington Trust Company ("**Wilmington Trust**"), as Trustee of the 2015 Notes, seeking a permanent and preliminary injunction, pursuant to section 105 of the Bankruptcy Code, to enjoin Wilmington Trust from taking certain actions against Non-Debtor Affiliates, including Obligor Non-Debtors. An Event of Default currently exists under the 2015 Notes due to the Debtors' chapter 11 filings. Because of the Event of Default, the holders of 2015 Notes have the right to accelerate the payment obligations under the 2015 Notes and to exercise rights and remedies against the Obligor Non-Debtors, including, but not limited to, foreclosing on the property subject to their liens. However, pursuant to the terms of the Intercreditor Agreement, any action to accelerate payment obligations or enforce claims against LBIAF or the Obligor Debtors and Obligor Non-Debtors is prohibited during the pendency of the "High Yield Notes Standstill Period" (as such term is defined in the Intercreditor Agreement, the "**Standstill Period**"). By agreement with Wilmington Trust, the Standstill Period was initially extended until September 18, 2009 (but see below for further discussion of such extension). Upon the expiration of the Standstill Period, the 2015 Notes Trustee may, absent further Court order, pursue claims against Obligor Non-Debtors.

Additionally, pursuant to that certain Master Definitions and Framework Deed dated July 29, 2005 between, amongst others, BS&M, Lyondell Chemie, Basell Polyolefins Collections Limited, The Royal Bank of Scotland plc and Citibank, N.A., as the same has been amended and restated (the "**Framework Deed**"), the impending end of the Standstill Period threatened certain European Obligor Non-Debtors' ability to sell receivables under the European Securitization Program. Under a side letter dated August 28, 2009 (the "**Side Letter**"), the purchasers of receivables (the "**Purchasers**") agreed to forbear from terminating the European Securitization Program until September 9, 2009.

The Debtors are seeking to enjoin Wilmington Trust until at least January 31, 2010 from any attempts to enforce rights or exercise remedies under the 2015 Notes against the Obligor Non-Debtors. The Debtors contemporaneously filed a motion requesting a preliminary injunction. On November 23, 2009, the Court so-ordered a stipulation entered between the parties pursuant to which Wilmington Trust agreed to treat the Standstill Period as tolled until January 22, 2010, subject to conditions and limitations set forth therein. Pursuant to the stipulation, a hearing on the Debtors' motion for a preliminary injunction will be held on January 11, 2010. As a

result of the extension of the Standstill Period, the parties to the European Securitization have agreed that the Purchasers will forbear from terminating the European Securitization Program until January 11, 2010, subject to certain conditions and limitations set forth in the Side Letter.

2. *Wilmington Trust Company, as Trustee v. LyondellBasell Industries AF S.C.A., et al., Adversary No. 09-01501*

On October 1, 2009, Wilmington Trust, as 2015 Notes Trustee, initiated an adversary proceeding against LBIAF, the lenders who participated in the financing of the 2007 Merger (the "**Bank Defendants**") and other holders of the debt arising from the financing of the 2007 Merger (the "**Successor Defendants**"), seeking (i) a declaratory judgment against LBIAF and the Bank Defendants that the Intercreditor Agreement and its provisions subordinating the interests of the holders of 2015 Notes are null and void; (ii) breach of contract damages against two of the Bank Defendants who were parties to the Intercreditor Agreement and a predecessor intercreditor agreement (the "**2005 Intercreditor Agreement**"); and (iii) equitable subordination of the claims of the Bank Defendants and the Successor Defendants.

Wilmington Trust alleges that the agreements memorializing the financing arrangements in connection with the 2007 Merger (the "**Credit Agreements**") violated certain provisions of the 2015 Notes Indenture and the 2005 Intercreditor Agreement and that the Bank Defendants, each of whom was a party to one or more of the Credit Agreements or the Intercreditor Agreement, played an essential role in consummating the transaction. The alleged violations include the incurrence of debt and granting of liens in violation of restrictive covenants, the improper refinancing of senior debt, and the improper replacement of the Intercreditor Agreement.

A pre-trial conference was initially set for November 12, 2009. On October 9, 2009, the Court so-ordered a stipulation entered between the parties pursuant to which the deadline for Debtors' response to the complaint was adjourned to November 30, 2009, subject to conditions and limitations set forth therein. In addition, in the stipulation, the parties agreed that this adversary proceeding, the aforementioned adversary proceeding commenced by Lyondell Chemical against Wilmington Trust Company, and the motion for injunction pending in connection with that adversary proceeding, would be consolidated for the purpose of discovery but not for any other purpose. On November 10, 2009, the Bankruptcy Court so-ordered a stipulation extending the Bank Defendants' time to answer the complaint until November 16, 2009 and the Bank Defendants and certain successor defendants filed a joint motion to dismiss on that date. On November 19, 2009, the Bankruptcy Court issued an order extending the Successor Defendants' time to answer the complaint until December 11, 2009. On November 23, 2009, the Court so-ordered a stipulation entered between the parties extending the Debtors' time to answer the complaint until December 11, 2009. The November 23 stipulation also adjourned the pre-trial conference until January 11, 2010.

3.       *Equistar Chemicals, LP v. Solutia, Inc., Adversary No. 09-01014/ Millennium Petrochemicals Inc. v. Solutia, Inc., Solutia Europe SPRL/BVBA, Adversary No. 09-01121*

On January 16, 2009, Equistar initiated an adversary proceeding against Solutia Inc. ("**Solutia**") by filing a turnover complaint to recover $29,517,059 contractually owed to it by Solutia under two sales contracts. Equistar sought a determination by the Bankruptcy Court that Solutia: (i) must pay amounts owed to Equistar; (ii) is in violation of the automatic stay by failing to pay Equistar and withholding payment of the debt; and (iii) has repudiated and breached both sales contracts. In addition, on March 13, 2009, MPI initiated an adversary proceeding against Solutia and Solutia Europe SPRL/BVBA ("**Solutia Europe**") by filing a turnover complaint to recover $1,964,896 contractually owed to it by Solutia and Solutia Europe for the breach and repudiation of a vinyl acetate monomer sales contract.

On December 8, 2009, Equistar and Solutia reached a settlement in principle of their adversary proceeding. The terms of the settlement in principle are described in Section III.O.1 below.

4.       *Houston Refining, LP v. Koch Supply & Trading, LP, Adversary No. 09-01037*

On February 7, 2009, Houston Refining commenced an adversary proceeding against Koch Supply & Trading, LP ("**KS&T**") by filing a turnover complaint (the "**HR Complaint**") to recover $11,339,925.42 contractually owed by KS&T for product (reformer feed, nonoxygenated conventional gasoline, high sulfur vacuum gas oil and feedstock) delivered through the Commencement Date. Prior to the hearing on the HR Complaint, Houston Refining reached a consensual resolution with KS&T, and on March 26, 2009, the Bankruptcy Court approved a stipulation between the parties. As part of the stipulation, KS&T agreed to pay the $11,339,925.42 in prepetition amounts owed to Houston Refining as well as $1,940,800.00 in prepetition amounts owed to Equistar. After receipt of these amounts, on May 1, 2009, Houston Refining filed a stipulation of dismissal, thereby effectively concluding the adversary proceeding.

5.       *Lyondell Chemical Company v. Air Products L.P., Air Products LLC, Air Products Chemicals Europe, B.V. and Air Products and Chemicals, Inc., Adversary No. 09-01072*

On March 2, 2009, Lyondell Chemical commenced an adversary proceeding against Air Products L.P., Air Products LLC, Air Products Chemicals Europe, B.V., and Air Products and Chemicals, Inc. to resolve a dispute over a prepetition settlement agreement resolving a 2006 breach of contract litigation between Lyondell Chemical and Air Products, L.P. ("**Air Products**").

Prior to the Commencement Date, Lyondell Chemical had duly made all payments required under the prepetition settlement agreement. After the Commencement Date, however, Lyondell Chemical communicated to Air Products that it would not make any further payments under the settlement agreement. Air Products then obtained *ex parte* French garnishments of the bank accounts of (i) Lyondell Chimie TDI, SCA ("**LCTDI**"), a French affiliate of Lyondell Chemical that had been included as a party to the settlement agreement in order to amend an unrelated contract to provide credits that would be offset against Lyondell Chemical's settlement payment obligations, and (ii) LCTDI's parent companies, Lyondell France Holdings SAS and Lyondell Chimie France SAS. Air Products claimed that LCTDI was jointly liable for Lyondell Chemical's obligations under the settlement agreement (and that by virtue of French law, LCTDI's parents were liable as well).

Lyondell Chemical responded by initiating the adversary proceeding, seeking a declaratory judgment that Lyondell Chemical was solely liable for payments under the settlement agreement. Air Products' affiliate, Air Products LLC, responded in turn by filing suit in New York State Supreme Court for breach of contract against LCTDI as an alleged co-obligor with Lyondell Chemical under the Settlement Agreement (the "**New York State Action**"). On March 17, 2009, Air Products also filed suit in the French commercial court of Salon de Provence against LCTDI's parent companies, on the ground that under French law they should be considered liable

for LCTDI's alleged debt (the "**Salon de Provence Action**").  Lyondell Chemical subsequently moved the Bankruptcy Court to issue a preliminary injunction and extension of the automatic stay under section 362 of the Bankruptcy Code to enjoin the New York State Action and to require Air Products and its affiliates to dissolve the French garnishments.  In a bench decision issued on June 10, 2009, the Bankruptcy Court denied Lyondell Chemical's request for an injunction due to a finding that it lacked jurisdiction over the action, although it noted that the circumstances of the case "strongly support" Lyondell Chemical's position that the payment provisions of the settlement agreement apply solely to Lyondell Chemical and not to LCTDI, and that Air Products has little, if any, chance of success on the merits.

On July 23, 2009, the Bankruptcy Court so ordered a stipulation between Lyondell Chemical and Air Products that indefinitely stays the adversary proceeding.  The parties also entered into a similar stipulation on July 17, 2009 that indefinitely stays the New York State Action as well.  Both stipulations required Air Products to withdraw the garnishments against LCTDI and its parent entities within two days of the Bankruptcy Court so ordering the stipulation.  Air Products withdrew the garnishments on July 25, 2009.  Both stipulations also required Air Products to take all necessary steps for the Salon de Provence Action to remain stayed for as long as the New York State Action is stayed.  Air Products and LCTDI's parent companies requested that the French commercial court of Salon de Provence issue a judgment staying the Salon de Provence Action, and on August 21, 2009, that court issued an order staying the Salon de Provence Action until such time as a decision on the merits is entered by a court in the United States.

6. *United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International and Service Workers International Union v. Equistar Chemicals LP, Adversary No. 09-01362*

On July 15, 2009, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International and Service Workers International Union (the "**Union**") filed an adversary complaint in the Bankruptcy Court against debtor Equistar Chemicals LP ("**Equistar Chemicals**") seeking to compel arbitration pursuant to the National Labor Relations Act of a dispute over whether employees who were represented by the Union and laid-off by Equistar Chemicals are entitled to severance pay.  The Union alleges that the severance pay dispute is subject to arbitration under the terms of the collective bargaining agreement between Equistar Chemicals and the Union.  On September 4, 2009, Equistar Chemicals filed a motion to dismiss the complaint in its entirety with prejudice on the basis that the severance pay dispute is not covered by the terms of the arbitration provisions of the collective bargaining agreement, and therefore, Equistar Chemicals cannot be compelled to arbitrate.  The Union has opposed the motion to dismiss.  Briefing was completed on October 2, 2009, and the Bankruptcy Court heard oral argument on December 1, 2009.  At the conclusion of the hearing, the Bankruptcy Court directed the parties to engage in settlement discussions and to report back to the Bankruptcy Court by January 1, 2010; if not resolved by that date, the Court will appoint a mediator.  If a resolution is not achieved through mediation, the Bankruptcy Court will then rule on Equistar's motion to dismiss.

**K.      The Committee Litigation and Settlement**

On June 15, 2009, as specifically contemplated by the Final DIP Financing Order, the Creditors' Committee filed a motion to obtain standing to pursue various  claims and actions on behalf of the Debtors' estates (the "**Standing Motion**").  In the proposed complaint attached to the Standing Motion, the Creditors' Committee asserted 21 separate claims for fraudulent transfer, avoidable preference, equitable subordination, avoidance of liens, breach of fiduciary duty and breach of contract, as well as tort and mismanagement claims arising under Luxembourg law, against certain of the prepetition secured lenders, shareholders, and officers and directors of LyondellBasell involved in the 2007 Merger.

The Debtors filed a limited objection to the Standing Motion primarily on the grounds that the prosecution of the claims should not be allowed to impede the Debtors, efforts to confirm the Plan and exit chapter 11 before the DIP Financing matures.  On July 21, 2009, the Bankruptcy Court granted the Creditors' Committee's Standing Motion, subject to the requirement that key issues be litigated before year-end, to better enable the Debtors to meet the milestones provided in the DIP Agreement.

The following day, the Creditors' Committee filed its complaint against certain prepetition secured lenders (including the Senior Secured Lenders and Bridge Lenders), agents, shareholders and certain officers and directors arising out of or related to the 2007 Merger, described in Section II above. In particular, the Creditors' Committee asserted claims to: (a) avoid certain obligations incurred by the Debtors to the prepetition secured lenders and the prepetition agents pursuant to the 2007 Merger, including certain of the financing obligations themselves, the financing fees and interest paid or incurred in connection with the financing obligations, and the guarantees, liens or other pledges granted by the Debtors to secure the repayment of the those financing obligations, and (b) recover consideration, merger, and transaction fees paid with respect to the 2007 Merger to former shareholders and officers and directors of Lyondell Chemical, including, without limitation, (i) consideration paid to Len Blavatnik or entities affiliated or controlled by him and (ii) change in control payments made to the officers and directors of Lyondell Chemical. The Creditors' Committee also sought to equitably subordinate various claims against the Debtors held by the Senior Secured Lenders, and the Bridge Lenders, the lead arrangers,[49] LeverageSource XI S.à.r.l., Access Holdings and AI International S.à.r.l. ("**AI**") to below the level of general unsecured claims, and sought to avoid certain allegedly unperfected liens in favor of Citibank, N.A. as collateral agent for the banks that financed the 2007 Merger.

The Creditors' Committee also asserted claims: (i) against the members of the pre-2007 Merger board of directors of Lyondell Chemical (the "**Lyondell Chemical Board**") and the members of the Supervisory Board[50] arising from their alleged breach of fiduciary duties to the Debtors in approving the 2007 Merger and the associated financings that allegedly resulted in the Debtors' financial impairment and insolvency; (ii) against Merrill, Lynch, Pierce, Fenner & Smith Incorporated for aiding and abetting the breach of fiduciary duties by the Supervisory Board and the Lyondell Chemical Board; and (iii) against members of the Supervisory Board and certain other representatives of LBIAF for mismanagement and tort under Luxembourg law.

In addition to claims related to the 2007 Merger, the Creditors' Committee asserted claims: (i) for avoidance of $300 million in alleged preferential transfers made by LBIAF to Access Holdings in October 2008, under the Access Facility; and (ii) against Access and AI for failing to fund the Access Facility at the end of December 2008.

On August 4, 2009, the Court ruled from the bench on case management issues related to the Creditors' Committee's adversary proceeding. The Court determined that the litigation would be divided into three separate phases, and set a discovery schedule for the first phase of the proceedings which schedule was subsequently amended by agreement of the parties. Trial on the first phase ("**Phase I Trial**") was set to begin on December 10, 2009, and would have litigated the fraudulent transfer, preference, and equitable subordination claims against the Debtors' prepetition lenders and their subsidiary guarantors, as well as the fraudulent transfer claims against certain Access entities and the Debtors' officers and directors. The second phase ("**Phase IA Trial**") will address, if necessary, the solvency of each individual Debtor, and any related or appropriate remedy or defense as a result. The third phase ("**Phase II Trial**") would litigate the remaining claims in the Creditors' Committee's complaint.

On August 21, 2009, the Creditors' Committee filed a motion to amend the complaint. Specifically, the Creditors' Committee sought to add to their complaint counts of fraudulent conveyance and equitable subordination as they related to approximately $7.5 billion of merger financing that was used to repay debt outstanding at the time of the merger. The Financing Party Defendants have filed an objection to the motion to amend. A hearing has not yet been set by the Bankruptcy Court on the motion to amend the Complaint.

On October 29, 2009, the Bankruptcy Court ordered the parties to engage in mediation for the purpose of facilitating settlement discussions. On November 9, 2009, the Bankruptcy Court appointed Myron Trepper, Esq. as the mediator. Parties to the Committee Litigation and the Debtors participated in an initial mediation session on November 17, 2009. Another mediation session was held on December 3, 2009, and after this

---

[49] The lead arrangers include Merrill, Lynch, Pierce, Fenner & Smith Incorporated; Citibank, N.A.; Goldman Sachs Credit Partners L.P.; and ABN AMRO Inc.

[50] At the time of the 2007 Merger, the Supervisory Board consisted of the following five persons: Len Blavatnik, Richard Floor, Kent Potter, Philip Kassin and Lincoln Benet.

mediation ended in an impasse, the Debtors delivered a non-negotiable settlement proposal (the "**Lender Litigation Settlement**") to the Ad Hoc Group and the Bridge Lenders (the "**Settling Defendants**").

To formulate the Lender Litigation Settlement, the Debtors' Litigation Committee[51] spent several months evaluating the critical legal and factual issues regarding liability, remedies available to general unsecured creditors (including which general unsecured creditors would be eligible for distributions in the event the Creditors' Committee prevailed in whole or in part) and affirmative defenses available to the Settling Defendants in determining what constitutes a fair and reasonable settlement.

In formulating the Lender Litigation Settlement proposal, the Litigation Committee primarily relied on counsel at Cadwalader, Wickersham & Taft LLP, and advice from Francis Conrad, a retired judge of the United States Bankruptcy Court for the District of Vermont, NERA, Nexant and an expert in decision analytics as well as data from Alix Partners and other sources. Together, the Litigation Committee and its advisors evaluated the factual and legal merits of the Committee Litigation as well as the range of remedies available to general unsecured creditors in the event the Creditors' Committee prevailed in part or whole. The Debtors concluded that while the Committee Litigation was not frivolous, it was more likely than not to be unsuccessful. The Debtors also concluded that in the event the Committee Litigation succeeded in establishing some grounds for liability, the most likely scenario was that the Settling Defendants would nonetheless receive a meaningful distribution on account of their Claims against the Obligor Debtors. Finally, the Debtors concluded that based on long-standing case law in this jurisdiction, any avoidance of liens or claims of the Settling Defendants at a particular legal entity could only occur to the extent necessary to benefit general unsecured creditors of such specific legal entity, and that each holder of a General Unsecured Claim could only recover value from the entity against which it has an Allowed Claim.

Based on the forgoing analysis and applying information about the value of General Unsecured Claims against each legal entity and ranges of value that could be available for distribution at each legal entity, the Debtors formulated the Lender Litigation Settlement proposal. The terms of the Lender Litigation Settlement are as follows:

> In return for receiving full releases from the Debtors' estates with respect to all allegations and causes of action raised in the Committee Litigation, the Settling Defendants have agreed to provide holders of Allowed General Unsecured Claims (including the 2015 Noteholders if Class 8 votes in favor of the Plan) against Obligor Debtors (as well as various Schedule III Debtors that would otherwise be Obligor Debtors) with (i) $300 million in cash funded through an additional equity rights offering and (ii) all of the proceeds of future prosecution of claims asserted in the Committee Litigation against non-settling defendants, to be prosecuted by the Litigation Trust, to be distributed according to the terms of the Plan.

> These proceeds will be available to satisfy the Allowed General Unsecured Claims against Obligor Debtors exclusive of any Deficiency Claims the Settling Defendants may have otherwise asserted.

> The Debtors will make advances to the Litigation Trust of up to $15 million to pay for fees and costs incurred by the Litigation Trust in connection with further litigation. This advance will be repaid out of the first proceeds realized from the prosecution of Committee Litigation claims against non-settling defendants prior to payment of the Litigation Trust Beneficiaries; in the event the Litigation Trust does not obtain further proceeds, the advance will be forgiven.

---

[51] The Litigation Committee members include James Gallogly, Kevin McShea and Stephen Cooper. No member of the Litigation Committee is a defendant in the Committee Action and each has substantial relevant experience. Access played no role in the formulation, recommendation or approvals of the Lender Litigation Settlement and is not a beneficiary thereof.

The Settling Defendants will assign to the Debtors the right to enforce all subordination and turnover provisions against the holders of 2015 Notes pursuant to the Intercreditor Agreement (as well as prior intercreditor agreements). If the 2015 Noteholders vote in favor of the Plan the Debtors will waive the subordination and turnover provisions and permit the holders of 2015 Notes Claims to recover as holders of Class 7-A Allowed Claims.

The settlement is not linked to or contingent upon any of the Settling Defendants or Access or any of its Affiliates being the ultimate Rights Offering Sponsor of an equity rights offering under the Plan, although it is contingent on Bankruptcy Court approval. The Lender Litigation Settlement does not impact the distribution of any assets found to have been unencumbered by the Settling Defendants' pre-petition liens, and such assets will be distributed to creditors with Allowed Claims in accordance with the terms of the Plan.

The Settling Defendants deliberated for approximately twelve hours before agreeing to the take-it-or-leave-it Lender Litigation Settlement. On December 4, 2009, the Debtors held a status conference to advise the Bankruptcy Court of the Lender Litigation Settlement. Subsequently, the Bankruptcy Court adjourned the Phase I Trial to a date to be determined. The Debtors will formally seek approval of the Lender Litigation Settlement after filing a motion and upon a hearing pursuant to Bankruptcy Rule 9019. The Bankruptcy Court must determine whether the Debtors had authority to settle the Committee Litigation and, if so, whether the Lender Litigation Settlement is appropriate under applicable law. No settlement can be effectuated without the approval of the Bankruptcy Court, and as of the time of the filing of this Disclosure Statement, no such approval has been granted. There can be no assurance that the Bankruptcy Court will approve the Lender Litigation Settlement.

**L.      Bank of New York Mellon Third Party Complaint in Intervention**

On October 14, 2009, as contemplated by the Final Case Management Order, The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A. (collectively, "**BONY**"), as indenture trustee for the Arco Notes and Equistar Notes, filed a proposed third-party complaint in intervention, which it amended on October 30, 2009, making similar allegations as the complaint filed by the Committee. Concurrently with the filing of the complaint in the intervention, BONY filed a "conditional" motion for standing, stating that the motion was likely necessary because BONY believes that the entirety of the complaint in intvention is encompassed within the grant of standing to the Creditors' Committee. In the proposed amended complaint, BONY brought suit against certain of the prepetition secured lenders, LyondellBasell Finance Company and Lyondell Europe Holdings Inc. BONY asserted claims for fraudulent transfer and equitable subordination against the prepetition secured lenders and a claim that Citibank, N.A. as collateral agent, failed to perfect senior liens. BONY also asserted claims for fraudulent transfer against LyondellBasell Finance Company and Lyondell Europe, in connection with, *inter alia,* liens or guarantees given in connection with intercompany loans (the "**Intercompany Loans**"). The proposed complaint alleges that Lyondell Chemical and Equistar were insolvent or rendered insolvent and did not receive reasonably equivalent value in connection with the obligations and guarantees they incurred in connection with the Senior Credit Facility, the Intercompany Loans and the Bridge Loan Facility.

If the Court approves the Lender Litigation Settlement, BONY's claims against the Settling Defendants, which are derivative of the Committee Litigation will likewise be extinguished.

On October 19, 2009, BONY filed another proposed third-party complaint, which it amended on November 9, 2009, making similar allegations as in its first third-party complaint.[52] In its proposed amended complaint, BONY asserted claims for equitable subordination against ABN AMRO Inc., ABN AMRO BANK N.V., and Wilmington Trust Company, as trustee for the 2015 Notes, and claims for fraudulent transfer against ABN AMRO Inc. and ABN AMRO BANK N.V. alleging, *inter alia,* that Lyondell Chemical and Equistar did not receive reasonably equivalent value or fair consideration in connection with their incurrence of the guarantees under the 2015 Notes Indenture, and that they were insolvent at the time they incurred these obligations, or rendered insolvent as a result of such incurrence.

---

[52] BONY filed a second separate complaint through different counsel because conflict of interest issues prevented their counsel, Friedman Kaplan Seiler & Adelman LLP from asserting claims against certain defendants in the October 19, 2009 complaint.

M. **Law Debenture Third Party Complaint**

On October 19, 2009, Law Debenture Trust of New York ("**Law Debenture**") as Indenture Trustee for the Millennium Notes filed a proposed third-party complaint asserting a fraudulent transfer and equitable subordination claim against Wilmington Trust Company ("**Wilmington**"), with respect to the guarantees incurred pursuant to that certain indenture dated December 20, 2007, pursuant to which the Millennium Guarantors[53] guaranteed certain obligations in connection with the 2015 Notes (the "**2015 Guarantees**"). Law Debenture alleges, *inter alia*, that the Millennium Guarantors did not receive reasonably equivalent value or fair consideration in exchange for their incurrence of obligations under the 2015 Guarantees, and that they were insolvent at the time they incurred these obligations, or rendered insolvent as a result of such incurrence. In its motion seeking standing, which accompanied the filing of its proposed complaint, Law Debenture stated that it requested the Committee prosecute these claims, and the Committee declined.

On November 4, 2009, the Bankruptcy Court approved a stipulation and order adjourning the standing motions of BONY and Law Debenture until after the conclusion of (i) the Phase I Trial, (ii) 60 days prior to the second anniversary of the original petition date, and (iii) the date that Law Debenture or BONY provides each party written notice that it intends to proceed with the adjudication of its standing motions.

N. **Bar Date and Summary of Claims**

1. *Schedules and Statements*

On April 6, 2009 and May 13, 2009, the Debtors filed with the Bankruptcy Court their respective Statements of Financial Affairs and Schedules of Assets and Liabilities (collectively, as amended, the "**Schedules**"). On May 28, 2009, certain Debtors filed amended Schedules.

2. *Bar Date*

By amended order dated May 18, 2009 (the "**Bar Date Order**"), pursuant to Bankruptcy Rule 3003(c)(3), the Bankruptcy Court set June 30, 2009 at 5:00 p.m. (prevailing Eastern time) (the "**Bar Date**"), as the date and time by which general proofs of claim were required to be filed by substantially all claimants of the Debtors (other than Governmental Units (as defined in the Bar Date Order), guarantors, sureties, indorsers, and other Debtors). The Bar Date Order set the deadline for Governmental Units to file proofs of claim against the Debtors that commenced their cases in January, April, and May 2009 as July 6, 2009 at 5:00 p.m. (prevailing Eastern time), October 21, 2009 at 5:00 p.m. (prevailing Eastern time), and November 4, 2009 at 5:00 p.m. (prevailing Eastern time), respectively.[54] Further, the Bar Date Order set the deadline for guarantors, sureties, indorsers and other Debtors to file proofs of claim against the Debtors as July 30, 2009 at 5:00 p.m. (prevailing Eastern time). Unless specifically exempted by the Bar Date Order, all potential creditors were required to file proofs of claim notwithstanding section 1111(a) of Bankruptcy Code and Bankruptcy Rule 3003(c)(2), which generally requires a proof of claim be filed only with respect to prepetition claims that are not scheduled in the Debtors' Schedules or that are in the Schedules as disputed, contingent or unliquidated.

Notice of the Bar Date and a proof of claim form were mailed to (i) all creditors and other known holders of claims, including all creditors listed in the Debtors' Schedules; (ii) all parties to executory contracts and unexpired leases of the Debtors; (iii) all parties to litigation with the Debtors; (iv) all members of the Creditors' Committee; (v) all governmental units required to be notified; (vi) all persons and entities included in the Debtors' Master Service List; and (vii) all persons and entities requesting notice pursuant to Bankruptcy Rule 2002 as of the entry of the Bar Date Order. The Court-approved notice of the Bar Date was published on June 4, 2009 in *USA*

---

[53] The Millennium Guarantors include Millennium America, Inc., Millennium Chemicals, Inc., MPCO, Millennium Worldwide Holdings I Inc., Millennium Specialty Chemicals Inc., Millennium America Holdings Inc., Millennium Petrochemicals GP LLC, Millennium Petrochemicals Partners, LP and Millennium Petrochemicals Inc.

[54] The Debtors entered into a stipulation with the United States government on July 8, 2009 extending the deadline to August 28, 2009 for the government to file proofs of claim relating to certain environmental matters disclosed in the amended Schedules.

*Today (National Edition)*, *Plainwell Union Enterprise (MI)*, *Saugatuck Commercial Record (MI)*, *Wall Street Journal (National)*, *Wall Street Journal (Europe)*, *Wall Street Journal (Asia)*, *Redding Record-Searchlight*, *Clinton Herald*, *The Danville Commercial News*, *Allegan County News*, *Holland Sentinel*, *Newark Star Ledger*, *The Houston Chronicle*, *Battle Creek Enquirer*, *Grand Rapids Press*, *Kalamazoo Gazette*, *Financial Times*, and *De Telegraf*. Notice of the Bar Date was also published on June 5, 2009 in *Yomiuri Shimbun (Japan)* and *Daily Yomuiri*.

3.  <u>Summary of Claims</u>

Approximately 280,000 proofs of claim asserting Claims against the Debtors were filed in the Chapter 11 Cases, exceeding a total $40 billion, including duplication, but excluding any estimated amounts for unliquidated Claims. As of the date hereof, 267,244 of the filed proofs of claim have been withdrawn or expunged via objection, and 12,207 proofs of claim remain filed, in an amount of approximately $36 billion.

a.  <u>Withdrawal of Certain Personal Injury Claims</u>

On August 31, 2009, the Debtors filed separate motions against two attorneys who purported to represent thousands of asbestos-related tort victims and who filed proofs of claim against multiple Debtors on behalf of these claimants. Brent Coon had filed over 266,000 proofs of claim (on behalf of 8,927 individuals, each asserting a separate claim against each of 30 Debtors) that alleged "personal injury" in an undetermined amount. Edward Moody had filed a single proof of claim (on behalf of 1,995 individuals against multiple, but unspecified, Debtors) that alleged "asbestos claims" in an undetermined amount. The Debtors' motions sought to compel the attorneys to submit verified statements pursuant to Bankruptcy Rule 2019, which rule requires, among other things, disclosure of the attorney's authority to act on behalf of the claimants. The motions also raised procedural objections to the proofs of claim insofar as the proofs of claim did not provide sufficient information to allow the Debtors or the Bankruptcy Court to make even a threshold determination of the claims' validity.

At a hearing on September 17, 2009, the Bankruptcy Court found that these attorneys had not complied with Bankruptcy Rule 2019. The Court ordered both attorneys to file verified statements pursuant to Bankruptcy Rule 2019, to include with those statements executed exemplar power of attorney forms, and to provide to the Debtors' professionals all executed power of attorney forms for each and every claimant. The Court also ordered that the attorneys supplement the proofs of claim they had filed with specific information as to each claimant identifying a specific Debtor(s) alleged to be liable and identifying basic facts regarding how the purported injury was sustained.

Following the Bankruptcy Court's orders, both attorneys began the process of withdrawing the proofs of claim they had filed. On September 24, 2009, Brent Coon filed a notice with the Bankruptcy Court withdrawing all 266,285 proofs of claim that he had previously filed. On September 28, 2009, Edward Moody filed a notice with the Bankruptcy Court withdrawing the proof of claim that he had previously filed on behalf of 1,995 purported claimants.

b.  <u>Claims Objections</u>

To date, the Debtors have filed partial objections pursuant to section 502(e)(1)(B) of the Bankruptcy Code to 75 claims asserting liabilities for cleanup and related costs for environmentally contaminated sites. The basis for these objections is that the claims should be disallowed because they are contingent and are for debts on which the claimants are co-liable with the Debtors to other primary creditors. In most cases the primary creditors are federal or state government environmental enforcement agencies, whose claims will be resolved through the claims resolution process. Although the claims are contingent and unliquidated, and therefore difficult to value, the Debtors' estimate of the aggregate value of the asserted claims objected to so far is approximately $600 million.

The Debtors have also filed partial objections to claims asserted by the United States, the California Department of Toxic Substances Control, the California Regional Water Quality Board and the California State Water Resources Control Board (collectively, the "**Government Parties**"). Specifically, the Debtors objected

to the legal assertion, articulated by the Government Parties in their proofs of claim, that current or future injunctive or work obligations that the Government Parties seek (or may in the future seek) to impose on the Debtors at environmental sites not owned or operated by the Debtors do not constitute "claims" under the Bankruptcy Code. The Debtors believe that the Government Parties' position is incorrect as a matter of law and that all such obligations arising from prepetition conduct are "claims" subject to discharge in these proceedings. The Government Parties have filed a motion with the United States District Court for the Southern District of New York (the "**District Court**") to withdraw the reference (the "**Motion to Withdraw**") of the Debtors' partial objection to their claims from the Bankruptcy Court. The Debtors and the Committee have filed responses in opposition to the Motion to Withdraw. The District Court has not yet issued a decision on the Motion to Withdraw.

The Debtors have filed fourteen tier I omnibus objections ("**Tier I Objections**"), pursuant to the claims objection procedures approved by Bankruptcy Court Order entered on August 11, 2009 (the "**Claims Objection Procedures**"), to 939 duplicate or amended and superseded proofs of claim, in an aggregate amount of approximately $6.633 billion, excluding unliquidated claims. On October 7, 2009, the Bankruptcy Court entered orders approving the first four Tier I Objections with respect to 397 proofs of claim totaling approximately $190 million, and accordingly these duplicate proofs of claim have been expunged from the Debtors' claims register. On November 12, 2009, the Bankruptcy Court entered orders approving the next five Tier I Objections, and partially approving the tenth Tier I Objection, with respect to 453 proofs of claim totaling approximately $4.7 billion, and accordingly, these proofs of claim have been expunged from the Debtors' claims register. The tenth Tier I Objection has been adjourned to January 12, 2010 with respect to an additional proof of claim in the amount of $1.5 billion. On December 1, 2009, the Bankruptcy Court entered orders approving the eleventh through fourteenth Tier I Objections with respect to 76 proofs of claim asserting $296.3 million and disallowing and expunging those claims. The eleventh Tier I Objection has been adjourned with respect to one proof of claim in the amount of $5.8 million to January 12, 2010. In addition, the Debtors have filed a fifteenth Tier I Objection to be heard by the Bankruptcy Court on December 8, 2009, seeking to reclassify certain proofs of claim asserted as administrative expenses as general unsecured claims.

The Debtors are continuing the process of reviewing the proofs of claim and reconciling them with their books and records, and will continue to object to proofs of claim when appropriate.[55] The Claims Agent maintains a claims register indicating the proofs of claim as filed, as well as the existing status of each Claim based on orders of the Bankruptcy Court. The Debtors estimate that the aggregate amount of scheduled, filed, and likely to be asserted, General Unsecured Claims against Obligor Debtors, General Unsecured Claims against Non-Obligor Debtors, General Unsecured Claims against Schedule III Debtors and 2015 Notes Claims that ultimately will become Allowed Claims in the Chapter 11 Cases will fall within the ranges identified in Section I.B above. The Debtors' estimate of Allowed Claims is based on a review and analysis of the Claims filed, which include many Claims filed against multiple Debtors and numerous contested litigation Claims.

## O. Idling of Certain Plants and Exit of Certain Businesses

### 1. *Chocolate Bayou Olefins Facility*

Equistar owned and operated a chemical production facility on property leased from Solutia, and now owned by Ascend Performance Materials, LLC ("**Ascend**"), located at the "Chocolate Bayou" chemical manufacturing plant in Brazoria County, Texas (the "**CB Olefins Facility**"), at which Equistar produced olefins products including ethylene, propylene, benzene, toluene and butadiene. On December 18, 2008, Equistar announced that it would temporarily idle the CB Olefins Facility due to declining market and economic conditions. In assessing the viability of the CB Olefins Facility during the Chapter 11 Cases, the Debtors determined that maintaining the facility in an idled state and continuing their related obligations would provide no benefit to the Debtors or their estates. Accordingly, the Debtors filed a motion to reject the lease and certain related agreements, to place the CB Olefins Facility in a long-term idle mode, to reduce the workforce employed at the facility, and to vacate the facility by August 4, 2009. By order dated March 13, 2009, the Bankruptcy Court granted the motion to reject and allowed Equistar to vacate the facility as of August 4, 2009. However, on July 6, 2009, Solutia and

---

[55] Under the Plan, the Debtors will continue to have the ability to object to Claims for up to one (1) year following the Effective Date, although this deadline can be extended by the Court on request by the Reorganized Debtors.

Ascend filed a motion with the Bankruptcy Court seeking to prohibit Equistar from vacating the facility on August 4 without first performing certain activities relating to the decommissioning of certain chemical equipment and facilities that Equistar would leave behind at the CB Olefins Facility (the "**CB Olefins Property**"). Equistar opposed that motion, and on August 5, 2009, the Bankruptcy Court ordered Equistar to remain in possession of the leasehold and to maintain the status quo at the facility pending the Court's decision on the motion filed by Solutia and Ascend. In a decision issued September 9, 2009, the Bankruptcy Court ruled that Equistar's plan to leave behind the CB Olefins Property was, in substance, an abandonment of that property that can only be accomplished through a notice of abandonment and the Bankruptcy Court's consideration of any objections in accordance with section 554(a) of the Bankruptcy Code and Bankruptcy Rule 6007. On October 16, 2009, the Debtors filed a motion seeking authorization from the Bankruptcy Court to abandon the CB Olefins Facility (the "**Motion to Abandon**"). The Bankruptcy Court has scheduled an evidentiary hearing on the Motion to Abandon for December 10, 2009.

On December 8, 2009, Equistar, Ascend and Solutia reached a settlement in principle of the Motion to Abandon as well as the Equistar Chemicals, LP v. Solutia, Inc. adversary proceeding, as described in Section III.J.3 herein. Generally, Equistar has agreed to perform certain decommissioning and decontamination work regarding the CB Olefins Property, estimated to take approximately two years; Ascend has agreed to provide support services, utilities and access to Equistar in return for monthly payments from Equistar; and Solutia has agreed to make a cash payment to Equistar. The parties have prepared a term sheet reflecting the major points of the settlement in principle and are in the process of drafting a formal settlement agreement, which will be attached to a motion for approval of the settlement agreement pursuant to Bankruptcy Rule 9019 that Equistar will file with the Bankruptcy Court in the near future.

2.        *Chocolate Bayou Polymers Facility*

Equistar owns and operates the polymers production facility at the Chocolate Bayou plant (the "**CB Polymers Facility**"), at which it produces high density polyethylene products ("**HDPE**"). Equistar owns the real property upon which the facility is situated, which is located within a manufacturing complex owned and operated by Ineos Olefins & Polymers USA. The CB Polymers Facility supplies products into the small part blow molding market, which has become extremely commoditized. On May 7, 2009, Equistar announced that, due to declining market and economic conditions, it would cease the production of HDPE at the CB Polymers Facility by July 31, 2009. Accordingly, on June 5, 2009, the Debtors filed a motion with the Bankruptcy Court seeking to shut down and demolish the CB Polymers Facility, and to reduce the workforce employed there to reflect the projected staffing needs through the clean-up phase and eventual demolition of the facility. The Debtors have withdrawn their motion to shut down the facility, and have determined to extend production at the CB Polymers Facility for the immediate future, and will continue to reassess the long-term utilization of this facility.

3.        *Lake Charles Occidental Facility*

Equistar operated a petrochemical manufacturing plant, leased from Occidental Chemical Company ("**Occidental**"), located in Lake Charles, Louisiana (the "**Lake Charles Occidental Facility**"). Equistar idled the facility in 2001, and since that time, market conditions (particularly customer demand for the product produced there) continued to decline. In assessing the viability of the Lake Charles Occidental Facility during the Chapter 11 Cases, the Debtors determined that maintaining the facility in an idled state and continuing their related obligations would provide no benefit to the Debtors or their estates. Accordingly, the Debtors filed a motion to reject the lease and certain related agreements. Pursuant to the Bankruptcy Court's order approving the Debtors' motion, Lyondell Chemical returned control and possession of the Lake Charles Occidental Facility to Occidental on May 13, 2009.

4.        *Lake Charles Lyondell Facility*

Lyondell Chemical owns certain manufacturing facilities and supporting infrastructure located in Lake Charles (the "**Lake Charles Lyondell Facility**"). Lyondell Chemical previously operated a portion of the facility for the production of petrochemicals, but idled those production units in or about September 2005 due to escalating prices for raw materials and energy and decreased demand.

A portion of the Lake Charles Lyondell Facility is leased to BioLab Inc. ("**BioLab**"), a subsidiary of Chemtura Corporation, pursuant to a prepetition land lease dated December 20, 1994 (the "**BioLab Lease**"). In addition, as of the Petition Date, Lyondell Chemical provided (i) utilities and related services to BioLab pursuant to an agreement dated February 3, 2003 (the "**BioLab Services Agreement**"), and (ii) railcar switching services pursuant to an agreement dated January 11, 1999 (the "**BioLab Railcar Agreement**"). Lyondell Chemical also provided similar utilities-related services to Arch Chemicals Inc. ("**Arch**"), which owns a production facility on real property adjacent to the Lake Charles Lyondell Facility, pursuant to an agreement dated December 4, 1996 (the "**Arch Services Agreement**").

To facilitate the provision of services in accordance with the various agreements with BioLab and Arch, Lyondell Chemical's predecessors in interest contracted with certain third parties to operate the utility infrastructure assets at the Lake Charles Lyondell Facility. Specifically, Veolia Water North America Operating Services LLC ("**Veolia**") operates a demineralized water plant at the Lake Charles Lyondell Facility pursuant to an agreement dated December 2, 1996 (the "**Veolia Agreement**"), and leases from Lyondell Chemical the land upon which its water plant is located, pursuant to a real estate lease dated December 2, 1996 (the "**Veolia Lease**"). Similarly, Air Products operates a nitrogen plant at the Lake Charles Lyondell Facility pursuant to an agreement dated June 1, 2001 (the "**Air Products Agreement**"). In addition, Lyondell Chemical also is a party to a natural gas supply contract with Targa Louisiana Field Services LLC ("**Targa**"), dated May 1, 2005 (the "**Targa Agreement**").

As noted above, Lyondell Chemical idled its production units at the Lake Charles Lyondell Facility in late 2005. It remained obligated, however, to provide services to Arch and BioLab, and to pay for the full amount of products and services provided by Veolia and Air Products under its agreements with them. This resulted in substantial ongoing losses to Lyondell Chemical because its costs exceed the amounts Lyondell Chemical recovers from Arch and BioLab. In addition, as a result of idling its production units, Lyondell Chemical no longer needed natural gas from Targa. Accordingly, the Debtors filed a motion on May 12, 2009 to reject (i) the BioLab Services Agreement; (ii) the BioLab Railcar Agreement; (iii) the Arch Services Agreement; (iv) the Veolia Agreement; (v) the Veolia Lease; (vi) the Air Products Agreement; and (vii) the Targa Agreement. On September 21, 2009 and November 2, 2009, the Bankruptcy Court entered orders approving the rejection of each of the agreements listed in (i) – (vii) above. Lyondell Chemical and BioLab remain in negotiations regarding the potential disposition of the BioLab Lease.

5.      *Aircraft Deicer Business*

On August 20, 2009, the Debtors filed their Tenth Omnibus Motion for Entry of An Order Authorizing Rejection of Certain Executory Contracts and Unexpired Equipment Leases Related to Debtors' Aircraft Deicer Business. Pursuant to section 365 of the Bankruptcy Code, the Debtors sought to reject certain executory contracts and equipment leases in connection with the Debtors' decision to discontinue its business in the production and supply of aircraft deicer products.

No objections were filed in opposition to this motion, and an order approving the rejection of certain executory contracts and leases and the Debtors' exit from the aircraft deicer business was entered by the Bankruptcy Court on September 8, 2009. The rejection of these executory contracts and equipment leases is effective as of the dates set forth in the schedules to the motion.

As a result of the allowance of the motion, the Debtors are exiting the aircraft deicer business, but will continue to supply that market with propylene glycol, the primary component of deicer products. Specifically, the Debtors (i) have rejected certain executory contracts and unexpired leases; (ii) have notified customers that offers and proposals to supply deicer products are withdrawn; and (iii) have recalled and are replacing all remaining ARCTIC Plus® type one deicer fluid still in the possession of their customers. The Debtors believe that the rejection of certain contracts and leases at this time will enhance their ability to reorganize by reducing cash expenditures and administrative expenses, including the reduction of the Debtors' working capital requirements.

6.      *PD Glycol, LP - Beaumont Facility*

As of the Petition Date, Equistar was a general partner and a limited partner of PD Glycol LP, a Texas limited partnership ("**PD Glycol**"). PD Glycol owns, among other assets, a facility in Beaumont, Texas that

produced ethylene glycols and related products. The facility was significantly damaged and rendered inoperable by Hurricane Ike in September 2008. Equistar determined that it was in the best interests of its estate to withdraw from the partnership and reject various related executory contracts and unexpired property leases. On August 11, 2009 the Bankruptcy Court entered an order approving an agreement among Equistar, PG Glycol and the other general and limited partners that effectuated, among other things, (i) Equistar's withdrawal as a general partner of PD Glycol, (ii) Equistar's rejection of certain agreements pursuant to section 365 of the Bankruptcy Code, (iii) transfer of managerial and operational control of PD Glycol to the other general partner, and (iv) the compromise of certain claims between and among Equistar, PG Glycol and the other general and limited partners.

P.    **Economic Benefits Achieved Through Assumption, Assignment, Rejection and Renegotiation of Certain Contracts**

The Debtors have been engaged in transactions to maximize benefits to the estates by assuming, assigning, rejecting and renegotiating certain contracts. As of the date hereof, the Debtors estimate that such actions will result in waivers of secured and administrative expense claims of more than $35 million and may potentially result in savings of approximately $110 million per year at a near-term run-rate.

Q.    **Employee Issues**

In 2008, the Debtors undertook an operational restructuring effort. As part of that effort, LyondellBasell determined that a substantial reduction of its workforce was a necessary component of efforts to reduce the existing cost structure. LyondellBasell terminated or provided notice of termination to approximately 105 U.S. based employees in the year preceding the Commencement Date. The Debtors continued their efforts to reduce headcount during the Chapter 11 Cases, and intend to continue reducing total global employee headcount to 14,300 by the end of 2010 (or approximately 3,000 fewer than the headcount of 17,319 as of July 31, 2008 and approximately 1,600 fewer than the headcount of 15,982 as of June 30, 2009). It is anticipated that slightly more than two thirds of the total reductions will be attributed to streamlining, with the final third associated with site closures. In an effort to meet this goal, LyondellBasell launched a voluntary severance program whereby employees could elect to voluntarily terminate employment and receive certain severance payments.

1.    *Short Term Incentive Payments*

On the Commencement Date, the Debtors filed a motion seeking authority to pay current employees substantially all unpaid prepetition wages and certain earned bonuses up to $10,950, the statutory priority claim afforded to such employees. The Debtors filed the motion in recognition of the importance of limiting the impact of the chapter 11 filing on their active employees. The motion also sought authority to continue certain prepetition employee compensation and benefits programs, including the Debtors' Short Term Incentive Plan ("**STI**" and the obligations related thereto, the "**Short-Term Incentive Obligations**"). The STI is applicable to the majority of the Debtors' employees, pursuant to which employees are eligible to receive an annual cash payout based on a percentage of each employee's salary, as well as the annual performance of the Debtors and the individual employee. On the Commencement Date, the Debtors had accrued a total of approximately $91,000,000 in Short-Term Incentive Obligations, of which amount approximately $54,000,000 fell within the $10,950 per employee limit. The Debtors received authority from the Bankruptcy Court to make payments pursuant to their Short-Term Incentive Obligations to eligible employees, but only in the aggregate amount of $54,000,000, so that no Employee would receive in excess of $10,950 on account of prepetition salary, wages and STI payments. The Debtors also received authority from the Bankruptcy Court to maintain and continue the STI on a postpetition basis, and to honor postpetition Short-Term Incentive Obligations in the ordinary course of the Debtors' business.

2.    *Management Incentive Plan, Retention Plan, Discretionary Bonus Plan and Hardship Plan*

On August 12, 2009, the Court authorized the implementation of the Debtors' proposed (i) management incentive plan (the "**MIP**"); (ii) non-insider employee retention plan (the "**Retention Plan**"); (iii) discretionary bonus plan (the "**Discretionary Bonus Plan**"); and (iv) hardship plan (the "**Hardship Plan**"). The MIP, Retention Plan and Discretionary Bonus Plan are designed to provide the Debtors' workforce with appropriate market-level competitive compensation and to align the interests of the Debtors, their employees and

their creditors. The largest of these plans, the MIP, is an incentive plan which applies to approximately 325 of the Debtors' senior officers and managers, and provides for payouts upon LyondellBasell hitting certain EBITDAR targets. The maximum amount payable on an annual basis under the MIP is $45 million. The Retention Plan is limited to approximately 350 non-executive employees of the Debtors who are critical to the Debtors' reorganization process. In order to be eligible for a payout under the Retention Plan, an employee must meet the stringent criteria developed by LyondellBasell and be approved by the executive committee of the Debtors' officers (the "**Executive Committee**"). The total cost of the Retention Plan is capped at $15 million. The Discretionary Bonus Plan, limited to the non-officer employees of the Debtors, is a continuation of LyondellBasell's practice of awarding special performance awards to recognize extraordinary contributions by individual employees. In order to be eligible for an award under the Discretionary Bonus Plan, an employee must meet the stringent criteria developed by LyondellBasell and be approved by the Executive Committee. The total cost of the Discretionary Bonus Plan is capped at $1 million and the maximum individual award is $10,000. Lastly, the Hardship Plan is a good will gesture limited to those former employees of the Debtors and their dependents who have a claim for unsecured deferred compensation or life insurance benefits and who are also in dire economic circumstances due to the hardships associated with the filing of these cases. Payouts under the Hardship Plan will be considered on a case-by-case basis at the discretion of the Executive Committee, with a maximum payout of $40,000 to an individual retiree or his or her dependent(s). The total cost of the Hardship Plan is capped at $2 million.

3.      *Termination of Benefits*

On July 10, 2009, the Debtors filed a Motion for Entry of an Order Authorizing the Termination of Certain Executive Benefits (the "**Benefits Termination Motion**"). By the Benefits Termination Motion, the Debtors sought to terminate certain executive benefit plans and programs that provide enhanced benefits to certain of the Debtors' current and former executive employees and senior managers. Specifically, the Debtors sought to terminate the Lyondell Chemical Company Executive Medical Plan, the Lyondell Chemical Company Executive Life Insurance Plan, certain deferred compensation plans and certain supplemental executive retirement plans (collectively, the "**Executive Benefit Plans**"). Termination of the Executive Benefit Plans will save the Debtors in excess of $3.6 million per year and cause an immediate return to their estates of approximately $57 million.

On July 29, 2009, the Debtors filed their Ninth Omnibus Motion for Entry of an Order Authorizing the Rejection of Certain Executory Contracts (the "**Ninth Omnibus Rejection Motion**") in conjunction with the Benefits Termination Motion. By the Ninth Omnibus Rejection Motion, the Debtors sought to reject certain severance agreements whereby former executives of the Debtors or a predecessor employer received severance payments in exchange for their voluntary resignation from the Debtors or predecessor employer. As part of these agreements, the executives were given a qualified right to continued participation in certain of the Executive Benefit Plans. Additionally, the Ninth Omnibus Rejection Motion sought Bankruptcy Court approval for, *inter alia*, the rejection of the Lyondell Chemical Company Executive Severance Pay Plan and a certain Employee Transfer Agreement between Nova Chemicals Inc. and ARCO Chemical Company, which became an obligation of Lyondell Chemical when ARCO Chemical Company merged into Lyondell Chemical in 1998.

On September 8, 2009, the Bankruptcy Court heard argument on the Benefits Termination Motion and Ninth Omnibus Rejection Motion in response to several objections that were filed. The Bankruptcy Court granted the Debtors the relief sought under both motions as to all affected individuals who had not objected, as well as to those affected individuals who had objected but had not appeared in court. With respect to the objectors who appeared, the Bankruptcy Court took the issue under advisement. The Bankruptcy Court rendered a decision on October 27, 2009 granting the relief sought and directing the parties to settle an order. The Bankruptcy Court entered settled orders for the Ninth Omnibus Rejection Motion and the Benefits Termination Motion on November 19, 2009 and November 20, 2009, respectively.

**R.     Management, Ownership and Board Changes**

1.      *Search for and Appointment of a New CEO*

Shortly after the commencement of the Chapter 11 Cases, Volker Trautz, who had served as CEO since October 2000, initially of Basell and since the merger, of LBIAF, elected to retire from his duties. With the

departure of Mr. Trautz, LyondellBasell was confronted with the significant task of finding and selecting a well-qualified and experienced CEO.

To facilitate the selection of a CEO, the Supervisory Board was tasked with overseeing the selection process, which began at the end of February 2009. The Supervisory Board subsequently formed an executive search committee to make recommendations to it.

After receiving information and advice from the executive search committee, the Supervisory Board discussed the merits of potential CEO candidates. The Supervisory Board initially identified nine candidates of interest and ultimately decided to pursue interviews with seven of the candidates. After a multiple-stage screening process which included follow-up interviews, consulting with references and conducting thorough due diligence on the CEO candidates, LyondellBasell, upon the advice and unanimous consent of the Supervisory Board, appointed James L. Gallogly as the CEO of LBIAF.

Mr. Gallogly has extensive experience in numerous departments of large international energy and chemical producers. He began his career at Phillips Petroleum Company, where he rose from working in the legal department to Vice President for North American production, and then to Senior Vice President of chemicals and plastics. In 2000, Mr. Gallogly was appointed President and CEO of Chevron Phillips Chemical Company LLC, and most recently held the position of Executive Vice President of Exploration and Production and Executive Vice President of Refining, Marketing and Transportation for ConocoPhillips. This work experience has given Mr. Gallogly a wealth of knowledge and particular expertise in the energy, refining, chemicals and polymers businesses.

Mr. Gallogly's duties include, among other things, overseeing the Debtors' operations and restructuring efforts during the Chapter 11 Cases, and assuming the duties and responsibilities customarily assigned to the position of CEO of a large, global company, as well as such other duties that may be assigned to these positions from time to time.

The Bankruptcy Court entered an order approving the Debtors' employment agreement with Mr. Gallogly on July 21, 2009.

2. *Other Senior Management Changes*

a. Chief Financial Officer

On August 1, 2009, C. Kent Potter became Chief Financial Officer of LyondellBasell, succeeding Alan Bigman. The Bankruptcy Court approved Mr. Potter's compensation by an order dated September 8, 2009. Mr. Potter most recently was a consultant in the petrochemicals sector and formerly was the Chief Financial Officer of TNK-BP, Russia's third largest oil company. He also served as a member of the Supervisory Board and Chairman of the Board Audit Committee of LBIAF from 2006 until 2009. From 2000 to July 2003, Mr. Potter held the positions of Senior Vice President and Chief Financial Officer for Chevron Phillips Chemical Company and served as a member of Chevron Phillips Chemical Company's Board of Directors.

Prior to his time with Chevron Phillips, Mr. Potter spent 27 years with Chevron. During that time, he held financial management positions in all areas of Chevron's operations, including Finance Director for Chevron's North Sea operations, CFO of Chevron's mining company, CFO of Tengizchevroil in Kazakhstan, and CFO of Chevron Overseas Petroleum (Chevron's international E&P operations).

b. Chief Legal Officer

On August 10, 2009, Craig Glidden became Executive Vice President and Chief Legal Officer of LyondellBasell. Mr. Glidden most recently served as Senior Vice President, General Counsel and Corporate Secretary of Chevron Phillips Chemical Company. Before joining Chevron Phillips Chemical, Mr. Glidden engaged in the private practice of law focusing on litigation and arbitration of complex commercial disputes.

3. *Ownership Changes*

On July 2, 2009, Nell Limited, an Access affiliate and the indirect owner of 100% of the share capital of LBIAF, transferred its indirect ownership interest in LyondellBasell to ProChemie GmbH, a wholly owned subsidiary of ProChemie Holding Ltd. ("**ProChemie Holding**"). As of July 2, 2009 Nell Limited and ProChemie Holding each own 50% of ProChemie GmbH, which owns 100% of the share capital of LBIAF.

**S.     Compliance Issues Under U.S. Laws**

LyondellBasell has identified certain past activities related to a proposed joint venture that may raise compliance issues under U.S. law. It has engaged outside counsel to investigate these activities, under the oversight of a special committee established by the Supervisory Board, and evaluate internal compliance, policies and procedures. LyondellBasell made a voluntary disclosure of these matters to the U.S. Department of Justice and is cooperating fully with that agency. LyondellBasell cannot predict the ultimate outcome of this matter at this time, nor can it reasonably estimate any potential penalty, if any. However, based on the facts currently known, LyondellBasell does not believe that these matters will have a material adverse effect on its financial condition, results of operations or cash flow.

**T.     Receipt of Preliminary Non-Binding Offer**

On November 15, 2009, the Debtors received an unsolicited preliminary non-binding offer from Reliance Industries Limited to acquire for cash a controlling interest in the Reorganized Debtors contemporaneously with the Reorganized Debtors' emergence from these Chapter 11 Cases. LyondellBasell and its advisors continue to evaluate this proposal and to discuss this proposal with the relevant constituencies. Should the Debtors choose to pursue a transaction with this company, the payment of any break-up fee to the Rights Offering Sponsors described in connection with the Rights Offering, among other things, will not be required.

**IV.     THE PLAN**

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN, AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, TO THE EXHIBITS ATTACHED THERETO, AND TO THE PLAN SUPPLEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS, THE REORGANIZED DEBTORS, AND OTHER PARTIES IN INTEREST.

THE PLAN INCORPORATES THE LENDER LITIGATION SETTLEMENT. THE LENDER LITIGATION SETTLEMENT PROVIDES, AMONG OTHER THINGS, FOR A DISTRIBUTION TO HOLDERS OF GENERAL UNSECURED CLAIMS AGAINST OBLIGOR DEBTORS AND RELEASES TO THE SETTLING DEFENDANTS, AS DESCRIBED IN SECTION IV.G.8 HEREOF. THE LENDER LITIGATION SETTLEMENT REMAINS SUBJECT TO BANKRUPTCY COURT APPROVAL AND THERE IS NO GUARANTY THE LENDER LITIGATION SETTLEMENT WILL BE APPROVED.

The Debtors believe that implementation of the Plan described in this Disclosure Statement will provide holders of Allowed Claims and Equity Interests a greater distribution than they would receive if these cases were converted to cases under chapter 7, which is the principal liquidation chapter of the Bankruptcy Code. The Plan is attached as Exhibit A hereto and forms a part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by reference to the provisions of the Plan. Unless otherwise provided, the holders of Allowed Secured Claims will receive a General Unsecured Claim to the extent of any deficiency.

Although the Chapter 11 Cases are jointly administered pursuant to an order of the Bankruptcy Court, the Debtors are not proposing the substantive consolidation of their respective bankruptcy estates. Thus, the Plan is really 94 distinct chapter 11 plans, one separate plan for each Debtor. However, because many of the procedural provisions of those separate plans are the same, and to save the Debtors' estates the cost of duplicative efforts to draft multiple disclosure statements and separately solicit approval of multiple plans, the Debtors are submitting a single Plan and this Disclosure Statement.

Although the plans for the Debtors are substantially similar, there are variances in certain Classes and distributions depending on whether the applicable Debtor is: (i) an Obligor Debtor, (ii) a Non-Obligor Debtor or (iii) a Schedule III Debtor.

## A.    Classification and Treatment of Holders of Claims and Equity Interests

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. In general, an "allowed" claim or "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court or other court of appropriate jurisdiction determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the debtor.

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divides the different claims against, and equity interests in, a debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. If a class of claims or interests is "impaired," the Bankruptcy Code affords certain rights to holders of such claims or interests, including the right to vote on the plan. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, grants such holder a claim for damages incurred, and does not otherwise alter the holders' legal, equitable and contractual rights.

### 1.    *Administrative Expenses*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses are not classified. Administrative Expenses are the actual and necessary costs and expenses of the Chapter 11 Cases that are Allowed under and in accordance with sections 330, 365, 503(b), 507(a)(1), 507(a)(2) and 507(b) of the Bankruptcy Code. Such expenses include, but are not limited to, amounts owed to vendors providing goods and services to the Debtors during the Chapter 11 Cases, actual and necessary expenses of operating the Debtors' businesses, Postpetition Intercompany Claims, and tax obligations incurred after the Commencement Date. Other Administrative Expenses include the actual, reasonable and necessary professional fees and expenses of the Debtors' advisors incurred during the pendency of the Chapter 11 Cases. Any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code are excluded from the definition of Administrative Expense and will be paid in accordance with Section 14.4 of the Plan.

Except to the extent that a holder of an Allowed Administrative Expense agrees to less favorable treatment, each Allowed Administrative Expense will be paid in full, in Cash, on, or as soon as is reasonably practicable after, the later of (i) the Effective Date, (ii) the date such Administrative Expense otherwise would become due in the ordinary course of business, and (iii) the last Business Day of the month in which such Administrative Expense becomes Allowed, provided such Administrative Expense becomes Allowed at least ten (10) days prior to the last Business Day of the month, otherwise the last Business Day of the following month.

Allowed Administrative Expenses representing obligations incurred by the Debtors in the ordinary course of business will be paid in full by the applicable Reorganized Debtor in the ordinary course of business in accordance with the terms and conditions of the particular transactions and any agreements related thereto. The Debtors estimate that Allowed Administrative Expenses payable on the Effective Date, exclusive of compensation and reimbursement of expenses payable to professionals retained in the Chapter 11 Cases and Postpetition Intercompany Claims, but inclusive of amounts payable in respect of reconciled cure payments under executory contracts and unexpired leases assumed pursuant to the Plan, will be approximately $311 million – $391 million.

All requests for Administrative Expenses that are not otherwise paid in the ordinary course of business, except Postpetition Administrative Expenses, must be filed with the Bankruptcy Court before the date that is sixty (60) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court (the "**Administrative Expense Bar Date**.") A notice setting forth the Administrative Expense Bar Date will be (i) filed on the Bankruptcy Court's docket and (ii) posted on the Debtors' case information website at *www.epiqbankruptcysolutions.com*. Further notice of the Administrative Expense Bar Date will be provided as may be directed by the Bankruptcy Court. All requests for payment of an Administrative Expense that accrued on or before the Effective Date (except Postpetition Intercompany Claims) must be filed with the Claims Agent and served on counsel for the Debtors by the Administrative Expense Bar Date. Any requests for payment of Administrative Expenses that are not properly filed and served by the Administrative Expense Bar Date will not appear on the register of claims maintained by the Claims Agent and will be disallowed automatically without the need for any objection from the Debtors or the Reorganized Debtors or any action by the Bankruptcy Court. Holders of Postpetition Intercompany Claims do not need to file a request for payment of Administrative Expense, but rather will be determined pursuant to the Company's books and records. All Administrative Expenses incurred in the ordinary course (including, but not limited to, those arising pursuant to Insurance Policies and related agreements assumed pursuant to the Plan) will be paid in the ordinary course by the Debtors or the Reorganized Debtors without the need or requirement for the creditor to file a motion, application or claim for allowance of payment thereof.

The Reorganized Debtors, in their sole and absolute discretion, may settle Administrative Expenses in the ordinary course of business without further Bankruptcy Court approval. The Debtors will have the right to object to any Administrative Expense within 180 days after the Administrative Expense Bar Date, subject to extensions from time to time by the Bankruptcy Court. Unless the Debtors or the Reorganized Debtors object to a timely-filed and properly served Administrative Expense, such Administrative Expense will be deemed allowed in the amount requested. In the event that the Debtors or the Reorganized Debtors object to an Administrative Expense, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Expense should be allowed and, if so, in what amount.

### 2. *Professional Compensation and Reimbursement Claims*

Any entity seeking an award by the Bankruptcy Court of compensation for services rendered and/or reimbursement of expenses incurred through and including the Effective Date under sections 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code will (i) file its final application for allowance of such compensation and/or reimbursement by no later than the date that is sixty (60) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court, and (ii) be paid by or on behalf of the Debtors or Reorganized Debtors, in full, in Cash, in such amounts as are Allowed, upon (A) the date the order granting such award becomes a Final Order, or as soon thereafter as is practicable, or (B) such other terms as may be mutually agreed upon by the professional and the Debtors or Reorganized Debtors. Notwithstanding any of the foregoing, the applicable Debtors or Reorganized Debtors will assume all postpetition liabilities, fees and expenses for, and make payment in the ordinary course to, any professional retained by the Debtors as an ordinary course professional pursuant to that certain order of the Bankruptcy Court, entered February 4, 2009.

As of December 31, 2009, the Debtors anticipate that they will have paid the various retained professionals, including the Debtors' professionals and the Committee's professionals, an aggregate of approximately $130 million since the Commencement Date and certain lenders' professionals, pursuant to the Final DIP Financing Order and DIP Term Loan Agreement, an aggregate of approximately $80 million. Assuming confirmation of the Plan on or around March 1, 2010, the Debtors estimate that various retained professionals will

seek compensation for $227 million in the aggregate, inclusive of potential success bonuses, and certain lenders' professionals will seek compensation for $142 million in the aggregate.

3.      *DIP New Money Claims and DIP ABL Claims*

Except to the extent that a holder of a DIP New Money Claim or DIP ABL Claim agrees to less favorable treatment, the Reorganized Debtors will pay, on the Effective Date, in full and complete satisfaction, settlement and release of such Claim (except the Excluded DIP Obligations), an amount in Cash equal to the Allowed amount of such DIP New Money Claim or DIP ABL Claim, as applicable, and all commitments under the DIP Agreement will terminate. To the extent any letters of credit issued pursuant to the DIP Agreement are outstanding as of the Effective Date, they will be replaced or backstopped with new letters of credit to be issued pursuant to the Exit Facility. Upon payment or satisfaction in full of the DIP New Money Claims and DIP ABL Claims (except the Excluded DIP Obligations) in accordance with the terms of this Plan, on the Effective Date all liens and security interests granted to secure such obligations will be terminated and of no further force or effect. The Excluded DIP Obligations will survive the Effective Date and will not be discharged or released pursuant to the Plan or Confirmation Order, notwithstanding any provision of the Plan (including, without limitation, Sections 12.4, 12.5 and 12.8(b) of the Plan) or the Confirmation Order to the contrary.

The Debtors estimate that, as of the Effective Date, (i) the DIP New Money Claim will be approximately $2.167 billion and (ii) the DIP ABL Claim will be approximately $875 million (excluding letters of credit, accrued interest and other fees).

4.      *Priority Tax Claims*

A Priority Tax Claim is any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code. Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim will receive, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim, at the sole option of the Debtor obligated on such Allowed Claim, (i) on the Effective Date, an amount in Cash equal to the Allowed amount of such Claim, or (ii) on the Effective Date and each year on the Effective Date Anniversary, or on any earlier date at the sole option of the applicable Debtor, equal annual Cash payments, in an aggregate amount equal to such Allowed Priority Tax Claim, together with a rate of interest determined under applicable nonbankruptcy law pursuant to section 511 of the Bankruptcy Code or such other amount as determined by the Bankruptcy Court in the Confirmation Order, over a period not exceeding five (5) years after the later of (a) the Commencement Date and (b) the date of assessment of such Allowed Priority Tax Claim; *provided, however*, that no holder of an Allowed Priority Tax Claim will be entitled to any payments on account of any pre-Effective Date interest or penalty accrued on or after the Commencement Date with respect to or in connection with such Allowed Priority Tax Claim. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date will be paid in the ordinary course of business by the applicable Debtor as such obligations become due.

5.      *Class 1 – Priority Non-Tax Claims*

Priority Non-Tax Claims in this Class include certain Claims that are granted priority in payment under section 507(a)(4), (5), (6) or (7) of the Bankruptcy Code, including certain wage, salary and compensation obligations to employees of the Debtors up to a statutory cap of $10,950 per employee. Because the Debtors were authorized by the prepetition wage order to pay such priority amounts to their employees, the Debtors estimate that the Allowed amount of such claims will be approximately $0.4 million – $2 million.

Class 1 is unimpaired by the Plan. Each holder of an Allowed Non-Tax Priority Claim against any Debtor is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that the holder agrees to less favorable treatment or has been paid by or on behalf of the Debtors prior to the Effective Date, each holder of an Allowed Priority Non-Tax Claim against any Debtor will receive, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim, Cash equal to the Allowed amount of such Priority Non-Tax Claim on the later of the Effective Date and the

date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable.

6.    *Class 2 – Secured Tax Claims*

Secured Tax Claims in this Class include any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of any time limitations therein and including any related Secured Claim for penalties).  The Reorganized Debtors estimate that on the Effective Date, the Allowed amount of such Claims will be approximately $10 million – $12 million.

Class 2 is unimpaired by the Plan.  Each holder of an Allowed Secured Tax Claim against any Debtor is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that the holder agrees to less favorable treatment, each holder of an Allowed Secured Tax Claim against any Debtor will, at the sole option of the Debtor obligated for the payment of such Allowed Secured Tax Claim, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim, either (i) receive from such Debtor on the Effective Date, Cash equal to the Allowed amount of such claim, or (ii) retain its lien securing such Allowed Secured Tax Claim and on the Effective Date and each year on the Effective Date Anniversary, or on any earlier date at the sole option of the applicable Debtor, receive from such Debtor equal annual Cash payments, in an aggregate amount equal to such Allowed Secured Tax Claim, together with a rate of interest determined under applicable nonbankruptcy law pursuant to section 511 of the Bankruptcy Code or such other amount as determined by the Bankruptcy Court in the Confirmation Order, over a period not exceeding five (5) years after the date of assessment of such claim.

7.    *Class 3 – DIP Roll-Up Claims*

DIP Roll-Up Claims include those Claims that arise under the DIP Roll-Up Loans.  For purposes of the Plan, the DIP Roll-Up Claims will be Allowed in the amount of $3.25 billion.

Class 3 is impaired by the Plan.  Each holder of an Allowed DIP Roll-Up Claim is entitled to vote to accept or reject the Plan.

Except to the extent that the holder agrees to less favorable treatment, each holder of an Allowed DIP Roll-Up Claim will receive on the Effective Date, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim against the Debtors and the Obligor Non-Debtors, New Third Lien Notes in the same principal amount as such Allowed Claim; *provided, however*, that if Class 3 votes to reject the Plan, (a) each holder of an Allowed DIP Roll-Up Claim that votes to reject the Plan will receive on the Effective Date, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim against the Debtors and the Obligor Non-Debtors, Cram Down Notes in the same principal amount as such Allowed Claim, and (b) each holder of an Allowed DIP Roll-Up Claim that does not vote to reject the Plan will receive on the Effective Date, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim against the Debtors and the Obligor Non-Debtors, New Third Lien Notes in the same principal amount as such Allowed Claim. Following the Voting Deadline, holders of Allowed DIP Roll-Up Claims will not be able to change their vote on the Plan without the written consent of the Debtors.

To the extent that the requisite majority of holders (in both number and amount of claims) of Allowed DIP Roll Up Claims cause Class 3 to accept the Plan, all holders of Allowed DIP Roll-Up Claims will receive New Third Lien Notes in the same principal amount as such Allowed Claims, no holder of an Allowed DIP Roll Up Claim will receive any Cram Down Notes, and the Debtors will not issue the Cram Down Notes.  The principal terms of the New Third Lien Notes and the Cram Down Notes are set forth in Exhibit D and Exhibit E to the Plan, respectively.  In that event, on the Effective Date, the 3% exit fee under the DIP Term Loan Agreement will be paid to the DIP Roll Up Lenders.

In addition, if a majority in the aggregate amount of Claims in Class 3 and Class 4 together vote in favor of the Plan, the guarantees made by, and liens on account of the DIP Roll-Up Claims and Senior Secured Claims against, the Obligor Non-Debtors will be released pursuant to the terms of the Senior Secured Credit Agreement.

8.      <u>*Class 4 – Senior Secured Claims*</u>

Senior Secured Claims in this Class include all Claims arising under the Senior Secured Credit Agreement, ARCO Notes Indenture and Equistar Notes Indenture. For purposes of the Plan, the Senior Secured Claims are Allowed in the estimated amount of $9.51 billion.

Class 4 is impaired by the Plan. Each holder of a Senior Secured Claim against the Obligor Debtors is entitled to vote to accept or reject the Plan.

Except to the extent that the holder agrees to less favorable treatment, each holder of an Allowed Senior Secured Claim will receive on the Effective Date, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim against the Debtors (i) its Pro Rata Share of 100% of Class A Shares based on the net value allocable to LBFC and its direct and indirect subsidiaries, less the number of Class A Shares provided to holders of Allowed Claims who receive a distribution in Classes 5 and 7-C, subject to dilution on account of the Equity Compensation Plan and the New Warrants; *provided, however*, that each holder of a Senior Secured Facility Claim will also receive on account of Claims against Obligor Non-Debtors distributions as set forth in Section 5.4(a) of the Plan, (ii) the right to purchase its Rights Offering Pro Rata Share of Class B Shares, *provided, however*, that the right of any holder of a Class 4 Claim to purchase its Rights Offering Pro Rata Share of Class B Shares will be limited to the amount corresponding to the number of Class A Shares to be distributed on the Effective Date pursuant to (i) of this Section 4.4(b) (other than the proviso thereto), and (iii) an Allowed Claim in Class 7-C in an amount up to $8.96 billion against each of MPCO, MPI and MSC. In addition, all holders of Allowed Senior Secured Claims will waive all Deficiency Claims they may have against Obligor Debtors. Additionally, as required by the Lender Litigation Settlement, on the Effective Date, the Senior Secured Lenders will assign to the Debtors all of their rights and remedies under the Intercreditor Agreement with respect to the holders of 2015 Notes.

If a majority in the aggregate amount of Claims in Class 3 and Class 4 together vote in favor of the Plan, the guarantees made by, and liens on account of the DIP Roll-Up Claims and Senior Secured Claims against, the Obligor Non-Debtors will be released pursuant to the terms of the Senior Secured Credit Agreement.

On the Effective Date, all outstanding Senior Secured Facility Letters of Credit will be terminated and replaced by letters of credit issued under the Exit Facility on terms satisfactory to the Senior Secured LC Issuer.

9.      <u>*Class 5 – Bridge Loan Claims*</u>

Bridge Loan Claims in this Class include all Claims arising under the Bridge Loan Agreement. For purposes of the Plan, the Bridge Loan Claims are Allowed in the estimated amount of $8.297 billion.

Class 5 is impaired by the Plan. Each holder of a Bridge Loan Claim is entitled to vote to accept or reject the Plan.

Each Allowed Bridge Loan Claim will receive on the Effective Date, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim against the Debtors (i) an Allowed Claim in Class 7-C against MPCO, MPI and MSC, (ii) its Pro Rata Share of 26,785,344 of the Class A Shares (which is the equivalent of 4.75% of the Class A and Class B Shares), subject to dilution on account of the Equity Compensation Plan and the New Warrants, and (iii) its Pro Rata Share of the New Warrants.

On the Effective Date, the rights and claims (including any guarantee claims) of holders of Bridge Claims against Obligor Non-Debtors will be extinguished.

10. *Class 6 – Other Secured Claims*

Other Secured Claims in this Class include any Secured Claim, including claims arising under properly asserted and perfected mechanic's and materialman's liens, against the Debtors other than a Secured Tax Claim, a DIP Claim, a Senior Secured Claim or a Bridge Loan Claim. The Debtors estimate that on the Effective Date, the Allowed Claims in this Class will be approximately $256 million – $262 million.

Class 6 is unimpaired by the Plan. Each holder of an Allowed Other Secured Claim against any Debtor is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

Except to the extent that the holder agrees to less favorable treatment, each Allowed Other Secured Claim will be, on the Effective Date, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim, at the sole discretion of the Debtor obligated for the payment of such Allowed Claim, either (i) reinstated or rendered unimpaired in accordance with section 1124 of the Bankruptcy Code (only if not due and payable on or before the Effective Date), notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an Other Secured Claim to demand or receive payment of such Claim prior to its stated maturity from and after the occurrence of a default; (ii) paid in the ordinary course of business in accordance with the course of practice between the Obligor Debtors and such holder with respect to such Allowed Claim; or (iii) paid by transfer of the Collateral securing such Allowed Claim to the holder of such Allowed Claim. Mechanic's and materialman's liens which were properly asserted and perfected under applicable law will be Allowed Claims and will be paid in full.

11. *Class 7-A – General Unsecured Claims Against Obligor Debtors*

General Unsecured Claims in this Class include any General Unsecured Claim against the Obligor Debtors, including any Deficiency Claims of the holders of the Senior Secured Facility Claims, Bridge Loan Claims and ARCO Note Claims. The Debtors estimate that on the Effective Date, the Allowed Claims in this Class will be approximately $944 million – $1.22 billion.

Class 7-A is impaired by the Plan. Each holder of a General Unsecured Claim against the Obligor Debtors (other than the Schedule III Debtors) is entitled to vote to accept or reject the Plan.

Except to the extent that the holder agrees to less favorable treatment, each holder of an Allowed General Unsecured Claim against an Obligor Debtor will receive on the Effective Date, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim, (i) its Pro Rata Share of Cash totaling $300 million, less an amount of Cash distributed to holders of Allowed Class 8 Claims on a pro rata basis as if the amount of such claimant's Allowed Class 8 Claims were included in Class 7-A, and (ii) its Pro Rata Share of the Litigation Trust, less the amount distributed to holders of Allowed Class 8 Claims on a pro rata basis as if the amount of such claimant's Allowed Class 8 Claims were included in Class 7-A.[56]

12. *Class 7-B – General Unsecured Claims Against Non-Obligor Debtors (other than Schedule III Debtors)*

General Unsecured Claims in this Class include any General Unsecured Claim against the Non-Obligor Debtors (other than Schedule III Debtors). The Non-Obligor Debtors are not obligors on the DIP Facility, the Senior Secured Credit Agreement or the Bridge Loan Agreement. Except as set forth below, the Debtors estimate that on the Effective Date, the Allowed Claims in this Class will be approximately $8 million – $9 million.

Class 7-B is 14 separate Classes, each a Class of General Unsecured Claims against a specific Non-Obligor Debtor. As set forth on Exhibit G to the Plan, depending on the applicable Non-Obligor Debtor, holders of Claims in each of these Classes will recover either 100% of their Claims or 0% of their Claims, as the

---

[56] Holders of General Unsecured Claims against MCI, MSC, MPI, Millennium America, Inc. and MPCO, other than Senior Secured Lenders and Bridge Lenders, will also be entitled to share in recoveries to holders in Class 7-A.

case may be. Holders of Allowed General Unsecured Claims that will recover 100% of their Claims will be deemed to accept the Plan. Holders of Allowed General Unsecured Claims that will recover 0% of their Claims will be deemed to reject the Plan.

Except to the extent that the holder agrees to less favorable treatment, each holder of an Allowed General Unsecured Claim against a Non-Obligor Debtor will receive on the Effective Date, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim, its Pro Rata Share of Cash totaling the net value of its applicable Debtor after allocation of Allowed Administrative Expenses, Other Secured Claims, Priority Tax Claims and Priority Non-Tax Claims against the applicable Non-Obligor Debtor. See Exhibit G to the Plan for the estimated recovery percentages for each Non-Obligor Debtor, estimated General Unsecured Claims against each Non-Obligor Debtor and the estimated value attributable to each Non-Obligor Debtor.

The Debtors estimate that the unencumbered assets of Lyondell Greater China, Lyondell Asia Pacific, LBAFGP and LyondellBasell Advanced Polyolefins USA, Inc. will have sufficient value for distribution on account of Claims of their respective General unsecured creditors.

13. _Class 7-C – General Unsecured Claims Against Schedule III Debtors_

General Unsecured Claims in this Class include any General Unsecured Claim against the Schedule III Debtors. The Debtors estimate that on the Effective Date, the Allowed Claims in this Class will be approximately $1.15 billion – $1.78 billion plus Senior Secured Lender general unsecured Claims.

Class 7-C is impaired by the Plan. Each holder of a General Unsecured Claim against a Schedule III Debtor is entitled to vote to accept or reject the Plan.

Each holder of an Allowed General Unsecured Claim against MCI will receive, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim, beneficial trust interests in the Millennium Custodial Trust, which will entitle such holder to its Pro Rata Share of recoveries with respect to the assets of the Millennium Custodial Trust, including any recovery by MCI as a result of its direct or indirect ownership interest in its direct and indirect subsidiaries. Each holder of an Allowed General Unsecured Claim against an MCI Subsidiary will receive, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim, a contractual right under the Plan from the applicable MCI Subsidiary entitling the holder to a potential payment up to the amount of such holder's Allowed Claims against the MCI Subsidiary on the Effective Date; _provided, however_, that to the extent holders of Claims in Class 5 are granted a Claim in Class 7-C by virtue of Section 4.5(b)(i) of the Plan, the total aggregate recovery available to each holder on account of such Class 7-C Claim will be its Pro Rata Share of 1,409,755 Class A Shares (which is the equivalent of 0.25% of the Class A and Class B Shares), subject to dilution on account of the Employee Compensation Plan and New Warrants (the "**Maximum Recovery**"). To the extent any contractual right described in the preceding sentence receives a distribution, for every $1 of value (which may be in the currency of Class A Shares) distributed to the aggregate amount of Claims held by the Senior Secured Lenders and the Bridge Lenders in this Class 7-C, the Senior Secured Lenders will receive 95% of such value and the Bridge Lenders will receive 5% of such value until the Bridge Lenders receive their Maximum Recovery, after which the Senior Secured Lenders will receive 100% of every such $1 of value. To the extent that holders of Claims in Class 5 that have been granted a Claim in Class 7-C by virtue of Section 4.5(b)(i) of the Plan do not receive their Maximum Recovery prior to the first Effective Date Anniversary, such holders will receive 100% of every $1 of value distributed to the combined Claims as described in the previous sentence until they receive their Maximum Recovery after which the Senior Secured Lenders will receive 100% of every such $1 of value. See Exhibit H to the Plan for the estimated recovery percentages for each Schedule III Debtor, estimated General Unsecured Claims against each Schedule III Debtor, and the estimated value attributable to each Schedule III Debtor. Holders of Allowed General Unsecured Claims against MCI, MSC, MPI, Millennium America, Inc. and MPCO, other than Senior Secured Lenders and Bridge Lenders, will also be entitled to share in recoveries as holders in Class 7-A.[57] See Section C.1 hereof for a detailed description of the Millennium Custodial Trust.

---

[57] Although certain of the Schedule III Debtors have Allowed Administrative Expenses (including professional fees), Other Secured Claims, Priority Tax Claims and Priority Non-Tax Claims allocable to such Schedule III Debtor, such Claims will be

14.     *Class 8 – 2015 Notes Claims*

Class 8 is impaired by the Plan.  Each holder of a 2015 Notes Claim is entitled to vote to accept or reject the Plan.  The Debtors estimate that on the Effective Date, the Allowed amount of such Claims will aggregate approximately $1.351 billion.

Class 8 is impaired by the Plan.  Each holder of a 2015 Notes Claim is entitled to vote to accept or reject the Plan.

If Class 8 votes to accept the Plan, the Debtors, as assignees as of the Effective Date of the rights and remedies of the Senior Secured Lenders and Bridge Lenders under the Intercreditor Agreement, will waive the contractual subordination and turnover provisions of the Intercreditor Agreement so that the holders of Allowed 2015 Notes Claims will receive on the Effective Date, and subject to dismissal with prejudice of the 2015 Note Adversary Proceeding, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim, their Pro Rata Share as holders of Class 7-A Claims.[58]  In addition, such vote will be deemed a direction to the 2015 Notes Trustee to dismiss with prejudice the 2015 Adversary Proceeding, as described in Section III.J.2 herein.  If Class 8 rejects the Plan, or the 2015 Note Adversary Proceeding will not be dismissed with prejudice, holders of Allowed 2015 Notes Claims will not receive any distribution under the Plan by reason of enforcement by the Debtors of the subordination and turnover provisions of the Intercreditor Agreement and the recovery of the holders of 2015 Notes Claims as holders of Claims in Class 7-A will be deemed turned over to the Reorganized Debtors.

Regardless of whether Class 8 votes to accept or reject the Plan, on the Effective Date, (i) the rights and claims of holders of 2015 Note Claims against Obligor Non-Debtors will be extinguished pursuant to Section 5.4 of the Plan and the Enforcement Action in accordance with the terms of the Intercreditor Agreement and the 2015 Notes Indenture, (ii) the holders thereof will, subject to the first paragraph of this Section 4.10(b), be entitled to no recovery against Obligor Debtors or Obligor Non-Debtors by reason of the turnover provisions of the Intercreditor Agreement, and (iii) the holders thereof will be enjoined from taking any action against any Debtor or Non-Debtor Affiliate on account of any 2015 Notes Claim.

15.     *Class 9 – Securities Claims*

Securities Claims include any Claim against any Debtor, whether or not the subject of an existing lawsuit, arising from the rescission of a purchase or sale of a debtor security, for damages arising from the purchase or sale of any such security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of any such Claim.  The Debtors estimate that on the Effective Date, the Allowed amount of such Claims will aggregate approximately $0.

Class 9 is impaired by the Plan.  Each holder of a Securities Claim against any Debtor is conclusively deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

Holders of Securities Claims will not receive or retain any interest or property under the Plan on account of such Claims.

16.     *Class 10 – Subordinated Claims*

Subordinated Claims include any Claim for any fine, penalty, forfeiture, attorneys' fees (to the extend such attorneys' fees are punitive in nature), multiple, exemplary or punitive damages, or for any other amount that does not represent compensation for actual pecuniary loss suffered by the holder of such Claim, all

---

paid or otherwise afforded the treatment set forth above by the non-Schedule III Debtors as part of the consideration for the releases that the Schedule III Debtors are granting to the non-Schedule III Debtors pursuant to the Plan.

[58] In the event that holders of 2015 Notes Claims receive Litigation Trust Interests and the Debtors exercise their turnover rights, such Litigation Trust Interests will be extinguished rather than held by the Debtors.

Claims against any of the Debtors that are subordinated pursuant to sections 510(a)-(c) of the Bankruptcy Code, other than Class 8 Claims, including any Claim against Lyondell Chemical for unexchanged shares of Lyondell Chemical or MCI that were not exchanged in connection with the 2007 Merger. The Debtors estimate that on the Effective Date, the Allowed amount of such Claims will aggregate approximately $0.

Class 10 is impaired by the Plan. Each holder of a Subordinated Claim against any Debtor is conclusively deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

Holders of Subordinated Claims will not receive or retain any interest or property under the Plan on account of such Claims.

17.    *Class 11 – Equity Interests in LBFC*

Equity Interest in LBFC are the shares of stock of LBFC. The Debtors estimate that on the Effective Date, the Allowed amount of such Claims will aggregate approximately $0.

Class 11 is impaired by the Plan. Each holder of an Equity Interest in LBFC is conclusively deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

Equity Interests in LBFC will be cancelled on the Effective Date. No distribution of any kind will be made on account of Equity Interests in LBFC.

18.    *Class 12 – Equity Interests in LBAFGP and LBIAF*

Equity Interests in LBAFGP and LBIAF are the shares of stock of LBAFGP and LBIAF, respectively. The Debtors estimate that on the Effective Date, the Allowed amount of such Claims will aggregate approximately $0.

Class 12 is impaired by the Plan. Each holder of an Equity Interest in LBAFGP and LBIAF is conclusively deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

As a result of the restructuring transactions, LBIAF's interests in its indirect subsidiaries will be terminated in recognition of the fact that there is no net equity value to LBIAF in any of those interests. See Section IVB.5 above. Accordingly, because LBAFGP and LBIAF (and LBIAF's sole direct subsidiary, Basell Funding S.à.r.l.) have no value, and no distribution of any kind will be made on account of Equity Interests in either LBIAF or LBAFGP. LBAFGP, LBIAF and Basell Funding S.à.r.l. will be dissolved post-emergence in accordance with applicable law.

19.    *Class 13 – Equity Interests in MCI and the Schedule III Debtors*

Equity Interests in the Schedule III Debtors are the shares of stock of the Schedule III Debtors. The Debtors estimate that on the Effective Date, the Allowed amount of such Claims will aggregate approximately $0.

Class 13 is impaired by the Plan. Each holder of an Equity Interest in any Schedule III Debtor is conclusively deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

Equity Interests in MCI will be transferred on the Effective Date to the Millennium Custodial Trust and cancelled after the sale of assets and distribution of proceeds by the Millennium Custodial Trust. No distribution of any kind will be made on account of Equity Interests in a Schedule III Debtor unless and until creditors of that Schedule III Debtor have been paid in full.

20. *Class 14 – Equity Interests in the Debtors (other than LBFC, LBAFGP, LBIAF and the Schedule III Debtors)*

Class 14 consists of the Equity Interests in the Debtors other than LBFC, LBAFGP, LBIAF and the Schedule III Debtors. The Debtors estimate that on the Effective Date, the Allowed amount of such Claims will aggregate approximately $1.5 million – $1.7 million.

Class 14 is unimpaired by the Plan. Each holder of Equity Interest in any Debtor (other than LBFC, LBAFGP, LBIAF and the Schedule III Debtors) is conclusively presumed to accept the Plan and is not entitled to vote to accept or reject the Plan.

At the election of New Topco, all Equity Interests in a Debtor held by a Debtor (i) will be unaffected by the Plan, in which case the entity holding an Equity Interest in such Debtor-subsidiary will continue to hold such Equity Interest in the applicable reorganized Debtor-subsidiary following the Effective Date, (ii) will be cancelled and new equity in the applicable reorganized Debtor will be issued pursuant to the Plan, or (iii) will be transferred pursuant to the Plan. In the case of Equity Interests in Basell Germany, which are held by LBIH, such Equity Interests will be unaffected by the Plan and LBIH will continue to hold such Equity Interest following the Effective Date.

**B.      Means for Implementation**

The Plan will be implemented, and the distributions thereunder funded, as described below.

1. *Settlement*

On the Effective Date and subject to Bankruptcy Court approval, Reorganized LyondellBasell will implement the terms of the Lender Litigation Settlement, which is described in detail in Section III.K hereof.

2. *Exit Facility*

On or before the Effective Date, Reorganized LyondellBasell will enter into the Exit Facility. The Exit Facility will be on terms and conditions as set forth in the Plan Supplement.

3. *Securities to be Issued*

a.      New Third Lien Notes

On the Effective Date, Lyondell Chemical will authorize and issue the New Third Lien Notes. The terms of the New Third Lien Notes will be governed by the New Third Lien Notes Indenture, and the principal terms of the New Third Lien Notes will be set forth in Exhibit D to the Plan.

b.      Cram Down Notes

To the extent necessary, on the Effective Date, Lyondell Chemical will authorize and issue the Cram Down Notes. The terms of the Cram Down Notes will be governed by the Cram Down Notes Indenture. The Cram Down Notes will include the principal terms set forth in Exhibit E to the Plan.

c.      New Common Stock

Pursuant to the New Topco Articles of Association in effect upon emergence, New Topco will be authorized to issue up to 1,275,000,000 shares of New Common Stock, which will consist of 1 billion Class A Shares and 275,000,000 Class B Shares. New Topco will not have any authorized shares of preferred stock. The rights attached to the New Common Stock are described in more detail in the New Topco Articles of Association, which will be included in the Plan Supplement.

Shares of New Common Stock issued in exchange for Allowed Claims under the Plan as well as shares of New Common Stock issuable upon the exercise of warrants issued pursuant to the Plan will be Class A Shares. Shares of New Common Stock issued in connection with, or pursuant to, the Rights Offering will be Class B Shares. Upon consummation of the Plan as set forth herein, 300,000,000 Class A Shares and 263,901,979 Class B Shares are expected to be outstanding. Additional Class A Shares are expected to be reserved for issuance upon exercise of options issued pursuant to the Employee Equity Plan.

Each share of New Common Stock will have a nominal value of four eurocents (EUR 0.04), will carry one vote in New Topco's general meeting of shareholders and will be entitled to dividends to the extent declared on a record date on or after the issue date of the New Common Stock. The Class B Shares will, however, rank senior in liquidation to the Class A Shares and any other classes of New Topco capital stock. Except with respect to the liquidation preference, conversion and class voting rights in certain situations described below, each Class B Share will have the same rights, entitlements and preferences as the Class A Shares.

*Class B Liquidation Preference*: Upon a Liquidation, prior to the Liquidation Preference Expiration Date, subject to the payment or provision for payment of the debts and other liabilities of New Topco, each outstanding Class B Share will be entitled to receive, out of the remaining assets of New Topco available for distribution to its stockholders, an amount equal to $10.61 per Class B Share (the "**Class B Liquidation Preference Amount**") before any distribution will be made to the holders of Class A Shares. Following receipt of the Class B Liquidation Preference Amount, the Class B Shares will not also participate in liquidation distributions to the Class A Shares.

*Class B Optional Conversion*: Each Class B Share will be convertible at any time at the option of the holder thereof into one Class A Share (subject to the anti-dilution adjustment).

*Class B Automatic Conversion*: On the Liquidation Preference Expiration Date, each outstanding Class B Share will automatically convert, without any further action required to be taken by New Topco or any shareholder, into one Class A Share (subject to anti-dilution adjustments) and the Class B Shares will no longer be outstanding. The "**Liquidation Preference Expiration Date**" will mean the first date upon which the closing price per share of the Class B Shares exceeds $21.22 (200% of the Initial Purchase Price per Class B Share) on a national securities exchange, subject to anti-dilution adjustments, for at least 45 trading days within a period of 60 consecutive trading days; *provided however*, the closing price per share of the Class B Shares must exceed such threshold on both the first and last day of such 60-day period.

*Conversion Ratio Anti-Dilution Adjustment:* The number of Class A Shares into which a Class B Share is convertible will be adjusted in the event of any stock split, subdivision of shares, combination of shares or stock dividend relating only to the Class A Shares or Class B Shares which does not relate also to the other class of ordinary shares in a pro rata manner such that a holder of Class B Shares thereafter converted will receive the number of Class A Shares which such holder would have received with respect to such conversion had such Class B Shares been converted immediately prior to such action.

*Class B Class Voting Rights*: All Class A and Class B Shares will vote as one class on all matters on which holders of shares of New Common Stock are entitled to vote, except as otherwise provided in this paragraph. The Class B Shares will have a separate class vote with respect to an acquisition, merger, sale of all or substantially all assets of New Topco and its consolidated subsidiaries taken as a whole, consolidation or, to the extent a vote of the shareholders of the New Topco is required, a Liquidation, in each case, pursuant to which the Class B Shares are redeemed, purchased, converted, retired or otherwise exchanged for value at a price less than their Liquidation Preference. Such Class B vote will require the approval of 85% of the then outstanding Class B Shares.

*Class B Amendment/Waiver*: Amendments or waivers to the terms of the Class B Shares will require the approval of a majority of the then outstanding Class B Shares, provided that (i) the approval of 85% of the then outstanding Class B Shares will be required for changes to the terms of the voting provisions and (ii) the approval of 100% of the then outstanding Class B Shares will be required for changes to the terms of the Class B Liquidation Preference, Liquidation Preference Expiration Date or Automatic Conversion provisions.

d.     Authorization and Issuance of New Securities.

The issuance of the New Common Stock, New Third Lien Notes and Cram Down Notes, if any, by a member of Reorganized LyondellBasell and the issuance of any and all securities, notes, stock, Instruments, certificates and other documents or agreements required to be issued, executed or delivered pursuant to the Plan, including the Exit Facility, and any other actions necessary or desirable in connection therewith will be authorized without further act or action under applicable law, regulation, order or rule, or the vote, consent, authorization or approval of any entity.  Upon the Effective Date, after giving effect to the transactions contemplated hereby, the authorized capital stock or other equity securities of New Topco and the Reorganized Debtors will be issued and authorized.  Notwithstanding the foregoing, the New Topco Manager and New Topco Supervisory Board will and are directed to take any required corporate action necessary to cause the foregoing Instruments to be duly authorized under Dutch law.

4.     *Rights Offering*

LeverageSource (Delaware) LLC, an affiliate of Apollo Management VII, L.P. ("**Apollo**"), AI LBI Investment LLC, an affiliate of Access Industries ("**Access**"), and Ares Corporate Opportunities Fund III, L.P. ("**Ares**"), as the Rights Offering Sponsors, have entered into the Equity Commitment Agreement with New Topco, LBIAF and the Debtor Parties.  Pursuant to the Equity Commitment Agreement, New Topco has agreed to sell 263,901,979 Class B Shares of which 240,339,302 shares, representing $2.55 billion (subject to adjustment as explained below) will be offered in the Rights Offering and 23,562,677 additional shares, representing $250 million, (the "**Backstop Consideration Shares**") will be purchased by the Rights Offering Sponsors (or affiliates of the Rights Offering Sponsors), in each case at a Subscription Purchase Price per Class B Share of $10.61.  On the Effective Date, the Rights Offering Sponsors (or affiliates of the Rights Offering Sponsors) will also purchase any Unsubscribed Shares and Excluded Shares at a price per Class B Share of $10.61.  Pursuant to the Equity Commitment Agreement, the Backstop Consideration Shares, the Unsubscribed Shares and the Excluded Shares, if any, will be allocated among the Rights Offering Sponsors in accordance with the following:

| Investors | Apollo | Ares | Access |
|---|---|---|---|
| **Total Commitment** | $1,518,398,134 | $475,682,849 | $805,919,017 |
| **BCS Sharing Percentage for Fees and Backstop Consideration Shares** | 51.60% | 16.16% | 32.24% |
| **Tranche 1 Commitment** | $1,289,963,134 | $404,117,849 | $805,919,017 |
| **Tranche 1 Sharing Percentage** | 42.573% | 14.854% | 42.573% |
| **Tranche 2 Commitment** | $228,435,000 | $71,565,000 | $0 |
| **Tranche 2 Sharing Percentage** | 76.145% | 23.855% | 0.0% |

The foregoing allocation is subject to certain adjustments if holders of claims other than Class 4 receive Rights or if any Rights Offering Sponsor acquires additional claims, as set forth in the Equity Commitment Agreement.

The Equity Commitment Agreement is terminable if the Rights Offering is not consummated by June 3, 2010 and upon certain other events.  If terminated, the Rights Offering Sponsors will have no further options thereunder.

Eligible Holders have the right, but not the obligation, to participate in the Rights Offering as provided herein.  No Subscription Rights may be exercised for fractional Class B Shares.  The closing date of the Rights Offering will be the Effective Date of the Plan.

The Debtors expect to file a motion to approve the Equity Commitment Agreement no later than December 18, 2009. The process to select the Rights Offering Sponsors will be described in the motion and incorporated herein.

a.    Subscription Rights

Pursuant to the Rights Offering, each Eligible Holder as of the Subscription Rights Record Date will be granted non-transferable Subscription Rights to purchase up to such holder's Rights Offering Pro Rata Share of 240,339,302 Class B Shares at the Subscription Purchase Price of $10.61 per share.

The number of Class B Shares for which any Eligible Holder may subscribe in the Rights Offering may be decreased to the extent reasonably required by the Debtor Parties and New Topco after consultation with counsel or as required by the Bankruptcy Court, in each case, to allow the Rights Offering to be exempt from registration under the Securities Act pursuant to Section 1145 of the Bankruptcy Code (or exempt from prospectus delivery requirements under the Prospectus Directive) (a "**Section 1145 Cutback**"). Any Class B Shares excluded from the Rights Offering due to a Section 1145 Cutback (the "**Excluded Shares**") will instead be purchased on the Effective Date directly from New Topco by the Rights Offering Sponsors (or affiliates of the Rights Offering Sponsors).

b.    Subscription Period

The Rights Offering will commence on the Subscription Commencement Date and will end at 5:00 p.m. (prevailing Eastern time) on the Rights Offering Expiration Date (or such later date as the Debtors, subject to the approval of the Rights Offering Sponsors (not to be unreasonably withheld), may specify in a notice provided to the Rights Offering Sponsors before 9:00 a.m. (prevailing Eastern time) on the business day before the then current Rights Offering Expiration Date) (such period of time, the "**Subscription Period**"). After the Rights Offering Expiration Date, any exercise of Subscription Rights by any entity (other than a purchase of Unsubscribed Shares or Excluded Shares by the Rights Offering Sponsors (or affiliates of the Rights Offering Sponsors) pursuant to the Equity Commitment Agreement) will be null and void and the Subscription Agent will not honor any such exercise of Subscription Rights, regardless of when the documents relating to such exercise were sent.

c.    Exercise of Subscription Rights

In order to exercise the Subscription Rights, each Eligible Holder must (a) return a duly completed Subscription Form to the Subscription Agent so that such form is received by the Subscription Agent on or prior to 5:00 p.m. (prevailing Eastern time) on the Rights Offering Expiration Date; and (b) pay in Cash, by wire transfer in immediately available funds or otherwise, an amount equal to the full Subscription Purchase Price for the number of Class B Shares elected to be purchased by such Eligible Holder, or, in the case of securities held through a bank or brokerage firm, send the Subscription Form to the bank or brokerage firm (or follow such firm's directions with respect to submitting subscription instructions to the firm) with sufficient time for the bank or brokerage firm to effect the subscription through DTC on or prior to 5:00 p.m. (prevailing Eastern time) on the Rights Offering Expiration Date. If the Subscription Agent for any reason does not receive from a given Eligible Holder both a timely and duly completed Subscription Form and timely payment of such holder's Subscription Purchase Price, such Eligible Holder will be deemed to have relinquished and irrevocably waived its right to participate in the Rights Offering.

The payments made in connection with the Rights Offering will be deposited and held by the Subscription Agent in a trust account or similarly segregated account or accounts which will be separate and apart from the Subscription Agent's general operating funds and any other funds subject to any lien or similar encumbrance and which segregated account or accounts will be maintained for the sole purpose of holding the money for administration of the Rights Offering until the Effective Date. The Subscription Agent will not use such funds for any other purpose prior to such date and will not encumber or permit such funds to be encumbered with any lien or similar encumbrance. Each Eligible Holder intending to participate in the Rights Offering must affirmatively elect to exercise all or any portion of its respective Subscription Rights on or prior to 5:00 p.m. (prevailing Eastern time) on the Rights Offering Expiration Date; *provided, however,* that to the extent that the Plan is amended in accordance with its terms, and the Debtors resolicit votes with respect to the Plan or the deadline

pursuant to which claimholders may vote to accept or reject a Plan is extended, Eligible Holders may withdraw any previously exercised Subscription Rights but may not exercise Subscription Rights to the extent not previously exercised prior to 5:00 p.m. (prevailing Eastern time) on the Rights Offering Expiration Date.

In the event any Eligible Holder elects to withdraw any of its previously exercised Subscription Rights, within five business days of such withdrawal the Subscription Agent will return to the withdrawing Eligible Holder, Cash in immediately available funds in an amount equal to the product of (i) the Subscription Purchase Price and (ii) the number of Class B Shares related to the Subscription Rights withdrawn by such Eligible Holder. Each Eligible Holder will be deemed to have relinquished and irrevocably waived its right with respect to the unexercised portion of such Subscription Rights.

In order to facilitate the exercise of the Subscription Rights, on or about the Subscription Commencement Date, the Subscription Form will be mailed to each Eligible Holder together with appropriate instructions for the proper completion, due execution and timely delivery of the Subscription Form, as well as instructions for payment. New Topco will instruct the Subscription Agent to deliver to each Eligible Holder that has sought to exercise its Subscription Rights (i) a written statement specifying the portion of the Subscription Rights which New Topco has accepted and (ii) in the event of a Section 1145 Cutback, or in the event that any portion of exercised Subscription Rights are not accepted for any reason, Cash in immediately available funds in an amount equal to the portion of the Subscription Purchase Price with respect to the number of Class B Shares elected to be purchased by such Eligible Holder but not accepted by New Topco as soon as reasonably practicable following the Effective Date.

d.      Undersubscription

Subject to the terms of the Equity Commitment Agreement, in the event that all of the Class B Shares offered pursuant to the Rights Offering are not purchased by Eligible Holders with Subscription Rights, the Rights Offering Sponsors (or affiliates of the Rights Offering Sponsors) will purchase on the Effective Date, for the Subscription Purchase Price per share, a number of Class B Shares equal to the Backstop Consideration Shares and the Unsubscribed Shares, as well as any Excluded Shares in accordance with the terms of the Equity Commitment Agreement.

The Subscription Agent will notify the Rights Offering Sponsors, on each Friday during the Subscription Period and on each Business Day during the five (5) Business Days prior to the Rights Offering Expiration Date (and any extensions thereto), or more frequently if reasonably requested by the Rights Offering Sponsors, of the aggregate number of Subscription Rights known by the Subscription Agent to have been exercised pursuant to the Rights Offering as of the close of business on the preceding Business Day or the most recent practicable time before such request, as the case may be.

The Subscription Agent will give the Rights Offering Sponsors, as soon as reasonably practicable after the Rights Offering Expiration Date and, in any event, not more than six (6) Business Days after the Rights Offering Expiration Date, by e-mail or by electronic facsimile transmission, written notification setting forth either (i) the calculation of the number of Unsubscribed Shares, the number of Excluded Shares known at such time and the aggregate Subscription Purchase Price for all Class B Shares being purchased by the Rights Offering Sponsors (or affiliates of the Rights Offering Sponsors) (a "**Purchase Notice**") or (ii) in the absence of any Unsubscribed Shares, the fact that there are no Unsubscribed Shares. The Subscription Agent will determine the number of Unsubscribed Shares, if any, in good faith, and provide the Rights Offering Sponsors with a Purchase Notice that reflects the number of Unsubscribed Shares as so determined. If an updated Purchase Notice is not subsequently delivered within three Business Days after entry of the Confirmation Order with respect to any Excluded Shares or additional Excluded Shares, as the case may be, the Purchase Notice will be final. On the Effective Date, the Rights Offering Sponsors (or affiliates of the Rights Offering Sponsors) will purchase the Backstop Consideration Shares and such number of Unsubscribed Shares and Excluded Shares as are listed in the Purchase Notice (as the same may be updated), if any, without prejudice to the rights of the Rights Offering Sponsors to seek later an upward or downward adjustment to the number of Unsubscribed Shares if such Purchase Notice is miscalculated.

Delivery of the Backstop Consideration Shares, Unsubscribed Shares and Excluded Shares will be made to the accounts of the respective Rights Offering Sponsors (or to such other accounts as the Rights Offering

Sponsors may designate), on the Effective Date against payment of the aggregate Subscription Purchase Price for the Backstop Consideration Shares, the Unsubscribed Shares and the Excluded Shares by wire transfer of immediately available funds to a bank account in the United States specified by the Subscription Agent to the Rights Offering Sponsors at least 24 hours in advance. All Backstop Consideration Shares, Unsubscribed Shares and Excluded Shares will be delivered with any and all issue, stamp, transfer or similar taxes or duties payable in connection with such delivery duly paid by the Debtors or the Reorganized Debtors to the extent required under the Confirmation Order or applicable law. Notwithstanding anything contained herein to the contrary, the Rights Offering Sponsors, in their sole discretion, may designate that some or all of the Backstop Consideration Shares, Unsubscribed Shares or Excluded Shares be issued in the name of, and delivered to, one or more affiliates.

e.        Equity Commitment Agreement

Subject to approval of the Equity Commitment Agreement by the Bankruptcy Court, unless the Equity Commitment Agreement has been previously terminated, the Debtors will pay to the Rights Offering Sponsors a transaction fee of $69,750,000 on the Effective Date, payable in accordance with the terms of the Equity Commitment Agreement. The Rights Offering Sponsors will receive reimbursement of the Rights Offering Fees and Expenses, as further set forth in the Equity Commitment Agreement. In certain circumstances the Rights Offering Sponsors will be entitled to a termination fee in accordance with the Equity Commitment Agreement.

Under the terms of the Equity Commitment Agreement, the consent of the Rights Offering Sponsors is required with respect to certain events, including, without limitation, certain changes to the Plan proposed to be made by the Debtors or the Debtors taking certain specified actions outside the ordinary course of business. The obligations of the Rights Offering Sponsors are subject to the satisfaction or waiver of specified closing conditions, including, without limitation, entry of the Confirmation Order in form and substance reasonably satisfactory to the Rights Offering Sponsors, the conditions to effectiveness of the Plan having been satisfied or waived in accordance with the Plan, the receipt of required regulatory approvals and the termination of required regulatory waiting periods, the consummation of the Debtors exit financing and except as disclosed in the disclosure statement, no event, fact or circumstance, including any court order with respect to a non-Debtor entity, having occurred since June 30, 2009 that has had or would reasonably be expected to have, individually, or in the aggregate, a material adverse effect on New Topco and LBIAF and its subsidiaries, taken as a whole.

The Equity Commitment Agreement (and the Rights Offering) will terminate automatically if certain conditions are not met, including if the transactions contemplated by the Equity Commitment Agreement have not occurred by June 3, 2010.

f.        Registration Rights Agreement

The Equity Commitment Agreement provides for the execution of a registration rights agreement to be entered into between New Topco and the Rights Offering Sponsors.

g.        Transfer of Subscription Rights; Revocation

Prior to the Effective Date, the Subscription Rights will be automatically transferred in connection with a transfer of a Claim with respect to which Subscription Rights are granted as of the Subscription Rights Record Date (a "**Rights Claim**"). The Subscription Rights will not be transferable separately from a Rights Claim.

Pursuant to the Equity Commitment Agreement, New Topco and the Debtor Parties have agreed to use their commercially reasonable efforts to obtain an order from the Bankruptcy Court that prohibits direct or indirect transfers of the Subscription Rights in violation of the preceding paragraph prior to the Effective Date. For the avoidance of doubt, the following will constitute, without limitation, impermissible indirect transfers of Subscription Rights: (i) derivatives, options, swaps, pledges, forward sales or other transactions in which any Person receives the right to own or acquire a Subscription Right, a Claim or a Class B Share; any current or future interest in any such Subscription Right, Claim or a Class B Share or the right to receive any economic benefit in respect of any such Subscription Right, Claim or a Class B Share other than through a sale of a Claim together with the Subscription Rights related thereto, and (ii) any direct or indirect transfer, whether through a direct transfer or

through a derivative, option, swap, pledge, forward sale or other transaction, in which the transferor would retain (or, in connection with such transfer, repurchase or agree to repurchase), directly or indirectly, any related Subscription Rights, Class A Shares or Class B Shares or otherwise have the right, directly or indirectly, to acquire or own any current or future interest in any related Subscription Rights, Class A Shares or Class B Shares or economic benefit in respect of any related Subscription Rights, Class A Shares or Class B Shares. Any sale, transfer, assignment or attempted sale, transfer or assignment in violation of this section will be null and void, and no purported transferee will be treated as an Eligible Holder of any Subscription Rights. Once an Eligible Holder has properly exercised its Subscription Rights, such exercise cannot be revoked, rescinded or modified.

h.      Withdrawal of Rights Offering

The Debtors may, after consultation with the Creditors' Committee, the Rights Offering Sponsors and the Ad Hoc Group, withdraw the Rights Offering.

i.      Distribution of Class B Shares

On the Effective Date, the Disbursing Agent will distribute the Class B Shares purchased by the Exercising Claimants and the Rights Offering Sponsors, pursuant to the Rights Offering to such purchasers.

j.      Fractional Rights

No fractional Subscription Rights will be issued. The number of Class B Shares available for purchase by Exercising Claimants will be rounded down to the nearest share. Any Class B Shares not subscribed for as a result of such rounding will be purchased by the Rights Offering Sponsors (or affiliates of the Rights Offering Sponsors) in accordance with the terms of the Equity Commitment Agreement.

k.      Validity of Exercise of Subscription Rights

All questions concerning the timeliness, viability, form and eligibility of any exercise of Subscription Rights will be determined by the Debtors, in consultation with the Rights Offering Sponsors, whose good faith determinations will be final and binding. The Debtors, subject to the approval of the Rights Offering Sponsors acting in good faith, may waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as the Debtors determine, or reject the purported exercise of any Subscription Rights. Subscription Forms will be deemed not to have been received or accepted until all irregularities have been waived or corrected within such time as the Debtors (subject to the approval of the Rights Offering Sponsors acting in good faith) determine in their reasonable discretion. Neither the Debtors nor the Subscription Agent will be under any duty to give notification of any defect or irregularity in connection with the submission of Subscription Forms or incur any liability for failure to give such notification.

l.      Rights Offering Procedures

Notwithstanding anything contained herein to the contrary, the Debtors (subject to the approval of the Rights Offering Sponsors) may modify the procedures relating to the Rights Offering or adopt such additional procedures substantially consistent with the provisions of this section in each case to more effectively administer the exercise of the Subscription Rights.

m.      Indemnification of Rights Offering Sponsors

Subject to the approval of the Equity Commitment Agreement by the Bankruptcy Court, the Rights Offering Indemnifying Parties agree to indemnify and hold harmless the Rights Offering Indemnified Persons from and against any and all losses, claims, damages, liabilities and reasonable expenses, joint or several, to which any such Rights Offering Indemnified Person may become subject arising out of or in connection with any claim, challenge, litigation, investigation or proceeding with respect to the Rights Offering, the Equity Commitment Agreement, or the transactions specifically contemplated thereby (but, for the avoidance of doubt, not other transactions relating to the Chapter 11 Cases or the Plan) including, without limitation, payment of the Backstop

Fee, distribution of the Subscription Rights, the purchase and sale of Class B Shares pursuant to the Rights Offering, and to reimburse such Rights Offering Indemnified Persons for reasonable legal or other reasonable out-of-pocket expenses as they are incurred in connection with investigating, responding to or defending any of the foregoing, *provided that* the foregoing indemnification will not, as to any Rights Offering Indemnified Person, apply to losses, claims, damages, liabilities or expenses to the extent that it is finally judicially determined by a court of competent jurisdiction to have resulted from gross negligence or willful misconduct on the part of such Rights Offering Indemnified Person. If for any reason the foregoing indemnification is unavailable to any Rights Offering Indemnified Person or insufficient to hold it harmless, then the Rights Offering Indemnifying Parties will contribute to the amount paid or payable by such Rights Offering Indemnified Person as a result of such loss, claim, damage, liability or expense in such proportion as is appropriate to reflect not only the relative benefits received by the Rights Offering Indemnifying Parties on the one hand and such Rights Offering Indemnified Person on the other hand, but also the relative fault of the Rights Offering Indemnifying Parties, on the one hand, and such Rights Offering Indemnified Person, on the other hand, as well as any relevant equitable considerations. The relative benefits to the Rights Offering Indemnifying Parties on the one hand and all Rights Offering Indemnified Persons on the other hand will be deemed to be in the same proportion as (i) the total value received or proposed to be received by New Topco pursuant to the sale of Class B Shares contemplated by the Equity Commitment Agreement bears to (ii) the aggregate fee paid or proposed to be paid to the Rights Offering Sponsors in connection with such sale. The indemnity and reimbursement obligations of the Rights Offering Indemnifying Parties described herein and the representations and warranties set forth in the Equity Commitment Agreement will terminate and be of no further force and effect following the earlier of the Equity Commitment Agreement Termination Date and the Effective Date.

n.       Use of Proceeds

On the Effective Date, the proceeds received by New Topco from the Rights Offering will be used to fund the Reorganized Debtors' emergence and provide necessary post-emergence liquidity.

5.       *Restructuring Transactions*

The Plan not only rationalizes the Debtors' balance sheet, it also incorporates a restructuring that accomplishes two goals: (i) structuring the postpetition enterprise in a way to maximize tax, reporting, and systems efficiencies; allow for tradable equity; and simplify the corporate structure; and (ii) limiting/eliminating the impact of guarantees issued by non-filing European entities by discharging obligations of European entities with respect to the Bridge Loan Agreement and 2015 Notes.

As described below, following the Effective Date, LyondellBasell will have the following simplified organizational structure:



a. Global Restructuring/Release of Bridge Guarantee Claims and 2015 Notes Guarantee Claims

Certain Obligor Non-Debtors are obligated under the Bridge Loan Agreement and 2015 Notes Indenture. Pursuant to the Intercreditor Agreement, the debt under the Bridge Loan Agreement is secured by liens junior to those securing the debt under the Senior Secured Credit Agreement, and the 2015 Notes are contractually subordinated.

The 2015 Notes Indenture provides that the obligations of any guarantor under the 2015 Notes Indenture will be "automatically and unconditionally released and discharged" upon, among other things, "a sale of all the Capital Stock of the applicable Guarantor (or any parent of such Guarantor) pursuant to an Enforcement Sale in accordance with the Intercreditor Agreement." 2015 Notes Indenture, section 11.04. The Bridge Loan Agreement also provides that the guarantee claims and the liens on collateral under the Bridge Loan will be "automatically" and "unconditionally" released in the event of an appropriate enforcement action. Bridge Loan Agreement, sections 9.09 and 11.21. In order for a sale or action to be an "Enforcement Sale" under the Intercreditor Agreement, (i) the proceeds of such sale must be in cash, (ii) all claims of senior parties must be disposed of concurrently with that sale, and (iii) such sale is made, among other things, pursuant to a process approved or supervised by a court.

In full and complete satisfaction, settlement and release of their Claims against Obligor Non-Debtors, and pursuant to distributions in connection with the Global Restructuring and otherwise pursuant to the Plan, holders of Senior Secured Facility Claims shall receive 100% of the Class A Shares allocable to the value of LBIAF and LBIH and any of their respective direct and indirect subsidiaries (other than LBFC and its direct and indirect subsidiaries).

Accordingly, in order to effectuate the bargained-for priorities among the Senior Secured Lenders, the Bridge Lenders and the 2015 Noteholders, the Plan provides for an "Enforcement Sale" against collateral pledged by the Obligor Non-Debtors, thereby releasing them of any liens and claims of the Bridge Lenders and claims of the 2015 Noteholders. The resulting distribution scheme under the Plan, therefore, takes into account the value of the 2015 Notes Claims and Bridge Claims against Non-Debtor Affiliates. Specifically, the Plan provides that:

On (or prior to) the Effective Date, the following transactions will be effectuated in the order set forth:

New Topco and LyondellBasell Holdings B.V. ("**LBHBV**") are formed outside the existing corporate structure of LyondellBasell. Each entity may be formed prior to the Effective Date.

LBIH distributes its single share of LBIAF to BF SARL.

LBIAF will transfer its Claims against Obligor Non-Debtors Basell Funding Company B.V. and LBIH to the holders of Senior Secured Claims. The holders of Senior Secured Claims will transfer their claims against the Obligor Non-Debtors and Basell Germany (including guarantee claims, liens, rights and interests under the Senior Secured Credit Agreement) to LBHBV in exchange for all of the outstanding stock of LBHBV. The holders of Senior Secured Claims will transfer all of the stock of LBHBV to New Topco in exchange for Class A Shares and any other consideration they are to receive under the Plan other than Subscription Rights. The security agent under the Intercreditor Agreement will sell the stock of LBIH (subject to its senior secured debt) to LBHBV for €10 in Cash. All guarantee claims and liens against Obligor Non-Debtors under the 2015 Notes Indenture and the Bridge Loan Agreement will be released pursuant to the Enforcement Action. (For the avoidance of doubt, obligations of Obligor Debtors will be discharged pursuant to the Plan.)

Pursuant to the Plan, LBFC will cancel its existing stock and will issue new capital stock to New Topco.

LBFC may assign a portion of the LCC/LBFC Intercompany Note to New Topco in consideration for cash and a portion of the Class A Shares. New Topco will transfer the remaining Class A Shares on account of Claims against the U.S. Debtors to LBFC as a capital contribution. LBFC in turn will transfer Class A Shares to each entity that is an obligor with respect to such Claims in proportion to the outstanding debt issued, and these obligors will immediately distribute the Class A Shares to the applicable holders of Claims. The value of Class A Shares distributed to the holders of Claims against the U.S. Debtors will be equal to the net value of the U.S. Debtors.

LBFC will contribute as capital to Lyondell Chemical the remainder of the LCC/LBFC Intercompany Note.

Pursuant to the Plan, LBIAF, BF SARL and LBAFGP will be liquidated (or dissolved).

The Plan contains and provides for an injunction for the benefit of the Non-Debtor Affiliates. On the Effective Date and except as otherwise provided herein, all holders of Senior Secured Claims, Bridge Loan Claims and 2015 Notes Claims who assert claims against Non-Debtor Affiliates based on such Senior Secured Claims, Bridge Loan Claims and 2015 Notes Claims (or any guaranty thereof) and all holders of claims against Non-Debtor Affiliates for which Debtors also are obligated (directly or indirectly) will be permanently enjoined from taking (i) any action with respect to claims or causes of actions released pursuant to Section G.8, (ii) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against the Non-Debtor Affiliates, (iii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Non-Debtor Affiliates and (iv) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance against the Non-Debtor Affiliates.

### C. North American Restructuring

The North American Restructuring incorporated in the Plan, among other things, (i) simplifies the overall corporate structure, (ii) simplifies financial and tax reporting, (iii) addresses numerous tax basis / reporting / consolidation issues, (iv) better matches business reporting with legal structure and applicable financial reporting systems, and (v) concentrates accounts receivable and inventory into fewer legal entities, simplifying and concentrating pools of assets and thereby facilitating cash management and securitization transactions.

The transactions constituting the North American Restructuring (certain of which are prerequisites to formation of the Millennium Custodial Trust and the Environmental Custodial Trust), as reflected in Exhibit E hereof, will be effectuated substantially contemporaneously with or prior to the Effective Date and in the following order:

New F&F Holdco, New Acetyls Holdco and New Equistar Holdco will be formed as wholly owned subsidiaries of Reorganized Lyondell Chemical Company. New F&F Op Co. ("**New F&F**"), New Acetyls Op Co. ("**New Acetyls**"), and New Equistar GP Holdco will be formed as wholly owned subsidiaries of New F&F Holdco, New Acetyls Holdco, and New Equistar Holdco, respectively.

Lyondell Chemical will transfer all of its membership interest in New Acetyls Holdco to LBFC.

Each of Millennium Worldwide Holdings I, Inc., Millennium America Holdings Inc. and Millennium America Inc. will be converted into a limited liability company.

Baselltech USA Inc. will merge into Basell North America Inc.

Lyondell Houston Refinery, Inc. will merge into Lyondell Refining I, LLC.

Lyondell Chemical will contribute its equity interests in Lyondell Refining I, LLC to Lyondell Refining Company LLC.

MCI will contribute certain intellectual property that pertain to the Acetyls Business to MPI.

Lyondell Bayport, LLC and Basell Impact Holding Company will merge into Equistar Bayport, LLC.

Lyondell General Methanol Company and Lyondell-Equistar Holdings Partners will merge into Equistar Chemicals, LP.

LyondellBasell Advanced Polyolefins USA Inc. and Basell Capital Corporation will merge into Basell USA Inc.

Basell USA Inc. will cancel its stock and then merge into Equistar Chemicals, LP.

Basell Finance USA Inc., Nell Acquisition (US) LLC, LBIH LLC and LBI Acquisition LLC will merge into LBFC.

The Fragrance and Flavors Business unit (the "**F&F Business**") of Schedule III Debtor MSC (which includes, *inter alia*, the equity interests in Smith Corona Marchant Finance A.G. held by Schedule III Debtor, MHC Inc. ("**MHC**")) will be transferred to New F&F for its reorganization enterprise value, payable in Class A Shares. The Acetyls Business unit (the "**Acetyls Business**") of Schedule III Debtor MPI will be transferred to New Acetyls for its reorganization enterprise value, payable in Class A Shares. Specifically:

> New F&F will purchase and acquire from MSC, and MSC will sell, convey, assign, transfer and deliver to New F&F, the F&F Business for its reorganization enterprise value, payable in Class A Shares. Specifically, New F&F will purchase all of MSC's assets, inventory, rights and properties that pertain to the F&F Business, including but not limited to (a) cash and cash equivalents or similar type investments, such as certificates of deposit, Treasury bills and other marketable securities; (b) claims for refunds of taxes and other governmental charges to the extent such refunds relate to periods ending on or prior to the Effective Date; (c) all assumed and postpetition contracts associated with the F&F Business including, but not limited to, the contracts set forth in the Assumption Schedule to be assumed by MSC and assigned to New F&F as of the Effective Date; (d) employees and employee benefit and pension plans; (e) all accounts receivable and accounts payable to the extent such receivables and payables, respectively, relate to periods ending on or prior to the Effective Date; (f) all intellectual property associated with, or utilized by, the F&F Business; (g) the manufacturing facilities located in Jacksonville, Florida and Colonel's Island, Georgia and all real and personal property appurtenant thereto; and (h) certain other specific assets comprising the F&F Business, but specifically excluding (x) the original corporate minute books, stock books, financial records, tax returns, personnel and payroll records and corporate policies and procedures manuals of MSC and other records required by applicable laws to be retained; (y) MSC's St. Helena property in Baltimore, Maryland; and (z) any other liabilities of MSC, known or unknown, absolute or contingent. Based on the midpoint of a reorganization enterprise value range of the F&F Business estimated by Evercore, the purchase price for the F&F Business will be $100 million, including net available Cash of $1 million as of September 30, 2009, which Cash will be subject to adjustment on the Effective Date, payable to MSC in Class A Shares.

> In addition, New F&F will purchase and acquire from MHC, and MHC will sell, convey, assign, transfer and deliver to New F&F all of MHC's equity interests in Smith Corona Marchant Finance A.G. ("**Smith Corona**") for its book value, payable in Class A Shares. Based on the book value of the Smith Corona equity interest as of September 30, 2009, the purchase price for the Smith Corona equity interest will be $1 million, payable to MHC in Class A Shares.

New Acetyls will purchase and acquire from MPI, and MPI will sell, convey, assign, transfer and deliver to New Acetyls, the Acetyls Business for its reorganization enterprise value payable in Class A Shares. Specifically, New Acetyls will purchase all of MPI's assets, inventory, rights and properties that pertain to the Acetyls Business, including but not limited to (a) cash and cash equivalents or similar type investments, such as certificates of deposit, Treasury bills and other marketable securities, (b) claims for refunds of taxes and other governmental charges to the extent such refunds relate to periods ending on or prior to the Effective Date, (c) all assumed and postpetition contracts associated with the Acetyls Business, including but not limited to, the contracts set forth in the Assumption Schedule to be assumed by MPI and assigned to New Acetyls as of the Effective Date, (d) all accounts receivable and accounts payable to the extent such receivables and payables, respectively, relate to periods ending on or prior to the Effective Date, (e) all equity interests in Millennium Methanol GP, Inc., a Delaware corporation, and Millennium Methanol LP Inc., a Delaware corporation, (f) all intellectual property associated with, or utilized by, the Acetyls Business, (g) the manufacturing facility located in LaPorte, Texas and all real and personal property appurtenant thereto, and (h) certain other assets that comprise the Acetyls Business; but expressly excluding (x) the original corporate minute books, stock books, financial records, tax returns, personnel and payroll records and corporate policies and procedures manuals of MPI and other records required by applicable laws to be retained, (y) any liabilities of MPI, known or unknown, absolute or contingent, other than the liabilities specifically set forth above and (z) any equity interests in any MPI subsidiary other than Millennium Methanol GP, Inc. and Millennium Methanol LP, Inc. Based on the midpoint of the reorganization enterprise value range of the Acetyls Business estimated by Evercore, the purchase price for the Acetyls Business will be $299 million, including net available Cash of $9 million as of September 30, 2009, which Cash will be subject to adjustment on the Effective Date, payable to MPI in Class A Shares.

New Acetyls Holdco will purchase and acquire from Millennium Petrochemicals GP LLC and Millennium Petrochemicals Partners LP (collectively, "**Millennium Partners**"), and the Millennium Partners will sell, convey, assign, transfer and deliver to New Acetyls Holdco, all of the Millennium Partners' partnership interest in Equistar for (i) $1.00 to each of the Millennium Partners and (ii) assumption of $350 million of MPI's indemnification obligation on postpetition accounts payable (including inventory borrowings) of Equistar.

LBFC will transfer all of its membership interest in New Acetyls Holdco to Lyondell Chemical.

MPI will be converted into a limited liability company.

Certain Debtors will contribute to the Environmental Custodial Trust the real property identified on Schedule IV (the "**Transferred Real Properties**").

Equistar Chemicals, LP will transfer its equity interest in Quantum Pipeline Company, Equistar Polypropylene, LLC, Equistar Transportation Company, LLC, and Equistar Funding Corporation to MCI.

Equistar Chemicals, LP will cancel all of its partnership interests and will issue new general partnership interests to New Equistar GP Holdco and new limited partnership interests to New Equistar Holdco. For the avoidance of doubt, Equistar Chemicals, LP will not issue any new partnership interests to New Acetyls Holdco, Millennium Petrochemicals GP LLC or Millennium Petrochemicals Partners, LP.

Lyondell LP3 GP, LLC, Lyondell LP3 Partners, LP, Lyondell LP4 Inc., Lyondell Petrochemical L.P. Inc., and Lyondell (Pelican) Petrochemical L.P.1, Inc. will merge into New Equistar Holdco.

Each of Millennium Worldwide Holdings I, Inc., Penn Navigation Company, Penn Export Company, Inc., Penn Shipping Company Inc., Penntrans Company and USI Credit Corp will conduct a reverse equity split so that its authorized equity interests are reduced to 100 shares or membership units, as applicable.

Lyondell Chemical will transfer its Equity Interests in MCI (with the corporate structure of the Schedule III Debtors remaining intact below MCI, except to the extent that the North American Restructuring contemplates changes to the legal status of certain MCI subsidiaries,) to the Millennium Custodial Trust as described in Section IV.D herein.

Lyondell Chemical Nederland, Ltd., Lyondell Chemical Wilmington, Inc., Lyondell Intermediate Holding Company and Lyondell Receivables I, LLC will be liquidated (or dissolved).

In addition, on or as of the Effective Date, the Debtors, in consultation with the Ad Hoc Group and Rights Offering Sponsors, except as set forth below, may, notwithstanding any other transactions described in the Plan, (i) cause any or all of the Debtors (other than the Schedule III Debtors) to be merged into one or more of the Debtors (other than the Schedule III Debtors) or be dissolved, (ii) cause any or all of the Schedule III Debtors to be merged into one or more of the Schedule III Debtors or be dissolved, (iii) cause the transfer of assets between or among the Debtors or among the Schedule III Debtors, or (iv) subject to any approval rights the Rights Offering Sponsors may have pursuant to the Equity Commitment Agreement with respect to such action, engage in any other transaction or disclosure in furtherance of the Plan.  Any such transaction will be effective as of the Effective Date pursuant to the Confirmation Order without any further action by the stockholders or directors of any of the Debtors or the Reorganized Debtors, or any other person.  The effectuating documents of any such transaction with a value in excess of $90 million will be in form and substance reasonably satisfactory to the Ad Hoc Group and the Rights Offering Sponsors.

1.    *The Trusts*

Pursuant to the Plan, two separate trusts will be formed in connection with the North American Restructuring.  The Millennium Custodial Trust, a Delaware statutory trust, will be formed to resolve the Claims against, and liquidate the assets of, the Schedule III Debtors (in general terms, the Millennium chain of Debtors).  A second Delaware statutory trust, the Environmental Custodial Trust, will be formed to own, administer, remediate as necessary, and transfer title to effect the disposition of, the Transferred Real Properties in accordance with the terms of a settlement agreement with and for the benefit of certain governmental environmental agencies.  The Transferred Real Properties are, generally, environmentally contaminated and the subject of current or expected clean-up obligations.

a.    The Millennium Custodial Trust

(i)    Structure

On or before the Effective Date, the Millennium Custodial Trust will be formed pursuant to the Millennium Custodial Trust Agreement and the filing of a certificate of trust with the Delaware Secretary of State.  A trustee (the "**Delaware Trustee**") with its principal place of business in Delaware will be appointed solely for purposes of complying with the requirements of the Delaware Statutory Trust Act.  A trustee (the "**Millennium Trust Trustee**") will be appointed to administer the Millennium Custodial Trust.  On or about the Effective Date, Equistar will transfer all of its Equity Interests in Quantum Pipeline Company, Equistar Polypropylene, LLC, Equistar Transportation Company, LLC, and Equistar Funding Corporation (the "**Former Equistar Subsidiaries**") to MCI.  On or about the Effective Date, certain Debtors, including certain MCI Subsidiaries, will transfer the Transferred Real Properties to the Environmental Custodial Trust.  Subsequently, Lyondell Chemical will transfer all of its Equity Interests in MCI to the Millennium Custodial Trust.  Accordingly, the "trust assets" of the Millennium Custodial Trust will be the Equity Interests in MCI and the Wind-Up Funds (as defined below) (the

"**Millennium Trust Assets**").  By virtue of Lyondell Chemical's transfer of its Equity Interests in MCI to the Millennium Custodial Trust, MCI's direct and indirect subsidiaries, including but not limited to the Former Equistar Subsidiaries (collectively, the "**MCI Subsidiaries**"), will be transferred to the Millennium Custodial Trust, and the Schedule III Debtors will be legally separated from the Reorganized Debtors.  Accordingly, on the Effective Date, the Reorganized Debtors will have no further duties, responsibilities, liabilities, or obligations on account of the Schedule III Debtors.  The holders of Allowed Claims against MCI will receive all of the beneficial trust interests in the Millennium Custodial Trust (the "**Millennium Custodial Trust Interests**"), which will entitle each such holder to its Pro Rata Share of recoveries with respect to the Millennium Trust Assets, including any recovery by MCI from its direct and indirect ownership of the MCI Subsidiaries.  The Millennium Trust Assets together with the assets of, and Equity Interests in, the MCI Subsidiaries are referred to herein as the "**Millennium Trust Chain Assets**."

The Debtors anticipate that the existing corporate structure of MCI and the MCI Subsidiaries will remain in place through the Effective Date, except to the extent that the North American Restructuring contemplates changes to the legal status of certain MCI Subsidiaries.  Accordingly, MCI and the MCI Subsidiaries will continue to hold the Equity Interests of their respective immediate subsidiaries.  See Exhibit F, which diagrams the Millennium Custodial Trust and Environmental Custodial Trust.  Each of the MCI Subsidiaries will continue to observe appropriate corporate (or other entity type) formalities and have a board of directors (or other appropriate governance structure) make the decisions with respect to the entity and officers (or other appropriate persons or entities responsible for management) to carry out such decisions.  It is anticipated that the directors and officers of these various entities will be employees of the Millennium Trust Trustee.

Each holder of Allowed Claim against an MCI Subsidiary will receive, in full and complete satisfaction of its Allowed Claim, a contractual right under the Plan from the applicable MCI Subsidiary entitling the holder to a potential payment up to the amount of such holder's Allowed Claims against the MCI Subsidiary on the Effective Date ("**Participation Rights**"), but excluding any amounts for postpetition interest or post-Effective Date interest.  If, upon liquidation, an MCI Subsidiary's assets are insufficient to satisfy all amounts payable under such MCI Subsidiary's Participation Rights, the holders of Participation Rights in such MCI Subsidiary will recover their Pro Rata Share of the assets of that MCI Subsidiary.  Conversely, to the extent an MCI Subsidiary's assets exceed the aggregate amount payable under such MCI Subsidiary's Participation Rights, such MCI Subsidiary will, subject to applicable law, distribute its excess assets in liquidation to the immediate parent entity that owns the Equity Interests in such MCI Subsidiary.  Any such distributed excess amounts thereafter will be available to the holders of the immediate parent entity's Participation Rights.  There is no assurance that any holder of Participation Rights will receive a specified minimum amount with respect to its Participation Rights.  See Exhibit H to the Plan for a range of possible recoveries for Claims against each Schedule III Debtor.  Participation Rights will not be certificated and, subject to applicable law, will not be transferable.

(ii)     General Distribution Scheme for Schedule III Debtors

Allowed Administrative Expenses (including Professional Fees), Other Secured Claims, Priority Tax Claims and Priority Non-Tax Claims allocable to the Schedule III Debtors (the "**Schedule III Allocations**") will be paid or otherwise afforded the treatment set forth in the Plan by the Reorganizing Debtors or Reorganized Debtors (as applicable), as partial consideration for the releases that the Schedule III Debtors are granting to the Reorganized Debtors and Non-Debtor Affiliates pursuant to the Plan.

As described above, prior to the contribution of the Equity Interests in MCI to the Millennium Custodial Trust, the Reorganizing Debtors will purchase from MSC, MHC and MPI, respectively, the F&F Business, the Smith Corona equity and the Acetyls Business for Class A Shares in an amount equal to the estimated reorganization enterprise value of the F&F Business and the Acetyls Business.  Thus, MSC, MHC and MPI will each hold Class A Shares when Lyondell Chemical contributes its Equity Interests in MCI to the Millennium Custodial Trust.  MSC and MPI have guaranteed the obligations under the Senior Secured Credit Agreement on an unsecured basis, and have other unsecured claims as well.  Any distribution of MSC's or MPI's Class A Shares to holders of Senior Secured Facility Claims and the Bridge Facility Claims will be in accordance with Plan provisions on distributions of Class A Shares.

All Intercompany Claims by a Schedule III Debtor against another Schedule III Debtor will remain in place after the Effective Date; *provided, however*, that (i) Millennium America Inc. will contribute its

prepetition net receivables from MHC Inc. to Millennium Holdings LLC, and (ii) Millennium Holdings LLC will contribute its prepetition net receivables from MHC Inc. to MHC Inc. All prepetition and postpetition Intercompany Claims and Administrative Expenses by Schedule III Debtors against Reorganized Debtors and Non-Debtor Affiliates, and for the benefit of Reorganized Debtors and Non-Debtor Affiliates against Schedule III Debtors (collectively, "**Schedule III Intercompany Claims**") as of the Effective Date will be discharged or waived; *provided*, *however*, that the Intercompany Claim of KIC Ltd. against MHC will be afforded the same treatment as General Unsecured Claims against MHC.

(iii)   Funding the Millennium Custodial Trust

The Reorganizing Debtors will contribute certain wind-up funds to the Millennium Custodial Trust in an amount to be determined and set forth in the Plan Supplement (the "**Wind-Up Funds**") in order to fund the resolution of Claims against Schedule III Debtors and Claims by those entities against others – such as ongoing insurance coverage and indemnity actions. The Wind-Up Funds will be held in an account maintained by the Millennium Trust Trustee for the benefit of the Schedule III Debtors and will likely be invested in cash equivalents and other low risk permitted investments until needed in connection with administration of the trust and liquidation of the Millennium Trust Chain Assets.

(iv)   Other Millennium Custodial Trust Provisions

(A)   Purpose

The Millennium Custodial Trust will be established for the sole purpose of holding, liquidating and distributing the assets of the Schedule III Debtors, subject to the North American Restructuring, in accordance with Treasury Regulation section 301.7701-4(d) and Revenue Procedure 94-45, with no objective to continue or engage in the conduct of a trade or business.

(B)   Role of the Millennium Trust Trustee and the Directors and Officers of the MCI Subsidiaries

The Millennium Custodial Trust will be managed by the Millennium Trust Trustee in accordance with the terms of the Millennium Custodial Trust Agreement. The Millennium Trust Trustee will be an independent third party and will initially be designated by the Debtors, in consultation with the Ad Hoc Group and the Rights Offerings Sponsors. In the event the Millennium Trust Trustee dies, is disabled, is removed or resigns for any reason, as provided in the Millennium Trust Agreement, the Millennium Trust Advisory Board (described below) will designate a successor.

In furtherance of and consistent with the purpose of the Millennium Custodial Trust and the Plan, the Millennium Trust Trustee will appoint the directors of MCI. Such directors will appoint the officers of MCI. The direct parent entity of each MCI Subsidiary will appoint the directors (or applicable equivalent) of such MCI Subsidiary and the directors of each MCI Subsidiary will appoint the officers (or applicable equivalent) of such MCI Subsidiary. All such directors and officers (or other entity type analogous governing bodies or other appropriate persons or entities responsible for management) are referred to herein as the "**Millennium Chain Governing Bodies**."

Pursuant to the Millennium Custodial Trust Agreement, the Millennium Trust Trustee and, with respect to each MCI Subsidiary, the relevant Millennium Chain Governing Bodies will (i) have the power and authority to hold, manage, convert to cash, and distribute the relevant Millennium Trust Chain Assets, including prosecuting and resolving the Claims belonging to the relevant Schedule III Debtors and defending Claims brought against the relevant Schedule III Debtors, (ii) hold the Millennium Trust Chain Assets for the benefit of the holders of their Participation Rights and Equity Interests in the relevant Schedule III Debtors who are entitled to distributions therefrom under the Plan, whether their Claims are Allowed on or after the Effective Date, and ultimately for

the benefit of the Millennium Custodial Trust Interests, and (iii) have the power and authority to hold, manage and distribute cash or non-cash assets to such holders.

The Delaware Trustee is appointed by the Debtors, upon consultation with the Ad Hoc Group and the Rights Offering Sponsors, solely for purposes of complying with the requirement of the Delaware Statutory Trust Act that the Millennium Custodial Trust have a trustee with a principal place of business in Delaware. The Delaware Trustee will have only nominal duties and obligations to the Millennium Trust and its beneficial owners. The Delaware Trustee for the Millennium Custodial Trust may be the same person as the Delaware Trustee for the Environmental Custodial Trust.

(C)     Role of Millennium Trust Advisory Board

The "**Millennium Trust Advisory Board**" will consist of three individuals. The initial members of the Millennium Trust Advisory Board will be appointed by the Debtors. In the event that any member of the Millennium Trust Advisory Board dies, resigns or is removed for any reason, the holders of Millennium Custodial Trust Interests will select a replacement member. The Millennium Trust Trustee will provide quarterly updates to the Millennium Trust Advisory Board, and will seek their guidance with respect to matters that arise which the Millennium Trust Trustee, in its sole discretion, determines are not addressed by the Millennium Custodial Trust Agreement. In the event the Millennium Trust Trustee dies, is removed or resigns for any reason, as provided in the Millennium Trust Agreement, the Millennium Trust Advisory Board will designate a successor.

(D)     Nontransferability of Millennium Custodial Trust Interests

The Millennium Custodial Trust Interests will not be certificated and, subject to applicable law, will not be transferable. The ownership of a Millennium Custodial Trust Interest will not entitle any holder to (A) any title in or to the assets of the Millennium Custodial Trust (which title will be vested in the Millennium Custodial Trust) or to any right to call for a partition or division of the assets of the Millennium Trust or to require an accounting; or (B) subject to applicable law, any voting rights with respect to the administration of the Millennium Custodial Trust (other than the right to appoint members of the Millennium Trust Advisory Board).

(E)     Securities Law Matters

To the extent the Millennium Custodial Trust Interests are deemed to be "securities," the issuance of Millennium Custodial Trust Interests under the Debtors' Plan are exempt, pursuant to section 1145 of the Bankruptcy Code, from registration under the Securities Act of 1933, as amended, and any applicable state and local laws requiring registration of securities.

(F)     Cash

The Millennium Trust Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code, *provided*, *however*, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable Internal Revenue Service ("**IRS**") guidelines, rulings, or other controlling authorities.

(G)     Distribution of Millennium Trust Chain Assets

At least annually, the Millennium Trust Trustee, in his role as such or the relevant Millennium Chain Governing Body of the applicable Schedule III Debtor, will make distributions to the holders of Participation Rights against each respective Schedule III Debtor of Cash on hand from liquidation of the Schedule III Debtor's assets, in accordance with the Millennium Custodial Trust

Agreement, except such amounts (i) that are earmarked for environmental clean-up costs (in the event that there are any remaining properties belonging to the Schedule III Debtors with remaining environmental clean-up liabilities), (ii) as would be distributable to a holder of a Disputed Claim if such Disputed Claim had been Allowed prior to the time of such distribution (but only until such Claim is resolved), (iii) as are reasonably necessary to meet contingent liabilities and to maintain the value of the Millennium Trust Chain Assets during liquidation, (iv) to pay reasonable expenses (including, but not limited to, any taxes imposed on the Millennium Custodial Trust, MCI or an MCI Subsidiary, as applicable), and (v) to satisfy other liabilities incurred by the Millennium Custodial Trust in accordance with this Plan or the Millennium Custodial Trust Agreement. Notwithstanding the foregoing, the Reorganizing Debtors or their designees reserve the right to resolve Claims against the Schedule III Debtors prior to the Effective Date.

(H)     Transfer Taxes

Any transfer of the Millennium Trust Chain Assets to the Millennium Custodial Trust will be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax to the extent permitted under section 1146(a) of the Bankruptcy Code.

(I)     Costs and Expenses and Retention of Professionals

The reasonable costs and expenses of the Millennium Custodial Trust and of each of the Schedule III Debtors, including the fees and expenses of the Millennium Trust Trustee, the Delaware Trustee, the Millennium Chain Governing Bodies, and their respective retained professionals, will be paid out of the Millennium Trust Chain Assets. Reasonable fees and expenses incurred in connection with the prosecution and settlement of any Claims will be considered costs and expenses of the Millennium Custodial Trust Chain. The Millennium Trust Trustee and the Delaware Trustee will be entitled to reasonable compensation approved by the Millennium Trust Advisory Board in an amount consistent with that of similar functionaries in similar roles. The Millennium Trust Trustee may retain and compensate attorneys and other professionals to assist in its duties as Millennium Trust Trustee on such terms as the Millennium Trust Trustee, acting in good faith as a fiduciary of the Millennium Custodial Trust, deems appropriate without Bankruptcy Court approval. Without limiting the foregoing, the Millennium Trust Trustee may retain any professional who represented parties in interest in the Chapter 11 Cases.

(J)     Term of Millennium Custodial Trust

The Millennium Custodial Trust will be dissolved (and MCI and all of the MCI Subsidiaries will be liquidated) no later than five (5) years from the Effective Date; *provided*, *however*, that the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Millennium Custodial Trust for a finite period if (i) such extension is necessary to the liquidating purpose of the Millennium Custodial Trust, (ii) the Millennium Trust Trustee receives an opinion of counsel or a ruling from the IRS stating that such extension would not adversely affect the status of the Millennium Custodial Trust as a liquidating trust for U.S. federal income tax purposes, and (iii) such extension is obtained within the six (6) month period prior to the Millennium Custodial Trust's fifth (5th) anniversary or the end of the immediately preceding extension period, as applicable.

(K)     Federal Income Tax Treatment of the Millennium Custodial Trust

The Millennium Custodial Trust is intended to qualify as a liquidating trust for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity for U.S. federal income tax purposes, but is instead treated as a grantor trust, *i.e.*, a pass-through entity. All parties must treat the transfer of the Millennium Trust Assets to the Millennium Custodial Trust as a transfer of such assets directly to the beneficiaries of the Millennium Custodial Trust, followed by the transfer of such assets by the beneficiaries to the Millennium Custodial Trust. Consistent therewith, all parties must treat the Millennium Custodial Trust as a grantor trust of which the

Millennium Custodial Trust's beneficiaries are the owners and grantors. Assuming the Millennium Custodial Trust is treated as a liquidating trust, the holders of Millennium Custodial Trust Interests generally should be treated for U.S. federal income tax purposes as the direct owners of an undivided interest in the Millennium Trust Assets. The Millennium Trust Trustee will determine the fair market value of the Millennium Trust Assets as soon as possible after the Effective Date, and all parties must consistently use this valuation for all U.S. federal income tax purposes.

        b.        <u>The Environmental Custodial Trust</u>

        (i)        <u>Structure</u>

On or before the Effective Date, the Environmental Custodial Trust will be formed pursuant to the Environmental Custodial Trust Agreement and the filing of a certificate of trust with the Delaware Secretary of State. The Delaware Trustee and a trustee (the "**<u>Environmental Trust Trustee</u>**") will be appointed by the Debtors (in consultation with the Environmental Trust Beneficiaries (as defined below)) to administer the Environmental Custodial Trust. On or about the Effective Date, the Debtors will contribute to the Environmental Custodial Trust, the Transferred Real Properties. Accordingly, on the Effective Date, the Reorganized Debtors will have no further duties, responsibilities, liabilities, or obligations on account of the Transferred Real Properties. Generally, the Transferred Real Properties are (1) environmentally contaminated property and the subject of current or expected clean-up obligations, and (2) no longer beneficial to the on-going operations of the Debtors. The United States Environmental Protection Agency (the "**<u>EPA</u>**") and the applicable environmental agencies of the states in which the Transferred Real Properties are located (the EPA and the applicable state environmental agencies, collectively, the "**<u>Environmental Trust Beneficiaries</u>**") will hold all of the beneficial interests in the Environmental Custodial Trust (the "**<u>Environmental Custodial Trust Interests</u>**"), which will entitle the Environmental Trust Beneficiaries to their share of the recoveries with respect to the Environmental Trust Assets in accordance with the terms of the Environmental Custodial Trust Agreement. Although the Debtors do not expect that there will be any recovery by the Environmental Trust Beneficiaries following the remediation and disposition of the Transferred Real Properties, any excess funds in the Environmental Custodial Trust following the disposition of all Transferred Real Properties will, after the payment or making of reasonable provision for payment of all claims and obligations of the Environmental Custodial Trust in accordance with applicable law, be disbursed to such federal and state accounts as the Environmental Trust Beneficiaries designate.

        (ii)        <u>Funding the Environmental Custodial Trust</u>

In order to address the clean-up obligations relating to the Transferred Real Properties and as part of the Debtors' overall settlement negotiations with the EPA and the other Environmental Trust Beneficiaries regarding their Claims and related interests, the Debtors are currently in negotiations with the EPA and state environmental agencies to agree upon an amount of money that will be contributed to the Environmental Custodial Trust (the "**<u>Clean Up Funds</u>**"). The Debtors anticipate that the Clean Up Funds will be allocated to address the cleanup costs of the Transferred Real Properties and in settlement of the position of the EPA and other Environmental Trust Beneficiaries regarding injunctive relief obligations at Debtor-owned property and third party sites.[59] The Clean Up Funds will be held and administered by the Environmental Trust Trustee in accordance with the Environmental Custodial Trust Agreement and pursuant to any settlement with the EPA and other Environmental Trust Beneficiaries.

---

[59] As of the date of this Disclosure Statement, the settlement negotiations are ongoing but no settlement has been reached.

(iii)    Other Environmental Custodial Trust Provisions

(A)    Transfer of Transferred Real Properties

The Debtors will effect the transfer of all of their rights, title and interests in the Transferred Real Properties by quit claim deed, and such transfer will be free and clear of all claims, liens, and interests against the Debtors.

(B)    Purpose of the Environmental Custodial Trust

The Environmental Custodial Trust will be established for the sole purpose of (a) owning the Transferred Real Properties and carrying out administrative and property management functions related to the Transferred Real Properties, (b) conducting, managing, and/or funding the implementation of Environmental Actions[60] with respect to the Transferred Real Properties, (c) selling, transferring or otherwise disposing of the Transferred Real Properties, and (d) making distributions, if any, in accordance with the terms of the Environmental Custodial Trust Agreement (collectively, the "**Environmental Trust Purpose**").

(C)    Role of the Environmental Trust Trustee

The Environmental Custodial Trust will be managed by the Environmental Trust Trustee in accordance with the terms of the Environmental Custodial Trust Agreement.  The Environmental Trust Trustee will be an independent third party that will initially be designated by the Debtors, in consultation with the Environmental Trust Beneficiaries.  In the event the Environmental Trust Trustee dies, is disabled, is removed or resigns for any reason, as provided in the Environmental Custodial Trust Agreement, the Environmental Trust Advisory Board (described below) will designate a successor.  The Environmental Trust Trustee may or may not be the same person as the Millennium Trust Trustee.

Pursuant to the Environmental Custodial Trust Agreement, the powers of the Environmental Trust Trustee will include, without limitation, each of the following: (i) to receive, manage, invest, supervise and protect the Environmental Trust Assets; (ii) to withdraw, make distributions and pay taxes and other obligations owed by the Environmental Custodial Trust from funds held by the Environmental Custodial Trust; (iii) to engage employees and professionals to assist the Environmental Custodial Trust and/or the Environmental Trust Trustee with respect to their responsibilities; and (iv) to effect all other actions and execute all agreements, instruments and other documents necessary to effectuate the Environmental Trust Purposes.

The Delaware Trustee is appointed by the Debtors solely for purposes of complying with the requirement of the Delaware Statutory Trust Act that the Environmental Custodial Trust have a trustee with a principal place of business in Delaware.  The Delaware Trustee will have only nominal duties and obligations to the Environmental Custodial Trust and its beneficial owners.  The Delaware Trustee for the Environmental Custodial Trust may be the same person as the Delaware Trustee for the Millennium Custodial Trust.

(D)    Role of Environmental Trust Advisory Board

The "**Environmental Trust Advisory Board**" will consist of three individuals.  The initial members of the Environmental Trust Advisory Board will be appointed by the Debtors after consultation with the Environmental Trust Beneficiaries.  In the event that any member of the Environmental Trust Advisory Board dies, resigns or is removed for any reason, the holders of

---

[60] "Environmental Actions" means any response, removal, investigation, remediation, reclamation, closure, post-closure, corrective actions, institutional controls, and operation and maintenance activities with respect to the Transferred Real Properties.

Environmental Custodial Trust Interests will select a replacement member. The Environmental Trust Trustee will provide quarterly updates to the Environmental Trust Advisory Board, and will seek their guidance with respect to matters that arise which are not addressed by the Environmental Custodial Trust Agreement. In the event the Environmental Trust Trustee dies, is removed or resigns for any reason, as provided in the Environmental Custodial Trust Agreement, the Environmental Trust Advisory Board will designate a successor.

(E)     Nontransferability of Environmental Custodial Trust Interests

The Environmental Custodial Trust Interests will not be certificated and, subject to applicable law, will not be transferable. The ownership of an Environmental Custodial Trust Interest will not entitle any holder to (A) any title in or to the assets of the Environmental Custodial Trust (which title will be vested in the Environmental Custodial Trust) or to any right to call for a partition or division of the assets of the Environmental Trust assets or to require an accounting; or (B) subject to applicable law, any voting rights with respect to the administration of the Environmental Custodial Trust (other than the right to appoint members of the Environmental Trust Advisory Board).

(F)     Securities Law Matters

To the extent the Environmental Custodial Trust Interests are deemed to be "securities," the issuance of Environmental Custodial Trust Interests under the Debtors' Plan are exempt, pursuant to section 1145 of the Bankruptcy Code, from registration under the Securities Act of 1933, as amended, and any applicable state and local laws requiring registration of securities.

(G)     Cash

The Environmental Trust Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code.

(H)     Transfer Taxes

Any transfer of the Transferred Real Properties to the Environmental Custodial Trust will be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax to the extent permitted under section 1146(a) of the Bankruptcy Code.

(I)     Costs and Expenses and Retention of Professionals

The reasonable costs and expenses of the Environmental Custodial Trust, including the fees and expenses of the Environmental Trust Trustee, the Delaware Trustee and their retained professionals, will be paid out of the Clean-Up Funds. Reasonable fees and expenses incurred in connection with the prosecution and settlement of any Claims will be considered costs and expenses of the Environmental Custodial Trust. The Environmental Trust Trustee and the Delaware Trustee will be entitled to reasonable compensation approved by the Environmental Trust Advisory Board in an amount consistent with that of similar functionaries in similar roles. The Environmental Trust Trustee may retain and compensate attorneys and other professionals to assist in its duties as Environmental Trust Trustee on such terms as the Environmental Trust Trustee, acting in good faith as a fiduciary of the Environmental Custodial Trust, deems appropriate without Bankruptcy Court approval. Without limiting the foregoing, the Environmental Trust Trustee may retain any professional who represented parties in interest in the Chapter 11 Cases.

(J)     Federal Income Tax Treatment of the Environmental Custodial Trust

The Environmental Custodial Trust is intended to be treated as a "qualified settlement fund" as that term is defined in Treasury Regulation section 1.468B-1 and as a separate taxable entity for U.S. federal income tax purposes. The Environmental Trust Trustee will not elect to have the Environmental Custodial Trust treated as a grantor trust for U.S. federal income tax purposes. The Environmental Trust Trustee will be the "administrator" of the Environmental Custodial Trust pursuant to Treasury Regulation section 1.468B-2(k)(3).

2. *The Litigation Trust*

On or after the Effective Date, the Debtors or the Reorganized Debtors, as the case may be, on their own behalf and on behalf of the holders of Allowed Class 7-A Claims, holders of Allowed General Unsecured Claims against MSC, MPI and MPCO (except on account of any holder of a Senior Secured Claim or Bridge Claim) and holders of Allowed Class 8 Claims if Class 8 votes to accept the Plan (the "**Litigation Trust Beneficiaries**"), if any, will execute the Litigation Trust Agreement and will take all other steps necessary to establish the Litigation Trust in accordance with and pursuant to the terms of the Plan. The Debtors and Reorganized Debtors will loan $15 million to the Litigation Trust and the Debtors or the Reorganized Debtors and the Creditors' Committee on behalf of the Litigation Trust Beneficiaries will transfer to the Litigation Trust all of their right, title, and interest in causes of action brought in the Committee Litigation, except those claims against the Settling Defendants that were settled as a result of the Lender Litigation Settlement, and any proceeds thereof. Any recoveries on account of the causes of action transferred to the Litigation Trust will be distributed to the Litigation Trust Beneficiaries following repayment of all funds advanced to fund the Committee Litigation in accordance with the Plan and the Litigation Trust Agreement. From and after the Confirmation Date, the Litigation Trustee will continue to prosecute any remaining claims related to the Committee Litigation.

The Litigation Trust will be established for the sole purpose of distributing the proceeds from the Committee Litigation, in accordance with Treasury Regulation section 301.7701-4(d) and Revenue Procedure 94-45, with no objective to continue or engage in the conduct of a trade or business. The Litigation Trust is intended to qualify as a liquidating trust for U.S. federal income tax purposes. All parties must treat the transfer of Cash and the claims identified in the Case Management Order to be tried in the Phase I, Phase IA and Phase II Trials and any proceeds thereof (collectively, the "**Litigation Trust Assets**") as a transfer of such assets directly to the Litigation Trust Beneficiaries, followed by the transfer of such assets by the beneficiaries to the Litigation Trust. Consistent therewith, all parties must treat the Litigation Trust as a guarantor trust of which the Litigation Trust Beneficiaries are the owners and grantors. The Litigation Trustee will determine the fair market value of the Litigation Trust Assets as soon as possible after the Effective Date, and all parties must consistently use this valuation for all U.S. income tax purposes.

The Litigation Trust will be dissolved no later than five (5) years from the Effective Date; *provided, however*, that the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Litigation Trust for a finite period if (i) such extension is necessary to the purpose of the Litigation Trust, (ii) the Litigation Trustee receives an opinion of counsel or a ruling from the IRS stating that such extension would not adversely affect the status of the Litigation Trust as a liquidating trust for U.S. federal income tax purposes, and (iii) such extension is obtained within the six (6) month period prior to the Litigation Trust's fifth (5th) anniversary or the end of the immediately preceding extension period, as applicable. Upon dissolution of the Litigation Trust, any remaining Cash on hand and other assets will be distributed to the Litigation Trust Beneficiaries.

3. *Intercompany Claims*

No distribution will be made on account of Prepetition Intercompany Claims, which Claims will be fully subordinated and cancelled (including, but not limited to, the Intercompany Claims set forth on Schedule V), left in place or otherwise compromised as determined by Reorganized LyondellBasell.

4. *Closing of the Chapter 11 Cases*

When all Disputed Claims against any Debtor have become Allowed or have been disallowed by Final Order, and no controverted matter remains outstanding, the Reorganized Debtors will seek authority from the

Bankruptcy Court to close the applicable Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

5.    *Early Payment*

Nothing in the Plan will prevent any of the Debtors or Reorganized Debtors from making any payments prior to the date provided for in the Plan, and neither the Debtors nor the Reorganized Debtors will suffer any penalty or prejudice from making any such payments.

**D.    Provisions Governing Distributions**

1.    *Disbursing Agent*

In general, a disbursing agent is an entity designated to administratively effect the distributions to be provided under a plan of reorganization. Except as otherwise provided in the Plan, all distributions and other payments to be made "by the Debtors" or "by the Reorganized Debtors" or by any of them, under the Plan or otherwise in connection with the Chapter 11 Cases (including, without limitation, professional compensation and statutory fees) will be made by New Topco (or such other entity designated by New Topco) as the Disbursing Agent. The Disbursing Agent will not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. In the event the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety will be borne by the Reorganized Debtors.

a.    Powers of the Disbursing Agent

The Disbursing Agent will be empowered to (i) effect all actions and execute all agreements, Instruments and other documents necessary to perform its duties under the Plan, (ii) make all distributions and other payments contemplated by the Plan, (iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

b.    Expenses Incurred on or after Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including, without limitation, taxes) and any reasonable compensation and expense reimbursement claims (including, without limitation, reasonable attorney fees and expenses) made by the Disbursing Agent will be paid in Cash from the assets of the Reorganized Debtors.

2.    *Distributions of Cash*

Any payment of Cash made under the Plan by any of the Debtors or Reorganized Debtors may be made at the option of such party either by check or by wire transfer. No payment of Cash less than one hundred dollars ($100) will be made by or on behalf of the Debtors or Reorganized Debtors to any holder of an Allowed Claim unless a request therefor is made in writing to the Reorganized Debtors at the address set forth in Section 14.19 of the Plan.

3.    *Distributions Free and Clear*

Except as otherwise provided in the Plan, any distribution or transfer by any of the Debtors or Reorganized Debtors, including but not limited to distributions to any holder of an Allowed Claim, will be free and clear of any liens, claims and encumbrances, and no other entity will have any interest – legal, beneficial, or otherwise – in assets transferred pursuant to the Plan.

4.        *Timing of Distributions*

Unless otherwise provided in the Plan, any distributions and deliveries to be made under the Plan on account of Allowed Administrative Expenses, Allowed Claims or Allowed Equity Interests as of the Effective Date will be made on the Effective Date or as soon as reasonably practicable thereafter and deemed made on the Effective Date. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed no later than the next succeeding Business Day, but will be deemed to have been completed as of the required day.

5.        *Distributions after Effective Date*

Distributions made after the Effective Date to holders of l Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims will be deemed to have been made on the Effective Date.

6.        *Delivery of Distributions*

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim will be made at the address of such holder as set forth on its proof of claim, and in the absence of a proof of claim, on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtors or their agents. The holder must provide in writing of a change of address pursuant to the notice requirements set forth in Section 14.19 of the Plan or, in the case of holders of transferred Claims only, by the filing of a proof of claim or statement pursuant to Bankruptcy Rule 3001(e) by such holder or transferee that contains an address for such holder different than the address of such holder as set forth in the Schedules. None of the Debtors or their agents will be liable for any distribution sent to the address of record of a holder in the absence of the written notice of change thereof as provided in the Plan.

Distributions under the Plan to holders of Allowed Claims in Classes 4 and 5 will be made to the applicable agent or indenture trustee, which, in turn, will make the distributions to the holders of such Allowed Claims.

7.        *Fractional Interests*

New Third Lien Notes and Cram Down Notes will be distributed under the Plan only in denominations of one dollar ($1.00). When any distribution pursuant to the Plan would result in the issuance of an amount of New Third Lien Notes or Cram Down Notes that is not a whole multiple of one (1), the portion of such distribution that is a fraction of such denomination will be rounded down. The total number of New Third Lien Notes and Cram Down Notes to be distributed to holders of Allowed Claims will be adjusted as necessary to account for the rounding.

No fractional shares of New Common Stock will be distributed under the Plan. When any distribution pursuant to the Plan would result in the issuance of a number of shares of New Common Stock that is not a whole number, the portion of such distribution that is a fractional share of New Common Stock will be rounded down. The total number of shares of New Common Stock to be distributed to holders of Allowed Claims will be adjusted as necessary to account for the rounding.

Cash will not be distributed under the plan in denominations of less than one cent ($0.01). When any distribution pursuant to the Plan would result in the issuance of Cash in an amount less than one cent ($0.01), the portion of such distribution that is a fraction of such denomination will be rounded as follows: (i) fractional cents of one-half (½) or greater will be rounded up to a whole cent; and (ii) fractional cents of less than one-half (½) will be rounded down to zero cents ($0.00) with no further payments therefor.

8.      *Distributions to Holders as of Record Date*

As of the close of business on the Record Date, the various books and records and transfer and claims registers for each of the Classes of Claims as maintained by the Debtors, their respective agents, and the indenture trustees for the ARCO Notes, Equistar Notes, Millennium Notes and 2015 Notes will be deemed closed, and there will be no further changes in the record holders of any of the Claims, and such holders will be the Allowed holders for purposes of distribution under the Plan. The Debtors will have no obligation to recognize any transfer of the Claims occurring after the close of business on the Record Date. The Debtors, the Disbursing Agent, and the trustees for the ARCO Notes, Equistar Notes and 2015 Notes will be entitled to recognize and deal for all purposes under the Plan only with those record holders stated on the transfer ledgers as of the close of business on the Record Date, to the extent applicable.

9.      *Undeliverable and Unclaimed Distributions*

If any distribution to the holder of an Administrative Expense or Claim is returned as undeliverable, no further distributions to such holder will be made unless and until the holder notifies the Reorganized Debtors in writing of such holder's then-current address, at which time all missed distributions will, subject to the final sentence of this paragraph, be made as soon as is practicable to such holder, without interest. Checks issued by or on behalf of the Debtors or Reorganized Debtors in respect of Allowed Administrative Expenses or Claims will be null and void if not negotiated within one hundred and twenty (120) days after the date of issuance thereof. Requests for re-issuance of any check will be made in accordance with the notice provisions of Section 14.19 of the Plan to the Reorganized Debtors, by the holder of the Allowed Administrative Expense or Claim to whom such check originally was issued. All claims for undeliverable distributions or voided checks will be made on or before one hundred and fifty (150) days after the date such undeliverable distribution was initially made. After such dates, all such distributions will be deemed unclaimed property under section 347(b) of the Bankruptcy Code and will become unencumbered Cash of the Reorganized Debtors and the claim of any other holder to such property (or interest in property) will be discharged and forever barred. The holder of any Administrative Expense or Claim for which any undeliverable distribution has been deemed unclaimed property under section 347(b) of the Bankruptcy Code will not be entitled to any other or further distribution under the Plan on account of such Claim or Equity Interest.

10.      *Setoffs*

To the extent permitted under applicable law, the Debtors or Reorganized Debtors may set off against or recoup from any Allowed Administrative Expense or Allowed Claim (except for the DIP ABL Claims, DIP Roll-Up Claims and DIP New Money Claims) and the distributions to be made under the Plan on account thereof (before any distribution is made on account of such Allowed Administrative Expense or Allowed Claim), the claims, rights and causes of action of any nature that the Debtors have asserted in writing against the holder of such Allowed Administrative Expense or Allowed Claim, including, without limitation, any rights under section 502(d) of the Bankruptcy Code. In the absence of a written objection by such holder of an Allowed Claim within thirty (30) days of the delivery of such a writing from the Debtors, it will be conclusively presumed that the requirements for disallowance of a Claim under section 502(d) of the Bankruptcy Code or setoff or recoupment under applicable law have been satisfied. If the holder of such Allowed Administrative Expense or Allowed Claim timely responds to the Debtors' written assertion that setoff or recoupment against such holder is appropriate, the party asserting such right must seek an order of the Bankruptcy Court allowing such setoff or recoupment; *provided*, *however*, that neither the failure to effect a such a setoff nor the allowance of any Claim under the Plan will constitute a waiver or release by the Debtors of any such claims, rights and causes of action that the Debtors may possess against such holder.

11.      *Nonconsensual Confirmation*

If any impaired Class of Claims that is entitled to vote will not accept the Plan by the requisite statutory majorities provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan, in consultation with the Ad Hoc Group and the Rights Offering Sponsors, or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, or both. With respect to impaired Classes of

Claims and Equity Interests that are deemed to reject the Plan, the Debtors will request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

12. *Hart-Scott-Rodino Compliance*

Any shares of New Equity to be distributed under the Plan to any entity required to file a Premerger Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, or to meet any similar requirements under applicable non-U.S. law will not be distributed until the notification and waiting periods applicable under such law to such entity will have expired or been terminated.

13. *Application of Distributions*

Distributions to any holder of an Allowed Claim will be applied first to the satisfaction of the principal portion (as determined for U.S. federal income tax purposes) of any such Allowed Claim and thereafter to the remaining portion of such Allowed Claim, if any. All distributions of Cash and New Third Lien Notes to the creditors of each of the Debtors under the Plan will be made by the applicable Debtor, and, to the extent applicable, New Topco will make a capital contribution, either directly or indirectly, to the applicable Reorganized Debtor of property (other than Subscription Rights) to be distributed to the holders of Allowed Claims of such Reorganized Debtor, but only at such time as, and to the extent, property is actually distributed to the applicable holders of Allowed Claims.

14. *Cancellation of Existing Securities and Agreements*

Pursuant to the Plan, on the Effective Date, any document, agreement or Instrument evidencing a Claim or Equity Interest, other than (a) a Claim that is reinstated and rendered unimpaired under the Plan, (b) Equity Interest held by a Debtor in another Debtor, (c) Intercompany Claims (including Claims that become Intercompany Claims), which will be governed by Section C.1 hereof, and (d) Equity Interests in Basell Germany, will be deemed cancelled without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors under such documents, agreements or Instruments evidencing such Claims and Equity Interest, as the case may be, will be discharged; *provided, however,* that the ARCO and Equistar Notes Indentures, Millennium Notes Indenture, Bridge Loan Agreement, Senior Secured Credit Agreement, the DIP Agreement and Intercreditor Agreement will continue in effect for the purposes of permitting the indenture trustees and agents thereunder (or party thereto) to (i) make distributions pursuant to the Plan and to perform such other necessary functions with respect thereto, (ii) maintain and assert any rights or liens for reasonable fees, costs and expenses thereunder and (iii) with regard to the DIP Agent, assert any right with regard to the Excluded DIP Obligations.

15. *Surrender of Securities*

Unless otherwise provided in the Plan, as a condition precedent to receiving any distribution under the Plan, each registered holder of a certificate or other Instrument evidencing a Claim must surrender to the Reorganized Debtors or the applicable Agents or Indenture Trustees for the Senior Secured Credit Facility, Bridge Loan Facility, DIP Roll-Up Loans, 2015 Notes, the Millennium Notes, ARCO Notes and Equistar Notes all Instruments or other documents representing or evidencing such Claim. Any holder of a Claim that fails to (i) surrender such Instrument or (ii) execute and deliver to the Disbursing Agent an affidavit of loss and/or indemnity reasonably satisfactory to the Reorganized Debtors by the later to occur of (a) the first Effective Date Anniversary and (b) six months following the date such holder's Claim becomes an Allowed Claim, will be deemed to have forfeited all rights and Claims with respect thereto, may not participate in any distribution under the Plan on account thereof, and all Cash, securities and other property owing with respect to such Allowed Claims will be retained by the Reorganized Debtors and any New Third Lien Notes, Cram Down Notes or New Common Stock owing with respect to such Allowed Claims will be cancelled and of no further force or effect.

16. *Postpetition Interest on Claims*

Unless expressly provided in the Plan, the Confirmation Order or any contract, Instrument, release, settlement or other agreement entered into in connection with the Plan, or required by applicable bankruptcy

law (including the fair and equitable rule), postpetition interest will not accrue on or after the Commencement Date on account of any Claim.

17. <u>Withholding and Reporting Requirements</u>

In connection with the Plan and all Instruments issued in connection therewith and distributed thereon, the Debtors, the Reorganized Debtors or any other paying agent, as applicable, will comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions under the Plan will be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit on account of such distribution, including withholding tax obligations in respect of in-kind (non-Cash) distributions. Any party issuing any Instrument or making an in-kind (non-Cash) distribution under the Plan has the right, but not the obligation, to refrain from making a distribution until the holder of the Allowed Claim, for which such distribution is to be made, has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

**E. Provisions for Resolving and Treating Disputed Claims**

Except with respect to Claims in Class 3, Class 4 and Class 5, if any portion of a Claim is Disputed, no payment or distribution provided under the Plan will be made on account of that Claim unless and until, and only to the extent, such Claim becomes Allowed; distributions will be made as provided under the Plan on account of each Claim in Class 3, Class 4 and Class 5 to the extent such Claim is Allowed from time to time, notwithstanding that some portion of such Claim remains Disputed. At the time that a Disputed Claim becomes an Allowed Claim, the holder of that Allowed Claim will be entitled to receive a distribution equal in percentage of recovery to the distribution(s) made to date on previously-allowed Allowed Claims of the same priority without interest.

1. <u>Objections</u>

As of the Effective Date, the Reorganized Debtors will have the right, to the exclusion of all others (except as to applications for allowances of compensation and reimbursement of expenses under sections 328, 330, 331 and 503 of the Bankruptcy Code), to make, file and prosecute objections to Claims. The Claims Objection Procedures will continue to apply to the Reorganized Debtors and the Schedule III Debtors. The Reorganized Debtors will serve a copy of each objection upon the holder of the Claim to which the objection is made as soon as practicable (unless such Claim was already the subject of a valid objection by the Debtors), but in no event will the service of such an objection be later than one (1) year after the Effective Date, unless such date is extended by order of the Bankruptcy Court. The Bankruptcy Court, for cause, may extend the deadline on the *ex parte* request of the Reorganized Debtors.

2. <u>Estimation of Claims</u>

The Debtors or the Reorganized Debtors may, at any time, request the Bankruptcy Court to estimate any Claim, pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors previously have objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim, at any time, including during litigation concerning any objection to such Claim. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount may constitute either the Allowed amount of such Claim or a maximum limitation on the Allowed amount of such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the Allowed amount of such Claim, the applicable Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another.

3. *Other Provisions Relating to Disputed Claims*

If, on or after the Effective Date, any Disputed Claim (or portion thereof) becomes an Allowed Claim, the applicable Reorganized Debtor will, as soon as practicable following the date on which the Disputed Claim becomes an Allowed Claim, except as otherwise provided in the Plan, distribute to the holder of such Allowed Claim an amount, without any interest thereon, that provides such holder with the same percentage recovery, as of the Effective Date, as holders of Claims in the Class that were Allowed on the Effective Date.

To the extent that a Disputed Claim is expunged or reduced, the holder of such Claim will not receive any distribution on account of the portion of such Claim that is disallowed. Any Disputed Claim, for which a proof of claim has not been deemed timely filed as of the Effective Date, will be disallowed without further order of the Bankruptcy Court.

**F.      Treatment of Executory Contracts and Unexpired Leases**

The Bankruptcy Code grants the Debtors the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases. If an executory contract or unexpired lease is rejected, the counterparty to such executory contract or unexpired lease may file a claim for damages incurred by reason of the rejection. In the case of rejection of leases of real property, damage claims are subject to certain limitations imposed by the Bankruptcy Code. To assume an executory contract or an unexpired lease, the debtor may be required to cure all outstanding defaults (a "**Cure Amount**") (subject to certain exceptions) and provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code). If there is a dispute regarding (i) the nature or size of any Cure Amount; (ii) the ability of the Debtors or any assignee to provide adequate assurance of future performance under the contract or lease to be assumed; or (iii) any other matter pertaining to assumption, payment of the Cure Amount will occur following the entry of a Final Order resolving the dispute and approving the assumption (or assumption and assignment, as the case may be).

The Plan provides that all executory contracts and unexpired leases that exist between a Debtor and any person will be deemed rejected, as of the Effective Date, by the applicable Debtor, except for (i) any executory contract or unexpired lease that previously expired or terminated pursuant to its own terms, (ii) any executory contract or unexpired lease that was previously assumed or rejected by the Debtors pursuant to an order of the Bankruptcy Court, (iii) any executory contract or unexpired lease that is the subject of a motion by the Debtors to assume or reject that is pending as of the Effective Date, (iv) any executory contract or unexpired lease that is specifically designated, in consultation with the Ad Hoc Group and the Rights Offering Sponsors, in a schedule in the Plan Supplement (the "**Assumption Schedule**") as a contract or lease to be assumed and assigned, as the case may be, (v) any provision that is an easement or right of way, to the extent executory, (vi) any contract, including Insurance Policies and Benefit Plans, that is assumed pursuant to the Plan, or (vii) any provision that is a confidentiality or indemnification provision, to the extent required to continue to be enforceable. The Assumption Schedule lists each executory contract or unexpired lease that will be assumed pursuant to the Plan, along with a proposed Cure Amount for each contract or lease. The Confirmation Order will constitute an order of the Bankruptcy Court under sections 365 and 1123(b) of the Bankruptcy Code approving, as of the Effective Date, the executory contract and unexpired lease assumptions and assignments, or rejections, as the case may be, described above. Each executory contract or unexpired lease that is assumed by any Debtor under the Plan and pursuant to the Confirmation Order or pursuant to any other Final Order entered by the Bankruptcy Court will be deemed to be assigned, without further notice or order of the Bankruptcy Court, to either the corresponding Reorganized Debtor or such Affiliate thereof or another Reorganized Debtor, on the later of (i) the Effective Date or (ii) the date of assumption.

The Debtors reserve the right, in consultation with the Ad Hoc Group and the Rights Offering Sponsors, on or prior to the date of the Confirmation Hearing, to (i) modify the Cure Amount for any executory contract or unexpired lease set forth in the Assumption Schedule or (ii) amend the Assumption Schedule to add or delete any executory contract or unexpired lease, in which event such executory contract(s) or unexpired lease(s) will be deemed to be, respectively, assumed or rejected. The Debtors will provide notice of any amendments to the Assumption Schedule to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document or Instrument on the Assumption Schedule will not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

Unless otherwise specified on the Assumption Schedule, each executory contract and unexpired lease listed or to be listed therein will include modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on the Assumption Schedule.

The Debtors are not required to make any payment or take any other action in order to satisfy the requirements of section 365(b) of the Bankruptcy Code with regard to any executory contracts and unexpired leases assumed.

The Schedule III Debtors or Reorganized Debtors, as applicable, will pay all Cure Amounts, if any, to the applicable counterparties to the executory contracts and unexpired leases assumed by ten (10) Business Days after resolution of the Cure Amount by Final Order or agreement of the parties, except as otherwise agreed to by the parties; *provided, however* that as to Insurance Policies and related agreements that are assumed for the benefit of the Reorganized Debtors and Non-Debtor Affiliates, the Reorganized Debtors or Non-Debtor Affiliates, as applicable, will remain liable for any premium arising thereunder that becomes liquidated, or is due and owing, after the time of assumption (regardless of when the underlying cause or action and/or claim arose). If a counterparty to an executory contract or unexpired lease assumed timely objects to the assumption or the proposed Cure Amount for such executory contract or unexpired lease, as applicable, the Debtors and the objecting counterparty may settle, compromise, or otherwise resolve the proper Cure Amount without further order of the Court or, at the Debtors' sole discretion, may submit the dispute to the Bankruptcy Court for a determination as to the proper Cure Amount. Notwithstanding the above, the Debtors or Reorganized Debtors, as applicable, may, in their sole and absolute discretion, determine to reject, as of the Confirmation Date, any executory contract or unexpired lease at any time prior to the later of: (i) thirty (30) days after the Effective Date and (ii) thirty (30) days after the entry of a Final Order determining the proper Cure Amount for such executory contract or unexpired lease, except for Insurance Policies as discussed herein.

Claims arising out of the rejection of an executory contract or unexpired lease must be filed with the Bankruptcy Court and served upon the Debtors or Reorganized Debtors, no later than thirty (30) days after the later of: (i) the date notice of entry of an order is mailed approving the rejection of such executory contract or unexpired lease; (ii) the date notice of entry of the Confirmation Order is mailed; (iii) the date notice of an amendment to the Assumption Schedule that results in the rejection of such executory contract or unexpired lease is mailed; and (iv) the date notice of rejection of such executory contract or unexpired lease pursuant to Article IX of the Plan is mailed. All such Claims not filed within such time will be forever barred from assertion against the Debtors and their estates or the Reorganized Debtors and their property.

Notwithstanding anything in the Disclosure Statement, the Plan, the Plan Supplement or the Confirmation Order to the contrary (including, without limitation, any other provision that purports to be preemptory or supervening or grants a release), all Insurance Policies and related agreements pursuant to which any of the Debtors are insured(s) will be deemed and treated as executory contracts pursuant to the Plan and are hereby automatically assumed on the Effective Date by the respective Debtors and Reorganized Debtors and will continue in full force and effect. All Insurance Policies will vest in the Debtors and the Reorganized Debtors on the Effective Date.

The Debtors maintain certain insurance and reinsurance policies providing coverage for directors and officers liability (the "**D&O Insurance Policies**"), which policies provide coverage through the anticipated Effective Date. The Reorganized Debtors intend to purchase "tail" insurance to the existing D&O Insurance Policies to extend coverage for a reasonable period of time beyond the Effective Date. The Reorganized Debtors also intend to purchase new D&O Insurance Policies after confirmation of the Plan.

The Debtors and the Reorganized Debtors will continue to honor their obligations under (1) applicable worker's compensation laws in states in which the Reorganized Debtors operate; and (2) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, all Insurance Policies and related agreements, insurance programs and plans for workers' compensation and insurance. All proofs of claim filed by workers' compensation claimants will be deemed satisfied and automatically expunged without any further notice to or action, order or approval of the Bankruptcy Court; *provided, however*, that nothing in the Plan

will limit, diminish, or otherwise waive the Debtors' or Reorganized Debtors' defenses, claims, causes of action or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs and plans.

Except with respect to any Benefit Plan that has been terminated or rejected as of the Effective Date, all Benefit Plans and collective bargaining agreements will remain in full force and effect as of the Effective Date. The Plan neither terminates nor impairs the Pension Plans, and for greater certainty, the U.S. Pension Plans and the U.K. Pension Plan will ride through the Chapter 11 Cases. Certain of the Debtors are contributing sponsors of the U.S. Pension Plans. Upon confirmation of the Plan, the applicable Reorganized Debtors will assume and continue the U.S. Pension Plans in accordance with their terms and the provisions of ERISA and the Internal Revenue Code of 1986, as amended, and satisfy the minimum funding standards pursuant to 26 U.S.C. §§ 412 and 430 and 29 U.S.C. § 1082. In addition, one of the Debtors, Lyondell Chemical Europe, Inc. is a contributing sponsor of the U.K. Pension Plan. Upon confirmation of the Plan, Lyondell Chemical Europe, Inc. will assume and continue the U.K. Pension Plan in accordance with the terms and provisions of the U.K. Pension Plan's governing documentation and under and in accordance with applicable legislative and regulatory requirements under the law of England and Wales, including (but not limited to) the Pensions Act 1995, the Pensions Act 2004 and the Finance Act 2004, and all other relevant legislation, regulation, codes of practice and guidance. Furthermore, nothing in the Plan will be construed as discharging, releasing or relieving the applicable Debtors or their successors, including the Reorganized Debtors, from any liability imposed under any law or regulatory provision with respect to the U.S. Pension Plan, the U.K. Pension Plan or PBGC. The PBGC, the U.S. Pension Plan and the U.K. Pension Plan will not be enjoined or precluded from enforcing such liability as a result of any provision of the Plan or the Confirmation Order. Without limiting the foregoing, no provision of the Plan or the Confirmation Order will limit, alter or impact in any way the ability and standing of the U.K. Pension Plan to seek compensation from, or entry to, the Pension Protection Fund ("**PPF**") under the applicable law or regulation of England and Wales. Notwithstanding the foregoing, the PBGC Claim and any Claim arising out of the U.K. Pension Plan will be deemed withdrawn on the Effective Date.

On and after the Effective Date, pursuant to section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors will continue to pay all retiree benefits of the Debtors (within the meaning of section 1114 of the Bankruptcy Code), if any, at the level established in accordance with section 1114 of the Bankruptcy Code at any time prior to the Confirmation Date, for the duration of the period for which the Debtors are obligated to provide such benefits.

### G.      Effect of Confirmation of the Plan on the Debtors

1.      *Vesting of Assets*

On the Effective Date, all property of each Debtor's estate, including all claims and causes of action against third parties that arose prior to or after the Commencement Date, will vest in the respective Reorganized Debtor or such other entity as provided in the Plan. From and after the Effective Date, the Reorganized Debtors may operate their business(es) and may use, acquire and dispose of property without the supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, subject to the terms and conditions of the Plan.

As of the Effective Date, all assets of the Reorganized Debtors will be free and clear of all Claims, liens, encumbrances, charges, and other interests, except as provided in the Plan or the Confirmation Order.

2.      *Compromise of Controversies*

Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, distribution, and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings will constitute its determination that such compromises and settlements are in the best interests of the Debtors, their estates, creditors, and other parties in interest, and are fair, equitable, and within the range of reasonableness.

3. *Binding Effect*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code or in the Confirmation Order, and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan will bind any holder of a Claim against or Equity Interest in the Debtors and their respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan. The rights, benefits and obligations of any entity named or referred to in the Plan whose actions may be required to effectuate the terms of the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or assign of such entity (including, but not limited to, any trustee appointed for the Debtors under chapters 7 or 11 of the Bankruptcy Code).

4. *Discharge*

Except as otherwise expressly provided in the Plan or in the Confirmation Order, upon the Effective Date and in consideration of the distributions to be made under the Plan, if any, each holder of a Claim or Equity Interest and any affiliate of such holder (and any trustee or agent on behalf of such holder or affiliate) will be deemed to have forever waived, released, and discharged the Debtors and the Reorganized Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Equity Interests, rights, and liabilities that arose prior to the Confirmation Date. Upon the Effective Date, all such Persons will be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting against the Debtors or Reorganized Debtors or their respective properties or interests in property, any such discharged Claim against or Equity Interest in any Debtor or Reorganized Debtor.

5. *Injunctions*

Except to the extent otherwise provided in the Plan, all consideration distributed under the Plan will be as a restructuring and not a refinancing, and in exchange for, and in complete satisfaction, release, discharge and settlement of all Administrative Expenses, Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Administrative Expense, Claim or Equity Interest from and after the Commencement Date through the Effective Date against the Debtors, or any of their assets or properties, or against the estates or properties or interests in property. Except as otherwise provided in the Plan or the Confirmation Order, subject to the occurrence of the Effective Date, the Confirmation Order will act as a discharge of all Administrative Expenses, and Claims against, Equity Interests in, liens on, and any other interests in the Debtors, the Debtors' assets, and their properties, arising at any time before the Confirmation Date, including Administrative Expenses, Claims and Equity Interests that arose before the Confirmation Date and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, against the Debtors, regardless of whether or not: (a) a proof of claim or proof of Interest based on such discharged debt or interest is filed or deemed filed with the Bankruptcy Court pursuant to section 501 of the Bankruptcy Code, (b) whether the Administrative Expense, Claim or Equity Interest is Allowed or (c) the holder of an Administrative Expense, Claim or Equity Interest based on such discharged debt or interest has accepted the Plan or is entitled to receive a distribution thereunder. Upon the Effective Date, any holder of such discharged Administrative Expense, Claim or Equity Interest will be precluded from asserting against the Debtors, the Reorganized Debtors, their successors or their assets or properties any other or future Administrative Expenses, Claims or Equity Interests based upon any document, Instrument, act or omission, transaction or other activity of any kind or nature that occurred before the entry of the Confirmation Order. The Confirmation Order will be a judicial determination of discharge of all liabilities of the Debtors, subject to the occurrence of the Effective Date.

By accepting distributions pursuant to the Plan, each holder of an Allowed Senior Secured Claim, Bridge Loan Claim or 2015 Notes Claim will be deemed to have specifically consented to the injunctions set forth in Section 12.5 of the Plan.

Except as otherwise provided in the Plan or the Confirmation Order, subject to the occurrence of the Effective Date, the Confirmation Order will act as a discharge of the Senior Facility Agreement Claims, Bridge Claims and 2015 Notes Claims against the Obligor Debtors and the Obligor Non-Debtors. Upon the Effective Date, any holder of such discharged Senior Facility Agreement Claims, Bridge Claims and 2015 Notes Claims will be precluded from asserting against the Obligor Debtors or the Obligor Non-Debtors, their successors or their assets or properties any other or future Senior Secured Claim, Bridge Loan Claim or 2015 Notes Claim based upon any

document, Instrument, act or omission, transaction or other activity of any kind or nature that occurred before the entry of the Confirmation Order. The Confirmation Order will be a judicial determination of discharge of all such liabilities of the Obligor Debtors and Obligor Non-Debtors, subject to the occurrence of the Effective Date.

6.    _Indemnification Obligations_

Notwithstanding anything to the contrary in the Plan, subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Commencement Date to indemnify, defend, reimburse, or limit the liability of directors or officers of the Debtors, serving in such capacities on or after the Commencement Date, against any claims or causes of action as provided in the Debtors' certificates of incorporation, bylaws, other organizational documents, or applicable law, will survive confirmation of the Plan, remain unaffected thereby and not be discharged, irrespective of whether such indemnification, defense, reimbursement, or limitation is owed in connection with an event occurring before or after the Commencement Date.

7.    _Exculpation_

*As of the Confirmation Date, the Debtors and their directors, officers, employees, financial advisors, attorneys, and other professionals and agents will be deemed to have solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Debtors, the Reorganized Debtors, the Ad Hoc Group and its members , the Arrangers, the Senior Secured Lenders, the DIP Agent, the DIP Lenders, the Rights Offering Sponsors, the Bridge Lenders, the current and former agents under the Senior Secured Credit Agreement and Bridge Loan Agreement, and the Creditors' Committee and its members, the security agent under the Intercreditor Agreement and the Disbursing Agent  (but in each case only in their capacity as members of the Ad Hoc Group, as Senior Secured Lenders, as the DIP Agent, as Rights Offering Sponsors, as Bridge Lenders, as Arrangers, as members of the Creditors' Committee, as the Disbursing Agent, and as the security agent under the Intercreditor Agreement, as applicable), and their respective principals, members, officers, directors, employees and agents (including any attorneys, financial advisors, and other professionals retained by such Persons)(in each case, in their capacity as such) will not have or incur any liability to any holder of any Claim or Equity Interest or any other Person for any act or omission taken or not taken in good faith in connection with, or arising out of, the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Agreement, the solicitation of votes for and the pursuit of confirmation of the Plan, the offer and issuance of any securities under the Plan, the Rights Offering under the Plan, the consummation of the Plan, including, without limitation, the steps taken to effectuate the transactions described in Section 5.4 of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions constituting willful misconduct or gross negligence or bad faith as determined by a Final Order; and in all respects such parties will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.*

8.    _Releases_

*As of the Confirmation Date, but subject to occurrence of the Effective Date, for good and valuable consideration, the adequacy of which is confirmed, the Debtors, the Reorganized Debtors and any Person seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor to the Debtors, will be deemed to unconditionally and forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever (other than for willful misconduct or gross negligence) (collectively, the "__Causes of Action__") in connection with or related to the Debtors, the Chapter 11 Cases, the Plan (other than the rights of the Debtors and the Reorganized Debtors to enforce the Plan and the contracts, Instruments, releases, indentures, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, or the Plan, and that may be asserted by or on behalf of the Debtors, their estates, or the Reorganized Debtors against (i) any of the directors, officers, or employees of any of the Debtors or any of the Non-Debtor Affiliates serving during the pendency of the Chapter 11 Cases, (ii) the financial and legal advisors of the Debtors, (iii) the members (but not in their individual capacities) of the Creditors' Committee; (iv) the respective financial and legal advisors of the members of the*

*Creditors' Committee (but not with respect to such members in their individual capacities); (v) members of the Ad Hoc Group; (vi) the Rights Offering Sponsors; (vii) the Senior Secured Lenders; (viii) the DIP Lenders; (ix) the DIP Agents (x) the Bridge Lenders; and (xi) the respective principals, officers, members, directors, employees, agents, attorneys, affiliates, financial advisors and other professionals retained by any of the entities listed in (v) – (xi) of this section; provided, however, that nothing in Section 11.8 of the Plan will be deemed to prohibit the Debtors or the Reorganized Debtors from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, causes of action or liabilities they may have against any employee (other than any director or officer) that is based upon an alleged breach of a confidentiality, non-compete or any other contractual or fiduciary obligation owed to the Debtors or the Reorganized Debtors; provided, further, that the foregoing will not operate as a waiver or release from any causes of action arising out of the actual or intentional fraud, gross negligence, willful misconduct or criminal conduct of any such Person; provided, further, however, that Section 11.8 of the Plan will not release any claims asserted in the Committee Litigation and not otherwise settled by the Lender Litigation Settlement (including, without limitation, claims asserted in the Committee Litigation against Access Group, or any of its or their principals, officers, members, directors, employees, agents, attorneys, financial advisors and other professionals who are named as defendants in such Committee Litigation), except with respect to any claims asserted against officers or employees of the Debtors and Non-Debtor Affiliates serving in such capacities on December 15, 2009, which are released hereby.*

*As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, (i) each holder of a Claim (including any Senior Secured Claim, Bridge Loan Claim and 2015 Notes Claim) that votes in favor of the Plan (or is deemed to accept the Plan), and (ii) to the fullest extent permissible under applicable law, as such law may be extended or interpreted after the Effective Date, each holder of a Claim that does not vote to accept the Plan, will be deemed to unconditionally and forever release, waive, and discharge (A) each present or former officer, director, employee, agent, financial advisor, attorney and representative (and their respective affiliates) of the Debtors who acted in such capacity on and after the Commencement Date, (B) the members (but not in their individual capacities) of the Creditors' Committee, (C) the members of the Ad Hoc Group, (D) the Rights Offering Sponsors, (E) the Senior Secured Lenders, (F) the DIP Lenders, (G) the DIP Agents; (H) the Bridge Lenders, (I) the Arrangers (but in each case only in their capacity as members of the Ad Hoc Group, the Rights Offering Sponsors, Senior Secured Lenders, DIP Lenders, DIP Agent, Bridge Lenders and Arrangers, as applicable) and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, parent corporations, subsidiaries, partners, affiliates and representatives (in each case, in their capacity as such), from any and all Causes of Action whatsoever in connection with, or related to, the Debtors, the Chapter 11 Cases, or the Plan (other than the rights of the Debtors and the Reorganized Debtors to enforce the Plan and the contracts, Instruments, releases, indentures and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, the Chapter 11 Cases, or the Plan; provided, however, that the foregoing will not operate as a waiver or release from any causes of action arising out of the actual or intentional fraud, gross negligence, willful misconduct or criminal conduct of any such Person; provided, further, that Section 11.8 of the Plan will not release any claims asserted in the Committee Litigation and not otherwise settled by the Lender Litigation Settlement (including, without limitation, claims asserted in the Committee Litigation against Access Group, or any of its or their principals, officers, members, directors, employees, agents, attorneys, financial advisors and other professionals who are named as defendants in such Committee Litigation), except with respect to any claims asserted against officers or employees of the Debtors and Non-Debtor Affiliates serving in such capacities on December 15, 2009, which are hereby released; provided, further, that Section 11.8 of the Plan will not release any claims that have been or could be asserted by any non-settling defendant in the Committee Litigation against any entity.*

*As of the Effective Date, for good and valuable consideration, the adequacy of which is confirmed, (i) each holder of a Claim (including any Senior Secured Claim, Bridge Loan Claim and 2015 Notes Claim) that votes in favor of the Plan (or is deemed to accept the Plan), and (ii) to the fullest extent permissible under applicable law, as such law may be extended or interpreted after the Effective Date, each holder of a Claim that does not vote to accept the Plan, will be deemed to unconditionally and forever release, waive, and discharge the Non-Debtor Affiliates, and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, parent corporations, subsidiaries, partners, affiliates and representatives from any and all claims,*

*obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities whatsoever arising from or relating to such Non-Debtor Affiliate's guarantee of Claims against the Debtors that are discharged pursuant to the Plan, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise.*

*Notwithstanding anything to the contrary contained in the Plan, the Disclosure Statement or the Confirmation Order, no released party will be discharged, exculpated or released on any claim, now existing or hereafter arising that the PBGC may have under ERISA with respect to any U.S. Pension Plan, and there will be no injunction against the assertion of any such claim.*

*As of the Effective Date, in consideration for contribution of the Wind-Up Funds and the Clean Up Funds, and payment of the Schedule III Allocations, on behalf of, and on behalf of their estates, forever release, acquit and discharge the Reorganized Debtors, New Topco, and the Non-Debtor Affiliates and their principals, shareholders, subsidiaries, affiliates, employees, agents, representatives, officers, directors, members, partners, professionals (all solely in their capacities as such), successors and assigns, and any entity claimed to be liable derivatively through the Schedule III Debtors, or any of the foregoing (collectively, the "__Reorganized Released Parties__") from any and all actions, causes of action, liabilities, obligations, rights, suits, accounts, covenants, contracts, agreements, promises, damages, judgments, claims, debts, remedies and demands whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in contract or in law, at equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the commencement of these Chapter 11 Cases or during the course of the Chapter 11 Cases (including through the Effective Date), in any way relating to the Schedule III Debtors, these Chapter 11 Cases, or the ownership, management, and operation of the Schedule III Debtors, including Intercompany Claims, that the Schedule III Debtors could assert directly or any holder of a Claim or Equity Interest or other entity could assert derivatively or on behalf of the Schedule III Debtors or their estates. The releases described in Section 11.8 of the Plan will be enforceable as a matter of contract and are in addition to, and not in lieu of, any other release or discharge provided by applicable law, including section 1141 of the Bankruptcy Code, or separately given, conditionally or unconditionally, by the Schedule III Debtors, the Millennium Trust Trustee, the Environmental Trust Trustee, the Delaware Trustee or any other entity. This release will be binding on the Millennium Custodial Trust, the Environmental Custodial Trust, the Millennium Trust Trustee, the Environmental Trust Trustee and any manager or board of directors of the Schedule III Debtors. The Schedule III Debtors and their estates will be permanently enjoined, from and after the Effective Date, from asserting any and all Claims and causes of action that may lie against the Reorganized Released Parties with respect to the releases granted to it pursuant to this Plan.*

*In exchange for the aggregate contributions to the Millennium Custodial Trust and the Environmental Custodial Trust of the Clean Up Funds, the Wind-Up Funds, payment of the Schedule III Allocations and waiver of Intercompany Claims by the Reorganizing Debtors against the Schedule III Debtors, pursuant to the Plan, each of the Schedule III Debtors will forever release each of the Reorganized Released Parties of any and all Claims that could be brought by, through, or on behalf of the Schedule III Debtors or anyone claiming under them, including Claims based on the theory of alter ego or piercing the corporate veil. The Schedule III Debtors will also forever release, acquit and discharge the Reorganized Released Parties from any and all Intercompany Claims. In addition, the releases include any Claims by the EPA or any other regulatory agency regarding environmental liabilities associated with the Reorganized Debtors and the Transferred Real Properties.*

### 9. Retention of Causes of Action/Reservation of Rights

Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order will be deemed to be a waiver or relinquishment of any rights or causes of action that the Debtors or the Reorganized Debtors may have or choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, (i) any and all Claims against any Person or entity, to the extent such Person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, their officers, directors, or representatives, (ii) any and all claims under chapter 5 of the Bankruptcy Code, and (iii) the turnover of any property of the Debtors' estates.

Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order will be deemed to be a waiver or relinquishment of any claim, cause of action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Commencement Date, against or with respect to any Claim left unimpaired by the Plan.  The Debtors and the Reorganized Debtors will have, retain, reserve, and be entitled to assert all such claims, causes of action, rights of setoff, and other legal or equitable defenses which they had immediately prior to the Commencement Date fully as if the Chapter 11 Cases had not been commenced, except for those claims, causes of action, rights of setoff or other legal or equitable defense, if any, that the Debtors have effectively waived after the Commencement Date, and all of the Debtors' and Reorganized Debtors' legal and equitable rights respecting any Claim left unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

Each of the Reorganized Debtors will, after the Effective Date, retain the rights to bring any causes of action that could have been brought by the respective Debtor at any time.

10.    *Section 506(c) Reservation*

The Debtors and the Reorganized Debtors reserve all rights under section 506(c) of the Bankruptcy Code with respect to any and all Secured Claims, except to the extent waived pursuant to the DIP Financing Order.

11.    *Chapter 5 Reservation*

Without limiting Section 12.11 of the Plan, the Debtors and Reorganized Debtors reserve all rights under chapter 5 of the Bankruptcy Code, including the right to retain or settle any claims arising under chapter 5, except to the extent waived pursuant to the DIP Financing Order or settled in the Lender Litigation Settlement.

**H.    Summary of Other Provisions of the Plan**

The following subsections summarize certain other significant provisions of the Plan.  The Plan should be referred to for the complete text of these and other provisions.

1.    *Plan Supplement*

The Plan Supplement will be filed with the Clerk of the Bankruptcy Court at least ten (10) days prior to the deadline to vote to accept or reject the Plan.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement on the website of the Claims Agent (*www.epiqbankruptcysolutions.com*) or upon written request to the Debtors' bankruptcy counsel.

2.    *Effectuating Documents and Further Transactions*Upon entry of the Confirmation Order, each of the Debtors and the Reorganized Debtors and their respective officers and directors file with the Bankruptcy Court or record or file such contracts, Instruments, releases, indentures, disclosures and other agreements or documents and take such actions as may be reasonably necessary or appropriate to effectuate and further evidence the terms, conditions and purposes of the Plan, or to otherwise comply with applicable law.

3.    *Modification of Plan*

The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan, in consultation with the Ad Hoc Group and Rights Offering Sponsors, at any time prior to the entry of the Confirmation Order.  After the entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend or modify the Plan in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan; *provided however*, in the case of a material amendment, the Debtors receive the consent of Rights Offering Sponsors as set forth Equity Commitment Agreement and Ad Hoc Group.  A holder of an Allowed Claim that has accepted the Plan will be deemed to have accepted the Plan as

modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

### 4. *Payment of Statutory Fees*

All fees payable pursuant to 28 U.S.C. § 1930(a)(6) will be paid on the Effective Date by the Debtors. Any such fees accruing after the Effective Date but prior to the closing of the Chapter 11 Cases will be paid by the Reorganized Debtors.

### 5. *Withdrawal or Revocation of Plan*

The Debtors may withdraw or revoke the Plan as to any or every Debtor at any time prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if the Confirmation Date does not occur, then the Plan will be deemed null and void with respect to the applicable Debtor(s). In such event, nothing contained in the Plan will be deemed to constitute a waiver or release of any Claim by or against the applicable Debtor(s) or any other Person or to prejudice in any manner the rights of the applicable Debtor(s) or any other Person in any further proceedings involving the applicable Debtor(s).

### 6. *Dissolution of the Creditors' Committee*

On the Confirmation Date, the Creditors' Committee will be dissolved and the members thereof will be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention and employment of the Creditors' Committee's attorneys, accountants, and other agents will terminate.

The Creditors' Committee will continue in existence after the Confirmation Date solely for the purpose of reviewing and being heard by the Bankruptcy Court, and on any appeal, with respect to applications for compensation and reimbursement of expenses pursuant to section 330 and/or 503(b) of the Bankruptcy Code. With respect only to the foregoing, the Reorganized Debtors will pay the reasonable fees and expenses of counsel to the Creditors' Committee.

### 7. *Exemption from Securities Laws*

The issuance of the New Common Stock and New Third Lien Notes pursuant to the Plan will be exempt from any securities laws registration requirements to the fullest extent permitted by section 1145 of the Bankruptcy Code, Section 4(2) of the Securities Act, and any other applicable exemptions.

### 8. *Exemption from Transfer Taxes*

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under or in connection with the Plan, the assignment or surrender of any lease or sublease, or the delivery of any deed or other Instrument of transfer under, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, assignments, mortgages, deeds of trust or similar documents executed in connection with any disposition of assets contemplated by the Plan, will not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax, nor any Uniform Commercial Code filing or recording, fee or similar or other governmental assessment. The Confirmation Order will direct the appropriate state or local government officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing Instruments or other documents without the payment of any such tax or governmental assessment.

### 9. *Expedited Determination of Postpetition Taxes*

The Debtors and Reorganized Debtors are authorized (but not required) to request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for any or all tax returns filed for taxable periods (or portions thereof) from the Commencement Date through (and including) the Effective Date.

10.     *Severability*

In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision of the Plan is invalid, void or unenforceable, the Bankruptcy Court will, with the consent of the Debtors, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the provision held to be invalid, void or unenforceable, and such provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable according to its terms.  Notwithstanding the foregoing, the provisions in the Plan relating to releases and exculpations are not severable from the remainder of the Plan unless otherwise agreed by the Debtors in their sole discretion.

If any separate Plan is unconfirmable, the Debtors will have the right to sever that Plan and proceed with the confirmation with all other Plans.

11.     *Governing Law*

Except to the extent the Bankruptcy Code or Bankruptcy Rules are applicable, or to the extent an Exhibit to the Plan or Plan Supplement provides otherwise (in which case the governing law specified therein will be applicable to such Exhibit), the rights, duties and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, the federal laws of the United States and, to the extent there is no applicable federal law, the laws of the State of New York (without giving effect to the principles of conflicts of law thereof).

12.     *Courts of Competent Jurisdiction*

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal or failure of jurisdiction will have no effect upon and will not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

13.     *Headings*

Headings are used in the Plan for convenience and reference only, and will not constitute a part of the Plan for any other purpose.

14.     *Exhibits/Schedules*

All Exhibits and Schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full in the Plan.

15.     *Plan Controls Disclosure Statement; Confirmation Order Controls Plan*

To the extent the Plan is inconsistent with the Disclosure Statement, the provisions of the Plan will be controlling.  To the extent the Confirmation Order is inconsistent with the Plan, the provisions of the Confirmation Order will be controlling.

16.     *Successors and Assigns*

All the rights, benefits, and obligations of any Person named or referred to in the Plan will be binding on, and will inure to the benefit of the heirs, executors, administrators, successors, and/or assigns of such Person.

17.    *Retention of Jurisdiction*

Except as otherwise provided in the Plan and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law.

18.    *Equity Compensation Plan*

On, or as soon as practicable after, the Effective Date, New Topco will adopt the Equity Compensation Plan, pursuant to which New Topco will implement an equity-based program. The terms of the Equity Compensation Plan will be filed as part of the Plan Supplement.

19.    *Reservation of Right to Convert*

If any of the Schedule III Debtors does not have an impaired consenting class or its Plan is otherwise unconfirmable, then the Debtors reserve the right to sever that case from the remaining cases covered by the Plan and convert the Chapter 11 Case of that Debtor to a case under chapter 7 of the Bankruptcy Code without otherwise impacting this Disclosure Statement, any order related to the Disclosure Statement, the application of the Plan to the remaining Debtors and any order related to the Plan, in respect of the remaining Debtors; *provided that*, if the remaining Debtors nonetheless contribute to any such Debtor whose case is to be converted to a case under chapter 7 of the Bankruptcy Code an amount equal to such Debtors' portion of the Wind-Up Funds and Clean-Up Funds, as determined by the Debtors, that Debtor will be deemed to have released the remaining Debtors of any and all causes of action or claims that such Schedule III Debtor, or anyone claiming by or through such Schedule III Debtor, may have against any or all of the remaining Debtors, including any claims for contribution, indemnity, reimbursement or based on or for piercing the corporate veil or alter ego in exchange for fair value or consideration given. This release will be binding upon any chapter 7 trustee appointed in the case of any such Debtor.

## V.    CONFIRMATION AND CONSUMMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### A.    Voting Procedures and Solicitation of Votes

The voting procedures and the procedures governing the solicitation of votes are described above in Section I.C, and in the Disclosure Statement Order, which has been sent to you with this Disclosure Statement if you are entitled to vote on the Plan.

### B.    Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan of reorganization. As set forth in the Disclosure Statement Order, the Confirmation Hearing has been scheduled for [_____], 2010, commencing at [9:45 a.m.] (prevailing Eastern time), before the Honorable Robert E. Gerber, United States Bankruptcy Judge, in Room 621 of the Bankruptcy Court, One Bowling Green, New York, NY, 10004. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing and filed with the Bankruptcy Court.

Objections, if any, to confirmation of the Plan must be filed and served so that they are received on or before [_____], 2010, at [4:00 p.m.] (prevailing Eastern time). Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Equity Interest held by the objector. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. Objections must be timely served upon the following parties:

A)  Cadwalader, Wickersham & Taft LLP    B)  Office of the United States Trustee

One World Financial Center      33 Whitehall Street, 21st Floor
New York, New York  10281      New York, NY  10004
Phone: (212) 504-6000      Attn:  Paul K.  Schwartzberg, Esq.
Attn:  George A. Davis, Esq.
       Andrew M.  Troop, Esq.

C)   Brown Rudnick LLP
    Seven Times Square       - and-     One Financial Center
    New York, NY 10036            Boston, MA 02111
    Phone: (212) 209-4800         Phone: (617) 856-8200
    Attn:  Edward S.  Weisfelner, Esq.    Attn:      Steven D.  Pohl, Esq.

D)   Davis, Polk & Wardwell LLP      E)   Milbank, Tweed, Hadley & McCloy LLP
    450 Lexington Avenue               One Chase Manhattan Plaza
    New York, NY 10017                New York, NY 10005-1413
    Phone: (212) 450-4000            Phone: (212) 530-50000
    Attn: Marshall S. Huebner, Esq.      Attn: Thomas J. Matz, Esq.
                                    Samuel Khalil, Esq.

F)   Akin Gump Strauss Hauer & Feld LLP    G)   Simpson Thacher & Bartlett LLP
    One Bryant Park                      425 Lexington Avenue
    New York, NY 10036                New York, New York 10017
    Phone: (212) 872-1000           Phone: (212) 455-2000
    Attn: Daniel H. Golden, Esq.       Attn: Kathrine A. McLendon, Esq.
           Arik Preis, Esq.             Anne L. Knight, Esq.

### C.       Confirmation of the Plan

In order to meet the requirements for confirmation, the Plan (among other things) must: (i) be accepted by all Impaired Classes of Claims and Equity Interests, or if rejected by an Impaired Class, not "discriminate unfairly" and be "fair and equitable" as to such class; (ii) be "feasible," and (iii) be in the "best interests" of holders of Claims and Equity Interests in Impaired Classes.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of chapter 11 of the Bankruptcy Code.  Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the following requirements of section 1129 of the Bankruptcy Code:

The Plan complies with the applicable provisions of the Bankruptcy Code.

The Debtors, as the proponents of the Plan, have complied with the applicable provisions of the Bankruptcy Code.

The Plan has been proposed in good faith and not by any means forbidden by law.

Any payment made or promised by the Debtors or by a person acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment: (i) made before the confirmation of the Plan is reasonable; or (ii) is subject to the approval of the Bankruptcy Court as reasonable, if such payment is to be fixed after confirmation of the Plan.

The Debtors, as proponents of the Plan, have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and with public policy.

The Debtors have disclosed the identity of any insider that will be employed or retained by the Reorganized Debtors and the nature of any compensation for such insider.

Each holder of an impaired Claim or Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Equity Interest, property of a value as of the Effective Date that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. *See discussion of "Best Interests Test" below and the Debtors' liquidation analysis in Exhibit B.*

Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code, each Class of Claims or Equity Interests either has accepted the Plan or is not an Impaired Class under the Plan.

Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expenses, Priority Tax Claims and Priority Non-Tax Claims will be paid in full as required by the Bankruptcy Code.

At least one Impaired Class has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Impaired Class.

Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Reorganized Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. *See discussion of "Feasibility" below and the Debtors' financial projections in Exhibit C.*

All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee will be paid as of the Effective Date.

The Plan provides for the continuation after the Effective Date of payment of all retiree benefits (as defined in section 1114 of the Bankruptcy Code), at the level established pursuant to section 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code at any time prior to confirmation of the Plan, for the duration of the period the Debtors have obligated themselves to provide such benefits.

1. *Acceptance*

Classes 3, 4, 5, 7-A, 7-C and 8 of the Plan are each an Impaired Class; holders of Claims in these Classes may receive or retain property under the Plan and are thus being treated as if they are entitled to vote to accept or reject the Plan. Classes 9, 10, 11, 12 and 13 and certain of the sub-classes in Classes 7-B of the Plan are also each an Impaired Class; however, because holders of Claims or Equity Interests in these Classes will not receive or retain property under the Plan, they are deemed to have voted to reject the Plan. Each of Classes 1, 2, 6 and 14, and certain of the sub-classes in Classes 7-B, of the Plan is not an Impaired Class and, therefore, is conclusively presumed to have voted to accept the Plan.

2. *Feasibility*

Section 1129(a)(11) of the Bankruptcy Code provides that a chapter 11 plan may be confirmed only if the Bankruptcy Court finds that the plan is "feasible." A feasible plan is one that will not lead to a need for further financial reorganization or liquidation of the debtors, unless such reorganization or liquidation is proposed in the plan.

In order to determine whether the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared the projections set forth in Exhibit C hereto (the "**Financial Projections**"). Based upon the Financial Projections, the Debtors believe that the Reorganized Debtors will be a viable operation following the Chapter 11 Cases thus, the Plan will meet the feasibility requirements of the Bankruptcy Code.

3. *Best Interests Test*

Often referred to as the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation of the Plan, that each holder of a Claim or Equity Interest either: (i) has accepted the Plan; or (ii) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The starting point in determining whether the Plan meets the "best interests" test is a determination of the amount of proceeds that would be generated from the liquidation of the Debtors' assets in the context of a chapter 7 liquidation (such amount, the "**Liquidation Proceeds**"). The Liquidation Proceeds must then be reduced by the costs of such liquidation, including costs incurred during the Chapter 11 Cases and allowed under chapter 7 of the Bankruptcy Code (such as professionals' fees and expenses, a chapter 7 trustee's fees, and the fees and expenses of professionals retained by the chapter 7 trustee). The potential chapter 7 liquidation distribution in respect of each Class must be reduced further by costs imposed by the delay caused by conversion to chapter 7. In addition, inefficiencies in the claims resolution process in a chapter 7 would negatively impact the recoveries of creditors. The net present value of a hypothetical chapter 7 liquidation distribution in respect of an impaired claim is then compared to the recovery provided by the Plan for such impaired claim.

Based on the Debtors' preliminary liquidation analysis set forth as Exhibit B hereto (the "**Liquidation Analysis**"), the Debtors believe that in the event of a chapter 7 liquidation of the Cases, (i) holders of DIP Roll-Up Claims would likely receive approximately 40% on account of their claims; (ii) holders of Senior Secured Claims would likely receive approximately 13% on account of their claims; (iii) holders of Bridge Loan Claims, General Unsecured Claims Against the Obligor Debtors and 2015 Notes Claims would likely receive approximately 0% on account of their claims; (iv) holders of General Unsecured Claims Against Non-Obligor Debtors likely would receive approximately 0 – 100% on account of their claims; and (v) holders of General Unsecured Claims Against Schedule III Debtors likely would receive approximately 0 – 0.3% on account of their claims. In contrast, the Plan provides for (i) holders of DIP Roll-Up Claims to receive 100% on account of their claims; (ii) holders of Senior Secured Claims to receive [__]% on account of their claims;[61] (iii) holders of Bridge Loan Claims to receive 6.3% on account of their claims; (iv) holders of General Unsecured Claims Against Obligor Debtors to receive 10.7% on account of their claims; (v) holders of General Unsecured Claims Against Non-Obligor Debtors to receive 0 – 100% on account of their claims; (vi) holders of General Unsecured Claims Against Schedule III Debtors to receive 0 – 100% on account of their claims; and (vii) holders of 2015 Notes Claims to receive 0 or 10.7% on account of their claims. Therefore, the Debtors believe that each Impaired Class will receive under the Plan a recovery at least equal in value to the recovery such Impaired Class would receive pursuant to a liquidation of each Debtor under chapter 7 of the Bankruptcy Code.

4. *"Cramdown"*

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a chapter 11 plan of reorganization even if not all impaired classes have accepted the plan; provided that such plan has been accepted by at least one impaired class. The Debtors will seek to confirm the Plan notwithstanding its rejection by any of the Impaired Classes. In order to obtain such nonconsensual confirmation (or "cramdown") of the Plan, the Debtors must demonstrate to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired Class that voted to reject the Plan (each such Impaired Class, a "**Non-Accepting Class**").

---

[61] Recoveries were determined on a post-Rights Offering basis. Holders of Senior Secured Claims will receive a [__]% recovery on account of their Claims against Debtors based on the net allocable value of LBFC and its direct and indirect subsidiaries. Holders of Senior Secured Facility Claims will receive an additional recovery on account of their Claims against LBIH and LBIAF and their direct and indirect subsidiaries (other than LBFC and its direct and indirect subsidiaries).

a.    Fair and Equitable Test

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable," and includes the general requirement that no class receive more than 100% of the amount of the allowed claims in such class. The "fair and equitable" test sets different standards for secured creditors, unsecured creditors, and equity holders, as follows:

(i)    Secured Creditors

With respect to Non-Accepting Classes of Secured Claims, the "fair and equitable" test requires that (i) each impaired secured creditor retains the liens securing its allowed secured claim and receives on account of that claim deferred cash payments having a present value equal to the amount of its allowed secured claim; (ii) the property securing the claim is sold free and clear of liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) above; and (iii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim.

(ii)    Unsecured Creditors

With respect to Non-Accepting Classes of Unsecured Claims, the "fair and equitable" test requires that (i) each impaired unsecured creditor receives or retains under the Plan property of a value equal to the amount of its allowed claim; or (ii) the holders of any claims (or Equity Interests) that are junior to the Non-Accepting Class will not receive any property under the Plan. (This provision is often referred to as the "absolute priority" rule.)

(iii)    Equity Interests

With respect to Non-Accepting Classes of Equity Interests, the "fair and equitable" test requires that (i) each holder of an Equity Interest will receive or retain under the Plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest; or (ii) the holder of an interest that is junior to the Non-Accepting Class will not receive or retain any property under the Plan.

b.    No Unfair Discrimination

A plan does not "discriminate unfairly" with respect to a Non-Accepting Class if the value of the cash and/or securities to be distributed to the Class is equal to, or otherwise fair when compared to, the value of the distributions to other Classes whose legal rights are the same as those of the Non-Accepting Class. Exact parity is not required. The Debtors believe that any discrepancy in treatment or potential distributions to otherwise unsecured creditors is objectively small and justified based on certain inherent differences in the nature of their Claims, the time that will be required to liquidate their Claims, and the relative levels of risk that are being taken by different creditors simply based upon the time it will take to liquidate their Claims.

## D.    Consummation

The Plan will be consummated on the first Business Day on which all of the conditions precedent set forth below (collectively, the "**Conditions Precedent**") have been satisfied or waived by the applicable parties, (the "**Effective Date**").

1.    *Conditions Precedent to Occurrence of the Effective Date of the Plan*

The following are conditions precedent to the occurrence Effective Date of the Plan:

(1) The Bankruptcy Court will have entered the Confirmation Order, in form and substance reasonably satisfactory to the Ad Hoc Group, which will approve the Plan on substantially the same terms and conditions set forth therein;

(2) The Plan approved by the Bankruptcy Court pursuant to the Confirmation Order will be in form and substance reasonably satisfactory to each of the Debtors and the Ad Hoc Group;

(3) No stay of the Confirmation Order will be in effect at the time the other conditions set forth in Section 11.1 of the Plan are satisfied or waived;

(4) All documents, Instruments and agreements provided for under, or necessary to implement, the Plan will have been executed and delivered by the parties thereto, in form and substance satisfactory to each of the Debtors, unless such execution or delivery has been waived by the parties benefited thereby and all such documents, Instruments and agreements shall be effective on the Effective Date;

(5) All of the payments to be made by the Debtors by or on the Effective Date will have been made or will be made on the Effective Date;

(6) The Debtors or the Reorganized Debtors, as applicable, will have entered into an Exit Facility providing for $[____] of financing, and all conditions precedent to funding under the Exit Facility will have been satisfied or waived;

(7) The Debtors will have raised $2.8 billion in cash pursuant to the Rights Offering and the Private Sale;

(8) The Debtors or the Reorganized Debtors, as applicable, will have obtained all governmental and other regulatory approvals or rulings that may be necessary (in their discretion) for consummation of the Plan or that are required by law, regulation or order;

(9) The Debtors will have sold the appropriate amount of Class B Shares to the Rights Offering Sponsors (or affiliates of the Rights Offering Sponsors) in accordance with the terms and conditions in the Equity Commitment Agreement, and will have paid the Rights Offering Fees and Expenses, in full in Cash, without the need for any of the members of the Ad Hoc Group or the Rights Offering Sponsors to file retention applications or fee applications with the Bankruptcy Court unless otherwise required by order of the Bankruptcy Court; and

(10) The Lender Litigation Settlement will have been approved by a final order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Debtors, the Ad Hoc Group and the Bridge Lenders.

Except with respect to the condition set forth in Section D.1(1), the Debtors, in consultation with the Ad Hoc Group, the Rights Offering Sponsors (except for the condition set forth in Section 10.1(j) of the Plan) and, solely with respect to the condition set forth in Section 10.1(j) of the Plan, the Bridge Lenders, and to the extent not prohibited by applicable law, may waive one or more of these Conditions Precedent. [62]

## 2.  *Effect of Failure of Conditions Precedent*

In the event that one or more of the Conditions Precedent have not been satisfied or waived by the date that is 180 days after the Confirmation Date, (i) the Confirmation Order shall be vacated without further order of the Bankruptcy Court; (ii) no distributions under the Plan shall be made, (iii) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; and (iv) the Debtors' obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other Person or will prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

---

[62] Notwithstanding anything to the contrary contained in the Plan or Disclosure Statement, if the Equity Commitment Agreement is terminated, the Rights Offering Sponsors shall, and the Ad Hoc Group may, no longer be entitled to the consent and consultation rights described herein.

# VI.    SECURITIES LAW MATTERS

## A.    U.S. Securities Law Matters

Each holder of an Allowed Claim in Classes 3 and 4 and certain holders of Allowed Claims in Class 7-C may receive securities pursuant to the Plan. Section 1145 of the Bankruptcy Code provides certain exemptions from the securities registration requirements of federal and state securities laws with respect to the distribution of securities under a plan.

### 1.    *Issuance and Resale of New Common Stock Under the Plan*

Section 1145(a)(1) of the Bankruptcy Code generally exempts from registration under the Securities Act of 1933 (the "**Securities Act**") the offer or sale of a debtor's securities under a chapter 11 plan if such securities are offered or sold in exchange for a claim against, or an equity interest in, such debtor, or if such securities are offered or sold principally in such exchange and partly for cash. In addition, in the case of rights so issued under a chapter 11 plan, section 1145(a)(2) also generally exempts the issuance of stock issued upon exercise of such rights. In reliance upon this exemption, the New Common Stock to be issued in respect of Claims and the exercise of the Subscription Rights by Eligible Holders as provided in the Plan (but not the Unsubscribed Shares, Excluded Shares or shares received by persons deemed to be underwriters) and the New Warrants and the Class A Shares issuable upon exercise of the New Warrants will be exempt from the registration requirements of the Securities Act and of any state securities laws. In general, offers and sales of securities made in reliance on the exemption afforded under section 1145(a) of the Bankruptcy Code are deemed to be made in a public offering. Accordingly, such securities may be resold without registration under the Securities Act or other federal securities laws pursuant to an exemption provided by section 4(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in the Bankruptcy Code. In addition, such securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim other than in ordinary trading transactions, or (b) offers to sell securities issued under a plan for the holders of such securities, or (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution of such securities, or (d) is a control person of the issuer of the securities or other issuer of the securities within the meaning of Section 2(11) of the Securities Act. The legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns at least ten percent (10%) of the securities of a reorganized debtor may be presumed to be a "control person."

Notwithstanding the foregoing, statutory underwriters may be able to sell their securities pursuant to the resale limitations of Rule 144 promulgated under the Securities Act. Rule 144 would, in effect, permit the resale of securities received by statutory underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own counsel concerning the availability of the exemption provided by Rule 144.

Whether any particular person would be deemed to be an "underwriter" with respect to any security issued under the Plan would depend upon the facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any particular person receiving distributions under the Plan would be an "underwriter" with respect to any security issued under the Plan and Debtors make no representation concerning the ability of any particular person to resell the securities to be distributed under the Plan. The Debtors recommend that potential recipients of securities pursuant to the Plan consult their own counsel concerning whether they may freely trade such securities.

The Rights Offering Sponsors will also receive shares of New Common Stock. New Topco will rely on Section 4(2) of the Securities Act and, to the extent applicable, Regulation D promulgated thereunder, and Section 18 of the Securities Act with respect to state securities law or Blue Sky Laws, to exempt the offering, sale and issuance of New Common Stock to the Rights Offering Sponsors. Section 4(2) exempts from the registration

requirements of the Securities Act any offering by an issuer not involving any public offering. Regulation D similarly exempts from the registration requirements of the Securities Act private offerings by an issuer of securities to "accredited investors," as such term is defined under Regulation D, and to certain other qualified investors.

2. *Listing of New Common Stock*

New Topco will use its commercially reasonable efforts to cause the shares of New Common Stock to be listed on the New York Stock Exchange as soon as reasonably practicable after the Effective Date. New Topco will use its commercially reasonable efforts to file a Form 10 with the Securities and Exchange Commission ("**Commission**") and seek to have such Form 10 be declared effective by the Commission as soon as reasonably practicable after the Effective Date in order to enable the shares of New Common Stock to be listed on the New York Stock Exchange.

Prior to the listing of the shares, the Debtors expect that the New Common Stock will be held in global form by a transfer agent in the form of one or more bearer global share certificates for the account of Cede & Company, the nominee of the Depository Trust Company. Subject to compliance with Dutch law and the rules of the Depository Trust Company, transfers of New Common Stock prior to listing may only be made by the transfer of a book entry position in the relevant global bearer share certificate.

**B.      Dutch Securities Law Matters**

In relation to each member state of the European Economic Area ("**EEA**") which has implemented the Prospectus Directive (each, a "**Relevant Member State**"), an offer to the public of the New Common Stock or Subscription Rights as provided in the Plan may not be made in that Relevant Member State, except that an offer to the public in that Relevant Member State of any New Common Stock or Subscription Rights may be made at any time under the following exemptions under the Prospectus Directive, in that Relevant Member State:

> to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

> to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in the relevant entity's last annual or consolidated accounts;

> to fewer than 100 natural or legal persons (other than qualified investors as defined in the Prospectus Directive); or

> in any other circumstances which do not require the publication by New Topco of a prospectus pursuant to Article 3(2) of the Prospectus Directive;

provided that no such offer of New Common Stock and/or Subscription Rights will result in a requirement for the publication by the New Topco of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer to the public" in relation to any New Common Stock or Subscription Rights in any Relevant Member State means the communication in any form and by any means of sufficient information the terms of the offer as provided in the Plan and New Common Stock or Subscription Rights to be offered so as to enable an investor to decide to purchase or subscribe for New Common Stock or Subscription Rights, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression Prospectus Directive means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

In the case of any New Common Stock or Subscription Rights being offered to a financial intermediary (as that term is used in Article 3(2) of the Prospectus Directive), such financial intermediary will also be deemed to have represented, acknowledged and agreed that the New Common Stock or Subscription Rights

acquired by it under the Plan have not been acquired on a non-discretionary basis on behalf of, nor have they been acquired with a view to their offer or resale to persons in circumstances which may give rise to an offer of any New Common Stock or Subscription Rights to the public other than their offer of resale in a relevant Member State to qualified investors as so defined. New Topco and its affiliates, and others will rely upon the truth and accuracy of the foregoing representation, acknowledgement and agreement. Notwithstanding the foregoing, a person who is not a qualified investor and who has notified New Topco of such fact in writing may, with the consent of New Topco, be permitted to purchase New Common Stock or Subscription Rights under the Plan.

IN THE EVENT THAT YOU ARE A RESIDENT OF A MEMBER STATE OF THE EEA WHICH HAS IMPLEMENTED THE PROSPECTUS DIRECTIVE, NO OFFER OR SOLICITATION OF AN OFFER TO RECEIVE ANY SECURITIES SHALL BE DEEMED TO BE MADE TO YOU PURSUANT TO THE PLAN OF REORGANIZATION OR RIGHTS OFFERING UNLESS YOU ARE EITHER (I) A QUALIFIED INVESTOR OR (II) LESS THAN 100 NON-QUALIFIED INVESTORS FROM SUCH MEMBER STATE PARTICIPATE IN THE RELEVANT OFFERING. IN THE EVENT THAT MORE THAN 100 NON-QUALIFIED INVESTORS FROM ANY EEA MEMBER STATE WHICH HAS ADOPTED THE PROSPECTUS DIRECTIVE SEEK TO RECEIVE SECURITIES PURSUANT TO THE PLAN OF REORGANIZATION OR RIGHTS OFFERING, LYONDELLBASELL RESERVES THE RIGHT TO DELIVER SUBSTITUTE CONSIDERATION OF EQUIVALENT VALUE WITH RESPECT TO ANY ELIGIBLE HOLDER TO WHOM AN OFFER CANNOT BE MADE WITHOUT PUBLICATION OF A PROSPECTUS PURSUANT TO THE PROSPECTUS DIRECTIVE.

## VII.    CORPORATE GOVERNANCE AND MANAGEMENT OF NEW TOPCO

### A.    Boards of Directors

New Topco will be a public limited liability company (*naamloze vennootschap*) formed under the laws of The Netherlands. The initial members of the supervisory board of New Topco (the "**New Topco Supervisory Board**") will be disclosed at or before the Confirmation Hearing. Each of the members of such initial board will serve in accordance with applicable Dutch law, the New Topco Supervisory Board charter, applicable corporate governance principles and the New Topco Articles of Association, as the same may be amended from time to time. The New Topco Supervisory Board, in consultation with the Management Board, will determine the overall strategy and policy of New Topco and the LyondellBasell group of companies. The Management Board will be responsible for the execution of such strategy and policy, as well as the management of the day-to-day operations of New Topco. The Management Board will submit proposals for the overall strategy and policy to the New Topco Supervisory Board for its approval. In addition, certain Management Board actions, including extraordinary transactions, will require the approval of the Supervisory Board. The Chief Executive Officer will be a member of the Management Board. The Management Board may delegate its responsibilities to the Chief Executive Officer and certain other officers of the LyondellBasell group of companies, but the Management Board will remain responsible for the proper performance of the delegated tasks. The New Topco Supervisory Board will have an audit committee, corporate governance and nominating committee and an organization and compensation committee.

The current members of the boards of directors of each of the Reorganized Debtors, other than New Topco, will serve, until replaced, as the initial directors of the Reorganized Debtors on and after the Effective Date.

The Reorganized Debtors will take all actions necessary to file, register or otherwise effectuate the amended certificates of incorporation and amended by-laws (or other relevant organizational documents) for the Reorganized Debtors. The certificates of incorporation and by-laws (or other relevant organizational documents) of each of the Reorganized Debtors, as applicable, will contain provisions necessary to prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code.

### B.    Senior Management

The officers of New Topco will be disclosed at or before the Confirmation Hearing.

The officers of each of the Debtors will serve as the initial officers of the Reorganized Debtors on and after the Effective Date. Such officers will serve in accordance with applicable nonbankruptcy law, any employment agreement with the Reorganized Debtors, and the applicable certificate of incorporation and by-laws (or other relevant organizational documents), as the same may be amended from time to time.

## C. Corporate Governance

The New Topco Articles of Association will be included in the Plan Supplement.

### 1. *Board Composition, Election and Term*

New Topco and the Debtors have agreed with the Rights Offering Sponsors that the New Topco Supervisory Board shall initially consist of nine members. Within one year of being listed on the NYSE, the size of the New Topco Supervisory Board would be increased and additional independent directors will be appointed as necessary to ensure that a majority of the directors would be independent.

Apollo will have the right to nominate three initial supervisory board members, Access will have the right to nominate one initial supervisory board member and Ares will have the right to nominate one initial supervisory board member. The remaining initial supervisory board members will be independent and will be identified by a search firm appointed by the Debtors, subject to the approval of the Rights Offering Sponsors (such approval not to be unreasonably withheld).

The Rights Offering Sponsors will each enter into a binding nomination agreement with the New Topco Supervisory Board pursuant to which the New Topco Supervisory Board will agree that following appointment of the initial New Topco Supervisory Board, (i) if a Rights Offering Sponsor, together with its affiliates, owns 18% or more of the outstanding New Common Stock, such Rights Offering Sponsor will have the right to nominate three members of the Supervisory Board; (ii) if a Rights Offering Sponsor, together with its affiliates, owns at least 12% but less than 18% of the outstanding New Common Stock, such Rights Offering Sponsor will have the right to nominate two members of the Supervisory Board; and (iii) if a Rights Offering Sponsor, together with its affiliates, owns at least 5% but less than 12% of the outstanding New Common Stock, such Rights Offering Sponsor will have the right to nominate one member of the Supervisory Board. The size of the New Topco Supervisory Board may be increased from time to time to the extent necessary to ensure that a majority of the members are independent in accordance with the NYSE standard for independence after giving effect to the foregoing.

### 2. *Removal of Members; Vacancies*

The New Topco Articles of Association will provide that the New Topco Supervisory Board members may be suspended or dismissed by a vote of the shareholders, at a general meeting of shareholders, upon a vote of holders of at least 2/3 of the shares present, which shares must represent at least half of the issued share capital. The members of the New Topco Management Board may be suspended or dismissed by a vote of a majority of the New Topco Supervisory Board members or by a vote of the shareholders, at a general meeting of shareholders, upon a vote of holders of at least 2/3 of the shares present, which shares must represent at least half of the issued share capital.

### 3. *Limitation on Calling Special Meetings of Stockholders*

The New Topco Articles of Association will provide that a special meeting of shareholders may be called by the New Topco Supervisory Board or the Management Board, and shareholders or groups of shareholders holding at least 10% of the issued share capital of New Topco will have the right to require the New Topco Supervisory Board to call a special meeting. Pursuant to the nomination agreement, any Rights Offering Sponsor that holds, together with its affiliates, greater than 5% of the issued share capital of New Topco will have the right to require the New Topco Supervisory Board to call a special meeting. All of New Topco's meetings of shareholders will take place in The Netherlands.

4. _Advance Notice Requirements for Stockholder Proposals and Member Nominations_

The New Topco Articles of Association will provide that any shareholder holding, together with its affiliates, at least 1% of the issued share capital of New Topco will have the right to propose items for the agenda of New Topco's general meeting of shareholders, including nomination of candidates for election as members of the New Topco Supervisory Board. Shareholders seeking to propose such agenda items must provide timely notice of their proposal in writing to the corporate secretary. In accordance with U.S. securities laws, in the case of an annual meeting, to be considered for inclusion in the company's proxy statement, a shareholder's notice must be received at the principal executive offices of New Topco not less than one hundred twenty (120) days prior to the first anniversary date of the date of the proxy statement released to shareholders in connection with the previous year's annual meeting or such shorter period prior to the relevant annual meeting as may be applicable under Dutch law or applicable regulations. Subject to applicable laws and regulations, in the case of a special meeting such notice must be received, not more than ninety (90) days prior to such special meeting nor less than forty-five (45) days prior to such special meeting.

5. _Shareholder Approval_

The New Topco Articles of Association will provide that certain matters will require shareholder approval, including a buy-back of shares, amendment to the New Topco Articles of Association, approval of the annual accounts and certain resolutions regarding a significant change in the identity or nature of New Topco.

## VIII. FINANCIAL INFORMATION, PROJECTIONS AND VALUATION ANALYSIS

### A. Overview of Business Strategy

In conjunction with its restructuring efforts, the LyondellBasell is currently pursuing a multi-pronged operational improvement strategy centered on the following: Operational Excellence; Cost Reduction / Revenue Enhancement; Capital Discipline; Portfolio Management; Performance-Driven Culture and Technology-Driven Growth.

Operational excellence, which includes a commitment to safety, environmental stewardship, and improved reliability, is key to LyondellBasell's future success. LyondellBasell believes optimal operations can be achieved through a systematic application of standards and improved maintenance procedures, which also indirectly results in improved personnel and process safety and environmental performance. LyondellBasell has set new operational excellence targets for each of its facilities based on industry benchmarks.

LyondellBasell is also pursuing cost reductions across its system with specific goals, also based in large part on benchmarks of industry leading performance. LyondellBasell believes that its global manufacturing scale provides the opportunity to minimize costs per unit, a critical operational measure for petrochemical and refining companies.

By leveraging its leading technological platform, global presence, strong customer relationships and positive reputation for reliability and quality, LyondellBasell also intends on increasing its sales of value-added, differentiated products. LyondellBasell will continue to focus on upgrading its customer product mix based on technology to realize premium pricing as opposed to competing in basic commodity markets.

Additionally, LyondellBasell remains focused on disciplined capital allocation. LyondellBasell intends to optimize its capital spending to address projects required to enhance reliability and maintain the overall asset portfolio. This includes key turnarounds in each segment, necessary regulatory and maintenance spending as well as a limited number of high return de-bottlenecking and energy reduction projects.

LyondellBasell will also carefully manage its portfolio as demonstrated by the recent closure of certain underperforming assets. This review of assets continues and will likely result in the closure of additional units, particularly in Europe.

The benchmarking, goal setting and results measurement described as part of the cost reduction and revenue enhancement efforts will become central to the new performance-driven, accountability culture that LyondellBasell intends to instill. LyondellBasell has outstanding people and assets, and with the right performance expectations, can rapidly increase its competitiveness.

LyondellBasell's strong, leading technologies provide it with a platform for future growth. LyondellBasell intends to continue to focus on the mature, highly sophisticated markets in Europe and North America but will also grow in quickly developing markets like Asia and regions with access to low cost feedstocks. However, the ability to capitalize on this growth opportunity will be delayed given current weak market conditions and LyondelBasell's specific situation. Consequently, these opportunities have not been included in LyondellBasell's five year forecast.

**B.       Projections**

The following charts reflect the Debtors' estimate of the future performance of the Reorganized Debtors and non-Debtors on an aggregate basis, for approximately the next five years, and the ten years thereafter, respectively:

| Current Cost ($ millions) [1] | Actual | | Projected | | | | | | CAGR |
|---|---|---|---|---|---|---|---|---|---|
| | **2008** | **2009** [6] | **2010** | **2011** | **2012** | **2013** | **2014** | | **2009 - 2014** |
| Revenue | $ 50,706 | $ 27,709 | $ 28,350 | $ 33,913 | $ 38,049 | $ 41,579 | $ 43,052 | | *9.2%* |
| *Growth* | *NA* | *-45.4%* | *2.3%* | *19.6%* | *12.2%* | *9.3%* | *3.5%* | | |
| Gross Profit [2] | $ 2,621 | $ 1,174 | $ 1,003 | $ 1,371 | $ 1,659 | $ 2,515 | $ 2,759 | | *18.7%* |
| *Margin* | *5.2%* | *4.2%* | *3.5%* | *4.0%* | *4.4%* | *6.0%* | *6.4%* | | |
| SG&A and R&D | $ 1,348 | $ 1,071 | $ 1,110 | $ 1,146 | $ 1,171 | $ 1,199 | $ 1,238 | | *2.9%* |
| *% of Revenue* | *2.7%* | *3.9%* | *3.9%* | *3.4%* | *3.1%* | *2.9%* | *2.9%* | | |
| EBITDAR [3] | $ 3,297 | $ 1,908 | $ 1,596 | $ 1,982 | $ 2,250 | $ 3,085 | $ 3,303 | | *11.6%* |
| *% Margin* | *6.5%* | *6.9%* | *5.6%* | *5.8%* | *5.9%* | *7.4%* | *7.7%* | | |
| Restructuring Costs [4] | $ - | 573 | $ 82 | $ - | $ - | $ - | $ - | | |
| EBITDA | $ 3,297 | $ 1,334 | $ 1,514 | $ 1,982 | $ 2,250 | $ 3,085 | $ 3,303 | | *19.9%* |
| *% Margin* | *6.5%* | *4.8%* | *5.3%* | *5.8%* | *5.9%* | *7.4%* | *7.7%* | | |
| JV Dividends | $ 98 | $ 16 | $ 27 | $ 78 | $ 123 | $ 145 | $ 186 | | *64.3%* |
| CapEx [5] | $ 1,178 | $ 888 | $ 953 | $ 1,179 | $ 1,159 | $ 923 | $ 983 | | |
| Cash Use of Working Capital | NM | NM | $ (401) | $ (299) | $ (331) | $ (330) | $ (55) | | |

Source: Preliminary Business Outlook dated August 31, 2009

(1) Historical and projected figures reflect current cost method of accounting. The company uses both first-in first-out ("FIFO") and last-in first-out ("LIFO") methods of accounting to determine inventory cost for reporting purposes

(2) In 2008, excludes impairments of the carrying value of goodwill and other assets of $4,982 and $225 million, respectively, and a $1,256 million charge to adjust the value of inventory to market value. In 2009, excludes asset impairment charge of $666 million

(3) EBITDAR is a non-GAAP number and excludes restructuring costs

(4) Includes costs related to cost-savings initiatives and chapter 11 professional fees

(5) Includes base, regulatory, turnaround and profit generating expenditures

(6) Reflects year to date actual results through May 2009 plus projections through December 2009

(7) The projections for 2015 - 2025 are an extrapolation based upon assumptions consistent with Exhibit B 2010 -2014 projections

| Current Cost ($ millions) [1] | Fiscal Year Ended December 31 [7] | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Projected | | | | | |
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** |
| Revenue | $ 42,793 | $ 43,508 | $ 44,076 | $ 44,394 | $ 45,089 | $ 46,088 | $ 48,017 | $ 48,718 | $ 49,927 | $ 50,556 | $ 51,310 |
| *Growth* | *-0.6%* | *1.7%* | *1.3%* | *0.7%* | *1.6%* | *2.2%* | *4.2%* | *1.5%* | *2.5%* | *1.3%* | *1.5%* |
| Gross Profit [2] | $ 3,259 | $ 3,201 | $ 2,860 | $ 2,200 | $ 2,246 | $ 2,822 | $ 3,385 | $ 3,847 | $ 4,229 | $ 3,725 | $ 3,434 |
| *Margin* | *7.6%* | *7.4%* | *6.5%* | *5.0%* | *5.0%* | *6.1%* | *7.0%* | *7.9%* | *8.5%* | *7.4%* | *6.7%* |
| SG&A and R&D | $ 1,293 | $ 1,319 | $ 1,343 | $ 1,365 | $ 1,388 | $ 1,417 | $ 1,454 | $ 1,471 | $ 1,496 | $ 1,505 | $ 1,517 |
| *% of Revenue* | *3.0%* | *3.0%* | *3.0%* | *3.1%* | *3.1%* | *3.1%* | *3.0%* | *3.0%* | *3.0%* | *3.0%* | *3.0%* |
| EBITDAR [3] | $ 3,748 | $ 3,664 | $ 3,300 | $ 2,619 | $ 2,641 | $ 3,190 | $ 3,715 | $ 4,161 | $ 4,519 | $ 4,006 | $ 3,703 |
| *% Margin* | *8.8%* | *8.4%* | *7.5%* | *5.9%* | *5.9%* | *6.9%* | *7.7%* | *8.5%* | *9.1%* | *7.9%* | *7.2%* |
| Restructuring Costs [4] | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| EBITDA | $ 3,748 | $ 3,664 | $ 3,300 | $ 2,619 | $ 2,641 | $ 3,190 | $ 3,715 | $ 4,161 | $ 4,519 | $ 4,006 | $ 3,703 |
| *% Margin* | *8.8%* | *8.4%* | *7.5%* | *5.9%* | *5.9%* | *6.9%* | *7.7%* | *8.5%* | *9.1%* | *7.9%* | *7.2%* |
| JV Dividends | $ 236 | $ 228 | $ 237 | $ 232 | $ 207 | $ 255 | $ 317 | $ 370 | $ 417 | $ 399 | $ 394 |
| CapEx [5] | $ 1,120 | $ 1,158 | $ 1,168 | $ 1,180 | $ 1,206 | $ 1,232 | $ 1,256 | $ 1,282 | $ 1,307 | $ 1,333 | $ 1,359 |
| Cash Use of Working Capital | $ (12) | $ (11) | $ (23) | $ (12) | $ (24) | $ (11) | $ (25) | $ (12) | $ (26) | $ (26) | $ (25) |

# IX.    REORGANIZATION VALUATION ANALYSIS

## IX. Reorganization Valuation Analysis

Evercore has performed an analysis of the estimated reorganization enterprise values of LyondellBasell, LyondellBasell's U.S. businesses, LyondellBasell's non-U.S. businesses, the F&F Business, and the Acetyls Business (collectively, the "**Valued Entities**"). LyondellBasell's U.S. businesses include, but are not limited to, (i) certain U.S. business operations, (ii) certain Canadian, Mexican, French and other foreign operations and interests, each of which ultimately has a U.S. domiciled parent company which is a Debtor, as well as (iii) certain royalty payments from Lyondell's non-U.S. businesses to certain U.S. businesses (collectively, the "**U.S. Buinesses**"). LyondellBasell's non-U.S. businesses are comprised of all LyondellBasell's businesses that are not included in the U.S. Businesses (collectively, the "**Non-U.S. Businesses**"). The valuation analysis was performed for the purpose of (i) estimating reorganization value available for distribution to Creditors pursuant to the Plan, (ii) analyzing the relative recoveries to Creditors thereunder, and (iii) with respect to the liquidation analysis prepared by the Debtors and set forth in Exhibit B hereto, facilitating the evaluation of whether the Plan meets the so-called "best interests" test under section 1129(a)(7) of the Bankruptcy Code.

In preparing its analysis, Evercore has, among other things: (i) reviewed certain recent publicly available financial results of LyondellBasell; (ii) reviewed certain internal financial and operating data of the Valued Entities, including the financial projections prepared and provided by LyondellBasell management relating to the business and prospects of the Valued Entities; (iii) discussed with certain senior executives the current operations and prospects of the Valued Entities; (iv) reviewed certain operating and financial forecasts of the Valued Entities prepared by LyondellBasell, including the business and financial projections in this Disclosure Statement (collectively, the "**Financial Projections**"); (v) discussed with certain senior executives of LyondellBasell and their advisors key assumptions related to these financial projections; (vi) prepared discounted cash flow analyses based on these financial projections, utilizing various discount rates and assumptions in the calculation of terminal values; (vii) considered the market value of certain publicly-traded peer companies of the Valued Entities; (viii) considered certain economic and industry information relevant to the operating businesses of the Valued Entities; (ix) considered the value assigned to certain precedent change-of-control transactions for businesses similar to those of the Valued Entities, although Evercore concluded precedent transaction analysis was not applicable in these valuation analyses; (x) separately accounted for the minority interests of third parties in consolidated joint ventures of LyondellBasell; (xi) separately analyzed and estimated the reorganization value of LyondellBasell's ownership interests in unconsolidated joint ventures; and (xii) conducted such other analyses as Evercore deemed necessary under the circumstances. Evercore also has considered a range of potential risk factors as discussed in Article X of the Disclosure Statement.

Evercore assumed, without independent verification, the accuracy and completeness of all of the financial and other information available to it from public sources or as provided to Evercore by LyondellBasell or its representatives. Evercore also assumed that the Financial Projections have been reasonably prepared in good faith on a basis reflecting LyondellBasell's best estimates and judgment as to future operating and financial performance. Evercore did not make any independent evaluation of LyondellBasell's assets, nor did Evercore verify any of the information it reviewed. The valuation is dependent upon the achievement of the Financial Projections and the valuations must be considered speculative. Evercore does not make any representation or warranty as to whether the terms of the Plan are fair to any one or more particular groups of creditors or shareholders or "fair and equitable" for purposes of section 1129(b) of the Bankruptcy Code or whether the Plan meets the so-called "best interests" test under section 1129(a)(7) of the Bankruptcy Code.

In addition to the foregoing, Evercore relied upon the following assumptions with respect to its analysis of the estimated values of the Valued Entities:

The Effective Date occurs on February 28, 2010;

The date of the valuations is as of February 28, 2010;

The transactions contemplated by the Plan provide adequate liquidity for New Topco and the Reorganized Debtors as of the Effective Date;

The pro forma net debt levels of New Topco and its subsidiaries will be approximately $5.53 billion after adjusting to include (i) the impact of the Private Sale and the Rights Offering, (ii) expenses associated with the issuance of debt and equity exit financing and (iii) cash payments with respect to certain items including administrative, priority, and secured and unsecured claims;

General financial and market conditions as of the Effective Date will not differ materially from those conditions prevailing as of the date of this Disclosure Statement. LyondellBasell's performance prior to the Effective Date and the cash requirements associated with the Debtors' exit from chapter 11 will not differ materially from that currently projected. The reorganization value analysis was presented to LyondellBasell's Board of Directors on December 9, 2009, and incorporates peer company information as of November 27, 2009.

As a result of such analyses, review, discussions, considerations, and assumptions, Evercore estimates the total reorganization enterprise value on a cash-free and debt-free basis (the "**TEV**") for consolidated LyondellBasell at approximately $13.50 billion to $15.50 billion, with a midpoint of $14.50 billion, which incorporates adjustments to include the estimated reorganization value of LyondellBasell's interests in unconsolidated joint ventures, and deducts the estimated book value of third party minority interests in consolidated joint ventures. Evercore reduced such TEV estimates by the estimated pro forma net debt levels of New Topco and its subsidiaries (approximately $5.53 billion) to estimate the implied reorganization equity value of New Topco. Evercore estimates that New Topco's implied total reorganization equity value will range from $7.97 billion to $9.97 billion, with a midpoint of $8.97 billion. After deducting a range of estimated reorganization value for the New Warrants of approximately $67 million to $96 million with a midpoint of $82 million, Evercore estimates that the implied reorganization equity value will range from $7.90 billion to $9.87 billion, with a midpoint of $8.88 billion. The implied reorganization equity value assumes that the Effective Date has occurred and that the $2.55 billion Rights Offering and the $250 million Private Sale have been consummated. After taking into account the issuance of New Common Stock in connection with the $2.55 billion Rights Offering and the $250 million Private Sale, each at the Purchase Price, Evercore estimates the potential per share price based on the implied reorganization equity value will range (i) from $14.01 to $17.51, with a midpoint of $15.76. The Plan provides for the distribution of 563.9 million shares of New Common Stock pursuant to the Plan, the Private Sale, and the Rights Offering (prior to issuance of any shares related to the New Warrants). The reorganization value of those shares is subject to dilution as a result of the exercise of certain rights (including options and other rights to acquire shares, etc.) in connection with certain equity incentive plans.

The table below summarizes the TEV ranges for the Valued Entities, as well as the respective midpoints:

| | Total Reorganization Enterprise Value ($ in millions) | | |
|---|---|---|---|
| Valued Entities | Low | Midpoint | High |
| LyondellBasell | $13,500 | $14,500 | $15,500 |
| U.S. Businesses | 8,425 | 9,050 | 9,675 |
| Non-U.S. Businesses | 5,075 | 5,450 | 5,825 |
| | | | |
| Acetyls Business [1] | 279 | 299 | 319 |
| F&F Business [1][2] | 90 | 100 | 110 |

(1)  Represents Reorganization Enterprise Value plus cash on hand as of September 30, 2009, net of selected Claims
(2)  Does not include $1 million of book value attributable to Smith Corona

These estimated ranges of reorganization values are based on a hypothetical reorganization value that reflects the estimated intrinsic reorganization value of the Valued Entities derived through the application of various valuation methodologies described above. The summary set forth above does not purport to be a complete description of the analyses performed by Evercore. The preparation of an estimate involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances and therefore, such an estimate is not readily susceptible to summary description. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimate of implied reorganization equity value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. In addition, estimates of implied reorganization equity value do not purport to be appraisals, nor do they necessarily reflect the values that might be realized if assets were sold as a going concern, in liquidation, or otherwise. Depending on the results of New Topco's operations or changes in the financial markets, Evercore's valuation analysis as of the Effective Date may differ from that disclosed herein.

In addition, the valuation of newly issued securities, such as the New Common Stock, is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of the New Common Stock at issuance will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the anticipated initial securities holdings of holders of New Common Stock, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis, the listing of the New Common Stock on a major exchange and the timing of such potential listing and other factors that generally influence the prices of securities. Also, there can be no assurance that a trading market will develop for the new securities issued pursuant to the reorganization. Actual market prices of such securities also may be affected by other factors not possible to predict.

THE FOREGOING REORGANIZATION VALUATIONS ARE BASED UPON A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF LYONDELLBASELL, NEW TOPCO, OR THE OTHER VALUED ENTITIES. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE RANGES REFLECTED IN THE VALUATION WOULD BE REALIZED IF THE PLAN WERE TO BECOME EFFECTIVE, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

THE ESTIMATED CALCULATION OF REORGANIZATION TOTAL ENTERPRISE VALUE IS HIGHLY DEPENDENT UPON ACHIEVING THE FUTURE FINANCIAL RESULTS AS SET FORTH IN THE FINANCIAL PROJECTIONS, AS WELL AS THE REALIZATION OF CERTAIN OTHER ASSUMPTIONS, NONE OF WHICH ARE GUARANTEED AND MANY OF WHICH ARE OUTSIDE OF LYONDELLBASELL'S CONTROL, AS FURTHER DISCUSSED IN SECTION X "RISK FACTORS" OF THE DISCLOSURE STATEMENT.

THE CALCULATIONS OF VALUE SET FORTH HEREIN REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE EQUITY VALUE STATED HEREIN DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE. SUCH VALUE, IF ANY, MAY BE MATERIALLY DIFFERENT FROM THE REORGANIZATION EQUITY VALUE RANGES ASSOCIATED WITH THIS REORGANIZATION VALUATION ANALYSIS. NO RESPONSIBILITY IS TAKEN BY EVERCORE FOR CHANGES IN MARKET CONDITIONS AND NO OBLIGATIONS ARE ASSUMED TO REVISE THIS CALCULATION OF THE REORGANIZATION VALUE OF THE VALUED ENTITIES TO REFLECT EVENTS OR CONDITIONS THAT SUBSEQUENTLY OCCUR. THE CALCULATIONS OF VALUE DO NOT CONFORM TO THE UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE OF THE APPRAISAL FOUNDATION.

## X.     RISK FACTORS

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE DOCUMENTS DELIVERED TOGETHER WITH THIS DISCLOSURE STATEMENT, AND THE PLAN SUPPLEMENT.  THE RISK FACTORS SET FORTH BELOW SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION OR AN INVESTMENT IN THE SECURITIES OF THE REORGANIZED DEBTORS.**

### A.     Certain Bankruptcy Considerations

#### 1.     *Risk of Non-Confirmation of the Plan*

In order for the Reorganized Debtors to emerge successfully from the Chapter 11 Cases as viable entities, the Debtors, like any other chapter 11 debtors, must obtain approval of the Plan from their creditors and confirmation of the Plan through the Bankruptcy Court, and then successfully implement the Plan. The foregoing process requires the Debtors to (a) meet certain statutory requirements with respect to the adequacy of this Disclosure Statement; (b) solicit and obtain creditor acceptances of the Plan; and (c) fulfill other statutory conditions with respect to the confirmation of the Plan.

The Debtors may or may not receive the requisite acceptances to confirm the Plan. If the requisite acceptances of the Plan are received, the Debtors will seek confirmation of the Plan by the Bankruptcy Court. If the requisite acceptances are not received, the Debtors will nevertheless seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code as long as at least one Impaired Class has accepted the Plan (determined without including the acceptance of any "insider" in such Impaired Class).

Even if the requisite acceptances of the Plan are received, or the Debtors are able to seek a "cramdown" confirmation, the Bankruptcy Court may not confirm the Plan as proposed. A holder of a Claim in a Non-Accepting Class could challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code. Even if the Bankruptcy Court determined that the balloting procedures and results were appropriate, the Bankruptcy Court could decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met. Specifically, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that: (a) confirmation of the Reorganized Debtor's Plan is not likely to be followed by a liquidation or a need for further financial reorganization of the Reorganized Debtors; (b) the value of distributions to holders of Claims within an Impaired Class will not be less than the value such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code; and (c) in the event of a "cramdown" confirmation, the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to Non-Accepting Classes. The Bankruptcy Court may determine that the Plan does not satisfy one or more of these applicable requirements, in which case the Plan could not be confirmed by the Bankruptcy Court.

2. *Risk of Non-Occurrence of Effective Date*

Although the Debtors anticipate that the Effective Date will occur soon after the Confirmation Date, if any, there can be no assurance as to such timing. If each of the Conditions Precedent has not been satisfied or duly waived on or before 180 days after the Confirmation Date, the Confirmation Order will be vacated without further order of the Bankruptcy Court, in which event the Plan would be deemed null and void.

3. *Risk that Claims Will Be Higher Than Estimated*

The projected distributions and recoveries set forth in this Disclosure Statement and the Liquidation Analysis are based on the Debtors' initial estimate of Allowed Claims, without having undertaken a substantive review of all filed Claims. The Debtors and the Reorganized Debtors reserve the right to seek estimation of Disputed Claims pursuant to section 502(c) of the Bankruptcy Code. The actual amount at which such Disputed Claims are ultimately allowed may differ from the estimates. If insufficient Plan consideration is available for distribution at the time of allowance of a Disputed Claim, the distributions on account of such Allowed Claim will be limited to such available amounts and the holder of such Allowed Claim will have no recourse against the Debtors or the Reorganized Debtors for any deficiency that may arise. The Debtors project that the Claims and Equity Interests asserted against them will be resolved in and reduced to an amount that approximates their estimates. There can be no assurance, however, that the Debtors' estimates will prove accurate. If claims are ultimately allowed in amounts higher than estimated, for example, distributions and recoveries on account of claims may be lower than estimated.

4. *Liquidity Risks Prior to Consummation of the Plan*

a. The DIP Financing May Be Insufficient to Fund the Debtors' Business Operations

Although the Debtors project that they will have sufficient liquidity to operate their businesses through the Effective Date, there can be no assurance that the revenue generated by the Debtors' business operations together with amounts available under the DIP Financing will be sufficient to fund the Debtors' operations or the operations of the Debtors' non-U.S. subsidiaries, especially as the Debtors expect to incur substantial professional and other fees related to the Chapter 11 Cases. In the event that revenue flows and available borrowings under the DIP Financing are not sufficient to meet the Debtors' or the Debtors' non-U.S. subsidiaries' liquidity requirements, the Debtors or the Debtors' non-U.S. subsidiaries may be required to seek additional financing. There can be no assurance that such additional financing would be available or, if available, offered on terms that are favorable to the Debtors or terms that would be approved by the Bankruptcy Court. If, for one or more reasons, the Debtors are unable to obtain such additional financing, the Debtors' businesses and assets may be subject to liquidation under chapter 7 of the Bankruptcy Code and the Debtors may cease to continue as going concerns.

b. The Debtors May Not Be Able to Comply with the Terms of the DIP Financing

The ability of the Debtors to continue as going concerns may depend upon their ability to comply with the covenants, terms and conditions set forth in the DIP Financing. The DIP Financing requires the Debtors, among other things, to (i) generate sufficient earnings before interest, taxes, depreciation and amortization and restructuring costs ("**EBITDAR**") and cash flows from operations to comply with a monthly minimum consolidated EBITDAR requirement; (ii) obtain the Bankruptcy Court's approval of a plan of reorganization by January 20, 2010 and to emerge from the Chapter 11 Cases by February 3, 2010[63] (with both such dates subject to extension by the Bankruptcy Court if the failure to meet either deadline is caused by the Bankruptcy Court's unavailability); and (iii) satisfy certain other covenants (including, without limitation, financial reporting covenants and financial

---

[63] On November 30, 2009, the Debtors posted an amendment to the DIP Term Loan Facility that would extend the maturity date to April 3, 2010, with an option to extend the maturity date for an additional two-month period at the Debtors' sole election, and approval of a plan of reorganization by May 20, 2010. Votes in favor of or against the amendment are due by December 10, 2009.

covenants with respect to minimum liquidity and limitations on capital expenditures and limitations on indebtedness, liens and investments). There can be no assurance that the Debtors will be able to comply with these covenants and meet their obligations as they become due or to comply with the other terms and conditions of the DIP Financing. Should business activity levels be below expectations and planned fixed cost reductions not be achieved or should margin volatility require more liquidity than the amount to which the Debtors have access through the DIP financing or should any non-Debtor legal entity be subjected to an involuntary bankruptcy proceeding, the Debtors could default on their DIP financing obligations.

In the event that the Debtors fail to comply with any of the terms or conditions of the DIP Financing, the outstanding principal balance under the DIP Financing (including accrued interest thereon) may become due and payable. Upon such occurrence, the Debtors will need to obtain additional financing to repay the amount due with respect to the DIP Financing. If the Debtors are unable for any reason to obtain such additional financing, the Debtors' businesses and assets may be subject to liquidation under chapter 7 of the Bankruptcy Code and the Debtors may cease to continue as going concerns.

c.      Reduction in Availability of Trade Credit

The public disclosure of the Debtors' liquidity constraints and the Chapter 11 Cases has impaired the Debtors ability to maintain normal credit terms with certain of its suppliers. As a result, the Debtors have been required to pay cash in advance to certain vendors and have experienced restrictions on the availability of trade credit, which has further reduced the Debtors' liquidity. If liquidity deteriorates further, the Debtors' suppliers could refuse to provide key products and services.

5.      *Risk that the Debtors May Not Obtain or Maintain Exit Financing*

The Debtors' business operations are dependent on the availability and cost of financing for use as working capital and may be adversely affected by any shortage or increased cost of such financing. The Debtors anticipate entering into the Exit Financing, the terms of which will provide the Debtors with financing, secured by liens on substantially all of the Debtors' assets. The Debtors anticipate that the Exit Financing will be used to (i) fund repayment of certain amounts outstanding under the DIP Financing; (ii) meet certain of the Debtors' obligations under the Plan; and (iii) provide short-term working capital needs.

The Debtors believe that a significant portion of the funds necessary to meet their obligations under the Plan will be met by financing under the Exit Financing. However, the Exit Financing may contain conditions and covenants that the Debtors may not be able to satisfy. If the Debtors are unable to satisfy the conditions and covenants of the Exit Financing, the Debtors will need to obtain additional financing in order to consummate the Plan. No assurance can be given, however, that any additional replacement financing will be available on terms that are favorable or acceptable to the Debtors. If the Debtors are unable for any reason to obtain such additional financing, the Debtors' businesses and assets may be subject to liquidation under chapter 7 of the Bankruptcy Code and the Debtors may cease to continue as going concerns.

6.      *The Debtors' Management Team May Allocate Less Time to the Operation of the Debtors' Business Operations*

Compliance with the terms of the DIP Financing, including those related to financial reporting, may require a significant amount of time and attention from members of the Debtors' management team. Further, so long as the Chapter 11 Cases continue, the Debtors' management team will be required to spend a significant amount of their time attending to the Debtors' restructuring instead of focusing exclusively on the Debtors' business operations.

*New Topco, U.S. Debtors and Holders of Allowed Claims May Suffer Adverse U.S. Federal Income Tax Consequences as a Result of the Implementation of the Plan*

Pursuant to the implementation of the Plan, New Topco will become the parent company of the Reorganized Debtors and the Non-Debtor Obligors.  The IRS could seek to apply section 7874 of the Tax Code to treat New Topco as a U.S. corporation if, after completion of the Plan, the creditors of LBFC and its direct and indirect subsidiaries hold at least 80% of the New Common Stock (by vote or value) by reason of holding Claims against those entities (as further discussed in Article XII below, the "80% test").  Application of the 80% test could result in a significant U.S. federal income tax liability to New Topco and the U.S. Debtors.  Alternatively, the IRS could seek to impose U.S. tax on the U.S. Debtors' "inversion gain" if, after completion of the Plan, the shareholders and creditors of LBFC and LCC own at least 60%, but less than 80%, of the New Common Stock (by vote or value) by reason of holding such Claims (as defined in Article XII below, the "60% test").  Inversion gain generally includes gain from the transfer of stock or properties and certain licensing income; tax on inversion gain generally cannot be offset by net operating losses, foreign tax credits or other tax attributes.

The Debtors believe that New Common Stock (other than Class B Shares issued for Cash) attributable to the value of non-U.S. Obligor Debtors and Obligor Non-Debtors (as defined in Article XII below, the "Foreign Parties") should not be treated as received by reason of holding stock of a U.S. Debtor.  The Debtors anticipate that, pursuant to the Plan and the Enforcement Action, holders of Allowed Claims will receive New Common Stock (other than Class B Shares issued for Cash) with a value greater than 40% of the aggregate value of New Topco by reason of Allowed Claims against the Foreign Parties, and, accordingly, former LyondellBasell shareholders and holders of Allowed Claims should be treated as receiving less than 60% of New Topco by reason of holding stock of a U.S. Debtor.  If, notwithstanding the foregoing, section 7874 applied to the transaction contemplated by the Plan, the Debtors believe that it is more likely that the 60% test, rather than the 80% test, would apply, and that the consequences of the 60% test's application generally should be manageable, as any inversion gain required to be recognized generally should not result in a material tax liability.  The Debtors also believe that strong arguments can be made that New Topco and its affiliates generally should be treated as having substantial business activities in The Netherlands, which could potentially provide an independent basis for precluding section 7874's application.  No assurance can be given, however, that the IRS would not take a contrary position regarding section 7874's application or that such position, if asserted, would not be sustained.  Accordingly, holders of Allowed Claims should contact their own tax advisors regarding section 7874's potential application to the transaction contemplated by the Plan.

For a discussion of these and other U.S. federal income tax consequences of the implementation of the Plan to the Debtors and holders of Allowed Claims, see Article XII.

**B.      Risks Related to the Reorganized Debtors' Significant Indebtedness**

1.      *Continuing Leverage and Ability to Service Debt*

Although the consummation of the Plan will significantly reduce Reorganized LyondellBasell's debt service obligations, Reorganized LyondellBasell will remain leveraged.  The Debtors believe that, following consummation of the Plan, Reorganized LyondellBasell will be able to meet its anticipated future operating expenses, capital expenditures and debt service obligations.  However, Reorganized LyondellBasell's ability to meet the Reorganized Debtors' debt service obligations will depend on a number of factors, including future operating performance and ability to achieve the business plan.  These factors will be affected by general economic, financial, competitive, regulatory, business and other factors beyond Reorganized LyondellBasell's control.

The Financial Projections reflect the most recent data collected in connection with Reorganized LyondellBasell' proposed business plan.  The business plan relies upon the success of the Debtors' business strategy and assumes increases in revenues and profitability over the course of the business plan.  However, there can be no assurance that such strategy will be successful or, even if successful, that it will have the effects upon sales and earnings that are reflected in and anticipated by the Financial Projections.  Although the Debtors believe that the Financial Projections are achievable if all assumptions are met, and that those assumptions are reasonable, there can be no assurance that the results set forth in such Financial Projections will be obtained.

2.     *Restrictive Financial and Operating Covenants under the Exit Facility*

Details about exit financing, and associated risks, will be included in the Plan Supplement.

**C.     Risks Relating to New Common Stock and New Third Lien Notes**

1.     *Lack of Trading Market for New Common Stock and New Third Lien Notes*

There is no existing trading market for the New Third Lien Notes or the New Common Stock, nor is it known with any certainty whether or when one would develop.  Although the Debtors anticipate that the New Common Stock will be listed or quoted on a major U.S. securities exchange, there can be no assurance that such shares will be accepted for listing by the relevant governing body.  The Debtors do not anticipate that New Third Lien Notes will be listed or quoted on any securities exchange.

The lack of liquidity for the New Common Stock and New Third Lien Notes may make it more difficult for Reorganized LyondellBasell to raise additional capital, if necessary, and it may affect the price volatility of the New Common Stock and New Third Lien Notes.

2.     *Dividend Policies of Reorganized Debtor*

Reorganized LyondellBasell does not anticipate paying any dividends with respect to the New Common Stock in the foreseeable future.  In addition, the Exit Restrictive Covenants may limit the ability of the Reorganized Debtor to pay dividends.

3.     *Significant Holders of New Common Stock*

Upon consummation of the Plan, certain holders of Claims may receive distributions of the New Common Stock representing a substantial percentage of the outstanding shares of the New Common Stock.  If certain holders of Claims obtain a sufficiently sizeable position of New Common Stock, such holders could be in a position to influence the outcome of actions requiring shareholder approval, including, among other things, the election of New Topco Supervisory Board members.  This concentration of ownership could also facilitate or hinder a negotiated change of control of Reorganized LyondellBasell and, consequently, impact the value of the New Common Stock.  Furthermore, the possibility that one or more holders of a significant number of shares of New Common Stock may sell all or a large portion of its shares of New Common Stock in a short period of time may adversely affect the trading prices of the New Common Stock.

**D.     Business Risks**

1.     *Inherent Uncertainty of Financial Projections*

Although the Financial Projections suggest that Reorganized LyondellBasell will be able to meet all of their financial obligations following consummation of the Plan, the Financial Projections are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Because the actual results achieved throughout the periods covered by the Financial Projections may vary from the projected results, the Financial Projections should not be relied upon as a guaranty, representation, or other assurance of the actual results that will occur.

Moreover, the Financial Projections are dependent on certain assumptions that are an integral part of the Financial Projections, regarding (among other things): (i) confirmation and consummation of the Plan in accordance with its terms; (ii) industry performance; (iii) general business and economic conditions; (iv) competition; (v) the adequacy of the Exit Financing; (vi) the availability of new financing; (vii) the ability of Reorganized LyondellBasell to obtain and maintain certain terms with vendors; (viii) service providers and customers; (ix) the continued supply and replenishment of inventory at assumed prices; (x) the ability of Reorganized LyondellBasell to attract, motivate and retain key employees and; (xi) other matters, many of which are beyond the control of Reorganized LyondellBasell, and some or all of which may not materialize.  In addition,

unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement may affect the actual financial results of Reorganized LyondellBasell's operations.

If the actual financial results of Reorganized LyondellBasell's operations differ from the Financial Projections, the trading prices of the New Common Stock and New Third Lien Notes may be negatively affected and Reorganized LyondellBasell may lack sufficient liquidity to continue as going concerns as planned after the Effective Date. These factors may adversely affect the value of the New Common Stock and New Third Lien Notes and the ability of Reorganized LyondellBasell to pay the holders of certain Claims the amount that such holders are entitled to be paid under the Plan.

2. *General Economic Conditions*

The Debtors' business operations have historically been, and Reorganized LyondellBasell's business operations may in the future be, materially affected by adverse conditions in the financial markets and depressed economic conditions generally, both in the United States and elsewhere around the world. The current economic downturn in the businesses and geographic areas in which the Debtors sells their products has substantially reduced demand for these products and resulted in decreased sales volumes. Recently, concerns over inflation, energy costs, geopolitical issues, the availability and cost of credit and the instability of financial and credit markets in the United States and worldwide have contributed to increased volatility and diminished expectations for the global economy and markets. These factors, combined with volatile raw material prices, declining business and consumer confidence, increased unemployment and continuing financial market fluctuations, have precipitated a worldwide economic recession that could continue for an extended period of time. The global recession has adversely affected the Debtors' business operations because of a reduction in worldwide demand for their products, in particular from their customers in industrial markets generally and specifically in the automotive, and housing.

Moreover, many of Reorganized LyondellBasell's customers and suppliers rely on access to credit to adequately fund their own operations. Disruptions in financial markets and economic slowdown may adversely impact the ability of Reorganized LyondellBasell's customers to finance the purchase of their products as well as the creditworthiness of those customers. These same factors may also impact the ability and willingness of suppliers to provide Reorganized LyondellBasell with raw materials for its businesses.

3. *Increased Competition*

The Debtors sell their products in highly competitive global markets. Due to the commodity nature of many of the Debtors' products, competition in these markets is based primarily on price and to a lesser extent on product performance, product quality, product deliverability, reliability of supply and customer service. As a result, LyondellBasell generally is not able to protect its market position for these products by product differentiation and may not be able to pass on cost increases to its customers.

Reorganized LyondellBasell may face increased competition from companies that may have greater financial resources and different cost structures or strategic goals than Reorganized LyondellBasell, such as large integrated oil companies (many of which also have chemical businesses), government-owned businesses, and companies that receive subsidies or other government incentives to produce certain products in a specified geographic region. Increased competition from these companies, especially in the Reorganized LyondellBasell's ethylene and refining businesses, could limit their ability to increase product sales prices in response to raw material and other cost increases, or could cause Reorganized LyondellBasell to reduce product sales prices to compete effectively, which could reduce Reorganized LyondellBasell's profitability. Competitors that have greater financial resources than Reorganized LyondellBasell may be able to invest significant capital into their businesses, including expenditures for research and development. In addition, specialty products that Reorganized LyondellBasell produces may become commoditized over time.

Accordingly, increases in raw material and other costs may not necessarily correlate with changes in prices for Reorganized LyondellBasell's products, either in the direction of the price change or in magnitude. In addition, Reorganized LyondellBasell's ability to increase product sales prices, and the timing of those increases, may be affected by the supply-demand balances for Reorganized LyondellBasell's products, as well as the capacity

utilization rates for those products. Timing differences in pricing between rising raw material costs, which may change daily, and contract product prices, which in many cases are negotiated only monthly or less often, sometimes with an additional lag in effective dates for increases may reduce the profitability of Reorganized LyondellBasell. Even in periods during which raw material prices decline, Reorganized LyondellBasell may suffer decreasing profits if raw material price reductions occur at a slower rate than decreases in the selling prices of its products.

Further, volatility in costs and pricing can result in commercial disputes with customers and suppliers with respect to interpretations of complex contractual arrangements. Significant adverse resolution of any such disputes also could reduce profitability of Reorganized LyondellBasell.

4.    *The Chapter 11 Cases May Affect Reorganized LyondellBasell's Relationship with Key Employees, Suppliers and Customers*

The Chapter 11 Cases could significantly harm relationships LyondellBasell has with key customers, joint venture partners, suppliers and employees, which in turn could materially and adversely affect their businesses and financial condition and make it less likely that Reorganized LyondellBasell will emerge from the Chapter 11 Cases as a sustainable and viable business.

Reorganized LyondellBasell's financial success will largely depend on the skills, experience and efforts of its key employees and management team together with the Debtors' professional advisors. LyondellBasell's ability to attract, motivate and retain key employees and managers is restricted by provisions in the Bankruptcy Code, which may limit the ability to implement a retention program or take other measures intended to motivate key employees and managers to remain with LyondellBasell until the Debtors' emergence from the Chapter 11 Cases.

5.    *The Cyclicality and Volatility of the Industries in Which Reorganized LyondellBasell Will Participate May Cause Significant Fluctuations in Their Operating Results*

The Debtors' business operations are subject to the cyclical and volatile nature of the supply-demand balance in the chemical and refining industries and Reorganized LyondellBasell's future operating results are expected to continue to be affected by this cyclicality and volatility. The Debtors' industries historically have experienced alternating periods of capacity shortages leading to tight supply conditions, causing prices and profit margins to increase, followed by periods when substantial capacity is added, resulting in oversupply, declining capacity utilization rates and declining prices and profit margins. The volatility of the Debtors' industries experience occurs as a result of changes in the supply and demand for products, changes in energy prices and changes in various other economic conditions around the world. The cyclicality and volatility of the chemical and refining industries may result in significant fluctuations in Reorganized LyondellBasell's profits and cash flow from period to period and over the business cycles.

The global economic and political environment continues to be uncertain, and a decline in demand could place further pressure on Reorganized LyondellBasell's operating results. In addition, new capacity additions by some participants in the industry, especially those in Asia, including the Middle East, that began in 2006 and are expected to continue, are expected to lead to another period of oversupply and low profitability. The timing and extent of any changes to currently prevailing market conditions is uncertain and supply and demand may be unbalanced at any time. As a consequence, the Debtors are unable to accurately predict the extent or duration of future industry cycles or their effect on Reorganized LyondellBasell's business, financial condition or performance, and can give no assurances as to any predictions made herein with respect to the timing, extent or duration of future industry cycles.

As a result of such industry cycles, Reorganized LyondellBasell may be required to reduce production at or idle certain facilities for an extended period of time or exit a business because of an oversupply of a particular product or a lack of demand for that particular product, or high raw material prices, which makes production uneconomical. Reorganized LyondellBasell may also reduce production at its facilities because Reorganized LyondellBasell have either fixed or minimum off-take arrangements with joint ventures or third parties with respect to other facilities. Any decision to permanently close facilities or exit a business would result in

impairment and other charges to earnings. Temporary outages sometimes last for several calendar quarters or, in certain cases, longer, and could cause Reorganized LyondellBasell to incur costs, including the expenses of maintaining and restarting these facilities. In addition, even though Reorganized LyondellBasell may need to reduce production, Reorganized LyondellBasell may still be required to continue to purchase or pay for utilities or raw materials under take-or-pay supply agreements. It is possible that factors such as increases in raw material costs or lower demand in the future will cause Reorganized LyondellBasell to reduce operating rates, idle facilities or exit uncompetitive businesses.

6. <em>Costs and Limitations on Supply of Raw Materials and Energy May Result in Increased Operating Expenses</em>

The cost of raw materials and energy will represent a substantial portion of Reorganized LyondellBasell's operating expenses. The costs of raw materials and energy generally follow price trends of, and vary with the market conditions for, crude oil and natural gas, which may be highly volatile and cyclical. In the past, many raw material and energy costs have experienced significant fluctuations, that may adversely affect Reorganized LyondellBasell's business segments.

Due to customer consolidation, among other things, Reorganized LyondellBasell may be unable to pass raw material and energy cost increases on to customers quickly enough to avoid adverse impacts on Reorganized LyondellBasell's operating results. Reorganized LyondellBasell's operating results may be significantly affected by increases and volatility in these costs. Cost increases also may increase working capital needs, which could reduce Reorganized LyondellBasell's liquidity and cash flow. In addition, when raw material and energy costs increase rapidly and are passed along to customers as product price increases, the credit risks associated with certain customers can be compounded. To the extent that Reorganized LyondellBasell increases its product sales prices to reflect rising raw material and energy costs, demand for products may decrease as customers reduce their consumption or use substitute products, which may have an adverse impact on Reorganized LyondellBasell's operating results.

In addition, higher North American and European natural gas prices relative to natural gas cost-advantaged regions, such as the Middle East, could diminish the ability of many chemical producers to compete internationally since the price for natural gas and natural gas liquid affects a significant portion of the industry's raw materials and energy sources. This environment may cause a reduction in Reorganized LyondellBasell's exports from North America and Europe, and has in the past reduced, and may in the future reduce, the competitiveness of U.S. and European producers. This Middle East production may increase the competition for product sales within North America and Europe, as with respect to product which could otherwise be sold in other geographic regions if not for such regions' natural gas cost advantage. This may result in lower margins in North America and Europe in the future.

Furthermore, across the Debtors' business, there are a limited number of suppliers for some of the Debtors' raw materials and utilities and, in some cases, the number of sources for and availability of raw materials and utilities is specific to the particular geographic region in which a facility is located. It is also common in the chemical and refining industries for a facility to have a sole, dedicated source for its utilities, such as steam, electricity and gas. Having a sole or limited number of suppliers may result in Reorganized LyondellBasell having limited negotiating power, particularly in the case of rising raw material costs. Alternatively, where Reorganized LyondellBasell has multiple suppliers for a raw material or utility, these suppliers may not make up for the loss of a major supplier. Any new supply agreements Reorganized LyondellBasell enters into may not have terms as favorable as those contained in its current supply agreements. For some of Reorganized LyondellBasell's products, the facilities or distribution channels of raw material suppliers and utilities suppliers and Reorganized LyondellBasell form an integrated system. This is especially true in the United States Gulf Coast where the infrastructure of the chemical and refining industries is tightly integrated such that a major disruption of supply of a given commodity or utility can negatively affect numerous participants, including suppliers of other raw materials.

If one or more of Reorganized LyondellBasell's significant raw material or utility suppliers were unable to meet its obligations under present supply arrangements, raw materials become unavailable within the geographic area from which they are now sourced, or supplies are otherwise disrupted, Reorganized L:yondellBasell's businesses could suffer reduced supplies or be forced to incur increased costs for their raw

materials or utilities, which would have a direct negative impact on plant operations.  For example, hurricanes have in the past negatively affected crude oil and natural gas supplies, as well as supplies of some of its other raw materials, contributing to increases in raw material prices and, in some cases, disrupting production.  In addition, hurricane-related disruption of rail and pipeline traffic in the United States Gulf Coast area will negatively affect shipments of raw materials and product.

In addition, with increased volatility in raw material costs, Reorganized LyondellBasell's suppliers could impose more onerous terms on Reorganized LyondellBasell, resulting in shorter payment cycles and increasing its working capital requirements.

7. *External Factors Beyond Reorganized LyondellBasell's Control May Cause Fluctuations in Demand for Their Products and in Reorganized LyondellBasell's Prices and Profit Margins*

External factors beyond Reorganized LyondellBasell's control may cause volatility in the price of raw materials and other operating costs, as well as significant fluctuations in demand for Reorganized LyondellBasell's products, and can magnify the impact of economic cycles on Reorganized LyondellBasell's businesses.  Examples of external factors include:

supply of and demand for crude oil and other raw materials;

changes in customer buying patterns and demand for Reorganized LyondellBasell's products;

general economic conditions;

domestic and international events and circumstances;

competitor actions;

governmental regulation; and

severe weather and natural disasters.

Also, the Debtors believe that global events have had an impact on its businesses in recent years and may continue to do so with respect to the business of Reorganized LyondellBasell.  The Debtors currently license their technology to customers in the Middle East and have three joint ventures in Saudi Arabia.  The Debtors also have offices in Egypt, Dubai and Turkey and third-party commercial representatives throughout the Middle East.  The uncertainty surrounding the continuing military action in the region and the threat of further armed hostilities or acts of terrorism may impact Reorganized LyondellBasell's businesses in the Middle East or elsewhere, or the businesses of its customers.

In addition, a number of the Debtors' products are highly dependent on durable goods markets, such as the construction and automotive markets, which also are cyclical and impacted by many of the external factors referenced above.  Many of the Debtors' products are components of other chemical products that, in turn, are subject to the supply-demand balance of both the chemical and refining industries and general economic conditions.  The recent volatility and relatively elevated level of prices for crude oil and natural gas resulted in increased raw material costs as compared to prior years.  The impact of the factors cited above and others may once again contribute to a slowdown in the business cycle or impact economic recovery, reducing demand and lowering operating rates and, ultimately, reducing the profitability of Reorganized LyondellBasell.

8. *Interruptions of Operations at the Reorganized LyondellBasell's Facilities May Result in Liabilities or Lower Operating Results*

Reorganized LyondellBasell's operating results will be dependent on the continued operation of various production facilities and the ability to complete construction and maintenance projects on schedule.  Material operating interruptions at Reorganized LyondellBasell's facilities, including interruptions caused by the events described below, may materially reduce the productivity and profitability of a particular manufacturing facility, or Reorganized LyondellBasell as a whole, during and after the period of such operational difficulties.  In

the past, LyondellBasell had to shut down plants on the U.S. Gulf Coast, including the temporary shut down of the Houston refinery, as a result of hurricanes striking the upper Texas coast.

In addition, because the Houston Refinery is LyondellBasell's only North American refining operation, an outage at the refinery could have a particularly negative impact on LyondellBasell's operating results. Unlike LyondellBasell's chemical and polymer production facilities, which may at times have sufficient excess capacity to mitigate the negative impact of lost production at another similar facility, LyondellBasell does not have the ability to increase refining production elsewhere in North America in an effort to mitigate the negative impact on operating results resulting from an outage at the Houston refinery.

Approximately 1,000 of LyondellBasell's employees located in North America are represented by labor unions. Of these union employees, approximately 50% are covered by a collective bargaining agreement between Houston Refining and the United Steelworkers Union, which expired in January 2009. Houston Refining believes it successfully negotiated an extension of the contract through January 30, 2012, but the union has refused to sign the agreement despite ratification by 87% of its membership. Houston Refining filed an unfair labor practice charge with the National Labor Relations Board seeking to compel union signature. The NLRB dismissed the charge, ruling that the union and Houston Refining did not achieve "a meeting of the minds." The company appealed the NLRB ruling, however, the NLRB General Counsel affirmed the Regional Director's dismissal. This ruling is not appealable. Currently, union workers continue to work at Houston Refining and to be compensated in accordance with the terms of the 2006-2009 collective bargaining agreement.

9.    *Certain Hazards of Chemical Manufacturing*

Although Reorganized LyondellBasell takes precautions to enhance the safety of its operations and minimize the risk of disruptions, Reorganized LyondellBasell's operations, along with the operations of other members of the chemical and refining industries, will be subject to hazards inherent in chemical manufacturing and refining and the related storage and transportation of raw materials, products and wastes.

Some of these hazards may cause personal injury and loss of life, severe damage to or destruction of property and equipment and environmental damage, and may result in suspension of operations, the shutdown of affected facilities and the imposition of civil or criminal penalties. Furthermore, Reorganized LyondellBasell may be subject to present and future claims with respect to workplace exposure, exposure of contractors on its premises as well as other persons located nearby, workers' compensation and other matters.

Reorganized LyondellBasell may not be fully insured against all potential hazards incident to its businesses, including losses resulting from natural disasters, war risks or terrorist acts. Changes in insurance market conditions have caused, and may in the future cause, premiums and deductibles for certain Insurance Policies to increase substantially and, in some instances, for certain insurance to become unavailable or available only for reduced amounts of coverage. If Reorganized LyondellBasell were to incur a significant liability for which Reorganized LyondellBasell was not fully insured, Reorganized LyondellBasell might not be able to finance the amount of the uninsured liability on terms acceptable to it or at all, and might be obligated to divert a significant portion of Reorganized LyondellBasell's cash flow from normal business operations.

Further, because a part of Reorganized LyondellBasell's business will involve licensing polyolefins process technology, Reorganized LyondellBasell's licensees are exposed to similar risks involved in the manufacture and marketing of polyolefins. Hazardous incidents involving Reorganized Debtors' licensees, if they do result or are perceived to result from use of the Debtors' technologies, may harm Reorganized LyondellBasell's reputation, threaten its relationships with other licensees or lead to customer attrition and financial losses. LyondellBasell's policy of covering these risks through contractual limitations of liability and indemnities and through insurance may not always be effective. As a result, Reorganized LyondellBasell's financial condition and results of operation would be adversely affected, and other companies with competing technologies may have the opportunity to secure a competitive advantage.

10.     *The Debtors' Crude Oil Contract with PDVSA-Petròleos S.A. is Subject to the Risk of Enforcing Contracts Against Non-U.S. Affiliates of a Sovereign Nation and Political, Force Majeure and Other Risks*

The Debtors' crude oil contract with PDVSA Oil provides for the purchase and supply of 230,000 barrels per day of heavy, high sulfur crude oil (approximately 86% of the refining capacity at the Houston Refinery). There are risks associated with reliance on PDVSA Oil for supplies of crude oil and with enforcing the provisions of contracts with companies such as PDVSA Oil that are non-U.S. affiliates of a sovereign nation. For example, from time to time in the past, and in 2009, PDVSA Oil has declared itself in a force majeure situation and subsequently reduced deliveries of crude oil purportedly based on announced OPEC production cuts. All of the crude oil supplied by PDVSA Oil under the crude oil contract is produced in Venezuela, and it is impossible to predict how governmental policies may change under the current or any subsequent Venezuelan government. In addition, there are risks associated with enforcing judgments of United States courts against entities whose assets are located outside of the United States and whose management does not reside in the United States. Any modification, breach or termination of the crude oil contract, or any interruption in this source of crude oil on its current terms, may adversely affect Reorganized LyondellBasell, as alternative crude oil supplies with similar profit margins may not always be available for purchase and may require modifications to the Houston refinery that may result in significant costs or down time.

11.     *The Debtors' Emergence from these Chapter 11 Cases May Trigger Consent Rights or Termination Rights in Certain Material Contracts*

The Debtors and their Non-Debtor Affiliates are parties to certain material contracts that contain various consent rights or potential termination rights which may or may not be triggered in connection with the Debtors' emergence from these Chapter 11 Cases. In the event that such rights are triggered, the Debtors or their Non-Debtor Affiliates may not be able to obtain the relevant consents or waivers on commercially reasonable terms, or at all. Accordingly, the counterparties to such contracts could have a right to terminate such contracts, and such termination could have a material adverse effect on the Debtors' or their Non-Debtor Affiliates' financial performance or affect their ability to carry out their business plan.

12.     *The Reorganized Debtors' Operations and Assets are Subject to Extensive Environmental, Health and Safety and Other Laws and Regulations*

a.     Claims Related to Chemical Exposure

Reorganized LyondellBasell may face liability for alleged personal injury or property damage due to exposure to chemicals or other hazardous substances at certain facilities or chemicals that Reorganized LyondellBasell will manufacture, handle or own. In addition, because Reorganized LyondellBasell's products are components of a variety of other end-use products, Reorganized LyondellBasell, along with other members of the chemical industry, are inherently subject to potential claims related to those end-use products. The success of these types of claims could result in the expenditure of a significant amount of cash by Reorganized LyondellBasell to pay claims, and could reduce Reorganized LyondellBasell's operating results.

b.     Regulatory Overview

Reorganized LyondellBasell (together with the industries in which Reorganized LyondellBasell operates) will be subject to extensive national, regional, state and local environmental laws, regulations, directives, rules and ordinances concerning, and are required to have permits and licenses regulating emissions to the air, discharges onto land or surface waters or into groundwater and the generation, handling, storage, transportation, treatment, disposal and remediation of hazardous substances and waste materials. Many of these laws and regulations provide for substantial fines and potential criminal sanctions for violations, and permits and licenses are subject to renewal, modification and in some circumstances, revocation. Some of these laws and regulations are subject to varying and conflicting interpretations. In addition, some of these laws and regulations may require Reorganized LyondellBasell to meet specific financial responsibility requirements. Reorganized LyondellBasell generally expect that regulatory controls worldwide will become increasingly more demanding, but cannot accurately predict future developments, such as increasingly strict environmental laws, and inspection and

enforcement policies, as well as higher compliance costs, which might affect the handling, manufacture, use, emission or disposal of products, other materials or hazardous and non-hazardous waste. Stricter environmental, safety and health laws, regulations and enforcement policies could result in increased costs and liabilities to Reorganized LyondellBasell or limitations on its operations, and could subject Reorganized LyondellBasell's handling, manufacture, use, reuse or disposal of substances or pollutants to more rigorous scrutiny than at present.

c.      IPPC

Under the European Union ("**EU**") Integrated Pollution Prevention and Control Directive ("**IPPC**"), EU Member State governments are to adopt rules and implement an environmental permitting program relating to air, water and waste for individual facilities. While the EU countries are at varying stages in their respective implementation of the IPPC permit program, LyondellBasell has submitted all necessary IPPC permit applications required to date, and in some cases received completed permits from the applicable government agency. However, LyondellBasell does not know with certainty what future IPPC permits will require, or the costs of compliance with the IPPC permit program. The EU also has passed legislation governing the registration, evaluation and authorization of chemicals (Regulation on Registration, Evaluation, Authorization and Restriction of Chemicals, or "**REACH**"). Under REACH, the Debtors are required to register chemicals and gain authorization for the use of certain substances. As an importer of chemicals and materials from outside the EU, the Debtors are subject to additional registration obligations. Furthermore, within the framework of EU emissions trading, the Debtors were allocated certain allowances of carbon dioxide per year for the affected plants of its European sites for the 2005 to 2007 period. For the second trading period (2008 to 2012), a number of the Debtors' chemical plants are included in the Europe-wide trading system. The Debtors expect to incur additional costs as a result of the existing emissions trading scheme and Reorganized LyondellBasell could incur additional costs in relation to any future carbon or other greenhouse gas emission trading schemes. The costs could be higher to the extent that Reorganized LyondellBasell sells credits that it needs in the future.

d.      Environmental Cleanup

Environmental laws may have a significant effect on the nature and scope of cleanup of contamination at current and former operating facilities and at other sites at which hazardous substances generated by the Debtors' current or former subsidiaries were disposed, the costs of transportation and storage of raw materials and finished products and the costs of the storage and disposal of wastewater. In the U.S., the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986 ("**CERCLA**") may impose joint and several liability for the costs of remedial investigations and cleanup actions, as well as damages to natural resources, on the entities that generated hazardous substances, arranged for disposal of the hazardous substances, transported to or selected the disposal sites and the past and present owners and operators of such sites. All such responsible parties (or any one of them, including the Debtors) may be required to bear all of such costs regardless of fault, the legality of the original disposal or ownership of the disposal site. Under the EU Environmental Liability Directive, EU Member States may require the remediation of soil and groundwater contamination in certain circumstances, under the "polluter pays principle." The scope of events and circumstances that could trigger remediation requirements and the level of remediation required vary from Member State to Member State. Similar environmental laws and regulations that have been or may be enacted in other countries outside of the U.S. may impose similar liabilities and costs upon the Reorganized Debtors.

The Debtors also have liabilities under the U.S. Resource Conservation and Recovery Act ("**RCRA**") and various U.S. state and non-U.S. government regulations related to several current and former plant sites. Some of the Debtors' manufacturing sites have an extended history of industrial chemical manufacturing and use, including on-site waste disposal. The Debtors are aware of soil, groundwater and surface water contamination at some of its sites, and the Debtors may find contamination at other sites in the future. It is anticipated that corrective measures will be necessary to comply with national and state requirements with respect to some of these facilities. The Debtors are also responsible under applicable environmental laws for a portion of the remediation of certain off-site waste disposal facilities. Prior to the Commencement Date, the Debtors contributed funds to the cleanup of several waste sites throughout the U.S. under CERCLA, including the Kalamazoo River Superfund Site discussed below. The Debtors also have been named as a potentially responsible party under CERCLA or similar law at several other sites. The Debtors' policy is to accrue remediation expenses when it is probable that such

efforts will be required and the related expenses can be reasonably estimated. Estimated costs for future environmental compliance and remediation are necessarily imprecise due to such factors as the continuing evolution of environmental laws and regulatory requirements, the availability and application of technology, the identification of presently unknown remediation sites, uncertainties relating to the choice and cost of remedial actions at various sites and the allocation of costs among the potentially responsible parties under applicable statutes.

Moreover, the Debtors are in the process of closing or shutting down more operating facilities, which may lead to increased remediation costs. In addition, the Debtors take the general position that claims and obligations owed to both governmental and private parties at sites not owned or leased by Debtors as of the date of the petitions arose or are deemed to have arisen prior to the Commencement Date and are general unsecured prepetition claims that will be discharged and satisfied through the Plan. The Debtors have ceased participation in remediation activities at third party sites. In contrast, the Debtors' general position is that they will continue to comply with certain ongoing environmental obligations at sites that are owned or leased by Debtors as of the date of the petitions. Whether, and the extent to which, those positions are supported or contested by adverse parties or upheld or rejected by the Bankruptcy Court in the Chapter 11 Cases adds further uncertainty to the Debtors' assessment of their environmental liabilities.

e.      Kalamazoo River Superfund Site

A Millennium subsidiary has been identified as a PRP under CERCLA or similar law with respect to the Kalamazoo River Superfund Site in Michigan. The site involves cleanup of river sediments and floodplain soils contaminated with polychlorinated biphenyls, cleanup of former paper mill operations, and cleanup and closure of landfills associated with the former paper mill operations. Litigation concerning the matter commenced by the State of Michigan in December 1987 was recently dismissed, although the State reserved its right to bring certain claims in the future if the issues are not resolved in the CERCLA process. In 2000, the Kalamazoo River Study Group (the "**KRSG**"), of which the Millennium subsidiary and other PRPs are members, submitted to the State of Michigan a Draft Remedial Investigation and Draft Feasibility Study, which evaluated a number of remedial options for the river. The estimated costs for these remedial options ranged from $0 to $2.5 billion.

Although the KRSG study identified a broad range of remedial options, management does not believe that any single remedy among those options represented the highest-cost reasonably possible outcome. In 2004, Lyondell Chemical recognized a liability representing Millennium's interim allocation of 55% of the $73 million total of estimated cost of riverbank stabilization, recommended as the preferred remedy in 2000 by the KRSG study, and of certain other costs.

At the end of 2001, the U.S. EPA took lead responsibility for the river portion of the site at the request of the State of Michigan. In 2004, the EPA initiated a confidential process to facilitate discussions among the agency, the Millennium subsidiary, other PRPs, the Michigan Departments of Environmental Quality and Natural Resources, and certain federal natural resource trustees about the need for additional investigation activities and different possible approaches for addressing the contamination in and along the Kalamazoo River.

As these discussions have continued, management has obtained new information about regulatory oversight costs and other remediation costs, including a proposed remedy to be applied to a specific portion of the river, and has been able to reasonably estimate anticipated costs for certain other segments of the river, based in part on experience to date with the remedy currently being applied to the one portion of the river. As a result, management can reasonably estimate the probable spending for remediation of three segments of the river, which has been accrued as of March 31, 2009. Management's best estimates for costs relating to other segments of the river, which may remain uncertain for the foreseeable future, also have been accrued, based on the KRSG study. As of March 31, 2009, the probable additional future remediation spending associated with the river cannot be determined with certainty but the amounts accrued are believed to be the current best estimate of future costs, based on information currently available.

In addition, prior to the filing of the bankruptcy petitions, LyondellBasell had recognized a liability primarily related to Millennium's estimated share of remediation costs for two former paper mill sites and associated landfills, which are also part of the Kalamazoo River Superfund Site. At the time of the petitions, Millennium was performing certain investigatory and remedial activity at certain property owned by its subsidiary

LeMean Property Holdings Corporation (Allied Mill, or OU#1) as well as at parts of the site it does not own. By letter from LyondellBasell's counsel dated February 5, 2009, Millennium informed EPA that it would continue to perform work at the OU#1 property it owns, but that its entry into bankruptcy precluded it from continuing to perform or pay for work costs or damages at any portion of the site not owned by the Debtor. Millennium's ultimate liability for the Kalamazoo River Superfund Site will depend on a combination of many factors that have not yet been determined, including the resolution to Millennium's legal position in the Bankruptcy Court, the ultimate remedy selected, the determination of natural resource damages, the number and financial viability of the other PRPs, and the determination of the final allocation among the PRPs. Actual payments to be made on these claims will depend on their treatment in the Bankruptcy Cases.

f.    Other Regulatory Requirements

In addition to the matters described above, the Reorganized Debtors are subject to other material regulatory requirements that could result in higher operating costs, such as regulatory requirements relating to the security of the Reorganized Debtors' facilities, and the transportation, exportation or registration of the Debtors' products. Although the Reorganized Debtors will have compliance programs and other processes intended to ensure compliance with all such regulations, the Debtors are subject to the risk that its compliance with such regulations could be challenged. Non-compliance with certain of these regulations could result in the incurrence of additional costs, penalties or assessments that could be significant.

13.    *Legislative and Other Actions Have Eliminated Substantially All U.S. Demand for MTBE*

Substantially all refiners and blenders have discontinued the use of methyl tertiary butyl ether (MTBE) in the United States, partly as a result of United States federal governmental initiatives to increase use of bio-ethanol in gasoline as well as some state legislation to reduce or ban the use of MTBE. Accordingly, LyondellBasell is marketing its U.S.-produced MTBE for use outside of the United States. However, there are higher distribution costs and import duties associated with exporting MTBE outside the United States and the increased supply of MTBE may reduce profitability of MTBE in these export markets. The Reorganized Debtors' United States-based and European-based plants will generally have the flexibility to produce either MTBE or ethyl tertiary butyl ether (ETBE) to accommodate market needs. LyondellBasell produces and sells ETBE in Europe to address Europe's growing demand for bio-based fuel. In addition, the Reorganized Debtors may, in the future, modify equipment to produce an alternative gasoline blending component to either MTBE or ETBE. Any decision to produce an alternative gasoline blending component will depend on the timing and cost of equipment modifications, and product decisions will continue to be influenced by regulatory and market developments. The profit contribution related to an alternative gasoline blending component may be significantly lower than that historically realized on MTBE and ETBE. There is a risk that European markets may also ban or stop the use of MTBE or ETBE.

14.    *Reorganized LyondellBasell's International Operations Are Subject to Exchange Rate Fluctuations, Exchange Controls, Political Risks and Other Risks Relating to International Operations*

a.    International Events

Reorganized LyondellBasell will be subject to the risks of doing business on a global level, including fluctuations in currency exchange rates, transportation delays and interruptions, war, terrorist activities, epidemics, pandemics, political and economic instability and disruptions, restrictions on the transfer of funds, the imposition of duties and tariffs, import and export controls, changes in governmental policies, labor unrest and current and changing regulatory environments. The occurrence of such events could reduce the demand for Reorganized LyondellBasell's products, decrease the prices at which Reorganized LyondellBasell can sell their products, disrupt production or other operations, require substantial capital and other costs to comply, or increase security costs or insurance premiums, all of which could reduce Reorganized LyondellBasell's operating results. In addition, Reorganized LyondellBasell may obtain a substantial portion of their principal raw materials from international sources that are subject to these same risks. Reorganized LyondellBasell's compliance with applicable customs, currency exchange control regulations, transfer pricing regulations or any other laws or regulations to

which Reorganized LyondellBasell may be subject could be challenged. Furthermore, these laws may be modified, the result of which may be to prevent or limit subsidiaries from transferring cash to Reorganized LyondellBasell.

b.      International Enforcement of Agreements

Reorganized LyondellBasell may experience difficulty enforcing agreements in certain jurisdictions. In jurisdictions where bankruptcy laws and practices may vary, Reorganized LyondellBasell may experience difficulty collecting receivables through the applicable legal systems. Reorganized LyondellBasell is subject to certain existing, and may be subject to possible future, laws that limit or may limit Reorganized LyondellBasell's activities while some of Reorganized LyondellBasell's competitors may not be subject to such laws, which may adversely affect Reorganized LyondellBasell's competitiveness.

c.      Exchange Rate Fluctuation

Reorganized LyondellBasell will generate revenue from export sales and operations that may be denominated in currencies other than the relevant functional currency. Exchange rates between these currencies may fluctuate significantly. Future events, which may significantly increase or decrease the risk of future movement in currencies in which Reorganized LyondellBasell conducts its business, cannot be predicted. Reorganized LyondellBasell may also hedge certain revenues and costs using derivative instruments to minimize the impact of changes in the exchange rates of those currencies compared to the respective functional currencies. It is possible that fluctuations in exchange rates may result in the reduced operating results of Reorganized LyondellBasell.

15.      *Significant Changes in Pension Fund Investment Performance or Assumptions Relating to Pension Costs May Adversely Affect the Valuation of Pension Obligations, the Funded Status of Pension Plans, and the Reorganized Debtors' Pension Cost*

The applicable Reorganized Debtors will maintain the U.S. Pension Plans in accordance with the requirements of ERISA and the Internal Revenue Code, including minimum funding requirements. Generally, Reorganized LyondellBasell's funding policy for Pension Plans will be to accumulate plan assets that, over the long run, will approximate the present value of projected benefit obligations. Reorganized LyondellBasell's pension cost may be materially affected by the discount rate used to measure pension obligations, the level of plan assets available to fund those obligations at the measurement date and the expected long-term rate of return on plan assets. Significant changes in investment performance or a change in the portfolio mix of invested assets may result in corresponding increases and decreases in the valuation of plan assets, particularly equity securities or in a change of the expected rate of return on plan assets. Any change in key actuarial assumptions, such as the discount rate, would impact the valuation of pension obligations, affecting the reported funded status of the Pension Plans as well as the net periodic pension cost in the following fiscal years.

In addition. Lyondell Chemical Europe, Inc. will maintain, and comply with its obligations to, the U.K. Pension Plan in accordance with the terms and provisions of the U.K. Pension Plan's governing documentation and under and in accordance with applicable legislative and regulatory requirements under the law of England and Wales including (but not limited to) the Pensions Act 1995, the Pensions Act 2004 and the Finance Act 2004 and all other relevant legislation, regulation, codes of practice and guidance.

Under ERISA, PBGC has the authority to terminate an underfunded pension plan under limited circumstances. In the event that the Reorganized Debtors' U.S. Pension Plans are terminated for any reason while the plans are underfunded, the applicable Reorganized Debtors (and their ERISA controlled group members on the termination date) will incur liability to PBGC that may be equal to the entire amount of the underfunding.

16. *Reorganized LyondellBasell's Future Success Will Depend in Part on Its Ability to Protect Its  Intellectual Property Rights, and Reorganized LyondellBasell's Inability to Do So May Reduce Reorganized Debtors' Ability to Maintain Their Competitiveness*

Upon emergence, Reorganized LyondellBasell will have a significant worldwide portfolio of issued and pending patents.  Such issued and pending patents, together with proprietary technical know-how, will be significant to Reorganized LyondellBasell's competitive position, particularly with regard to propylene oxide, performance chemicals, petrochemicals, flavor and fragrance chemicals, and polymers, including processing technologies such as *Spheripol, Spherizone, Hostalen, Spherilene, Lupotech T* and *Lupotech G* and *Avant* catalyst family technology rights.  Reorganized LyondellBasell will need to rely on the patent, copyright and trade secret laws of the United States and other countries to protect its investment in research and development, manufacturing and marketing.  However, Reorganized LyondellBasell may be unable to prevent third parties from using its intellectual property without authorization.  Proceedings to protect these rights could be costly and Reorganized LyondellBasell may not prevail.

The protection afforded to Reorganized LyondellBasell with respect to these patents will vary from country to country and depends upon the type of patent and its scope of coverage.  While a presumption of validity should with respect to patents issued to Reorganized LyondellBasell, Reorganized LyondellBasell's patents may be challenged, invalidated, circumvented or rendered unenforceable.  In addition, if any pending patent application filed by Reorganized LyondellBasell does not result in an issued patent, or if patents are issued to Reorganized LyondellBasell but such patents do not provide meaningful protection of Reorganized LyondellBasell's intellectual property, then Reorganized LyondellBasell's ability to exploit its intellectual property may be adversely affected.  Furthermore, as patents expire, the products and processes described and claimed under those patents become generally available for use by competitors.  Reorganized LyondellBasell's continued growth strategy may also bring Reorganized LyondellBasell to regions of the world where intellectual property protection may be limited and difficult to enforce.  In addition, patent rights may not prevent its competitors from developing, using or selling products that are similar or functionally equivalent to Reorganized LyondellBasell's products.  Moreover, Reorganized LyondellBasell's competitors or other third parties may obtain patents that restrict or preclude Reorganized LyondellBasell's ability to lawfully produce or sell its products in a competitive manner, which could result in significantly lower revenues, reduced profit margins or loss of market share.

Reorganized LyondellBasell may also rely upon unpatented proprietary know-how and continuing technological innovation and other trade secrets to develop and maintain its competitive position.  While Reorganized LyondellBasell may enter into confidentiality agreements with their employees and third parties to protect its intellectual property, these confidentiality agreements may be breached, may not provide meaningful protection for Reorganized LyondellBasell's trade secrets or proprietary know-how, or adequate remedies may not be available in the event of an unauthorized use or disclosure of Reorganized LyondellBasell's trade secrets and know-how.  In addition, others could obtain knowledge of Reorganized LyondellBasell's trade secrets through independent development or other access by legal or illegal means.

The failure of Reorganized LyondellBasell's patents or confidentiality agreements to protect the Reorganized Debtors' processes, apparatuses, technology, trade secrets or proprietary know-how could result in significantly lower revenues, reduced profit margins and cash flows or loss of market share.  Additionally, the Reorganized Debtors may be subject to claims that its technology, patents or other intellectual property infringes on a third party's intellectual property rights.  Unfavorable resolution of these claims could either result in the Reorganized Debtors being restricted from delivering the related service or result in a settlement that could be material to the Reorganized Debtors.

17. *The Continued Integration of Historical Lyondell Chemical Businesses with Historical Basell Businesses May Be Extremely Time-Consuming*

The process of effectively integrating the historical Basell and Lyondell Chemical businesses into one consolidated enterprise will continue to require significant managerial and financial resources.  The costs and time required to integrate these businesses into one consolidated enterprise could cause the interruption of, or a loss of momentum in, the activities of any one, or several, of the operations of the constituent entities.  Furthermore, the

combination of the Lyondell Chemical and Basell businesses has significantly increased the Debtors' size and has also substantially increased the scope and complexity of the Debtors' operations. There can be no assurance that the Reorganized Debtors will be able to effectively manage this enlarged operation or achieve the desired profitability from the combination of the Lyondell Chemical and Basell businesses. A failure to successfully integrate Lyondell Chemical with Basell's legacy business operations within the expected time frame could adversely affect the Reorganized Debtors' business, financial condition and operating results.

18.     *Shared Control of Joint Ventures May Delay Decisions or Actions*

A portion of the Debtors' operations currently are, and Reorganized LyondellBasell's future operations may be, conducted through joint ventures. In the event that any of Reorganized LyondellBasell's joint venture partners do not observe their joint venture obligations, it is possible that the affected joint venture would not be able to operate in accordance with Reorganized LyondellBasell's business plans or that Reorganized LyondellBasell would be required to increase their level of commitment in order to give effect to such plans.

As with any such joint venture arrangements, differences in views among the joint venture participants may result in delayed decisions or in failures to agree on major matters, potentially adversely affecting the business and operations of the joint ventures and in turn Reorganized LyondellBasell's business and operations.

19.     *The Current Instability and Uncertainty in the Global Financial Markets May Create Increased Counterparty Risk*

Reorganized LyondellBasell may have exposure to various financial institutions under commodity hedging contracts and the risk of counterparty default is currently higher in light of existing capital market and economic conditions. Reduced liquidity or financial losses resulting from exposure to the risk of counterparties could have a material adverse effect on Reorganized LyondellBasell's cash flow and financial condition.

**E.     Material U.S. Federal Income Tax Considerations**

THERE ARE A NUMBER OF MATERIAL U.S. FEDERAL INCOME TAX CONSIDERATIONS, RISKS AND UNCERTAINTIES ASSOCIATED WITH CONSUMMATION OF THE PLAN. INTERESTED PARTIES SHOULD READ CAREFULLY THE DISCUSSION SET FORTH IN ARTICLE XII OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN" FOR A DISCUSSION OF THE MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES AND RISKS FOR THE DEBTORS AND FOR HOLDERS OF CLAIMS AND EQUITY INTERESTS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN RESULTING FROM THE TRANSACTIONS OCCURRING IN CONNECTION WITH THE PLAN.

**XI.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

If the Plan is not confirmed and consummated, the Debtors' alternatives include (i) liquidation of all of the Debtors under chapter 7 of the Bankruptcy Code and (ii) the preparation and presentation of an alternative plan or plans of reorganization.

**A.     Liquidation Under Chapter 7**

If the Plan or any other chapter 11 plan for the Debtors cannot be confirmed under section 1129(a) or (b) of the Bankruptcy Code, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, in which case a trustee would be elected or appointed to liquidate any remaining assets of the Debtors for distribution to creditors pursuant to chapter 7 of the Bankruptcy Code. In that event, all creditors holding Allowed General Unsecured Claims likely would receive distributions of a lesser value on account of their Allowed Claims and would have to wait a longer period of time to receive such distributions than they would under the Plan.

Further, if the Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code, the Debtors will experience excessive operating losses due to the costs of shutdown. The Worker Adjustment and

Retraining Notification Act (the "**WARN Act**") requires the Debtors, if planning a plant closing or a mass layoff, to give affected employees at least sixty (60) days notice of this employment action. If at least 60 days notice is not given, the Debtors are required under the WARN Act to make severance payments to those affected employees. In addition to the costs associated with compliance with the WARN Act, a liquidation plan would require the Debtors to incur costs in evaluating and securing key resources, and preparing to support employees. It is highly likely that the PBGC will terminate the U.S. Pension Plans, creating an underfunding obligation and a sizeable claim. The Debtors would incur costs in their management of the winding down process, which would entail communicating proactively with all constituencies, establishing a transition management team, ensuring ongoing access to critical resources, managing public relations and terminating employee relationships and contracted services. The Debtors would also incur substantial losses during the regulatory process associated with the closure of their various facilities. In order to support post-closure activities, the Debtors would incur costs in disposing of equipment and supplies, maintaining access to key records, processing remaining financials, maintaining security and necessary utilities, and disposing of hazardous materials and normal wastes. These windup or shut down costs would all be entitled to priority treatment as an administrative expense under Chapter 7 of the Bankruptcy Code.

Based on the Liquidation Analysis, it appears that, upon liquidation, creditors would receive distributions as follows:

| Class | Description | Estimated Recovery |
|---|---|---|
| | | Liquidation |
| -- | Administrative Expenses | 0.0% |
| -- | DIP New Money Claims and DIP ABL Claims | 100% |
| -- | Priority Tax Claims | 0.0% |
| 1 | Priority Non-Tax Claims | 0.0% |
| 2 | Secured Tax Claims | 0.0% |
| 3 | DIP Roll-Up Claims | 40% |
| 4 | Senior Secured Claims | 13% |
| 5 | Bridge Loan Claims | 0.0% |
| 6 | Other Secured Claims | 0.0% |
| 7-A | General Unsecured Claims Against the Obligor Debtors | 0.0% |
| 7-B | General Unsecured Claims Against Non-Obligor Debtors | 0.0 – 100% |
| 7-C | General Unsecured Claims Against Schedule III Debtors | 0.0 – 0.3% |
| 8 | 2015 Notes Claims | 0.0% |

## B. Alternative Plans of Reorganization

If the Plan is not confirmed, the Debtors, or any other party in interest, may attempt to formulate an alternative chapter 11 plan, which might provide for the liquidation of the Debtors' remaining assets other than as provided by the Plan. Any attempt to formulate an alternative chapter 11 plan would, necessarily delay creditors' receipt of distributions and, due to the incurrence of additional administrative expenses during such period of delay, may provide for smaller distributions to holders of Allowed General Unsecured Claims and Equity Interests than are currently provided for under the Plan. Accordingly, the Debtors believe that the Plan will enable all creditors to realize the greatest possible recovery on their respective Claims or Equity Interests with the least delay.

## XII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

This discussion is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), in effect on the date of this Disclosure Statement, U.S. Treasury Regulations in effect (or, in certain cases, proposed) on such date, and judicial and administrative interpretations thereof available on or before such date. All of the foregoing are subject to change, which change could apply retroactively and could affect the tax consequences

described below. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling from the IRS or any other taxing authority as to any of the U.S. federal income tax consequences expected to result from the implementation of the Plan discussed below. There can be no assurance that the IRS or another taxing authority will not take a contrary view with respect to any issue discussed below.

The following summary is for general information only and does not purport to address all of the U.S. federal income tax consequences that may be applicable to any particular holder. The U.S. federal income tax treatment of a holder of an Allowed Claim may vary depending upon such holder's particular situation. The following discussion assumes that a holder holds an Allowed Claim as a capital asset. The following discussion does not address U.S. state or local tax considerations that may be applicable to the Debtors and holders of an Allowed Claim. This U.S. federal income tax summary does not address tax considerations applicable to holders that may be subject to special tax rules, such as financial institutions, insurance companies, real estate investment trusts, regulated investment companies, grantor trusts, dealers or traders in securities or currencies, tax-exempt entities, persons that hold an equity interest in, or a debt obligation of, a Debtor as a position in a straddle or as part of a hedging, conversion or integrated transaction for U.S. federal income tax purposes, controlled foreign corporations, passive foreign investment companies, persons that have a functional currency other than the U.S. dollar, persons who acquired a debt obligation of a Debtor in connection with the performance of services, and, except as otherwise expressly provided herein, persons who are not U.S. persons (as defined in the Tax Code). In addition, this discussion does not address the U.S. federal income tax consequences to holders of Allowed Claims that are not entitled to vote regarding the acceptance of the Plan or are unimpaired or otherwise entitled to payment in full in Cash under the Plan, or to holders of Equity Interests that are not entitled to vote regarding the acceptance of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES EXPECTED TO RESULT FROM THE IMPLEMENTATION OF THE PLAN IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM. HOLDERS OF ALLOWED CLAIMS, INCLUDING HOLDERS OF ALLOWED CLAIMS IN MORE THAN ONE CLASS RELATING TO THE SAME UNDERLYING OBLIGATION, ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE U.S. FEDERAL INCOME TAX CONSEQUENCES EXPECTED TO RESULT FROM THE IMPLEMENTATION OF THE PLAN.**

**IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF ALLOWED CLAIMS ARE HEREBY NOTIFIED THAT: (1) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF ALLOWED CLAIMS FOR THE PURPOSE OF AVOIDING U.S. FEDERAL, STATE OR LOCAL TAX PENALTIES, (2) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS DISCUSSED HEREIN, AND (3) HOLDERS OF ALLOWED CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A.      **Certain Consequences to U.S. Debtors**

The U.S. Debtors file a consolidated U.S. federal income tax return which takes into account the operation of all of the U.S. Debtors (some of which are treated as partnerships or disregarded entities for U.S. federal income tax purposes). The U.S. Debtors reported a consolidated net operating loss ("**NOL**") carryforward for U.S. federal income tax purposes of approximately $1,250,000,000 as of December 31, 2008, and expect to report additional losses with respect to their 2009 taxable year.

1. *COD Income and Attribute Reduction*

Generally, a taxpayer must recognize cancellation of indebtedness ("**COD**") income to the extent the taxpayer's indebtedness is discharged for less than the amount of such indebtedness. For this purpose, COD income is the amount by which the discharged indebtedness exceeds any consideration given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD income (such as where the payment of the cancelled debt would have given rise to a tax deduction). The amount of consideration paid to a creditor generally would equal the amount of Cash, the fair market value of property (including stock), and/or the issue price of any new debt instrument paid to such creditor. If a new debt instrument is issued to the creditor, then the issue price of such debt instrument is determined under either section 1273 or 1274 of the Tax Code. Generally, these provisions treat the issue price of a publicly traded debt instrument as its fair market value, determined as of the issue date, and the issue price of any other debt instrument as its stated principal amount, provided that the debt instrument's terms provide for the payment of adequate stated interest.

A debtor will not be required to include any COD income in its gross income if the debtor is under the jurisdiction of a court in a Title 11 bankruptcy proceeding and the discharge of debt occurs pursuant to such proceeding (the "**Title 11 exception**") or to the extent the debtor is insolvent, as determined immediately prior to the discharge (the "**insolvency exception**"). The debtor is, however, generally required to reduce its tax attributes— such as NOL carryforwards, current year NOLs, tax credits, and tax basis in assets—by the amount of the excluded COD income (but not in an amount greater than the excess of the aggregate tax bases of the property held by the debtor immediately after the discharge over the debtor's aggregate liabilities immediately after the discharge). Treasury Regulations address the application of the rules for the reduction of tax attributes to situations where a member of a U.S. consolidated group realizes excluded COD income. Under the ordering rules of the Treasury Regulations, generally, the attributes of the debtor corporation are reduced first (including the stock and assets of its direct and indirect subsidiaries). In this regard, the Treasury Regulations adopt a "tier-down" approach such that, if the debtor reduces its tax basis in its stock in a subsidiary, corresponding reductions must be made to the attributes of that subsidiary. To the extent that the excluded COD income exceeds the tax attributes of the debtor member, the Treasury Regulations require the reduction of certain consolidated attributes (*e.g.*, NOLs, but not tax basis in assets) attributable to other members of the consolidated group. To the extent the amount of excluded COD income exceeds the tax attributes available for reduction, the remaining COD income continues to be excluded from gross income. Generally, a debtor must reduce its tax attributes with respect to excluded COD income after the calculation of its tax for the taxable year in which the debt is discharged.

Under section 108(b)(5) of the Tax Code, a debtor that realizes excluded COD income can elect to reduce its tax basis in depreciable assets prior to the reduction of other tax attributes, and any excess COD income is applied next to reduce NOLs and other tax attributes in the prescribed statutory order. The U.S. Debtors have not yet determined whether they will make this election. In addition, under section 1017(b)(3)(D) of the Tax Code, a debtor can elect to treat its stock in a subsidiary as a depreciable asset to the extent that the subsidiary consents to a reduction in the tax basis of its depreciable assets.

If a U.S. Debtor is a partnership (or an entity treated as a partnership for U.S. federal income tax purposes), the COD income exclusion and attribute reduction rules apply at the partner, rather than partnership, level. Any COD income recognized by a U.S. Debtor that is treated as a partnership for U.S. federal income tax purposes will be allocated to its partners, and each partner generally must include its share of the COD income in determining the partner's own taxable income, except to the extent that the partner can exclude the COD income under the Title 11 exception or the insolvency exception.

As discussed below, the IRS may seek to treat certain holders of Allowed Claims against U.S. Debtors as contributing such Allowed Claims to New Topco in exchange for Class A Shares. If the IRS integrates the deemed contribution and cancellation of these Allowed Claims, each relevant U.S. Debtor generally should realize COD income equal to the difference between the adjusted issue price of the applicable Allowed Claims against such U.S. Debtor and the fair market value of the Class A Shares transferred in satisfaction of such Allowed Claims. If the IRS instead treats the deemed contribution to New Topco and cancellation as separate transactions, section 108(e)(4) of the Tax Code should generally apply to treat each relevant U.S. Debtor as realizing COD income equal to the excess, if any, of the adjusted issue price of the canceled Allowed Claims against such U.S. Debtor over the fair market value of such Allowed Claims or New Topco's adjusted tax basis in such Allowed

Claims, as determined under Treasury Regulation section 1.108-2(f) and excluding Allowed Claims relating to indebtedness that has a stated maturity date (and that is, in fact, retired) within one year of the Effective Date. While section 108(e)(4) may affect the amount of COD income realized by the U.S. Debtors, the U.S. Debtors believe that any such COD income generally should be excluded pursuant to the Title 11 exception or the insolvency exception discussed above.

As a result of the discharge of Allowed Claims under the Plan, the U.S. Debtors expect to realize a substantial amount of COD income. The actual amount of such COD income will depend, in significant part, on the value of the Class A Shares and other property that is distributed pursuant to the Plan and, accordingly, cannot be determined prior to the Effective Date. The extent to which NOLs and other tax attributes remain following attribute reduction, and the extent of the reduction in the tax basis of the U.S. Debtors' assets, will depend upon the amount of the COD income that the U.S. Debtors realize under the Plan. The U.S. Debtors do not anticipate retaining a significant NOL carryforward following attribute reduction.

Under section 382 of the Tax Code, if a corporation undergoes an "ownership change," the utilization of its pre-change losses, and certain losses or deductions that are "built-in" (*i.e.*, economically accrued but unrecognized) as of the date of the ownership change and recognized within five years of such date, is subject to an annual limitation. In general, an ownership change occurs when the percentage of a corporation's stock owned by "5% shareholders" increases by more than 50 percentage points over the lowest percentage owned by those shareholders at any time during the applicable "testing period" (generally, the shorter of the three-year period preceding the testing date or the period of time since the corporation's most recent ownership change). A 5% shareholder for these purposes generally includes an individual or entity that, directly or indirectly, owns 5% or more of a corporation's stock during the relevant period, and may include one or more groups of shareholders that, in the aggregate, own less than 5% of the value of the corporation's stock. The U.S. Debtors do not expect to undergo an ownership change until the consummation of the Plan, at which time all of the Equity Interests of LBFC will be cancelled, certain LyondellBasell creditors will receive Class A Shares, and New Topco will issue the Class B Shares. As discussed above, the U.S. Debtors do not anticipate retaining a significant NOL carryforward following attribute reduction.

Finally, pursuant to the Plan, the U.S. Debtors will engage in various intercompany restructuring transactions, including the transfer of the Acetyls Business to New Acetyls which is intended to qualify as a tax-free reorganization under section 368(a) of the Tax Code, and will transfer certain assets that will be held by the Litigation Trust, the Millennium Custodial Trust and the Environmental Custodial Trust. The U.S. Debtors believe that any income or gain recognized in these intercompany restructuring transactions and asset transfers would be offset by NOLs of the U.S. Debtors that otherwise would be eliminated by attribute reduction required with respect to excluded COD income, as discussed above. Assuming the Environmental Custodial Trust qualifies as a qualified settlement fund ("**QSF**") pursuant to the Treasury Regulations under section 468B of the Tax Code (as discussed below), the U.S. Debtors generally should be entitled to a deduction at the time of transfer with respect to amounts paid to the Environmental Custodial Trust in satisfaction of environmental Claims, except to the extent that any such payments represent insurance proceeds received by the U.S. Debtors. The U.S. Debtors also generally will not be allowed a deduction for payments to the Environmental Custodial Trust to the extent the U.S. Debtors have a right to reimbursement with respect to such payments from any third party.

2.    *New Topco's Status as a Non-U.S. Corporation*

The Reorganized Debtors will continue to operate under a non-U.S. parent company and intend to organize their new parent company, New Topco, in The Netherlands, and New Topco will be subject to the tax laws of that jurisdiction. See Article XIII below. In the reorganized structure, as in the current structure, the subsidiaries of New Topco organized in the United States will continue to be subject to U.S. tax at the applicable U.S. tax rates and will file a consolidated U.S. federal income tax return, and the subsidiaries of New Topco organized outside of the United States will continue to be taxed at the applicable local tax rates. In addition, distributions or payments from entities in one jurisdiction to entities in another jurisdiction may be subject to withholding taxes.

New Topco does not intend to operate in a manner that will cause it to be treated as engaged in a U.S. trade or business or otherwise be subject to U.S. federal income taxes on its net income. However, even if New Topco is not treated as engaged in a U.S. trade or business, unless an exception applies, New Topco generally will

be subject to U.S. federal withholding tax on certain "fixed or determinable annual or periodic gains, profits and income" derived from sources within the United States, such as dividends and certain types of interest. In addition, under legislation proposed in Congress, a foreign corporation may be treated as a domestic corporation for U.S. federal income tax purposes if such foreign corporation is publicly traded and substantially all of the executive officers and senior management of the corporation who exercise day-to-day responsibility for making strategic, financial, and operational policies of the corporation are located primarily within the United States. This provision would be effective two years after enactment. Also, legislation recently proposed in Congress may require a 30% U.S. federal withholding tax on payments to foreign corporations that fail to disclose the name, address, and tax identification number of any U.S. individual who owns more than 10% of a foreign corporation's stock (by vote or value).

Section 7874 of the Tax Code, which was added by the American Jobs Creation Act of 2004, is intended to prevent U.S.-based multinationals from improperly avoiding U.S. taxation by inversion. As discussed below, the U.S. Debtors do not believe that section 7874 should apply to the implementation of the Plan.

Section 7874(b) of the Tax Code provides that, in certain instances, a foreign corporation may be treated as a domestic corporation for U.S. federal income tax purposes. Specifically, section 7874(b) provides that a foreign corporation will be treated as a domestic corporation if, pursuant to a plan or a series of related transactions, (1) the foreign corporation acquires, directly or indirectly, substantially all of the properties held directly or indirectly by a domestic corporation, (2) after the acquisition, at least 80% of the stock (by vote or value) of the foreign corporation is held by former shareholders of the domestic corporation by reason of holding stock in the domestic corporation, and (3) after the acquisition, the expanded affiliated group, which includes the foreign corporation, does not have substantial business activities in the foreign country in which the foreign corporation is organized (collectively, the "**80% test**"). For this purpose, a foreign corporation's acquisition of a domestic corporation's stock is considered an indirect acquisition by the foreign corporation of a proportionate amount of the domestic corporation's properties. Alternatively, if, under the above test, former shareholders of the expatriated domestic corporation own at least 60%, but less than 80% (by vote or value) of the foreign corporation's stock after the acquisition, section 7874(a) will instead impose a minimum level of tax on the inversion gain of the expatriated entity (collectively, the "**60% test**"). Specifically, section 7874(a) provides that the taxable income of an expatriated entity for any taxable year that includes any portion of the "applicable period" (*i.e.*, generally the ten-year period that begins with a corporate inversion transaction) cannot be less than the inversion gain of the entity for that taxable year. Generally, inversion gain is defined as the sum of (1) the income or gain recognized by reason of the transfer during the applicable period of stock or other properties by an expatriated entity, and (2) any income received or accrued during the applicable period by reason of a license of any property by an expatriated entity as part of the domestic corporation's acquisition or after the acquisition if the transfer or license is to a foreign related person. Tax on inversion gain generally cannot be offset by NOLs, foreign tax credits or other tax attributes.

Recently issued Temporary Treasury Regulations provide that, if pursuant to the same transaction, foreign corporation stock is received in exchange for, or with respect to, stock of a domestic corporation and other property, the foreign corporation stock received in exchange for, or with respect to, the domestic corporation stock is determined based on the relative value of the domestic corporation stock compared to the aggregate value of such stock and other property. Subject to certain avoidance transfers and general tax principles, the foregoing rule applies notwithstanding any relationship between the domestic corporation stock and the other property. In addition, the Temporary Treasury Regulations generally provide that, if a domestic corporation is in a Title 11 or similar case or is insolvent, then each creditor of the domestic corporation is treated as a shareholder of such domestic corporation for all purposes of section 7874, and any claim by a creditor against the domestic corporation is treated as domestic corporation stock.

The IRS and the Treasury Department recently announced that they intend to publish regulations that will apply to acquisitions completed after September 16, 2009, and will exclude for purposes of the stock ownership tests described above foreign corporation stock issued in exchange for (1) cash or cash equivalents, (2) marketable securities (as defined in section 453(f)(2) of the Tax Code), or (3) any other property acquired in a transaction with a principal purpose of avoiding the purposes of section 7874 of the Tax Code. Accordingly, based on this announcement, the discussion below excludes the Class B Shares that New Topco will issue in exchange for Cash in determining whether section 7874 applies to the transaction contemplated by the Plan and the Enforcement Action.

The U.S. Debtors believe that strong arguments can be made that section 7874 should not apply to the transaction contemplated by the Plan and the Enforcement Action because the expanded affiliated group that will include New Topco should be treated as having substantial business activities in The Netherlands. In addition, although the Temporary Treasury Regulations do not specifically address a transaction such as that contemplated by the Plan and the Enforcement Action, the U.S. Debtors believe that New Common Stock (other than Class B Shares issued for Cash) attributable to the value of the Obligor Debtors and the Obligor Non-Debtors, in each case, that are created or organized outside the United States (collectively, the "**Foreign Parties**") should be treated as received in exchange for other property under section 7874 and, therefore, should not be treated as received by reason of holding stock of a U.S. Debtor. The U.S. Debtors anticipate that, pursuant to the Plan and the Enforcement Action, holders of Allowed Claims will receive Class A Shares (plus any Class B Shares treated as directly received in partial satisfaction of Allowed Claims if exercised Subscription Rights are disregarded for U.S. federal income tax purposes) with a value greater than 40% of the aggregate value of New Topco by reason of Allowed Claims against the Foreign Parties, and, accordingly, former LyondellBasell shareholders and holders of Allowed Claims should be treated as owning less than 60% of New Topco by reason of holding stock of a U.S. Debtor. However, the IRS may contend that the expanded affiliated group does not satisfy the substantial business activities test and that the transaction contemplated by the Plan and the Enforcement Action does not satisfy either stock ownership test discussed above and, thus, may assert that New Topco constitutes a domestic corporation or that the U.S. Debtors must recognize inversion gain under section 7874. There can be no assurance that any such assertion would be unsuccessful.

If section 7874 applies to the transaction contemplated by the Plan and the Enforcement Action, the U.S. Debtors believe that it is more likely that the 60% test, rather than the 80% test, would apply. If the 60% test were applicable, the U.S. Debtors may recognize inversion gain because the LBFC consolidated group currently licenses property to foreign affiliates. As discussed above, this inversion gain generally could not be offset by NOLs, foreign tax credits or other tax attributes of the LBFC consolidated group. The U.S. Debtors believe that the consequences of the 60% test's application generally should be manageable, as any inversion gain required to be recognized in such case generally should not result in a material tax liability. The U.S. Debtors do not anticipate, for instance, that the LBFC consolidated group will transfer a material amount of assets to foreign affiliates pursuant to the Plan.

If the 80% test were to apply to New Topco, New Topco would be subject to U.S. federal income tax as a domestic corporation on its worldwide income, would generally be subject to the withholding rules applicable to a domestic corporation (including on the payment of dividends to non-U.S. shareholders), and would generally be subject to current U.S. federal income tax with respect to any Subpart F income of its foreign subsidiaries. Additionally, if New Topco is treated as a domestic corporation, the taxable year of the U.S. Debtors' consolidated group could end on the date the Plan is consummated, thereby accelerating the timing of the attribute reduction required with respect to excluded COD income, and the IRS may require New Topco and the other U.S. corporate subsidiaries to file their U.S. federal income tax returns on a separate company basis. New Topco generally could be subject to interest and penalties due to a failure to comply with the above mentioned rules, and additional adverse U.S. federal income tax consequences are possible if New Topco is treated as a domestic corporation under section 7874.

The IRS may also assert that section 269 of the Tax Code applies to New Topco's organization in The Netherlands pursuant to the implementation of the Plan. Under section 269, if the IRS determines that the principal purpose of an acquisition was to evade or avoid U.S. federal income tax by allowing the taxpayer to secure the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, the IRS may disallow such deduction, credit or other allowance. Section 269 applies to a direct or indirect acquisition of 50% or more (by vote or value) of a corporation's stock. The U.S. Debtors believe that, if the Plan were challenged by the IRS, the U.S. Debtors could show, among other things, that the principal purpose for the Plan was not to evade or avoid federal income tax, and thus, section 269 should not apply. However, no assurance can be given in this regard.

In addition, under some circumstances, a current deduction of interest expense in the United States may be disallowed under section 163(j) of the Tax Code. Generally, a U.S. corporation's interest expense deductions are limited when incurred on debt obligations to a related party if the interest income to the related party is not taxed in the United States. Section 163(j) also limits a deduction for interest expense incurred on indebtedness

extended by non-related parties if there is a "disqualified guarantee" on such indebtedness and the interest paid on that indebtedness is not subject to a U.S. gross basis tax such as a withholding tax ("**Guaranteed Debt**").  Under current law, the rules of section 163(j) generally limit a corporation's interest expense deduction in a taxable year if (1) there is excess interest expense (the excess of the corporation's net interest expense over 50% of its adjusted taxable income), and (2) the debt-to-equity ratio exceeds 1.5:1.  Disallowed interest expense may be carried forward indefinitely and deducted to the extent of any excess limitation for the carryforward year.  The Obama Administration has proposed additional section 163(j) limitations on interest deductions of certain expatriated entities.  Under the Obama Administration's proposal, the debt-to-equity safe harbor would be eliminated, the adjusted taxable income threshold for excess interest expense would be reduced from 50% to 25% with respect to interest paid or accrued to related persons (but generally not with respect to interest attributable to Guaranteed Debt), the carryforward for disallowed interest would be limited to ten years, and the excess limitation carryforward would be eliminated.  If enacted, the proposal would be effective for taxable years beginning after December 31, 2010, and would not apply to foreign corporations treated as domestic corporations under section 7874(b).  Based on the projected financial data, it is anticipated that the section 163(j) limitations described above will not substantially impact the U.S. Debtors.

**B.      Certain Consequences to Non-U.S. Debtors**

The U.S. federal income tax consequences to a Non-U.S. Debtor expected to result from the implementation of the Plan generally should depend, among other things, upon the status of such Non-U.S. Debtor, *e.g.*, whether such entity is disregarded as separate from its owner for U.S. federal income tax purposes.  In general, a non-U.S. person should not be subject to U.S. federal income tax except with respect to income recognized in the conduct of a U.S. trade or business or a permanent establishment in the United States.

**C.      Certain Consequences to Holders of Allowed Claims**

The U.S. federal income tax consequences to holders of Allowed Claims arising from the distributions to be made under the Plan may vary depending upon, among other things, the U.S. federal income tax characterization of the transactions adopted to implement the Plan, the nature of the indebtedness owing to the holder, whether the holder has previously claimed a bad debt or worthless security deduction in respect of its Allowed Claim, whether the holder is a U.S. resident for tax purposes, whether the holder reports income on the accrual or cash basis, and whether the holder receives distributions under the Plan in more than one taxable year.

1.      *General Considerations*

a.      Accrued but Unpaid Interest

In general, to the extent a holder of a debt instrument receives property in satisfaction of interest accrued during the holding period of such instrument, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income).  Conversely, such holder may recognize a deductible loss to the extent that any accrued interest claimed or amortized original issue discount ("**OID**") was previously included in the holder's gross income and is not paid in full.  The extent to which property received by a holder of a debt instrument will be attributable to accrued but unpaid interest is unclear.  Pursuant to the Plan, all distributions in respect of any Allowed Claim will be allocated first to the principal amount of such Allowed Claim, and thereafter to accrued but unpaid interest, if any.  Certain legislative history indicates that an allocation of consideration between principal and interest provided in a bankruptcy plan of reorganization generally is binding for U.S. federal income tax purposes.  However, there is no assurance that such allocation will be respected by the IRS.  Holders of Allowed Claims are urged to consult their own tax advisors regarding the inclusion in income of amounts received in satisfaction of accrued but unpaid interest, the allocation of consideration between principal and interest, and the deductibility of previously included unpaid interest and OID for tax purposes.

b.      Bad Debt Deduction and Worthless Securities Deduction

A holder of an Allowed Claim that is not a security for purposes of section 165(g) of the Tax Code who receives, pursuant to the Plan, an amount less than such holder's tax basis in that Allowed Claim may be

entitled in the year of receipt (or in an earlier year) to a bad debt deduction under section 166(a) of the Tax Code or may be entitled to a loss under section 165(a) in the year of receipt. A holder of a security, the Allowed Claim with respect to which is wholly worthless, may be entitled to a worthless securities deduction under sections 165(g) and 165(a) of the Tax Code. The rules governing the timing and amount of deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a loss or deduction is claimed. Such loss or deduction would be limited to the holder's adjusted tax basis in the indebtedness underlying its Allowed Claim. Holders of Allowed Claims are urged to consult their own tax advisors with respect to their ability to take any loss or deduction described above.

### c. Market Discount

Holders of Allowed Claims may be affected by the "market discount" provisions of sections 1276 through 1278 of the Tax Code. Under these provisions, some or all of the gain realized by a holder may be treated as ordinary income (instead of capital gain) to the extent of accrued "market discount" on such holder's Allowed Claims. Any gain realized by a holder on the exchange of its Allowed Claims on the Effective Date generally should be treated as ordinary income to the extent of any market discount accrued on the underlying debt obligation by the holder on or prior to the date of the exchange. In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price as defined in section 1278 of the Tax Code, in the case of a debt obligation issued with OID) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition by more than a *de minimis* amount. Holders of Allowed Claims are urged to consult their own tax advisors regarding the application of the market discount rules upon the exchange of their Allowed Claims pursuant to the Plan.

### d. Effect of Potential Future Distributions

Certain holders of Allowed Claims may receive distributions after the Effective Date. The imputed interest provisions of the Tax Code may apply to treat a portion of the distributions to such holders as imputed interest. With respect to such holders, imputed interest may accrue over time using the constant interest method, in which case such holders may be required to include imputed interest in income prior to the actual distribution. It is possible that recognition of any loss realized by a holder of an Allowed Claim may be deferred until such holder can no longer receive future distributions under the Plan. It is also possible that any gain realized by a holder of an Allowed Claim in respect of distributions under the Plan may be deferred under the "installment method" of reporting. Deferral of gain recognition may not be advantageous to a particular holder, and, accordingly, holders of Allowed Claims should consider the desirability of making an election to forego application of the installment method. Holders of Allowed Claims are urged to consult their own tax advisors regarding the possibility for deferral of recognition of gains and losses and the possibility of electing out of the installment method of reporting any gain realized in respect of their Allowed Claims.

### e. Recapture of Gain on Disposition of New Common Stock

Any gain recognized by a holder on a subsequent sale or exchange of New Common Stock received in exchange for Allowed Claims under the Plan generally should be treated as ordinary income to the extent of the sum of any (1) bad debt deductions or charges to bad debt reserves claimed with respect to such Allowed Claims, (2) ordinary loss taken on the exchange of such Allowed Claims for New Common Stock, and (3) income not recognized due to the use of the cash method of tax accounting with respect to the Allowed Claims exchanged. Holders of Allowed Claims are urged to consult their own tax advisors regarding the application of this recapture rule with respect to New Common Stock received pursuant to the Plan.

2. *Holders of Allowed Claims*

    a. Certain Consequences to Holders of Senior Secured Claims and Bridge Loan Claims

Pursuant to the Plan, (1) holders of Senior Secured Claims will receive Class A Shares, Subscription Rights and Participation Rights, and (2) holders of Bridge Loan Claims will receive Class A Shares, New Warrants to purchase Class A Shares and Participation Rights. Under the terms of the Plan, the holders of Allowed Claims against Foreign Parties ("**Foreign Claims**") will transfer such Allowed Claims to LBHBV in exchange for all of its outstanding stock (the "**LBHBV Contribution**," and such shares, the "**LBHBV Shares**"), and will then transfer all of the LBHBV Shares to New Topco in exchange for the direct issuance of Class A Shares (the "**Topco Contribution**"). Conversely, holders of certain Allowed Claims against U.S. Obligor Debtors ("**U.S. Claims**") will receive Class A Shares in satisfaction of such Allowed Claims directly from the relevant U.S. Debtor (together, with the LBHBV Contribution and the Topco Contribution, the "**Stock Transactions**"). The treatment of the Stock Transactions for U.S. federal income tax purposes is unclear, and the relevant holders of Allowed Claims are urged to consult their own tax advisors with respect to such treatment.

In general, subject to the discussion below, the U.S. Debtors believe that, to the extent Foreign Claims represent separate property for U.S. federal income tax purposes, holders of Foreign Claims can take the position that the LBHBV Contribution and the Topco Contribution should each constitute a contribution of property to a transferee corporation in exchange for stock under section 351 of the Tax Code. Section 351 generally provides that a transferor does not recognize gain or loss on the transfer of property to a corporation to the extent such property is transferred solely in exchange for stock of the transferee corporation, and the transferors are in control of the transferee corporation immediately after the exchange. For this purpose, "control" means ownership of (1) stock possessing at least 80% of the combined voting power of all classes of stock entitled to vote and (2) 80% of the shares of each other class of the corporation's stock. A transferor that receives other property in the section 351 exchange generally should recognize gain (but not loss) realized in such exchange up to the fair market value of the other property received and any accrued market discount, and generally should receive a fair market value tax basis in any such other property.

U.S. persons that effect the LBHBV Contribution and the Topco Contribution pursuant to section 351 exchanges generally would be subject to the gain recognition rules in section 367 of the Tax Code with respect to such exchanges (assuming, as the following discussion does, that the 80% test under section 7874 of the Tax Code will not apply to the transaction contemplated by the Plan and the Enforcement Action to treat New Topco as a domestic corporation). Subject to certain exceptions, section 367 generally treats a U.S. person's transfer of property to a foreign corporation in an otherwise tax-free exchange, including a section 351 exchange, as taxable.

A U.S. person transferring stock or securities of a foreign corporation in exchange for foreign corporation stock generally should not be subject to tax under section 367 if such U.S. person (1) owns less than 5% of the transferee foreign corporation's stock (by vote and value) immediately after the transaction or (2) enters into a gain recognition agreement ("**GRA**") with the IRS. All facts and circumstances pertaining to the origin and character of an instrument generally are relevant in determining its status as a "security" for U.S. federal income tax purposes. Prominent factors that courts have relied upon in determining whether an obligation constitutes a "security" for U.S. federal income tax purposes include the term of the instrument, whether the instrument is secured, the degree of subordination of the instrument, the ratio of debt to equity of the obligor, the negotiability of the instrument, the creditworthiness of the obligor, the right to vote or otherwise participate in management of the obligor, the convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or are accrued. Courts generally have held that corporate debt obligations evidenced by written instruments with original maturities of ten years or more will be considered securities, while instruments with original maturities of less than five years will not be considered securities.

In the case of U.S. persons that contribute to LBHBV Foreign Claims constituting securities of a foreign corporation for U.S. federal income tax purposes, the Treasury Regulations under section 367 generally require a U.S. person to recognize the gain deferred upon entry into a GRA if the transferee foreign corporation disposes of the contributed property during the period beginning on the date of the contribution and ending on the

close of the fifth full taxable year (not less than 60 months) following the close of the taxable year in which the contribution occurs.  Assuming the Topco Contribution is treated as part of a section 351 exchange, this contribution, standing alone, generally should not require U.S. persons to recognize gain that would otherwise be deferred under a GRA executed with respect to the LBHBV Contribution.  However, the Foreign Claims generally should be treated as extinguished for U.S. federal income tax purposes immediately after the Topco Contribution, and the U.S. Debtors believe that this extinguishment would effectively preclude U.S. persons from availing themselves of the GRA exception with respect to any gain realized in any Foreign Claims.  Accordingly, the U.S. Debtors believe that only U.S. persons who own less than 5% of New Topco's stock following the implementation of the Plan may be able to take the position that their contribution to LBHBV of Foreign Claims constituting securities of a foreign corporation for U.S. federal income tax purposes satisfies section 367.

A holder's aggregate tax basis in New Common Stock received pursuant to a section 351 exchange generally should equal the holder's adjusted tax basis in the property treated as surrendered in such exchange, increased by any gain recognized by the holder in such exchange and decreased by the fair market value of any other property received by the holder in such exchange.  The holding period for any property received in a section 351 exchange generally should include the holding period of the property treated as surrendered in such exchange, except that the holding period of any stock issued in respect of a Foreign Claim for accrued but unpaid interest generally should begin on the date following the receipt of such stock.

The U.S. Debtors believe that the satisfaction of U.S. Claims in exchange for Class A Shares received directly from the relevant U.S. Debtor generally should be a taxable transaction for U.S. federal income tax purposes.  Holders of the applicable U.S. Claims generally should recognize gain or loss upon the discharge of their U.S. Claims equal to the difference between (1) the amount realized by the holder in satisfaction of such U.S. Claims, and (2) the holder's adjusted tax basis in such U.S. Claims.  The holder's amount realized with respect to such transaction generally should equal the fair market value of the property received by the holder.  Any gain or loss recognized in the transaction generally should be capital gain or loss.  In the case of a noncorporate holder, capital gain currently is subject to tax at a 15% rate if the holder's holding period for the U.S. Claims is more than one year at the time of the exchange.  The Obama Administration has proposed taxing long term capital gains at a 20% rate for certain individuals in taxable years beginning after December 31, 2010.  The holder's tax basis in property received in the exchange generally should equal the fair market value of such property, and the holding period for such property generally should begin on the date following its receipt.

Notwithstanding the U.S. Debtors' actual distribution of Class A Shares in satisfaction of the U.S. Claims, the U.S. Debtors believe that the IRS may seek to treat Class A Shares received in satisfaction of the U.S. Claims as having been issued directly by New Topco in exchange for such U.S. Claims, in which case section 351 may apply to the discharge of the U.S. Claims.  Under such a recast, holders of U.S. Claims generally would not be permitted to recognize any loss, but would be required to recognize gain, realized upon the disposition of their U.S. Claims, because the applicable requirements in the Treasury Regulations under section 367, which include an active trade or business test, generally would not be satisfied.

As stated above, holders of Senior Secured Claims will also receive Subscription Rights entitling such holders to purchase Class B Shares.  The characterization of the Subscription Rights for U.S. federal income tax purposes is uncertain.  Because the Subscription Rights are exercisable prior to the Effective Date, a holder of Allowed Claims that exercises its Subscription Rights may be treated for U.S. federal income tax purposes as directly receiving Class B Shares in respect of its Allowed Claims with a value equal to the value of such rights, rather than as receiving and thereafter exercising the rights.  A holder of Subscription Rights (however characterized) generally should not recognize taxable gain or loss upon the exercise of Subscription Rights.  The holder's tax basis in Class B Shares generally should equal the sum of (1) the holder's tax basis, if any, in the Subscription Rights (or, if the exercised Subscription Rights are disregarded for U.S. federal income tax purposes, the Class B Shares equal to the value of such rights) received in partial satisfaction of its Allowed Claims, and (2) the amount paid for such Class B Shares.  The holding period in such Class B Shares generally should begin on the date following receipt of such shares.  It is uncertain whether a holder that does not exercise its Subscription Rights should be treated as receiving anything of additional value in respect of its Allowed Claims or, alternatively, as receiving Subscription Rights that lapsed.  In the latter event, the holder generally should recognize a loss equal to its tax basis in the Subscription Rights, and such loss generally should be a capital loss.  Holders of Senior Secured

Claims are urged to consult their own tax advisors regarding the U.S. federal income tax treatment of Subscription Rights.

Holders of Bridge Loan Claims will receive New Warrants to purchase Class A Shares. Holders of Bridge Loan Claims generally should recognize gain or loss upon the receipt of New Warrants equal to the difference between (1) the fair market value of the New Warrants, and (2) the holder's adjusted tax basis in the Bridge Loan Claims transferred in exchange therefor. Any gain or loss recognized in the exchange generally should be capital gain or loss. The holder's tax basis in the New Warrants generally should equal the fair market value of the New Warrants, and the holding period for such warrants generally should begin on the date following receipt of such warrants. A holder generally should not recognize gain or loss upon exercise of the New Warrants to acquire Class A Shares. The holder's aggregate tax basis in the Class A Shares received upon exercise of the New Warrants generally should equal the holder's tax basis in the exercised New Warrants increased by the exercise price, and the holder's holding period in such Class A Shares generally should commence on the date following exercise of the New Warrants. Upon the lapse or disposition of the New Warrants, the holder generally should recognize gain or loss equal to the difference between the amount realized (zero in the case of a lapse) and the holder's adjusted tax basis in the New Warrants, and such gain or loss generally should be capital gain or loss. Holders of Bridge Loan Claims are urged to consult their own tax advisors regarding the U.S. federal income tax treatment of the New Warrants.

The U.S. federal income tax treatment to holders of (1) accrued but unpaid interest and distributions received after the Effective Date is discussed above, and (2) the receipt and ownership of Participation Rights is discussed below.

b.    Certain Consequences to Holders of DIP Roll-Up Claims

Under the terms of the Plan, holders of DIP Roll-Up Claims generally will receive, as applicable, New Third Lien Notes or Cram Down Notes (each, "**Notes**") in exchange for their Allowed Claims. Each holder of DIP Roll-Up Claims exchanged for Notes generally should recognize gain or loss equal to the difference, if any, between (1) the issue price of the Notes received in exchange for the DIP Roll-Up Claims, and (2) such holder's adjusted tax basis in the DIP Roll-Up Claims. Any gain or loss recognized in the exchange generally should be capital gain or loss. In the case of a noncorporate holder, capital gain currently is subject to tax at a 15% rate if the holder's holding period for the DIP Roll-Up Claims is more than one year at the time of the exchange. The Obama Administration has proposed taxing long term capital gains at a 20% rate for certain individuals in taxable years beginning after December 31, 2010. A holder's tax basis in the Notes should equal the issue price of such Notes, and a holder's holding period for the Notes generally should begin on the date following the Effective Date.

The "issue price" of the Notes generally should depend on whether, at any time during the 60-day period ending 30 days after the Effective Date, the applicable Notes or the DIP Roll-Up Claims are traded on an "established market." If the applicable Notes or the DIP Roll-Up Claims are treated for this purpose as traded on an established market, the issue price of such Notes generally should equal the fair market value of the Notes (or the DIP Roll-Up Claims if they, rather than the Notes, are traded on an established market) as of the Effective Date. Pursuant to applicable Treasury Regulations, an "established market" need not be a formal market. It is sufficient that the relevant debt obligation appears on a system of general circulation (including a computer listing disseminated to subscribing brokers, dealers or traders) that provides a reasonable basis to determine fair market value by disseminating either recent price quotations or actual prices of recent sales transactions. Also, under certain circumstances, a debt obligation is considered to be publicly traded when price quotations for such debt are readily available from dealers, brokers or traders. If neither the applicable Notes nor the DIP Roll-Up Claims are traded on an established market, the issue price of such Notes generally should be their stated principal amount. In general, the issuer's determination of issue price will be binding on all holders of Notes, other than a holder that explicitly discloses its inconsistent treatment in a statement attached to its timely filed U.S. federal income tax return for the taxable year in which the exchange occurs.

The U.S. federal income tax treatment to holders of accrued but unpaid interest and distributions received after the Effective Date is discussed above.

Holders of Allowed Claims against MCI ("**Millennium Custodial Trust Beneficiaries**") will receive Millennium Custodial Trust Interests.  Holders of General Unsecured Claims against an MCI Subsidiary will receive Participation Rights entitling the holder to a potential payment on a pro rata basis in order of priority up to the amount of the holder's Allowed Claims against the MCI Subsidiary on the Effective Date, but excluding any amounts for postpetition interest or post-Effective Date interest.  The U.S. federal income tax treatment of the Millennium Custodial Trust and of holders of Millennium Custodial Trust Interests and Participation Rights is unclear.  Accordingly, holders of General Unsecured Claims against Schedule III Debtors are urged to consult their own tax advisors regarding such treatment.  In addition to Millennium Custodial Trust Interests or Participation Rights, as applicable, holders of General Unsecured Claims against MCI, MSC, MPI, Millennium America, Inc. and MPCO, other than the Senior Secured Lenders and Bridge Lenders, will be entitled to Litigation Trust Beneficial Interests and Cash.  The U.S. federal income tax treatment of the receipt and ownership of Litigation Trust Beneficial Interests is discussed below.

(i)     Consequences of Holding Millennium Custodial Trust Interests

(A)     Receipt of Millennium Custodial Trust Interests

For U.S. federal income tax purposes, all parties (including the Debtors, the Millennium Trust Trustee and the Millennium Custodial Trust Beneficiaries) must treat the transfer of the Millennium Trust Assets to the Millennium Custodial Trust as a transfer of the Millennium Trust Assets directly to the Millennium Custodial Trust Beneficiaries, followed by the transfer of such assets by the beneficiaries to the Millennium Custodial Trust. It is possible that a holder's deemed exchange of Allowed Claims against MCI that constitute securities of MCI for U.S. federal income tax purposes for Equity Interests of MCI could be treated as a recapitalization to such holder, in which case such holder would not recognize gain or loss with respect to its deemed receipt of Equity Interests of MCI.  The following discussion assumes that no recapitalization will occur, and a Millennium Custodial Trust Beneficiary will recognize gain or loss on the exchange in an amount equal to the difference between (1) the beneficiary's amount realized (generally, the fair market value of the property received) and (2) the beneficiary's adjusted tax basis in its Allowed Claims.  The U.S. federal income tax treatment to holders of accrued but unpaid interest and distributions received after the Effective Date is discussed above.

(B)     Classification of Millennium Custodial Trust as Liquidating Trust

The Millennium Custodial Trust is intended to qualify as a liquidating trust for U.S. federal income tax purposes.  In general, a liquidating trust is not a separate taxable entity for U.S. federal income tax purposes, but is instead treated as a grantor trust, *i.e.*, a pass-through entity.  However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as such for U.S. federal income tax purposes.  In Revenue Procedure 94-45, the IRS set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a Title 11 plan.  The Millennium Custodial Trust has been structured with the intention of complying with such general criteria.  Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the Debtors, the Millennium Trust Trustee and the Millennium Custodial Trust Beneficiaries) are required to treat, for U.S. federal income tax purposes, the Millennium Custodial Trust as a grantor trust of which the Millennium Custodial Trust Beneficiaries are the owners and grantors.  The following discussion assumes that the Millennium Custodial Trust will be so respected for U.S. federal income tax purposes.  However, no ruling from the IRS or opinion of counsel has been requested concerning the tax status of the Millennium Custodial Trust, and the U.S. Debtors are unaware of any authority directly addressing the qualification of a trust structured similarly to the Millennium Custodial Trust as a liquidating trust for U.S. federal income tax purposes.  Accordingly, there can be no assurance that the IRS would not take a contrary position.  Were the IRS successfully to challenge such classification, the U.S. federal income tax consequences to the Millennium Custodial Trust, the Millennium Custodial Trust Beneficiaries and the Debtors could vary significantly from those discussed herein, including with respect to the potential for an entity level tax on the Millennium Custodial Trust's income.

(C)     General Tax Reporting by Millennium Custodial Trust and Beneficiaries

All parties must treat the Millennium Custodial Trust as a grantor trust of which the Millennium Custodial Trust Beneficiaries are the owners and grantors. The Millennium Trust Trustee will determine the fair market value of the Millennium Trust Assets as soon as possible after the Effective Date, and all parties must consistently use this valuation for all U.S. federal income tax purposes, including for determining gain, loss or tax basis. Accordingly, assuming the Millennium Custodial Trust qualifies as a liquidating trust for U.S. federal income tax purposes, each Millennium Custodial Trust Beneficiary generally should be required to report on the beneficiary's U.S. federal income tax return its allocable share of any income, gain, loss, deduction or credit recognized or incurred by the Millennium Custodial Trust, in accordance with such beneficiary's relative beneficial interest in the trust. The character of items of income, gain, loss, deduction or credit to any Millennium Custodial Trust Beneficiary, and such beneficiary's ability to benefit from any deductions or losses, may depend on such beneficiary's particular situation.

The U.S. federal income tax obligations of a Millennium Custodial Trust Beneficiary are not dependent upon the Millennium Custodial Trust distributing any Cash or other property. Therefore, a Millennium Custodial Trust Beneficiary may incur a U.S. federal income tax liability with respect to its allocable share of the Millennium Custodial Trust's income even if the trust has not made a concurrent distribution to such beneficiary. In general, a distribution of Cash or other property by the Millennium Custodial Trust will not be taxable to the Millennium Custodial Trust Beneficiary as such beneficiary will already be regarded for U.S. federal income tax purposes as owning the underlying assets or realizing the income of the Millennium Custodial Trust. Assuming MCI continues to be treated as a corporation for U.S. federal income tax purposes, the U.S. Debtors expect that the Millennium Custodial Trust Beneficiaries generally should only recognize income or loss (other than any income attributable to the Wind-Up Funds) if MCI makes distributions to the Millennium Custodial Trust.

The Millennium Trust Trustee will file with the IRS tax returns for the Millennium Custodial Trust treating such trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Millennium Trust Trustee will also send to each record holder a separate statement setting forth the information necessary for such holder to determine its share of items of income, gain, loss, deduction or credit, and will instruct the holder to report such items on its U.S. federal income tax return or to forward the appropriate information to the beneficial owners with instructions to report such items on their U.S. federal income tax returns.

Schedule III Debtors that are corporations generally would be subject to an entity level tax on their income, subject to any available losses or deductions. In addition, Schedule III Debtors that are U.S. corporations may not be permitted to file a consolidated U.S. federal income tax return because each Schedule III Debtor may not be treated as owning at least 80% of its respective subsidiary's equity (by vote and value) due to the issuance of Participation Rights. The absence of a consolidated group filing generally could trigger any outstanding intercompany obligations between Schedule III Debtors that are U.S. corporations.

MCI Subsidiaries that currently are disregarded entities may become partnerships for U.S. federal income tax purposes as a result of the issuance of Participation Rights to holders in satisfaction of Allowed Claims. An MCI Subsidiary that is treated as a partnership for U.S. federal income tax purposes itself will not be subject to U.S. federal income tax. Instead, such MCI Subsidiary's income, gains, losses, deductions and credits will be allocated to its partners for U.S. federal income tax purposes, regardless of whether such MCI Subsidiary makes any distributions of Cash or other property to its partners.

(ii)     Consequences of Holding Participation Rights

The U.S. federal income tax treatment of Participation Rights is unclear, and holders of Participation Rights are urged to consult their own tax advisors regarding such treatment. Treatment of the Participation Rights will depend in part on whether the receipt of such rights is a "closed transaction" or an "open transaction" and whether the Participation Rights are treated as a right to payment under a contract or as a debt instrument for U.S. federal income tax purposes. Open transaction treatment should apply only if the fair market value of the Participation Rights cannot be ascertained at the time of the exchange, and the IRS has taken the position that only in "rare and extraordinary circumstances" is the value of property so uncertain that open transaction treatment is available. In general, the U.S. Debtors intend to take the position for U.S. federal income tax purposes that closed transaction treatment applies to the issuance of Participation Rights and such rights represent a right to payment under a contract. The IRS is not bound by any position taken by the U.S. Debtors, and

may characterize the Participation Rights as a debt instrument or otherwise. If the IRS disagrees with any position taken by the U.S. Debtors, the tax treatment to holders receiving Participation Rights in exchange for Allowed Claims may be materially different from the treatment described below.

Assuming closed transaction treatment applies to a holder's receipt of Participation Rights, the U.S. Debtors believe that holders receiving Participation Rights generally should recognize gain or loss on the exchange of Allowed Claims for such Participation Rights equal to the difference between (1) the holder's amount realized (generally, the fair market value of the holder's contractual Participation Rights on the Effective Date), and (2) the holder's adjusted tax basis in its Allowed Claims. Alternatively, if a holder is treated for U.S. federal income tax purposes as receiving Participation Rights from an MCI Subsidiary that is treated as a corporation for U.S. federal income tax purposes in exchange for Allowed Claims that constitute securities of such MCI Subsidiary, the exchange may qualify as a recapitalization to the applicable holder for U.S. federal income tax purposes, in which case such holder generally would not recognize gain or loss with respect to its receipt of Participation Rights. A holder also generally may not recognize gain or loss for U.S. federal income tax purposes if such holder is treated as receiving its Participation Rights in exchange for a contribution of property to an entity taxable as a partnership for U.S. federal income tax purposes. In addition, amounts received by a holder of Allowed Claims that are attributable to, or in compensation for, such holder's personal injuries or sickness, within the meaning of section 104 of the Tax Code, generally should be nontaxable to such holder, except to the extent amounts are attributable to medical expense deductions allowed under section 213 of the Tax Code for a prior taxable year or potentially to the extent amounts received after the Effective Date are treated as imputed interest for U.S. federal income tax purposes.

Any gain or loss recognized by a holder upon an exchange of Allowed Claims for Participation Rights generally should be capital gain or loss. In the case of a noncorporate holder, capital gain currently is subject to tax at a 15% rate if the holder's holding period for the Allowed Claims is more than one year at the time of the exchange. The Obama Administration has proposed taxing long term capital gains at a 20% rate for certain individuals in taxable years beginning after December 31, 2010. The holder's tax basis in the Participation Rights received in the exchange generally should equal the fair market value of such property, and the holding period for the Participation Rights generally should begin on the date following their receipt. The U.S. federal income tax treatment of accrued but unpaid interest is discussed above.

If a payment is made in a future taxable year with respect to the Participation Rights, each holder generally should recognize gain in the amount by which such payment (other than the portion characterized as interest as discussed below) exceeds the holder's tax basis in its Participation Rights. If no payment is made, or if the payment is less than the holder's tax basis in its Participation Rights, the holder generally should recognize a loss. Assuming the receipt of Participation Rights is treated as a closed transaction, the character of any gain or loss recognized by a holder in a future taxable year with respect to the Participation Rights generally is unclear. In addition, a deferred payment given as consideration in exchange for non-publicly traded property generally must provide for adequate stated interest or a portion of the payment will be characterized as interest for U.S. federal income tax purposes. Generally, section 483 of the Tax Code applies to contracts for the sale or exchange of property if the contract provides for one or more contingent payments. Participation Rights will only provide for contingent payments. Contingent payments are accounted for when payment is made. Under section 483, a portion of a contingent payment equal to the amount of "unstated interest" is treated as interest, and the rest of the payment is treated as a receipt of the sales price. "Unstated interest" represents the excess of (1) the total deferred payments (*i.e.*, all payments due more than six months after the date of the sale or exchange) over (2) the aggregate present value of all deferred payments plus any stated interest. The holder must include this interest in taxable income in the taxable year in which the payment is made.

Finally, if open transaction treatment applies to a holder's receipt of Participation Rights, the holder generally would not take the Participation Rights into account on the Effective Date for purposes of determining gain or loss with respect to the exchange. Instead, the holder generally would take no tax basis in the Participation Rights, but would be subject to tax as payments with respect to the Participation Rights are made or deemed made in accordance with the holder's regular method of accounting. The holder generally would treat a portion of such payments as interest income under section 483, then as recovery of tax basis in the holder's Allowed Claims, and the balance as gain. To the extent the holder has unrecovered tax basis in its Allowed Claims after receipt of all payments pursuant to the Participation Rights, the holder generally should recognize a loss. Any recognized gain or loss generally should be capital gain or loss.

d.      Certain Consequences to Litigation Trust Beneficiaries

Litigation Trust Beneficiaries, including holders of General Unsecured Claims against Obligor Debtors and holders of 2015 Notes Claims (other than 2015 Notes Claims against Obligor Non-Debtors) with respect to Classes that vote to accept the Plan, will receive an interest in the Litigation Trust and Cash.  Holders of General Unsecured Claims against Obligor Debtors and holders of 2015 Notes Claims (other than 2015 Notes Claims against Obligor Non-Debtors) that receive Litigation Trust Beneficial Interests are urged to consult their own tax advisors regarding the U.S. federal income tax treatment of the Litigation Trust and of the Litigation Trust Beneficiaries that will hold an interest therein.

(i)      Receipt of Litigation Trust Beneficial Interests and Cash

In general, the receipt of Litigation Trust Beneficial Interests and Cash in exchange for Allowed Claims should result in the recognition of gain or loss in an amount equal to the difference between (1) the fair market value of Litigation Trust Beneficial Interests and any Cash received and (2) the holder's adjusted tax basis in the Allowed Claims exchanged therefor.  The U.S. federal income tax treatment to holders of accrued but unpaid interest and distributions received after the Effective Date is discussed above.

(ii)      Classification of Litigation Trust as Liquidating Trust

The Litigation Trust is intended to qualify as a liquidating trust for U.S. federal income tax purposes.  In general, a liquidating trust is not a separate taxable entity for U.S. federal income tax purposes, but is instead treated as a grantor trust, *i.e.*, a pass-through entity.  However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as such for U.S. federal income tax purposes.  In Revenue Procedure 94-45, the IRS set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a Title 11 plan.  The Litigation Trust has been structured with the intention of complying with such general criteria.  Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the Debtors, the Litigation Trustee and the Litigation Trust Beneficiaries) are required to treat, for U.S. federal income tax purposes, the Litigation Trust as a grantor trust of which the Litigation Trust Beneficiaries are the owners and grantors.  The following discussion assumes that the Litigation Trust will be so respected for U.S. federal income tax purposes.  However, no ruling has been requested from the IRS, and no opinion of counsel has been requested concerning the tax status of the Litigation Trust as a grantor trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position.  Were the IRS successfully to challenge such classification, the U.S. federal income tax consequences to the Litigation Trust, the Litigation Trust Beneficiaries and the Debtors could vary significantly from those discussed herein, including with respect to the potential for an entity level tax on the Litigation Trust's income.

(iii)      General Tax Reporting by Litigation Trust and Beneficiaries

For U.S. federal income tax purposes, all parties (including the Debtors, the Litigation Trustee and the Litigation Trust Beneficiaries) must treat the transfer of the Litigation Trust Assets as a transfer of such assets directly to the Litigation Trust Beneficiaries, followed by the transfer of such assets by the beneficiaries to the Litigation Trust.  Consistent therewith, all parties must treat the Litigation Trust as a grantor trust of which the Litigation Trust Beneficiaries are the owners and grantors.  The Litigation Trustee will determine the fair market value of the Litigation Trust Assets as soon as possible after the Effective Date, and all parties must consistently use this valuation for all U.S. federal income tax purposes, including for determining gain, loss or tax basis.

Accordingly, assuming the Litigation Trust qualifies as a liquidating trust for U.S. federal income tax purposes, each Litigation Trust Beneficiary generally should be required to report on the beneficiary's U.S. federal income tax return its allocable share of any income, gain, loss, deduction or credit recognized or incurred by the Litigation Trust, in accordance with such beneficiary's relative beneficial interest in the trust.  The character of items of income, gain, loss, deduction or credit to any Litigation Trust Beneficiary, and such beneficiary's ability to benefit from any deductions or losses, may depend on such beneficiary's particular situation.

The U.S. federal income tax obligations of a Litigation Trust Beneficiary are not dependent upon the Litigation Trust distributing any Cash or other property. Therefore, a Litigation Trust Beneficiary may incur a U.S. federal income tax liability with respect to its allocable share of the Litigation Trust's income even if the trust has not made a concurrent distribution to such beneficiary. In general, a distribution of Cash or other property by the Litigation Trust will not be taxable to the Litigation Trust Beneficiary as such beneficiary will already be regarded for U.S. federal income tax purposes as owning the underlying assets or realizing the income of the Litigation Trust.

The Litigation Trustee will file with the IRS tax returns for the Litigation Trust treating such trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Litigation Trustee will also send to each record holder a separate statement setting forth the information necessary for such holder to determine its share of items of income, gain, loss, deduction or credit, and will instruct the holder to report such items on its U.S. federal income tax return or to forward the appropriate information to the beneficial owners with instructions to report such items on their U.S. federal income tax returns.

### e. Certain Consequences to Holders of 2015 Notes Claims

Under the terms of the Plan, if holders of 2015 Notes Claims vote to reject the Plan or the 2015 Notes Adversary Proceeding is not dismissed with prejudice, this Class will not receive or retain any interest or property on account of the 2015 Notes Claims. Regardless of whether holders of 2015 Notes Claims vote to accept or reject the Plan, holders of 2015 Notes Claims against Obligor Non-Debtors will not receive or retain any interest or property on account of such Claims. Holders of 2015 Notes Claims that do not receive or retain any interest or property on account of such Claims generally should recognize a capital loss for U.S. federal income tax purposes in an amount equal to such holder's adjusted tax basis in the relevant Claims on the Effective Date. Holders of 2015 Notes Claims are urged to consult their own tax advisors with respect to the tax consequences expected to result to such holders from the implementation of the Plan.

### D. Certain Consequences Relating to the Environmental Custodial Trust

The Environmental Custodial Trust will be formed to own, administer, remediate as necessary, and transfer title to, or otherwise effect the disposition of, the Transferred Real Properties. The Environmental Trust Beneficiaries, which will consist of several governmental environmental agencies, will hold the Environmental Custodial Trust Interests.

The Treasury Regulations promulgated under section 468B of the Tax Code provide that a fund, account or trust will be treated as a QSF for U.S. federal income tax purposes if three conditions are met. First, the fund, account or trust must be established pursuant to an order of, or be approved by, a government authority, including a court, and must be subject to the continuing jurisdiction of that government authority. Second, the fund, account or trust must be established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event or related series of events that has occurred and that has given rise to at least one claim asserting liability arising out of, among other things, a tort, violation of law or CERCLA claim. Third, the fund, account or trust must be a trust under applicable state law or have its assets physically segregated from the other assets of the transferor and persons related to the transferor.

The Environmental Custodial Trust has been structured to comply with the foregoing requirements to the maximum extent possible. The Environmental Trust Trustee will not elect to have the Environmental Custodial Trust treated as a grantor trust for U.S. federal income tax purposes. The following discussion assumes that the Environmental Custodial Trust will be respected as a QSF for U.S. federal income tax purposes. However, no ruling has been requested from the IRS, and no opinion of counsel has been requested concerning the tax status of the Environmental Custodial Trust as a QSF. Accordingly, there can be no assurance that the IRS would not take a contrary position. Were the IRS successfully to challenge such classification, the U.S. federal income tax consequences relating to the Environmental Custodial Trust could vary significantly from those discussed herein.

Assuming the Environmental Custodial Trust is treated as a QSF for U.S. federal income tax purposes, the Environmental Custodial Trust generally will be treated as a separate taxable entity, and, to the extent such Environmental Custodial Trust is not treated for U.S. federal income tax purpose as beneficially owned by the

United States pursuant to section 468B(g)(2) of the Tax Code, generally will be subject to U.S. federal income tax on the Environmental Custodial Trust's modified taxable income at the maximum rate applicable to trusts, which is currently 35%. In determining the modified taxable income of the Environmental Custodial Trust, (1) amounts transferred by the U.S. Debtors to such trust (other than certain specified amounts such as payments in compensation for late or delayed transfers) pursuant to the Plan generally will be excluded from the trust's income, (2) any sale, exchange or distribution of property by such trust generally will be treated as a sale and result in the trust's recognition of gain or loss in an amount equal to the difference between the fair market value of the property on the date of such disposition and the trust's adjusted tax basis in the relevant property, and (3) administrative costs (including state and local taxes) incurred by such trust that would be deductible in determining the taxable income of a corporation generally will be deductible by the trust. The adjusted tax basis of the Environmental Custodial Trust in property received from the U.S. Debtors pursuant to the Plan generally will be the fair market value of such property at the time of the transfer.

E.    **Certain Consequences of Ownership and Disposition of New Common Stock and Notes**

The following is a discussion of certain U.S. federal income tax consequences that may be relevant with respect to the ownership and disposition of New Common Stock and/or Notes. This discussion addresses only the U.S. federal income tax considerations of holders that will receive New Common Stock and/or Notes under the Plan (and New Common Stock received upon the exercise of New Warrants) and that will hold such New Common Stock and/or Notes as capital assets. This discussion assumes that New Topco will be treated as a foreign corporation for all U.S. federal income tax purposes. For purposes of this discussion, a "**U.S. Holder**" is a beneficial owner of New Common Stock and/or Notes that, for U.S. federal income tax purposes, is (1) a citizen or resident of the United States, (2) a corporation created or organized in or under the laws of the United States, any state thereof, or the District of Columbia, (3) an estate, the income of which is subject to U.S. federal income taxation regardless of its source, or (4) a trust that validly elects to be treated as a U.S. person for U.S. federal income tax purposes, or if a court within the United States is able to exercise primary supervision over the trust's administration and one or more U.S. persons have the authority to control all of the substantial decisions of such trust. A "**Non-U.S. Holder**" is a beneficial owner of New Common Stock and/or Notes that is not a U.S. Holder. If a partnership (or an entity treated as a partnership for U.S. federal income tax purposes) holds New Common Stock and/or Notes, the tax treatment of a partner in such partnership will generally depend on the status of the partner and the activities of the partnership. Such a partner should consult its own tax advisor as to the tax consequences expected to result to such partner from the implementation of the Plan.

1.    *Ownership of New Common Stock*

a.    New Topco

New Topco will be treated as a passive foreign investment company ("**PFIC**") for U.S. federal income tax purposes for any taxable year in which at least 75% of its gross income is passive income, or in which at least 50% of its assets on average produce passive income or are held for the production of passive income (taking into account certain look-through rules). A shareholder in a PFIC that does not make a timely qualified electing fund election generally is required to both report any gain on the disposition of its stock as ordinary income, rather than capital gain, and compute the tax liability on such gain and any "excess distribution" received in respect of the stock as if such items had been earned ratably over each day in the holder's holding period for the stock, and may also be subject to a non-deductible interest charge. The U.S. Debtors do not expect that New Topco will be treated as a PFIC.

New Topco will constitute a controlled foreign corporation ("**CFC**") if more than 50% of the stock in New Topco (by vote or value) is owned, directly, indirectly, or constructively, by United States shareholders. For this purpose, a United States shareholder is any U.S. person that possesses, directly, indirectly, or constructively, at least 10% of the combined voting power of all classes of New Topco's stock. In general, if for any given taxable year New Topco is treated as a CFC, a United States shareholder of New Topco on the last day of New Topco's taxable year would be required to include as ordinary income an amount equal to the holder's pro rata share of New Topco's Subpart F income and investment in earnings in U.S. property at the end of such taxable year, regardless of whether the holder received any distributions on its New Common Stock during such taxable year. In addition, special foreign tax credit rules generally should apply. A holder's adjusted tax basis in New Common

Stock generally should be increased to reflect any taxed but undistributed earnings and profits. Any distribution of earnings and profits with respect to which a holder previously had been taxed generally should result in a corresponding reduction in the adjusted tax basis of the holder's New Common Stock, and the holder generally should not be taxed again upon distribution. Subject to an exception for certain individuals, any gain realized by a United States shareholder upon the disposition of New Common Stock would be treated as ordinary income to the extent of the holder's pro rata share of New Topco's earnings that were accumulated during the period the holder held its New Common Stock. Because CFC status will depend upon the identity of New Topco's future shareholders and their respective stock ownership, there can be no assurance that New Topco will not be treated as a CFC for any taxable year.

b.      Distributions on New Common Stock

Subject to the PFIC and CFC rules discussed above, the gross amount of any distribution by New Topco of Cash or other property with respect to New Common Stock, other than certain distributions, if any, of New Common Stock distributed pro rata to all shareholders of New Topco, will be includible in income by a U.S. Holder as dividend income to the extent such distributions are paid out of the current or accumulated earnings and profits of New Topco, as determined under U.S. federal income tax principles. Individuals who are U.S. Holders will be taxed on such distributions made in taxable years beginning before January 1, 2011 at the lower rates applicable to long term capital gains if New Common Stock is readily tradable on an established securities market in the United States and such individuals satisfy certain holding period and risk requirements ("**Qualified Dividends**"). The Obama Administration has proposed taxing Qualified Dividends at a 20% rate for certain individuals in taxable years beginning after December 31, 2010. A U.S. corporation that holds New Common Stock will not be eligible for the dividend received deduction ("**DRD**") with respect to dividends received from New Topco. Dividends paid to U.S. Holders with respect to their New Common Stock will be treated as foreign source income, which may be relevant in calculating foreign tax credit limitations. Subject to certain conditions and limitations, any Dutch withholding taxes imposed on any dividends paid on New Common Stock may be deducted from a U.S. Holder's taxable income or credited against such holder's U.S. federal income tax liability. The limitation on foreign taxes eligible for credit is calculated separately with respect to specific classes of income, and dividends paid on New Common Stock generally will constitute passive income. To the extent, if any, that the amount of any distribution by New Topco exceeds New Topco's current and accumulated earnings and profits as determined under U.S. federal income tax principles, such distribution will be treated first as a tax-free return of the U.S. Holder's adjusted tax basis in the New Common Stock and thereafter as capital gain.

Non-U.S. Holders of New Common Stock generally will not be subject to U.S. federal income or withholding tax on dividends received on New Common Stock, unless such income is effectively connected with the conduct by the Non-U.S. Holder of a U.S. trade or business or a permanent establishment in the United States.

c.      Sale or Exchange of New Common Stock

Subject to the PFIC and CFC rules discussed above, a U.S. Holder of New Common Stock generally will recognize gain or loss on its sale or exchange of New Common Stock equal to the difference between the amount realized on such sale or exchange and the U.S. Holder's adjusted tax basis in the relevant shares of New Common Stock. Subject to the ordinary income recapture rules for New Common Stock discussed above, such gain or loss generally will be capital gain or loss. In the case of a noncorporate U.S. Holder, such gain currently is subject to tax at a 15% rate if the U.S. Holder's holding period for the New Common Stock is more than one year at the time of disposition. The Obama Administration has proposed taxing long term capital gains at a 20% rate for certain individuals in taxable years beginning after December 31, 2010. Gain or loss, if any, recognized by a U.S. Holder generally will be treated as U.S. source income or loss for U.S. foreign tax credit purposes. The deductibility of capital losses is subject to limitations.

A Non-U.S. Holder of New Common Stock generally will not be subject to U.S. federal income or withholding tax on any gain realized on the sale or exchange of New Common Stock unless (1) such gain is effectively connected with the conduct by the Non-U.S. Holder of a U.S. trade or business or a permanent establishment in the United States, or (2) in the case of any gain realized by an individual Non-U.S. Holder, the holder is present in the United States for 183 days or more in the taxable year of disposition and certain other conditions are met.

## 2. *Ownership of Notes*

Lyondell Chemical will issue the New Third Lien Notes and the Cram Down Notes. Stated interest paid on a Note will be includible in a U.S. Holder's gross income as ordinary interest income in accordance with the U.S. Holder's usual method of tax accounting to the extent such stated interest is "qualified stated interest." Stated interest is "qualified stated interest" if it is payable in Cash or property (other than debt instruments of the issuer) at least annually. The Notes (or a portion thereof) may be considered to be issued with OID depending on the issue price of such Notes. A debt instrument generally has OID if its "stated redemption price at maturity" exceeds its issue price by more than a *de minimis* amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the Notes, other than qualified stated interest. See "Certain Consequences to Holders of DIP Roll-Up Claims" above for a discussion regarding the determination of issue price.

If a New Third Lien Note is treated as an applicable high yield discount obligation ("**AHYDO**") within the meaning of section 163(i) of the Tax Code, any OID deductions of Lyondell Chemical with respect to such New Third Lien Note generally would be deferred, and a portion of the OID may be permanently disallowed. Generally, such treatment would not affect the accrual and reporting of income under the OID rules by a holder of New Third Lien Notes. However, in the case of a corporate holder of New Third Lien Notes, a portion of such holder's income with respect to accrued OID equal to the portion, if any, for which Lyondell Chemical is disallowed a deduction would be treated as a dividend for purposes of the DRD rules, but only to the extent such amount would be treated as a dividend if it had been a distribution made by Lyondell Chemical with respect to its stock, *i.e.*, to the extent Lyondell Chemical has sufficient earnings and profits such that a distribution in respect of its stock would constitute a dividend for U.S. federal income tax purposes. A corporate holder's entitlement to any such DRD should presumably be subject to the normal holding period, taxable income requirements and other limitations applicable to a DRD. (Assuming the Cram Down Notes only have a five-year term as set forth in Exhibit E to the Plan, such notes generally should not be subject to potential treatment as an AHYDO).

Lyondell Chemical's payments of interest on the Notes to a Non-U.S. Holder generally should not be subject to any U.S. withholding tax, provided that the following conditions are satisfied: (1) the Non-U.S. Holder does not, directly or indirectly, actually or constructively, own at least 10% of the total combined voting power of all classes of Lyondell Chemical's stock entitled to vote; (2) the Non-U.S. Holder is not a CFC for U.S. federal income tax purposes that is related to Lyondell Chemical through stock ownership; (3) the Non-U.S. Holder is not a bank described in section 881(c)(3)(A) of the Tax Code; and (4) either (a) the beneficial owner certifies on IRS Form W-8BEN (or a suitable substitute form or successor form), under penalties of perjury, that the beneficial owner of the Notes is not a U.S. person, and provides its name and address, or (b) a securities clearing organization, bank or other financial institution that holds customers' securities in the ordinary course of its trade or business and holds the Notes on behalf of the beneficial owner certifies, under penalties of perjury, that such a statement has been received from the beneficial owner by it or by a financial institution between it and the beneficial owner, and furnishes Lyondell Chemical with a copy thereof.

Upon the sale, exchange or retirement of a Note, a U.S. Holder generally will recognize taxable gain or loss equal to the difference, if any, between the amount realized on the sale, exchange or retirement, other than accrued but unpaid interest which will be taxable as such, and such U.S. Holder's adjusted tax basis in the relevant Note. Such gain or loss generally will be capital gain or loss. In the case of a noncorporate U.S. Holder, such gain currently is subject to tax at a 15% rate if the U.S. Holder's holding period for the Note is more than one year at the time of disposition. The Obama Administration has proposed taxing long term capital gains at a 20% rate for certain individuals in taxable years beginning after December 31, 2010. The deductibility of capital losses is subject to limitations.

Any gain realized by a Non-U.S. Holder upon the sale, exchange or retirement of a Note generally will not be subject to U.S. federal income tax, unless (1) such gain is effectively connected with the conduct by the Non-U.S. Holder of a U.S. trade or business or a permanent establishment in the United States, or (2) in the case of any gain realized by an individual Non-U.S. Holder, the holder is present in the United States for 183 days or more in the taxable year of disposition and certain other conditions are met.

**Certain Information Reporting and Backup Withholding Requirements**

            In general, information reporting requirements may apply to distributions or payments under the Plan.  Furthermore, interest, dividends and other reportable payments may, under certain circumstances, be subject to backup withholding at the then-applicable rate (currently 28%).  Backup withholding generally applies if the U.S. Holder (1) fails to provide an accurate taxpayer identification number, (2) is notified by the IRS of a failure to report interest or dividends properly or (3) otherwise fails to comply with applicable certification requirements.  The amount of backup withholding imposed on a payment to a U.S. Holder may be refunded by the IRS or allowed as a credit against the holder's U.S. federal income tax liability, provided that the required information is properly furnished to the IRS.  Certain persons are exempt from backup withholding, including, under certain circumstances, corporations and financial institutions.

## XIII.    CERTAIN DUTCH TAX CONSEQUENCES OF THE PLAN

            The following summary of certain Dutch taxation matters is based on the laws and practice in effect on the date of this Disclosure Statement and is subject to any changes in law and the interpretation and application thereof, which changes could be made with retroactive effect.  The following summary does not purport to be a comprehensive description of all the tax considerations that may be relevant to a decision to acquire, hold or dispose of New Common Stock, New Third Lien Notes or Subscription Rights, and does not purport to deal with the tax consequences applicable to all categories of investors, some of which may be subject to special rules.  Where in this summary English terms and expressions are used to refer to Dutch taxation concepts, the meaning to be attributed to such terms and expressions shall be the meaning attributed to the equivalent Dutch concepts under Dutch tax law.

            For the purpose of this summary, it is assumed that:

            (i)        no individual acquiring New Common Stock, New Third Lien Notes or Subscription Rights upon conversion, including certain individuals connected to such holder, has or will have a substantial interest in a Debtor;

            (ii)       no individual holding Class A Shares or Subscription Rights has or will have a substantial interest or a deemed substantial interest in New Topco; and

            (iii)      no individual holding a New Note, including certain individuals connected to such holder, has or will have a substantial interest in New Topco.

            (iv)      no entity which is subject to Dutch corporate income tax will have an interest of one third or more in New Topco.

            Generally, an individual has a substantial interest in a company if (a) such individual, either alone or together with his partner, directly or indirectly has, or (b) certain relatives of such individual or his partner, directly or indirectly have, (I) the ownership of, a right to acquire the ownership of (including Subscription Rights), or certain rights over, shares representing 5% or more of either the total issued and outstanding capital of such company or the issued and outstanding capital of any class of shares of such company, or (II) the ownership of, or certain rights over, profit participating certificates (*winstbewijzen*) that relate to 5% or more of either the annual profit or the liquidation proceeds of such company.  Also, an individual has a substantial interest in a company if his partner has, or if certain relatives of the individual or his partner have, a deemed substantial interest in such company.  An individual, or his partner or relevant relative, has a deemed substantial interest in a company if either (a) such person or his predecessor has disposed of or is deemed to have disposed of all or part of a substantial interest or (b) such person has transferred an enterprise in exchange for shares in such company, on a non-recognition basis.

            Generally, an entity has a substantial interest in a company if such entity, directly or indirectly has, (I) the ownership of, a right to acquire the ownership of, or certain rights over shares representing 5% or more of either the total issued and outstanding capital of such company or the issued and outstanding capital of any class of

shares of such company, or (II) the ownership of, or certain rights over, profit participating certificates (*winstbewijzen*) that relate to 5% or more of either the annual profit or the liquidation proceeds of such company. An entity has a deemed substantial interest in a company if such entity has disposed of or is deemed to have disposed of all or part of a substantial interest on a non-recognition basis.

Furthermore, and in addition to the assumptions above, it is assumed that none of the Debtors is tax resident in The Netherlands, and that certain members of the Dutch group may be parties to loans that will be restructured as part of the Plan.

For the purpose of this summary, the term entity means a corporation as well as any other person that is taxable as a corporation for Dutch corporate tax purposes.

**INVESTORS ARE ADVISED TO CONSULT THEIR PROFESSIONAL ADVISERS AS TO THE TAX CONSEQUENCES OF PURCHASE, OWNERSHIP AND DISPOSITION OF NEW COMMON STOCK, A NEW THIRD LIEN NOTE OR A SUBSCRIPTION RIGHT.**

A. **Dutch Income Tax Consequences to LBIH and other members of the Dutch group**

LBIH files a consolidated Dutch income tax return which takes into account the operation of all of Dutch entities.  The consolidated Dutch tax group reported a consolidated NOL carry forward for Dutch income tax purposes of approximately EUR 436 million as of December 31, 2008, and expects to report additional losses with respect to its 2009 taxable year.  It is intended that New Topco will be included in LBIH's consolidated Dutch tax group with New Topco as the head of this consolidated group.

1. *Dutch Tax Consequences of Loan Restructuring (Both External Loans and Intercompany Loans)*

a. Full or partial waiver of debt

With regard to a possible full or partial waiver of debts, two situations need to be distinguished at the level of a debtor that is subject to Dutch corporate income tax:

(i) Circumstances where the debt is (fully or partially) waived for business reasons, i.e., it cannot reasonably be expected that the debt will be (wholly) repaid.  In this case, a profit derived from the waiver of debts for business reasons in principle is exempt to the extent it exceeds the available losses of the taxpayer (in the year of the waiver and in prior years).  Under certain circumstances, this exemption may be limited, resulting in corporate income tax payable with respect to the waiver.  Debtors believe that this limitation should not apply to LBIH and other members of the Dutch group.

(ii) Circumstances where the debt is waived for shareholder reasons (i.e., related party motives).  In this case, if the debt is waived for shareholder reasons, no profit should generally be recognized at the level of the Dutch debtor (instead, such waiver is regarded as an equity movement for Dutch corporate tax purposes).

If a receivable on a non-Dutch group company is owned directly or indirectly by the Dutch group and such receivable has decreased in value, LBIH (being the parent company of the fiscal unity for corporate income tax purposes) will in principle recognize a tax deductible impairment for the amount of the value decrease.  Under certain circumstances, however, LBIH may be obliged to recapture the tax deductible impairment (i.e., the tax deduction is added to the taxable profits again) if it (or a related party) owns or acquires, directly or indirectly, a "participation" in the debtor (generally, a shareholding of at least 5%).

b.      Conversion of an Allowed Claim into Class A Shares

If, upon the conversion of an Allowed Claim into New Common Stock, New Topco becomes the owner of a receivable on a Debtor, such acquisition should not result in the recognition of taxable income for Dutch tax purposes.  In principle, New Topco will record the receivable for its fair market value for Dutch corporate tax purposes.

c.      Conversion of a debt into another debt

The conversion of debt owed by LBIH or other members of the Dutch group into another debt owed by the same entity in the same amount, but with different terms and conditions, should generally not result in the recognition of taxable income for Dutch tax purposes.  If, upon conversion, the amount of the debt will be reduced, the reduction of the debt should be treated as a partial waiver of debt for Dutch tax purposes.  We refer to subparagraph (a).

d.      Ruling from the Dutch tax authorities

It is intended that, as soon as practically possible, a ruling is sought from the Dutch tax authorities as regards the Dutch tax consequences of the loan restructuring for LBIH and its Dutch subsidiaries.

**B.      Dutch Income Tax Consequences to Holders of Allowed Claims Upon Conversion**

1.      *Dutch Resident Entities*

Upon conversion[64] by a holder of an Allowed Claim into New Common Stock, New Third Lien Notes and/or Subscription Rights, any gain or loss realized by a holder of such Allowed Claim will generally be included in the taxable income of such holder for the difference between (i) the tax book value and (ii) the value of the New Common Stock, New Third Lien Notes, and/or Subscription Rights.  However, if a holder of an Allowed Claim, or a related company to such holder, owns or acquires, directly or indirectly, a "participation" (generally, a shareholding of at least 5%) in the relevant Debtor of the Allowed Claim, then under certain circumstances, the holder may be obliged to recapture any tax deductible impairment of the Allowed Claim claimed in the past.

2.      *Dutch Resident Individuals*

An individual holding an Allowed Claim converting into Class A Shares, a New Note and/or a Subscription Right who is, is deemed to be, or has elected to be treated as, resident in The Netherlands for income tax purposes will generally be taxable (or should be entitled to claim a tax loss as the case may be) for the difference between (i) the tax book value and (ii) the value of the Class A Shares, a New Note and/or a Subscription Right at rates up to 52% if:

(i)      the income or capital gain is attributable to an enterprise from which the holder derives profits (other than as a shareholder); or

(ii)      the income or capital gain qualifies as income from miscellaneous activities (*belastbaar resultaat uit overige werkzaamheden*) as defined in the Income Tax Act (*Wet inkomstenbelasting 2001*), including, without limitation, activities that exceed normal, active asset management (*normaal, actief vermogensbeheer*).

---

[64] As used in this Section XIII, the term "conversion" means contribution of Senior Secured Claims and DIP Roll-Up Claims as consideration for New Common Stock or New Third Lien Notes.

3. *Non-Residents Entities*

A holder of an Allowed Claim converting into Class A Shares, a New Note and/or a Subscription Right which is not, is not deemed to be, resident in The Netherlands for the relevant tax purposes will not be subject to Dutch income tax unless the income or capital gain is attributable to an enterprise or part thereof which is either effectively managed in The Netherlands or carried on through a permanent establishment (*vaste inrichting*) or permanent representative (*vaste vertegenwoordiger*) in The Netherlands.

4. *Non-Residents Individuals*

A holder of an Allowed Claim converting into Class A Shares, a New Note and/or a Subscription Right which is not, is not deemed to be, and has not elected to be treated as, resident in The Netherlands for the relevant tax purposes will not be subject to Dutch income tax unless:

(i) the income or capital gain is attributable to an enterprise or part thereof which is either effectively managed in The Netherlands or carried on through a permanent establishment (*vaste inrichting*) or permanent representative (*vaste vertegenwoordiger*) in The Netherlands; or

(ii) the income or capital gain qualifies as income from miscellaneous activities (*belastbaar resultaat uit overige werkzaamheden*) in The Netherlands as defined in the Income Tax Act (*Wet inkomstenbelasting 2001*), including, without limitation, activities that exceed normal, active asset management (*normaal, actief vermogensbeheer*).

**C.   Dutch Income Tax Consequences of Ownership of New Common Stock or New Third Lien Notes**

1. *Withholding Tax*

a.   Holders of New Common Stock

In general, New Topco must withhold tax ("**dividend tax**") from dividends distributed on the New Common Stock at the rate of 15%.  Dividends include, without limitation:

(i) distributions of profits (including paid-in capital not recognized for dividend tax purposes) in Cash or in kind, including deemed and constructive dividends;

(ii) liquidation distributions and, generally, proceeds realized upon a repurchase of New Common Stock by New Topco or upon the transfer of New Common Stock to a direct or indirect subsidiary of New Topco, in excess of the average paid-in capital recognized for dividend tax purposes;

(iii) the par value of New Common Stock issued or any increase in the par value of New Common Stock, except where such increase in the par value of New Common Stock is funded out of New Topco's paid-in capital recognized for dividend tax purposes; and

(iv) repayments of paid-in capital recognized for dividend tax purposes up to the amount of New Topco's profits (*zuivere winst*) unless New Topco's general meeting of shareholders has resolved in advance that New Topco shall make such repayments and the par value of the New Common Stock concerned has been reduced by a corresponding amount through an amendment of New Topco's articles of association.

A holder of New Common Stock which is, is deemed to be, or – in case the holder is an individual – has elected to be treated as, resident in The Netherlands for the relevant tax purposes is generally entitled to credit the dividend tax withheld against such holder's tax liability on income and capital gains or, in certain cases, to apply for a full refund of the dividend tax withheld.

A holder of New Common Stock which is not, is not deemed to be, and – in case the holder is an individual – has not elected to be treated as, resident in The Netherlands for the relevant tax purposes may be eligible for a partial or full exemption or refund of the dividend tax under an income tax convention in effect between The Netherlands and the holder's country of residence or under the Dutch rules relating to the implementation of the Parent / Subsidiary Directive as the case may be. Moreover, residents benefitting from the participation exemption are eligible for a full exemption of dividend tax.

Under the terms of domestic anti-dividend stripping rules, a recipient of dividends distributed on New Common Stock will not be entitled to an exemption from, reduction, refund, or credit of dividend tax if the recipient is not the beneficial owner of such dividends within the meaning of such rules.

b.     <u>Holders of Notes</u>

All payments by New Topco of interest and principal to Holders of the New Third Lien Notes can be made free of withholding or deduction for any taxes imposed, levied, withheld or assessed by The Netherlands or any political subdivision or taxing authority thereof or therein.

2.     *<u>Taxes on income and capital gains</u>*

a.     <u>Resident Entities</u>

An entity holding New Common Stock which is, or is deemed to be, resident in The Netherlands for corporate tax purposes and which is not tax exempt, will generally be subject to corporate tax in respect of income or a capital gain derived from New Common Stock at rates up to 25.5%, unless the holder has the benefit of the participation exemption (*deelnemingsvrijstelling*) with respect to such New Common Stock.

An entity holding a New Note which is, or is deemed to be, resident in The Netherlands for corporate tax purposes and which is not tax exempt, will generally be subject to corporate tax in respect of income or a capital gain derived from a New Note at rates up to 25.5%.

An entity holding a Subscription Right which is, or is deemed to be, resident in The Netherlands for corporate tax purposes and which is not tax exempt, will generally be subject to corporate tax in respect of income or a capital gain derived from the Subscription Right at rates up to 25.5%, unless the holder has the benefit of the participation exemption (*deelnemingsvrijstelling*) with respect to such Subscription Right.

b.     <u>Resident Individuals</u>

An individual holding New Common Stock, a New Note and/or a Subscription Right who is, is deemed to be, or has elected to be treated as, resident in The Netherlands for income tax purposes is subject to income tax in respect of income or a capital gain derived from New Common Stock, a New Note and/or a Subscription Right at rates up to 52% if:

     (i)     the income or capital gain is attributable to an enterprise from which the holder derives profits (other than as a shareholder); or

     (ii)     the income or capital gain qualifies as income from miscellaneous activities (*belastbaar resultaat uit overige werkzaamheden*) as defined in the Income Tax Act (*Wet inkomstenbelasting 2001*), including, without limitation, activities that exceed normal, active asset management (*normaal, actief vermogensbeheer*).

If neither condition (i) nor (ii) applies, an individual holding New Common Stock, a New Note or a Subscription Right will be subject to income tax on the basis of a deemed return, regardless of any actual income or capital gain derived from New Common Stock, a New Note and/or a Subscription Right. The deemed return amounts to 4% of the average value of the individual's net assets in the relevant fiscal year (including the New

Common Stock, a New Note and/or a Subscription Right). Subject to application of personal allowances, the deemed return shall be taxed at a rate of 30%.

c.        Non-Residents Entities

A holder of New Common Stock, a New Note and/or a Subscription Right which is not, or is not deemed to be resident in The Netherlands for the relevant tax purposes will not be subject to taxation on income or a capital gain derived from the New Common Stock, a New Note or a Subscription Right unless:

(i)        the income or capital gain is attributable to an enterprise or part thereof which is either effectively managed in The Netherlands or carried on through a permanent establishment (*vaste inrichting*) or permanent representative (*vaste vertegenwoordiger*) in The Netherlands; or

(ii)        the holder has a substantial interest or a deemed substantial interest in New Topco and the New Common Stock and the Subscription Right cannot be allocated to a business enterprise of such holder.

The holder may be exempt from such taxation under an income tax convention in effect between The Netherlands and the holder's country of residence.

d.        Non-Resident Individuals

A holder of New Common Stock, a New Note and/or a Subscription Right which is not, is not deemed to be, and has not elected to be treated as, resident in The Netherlands for the relevant tax purposes will not be subject to taxation on income or a capital gain derived from New Common Stock, a New Note or a Subscription Right unless:

(i)        the income or capital gain is attributable to an enterprise or part thereof which is either effectively managed in The Netherlands or carried on through a permanent establishment (*vaste inrichting*) or permanent representative (*vaste vertegenwoordiger*) in The Netherlands; or

(ii)        the income or capital gain qualifies as income from miscellaneous activities (*belastbaar resultaat uit overige werkzaamheden*) in The Netherlands as defined in the Income Tax Act (*Wet inkomstenbelasting 2001*), including, without limitation, activities that exceed normal, active asset management (*normaal, actief vermogensbeheer*).

The holder may be exempt from such taxation under an income tax convention in effect between The Netherlands and the holder's country of residence.

3.        *Value added tax*

The issuance or transfer of New Common Stock, a New Note or a Subscription Right, and payments made with respect to New Common Stock, a New Note or a Subscription Right, will not be subject to value added tax in The Netherlands.

4.        *Other taxes and duties*

The subscription, issue, placement, allotment, delivery, transfer or execution of New Common Stock, a New Note or a Subscription Right will not be subject to registration tax, capital tax, customs duty, transfer tax, stamp duty, or any other similar tax or duty in The Netherlands.

5.        *Residence*

A holder of New Common Stock, a New Note or a Subscription Right will not be, or deemed to be, resident in The Netherlands for tax purposes and, subject to the exceptions set out above, will not otherwise be

subject to Dutch taxation, merely by reason of acquiring, holding or disposing of New Common Stock, a New Note or a Subscription Right or the execution, performance, delivery and/or enforcement of New Common Stock, a New Note or a Subscription Right.

6.    *EU Council Directive on Taxation of Savings Income*

In accordance with EC Council Directive 2003/48/EC on the taxation of savings income, The Netherlands will provide to the tax authorities of another EU member state (and certain non-EU countries and associated territories specified in said directive) details of payments of interest or other similar income paid by a person within The Netherlands to, or collected by such a person for, an individual resident in such other state.

**THE U.S. FEDERAL, STATE AND LOCAL TAX CONSEQUENCES AND THE FOREIGN TAX CONSEQUENCES EXPECTED TO RESULT FROM THE IMPLEMENTATION OF THE PLAN ARE COMPLEX.  THE ABOVE SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY.  ALL HOLDERS OF ALLOWED CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE TAX CONSEQUENCES EXPECTED TO RESULT FROM THE IMPLEMENTATION OF THE PLAN.**

## XIV.    CONCLUSION AND RECOMMENDATION

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest and quickest recoveries to holders of Claims and Equity Interests.  Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs.  The Debtors urge holders of impaired Claims and Equity Interests entitled to vote on the Plan to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received no later than [4:00 p.m.], New York City Time, on [_____], 2010.

Dated:      New York, New York
            December 11, 2010

                              LYONDELL CHEMICAL COMPANY
                              (for itself and on behalf of each of the Debtors)


                              By:    _/s/_____
                              Name:  [_____]
                              Title: [_____]

**SCHEDULE I**

**List of Debtors**

<u>Debtors that filed voluntary petitions for relief on January 6, 2009</u>

Basell Finance USA Inc.
Basell Germany Holdings GmbH
Basell North America Inc.
Basell USA Inc.
Circle Steel Corporation
Duke City Lumber Company, Inc.
Equistar Chemicals, LP
Equistar Transportation Company, LLC
Glidco Leasing, Inc.
Glidden Latin America Holdings Inc.
H.W. Loud Co.
HOISU Ltd.
Houston Refining LP
HPT 28 Inc.
HPT 29 Inc.
IMWA Equities II, Co., L.P.
ISB Liquidating Company
LBI Acquisition LLC
LBIH LLC
LeMean Property Holdings Corporation
Lyondell (Pelican) Petrochemical L.P. 1, Inc.
Lyondell Asia Pacific, Ltd.
Lyondell Chemical Company
Lyondell Chemical Delaware Company
Lyondell Chemical Espana Co.
Lyondell Chemical Europe, Inc.
Lyondell Chemical International Co.
Lyondell Chemical Nederland, Ltd.
Lyondell Chemical Products Europe, LLC
Lyondell Chemical Properties, L.P.
Lyondell Chemical Technology 1 Inc.
Lyondell Chemical Technology Management, Inc.
Lyondell Chemical Technology, L.P.
Lyondell Chimie France LLC
Lyondell Europe Holdings Inc.
Lyondell Greater China, Ltd.
Lyondell Houston Refinery Inc.
Lyondell LP3 GP, LLC
Lyondell LP3 Partners, LP
Lyondell LP4 Inc.

Lyondell Petrochemical L.P. Inc.
Lyondell Refining Company LLC
Lyondell Refining I LLC
LyondellBasell Advanced Polyolefins USA Inc.
LyondellBasell Finance Company
Lyondell-Equistar Holdings Partners
MHC Inc.
Millennium America Holdings Inc.
Millennium America Inc.
Millennium Chemicals Inc.
Millennium Holdings, LLC
Millennium Petrochemicals GP LLC
Millennium Petrochemicals Inc.
Millennium Petrochemicals LP LLC
Millennium Petrochemicals Partners, LP
Millennium Realty Inc.
Millennium Specialty Chemicals Inc.
Millennium US Op Co LLC
Millennium Worldwide Holdings I Inc.
MWH South America LLC
National Distillers & Chemical Corporation
NDCC International II Inc.
Nell Acquisition (US) LLC
Penn Export Company, Inc.
Penn Navigation Company
Penn Shipping Company, Inc.
Penntrans Company
PH Burbank Holdings, Inc.
Power Liquidating Company, Inc.
Quantum Acceptance Corporation
SCM Plants, Inc.
Suburban Propane GP, Inc.
Tiona, Ltd.
UAR Liquidating Inc.
USI Chemicals International, Inc.
USI Credit Corp.
USI Puerto Rico Properties, Inc.
Walter Kidde & Company, Inc.
Wyatt Industries, Inc.

<u>Debtors that filed voluntary petitions for relief on April 24, 2009</u>

LyondellBasell AF GP S.à.r.l.
LyondellBasell Industries AF S.C.A.

<u>Debtors that filed voluntary petitions for relief on May 8, 2009</u>

Basell Capital Corporation
Basell Impact Holding Company
Equistar Bayport, LLC
Equistar Funding Corporation
Equistar Polypropylene, LLC
LPC Partners Inc.
Lyondell Bayport, LLC
Lyondell Chemical Holding Company
Lyondell Chemical Wilmington, Inc.
Lyondell General Methanol Company
Lyondell Intermediate Holding Company
Quantum Pipeline Company
SCM Chemicals Inc.

## List of Non-Debtor Affiliates

ABC Producer A/S
Agricola do Brazil Ltd.
Al-Waha Petrochemical Company
BAFB B.V.
Basell (Thailand) Holdings B.V.
Basell (VI) Corporation
Basell Advanced Polyolefins (Suzhou) Co. Ltd
Basell Advanced Polyolefins (Thailand) Company Ltd.
Basell Arabie Investissements SAS
Basell Asia Pacific Consulting (Shanghai) Co., Ltd.
Basell Asia Pacific Ltd.
Basell Asia Pacific Trading (Shenzhen) Limited
Basell Bayreuth Chemie GmbH
Basell Benelux B.V.
Basell Brindisi S.r.l.
Basell Canada Inc.
Basell Cayman Corporation
Basell Chemie Köln GmbH
Basell China AP Holdings B.V.
Basell Deutschland GmbH
Basell Europe Holdings B.V.
Basell Finance & Trading Company B.V.
Basell Finance Company B.V.
Basell FOS S.A.S.
Basell France S.A.S.
Basell Funding S.à.r.l.
Basell Gemma S.A.S.
Basell Holdings Middle East GmbH
Basell Ibérica Poliolefinas Holdings S.L.
Basell International Holdings B.V.
Basell International Trading FZE
Basell Iso-Olefins S.A.S.
Basell Italia S.r.l.
Basell Mexico, S. de R.L. de C.V.
Basell Moyen Orient Investissements SAS
Basell Nederland B.V.
Basell Orlen Polyolefins Sp. z o.o.
Basell Orlen Polyolefins Sprzedaz Sp. z o.o.
Basell Plasticos Lda.
Basell Poliolefinas Comercial Espagñola S.L.
Basell Poliolefinas Ibérica S.L.
Basell Poliolefinas Ltda.
Basell Poliolefinas, S. de R.L. de C.V.
Basell Poliolefine Italia S.r.l.
Basell Polyéthylène S.A.S.
Basell Polyolefin Istanbul Ticaret Limited Sirketi
Basell Polyolefine GmbH
Basell Polyoléfines France S.A.S.
Basell Polyolefins Company BVBA
Basell Polyolefins India Private Ltd.
Basell Polyolefins Korea Ltd
Basell Polyolefins UK Ltd.
Basell Polypropylene S.A.S.

Basell Production France S.A.S.
Basell Sales & Marketing Company B.V.
Basell Service Company B.V.
Basell UK Holdings Ltd.
Basell UK Ltd.
Baselltech USA Inc.
Big Dutchman de Mexico S.A.
Brindisi Servizi Generali S.c.a r.l.
Carribbean Industrial Credit
Compagnie de Distribution des Hydrocarbures S.A.S.
Compagnie Petrochimique de Berre S.A.S.
Complejo Industrial Taqsa A.I.E.
Cue Insurance Bermuda Corp.
Diversity Insurance Co. Ltd.
DR Insurance Company
Equistar Chemicals de Mexico, Inc.
Equistar Mont Belvieu Corporation
Equistar Olefins G.P., LLC
Equistar Olefins Offtake G.P., LLC
Equistar Olefins Offtake LP
GIE Groupement Pétrolier de la Côté d'Azur
GIE Stockage Terminal de la Crau
Glidden Iberica, S.A.
Glidden Salchi S.p.A.
GP Enterprise SA
Guangzhou Basell Advanced Polyolefins Co. Ltd
Hisane A.I.E.
HMC Polymers Company Ltd.
I.F.M.  S.c.a r.l.
Indelpro S.A. de C.V.
Industrias Glidden de Espana, S.A.
Industrias Glidden S.A. de C.V.
Industriepark Münchsmünster GmbH & Co. KG
Industriepark Münchsmünster Verwaltungs-gesellschaft mbH
InfraServ GmbH & Co. Knapsack KG
Inter-World Enterprises Company
Kazakhstan Petrochemicals Industries Inc. LLP
KIC Ltd.
LaPorte Methanol Company, LP
Lyondell Asia Holdings Limited
Lyondell Bayer Manufacturing Maasvlakte VOF
Lyondell Centennial Corp.
Lyondell Chemical Central Europe GmbH
Lyondell Chemical Italia S.r.l.
Lyondell Chemical Overseas Services Inc.
Lyondell Chemical Pan America, Inc.
Lyondell Chemie (PO11) B.V.
Lyondell Chemie (POSM) B.V.
Lyondell Chemie International B.V.
Lyondell Chemie Investment Nederland B.V.
Lyondell Chemie Nederland B.V.
Lyondell Chemie Utilities B.V.

Lyondell Chimie France SAS
Lyondell Chimie TDI SCA
Lyondell China Holdings Limited
Lyondell France Holdings SAS
Lyondell Greater China Holdings Ltd.
Lyondell Greater China Trading Limited
Lyondell Japan, Inc.
Lyondell PO11 C.V.
Lyondell POJVGP, LLC
Lyondell POJVLP, LLC
Lyondell POTechGP, Inc
Lyondell POTechLP, Inc.
Lyondell Quimica do Brasil, Ltda.
Lyondell South Asia PTE Ltd.
LyondellBasell Advanced Polyolefins Canada Inc.
LyondellBasell Advanced Polyolefins Mexico S.A. de C.V.
LyondellBasell Australia (Holdings) Pty Ltd
LyondellBasell Australia Pty Ltd
LyondellBasell Brasil Holdings B.V.
LyondellBasell Industries Holdings B.V.
LyondellBasell Kazakhstan Holdings B.V.
LyondellBasell Netherlands Holdings B.V.
LyondellBasell Proche Orient Investissements SAS
LyondellBasell Receivables 1, L.L.C.
Millennium Methanol GP Inc.
Millennium Methanol LP Inc.
Millennium Petro Corp Ltd
Nauta Corporation
Nihon Oxirane Co., Ltd.
Ningbo ZRCC Lyondell Chemicals Co. Ltd.
Olefins JV LP
PD Glycol

Petroken Petroquimica Ensenada SA
PO Offtake, LP
POJV, LP
Polymer Servizi Ecologici
Polymirae Co. Ltd
PolyPacific Polymers Sdn.Bhd.
PolyPacific Pty Ltd
POSM Delaware, Inc.
POSM II Limited Partnership, L.P.
POSM II Properties Partnership, L.P.
Saudi Ethylene & Polyethylene Company
Saudi Polyolefins Company
SCI de Plastiques de Normandie
SCM Europe S.A.
SCM Holdings Pty. Ltd.
Smith Corona Marchant Finance A.G.
SN2A SNC
Société de Stockages Pétrolier du Rhône SA
Société du Craqueur de l'Aubette S.A.S.
Société du Pipeline Méditerranéen Rhône S.A.S.
Steamelec B.V.
SunAllomer Ltd.
Technology JV, LP
TRV Thermische Rückstandsverwertung GmbH & Co. KG
TRV Thermische Rückstandsverwertung Verwaltungs-GmbH
U.S. Industries Overseas Fin.
U.S. Industries Worldwide Corp.
U.S. Industries Worldwide N.V.
UNA S.A.

# SCHEDULE III

## Schedule III Debtors

Circle Steel Corporation
Duke City Lumber Company, Inc.
Equistar Funding Corporation
Equistar Polypropylene, LLC
Equistar Transportation Company, LLC
Glidco Leasing, Inc.
Glidden Latin America Holdings Inc.
H.W.  Loud Co.
HOISU Ltd.
HPT 28 Inc.
HPT 29 Inc.
IMWA Equities II, Co., L.P.
ISB Liquidating Company
LeMean Property Holdings Corporation
LPC Partners Inc.
MHC Inc.
Millennium America Holdings Inc.
Millennium America Inc.
Millennium Chemicals Inc.
Millennium Holdings, LLC
Millennium Petrochemicals GP LLC*
Millennium Petrochemicals Inc.**
Millennium Petrochemicals LP LLC
Millennium Petrochemicals Partners, LP*
Millennium Realty Inc.

Millennium Specialty Chemicals Inc.**
Millennium US Op Co LLC
Millennium Worldwide Holdings I Inc.
MWH South America LLC
National Distillers & Chemical Corporation
NDCC International II Inc.
Penn Export Company, Inc.
Penn Navigation Company
Penn Shipping Company, Inc.
Penntrans Company
PH Burbank Holdings, Inc.
Power Liquidating Company, Inc.
Quantum Acceptance Corporation
Quantum Pipeline Company
SCM Chemicals Inc.
SCM Plants, Inc.
Suburban Propane GP, Inc.
Tiona, Ltd.
UAR Liquidating Inc.
USI Chemicals International, Inc.
USI Credit Corp.
USI Puerto Rico Properties, Inc.
Walter Kidde & Company, Inc.
Wyatt Industries, Inc.

_____

* Pursuant to the North American Restructuring, these entities' partnership interests in Equistar Chemicals, LP will be transferred.  The North American Restructuring is described in more detail in Section IV.C of the Disclosure Statement.

** Certain assets of these entities will be transferred to subsidiaries of Lyondell Chemical that will be formed substantially contemporaneously with (or prior to) the Effective Date pursuant to the North American Restructuring. The North American Restructuring is described in more detail in Section IV.C of the Disclosure Statement.

**SCHEDULE IV**

**<u>List of Real Property Transferred to Environmental Custodial Trust</u>**

Allied Paper Mill, Kalamazoo, Michigan from LeMean Property Holdings Corporation

Beaver Valley property near Monaca, Pennsylvania from Lyondell Chemical Company

Bully Hills, Rising Star and Excelsior mines in Shasta County, California from Millennium Holdings, LLC

Charlotte, North Carolina site from Millennium Holdings, LLC

Morris, Illinois gypsum pile area from Equistar Chemicals, LP

Port Arthur, Texas site from Equistar Chemicals, LP

Saint Helena site in Baltimore, Maryland from Millennium Specialty Chemicals, Inc.

Turtle Bayou parcels in Liberty County, Texas site from Lyondell Chemical Company

**SCHEDULE V**

**Non-Exclusive List of Discharged Prepetition Intercompany Claims**

In addition to all Schedule III Intercompany Claims, pursuant to Section 5.8 of the Plan, upon the Effective Date, the following Intercompany Claims, *inter alia*, will be fully discharged or waived:

all Intercompany Claims between Basell Asia Pacific Ltd. and Lyondell Asia Pacific Ltd.,

all Intercompany Claims between Basell Finance Company BV and Basell USA, Inc., Basell Finance USA, Inc., and Nell Acquisition US LLC,

all Intercompany Claims between Basell Holdings BV and Nell Acquisition LLC,

all Intercompany Claims between Basell Mexico S. de R.L. de C.V. and Basell USA, Inc.,

all Intercompany Claims between Basell Poliolefine Italia Srl and Basell USA, Inc.,

all Intercompany Claims between Basell Polyolefine GmbH and Basell USA, Inc.,

all Intercompany Claims between Basell Polyolefins UK Ltd. and Basell USA, Inc.,

all Intercompany Claims between Lyondell Chimie France SAS and Lyondell Chemical, Lyondell Chemical Delaware Company, and Lyondell Chemical Europe, Inc.,

all Intercompany Claims between Lyondell Chimie TDI SCA and Lyondell Chemical,

all Intercompany Claims between Lyondell China Holdings Limited and Lyondell Chemical,

all Intercompany Claims between Lyondell Funding II, LLC and Lyondell Chemical,

all Intercompany Claims between LBIAF and Lyondell Chemical, LBIH LLC, Basell Germany and LBFC,

all Intercompany Claims between Lyondell POTech GP, Inc. and Lyondell Chemical,

all Intercompany Claims between Lyondell South Asia PTE Ltd. and Lyondell Asia Pacific Ltd., and

all Intercompany Claims between LyondellBasell Receivables I LLC and Equistar.