Edward S. Weisfelner, Esquire
BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036
(212) 209-4800

Steven D. Pohl, Esquire
John C. Elstad, Esquire
BROWN RUDNICK LLP
One Financial Center
Boston, MA 02111
(617) 856-8200

Counsel for the Official Committee
of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
                                            :
In re:                                      :       Case No. 09-10023 (REG)
                                            :
LYONDELL CHEMICAL              :       Chapter 11
COMPANY, et al.,                       :
                                            :       (Jointly Administered)
                      Debtors.            :
                                            :
-------------------------------------------------------x

**MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**FOR PARTIAL RELIEF FROM FINAL ORDER (I) AUTHORIZING DEBTORS (A)**
**TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361,**
**362, 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1) AND 364(E), (B) TO UTILIZE CASH**
**COLLATERAL PURSUANT TO 11 U.S.C. § 363 AND (C) TO PURCHASE**
**CERTAIN ASSETS PURSUANT TO 11 U.S.C. § 363 AND (II) GRANTING**
**ADEQUATE PROTECTION TO PRE-PETITION SECURED PARTIES**
**PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364**

# TABLE OF CONTENTS

**Preliminary Statement**......................................................................................................1

**Jurisdiction, Venue, And Statutory Predicates**.........................................................5

**Procedural Background** ..................................................................................................5

**The Order** ..........................................................................................................................6

**Factual Developments Since Entry Of The Order**.....................................................7

**Argument** ...........................................................................................................................8

    The Legal Standard ....................................................................................................8

    The Order Has Prospective Application and Thus is Subject to Federal Rule 60(b)(5)........10

    The Motion Was Brought Within a Reasonable Time.........................................11

    Circumstances Have Changed Significantly and Enforcement of the Adequate Protection Obligations Would be Inequitable .......................................................13

    Cessation of the Adequate Protection Payments is Suitably Tailored to the Under-Secured Position of the First Lien Lenders.........................................................16

**Notice**................................................................................................................................17

**No Prior Request**...........................................................................................................17

**Conclusion** .....................................................................................................................18

# TABLE OF AUTHORITIES

**Federal Cases**

Bros. Inc. v. W.E. Grace Mfg. Co., 320 F.2d 594 (5th Cir. 1963) .................................. 9

Davis v. Musler, 713 F.2d 907 (2d Cir. 1983) .............................................................. 12

Delta Air Lines Inc. v. Pan Am. Corp. (In re Pan Am. Corp.), 162 B.R. 667 (S.D.N.Y. 1993).. 10, 13

DeWeerth v. Baldinger, 38 F.3d 1266 (2d Cir. 1994) .................................................. 10

Di Vito v. Fidelity & Deposit Co. of Md., 361 F.2d 936 (7th Cir. 1966)....................... 9

In re A.H. Robins Co., 163 F.3d 598 (4th Cir. 1998) .................................................. 15

In re B.O.S.S. Partners I, 37 B.R. 348 (Bankr. M.D. Fla. 1984) ............................ 13, 14

In re Casco Chem. Co., 335 F.2d 645 (5th Cir. 1964) .................................................. 9

In re Delta Resources, Inc., 54 F.3d 722 (11th Cir. 1995) ........................................ 15

In re Int'l Fibercom, Inc., 503 F.3d 933 (9th Cir. 2007) ............................................. 9

In re Loewen Group Int'l, Inc., 274 B.R. 427 (Bankr. D. Del. 2002) .......................... 16

In re Prime, Inc., 26 B.R. 556 (Bankr. W.D. Mo. 1983) ............................................ 13

In re TCI 2 Holdings, LLC, Case No. 09-13654 (Bankr. D.N.J.)................................. 16

In re T-H New Orleans Ltd., 116 F.3d 790 (5th Cir. 1997)......................................... 15

Montco, Inc. v. Barr (In re Emergency Beacon Corp.), 666 F.2d 754 (2d Cir. 1981)................. 10

Nat'l Petrochemical Co. v. M/T Stolt Sheaf, 930 F.2d 240 (2d Cir. 1991)...................... 9

Paddington Partners v. Bouchard, 34 F.3d 1132 (2d Cir. 1994)................................... 8

Patterson v. Newspaper & Mail Deliverer's Union, 13 F.3d 33 (2d Cir. 1993)........... 10

Rufo v. Inmates of Suffolk Jail, 502 U.S. 367 (1992) ............................................ 9, 17

Still's Pharmacy, Inc. v. Cuomo, 981 F.2d 632 (2d Cir. 1992)................................... 17

U.S. v. Swift & Co., 208 U.S. 106 (1932) .................................................................. 10

United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365 (1988).... 15


**Federal Statutes**

11 U.S.C. § 105............................................................................................................. 5

11 U.S.C. § 506(b) ............................................................................................ 4, 5, 15, 16

11 U.S.C. § 1102 ........................................................................................................... 6

11 U.S.C. § 1107(a) ...................................................................................................... 6

28 U.S.C. § 1108 ........................................................................................................... 6

28 U.S.C. § 157.............................................................................................................. 5

28 U.S.C. § 1334 ................................................................................................................... 5

28 U.S.C. § 1408 ................................................................................................................... 5

28 U.S.C. § 1409 ................................................................................................................... 5

## **Federal Rules**

Federal Rule of Bankruptcy Procedure 9024 ....................................................... 4, 5, 8

Federal Rule of Civil Procedure 60(b) ................................... 4, 5, 8, 9, 10, 11, 12

Federal Rule of Civil Procedure 60(c) ................................................................. 9, 11

## **Other**

Moore's Federal Practice, § 60.65 .......................................................................... 9

Queenan, Chapter 11 Theory and Practice, § 13.62 ........................................... 10

Wright & Miller Federal Practice & Procedure, § 2863 ..................................... 9

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases of the above-captioned debtors and debtors-in-possession (collectively, and as further defined below, the "Debtors"), by and through its counsel, Brown Rudnick LLP, hereby submits this motion (the "Motion") of the Official Committee of Unsecured Creditors for partial relief from *Final Order (I) Authorizing Debtors (A) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (C) to Purchase Certain Assets Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364* [Docket No. 1002] (the "Order").[1]  In support of this Motion, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Since entry of the Order, the DIP Lenders and First Lien Lenders (as defined below) have steered this restructuring to their exclusive benefit.  In the process, the First Lien Lenders have improperly received hundreds of millions of dollars in post-petition interest payments and reimbursement of most of their professionals' fees and expenses as "Adequate Protection Payments" (as defined below).  However, since the Final Hearing, the parties-in-interest have improved their understanding of the Debtors' enterprise valuation and the value of the collateral securing the loans held by the DIP Lenders and First Lien Lenders.  It has become readily apparent that the Debtors' enterprise value is such that the First Lien Lenders are under-secured and a modification of the Order to discontinue Adequate Protection Payments is necessary for the benefit of the Debtors' estates.

---

[1]      All capitalized terms not defined herein shall have the meaning ascribed to such terms in the Order or Disclosure Statement (as defined below), as appropriate.

2. The Committee seeks relief from certain specific provisions of the Order. Currently, these provisions require approximately $40 million in monthly Adequate Protection Payments to the Senior Facility Pre-Petition Secured Lenders (the "First Lien Lenders").[2] Since the Order was entered, approximately $440 million in Post-Petition Interest Payments (as defined below) and approximately $32 million in Advisor Payments (as defined below) have been made to the First Lien Lenders through September.[3] In the aggregate, these payments totaling at least $472 million provide no benefit to the estate and only provide a windfall to the First Lien Lenders. In fact, Jack F. Williams, the examiner appointed by the Court (the "Examiner"), noted in his report (the "Report") that at least 45-60% of the $100 million plus of the Debtors' total monthly restructuring expenses relate to adequate protection payments and professional fees in connection with the Financing. See Report, p. 59. Importantly, the Examiner states: "In light of the other prospective sources of exit financing that have materialized in the weeks preceding this Report, a thorough analysis of these Adequate Protection Payments should be considered if the

---

[2] The First Lien Lenders are those Senior Facility Pre-Petition Secured Lenders holding First Lien Loans that are not Roll Up DIP Loans.

[3] The Debtors estimate in the Disclosure Statement that as of December 31, 2009, the Debtors will have paid all lenders' professionals approximately $80 million in the aggregate. See Disclosure Statement at p. 58. Moreover, assuming confirmation of a plan on or about March 1, 2010, the Debtors estimate that total compensation paid to all lenders' professionals will be $142 million in the aggregate. See id. at 58-59.

Court were to instruct the Debtors to provide for a more careful vetting of any additional bids." See id.[4]

3.      The First Lien Lenders are under-secured and will have their claims equitized under the Debtors' plan of reorganization. Therefore, it will not be possible to "disgorge" these improper payments by crediting the Post-Petition Interest Payments to the principal balance of the first lien debt, as would be the customary remedy. In essence, each dollar paid to First Lien Lenders and their advisors is a dollar increase in needed exit financing because of the drain on available cash on hand and the liquidity needs of the reorganized Debtors. The DIP Lenders and First Lien Lenders have had a stranglehold on the Debtors' estates for far too long. The Debtors should not be required to throw cash down the drain because of a premature, now wholly outdated and overly optimistic assessment of enterprise value that was presented to this Court at the Final Hearing.

4.      Specifically, the Committee seeks relief from (i) the provisions of paragraph 18(ii) of the Order which require Lyondell and Basell GmbH, respectively, to pay all accrued but unpaid interest and letter of credit and other fees on the first business day of each month beginning on March 2, 2009 for the preceding calendar month (contingent on a liquidity test) under the Senior Facility Pre-Petition Credit Agreement with respect to the Senior Facility Pre-Petition Debt, that has not been designated as Roll Up Dip Loans, at the non-default contract rate

---

[4]      The Committee has separately filed its Motion of the Official Committee of Unsecured Creditors to Expand the Scope of Examiner's Investigation and Duties (the "Examiner Motion"). In such Motion, the Committee asks the Court to direct the Examiner (i) to ensure that the Debtors' are sufficiently receptive to investment proposals from strategic investors that may be more beneficial to creditors, including unsecured creditors, and (ii) to investigate the Adequate Protection payments. The second form of relief sought in the Examiner Motion differs from the relief sought here. In the Examiner Motion, the Committee asks that the Examiner investigate the Court's (as well as the Committee's) concern as to how it came to pass that these undersecured creditors have been paid $500 million as well as attorneys' fees in these cases. In the instant Motion, the Committee seeks to have such payments discontinued.

under the Senior Facility Pre-Petition Loan Documents (the "Post-Petition Interest Payments") and (ii) the provisions of paragraph 17(c) of the Order which require the Debtors to make current cash payments of all fees and expenses, including, but not limited to, the reasonable fees and disbursements of counsel, financial and other consultants and advisors (collectively, the "Advisors") to, among others, the Pre-Petition Agents, LeverageSource (Apollo), and the Ad Hoc Group of Senior Secured Lenders[5] (the "Advisor Payments" and together with the Post-Petition Interest Payments, the "Adequate Protection Payments").

5.      As more particularly demonstrated below, the foregoing provisions should be vacated, as to the First Lien Lenders and Advisors, pursuant to Section 506(b) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 60(b) of the Federal Rules of Civil Procedure (the "Federal Rules"), made applicable to these proceedings by Rule 9024 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The prospective application of such provisions would be grossly inequitable and would not be allowed by the Court on these facts if such facts were before the Court at the time of the entry of the Order. Moreover, the Adequate Protection Payments are a $40 million per month drain on the Debtors' estates without a commensurate benefit and only serve to increase the amount needed for exit financing.

6.      This Court has the power under Federal Rule 60(b)(5) to modify the Order because the prospective application of the challenged provisions is no longer equitable. The waste of estate assets to the detriment of the Debtors' estates and their creditors strongly suggests that the Court should exercise its powers at this time and vacate those provisions of the Order, including, without limitation, the Post-Petition Interest Payments and the Advisor Payments as to

---

[5]      The members of the Ad Hoc Group of Senior Secured Lenders hold approximately 57% of the debt held by the First Lien Lenders and are represented by Milbank, Tweed Hadley & McCloy LLP and Moelis & Company LLC.

the First Lien Lenders and Advisors. No legally cognizable prejudice will be suffered by the First Lien Lenders and Advisors if the foregoing provisions are modified and vacated because the First Lien Lenders are under-secured and not legally entitled to payment of post-petition interest or expenses. Rather, the modification of the foregoing terms mutually benefits the Debtors' estates and all creditors by bolstering the Debtors' cash position and decreasing the amount of exit financing required to successfully emerge from bankruptcy.

## JURISDICTION, VENUE, AND STATUTORY PREDICATES

7.        This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for this Motion are Bankruptcy Code Sections 105 and 506(b) and Bankruptcy Rule 9024, through which Federal Rule 60(b) is made applicable.

## PROCEDURAL BACKGROUND

8.        These chapter 11 cases were commenced on January 6, 2009 (the "Petition Date"), by the filing of voluntary petitions for relief under chapter 11 of the Bankruptcy Code by Lyondell Chemical Company ("Lyondell"), its corporate parent, LyondellBasell Finance Company ("LBF"), its major operating subsidiaries and other of its direct and indirect subsidiaries and affiliates (the "Original Debtors"). On April 24, 2009, Lyondell Basell AF S.C.A. ("LBI"), a Luxembourg entity and its Luxembourg general partner, Lyondell Basell AF GP S.à.r.l. ("LB AFGP"), were added to the bankruptcy proceedings, and on May 8, 2009, an additional thirteen dormant corporate entities were added (the "Subsequent Debtors" and together with the Original Debtors, LBI, LB AFGP and the Subsequent Debtors, the "Debtors").

Each of the Debtors continues to operate its business and manage its properties as debtors-in-possession under Bankruptcy Code Sections 1107(a) and 1108.

9.      On January 16, 2009, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Committee to represent all unsecured creditors of the Debtors pursuant to Bankruptcy Code Section 1102.

10.     On March 1, 2009, this Court entered the Order approving post-petition financing for the Debtors.

## THE ORDER

11.     The Order requires the Debtors to make the Adequate Protection Payments to the First Lien Lenders and Advisors. See Order, ¶¶ 17(c), 18(ii). The Debtors stipulated that the "aggregate value of the Senior Facility Pre-Petition Collateral exceeds the aggregate amount of pre-petition debt secured by such collateral." See id. ¶ 4(g). This finding was based in part on testimony elicited by the Debtors at the three day hearing regarding the Financing that provided a preliminary enterprise valuation of the Debtors and non-Debtors of approximately $19 billion, an amount exceeding the ABL Pre-Petition Debt and Senior Facility Pre-Petition Debt taken together. Final Hearing Transcript, 104:7-18 (testimony of Alan Bigman); 427:18-21 (testimony of Robert Bartell).[6] This testimony notably was at variance with the views of the marketplace at that time. The First Lien debt was bid at that time at 23 – 28 cents. See Debtwire, LyondellBasell Considers Putting Luxembourg Sub in Bankruptcy; CDS Auctions Proceed – Sources, February 3, 2009 [Attached hereto as Exhibit A].

---

[6]     Mr. Bartell works for Duff & Phelps, the entity retained by the Debtors to prepare the valuation and provide valuation testimony upon which testimony the Debtors, and ultimately the Court, relied. The Committee notes that, notwithstanding the questioning on the record at the Final Hearing, to this date (almost one year into the cases), the Debtors still have not submitted an application to approve their retention of Duff & Phelps.

12.     The Court relied on such testimony as it specifically found that there was an "equity cushion in the Adequate Protection Parties' collateral, which is both preserved and enhanced by entry into the Financing." See Order, ¶ 19. Accordingly, at the time of the Order, based on the only evidence before it, the Court found the secured debt held by the First Lien Lenders was over-secured.

## FACTUAL DEVELOPMENTS SINCE ENTRY OF THE ORDER

13.     The valuation of the Debtors' enterprise has developed significantly since March 1, 2009. In marked contrast to the valuation presented to the Court at the time of contemplation of the Order, the enterprise valuations being advocated currently by rights offering sponsors fall far below this amount. Indeed, the Debtors themselves have estimated the Debtors' mid-point enterprise value at approximately $14.5 billion. See First Amended Disclosure Statement Accompanying First Amended Joint Chapter 11 Plan of Reorganization for the LyondellBasell Debtors, filed on December 11, 2009 [Docket No. 3432] at 117 (the "Disclosure Statement"). Meanwhile, the Debtors' estimated secured debt is approximately $15.8 billion consisting of (i) $3.04 billion (expected at exit) under the ABL DIP Facility and New Money DIP Loans; (ii) $3.25 billion under the Roll Up DIP Loans; and (iii) $9.51 billion owed to First Lien Lenders. See Disclosure Statement at 3-6.

14.     Accordingly, the secured debt held by the First Lien Lenders is clearly under-secured. After reducing the Debtors' mid-point valuation of $14.5 billion for repayment of the DIP and Roll up DIP Loans, only $8.21 billion of value would remain to repay the $9.51 billion of First Lien Lender debt. Furthermore, the Debtors and the First Lien Lenders have acknowledged by their actions that the First Lien Lenders are nothing more than under-secured creditors. For example, the First Lien Lenders will receive primarily – if not solely – equity on account of their secured debt pursuant to the Debtors' plan. Id. at p. 6. In addition, the First

Lien debt trades in the secondary market at a substantial discount to par indicating that the market considers the First Lien Lenders under-secured.

15.     This now developed valuation does not represent a drop in intrinsic value over the duration of these proceedings or a diminution in the value of the First Lien Lenders' collateral. Quite to the contrary, the value of the First Lien Lenders' collateral may have actually increased over the life of these proceedings as evidenced by the increase in value of the First Lien Lenders' debt on the secondary market from a low of 23 - 28 cents[7] to 74 cents recently[8] and on the considerable efforts that have been expended in stabilizing the Debtors' businesses during these proceedings. The Debtors have reported positive EBITDAR for the first three quarters of 2009 of approximately $1.7 billion. Instead, the now fully vetted valuation differs from the valuation at the outset of these cases because the valuation upon which the Order was premised was rushed and necessarily preliminary. The present understanding of the Debtors' valuation, in contrast, is the result of much more extensive diligence.

## ARGUMENT

### I.     The Legal Standard

16.     Federal Rule 60(b)(5), made applicable in these bankruptcy proceedings by Bankruptcy Rule 9024, provides that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order or proceeding [if] . . . applying it prospectively is no longer equitable." Federal Rule 60 "preserves a balance between serving the ends of justice and ensuring that litigation reaches an end within a finite period of time." Paddington Partners v. Bouchard, 34 F.3d 1132, 1144 (2d Cir. 1994) (internal citations omitted).

---

[7]     See supra and Exhibit A.

[8]     See Debtwire, Lyondell Bond Holders Plan Objection to POR Crafted with Apollo, Ares and Access, December 17, 2009 [Attached hereto as Exhibit B].

In addition, adjudication of this Motion is committed to the sound discretion of the Court. See Nat'l Petrochemical Co. v. M/T Stolt Sheaf, 930 F.2d 240, 244 (2d Cir. 1991) ("A motion to vacate a judgment under Fed. R. Civ. P. 60(b) is addressed to the sound discretion of the trial court, whose disposition of the motion will not be disturbed on appeal absent an abuse of that discretion."). Furthermore, a motion pursuant to Federal Rule 60(b)(5) must be brought within a reasonable time of the order sought to be modified. See Fed. R. Civ. P. 60(c)(1); see also Moore's Federal Practice § 60.65[1] ("What is or is not a 'reasonable time' under Rule 60(c)(1) is not a fixed concept. It depends on the facts and circumstances of each case.").

17.     The provisions of Federal Rule 60(b)(5) are based upon the "historic power of a court of equity to modify its decree in light of changed circumstances." Wright & Miller Federal Practice & Procedure, § 2863. The rule "compliments the discretionary power that bankruptcy courts have as courts of equity to reconsider, modify or vacate their prior orders so long as no intervening rights have become vested." In re Int'l Fibercom, Inc., 503 F.3d 933, 940 (9th Cir. 2007) (internal citations omitted). As a consequence, equitable principles may be taken into account by a court in the exercise of its discretion under Federal Rule 60(b). Di Vito v. Fidelity & Deposit Co. of Md., 361 F.2d 936, 939 (7th Cir. 1966); Bros. Inc. v. W.E. Grace Mfg. Co., 320 F.2d 594, 606-09 (5th Cir. 1963). Federal Rule 60 also reflects an effort to balance the law's interest in the prevention of injustice with the need for finality in litigation. In re Casco Chem. Co., 335 F.2d 645, 651 (5th Cir. 1964).

18.     Relief under Federal Rule 60(b)(5) is warranted where there is a "significant change in circumstances" surrounding the original order. See Rufo v. Inmates of Suffolk Jail, 502 U.S. 367, 380-383 (1992). In Rufo, the Supreme Court adopted a standard that requires the moving party to show that (i) "a significant change in circumstances warrants revision" of the

order and (ii) "the proposed modification is suitably tailored to the changed circumstance." Id. at 383 (rejecting the requirement of "a clear showing of grievous wrong evoked by new and unforeseen conditions" outlined in U.S. v. Swift & Co., 208 U.S. 106, 119 (1932)); see also Patterson v. Newspaper & Mail Deliverer's Union, 13 F.3d 33, 37-38 (2d Cir. 1993) (adopting and applying Rufo to an injunction in a discrimination case involving a private employer). An order may be revisited only when continued application will be inequitable, not "when it is no longer convenient" for a party to abide by the terms of the order. Rufo, 502 U.S. at 383.

19.     Moreover, Federal Rule 60(b) is the proper procedural vehicle for modification of a debtor-in-possession financing order. Delta Air Lines Inc. v. Pan Am. Corp. (In re Pan Am. Corp.), 162 B.R. 667, 671 (S.D.N.Y. 1993)[9] (citing Montco, Inc. v. Barr (In re Emergency Beacon Corp.), 666 F.2d 754, 758 (2d Cir. 1981) ("The amenability of a final order to modification by the bankruptcy court itself, however, is governed by Bankruptcy Rule [9024] which incorporates Fed. R. Civ. P. 60")); Queenan, Chapter 11 Theory and Practice § 13.62 ("The gravamen of the rule is that the circumstances, not the court's mind, must have changed since the order was entered.").

## II.     The Order Has Prospective Application and Thus is Subject to Federal Rule 60(b)(5)

20.     The Second Circuit has held that "in practical terms, . . . judgments involving injunctions have prospective application, while money judgments do not." DeWeerth v. Baldinger, 38 F.3d 1266, 1275 (2d Cir. 1994). Judgments that "affect events that happen in the

---

[9]     In Pan Am, the Bankruptcy Court consolidated a lender motion to enforce a debtor-in-possession financing order with an adversary proceeding against the lender that it had wrongfully failed to participate in the Debtor's chapter 11 case. 162 B.R. at 669-70. On appeal, the District Court ruled that consolidation of the two proceedings would only be appropriate if the DIP orders were modifiable under Federal Rule 60(b)(5) or 60(b)(6) and remanded the case to the Bankruptcy Court for a statement of the reasons, if any, warranting modification of the DIP orders. Id. at 672. No further opinion was issued in the case by the Bankruptcy Court or the District Court.

future" qualify as having prospective application. Id. at 1276. The Order, specifically the portion outlining the Adequate Protection Payments, has prospective application as it affects the entirety of these chapter 11 proceedings including providing for mandatory case milestones and disbursements to the First Lien Lenders. First, the Post-Petition Interest Payments are paid on a monthly, ongoing basis pursuant to the Order, despite the current under-secured status of the First Lien Lenders, directly affecting future cash disbursements by the Debtors and their pursuit of necessary exit financing. See Order, ¶ 18   Second, the necessity of making the Advisor Payments can only arise on account of the future activities of the Advisors to the Pre-Petition Agents, the Ad Hoc Group of Senior Secured Lenders and other First Lien Lenders that benefit under the Order – the reimbursement of which effectively funds the participation of the First Lien Lenders in the bankruptcy proceedings – thus affecting events occurring after entry of the Order. Id. ¶ 17(c). Therefore, the provisions of the Order requiring the Adequate Protection Payments have prospective application and are thus subject to modification pursuant to Federal Rule 60(b)(5).

### III.    The Motion Was Brought Within a Reasonable Time

21.     Federal Rule 60(c)(1) requires a motion pursuant to Federal Rule 60(b)(5) to be brought within a reasonable time. The true valuation of the Debtors is only now beginning to come into focus. This picture of enterprise valuation is much more developed now than it was at the time of the Order.   The enterprise valuations employed by the potential rights offering sponsors and the Debtors' themselves in their Disclosure Statement (recently filed on December 11) clearly set forth the view of the Debtors and the funding parties that the secured debt held by the First Lien Lenders is under-secured. The Committee has engaged the Debtors in discussions about the cessation of the Adequate Protection Payments and understands that the Debtors have

discussed discontinuance with the First Lien Lenders. However, as a result of these discussions, as well as the recently announced Settlement, it has become clear to the Committee that the Debtors will not take any further steps to stop the waste of hundreds of millions of dollars by discontinuing the Adequate Protection Payments. Thus, as soon as the Committee gained knowledge of the need, it filed this Motion.

22.     The Committee anticipates that the Debtors and others will vigorously oppose this Motion on the grounds that modifying the Order will delay the Debtors' reorganization going forward because of potential complications in connection with the event of default provisions in the Senior Facility Pre-Petition Credit Agreement and DIP Documents. However, "delay alone [caused by the grant of a Federal Rule 60(b) motion] is not a sufficient basis" for the establishment of prejudice by a party opposing a Federal Rule 60(b) motion. See Davis v. Musler, 713 F.2d 907, 916 (2d Cir. 1983). The concern that modification of the Order might result in an Event of Default (see Order, ¶ 22(b)) and thus cause delay in these bankruptcy proceedings is facially insufficient to justify the Debtors to continue wasting $40 million per month when no continuing legal justification exists for such payments. As the Court is aware, the Debtors have already successfully negotiated modifications of the case milestone provisions – the breach of which would have triggered certain Events of Default. They should now, to the extent necessary and in the exercise of their fiduciary duties, negotiate the waiver of any Events of Default that might arise from the discontinuance of Adequate Protection Payments. It is exceedingly unlikely that the DIP Lenders or First Lien lenders would declare an Event of Default or exercise available remedies in response to such default where any such action would be akin to biting off their nose to spite their face because such action would only injure there own interests. These lenders need this case to be a reorganization and not a liquidation, because

a liquidation would result in massive losses for these lenders. See Disclosure Statement, Exhibit B Liquidation Analysis at 13 (estimating that in a liquidation only the DIP New Money Claims, DIP ABL Claims and professional fees carve out would receive payment in full, while the DIP Roll-Up Claims would receive only a 40% recovery and the Senior Secured Claims would receive only a 13% recovery).

## IV. Circumstances Have Changed Significantly and Enforcement of the Adequate Protection Obligations Would be Inequitable

23. Several bankruptcy courts have considered whether an exceptional, extraordinary, or a significant change of circumstances would warrant reconsideration of orders granting debtor-in-possession financing, adequate protection, or automatic stay stipulations. See Pan Am, 162 B.R. 667; In re Prime, Inc., 26 B.R. 556 (Bankr. W.D. Mo. 1983); In re B.O.S.S. Partners I, 37 B.R. 348 (Bankr. M.D. Fla. 1984).

24. In Prime, adequate protection orders obligated the debtor to surrender its collateral upon default. When the secured creditor declared a default for failure to make payment and sought the return of its collateral, the court declined to enforce the order because "[t]he obvious result of such an enforcement would be to shut down the debtor's operations, eliminating about 200 jobs and a multimillion dollar business from the economy and probably depriving unsecured creditors in excess of $3,000,000 of any payment." 26 B.R. at 558. The court determined that it had the power as a court of equity to modify its prior order and to reinstitute the automatic stay because of changed circumstances. Id.

25. In B.O.S.S., the court upheld the enforceability of an automatic stay stipulation which permitted secured creditors to take continued action against their collateral because the stipulation operated as a waiver by the debtor of any right to obtain protection from the court, but in doing so expressly noted:

This proposition, however, is not etched in cement and should not be applied in an inflexible and pragmatic manner and under [the] proper circumstances, the Court may use its equitable powers and grant further relief to a debtor pursuant to § 105 of the Code . . . if there is a radical and new development which drastically changes the economic picture . . . .

B.O.S.S., 37 B.R. at 351.

26.     The Order was entered upon the premise that the First Lien Lenders were over-secured as evidenced by the testimony at the Final Hearing and the stipulations in the Order. See Order, ¶ 4(g). Now, the evidence supports the conclusion that the First Lien Lenders are under-secured. This under-secured status is evidenced by the amount of First Lien debt and DIP debt disclosed in the Debtors' Disclosure Statement ($15.8 billion) when compared to the valuation determined by the Debtors themselves ($14.5 billion). This under-secured status is further evidenced by the fact that the First Lien Lenders will only be receiving equity on account of their claims against the estates under the Debtors' plan (see Disclosure Statement, p. 6) and the fact that the First Lien debt trades on the secondary market at a substantial discount to par (about 60 – 75 cents recently).

27.     In addition, because the First Lien Lenders will only be receiving equity under the Debtors' plan, it will not be possible to rectify the problem by crediting improvidently made Post-Petition Interest Payments to principal repayment. This significant change in circumstances was not anticipated by the parties-in-interest or the Court at the time of the Order. Indeed, under the current circumstances, the First Lien Lenders are not entitled to any post-petition interest or fees under the Bankruptcy Code, nor would the Court have permitted such payments had it been provided with the true picture at the time of the Final Hearing. See 11 U.S.C. § 506(b) ("To the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such

claim, and any reasonable fees, costs or charges provided for under the agreement . . . .") (emphasis added).

28.     Significantly, post-petition interest can only be collected to the extent of the oversecurity. This follows from a natural reading of Bankruptcy Code Section 506(b): "[to] the extent [of the oversecurity of] an allowed secured claim . . . there shall be allowed to the holder of such claim, interest on such claim . . . ." See 11 U.S.C. § 506(b); United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 372-73 (1988) ("[Th]is provision [§ 506(b)] permits postpetition interest to be paid only out of the 'security cushion.'"); In re A.H. Robins Co., 163 F.3d 598, *4 (4th Cir. 1998) (Bankruptcy Code Section 506(b) "permits an oversecured creditor . . . to collect postpetition interest to the extent of the oversecurity."); In re T-H New Orleans Ltd., 116 F.3d 790, 799 (5th Cir. 1997) ("[T]he amount of interest allowed under § 506(b) is limited to the amount of interest which, when added to the amount of [a secured creditor's] allowed claim, will not exceed the value of its collateral."); In re Delta Resources, Inc., 54 F.3d 722, 728 (11th Cir. 1995) (holding that "the size of the equity cushion decreases as postpetition interest accrues" pursuant to Bankruptcy Code Section 506(b)).

29.     The continuance of the Adequate Protection Payments when it has become apparent that the First Lien Lenders are under-secured would be particularly inequitable. The continuance of the Adequate Protection Payments represents a $40 million per month (before fees) drain on the Debtors' estates and increases the Debtors' exit financing needs. Therefore, the Debtors continued compliance with the Order and payment of the Adequate Protection Payments under significantly changed circumstances – i.e., the First Lien Lenders are now understood to be under-secured – harms the Debtors' estates and will ultimately increase the exit financing needs.

30.    The First Lien Lenders can hardly fairly contend that they will be prejudiced if the

Adequate Protection Payments cease.  Bankruptcy Code Section 506(b) bars an under-secured

creditor – i.e., the First Lien Lenders – from receiving postpetition interest and attorneys' fees in

the first place.[10]  They have no legally cognizable right to such payments, other than in the

Order, which was entered under a now mistaken premise.  Moreover, the altered circumstances,

the updated information on valuation, is not the result of a deterioration of value during these

cases (the opposite is true), but instead is the result of a more thorough examination of valuation

by potential third party rights offering sponsors and the Debtors.

**VI.    Cessation of the Adequate Protection Payments is Suitably Tailored to the Under-
Secured Position of the First Lien Lenders**

31.    The cessation of the Adequate Protection Payments is suitably tailored to the

significant change in circumstances here.  The Debtors would retain needed cash for liquidity

and their exit from bankruptcy while the First Lien Lenders would retain their right to a host of

other adequate protection rights under the Order.[11]  Because of the changed circumstances the

---

[10]    The filing of the bankruptcy petition relieves a debtor of the obligation of paying attorneys' fees
to an undersecured creditor as part of that creditor's secured claim.  In re Loewen Group Int'l,
Inc., 274 B.R. 427, 445 n.36 (Bankr. D. Del. 2002) ("Although a contractual provision providing
for the recovery of attorneys' fees and costs may enable an unsecured creditor to pursue recovery
of such fees and costs in an action in state court, in the context of bankruptcy, the creditor's
right to assert such claims is limited by the provisions of the Bankruptcy Code.").

In fact, the Bankruptcy Court for the District of New Jersey, in the recently filed Trump Casino
case, has disallowed professional fees for under-secured noteholders.  This court held that the
express language of Bankruptcy Code Section 506(b) was "a showstopper" – an under-secured
creditor is not entitled professional fees.  The court further held that even though an undersecured
creditor may be entitled to adequate protection, such protection does not extend to payment of
professional fees in contravention of Section 506(b), even when such arrangement is reached
consensually between debtors, creditors, and banks.  In re TCI 2 Holdings, LLC, Case No. 09-
13654, March 17, 2009 Hearing, pp. 71-78 (Bankr. D.N.J.), **Exhibit C**, attached hereto.  This
holding may be easily analogized to the payment of postpetition interest as well.

[11]    The First Lien Lenders would maintain their Adequate Protection Liens and Adequate Protection
Claims and still be entitled to the financial and other reporting described in the DIP Documents.
See Order, ¶ 17(a)-(b), (e).

First Lien Lenders are under-secured creditors thus warranting discontinuance of the Adequate Protection Payments. See Rufo, 502 U.S. at 391 ("[T]he focus should be on whether the proposed modification is tailored to resolve the problems created by the change in circumstances."); Still's Pharmacy, Inc. v. Cuomo, 981 F.2d 632, 638 (2d Cir. 1992) (holding that the most narrowly tailored method is not required under Rufo). This remedy is suitably tailored because the Committee is only requesting that the Order be modified to the extent needed to preserve cash for the Debtors' estate.

## NOTICE

32.     Notice of this Motion has been provided to (i) the U.S. Trustee, (ii) counsel to the Debtors' Pre-Petition Secured Lenders and to the DIP Lenders, (iii) counsel to the Debtors, and (iv) all other parties on the Master Service List. The Committee submits that no other or further notice is required.

## NO PRIOR REQUEST

33.     No previous request for the relief sought herein has been made by the Committee to this or any other Court.

## CONCLUSION

34.     The Committee respectfully requests that this Court (a) grant this Motion and (b)

grant to the Committee such other and further relief as this Court deems appropriate.


Dated: Boston, Massachusetts
        December 23, 2009

                    Respectfully submitted,

                    THE OFFICIAL COMMITTEE OF
                    UNSECURED CREDITORS

                    By: */s/ Steven D. Pohl*
                        Steven D. Pohl, Esquire
                        John C. Elstad, Esquire
                        BROWN RUDNICK LLP
                        One Financial Center
                        Boston, MA 02111
                        (617) 856-8200

                        Edward S. Weisfelner, Esquire
                        BROWN RUDNICK LLP
                        Seven Times Square
                        New York, NY 10036
                        (212) 209-4800

                        Counsel for the Official Committee of Unsecured
                        Creditors

**<u>EXHIBIT A</u>**

03-Feb-09
12:54

**LyondellBasell considers putting Luxembourg sub in bankruptcy; CDS auctions proceed - sources**

Story:

LyondellBasell is considering a bankruptcy filing of its LyondellBasell Industries A.F.S.C.A subsidiary in Luxembourg due to myriad cross border, cash management and CDS complications, said three sources familiar with the matter.
Management retained the law firm of Clifford Chance to explore European restructuring, added two of the sources. Calls to LyondellBasell and Clifford Chance were not returned.
The debtor initially left its European subsidiaries out of bankruptcy when Lyondell Chemical filed for Chapter 11 in the US on 6 January because creditors feared an overseas court would destroy value by liquidating the assets. But that strategy caused chaos for investors in CDS referencing the company's USD 615m and EUR 500m 8.375% unsecured notes backed by the Luxembourg-based "Nell" assets.
Nell bond holders that also bought CDS have been consolidating their positions to push for an acceleration despite the debtors promise to remain current on the notes. Under the Nell bond indentures, the filing of Lyondell Chemical should have set off a cross default in the Nell bonds. However, the cross default was allegedly negated because the debtor's interim DIP agreement includes a forbearance of the matter, as reported. "Ultimately [the company] does not want to give holders grounds to accelerate," said one of the sources familiar. "They are still exploring alternatives to filing Luxembourg by talking to those bond holders, but it's on the table." Lyondell will likely decide the fate of the unit before 15 February when the next coupon on the Nell bonds falls due, added a second of the sources familiar. Rumors circulated in the European market early this week that the company might have also been exploring an out-of-court restructuring of some sort in order to effect a CDS trigger, said an industry source.

**CDS auctions run on schedule**

As management crafts its strategy concerning the European subsidiaries, Markit held auctions this morning for Lyondell Chemical's CDS and LCDS. The auctions set the inside market midpoint for both bonds and loans at around 23, according to administrator Creditex. Lyondell's CDS mid is 23.25 and the LCDS mid is 23.125.
That presents a stark contrast to the most recent CDS/LCDS auction held on 6 January for Tribune in which CDS recovery was set at 1.5 and LCDS was set at 23.75.
There were also CDS auctions held on Equistar and Millennium America Inc. The inside market for Equistar was set at 30.275 with USD 33.476m net open interest to sell, and the inside market mid for Millennium was 6.125 with net open interest to sell USD 10.15m in bonds this afternoon.
Some Lyondell bonds rallied last month as investors speculated that they could obtain first

**Dealscope potential activity analysis**

Topics:
CDS Coverage

| Issuer | Brown Rudnick LLP. (formerly Brown, Rudnick, Berlack Israels, LLP) | Intel |
|---|---|---|
| Issuer | Lyondell Chemical Company | Intel |
| Issuer | LyondellBasell Industries | Intel |
| Financial advisor | AlixPartners LLP | Intel |
| Financial advisor | Evercore Partners Inc | Intel |
| Lawyer | Cadwalader, Wickersham & Taft LLP | Intel |
| Lawyer | Skadden Arps Slate Meagher & Flom LLP | Intel |
| Lead Manager | Goldman Sachs | Intel |
| Other | Clifford Chance | Intel |
| Other | ABN AMRO ~ | Intel |
| Other | Merrill Lynch | Intel |
| Other | Citigroup Inc | Intel |
| Other | Angelo, Gordon & Co | Intel |
| Other | Cerberus Capital Management LP | Intel |
| Other | Strategic Value Partners LLC | Intel |
| Other | Apollo Investment Corporation | Intel |
| Other | Oak Tree | Intel |
| Other | SilverPoint Capital LP | Intel |
| Other | Appaloosa Management LP | Intel |
| Other | UBS Global Asset Management Americas Inc. | Intel |
| Other | Moelis & Company LLC | Intel |
| Other | Mayer, Brown, Rowe & Maw LLP | Intel |
| Other | Credit Default Swap - CDS | Intel |

lien creditor status. The debtor's loans also traded down because of perceived DIP priming risk and fears of a convoluted collateral allocation mechanism (CAM) exchange that was only resolved yesterday

The net open interest for both auctions today was also nearly in lockstep with USD 143m to sell in the CDS auction this afternoon and USD 138m to sell in the LCDS auction.

One sellside trader involved in the auction said that the range of recovery assumptions being used by market participants is on the low end to incorporate the uncertainties of the complex situation.

Lyondell's USD 9.5bn prepetition Libor+ 375bps TLB is bid at 22.8 today, down from 28 on 26 Janury. The debtor's USD 2.375bn L+ 1000bps DIP TL is bid at 99.9 today, down from 100.25 on 19 January. Meanwhile, the Nell bonds have been trading around 8 since 23 January, up from 2.5 on 6 January, according to Markit.

Procedurally in the US case, a 4 February hearing scheduled for permanent DIP approval has been re-scheduled to 10 February, two of the sources said. The delay is partially attributable to a dispute the company is having with holders of its USD 100m 10.25% first lien ARCO notes, the USD 225m 9.8% first lien ARCO notes, and the USD 150m 7.55% first lien Equistar notes.

Both the Equistar and Arco bond classes have first-lien claims on specific asset pools, but their claims are diluted by more than USD 20bn of bank and DIP debt. The holders organized and hired legal counsel Dechert LLP to challenge the super-priority status obtained by Lyondell Chemical's pre-bankruptcy lenders who backed the company's USD 8bn DIP.

USD 100m 10.25% first lien ARCO notes last traded at 25.75 on 28 January. The USD 150m 7.55% first lien Equistar notes traded at 30.75 on 30 January, up from 18 on 10 December, according to TRACE.

by Andrew Ragsly and Nicoletta Kotsianas

Keywords: CDS Coverage

**Source:** Debtwire, Court document(s), U.S. Securities & Exchange Commission

**Intel. Grade:** Strong evidence

**Intelligence ID:** 758164

## Lyondell Chemical Company is in CH11-Restructuring

| Balance Sheet & Docs | Restructuring Details |

## LyondellBasell Industries is in Pre-Restructuring

| Balance Sheet & Docs | Timetable |

## LyondellBasell Industries is in Lev. Loan/High Yield

| Balance Sheet & Docs | Timetable |

## Credit Default Swap - CDS is in Stressed Debt

## LyondellBasell Industries is in Debt Maturity

| Balance Sheet & Docs | Timetable |

Suggest Tear Sheet

*Debtwire only provides Tear Sheet on companies that have public financial statements*

# EXHIBIT B

| | | | |
|---|---|---|---|

17-Dec-09
16:34
Story:

**Lyondell bond holders plan objection to POR crafted with Apollo, Ares and Access**

Holders of Lyondell Chemical's first lien Arco and Equistar bonds plan to object to the amended plan of reorganization the company filed last week, said two sources familiar with the matter. The tweaked restructuring proposal allows holders of the debtor's CAM loan to double-dip recoveries in a fashion the bond holders deem prejudicial, said the sources and several investors and analysts.

The bond holders – organized with trustee Bank of New York's legal counsel Dechert LLP and financial advisor Broadpoint – intend to file an objection by January, said the sources familiar.

The group contends that three holders of the USD 8.9bn CAM loan – Apollo Management, Access Industries and Ares Opportunities Fund – cut a side deal with the company that could dilute value from the far smaller USD 500m ARCO and Equistar claims. The funds are backstopping the USD 2.8bn rights offering that would fund Lyondell's exit from bankruptcy.

The USD 100m 10.25% and USD 225m 9.8% ARCO notes traded around 73 this week, down from 90 prior to the plan amendment, while the CAM loans dropped far less to 74 from 77.7, according to MarketAxess and Markit.

The amended POR filed on 11 December lumps the bonds and CAM together in a USD 9.5bn claims class – Class IV – that is the fulcrum creditor group under the plan. The CAM comprises 94.5% of the claims in Class IV but would recoup more than that under the new terms.

That's because CAM lenders "receive an additional recovery on account of their [equity guarantor] claims against [foreign subsidiaries] LBIH and LBIAF and … LBFC," according to the disclosure statement.

Recovery from European equity guarantors was not part of the original disclosure statement filed in September. That plan treated the CAM TL as pari passu to the Equistar and Arco notes.

"Knowing that the CAM lenders were a big part in crafting this [amended] plan, it's not a shock to see that they pushed an aggressive treatment that benefits themselves," said one of the sources familiar.

The Arco/Equistar group is also considering an assertion of marshalling rights in effort to compel the CAM to take its recovery primarily out of the European equity, thereby leaving more North American asset value for the bonds. The committee could argue the bonds belong in a separate creditor class of their own, giving them more leverage to approve or reject a plan, they added.

**Slices of fulcrum pie**

**Dealscope potential activity analysis**

**Topics:**
Committee Activity

| | | |
|---|---|---|
| DS Target | LyondellBasell Industries | Intel |
| Financial advisor | Evercore Partners Inc | Intel |
| DS Bidder | TPG Capital LP | Intel |
| DS Bidder | China Petroleum & Chemical Corporation | Intel |
| DS Bidder | Reliance Industries Ltd | Intel |
| Financial advisor | Bank of America Merrill Lynch | Intel |
| Financial advisor | Perella Weinberg Partners LP | Intel |
| Lawyer | Davis Polk & Wardwell | Intel |
| Issuer | Lyondell Chemical Company | Intel |
| Issuer | LyondellBasell Industries | Intel |
| Financial advisor | AlixPartners LLP | Intel |
| Financial advisor | Evercore Partners Inc | Intel |
| Lawyer | Cadwalader, Wickersham & Taft LLP | Intel |
| Lawyer | Skadden Arps Slate Meagher & Flom LLP | Intel |
| Lead Manager | Goldman Sachs | Intel |
| Other | Davis Polk & Wardwell | Intel |
| Other | ABN AMRO ~ | Intel |
| Other | Brown Rudnick LLP. (formerly Brown, Rudnick, Berlack Israels, LLP) | Intel |
| Other | Andrews Kurth LLP | Intel |
| Other | Kohlberg Kravis Roberts & Co | Intel |
| Other | Merrill Lynch | Intel |
| Other | Houlihan Lokey | Intel |
| Other | Citigroup Inc | Intel |
| Other | Blackstone Group Holdings | Intel |

Lyondell's disclosure statement assigns recovery to the USD 9.5bn Class IV through full equitization and the right to buy more shares at a discount. Under the plan, Class IV will be converted into 273m Class A shares of stock with a mid-point value of USD 15.76 per share. In addition, the class has the right to subscribe to another 240m Class B shares at a price of USD 10.61 per share. All together, the transaction yields the class a total share pot worth roughly USD 5.5bn of value through 513m shares, or 91% of the reorganized equity, said the analysts.

Court documents do not detail exactly how the shares are portioned between CAM lenders and bond holders. But analysts citing the disclosure statement's valuation of foreign assets as 40% of LyondellBasell's total enterprise value, extrapolate that 40% through the 513m share pot. Under that scenario, CAM lenders are entitled to grab around 205m shares, or 40%, of the pot based on the European equity claim alone.

In addition, the CAM lenders would be in line to take another 290m shares, or 94%, of the 308m remaining shares. That leaves just around 18m shares for the ARCO and Equistar notes, according to the buyside and sellside analysts and one of the sources familiar.

All told, CAM lenders would receive around 495m shares, versus the 482m shares they would get without the foreign equity guarantors, they continued. While the 13m share count difference appears slim in the grand scheme, it takes roughly USD 200m of value away from the USD 500m of Arco and Equistar notes.

Moreover, assuming the 15.76 per share mid-point, the 18m shares left for the bond holders under the above scenario totals USD 283m of value against USD 500m of claims at ARCO and Equistar.

Spokespersons for Lyondell's legal counsel Cadwalader, and for Apollo and Dechert declined to comment. Calls to officials at Broadpoint, Access and Ares were not returned.

by Andrew Ragsly

**Source:** Debtwire, Court document(s)
**Intel. Grade:** Strong evidence
**Intelligence ID:** 909960

| | | |
|---|---|---|
| | LLC | |
| Other | Apollo Management LP | Intel |
| Other | Dechert LLP | Intel |
| Other | DZ Bank AG | Intel |
| Other | Angelo, Gordon & Co | Intel |
| Other | Cerberus Capital Management LP | Intel |
| Other | Strategic Value Partners LLC | Intel |
| Other | Ares Management LLC | Intel |
| Other | Kasowitz Benson Torres & Friedman LLP | Intel |
| Other | Oak Tree | Intel |
| Other | Broadpoint Gleacher Securities Group Inc | Intel |
| Other | SilverPoint Capital LP | Intel |
| Other | Appaloosa Management LP | Intel |
| Other | UBS Global Asset Management Americas Inc. | Intel |
| Other | Moelis & Company LLC | Intel |
| Other | Mayer, Brown, Rowe & Maw LLP | Intel |

**Lyondell Chemical Company is in CH11-Restructuring**

Balance Sheet & Docs    Restructuring Details

**LyondellBasell Industries is in Pre-Restructuring**

Balance Sheet & Docs    Timetable

**LyondellBasell Industries is in Lev. Loan/High Yield**

Balance Sheet & Docs    Timetable

**LyondellBasell Industries is in Debt Maturity**

Balance Sheet & Docs    Timetable

Suggest Tear Sheet

## <u>EXHIBIT C</u>

## TRUMP CASINO HEARING TRANSCRIPT

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

|  | ) | Bankruptcy Action |
|---|---|---|
| IN RE: | ) | Case No.: 09-13654(JHW) |
|  | ) |  |
| TCI 2 HOLDINGS, LLC., | ) |  |
| et al., | ) |  |
|  | ) | Chapter 11 |
| Debtors, | ) | Camden, New Jersey |
|  | ) | March 17, 2009 |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE JUDITH H. WIZMUR
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:            CHARLES A. STANZIALE, JR., ESQUIRE
                           JOSEPH LUBERTAZZI, JR., ESQUIRE
                           McCarter & English, LLP
                           Four Gateway Center
                           100 Mulberry Street
                           Newark, New Jersey 07102

For Ad Hoc Committee:      KRISTOPHER M. HANSEN, ESQUIRE
                           Stroock & Stroock & Lavan, LLP
                           180 Maiden Lane
                           New York, New York 10038

For Former Shareholders:   JERRY KULBACK, ESQUIRE
                           Archer & Greiner
                           One Centennial Square
                           Haddonfield, New Jersey 08033

For Donald Trump:          PAUL MAINARDI, ESQUIRE
                           DONALD LUDMAN, ESQUIRE
                           Brown & Connery
                           6 N. Broad Street
                           Woodbury, New Jersey 08096

                           DAVID FRIEDMAN, ESQUIRE
                           Kasowitz, Benson, Torres & Friedman
                           1633 Broadway
                           New York, New York 10019

For Beal Bank:             CHARLES GIBBS, ESQUIRE
                           Akin, Gump, Strauss, Hauer & Feld
                           1700 Pacific Avenue
                           Dallas, Texas

(Appearances Continued)

For U.S. Bank:                    MARK W. PAGE, ESQUIRE

                                  (Via Telephone)
                                  Kelley, Drye & Warren, LLP
                                  333 West Wacker Drive
                                  Chicago, Illinois

For U.S. Trustee:                 JEFFREY M. SPONDER, ESQUIRE
                                  Office of the U.S. Trustee
                                  One Newark Center
                                  Newark, New Jersey 07102


Audio Operator:                   Norma Sader

Transcribed by:                   DIANA DOMAN TRANSCRIBING
                                  P.O. Box 129
                                  Gibbsboro, New Jersey  08026-129
                                  PHONE:  (856)435-7172
                                  FAX:    (856) 435-7124
                                  Email:  Dianadoman@comcast.net

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

1      THE COURT:  And I appreciate the arguments very much

2  and I am prepared to rule.  I do think this has been an

3  excellent discussion of a difficult issue.

4      And, indeed, I recognize, at the outset, that this is

5  a negotiated proposal to pay for professional fees.  A proposal

6  that was negotiated between the debtor, Beal Bank, whose cash

7  collateral is being used, and the note holders.  That it has

8  been properly noticed.

9      I take note of the 4001 alliance by the note holders

10 to suggest that it is not a procedural hurdle that I'm

11 concerned with, as I approach this issue and feel compelled to

12 deny the opportunity of the note holders to achieve this

13 payment, at this point in the case, in this record.

14      Indeed, it is certainly preferable, Mr. Hansen is

15 certainly correct, to have a negotiation, an active

16 participation, a focus on the major issues, an active

17 involvement on behalf of the note holders, certainly as with

18 all parties, and everything that the parties can do and the

19 Court can do to facilitate that negotiated process, is to be

20 done.

21      And that is clear, and it would certainly be my

22 intent to have that approach, as we take on each issue that is

23 presented.  But that does not permit me to ignore the clear

24 mandate of the Bankruptcy Code.

25      And I start, of course, with 506(b).  I think that

1   Mr. Trump is correct to assert that 506(b), if I may borrow Mr.

2   Friedman's language, is the showstopper. From the standpoint

3   that it lays out very clearly, very directly, and in a way that

4   was clearly recognized, as well, by Justice Scalia in the

5   Timbers case, the opportunity only of over secured creditors to

6   achieve post-petition interest, as was the case in the Timbers

7   case. And within the same clause of 506(b), attorney's fees,

8   as are contemplated here.

9       We don't have a definitive evidential record of what

10  the status of the note holders are in this case. But suffice

11  it to say that, we can whittle -- we can glean from the

12  comments of Mr. Hansen, and assume for these purposes that we

13  are dealing with a set of creditors, the note holders, who have

14  under secured status. That means that they are secured to some

15  extent, beyond the secured position of Beal Bank.

16      But that the value of the collateral they hold, may

17  not extend fully to support their entire 1.2 billion dollar

18  claim.

19      If that's the case, then the 506(b) opportunity would

20  not be available to them. And by the same token, it is clear

21  that the burden to establish over secured status would be on

22  the note holders, and that burden has not been met here.

23      The Timbers case is critical in this analysis. The

24  Timbers case offered -- understood, let me say, that under

25  secured creditors may be entitled to adequate protection. And

Mr. Hansen is certainly correct in his recitation of the

context in which the Court was speaking, the fact that the

collateral in <u>Timbers</u> was rising in value and there is, at

least argument advanced, that that might be the opposite in

this case, that there may be a diminution in value.

But I agree with Mr. Trump, that payment of

professional fees does not correlate here to adequate

protection.  There is adequate protection, which may be

approved in this case for the note holders, in terms of

replacement liens and super priority administrative claim, in

the event that there is established a diminution.

But if we understand that 361, which defines adequate

protection allows for cash payments or additional security, to

the extent of any decline in value, we don't have a record to

support the proposition that the payment of professional fees

in this case, in the amounts that are contemplated, would

comport with, correlate with the potential decline in value of

the collateral supporting the note holders position.

363(e) does not provide a sufficient basis to allow

this provision of the cash collateral order to go forward.

Indeed, 363(e) may -- permits a Court to prohibit, or condition

the use, sale or lease of property, as is necessary, and I'm

quoting "to provide adequate protection of the interest."

But this -- in evaluating what this means, it's

really the same analysis that the <u>Timbers</u> court used to look at

1    the adequate protection language of 362(d)(1), that there is

2    opportunity only within the context of the Bankruptcy Code.

3        And the context, the particular Bankruptcy Code

4    provision that controls here is 506(b). There cannot be,

5    notwithstanding the flexibility of the term, that is adequate

6    protection, there cannot be use of that term no matter how

7    flexible, in violation of other Code provisions. In

8    particular, 506(b).

9        503(b) does not apply here. It may apply, indeed, if

10   the note holders ad hoc committee continues their active

11   participation, succeeds in achieving a resolution, it is easy

12   to see that they might very well be entitled to a substantial

13   contribution award under 503(b).

14       But that showing has to be made after the fact, not

15   before. Their role pre-petition was perfectly acceptable.

16   Their arrangements with the debtors understandable and

17   necessary, from the standpoint of the need for the debtors to

18   achieve forbearance agreements and to attempt to negotiate a

19   reorganization resolution before the fact. And it is quite

20   common, as Mr. Hansen suggests, to have ad hoc committee

21   participation that has been shown, now, today, by the 2019

22   statement filed.

23       That, indeed, a substantial percentage of the note

24   holders is represented by this set of professionals. And,

25   frankly, that's very helpful to the case. But that does not

1    offer that set of professionals the opportunity to be afforded

2    payment for their professional fees, at this stage.

3         There is -- we didn't discuss it, but I noted in

4    passing, a citation to Section 1109 in the note holder's

5    submission, to support their contention that professional fees

6    are appropriate.

7         Of course, that gives them standing to appear and to

8    be heard on all issues, and we welcome and encourage their

9    continued appearance and participation.  But that does not

10   support the payment, either.  And, indeed, Mr. Friedman

11   correctly recites that the provisions for counsel fees are well

12   set out and limited in the structure of the Code.

13        We've dealt with the Business Judgment Rule.  Indeed,

14   that is very persuasive in many instances.  It is not a blank

15   check to overcome specific proposals.  The so called precedent

16   for the 2004 case, must be rejected as well.  Indeed, I did

17   approve professional fees paid ongoing to ad hoc committees in

18   that case early on, in the context, if I'm not mistaken, of

19   cash collateral arrangements.

20        But there was significant difference.  Number one, by

21   reason of the global resolution, which was maintained pretty

22   much intact throughout the case, on total reorganization.

23        The case came in with those major blocks of bond

24   holders agreed to specific provisions.  They did -- they, the

25   bond holders in that situation, had a security interest in the

1  debtor's cash collateral, and there was a priming issue in that

2  case, a hundred million dollars of VIP financing, as well an

3  uncertain status about whether they were over secured.

4          The claw back and disgorgement provisions don't say

5  this, indeed, it could be undone.  All they do is provide the

6  opportunity to undo what is not authorized to be done in the

7  first place.  And so that is not an appropriate way to look at

8  it.  Nor is it that, in other places with this exact scenario,

9  this would be approved.

10         Certainly, it's hard to say, but I'd pass that

11 argument and must reject it.  The support of Beal Bank is

12 understood, but it does not offer the authoritative basis for

13 approving this payment, nor does the position of the U.S. Bank.

14 Indeed, if all are benefitted, as U.S. Bank suggests, again,

15 there is entitlement, there will be entitlement to 503(b)

16 payment for professional fees, and I look forward to that

17 result.

18         So I will decline to approve that aspect of the cash

19 collateral arrangement.  Mr. Lubertazzi?

20         MR. LUBERTAZZI:  Yes, Your Honor.  If I can speak to

21 the form of the final order.  And I know we have to submit a

22 revised order.

23         Your Honor, we will submit a revised order which

24 addresses Mr. Sponder's concern that he receive the forecasts.

25         When I was here the first time, earlier this morning,

1    Your Honor mentioned about the releases of officers and

2    employees, and we placed on the record that that's solely to

3    the extent in their capacity as agents for the pre-petition

4    secured creditors.  We can put that language in the order, Your

5    Honor.

6            And Your Honor mentioned a moment ago, and I just

7    want to get clarity.  There are three types of protection that

8    are being given to Beal Bank and to the note holders.  One was

9    the payment of fees, and Your Honor just addressed that.  And I

10   went back and I looked at the order, also, Your Honor.  It is

11   very specific for, if Beal Bank submits its application to the

12   U.S. Trustee and time to object.  But there's also protection

13   for the pre-petition secured creditors, which is the note

14   holders, as well as Beal Bank, for replacement liens and super

15   priority claims.  I didn't understand anything Your Honor just

16   said now to alter what's in that form of order.

17           THE COURT:  No, I don't mean to alter that aspect of

18   the arrangement.

19           MR. LUBERTAZZI:  Okay.  So what we will do is, we

20   will take the final order and we will circulate it.  And we'll

21   eliminate -- we'll make the two modifications that I mentioned

22   a moment ago.  And we'll eliminate the provision of fees for

23   the note holder -- the ad hoc committee.

24           I don't know if Your Honor wants a separate order

25   having to deal with that.  And I understand Your Honor's ruling

1    right now to essentially be to be without prejudice.

2         So I don't know if you want a separate order for that

3    also, Your Honor.

4         THE COURT:  Perhaps that's helpful.  In case it's

5    challenged it might clarify the scenario.

6         MR. LUBERTAZZI:  Okay.  Thank you, Your Honor.

7      (End of requested portion 11:54:00)

8      (Court adjourned)

9                      *  *  *  *  *

10                 C E R T I F I C A T I O N

11   I, Josette Jones, court approved transcriber, certify that the

12   foregoing is a correct transcript from the official electronic

13   sound recording of the proceedings in the above-entitled

14   matter.

15

16   /s/Josette Jones                       04/29/09

17   JOSETTE JONES                          DATE

18   DIANA DOMAN TRANSCRIBING