George A. Davis, Esq.
Andrew M. Troop, Esq.
Christopher R. Mirick, Esq.
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York  10281

-and-

Mark C. Ellenberg, Esq.
Peter Friedman, Esq.
CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street, N.W.
Washington, DC  20001

Attorneys for Lyondell Chemical Company, et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------x
                                                          :
**In re:**                                                :
                                                          :         **Chapter 11**
                                                          :
**LYONDELL CHEMICAL COMPANY, et al.,**  :         **Case No. 09-10023 (REG)**
                                                          :
                                                          :         **Jointly Administered**
                                        **Debtors.**      :
                                                          :
----------------------------------------------------------x

### PLAN SUPPLEMENT TO THIRD AMENDED JOINT PLAN OF REORGANIZATION FOR LYONDELLBASELL DEBTORS

Lyondell Chemical Company and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (the "Debtors"), hereby submit the Plan Supplement pursuant to Section 13.2 of the Third Amended Joint Plan of Reorganization for LyondellBasell Debtors, dated March 12, 2010 (as it may be modified or further amended from time to time, the "Plan").

The Plan Supplement contains substantially final forms of the following documents:

| TAB NO. | DOCUMENT |
|---|---|
| 1 | Assumption Schedule |
| 2 | List of Identified Initial Members of New Topco Supervisory Board |
| 3 | List of Initial Officers of New Topco |
| 4-A | New Topco Articles of Association |
| 4-B | Form of Nominating Agreement |
| 4-C | Supervisory Board Rules |
| 4-D | Management Board Rules |
| 5 | Form of Certificate of Amendment for Certificate of Incorporation of Reorganized Debtors |
| 6-A | Letter from Committee Regarding Certain Plan Supplement Documents |
| 6-B | Creditor Representative Responsibilities |
| 6-C | Litigation Trust Agreement |
| 6-D | Creditor Trust Agreement |
| 6-E | Cooperation Agreement |
| 7 | Millennium Custodial Trust Agreement and Conveyance Agreement |
| 8 | Environmental Custodial Trust Agreement |
| 9-A | Summary of the Equity Compensation Plan and Awarded Bonus |
| 9-B | Medium Term Incentive Plan |
| 9-C | Long Term Incentive Plan |
| 10 | Equity Registration Rights Agreement |
| 11 | Description of Third Lien Notes |
| 12 | Third Lien Notes Indenture |
| 13 | Description of 2014 Notes |
| 14 | 2014 Notes Indenture |
| 15 | Warrant Agreement |
| 16-A | Term Loan Agreement |
| 16-B | First Lien Indenture |
| 16-C | ABL Commitment Letter |
| 16-D | First Lien Intercreditor Agreement |
| 16-E | Junior Lien Intercreditor Agreement |
| 16-F | Third Lien Intercreditor Agreement |

The aforementioned forms are non-binding drafts that continue to be reviewed and revised by the Debtors and other parties in interest. Until such drafts are finalized, all rights are reserved.

Holders of Claims and Interests may obtain a copy of the Plan Supplement (i) on the official website for the Bankruptcy Court (www.nysb.uscourts.gov); note that a PACER password is needed to access documents on the Court's website and may be obtained by accessing the PACER website, http://pacer.psc.uscourts.gov, (ii) on the website of the Claims Agent (www.epiqbankruptcysolutions.com), (iii) on the website of the Debtors (www.lyondellbasell.com/News/Chapter11Restructuring/) or (iv) upon written request to the Debtors' bankruptcy counsel (George A. Davis, Esq. and Andrew M. Troop, Esq., Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, New York 10281).

Dated: New York, New York
      April 5, 2010

                                   CADWALADER, WICKERSHAM & TAFT LLP

                                   */s/George A. Davis*
                                   George A. Davis, Esq.
                                   Andrew M. Troop, Esq.
                                   Christopher R. Mirick, Esq.
                                   One World Financial Center
                                   New York, New York  10281
                                   Telephone:  (212) 504-6000
                                   Facsimile:  (212) 504-6666
                                   george.davis@cwt.com
                                   andrew.troop@cwt.com
                                   christopher.mirick@cwt.com

                                   and

                                   Mark C. Ellenberg, Esq.
                                   Peter Friedman, Esq.
                                   700 Sixth Street, N.W.
                                   Washington, DC  20001
                                   Telephone:  (202) 862-2200
                                   Facsimile:  (202) 862-2400
                                   mark.ellenberg@cwt.com
                                   peter.friedman@cwt.com

**<u>TAB 1</u>**

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| 3M SOURCING OPERATIONS 3M Center, Building 216-2N-07 St. Paul, MN 55144-1000 USA | 3M Company | 85697 | Equistar Chemicals, LP | Sales Agreements | 1/1/2006 | $0.00 | | |
| 3V INC. 888 Woodstock St. Georgetown, SC 29440 USA | 3V_La Porte | 5594 | Equistar Chemicals, LP; Millennium Petrochemicals Inc.(Virginia) | Sales Agreements | 1/1/2006 | $0.00 | Millennium Petrochemicals Inc | LyondellBasell Acetyls LLC |
| AB NYNAS PETROLEUM Box 10700 12129 Stockholm , Sweden | License Agreement | 80166 | Lyondell Chemical Company | License Agreement | 12/18/1996 | $0.00 | | |
| ABC GROUP INC. 2 Norelco Drive Toronto, Canada M9L 2X6 | Final Purchase Agreement | 30800 | Basell USA Inc. | Purchase Agreements | 1/1/2007 | $0.00 | | |
| ABC LABORATORIES 7200 E. ABC Lane Columbia , MO 65202 USA | Agreement 2008-P-0063 | 51424 | Equistar Chemicals, LP; Lyondell Chemical Company | Service Agreements | 12/16/2008 | $925.00 | | |
| ABZ INCORPORATED 4451 Brookfield Corp. Dr. Suite 101 Chantilly, VA 20151 USA | Purchase Order | 20265 | Lyondell Chemical Company | Purchase Agreements | 5/1/2007 | $0.00 | | |
| ACCELRYS SOFTWARE INC 10188 Telesis Court, Suite 200 San Diego, CA 92121 USA | 09006963804301 27 - 200712-Accelrys Inc | 55973 | Lyondell Chemical Company | Service Agreements | 12/31/2008 | $1,054.79 | | |
| ACCESS BUSINESS GROUP 7575 Fulton Street East Ada , MI 49355 USA | Sales Agreement - Access Business Group - LP5002 and NA814000 Amendment No. 2 | 25787 | Equistar Chemicals, LP | Sales Agreements | 1/1/2007 | $0.00 | | |
| ACCUTECH FILMS, INC. 620 Hardin Street Coldwater , OH 45828 USA | Contract for Sale | 75862 | Equistar Chemicals, LP | Purchase and Sales Agreement | 7/1/2008 | $0.00 | | |

1

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| ACE AMERICAN INSURANCE COMPANY Two Riverway St., Suite 1100 Houston , TX  77056 USA | Security Agreement | 66759 | Lyondell Chemical Company | Insurance Contracts | 6/1/2007 | $0.00 | | |
| ACE AMERICAN INSURANCE COMPANY Two Riverway St., Suite 1100 Houston , TX  77056 USA | Workers' Compensation and Employers' Liability Insurance Policy (Part 3) | 66758 | Lyondell Chemical Company | Insurance Contracts | 6/1/2007 | $0.00 | | |
| ACE AMERICAN INSURANCE COMPANY Two Riverway, Suite 1100 Houston, TX 77056 USA | Workers' Compensation and Employers' Liability Insurance Policy (Part 2) | 66757 | Lyondell Chemical Company | Insurance Contracts | 6/1/2007 | $0.00 | | |
| ACE AMERICAN INSURANCE COMPANY Houston Branch Office Two Riverway, Suite 1100 Houston , TX  77056 USA | Workers' Compensation and Employers' Liability Policy (Part 1) | 66756 | Lyondell Chemical Company | Insurance Contracts | 6/1/2007 | $0.00 | | |
| ACE AMERICAN INSURANCE COMPANY Centralized Operations 1 Beaver Valley Road Wilmington , DE  19803 USA | Workers' Compensation and Employers' Liability Insurance Policy | 66755 | Houston Refining LP | Insurance Contracts | 6/1/2006 | $0.00 | | |
| ACE AMERICAN INSURANCE COMPANY Houston Branch Office Two Riverway, Suite 1100 Houston , TX  77056 USA | Workers' Compensation and Employer's Liability Policy | 66753 | Houston Refining LP | Insurance Contracts | 6/1/2006 | $0.00 | | |
| ACE AMERICAN INSURANCE COMPANY Houston Branch Office Two Riverway, Suite 1100 Houston , TX  77056 USA | Workers' Compensation and Employer's Liability Insurance Policy (Part 3) | 66752 | Lyondell Chemical Company | Insurance Contracts | 6/1/2005 | $0.00 | | |
| ACE AMERICAN INSURANCE COMPANY Houston Branch Office Two Riverway, Suite 1100 Houston , TX  77056 USA | Workers' Compensation and Employer's Liability Insurance Policy (Part 2) | 66751 | Lyondell Chemical Company | Insurance Contracts | 6/1/2005 | $0.00 | | |
| ACE AMERICAN INSURANCE COMPANY Two Riverway, Suite 1100 Houston , TX  77056 USA | Workers' Compensation and Employer's Liability Insurance Policy (Part 1) | 66750 | Lyondell Chemical Company | Insurance Contracts | 6/1/2005 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| ACE AMERICAN INSURANCE COMPANY Houston Branch Office Two Riverway, Suite 1100 Houston , TX  77056 USA | Program Agreement | 66749 | Lyondell Chemical Company | Insurance Contracts | 6/1/2005 | $0.00 | | |
| ACETATI SPA Viale Azari, 110 Verbania , Italy  28922 | AcetatiSpA_La Porte | 51363 | Millennium Petrochemicals Inc.(Virginia) | Sales Agreements | 1/1/2008 | $0.00 | Millennium Petrochemic als Inc. | LyondellB asell Acetyls LLC |
| ACOMON AG Weinbergstrasse 5 CH-6300 Zug  , Switzerland | Chemtura/Acomo n_Channelview | 10700 | Lyondell Chemical Company;  Lyondell Chemie Nederland B.V. (Non-Debtor) | Sales Agreements | 1/1/2007 | $0.00 | | |
| ADP, INC. 5800 Windward Pkwy Alpharetta , GA  30005 USA | Master Payroll Administration Services Agreement | 80831 | Lyondell Chemical Company | Service Agreements | 5/24/2007 | $0.00 | | |
| ADT SECURITY SERVICES INC. 29 Commerce Way Totowa , NJ  07512 USA | Equistar Chemicals Amendment Agreement | 70659 | Equistar Chemicals, LP | Sales Agreements | 7/1/2008 | $0.00 | | |
| ADVANCED AROMATICS, L.P. 5501 Baker Road Baytown , Texas  77520 USA | Contract for Sale PGO | 25720 | Equistar Chemicals, LP | Sales Agreements | 2/1/2005 | $0.00 | | |
| ADVANCED CHEMISTRY DEVELOPMENT INC 110 Yonge St 14th Fl Toronto,  Canada  M5C 1T4 | Purchase Order | 35308 | Lyondell Chemical Company | Purchase Agreements | 5/1/2008 | $0.00 | | |
| ADVANCED DRAINAGE SYSTEMS, INC 4640 Trueman Blvd Hilliard , OH  43026 USA | Contract for Sale of Polymers | 15500 | Equistar Chemicals, LP | Sales Agreements | 1/1/2008 | $0.00 | | |
| ADVANCED POLYBAG, INC. 3200 Ridgelake Drive, Suite 100 Metairie , LA  70002 USA | Sales Agreement - Alathon L5005 - Amendment No. 1 | 65650 | Equistar Chemicals, LP | Sales Agreements | 1/1/2008 | $0.00 | | |

3

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| AEP INDUSTRIES, INC 125 Phillips Ave. South Hackensack , NJ 07606 USA | Contract for Sale of Polymers | 76081 | Equistar Chemicals, LP | Purchase and Sales Agreement | 1/6/2009 | $0.00 | | |
| AETNA LIFE INSURANCE COMPANY 151 Farmington Avenue Hartford, CT 06156 USA | Administrative Services Contract | 65725 | Lyondell Chemical Company | Master Services Agreement | 1/1/2002 | $0.00 | | |
| AETNA LIFE INSURANCE COMPANY 151 Farmington Avenue Hartford, CT 06156 USA | Services Agreement for Active Health from Aetna | 65722 | Lyondell Chemical Company | Pension/Benefits/Medical-Related Agreements | 8/1/2007 | $0.00 | | |
| AIG EUROPE ALLIANZ K.P. van der Mandelelaan 600 3062 MB Rotterdam The Netherlands | Marine Cargo Contract of Insurance | 70770 | LyondellBasell Industries AF S.C.A. | Insurance Contract | 5/1/2008 | $0.00 | LyondellBasell Industries AF S.C.A. | New Topco |
| AIG EUROPE (NETHERLANDS) N.V. Brainpark/K.P. van der Mandelelaan 50 3062 MB Rotterdam The Netherlands | Pension Trustee Liability Insurance | 90720 | LyondellBasell Industries AF S.C.A. | Insurance Contracts | 3/31/2008 | $0.00 | LyondellBasell Industries AF S.C.A. | LyondellBasell Industries NV |
| AIR LIQUIDE 2700 Post Oak Blvd, Suite 1800 Houston, TX 77056 USA | Nitrogen Sales Contract | 65821 | Equistar Chemicals, LP | Sales Agreements | 9/1/1982 | $0.00 | | |
| AIR LIQUIDE 2700 Post Oak Blvd, Suite 1800 Houston, TX 77056 USA | Nitrogen Sales Agreement | 66768 | Lyondell Chemical Company | Sales Agreements | 7/1/1986 | Disputed Cure | | |
| AIR LIQUIDE 2700 Post Oak Blvd, Suite 1800 Houston, TX 77056 USA | Industrial Water Treatment, Supply and Sales Contract | 100752 | Lyondell Chemical Company | Utility Agreements | 2/8/2007 | Disputed Cure | | |
| AIR LIQUIDE 2700 Post Oak Blvd, Suite 1800 Houston, TX 77056 USA | Deionized Water Sales Contract | 100750 | Lyondell Chemical Company | Utility Agreements | 1/1/1991 | Disputed Cure | | |
| AIR LIQUIDE 2700 Post Oak Blvd, Suite 1800 Houston, TX 77056 USA | Combined Oxygen and Steam Agreement | 100746 | Equistar Chemicals, LP | Utility Agreements | 9/1/1992 | Disputed Cure | | |

4

# Schedule 1
### Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| AIR LIQUIDE 2700 Post Oak Blvd, Suite 1800 Houston , TX  77056 USA | Nitrogen Sales Contract | 66774 | Equistar Chemicals, LP | Sales Agreements | 3/8/1977 | Disputed Cure | | |
| AIR LIQUIDE 2700 Post Oak Blvd, Suite 1800 Houston, TX  77056 USA | Gaseous Oxygen, Supply and Sales Contract | 100765 | Lyondell Chemical Company | Utility Agreements | 4/20/2007 | Disputed Cure | | |
| AIR LIQUIDE 2700 Post Oak Blvd, Suite 1800 Houston, TX  77056 USA | Nitrogen Sales Contract | 66773 | Lyondell Chemical Company | Sales Agreements | 9/1/1986 | Disputed Cure | | |
| AIR LIQUIDE 2700 Post Oak Blvd, Suite 1800 Houston, TX  77056 USA | Nitrogen Sales Contract | 66775 | Equistar Chemicals, LP | Sales Agreements | 9/1/1982 | Disputed Cure | | |
| AIR LIQUIDE 2700 Post Oak Blvd, Suite 1800 Houston, TX  77056 USA | Nitrogen Sales Agreement | 66772 | Equistar Chemicals, LP | Sales Agreements | 2/1/2001 | Disputed Cure | | |
| AIR LIQUIDE AMERICA CORPORATION 2700 Post Oak Blvd, Suite 1800 Houston, TX  77056 USA | Sales Agreement | 66767 | Equistar Chemicals, LP | Sales Agreements | 11/2/1992 | Disputed Cure | | |
| AIR LIQUIDE AMERICA CORPORATION 2700 Past Oak Boulevard, Suite 1800 Houston, TX  77056 USA | Industrial Water Treatment, Supply and Sales Contract | 30814 | Basell USA Inc. | Sales Agreements | 1/1/2000 | Disputed Cure | | |
| AIR LIQUIDE AMERICA CORPORATION 2700 Post Oak Blvd., Suite 1800 Houston, TX  77056 USA | Power Line Project Agreement | 66769 | Lyondell Chemical Company | Project/Construction Agreements | 10/28/2004 | Disputed Cure | | |
| AIR LIQUIDE AMERICA CORPORATION 2700 Post Oak Blvd, Suite 1800 Houston, TX  77056 USA | Gaseous Nitrogen Supply and Sales Agreement | 66766 | Equistar Chemicals, LP | Sales Agreements | 1/1/2008 | Disputed Cure | | |

5

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| AIR LIQUIDE LARGE INDUSTRIES U.S. LP 2700 Post Oak Blvd, Suite 1800 Houston , TX  77056 USA | Steam, Oxygen and Off-Fuels Sales Contract | 66624 | Lyondell Chemical Company | Sales Agreements | 12/21/2007 | $0.00 | | |
| AIR LIQUIDE LARGE INDUSTRIES U.S. LP 2700 Post Oak Blvd, Suite 1800 Houston , TX  77056 USA | Steam, Condensate, and Fuel Gas Contract | 65870 | Basell USA Inc. | Sales Agreements | 2/1/1987 | $0.00 | | |
| AIR PRODUCTS AND CHEMICAL, INC. 7201 Hamilton Boulevard Allentown , PA  18195 USA | Air Products and Chemical Inc_Bayport Channelview | 80871 | Lyondell Chemical Company | Sales Agreements | 10/1/2007 | $0.00 | | |
| AIR PRODUCTS AND CHEMICALS INC PO BOX 538 Allentown , PA  18105 USA | Nitrogen Agreement | 101204 | Equistar Chemicals, LP | Purchase Agreements | 12/10/1993 | $273,794.33 | | |
| AIR PRODUCTS AND CHEMICALS INC 7201 Hamilton Blvd Allentown , PA  18195 USA | On Site Generator Addendum to Product Supply Agreement | 11808 | Millennium Specialty Chemicals Inc. | Supply Agreements | 10/5/2000 | $15,972.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| AIR PRODUCTS AND CHEMICALS INC. 2700 Braselton Hwy, Suite 10-287 Dacula , GA  30019 USA | Nitrogen Supply Agreement | 50660 | Millennium Specialty Chemicals Inc. | Supply Agreements | 6/16/2000 | $4,129.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| AIR PRODUCTS AND CHEMICALS INC. 2700 Braselton Hwy, Suite 10-287 Dacula , GA  30019 USA | Product Supply Agreement | 50659 | Millennium Specialty Chemicals Inc. | Purchase Agreements | 9/1/1992 | $198,783.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| AIR PRODUCTS INCORPORATED, A DELAWARE CORPORATION 7201 Hamilton Boulevard Allentown , PA  18195-1501 USA | Hydrogen and Synthesis Gas Supply Agreement | 90672 | Lyondell Chemical Company | Utility Agreements | 12/12/1995 | $1,602,719.92 | | |
| AIR PRODUCTS MANUFACTURING CORPORATION 7201 Hamilton Blvd. Allentown , PA  18195-1501 USA | Steam Supply Agreement | 100771 | Equistar Chemicals, LP | Utility Agreements | 10/31/1993 | $28,627.38 | | |

6

# Schedule 1

### Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| AIR PRODUCTS POLYMERS L.P. 7201 Hamilton Blvd Allentown , PA  18195-1501 USA | Air Products Polymers L.P._Olefins | 40266 | Equistar Chemicals, LP | Sales Agreements | 1/1/2005 | $0.00 | | |
| AIR PRODUCTS, LP 7201 Hamilton Boulevard Allentown , PA  18195-1501 USA | Hydrogen Agreement | 101214 | Equistar Chemicals, LP | Utility Agreements | 11/13/1987 | $39,633.01 | | |
| AIR PRODUCTS, LP 7201 Hamilton Blvd Allentown , PA  18195-1501 USA | Amended and Restated Hydrogen Supply Agreement | 21321 | Houston Refining LP | Supply Agreements | 8/1/2005 | $15,281,991.93 | | |
| AIR PRODUCTS, LP 7201 Hamilton Blvd. Allentown , PA  18195-1501 USA | Nitrogen Agreement | 80106 | Millennium Petrochemicals Inc.(Virginia) | Utility Agreements | 11/30/2000 | $273,868.68 | Millennium Petrochemicals Inc.(Virginia) | Lyondellbasell Acetyls, LLC |
| AIR PRODUCTS, LP 7201 Hamilton Blvd. Allentown , PA  18195-1501 USA | Oxygen Agreement | 80105 | Millennium Petrochemicals Inc.(Virginia) | Utility Agreements | 11/13/2000 | $278,253.79 | Millennium Petrochemicals Inc.(Virginia) | Lyondellbasell Acetyls, LLC |
| AIRGAS-NORTH CENTRAL, INC. 1250 West Washington St. West Chicago , IL  60185 USA | Product Sale Agreement | 20838 | Equistar Chemicals, LP | Product Agreements | 10/15/2008 | $0.00 | | |
| AIRLITE PLASTICS, INC 6110 Abbot Dr Omaha , NE  68110 USA | Contract for Sale of Polymers | 15498 | Equistar Chemicals, LP | Sales Agreements | 12/1/2007 | $0.00 | | |
| AKZO NOBEL 15200 Almeda Road Houston , Texas  77053 USA | Akzo Nobel_Solvents | 25657 | Equistar Chemicals, LP | Sales Agreements | 1/1/2004 | $0.00 | | |
| AKZO- NOBEL 15200 Almeda Road Houston , TX  77053 USA | Hydrogen Purchase and Sale Agreement | 81114 | Equistar Chemicals, LP | Sales Agreements | 8/1/1982 | $0.00 | | |
| AKZO- NOBEL 15200 Almeda Road Houston , TX  77053 USA | Utilities Services Agreement | 100785 | Equistar Chemicals, LP | Sales Agreements | 10/9/2000 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| AKZO NOBEL FUNCTIONAL CHEMICALS BV Barchman Wuytierslaan 10, 3800 AE Amersfoort, The Netherlands | AkzoNobelFunctionalChemicalsbv_La Porte | 65599 | Millennium Chemicals Inc. | Sales Agreements | 1/1/2002 | $0.00 | Millennium Chemicals Inc. (Debtor) | LyondellBasell Acetyls LLC |
| AKZO NOBEL POLYMER CHEMICALS BV Stationsplein 4 3818 LE Amersfoort The Netherlands | AkzoNobelPolymerChemicalsBV_La Porte | 40942 | Millennium Petrochemicals Inc.(Virginia) | Sales Agreements | 1/1/2007 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls LLC |
| AKZO NOBEL POLYMER CHEMICALS LLC 525 West Van Buren Street Chicago , IL  60607 USA | AkzoNobel_Bayport | 26114 | Lyondell Chemical Company | Sales Agreements | 1/1/2004 | $0.00 | | |
| ALBEMARLE CORPORATION 451 Florida Street Baton Rouge , LA  70801 USA | Albemarle_Bayport | 80459 | Lyondell Chemical Company | Sales Agreements | 1/1/2008 | $0.00 | | |
| ALCAN CABLE Three Ravinia Drive, Suite 1600 Atlanta , GA  30346-2133 USA | Contract for Sale of Polymers | 80465 | Equistar Chemicals, LP | Sales Agreements | 1/1/2008 | $0.00 | | |
| ALCAN COMPOSITES, INC. 208 West 5th Street Benton , KY  42025-0507 USA | Polymers Sales Contract | 85689 | Equistar Chemicals, LP | Sales Agreements | 8/1/2006 | $0.00 | | |
| ALCAN GLOBAL PHARMACEUTICAL PACKAGING, INC. 1101 Wheaton Ave. Millville , NJ  08332 USA | Contract Supplement for Sale of Polymers | 5604 | Equistar Chemicals, LP | Sales Agreements | 10/1/2004 | $0.00 | | |
| ALCAN PACKAGING 8770 W Bryn Mawr Ave Chicago , IL  60631 USA | Draft Master Agreement | 10904 | Equistar Chemicals, LP | Master Services Agreement | 7/31/2008 | $0.00 | | |
| ALCANCE BROADCASAT NETWORK 2705 Creek Crossing Mesquite , TX  75181 USA | Telecommunications Tower License Agreement | 26001 | Equistar Chemicals, LP | Lease | 6/1/2006 | $0.00 | | |

8

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| ALDRICH CHEMICAL COMPANY 1001 West Saint Paul Avenue Milwaukee , WI 53233 USA | Aldrich_Channel view | 90674 | Lyondell Chemical Company | Sales Agreements | 1/1/2003 | $0.00 | | |
| ALK ASSOCIATES INC. 1000 Herrontown Road Princeton , NJ 08540 USA | Purchase Order | 5911 | Lyondell Chemical Company | Purchase Agreements | 5/18/2004 | $0.00 | | |
| ALL STAR DAIRY ASSOCIATION 1050 Monarch St., Suite 101 Lexington , KY 40513-1819 USA | Contract for Sale of Polymers | 25779 | Equistar Chemicals, LP | Sales Agreements | 8/1/2007 | $0.00 | | |
| ALLEGRO DEVELOPMENT CORPORATION 1445 Ross Avenue, Suite 2200 Dallas , TX 75202-2712 USA | Software License and Services Agreement | 20370 | Lyondell Chemical Company | License Agreement | 8/19/2002 | $0.00 | | |
| ALLOY POLYMERS, INC. 3310 Deepwater Terminal Road Richmond , VA 23234 USA | Settlement Agreement | 30824 | Basell USA Inc. | Financing Agreements | 10/21/2008 | $0.00 | | |
| ALPHA INDUSTRIAL INC. D/B/A SIGMA PLASTIC GROUP PO Box 808 PAGE & SCHUYLER AVE. LYNDHURST , NJ 07071 USA | CONTRACT FOR SALE OF POLYMERS #40001307 | 55693 | Equistar Chemicals, LP | Purchase and Sales Agreement | 1/1/2007 | $0.00 | | |
| ALPHA PACKAGING 1555 Page Industrial Blvd. St. Louis , MO 63132 USA | Contract for Sale of Polymers | 80472 | Equistar Chemicals, LP | Sales Agreements | 3/1/2008 | $0.00 | | |
| ALPHAMIN S.A. Avenue Pasteur, 15, B-1300 Wavre , Belgium 1300 | Form of Distributor Agreement | 30577 | Equistar Chemicals, LP | Supply Agreements | 4/1/2000 | $0.00 | | |
| ALPINA NEPTUNE LOGISTICS NV Ankerrui 2 B-2000 Antwerp , Belgium | Umbrella Contract for Forwarding | 101051 | Lyondell Chemical Nederland, Ltd.; Millennium Petrochemicals Inc.(Virginia) | Transportation Agreements | 1/1/2000 | $10,919.00 | Millennium Petrochemicals Inc.(Virginia) | 201 - Lyondell Chemie Nederland B.V. |

9

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| ALS LABORATORY GROUP 10450 Stancliff Road, Suite 210 Houston , TX  77099 USA | MASTER LABORATORY AGREEMENT | 85831 | Equistar Chemicals, LP; Houston Refining LP; Lyondell Chemical Company;  Millennium Petrochemicals Partners, LP | Service Agreements | 10/1/2008 | $0.00 | Millennium Petrochemicals Partners, LP (Debtor) | LyondellBasell Acetyls, LLC |
| ALVAREZ & MARSAL TAX ADVISORY SERVICES, LLC 2911 Turtle Creek Blvd, Suite 300 Dallas , TX  75219 USA | Services Agreement | 66835 | Lyondell Chemical Company | Consulting Agreements | 2/24/2006 | $24,011.00 | | |
| AMALIE OIL CO. 1610 McCloskey Blvd. Tampa , FL  33605 USA | Sales Agreement | 70482 | Equistar Chemicals, LP | Sales Agreements | 7/1/2006 | $0.00 | | |
| AMCOR FLEXIBLES, INC 1919 South Butterfield Road Mundelein , IL  60060 USA | Contract for Sale of Polymers | 76078 | Equistar Chemicals, LP | Purchase and Sales Agreement | 2/1/2008 | $0.00 | | |
| AMERICAN CHEMICAL SOCIETY 2540 Olentangy River Road Columbus , Ohio  43202-1505 USA | License Agreement | 35307 | Lyondell Chemical Company | License Agreement | 5/1/2008 | $0.00 | | |
| AMERICAN EXPRESS 5000 Atrium Way, Attn: Contracts Dept. Mount Laurel , NJ  08054 USA | Corporate Services Commerical Account Agreement | 51257 | Lyondell Chemical Company | Financing Agreements | 1/31/2008 | $0.00 | | |
| AMERICAN EXPRESS 5000 Atrium Way, Attn: Contracts Dept. Mount Laurel , NJ  08054 USA | American Express @ Work | 11026 | Basell USA Inc. | Service Agreements | 7/10/2006 | $0.00 | | |
| AMERICAN FUJI SEAL 1051 Bloomfield Rd Bardstown , KY  40004 USA | Sales Agreement - LB5604-00 Amendment No. One | 15507 | Equistar Chemicals, LP | Sales Agreements | 1/1/2008 | $0.00 | | |
| AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY 12222 Merit Drive Suite 700 Dallas , TX  75251 USA | Deductible Agreement | 66748 | Equistar Chemicals, LP; Lyondell Chemical Company; Millennium Chemicals Inc. | Insurance Contracts | 3/1/2005 | $0.00 | Millennium Chemicals Inc. (Debtor) | LyondellBasell Acetyls, LLC |

10

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| AMERICAN INTERNATIONAL ASSURANCE CO., LTD Administration Office, 5/F Cornwall House, Taikoo Place, 979 King's Rd Quarry Bay , HONG KONG | Letter Confirmation of MPF Supplementary Scheme Rules | 10992 | Lyondell Asia Pacific, Ltd. | Pension/Benefits/Medical-Related Agreements | 12/1/2000 | $0.00 | | |
| AMERICAN INTERNATIONAL UNDERWRITERS, LIMITED 12/F A/A Building, 1 Stubbs Road Hong Kong | Group Accident Insurance for Employees | 5775 | Lyondell Asia Pacific, Ltd. | Pension/Benefits/Medical-Related Agreements | 5/1/2008 | $0.00 | | |
| AMERICAN PACKAGING CORP. 777 Driving Park Avenue Rochester , NY  14613 USA | Contract for Sale of Polymers | 10962 | Equistar Chemicals, LP | Sales Agreements | 1/1/2007 | $0.00 | | |
| AMERICAN PACKAGING CORPORATION 777 Driving Park Avenue Rochester , NY  14613 USA | Contract for Sale of Polymers | 76087 | Equistar Chemicals, LP | Purchase and Sales Agreement | 1/1/2007 | $0.00 | | |
| AMES TRUE TEMPER 465 Railroad Avenue Camp Hill , PA  17011 USA | Contract for Sale of Polymers | 10758 | Equistar Chemicals, LP | Sales Agreements | 10/1/2007 | $0.00 | | |
| AMOCO CHEMICAL COMPANY PO Box 1488 Alvin , TX  77511 USA | Waiver and Consent | 55264 | Equistar Chemicals, LP | Access Agreements | 12/1/1997 | $0.00 | | |
| AMPACET CORP. 660 White Plains Rd. Tarrytown , NY  10591-5130 USA | License Agreement - Blowing agents | 50123 | Equistar Chemicals, LP | License Agreement | 4/30/1999 | $0.00 | | |
| ANGLETON INDEPENDENT SCHOOL DISTRICT 1900 N Downing Rd Angleton , TX  77515 USA | Hold-Harmless Agreement | 66705 | Equistar Chemicals, LP | Tax Related Agreements | 11/16/1999 | $0.00 | | |
| ANSCOTT INDUSTRIES, INC.D/B/A CALED CHEMICAL 26 Hanes Drive Wayne , NJ  07470 USA | PATENT LICENSE AGREEMENT | 55370 | Lyondell Chemical Technology, L.P. | License Agreement | 3/20/2007 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| AOC, LLC 950 Highway 57 East Collierville , TN  38017 USA | AOC_Channelview | 90675 | Lyondell Chemical Company | Purchase and Sales Agreement | 1/1/2001 | $0.00 | | |
| AOC, LLC 950 Highway 57 East Collierville , TN  38017 USA | AOC LLC_Channelview | 75708 | Lyondell Chemical Company | Sales Agreements | 1/1/2007 | $0.00 | | |
| AOC, LLC 950 Hwy 57 E. Collierville , TN  38017 USA | AOC_Channelview | 40938 | Lyondell Chemical Company | Sales Agreements | 1/1/2007 | $0.00 | | |
| AOC, LLC 950 Hwy 57 East Collierville , TN  38017 USA | AOC, LLC_Channelview | 40261 | Equistar Chemicals, LP | Sales Agreements | 4/1/2005 | $0.00 | | |
| AON RISK SERVICES OF TEXAS, INC. 1330 Post Oak Blvd. Suite 900 Houston , TX  77056 USA | Amendment #1 to Broker Service Agreement | 65496 | Lyondell Chemical Company | Service Agreements | 3/1/2008 | $0.00 | | |
| APPROVA CORPORATION 1950 Roland Clarke Place Reston , VA  20191 USA | APPROVA CORPORATION SOFTWARE LICENSE AGREEMENT | 55344 | Lyondell Chemical Company | License Agreement | 11/30/2006 | $0.00 | | |
| AQUAQUIM S.A. DE C.V. Col Independencia Calle 2a Sur No 4 Tultitlan  , EDM, 54900 Mexico | Aquaquim SA de CV_Bayport Channelview | 70524 | Lyondell Chemical Company | Sales Agreements | 3/1/2007 | $0.00 | | |
| ARCH CHEMICALS, INC. 501 Merritt 7 P.O. Box 5204 Norwalk , CT  06856-5204 USA | Arch Chemicals Inc_Bayport Channelview | 80872 | Lyondell Chemical Company | Sales Agreements | 1/1/2001 | $0.00 | | |
| ARCH CHEMICALS, INC. 1955 Lake Park Drive Smyrna  , GA  30080 USA | Arch Chemicals Inc_Bayport Lyondell Operations | 86046 | Lyondell Chemical Company | Sales Agreements | 1/1/2007 | $0.00 | | |

12

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| ARCH CHEMICALS, INC.<br>Highway 933<br>P.O. Box 547<br>Brandenburg , KY 40108-0547<br>USA | Arch Chemicals_Chanelview | 50521 | Lyondell Chemical Company | Supply Agreements | 2/25/2002 | $0.00 | | |
| ARCH CHEMICALS, INC.<br>5660 New Northside Drive NW, STE 1100<br>Atlanta , GA  30328<br>USA | TDI Olin Agreement of Settlement, Termination and Release | 95431 | Lyondell Chemical Company | Purchase Agreements | 9/30/1999 | $0.00 | | |
| ARCO PIPELINE COMPANY<br>550 Westlake Park Blvd<br>Houston, TX  77079<br>USA | Arco Midcon TBA THROUGHPUT AGREEMENT | 66542 | Lyondell Chemical Company | Through Put Agreements | 2/1/1996 | $0.00 | | |
| ARCO MIDCON LLC<br>BP Pipelines (North America) Inc.<br>550 Westlake Park Blvd<br>Houston, TX  77079<br>USA | Arco Midcon Lease I Agreement | 45752 | Equistar Chemicals, LP | Lease | 1/1/1999 | $6,719,409.02 | | |
| ARGUS MEDIA LTD<br>Argus House, 175th St., John Street<br>London , UK  EC1V 4LW | Argus Media Subscription Agreement | 40289 | Lyondell Chemical Company | Subscription Agreement | 8/19/2008 | $15,130.41 | | |
| ARKANSAS & MISSOURI RAILROAD<br>306 East Emma<br>Spring dale , AR  72901<br>USA | 95741_A&MRR - Rogers, AR - Equistar | 95741 | Equistar Chemicals, LP | Lease Storage Agreements | 5/1/1992 | $0.00 | | |
| ARKEMA<br>4-8 cours Michelet 92091<br>Paris LA Defense Cedex , France | Arkema_Bayport | 26169 | Lyondell Chemical Company | Sales Agreements | 1/1/2005 | $0.00 | | |
| ARKEMA INC.<br>2000 Market Street<br>Philadelphia , PA  19103<br>USA | Arkema Inc._Channelview | 65702 | Equistar Chemicals, LP | Sales Agreements | 1/1/2007 | $0.00 | | |
| ARNECOM S.A. DE C.V.<br>Av. CONDUCTORES N. 505<br>AND NICOLAS de los GARZA, N.L. CP , MONTERREY, MEXICO 66493 | POLYMERS SALES AGREEMENT BETWEEN EQUISTAR CHEMICALS, LP AND ARNECOM, S.A. DE C.V. | 45646 | Equistar Chemicals, LP | Sales Agreements | 10/29/2007 | $0.00 | | |

13

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| ASHLAND CANADA INC 2463 Royal Windsor Drive Mississauga , ON L5J1K9 Canada | INDEPENDENT CONTRACTOR AGREEMENT | 76268 | Basell USA Inc. | Service Agreements | 6/1/2000 | $0.00 | | |
| ASHLAND CHEMICAL COMPANY P. O. Box 2219 Columbus , OH 43216 USA | DISTRIBUTORS HIP AGREEMENT | 60133 | Equistar Chemicals, LP | Sales Agreements | 4/1/1998 | $0.00 | | |
| ASHLAND DISTRIBUTION COMPANY, DIVISION OF ASHLAND, INC. 5200 Blazer Parkway, Dublin, OH 43017 USA | Non-Exclusive Distributorship Agreement | 30840 | Basell USA Inc. | Sales Agreements | 2/1/2002 | $0.00 | | |
| ASHLAND INC. 5200 Blazer Parkway Dublin , OH 43017 USA | Ashland Inc_Bayport Lyondell Operations | 66876 | Lyondell Chemical Company | Purchase and Sales Agreement | 1/1/2009 | $0.00 | | |
| ASHLAND, INC. 5200 Blazer Parkway Dublin , OH 43017 USA | Ashland, Inc._Channelview | 100482 | Equistar Chemicals, LP | Sales Agreements | 6/1/2008 | $0.00 | | |
| ASM INTERNATIONAL 9639 Kinsman Rd Materials Park , OH 44073 USA | License Agreement | 20306 | Lyondell Chemical Company | License Agreement | 5/27/2005 | $0.00 | | |
| ASPEN TECHNOLOGY INC Ten Canal Park Cambridge , MA 02141 USA | Master Services Agreement | 10633 | Lyondell Petrochemical L.P. Inc. | Master Services Agreement | 7/1/2004 | Disputed | | |
| ASPEN TECHNOLOGY, INC. 200 Wheeler Road Burlington , MA 01803 USA | SOFTWARE LICENSE & MAINTENANCE AGREEMENT | 55888 | Lyondell Chemical Company | Software Agreements | 12/22/2008 | Disputed | | |
| AT&T CORPORATION 6500 West Loop S Bellaire , TX 77401 USA | MASTER AGREEMENT - MA Ref # 113381UA | 55945 | Lyondell Chemical Company | Service Agreements | 9/30/2008 | $0.00 | | |

14

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| AT&T MOBILITY NATIONAL ACCOUNTS, L.L.C. 32 Avenue of Americas New York , NY 10013 USA | Corporate Digital Advantage Agreement dated 9/27/05 | 95166 | Lyondell Chemical Company | Access Agreements | 2/20/2008 | $0.00 | | |
| AT&T WIRELESS SERVICES NATIONAL ACCOUNTS, INC. P.O. Box 9706 Redmond , WA 98073-9761 USA | Corporate Digital Advantage Agreement | 30841 | Basell USA Inc. | Service Agreements | 11/30/1999 | $0.00 | | |
| ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY 920 S.E. Quincy St. P.O. Box 1738 Topeka , KS 66628 USA | 41801_ATSF 4241 - MTO Switching Allowance - Equistar | 41801 | Equistar Chemicals, LP | Transportation Agreements | 3/3/1998 | $0.00 | | |
| ATEL LEASING CORPORATION 27 Waterview Dr. Shelton , CT 06484 USA | Notice and Acknowledgment of Assignement | 101198 | Lyondell Chemical Company | Lease - Equipment | 1/25/2007 | $168,136.58 | | |
| ATLANTIC INDEPENDENT UNION 2700 W. Passyunk Avenue Philadelphia , PA 19145 USA | Collective Bargaining Agreement - NewSq | 95416 | Lyondell Chemical Company | Employment, Collective Bargaining, and Related Agreements | 1/28/2008 | $0.00 | | |
| ATLANTIC RICHFIELD COMPANY 333 South Hope Street Los Angeles , CA 90071 USA | Trademark License Agreement | 50152 | Lyondell Chemical Company | License Agreement | 10/1/1997 | $0.00 | | |
| ATLANTIC RICHFIELD COMPANY 515 South Flower Street Los Angeles , California 90071 USA | Amendment to Immunity from Suit Agreement | 90181 | Lyondell Petrochemical L.P. Inc. | Immunity Agreement | 7/1/1988 | $0.00 | | |
| AUDIT TECHS 4582 E. Kingwood Drive, Suite 509 Kingwood , TX 77345 USA | Agreement for Audit of Freight Invoices for Overcharges | 66839 | Equistar Chemicals, LP;Lyondell Chemical Company;Millennium Petrochemicals Inc. (Virginia) | Service Agreements | 12/4/2006 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls LLC |
| AVATIER CORPORATION 12647 Alcosta Boulevard Suite 400 San Ramon , CA 94583 USA | LICENSES AGREEMENT | 55341 | Lyondell Chemical Company | License Agreement | 12/20/2006 | $0.00 | | |

15

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| AVECIA INC 13 Corwin Street PO Box 3039 Peabody, MA  01960 USA | Avecis/DSM_Ch annelview | 76763 | Lyondell Chemical Company | Purchase and Sales Agreement | 1/1/2001 | $0.00 | | |
| AVEPOINT, INC. 3 SECOND STREET, SUITE 803 JERSEY CITY , NJ 07311 USA | SOFTWARE LICENSE AGREEMENT | 55959 | Lyondell Chemical Company | License Agreement | 1/12/2009 | $1,809.74 | | |
| AVEPOINT, INC. PREMIER 3 Second Street, Suite 803 Jersey City , NJ  07311 USA | SOFTWARE MAINTENANC E AGREEMENT | 55960 | Lyondell Chemical Company | Maintenance Agreements | 12/17/2008 | $0.00 | | |
| AXA CHINA REGION INSURANCE COMPANY LIMITED 36/F Tower, One Times Square 1 Matheson Street Causeway Bay , Hong Kong | Employee Health Benefits Policy | 5786 | Lyondell Asia Pacific, Ltd. | Pension/Benef its/Medical-Related Agreements | 5/1/2008 | $0.00 | | |
| AXA CHINA REGION INSURANCE COMPANY LIMITED 36/F Tower One Times Square 1 Matheson Street Causeway Bay , Hong Kong | Life Insurance Policy | 5785 | Lyondell Asia Pacific, Ltd. | Pension/Benef its/Medical-Related Agreements | 5/1/2008 | $0.00 | | |
| AYCO COMPANY, L.P. One Wall Street Albany , NY  12205 USA | Survivor Support Services Agreement | 85752 | Lyondell Chemical Company | Pension/Benef its/Medical-Related Agreements | 8/8/2001 | $0.00 | | |
| AZ ELECTRONIC MATERIALS USA CORP. 70 Meister Ave Somerville , NJ  08878 USA | AZ Electronics_Solve nts | 25874 | Lyondell Chemical Company | Sales Agreements | 1/1/2005 | $0.00 | | |
| BAKER BOTTS LLP One Shell Plaza 910 Louisiana St. Houston , TX  77002 USA | ngagement on Houston/Galvesto n SIP Rule | 66909 | Lyondell Chemical Company | Service Agreements | 1/31/2001 | $0.00 | | |
| BAKER PETROLITE CORPORATION 12645 West Airport Sugar Land , TX  77487 USA | Baker Petrolite Corporation_BC O | 25891 | Equistar Chemicals, LP | Sales Agreements | 1/1/2005 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| BALCHEM CORPORATION P.O. BOX 175 SLATE HILL , NEW YORK 10973 USA | Balchem Corp_Bayport Channelview | 45636 | Lyondell Chemical Company | Sales Agreements | 1/1/2007 | $0.00 | | |
| BAOTOU IRON & STEEL CO. LTD. Baotou Iron & Steel Factory Area Inner Mongolia , P.R. China 14010 | License Contract No. 07ZL/45-11VUS | 30256 | Lyondell Chemical Company | License Agreement | 8/17/2007 | $0.00 | | |
| BASF CORP 3000 Continental Dr N Mount Olive , NJ 07828-1234 USA | BASF Corp_Bayport Channelview | 90612 | Lyondell Chemical Company | Financing Agreements | 11/9/2007 | $0.00 | | |
| BASF CORPORATION 100 Cherry Hill Rd Parsippany , New Jersey 07054 USA | BASF_Channelview | 41553 | Lyondell Chemical Company | Manufacturing Agreement | 6/10/1991 | $0.00 | | |
| BASF CORPORATION 100 Campus Drive Florham Park , NJ 07932 USA | BASF_Channelview/Botlek | 90676 | Lyondell Chemical Company | Purchase and Sales Agreement | 7/1/2007 | $0.00 | | |
| BASF CORPORATION 3000 Continental Drive - North Mount Olive , NJ 07828 USA | BASF_Channelview | 50494 | Lyondell Chemical Company | Exchange Agreements | 4/1/2001 | $0.00 | | |
| BASF CORPORATION 100 Campus Drive Florham Park , NJ 07932 USA | BASF Corporation_Olefins | 80468 | Equistar Chemicals, LP | Exchange Agreements | 11/1/2004 | $0.00 | | |
| BASF CORPORATION 3000 Continental Drive - North Mount Olive , NJ 07828-1234 USA | BASF_Solvents | 65583 | Lyondell Chemical Company | Sales Agreements | 1/1/2003 | $0.00 | | |
| BAXTER HEALTHCARE CORPORATION Route 120 and Wilson Road Round Lake , IL 60073 USA | Contract for Sale of Polymers | 35782 | Equistar Chemicals, LP | Sales Agreements | 1/1/2001 | $0.00 | | |

17

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| BAYER AG D-51373 Leverkusen , Germany | Bayer_JV | 66874 | Lyondell Chemical Company | Service Agreements | 3/31/2000 | $0.00 | | |
| BAYER AG D-51373 Leverkusen , Germany | Bayer_JV | 66859 | Lyondell Chemical Nederland, Ltd. | Sales Agreements | 3/31/2000 | $0.00 | Lyondell Chemical Nederland, Ltd. (Debtor) | Lyondell Chemie Nederland B.V. |
| BAYER AG D-51373 Leverkusen , Germany | Bayer_JV | 66819 | Lyondell Chemical Company | JV Agreement | 12/18/2000 | $0.00 | | |
| BAYER AG D-51373 Leverkusen , Germany | Bayer_JV | 66818 | Lyondell Chemical Company | License Agreement | 12/18/2000 | $0.00 | | |
| BAYER AG D-51373 Leverkusen , Germany | Bayer_JV | 81145 | Lyondell Chemical Company | JV Agreement | 12/18/2000 | $0.00 | | |
| BAYER AG D-51368 Leverkusen , Germany | Performance Chemicals Agreement | 15979 | Lyondell Chemical Company | License Agreement | 3/31/2000 | $0.00 | | |
| BAYER AG AND BAYER CORPORATION D-51373 Leverkusen , Germany | Bayer_JV | 21366 | Lyondell Chemical Company | JV Agreement | 3/31/2000 | $0.00 | | |
| BAYER CORPORATION 100 Bayer Road Pittsburgh , PA  15205 USA | Bayer_JV | 71051 | Lyondell Chemical Company; Lyondell Chemical Nederland, Ltd. | Service Agreements | 3/31/2000 | $0.00 | Lyondell Chemical Nederland, Ltd. (Debtor) | Lyondell Chemie Nederland B.V. |
| BAYER CORPORATION 100 Bayer Road Pittsburgh , PA  15205 USA | Bayer_JV | 71048 | Lyondell Chemical Company | Sales Agreements | 3/31/2000 | $0.00 | | |
| BAYER CORPORATION 100 Bayer Road Pittsburg , PA  15205 USA | Bayer_JV | 81155 | Lyondell Chemical Company | Service Agreements | 2/14/2002 | $0.00 | | |

18

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| BAYER CORPORATION 100 Bayer Road Pittsburgh , PA 15205 USA | Bayer_JV | 66393 | Lyondell Chemical Company | Lease | 3/31/2000 | $0.00 | | |
| BAYER CORPORATION 100 Bayer Road Pittsburgh , PA 15204 USA | Bayer_JV | 45968 | Lyondell Chemical Company | Service Agreements | 3/31/2000 | $0.00 | | |
| BAYER CORPORATION 100 Bayer Road Pittsburgh , PA 15205 USA | Bayer_JV | 26244 | Equistar Chemicals, LP | Service Agreements | 5/1/2001 | $0.00 | | |
| BAYER CORPORATION 100 Bayer Road Pittsburgh , PA 15204 USA | Intellectual Property Assets License Agreement | 70737 | Lyondell Chemical Company | License Agreement | 1/4/2002 | $0.00 | | |
| BAYER MATERIAL LLC 100 Bayer Rd Pittsburgh , PA 15205 USA | Bayer_Channelview | 10727 | Lyondell Chemical Company | Sales Agreements | 7/1/2007 | $0.00 | | |
| BAYER MATERIAL SCIENCE LLC 100 Bayer Rd Pittsburgh , PA 15205 USA | Bayer Material Science LLC_Bayport Lyondell Operations | 10721 | Lyondell Chemical Company | Sales Agreements | 7/1/2007 | $0.00 | | |
| BAYER MATERIAL SCIENCE LLC ON BEHALF OF BAYER AND AFFILIATES 100 Bayer Road Pittsburgh , PA 15205 USA | Bayer_JV | 66857 | Lyondell Chemical Company | JV Agreement | 7/1/2007 | $0.00 | | |
| BAYER MATERIALSCIENCE LLC 100 Bayer Road Pittsburg , PA 15205 USA | Bayer_JV | 81172 | Lyondell Chemical Company | JV Agreement | 10/10/2008 | $0.00 | | |
| BAYER MATERIALSCIENCE LLC 100 Bayer Road Pittsburg , PA 15205 USA | Bayer Corporation_BCO | 60570 | Equistar Chemicals, LP | Sales Agreements | 3/31/2000 | $0.00 | | |

19

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| BAYER MATERIALSCIENCE LLC 100 Bayer Road Pittsburg, PA 15205-9741 USA | Bayer_Channelview | 45645 | Lyondell Chemical Company | Sales Agreements | 1/1/2008 | $0.00 | | |
| BAYER MATERIALSCIENCE LLC, D-51373 Leverkusen , Germany | Bayer_JV | 81151 | Lyondell Chemical Company; Lyondell POJV GP, LLC (Non-Debtor); Offtake, LP (Non-Debtor) | JV Agreement | 1/1/2003 | $0.00 | | |
| BAYER PARTIES AND PO PARTNERSHIPS D-51373 Leverkusen , Germany | Bayer_JV | 81171 | Lyondell Chemical Company; Lyondell Chemical Nederland, Ltd.; Lyondell Chemical Technology, L.P.; Lyondell Chemie Nederland B.V. (Non-Debtor); Lyondell PO11 C.V. (Non-Debtor); Lyondell POJV GP, LLC (Non-Debtor); Lyondell POTech GP, Inc. (Non-Debtor); Lyondell POTech LP, Inc. (Non-Debtor); PO JV, LP (Non-Debtor); PO Offtake, LP (Non-Debtor); Technology JV, LP (Non-Debtor); Lyondell Bayer MM VOF (Non-Debtor) | JV Agreement | 12/19/2008 | $0.00 | 27-Lyondell Chemical Nederland, Ltd. | Lyondell Chemie Nederland B.V. |
| BAYER PARTIES, PO JV LP, TECHNOLOGY JV, LP, Leverkusen , Germany | Bayer_JV | 81160 | Lyondell Chemical Company; Lyondell Chemical Nederland, Ltd.; Lyondell Greater China, Ltd.; Lyondell PO11 C.V. (Non-Debtor); Lyondell POJV GP, Inc. (Non-Debtor); Lyondell POTech LP, Inc. (Non-Debtor); PO JV, LP (Non-Debtor); PO Offtake, LP (Non-Debtor); Technology JV, LP (Non-Debtor); Lyondell Bayer MM VOF (Non-Debtor); Lyondell Chemie Nederland B.V. (Non-Debtor) | JV Agreement | 12/19/2008 | $0.00 | 27-Lyondell Chemical Nederland, Ltd. | Lyondell Chemie Nederland B.V. |
| BAYER POLYURETHANES B.V. Energieweg 1, 3641 RT Mijdrecht The Netherlands | Bayer_JV | 81140 | Lyondell Chemical Technology, L.P. | License Agreement | 12/18/2000 | $0.00 | | |
| BAYTEK INTERNATIONAL INC. 3700 Bay Area Blvd Suite 100 Houston , TX 77058 USA | BLANKET ORDER 490000020 | 55938 | Houston Refining LP | License Agreement | 11/5/2004 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| BBS TECHNOLOGIES, INC.<br>802 Lovett Blvd<br>Houston , TX 77006<br>USA | SQL Compliance Manager Software License and Maintenance Agreement | 40730 | Lyondell Chemical Company | License Agreement | 10/13/2006 | $0.00 | | |
| BEAZER EAST, INC.<br>436 Seventh Ave.<br>Pittsburgh , PA 15219<br>USA | Cost Sharing Agreement | 100860 | Lyondell Chemical Company | Joint Development Agreements | 10/1/1995 | $0.00 | | |
| BELDEN CDT INC.<br>505 North 51st Avenue<br>Phoenix , AZ 85043<br>USA | Contract for Sale of Polymers | 55585 | Equistar Chemicals, LP | Sales Agreements | 1/1/2007 | $0.00 | | |
| BEMIS COMPANY, INC<br>220 Badger Ave<br>Oshkosh , Wisconsin 54904<br>USA | PURCHASE AGREEMENT BETWEEN | 45627 | Equistar Chemicals, LP | Purchase Agreements | 1/1/2007 | $0.00 | | |
| BENNIS G. LEE<br>2163 Treemont St.<br>Orange , TX 77630<br>USA | Fourth Amendment to Grazing Lease | 60584 | Basell USA Inc. | Lease | 3/17/1993 | $0.00 | | |
| BERRY PLASTICS HOLDING CORPORATION<br>101 Oakley St<br>Evansville , IN 47710<br>USA | Contract for Sale of Polymers | 15499 | Equistar Chemicals, LP | Sales Agreements | 8/1/2007 | $0.00 | | |
| BETTS USA, INCORPORATED<br>7850 Foundation Drive<br>Florence , KY 41042<br>USA | Contract for Sale of Polymers | 65663 | Equistar Chemicals, LP | Sales Agreements | 1/1/2006 | $0.00 | | |
| BHAR INCORPORATED<br>6509 Moeller Drive<br>Ft. Wayne , Indiana 46859<br>USA | Contract for Sale of Polymers | 60339 | Basell USA Inc. | Sales Agreements | 1/1/2009 | $0.00 | | |
| BI LE-KHAC<br>1210 Birmingham Road<br>West Chester , PA 19382<br>USA | Research Consulting Agreement | 15863 | Lyondell Chemical Company | Consulting Agreements | 2/1/2009 | $14,330.37 | | |
| BIOLAB, INC<br>627 East College Avenue<br>Decatur , GA 30030<br>USA | Land Lease | 10884 | Lyondell Chemical Company | Lease | 12/20/1994 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| BIO-RAD LABORATORIES INFORMATICS DI, INFORMATICS DIVISION 1500 John F Kennedy Blvd Ste 800 Philadelphia , PA 19102-1737 USA | Purchase Order | 35352 | Lyondell Chemical Company | Purchase Agreements | 7/23/2008 | $0.00 | | |
| BLITZ U.S.A. INC 404 - 26th Avenue NW Miami , OK 74354 USA | Contract for Sale of Polymers | 10895 | Equistar Chemicals, LP | Sales Agreements | 1/1/2006 | $0.00 | | |
| BLOOMBERG L.P. 499 Park Avenue New York , NY 10022 USA | Bloomberg Datafeed Addendum | 75899 | Lyondell Chemical Company | Service Agreements | 6/4/1999 | $0.00 | | |
| BLUE CROSS AND BLUE SHIELD OF TEXAS 901 South Central Expressway Richardson , TX 75080 USA | BCBS Administrative Services Agreement | 60434 | Lyondell Chemical Company | Master Services Agreement | 1/1/2006 | $0.00 | | |
| BNSF 2650 Lou Menk Drive Fort Worth , TX 76131 USA | BNSF Basell Letter Agreement | 66961 | Basell USA Inc. | Transportation Agreements | 12/17/2004 | $0.00 | | |
| BNSF 2650 Lou Menk Drive Fort Worth , TX 76131 USA | Settlement Agreement - Sept 2004 - Equistar BNSF | 66960 | Equistar Chemicals, LP | Transportation Agreements | 9/24/2004 | $0.00 | | |
| BNSF 2500 Lou Menk Dr. Fort Worth , TX 76161 USA | Memorandum Agreement | 66956 | Basell USA Inc.;Equistar Chemicals, LP | Freight/Shipping Related Contracts | 11/15/2004 | $0.00 | | |
| BNSF 2500 Lou Menk Dr. Fort Worth , TX 76161 USA | Unanimous written consent | 66955 | Basell USA Inc.;Equistar Chemicals, LP | Consent Agreements | 6/29/2001 | $0.00 | | |
| BNSF 2500 Lou Menk Dr. Fort Worth , TX 76161 USA | Operating and Maintenance Agreement | 66954 | Basell USA Inc.; Equistar Chemicals, LP | Freight/Shipping Related Contracts | 6/29/2001 | $0.00 | | |

22

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| BNSF 2500 Lou Menk Dr. Fort Worth , TX  76161 USA | Funding Support Agreement | 66953 | Basell USA Inc.; Equistar Chemicals, LP | Freight/Shipping Related Contracts | 6/29/2001 | $0.00 | | |
| BNSF 176 E. Fifth Street St.Paul , MN  55101 USA | San Jacinto Rail Project | 66952 | Equistar Chemicals, LP | Freight/Shipping Related Contracts | 3/21/2003 | $0.00 | | |
| BNSF 176 E. Fifth Street St.Paul , MN  55101 USA | Mutual Cooperation Agreement | 66951 | Basell USA Inc.;Lyondell Chemical Company | Participation Agreement | 5/8/2000 | $0.00 | | |
| BNSF 2500 Lou Menk Drive Fort Worth , TX  76161 USA | Memorandum of Understanding | 66950 | Equistar Chemicals, LP | Freight/Shipping Related Contracts | 7/19/1999 | $0.00 | | |
| BNSF 2500 Lou Menk Drive Fort Worth , TX  76161 USA | Limited Partnership Agreement | 66949 | Lyondell Bayport, LLC; Equistar Bayport, LLC; Basell Impact Holding Company | Participation Agreement | 6/29/2001 | $0.00 | | |
| BNSF 2500 Lou Menk Drive Fort Worth , TX  76161 USA | Access Agreement - BNSF | 66948 | Basell USA Inc.;Equistar Chemicals, LP;Lyondell Chemical Company | Access Agreements | 6/29/2001 | $0.00 | | |
| BNSF RAILWAY CO. PO Box 961069 Fort Worth , TX  76161-0069 USA | 41808_BNSF 305182 - MTO Allowance (San Jac) - Equistar | 41808 | Equistar Chemicals, LP | Transportation Agreements | 4/1/2004 | $0.00 | | |
| BNSF RAILWAY CO. PO Box 64955 176 East Fifth St St. Paul , MN  55101 USA | BNSF 305125 - Rail Freight (San Jac) - Basell[2] | 41807 | Basell USA Inc. | Transportation Agreements | 2/1/2002 | $1,347,025.27 | | |
| BNSF RAILWAY CO. PO Box 961069 Ft Worth , TX  76161-0069 USA | 41802_ATSF 20285-009 - MTO Rates - Equistar | 41802 | Equistar Chemicals, LP | Transportation Agreements | 2/5/2009 | $834,550.66 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| BOLLINGER SHIPYARDS LOCKPORT, LLC Post Office Box 250 Lockport , Louisiana 70374 USA | Master Shipyard Service Agreement | 70007 | Lyondell Chemical Company | Service Agreements | 8/2/2002 | $0.00 | | |
| BOOTMAN CHEMICAL SAFETY, LTD. Diss Business Centre Norfolk , U.K. IP21 4HD | Toxicology Consulting Services Contract | 90525 | Equistar Chemicals, LP; Lyondell Chemical Company; Lyondell Chemie Nederland B.V. (Non-Debtor); Lyondell Chimie France SAS (France) (Non-Debtor) | Service Agreements | 3/3/2008 | $0.00 | | |
| BOSE MCKINNEY & EVANS LLP 2700 First Indiana Plaza 135 North Pennsylvania Indianapolis , IN 46204 USA | Engagement Letter for Tax Services | 75146 | Equistar Chemicals, LP | Tax Related Agreements | 1/30/2004 | $69,135.27 | | |
| BOULDER SCIENTIFIC CO. 598 Third St. Mead , CO 80542 USA | Boulder Scientific_Channelview | 10911 | Lyondell Chemical Company | Sales Agreements | 1/1/2007 | $0.00 | | |
| BOURQUE DATA SYSTEMS INC. 1610 Woodstead Court Suite 220 The Woodlands, TX 77380 USA | Bourque Data Systems - PP Fleet Management - Basell | 66864 | Basell USA Inc. | Service Agreements | 5/15/2003 | $0.00 | | |
| BP NORTH AMERICA PETROLEUM 23801 Ferry Road Warrenville , IL 60555 USA | RST-05311 | 66598 | Houston Refining LP | Sales Agreements | 11/1/2008 | $0.00 | | |
| BP PIPELINES NORTH AMERICA DBA ARCO MIDCON LLC 550 Westlake Blvd Houston , TX 77079 USA | Arco Midcon Houston Ship Channel Tunnel Leases | 100547 | Lyondell Petrochemical L.P. Inc. | Pipeline Agreements | 11/1/1998 | $0.00 | | |
| BP PRODUCTS NORTH AMERICA INC., CHEVRON USA INC, ET AL 5750 Old Orchard Road Suite 200 Skokie , IL 60017 USA | Cost-Sharing Agreement | 75670 | Lyondell Chemical Company | Cost Sharing Agreement | 9/4/2008 | $0.00 | | |
| BRAKECHEM LLC, A TEXAS LIMITED LIABILITY COMPANY 1865 Mykawa Road Pearland , TX 77581 USA | BrakeChem_Channelview | 90686 | Equistar Chemicals, LP | Sales Agreements | 7/1/2007 | $0.00 | | |

24

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| BRENNTAG PACIFIC 4199 Lathrop St. Fairbanks , AK  99701 USA | Brenntag Pacific_BCO | 10735 | Equistar Chemicals, LP | Sales Agreements | 9/1/2007 | $0.00 | | |
| BRENNTAG SOUTHEAST INC. 2000 East Pettigrew Street Durham , NC  27703 USA | Brentag Southeast Inc_Bayport Lyondell Operations | 86051 | Lyondell Chemical Company | Sales Agreements | 1/1/2009 | $0.00 | | |
| BROERE SHIPPING BV Wieldrechtseweg 50 3316 BG Dordrecht The Netherlands | Styrene Monomer and Vinyl Acetate Monomer Contract of Affreightment | 11593 | Millennium Petrochemicals Inc.(Virginia); Lyondell Chemie Nederland B.V. (Non-Debtor) | Transportation Agreements | 3/1/2008 | $0.00 | Millennium Petrochemic als Inc.(Virginia ) | Lyondell Chemie Nederland b.v. |
| BROKER: MERCER BROKING LTD. 4F, No. 2, Sec. 3, Minquan E. Rd. Taipei , Taiwan 104, ROC | Group Insurance Policy for Employees | 100940 | Lyondell Greater China, Ltd. | Pension/Benef its/Medical- Related Agreements | 5/1/2008 | $0.00 | | |
| BRUNO HERY Avenue Jean-Francois Debecker 154 Brussels' , Belgium  1200 | Hery Employment Agreement | 5776 | Lyondell Chemical Products Europe, LLC | Employment, Collective Bargaining, and Related Agreements | 10/1/2004 | $0.00 | | |
| BRYAN RESEARCH & ENGINEERING 3131 Briarcrest Dr, Suite 200 Bryan , TX  77802 USA | Purchase Order | 35318 | Houston Refining LP | Purchase Agreements | 5/29/2008 | $0.00 | | |
| BUCK CONSULTANTS 500 Plaza Drive Secaucus , NJ  07096-1533 USA | Engagement Letter | 66349 | Millennium Chemicals Inc. | Pension/Benef its/Medical- Related Agreements | 9/1/2003 | $7,525.00 | Millennium Chemicals Inc. | Lyondell Chemical Company |
| BUNGE NORTH AMERICA 11720 Borman Dr. P.O Box 28500 St. Louis , MO  63146-1000 USA | 41828_AGRI - SIT - Equistar | 41828 | Equistar Chemicals, LP | Lease Storage Agreements | 12/1/2005 | $0.00 | | |
| BUREAU OF NATIONAL AFFAIRS INC. 1801 S.Bell St. Arlington , VA  22202 USA | Contract for Firm Web Reference Order | 60211 | Lyondell Chemical Company | License Agreement | 9/9/2008 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| C.B. FLEET, INC. 4615 Murray Place Lynchburg, VA 24506 USA | Contract for Sale of Polymers | 5600 | Equistar Chemicals, LP | Sales Agreements | 1/1/2006 | $0.00 | | |
| CABOT CORPORATION 157 Concord Road P.O. Box 7001 Billerica , MA 01821-7001 USA | Sales Agreement | 100779 | Equistar Chemicals, LP | Sales Agreements | 10/22/1992 | $0.00 | | |
| CABOT CORPORATION 700 East US Highway 36 Tuscola , IL 61953 USA | Access Agreement | 76400 | Equistar Chemicals, LP | Access Agreements | 7/26/2006 | $0.00 | | |
| CABOT CORPORATION 157 Concord Road P.O. Box 7001 Billerica , MA 01821-7001 USA | Supply Agreement | 80664 | Equistar Chemicals, LP | Purchase Agreements | 10/22/1992 | $87,099.21 | | |
| CALALLEN INDEPENDENT SCHOOL DISTRICT 4205 Wildcat Dr Corpus Christi , TX 78410 USA | Revenue Hold-Harmless Agreement | 66706 | Equistar Chemicals, LP | Tax Related Agreements | 2/14/2000 | $0.00 | | |
| CALLAHAN CHEMCIAL CO. Broad Street & Filmore Avenue Palmyra , NJ 08065 USA | Callahan Chemcial Co._Distribution | 6166 | Equistar Chemicals, LP;Lyondell Chemical Company;Millennium Chemicals Inc. | Sales Agreements | 1/1/2008 | $0.00 | Millennium Chemicals Inc. (Debtor) | LyondellBasell Acetyls, LLC, |
| CALPINE CONSTRUCTION FINANCE COMPANY LP 700 Lousiana Houston , TX 77002 USA | Energy Services Agreement | 16 | Houston Refining LP | Utility Agreements | 1/25/2000 | Disputed Cure | | |
| CAMBS MARINE SERVICES P.O. Box 2094 Winnie , TX 77665 USA | Service and Sales Agreement, Paraffin Solvent Removal and Sales | 66563 | Equistar Chemicals, LP | Service Agreements | 7/1/2008 | $0.00 | | |
| CANADIAN NATIONAL RAILWAY COMPANY 935 de La Gaucheti Montreal , PQ, Canada H3C 3N4 | CN - 6676-C Neenah, WI - Basell | 41831 | Basell USA Inc.; Basell Canada Inc. (Non-Debtor) | Lease Storage Agreements | 5/1/2008 | $0.00 | | |

26

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| CANADIAN NATIONAL RAILWAY COMPANY PO Box 8100 Montreal , PQ, Canada H3C 3N4 | 95745_CN - Misc, WI - Equistar | 95745 | Lyondell Chemical Company,Equistar Chemicals, LP | Lease Storage Agreements | 9/1/2008 | $0.00 | | |
| CANADIAN PACIFIC RAILWAY Ste. 500 Gulf Canada Square 401 - 9th Avenue SW Calgary , Alberta, T2P 4Z4 Canada | 101169_CPRS 151377 Rail Freight (Chemicals) - Lyondell Equistar | 101169 | Lyondell Chemical Company | Freight/Shipping Related Contracts | 9/1/2008 | $0.00 | | |
| CANADIAN PACIFIC RAILWAY 501 Marquette Avenue South Minneapolis , MN 55402 USA | 76734_CPRS 151376 - Rail Freight (Polymers) - Equistar | 76734 | Lyondell Chemical Company | Transportation Agreements | 9/1/2008 | $0.00 | | |
| CANDLE LAMP CORPORATION 1799 Rustin Avenue Riverside , CA 92507 USA | Candle Lamp Corporation_BCO | 75832 | Equistar Chemicals, LP | Purchase and Sales Agreement | 1/1/2003 | $0.00 | | |
| CAREMARK INC. Prescription Service Division 2211 Sanders Road Northbrook , IL 60062 USA | Caremark Prescription Benefit Management Agreement | 66561 | Lyondell Chemical Company,Equistar Chemicals, LP | Master Services Agreement | 12/1/2001 | $0.00 | | |
| CAREMARK LLC 9501 E Shea Blvd Scottsdale , AZ 85260 USA | Caremark Pricing Implementation for 2009 | 76375 | Lyondell Chemical Company | Pension/Benefits/Medical-Related Agreements | 1/1/2009 | $0.00 | | |
| CASECENTRAL INC. 760 Market Street, Suite 200 San Francisco, CA 94102 USA | Services Agreement | 75221 | Lyondell Chemical Company | Service Agreements | 6/6/2005 | $0.00 | | |
| CASECENTRAL INC. 760 Market Street, Suite 200 San Francisco, CA 94102 USA | Services Agreement | 75220 | Lyondell Chemical Company | Service Agreements | 6/6/2005 | $0.00 | | |
| CDW DIRECT, LLC 200 N. Milwaukee Ave Vernon Hills , IL 60061 USA | Master Product Purchase Agreement | 40760 | Basell USA Inc.; Equistar Chemicals, LP; Lyondell Chemical Company; Millennium Specialty Chemicals Inc. | Purchase Agreements | 10/30/2006 | $58,780.09 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors and Fragrances, LLC |

27

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| CEA SYSTEMS, INC. 9801 Westheimer Rd., Suite 302 Houston, TX 77042 USA | Master Agreement No. SWCEA1202PLNT4D | 5579 | Lyondell Chemical Company | Master Services Agreement | 12/31/2002 | $0.00 | | |
| CELANESE INTERNATIONAL CORP. 1601 West LBJ Freeway Dallas, TX 75234-6034 USA | Celanese_Channelview | 40907 | Lyondell Chemical Company | Sales Agreements | 1/1/2006 | $0.00 | | |
| CELANESE LTD. 1601 West LBJ Freeway Dallas, TX 75381 | Celanese Ltd._Olefins Sales Agreement | 76069 | Equistar Chemicals, LP | Sales Agreements | 12/1/2002 | $0.00 | | |
| CENTER OIL COMPANY 600 Mason Ridge Center St. Louis , MO 63141 USA | RST-05445 | 66606 | Houston Refining LP | Sales Agreements | 12/1/2008 | $0.00 | | |
| CENTER OIL COMPANY 600 Mason Ridge Center St. Louis , MO 63141 USA | RST-04098 | 66599 | Houston Refining LP | Sales Agreements | 5/1/2008 | $0.00 | | |
| CENTRAL RAILROAD COMPANY OF NEW JERSEY 148 Liberty Street New York , NY 10005 USA | Private Siding Agreement | 66822 | National Distillers & Chemical Corporation | Transportation Agreements | 7/7/1955 | $0.00 | National Distillers & Chemical Corporation | Equistar Chemicals, LP |
| CERIDIAN CORPORATION 3311 East Olc Shakopee Road Minneapolis, MN 55425 USA | MASTER CONTRACT 4600001366 | 56086 | Houston Refining LP | Master Services Agreement | 5/2/2007 | $0.00 | | |
| CERIDIAN EMPLOYER SERVICES 8100 34th Avenue South Minneapolis, MN 55425 USA | Master Payroll Service Agreement | 46012 | Houston Refining LP | Master Services Agreement | 1/1/2007 | $0.00 | | |
| CHAMPION TECHNOLOGIES, INC. 3200 Southwest Fwy, Suite 2700 Houston , TX 77027 USA | Champion Technologies_Solvents | 70558 | Equistar Chemicals, LP | Sales Agreements | 7/1/2008 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| CHANGZHOU XINHUA PETROCHEMICAL STORAGE & TRANSPORTATION CO., LTD. Xinhua Road Chun Jiang Town New Zone Changzhou, Jiangsu, China | Addendum Number 2 | 50908 | Lyondell Greater China, Ltd. | Storage Agreements | 1/1/2009 | $0.00 | | |
| CHANGZHOU XINHUA PETROCHEMICAL STORAGE & TRANSPORTATION CO., LTD., Xinhua Road Chun Jiang Town New Zone, Changzhou, Jiangsu, China | Storage Agreement | 85203 | Lyondell Greater China, Ltd. | Storage Agreements | 1/1/2007 | $0.00 | | |
| CHANNELVIEW GOLF ASSOCIATION, INC. 11811 East Freeway, Suite 195 Houston, TX 77029 USA | Golf Course Lease | 90606 | Lyondell Petrochemical L.P. Inc. | Lease | 5/8/1997 | $0.00 | | |
| CHARLES C. ZATARAIN AND ASSOCIATES, INC. 2955 Ridgelake Drive, Suite 208 Metairie , LA 70002 USA | Consulting Agreement | 100027 | Lyondell Chemical Company | Consulting Agreements | 1/1/2003 | $0.00 | | |
| CHARTER FILMS, INC. 1901 Winter  Street Superior  WI 54880 USA | Charter Films, Inc. | 85690 | Equistar Chemicals, LP | Sales Agreements | 7/1/2005 | $0.00 | | |
| CHEMADVISOR INC 811 Camp Horne Rd Pittsburg , PA 15237 USA | License Agreement | 20236 | Lyondell Chemical Company | License Agreement | 2/8/2007 | $0.00 | | |
| CHEMBULK TRADING LLC 500 Post Rd. East Westport, CT 06880 USA | China Requirements Contract 04/01/2005 | 95072 | Lyondell Chemical Company;Millennium Petrochemicals Inc. (Virginia) | Transportation Agreements | 4/1/2005 | $0.00 | Millennium Petrochemic als Inc.(Virginia ) | LyondellB asell Acetyls LLC |
| CHEMICAL MARKET ASSOCIATES, INC. 11757 Katy Fwy, Ste 700 Houston , TX 77079 USA | CMAI consulting agreement | 40293 | Lyondell Chemical Company | Consulting Agreements | 8/29/2008 | $1,474.52 | | |
| CHEMICAL MARKETING CONCEPTS, INC. 200 Pickett District Road New Milford , CT 06776 USA | Sample Packaging | 75975 | Lyondell Chemical Company | Service Agreements | 4/21/1993 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| CHEMICAL RESOURCES INC. 20 Nassau Street Suite 100 A Princeton, NJ 08542 USA | CONTRACT FOR SALE OF POLYMERS #40001204 | 55703 | Equistar Chemicals, LP | Sales Agreements | 1/1/2007 | $0.00 | | |
| CHEMICAL SPECIALIST AND DEVELOPMENT DBA CSD INC. 9733 Meador Road Conroe, TX 77303 USA | Chemical Specialist and Development DBA CSD Inc._Distribution | 6167 | Equistar Chemicals, LP;Lyondell Chemical Company;Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 1/1/2008 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | 1-Lyondell Chemical Company |
| CHEMISPHERE INC 9165 Park Dr Miami Shores , FL 33138 USA | Chemisphere_Sales Agency Agreement_La Porte | 10230 | Equistar Chemicals, LP;Lyondell Chemical Company;Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 1/1/2004 | $14,744.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls LLC |
| CHEMSTAR PRODUCTS COMPANY, INC. 3915 Hiawatha Avenue Minneapolis , MN 55406 USA | Chemstar Products Company Inc._Bayport Channelview | 86053 | Lyondell Chemical Company | Sales Agreements | 7/1/2008 | $0.00 | | |
| CHEMTREAT, INC. 4461 Cox Road Glen Allen , VA 23060 USA | ChemTreat Contract | 11203 | Equistar Chemicals, LP | Purchase/Pricing and Supply Agreements | 10/1/2008 | $0.00 | | |
| CHEMTURA CORP 199 Benson Rd Middlebury , CT 06749 USA | Chemtura Corp_Olefins | 10969 | Equistar Chemicals, LP | Sales Agreements | 2/1/2007 | $0.00 | | |
| CHEMTURA CORPORATION 199 Benson Road Middlebury , CT 06749 USA | Chemtura_Channelview | 36204 | Lyondell Chemical Company | Sales Agreements | 4/1/2009 | $0.00 | | |
| CHEVRON CHEMICAL CO. P.O. Box 3766 Houston , TX 77253 USA | Chevron Chemical Co._Olefins | 80469 | Lyondell Petrochemical L.P. Inc. | Exchange Agreements | 1/1/1989 | $0.00 | | |
| CHEVRON CHEMICAL COMPANY LLC, ORONITE DIVISION 1301 McKinney, 14th Floor Houston , Texas 77010 USA | Chevron_Bayport | 5650 | Lyondell Chemical Company | Sales Agreements | 1/26/1999 | $0.00 | | |

30

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| CHEVRON PHILLIPS CHEMICAL COMPANY LP 10001 Six Pines Drive The Woodlands , TX 77380 USA | Amendment | 36179 | Basell USA Inc. | Sales Agreements | 6/1/2004 | $0.00 | | |
| CHEVRON PHILLIPS CHEMICAL COMPANY LP 10001 Six Pines Drive The Woodlands , TX 77380 USA | First Amendment to Contract of Sale | 21425 | Basell USA Inc., Basell Canada Inc. (Non-Debtor), Basell Mexico, S. de R.L. de C.V. (Non-Debtor) | Sales Agreements | 6/1/2004 | $0.00 | | |
| CHEVRON PHILLIPS CHEMICAL COMPANY LP 10001 Six Pines Drive The Woodlands , Texas 77380 USA | Catalyst Supply Agreement | 80870 | Basell USA Inc. | Supply Agreements | 6/1/2004 | $0.00 | | |
| CHEVRON-PHILLIPS CHEMICAL COMPANY, L.P. 10001 SIX PINES DRIVE The Woodlands , Texas 77380 USA | Chevron Phillips_Channel view | 85660 | Lyondell Chemical Company | Sales Agreements | 1/1/2006 | $0.00 | | |
| CHI MEI STORAGE CO., LTD. No. 7 Chian Han Street, Chien Tsen District Kaohsiung , ROC | Amendment 1 | 30911 | Lyondell Greater China, Ltd. | Storage Agreements | 3/1/2009 | $0.00 | | |
| CHI MEI STORAGE CO., LTD. No. 7 Chian Han Street, Chien Tsen District, Kaohsiung , ROC ROC | Storage Agreement | 85210 | Lyondell Greater China, Ltd. | Storage Agreements | 3/1/2007 | $0.00 | | |
| CHI SHEN TRANSPORTATION CORP. No. 101-1 Chong Ren Road  Da Shen Hsiang, Kaohsiung County , Taiwan, ROC | Transportation Agreement | 80016 | Lyondell Greater China, Ltd. | Transportation Agreements | 4/1/2007 | $0.00 | | |
| CHUBB & SON Sears Tower, Suite 4600 233 South Wacker Drive Chicago , IL  60606-6303 USA | BTA Insurance Policy | 20754 | Lyondell Chemical Company | Pension/Benefits/Medical-Related Agreements | 1/1/2007 | $0.00 | | |
| CHUBB & SON, A DIVISION OF FEDERAL INSURANCE CO. 1330 Post Oak Blvd #2400 Houston , TX  77056-3031 USA | Voluntary Accident (VADD) Insurance Policy | 66527 | Lyondell Chemical Company,Equistar Chemicals, LP | Pension/Benefits/Medical-Related Agreements | 1/1/2004 | $0.00 | | |

31

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| CHUSEI (U.S.A.) INC., DBA QUEST SEPARATION TECHNOLOGIES, INC. 12500 Bay Area Blvd Pasadena , TX 77507 USA | Appendix I - Transaction Agreement | 40903 | Lyondell Chemical Company | Manufacturing Agreement | 1/2/2004 | $0.00 | | |
| CHUSEI-WAXTECH POLYMERS LLC 12500 Bay Area Boulevard Pasadena , Texas 77507 USA | Wax Supply and Purchase GAreement | 85374 | Equistar Chemicals, LP | Purchase Agreements | 8/1/2005 | $0.00 | | |
| CIBA SPECIALTY CHEMICALS CORP 540 White Plains Rd Tarrytown , NY 10591 USA | CIBA_Channelview | 10944 | Lyondell Chemical Company | Sales Agreements | 1/1/2006 | $0.00 | | |
| CINCINNATI BELL TELEPHONE COMPANY P.O. Box 2301 Cincinnati , OH 45201 USA | Pricing Agreement | 15247 | Lyondell Chemical Company | Purchase/Pricing and Supply Agreements | 12/24/2007 | $1,238.23 | | |
| CISCO SYSTEMS, INC. 170 West Tasman Drive San Jose , CA 95134 USA | Master Services Agreement | 35073 | Lyondell Chemical Company | Service Agreements | 2/5/2003 | $0.00 | | |
| CITGO PETROLEUM CORPORATION 6100 S. Yale Tulsa , OK 74136 USA | Sales Agreement | 35623 | Equistar Chemicals, LP | Utility Agreements | 1/1/2001 | $0.00 | | |
| CITGO PETROLEUM CORPORATION 6100 S. Yale Tulsa , OK 74136 USA | RST-02828 | 66607 | Houston Refining LP | Sales Agreements | 6/1/2008 | $0.00 | | |
| CITRIX SYSTEMS INC. 5385 Hollister Ave., Suite 111 Santa Barbara , CA 93111 USA | Blanket Order | 95146 | Houston Refining LP | Purchase Agreements | 2/14/2007 | $0.00 | | |
| CITY OF CORPUS CHRISTI, TEXAS P.O. Box 9277 Corpus Christi , TX 78469-9277 USA | Industrial District Agreement  No. 5 | 66711 | Equistar Chemicals, LP | Tax Related Agreements | 1/1/2005 | $0.00 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| CITY OF HOUSTON P.O. Box 1562 Houston , TX  77251 USA | City of Houston - Tax Agreement | 66963 | Lyondell Chemical Company | Tax Related Agreements | 6/1/1997 | $0.00 | | |
| CITY OF HOUSTON P.O. Box 1562 Houston , TX  77251 USA | Untreated Water supply contract | 66962 | Lyondell Chemical Company | Utility Agreements | 1/22/1997 | $149.44 | | |
| CITY OF HOUSTON P.O. Box 1562 Houston , TX  77251-1562 USA | Channel Area - Industrial District Agreement | 66720 | Lyondell Petrochemical L.P. Inc. | Tax Related Agreements | 6/17/1997 | $0.00 | | |
| CITY OF HOUSTON 900 Bagby P.O. Box 1562 Houston , TX  77251-1562 USA | Foreign Trade Zone Agreement for the Payment of AD VALOREM Taxes | 66717 | Lyondell Refining Company LLC | Tax Related Agreements | 2/13/1998 | $0.00 | | |
| CITY OF HOUSTON 900 Bagby P.O. Box 1562 Houston , TX  77251-1562 USA | Channel Area Industrial District Agreement | 51016 | Lyondell Refining Company LLC | Tax Related Agreements | 1/29/1997 | $0.00 | | |
| CITY OF HOUSTON UTILITY CUSTOMER SERVICE DIVISION PO Box 1560 Houston , TX  77251 USA | Untreated Water Supply Contract | 41591 | Lyondell Petrochemical L.P. Inc. | Utility Agreements | 4/1/1995 | $215.00 | | |
| CITY OF HOUSTON, TEXAS Contract Water Accounting Section PO Box 1560 P.O. Box 1560 Houston , TX  77251 USA | Untreated Water Supply Contract (036887) | 66783 | Equistar Chemicals, LP | Utility Agreements | 9/9/1996 | $4,659.00 | | |
| CITY OF HOUSTON, TEXAS Contract Water Accounting Section PO Box 1560 P.O. Box 1560 Houston , TX  77251 USA | Contract Amendment (36873) | 66736 | Houston Refining LP | Utility Agreements | 9/11/2002 | $18,073.60 | | |
| CITY OF HOUSTON, TEXAS Contract Water Accounting Section P.O. Box 1560 Houston , TX  77251 USA | Untreated Water Supply Contract | 66726 | Lyondell Petrochemical L.P. Inc. | Utility Agreements | 6/2/1997 | $28,000.00 | | |

33

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| CITY OF HOUSTON, TEXAS Contract Water Accounting Section P.O. Box 1560 Houston , TX 77251 USA | Untreated Water Contract Assignment and Assumption of Contract | 80139 | Equistar Chemicals, LP | Assignment Agreements | 12/15/2006 | $1,953.00 | | |
| CITY OF LA PORTE 604 W. Fairmont Parkway La Porte , TX 77571 USA | Industrial District Agreement, Ordinance No. 2007-IDA-29 | 66724 | Millennium Petrochemicals Inc. (Virginia) | Tax Related Agreements | 1/1/2008 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls, LLC |
| CITY OF LA PORTE, TEXAS 604 W. Fairmont Parkway La Porte , Texas 77571 USA | Industrial District Agreement, Ordinance No. 2007-IDA-29 | 66723 | Lyondell Chemical Company | Tax Related Agreements | 1/1/2008 | $0.00 | | |
| CITY OF LA PORTE, TEXAS 604 West Fairmont Parkway La Porte , TX 77571 USA | Ordinance No. 2007-IDA-25 | 66712 | Equistar Chemicals, LP | Tax Related Agreements | 1/1/2008 | $0.00 | | |
| CITY OF LA PORTE, TEXAS P.O. Box 1115 La Porte , TX 77572-1115 USA | Industrial District Agreement | 66709 | Equistar Chemicals, LP | Tax Related Agreements | 1/1/2001 | $0.00 | | |
| CITY OF LIVERPOOL, TEXAS 8901 County Road 171 Liverpool , TX 77577 USA | City - Industrial Agreement | 66713 | Equistar Chemicals, LP | Tax Related Agreements | 1/1/2008 | $0.00 | | |
| CITY OF PASADENA P O Box 672 Pasadena , TX 77501-2022 USA | Water Supply Agreement | 100781 | Lyondell Chemical Company | Supply Agreements | 2/4/2003 | $3,992.50 | | |
| CITY OF PASADENA P O Box 672 Pasadena , TX 77501-2022 USA | Water Supply Agreement | 100780 | Equistar Chemicals, LP | Supply Agreements | 2/4/2003 | $38,574.36 | | |
| CITY OF PASADENA - TAX DEPARTMENT P.O. Box 2022 Pasadena , TX 77501-2022 USA | Industrial District Agreement as Approved by Ord. 2003-168 | 66710 | Equistar Chemicals, LP | Tax Related Agreements | 1/1/2004 | $0.00 | | |

34

# Schedule 1
### Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| CITY OF PASADENA TEXAS P O Box 672 Pasadena , TX  77501 USA | Water Supply Agreement | 35885 | Basell USA Inc. | Utility Agreements | 7/29/2004 | $721.00 | | |
| CITY OF PASADENA, TEXAS P O Box 672 Pasadena , TX  77501 USA | Foreign Trade Zone Agreement for the Payment of AD VALOREM Taxes | 66722 | Lyondell Chemical Company | Tax Related Agreements | 4/30/2004 | $0.00 | | |
| CLARIANT CORPORATION 400 Monroe Road Charlotte , NC  28218 USA | Clariant Corp_Bayport Channelview | 25703 | Equistar Chemicals, LP;Lyondell Chemical Company | Purchase and Sales Agreement | 1/1/2002 | $0.00 | | |
| CLARIANT LIFE SCIENCE MOLECULES (AMERICA) 2114 Larry Jeffers Road Elgin , SC  29045 USA | Clariant/Elgin_C hannelview | 90429 | Lyondell Chemical Company | Sales Agreements | 4/1/2005 | $0.00 | | |
| CLARIANT LIFE SCIENCE MOLECULES (AMERICA) INC. 2114 Larry Jeffers Road Elgin , SC  29045 USA | CLARIANT Life Science Molecules (America) INC._BCO | 55691 | Equistar Chemicals, LP | Sales Agreements | 8/1/2006 | $0.00 | | |
| CLEAR LAM PACKAGING INC 1950 Pratt Blvd Elk Grove Village , IL 60007 USA | Contract for Sale of Polymers | 10968 | Equistar Chemicals, LP | Sales Agreements | 1/1/2007 | $0.00 | | |
| CLEAR TECHNOLOGIES, INC. 1199 S. Beltline Road, Suite 102 Coppell , TX  75019 USA | Transaction Report | 50593 | LyondellBasell Advanced Polyolefins USA Inc. | Purchase Agreements | 3/24/2008 | $0.00 | | |
| CLOPAY PLASTIC PRODUCTS 8585 Duke Blvd Mason , OH  45040 USA | Letter Agreement - Polymers Sales Agreement | 10967 | Equistar Chemicals, LP | Sales Agreements | 1/1/2007 | $0.00 | | |
| COASTAL CHEMICAL CO., LLC 1312 Industrial Blvd. Kilgore , TX  75662 USA | Coastal Chemical Co., LLC_BCO | 25911 | Equistar Chemicals, LP | Sales Agreements | 1/1/2005 | $0.00 | | |
| COATEX, INC. 547 Ecology Lane Chester , SC  29706 USA | Coatex Inc._Bayport Channelview | 86057 | Lyondell Chemical Company;Equistar Chemicals, LP | Sales Agreements | 5/30/2008 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| CODEWARE 3100 S. Gessner Rd Suite 610 Houston , TX 77063 USA | Purchase Order | 35354 | Lyondell Chemical Company | Purchase Agreements | 6/1/2008 | $0.00 | | |
| COGNIS CORPORATION 5051 Estecreek Drive Cincinnati , OH 45232-1446 USA | Cognis Corp_Bayport Channelview | 86058 | Lyondell Chemical Company | Sales Agreements | 1/1/2007 | $0.00 | | |
| COLE CHEMICAL 900 Threadneedle, Suite 350 Houston , TX 77079-2919 USA | Cole Chemical_Solvents | 10726 | Equistar Chemicals, LP | Sales Agreements | 7/1/2007 | $0.00 | | |
| COLEMAN CABLE, INC. 1530 Shields Drive Waukegan , IL 60085 USA | Contract for Sale | 75863 | Equistar Chemicals, LP | Purchase and Sales Agreement | 8/1/2007 | $0.00 | | |
| COMERICA BANK 1717 Main Street Dallas , TX 75201 USA | PAC Depository Agreement | 66770 | Lyondell Chemical Company | Tax Related Agreements | 8/21/2000 | $3,238.90 | | |
| COMMSCOPE, INC. OF NORTH CAROLINA 1100 CommScope Place SE Hickory , NC 28602 USA | Polymers Sales Contract | 85700 | Equistar Chemicals, LP | Sales Agreements | 1/1/2007 | $0.00 | | |
| COMPUCYCLE INC 7700 KEMPWOOD DR Houston , TX 77055 USA | Master Contract | 75562 | Houston Refining LP | Master Services Agreement | 3/22/2007 | $0.00 | | |
| COMPUTER PACKAGES, INC. 414 Hungerford Drive Rockville , MD 20850 USA | Software Licensing Agreement | 40786 | Lyondell Chemical Company | License Agreement | 4/20/2006 | $29.26 | | |
| COMPUTERSHARE INC 250 Royall St. Canton , MA 02021 USA | Successor Cash Exchange Agent Agreements | 66942 | Lyondell Chemical Company | Exchange Agreements | 3/6/2008 | $0.00 | | |
| COMSOL INC. 1100 Glendon Avenue 17th Floor Los Angeles , CA 90024 USA | Purchase Order | 35306 | Lyondell Chemical Company | Purchase Agreements | 5/1/2008 | $0.00 | | |

36

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| CONCUR TECHNOLOGIES, INC 6222 185th Avenue NE Redmond , WA 98052 USA | Volume License Agreement | 20946 | Equistar Chemicals, LP | License Agreement | 9/30/1999 | $0.00 | | |
| CONDUCTORES MONTERREY, S.A. DE C.V. Av. Conductores N. 505 San Nicolas de los Garza, N.L. Monterrey , CP 66493 Mexico | Polymers Sales Agreement | 66625 | Equistar Chemicals, LP | Sales Agreements | 7/1/2007 | $0.00 | | |
| CONDUMEX, INC. 2590 114th Street #200 Grand Prairie , TX 75050 USA | Polymers Sales Agreement | 66626 | Equistar Chemicals, LP | Sales Agreements | 7/1/2007 | $0.00 | | |
| CONGLOMERATE GAS IT LP 309 West 7th St Ste 810 Fort Worth , TX 76102 USA | Paid Up Oil Gas Lease | 15941 | LyondellBasell Advanced Polyolefins USA Inc. | Lease | 2/7/2007 | $0.00 | | |
| CONNOR SPORT COURT INTERNATIONAL 939 South 700 West Salt Lake City, UT 84104 USA | Contract for Sale of Polymers | 45820 | Basell USA Inc. | Sales Agreements | 1/6/2009 | $0.00 | | |
| CONOCOPHILLIPS CO. 600 North Dairy Ashford Cherokee 1000 Houston , TX 77079 USA | Contract # 1914 | 66947 | Lyondell Chemical Company | Supply Agreements | 7/22/1999 | $0.00 | | |
| CONOCOPHILLIPS CO. 600 North Dairy Ashford Cherokee 1000 Houston , TX 77079 USA | Netting Agreement | 66946 | Lyondell Chemical Company | Supply Agreements | 6/1/2004 | $0.00 | | |
| CONOCOPHILLIPS CO. 600 North Dairy Ashford Cherokee 1000 Houston , TX 77079-1175 USA | Contract # 40055769R2 | 11601 | Lyondell Chemical Company | Supply Agreements | 6/7/2002 | $0.00 | | |
| CONSOLIDATED RAIL CORPORATION 1717 Arch Street, 32nd Floor Philadelphia , PA 19103 USA | Agreement of Lease | 66824 | National Distillers & Chemical Corporation | Lease | 4/1/1979 | $0.00 | National Distillers & Chemical Corporation | Equistar Chemicals, LP |

37

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| CONTINENTAL AIRLINES 1600 Smith Street Houston , TX 77002 USA | RST-05698 | 66600 | Houston Refining LP | Sales Agreements | 1/1/2009 | $0.00 | | |
| CONTINENTAL CASUALTY CO CNA Plaza Chicago , IL 60685 USA | Contract to Provide Long Term Care Insurance Coverage | 11000 | Equistar Chemicals, LP;Lyondell Chemical Company | Pension/Benefits/Medical-Related Agreements | 1/1/2003 | $0.00 | | |
| COOK COMPOSITES AND POLYMERS P.O. Box 419389 Kansas City , MO 64141-6389 USA | License Agreement PEER resins | 10444 | Lyondell Chemical Technology, L.P. | License Agreement | 1/1/2001 | $0.00 | | |
| COPERSUCAR - COOPERATIVA, ACUCAR E ALCOLL DO ESTADO DE SAO PAULO Av. Paulista 287 - 3 andar 01311 Sao PAulo , Brazil | Purchase Contract | 26316 | Lyondell Chemical Company | Supply Agreements | 8/1/2009 | $0.00 | | |
| COPYRIGHT CLEARANCE CENTER, INC. 222 Rosewood Dr Danvers , MA 01923 USA | Annual Copyright License Agreement | 40296 | Lyondell Chemical Company | License Agreement | 12/1/1998 | $0.00 | | |
| COREY A. SIEGEL 158 Downey Drive Tenefly , NJ 07670 USA | CONSULTING AGREEMENT | 45257 | Lyondell Chemical Company | Consulting Agreements | 2/18/2008 | $0.00 | | |
| CORSICANA TECHNOLOGIES INC 2733 East Highway 31 Corsicana , TX 75109 USA | Corsicana_Solvents | 45643 | Equistar Chemicals, LP | Sales Agreements | 11/1/2007 | $0.00 | | |
| COWBOY PIPELINE SERVICE COMPANY Two Allen Center 1200 Smith Street, Suite 2250 Houston , TX 77002 USA | Cowboy Pipeline hydrogen Lease/Installment Purchase Agreement | 66545 | Equistar Chemicals, LP;Lyondell Petrochemical L.P. Inc. | Lease | 9/9/1994 | $16,774.26 | | |
| C-P FLEXIBLE PACKAGING, INC. 15 Grumbacher Road York , Pennsylvania 17402 USA | Contract for Sale of Polymers | 5603 | Equistar Chemicals, LP | Sales Agreements | 2/1/2006 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| CRAWFORD INDUSTRIES 1414 Crawford Dr. Crawfordsville , IN 47933 USA | Contract for Sale of Polymers | 15536 | Equistar Chemicals, LP | Sales Agreements | 1/1/2008 | $0.00 | | |
| CRAYEX CORPORATION 1747 Commerce Drive Piqua , OH  45356 USA | Sales Agreement - Amendment No. 2 | 15555 | Equistar Chemicals, LP | Sales Agreements | 1/1/2009 | $0.00 | | |
| CRISTAL INORGANIC CHEMICALS LIMITED 20 Wight Avenue, Suite 100 Hunt Valley , , Maryland 21030 USA | Millennium Trademark | 66904 | Millennium Chemicals Inc. | License Agreement | 5/15/2007 | $0.00 | | |
| CRISTAL INORGANIC CHEMICALS LIMITED 20 Wight Avenue, Suite 100 Hunt Valley , MD  21030 USA | Amendment 2 to Exhibit H to Sale and Puchase Agreement, Research Agreement | 65519 | Lyondell Chemical Company | Research Agreements | 1/1/2009 | $34,113.00 | | |
| CRITICAL RESPONSE ASSOCIATES, LLC PO Box 29644 Atlanta , GA  30359 USA | Consultation Agreement | 26328 | Lyondell Chemical Company | Consulting Agreements | 11/24/2008 | $0.00 | | |
| CRODA INC. 8 Croda Way Mill Hall , PA  17751 USA | Croda Inc._BCO | 10731 | Equistar Chemicals, LP | Sales Agreements | 1/1/2007 | $0.00 | | |
| CROWN POLY, INC 5700 Bickett Street Huntington Park , CA  90255 USA | Contract for Sale of Polymers | 76072 | Equistar Chemicals, LP | Purchase and Sales Agreement | 1/1/2009 | $0.00 | | |
| CRYOTECH DEICING TECHNOLOGIES 6103 Orthoway Fort Madison , IA  52627 USA | Cryotech Deicing Technologies_Bayport Lyondell Operations | 25796 | Lyondell Chemical Company | Sales Agreements | 8/1/2008 | $66,379.60 | | |
| CRYSTAPHASE 16945 Northchase Dr. Ste 1610 Houston , TX  77060 USA | Commodity Supply Contract | 41365 | Lyondell Chemical Company,Equistar Chemicals, LP,Houston Refining LP | Supply Agreements | 10/1/2008 | $0.00 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| CSX TRANSPORTATION 500 Water Street Jacksonville , FL  32202 USA | Private CSXT 7898.026 (2) Price List | 101184 | Lyondell Chemical Company | Transportation Agreements | 3/1/2009 | $0.00 | | |
| CSX TRANSPORTATION Chemicals Jacksonville , FL  32202 USA | Supplement 2 - Private Price List CSXT 7898.026 - Chemicals | 101183 | Lyondell Chemical Company | Transportation Agreements | 5/12/2009 | $0.00 | | |
| CSX TRANSPORTATION 500 Water Street Jacksonville , FL  32202 USA | 101174_CSXT 99505 (Supp 3) - Rail Freight (Chemicals Highly Hazardous) - Lyondell Equistar | 101174 | Equistar Chemicals, LP;Lyondell Chemical Company | Freight/Shipping Related Contracts | 5/10/2008 | $0.00 | | |
| CSX TRANSPORTATION INC. 500 Water St. Jacksonville , FL  32202 USA | Contract CSXT 83770 (2) - PDF.pdf | 66903 | Basell USA Inc. | Transportation Agreements | 8/1/2009 | $0.00 | | |
| CSX TRANSPORTATION INC. 500 Water Street Jacksonville , FL  32202 USA | 95746_CSX - Abbeville, SC - Equistar | 95746 | Equistar Chemicals, LP | Lease Storage Agreements | 9/19/2000 | $0.00 | | |
| CSX TRANSPORTATION INC. 500 Water Street Jacksonville , FL  32202 USA | 66795_CSXT - T BO L38936 ITA for Tuscola, IL | 66795 | Equistar Chemicals, LP | Transportation Agreements | 8/28/1953 | $0.00 | | |
| CSX TRANSPORTATION INC. 500 Water Street Jacksonville , FL  32202 USA | 66663_CSXT-T-10177- ITA for Jackson, TN | 66663 | Basell USA Inc. | Transportation Agreements | 8/11/1993 | $0.00 | | |
| CSX TRANSPORTATION INC. 500 Water Street - J865 Jacksonville , FL  32202 USA | 66582_CSXT 84373 (Supp 0) - Rail Freight - (Alcohols - Chemicals) | 66582 | Equistar Chemicals, LP | Transportation Agreements | 8/1/2008 | $0.00 | | |
| CSX TRANSPORTATION, INC 500 Water Street Jacksonville , FL  32202 USA | 76792 - LaGrange, GA - Basell | 76792 | Basell USA Inc. | Transportation Agreements | 4/15/1992 | $0.00 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| CSX TRANSPORTATION, INC 500 Water Street Jacksonville , FL 32202 USA | 76791_CSX - Jackson, TN - Basell | 76791 | Basell USA Inc. | Lease Storage Agreements | 1/16/2001 | $0.00 | | |
| CSX TRANSPORTATION, INC 500 Water Street Jacksonville , FL 32202 USA | 76738_CSXT-83509 - Rail Freight (Polymers % off tariff backup scale) - Equistar | 76738 | Equistar Chemicals, LP | Financing Agreements | 10/24/2005 | $0.00 | | |
| CSX TRANSPORTATION, INC 500 Water Street Jacksonville , FL 32202 USA | 76737_CSXT 99506 - Rail Freight (Polymers) - Equistar | 76737 | Equistar Chemicals, LP | Transportation Agreements | 10/15/2008 | $0.00 | | |
| CSX TRANSPORTATION, INC. 500 Water Street Jacksonville , FL 32202 USA | 101179_CXTF 17655 - Rail Freight (Polymers) - Bundled Transflo Rates - Basell | 101179 | Equistar Chemicals, LP | Transportation Agreements | 2/1/2007 | $0.00 | | |
| CSX TRANSPORTATION, INC. (CSXT) 500 Water St Jacksonville , FL 32202 USA | 41835_CSX - SIT Tuscola, IL - Lyondell | 41835 | Lyondell Chemical Company | Lease Storage Agreements | 9/17/2002 | $0.00 | | |
| CSXT RAILROAD TRANSPORTATION 500 Water St Jacksonville , FL 32202 USA | 101173_CSXT 99504 (Supp 9) - Rail Freight (Chemicals) - Lyondell Equistar | 101173 | Lyondell Chemical Company | Freight/Shipping Related Contracts | 4/24/2009 | $0.00 | | |
| CUMMINGS WESTLAKE, LLC 12837 Louetta Road, Suite 201 Cypress , TX 77429 USA | AMENDED & RESTATED PROPERTY TAX CONSULTING SERVICE AGREEMENT | 45260 | Lyondell Chemical Company | Consulting Agreements | 1/1/2008 | $13,900.46 | | |
| CUTLER TECHNOLOGY CORPORATION 70 NE Loop 410 Suite 315 San Antonio , TX 78216 USA | License Agreement for UPID and CTC-SIM for Simulation | 50007 | Lyondell Chemical Company | License Agreement | 1/1/2008 | $0.00 | | |
| CYTEC (SURFACE SPECIALTIES) 1950 Lake Park Dr. Smyrna , GA 30080 USA | Cytec Surface Specialties_Channelview | 35720 | Lyondell Chemical Company | Sales Agreements | 8/1/2004 | $0.00 | | |

41

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| D3 SECURITY MANAGEMENT SYSTEMS INC. suite 4, 1173 North Service Road W. Oakville, ON L6M 2W1 Canada | D3 Security Master Software Hosting Agreement | 26326 | Lyondell Chemical Company | Service Agreements | 8/14/2008 | $0.00 | | |
| DAIREN CHEMICAL CORP No. 301 Songkiang Road, 9th Floor Taipei , Taiwan | Dairen_Sales and purchase_La Porte | 10588 | Lyondell Greater China, Ltd. | Purchase/Pricing and Supply Agreements | 1/1/2007 | $0.00 | | |
| DAK AMERICAS LLC 5925 Carnegie Blvd., Suite 500 Charlotte , NC 28209 USA | DAK Americas LLC_BCO | 25912 | Equistar Chemicals, LP | Sales Agreements | 1/1/2006 | $0.00 | | |
| DART CONTAINER COMPANY INC. 500 Hogsback Road Mason , MI 48854 USA | Dart Containter Company_Channelview | 55642 | Lyondell Chemical Company | Sales Agreements | 1/1/2007 | $0.00 | | |
| DATA SYSTEMS AND SOLUTIONS 1900 West Loop South, Suite 300 Houston , TX 77027 USA | Blanket Order 4900000018 | 95112 | Houston Refining LP | Software Agreements | 11/1/2007 | $0.00 | | |
| DATA TRANSMISSION NETWORK CORPORATION (DTN) 9110 W. Dodge Rd Omaha , NE 68114 USA | DTN ProphetX Network Connection | 40299 | Lyondell Chemical Company | License Agreement | 9/10/2008 | $3,995.80 | | |
| DAVID C. DOUGLAS P.O. Box 1133 DeerPark , TX 77536 | David C. Douglas_BCO | 66890 | Lyondell Chemical Company | Service Agreements | 6/12/2008 | $0.00 | | |
| DAVID RAMSEY P. O. Box 1243 Crosby , TX 77532-1243 USA | Hay Production License Agreement (and amendment) | 60532 | Equistar Chemicals, LP | Lease | 1/1/2007 | $0.00 | | |
| DECISION SYSTEMS INC 208 N Green St Ste 600 Longview , TX 75601 USA | Reason Unlimited Access Facility License Agreement | 15284 | Houston Refining LP | Technical Agreements | 9/6/2006 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| DELOITTE & TOUCHE LLP 180 Strand London , UK  WC2R 1BL | Letter agreement - corporate tax compliance & ad hoc tax consulting svcs | 35203 | 25-Lyondell Chemical Europe, Inc. (Debtor) | Consulting Agreements | 10/1/2005 | $0.00 | | |
| DELOITTE & TOUCHE TAX TECHNOLOGIES LLC 1751 Lake Cook Rd. Suite 200 Deerfield , IL  60015 USA | Software License Agreement #X7936 | 10609 | Lyondell Chemical Company | License Agreement | 3/1/2004 | $0.00 | | |
| DELOITTE TAX LLP 333 Clay Street Suite 2300 Houston , TX  77002 USA | Letter agreement - sales, use and excise tax consulting svcs | 70109 | Lyondell Chemical Company | Sales Agreements | 10/13/2008 | $0.00 | | |
| DELSTAR TECHNOLOGIES, INC. 601 Industrial Drive Middleton , DE  19709 USA | Amendment No. One | 40955 | Equistar Chemicals, LP | Sales Agreements | 1/1/2005 | $0.00 | | |
| DELTA NATURAL KRAFT P.O. Box 7857 Pine Bluff , AR  71611 USA | Crude Turpentine Purchase Agreement | 50667 | Millennium Specialty Chemicals Inc. | Purchase Agreements | 1/15/2003 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| DEN HARTOG INDUSTRIES INC. 4010 Hwy 60 Blvd., P.O. Box 425 Hospers , IA  51238-0425 USA | Contract for Sale of Polymers | 65646 | Equistar Chemicals, LP | Sales Agreements | 1/1/2002 | $0.00 | | |
| DEXCO POLYMERS LP 12012 Wickchester Houston , TX  77079 USA | Dexco Polymers LP_Channelview | 75714 | Equistar Chemicals, LP | Sales Agreements | 1/1/2008 | $0.00 | | |
| DLL QUALITY CONSULTING, LLC 724 Hale Ave Asland , Ohio  44805 USA | Letter Agreement | 15849 | Lyondell Chemical Company | Consulting Agreements | 2/17/2007 | $0.00 | | |
| DMA, DUCHARME, MCMILLEN & ASSOCIATES, INC. 13135 Dairy Ashford Blvd., Suite 200 Sugar Land , TX  77478 USA | SALES/USE TAX SERVICE AGREEMENT | 45253 | Equistar Chemicals, LP | Sales Agreements | 12/18/2007 | $0.00 | | |

43

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| DOCUMENTUM, INC 5671 Gibralter Dr. Pleasanton , CA 94588 USA | Software End User License Agreement | 75370 | Lyondell Chemical Company | Software Agreements | 6/24/1996 | $0.00 | | |
| DOME PETROLEUM CORP PO Box 138 Goshen , IN 46527 USA | Modification of Agreement Respecting Tuscola Storage Caverns | 76628 | Equistar Chemicals, LP | Storage Agreements | 7/26/2002 | $0.00 | | |
| DOW CHEMICAL COMPANY 1254 Enclave Parkway Houston , TX 77077 USA | Dow Chemical Company_Light Olefins | 51209 | Equistar Chemicals, LP | Exchange Agreements | 1/1/2008 | $0.00 | | |
| DOW CHEMICAL COMPANY 1254 Enclave Parkway Houston , TX 77077 USA | Dow Hydrocarbons and Resources Inc._Light Olefins | 85569 | Equistar Chemicals, LP | Exchange Agreements | 1/1/1995 | $0.00 | | |
| DOW CHEMICAL COMPANY 1254 Enclave Parkway Houston , TX 77077 USA | Dow Hydrocarbons and Resources Inc._Light Olefins | 70133 | Equistar Chemicals, LP | Exchange Agreements | 1/1/1995 | $0.00 | | |
| DOW CHEMICAL COMPANY AND DOW EUROPE GMBH 2030 WHDC Midland , MI 48674 USA | Dow Chemical Company and Dow Europe GmbH_La Porte | 95729 | Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 1/1/2009 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls LLC |
| DOW HYDROCARBONS AND RESOURCES 1254 Enclave Pkwy Houston , TX 77077 USA | Dow Hydrocarbons and Resources_Olefins | 60353 | Equistar Chemicals, LP | Exchange Agreements | 1/1/2009 | $0.00 | | |
| DOW HYDROCARBONS AND RESOURCES INC. 1254 Enclave Parkway Houston , TX 77077 USA | Dow Hydrocarbons and Resources Inc._Light Olefins | 51208 | Equistar Chemicals, LP | Exchange Agreements | 1/1/2008 | $0.00 | | |
| DR. ANN DE PEYSTER San Diego State University 5500 Companile Drive San Diego , CA 92182-4162 USA | Letter Agreement | 85816 | Lyondell Chemical Company | Service Agreements | 9/30/2008 | $0.00 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| DR. DOUGLAS B. MCGREGOR 38 Shore Road Aberdour KYS 0TU , Scotland, United Kingdom UK | Toxicology Consulting Services Contract 2005-P-0445 | 6066 | Equistar Chemicals, LP;Lyondell Chemical Company;Millennium Petrochemicals Inc. (Virginia) | Consulting Agreements | 1/1/2006 | $625.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls, LLC |
| DR. F. JAY MURRAY 5529 Perugia Circle San Jose , CA 95138 USA | 2006-P-0096 | 6055 | Lyondell Chemical Company | Consulting Agreements | 2/1/2006 | $0.00 | | |
| DR. GORDON HARD 203 Paku Drive P.O. Box 86 Tairua 2853 , New Zealand | Letter Agreement | 85824 | Lyondell Chemical Company | Consulting Agreements | 9/30/2008 | $0.00 | | |
| DR. SUSAN BORGHOFF 108 Tulliallan Lane Cary , NC 27511 USA | Letter Agreement | 85820 | Lyondell Chemical Company | Supply Agreements | 9/30/2008 | $0.00 | | |
| DRAKE BEAM MORIN, INC. 11200 Westheimer, Suite 250 Houston , TX 77042 USA | Services Agreement Amendment | 80827 | LyondellBasell Industries AF S.C.A. | Service Agreements | 8/20/2008 | $0.00 | LyondellBasell Industries AF S.C.A. | Lyondell Chemical Company |
| DRUG PLASTICS & GLASS COMPANY, INC 1 Bottle Drive Bayer town , PA 19512 USA | Sales Agreement - Polymers Amendments No. 1, 2, 3 & 4 | 25816 | Equistar Chemicals, LP | Sales Agreements | 10/1/2006 | $0.00 | | |
| DSM NEORESINS INC 730 Main St Wilmington ,DE 1887 USA | DSM NeoResins_Chanelview | 15495 | Lyondell Chemical Company | Sales Agreements | 1/1/2006 | $0.00 | | |
| DSM POLYETHYLENES B.V. Postbus 24 6190AA Beek , Holland | License Agreement | 90300 | Equistar Chemicals, LP | License Agreement | 8/1/1996 | $0.00 | | |
| DUCHARME, MCMILLEN & ASSOCIATES 13135 Dairy Ashford Blvd., Suite 200 Sugar Land , TX 77478 USA | Service Agreement | 25278 | Lyondell Chemical Company | Tax Related Agreements | 7/9/2003 | $58,437.50 | | |

45

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| DUCHARME, MCMILLEN AND ASSOCIATES, INC. 13135 Dairy Ashford Blvd., Suite 200 Sugar Land , TX  77478 USA | Sales/Use Tax Service Agreement | 80125 | Lyondell Chemical Company | Tax Related Agreements | 4/24/2007 | $0.00 | | |
| DUN & BRADSTREET, INC. P. O. Box 75434 Chicago , IL  60675-5434 USA | Cross Border Risk Mgmt Plan | 80645 | Lyondell Chemical Company | Subscription Agreement | 8/16/2008 | $424.49 | | |
| DUPONT DOW ELASTORMERS L.L.C. 300 Bellevue Parkway Wilmington , Delaware 19809 USA | DuPont Performance Elastomers | 85645 | Equistar Chemicals, LP | Sales Agreements | 9/1/2008 | $0.00 | | |
| DUPONT PACKAGING AND INDUSTRIAL PRODUCTS 15115 Park Row, Suite 118 Houston , TX  77084 USA | Dupont Packaging and Industrial Products_Olefins | 76068 | Equistar Chemicals, LP | Exchange Agreements | 1/1/2009 | $0.00 | | |
| E. I. DU PONT DE NEMOURS AND COMPANY 1007 Market Street Wilmington , DE  19808 USA | Hydrogen Peroxide License Agreement | 65343 | Lyondell Chemical Company | License Agreement | 6/24/1999 | $0.00 | | |
| E. I. DU PONT DE NEMOURS AND COMPANY 1007 Market St. Wilmington , DE  19808 USA | Amendment No. 1- Hydrogen Peroxide License Agreement | 70263 | Lyondell Chemical Company | License Agreement | 6/24/1999 | $0.00 | | |
| E. I. DUPONT AND COMPANY 1007 MARKET STREET WILMINGTON , DE  19898 USA | MANUFACTURING SUPPORT SERVICES AGREEMENT | 56241 | Equistar Chemicals, LP | Service Agreements | 6/9/1987 | $0.00 | | |
| E. I. DUPONT DE NEMOURS AND COMPANY Chambers Works, Route 130, Tech Lab Room 109D+ Deepwater , NJ  08023 USA | Dupont_Bayport TBA | 5638 | Lyondell Chemical Company | Sales Agreements | 1/1/1999 | $0.00 | | |
| E. I. DUPONT DE NEMOURS AND COMPANY 1007 Market Street Wilmington , Delaware 19898 USA | Contract Supplement Virgin High Density Polyethylene | 5628 | Equistar Chemicals, LP | Product Agreements | 3/1/2005 | $0.00 | | |

46

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| E. I. DUPONT DE NEMOURS AND COMPANY 1007 Market Street Wilmington , Delaware 19898 USA | Sales Agreement-Polymers P & IP Amendment No. 4 | 5619 | Equistar Chemicals, LP | Sales Agreements | 8/1/2008 | $0.00 | | |
| E. R. CARPENTER, L.P. 5016 Monument Avenue Richmond , VA 23230 USA | ER Carpenter LP_Bayport Channelview | 100438 | Lyondell Chemical Company | Sales Agreements | 4/1/2005 | $0.00 | | |
| E.I DUPONT DE NEMOURS & CO. 4417 Lancaster Pike Wilmington , DE 19805 USA | E.I. DuPont de Nemours & Company_La Porte | 10951 | Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 1/1/2007 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls LLC |
| E.I. DU PONT DE NEMOURS & CO., 1007 Market St. Wilmington , DE 19898 USA | DuPont_Channelview | 10767 | Lyondell Chemical Company | Purchase and Sales Agreement | 1/1/2007 | $0.00 | | |
| E.I. DU PONT DE NEMOURS AND COMPANY 1007 Market St Wilmington , De 19898 USA | E.I. Du Pont_Channelview | 15501 | Lyondell Chemical Company | Sales Agreements | 1/1/2007 | $0.00 | | |
| E.I. DU PONT DE NEMOURS AND COMPANY 1007 Market Street Wilmington , DE 19898 USA | Master Services Agreement | 35383 | Lyondell Chemical Company | Service Agreements | 7/7/2008 | $0.00 | | |
| E.I. DUPONT & COMPANY 1007 Market Street Wilmington , DE 19898 USA | Dupont_Master1989 | 50813 | Lyondell Chemical Company | Sales Agreements | 6/1/1989 | $0.00 | | |
| E.I. DUPONT DE NEMOURS & CO Barley Mill Plaza, 4417 Lancaster Pike Wilmington , DE 19805 USA | E.I. DuPont de Nemours & Company_La Porte | 10952 | Millennium Petrochemicals Inc. (Virginia) | Exchange Agreements | 1/1/2007 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls LLC |
| E.I. DUPONT DE NEMOURS & COMPANY Barley Mill Plaza 22/2320 4417 Lancaster Pike Wilmington , DE 19805 USA | Master Agreement | 66564 | Equistar Chemicals, LP | Sales Agreements | 1/1/2007 | $0.00 | | |

47

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| E.I. DUPONT DE NEMOURS AND CO. PO Box 80705 Chestnut Run Plaza 705/2S16 Wilmington , DE 19898-0705 USA | Dupont_Bayport | 80507 | Lyondell Chemical Company | Sales Agreements | 1/1/2002 | $0.00 | | |
| E.R CARPENTER LP 5016 Monument Avenue Richmond , VA 23230 USA | ER Carpenter LP_Bayport Channelview | 86052 | Lyondell Chemical Company | Sales Agreements | 4/1/2005 | $0.00 | | |
| E.R. CARPENTER, L.P. 5016 Monument Ave. Richmond , VA 23230 USA | E.R. Carpenter, L.P._BCO | 40930 | Equistar Chemicals, LP | Sales Agreements | 1/1/2007 | $0.00 | | |
| EASTMAN CHEMICAL CO 200 South Wilcox Dr Kingsport , TN 37662 USA | Eastman Chemical Co_Tuscola | 10795 | Equistar Chemicals, LP | Sales Agreements | 1/1/2004 | $0.00 | | |
| EASTMAN CHEMICAL COMPANY 200 South Wilcox Drive Kingsport , TN 37660 USA | Eastman Chemical Company_La Porte | 75868 | Millennium Petrochemicals Inc. (Virginia) | Exchange Agreements | 8/1/2007 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls LLC |
| EASTMAN CHEMICAL COMPANY 200 South Wilcox Drive Kingsport , TN 37662-5370 USA | Eastman Chemical Company_Channelview | 65662 | Equistar Chemicals, LP | Sales Agreements | 7/1/2005 | $0.00 | | |
| EASTMAN CHEMICAL COMPANY 200 South Wilcox Drive Kingsport , TN 37662-5370 USA | Eastman_Bayport | 80460 | Lyondell Chemical Company | Sales Agreements | 12/1/2007 | $0.00 | | |
| EASTMAN CHEMICAL COMPANY 200 South Wilcox Drive Kingsport , TN 37662 USA | Eastman_Solvents | 85595 | Lyondell Chemical Company | Sales Agreements | 1/1/2004 | $0.00 | | |
| EASTMAN CHEMICAL COMPANY 200 South Wilcox Drive Kingsport , TN 37662-5370 USA | Eastman Chemical Company_Channelview | 55540 | Equistar Chemicals, LP | Sales Agreements | 1/1/2008 | $0.00 | | |

48

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| EASTMAN CHEMICAL COMPANY 200 South Wilcox Drive Kingsport, , TN 37662-5370 USA | Eastman Chemical Co_Bayport Lyondell Operations | 35492 | Lyondell Chemical Company | Assignment Agreements | 9/17/1991 | $0.00 | | |
| ECON TRANSPORTATION 1F, No. 12, Lane 85, Chung Cheng Road, Jen Wu Village, Jen Wu Hsiang, Kaohsiung Hsien, ,Taiwan | Transportation Agreement | 75116 | Lyondell Greater China, Ltd. | Transportation Agreements | 2/1/2007 | $29,350.13 | | |
| ECONOMIC ANALYSIS GROUP LTD (EAG) 2000 M Street, NW Suite 202 Washington , DC 20036 USA | Master Agreement for e.CaseTrack | 10533 | Lyondell Chemical Company | Master Services Agreement | 11/4/2003 | $0.00 | | |
| ECONOMIC ANALYSIS GROUP, LTD. 1828 L Street, N.W. Suite 1060 WASHINGTON , DC 20036 USA | PRICE QUOTE | 55894 | Lyondell Chemical Company | Software Agreements | 2/1/2009 | $0.00 | | |
| ECONOMY MUD 435 East Anderson Houston , TX 77047 USA | Economy Mud_Bayport Channelview | 70525 | Lyondell Chemical Company | Sales Agreements | 6/1/2007 | $0.00 | | |
| EL PASO PETROLEUM MARKETS Global Petroleum Markets, Chemical Marketing & Trading, 1001 Louisiana St. Houston , TX 77002 USA | El Paso Petroleum Markets_Olefins | 10841 | Equistar Chemicals, LP | Exchange Agreements | 12/31/1999 | $0.00 | | |
| ELE CORPORATION 7874 West 47th Street Lyons , IL 60534 USA | ELE Corporation_BCO | 51138 | Lyondell Chemical Company,Equistar Chemicals, LP | Sales Agreements | 1/1/2002 | $0.00 | | |
| ELGIN, JOLIET AND EASTERN RAILWAY COMPANY 1141 Maple Road Joliet , IL 60432 USA | 66794_EJE-T-1749 -ITA for MIO | 66794 | Equistar Chemicals, LP | Transportation Agreements | 7/11/2001 | $0.00 | | |
| ELITE INTERNATIONAL HK LTD Unit A-B, 18/F, CNT Tower, 388 Hennessy Rd, Wanchai , Hong Kong, PRC | Warehouse and Transport Agreement | 10257 | Lyondell Greater China, Ltd. | Transportation Agreements | 10/15/2005 | $0.00 | | |

49

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| ELITE INTERNATIONAL HK LTD. Unit A-B, 26/f, CNT Tower, 388 Hennessy Road Wanchai , Hong Kong PRC | Warehouse and Transport Agreement | 25268 | Lyondell Greater China, Ltd. | Storage Agreements | 7/1/2003 | $0.00 | | |
| EMC LEGATO 2350 West El Camino Real Mountain View , CA 94040 USA | Ammendment to Purchase Order 4400718625 | 60777 | Lyondell Chemical Company | Purchase Agreements | 7/30/2006 | $0.00 | | |
| EMCO CHEMICAL DISTRIBUTORS 2100 Commonwealth Ave. North Chicago , Illinois 60064 USA | EMCO Chemical Distributors_Distribution | 6168 | Equistar Chemicals, LP;Lyondell Chemical Company;Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 1/1/2008 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | 1-Lyondell Chemical Company |
| EMERAL PERFORMANCE MATERIALS, LLC 9911 Brecksville Rd Cleveland , OH 44141 USA | Emeral Performance Materials, LLC_Channelview | 40912 | Equistar Chemicals, LP | Sales Agreements | 6/1/2006 | $0.00 | | |
| EMERALD PERFORMANCE MATERIALS 1296 Third Street NW Kalama , WA 98625 USA | Emerald Performance Materials_Bayport Lyondell Operations | 55524 | Lyondell Chemical Company | Sales Agreements | 1/1/2008 | $0.00 | | |
| EMERSON ELECTRIC CO. 8000 W Florissant Ave St. Louis , MO 63136-8506 USA | Emerson Master Supply Agreement | 35920 | Basell USA Inc. | Supply Agreements | 3/1/2007 | $0.00 | | |
| EMERSON PROCESS MANAGEMENT 835 Innovation Drive Knoxville, TN 37932 USA | Purchasing Support Agreement Renewal | 60333 | Lyondell Chemical Company | Maintenance Agreements | 8/31/2003 | $0.00 | | |
| EMERSON PROCESS MANAGEMENT LLLP 12301 Research Blvd Austin, TX 78759 USA | Master Agreement for Instrumentation Supply and Distribution Services 2007-P-0049 | 31307 | Basell USA Inc.;Equistar Chemicals, LP;Houston Refining LP;Lyondell Chemical Company;Millennium Petrochemicals Inc. (Virginia);Millennium Specialty Chemicals Inc. | Supply Agreements | 8/14/2008 | $0.00 | Millennium Petrochemicals Inc.(Virginia ); Millennium Specialty Chemicals Inc. (Debtor) | LyondellBasell Acetyls LLC, LyondellBasell Flavors and Fragrances LLC |
| ENTERPRISE PRODUCTS OPERATING LP PO Box 4324 Houston, TX 77210 USA | E/P Exchange | 40428 | Equistar Chemicals, LP | Supply Agreements | 8/31/2000 | $0.00 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| ENVENT CORPORATION 2398 California Ave Signal Hill, CA 90755 USA | Master Field Services Contract | 41304 | Equistar Chemicals, LP;Lyondell Chemical Company;Millennium Petrochemicals Inc. (Virginia) | Master Services Agreement | 9/15/2007 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | Lyondell Chemical Co. |
| EPCON INTERNATIONAL 16225 Park Ten Place, Suite 600 Houston , TX 77084 USA | Purchase Order | 100131 | Lyondell Chemical Company | Maintenance Agreements | 7/1/2008 | $0.00 | | |
| EPCOR UTILITIES INC. 2000 York Road Suite 129 Oak Brook , IL 60523 USA | Energy, Services, & Lease Agreements | 66336 | Equistar Chemicals, LP | Supply Agreements | 7/23/1997 | $10,633,598.98 | | |
| EPL PATHOLOGY ARCHIVES, INC. PO Box 1253 Sterling , VA 20167 USA | Agreement | 41174 | Equistar Chemicals, LP | Service Agreements | 10/7/2002 | $0.00 | | |
| EQUISTAR CHEMICALS, L.P. One Houston Center, 1221 McKinney St., Suite 1600, P.O. Box 2583 Houston , TX 77252-2583 USA | Equistar Chemicals, L.P._La Porte | 10898 | Lyondell Chemical Company;Millennium Chemicals Inc. | Sales Agreements | 1/1/2005 | $0.00 | Millennium Chemicals Inc. | LyondellBasell Acetyls LLC |
| EQUISTAR CHEMICALS, L.P. 1221 McKinnery Ave Suite 700 Houston , TX 77010 USA | Equistar Chemicals, L.P._La Porte | 10897 | Lyondell Chemical Company;Millennium Chemicals Inc. | Sales Agreements | 1/1/2005 | $0.00 | Millennium Chemicals Inc. | LyondellBasell Acetyls LLC |
| EQUISTAR CHEMICALS, LP 1221 McKinney Street Houston , TX 77070 USA | Amended and Restated Shared Services Agreement for the LaPorte Complex | 21322 | Equistar Chemicals, LP;Millennium Petrochemicals Inc. (Virginia) | Service Agreements | 1/1/2000 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls, LLC |
| EQUISTAR CHEMICALS, LP 1221 McKinney Street Houston , Texas 77010 USA | Amended and Restated Net Payment Agreement | 26010 | Millennium Petrochemicals Inc. (Virginia) | Service Agreements | 1/1/2000 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls LLC |
| EQUISTAR CHEMICALS, LP 1221 McKinney Street Houston , TX 77010 USA | Shared Services Agreement for Wastewater | 65136 | Millennium Petrochemicals Inc. (Virginia) | Service Agreements | 12/1/1997 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls, LLC |

51

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| EQUISTAR CHEMICALS, LP 1221 McKinney Street Houston, TX 77010 USA | AMENDMENT AGREEMENT RE NITROGEN | 75137 | Millennium Petrochemicals Inc. (Virginia) | Supply Agreements | 11/30/2000 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls, LLC |
| EQUISTAR CHEMICALS, LP 1221 McKinney Street Houston, TX 77010 USA | AMENDMENT AGREEMENT | 75141 | Millennium Petrochemicals Inc. (Virginia) | Service Agreements | 1/1/2000 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls, LLC |
| EQUITY TRUST 16/F Standard Chartered Bank Building 4-4A Des Voeux Road Central, Hong Kong | EQ Corporate Management (HK) Limited Letter of Appointment | 40381 | Lyondell Asia Pacific, Ltd. | Service Agreements | 5/11/2004 | $0.00 | | |
| ERNST & YOUNG TAX SERVICES LIMITED 18th Floor, Two International Finance Centre, 8 Finance Street Central, Hong Kong | Engagement Letter for De-registration of Shanghai Representative Office | 26147 | Lyondell Greater China, Ltd. | Tax Related Agreements | 7/9/2007 | $0.00 | | |
| ERNST & YOUNG TAX SERVICES LIMITED 18th Floor, Two International Finance Centre, 8 Finance Street, Central, Hong Kong | Engagement Letter E&Y | 26124 | Lyondell Greater China, Ltd. | Tax Related Agreements | 11/3/2008 | $0.00 | | |
| ESSENTIAL INFORMATION SYSTEMS, INC. 1700 Research Blvd., Suite 200 Rockville, MD 20850 USA | Blanket Order 4900000019 | 95119 | Houston Refining LP | Purchase Agreements | 4/1/2004 | $0.00 | | |
| ESSEX GROUP INC 1601 Wall Street Fort Wayne, IN 46801-1601 USA | Vendor Managed Consigned Inventory Agreement | 65577 | Lyondell Chemical Company | Sales Agreements | 2/15/2002 | $0.00 | | |
| ESSEX GROUP, INC. 1601 Wall Street Fort Wayne, IN 46801-1601 USA | Superior Essex_Channelview | 40829 | Lyondell Chemical Company | Sales Agreements | 5/1/2001 | $0.00 | | |
| ETHOX CHEMICALS, LLC P.O. Box 5094 Greenville , SC 29606 USA | Ethox Chemicals, LLC_BCO | 86066 | Equistar Chemicals, LP; Lyondell Chemical Company | Sales Agreements | 1/1/2002 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| EUROTAINER Le Stratege- 172, ru de la Republique, 92817 PUTEAUX Cedex France | Lease of Containers | 40338 | Lyondell Chemical Company | Lease - Equipment | 2/10/2008 | $0.00 | | |
| EVERCREST INC. 200 Racoonsin Dr., Suite 105 Aston , PA  19017 USA | Evercrest Inc_Bayport Lyondell Operations | 25878 | Lyondell Chemical Company | Sales Agreements | 1/1/2005 | $0.00 | | |
| EVERGREEN PACKAGING INC 5201 Fairfield Road Pine Bluff , AR  71601 USA | Addendum No. 1 Contract #40001802 | 10738 | Equistar Chemicals, LP | Assignment Agreements | 3/12/2007 | $0.00 | | |
| EVERS & BUTLER P. O. Box  1489 Crosby , Texas  77532 USA | Consulting and Administrative Services Agreement | 5214 | Lyondell Chemical Company | Consulting Agreements | 1/1/2001 | $0.00 | | |
| EVERS & BUTLER, LLP P.O. Box 1489 Crosby , Texas  77532 USA | First Amendment Consulting and Administrative Services Agreement | 5792 | Lyondell Chemical Company | Consulting Agreements | 1/1/2001 | $0.00 | | |
| EVONIK DEGUSSA CORPORATION 379 Interspace Parkway Parsippany , NJ  07054-0677 USA | Evonik Degussa Corporation_Tusc ola | 66613 | Equistar Chemicals, LP | Sales Agreements | 1/1/2009 | $0.00 | | |
| EXPONENT, INC. 15375 SE 30th Place, Suite 250 Bellvue , WA  98007 USA | TOXICOLOGY CONSULTING SERVICES CONTRACT # 00046-2008 | 85851 | Equistar Chemicals, LP; Lyondell Chemical Company | Consulting Agreements | 11/20/2008 | $7,017.39 | | |
| EXXON CHEMICAL COMPANY 13501 Katy Freeway Houston , TX  77253 USA | Exxon Chemical Company_Olefin s | 76065 | Equistar Chemicals, LP | Exchange Agreements | 9/21/1999 | $0.00 | | |
| EXXON CHEMICAL COMPANY 1305 Katy Freeway Houston , TX  77079 USA | ExxonMobil_Bay port | 60325 | Lyondell Chemical Company | Sales Agreements | 1/1/1997 | $0.00 | | |
| EXXON CHEMICAL COMPANY 13501 Katy Freeway Houston , TX  77079-1398 USA | EXXON CHEMICAL COMPANY_Cha nnelview | 55311 | Equistar Chemicals, LP | Exchange Agreements | 12/31/1999 | $0.00 | | |

53

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| EXXON MOBIL CHEMICAL COMPANY 4500 Dacoma St. Houston , TX  77092 USA | Exxon Mobil Chemical Company_La Porte | 5686 | Millennium Petrochemicals Inc. (Virginia) | Service Agreements | 3/1/2007 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls LLC |
| EXXONMOBIL CHEMICAL COMPANY 13501 Katy Freeway P.O. Box 3272 Houston , TX  77253-3272 USA | ExxonMobil Chemical Company_Light Olefins | 31143 | Equistar Chemicals, LP | Exchange Agreements | 1/31/1998 | $0.00 | | |
| EXXONMOBIL CHEMICAL COMPANY 13501 Katy Freeway, PO Box 3272 Houston , Texas  77253-3272 USA | ExxonMobil Chemical Company_Light Olefins | 26185 | Equistar Chemicals, LP | Exchange Agreements | 1/30/1998 | $0.00 | | |
| EXXONMOBIL CHEMICAL COMPANY 13501 Katy Freeway Houston , TX  77079 USA | ExxonMobil Chemical Company_Light Olefins | 75877 | Equistar Chemicals, LP | Exchange Agreements | 1/1/2005 | $0.00 | | |
| EXXONMOBIL CHEMICAL COMPANY 13501 Katy Freeway Houston , TX  77079 USA | Materials Agreement Principal Document | 21424 | Basell USA Inc. | Supply Agreements | 1/1/2002 | $0.00 | | |
| EXXONMOBIL CHEMICAL COMPANY 13501 Katy Freeway Houston , TX  77079-1398 USA | ExxonMobil Chemical Company_Channelview | 15563 | Equistar Chemicals, LP | Exchange Agreements | 10/1/2007 | $0.00 | | |
| FEDERAL INSURANCE COMPANY Sears Tower, Suite 4700 233 South Wacker Drive Chicago , IL  60606-6303 USA | Basic AD&D InsurancePolicy | 85760 | Lyondell Chemical Company | Pension/Benefits/Medical-Related Agreements | 1/1/2007 | $0.00 | | |
| FIDELITY MANAGEMENT TRUST CO. 82 Devonshire St Boston , MA  02109 USA | Fidelity Master Trust Agreement | 41009 | Basell North America Inc.;Equistar Chemicals, LP;Houston Refining LP;Lyondell Chemical Company;Millennium America Holdings Inc. | Pension/Benefits/Medical-Related Agreements | 1/2/2009 | $0.00 | Millennium America Holdings Inc. | LyondellBasell Flavors & Fragrances LLC |
| FIRESTONE POLYMERS LLC 381 W. Wilbeth Road Akron , OH  44319 USA | Firestone_Channelview | 25828 | Lyondell Chemical Company | Sales Agreements | 1/1/2008 | $0.00 | | |

54

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| FIRESTONE POLYMERS, LLC 381 W. Wilbeth Road Akron , OH  44319 USA | Firestone Polymers, LLC_Channelview | 85724 | Equistar Chemicals, LP | Sales Agreements | 1/1/2008 | Disputed Cure | | |
| FIRST UNION RAIL One O'Hare Centre 6250 River Road, Suite 5000 Rosemont , IL  60018 USA | First Union Rail Rental | 70586 | Millennium Specialty Chemicals Inc. | Lease | 12/28/2007 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| FLAMBEAU, SUBSIDIARY OF NORDIC GROUP OF COMPANIES LTD. 801 Lynn Avenue Baraboo , WI  53913 USA | Contract for Sale of Polymers | 60338 | Equistar Chemicals, LP | Exchange Agreements | 5/1/2008 | $0.00 | | |
| FLORIDA EAST COAST RAILWAY 7411 Fullerton Street Suite 300 Jacksonville , FL  32256 USA | 95750_FEC - Villa Rica, FL - Equistar | 95750 | Lyondell Chemical Company | Lease Storage Agreements | 11/15/2006 | $0.00 | | |
| FORBO ADHESIVES PO Box 110447 Research Triangle Park , NC  27709-0447 USA | Forbo Adhesives_Olefins | 25777 | Equistar Chemicals, LP | Sales Agreements | 1/1/2006 | $0.00 | | |
| FORD GLOBAL TECHNOLOGIES, INC. 911 Parklane Towers East Dearborn , MI  48126 USA | License Agreement Impact PP | 20490 | LyondellBasell Advanced Polyolefins USA Inc. | License Agreement | 11/28/1997 | $0.00 | | |
| FORD MOTOR CO. One American Road Dearborn , MI  48126 USA | Ford agreement | 46091 | Basell USA Inc. | Sales Agreements | 4/1/2006 | $469,734.02 | | |
| FORD MOTOR CO. One American Road Dearborn , MI  48126 USA | Amendment 2 Appendix A1 | 80621 | Basell USA Inc. | Sales Agreements | 7/1/2008 | $0.00 | | |
| FORD MOTOR CO. One American Road Dearborn , MI  48126 USA | Amendment 2 Page 3 | 80618 | Basell USA Inc.; Basell Canada Inc. (Non-Debtor); | Sales Agreements | 7/1/2008 | $0.00 | | |

55

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| FORD MOTOR CO. One American Road Dearborn , MI 48126 USA | Amendment 2 Page 2 | 80617 | Basell USA Inc. | Sales Agreements | 7/1/2008 | $0.00 | | |
| FORD MOTOR CO. One American Road Dearborn , MI 48126 USA | Amendment 2 Page 1 | 80615 | Basell USA Inc.; Basell Canada Inc. (Non-Debtor); | Sales Agreements | 7/1/2008 | $0.00 | | |
| FORMOSA PLASTICS CORP., USA 9 Peach Tree Hill Road Livingston , NJ 07039 USA | Formosa Plastics Corp., USA_La Porte | 80463 | Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 1/1/2007 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls LLC |
| FORMOSA PLASTICS CORPORATION 9 Peach Tree Hill Road LIVINGTON , NJ 07039 USA | FORMOSA PLASTICS CORPORATION _Olefins | 55874 | Equistar Chemicals, LP | Storage Agreements | 12/31/1999 | $0.00 | | |
| FORMOSA PLASTICS CORPORATION, USA 9 Peach Tree Hill Road Livingston , NJ 07039 USA | Formosa Plastics Corporation, USA_Olefins | 76071 | Equistar Chemicals, LP | Sales Agreements | 1/1/2005 | $0.00 | | |
| FORMOSA PLASTICS CORPORATION, USA 9 Peach Treet Hill Road Livingston , NJ 07039 USA | Formosa Plastics Corporation, USA_Light Olefins | 25812 | Equistar Chemicals, LP | Exchange Agreements | 3/1/2004 | $0.00 | | |
| FORTCO PLASTICS HOLDINGS, INC. 500 Industrial Park Road Portland , Indiana 47371 USA | Sales Agreement | 70523 | Equistar Chemicals, LP | Sales Agreements | 6/1/2006 | $0.00 | | |
| FORTRON INDUSTRIES LLC 8040 Dixie Hwy Florence , KY 41042 USA | Fortron_Channel view | 40908 | Lyondell Chemical Company | Sales Agreements | 1/1/2006 | $0.00 | | |
| FREE & CLEAR, INC 999 Third Ave, Ste 2100 Seattle , WA 98104 USA | Tobacco Cessation Service Agreement | 41020 | Lyondell Chemical Company | Pension/Benefits/Medical-Related Agreements | 6/5/2007 | $0.00 | | |
| GALENA PARK INDEPENDENT SCHOOL DISTRICT P.O. Box 565 Galena Park , TX 77547 USA | Foreign Trade Zone Agreement for the Payment of AD VALOREM Taxes | 66718 | Lyondell Refining Company LLC | Tax Related Agreements | 7/28/1999 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| GALVESTON COUNTY WATER AUTHORITY 4618 Crane St Hitchcock , TX  77563 USA | Canal Customer Contract | 66894 | Lyondell Chemical Company | Purchase and Sales Agreement | 6/1/1988 | $0.00 | | |
| GANADO TELEPHONE COMPANY 115 W. Putnan, PO Box 329 Grando, TX  77962 USA | SERVICE ORDER | 55944 | Equistar Chemicals, LP | Service Agreements | 6/12/2008 | $346.38 | | |
| GATX 120 S. Riverside Plaza Chicago , IL  60606 USA | Master Contract # 7009 | 66957 | Millennium Specialty Chemicals Inc. | Transportation Agreements | 5/20/1986 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| GATX CORPORATION 4 Houston Center 1221 Lamar Street, Suite 1120 Houston , TX  77010 USA | Renewal of Contract 3552, Rider 92 | 66731 | Lyondell Chemical Company | Transportation Agreements | 5/1/2008 | $0.00 | | |
| GATX CORPORATION 222 West Adams Street Chicago , IL  60606 USA | Rider No. 38 To Car Service Contract No. 7009 | 70598 | Millennium Specialty Chemicals Inc. | Service Agreements | 9/18/2008 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| GATX CORPORATION 222 West Adams Street Chicago , IL  60606 USA | Rider No. 37 To Car Service Contract No. 7009 | 70597 | Millennium Specialty Chemicals Inc. | Service Agreements | 12/13/2007 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| GATX CORPORATION 222 West Adams Street Chicago , IL  60606 USA | Renewal of Rider 0033 | 70593 | Millennium Specialty Chemicals Inc. | Service Agreements | 10/7/2008 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| GATX CORPORATION 222 West Adams Street Chicago , IL  60606 USA | Renewal of Rider 0031 | 70592 | Millennium Specialty Chemicals Inc. | Service Agreements | 2/25/2008 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| GATX CORPORATION 222 West Adams Street Chicago , IL  60606 USA | Renewal of Rider 0030 | 70591 | Millennium Specialty Chemicals Inc. | Service Agreements | 6/2/2008 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| GATX CORPORATION 222 West Adams Street Chicago , IL  60606 USA | Renewal of Rider 0021 | 70588 | Millennium Specialty Chemicals Inc. | Service Agreements | 10/1/2008 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| GATX CORPORATION 222 West Adams Street Chicago , IL 60606 USA | Renewal of Rider 0003 | 70587 | Millennium Specialty Chemicals Inc. | Access Agreements | 2/25/2008 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| GATX FINANCIAL CORPORATION 500 W. Monroe, 41st Floor Chicago , IL 60661-3677 USA | 95054_09006963 80171473 - GATX 3552 Master Amdt 2 | 95054 | Lyondell Chemical Company | Service Agreements | 12/1/2002 | $0.00 | | |
| GATX RAIL 222 West Adams Street Chicago , IL 60606 USA | Renewal of Rider 0029 | 70590 | Millennium Specialty Chemicals Inc. | Service Agreements | 11/23/2005 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| GATX RAIL 222 West Adams Street Chicago , IL 60606 USA | Renewal of Rider 0028 | 70589 | Millennium Specialty Chemicals Inc. | Service Agreements | 1/4/2006 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| GATX RAIL CORPORATION 222 West Adams Street Chicago , IL 60606 USA | Rider No. 36 To Car Service Contract No. 7009 | 70596 | Millennium Specialty Chemicals Inc. | Service Agreements | 6/29/2006 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| GATX RAIL CORPORATION 222 West Adams Street Chicago , IL 60606 USA | Railcar Lease, Rider No. 35 | 70595 | Millennium Specialty Chemicals Inc. | Service Agreements | 4/7/2006 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| GATX RAIL CORPORATION 222 West Adams Street Chicago , IL 60606 USA | Rider No. 34 To Car Service Contract No. 7009 | 70594 | Millennium Specialty Chemicals Inc. | Service Agreements | 3/6/2006 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| GATX TERMINALS CORP. 405 Clinton Dr Galena Park , TX 77547 USA | Contract 76-813 | 41470 | Houston Refining LP | Pipeline Agreements | 5/23/1997 | $0.00 | | |
| GATX THIRD AIRCRAFT CORPORATION Four Embarcadero Center, Ste. 2200 San Francisco , CA 94111 USA | Notice and Acknowledgement | 101199 | Lyondell Chemical Company | Lease - Equipment | 6/11/2007 | $78,798.91 | | |

58

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| GAYLORD CHEMICAL CORPORATION 106 Galeria Blvd Slidell , LA  70458 USA | Gaylord Chemical Purchase Agreement | 70581 | Millennium Specialty Chemicals Inc. | Purchase Agreements | 2/5/2003 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellB asell Flavors & Fragrances LLC |
| GE BETZ 4636 Somerton Rd Trevose , PA  19053 USA | GE Betz_Channelvie w | 35666 | Lyondell Chemical Company | Sales Agreements | 1/1/2003 | $0.00 | | |
| GE BETZ INC (PROCESS & WATER) 4636 Somerton Rd Trevoso , PA  19053 USA | Purchase Order | 20487 | Lyondell Chemical Company | Purchase Agreements | 7/1/2008 | $0.00 | | |
| GELCO INFORMATION NETWORK, INC. 10700 Prairie Lakes Drive Eden Prairie , MN  55344-3886 USA | Gelco Information Network,Inc. ExpenseLink/PC Service Agreement | 35947 | Basell USA Inc. | Service Agreements | 9/29/1999 | $15,709.12 | | |
| GELCO INFORMATION NETWORK, INC. 10700 Prairie Lakes Drive Eden Prairie , MN  55344-3886 USA | Master Product Services Agreement | 30274 | Lyondell Chemical Company | Service Agreements | 4/30/2008 | $66,996.77 | | |
| GEM MOBILE TREATMENT SERVICES, INC. 1196 E. Willow St. Signal Hill , California 90755 USA | Master Field Services Contract | 5967 | Equistar Chemicals, LP;Lyondell Chemical Company;Millennium Petrochemicals Inc. (Virginia) | Service Agreements | 9/15/2007 | $0.00 | Millennium Petrochemic als Inc.(Virginia ) | Lyondell Chemical Co. |
| GENERAL AMERICAN TRANSPORTATION CORPORATION 120 South Riverside Plaza Chicago , IL  60606-3943 USA | Amendment No. 2 to Contract No. 7481 | 66633 | Quantum Pipeline Company | Transportation Agreements | 11/3/1994 | $0.00 | Quantum Pipeline Company | LyondellB asell Acetyls LLC |
| GENERAL AMERICAN TRANSPORTATION CORPORATION 120 South Riverside Plaza Chicago , IL  60606-3943 USA | Amendment  to Contract No. 8483 & 7481 | 66632 | Quantum Pipeline Company;USI Chemicals International Inc. | Transportation Agreements | 1/1/1988 | $0.00 | Quantum Pipeline Company (Debtor); USI Chemicals International Inc. (Debtor) | Lyondellba sell Acetyls, LLC; Lyondellba sell Acetyls, LLC |
| GENERAL AMERICAN TRANSPORTATION CORPORATION 120 South Riverside Plaza Chicago , IL  60606 USA | Amendment No. 3 to Contract No. 7481 | 66631 | Millennium Petrochemicals Inc. (Virginia) | Transportation Agreements | 2/27/1997 | $0.00 | Millennium Petrochemic als Inc.(Virginia ) | Lyondellba sell Acetyls, LLC |

59

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| GENERAL CABLE CORPORATION 4 Tesseneer Drive Highland Height , KY 41076-9167 USA | POLYERS SALES AGREEMENT CONTRACT #40005503 | 55552 | Equistar Chemicals, LP | Sales Agreements | 1/1/2008 | $0.00 | | |
| GEOCHEM INTERNATIONAL CORP. 137 Rowayton Avenue Suite 330 Rowayton , CT  06853 USA | Distributor Agreement | 66565 | Equistar Chemicals, LP | Purchase and Sales Agreement | 8/1/2004 | $0.00 | | |
| GEORGIA-PACIFIC RESINS, INC. P.o. Box 389 Jacksonville , FL  32201 USA | Crude Turpentine Purchase Agreement | 50670 | Millennium Specialty Chemicals Inc. | Purchase Agreements | 1/1/1997 | $112,106.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| GLENROY, INC. W 158 N 9332 Nor-X-Way Ave Menomonee Falls , Wisconsin  53052-0534 USA | Contract for Sale of Polymers | 40993 | Equistar Chemicals, LP | Sales Agreements | 1/1/2007 | $0.00 | | |
| GLIDDEN COMPANY D/B/A ICI PAINTS 15885 W.Sprague Rd Strongsville , OH  44136 USA | Joint Defense Agreement | 90787 | Millennium Holdings, LLC | Joint Defense Agreement | 12/27/2003 | $0.00 | | |
| GLOBAL KNOWLEDGE NETWORK, INC. 9000 Regency Parkway, Suite 500 Cary , NC  27511 USA | License and Maintenance | 20476 | Lyondell Chemical Company | License Agreement | 9/28/2004 | $0.00 | | |
| GLOBAL KNOWLEDGE TRAINING LLC 9000 Regency Parkway, Suite 500 Cary , NC  27518 USA | Freedom Super Saver Agreement | 35382 | Lyondell Chemical Company | Software Agreements | 1/21/2008 | $0.00 | | |
| GOJO INDUSTRIES, INC. 3783 State Road Cuyahoga Falls , OH 44223 USA | GOJO Industries, Inc._Tuscola | 65694 | Equistar Chemicals, LP | Sales Agreements | 1/1/2007 | $0.00 | | |
| GRAHAM PACKAGING CO. L.P. 2401 Pleasant Valley Rd York , PA  17402 USA | Contract for Sale of Polymers | 10720 | Equistar Chemicals, LP | Sales Agreements | 9/1/2006 | $0.00 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| GRAHAM PACKAGING COMPANY 2401 Pleasant Valley Road York , PA 17402 USA | Contract for Sale of Polymers | 85707 | Equistar Chemicals, LP | Sales Agreements | 1/1/2006 | $0.00 | | |
| GRUPO INDUSTRIAL DEL PARQUIE S.A. DE C.V. Oriente 2 #10, Nueve Parque Industrial San Juan del Rio Queretaro , Mexico 76800 | Grupo Industrial_Channelview | 80486 | Lyondell Chemical Company | Sales Agreements | 1/1/2008 | $0.00 | | |
| GTC TECHNOLOGY CORPORATION 1001 Dairy Ashford Road, Suite 200 Houston , TX 77077 USA | Agreement | 65354 | Lyondell Chemical Company | License Agreement | 1/27/2000 | $0.00 | | |
| GTC TECHNOLOGY CORPORATION 1001 Dairy Ashford Road Suite 200 Houston , Texas 77077 USA | Agreement | 90136 | Lyondell Chemical Company | License Agreement | 8/3/1999 | $0.00 | | |
| GTC TECHNOLOGY CORPORATION, A DELAWARE CORPORATION 1001 Dairy Ashford Road Houston, TX 77077 USA | Memorandum of Agreement | 90135 | Lyondell Chemical Company | License Agreement | 7/7/1999 | $0.00 | | |
| GUIDANCE SOFTWARE, INC. 215 North Marengo Avenue Pasadena , CA 91101 USA | SOFTWARE LICENSE AND SERVICE AGREEMENT | 45048 | Lyondell Chemical Company | Software Agreements | 8/29/2007 | $0.00 | | |
| GULF COAST WASTE DISPOSAL AUTHORITY 910 Bay Area Blvd Houston , TX 77058 USA | Gulf Coast Waste Disposal Authority | 66885 | Houston Refining LP | Service Agreements | 8/24/1972 | $3,561,498.57 | | |
| GULF STATES PAPER CORPORATION 1400 Jack Warner Parkway NE Box 48999 Tuscaloosa , AL 35404 USA | Crude Sulphate Turpentine | 11818 | Millennium Specialty Chemicals Inc. | Purchase Agreements | 10/1/1975 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| H & C INDUSTRIES, INC. 1311 Crenshaw Blvd. Torrence , CA 90501 USA | Letter of contract assignment | 30578 | Equistar Chemicals, LP | Supply Agreements | 5/1/2008 | $0.00 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| H. MUEHLSTEIN & CO., INC. 800 Connecticut Avenue Norwalk , CT 06854-1631 USA | Memorandum of Understanding | 35870 | Basell USA Inc. | Service Agreements | 5/11/2000 | $0.00 | | |
| HALTECH INC 465 Coronation Drive Scarbourgh, Ontario M1E2K2 Canada | Haltech Inc_La Porte | 15569 | Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 7/1/2005 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls LLC |
| HARCROS CHEMICALS, INC 5200 Speaker Road Kansas City, KS 66106 USA | Harcros Chemicals, Inc_BCO | 20559 | Equistar Chemicals, LP | Sales Agreements | 1/1/2000 | $0.00 | | |
| HARCROS CHEMICALS, INC. 5200 Speaker Road Kansas City , KS 66106 USA | Harcros Chemicals Inc_Bayport Channelview | 86069 | Lyondell Chemical Company | Sales Agreements | 1/1/2000 | $0.00 | | |
| HARRIS COUNTY Harris County Administration Building 1001 Preston, 9th Floor Houston , TX 77002-8193 USA | Foreign Trade Zone Agreement for the Payment of AD VALOREM Taxes | 66715 | Lyondell Refining Company LLC | Tax Related Agreements | 7/1/1997 | $0.00 | | |
| HARRIS COUNTY COMMISSIONERS COURT Harris County Administration Building 1001 Preston, 9th Floor Houston , TX 77002-8193 USA | Foreign Trade Zone Agreement for the Payment of AD VALOREM Taxes | 66719 | Lyondell Petrochemical L.P. Inc. | Tax Related Agreements | 6/11/1997 | $0.00 | | |
| HARRIS COUNTY W.C. 6919 Maynard Regulatory Compliance Muniservice Corporation Houston , TX 77041 USA | Water Control Contract | 66945 | Lyondell Chemical Company | Wholesale Rack And Index | 2/20/1998 | $2,546.80 | | |
| HAVELKA FARMS 3747 County Road 61 Robstown , TX 78380 USA | Farming License Agreement | 65936 | Equistar Chemicals, LP;Lyondell Chemical Company | Lease | 11/1/2008 | $0.00 | | |
| HAY GROUP PAYNET 100 Penn Square East Philadelphia , PA 19107-3388 USA | HayNet Paygroup Subscriber Services Agreement | 90623 | LyondellBasell Industries AF S.C.A. | Service Agreements | 10/13/2008 | $0.00 | LyondellBasell Industries AF S.C.A. (Debtor) | Basell Service Company BV |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| HEALTH MAINTENANCE MEDICAL PRACTICE LIMITED Unit A2, 12/F Guangdong Investment Tower 148 Connaught Road Central Central , Hong Kong | Annual Medical Exam Program | 65781 | Lyondell Asia Pacific, Ltd. | Pension/Benefits/Medical-Related Agreements | 5/1/2008 | $0.00 | | |
| HENAN SHENMA NYLON CHEMICAL CO. LTD Development Zone East Of Jianshe Rd Pingdingshan , Henan 467013 China | License Agreement | 20298 | Lyondell Chemical Company | License Agreement | 4/1/2007 | $0.00 | | |
| HENAN SHUNCHENG GROUP COKING CO., LTD Anyang, henan 455000 P.R. China | License Agreement | 36084 | Lyondell Chemical Company | License Agreement | 6/21/2007 | $0.00 | | |
| HENDRIX WIRE & CABLE, INC. 53 Old Wilton Rd Milford , NH  03055-3119 USA | Amendment No. 1 | 40944 | Equistar Chemicals, LP | Sales Agreements | 7/1/2006 | $0.00 | | |
| HERCULES INC. 1313 North Market St. Wilmington , DE  19897-0001 USA | Tolling Agreement | 11835 | Millennium Specialty Chemicals Inc. | Manufacturing Agreement | 5/1/2006 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| HERCULES INCORPORATED 1313 North Market Street Wilmington , DE  19894 USA | Hercules Inc_Bayport Channelview | 70508 | Lyondell Chemical Company | Sales Agreements | 1/1/2007 | $0.00 | | |
| HERITAGE BAG CO 1648 Diplomat Dr Carrollton , TX  75006 USA | Letter Agreement - Polymers Sales Agreement | 10966 | Equistar Chemicals, LP | Sales Agreements | 1/1/2007 | $0.00 | | |
| HEWITT ASSOCIATES LLC 100 Half Day Rd Lincolnshire , IL  60069 USA | Master Services Agreement | 11765 | Lyondell Chemical Company | Master Services Agreement | 11/30/2007 | $0.00 | | |
| HONEYWELL INTERNATIONAL INC. 1250 W. Sam Houston Parkway South Houston , Tx  77042-4128 USA | Unisim Operations Suite Software License and Benefits Guardianship Support Program | 20206 | Lyondell Chemical Company | Software Agreements | 1/1/2005 | $0.00 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| HORIZON LINES LLC 4064 Colony Road, Suite 200 Charlotte, NC 28211 USA | Horizon Lines, LLC Confidential Transportation Agreement | 31348 | Equistar Chemicals, LP;Lyondell Chemical Company;LyondellBasell Advanced Polyolefins USA Inc. | Transportation Agreements | 1/1/2008 | $0.00 | | |
| HOUGHTON CHEMICAL CORP 52 Cambridge St Allston , MA 02134 USA | Houghton Chemical Corp_Bayport Lyondell Operations | 10722 | Lyondell Chemical Company | Sales Agreements | 7/1/2007 | $0.00 | | |
| HOUSTON INDEPENDENT SCHOOL DISTRICT 3830 Richmond Avenue Houston , TX 77027 USA | Foreign Trade Zone Agreement | 51017 | Lyondell Refining Company LLC | Tax Related Agreements | 12/18/1997 | $0.00 | | |
| HOUSTON PIPELINE COMPANY LP 711 Louisiana St Suite 900 Houston , TX 77002 USA | Gas Pipeline Agreement | 36095 | Lyondell Chemical Company | Pipeline Agreements | 11/1/1981 | $2,731.37 | | |
| HOUSTON PIPELINE COMPANY LP 711 Louisiana St Suite 900 Houston , TX 77002 USA | Capacity Agreement | 36094 | Equistar Chemicals, LP | Pipeline Agreements | 8/24/1995 | $0.00 | | |
| HRI, INC 100 Overlook Center, Suite 400 Princeton , NJ 08540 USA | Sublicense Agreement | 65281 | Lyondell Petrochemical L.P. Inc. | License Agreement | 12/9/1993 | $0.00 | | |
| HUELS AKTIENGESELLSCHAFT Paul-Baumann Strasse, D-4370 Marl , Germany | Cooperative licensing agreement reaction with distillation technology | 85295 | Lyondell Chemical Technology, L.P. | License Agreement | 1/12/1993 | $0.00 | | |
| HULCHER SERVICES, INC. 611 Kimberly Dr. Denton , Texas 76202-0271 USA | Master Environmental Field Services Contract No. | 5939 | Equistar Chemicals, LP;Houston Refining LP;Lyondell Chemical Company;Millennium Petrochemicals Inc. (Virginia) | Service Agreements | 11/1/2008 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls, LLC |
| HUNTSMAN INTERNATIONAL LLC 10003 Woodloch Forest Drive The Woodlands , Texas 77380 USA | Hunstman International LLC_Bayport Channelview | 86073 | Lyondell Chemical Company | Sales Agreements | 1/1/2006 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| HUNTSMAN INTERNATIONAL LLC (FLINT HILLS) 10003 Woodloch Forest Dr. The Woodlands , TX 77380 USA | Flint Hills Resources_Channelview | 40939 | Lyondell Chemical Company | Manufacturing Agreement | 7/1/2007 | $0.00 | | |
| HUNTSMAN PETROCHEMICAL CORP 10003 Woodloch Forest Dr The Woodlands , TX 77380 USA | Huntsman Petrochemical Corp_BCO | 15526 | Equistar Chemicals, LP | Exchange Agreements | 1/1/2008 | $0.00 | | |
| HUNTSMAN PETROCHEMICAL CORPORATION P.O. Box 4980 The Woodlands , TX 77387-4980 USA | Huntsman Petrochemical Corporation_Olefins | 100977 | Equistar Chemicals, LP | Exchange Agreements | 4/1/2008 | $0.00 | | |
| HUNTSMAN PETROCHEMICAL CORPORATION 3040 Post Oak Boulevard Houston , TX  77056 USA | Propylene Carbonate Processing Agreement | 21285 | Lyondell Chemical Company | Manufacturing Agreement | 1/1/2004 | $0.00 | | |
| HUNTSMAN PROPYLENE OXIDE 3040 Post Oak Boulevard Houston , TX  77056 USA | License Agreement TBA Dehydration Process | 65377 | Lyondell Chemical Company | License Agreement | 5/18/2001 | $0.00 | | |
| HUNTSMAN PROPYLENE OXIDE LTD. 2701 Spur 136 Port Neches , Texas 77651 USA | License Agreement | 5008 | Lyondell Chemical Technology, L.P. | License Agreement | 8/23/2002 | $0.00 | | |
| HWRT OIL COMPANY P.O. Box 484 Alton , IL  62002 USA | RST-03705 | 66609 | Houston Refining LP | Sales Agreements | 6/1/2008 | $0.00 | | |
| HYATT LEGAL PLANS, INC. 1111 SUPERIOR AVENUE CLEVELAND , OHIO 44114-2507 USA | Hyatt Legal Plans Agreement | 45647 | Lyondell Chemical Company | Pension/Benefits/Medical-Related Agreements | 11/11/2008 | $0.00 | | |
| ICISNEWS 3355 West Alabama, Ste 700 Houston , TX  77098 USA | ICISnews Subscription Agreement | 40334 | Lyondell Chemical Company | Subscription Agreement | 1/1/2009 | $688.04 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| ICISPRICING 3355 West Alabama, Ste 700 Houston , TX  77098 USA | ICISpricing subscription agreement | 40333 | Lyondell Chemical Company | Subscription Agreement | 1/1/2009 | $4,200.00 | | |
| ICO POLYMERS NORTH AMERICA, INC., F/K/A WEDCO INC. 5333 Westheimer, Suite 600 Houston , TX  77056 USA | 3rd Supplement to Toll Processing Agreement | 10746 | Equistar Chemicals, LP | Purchase Agreements | 1/1/2008 | $0.00 | | |
| IEDCO 3, El Saray El Kobra Street, P.O. Box 57 Cairo , Egypt | IEDCO_Botlek | 50390 | Lyondell Chemical Company | Sales Agreements | 12/31/1999 | $0.00 | | |
| IFF CHEMICAL HOLDINGS INC 2051 North lane Avenue Jacksonville , FL  32254 USA | Millennium/IFF Alpha-Pinene & Beta Piene Agreement | 11821 | Millennium Specialty Chemicals Inc. | Purchase and Sales Agreement | 1/1/2007 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| IGLOO PRODUCTS CORP 777 Igloo Road Katy , TX  77494 USA | Sales Agreement - Alathon L5840 Amendment No. 3 | 15545 | Equistar Chemicals, LP | Sales Agreements | 1/1/2008 | $0.00 | | |
| IGLOO PRODUCTS CORP. 777 Igloo Road Katy , Texas  77494 USA | Tolling Agreement | 75884 | Equistar Chemicals, LP | Supply Agreements | 12/11/2008 | $0.00 | | |
| IHS GLOBAL INSIGHT (USA) INC. PO Box 845730 Boston , MA  02284-5730 USA | Global Insight Consulting Agreement | 40337 | Lyondell Chemical Company | Consulting Agreements | 1/1/2009 | $634.92 | | |
| IMMINGHAM STORAGE COMPANY LIMITED Priory House 60 Station Road Redhill , Surrey, UK  RH1 1PE | Storage Agreements | 41679 | Millennium Petrochemicals Inc. (Virginia); Lyondell Chimie France SAS (France) (Non-Debtor) | Storage Agreements | 3/1/2008 | $7,848.00 | Millennium Petrochemicals Inc.(Virginia) | Lyondell Chemie Nederland b.v. |
| IMPACTWEATHER, INC. P.O. Box 751869 Houston , TX  77275 USA | Impact Weather Services Agreement | 51197 | Equistar Chemicals, LP;Houston Refining LP;Lyondell Chemical Company;Millennium Petrochemicals Inc. (Virginia) | Service Agreements | 12/18/2008 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls, LLC |

66

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| INDEPENDENT PROJECT ANALYSIS, INC 44426 Atwater Drive, Suite 100 Ashburn , Virginia  20147 USA | License Agreement for Facilities fel toolbox web application and documentation | 20451 | Lyondell Chemical Company | License Agreement | 8/3/2006 | $0.00 | | |
| INDUSTRIAL NETWORKS, LTD. 240 SPRING HILL DRIVE, SUITE 400 SPRING , TX  77386 USA | SYSTEM LICENSE & SERVICE AGREEMENT | 55926 | Lyondell Chemical Company | License Agreement | 12/20/2006 | $0.00 | | |
| INDUSTRIAS DERIVADAS DEL ETILENO S.A. DE C.V Bosque de Radiatas No 34 Col. Bosques de las Lomas  05120, Mexico | Industrias Derivadas del Etileno S.A. de C.V_Bayport Lyondell Operations | 70143 | Lyondell Chemical Company | Sales Agreements | 7/1/2001 | $0.00 | | |
| INDUSTRIAS NEGROMEX S.A. DE C.V. Carretera Tampico-Mante Km. Km. 13.5 C.P. Altamira , Tamaulipas, Mexico  89600 | Industrias Negromex S.A. de C.V._Channelview | 10768 | Equistar Chemicals, LP | Sales Agreements | 1/1/1998 | $0.00 | | |
| INEOS ABS 2600 South Shore Blvd. League City, TX  77573 USA | Ineos ABS_Channelview | 80489 | Lyondell Chemical Company | Sales Agreements | 1/1/2006 | $0.00 | | |
| INEOS NOVA LLC 12222 Port Road Pasadena, TX  77507 USA | Ineos Nova LLC_Exchange | 60723 | Lyondell Chemical Company | Exchange Agreements | 1/1/2009 | $0.00 | | |
| INEOS OLEFINS & POLYMERS USA Marina View Bld 2600 South Shore Blvd, Ste 500 Leaque City, TX  77573 USA | Olefins Exchange Agreement | 10834 | Equistar Chemicals, LP | Exchange Agreements | 1/1/1999 | $0.00 | | |
| INEOS OLEFINS & POLYMERS USA Marina View Bld 2600 South Shore Blvd, Ste 500 Leaque City, TX  77573 USA | Ineos Olefins & Polymers USA_Light Olefins | 41519 | Equistar Chemicals, LP | Sales Agreements | 1/1/2006 | $0.00 | | |
| INEOS OLEFINS & POLYMERS USA Marina View Bld 2600 South Shore Blvd, Ste 500 Leaque City, TX  77573 USA | Ineos - Choc Bayou SIT - Equistar | 25338 | Equistar Chemicals, LP | Storage Agreements | 7/1/2006 | $0.00 | | |

67

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| INEOS USA LLC 2600 South Shore Blvd. Suite 400 League City, TX 77573 USA | INEOS_Bayport | 70547 | Lyondell Chemical Company | Sales Agreements | 4/1/2008 | $0.00 | | |
| INFINEUM USA L.P. C/O Bayway Chemical Plant Corner of Park Ave & Brunswick Ave Linden, NJ 07036 USA | Infineum USA L.P._BCO | 41520 | Equistar Chemicals, LP | Purchase Agreements | 6/1/2008 | $0.00 | | |
| INFO SYSTEMS, INC. 590 Century Blvd. Wilmington, DE 19808 USA | Independent Contractor Agreement | 30744 | Basell USA Inc. | Service Agreements | 5/28/1999 | $0.00 | | |
| INFOLINK 714 E. KALISTE Soloom Unit B1 Lafayette, La 70508 Usa | MASTER CONTRACT 4600000984 | 45862 | Houston Refining LP | Software Agreements | 6/4/2004 | $0.00 | | |
| INSPECTIONLOGIC CORPORATION,SUBSIDIARY OF ORR PROTECTION SYSTEMS, INC. 11601 Interchange Drive Louisville, KY 40229 USA | End User License Agreement | 35069 | Lyondell Chemical Company | License Agreement | 11/24/2005 | $0.00 | | |
| INTERGRAPH CORPORATION DBA PROCESS, POWER & MARINE 300 Intergraph Way - Mail Stop 135 Madison, AL 35758 USA | Consulting Agreements | 55408 | Lyondell Chemical Company | Consulting Agreements | 12/1/2004 | $0.00 | | |
| INTERNATIONAL DISTRIBUTION CORPORATION 13103 Bay Park Pasadena, TX 77507 USA | 66473_IDC - Whse Contract - Basell | 66473 | Basell USA Inc. | Transportation Agreements | 10/1/2000 | $0.00 | | |
| INTERNATIONAL PAPER COMPANY 6400 Poplar Avenue Memphis, TN 38197 USA | Release and Wrap-Around Agreement for Crude Sulfate Turpentine | 20796 | Millennium Specialty Chemicals Inc. | Sales Agreements | 12/1/2007 | $119,326.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| INTERNATIONAL PLASTICS AND EQUIPMENT CORPORATION, IPEC 185 Northgate Circle New Castle, PA 16105 USA | Contract for Sale of Polymers | 60343 | Equistar Chemicals, LP | Sales Agreements | 1/1/2009 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| INTERNATIONAL UNION OF OPERATING ENGINEERS 1125 17th Street, NW Washington, DC 20036 USA | Collective Bargaining Agreement - Tuscola | 70857 | Equistar Chemicals, LP | Employment, Collective Bargaining, and Related Agreements | 11/1/2006 | $0.00 | | |
| INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL UNION NO. 347, AFL-CLO 1125 17th Street, NW Washington, DC 20036 USA | Collective Bargaining Agreement - BLO | 85774 | Lyondell Chemical Company | Employment, Collective Bargaining, and Related Agreements | 2/13/2007 | $0.00 | | |
| INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 407, AFL-CIO 1125 17th Street, NW Washington , DC 20036 USA | Collective Bargaining Agreement - Lake Charles IUOE | 50887 | Basell USA Inc. | Employment, Collective Bargaining, and Related Agreements | 4/30/2006 | $0.00 | | |
| INTERQUISA CANADA 10200 Sherbrooke St., Montreal , Quebec, Canada H1B 1B4 | Interquisa Canada_La Porte | 10739 | Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 1/1/2006 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls LLC |
| INTERSTATE CHEMICAL CO., INC 2797 Freeland Road Hermitage, PA 16148 USA | Interstate Chemical Co., Inc_BCO | 10734 | Equistar Chemicals, LP | Sales Agreements | 10/1/2007 | $0.00 | | |
| INTERSTATE POWER COMPANY 1000 Main Street, P.O. Box 769 Dubuque, IA 52004-0769 USA | Firm Gas Purchase and Sales Agreement | 6119 | Equistar Chemicals, LP | Supply Agreements | 8/22/1995 | $0.00 | | |
| INTERSTATE POWER COMPANY (AKA ALLIANT ENERGY) 1000 Main St PO Box 769 Dubuque, IA 52004-0769 USA | Industrial Electric Bulk Supply Contract | 101206 | Equistar Chemicals, LP | Utility Agreements | 6/6/1989 | $2,366,539.94 | | |
| INTRALOX, LLC 201 Laitram Lane New Orleans, LA 70123 USA | Sales Agreement - Amendment No. 2 | 25831 | Equistar Chemicals, LP | Sales Agreements | 1/1/2009 | $0.00 | | |
| INVISTA S A R L 4123 East 37th Street North Wichita, KS 67220 USA | E.I. Dupont De Nemours & Co. Inc. _LaPorte | 65902 | Equistar Chemicals, LP | Sales Agreements | 10/10/1988 | $0.00 | | |

69

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| INVISTA S.A.R.L. 4123 East 37th Street North Wichita, KS 67220 USA | INVISTA S.A.R.L._BCO | 45621 | Equistar Chemicals, LP | Sales Agreements | 1/1/2007 | $0.00 | | |
| INX INC. 1955 Lakeway Drive Suite 220 Lewisville , TX 75057 USA | Professional Services Agreement | 50022 | Lyondell Chemical Company | Service Agreements | 7/15/2007 | $0.00 | | |
| IOWA, CHICAGO, & EASTERN RAILROAD CORPORATION 140 North Phillips Avenue Sioux Falls , SD 57104 USA | 66504_IC&E - SIT - Equistar | 66504 | Equistar Chemicals, LP | Lease Storage Agreements | 5/6/2006 | $0.00 | | |
| IPL RESEARCH LIMITED 29/F, Prosperity Millennia Plaza 663 King's Rd North Point Hong Kong | IPL Software Support & Maintenance Agreement | 15957 | Lyondell Asia Pacific, Ltd. | Service Agreements | 9/1/2008 | $0.00 | | |
| IRON MOUNTAIN INFORMATION MANAGEMENT, INC. 2500 Henderson Drive Sharon Hill , PA 19079 USA | Contract #2006-S-0283 | 66927 | Lyondell Chemical Company | Purchase Agreements | 11/6/2006 | $788.29 | | |
| ISP SYNTHETIC ELASTOMERS LP AND ISP CHEMCO LLC 1215 Main St. Port Neches, TX 77651 USA | ISP Chemco LLC_Channelview | 80428 | Equistar Chemicals, LP | Sales Agreements | 1/1/2008 | $0.00 | | |
| JACKSON ENERGY AUTHORITY 119 East College Street Jackson, TN 38301 USA | Energy and Utility Service Agreement | 70748 | Basell USA Inc. | Utility Agreements | 2/1/2007 | $344,060.66 | | |
| JACKSONVILLE ELECTRIC AUTHORITY 21 West Church St. Jacksonville, FL 32202 USA | General Service Large Demand Rider Electric Service Agreement | 66915 | Millennium Specialty Chemicals Inc. | Utility Agreements | 1/27/1997 | $406,090.27 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| JAMES B. TRIPPETT 2003 Warwick Circle West Longview, TX 75601 USA | James B. Trippett_BCO | 66889 | Lyondell Chemical Company | Service Agreements | 2/14/2008 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| JAMES FLORA 5726 FM 2917 Alvin, TX 77511 USA | Grazing License Agreement | 80133 | Equistar Chemicals, LP | Lease | 1/1/2007 | $0.00 | | |
| JAMES RIVER MARATHON, LTD P.O. 'Bag JR' Marathon, Ontario, POT 2EO Canada | Crude Terpentine Purchase Agreement | 11817 | Millennium Specialty Chemicals Inc. | Purchase Agreements | 1/1/1995 | $57,423.44 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| JAPAN STEEL WORKS AMERICA INC 41135 Vincenti Court Novi, MI 48375 USA | MRO Spare Parts | 66899 | Basell USA Inc. | Purchase Order | 4/8/2008 | $0.00 | | |
| JD STREETT & COMPANY 144 Weldon Parkway Maryland Heights , MO 63043 USA | RST-01516 | 66610 | Houston Refining LP | Sales Agreements | 1/1/2007 | $0.00 | | |
| JD STREETT & COMPANY INC. 144 Weldon Parkway Maryland Heights , MO 63043 USA | RST-03824 | 66602 | Houston Refining LP | Sales Agreements | 3/1/2008 | $0.00 | | |
| JEL SERT CO. PO Box 261 Rte. 59 and Conde St. West Chicago , IL 60185 USA | 2nd Amendment to Polymers Sales Agreement | 10902 | Equistar Chemicals, LP | Sales Agreements | 1/1/2005 | $0.00 | | |
| J-M MANUFACTURING COMPANY Nine Peach Tree Hill Rd Livingston , NJ 07039 USA | Contract for Sale of Polymers | 15544 | Equistar Chemicals, LP | Product Agreements | 10/1/2007 | $0.00 | | |
| JOB PERFORMANCE SYSTEMS, INC 1240 N. Pitt St Ste 100 Alexandria , VA 22314 USA | JBS Software License | 15272 | Houston Refining LP | Maintenance Agreements | 5/10/2004 | $0.00 | | |
| JOB PERFORMANCE SYSTEMS, INC. 1240 North Pitt St., Suite 200 Alexandria, VA 22314 USA | JPS Software License Standard Terms and Conditions | 36031 | Basell USA Inc. | License Agreement | 8/14/2003 | $0.00 | | |
| JOHANN HALTERMANN, LTD. 16717 Jacintoport Blvd. Houston, TX 77015 USA | Appendix II - Transaction Agreement | 65708 | Lyondell Chemical Company | Manufacturing Agreement | 1/1/2007 | $350,000.00 | | |

71

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| JOHANN HALTERMANN, LTD. 16717 Jacintoport Blvd. Houston, TX 77015 USA | Appendix I - Transaction Agreement | 65707 | Lyondell Chemical Company | Manufacturing Agreement | 1/1/2007 | $25,337.73 | | |
| JOHANN HALTERMANN, LTD. 16717 Jacintoport Blvd. Houston, TX 77015 USA | Appendix VII - Transaction Agreement | 55594 | Lyondell Chemical Company | Manufacturing Agreement | 1/1/2008 | $60,000.00 | | |
| JOHN C. BENNER 708 Shannon Drive Greenville, IL 62246 USA | Site Access Agreement | 76399 | Equistar Chemicals, LP | Access Agreements | 10/1/2005 | $0.00 | | |
| JOHN L. ARMITAGE AND COMPANY 5454 National Drive Gallatin, TN 37066 USA | John Armitage_Channelview | 25846 | Lyondell Chemical Company | Sales Agreements | 7/1/2004 | $0.00 | | |
| JOHNSON POLYMER, LLC (OWNED BY BASF) 8310 16th Street Sturtevant , WI 53177-0902 USA | BASF (formerly Johnson Polymers)_Solvents | 65660 | Lyondell Chemical Company | Sales Agreements | 7/1/2006 | $0.00 | | |
| JURGEMEYER, FRAY & HAUFE 601 South third street Clinton , IA 52732 USA | Credit Union Sublease | 76609 | USI Chemicals International Inc. | Lease | 12/1/1987 | $0.00 | USI Chemicals International Inc. (Debtor) | 7 - Equistar Chemicals, LP |
| KANSAS CITY SOUTHERN P.O. Box 219335 Kansas City , MO 64121 USA | 95752_KCS - Corinth, MS - Basell | 95752 | Basell USA Inc. | Lease Storage Agreements | 4/1/2008 | $0.00 | | |
| KAO SPECIALTIES AMERICAS LLC 243 Woodbine Street High Point , NC 27261 USA | Kao Specialties Americas LLC_Bayport Channelview | 90384 | Lyondell Chemical Company | Sales Agreements | 1/1/2005 | $0.00 | | |
| KELTIC PETROCHEMICALS INC 523-5151 George Street Halifax , Nova Scotia, B3J 1M5 Canada | Second Amendment | 36043 | Basell USA Inc. | Supply Agreements | 11/18/2008 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| KELTIC PETROCHEMICALS, INC. 523-5151 George Street Halifax , Nova Scotia, B3J 1M5 Canada | Memorandum of Understanding | 81054 | Basell USA Inc. | Joint Development Agreements | 5/7/2007 | $0.00 | | |
| KENNETH BERRYMAN AND TALMAGE TAYLOR P O Box 505 Cayuga , TX  75832 USA | Grazing License Agreement | 60453 | Equistar Chemicals, LP | Lease | 10/1/2004 | $0.00 | | |
| KIK CORPORATION 313 MacIntosh Road Concord, Ontario, L4K4L5 Canada | KIK Corporation_Tuscola | 80430 | Equistar Chemicals, LP | Sales Agreements | 1/1/2008 | $0.00 | | |
| KIK INTERNATIONAL, LLC 900 Magnolia Ave. Auburndale , FL  33823 USA | Contract for Sale of Polymers | 100489 | Equistar Chemicals, LP | Sales Agreements | 6/1/2008 | $0.00 | | |
| KIMBERLY CLARK Highway 235 North Coosa Pines , AL  35044 USA | Crude Turpentine Purchase Agreement | 70583 | Millennium Specialty Chemicals Inc. | Purchase Agreements | 8/1/1995 | $34,443.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| KIMICA CHILE LTD. Camino Lonquen s/n Parcela 12 Paine, Chile | Kimica Chile Ltd_Bayport Channelview | 70517 | Lyondell Chemical Company | Sales Agreements | 4/1/2007 | $0.00 | | |
| KINGDEE INTERNATIONAL SOFTWARE GROUP (H.K.) LTD. Suite 1501, 15/F, Central Plaza 18 Harbour Road Wan Chai , Hong Kong | Kingdee Software License & Service Agreement | 51366 | Lyondell Greater China, Ltd. | Service Agreements | 11/5/2008 | $0.00 | | |
| KPMG 1266 Nanjing West Road Shanghai , China  200040 | Proposal for professional service - corporate tax compliance service | 51023 | Lyondell Greater China, Ltd. | Tax Related Agreements | 8/11/2006 | $8,143.01 | | |
| KPMG 68F Taipei, 101 Tower, No. 7, Sec. 5, Xinyi Road Taipei 11049 , Taiwan, R.O.C. | Master Professional Services Agreement | 26125 | Lyondell Greater China, Ltd. | Consulting Agreements | 12/11/2008 | $0.00 | | |

73

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| KPMG TAX LIMITED 8th Floor, Prince's Building, 10 Chater Road Central , Hong Kong | Engagement Letter for Profits Tax Services | 26129 | Lyondell Asia Pacific, Ltd. | Tax Related Agreements | 9/7/2007 | $0.00 | | |
| KPMG, LLP 1601 Market Street Philadelphia , PA  19103-2499 USA | Engagement Letter for Tax Services for Expats | 85758 | Basell North America Inc. | Service Agreements | 2/19/2008 | $10,000.00 | | |
| KRATON POLYMERS LLC 700 Milam Suite 1300 Houston, TX  77002 USA | Kraton Polymers LLC_Channelview | 60733 | Lyondell Chemical Company | Sales Agreements | 7/1/2006 | $0.00 | | |
| KRATON POLYMERS U.S. LLC 700 Milam, Pennzoil Building, North Tower, Suite 13035 Houston , TX  77032 USA | KRATON Polymers U.S. LLC_Tuscola | 50479 | Equistar Chemicals, LP | Sales Agreements | 1/1/2004 | $0.00 | | |
| KUNIEI TOYODA 3-4-5 KEGENUMA MATSUGAOKA FUJISAWA , JAPAN | Consulting Agreement | 70580 | Millennium Specialty Chemicals Inc. | Consulting Agreements | 5/16/2003 | $1,551.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| KVAERNER U.S., INC. 7909 Parkwood Circle, Drive Houston , TX  77036 USA | Licensing Alliance Agreement | 90166 | Lyondell Chemical Company | License Agreement | 8/15/2000 | $0.00 | | |
| KVAERNER U.S., INC. 7909 Parkwood Circle Drive Houston, TX  77036 USA | Agreement | 5363 | Lyondell Chemical Company | Technical Agreements | 5/5/1999 | $0.00 | | |
| KX INDUTRIES, L.P. 269 South Lambert Road Orange, CT  06477 USA | Contract for Sale of Polymers | 85694 | Equistar Chemicals, LP | Sales Agreements | 1/1/2007 | $0.00 | | |
| L. R. LAW JR. 6435 Miller Road 2 Channelview, TX  77049-4803 USA | Grazing License Agreement | 60527 | Equistar Chemicals, LP | Lease | 12/15/2006 | $0.00 | | |

74

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| L.C. MAYFIELD AND ASSOCIATES, INC. 17103 FM 2100 Crosby, TX  77532 USA | Surplus Sales Service Agreement | 95593 | Basell North America Inc.;Equistar Chemicals, LP;Houston Refining LP;Lyondell Chemical Company;Millennium Petrochemicals GP LLC;Millennium Specialty Chemicals Inc. | Service Agreements | 1/1/2005 | $0.00 | Millennium Petrochemicals GP LLC ; Millennium Specialty Chemicals Inc. | 9998 - LyondellBasell Acetyls, LLC; 9999 - LyondellBasell Flavors and Fragrances, LLC |
| L.R. LAW 6435 Miller Road #2 Houston, TX  77049-4803 USA | Grazing License Agreement | 81133 | Equistar Chemicals, LP | Lease | 1/1/2008 | $0.00 | | |
| L.R. LAW 6435 Miller Road #2 Houston, TX  77049-48033 USA | Grazing License Agreement | 90618 | Lyondell Chemical Company | Lease | 1/1/2003 | $0.00 | | |
| LA PETROLIFERA ITALO RUMENA SPA VIALE ALDINI 190 BOLOGNA , ITALY | MASTER SERVICE AGREEMENT REF. Q/P-02 | 56204 | Quantum Pipeline Company | Master Services Agreement | 7/4/1995 | $56,854.00 | Quantum Pipeline Company (Debtor) | Lyondell Chemie Nederland b.v. |
| LAKE CHARLES HARBOR & TERMINAL DISTRICT P.O. Box AAA Lake Charles , LA  70602 USA | Side Track Agreement | 66664 | Basell USA Inc. | Transportation Agreements | 1/1/1988 | $0.00 | | |
| LAKE CHARLES METAL TRADES COUNCIL P O Box 3753 Lake Charles , LA  70602 USA | Collective Bargaining Agreement - Lake Charles LXO | 55770 | Lyondell Chemical Company | Employment, Collective Bargaining, and Related Agreements | 7/1/2007 | $0.00 | | |
| LAKE CHARLES METAL TRADES COUNCIL, AFL-CIO P O Box 3753 Lake Charles , LA  70602 USA | Collective Bargaining Agreement - Lake Charles | 50888 | Basell USA Inc. | Employment, Collective Bargaining, and Related Agreements | 4/30/2006 | $0.00 | | |
| LAMBERTI SYNTHESIS USA, INC. Eight Tower Bridge, Suite 1000 161 Washington Street Conshohocken , PA 19428 USA | Lamberti Synthesis USA, Inc_Bayport Channelview | 86077 | Lyondell Chemical Company | Sales Agreements | 11/1/2007 | $0.00 | | |
| LAMINATIONS INC 101 Power blvd Archbald , PA  18403 USA | Contract for Sale of Polymers | 10752 | Equistar Chemicals, LP | Sales Agreements | 7/1/2007 | $0.00 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| LANE ENTERPRISES, INC. 34 Strohm Rd Shippensburg , PA 17251 USA | Amendment No. 6 | 80424 | Equistar Chemicals, LP | Sales Agreements | 10/1/2001 | $0.00 | | |
| LCY ELASTOMERS LP 4803 Decker Drive Baytown , TX 77520 USA | LCY Elastomers_Channelview | 25715 | Lyondell Chemical Company | Sales Agreements | 1/1/2005 | $0.00 | | |
| LEE CHANG YUNG CHEMICAL INDUSTRY CORP. 5th Floor, 83 Pateh Rd, Sec. 4 Taipei 105 , Taiwan | MMA License Agreement | 10475 | Lyondell Chemical Technology, L.P. | License Agreement | 8/3/2001 | $0.00 | | |
| LEE TECHNOLOGIES SERVICES, INC. 12150 Monument Dr., Suite 150 Fairfax , VA 22033 USA | Professional Services Agreement | 50060 | Lyondell Chemical Company | Service Agreements | 10/10/2007 | $0.00 | | |
| LEWIS MARSHALL P. O. Box 684 Nome , TX 77629 USA | Grazing License Agreement | 60530 | Equistar Chemicals, LP | Lease | 10/1/2004 | $0.00 | | |
| LIBERMAN SOFTWARE CORPORATION 1900 Avenue of Stars, Suite 425 Los Angeles , CA 90067 USA | License Agreement | 55345 | Lyondell Chemical Company | License Agreement | 12/28/2006 | $0.00 | | |
| LINAU CHEMICAL 731 Rosewood Dr, P.O. Box 13565 Columbia , SC 29201 USA | Linau Chemical_Channelview | 10730 | Equistar Chemicals, LP | Sales Agreements | 1/1/2008 | $0.00 | | |
| LINHUAN COKING COMPANY Xiaohuzi, Hancun town,Suixi County Huaibei City, Anhui Province China | License Agreement | 35358 | Lyondell Chemical Company | License Agreement | 6/25/2008 | $0.00 | | |
| LONDON TANKER BROKERS' PANEL LIMITED Copenhagen House, 5-10 Bury St London , UK EC3A 5AT | Subscription | 40326 | Lyondell Chemical Company | Subscription Agreement | 1/1/2009 | $0.00 | | |

76

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| LONZA INC. 17-17 Route 208 Fair Lawn , NJ  07410 USA | Lonza Inc._BCO | 25702 | Equistar Chemicals, LP | Sales Agreements | 7/1/2004 | $0.00 | | |
| LUBRIZOL ADVANCED MATERIALS 9911 Brecksville Road Cleveland , OH  44141-3247 USA | Lubrizol Advanced Materials_Channelview | 85510 | Lyondell Chemical Company | Sales Agreements | 1/1/2005 | $0.00 | | |
| LUBRIZOL ADVANCED MATERIALS, INC. 9911 Brecksville Road Cleveland , Ohio  44141 USA | Lubrizol_Channelview | 90710 | Lyondell Chemical Company | Sales Agreements | 1/1/2008 | $0.00 | | |
| LYONDELL CHEMICAL CO Suite 1600, 1221 McKinney Houston , TX  77010 USA | Lyondell Chemical Co_La Porte | 15570 | Lyondell Chemical Company;Millennium Chemicals Inc. | Sales Agreements | 1/1/2005 | $0.00 | Millennium Chemicals Inc. (Debtor) | LyondellBasell Acetyls LLC |
| LYONDELL GREATER CHINA, LTD. 4101, 41st Floor, The Lee Gardens, 33 Hysan Avenue Causeway Bay , Hong Kong | Distributor Agreement_La Porte | 6101 | Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 9/1/2005 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls LLC |
| LYONDELL GREATER CHINA, LTD. Kioicho Building 4F, 3-12 Kiocho, Chiyoda-ku, Tokyo , Japan, 102-0094 | Representative Agreement_La Porte | 40254 | Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 12/1/2004 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls LLC |
| LYONDELL SOUTH ASIA PTE. LTD. 250, North Bridge Rd. #14-03/04, Raffles City Tower  Singapore 179101 | Office Services Agreement | 101141 | Millennium Specialty Chemicals Inc. | Service Agreements | 6/1/2005 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| M & I FIRST NATIONAL LEASING CORP. 250 E. Wisconsin Ave., Ste. 1400 Milwaukee , WI  53202 USA | Amendment to a Lease 23754 | 60691 | Millennium Specialty Chemicals Inc. | Environmental Agreements | 5/9/2000 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| M. HOLLAND COMPANY 400 Skokie Blvd., Suite 600 Northbrook , IL  60062 USA | Distributor Agreement | 66566 | Equistar Chemicals, LP | Purchase and Sales Agreement | 4/1/1998 | $0.00 | | |

77

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| MAERSK INC. 10, 11 & 12th Floor, Prince Info City, 286/1 Rajiv Gandhi Salai, Kottivakkam-Kandhanchavadi, Chennai-600 096, Tamil Nadu India. | Service Contract No: 237308, Proposal No: 20.0 | 66808 | Equistar Chemicals, LP;Lyondell Chemical Company | Transportation Agreements | 12/26/2008 | $0.00 | | |
| MAGELLAN BEHAVIORAL HEALTH INC 14100 Magellan Plaza Dr Maryland Heights , MO 63043 USA | Services Agreement for Magellan Behavior Health | 10995 | Lyondell Chemical Company | Pension/Benefits/Medical-Related Agreements | 1/1/2006 | $0.00 | | |
| MAGNUM INTERNATIONAL , INC. 1965 Bernice Road Lansing , IL 60438 USA | Magnum International_Solvents | 70550 | Equistar Chemicals, LP | Sales Agreements | 1/1/2008 | $0.00 | | |
| MALLARD CREEK POLYMERS, INC. 14700 Mallard Creek Rd Charlotte , NC 28262 USA | Mallard Creek Polymers, Inc._Channelview | 40899 | Equistar Chemicals, LP | Sales Agreements | 8/1/2006 | $0.00 | | |
| MAN FINANCIAL INC. 717 FIFTH AVENUE 9TH FLOOR New York , NY 10022 USA | Customer Agreement | 60448 | Houston Refining LP | Service Agreements | 10/16/2006 | $0.00 | | |
| MAPEI CORPORATION 1144 East Newport Center Drive Deerfield Beach , FL 33442 USA | Mapei Corporation_La Porte | 51310 | Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 1/1/2008 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls LLC |
| MARCIA MACHADO 361 Duperu Drive Crockett , CA 94525 USA | Marcia Machado | 15851 | Equistar Chemicals, LP;Lyondell Chemical Company;Millennium Petrochemicals GP LLC | Consulting Agreements | 4/1/2008 | $28,730.00 | Millennium Petrochemicals GP LLC | LyondellBasell Acetyls, LLC |
| MARK WESCH AND CONNIE WESCH 610 East County Road 1075N Tuscola , IL 61953 USA | Site Access Agreement | 76404 | Equistar Chemicals, LP | Access Agreements | 10/1/2005 | $0.00 | | |
| MARKMONITOR INC. 303 2nd Street San Francisco , CA 94107 USA | Domain Solution Center Letter Agreement | 66032 | Lyondell Chemical Company | Trademark and License Related Agreements | 10/29/2001 | $2,465.00 | | |

78

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| MARSH USA INC. 1000 Main Street, Suite 3000 Houston , TX  77002 USA | Lyondell Hurricane ACV Calculation | 65500 | LyondellBasell Industries AF S.C.A. | Service Agreements | 8/6/2008 | $0.00 | - LyondellBasell Industries AF S.C.A. (Debtor) | Lyondell Chemical Company |
| MARSH USA INC. 1000 Main Street, Suite 3000 Houston , TX  77002 USA | Service Agreement | 65498 | Lyondell Chemical Company | Service Agreements | 6/1/2008 | $0.00 | | |
| MARSH USA INC. 1000 Main Street, Suite 3000 Houston , TX  77002 USA | Trust Agreement | 11001 | Equistar Chemicals, LP;Houston Refining LP;Lyondell Chemical Company | Pension/Benefits/Medical-Related Agreements | 1/1/1990 | $0.00 | | |
| MARSH USA INC. HOUSTON P.O. Box 973767 Dallas , TX  75397-3767 USA | STATEMENT OF WORK LYONDELL HURRICANE IKE ACV CALCULATION - BEAUMONT PD GLYCOL PLANT | 56170 | Lyondell Chemical Company | Consulting Agreements | 10/23/2008 | $12,107.95 | | |
| MARSH VOLUNTARY BENEFITS, A SERVICE OF SEABURY & SMITH, INC. 3475 Piedmont Rd. NE, Suite 1200 Atlanta , GA  30305 USA | PersonalPlans Program Agreement | 80940 | Lyondell Chemical Company | Pension/Benefits/Medical-Related Agreements | 9/1/2008 | $0.00 | | |
| MARUBENI AMERICA COPRORATION 2800 Post Oak Blvd., Suite 6000 Houston , TX  77056-6118 USA | Marubeni America Coprporation_BCO | 30528 | Equistar Chemicals, LP | Sales Agreements | 1/1/1997 | $0.00 | | |
| MATAGORDA EMPLOYEES RECREATION ASSOCIATION P.O. Box 2100 Bay City , Texas  77414 USA | Lease | 81134 | Lyondell Chemical Company | Lease | 10/1/1995 | $0.00 | | |
| MATTEL INC. 333 Continental Blvd. El Segundo, CA  90245 USA | CONTRACT FOR SALE OF POLYMERS #40001208 | 55669 | Equistar Chemicals, LP | Purchase Agreements | 1/1/2006 | $0.00 | | |
| MCLAREN TECHNOLOGIES LTD 24 Greenway Plaza Suite 1000 Houston , TX  77046 USA | Purchase Orders | 40757 | Lyondell Chemical Company | Purchase Agreements | 12/5/2006 | $0.00 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| MCLAREN TECHNOLOGIES LIMITED 3 Atlantic Quay 20 York Street Glasgow, Scotland G28LN UK | SOFTWARE & MAINTENANCE SUPPORT AGREEMENT | 45435 | Lyondell Chemical Company | Maintenance Agreements | 3/20/2002 | $0.00 | | |
| MCWHORTER TECHNOLOGIES / HEXION 400 East Cottage Place Carpentersville , IL 60110 USA | Hexion / McWhorter DCPD Sales Contract | 66936 | Equistar Chemicals, LP | Sales Agreements | 1/1/2000 | $0.00 | | |
| MEAD PAPER Chillicothe Mills Chillicothe , OH 45601 USA | Crude Turpentine Purchase Agreement | 50669 | Millennium Specialty Chemicals Inc. | Purchase Agreements | 7/1/1995 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| MEADWESTVACO CORP. 11013 West Broad St Glen Allen , Virginia 23060 USA | Amendment No. 1 | 40943 | Equistar Chemicals, LP | Sales Agreements | 1/7/2009 | $0.00 | | |
| MERCER BROKING LTD. 26/F and 27/F Central Plaza, 18 Harbour Rd. Wanchai , Hong Kong | Insurance Broker Appointment Letter | 5777 | Lyondell Greater China, Ltd. | Pension/Benefits/Medical-Related Agreements | 8/8/2008 | $0.00 | | |
| MERCER HUMAN RESOURCE CONSULTING INC 1000 Main Street Suite 2900 Houston , TX 77002 USA | Consulting Agreement for Actuarial Services | 11012 | Lyondell Chemical Company | Master Services Agreement | 10/1/2002 | $0.00 | | |
| MERCER HUMAN RESOURCE CONSULTING LTD. 26/F & 27/F Central Plaza 18 Harbor Road Wanchai , Hong Kong | Mercer Engagement Letter for Broker Services | 5774 | Lyondell Asia Pacific, Ltd. | Pension/Benefits/Medical-Related Agreements | 5/9/2006 | $0.00 | | |
| MERIDIUM 10 S Jefferson St Roanoke , VA 24011 USA | Software Maintenance, Support and Services Agreement | 66892 | Equistar Chemicals, LP;Lyondell Chemical Company | Purchase and Sales Agreement | 7/14/2000 | $0.00 | | |
| MERIDIUM, INC. 10. S. Jefferson St. Roanoke , Virginia 24011 USA | Source Code Escrow Agreement | 5581 | Equistar Chemicals, LP;Lyondell Chemical Company | Escrow Agreement | 7/14/2000 | $0.00 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| METASYS, INC. 2550 West Tyvola Road, Suite 500 Charlotte , NC  28217 USA | Software License and Services Agreement | 81059 | Basell USA Inc. | Software Agreements | 6/30/1998 | $0.00 | | |
| METHANEX METHANOL COMPANY 15301 Dallas Pkwy, Ste 900 Addison, TX  75001 USA | METHANEX METHANOL COMPANY_La Porte | 45623 | Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 8/1/2007 | $0.00 | Millennium Petrochemic als Inc.(Virginia ) | LyondellIB asell Acetyls LLC |
| METHANEX METHANOL COMPANY 15301 Dallas Pkwy, Ste 1150 Addison , TX  75001-6720 USA | Methanol Sales Agreement | 40796 | Lyondell Chemical Company; Lyondell Chemie Nederland B.V. (Non-Debtor); Lyondell Chimie France SAS (France) (Non-Debtor) | Supply Agreements | 7/1/2005 | $0.00 | | |
| METROPOLITAN LIFE INSURANCE COMPANY 200 Park Ave New York , NY  10166 USA | MetLIfe Master Employee Life Insurance Policy | 41205 | Lyondell Chemical Company | Pension/Benef its/Medical-Related Agreements | 1/1/2007 | $0.00 | | |
| METROPOLITAN LIFE INSURANCE COMPANY 200 Park Ave New York , NY  10166 USA | Administrative Services Agmt - FMLA | 41203 | Lyondell Chemical Company | Pension/Benef its/Medical-Related Agreements | 4/1/2007 | $0.00 | | |
| METROPOLITIAN LIFE INSURANCE COMPANY 200 Park Avenue New York , NY  10166 USA | Administrative Services Agreement for STD | 5915 | Lyondell Chemical Company | Pension/Benef its/Medical-Related Agreements | 4/1/2007 | $0.00 | | |
| METROPOLITIAN LIFE INSURANCE COMPANY 200 Park Avenue New York , NY  10166 USA | Disability Services Agreement | 5914 | Lyondell Chemical Company | Pension/Benef its/Medical-Related Agreements | 1/1/2007 | $0.00 | | |
| MID-AMERICA PIPELINE COMPANY P.O. Box 4735 Houston  , TX 77210-4735 USA | MAPL Ethylene Transportation Agreement | 66547 | Equistar Chemicals, LP | Transportation Agreements | 9/29/1988 | $78,903.78 | | |
| MID-AMERICA PIPELINE COMPANY, LLC('MAPL') P.O. BOX 4324 HOUSTON , TX  77210-4324 USA | Pipeage Agreement | 56193 | Equistar Chemicals, LP | Pipeline Agreements | 1/1/2004 | $0.00 | | |

81

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| MILLENIUM PETROCHEMICALS, INC. 99 Wood Ave South Iselin , NJ 08830 USA | Sales Agreement | 31186 | Equistar Chemicals, LP;Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 12/1/1997 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | Lyondellbasell Acetyls, LLC |
| MILLENNIUM PETROCHEMICAL, INC. One Houston Center, 1221 McKinney, Houston , TX 77010 USA | Services Agreement | 66092 | Lyondell Quimica do Brasil, Ltda. (Non-Debtor); Millennium Petrochemicals Inc. (Virginia) | Service Agreements | 1/1/2007 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls, LLC |
| MILLENNIUM PETROCHEMICALS INC. 11500 Northlake Dr Cincinnati , OH 45249 USA | Shared Services Agreement for Water and Utility Instrument Air | 16134 | Equistar Chemicals, LP;Millennium Petrochemicals Inc. (Virginia) | Service Agreements | 12/1/1997 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | Lyondellbasell Acetyls, LLC |
| MILLIKEN & COMPANY 920 Milliken Road, P.O. Box 1927 Spartanburg , SC 29304-1927 USA | Milliken & Co_Bayport Channelview | 85713 | Lyondell Chemical Company;Equistar Chemicals, LP | Sales Agreements | 1/1/2005 | $0.00 | | |
| MINDY ELLMER, LOBBYIST 1611 Margaret Street Austin , TX 78704 USA | GOVERNMENT RELATION SERVICE CONTRACT | 55866 | Lyondell Chemical Company | Service Agreements | 1/1/2009 | $0.00 | | |
| MINIGRIP/ZIPPAK 171 Route 303 Orangeburg , NY 10962-2298 USA | SALES AGREEMENT - LDPE, LLDPE, EVA, PP, HDPE AMENDMENT NO. 1 | 45625 | Equistar Chemicals, LP | Sales Agreements | 1/1/2006 | $0.00 | | |
| MISSION E&P LIMITED PARTNERSHIP 1331 Lamar, Suite 1455 Houston , Texas 77010 USA | Oil and Gas Lease | 21329 | Equistar Chemicals, LP | Lease | 2/16/2005 | $0.00 | | |
| MITSUBISHIN POLYESTER FILM, LLC Hood Road Greer , South Carolina 29650 USA | Mitsubishin Polyester Film, LLC_BCO | 41533 | Equistar Chemicals, LP | Purchase Agreements | 1/1/2000 | $0.00 | | |
| MITSUI & CO. ENERGY RISK MANAGEMENT LTD 5th Floor, St. Martin's Court 10 Paternoster Row London , United Kingdom EC4M 7BB | ISDA, Master Agreement | 66291 | Lyondell Chemical Company | Service Agreements | 9/22/2006 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| MK DATA SERVICES 5501 Twin Knolls Rd., Suite 107 Columbia , MD 21045 USA | License Agreement for MK Denial List Services | 50057 | Lyondell Chemical Company | License Agreement | 12/27/2006 | $0.00 | | |
| MONTELL TECHNOLOGY COMPANY B.V. 3801 West Chester Pike Newtown Square , PA 19073 USA | Patent Sub-Licence Agreement | 35868 | Basell USA Inc. | License Agreement | 6/25/1999 | $0.00 | | |
| MOSAIC FERTILIZER, LLC 8813 Hwy. 41 South Riverview , FL 33578-4865 USA | Product Sales Agreement | 100959 | Houston Refining LP | Sales Agreements | 1/1/2009 | $0.00 | | |
| MR. CHARLES SMITH 10813 Stonewall Corpus Christi , TX 78410 USA | Farming License Agreement | 60562 | Equistar Chemicals, LP | Lease | 11/1/2003 | $0.00 | | |
| MR. THOMAS BATTLE 6 Country Gates Drive Wilmington , DE 19810 USA | Battle Services Agreement | 30874 | Basell USA Inc. | Service Agreements | 7/1/2008 | $0.00 | | |
| MUEHLSTEIN COMPOUNDED PRODUCTS 13001 Almeda Rd Houston , TX 77045 USA | Master Processing Agreement | 10764 | Lyondell Chemical Company | Purchase and Sales Agreement | 10/1/2007 | $0.00 | | |
| MULTICHEM, INC. 1570 Ampere, Suite 106 Bouchetville, Quebec , Canada J4B 7L4 | MultiChem, Inc._Tuscola | 100493 | Equistar Chemicals, LP | Sales Agreements | 12/31/1999 | $0.00 | | |
| MUSTANG ENGINEERING LP 16001 Park Ten Place Houston , TX 77084 USA | Terms and condition for software package | 75622 | Houston Refining LP | Service Agreements | 6/20/2008 | $0.00 | | |
| MUSTANG ENGINEERS AND CONSTRUCTORS, L.P. 16001 Park Ten Place Houston, TX 77084 USA | AMENDMENT OF LICENSING SUPPORT AGREEMENT | 45068 | Lyondell Chemical Company | License Agreement | 8/28/2006 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| NAPHTHA INTERNATIONAL 475 Park Avenue #9C New York , NY  10022 USA | Naphtha International subscription agreement | 40325 | Equistar Chemicals, LP | Subscription Agreement | 1/1/2006 | $0.00 | | |
| NASCOTE INDUSTRIES INC. 18310 Enterprise Avenue Nashville , IL  62263 USA | Consignment Agreement | 35873 | Basell USA Inc. | Sales Agreements | 10/1/2006 | $0.00 | | |
| NATALIA NAGY 561 Stanhope Court Naperville , IL  60565 USA | Research Consulting Agreement | 15290 | Equistar Chemicals, LP | Consulting Agreements | 4/18/2002 | $0.00 | | |
| NATIONAL FOOD LABORATORY INC. 6363 Clark Avenue Dublin , CA  94568 USA | No. 2007-P-0159. Master Laboratory Agreement | 11455 | Lyondell Chemical Company | Service Agreements | 7/1/2007 | $0.00 | | |
| NATIONAL STARCH & CHEMICAL COMPANY 10 Finderne Avenue Bridgewater , NJ  08807 USA | National Starch & Chemical Co._Bayport Channelview | 86084 | Lyondell Chemical Company | Manufacturing Agreement | 1/1/1999 | $0.00 | | |
| NATIONAL TECHNOLOGY SERVICES, INC. 15 Redstone Rdg. Voorhees , NJ  08043 USA | RFID/Bar Code reader Order | 35874 | Basell USA Inc. | Software Agreements | 9/20/2006 | $0.00 | | |
| NAVIGANT CONSULTING, INC. 4511 Paysphere Circle Chicago , IL  60674 USA | LyondellBasell Industries Hurricane Ike Insurance Claim | 65499 | Lyondell Chemical Company | Service Agreements | 10/14/2008 | $0.00 | | |
| NETELLIGENT CORPORATION 400 S Woods Mill Suite 105 Chesterfield , MO  63017 USA | Purchase Order | 35319 | Lyondell Chemical Company | Purchase Agreements | 5/12/2008 | $0.00 | | |
| NEWPARK SHIPBUILDING- BRADY ISLAND, INC. 8502 Cypress Street Houston , Texas  77012 USA | Master Service Agreement | 70005 | Lyondell Chemical Company | Maintenance Agreements | 3/29/2002 | $0.00 | | |
| NEXAIR 1385 Corporate Ave. P.O. Box 161182 Memphis , Tennessee 38186 USA | Product Supply Agreement | 70753 | Basell USA Inc. | Supply Agreements | 3/17/2008 | $7,271.28 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| NEXANT, INC 44 South Broadway, 4th Floor White Plains , NY 10601-4425 USA | PPE Program (replacement) | 20794 | Lyondell Chemical Company | Subscription Agreement | 1/1/2009 | $0.00 | | |
| NEXUS PLASTICS, INC. One Loretto Avenue Hawthorne , New Jersey 07506-1303 USA | Sales Agreement- - LD &LLD Amendment No. 1 | 5665 | Equistar Chemicals, LP | Sales Agreements | 1/7/2009 | $0.00 | | |
| NICOR GAS 1844 Ferry Road Naperville, IL 60563-9600 USA | Agreement | 21274 | Equistar Chemicals, LP | Supply Agreements | 9/9/1997 | $36,149.03 | | |
| NIHON OXIRANE CO, LTD No.2 Yanagiya Bldg. 12-8, Nihonbashi, 1-chome Chuo-ku, Tokyo 103-0027 Japan | License Agreement | 35222 | Lyondell Chemical Technology, L.P. | License Agreement | 8/25/2003 | $0.00 | | |
| NIHON OXIRANE CO. Kanematsu Bldg. 4F Chuo-ku , Tokyo 104-0031 Japan | Agreement for employees loaned from LAP to NOC | 75138 | Lyondell Asia Pacific, Ltd. | Employment, Collective Bargaining, and Related Agreements | 9/22/2003 | $0.00 | | |
| NIHON OXIRANE CO. LTD. Kanematsu Bldg, 4F, 14-1 Kyobashi 2 Chome, Chuo-Ku Tokyo , Japan 104-0031 | Propylene Glycol Sales & Purchase Agreement | 40426 | Lyondell Greater China, Ltd. | Purchase Agreements | 4/1/2005 | $0.00 | | |
| NIHON OXIRANE CO. LTD. Kanematsu Bldg. 4F, 14-1, Kyobashi 2-chome Chuo-ku Tokyo , Japan | PG Consulting and General Services Agreement | 75270 | Lyondell Greater China, Ltd.,Lyondell South Asia PTE Ltd. (Non-Debtor) | Joint Development Agreements | 4/1/2005 | $0.00 | | |
| NIHON OXIRANE CO. LTD. Kanematsu Bldg. 4F, 14-1, Kyobashi 2-chome Chuo-ku Japan | PO Consulting and General Services Agreement | 75179 | Lyondell Greater China, Ltd.,Lyondell South Asia PTE Ltd. (Non-Debtor) | Service Agreements | 4/1/2003 | $0.00 | | |
| NIHON OXIRANE CO. LTD. Kanematsu Bldg, 4F, 14-1, Kyobashi 2 Chome, Chuo-Ku Tokyo , Japan 104-0031 | PO Sales and Purchase Agreements | 75178 | Lyondell Greater China, Ltd.;Lyondell South Asia PTE Ltd. (Non-Debtor) | Joint Development Agreements | 10/1/2003 | $11,981,074.66 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| NIHON OXIRANE CO. LTD. Kanematsu Bldg, 4F, 14-1, Kyobashi 2 Chome, Chuo-Ku Tokyo , Japan  104-0031 | Office Services Agreement | 40279 | Lyondell Asia Pacific, Ltd. | Service Agreements | 5/24/2004 | $0.00 | | |
| NIHON OXIRANE CO., LTD 2 Yanagiya Building, 12-8 Nihonbashi 1-chome, Chuo-ku Tokyo 103-0027 , Japan | License Agreement for PG Techn. | 15332 | Lyondell Chemical Technology, L.P. | License Agreement | 8/25/2003 | $0.00 | | |
| NIHON OXIRANE CO., LTD. No. 2 Yanagiya Bldg. 12-8 Mihonbashi 1-Chome Chuo-Ku , Tokyo, Japan 103-0027 | Propylene Oxide NOC Exchange | 51322 | Lyondell Greater China, Ltd.,Lyondell Greater China Holdings Ltd. Hong Kong Corp (Non-Debtor) | Exchange Agreements | 2/8/2008 | $0.00 | | |
| NINESIGMA 23611 Chagrin Blvd, Ste 320 Cleveland , OH  44122-5540 USA | Master Service Agreement | 40959 | Lyondell Chemical Company | Master Services Agreement | 6/18/2007 | $0.00 | | |
| NISSAN CHEMICAL INDUSTRIES, LTD 7-1, Kanda Nishiki-cho 3-chome Chiyoda-ku, Tokyo 104 , Japan | Joint Licensing Agreement | 90173 | Lyondell Petrochemical L.P. Inc. | License Agreement | 7/30/1996 | $0.00 | | |
| NISSEKI CHEMICAL TEXAS INC. 10500 Bay Area Blvd. Pasadena, TX  77507 USA | Nisseki Chemical_Channelview | 55644 | Lyondell Chemical Company | Sales Agreements | 1/1/2005 | $0.00 | | |
| NISSEKI CHEMICAL TEXAS INC. 10500 Bay Area Pasadena , TX  77507 USA | Nisseki Chemical Texas Inc._Channelview | 15506 | Equistar Chemicals, LP | Sales Agreements | 1/1/2008 | $0.00 | | |
| NOLTEX L.C.C. 12220 Strang Road LaPorte , TX  77571-9740 USA | Noltex LLC_La Porte | 45624 | Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 1/1/2008 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls LLC |
| NOLTEX L.C.C. 12220 Strang Road LaPorte , TX  77571-9740 USA | NOLTEX L.C.C._Olefins | 45614 | Equistar Chemicals, LP | Sales Agreements | 11/19/2007 | $0.00 | | |

86

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| NOLTEX LLC 12220 Strang Road La Porte , TX  77571 USA | Noltex LLC_La Porte | 76079 | Millennium Petrochemicals Inc. (Virginia) | Purchase and Sales Agreement | 1/1/2009 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls LLC |
| NORDENIA USA 14591 State Highway 177 Jackson, MO  63755 USA | Sales Agreement - HDPE, LDPE & Polyproplene Amendment No. 1 | 25786 | Equistar Chemicals, LP | Sales Agreements | 5/1/2007 | $0.00 | | |
| NORFOLK SOUTHERN 110 Franklin Rd. Roanoke , VA  24042-0041 USA | Rate Authority NSSC 88811 002-G-00 | 66581 | Millennium Specialty Chemicals Inc. | Transportation Agreements | 10/11/2008 | $27,844.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| NORFOLK SOUTHERN 110 Franklin Road, S.E. Roanoke , VA  24042-0041 USA | 100874 NS 89921 - Rail Freight (Polymers - direct) - Basell | 100874 | Basell North America Inc. | Transportation Agreements | 7/10/2008 | $199,422.90 | | |
| NORFOLK SOUTHERN 110 Franklin Road, S.E. Roanoke , VA  24042-0041 USA | 100873 NS 89233 - Rail Freight (Polymers) - Basell | 100873 | Basell USA Inc. | Transportation Agreements | 6/1/2008 | $5,566.96 | | |
| NORFOLK SOUTHERN RAILWAY CO. & CONSOLIDATED SUBSIDIARIES 110 Franklin Rd. SE Roanoke , VA  24042 USA | 100872 NS 19253 - Rail Freight (Polymers - Discount Off Tariff) - Equistar | 100872 | Lyondell Chemical Company | Transportation Agreements | 8/1/2005 | $97,949.98 | | |
| NORFOLK SOUTHERN RAILWAY CO. & CONSOLIDATED SUBSIDIARIES 110 Franklin Rd. SE Roanoke , VA  24042-0041 USA | 100871 NS 19247 - Rail Freight (Polymers) - Equistar | 100871 | Lyondell Chemical Company | Transportation Agreements | 8/1/2005 | $1,496,116.82 | | |
| NORFOLK SOUTHERN RAILWAY COMPANY Foster Plaza Bldg. II 425 Holiday Drive - Suite 300 Pittsburgh , PA  15220 USA | 66776_NS - ITA for Fairport Harbor | 66776 | USI Chemicals International Inc. | Transportation Agreements | 11/1/1981 | $0.00 | USI Chemicals International Inc. (Debtor) | Equistar Chemicals, LP |
| NORFOLK SOUTHERN RAILWAY COMPANY 110 Franklin Road, S.E. Roanoke , VA  24042-0041 USA | 66583_NS 19248 - Rail Contract - Chemicals - Lyondell Equistar | 66583 | Lyondell Chemical Company | Transportation Agreements | 8/1/2005 | $665,633.01 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| NORFOLK SOUTHERN RAILWAY COMPANY 110 Franklin Rd. SE Roanoke , VA 24042-0041 USA | 66509_NS - SIT Painesville, OH - Equistar | 66509 | Equistar Chemicals, LP | Lease Storage Agreements | 3/1/2001 | $0.00 | | |
| NORFOLK SOUTHERN RAILWAY COMPANY 110 Franklin Rd. SE Roanoke , VA 24042-0041 USA | 95756_NS - Lynchburg, VA - Equistar | 95756 | Equistar Chemicals, LP | Lease Storage Agreements | 11/1/2005 | $0.00 | | |
| NORFOLK SOUTHERN RAILWAY COMPANY 110 Franklin Rd. SE Roanoke , VA 24042-0041 USA | 95755_NS - Lawrenceburg, KY - Quantum | 95755 | Quantum Pipeline Company | Lease Storage Agreements | 9/16/1996 | $0.00 | Quantum Pipeline Company (Debtor) | Equistar Chemcials LP |
| NORFOLK SOUTHERN RAILWAY COMPANY 110 Franklin Rd. SE Roanoke , VA 24042-0041 USA | 95754_NS - Chatham, VA - Equistar | 95754 | Equistar Chemicals, LP | Lease Storage Agreements | 8/1/1991 | $0.00 | | |
| NORFOLK SOUTHERN RAILWAY COMPANY 110 Franklin Rd. SE Roanoke , VA 24042-0041 USA | 95753_NS - Catawba, NC - Equistar | 95753 | Equistar Chemicals, LP | Lease Storage Agreements | 7/21/2007 | $0.00 | | |
| NORFOLK SOUTHERN RAILWAY COMPANY & CONSOLIDATED SUBSIDIARIES (NS AND/OR RAILROAD) 110 Franklin Rd., SE Roanoke , VA 24042-0041 USA | 101170_NS 19249 - Rail Contract - Chemicals Highly Hazardous | 101170 | Lyondell Chemical Company | Freight/Shipping Related Contracts | 8/1/2005 | $198,966.47 | | |
| NORFOLK SOUTHERN RATE AUTHORITY 110 Franklin Rd., SE Roanoke , VA 24042-0041 USA | Norfolk Southern Rate Authority 64802 (file no. NSRQ 4334) | 100879 | Basell USA Inc. | Transportation Agreements | 8/1/2008 | $163,858.27 | | |
| NORFOLK SOUTHERN RATE AUTHORITY 110 Franklin Rd., SE Roanoke , VA 24042-0041 USA | 100878 NS 90697 - Rail Freight (Polymers) - SEP | 100878 | LyondellBasell Advanced Polyolefins USA Inc. | Transportation Agreements | 4/12/2008 | $0.00 | | |
| NORFOLK SOUTHERN RATE AUTHORITY 110 Franklin Rd., SE Roanoke , VA 24042-0041 USA | 100877 NS 90676 - Rail Freight (Polymers - direct) - Basell | 100877 | Basell USA Inc. | Transportation Agreements | 7/10/2008 | $62,334.00 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| NORFOLK SOUTHERN RATE AUTHORITY 110 Franklin Rd., SE Roanoke , VA  24042-0041 USA | 100876 NS 90676 - Rail Freight (Polymers - M&E) - Basell | 100876 | Basell USA Inc. | Transportation Agreements | 7/15/2008 | $0.00 | | |
| NORFOLK SOUTHERN RATE AUTHORITY 110 Franklin Rd., SE Roanoke , VA  24042-0041 USA | 100875 NS 89921 - Rail Freight (Polymers-BPRR) - Basell | 100875 | Basell USA Inc. | Transportation Agreements | 7/10/2008 | $0.00 | | |
| NORTHVILLE PRODUCT SERVICES, LP P.O. Box 2937 Melville, NY  11747 USA | RST-05292 | 66603 | Houston Refining LP | Sales Agreements | 11/1/2008 | $0.00 | | |
| NORTHVILLE PRODUCT SERVICES, LP P.O. Box 2937 Melville, NY  11747 USA | Exchange Agreement | 76638 | Houston Refining LP | Exchange Agreements | 4/1/2005 | $70,648.75 | | |
| NORTHWEST ANALYTICAL INC P.O. Box 40164 Portland , OR  97240-0164 USA | Purchase Order | 100130 | Lyondell Chemical Company | Maintenance Agreements | 10/1/2008 | $0.00 | | |
| NOTOX B.V. Hambakenwetering 7,5231 DD 's - Hertogenbosh, Netherlands | Master Laboratory Contract | 41352 | Equistar Chemicals, LP;Equistar Funding Corporation;Houston Refining LP;Lyondell Chemical Company;Millennium Petrochemicals Inc. (Virginia) | Research Agreements | 11/1/2008 | $5,193.96 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls, LLC |
| NOVA CHEMICALS INC. 1550 Coraopolis Heights Rd Moon Township , PA 15108 USA | Nova_Channelview | 31203 | Lyondell Chemical Company | Manufacturing Agreement | 7/27/1990 | $0.00 | | |
| NOVA CHEMICALS INC. 1550 Coraopolis Heights Road Moon Township , PA 15108 USA | Nova Chemicals_Channelview | 50386 | Lyondell Chemical Company | Exchange Agreements | 4/1/2001 | $0.00 | | |
| NOVA CHEMICALS, INC 1550 Coraopolis Heights Rd Moon Township , PA 15108 USA | Contract for Sale of Polymers | 15493 | Equistar Chemicals, LP | Sales Agreements | 1/1/2007 | $0.00 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| NOVEON, INC. 9911 Brecksville Road Cleveland , OH 44141-3247 USA | Noveon, Inc._La Porte | 65675 | Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 6/1/2005 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls LLC |
| NOVEON, INC. AND LUBRIZOL, INC. 9911 Brecksville Rd Cleveland , OH 44141 USA | Lubrizol, Inc_Channelview | 40914 | Equistar Chemicals, LP | Sales Agreements | 6/1/2006 | $0.00 | | |
| NOVIDESA S.A. DE C.V. Bosque de Radiatas No. 34 Cauajimalpa Morelos , Mexico 5120 | Novidesa_Channelview | 75872 | Lyondell Chemical Company | Sales Agreements | 6/1/2008 | $0.00 | | |
| NOVOLEN TECHNOLOGY HOLDINGS C.V. Oostduinlaan 75 2596 JJ The Hague , The Netherlands | RESEARCH, DEVELOPMENT AND TECHNICAL SERVICES AGREEMENT(2007) | 45082 | Equistar Chemicals, LP | Research Agreements | 5/16/2007 | $0.00 | | |
| OATEY COMPANY 4700 W. 160th St. Cleveland , OH 44135 USA | Oatey_Channelview | 25889 | Lyondell Chemical Company | Sales Agreements | 2/1/2002 | $0.00 | | |
| OCCIDENTAL CHEMICAL CO. Occidental Tower, 500 LBJ Pkwy. Dallas , TX 75244 USA | Oxy - Dech Plus - #2003-C-0021 | 95541 | Lyondell Chemical Company | Supply Agreements | 11/11/2003 | $0.00 | | |
| OCCIDENTAL CHEMICAL CORPORATION 5005 LBJ Freeway Dallas , TX 75244 USA | Occidental Chemical Corporation_Olefins | 40386 | Equistar Chemicals, LP | Sales Agreements | 5/15/1998 | $0.00 | | |
| OCCIDENTAL CHEMICAL CORPORATION 5005 LBJ Freeway Dallas , TX 75244 USA | Occidental Chemical Corporation _Olefins | 60354 | Equistar Chemicals, LP | Settlement Agreement | 4/1/2004 | $0.00 | | |
| OCEANWIDE INC. 8200 NW 33 St. Suite 316 Doral , FL 33122 USA | Services Agreement | 50026 | Lyondell Chemical Company | Service Agreements | 9/20/2007 | $0.00 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| OIL PRICE INFORMATION SERVICE 11300 Rockville Pike, ste 1100 Rockville , MD 20852-3030 USA | OPIS Rack Prices subscription agreement | 40323 | Lyondell Chemical Company | Subscription Agreement | 3/1/2004 | $0.00 | | |
| OILTANKING STOLTHAVEN ANTWERP N.V. Scheldelaan 450 Haven 623 2040 Antwerp , Belgium | Umbrella Contract | 101052 | Millennium Petrochemicals Inc. (Virginia); Lyondell Chemie Nederland B.V. (Non-Debtor); Lyondell Chimie France SAS (France) (Non-Debtor) | Terminal Agreements | 5/1/2008 | $81,802.00 | Millennium Petrochemicals Inc.(Virginia) | Lyondell Chemie Nederland b.v. |
| OLD WORLD INDUSTRIES 4065 Commericial Avenue Northbrook, IL 60062 USA | Old World Industries_BCO | 55576 | Equistar Chemicals, LP | Exchange Agreements | 4/1/2008 | $0.00 | | |
| OLEFINS JV, LP 1221 McKinney Houston , TX 77010 USA | Ground Lease | 70702 | Equistar Chemicals, LP | Lease | 3/31/2003 | $0.00 | | |
| OLIN CORPORATION 190 Carondelet Plaza, Suite 1530 Clayton , MO 63105 USA | Patent Cross-License Agreement: DMC | 5076 | Lyondell Chemical Technology, L.P. | License Agreement | 1/30/1995 | $0.00 | | |
| OLIN CORPORATION 190 Carondelet Plaza, Suite 1530 Clayton , MO 63105 USA | Patent Cross-License Agreement: DMC + Polymer/Polyol | 5073 | Lyondell Chemical Technology, L.P. | License Agreement | 1/30/1995 | $0.00 | | |
| OMNOVA SOLUTIONS INC 175 Ghent Rd Fairlawn , OH 44333 USA | OMNOVA Solutions Inc_Channelview | 10743 | Equistar Chemicals, LP | Sales Agreements | 1/1/2008 | $0.00 | | |
| OPTIMENERGY 225 E. John Carpenter Suite 1500, Tower II Irving , TX 75062 USA | Steam and Electric Power Sales Agreement | 66693 | Lyondell Chemical Company | Sales Agreements | 9/6/2005 | $959,033.52 | | |
| OPTIMUM LOGISTICS LTD. 301 North Harrison St. Princeton , NJ 08540 USA | Lyondell Chemical Company and Optimum Logistics Ltd. | 50059 | Lyondell Chemical Company | Service Agreements | 2/1/2001 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| ORACLE CORPORATION P.O.Box 71028 Chicago , IL  60694-1028 USA | PO-a1145 | 15906 | LyondellBasell Advanced Polyolefins USA Inc. | Purchase Agreements | 8/11/2007 | $0.00 | | |
| ORACLE CORPORATION 500 Oracle Parkway Redwood Shores, CA 94065 USA | ORACLE LICENSE AND SERVICES AGREEMENT | 45327 | Lyondell Chemical Company | License Agreement | 5/28/2004 | $0.00 | | |
| ORACLE CORPORATION 500 Oracle Parkway Redwood Shores, CA 94065 USA | LETTER - ORACLE PRODUCT | 55950 | Lyondell Chemical Company | Service Agreements | 11/26/2008 | $9,349.01 | | |
| ORACLE USA, INC 500 Oracle Parkway Redwood Shores, CA 94065 USA | Oracle Hyperion | 66908 | Lyondell Chemical Company | Purchase Agreements | 12/30/1998 | $4,373.22 | | |
| ORACLE USA, INC 500 Oracle Parkway Redwood Shores, CA 94065 USA | Oracle Crystal Ball | 66907 | Lyondell Chemical Company | Purchase Agreements | 1/18/2007 | $7,921.10 | | |
| ORACLE USA, INC 500 Oracle Parkway Redwood Shores, CA 94065 USA | Oracle License and Services Agreement | 66906 | Lyondell Chemical Company | Purchase Agreements | 11/26/2008 | $3,607.40 | | |
| ORACLE USA, INC. 500 Oracle Parkway Redwood City, CA  94065 USA | Oracle Purchase Agreement | 95128 | Lyondell Chemical Company | Purchase Agreements | 5/30/2007 | $0.00 | | |
| ORACLE USA, INC. 500 Oracle Parkway Redwood City, CA  94065 USA | Assigment and Certification | 95120 | Lyondell Chemical Company | Assignment Agreements | 5/23/2007 | $0.00 | | |
| ORACLE USA, INC. 500 Oracle Parkway Redwood City, CA  94065 USA | Blanket Order 4900000013 | 95110 | Houston Refining LP | Maintenance Agreements | 10/30/2007 | $0.00 | | |
| ORREX PLASTIC COMPANY, LLC 2800 S. Orrex Ave Odessa , TX  79760-4269 USA | Toll Operator Contract | 15907 | Basell USA Inc. | Service Agreements | 8/18/2005 | $142,898.79 | | |

92

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| OTTO ENVIRONMENTAL SYSTEMS NORTH AMERICA, INC. 12700 General Drive Charlotte , NC  28273 USA | Alathon M4855 Supply Agreement | 80458 | Equistar Chemicals, LP | Sales Agreements | 1/1/2009 | $0.00 | | |
| OVATION DATA SERVICES, INC. 14199 Westfair East Drive Houston , TX  77041 USA | Acceptance Form | 75652 | Lyondell Chemical Company | Service Agreements | 9/28/2008 | $0.00 | | |
| OXEA CORPORATION 1505  West LBJ Freeway,m Suite 400 Dallas , TX  75234 USA | Oxea Corporation_Light Olefins | 100978 | Equistar Chemicals, LP | Sales Agreements | 1/1/2008 | $0.00 | | |
| OXEA CORPORATION 1505  West LBJ Freeway,m Suite 400 Dallas , TX  75234 USA | Oxea Corporation_Light Olefins | 65700 | Equistar Chemicals, LP | Sales Agreements | 1/1/2007 | $0.00 | | |
| OXEA CORPORATION 1603 West LBJ Freeway Dallas , TX  75381 USA | Oxea Corporation_Olefins | 70496 | Equistar Chemicals, LP | Sales Agreements | 3/1/2007 | $0.00 | | |
| OXEA CORPORATION 1505  West LBJ Freeway,m Suite 400 Dallas , TX  75234 USA | Oxea Corporation_Light Olefins | 10798 | Equistar Chemicals, LP | Sales Agreements | 1/1/2000 | $0.00 | | |
| OXEA CORPORATION 1505  West LBJ Freeway,m Suite 400 1505  West LBJ Freeway,m Suite 400 Dallas , TX  75234 USA | Oxea Corporation_Light Olefins | 25424 | Equistar Chemicals, LP | Sales Agreements | 3/1/2007 | $0.00 | | |
| OXEA CORPORATION 1505  West LBJ Freeway, Suite 400 1505  West LBJ Freeway, Suite 400 Dallas , TX  75234 USA | Oxea Corporation_Light Olefins | 25206 | Equistar Chemicals, LP | Sales Agreements | 6/1/2004 | $0.00 | | |
| OXID, L.P. 1177 West Loop South, Suite 1700 Houston , TX  77027 USA | Oxid, L.P._BCO | 60323 | Equistar Chemicals, LP | Sales Agreements | 11/1/2002 | $0.00 | | |

93

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| OXITENO ANDIANA, C.A. Calle Guaicaipuro con Calle Mohedano, Torre Hener, tercer piso, oficina No. 3-A, EL Rosal Caracas , Venezuela | Oxiteno Andina SA_Bayport Channelview | 55525 | Lyondell Chemical Company | Sales Agreements | 3/1/2008 | $105,295.25 | | |
| OXITENO MEXICO SA DE CV (CANAMEX) Insurgentes Sur # 1684; Piso 11  A; Colonia Guadalupe Inn Mexico , Mexico, D.F. 1020 | Oxiteno Mexico SA_Bayport Channelview | 86085 | Lyondell Chemical Company | Sales Agreements | 1/1/2007 | $0.00 | | |
| OXITENO SA INDUSTRIA E COMMERCIO Avenida Brig. Luis Antonio 1343, 7a. 01317-910 San Paulo , Brazil | Oxiteno SA Industria e Commercio_La Porte | 51334 | Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 1/1/2008 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls LLC |
| OXYDE CHEMICALS, INC. 225 Pennbright Dr., Suite 101 Houston , TX  77090 USA | Oxyde Chemicals, Inc._BCO | 80448 | Lyondell Chemical Company,Equistar Chemicals, LP | Exchange Agreements | 1/1/2008 | $0.00 | | |
| PADANAPLAST USA, INC. 3220 Crocker Ave Sheboygan , WI  53801 USA | Amendment No. 1 | 40991 | Equistar Chemicals, LP | Sales Agreements | 1/1/2006 | $0.00 | | |
| PAISLEY CONSULTING, INC. 400 Cokato Street E. Cokato , MN  55321 USA | Annual Support for 43 AutoAudit Windows Licenses | 60216 | Equistar Chemicals, LP;Lyondell Chemical Company | License Agreement | 1/1/2009 | $0.00 | | |
| PANJIN ZHEN'AO CHEMICAL INDUSTRY CO., LTD 426 Liaohe North Road, Shuangtaizi District, Panjin City, Liaoning Province, P.R. China 1240000 | License Agreement | 20273 | Lyondell Chemical Company | License Agreement | 3/20/2007 | $0.00 | | |
| PARAGON DECISION TECHNOLOGY 5400 Carillon Point Kirkland , WA  98033 USA | Q/2007/12/U701 License for Use by Lyondell | 60226 | Lyondell Chemical Company | License Agreement | 1/1/2008 | $0.00 | | |
| PARAMETER MEASUREMENT INC. 611 9th St. San Leon , TX  77539 USA | Purchase Agreement | 95121 | Lyondell Chemical Company | Purchase Agreements | 2/1/2008 | $0.00 | | |

94

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| PARKE TOLL PACKAGING 3493 Rupp Pkwy Decantur, IL 62526 USA | Toll Processing Agreement | 15594 | Equistar Chemicals, LP | Processing Agreement | 1/1/2008 | $0.00 | | |
| PAS INC. 16055 Space Center Blvd. Suite 600 Houston, TX 77062 USA | PAS Software License Agreement and Warranties | 66868 | Lyondell Chemical Company | License Agreement | 11/18/2005 | $0.00 | | |
| PASADENA INDEPENDENT SCHOOL DISTRICT 1515 Cherry Brook Pasadena, TX 77523 USA | Foreign Trade Zone Agreement for the Payment of AD VALOREM Taxes | 66716 | Lyondell Refining Company LLC | Tax Related Agreements | 11/4/1997 | $0.00 | | |
| PASADENA INDEPENDENT SCHOOL DISTRICT 1515 Cherry Brook Pasadena, TX 77523 USA | Foreign Trade Zone Agreement for the Payment of Ad Valorem Taxes | 51018 | Lyondell Refining Company LLC | Tax Related Agreements | 7/26/1999 | $0.00 | | |
| PAVILION TECHNOLOGIES, INC. 10415 Morado Circle, Bldg. III, Suite 100 Austin, TX 78759 USA | MASTER LICENSE AGREEMENT | 55955 | Equistar Chemicals, LP;Houston Refining LP;Lyondell Chemical Company;Millennium Petrochemicals Inc. (Virginia) | License Agreement | 9/30/2004 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls, LLC |
| PCK RAFFINERIE GMBH Passower Chasussee 111 16303 Schwedt/Oder Germany | PCK Raffinerie GmbH _La Porte | 66340 | Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 7/1/2008 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls LLC |
| PDG CHEMICALS INC. 5005 LBJ Freeway Dallas, TX 75244 USA | PDG Chemicals Inc._Beaumont | 65151 | Equistar Chemicals, LP | Assignment Agreements | 5/15/1998 | $0.00 | | |
| PDVSA-PETROLEO S.A. Avenida Libertador, Edifcio Petroleos de Venezuela Torre Oeste Piso 7, La Campina Caracas 1060-A Venezuela | Crude Oil Sales Agreement | 65512 | Houston Refining LP | Supply Agreements | 8/1/2006 | $0.00 | | |
| PE BIOSYSTEMS, INC 3833 North First Street San Jose, CA 95134 USA | INDEPENDENT CONTRACTOR AGREEMENT | 76290 | Basell USA Inc. | Service Agreements | 12/20/1999 | $0.00 | | |

95

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| PECHINEY PLASTIC PACKAGING, INC. 8770 West Bryn Mawr Avenue Chicago, IL  60631-3657 USA | Contract for Sale of Polymers | 90417 | Equistar Chemicals, LP | Sales Agreements | 8/1/2004 | $0.00 | | |
| PENN CHEMICAL COMPANY LLC 426 Freeport Road Creighton, PA  15030 USA | LICENSE AGREEMENT | 75454 | Lyondell Chemical Technology, L.P. | License Agreement | 3/1/1999 | $0.00 | | |
| PENN SPECIALTY CHEMICALS, INC. 1000 Germantown Pike Plymouth Meeting, PA 19462 USA | PTMEG License Agreement | 5282 | Lyondell Chemical Technology, L.P. | License Agreement | 7/9/2001 | $0.00 | | |
| PENN SPECIALTY CHEMICALS, INC. 3324 Chelsea Avenue Memphis, TN  38108 USA | THF License Agreement | 5279 | Lyondell Chemical Technology, L.P. | License Agreement | 3/1/1999 | $0.00 | | |
| PENSION BENEFIT GUARANTY CORPORATION 1200 K. Street, N.W. Suit 270 Washington, DC  20005 USA | Settlement Agreement with PBGC | 46034 | Lyondell Chemical Company | Pension/Benefits/Medical-Related Agreements | 7/22/1998 | $0.00 | | |
| PEOPLES GAS SYSTEM 702 Franklin St P.o. Box 2562 Tampa, FL  33601-2562 USA | 6th Amendment to Pipeline Capacity Release Agreement | 11810 | Millennium Specialty Chemicals Inc. | Pipeline Agreements | 1/1/2008 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| PEOPLES GAS SYSTEM 702 Franklin Street Tampa, FL  33601-2562 USA | Gas Transportation Agreement | 6155 | Millennium Specialty Chemicals Inc. | Transportation Agreements | 1/1/2004 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| PERGAN MARSHALL LLC 710-A Bussey Road Marshall, TX  75670 USA | Pergan_Bayport | 75873 | Lyondell Chemical Company | Sales Agreements | 4/1/2008 | $0.00 | | |
| PETROCEL: DAK AMERICAS-PRODUCTORA DE TEREFTALATOS DE ALTAMIRA, S.A. DE C.V. Belisario Dominguez 2002 Col. Obispado Monterrey, N.L. , Mexico C.P.  64060 | DAK Americas LLC Productora de Tereftalatos de Altamira, S.A. de C.V._La Porte | 15522 | Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 1/1/2008 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls LLC |

96

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| PETROCOM ENERGY GROUP LLC. 1330 Post Oak Blvd, Suite 2350 Houston , TX 77056 USA | RST-04267 | 66604 | Houston Refining LP | Sales Agreements | 6/1/2008 | $0.00 | | |
| PETROCOM ENERGY GROUP LTD 1330 Post Oak Blvd, Suite 2350 Houston , TX 77056 USA | RST-2826 | 66611 | Houston Refining LP | Sales Agreements | 1/1/2007 | $0.00 | | |
| PETROFLEX INDUSTRIA E COMERCIO S. A. RUA MARUMBI, 600 CAMPOS ELISEOS DUQUE DE CAXIAS RIO JANEIRO , BRAZIL | Petroflex Industria_Channe lview | 55647 | Lyondell Chemical Company | Sales Agreements | 1/1/2005 | $0.00 | | |
| PETROHAWK ENERGY CORPORATION 6100 S. Yale, Suite 500 Tulsa , OK 74136 USA | Oil and Gas Lease | 86022 | Millennium Petrochemicals Inc. (Virginia) | Lease | 11/19/2008 | $0.00 | Millennium Petrochemic als Inc.(Virginia ) | Lyondellba sell Acetyls, LLC |
| PILOT TRAVEL CENTERS LLC P.O. Box 10146 Knoxville , TN 37939-0146 USA | RST-01377 | 66612 | Houston Refining LP | Sales Agreements | 11/1/2006 | $0.00 | | |
| PIRA ENERGY GROUP 3 Park Avenue, 26th Floor New York , NY 10016-5989 USA | PIRA Residual Fuel Study | 80944 | Lyondell Chemical Company | Consulting Agreements | 2/1/2007 | $0.00 | | |
| PIRA ENERGY GROUP 3 Park Ave, 26th Floor New York , NY 10016 USA | PIRA Middle Distillate Study | 40318 | Lyondell Chemical Company | Consulting Agreements | 1/1/2008 | $0.00 | | |
| PIRA ENERGY GROUP, INC. 3 Park Ave, 26th Floor New York , NY 10016 USA | License Agreement for database | 40317 | Lyondell Chemical Company | License Agreement | 8/1/2008 | $0.00 | | |
| PITT PLASTICS, INC. 1400 Atkinson Venue Pittsburgh , KS 66762 USA | Contract for Sale of Polymers | 100488 | Equistar Chemicals, LP | Sales Agreements | 7/1/2008 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| PLANT AUTOMATION SERVICES, INC 16511 Space Center Blvd Suite 120 Houston , TX 77573 USA | License and Joint Development Agreement | 90651 | Houston Refining LP | Software Agreements | 3/25/1999 | $0.00 | | |
| PLASTIC CONTAINER CORPORATION 2508 North Oak Street Urbana, IL 61802 USA | AMENDMENT 2 | 55699 | Equistar Chemicals, LP | Sales Agreements | 12/1/2002 | $0.00 | | |
| PLASTIC OMNIUM AUTO EXTERIOR LLC 1050 Wilshire Drive, Suite 170 Troy , MI 48084 USA | Consignment Agreement | 50821 | Basell USA Inc. | Sales Agreements | 12/1/2008 | $0.00 | | |
| PLASTIC OMNIUM AUTO EXTERIOR LLC 1050 Wilshire Drive, Suite 170 Troy , MI 48084 USA | Consignment Agreement | 60340 | Basell USA Inc. | Sales Agreements | 12/1/2008 | $0.00 | | |
| PLASTICS ENTERPRISES COMPANY, INC. 401 Southeast Thompson Drive Lee's Summit , MO 64082 USA | Contract for Sale of Polymers | 80414 | Equistar Chemicals, LP | Sales Agreements | 1/1/2008 | $0.00 | | |
| PO JV, LP 1221 McKinney, Suite 700 Houston , TX 77010 USA | Bayer_JV | 71063 | Lyondell Chemical Company | Lease | 3/31/2000 | $0.00 | | |
| PO JV, LP 1221 McKinney, Suite 700 Houston , TX 77010 USA | Bayer_JV | 71056 | Lyondell Chemical Company | Financing Agreements | 3/31/2000 | $0.00 | | |
| PO JV, LP 1221 McKinney St. Houston , TX 77010 USA | Bayer_JV | 71052 | Lyondell Chemical Company | Financing Agreements | 3/31/2000 | $0.00 | | |
| PO JV, LP Two Greenville Crossing 4001 Kennett Pike, Suite 220 Greenville , DE 19807 USA | Bayer_JV | 71045 | Lyondell Chemical Company | Service Agreements | 3/31/2000 | $0.00 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| PO JV, LP 1221 McKinney, Suite 700 Houston , TX 77010 USA | Bayer_JV | 71042 | Lyondell Chemical Company | Lease | 3/31/2000 | $0.00 | | |
| POLARIS INDUSTRIES 7290 Viking Boulevard East Wyoming , MN 55092 USA | Letter Agreement | 85691 | Equistar Chemicals, LP | Sales Agreements | 1/1/2007 | $0.00 | | |
| POLY-AMERICA, L.P. 2000 W. Marshall Drive Grand Prairie , TX 75051 USA | Contract #40002601 | 85696 | Equistar Chemicals, LP | Purchase Agreements | 1/1/2007 | $0.00 | | |
| POLYEXCEL LLC Bldg.A-16A, Freeport Center Clearfield , UT 84016 USA | Guarantee | 35905 | Basell USA Inc. | Guaranty | 4/13/2004 | $0.00 | | |
| POLYMERS INTERNATIONAL Grand Bahama Island, Queens Highway Freeport  , Bahamas | Polymers International_Channelview | 75272 | Lyondell Chemical Company | Sales Agreements | 7/1/2001 | $0.00 | | |
| POLYMERS INTERNATIONAL Grand Bahama Island Bahamas  , Bahamas | Polymers International_Channelview | 10782 | Lyondell Chemical Company | Sales Agreements | 6/1/2006 | $0.00 | | |
| PORT OF HOUSTON AUTHORITY 111 East Loop North Houston , TX 77029 USA | Grantee/Subzone Operator Agreement | 66704 | Equistar Chemicals, LP | Tax Related Agreements | 4/28/1998 | $0.00 | | |
| POSM DELAWARE INC. Three Christina Centre, Suite 902 201 North Walnut St Wilmington , DE 19801 USA | Partnership Agreement | 16051 | Lyondell Chemical Company | Joint Development Agreements | 7/25/1990 | $0.00 | | |
| POSM II LIMITED PARTNERSHIP, L.P. Three Christina Centre, Suite 902 201 North Walnut St Wilmington , DE 19801 USA | Land Lease Agreement | 16042 | Lyondell Chemical Company | Lease | 9/18/1992 | $0.00 | | |

99

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| POTLATCH CORPORATION P.O. Box 1016 Lewiston , Idaho 83501 USA | Crude Turpentine Purchase Agreement | 11819 | Millennium Specialty Chemicals Inc. | Purchase Agreements | 1/1/1997 | $4,430.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| POTLATCH CORPORATION Highway 4, near Rohwer, P.O. Box 727 McGehee , AR 71654-0727 USA | Crude Turpentine Purchase Agreement | 50666 | Millennium Specialty Chemicals Inc. | Purchase Agreements | 7/1/1998 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| POTLATCH FORREST PRODUCTS CORPORATION 805 Mills Road Lewiston , ID 83501 USA | CONTRACT FOR SALE OF POLYMERS CONTRACT #40004802 | 55566 | Equistar Chemicals, LP | Sales Agreements | 1/1/2008 | $0.00 | | |
| PPG INDUSTRIES One PPG Place Pittsburgh , PA 15272 USA | PPG_Channelview | 95652 | Lyondell Chemical Company | Sales Agreements | 10/1/1991 | $0.00 | | |
| PPG INDUSTRIES, INC. PPG Place Pittsburgh , PA 15272 USA | PPG_Solvents | 90428 | Lyondell Chemical Company | Sales Agreements | 1/1/2004 | $0.00 | | |
| PRAIRIE SAND AND GRAVEL INC PO Box 210 Prairie du Chien , WI 53821 USA | 95757_Prairie Sand & Gravel - Lease Track - Basell | 95757 | Basell USA Inc. | Lease Storage Agreements | 1/18/2008 | $0.00 | | |
| PRAXAIR, INC 39 Old Ridgebury Rd Danbury , CT 06810-5113 USA | Hydrogen Supply Agreement | 15947 | Houston Refining LP | Purchase and Sales Agreement | 4/1/1996 | $0.00 | | |
| PREGES CORP 1650 lake Cook Rd, Suite 400 Deerfield , IL 60015 USA | Letter Agreement - Authorization Form | 10961 | Equistar Chemicals, LP | Sales Agreements | 10/1/2006 | $0.00 | | |
| PRESTOLITE WIRE CORPORATION 200 Galleria Off-center Southfield , MI 48034 USA | Sales Agreement | 70521 | Equistar Chemicals, LP | Sales Agreements | 7/1/2006 | $0.00 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| PRESTONE PRODUCTS CORPORATION 39 Old Ridgebury Rd Danbury , CT 06810-5109 USA | Prestone Products Corporation LM6007, LP 5002 Amendment No. 5 | 65661 | Equistar Chemicals, LP | Sales Agreements | 4/1/2006 | $0.00 | | |
| PRETIUM PACKAGING 8112 Maryland Ave., Ste. 250 St. Louis , MO 63105 USA | Amendment No. 2 | 80495 | Equistar Chemicals, LP | Sales Agreements | 10/1/2008 | $0.00 | | |
| PRICEWATERHOUSEC OOPERS AG Moskauer StraÃŸe 10 Dusseldorf , 40227 Germany | Counsultancy Agreement for annual accounts 2008 | 41628 | Basell Germany Holdings GmbH | Consulting Agreements | 12/1/2008 | $0.00 | | |
| PRIDE SOLVENTS & CHEMICALS COMPANY OF NY 6 Long Island Avenue Holtsville , NY 11742 USA | Pride Solvents & Chemicals Company of NY_Distribution | 6170 | Equistar Chemicals, LP;Lyondell Chemical Company;Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 1/1/2008 | $0.00 | Millennium Petrochemic als Inc.(Virginia) | 1-Lyondell Chemical Company |
| PRIMATECH INC 50 Northwoods Boulevard Columbus , OH 43235 USA | Software license | 35351 | Lyondell Chemical Company | Purchase Agreements | 1/31/2005 | $0.00 | | |
| PRIMAVERA SYSTEMS INC. Three Bala Plaza West Bala Cynwyd, PA 19004 USA | Software License Agreement | 16146 | Lyondell Chemical Company | Software Agreements | 11/29/2005 | $0.00 | | |
| PRINTPACK INC. 2800 Overlook Pky. Atlanta , GA 30339 USA | Polymers Sales Agreement | 101213 | Equistar Chemicals, LP | Sales Agreements | 5/11/2009 | $0.00 | | |
| PROCESS DATA CONTROL CORP.PDC 903-D Medical Centre Drive Arlington , TX 76012 USA | Purchase Order | 35350 | Lyondell Chemical Company | Purchase Agreements | 5/1/2008 | $0.00 | | |
| PROCTER & GAMBLE 1 Procter & Gamble Plaza 301 East Sixth St Cincinnati , OH 45202 USA | Proctor and Gamble Manufacturing Co._Bayport Lyondell Operations | 66875 | Lyondell Chemical Company | Supply Agreements | 1/1/2008 | $0.00 | | |
| PROFESSIONAL BOOKKEEPING SERVICES, SL Avda, Diagonal, 575 6, Edifici L'iLLA 08029 Barcelona, Spain | Consulting Agreements | 5285 | Lyondell Chemical Espana Co. | Consulting Agreements | 4/9/2001 | $0.00 | | |

# Schedule 1

### Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| PROMENS NORTH AMERICA 51703 Packard Drive Middlebury, IN 46540 USA | Contract for Sale of Polymers | 76084 | Equistar Chemicals, LP | Purchase and Sales Agreement | 1/1/2009 | $0.00 | | |
| PRUDENTIAL ALMON REALTY COMMERCIAL 111 South 33rd Street, Suite 200 Yakima, WA 98901 USA | 95744_BNSF - Yakima, WA - Equistar | 95744 | Lyondell Chemical Company | Lease Storage Agreements | 12/1/2003 | $0.00 | | |
| PRUDENTIAL BACHE COMMODITIES, LLC ONE NEW YORK PLAZA 13th Floor New York City, NY 10292 USA | Agreement | 90795 | Houston Refining LP | Service Agreements | 9/24/2007 | $0.00 | | |
| PRYSMIAN POWER CABLES & SYSTEMS USA, LLC 700 Indistrial Drive Lexington, SC 29072 USA | Letter Confirmation of Polymers Sales Agreement | 10989 | Equistar Chemicals, LP | Purchase and Sales Agreement | 4/1/2007 | $0.00 | | |
| PURCHASING POWER, LLC 695 Pylant Street, N.E. Atlanta, GA 30306 USA | Purchasing Power Agreement | 85974 | Lyondell Chemical Company | Pension/Benefits/Medical-Related Agreements | 8/11/2008 | $0.00 | | |
| PURVIN & GERTZ 600 Travis, Ste. 2150 Houston, TX 77002-2979 USA | Purvin & Gertz Petroleum Study--restructuring cost | 101197 | Lyondell Chemical Company | Subscription Agreement | 6/4/2009 | $0.00 | | |
| PVC CONTAINER CORPORATION 2 Industrial Way W Eatontown , NJ 07724 USA | Sales Agreement - Polymer with Amendments No. 1, 2 and 3 | 25780 | Equistar Chemicals, LP | Sales Agreements | 5/1/2008 | $0.00 | | |
| QCS PURCHASING, LLC 1600 Essex Avenue DeLand, FL 32721 USA | QCS Purchasing | 85715 | Equistar Chemicals, LP | Sales Agreements | 6/1/2008 | $0.00 | | |
| QUADRANT EPP USA, INC. 2120 Fairmont Avenue Reading , PA 19612 USA | Contract for Sale of Polymers | 66567 | Equistar Chemicals, LP | Sales Agreements | 1/1/2007 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| QUALITY CULVERT INC. 25726 CR 561, PO Box 435 Astatula, FL 34705-0435 USA | Quality Culvert, Inc. | 40992 | Equistar Chemicals, LP | Sales Agreements | 3/1/2007 | $0.00 | | |
| QUALITY GRINDING AIDS INC 626 West Alabama Houston, TX 77006 USA | Quality Grinding_Solvents | 90358 | Lyondell Chemical Company | Sales Agreements | 7/1/2004 | $0.00 | | |
| QUEST RELIABILITY LLC 2465 Central Ave, Suite 110 Boulder , CO 80301 USA | Purchase Order | 76564 | Lyondell Chemical Company | Sales Agreements | 1/1/2007 | $0.00 | | |
| QUEST SOFTWARE INC. 5 Polaris Way Aliso Viejo, CA 92656 USA | TRANSACTION PRODUCT AGREEMENT | 55843 | Lyondell Chemical Company | Purchase Agreements | 2/2/2009 | $0.00 | | |
| QUEST SOFTWARE INC. 5 Polaris Way Aliso Viejo, CA 92656 USA | Purchase Order 4400911299 | 60330 | Lyondell Chemical Company | Maintenance Agreements | 7/31/2008 | $0.00 | | |
| QUEST SOFTWARE INC. 5 Polaris Way Aliso Viejo, CA 92656 USA | Quest Software, Inc. Software License Agreement | 50020 | Lyondell Chemical Company | Software Agreements | 8/27/2007 | $6,021.86 | | |
| QUEST SOFTWARE, INC. 5 Polaris Way Aliso Viejo, CA 92656 USA | Software License Agreement | 100096 | Lyondell Chemical Company | License Agreement | 8/18/2008 | $4,461.79 | | |
| QUEST SOFTWARE, INC. 5 Polaris Way Aliso Viejo, CA 92656 USA | Professional Services Contract | 100095 | Lyondell Chemical Company | Service Agreements | 9/16/2008 | $0.00 | | |
| QUIMICA PUMEX S. A. DE C.V. Libramiento Noroeste Km. 12.8 Garcia, Nuevo Leon C.P. 66000 Mexico | Quimica Pumex SA de CV_Bayport Channelview | 35752 | Lyondell Chemical Company | Sales Agreements | 1/1/2006 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| QUIMICA PUMEX S.A. DE C.V. Libramiento Noroester KM 12.8, Garcia nuevo Leon 66000, Mexico | Quimica Pumex_Solvents | 5676 | Equistar Chemicals, LP | Sales Agreements | 1/1/2007 | $0.00 | | |
| QWEST CORPORATION 1801 California St. #900 Denver , CO  80202 USA | Qwest ISDN PRS/DSS Advanced Spring Action Offer | 35363 | Equistar Chemicals, LP | Service Agreements | 6/6/2008 | $4,810.55 | | |
| R & K FARMS 3233 Harpers Ferry Corpus Christi , TX 78410 USA | Farming License Agreement Amendment No 2 | 60565 | Equistar Chemicals, LP | Lease | 1/1/2005 | $0.00 | | |
| RADIO FREQUENCY SYSTEMS INC. 200 Pondview Drive Meriden, CT  06450 USA | Product Purchase Agreement | 66627 | Equistar Chemicals, LP | Purchase Agreements | 7/1/2008 | $0.00 | | |
| RAND MCNALLY & COMPANY 8255 North Central Park Skokie, IL  60076 USA | Rand McNally & Company, IntelliRoute Deluxe with Milemaker LAN | 35314 | Lyondell Chemical Company | License Agreement | 5/24/2005 | $0.00 | | |
| RANDY SEESER 4540 Lincolnway Clinton, IA  52732 USA | Amendment No. 1 to Farming License Agreement | 60533 | Equistar Chemicals, LP | Lease | 4/1/2007 | $0.00 | | |
| RANSOLUTIONS LTD 606 Varsity Estates Place, N.W. Calgary, Alberta  T3B 3C2 Canada | RANSolutions Ltd_Olefins | 75869 | Equistar Chemicals, LP | Consulting Agreements | 12/31/1999 | $0.00 | | |
| RAYTHEON ENGINEERS & CONSTRUCTORS, INC., BADGER TECHNOLOGY DIVISION One Broadway Cambridge, MA  02142 USA | Agreement | 35398 | Lyondell Chemical Technology, L.P. | Agent Agreements | 8/1/1994 | $0.00 | | |
| READING BLUE MOUNTAIN AND NORTHERN RAILROAD COMPANY P.O. Box 218 Port Clinton, PA  19549 USA | 95758_RBM&N RR - Tamaqua, PA - Equistar | 95758 | Equistar Chemicals, LP | Lease Storage Agreements | 7/1/2005 | $0.00 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| RECKITT BENCKISER, INC 399 Interpace Parkway Parsippany, NJ 07054 USA | Sales Agreement - LR732001, HDPE - Amendment No. 1 | 15543 | Equistar Chemicals, LP | Sales Agreements | 8/1/2007 | $0.00 | | |
| REICHHOLD INC. 2400 Ellis rd Researce Triange Park, NC 27703 USA | Reichhold_Channelview | 10714 | Lyondell Chemical Company | Sales Agreements | 5/1/2007 | $0.00 | | |
| REICHHOLD, INC. 2400 Ellis Road Research Triangle Park, NC 27703 USA | Reichold_Channelview | 85722 | Lyondell Chemical Company | Sales Agreements | 1/1/2009 | $0.00 | | |
| REICHOLD AGREEMENT 2400 Ellis Road Research Triangle Park, NC 27703 USA | Sales Agreement | 66958 | Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 1/1/2009 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls LLC |
| REICHOLD INC 2400 Ellis Rd Research Triangle Park, NC 27703 USA | Reichold Inc_Bayport Lyondell Operations | 10718 | Lyondell Chemical Company | Sales Agreements | 1/1/2007 | $0.00 | | |
| RELIANT ENERGY HL&P P.O. Box 1700 Houston, TX 77251 USA | Right of Entry Agreement | 50846 | Basell USA Inc. | Utility Agreements | 8/3/2001 | $0.00 | | |
| RESINALL CORP 102 Dixie Pine Rd Hattiesburg, MS 39401 USA | Resinall Corp_Channelview | 10810 | Equistar Chemicals, LP | Sales Agreements | 1/1/2009 | $0.00 | | |
| REUTERS The Reuters Bldg, Three Times Square New York, NY 10036 USA | Reuters USA & Netherlands subscription agreement | 40312 | Lyondell Chemical Company | Service Agreements | 12/1/2007 | $836.42 | | |
| REUTERS AMERICA LLC The Reuters Bldg, Three Times Square New York, NY 10036 USA | Reuters Enterprise Services MA | 71034 | Lyondell Chemical Company | Service Agreements | 4/1/2007 | $878.74 | | |
| REXAM BEAUTY 710 West Park Rd. Union , MO 63084 USA | Amendment No. 1 | 80476 | Equistar Chemicals, LP | Sales Agreements | 1/1/2007 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| REXAM PLC 4 Millbank London, United Kingdom SW1P 3XR | Global Resin Supply and Purchase Agreement | 50847 | Basell USA Inc. | Supply Agreements | 1/1/2002 | $0.00 | | |
| REYNOLDS CONSUMER PRODUCTS, INC. D/B/A PRESTO PRODUCT 6641 W Broad St Richmond , VA 23230 USA | Sales Agreement - Polymers Amendment 3 | 50792 | Equistar Chemicals, LP | Sales Agreements | 3/1/2007 | $0.00 | | |
| RHODIA , INC CN 7500 Cranbury, NJ 08512-7500 USA | Rhodia , Inc_BCO | 20667 | Equistar Chemicals, LP | Sales Agreements | 7/1/2000 | $0.00 | | |
| RHODIA, INC 8 Cedar Brook Drive Cranbury, NJ 08512 USA | Rhodia Inc_Bayport Channelview | 86087 | Lyondell Chemical Company | Sales Agreements | 1/1/2004 | $0.00 | | |
| RHODIA POLIAMIDA E ESPECIALEDADES, LTDA Av. Maria Coelho Aguiar 215-Bloco B- 1st Andar Sao Paulo SP , Brazil CEP 05894-902 | Rhodia Poliamida e Especialedades, Ltda_La Porte | 85674 | Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 4/1/2006 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls LLC |
| RHOM & HAAS COMPANY 100 Independence Mall Philadelphia, Pa 19106 USA | Battleground Water Distribution Company Joint Venture Agreement - Segment 3 | 100837 | National Distillers & Chemical Corporation | Joint Development Agreements | 1/1/1976 | $25,204.00 | National Distillers & Chemical Corporation | Lyondellbasell Acetyls, LLC |
| RIGHT MANAGEMENT INC. 3050 Post Oak Blvd Suite 1130 Houston , TX 77056 USA | Career Transition Services Agreement 2007-P-0181 | 31014 | Lyondell Chemical Company | Service Agreements | 8/1/2007 | $0.00 | | |
| ROGERSCASEY, LLC One Parklands Drive Darien , CT 06870 USA | Engagement Contract for DC Consulting Service | 45834 | Lyondell Chemical Company | Consulting Agreements | 4/14/2003 | $0.00 | | |
| RON NEMEC P. O. Box 847 Robstown , TX 78380 USA | Farming License Agreement FSA 505 | 60566 | Equistar Chemicals, LP | Lease | 1/1/2004 | $0.00 | | |

# Schedule 1

### Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| ROSETTA STONE LTD. 135 WEST MARKET STREET HARRISBURG , VA 22801 USA | LICENSE AGREEMENT ROSETTA STONE LTD. | 55937 | Lyondell Chemical Company | Software Agreements | 8/28/2008 | $0.00 | | |
| ROXIO A DIVISION OF SONIC SOLUTION 17430 Campbell Rd. Ste. 225 Dallas , TX 75252 USA | Purchase Agreements | 20488 | Lyondell Chemical Company | Purchase Agreements | 10/21/2008 | $0.00 | | |
| ROYAL & SUNALLIANCE 32/F Dorset House Taikoo Place, 979 King's Road Quarry Bay , Hong Kong | Accident Insurance | 5778 | Lyondell Asia Pacific, Ltd. | Pension/Benefits/Medical-Related Agreements | 1/6/2008 | $0.00 | | |
| ROYCE ASSOCIATES 28-36 Paterson Street Paterson , NJ 07501 USA | Royce Associates_Bayport Lyondell Operations | 70566 | Lyondell Chemical Company | Sales Agreements | 11/13/2008 | $0.00 | | |
| RUBICON, LLC 9156 Highway 75 Geismar , LA 70734 USA | Rubicon, LLC_BCO | 86013 | Equistar Chemicals, LP | Sales Agreements | 6/1/2006 | $0.00 | | |
| RYAN & COMPANY THREE GALLERIA TOWER, 13155 Noel ROAD, 12th Floor, LB 72 Dallas, TX 75240-5090 USA | Texas Sales and Use Tax Services | 45836 | Basell USA Inc. | Tax Related Agreements | 11/1/2003 | $0.00 | | |
| RYAN & COMPANY THREE GALLERIA TOWER, 13155 NOWL ROAD, 12th Floor, LB 72 Dallas, TX 75240-5090 USA | Texas Sales and Use Tax Services | 45835 | Basell USA Inc. | Tax Related Agreements | 1/1/1996 | $0.00 | | |
| SABIC INNOVATIVE PLASTICS US LLC One Plastics Avenue Pittsfield , MA 01201 USA | SABIC_Channelview | 50812 | Lyondell Chemical Company | Sales Agreements | 7/1/2008 | $0.00 | | |
| SABINE RIVER AUTHORITY, STATE OF LOUISIANA Department of Public Works-State of Lousiana 15091 Texas Hwy Many , LA 71449 USA | Water Purchase Agreement | 76663 | Lyondell Chemical Company | Utility Agreements | 11/18/1971 | $3,593.99 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| SABINE RIVER AUTHORITY, STATE OF LOUISIANA Department of Public Works-State of Lousiana 15091 Texas Hwy Many , LA  71449 USA | Class II Water Purchase Agreement | 90559 | Basell USA Inc. | Utility Agreements | 1/1/1995 | $1,074.99 | | |
| SAFER SYSTEMS INC. 5284 Adolfo Road Suite 100 Camarillo , CA  93012 USA | Software Support and Upgrade Contract | 66869 | Lyondell Chemical Company | Software Agreements | 1/1/2009 | $0.00 | | |
| SAFESITE, INC. 10303 Regal Row Houston , TX  77040 USA | Tape Storage and Rotation Service Agreement | 40713 | Lyondell Chemical Company | Service Agreements | 10/8/2004 | $4,741.62 | | |
| SAI GLOBAL COMPANY 101 Morgan Lane, Suite 301 Plainsboro, NJ  08536 USA | Licensing and Services Agreement-Addendum 1 | 45838 | LyondellBasell Advanced Polyolefins USA Inc. | Service Agreements | 6/27/2008 | $0.00 | | |
| SANTA FE RAILWAY 2650 Lou Menk Drive Fort Worth , TX  76131 USA | BNSF-T-167754-ITA for MTO plant | 66913 | Lyondell Chemical Company | Assignment Agreements | 5/19/1987 | $0.00 | | |
| SARTOMER CO. 468 Thomas Jones Way Exton , PA  19341 USA | Sartomer Co._Channelview | 40895 | Lyondell Petrochemical L.P. Inc. | Sales Agreements | 1/1/1996 | $0.00 | | |
| SARTOMER COMPANY, INC 502 Thomas Jones Way Exton , PA  19341 USA | SMA / Poly BD OPERATING AGREEMENT | 25514 | Lyondell Petrochemical L.P. Inc. | Operations and Development Agreements | 12/19/1986 | $0.00 | | |
| SARTOMER COMPANY, INC. Oaklands Corporate Center, 502 Thomas Jones Way Exton , PA  19341 USA | Sartomer Company, Inc._Channelview | 65552 | Equistar Chemicals, LP | Sales Agreements | 1/1/2006 | $0.00 | | |
| SARTOMER DIVISION, PONY INDUSTRIES, INC., Marshal Building West Chester Plaza Westchester, PA  19380 USA | Sartomer Division, Pony Industries, Inc._Channelview | 25312 | Lyondell Petrochemical L.P. Inc. | Sales Agreements | 12/19/1986 | $0.00 | | |

108

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| SAS INSTITUTE INC. 100 SAS Campus Dr. Cary, NC 27513 USA | Enterprise Computing Offer Attachment | 90265 | Lyondell Chemical Company | Access Agreements | 3/20/2002 | $0.00 | | |
| SASOL NORTH AMERICA, INC. 900 Threadneedle Houston, TX 77079-2990 USA | SASOL North America, Inc._BCO | 30583 | Equistar Chemicals, LP | Sales Agreements | 1/1/2001 | $0.00 | | |
| SAT CORPORATION 16511 Space Center Blvd Ste 127 Houston, TX 77017 USA | Site Software License Agreement | 41496 | Houston Refining LP | License Agreement | 8/24/2001 | $0.00 | | |
| SBC GLOBAL SERVICES INC. DBA AT&T GLOBAL SERVICES 225 W. Randolph, 9C Chicago, IL 60608 USA | ISDN PRIME NON-STANDARD SERVICE AGREEMENT - 20060622-0335 | 55947 | Equistar Chemicals, LP | Service Agreements | 6/22/2006 | $0.00 | | |
| SCHOLLE PACKAGING INC. 200 West North Avenue Northlake, IL 60164-2490 USA | Contract for Sale of Polymers & Chemicals | 10753 | Equistar Chemicals, LP | Sales Agreements | 1/1/2007 | $0.00 | | |
| SCRANTON PRODUCTS INC. 52 Glen Maura National Blvd. Moosic, PA 18507 USA | CONTRACT FOR SALE OF POLYMERS #40000510 | 55702 | Equistar Chemicals, LP | Sales Agreements | 1/1/2009 | $0.00 | | |
| SEAWAY CRUDE PIPELINE COMPANY 210 Park Avenue, Suite 1600 Oklahoma City , OK 73102 USA | Connection Agreement | 66922 | Houston Refining LP | Pipeline Agreements | 3/15/2004 | $0.00 | | |
| SEAWAY CRUDE PIPELINE COMPANY 210 Park Avenue, Suite 1600 Oklahoma City , OK 73102-5630 USA | Tank Lease and Transportation Agreement | 66787 | Houston Refining LP | System Storage Lease Agreement | 3/1/2001 | $0.00 | | |
| SEAWAY CRUDE PIPELINE COMPANY 210 Park Avenue, Suite 1600 Oklahoma City , OK 73102 USA | Transportation and Terminaling Agreement | 66786 | Houston Refining LP | System Storage Lease Agreement | 4/13/2000 | $1,088,990.78 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| SEDA-COG JOINT RAIL AUTHORITY 201 Furnace Rd Lewisburg , PA 17837 USA | 95759_SEDA-COG - Williamsport, PA - Equistar | 95759 | Equistar Chemicals, LP | Lease Storage Agreements | 1/25/1988 | $0.00 | | |
| SGS SOCIETE GENERALE DE SURVEILLANCE SA 1 Place de Alpes PO Box 2152 CH 12 Geneva 1 , Switzerland | Umbrella Contract | 90731 | Millennium Petrochemicals Inc.(Virginia); Lyondell Bayer MM VOF (Non-Debtor); Lyondell Chemie Nederland B.V. (Non-Debtor); Lyondell Chimie France SAS (France) (Non-Debtor); Lyondell Chimie TDI SCA (France) (Non-Debtor) | Freight/Shipping Related Contracts | 1/1/2006 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | Lyondell Chemie Nederland b.v. |
| SHANGHAI LEAD-FAST ADVERTISING AND MEDIA DEVELOPMENT CO., LTD. Auite AD, 8/F Shu Guang Building, No. 189 PuAn Rd Shanghai , China | PUWORLD Information Service Agreement | 26199 | Lyondell Asia Pacific, Ltd. | Service Agreements | 8/26/2008 | $0.00 | | |
| SHANGHAI LEAD-FAST ADVERTISING AND MEDIA DEVELOPMENT CO., LTD. Suite AD, 8/F Shu Guang Building, No. 189 PuAn Rd Shanghai , China | PUWORLD Information Service Agreement | 26198 | Lyondell Asia Pacific, Ltd. | Service Agreements | 7/1/2008 | $0.00 | | |
| SHANNON INDUSTRIAL CORPORATION 2041 Dillard Court Woodstock, IL 60098 USA | Non-Exclusive Distributor Agreement | 50862 | Basell USA Inc. | Service Agreements | 7/1/2006 | $0.00 | | |
| SHELDON INDEPENDENT SCHOOL DISTRICT 11411 C E King Pkwy Houston, TX 77044 USA | Foreign Trade Zone Agreement for the Payment of AD VALOREM Taxes | 66721 | Lyondell Petrochemical L.P. Inc. | Tax Related Agreements | 2/3/1998 | $0.00 | | |
| SHELL CHEMICAL CO. 910 Louisiana Street Houston, TX 77002 USA | Shell_Exchange | 56138 | Lyondell Chemical Company | Exchange Agreements | 11/1/2008 | $0.00 | | |
| SHELL CHEMICAL LP One Shell Plaza, 910 Louisiana Houston , TX 77002 USA | Shell Crude C4 Mt Belvieu Storage and Handling Agreement | 76516 | Equistar Chemicals, LP | Storage Agreements | 1/1/2004 | $0.00 | | |

110

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| SHELL CHEMICAL LP P.O. Box 2463 Houston , TX 77252-2463 USA | Shell Chemical LP_Olefins | 66227 | Basell USA Inc. | Exchange Agreements | 8/1/2005 | $30,218.50 | | |
| SHELL CHEMICAL LP P.O. Box 2463 Houston , TX 77252-2463 USA | Shell Chemical LP_Light Olefins | 66224 | Basell USA Inc. | Sales Agreements | 8/1/2005 | $0.00 | | |
| SHELL CHEMICAL LP P.O. Box 2463 Houston  , TX 77252 USA | Shell Chemical LP_Light Olefins | 30909 | Basell USA Inc. | Exchange Agreements | 11/1/2008 | $0.00 | | |
| SHELL CHEMICAL LP One Shell Plaza, P.O. Box 2463 Houston, TX 77252-2463 USA | SHELL CHEMICAL LP_Channelview | 45635 | Equistar Chemicals, LP | Exchange Agreements | 1/1/2005 | $0.00 | | |
| SHELL CHEMICALS EUROPE B. V. Hoofdweg 256-258 GJ 3067 Rotterdam , Netherlands | Propylene Oxide Exchange Agreement | 17 | Lyondell Greater China, Ltd.; Lyondell Chemie Nederland B.V. (Non-Debtor); Lyondell South Asia PTE Ltd. (Non-Debtor) | Exchange Agreements | 7/1/2007 | $0.00 | | |
| SHELL CHEMICALS EUROPE B.V. Hoofdweg 256-258 GJ 3067 Rotterdam , The Netherlands | Tolling Agreement MP-MDP | 66799 | Lyondell Greater China, Ltd.; Lyondell Chemie Nederland B.V. (Non-Debtor) | Purchase and Sales Agreement | 1/1/2008 | $0.00 | | |
| SHELL CHEMICALS EUROPE B.V. Hoofdweg 256-258, GJ 3067 Rotterdam , The Netherlands | Shell Chemicals Europe BV_PO11 | 26131 | Lyondell Greater China, Ltd.; Lyondell Chemie Nederland B.V. (Non-Debtor); Lyondell South Asia PTE Ltd. (Non-Debtor) | Exchange Agreements | 7/1/2007 | $0.00 | | |
| SHELL CHEMICALS LTD Shell Centre London , UK  SE1 7NA | Feedstock Coordination Agreement | 21037 | Basell USA Inc. | Supply Agreements | 8/1/2005 | $0.00 | | |
| SHELL GLOBAL SOLUTIONS (US) INC. Westhollow Technolgoy Center 3333 Highway 6 South Houston , TX 77082 USA | Agreement for Supply of Reactor Internals, License and Technical Assistance | 41614 | Lyondell Chemical Company | License Agreement | 10/5/2006 | $0.00 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| SHELL GLOBAL SOLUTIONS (US) INC. Westhollow Technology Center, 3333 Highway 6 South Houston , TX  77082 USA | 2004-P-0176 Agreement for Supply of Reactor Internals, License & Technical Assistance | 100637 | Equistar Chemicals, LP | License Agreement | 1/31/2005 | $0.00 | | |
| SHELL GLOBAL SOLUTIONS (US) INC. Westhollow Technology Center, 3333 Highway 6 South Houston , TX  77082 USA | Agreement for Supply of Reactor Internals, License & Technical Assistance | 100638 | Equistar Chemicals, LP | License Agreement | 8/19/2005 | $0.00 | | |
| SHELL GLOBAL SOLUTIONS (US), INC., Westhollow Technnology Center 3333 Highway 6 Houston , Texas  77082 USA | Agreement for Supply of Reactor Internals, License and Technical Assistance | 80718 | Houston Refining LP | License Agreement | 3/15/2005 | $0.00 | | |
| SHELL GLOBAL SOLUTIONS(US) INC. Westhollow Technology Center, 3333 Hwy 6 s Houston, TX  77082 USA | AGREEMENT FOR SUPPLY OF REACTOR INTERNALS, LICENSE AND TECHNICAL ASSISTANCE | 56121 | Houston Refining LP | License Agreement | 5/21/2004 | $0.00 | | |
| SHELL OIL COMPANY P O Box 2463 Houston , TX  77252-2463 USA | Zeolyst Agreement | 70255 | Equistar Chemicals, LP | License Agreement | 12/1/1999 | $0.00 | | |
| SHERWIN WILLIAMS COMPANY 101 Prospect Ave NW Cleveland , OH  44115 USA | Sherwin Williams Company_BCO | 15657 | Equistar Chemicals, LP | Sales Agreements | 10/1/2004 | $0.00 | | |
| SHIELDS BAG AND PRINTING CO. P.O. Box 9848 Yakima , WA  98909 USA | Amendment No. 4 to LDPE- Sales Agreement | 10965 | Equistar Chemicals, LP | Purchase and Sales Agreement | 1/1/2002 | $0.00 | | |
| SHINY No. 5 Yeong Gong 1st Rd Yeong An Hsiang Kaoshiung Hsien , Taiwan ROC | Processing Agreement | 40795 | Lyondell Chemical Technology, L.P.;Lyondell Greater China, Ltd. | Product Agreements | 9/12/2005 | $0.00 | | |
| SHINY CHEMICAL INDUSTRIAL CO. LTD No. 5, Yeong Gong 1st Rd, Yeong An Hsiang Kaoshiung Hsien , Taiwan ROC | Service Agreement | 66812 | Lyondell Greater China, Ltd. | Service Agreements | 7/1/2007 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| SHINY CHEMICAL INDUSTRIAL CO. LTD No. 5, Yeong Gong 1st Rd, Yeong An Hsiang Kaohsiung Hsien , Taiwan ROC | Manufacturing Agreement | 66809 | Lyondell Greater China, Ltd. | Manufacturing Agreement | 4/1/2000 | $0.00 | | |
| SHINY CHEMICAL INDUSTRIAL CO. LTD. No. 5 Yeong Gong 1st Road, Yeong An Shiang, Kaohsiung Shan, , Taiwan, ROC | STORAGE AGREEMENT | 75612 | Lyondell Greater China, Ltd. | Storage Agreements | 8/15/2008 | $0.00 | | |
| SHINY CHEMICAL INDUSTRIAL CO. LTD. No. 5 Yeong Gong 1st Road, Yeong An Shiang Kaohsiung Shan, , Taiwan, ROC | STORAGE AGREEMENT | 75277 | Lyondell Greater China, Ltd. | Storage Agreements | 8/1/2006 | $0.00 | | |
| SHINY CHEMICAL INDUSTRIAL CO., LTD. No. 5 Yeong Gong 1st Road Yoeung An Hsiang Kaohsiung Hsien , Taiwan ROC | Supply Agreement | 95101 | Lyondell Greater China, Ltd. | Supply Agreements | 1/1/2007 | $0.00 | | |
| SIELKEN & ASSOCIATES, INC. 3833 Texas Avenue, Suite 230 Bryan , Texas  77802 USA | TOXICOLOGY CONSULTING SERVICES CONTRACT | 85848 | Lyondell Chemical Company | Consulting Agreements | 11/1/2004 | $0.00 | | |
| SIKA AG Tuffenwies 16-20 Zurich , Switzerland | License Agreement | 30242 | Lyondell Chemical Technology, L.P. | License Agreement | 11/16/1997 | $0.00 | | |
| SILGAN PLASTICS CORPORATION 14515 North Outer Forty Dr Suite 210 Chesterfield , MO  63017 USA | CONTRACT FOR SALE OF POLYMERS | 45600 | Equistar Chemicals, LP | Sales Agreements | 8/1/2007 | $0.00 | | |
| SKC CO., LTD. 633 Jeongja-Dong Jangahn-Gu Soowon-Si , Gyeonggi-Do 137-855 South Korea | Amendment to License Agreement | 40753 | Lyondell Chemical Technology, L.P. | License Agreement | 10/16/1987 | $0.00 | | |
| SKILLSOFT CORPORATION 107 Northeastern Blvd Nashua , New Hampshire 3062 USA | Master License Agreement | 35333 | Lyondell Chemical Company | License Agreement | 1/31/2005 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| SMURFIT STONE CONTAINER CANADA, INC 15400 Sherbrooke Street East Montreal Quebec H1A3S2 , QC CANADA | CONTRACT FOR SALE OF POLYMERS #40002201 | 55700 | Equistar Chemicals, LP | Sales Agreements | 1/1/2007 | $0.00 | | |
| SNYDER INDUSTRIES, INC. 340 Wales Ave. Lincoln , NE 68504 USA | CONTRACT FOR SALE OF POLYMERS CONTRACT# 40005601 | 55587 | Equistar Chemicals, LP | Sales Agreements | 11/1/2008 | $0.00 | | |
| SOFTWARE AND MANAGEMENT ASSOCIATES 15600 John F. Kennedy Blvd., Suite 710 Houston , TX 77032 USA | Software License and Maintenance Agreement | 20507 | Lyondell Petrochemical L.P. Inc. | License Agreement | 3/13/1996 | $0.00 | | |
| SOLUTIONS NOW GK, LLC P.O. Box 109 Abbott , TX 76621 USA | License Agreement #8190 | 50076 | Lyondell Chemical Company | License Agreement | 11/8/2007 | $10,000.00 | | |
| SOLVAY AMERICA, INC. 3333 Richmond Avenue Houston , TX 77098 USA | Stock Purchase Agreement | 66667 | Basell USA Inc. | Purchase Agreements | 11/28/2007 | $0.00 | | |
| SOLVAY, LB USA 3333 Richmond Ave. Houston , TX 77098 USA | Tax Payment Agreement | 50979 | LyondellBasell Advanced Polyolefins USA Inc. | Tax Related Agreements | 11/12/2008 | $0.00 | | |
| SOUTHERN PACIFIC TRANSPORTATION COMPANY One Market Plaza San Francisco, CA 94105 USA | 66506_KCS - SIT Chaison, TX - Equistar | 66506 | Equistar Chemicals, LP | Lease Storage Agreements | 7/26/1982 | $0.00 | | |
| SOUTHERNFARE 8100 Washington Avenue Houston , TX 77007 USA | Southernfare_La Porte | 75702 | Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 7/1/2008 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls LLC |
| SOUTHWEST SHIPYARD, L.P. 18310 Market Street Channelview , TX 77530 USA | Master Service Agreement (Drill Vessels, Barges, Boats and Ship Repairs) | 66798 | Lyondell Chemical Company | Transportation Agreements | 6/7/2002 | $0.00 | | |

114

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| SPARTAN POLYMERS, INC. 432 Maple Street Winnetka , IL  60093 USA | Supply Agreement | 50976 | Basell USA Inc. | Sales Agreements | 6/1/2007 | $0.00 | | |
| SPECIALIZED RESPONSE SOLUTIONS, LP 2670 Gravel Dr. Fort Worth , TX  76118 USA | Master Environmental Field Services Contract | 66418 | Equistar Chemicals, LP;Houston Refining LP;Lyondell Chemical Company;Millennium Petrochemicals Inc. (Virginia) | Service Agreements | 2/1/2008 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls, LLC |
| STATE OF TEXAS PO Box 961069 2650 Lou Menk Drive Ft Worth , TX  76161 USA | BNSF-T-165195 - ITA for MTO spur | 66912 | Basell USA Inc. | Purchase/Pricing and Supply Agreements | 2/17/1982 | $0.00 | | |
| STEALTHBITS TECHNOLOGIES 55 Harristown Road Glen Rock , NJ  07452 USA | STEALTHbits TECHNOLOGIES, INC. SOFTWARE LICENSE AGREEMENT | 45088 | Lyondell Chemical Company | License Agreement | 10/4/2007 | $0.00 | | |
| STEELCASE FINANCIAL SERVICES INC. 180 Montgomery Street San Francisco, CA  94104 USA | Master Lease No. 32133, Equipment Schedule | 70992 | Basell USA Inc. | Lease | 11/4/2008 | $17,361.02 | | |
| STEELCASE FINANCIAL SERVICES INC. 180 Montgomery Street San Francisco, CA  94104 USA | Master Lease No. 32133, Equipment Schedule | 70991 | Basell USA Inc. | Lease | 11/4/2008 | $0.00 | | |
| STERILITE CORPORATION 30 Scales Lane, P.O. Box 524 Townsend, MA  01469-0524 USA | 2008-2010 Sales Agreement | 50968 | Basell USA Inc. | Sales Agreements | 1/1/2008 | $0.00 | | |
| STERLING COMMERCE (AMERICA) INC 4600 Lakehurst Court Dublin, OH  43016 USA | Sterling Network Service Agreement | 66918 | Lyondell Chemical Company | Purchase Agreements | 10/21/1997 | $21,799.50 | | |
| STERLING COMMERCE (AMERICA) INC 4600 Lakehurst Court Dublin, OH  43016-2000 USA | Sterling Licensing Agreement | 66917 | Lyondell Chemical Company | Purchase Agreements | 11/26/2008 | $5,310.24 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| STERLING COMMERCE (AMERICA), INC 4600 Lakehurst Court Dublin, OH 43016-2000 USA | Sterling Commerce Network Service Agreement | 66933 | Houston Refining LP | Purchase Agreements | 12/22/2003 | $0.00 | | |
| STERLING COMMERCE (FRANCE) SARL & STERLING COMMERCE (AMERICA), INC. 4600 Lakehurst Court Dublin , OH 43016-2000 USA | Novation Agreement | 25418 | Lyondell Chemical Company | Assignment Agreements | 12/15/2008 | $0.00 | | |
| STOLT TANKERS B.V. Westerlaan 5 3016 Rotterdam , Netherlands | Deep Sea Master Contract of Affreightment | 36196 | Equistar Chemicals, LP; Lyondell Chemical Company; Millennium Petrochemicals Inc.(Virginia); Lyondell Chemie Nederland B.V. (Non-Debtor); Lyondell Chimie France SAS (France) (Non-Debtor); Lyondell South Asia PTE Ltd. (Non-Debtor) | Transportation Agreements | 4/1/2008 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls LLC |
| STULL TECHNOLOGIES 17 Veronica Avenue Somerset, NJ 08873 USA | SALES AGREEMENT - LDPE, PP AMENDMENT NO. 1 | 45626 | Equistar Chemicals, LP | Sales Agreements | 11/1/2007 | $0.00 | | |
| SUEZ-DEGS OF TUSCOLA, LLC c/o Trigen-Cinergy Corp., 1000 E. Main St Plainfield , IN 46168 USA | Amended and Restated Energy, Water and Wastewater Services Agmt | 40770 | Equistar Chemicals, LP | Utility Agreements | 10/30/1998 | $3,512,347.80 | | |
| SULZER CHEMTECH AG P.O.Box 65 CH-8404 Winterthur , Switzerland | H2O2 License Agreement | 85287 | Lyondell Chemical Technology, L.P. | License Agreement | 11/10/1994 | $0.00 | | |
| SUMITOMO CHEMICAL 27-1 Shinkawa 2-Chome, Chuo-ku Tokyo 104-8260 , Japan | Distribution of PO from the Rabigh JV | 26025 | Lyondell Chemical Company | Manufacturing Agreement | 12/1/2005 | $0.00 | | |
| SUMITOMO CHEMICAL CO. LTD 27-1, Shinkawa 2-chome Chuo-ku, Tokyo 104-8260 Japan | Heads of Agreement Concerning NOC Asia Ltd. | 95143 | Lyondell Chemical Company | Operations and Development Agreements | 1/31/2008 | $0.00 | | |
| SUMITOMO CHEMICAL CO. LTD. 5-33, Kitahama 4-chome Chuo-ku, Osaka , Japan 541-8550 | Amended Shareholders Agreement | 60783 | Lyondell Chemical Company; Lyondell Centennial Corp. (Non-Debtor) | Shareholders Agreement | 12/19/1986 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| SUMITOMO CHEMICAL CO., LTD 5-33, Kitahama 4-chome, Chuo-ku Osaka 541-8550 , Japan | Agreement on Ownership and Rights | 10278 | Lyondell Chemical Company,Lyondell Chemical Technology, L.P., Nihon Oxirane Co., Ltd.(Japan) (Non-Debtor) | License Agreement | 3/10/2003 | $0.00 | | |
| SUMITOMO CHEMICAL CO., LTD. 5-33, KITAHAMA 4-CHOME, CHUO-KU OSAKA 541-8550 , Japan | LYONDELL LICENSE OPTION AGREEMENT | 55952 | Lyondell Chemical Company | License Agreement | 3/10/2003 | $0.00 | | |
| SUMITOMO CHEMICAL COMPANY, LIMITED 27-1, Shinkawa 2-Chome, Chuo-ku Tokyo , Japan | License Agreement catalyst | 75381 | Lyondell Chemical Technology, L.P. | License Agreement | 5/31/1993 | $0.00 | | |
| SUMITOMO CHEMICAL COMPANY, LIMITED 27-1, Shinkawa 2-chome, Chuo-ku Tokyo 104-8260 , Japan | Rabigh Rights Agreement | 35285 | Lyondell Chemical Company,Lyondell Chemical Technology, L.P.,; Nihon Oxirane Co., Ltd.(Japan) (Non-Debtor) | Rights Agreement | 12/1/2005 | $0.00 | | |
| SUMITOMO CHEMICAL COMPANY, LIMITED 27-1, Shinkawa 2-Chome, Chuo-ku Tokyo 104-8260 , Japan | RABIGH RIGHTS AGREEMENT | 45230 | Lyondell Chemical Company;Lyondell Chemical Technology, L.P. | License Agreement | 12/1/2005 | $0.00 | | |
| SUNBELT CHEMICALS 14401 Industrial Seaway Blvd Gulfport , MS  39501 USA | Sunbelt Chemicals_Channelview | 10812 | Equistar Chemicals, LP | Sales Agreements | 1/1/2009 | $0.00 | | |
| SUNOCO GP P.O. Box 398 Claymont DE 19703 PO Box 4324 Philadelphia, PA 19103 USA | Sunoco GP_Light Olefins | 20197 | Equistar Chemicals, LP | Joint Development Agreements | 3/31/2003 | $0.00 | | |
| SUNOCO OLEFINS, L.P. 1735 Market Street Ten Penn Center - 18th and Market Streets Philadelphia , PA  19103 USA | Sunoco Olefins, L.P._Light Olefins | 20191 | Equistar Chemicals, LP | Exchange Agreements | 3/31/2003 | $0.00 | | |
| SUNOCO, INC (R&M) Ten Penn Center 18th and Market Streets Ten Penn Center 18th and Market Streets Philadelphia , PA  19103 USA | Sunoco, Inc (R&M)_Light Olefins | 20179 | Equistar Chemicals, LP | Supply Agreements | 3/31/2003 | $0.00 | | |

117

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| SUNOCO, INC. 1735 Market Street Philadelphia , PA 19103 USA | Sunoco, Inc._Light Olefins | 70704 | Equistar Chemicals, LP | Assignment Agreements | 3/31/2003 | $0.00 | | |
| SUPERIOR SOLVENTS AND CHEMICALS 1402 N. Capitol Avenue Indianapolis , IN 46202 USA | Superior Solvents and Chemicals_Distribution | 6171 | Equistar Chemicals, LP;Lyondell Chemical Company;Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 1/1/2008 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | 1-Lyondell Chemical Company |
| SUPRESTA U.S. LLC 420 Saw Mill River Road Ardsley , NY 10502 USA | Supresta_Bayport | 65669 | Lyondell Chemical Company | Sales Agreements | 1/1/2006 | $0.00 | | |
| SUPRESTA US LLC, SUPRESTA GMBH & CO. KG 420 Saw Mill River Road Ardsley , NY 10502 USA | Supresta US LLC_Bayport Channelview | 25805 | Lyondell Chemical Company, Lyondell Chemie Nederland B.V. (Non-Debtor) | Sales Agreements | 1/1/2005 | $0.00 | | |
| SURFACE SPECIALTIES, INC. 1950 Lake Park Drive Smyrna , GA 30080 USA | Surface Specialties Inc_Bayport Lyondell Operations | 95708 | Lyondell Chemical Company | Sales Agreements | 10/1/2004 | $0.00 | | |
| SWD URETHANE COMPANY 222 South Date Street Mesa , AZ 85210 USA | SWD Urethanes Co_Bayport Channelview | 70509 | Lyondell Chemical Company | Sales Agreements | 6/1/2007 | $0.00 | | |
| SWISS LIFE BELGIUM NV Fonsnylaan 38 1060 Brussels , Belgium | Master Care Plan for LCPE | 11025 | Lyondell Chemical Products Europe, LLC | Pension/Benefits/Medical-Related Agreements | 7/16/2007 | $0.00 | | |
| SYDNEYPLUS INTERNATIONAL LIBRARY SYSTEMS CORP 13562 Maycrest Way Richmond , British Columbia V6V 2J7 CANADA | Terms & Conditions | 10549 | Lyondell Chemical Company | Term Agreements | 2/23/2007 | $0.00 | | |
| SYLVAN CHEMICAL CORPORATION 345 Route 17 South Upper Saddle River , NJ 07458-2327 USA | Sylvan Chemical Corp_Bayport Channelview | 80877 | Lyondell Chemical Company | Sales Agreements | 1/1/2007 | $0.00 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| SYNTEX MANAGEMENT SYSTEMS, INC. Eight Greenway Plaza, Suite 404 Houston , TX  77046 USA | Software Maintenance & Support Agreement | 60334 | Equistar Chemicals, LP;Lyondell Chemical Company | License Agreement | 3/20/2002 | $0.00 | | |
| SYNTHOMER LIMITED 460 Village Park Dr Powell , OH  43065 USA | Synthomer Limited_La Porte | 65559 | Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 1/1/2007 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls LLC |
| T SYSTEMS INTERNATIONAL INC. 7545 Carroll Road San Diego, CA  92121 USA | Amendment No. 2 - Petrothene - Sales Agreement | 10958 | Equistar Chemicals, LP | Sales Agreements | 10/1/2008 | $0.00 | | |
| T.A. DAVIES COMPANY 363 West 133rd Street Los Angeles, CA  90059 USA | TA Davies Company_Bayport Channelview | 70507 | Lyondell Chemical Company | Sales Agreements | 6/1/2007 | $0.00 | | |
| TAIWAN ADVENTIST HOSPITAL 424 Pa Te Road, Section 2 Taipei, Taiwan 105 , Republic of China | Annual Medical Exam Plan | 65782 | Lyondell Greater China, Ltd. | Pension/Benefits/Medical-Related Agreements | 5/1/2008 | $0.00 | | |
| TALEO CORP. 575 Market St., 8th floor San Francisco, CA  94105 USA | Taleo Master Agreement | 95174 | Lyondell Chemical Company | Software Agreements | 5/5/2006 | $0.00 | | |
| TALEO CORPORATION 575 Market Street San Francisco, CA  94105 USA | Taleo Master Agreement | 70853 | Lyondell Chemical Company | Master Services Agreement | 5/5/2006 | $0.00 | | |
| TALX CORPORATION 11432 Lackland Road St. Louis , MO  63146 USA | Universal Service Agreement | 80833 | Lyondell Chemical Company | Service Agreements | 4/1/2007 | $0.00 | | |
| TALX UC EXPRESS 10101 Woodfield Ln St. Louis , MO  63132 USA | Agreement to provide Unemployment Services | 41061 | Houston Refining LP | Service Agreements | 4/1/2006 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| TANNER INDUSTRIES, INC. 735 Davisville Road Southampton , PA 18966 USA | Equipment Lease Agreement | 70611 | Millennium Specialty Chemicals Inc. | Lease - Equipment | 8/30/2007 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| TARGA MIDSTREAM SERVICES LIMITED PARTNERSHIP 1000 Louisiana Street - Suite 4300 Houston , TX 77002 USA | CONTRACT OF AFFREIGHTMENT | 45125 | Equistar Chemicals, LP | Freight/Shipping Related Contracts | 4/15/2008 | $0.00 | | |
| TATA AMERICAN INTERNATIONAL CORPORATION 101 Park Ave New York, NY 10178 USA | Master Agreement for Professional Services | 40017 | Lyondell Chemical Company | Service Agreements | 3/1/2006 | $0.00 | | |
| TAX COMPLIANCE, INC. 10200-A Willow Creek Road San Diego , CA 92131 USA | Tax Compliance, Inc. Turnkey Software and Support Agreement | 95127 | Lyondell Chemical Company | Software Agreements | 2/12/2007 | $0.00 | | |
| TECHNOLOGY JV LP Two Greenville Crossing 4001 Kennet Pike, Suite 238 Greenville , DE 19807 USA | Bayer_JV | 5525 | Lyondell Chemical Company | Research Agreements | 3/31/2000 | $0.00 | | |
| TECHNOLOGY JV, L.P. Two Greenville Crossing, 4001 Kennett Pike, Suite 238 Greenville, DE 19807 USA | R&D Services Agreement | 86002 | Lyondell Chemical Company | Research Agreements | 3/31/2000 | $0.00 | | |
| TEPPCO CRUDE OIL, L.P. 210 Park Avenue, Suite 1600 Oklahoma City, OK 73102 USA | S05126087-G | 66925 | Houston Refining LP | Supply Agreements | 12/1/2005 | $0.00 | | |
| TEPPCO CRUDE OIL, L.P. 210 Park Avenue, Suite 1600 Oklahoma City, OK 73102 USA | S05126088-G | 66814 | Houston Refining LP | Supply Agreements | 12/1/2005 | $0.00 | | |
| TETRA TECHNOLOGIES INC 25025 I-45 North The Woodlands, TX 77380 USA | Agreement for Access to Barge Dock | 10937 | Lyondell Chemical Company | Access Agreements | 10/1/2006 | $0.00 | | |

120

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| TEXAS AROMATICS, LP 3555 Timmons Ln, Suite 700 P.O. Box 22856 Houston, TX 77227-2856 USA | Sales Agreement | 40874 | Equistar Chemicals, LP | Purchase Agreements | 1/1/2006 | $0.00 | | |
| TEXAS PETROCHEMICALS LP 5151 San Felipe, Suite 800 Houston, TX 77056 USA | Texas Petrochemicals LP_Channelview | 80456 | Equistar Chemicals, LP | Exchange Agreements | 1/1/2008 | $0.00 | | |
| TEXAS PETROCHEMICALS LP 5151 San Felipe, Suite 800 Houston , TX 77056 USA | Texas Petrochemicals LP_Channelview | 80454 | Equistar Chemicals, LP | Exchange Agreements | 1/1/2008 | $0.00 | | |
| TEXTRON AUTOMOTIVE COMPANY INC. Kautex North America Division 750 Stephenson Highway Troy , MI 48083 USA | Purchase Agreement | 66815 | Basell USA Inc. | Purchase Agreements | 1/1/2000 | $0.00 | | |
| THE AMERICAN CHAMBER OF COMMERCE IN HONG KONG 1904 Bank of America Tower 12 Harcourt Road Hong Kong | Membership Renewal Debit Note | 65740 | Lyondell Asia Pacific, Ltd. | Service Agreements | 1/1/2009 | $0.00 | | |
| THE BANK OF NEW YORK 101 Barclay Street New York, NY 10007 USA | Master Trust Agreement with BONY | 55772 | Lyondell Chemical Company | Pension/Benefits/Medical-Related Agreements | 7/1/1997 | $0.00 | | |
| THE BANK OF NEW YORK 101 Barclay Street New York, NY 10007 USA | Trust Agreement | 51399 | Houston Refining LP | Financing Agreements | 2/1/2007 | $0.00 | | |
| THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY P.O. Box 961069 Fort Worth , TX 76161-0069 USA | 66792_BNSF 9306 - Switching Contract - Basell | 66792 | Basell USA Inc. | Transportation Agreements | 9/1/2002 | $0.00 | | |
| THE C. P. HALL CO. 311 S. Wacker, Suite 4700 Chicago , IL 60606 USA | CPHall_Channelview | 95331 | Lyondell Chemical Company;Equistar Chemicals, LP | Sales Agreements | 6/1/2002 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| THE DOW CHEMICAL COMPANY 2030 Dow Center Midland , MI 48674-0001 USA | Agreement Polyol International B.V. | 5078 | Lyondell Chemical Company | License Agreement | 6/1/1998 | $0.00 | | |
| THE EQUITY ENGINEERING GROUP, INC 20600 Chagrin Blvd, Ste 1200 Shaker Height, OH 44122 USA | Software License Agreement- Risk-Based Inspection Software | 15225 | Lyondell Chemical Company | Software Agreements | 10/16/2007 | $7,487.67 | | |
| THE GOODYEAR TIRE & RUBBER COMPANY 1144 East Market Street Akron, OH 44316 USA | The Goodyear Tire & Rubber Company_Channelview | 25823 | Equistar Chemicals, LP | Sales Agreements | 10/1/2007 | Disputed Cure | | |
| THE GOODYEAR TIRE & RUBBER COMPANY 1144 East Market St Akron, OH 44316 USA | The Goodyear Tire & Rubber Company_Channelview | 40871 | Equistar Chemicals, LP | Sales Agreements | 1/1/2006 | $0.00 | | |
| THE GOODYEAR TIRE & RUBBER COMPANY 1144 East Market Street Akron, OH 44316 USA | Goodyear Tire and Rubber_Channelview | 65560 | Lyondell Chemical Company | Sales Agreements | 1/1/2006 | $0.00 | | |
| THE GOODYEAR TIRE AND RUBBER COMPANY 1144 East Market Street Akron, OH 44316-0001 USA | The Goodyear Tire and Rubber Company_Channelview | 60337 | Equistar Chemicals, LP | Exchange Agreements | 1/1/2008 | $0.00 | | |
| THE INDIANA RAILROAD COMPANY 101 West Ohio Street Suite 1600 Indianapolis, IN 46204 USA | 95751_INRD - Terre Haute, IN - Equistar | 95751 | Lyondell Chemical Company | Lease Storage Agreements | 12/1/2005 | $0.00 | | |
| THE LUBRIZOL CORPORATION 29400 Lakeland Boulevard Wickliffe, OH 44092 USA | Lubrizol_Channelview | 76567 | Lyondell Chemical Company | Sales Agreements | 1/1/2009 | $0.00 | | |
| THE LUBRIZOL CORPORATION 41 Tidal Road Deer Park, TX 77536 USA | The Lubrizol Corp_Bayport Channelview | 86078 | Lyondell Chemical Company | Sales Agreements | 2/1/2005 | $0.00 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| THE LUBRIZOL CORPORATION 29400 Lakelane Blvd. Wickliffe, OH 44092 USA | Lubrizol_Bayport | 70546 | Lyondell Chemical Company | Sales Agreements | 1/1/2008 | $0.00 | | |
| THE LUBRIZOL CORPORATION 29400 Lakeland Boulevard Wickliffe, OH 44092 USA | Lubrizol_Solvents | 60342 | Lyondell Chemical Company | Sales Agreements | 1/1/2009 | $0.00 | | |
| THE M.W. KELLOGG TECHNOLOGY COMPANY 601 Jefferson Houston, TX 77002 USA | Amendment SUPERFLEX | 90156 | Lyondell Chemical Technology, L.P. | License Agreement | 5/29/1998 | $0.00 | | |
| THE M.W. KELLOGG TECHNOLOGY COMPANY., A DELAWARE CORPORATION 601 Jefferson Houston, TX 77002 USA | Agreement (SuperFlex) | 90160 | Lyondell Chemical Technology, L.P. | License Agreement | 5/29/1998 | $0.00 | | |
| THE OKONITE CO. Hilltop Rd, P.O. Box 340 Ramsey, NJ 07446 USA | Polymers Sales Agreement | 40900 | Lyondell Chemical Company | Sales Agreements | 9/1/2006 | $0.00 | | |
| THE PLAZA GROUP LTD 10375 Richmond Avenue, Suite 1620 Houston, TX 77042 USA | The Plaza Group Ltd_La Porte | 55596 | Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 4/1/2008 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls LLC |
| THE STANDARD REGISTER COMPANY 600 Albany Street Dayton, OH 45408-1442 USA | SOFTWARE SUPORT AGREEMENT | 55388 | Lyondell Chemical Company | Software Agreements | 4/13/2007 | $666.74 | | |
| THE UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED-INDUSTRIAL AND SERVICES WORKERS INTERNATIONAL UNION 470 Orleans Street, Suite 900 Beaumont, TX 77704 USA | Collective Bargaining Agreement - Beaumont | 85768 | Equistar Chemicals, LP | Employment, Collective Bargaining, and Related Agreements | 6/1/2007 | $0.00 | | |

123

# Schedule 1
### Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| THERM-O-LINK INC P.O. Box 285, 10513 Freedom St Garrettsville , OH 44231 USA | Contract for Sale of Polymers | 10991 | Equistar Chemicals, LP | Sales Agreements | 1/1/2006 | $0.00 | | |
| THIRD COAST CHEMICALS P.O. Box 239 Pearland , TX 77588 USA | Third Coast Chemicals_BCO | 10736 | Equistar Chemicals, LP | Sales Agreements | 9/1/2007 | $0.00 | | |
| THORP PETROLEUM CORPORATION 1001 McKinney St. Suite 2200 Houston , TX 77002 USA | Gas Sales Agreement | 66964 | Lyondell Chemical Company | Sales Agreements | 7/31/1990 | $89,954.94 | | |
| TICONA POLYMERS, INC. 90 Morris Avenue Summit , NJ 07901 USA | Ticona Polymers, Inc._Olefins | 76070 | Equistar Chemicals, LP | Sales Agreements | 12/31/1999 | $0.00 | | |
| TIDAL SOFTWARE, INC. 2100 Geng Road, STE #210 Palo Alto, CA 94303-3343 USA | Master License Agreement 130122-2 | 30255 | Lyondell Chemical Company | License Agreement | 3/28/2008 | $0.00 | | |
| TIE COMMERCE 6 New England Executive Park Burlington , MA 01803 USA | Master Contract No. 4600001379 | 95134 | Houston Refining LP | Purchase Agreements | 6/28/2007 | $0.00 | | |
| TILLEY CHEMICAL CO. 501 Chesapeake Park Plaza Baltimore, MD 21220 USA | Tilley Chemical Co._Distribution | 6172 | Equistar Chemicals, LP;Lyondell Chemical Company;Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 1/1/2008 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | 1-Lyondell Chemical Company |
| TIPS, INCORPORATED 2402 Williams Dr. Georgetown, TX 78628 USA | License Agreement | 20205 | Lyondell Chemical Company | License Agreement | 5/12/2006 | $6,991.20 | | |
| TISCOR 12250 Parkway Centre Drive Poway, CA 92064 USA | Software Agreements | 6266 | Equistar Chemicals, LP;Lyondell Chemical Company | Software Agreements | 10/11/2007 | $0.00 | | |

124

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| TISCOR 12250 Parkway Centre Drive Poway, CA 92064 USA | Purchase Order | 35371 | Lyondell Chemical Company | Service Agreements | 5/13/2008 | $0.00 | | |
| TMH ACQUISITION, LLC DBA SOUTHERN STATES TOYOTALIFT 3000 West 45th Street Jacksonville, FL 32209 USA | Commercial Lease Agreement LA50169 | 70613 | Millennium Specialty Chemicals Inc. | Lease - Equipment | 5/21/2007 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| TMH ACQUISITION, LLC DBA SOUTHERN STATES TOYOTALIFT 3000 W. 45th St. Jacksonville, FL 32209 USA | Commercial Lease Agreement LA51050 (3/27/2007) | 70612 | Millennium Specialty Chemicals Inc. | Financing Agreements | 3/27/2007 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| TOMAH PRODUCTS, INC. 1012 Terra Drive Milton, WI 53563-0388 USA | Tomah Products, Inc._La Porte | 90423 | Millennium Chemicals Inc. | Sales Agreements | 10/1/2006 | $0.00 | Millennium Chemicals Inc. (Debtor) | LyondellBasell Acetyls LLC |
| TOTAL PETROCHEMICALS USA, INC 1201 Louisiana St., Ste. 1800 Houston, TX 77002 USA | Catalyst Component Supply Agreement | 21427 | Basell USA Inc. | Supply Agreements | 8/31/2006 | $0.00 | | |
| TOTAL PETROCHEMICALS USA, INC. 1201 Louisiana Street Suite 1800 Houston, TX 77002 USA | Catalyst Component Supply Agreement | 80875 | Basell USA Inc. | Supply Agreements | 8/31/2006 | $0.00 | | |
| TOTAL PETROCHEMICALS USA, INC. 1201 Louisiana, Suite 1800 Houston, TX 77002 USA | Catalyst Component Supply Agreement | 50938 | Basell USA Inc. | Service Agreements | 9/5/2006 | $0.00 | | |
| TOTAL PETROCHEMICALS USA, INC. 1201 Louisiana, Ste. 1800 Houston, TX 77002 USA | Total Petrochemicals USA, Inc._Olefins | 100491 | Equistar Chemicals, LP | Exchange Agreements | 12/31/1999 | $0.00 | | |
| TOTAL PETROCHEMICALS USA, INC. 1201 Louisiana Street, Suite 1800 Houston, TX 77001 USA | Total Petrochemicals USA, Inc. _Light Olefins | 66730 | Equistar Chemicals, LP | Sales Agreements | 7/1/2002 | $0.00 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| TOWER ENERGY GROUP 1983 West 190th St Torrance, CA  90504 USA | RST-04850 | 66605 | Houston Refining LP | Sales Agreements | 9/1/2008 | $0.00 | | |
| TOWERS PERRIN One Houston Center 1221 McKinney, Suite 2600 Houston, TX  77010 USA | Compensation Consulting Services Letter Agreement | 55776 | LyondellBasell Industries AF S.C.A. | Consulting Agreements | 6/12/2008 | $0.00 | LyondellBasell Industries AF S.C.A. (Debtor) | Lyondell Chemical Company |
| TOWERS, PERRIN, FORSTER AND CROSBY, INC. 1500 Market Street, Centre Square East Philadelphia , PA  19102 USA | Business Associate Agreement | 50937 | Basell North America Inc. | Pension/Benefits/Medical-Related Agreements | 4/16/2003 | $0.00 | | |
| TOWERS, PERRIN, FOSTER & CROSBY, INC. 1500 Market Street, Centre Square East Philadelphia , PA  19102 USA | Engagement for Premier Chemical Compensation Services | 76369 | Lyondell Chemical Company | Service Agreements | 6/10/2008 | $0.00 | | |
| TRANS AUDIT, INC. 11 Marshall Road, Suite 2D Wappingers Falls, NY 12590 USA | Trans Audit Freight & Parcel Audit Contract | 50935 | Basell USA Inc. | Service Agreements | 10/1/2008 | $0.00 | | |
| TRANS PACIFIC CHEMICAL CORP. No. 3, Kuo Hwa 1st Street, Kaohsiung , ROC | Storage Agreement between Trans Pacific Chemical Corp. and Lyondell Greater China Ltd., Taiwan Branch | 95167 | Lyondell Greater China, Ltd. | Storage Agreements | 3/1/2008 | $0.00 | | |
| TRANS PACIFIC CHEMICAL CORP. No. 3 Kuo Hwa 1st Street Kaohsiung , ROC | Storage Agreement | 85209 | Lyondell Greater China, Ltd. | Storage Agreements | 4/16/2007 | $0.00 | | |
| TRANS PACIFIC CHEMICAL CORP. No. 3 Kuo Hwa 1st Street, Kaohsinung , ROC | Storage Agreement | 25389 | Lyondell Greater China, Ltd. | Storage Agreements | 11/1/2008 | $0.00 | | |
| TRANS PACIFIC CHEMICAL CORP. No.3 Kuo Hwa 1st Street Kaohsiung , R.O.C. | Storage Agreement OTK-14 | 30253 | Lyondell Greater China, Ltd. | Storage Agreements | 7/1/2008 | $0.00 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| TRANS PACIFIC CHEMICAL CORP. No. 3 Kuo Hwa 1st Street, Kaohsiung, , ROC | STORAGE AGREEMENT | 75284 | Lyondell Greater China, Ltd. | Storage Agreements | 5/1/2007 | $0.00 | | |
| TRANS PACIFIC CHEMICAL CORP. No. 3 Kuo Hwa 1st Street Kaohsiung , ROC | STORAGE AGREEMENT | 45052 | Lyondell Greater China, Ltd. | Storage Agreements | 7/1/2007 | $0.00 | | |
| TRANSCHEMICAL INCORPORATED 419 E De Soto Ave. St. Louis , MO  63147 USA | Transchemical Incorporated_Distribution | 6173 | Equistar Chemicals, LP;Lyondell Chemical Company;Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 1/1/2008 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | 1-Lyondell Chemical Company |
| TRANSPETROL GMBH INTERNATIONALE EISENBAHNSPEDITION Nagelsweg 34 D-20097  Hamburg , Germany | Master Purchase Agreement | 90750 | Millennium Petrochemicals Inc.(Virginia), Lyondell Chemie Nederland B.V. (Non-Debtor); Lyondell Chimie France SAS (France) (Non-Debtor); Lyondell Chimie TDI SCA (France) (Non-Debtor) | Purchase Agreements | 12/1/2006 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | Lyondell Chemie Nederland b.v. |
| TREDEGAR FILM PRODUCTS 1100 Boulders Parkway Richmond, VA  23225 USA | Sales Agreement NA 217-000 and NA 219-000 | 85683 | Equistar Chemicals, LP | Sales Agreements | 10/1/2008 | $0.00 | | |
| TRIANGLE CATTLE CO. RICE FARMS 10919 SH 60 South Bay City, TX  77414 USA | Farming and Grazing License Agreement (FSA Farm # 2168) | 60614 | Equistar Chemicals, LP | Lease | 1/1/2007 | $0.00 | | |
| TRUTH RESOURCES, LP 440 Louisiana Street, Suite 900 Houston , TX  77002 USA | Consulting Services Contract | 56062 | Houston Refining LP | Service Agreements | 1/30/2007 | $6,000.00 | | |
| TULOSO INDEPENDENT SCHOOL DISTRICT 9760 LaBranch P. O. Box 10900 Corpus Christie , TX 78410 USA | Revenue Hold-Harmless Agreement | 66708 | Equistar Chemicals, LP | Tax Related Agreements | 4/11/2000 | $0.00 | | |
| TULOSO-MIDWAY INDEPENDENT SCHOOL DISTRICT 9760 LaBranch P. O. Box 10900 Corpus Christie, TX 78410 USA | Revenue Hold-Harmless Agreement | 66707 | Equistar Chemicals, LP | Tax Related Agreements | 2/21/2000 | $0.00 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| TWL KNOWLEDGE GROUP, L.L.C. 4101 International Parkway Carrollton, TX 75007 USA | Content License Subscription Agreement | 35309 | Lyondell Chemical Company | Subscription Agreement | 3/28/2008 | $0.00 | | |
| TXI OPERATIONS, LP 1341 West Mockingbird Lane Dallas, TX 75247 USA | Environmental Services Contract | 70689 | Equistar Chemicals, LP;Lyondell Chemical Company;Millennium Petrochemicals Inc. (Virginia) | Environmental Agreements | 8/1/2007 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls, LLC |
| TYCO HELATHCARE GROUP LP, D/B/A COVIDIEN 15 Hampshire Street Mansfield , MA 02048 USA | Supply Agreement | 10816 | Basell USA Inc. | Sales Agreements | 1/1/2009 | $0.00 | | |
| U.S. SHIPPERS ASSOCIATION PO Box. 67 East Texas , PA 18046 USA | Membership Agreement | 21482 | Basell USA Inc. | Freight/Shipping Related Contracts | 4/1/2003 | $0.00 | | |
| U.S. SMOKELESS TOBACCO MANUFACTURING COMPANY 800 Harrison Street Nashville , TN 37203 USA | Purchase Agreement | 50929 | Basell USA Inc. | Sales Agreements | 7/1/2007 | $0.00 | | |
| UBS AG 1285 Avenue Of The Americas New York , NY 10019 USA | ISDA Master Agreement | 5877 | Lyondell Chemical Company | Service Agreements | 5/15/2008 | $0.00 | | |
| UNGERMANN-BASS, INC 3900 Freedom Circle Santa Clara , Ca 95054 USA | Master Purchase Agreement | 15434 | Lyondell Chemical Company | Purchase/Pricing and Supply Agreements | 1/5/1994 | $0.00 | | |
| UNION CARBIDE CHEMICALS AND PLASTICS COMPANY, INC. 39 Old Ridgebury Road Danbury, CT 06817-0001 USA | Union Carbide_JV | 81159 | Lyondell Chemical Company | Terminal Agreements | 9/11/1990 | $0.00 | | |
| UNION CARBIDE CHEMICALS AND PLASTICS COMPANY, INC. 39 Old Ridgebury Road Danbury, CT 06817-0001 USA | Union Carbide_JV | 81139 | Lyondell Chemical Company | Lease | 9/11/1990 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| UNION CARBIDE CORP. 39 Old Ridgebury Road Danbury, CT 06817-0001 USA | Union Carbide/Dow_Channelview | 10755 | Lyondell Chemical Company | Sales Agreements | 1/1/2007 | $0.00 | | |
| UNION CARBIDE CORPORATION. 400 West Sam Houston Pkwy S. Houston, TX 77042 USA | Dow Chemical_Bayport Channelview | 40847 | Lyondell Chemical Company | Manufacturing Agreement | 10/1/2005 | $0.00 | | |
| UNION PACIFIC 1800 Parnam St. Omaha, NE 68102 USA | Union Pacific Supplemental Agreement | 20113 | Lyondell Chemical Company | Lease | 1/1/2000 | $0.00 | | |
| UNION PACIFIC RAILROAD COMPANY 1400 Douglas Street Omaha , NE 68179 USA | 66777_UP 7236 CXO Switch Allowances Chemicals | 66777 | Lyondell Chemical Company | Transportation Agreements | 1/1/1994 | $0.00 | | |
| UNION TANK CAR COMPANY 115 Perimeter Center Place Atlanta , GA 30346 USA | Rider No. 25 To Car Service Agreement | 70606 | Millennium Specialty Chemicals Inc. | Maintenance Agreements | 12/11/2008 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| UNION TANK CAR COMPANY (UTLX) 115 Perimeter Center Place Suite 625 Atlanta , GA 30346 USA | Letter-Canceling Rider A016 | 11829 | Millennium Specialty Chemicals Inc. | Transportation Agreements | 9/14/2006 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| UNITED ASSOCIATION OF WORKERS OF AMERICA, LOCAL 528 148-06 Hillside Avenue Jamaica , NY 11435 USA | Collective Bargaining Agreement - Newark | 66371 | Equistar Chemicals, LP | Employment, Collective Bargaining, and Related Agreements | 1/31/2008 | $0.00 | | |
| UNITED HEALTHCARE INSURANCE COMPANY 1333 West Loop South Houston , TX 77010 USA | Agreement to provide AARP Coverage | 65718 | Millennium America Holdings Inc. | Pension/Benefits/Medical-Related Agreements | 4/1/2004 | $0.00 | Millennium America Holdings Inc. (Debtor) | Lyondell Chemical Company |
| UNIVATION TECHNOLOGIES LLC 5555 San Felipe Houston , TX 77056 USA | Catalyst Supply Agreement | 65981 | Equistar Chemicals, LP | Supply Agreements | 12/1/2004 | $0.00 | | |

129

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| UNIVATION TECHNOLOGIES, LLC 5555 San Felipe Houston , TX  77056 USA | UNIPOL POLYETHYLENE METALLOCENE LICENSE AGREEMENT | 45346 | Equistar Chemicals, LP | License Agreement | 10/4/2004 | $0.00 | | |
| UNIVATION TECHNOLOGIES, LLC 5555 San Felipe Houston , TX  77056 USA | HPR-3 Commercialization Agreement | 30120 | Equistar Chemicals, LP | Commercialization Agreement | 12/1/2004 | $0.00 | | |
| UNIVERSE TECHNICAL TRANSLATION INC 8707  Katy Freeway, Suite 20B Houston , TX  77024 USA | Professional Translation Services Agreement | 10646 | Lyondell Chemical Company | Service Agreements | 4/12/2005 | $0.00 | | |
| UNIVERSITY OF OLDENBURG INDUSTRIAL CHEMISTRY Ammerländer Heerstr. 114-118, A5, Room 72/72a D-26111 Oldenburg Postfach 2503 , FRG, Germany  D-26111 | Agreement between the University of Oldenburg, Industrial Chemistry, FB9 and Lyondell Chemical Company | 70473 | Lyondell Chemical Company | Service Agreements | 6/8/2000 | $0.00 | | |
| UNIVERSITY OF TEXAS AT ARLINGTON Office of Research Box 19145 Arlington , TX  76019 USA | Equipment Use Agreement | 25393 | LyondellBasell Advanced Polyolefins USA Inc. | Lease - Equipment | 1/1/2003 | $0.00 | | |
| UOP 25 East Algonquin Road Des Plaines, IL  60017-5017 USA | COOPERATIVE LICENSING AGREEMENT REACTION WITH DISTILLATION TECHNOLOGY | 85294 | Lyondell Chemical Technology, L.P. | License Agreement | 1/12/1993 | $0.00 | | |
| UOP LLC 25 East Algonquin Road Des Plaines , IL  60017-5017 USA | KLP-60 Catalyst Supply Contract | 100693 | Equistar Chemicals, LP | Supply Agreements | 3/1/2005 | $0.00 | | |
| UOP LLC 13105 Northwest Freeway Suite 600 Houston , TX  77040-6312 USA | Molecular Sieve Supply Contract | 65823 | Equistar Chemicals, LP | Supply Agreements | 1/1/2000 | $0.00 | | |
| UREASON HOLDING B.V. Rooseveltstraat 18V 2321B Leiden The Netherlands | CORPORATE LICENSE AGREEMENT | 55934 | Lyondell Chemical Company | License Agreement | 5/17/2006 | $2,583.88 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| US INDUSTRIAL CHEMICALS CO 25 Middlesex Essex Turnpike Iselin , NJ 08830-2721 USA | Acetyls Contract | 66928 | Millennium Petrochemicals Inc. | Purchase Agreements | 10/15/1969 | $0.00 | Millennium Petrochemicals Inc. | LyondellBasell Acetyls, LLC |
| UTLX - UNION TANK CAR CO 115 Perimeter Center Place Suite 625 Atlanta , GA 30348 USA | Letter-Revising Rider A024 | 11826 | Millennium Specialty Chemicals Inc. | Transportation Agreements | 9/1/2008 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| UTLX - UNION TANK CAR CO. 115 Perimeter Center Place Suite 625 Atlanta , GA 30346 USA | Letter-Canceling Rider A014 | 11828 | Millennium Specialty Chemicals Inc. | Transportation Agreements | 6/28/2005 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| UTLX - UNION TANK CAR COMPANY 115 Perimeter Center Place Suite 625 Atlanta , GA 30346 USA | Letter Canceling Rider A021 | 11825 | Millennium Specialty Chemicals Inc. | Transportation Agreements | 12/1/2008 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| VALERO REFINING - TEXAS L.P. One Valero Way Mail Station F3L San Antonio , TX 78249-1616 USA | Valero Corpus Christi Connection Agreement | 66840 | Equistar Chemicals, LP | Pipeline Agreements | 3/30/2006 | $0.00 | | |
| VALERON STRENGTH FILMS 9505 Bamboo Road Houston, TX 77041 USA | Valeron Strength Films | 5620 | Equistar Chemicals, LP | Sales Agreements | 2/1/2006 | $0.00 | | |
| VALSPAR 1101 South Third Street Minneapolis , MN 55415 USA | Valspar_Solvents | 25905 | Lyondell Chemical Company | Sales Agreements | 1/1/2005 | $0.00 | | |
| VELSICOL CHEMICAL CORPORATION 10400 W. Higgins Rd, Ste 600 Rosemont , IL 60018 USA | Velsicol Chemical Corporation_BCO | 41432 | Equistar Chemicals, LP | Sales Agreements | 1/1/2008 | $0.00 | | |
| VELSICOL CHEMICAL CORPORATION 10400 W. Higgins Rd, Ste 600 Rosemont , IL 60018 USA | VELSICOL CHEMICAL CORPORATION _Channelview | 45638 | Equistar Chemicals, LP | Sales Agreements | 7/1/2007 | $0.00 | | |

131

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| VEOLIA WATER NORTH AMERICA E&C INC 14950 Heathrow Forest Parkway, Suite 200 Houston , TX 77032 USA | AGREEMENT FOR OPERATING LEASE OF INITIAL CAPITAL IMPROVEMENTS | 95536 | Lyondell Chemical Company | Service Agreements | 7/18/2001 | $33,090.00 | | |
| VERITECH INC 22960 Shaw Rd Ste 620 Sterling , VA 20166 USA | Software License Agreement | 15287 | Houston Refining LP | License Agreement | 3/1/2005 | $0.00 | | |
| VERTEX, INC. 1041 Old Cassatt Road Berwyn, PA 19312 USA | Vertex Inc. End-User Licence | 5210 | Lyondell Chemical Company | Software Agreements | 10/3/1997 | $0.00 | | |
| VINMAR INTERNATIONAL LTD 16800 Imperial Valley, Suite 499 Houston , TX 77060 USA | Distributor Agreement | 66569 | Equistar Chemicals, LP | Purchase and Sales Agreement | 8/1/2000 | $0.00 | | |
| VISION SERVICE PLAN INSURANCE CO. 333 Quality Dr. Rancho Cordova, CA 95670 USA | Vision Service Plan | 41456 | Equistar Chemicals, LP | Pension/Benefits/Medical-Related Agreements | 12/1/2000 | $0.00 | | |
| VISIONMONITOR SOFTWARE, L.L.C. 11451 Katy Frwy., Ste 510 Houston , TX 77079 USA | Software License Agreement | 40035 | Lyondell Chemical Company | Software Agreements | 3/11/2005 | $0.00 | | |
| VOLTEK, DIVISION OF SEKISNI AMERICA CORP 100 Shepard St Lawerence , MA 01843 USA | Sales Agreement - LDPE Amendment No. 1 | 15567 | Equistar Chemicals, LP | Sales Agreements | 4/1/2001 | $0.00 | | |
| VOPAK NANJIANG PETROCHEMICALS TERMINALS TIANJIN COMPANY LTD. No. 2770 Nanjiang Road, Tanggu, Tianjin, , China 300452 | Storage Agreement Contract No. VN11-2008-02 | 30254 | Lyondell Greater China, Ltd. | Storage Agreements | 10/1/2008 | $0.00 | | |
| VOPAK TERMINAL SHANDONG LANSHAN LTD Lanshan, Rizhao , Province of Shandong, China | Storage Agreement | 15270 | Lyondell Greater China, Ltd. | Storage Agreements | 1/1/2007 | $0.00 | | |

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| VOPAK TERMINAL SHANDONG LANSHAN LTD. Lanshan, Rizhao , Province of Shandong, China | AMENDMENT 2 | 55869 | Lyondell Greater China, Ltd. | Storage Agreements | 1/1/2009 | $0.00 | | |
| VOPAK TERMINAL ZHANGJIAGANG COMPANY LIMITED Block A5, Zhangjiagang Bonded Logistic Park, Zhangjiagang,China , Province of Jiangsu, 215635 China | Storage Agreement | 25284 | Lyondell Greater China, Ltd. | Storage Agreements | 6/1/2007 | $0.00 | | |
| VOPAK TERMINAL ZHANGJIAGANG COMPANY LTD. Block A5 Zhangjiagang Bonded Logistic Park Zhangjiagang,China , Province of Jiangsu 215635 China | Storage Agreement | 16150 | Lyondell Greater China, Ltd. | Storage Agreements | 9/1/2007 | $0.00 | | |
| VOPAK TERMINAL ZHANGJIAGANG COMPANY LTD. Block A5, Zhangjiagang Bonded Logistic Park, Zhangjiagang,China , Province of Jiangsu, 215635 China | Addendum One to Storage Agreement | 35376 | Lyondell Greater China, Ltd. | Storage Agreements | 7/1/2008 | $0.00 | | |
| VOPAK TERMINAL ZHANGJIAGANG COMPANY LTD. Block A5, Zhangjiagang Bonded Logistic Park, Zhangjiagang,China , Province of Jiangsu, 215635 China | Storage Agreement No. VTZ-TC-2007-058 | 500001 | Lyondell Greater China, Ltd. | Storage Agreements | 9/1/2007 | $0.00 | | |
| W. R. GRACE & CO.-CONN 7500 Grace Drive Columbia , MD  21044 USA | Ground Lease | 50918 | Basell USA Inc. | Lease | 6/2/2006 | $0.00 | | |
| W.R. GRACE & CO.-CONN 7500 Grace Drive Columbia , MD  21044 USA | Amendment No. 2 to teh Services Agreement | 76453 | Basell USA Inc. | Service Agreements | 3/18/2008 | $0.00 | | |
| W.R. GRACE & CO.-CONN 7500 Grace Drive Columbia , MD  21044 USA | AMENDMENT NO.1 TO THE SERVICES AGREEMENT | 76452 | Basell USA Inc. | Service Agreements | 8/22/2006 | $0.00 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| W.R. GRACE & CO.-CONN 7500 Grace Drive Columbia , MD 21044 USA | Transition Services | 56053 | Basell USA Inc. | Consent Agreements | 6/13/2006 | $0.00 | | |
| WACKER CHEMICAL CORPORATION 3301 Sutton Road Adrian , MI 49221 USA | Silanes Supply Contract | 70824 | Lyondell Chemical Company | Supply Agreements | 9/1/2006 | $0.00 | | |
| WAM SYSTEMS, INC. 2250 Hickory Road Plymouth Meeting, PA 19462 USA | Picaso Software Maintenance Agreement | 55930 | Equistar Chemicals, LP;Lyondell Chemical Company | Maintenance Agreements | 6/28/2002 | $0.00 | | |
| WAM SYSTEMS, INC. 2250 Hickory Road Plymouth Meeting , PA 19462 USA | Picaso Software License Agreement | 5687 | Lyondell Chemical Company | Software Agreements | 6/28/2002 | $0.00 | | |
| WAREHOUSEMAN: TKT, INC. D/B/A NORRENBERNS TRUCK SERVICE 17579 Mockingbird Road Nashville , IL 62263 USA | 51039_Warehousing Agreement WIL NOTS 080105 | 51039 | Lyondell Chemical Company | Storage Agreements | 8/1/2005 | $0.00 | | |
| WARREN PETROLEUM COMPANY a Division of Gulf Oil Corporation P.O. Box 10 Mont Belvieu , TX 77580 USA | Targa Mt Belvieu Arco II LIne Agreement | 66543 | Equistar Chemicals, LP;Lyondell Chemical Company | Pipeline Agreements | 12/15/1983 | $0.00 | | |
| WAUSAU-MOSINEE PAPER CORPORATION 100 Main Street Mosinee , WI 54455 USA | Crude Turpentine Purchase Agreement | 70584 | Millennium Specialty Chemicals Inc. | Purchase Agreements | 4/1/1998 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| WELLMAN , INC. P.O. Box 188 Johnsonville, SC 29555-0188 USA | Wellman , Inc._BCO | 30586 | Equistar Chemicals, LP | Sales Agreements | 1/1/1993 | $0.00 | | |
| WERNER SYNTHETICS 6965 F North Park Blvd. Charlotte, NC 28216 USA | Sales Agreement - Polymer Amendment 3 | 15492 | Equistar Chemicals, LP | Sales Agreements | 1/1/2008 | $0.00 | | |

134

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| WESCH ENTERPRISES, INC. 610E County Road 1075N Tuscola , IL 61953 USA | Farming License Agreement | 60561 | Equistar Chemicals, LP | Lease | 10/1/2005 | $0.00 | | |
| WESTCHESTER FIRE INSURANCE COMPANY 436 Walnut Street P.O. Box 1000 Philadelphia, PA 19106 USA | Indemnity Agreement | 95496 | LyondellBasell Industries AF S.C.A. | Guaranty | 4/24/2008 | $0.00 | LyondellBasell Industries AF S.C.A. (Debtor) | New Topco |
| WESTVACO CORPORATION 3950 Faber Place Dr. Charleston, SC 29405 USA | Westvaco Corporation_Channelview | 40894 | Equistar Chemicals, LP | Sales Agreements | 1/1/1998 | $0.00 | | |
| WEYERHAEUSER COMPANY PO Box 9777 CH 1K32 Federal Way, WA 98003 USA | Agreement | 70585 | Millennium Specialty Chemicals Inc. | Purchase Agreements | 12/1/2007 | $0.00 | Millennium Specialty Chemicals Inc. | LyondellBasell Flavors & Fragrances LLC |
| WFI 9203 Emmott Road Houston, TX 77040 USA | Addendum to Master Agreement | 100144 | Lyondell Chemical Company | Service Agreements | 10/17/2002 | $0.00 | | |
| WHITAKER OIL COMPANY 1557 Mariatta Road Atlanta, GA 30318 USA | Whitaker Oil Company_Distribution | 6165 | Equistar Chemicals, LP;Lyondell Chemical Company;Millennium Petrochemicals Inc. (Virginia) | Sales Agreements | 5/1/2008 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | Lyondell Chemical Company |
| WIL RESEARCH LABORATORIES LLC 1407 George Road Ashland, OH 44805-8946 USA | CONTRACT NO. MA 00047-2008 | 85859 | Lyondell Chemical Company;Equistar Chemicals, LP | Construction Agreements | 11/8/2008 | $0.00 | | |
| WILLIAMS OLEFINS L.L.C. one William Center Tulsa, OK 74172 USA | Williams Olefins L.L.C._Olefins | 55607 | Equistar Chemicals, LP | Exchange Agreements | 12/31/1999 | $0.00 | | |
| WILLIS B.V. Piet Heijnkade 55 1019 GM Amsterdam The Netherlands | Service Level Agreement 2008/2011 | 65497 | Lyondell Chemical Company | Service Agreements | 2/1/2008 | $0.00 | | |

135

# Schedule 1

## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| WL PLASTICS CORP. 2075 N. Pyrite Road Mills, WY 82644 USA | Contract for Sale of Polymers | 10963 | Equistar Chemicals, LP | Sales Agreements | 1/1/2007 | $0.00 | | |
| YUKONG ARCO CHEMICAL LTD. Yoido P.O. Box 548 26 - 4 Yoido - dong Youndungpo-ku , Seoul 150 South Korea | hexion / McWhorter DCPD Sales Contract | 66959 | Lyondell Chemical Company; Lyondell Chemical Products Europe, LLC; Lyondell Japan, Inc. (Non-Debtor); Lyondell South Asia PTE Ltd. (Non-Debtor) | Participation Agreement | 8/8/1992 | $0.00 | | |
| ZASIO ENTERPRISES INC P O Box 2089 Eagle, ID 83616-2089 USA | Scope of Work: International Legal Records Retention Research Project | 35349 | Lyondell Chemical Company | Consulting Agreements | 6/15/2008 | $0.00 | | |
| ZELLE, HOFMAN, VOELBEL & GETTE 1201 Main Street, Suite 3000 Dallas, TX 75202 USA | Retention of Recovery Counsel | 76461 | Equistar Chemicals, LP | Consulting Agreements | 12/1/1999 | $0.00 | | |
| ZEOLYST ENTERPRISES 280 Cedar Grove Road Conshohocken, PA 19428 USA | License Agreement | 80212 | Lyondell Chemical Company | License Agreement | 12/1/1991 | $0.00 | | |
| ZEON CHEMICALS LP 4100 Bells Lane Louisville, KY 40211 USA | Zeon Chemicals LP_Channelview | 10953 | Equistar Chemicals, LP | Sales Agreements | 1/1/2007 | $0.00 | | |
| ZHANGJIAGANG HONGFA STEEL MAKING CO., LTD. Jinfeng Town, Zhangjiagang Jiangsu Province 215625 China | Technology Agreement | 30258 | Lyondell Chemical Company | License Agreement | 5/8/2008 | $0.00 | | |
| ZHANGJIAGANG TRANS-OCEAN ENTERPRISE CO., LTD Yongyu Village, Jinfeng Town, Zhangjiagang City, , Jiangsu Province, China | Addendum No. 1 | 35313 | Lyondell Greater China, Ltd. | Storage Agreements | 6/1/2007 | $0.00 | | |
| ZHANGJIAGANG TRANS-OCEAN ENTERPRISE CO., LTD. Yongyu Village, Jinfeng Town, Zhangjiagang City, , Jiangsu Province, China | Storage Agreement | 85212 | Lyondell Greater China, Ltd. | Storage Agreements | 6/1/2007 | $0.00 | | |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| ZHANGJIAGANG TRANS-OCEAN ENTERPRISE CO., LTD. Yongyu Village, Jinfeng Town, Zhangjiagang City, Jiangsu Province, China | Storage Agreement | 85211 | Lyondell Greater China, Ltd. | Storage Agreements | 5/1/2007 | $0.00 | | |
| ZURICH AMERICAN INSURANCE COMPANY 3249 Quality Drive, Suite 300 Rancho Cordova, CA 95670 USA | Worker' Compensation and Employers Liability Insurance Policy | 66765 | Equistar Chemicals, LP;Houston Refining LP;Lyondell Chemical Company;Millennium Chemicals Inc. | Insurance Contracts | 3/1/2008 | $0.00 | Millennium Chemicals Inc. (Debtor) | LyondellBasell Acetyls, LLC |
| ZURICH AMERICAN INSURANCE COMPANY 3249 Quality Drive, Suite 300 Rancho Cordova, CA 95670 USA | Worker' Compensation and Employers Liability Insurance Policy | 66764 | Equistar Chemicals, LP;Houston Refining LP;Lyondell Chemical Company;Millennium Chemicals Inc. | Insurance Contracts | 3/1/2007 | $0.00 | Millennium Chemicals Inc. (Debtor) | LyondellBasell Acetyls, LLC |
| ZURICH AMERICAN INSURANCE COMPANY 12222 Merit Drive, Suite 700 Dallas, TX 75251 USA | Worker' Compensation and Employers Liability Insurance Policy | 66763 | Equistar Chemicals, LP;Lyondell Chemical Company;Millennium Chemicals Inc. | Insurance Contracts | 3/1/2006 | $0.00 | Millennium Chemicals Inc. (Debtor) | LyondellBasell Acetyls, LLC |
| ZURICH AMERICAN INSURANCE COMPANY One Liberty Plaza 165 Broadway, 28th Floor New York, NY 10006 USA | Deductible Agreement | 66754 | Equistar Chemicals, LP;Lyondell Chemical Company;Millennium Chemicals Inc. | Insurance Contracts | 3/1/2006 | $0.00 | Millennium Chemicals Inc. (Debtor) | LyondellBasell Acetyls, LLC |
| ZURICH AMERICAN INSURANCE COMPANY One Liberty Plaza 165 Broadway, 28th Floor New York, NY 10006 USA | Workers Compensation and Employers Liability Insurance Policy | 66746 | Lyondell Chemical Company | Insurance Contracts | 7/22/1999 | $0.00 | | |
| ZURICH AMERICAN INSURANCE COMPANY 160 Chestnut St. Philadelphia, PA 19192 USA | Workers Compensation and Employers Liability Insurance Policy | 66745 | Equistar Chemicals, LP | Insurance Contracts | 12/31/1999 | $0.00 | | |
| ZURICH INSURANCE Zurich Towers 1400 American Lane Schaumburg, IL 60195-1056 USA | General Agreement of Indemnity | 100961 | Millennium Petrochemicals Inc. (Virginia) | Insurance Contracts | 8/1/2005 | $0.00 | Millennium Petrochemicals Inc.(Virginia) | LyondellBasell Acetyls, LLC |
| ZURICH INSURANCE COMPANY One Liberty Plaza 165 Broadway, 32nd Floor New York, NY 10006-1424 USA | Worker' Compensation and Employers Liability Insurance Policy | 66762 | Equistar Chemicals, LP;Lyondell Chemical Company;Millennium Chemicals Inc. | Insurance Contracts | 3/1/2005 | $0.00 | Millennium Chemicals Inc. (Debtor) | LyondellBasell Acetyls, LLC |

# Schedule 1
## Executory Contracts to Assume

| Counterparty Name & Address | Contract Title | Contract ID | Debtor Name | Contract Type | Dated | Cure Amount($) | Assigning Entity | Assignee Entity |
|---|---|---|---|---|---|---|---|---|
| ZURICH INSURANCE COMPANY One Liberty Plaza 165 Broadway, 32nd Floor New York, NY 10006-1424 USA | Deductible Premium Agreements | 66744 | Lyondell Chemical Company | Insurance Contracts | 7/22/1998 | $0.00 | | |
| ZURICH INSURANCE COMPANY One Liberty Plaza 165 Broadway, 32nd Floor New York, NY 10006-1424 USA | Workers Compensation and Employers Liability Insurance Policy | 66742 | Lyondell Chemical Company | Insurance Contracts | 7/22/1998 | $0.00 | | |
| ZURICH-AMERICAN INSURANCE COMPANY One Liberty Plaza 165 Broadway, 28th Floor New York, NY 10006-1424 USA | Workers' Compensation and Employers' Liability Insurance Policy | 66741 | Lyondell Petrochemical L.P. Inc. | Insurance Contracts | 12/31/1993 | $0.00 | | |
| ZURICH-AMERICAN INSURANCE COMPANY One Liberty Plaza 165 Broadway, 28th Floor New York, NY 10006-1424 USA | Workers Compensation and Employers Liability Insurance Policy | 66747 | Equistar Chemicals, LP | Insurance Contracts | 12/31/2002 | $0.00 | | |

138

**TAB 2**

## IDENTIFIED INITIAL MEMBERS OF THE NEW TOPCO SUPERVISORY BOARD

In accordance with section 1129(a)(5)(A) of the Bankruptcy Code and Section 6.1 of the Plan, subject to confirmation of the Plan and the occurrence of the Effective Date, the below individuals are the current known, expected members of the initial Supervisory Board of LyondellBasell Industries N.V. The other members of the Supervisory Board have not yet been identified and will be disclosed prior to the Confirmation Hearing.

> _Joshua J. Harris_. Mr. Harris is a founding Senior Managing Director at Apollo Global Management, LLC and has served as Managing Partner of certain affiliates of Apollo since 1990. Prior to that time, Mr. Harris was a member of the Mergers and Acquisitions Department of Drexel Burnham Lambert Incorporated. Mr. Harris is also a director of Apollo Global Management, LLC, Berry Plastics Group, CEVA Logistics, Hexion Specialty Chemicals, Inc., Momentive Performance Materials and several non-profit organizations.

> _Scott M. Kleinman_. Mr. Kleinman is a Senior Partner at Apollo, where he has worked since February 1996. Prior to that time, Mr. Kleinman was employed by Smith Barney Inc. in its Investment Banking division. Mr. Kleinman is also a director of Hexion Specialty Chemicals, Inc., Momentive Performance Materials, Noranda Aluminum Holding Corporation, Realogy Corporation and Verso Paper Corp.

> _Philip Kassin_. Mr. Kassin is Executive Vice President and Head of M&A and Financing of Access Industries and has served as an officer and director of certain affiliates of Access Industries since 2005. Mr. Kassin served as financial advisor to Access Industries on the acquisition of Basell in 2005 and then on the Basell Supervisory Board from 2005–2007. Mr. Kassin currently serves on the Supervisory Board of LyondellBasell and is Chairman of the Audit Committee. Mr. Kassin is also a director of Boomerang Tube, an oil country tubular goods manufacturer and Prochemie GmbH.

> _Jeffrey S. Serota_. Mr. Serota is a Senior Partner in the Private Equity Group of Ares Management LLC, where he has worked since 1997. Mr. Serota is also a director of Douglas Dynamics, Inc., Exco Resources, Inc., Marietta Corporation, SandRidge Energy, Inc., and WCA Waste Corporation.

**TAB 3**

## INITIAL OFFICERS OF NEW TOPCO

In accordance with section 1129(a)(5)(A) of the Bankruptcy Code and Section 6.2 of the Plan, subject to confirmation of the Plan and the occurrence of the Effective Date, the below individuals are the executive officers who will manage LyondellBasell Industries N.V.

*Chief Executive Officer.* James L. Gallogly was named Chief Executive Officer of LyondellBasell AF in May 2009. He was Executive Vice President of Exploration and Production for ConocoPhillips from October 2008 to May 2009 and served as its Executive Vice President of Refining, Marketing and Transportation from April 2006 to October 2008. Mr. Gallogly was President and CEO of Chevron Phillips Chemical Company LLC from July 2000 to March 2006 and served as a member of its Board of Directors.

*Chief Financial Officer.* C. Kent Potter was named Chief Financial Officer of LyondellBasell AF in August 2009. Mr. Potter was the Chief Financial Officer of TNK-BP, Russia's third largest oil company from June 2003 to October 2005. Mr. Potter was previously Senior Vice President and Chief Financial Officer for Chevron Phillips Chemical Company (a major producer of polyolefins) from 2000 to June 2003 and served as a member of Chevron Phillips Chemical Company's Board of Directors. Mr. Potter also served as a member of the Supervisory Board and Chairman of the Audit Committee of Basell AF S.C.A. and its successor, LyondellBasell AF, from November 2005 through July 2009.

*Executive Vice President and Chief Legal Officer.* Craig Glidden was named Executive Vice President and Chief Legal Officer of LyondellBasell AF in August 2009. Mr. Glidden served as Senior Vice President, legal and Public Affairs, General Counsel and Corporate Secretary of Chevron Phillips Chemical Company from April 2004 to August 2009 and as its Vice President, General Counsel and Corporate Secretary from July 2000 to April 2004. Before joining Chevron Phillips Chemical, Mr. Glidden engaged in the private practice of law, focusing on litigation and arbitration of complex commercial disputes.

*Senior Vice President, Refining.* Kevin W. Brown was named Senior Vice President, Refining of LyondellBasell AF in October 2009. He served as Senior Vice President and Executive Vice President, Operations for Sinclair Oil Corporation from March 1994 to September 2009 and served as a member of Sinclair's Board of Directors. From July 1992 to February 1994, Mr. Brown was Refinery Manager of the Sinclair Tulsa Refinery. From September 2008 to June 2009, he also served as the Chairman of the Board of the National Petrochemical and Refiners Association.

*Senior Vice President, O&P—Americas.* Bhavesh B. (Bob) Patel will become Senior Vice President, O&P—Americas in April 2010. He served as General Manager, Olefins and NGLs for Chevron Phillips Chemical Company from May

2009 to March 2010 and as its General Manager, Asia Pacific Region—Singapore from April 2008 to May 2009. Previously, he served as Business Manager, Olefins for Chevron Phillips Chemical Company from January 2005 to April 2008.

*Senior Vice President, O&P—EAI*. Anton de Vries was named Senior Vice President, O&P—EAI of LyondellBasell AF in January 2010. He served as the president of the Polymers division at LyondellBasell AF from December 2007 to December 2009. From March 2007 to December 2007, Mr. de Vries was president of Basell Polyolefins Europe. From 2005 to 2007, he was president of the Global Advanced Polyolefins business of Basell. From 2002 to 2005, he served as president of research and development and a member of the Basell Management Team.

*Senior Vice President Intermediates & Derivates*. Patrick Quarles was named Senior Vice President, Intermediates & Derivates of LyondellBasell AF in January 2010. He served as Divisional Senior Vice President at LyondellBasell AF from December 2007 to December 2009. He served as vice president for Performance Chemicals at Lyondell Chemical from 2004 to December 2007. From 2000 to 2004, Mr. Quarles held positions as director, Investor Relations and director, Business Performance Analysis and Reporting, at Lyondell Chemical.

*Senior Vice President, Technology*. Just Jansz was named Senior Vice President, Technology of LyondellBasell AF in January 2010. He served as the president of the Technology division at LyondellBasell AF from December 2007 to December 2009. He served as president of the Basell Technology business form April 2004 to December 2007. From 2000 to April 2004, Mr. Jansz served as senior vice president, Advanced Polyolefins at Basell.

**TAB 4-A**

# AMENDMENT TO THE ARTICLES OF ASSOCIATION OF LYONDELLBASELL INDUSTRIES N.V.

On [DATE] appeared before me, dr. Thomas Pieter van Duuren, civil law notary (*notaris*) in Amsterdam, The Netherlands:

[NAME], in this matter with residence at the offices of Clifford Chance LLP, Droogbak 1a, 1013 GE Amsterdam, The Netherlands, born in [PLACE], [COUNTRY] on [DATE].

The person appearing has declared that the general meeting of shareholders of **LyondellBasell Industries N.V.,** a public company (*naamloze vennootschap*) incorporated under Dutch law, having its seat (*statutaire zetel*) in Rotterdam, The Netherlands and its registered office at Weena 737, 3013 AM Rotterdam, The Netherlands and registered with the Dutch Commercial Register (*Handelsregister*) under number 24473890 (the "**Company**"), has resolved on [  ] to amend and to completely renew the articles of association of the Company as stated hereinafter as well as to authorise the person appearing to execute this deed of amendment to the articles of association of which resolutions appear from a photocopy of the shareholder's resolution attached to this deed (Schedule I).

The person appearing has also declared that the articles of association of the above mentioned Company were previously amended by deed of amendment of the articles of association on [  ] two thousand and ten executed before [a deputy of me,] civil law notary, for which the ministerial declaration of no objections was granted on [  ] and ten under number N.V. 1567749, and have not been amended since then.

In order to execute said resolution to amend the articles of association, the person appearing has declared to amend and to completely renew the articles of association as follows:

## ARTICLES OF ASSOCIATION

## CHAPTER I DEFINITIONS

1. **DEFINITIONS**

1.1    In these articles of association the following expressions shall have the following meanings:

1.1.1    an "**Accountant**": a *register-accountant* or other expert referred to in section 2:393 Dutch Civil Code ("**DCC**"), or an organisation within which such accountants cooperate.

1.1.2    the "**Annual Accounts**": the balance sheet and the profit and loss account including the explanatory notes;

1.1.3    the "**CEO**" the Chief Executive Officer of the Company;

1.1.4    the "**Class B Liquidation Preference**" ten dollars and sixty-one cents (USD 10.61) per class B ordinary share, subject to adjustments for any stock splits or stock combinations;

1.1.5    "**Closing Price**" means, as of any date, the last reported per share sales price of a share of class B ordinary shares on such date (or, if no last reported sale price is reported, the average of the bid and ask prices or, if more than one in either case, the average of the average bid and the average ask prices on such date) as reported on the New York Stock Exchange, or if the class B ordinary shares are not listed on the New York Stock Exchange, as reported by the principal national or regional securities exchange or quotation system on which the class B ordinary shares are then listed or quoted, or if the class B ordinary shares are not so listed or reported, as reported on the OTC Bulletin Board or, if not so listed or reported, as reported in the "pink sheets" published by Pink OTC Markets, Inc. (or similar organization or agency succeeding to its functions of reporting prices); *provided*, *however*, that in the absence of such quotations, the Closing Price for the class B ordinary shares shall be the Closing Price (similarly determined in the manner set forth in this definition) of the class A ordinary shares, and in the absence of such quotations, the Closing Price for the class B ordinary shares will be determined by the supervisory board in good faith.

1.1.6    the "**Company**": the company governed by these articles of association;

1.1.7    a "**Deemed Liquidation**": the voluntary or involuntary liquidation, dissolution or winding up of subsidiaries of the Company whose assets constitute all or substantially all of the assets of the Company and its subsidiaries taken as a whole;

1.1.8    the "**Distributable Part of the Shareholders' Equity**": the part of the shareholders' equity exceeding the issued share capital plus the reserves which must be maintained by law;

1.1.9    an "**e-mail**": a legible and reproducible message sent by electronic means of communication;

2

1.1.10    a "**Liquidation**": the voluntary or involuntary liquidation, dissolution or winding up ("*ontbinding*") of the Company;

1.1.11    the "**Liquidation Preference Expiration Date**": the first date upon which the Closing Price exceeds two hundred percent (200%) of the Class B Liquidation Preference, for at least forty-five (45) trading days within a period of sixty (60) consecutive trading days; provided however, that the Closing Price must exceed such threshold on both the first and last day of the sixty (60) day period.

1.2    In addition, unless the content requires otherwise, the expression "**written**" or "**in writing**" shall include messages sent by e-mail.

## CHAPTER II NAME, SEAT, OBJECTS

2.    **NAME, SEAT**

2.1    The name of the Company is: LYONDELLBASELL INDUSTRIES N.V.

2.2    The seat (*statutaire zetel*) of the Company is in Rotterdam, The Netherlands.

3.    **OBJECTS**

The objects of the Company are:

(a)    to incorporate, to participate in any manner whatsoever, to manage, to supervise, to cooperate with, to acquire, to maintain, to dispose of, to transfer or to administer in any other manner whatsoever all sorts of participations and interests in businesses and companies;

(b)    to borrow, to lend and to raise funds, including the issue of bonds, promissory notes or other securities in the widest sense of the word;

(c)    to grant guarantees and to grant securities over the assets of the Company for the benefit of companies and enterprises with which the Company forms a group;

(d)    to acquire, to administer, to operate, to encumber, to dispose of and to transfer moveable assets and real property and any right to or interest therein;

(e)    to advise and to render services to enterprises of any nature;

(f)    to carry out all sorts of industrial, financial and commercial activities, including manufacturing, the import, export, purchase, sale, distribution and marketing of products and raw materials;

and all matters associated with the foregoing, related or conducive thereto, with the objects to be given their most expansive interpretation.

3

## CHAPTER III CAPITAL AND SHARES

4.  **AUTHORISED CAPITAL**

4.1   The authorised capital amounts to fifty one million euro (EUR 51,000,000.00) and is divided into one billion (1,000,000,000) class A ordinary shares of four eurocent (EUR 0.04) each and two hundred seventy-five million (275,000,000) class B ordinary shares of four eurocent (EUR 0.04) each. The composition of the authorised capital may change pursuant to the conversion of shares as set out in article 5.7, so that the number of class A ordinary shares in the authorised capital is increased by the number of class B ordinary shares being converted into class A ordinary shares, while the number of  class B ordinary shares in the authorised capital is decreased by that same number of shares, taking into account that as soon as all issued class B ordinary shares have been converted into class A ordinary shares, any remaining class B ordinary shares in the authorized share capital of the Company will be converted into class A ordinary shares so that there shall no longer be any class B ordinary shares in the authorized share capital of the Company.

4.2   The class A ordinary shares shall be numbered consecutively from A-1 onwards, the class B ordinary shares shall be numbered consecutively from B-1 onwards.

4.3   References in these articles of association to "shares" and "shareholders" shall include both classes of ordinary shares and the holders of those ordinary shares, except where the context requires otherwise.

4.4   Any amounts paid up on shares of any class in excess of the nominal value of such shares shall be added to the general share premium reserve attached to all issued ordinary shares.

4.5   As long as class B ordinary shares are issued and outstanding, any stock split, stock dividend, stock combination or similar transaction, can only be resolved by the general meeting of shareholders if such stock split, stock dividend, stock combination or similar transaction is performed equally and simultaneously both for class A ordinary shares and class B ordinary shares.

## CHAPTER IV ISSUE OF SHARES, COMPANY SHARES, CAPITAL REDUCTION

4

5.    **ISSUE OF SHARES, BODY OF THE COMPANY AUTHORISED TO ISSUE SHARES, CONVERSION OF SHARES**

5.1    Shares will be issued pursuant to a resolution of the supervisory board, which resolution will set forth the number of shares to be issued, the person to whom such shares will be issued, the price for each share and the other pertinent terms of issuance. The issue of a registered share, not being a share as referred to in section 2:86c DCC, will require an instrument intended for such purpose executed before a civil law notary in the Netherlands.

5.2    The designation of the supervisory board as being the body competent to issue shares shall be valid for a period of five years starting on the [  ] two thousand ten and ending on the [  ] two thousand fifteen (unless this period is extended in accordance with article 5.3) and shall include the authority to issue twenty percent of the authorised capital from time to time, provided that the class A ordinary shares issued in accordance with article 5.7 upon conversion of one or more class B ordinary shares shall be excluded from this limitation.

5.3    The designation of the supervisory board as being the body competent to issue shares may, subject to article 5.4, by these articles of association or by a resolution of the general meeting of shareholders, be extended each time for a period not exceeding five years. If the designation is extended, the number of shares which may be issued shall be determined at the same time, with a maximum of twenty percent of the authorised capital from time to time, provided that the class A ordinary shares issued in accordance with article 5.7 upon conversion of one or more class B ordinary shares shall be excluded from this limitation. Unless laid down otherwise in the designation, it may not be withdrawn.

5.4    If the designation of the supervisory board as being the body competent to issue shares ends, the general meeting of shareholders shall be competent to issue shares unless another body is designated for this purpose by the general meeting of shareholders. The resolution of the general meeting of shareholders to designate another body for this purpose or to issue shares will only be taken on the proposal of the management board which proposal will have been approved by the supervisory board and will have a duration of no more than five years and relate to no more than twenty percent of the authorised capital from time to time, provided that the class A ordinary shares issued in accordance with article 5.7 upon conversion of one or more class B ordinary shares shall be excluded from this limitation.

5.5    Other than in connection with any stock split, stock dividend, stock combination or similar transaction, as long as class B ordinary shares are issued and outstanding,

5

no additional class B ordinary shares can be issued without the unanimous approval of the meeting of holders of class A ordinary shares and class B ordinary shares, resolved in a meeting in which all holders of class A ordinary shares and class B ordinary shares are present or represented.

5.6    The provisions in paragraphs 1 up to and including 5 of this article will be correspondingly applicable to the granting of rights to subscribe for shares but will not apply to the issue of shares to a party exercising a previously acquired right to subscribe for shares.

5.7    At the earlier of (i) receipt by the management board of a written request of the relevant holder of class B ordinary shares with respect to the number of class B ordinary shares specified by such holder, (ii) acquisition by the Company of one or more class B ordinary shares or (iii) upon the Liquidation Preference Expiration Date with respect to each outstanding class B ordinary share, each such class B ordinary share will be converted into one (1) class A ordinary share. The conversion of class B ordinary shares shall take place immediately upon the occurrence of any of the events specified above in this paragraph. In case of the conversion of a registered class B ordinary share into a registered class A ordinary share, such conversion shall take place without any further action being required. In case of the conversion of a registered class B ordinary share into a class A ordinary bearer share, such conversion shall take place by means of an issue of a class A ordinary share bearer certificate to such shareholder or adding such class A ordinary share to the global certificate A. In case of the conversion of a class B ordinary bearer share into a class A ordinary bearer share, such conversion shall take place after lodging the class B ordinary bearer share certificate with the Company or removing such class B ordinary share from the global certificate B against an issue of a class A ordinary bearer share certificate to such shareholder or adding such class A ordinary share to the global certificate A. In case of the conversion of a class B ordinary bearer share into a registered class A ordinary share, such conversion shall take place after lodging the class B ordinary bearer share certificate with the Company or removing such class B ordinary share from the global certificate B. Within one (1) day after the conversion of class B ordinary shares into class A ordinary shares, a special declaration regarding the conversion shall be deposited by the management board at the offices of the Trade Register of the district in which the Company is registered. This declaration shall include the changes which were made to the composition of the issued and authorised capital of the Company as a result of the conversion of shares.

6.    **CONDITIONS OF ISSUE OF SHARES, PRE-EMPTIVE RIGHTS**

6.1    In the resolution to issue shares the price and further conditions of the issue will be determined. Apart from the provisions laid down in section 2:80 paragraph 2 DCC the issue price may not be below par.

6.2    In case of shares being issued, every holder of shares will hold a pre-emptive right in the proportion that the aggregate amount of his shares bears to the total amount of shares outstanding.

However, a holder of shares will not have a pre-emptive right to shares which are being issued against contribution other than in cash, to shares which will be issued to employees of the Company or of a group company and to shares which will be issued as a result of a legal merger or legal split-off.

6.3    The pre-emptive right may be restricted or excluded by a resolution of the supervisory board and provided that the supervisory board may only exercise this authority if it will then also be competent to pass a resolution for the issue of shares with the restriction or exclusion of pre-emptive rights. The provisions of paragraphs 1 up to and including 4 of article 5 will be correspondingly applicable to the extent possible. In case the general meeting of shareholders wishes to restrict or exclude the pre-emptive right, the pre-emptive right accruing to shareholders may only be restricted or excluded, on the proposal of the supervisory board. If another body than the general meeting of shareholders or the supervisory board is competent to restrict or exclude the pre-emptive rights, the pre-emptive right accruing to shareholders may only be restricted or excluded, with the approval of the supervisory board. The resolution of the general meeting of shareholders subject to the required approval of the supervisory board to restrict or exclude the pre-emptive rights, or the resolution of the general meeting of shareholders to designate another body competent to restrict or exclude the pre-emptive rights subject to the required approval of the supervisory board, will require a majority of at least two thirds (2/3) of the votes cast in case less than one half (1/2) of the issued capital is represented at the general meeting of shareholders.

6.4    In case of rights to subscribe for shares being granted, paragraphs 2 and 3 of this article will be correspondingly applicable. Shareholders will not hold a pre-emptive right to shares which are being issued to a party who exercises an already previously acquired right to subscribe for shares.

6.5    Notwithstanding anything herein to the contrary, the Company shall not issue any class of non-voting equity securities unless and solely to the extent permitted by

7

section 1123(a)(6) of the United States Bankruptcy Code (the "Bankruptcy Code") as in effect on the date of execution of the amendment of articles of association by which this article 6.5 became legally effective; provided, however, that this Section 6.5 (a) will have no further force and effect beyond that required under section 1123(a)(6) of the Bankruptcy Code; (b) will have such force and effect, if any, only for so long as section 1123(a)(6) of the Bankruptcy Code is in effect and applicable to the Company; and (c) in all events may be amended or eliminated in accordance with applicable law from time to time in effect.

### 7. PAYMENTS ON SHARES

7.1 Upon subscription for a share the full nominal amount must be paid thereon, as well as in case the share is subscribed at a higher amount, the difference between said amounts, everything without prejudice to the provisions in section 2:80 paragraph 2 DCC.

7.2 Payment in foreign currency may only be made with permission of the Company.

7.3 The management board will be competent to enter into legal acts stated in section 2:94 DCC, without prior approval of the general meeting of shareholders.

### 8. COMPANY SHARES

8.1 Acquisition by the Company of shares in its capital not paid up will be null and void. The Company may, without prejudice to the statutory provisions and those laid down in these articles of association, only acquire said company shares for a consideration in case:

a. its equity capital reduced by the price of acquisition, will not be lower than the paid and claimed part of its capital increased by the reserves which must be maintained by law, and

b. the nominal amount of the shares in its capital acquired, held or held in pledge by the Company or those held by a subsidiary, will not exceed one–half of its issued capital.

Decisive for the validity of the acquisition will be the amount of the equity capital according to the last adopted balance sheet, reduced by the acquisition price for the shares in the capital of the Company, the amount of the loans referred to in section 2:98c paragraph 2 DCC and distributions to the charge of the profit or reserves to other parties which the Company and its subsidiaries owed after the date of the balance sheet. In case a financial year will have expired for longer than six (6) months without the annual accounts having been adopted, an acquisition in

8

accordance with the present paragraph will not be permitted. If depository receipts for shares in the capital of the Company have been issued, such depository receipts shall be put on par with shares for the purpose of the foregoing.

8.2    Other than gratuitously, the Company may only acquire shares in case the general meeting of shareholders will have authorized the management board for that purpose and only if it acquires class A ordinary shares and class B ordinary shares pro rata on the same terms, including price per share; provided, however, notwithstanding the foregoing, the Company may:

(1)    purchase class A ordinary shares or class B ordinary shares in the open market or in privately negotiated transactions (in each case, other than in connection with an offer to all holders of either class A ordinary shares or class B ordinary shares) which transaction has been approved by a majority of the disinterested non-employee directors of the supervisory board;

(2)    purchase shares from members of the supervisory board, members of the management board, directors, officers or employees of the Company or any of its direct or indirect subsidiaries upon their death or termination of employment or service in accordance with the Company's benefit plans;

(3)    purchase shares in connection with the "cashless exercise" or "net share settlement" upon the exercise or conversion of any option, warrant or other security that is exercisable or convertible into ordinary shares in accordance with its terms;

(4)    purchase fractional shares and deliver cash in lieu of issuing fractional shares.

Said authorisation will only be valid for a period not exceeding eighteen (18) months. In the authorisation the general meeting of shareholders shall determine how many shares or depository receipts thereof may be acquired, the manner in which they may be acquired and between what limits the price shall be.

8.3    The authorisation will not be required for the acquisition of company class A ordinary shares by the Company or depository receipts thereof in order to transfer these to employees in the employ of the Company or of a legal entity with which it is associated in a group by virtue of an arrangement applicable to said employees. These shares or the depository receipts shall be included in the price list of a stock exchange.

8.4    A resolution of the management board with respect to the acquisition or alienation of company shares or depository receipts thereof will be subject to the approval of the supervisory board.

8.5   In the general meeting of shareholders no votes may be cast in respect of a company share held by the Company or a subsidiary company; no votes may be cast in respect of a share for which the depository receipt is held by the Company or a subsidiary company. Usufructuaries or pledgees of a company share held by the Company or a subsidiary company will not be excluded from voting rights, if the right of usufruct or lien was created before the Company or such subsidiary company held such share. The Company or a subsidiary company may not cast votes for shares on which it holds a right of usufruct or a right of lien.

8.6   In the determination of the number of votes exercised in a general meeting of shareholders, to what extent shareholders are present or represented or to what extent the share capital has been provided or is represented, the shares for which no votes may be cast in compliance with the above will not be taken into account.

9.   **CAPITAL REDUCTION**

9.1   The general meeting of shareholders may pass a resolution for the reduction of the issued capital, however, exclusively on proposal of the management board which proposal will have been approved by the supervisory board:

a.  by the withdrawal of shares; or

b.  by reducing the amount of the shares in an amendment of the articles of association, provided that as a result thereof the issued capital or the paid part thereof will not fall below the amount prescribed in section 2:67 DCC.

In said resolution, the shares to which the resolution relates shall be designated and the implementation of the resolution shall be arranged.

9.2   A resolution for withdrawal may only relate to shares held by the Company itself or of which it holds the depositary receipts.

9.3   Reduction of the amount of the shares without repayment and without exemption from the liability for payment shall be made proportionately on all shares. The requirement of proportion may be deviated from with the consent of all shareholders concerned.

9.4   Partial repayment on shares or exemption from the liability for payment will only be possible by way of implementation of a resolution for reduction of the amount of the shares. Such a repayment or exemption shall be made proportionately on all shares. The requirement of proportion may be deviated from with the consent of all shareholders concerned.

9.5    A resolution for capital reduction will require a majority of at least two thirds (2/3 of the votes cast in case less than one half (1/2) of the issued capital is represented at the general meeting of shareholders.

9.6    The convening notice for a meeting in which a resolution as stated in the present article will be passed will state the object of the capital reduction and the manner of implementation. In case the capital reduction will involve an amendment of the articles of association, those parties who have sent such a convening notice shall simultaneously deposit a copy of said proposal, containing the verbatim text of the proposed amendment, at the office of the Company as well as at an address to be mentioned in the convening notice, for perusal by every shareholder and holder of depository receipts of shares issued with the cooperation of the Company, until the end of the meeting.

9.7    The Company will deposit the resolutions referred to in the present article at the office of the Trade Register and will announce the depositing in a nationally distributed daily newspaper.

9.8    On the proposal of the management board, which proposal will have been approved by the supervisory board, the general meeting of shareholders may decide that a repayment on shares will either fully or partly be made not in cash but in participations in a company in which the Company participates either directly or indirectly.

10.    **BEARER    SHARES    AND    REGISTERED    SHARES,    SHARE CERTIFICATES, MISSING AND DAMAGED SHARE CERTIFICATES**

10.1    The shares will, at the option of the management board which will have been approved by the supervisory board, either be in bearer form or in registered form.

10.2    Bearer share certificates will either be available in the denominations one (1) share, five (5) shares, ten (10) shares and one hundred (100) shares and further denominations of such higher numbers of shares as the management board may determine or in the form of one (1) or more global certificates A for class A ordinary bearer shares and/or one (1) global certificate B for class B ordinary bearer shares, as the management board may determine. All share certificates shall be identified by numbers and/or letters.

10.3    At the discretion of the management board and with the approval of the supervisory board, the holder of bearer shares may, after lodging his bearer share certificate(s) with the Company, have issued to him registered shares of the same nominal amount. At the discretion of the management board and with the approval

11

of the supervisory board, the holder of registered shares may have issued to him bearer share certificate(s) of the same nominal amount.

10.4    Upon written request by or on behalf of a shareholder, missing or damaged share certificates may be replaced by new share certificates bearing the same number and/or letters, provided that the shareholder who has made such request, or the person making such request on his behalf, provides satisfactory evidence of his title and in so far as applicable, the loss of his share certificates to the management board, and further subject to such conditions as the management board may deem appropriate.

10.5    The issue of a new share certificate shall render the share certificate which its replaces invalid.

11.    **SHAREHOLDERS' REGISTER**

11.1    A register will be kept at the office of the Company in which all holders of registered shares will be registered, with additional statement of their addresses, the class of shares held and the amount paid on each share.

       The register will also include the name and addresses of those parties holding a right of usufruct or a right of lien on said shares, with additional statement which rights attached to the shares will accrue to them in accordance with article 12.

11.2    At request, the management board will gratuitously provide a shareholder, a usufructuary and a pledgee with an extract from the register with respect to his right to a registered share.

       In case the share will be subject to a right of usufruct or a right of lien, the extract will state to whom the rights referred to in article 12 will accrue.

11.3    The management board will deposit the register at the office of the Company for perusal by the shareholders as well as the usufructuaries and pledgees to whom the rights of a holder of depository receipts referred to in the next article accrue.

       The preceding sentence will not apply to the part of the register kept outside the Netherlands in order to comply with the legalisation applicable there or by virtue of any stock exchange regulations.

11.4    The register will be kept up-to-date regularly.

       Every annotation in a register will be signed on behalf of or by the management board.

12

Otherwise the manner in which the register will be arranged will be determined by the management board, with approval of the supervisory board.

## CHAPTER V TRANSFER OF SHARES, RIGHTS IN REM

12.    **TRANSFER OF SHARES, USUFRUCT AND PLEDGE, SHARES IN AN UNDIVIDED COMMUNITY OF PROPERTY**

12.1    The transfer of a registered share, not being a share referred to in section 2:86c DCC, will require an instrument intended for such purpose executed before a civil law notary in the Netherlands. The transfer of a registered share, being a share referred to in section 2:86c DCC, will require a deed of transfer and serving of said deed upon the Company or written acknowledgement of the delivery by the Company, unless pursuant to section 13.2 and section 10.2 or section 16.2 of the Dutch act of conflict law with respect to property law (*Wet conflictenrecht goederenrecht*) other legal requirements for the transfer of registered shares are applicable. To the extent applicable, the Company hereby chooses to apply the laws of the State of New York with respect to property law (*Wet conflictenrecht goederenrecht*).

12.2    The provisions in paragraph 1 of this article will be correspondingly applicable to the creation and delivery of the right of usufruct and to the creation of a right of lien on a registered share.

12.3    The provisions in paragraph 1 of this article will be correspondingly applicable to the apportionment of registered shares in case of a division of any community of property.

12.4    The shareholder will hold the voting right on the shares on which a right of usufruct or a right of lien will have been created. However, the voting right will accrue to the usufructuary or the pledgee in case this is determined at the creation of the right of usufruct or the right of lien. The shareholder not holding the voting right, and the usufructuary and the pledgee holding the voting right, will hold the rights granted by law to the holders of depository receipts of shares issued with the cooperation of the Company.

The rights referred to in the preceding sentence will not accrue to the usufructuary and the pledgee not holding the voting right.

12.5    The rights for the acquisition of shares ensuing from the share will accrue to the usufructuary holding the voting right, subject to the proviso that he shall compensate the value of said rights to the shareholder insofar he has no claim to them by virtue of his right of usufruct.

13

12.6    In case shares or a right of usufruct or a right of lien thereon will form part of an undivided community of property, the parties entitled may only exercise their rights ensuing from said shares or the restricted right by a person to be designated by them in writing.

**CHAPTER VI MANAGEMENT, SUPERVISION ON MANAGEMENT.**

13.    **THE MANAGEMENT BOARD AND SUPERVISORY BOARD.**

13.1    The Company will be managed by a management board consisting of at least one (1) member under the supervision of a supervisory board.  In case the management board consists of one (1) member, such member will hold the title of Chief Executive Officer (CEO).

With due observance of the provisions in the previous sentence, the number of members of the management board and the supervisory board will be determined by the supervisory board.

13.2    Subject to article 13.4, the general meeting of shareholders will appoint the member(s) of the management board upon the nomination of the supervisory board and the members of the supervisory board.

Subject to article 13.4, the appointment of a member of the supervisory board shall take place by way of a binding nomination naming at least two persons for each vacancy to be filled and prepared by the supervisory board, or, at the discretion of the supervisory board, by way of a non-binding nomination prepared by the supervisory board. In case of a binding nomination, the general meeting of shareholders may render such nomination non-binding by means of a resolution adopted by at least two-thirds of the valid votes cast, such two-third majority representing more than half of the issued capital.  In case of such a vote, the general meeting of shareholders will be free in its selection and appointment of a supervisory board member to fill the vacancy by means of a resolution adopted by at least two-thirds of the valid votes cast, such two-third majority representing more than half of the issued capital.  If the proportion of the share capital of at least one-half (1/2) as referred to in the preceding sentence is not represented at the meeting, then no new meeting referred to in section 2:120 paragraph 3 DCC may be convened.

Following implementation of Bill number 31 763, "Amendment of book 2 of the Dutch Civil Code in connection with rules for management and supervision in limited liability companies and private companies with limited liability" (Wetsvoorstel 31 763, "Wijziging van boek 2 van het Burgerlijk Wetboek in

14

verband met de aanpassing van regels over bestuur en toezicht in naamloze en besloten vennootschappen"), the binding nomination referred to above shall name at least one person for each vacancy to be filled. If then a nomination names only one person, a resolution by the general meeting of shareholders on the proposal results in such person being appointed, unless the general meeting of shareholders renders the nomination non-binding by means of a resolution adopted by at least two-thirds of the valid votes cast, such two-third majority representing more than half of the issued capital. In case of such a vote, the general meeting of shareholders will be free in its selection and appointment of a supervisory board member to fill the vacancy by means of a resolution adopted by at least two-thirds of the valid votes cast, such two-third majority representing more than half of the issued capital.

The initial term of the CEO in office immediately following the date of execution of the deed of amendment of articles of association by which this article 13.2 became legally effective shall be five (5) years.  Subsequent member(s) of the management board can be appointed for a maximum term of four (4) years and may be reappointed. There is no limit to the number of times a member of the management board can be reappointed.

The general meeting of shareholders may with due observance of articles 13.5 and 13.6 at any time suspend and dismiss one or more members of the management board and/or the supervisory board.

The supervisory board may at any time suspend one or more members of the management board.

13.3   Unless the general meeting of shareholders, on the proposal of the supervisory board, determines that a member of the supervisory board shall be appointed for a longer period, a member of the supervisory board will be appointed for a maximum period of three (3) years, provided however that unless such member of the supervisory board has resigned at an earlier date, his term of office shall lapse at the end of the first annual general meeting of shareholders, to be held after lapse of his term of appointment. A member may be re-appointed with due observance of the preceding sentence. There is no limit to the number of times a member of the supervisory board can be reappointed. The supervisory board may draw up a retirement schedule for the members of the supervisory board.

Periodical resignation will take place per the date of the annual general meeting of shareholders.

In case the number of members of the supervisory board will be less than three (3), the supervisory board will remain competent.

13.4   The supervisory board itself shall be entitled to appoint up to one-third of the members of the supervisory board in accordance with the provisions of Article 2:143 DCC.  Such appointments shall terminate on the date of the next following general meeting of shareholders.

13.5   The general meeting of shareholders may only adopt a resolution to suspend or dismiss a member of the supervisory board or management board by means of a resolution adopted by at least two-thirds of the valid votes cast, such two-third majority representing more than half of the issued capital. If the proportion of the share capital of at least on-half (1/2) as referred to in the preceding sentence is not represented at the meeting, then no new meeting referred to in section 2:120 paragraph 3 DCC may be convened.

13.6   If either the general meeting of shareholders or the supervisory board has suspended a member of the management board or if the general meeting of shareholders has suspended a member of the supervisory board, the general meeting of shareholders shall within three (3) months after the suspension has taken effect resolve either to dismiss such member of the management board or such member of the supervisory board, or to terminate or continue the suspension, failing which the suspension shall lapse.

A resolution to continue the suspension may be adopted in compliance with paragraph 4 of this article but only once and in such event the suspension may be continued for a maximum period of three (3) months commencing on the day the general meeting of shareholders has adopted the resolution to continue suspension. If within the period of continued suspension the general meeting of shareholders has not resolved either to dismiss such member of the management board or such member of the supervisory board or to terminate the suspension, the suspension shall lapse.

13.7   A member of the management board or a member of the supervisory board shall in the event of a dismissal or suspension be given the opportunity to account for his actions at the general meeting of shareholders and to be assisted by an adviser.

13.8   On the basis of a remuneration policy determined by the general meeting of shareholders, the supervisory board shall determine the remuneration and other terms of employment for the management board.  With regard to arrangements concerning remuneration in the form of shares or share options, the supervisory board shall submit a proposal to the general meeting of shareholders for its

approval. This proposal must, at a minimum, state the number of shares or share options that may be granted to the management board and the criteria that apply to the granting of such shares or share options or the alteration of such arrangements.

13.9    Each member of the supervisory board shall be paid a fee at such rate as may from time to time be determined by the supervisory board provided that the aggregate of all fees so paid per annum to the members of the supervisory board shall not exceed the amount per annum decided by the general meeting of shareholders.

## CHAPTER VII THE MANAGEMENT BOARD

14.    **DUTIES OF THE MANAGEMENT BOARD, DECISION MAKING PROCESS**

14.1    The management board will be charged with the management of the day to day affairs of the Company, subject to the supervision of the supervisory board.

14.2    The management board may have itself assisted by one or more persons to whom the title managing director or any other title of which the word managing director forms part, may be granted. The management board may grant a power of attorney or another continuous representative power to one or more persons, whether or not employed by the Company.

14.3    The management board may draw up regulations in which its internal matters will be arranged. The regulations will require the approval of the supervisory board.

14.4    Without prejudice to any other applicable provisions of these articles of association, the management board shall furthermore require the approval of the supervisory board and the general meeting of shareholders for resolutions of the management board regarding a significant change in the identity or nature of the Company or its associated enterprise, including in any event:

a.    the transfer of the entire enterprise or practically the entire enterprise of the Company to a third party, whether by acquisition, business merger, consolidation, sale of all or substantially all assets of the Company and its consolidated subsidiaries taken as a whole;

b.    to conclude or cancel any long-lasting co-operation by the Company or a subsidiary with any other legal person or company or as a fully liable general partner of a limited partnership or a general partnership, provided that such co-operation or the cancellation thereof is of essential importance to the Company;

c.      to acquire or dispose of a participating interest in the capital of a company with a value of at least one third of the sum of the assets according to the consolidated balance sheet with explanatory notes thereto according to the last adopted Annual Accounts of the Company, by the Company or a subsidiary.

In addition, in the event that any such transaction occurs in connection with an acquisition, business merger, sale of all or substantially all assets of the Company and its consolidated subsidiaries taken as a whole, consolidation or a voluntary or involuntary liquidation, dissolution or winding up of the Company (or its subsidiaries, the assets of which constitute all or substantially all of the assets of the Company and its subsidiaries, taken as a whole), in a single transaction or series of transactions, in each case, pursuant to which the class B ordinary shares are redeemed, purchased, converted, retired or otherwise exchanged for value at the price less than the Class B Liquidation Preference, the management board shall require, in addition to the approval of the general meeting of shareholders, the approval of (i) the meeting of holders of class B ordinary shares in accordance with the provisions of article 21.1 and (ii) the supervisory board.

14.5    The approval of the supervisory board is required per resolution of the management board with regard to:

a.      adopting or changing substantially the strategy of the Company and its associated enterprises from that set forth in the existing strategic plan, budget and business plan;

b.      to adopt or change any material new strategic plan, budget or business plan for the Company and its associated enterprises or any material amendments to any such existing strategic plan, budget or business plan adopted by the Company and its associated enterprises or aggregate expenditures exceeding the overall budget by greater than 10%.

14.6    Without prejudice to the other relevant provisions of these articles of association the supervisory board may adopt resolutions pursuant to which other clearly specified resolutions of the management board will also require its approval.

The supervisory board shall inform the management board without delay of any such resolution.

14.7    The lacking of the approval of the supervisory board as mentioned in paragraph 4, 5 and 6 of this article may not be invoked by or against third parties.

15.    **REPRESENTATION**

15.1    The Company shall be represented by the management board or any member of the management board acting individually.

15.2    In case of any conflicting interest between the Company and a member of the management board, the Company will be represented by two (2) members of the supervisory board.    The general meeting of shareholders shall always be authorised to designate one (1) or more other persons to represent the Company in such case.

15.3    In case all members of the management board are absent or unable to attend, the supervisory board shall be temporarily entrusted with the management of the Company. The supervisory board will in said case be competent to temporarily entrust the management of the Company to one (1) or several persons from its number or otherwise. Any such person or persons shall be bound by the rules of the management board when acting in such capacity.

15.4    The management board may appoint representatives with full or limited authority to represent the Company, acting either individually or jointly with one or more other persons. Each of those representatives shall represent the Company with due observance of those limits. The management board will determine their title.

16.    **SUPERVISORY BOARD**

16.1    It will be the task of the supervisory board to supervise the policy of the management board and the general course of affairs of the Company and its associated enterprise. The supervisory board will assist the management board by the rendering of advice. In the performance of their duties, the supervisory board will be guided by the interest of the Company and its associated enterprise. The members of the supervisory board shall be natural persons.

16.2    The management board will timely provide the supervisory board with the data necessary for the performance of its duties.

16.3    The supervisory board may appoint committees from among its members.

16.4    The supervisory board shall, in its sole discretion, determine the size of the supervisory board.

17.    **MEETINGS OF THE SUPERVISORY BOARD, DECISION MAKING PROCESS**

17.1    The supervisory board shall appoint a chairman and, if necessary, a deputy chairman from its number. The supervisory board will designate a secretary and, if necessary, a deputy secretary whether or not from its number.

17.2    The supervisory board will hold a meeting whenever deemed desirable by the chairman or the other members of the supervisory board. A member of the supervisory board may have himself represented at a meeting by one other member of the supervisory board authorised in writing.

17.3    The supervisory board shall include the division of duties within and the procedure of the supervisory board and its committees in a set of rules. The supervisory board and its members shall be bound to fully observe the provisions of such rules in all their actions and decision making. Such rules can only be amended by the supervisory board.

17.4    The supervisory board will pass its resolutions by an absolute majority of the votes validly cast.

Abstentions will be regarded as votes not cast.

In case of a voting tie on matters, the proposal will have been rejected.

In case of a voting tie on matters relating to persons (including nominations and appointments), the resolution will be postponed until the next following meeting. In case there will again be an equality of votes, no resolution will be passed.

17.5    The passing of resolutions will require a majority of the members of the supervisory board holding office being present or represented at that meeting.

17.6    Minutes of the proceedings at the meetings will be kept by the secretary of the supervisory board. The minutes will be confirmed and signed by the persons who will have acted as chairman and secretary at the meeting.

17.7    The supervisory board may also pass resolutions without a meeting being held, provided (i) the proposal concerned has been despatched to the home address or to a previously stated other address of all members of the supervisory board by letter, facsimile or e-mail, (ii) none of them has opposed said manner of passing resolutions and (iii) the majority of the supervisory board holding office has declared to favour the proposals concerned by letter, facsimile or e-mail.

20

The secretary will draw up a report of a resolution thus passed whilst adding the incoming replies, which report will be added to the minutes after having been co-signed by the chairman.

17.8 A member of the supervisory board shall disclose to the other members of the Supervisory Board, and shall not take part in a decision-making on, a subject or transaction in relation to which he has a conflict of interest with the Company.

## CHAPTER VII GENERAL MEETING OF SHAREHOLDERS, MEETINGS OF HOLDERS OF A CERTAIN CLASS OF SHARES

18.    **ANNUAL AND EXTRAORDINARY MEETING OF SHAREHOLDERS**

18.1 Annually a general meeting of shareholders will be held, at which inter alia the following items will be considered;

   a.    the adoption of the Annual Accounts and – with due observance of the provisions of article 23 – the allocation of profits;

   b.    the proposal regarding the discharge from liability to members of the management board for the management in the last financial year;

   c.    the proposal regarding the discharge from liability to the members of the supervisory board for their supervision in the last financial year;

   d.    if applicable, the proposal to pay dividends;

   e.    other proposals raised for consideration by the supervisory board or the management board, such as in respect of the authorisation to the management board to have the Company acquire and take in pledge company shares or depository receipts thereof.

18.2 The annual general meeting of shareholders will at the latest be held in the month of June.

18.3 Other general meetings of shareholders will be held whenever the management board and/or the supervisory board will pass a resolution to convene such a meeting.

18.4 The shareholders as well as the holders of depository receipts of shares issued with the cooperation of the Company will be called to attend a general meeting of shareholders by or on behalf of the management board or the supervisory board.

21

18.5    The convening notice for a general meeting of shareholders will be published not later than on the fifteenth day prior to the date of the meeting.

18.6    The convening notice will state the subjects to be considered in an agenda or the information that the shareholders and the holders of depository receipts of shares, issued with the cooperation of the Company, may take cognizance thereof at the office of the Company, without prejudice to the provisions in article 24, paragraph 3 in respect of a proposal for the amendment of the articles of association.

18.7    One or more shareholders representing solely or jointly at least one/hundredth (1/100) part of the issued share capital or, as long as the shares of the Company are admitted to trading on a market in financial instruments as referred to in article 1:1 of the Financial Supervision Act (*Wet financieel toezicht*), whose shares represent a value of fifty million euro (EUR 50,000,000.00) or more can request the supervisory board to place a matter on the agenda, provided that the Company has received such request at least sixty (60) days prior to the date of the general meeting of shareholders concerned.

18.8    One or more shareholders representing solely or jointly at least one-tenth (1/10) part of the issued share capital can request the supervisory board to convene a general meeting of shareholders. The supervisory board shall publish a convening notice for such a general meeting of shareholders within four (4) weeks of receipt from such shareholders of a specified agenda for such general meeting of shareholders and, in the sole discretion of the supervisory board, compelling evidence of the number of shares held by such shareholder or shareholders.

18.9    No valid resolutions can be adopted at a general meeting of shareholders in respect of items which are not included in the agenda.

18.10    The agenda may be obtained free of charge by the shareholders and the holders of depositary receipts referred to in paragraph 6 of this article at the office of the Company.

18.11    The management board and the supervisory board shall provide the general meeting of shareholders with all requested information, unless this would be contrary to an overriding interest of the Company. If the management board and the supervisory board invoke an overriding interest, they must give reasons therefore.

The management board and the supervisory board shall inform the general meeting of shareholders by means of explanatory notes to the agenda of all facts

22

and circumstances relevant to the proposals on the agenda. These explanatory notes to the agenda shall be put on the Company's website.

19. **PLACE OF MEETING, CONVENING NOTICE**

19.1 The general meeting of shareholders will be held in Rotterdam, Amsterdam or Haarlemmermeer (Schiphol Airport).

19.2 All convening notices for said meetings will be announced in an advertisement in a nationally distributed daily newspaper. In the case that shareholders own registered shares, such shareholders shall be notified of said meetings by mail.

The advertisement may moreover be placed in other papers.

Each convening notice will state the place and time of the meeting.

20. **CHAIRMANSHIP, MINUTES, RIGHTS TO ATTEND MEETINGS, DECISION-TAKING PROCESS**

20.1 The chairman of the supervisory board will act as chairman of the general meeting of shareholders or, in case of his absence, one of the other members of the supervisory board to be designated by the supervisory board. In case no member of the supervisory board will be present, the general meeting of shareholders itself will designate its presidium.

20.2 Minutes of the meetings will be kept at each meeting by the secretary of the supervisory board or, in case of his absence, by the deputy secretary of said board - in case he will have been designated-, which minutes will be confirmed and signed by the chairman and the minutes secretary unless, at the request of the parties having convened the meetings, an official record will be drawn up by a civil law notary to be designated by them, in which case said official record need only be signed by the civil law notary and by the witnesses, if any.

The draft minutes of the general meeting of shareholders shall be made available, on request, to shareholders no later than three (3) months after the end of the meeting, after which the shareholders shall have the opportunity to react to the draft minutes in the following three months. The minutes shall then be adopted in the manner as described in the first sentence of this article 20.2.

If the notarial official record has been drawn up, the notarial official record shall be made available, on request, no later than three (3) months after the end of the general meeting of shareholders.

20.3    Every shareholder, pledgee and usufructuary (both provided they hold voting right on the relevant shares) will be competent, either personally or through an attorney authorised in writing, to attend the general meeting of shareholders, to address said meetings and to exercise the voting right. Every holder of a depositary receipt of share issued with the cooperation of the Company (hereinafter: "**holder of a depository receipt**") will be competent, either personally or through an attorney authorised in writing, to attend the general meeting of shareholders and to address the meeting.

20.4    The supervisory board may determine that attending and addressing the general meeting as well as participating in the deliberations and exercising the voting right may also take place by way of electronic means of communication. For that purpose it is required that the shareholders, pledgees, usufructuaries and holders of depository receipts or their attorneys authorised in writing can be identified and that they can simultaneously take note of the discussions at the meeting. The supervisory board may set conditions for the use of electronic means of communication; these conditions shall be announced in the convening notice.

20.5    The management board may determine that the provisions of paragraphs 3 and 4 of this article will be applicable to those applicants who (i) are a shareholder, usufructuary and pledgee (provided they hold the voting rights on the relevant shares) or a holder of a depository receipt as per a certain date, determined by the management board, such date hereinafter referred to as: the "**record date**", and (ii) who are as such registered in a register (or one or more parts thereof) designated thereto by the management board, hereinafter referred to as: the "**register**", in as far as (iii) at the request of the relative applicant, the holder of the register has notified the Company in writing prior to the general meeting of shareholders that the relative applicant has the intention to attend the general meeting of shareholders, regardless who will be applicant as referred to hereinbefore at the time of the general meeting of shareholders. The notification will state the name and the number of shares or depository receipts, for which the applicant is entitled to attend the general meeting of shareholders. The provision above under (iii) on the notification to the Company will also apply to the attorney authorised in writing of an applicant.

20.6    The record date mentioned in paragraph 5 of this article and the date mentioned in said paragraph on which the notification of the intention to attend the general meeting of shareholders shall have been given at the latest, can not be fixed earlier than at a time on the thirtieth day, prior to the date of the general meeting of shareholders. The convocation of the general meeting of shareholders will include

said times, the place of meeting and the proceedings for registration and/or notification.

20.7    In case the management board does not exercise the power referred to in paragraph 5 of this article, the holders of bearer shares, in order to attend the general meeting of shareholders and to take part in the voting, shall deposit their bearer share certificate or a written statement from the relevant depositary institution at the office of the Company or at the place designated for this purpose in the convocation for the meeting. Said statement shall be to the effect that the number of bearer shares listed in such statement is the entitlement of such shareholder and will be so until after the meeting. The announcement shall state the day on which the depositing of the bearer shares or the said statement shall be made at the latest; this day may not be set earlier than on the seventh day prior to the day of the meeting.

20.8    In case the management board does not exercise its power referred to in paragraph 5 of this article, the holders of the depository receipts referred to in paragraph 3 of this article, as well as usufructuaries and pledgees holding voting rights, in order to be able to exercise their rights to attend meetings, shall deposit documentary evidence of their rights at the office of the Company or at a place designated for this purpose in the convocation for the meeting not later than on the seventh day prior to the meeting.

20.9    Moreover, the person who wishes to exercise the right to vote and to attend the meeting, shall sign the attendance list prior to the meeting, stating his name, the name(s) of the person(s) for whom he acts as attorney, the number of shares he is representing and, as far as applicable, the number of votes he is able to cast.

20.10   Those who have been authorised in writing shall present their warrant of attorney at the general meeting of shareholders. The supervisory board may resolve that the warrants of attorney of holders of voting rights will be attached to the attendance list.

20.11   Every share will carry the right to cast one (1) vote.

20.12   All votes will be cast orally, unless the chairman will deem a written ballot desirable or one of the parties entitled to vote will make the relative request prior to the ballot. Written votes will be cast by unsigned, closed ballot-papers. In case none of the parties entitled to vote present will oppose this, proposals may be adopted by acclamation.

20.13   All resolutions for which the law or the articles of association do not prescribe a larger majority, will be passed by an absolute majority of the votes cast.

20.14   Abstentions will be regarded as votes not cast.

20.15   The opinion of the chairman expressed at the meeting that a resolution has been passed by the general meeting of shareholders will be decisive. The same will apply to the text of a resolution passed insofar as votes will have been cast on a proposal not laid down in writing. However, in case immediately after said opinion having been expressed, its correctness will be challenged, a new ballot will be held in case the majority of the parties entitled to vote and present at the meeting, or in case the original votes will not have been cast by poll or in writing, a party entitled to vote and present at the meeting will make the relative request. As a result of said new ballot, the legal consequences of the original vote will be cancelled.

20.16   A certificate signed by the chairman and the secretary of the general meeting of shareholders confirming that the general meeting of shareholders has adopted a particular resolution, shall constitute evidence of such resolution vis-à-vis third parties.

21.   **MEETINGS OF HOLDERS OF A CERTAIN CLASS OF SHARES**

21.1   Separate meetings of holders of class A ordinary shares and/or class B ordinary shares will be held in case the approval of the meeting of holders of class A ordinary shares and/or class B ordinary shares is required.

21.2   Unless otherwise specified in these articles of association, all resolutions of the meeting of holders of class B ordinary shares will be passed by eighty-five percent (85%) of the total number of class B shares outstanding.

21.3   Subject to the provisions in the previous paragraph, the provisions of articles 18, 19 and 20 will correspondingly be applicable to the extent relevant.

**CHAPTER IX ANNUAL ACCOUNTS, PROFIT**

22.   **FINANCIAL YEAR AND ANNUAL ACCOUNTS**

22.1   The financial year of the Company will coincide with the calendar year.

22.2   Annually, within four (4) months after the end of the financial year of the Company, the management board will compile an annual account and annual report.

22.3   The Company will grant an Accountant the assignment to audit the Annual Accounts. The general meeting of shareholders will be competent to grant the assignment. In case it will not proceed to do so, the supervisory board will be competent or, in case the members of the supervisory board will be lacking or the supervisory board will fail to do so, the management board will be competent.

The designation of an Accountant will not be restricted by any nomination whatsoever; the assignment may be withdrawn at any time by the general meeting of shareholders or by the party by which it will have been granted; the assignment granted by the management board may moreover be withdrawn by the supervisory board. The Accountant will report to the supervisory board and the management board with respect to his findings.

22.4   The general meeting of shareholders adopts the Annual Accounts. The Accountant may be questioned by the general meeting of shareholders in relation to its statement on the fairness of the Annual Accounts. The Accountant shall therefore be invited to attend this meeting and be entitled to address this meeting.

22.5   The Annual Accounts will be signed by the management board and all members of the supervisory board. In case any signature(s) should be lacking, the reason thereof will be stated.

22.6   The Annual Accounts, the annual report and the data to be added by virtue of section 2:392 paragraph 1 DCC, will be deposited at the office of the Company, for perusal by the shareholders as well as the holders of depositary receipts of shares issued with the cooperation of the Company as of the date of the convening notice for the annual meeting.

Said shareholders and holders of depositary receipts may peruse the documents there and gratuitously obtain a copy thereof.

Furthermore, anyone else may inspect the documents referred to in the first sentence of the present paragraph, insofar as said documents shall be made public after adoption, and obtain a copy thereof at a price not exceeding cost.

22.7   The Annual Accounts shall be published within eight (8) days after having been adopted. It will be made public by depositing a full copy thereof in the Dutch language, or in case this will not have been drawn up, a copy in English at the office of the Trade Register. The date of adoption shall be stated on the copy.

23.    **APPROPRIATION OF PROFIT**

23.1    To the charge of the profit, any such amounts will be allocated to reserves as will be fixed by the management board with approval of the supervisory board.

23.2    After the allocation to the reserves in accordance with the preceding paragraph the general meeting of shareholders shall determine the allocation of the remaining profits. For the computation of the amount of profit to be distributed on each share, only the amount of the obligatory payments on the nominal amount of the shares shall be taken into account.

23.3    Distributions can only be made up to the amount of the Distributable Part of the Shareholders Equity.

23.4    Distributions will be made after adoption of the Annual Accounts evidencing these to be permissible.

23.5    With approval of the supervisory board, the management board may pass a resolution for the distribution of an interim dividend or other interim distribution provided the requirement of paragraph 3 of this article will have been fulfilled as will be evident from an interim specification of equity; provided however, that upon consummation of a Deemed Liquidation, no resolution for the distribution of an interim dividend or other interim distribution of the supervisory board will be required. Said specification will relate to the position of the equity at the earliest on the first day of the third month prior to the month in which the resolution for the distribution of an interim dividend will be announced. Said specification will be drawn up with due observance of the valuation methods deemed acceptable in society. The amounts to be reserved by virtue of the law will figure in the specification of equity. It will be signed by or on behalf of the management board if the signature should be lacking, the reason thereof will be stated. The specification of equity will be deposited at the offices of the Trade Register of the district in which the Company is registered within eight (8) days after the date on which the resolution for distribution will be announced.

23.6    The supervisory board will decide at what places and as of what dates dividends and other distribution on shares will be made payable. The management board will announce this by means of an advertisement in a nationally distributed daily newspaper.

23.7    The Company shall only pay dividends and other distributions (irrespective of their form) on shares to those in whose name the shares are registered on the date

28

that such dividends or other distribution was declared. Such payment discharges the Company.

23.8    Dividends, not collected within five (5) years after the first day on which they became payable, will revert to the Company.

23.9    In case the profit and loss account in any year will show any loss that cannot be covered by the reserves or extinguished in any other manner, no profit will be distributed in a following year or in subsequent years until said loss has been covered by reserves or extinguished in any other manner.

23.10  On a proposal of the management board, approved by the supervisory board, the general meeting of shareholders may pass a resolution for distributions of profit – or also to the charge of a reserve susceptible to distribution in shares, in depository receipts thereof or in participations in a company in which the Company participates directly or indirectly.

## CHAPTER X AMENDMENT TO THE ARTICLES OF ASSOCIATION, LIQUIDATION

24.    **AMENDMENT TO THE ARTICLES OF ASSOCIATION. DISSOLUTION.**

24.1    A resolution for the amendment of the articles of association or for dissolution of the Company may only be passed by the general meeting of shareholders on the proposal of the management board with approval of the supervisory board; provided however, that, (i) as long as any class B ordinary shares are issued and outstanding, an amendment of articles 1.1.4, 1.1.5, 1.1.10, 1.1.11, 5.7, 14.4 (last paragraph), 20.11, 21, 24 or 25 requires the unanimous approval of the meeting of holders of class B ordinary shares, resolved in a meeting in which all holders of class B ordinary shares are present or represented; and (ii) as long as any class B ordinary shares are issued and outstanding, an amendment of articles 1.1.4, 1.1.5, 1.1.11, 4.5, 5.5, 5.7 (first sentence), 8.2, [9.3, 9.4], 20.11, 23.2 or 24.1 (this clause (ii) only), in each case, in a manner which would adversely affect one class of ordinary shares in a disproportionate manner requires the approval of 2/3 of the outstanding shares of such adversely affected class.

24.2    A resolution for the legal merger (*juridische fusie*) or legal demerger (*juridische splitsing*) of the Company may only be passed by the general meeting of shareholders with the approval of the meeting of holders of class B ordinary shares in the event that in any such transaction one or more class B ordinary shares would be purchased, converted or exchanged at a value less than the Class B Liquidation Preference and on the proposal of the management board with the approval of the

supervisory board. A resolution of the general meeting of shareholders leading to or in connection with any of the events mentioned in the last paragraph of article 14.4 shall require the approval of the meeting of holders of class B ordinary shares in accordance with the provisions of article 21.1.

24.3    In case a proposal for amendment of the articles of association or dissolution of the Company will be made to the general meeting of shareholders, this shall invariably be stated in the actual  convening notice for said meeting and – in case it will concern an amendment of the articles of association – a copy of the proposal, containing the verbatim text of the proposed amendment, shall simultaneously be deposited at the office of the Company for perusal by every shareholder and every holder of a depository receipt of share issued with the cooperation of the Company, until the end of the meeting.

25.    **LIQUIDATION.**

25.1    In case of a Liquidation of the Company the management board will be charged with the liquidation of the affairs of the Company and the supervisory board will be charged with the supervision thereof, without prejudice to the provisions in section 2:23 paragraph 2 DCC.

25.2    During the Liquidation, the provisions of the articles of association will as much as possible continue to be effective.

In the event of a Liquidation prior to the Liquidation Preference Expiration Date, from the balance, if any, remaining after payment of all creditors of the Company, to the extent possible, an amount equal to the Class B Liquidation Preference, minus any amount distributed to the class B ordinary shares following a Deemed Liquidation, if any, will be distributed to each holder of class B ordinary shares with respect to each class B ordinary share held. The balance remaining after application of the preceding sentence will be distributed to the holders of class A ordinary shares in proportion to each of their shareholding.

**CHAPTER XI INDEMNIFICATION BY THE COMPANY**

26.    **INDEMNIFICATION**

The Company shall indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended, any person who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "**Proceeding**") by reason of the fact that he or she (or a person or entity for whom he or she) is or was a member of the management board or a member of the supervisory board

of the Company or a member of a similar body of any direct or indirect subsidiary of the Company or is or was serving as an agent (as defined below) of the Company, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such person, except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable for gross negligence or willful misconduct in the performance of his duty to the Company, unless and only to the extent that the court in which such action suit or proceeding was brought or any other court having appropriate jurisdiction shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnification against such expenses which the court in which such action or proceeding was brought or such other court having appropriate jurisdiction shall deem proper.

The Company shall be required to indemnify a person in connection with a Proceeding (or part thereof) initiated by such person only, if the Proceeding (or part thereof) was authorised by the management board with approval of the supervisory board of the Company. For purposes of this article, an "agent" of the Company includes any person who is or was a supervisory board member, management board member, director, officer, employee or other agent of the Company or is or was serving at the request of the Company as a supervisory board member, management board member, director, officer, employee or other agent of another company, partnership, joint venture, trust or other enterprise; or was a director, officer, employee or other agent of a company which was a predecessor company of the Company or of another enterprise at the request of such predecessor company.

Expenses (including attorneys' fees) incurred in defending a Proceeding may be paid by the Company in advance of the final disposition of such Proceeding upon a resolution of the management board which will have been approved by supervisory board with respect to the specific case; provided that the Company shall have received an undertaking by or on behalf of the person seeking to have his expenses paid to repay such amount unless it shall ultimately be determined that he or she is entitled to be indemnified by the Company in accordance with this article.

27.   **TRANSITIONAL PROVISION 1**

The first financial year of the Company shall end on the thirty-first day of December two thousand ten. This provision will lapse after the first financial year.

28.   **TRANSITIONAL PROVISION 2**

This transitional provision 2, including its heading, shall only be effective during the period between execution of the deed of amendment of the articles of association of the Company by which this transitional provision is included in the articles of association of the Company for the first time, until the first day of listing for trade of all or part of the shares of the Company on the New York Stock Exchange, this period hereinafter referred to as the "**Transitional Period**".

For the duration of the Transitional Period, the Chief Legal Officer and the Chief Financial Officer of the Company, as appointed as such from time to time, are by means of this transitional provision installed as sole members of the "**Transitional Appointment Committee**", for the duration of their appointment as Chief Legal Officer and Chief Financial Officer of the Company, respectively, and to the extent that the Chief Legal Officer respectively the Chief Financial Officer is not a member of the management board of the Company during the Transitional Period.

During the Transitional Period article 13.4 will, contrary to its current wording, read as follows:

*13.4    The Transitional Appointment Committee shall be entitled to appoint up to one-third of the members of the supervisory board in accordance with Article 2:143 DCC. Such appointments shall terminate on the date of the next general meeting of shareholders following these appointments. The members of the Transitional Appointment Committee can only resolve with unanimous votes to appoint a member of the supervisory board.*

A resolution of the general meeting of shareholders for the amendment of article 13.4, this transitional provision 2 or any amendment materially affecting the content of the provisions of article 13.4 or this transitional provision 2 in any other way, shall be subject to the prior written approval of the Transitional Appointment Committee. The members of the Transitional Appointment Committee can only resolve to approve such amendment of the articles of association of the Company with unanimous votes.

**FINAL STATEMENTS**

Finally, the person appearing made the following statements:

(i)    up to today the issued share capital amounts to forty-five thousand euro (EUR 45,000.00), divided into one million one hundred twenty-five thousand (1,125,000) ordinary shares of four eurocent (EUR 0.04) each;

(ii)    each of the issued ordinary shares, with a nominal value of four eurocent (EUR 0.04) each, is hereby converted into class A ordinary shares with a nominal value of four eurocent (EUR 0.04) each;

(iii)    as a result of the present amendment of the articles of association three hundred million (300,000,000) class A ordinary shares and  [ ] class B ordinary shares of four eurocent (EUR 0.04) each are issued, since a condition in a deed of issuance executed earlier today before me, civil law notary, has been fulfilled, after which the issued capital amounts to [*the mandatory minimum in accordance with the Dutch Civil Code is 1/5 of the authorised capital*] divided into three hundred one million one hundred twenty-five thousand (301,125,000) class A ordinary shares and [ ] class B ordinary shares of four eurocent (EUR 0.04) each.

(iv)    the ministerial declaration of no objection was granted on the [_] day of [_] two thousand [_], under number N.V. 1567749, as stated in the written declaration of the Ministry of Justice which has been attached to this instrument as <u>Schedule 2</u>.

THIS DEED, was executed in Amsterdam on the date first above written.

The person appearing is known to me, civil law notary.

The essential contents of this deed were communicated and explained to the person appearing.

The person appearing then declared to have noted and approved the contents and did not want a full reading thereof. Thereupon, after limited reading, this deed was signed by the person appearing and by me, civil law notary.

33

**SCHEDULE 1** [[Shareholder's][Shareholders'] Resolution][Minutes of the General Meeting of Shareholders]

**SCHEDULE 2 DECLARATION OF NO OBJECTION MINISTRY OF JUSTICE**

**TAB 4-B**

# NOMINATION AGREEMENT

**between**

# [INVESTOR]

and

# LYONDELLBASELL INDUSTRIES N.V.

---

In relation to the nomination of the
members of the Supervisory Board

---

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| 1.1 | Definitions | 2 |
| 1.2 | Interpretation | 3 |
| 1.3 | Appendices | 4 |
| 2. | ARTICLES OF ASSOCIATION | 4 |
| 3. | SUPERVISORY BOARD REGULATIONS | 4 |
| 4. | SUPERVISORY BOARD NOMINATIONS | 4 |
| 5. | SUPERVISORY BOARD COMMITTEES; LBI SUBSIDIARY BOARDS | 6 |
| 6. | DURATION | 7 |
| 7. | MISCELLANEOUS | 7 |
| 7.1 | Invalid provisions | 7 |
| 7.2 | Amendment | 7 |
| 7.3 | Entire agreement | 8 |
| 7.4 | No implied waiver; no forfeit of rights | 8 |
| 7.5 | No rescission | 8 |
| 7.6 | No assignment | 8 |
| 7.7 | Resignation of members for Cause | 8 |
| 7.8 | Resignation of Director Nominees | 9 |
| 7.9 | Nomination of Additional Director Nominees | 10 |
| 7.10 | Appointment Pending General Meeting of Shareholders | 10 |
| 7.11 | Calling General Meeting | 11 |
| 7.12 | Choice of law | 11 |
| 7.13 | Disputes | 11 |

**LIST OF APPENDICES**

1. Articles of association.
2. The internal rules of procedure of the Supervisory Board.

## NOMINATION AGREEMENT

**THE UNDERSIGNED:**

1.  **[INVESTOR]**, a [ ] company formed under the laws of [ ] principal place of business at [ ], hereinafter referred to as "**Investor**";

2.  **LYONDELLBASELL INDUSTRIES N.V.**, a public limited liability company (*naamloze vennootschap*) incorporated under the laws of the Netherlands with its corporate seat at Rotterdam (registered office: Weena 737, 3013AM Rotterdam, the Netherlands), registered with the Chamber of Commerce with number 24473890, hereinafter referred to as the "**LBI**" and together with Investor as "**Parties**".

**RECITALS**

A.  The Investor and LBI are a party to that certain equity commitment agreement dated December 11, 2009 by and among AI LBI Investments LLC ("**Access**"), Ares Corporate Opportunities Fund III, L.P. ("**Ares**"), Leveragesource (Delaware), LLC ("**Apollo**"), LBI and the other parties signatory thereto (as amended from time to time, the "**Equity Commitment Agreement**").

B.  Upon issuance of shares in the capital of LBI pursuant to the Plan, the Investor, together with its Affiliates, will directly or indirectly hold shares of LBI to be issued to it upon the terms and conditions set forth in the Equity Commitment Agreement.

C.  Pursuant to the Plan and the Equity Commitment Agreement, the Investor has nominated [ ] member[s] of the initial Supervisory Board.

D.  Pursuant to this Agreement, the Investor shall as from issuance of the shares be entitled to nominate one, two or three (as the case may be) individuals to be appointed as members of the Supervisory Board.

E.  [Pursuant to this Agreement, at least one person nominated by the Investor as a member of the Supervisory Board shall serve on the [ ] Committee(s).][1]

**HEREBY AGREE AS FOLLOWS:**

---

[1] Note: This provision is to be included in the Apollo Nomination Agreement only.

1

## 1.    DEFINITIONS AND INTERPRETATION

### 1.1    Definitions

| | |
|---|---|
| **Affiliate** | with respect to any person, any other person that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such person.  For purposes of this definition, the terms "control," "controlling," "controlled by" and "under common control with," as used with respect to any person, means the possession, directly or indirectly, of the power to direct the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise.  For the avoidance of doubt, with respect to the Investor, "Affiliate" shall include all investment funds managed or controlled by the Investor or the Investor's Affiliates. |
| **Agreement** | this Nomination Agreement |
| **Appendix** | an appendix to this Agreement |
| **Articles** | the draft articles of association of LBI attached as Appendix 1 to this Agreement. |
| **Business Day** | any day other than (a) a Saturday, (b) a Sunday, (c) any day on which commercial banks in New York, New York or The Netherlands are required or authorized to close by law or executive order and (d) the Friday after Thanksgiving. |
| **Clause** | a clause in this Agreement |
| **Committees** | the  committees of the Supervisory Board |
| **Disclosure Statement** | means the disclosure statement to accompany the Plan as amended, modified or supplemented |
| **Equity Commitment Agreement** | has the meaning set forth in the recitals of this Agreement |
| **Investor** | has the meaning attributed in the |

| | |
|---|---|
| | heading of this Agreement |
| **LBI** | has the meaning attributed in the heading of this Agreement |
| **One Director Investor** | the Investor, if entitled to nominate one member of the Supervisory Board pursuant to Clause 4.1 of this Agreement |
| **Parties** | has the meaning attributed in the heading of this Agreement |
| **Plan** | means the joint chapter 11 plan of reorganization of Lyondell Chemical Company and certain of its subsidiaries and affiliates who are debtors and debtors-in-possession, including all exhibits and schedules annexed thereto or associated therewith, as altered, amended or modified from time to time |
| **Supervisory Board** | the supervisory board of LBI |
| **Termination Date** | has the meaning attributed in Clause 6.2 |
| **Three Director Investor** | the Investor, if entitled to nominate three members of the Supervisory Board pursuant to Clause 4.3 of this Agreement |
| **Two Director Investor** | the Investor, if entitled to nominate two members of the Supervisory Board pursuant to Clause 4.2 of this Agreement |

1.2     **Interpretation**

In this Agreement, unless the context dictates otherwise:

1.2.1    the masculine gender shall include the feminine and the neuter and vice versa;

1.2.2    references to a person shall include a reference to any individual, company, association, partnership or joint venture;

1.2.3    references to "include" and "including" shall be treated as references to "include without limitation "or "including without limitation";

1.2.4    references to documents in "agreed form" shall be to documents agreed between the Parties, annexed to this Agreement;

1.2.5    the headings are for identification only and shall not affect the

3

interpretation of this Agreement;

1.2.6    references to "Clauses", "paragraphs" and "Appendices" are to clauses, paragraphs of, and appendices to, this Agreement.

1.3    **Appendices**

Any Appendix referred to in this Agreement forms an integral part of this Agreement.

2.    **ARTICLES OF ASSOCIATION**

Prior to issuance of shares in the capital of LBI on the terms and conditions agreed upon in the Equity Commitment Agreement, the articles of association of LBI shall be amended in accordance with the agreed form attached to this Agreement as Appendix 1. No further amendment which adversely affects the nomination rights of the Investor shall be made to the Articles (including, without limitation, any amendments to paragraphs 13.2, 16.4, 17.3 and 24.1 of the Articles which adversely affects the nomination rights of the Investor) without prior written approval of the Investor.

3.    **SUPERVISORY BOARD REGULATIONS**

3.1    The internal rules of procedure of the Supervisory Board are set out in Appendix 2 to this Agreement. LBI shall not take any action to cause the Supervisory Board to make any amendment to the internal rules of procedure of the Supervisory Board which adversely affects the nomination rights of the Investor without prior written approval of the Investor.

3.2    LBI hereby confirms that each of the members of the Supervisory Board as of the date hereof has agreed to be bound by the attached internal rules of procedure of the Supervisory Board and has signed a copy thereof as his acceptance of such internal rules of procedure.

3.3    It shall be a condition for nomination of any person as a member of the Supervisory Board, whether or not an Investor nominee, that such person shall undertake to be bound by the attached internal rules of procedure of the Supervisory Board and that such person shall sign a copy thereof as his acceptance of such internal rules of procedure.

4.    **SUPERVISORY BOARD NOMINATIONS**

4.1    Pursuant to the Equity Commitment Agreement and the Plan, the initial Supervisory Board shall have nine members. Apollo shall have the right to nominate three members to the initial Supervisory Board, Access shall have the right to nominate one member to the initial Supervisory Board

4

and Ares shall have the right to nominate one member to the initial Supervisory Board. In accordance therewith, and following completion of the selection procedure for the remaining members of the Supervisory Board, the Supervisory Board, as of the date hereof, shall be composed as follows:

1. [name of individual] (based on nomination put forward by [Apollo])
2. [name of individual] (based on nomination put forward by [Apollo])
3. [name of individual] (based on nomination put forward by [Apollo])
4. [name of individual] (based on nomination put forward by [Access])
5. [name of individual] (based on nomination put forward by [Ares])
6. [name of individual]
7. [name of individual]
8. [name of individual]
9. [name of individual]

4.2    In case the Supervisory Board at the date of this Agreement consists of less than nine members, a Transitional Appointment Committee consisting of the Chief Financial Officer and the Chief Legal Officer has the right, during the period until the listing of LBI's shares on the New York Stock Exchange to appoint such number of members to the Supervisory Board so that the Supervisory Board will consist of nine members in total, it being understood (i) that the Transitional Appointment Committee cannot appoint more than one-third of the members of the Supervisory Board in accordance with Article 2:143 DCC, as provided pursuant to the Transitional Provision 2 of the agreed form draft articles of association attached to this Agreement as Appendix 1, (ii) such appointees shall be independent in accordance with applicable listing standards and (iii) such appointees shall be subject to the approval of the Investor, such approval not to be unreasonably withheld.

4.3    Subsequent to the appointment of the Supervisory Board in accordance with Clauses 4.1 and 4.2, in the event the Investor, together with its Affiliates, holds directly or indirectly 5% or more, but less than 12%, of the issued share capital of LBI, LBI shall use its reasonable best efforts to cause the Supervisory Board to take all required action to make the appointments by the Supervisory Board in accordance with article 13.4 of the Articles and the binding nominations by the Supervisory Board in accordance with article 13.2 of the Articles for the appointment of members of the Supervisory Board in such a way that at least one of the members of the Supervisory Board shall be a person nominated by the Investor.

4.4    Subsequent to the appointment of the Supervisory Board in accordance with Clauses 4.1 and 4.2, in the event the Investor, together with its Affiliates, holds directly or indirectly 12% or more, but less than 18%,

of the issued share capital of LBI, LBI shall use its reasonable best efforts to cause the Supervisory Board to take all required action to make the appointments by the Supervisory Board in accordance with article 13.4 of the Articles and the binding nominations by the Supervisory Board in accordance with article 13.2 of the Articles for the appointment of members of the Supervisory Board in such a way that at least two of the members of the Supervisory Board shall be persons nominated by the Investor.

4.5     Subsequent to the appointment of the Supervisory Board in accordance with Clauses 4.1 and 4.2, in the event the Investor, together with its Affiliates, holds directly or indirectly 18% or more of the issued share capital of LBI, LBI shall use its reasonable best efforts to cause the Supervisory Board to take all required action to make the appointments by the Supervisory Board in accordance with article 13.4 of the Articles and the binding nominations by the Supervisory Board in accordance with article 13.2 of the Articles for the appointment of members of the Supervisory Board in such a way that at least three of the members of the Supervisory Board shall be persons nominated by the Investor.

4.6     LBI hereby represents to the Investor that each of [Apollo/Ares and Access/Ares] have equivalent nomination rights to the nomination rights of the Investor set forth in Clauses 4.1 through 4.5 above, Clause 6.2 below and Clauses 7.7 through 7.10 below.  LBI hereby agrees with the Investor that it shall not grant any additional nomination rights to [Apollo/Ares or Access/Ares] without offering the same rights to the Investor, without further consideration.

5.      **SUPERVISORY BOARD COMMITTEES; LBI SUBSIDIARY BOARDS**[2]

5.1     At least one member of the Supervisory Board nominated by the Investor shall be entitled to serve on each Committee to the extent not prohibited by law.   [*Note: this provision shall also be reflected in the internal rules of procedure of the Supervisory Board as set out in Appendix 2 to this Agreement.*]

5.2     The Investor shall be entitled to nominate at least one member to the board of directors of each of LBI's direct and indirect significant subsidiaries to the extent that such appointment is consistent with applicable law and such Investor agrees to be bound by the policies of the applicable company. To the extent not prohibited by law, such nominee shall be entitled to serve on each of the committees of such board of directors.  LBI shall cause each of its direct and indirect significant subsidiaries to take all actions necessary to give effect to this

---

[2] Note:  Clause 5 will only be included in Apollo's nomination agreement.

6

Clause 5.2.

## 6.    DURATION

6.1    This Agreement shall take effect as of the date of issuance of shares to the Investor (or its Affiliates) pursuant to the Equity Commitment Agreement.

6.2    Except with respect to the provisions of this Agreement that expressly survive the Termination Date (defined below), this Agreement is entered into for an indefinite period of time and shall terminate as of the date on which the Investor, together with its Affiliates, holds directly or indirectly less than 5% of the issued share capital of LBI (the "Termination Date"); provided, that in no event may the Termination Date occur within the first anniversary of the date of this Agreement. Within three Business Days after the Termination Date the Investor shall notify LBI and, promptly following the written request of the Corporate Governance and Nominating Committee of the Supervisory Board, shall cause the nominee or nominees of the Investor, as applicable, to execute and deliver a written resignation which shall be effective with respect to LBI [and any subsidiary of LBI for which such nominee serves as a director on the date of such resignation][3] and shall not permit any such nominee or nominees to revoke any such resignation; provided that in no event may the Corporate Governance and Nominating Committee of the Supervisory Board request or solicit, directly or indirectly, such resignation prior to the first anniversary of the date of this Agreement.

## 7.    MISCELLANEOUS

7.1    **Invalid provisions**

In the event that a provision of this Agreement is null and void or unenforceable (either in whole or in part), the remainder of this Agreement shall continue to be effective to the extent that, given this Agreement's substance and purpose, such remainder is not inextricably related to the null and void or unenforceable provision. The Parties shall make every effort to reach agreement on a new clause whose effect differs as little as possible from the null and void or unenforceable provision, taking into account the substance and purpose of this Agreement.

7.2    **Amendment**

No amendment to this Agreement shall have any force or effect unless it is in writing and signed by both Parties.

---

[3] Note: Bracketed language is only applicable to Apollo.

7

7.3     **Entire agreement**

This Agreement, including all Appendices, contains the entire agreement between the Parties with respect to the subject matter covered hereby and supersedes all earlier agreements and understandings, whether oral, written or otherwise, between Parties.

7.4     **No implied waiver; no forfeit of rights**

a.      Any waiver under this Agreement must be given by notice to that effect.

b.      If the Investor does not exercise any right under this Agreement, this shall not be deemed to constitute a forfeit of any such rights (*rechtsverwerking*).

7.5     **No rescission**

To the extent permitted by law, the Parties hereby waive their rights under Articles 6:265 to 6:272 inclusive of the Civil Code to rescind (*ontbinden*), or demand in legal proceedings the total or partial rescission (*ontbinding*) of this Agreement or to nullify this Agreement because of error (*dwaling*).

7.6     **No assignment**

This Agreement and the rights granted to the Investor hereunder are personal to the Investor and are not attached to any shares of the share capital of LBI. The Investor may not transfer or assign this Agreement (*contractsoverneming*) or any of its rights hereunder. Any transfer or assignment in violation of this Agreement shall be null and void and of no force and effect.

7.7     **Resignation of members for Cause**

8

a.    In the event that the Supervisory Board resolves that a member of the Supervisory Board should resign for Cause, such member shall and, in case such member is a nominee of the Investor, the Investor shall cause such member to, promptly execute and deliver an irrevocable resignation which shall be effective with respect to LBI [and any subsidiary of LBI for which such Member serves as a director on the date of such resignation].[4]

b.    For the purpose of this Clause 7.7, "Cause" shall mean in respect to any member of the Supervisory Board: (A) indictment, conviction, guilty plea or plea of *no lo contendere* to, or confession of guilt of a felony or criminal act involving moral turpitude during such member's term; (B) willful misconduct or gross negligence in the performance or intentional non-performance of member's duties to LBI or any of its subsidiaries; (C) commission of a fraudulent or illegal (including, without limitation, misappropriation, embezzlement or similar conduct) in respect of LBI or any of its Affiliates, customers or subsidiaries or (D) material breach of any LBI policy or any other misconduct that causes material harm to LBI, its Affiliates, customers or subsidiaries, or its or their respective business reputations.

### 7.8    Resignation of Director Nominees

Without prejudice to Clause 7.7, in the event that (i) a Three Director Investor becomes a Two Director Investor, (ii) a Three Director Investor becomes a One Director Investor, or (iii) a Two Director Investor becomes a One Director Investor (in each case, because such Investor, together with its Affiliates, ceases to hold directly or indirectly the requisite amount of the issued share capital of LBI set forth in Clause 4 of this Agreement), such Investor shall notify LBI within three Business Days of such event and, promptly following the written request of the Corporate Governance and Nominating Committee of the Supervisory Board, shall cause one or more of the nominees of the Investor, as applicable, to execute and deliver a resignation which shall be effective with respect to LBI [and any subsidiary of LBI for which such nominee serves as a director][5] on the date of such resignation and shall not permit any such nominee or nominees to revoke any such resignation; <u>provided</u> that in no event may the Corporate Governance and Nominating Committee of the Supervisory Board request such resignation prior to the first anniversary of the date of this Agreement.

---

[4] Note:  Bracketed language is only applicable to Apollo.

[5] Note:  Bracketed language is only applicable to Apollo.

7.9      **Nomination of Additional Director Nominees**

In the event that (i) a One Director Investor becomes a Two Director Investor, (ii) a One Director Investor becomes a Three Director Investor, (iii) a Two Director Investor becomes a Three Director Investor (in each case, because such Investor, together with its Affiliates, acquires directly or indirectly the requisite amount of the issued share capital of LBI set forth in Clause 4 of this Agreement), or (iv) a nominee of the Investor on the Supervisory Board resigns his position or otherwise terminates his membership on the Supervisory Board, such Investor shall notify LBI within three Business Days of such event and, as soon as commercially practicable following the written request of the Investor, LBI shall use its reasonable best efforts to cause the Supervisory Board to take all of the actions that are necessary to ensure that the Investor is able to nominate to the Supervisory Board the number of members indicated in Clause 4 of this Agreement so that the relevant nominee is, or nominees are, appointed to the Supervisory Board within the shortest possible period of time (including, for the avoidance of doubt, the increase of the number of Supervisory Board members, the appointment of additional independent Supervisory Board members to ensure compliance with applicable listing standards, and the appointment of the Investor's nominee in accordance with Clause 7.11); provided, however, that the failure of such Investor to so notify LBI within three Business Days shall not affect such Investor's rights to appoint members of the Supervisory Board pursuant to this Agreement.    For the avoidance of doubt, if the appointment of the Investor's nominee(s) pursuant to this Clause 7.9 would cause the Supervisory Board to fail to have a majority of independent members under the applicable listing standards, the appointment of such Investor's nominee(s) may be delayed for up to ninety (90) days in order to select and appoint a sufficient number of independent Supervisory Board members so that, upon the appointment of such Investor nominee(s), the Supervisory Board will be comprised of a majority of independent members.

7.10     **Appointment Pending General Meeting of Shareholders**

As soon as practicable after the date on which the right to nominate one or more members to the Supervisory Board arises, the Investor shall submit to LBI all personal details LBI reasonably requires in connection with the appointment of a Supervisory Board member.    Following such submission, LBI shall use its reasonable best efforts to cause the Supervisory Board to take all of the actions to appoint the relevant nominee or nominees as soon as practicable to the Supervisory Board in accordance with the provisions of Article 2:143 of the Civil Code and Article 13.4 of the Articles, which appointment shall terminate on the date of the next general meeting of shareholders of LBI, on which date the relevant nominee or nominees shall be nominated for (re)appointment

to the Supervisory Board.  If any Investor nominee, for any reason, is not appointed to the Supervisory Board during a general meeting of the shareholders of LBI, the Investor shall as soon as practicable put forward a nominee who shall be appointed to the Supervisory Board by the Supervisory Board in accordance with the provisions of Article 2:143 of the Civil Code and Article 13.4 of the Articles, which appointment shall terminate on the date of the then following general meeting of shareholders of LBI, on which date an Investor nominee shall be nominated for appointment to the Supervisory Board.

7.11    **Calling General Meeting**

In the event the Investor, together with its Affiliates, holds directly or indirectly 5% or more of the issued share capital of LBI, the Investor can require the Supervisory Board to convene a general meeting of the shareholders. LBI agrees, in any event, to use its reasonable best efforts to cause the Supervisory Board to call a general meeting of shareholders at the shortest practicable notice in the event the ability to appoint an additional member of the Supervisory Board pursuant to Clauses 7.10 and 7.11 above would be frustrated by the fact that by doing so the Supervisory Board would need to exceed the 1/3 limit laid down in Article 2:143 of the Civil Code and Article 13.4 of the Articles.

7.12    **Choice of law**

This Agreement shall be exclusively governed by and construed in accordance with the laws of the Netherlands, without regard to any conflict of law rules under Dutch private international law.

7.13    **Disputes**

All disputes arising in connection with this Agreement shall be finally settled in accordance with the arbitration rules of the Netherlands Arbitration Institute (NAI). The arbitral tribunal shall be composed of 3 (three) arbitrators; one selected by LBI, one selected by the Investor and the third agreed upon by the first two selected arbitrators. The place of arbitration shall be Amsterdam. The arbitral procedures shall be conducted in the English language. Consolidation of the arbitral proceedings with other arbitral proceedings pending in the Netherlands, as provided in article 1046 of the Netherlands Code of Civil Procedure, is excluded.

Signed in two copies on _____ 2010

_____   _____
By:                                                 By:

_____   _____
By:                                                 By:

_____   _____
By:                                                 By:

_____
By:

**TAB 4-C**

---

**RULES**
**FOR THE**
**SUPERVISORY BOARD**

**OF**

**LYONDELLBASELL INDUSTRIES N.V.**

---

These rules for the supervisory board are adopted on [   ] 2010, in accordance with article 17.3 of the articles of
association of LyondellBasell Industries N.V.

# CONTENTS

CLAUSE                                                              PAGE

1. INTRODUCTION                                                      3

2. THE SUPERVISORY BOARD                                             4
2.1 Responsibilities                                                4
2.2 Composition and term                                            5
2.3 Appointment and dismissal of Members                            6
2.4 Remuneration                                                    7
2.5 Majority and quorum                                             7
2.6 Meetings                                                        8

3. CONFLICT OF INTERESTS                                            9

4. CHAIRMAN AND MEMBERS                                             9
4.1 General                                                        9
4.2 Tasks and responsibilities                                     9

5. COMMITTEES                                                       10

6. GOVERNING LAW                                                    11

**RULES FOR THE
SUPERVISORY BOARD
OF
LYONDELLBASELL INDUSTRIES N.V.**

1.      **INTRODUCTION**

1.1     Article 17, paragraph 3 of the Articles provides that the Supervisory Board
        may adopt rules governing its internal affairs.

1.2     No amendment shall be made to the Rules which adversely affects the rights of
        any Investor without the prior written approval of such Investor.

1.3     The Supervisory Board and each of its Members shall observe and comply
        with these Rules and action shall be taken by the Supervisory Board and its
        Members to ensure that each of the Members shall observe and comply with
        the principles set out in these Rules.

1.4     These Rules are complementary to (i) the provisions regarding the Supervisory
        Board and its Members contained in applicable law and regulations, including,
        when applicable, the NYSE listing standards, (ii) the Articles and (iii) the rules
        pertaining to the relationship between the Supervisory Board and the Manage-
        ment Board, contained in the rules governing the Management Board's internal
        affairs.

1.5     In these Rules, the following expressions shall have the following respective
        meanings:

        *Access* means AI LBI Investments LLC, a limited liability company organized
        under the laws of the state of Delaware, located in the United States of Amer-
        ica, as long as the Nomination Agreement it has entered into remains in full
        force and effect

        *Affiliate* means, with respect to any person, any other person that, directly or
        indirectly, through one or more intermediaries, controls, or is controlled by, or
        is under common control with, such person.  For purposes of this definition,
        the terms "control," "controlling," "controlled by" and "under common control
        with," as used with respect to any person, means the possession, directly or in-
        directly, of the power to direct the management and policies of a person,
        whether through the ownership of voting securities, by contract or otherwise.
        For the avoidance of doubt, with respect to each Investor, "Affiliate" shall in-

3

clude all investment funds managed or controlled by the Investor or the Investor's Affiliates.

*Apollo* means LeverageSource (Delaware), LLC, a limited liability company organized under the laws of the state of Delaware, located in the United States of America, as long as the Nomination Agreement it has entered into remains in full force and effect

*Ares* means Ares Corporate Opportunities Fund III, L.P., a limited partnership organized under the laws of the state of Delaware, located in the United States of America, as long as the Nomination Agreement it has entered into remains in full force and effect

*Articles* means the articles of association of the Company

*Chairman* means the chairman of the Supervisory Board, referred to in Article 17 paragraph 1 of the Articles and Clauses 2.2.4 and 4

*Clause* means a clause of these Rules

*Committee* means any committee which the Supervisory Board may establish from time to time in accordance with Clause 5

*Company* means LyondellBasell Industries N.V.

*Deputy Secretary* means the deputy secretary of the Supervisory Board, referred to in Article 17 paragraph 1 of the Articles and Clause 2.2.5

*General Meeting* means the Company's general meeting of shareholders

*Investor* means each of Access, Apollo and Ares, respectively

*Management Board* means the management board of the Company

*Members* means the members of the Supervisory Board and *Member* means anyone of them

*Meeting* means a meeting of the Supervisory Board

*Nomination Agreement* means the respective agreements in relation to the nomination of members of the Supervisory Board entered into between the Company and each of the respective Investors

4

*NYSE* means the New York Stock Exchange

*Rules* means these rules governing the Supervisory Board's internal affairs, including its annexes

*Secretary* means the secretary of the Supervisory Board, referred to in Article 17 paragraph 1 of the Articles and Clause 2.2.5

*Supervisory Board* means the supervisory board of the Company

*Vice Chairman* means the deputy chairman of the Supervisory Board, referred to in Article 17 paragraph 1 of the Articles and Clause 2.2.4.

## 2.    THE SUPERVISORY BOARD

### 2.1    Responsibilities

2.1.1    In addition to the responsibilities that follow from the law and the Articles, the Members shall be collectively responsible for the supervision of the policy of the management board and of the general course of affairs of the Company and its associated enterprise. In the performance of its duties, the Supervisory Board and each of its Members shall be guided by the interests of the Company and its associated enterprise.  On an annual basis, the Supervisory Board shall review and adopt a five year strategic plan, an annual budget and business plan which shall be proposed by the Management Board.

### 2.2    Composition and term

2.2.1    The Supervisory Board shall, in its sole discretion, determine the size of the Supervisory Board in accordance with and in order to comply with (i) the Articles, (ii) the terms of any Nomination Agreement, and (iii) applicable law or regulation, including the NYSE listing standards (when applicable), <u>provided</u> that the Supervisory Board shall not have more than eleven (11) Members unless required to effectuate one of the items set forth in (i)-(iii) hereof.

2.2.2    The Supervisory Board initially shall consist of nine members.  After the Company's capital stock has been listed on the NYSE, the size of the Supervisory Board will be increased and additional independent directors will be appointed as necessary to ensure that the majority of directors will be independent within the meaning of the NYSE listing standards.

5

2.2.3    The Supervisory Board shall be divided in three classes initially consisting of three members each, Class 1, Class 2 and Class 3.  Class 1 members shall serve for a one year initial term and stand for election at the first annual meeting, Class 2 members shall serve for a two year initial term and stand for election at the second annual meeting and Class 3 members shall serve for a three year initial term and stand for election at the third annual meeting.  Following their initial appointment, nominees for each class will stand for election for three year terms at the annual meeting of shareholders of the Company, so long as the Company maintains a staggered Supervisory Board.

2.2.4    Notwithstanding anything to the contrary set forth herein, in case the Supervisory Board at the date of these Rules consists of less than nine members, a Transitional Appointment Committee consisting of the Chief Financial Officer and the Chief Legal Officer has the right, during the period until the listing of LBI's shares on the New York Stock Exchange to appoint such number of members to the Supervisory Board so that the Supervisory Board will consist of nine members in total, it being understood that the Transitional Appointment Committee cannot appoint more than one-third of the members of the Supervisory Board in accordance with Article 2:143 DCC, as provided pursuant to the Transitional Provision 2 of the Articles.

2.2.5    The Members shall be natural persons.

2.2.6    The Supervisory Board shall appoint a Chairman and, if necessary, a Vice Chairman from its number.

2.2.7    The Supervisory Board shall appoint a Secretary and, if necessary, a Deputy Secretary whether or not from its number.

2.2.8    The Supervisory Board shall adopt a profile of its size and composition, taking account of the nature of the business, its activities and the desired expertise and background of the Members; provided that the composition of the Supervisory Board shall comply with applicable listing standards (including, when applicable, the NYSE listing standards) and at least one member of the Supervisory Board who is deemed to be independent under NYSE Rule 303A.02 shall also be a "financial expert" pursuant to Section 407 of the Sarbanes-Oxley Act of 2002.

.**2.3**    **Appointment and dismissal of Members**

2.3.1    Except as provided in Clause 2.3.7 and Article 13.4 of the Articles, the Members are appointed by the General Meeting. The appointment of a Member nominated by an Investor pursuant to a Nomination Agreement shall

6

take place by way of a binding nomination naming at least two persons for each vacancy to be filled and shall be prepared by the Supervisory Board, within three months after the vacancy has arisen or as soon as practicable when an Investor has become entitled to nominate a Member pursuant to any of the Nomination Agreements, in which event the Supervisory Board shall submit to the General Meeting the nominations received by it in accordance with the terms of the Nomination Agreements.  To the extent the nomination for any vacancy is not submitted to the Supervisory Board by an Investor pursuant to its Nomination Agreement, the Supervisory Board shall provide notice to such Investor, and, no earlier than 20 days after providing such notice and the continued failure by the Investor to identify the nominee, shall select the appropriate nominees based on candidates' qualifications and profile, taking into due consideration the desired profile laid out in advance by the Supervisory Board in accordance with Clause 2.2.6, in which event the Supervisory Board shall submit a non-binding nomination to the General Meeting.

Following implementation of Bill number 31 763, "Amendment of book 2 of the Dutch Civil Code in connection with rules for management and supervision in limited liability companies and private companies with limited liability" (*Wetsvoorstel 31 763, "Wijziging van boek 2 van het Burgerlijk Wetboek in verband met de aanpassing van regels over bestuur en toezicht in naamloze en besloten vennootschappen"*), the binding nomination referred to above shall name at least one person for each vacancy to be filled. If then a nomination names only one person, a resolution by the General Meeting on the proposal shall result in such person being appointed, unless the General Meeting renders the nomination non-binding by means of a resolution adopted by at least two-thirds of the valid votes cast and the valid votes cast represent more than half of the Company's issued capital.

Notwithstanding anything in this Clause 2.3.1 to the contrary, the provisions relating to the appointment of Members contained in each Nomination Agreement shall supplement the provisions of the Articles relating to the appointment of Members.

2.3.2   The binding nominations referred to in Clause 2.3.1 shall be made in accordance with article 2:142(3) of the Netherlands Civil Code and with due observance of Clause 2.5 and the terms and conditions agreed upon in any Nomination Agreement entered into between the Company and any Investor.

2.3.3   Except with respect to Members appointed in accordance with Clause 2.3.7, and unless the General Meeting, on the proposal of the Supervisory Board, de-

7

termines that a Member shall be appointed for a longer period, a Member will be appointed for a maximum period of three (3) years, provided however that unless such Member has resigned at an earlier date, his term of office shall lapse at the end of the first annual General Meeting of shareholders, to be held after lapse of his term of appointment. A Member may be re-appointed with due observance of the preceding sentence. There is no limit to the number of times a Member can be reappointed.

2.3.4    The Supervisory Board may draw up a retirement schedule for the Members. Periodical resignation will take place per the date of the annual General Meeting of shareholders.

2.3.5    The Members are suspended and dismissed by the General Meeting in the manner as described in Article 13 paragraphs 5, 6 and 7 of the Articles. If a Member is suspended and the General Meeting does not resolve to dismiss him or to terminate or continue the suspension within three months from the date of suspension, the suspension shall lapse. A suspended Member shall be given an opportunity to account for his actions at the General Meeting and to be assisted by an adviser in doing so.

A resolution to continue the suspension as referred to above may be adopted only once. In such event the suspension may be continued for a maximum period of three (3) months commencing on the day the General Meeting has adopted the resolution to continue the suspension. If within the period of continued suspension the General Meeting has not resolved either to dismiss such Member or to terminate the suspension, the suspension shall lapse.

2.3.6    In case the number of Members will be less than three (3), the Supervisory Board will remain competent.

2.3.7    In the event an Investor is entitled to submit the nomination of a Member pursuant to the terms of its Nomination Agreement, the Supervisory Board shall, subject to applicable law and regulation, as soon as practicable effect the appointment of such nominee in accordance with Article 13.4 of the Articles and Article 2:143 of the Civil Code, which appointment shall terminate on the date of the next General Meeting.

**2.4**    **Remuneration**

Each Member shall be paid a fee at such rate as may from time to time be determined by the Supervisory Board upon recommendation of the Corporate Governance and Nominating Committee provided that the aggregate of all fees

8

so paid per annum to the Members shall not exceed the amount per annum de-
cided by the General Meeting.

**2.5      Majority and quorum**

2.5.1    Each Member shall have the right to cast one vote in a Meeting.

2.5.2    The Supervisory Board shall pass resolutions by an absolute majority of the
votes cast. Abstentions will be regarded as votes not cast. In the event of a tie
vote, the proposal will have been rejected.

In the event of a tie vote on persons, the resolution will be postponed until the
next following Meeting provided that if there is a tie vote again, no resolution
will be passed.

2.5.3    The determination of the Chairman with regard to the results of a vote, and,
where there has been a vote about a proposal which has not been put in writing,
his determination as to the contents of the resolution passed, shall be decisive.
However, where the accuracy of the determination referred to in the previous
sentence is contested promptly after it has been made, a new vote shall take
place if so required by a majority of the votes or, where the first vote did not
take place by response to a roll call or in writing, if one person present with the
right to vote so requires. The legal consequences of the original vote shall be-
come void as a result of the new vote. The Chairman does not hold a casting
vote.

2.5.4    In order to hold a valid Supervisory Board Meeting a quorum constituting a
majority of the number of Members holding office is required.

**2.6      Meetings**

2.6.1    The Supervisory Board will hold a Meeting whenever deemed desirable by the
Chairman or the other Members. The Supervisory Board shall conduct six
regularly scheduled Meetings per year.

2.6.2    The Chairman shall chair the meetings of the Supervisory Board. If the Chair-
man is absent, the Vice Chairman, if appointed, shall chair the Meeting. If no
chairman has been appointed, the Member present at the Meeting who has held
that office longest shall chair the Meeting. If two or more Members have equal
seniority, the eldest of them shall chair the Meeting.

2.6.3    A Member may be represented at a Meeting by a fellow Member, authorized in

writing, only.

2.6.4 The notice of the Meeting shall be given by the Chairman, or in his absence the Vice Chairman, or in the event no Vice Chairman has been appointed, the Member referred to in 2.6.2, and shall set out an agenda identifying in reasonable detail the matters to be discussed at the meeting and shall be accompanied by copies of any relevant papers to be discussed at the meeting. Any matter which is to be submitted to the Supervisory Board for a decision which is not identified in reasonable detail as aforesaid may, notwithstanding the foregoing, be decided upon at the applicable Meeting, unless any Member, acting reasonably, requests reasonable detail in which case the meeting shall be adjourned, for fourteen days maximum in which time the Member or Members having submitted the matter to the Supervisory Board shall supply reasonable detail to the others.

2.6.5 Meetings of the Supervisory Board shall be held in the Netherlands. There shall be at least seven days between the date on which notice is given to each of the Members and the date on which such Meeting is held, unless the person giving notice of the Meeting determines, for urgent reasons, a shorter notice period is necessary.

2.6.6 Minutes of the proceedings at the meetings will be kept by the Secretary. The minutes will be confirmed and signed by the Chairman and Secretary, or in their absence, by the persons who will have acted as chairman and secretary, respectively, at the meeting.

## 3. CONFLICT OF INTERESTS

3.1 A Member shall not participate in the discussions and/or decision-making process on a subject or transaction in relation to which he has a direct or indirect personal interest, which is in conflict with the interests of the Company and its associated enterprise. In the event that - as a result of such conflict of interest - no resolution of the Supervisory Board can be adopted in respect of a certain subject or transaction, the General Meeting shall decide on the matter concerned.

3.2 Without prejudice to Clause 3.1, Members shall not have any duty to refrain, directly or indirectly, from (a) pursuing a corporate opportunity in the same or similar business activities or lines of business in which the Company or any of its Affiliates now engages or proposes to engage or (b) otherwise competing with the Company or any of its Affiliates. The Members do not have any duty to offer to the Company an opportunity to participate in, any business opportu-

nity which may be a corporate opportunity for the Company or any of its Affiliates.

3.3   In the event that a Member acquires knowledge of a potential transaction or other business opportunity which may be a corporate opportunity for the Company or any of its Affiliates, such Member shall have no duty to communicate or offer such transaction or other business opportunity to the Company or any of its Affiliates.[1]

**4.    CHAIRMAN AND MEMBERS**

**4.1    General**

4.1.1   The Chairman and the Members are equally responsible for the supervision of the policy of the management board and of the general course of affairs of the Company and its associated enterprise.

**4.2    Tasks and Responsibilities**

4.2.1   The Chairman shall act as chairman of the General Meeting.

4.2.2   If the Chairman is permanently incapacitated or prevented from acting, the Vice Chairman, or in the event no Vice Chairman has been appointed, the Member referred to in Clause 2.6.2 shall be temporarily charged with his tasks.

**5.    COMMITTEES**

5.1   The Supervisory Board shall have the following standing committees: an audit committee, a corporate governance and nominating committee, an organisation and compensation committee and a health safety and environmental committee.  The responsibilities for these Committees is set out in Annex A  Subject to Clause 5.4, each of these Committees shall be made up of at least three Members, provided that the composition and responsibilities for each such Committee shall comply with the NYSE listing standards (when applicable).

5.2   The Supervisory Board may establish one or more other additional committees from among its Members as it deems fit, subject to Clause 5.3 and provided that the composition and responsibilities for any such committee shall comply with applicable listing standards (including, when applicable, the NYSE listing

---

[1] Note:  Provisions similar to Sections 3.2 and 3.3 will be included in the organizational documents of each significant subsidiary for which Apollo has the right to board representation.

11

standards). The Supervisory Board may also delegate certain of its tasks to a Committee. The delegation of certain tasks to a Committee does not negate the joint responsibility of all Members. The Supervisory Board may reverse a delegation at any time

5.2     Each Committee may adopt internal rules as it deems fit provided that the adoption of internal rules by a Committee, as well as any amendment to the internal rules of a Committee, are subject to approval as referred to in Clause 1.2. The internal rules of each Committee will form an integral part of these Rules.

5.4     At least one Member of the Supervisory Board nominated by Apollo shall be entitled to serve on each Committee, except as may be prohibited by law or regulation (including, when applicable, the NYSE listing standards).

**6.     GOVERNING LAW**

6.1     These Rules shall be governed by, and be construed in accordance with, the laws of The Netherlands.

6.2     [All disputes arising in connection with these Rules shall be finally settled in accordance with the arbitration rules of the Netherlands Arbitration Institute (NAI). The arbitral tribunal shall be composed of 3 (three) arbitrators: two selected by the Supervisory Board and the third agreed upon by the first two selected arbitrators. The place of arbitration shall be Amsterdam. The arbitral procedures shall be conducted in the English language. Consolidation of the arbitral proceedings with other arbitral proceedings pending in The Netherlands, as provided in article 1046 of the Netherlands Code of Civil Procedure, is excluded.]

These Rules are adopted on [   ] 2010 in accordance with Article 17.3 of the Articles.

## ANNEX A

*Audit Committee*.  In accordance with its charter, the audit committee will be responsible for:

> Recommending independent auditors for shareholder approval, overseeing and reviewing reports of independent auditors and serving as an intermediary between independent auditors and management.

> Overseeing the proper functioning and appropriateness of the Company's financial reporting processes and accounting policies.

> Overseeing and reviewing the internal audit functions and reporting.

> Monitoring and discussing risk assessment and risk management services with the management and the internal auditor.

> Evaluating and maintaining proper ethical compliance functions.

*Organisation and Compensation Committee*.  In accordance with its charter, the organisation and compensation committee will be responsible for:

> Making a proposal for adoption by the Supervisory Board of the compensation philosophy, structure, policies and guidelines for the managing directors, executive officers and senior management.

> Establishing and reviewing annual incentive and long-term incentive compensation plans, including equity-based incentive compensation plans, for employees.

> Establishing and reviewing benefit or other plans or programs for employees.

> Establishing and reviewing corporate goals and objectives relevant to the Chief Executive Officer's compensation, including the long-term incentive component, evaluate the Chief Executive Officer's performance in light of those goals and objectives and determine the Chief Executive Officer's compensation level based on this evaluation.

> Preparing a report on executive compensation, as required by the SEC rules, to be included in the Company's annual proxy statement to shareholders and the Supervisory Board report on compensation to be included in the Dutch Annual Report.

*Corporate Governance and Nominating Committee*.  In accordance with its charter, the corporate governance and nominating committee will be responsible for:

> Periodically evaluating the performance and functioning of the Supervisory Board and the Management Board.

13

Developing, reviewing and recommending to the Supervisory Board a set of corporate governance guidelines.

Developing and recommending criteria for Supervisory Board membership and size and structure of the Supervisory Board.

Identifying and recommending qualified candidates for membership on the Supervisory Board.

Recommending the structure and composition of, and nominees for, the standing committees of the Supervisory Board.

***Health, Safety and Environmental Committee*** .  In accordance with its charter, the health, safety and environmental committee will be responsible for

[to come]

**<u>TAB 4-D</u>**

_____

**RULES**
**FOR THE**
**MANAGEMENT BOARD**

**OF**

**LYONDELLBASELL INDUSTRIES N.V.**

_____

These rules for the management board are adopted on [   ] 2010 and approved by the supervisory board of LyondellBasell Industries N.V. on the same day, all in accordance with article 14.3 of the articles of association of LyondellBasell Industries N.V.

CONTENTS

CLAUSE                                                    PAGE

1. INTRODUCTION                                             3

2. THE MANAGEMENT BOARD                                     4
2.1 Responsibilities                                        4
2.2 Composition and term                                    4
2.3 Appointment and dismissal of Members                    5
2.4 Remuneration                                            5
2.5 Majority and quorum                                     5
2.6 Meetings                                                6

3. CONFLICT OF INTERESTS                                    7

4. MEMBERS                                                  7
4.1 General                                                 7
4.2 Tasks and responsibilities                              7

5. GOVERNING LAW                                            8

**RULES FOR THE**
**MANAGEMENT BOARD**
**OF**
**LYONDELLBASELL INDUSTRIES N.V.**

### 1.    INTRODUCTION

1.1    Article 14, paragraph 3 of the Articles provides that the Management Board may adopt rules governing its internal affairs, which rules require the approval of the Supervisory Board.

1.2    The Rules may only be amended by the Management Board with the approval of the Supervisory Board.

1.3    The Management Board and its Members shall observe and comply with these Rules and action shall be taken by the Management Board and its Members to ensure that the Members shall observe and comply with the principles set out in these Rules.

1.4    These Rules are complementary to (i) the provisions regarding the Management Board and its Members contained in applicable law and regulations, including the rules of the New York Stock Exchange or any other applicable exchange, (ii) the Articles and (iii) the rules pertaining to the relationship between the Supervisory Board and the Management Board, contained in the rules governing the Supervisory Board's internal affairs.

1.5    In these Rules, the following expressions shall have the following respective meanings:

*Articles* means the articles of association of the Company

*CEO* means the Chief Executive Officer referred to in Article 13 paragraph 1 of the Articles and Clause 2.2.2

*Clause* means a clause of these Rules

*Company* means LyondellBasell Industries N.V.

*General Meeting* means the Company's general meeting of shareholders

*Management Board* means the management board of the Company

3

*Member* means a member of the Management Board

*Meeting* means a meeting of the Management Board

*Meeting of B Shareholders* means a meeting of holders of class B ordinary shares in the Company's share capital

*Rules* means these rules governing the Management Board's internal affairs, including its annexes

*Supervisory Board* means the supervisory board of the Company

## 2.    THE MANAGEMENT BOARD

### 2.1    Responsibilities

2.1.1    In addition to the responsibilities that follow from the law and the Articles, the Management Board shall be responsible for the day to day affairs of the Company. In the performance of its duties, the Management Board and its Member(s) shall be guided by the interests of the Company and its associated enterprise.

### 2.2    Composition and term

2.2.1    The initial Management Board shall consist of one (1) Member.  The term of the initial Management Board will be five (5) years.  Thereafter, the Supervisory Board may determine the number of Members on subsequent Management Boards.

2.2.2    The Chief Executive Officer (CEO) of the LBI Group shall be the sole Member of the initial Management Board.  Thereafter, in the event that the Supervisory Board determines that a subsequent Management Board will consist of more than one (1) Member, the CEO shall be a Member of such subsequent Management Board.

2.2.3    The term of the Member of the initial Management Board will be five (5) years.  Thereafter, a Member can be appointed for a maximum term of four (4) years and may be reappointed. There is no limit to the number of times a Member can be reappointed.

2.2.2    If a Member is permanently incapacitated or prevented from acting, Article 15

paragraph 3 of the Articles shall apply.

**2.3**      **Appointment and dismissal of Members**

2.3.1    The Member(s) shall be appointed by the General Meeting in the manner as described in Article 13.2 of the Articles.

2.3.2    A Member is suspended and dismissed in the manner as described in Article 13 paragraphs 2, 5, 6 and 7 of the Articles. If a Member is suspended by the General Meeting or the Supervisory Board and the General Meeting does not resolve to dismiss him or to terminate or continue the suspension within three months from the date of suspension, the suspension shall lapse. A suspended Member shall be given an opportunity to account for his actions at the General Meeting and to be assisted by an adviser in doing so.

A resolution to continue the suspension as referred to above may be adopted only once. In such event the suspension may be continued for a maximum period of three (3) months commencing on the day the General Meeting has adopted the resolution to continue the suspension. If within the period of continued suspension the General Meeting has not resolved either to dismiss such Member or to terminate the suspension, the suspension shall lapse.

**2.4**      **Remuneration**

The Supervisory Board shall determine the remuneration and other terms of employment for the Member(s) (in their capacity as such) on the basis of a remuneration policy determined by the General Meeting, with due observance of Article 13.8 of the Articles.

**2.5**      **Majority and quorum**

2.5.1    Each Member shall have the right to cast one vote in a Meeting.

2.5.2    After the term of the initial Management Board has expired, in the event that a subsequent Management Board consists of more than one (1) Member, resolutions shall be passed by an absolute majority of the votes cast. Abstentions will be regarded as votes not cast. In the event of a tie vote or that no votes are cast, the matter shall be decided by the Supervisory Board.

2.5.3    The determination of the CEO with regard to the results of a vote, and, where

5

there has been a vote about a proposal which has not been put in writing, his determination as to the contents of the resolution passed, shall be decisive. However, where the accuracy of the determination referred to in the previous sentence is contested promptly after it has been made, a new vote shall take place if so required by a majority of the votes or, where the first vote did not take place by response to a roll call or in writing, if one person present with the right to vote so requires. The legal consequences of the original vote shall become void as a result of the new vote.

2.5.4    After the term of the initial Management Board has expired, in the event that a subsequent Management Board consists of two (2) Members, a quorum of one (1) Member holding office is required in order to validly hold a Meeting, and in the event that a subsequent Management Board consists of three (3) or more Members, a quorum of the majority of the number of Members holding office is required to validly hold a Meeting.

**2.6**    **Meetings**

2.6.1    The Management Board shall conduct six regularly scheduled Meetings a year and such meetings shall coincide with the meetings of the Supervisory Board. Meetings of the Management Board shall be held in The Netherlands.

2.6.2    The CEO shall chair the meetings of the Management Board.

2.6.3    [Omitted]

2.6.4    Notice of the Meeting shall be given by the CEO and shall set out an agenda identifying in reasonable detail the matters to be discussed at the meeting and shall be accompanied by copies of any relevant papers to be discussed at the meeting. Any matter which is to be submitted to the Management Board for a decision which is not identified in reasonable detail as aforesaid may, notwithstanding the foregoing, be decided upon at the applicable Meeting.

2.6.5    There shall be at least two days between the date on which notice is given to the Member(s) of any Meeting and the date on which it is held, unless the person giving notice of the Meeting determines, for urgent reasons, a shorter notice period is necessary.

2.6.6    [Omitted]

2.6.7    [Omitted]

2.6.8    The minutes of a Meeting shall be adopted in the same or in the next meeting. Minutes of the matters dealt with at a Meeting shall be sufficient evidence thereof and of the observance of all necessary formalities, provided such minutes are certified by the CEO.

2.6.9    The Management Board shall require the approval of:
a.    the General Meeting and the Supervisory Board, for the resolutions listed in Annex A;
b.    the Supervisory Board, for the resolutions listed in Annex B, except as contemplated by the then approved business plan and budget; and
c.    the General Meeting, the Supervisory Board and the Meeting of B Shareholders in accordance with article 21.1 of the Articles, for the resolutions listed in Annex C.

2.6.10   The Management Board shall further require the approval of the Supervisory Board for such resolutions of the Management Board as the Supervisory Board, after reasonable consultation with the Management Board, has specified in a resolution to that effect and notified to the Management Board.

3.    **CONFLICT OF INTERESTS**

A Member shall not participate in taking a decision on a subject or transaction in relation to which he has a direct or indirect personal interest, which is in conflict with the interests of the Company and its associated enterprise. In the event that - as a result of such conflict of interest - no resolution of the Management Board can be adopted in respect of a certain subject or transaction, the Supervisory Board shall decide on the matter concerned.

[*note: Clause 3 will not be imperative prior to the envisaged implementation of Bill number 31 763, "Amendment of book 2 of the Dutch Civil Code in connection with rules for management and supervision in limited liability companies and private companies with limited liability"; changes to the wording of the proposed legislation - on which this Clause was based - may still occur*]

4.    **MEMBERS**

4.1    **General**

4.1.1    The CEO is entitled to represent the Company.

4.2    **Tasks and Responsibilities**

7

4.2.1   The CEO shall see to it that:
   a.      the Member(s) receive in good time all information which is necessary for the proper performance of their duties;
   b.      there is sufficient time for consultation and decision-making by the Management Board;
   c.      the Management Board shall be constituted and function properly.

4.2.2   The Management Board shall, at least once every year, inform the Supervisory Board in writing of the main features of the strategic plan and annual budget of the Company.

4.2.3   If the CEO is permanently incapacitated or prevented from acting, a replacement Member may be temporarily charged with his tasks.

**5.      GOVERNING LAW**

5.1     These Rules shall be governed by, and be construed in accordance with, the laws of The Netherlands.

5.2     [All disputes arising in connection with these Rules shall be finally settled in accordance with the arbitration rules of the Netherlands Arbitration Institute (NAI). The arbitral tribunal shall be composed of 3 (three) arbitrators: one selected by the Management Board, one selected by the Supervisory Board and the third agreed upon by the first two selected arbitrators. The place of arbitration shall be Amsterdam. The arbitral procedures shall be conducted in the English language. Consolidation of the arbitral proceedings with other arbitral proceedings pending in The Netherlands, as provided in article 1046 of the Netherlands Code of Civil Procedure, is excluded.]

These Rules are adopted on [   ] 2010 and approved by resolution of the Supervisory Board on the same day, all in accordance with Article 14.3 of the Articles.

**ANNEX A**

Resolutions:

I.      regarding a significant change in the identity or nature of the Company or its associated enterprise, including in any event:

      (i)      the transfer of the entire enterprise or practically the entire enterprise of the Company to a third party, whether by acquisition, business merger, consolidation, or sale of all or substantially all assets of the Company and its consolidated subsidiaries taken as a whole;

      (ii)     to conclude or cancel any long-lasting co-operation by the Company or a subsidiary with any other legal person or company or as a fully liable general partner of a limited partnership or a general partnership, provided that such co-operation or the cancellation thereof is of essential importance to the Company; and

      (iii)    to acquire or dispose of a participating interest in the capital of a company with a value of at least one third of the sum of the assets according to the consolidated balance sheet with explanatory notes thereto according to the last adopted annual accounts of the Company, by the Company or a subsidiary.

**ANNEX B**

Resolutions to (to the extent applicable, in one or a series of related transactions):

1.  acquire, repurchase, redeem, cancel, sell, or otherwise dispose of any equity interest of the Company or any of its significant subsidiaries, or any equity interest convertible into or exchangeable for, or any rights, warrants or options to acquire any shares of, capital stock of the Company or any of its significant subsidiaries;

2.  declare, set aside, make or pay any dividend or other distribution in respect of the Company's Securities, or purchase or redeem, directly or indirectly, such Securities;

3.  amend, modify or waive any material term of any outstanding (i) Security of the Company or any of its significant subsidiaries or (ii) indebtedness (as defined in GAAP) in excess of $100,000,000 of the Company or any of its significant subsidiaries;

4.  consummate an initial public offering or a public offering of the Securities of any subsidiary.

5.  make any acquisition or divestiture of any material business or material assets, or enter into, withdraw from or make any material change to any joint venture, agreements or commitments relating thereto;

6.  With respect to any action or transaction that would require approval of the Supervisory Board hereunder if such action were to be taken by the Company, cast any votes with respect to non-wholly owned investments or subsidiaries, or grant any proxy with respect to the voting of any shares directly or indirectly;

7.  to adopt, materially amend or materially change the annual budget or strategic plan for the Company and its associated enterprises or make aggregate expenditures exceeding the overall budget by greater than 10%;

8.  make expenditures for capital projects (i) contemplated by the then approved annual budget, in excess of $[100,000,000] or (ii) not contemplated by the then approved annual budget, in excess of $[30,000,000];

9.  adopt or amend rules governing the Management Board's internal affairs;

10.    enter into any material new line of business;

11.    agree to enter into or consummate any mergers, amalgamations, consolidations, reorganizations, recapitalizations or other business combinations with unrelated third parties;

12.    commence the termination, liquidation or dissolution of the Company, or enter into any agreement or arrangement relating thereto;

13.    propose or institute proceedings to adjudicate the Company or any of its subsidiaries as bankrupt, or consent to the filing of a bankruptcy proceeding against the Company or any of its subsidiaries, or file a petition or answer or consent seeking reorganization of the Company or any of its subsidiaries under any applicable bankruptcy or insolvency laws, or consent to the filing of any such petition against the Company or any of its subsidiaries, or consent to the appointment of a receiver or liquidator or trustee or assignee in bankruptcy or insolvency of the Company or any of its subsidiaries, or make an assignment for the benefit of creditors of the Company or any of its subsidiaries or admit in writing the Company's or any of its subsidiary's inability to pay its debts generally as they become due;

14.    subject to applicable insolvency law, propose that the Company or any of its subsidiaries be wound up or that any liquidation proceedings be commenced;

15.    make any payments to a Manager other than (A) regular salary payments, (B) expense reimbursement in the ordinary course of business consistent with past practice, (C) pursuant to any contract previously approved by the Supervisory Board, (D) payments arising under the Company's employee benefit plans which are generally applicable to all employees of the Company and its subsidiaries and (E) director and observer expenses generally payable to the directors and observers of the Company and its subsidiaries, in accordance with policies approved by the Supervisory Board;

16.    other than as permitted under the Transaction Documents and the Financing Agreements, enter into any transaction (i) with any officer, director or any relative thereof, except as permitted under Item 15, (ii) other than in the ordinary course of business, with any Rights Offering Sponsor or 5% shareholder or any of its Affiliates;

17.    enter into, extend or terminate any contract, agreement, arrangement, commitment, letter of intent, memorandum of understanding, obligation or similar understanding (i) in the ordinary course of business, involving more than

$[250,000,000] or (ii) outside of the ordinary course of business, involving more than $50,000,000;

18. hire or fire any Senior Officer or create any new Senior Officer position;

19. (i) adopt, approve or materially amend compensation and benefit plans and programs of the Company or any of its subsidiaries, including cash bonus plans, option and equity-based or profit sharing plans, (ii) approve any grant under any option or equity-based or profit sharing plan, (iii) change the compensation of Senior Officers or (iv) enter into or adopt any welfare, pension or benefit plan or arrangement involving any labor organization (including without limitation any multi-employer trust providing retirement benefits);

20. adopt or approve any Company-wide severance agreements or arrangements or any severance agreements or arrangements with any Senior Officer;

21. enter into any agreement providing for the indemnification of any officer, director or employee of the Company or any of its subsidiaries;

22. purchase or obtain "director and officer" insurance for the benefit of any officer, director, employee, agent or representative of the Company or any of its subsidiaries;

23. pay any fees to any of the Rights Offering Sponsors or any of their respective Affiliates, other than as contemplated by the Transaction Documents;

24. make any public filing with, or public report to, any regulatory agency relating to or referring to the Rights Offering Sponsors and their financial circumstances or capital structure, except as it relates to their equity ownership, governance rights or as otherwise required by applicable law or regulation, including the rules of the New York Stock Exchange or any other applicable exchange;

25. accept or approve the external auditors or auditors' reports;

26. approve the payment of any investment banking fees in excess of $10,000,000;

27. settle any litigation in excess of $[50,000,000];

28. issue any press releases or other public announcements, or give any media interview relating to or referring to the Rights Offering Sponsors and their financial circumstances or capital structure, except as it relates to their equity ownership, governance rights or as otherwise required by applicable law or regulation,

including the rules of the New York Stock Exchange or any other applicable exchange;

29.    make any political contribution or make any charitable contribution in excess of $500,000;

30.    amend or waive any material term of any agreement or transaction that required, or would have required had such agreement or transaction been entered into after the adoption hereof, approval of the Supervisory Board hereunder;

31.    change the corporate seat of the Company; or

32.    make, permit or approve any of the following transactions:

> other than [as permitted] under the Financing Agreements or in the ordinary course of business consistent with the then approved business plan and budget, mortgage or otherwise encumber or subject to any Encumbrance any material assets of the Company or any of its subsidiaries;
> other than [as permitted] under the Financing Agreements or in the ordinary course of business consistent with the then approved business plan and budget, lend any money or assets of the Company to any other Person in excess of $[100,000,000]; provided however, that any loans made to directors, officers or employees of either the Company or of any of its subsidiaries other than normal advances for travel and entertainment expenses and the like, shall require approval irrespective of the amount; or
> other than [as permitted] under the Financing Agreements (including from time to time drawing down proceeds under any Financing Agreements), incurrence of (a) indebtedness of the Company or its subsidiaries for money borrowed from others and purchase money indebtedness, in each case in excess of $[100,000,000]; (b) guarantees by the Company or its subsidiaries of third party indebtedness of the type and amounts described in clause (a) above, but excluding endorsements of checks and other instruments in the ordinary course; and (c) obligations of the Company or its subsidiaries to pay rent or other amounts under any lease of (or other arrangement covering the right to use) real or personal property in excess of $[100,000,000], which obligations are required to be classified and accounted for as capital leases on a balance sheet of the Company, as of such date computed in accordance with GAAP.

In this Annex B, the following expressions shall have the following respective meanings:

"*Affiliate*" means, with respect to any Person, any other Person that, directly or

13

indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person. For purposes of this definition, the terms "control," "controlling," "controlled by" and "under common control with," as used with respect to any person, means the possession, directly or indirectly, of the power to direct the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise. For the avoidance of doubt, with respect to any Rights Offering Sponsor, "Affiliate" shall include all investment funds managed or controlled by such Rights Offering Sponsor or such Rights Offering Sponsor's Affiliates.

"*Encumbrances*" means any encumbrances, lien, pledge, security interest, claim, charges, option, right of first refusal or offer, mortgage, deed of trust, easement, including restrictions on the right to vote equity interests.

"*Equity Commitment Agreement*" means that certain Equity Commitment Agreement, dated as of December 11, 2009 by and among the Company, the Rights Offering Sponsors and the Company's subsidiaries and affiliates who are party thereto, as it may be amended, supplemented or modified from time to time.

"*Financing Agreements*" means [all documents with respect to financing in effect as of the date on which the Plan becomes effective in accordance with its terms].

"*GAAP*" means the generally accepted accounting principles in the United States of America.

"*Manager*" means any Member of the Management Board, any officer of the Company or any of its subsidiaries, any employee earning more than $[250,000] in compensation and retirement benefits and any Affiliate of any of the foregoing.

"*Person*" shall be construed broadly and shall include, without limitation, an individual, a partnership, stichting, commanditaire vennootschap, besloten vennootschap, a limited liability company, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"*Plan*" means the joint chapter 11 plan of reorganization of LyondellBasell Industries AF S.C.A. and its subsidiaries and affiliates who are debtors and debtors-in-possession, including all exhibits and schedules annexed thereto or associated therewith.

"*Rights Offering Sponsors*" means LeverageSource (Delaware) LLC, AI LBI Investment LLC and Ares Corporate Opportunities Fund III, L.P.

"*Securities*" means, with respect to any Person, such Person's capital stock or other equity interests or any options, warrants or other securities that are directly or indirectly convertible into, or exercisable or exchangeable for, such Person's capital stock or other equity or equity-linked interests, including phantom stock and stock appreciation rights.

"*Senior Officer*" means Persons who serve in the following positions within the LBI Group:  President and Chief Executive Officer, Executive Vice President & Chief Financial Officer, Executive Vice President & Chief Legal Officer, Senior Vice President, Intermediate & Derivatives, Senior Vice President, Olefins and Polyolefins, Americas, Senior Vice President, Olefins and Polyolefins, EAI, Senior Vice President, Refining, Senior Vice President, Research & Development, Senior Vice President, Manufacturing, Americas, Senior Vice President, Manufacturing, EAI, Senior Vice President, Technology, Vice President, Health, Safety and Environment and Vice President, Human Resources or such other Person who may serve as a direct report to the CEO.

"*Transaction Documents*" means the Equity Commitment Agreement, the Plan, [others to come].

Resolutions:

I.    An acquisition, business merger, sale of all or substantially all assets of the Company and its consolidated subsidiaries taken as a whole, consolidation or a voluntary or involuntary liquidation, dissolution or winding up of the Company (or its subsidiaries, the assets of which constitute all or substantially all of the assets of the Company and its subsidiaries, taken as a whole), in a single transaction or series of transactions, in each case, pursuant to which the class B ordinary shares in the Company' share capital are redeemed, purchased, converted, retired or otherwise exchanged for value at the price less than USD 10.61 per class B ordinary share in the Company' share capital, subject to anti-dilution adjustments as set forth in the Articles (the "**Class B Liquidation Preference**").

**TAB 5**

**CERTIFICATE OF AMENDMENT**
**OF**
**CERTIFICATE OF INCORPORATION**
**OF**
**LYONDELL CHEMICAL COMPANY**

Lyondell Chemical Company (the "Corporation"), a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, hereby adopts this Certificate of Amendment to its Certificate of Incorporation, which amends the Amended and Restated Certificate of Incorporation as described below, and does hereby certify that:

*First.* The Amended and Restated Certificate of Incorporation of the Corporation is hereby amended to add a new Article IX to read in its entirety as follows:

*ARTICLE IX.*

Notwithstanding anything herein to the contrary, the Corporation shall not issue any class of non-voting equity securities unless and solely to the extent permitted by section 1123(a)(6) of the United States Bankruptcy Code (the "Bankruptcy Code"); provided, however, that this Article IX (a) will have no further force and effect beyond that required under section 1123(a)(6) of the Bankruptcy Code; (b) will have such force and effect, if any, only for so long as section 1123(a)(6) of the Bankruptcy Code is in effect and applicable to the Corporation; and (c) in all events may be amended or eliminated in accordance with applicable law from time to time in effect.

*Second.* The foregoing amendment was duly adopted in accordance with the provisions of Section 303 of the General Corporation Law of the State of Delaware.

*Third.* Provision for the making of this Certificate of Amendment is contained in the order of the United States Bankruptcy Court for the Southern District of New York confirming the Joint Chapter 11 Plan of Reorganization of Lyondell Chemical Company and certain of its affiliates, which court has jurisdiction over the bankruptcy proceedings of Lyondell Chemical Company and certain of its affiliates.

IN WITNESS WHEREOF, the Corporation has caused this certificate to be signed this _____ day of _____, 2010.

**LYONDELL CHEMICAL COMPANY**

By: _____
     Name:
     Title:

**TAB 6-A**

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OF LYONDELL CHEMICAL COMPANY, *ET AL.***

c/o Brown Rudnick LLP
7 Times Square
New York, NY  10036

April 5, 2010

TO:   **THE HOLDERS OF UNSECURED CLAIMS AGAINST LYONDELL
CHEMICAL COMPANY AND ITS AFFILIATED DEBTORS**

RE:   **CLAIMS THAT WILL BE PURSUED BY THE LITIGATION TRUST AND THE
CREDITOR TRUST**

---

Brown Rudnick LLP ("Brown Rudnick") is counsel to the Official Committee of Unsecured Creditors (the "Creditors' Committee") in the bankruptcy cases of Lyondell Chemical Company, *et al.* (collectively, the "Debtors"), Chapter 11 Case No. 09-10023 (REG) (Jointly Administered).

We wrote to you previously to recommend that you vote to accept the Debtors' Plan of Reorganization (the "Plan")[1].  Our previous letter was included in the Debtors' solicitation package for their Plan.  This letter is written for the purpose of providing you with information related to certain of the documents contained in the accompanying Plan Supplement, which will create the vehicles for pursuing certain claims (collectively, the "Claims") on behalf of holders of Allowed General Unsecured Claims and Allowed 2015 Notes Claims after the confirmation of the Debtors' Plan and, in particular, to provide you with information related to the claims to be pursued by those vehicles.  This letter supplements, but does not replace, our previous letter to you.  The Committee continues to support the Plan and recommend that you vote to accept it.

Two separate trusts, the Litigation Trust and the Creditor Trust (the "Trusts"), will be formed to pursue the Claims.  Pursuant to the Plan, the Trusts will be funded with $20 million for payment of costs and fees associated with the Trusts,[2] including for pursuit of the Claims.  The Litigation Trust will pursue (i) Claims asserted, or which could have been asserted, in the Committee Litigation[3] and that were not released in the Lender Litigation Settlement (including

---

[1]     Capitalized terms not otherwise defined herein shall have the meanings assigned to them in the Disclosure Statement or the Plan.

[2]     These funds will also defray the costs of the Creditor Representative function, *i.e.* distributing proceeds of future recoveries to unsecured creditors and liaison with the Reorganized Debtors with regard to the resolution of disputed claims.

[3]     The lawsuit styled *Official Committee of Unsecured Creditors, on behalf of the Debtors' Estates v. Citibank, N.A., London Branch, et al.*, Adversary Proceeding No. 09-01375 (REG), commenced by the Creditors' Committee on July 22, 2009 (the "Committee Litigation").

certain Claims against directors and officers of the Debtors and against Access Industries and certain of its affiliates) (the "Non-Settling Defendant Claims") and (ii) Certain Claims to recover preferential payments made to creditors prior to the bankruptcy filings (the "Assigned Preference Claims").  The Creditor Trust will pursue Claims of creditors of the Debtors arising under state law against the former shareholders of Lyondell Chemical Company on account of their receipt of cash consideration pursuant to the 2007 merger transaction involving certain of the Debtors (the "Merger") (the "State Law Avoidance Claims").  As described in the Plan, Holders of Allowed General Unsecured Claims and Allowed 2015 Notes Claims are generally entitled to receive a Pro Rata Share of any net recoveries on (i) Non-Settling Defendant Claims and State Law Avoidance Claims, and (ii) 90% of the Assigned Preference Claims up to the amount of their claims.  Annex A hereto contains a brief description of several of the terms in the Creditor Trust Agreement.  A version of the Creditor Trust Agreement in substantially final form is part of the Plan Supplement.

### The Litigation Trust and the Creditor Trust

The Litigation Trust Agreement and the Creditor Trust Agreement are included in this Plan Supplement.  Each of the Trusts will be governed by a five member Trust Advisory Board.  The membership will be the same for each Board.  Four of the members previously served on the Creditors' Committee.  They are Wilmington Trust Company, the indenture trustee for the 2015 Notes, represented by Patrick Healy, Law Debenture Trust of New York, the indenture trustee for the Millennium Notes, represented by Robert L. Bice, II, BASF Corporation, represented by Peter Argiriou, and James Schorr, a retired employee of the Debtors.  We believe that these members are fairly representative of the general unsecured creditors as a whole.  These four members will pick the fifth member.

Edward S. Weisfelner, Esq., a member of Brown Rudnick, and the Creditors' Committee's lead attorney, has been selected as Trustee for both Trusts, subject to the oversight of the Trust Advisory Board.

### Certain Information About The Trust Claims

The Assigned Preference Claims.  According to the schedules the Debtors filed with the Bankruptcy Court, approximately $7.5 billion in payments were made by the Debtors within the 90 days prior to filing for bankruptcy.  Subject to a number of legal defenses, bankruptcy law provides that the Debtors (or a representative on behalf of the Debtors) may seek to recover these payments as preferential transfers.  The Lender Litigation Settlement effected the release of preference claims against certain parties and also included a provision which permits the Debtors to release preference claims that could otherwise be asserted against certain vendors, customers and other persons with whom the Reorganized Debtors will have an ongoing business relationship.  The preference claims that are not subject to the foregoing releases (collectively, the "Preference Releases") are referred to herein (except as described below) as the "Assigned Preference Claims."  Based on our inquiry to the Debtors and their advisors regarding payments made in the 90 days prior to the bankruptcy, it appears that the maximum possible recovery on the Assigned Preference Claims is no more than $200 million, taking into account the Preference Releases.  The actual recovery on the Assigned Preference Claims is likely to be significantly

less after recipients of allegedly preferential transfers assert various  defenses that may be available to them.

The Non-Settling Defendant Claims.  Certain of the Non-Settling Defendant Claims were scheduled to be tried as part of the Phase I trial in December 2009 and others were scheduled to be tried during a subsequent Phase II.  The Phase I trial, however, was postponed on account of the Lender Litigation Settlement.  The trial on these Claims may commence as soon as late 2010.  The Non-Settling Defendant Claims include Claims against Access Industries and related entities including: (i) Claims for approximately $1.2 billion representing cash consideration paid in the Merger (the "Toe Hold Transfers"), (ii) a $300 million preference claim based on the repayment within 90 days of the bankruptcy filing of amounts drawn by one of the Debtors under a revolving line of credit (the "Access Revolver"') (which is not included in the Assigned Preference Claims described above), (iii) a claim against Nell Limited for recovery of $125 million in purported advisory fees in connection with the Merger, and (iv) a breach of contract claim for failure to fund under the Access Revolver, with unspecified damages.  The Claims regarding the Toe Hold Transfers are subject to a summary judgment motion brought by Nell Limited that has been fully briefed.  The Non-Settling Defendant Claims also include Claims against former directors and officers of Lyondell entities for recovery of approximately $270 million in Change of Control Payments associated with the  Merger as well as claims for breach of fiduciary duty and mismanagement against former directors and officers of Lyondell entities and of LyondellBasell Industries AF S.C.A., with unspecified damages.  Certain of the Claims against the directors and officers are also subject to a fully briefed summary judgment motion by the former Lyondell directors and officers.

The State Law Avoidance Claims.  The State Law Avoidance Claims seek recovery, as fraudulent transfers, of cash consideration paid in connection with the Merger to former holders of Lyondell common stock.  We anticipate that these Claims, which involve a very large number of defendants, will involve significant legal and logistical challenges, including the initial identification of the shareholders potentially liable.  Accordingly, the prosecution of the State Law Avoidance Claims can be expected to follow a different schedule than the claims to be pursued by the Litigation Trust.

Uncertainties Regarding Claims and Trust Distributions.  There can be no assurance that either Trust will obtain a favorable judgment or settlement with respect to any Claim.  In addition, if there is a recovery, there can be no assurance as to the timing or amount of any such recovery.  The Trusts will only make distributions to beneficiaries if and to the extent that they receive proceeds from the Claims, and then only to the extent that the proceeds from such Claims exceed any amounts withheld to fund the prosecution of remaining Claims and operations of the Trusts.  Therefore, it is not possible to predict whether any distributions will be made to the beneficiaries of the Trusts or, if any distributions are made, the timing and amount of those distributions.

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LYONDELL CHEMICAL COMPANY, *ET AL.***

Dated: April 5, 2010
         New York, NY

**ANNEX A**

**RE:    FORM OF CREDITOR TRUST AGREEMENT**

---

The Creditor Trust (i) will be established for the sole purpose of taking title to, protecting, conserving and distributing any recoveries from the State Law Avoidance Claims, in accordance with Treasury Regulation section 301.7701-4(a) for the Creditor Trust Beneficiaries, with no objective to continue or engage in the conduct of a trade or business, and (ii) is intended to qualify as a grantor trust for U.S. federal income tax purposes.

The Creditor Trust Agreement requires all parties to (i) treat the transfer of the Creditor Trust Assets to the Creditor Trust as a transfer of such assets directly from the Creditor Trust Beneficiaries to the Creditor Trust, and (ii) consistent therewith, to treat the Creditor Trust as a grantor trust of which the Creditor Trust Beneficiaries are the owners and grantors.

The Creditor Trust will be dissolved as set forth in the Creditor Trust Agreement.

The definitive terms of the Creditor Trust are as set forth in the Creditor Trust Agreement contained in the Plan Supplement.

# 1735839 v5

**TAB 6-B**

## CREDITOR REPRESENTATIVE PLAN SUPPLEMENT

This Creditor Representative Plan Supplement (the "**Supplement**") supplements that certain Third Amended Joint Chapter 11 Plan of Reorganization for Lyondell Chemical Company and the other Debtors thereunder dated March 12, 2010 (as the same may be amended, modified or supplemented from time to time in accordance with the terms and provisions thereof, the "**Plan**"). The Plan provides for the appointment of a Creditor Representative.   This Supplement further sets forth the rights, duties and powers of the Creditor Representative.

## ARTICLE I
## DEFINITIONS

Section 1.1    Defined Terms.   Capitalized terms used herein and not otherwise defined shall have the respective meanings set forth in the Plan.

## ARTICLE II
## APPOINTMENT

Section 2.1    Appointment of Creditor Representative.   The Creditor Representative is appointed as of the Effective Date to perform the duties and obligations of the Creditor Representative under the Plan, the Confirmation Order and this Supplement.   The Creditor Representative shall have the rights, powers and duties set forth in the Plan, the Confirmation Order and this Supplement.   The Creditor Representative will be comprised of an Advisory Board (the "**Advisory Board**") and a Manager (the "**Manager**").   Subject to the management and direction of the Advisory Board, the Manager shall manage the daily affairs and business of the Creditor Representative.   Except to the extent otherwise explicitly limited by this Agreement, the Manager in consultation with, and subject to the management and direction of, the Advisory Board shall exercise all of the powers of the Creditor Representative subject to the management and direction of the Advisory Board.   The Advisory Board shall have the authority and responsibilities provided in Section 5.2 hereof.   The Manager and Advisory Board may serve without bond.   For the avoidance of doubt, none of the Creditor Representative, the Manager or any member of the Advisory Board is an officer, director or fiduciary of any of the Reorganized Debtors.

## ARTICLE III
## POWERS, RIGHTS AND DUTIES OF THE CREDITOR REPRESENTATIVE

Section 3.1    Powers and Rights of the Creditor Representative.    The Creditor Representative shall have the following specific powers and rights in addition to any powers conferred upon the Creditor Representative by any other section or provision of this Supplement, the Plan or the Confirmation Order; *provided, however*, that the enumeration of the following powers shall not be considered in any way to limit or control the power or obligation of the Creditor Representative to act as specifically authorized by any other section or provision of the Plan, the Confirmation Order, this Supplement or by any other order of the Bankruptcy Court:

SUBSTANTIALLY FINAL FORM

(a)     establish and maintain accounts, reserves, and trusts (collectively, referred to herein as the "**Reserves**") as it deems necessary or desirable to carry out the provisions of the Plan, the Confirmation Order and this Supplement;

(b)     participate in the resolution of Disputed General Unsecured Claims as provided for in the Plan;

(c)     employ, supervise and compensate counsel and other professionals as the Creditor Representative in its sole discretion may select to assist the Creditor Representative with respect to its responsibilities hereunder. A law firm or other professional shall not be disqualified from serving the Creditor Representative solely because of its prior employment in any capacity in the Debtors' bankruptcy cases on behalf of the Debtors, their estates, the Creditors' Committee, any creditors or concurrent representation of the Creditor Trust or the Litigation Trust; *provided, however,* that the Creditor Representative may not employ any law firm or professional that has represented the Debtors in connection with the Chapter 11 Cases without the express written consent of the Reorganized Debtors, such consent not to be unreasonably withheld or delayed; *provided, further* that nothing herein shall be construed as providing a release of, or requiring that the Reorganized Debtors release, any ethical obligation owed by such law firms or professionals to the Reorganized Debtors**;**

(d)     employ, supervise and compensate such third parties as the Creditor Representative in its sole discretion may deem necessary or appropriate to assist the Creditor Representative in carrying out its powers and duties under this Supplement;

(e)     employ such employees as the Creditor Representative in its sole discretion may deem necessary or appropriate to assist the Creditor Representative in carrying out its powers and duties under this Supplement;

(f)     indemnify the Advisory Board, the Manager, employees, professionals and other third parties in connection with the performance of services;

(g)     prepare and file, if necessary, any tax or information returns and pay taxes, if any, properly payable by the Creditor Representative;

(h)     obtain insurance coverage with respect to the potential liabilities and obligations of the Creditor Representative, the Advisory Board and the Manager (in the form of a directors and officers policy, an errors and omissions policy or otherwise);

(i)     manage, administer and vote the Class A Shares pending distribution in accordance with this Supplement and the Plan;

(j)     administer and perform any administrative functions, including, but not limited to bookkeeping and accounting;

(k)     exercise such other powers as may be vested in the Creditor Representative pursuant to the Plan, the Confirmation Order, this Supplement, or any other order of the Bankruptcy Court; and

(l)        taking any and all other actions necessary or appropriate to implement or consummate the Plan, the Confirmation Order and this Supplement.

Section 3.2    Expense Fund.  On the Effective Date, the Reorganized Debtors shall transfer $20 million (together with any earnings thereon, the "**Expense Fund**") to the Creditor Representative as provided by Section 5.9 of the Plan.  Such funds shall be used to pay for the costs, fees and expenses of the Trusts, and the costs and expenses of the Creditor Representative, including without limitation any indemnification obligations set forth in the applicable Trust Agreement or herein.  The allocation and disbursement of the Expense Fund shall be determined in the sole judgment of the Creditor Representative.  Without limiting the foregoing, any of the Expense Fund allocated to the Creditor Trust, the Litigation Trust or the Creditor Representative may be reallocated among the Creditor Trust, the Litigation Trust and the Creditor Representative as determined in the sole judgment of the Creditor Representative.  To the extent that a portion of the Expense Fund is not needed or used to defray the costs and expenses of the Creditor Trust, the Litigation Trust or the Creditor Representative, it shall be available for use as provided in the Plan.

Section 3.3    Disputed Claims Reserve.

(a)        As provided in the Plan, on the Effective Date, the Reorganized Debtors shall transfer to the Creditor Representative the portion of the Fixed Settlement Plan Consideration (consisting of Cash and Class A Shares) reserved for the holders of Allowed General Unsecured Claims upon the resolution of the Disputed General Unsecured Claims pursuant to Article VIII of the Plan (together with any proceeds or earnings thereon, the "**Disputed Claims Reserve**").  The Reorganized Debtors shall provide information to the Creditor Representative as to the Disputed General Unsecured Claims that have become Allowed General Unsecured Claims and except as otherwise agreed in Section 3.4, the Creditor Representative shall act as Disbursing Agent for the Disputed Claims Reserve in accordance with Article VIII of the Plan.  [With respect to distributions to be made from the Disputed Claims Reserve, to the extent reasonably available and to the extent permitted by applicable law and the internal policies and procedures of the Reorganized Debtors, the Reorganized Debtors shall provide the Creditor Representative with a distributee's employer or taxpayer identification number as assigned by the IRS and any related documentation (including but not limited to a W-8 or W-9); *provided, however*, that the Reorganized Debtors shall have no liability to any party for any error or inaccuracy contained in any such distributee's original, unaltered documentation.]

(b)        For the avoidance of doubt, all disbursements of Class A Shares shall be deemed to have the value set forth in the Plan.  All distributions in respect of each Class A Share shall include, in lieu of or in addition to such Class A Share (as applicable), any distributions received in respect of each Class A Share.

(c)        Any Class A Shares in the Disputed Claims Reserve may be voted by the Creditor Representative proportionally in the same manner as the other Class A Shares not held by the Creditor Representative are voted.

SUBSTANTIALLY FINAL FORM

(d)    If the Millennium Custodial Trust assumes any authority to resolve any of the Disputed General Unsecured Claims, the Millennium Custodial Trust shall afford the same level of cooperation, notice and other rights to the Trusts and the Creditor Representative, and each of their respective professionals, as provided for in the Plan.

Section 3.4    Distributions and Withholdings.  Prior to the Effective Date, the Debtors shall provide the Creditor Representative with a list of all Allowed and Disputed General Unsecured Claims for wages or other remuneration in connection with the performance of services as an employee of a Debtor for any period prior to the filing of the Chapter 11 Cases (an "**Identified Employee Claim**").  Distributions on Identified Employee Claims made in respect of the Effective Date, including distributions to holders of Allowed Identified Employee Claims upon the resolution of the Disputed Identified Employee Claims are hereinafter referred to as the "**Initial Wage Distributions**."  The Reorganized Debtors shall, for all Settlement Consideration distributed in the Initial Wage Distributions, be responsible for withholding, reporting and remittance required for federal, state and local income taxes; the employee and employer portion of social security and Medicare (i.e., Federal Insurance Contribution Act amounts) and unemployment taxes; interest; penalties; additions to tax; and similar amounts owed to a federal, state, local or other governmental authority (such amounts, the "**Withholdings**") to the appropriate governmental authorities.  In respect of Initial Wage Distributions to holders of Allowed Identified Employee Claims upon the resolution of the Disputed Identified Employee Claims (the "**Applicable Distributions**"), the Creditor Representative shall transfer to the Reorganized Debtors out of the Disputed Claims Reserve the Applicable Distributions.  As soon as practicable after receipt of such funds, and such additional information as the Reorganized Debtors may reasonably request to process the Applicable Distributions, the Reorganized Debtors shall arrange (i) to withhold, report and remit to the appropriate government authority in accordance with applicable laws and regulations, from the funds so provided, the Withholdings required in respect of the Applicable Distributions using the Reorganized Debtors' payroll system and applicable employer identification numbers, and (ii) to distribute the balance of the Applicable Distributions to the applicable holder of the Allowed Identified Employee Claims.  If the amount of Withholdings due for any Allowed General Unsecured Claim exceeds the amount of allocable cash to such Claim, then the Creditor Representative may, on behalf of such holder, sell a portion of such holder's Class A Shares to the extent necessary to provide the Reorganized Debtors with sufficient cash to make the appropriate amount of Withholdings.  If the amount of Withholdings due for any Allowed General Unsecured Claim exceeds the amount of allocable cash to such Claim, then the  Reorganized Debtors may require, as a condition to the distribution of the Initial Wage Distribution, that the holder of the General Unsecured Claim pay the Reorganized Debtors the amount of any taxes which the Reorganized Debtors may determine is required to be collected or withheld.  For the avoidance of doubt, the Reorganized Debtors shall pay out of their own funds and not otherwise deduct from the Settlement Consideration any employer portion of such Withholdings, but shall deduct the employee portion of such Withholdings from the Settlement Consideration.  The Creditor Representative further agrees to cooperate with all reasonable requests for assistance and information relating to the Identified Employee Claims, and the Reorganized Debtors obligations hereunder.  Nothing herein is intended to modify Section 7.17 of the Plan, which remains in effect.  The provisions of this Section 3.4 (including the Creditor Representative's obligation to transfer to the Reorganized Debtors the employee portion of the Withholdings on any amounts treated as Initial Wage

SUBSTANTIALLY FINAL FORM

Distributions) shall also apply, if and only to the extent applicable, to amounts allocated and disbursed from the Expense Fund.

Section 3.5    <u>Investment of Cash</u>.  The Creditor Representative may invest any Cash (including any earnings thereon or proceeds therefrom) in United States Treasury bills and notes, institutional money market funds, commercial paper and time deposits and certificates of deposit with commercial banks, in each case, with a maturity of twelve months or less.

Section 3.6    <u>Treatment of Accounts</u>.    For purposes of this Supplement, unless otherwise ordered by the Bankruptcy Court, the Creditor Representative may pool for investment purposes any funds which may or which are required to be segregated or placed into separate Reserves, escrows or accounts under the Plan or this Supplement; *provided, however*, that the Creditor Representative shall treat such funds as segregated accounts in its books and records.  In addition, notwithstanding any requirement that distributions hereunder to any holder of an Allowed General Unsecured Claim be made from a specified Reserve, escrow or account, disbursements may be made as a single aggregate disbursement to such Holder of an Allowed General Unsecured Claim; *provided, further*, that the Creditor Representative shall treat the funds so distributed as having been distributed from the appropriate Reserve or account in the Creditor Representative's books and records.

Section 3.7    <u>Books, Records and Tax Returns</u>.    The Creditor Representative shall maintain books and records and prepare and file such tax forms and returns as are required under applicable law.

Section 3.8    <u>Tax Reporting</u>.  The Creditor Representative in its discretion may, for U.S. federal income tax purposes (and to the extent permitted by law, for state and local income tax purposes), (i) make an election to treat the assets held by the Creditor Representative as held in a "disputed ownership fund" within the meaning of Treasury Regulation Section 1.468-9B, or, alternatively, (ii) treat the assets held by the Creditor Representative as held in a discrete trust (which may consist of separate and independent shares) in accordance with the trust provisions of the Internal Revenue Code of 1986, as amended (the "**IRC**") (Section 641, *et seq*.).  All parties must report consistently with the income tax treatment determined by the Creditor Representative in its sole discretion.  With respect to the Class A Shares, in no event shall any distribution of the Class A Shares be deemed to be a distribution in satisfaction of a right to receive a distribution of (i) a specific dollar amount, (ii) specific property other than that distributed or (iii) income as defined under IRC Section 643(b) and the applicable regulations; the foregoing provision is intended to, and shall be construed so as to, preclude the recognition of gain or loss upon the distribution of Class A Shares, within the meaning of Treasury Regulation Section 1.661(a)-2(f).

Section 3.9    <u>No Other Duties</u>.  Other than the duties and obligations of the Creditor Representative specifically set forth in this Supplement, the Plan, or the Confirmation Order, the Creditor Representative shall have no duties or obligations of any kind or nature with respect to its appointment as such.

Section 3.10    <u>No Obligations of Reorganized Debtors</u>.  Except as otherwise provided by the Plan or the Confirmation Order, neither the Debtors nor the Reorganized Debtors shall have

SUBSTANTIALLY FINAL FORM

any obligation or owe any duty to the Creditor Representative under this Section 3 other than as expressly set forth in Section 3.2 and 3.3(a).

# ARTICLE IV
# THE MANAGER

Section 4.1    Tenure of the Manager.  The individual listed on Exhibit A hereto has been appointed by the Creditors' Committee as the Manager of the Creditor Representative.  The Manager will serve until death or resignation pursuant to Section 4.2 below, or removal pursuant to Section 4.3 below.

Section 4.2    Manager's Compensation and Reimbursement.  The Manager shall receive compensation from the Litigation Trust as follows:

(a)    Compensation.  The Manager and his counsel shall be compensated for his time expended in Creditor Representative matters as provided on Exhibit B.  For the avoidance of doubt, none of the fees and expenses of the Manager shall be paid by the Reorganized Debtors.

(b)    Expenses.  In addition, the Creditor Representative will reimburse the Manager for all reasonable, out-of-pocket expenses incurred by the Manager in connection with the performance of his duties for the Creditor Representative.

(c)    Payment.  The fees and expenses payable to the Manager shall be paid to the Manager upon approval of such fees by the Advisory Board without necessity for review or approval by the Bankruptcy Court or any other Person. The Bankruptcy Court shall retain jurisdiction to adjudicate any dispute between the Manager and the Advisory Board regarding the fees, compensation, and expenses of the Manager.

(d)    Modification of Compensation Terms.  The Advisory Board may without application to or approval by the Bankruptcy Court, subject to the consent of the Manager, reasonably modify the Manager's compensation and other terms regarding the retention of the Manager.

Section 4.3    Resignation. The Manager may resign by giving not less than ninety (90) days' prior written notice thereof to the Advisory Board.  Such resignation shall become effective on the later to occur of: (i) the day specified in such notice, and (ii) the appointment of a successor by a majority of the directors (each, a "**Director**") of the Advisory Board and the acceptance by such successor of such appointment.  If a successor Manager is not appointed or does not accept its appointment within ninety (90) days following delivery of notice of resignation, the Manager may petition any court of competent jurisdiction for the appointment of a successor Manager.

SUBSTANTIALLY FINAL FORM

Section 4.4    Removal.

(a)    The Manager may be removed by the Advisory Board, with or without cause.

(b)    To the extent there is any dispute regarding the removal of the Manager (including any dispute relating to any compensation or expense reimbursement due), the Bankruptcy Court shall retain jurisdiction to consider and adjudicate any such dispute. Notwithstanding the foregoing, the Manager will continue to serve as such after his removal until the earlier of (a) the time when appointment of a successor Manager will become effective with the permission of the Bankruptcy Court or (b) such date as the Bankruptcy Court otherwise orders.

Section 4.5    Appointment of a Successor Manager.

(a)    Appointment of Successor Manager.  In the event of the death (in the case of a Manager that is a natural person), dissolution (in the case of a Manager that is not a natural person), resignation, incompetency, or removal of the Manager, the Advisory Board shall designate a successor Manager.  Such appointment shall specify the date on which such appointment shall be effective.  Every successor Manager appointed hereunder shall execute, acknowledge, and deliver to the Advisory Board an instrument accepting the appointment as Manager, and thereupon the successor Manager, without any further act, deed, or conveyance, shall become vested with all rights, powers, trusts, and duties of the retiring Manager; *provided, however*, that a removed or resigning Manager shall, nevertheless, when requested in writing by the successor Manager, execute and deliver an instrument or instruments conveying and transferring to such successor Manager all the estates, properties, rights, powers, and trusts of such predecessor Manager.

Section 4.6    Effect of Resignation or Removal.  The death, resignation, incompetency or removal of the Manager shall not operate to terminate the appointment of the Creditor Representative or to revoke any existing agency created pursuant to the terms of the Plan, the Confirmation Order and this Supplement or invalidate any action theretofore taken by the Manager or any prior Manager.  In the event of the resignation or removal of the Manager, such Manager will promptly (a) execute and deliver such documents, instruments and other writings as may be ordered by the Bankruptcy Court or reasonably requested by the successor Manager to effect the termination of such Manager's capacity, (b) deliver to the Bankruptcy Court (if required) or the successor Manager all documents, instruments, records and other writings related to the Creditor Representative as may be in the possession of such Manager (provided that such Manager may retain one copy of such documents for archival purposes) and (c) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Manager.

**ARTICLE V**
**THE ADVISORY BOARD**

Section 5.1    The Advisory Board. On the Effective Date, a governing board of five (5) persons or entities shall commence serving as Directors of the Advisory Board. The Advisory

Board shall initially consist of five (5) Directors selected by the Creditors' Committee and listed on <u>Exhibit C</u> hereto.  The Advisory Board may from time to time set such procedures and rules for the Creditor Representative and the Advisory Board consistent with the Plan, the Confirmation Order and this Supplement as it determines are appropriate.

Section 5.2    <u>Authority and Responsibilities</u>.  The Advisory Board shall have the authority and responsibility to oversee, manage and direct the activities of the Creditor Representative and the performance of the Manager and shall have the authority to remove the Manager in accordance with Section 4.3 hereof.  The  Advisory Board shall also (a) monitor and oversee the administration of the Creditor Representative and the Creditor Representative's performance of its responsibilities under the Plan, the Confirmation Order and this Supplement, and (b) perform such other tasks as set forth in the Plan, the Confirmation Order and this Supplement.  The Manager shall consult with and provide information to the Advisory Board in accordance with and pursuant to the terms of the Plan, the Confirmation Order and this Supplement to enable the Advisory Board to meet its obligations hereunder.

Section 5.3    <u>Meetings of the Advisory Board</u>. Meetings of the Advisory Board are to be held not less than quarterly.  Special meetings of the Advisory Board may be held whenever and wherever called for by the Manager or any one Director.  Any action required or permitted to be taken by the Advisory Board at a meeting may be taken without a meeting if the action is taken by unanimous written consent of the Advisory Board as evidenced by one or more written consents describing the action taken, signed by all Directors and recorded in the minutes, if any, or other transcript, if any, of proceedings of the Advisory Board.  Unless the Advisory Board decides otherwise (which decision shall rest in the reasonable discretion of the Advisory Board), the Manager and the Creditor Representative's designated advisors may attend meetings of the Advisory Board.

Section 5.4    <u>Manner of Acting</u>.  Three Directors shall constitute a quorum for the transaction of business at any meeting of the Advisory Board.  The affirmative vote of a majority of the Directors present at a meeting shall be the act of the Advisory Board except as otherwise required by law or as provided in this Supplement.  Any or all of the Directors may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone or similar communications equipment by means of which all persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition to the place) for the holding thereof.  Any Director participating in a meeting by this means is deemed to be present in person at the meeting.  Voting (including on negative notice) may, if approved by the Directors at a meeting, be conducted by electronic mail or individual communications by the Manager and each Director.

Section 5.5    <u>Tenure of the Members of the Advisory Board</u>. The authority of the Directors will be effective as of the Effective Date and will remain and continue in effect until the appointment .  Each Director will serve until death or resignation pursuant to Section 5.6 below, or removal pursuant to Section 5.7 below.

Section 5.6    <u>Resignation</u>. A Director may resign by giving not less than ninety (90) days' prior written notice thereof to the Manager and the other Directors. Such resignation shall

SUBSTANTIALLY FINAL FORM

become effective on the later to occur of: (i) the day specified in such notice; and (ii) the appointment of a successor in accordance with Section 5.8 below.

Section 5.7    <u>Removal</u>.  A majority of the Advisory Board may remove any Director for Cause.

Section 5.8    <u>Appointment of a Successor Director</u>.

(a)    In the event of a vacancy on the Advisory Board (whether by removal, death, or resignation), a new Director may be appointed to fill such position (i) if such position is filled by an individual who is not subject to appointment by a particular designator (as set forth on <u>Exhibit C</u>) by the remaining Directors or (ii) if such position is subject to appointment by a particular designator, then by such designator.  The appointment of a successor Director will be evidenced by the Manager's filing with the Bankruptcy Court of a notice of appointment, which notice will include the name, address, and telephone number of the successor Director.

(b)    Immediately upon the appointment of any successor Director, all rights, powers, duties, authority, and privileges of the predecessor Director hereunder will be vested in and undertaken by the successor Director without any further act; and the successor Director will not be liable personally for any act or omission of the predecessor Director.

(c)    Every successor Director appointed hereunder shall execute, acknowledge and deliver to the Manager and other Directors an instrument accepting the appointment and agreeing to be bound to the obligations thereof, and thereupon the successor Director without any further act, deed, or conveyance, shall become vested with all rights, powers, trusts, and duties of the retiring Director.

Section 5.9    <u>Compensation and Reimbursement of Expenses</u>.  Each Director shall be compensated for his or her time expended in Creditor Representative matters as provided in the Litigation Trust Agreement.   The Creditor Representative will reimburse the Directors for all reasonable, out-of-pocket expenses incurred by the Directors in connection with the performance of each of their duties hereunder.  For the avoidance of doubt, none of the fees and expenses of the Advisory Board shall be paid by the Reorganized Debtors.

## ARTICLE VI
## TERMINATION

Section 6.1    <u>Termination</u>.    The appointment of the Creditor Representative shall commence on the Effective Date.  The appointment shall terminate upon the filing of a certificate of termination by the Manager or the Advisory Board with the Bankruptcy Court, which shall be filed upon the latest of:  (a)  the resolution of all Disputed General Unsecured Claims, (b) the distribution of the entire Disputed Claims Reserve held by the Creditor Representative, (c) the payment of all costs and expenses of the Creditor Representative and (d) the distribution of any remaining Expense Fund or other assets (other than the Disputed Claims Reserve) to the Trusts or in accordance with the Plan.

Section 6.2    <u>Survival</u>.  Sections 7.1, 7.2, 7.3 and 7.4 shall survive the expiration of the appointment of the Creditor Representative.  Except as specifically provided herein, upon the

SUBSTANTIALLY FINAL FORM

termination of the appointment of the Creditor Representative in accordance with Section 6.1, the Creditor Representative shall have no further duties or obligations hereunder or as Creditor Representative. For the avoidance of doubt, any other provision in the Supplement, which, by its terms, specifically survives termination of the Supplement, shall survive termination of the appointment of the Creditor Representative.

## ARTICLE VII
## MISCELLANEOUS PROVISIONS

Section 7.1    No Further Liability. Each of the Manager and the Directors shall not be liable for any action taken or omitted by any of them in good faith and reasonably believed by the Manager or the Director (as applicable) to be authorized within the discretion or rights or powers conferred upon it, him or her (as the case may be) in accordance with the Plan, the Settlement Agreement or this Supplement. In performing its, his or her (as the case may be) duties, each of the Manager and the Directors (as applicable) shall have no liability for any action taken by the Manager and the Directors in good faith in accordance with the advice of counsel, accountants, appraisers and other professionals retained by the Managers or Directors on behalf of the Creditor Representative. Without limiting the generality of the foregoing, the Manager and the Directors may rely without independent investigation on copies of orders of the Bankruptcy Court reasonably believed by the Manager or the Director (as applicable) to be genuine, and shall have no liability for actions taken in good faith in reliance thereon. None of the provisions of this Supplement shall require the Manager or the Directors to expend or risk their own funds or otherwise incur personal financial liability in the performance of any of their duties hereunder or in the exercise of any of their rights and powers. Each of the Manager and the Directors may rely without inquiry upon writings delivered to it, him or her (as the case may be) that the Manager or Director reasonably believes in good faith to be genuine and to have been given by a proper Person. Notwithstanding the foregoing, nothing in this Section 7.1 shall relieve the Manager or the Directors from any liability for any actions or omissions arising out of their gross negligence, bad faith or willful misconduct. Any action taken or omitted to be taken in the case of the Manager or the Advisory Board with the express approval of the Bankruptcy Court and, in the case of the Manager, with the express approval of the Advisory Board will conclusively be deemed not to constitute gross negligence, bad faith or willful misconduct.

Section 7.2    Indemnification of the Manager and Advisory Board.

(a)    To the fullest extent permitted by law, the Creditor Representative, to the extent of its assets other than the Disputed Claims Reserve legally available for that purpose, will indemnify and hold harmless the Manager and the Advisory Board and each of their respective directors, members, shareholders, partners, officers, agents, professionals or employees (collectively, the "**Indemnified Persons**") from and against any and all loss, cost, damage, expense (including, without limitation, fees and expenses of attorneys and other advisors and any court costs incurred by any Indemnified Person) or liability by reason of anything any Indemnified Person did, does or refrains from doing for the business or affairs of the Creditor Representative, except to the extent that it is finally judicially determined by a court of competent jurisdiction that the loss, cost, damage, expense or liability resulted primarily from the Indemnified Person's gross negligence or willful misconduct.

SUBSTANTIALLY FINAL FORM

(b)    Notwithstanding any provision herein to the contrary, the Indemnified Persons shall be entitled to obtain advances from the Creditor Representative to cover their reasonable expenses of defending themselves in any action brought against them as a result of the acts and omissions, actual or alleged, of an Indemnified Person in its capacity as such, *provided, however*, that the Indemnified Persons receiving such advances shall repay the amounts so advanced by the Creditor Representative immediately upon the entry of a final, non-appealable judgment or order finding that such Indemnified Persons were not entitled to any indemnity under the provisions of this Section 7.2.  The foregoing indemnity in respect of any Indemnified Person shall survive the termination of such Indemnified Person from the capacity for which they are indemnified.

(c)    The Creditor Representative may indemnify any of the Indemnified Persons for any loss, cost, damage, expense or liability for which the Indemnified Persons would not be entitled to mandatory indemnification under this Section 7.2.

(d)    Any Indemnified Person may waive the benefits of indemnification under this Section 7.2, but only by an instrument in writing executed by such Indemnified Person.

(e)    The rights to indemnification under this Section 7.2 are not exclusive of other rights which any Indemnified Person may otherwise have at law or in equity, including without limitation common law rights to indemnification or contribution. Nothing in this Section 7.2 will affect the rights or obligations of any Person (or the limitations on those rights or obligations) under any other agreement or instrument to which that Person is a party.

Section 7.3    <u>Creditor Representative Liabilities</u>.    All liabilities of the Creditor Representative, including without limitation indemnity obligations under Section 7.2 of this Supplement, will be liabilities of the Creditor Representative.  No liability of the Creditor Representative will be payable in whole or in part by the Manager in the Manager's capacity as Manager, by any Director in the Director's capacity as Director or by any member, partner, shareholder, director, officer, professional, employees, agent, affiliate or advisor of any Director, the Manager or their respective affiliates.

Section 7.4    <u>Limitation of Liability</u>.    Neither the Manager, the Directors nor their professionals will be liable for punitive, exemplary, consequential, special or other damages arising out of, or related to, their services to the Creditor Representative.

Section 7.5    <u>Descriptive Headings</u>.  The headings contained in this Supplement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Supplement.

Section 7.6    <u>Amendment and Waiver</u>.  The terms of this Supplement may not be amended except by an instrument in writing approved by the Advisory Board.

SUBSTANTIALLY FINAL FORM

**Exhibit A**
**Manager**

Edward S. Weisfelner

SUBSTANTIALLY FINAL FORM

**Exhibit B**
**Compensation of Manager**

As determined by the Advisory Board.

SUBSTANTIALLY FINAL FORM

**Exhibit C**
**Advisory Board**

Wilmington Trust Company, initially by its designee Patrick J. Healy

Law Debenture Trust of New York, initially by its designee Robert L. Bice II

BASF Corporation, initially by its designee Peter Arigirou

James F. Schorr

One person appointed by the other four Directors

# 1734127 v15

**TAB 6-C**

## LB LITIGATION TRUST AGREEMENT

This LB Litigation Trust Agreement (the "**Litigation Trust Agreement**"), made this _____ day of April, 2010 by and between (a) LyondellBasell Industries AF S.C.A. ("**LBIAF**") on behalf of itself and the other Debtors and (b) the individual identified on <u>Exhibit A</u>, as trustee for the liquidating trust established pursuant to this Litigation Trust Agreement (such person and each successor trustee the "**Litigation Trustee**") is executed to facilitate the implementation of the Third Amended Joint Chapter 11 Plan of Reorganization for the LyondellBasell Debtors dated March 12, 2010 (as the same may be amended, modified or supplemented from time to time in accordance with the terms and provisions thereof, the "**Plan**") that provides for the establishment of the litigation trust created hereby (the "**Litigation Trust**"). Each of the Debtors (or, after the Effective Date, the Reorganized Debtors) and the Litigation Trustee are sometimes referred to individually as a "**Party**" and collectively as the "**Parties**."

## RECITALS

WHEREAS, Lyondell Chemical Company ("**Lyondell Chemical**") and certain of its Affiliates filed for protection under chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") on January 6, 2009 (the "**Petition Date**"), and LBIAF and certain other of Lyondell Chemical's Affiliates filed thereafter (Lyondell Chemical, LBIAF and all such Affiliates, collectively, as debtors and debtors in possession, the "**Debtors**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"); and

WHEREAS, on April __, 2010, the Bankruptcy Court entered its order confirming the Plan (the "**Confirmation Order**"); and

WHEREAS, the Plan provides, among other things, as of the effective date of the Plan (the "**Effective Date**"), for (a) the creation of the Litigation Trust and the creation of the beneficial interests in the Litigation Trust for the benefit of the Beneficiaries, (b) the transfer to the Litigation Trust of the Litigation Trust Assets, (c) the administration and liquidation of the Litigation Trust Assets and the distribution of the proceeds therefrom to the Beneficiaries and Other Distributees, in accordance with this Litigation Trust Agreement, the Plan and the Confirmation Order; and

WHEREAS, pursuant to Treasury Regulation section 301.7701-4(d), the Litigation Trust is being created for the primary purpose of liquidating the Litigation Trust Assets in an expeditious but orderly manner for the benefit of the Beneficiaries, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to and consistent with the liquidating purpose of the Litigation Trust and the Plan; and

WHEREAS, the Litigation Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes, pursuant to sections 671-677 of the IRC, with the Beneficiaries to be treated as the grantors of the Litigation Trust and deemed to be the owners of the Litigation Trust Assets (subject to the rights of creditors of the Litigation Trust), and, consequently, the transfer of the Litigation Trust Assets to the Litigation Trust shall be treated as a deemed transfer of those assets from the Debtor to the Beneficiaries followed by a deemed transfer by such Beneficiaries to the Litigation Trust for federal income tax purposes;

Substantially Final Form

WHEREAS, the Litigation Trustee was duly appointed as a representative of the Debtors' estates pursuant to sections 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code to hold and pursue the Assigned Actions; and

WHEREAS, the Reorganized Debtors and the Litigation Trustee entered into a Cooperation Agreement dated April __, 2010 which provides that the Reorganized Debtors will provide certain cooperation to the Litigation Trust.

NOW, THEREFORE, pursuant to the Plan and the Confirmation Order, in consideration of the premises, the mutual agreements of the Parties contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

For all purposes of this Litigation Trust Agreement, capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in Annex A attached hereto and made part hereof. Capitalized terms used herein and not otherwise defined herein or in Annex A shall have the meanings ascribed to such terms in the Plan. Unless otherwise specified, Article, Section and Paragraph references herein are to Articles, Sections and Paragraphs of this Litigation Trust Agreement.

## ARTICLE II
## ESTABLISHMENT OF THE LITIGATION TRUST

2.1     Establishment of Litigation Trust and Appointment of Litigation Trustee.

(a)     Pursuant to the Plan, the Parties hereby establish a trust which shall be known as the "LB Litigation Trust" on behalf of the Beneficiaries.

(b)     The Litigation Trustee is hereby appointed as trustee of the Litigation Trust effective as of the Effective Date and agrees to accept and hold the assets of the Litigation Trust in trust for the Beneficiaries subject to the terms of the Plan, the Confirmation Order and this Litigation Trust Agreement. The Litigation Trustee and each successor trustee serving from time to time hereunder shall have all the rights, powers and duties set forth herein.

(c)     Subject to the terms of this Litigation Trust Agreement, any action by the Litigation Trustee and/or the Trust Board which affects the interests of more than one Beneficiary shall be binding and conclusive on all Beneficiaries and Other Distributees, even if such Beneficiaries and Other Distributees have different or conflicting interests.

(d)     The Litigation Trustee and the Directors may serve without bond.

(e)     For the avoidance of doubt, none of the Litigation Trustee or any Director is an officer, director or fiduciary of any of the Reorganized Debtors.

2.2     Transfer of Litigation Trust Assets. Pursuant to the Plan, as of the Effective Date:

2

Substantially Final Form

(a)     Debtors hereby transfer, assign, and deliver to the Litigation Trust, without recourse, all of their respective rights, title, and interests in and to the Contributed Claims free and clear of any and all liens, claims, encumbrances or interests of any kind in such property; and

(b)     Debtors hereby transfer, assign, and deliver to the Litigation Trust and the Litigation Trustee , without waiver, all of their respective rights, title and interests in and to any privilege or immunity attaching to any documents or communications (whether written or oral) associated with the Contributed Claims (collectively, "**Privileges**" and, together with Contributed Claims, "**Assigned Actions**"), which shall vest in the Litigation Trustee and the Litigation Trust, in trust, and, consistent with section 1123(b)(3)(B) of the Bankruptcy Code, for the benefit of the Beneficiaries; *provided*, that the Reorganized Debtors shall not be required to transfer or deliver (i) any privileged documents created during (or in preparation for) the Chapter 11 Cases except to the extent that they contain analysis of the merits of the Contributed Claims and not the conduct or strategy of any aspect of the Chapter 11 Cases; (ii) any privileged documents with respect to the determination of whether any person or party is an Excluded Person as that term is defined in Section 3.3 of the Lender Litigation Settlement Agreement; (iii) any privileged documents created by or at the direction of the Reorganized Debtors on or after the Effective Date; or (iv) any document that the Reorganized Debtors are under a legal obligation due to personal privacy issues of an employee or contractual obligation to refrain absent a subpoena or formal discovery request from providing to a third party, whether or not privileged.  For purposes of the transfer of documents, the Litigation Trust is an assignee and successor to the Debtors in respect of the Contributed Claims and shall be treated as such in any review of confidentiality restrictions in requested documents. For purposes of this Section 2.2(b), "privileged" means attorney-client privilege or work product protection (or both as the case may be) as those terms are defined in Federal Rule of Evidence 502(g).

(c)     As and to extent provided in the Cooperation Agreement, the Debtors and Reorganized Debtors shall deliver or cause to be delivered to the Litigation Trustee the documents required in connection with the Assigned Actions other than Non-Settling Defendant Claims against Directors, Officers and Subsidiary Directors (including those maintained in electronic format and original documents) whether held by the Debtors or Reorganized Debtors, their agents, advisors, attorneys, accountants or any other professional hired by the Debtors or Reorganized Debtors.

2.3     <u>Funding of the Litigation Trust.</u>

(a)     On the Effective Date, the Creditor Representative may provide the Initial Funding Amount to the Litigation Trust.  From time to time thereafter, the Creditor Representative may provide additional funding in accordance with the Creditor Representative Supplement to fund the fees, expenses, and costs of the Litigation Trust.  To the extent that a portion of any funding provided to the Litigation Trust by the Creditor Representative is not needed or reasonably likely to be used to defray the costs and expenses of the Litigation Trust, such funds shall be returned to Creditor Representative.   Neither the Debtors nor the Reorganized Debtors shall have any obligation with respect to, or liability for, any decision by the Creditor Representative with respect to funding of the Litigation Trust.

Substantially Final Form

(b)    Any failure or inability of the Litigation Trust to obtain funding will not affect the enforceability of the Litigation Trust.

2.4    <u>Title to the Litigation Trust Assets</u>.  The transfer of the Litigation Trust Assets to the Litigation Trust pursuant to Section 2.2 hereof is being made by the Debtors for the sole benefit, and on behalf of, the Beneficiaries. Upon the transfer of the initial Litigation Trust Assets to the Litigation Trust, the Litigation Trust shall succeed to all of the Debtors' and Beneficiaries' rights, title and interests in the Litigation Trust Assets and no other entity shall have any interest, legal, beneficial, or otherwise, in the Litigation Trust or the Litigation Trust Assets upon their assignment and transfer to the Litigation Trust (other than as provided herein or in the Plan).

2.5    <u>Nature and Purpose of the Litigation Trust</u>.

(a)    <u>Purpose</u>.  The Litigation Trust is organized and established as a trust pursuant to which the Litigation Trustee, subject to the terms and conditions contained herein and in the Plan, is to (i) hold the Litigation Trust Assets and dispose of the same in accordance with this Litigation Trust Agreement and the Plan in accordance with Treasury Regulation section 301.7701-4(d), and (ii) oversee and direct the expeditious but orderly liquidation of the Litigation Trust Assets. The primary purpose of the Litigation Trust is to liquidate the Litigation Trust Assets with no objective to continue or engage in the conduct of a trade or business.

(b)    <u>Relationship</u>.  This Litigation Trust Agreement is intended to create a trust and a trust relationship and to be governed and construed in all respects as a trust. The Litigation Trust is not intended to be, and shall not be deemed to be, or be treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company or association, nor shall the Litigation Trustee, the Trust Board (or any of its Directors), or the Beneficiaries, or any of them, for any purpose be, or be deemed to be or treated in any way whatsoever to be, liable or responsible hereunder as partners or joint venturers. The relationship of the Beneficiaries to the Litigation Trustee and the Trust Board shall be solely that of beneficiaries of a trust and shall not be deemed a principal and agency relationship, and their rights shall be limited to those conferred upon them by this Litigation Trust Agreement.  Notwithstanding anything to the contrary contained herein, while the Other Distributees have certain contract rights to payments from certain distributions by the Litigation Trust as provided in the Distribution Schedule, the Other Distributees are not beneficiaries of the Litigation Trust and are not owed a fiduciary duty or any other duty by the Litigation Trustee, the Trust Board, or their respective professionals or agents.

2.6    <u>Cooperation of Reorganized Debtors</u>.  The Reorganized Debtors shall cooperate with the Litigation Trustee in the administration of the Litigation Trust as provided in the Cooperation Agreement, it being understood and agreed that the Reorganized Debtors are not a fiduciary or agent of the Litigation Trust and owe no duties or obligations to the Litigation Trust, the Beneficiaries or Other Designees   except as expressly set forth in the Cooperation Agreement, this Litigation Trust Agreement or the Plan.

2.7    <u>Appointment as Representative</u>.  Pursuant to section 1123(b)(3) of the Bankruptcy Code, the Litigation Trustee shall be the duly appointed representative of the estates for

certain limited purposes, and, as such, to the extent provided herein, the Litigation Trustee succeeds to the rights and powers of a trustee in bankruptcy solely with respect to prosecution of the Assigned Actions for the benefit of the Beneficiaries. To the extent that any Assigned Actions cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Litigation Trust Assets shall be deemed to have been retained by the Reorganized Debtors (other than for tax purposes) and the Litigation Trustee shall be deemed to have been designated as a representative of the Debtors' estates to the extent provided herein pursuant to section 1123(b)(3)(B) of the Bankruptcy Code solely to enforce and pursue such Assigned Actions on behalf of the estates. Notwithstanding the foregoing, all net proceeds of the Litigation Trust Assets shall be distributed consistent with the provisions of the Plan and this Litigation Trust Agreement in accordance with the Distribution Schedule.  For avoidance of doubt, any Assigned Action subject to this Section 2.7 shall be treated by the Parties for U.S. federal, state and local income tax purposes as a disposition of the Assigned Action by the Reorganized Debtor as described in Section 8.1 below.

       2.8    <u>Relationship to, and Incorporation of, the Plan</u>.  The principal purpose of this Litigation Trust Agreement is to aid in the implementation of the Plan and the Confirmation Order, and therefore this Litigation Trust Agreement incorporates the provisions of the Plan and the Confirmation Order by this reference. To that end, the Litigation Trustee shall have full power and authority to take any action consistent with the purpose and provisions of the Plan, to seek any orders from the Bankruptcy Court in furtherance of implementation of the Plan that directly affect the interests of the Litigation Trust, and to seek any orders from the Bankruptcy Court solely in furtherance of this Litigation Trust Agreement.  As among the Litigation Trust, the Litigation Trustee, the Trust Board, the Beneficiaries, the Debtors and the Reorganized Debtors, if any provisions of this Litigation Trust Agreement are found to be inconsistent with the provisions of the Plan, Lender Litigation Settlement Agreement and the Lender Litigation Settlement Approval Order or the Confirmation Order, each such document shall have controlling effect in the following rank order: (i) the Confirmation Order; (ii) this Litigation Trust Agreement; (iii) the Lender Litigation Settlement Agreement and the Lender Litigation Settlement Approval Order and (iv) the Plan.  As among any of the Litigation Trust, the Litigation Trustee, the Trust Board, the Beneficiaries, the Debtors or the Reorganized Debtors on the one hand, and any of the Other Distributees (other than the Reorganized Debtors) on the other hand, if any provisions of this Litigation Trust Agreement are found to be inconsistent with the provisions of the Plan, Lender Litigation Settlement Agreement and the Lender Litigation Settlement Approval Order or the Confirmation Order, each such document shall have controlling effect in the following rank order: (i) the Confirmation Order; (ii) the Lender Litigation Settlement Agreement and the Lender Litigation Settlement Approval Order; (iii) this Litigation Trust Agreement and (iv) the Plan.

       2.9    <u>No Effect on Certain Parties.</u> For the avoidance of doubt, and notwithstanding anything to the contrary contained in this Litigation Trust Agreement (including, without limitation, this Section 2.9), the Parties hereby agree and acknowledge that, other than in each of their capacities as an Other Distributee, nothing in this Litigation Trust Agreement is intended to, does, or shall be construed to affect, prejudice, harm or impact in any way, the rights, remedies, or treatment (including any releases, exculpation, indemnification or otherwise), of any Secured Lender, Secured Lender Releasee, Settling Defendant, or Settling Defendant Releasee

(collectively, the "Unaffected Parties") under the Plan, the Lender Litigation Settlement Agreement or the Lender Litigation Settlement Approval Order. The Parties further agree that the preceding sentence and a statement that this Section 2.9 may not be amended shall be included in the Confirmation Order, and that notwithstanding any ability of the Parties to amend this Litigation Trust Agreement, the Parties shall not be permitted to amend this Section 2.9.

## ARTICLE III
## LITIGATION TRUST INTERESTS

3.1    Litigation Trust Interests.  Beneficial interests in the Litigation Trust ("**Litigation Trust Interests**") will be represented by book entries on the books and records of the Litigation Trust.

3.2    Allocation of Litigation Trust Interests.  The allocation and distribution of the Litigation Trust Interests shall be accomplished as set forth in the Plan, including, without limitation, Sections 4.7, 4.9, 4.10, 4.11 and 5.7 and Article VII of the Plan.

3.3    Interests Beneficial Only.  The ownership of a Litigation Trust Interest shall not entitle any Beneficiary to any title in or to the assets of the Litigation Trust as such (which title shall be vested in the Litigation Trust) or to any right to call for a partition or division of the assets of the Litigation Trust or to require an accounting.

3.4    Identification of Holders of Litigation Trust Interests.  The Litigation Trust will not issue any certificate or certificates to evidence any Litigation Trust Interests.[1]  The record holders of Litigation Trust Interests shall be recorded and set forth in a register maintained by the Litigation Trustee expressly for such purpose ("**Register**"); *provided* that the Litigation Trust shall have no obligation to record the identities of the Other Distributees except for the list of agents for the Other Distributees set forth on Exhibit D (as updated from time to time) and the Reorganized Debtors. Such Register shall be updated monthly as Disputed General Unsecured Claims become Allowed General Unsecured Claims.  Other than providing information to the Litigation Trustee as to the Disputed General Unsecured Claims that have become Allowed General Unsecured Claims, none of the Reorganized Debtors or their agents, professionals, contractors or employees shall have any responsibility or liability for the maintenance of the Register.  All references in this Litigation Trust Agreement to holders of Litigation Trust Interests shall be read to mean holders of record as set forth in the official Register maintained by the Litigation Trustee and shall not mean any beneficial owner not recorded on such official registry.

---

[1] This agreement provides that the Litigation Trust Interests are not transferable.  The Creditors' Committee understands that representatives of certain of the trust beneficiaries are of the view that the Litigation Trust Interests should be transferrable.  Prior to the hearing on confirmation of the Plan, the Creditors' Committee may consider this issue further, including matters relating to funding the costs associated with making the Litigation Trust Interests transferrable (but such costs shall not be borne by the Debtors or Reorganized Debtors).   If the Creditors' Committee decides to permit the Litigation Trust Interests to be certificated and/or transferred, the terms of this Litigation Trust Agreement shall be modified accordingly prior to the Effective Date.

Substantially Final Form

3.5     Non-Transferability of Litigation Trust Interests.  No transfer, assignment, pledge or hypothecation of any Litigation Trust Interests, either in whole or in part, shall be permitted except with respect to a transfer by operation of law, will or under the laws of descent and distribution; *provided* that the Reorganized Debtors shall be permitted to transfer their interests in the Litigation Trust as an Other Distributee to any wholly-owned subsidiary of New Topco. Any transfer permitted under this Section 3.5 will not be effective until and unless the Litigation Trustee receives written notice of such transfer.

3.6     Exemption from Registration.  The parties hereto intend that the rights of the Beneficiaries arising under this Trust shall not be "securities" under applicable laws, but none of the parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If such rights constitute securities, the parties hereto intend for the exemption from registration provided by section 1145 of the Bankruptcy Code and under applicable securities laws to apply to their issuance under the Plan.

3.7     Change of Address.  A Beneficiary may, after the Effective Date, select an alternative distribution address by providing notice to the Litigation Trustee identifying such alternative distribution address.  Such notification shall be effective only upon receipt by the Litigation Trustee.  Absent actual receipt of such notice by the Litigation Trustee, the Litigation Trustee shall not recognize any such change of distribution address.

3.8     Tax Identification Numbers.  The Litigation Trustee may require any Beneficiary or Other Distributee to furnish to the Litigation Trustee its social security number or employer or taxpayer identification number as assigned by the IRS and complete any related documentation (including but not limited to a Form W-8 or Form W-9), and the Litigation Trustee may condition any distribution to any Beneficiary or Other Distributee upon the receipt of such information and the receipt of such other documents as the Litigation Trustee reasonably requests.

ARTICLE IV
**RIGHTS, POWERS AND DUTIES OF LITIGATION TRUSTEE**

4.1     Role of the Litigation Trustee.  In furtherance of and consistent with the purpose of the Litigation Trust and the Plan, subject to the terms and conditions contained herein (including in all cases management and direction by the Trust Board) and in the Plan, the Litigation Trustee shall (i) hold the Litigation Trust Assets for the benefit of Beneficiaries as described in the Distribution Schedule, and (ii) make distributions of Proceeds and other Litigation Trust Assets in accordance with the Distribution Schedule. The Litigation Trustee in consultation with, and subject to the management and direction of, the Trust Board shall be responsible for all decisions and duties with respect to the Litigation Trust and the Litigation Trust Assets. In all circumstances, the Litigation Trustee shall act in the best interests of all Beneficiaries and in furtherance of the purpose of the Litigation Trust, and shall use commercially reasonable efforts to dispose of the Litigation Trust Assets and to make timely distributions and not unduly prolong the duration of the Litigation Trust.

4.2     Prosecution of Assigned Actions.

7

(a)    Subject to the provisions of this Litigation Trust Agreement and direction by the Trust Board, the Litigation Trustee shall hold, pursue, prosecute, release, settle or abandon, as the case may be, any and all Assigned Actions (including any counterclaims to the extent such counterclaims are set off against the proceeds of any such causes of action); *provided, however*, that with respect to the Preference Claims related to a contested Administrative Expense (an initial list of which is set forth on Exhibit F, and as such list may be amended or supplemented, the "**Debtor Controlled Claims**"), whether or not an action has been taken by Debtors prior to the Effective Date to prosecute or otherwise resolve such Preference Claims, the Reorganized Debtors shall have sole authority to pursue, prosecute, release, settle or abandon such Preference Claims, *provided* that (i) the Reorganized Debtors shall consult in good faith with the Litigation Trustee regarding any proposed release, settlement or abandonment of a Debtor Controlled Claim, and (ii) if the Litigation Trustee opposes any such proposed action, then the proposed release, settlement or abandonment of the Debtor Controlled Claim shall be subject to approval of the Bankruptcy Court after proper notice, including to the Litigation Trustee.  The Reorganized Debtors may supplement the list of Debtor Controlled Claims at any time and from time to time up to the first business day that is ninety (90) days following the Effective Date.  If the Litigation Trust asserts a Preference Claim that is, or becomes, a Debtor Controlled Claim, the Litigation Trust shall, at the written request of the Reorganized Debtors, suspend its prosecution of such action, and the Reorganized Debtors shall have sole authority to pursue, prosecute, release, settle or abandon such Preference Claim as set forth above, subject to (i) the Reorganized Debtors' obligation to consult in good faith with the Litigation Trustee regarding any proposed release, settlement or abandonment of such Claim, and (ii) the Litigation Trustee's right to oppose any such proposed release, settlement or abandonment of the Claim, as described in this Section 4.2(a).  Upon final disposition of any Debtor Controlled Claim, the Litigation Trust shall either (i) file a notice of dismissal with prejudice with respect to any action it has commenced with respect to such Claim or, (ii) in the event the defendant in such action has filed either an answer or motion for summary judgment, take reasonable efforts to enter into a stipulation of dismissal with such defendant.

(b)    Notwithstanding the assignment of the Assigned Preference Claims to the Litigation Trust, the Litigation Trust may not assert or prosecute any Assigned Preference Claim against any Persons with whom the Reorganized Debtors, in good faith, have, or reasonably intend to have, a continuing relationship following the Confirmation Date (each an "**Excluded Person**").  Prior to the Effective Date, in order to assist the Creditors' Committee with respect to its analysis of the Assigned Preference Claims, the Debtors compiled a list of potential preference payments and recipients which the Debtors have determined do not constitute Excluded Persons and delivered such list to the Creditors' Committee on March 20, 2010 (as such list may be amended, modified, and/or supplemented from time to time prior to, or on, the Effective Date, the "**Non-Excluded Person List**").  At any time during the forty-five (45) days immediately following the Effective Date, the Litigation Trust may issue demand letters to any Persons identified on the Non-Excluded Person List, seeking to recover potential preference payments from such Persons and may commence legal action to collect any Assigned Preference Claims against such Persons.  On and after the forty-sixth (46th) day following the Effective Date, the Litigation Trust, prior to making any demand to collect or commencing any legal action to collect an Assigned Preference Claim with respect to any Person whom the Litigation Trust did not previously make a demand of or commence legal action against to collect such Assigned Preference Claims, shall confirm with the Reorganized Debtors, in writing (including

Substantially Final Form

by email notification) (the "**Exclusion Confirmation**"), that the potential target of any such demand or action is not an Excluded Person.  In order to remove the potential target from the Non-Excluded Person List, the Reorganized Debtors must notify the Litigation Trust in writing within seven (7) Business Days following the issuance of the Exclusion Confirmation, setting forth in reasonable detail the basis for the requested removal.  In the event that the Reorganized Debtors do not so timely designate the potential target as an Excluded Person, such potential target shall be deemed for all purposes not to be an Excluded Person; *provided, however,* that an Assigned Preference Claim against such Excluded Person may nevertheless become a Debtor Controlled Claim in accordance with the provisions of Section 4.2(a).  On November 22, 2010, the Reorganized Debtors shall provide the Litigation Trust with a list of Persons who were previously deemed to be Excluded Persons but with respect to whom the Reorganized Debtors do not, as of such date, have an ongoing commercial relationship (the "**Supplemental Non-Excluded Person List**").  Unless the Reorganized Debtors, on or before December 6, 2010, provide the Litigation Trust with written notification of an error in the Supplemental Non-Excluded Person List, the Persons included on the Supplemental Non-Excluded Person List shall be deemed for all purposes and for all time not to be Excluded Persons, and the Litigation Trust may, on or after December 7, 2010, make any demand to collect or commence any legal action to collect an Assigned Preference Claim against such Persons.  If at any time the Litigation Trust disputes the reasonableness of the Debtors or Reorganized Debtors' designation of a Person as an Excluded Person (a "**Disputed Excluded Person**"), the Litigation Trust may petition the Bankruptcy Court for an order determining that the Debtors or Reorganized Debtors' designation of a Person as an Excluded Person is improper.  The Reorganized Debtors and the Litigation Trust agree to waive any appellate rights either may have with respect to the Bankruptcy Court's decision on the Debtors' or Reorganized Debtors' Excluded Person designation; *provided* that, pending the Bankruptcy Court's resolution of the dispute, claims and causes of action against the Disputed Excluded Person will be expressly preserved for the benefit of the Litigation Trust.

(c)     To the extent that any action has been taken to prosecute or otherwise resolve any Assigned Actions prior to the Effective Date by the Debtors and/or the Creditors' Committee, the Litigation Trustee shall be substituted for the Debtors and/or the Creditors' Committee in connection therewith in accordance with Rule 25 of the Federal Rules of Civil Procedure, made applicable to the litigation by Rule 7025 of the Federal Rules of Bankruptcy Procedure and the caption with respect to such pending litigation shall be changed to the following: "Edward S. Weisfelner, as Trustee for the LB Litigation Trust, et. al v. [Defendant]"; *provided, however*, that the Litigation Trustee shall not be substituted for the Debtors in connection with Debtor Controlled Claims absent written consent of the Reorganized Debtors. For purposes of exercising its powers, the Litigation Trustee shall be deemed to be a representative of the estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

(d)     In the case of any Debtor Controlled Claims with respect to which the Reorganized Debtors do not provide written consent allowing the Litigation Trustee to be substituted for the Debtors, after deduction for any direct costs and expenses of the Reorganized Debtors related to such Debtor Controlled Claims, all net cash proceeds of such Debtor Controlled Claims shall be transferred to the Beneficiaries consistent with the provisions of the Plan and this Litigation Trust Agreement in accordance with the Distribution Schedule, including the Reorganized Debtors' right to retain a portion of any such recoveries attributable to assigned Preference Claims as set forth in the Distribution Schedule.

4.3     Authority to Settle Assigned Actions.

(a)     Subject to direction by the Trust Board, the Litigation Trustee shall be empowered and authorized to settle, dispose of or abandon any Assigned Actions (including any counterclaims to the extent such counterclaims are set off against the proceeds of any such Assigned Actions).

(b)     Any determinations by the Litigation Trustee, under the direction of the Trust Board, with regard to the amount or timing of settlement or other disposition of any Assigned Action shall be conclusive and binding on all Beneficiaries and all other parties in interest.

4.4     Retention of Litigation Counsel and Other Professionals.  The Litigation Trustee may, subject to the direction of the Trust Board, but without necessity for review or approval by the Bankruptcy Court or any other Person (a) retain such independent experts and advisors (including, but not limited to, counsel, tax advisors, consultants, or other professionals) as the Litigation Trustee deems necessary to aid it in the performance of its duties and responsibilities hereunder and under the Plan and to perform such other functions as may be appropriate in furtherance of the intent and purpose of this Litigation Trust Agreement, and (b) commit the Litigation Trust to provide such professional persons or entities reasonable compensation and reimbursement from the Litigation Trust Assets for services rendered and expenses incurred.  The Litigation Trust may select any of the foregoing professionals in its sole discretion, and prior employment in any capacity in the Debtors' bankruptcy cases on behalf of the Debtors, their estates, the Creditors' Committee, any creditors or concurrent representation of the Creditor Trust or the Creditor Representative shall not preclude the Litigation Trust's retention of such professionals; *provided* that the Litigation Trustee may not employ any law firm or professional that has represented the Debtors in connection with the Chapter 11 Cases without the express written consent of the Reorganized Debtors, which consent shall not be unreasonably withheld or delayed; *provided*, *further* that nothing herein shall be construed as providing a release of, or requiring that the Reorganized Debtors release, any ethical obligation owed by such law firms or professionals to the Reorganized Debtors.  The Litigation Trustee, subject to the direction of the Trust Board, will make all reasonable and customary arrangements for payment or reimbursement of such compensation and expenses.

4.5     Litigation Trust Expenses.  The Litigation Trustee may incur any reasonable and necessary expenses in liquidating the Litigation Trust Assets. Other than the Initial Funding Amount and such other funds provided by the Creditor Representative from time to time, all fees, expenses, and costs of the Litigation Trust shall be paid by, and solely be the obligation of, the Litigation Trust.  For avoidance of doubt, in no event shall the Reorganized Debtors be required to provide any funding to the Litigation Trust other than the initial funding provided to the Creditor Representative.

(a)     The Litigation Trustee may maintain a litigation expense fund (the "**Litigation Expense Fund**") and expend the assets of the Litigation Expense Fund (i) as are reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Litigation Trust during liquidation, (ii) to pay reasonable administrative expenses (including but not limited to, the costs and expenses of the Litigation Trustee (including reasonable fees, costs,

Substantially Final Form

and expenses of professionals) and the Directors (including reasonable fees, costs, and expenses of legal counsel, subject to the approval of the Trust Board), any taxes imposed on the Litigation Trust or in respect of the Litigation Trust Assets or fees and expenses in connection with, arising out of or related to the Litigation Trust Assets, and (iii) to satisfy other liabilities incurred or assumed by the Litigation Trust (or to which the assets are otherwise subject) in accordance with the Plan or this Litigation Trust Agreement).

(b)    The Litigation Trustee may retain from the Proceeds and add to the Litigation Expense Fund, at any time and from time to time, such amounts as the Litigation Trustee deems reasonable and appropriate to ensure that the Litigation Expense Fund will be adequate to meet the expenses and liabilities described in Section 4.5(a) above.

(c)    Notwithstanding any other provision of this Litigation Trust Agreement to the contrary, the Litigation Trustee shall not be required to take any action or enter into or maintain any claim, demand, action or proceeding relating to the Litigation Trust unless it shall have sufficient funds in the Litigation Expense Fund for that purpose.

(d)    The Litigation Trustee may retain from the Proceeds and disburse to the Creditor Representative, at any time and from time to time, such amounts as may be necessary to fulfill its indemnification obligations to the Creditor Representative.

4.6    Distributions.

(a)    In the reasonable discretion of the Litigation Trustee and subject to the requirements of Revenue Procedure 94-45 and the direction of the Trust Board, the Litigation Trustee shall distribute all Cash on hand (including, but not limited to, the Litigation Trust's net income and net proceeds from the sale of assets, any Cash received on account of or representing Proceeds, and treating as Cash for purposes of this Section 4.6 any permitted investments under Section 4.10 below), except such amounts (i) as are reserved for distribution to holders of a Disputed General Unsecured Claim (as of the time of such distribution but only until such General Unsecured Claim is resolved), which amounts shall be held in the Disputed Claims Reserve, and (ii) as are reasonably necessary for the Litigation Expense Fund or otherwise to meet contingent liabilities and to maintain the value of the Litigation Trust Assets. The Litigation Trustee shall make all such distributions at least annually as set forth in the Distribution Schedule; in accordance with the provisions of Tax Code Section 677, the income of the Litigation Trust shall be distributed or held or accumulated for future distribution pursuant to the Distribution Schedule.

(b)    The Litigation Trust may withhold from amounts distributable to any Person any and all amounts, determined in the Litigation Trustee's reasonable sole discretion, required by any law, regulation, rule, ruling, directive, or other governmental requirement (including, without limitation, tax withholding relating to wage claims). Any Litigation Trust Assets which are undistributable in accordance with this Section 4.6(b) as of the termination of the Litigation Trust shall be distributed in accordance with the Distribution Schedule.

(c)      The Litigation Trustee may retain a distribution agent for the effective administration and distribution of amounts payable to Beneficiaries or Other Distributees and all costs and expenses of such distribution agent shall be paid from Litigation Expense Fund.

(d)      If any distribution to any Beneficiary is returned as undeliverable, and after reasonable efforts Litigation Trustee has not been able to determine the current address of the Beneficiary, such undeliverable or unclaimed distribution shall be deemed unclaimed property 120 days after the date of such distribution and shall be reallocated to the remaining Beneficiaries and shall be distributed in accordance with the Distribution Schedule.  Such undeliverable or unclaimed distributions shall not be subject to (i) any claims by such Beneficiary or (ii) the unclaimed property or escheat laws of any state or governmental unit.

4.7      <u>Reserve Accounts for Disputed General Unsecured Claims</u>.  The Litigation Trustee shall establish the Disputed Claims Reserve, which shall include assets held separately from other assets of the Litigation Trust, subject to an allocable share of all expenses and obligations of the Litigation Trust, on account of Disputed General Unsecured Claims. The Litigation Trustee shall remove funds from the Disputed Claims Reserve as the Disputed General Unsecured Claims are resolved, which funds shall be distributed as provided in Section 4.6(a). Neither the Debtors nor the Reorganized Debtors shall have any obligation with respect to, or liability for, any deficiency in or underfunding of the Disputed Claims Reserve.

4.8      <u>Treatment of Disputed Claims Reserve</u>.  Notwithstanding any other provision of this Litigation Trust Agreement to the contrary, subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Litigation Trust may treat any Litigation Trust Assets allocable to, or retained on account of, the Disputed Claims Reserve as held by one or more discrete entities for federal, and applicable state, local or other, income tax purposes, and may determine that such entity or entities shall constitute "disputed ownership funds" under, and may make the election permitted by, Treasury Regulation section 1.468B-9, or any successor provision thereto. All Beneficiaries and Other Distributees shall be bound by, and shall report consistently with, such income tax treatment.

4.9      <u>Management of Litigation Trust Assets.</u>

(a)      Except as otherwise provided in this Litigation Trust Agreement, the Plan or the Confirmation Order, and subject to Treasury Regulations governing liquidating trusts and the retained jurisdiction of the Bankruptcy Court as provided for in the Plan, but without prior or further authorization, the Litigation Trustee may, subject to the direction of the Trust Board, control and exercise authority over the Litigation Trust Assets, over the acquisition, management and disposition thereof and over the management and conduct of the Litigation Trust, in each case, to the extent necessary to enable the Litigation Trustee to fulfill the intents and purposes of this Litigation Trust Agreement. No person dealing with the Litigation Trust will be obligated to inquire into the authority of the Litigation Trustee in connection with the acquisition, management or disposition of the Litigation Trust Assets.

(b)      In connection with the management and use of the Litigation Trust Assets and except as otherwise expressly limited in this Litigation Trust Agreement, the Plan or the Confirmation Order, the Litigation Trustee will have, subject to the direction of the Trust Board,

in addition to any powers conferred upon the Litigation Trustee by any other provision of this Litigation Trust Agreement, the power to take any and all actions as, in the Litigation Trustee's discretion, are necessary or advisable to effectuate the primary purposes of the Litigation Trust, including, without limitation, the power and authority (i) to distribute the Litigation Trust Assets to Beneficiaries in accordance with the terms of this Litigation Trust Agreement and the Plan, (ii) to pay all expenses of the Litigation Trust, (iii) to sell, convey, transfer, assign, liquidate or abandon the Litigation Trust Assets, or any part thereof or any interest therein, upon such terms and for such consideration as may be commercially reasonable, (iv) to endorse the payment of notes or other obligations of any Person or to make contracts with respect thereto, and (v) to borrow such sums of money, at any time and from time to time, for such periods of time, upon such terms and conditions, from such Persons, for such purposes as may be commercially reasonable. The Litigation Trustee will not at any time, on behalf of the Litigation Trust or the Beneficiaries, enter into or engage in any trade or business, and no part of the Litigation Trust Assets will be used or disposed of by the Litigation Trustee in furtherance of any trade or business.

(c)     All decisions and actions by the Litigation Trustee under the authority of this Litigation Trust Agreement will be binding upon all of the Beneficiaries and Other Distributees and the Litigation Trust.

4.10    <u>Investment of Cash</u>.  The Litigation Trustee, subject to the direction of the Trust Board, may invest any Cash (including any earnings thereon or proceeds therefrom) in United States Treasury bills and notes, institutional money market funds, commercial paper and time deposits and certificates of deposit with commercial banks, in each case, with a maturity of twelve months or less; *provided, however,* that the scope of any such investments shall be limited to investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d) or under applicable IRS guidelines, rulings or other controlling authorities; *provided, further, however,* that sections 11-2.3, 11-2.3-A and 11-2.4 of the Estates, Powers and Trusts Law of New York shall be inapplicable to the Litigation Trust herein.

4.11    <u>Additional Powers of the Litigation Trustee</u>.  In addition to any and all of the powers enumerated above, and except as otherwise provided in this Litigation Trust Agreement, the Plan, the Lender Litigation Settlement Agreement and the Lender Litigation Settlement Approval Order or the Confirmation Order, and subject to the Treasury Regulations governing liquidating trusts and the retained jurisdiction of the Bankruptcy Court as provided for in the Plan, the Litigation Trustee, subject to the direction of the Trust Board, shall be empowered to:

(a)     hold legal title to any and all rights of the holders of the Litigation Trust Interests in or arising from the Litigation Trust Assets, including, but not limited to, the right to collect any and all money and other property belonging to the Litigation Trust;

(b)     perform the duties, exercise the powers, and assert the rights of a Trustee under sections 704 and 1106 of the Bankruptcy Code with respect to the Litigation Trust Assets, including assert claims, defenses, offsets, and privileges;

(c)     protect and enforce the rights of the Litigation Trust to the Litigation Trust Assets by any method deemed appropriate including, without limitation, by judicial proceedings

or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law and general principles of equity;

(d)    determine and satisfy any and all liabilities created, incurred or assumed by the Litigation Trust;

(e)    assert or waive any privilege or defense on behalf of the Litigation Trust;

(f)    make all payments relating to the Litigation Trust Assets;

(g)    obtain insurance coverage with respect to the potential liabilities and obligations of the Litigation Trust, the Litigation Trustee, the Trust Board and the Directors under this Litigation Trust Agreement (in the form of a directors and officers policy, an errors and omissions policy or otherwise);

(h)    file, if necessary, any and all tax and information returns with respect to the Litigation Trust and pay taxes properly payable by the Litigation Trust, if any;

(i)    request any appropriate tax determination with respect to the Litigation Trust, including, without limitation, a determination pursuant to section 505 of the Bankruptcy Code;

(j)    retain and reasonably compensate for services rendered and expenses incurred an accounting firm or financial consulting firm to perform such reviews and/or audits of the financial books and records of the Litigation Trust as may be appropriate in the Litigation Trustee's discretion and to prepare and file any tax returns or informational returns for the Litigation Trust as may be required;

(k)    take or refrain from taking any and all actions the Litigation Trustee reasonably deems necessary for the continuation, protection, and maximization of the Litigation Trust Assets consistent with the purposes hereof;

(l)    take all steps and execute all instruments and documents necessary to effectuate the Litigation Trust;

(m)    take all actions necessary to comply with the Plan, the Confirmation Order, the Lender Litigation Settlement Agreement and the Lender Litigation Settlement Approval Order and this Litigation Trust Agreement and the obligations thereunder and hereunder; and

(n)    exercise such other powers as may be vested in the Litigation Trustee pursuant to an order of the Bankruptcy Court or this Litigation Trust Agreement, or as deemed by the Trust Board consistent with the Lender Litigation Settlement Agreement and Lender Litigation Settlement Approval Order, the Plan, the Confirmation Order and this Litigation Trust Agreement to be necessary and proper to carry out the obligations of the Litigation Trust.

4.12    <u>Limitations on Power and Authority of the Litigation Trustee</u>.  Notwithstanding anything in this Trust Agreement to the contrary, the Litigation Trustee will not have the authority to do any of the following:

(a)    take any action in contravention of this Litigation Trust Agreement, the Plan, the Lender Litigation Settlement Agreement and Lender Litigation Settlement Approval Order or the Confirmation Order;

(b)    take any action which would make it impossible to carry on the activities of the Litigation Trust;

(c)    possess property of the Litigation Trust or assign the Litigation Trust's rights in specific property for other than Litigation Trust purposes;

(d)    engage in any trade or business;

(e)    permit the Litigation Trust to receive or retain cash or cash equivalents in excess of a reasonable amount necessary to meet claims and contingent liabilities (including without limitation expected expenses) or to maintain the value of its assets during liquidation;

(f)    receive transfers of any listed stocks or securities, or any readily-marketable assets or any operating assets of a going business, except as is absolutely necessary or required under the Plan and the Confirmation Order; *provided, however*, that in no event shall the Litigation Trustee receive any such investment that would jeopardize treatment of the Litigation Trust as a "liquidating trust" for federal income tax purposes under Treasury Regulation section 301.7701-4(d), or any successor provision thereof;

(g)    exercise any investment power other than the power to invest in demand and time deposits in banks or savings institutions, or temporary investments such as short term certificates of deposit or Treasury bills or other investments that may be held by a "liquidating trust" for federal income tax purposes under Treasury Regulation section 301.7701-4(d), or any successor provision thereof; and

(h)    receive or retain any operating assets of a going business, a partnership interest in a partnership that holds operating assets, or fifty percent (50%) or more of the stock of a corporation with operating assets, except as is absolutely necessary or required under the Plan and the Confirmation Order; *provided, however*, that in no event shall the Litigation Trustee receive or retain any such asset or interest that would jeopardize treatment of the Litigation Trust as a "liquidating trust" for federal income tax purposes under Treasury Regulation section 301-7701-4(d), or any successor provision thereof; or

(i)    take any other action that would jeopardize treatment of the Litigation Trust as a liquidating trust for federal income tax purposes under Treasury Regulation section 301.7701-4(d), or any successor provision thereof.

4.13    <u>Books and Records</u>. The Litigation Trustee shall maintain in respect of the Litigation Trust, the holders of Litigation Trust Interests and the Other Distributees books and records relating to the Litigation Trust Assets and income of the Litigation Trust and the payment of, expenses of, and liabilities of claims against or assumed by, the Litigation Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof. Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements of the Litigation Trust.

Substantially Final Form

Nothing in this Litigation Trust Agreement requires the Litigation Trustee to file any accounting or seek approval of any court with respect to the administration of the Litigation Trust, or as a condition for managing any payment or distribution out of the Litigation Trust Assets. The Litigation Trust shall provide to the Reorganized Debtors a semi-annual accounting solely with respect to Proceeds of the Assigned Preference Claims.

4.14    Reports

(a)    Securities Reports. To the extent that the Litigation Trust Interests are deemed securities the issuance of Litigation Trust Interests under the Plan shall be exempt from registration under the Securities Act of 1933, as amended, and applicable state and local laws requiring registration of securities pursuant to section 1145 of the Bankruptcy Code. If the Litigation Trustee determines, with the advice of counsel, that the Litigation Trustee is required to comply with the registration and reporting requirements of the Securities Exchange Act of 1934, as amended, or the Investment Company Act of 1940, as amended, then the Litigation Trustee shall take commercially reasonable efforts to comply with such reporting requirements and file periodic reports with the Securities and Exchange Commission.

(b)    Financial and Status Reports. Within 90 days after the calendar year-end following the Effective Date and for each calendar year end thereafter, and as soon as practicable upon termination of the Litigation Trust, the Litigation Trustee shall make available upon request to the Reorganized Debtors, agents for the Other Distributees and to each Beneficiary appearing on its records as of the end of such period or such date of termination a written report including: (i) financial statements of the Litigation Trust for such period, and, if the end of a calendar year, a report (which may be prepared by an independent certified public accountant employed by the Litigation Trustee) reflecting the result of such agreed upon procedures relating to the financial accounting administration of the Litigation Trust as proposed by the Litigation Trustee; (ii) a description of any action taken by the Litigation Trust which materially affects the Litigation Trust and of which notice has not previously been given to the holders of Litigation Trust Interests; and (iii) a description of the progress of liquidating Litigation Trust Assets and making distributions to Beneficiaries and any other material information relating to the Litigation Trust Assets and the administration of the Litigation Trust. The Litigation Trustee may post any such report on a web site maintained by the Litigation Trustee or electronically file it with the Bankruptcy Court in lieu of actual notice to the Other Distributees and to each Beneficiary (unless otherwise required by law). The Litigation Trustee may require the recipient of such information to agree to keep such information confidential pursuant to reasonable confidentiality provisions. Additionally, the Litigation Trustee shall provide the Other Distributees notice when the holders of Allowed General Unsecured Claims and Allowed 2015 Notes Claims have received aggregate distributions under the Plan, the Lender Litigation Settlement Agreement and the Lender Litigation Settlement Approval Order, the Creditor Trust, and this Litigation Trust sufficient to pay such holder 85% of the Allowed Base Claim Amounts in Cash and Class A Shares. Additional notices shall be provided upon such distributions achieving 90% and 95% of the Allowed Base Claim Amounts and upon the occurrence of the Excess Recovery Trigger Date.

(c)     Annual Plan and Budget.  If instructed by the Trust Board, the Litigation Trustee shall prepare and submit to the Trust Board for approval an annual plan and budget in such detail as is reasonably requested.

4.15     Communications with Trust Board.  The Litigation Trustee may require that the Trust Board maintain as confidential any confidential or proprietary information concerning the prosecution of the Assigned Actions (including counterclaims, if any).

4.16     Compliance with Laws.  Any and all distributions of Litigation Trust Assets and proceeds of borrowings, if any, shall be in compliance with applicable laws, including, but not limited to, applicable federal and state securities laws.

4.17     Compliance with Lender Litigation Settlement Approval Order.  The Litigation Trustee and the Litigation Trust shall comply with the obligations of the Litigation Trust under the Lender Litigation Settlement Approval Order.

## ARTICLE V
## THE LITIGATION TRUSTEE

5.1     Independent Trustee.  The Litigation Trustee may not be a Beneficiary or Other Distributee or related or subordinate (within the meaning of section 672(c) of the Tax Code) to any Beneficiary or Other Distributee.

5.2     Trustee's Compensation and Reimbursement.  The Litigation Trustee shall receive compensation from the Litigation Trust as follows:

(a)     Compensation.  The Litigation Trustee shall receive the compensation set, from time to time, by the Trust Board.  The Trust Board may without application to or approval by the Bankruptcy Court reasonably modify the Litigation Trustee's compensation and other terms regarding the retention of the Litigation Trustee.

(b)     Expenses.  In addition, the Litigation Trust will reimburse the Litigation Trustee (out of the Litigation Trust Assets) for all reasonable, out-of-pocket expenses incurred by the Litigation Trustee in connection with the performance of its duties hereunder and under the Plan.

(c)     Payment.  The fees and expenses payable to the Litigation Trustee shall be paid to the Litigation Trustee upon approval of such fees by the Trust Board without necessity for review or approval by the Bankruptcy Court or any other Person. The Bankruptcy Court shall retain jurisdiction to adjudicate any dispute between the Litigation Trustee and the Trust Board regarding the fees, compensation, and expenses of the Litigation Trustee.

5.3     Resignation.  The Litigation Trustee may resign by giving not less than ninety (90) days' prior written notice thereof to the Trust Board. Such resignation shall become effective on the later to occur of: (a) the day specified in such notice, and (b) the appointment of a successor by a majority of the Directors and the acceptance by such successor of such appointment. If a successor Litigation Trustee is not appointed or does not accept its appointment within ninety (90) days following delivery of notice of resignation, the Litigation Trustee may petition any

Substantially Final Form

court of competent jurisdiction for the appointment of a successor Litigation Trustee. Notwithstanding the foregoing, upon the occurrence of the Excess Recovery Trigger Date, the Litigation Trustee shall be deemed to have resigned and such resignation shall become effective upon the earlier of thirty days after the Excess Recovery Trigger Date or upon the appointment of a successor Litigation Trustee.

5.4    Removal.

(a)    The Litigation Trustee may be removed by the Trust Board, with or without a cause.

(b)    To the extent there is any dispute regarding the removal of a Litigation Trustee (including any dispute relating to any compensation or expense reimbursement due under this Litigation Trust Agreement), the Bankruptcy Court shall retain jurisdiction to consider and adjudicate any such dispute. Notwithstanding the foregoing, the Litigation Trustee will continue to serve as a trustee after his removal until the earlier of (a) the time when appointment of a successor Litigation Trustee will become effective in accordance with Section 5.5 of this Litigation Trust Agreement or (b) such date as the Bankruptcy Court otherwise orders.

5.5    Appointment of Successor Litigation Trustee.  In the event of the death (in the case of a Litigation Trustee that is a natural person), dissolution (in the case of a Litigation Trustee that is not a natural person), resignation, incompetency, or removal of the Litigation Trustee, the Trust Board shall designate a successor Litigation Trustee. Such appointment shall specify the date on which such appointment shall be effective. Every successor Litigation Trustee appointed hereunder shall execute, acknowledge, and deliver to the Trust Board an instrument accepting the appointment under this Litigation Trust Agreement and agreeing to be bound thereto, and thereupon the successor Litigation Trustee, without any further act, deed, or conveyance, shall become vested with all rights, powers, trusts, and duties of the retiring Litigation Trustee; *provided, however*, that a removed or resigning Litigation Trustee shall, nevertheless, when requested in writing by the successor Litigation Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Litigation Trustee under the Litigation Trust all the estates, properties, rights, powers, and trusts of such predecessor Litigation Trustee.

5.6    Effect of Resignation or Removal.  The death, resignation, incompetency or removal of the Litigation Trustee shall not operate to terminate the Litigation Trust created by this Litigation Trust Agreement or to revoke any existing agency created pursuant to the terms of this Litigation Trust Agreement or invalidate any action theretofore taken by the Litigation Trustee or any prior Litigation Trustee. In the event of the resignation or removal of the Litigation Trustee, such Litigation Trustee will promptly (a) execute and deliver such documents, instruments and other writings as may be ordered by the Bankruptcy Court or reasonably requested by the successor Litigation Trustee to effect the termination of such Litigation Trustee's capacity under this Litigation Trust Agreement, (b) deliver to the Bankruptcy Court (if required) or the successor Litigation Trustee all documents, instruments, records and other writings related to the Litigation Trust as may be in the possession of such Litigation Trustee (provided that such Litigation Trustee may retain one copy of such documents for archival purposes) and (c) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Litigation Trustee.

5.7    <u>Confidentiality</u>.  The Litigation Trustee shall, during the period that the Litigation Trustee serves as Litigation Trustee under this Litigation Trust Agreement and following the termination of this Litigation Trust Agreement or following its removal or resignation hereunder, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any entity to which any of the Litigation Trust Assets relates or of which the Litigation Trustee has become aware in the Litigation Trustee's capacity as Litigation Trustee, except as otherwise required by law.

## ARTICLE VI
## TRUST BOARD

6.1    <u>The Trust Board</u>.  On the Effective Date, a governing board of five (5) persons or entities shall commence serving as directors of the Litigation Trust (the "**Trust Board**"). The Trust Board shall initially consist of five (5) directors (each, a "**Director**") selected by the Creditors' Committee and listed on Exhibit B hereto.  The Trust Board may from time to time set such procedures and rules, consistent with the Confirmation Order and the Plan, for the Litigation Trust and the Trust Board consistent with this Litigation Trust Agreement as it determines are appropriate.

6.2    <u>Authority and Responsibilities</u>.  The Trust Board shall have the authority and responsibility to oversee, manage, and direct the activities of the Litigation Trust and the performance of the Litigation Trustee and shall have the authority to remove the Litigation Trustee in accordance with Section 5.4 hereof.  The Trust Board shall also (a) monitor and oversee the administration of the Litigation Trust and the Litigation Trustee's performance of its responsibilities under this Litigation Trust Agreement and/or the Plan, and (b) perform such other tasks as set forth in this Litigation Trust Agreement and/or in the Plan. In all circumstances, except as explicitly provided herein, the Trust Board shall exercise its responsibilities under the Litigation Trust consistent with fiduciary standards. In all circumstances, the Trust Board shall act in the best interests of the Beneficiaries and in furtherance of the purpose of the Litigation Trust. The Litigation Trustee shall consult with and provide information to the Trust Board in accordance with and pursuant to the terms of this Litigation Trust Agreement and the Plan to enable the Trust Board to meet its obligations hereunder.

6.3    <u>Meetings of the Trust Board</u>.  Meetings of the Trust Board are to be held not less often than quarterly.  Special meetings of the Trust Board may be held whenever and wherever called for by the Litigation Trustee or any Director. Any action required or permitted to be taken by the Trust Board at a meeting may be taken without a meeting if the action is taken by unanimous written consent of the Trust Board as evidenced by one or more written consents describing the action taken, signed by all Directors and recorded in the minutes, if any, or other transcript, if any, of proceedings of the Trust Board.  Unless the Trust Board decides otherwise (which decision shall rest in the reasonable discretion of the Trust Board), the Litigation Trustee and the Litigation Trustee's designated advisors may attend meetings of the Trust Board.

6.4    <u>Manner of Acting</u>.  Three Directors shall constitute a quorum for the transaction of business at any meeting of the Trust Board. The affirmative vote of a majority of the Directors present at a meeting shall be the act of the Trust Board except as otherwise required by law or as provided in this Litigation Trust Agreement. Any or all of the Directors may participate in a

regular or special meeting by, or conduct the meeting through the use of, conference telephone or similar communications equipment by means of which all persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition to the place) for the holding thereof. Any Director participating in a meeting by this means is deemed to be present in person at the meeting. Voting (including on negative notice) may, if approved by the Directors at a meeting, be conducted by electronic mail or individual communications by the Litigation Trustee and each Director.

6.5     Tenure of the Members of the Trust Board.  The authority of the Directors will be effective as of the Effective Date and will remain and continue in full force and effect until the Litigation Trust is terminated in accordance with Article IX hereof. The Directors will serve until death or resignation pursuant to Section 6.6 below, or removal pursuant to Section 6.7 below.

6.6     Resignation.  A Director may resign by giving not less than ninety (90) days' prior written notice thereof to the Litigation Trustee and the other Directors. Such resignation shall become effective on the later to occur of: (i) the day specified in such notice; and (ii) the appointment of a successor in accordance with Section 6.8 below.

6.7     Removal.  A majority of the Trust Board may remove any Director for Cause. Notwithstanding the foregoing, upon the occurrence of the Excess Recovery Trigger Date, any or all of the Directors shall (a) be deemed to have resigned, such resignation to become effective upon the earlier of (i) the appointment of successor Directors by the then holders of the majority in outstanding amount of the Deficiency Claims on account of Senior Secured Claims and Bridge Loan Claims or (ii) thirty days after the Excess Recovery Trigger Date and (b) act and cause the Litigation Trustee to act under the direction of the agents for the Senior Secured Claims and Bridge Loan Claims.

6.8     Appointment of a Successor Director.

(a)     In the event of a vacancy on the Trust Board (whether by removal, death, or resignation), a new Director may be appointed to fill such position (i) if such position is filled by an individual who is not subject to appointment by a particular Beneficiary, then by the remaining Directors or (ii) if such position is subject to appointment by a particular Beneficiary or agent of certain Beneficiaries (as specified on Exhibit B), then by such Beneficiary or such agent. The appointment of a successor Director will be evidenced by the Litigation Trustee's filing with the Bankruptcy Court of a notice of appointment, which notice will include the name, address, and telephone number of the successor Director.

(b)     Immediately upon the appointment of any successor Director, all rights, powers, duties, authority, and privileges of the predecessor Director hereunder will be vested in and undertaken by the successor Director without any further act; and the successor Director will not be liable personally for any act or omission of the predecessor Director.

(c)     Every successor Director appointed hereunder shall execute, acknowledge and deliver to the Litigation Trustee and other Directors an instrument accepting the appointment under this Litigation Trust Agreement and agreeing to be bound thereto, and thereupon the

Substantially Final Form

successor Director without any further act, deed, or conveyance, shall become vested with all rights, powers, trusts, and duties of the retiring Director.

6.9     Compensation and Reimbursement of Expenses.     Each Director shall be compensated for his or her time expended in Litigation Trust matters as provided on Exhibit C. The Litigation Trust will reimburse the Directors for all reasonable, out-of-pocket expenses incurred by the Directors in connection with the performance of each of their duties hereunder (including reasonable fees, costs, and expenses of legal counsel, subject to the approval of the Trust Board). All fees and expenses of the Directors shall be paid solely from Litigation Trust Assets.

## ARTICLE VII
## LIABILITY AND INDEMNIFICATION

7.1     No Further Liability.  Each of the Litigation Trustee and the Directors shall have no liability for any actions or omissions in accordance with this Litigation Trust Agreement unless arising out of their gross negligence or willful misconduct. In performing its duties under this Litigation Trust Agreement, the Litigation Trustee or the Director (as applicable) shall have no liability for any action taken by the Litigation Trustee and the Directors in accordance with the advice of counsel, accountants, appraisers and other professionals retained by the Directors or the Litigation Trust. Without limiting the generality of the foregoing, the Litigation Trustee and the Directors may rely without independent investigation on copies of orders of the Bankruptcy Court reasonably believed by the Litigation Trustee or the Director (as applicable) to be genuine, and shall have no liability for actions taken in reliance thereon. None of the provisions of this Litigation Trust Agreement shall require the Litigation Trustee or the Directors to expend or risk their own funds or otherwise incur personal financial liability in the performance of any of their duties hereunder or in the exercise of any of their rights and powers. Each of the Litigation Trustee and the Directors may rely without inquiry upon writings delivered to it under the Plan which the Litigation Trustee or the Director (as applicable) reasonably believes to be genuine and to have been given by a proper Person. Notwithstanding the foregoing, nothing in this Section 7.1 shall relieve the Litigation Trustee or the Directors from any liability for any actions or omissions arising out of their gross negligence or willful misconduct.  Any action taken or omitted to be taken in the case of the Litigation Trustee or the Trust Board with the express approval of the Bankruptcy Court and, in the case of the Litigation Trustee, with the express approval of the Trust Board will conclusively be deemed not to constitute gross negligence or willful misconduct.

7.2     Indemnification of the Litigation Trustee and Trust Board.

(a)     To the fullest extent permitted by law, the Litigation Trust, to the extent of its assets legally available for that purpose, will indemnify and hold harmless the Litigation Trustee and the Trust Board and each of their respective directors, members, shareholders, partners, officers, agents, professionals or employees (collectively, the "**Indemnified Persons**") from and against any and all loss, cost, damage, expense (including, without limitation, fees and expenses of attorneys and other advisors and any court costs incurred by any Indemnified Person) or liability by reason of anything any Indemnified Person did, does or refrains from doing for the business or affairs of the Litigation Trust, except to the extent that it

Substantially Final Form

is finally judicially determined by a court of competent jurisdiction that the loss, cost, damage, expense or liability resulted from the Indemnified Person's gross negligence or willful misconduct.

(b)    Notwithstanding any provision herein to the contrary, the Indemnified Persons shall be entitled to obtain advances from the Litigation Trust to cover their reasonable expenses of defending themselves in any action brought against them as a result of the acts and omissions, actual or alleged, of an Indemnified Person in its capacity as such, *provided, however*, that the Indemnified Persons receiving such advances shall repay the amounts so advanced to the Litigation Trust immediately upon the entry of a final, non-appealable judgment or order finding that such Indemnified Persons were not entitled to any indemnity under the provisions of this Section 7.2.  The foregoing indemnity in respect of any Indemnified Person shall survive the termination of such Indemnified Person from the capacity for which they are indemnified. Termination or modification of the Trust Agreement shall not affect any indemnification rights or obligations then existing.

(c)    The Litigation Trust, with the approval of the Beneficiaries holding a majority of the Allowed General Unsecured Claims and 2015 Notes Claims in the aggregate, may indemnify any of the Indemnified Persons for any loss, cost, damage, expense or liability for which the Indemnified Persons would not be entitled to mandatory indemnification under this Section 7.2.

(d)    Any Indemnified Person may waive the benefits of indemnification under this Section 7.2, but only by an instrument in writing executed by such Indemnified Person.

(e)    The rights to indemnification under this Section 7.2 are not exclusive of other rights which any Indemnified Person may otherwise have at law or in equity, including without limitation common law rights to indemnification or contribution. Nothing in this Section 7.2 will affect the rights or obligations of any Person (or the limitations on those rights or obligations) under any other agreement or instrument to which that Person is a party.

7.3    Litigation Trust Liabilities.  All liabilities of the Litigation Trust, including without limitation indemnity obligations under Section 7.2 of this Litigation Trust Agreement, will be liabilities of the Litigation Trust as an entity, and will be paid or satisfied from Litigation Trust Assets. No liability of the Litigation Trust will be payable in whole or in part by any Beneficiary in the Beneficiary's capacity as a Beneficiary, by the Litigation Trustee in the Litigation Trustee's capacity as Litigation Trustee, by any Director in the Director's capacity as Director or by any member, partner, shareholder, director, officer, professional, employees, agent, affiliate or advisor of any Beneficiary, any Director, the Litigation Trustee or their respective affiliates.

7.4    Limitation of Liability.  Neither the Litigation Trustee, the Directors nor their professionals will be liable for punitive, exemplary, consequential, special or other damages for a breach of this Trust Agreement under any circumstances.

7.5    Burden of Proof.  In making a determination with respect to entitlement to exculpation or indemnification hereunder, the person, persons or entity making such

determination shall presume that the Indemnified Person is entitled to exculpation and indemnification under this Litigation Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome that presumption.

ARTICLE VIII
**TAX MATTERS**

8.1    <u>Treatment of Litigation Trust Assets Transfer</u>.  For all federal income tax purposes, subject to Section 8.2(b), all parties (including, without limitation, the Debtors, the Reorganized Debtors, the Litigation Trustee and the holders of Allowed General Unsecured Claims and the holders of 2015 Note Claims) shall treat the transfer of the Litigation Trust Assets to the Litigation Trust including any amounts or other assets subsequently transferred to the Litigation Trust (but only at such time as actually transferred) for the benefit of the holders of 2015 Note Claims and Allowed General Unsecured Claims, whether Allowed on or after the Effective Date, and such other beneficiaries as described in the Distribution Schedule as (i) a transfer of the Litigation Trust Assets, for all purposes of the IRC directly to the beneficiaries of the Litigation Trust, followed by (ii) the transfer by such persons to the Litigation Trust of such Litigation Trust Assets in exchange for beneficial interests in the Litigation Trust. The holders of 2015 Note Claims and the holders of Allowed General Unsecured Claims, whether Allowed on or after the Effective Date, and such other beneficiaries as described in the Distribution Schedule shall be treated for federal income tax purposes as the grantors and owners of their respective shares of the applicable Litigation Trust Assets.

8.2    <u>Income Tax Status</u>.

(a)    For United States federal income tax purposes (and for purposes of all state, local and other jurisdictions to the extent applicable), this Litigation Trust shall be treated as a liquidating trust pursuant to Treasury Regulation section 301.7701-4(d) and as a grantor trust pursuant to IRC sections 671-677.  To the extent consistent with Revenue Procedure 94-45 and not otherwise inconsistent with this Litigation Trust Agreement, this Trust Agreement shall be construed so as to satisfy the requirements for liquidating trust status.  Except as provided in Section 8.2(b) or with respect to the Litigation Trust Assets allocable to the Disputed Claims Reserve, as set forth in Article IV hereof, (i) the Beneficiaries will be treated as both the grantors and the deemed owners of the Litigation Trust, and (ii) any items of income, deduction, credit and loss of the Litigation Trust shall be allocated for federal income tax purposes to the Beneficiaries in accordance with Section 8.3.  The Litigation Trust shall at all times be administered so as to constitute a domestic trust for United States federal income tax purposes.

(b)    For U.S. federal, state and local income tax purposes, the Reorganized Debtors will be treated as retaining a portion of the Litigation Trust Assets consisting of Cash and Assigned Preference Claims and transferring such Litigation Trust Assets directly to the Litigation Trust, and will be treated as the grantors and owners of their respective shares of the applicable Litigation Trust Assets.

8.3    <u>Tax Returns</u>.  Except with respect to the Disputed Claims Reserve, in accordance with IRC section 6012 and Treasury Regulation section 1.671-4(a), the Litigation Trust shall file with the IRS annual tax returns on Form 1041.  In addition, the Litigation Trust shall file in a

23

timely manner such other tax returns, including any state and local tax returns, as are required by applicable law and pay any taxes shown as due thereon.  Within a reasonable time following the end of the taxable year, the Litigation Trust shall send to each Beneficiary or Other Distributee a separate statement setting forth such Beneficiary's or Other Distributee's share of items of income, gain, loss, deduction or credit and will instruct each such Beneficiary to report such items on his/her applicable income tax return.  The Litigation Trust may provide each Beneficiary or Other Distributee with a copy of the Form 1041 for the Litigation Trust (without attaching any other Beneficiary's Schedule K-1 or other applicable information form) along with such Beneficiary's or Other Distributee's Schedule K-1 or other applicable information form in order to satisfy the foregoing requirement.  The Litigation Trust shall allocate the taxable income, gain, loss, deduction or credit of the Litigation Trust with respect to each Beneficiary or Other Distributee as follows:  (1) Allocations of Litigation Trust taxable income shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restriction on distributions described herein or in the Plan) if, immediately prior to such deemed distribution, the Litigation Trust had distributed all of its other assets (valued at their tax book value) to the Beneficiaries and Other Distributees in accordance with the Distribution Schedule (treating all Claims that are Disputed as if they were Allowed Claims), in each case up to the tax book value of the assets treated as contributed by such holders, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Litigation Trust; and (2) allocations of taxable loss of the Litigation Trust shall be determined by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Litigation Trust Assets. For these purposes, the tax book value of the Litigation Trust Assets shall equal the fair market value of the Litigation Trust Assets on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, the Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

8.4     <u>Withholding of Taxes and Reporting Related to Litigation Trust Operations</u>**.**  The Litigation Trust shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions made by the Litigation Trust shall be subject to any such withholding and reporting requirements.  To the extent that the operation of the Litigation Trust or the liquidation of the Litigation Trust Assets creates a tax liability imposed on the Litigation Trust, including the Disputed Claims Reserve, the Litigation Trust shall timely pay such tax liability and any such payment shall be considered a cost and expense of the operation of the Litigation Trust payable without Bankruptcy Court order.  Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from distributions hereunder.  All Beneficiaries or Other Distributees shall be required to provide any information necessary to effect the withholding of such taxes.

8.5     <u>Valuation</u>**.**  The valuation of the Litigation Trust Assets agreed to by the Parties shall be used consistently by all parties (including, without limitation, the Litigation Trust, the Reorganized Debtors, the Beneficiaries and the Other Distributees) for all federal income tax purposes. The Litigation Trust also shall file (or cause to be filed) any other statements, returns or disclosures relating to the Litigation Trust that are required by any governmental unit.

Substantially Final Form

8.6     Expedited Determination of Taxes**.**   The Litigation Trustee may request an expedited determination of taxes of the Litigation Trust, including the Disputed Claims Reserve, under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Litigation Trust for all taxable periods through the termination of the Litigation Trust.

8.7     Excess Recovery Trigger Date.   For United States federal income tax purposes (and for purposes of all state, local and other jurisdictions to the extent applicable) and to the extent permitted by applicable income tax laws, in the event of the occurrence of the Excess Recovery Trigger Date, (i) the Litigation Trustee serving immediately prior to the Excess Recovery Trigger Date or his designee shall be empowered to file all tax returns, make all reports and furnish all required information with respect to this Litigation Trust through the date of such termination and shall file a final return with respect to the tax period ending on such date; (ii) the Litigation Trustee serving immediately prior to the Excess Recovery Trigger Date shall have sole control over all tax matters with respect to this Litigation Trust for all tax periods or portions thereof ending on or before (or including) such date of such termination, and (iii) the provisions of Article VII shall be applicable to the prior Litigation Trustee and Directors and shall provide indemnification for liability arising from the actions or omissions by the successor Litigation Trustee and Directors.   The Litigation Trustee appointed following the Excess Recovery Trigger Date shall file all returns, reports and statements in a manner consistent with the foregoing provisions of this Section 8.7.

## ARTICLE IX
## TERMINATION OF LITIGATION TRUST

The Litigation Trustee and the Litigation Trust shall be discharged or dissolved, as the case may be, at such time as (i) the Litigation Trustee determines that the pursuit of additional Assigned Actions is not likely to yield sufficient additional Proceeds to justify further pursuit of such claims and (ii) all distributions of Proceeds and other Litigation Trust Assets required to be made by the Litigation Trustee under the Plan and this Litigation Trust Agreement have been made in accordance with the Distribution Schedule, but in no event shall the Litigation Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion made by a party in interest within the six (6) month period prior to such fifth (5th) anniversary (and, in the event for further extension, at least six (6) months prior to the end of the preceding extension), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable letter ruling from the IRS that any further extension would not adversely affect the status of the Litigation Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on and liquidation of the Litigation Trust Assets; provided that in no event shall the term of the Litigation Trust be extended beyond April 30, 2031.   Upon dissolution of the Litigation Trust, any remaining Cash on hand and other Litigation Trust Assets shall be distributed in accordance with the Distribution Schedule.   Article VII shall survive any termination of the Litigation Trust Agreement including, without limitation, termination pursuant to Section 8.7.

## ARTICLE X
## AMENDMENT AND WAIVER

Any substantive provision of this Litigation Trust Agreement may be amended or waived in writing by the Litigation Trustee, upon notice and unanimous approval by the Trust Board and approval of the Bankruptcy Court and provision of reasonable notice to the Reorganized Debtors. Notwithstanding the foregoing, any amendment or waiver which materially and adversely affects (a) the Reorganized Debtors shall require their consent, or (b) the Other Distributees other than the Reorganized Debtors, shall require the consent of the agents of such Other Distributees. Technical amendments to this Litigation Trust Agreement may be made, as necessary to clarify this Litigation Trust Agreement or enable the Litigation Trustee to effectuate the terms of this Litigation Trust Agreement, by the Litigation Trustee with approval by a majority of the Trust Board; *provided, however,* that all amendments of this Litigation Trust Agreement shall be consistent with the purpose and intention of the Litigation Trust to liquidate in an expeditious but orderly manner the Liquidation Trust Assets in accordance with Treasury Regulation section 301.7701-4(d) and Section 2.5 hereof.  After the occurrence of the Excess Recovery Trigger Date, the Settling Defendants who hold a majority of Litigation Trust Interests of the Settling Defendants may modify this Litigation Trust Agreement as they deem appropriate; *provided, however,* that any modification that may adversely affect distributions to (a) Reorganized Debtors shall require their consent, or (b) the Beneficiaries shall require the consent of the Beneficiaries holding a majority of the Litigation Trust Interests.

ARTICLE XI
**MISCELLANEOUS PROVISIONS**

11.1    <u>Intention of Parties to Establish Liquidating Trust</u>.    This Litigation Trust Agreement is intended to create for federal income tax purposes a "liquidating trust" that satisfies the requirements of Revenue Procedure 94-45 and, to the extent provided by law, shall be governed and construed in all respects as such a liquidating trust. Notwithstanding anything to the contrary contained herein, any ambiguity herein shall be construed consistent herewith and, if necessary, this Litigation Trust Agreement may be amended to comply with such federal income tax laws, which amendments may apply retroactively.

11.2    <u>Independent Contractor</u>.    The Reorganized Debtors shall be deemed to be an independent contractor of the Litigation Trust and employees of Reorganized Debtors shall at all times be regarded as employees of Reorganized Debtors. Nothing contained in this Litigation Trust Agreement shall create or be deemed to create an employment, agency, joint venture or partnership relationship between the Litigation Trust and Reorganized Debtors or any of its employees.

11.3    <u>Effectiveness</u>.    This Litigation Trust Agreement shall become effective on the Effective Date.

11.4    <u>Counterparts</u>.    This Litigation Trust Agreement may be executed in two or more counterparts, all of which shall be taken together to constitute one and the same instrument.

11.5    <u>Governing Law</u>.    Except to the extent the Bankruptcy Code or Federal Rules of Bankruptcy Procedure are applicable, this Litigation Trust Agreement shall be governed by, and construed and enforced in accordance with, the federal laws of the United States and, to the

extent there is no applicable federal law, the domestic laws of the state of New York, without giving effect to the principles of conflicts of law thereof.

11.6    <u>Headings</u>.  Sections, subheadings and other headings used in this Litigation Trust Agreement are for convenience only and shall not affect the construction or interpretation of this Litigation Trust Agreement or any provision thereof.

11.7    <u>Severability</u>.  If any provision of this Litigation Trust Agreement or the application thereof to any Person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Litigation Trust Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provisions of this Litigation Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

11.8    <u>Notices</u>.  All notices, requests or other communications, required or permitted to be made in accordance with this Litigation Trust Agreement including any change of address of any Beneficiary for the purposes of receiving distributions from the Litigation Trust shall be in writing and shall be delivered personally or by first class or express mail, return receipt requested or fax with confirmation of receipt or email with receipt acknowledgement.  Notices should be directed to:

(a)    If to the Litigation Trust or the Litigation Trustee:

as specified on <u>Exhibit A</u>

If to the Trust Board:

as specified on <u>Exhibit B</u>

(b)    If to the Reorganized Debtors:  to such persons as the Reorganized Debtors may designate from time to time.

(c)    If to a Beneficiary: To the name and address set forth on the registry maintained by the Litigation Trustee, provided that general notices to all Beneficiaries may be made by posting such notice to a web-site identified in advance for communication with Beneficiaries.

(d)    If to an Other Distributee (other than the Reorganized Debtors):  to the agents set forth on <u>Exhibit D</u>.

IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this Litigation Trust Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as of the date first above written.

LYONDELLBASELL INDUSTRIES AF S.C.A.
On behalf of itself and the other Debtors

By:  LyondellBasell AF GP S.a.r.l.

By:  _____
Name:
Title:

[INSERT NAME], LITIGATION TRUSTEE OF THE LB LITIGATION TRUST ESTABLISHED UNDER THE LITIGATION TRUST AGREEMENT DATED _____, 2010 PURSUANT TO THE THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR LYONDELLBASELL DEBTORS

_____

[INSERT NAME], as

Litigation Trustee

## DEFINITIONS

"**Beneficiaries**" means (a) prior to the Excess Recovery Trigger Date, (i) holders of Allowed Class 7-A Claims and Class 7-C Claims (except the Senior/Bridge Guarantee Claims), (ii) holders of Allowed Class 7-D Claims (except the Senior/Bridge Deficiency Claims), and (iii) subject to the satisfaction of the 2015 Notes Plan Conditions, holders of Allowed Class 8 Claims and (b) after the Excess Recovery Trigger Date, may also include (i) the Reorganized Debtors to the extent of 1/3rd of any recoveries on account of the Assigned Preference Claims and (ii) the holders of the Deficiency Claims on account of the Senior Secured Claims and the Bridge Loan Claims.  After the Excess Recovery Trigger Date, the parties in section (a) are Beneficiaries only to the extent of their Post-Effective Date Interest Amount.

"**Cause**" shall be defined as: (i) the Person's willful failure to perform his material duties hereunder, which is not remedied within thirty (30) days of notice; (ii) the Person's commission of an act of fraud, theft or embezzlement during the duties of his employment hereunder; or (iii) the Person's conviction for the commission of a felony with all appeals having been exhausted or appeal periods lapsed; *provided,* that no Cause shall exist involving subsection (i) above until the Person first has failed to cure such failure within thirty (30) days of having been given written notice of such failure.  For purposes of the foregoing, no act or failure to act on the part of the Person shall be considered "willful" unless it is done, or permitted to be done, by the Person without reasonable belief that Person's action or omission was in the best interests of the Trust.

"**Contributed Claims**" means the Non-Settling Defendant Claims, the Assigned Preference Claims and all Causes of Action with respect thereto; *provided* that, following the Excess Recovery Trigger Date, all Assigned Preference Claims against present or former employees of the Debtors will be extinguished.  For avoidance of doubt, Debtor Controlled Claims shall not be considered Contributed Claims.

"**Creditor Representative Expense Fund**" means the fund established pursuant to section 5.9 of the Plan.

"**Creditor Representative Supplement**" means the supplement to the Plan which identifies certain terms relating to the operation of the Creditor Representative.

"**Disputed Claims Reserve**" means an allocation of Cash or other property to account for Disputed Claims and established by the Litigation Trustee pursuant to Section 4.6 of this Litigation Trust Agreement.

"**Distribution Schedule**" means the schedule for distribution of Proceeds and other Litigation Trust Assets by the Litigation Trust set forth on Exhibit E.

"**GUC Beneficiaries**" means (i) holders of Allowed Class 7-A Claims and Class 7-C Claims (except the Senior/Bridge Guarantee Claims), (ii) holders of Allowed Class 7-D Claims (except the Senior/Bridge Deficiency Claims), and (iii) subject to the satisfaction of the 2015 Notes Plan Conditions, holders of Allowed Class 8 Claims.

"**GUC Claims**" means (i) Allowed Class 7-A Claims and Class 7-C Claims (except the Senior/Bridge Guarantee Claims), (ii) Allowed Class 7-D Claims (except the Senior/Bridge Deficiency Claims), and (iii) subject to the satisfaction of the 2015 Notes Plan Conditions, holders of Allowed Class 8 Claims.

"**Initial Funding Amount**" means the initial amount of funding provided to the Litigation Trust by the Creditor Representative.

"**Interests**" means beneficial interests in this Litigation Trust.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**IRS**" means the Internal Revenue Service.

"**Litigation Trust Assets**" means the Initial Funding Amount, the Assigned Actions and certain other assets, conveyed to the Litigation Trust, together with all collections, recoveries, proceeds, income, gains, earnings, or other assets inuring to the Litigation Trust, to be liquidated and distributed to the Beneficiaries as set forth in this Litigation Trust Agreement.

"**Lender Litigation Settlement Approval Order**" means the *Order Approving Revised Settlement with Financing Party Defendants in Committee Litigation Pursuant to Bankruptcy Rule 9019*, entered March 11, 2010 (Committee Litigation Docket No. 371).

"**Other Distributees**" means, prior to the Excess Recovery Trigger Date, the Reorganized Debtors and the holders of Deficiency Claims on account of the Senior Secured Claims and Bridge Loan Claims. For the avoidance of doubt, in no event shall the Other Distributees be third party or other beneficiaries of this Litigation Trust, prior to the Excess Recovery Trigger Date, except to the extent provided in Article VIII.

"**Proceeds**" means the actual consideration, if any, received by the Litigation Trust as a result of any judgment, settlement, or compromise of any of the Assigned Actions.

"**Treasury Regulation**" mean any regulation promulgated under the Internal Revenue Code of 1986, as amended.

"**True-up Amount**" means, if, after all Disputed General Unsecured Claims become Allowed General Unsecured Claims (or Disallowed), there is insufficient Fixed Settlement Plan Consideration to provide all holders of Allowed General Unsecured Claims (other than Millennium Notes Claims) eligible to receive Fixed Settlement Plan Consideration the same pro rata distribution of the Fixed Settlement Plan Consideration, the minimum aggregate amount of net Proceeds sufficient to provide all holders of Allowed General Unsecured Claims (other than Millennium Notes Claims) eligible to receive Fixed Settlement Plan Consideration the same pro rata distribution of the Fixed Settlement Plan Consideration (including for purposes of such determination the True-up Amount); *provided, however*, holders of the 2015 Notes Claims shall not receive a True-up Amount on account of the Fixed Settlement Plan Consideration reallocated from the

holders of the 2015 Notes Claims to the holders of Millennium Notes Claims pursuant to Section 4.10 of the Plan.

Substantially Final Form

## Exhibit A

### Trustee for the Litigation Trust

Edward S. Weisfelner

### Contact Information for the Litigation Trust and Litigation Trustee

**Exhibit B**

**Initial Directors of the Trust Board**

Wilmington Trust Company, initially by its designee Patrick J. Healy

Law Debenture Trust of New York, initially by its designee Robert L. Bice II

BASF Corporation, initially by its designee Peter Arigirou

James F. Schorr

One person appointed by the other four Directors

**Contact Information for the Trust Board**

Substantially Final Form

**Exhibit C**

**Compensation for Directors**

The following aggregate compensation schedule shall apply to the Directors in their roles as Directors of the Litigation Trust Board, the Creditor Trust Board and the Advisory Board of the Creditor Representative (the "**Boards**"):

$60,000 annual aggregate fee to serve on the Boards, to be paid in quarterly increments. Such fee  shall include attendance at four (4) meetings per year.

$2,500 per meeting attended in excess of the four (4) per year included in the annual fee. For the avoidance of doubt, meetings held on the same day, whether as joint meetings or sequentially, shall be considered one (1) meeting.

**Exhibit D**

**Agents for Other Distributees**

Substantially Final Form

## Exhibit E

## Litigation Trust Distribution Schedule

*Prior to the Excess Recovery Trigger Date*, distributions made under the Litigation Trust Agreement shall be made as follows:

For net recoveries based upon Assigned Preference Claims:

> 90% to the Creditor Representative until the True-up Amount is fully paid, and, thereafter, to the GUC Beneficiaries (which distribution shall be based on each such GUC Beneficiary's pro rata share of GUC Claims).
> 10% to _____ for distribution to the Reorganized Debtors *provided* that in the case of such distributions to the Reorganized Debtor, such distribution shall only be net of the actual direct costs of the Litigation Trust incurred in connection with the pursuit, prosecution and resolution of Assigned Preference Claims.

For net recoveries based upon Non-Settling Defendant Claims:

1. First, to the Creditor Representative until the True-up Amount is fully paid.
2. Second, to the GUC Beneficiaries (which distribution shall be based on each such GUC Beneficiary's pro rata share of GUC Claims).

*After the Excess Recovery Trigger Date and until each of the GUC Beneficiaries are paid the Post-Effective Date Interest Amount*, distributions made under the Litigation Trust Agreement shall be made as follows:

For net recoveries based upon Assigned Preference Claims:

> one-third to the Reorganized Debtors,
> two-ninths to the GUC Beneficiaries (which distribution shall be based on each such GUC Beneficiary's pro rata share of GUC Claims),
> two-ninths to _____ for distribution to holders of the Deficiency Claims on account of the Senior Secured Claims, and
> two-ninths to _____ for distribution to holders of the Deficiency Claims on account of the Bridge Loan Claims.

For net recoveries based upon Non-Settling Defendant Claims:

> one-third to the GUC Beneficiaries (which distribution shall be based on each such GUC Beneficiary's pro rata share of GUC Claims),
> one-third to _____ for distribution to holders of the Deficiency Claims on account of the Senior Secured Claims, and

one-third to _____ for distribution to holders of the Deficiency Claims on account of the Bridge Loan Claims.

*After each of the Beneficiaries are paid the Post-Effective Date Interest Amount and until the holders of Senior Secured Claims are paid in full,* distributions made under the Litigation Trust Agreement shall be made as follows:

For net recoveries based upon Assigned Preference Claims:

> one-third to the Reorganized Debtors,
> one-third to _____ for distribution to holders of the Deficiency Claims on account of the Senior Secured Claims, and
> one-third to _____ for distribution to holders of the Deficiency Claims on account of the Bridge Loan Claims.

For net recoveries based upon Non-Settling Defendant Claims:

> one-half to _____ for distribution to holders of the Deficiency Claims on account of the Senior Secured Claims, and
> one-half to _____ for distribution to holders of the Deficiency Claims on account of the Bridge Loan Claims.

*After holders of Senior Secured Claims are paid in full*, distributions made under the Litigation Trust Agreement shall be made as follows:

For net recoveries based upon Assigned Preference Claims:

> one-third to the Reorganized Debtors, and
> two-thirds to _____ for distribution to holders of the Deficiency Claims on account of the Bridge Loan Claims.

For net recoveries based upon Non-Settling Defendant Claims:

> 100% to _____ for distribution to holders of the Deficiency Claims on account of the Bridge Loan Claims.

# Exhibit F

## Debtor Controlled Claims

# 1734273 v11

**TAB 6-D**

## LB CREDITOR TRUST AGREEMENT

This LB Creditor Trust Agreement (the "**Creditor Trust Agreement**"), made this _____ day of April, 2010 by the individual identified on <u>Exhibit A</u>, as trustee for the grantor trust established pursuant to this Creditor Trust Agreement (such person and each successor trustee the "**Creditor Trustee**"), is executed pursuant to the Confirmation Order and Settlement Agreement to facilitate the implementation of the Third Amended Joint Chapter 11 Plan of Reorganization for the LyondellBasell Debtors dated March 12, 2010 (as the same may be amended, modified or supplemented from time to time in accordance with the terms and provisions thereof, the "**Plan**") that provides for the establishment of the creditor trust created hereby (the "**Creditor Trust**").

## RECITALS

WHEREAS, Lyondell Chemical Company ("**Lyondell Chemical**") and certain of its Affiliates filed for protection under chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") on January 6, 2009 (the "**Petition Date**"), and LyondellBasell Industries AF S.C.A. ("**LBIAF**") and certain other of Lyondell Chemical's Affiliates filed thereafter (Lyondell Chemical, LBIAF and all such Affiliates, collectively, as debtors and debtors in possession, the "**Debtors**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"); and

WHEREAS, on April __, 2010, the Bankruptcy Court entered its order confirming the Plan (the "**Confirmation Order**"); and

WHEREAS, the Plan provides, among other things, as of the effective date of the Plan (the "**Effective Date**"), for (a) the creation of this Creditor Trust and the creation of the beneficial interests in the Creditor Trust for the benefit of the Beneficiaries, (b) the transfer by the Beneficiaries and Other Distributees to the Creditor Trust of the Creditor Trust Assets, (c) the administration of the Creditor Trust Assets and the distribution of the proceeds therefrom to the Beneficiaries and Other Distributees, in accordance with this Creditor Trust Agreement; and

WHEREAS, pursuant to Treasury Regulation section 301.7701-4(a), the Creditor Trust is created for the sole purpose of taking title to, protecting, conserving and distributing any recoveries from the State Law Avoidance Claims with no objective to continue or engage in the conduct of a trade or business;

WHEREAS, the Creditor Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes, pursuant to sections 671-677 of the IRC, with the Beneficiaries and Other Distributees to be treated as the grantors of the Creditor Trust and deemed to be the owners of the Creditor Trust Assets (subject to the rights of creditors of the Creditor Trust);

NOW, THEREFORE, in consideration of the premises, the agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, it is hereby agreed as follows:

Substantially Final Form

# ARTICLE I
## DEFINITIONS

For all purposes of this Creditor Trust Agreement, capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in Annex A attached hereto. Unless otherwise specified, Article, Section and Paragraph references herein are to Articles, Sections and Paragraphs of this Creditor Trust Agreement.

# ARTICLE II
## ESTABLISHMENT OF THE CREDITOR TRUST

2.1     <u>Establishment of Creditor Trust and Appointment of Creditor Trustee</u>.

(a)     A trust is hereby established which shall be known as the "LB Creditor Trust" on behalf of the Beneficiaries.

(b)     The Creditor Trustee is hereby appointed as trustee of the Creditor Trust effective as of the Effective Date and agrees to accept and hold the assets of the Creditor Trust in trust for the Beneficiaries subject to the terms of this Creditor Trust Agreement. The Creditor Trustee and each successor trustee serving from time to time hereunder shall have all the rights, powers and duties set forth herein.

(c)     Subject to the terms of this Creditor Trust Agreement, any action by the Creditor Trustee and/or the Trust Board which affects the interests of more than one Beneficiary shall be binding and conclusive on all Beneficiaries and Other Distributees, even if such Beneficiaries and Other Distributees have different or conflicting interests.

(d)     The Creditor Trustee and the Directors may serve without bond.

2.2     <u>Transfer of Creditor Trust Assets</u>.  As of the Effective Date and pursuant to the Confirmation Order, the Beneficiaries and Other Distributees have transferred, assigned, and delivered to the Creditor Trust, without recourse, all of their respective rights, title, and interests in and to the State Law Avoidance Claims (the "**Assigned Actions**") free and clear of any and all liens, claims, encumbrances or interests of any kind in such property.

2.3     <u>Funding of the Creditor Trust</u>.

(a)     On the Effective Date, the Creditor Representative may provide the Initial Funding Amount to the Creditor Trust. From time to time thereafter, the Creditor Representative may provide additional funding in accordance with the Creditor Representative Supplement to fund the fees, expenses, and costs of the Creditor Trust. To the extent that a portion of any funding provided to the Creditor Trust by the Creditor Representative is not needed or reasonably likely to be used to defray the costs and expenses of the Creditor Trust, such funds shall be returned to Creditor Representative. Neither the Debtors nor the Reorganized Debtors shall have any obligation with respect to, or liability for, any decision by the Creditor Representative with respect to funding of the Creditor Trust.

(b)     Any failure or inability of the Creditor Trust to obtain funding will not affect the enforceability of the Creditor Trust.

2.4     <u>Title to the Creditor Trust Assets</u>.  The transfer of the Creditor Trust Assets to the Creditor Trust is being made by the Beneficiaries and Other Distributees for the sole benefit of the Beneficiaries and Other Distributees. Upon the transfer of the initial Creditor Trust Assets to the Creditor Trust, the Creditor Trust succeeded to all of Beneficiaries' and Other Distributees' rights, title and interests in the Creditor Trust Assets and no other entity has any interest, legal, beneficial, or otherwise, in the Creditor Trust or the Creditor Trust Assets as of their assignment and transfer to the Creditor Trust.

2.5     <u>Nature and Purpose of the Creditor Trust.</u>

(a)     <u>Purpose</u>.  The Creditor Trust is created for the sole purpose of taking title to, protecting, conserving and distributing any recoveries from the State Law Avoidance Claims, in accordance with Treasury Regulation section 301.7701-4(a), with no objective to continue or engage in the conduct of a trade or business.  The Creditor Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes, pursuant to sections 671-677 of the IRC, with the Beneficiaries and Other Distributees to be treated as the grantors of the Creditor Trust and deemed to be the owners of the Creditor Trust Assets (subject to the rights of creditors of the Creditor Trust).

(b)     <u>Relationship</u>.  This Creditor Trust Agreement is intended to create a trust and a trust relationship and to be governed and construed in all respects as a trust. The Creditor Trust is not intended to be, and shall not be deemed to be, or be treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company or association, nor shall the Creditor Trustee, the Trust Board (or any of its Directors), the Reorganized Debtors, Other Distributees or the Beneficiaries, or any of them, for any purpose be, or be deemed to be, or be treated in any way whatsoever to be, liable or responsible hereunder as partners or joint venturers. The relationship of the Beneficiaries to the Creditor Trustee and the Trust Board shall be solely that of beneficiaries of a trust and shall not be deemed a principal and agency relationship, and their rights shall be limited to those conferred upon them by this Creditor Trust Agreement. Notwithstanding anything to the contrary contained herein, while the Other Distributees have certain contract rights to payments from certain distributions by the Creditor Trust after the Excess Recovery Date as provided in the Distribution Schedule, the Other Distributees are not beneficiaries of the Creditor Trust and are not owed a fiduciary duty or any other duty by the Creditor Trustee, the Trust Board, or their respective professionals or agents.

2.6     <u>Appointment as Representative</u>.  The Creditor Trustee is the duly appointed representative of the Beneficiaries and Other Distributees with respect to the Creditor Trust Assets, and, as such, the Creditor Trustee succeeds to all of the rights and powers of the Beneficiaries and Other Distributees with respect to prosecution of the Assigned Actions. To the extent that any Assigned Actions cannot be transferred to the Creditor Trust because of a restriction on transferability under applicable law, such Creditor Trust Assets shall be deemed to have been retained by the Beneficiary and Other Distributes, and the Creditor Trustee shall be deemed to have been designated as a representative of such Beneficiary and Other Distributee to enforce and pursue such Assigned Actions on behalf of such Beneficiary and Other Distributee.

Substantially Final Form

Notwithstanding the foregoing, all net Proceeds of such Creditor Trust Assets shall be paid over to the Creditor Trust and shall be distributed in accordance with the Distribution Schedule.

2.7     <u>Relationship to the Plan, Lender Litigation Settlement Agreement and Confirmation Order</u>.  As among the Creditor Trust, the Creditor Trustee, the Trust Board, the Beneficiaries, the Debtors and the Reorganized Debtors, if any provisions of the Creditor Trust Agreement are found to be inconsistent with the provisions of the Plan, Lender Litigation Settlement Agreement and the Lender Litigation Settlement Approval Order or the Confirmation Order, each such document shall have controlling effect in the following rank order: (i) the Confirmation Order; (ii) this Creditor Trust Agreement; (iii) the Lender Litigation Settlement Agreement and the Lender Litigation Settlement Approval Order and (iv) the Plan.  As among any of the Creditor Trust, the Creditor Trustee, the Trust Board, the Beneficiaries, the Debtors or the Reorganized Debtors on the one hand, and any of the Other Distributees (other than the Reorganized Debtors) on the other hand, if any provisions of the Creditor Trust Agreement are found to be inconsistent with the provisions of the Plan, Lender Litigation Settlement Agreement and the Lender Litigation Settlement Approval Order or the Confirmation Order, each such document shall have controlling effect in the following rank order: (i) the Confirmation Order; (ii) the Lender Litigation Settlement Agreement and the Lender Litigation Settlement Approval Order; (iii) this Creditor Trust Agreement and (iv) the Plan.

2.8     <u>No Effect on Certain Parties.</u> For the avoidance of doubt, and notwithstanding anything to the contrary contained in this Creditor Trust Agreement (including, without limitation, this Section 2.8), the parties to this Creditor Trust Agreement hereby agree and acknowledge that, other than in each of their capacities as an Other Distributee, nothing in this Creditor Trust Agreement is intended to, does, or shall be construed to affect, prejudice, harm or impact in any way, the rights, remedies, or treatment (including any releases, exculpation, indemnification or otherwise), of any Secured Lender, Secured Lender Releasee, Settling Defendant, or Settling Defendant Releasee (collectively, the "<u>Unaffected Parties</u>") under the Plan, the Lender Litigation Settlement Agreement or the Lender Litigation Settlement Approval Order.  The parties to this Creditor Trust Agreement further agree that the preceding sentence and a statement that this Section 2.8 may not be amended shall be included in the Confirmation Order, and that notwithstanding any ability of such parties to amend this Litigation Trust Agreement, such parties shall not be permitted to amend this Section 2.8.

ARTICLE III
**CREDITOR TRUST INTERESTS**

3.1     <u>Creditor Trust Interests</u>.  Beneficial interests in the Creditor Trust ("**Creditor Trust Interests**") will be represented by book entries on the books and records of the Creditor Trust.

3.2     <u>Allocation of Creditor Trust Interests</u>.   The allocation and distribution of the Creditor Trust Interests shall be accomplished as set forth in the Plan, including without limitation, Sections 4.7, 4.9, 4.10, 4.11 and 5.8 and Article VII of the Plan.

3.3     <u>Interests Beneficial Only</u>.  The ownership of a Creditor Trust Interest shall not entitle any Beneficiary to any title in or to the assets of the Creditor Trust as such (which title

Substantially Final Form

shall be vested in the Creditor Trustee ) or to any right to call for a partition or division of the assets of the Creditor Trust or to require an accounting.

3.4     Identification of Holders of Creditor Trust Interests.  The Creditor Trust will not issue any certificate or certificates to evidence any Creditor Trust Interests.  The record holders of Creditor Trust Interests shall be recorded and set forth in a register maintained by the Creditor Trustee expressly for such purpose (the "**Register**"); provided that the Creditor Trust shall have no obligation to record the identities of Other Distributees except for the list of agents for the Other Distributees set forth on Exhibit D (as updated from time to time). Such Register shall be updated periodically (as determined by the Creditor Trustee) as Disputed General Unsecured Claims become Allowed General Unsecured Claims. All references in this Creditor Trust Agreement to holders of Creditor Trust Interests shall be read to mean holders of record as set forth in the official Register maintained by the Creditor Trustee and shall not mean any beneficial owner not recorded on such official Register.

3.5     Non-Transferability of Creditor Trust Interests.  No transfer, assignment, pledge or hypothecation of any Creditor Trust Interests, either in whole or in part, shall be permitted except with respect to a transfer by operation of law, will or under the laws of descent and distribution. Any transfer permitted under this Section 3.5 will not be effective until and unless the Creditor Trustee receives written notice of such transfer.

3.6     Exemption from Registration.  The parties hereto intend that the rights of the Beneficiaries and Other Distributees arising under this Trust shall not be "securities" under applicable laws, but none of the parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws.

3.7     Change of Address.  A Beneficiary may, after the Effective Date, select an alternative distribution address by providing notice to the Creditor Trustee identifying such alternative distribution address.  Such notification shall be effective only upon receipt by the Creditor Trustee.  Absent receipt of such notice by the Creditor Trustee, the Creditor Trustee shall not recognize any such change of distribution address.

3.8     Tax Identification Numbers.  The Creditor Trustee may require any Beneficiary or Other Distributee to furnish to the Creditor Trustee its social security number or employer or taxpayer identification number as assigned by the IRS and complete any related documentation (including but not limited to a Form W-8 or Form W-9) and the Creditor Trustee may condition any distribution to any Beneficiary or payment to any Other Distributee upon the receipt of such information and the receipt of such other documents as the Creditor Trustee reasonably requests.

ARTICLE IV
**RIGHTS, POWERS AND DUTIES OF CREDITOR TRUSTEE**

4.1     Role of the Creditor Trustee.  In furtherance of and consistent with the purpose of the Creditor Trust, subject to the terms and conditions contained herein (including in all cases management and direction by the Trust Board, the Creditor Trustee shall (i) hold the Creditor Trust Assets for the benefit of Beneficiaries, and (ii) make distributions of Proceeds and other Creditor Trust Assets in accordance with the Distribution Schedule. Subject to the provisions of

the Creditor Trust Agreement, the Creditor Trustee in consultation with, and subject to the management and direction of, the Trust Board shall be responsible for all decisions and duties with respect to the Creditor Trust and the Creditor Trust Assets. In all circumstances, the Creditor Trustee shall act in the best interests of all Beneficiaries and in furtherance of the purpose of the Creditor Trust, and shall use commercially reasonable efforts to dispose of the Creditor Trust Assets and to make timely distributions and not unduly prolong the duration of the Creditor Trust.

4.2    Prosecution of Assigned Actions.    Subject to the provisions of this Creditor Trust Agreement and direction by the Trust Board, the Creditor Trustee shall hold, pursue, prosecute, release, settle or abandon, as the case may be, any and all Assigned Actions (including any counterclaims to the extent such counterclaims are setoff against the proceeds of any such causes of action). To the extent that any action has been taken to prosecute or otherwise resolve any Assigned Actions prior to the Effective Date by any Beneficiary or Other Distributee, the Creditor Trustee shall be substituted for such Beneficiary or Other Distributee in connection therewith and the caption with respect to such pending litigation shall be changed to the following: "Edward S. Weisfelner, as Trustee for the LB Creditor Trust, et. al v.  [Defendant]"

4.3    Authority to Settle Assigned Actions.

(a)    Subject to direction by the Trust Board, the Creditor Trustee shall be empowered and authorized to settle, dispose of or abandon any Assigned Actions (including any counterclaims to the extent such counterclaims are setoff against the proceeds of any such Assigned Actions).

(b)    Any determinations by the Creditor Trustee, under the direction of the Trust Board, with regard to the amount or timing of settlement or other disposition of any Assigned Action shall be conclusive and binding on all Beneficiaries and all other parties in interest.

4.4    Retention of Litigation Counsel and Other Professionals.    The Creditor Trustee may, subject to the direction of the Trust Board, (a) retain such independent experts and advisors (including, but not limited to, counsel, tax advisors, consultants, or other professionals) as the Creditor Trustee deems necessary to aid it in the performance of its duties and responsibilities hereunder and to perform such other functions as may be appropriate in furtherance of the intent and purpose of this Creditor Trust Agreement, and (b) commit the Creditor Trust to provide such professional persons or entities reasonable compensation and reimbursement from the Creditor Trust Assets for services rendered and expenses incurred. The Creditor Trust may select any of the foregoing professionals in its sole discretion, and prior employment in any capacity in the Debtors' bankruptcy cases on behalf of the Debtors, their estates, the Creditors' Committee, any creditors or concurrent representation of the Creditor Trust or the Creditor Representative shall not preclude the Creditor Trustee from retaining such professionals on behalf of the Creditor Trust, *provided* that the Creditor Trustee may not employ any law firm or professional that has represented the Debtors in connection with the Chapter 11 Cases without the express written consent of the Reorganized Debtors; provided, further that nothing herein shall be construed as providing a release of any ethical obligation owed by such law firms or professionals to the Reorganized Debtors. The Creditor Trustee, subject to the

Substantially Final Form

direction of the Trust Board, will make all reasonable and customary arrangements for payment or reimbursement of such compensation and expenses.

4.5    <u>Creditor Trust Expenses</u>.  The Creditor Trustee may incur any reasonable and necessary expenses in liquidating the Creditor Trust Assets. Other than the Initial Funding Amount and such other funds provided by the Creditor Representative from time to time all fees, expenses, and costs of the Creditor Trust shall be paid by, and solely be the obligation of, the Creditor Trust.  For avoidance of doubt, in no event shall the Reorganized Debtors be required to provide any funding to the Creditor Trust other than the initial funding provided to the Creditor Representative.

(a)    The Creditor Trustee may maintain a litigation expense fund (the "**Creditor Expense Fund**") and expend the assets of the Creditor Expense Fund (i) as are reasonably necessary to meet contingent liabilities and to maintain the value of the assets of the Creditor Trust during liquidation, (ii) to pay reasonable administrative expenses (including but not limited to, the costs and expenses of the Creditor Trustee (including reasonable fees, costs, and expenses of professionals) and the Directors (including reasonable fees, costs, and expenses of legal counsel, subject to the approval of the Trust Board), any taxes imposed on the Creditor Trust or in respect of the Creditor Trust Assets or fees and expenses in connection with, arising out of or related to the Creditor Trust Assets, and (iii) to satisfy other liabilities incurred or assumed by the Creditor Trust (or to which the Creditor Trust Assets are otherwise subject) in accordance with this Creditor Trust Agreement.

(b)    The Creditor Trustee may retain from the Proceeds and add to the Creditor Expense Fund, at any time and from time to time, such amounts as the Creditor Trustee deems reasonable and appropriate to ensure that the Creditor Expense Fund will be adequate to meet the expenses and liabilities described in this Section 4.5(a) above.

(c)    Notwithstanding any other provision of this Creditor Trust Agreement to the contrary, the Creditor Trustee shall not be required to take any action or enter into or maintain any claim, demand, action or proceeding relating to the Creditor Trust unless it shall have sufficient funds in the Creditor Expense Fund for that purpose.

(d)    The Creditor Trustee may retain from the Proceeds and disburse to the Creditor Representative, at any time and from time to time, such amounts as may be necessary to fulfill its indemnification obligations to the Creditors Representative.

4.6    <u>Distributions</u>.

(a)    In the reasonable discretion of the Creditor Trustee, subject to the direction of the Trust Board, the Creditor Trustee shall, not less than annually, distribute all Cash on hand (including, but not limited to, the Creditor Trust's net income and net proceeds from the sale of assets, any Cash received on account of or representing Proceeds, and treating as Cash for purposes of this Section 4.6 any permitted investments under Section 4.10 below), except such amounts (i) as are reserved for distribution to holders of a Disputed General Unsecured Claim (as of the time of such distribution but only until such General Unsecured Claim is resolved), which amounts shall be held in the Disputed Claims Reserve, (ii) as are reasonably necessary for

Substantially Final Form

the Creditor Expense Fund or otherwise to meet contingent liabilities and to maintain the value of the Creditor Trust Assets and (iii) as may otherwise be required by court order or otherwise under law. The Creditor Trustee shall make all such distributions in accordance with the Distribution Schedule.  Any Creditor Trust Assets which are undistributable in accordance with this Section 4.6(a) as of the termination of the Creditor Trust hereof shall be distributed in accordance with the Distribution Schedule.

(b)    The Creditor Trust may withhold from amounts distributable to any Person any and all amounts, determined in the Creditor Trustee's reasonable sole discretion, required by any law, regulation, rule, ruling, directive, or other governmental requirement (including, without limitation, tax withholding relating to wage claims).

(c)    The Creditor Trustee may retain a distribution agent for the effective administration and distribution of amounts payable to Beneficiaries or Other Distributees and all costs and expenses of such distribution agent shall be paid from Creditor Expense Fund.

(d)    If any distribution to any Beneficiary is returned as undeliverable, and after reasonable efforts the Creditor Trustee has not been able to determine the current address of the Beneficiary, such undeliverable or unclaimed distribution shall be deemed unclaimed property 120 days after the date of such distribution and shall be reallocated to the remaining Beneficiaries and shall be distributed in accordance with the Distribution Schedule.  Such undeliverable or unclaimed distributions shall not be subject to (i) any claims by such Beneficiary or (ii) the unclaimed property or escheat laws of any state or governmental unit.

4.7    <u>Reserve Accounts for Disputed Claims</u>.  The Creditor Trustee shall establish the Disputed Claims Reserve, which shall include assets held separately from other assets of the Creditor Trust, subject to an allocable share of all expenses and obligations of the Creditor Trust, on account of Disputed General Unsecured Claims. The Creditor Trustee shall remove funds from the Disputed Claims Reserve as the Disputed Claims are resolved, which funds shall be distributed as provided in Section 4.6(a).  Neither the Debtors nor the Reorganized Debtors shall have any obligation with respect to, or liability for, any deficiency in or underfunding of the Disputed Claims Reserve.

4.8    <u>Management of Creditor Trust Assets.</u>

(a)    Except as otherwise provided in this Creditor Trust Agreement and subject to Treasury Regulations governing grantor trusts, but without prior or further authorization, the Creditor Trustee may, subject to the direction of the Trust Board control and exercise authority over the Creditor Trust Assets, over the acquisition, management and disposition thereof and over the management and conduct of the Creditor Trust, in each case, to the extent necessary to enable the Creditor Trustee to fulfill the intents and purposes of this Creditor Trust Agreement. No person dealing with the Creditor Trust will be obligated to inquire into the authority of the Creditor Trustee in connection with the acquisition, management or disposition of the Creditor Trust Assets.

(b)    In connection with the management and use of the Creditor Trust Assets and except as otherwise expressly limited in this Creditor Trust Agreement, the Creditor Trustee

Substantially Final Form

will have, subject to the direction of the Trust Advisory Broad, in addition to any powers conferred upon the Creditor Trustee by any other provision of this Creditor Trust Agreement, the power to take any and all actions as, in the Creditor Trustee's discretion, are necessary or advisable to effectuate the primary purposes of the Creditor Trust, including, without limitation, the power and authority (i) to distribute the Creditor Trust Assets to Beneficiaries in accordance with the terms of this Creditor Trust Agreement, (ii) to pay all expenses of the Creditor Trust, (iii) to sell, convey, transfer, assign, liquidate or abandon the Creditor Trust Assets, or any part thereof or any interest therein, upon such terms and for such consideration as may be commercially reasonable, (iv) to endorse the payment of notes or other obligations of any Person or to make contracts with respect thereto, and (v) to borrow such sums of money, at any time and from time to time, for such periods of time, upon such terms and conditions, from such Persons, for such purposes as may be commercially reasonable. The Creditor Trustee will not at any time, on behalf of the Creditor Trust or the Beneficiaries, enter into or engage in any trade or business, and no part of the Creditor Trust Assets will be used or disposed of by the Creditor Trustee in furtherance of any trade or business.

(c)      All decisions and actions by the Creditor Trustee under the authority of this Creditor Trust Agreement will be binding upon all of the Beneficiaries, the Other Distributees and the Creditor Trust.

4.9      <u>Investment of Cash</u>.  The Creditor Trustee, subject to the direction of the Trust Board, may invest any Cash (including any earnings thereon or proceeds therefrom) in United States Treasury bills and notes, institutional money market funds, commercial paper and time deposits and certificates of deposit with commercial banks, in each case, with a maturity of twelve months or less; *provided, further, however*, that sections 11-2.3, 11-2.3-A and 11-2.4 of the Estates, Powers and Trusts Law of New York shall be inapplicable to the Creditor Trust herein.

4.10      <u>Additional Powers of the Creditor Trustee</u>.  In addition to any and all of the powers enumerated above, and except as otherwise provided in this Creditor Trust Agreement and subject to the Treasury Regulations governing liquidating trusts, the Creditor Trustee, subject to the direction of the Trust Board, shall be empowered to:

(a)      hold legal title to any and all rights of the holders of the Creditor Trust Interests in or arising from the Creditor Trust Assets, including, but not limited to, the right to collect any and all money and other property belonging to the Creditor Trust;

(b)      protect and enforce the rights of the Creditor Trust to the Creditor Trust Assets by any method deemed appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law and general principles of equity;

(c)      determine and satisfy any and all liabilities created, incurred or assumed by the Creditor Trust;

(d)      assert or waive any privilege or defense on behalf of the Creditor Trust;

(e)      make all payments relating to the Creditor Trust Assets;

Substantially Final Form

(f)    obtain insurance coverage with respect to the potential liabilities and obligations of the Creditor Trust, the Creditor Trustee and the Directors under this Creditor Trust Agreement (in the form of a directors and officers policy, an errors and omissions policy or otherwise);

(g)    file, if necessary, any and all tax and information returns with respect to the Creditor Trust and pay taxes properly payable by the Creditor Trust, if any;

(h)    request any appropriate tax determination with respect to the Creditor Trust;

(i)    retain and reasonably compensate for services rendered and expenses incurred an accounting firm or financial consulting firm to perform such reviews and/or audits of the financial books and records of the Creditor Trust as may be appropriate in the Creditor Trustee's discretion and to prepare and file any tax returns or informational returns for the Creditor Trust as may be required;

(j)    take or refrain from taking any and all actions the Creditor Trustee reasonably deems necessary for the continuation, protection, and maximization of the Creditor Trust Assets consistent with the purposes hereof take all steps and execute all instruments and documents necessary to effectuate the Creditor Trust;

(k)    take all actions necessary to comply with this Creditor Trust Agreement and the obligations thereunder and hereunder; and

(l)    exercise such other powers as may be vested in the Creditor Trustee pursuant to this Creditor Trust Agreement, or as deemed by the Trust Board to be necessary and proper to carry out the obligations of the Creditor Trust.

4.11    Limitations on Power and Authority of the Creditor Trustee.  Notwithstanding anything in this Trust Agreement to the contrary, the Creditor Trustee will not have the authority to do any of the following:

(a)    take any action in contravention of this Creditor Trust Agreement;

(b)    take any action which would make it impossible to carry on the activities of the Creditor Trust;

(c)    possess property of the Creditor Trust or assign the Creditor Trust's rights in specific property for other than Creditor Trust purposes;

(d)    engage in any trade or business on behalf of or with respect to the Creditor Trust;

(e)    permit the Creditor Trust to receive or retain cash or cash equivalents in excess of a reasonable amount necessary to meet claims and contingent liabilities (including without limitation expected expenses) or to maintain the value of its assets during liquidation;

10

(f)      receive transfers of any listed stocks or securities, or any readily-marketable assets or any operating assets of a going business; or

(g)      take any action that would jeopardize treatment of the Creditor Trust as a grantor trust for federal income tax purposes under Treasury Regulation section 301.7701-4(a), or any successor provision thereof, except such prohibition shall not apply with respect to the Disputed Claims Reserve.

4.12    Books and Records.    The Creditor Trustee shall maintain in respect of the Creditor Trust and the holders of Creditor Trust Interests books and records relating to the Creditor Trust Assets and income of the Creditor Trust and the payment of, expenses of, and liabilities of claims against or assumed by, the Creditor Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof. Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements of the Creditor Trust. Nothing in this Creditor Trust Agreement requires the Creditor Trustee to file any accounting or seek approval of any court with respect to the administration of the Creditor Trust, or as a condition for managing any payment or distribution out of the Creditor Trust Assets.

4.13    Reports

(a)      Securities Reports.    If the Creditor Trustee determines, with the advice of counsel, that the Creditor Trustee is required to comply with the registration and reporting requirements of the Securities Exchange Act of 1934, as amended, or the Investment Company Act of 1940, as amended, then the Creditor Trustee shall take commercially reasonable efforts to comply with such reporting requirements and file periodic reports with the Securities and Exchange Commission.

(b)      Financial and Status Reports.    Within 90 days after the calendar year-end following the Effective Date and for each calendar year end thereafter, and as soon as practicable upon termination of the Creditor Trust, the Creditor Trustee shall make available upon request to the agents for Other Distributees and each Beneficiary appearing on his/her records as of the end of such period or such date of termination a written report including: (i) financial statements of the Creditor Trust for such period, and, if the end of a calendar year, a report (which may be prepared by an independent certified public accountant employed by the Creditor Trustee ) reflecting the result of such agreed upon procedures relating to the financial accounting administration of the Creditor Trust as proposed by the Creditor Trustee; (ii) a description of any action taken by the Creditor Trust which materially affects the Creditor Trust and of which notice has not previously been given to the holders of Creditor Trust Interests; and (iii) a description of the progress of liquidating Creditor Trust Assets and making distributions to Beneficiaries and any other material information relating to the Creditor Trust Assets and the administration of the Creditor Trust. The Creditor Trustee may post any such report on a web site maintained by the Creditor Trustee in lieu of actual notice to holders of Creditor Trust Interests (unless otherwise required by law).   The Creditor Trustee may require the recipient of such information to agree to keep such information confidential pursuant to reasonable confidentiality provisions.   Additionally, the Creditor Trustee shall provide the Other Distributees notice when the holders of Allowed General Unsecured Claims and Allowed 2015 Notes Claims have

11

Substantially Final Form

received aggregate distributions under the Plan, the Lender Litigation Settlement, the Creditor Trust, and this Creditor Trust sufficient to pay such holder 85% of the Allowed Base Claim Amounts in Cash and Class A Shares.  Additional notices shall be provided upon such distributions achieving 90% and 95% of the Allowed Base Claim Amounts and upon the occurrence of the Excess Recovery Trigger Date.

(c)      Annual Plan and Budget.  If instructed by the Trust Board, the Creditor Trustee shall prepare and submit to the Trust Board for approval an annual plan and budget in such detail as is reasonably requested.

4.14    Communications with Trust Board.  The Creditor Trustee may require that the Trust Board maintain as confidential any confidential or proprietary information concerning the prosecution of the Assigned Actions (including counterclaims, if any).

4.15    Compliance with Laws.  Any and all distributions of Creditor Trust Assets and proceeds of borrowings, if any, shall be in compliance with applicable laws, including, but not limited to, applicable federal and state securities laws.

4.16    Compliance with Lender Litigation Settlement Approval Order.  The Creditor Trustee and the Creditor Trust shall comply with the obligations of the Creditor Trust under the Lender Litigation Settlement Approval Order.

ARTICLE V
**THE CREDITOR TRUSTEE**

5.1      Independent Trustee.  The Creditor Trustee may not be a Beneficiary or Other Distributee or related to or subordinate (within the meaning of section 672 (c) of the Tax Code) any Beneficiary or Other Distributee.

5.2      Trustee's Compensation and Reimbursement.  The Creditor Trustee shall receive compensation from the Creditor Trust as follows:

(a)      Compensation.  The Creditor Trustee shall receive the compensation set, from time to time, by the Trust Board.  The Trust Board may reasonably modify the Creditor Trustee's compensation and other terms regarding the retention of the Creditor Trustee.

(b)      Expenses.  In addition, the Creditor Trust will reimburse the Creditor Trustee (out of the Proceeds) for all reasonable, out-of-pocket expenses incurred by the Creditor Trustee in connection with the performance of its duties hereunder.

(c)      Payment.  The fees and expenses payable to the Creditor Trustee shall be paid to the Creditor Trustee upon approval of such fees by the Trust Board without necessity for review or approval by any other Person.

5.3      Resignation.  The Creditor Trustee may resign by giving not less than ninety (90) days' prior written notice thereof to the Trust Board. Such resignation shall become effective on the day specified in such notice or, if later, the appointment of a successor by a majority of the Directors and the acceptance by such successor of such appointment. If a successor Creditor

Trustee is not appointed or does not accept its appointment within ninety (90) days following delivery of notice of resignation, the Creditor Trustee may petition any court of competent jurisdiction for the appointment of a successor Creditor Trustee. Notwithstanding the foregoing, upon the occurrence of the Excess Recovery Trigger Date, the Creditor Trustee shall be deemed to have resigned and such resignation shall become effective upon the earlier of thirty days after the Excess Recovery Trigger Date or upon the appointment of a successor Creditor Trustee.

    5.4    <u>Removal</u>.

    (a)    The Trust Board may remove the Creditor Trustee without cause.

    (b)    To the extent there is any dispute regarding the removal of a Creditor Trustee (including any dispute relating to any compensation or expense reimbursement due the Creditor Trustee under this Creditor Trust Agreement), the federal district courts or higher federal courts in the Southern District of New York (the "**Court**") shall retain jurisdiction to consider and adjudicate any such dispute. Notwithstanding removal under Section 5.4(a), the Creditor Trustee will continue to serve as a trustee after his removal until the time when appointment of a successor Creditor Trustee will become effective in accordance with Section 5.5 of this Creditor Trust Agreement.

    5.5    <u>Appointment of Successor Creditor Trustee.</u>  In the event of the death (in the case of a Creditor Trustee that is a natural person), dissolution (in the case of a Creditor Trustee that is not a natural person), resignation, incompetency, or removal of the Creditor Trustee, the Trust Board shall designate a successor Creditor Trustee.  Such appointment shall specify the date on which such appointment shall be effective. Every successor Creditor Trustee appointed hereunder shall execute, acknowledge, and deliver to the Creditor Trust and retiring Creditor Trustee an instrument accepting the appointment under this Creditor Trust Agreement and agreeing to be bound thereto, and thereupon the successor Creditor Trustee, without any further act, deed, or conveyance, shall become vested with all rights, powers, trusts, and duties of the retiring Creditor Trustee; *provided, however*, that a removed or resigning Creditor Trustee shall, nevertheless, when requested in writing by the successor Creditor Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Creditor Trustee under the Creditor Trust all the estates, properties, rights, powers, and trusts of such predecessor Creditor Trustee.

    5.6    <u>Effect of Resignation or Removal.</u>  The death, resignation, incompetency or removal of the Creditor Trustee shall not operate to terminate the Creditor Trust created by this Creditor Trust Agreement or to revoke any existing agency created pursuant to the terms of this Creditor Trust Agreement or invalidate any action theretofore taken by the Creditor Trustee or any prior Creditor Trustee. In the event of the resignation or removal of the Creditor Trustee, such Creditor Trustee will promptly (a) execute and deliver such documents, instruments and other writings as may be reasonably requested by the successor Creditor Trustee to effect the termination of such Creditor Trustee's capacity under this Creditor Trust Agreement, (b) deliver to the successor Creditor Trustee all documents, instruments, records and other writings related to the Creditor Trust as may be in the possession of such Creditor Trustee (provided that such Creditor Trustee may retain one copy of such documents for archival purposes) and (c)

otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Creditor Trustee.

5.7     Confidentiality.  The Creditor Trustee shall, during the period that the Creditor Trustee serves as Creditor Trustee under this Creditor Trust Agreement and following the termination of this Creditor Trust Agreement or following its removal or resignation hereunder, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any entity to which any of the Creditor Trust Assets relates or of which the Creditor Trustee has become aware in the Creditor Trustee's capacity as Creditor Trustee, except as otherwise required by law.

# ARTICLE VI
# TRUST BOARD

6.1     The Trust Board.  On the Effective Date, a governing board of five (5) persons or entities shall commence serving as directors of the Creditor Trust (the "**Trust Board**"). The Trust Board shall initially consist of five (5) directors (each, a "**Director**") selected by the Creditors' Committee and listed on Exhibit B hereto.  The Trust Board may from time to time set such procedures and rules for the Creditor Trust and the Trust Board consistent with this Creditor Trust Agreement as it determines are appropriate.

6.2     Authority and Responsibilities.  The Trust Board shall have the authority and responsibility to oversee, manage, and direct the activities of the Creditor Trustee and performance of the Creditor Trustee and shall have the authority to remove the Creditor Trustee in accordance with Section 5.4 hereof.  The Trust Board shall also (a) monitor and oversee the administration of the Creditor Trust and the Creditor Trustee's performance of its responsibilities under this Creditor Trust Agreement, and (b) perform such other tasks as set forth in this Creditor Trust Agreement. In all circumstances, except as explicitly provided herein, the Trust Board shall exercise its responsibilities under the Creditor Trust consistent with fiduciary standards. In all circumstances, the Trust Board shall act in the best interests of the Beneficiaries and in furtherance of the purpose of the Creditor Trust. The Creditor Trustee shall consult with and provide information to the Trust Board in accordance with and pursuant to the terms of this Creditor Trust Agreement to enable the Trust Board to meet its obligations hereunder.

6.3     Meetings of the Trust Board.  Meetings of the Trust Board are to be held not less than quarterly. Special meetings of the Trust Board may be held whenever and wherever called for by the Creditor Trustee or any one Director. Any action required or permitted to be taken by the Trust Board at a meeting may be taken without a meeting if the action is taken by unanimous written consent of the Trust Board as evidenced by one or more written consents describing the action taken, signed by all Directors and recorded in the minutes, if any, or other transcript, if any, of proceedings of the Trust Board. Unless the Trust Board decides otherwise (which decision shall rest in the reasonable discretion of the Trust Board), the Creditor Trustee and the Creditor Trustee's designated advisors may attend meetings of the Trust Board.

6.4     Manner of Acting.  Three Directors shall constitute a quorum for the transaction of business at any meeting of the Trust Board. The affirmative vote of a majority of the Directors present at a meeting shall be the act of the Trust Board except as otherwise required by law or as

Substantially Final Form

provided in this Creditor Trust Agreement. Any or all of the Directors may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone or similar communications equipment by means of which all persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition to the place) for the holding thereof. Any Director participating in a meeting by this means is deemed to be present in person at the meeting. Voting (including on negative notice) may, if approved by the Directors at a meeting, be conducted by electronic mail or individual communications by the Creditor Trustee and each Director.

6.5     <u>Tenure of the Members of the Trust Board</u>.  The authority of the Directors will be effective as of the Effective Date and will remain and continue in full force and effect until the Creditor Trust is terminated in accordance with Article IX hereof. The Directors will serve until death or resignation pursuant to Section 6.6 below, or removal pursuant to Section 6.7 below.

6.6     <u>Resignation</u>.  A Director may resign by giving not less than ninety (90) days' prior written notice thereof to the Creditor Trustee and the other Directors. Such resignation shall become effective on the later to occur of: (i) the day specified in such notice; and (ii) the appointment of a successor in accordance with Section 6.8 below.

6.7     <u>Removal</u>.  A majority of the Trust Board may remove any Director for Cause. Notwithstanding the foregoing, upon the occurrence of the Excess Recovery Trigger Date, all of the Directors shall (a) be deemed to have resigned, such resignation to become effective upon the earlier of (i) the appointment of successor Directors by the then holders of the majority in outstanding amount of the Deficiency Claims on account of Senior Secured Claims and Bridge Loan Claims or (ii) thirty days after the Excess Recovery Trigger Date and (b) act and cause the Creditor Trustee to act under the direction of the agents for the Senior Secured Claims and Bridge Loan Claims.

6.8     <u>Appointment of a Successor Trust Board Director</u>.

(a)     In the event of a vacancy on the Trust Board (whether by removal, death, or resignation), a new Director may be appointed to fill such position (i) if such position is filled by an individual who is not subject to appointment by a particular Beneficiary or agent of particular Beneficiaries (as specified in <u>Exhibit B</u>), then by the remaining Directors or (ii) if such position is subject to appointment by a particular Beneficiary or agent of particular Beneficiaries (as specified in <u>Exhibit B</u>), then by such Beneficiary or such agent.

(b)     Immediately upon the appointment of any successor Director, all rights, powers, duties, authority, and privileges of the predecessor Director hereunder will be vested in and undertaken by the successor Director without any further act; and the successor Director will not be liable personally for any act or omission of the predecessor Director.

(c)     Every successor Director appointed hereunder shall execute, acknowledge and deliver to the Creditor Trustee and other Directors an instrument accepting the appointment under this Creditor Trust Agreement and agreeing to be bound thereto, and thereupon the

Substantially Final Form

successor Director without any further act, deed, or conveyance, shall become vested with all rights, powers, trusts, and duties of the retiring Director.

(d)    The appointment of successor Directors after the occurrence of the Excess Recovery Trigger Date shall be governed by Section 6.7 above.  The appointment of a successor Director will be evidenced by the Creditor Trustee's filing with the Court of a notice of appointment, which notice will include the name, address, and telephone number of the successor Director.

6.9    <u>Compensation and Reimbursement of Expenses</u>.    Each Director shall be compensated for his or her time expended in Creditor Trust matters as provided on <u>Exhibit C</u>. The Creditor Trust will reimburse the Directors for all reasonable, out-of-pocket expenses incurred by the Directors in connection with the performance of each of their duties hereunder (including reasonable fees, costs, and expenses of legal counsel, subject to the approval of the Trust Board). All fees and expenses of the Directors shall be paid solely from Creditor Trust Assets.

ARTICLE VII
**LIABILITY AND INDEMNIFICATION**

7.1    <u>No Further Liability</u>.  Each of the Creditor Trustee and the Directors shall have no liability for any actions or omissions in accordance with this Creditor Trust Agreement unless arising out of their gross negligence or willful misconduct.  In performing its, his or her (as the case may be) duties under this Creditor Trust Agreement, the Creditor Trustee or the Director (as applicable) shall have no liability for any action taken by the Creditor Trustee and the Directors in accordance with the advice of counsel, accountants, appraisers and other professionals retained by the Directors or the Creditor Trust. Without limiting the generality of the foregoing, the Creditor Trustee and the Directors may rely without independent investigation on copies of orders of the Court reasonably believed by the Creditor Trustee or the Director (as applicable) to be genuine, and shall have no liability for actions taken in reliance thereon. None of the provisions of this Creditor Trust Agreement shall require the Creditor Trustee or the Directors to expend or risk their own funds or otherwise incur personal financial liability in the performance of any of their duties hereunder or in the exercise of any of their rights and powers. Each of the Creditor Trustee and the Directors may rely without inquiry upon writings delivered to it, him or her (as the case may be) under the Plan which the Creditor Trustee or the Director (as applicable) reasonably believes to be genuine and to have been given by a proper Person. Notwithstanding the foregoing, nothing in this Section 7.1 shall relieve the Creditor Trustee or the Directors from any liability for any actions or omissions arising out of their gross negligence or willful misconduct.  Any action taken or omitted to be taken in the case of the Creditor Trustee or the Trust Board with the express approval of the Court and, in the case of the Creditor Trustee, with the express approval of the Trust Board will conclusively be deemed not to constitute gross negligence or willful misconduct.

7.2    <u>Indemnification of the Creditor Trustee and Trust Board</u>.

(a)    To the fullest extent permitted by law, the Creditor Trust, to the extent of its assets legally available for that purpose, will indemnify and hold harmless the Creditor

16

Substantially Final Form

Trustee and the Trust Board and each of their respective directors, members, shareholders, partners, officers, agents, professionals or employees (collectively, the "**Indemnified Persons**") from and against any and all loss, cost, damage, expense (including, without limitation, fees and expenses of attorneys and other advisors and any court costs incurred by any Indemnified Person) or liability by reason of anything any Indemnified Person did, does or refrains from doing for the business or affairs of the Creditor Trust, except to the extent that it is finally judicially determined by a court of competent jurisdiction that the loss, cost, damage, expense or liability resulted from the Indemnified Person's gross negligence or willful misconduct.

(b)    Notwithstanding any provision herein to the contrary, the Indemnified Persons shall be entitled to obtain advances from the Creditor Trust to cover their reasonable expenses of defending themselves in any action brought against them as a result of the acts and omissions, actual or alleged, of an Indemnified Person in its capacity as such, *provided, however*, that the Indemnified Persons receiving such advances shall repay the amounts so advanced to the Creditor Trust immediately upon the entry of a final, non-appealable judgment or order finding that such Indemnified Persons were not entitled to any indemnity under the provisions of this Section 7.2.  The foregoing indemnity in respect of any Indemnified Person shall survive the termination of such Indemnified Person from the capacity for which they are indemnified. Termination or modification of the Trust Agreement shall not affect any indemnification rights or obligations then existing.

(c)    The Creditor Trust, with the approval of the Beneficiaries holding a majority of the Creditor Trust Interests, may indemnify any of the Indemnified Persons for any loss, cost, damage, expense or liability for which the Indemnified Persons would not be entitled to mandatory indemnification under this Section 7.2.

(d)    Any Indemnified Person may waive the benefits of indemnification under this Section 7.2, but only by an instrument in writing executed by such Indemnified Person.

(e)    The rights to indemnification under this Section 7.2 are not exclusive of other rights which any Indemnified Person may otherwise have at law or in equity, including without limitation common law rights to indemnification or contribution. Nothing in this Section 7.2 will affect the rights or obligations of any Person (or the limitations on those rights or obligations) under any other agreement or instrument to which that Person is a party.

7.3    Creditor Trust Liabilities.  All liabilities of the Creditor Trust, including without limitation indemnity obligations under Section 7.2 of this Creditor Trust Agreement, will be liabilities of the Creditor Trust as an entity, and will be paid or satisfied from Creditor Trust Assets. No liability of the Creditor Trust will be payable in whole or in part by any Beneficiary in the Beneficiary's capacity as a Beneficiary, by the Creditor Trustee in the Creditor Trustee's capacity as Creditor Trustee, by any Director in the Director's capacity as a Director or by any member, partner, shareholder, director, officer, professional, employees, agent, affiliate or advisor of any Beneficiary, any Director, the Creditor Trustee or their respective affiliates.

Substantially Final Form

7.4    Limitation of Liability.  Neither the Liquidating Trustee, the Directors nor their professionals will be liable for punitive, exemplary, consequential, special or other damages for a breach of this Trust Agreement under any circumstances.

7.5    Survival.  The provisions of this Article VII shall survive any termination of the Creditor Trust Agreement.

7.6    Burden of Proof.  In making a determination with respect to entitlement to exculpation or indemnification hereunder, the person, persons or entity making such determination shall presume that the Indemnified Person is entitled to exculpation and indemnification under this Creditor Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome that presumption.

## ARTICLE VIII
## TAX MATTERS

8.1    Treatment of Creditor Trust Assets Transfer.  Except with respect to the Disputed Claims Reserve, for all federal income tax purposes, all parties (including, without limitation, the Creditor Trustee and the holders of Allowed General Unsecured Claims) shall treat the transfer of the Creditor Trust Assets to the Creditor Trust including any amounts or other assets subsequently transferred to the Creditor Trust (but only at such time as actually transferred) for the benefit of the Beneficiaries as described in the Distribution Schedule as the transfer by such persons to the Creditor Trust of such Creditor Trust Assets in exchange for beneficial interests in the Creditor Trust.

8.2    Income Tax Status.  For United States federal income tax purposes (and for purposes of all state, local and other jurisdictions to the extent applicable), this Creditor Trust shall be treated as a grantor trust pursuant to IRC sections 671-677.  Except with respect to the Creditor Trust Assets allocable to the Disputed Claims Reserve, as set forth in Section 4.7 hereof, (i) the Beneficiaries will be treated as both the grantors and the deemed owners of the Creditor Trust, and (ii) any items of income, deduction, credit and loss of the Creditor Trust shall be allocated for federal income tax purposes to the Beneficiaries.

8.3    Tax Returns.  Except with respect to the Disputed Claims Reserve, in accordance with IRC section 6012 and Treasury Regulation section 1.671-4(a), the Creditor Trust shall file with the IRS annual tax returns on Form 1041.  In addition, the Creditor Trust shall file in a timely manner such other tax returns, including any state and local tax returns, as are required by applicable law and pay any taxes shown as due thereon.  Within a reasonable time following the end of the taxable year, the Creditor Trust shall send to each Beneficiary a separate statement setting forth the Beneficiary's share of items of income, gain, loss, deduction or credit and will instruct each such Beneficiary to report such items on his/her applicable income tax return.  The Creditor Trust may provide each Beneficiary with a copy of the Form 1041 for the Creditor Trust (without attaching any other Beneficiary's Schedule K-1 or other applicable information form) along with such Beneficiary's Schedule K-1 or other applicable information form in order to satisfy the foregoing requirement.

Substantially Final Form

8.4     Withholding of Taxes; Creditor Trust Taxes.  The Creditor Trust shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions made by the Creditor Trust to the Beneficiaries or other payments to the Other Distributees shall be subject to any such withholding and reporting requirements.  To the extent that the operation of the Creditor Trust or the liquidation of the Creditor Trust Assets creates a tax liability imposed on the Creditor Trust, including the Disputed Claims Reserve, the Creditor Trust shall timely pay such tax liability and any such payment shall be considered a cost and expense of the operation of the Creditor Trust.  All Beneficiaries or Other Distributees shall be required to provide any information necessary to comply with all  withholding and reporting requirements.

8.5     Expedited Determination of Taxes.  The Creditor Trust may request an expedited determination of taxes of the Creditor Trust, including the Disputed Claims Reserve, for all returns filed for, or on behalf of, the Creditor Trust for all taxable periods through the termination of the Creditor Trust.

8.6     Tax Treatment of Disputed Claims Reserve.  Notwithstanding any other provision of this Creditor Trust Agreement to the contrary, subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, with respect to any Creditor Trust Assets allocable to the Disputed Claims Reserve, the Creditor Trustee may in his discretion, for U.S. federal income tax purposes (and to the extent permitted by law, for state and local income tax purposes), (i) make an election to treat such assets  as held in a "disputed ownership fund" within the meaning of Treasury Regulation section 1.468-9B, or, alternatively, (ii) treat such assets as held in a discrete trust (which may consist of separate and independent shares) in accordance with the trust provisions of the Tax Code (section 641, *et seq*.).  All parties must report consistently with the income tax treatment determined by the Creditor Trustee in his discretion.

8.7     Excess Recovery Trigger Date.  For United States federal income tax purposes (and for purposes of all state, local and other jurisdictions to the extent applicable) and to the extent permitted by applicable income tax laws, in the event of an Excess Recovery Trigger Date (i) the Creditor Trustee serving immediately prior to the Excess Recovery Trigger Date shall be empowered to file all tax returns, make all reports and furnish all required information with respect to this Creditor Trust through the date of such termination and shall file a final return with respect to the tax period ending on such date; (ii) the Creditor Trustee serving immediately prior to the Excess Recovery Trigger Date shall have sole control over all tax matters with respect to this Creditor Trust for all tax periods or portions thereof ending on or before (or including) such date of such termination, and (iii) the provisions of Article VII shall be applicable to prior Creditor Trustee and Directors and shall provide indemnification for liability arising from the actions or omissions by the successor Creditor Trustee and Directors.  The Creditor Trustee appointed following the Excess Recovery Trigger Date shall file all returns, reports and statements in a manner consistent with the foregoing provisions of this Section 8.7.

ARTICLE IX
**TERMINATION OF CREDITOR TRUST**

The Creditor Trustee and the Creditor Trust shall be discharged or dissolved, as the case may be, at such time as (i) the Creditor Trustee determines that the pursuit of additional

Substantially Final Form

Assigned Actions is not likely to yield sufficient additional Proceeds to justify further pursuit of such claims and (ii) all distributions of Proceeds and other Creditor Trust Assets required to be made by the Creditor Trustee under this Creditor Trust Agreement have been made in accordance with the Distribution Schedule; provided that in no event shall the term of the Creditor Trust be extended beyond April 30, 2031. Upon dissolution of the Creditor Trust, any remaining Cash on hand and other Creditor Trust Assets shall be distributed in accordance with the Distribution Schedule.  Article VII shall survive any termination of the Creditor Trust Agreement.

## ARTICLE X
## AMENDMENT AND WAIVER

Any substantive provision of this Creditor Trust Agreement may be amended or waived in writing by the Creditor Trustee, upon notice and unanimous approval by the Trust Board. Notwithstanding the foregoing, any amendment or waiver which materially and adversely affects the Other Distributees, shall require the consent of the agents of the Other Distributees. Technical amendments to this Creditor Trust Agreement may be made, as necessary to clarify this Creditor Trust Agreement or enable the Creditor Trustee to effectuate the terms of this Creditor Trust Agreement, by the Creditor Trustee with approval by a majority of the Trust Board; *provided, however*, that all amendments of this Creditor Trust Agreement shall be consistent with the purpose and intention of the Creditor Trust to liquidate in an expeditious but orderly manner the Creditor Trust Assets in accordance with Treasury Regulation section 301.7701-4(a) and Section 2.5 hereof.  After the occurrence of the Excess Recovery Trigger Date, agent for the Settling Defendants may modify this Creditor Trust Agreement as it deems appropriate; *provided, however*, that any modification that may adversely affect distributions to the Beneficiaries shall require the consent of the Beneficiaries who hold a majority of the Creditor Trust Interests.

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

11.1  <u>Effectiveness</u>.  This Creditor Trust Agreement shall become effective on the Effective Date.

11.2  <u>Counterparts</u>.  This Creditor Trust Agreement may be executed in two or more counterparts, all of which shall be taken together to constitute one and the same instrument.

11.3  <u>Governing Law</u>.  This Creditor Trust Agreement shall be governed by, and construed and enforced in accordance with, the federal laws of the United States and, to the extent there is no applicable federal law, the domestic laws of the state of New York, without giving effect to the principles of conflicts of law thereof.  The courts within the Southern District of New York shall have exclusive jurisdiction with respect to any action relating to or arising from the Creditor Trust.

11.4  <u>Headings</u>.  Sections, subheadings and other headings used in this Creditor Trust Agreement are for convenience only and shall not affect the construction or interpretation of this Creditor Trust Agreement or any provision thereof.

Substantially Final Form

11.5    <u>Severability</u>.  If any provision of this Creditor Trust Agreement or the application thereof to any Person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Creditor Trust Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provisions of this Creditor Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

11.6    <u>Notices</u>.  All notices, requests or other communications, required or permitted to be made in accordance with this Creditor Trust Agreement including any change of address of any Beneficiary for the purposes of receiving distributions from the Creditor Trust shall be in writing and shall be delivered personally or by first class or express mail, return receipt requested or fax with confirmation of receipt or email with receipt acknowledgement.  Notices should be directed to:

    (a)    If to the Creditor Trust or the Creditor Trustee :

    as specified on <u>Exhibit A</u>

    If to the Trust Board:

    as specified on <u>Exhibit B</u>

    (b)    If to a Beneficiary: To the name and address set forth on the registry maintained by the Creditor Trustee, provided that general notices to all Beneficiaries may be made by posting such notice to a web-site identified in advance for communication with Beneficiaries.

    (c)    If to an Other Distributee:  to the agents set forth on <u>Exhibit D</u>.

IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this Creditor Trust Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as of the date first above written.

> [INSERT NAME], CREDITOR TRUSTEE OF THE LB CREDITOR TRUST ESTABLISHED UNDER THE CREDITOR TRUST AGREEMENT DATED _____, 2010 PURSUANT TO THE THIRD AMNEDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR LYONDELLBASELL DEBTOR
>
> [INSERT NAME], as
>
> Creditor Trustee

## Annex A

## Definitions

"**2015 Notes**" means the 8.375% senior notes due 2015 in the principal amounts of $615 million and €500 million issued pursuant to the 2015 Notes Indenture.

"**2015 Notes Ad Hoc Group**" means the informal group of holders (and/or their respective investment managers) of 2015 Notes, whose members consist of Arrowgrass Master Fund Ltd., Arrowgrass Distressed Opportunities Fund Limited, Basso Credit Opportunities Holding Fund Ltd., Basso Fund Ltd., Basso Multi-Strategy Holding Fund Ltd., Columbus Hill Partners, L.P., Columbus Hill Overseas, Ltd., CQS Directional Opportunities Master Fund Limited, Kivu Investment Fund Limited, Mariner LDC, Caspian Capital Partners, LP, Caspian Select Credit Master Fund, Ltd., CVI GVF (Lux) Master S.a.r.l., Fortelus Special Situations Master Fund Ltd., and Panton Master Fund, L.P. and  that has the ability to direct and is directing the 2015 Notes Trustee to execute the Lender Litigation Settlement.

"**2015 Notes Adversary Proceeding**" means the adversary proceeding in the Chapter 11 Cases styled *Wilmington Trust Company, as Trustee v. LyondellBasell Industries AF S.C.A., et al.*, Adversary No. 09-01501 (REG), described more fully in Section III.J.2 of the Disclosure Statement.

"**2015 Notes Claims**" means all Claims arising under the 2015 Notes Indenture, including, without limitation, all accrued but unpaid interest thereon, which shall be Allowed in the amount of $1,351,695,059.96 (excluding fees and expenses of the 2015 Notes Trustee) solely if the 2015 Notes Plan Conditions are satisfied or otherwise waived.

"**2015 Notes Indenture**" means the indenture, dated as of August 10, 2005, among LyondellBasell Industries AF S.C.A. (formerly Nell AF S.à.r.l.), as the Company, the guarantor parties thereto, Wilmington Trust Co. (successor to The Bank of New York), as Trustee, Registrar, Paying Agent, Transfer Agent and Listing Agent; ABN Amro Bank N.V. (n/k/a The Royal Bank of Scotland, N.V.), as Security Agent; and AIB/BNY Fund Management, as Irish Paying Agent; pursuant to which the 2015 Notes were issued, and all of the ancillary documents and Instruments relating thereto, as amended, supplemented, modified or restated as of the Commencement Date.

"**2015 Notes Plan Conditions**" means, subject to Section 7.7 of the Lender Litigation Settlement Agreement, the following conditions: (a) (1) the class of 2015 Notes Claims (Class 8) has voted to accept the Plan, (2) neither the 2015 Notes Trustee nor any member of the 2015 Notes Ad Hoc Group has objected to or appealed the approval of the Lender Litigation Settlement Agreement, and (3) neither the 2015 Notes Trustee nor any member of the 2015 Notes Ad Hoc Group has objected to confirmation of the Plan, or appealed the Confirmation Order (in each case as long as the Plan is consistent with and effectuates the Lender Litigation Settlement); and (b) (1) the 2015 Notes Trustee has

taken no further action, directly or indirectly, to prosecute the 2015 Notes Adversary Proceeding, and (2) neither the 2015 Notes Trustee nor any member of the 2015 Notes Ad Hoc Group has objected to any motions filed by the Debtors in the Debtors' Injunction Litigation or taken any further action either in the Debtors' Injunction Litigation or in the bankruptcy case with regard to the Debtors' Injunction Litigation; and (c) neither the 2015 Notes Trustee nor any member of the 2015 Notes Ad Hoc Group has breached the Lender Litigation Settlement Agreement.

"**2015 Notes Trustee**" means Wilmington Trust Company, solely in its capacity as successor indenture trustee under the 2015 Notes Indenture, or its duly appointed successor.

"**Ad Hoc Group**" means the *ad hoc* group of lenders consisting of certain lenders (and/or their investment managers) under the Senior Secured Credit Agreement, as referred to in the DIP Financing Order as the "Ad Hoc Group of Senior Secured Lenders."

"**Administrative Expense**" means any right to payment constituting a cost or expense of administration of any of the Chapter 11 Cases under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the estates of the Debtors, any actual and necessary costs and expenses of operating the business of the Debtors, any indebtedness or obligations incurred or assumed by the Debtors in connection with the conduct of their business, amounts owed to vendors providing goods and services to the Debtors during the Chapter 11 Cases, Postpetition Intercompany Claims, and tax obligations incurred after the Commencement Date, and all compensation and reimbursement of expenses to the extent Allowed by the Bankruptcy Court under sections 328, 330, 331 and/or 503 of the Bankruptcy Code, whether fixed before or after the Effective Date (excluding, for the avoidance of doubt, DIP ABL Claims, DIP New Money Claims and DIP Roll-Up Claims).

"**Affiliate**" means "affiliate" as set forth in section 101(2)(B) of the Bankruptcy Code (and specifically includes, without limitation, any partnership that otherwise satisfies the requirements of section 101(2)(B) of the Bankruptcy Code), but excludes BI S.à.r.l. or any entity that directly or indirectly owns, controls or holds any interest thereof.

"**Allowed**" means, with reference to any Claim or Administrative Expense, (a) allowed pursuant to the Plan, (b) not Disputed, (c) listed by the relevant Debtor in its Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed, (d) compromised, settled, Allowed or otherwise resolved pursuant to a Final Order, (e) if Disputed, has been allowed by a Final Order, or (f) asserted by a timely filed proof of Claim or Administrative Expense (or motion for Administrative Expense) as to which no timely objection has been or is interposed (as determined in accordance with Section 8.1 of the Plan or any applicable period of limitation fixed by the Bankruptcy Code, or the Bankruptcy Rules, or the Bankruptcy Court); *provided, however*, that Claims allowed pursuant to an order of the

Bankruptcy Court solely for the purpose of voting to accept or reject the Plan shall not be considered "Allowed Claims" hereunder.

"**Arrangers**" means ABN AMRO Incorporated, Citigroup Global Markets Inc., Goldman Sachs Credit Partners L.P., Merrill Lynch, Pierce, Fenner & Smith Incorporated and UBS Securities LLC, and the affiliates thereof, as Joint Lead Arrangers and Joint Bookrunners and in all other capacities under or with respect to the Senior Secured Credit Agreement and the Bridge Loan Agreement.

"**ARCO/Equistar Settlement Pro Rata Allocation**" means the allocation of distributable value to certain subcategories of Senior Secured Claims, calculated based on the following assumptions:  (i) the aggregate principal amount of claims outstanding under the Senior Secured Credit Agreement equals $8,805,849,206.12 (less any adequate protection payments made pursuant to Section 18 of the DIP Financing Order and received by the Senior Secured Lenders through and including the Effective Date (to the extent any such payments have accrued but have not been paid and received on or before the Effective Date, then such accrual shall not be applied to reduce Claims under the Senior Secured Credit Agreement unless payment thereof is provided for in connection with consummation so that such Claims shall receive either Cash in respect of such accrual or a higher allocation reflecting such accrual, but such Claims shall not in any event receive both Cash and a higher allocation)), (ii) the aggregate amount of claims outstanding  under the Secured Hedge Agreements equals $154,188,000, (iii) the aggregate amount of claims outstanding under or in connection with the ARCO Notes equals $336,344,000, (iv) the aggregate amount of claims outstanding under or in connection with the Equistar Notes equals $154,404,000, and (v) solely for purposes of allocating distributable value among subcategories (i)-(iv), the aggregate amount of claims in Class 4 equals $9,450,785,206.12 (less any adequate protection payments as set forth in subcategory (i) above).  The allocation shall be calculated and reflected in a statement filed with the Bankruptcy Court.

"**ARCO Notes**" means the $100 million 10.25% Debentures due 2010 and $225 million 9.8% Debentures due 2020 issued pursuant to the ARCO Notes Indenture.

"**ARCO Notes Indenture**" means the indenture, dated as of June 15, 1988, between ARCO Chemical Company and The Bank of New York, pursuant to which the ARCO Notes were issued, and all of the ancillary documents and Instruments relating thereto, as amended, supplemented, modified or restated as of the Commencement Date for Lyondell Chemical.

"**Assigned Preference Claims**" means any Preference Claim, other than (i) any Non-Settling Defendant Claim, (ii) any Preference Claim (other than an Acquired Third Party Preference Claim) against any Settling Defendant Releasee or Secured Lender Releasee, (iii) any Preference Claim against any other party that is released by the Debtors under the Plan, and in the case of (ii) and (iii) above, including any of such party's professionals, agents, representatives or attorneys (each, in such capacities), and (iv) any Preference Claim that the Debtors, in consultation with the Committee (and subject to the

right of the Committee (or post-Effective Date, the Litigation Trust, as the case may be) to object), waive or settle as part of any settlement of a contested Administrative Expense that the Debtors believe to be in the best interests of their estates, provided that the Debtors shall not waive or settle any Non-Settling Defendant Claim in connection with their settlement of a Disputed Administrative Expense.

"**Assumption Schedule**" means that certain schedule, prepared in consultation with the Ad Hoc Group and the Rights Offering Sponsors and, with respect to contracts or leases with a value exceeding $90 million, with the consent of the Ad Hoc Group and the Rights Offering Sponsors, such consent not to be unreasonably withheld, to be included in the Plan Supplement that specifically designates executory contracts or unexpired leases as contracts or leases to be assumed pursuant to the Plan.

"**Backstop Consideration Shares**" means the 23,562,677 Class B Shares purchased by the Rights Offering Sponsors in a private sale pursuant to the Equity Commitment Agreement.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, applicable to the Chapter 11 Cases, and the related Official Bankruptcy Forms, and any Local Rules of the Bankruptcy Court.

"**Base Claim Amount**" means, with respect to any Allowed General Unsecured Claim or 2015 Notes Claim, the amount of such Allowed General Unsecured Claim or 2015 Notes Claim, as applicable, calculated as of the Commencement Date and excluding any interest or other charges subsequent to the Commencement Date.

"**Beneficial Holder**" means any entity that was party to a binding trade not yet settled to acquire debt under the Senior Facility (including the portion of the facility under the Senior Secured Credit Agreement that qualifies as DIP Roll-Up Loans) or the facility under the Bridge Loan Agreement on December 23, 2009, but does not include any entity that was party to a binding trade not yet settled to sell all of its holdings of such debt on December 23, 2009.

"**Beneficiaries**" means (a) prior to the Excess Recovery Trigger Date, holders of Allowed (i) Class 7-A Claims, (ii) Class 7-C Claims (except the Senior/Bridge Guarantee Claims), (iii) Class 7-D Claims (except the Senior/Bridge Deficiency Claims), and (iv) subject to the satisfaction of the 2015 Notes Plan Conditions, the holders of Allowed Class 8 Claims. and (b) after the Excess Recovery Trigger Date, including the holders of the Deficiency Claims on account of the Senior Secured Claims and Bridge Loan Claims. After the Excess Recovery Trigger Date, the parties in subsection (a) are Beneficiaries only to the extent of their Post-Effective Date Interest Amount.

"**Bridge Lenders**" means the lenders from time to time party to the Bridge Loan Agreement.

"**Bridge Loan Agreement**" means the Bridge Loan Agreement, dated as of December 20, 2007 (as amended and restated on April 30, 2008 and October 17, 2008), among LyondellBasell Finance Company, the Obligor Debtors, the Obligor Non-Debtors, Merrill Lynch Capital Corporation, as administrative agent, Citibank, N.A., as collateral agent, the Arrangers, and the Bridge Lenders, and all of the documents and Instruments relating thereto, as amended, supplemented, modified or restated as of the Commencement Date.

"**Bridge Loan Claims**" means all Claims, claims against guarantors, liens, rights and interests arising under the Bridge Loan Agreement, including, without limitation, all accrued but unpaid interest thereon and any claims arising under section 507(b) of the Bankruptcy Code, which Claims shall be deemed Allowed for purposes of the Plan in an amount not less than $8,297,464,839.96; *provided*, *however*, that any Deficiency Claims held by a Bridge Lender shall not be a Bridge Loan Claim, other than as set forth in Exhibit A-9 to the Plan or with regard to the right to participate in Excess Recoveries in the Creditor Trust and the Litigation Trust.

"**Business Day**" means any day other than (a) a Saturday, (b) a Sunday, (c) any day on which commercial banks in New York, New York are required or authorized to close by law or executive order, and (d) the Friday after Thanksgiving Day.

"**Cash**" means legal tender of the United States of America unless otherwise noted.

"**Cause**" shall be defined as: (i) the Person's willful failure to perform his material duties hereunder, which is not remedied within thirty (30) days of notice; (ii) the Person's commission of an act of fraud, theft or embezzlement during the duties of his employment hereunder; or (iii) the Person's conviction for the commission of a felony with all appeals having been exhausted or appeal periods lapsed; provided, that no Cause shall exist involving subsection (i) above until the Person first has failed to cure such failure within thirty (30) days of having been given written notice of such failure.  For purposes of the foregoing, no act or failure to act on the part of the Person shall be considered "willful" unless it is done, or permitted to be done, by the Person without reasonable belief that Person's action or omission was in the best interests of the Creditor Trust.

"**Chapter 11 Cases**" means the cases commenced by the Debtors pursuant to chapter 11 of the Bankruptcy Code which are jointly administered under the caption In re Lyondell Chemical Company, et al., Chapter 11 Case No. 09-10023 (REG) (Jointly Administered).

"**Claim**" means a "claim" as defined in section 101(5) of the Bankruptcy Code, against any one or more of the Debtors, or their property, whether or not asserted.

"**Class**" means a category of holders of Claims as set forth in the Plan pursuant to section 1123(a)(1) of the Bankruptcy Code.

"**Class A Shares**" means the Class A ordinary shares of New Topco, with a nominal value of four eurocents (€0.04) per share authorized to be issued pursuant to the Plan. The Class A Shares shall have such rights with respect to dividends, liquidation, voting and other matters as are provided for by applicable nonbankruptcy law and in the New Topco Articles of Association.

"**Class B Shares**" means the Class B ordinary shares of New Topco, with a nominal value of four eurocents (€0.04) per share authorized to be issued pursuant to the Plan in connection with the Rights Offering. The Class B Shares shall have such rights with respect to dividends, liquidation preference, voting and other matters as are provided for by applicable nonbankruptcy law and in the New Topco Articles of Association.

"**Commencement Date**" means, as to each Debtor, the date of filing of its voluntary petition for relief under the Bankruptcy Code.

"**Committee Litigation**" means the lawsuit styled *Official Committee of Unsecured Creditors, on behalf of the Debtors' Estates v. Citibank, N.A., London Branch, et al.*, Adversary Proceeding No. 09-01375 (REG), commenced by the Creditors' Committee on July 22, 2009, described more fully in Section III.K of the Disclosure Statement.

"**Confirmation Date**" means the date upon which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket in the Chapter 11 Cases.

"**Confirmation Hearing**" means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code. "Non-Settling Defendant" means any defendant in the Committee Litigation (including each of its direct and indirect parent companies, subsidiaries, Affiliates, members, partners and joint ventures, each of their respective predecessors, successors, general partners, and assigns, and all of each of their respective past and present employees, officers, directors and managers) other than Settling Defendant Releasees and the Secured Lender Releasees.

"**Covered Professionals**" means representatives, agents, financial advisors, industry experts/advisors, and attorneys, in each case only to the extent that such Person represented or provided services in connection with the merger of BIL Acquisition Holdings Limited into Lyondell Chemical on December 20, 2007 (including the financing thereof), the Senior Secured Credit Agreement, the Bridge Loan Agreement, the DIP Agreement, the Chapter 11 Cases or any matter that could have been the subject of the Committee Complaint.

"**Cooperation Agreement**" means the agreement provided for in the Lender Litigation Settlement, substantially in the form to be filed as part of the Plan Supplement.

"Creditor Representative" means the representative selected by the Creditors' Committee to, among other things, administer funds under Section 5.9 of the Plan.

"**Creditor Representative Expense Fund**" means the fund established pursuant to section 5.9 of the Plan.

"**Creditor Representative Supplement"** means the supplement to the Plan which identifies certain terms relating to the operation of the Creditor Representative.

 "**Creditors' Committee**" means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

"**Creditor Trust Assets**" means the Initial Funding Amount, the Assigned Actions and certain other assets, conveyed to the Creditor Trust, together with all collections, recoveries, proceeds, income, gains, earnings, or other assets inuring to the Creditor Trust, to be distributed to the Beneficiaries as set forth in this Creditor Trust Agreement.

 "**Debtors' Injunction Litigation**" means that certain adversary proceeding styled *Lyondell Chemical Company, et al. v. Wilmington Trust Company*, as Trustee, Adv. P. No. 09-01459 (REG) (Bankr. S.D.N.Y.) commenced by the Debtors by filing a complaint [09-01459 Docket No. 1] against the 2015 Notes Trustee, seeking to enjoin the 2015 Notes Trustee from any attempts to enforce any rights or exercise any remedy under the 2015 Notes against the Debtors' non-debtor Affiliates.

"**Deficiency Claim**" means that portion of a Claim secured by a lien on property in which the estate has an interest that is determined, pursuant to section 506(a) of the Bankruptcy Code or through agreement, to exceed the value of the claimant's interest in such property.

"**Deficiency Claims on account of the Senior Secured Claims and Bridge Claims**" means that portion of a Claim secured by a lien on property in which the estate has an interest that is determined, pursuant to section 506(a) of the Bankruptcy Code or through agreement, to exceed the value of the claimant's interest in such property.

"**Delaware Trustee**" means the trustee with its principal place of business in Delaware who is appointed, upon consultation with the Ad Hoc Group and the Rights Offering Sponsors, with respect to the Millennium Custodial Trust.

"**DIP ABL Claims**" means all Claims, rights and interests of the DIP Lenders arising out of or related to the DIP Revolving Credit Agreement including, without limitation, all fees and expenses payable thereunder and any and all "Obligations" as defined therein.

"**DIP Agreement**" means, collectively, (a) the DIP Term Loan Agreement, and (b) the DIP Revolving Credit Agreement, as modified or supplemented by the terms of the DIP Financing Order, and as amended, modified or supplemented from time to time thereafter.

"**DIP Financing Order**" means the *Final Order (I) Authorizing Debtors (A) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (C) to Purchase Certain Assets Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant To 11 U.S.C. §§ 361, 362, 363 and 364*, entered March 1, 2009 (Docket No. 1002).

"**DIP Lenders**" means each lender under the DIP Agreement, and any other Person becoming a lender thereunder prior to the Effective Date.

"**DIP New Money Claims**" means all Claims, rights and interests of the DIP Lenders arising out of or related to the $3.25 billion new funding portion of the DIP Term Loan Agreement (including, without limitation, all fees and expenses payable thereunder and any and all "Obligations" except DIP Roll-Up Claims, as defined in the DIP Term Loan Agreement).

"**DIP Revolving Credit Agreement**" means the Debtor-in-Possession Credit Agreement, dated as of March 3, 2009, among Lyondell Chemical, Equistar Chemicals, LP, Houston Refining LP, Basell USA Inc., Millennium Chemicals Inc., Millennium Petrochemicals Inc., LBIAF; the lenders from time to time party thereto; Citibank, N.A., as administrative agent and collateral agent; UBS Securities LLC, as syndication agent; and Citibank, N.A., as fronting bank (as amended, modified or supplemented from time to time).

"**DIP Roll-Up Claims**" means all Claims, rights and interests of the DIP Lenders arising out of or related to the dollar-for-dollar roll-up portion of the DIP Term Loan Agreement.

"**DIP Term Loan Agreemen**t" means the Debtor-in-Possession Credit Agreement, dated as of March 3, 2009, among LBIAF, Lyondell Chemical, Basell USA Inc., Equistar Chemicals, LP, Houston Refining LP, Millennium Chemicals Inc., Millennium Petrochemicals Inc., UBS AG, Stamford Branch, as administrative agent and collateral agent; and the lenders from time to time party thereto (as amended, modified or supplemented from time to time).

"**Disputed**" means, with reference to any Claim or Administrative Expense, (i) disputed under the Plan, or subject or potentially subject to a timely objection and/or request for estimation, in accordance with section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018, interposed by the Debtors, the Reorganized Debtors, or the Creditors' Committee, which objection and/or request for estimation has not been withdrawn or determined by a Final Order, (ii) improperly asserted, by the untimely or otherwise improper filing of a proof of Claim or Administrative Expense as required by order of the Bankruptcy Court, or (iii)  disallowed pursuant to section 502(d) of the Bankruptcy Code. A Claim or Administrative Expense that is Disputed as to its amount shall not be Allowed in any amount for purposes of distribution, including, for the avoidance of

doubt, for the purpose of being granted Participation Rights with respect to any MCI Subsidiary, until it is no longer a Disputed Claim.

"**Disputed Claim**" means a Claim which is Disputed under Section 8.1 of the Plan until such time as such Claim ceases to be Disputed.

"**Disputed Claims Reserve**" means an allocation of Cash or other property to account for Disputed Claims and established by the Creditor Trustee pursuant to Section __ of this Creditor Trust Agreement.

"**Distribution Schedule**" means the distribution of Proceeds and other Creditor Trust Assets by the Creditor Trust in Exhibit E.

"**Disclosure Statement**" means the disclosure statement relating to the Plan as amended from time to time, including, without limitation, all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

"**Eligible Holder**" means a holder of an Allowed Claim in Class 4 entitled to participate in the Rights Offering.

"**Equistar Notes**" means the $150,000,000 7.55% Senior Notes due 2026 issued pursuant to the Equistar Notes Indenture.

"**Equistar Notes Indenture**" means the indenture, dated as of January 29, 1996, between Lyondell Chemical Company and Texas Commerce Bank National Association, pursuant to which the Equistar Notes were issued, and all of the ancillary documents and Instruments relating thereto, as amended, supplemented, modified or restated as of the Commencement Date of Lyondell Chemical.

"**Equity Commitment Agreement**" means the agreement between the Rights Offering Sponsors, New Topco and the Debtor Parties under which the Rights Offering Sponsors commit to purchase the Unsubscribed Shares, the Backstop Consideration Shares and the Excluded Shares.

"**Equity Compensation Plan**" means the equity plan for certain employees of the Reorganized Debtors, in form and substance reasonably satisfactory to the Ad Hoc Group and the Rights Offering Sponsors, filed as part of the Plan Supplement.

"**Excess Recoveries**" means all recoveries of the Creditor Trust and the Litigation Trust, in the aggregate (net of the Creditor Representative's and Trusts' costs and expenses), after any distributions made to the Reorganized Debtors from the Litigation Trust (which, after the Excess Recovery Trigger Date, will be one-third of all Assigned Preference Claims instead of 10%) that are in excess of the amount required to pay to the holders of the Allowed General Unsecured Claims their Allowed Base Claim Amounts, in Cash or Class A Shares, after giving effect to other distributions made to holders of Allowed

Substantially Final Form

General Unsecured Claims under the Plan, the Lender Litigation Settlement or pursuant to distributions from the Creditor Trust or Litigation Trust.

"**Excess Recovery Trigger Date**" means the later of both of the following: (i) the date on which distributions to holders of Allowed General Unsecured Claims and Allowed 2015 Notes Claims have been made, in the aggregate, sufficient to pay such holders the Allowed Base Claim Amounts, in Cash or Class A Shares, after giving effect to other distributions made to holders of Allowed General Unsecured Claims and Allowed 2015 Notes Claims under the Plan, the Lender Litigation Settlement or pursuant to distributions from the Creditor Trust or Litigation Trust, and (ii) the date on which the Creditor Representative's and Trusts' costs and expenses incurred through the date set forth in (i) above have been paid in full.

"**Exit Facility**" means the credit facility, indenture, or facilities (in whatever form or Instrument) entered into as of the Effective Date by Reorganized LyondellBasell and the guarantors thereunder in order to meet their Plan obligations and working capital needs as of the Effective Date, in form and substance reasonably satisfactory to the Ad Hoc Group and the Rights Offering Sponsors.

"**Exit Facility Commitment Letter**" means the commitment letter(s) (if any) to provide the financing contemplated by the Exit Facility, in form and substance reasonably satisfactory to the Ad Hoc Group.

"**Excluded Shares**" means any Class B Shares excluded from the Rights Offering pursuant to a Section 1145 Cutback.

"**Final Order**" means an order of the Bankruptcy Court or District Court as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or motion for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, or move to reargue or rehear shall have been waived in writing in form and substance satisfactory to the Debtors or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or District Court shall have been upheld by the highest court to which such order was appealed, or from which certiorari, reargument or rehearing was sought and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; *provided, however*, the possibility that a timely motion under Bankruptcy Rule 9024 or any applicable analogous rule may be filed with respect to such order shall not prevent such order from being a Final Order.

"**General Unsecured Claim**" means any Claim that is not a Senior Secured Claim, Bridge Loan Claim, DIP Roll-Up Claim, DIP ABL Claim, DIP New Money Claim, Other Secured Claim, Administrative Expense (including fees and costs for professional compensation and reimbursement), Priority Non-Tax Claim, Priority Tax Claim, 2015 Notes Claim, PBGC Claim, the Senior/Bridge Guarantee Claim, any Senior/Bridge Deficiency Claim, any other Deficiency Claim on account of the Senior Secured Claims

and Bridge Loan Claims, or Intercompany Claim.  For the avoidance of doubt, any Millennium Notes Claim shall be a General Unsecured Claim.

"**GUC Beneficiaries**" means (i) holders of Allowed Class 7-A Claims and Class 7-C Claims (except the Senior/Bridge Guarantee Claims), (ii) holders of Allowed Class 7-D Claims (except the Senior/Bridge Deficiency Claims), and (iii) subject to the satisfaction of the 2015 Notes Plan Conditions, holders of Allowed Class 8 Claims.

"**GUC Claims**" means (i) Allowed Class 7-A Claims and Class 7-C Claims (except the Senior/Bridge Guarantee Claims), (ii) Allowed Class 7-D Claims (except the Senior/Bridge Deficiency Claims), and (iii) subject to the satisfaction of the 2015 Notes Plan Conditions, holders of Allowed Class 8 Claims.

"**Initial Funding Amount**" means the initial funding (if any) provided to the Creditor Trust by the Creditor Representative.

"**Instrument**" means any mortgage, share of stock, security, promissory note, bond or any other "Instrument" as that term is defined in section 9-102(a)(47) of the Uniform Commercial Code in effect in the State of New York on the Commencement Date.

 "**IRC**" means the Internal Revenue Code of 1986, as amended.

"**IRS**" means the Internal Revenue Service.

"**Intercompany Claim**" means any Prepetition Intercompany Claim or Postpetition Intercompany Claim.

"**Interests**" means beneficial interests in this Creditor Trust.

"**Lender Litigation Settlement**" means the settlement of the Committee Litigation, as described in Section III.K of the Disclosure Statement, whose terms of which are incorporated herein, and memorialized in the Lender Litigation Settlement Agreement. "Lender Litigation Settlement Agreement" means that certain Amended and Restated Settlement Agreement Relating to Commercial Litigation (*Official Committee of Unsecured Creditors v. Citibank, N.A., et al.*, Adv. P.No. 09-01375 (REG) (Bankr. S.D.N.Y.)), dated as of March 11, 2010, by and among LBIAF, on behalf of itself and certain identified affiliates, the Creditors' Committee, the 2015 Notes Trustee, the 2015 Notes Ad Hoc Group, the Senior Secured Lenders and the Bridge Lenders.

"**Lender Litigation Settlement Approval Order**" means the *Order Approving Revised Settlement with Financing Party Defendants in the Committee Litigation Pursuant to Bankruptcy Rule 9019*, entered March 11, 2010 (Committee Litigation Docket No.371)

 "**Litigation Trust Agreement**" means the trust agreement governing the Litigation Trust, substantially in the form contained in the Plan Supplement and in all respects in a form acceptable to the Creditors' Committee, and the Debtors (but only as to provisions affecting or binding the Debtors), and otherwise consistent with the Lender Litigation

Settlement; provided that such trust agreement will include (i) a provision stating that, after the Excess Recovery Trigger Date, the Debtors and the holders of Deficiency Claims on account of the Senior Secured Claims and Bridge Claims shall have sole control over and, subject to the right of the holders of Allowed General Unsecured Claims and 2015 Notes Claims to receive their Post-Effective Date Interest Amount, shall be entitled to any property or assets of the Litigation Trust and (ii) a provision to be agreed upon between and among the Debtors and the Settling Defendants that shall govern the manner in which the Litigation Trust may be modified after the Excess Recovery Trigger Date.

"**Merger Consideration**" means funds paid in respect of the conversion, upon the merger of BIL Acquisition Holdings Limited into Lyondell Chemical on December 20, 2007, of formerly outstanding shares of Lyondell Chemical into the right to receive $48 per share.

"**Millennium Custodial Trust**" means the trust established under Section 5.5 of the Plan to implement the resolution of Claims against the Schedule III Debtors.

"**Millennium Notes**" means the 7.625% senior unsecured notes of Millennium America Inc. due 2026 in the principal amount of $241 million.

"**Millennium Notes Claim**" means all general unsecured Claims arising under the Millennium Notes Indenture, which shall be deemed Allowed for Plan purposes in the amount of $244,058,317.71 (which amount excludes fees and expenses of the Millennium Notes Trustee) solely if the Millennium Notes Plan Conditions are satisfied or otherwise waived.

"**Millennium Notes Indenture**" means the indenture, dated as of November 27, 1996, between Millennium America Inc. and Law Debenture Trust Company of New York, as successor to The Bank of New York, pursuant to which the Millennium Notes were issued, and all of the ancillary documents and Instruments relating thereto, as amended, supplemented, modified or restated as of the Commencement Date of Lyondell Chemical.

"**Millennium Notes Plan Conditions**" means, subject to Section 7.7 of the Lender Litigation Settlement Agreement, the following conditions: (a) the Specified Millennium Noteholders have executed plan support agreements before 9:45 a.m. on March 11, 2010 and such agreements have not been breached or terminated thereafter by a Specified Millennium Noteholder, (b) the Millennium Notes Trustee has not objected to or appealed the approval of the Lender Litigation Settlement, (c) the Millennium Notes Trustee has not objected to confirmation of the Plan or appealed the order confirming the Plan (in each case, so long as the Plan is consistent with and effectuates the Lender Litigation Settlement), and (d) the Millennium Notes Trustee has taken no further action, directly or indirectly, to prosecute the Millennium Notes STN Motion.

"**Millennium Notes STN Motion**" means the motion by the Millennium Notes Trustee seeking authority to pursue claims that the Debtors' estates may have relating to the

granting by certain Obligor Debtors of guarantees to the 2015 Notes Trustee [Docket No. 3073]

"**Millennium Notes Trustee**" means Law Debenture Trust Company of New York, not individually, but solely in its capacity as successor trustee for the holders of the Millennium Notes.

"**Millennium Trust Trustee**" means the trustee appointed, in consultation with the Ad Hoc Group, to administer the Millennium Custodial Trust.

"**MPCO**" means Millennium US Op Co, LLC.

"**MPI**" means Millennium Petrochemicals, Inc.

"**MSC**" means Millennium Specialty Chemicals, Inc.

"**Non-Debtor Affiliate**" means any Affiliate of the Debtors that is not a Debtor in the Chapter 11 Cases.

"**New Topco**" means LyondellBasell Industries N.V., a *naamloze vennootschap* (public limited liability corporation) formed under the laws of The Netherlands.

"**New Topco Articles of Association**" means the Articles of Association of New Topco, in form and substance reasonably satisfactory to (1) the Ad Hoc Group, (2) the Rights Offering Sponsors and (3) the Majority Arrangers, but in the case of (3), solely with regard to any difference between Class A Shares on the one hand and Class B Shares or any other class of preferred stock or common stock on the other hand, other than as set forth in the Equity Commitment Agreement (as filed with the Debtors' motion for approval thereof on December 23, 2009) or as described in the Disclosure Statement as filed by the Debtors on March 15, 2010.

"**New Topco Supervisory Board**" means the supervisory board of New Topco.

"**Non-Settling Defendant Claims**" means all claims and causes of action (other than Abandoned Claims) that have been asserted in (or arise from the same transaction or occurrences as alleged in) the Committee Litigation against one or more Non-Settling Defendants, to the extent such claims and causes of action are not released pursuant to the Plan.

"**Obligor Debtors**" means those Debtors that are obligors, issuers, borrowers or guarantors under the Senior Secured Credit Agreement, the Bridge Loan Agreement and the 2015 Notes Indenture, other than MPCO, MPI and MSC.

"**Obligor Non-Debtors**" means those Non-Debtor Affiliates, listed on Exhibit A-2 of the Plan, that are obligors, issuers, borrowers or guarantors under the Senior Secured Loan

Agreement, the Bridge Loan Agreement and the 2015 Notes Indenture. The Obligor Non-Debtors are co-proponents of the Plan.

"**Other Distributees**" means the holders of Deficiency Claims on account of the Senior Secured Claims and Bridge Claims. For the avoidance of doubt, in no event shall the Other Distributees be third party or other beneficiaries of this Creditor Trust prior to the Excess Recovery Trigger Date.

"**Other Secured Claim**" means any Secured Claim other than a Senior Secured Claim or a Bridge Loan Claim.

"**Participation Rights**" means a contractual right pursuant to the Plan entitling the holder of an Allowed Claim against an MCI Subsidiary to a potential payment up to the amount of such holder's Allowed Claims against the applicable MCI Subsidiary on or following the Effective Date.

"**PBGC Claim**" means any Claim of the PBGC arising out of the Pension Plan.

"**Pension Plan**" means, collectively, (i) the U.S. Pension Plans, and (ii) the U.K. Pension Plan.

"**Person**" means an individual, partnership, corporation, limited liability company, business trust, joint stock company trust, unincorporated association, joint venture, governmental authority, governmental unit, or other entity of whatever nature.

"**Plan Supplement**" means the compilation of documents and forms of documents or term sheets for such documents specified  in the Plan that shall be filed with the Bankruptcy Court on or before the date that is ten (10) days prior to the deadline to vote to accept or reject the Plan, which is an integral part of the Plan, and shall include, but is not limited to, a list of the initial members of the New Topco Supervisory Board, the Assumption Schedule, the Equity Compensation Plan, the Millennium Custodial Trust Agreement, the Reorganized Certificate of Incorporation, the Reorganized By-laws, the New Topco Articles of Association, the Litigation Trust Agreement, the Creditor Trust Agreement, the Equity Commitment Agreement, the Cooperation Agreement, and the Exit Facility Commitment Letter (if any).

"**Post-Effective Date Interest Amount**" means, with respect to any Allowed General Unsecured Claim or 2015 Notes Claim, the aggregate amount of simple interest at the annual rate of 5% that accrues on the unpaid portion of the Allowed Base Claim Amount of such Allowed General Unsecured Claim or 2015 Notes Claim from the Effective Date until the date that the Allowed Base Claim Amount of such Allowed General Unsecured Claim or 2015 Notes Claim is paid in full.

"**Postpetition Intercompany Claim**" means any Claim against any Reorganizing Debtor by any other Reorganizing Debtor or any Non-Debtor Affiliate that arose on or after the

Commencement Date, and for the avoidance of doubt, excluding Schedule III Intercompany Claims.

"**Prepetition Intercompany Claim**" means any Claim against any Reorganizing Debtor by any other Reorganizing Debtor or any Non-Debtor Affiliate that arose prior to the Commencement Date, and for the avoidance of doubt, excluding Schedule III Intercompany Claims.

"**Preference Claims**" means any and all claims of the Debtors' estates that could be brought under section 547 of the Bankruptcy Code or in the alternative based upon the same underlying facts under section 548 of the Bankruptcy Code, and the right to recover on account of any such claim under section 550 of the Bankruptcy Code.

"**Priority Non-Tax Claim**" means any Claim entitled to priority in payment, as specified in sections 507(a)(2)-(7) and (9) of the Bankruptcy Code, other than a Priority Tax Claim.

"**Priority Tax Claim**" means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code. "Proceeds" means the actual consideration, if any, received by the Creditor Trust as a result of any judgment, settlement, or compromise of any of the Contributed Claims.

"**Proceeds**" means the actual consideration, if any, received by the Creditor Trust as a result of any judgment, settlement, or compromise of any of the Assigned Actions.

"**Reorganized By-laws**" means the by-laws or similar corporate organizational document, to the extent applicable, of the Reorganized Debtors (other than New Topco), as amended and restated, substantially in the forms set forth in the Plan Supplement, in form and substance reasonably satisfactory to the Ad Hoc Group and Rights Offering Sponsors.

"**Reorganized Certificate of Incorporation**" means the certificate of incorporation or similar corporate organizational document of the Reorganized Debtors (other than New Topco), as amended and restated, substantially in the forms to be filed as part of the Plan Supplement, in form and substance reasonably satisfactory to the Ad Hoc Group and Rights Offering Sponsors.

"**Reorganized Debtors**" means the Debtors (other than the Schedule III Debtors) as reorganized on and after the Effective Date.

"**Reorganizing Debtors**" means the Debtors other than the Schedule III Debtors prior to the Effective Date.

"**Rights Offering**" means the offering to Eligible Holders to subscribe to purchase Class B Shares, as set forth in Section 5.3 of the Plan.

"**Rights Offering Expiration Date**" means the final date by which an Eligible Holder may elect to subscribe to the Rights Offering, which shall be not more than 30 days after the Subscription Commencement Date or such later date as the Debtor Parties, subject to the approval of each of the Rights Offering Sponsors (not to be unreasonably withheld), may specify in a notice provided to the Rights Offering Sponsors before 9:00 a.m., New York City time, on the Business Day before the then-effective Rights Offering Expiration Date.

"**Rights Offering Sponsors**" means LeverageSource (Delaware) LLC, an affiliate of Apollo Management VII, L.P., AI LBI Investment LLC, an affiliate of Access Industries, and Ares Corporate Opportunities Fund III, L.P.

"**Schedule III Debtors**" means the Debtors listed on Exhibit A-3 of the Plan.

"**Schedule III Intercompany Claims**" means any prepetition and postpetition Claims and Administrative Expenses held by a Schedule III Debtor against a Reorganizing Debtor or Non-Debtor Affiliate and all prepetition and postpetition Claims and Administrative Expenses held by a Reorganizing Debtor or Non-Debtor Affiliate against a Schedule III Debtor.

"**Schedule III Obligor Debtors**" means Millennium Chemicals Inc., Millennium Worldwide Holdings I Inc., Millennium America Holdings Inc., Millennium America Inc., Millennium Petrochemicals GP LLC, and Millennium Petrochemicals, LP.

"**Schedules**" means the schedules of assets and liabilities and the statements of financial affairs filed by each of the Debtors on April 6, 2009 and May 13, 2009 as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, including any supplements or amendments thereto through the Confirmation Date.

"**Secured Hedge Agreement**" has the meaning set forth in Section 1.01 of the Senior Secured Credit Agreement.

"**Secured Lenders**" means the past, present and future lenders under the Senior Secured Credit Agreement (including the portion that qualifies as DIP Roll-Up Loans) and the Bridge Loan Agreement, and their successors and assigns, but each only in its respective capacity as a lender whether under the Senior Secured Credit Agreement or the Bridge Loan Agreement, or both if applicable (it being understood that each Beneficial Holder of debt under the Senior Secured Credit Agreement (including the portion of the Senior Credit Agreement that qualifies as DIP Roll-Up Loans) or Bridge Loan Agreement shall be deemed a Secured Lender).

"**Secured Lender Releasees**" means the Secured Lenders and each of their respective direct and indirect parent companies, subsidiaries and Affiliates (including funds managed by Secured Lenders or by Affiliates of Secured Lenders or Affiliates of any such funds), each of their respective predecessors, successors, and assigns, and all of each

of their respective past and present employees, officers, directors, managers and Covered Professionals.

"**Senior/Bridge Deficiency Claims**" means the Deficiency Claims that the holders of the Senior Secured Claims (taking into account the ARCO/Equistar Settlement Pro Rata Allocation) and Bridge Lender Claims hold against the Schedule III Obligor Debtors. "Senior/Bridge Guarantee Claims" means the general unsecured guarantee claims that the holders of the Senior Secured Claims (which shall, for purposes of any distributions under this Plan, be deemed to take into account the ARCO/Equistar Settlement Pro Rata Allocation) and Bridge Lender Claims hold against MSC, MPI and MPCO.

"**Senior Secured Claims**" means all Claims, claims against guarantors, liens, rights and interests arising under the Senior Secured Credit Agreement, the Secured Hedge Agreements, ARCO Notes Indenture and Equistar Notes Indenture, including, without limitation, all accrued but unpaid interest thereon and any claims arising under section 507(b) of the Bankruptcy Code.

"**Senior Secured Credit Agreement**" means the Senior Secured Credit Agreement, dated as of December 20, 2007 (as amended and restated on April 30, 2008), among LBIAF, Lyondell Chemical and the other borrowers thereto; the Obligor Debtors; the Obligor Non-Debtors; Deutsche Bank Trust Company Americas (successor to Citibank, N.A.), as primary administrative agent; Deutsche Bank Trust Company Americas (successor to Citibank International plc), as European administrative agent; the Arrangers; and the Senior Secured Lenders; and all of the documents and Instruments relating thereto, as amended, supplemented, modified or restated.

"**Settlement Agreement**" means that certain Amended and Restated Settlement Agreement Relating to Commercial Litigation (*Official Committee of Unsecured Creditors v. Citibank, N.A., et al.*, Adv. P.No. 09-01375 (REG) (Bankr. S.D.N.Y.)), dated as of March 11, 2010, by and among LBIAF, on behalf of itself and certain identified affiliates, the Creditors' Committee, the 2015 Notes Trustee, the 2015 Notes Ad Hoc Group, the Senior Secured Lenders and the Bridge Lenders.

"**Settling Defendants**" means Citibank, N.A., Citibank International plc, and Citigroup Global Markets Inc., Goldman Sachs Credit Partners, L.P. and Goldman Sachs International, Merrill, Lynch, Pierce, Fenner & Smith and Merrill Lynch Capital Corporation, ABN AMRO Inc. and The Royal Bank of Scotland, N.V., f/k/a ABN Amro Bank N.V., UBS Securities LLC and UBS Loan Finance LLC; LeverageSource III S.à.r.l., Ares Management LLC, Bank of Scotland, DZ Bank AG, Kolberg Kravis Roberts & Co. (Fixed Income) LLC and UBS AG, and the Ad Hoc Group.

"**Settling Defendant Releasees**" means the Settling Defendants and each of their respective direct and indirect parent companies, subsidiaries and Affiliates (including funds managed by Settling Defendants or by Affiliates of Settling Defendants or Affiliates of any such funds), each of their respective predecessors, successors, and assigns, and all of each of their respective past and present employees, general partners, officers, directors, managers and Covered Professionals.

"**Specified Millennium Noteholders**" means all funds managed by Aurelius Capital Management, LP, each only in its capacity as a holder of (or on behalf of a holder of) any Claim or interest other than a Claim or interest on account of Arco Notes, Equistar Notes or 2027 Notes and (ii) Appaloosa Management LP, on behalf of the funds for which it acts as investment advisor, each in its capacity as a holder of (or on behalf of a holder of) any Claim or interest, which together hold a majority in principal amount of the Millennium Notes.

"**State Law Avoidance Claims**" means any and all claims, rights and causes of action arising under state law against former shareholders of Lyondell Chemical and their respective successors and assigns, (based on the receipt by any such Persons of Merger Consideration, other than claims against those parties that are released by the Debtors under the Plan or under the Lender Litigation Settlement.

"**Subscription Commencement Date**" means the Business Day approved by the Bankruptcy Court on which the Rights Offering shall commence.

"**Treasury Regulation**" means any regulation promulgated under the Internal Revenue Code of 1986, as amended.

"**True-up Amount**" means, if, after all Disputed General Unsecured Claims become Allowed General Unsecured Claims (or Disallowed), there is insufficient Fixed Settlement Plan Consideration to provide all holders of Allowed General Unsecured Claims (other than Millennium Notes Claims) eligible to receive Fixed Settlement Plan Consideration the same pro rata distribution of the Fixed Settlement Plan Consideration, the minimum aggregate amount of net Proceeds sufficient to provide all holders of Allowed General Unsecured Claims (other than Millennium Notes Claims) eligible to receive Fixed Settlement Plan Consideration the same pro rata distribution of the Fixed Settlement Plan Consideration (including for purposes of such determination the True-up Amount); *provided, however*, holders of the 2015 Notes Claims shall not receive a True-up Amount on account of the Fixed Settlement Plan Consideration reallocated from the holders of the 2015 Notes Claims to the holders of Millennium Notes Claims pursuant to Section 4.10 of the Plan.

"**Unclaimed Property**" means any distribution from this Creditor Trust to which a Beneficiary is entitled, but does not take possession.

"**Unsubscribed Shares**" means a number of Class B Shares equal to (i) the Rights Offering Shares minus (ii) the number of Class B Shares offered pursuant to the Rights Offering and duly subscribed for and paid for on or prior to 5:00 p.m. (prevailing Eastern time) on the Rights Offering Expiration Date.

"**Without Cause Removal**" means the removal of the Creditor Trustee upon a unanimous determination by the Directors of the Trust Board without any necessity for showing cause.

Substantially Final Form

Substantially Final Form

## Exhibit A

### Trustee for the Creditor Trust

Edward S. Weisfelner

### Contact Information for the Creditor Trust and Creditor Trustee

## Exhibit B

### Initial Directors of the Trust Board

Wilmington Trust Company, initially by its designee Patrick J. Healy

Law Debenture Trust of New York, initially by its designee Robert L. Bice II

BASF Corporation, initially by its designee Peter Arigirou

James F. Schorr

One person appointed by the other four Directors

### Contact Information for the Trust Board

## Exhibit C

## Compensation for Directors

The following aggregate compensation schedule shall apply to the Directors in their roles as Directors of the Litigation Trust Board, the Creditor Trust Board and the Advisory Board of the Creditor Representative (the "**Boards**"):

$60,000 annual aggregate fee to serve on the Boards, to be paid in quarterly increments. Such fee  shall include attendance at four (4) meetings per year.

$2,500 per meeting attended in excess of the four (4) per year included in the annual fee. For the avoidance of doubt, meetings held on the same day, whether as joint meetings or sequentially, shall be considered one (1) meeting.

**Exhibit D**

**Agents for Other Distributees**

Substantially Final Form

## Exhibit E

## Creditor Trust Distribution Schedule

*Prior to the Excess Recovery Trigger Date*, distributions made under the Creditor Trust Agreement shall be made as follows:

To the GUC Beneficiaries (which distribution shall be based on each such GUC Beneficiary's pro rata share of GUC Claims).

*After the Excess Recovery Trigger Date and until each of the GUC Beneficiaries are paid the Post-Effective Date Interest Amount*, distributions made under the Creditor Trust Agreement shall be made as follows:

one-third to the GUC Beneficiaries (which distribution shall be based on each such GUC Beneficiary's pro rata share of GUC Claims),
one-third to _____ for distribution to holders of the Deficiency Claims on account of the Senior Secured Claims, and
one-third to _____ for distribution to holders of the Deficiency Claims on account of the Bridge Loan Claims.

*After each of the Beneficiaries are paid the Post-Effective Date Interest Amount and until the holders of Senior Secured Claims are paid in full,* distributions made under the Creditor Trust Agreement shall be made as follows:

one-half to _____ for distribution to holders of the Deficiency Claims on account of the Senior Secured Claims, and
one-half to _____ for distribution to holders of the Deficiency Claims on account of the Bridge Loan Claims.

*After holders of Senior Secured Claims are paid in full*, distributions made under the Creditor Trust Agreement shall be made as follows:

100% to _____ for distribution to holders of the Deficiency Claims on account of the Bridge Loan Claims.

Substantially Final Form

**TAB 6-E**

COOPERATION AGREEMENT

THIS COOPERATION AGREEMENT ("**Cooperation Agreement**" or "**Agreement**") is made this __day of April, 2010, by and among LyondellBasell Industries AF S.C.A. on behalf of itself and the Reorganized Debtors (the **"Reorganized Debtors"**), the Litigation Trustee and the Creditor Trustee (together with the Litigation Trustee, the "**Trustees**"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization for the LyondellBasell Debtors dated as of March 12, 2010, as the same may from time to time be amended or modified (the "**Plan**").

RECITALS

WHEREAS, the Litigation Trustee is the trustee of the Litigation Trust established under the Litigation Trust Agreement dated April __, 2010 pursuant to the Plan;

WHEREAS, the Creditor Trustee is the trustee of the Creditor Trust established under the Creditor Trust Agreement dated April ___, 2010 pursuant to the Plan;

WHEREAS, the Plan and Confirmation Order contemplate that a Cooperation Agreement will be executed between the Reorganized Debtors and the Trustees;

WHEREAS, Section 2.2(c) of the Litigation Trust Agreement provides that the Reorganized Debtors shall deliver certain documents to the Litigation Trustee in connection with the Assigned Preference Claims and the Non-Settling Defendant Claims, other than the Non-Settling Defendant Claims against the Directors, Officers, and Subsidiary Directors (as defined in the complaint in the Committee Litigation, as such complaint may be amended and/or modified from time to time) (the "**Non-D&O Non-Settling Defendant Claims**");

WHEREAS, the Reorganized Debtors have advised that they will be unable to deliver such documents on the Effective Date; and

WHEREAS, among other things, execution of this Cooperation Agreement is intended to satisfy the Reorganized Debtors' obligations to deliver such documents.

NOW THEREFORE, in consideration of the above-stated premises, the mutual covenants contained herein, and for other good and valuable consideration, the parties agree as follows:

ARTICLE I.
OBLIGATIONS AND RIGHTS

Section 1.1    Cooperation.  On and after the Effective Date, the Reorganized Debtors agree to the reasonable cooperation with (i) the Litigation Trust in connection with the Litigation Trust's pursuit of the Assigned Preference Claims and the Non-D&O Non-Settling Defendant Claims and (ii) the Creditor Trust in connection with the Creditor Trust's pursuit of the State Law Avoidance Claims (together with the Assigned Preference Claims and the Non-D&O Non-Settling Defendant Claims, the "**Claims**") as follows:

SUBSTANTIALLY FINAL FORM

(a)     Providing such Trustee (or its professionals) upon written request (including E-mail) of the respective Trustee (or its professionals) reasonable access to information regarding the Claims, including but not limited to delivery of documents in the possession of, or witnesses under the control of, the Reorganized Debtors, to the extent that the Trustee could obtain the same by subpoena, notice of deposition or other permissible discovery request (a "**Discovery Request**"), without the need for a Discovery Request, such information to be used solely for the purposes set forth herein;

(b)     Causing witnesses under the Reorganized Debtors' control to appear at any trial of the Causes of Action asserted in the Claims, without the need for the Trustee to serve a trial subpoena upon such witness;

(c)     At the reasonable request of either Trustee, take, or cause to be taken, all such further action as the respective Trustee may request in order to evidence or effectuate the transfer of the Litigation Trust Assets to the Litigation Trust and the Creditor Trust Assets to the Creditor Trust;

(d)     [With respect to distributions to be made by the Trusts, to the extent reasonably available and to the extent permitted by applicable law and the internal policies and procedures of the Reorganized Debtors, the Reorganized Debtors shall provide the respective Trust with a distributee's employer or taxpayer identification number as assigned by the IRS and any related documentation (including but not limited to a W-8 or W-9); *provided, however*, that the Reorganized Debtors shall have no liability to any party for any error or inaccuracy contained in any such distributee's original, unaltered documentation;]

(e)     Notwithstanding Article I, the obligations of the Reorganized Debtors with respect to the Creditor's Trust pursuit of the State Law Avoidance Claims shall be limited in scope to responding to requests from the Creditor Trustee regarding the identification of former shareholders of Lyondell Chemical who received Merger Consideration (as defined in the Lender Litigation Settlement Agreement), and their respective successors and assigns, and information related to the amounts received;

(f)     Retaining all books, records and other documents supporting the Claims and not destroying any such records until after the termination of the Trusts.  To the extent a formal or informal document request, subpoena or other demand for production of documents related to a Claim is served upon the Reorganized Debtors by a defendant in an action pursued by or on behalf of the Trusts and the Trusts are in possession, custody or control of all or part of the responsive documents, the Reorganized Debtors may demand that the Trusts be responsible for producing such responsive documents in the Trusts' possession, custody or control and the Trusts shall undertake such production;

SUBSTANTIALLY FINAL FORM

(g)    Prior to the Effective Date, the Debtors shall provide the Trusts with a list of all Allowed and Disputed General Unsecured Claims for wages or other remuneration in connection with the performance of services as an employee of a Debtor for any period prior to the filing of the Chapter 11 Cases (an "**Identified Employee Claim**").  Distributions from a Trust in respect of an Identified Employee Claim and for which Withholdings (as defined below) are required are hereinafter referred to as the "**Trust Wage Distributions**."  Each Trust, severally and not jointly, hereby agrees to be responsible for the withholding, reporting and remittance on Trust Wage Distributions by such Trust required for federal, state and local income taxes; the employee and employer portion of social security and Medicare (i.e., Federal Insurance Contribution Act amounts) and unemployment taxes; interest; penalties; additions to tax; and similar amounts owed to a federal, state, local or other governmental authority (such amounts, the "**Withholdings**") to the appropriate governmental authorities.  Notwithstanding the foregoing, to the extent requested by a Trust in writing at least 45 days prior to a distribution date, the Reorganized Debtors hereby agree to act as disbursing agent for all of the Trust Wage Distributions to be made on such scheduled distribution date (the "**Applicable Distributions**").  In connection with such written request, the Trust shall remit to the Reorganized Debtors the Applicable Distributions (from which the employee portion of any Withholdings, including interest, penalties, additions to tax and any similar amounts are to be taken), together with such additional amounts that may be required to cover the employer portion of social security and Medicare (i.e., Federal Insurance Contribution Act amounts) and unemployment taxes; interest; penalties; additions to tax; and similar amounts owed to a federal, state, local or other governmental authority.  As soon as practicable after receipt of such funds, and such additional information as the Reorganized Debtors may reasonably request to process the Applicable Distributions, the Reorganized Debtors shall arrange (i) to withhold, report and remit to the appropriate government authority in accordance with applicable laws and regulations, from the funds so provided, the Withholdings required in respect of the Applicable Distributions using the Reorganized Debtors' payroll system and applicable employer identification numbers, and (ii) to distribute the balance of the Applicable Distributions to the applicable beneficiary of the Trust.  Nothing herein is intended to modify Section 7.17 of the Plan, which remains in effect.  The parties further agree to cooperate with all reasonable requests for assistance and information relating to the Identified Employee Claims, and their respective obligations hereunder.  For the avoidance of doubt, the Trusts are assuming no obligation for Withholdings hereunder for any General Unsecured Claim that is not an Identified Employee Claim; and nothing herein shall require the Trust to withhold on distributions in respect of an Identified Employee Claim except as otherwise required by law, *provided* that the applicable Trust shall be responsible for any liabilities with respect to Withholdings on Identified Employee Claims in accordance with the third sentence of this Section 1.1(g).

(h)    All references in this Section 1.1 (and elsewhere in this Agreement) to cooperation and similar obligations running in favor of the Trustees, shall be deemed also to run in favor of such Trustee's agents and representatives retained by the Trustees to pursue the Claims (including, for example, counsel, accountants and financial advisors) provided that each Trustee and its agents and representatives shall endeavor to use commercially reasonable efforts to coordinate between and among themselves with respect to requests made to the Reorganized Debtors in order to minimize burdens on the Reorganized Debtors; and

SUBSTANTIALLY FINAL FORM

(i)     For the avoidance of any doubt, nothing within this Agreement shall obligate the Reorganized Debtors to facilitate the cooperation of any of its non-employee directors to be appointed in accordance to the Plan or any of the directors' affiliates (other than the Reorganized Debtors), or their agents or employees (in their capacities as such).  This Agreement shall not encompass any information, documents, or materials developed by the Settling Defendants in the course of the Committee Litigation or that were in the sole custody of the Settling Defendants prior to the execution of the Lender Litigation Settlement Agreement.

Section 1.2     Access.

(a)     Access with respect to individuals shall include, without limitation, reasonable access by telephone, periodic meetings, interviews, and appearance of such employees as witnesses (by affidavits, at depositions and at trials, as necessary) and availability for preparation as a witness during normal business hours;

(b)     Subject to Sections 1.2(c), (d) and (e) below, access to documents shall include, without limitation, making reasonably available for inspection during normal business hours and, at the request of the Trustee, delivering all documents (except for privileged documents as set forth below), instruments, books and records held by the Reorganized Debtors or their professionals (including those maintained in electronic format and original documents) reasonably related to the Claims (other than Assigned Preference Claims that the Litigation Trust is precluded from bringing against Excluded Persons under Section 3.3 of the Lender Litigation Settlement Agreement), which documents shall include without limitation, accounting and financial records, shareholder lists, customer and vendor lists and records including payment/billing histories, e-mail records, contracts, reports, documents and other instruments relating to payments for goods and services (e.g., invoices, purchase orders, checks, requisitions, correspondence, etc.).  With respect to Assigned Preference Claims in which the Reorganized Debtors have designated the potential defendant as an Excluded Person, the Reorganized Debtors shall provide to the Trustee, upon request, information sufficient to identify the basis upon which the Reorganized Debtors have determined that such potential defendant constitutes an Excluded Person.

(c)     Access to documents shall include making reasonably available privileged documents related to the Claims created by the Debtors, except that the Reorganized Debtors shall not be required to produce or make available for inspection:

(i)     privileged documents created during (or in preparation for) the Chapter 11 Cases except to the extent that they contain analysis of the merits of the claims identified in Section 1.1 above and not the conduct or strategy of any aspect of the Chapter 11 Case;

(ii)     privileged documents with respect to the determination of whether any person or party is an Excluded Person as that term is defined in Section 3.3 of the Lender Litigation Settlement Agreement;

(iii)    any privileged documents created by or at the direction of the Reorganized Debtors on or after the Effective Date; and

(iv)    any document that the Reorganized Debtors are under a legal obligation due to personal privacy issues of an employee or contractual obligation to refrain absent a subpoena or formal discovery request from providing to a third party, whether or not privileged.

For purposes of this Section 1.2(c), "privileged" means either attorney-client privilege or work product protection (or both as the case may be) as those terms are defined in Federal Rule of Evidence 502(g).

(d)    For purposes of transfer of documents, the Trusts are assignees and successors to the Debtors in respect of the Assigned Preference Claims and shall be treated as such in any review of confidentiality restrictions in requested documents.

(e)    Access to documents shall also include the Reorganized Debtors' coordination with either Trustee to provide such Trust and its professionals with access to electronic databases of documents containing the documents produced in response to discovery requests served in connection with Bankruptcy Rule 2004 and the Committee Litigation (the "**Discovery Database**"); *provided, however,* that prior to obtaining access to the Discovery Database, the Trustee and any professional acting on behalf of the Trust (each in his, her or its capacity as such) shall execute (in accordance with the terms therewith) and agree to be bound by the terms of the Stipulation and Protective Order dated November 13, 2009 entered in the Committee Litigation; *provided, further*, that the continued maintenance of the Discovery Database shall be at the expense of the Trust(s) that requests such access; *provided, further*, that the applicable Trust(s) shall not provide access to any document in the Discovery Database designated as confidential or highly confidential and produced by any party other than the Debtors (each a "Producing Party") to third parties unless such third parties have executed a confidentiality agreement providing the consent of each Producing Party whose production is sought to be accessed by such third party.  The Reorganized Debtors shall reasonably cooperate with the Trust in connection with executing such written confidentiality agreements on behalf of the Reorganized Debtors.

(f)    Notwithstanding any other subsection of this Section 1.2, with respect to Assigned Preference Claims in which the aggregate amount of payments that the Litigation Trust may seek to recover against a particular potential defendant is less than $100,000, the Reorganized Debtors shall initially provide the Litigation Trustee with (i) the name and address of the potential defendant, (ii) an itemized list of all payments made to such potential defendant within the applicable preference period, including the date and amount of each payment and (iii) any other information reasonably requested by the Litigation Trustee to enable the Litigation Trust to serve a demand letter on such potential defendant.  If the Litigation Trustee determines to commence litigation against such potential defendant regarding the Assigned Preference Claim, then the more comprehensive access described in Section 1.2(a) shall be afforded.

(g)    The parties agree to work together constructively to structure the access and delivery requirements so as not to materially detract from the Reorganized Debtors' ability

to conduct their business operations; *provided, however*, that it is understood and agreed that the Reorganized Debtors shall at all times use reasonable efforts to provide such assistance in a timely manner, so as to enable the Trustees to timely pursue the Claims, it being understood that time may be of the essence in certain instances where the respective Trust is under deadlines in connection with certain statutes of limitation or court hearing or filing deadlines. The Trustees will endeavor to use their commercially reasonable efforts to provide the Reorganized Debtors as much notice as is reasonably practical in requesting cooperation under this Agreement.

Section 1.3    <u>Cooperation Coordinators</u>. The Reorganized Debtors hereby designate the following two (2) employees to serve as contacts for the Trustees, facilitating the Trustees' access to information provided for in this Agreement (each a "**Cooperation Coordinator**"): [_____ and _____]. The Cooperation Coordinators shall designate an alternate to deal with requests for access and information when neither Cooperation Coordinator is available. The Reorganized Debtors shall require the Cooperation Coordinators and their alternate to facilitate the cooperation contemplated by this Agreement in accordance with the terms hereof. To the extent practicable, all requests for information, documentation or access to the Reorganized Debtors' employees will be made to a Cooperation Coordinator, or if not available, the alternate. Nothing herein shall preclude either Trustee from making requests to counsel to the Reorganized Debtors, or from seeking information from sources other than the Cooperation Coordinators or the alternate, if such persons are not available or do not otherwise provide the information or access requested in a timely manner.

Section 1.4    <u>No Limitation on Access</u>. Notwithstanding anything in this Agreement to the contrary, the parties acknowledge and agree that nothing herein shall limit the full exercise of the rights under applicable law of either Trustee to seek and obtain information, documents or to take depositions of any person by subpoena or otherwise pursuant to legal process, regardless of whether or not an obligation of cooperation is owed hereunder with respect to such information, documents or depositions or any demands made under this Agreement shall have been complied with in full or in part or any remedy with respect to any actual or purported breach or noncompliance with this Agreement has been sought; *provided, however,* that in connection with any exercise of rights by a Trustee to seek and obtain information, documents or to take depositions of any person by subpoena or otherwise pursuant to legal process, the Reorganized Debtors shall retain any objections or defenses to such exercise of rights that they may have under applicable law.

Section 1.5    <u>Preservation of Privilege and Defenses</u>. Any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to either Trust or provided to a Trustee on behalf of the respective Trust shall vest in the applicable Trustee and its representatives, and the Reorganized Debtors and the respective Trustee are authorized to take all necessary actions to effectuate the transfer of such privileges and available defenses; *provided, however*, that to the extent the Reorganized Debtors inadvertently transfer to a Trustee any documents to which a privilege or immunity attaches which the Reorganized Debtors contend (x) does not reasonably relate to the Claims, or (y) they are exempted from being required to provide pursuant to section 1.2(c) of this Agreement (any document falling within (x) or (y) an "Inadvertently Provided Document") the Reorganized Debtors may, in writing following actual discovery of such inadvertent production, request the return of any Inadvertently Provided Document. A request

SUBSTANTIALLY FINAL FORM

for the return of an Inadvertently Provided Document shall identify the document inadvertently provided and the basis for withholding such document from production.  If the Reorganized Debtors request the return, pursuant to this paragraph, of any Inadvertently Provided Document then in the custody of either of the Trusts, the applicable Trust shall within ten (10) business days (a) return to the Reorganized Debtors the Inadvertently Provided Document and all copies thereof; and (b) destroy all notes or other work product reflecting the content of such Inadvertently Provided Document.   The Trust returning such material may then move the Bankruptcy Court or other court of competent jurisdiction for an order compelling the provision of the material pursuant to the terms of this Agreement, but shall not contend that the provision of the document constituted a waiver of any applicable privilege or immunity.

Section 1.6   <u>Confidentiality</u>.   The Reorganized Debtors shall have the ability to reasonably designate certain business information that represents trade secrets, confidential research, development or commercial or strategic information that, the Reorganized Debtors reasonably believe if disclosed to competitors, suppliers or vendors, would put the Reorganized Debtors at a competitive disadvantage (the "**Highly Confidential Material**").  The term "**Highly Confidential Material**" shall not include information which (i) is or becomes generally available to, or known by, the public other than as a result of the unauthorized disclosure by either Trustee; or (ii) becomes available to either Trustee on a non-confidential basis from a source other than the Reorganized Debtors or any of their advisors, agents or affiliates, provided that the information from such source is not known by the Trustee  to be subject to a confidentiality agreement with, or other obligation of secrecy to, the Reorganized Debtors, whether by a contractual, legal or fiduciary obligation, or subject to any other prohibition against disclosing such information.   If the Reorganized Debtors designate information as highly confidential, the respective Trustee hereby agrees that it will use (directly or indirectly) the Highly Confidential Material obtained herein solely in connection with the such Trust's pursuit of the Claims, and, except as set forth below, shall only provide such information to the Trustee and retained professionals who agree in writing reasonably satisfactory to the Reorganized Debtors to keep such information highly confidential.  The Highly Confidential Material will be kept confidential by the respective Trust; *provided, however*, that nothing herein shall be deemed to restrict such Trustee from disclosing the Highly Confidential Material to the Bankruptcy Court or other court of competent jurisdiction orally or in writing; *provided, further* that, to the extent reasonably practical and so long as the information is otherwise discoverable, the Trustee shall provide five business days' notice (unless exigent circumstances do not afford time for such notice, in which case the Trustee shall endeavor to provide as much notice as possible) to the Reorganized Debtors before disclosing such material to such court to allow the Reorganized Debtors to obtain a protective order or agreement (if they choose to do so), and if the Reorganized Debtors do not obtain a protective order or agreement, the Trustee shall make any such disclosure under seal, unless such court orders otherwise.   In the event that the Trustee is required or requested (i) by a court of competent jurisdiction, (ii) in connection with a foreign proceeding or litigation, or (iii) by a federal, state or local governmental or regulatory body, in each case, to disclose any Highly Confidential Material supplied to the Trustee, the Trustee will provide the Reorganized Debtors with prompt written notice of such request or requirements so that the Reorganized Debtors and/or their affiliates may seek, at their sole cost and expense, an appropriate protective order or agreement and/or seek appropriate approvals from the Bankruptcy Court and/or any other court, tribunal or governmental or regulatory body having

SUBSTANTIALLY FINAL FORM

jurisdiction over the relevant action, litigation, proceeding or hearing, as applicable.  In the absence of a protective order entered by the Bankruptcy Court or the receipt of a waiver hereunder, the Trustee may only disclose that portion of the Highly Confidential Material that its counsel advises to be disclosed to such tribunal or governmental authority without liability hereunder.  To the extent that the Trustee is subject to examination by a regulatory authority or bank auditor, it shall not be in breach of its obligations hereunder if it permits such authority or bank auditor to review the Highly Confidential Material, without notice to any persons, in connection with a review of the Trustee's files.

Section 1.7    Reimbursement of Certain Expenses.

(a)    Except as set forth in Section 1.7(b) below, the Litigation Trust or the Creditor Trust, as applicable, shall reimburse the Reorganized Debtors in connection with the such Trust's requests hereunder, for any reasonable documented out-of-pocket expenses incurred by the Reorganized Debtors.  In connection with such requests, the appropriate Trust shall reimburse the Reorganized Debtors for any employee's out of pocket travel costs.  For the avoidance of doubt, such reimbursement shall not include any fees or expenses of the Reorganized Debtors' professionals.

(b)    Notwithstanding the above in Section 1.7(a), in no event shall either Trust be required to reimburse the Reorganized Debtors for any costs associated with the production of documents (including copying and shipping costs and the time of any employees associated with responding to document requests) or for time spent by any employee of the Reorganized Debtors on matters related to this Agreement.

Section 1.8    Relationship to, and Incorporation of, the Plan.  The principal purpose of this Cooperation Agreement is to aid in the implementation of the Plan and the Confirmation Order, and therefore this Cooperation Agreement incorporates the provisions of the Plan and the Confirmation Order by this reference.  If any provisions of this Cooperation Agreement are found to be inconsistent with the provisions of the Plan, Lender Litigation Settlement Agreement and the *Order Approving Revised Settlement with Financing Party Defendants in Committee Litigation Pursuant to Bankruptcy Rule 9019*, entered March 11, 2010 (Committee Litigation Docket No. 371) (the "**Lender Litigation Settlement Approval Order**") or the Confirmation Order, each such document shall have controlling effect in the following rank order: (i) the Confirmation Order; (ii) this Cooperation  Agreement; (iii) the Lender Litigation Settlement Agreement and the Lender Litigation Settlement Approval Order and (iv) the Plan.

Section 1.9    No Effect on Certain Parties.    For the avoidance of doubt, and notwithstanding anything to the contrary contained in this Cooperation  Agreement (including, without limitation, this Section 1.9), the parties hereby agree and acknowledge that nothing in this Cooperation Agreement is intended to, does, or shall be construed to affect, prejudice, harm or impact in any way, the rights, remedies, or treatment (including any releases, exculpation, indemnification or otherwise), of any Secured Lender, Secured Lender Releasee, Settling Defendant, or Settling Defendant Releasee (collectively, the "Unaffected Parties") under the Plan, the Lender Litigation Settlement Agreement or the Lender Litigation Settlement Approval Order. The Parties further agree that the preceding sentence and a statement that this Section 1.9 may not be amended shall be included in the Confirmation Order, and that notwithstanding any

ability of the parties to amend this Cooperation Agreement, such parties shall not be permitted to amend this Section.

## ARTICLE II.
## TERM OF THIS AGREEMENT

Section 2.1    <u>General</u>.    This Agreement shall terminate automatically upon the termination of the Trusts in accordance with their governing documents.

## ARTICLE III.
## MISCELLANEOUS

Section 3.1    <u>Notices</u>.    All notices, requests or other communications required or permitted to be made in accordance with this Cooperation Agreement shall be in writing and shall be effective when either served by hand delivery, electronic mail, electronic facsimile transmission, express overnight courier service, or by registered or certified mail, return receipt requested, addressed to the parties at their respective addresses set forth below, or to such other address or addresses as either party may later specify by written notice to the other:

(a)    To the Litigation Trust: to the address designated in the Litigation Trust Agreement;

(b)    To the Creditor Trust: to the address designated in the Creditor Trust Agreement; or

(c)    To the Reorganized Debtors: to the Cooperation Coordinator(s) or such persons as the Reorganized Debtors may designate from time to time.

Section 3.2    <u>Effectiveness</u>.    This Cooperation Agreement shall become effective on the Effective Date of the Plan.

Section 3.3    <u>Counterparts; Effectiveness</u>.    This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement. This Agreement shall become effective when each party hereto shall have received counterparts thereof signed by all the other parties hereto.

Section 3.4    <u>Specific Performance</u>.    It is understood and agreed by the parties that money damages would be an insufficient remedy for any breach of this Agreement by any party and each non-breaching party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any party to comply promptly with any of its obligations hereunder; *provided, however,* that in the event the Reorganized Debtors determine in good faith that compliance with a request for cooperation relating to a Claim made by a Trustee under this Cooperation Agreement would impose a financial burden on them that would exceed the potential value of such Claim, the Reorganized

SUBSTANTIALLY FINAL FORM

Debtors may petition the Bankruptcy Court or other court of competent jurisdiction for a remedy in the form of money damages.

Section 3.5    <u>Governing Law, Consent to Jurisdiction</u>.    This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to the rules of conflict of laws of the State of New York or any other jurisdiction. Notwithstanding the foregoing consent to New York jurisdiction, the parties agree that the Bankruptcy Court will have exclusive jurisdiction of all matters arising out of or in connection with this Agreement until the closing of the Chapter 11 Cases, and thereafter the parties agree that the United States District Court for the Southern District of New York shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement; provided, that at any time matters involving the Creditor Trust may only be brought in the United States District Court for the Southern District of New York.

Section 3.6    <u>Severability; Validity</u>.    Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but to the extent that any provision of this Agreement or the application thereof to any person or circumstance is held invalid or unenforceable, the remainder of this Agreement, and the application of such provision to other persons or circumstances, shall not be affected thereby, unless doing so would alter the fundamental agreements expressed in this Agreement, and to such end, the provisions of this Agreement are agreed to be severable.

Section 3.7    <u>Independent Contractor Status</u>. The Reorganized Debtors, Litigation Trust and Creditor Trust shall each be deemed to be an independent contractor of the other and employees of any such party shall at all times be regarded only as employees of such party. Nothing contained in this Cooperation Agreement shall create or be deemed to create an employment, agency, fiduciary, joint venture or partnership relationship between any of the Reorganized Debtors, Litigation Trust or the Creditor Trust, on the one hand, or any of such other parties' employees, on the other hand.

Section 3.8    <u>No Waiver</u>.    The Reorganized Debtors, the Litigation Trust and the Creditor Trust agree that no failure or delay by either party in exercising any right, power or privilege hereunder will operate as a waiver thereof, and that no single or partial exercise thereof will preclude any other or further exercise thereof or the exercise of any right, power and privilege hereunder.

Section 3.9    <u>Entire Agreement</u>.    This Cooperation Agreement, the Lender Litigation Settlement Agreement and the Plan contain the entire agreement of the parties concerning the subject matter hereof, and no modification of this Cooperation Agreement or waiver of the terms and conditions hereof will be binding upon the parties unless approved in writing by the parties.

Section 3.10    <u>Authorization</u>.    Each of the undersigned individuals represents and warrants that he/she has the power and authority to enter into this Cooperation Agreement and bind their respective companies or trust as its authorized representatives.

SUBSTANTIALLY FINAL FORM

Section 3.11    Titles.  The section titles used herein are for convenience only and shall not be considered in construing or interpreting any of the provisions of this Cooperation Agreement.

Section 3.12    Binding Effect. The parties agree that this Cooperation Agreement is for the benefit of and shall be binding upon the parties and their respective representatives, transferees, successors and assigns.

[SIGNATURES ON FOLLOWING PAGE]

SUBSTANTIALLY FINAL FORM

IN WITNESS WHEREOF, the parties hereto have executed this Cooperation Agreement or caused this Cooperation Agreement to be duly executed by their respective representatives thereunto duly authorized as of the day and year first above written.

LYONDELLBASSELL INDUSTRIES AF S.C.A. on behalf of itself and the Reorganized Debtors

By:_____
Name:
Title:

[INSERT NAME], LITIGATION TRUSTEE OF THE LB LITIGATION TRUST ESTABLISHED UNDER THE LITIGATION TRUST AGREEMENT DATED ____, 2010 PURSUANT TO THE THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR LYONDELLBASELL DEBTOR

_____

[INSERT NAME], as

Litigation Trustee

[INSERT NAME], CREDITOR TRUSTEE OF THE LB CREDITOR TRUST ESTABLISHED UNDER THE CREDITOR TRUST AGREEMENT DATED ____, 2010 PURSUANT TO THE THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR LYONDELLBASELL DEBTOR

_____

[INSERT NAME], as

Creditor Trustee

1733629 v/9

**TAB 7**

## MILLENNIUM CUSTODIAL TRUST AGREEMENT

This Millennium Custodial Trust Agreement (the "Agreement"), dated as of April [    ], 2010, by and among Millennium Chemicals, Inc., a Delaware corporation, ("MCI"); [AlixPartners LLP], as managing and liquidating trustee (together with any successor appointed under the terms hereof, the "Trustee") and **[DELAWARE TRUSTEE]**, as Delaware statutory trustee (together with any successor appointed under the terms hereof, the "Delaware Trustee").

## RECITALS

A.      On January 6, 2009, Lyondell Chemical, MCI, and certain other of their Affiliates and subsidiaries as debtors and debtors in possession commenced reorganization cases by filing petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

B.      On March 12, 2010, the Debtors filed the Third Amended Joint Chapter 11 Plan of Reorganization with the Bankruptcy Court (the joint chapter 11 plans of reorganization for the Debtors, including all applicable exhibits and schedules annexed hereto or associated herewith (including the Plan Supplement), that shall be filed with the Bankruptcy Court, as altered, amended or modified from time to time in accordance with the terms hereof, the Bankruptcy Code and the Bankruptcy Rules, being hereinafter referred to as the "Plan").

C.      The Plan provides for the creation of the Millennium Custodial Trust, a Delaware statutory trust (the "Trust"), to resolve the Claims against MCI and, indirectly, against the MCI Subsidiaries, and to liquidate the Millennium Trust Assets.

D.      The parties to this Agreement desire to establish the Trust upon the terms set forth in this Agreement.

E.      Pursuant to the Plan, on the Effective Date, *inter alia*:

   (i)      MCI will contribute certain intellectual property that pertain to the Acetyls Business to MPI;

   (ii)      Certain Debtors, including certain MCI Subsidiaries, will contribute to the Environmental Custodial Trust the Transferred Real Properties;

   (iii)      Equistar Chemicals, LP shall transfer and convey to MCI all of the Equity Interests of Quantum Pipeline Company, Equistar Polypropylene, LLC, Equistar Transportation Company, LLC and Equistar Funding Corporation;

   (iv)      Substantially all of the assets related to the Acetyls Business and F&F Business shall be transferred and conveyed to Affiliates of Lyondell; and

   (v)      Subsequent to the transactions set forth above, Lyondell Chemical will transfer all of its Equity Interests of MCI and the Wind-Up Funds to the Trust pursuant to the Conveyance Agreement.

F.    The beneficiaries of the Trust will be the holders of Allowed Claims (whether Allowed on or after the Effective Date) against MCI, in each case, as and when Allowed (each, a "<u>Beneficiary</u>" and, collectively, the "<u>Beneficiaries</u>"), and the Beneficiaries will hold all of the beneficial interests in the Trust (collectively, the "<u>Millennium Custodial Trust Interests</u>").

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, the parties hereto agree as follows:

## ARTICLE 1

## DEFINITIONS

Section 1.1.    <u>Defined Terms</u>.    Capitalized terms used in this Agreement shall have the meaning set forth in the Plan or in this Agreement.

Section 1.2.    <u>Principles of Construction</u>.  (a)  The meanings set forth for defined terms in this Agreement shall be equally applicable to both the singular and plural forms of the terms defined.

(b)    All references to "this Agreement" or "hereof" and other like terms mean, unless the context requires otherwise, this Agreement, including the schedules and exhibits hereto, as the same may be amended, modified or supplemented from time to time in accordance with the terms of this Agreement.

(c)    The section headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or of any term or provision hereof.

(d)    References in this Agreement to sections, schedules and exhibits, unless otherwise specified, are to sections, schedules and exhibits to this Agreement.

## ARTICLE 2

## ESTABLISHMENT OF THE TRUST

Section 2.1.    <u>Name</u>.  The name of the Trust shall be the "Millennium Custodial Trust" or such other name as the Trust, in its discretion, shall determine.  In connection with the exercise of the Trustee's powers hereunder, the Trustee may use this name or such variations thereof as he determines appropriate.

Section 2.2.    <u>Establishment of Trust</u>.  The parties hereto hereby establish the Trust for the benefit of the Beneficiaries to be effective as of or as soon as practicable after the Effective Date.  It is the intention of the parties hereto that the Trust constitute a statutory trust under the Act and that this Agreement constitute the governing instrument of the Trust.  Pursuant to Section 3810 of the Act, the Trustee shall file a certificate of trust with the Delaware Secretary of State on the date hereof in order to form the Trust.  Effective as of the date hereof, the Trustee

shall have all the rights, powers and duties set forth herein and, to the extent not inconsistent herewith, in the Act with respect to accomplishing the purpose of the Trust set forth below.

Section 2.3.    <u>Purpose of the Trust</u>.  The Trust shall be established for the sole purpose of holding, liquidating and distributing the Millennium Trust Assets and resolving the Claims against MCI and, indirectly, Claims against the MCI Subsidiaries, with no objective to continue or engage in the conduct of a trade or business (except for activities necessary to preserve value or accomplish an orderly liquidation of the Millennium Trust Assets), and the Trust shall have the power and authority to engage in the foregoing activities.  Subject to the terms and conditions of this Agreement, the Trustee shall, in an expeditious but orderly manner, liquidate the Millennium Trust Assets, make timely distributions to the Beneficiaries and not unduly prolong the duration of the Trust.  For the avoidance of doubt, the parties hereto recognize that the liquidation of the Millennium Trust Assets will be subject to the liquidation of the MCI Subsidiaries by the applicable Millennium Chain Governing Bodies.

Section 2.4.    <u>Transfer of Assets and Rights to the Trust</u>.  On or as of the Effective Date, pursuant to the Conveyance Agreement, Lyondell Chemical will irrevocably and absolutely transfer, assign, convey and deliver to the Trust, in trust for the benefit of the Beneficiaries for the uses and purposes stated herein, all of its right, title, and interest in the Millennium Trust Assets, and the Trust shall accept all such Millennium Trust Assets and shall agree to hold and administer the Millennium Trust Assets for the benefit of the Beneficiaries and shall release and indemnify Lyondell Chemical and its Affiliates from all liabilities arising out of or relating to the Millennium Trust Assets, subject to the terms and conditions of this Agreement and the Plan; provided, however, that the Millennium Trust Assets transferred to the Trust shall not include the Assigned Preference Claims or the Non-Settling Defendant Claims as such terms are defined in the Plan.

Section 2.5.    <u>Return of Assets</u>.  At any time following the Effective Date, if the Trust becomes aware that any asset primarily related to the Acetyls Business, the F&F Business or any of the assets or businesses of the Reorganized Debtors is held by MCI or the MCI Subsidiaries, including any real property, the Trust will execute such documents as are reasonably requested by Lyondell Chemical in order to transfer such assets to Lyondell Chemical or its Affiliates.

Section 2.6.    <u>Access to Information</u>.    (a) Pursuant to the Conveyance Agreement, Lyondell Chemical and its Affiliates and representatives shall have, upon reasonable written notice to the Trustee, the right to examine and, at their own expense, receive copies of all documents, books and records related to the Millennium Trust Assets that are delivered by or on behalf of Lyondell Chemical or its Affiliates to the Trust pursuant to the Conveyance Agreement.

(b)    To the extent reasonably necessary for the administration of the Environmental Custodial Trust, the Environmental Custodial Trust shall have, upon reasonable notice to the Trustee, the right to examine and, at its own expense, receive copies of all documents, books and records related to the assets of the Environmental Custodial Trust that were delivered by or on behalf of Lyondell Chemical or its Affiliates to the Trust pursuant to the Plan.

Section 2.7.    <u>Formation Expenses</u>.  As soon as practicable after the Effective Date, but in no event later than sixty (60) days thereafter, subject to the Trustee's receipt of reasonable supporting documentation, the Trust shall reimburse Lyondell and each Released Party for all reasonable costs and expenses each such entity incurred in connection with the development and formation of the Trust, including, but not limited to, reasonable attorney and consulting fees and expenses.

Section 2.8.    <u>Valuation of Millennium Trust Assets</u>.  As soon as practicable after the Effective Date, but in no event later than ninety (90) days thereafter, the Trustee shall (a) make a good faith valuation (as of the Effective Date) of the Millennium Trust Assets, and (b) notify the Beneficiaries in writing of such valuation (indicating therein such Beneficiary's respective percentage ownership interests in the Trust based on such Beneficiary's relative Millennium Custodial Trust Interests as of the Effective Date).  The above valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Trustee and the Beneficiaries) for all purposes, including, without limitation, all U.S. federal income tax purposes.

# ARTICLE 3

# MILLENNIUM TRUST TRUSTEE

Section 3.1.    <u>Appointment of the Trustee; Role</u>.  As of the date hereof, the Trustee shall be [AlixPartners LLP].  The Trustee shall manage the affairs of the Trust and shall have the authority to bind the Trust to the extent the Trustee is acting in the capacity of a trustee and not individually.  The Trustee may not be a Beneficiary or related or subordinate (within the meaning of section 672(c) of the Internal Revenue Code) to any Beneficiary.  The Trustee shall be subject to removal and replacement as and to the extent provided in Article 10.  To the fullest extent as such duties may be disclaimed or limited under the Act or other applicable law, this Agreement is not intended to create fiduciary duties to, and the Trustee shall not be deemed to be (or be treated in any way as) a fiduciary of, the Beneficiaries.

Section 3.2.    <u>Authority of Trustee</u>.  In connection with the administration of the Trust, except as set forth in this Agreement, the Trustee is authorized to perform any action necessary or desirable to accomplish the purpose of the Trust to the extent such action is consistent with IRS Revenue Procedure 94-45, 1994-2 C.B. 684, and Treasury Regulations section 301.7701-4(d).  Without limiting, but subject to, the foregoing, the Trustee shall be expressly authorized, but shall not be required, to:

(a)    perform the duties, exercise the powers, and assert the rights of a trustee under Sections 704 and 1106 of the Bankruptcy Code, including, without limitation, commencing, prosecuting or settling Causes of Action, enforcing contracts, and asserting claims, defenses, offsets and privileges;

(b)    manage, sell, transfer, assign or deal in any other manner with any of the Millennium Trust Assets in such manner not otherwise explicitly provided for herein as the Trustee may deem advisable, to the extent any such action would be consistent with the terms of this Agreement and the Plan and subject to consultation with the Trust Advisory Board;

-4-

(c)     execute and file any and all documents and take any and all other actions related to, or in connection with, the liquidation of the Millennium Trust Assets, the exercise of the Trustee's powers granted herein and the enforcement of any and all instruments, contracts, agreements or causes of action relating to the Trust;

(d)     protect and enforce the rights to the Millennium Trust Assets by any method deemed appropriate, including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(e)     borrow funds, incur or assume liabilities, and pledge any portion of the Millennium Trust Assets on behalf of the Trust in furtherance of or in connection with the Trustee's or the Trust's duties, powers, authority, and obligations under this Agreement, and determine and satisfy any and all liabilities created, incurred or assumed by the Trust;

(f)     timely file (or cause to be timely filed) all tax and information returns required to be filed by the Trust, and timely pay (or cause to be timely paid) all taxes properly due and owing by the Trust or the DC Reserve;

(g)     pay all expenses and make all other payments relating to the Millennium Trust Assets;

(h)     obtain reasonable insurance coverage with respect to the Trustee's liabilities and obligations as Trustee under this Agreement (in the form of an errors and omissions policy or otherwise) as well as insurance coverage with respect to the any liability for indemnification of the Trustee, the Indemnified Persons, and any persons with other contractual rights to indemnification, each of the foregoing to the fullest extent provided for in the Plan, hereunder or under the terms of such contracts;

(i)     have the sole and exclusive power to exercise all voting right with respect to the Equity Interests of MCI pursuant to this Agreement in Person, by proxy, by consent to corporate action or otherwise, in the Trustee's reasonable discretion in accordance with the purpose of the Trust (it being understood that the Trustee shall be entitled to serve as a director of MCI and shall have the sole power to appoint and to remove all other directors and officers of MCI);

(j)     cause the Trust, MCI, and/or the MCI Subsidiaries to retain and employ [AlixPartners LLP] including retaining and appointing that firm's personnel to assist the Trustee or to assist and/or serve as directors and officers (or other appropriate Persons responsible for management) of, as needed, MCI and each MCI Subsidiary, and instruct such directors (or such other appropriate Persons) to cause such appointed officers to maintain separate records and accounts with respect to all funds held on behalf of MCI and each MCI Subsidiary, provided that, (x) the retention of such firm and personnel shall be pursuant to an agreement with terms and conditions that shall also be generally applicable to the Trust's retention of the Trustee, (y) any such retention agreement executed on behalf of the Trust, MCI or the MCI Subsidiaries is hereby affirmed and the terms of same are hereby incorporated by reference herein, and

(z) upon such retention(s), such firm and personnel shall be included as Indemnified Persons and entitled to all protections and rights pursuant to Article 11 hereunder;

(k)    retain and pay such counsel and other professionals as the Trustee may select to assist the Trustee in its duties, on such terms (including contingency-fee arrangements) as the Trustee deems appropriate, without Bankruptcy Court approval (it being understood that the Trust may retain any professional who represented parties in interest in the Chapter 11 Cases);

(l)    retain and pay an independent public accounting firm to perform such reviews and/or audits of the financial books and records of the Trust as may be appropriate (it being understood that the Trustee may commit the Trust to, and shall, pay such independent public accounting firm reasonable compensation for services rendered and expenses incurred);

(m)    retain and pay such other third parties as the Trustee may deem necessary or appropriate to assist the Trustee in carrying out its powers and duties under this Agreement (it being understood that the Trustee may commit the Trust to, and shall, pay all such third parties reasonable compensation for services rendered and expenses incurred, and may commit the Trust to indemnify any such third parties in connection with the performance of services);

(n)    assert or waive any privilege or defense on behalf of the Trust;

(o)    compromise, adjust, arbitrate, sue on or defend, pursue, prosecute, abandon, exercise rights, powers, and privileges with respect to, or otherwise deal with and settle, in accordance with the terms set forth herein, any Causes of Action in favor of or against the Trust as the Trustee shall deem advisable, provided, however, that the aforementioned Causes of Action shall not include any   Assigned Preference Claims or the Non-Settling Defendant Claims, as such terms are defined in the Plan;

(p)    invest in, and only in, demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as U.S. Treasury bills;

(q)    establish and maintain a website for the purpose of providing notice of Trust activities in lieu of sending written notice to the Beneficiaries, subject to providing notice of such website to the Beneficiaries;

(r)    make interim and final distributions to Beneficiaries of the proceeds of the Millennium Trust Assets, including, without limitation, any proceeds received by MCI upon the liquidation of any MCI Subsidiary;

(s)    take or refrain from taking any and all actions the Trustee reasonably deems necessary or convenient for the protection and maximization of the Millennium Trust Assets or to carry out the purposes hereof;

(t)    seek the examination of any Person pursuant to Bankruptcy Rule 2004;

(u)     request any appropriate tax determination with respect to the Trust, including, without limitation, any determination pursuant to Section 505(a) and Section 505(b) of the Bankruptcy Code;

(v)     make any tax election, settle or compromise any tax liability, or consent to any claim or assessment relating to taxes; and

(w)     take all other actions that the Trustee deems appropriate with respect to the Millennium Trust Assets to the extent consistent with the purpose of the Trust.

Section 3.3.    <u>Limitations on Authority of Trustee</u>.   Notwithstanding anything herein to the contrary, the Trustee shall have no authority to do any of the following:

(a)     take any action in contravention of this Agreement, the Plan, the Bankruptcy Court's order confirming the Plan or applicable law, or any action that would make it impossible to carry on the activities of the Trust;

(b)     possess property of the Trust or assign the Trust's rights in specific property for other than Trust purposes;

(c)     permit the Trust, MCI or any MCI Subsidiary to engage in any trade or business or hold any operating assets except as contemplated in Section 2.3;

(d)     permit the Trust, MCI or any MCI Subsidiary to receive or retain Cash or cash equivalents in excess of a reasonable amount necessary to pay costs and expenses of the Trust as such become due and payable and to meet Claims and contingent liabilities or to maintain the value of such entity's assets during liquidation;

(e)     permit the Trust to hold (directly or indirectly) any interest in an entity other than MCI or an MCI Subsidiary; or

(f)     take (or permit the Trust, MCI or any MCI Subsidiary to take) any action which unreasonably prolongs the liquidation of the Trust, MCI or any MCI Subsidiary, or otherwise engage (or permit the Trust, MCI or any MCI Subsidiary to engage) in any investments or activities inconsistent with the treatment of the Trust as a liquidating trust under Treasury Regulations section 301.7701-4(d) or for purposes of IRS Revenue Procedure 94-45, 1994-2 C.B. 684.

Section 3.4.    <u>Wind-Up Funds Account</u>.   The Wind-Up Funds will be held in an account maintained by the Trustee and may be invested in accordance with Section 3.2 until such Wind-Up Funds are required to fund the expenses of the resolution of Claims, Causes of Action, liquidation of Millennium Trust Assets and Millennium Trust Chain Assets and general expenses of the Trust, MCI and the MCI Subsidiaries.

Section 3.5.    <u>Books and Records</u>.   The Trustee shall maintain, or cause to be maintained, in respect of the Trust and the Beneficiaries books and records relating to the Millennium Trust Assets and income of the Trust and the payment or assumption by the Trust of liabilities, expenses or claims in such detail and for such period of time as may be necessary to

enable the Trust to make full and proper accounting in respect thereof.  Such books and records shall be maintained on a modified cash or other comprehensive basis of accounting.  The members of the Trust Advisory Board shall have the right to examine all such books and records and all other books and records of the Trust.  Except as otherwise may be expressly provided herein, nothing in this Agreement requires the Trustee to file any accounting, or seek approval of any court, with respect to the administration of the Trust, or as a condition for managing any payment or distribution out of the Millennium Trust Assets.

Section 3.6.    <u>Reporting Duties</u>.  Commencing thirty (30) days after the Effective Date, and continuing quarterly thereafter until the Trust is terminated, the Trustee shall provide written reports to the Trust Advisory Board which shall contain, at a minimum, the following information:  (a) the aggregate amount of Cash received and distributed by the Trust during such period, (b) the amount of Cash on hand in the Trust as the date of the applicable report, (c) the status of the liquidation of the Millennium Trust Chain Assets, and (d) any other material developments with respect to the Trust or any of the Millennium Trust Chain Assets during such period.  The Trustee shall further provide an annual report to the Trust Advisory Board containing a valuation of the Millennium Trust Chain Assets held by the Trust as of the date of such report.  The Trustee shall provide such additional information to the Trust Advisory Board as may be reasonably requested and shall be responsible for all tax and other matters set forth in Article 8.

Section 3.7.    <u>Compensation of the Trustee and Professionals</u>. The Trust shall pay reasonable compensation to, reimburse expenses reasonably incurred by, and abide by all other terms granting protections or rights to or in favor of the Trustee and the Delaware Trustee, as well as Persons retained as contemplated under Section 3.2(j), in accordance with the terms of their respective retention agreements.  The compensation payable by the Trust specifically for the services of [AlixPartners LLP] as Trustee shall be in the base amount of $9,000 per month, plus such other generally applicable terms and conditions under the Trust's retention agreement entered into pursuant to Section 3.2(j), as same may be amended from time to time.  In addition, the Trust shall also pay reasonable compensation for and reimburse expenses incurred in connection with the services provided by any other professionals or other Persons retained by the Trustee, the Delaware Trustee or the Trust as permitted under this Agreement.

Section 3.8.    <u>Reliance by Trustee</u>.  Except as otherwise provided herein, (a) the Trustee may rely, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by the Trustee to be genuine and to have been signed or presented by the proper party or parties; and (b) any Person dealing with the Trustee shall look only to the Millennium Trust Assets to satisfy any liability incurred by the Trustee to such Person in carrying out the terms of this Agreement, and neither the Trustee nor any member of the Trust Advisory Board shall have any personal liability or other obligation to satisfy any such liability.

# ARTICLE 4

## DELAWARE TRUSTEE

Section 4.1.    <u>Appointment of the Delaware Trustee; Role</u>.  As of the date hereof the Delaware Trustee shall be **[NAME]**.  The Delaware Trustee shall at all times have its principal place of business in the State of Delaware, and may not be a Beneficiary or related or subordinate (within the meaning of section 672(c) of the Internal Revenue Code) to any Beneficiary.  Notwithstanding any other provision of this Agreement, the Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and liabilities of, the Trustee described in this Agreement.  The Delaware Trustee shall be a trustee of the Trust for the sole and limited purpose of fulfilling the requirements of Section 3807 of the Act, and shall have no duties (including fiduciary duties) to the Trust, the Trustee, any Beneficiary or any other Persons, except as expressly provided herein or as required by the Act.  The Delaware Trustee shall maintain its authority and power to act as the Delaware Trustee in the State of Delaware, and shall be subject to removal and replacement as and to the extent provided in Article 10.  The Delaware Trustee shall be entitled to all of the same rights, protections, indemnities and immunities under this Agreement and with respect to the Trust as the Trustee.  No amendment or waiver of any provision of this Agreement which adversely affects the Delaware Trustee shall be effective against it without its prior written consent.

Section 4.2.    <u>Duties of Delaware Trustee.</u>  The duties of the Delaware Trustee shall be limited to (i) accepting legal process served on the Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Delaware Secretary of State which the Delaware Trustee is required to execute under the Act.  If the Delaware Trustee receives any service of process, legal complaints, notices, correspondence, instruments, property or any documents relating to the Trust, the Delaware Trustee shall remit same to the Trustee within five (5) days of such receipt.

# ARTICLE 5

## TRUST ADVISORY BOARD

Section 5.1.    <u>Membership; Authority; Tenure; Removal and Vacancies</u>.  As of the Effective Date, the advisory board of the Trust (the "<u>Trust Advisory Board</u>") shall consist of three (3) members to be appointed by the Debtors.  This Agreement is not intended to create a fiduciary duty, nor to the fullest extent permitted by law shall the Trust Advisory Board or any member thereof be deemed to be (or be treated in any way as) a fiduciary of the Beneficiaries.  For the avoidance of doubt, to the fullest extent permitted by law neither the power to give direction to or otherwise control the Trustee nor the exercise thereof by the Trust Advisory Board shall cause such Persons to have duties (including fiduciary duties) or liabilities relating thereto at law or in equity to the Trust or to any Beneficiary or to any other Person.  Each member of the Trust Advisory Board shall hold office until the termination of the Trust or the earlier resignation, removal, death or disability of such member.  Any member of the Trust Advisory Board may be removed for cause by a vote of the Beneficiaries holding a majority of the Millennium Custodial Trust Interests.  In the event of a vacancy on the Trust Advisory Board, either by resignation, removal, death or disability, the Beneficiaries holding a majority of

the Millennium Custodial Trust Interests shall promptly select a replacement member of the Trust Advisory Board.

Section 5.2.    Governance.    (a) Except as otherwise provided herein, all three Trust Advisory Board members must be present to constitute a quorum to conduct Trust Advisory Board business; provided, however, that the Trust Advisory Board may, by the unanimous vote of its members, designate a single member of the Trust Advisory Board to exercise all power of the Trust Advisory Board in respect of any particular matter.  Except as otherwise provided herein, no Trust Advisory Board business may be conducted absent a quorum.  Meetings may be held in person, telephonically or electronically, and upon such notice as may be determined from time to time by the Trust Advisory Board.  Members of the Trust Advisory Board may act by unanimous written consent in lieu of a meeting.

(b)    Trust Advisory Board actions, other than pursuant to unanimous written consent as contemplated above, may be approved only by a majority of members entitled to vote on a matter.  The Trust Advisory Board shall meet at least quarterly during the first year after the Effective Date, and at least semi-annually thereafter, unless the Trust Advisory Board, in its discretion, elects to meet more or less frequently.  The Trust Advisory Board is authorized to retain such counsel and other professional Persons to represent them as selected by a majority of the Trust Advisory Board members.

Section 5.3.    Guidance.    The Trust Advisory Board may provide information, advice and guidance to the Trustee with respect to matters which are not directly addressed by this Agreement.

# ARTICLE 6

## BENEFICIARIES; TRANSFER OF INTERESTS

Section 6.1.    Distribution of Millennium Custodial Trust Interests.    On or as of the Effective Date, the Trust shall issue Millennium Custodial Trust Interests to each Beneficiary in accordance with the right of such Beneficiary to distributions from the Millennium Trust Assets in the amount accorded to such Beneficiary under the Plan.  The Millennium Custodial Trust Interests will be uncertificated, and distributions of Millennium Custodial Trust Interests will be accomplished solely by the entry of the name of each Beneficiary and its respective Millennium Custodial Trust Interests in the books and records of the Trust.  Such entries shall be updated monthly as Claims against MCI become Allowed.

Section 6.2.    Limitation on Transferability of Millennium Custodial Trust Interests.    To the fullest extent permitted by law, the Millennium Custodial Trust Interests shall not be transferable except by operation of law.  Any permitted transfer shall not be effective until appropriate notification and proof thereof is submitted to the Trustee who may rely upon such proof without the requirement of any further investigation.

Section 6.3.    Other Rights.    A Beneficiary shall have no right to withdraw any portion of the Millennium Trust Assets, except with the consent of the Trustee, which consent may be withheld in the Trustee's sole discretion.  No Beneficiary shall have any consent or

appraisal rights with respect to the Trust. The ownership of a Millennium Custodial Trust Interest shall not entitle any Beneficiary to (a) any title in or to any Millennium Trust Asset or any right to call for a partition, division or accounting of the Millennium Trust Assets, or (b) subject to applicable law, any voting rights with respect to the administration of the Trust (other than the right to appoint members of the Trust Advisory Board).

Section 6.4.    Exemption from Registration.    The parties hereto intend that the Millennium Custodial Trust Interests shall not be "securities" under applicable laws, but none of the parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If such rights constitute securities, the parties hereto intend for the exemption from registration provided by section 1145 of the Bankruptcy Code and any exemption from registration under any applicable securities laws to apply to the issuance of Millennium Custodial Trust Interests under the Plan.

# ARTICLE 7

# MCI CORPORATE CHAIN ASSETS

Section 7.1.    Corporate Structure.    After the Effective Date, MCI shall and shall cause each MCI Subsidiary to (a) continue to observe appropriate corporate (or other entity type) formalities, and (b) have a board of directors (or other appropriate governance structure) appointed by the holder of its respective Equity Interests which shall make the decisions with respect to such entity and appoint officers (or other appropriate Persons or entities responsible for management) to implement such decisions. The directors and officers (or other appropriate Persons or entities responsible for management) of MCI or any MCI Subsidiary may be retained as contemplated under Section 3.2(j).

Section 7.2.    Directors and Officers.    The Trustee shall appoint the directors of MCI, and such directors shall appoint the officers of MCI. The direct parent entity of each MCI Subsidiary (including MCI in the case of any MCI Subsidiary with respect to which MCI directly holds all of the Equity Interests therein on the Effective Date) shall appoint the directors (or other appropriate Persons or entities responsible for management) of such MCI Subsidiary, and the directors of each MCI Subsidiary shall appoint that entity's officers. The directors and officers of MCI and all MCI Subsidiaries (or analogous governing bodies or other appropriate persons or entities responsible for management) are referred to herein as the "Millennium Chain Governing Bodies." Each Millennium Chain Governing Body with respect to its relevant entity shall have the power and authority to hold, manage, convert to Cash, and distribute the relevant Millennium Millennium Trust Chain Assets, including prosecuting and resolving the Claims belonging to the relevant entity and defending Claims brought against such entity, subject to the terms of this Agreement and the Plan; provided, however that the Millennium Trust Chain Assets shall not include the Assigned Preference Claims or the Non-Settling Defendant Claims as such terms are defined in the Plan.

Section 7.3.    Participation Rights.    Each holder of an Allowed Claim against an MCI Subsidiary will receive, pursuant to the Plan and in satisfaction of the holder's Allowed Claims, a contractual right pursuant to the Plan entitling the holder of an Allowed Claim against an MCI Subsidiary to a potential payment up to the amount of such holder's Allowed Claims

-11-

against the applicable MCI Subsidiary ("Participation Rights") on or following the Effective Date, but excluding any amounts for post petition interest or post-Effective Date interest.  If, upon liquidation, the assets of a MCI Subsidiary are insufficient to satisfy all amounts payable to the holders of Participation Rights of such MCI Subsidiary, the holders of Participation Rights in such MCI Subsidiary shall recover their pro rata share of the assets of that MCI Subsidiary as required under the Plan.  To the extent a MCI Subsidiary's assets exceed the aggregate amount payable to the holders of Participation Rights of such MCI Subsidiary, such MCI Subsidiary shall, subject to applicable law, distribute its excess assets in liquidation to the immediate parent entity that owns the Equity Interests of such MCI Subsidiary as required under the Plan.  Any such distributed excess amounts thereafter shall be available to the holders of the immediate parent entity's Participation Rights.

## ARTICLE 8

## TAX & ACCOUNTING MATTERS

Section 8.1.    Tax Treatment of the Trust.  For U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Trustee, and the Beneficiaries) shall treat the transfer of the Millennium Trust Assets to the Trust as the (a) deemed transfer of the Millennium Trust Assets directly to the Beneficiaries in satisfaction of their Allowed Claims against MCI (whether Allowed on or after the Effective Date), followed by (b) the deemed transfer by such Persons to the Trust of the Millennium Trust Assets in exchange for Millennium Custodial Trust Interests.  The Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors, and deemed owners, of their respective share of the Millennium Trust Assets.

Section 8.2.    Tax Matters.  (a)  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, all parties shall treat the Trust for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes) as a liquidating trust under Treasury Regulations section 301.7701-4(d) of which the Beneficiaries are the grantors, and deemed owners, of their respective share of the Millennium Trust Assets, provided that, in the event an alternative treatment of the Trust is required for U.S. federal income tax purposes, the Trustee shall promptly notify in writing (or by comparable means) all Beneficiaries of such alternative treatment.  The Trustee shall file tax returns for the Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a).  The Trustee shall send annually to each Beneficiary a separate statement setting forth such Beneficiary's share of items of income, gain, loss, deduction or credit with respect to the Trust, and shall instruct all Beneficiaries to report such items on their U.S. federal income tax returns.  The Trust's items of income, gain, loss, deduction or credit shall be allocated to the Beneficiaries in accordance with their relative Millennium Custodial Trust Interests.  The Trustee shall comply with all withholding and reporting requirements imposed by applicable law with respect to the Trust, including in connection with the transfer and assignment of the Millennium Trust Assets to the Trust pursuant to the Plan and any distributions to Beneficiaries.  The Trustee shall timely pay (or cause to be timely paid), out of the Millennium Trust Assets, any taxes imposed on the Trust, and shall timely file (or cause to be timely filed) all statements, returns and other disclosures relating to the Trust that are required by applicable law.

(b)    Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Trustee shall, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), (i) make an election pursuant to Treasury Regulations section 1.468B-9 to treat any reserve established to satisfy Disputed Claims with respect to MCI (a "<u>DC Reserve</u>") as a "disputed ownership fund" within the meaning of that section; (ii) treat as taxable income or loss of the DC Reserve, with respect to any given taxable year, the portion of the taxable income or loss of the Trust that would have been allocated to the holders of Disputed Claims against MCI had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are unresolved), and (iii) treat as a distribution from the DC Reserve any assets previously allocated to or retained on account of Disputed Claims as and when, and to the extent, such Claims are subsequently resolved (following which time such assets shall no longer be held in the DC Reserve).  The Beneficiaries shall, for U.S. federal income tax purposes (and, to the extent permitted by law, for state and local income tax purposes), report consistently with the foregoing.

Section 8.3.    <u>Delivery of Reports</u>.  As soon as practicable after June 30 and December 31 of each year, and as soon as practicable upon termination of the Trust, the Trustee shall submit to each Beneficiary appearing on its records as of the relevant date a written report which shall contain, at a minimum, the following information:  (a) financial statements of the Trust for the applicable period prepared on a modified cash basis or other comprehensive basis of accounting, and, if the end of a calendar year, a report of an independent certified public accountant employed by the Trustee, which report shall reflect the result of such procedures relating to the financial accounting administration of the Trust as approved by the Trustee; and (b) a description of any action taken by the Trustee in the performance of its duties that materially affects the Trust and of which notice has not previously been given to the Beneficiaries.  The Trustee shall promptly submit additional reports to the Beneficiaries whenever a material event or change occurs that affects either the Trust or the rights of the Beneficiaries.  The semiannual reports furnished pursuant to this Section 8.3 shall include a description of the progress of converting the Millennium Trust Assets to Cash and making distributions to Beneficiaries and any other material information relating to the Millennium Trust Assets and the administration of the Trust.

Section 8.4.    <u>Fiscal Year</u>.  The Trust's fiscal year shall be the calendar year or such other period as may be fixed by the Trustee with the prior written consent of the Trust Advisory Board or as otherwise required by applicable law.

# ARTICLE 9

## DISTRIBUTIONS

Section 9.1.    <u>Expenses</u>.  The Trustee must pay, or reserve for, the operating expenses of the Trust before approving distributions to or for the benefit of the Beneficiaries.  Consistent therewith, the Trustee and the Delaware Trustee (as well as Persons retained as contemplated under Section 3.2(j)) shall be entitled to reasonable compensation and reimbursement of expenses in an amount consistent with that of similar functionaries in similar roles, but in no event less than the terms of their respective retention agreements.  The Trustee

may retain and compensate attorneys and other professionals to assist in its duties as Trustee on such terms as the Trustee, acting in its sole discretion, deems appropriate without Bankruptcy Court approval.  The Trust, MCI and each MCI Subsidiary shall be responsible for the payment of such entity's expenses out of such entity's own assets, provided that the Trust shall be responsible for compensation payable to the Trustee and the Delaware Trustee as well as Persons retained as contemplated under Section 3.2(j).

           Section 9.2.    Annual Distributions.    The Trustee shall distribute to the Beneficiaries at least annually all Cash on hand (including, without limitation, the Trust's net income and net proceeds from the sale of assets); provided, however, that the Trustee shall retain and reserve in the Trust such amounts (a) as are reasonably necessary to meet Claims and contingent liabilities or to maintain the value of the Millennium Trust Assets, (b) as are reasonably necessary (as determined in consultation with the Trust Advisory Board) to satisfy Disputed Claims, (c) to pay reasonable expenses incurred by the Trust (including but not limited to any taxes imposed on the Trust or the DC Reserve) and (d) to satisfy other liabilities incurred by the Trust in accordance with the Plan or this Agreement.  The Trustee shall cause MCI and each MCI Subsidiary to adopt substantially identical annual distribution policies with respect to holders of each such entity's Equity Interests and, if applicable, Participation Rights.

           Section 9.3.    Delivery of Trust Distributions.    All distributions under this Agreement to any Beneficiary shall be made by check at the address of such Beneficiary as set forth on the records of the Trust, unless the Trustee has previously been notified in writing of a change of address.   In the event that any distribution to any Beneficiary is returned as undeliverable, the Trustee shall use reasonable efforts to determine the current address of such Beneficiary, but no distribution to such Beneficiary shall be made unless and until the Trustee has determined the then current address of such Beneficiary, at which time such distribution shall be made to such Beneficiary without interest; provided, however, that any undeliverable or unclaimed distributions shall be deemed unclaimed property and, subject to applicable law, the applicable Beneficiary shall forfeit all rights related thereto at the expiration of one year from the scheduled date of distribution.  Upon forfeiture of any Millennium Custodial Trust Interest, such interest shall be deemed cancelled and of no further force or effect.  Upon such forfeiture of Cash or other property, such Cash or property shall, subject to applicable escheat laws, be the property of the Trust.

           Section 9.4.    De Minimis Distributions.  No distribution shall be required to be made hereunder to any Beneficiary, unless such entity is entitled to receive, in any distribution from the Trust, at least $100.00. Any holder of a Millennium Custodial Trust Interest on account of which the amount of cash to be distributed pursuant to any distribution from the Trust is less than $100.00 shall be deemed to have no claim for such distribution against the Trust or the Millennium Trust Assets. Any cash not distributed pursuant to this Section 9.4 shall be the property of the Trust.

           Section 9.5.    Distributions Upon Termination of Trust.  Upon the dissolution of the Trust, and after paying or making reasonable provision for payment of all liabilities of the Trust in accordance with applicable law, the Trustee shall, as expeditiously as is consistent with the conservation and preservation of the Millennium Trust Assets, distribute any remaining

assets in the Trust to the Beneficiaries pro rata in accordance with their Millennium Custodial Trust Interests.

## ARTICLE 10

## SUCCESSOR TRUSTEES

Section 10.1.  <u>Resignation of Trustee</u>.  Either the Trustee or the Delaware Trustee (and their successors, if any) may resign by giving not less than sixty (60) days' prior written notice thereof to the Trust Advisory Board, and, if required, the Bankruptcy Court.  Such resignation shall become effective on the later to occur of:  (a) the day specified in such notice; or (b) the appointment of a successor trustee by the Trust Advisory Board and the acceptance by such successor trustee of such appointment.  If a successor trustee is not appointed or does not accept its appointment within sixty (60) days following delivery of notice of resignation, the Trustee or the Delaware Trustee may petition the Bankruptcy Court for the appointment of a successor Trustee.

Section 10.2.  <u>Removal of Trustee</u>.  The Trustee or Delaware Trustee (and their successors, if any) may be removed at any time by the unanimous vote of the members of the Trust Advisory Board or upon order of the Bankruptcy Court, and such removal shall take effect on the date specified by the Trust Advisory Board or at the time specified by the Bankruptcy Court, as the case may be.  Whether pursuant to the vote of the Trust Advisory Board or otherwise, the removal of the Trustee (and Persons retained as contemplated under Section 3.2(j)) shall be based solely on a factual showing that the Trustee (or such Person) has materially breached the express terms of this Agreement (or such Person's retention agreement) and, in such case, the Trustee (or such Person) shall be informed in writing of such alleged breach and factual basis and shall be afforded an opportunity to refute or cure same (within 15 business days) before the removal may be given effect.  Upon such removal or resignation of the Trustee or the Delaware Trustee or the death or disability or other incapacity of the Trustee or the Delaware Trustee, members of the Trust Advisory Board, within thirty (30) days, shall designate a successor trustee and shall petition the Bankruptcy Court to appoint such successor trustee.

Section 10.3.  <u>Acceptance of Appointment by Successor Trustee</u>.  Any successor trustee appointed hereunder shall execute an instrument accepting such appointment hereunder and shall file such acceptance with the Trust records.  Such successor trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trusts and duties of its predecessor in the Trust with like effect as if originally named herein; <u>provided</u>, <u>however</u>, (A) that a removed, incapacitated, or resigning Trustee shall, upon request in writing by the successor trustee, execute and deliver an instrument or instruments conveying and transferring to such successor trustee under the Trust all the estates, properties, rights, powers, and trusts of such predecessor Trustee or the Delaware Trustee, and (B) that, after the removal or resignation of the Trustee or a Person that was retained as contemplated under Section 3.2(j), all rights of such Trustee or Person arising hereunder shall survive such removal or resignation, including rights to payment for services rendered and expenses incurred as well as all rights and protections relating to advancement, indemnification, insurance and exculpation.

Section 10.4.  <u>Merger of Delaware Trustee</u>.  Any Person into which the Delaware Trustee may be merged or with which it may be consolidated, any Person resulting from any merger or consolidation to which the Delaware Trustee shall be a party, or any Person which succeeds to all or substantially all of the corporate trust business of the Delaware Trustee shall be the successor Delaware Trustee under this Agreement without the execution, delivery or filing of any paper or instrument or further act to be done on the part of the parties hereto, except as may be required by applicable law.

## ARTICLE 11

## INDEMNIFICATION; INSURANCE; LIMITATIONS OF LIABILITY

Section 11.1.  <u>Indemnification of Trustees and Trust Advisory Board</u>.  The Trustee, the Delaware Trustee and their respective agents, representatives, designees, and professionals, and their respective employees (which includes all Persons retained as contemplated under Section 3.2(j)), shall not be liable for actions taken or omitted by the Trustee, the Delaware Trustee or any such agent, representative, designee, professional, or employee, and shall not be liable for any actions taken or omitted in respect of the Trust or in its capacity acting as, or on behalf of, the Trustee or the Delaware Trustee, except those acts or omissions determined by final, non-appealable adjudication in the underlying matter to be caused solely by such person's own willful misconduct, fraud, or gross negligence, and each such person shall be entitled to indemnification as well as advancement of defense fees and expenses to the fullest extent as may be permitted under the Act or any other applicable law, as further set forth herein.  Any indemnification claim of the Trustee (and the other parties entitled to indemnification under this Section 11.1) shall be satisfied from the Millennium Trust Assets only, including proceeds from any insurance coverage purchased pursuant to Article 3.2.  The Trustee and the Delaware Trustee shall be entitled to rely, in good faith, on the advice of its retained professionals.  To the fullest extent as may be permitted under the Act or any other applicable law, the Trust shall indemnify and hold harmless the Trustee, the Delaware Trustee and the members of the Trust Advisory Board and their respective designees, agents, attorneys, professionals, and representatives (including Persons retained as contemplated under Section 3.2(j), all of the foregoing, collectively, the "<u>Indemnified Persons</u>"), from and against and in respect of all liabilities, losses, damages, claims, costs, and expenses, including without limitation attorneys' fees and costs relating to, arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Trust or the implementation or administration of this Agreement and the Plan ("<u>Indemnifiable Expenses</u>"); <u>provided</u>, <u>however</u>, that no amount of such expenses will be paid to or retained by an Indemnified Person to the extent that such amount directly relates to actions or omissions which have been determined by final, non-appealable adjudication in the underlying matter to be ineligible for indemnification under the Act ("<u>Carved-Out Expenses</u>").  The Trust shall advance to any Indemnified Person incurring any expenses that may potentially be Indemnifiable Expenses such amounts, on a monthly basis, if the Indemnified Person provides the Trust with an undertaking, as a general and unsecured personal obligation, that such Indemnified Person will repay any amounts determined by final, non-appealable adjudication in the underlying matter to be Carved-Out Expenses of that Indemnified Person.  For avoidance of doubt, and notwithstanding anything to the contrary herein or elsewhere, the advancement, indemnification and insurance obligations set forth in this

Agreement shall be primary to, and without allocation against, any similar advancement, indemnification and insurance obligations in favor of or otherwise available to the Indemnified Persons (all of which obligations shall be secondary).

Section 11.2. <u>Insurance</u>. The Trust shall, at its own expense, maintain and keep in force and effect adequate insurance coverage for the performance of its obligations pursuant to Section 2.2 of the Conveyance Agreement. Such policy or policies shall name Lyondell Chemical as a beneficiary and certificates evidencing such insurance policies shall be provided to Lyondell Chemical annually. Additionally, the Trust shall, at its own expense, maintain and keep in force and effect adequate insurance coverage for the performance of its advancement and indemnification obligations to the Indemnified Persons hereunder or to any other Persons with contractual rights to advancement and indemnification. Such policy or policies for the Indemnified Persons shall be primary to any other coverage available to such Persons, without retention or deductible and without allocation or apportionment to any other coverage. Such policy or policies shall name the Indemnified Persons as beneficiaries, and copies of (and certificates evidencing) such insurance policies shall be provided to the Indemnified Persons upon request. The amount of insurance referenced in this Section 11.2 shall in no way limit the Trust's indemnification of Lyondell Chemical or the Indemnified Persons.

Section 11.3. <u>Limitation on Liability of Trust Advisory Board</u>. Subject to applicable law, no member of the Trust Advisory Board shall be liable for any act such member may take or omit to take as a member of the Trust Advisory Board while acting in good faith and in the exercise of such member's reasonable judgment; nor will any member of the Trust Advisory Board be liable in any event except for such member's own gross negligence or fraud or willful misconduct. The foregoing limitation on liability shall apply equally to the agents, professionals, representatives, and/or employees of a member of the Trust Advisory Board acting on behalf of such member in the fulfillment of such member's duties hereunder.

## ARTICLE 12

## DISPUTE RESOLUTION

Section 12.1. <u>GOVERNING LAW</u>. THIS AGREEMENT SHALL BE CONSTRUED (BOTH AS TO VALIDITY AND PERFORMANCE), INTERPRETED AND ENFORCED IN ACCORDANCE WITH, AND GOVERNED BY, THE LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO THE CONFLICTS OF LAW PRINCIPLES THEREOF.

Section 12.2. <u>JURISDICTION; CONSENT TO SERVICE OF PROCESS; WAIVER</u>. **WITHOUT LIMITING ANY PARTY'S RIGHT TO APPEAL ANY ORDER OF THE BANKRUPTCY COURT, (a) THE BANKRUPTCY COURT WILL RETAIN EXCLUSIVE JURISDICTION TO ENFORCE THE TERMS OF THIS AGREEMENT AND TO DECIDE ANY CLAIMS OR DISPUTES WHICH MAY ARISE OR RESULT FROM, OR BE CONNECTED WITH, THIS AGREEMENT, ANY BREACH OR DEFAULT HEREUNDER, OR THE TRANSACTIONS CONTEMPLATED HEREBY, AND (b) ANY AND ALL PROCEEDINGS RELATED TO THE FOREGOING SHALL BE FILED AND MAINTAINED ONLY IN THE BANKRUPTCY COURT, AND THE**

**PARTIES HEREBY CONSENT TO AND SUBMIT TO THE JURISDICTION AND VENUE OF THE BANKRUPTCY COURT AND SHALL RECEIVE NOTICES AT SUCH LOCATIONS AS INDICATED IN** <u>**SECTION 14.4.**</u>  **NOTWITHSTANDING THE FOREGOING, IF THE BANKRUPTCY CASES HAVE CLOSED, EACH OF THE PARTIES AGREES THAT IT SHALL BRING ANY ACTION OR PROCEEDING IN RESPECT OF ANY CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER IN TORT OR CONTRACT OR AT LAW OR IN EQUITY, EXCLUSIVELY IN ANY FEDERAL OR STATE COURT IN THE STATE OF DELAWARE AND SOLELY IN CONNECTION WITH CLAIMS ARISING UNDER SUCH AGREEMENT OR INSTRUMENT OR THE TRANSACTIONS CONTAINED IN OR CONTEMPLATED BY SUCH AGREEMENT OR INSTRUMENT, (i) IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS, (ii) WAIVES ANY OBJECTION TO LAYING VENUE IN ANY SUCH ACTION OR PROCEEDING IN SUCH COURTS, (iii) WAIVES ANY OBJECTION THAT SUCH COURTS ARE AN INCONVENIENT FORUM OR DO NOT HAVE JURISDICTION OVER IT AND (iv) AGREES THAT SERVICE OF PROCESS UPON IT MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO IT AT ITS ADDRESS SPECIFIED IN** <u>**SECTION 14.4.**</u>  **THE FOREGOING CONSENTS TO JURISDICTION AND SERVICE OF PROCESS SHALL NOT CONSTITUTE GENERAL CONSENTS TO SERVICE OF PROCESS IN THE STATE OF DELAWARE FOR ANY PURPOSE EXCEPT AS PROVIDED HEREIN AND SHALL NOT BE DEEMED TO CONFER RIGHTS ON ANY PERSON OTHER THAN THE PARTIES.  EACH OF THE PARTIES HEREBY KNOWINGLY AND INTENTIONALLY, IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND FOR ANY COUNTERCLAIM THEREIN.**

**ARTICLE 13**

**TERMINATION OF TRUST; AMENDMENT**

Section 13.1.  <u>Termination</u>.  The Trust shall be dissolved by the Trustee (and MCI and all of the MCI Subsidiaries shall be liquidated) no later than five (5) years from the Effective Date; <u>provided</u>, <u>however</u>, that the Bankruptcy Court, upon motion by any Party, may extend the term of the Trust for a finite period if (a) such extension is necessary to the liquidating purpose of the Trust, (b) the Trustee receives an opinion of counsel or a ruling from the IRS stating that such extension would not adversely affect the status of the Trust as a liquidating trust for U.S. federal income tax purposes, and (c) such extension is obtained within the six (6) month period prior to the Trust's fifth (5th) anniversary or the end of the immediately preceding extension period, as applicable.  The Trustee shall make continuing efforts to dispose of the Millennium Trust Assets, make timely distributions to Beneficiaries in accordance with the terms hereof, and not unduly prolong the duration of the Trust, provided, that, in managing the Millennium Trust Assets, the Trustee shall be allowed to take into consideration, the risks, timing and costs of potential actions in making determination as to the maximization of recoveries for the Beneficiaries.  Upon the completion of winding up of the Trust, including the

-18-

payment or the making reasonable provision for payment of all obligations of the Trust in accordance with Section 3808(e) of the Act, the Trustee and the Delaware Trustee shall execute (and the Trustee shall file) a certificate of cancellation with the Delaware Secretary of State in accordance with Section 3810 of the Act, at which time the Trust shall terminate.

Section 13.2.  Amendment and Waiver.  Any substantive provision of this Agreement may be amended or waived by the Trustee with the prior written consent of the Trust Advisory Board; and, provided, however, that no amendment or waiver may be made or granted to the extent such action would adversely affect the U.S. federal income tax treatment of the Trust as a liquidating trust under Treasury Regulations section 301.7701-4(d) or for purposes of IRS Revenue Procedure 94-45, 1994-2 C.B. 684.

# ARTICLE 14

## MISCELLANEOUS PROVISIONS

Section 14.1.  Intention of Parties to Establish Trust.  This Agreement is intended to create a liquidating trust for U.S. federal income tax purposes (including, without limitation, for purposes of IRS Revenue Procedure 94-45, 1994-2 C.B. 684), and shall be governed and construed in all respects consistently with such intent.  Notwithstanding anything to the contrary contained herein, any ambiguity in this Agreement shall be construed consistently with the immediately preceding sentence, and, if necessary, this Agreement may be amended to comply with such federal income tax laws, which amendments may apply retroactively.

Section 14.2.  Preservation of Privilege and Defenses.  In connection with any rights, Claims or Causes of Action that constitute the Millennium Trust Assets, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Trust shall vest in the Trust and its representatives, and the Debtors are authorized to take all necessary actions to effectuate the transfer of such privileges and available defenses; provided, however, that the Trustee shall not waive any privilege or defense transferred to it by a Reorganized Debtor without the prior written consent of such Reorganized Debtor.

Section 14.3.  Severability.  If any provision of this Agreement or the application thereof to any Person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which such provision is held invalid or unenforceable, shall not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

Section 14.4.  Notices.  Any notice or other communication hereunder shall be in writing (including by facsimile transmission or by e-mail) and shall be deemed to have been sufficiently given, for all purposes, if deposited, postage prepaid, in a post office or letter box addressed to the Person for whom such notice is intended (or, in the case of notice by facsimile transmission or e-mail, when received and telephonically or electronically confirmed), addressed as follows; provided, however, that only one notice or other communication hereunder need be sent to Beneficiaries sharing the same address:

If to the Trustee, to:

> [AlixPartners LLP], Trustee of Millennium Custodial Trust
> 2101 Cedar Springs Road, Suite 1100
> Dallas, TX  75201

With a copy to:

> Office of the General Counsel
> [AlixPartners LLP]
> 2000 Town Center, Suite 2400
> Southfield, MI  48075

If to the Trust Advisory Board, to:

> **[Add contact information.]**

If to the Beneficiaries,

> to the addresses set forth on records of the Trust.

Section 14.5.  <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original instrument, but all together shall constitute one agreement.

Section 14.6.  <u>Relationship to the Plan</u>.  The principal purpose of this Agreement is to aid in the implementation of the Plan and therefore this Agreement incorporates the provisions of the Plan.  To that end, subject to the terms and conditions of this Agreement, the Trustee shall have full power and authority to take any action consistent with the purpose and provisions of the Plan, and to seek any orders from the Bankruptcy Court in furtherance of implementation of this Agreement and the Plan.  If any provisions of this Agreement are found to be inconsistent with the provisions of the Plan, the provisions of this Agreement shall control.

Section 14.7.  <u>No Partnership</u>.  This Agreement is intended to create a trust and a trust relationship and to be governed and construed in all respects as a trust.  The Trust is not intended to be, and shall not be deemed to be or treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company or association, nor shall the Trustee or the Beneficiaries, or any of them, for any purpose be, or be deemed to be or be treated in any way whatsoever to be, liable or responsible hereunder as partners or joint venturers.  The relationship of the Beneficiaries to the Trustee shall be solely that of beneficiaries of a trust and shall not be deemed to be a principal or agency relationship, and the rights of the Beneficiaries shall be limited to those conferred upon them by this Agreement.

Section 14.8.  <u>No Bond</u>.  The Trustee may serve without bond.

Section 14.9.  <u>Confidentiality</u>.  The Trustee shall, during the period that it serves in such capacity under this Agreement and following either the termination of this Agreement or such Trustee's removal, incapacity, or resignation hereunder, hold strictly confidential and not

use for personal gain any material, non-public information of or pertaining to any entity to which any of the Millennium Trust Assets relates or of which it has become aware in its capacity as Trustee.  Notwithstanding anything else in the Plan, this Agreement or any other agreements implementing the Plan, each of the parties hereto (and each employee, representative, or other agent of such Person) may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are provided to such Person relating to such tax treatment and tax structure.

Section 14.10.  <u>Effect of Death, Incapacity or Bankruptcy of A Beneficiary</u>.  The death, incapacity or bankruptcy of a Beneficiary during the term of this Agreement shall not operate to terminate the Trust or this Agreement, nor shall such event affect the rights and obligations of any Beneficiary or entitle any representative or creditor of the deceased Beneficiary to an accounting or to the right to take any action in the courts or elsewhere for the distribution of the property constituting the Millennium Trust Assets or for a partition thereof.

Section 14.11.  <u>No Third Party Rights</u>.  Lyondell Chemical shall be a third party beneficiary of Sections 2.4, 2.5 and 2.6.  The Environmental Custodial Trust shall be a third party beneficiary of Section 2.6(b).  Except as set forth in the preceding two sentences, the provisions of this Agreement are intended to bind the Parties to each other and are not intended to and do not create rights in any other person or confer upon any other person any benefits, rights or remedies and no person is or is intended to be a third party beneficiary of any of the provisions of this Agreement.

IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as of the date first above written.

MILLENNIUM CHEMICALS, INC.

By: _____
    Name:
    Title:

[ALIXPARTNERS LLP]

By: _____
    Name:
    Title:

[DELAWARE TRUSTEE]

By: _____
    Name:
    Title:

LYONDELL CHEMICAL COMPANY intervenes herein for the sole purpose of acknowledging and accepting its rights and obligations under Sections 2.4, 2.5, 2.6 and 2.7 of this Agreement.

LYONDELL CHEMICAL COMPANY

By: _____
    Name:
    Title:

THE ENVIRONMENTAL CUSTODIAL TRUST intervenes herein for the sole purpose of acknowledging and accepting its rights and obligations under Section 2.6(b) of this Agreement.

ENVIRONMENTAL CUSTODIAL TRUST

By: _____
    Name:
    Title:

# CONVEYANCE AGREEMENT

This Conveyance Agreement (this "<u>Agreement</u>") dated as of the [  ] day of April, 2010 is entered into by and between **LYONDELL CHEMICAL COMPANY**, a Delaware corporation ("<u>Lyondell</u>"), and **MILLENNIUM CUSTODIAL TRUST**, a Delaware statutory trust (the "<u>Trust</u>") and is made effective as of the Effective Date. Lyondell and the Trust are sometimes hereinafter referred to individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>."

The definitions of capitalized terms used but not defined in this Agreement are set forth in the Plan (as defined below) or in the Millennium Custodial Trust Agreement, dated as of April ___, 2010 (the "<u>Custodial Trust Agreement</u>"), by and among Millennium Chemicals, Inc., a Delaware corporation ("<u>MCI</u>"), [AlixPartners LLP], as managing and liquidating trustee (together with any successor appointed under the terms hereof, the "<u>Trustee</u>") and **[DELAWARE TRUSTEE]**, as Delaware statutory trustee (together with any successor appointed under the terms hereof, the "<u>Delaware Trustee</u>").

# RECITALS

A.    On January 6, 2009, Lyondell, MCI, and certain other of their Affiliates and subsidiaries as debtors and debtors in possession commenced reorganization cases by filing petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>").

B.    On March 12, 2010, the Debtors filed the Third Amended Joint Chapter 11 Plan of Reorganization with the Bankruptcy Court (the joint Chapter 11 plans of reorganization for the Debtors, including all applicable exhibits and schedules annexed hereto or associated herewith (including the Plan Supplement), that shall be filed with the Bankruptcy Court, as altered, amended or modified from time to time in accordance with the terms hereof, the Bankruptcy Code and the Bankruptcy Rules, being hereinafter referred to as the "<u>Plan</u>").

C.    The Plan provides for the creation of the Trust to resolve the Claims against MCI and, indirectly, against the MCI Subsidiaries, and to liquidate the Trust Assets.

D.    As contemplated by the Plan, MCI, the Trustee, the Delaware Trustee and the Debtors party to the Custodial Trust Agreement have established the Trust upon the terms set forth in the Custodial Trust Agreement.

E.    Pursuant to the Plan, on the Effective Date, *inter alia*:

i.    MCI will contribute certain intellectual property that pertain to the Acetyls Business to MPI;

ii.    Certain Debtors, including certain MCI Subsidiaries, will contribute to the Environmental Custodial Trust the Transferred Real Properties;

iii.    Equistar Chemicals, LP shall transfer and convey to MCI all of the Equity Interests of Quantum Pipeline Company, Equistar Polypropylene, LLC, Equistar Transportation Company, LLC and Equistar Funding Corporation;

iv.    Substantially all of the assets related to the Acetyls Business and F&F Business shall be transferred and conveyed to Affiliates of Lyondell; and

v.    Subsequent to the transactions set forth above, Lyondell will transfer all of its right, title, and interest in (i) the Equity Interests of MCI and (ii) wind-up funds, in an amount of **$[AMOUNT]**, to fund the resolution of Claims against the Schedule III Debtors and Claims by those entities against others (together, the "Trust Assets") to the Trust.

F.    The beneficiaries of the Trust will be the holders of Allowed Claims (whether Allowed on or after the Effective Date) against MCI, in each case, as and when Allowed (each, a "Beneficiary" and, collectively, the "Beneficiaries"), and the Beneficiaries will hold all of the beneficial interests in the Trust.

NOW, THEREFORE, in consideration of the foregoing and their mutual undertakings and agreements hereunder, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, undertake and agree as follows:

## ARTICLE I
## CONVEYANCE OF TRUST ASSETS; ASSUMPTION OF LIABILITIES

Section 1.1.    <u>Conveyance of Trust Assets to the Trust</u>.    Lyondell hereby irrevocably and absolutely grants, contributes, bargains, conveys, assigns, transfers, sets over and delivers to the Trust, its successors and assigns, for its and their own use forever, in trust for the benefit of the Beneficiaries for the uses and purposes stated in the Custodial Trust Agreement, the Trust Assets and the documents, books and records related thereto, and the Trust hereby accepts the Trust Assets and agrees to hold and administer the Trust Assets, documents, books and records for the benefit of the Beneficiaries.

Section 1.2.    <u>Assumption of Liabilities by the Trust</u>.    By accepting the Trust Assets, the Trust assumes any and all liabilities and/or obligations of the Released Parties (as defined below), of whatever nature, whether presently in existence or arising hereafter, whether known or unknown, or whether absolute or contingent, including any and all tax liabilities and insurance premium liabilities, arising out of or related to the Trust Assets or the conveyance of the Trust Assets by Lyondell, and agrees to duly pay and discharge all such liabilities and/or obligations, subject to the terms and conditions of this Agreement, the Custodial Trust Agreement and the Plan; provided, however, that said assumption and agreement to duly and timely pay, perform and discharge the Liabilities shall not (a) waive any valid defense that was available to Lyondell or any Released Party with respect to such liabilities and/or obligations or (b) enlarge any rights or remedies of any third party under any of such liabilities and/or obligations.

-2-

Section 1.3.    <u>Title to Trust Assets</u>.    Upon the transfer of the Trust Assets pursuant to this Agreement, the Trust shall succeed to all of the Reorganized Debtors' right, title and interest in the Trust Assets, and the Reorganized Debtors shall have no further rights or interest in or with respect to the Trust Assets, the Trust Chain Assets or the Trust, and shall have no liability whatsoever, whether arising out of or relating to a period before or after the Effective Date, with respect to the Trust Assets.  Legal title to all of the Equity Interests of MCI shall be vested at all times in the Trust as a separate legal entity except as may be determined otherwise by the Trustee or where applicable law in any jurisdiction requires title to any portion of the Equity Interests of MCI to be vested in a trustee or other nominee, in which case title shall be deemed to be vested in the trustee or nominee or in any other Person designated by the Trustee; <u>provided</u>, <u>however</u>, that in each of the foregoing cases such Person shall hold any such Equity Interests for the sole benefit of the Trust.

Section 1.4.    <u>Further Assurances; Cooperation</u>.    Lyondell shall use its commercially reasonable efforts to deliver or cause to be delivered to the Trust any and all material and known documents, books and records that relate to the Trust Assets, whether held by the Debtors, their agents, advisors, attorneys, accountants and any other professional hired by the Debtors, as soon as reasonably practicable following the Effective Date.  For a period of 30 days after the Effective Date, and for an additional 30 days thereafter by mutual agreement of the Parties, Lyondell shall provide commercially reasonable access to such employees of the Debtors, their agents, advisors, attorneys, accountants or any other professionals hired by the Debtors with knowledge of matters relevant to the Trust Assets, in consideration for which the Trust shall pay to Lyondell a fee of $[50,000].  The Trustee on behalf of the Trust may execute and deliver any instruments, documents, books, and records, and take (or cause to be taken) all such further action in order to evidence, vest, perfect or effectuate the transfer of the Trust Assets to the Trust and consummation of the transactions contemplated hereby and to otherwise carry out the intent of the parties hereunder.

## ARTICLE II
## RELEASE AND INDEMNIFICATION

Section 2.1.    <u>Release of Lyondell</u>.  (a)  As of Effective Date, in consideration for the contribution of the Wind-Up Funds, the Trust, on its own behalf and on behalf of the Beneficiaries, hereby forever unconditionally, irrevocably, completely, and forever releases, acquits and discharges Lyondell, and any parent, subsidiaries, Affiliates, successors and assigns, together with any past and present directors, managers, members, partners, officers, employees, agents, representatives and any other party associated with Lyondell, each in their capacity as such, (collectively, the "<u>Released Parties</u>") from any and all actions, causes of action, liabilities, obligations, rights, suits, accounts, covenants, contracts, agreements, promises, damages, judgments, claims, debts, remedies and demands whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in contract or in law, at equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the commencement of the Chapter 11 Cases or during the course of the Chapter 11 Cases (including through the Effective Date), in any way relating to the Released Parties, the Chapter 11 Cases, or the operation, management, and operation of the Trust Assets, including Intercompany Claims (as

defined in the Plan), that the Trust could assert directly or any holder of a Claim or Equity Interest could assert derivatively or on behalf of the Trust or its Beneficiaries; provided, however, that the foregoing releases are not intended to, and shall not, release any party from the Assigned Preference Claims or the Non-Settling Defendant Claims, as such terms are defined in the Plan.  The releases described herein shall be enforceable as a matter of contract and are in addition to, and not in lieu of, any other release or discharge provided by applicable law, including section 1141 of the Bankruptcy Code, or separately given, conditionally or unconditionally, by the Trust, the Trustee, the Delaware Trustee or any other entity.  This release shall be binding on the Trust, the Trustee (in his capacity as such) and any manager or board of directors of MCI or the MCI Subsidiaries (each in their capacity as such).

(b)    In exchange for the contribution to Trust of the Wind-Up Funds, pursuant to the Plan, the Trust shall also forever release each of the Released Parties of any and all Claims that could be brought by, through, or on behalf of the Trust or anyone claiming under them, including, but not limited to, Claims based on the theory of alter ego or piercing the corporate veil; provided, however, that the foregoing releases are not intended to, and shall not, release any party from the Assigned Preference Claims or the Non-Settling Defendant Claims, as such terms are defined in the Plan. The Trust shall also forever release, acquit and discharge the Released Parties from any and all Intercompany Claims.

Section 2.2.    Indemnification.    (a) **IN EXCHANGE FOR THE CONTRIBUTION TO TRUST OF THE WIND-UP FUNDS, PURSUANT TO THE PLAN, THE TRUST HEREBY AGREES TO INDEMNIFY AND DEFEND THE RELEASED PARTIES AND TO HOLD THE RELEASED PARTIES HARMLESS AGAINST ALL DAMAGES, LIABILITIES AND EXPENSES (INCLUDING ATTORNEY'S FEES) THAT ARISE FROM THE CLAIMS RELEASED HEREBY THAT HAVE BEEN OR THAT MAY LATER BE ASSERTED AGAINST THE RELEASED PARTIES BY ANY PERSON, ENTITY, FIRM OR CORPORATION; PROVIDED, HOWEVER, FOR THE AVOIDANCE OF DOUBT, THAT THE FOREGOING INDEMNIFICATION SHALL NOT APPLY TO ANY PARTY SEEKING INDEMNIFICATION ON ACCOUNT OF THE ASSIGNED PREFERENCE CLAIMS OR THE NON-SETTLING DEFENDANT CLAIMS, AS SUCH TERMS ARE DEFINED IN THE PLAN.  THE TRUST AGREES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, TO INDEMNIFY, DEFEND AND HOLD HARMLESS THE RELEASED PARTIES FROM, AGAINST AND IN RESPECT OF ANY LOSSES OR CLAIMS WHICH THE RELEASED PARTIES MAY SUSTAIN, INCUR OR ASSUME AS A RESULT OF OR RELATIVE TO A THIRD-PARTY CLAIM ARISING OUT OF ANY FAILURE OF LYONDELL TO PERFORM ANY OF ITS COVENANTS OR OBLIGATIONS CONTAINED IN THIS AGREEMENT, EXCEPT FOR ANY LOSS OR CLAIM, DETERMINED BY FINAL, NON-APPEALABLE ADJUDICATION IN THE UNDERLYING MATTER, TO BE CAUSED SOLELY FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF LYONDELL.    SUBJECT TO THE TRUST'S RECEIPT OF REASONABLE SUPPORTING DOCUMENTATION, THE TRUST SHALL ADVANCE, ON A MONTHLY BASIS, ANY PERSON ENTITLED TO INDEMNITY UNDER THIS SECTION 2.2 AMOUNTS FOR ITS LEGAL AND OTHER EXPENSES INCURRED IN CONNECTION WITH DEFENDING ANY CLAIM WITH RESPECT TO SUCH LOSSES.    FOR PURPOSES OF THIS AGREEMENT, "LOSS" MEANS ALL**

**DAMAGES, DUES, PENALTIES, FINES, COSTS, AMOUNTS PAID IN SETTLEMENT, LIABILITIES, TAXES, LIENS, LOSSES, EXPENSES AND FEES, INCLUDING COSTS OF INVESTIGATION, COURT COSTS, COSTS OF DEFENSE AND REASONABLE ATTORNEYS' FEES AND EXPENSES.**

(b)     If any third party shall notify a Released Party with respect to any matter (a "<u>Third-Party Claim</u>") that may give rise to a claim for indemnification against the Trust under this Section 2.2, then the Released Party shall promptly (and in any event within ten Business Days after receiving notice of the Third-Party Claim) notify the Trust thereof in writing; <u>provided</u>, <u>however</u>, that the failure to provide such notice shall not release the Trust from its obligations under this Section 2.2 except to the extent the Trust is prejudiced by such failure. Upon receipt of such notice, the Trust shall promptly file a motion to dismiss with respect to such claim.

(c)     For a period of 60 days following notice to it from the Released Party of a Third-Party Claim, the Trust will have the right to assume and thereafter conduct the defense of the Third-Party Claim (with counsel of its choice reasonably satisfactory to the Released Party) by the giving of notice to the Released Party confirming the obligation of the Trust to hold harmless the Released Party with respect to the Losses arising from the Third Party Claim; <u>provided</u>, that the Trust will not consent to the entry of any judgment or enter into any settlement with respect to the Third-Party Claim without the prior written consent of the Released Party (not to be unreasonably withheld) unless the judgment or proposed settlement involves only the payment of money damages that will be satisfied in full by the Trust and does not impose an injunction or other equitable relief upon the Released Party or any of its Affiliates.

(d)     Unless and until the Trust assumes the defense of the Third-Party Claim as provided in subsection (c), the Released Party may defend against the Third-Party Claim in any manner it may reasonably deem appropriate.

(e)     If the Trust assumes the defense of a Third Party Claim in accordance with subsection (c), in no event will the Released Party consent to the entry of any judgment or enter into any settlement with respect to the Third-Party Claim without the prior written consent of the Trust (not to be unreasonably withheld).

Section 2.3.     <u>Insurance</u>.  The Trust shall, at its own expense, maintain and keep in force and effect adequate insurance coverage for the performance of its obligations pursuant to Section 2.2.  Such policy or policies shall name Lyondell as a beneficiary, and certificates evidencing such insurance policies shall be provided to Lyondell annually.  The amount of such insurance shall in no way limit the Trust's indemnification of Lyondell.

Section 2.4.     <u>General Release</u>.  From and after the Effective Date, the Trust hereby waives all rights and benefits afforded by any state laws which provide in substance that a general release does not extend to the claims which a person does not know or suspect to exist in his favor at the time of executing the release, which, if known by him, must have materially affected his settlement with the other person.

Section 2.5.     <u>Trust's Covenant not to Sue</u>.  The Trust and its Beneficiaries shall be permanently enjoined, from and after the Effective Date, from asserting any and all Claims

and causes of action that may lie against the Released Parties with respect to the releases granted to it pursuant to this Agreement.

Section 2.6.    Termination.    The duties, responsibilities and powers of the Trustee under this Agreement will terminate on the date the Trust is dissolved under applicable law in accordance with the Custodial Trust Agreement, or by an order of the Court; provided that this Article II shall survive such termination, dissolution and entry.

## ARTICLE III
## DOCUMENTS, BOOKS AND RECORDS

Section 3.1.    Books and Records.    (a)  The Trustee shall maintain, or cause to be maintained, in respect of the Trust and the Beneficiaries books and records relating to the Trust Assets and income of the Trust and the payment or assumption by the Trust of liabilities, expenses or claims in such detail and for such period of time as may be necessary to enable the Trust to make full and proper accounting in respect thereof.  Such books and records shall be maintained on a modified cash or other comprehensive basis of accounting.  Lyondell and its Affiliates and representatives shall have, upon reasonable written notice to the Trustee, the right to examine and, at their own expense, receive copies of all documents, books and records related to the Trust Assets that are delivered by or on behalf of Lyondell or its Affiliates to the Trust pursuant to this Agreement.  Except as otherwise may be expressly provided herein, nothing in this Agreement requires the Trustee to file any accounting, or seek approval of any court, with respect to the administration of the Trust, or as a condition for managing any payment or distribution out of the Trust Assets.

(b)    Each Party shall maintain its own documents, books and records in accordance with its own document retention policies; provided, that either Party may request that certain documents, books or records of the other Party be retained for such period of time as such Party may specify (a "Retention Request").  The Parties hereby agree that, in the event that either Party inadvertently destroys any documents, books or records that should have been delivered or returned to the other Party in accordance with Section 3.3 but that were not subject to a Retention Request, such Party shall have no liability to the other Party with respect thereto, unless the such destruction resulted from the bad faith or willful misconduct of such Party.

Section 3.2.    Mail or Other Communications.    Lyondell authorizes and empowers the Trust on and after the Effective Date to receive and open all mail received by the Trust relating to the Trust Assets and to deal with the contents of such communications in any proper manner.  Lyondell shall promptly deliver to the Trust any mail or other communication received by it on and after the Effective Date pertaining to the Trust Assets and any cash, checks or other instruments of payment to which the Trust is entitled.

Section 3.3.    Return of Documents.    If either Lyondell or the Trust should discover at any time that any of the documents, books or records delivered by Lyondell to the Trust pursuant to Section 1.4 do not relate solely to the Trust Assets, or that contain confidential or privileged information of Lyondell, the Trustee shall promptly, but in any case within 30 days of such discovery or of notice of such discovery from Lyondell, return such documents, books or records to Lyondell.  If either Lyondell or the Trust should discover at any time that Lyondell has

retained any documents, books or records that relate solely to the Trust Assets, or that contain confidential or privileged information of the Trust, Lyondell shall promptly, but in any case within 30 days of such discovery or of notice of such discovery from the Trust, deliver such documents, books or records to the Trust.

Section 3.4.    Return of Assets.    At any time following the Effective Date, if the Trust becomes aware that any asset primarily related to the Acetyls Business, the F&F Business or any of the assets or businesses of the Reorganized Debtors is held by MCI or the MCI Subsidiaries, including any real property, the Trust will execute such documents as are reasonably requested by Lyondell in order to transfer such assets to Lyondell or its Affiliates.

## ARTICLE IV
## REPRESENTATIONS, WARRANTIES AND COVENANTS

Section 4.1.    Representations and Warranties of Lyondell.    Lyondell represents and warrants to the Trust as follows:

(a)    Due Organization and Good Standing.    Lyondell is a corporation duly organized or formed, validly existing and in good standing under the laws of Delaware, with all requisite corporate power and authority to carry on its business as it is now being conducted.

(b)    Due Authorization.    Lyondell has full corporate power and authority to enter into this Agreement and any instruments to be executed and delivered by it in connection with this Agreement and to consummate the transactions contemplated hereby.  The execution, delivery and performance by Lyondell of this Agreement and any such instruments have been duly and validly approved by Lyondell and no other proceeding on the part of Lyondell is necessary to authorize this Agreement, any such instruments or the transactions contemplated hereby.

(c)    Enforceability.    Assuming due authorization, execution and delivery of this Agreement and such instruments by the other parties thereto, this Agreement and each such instrument constitutes the valid and binding obligations of Lyondell enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization, similar laws or court decisions from time to time in effect that affect creditors' rights generally and by legal and equitable limitations on the availability of specific remedies.

(d)    No Conflicts; No Consents.    The execution, delivery and performance by Lyondell of this Agreement and any instruments to be executed and delivered by it in connection with this Agreement, and the consummation of the transactions contemplated hereby, do not and will not (i) require any consent, or (ii) violate (with or without the giving of notice or the lapse of time or both), or conflict with, or result in the breach or termination of any provision of, or constitute a default under, or result in the acceleration of the performance of the obligations of Lyondell, under, the certificate of incorporation or bylaws of Lyondell, or any indenture, mortgage, deed of trust, lease, licensing agreement, contract, instrument or other agreement to which Lyondell is a party or by which Lyondell is bound, or any statute, law, ordinance, rule, regulation, order or judicial decision of any authority.

(e)    <u>Ownership of Trust Assets</u>.  Lyondell is at the date of this Agreement, the record and beneficial owner of the Trust Assets; and except for this Agreement, the Custodial Trust Agreement and the Plan, there are no contracts, subscriptions, options or other agreements relating to the sale or transfer of ownership of the Trust Assets.

(f)    <u>Millennium Chain Governing Bodies</u>.  As of the Effective Date, each employee of Lyondell or an Affiliate serving on a Millennium Chain Governing Body has resigned from his or her position.

Section 4.2.    <u>Representations and Warranties of the Trust</u>.  The Trust represents and warrants to Lyondell as follows:

(a)    <u>Due Organization and Good Standing</u>.  The Trust is a statutory trust duly organized or formed, validly existing and in good standing under the laws of Delaware, with all requisite statutory trust power and authority to carry on its business as it is now being conducted.

(b)    <u>Due Authorization</u>.  The Trust has full statutory trust power and authority to enter into this Agreement and any instruments to be executed and delivered by it in connection with this Agreement and to consummate the transactions contemplated hereby.  The execution, delivery and performance by the Trust of this Agreement and any such instruments have been duly and validly approved by the Trust and the Trustee and no other proceeding on the part of the Trust is necessary to authorize this Agreement, any such instruments or the transactions contemplated hereby.

(c)    <u>Enforceability</u>.  Assuming due authorization, execution and delivery of this Agreement and any such instruments by the other parties thereto, this Agreement and each such instrument constitutes the valid and binding obligations of the Trust enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization, similar laws or court decisions from time to time in effect that affect creditors' rights generally and by legal and equitable limitations on the availability of specific remedies.

(d)    <u>No Conflicts; No Consents</u>.  The execution, delivery and performance by the Trust of this Agreement and any instruments to be executed and delivered by it in connection with this Agreement, and the consummation of the transactions contemplated hereby, do not and will not (i) require any consent, or (ii) violate (with or without the giving of notice or the lapse of time or both), or conflict with, or result in the breach or termination of any provision of, or constitute a default under, or result in the acceleration of the performance of the obligations of the Trust, under, the organizational documents of the Trust, or any indenture, mortgage, deed of trust, lease, licensing agreement, contract, instrument or other agreement to which the Trust is a party or by which the Trust is bound, or any statute, law, ordinance, rule, regulation, order or judicial decision of any authority.

(e)    <u>Due Diligence</u>.  As of the Effective Date, the Trust has had the opportunity to visit with MCI and the MCI Subsidiaries and meet with the Millennium Chain Governing Bodies and other representatives of MCI and the MCI Subsidiaries to discuss the business, assets, liabilities, financial condition, and operations of MCI and the MCI Subsidiaries,

has received all materials, documents and other information that it deems necessary or advisable to evaluate the Equity Interests of MCI, and has made its own independent examination, investigation, analysis and evaluation of MCI and the MCI Subsidiaries, including its own estimate of the value of the Equity Interests of MCI.  The Trust has undertaken such due diligence (including a review of the properties, liabilities, books, records and contracts of MCI and the MCI Subsidiaries) as it deems adequate.

(f)    Solvency.  As of the Effective Date, the Trust is able to pay its debts as they become due, has capital sufficient to carry on its business as presently conducted and proposed to be conducted, owns property that has both a fair value and a fair market value in excess of the amount required to pay its debts as they become due and is solvent in all other respects.

## ARTICLE V
## TRADEMARK LICENSE

For no additional consideration, the Trust hereby grants to Lyondell an exclusive, royalty-free worldwide license to use the trademarks held by MCI and the MCI Subsidiaries (the "Trademarks"), which are being conveyed to the Trust hereby as part of the Trust Assets, for nine months following the Effective Date for any purpose whatsoever, including without limitation promotional and advertising materials, website content, collateral material, trucks, signage, uniforms, business cards, letterhead and other existing commercial documents.  The foregoing license shall include the right to grant royalty-free sublicenses to Affiliates of Lyondell on the terms set forth in this Article V.  Lyondell acknowledges the Trust's ownership of the Trademarks as of the Effective Date and agrees that it will do nothing inconsistent with such ownership and that all use of the Trademarks by Lyondell shall inure to the benefit of and be on behalf of the Trust.

## ARTICLE VI
## MISCELLANEOUS

Section 6.1.    Construction.  Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine and neuter.  Terms defined in the singular have the corresponding meanings in the plural, and vice versa.   Unless otherwise specified, all references to Articles and Sections refer to articles and sections of this Agreement and all references to Exhibits, Schedules or Appendices refer to exhibits, schedules or appendices to this Agreement, which are attached hereto and made a part hereof for all purposes.  The word "including" means "including, but not limited to."   The words "hereof," "hereby," "herein," "hereunder" and similar terms in this Agreement shall refer to this Agreement as a whole and not any particular section or article in which such words appear.  Any reference to a statute, regulation or law shall include any amendment thereof or any successor thereto and any rules and regulations promulgated thereunder, all as in effect as of the Effective Date.  Currency amounts referenced herein, unless otherwise specified, are in U.S. Dollars.   Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified.

Section 6.2.    <u>Successors and Assigns</u>.    The Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

Section 6.3.    <u>No Third Party Rights</u>.    The provisions of this Agreement are intended to bind the Parties to each other and are not intended to and do not create rights in any other person or confer upon any other person any benefits, rights or remedies and no person is or is intended to be a third party beneficiary of any of the provisions of this Agreement.

Section 6.4.    <u>Notices</u>.  Any notice or other communication hereunder shall be in writing (including by facsimile transmission or by e-mail) and shall be deemed to have been sufficiently given, for all purposes, if deposited, postage prepaid, in a post office or letter box addressed to the Person for whom such notice is intended (or, in the case of notice by facsimile transmission or e-mail, when received and telephonically or electronically confirmed), addressed as follows:

If to Lyondell, to:

Lyondell Chemical Company
One Houston Center
1221 McKinney Street, Suite 700
Houston, Texas 77010
Attention:    Chief Legal Officer
Telephone:    (713) 309-7200
Facsimile:    (713) 309-2143

If to the Trustee, to:

[AlixPartners LLP], Trustee of Millennium Custodial Trust
2101 Cedar Springs Road, Suite 1100
Dallas, TX 75201

With a copy to:

Office of the General Counsel
[AlixPartners LLP]
2000 Town Center, Suite 2400
Southfield, MI 48075

or to such other address or facsimile number as Lyondell or the Trust may, from time to time, designate in a written notice given in accordance with this Section 6.4.  Any such notice or communication shall be effective (a) if delivered in person or by courier, upon actual receipt at the address of the intended recipient, (b) if sent by facsimile transmission, upon actual receipt if received during the recipient's normal business hours, or at the beginning of the recipient's next Business Day after receipt if not received during recipient's normal business hours, or (c) if mailed, upon the earlier of five days after deposit in the mail and the date of delivery as shown by the return receipt therefor.

Section 6.5.    <u>Severability</u>.  If any provision of this Agreement or the application thereof to any Person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which such provision is held invalid or unenforceable, shall not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

Section 6.6.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, all of which together shall constitute one agreement binding on the Parties.

Section 6.7.    <u>Governing Law</u>.    **THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED WHOLLY WITHIN SUCH STATE WITHOUT GIVING EFFECT TO CONFLICT OF LAW PRINCIPLES THEREOF.**

Section 6.8.    <u>Amendment</u>.  This Agreement may not be amended except by an instrument in writing signed by Lyondell and the Trust.

Section 6.9.    <u>Dispute Resolution</u>.  All controversies and disputes arising out of and related to this Agreement shall be resolved in accordance with the dispute resolution procedures set forth in Exhibit A.

Section 6.10.    <u>Jurisdiction; Consent to Service of Process; Waiver</u>.  **WITHOUT LIMITING ANY PARTY'S RIGHT TO APPEAL AN ORDER OF THE BANKRUPTCY COURT, (A) THE BANKRUPTCY COURT WILL RETAIN EXCLUSIVE JURISDICTION TO ENFORCE THE TERMS OF THIS AGREEMENT AND TO DECIDE ANY CLAIMS OR DISPUTES WHICH MAY ARISE OR RESULT FROM, OR BE CONNECTED WITH, THIS AGREEMENT, ANY BREACH OR DEFAULT HEREUNDER, OR THE TRANSACTIONS CONTEMPLATED HEREBY, AND (B) ANY AND ALL PROCEEDINGS RELATED TO THE FOREGOING SHALL BE FILED AND MAINTAINED ONLY IN THE BANKRUPTCY COURT, AND THE PARTIES HEREBY CONSENT TO AND SUBMIT TO THE JURISDICTION AND VENUE OF THE BANKRUPTCY COURT AND SHALL RECEIVE NOTICES AT SUCH LOCATIONS AS INDICATED IN SECTION 6.4.    NOTWITHSTANDING THE FOREGOING, IF THE CHAPTER 11 CASES HAVE CLOSED, EACH OF THE PARTIES AGREES THAT IT SHALL BRING ANY ACTION OR PROCEEDING IN RESPECT OF ANY CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER IN TORT OR CONTRACT OR AT LAW OR IN EQUITY, EXCLUSIVELY IN ANY FEDERAL OR STATE COURT IN THE STATE OF TEXAS AND SOLELY IN CONNECTION WITH CLAIMS ARISING UNDER THIS AGREEMENT, (I) IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS, (II) WAIVES ANY OBJECTION TO LAYING VENUE IN ANY SUCH ACTION OR PROCEEDING IN SUCH COURTS, (III) WAIVES AND OBJECTION THAT SUCH COURTS ARE AN INCONVENIENT FORUM OR DO NOT HAVE JURISDICTION OVER IT AND (IV) AGREES THAT SERVICE OF PROCESS UPON IT MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY**

**SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO IT AT ITS ADDRESS SPECIFIED IN SECTION 6.4.    THE FOREGOING CONSENTS TO JURISDICTION AND SERVICE OF PROCESS SHALL NOT CONSTITUTE GENERAL CONSENTS TO SERVICE OF PROCESS IN THE STATE OF TEXAS FOR ANY PURPOSE EXCEPT AS PROVIDED HEREIN AND SHALL NOT BE DEEMED TO CONFER RIGHTS ON ANY PERSON OTHER THAN THE PARTIES.    EACH OF THE PARTIES HEREBY KNOWINGLY AND INTENTIONALLY, IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND FOR ANY COUNTERCLAIMS.**

Section 6.11.  <u>Expenses</u>.  The Trust shall be solely responsible for and bear all of the costs and expenses it and Lyondell incurred in connection with this Agreement, the Custodial Trust Agreement and the transactions contemplated hereby and thereby, including but not limited to all reasonable professional fees and expenses incurred in connection with the development and formation of the Trust.

Section 6.12.  <u>Bill of Sale; Assignment</u>.  To the extent required and permitted by applicable law, this Agreement shall also constitute a "bill of sale" or "assignment" of the Trust Assets.

Section 6.13.  <u>Full and Complete Agreement</u>.  This Agreement, the Custodial Trust Agreement and the Plan comprise the full and complete agreement of Lyondell and the Trust with respect to the subject matter hereof, and replaces and supersedes all prior communications, understandings and agreements between Lyondell and the Trust, whether oral or written, expressed or implied with respect to the matters addressed herein.  Furthermore, if there are any conflicts between the provisions of this Agreement and any other prior or contemporaneous agreement between the parties hereto, this Agreement shall prevail in all cases.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, this Agreement has been executed on behalf of each of the Parties by their respective officers thereunto duly authorized, effective as of the Effective Date.

LYONDELL CHEMICAL COMPANY


By: _____
    Name:
    Title:


MILLENNIUM CUSTODIAL TRUST


By: _____
    Name:
    Title:

EXHIBIT A

Dispute Resolution Procedures

Terms used but not otherwise defined herein shall have the meanings assigned to them in the Agreement.

(a)　　Binding and Exclusive Means. The provisions set forth in these Dispute Resolution Procedures shall be the binding and exclusive means to resolve all disputes arising under this Agreement (each a "Dispute"); provided, however, that this Exhibit A shall not limit any Party's recourse to courts of competent jurisdiction for injunctive or equitable relief that may be necessary to protect the rights and property of such Party or maintain the status quo during the pendency of the process set forth in this Exhibit A.

(b)　　Standards and Criteria.　In resolving any Dispute, the standards and criteria for resolving such Dispute shall be determined in light of the nature of the Dispute, the circumstances surrounding the Dispute, the provisions of this Agreement and applicable law so as to do substantial justice to the Parties.

(c)　　ADR and Binding Arbitration Procedures.　If a Dispute arises, the following procedures shall be implemented:

(i)　　Any Party may at any time invoke the procedures set forth in these Dispute Resolution Procedures as to any Dispute by providing written notice of such action to the other Parties. The disputing Parties within five days after such notice has been received shall schedule a meeting between the disputing Parties to be held in Houston, Texas, or at such other place as the disputing Parties may mutually agree. The meeting shall occur within ten days after notice of the meeting is delivered to the disputing Parties. The meeting shall be attended by the chief legal officer, or Person of similar title of each of the Parties involved in the Dispute. Such Persons shall attempt in a commercially reasonable manner to negotiate a resolution of the Dispute. If such Persons succeed in negotiating a resolution of the Dispute, one or more disputing Parties shall be directed (in as comprehensive detail as reasonably practicable) to take the actions necessary to carry out such resolution. Unless mutually agreed to between the disputing Parties, each Party shall have 90 days in which to take such actions (a "Cure Period").

A-1

(ii)    As part of the process set forth in clause (c)(i), or if following the Cure Period, a Party believes in good faith that a Dispute still exists, the representatives of the disputing Parties shall cooperate in a commercially reasonable manner and shall explore whether techniques such as mediation, mini-trials, mock trials or other techniques of alternative dispute resolution might be useful, although each party may agree or decline to participate in such techniques of alternative dispute resolution at its sole discretion.  In the event that a technique of alternative dispute resolution is so agreed upon, a specific timetable and completion date for its implementation shall also be agreed upon.  The representatives will continue to meet and discuss settlement until the date (the "Interim Decision Date") that is the earliest to occur of the following events:

(A)    an agreement shall be reached by the Parties resolving the Dispute;

(B)    if a technique of alternative dispute resolution is agreed upon, the completion date therefor shall occur without the Parties having resolved the Dispute; or

(C)    if a technique of alternative dispute resolution is not agreed upon, 90 days after the date of the original notice.

Unless the Parties expressly agree otherwise, the contents of any negotiations pursuant to this clause (c)(ii) (including but not limited to any documents or correspondence exchanged by the Parties) shall be confidential among the Parties, and shall not be admissible in any subsequent judicial or arbitral proceedings.

(iii)    If, as of the Interim Decision Date, the disputing Parties have not succeeded in negotiating a resolution of the Dispute pursuant to clause (c)(ii), the disputing Parties shall proceed under clauses (c)(iv), (c)(v) and (c)(vi).

(iv)    After satisfying the requirements above, such Dispute shall be submitted to mandatory and binding arbitration at the election of any Party involved in the Dispute (the "Disputing Party").  The arbitration shall be subject to the Federal Arbitration Act, 9 U.S.C. § 1, et seq. as supplemented by the conditions set forth in these Dispute Resolution Procedures.  The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association in effect on the date the notice of arbitration is served, other than as specifically modified herein.  In the absence of an agreement to the contrary, the arbitration shall be held in Houston, Texas.  The Arbitrators will allow reasonable discovery in the forms permitted by the Federal Rules of Civil Procedure, to the extent consistent with the purpose of the arbitration.  During the pendency of the Dispute, each disputing Party shall make available to the Arbitrators and the other disputing Parties all books, records and other information within its control pertaining to the Dispute requested by the other disputing Parties or the Arbitrators subject to the confidentiality provisions contained herein.  Recognizing the express desire of the Parties for an expeditious means of dispute resolution, the Arbitrators may limit the scope of discovery between the disputing Parties as may be reasonable under the circumstances.  In deciding the substance of the disputing

Parties' claims, this Agreement shall be governed by and interpreted, construed and enforced (both as to validity and performance) in accordance with the substantive law of the State of Texas, without giving effect to any conflicts of law principles. The arbitration hearing shall be commenced promptly and conducted expeditiously, with each Party involved in the Dispute being allocated an equal amount of time for the presentation of its case. Unless otherwise agreed to by the disputing Parties, the arbitration hearing shall be conducted on consecutive days. To the fullest extent permitted by applicable law, the arbitration proceedings and award shall be maintained in confidence by the Arbitrators and the Parties.

(v)     The Disputing Party shall notify the American Arbitration Association ("AAA") and the other Parties in writing describing in reasonable detail the nature of the Dispute (the "Dispute Notice"). Each Party to the dispute shall select one arbitrator (the "Selected Arbitrators") no later than 15 days after the date of the Dispute Notice. The Selected Arbitrators shall then jointly select a third arbitrator (together with the Selected Arbitrators, the "Arbitrators") from the members of a panel of arbitrators of the AAA or, if the AAA fails or refuses to provide a list of potential arbitrators, of the Center for Public Resources, and such Arbitrator shall be experienced in commercial arbitration and shall otherwise be an appropriate person based on the nature of the Dispute. In the event that the Selected Arbitrators are unable to agree on the selection of the third Arbitrator, the AAA shall select the third Arbitrator, using the criteria set forth in these Dispute Resolution Procedures, within 30 days after the date of the Dispute Notice. In the event that any Arbitrator is unable to serve, his or her replacement will be selected in the same manner as the Arbitrator to be replaced. The vote of two of the three Arbitrators shall be required for any decision under these Dispute Resolution Procedures. During the pendency of the Dispute (A) all costs and expenses incurred by a Party in connection with the Dispute that are required to be paid during the pendency of the Dispute (other than costs and expenses of the Arbitrators) shall be paid by the Party that incurs such cost, and (B) each disputing Party shall pay an equal share of the costs and expenses of the Arbitrators; provided, however, that all costs and expenses (including the Arbitrators' and attorneys' fees and expenses) of the prevailing Party will be borne by the non-prevailing Party and the non-prevailing Party shall reimburse the prevailing Party for any costs it incurred during the pendency of the Dispute, provided that the award of the Arbitrators specifies (and the Arbitrators are hereby instructed and authorized to so specify if in their determination such specification is feasible) that a Party has prevailed with respect to a preponderance of the Disputes determined by the Arbitrators. If there is no specified prevailing Party, the Arbitrators shall have the authority and discretion to assess the costs and expenses of the arbitration proceeding against all of the disputing Parties as the Arbitrators deem appropriate although the Arbitrators shall not be required to do so.

(vi)     The Arbitrators shall decide all Disputes and all substantive and procedural issues related thereto, and shall enforce this Agreement in accordance with its terms. Without limiting the generality of the previous sentence, the Arbitrators shall have the authority to issue injunctive relief; however, the Arbitrators shall not have any power or authority to (A) award consequential, incidental, indirect or punitive damages, or (B) amend this Agreement. The Arbitrators shall render the arbitration award, in writing,

within 20 days following the completion of the arbitration hearing, and shall set forth the reasons for the award.  In the event that the Arbitrators award monetary damages in favor of either party, the Arbitrators must certify in the award that no consequential, incidental, indirect or punitive damages are included in such award.  If the Arbitrator's decision results in a monetary award, the interest on such award shall accrue on the award at a rate of 10%, compounded quarterly, until such amount, together with all accrued but unpaid interest thereon, are paid in full.  Subject to clause (a) and Section 6.10 of the Agreement, the arbitration award shall be final and binding on the Parties, and judgment thereon may be entered in any court of competent jurisdiction pursuant to this clause (c)(vi) and Section 6.10 of the Agreement, as applicable, and may not be appealed, except to the extent permitted by the Federal Arbitration Act.

A-4

**TAB 8**

**ENVIRONMENTAL CUSTODIAL TRUST AGREEMENT**


**BY AND AMONG**


**LYONDELL CHEMICAL COMPANY,**
**LEMEAN PROPERTY HOLDINGS CORPORATION,**
**MILLENNIUM HOLDINGS, LLC,**
**EQUISTAR CHEMICALS, LP,**
and
**MILLENNIUM SPECIALTY CHEMICALS, INC**
as Settlors,


**LE PETOMANE XXIII, INC.,**
**not individually but solely in its representative capacity**
**as Environmental Custodial Trust Trustee,**


**AND**


**THE UNITED STATES OF AMERICA, THE CALIFORNIA REGIONAL WATER**
**QUALITY CONTROL BOARD, CENTRAL VALLEY REGION, THE STATE OF**
**ILLINOIS, THE ILLINOIS ENVIRONMENTAL PROTECTION AGENCY, THE**
**MARYLAND DEPARTMENT OF THE ENVIRONMENT, THE MICHIGAN**
**DEPARTMENT OF NATURAL RESOURCES AND THE ENVIRONMENT, THE**
**NORTH CAROLINA DIVISION OF WASTE MANAGEMENT, THE DEPARTMENT**
**OF ENVIRONMENTAL PROTECTION OF THE COMMONWEALTH OF**
**PENNSYLVANIA and THE TEXAS COMMISSION ON ENVIRONMENTAL**
**QUALITY,**
**as Environmental Trust Beneficiaries**


**As of March 30, 2010**

# TABLE OF CONTENTS

ARTICLE 1 DEFINITIONS AND PRINCIPLES OF CONSTRUCTION.................................. 4
1.1    Definitions...........................................................................................................4
1.2    Principles of Construction................................................................................10

ARTICLE 2 ESTABLISHMENT OF THE ENVIRONMENTAL CUSTODIAL TRUST......... 10
2.1    Name ................................................................................................................10
2.2    Establishment of Environmental Custodial Trust...........................................10
2.3    Purpose of the Environmental Custodial Trust................................................11
2.4    Transfer of Ownership ....................................................................................11
2.5    Transfer of Funds and Creation of Custodial Trust Accounts ........................12
2.6    Holder of Custodial Trust Assets....................................................................13
2.7    Management of Custodial Trust Assets...........................................................14
2.8    Investment and Safekeeping of Custodial Trust Assets.................................15
2.9    Insurance Policy to Cover Future Response Actions......................................17
2.10   Access and Deed Restrictions.........................................................................17
2.11   Accounting ......................................................................................................17
2.12   Termination......................................................................................................17
2.13   Property Disposition .......................................................................................18

ARTICLE 3 WORK AND DISTRIBUTIONS.......................................................... 19
3.1    Budgets for and Payments by the Environmental Custodial Trust..................19
3.2    Liens by Government.......................................................................................21
3.3    Manner of Payment..........................................................................................21
3.4    Unclaimed Distributions .................................................................................21

ARTICLE 4 THE ENVIRONMENTAL CUSTODIAL TRUST TRUSTEE ........................ 22
4.1    Appointment ....................................................................................................22
4.2    General Authority ...........................................................................................23
4.3    Powers..............................................................................................................23
4.4    Other Professionals .........................................................................................25
4.5    Books and Records ..........................................................................................25
4.6    Limitation of the Environmental Custodial Trust Trustee's Authority ..........26
4.7    Reliance by the Custodial Trust Parties ..........................................................26
4.8    Compensation of the Environmental Custodial Trust Trustee.........................26
4.9    Liability of Custodial Trust Parties .................................................................27
4.10   Exculpation and Indemnification.....................................................................27
4.11   Termination of the Environmental Custodial Trust, Replacement or Removal of the
       Environmental Trust and Transfer of Remaining Funds to the USEPA or State. ..........29
4.12   Appointment of Successor Environmental Custodial Trust Trustees..............30
4.13   No Bond...........................................................................................................30

ARTICLE 5 ENVIRONMENTAL TRUST BENEFICIARIES ...................................... 31
5.1    Environmental Trust Beneficiaries ..................................................................31
5.2    Identification of Environmental Trust Beneficiaries .......................................31
5.3    Non-Beneficiaries ...........................................................................................34
5.4    Transfer of Beneficial Interests.......................................................................35

i

ARTICLE 6 REPORTING AND TAXES ........................................................................................ 35
6.1     Reports .............................................................................................................35
6.2     Other ................................................................................................................35
6.3     Reports in Support of Insurance Claims .........................................................36
6.4     Tax Treatment of the Environmental Custodial Trust .....................................36
6.5     Taxable Entity ..................................................................................................36
6.6     Trustee as Administrator..................................................................................36
6.7     Fiscal Year .......................................................................................................36

ARTICLE 7 MISCELLANEOUS PROVISIONS ....................................................................... 37
7.1     Amendments and Waivers ...............................................................................37
7.2     Cooperation.......................................................................................................37
7.3     Situs of the Environmental Custodial Trust.....................................................38
7.4     Intention of the Parties to Establish Qualified Settlement Fund......................38
7.5     Headings ...........................................................................................................38
7.6     Severability .......................................................................................................38
7.7     Sufficient Notice ..............................................................................................38
7.8     Counterparts......................................................................................................39
7.9     Relationship to the Plan ...................................................................................39
7.10    Actions Taken on Other Than Business Day....................................................39
7.11    Compliance with Laws .....................................................................................39
7.12    Preservation of Privilege...................................................................................39
7.13    No Partnership ..................................................................................................39
7.14    Confidentiality ..................................................................................................40
7.15    Uniform Custodial Trust Act ...........................................................................40

## ENVIRONMENTAL CUSTODIAL TRUST AGREEMENT

This Environmental Custodial Trust Agreement (the "Agreement") is made and entered as of the _____ day of March, 2010, by and among LYONDELL CHEMICAL COMPANY ("Lyondell Chemical"), a Delaware corporation, LEMEAN PROPERTY HOLDINGS CORPORATION, a Delaware corporation, MILLENNIUM HOLDINGS, LLC, a Delaware corporation, EQUISTAR CHEMICALS, LP, a Delaware corporation, and MILLENNIUM SPECIALTY CHEMICALS, INC., a Delaware corporation, as debtors and debtors in possession in the Bankruptcy Case (defined below) (collectively "Settlors"); LE PETOMANE XXIII, INC., not individually but solely in its representative capacity as Environmental Custodial Trust Trustee (defined herein) of the Environmental Custodial Trust established hereby (the "Environmental Custodial Trust"); and the Environmental Trust Beneficiaries (defined herein).

## R E C I T A L S:

WHEREAS, on January 6, 2009, the Settlors and certain of their affiliates and subsidiaries (collectively, the "Debtors") commenced reorganization cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*, as amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York, (the "Bankruptcy Court") (collectively, the "Chapter 11 Cases");

WHEREAS, on December 24, 2009, the Debtors filed the Second Amended Joint Chapter 11 Plan of Reorganization (as amended, modified and supplemented from time to time, the "Plan") with the Bankruptcy Court;

WHEREAS, the Transferred Real Properties (defined herein and identified in Exhibit "B" attached hereto) have known or suspected environmental contamination and are the subject of current or expected clean-up obligations;

WHEREAS, the Debtors contend that the Transferred Real Properties are no longer beneficial to the ongoing operations of the Debtors;

WHEREAS, the Settlors and the Environmental Trust Beneficiaries have entered into a Settlement Agreement (the "Settlement Agreement") with respect to the Transferred Real Properties;

WHEREAS, the Plan provides for the creation of the Environmental Custodial Trust and transfer of the Transferred Real Properties to the Environmental Custodial Trust to be administered by the Environmental Custodial Trust Trustee pursuant to this Agreement and the Settlement Agreement;

WHEREAS, in accordance with the Plan, the Settlement Agreement and this Agreement, the Environmental Custodial Trust is established for the purposes of (a) owning the Transferred Real Properties and carrying out administrative and property management functions related to the Transferred Real Properties, (b) managing and/or funding the implementation of Environmental Actions (defined herein) with respect to the Transferred Real Properties, (c)

paying future oversight costs, and (d) ultimately selling, transferring or otherwise disposing of the Transferred Real Properties, if possible;

WHEREAS, pursuant to the Plan and the Settlement Agreement, on the Effective Date (defined herein), Debtors shall transfer the Transferred Real Properties, along with the Funds (defined herein), to the Environmental Custodial Trust;

WHEREAS, this Agreement and the Settlement Agreement govern the Environmental Custodial Trust, which is created pursuant to section 1.468B-1 of the Treasury Regulations promulgated under the Internal Revenue Code ("Treasury Regulations");

WHEREAS, the Environmental Custodial Trust shall be the exclusive holder of the assets described herein and the Settlement Agreement for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3);

WHEREAS, the Environmental Trust Beneficiaries will hold all of the beneficial trust interests in the Environmental Custodial Trust; and

WHEREAS, the Environmental Custodial Trust is intended to qualify as a qualified settlement fund (for which no grantor trust election has been made) pursuant to section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder, and as a tax-exempt settlement fund (to the extent that interests in the Environmental Custodial Trust are owned by "government entities" within the meaning of section 468B(g)(2) of the Internal Revenue Code) pursuant to section 468B(g)(2) of the Internal Revenue Code.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and agreements contained herein and the Settlement Agreement, the Parties hereby agree as follows:

## ARTICLE 1
## DEFINITIONS AND PRINCIPLES OF CONSTRUCTION

1.1     Definitions

The following terms as used in this Agreement shall have the definitions given below:

1.1.1   "Administrative Expenses" means the expenses incurred in administering the Environmental Custodial Trust, including but not limited to real estate taxes, insurance, and maintenance costs.

1.1.2   "Agreement" has the meaning set forth in the preamble to this Agreement and the Settlement Agreement.

1.1.3    "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

1.1.4   "Bankruptcy Code" has the meaning set forth in the recitals to this Agreement.

4

1.1.5     "Carved Out Expenses" has the meaning set forth in Section 4.10.2 of this Agreement.

1.1.6     "CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended.

1.1.7     "Chapter 11 Cases" has the meaning set forth in the recitals to this Agreement.

1.1.8     "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.1.9     "Court" means the Bankruptcy Court or, if the Bankruptcy Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of this Agreement, a United States District Court having competent jurisdiction with respect to such matters.

1.1.10    "Custodial Trust Account" shall have the meaning given in Section 2.5.2. hereof.

1.1.11    "Custodial Trust Assets" means (a) those assets and properties, including the Funds, the Transferred Real Properties, the Transferred Contracts, and any documents and/or information concerning the Transferred Real Properties and related Sites in the possession of environmental contractors or consultants previously retained by the Debtors, to be transferred to the Environmental Custodial Trust pursuant to the Plan and the Settlement Agreement; and (b) such other assets acquired or held by the Environmental Custodial Trust from time to time pursuant to this Agreement, the Settlement Agreement and the Plan, or an order of the Court.

1.1.12    "Custodial Trust Administrative Expense Account" means the Custodial Trust Account established to hold funds to pay real estate taxes, insurance, and other costs incurred in administering the Environmental Custodial Trust.

1.1.13    "Custodial Trust Environmental Cost Account" means each of the Custodial Trust Accounts established pursuant to Section 2.5 to hold funds to pay Environmental Costs for each Transferred Real Property.  With respect to the Allied Paper Mill Transferred Real Property, Custodial Trust Environmental Cost Account shall mean (i) the Custodial Trust Response Cost Account, (ii) the Custodial Trust Restoration Cost Account, and (iii) the Custodial Trust MDNRE Cost Account.

1.1.14    "Custodial Trust MDNRE Cost Account" means the Custodial Trust Account established pursuant to Section 2.5 to hold funds to pay Environmental Costs for Environmental Actions approved by MDNRE with respect to the Allied Paper Mill Transferred Real Property.

5

1.1.15 "Custodial Trust Response Cost Account" means the Custodial Trust Account established pursuant to Section 2.5 to hold funds to pay Environmental Costs for Environmental Actions approved by USEPA with respect to the Allied Paper Mill Transferred Real Property.

1.1.16 "Custodial Trust Restoration Cost Account" means the Custodial Trust Account established pursuant to Section 2.5 to hold funds to pay Restoration Costs for Restoration Actions approved by DOC/NOAA and DOI with respect to the Allied Paper Mill Transferred Real Property.

1.1.17 "Custodial Trust Parties" means the Environmental Custodial Trust, the Environmental Custodial Trust Trustee, the Environmental Custodial Trust Trustee's shareholders, officers, directors, employees, consultants, agents, or other professionals employed by the Environmental Custodial Trust or the Environmental Custodial Trust Trustee. Each of the Custodial Trust Parties is, individually, a Custodial Trust Party.

1.1.18 "Custodial Trust Proceeds" means the proceeds of any liquidation, sale, lease, recovery or other disposition of or other proceeds in respect of the Custodial Trust Assets.

1.1.19 "Debtors" has the meaning set forth in the recitals to this Agreement.

1.1.20 "DOC/NOAA" means the United States Department of Commerce, National Oceanic and Atmospheric Administration and any successor departments or agencies of the United States.

1.1.21 "DOI" means the United States Department of the Interior and any successor departments or agencies of the United States.

1.1.22 "Effective Date" means the first Business Day on which the conditions specified in Section 10.1 of the Plan have been satisfied or waived and the Plan becomes effective in accordance with its terms and the Confirmation Order.

1.1.23 "Environmental Actions" means any response, removal, investigation, remediation, reclamation, closure, post-closure, corrective action, institutional controls, and operation and maintenance activities selected and approved by the Lead Government Agency with respect to a Transferred Real Property. Environmental Actions may also include Restoration Actions.

1.1.24 "Environmental Costs" means the costs and expenses of implementing Environmental Actions and the costs of payment of oversight costs of any Environmental Trust Beneficiary with respect to a Transferred Real Property.

6

1.1.25 "<u>Environmental Custodial Trust</u>" has the meaning set forth in the preamble to this Agreement.

1.1.26 "<u>Environmental Custodial Trust Trustee</u>" means the Environmental Custodial Trust by and through its trustee not individually but solely in its representative capacity.

1.1.27 "<u>Environmental Trust Beneficiary</u>" means any one of the United States and/or the California Regional Water Quality Control Board, Central Valley Region, the State of Illinois, IEPA, MDE, MDNRE, NCDWM, PADEP, and/or TCEQ, collectively, the "Environmental Trust Beneficiaries."

1.1.28 "<u>Environmental Law</u>" means any applicable federal, tribal, state or local law, statute, ordinance, rule, regulation or code, any license, permit, authorization, administrative or court order, judgment, decree or injunction, including all common law, related to pollution, protection or restoration of health, safety or the environment, or the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, production, release or disposal of pollutants or Hazardous Substances, including, without limitation, CERCLA; RCRA; the Clean Air Act, 42 U.S.C. Section 7401, et seq.; the Federal Water Pollution Control Act, 33 U.S.C. Section 1251, et seq.; the Toxic Substances Control Act, 15 U.S.C. Section 2601, et seq.; the Emergency Planning and Community Right to Know Act, 42 U.S.C. Section 11001, et seq.; the Safe Drinking Water Act, 42 U.S.C. Section 300f, et seq.; the Oil Pollution Act of 1990, 33 U.S.C. Section 2701 et seq.; and the Occupational Safety and Health Act, 29 U.S.C. 651, et seq., and any applicable tribal, state, or local law counterparts, as the same may be reauthorized or amended from time to time.

1.1.29 "<u>Funds</u>" means those funds contributed by the Debtors to the Environmental Custodial Trust in the amount of $108,421,850 in order to pay Environmental Costs and Administrative Expenses of the Transferred Real Properties and the Environmental Custodial Trust, and to fulfill the purposes of the Environmental Custodial Trust consistent with this Agreement, the Settlement Agreement and the Plan.

1.1.30 "<u>Hazardous Substances</u>" means all materials, substances, or wastes defined, designated, regulated or classified as hazardous, toxic or radioactive, under any Environmental Laws, whether by type or by quantity, and shall include petroleum or any derivative or by-product thereof and asbestos containing materials.

1.1.31 "<u>IEPA</u>" means the Illinois Environmental Protection Agency and any successor departments or agencies thereto.

1.1.32  Indemnifiable Expenses" has the meaning set forth in Section 4.10.2.

1.1.33  "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

1.1.34  "Lead Government Agency" with respect to a Transferred Real Property means the Environmental Trust Beneficiary with primary oversight authority over particular Environmental Actions with respect to such Transferred Real Property, as identified in the Settlement Agreement. With respect to the Allied Paper Mill Transferred Real Property, Lead Government Agency shall mean (i) USEPA (for Environmental Actions approved by USEPA); (ii) DOC/NOAA and DOI (for Restoration Actions approved by DOC/NOAA and DOI); and (iii) MDNRE (for Environmental Actions approved by MDNRE).

1.1.35  "MDE" means the Maryland Department of the Environment and any successor departments or agencies thereto.

1.1.36   "MDNRE" means the Michigan Department of Natural Resources and the Environment and any successor departments or agencies thereto.

1.1.37   "Natural Resource Damages" means damages for injury to, destruction of, or loss of natural resources as defined in 42 U.S.C. § 101(16) and includes natural resource damages assessment costs and Restoration Actions.

1.1.38  "NCDWM" means the North Carolina Division of Waste Management and any successor departments or agencies thereto.

1.1.39  "PADEP" means the Department of Environmental Protection of the Commonwealth of Pennsylvania and any successor departments or agencies thereto.

1.1.40   "Parties" means the Settlors, the Environmental Custodial Trust Trustee, and the Environmental Trust Beneficiaries.

1.1.41  "Person" means any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, charitable foundation, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

1.1.42  "Plan" has the meaning set forth in the recitals to this Agreement.

1.1.43   "RCRA" means the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., as amended.

1.1.44 "Reorganized Debtors" has the meaning set forth in the Plan (other than the Schedule III Debtors).

1.1.45 "Restoration Actions" means restoration or other actions related to Natural Resource Damages with respect to Transferred Real Properties.

1.1.46 "Restoration Costs" means the costs and expenses of implementing Restoration Actions.

1.1.47 "Schedule III Debtors" means the Debtors listed on Exhibit C to the Plan.

1.1.48 "Settlement Agreement" has the meaning set forth in the recitals to this Agreement.

1.1.49 "Settlors" has the meaning set forth in the preamble to this Agreement.

1.1.50 "Sites" means all of the sites described in Exhibit "A" to this Agreement.

1.1.51 "States" means the California Regional Water Quality Control Board, Central Valley Region, the State of Illinois, IEPA, MDE, MDNRE, NCDWM, PADEP, and TCEQ.

1.1.52 "Superfund" means the "Hazardous Substance Superfund" established by 26 U.S.C. § 9507 or, in the event such Hazardous Substance Superfund no longer exists, any successor fund or comparable account of the Treasury of the United States to be used for removal or remedial actions to address releases or threats of releases of hazardous substances.

1.1.53 "TCEQ" means the Texas Commission on Environmental Quality and any successor departments or agencies thereto.

1.1.54 "Transferred Contracts" means those contracts and agreements relating to the Transferred Real Properties listed in Exhibit "D" to this Agreement.

1.1.55 "Transferred Real Properties" means the portions of each of the Sites that are owned by Settlors immediately prior to the Effective Date, as set forth and more particularly described in Exhibit "B" to this Agreement including, without limitation, all fixtures, improvements, and equipment located thereon as of the Effective Date and all appurtenances, rights, easements, rights-of-way, mining rights (including unpatented mining claims, mill site claims, and placer claims), mineral rights, mineral claims, appurtenant groundwater rights, associated surface water rights, claims, and filings or other interests relating to or benefitting such properties.

1.1.56 "Treasury Regulations" has the meaning set forth in the recitals to this Agreement.

9

1.1.57 "United States" means the United States of America on behalf of its agencies and departments.

1.1.58 "USEPA" means the United States Environmental Protection Agency and any successor departments or agencies of the United States.

1.2     Principles of Construction

1.2.1   The meanings set forth for defined terms in Section 1.1 or elsewhere in this Agreement shall be equally applicable to both the singular and plural forms of the terms defined.

1.2.2   All references to "this Agreement" or "hereof" and other like terms mean, unless the context requires otherwise, this Agreement, including the Exhibits hereto, as the same may be amended, modified or supplemented from time to time in accordance with the terms of this Agreement.

1.2.3   The section headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or of any term or provision hereof.

1.2.4   References in this Agreement to Sections and Exhibits, unless otherwise specified, are to Sections of and Exhibits to this Agreement.

1.2.5   To the extent reasonably possible, the provisions of this Agreement shall be interpreted in a manner consistent with the Plan and the Settlement Agreement. Where the provisions of this Agreement are irreconcilable with the provisions of the Plan, the terms of this Agreement shall govern. Where the provisions of this Agreement are irreconcilable with the provisions of the Settlement Agreement, the terms of the Settlement Agreement shall govern, with the exception of Article 4, in which case this Agreement shall govern.

ARTICLE 2
ESTABLISHMENT OF THE ENVIRONMENTAL CUSTODIAL TRUST

2.1     Name

The name of the Environmental Custodial Trust shall be the "Lyondell Environmental Custodial Trust" or such other name as the Environmental Custodial Trust Trustee, in its discretion, shall determine.

2.2     Establishment of Environmental Custodial Trust

The Parties hereto hereby establish the Environmental Custodial Trust pursuant to this Agreement and the Settlement Agreement and as approved by the Bankruptcy Court for the benefit of the Environmental Trust Beneficiaries to be effective as of the Effective Date. It is the intention of the Parties that this Agreement and the Settlement Agreement constitute the

10

governing instruments of the Environmental Custodial Trust. Effective as of the date hereof, the Environmental Custodial Trust Trustee shall have all the rights, powers and duties set forth herein with respect to accomplishing the purpose of the Environmental Custodial Trust set forth below.  The Bankruptcy Court shall retain continuing jurisdiction over the Environmental Custodial Trust.

2.3    Purpose of the Environmental Custodial Trust

The exclusive purposes and functions of the Environmental Custodial Trust are to:  (a) own the Transferred Real Properties; (b) carry out administrative and property management functions related to the Transferred Real Properties; (c) conduct, manage, and/or fund the implementation of Environmental Actions approved by the Lead Government Agencies with respect to the Transferred Real Properties, (d) sell, transfer, or otherwise dispose of the Transferred Real Properties; and (e) make distributions, if any, in accordance with the terms of this Agreement and the Settlement Agreement.  The Environmental Custodial Trust shall have no objective or authority to engage in any trade or business. The performance of the Environmental Custodial Trust Trustee of its duties under this Agreement and the Settlement Agreement shall not be considered to be the Environmental Custodial Trust Trustee's engaging in a trade or business.  This Environmental Custodial Trust satisfies all of the requirements of, and is intended by the Parties to be classified as, a qualified settlement fund (for which no grantor trust election has been made) pursuant to section 468B of the Internal Revenue Code and related Treasury Regulations.

2.4    Transfer of Ownership

Pursuant to the Plan and the Settlement Agreement, the Parties hereby establish, on behalf of the Environmental Trust Beneficiaries named herein, and Settlors hereby agree to transfer, assign, and deliver to, the Environmental Custodial Trust, or to the Environmental Custodial Trust Trustee, not individually but solely in its representative capacity as Environmental Custodial Trust Trustee, if the law of the state in which the property to be transferred is situated prohibits a trust entity from holding such title, on behalf of the Environmental Trust Beneficiaries, all of Settlors' right, title and interest in and to the Custodial Trust Assets.  Settlors shall retain no ownership or other interest whatsoever in the Transferred Real Properties, the Funds or the Transferred Contracts.  The transfer of ownership shall be of all of the Settlors' rights, titles and interests, and the transfer of the Transferred Real Properties (i) shall be free and clear of all claims, liens and interests against the Debtors other than any liability to the Governments under the Settlement Agreement, but subject to any existing *in rem* claims other than liens for the payment of monetary claims such as property taxes or other monetary claims asserted or that could have been asserted in the Chapter 11 Cases, and (ii) shall be done by quit claim deed, in a form substantially similar to the quit claim deed attached as Exhibit "C" to this Agreement, and/or personal property bill of sale without warranty, all such conveyance documents to be agreed to in form by Lyondell Chemical and the Environmental Custodial Trust, provided that in no event shall the conveyance include any warranty whatsoever by the grantor by virtue of the grant document or statutory or common law or otherwise.  The grantee for each such deed and personal property bill of sale shall be the Environmental Custodial Trust by and through the Environmental Custodial Trust Trustee, not individually but solely in its representative capacity as Environmental Custodial Trust Trustee, or if the law of the state in

11

which the property to be transferred is situated prohibits a trust entity from holding such title, the Environmental Custodial Trust Trustee, not individually but solely in its representative capacity as Environmental Custodial Trust Trustee.  Settlors shall pay all property taxes relating to the Transferred Real Properties prorated through the Effective Date, and the Debtors shall not further encumber the Transferred Real Properties or their other interests therein and shall, before transfer, maintain such properties, including the improvements thereon and fixtures thereto that are related to ongoing remediation activities in the condition that they exist as of the date of this Agreement's execution, except to the extent that ongoing environmental actions require otherwise.  The Environmental Custodial Trust Trustee shall pay premiums for policies of title insurance for any of the Transferred Real Properties.  Nothing in this paragraph shall require the Debtors to provide any deed or other documentation other than a quit claim deed and personal property bill of sale without warranty for any Transferred Real Property.  The Environmental Custodial Trust hereby accepts and agrees to hold the Custodial Trust Assets in the Environmental Custodial Trust for the benefit of the Environmental Trust Beneficiaries for the purposes described in Section 2.3, subject to the terms of the Plan, the Settlement Agreement and this Agreement, and any applicable orders of the Court.

    2.5    <u>Transfer of Funds and Creation of Custodial Trust Accounts</u>

        2.5.1    <u>Funding</u>.  On the Effective Date, the Settlors shall cause to be transferred to or at the direction of the Environmental Custodial Trust Trustee cash in the amount of $108,421,850, which constitutes the Funds and represents the aggregate amounts approved by the Court as sufficient to pay the Environmental Costs and the costs of administering the Environmental Custodial Trust.  Upon the Settlors' transfer of the Funds pursuant to this Subparagraph, Debtors shall have no further obligation to transfer any additional funds under this Agreement, the Settlement Agreement or otherwise for the purpose of paying Environmental Costs, the costs of administering the Environmental Custodial Trust or for any other purpose relating to the Transferred Real Properties.

        2.5.2    <u>Custodial Trust Accounts</u>.  Upon receipt of the Transferred Real Properties and the Funds, the Environmental Custodial Trust Trustee shall set aside in separate segregated trust accounts (each a "Custodial Trust Environmental Cost Account"), the Funding for Environmental Costs with respect to each Transferred Real Property.  The Environmental Custodial Trust Trustee shall also set aside the Funding provided for general administration in a separate Custodial Trust Administrative Expense Account, which account shall not include any of the Transferred Real Properties.  The separate accounts are referred to in this Agreement individually as a "Custodial Trust Account" and collectively as the "Custodial Trust Accounts."  The initial Funds for each of the Custodial Trust Accounts shall be as set forth in the Settlement Agreement.  Subject to Section 2.7 of this Agreement, the income and gains from any investment of the Custodial Trust Assets shall be allocated, paid and credited to such Custodial Trust Account.

2.5.3   <u>Separate Accounts</u>.  Without limiting the foregoing, the Environmental Custodial Trust shall at all times maintain at least one Custodial Trust Environmental Cost Account for each of the Transferred Real Properties to fund Environmental Costs with respect to that Transferred Real Property, except with respect to the Bully Hill Transferred Real Property, the Rising Star Transferred Real Property, and the Excelsior Mine Transferred Real Property, for which the Environmental Custodial Trust may maintain one common Custodial Trust Environmental Cost Account. With respect to the Allied Paper Mill Transferred Real Property, the Environmental Custodial Trust shall at all times maintain (i) the Custodial Trust Response Cost Account, (ii) the Custodial Trust Restoration Cost Account, and (iii) the Custodial Trust MDNRE Cost Account.  Funds designated for a Transferred Real Property shall be held and distributed from its respective Custodial Trust Account as set forth herein, and Funds from a Custodial Trust Account may not be used for another Transferred Real Property except as otherwise expressly provided by and in accordance with this Section and Section 2.7.3 of this Agreement.

2.5.4   <u>Subaccounts</u>.  Each Custodial Trust Account may be divided into such number of trust subaccounts dedicated for specific uses as may be deemed necessary in the sole discretion of the Environmental Custodial Trust Trustee to comply with the terms of, and implement, the Plan, the Settlement Agreement and this Agreement.

2.5.5   <u>Qualified Settlement Fund</u>.  For all federal income tax purposes, the Environmental Custodial Trust Trustee and Settlors shall treat the transfer of the Custodial Trust Assets by Settlors to the Environmental Custodial Trust as a transfer to a qualified settlement fund pursuant to section 468B of the Internal Revenue Code and related Treasury Regulations.  The Environmental Custodial Trust Trustee will at all times seek to have the Environmental Custodial Trust treated as a "qualified settlement fund" as that term is defined in Treasury Regulation section 1.468B-1.  The Environmental Custodial Trust Trustee will not elect to have the Environmental Custodial Trust treated as a grantor trust.  The Environmental Custodial Trust will be treated as a separate taxable entity. The Environmental Custodial Trust Trustee shall cause any taxes imposed on the earnings of the Environmental Custodial Trust to be paid out of such earnings and shall comply with all tax reporting and withholding requirements imposed on the Environmental Custodial Trust under applicable tax laws.

2.6   <u>Holder of Custodial Trust Assets</u>

Upon transfer of the Environmental Trust Assets to the Environmental Custodial Trust, the Environmental Custodial Trust shall be the exclusive holder of the Custodial Trust Assets and Custodial Trust Accounts described herein for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012 (b)(3)**.**

2.7     Management of Custodial Trust Assets

2.7.1     Consistent with this Agreement and the Settlement Agreement, the Environmental Custodial Trust shall use the Custodial Trust Environmental Cost Account for each of the Transferred Real Properties to fund Environmental Actions and oversight costs approved by the Lead Government Agency pursuant to CERCLA, RCRA, or similar state or federal statutes applicable to that Transferred Real Property.   The Environmental Custodial Trust shall also fund from the Custodial Trust Administrative Expense Account administrative costs of the Environmental Custodial Trust approved by the United States after consultation with States that are Lead Government Agencies.

2.7.2     The Environmental Custodial Trust Trustee may enter into a consent decree or consent order or agreement with the United States and/or a State in which a Transferred Real Property is located, and may perform work pursuant to Unilateral Administrative Orders issued by USEPA, to facilitate implementation of Section 2.7 with respect to such Transferred Real Property.

2.7.3     Except as provided in Section 2.7.4, upon the completion of all Environmental Actions and disbursement of all Environmental Costs for a Transferred Real Property and related Site, any funds remaining in the Custodial Trust Environmental Cost Account for such Transferred Real Property shall be transferred in the following order:   (1) first, in accordance with instructions provided by the United States Department of Justice and the respective State to any of the other Custodial Trust Environmental Cost Accounts established under this Agreement for a Transferred Real Property in that State or USEPA region with remaining actions to be performed and a need for additional trust funding; (2) second, then in accordance with instructions provided by the United States Department of Justice after consultation with the States, to any of the other Custodial Trust Environmental Cost Accounts established under this Agreement, and (3) third, in accordance with instructions provided by the United States Department of Justice after consultation with the States, to the Superfund and/or a state fund.  In addition, the United States and the State in which a Transferred Real Property is located may agree in writing at any time after one year from the Effective Date that based on new information about the estimated cost of cleanup or the assumption of liability by a buyer or other party for a Transferred Real Property, the funding in a Custodial Trust Environmental Cost Account is more than is conservatively projected to be needed.  Upon such an agreement, the United States Department of Justice, after consultation with the States, may instruct the Environmental Custodial Trust Trustee to transfer any such excess funding to one or more of the other Custodial Trust Environmental Cost Accounts established under this Agreement for a Transferred Real Property with remaining actions to be performed and a

14

need for additional trust funding (giving priority first to Custodial Trust Environmental Cost Accounts in the same State). During the eighth year after the Effective Date, the Environmental Custodial Trust Trustee shall provide the United States Department of Justice and the States an update of anticipated future administrative costs of the Environmental Custodial Trust. The United States Department of Justice may thereafter instruct in writing after consultation with the States and the Environmental Custodial Trust Trustee that any conservatively projected surplus funding in the Custodial Trust Administrative Expense Account be transferred to one or more of the other Custodial Trust Environmental Cost Accounts established under this Agreement for a Transferred Real Property with remaining actions to be performed and a need for additional funding.

2.7.4    Upon  certification of completion of the remedial action  by USEPA with respect to the Allied Paper Mill Transferred Real Property, any funds remaining in the Custodial Trust Response Cost Account shall be transferred in accordance with instructions provided by the United States Department of Justice to the USEPA site-wide special account for the Allied Paper, Inc./Portage Creek/Kalamazoo River Superfund Site.  Upon the completion of all Restoration Actions approved by DOC/NOAA and DOI with respect to the Allied Paper Mill Transferred Real Property, any funds remaining in the Custodial Trust Restoration Cost Account shall be transferred in accordance with instructions provided by the United States Department of Justice to the Natural Resource Damage Assessment and Restoration Fund for the Allied Paper, Inc./Portage Creek/Kalamazoo River Superfund Site.  Upon the completion of all Environmental Actions approved by MDNRE with respect to the Allied Paper Mill Transferred Real Property, any funds remaining in the Custodial Trust MDNRE Cost Account shall be transferred in accordance with instructions provided by the United States Department of Justice, after consultation with MDNRE, to (i) a site account established by MDNRE for the Allied Paper, Inc./Portage Creek/Kalamazoo River Superfund Site; (ii) the USEPA site-wide special account for the Allied Paper, Inc./Portage Creek/Kalamazoo River Superfund Site; and/or (iii) the Natural Resource Damage Assessment and Restoration Fund for the Allied Paper, Inc./Portage Creek/Kalamazoo River Superfund Site.

2.8    <u>Investment and Safekeeping of Custodial Trust Assets</u>

2.8.1    The Custodial Trust Assets, until sold as provided herein and in the Plan, shall be held in trust and segregated.  The Environmental Custodial Trust Trustee shall be under no liability for interest or producing income on any moneys received by the Environmental Custodial Trust hereunder and held for distribution or payment as provided in this Agreement, except as such interest is actually received by the Environmental Custodial Trust. Investments of any moneys held by the Environmental Custodial Trust shall be administered in a manner consistent with the standards and

15

requirements applicable to a trustee in connection with a Chapter 7 liquidation; provided, however, that the right and power of the Environmental Custodial Trust to invest the Custodial Trust Assets, the Custodial Trust Proceeds, or any income earned by the Environmental Custodial Trust, shall be limited to the right and power to invest such assets (pending periodic distributions in accordance with Article 3 hereof) in demand and time deposits, such as certificates of deposit, in banks or other savings institutions whose deposits are federally insured, or other liquid investments, such as Treasury bills; and provided further, that the scope of any such permissible investments shall be limited to include only those investments, or shall be expanded to include any additional investments, as the case may be, that a liquidating trust, within the meaning of Treasury Regulation section 301.7701-4(d), may be permitted to hold, pursuant to Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise (although the Parties acknowledge and agree that the Environmental Custodial Trust is properly characterized for federal tax purposes as a qualified settlement fund within the meaning of Section 1.468B-1 of the Treasury Regulations, and not as a liquidating trust under Section 301.7701-4(d) of the Treasury Regulations).

2.8.2   The Environmental Custodial Trust Trustee is expressly prohibited from holding any or all of the Funds provided for Environmental Costs in a common, commingled or collective trust fund and from holding any or all of the Funds in a common, commingled or collective trust fund with the assets of any other entity.   However, the Funds provided for Administrative Expenses can be held in one account.

2.8.3   Nothing in this Section 2.8 shall be construed as authorizing the Environmental Custodial Trust Trustee to cause the Environmental Custodial Trust to carry on any business or to divide the gains therefrom, including without limitation, the business of an investment company, a company "controlled" by an "investment company," required to register as such under the Investment Company Act of 1940, as amended.   The sole purpose of this Section 2.8 is to authorize the investment of the funds in the Custodial Trust Accounts or any portions thereof as may be reasonably prudent pending use of the proceeds for the purposes of the Environmental Custodial Trust.

2.8.4   The Custodial Trust Parties shall not incur any liability for following any written direction or order to act (or to refrain to act) from any Environmental Trust Beneficiary so long as such written direction is not inconsistent with this Agreement and the Plan.

16

2.9     Insurance Policy to Cover Future Response Actions

Only at the direction of the United States and the States in which the relevant Transferred Real Properties are located, shall the Environmental Custodial Trust Trustee investigate the possible purchase of an insurance policy to cover future Environmental Actions and general liability at one or more of the Transferred Real Properties.  If, and only if, the United States and the States in which the relevant Transferred Real Properties are located unanimously direct the Environmental Custodial Trust Trustee in writing to purchase such insurance, shall the Environmental Custodial Trust Trustee use Custodial Trust Assets to purchase such insurance.

2.10    Access and Deed Restrictions

The Environmental Custodial Trust shall provide the United States and the respective States and their representatives and contractors with reasonable access at all reasonable times to the Transferred Real Properties for the purposes of conducting Environmental Actions or related activities at or near the Transferred Real Properties.  The Environmental Custodial Trust Trustee shall implement any institutional controls or deed restrictions requested by the Governments with respect to any of the Transferred Real Properties.  The Environmental Custodial Trust shall execute and record in the appropriate local real estate records any easements or deed restrictions restricting the use of the Transferred Real Properties requested by the Environmental Trust Beneficiaries in order to protect public health, welfare or safety or the environment or ensure non-interference with or protectiveness of any action.  Nothing in the Plan, the Settlement Agreement or this Agreement is intended to or shall be construed to terminate or otherwise amend any easements or deed restrictions of record as to any Transferred Real Property existing prior to the Effective Date.  The Environmental Custodial Trust Trustee shall abide by the terms of any institutional controls or deed restrictions in place or of record as to any Transferred Real Property.

2.11    Accounting

The Environmental Custodial Trust Trustee shall maintain proper books, records, and accounts relating to all transactions pertaining to the Environmental Custodial Trust, and the assets and liabilities of, and claims against or assumed by, the Environmental Custodial Trust in such detail and for such period of time as may be necessary to enable the Environmental Custodial Trust Trustee to make full and proper accounting in respect thereof in accordance with Article 6 below and to comply with applicable provisions of law and good accounting practices. Except as otherwise provided herein or by the Plan or the Settlement Agreement, the Environmental Custodial Trust Trustee shall not be required to file any accounting or seek approval of the Court with respect to the administration of the Environmental Custodial Trust, or as a condition for making any payment or distribution out of the Custodial Trust Assets. Environmental Trust Beneficiaries shall have the right upon fourteen (14) days' prior written notice delivered to the Environmental Custodial Trust Trustee to inspect such books and records.

2.12    Termination

2.12.1  Consistent with the terms of this Agreement, the Settlement Agreement and the Plan, the Environmental Custodial Trust Trustee shall not unduly

prolong the duration of the Environmental Custodial Trust and shall at all times endeavor to resolve, settle, or otherwise dispose of all claims against Custodial Trust Assets and to effect the distribution of Custodial Trust Assets and other receipts relating thereto to the Environmental Trust Beneficiaries and the others who receive distributions hereunder in accordance with the terms hereof, and to terminate the Environmental Custodial Trust as soon as practicable consistent with this Agreement, the Settlement Agreement and the Plan.

2.12.2   The parties agree that the rule against perpetuities does not apply to the Environmental Custodial Trust, but to the extent that any rule against perpetuities shall be deemed applicable, the Environmental Custodial Trust shall automatically dissolve on the date 90 days after the date on which 21 years less 91 days pass after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof.    If the Environmental Custodial Trust is terminated pursuant to this Section 2.12.2, title to the Environmental Custodial Trust's assets shall be transferred to or at the direction of the United States in consultation with any of the States in which Transferred Real Properties then remaining in the Environmental Custodial Trust are located.

2.13    Property Disposition

2.13.1   Subject to Section 2.12.2 of this Agreement, the United States, the State in which a Transferred Real Property is located, or a governmental unit that is a designee thereof, may at any time propose in writing to take ownership of any of the Transferred Real Properties or any part thereof. Any such proposed transfer and the terms thereof are subject to approval in writing by USEPA, DOI and DOC/NOAA as applicable, and the State in which the Transferred Real Property is located.    The Environmental Custodial Trust Trustee may at any time seek the approval of USEPA, DOI and DOC/NOAA as applicable, and the applicable State for the sale or lease or other disposition of all or part of a Transferred Real Property. In the event of any approved sale or lease or other disposition under this Paragraph, any net proceeds from the sale or lease or other disposition shall be paid to the Custodial Trust Environmental Cost Account for that Transferred Real Property (subject to the provisions of Sections 2.7.3 and 2.7.4) in a proportion approved by USEPA, DOI and DOC/NOAA as applicable, and the State in writing.    With the prior written approval of USEPA, DOI and DOC/NOAA as applicable, and the applicable State, the Environmental Custodial Trust may, after the sale or lease of all or part of a Transferred Real Property to a third party pursuant to this Section, continue to conduct, manage, and/or fund Environmental Actions, and pay oversight costs, with respect to that property.

2.13.2 Any actions by the Environmental Custodial Trust Trustee on property administered by any federal agency can only be taken after the written concurrence of the federal agency.

ARTICLE 3
WORK AND DISTRIBUTIONS

3.1    Budgets for and Payments by the Environmental Custodial Trust

On or before the date that is ninety (90) days after the Effective Date, the Environmental Custodial Trust Trustee shall provide the United States and the Lead Government Agency for a Transferred Real Property with a proposed budget for the balance of the calendar year and the next calendar year.  On or before January 1 of each calendar year, the Environmental Custodial Trust Trustee shall provide the United States and the Lead Government Agency with balance statements and proposed budgets as described in Sections 3.1.1 and 3.1.3 of this Agreement.  The Environmental Custodial Trust Trustee shall not pay any expense that has not been provided for in the applicable budget and approved by the Lead Government Agency.

3.1.1    Administrative Expenses of the Environmental Custodial Trust.  On or before January 1 of each year, the Environmental Custodial Trust Trustee shall provide the United States and the States with a balance statement and an annual budget for administration of the Environmental Custodial Trust for that calendar year, which may be approved or disapproved in whole or in part by the United States and States that are Lead Government Agencies.  If disapproved, such budget shall be revised and resubmitted as expeditiously as possible.  No administrative expenses may be incurred or paid by the Environmental Custodial Trust Trustee that are inconsistent with the approved budget, unless the United States and States that are Lead Government Agencies approve a revised budget.  Each annual budget shall include a future year forecast of administrative expenditures, with annual details for at least the next three years (or such longer period as the United States and States that are Lead Government Agencies shall reasonably request).  The Environmental Custodial Trust shall regularly, but not less often than annually, and otherwise upon the reasonable request of the United States or the States, provide documentation to the United States and the States to substantiate compliance with the applicable approved budget and application of Custodial Trust Assets consistently with the terms of this Agreement, the Settlement Agreement and the Plan.  The approved budget shall be funded by the transfer of the approved amounts from the Custodial Trust Assets.

3.1.2    <u>Remuneration for Environmental Custodial Trust Trustee's Start-Up Fees and Expenses.</u>    The Environmental Custodial Trust Trustee shall be entitled to remuneration from the Custodial Trust Administrative Expense Account of up to $90,000 for its fees and expenses incurred prior to the Effective Date in connection with the formation of the Environmental Custodial Trust.

3.1.3    <u>Environmental Expenses of the Environmental Custodial Trust</u>.    In consultation with the Lead Government Agency, the Environmental Custodial Trust Trustee shall prepare balance statements and annual budgets of projected expenditures for Environmental Costs from each of the Custodial Trust Environmental Cost Accounts.  The first budget for the remainder of the current calendar year and the next calendar year shall be prepared within ninety (90) days following the Effective Date and annual budgets shall be prepared thereafter on or before each January 1 during the term of the Environmental Custodial Trust.  The Lead Government Agency shall have the authority to approve or disapprove the proposed budget for the relevant Custodial Trust Environmental Cost Account after consultation with the other governmental agency (i.e., the State in which the Transferred Real Property is located for a Site for which USEPA, DOI, and/or DOC/NOAA is the Lead Government Agency and vice versa).  If disapproved, a budget shall be revised and resubmitted as expeditiously as possible.  No expenses may be incurred or paid by the Environmental Custodial Trust Trustee that are inconsistent with an approved budget, unless the Lead Government Agency after consultation with the other governmental agency approves a revised budget; provided, however, that the Environmental Custodial Trust Trustee may incur or pay ongoing or recurring expenses approved in the prior year's budget that occur between the time a proposed annual budget is submitted and the time it is approved.  In addition, the Environmental Custodial Trust Trustee shall pay funds from a Custodial Trust Environmental Cost Account to the Lead Government Agency within 10 days of a written request by the Lead Government Agency for such funds.  Such written request shall specify what expenditures by the Lead Government Agency the funds would reimburse and shall certify that such expenditures by the Lead Government Agency were only for Environmental Actions and/or oversight costs with respect to the Transferred Real Property and related Site.  The Environmental Custodial Trustee shall also, within 10 days of a written request by the Lead Government Agency, pay annual funds from a Custodial Trust Environmental Cost Account to pay the Lead Government Agency's projected expenditures with respect to the Transferred Real Property and related Site, provided that the Lead Government Agency's written request shall specify what projected expenditures by the Lead Government Agency the funds are for and shall certify that such projected expenditures by the Lead Government Agency are only for Environmental Actions that are expected to occur in the following year with respect to the Transferred Real Property and related Site.  The Environmental Custodial

Trust Trustee shall also pay funds from a Custodial Trust Environmental Cost Account to the other governmental agency (as described in the third sentence of this Section) within 10 days of such request, where the Lead Government Agency has requested the assistance of the other governmental agency with respect to the Transferred Real Property and related Site. Any request for payment pursuant to the preceding sentence shall comply with the same requirements set forth in this Section for requests for payment to a Lead Government Agency.

3.1.4    <u>Annual Reports.</u>  By January 1 of each year during the term of the Environmental Custodial Trust and within nine (9) months after termination of the Environmental Custodial Trust, the Environmental Custodial Trust Trustee shall prepare and submit to the Environmental Trust Beneficiaries an annual report with respect to each of the Custodial Trust Accounts. The annual report shall pertain to the prior calendar year, or if the report is a final report, such period from the most recent annual report to the termination of the Custodial Trust Accounts.

3.2    <u>Liens</u>

Notwithstanding anything to the contrary in this Article 3, the Environmental Custodial Trust hereby grants to the Environmental Custodial Trust Trustee, the United States and the respective States a first-priority lien on and security interest in the Custodial Trust Assets to secure the payment of all amounts owed to, accrued or reserved on account of the Environmental Custodial Trust or to be retained by the Environmental Custodial Trust Trustee hereunder or otherwise due hereunder. Upon written request by the Environmental Trust Beneficiaries, the Environmental Custodial Trust agrees to take appropriate actions and execute appropriate documents to perfect the Environmental Custodial Trust Trustee's, liens and security interest hereunder. However, only the Environmental Custodial Trust Trustee shall have a first-priority lien and security interest in the Custodial Trust Administrative Expense Account and only the United States and the respective States shall have a first-priority lien on and security interest in the Custodial Trust Environmental Cost Accounts.

3.3    <u>Manner of Payment</u>

Cash payments made by the Environmental Custodial Trust pursuant to this Agreement and the Settlement Agreement shall be in United States dollars by checks drawn on a domestic bank whose deposits are federally insured selected by the Environmental Custodial Trust Trustee, or by wire transfer from such a domestic bank, at the option of the Environmental Custodial Trust Trustee.

3.4    <u>Unclaimed Distributions</u>

Upon the dissolution of the Environmental Custodial Trust, and after the payment or making of reasonable provision for payment of all obligations of the Environmental Custodial Trust in accordance with applicable law, the Environmental Custodial Trust Trustee shall, as expeditiously as is consistent with the conservation and preservation of the Environmental Trust

Assets, distribute any remaining assets in the Environmental Custodial Trust to such federal and state accounts as the Environmental Trust Beneficiaries designate; provided none of such assets shall be distributed to any of the Debtors or Reorganized Debtors.

## ARTICLE 4
## THE ENVIRONMENTAL CUSTODIAL TRUST TRUSTEE

4.1     Appointment

    4.1.1    Debtors, after approval by the United States, hereby appoint Le Petomane XXIII, Inc., not individually but solely in its representative capacity as Environmental Custodial Trust Trustee, by and through Jay A. Steinberg, not individually but solely in his representative capacity as president of the Environmental Custodial Trust Trustee, to serve as the Environmental Custodial Trust Trustee, and the Environmental Custodial Trust Trustee hereby accepts such appointment and agrees to serve in such representative capacity, effective upon the Effective Date of this Agreement. Subject to the provisions of Section 4.11 herein, the term of the Environmental Custodial Trust Trustee shall be for ten years at which time the Environmental Custodial Trust Trustee may be re-appointed or terminated.  Any successor Environmental Custodial Trust Trustee shall be appointed in accordance with Section 4.12 of this Agreement.  If the Environmental Custodial Trust Trustee is not reappointed and no successor Environmental Custodial Trust Trustee is appointed by the expiration of the Environmental Custodial Trust Trustee's term, the Court may reappoint the Environmental Custodial Trust Trustee or appoint a successor Environmental Custodial Trust Trustee.

    4.1.2    After consultation with the United States and the States, the Environmental Custodial Trust is authorized to obtain the services of an environmental consultant to implement the future Environmental Actions (the "Consultant").  The Consultant shall obtain environmental, general and professional liability insurance in the sum of $25,000,000 or such lesser amount as agreed to by the Environmental Custodial Trust after consultation with the United States and the States. The beneficiary of the insurance policies shall be the Environmental Custodial Trust and shall cover negligence committed by the Consultant in implementing the future Environmental Actions or any other negligence committed by the Consultant.  The legal relationship of the Consultant to the Environmental Custodial Trust and Environmental Custodial Trust Trustee is that of an independent contractor professional, not that of an entity employed by the Environmental Custodial Trust or the Environmental Custodial Trust Trustee.  The Consultant shall not be deemed a Custodial Trust Party.

4.2    <u>General Authority</u>

The Environmental Custodial Trust Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purposes of the Environmental Custodial Trust and not otherwise.  The Environmental Custodial Trust Trustee shall have the authority to bind the Environmental Custodial Trust, and any successor Environmental Custodial Trust Trustee, or successor or assign of the Environmental Custodial Trust, but shall for all purposes hereunder be acting in its representative capacity as Environmental Custodial Trust Trustee and not individually.  Notwithstanding anything to the contrary contained herein, the Environmental Custodial Trust Trustee shall not be required to take action or omit to take any action if, after the advice of counsel, the Environmental Custodial Trust Trustee believes in good faith such action or omission is not consistent with the Environmental Custodial Trust Trustee's fiduciary duties.

4.3    <u>Powers</u>

In connection with the administration of the Environmental Custodial Trust, except as otherwise set forth in this Agreement and the Settlement Agreement, the Environmental Custodial Trust Trustee is authorized to perform any and all acts necessary to accomplish the purposes of the Environmental Custodial Trust.  However no such action shall cause the Environmental Custodial Trust to fail to qualify as a qualified settlement fund (for which no grantor trust election has been made) under section 468B of the Internal Revenue Code and the Treasury Regulations thereunder.  The powers of the Environmental Custodial Trust Trustee shall, without any further Court approval or order, include, without limitation, each of the following:

4.3.1    to receive, manage, invest, supervise and protect the Custodial Trust Assets, withdraw, make distributions and pay taxes and other obligations owed by the Environmental Custodial Trust or the Custodial Trust Accounts from funds held by the Environmental Custodial Trust Trustee and/or the Environmental Custodial Trust (or the Custodial Trust Accounts) in accordance with this Agreement and the Settlement Agreement, and withhold and pay to the appropriate taxing authority any withholding taxes on distributions from the Environmental Custodial Trust;

4.3.2    to invest in, and only in, demand and time deposits such as short term certificates of deposit, in banks or other savings institutions or other temporary, liquid investments, such as a U.S. Treasury bills as permitted by Section 345 of the Bankruptcy Code, but including only those investments, and expanded to include any additional investments, as the case may be, that a liquidating trust, within the meaning of Treasury Regulation section 301.7701-4(d), may be permitted to hold, pursuant to Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise;

4.3.3    to borrow funds, incur or assume liabilities, and pledge any portion of the Environmental Trust Assets on behalf of the Environmental Custodial

Trust in furtherance of or in connection with the Environmental Custodial Trust Trustee's or the Environmental Custodial Trust's duties, powers, authority, and obligations under this Agreement and determine and satisfy any and all liabilities created, incurred or assumed by the Environmental Custodial Trust;

4.3.4    to make distributions of the Custodial Trust Assets from the Custodial Trust Accounts for the purposes contemplated in this Agreement and the Plan;

4.3.5    to engage and retain employees, counsel and other professionals, including any professional who represented parties in interest in the Chapter 11 Cases, to assist the Environmental Custodial Trust Trustee with respect to the responsibilities described herein, on such terms as the Environmental Custodial Trust Trustee deems appropriate, without Bankruptcy Court approval;

4.3.6    to perform duties, exercise the powers, and assert the rights of a trustee under Section 704 and 1106 of the Bankruptcy Code;

4.3.7    to obtain general liability insurance and other reasonable insurance coverage with respect to the Environmental Custodial Trust Trustee's liabilities and obligations as Environmental Custodial Trust Trustee under this Agreement and the Settlement Agreement (in the form of an errors and omissions policy or otherwise) and indemnification for the Environmental Custodial Trust Trustee and others to the extent provided for in the Plan and this Agreement;

4.3.8    to request any appropriate tax determination with respect to the Environmental Custodial Trust, protest, contest or otherwise object to any such tax determination, and make any tax election, settle or compromise any tax liability, or consent to any claim or assessment relating to taxes;

4.3.9    to establish and maintain a website for the purpose of providing notice of Trust activities in lieu of sending written notice to the Environmental Trust Beneficiaries, and for any other purpose identified by the Environmental Custodial Trust Trustee in the reasonable exercise of its discretion, subject to providing notice of such website to the Environmental Trust Beneficiaries;

4.3.10    to effect all actions and execute all agreements, instruments and other documents necessary to implement this Agreement and the Settlement Agreement, including to exercise such other powers as may be vested in or assumed by the Environmental Custodial Trust and/or the Environmental Custodial Trust Trustee pursuant to this Agreement and any order of the Court or as may be necessary and proper to carry out the provisions of this Agreement.  No Person dealing with the Environmental Custodial Trust

shall be obligated to inquire into the authority of the Environmental Custodial Trust Trustee in connection with the protection, conservation or disposition of Custodial Trust Assets. The Environmental Custodial Trust Trustee is authorized to execute and deliver all documents on behalf of the Environmental Custodial Trust to accomplish the purposes of this Agreement and the Settlement Agreement; and

4.3.11  to take all other appropriate action with respect to the Environmental Trust Assets to the extent consistent with the purpose of the Environmental Custodial Trust.

4.4     <u>Other Professionals</u>

After consultation with the United States and the States, the Environmental Custodial Trust is authorized to retain on behalf of the Environmental Custodial Trust and pay such third parties as the Environmental Custodial Trust Trustee (in accordance with a budget approved pursuant to Section 3.1 above) may deem necessary or appropriate to assist the Environmental Custodial Trust Trustee in carrying out its powers and duties under this Agreement, the Settlement Agreement and the Plan, including, without limitation, (i) counsel to the Environmental Custodial Trust and/or Environmental Custodial Trust Trustee, (ii) a public accounting firm to perform such reviews and/or audits of the financial books and records of the Environmental Custodial Trust as may be appropriate in the Environmental Custodial Trust Trustee's reasonable discretion and to prepare and file any tax returns or informational returns for the Environmental Custodial Trust or the Custodial Trust Accounts as may be required, and (iii) environmental consultants, custodians, security personnel, engineers, surveyors, brokers, contractors, and clerks. The Environmental Custodial Trust Trustee may pay all such Persons compensation for services rendered and expenses incurred in accordance with a budget approved as provided in Section 3.1.

4.5     <u>Books and Records</u>

The Environmental Custodial Trust Trustee shall maintain, or cause to be maintained, in respect of the Environmental Custodial Trust and the Environmental Trust Beneficiaries, books and records relating to the Environmental Trust Assets and income of the Environmental Custodial Trust and the payment or assumption by the Environmental Custodial Trust of liabilities, expenses or obligations in such detail and for such period of time as may be necessary to enable the Environmental Custodial Trust to make full and proper accounting in respect thereof. Such books and records shall be maintained on a modified cash or other comprehensive basis of accounting. The United States and the States shall have the right to examine all such books and records and all other books and records of the Environmental Custodial Trust. Except as otherwise may be expressly provided herein, nothing in this Agreement requires the Environmental Custodial Trust Trustee to file any accounting, or seek approval of any court, with respect to the administration of the Environmental Custodial Trust, or as a condition for managing any payment or distribution out of the Environmental Trust Assets.

4.6    Limitation of the Environmental Custodial Trust Trustee's Authority

The Environmental Custodial Trust and the Environmental Custodial Trust Trustee shall have no authority to do any of the following:

4.6.1    to engage in any trade or business with respect to the Custodial Trust Assets or collect any proceeds therefrom except as, and to the extent the same is deemed in good faith by the Environmental Custodial Trust Trustee, to be reasonably necessary or proper for the conservation or protection of the Custodial Trust Assets, or the fulfillment of the purposes of the Environmental Custodial Trust;

4.6.2    take any action that would cause the Environmental Custodial Trust to fail to qualify as a qualified settlement fund (for which no grantor trust election has been made) under Section 468B of the Internal Revenue Code and the related Treasury Regulations;

4.6.3    take any action in contravention of this Agreement, the Plan, the Confirmation Order or applicable law, or any action that would make it impossible to carry on the activities of the Environmental Custodial Trust; or

4.6.4    possess property of the Environmental Custodial Trust or assign the Environmental Custodial Trust's rights in specific property for other than purposes of the Environmental Custodial Trust.

4.7    Reliance by the Custodial Trust Parties

Except as may otherwise be provided herein: (a) the Custodial Trust Parties may rely, and shall be protected from liability in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties; (b) the Custodial Trust Parties may consult with legal counsel, financial or accounting advisors and other professionals or environmental consultants to be selected by them, and the Custodial Trust Parties shall not be personally liable for any action taken or omitted to be taken by them in accordance with the advice thereof; and (c) Persons dealing with the Custodial Trust Parties shall look only to the Custodial Trust Assets to satisfy any liability incurred by the Custodial Trust Parties to such Person in carrying out the terms of this Agreement, the Settlement Agreement and the Plan, or any order of the Court and the Custodial Trust Parties shall have no personal obligation to satisfy any such liability.

4.8    Compensation of the Environmental Custodial Trust Trustee

The Environmental Custodial Trust shall pay its own reasonable and necessary costs and expenses, and shall reimburse the Environmental Custodial Trust Trustee for the actual reasonable out-of-pocket fees and expenses to the extent incurred by the Environmental Custodial Trust Trustee in connection with the Environmental Custodial Trust Trustee's duties hereunder, including, without limitation, necessary travel, lodging, office rent (to be paid directly

26

by the Environmental Custodial Trust), postage, photocopying, telephone and facsimile charges upon receipt of periodic billings, all in accordance with an annual budget or fee schedule approved by the Environmental Trust Beneficiaries.  The Environmental Custodial Trust Trustee and employees of the Environmental Custodial Trust and the Environmental Custodial Trust Trustee who perform services for the Environmental Custodial Trust shall be entitled to receive reasonable compensation for services rendered on behalf of the Environmental Custodial Trust in accordance with an annual budget or fee schedule approved by the Environmental Trust Beneficiaries.

The Custodial Trust Assets shall be subject to the claims of the Lyondell Environmental Custodial Trust Trustee, and the Lyondell Environmental Custodial Trust Trustee shall be entitled to compensate itself for administrative work performed consistent with the annual budget approved by the Environmental Trust Beneficiaries out of any available cash in the Custodial Trust Administrative Expense Account, and compensate itself for environmental work performed consistent with the annual budget from the Custodial Trust Environmental Cost Account for the Transferred Real Property that the environmental services related to.  The Lyondell Environmental Custodial Trust shall be obligated to pay for actual out-of-pocket expenses and for actual hours worked.  All compensation payable to the Lyondell Environmental Custodial Trust Trustee shall be paid from the appropriate Custodial Trust Account based on the nature of the work being either administrative or environmental.

4.9    Liability of Custodial Trust Parties

In no event shall the Custodial Trust Parties be held liable to any third parties for any liability, action, or inaction of any other party including each other and the Settlors. The Custodial Trust Parties shall, further, be indemnified and exculpated in accordance with Section 4.10 of this Agreement.

As provided in the Settlement Agreement, the Custodial Trust Parties are deemed to have resolved their civil liability under CERCLA and State environmental statutes to the United States and States, and have protection from contribution actions or claims as provided by Sections 113(f)(2) of CERCLA, 42 U.S.C. Section 9613(f)(2) or similar state law for matters addressed in the Settlement Agreement.  The Custodial Trust Parties shall have the benefits of the covenants not to sue, contribution protections, and the other protection provisions as specified for the Debtors as set forth in the Settlement Agreement.

4.10    Exculpation and Indemnification

The Custodial Trust Parties shall be exculpated and indemnified, consistent with the provisions of this Section 4.10, for any claims, causes of action, or other assertions of liability arising out of or in connection with:

(a) the ownership of Custodial Trust Assets;

(b) the discharge of duties and powers conferred upon the Environmental Custodial Trust and/or Environmental Custodial Trust Trustee by this Agreement, the Settlement Agreement and the Plan, any order of the Court, or applicable law or

27

otherwise, including the making of payments in accordance with this Agreement, the Settlement Agreement and the Plan, or any order of court, and the implementing of the provisions of this Agreement, the Settlement Agreement and the Plan or any order of court; or

(c)   any claim against Settlors.

4.10.1   <u>Exculpation.</u>   No Custodial Trust Party shall be personally liable unless the Court finds, by a final order, that the Custodial Trust Party committed fraud or willful misconduct after the Effective Date in relation to the Environmental Custodial Trust Trustee's duties that are alleged to be the basis for liability.   Each Custodial Trust Party shall be and hereby is exculpated by all Persons, including, without limitation, holders of claims and other parties in interest, of and from any and all claims, causes of action, and other assertions of liability arising out of or in connection with the matters contained in the provisions of Section 4.10 (a), (b) and (c).   No Person, including without limitation, holders of claims and other parties in interest, will be allowed to pursue any claims or cause of action against any Custodial Trust Party for the matters contained in the provisions of Section 4.10 (a), (b), and (c).   However, nothing in this paragraph or this Agreement shall preclude the Governments (as defined in the Settlement Agreement) from enforcing the terms of the Settlement Agreement against the Parties.

4.10.2   <u>Indemnification</u>.   The Environmental Custodial Trust shall indemnify, defend and hold harmless (without the Custodial Trust Parties having to first pay from their personal funds) the Custodial Trust Parties from and against any and all claims, causes of action, liabilities, obligations, losses, costs, judgments, damages or expenses (including attorneys' fees) and any other assertion of liability arising out of or in connection with the matters contained in the provisions of Section 4.10 (a), (b) and (c) (collectively, the "<u>Indemnifiable Expenses</u>"), to the fullest extent permitted by applicable law.   The Indemnifiable Expenses shall be limited to and satisfied from funds in the Custodial Trust Environmental Cost Account for the relevant property and the Custodial Trust Administrative Expense Account.   Without limiting the foregoing, any such judgment against a Custodial Trust Party and any such costs of defense relating to any Custodial Trust Party shall be paid by the Environmental Cost Custodial Trust consistent with the terms and conditions of this Section 4.10.2. Notwithstanding the foregoing, to the extent fraud or willful misconduct of any Custodial Trust Party is alleged and the Court finds, by a final order, that such Custodial Trust Party committed fraud or willful misconduct after the Effective Date in relation to the Environmental Custodial Trust Trustee's duties that are alleged to be the basis for liability, there shall be no indemnification, of that Custodial Trust Party, for any judgments arising from such allegations of fraud or willful

28

misconduct (the "Carved Out Expenses"). It shall be an irrebuttable presumption that any action taken, or inaction, consistent with Court approval shall not constitute willful misconduct or fraud. The Environmental Custodial Trust shall advance to any Custodial Trust Party incurring any Indemnifiable Expenses such amounts, on a monthly basis, if the Custodial Trust Party provides the Environmental Custodial Trust with an undertaking reasonably satisfactory to the Environmental Custodial Trust Trustee that such Custodial Trust Party will repay any amounts finally determined to be Carved Out Expenses.

4.11    Termination of the Environmental Custodial Trust, Replacement or Removal of the Environmental Trust and Transfer of Remaining Funds to the United States or State.

4.11.1  Termination.    The duties, responsibilities and powers of the Environmental Custodial Trust Trustee will terminate on the date the Environmental Custodial Trust is dissolved under applicable law in accordance with this Agreement and the Settlement Agreement, or by an order of the Court; provided that this Section and Sections 4.7, 4.9 and 4.10 above shall survive such termination, dissolution and entry.

4.11.2  Resignation.  The Environmental Custodial Trust Trustee may resign by giving not less than thirty (30) days prior written notice thereof to the Court, the United States, and the States.

4.11.3  Replacement.    The Environmental Custodial Trust Trustee may be replaced upon completion of any ten (10) year term, however, this Section and Sections 4.7, 4.9 and 4.10 above shall survive such replacement.

4.11.4  Removal.  The Environmental Custodial Trust Trustee may be removed or the Custodial Trust Assets may be transferred to the United States and/or the States by:

(1) The entry of an order by the Bankruptcy Court, immediately upon notice of appointment of a temporary or permanent successor, finding that the Environmental Custodial Trust Trustee committed fraud or willful misconduct after the Effective Date in relation to the Environmental Custodial Trust Trustee's duties under the Environmental Custodial Trust; or

(2) The entry of an order by the Bankruptcy Court, immediately upon notice of appointment of a temporary or permanent successor, finding that, (i) the Environmental Custodial Trust Trustee has in any material respect, as a result of negligence, exacerbated conditions at any of the Transferred Real Properties, or (ii) has been seriously or repeatedly deficient or seriously or repeatedly late in the performance of its duties, or (iii) has violated the provisions of

29

this Agreement or other related implementation agreements.  In the event of a finding of the occurrence of the events set forth in the foregoing clauses (i), (ii) or (iii), the United States and the State in which the relevant Transferred Real Property is located may jointly direct that the Environmental Custodial Trust Trustee be replaced in accordance with this Agreement or may retain the Environmental Custodial Trust Trustee and direct that all remaining funds and future proceeds or income, if any, attributable to the Custodial Trust Assets in the Environmental Custodial Trust be paid to the United States and/or to the State to be used in accordance with the terms of this Agreement, the Settlement Agreement or the Plan.  In the event the funds are so paid, so long as title to any Transferred Real Property remains in the name of the Environmental Custodial Trust or Environmental Custodial Trust Trustee, funds deemed reasonably sufficient by the applicable beneficiaries to cover property taxes and other property management costs to be paid by the Environmental Custodial Trust for any Transferred Real Property shall be left in the Custodial Trust Administrative Expense Account.

(3) The provisions of this Section and Section 4.7, 4.9 and 4.10 above shall survive the removal of the Environmental Custodial Trust Trustee or transfer of funds.

4.12    Appointment of Successor Environmental Custodial Trust Trustees

Any successor Environmental Custodial Trust Trustee shall be proposed by the United States and the States and appointed by the Court.  Any successor Environmental Custodial Trust Trustee appointed hereunder shall execute an instrument accepting such appointment hereunder and shall file such acceptance with the Environmental Custodial Trust records.  Thereupon, such successor Environmental Custodial Trust Trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trusts and duties of its predecessor in the Environmental Custodial Trust with like effect as if originally named herein; provided, however, that a removed, incapacitated or resigning Environmental Custodial Trust Trustee shall, nevertheless, when requested in writing by the successor Environmental Custodial Trust Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Environmental Custodial Trust Trustee under the Environmental Custodial Trust all the estates, properties, rights, powers, and trusts of such predecessor Environmental Custodial Trust Trustee.

4.13    No Bond

Notwithstanding any state law to the contrary, the Environmental Custodial Trust Trustee, including any successor Environmental Custodial Trust Trustee, shall be exempt from giving any bond or other security in any jurisdiction.

ARTICLE 5
ENVIRONMENTAL TRUST BENEFICIARIES

5.1     Environmental Trust Beneficiaries

Beneficial interests in the Environmental Custodial Trust shall be held by each of the Environmental Trust Beneficiaries.

5.2     Identification of Environmental Trust Beneficiaries

5.2.1     In order to determine the actual names and addresses of the authorized representatives of an Environmental Trust Beneficiary, the Environmental Custodial Trust and the Environmental Custodial Trust Trustee shall be entitled to rely conclusively on the name and address of the authorized representative for such Environmental Trust Beneficiary listed below in Section 5.2.2, who may from time to time provide additional or replacement names and addresses of authorized representatives, or listed in any written notice provided to the Environmental Custodial Trust Trustee in the future by an authorized representative of such Environmental Trust Beneficiary.

5.2.2     The Environmental Custodial Trust Trustee shall send copies of all reports, budgets, annual balance statements, and other documents that the Environmental Custodial Trust Trustee is required to submit to an Environmental Trust Beneficiary under this Agreement and the Settlement Agreement, and related implementation documents including any unilateral administrative orders, consent decrees, or administrative orders on consent to the following person(s), as applicable:

As to the United States of America as an Environmental Trust Beneficiary:

Authorized representative and party to receive all notices under Section 5.2.2:

The United States:

Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, DC 20044
Ref. DOJ File No. 90-5-2-1-2132/3

31

Pierre G. Armand
Assistant United States Attorney
Office of the United States Attorney
for the Southern District of New York
86 Chambers Street, Third Floor
New York, NY 10007

EPA:

David Smith-Watts
Attorney-Advisor
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, NW
Washington, DC 20460

DOI:

Amy Horner
Attorney Advisor
U.S. Department of the Interior
Office of the Solicitor
1849 C Street, NW
Washington, DC 20240

NOAA:

M.E. Rolle
National Oceanic and Atmospheric Administration
263 13th Avenue South
Saint Petersburg, FL 33701

As to each of the following state Environmental Trust Beneficiaries:

California Regional Water Quality Control Board, Central Valley Region

Marilyn H. Levin
Noah Golden-Krasner
Deputy Attorneys General
300 South Spring Street, 11th Floor
Los Angeles, CA 90013

Pamela Creedon
Executive Officer
Central Valley Regional Water Quality Control Board
11020 Sun Center Drive, Suite 200
Rancho Cordova, CA 95670

Patrick Pulupa
Staff Counsel
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812

The State of Illinois and IEPA:

Chief, Environmental Bureau South
Office of the Attorney General
500 South Second Street
Springfield, IL 62706

James Kropid
Illinois Environmental Protection Agency
Division of Legal Counsel
P.O. Box 19726
1021 North Grand Avenue East
Springfield, IL 62796

MDE

Horacio Tablada, Director
Land Management Administration
Maryland Department of the Environment
1800 Washington Boulevard
Baltimore, MD 21230

MDNRE

Polly Synk
Assistant Attorney General
Michigan Department of Attorney General
Environment, Natural Resources, and Agriculture Division
P.O. Box 30755
Lansing, MI 48909

Brian Monroe
Chief, Redevelopment and Enforcement Support Unit
Compliance and Enforcement Section
Remediation and Redevelopment Division
Michigan Department of Natural Resources and the Environment
P.O. Box 30426
Lansing, MI 48909-7926

NCDWM:

Bruce Parris
Western Regional Supervisor
Inactive Hazardous Sites Branch
N.C. Department of Environment and Natural Resources
610 East Center Ave., Suite 301
Mooresville, North Carolina  28118

PADEP:

Manager
Waste Management
400 Waterfront Drive
Pittsburgh, PA 15222

Regional Counsel
Office of Chief Counsel
400 Waterfront Drive
Pittsburgh, PA 15222

TCEQ:

Robert Mosley
Staff Attorney
Litigation Division, MC 175
Texas Commission on Environmental Quality
P.O. Box 13087
Austin, TX 78711-3087

5.3    Non-Beneficiaries

Upon the Effective Date of this Agreement, the Settlors shall have no interests including, without limitation, any reversionary interest, in the Environmental Custodial Trust or any Custodial Trust Assets.

5.4     Transfer of Beneficial Interests

The interest of the Environmental Trust Beneficiaries in the Environmental Custodial Trust, which are reflected only on the records of the Environmental Custodial Trust maintained by the Environmental Custodial Trust, are not negotiable and may be transferred only after written notice to the Environmental Custodial Trust, by order of the Court or by operation of law. The Environmental Custodial Trust shall not be required to record any transfer in favor of any transferee who, in the sole discretion of the Environmental Custodial Trust Trustee, is or might be construed to be ambiguous or to create uncertainty as to the holder of the interest in the Environmental Custodial Trust.   Until a transfer is in fact recorded on the books and records maintained by the Environmental Custodial Trust for the purpose of identifying Environmental Trust Beneficiaries, the Environmental Custodial Trust, whether or not in receipt of documents of transfer or other documents relating to the transfer, may nevertheless make distributions and send communications to Environmental Trust Beneficiaries, as though it has no notice of any such transfer, and in so doing the Environmental Custodial Trust and Environmental Custodial Trust Trustee shall be fully protected and incur no liability to any purported transferee or any other Person.   Interests in the Environmental Custodial Trust may not be transferred to the Settlors, Lyondell Chemical Company, its successors, its affiliates, or any Persons related to any of the preceding (within the meaning of Section 468B(d)(3) of the Internal Revenue Code).

ARTICLE 6
REPORTING AND TAXES

6.1     Reports

As soon as practicable after the end of the second and fourth quarters of each calendar year, beginning with the first such quarter ended after assets are first received by the Environmental Custodial Trust and ending as soon as practicable upon termination of the Environmental Custodial Trust, the Environmental Custodial Trust shall submit to the Environmental Trust Beneficiaries a written report, including: (a) financial statements of the Environmental Custodial Trust at the end of such calendar quarter; and (b) a description of any action taken by the Environmental Custodial Trust in the performance of its duties which, as determined by outside counsel, accountants or other professional advisors, materially and adversely affects the Environmental Custodial Trust and of which notice has not previously been given to the Environmental Trust Beneficiaries.   The Environmental Custodial Trust shall promptly submit additional reports to the Environmental Trust Beneficiaries whenever, as determined by outside counsel, accountants or other professional advisors, an adverse material event or change occurs which affects either the Environmental Custodial Trust or the rights of the Persons receiving distributions (including, without limitation, the Environmental Trust Beneficiaries) hereunder.   The Environmental Custodial Trust shall also provide the reports or information required by Section 3.1 of this Agreement.

6.2     Other

The Environmental Custodial Trust shall also file (or cause to be filed) any other statements, returns or disclosures relating to the Environmental Custodial Trust, that are required by any applicable governmental unit.

6.3    Reports in Support of Insurance Claims

The Environmental Custodial Trust shall also file (or cause to be filed) reports and cost analyses in support of claims against insurance carriers at the request of the United States and the States and shall provide the United States and the States a copy of any such reports and cost analyses.

6.4    Tax Treatment of the Environmental Custodial Trust

For U.S. federal income tax purposes, the Environmental Custodial Trust is intended to be treated as a qualified settlement fund (for which no grantor trust election has been made) pursuant to section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder, and as a tax-exempt settlement fund (to the extent that the interests in the Environmental Custodial Trust are owned by "government entities" within the meaning of section 468B(g)(2) of the Internal Revenue Code) pursuant to section 468B(g)(2) of the Internal Revenue Code, and, to the extent provided by law, this Agreement shall be governed and construed in all respects consistently with such intent.

6.5    Taxable Entity

In connection with the foregoing, the Environmental Custodial Trust will be treated as a separate taxable entity.  The Environmental Custodial Trust Trustee shall cause any property taxes imposed on property owned by the Environmental Custodial Trust, and all other taxes imposed on the Environmental Custodial Trust or its earnings, to be timely paid out of the Environmental Trust Assets, and shall timely comply with all tax reporting and withholding requirements imposed on the Environmental Custodial Trust under applicable law.

6.6    Trustee as Administrator

The Environmental Custodial Trust Trustee shall be the "administrator," within the meaning of Treasury Regulation Section 1.468B-2(k)(3), of the Environmental Custodial Trust.  Subject to definitive guidance from the Internal Revenue Service or a judicial decision to the contrary, the Environmental Custodial Trust Trustee shall file tax returns and pay applicable taxes with respect to the Environmental Custodial Trust in a manner consistent with the provisions of Treasury Regulation Section 1.468B-2.  All such taxes shall be paid from the Custodial Trust Assets.

6.7    Fiscal Year

The Environmental Custodial Trust's fiscal year shall be the calendar year or such other period as may be fixed by the Environmental Custodial Trust Trustee or as otherwise required by applicable law.

ARTICLE 7
MISCELLANEOUS PROVISIONS

7.1     Amendments and Waivers

Any provision of this Agreement may be amended or waived by mutual written consent of the Environmental Custodial Trust, the United States, and the States; provided, however, that no change shall be made to this Agreement that would alter the provisions of Section 7.4 hereof or adversely affect the federal income tax status of the Environmental Custodial Trust as a "qualified settlement fund" for which no grantor trust election has been made (in accordance with Section 2.5.5 hereof), or, unless agreed to in writing by the affected Environmental Custodial Trust Trustee, the rights of the Environmental Custodial Trust Trustee.  Technical amendments to this Agreement may be made as necessary, to clarify this Agreement or enable the Environmental Custodial Trust Trustee to effectuate the terms of this Agreement in a manner consistent with the Settlement Agreement with the mutual consent of the Environmental Custodial Trust, the United States, and the States.

7.2     Cooperation

Debtors agree to cooperate with the Environmental Custodial Trust Trustee prior to the Effective Date by providing reasonable access to and/or copies of such of their non-privileged books and records relating to the Transferred Real Properties for the purpose of performing the Environmental Custodial Trust Trustee's duties and exercising its powers hereunder, including all environmental information and/or data in the state and condition in which such records are found regarding the Transferred Real Properties in possession of Debtors or any environmental consultants or contractors previously retained by Debtors.  Within ninety (90) days after the Effective Date, the Debtors or Reorganized Debtors shall deliver or cause to be delivered to the Environmental Custodial Trust copies or originals, as appropriate in the judgment of Debtors of all material and known non-privileged documents in the Debtors' or Reorganized Debtors' possession that relate to the Environmental Trust Assets (including documents held by the Debtors, their agents, advisors and attorneys).  Prior to the Effective Date and for a period of thirty (30) days after the Effective Date, Debtors and Reorganized Debtors and shall provide reasonable access to such employees of Debtors, Reorganized Debtors, their agents, advisors, attorneys, accountants or any other professionals hired by the Debtors with knowledge of matters relevant to the Environmental Trust Assets.  The Environmental Custodial Trust and Environmental Custodial Trust Trustee shall take such actions and execute such documents as are reasonably requested by Debtors with respect to effectuating this Agreement, the Settlement Agreement and the transactions contemplated thereby, provided that such actions are not inconsistent with this Agreement, the Settlement Agreement or the Plan, and provided that such actions shall be at the sole expense of the Debtors.  The Environmental Custodial Trust Trustee, Debtor, and the Lead Government Agency for each of the Transferred Real Properties will exchange information and reasonably cooperate to determine the appropriate disposition of executor contracts or unexpired leases, if any, that relate to the relevant Transferred Real Property.

7.3   Situs of the Environmental Custodial Trust

The situs of the Environmental Custodial Trust herein established is New York, and the laws of New York shall control with respect to the construction, administration, and validity of the Environmental Custodial Trust, without giving effect to rules governing the conflict of law that otherwise would apply the law of another jurisdiction.

7.4   Intention of the Parties to Establish Qualified Settlement Fund

This Agreement is intended to create a qualified settlement fund for United States federal income tax purposes and shall be governed and construed in all respects consistently with such intent.   Notwithstanding anything to the contrary contained herein, any ambiguity in this Agreement shall be construed consistently with the immediately preceding sentence, and, if necessary, this Agreement may be amended to comply with such United States federal income tax laws, which amendments may apply retroactively.

7.5   Headings

The section headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or any term or provision hereof.

7.6   Severability

If any provision of this Agreement or application thereof to any Person or circumstance shall be finally determined by the Court to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

7.7   Sufficient Notice

Any notice or other communication hereunder shall be in writing (including facsimile transmission or by e-mail) and shall be deemed to have been sufficiently given, for all purposes, if deposited, postage prepaid, in a post office or letter box addressed to the Person for whom such notice is intended (or in the case of notice by facsimile or e-mail, when received and telephonically or electronically confirmed), to the name and address set forth in the case of a Environmental Trust Beneficiary in Section 5.2 of this Agreement or such other address provided in writing to the Environmental Custodial Trust by an authorized representative of the respective Environmental Trust Beneficiary.

If notice to the Environmental Custodial Trust Trustee, to:

The Lyondell Environmental Custodial Trust
Le Petomane XXIII, Inc., not individually but
solely as Custodial Trust Trustee
35 E. Wacker Drive – Suite 1550
Chicago, IL 60601

7.8     Counterparts

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original instrument, but all together shall constitute one agreement.

7.9     Relationship to the Plan

The principal purpose of this Agreement is to aid in the implementation of the Plan and therefore this Agreement incorporates the provisions of the Plan.  To that end, subject to the terms and conditions of this Agreement, the Environmental Custodial Trust Trustee shall have full power and authority to take any action consistent with the purpose and provisions of the Plan, and to seek any orders from the Bankruptcy Court in furtherance of implementation of this Agreement and the Plan.

7.10    Actions Taken on Other Than Business Day

If any payment or act under the Plan, this Agreement or the Settlement Agreement is required to be made or performed on a date that is not a business day, then the making of such payment or the performance of such act may be completed on the next succeeding business day, but shall be deemed to have been completed as of the required date.  For the purposes of this agreement, a business day shall be any of the days Monday through Friday, excluding national holidays.

7.11    Compliance with Laws

Any and all distributions of Custodial Trust Assets shall be in compliance with applicable laws, including, but not limited to, applicable federal and state securities laws.

7.12    Preservation of Privilege

In connection with the rights, claims, and causes of action that constitute the Custodial Trust Assets, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Environmental Custodial Trust shall vest in the Environmental Custodial Trust and its representatives, and the Parties are authorized to take all necessary actions to effectuate the transfer of such privileges.

7.13    No Partnership

This Agreement is intended to create a trust and a trust relationship and to be governed and construed in all respects as a trust.  The Environmental Custodial Trust is not intended to be, and shall not be deemed to be or treated as, a general partnership, limited partnership, joint

39

venture, corporation, joint stock company or association, nor shall the Environmental Custodial Trust Trustee or the Environmental Trust Beneficiaries, or any of them, for any purpose be, or be deemed to be or be treated in any way whatsoever to be, liable or responsible hereunder as partners or joint venturers.  The relationship of the Environmental Trust Beneficiaries to the Environmental Custodial Trust Trustee shall be solely that of Environmental Trust Beneficiaries of a trust and shall not be deemed to be a principal or agency relationship, and the rights of the Environmental Trust Beneficiaries shall be limited to those conferred upon them by this Agreement and the Settlement Agreement.

      7.14   <u>Confidentiality</u>

The Environmental Custodial Trust Trustee shall, during the period that it serves in such capacity under this Agreement and following either the termination of this Agreement or such Environmental Custodial Trust Trustee's removal, incapacity, or resignation hereunder, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any entity to which any of the Environmental Trust Assets relates or of which it has become aware in its capacity as Environment Trust Trustee.  Notwithstanding anything else in the Plan, this Agreement or any other agreements implementing the Plan, each of the parties hereto (and each employee, representative, or other agent of such Person) may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are provided to such Person relating to such tax treatment and tax structure.

      7.15   <u>Uniform Custodial Trust Act</u>

The Environmental Custodial Trust Agreement shall not be subject to any provision of the Uniform Custodial Trust Act as adopted by any State, now or in the future.

[Remainder of this page is intentionally blank]

40

**EXHIBIT "A"**

<u>**Description of Sites**</u>

1.  "Allied Paper Mill Site" consists of the Allied Paper Mill Transferred Real Property and any location at which and any media in which Hazardous Substances from the Allied Paper Mill Transferred Real Property have come to be located.

2.  "Beaver Valley Site" consists of the Beaver Valley Transferred Real Property and any location at which and any media in which Hazardous Substances from the Beaver Valley Transferred Real Property have come to be located.

3.  "Bully Hill Mine Site" consists of the Bully Hill Mine Transferred Real Property and any location at which and any media in which Hazardous Substances from the Bully Hill Mine Transferred Real Property have come to be located.

4.  "Rising Star Mine Site" consists of the Rising Star Mine Transferred Real Property and any location at which and any media in which Hazardous Substances from the Rising Star Mine Transferred Real Property have come to be located

5.  "Excelsior Mine Site" consists of the Excelsior Mine Transferred Real Property and any location at which and any media in which Hazardous Substances from the Excelsior Mine Transferred Real Property have come to be located.

6.  "Charlotte Site" consists of the Charlotte Transferred Real Property and any location at which and any media in which Hazardous Substances from the Charlotte Transferred Real Property have come to be located.

7.  "Gypsum Pile Site" consists of the Gypsum Pile Transferred Real Property and any location at which and any media in which Hazardous Substances from the Gypsum Pile Transferred Real Property have come to be located.

9.  "Saint Helena Site" consists of the Saint Helena Transferred Real Property and any location at which and any media in which Hazardous Substances from the Saint Helena Transferred Real Property have come to be located.

10.  "Turtle Bayou Site" consists of the Turtle Bayou Transferred Real Property and any location at which and any media in which Hazardous Substances from the Turtle Bayou Transferred Real Property have come to be located.

## EXHIBIT "B"

## Description of Transferred Real Properties

**Allied Paper Mill Transferred Real Property:**

KALAMAZOO, KALAMAZOO COUNTY, MI

LEGAL DESCRIPTION

PARCEL 1

COMMENCING AT THE CENTER 1/4 POST OF SECTION 27, TOWN 2 SOUTH, RANGE 11 WEST, AND RUNNING THENCE SOUTH 89 DEGREES 50 MINUTES 06 SECONDS EAST (ALSO RECORDED AS SOUTH 89 DEGREES 52 MINUTES EAST), ALONG THE EAST AND WEST 1/4 LINE, 99.10 FEET TO THE EASTERLY LINE OF THE CONRAIL (FORMERLY N.Y.C. RAILROAD) RIGHT-OF-WAY; THENCE NORTH 3 DEGREES 20 MINUTES 13 SECONDS EAST, THEREON 638.49 FEET (ALSO RECORDED AS NORTH 3 DEGREES 23 MINUTES EAST, 638.5 FEET); THENCE CONTINUING ALONG THE EASTERLY LINE OF THE SAID RIGHT-OF-WAY NORTH 3 DEGREES 22 MINUTES 59 SECONDS EAST 218.09 FEET (ALSO RECORDED AS NORTH 3 DEGREES 23 MINUTES EAST, 217.80 FEET); THENCE CONTINUING ALONG THE EASTERLY LINE OF THE SAID RIGHT-OF-WAY NORTH 89 DEGREES 27 MINUTES 54 SECONDS EAST, 11.65 FEET (ALSO RECORDED AS NORTH 89 DEGREES 22 MINUTES EAST, 11.65 FEET); THENCE CONTINUING ALONG THE EASTERLY LINE OF THE SAID RIGHT-OF-WAY, NORTH 1 DEGREES 14 MINUTES 54 SECONDS WEST, 361.95 FEET (ALSO RECORDED AS NORTH 1 DEGREES 20 MINUTES WEST, 361.95 FEET) TO THE SOUTH LINE OF ALCOTT STREET; THENCE NORTH 89 DEGREES 27 MINUTES 04 SECONDS EAST, THEREON, 240.00 FEET FOR THE PLACE OF BEGINNING OF THE LAND HEREINAFTER DESCRIBED; THENCE CONTINUING ALONG THE SOUTH LINE OF ALCOTT STREET, NORTH 89 DEGREES 27 MINUTES 04 SECONDS EAST, 151.30 FEET; THENCE SOUTH 25 DEGREES 39 MINUTES 08 SECONDS EAST, 81.17 FEET; THENCE SOUTH 67 DEGREES 16 MINUTES 54 SECONDS EAST, 53.41 FEET; THENCE SOUTH 86 DEGREES 33 MINUTES 38 SECONDS EAST, 184.44 FEET; THENCE SOUTH 1 DEGREES 32 MINUTES 19 SECONDS EAST, 373.34 FEET; THENCE NORTH 89 DEGREES 50 MINUTES 06 SECONDS WEST, 441.52 FEET; THENCE NORTH 9 DEGREES 31 MINUTES 16 SECONDS WEST, 482.26 FEET TO THE PLACE OF BEGINNING.

PARCEL 2

COMMENCING AT THE CENTER 1/4 POST OF SECTION 27, TOWN 2 SOUTH, RANGE 11 WEST, AND RUNNING THENCE SOUTH 89 DEGREES 50 MINUTES 06 SECONDS EAST (ALSO RECORDED AS SOUTH 89 DEGREES 52 MINUTES EAST), ALONG THE EAST AND WEST 1/4 LINE, 99.10 FEET TO THE EASTERLY LINE OF THE CONRAIL (FORMERLY N.Y.C. RAILROAD) RIGHT-OF-WAY; THENCE NORTH 3 DEGREES 20 MINUTES 13 SECONDS EAST, THEREON 638.49 FEET (ALSO RECORDED AS NORTH 3 DEGREES 23 MINUTES EAST, 638.5 FEET); THENCE CONTINUING ALONG THE EASTERLY LINE OF THE SAID RIGHT-OF-WAY NORTH 3 DEGREES 22 MINUTES 59 SECONDS EAST 218.09 FEET (ALSO RECORDED AS NORTH 3 DEGREES 23 MINUTES EAST, 217.80 FEET); THENCE CONTINUING ALONG THE EASTERLY LINE OF THE SAID RIGHT-OF-WAY NORTH 89 DEGREES 27 MINUTES 54 SECONDS EAST, 11.65 FEET (ALSO RECORDED AS NORTH 89 DEGREES 22 MINUTES EAST, 11.65 FEET); THENCE CONTINUING ALONG THE EASTERLY LINE OF THE SAID RIGHT-OF-WAY, NORTH 1 DEGREES 14 MINUTES 54 SECONDS WEST, 361.95 FEET (ALSO RECORDED AS NORTH 1 DEGREES 20 MINUTES WEST, 361.95 FEET) TO THE SOUTH LINE OF ALCOTT STREET; THENCE NORTH 89 DEGREES 27 MINUTES 04 SECONDS EAST, THEREON, 391.30 FEET FOR THE PLACE OF BEGINNING OF THE LAND HEREINAFTER DESCRIBED; THENCE CONTINUING ALONG THE SOUTH LINE OF ALCOTT STREET, NORTH 85 DEGREES 21 MINUTES 26 SECONDS EAST, 270.06 FEET; THENCE SOUTH 4 DEGREES 38 MINUTES 34 SECONDS EAST, 30.00 FEET; THENCE SOUTH 85 DEGREES 21 MINUTES 26 SECONDS WEST, 5.69 FEET; THENCE SOUTH 1 DEGREES 32 MINUTES 19 SECONDS EAST, 96.40 FEET; THENCE NORTH 86 DEGREES 33 MINUTES 38 SECONDS WEST, 184.44 FEET; THENCE NORTH 67 DEGREES 16 MINUTES 54 SECONDS WEST, 53.41 FEET; THENCE NORTH 25 DEGREES 39 MINUTES 08 SECONDS WEST, 81.17 FEET TO THE PLACE OF BEGINNING.

PARCEL 3

COMMENCING AT THE CENTER 1/4 POST OF SECTION 27, TOWN 2 SOUTH, RANGE 11 WEST, AND RUNNING THENCE SOUTH 89 DEGREES 50 MINUTES 06 SECONDS EAST (ALSO RECORDED AS SOUTH 89 DEGREES 52 MINUTES EAST), ALONG THE EAST AND WEST 1/4 LINE, 99.10 FEET TO THE EASTERLY LINE OF THE CONRAIL (FORMERLY N.Y.C. RAILROAD) RIGHT-OF-WAY; THENCE NORTH 3 DEGREES 20 MINUTES 13 SECONDS EAST, THEREON 638.49 FEET (ALSO RECORDED AS NORTH 3 DEGREES 23 MINUTES EAST, 638.5 FEET) FOR THE PLACE OF BEGINNING OF THE LAND HEREINAFTER DESCRIBED; THENCE CONTINUING ALONG THE EASTERLY LINE OF THE SAID RIGHT-OF-WAY NORTH 3 DEGREES 22 MINUTES 59 SECONDS EAST 218.09 FEET (ALSO RECORDED AS NORTH 3 DEGREES 23 MINUTES EAST, 217.80 FEET); THENCE CONTINUING ALONG THE EASTERLY LINE OF THE SAID RIGHT-OF-WAY NORTH 89 DEGREES 27 MINUTES 54 SECONDS EAST, 11.65 FEET (ALSO RECORDED AS NORTH 89 DEGREES 22 MINUTES EAST, 11.65 FEET); THENCE CONTINUING ALONG THE EASTERLY LINE OF THE SAID RIGHT-OF-WAY, NORTH 1 DEGREES 14 MINUTES 54 SECONDS WEST, 361.95 FEET (ALSO RECORDED AS NORTH 1 DEGREES 20 MINUTES WEST, 361.95 FEET) TO THE SOUTH LINE OF ALCOTT STREET; THENCE NORTH 89 DEGREES 27 MINUTES 04 SECONDS EAST, THEREON, 240.0 FEET; THENCE SOUTH 9 DEGREES 31 MINUTES 16 SECONDS EAST, 482.26 FEET; THENCE NORTH 89 DEGREES 50 MINUTES 06 SECONDS WEST, (ALSO RECORDED AS NORTH 89 DEGREES 52 MINUTES WEST), 91.45 FEET; THENCE SOUTH 0 DEGREES 05 MINUTES EAST, 47.50 FEET; THENCE NORTH 89 DEGREES 50 MINUTES 06 SECONDS WEST (ALSO RECORDED AS NORTH 89 DEGREES 52 MINUTES WEST), 65.40 FEET; THENCE SOUTH 31 DEGREES 48 MINUTES WEST, 77.39 FEET (ALSO RECORDED AS SOUTH 31 DEGREES 53 MINUTES WEST, 77.85 FEET); THENCE SOUTH 76 DEGREES 21 MINUTES 46 SECONDS WEST, 26.92 FEET, (ALSO RECORDED AS SOUTH 76 DEGREES 21 MINUTES WEST, 26.9 FEET); THENCE NORTH 83 DEGREES 31 MINUTES WEST, 113.40 FEET TO THE PLACE OF BEGINNING.

PARCEL 4

COMMENCING AT THE CENTER 1/4 POST OF SECTION 27, TOWN 2 SOUTH, RANGE 11 WEST, AND RUNNING THENCE SOUTH 89 DEGREES 50 MINUTES 06 SECONDS EAST (ALSO RECORDED AS SOUTH 89 DEGREES 52 MINUTES EAST), ALONG THE EAST AND WEST 1/4 LINE, 99.10 FEET TO THE EASTERLY LINE OF THE CONRAIL (FORMERLY N.Y.C. RAILROAD) RIGHT-OF-WAY; THENCE NORTH 3 DEGREES 20 MINUTES 13 SECONDS EAST, THEREON 638.49 FEET (ALSO RECORDED AS NORTH 3 DEGREES 23 MINUTES EAST, 638.5 FEET); THENCE SOUTH 83 DEGREES 31 MINUTES EAST, 113.40 FEET; THENCE NORTH 76 DEGREES 21 MINUTES 46 SECONDS EAST, 26.92 FEET (ALSO RECORDED AS NORTH 76 DEGREES 21 MINUTES EAST, 26.90 FEET); THENCE NORTH 31 DEGREES 48 MINUTES EAST, 77.39 FEET (ALSO RECORDED AS NORTH 31 DEGREES 53 MINUTES EAST, 77.85 FEET); THENCE SOUTH 89 DEGREES 50 MINUTES 06 SECONDS EAST (ALSO RECORDED AS SOUTH 89 DEGREES 52 MINUTES EAST) 65.40 FEET; THENCE NORTH 0 DEGREES 05 MINUTES WEST, 47.50 FEET; THENCE SOUTH 89 DEGREES 50 MINUTES 06 SECONDS EAST (ALSO RECORDED AS SOUTH 89 DEGREES 52 MINUTES EAST), 91.45 FEET; THENCE SOUTH 1 DEGREES 14 MINUTES 06 SECONDS EAST (ALSO RECORDED AS SOUTH 1 DEGREES 16 MINUTES EAST), 130.30 FEET; THENCE SOUTH 54 DEGREES 46 MINUTES 06 SECONDS EAST (ALSO RECORDED AS SOUTH 54 DEGREES 48 MINUTES EAST), 23.77 FEET FOR THE PLACE OF BEGINNING OF THE LAND HEREINAFTER DESCRIBED; THENCE SOUTH 81 DEGREES 43 MINUTES 06 SECONDS EAST (ALSO RECORDED AS SOUTH 81 DEGREES 45 MINUTES EAST) 31.70 FEET; THENCE SOUTH 38 DEGREES 35 MINUTES 06 SECONDS EAST (ALSO RECORDED AS SOUTH 38 DEGREES 37 MINUTES EAST), 58.53 FEET; THENCE SOUTH 8 DEGREES 24 MINUTES 31 SECONDS WEST (ALSO RECORDED AS SOUTH 8 DEGREES 20 MINUTES WEST), 171.23 FEET; THENCE NORTH 81 DEGREES 43 MINUTES 06 SECONDS WEST (ALSO RECORDED AS NORTH 81 DEGREES 45 MINUTES WEST), 74.29 FEET; THENCE NORTH 8 DEGREES 21 MINUTES 04 SECONDS EAST, 211.25 FEET (ALSO RECORDED AS NORTH 8 DEGREES 18 MINUTES EAST, 211.21 FEET) TO THE PLACE OF BEGINNING. TOGETHER WITH A RIGHT-OF-WAY FOR INGRESS AND EGRESS AND UTILITIES DESCRIBED AS FOLLOWS: BEGINNING AT THE NORTHWESTERLY CORNER OF THE ABOVE DESCRIBED PARCEL AND RUNNING THENCE SOUTH 8 DEGREES 21 MINUTES 04 SECONDS WEST (ALSO RECORDED AS SOUTH 8 DEGREES 18 MINUTES WEST), 22.43 FEET; THENCE NORTH 54 DEGREES 46 MINUTES 06 SECONDS WEST (ALSO RECORDED AS NORTH 54 DEGREES 48 MINUTES WEST), 44.00 FEET; THENCE NORTH 1 DEGREES 14 MINUTES 06 SECONDS WEST (ALSO RECORDED AS NORTH 1 DEGREES 16 MINUTES WEST), 140.88 FEET; THENCE SOUTH 89 DEGREES 50 MINUTES 06 SECONDS EAST (ALSO RECORDED AS SOUTH 89 DEGREES 52 MINUTES EAST), 20.00 FEET; THENCE SOUTH 1 DEGREES 14 MINUTES 06 SECONDS EAST (ALSO RECORDED AS SOUTH 1 DEGREES 16 MINUTES EAST) 130.30 FEET; THENCE SOUTH 54 DEGREES 46 MINUTES 06 SECONDS EAST (ALSO RECORDED AS SOUTH 54 DEGREES 48 MINUTES EAST), 23.77 FEET TO THE PLACE OF BEGINNING.

PARCEL 5

THAT CERTAIN TRACT OR PARCEL OF LAND CONTAINING APPROXIMATELY 41.00 ACRES, AND BEING ALL OF KALAMAZOO COUNTY TAX PARCEL NO. 06-27-464-001, AND BEING LOCATED AT 303 E CORK ST, KALAMAZOO, KALAMAZOO COUNTY, MICHIGAN, SAID TRACT OR PARCEL OF LAND BEING DESCRIBED BY THE KALAMAZOO COUNTY EQUALIZATION DEPARTMENT AS FOLLOWS:

SECTION 27-2-11 COM AT S 1/4 POST SEC 27-2-11, RNG TH N 89DEG 50MIN 36SEC E ALG S LI SD SEC 665.9IFTTO ELY LI CONRAIL, FORMERLY N.Y.C. RAILROAD, R-O-W & PL OF BEG, TH N 13DEG 32MIN 24SEC W ALG ELY LI SD RAILROAD 511.90FT, TH CONTINUING ALG ELY LI SD RAILROAD N 78DEG 3MIN 36SEC E 90.03FT, TH CONTINUING ALG ELY LISD RAILROAD N 13DEG 26MIN 8SEC W 1093.96FT, TH S 89DEG 24MIN E 509.87FT, TH S 3DEG 33MIN 43SEC W 417.54FT, TH N 72DEG 45MIN 30SEC E 1049.09FT, TH N 58DEG 28MIN 16SEC W 417.61FT, TH S 70DEG 53MIN 10SEC E 437.05FT, THS 24DEG 2MIN 59SEC E 465FT, TH S 2DEG 18MIN 46SEC E 479.85 FT, TH S 49DEG 19MIN 48SEC W 116.73FT, TH S 56DEG 35MIN 41SEC W 58.17FT, TH S 63DEG 30MIN 47SEC W 85.93FT, TH S 51DEG 1MIN 42SEC W 116.22FT, TH S 55DEG 20MIN W 87.43FT, TH S 73DEG 22MIN 6SEC W 88.34FT, TH N 85DEG 16MIN 42SEC W 59.64FT, TH S 80DEG 15MIN 29SEC W 18.40FT, TH S 64DEG 10MIN 31SEC W 75.06FT, TH S 89DEG 21MIN 53SEC W 54.10FT, TH S 65DEG 47MIN 15SEC W 80.23FT, TH S 56DEG 4MIN 31SEC W 92.59FT, TH S 61DEG 33MIN 26SEC W 31.04FT, TH S 45DEG 0MIN 56SEC W 32.77FT, TH S 85DEG 13MIN 47SEC W 20.86FT, TH S 36DEG 1MIN 28SEC E 28FT, TH S 81DEG 0MIN 3SEC W 147.37FT, TH S 40DEG 31MIN 56SEC W 58FT, TH N 16DEG 27MIN 24SEC W 103.86FT, TH S 76DEG 8MIN 36SEC W 145.08FT, TH S 16DEG 27MIN 24SEC E 171.22FTTO S LI SD SEC, TH S 89DEG 50MIN 36SEC W THEREON 347.71FT TO PL OF BEG, EXC COM AT S 1/4 POST SD SEC, RNG TH N 8D9EG 50MIN 36SEC E ALG S LI SD SEC 1304.4SFT, TH N 0DEG 9MIN 24SEC W 921.50FT FOR PL OF BEG, TH N 62DEG 20MIN 44SEC W 208.7IFT, TH N 27DEG 39MIN 16SEC E 208.71 FT, TH S 62DEG 20MIN 44SEC E 208.71FT, TH S 27DEG 39MIN 16SEC W 208.71FTTO PL OF BEG.

PARCEL 6

THAT CERTAIN TRACT OR PARCEL OF LAND CONTAINING APPROXIMATELY 0.16
ACRES, AND BEING ALL OF KALAMAZOO COUNTY TAX PARCEL NO. 06-27-473-001,
AND BEING LOCATED AT 405 E CORK ST, KALAMAZOO, KALAMAZOO COUNTY,
MICHIGAN, SAID TRACT OR PARCEL OF LAND BEING DESCRIBED BY THE KALAMAZOO
COUNTY EQUALIZATION DEPARTMENT AS FOLLOWS:

SECTION 27-2-11 COM AT S 1/4 POST SEC 27-2-11, RNG TH N 89DEG 50MIN 36SEC E
ALG S LI SD SEC 1013.62FT, TH N 16DEG 27MIN 24SEC W 171.22FT, TH N 76DEG
8MIN 36SEC E 75.08FT FOR PL OF BEG, TH CONTINUING N 76DEG 8MIN 36SEC E
70FT, TH S 16DEG 27MIN 24SEC E 103.86FT, TH S 79DEG 6MIN 35SEC W 70.26FT, TH
N 16DEG 27MIN 24SEC W 100.22FT TO PL OF BEG

PARCEL 7

THAT CERTAIN TRACT OR PARCEL OF LAND CONTAINING APPROXIMATELY 7.73 ACRES, AND BEING ALL OF KALAMAZOO COUNTY TAX PARCEL NO. 06-27-423-001, AND BEING LOCATED AT 425 E CORK ST, KALAMAZOO, KALAMAZOO COUNTY, MICHIGAN, SAID TRACT OR PARCEL OF LAND BEING DESCRIBED BY THE KALAMAZOO COUNTY EQUALIZATION DEPARTMENT AS FOLLOWS:

SECTION 27-2-11 COM AT SW COR SEC 27-2-11, RNG TH S 89DEG 50MIN 36SEC W, ALSO RECORDED AS S 89DEG 48MIN 5SEC W, ALG S LI SD SEC 1731.80FT, TH N 0DEG 2MIN 31SEC E, ALSO RECORDED AS N, 1157.57FT FOR PL OF BEG, TH N 3DEG 33MIN 43SEC W, ALSO RECORDED AS N 3DEG 36MIN 14SEC W, 417.54FT, TH S 89DEG 24MIN E 46.17FT, TH N 36DEG 36MIN W 84.46FT, TH N 3DEG 33MIN 43SEC W, ALSO RECORDED AS N 3DEG 36MIN 14SEC W, 99.84FT, TH N 77DEG 7MIN 45SEC E, ALSO RECORDED AS N 77DEG 5MIN 14SEC E, 192.42FT, TH S 45DEG 47MIN 4SEC E, ALSO RECORDED AS S 45DEG 49MIN 35SEC E, 311.29FT, TH N 66DEG 11MIN 30SEC E, ALSO RECORDED AS N 66DEG 8MIN 59SEC E, 296.89FT, TH S 58DEG 28MIN 16SEC E, ALSO RECORDED AS S 58DEG 30MIN 47SEC E, 417.61FT, TH S 72DEG 45MIN 30SEC W, ALSO RECORDED AS S 72DEG 43MIN W, 1049.09FT TO PL OF BEG.

PARCEL 8

THAT CERTAIN TRACT OR PARCEL OF LAND CONTAINING APPROXIMATELY 1.00
ACRES, AND BEING ALL OF KALAMAZOO COUNTY TAX PARCEL NO. 06-27-454-001,
AND BEING LOCATED AT 455 E CORK ST, KALAMAZOO, KALAMAZOO COUNTY,
MICHIGAN, SAID TRACT OR PARCEL OF LAND BEING DESCRIBED BY THE KALAMAZOO
COUNTY EQUALIZATION DEPARTMENT AS FOLLOWS:

SECTION 27-2-11 COM AT 5 1/4 POST SEC 27-2-11, RNG TH N 89DEG 50MIN 36SEC E
ALG S LI SD SEC 1304.45FT, TH N 0DEG 9MIN 24SEC W 921.50FT FOR PL OF BEG, TH
N 62DEG 20MIN 44SEC W 208.71FT, TH N 27DEG 39MIN 16SEC E 208.71FT, TH S
62DEG 20MIN 44SEC E 208.71FT, TH S 27DEG 39MIN 16SEC W 208.71FT TO PL OF
BEG.

PARCEL 9

THAT CERTAIN TRACT OR PARCEL OF LAND CONTAINING APPROXIMATELY 1.52 ACRES, AND BEING ALL OF KALAMAZOO COUNTY TAX PARCEL NO. 06-27-495-001, AND BEING LOCATED AT 501 E CORK ST, KALAMAZOO, KALAMAZOO COUNTY, MICHIGAN, SAID TRACT OR PARCEL OF LAND BEING DESCRIBED BY THE KALAMAZOO COUNTY EQUALIZATION DEPARTMENT AS FOLLOWS:

SECTION 27-2-11 COM ATS 1/4 POST SEC 27-2-11, RNG TH N89DEG 50MIN 36SEC E ALG S LI SD SEC 1304.45FT FOR PL OF BEG,TH CONTINUING N 89DEG 50MIN 36SEC E ALG SD S LI 276.20.FT, TH N 0DEG 9MIN 24SEC W 290.20FT, TH S 84DEG 39MIN 3SSEC W 64.01FT, TH S 71DEG 2MIN 18SEC W 45.28FT, TH S 52DEG 32MIN 33SEC W 105.70FT, TH S 44DEG 5SMIN 49SEC W 37.90FT, TH S 46DEG 13MIN 14SEC W 81.04FT, TH S 0DEG 9MIN 24SEC E 123.10FT TO PL OF BEG.

PARCEL 10

THAT CERTAIN TRACT OR PARCEL OF LAND CONTAINING APPROXIMATELY 5.00
ACRES, AND BEING ALL OF KALAMAZOO COUNTY TAX PARCEL NO. 06-27-419-001,
AND BEING LOCATED AT 525 E CORK ST REAR, KALAMAZOO, KALAMAZOO COUNTY,
MICHIGAN, SAID TRACT OR PARCEL OF LAND BEING DESCRIBED BY THE KALAMAZOO
COUNTY EQUALIZATION DEPARTMENT AS FOLLOWS:

SECTION 27-2-11 ALL THAT PROPERTY IN SE 1/4 SEC 27-2-11 LYING WLY& SWLY OF
ELY LI PORTAGE CREEK & BRYANT MILL POND & ELY OF FOLLOWING DESCRIBED
LINE COM AT CEN 1/4 POST SD SEC, TH S 89DEG 50MIN 6SEC E 728.51FT ALG E&W
1/4 LI SD SEC, TH S 6DEG 22MIN 0SEC E 54.95FT FOR PL OF BEG, TH N 85DEG 59MIN
0SEC W 187.22FT, TH S 48DEG 39MIN 0SEC W 60.49FT, TH S 0DEG 19MIN 1SEC E
276.75FT, TH N 79DEG 35MIN 33SEC W 84.14FT, TH S 5DEG 38MIN 4SEC E 34.96FT,
TH S 36DEG 36MIN 0SEC E 783.29FT, TH N 3DEG 33MIN 43SEC W 99.84FT, TH N
77DEG 7MIN 45SEC E 192.42FT, TH S 45DEG 47MIN 4SEC E 311.29FT, TH N 66DEG
11MIN 30SEC E 296.89FT, TH S 70DEG 53MIN 10SEC E 437.05FT, TH S 24DEG 2MIN
59SEC E 465FT, TH S 2DEG 18MIN 46SEC E 550FT, M-OR-L, TO SELY BANK PORTAGE
CREEK, & PT OF ENDING.

PARCEL 11

THAT CERTAIN TRACT OR PARCEL OF LAND CONTAINING APPROXIMATELY 8.94
ACRES, AND BEING ALL OF KALAMAZOO COUNTY TAX PARCEL NO. 06-27-492-001,
AND BEING LOCATED AT 603 E CORK ST, KALAMAZOO, KALAMAZOO COUNTY,
MICHIGAN, SAID TRACT OR PARCEL OF LAND BEING DESCRIBED BY THE KALAMAZOO
COUNTY EQUALIZATION DEPARTMENT AS FOLLOWS:

SECTION 27-2-11 COM SE COR SEC 27-2-11, TH S 89DEG 50MIN 36SEC W ALG S LI SD
SEC 385.74FT FOR PL OF BEG, TH N 0DEG 9MIN 24SEC W 153.78FT, TH N 32DEG
30MIN 36SEC E 65.17FT, TH N 89DEG 50MIN 36SEC E 50.99FT, TH N 0DEG 9MIN
24SEC W 326.36FT, TH N 59DEG 39MIN 24SEC W 134.55FT, TH S 23DEG 43MIN
11SEC W 19.33FT, TH S 65DEG 50MIN 32SEC W 60.29FT, TH S 63DEG 16MIN 48SEC
W 105.72FT, TH S 68DEG 2MIN 57SEC W 70.90FT, TH S 54DEG 7MIN W 53.34FT, TH S
58DEG 46MIN 15SEC W 23.77FT, TH S 42DEG 26MIN 7SEC W 41.13FT, TH S 54DEG
55MIN 52SEC W 67.28FT, TH S 43DEG 15MIN 18SEC W 32.97FT, TH S 60DEG 50MIN
22SEC W 19.15FT, TH S 78DEG 42MIN W 45.61FT, TH S 77DEG 1MIN 16SEC W
38.84FT, TH S 89DEG 57MIN 7SEC W 72.26FT, TH S 63DEG 21MIN 52SEC W 49.07FT,
TH S 73DEG 1IMIN 37SEC W 44.24FT, TH S 1247.34FT TO PL OF BEG, EXC COM AT S
1/4 POST SD SEC 27, RNG TH N 89DEG 50MIN 36SEC E ALG S LI SD SEC 1304.45FT
FOR PL OF BEG, TH CONTINUING N 89DEG 50MIN 36SEC E ALG SD S LI 276.20FT, TH
N 0DEG 9MIN 24SEC W 290.20FT, TH S 84DEG 39MIN 35SEC W 64.01FT, TH S 71DEG
2MIN 18SEC W 45.28FT, TH S 52DEG 32MIN 33SEC W 105.70FT, TH S 44DEG 55MIN
49SEC W 37.90FT, TH S 46DEG 13MIN 14SEC W 81.04FT, TH S 0DEG 9MIN 24SEC E
123.10FT TO PL OF BEG.

**Beaver Valley Transferred Real Property:**

MONACA, BEAVER COUNTY, PA
LEGAL DESCRIPTION

THAT CERTAIN TRACT OR PARCEL OF LAND **CONTAINING APPROXIMATELY 139.769 ACRES**, MORE OR LESS, BEING THE **RESIDUE OF THAT CERTAIN 435.879 ACRE TRACT** OF LAND BEING THE SAME PREMISES WHICH ATLANTIC RICHFIELD COMPANY, BY DEED DATED AUGUST 28, 1987 AND RECORDED ON OCTOBER 5, 1987 IN THE BEAVER COUNTY RECORDER OF DEEDS OFFICE IN DEED BOOK VOLUME 1316, PAGE 298, GRANTED AND CONVEYED UNTO ARCO CHEMICAL COMPANY, SAID 435.879 ACRE TRACT OF LAND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

ALL THAT CERTAIN PIECE OF PARCEL OF LAND WITH THE BUILDINGS AND IMPROVEMENTS THEREON ERECTED SITUATE IN POTTER TOWNSHIP, BEAVER COUNTY, PENNSYLVANIA BOUNDED AND DESCRIBED IN ACCORDANCE WITH A LAND TITLE SURVEY OF THE 435.879 ACRE TRACT OF ATLANTIC RICHFIELD COMPANY DATED JULY 22. 1987 (THE "SURVEY"), AS PREPARED-BY MICHAEL BAKER, JR., INC., CONSULTING ENGINEERS, BEAVER, PENNSYLVANIA AS FOLLOWS:

BEGINNING AT A POINT RR SPIKE (SET) IN 'THE INTERSECTION OF PENNSYLVANIA STATE HIGHWAY ROUTE 18 AND LEGISLATIVE ROUTE 04101;

THENCE WITH THE CENTERLINE OF L.R.04101, SOUTH 73° 55′ 00″ EAST, A DISTANCE OF 267.63 FEET TO APOINT, RR SPIKE (SET);

THENCE, SOUTH 88° 51′ 30″ EAST, A DISTANCE OF 90.18 FEET TO A POINT, RR SPIKE (SET);

THENCE, NORTH 74°56′ 30″ EAST, A DISTANCE OF 152.67 FEET TO A POINT, RR SPIKE (SET);

THENCE, NORTH 88° 27′ 30″ EAST, A DISTANCE OF 126.26 FEET TO A POINT, RR SPIKE(SET), SAID-POINT BEING A COMMON CORNER TO LANDS NOW OR FORMERLY OF ST. JOE MINERALS CORPORATION ("ST. JOE");

THENCE, LEAVING SAID CENTERLINE AND WITH SAID LANDS OF ST. JOE, AND RUNNING THROUGH FOUR IRON PINS (FOUND), SOUTH 18° 05′ 00″ WEST, A DISTANCE OF 1,660.98 FEET TO A POINT, IRON PIN (SET);

THENCE, WITH THE SAME AND RUNNING THROUGH THREE IRON PINS (FOUND). NORTH 64° 04′ ′30″ WEST, A DISTANCE OF 540.24 FEET TO A POINT, IRON PIN (SET);

THENCE, WITH SAID LANDS OF ST. JOE, NORTH 85° 41′ 00″ WEST, A DISTANCEOF 157.10 FEET TO A POINT, IRON PIN (SET);

THENCE, NORTH 89° 02′ 00″ WEST, A DISTANCE OF 195.50 FEET'TO A POINT, IRON PIN (SET);

THENCE, NORTH 85° 56′ .00″ WEST, A DISTANCE OF 869.81 FEET TO A POINT, IRON PIN (SET);

THENCE, SOUTH 67° 58′ 00″ WEST, A DISTANCE OF 421.74 FEET TO A POINT, IRON PIN (SET);

THENCE, SOUTH 67° 43′ 00″ WEST, A DISTANCE OF 168.35 FEET TO A POINT, IRON PIN (SET);

THENCE, SOUTH 74° 28′ 00″ WEST, A DISTANCE OF 714.45 FEET TO A POINT, IRON PIN (SET), SAID POINT BEING A COMMON CORNER TO LANDS NOW ÀR FORMERLY OF DRAVO CORPORATION ("DRAVO");

THENCE, WITH SAID LANDS OF DRAVO, NORTH 17° 56′ 00″ WEST, A DISTANCE OF 635.18 FEET TO A POINT, RR SPIKE (SET) IN THE CENTERLINE OF SAID ROUTE 18.;

THENCE, WITH THE SAME AND RUNNING THROUGH AN IRON PIN (SET) AT A DISTANCE OF 1,500.00 FEET NORTH 17° 56′ 00″ WEST, A TOTAL DISTANCE OF 1,852.00 FEET, TO A POINT AT THE LOW WATER MARK AS DETERMINED AND SHOWN ON PLAT OF SURVEY BY THE U.S. CORPS OF ENGINEERS, DATED MARCH 27. 1941;

THENCE, WITH SAID LOW WATER MARK, NORTH 52° 00′ 00″ EAST, A DISTANCE OF 2,405.06 FEET TO A POINT; THENCE, WITH THE SAME, NORTH 340 00′ 00″ EAST, A DISTANCE OF 2,193,36 FEET TO A POINT;

THENCE, WITH SAID LOW WATER MARK, NORTH 29° 19′ 30″ EAST, A DISTANCE OF 662.53 FEET TO A POINT;

THENCE, LEAVING SAID LOW WATER MARK, SOUTH 45° 51.′ 4!″ EAST, A DISTANCE OF 588.42 FEET TO A POINT;

THENCE, NORTH 43° 44′ 15″ EAST, A DISTANCE OF 402,31 FEET TO A POINT, SAID POINT BEING A CORNER TO LANDS NOW OR FORMERLY OF ST. JOE;

THENCE WITH SAID LANDS OF ST. JOE, SOUTH 46° 15′ 45″ EAST, A DISTANCE OF 198.56 FEET TO A POINT, IRON PIN (FOUND) SAID POINT BEING A COMMON CORNER TO SAID LANDS OF ST. JOE;

THENCE, WITH SAID LANDS OF ST. JOE, SOUTH 88° 46′ 15″ EAST, A DISTANCE OF 526.94 FEET TO A POINT, IRON PIN (SET);

THENCE, WITH THE SAME, SOUTH 85° 54′ 00″ EAST, A DISTANCE OF 774.16 FEET TO A POINT, IRON PIN (FOUND);

THENCE, SOUTH 84° 02′ 30″ EAST, A DISTANCE OF 303.12 FEET TO A POINT IRON PIN (SET);

THENCE, NORTH 87° 26′ 30″ EAST, A DISTANCE OF 369.94 FEET TO A POINT, IRON PIN (FOUND);

THENCE, SOUTH 74° 54′ 37″ EAST, A DISTANCE OF 425.69 FEET TO A POINT, IRON PIN (FOUND) ON THE NORTHERLY RIGHT-OF-WAY LINE NOW OR FORMERLY OF THE PITTSBURGH AND LAKE ERIE RAILROAD COMPANY;

THENCE, WITH SAID RIGHT-OF-WAY, SOUTH 43° 00′ 30″ WEST, A DISTANCE OF 933.82 FEET TO A POINT,.IRON PIN(SET);

THENCE,•WITH SAID RIGHT-OF-WAY, SOUTH 38° 05′ 39″,WEST, A DISTANCE OF 995.61 FEET TO A POINT, IRON PIN (SET);

THENCE, SOUTH 45° 51′ 45″ EAST, A DISTANCE OF 3.97 FEET TO A POINT, IRON PIN (SET), SAID POINT BEING A COMMON CORNER TO LANDS NEW OR FORMERLY OF THE PITTSBURGH AND LAKE ERIE RAILROAD COMPANY;

THENCE, WITH LANDS OF SAID RAILROAD, SOUTH 43° 00′ 00″ WEST, A DISTANCE OF 290.50 FEET TO A POINT, IRON PIN (SET);

THENCE, WITH THE SAME, BY A CURVE TO THE RIGHT HAVING A RADIUS OF 508.34 FEET, AN ARC LENGTH OF 249.44 FEET AND A CHORD OF SOUTH 28° 56′ 49.3″ WEST, A DISTANCE OF 246.94 FEET TO A POINT, IRON PIN. (SET);

THENCE, WITH THE SAME, SOUTH 46° 59′ 45″ EAST, A DISTANCE OF 39.56 FEET TO A POINT, RR SPIKE (SET) IN THE CENTERLINE OF SAID ROUTE 18;

THENCE, WITH SAID CENTERLINE OF ROUTE 18 SOUTH 43° 30′ 00″ WEST, A DISTANCE OF 1,062.86 FEET TO A POINT, PLC NAIL (SET);

THENCE, WITH SAID CENTERLINE OF ROUTE 18 SOUTH 43° 31′ 00″ WEST, A DISTANCE OF 390.50 FEET TO A POINT, PLC NAIL (SET);

THENCE, WITH SAID CENTERLINE OF ROUTE 18, SOUTH 35° 46′ 44″ WEST, A DISTANCE OF 136.30 FEET TO A POINT, RR SPIKE (SET);

THENCE, WITH THE SAME, SOUTH 28° 39′ 30″ WEST, A DISTANCE OF 184.17 FEET TO A POINT, RR SPIKE (SET);

THENCE, WITH THE SAME, SOUTH 22° 48′ 40″ WEST, A DISTANCE OF 718.37 FEET TO A POINT, X-CUT IN CONCRETE;

THENCE, WITH THE SAME, SOUTH 26° 58′ 30″ WEST, 189.46 FEET TO THE POINT OR PLACE OF BEGINNING.


BEING, AS TO PART, THE SAME PREMISES WHICH SINCLAIR-KOPPERS COMPANY, BY DEED DATED JANUARY 1, 1974 AND RECORDED IN THE BEAVER COUNTY RECORDER OF DEEDS OFFICE IN DEED BOOK 1020, PAGE 719, GRANTED AND CONVEYED UNTO ARCO POLYMERS, INC.


AND BEING, AS TO THE REMAINDER, THE SAME PREMISES WHICH THE PENN CENTRAL CORPORATION, BY DEED DATED MAY 27, 1980 AND RECORDED IN THE BEAVER COUNTY RECORDER OF DEEDS OFFICE IN DEED BOOK 1147, PAGE 874, GRANTED AND CONVEYED UNTO ARCO POLYMERS, INC. AND THE SAID ARCO POLYMERS, INC. MERGED INTO ATLANTIC RICHFIELD COMPANY, A DELAWARE CORPORATION, PURSUANT TO A PLAN OF MERGER EFFECTIVE JUNE 30, 1981, SUCH MERGER BEING EFFECTIVE JUNE 30, 1981, SUCH MERGER BEING EVIDENCED BY A CERTIFICATE OF MERGER FILED IN THE DEPARTMENT OF STATE OF THE COMMONWEALTH OF PENNSYLVANIA ON JUNE 1, 1981 AND EFFECTIVE ON JUNE 30, 1981, AND THE SAID ATLANTIC RICHFIELD CORPORATION WAS THE SURVIVING CORPORATION OF SUCH MERGER.


**EXCEPTING THEREOUT AND THEREFROM** ALL THAT CERTAIN 225 SQUARE FEET PIECE OR PARCEL OF LAND WHICH THE COUNTY OF BEAVER, BY DEED DATED JANUARY 2, 1964 AND RECORDED IN THE BEAVER COUNTY RECORDER OF DEEDS OFFICE IN DEED BOOK 848, PAGE 415, GRANTED AND CONVEYED UNTO ST. JOSEPH LEAD COMPANY, A NEW YORK CORPORATION, AS MORE FULLY DESCRIBED THEREIN AS TRACT 9 ON PAGE 418 THEREOF.


**ALSO EXCEPTING THEREOUT AND THEREFROM** ALL THAT CERTAIN PIECE OR PARCEL OF LAND WHICH ARCO POLYMERS, INC., BY DEED DATED JUNE 17, 1980 AND RECORDED IN THE BEAVER COUNTY RECORDER OF DEEDS OFFICE IN DEED BOOK 1147, PAGE 880, GRANTED AND CONVEYED UNTO POLYSAR INCORPORATED, AS FOLLOWS, TO WIT:

BEGINNING AT A POINT ON THE CENTERLINE OF MONACA ROAD (PA. T. R. 18) WHERE THE SAME IS INTERSECTED BY THE EASTERLY LINE OF LANDS N/F OF ARCO POLYMERS, INC.;

THENCE BY SAID EASTERLY LINE N 45° 51' 45" W, 241.00' TO A POINT, SAID POINT BEING THE TRUE POINT OF BEGINNING FOR THE PARCEL HEREIN DESCRIBED;

THENCE ALONG LANDS N/F OF ARCO POLYMERS, INC., S 43° 13' 31" W, 174.47' TO A POINT CUT THE WESTERLY LINE OF A RIGHT-OF-WAY N/F PENDEL CORPORATION;

THENCE BY SAID RIGHT OF WAY IN A SOUTHWEST DIRECTION, BY A CURVE TO THE RIGHT, HAVING A RADIUS OF 468.34' AND AN ARC LENGTH OF 407.95';

THENCE CONTINUING BY SAID RIGHT OF WAY, S 43° 00' 15" W, 188.58' TO A POINT;

THENCE ALONG LANDS N/F OF ARCO POLYMERS, INC., THE FOLLOWING FOUR (4) COURSES AND DISTANCES:

N 46° 43' 37" W, 733 78';
N 16° 04' 03" E, 575 32';
N 44° 08' 15" E, 221.32';
S 45° 51' 45" E, 824.13' TO THE PLACE OF BEGINNING.

SAID PARCEL CONTAINING AN AREA OF 607,322.83 SQUARE FEET, OR 13.94 ACRES, AS SHOWN ON MICHAEL BAKER, JR., INC., DRAWING NUMBER 2-10-4736-A DATED FEBRUARY 22, 1980.

**AND ALSO EXCEPTING THEREOUT AND THEREFROM** ALL THAT CERTAIN REAL PROPERTY WHICH ATLANTIC RICHFIELD COMPANY, BY DEED DATED SEPTEMBER 17, 1985 END RECORDED IN THE BEAVER COUNTY RECORDER OF DEEDS OFFICE IN DEED BOOK 1251, PAGE 744, GRANTED AND CONVEYED UNTO BV PARTNERS, A PENNSYLVANIA GENERAL PARTNERSHIP.

**CONTAINING A NET AREA OF 435.879 ACRES, MORE OR LESS.**

**EXCEPTING THEREOUT AND THEREFROM** SAID 435.879 ACRE TRACT OF LAND ALL THAT CERTAIN TRACT OR PARCEL OF LAND CONTAINING 296.110 ACRES, MORE OR LESS, WHICH ARCO CHEMICAL COMPANY, BY DEED DATED NOVEMBER 21, 1997 AND RECORDED IN THE BEAVER COUNTY RECORDER OF DEEDS OFFICE IN DEED BOOK 1797, PAGE 492 GRANTED AND CONVEYED UNTO NOVA CHEMICALS, INC., SAID 296.110 ACRE TRACT OF LAND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

ALL THAT CERTAIN PIECE OR PARCEL OF LAND LOCATED IN POTTER TOWNSHIP, BEAVER COUNTY, PENNSYLVANIA, AND BEING THE COMBINED AREA OF LOTS KNOWN AS NO. 1A AND NO. 1B AS SHOWN ON THE LAND TIDE SURVEY FOR THE PROPERTY OF ARCO CHEMICAL COMPANY DATED SEPTEMBER 20. 1996 (M. B. JR. 2-10-5251) AS PREPARED BY MICHAEL BAKER JR., INC.. CONSULTING ENGINEERS. BEAVER, PENNSYLVANIA, AND BEING MORE PARTICULARLY BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT, CONCRETE MONUMENT (FOUND) AT THE SOUTHWESTERLY CORNER OF LOT NO. 1A AS SHOWN ON SAID TITLE SURVEY, SAID POINT ALSO BEING THE SOUTHWESTERLY CORNER OF THE LANDS HEREIN DESCRIBED AND ALSO BEING A COMMON CORNER OF THE LANDS, NOW OR FORMERLY, OF HORSEHEAD INDUSTRIES, INC. AND OF DRAVO BASIC MATERIALS COMPANY, INC.;

THENCE, WITH THE EASTERLY LINE OF LAND OF SAID DRAVO AND LANDS, NOW OR FORMERLY, OF CONRAIL, NORTH 17° 56′ 53″ WEST. 1,078.18 FEET TO A POINT, IRON PIN (SET), SAID POINT BEING THE NORTHWESTERLY CORNER OF LOT NO. 1B AND THE SOUTHWESTERLY CORNER OF LOT NO. 3B AS SHOWN ON SAID TITLE SURVEY;

THENCE, WITH THE DIVIDING LINE BETWEEN SAID LOT NO. 1B AND 3B, NORTH 76° 29′ 47″ EAST, 185.28 FEET TO A POINT, IRON PIN (SET);

THENCE, WITH THE SAME, NORTH 74° 46′ 19″ EAST. 163.53 FEET TO A POINT, IRON PIN (SET);

THENCE, WITH THE SAME, NORTH 76° 31′ 27″ EAST. 407.34 FEET TO A POINT, IRON PIN (SET);

THENCE, WITH THE SAME, NORTH 43° 57′ 30″ EAST, 19.04 FEET TO A POINT, IRON PIN (SET), SAID POINT BEING ON THE SOUTHERLY LINE OF LOT NO. 2A AS SHOWN ON THE SAID TITLE SURVEY;

THENCE, WITH THE SOUTHERLY LINE OF SAID LOT NO. 2A. NORTH 43° 57′ 30″ EAST, 390.91 FEET TO A POINT, IRON PIN (SET);

THENCE, WITH THE EASTERLY LINE OF SAID LOT NO. 2A, BY A CURVE TO THE RIGHT HAVING A RADIUS OF 286′.22 FEET, AN ARC LENGTH OF 140.11 FEET AND A CHORD OF NORTH 60° 26′ 42″ WEST, 138.71 FEET TO A POINT, IRON PIN (SET);

THENCE, WITH THE NORTHERLY LINE OF SAID LOT NO. 2A, SOUTH 87° 46′ 59″ WEST, 788.92 FEET TO A POINT, IRON PIN (SET);

THENCE, WITH THE SAME, NORTH 33° 53′ 26″ WEST, 98.49 FEET TO A POINT, IRON PIN (SET);

THENCE, WITH THE SAME, SOUTH 56° 06′ 34″ WEST, 245.11 FEET TO A POINT, IRON PIN (SET);

THENCE, WITH THE WESTERLY LINE OF SAID LOT NO. 1A AND THE EASTERLY LINE OF OTHER LANDS, NOW OR FORMERLY, OF ARCO CHEMICAL COMPANY; NORTH 17° 56′ 53″ WEST, 924.92 FEET TO A POINT AT THE LOW WATER MARK AS DETERMINED AND SHOWN ON PLAT OF SURVEY BY THE U.S. CORPS OF ENGINEERS, DATED MARCH 27, 1941; THENCE, WITH SAID LOW WATER MARK, NORTH 52° 00′ 00″ EAST, 2,405.18 FEET TO A POINT;

THENCE, WITH THE SAME, NORTH 40° 00′ 00″ EAST, 2,193.36 FEET TO A POINT, SAID POINT BEING THE NORTHEASTERLY CORNER OF SAID LOT NO. IA AND THE NORTHWESTERLY CORNER OF LOT NO. 3A AS SHOWN ON SAID TITLE SURVEY;

THENCE, LEAVING SAID LOW WATER MARK, SOUTH 26° 54′ 02″ EAST, 944.86 FEET TO A POINT AT THE WEST EDGE OF RACCOON CREEK;

THENCE, WITH SAID WEST EDGE THE FOLLOWING COURSES AND DISTANCES:

SOUTH 16° 32′ 58″ EAST. 271.10 FEET TO A POINT;

SOUTH 14° 50′ 40″ EAST. 231.62 FEET TO A POINT;

SOUTH 11° 03′ 10″ EAST, 313.91 FEET TO A POINT;

SOUTH 10° 14′ 19″ EAST, 271.84 FEET TO A POINT;

SOUTH 08° 39 22″ EAST, 266.80 FEET TO A POINT;

SOUTH 00° 08′ 09″ EAST, 242.17 FEET TO A POINT:

SOUTH 06° 16′ 24″ WEST, 298.86 FEET TO A POINT:

SOUTH 22° 10′ 24″ WEST. 121.98 FEET TO A POINT:

SOUTH 23° 14′ 33″ WEST, 76.73 FEET TO A POINT:

SOUTH 32° 28′ 59″ WEC. 189.98 FEET TO A PALM:

SOUTH 28° 10′ 33″ WEST, 285.52 FEET TO A POINT:

SOUTH 2° 15′ 58″ WEST, 170.61 FEET TO A POINT;

SOUTH 02° 50′ 17″ WEST, 83.29 FEET TO A POINT;

SOUTH 27° 36′ 31″ EAST, 131.28 FEET TO A POINT:

SOUTH 51° 25′ 30″ EAST. 107.28 FEET TO A POINT;

SOUTH 70° 06′ 08″ EAST 141.96 FEET TO A POINT;

SOUTH 70° 06′ 08″ EAST, 52.27 FEET TO A POINT IN THE CENTERLINE OF PENNSYLVANIA STATE HIGHWAY ROUTE 18:

THENCE, WITH SAID CENTERLINE, SOUTH 22° 48′ 40″ WEST, 27.35 FEET TO A POINT, X-CUT IN CONCRETE (FOUND);

THENCE, WITH THE SAME. SOUTH 26° 58′ 30″ WEST, 189.46 FEET TO A POINT, P.K. NAIL (FOUND) IN THE CENTERLINE INTERSECTION OF SAID ROUTE 18 AND SR 3019;

THENCE, WITH THE CENTERLINE OF SAID SR 3019, SOUTH 73° 55′ 00″ EAST, 267.63 FEET TO A POINT. R. R. SPIKE (FOUND);

THENCE, WITH THE SAME, SOUTH 88° 51′ 30″ EAST. 90.18 FEET TO A POINT. R. R. SPIKE (FOUND);

THENCE, WITH THE SAME. NORTH 74° 56′ 30″ EAST, 152.67 FEET TO A POINT, R. R. SPIKE (FOUND);

THENCE, WITH THE SAME, NORTH 88° 27′ 30″ EAST. 126.26 FEET TO A POINT, R. R. SPIKE (FOUND), SAID POINT BEING ON THE EASTERLY LINE OF LOT NO. 1A AS SHOWN ON SAID TITLE SURVEY:

THENCE, LEAVING SAID CENTERLINE OF SR 3019 AND WITH THE LANDS, NOW OR FORMERLY, OF HORSEHEAD INDUSTRIES, INC., SOUTH 18° 07′ 41″ WEST, 1,659.94 FEET TO A POINT. IRON PIN (FOUND);

THENCE, WITH THE NORTHERLY LINE OF LANDS OF SAID HORSEHEAD, NORTH 64° 04′ 17″ WEST, 539.38 FEET TO A POINT, CONCRETE MONUMENT (FOUND);

THENCE, WITH THE SAME, NORTH 85° 15′ 4″ WEST, 157.46 FEET TO A POINT, CONCRETE MONUMENT (FOUND);

THENCE, WITH THE SAME. NORTH 89° 02′ 01″ WEST. 195.48 FEET TO A POINT, IRON PIN (SET);

THENCE, WITH THE SAME. NORTH 85° 56′ 06″ WEST. 869.79 FEET TO A POINT, CONCRETE MONUMENT (FOUND):

THENCE WITH THE SAME, SOUTH 67° 55′ 18″ WEST, 421.71 FEET TO A POINT, CONCRETE MONUMENT (FOUND);

THENCE, WITH THE SAME. SOUTH 67° 41′ 03″ WEST, 168.32 FEET TO A POINT, CONCRETE MONUMENT (FOUND);

THENCE, WITH THE SAME, SOUTH 74° 25′ 46″ WEST, 714.34 FEET TO A POINT OR PLACE OF BEGINNING.

SAID PARCEL CONTAINING AN AREA OF 296.110 ACRES, MORE OR LESS.

**Bully Hill, Rising Star, and Excelsior Mines Transferred Real Properties:**

## SHASTA COUNTY, CA

## <u>LEGAL DESCRIPTION</u>

### PARCEL 1 (BULLY HILL MINE - APN 026-120-034):

ALL OF THE RIGHT TITLE AND INTEREST IN THE PROPERTY IDENTIFIED AS SHASTA COUNTY **ASSESSOR'S PARCEL NO. 026-120-034**, INCLUDING, BUT NOT LIMITED TO CERTAIN PROPERTY INTERESTS ASSOCIATED WITH THE BULLY HILL MINE OPERATIONS LOCATED IN PORTIONS OF SECTIONS 15, 16 AND 22, TOWNSHIP 34 NORTH, RANGE 3 WEST, M.D.M., SAID ASSESSOR'S PARCEL BEING COMPRISED OF THE FOLLOWING PATENTED MINING CLAIMS:

A) THAT PATENTED PLACER MINING CLAIM KNOWN AS THE POPEJOY, DESCRIBED IN THE PATENT RECORDED OCTOBER 13, 1892 IN BOOK 4 OF PATENTS AT PAGE 352, DESIGNATED BY THE SURVEYOR GENERAL AS LOT NO. 45 BEING A PORTION OF SECTIONS 15, 16 AND 22, TOWNSHIP 34 NORTH, RANGE 3 WEST, M.D.M. ACCORDING TO THE OFFICIAL PLAT THEREOF;

EXCEPTING THEREFROM ANY VEINS OR LODES OF QUARTZ, OR OTHER ROCK IN PLACE BEARING GOLD, SILVER, CINNABAR, LEAD, TIN, COPPER OR OTHER VALUABLE DEPOSITS WITHIN THE LAND ABOVE DESCRIBED, WHICH MAY HAVE DISCOVERED OR KNOWN TO EXIST ON OR PRIOR TO THE 21ST DAY OF FEBRUARY, 1887.

ALSO EXCEPTING THEREFROM ALL SURFACE RIGHTS AT OR BELOW THE 1070 FOOT CONTOUR ABOVE MEAN SEA LEVEL AS CONVEYED TO THE UNITED STATES OF AMERICA BY JUDGMENT DATED DECEMBER 16, 1948 AND RECORDED MAY 8, 1975 IN BOOK 1272, PAGE 265 OFFICIAL RECORDS.

**PARCEL 2 (RISING STAR MINE – APN 026-110-008):**

ALL OF THE RIGHT TITLE AND INTEREST IN THE PROPERTY IDENTIFIED AS SHASTA COUNTY **ASSESSOR'S PARCEL NUMBER 026-110-008**, INCLUDING, BUT NOT LIMITED TO ALL OF THE PROPERTY INTERESTS ASSOCIATED WITH THE RISING STAR MINE OPERATIONS AND A PORTION OF THE PROPERTY INTERESTS ASSOCIATED WITH THE BULLY HILL MINE OPERATIONS, ALL LOCATED IN PORTIONS OF SECTIONS 15, 16 AND 21, TOWNSHIP 34 NORTH, RANGE 3 WEST, M.D.M., SAID ASSESSOR'S PARCEL BEING COMPRISED OF THE FOLLOWING PATENTED MINING CLAIMS:

A) THAT PATENTED LODE MINING CLAIM KNOWN AS THE NORTHERN LIGHT, DESCRIBED IN THE PATENT RECORDED NOVEMBER 17, 1896 IN BOOK 5 OF PATENTS AT PAGE 295, DESIGNATED BY THE SURVEYOR GENERAL AS LOT NO. 46, SURVEY NO. 3226, BEING A PORTION OF SECTIONS 15 AND 16, TOWNSHIP 34 NORTH, RANGE 3 WEST, M.D.M. ACCORDING TO THE OFFICIAL PLAT THEREOF; AND

B) THAT PATENTED LODE MINING CLAIM KNOWN AS THE REDDING CONSOLIDATED CONSISTING OF THE REDDING, SHASTA AND KESWICK DESCRIBED IN THE PATENT RECORDED SEPTEMBER 27, 1904 IN BOOK 7 OF PATENTS AT PAGE 354, DESIGNATED BY THE SURVEYOR GENERAL AS SURVEY NO. 3729, BEING A PORTION OF SECTIONS 15, 16 AND 21, TOWNSHIP 34 NORTH, RANGE 3 WEST, M.D.M. ACCORDING TO THE OFFICIAL PLAT THEREOF; AND

C) THAT PATENTED LODE MINING CLAIM KNOWN AS THE AQUEOUS, DESCRIBED IN THE PATENT RECORDED DECEMBER 31, 1904 IN BOOK 9 OF PATENTS AT PAGE 30, DESIGNATED BY THE SURVEYOR GENERAL AS SURVEY NO. 3910, BEING A PORTION OF SECTIONS 15 AND 16, TOWNSHIP 34 NORTH, RANGE 3 WEST, M.D.M., ACCORDING TO THE OFFICIAL PLAT THEREOF; AND

D) THAT PATENTED LODE MINING CLAIM KNOWN AS THE POTTER QUARTZ CONSISTING OF THE POPEJOY, BULLY HILL AND JENNIE JUNE QUARTZ LOCATIONS, DESCRIBED IN THE PATENT RECORDED NOVEMBER 12, 1895 IN BOOK 5 OF PATENTS AT PAGE 264, DESIGNATED BY THE SURVEYOR GENERAL AS LOT NOS. 42, 43 AND 44, SURVEY NO. 2518, BEING A PORTION OF SECTIONS 16 AND 21, TOWNSHIP 34 NORTH, RANGE 3 WEST, M.D.M., ACCORDING TO THE OFFICIAL PLAT THEREOF,

EXCEPTING THEREFROM THAT PORTION OF THE JENNIE JUNE DESCRIBED IN THE DEED TO H.C. MCCLURE RECORDED FEBRUARY 13, 1902 IN BOOK 69 OF DEEDS AT PAGE 316; AND

E) THAT PATENTED LODE MINING CLAIM KNOWN AS THE RISING STAR AND HILLSIDE DESCRIBED IN THE PATENT RECORDED APRIL 29, 1907 IN BOOK 11 OF PATENTS AT PAGE 124, DESIGNATED BY THE SURVEYOR GENERAL AS SURVEY NO. 3727, BEING A PORTION OF SECTION 21, TOWNSHIP 34 NORTH, RANGE 3 WEST, M.D.M. ACCORDING TO THE OFFICIAL PLAT THEREOF; AND

F) THAT PATENTED LODE MINING CLAIM KNOWN AS THE HOWARD, SANDERS AND DIAMOND FRACTION, DESCRIBED IN THE PATENT RECORDED JULY 8, 1930 IN BOOK 58, PAGE 218, OFFICIAL RECORDS, DESIGNATED BY THE SURVEYOR GENERAL AS SURVEY NO. 5975, BEING A PORTION OF SECTION 21, TOWNSHIP 34 NORTH, RANGE 3 WEST, M.D.M. ACCORDING TO THE OFFICIAL PLAT THEREOF;

EXCEPTING FROM SAID HOWARD AND SANDERS CLAIMS ALL SURFACE RIGHTS AT OR BELOW THE 1070 FOOT CONTOUR ABOVE MEAN SEA LEVEL AS CONVEYED TO THE UNITED STATES OF AMERICA BY JUDGMENT DATED DECEMBER 16, 1948 AND RECORDED MAY 8, 1975 IN BOOK 1272, PAGE 265, OFFICIAL RECORDS.

G) THAT PATENTED LODE MINING CLAIM KNOWN AS THE BROWN, DESCRIBED IN THE PATENT RECORDED OCTOBER 1, 1904 IN BOOK 7 OF PATENTS AT PAGE 361, DESIGNATED BY THE SURVEYOR GENERAL AS SURVEY NO. 3909, BEING A PORTION OF SECTION 21, TOWNSHIP 34 NORTH, RANGE 3 WEST, M.D.M., ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL SURFACE RIGHTS AT OR BELOW THE 1070 FOOT CONTOUR ABOVE MEAN SEA LEVEL AS CONVEYED TO THE UNITED STATES OF AMERICA BY JUDGMENT DATED DECEMBER 16, 1948 AND RECORDED MAY 8, 1975 IN BOOK 1272 PAGE 265, OFFICIAL RECORDS.

**PARCEL 3 (EXCELSIOR MINE – APN 026-110-017)**

ALL OF THE RIGHT TITLE AND INTERST IN THE PROPERTY IDENTIFIED AS SHASTA COUNTY **ASSESSOR'S PARCEL NUMBER 026-110-017**, INCLUDING, BUT NOT LIMITED TO ALL OF THE PROPERTY INTERESTS ASSOCIATED WITH THE EXCELSIOR MINE OPERATIONS LOCATED IN PORTIONS OF SECTIONS 21 AND 28, TOWNSHIP 34 NORTH, RANGE 3 WEST, M.D.M., SAID ASSESSOR'S PARCEL BEING COMPRISED OF THE FOLLOWING PATENTED MINING CLAIMS:

A) THAT PATENTED LODE MINING CLAIM KNOWN AS THE EXCELSIOR MINE DESCRIBED IN THE PATENT RECORDED JANUARY 20, 1950 IN BOOK 16 OF PATENTS AT PAGE 277, DESIGNATED BY THE SURVEYOR GENERAL AS LOT NO. 39A, BEING A PORTION OF SECTION 21, TOWNSHIP 34 NORTH, RANGE 3 WEST, M.D.M. ACCORDING TO THE OFFICIAL PLAT THEREOF; AND

B) THAT PATENTED LODE MINING CLAIM KNOWN AS THE BAXTER, DESCRIBED IN THE PATENT RECORDED JULY 13, 1899 IN BOOK 7 OF PATENTS AT PAGE 21, DESIGNATED BY THE SURVEYOR GENERAL AS LOT NO. 47, SURVEY NO. 3425, BEING A PORTION OF SECTIONS 21 AND 28, TOWNSHIP 34 NORTH, RANGE 3 WEST, M.D.M. ACCORDING TO THE OFFICIAL PLAT THEREOF;

EXCEPTING THEREFROM ALL SURFACE RIGHTS AT OR BELOW THE 1070 FOOT CONTOUR ABOVE MEAN SEA LEVEL AS CONVEYED TO THE UNITED STATES OF AMERICA BY JUDGMENT DATED, DECEMBER 16, 1948 AND RECORDED MAY 8, 1975 IN BOOK 1272, PAGE 265, OFFICIAL RECORDS.

**Charlotte Transferred Real Property:**

MECKLENBERG COUNTY, NC

LEGAL DESCRIPTION

BEGINNING AT AN IRON PIN IN THE NORTHEASTERLY CORNER OF PROPERTY NOW OR FORMERLY OWNED BY FRED LYONS, AND BEING A CORNER OF PROPERTY CONVEYED TO PIEDMONT AND NORTHERN RAILWAY COMPANY BY THE TRUSTEE OF REALTY INVESTMENT AND SECURITIES COMPANY, SAID POINT ALSO BEING THE BEGINNING POINT OF THAT DEED RECORDED IN BOOK 1809, PAGE 125 OF THE MECKLENBURG PUBLIC REGISTRY;

AND FROM SAID BEGINNING POINT RUNNING THENCE S. 73-08 W. 377.61 FEET TO A STAKE IN THE EASTERLY MARGIN OF GLENWOOD DRIVE, SAID STAKE BEING 30 FEET FROM THE CENTER LINE OF SAID ROAD, MEASURED AT RIGHT ANGLES;

THENCE RUNNING WITH THE EASTERLY MARGIN OF GLENWOOD DRIVE N. 12-25-15 W. 490.38 FEET TO A STAKE;

THENCE N. 77-34-45 E. 1074.20 FEET TO A STAKE IN THE LINE OF THE P & N REALTY COMPANY PROPERTY AS SHOWN ON THAT SURVEY OF R. B. PHARR AND ASSOCIATES DATED MARCH 23, 1971;

RUNNING THENCE WITH THE LINE OF SAID P & N REALTY COMPANY PROPERTY S. 10-36-45 E. 536.71 FEET TO A POINT;

THENCE RUNNING S. 0-45 W. 324.76 FEET TO A MANHOLE;

THENCE RUNNING S. 62-34 W. 187.65 FEET TO A MANHOLE;

THENCE RUNNING S. 53-38-30 W 209.05 FEET TO A POINT;

THENCE RUNNING N. 43-15 W. 162.77 FEET TO A POINT;

THENCE RUNNING S. 47-15 W. 11.49 FEET TO A POINT;

THENCE RUNNING N. 32-16 W. 415.70 FEET TO THE POINT AND PLACE OF BEGINNING.

**Gypsum Pile Transferred Real Property:**

MORRIS, GRUNDY COUNTY, IL

LEGAL DESCRIPTION

THAT PART OF SECTION 28 AND THAT PART OF SECTION 33, BOTH IN TOWNSHIP 34 NORTH, RANGE 8 EAST OF THE THIRD PRINCIPAL MERIDIAN DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF SAID SECTION 28;

THENCE SOUTH 01° 16′ 52″ EAST ALONG THE EAST LINE OF THE NORTHEAST QUARTER OF SAID SECTION 28 FOR A DISTANCE OF 205.76 FEET (205.41 FEET DEED) TO THE SOUTH LINE OF A 100 FOOT WIDE PARCEL OF LAND AS DESCRIBED IN WARRANTY DEED RECORDED MAY 7, 1962 IN BOOK 251 PAGE 692 SAID POINT ALSO BEING THE POINT OF BEGINNING;

THENCE SOUTH 01° 16′ 52″ EAST ALONG THE EAST LINE OF SAID NORTHEAST QUARTER FOR A DISTANCE OF 2439.86 FEET TO THE SOUTHEAST CORNER OF THE NORTHEAST QUARTER OF SAID SECTION 28;

THENCE SOUTH 00° 49′ 15″ EAST ALONG THE EAST LINE OF THE SOUTHEAST FRACTIONAL QUARTER OF SAID SECTION 28 FOR A DISTANCE OF 1240 FEET MORE OR LESS TO THE CENTER THREAD OF THE ILLINOIS RIVER;

THENCE SOUTHWESTERLY ALONG THE CENTER THREAD OF THE ILLINOIS RIVER TO THE INTERSECTION OF SAID CENTER THREAD WITH THE SOUTHERLY EXTENSION OF A LINE PARALLEL WITH AND 2849.57 FEET WEST OF THE EAST LINE OF THE SOUTHEAST FRACTIONAL QUARTER (AS MEASURED ALONG THE EAST-WEST HALF SECTION LINE) OF SAID SECTION 28;

THENCE NORTH 00° 49′ 15″ WEST ALONG SAID LINE PARALLEL WITH AND 2849.57 FEET WEST OF THE EAST LINE OF THE SOUTHEAST FRACTIONAL QUARTER SECTION (AS MEASURED ALONG THE EAST-WEST HALF SECTION LINE) OF SAID SECTION 28 FOR A DISTANCE OF 326 FEET MORE OR LESS TO THE NORTH BANK OF THE ILLINOIS RIVER;

THENCE SOUTHWESTERLY ALONG THE NORTH BANK OF THE ILLINOIS RIVER TO THE INTERSECTION OF SAID NORTH BANK WITH THE SOUTHERLY EXTENSION OF A LINE PARALLEL WITH AND 3349.57 FEET WEST OF THE EAST LINE OF THE SOUTHEAST FRACTIONAL QUARTER (AS MEASURED ALONG THE EAST-WEST HALF SECTION LINE) OF SAID SECTION 28;

THENCE NORTH 00° 49′ 15″ WEST ALONG A LINE PARALLEL WITH AND 3349.57 FEET WEST OF THE EAST LINE OF THE SOUTHEAST FRACTIONAL QUARTER (AS MEASURED ALONG THE EAST-WEST HALF SECTION LINE) OF SAID SECTION 28 FOR A DISTANCE OF 2817 FEET MORE OR LESS TO THE EAST-WEST HALF SECTION LINE OF SAID SECTION 28;

THENCE NORTH 01° 16′ 52″ WEST ALONG A LINE PARALLEL WITH AND 3349.57 FEET WEST OF THE EAST LINE OF THE NORTHEAST QUARTER (AS MEASURED ALONG THE EAST-WEST HALF SECTION LINE) OF SAID SECTION 28 FOR A DISTANCE OF 861.90 FEET;

THENCE NORTH 84° 54′ 24″ EAST, 148.97 FEET;

THENCE NORTH 87° 28′ 50″ EAST, 292.10 FEET;

THENCE NORTHEASTERLY ALONG THE ARC OF A TANGENT CURVE CONCAVE TO THE NORTH WITH A CHORD BEARING AND DISTANCE OF NORTH 77° 45′ 33″ EAST, 194.19 FEET, HAVING A RADIUS OF 575.00 FEET FOR AN ARC DISTANCE OF 195.12 FEET;

THENCE NORTH 68° 02′ 16″ EAST, 171.34 FEET;

THENCE NORTH 19° 00′ 41″ WEST, 142.06 FEET TO THE SOUTH LINE OF A 100 FOOT WIDE PARCEL OF LAND AS DESCRIBED IN WARRANTY DEED RECORDED MAY 7, 1962 IN BOOK 251 PAGE 692;

THENCE NORTH 70° 59′ 10″ EAST, 554.01 FEET MEASURED (NORTH 72° 57′ 20″ EAST DEED) ALONG THE SOUTH LINE OF SAID 100 FOOT WIDE PARCEL OF LAND AS DESCRIBED IN SAID WARRANTY DEED;

THENCE NORTH 69° 11′ 40″ EAST, 157.56 FEET MEASURED (NORTH 71° 03′ 20″ EAST, 157.79 FEET DEED) ALONG THE SOUTH LINE OF SAID 100 FOOT WIDE PARCEL OF LAND AS DESCRIBED IN SAID WARRANTY DEED;

THENCE NORTH 65° 40′ 35″ EAST, 180.70 FEET MEASURED (NORTH 67° 25′ 30″ EAST, 180.81 FEET DEED) ALONG THE SOUTH LINE OF SAID 100 FOOT WIDE PARCEL OF LAND AS DESCRIBED IN SAID WARRANTY DEED;

THENCE NORTH 61° 39 07″ EAST, 266.54 FEET MEASURED (NORTH 63° 27′ 15″ EAST, 265.91 FEET DEED) ALONG THE SOUTH LINE OF SAID 100 FOOT WIDE PARCEL OF LAND AS DESCRIBED IN SAID WARRANTY DEED;

THENCE NORTH 58° 09′ 51″ EAST, 1766.67 FEET MEASURED (NORTH 60° 13′ 30″ EAST, 1764.03 FEET DEED) ALONG THE SOUTH LINE OF SAID 100 FOOT WIDE PARCEL OF LAND AS DESCRIBED IN SAID WARRANTY DEED TO THE POINT OF

BEGINNING, CONTAINING 265.643 ACRES, MORE OR LESS ALL SITUATED IN GRUNDY COUNTY, ILLINOIS.

**Saint Helena Transferred Real Property:**

ST. HELENA PLANT, 2701 BROENING HIGHWAY

BALTIMORE, BALTIMORE COUNTY, MD

<u>LEGAL DESCRIPTION</u>

ALL THOSE LOTS OF GROUND SITUATE IN BALTIMORE CITY, STATE OF MARYLAND, AND DESCRIBED AS FOLLOWS, THAT IS TO SAY: ALL THOSE LOTS OR PARCELS OF LAND MORE PARTICULARLY SET FORTH IN THE FOLLOWING CONVEYANCES, THE DESCRIPTIONS THEREIN BEING INCORPCRATED HEREIN BY REFERENCE THERETO, LESS ANY PORTIONS HERETOFORE CONVEYED:

1. DEED FROM MAYOR AND CITY COUNCIL OF BALTIMORE TO THE GLIDDEN COMPANY DATED APRIL 24, 1950, AND RECORDED AMONG THE LAND RECORDS O1 BALTIMORE CITY IN LIBER M.L.P. NO. 8100, PAGE 578.

2. DEED FROM PERRY T. DARBY, ET. AL., TO THE GLIDDEN COMPANY DATED AUGUST 17, 1945, AND RECORDED AMONG THE LAND RECORDS OF BALTIMORE CITY IN LIBER M.L.P. NO. 6785, PAGE 61.

3. DEED FROM AMERICAN ZIRCONUIUM CORPORATION TO THE GLIDDEN COMPANY DATED July 19, 1944, AND RECORDED AMONG THE LAND RECORDS OF BALTIMORE CITY IN LIBER M.L.P. NO. 6653, PAGE 369.

4. DEED OF RELEASE FROM RAYMOND CONCRETE PILE COMPANY TO THE GLIDDEN COMPANY DATED JUNE 23, 1937, AND RECORDED AMONG THE LAND RECORDS OF BALTIMORE CITY IN LIBER S.C.L. NO. 5741, PAGE 409.

5. DEED FROM VIRGINIA C. COX, WIDOW, TO THE GLIDDEN COMPANY DATED MAY 29, 1930, AND RECORDED AMONG THE LAND RECORDS OF BALTIMORE CITY IN LIBER S.C.L. NO. 5124, PAGE 106.

6. DEED FROM AGNES MARKOE DUGAN, ET. AL., TO THE GLIDDEN COMPANY DATED MAY 17, 1937, AND RECORDED AMONG THE LAND RECORDS OF BALTIMORE CITY IN LIBER S.C.L. NO. 5725, PAGE 10.

7. DEED FROM VIRGINIA C. MC GINLEY, ET. VIR., TO THE GLIDDEN COMPANY DATED MAY 26, 1937, AND RECORDED AMONG THE LAND RECORDS OF BALTIMORE CITY IN LIBER S.C.L. NO. 5725, PAGE 408.

8. DEED FROM T. BAYARD WILLIAMS, ET. UX., TO THE GLIDDEN COMPANY DATED MAY 1, 1929, AND RECORDED AMONG THE LAND RECORDS OF BALTIMORE CITY IN LIBER S.C.L. NO. 4997, PAGE 343.

9. DEED FROM T. MATHANEY, ET VIR, TO THE GLIDDEN COMPANY DATED DECEMBER 31, 1928, AND RECORDED AMONG THE LAND RECORDS OF BALTIMORE CITY IN LIBER S.C.L. NO. 4961, PAGE 190.

10. DEED FROM MILTON SHORT, ET. UX., TO THE GLIDDEN COMPANY DATED AUGUST 17, 1925, AND RECORDED AMONG THE LAND RECORDS OF BALTIMORE CITY IN LIBER S.C.L. NO. 4442, PAGE 18.

11. DEED FROM ELLA K. PERRIN, WIDOW, TO THE GLIDDEN COMPANY DATED DECEMBER 19, 1923, AND RECORDED AMONG THE LAND RECORDS OF BALTIMORE CITY IN LIBER S.C.L. NO. 4163, PAGE 289.

12. DEED FROM THE CHEMICAL PIGMENTS CORPORATION TO THE GLIDDEN COMPANY DATED AUGUST 10, 1920, AND RECORDED AMONG THE LAND RECORDS OF BALTIMORE CITY IN LIBER S.C.L. NO. 3657, PAGE 364.

13. DEED FROM THE CHEMICAL PIGMENTS CORPORATION TO THE GLIDDEN COMPANY DATED JULY 1, 1920, AND RECORDED AMONG THE LAND RECORDS OF BALTIMORE CITY IN LIBER S.C.L. NO. 3612, PAGE 425.

14. DEED FROM MAYOR AND CITY COUNMCIL OF BALTIMORE TO SCM CORPORATION DATED FEBRUARY 13, 1969, AND RECORDED AMONG THE LAND RECORDS OF BALTIMORE CITY IN LIBER R.H.B. NO. 2486, PAGE 89.

BEING ALL THAT PROPERTY DESCRIBED IN DEED FROM THE SCM CORODRATION TO ABC CHEMICALS, INC. DATED SEPTEMBER 19, 1985, AND RECORDED AMONG THE LAND RECORDS OF BALTIMORE CITY IN LIBER S.E.B. NO. 0667, PAGE 318.  AND FURTHER BEING THE SAME TRACTS OR PARCELS OF LAND CONVEYED FROM SCM CHEMICALS, INC., A DELAWARE CORPORATION (FORMERLY ABC CHEMICALS, INC.) TO SCM GLIDCO ORGANICS CORP., A DELAWARE CORPORATION BY DEED DATED MAY 29, 1987, RECORDED AMONG THE LAND RECORDS OF BALTIMORE CITY, MARYLAND, IN LIBER S.E.B. NO. 1376, FOLIO 224, AND BEING THE SAME PROPERTY KNOWN AS "THE ST. HELENA PLANT, BEING KNOWN AS 2701 BROENING HIGHWAY" AS RATIFIED AND CONFIRMED BY CONFIRMATORY DEED DATED NOVEMBER 12, 1987 FROM SCM CHEMICALS, INC., A DELAWARE CORPORATION (FORMERLY ABC CHEMICALS, INC.) TO SCM GLIDCO ORGANICS CORP., A DELAWARE CORPORATION, RECORDED AMONG THE LAND RECORDS OF BALTIMORE CITY, MARYLAND, IN LIBER S.E.B. NO. 1520, FOLIO 078.

**Turtle Bayou Transferred Real Property**:

TURTLE BAYOU TRACTS, LIBERTY COUNTY, TX

LEGAL DESCRIPTION

PARCEL 1 (GARZA)

ALL THAT CERTAIN TRACT OR PARCEL OF LAND BEING 7.6099 ACRES, MORE OR LESS, IN THE B. M. SPINKS SURVEY, A-108, LIBERTY COUNTY, TEXAS, SAID LANDS BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

FIELD NOTES OF A 7.6099 ACRE TRACT OF LAND SITUATED IN THE B. M. SPINKS LEAGUE, ABSTRACT 108, LIBERTY COUNTY, TEXAS AND BEING OUT OF THAT CERTAIN "CALLED" 300 ACRE TRACT (SURVEYED TO BE 296.06 1 ACRES) DESCRIBED AS TRACT II CONVEYED BY DONALD R. LANG TO WALLIS WILSON SMITH BY DEED DATED JULY 1, 1976 AND RECORDED IN VOLUME 779 AT PAGE 872 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS. SAID 7.6099 ACRES IS THAT SAME TRACT "CALLED" 7.58 ACRES CONVEYED BY WALLIS WILSON SMITH TO R. L. GARZA, ET AX, BY DEED DATED MAY 5, 1980 AND RECORDED IN VOLUME 878 AT PAGE 801 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS. THIS 7.6099 ACRE TRACT IS MORE PARTICULARLY DESCRIBED BY THE FOLLOWING METES AND BOUNDS, TO-WIT:

NOTE: BEARINGS ARE BASED ON FOUND MONUMENTS IN THE EAST LINE OF THE C. A. MILES SUBDIVISION AND THE EAST LINE OF THE W. W. SMITH TRACT AS SURVEYED BY J. O. BELCHER, RPLS NO. 1491, IN 1990; SAID LINE HAVING A CONTROL BEARING OF NORTH 01°11'40" WEST. MAP OF SAID MILES SUBDIVISION BEING OF RECORD IN VOLUME 106 AT PAGE 22 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS. SAD W. W. SMITH TRACT BEING THAT SAME TRACT (296.061 ACRE) REFERRED TO ABOVE.

BEGINNING AT A 5/8 INCH IRON ROD, WITH CAP, FOUND IN THE NORTH RIGHT-OF-WAY LINE OF FRONTIER PARK ROAD (COUNTY ROAD 126-60 FEET WIDE RIGHT-OF-WAY) IN THE WEST LINE OF SAID W. W. SMITH 296.061 ACRE TRACT AND THE EAST LINE OF THAT CERTAIN RESIDUE OF A 3.00 ACRE TRACT OF LAND (PARCEL "C") CONVEYED BY MARY FUSON TO ORVILLE E. MAXFIELD, ET UX, BY DEED DATED JANUARY 24, 1963 AND RECORDED IN VOLUME 560 AT PAGE 196 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS. SAID POINT BEING THE SOUTHWEST CORNER AND POINT OF BEGINNING OF THIS TRACT;

THENCE: NORTH 00°56'40" WEST ALONG THE WEST LINE OF THIS TRACT, THE EAST LINE OF SAID RESIDUE OF 3.00 ACRES, THE EAST LINE OF THAT CERTAIN 4.00 ACRE TRACT CONVEYED BY ATHEM P. DAGGETT TO ORVILLE E. MAXFIELD, ET UX, BY DEED DATED DECEMBER 21, 1964, AND RECORDED IN VOLUME 582 AT PAGE 521 OF THE

DEED RECORDS OF LIBERTY COUNTY, TEXAS; THE EAST LINE OF THAT CERTAIN 2.00 ACRE TRACT DESCRIBED IN DEED DATED MARCH 26, 1986 FROM METHODIST HOSPITAL TO METHODIST HOSPITAL SYSTEM AND RECORDED IN VOLUME 1120 AT PAGE 679 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS; THE EAST LINE OF THAT CERTAIN 1.00 ACRE TRACT SET ASIDE TO RICHARD N. PICKETT IN PARTITION DEED DATED JANUARY 1, 1992 AND RECORDED IN VOLUME 1442 AT PAGE 265 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS; THE EAST LINE OF THAT CERTAIN 1.00 ACRE TRACT (PARCEL "B") CONVEYED BY FUSON TO MAXFLELD IN THE HERETOFORE MENTIONED DEED; AND THE EAST LINE OF THAT CERTAIN 2.00 ACRE TRACT OF LAND CONVEYED BY ALICE B. MORRIS, ET AL, TO ORVILLE E. MAXFIELD, ET UX, BY DEED DATED OCTOBER 1, 1969 AND RECORDED IN VOLUME 652 AT PAGE 434 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS, FOR A DISTANCE OF 689.95 FEET (CALLED NORTH 687.80 FEET) TO A 1/2 INCH IRON ROD, WITH CAP, SET IN THE NORTH LINE OF THE SPINKS LEAGUE, THE SOUTH LINE OF THE SILAS SMITH SURVEY, ABSTRACT 341, AND THE SOUTH LINE OF THAT CERTAIN 300.1647 ACRE TRACT OF LAND DESCRIBED IN DEED DATE JULY 9, 1997 FROM MARY RICH BIRD, ET AL, TO 770, INC. AND, RECORDED IN VOLUME 1678 AT PAGE 467 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS, FOR THE NORTHEAST CORNER OF SAID 2.00 ACRES LAST MENTIONED ABOVE, THE NORTHWEST CORNER OF SAID W. W. SMITH TRACT AND THE NORTHWEST CORNER OF THIS TRACT;

THENCE: NORTH 89°05′18″ EAST ALONG THE NORTH LINE OF THIS TRACT, THE NORTH LINE OF SAID SPINKS LEAGUE, THE NORTH LINE OF SAID W. W. SMITH TRACT, THE SOUTH LINE OF SAID 300.1657 ACRES AND THE WESTERNMOST SOUTH LINE OF SAID SILAS SMITH SURVEY, FOR A DISTANCE OF 596.80 FEET (CALLED EAST 597.55 FEET) TO A 1/2 INCH IRON ROD, WITH CAP, SET FOR THE NORTHEAST CORNER OF THIS TRACT AND THE NORTHWEST CORNER OF THAT CERTAIN 6.86 ACRE TRACT OF LAND CONVEYED BY WALLIS WILSON SMITH TO CURTIS B. HUCKABY, ET UX, BY DEED DATED APRIL 15, 1981 AND RECORDED IN VOLUME 1592 AT PAGE 320 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS;

THENCE: SOUTH 11°35′40″ EAST ALONG THE EAST LINE OF THIS TRACT AND THE WEST LINE OF SAID 6.86 ACRES FOR A DISTANCE OF 367.36 FEET (CALLED SOUTH 10039 EAST 364.99 FEET) TO A 1/2 INCH IRON ROD FOUND IN THE NORTH RIGHT-OF-WAY LINE OF SAID FRONTIER PARK ROAD FOR THE SOUTHEAST CORNER OF THIS TRACT AND THE SOUTHWEST CORNER OF SAID 6.86 ACRES;

THENCE: SOUTH 88°48′56″ WEST ALONG THE SOUTH LINE OF THIS TRACT AND THE NORTH RIGHT-OF-WAY LINE OF SAID FRONTIER PARK ROAD FOR A DISTANCE OF 33.95 FEET (CALLED SOUTH 89°44′WEST) TO A 1/2 INCH IRON ROD FOUND FOR AN ANGLE POINT IN SAID LINE;

THENCE: SOUTH 61°32'56" WEST ALONG THE SOUTH LINE OF THIS TRACT AND THE NORTH RIGHT-OF-WAY LINE OF SAID FRONTIER PARK ROAD FOR A DISTANCE OF 711.12 FEET (CALLED SOUTH 62°28 'WEST 711.60 FEET) TO THE PLACE OF BEGINNING AND CONTAINING WITHIN THESE BOUNDARIES 7.6099 ACRES OF LAND.

PARCEL 2 (HUCKABY)

DESCRIPTION OF A 0.2821 ACRES (12,286 SQUARE FEET) OF LAND BEING OUT OF A 6.86 ACRE TRACT IN THE B.M. SPINKS SURVEY, ABSTRACT NO. 108, IN LIBERTY COUNTY, TEXAS, SAID 6.86 ACRE TRACT BEING DESCRIBED IN DEED CONVEYED TO CURTIS B. HUCKABY AND WIFE, CAROL L. HUCKABY RECORDED IN VOL. 1592, PG. 320 OF THE LIBERTY COUNTY DEED RECORDS, AND BEING KNOWN AS TRACT #2 OF A 296.061 ACRE TRACT (CALLED 300 AC.) DESCRIBED IN DEED CONVEYED TO DEMPSIE HENLEY RECORDED IN VOL 642, PG. 548 OF THE LIBERTY COUNTY DEED RECORDS, SAID 0.2821 ACRE TRACT BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS (WITH BEARINGS REFERENCED TO THE TEXAS STATE PLANE COORDINATE SYSTEM, SOUTH CENTRAL ZONE, NAD27 AND BASED ON NGS TRIANGULATION STATION WATTS 1951):

COMMENCING AT A 5/8—INCH IRON ROD FOUND IN THE NORTHWESTERLY RIGHT-OF-WAY LINE OF FRONTIER PARK ROAD (COUNTY ROAD NO.126, 60.00 FEET RO.W.), BEING THE SOUTHWEST CORNER OF A 7.6099 ACRE TRACT CONVEYED TO LYONDELL CHEMICAL CO. RECORDED IN FILE NO. 4028249 OF THE LIBERTY COUNTY DEED RECORDS, SAID 7.6099 ACRE TRACT BEING KNOWN AS TRACT #1 (ALSO CALLED 7.58 ACRE TRACT DESCRIBED IN DEED TO R.L. GARZA & WIFE, OLGA L. GARZA RECORDED IN VOL 878, PG. 801 OF THE LIBERTY COUNTY DEED RECORDS) OF THE SAID 300 ACRE TRACT;

THENCE, NORTH 59°23'12" EAST, ALONG THE NORTHWESTERLY RIGHT-OF-WAY LINE OF SAID FRONTIER PARK ROAD, A DISTANCE OF 711.65 FEET (CALLED NORTH 62°28'00" EAST, 711.60 FEET) TO A 1/2-INCH IRON ROD FOUND FOR A CORNER OF THE AFOREMENTIONED 7.6099 ACRE TRACT;

THENCE, NORTH 86°39'12" EAST, ALONG THE NORTHERLY RIGHT-OF-WAY LINE OF SAID FRONTIER PARK ROAD, A DISTANCE OF 33.95 FEET (CALLED NORTH 89°44'00" EAST, 33.95 FEET) TO A 5/8"-INCH IRON ROD SET WITH CAP FOR THE SOUTHEAST CORNER OF THE AFOREMENTIONED 7.6099 ACRE TRACT, AND ALSO BEING THE SOUTHWEST CORNER OF THE ABOVEMENTIONED 6.86 ACRE TRACT, FROM WHICH, A FOUND 1/2-INCH IRON ROD BEARS SOUTH 38°13'04" WEST, 1.20 FEET, AND SAID 5/8"-INCH IRON ROD WITH CAP BEING THE PLACE OF BEGINNING AND SOUTHERLY CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE, NORTH 13°43'48" WEST, DEPARTING THE NORTHERLY RIGHT-OF-WAY LINE OF SAID FRONTIER PARK ROAD, AND ALONG THE COMMON LINE OF SAID 7.6099 AND 6.86 ACRE TRACTS, A DISTANCE OF 364.99 FEET (CALLED NORTH 10°39'00" WEST, 364.99 FEET) TO A 5/8"-INCH IRON ROD SET WITH CAP AS THE COMMON CORNER OF THE SAID 7.6099 AND 6.86 ACRE TRACTS, FROM WHICH A FOUND 1/2-INCH IRON ROD WITH CAP, BEARS SOUTH 38°13'04" WEST, 1.20 FEET, AND SAID

5/8-INCH IRON ROD WITH CAP BEING THE NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE, NORTH 86°55'11" EAST, ALONG THE NORTH LINE OF AFOREMENTIONED 6.86 ACRE TRACT, A DISTANCE OF 68.50 FEET TO A 5/8"-INCH IRON ROD SET WITH CAP FOR THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE, SOUTH 02°54'44" EAST, CROSSING THE AFOREMENTIONED 6.86 ACRE TRACT, A DISTANCE OF 358.70 FEET TO THE POINT OF BEGINNING AND CONTAINING AN AREA OF 0.2821 ACRES (12,286 SQUARE FEET) OF LAND.

THE CALLED BEARING AND DISTANCE ARE REFERRED TO THE DEED OF AFOREMENTIONED 7.58 ACRE TRACT

PARCEL 3 (MAXFIELD)

FIELD NOTES OF A 15.0000 ACRE TRACT OF LAND SITUATED IN THE B. M. SPINKS LEAGUE, ABSTRACT 108, LIBERTY COUNTY, TEXAS, AND BEING THAT SAME LAND "CALLED" 15.00 ACRES (PARCEL A) IN DEED DATED JANUARY 24, 1963 FROM MARY FUSON TO ORVILLE E. MAXFIELD, ET UX, AND RECORDED IN VOLUME 560 AT PAGE 196 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS. THIS 15.000 ACRE TRACT OF LAND IS MORE PARTICULARLY DESCRIBED BY THE FOLLOWING METES AND BOUNDS, TO-WIT:

NOTE: BEARINGS ARE BASED ON FOUND MONUMENTS IN THE EAST LINE OF THE C. A. MILES SUBDIVISION AND THE EAST LINE OF THE W. W. SMITH TRACT AS SURVEYED BY J. O. BELCHER, R.P.L.S NO. 1941, IN 1990; SAID LINE HAVE A CONTROL BEARING OF NORTH 01°11'40" WEST. MAP OF SAID MILES SUBDIVISION BEING OF RECORD IN VOLUME 106 AT PAGE 22 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS. SAID W. W. SMITH TRACT BEING THAT SAME TRACT "CALLED" 300 ACRE TRACT (SURVEYED TO BE 296.061 ACRES) DESCRIBED AS TRACT II CONVEYED BY DONALD IT LANG TO WALLIS WILSON SMITH BY DEED DATED JULY 1, 1976 AND RECORDED IN VOLUME 779 AT PAGE 872 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS.

BEGINNING AT A 1/2 INCH IRON ROD, WITH CAP, SET IN THE SOUTH LINE OF THE SILAS SMITH SURVEY, ABSTRACT 341, THE SOUTH LINE OF THAT CERTAIN 300.1647 ACRE TRACT OF LAND CONVEYED BY MARY RICH BIRD, ET AL, TO 770, INC. (UNDIVIDED INTEREST) BY DEED DATED JULY 9, 1997 AND RECORDED IN VOLUME 1678 AT PAGE 467 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS, AND THE NORTH LINE OF THE B. M. SPINKS LEAGUE, AT THE NORTHWEST CORNER OF THAT CERTAIN "CALLED" 13 ACRE TRACT OF LAND OUT OF THE WHITE 104.4 ACRE TRACT DEEDED TO F. B. FUSON BY C. A. MILES ON AUGUST 22, 1921 BY DEED RECORDED IN VOLUME 106 AT PAGE 595 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS. SAID POINT BEING THE NORTHWEST CORNER OF THAT CERTAIN 1.9995 ACRES (TRACT 4) SURVEYED THIS DATE AND THE NORTHEAST CORNER AND POINT OF BEGINNING OF THIS TRACT; FROM WHICH A 1/2 INCH IRON ROD, WITH CAP, SET FOR THE NORTHEAST CORNER OF SAID 1.9995 ACRES AND THE NORTHEAST CORNER OF SAID 13 ACRES BEARS NORTH 89°05'18" EAST 637.50 FEET. SAID 1.9995 ACRES BEING THAT SAME LAND "CALLED" 2.00 ACRES CONVEYED BY ALICE B. MERRIS, ET AL, TO ORVILLE E. MAXFIELD, ET UX, BY DEED DATED OCTOBER 1, 1969 AND RECORDED IN VOLUME 652 AT PAGE 434 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS;

THENCE: SOUTH 00°50'51" EAST ALONG THE EAST LINE OF THIS TRACT AND THE WEST LINE OF SAID 13 ACRES FOR A DISTANCE OF 886.87 FEET TO A ½ INCH IRON ROD, WITH CAP, SET IN THE NORTH RIGHT- OF-WAY LINE OF FRONTIER PARK ROAD (COUNTY ROAD 126-60 FEET WIDE RIGHT-OF-WAY) FOR THE SOUTHWEST CORNER

OF SAID 13 ACRES AND THE SOUTHEAST CORNER OF THIS TRACT; FROM WHICH A 5/8 INCH IRON ROD, WITH CAP, (FOUND) BEARS SOUTH 00°50'51" EAST 1.55 FEET SAID 1/2 INCH IRON ROD ALSO BEING THE SOUTHWEST CORNER OF THAT CERTAIN 3.0039 ACRES (TRACT 3) SURVEYED THIS DATE. SAID 3.0039 ACRES BEING THAT SAME LAND "CALLED" 3.00 ACRES (PARCEL C) CONVEYED BY MARY FUSON TO ORVILLE E. MAXFIELD, ET UX, BY DEED DATED JANUARY 24, 1963 AND RECORDED IN VOLUME 560 AT PAGE 196 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS;

THENCE: SOUTH 88°30'41" WEST ALONG THE SOUTH LINE OF THIS TRACT AND THE NORTH RIGHT-OF- WAY LINE OF SAID FRONTIER PARK ROAD FOR A DISTANCE OF 736.71 FEET TO A 1/2 INCH IRON ROD, WITH CAP, SET FOR THE SOUTHEAST CORNER OF THAT CERTAIN "CALLED" 16.9 ACRE TRACT OF LAND CONVEYED BY THE CONSERVATION FUND TO DONNIE SMITH BY DEED DATED AUGUST 18, 1997 AND RECORDED IN VOLUME 1683 AT PAGE 785 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS AND THE SOUTHWEST CORNER OF THIS TRACT;

THENCE: NORTH 00°39'02" WEST ALONG THE WEST LINE OF THIS TRACT AND THE EAST LINE OF SAID "CALLED" 16.9 ACRES FOR A DISTANCE OF 889.38 FEET TO A Y2 INCH IRON ROD, WITH CAP, SET IN THE NORTH LINE OF SAID SPINKS LEAGUE, THE SOUTH LINE OF THE T. D. YOACUM SURVEY, ABSTRACT 125, AND THE SOUTH LINE OF THAT CERTAIN TRACT OF LAND CONVEYED BY DAVID MACON MIDDLETON IRREVOCABLE MANAGEMENT TRUST AND DAVID MACON MIDDLETON TO LEGACY TRUST CO., ET AL, BY DEED DATED DECEMBER 3, 1998, EFFECTIVE OCTOBER 15, 1998, AND RECORDED IN VOLUME 1753 AT PAGE 23 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS, FOR THE NORTHWEST CORNER OF THIS TRACT AND THE NORTHEAST CORNER OF SAID "CALLED" 16.9 ACRES;

THENCE: NORTH 88°31'22" EAST ALONG THE NORTH LINE OF THIS TRACT, THE NORTH LINE OF SAID SPINKS LEAGUE, THE SOUTH LINE OF SAID YOACUM SURVEY AND THE SOUTH LINE OF SAID LEGACY TRUST CO. TRACT FOR A DISTANCE OF 62.80 FEET TO A 2-1/2 INCH IRON PIPE FOUND FOR AN ANGLE POINT IN SAID LINE.

THENCE: NORTH 88°33'20" EAST ALONG THE NORTH LINE OF THIS TRACT, THE NORTH LINE OF SAID SPINKS LEAGUE, THE SOUTH LINE OF SAID LEGACY TRUST CO. TRACT AND THE SOUTH LINE OF SAID YOACUM SURVEY FOR A DISTANCE OF 462.00 FEET TO A 2 INCH IRON PIPE FOUND FOR THE SOUTHEAST CORNER OF SAID YOACUM SURVEY, THE SOUTHEAST CORNER OF SAID LEGACY TRUST CO. TRACT, THE SOUTHWEST CORNER OF SAID SMITH SURVEY AND THE SOUTHWEST CORNER OF SAID 300.1647 ACRES. SAID POINT BEING AN ANGLE POINT IN THE NORTH LINE OF THIS TRACT.

THENCE: NORTH 89°05'18" EAST ALONG THE NORTH LINE OF THIS TRACT, THE NORTH LINE OF SAID SPINKS LEAGUE, THE SOUTH LINE OF SAID SMITH SURVEY AND THE SOUTH LINE OF SAID 300.1647 ACRES FOR A DISTANCE OF 208.84 FEET TO

THE PLACE OF BEGINNING AND CONTAINING WITHIN THESE BOUNDARIES 15.0000 ACRES OF LAND.

TRACT 2:

FIELD NOTES OF A 0.9967 OF AN ACRE TRACT OF LAND SITUATED IN THE B. M. SPINKS LEAGUE, ABSTRACT 108, LIBERTY COUNTY, TEXAS, OUT OF AND A PART OF THAT CERTAIN "CALLED" 13 ACRE TRACT OF LAND OUT OF THE WHITE 104.4 ACRE TRACT DEEDED TO F. B. FUSON BY C. A. MILES ON AUGUST 22, 1921 BY DEED RECORDED IN VOLUME 106 AT PAGE 595 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS; AND BEING THAT SAME LAND "CALLED" 1.00 ACRES (PARCEL B) IN DEED DATED JANUARY 24, 1963 FROM MARY FUSON TO ORVILLE E. MAXFIELD, ET UX, AND RECORDED IN VOLUME 560 AT PAGE
196 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS. THIS 0.9967 OF AN ACRE TRACT OF LAND IS MORE PARTICULARLY DESCRIBED BY THE FOLLOWING METES AND BOUNDS, TO-WIT:

NOTE: BEARINGS ARE BASED ON FOUND MONUMENTS IN THE EAST LINE OF THE C. A. MILES SUBDIVISION AND THE EAST LINE OF THE W. W. SMITH TRACT AS SURVEYED BY S. O. BELCHER, R.P.L.S NO. 1941, IN 1990; SAID LINE HAVE A CONTROL BEARING OF NORTH 01°11'40" WEST. MAP OF SAID MILES SUBDIVISION BEING OF RECORD IN VOLUME 106 AT PAGE 22 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS. SAID W. W. SMITH TRACT BEING THAT SAME TRACT "CALLED" 300 ACRE TRACT (SURVEYED TO BE 296.061 ACRES) DESCRIBED AS TRACT II CONVEYED BY DONALD IT LANG TO WALLIS WILSON SMITH BY DEED DATED JULY 1, 1976 AND RECORDED IN VOLUME 779 AT PAGE 872 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS.

COMMENCING AT A 1/2 INCH IRON ROD, WITH CAP, SET IN THE SOUTH LINE OF THE SILAS SMITH SURVEY, ABSTRACT 341, THE SOUTH LINE OF THAT CERTAIN 300.1647 ACRE TRACT OF LAND CONVEYED BY MARY RICH BIRD, ET AL, TO 770, INC. (UNDIVIDED INTEREST) BY DEED DATED JULY 9, 1997 AND RECORDED IN VOLUME 1678 AT PAGE 467 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS, AND THE NORTH LINE OF THE B. M. SPINKS LEAGUE, AT THE NORTHWEST CORNER OF THAT CERTAIN "CALLED" 13 ACRE TRACT OF LAND OUT OF THE WHITE 104.4 ACRE TRACT DEEDED TO F. B. FUSON BY C. A. MILES ON AUGUST 22, 1921 BY DEED RECORDED IN VOLUME 106 AT PAGE 595 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS. SAID POINT BEING THE NORTHWEST CORNER OF THAT CERTAIN 1.9995 ACRES (TRACT 4) SURVEYED THIS DATE AND THE NORTHEAST CORNER OF THAT CERTAIN 15.0000 ACRES (TRACT 1) SURVEYED THIS DATE. SAID 15.0000 ACRES BEING THAT SAME LAND (PARCEL A) CONVEYED BY MARY FUSON TO ORVILLE E. MAXFIELD, ET AX, BY DEED DATED JANUARY 24, 1963 AND RECORDED IN VOLUME 560 AT PAGE 196 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS;

THENCE SOUTH 00°50'51" EAST ALONG THE EAST LINE OF SAID 13 ACRES, THE EAST LINE OF SAID 15.0000 ACRES AND THE WEST LINE OF SAID 1.9995 ACRES FOR A DISTANCE OF 136.60 FEET TO A 1/2 INCH IRON ROD, WITH CAP, SET FOR THE SOUTHWEST CORNER OF SAID 1.9995 ACRES AND THE NORTHWEST CORNER AND POINT OF BEGINNING OF THIS TRACT;

THENCE NORTH 89°05'18" EAST ALONG THE NORTH LINE OF THIS TRACT AND THE SOUTH LINE OF SAID 1.9995 ACRES FOR A DISTANCE OF 637.73 FEET TO A /2 INCH IRON ROD, WITH CAP, SET IN THE EAST LINE OF SAID 13 ACRES, THE NORTHERNMOST WEST LINE OF SAID 296.061 ACRES AND THE WEST LINE OF THAT CERTAIN "CALLED" 7.58 ACRE TRACT CONVEYED BY WALLIS WILSON SMITH TO R. L. GARZA, ET AX, BY DEED DATED MAY 5, 1980 AND RECORDED IN VOLUME 878 AT PAGE 801 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS;

THENCE SOUTH 00°56'40" EAST ALONG THE EAST LINE OF THIS TRACT, THE WEST LINE OF SAID "CALLED" 7.58 ACRES, THE NORTHERNMOST WEST LINE OF SAID 296.061 ACRES AND THE EAST LINE OF SAID 13 ACRES FOR A DISTANCE OF 68.30 FEET TO A 1/2 INCH IRON ROD, WITH CAP, SET FOR THE SOUTHEAST CORNER OF THIS TRACT AND THE NORTHEAST CORNER OF THAT CERTAIN "CALLED" 1.00 ACRE TRACT OF LAND AS SET ASIDE TO RICHARD N. PICKETT IN PARTITION DEED DATED JANUARY 1, 1992 AND RECORDED IN VOLUME 1442 AT PAGE 265 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS;

THENCE SOUTH 89°05'18" WEST ALONG THE SOUTH LINE OF THIS TRACT AND THE NORTH LINE OF SAID "CALLED" 1.00 ACRES FOR A DISTANCE OF 637.85 FEET TO A 1/2 INCH IRON ROD, WITH CAP, SET IN THE WEST LINE OF SAID 13 ACRES AND THE EAST LINE OF SAID 15.0000 ACRES FOR THE NORTHWEST CORNER OF SAID "CALLED" 1.00 ACRES AND THE SOUTHWEST CORNER OF THIS TRACT;

THENCE NORTH 00°50'51" WEST ALONG THE WEST LINE OF THIS TRACT, THE WEST LINE OF SAID 13 ACRES AND THE EAST LINE OF SAID 15.0000 ACRES FOR A DISTANCE OF 68.30 FEET TO THE PLACE OF BEGINNING AND CONTAINING WITHIN THESE BOUNDARIES 0.9967 OF AN ACRE OF LAND.

TRACT 3:

FIELD NOTES OF A 3.0039 ACRE TRACT OF LAND SITUATED IN THE B. M. SPINKS LEAGUE, ABSTRACT 108, LIBERTY COUNTY, TEXAS, OUT OF AND A PART OF THAT CERTAIN "CALLED" 13 ACRE TRACT OF LAND OUT OF THE WHITE 104.4 ACRE TRACT DEEDED TO F. B. FUSON BY C. A. MILES ON AUGUST 22, 1921 BY DEED RECORDED IN VOLUME 106 AT PAGE 595 OF THE DEED RECORDS OF LIBERTY COUNTY,. TEXAS; AND BEING THAT SAME LAND "CALLED" 3.00 ACRES (PARCEL C) IN DEED DATED JANUARY 24, 1963 FROM MARY FUSON TO ORVILLE E. MAXFIELD, ET UX, AND RECORDED IN VOLUME 560 AT PAGE 196 OF THE DEED RECORDS OF LIBERTY

COUNTY, TEXAS. THIS 3.0039 ACRE TRACT OF LAND IS MORE PARTICULARLY DESCRIBED BY THE FOLLOWING METES AND BOUNDS, TO-WIT:

NOTE: BEARINGS ARE BASED ON FOUND MONUMENTS IN THE EAST LINE OF THE C. A. MILES SUBDIVISION AND THE EAST LINE OF THE W. W. SMITH TRACT AS SURVEYED BY J. O. BELCHER, R.P.L.S NO. 1941, IN 1990; SAID LINE HAVE A CONTROL BEARING OF NORTH 01°11'40" WEST. MAP OF SAID MILES SUBDIVISION BEING OF RECORD IN VOLUME 106 AT PAGE 22 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS. SAID W. W. SMITH TRACT BEING THAT SAME TRACT "CALLED" 300 ACRE TRACT (SURVEYED TO BE 296.061 ACRES) DESCRIBED AS TRACT II CONVEYED BY DONALD R. LANG TO WALLIS WILSON SMITH BY DEED DATED JULY 1,1976 AND RECORDED IN VOLUME 779 AT PAGE 872 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS.

COMMENCING AT A 1/2 INCH IRON ROD, WITH CAP, SET IN THE SOUTH LINE OF THE SILAS SMITH SURVEY, ABSTRACT 341, THE SOUTH LINE OF THAT CERTAIN 300.1647 ACRE TRACT OF LAND CONVEYED BY MARY RICH BIRD, ET AL, TO 770, INC. (UNDIVIDED INTEREST) BY DEED DATED JULY 9, 1997 AND RECORDED IN VOLUME 1678 AT PAGE 467 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS, AND THE NORTH LINE OF THE B. M. SPINKS LEAGUE, AT THE NORTHWEST CORNER OF SAID "CALLED" 13 ACRES. SAID POINT BEING THE NORTHWEST CORNER OF THAT CERTAIN 1.9995 ACRES (TRACT 4) SURVEYED THIS DATE AND THE NORTHEAST CORNER OF THAT CERTAIN 15.0000 ACRES (TRACT 1) SURVEYED THIS DATE. SAID 15.0000 ACRES BEING THAT SAME LAND (PARCEL A) CONVEYED BY MARY FUSON TO ORVILLE E. MAXFIELD, ET UX, BY DEED DATED JANUARY 24, 1963 AND RECORDED IN VOLUME 560 AT PAGE 196 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS. SAID 1.9995 ACRES BEING THAT SAME LAND "CALLED" 2.00 ACRES CONVEYED BY ALICE B. MERRIS, ET AL, TO ORVILLE E. MAXFIELD, ET UX, BY DEED DATED OCTOBER 1, 1969 AND RECORDED IN VOLUME 652 AT PAGE 434 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS;

THENCE: SOUTH 00°50'51" EAST ALONG THE WEST LINE OF SAID 13 ACRES AND THE EAST LINE OF SAID 15.0000 ACRES FOR A DISTANCE OF 681.95 FEET TO A POINT FOR THE SOUTHWEST CORNER OF THAT CERTAIN 3.9416 ACRES (TRACTS) SURVEYED THIS DATE AND THE NORTHWEST CORNER AND POINT OF BEGINNING OF THIS TRACT. SAID 3.9416 ACRES BEING THAT SAME LAND "CALLED" 4.00 ACRES AS CONVEYED BY ATHERN P. DAGGETT TO ORVILLE E. MAXFLELD, ET UX, BY DEED DATED DECEMBER 21, 1964 AND RECORDED IN VOLUME 582 AT PAGE 521 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS;

THENCE: NORTH 88°30'41" EAST ALONG THE NORTH LINE OF THIS TRACT AND THE SOUTH LINE OF SAID 3.9416 ACRES FOR A DISTANCE OF 638.68 FEET TO A 5/8 INCH IRON ROD, WITH CAP, FOUND IN THE EAST LINE OF SAID 13 ACRES, THE NORTHERNMOST WEST LINE OF SAID 296.061 ACRES AND THE WEST LINE OF THAT

CERTAIN "CALLED" 7.58 ACRE TRACT CONVEYED BY WALLIS WILSON SMITH TO IT L. GARZA, ET UX, BY DEED DATED MAY 5, 1980 AND RECORDED IN VOLUME 878 AT PAGE 801 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS FOR THE SOUTHEAST CORNER OF SAID 3.9416 ACRES AND THE NORTHEAST CORNER OF THIS TRACT;

THENCE: SOUTH 00°56'40" EAST ALONG THE EAST LINE OF THIS TRACT, THE WEST LINE OF SAID "CALLED" 7.58 ACRES, THE NORTHERNMOST WEST LINE OF SAID 296.061 ACRES AND THE EAST LINE OF SAID 13 ACRES FOR A DISTANCE OF 14.28 FEET TO A 5/8 INCH IRON ROD FOUND IN THE NORTH RIGHT-OF- WAY LINE OF FRONTIER PARK ROAD (COUNTY ROAD 126-60 FEET WIDE RIGHT-OF-WAY) FOR THE SOUTHWEST CORNER OF SAID "CALLED" 7.58 ACRES AND AN ANGLE POINT IN THE EAST LINE OF THIS TRACT;

THENCE: SOUTH 00°47'15" EAST ALONG THE EAST LINE OF THIS TRACT, THE EAST LINE OF SAID 13 ACRES AND THE NORTHERNMOST WEST LINE OF SAID 296.061 ACRES AND AT 67.75 FEET PASS A 1/2 INCH IRON ROD, WITH CAP, SET IN THE SOUTH RIGHT-OF-WAY LINE OF SAID FRONTIER PARK ROAD AT THE WESTERNMOST NORTHWEST CORNER OF THAT CERTAIN "CALLED" 5.00 ACRE TRACT CONVEYED BY DOUGLAS K. TRAYLOR TO LIMESTONE LAND CONSERVANCY, INC. BY DEED DATED AUGUST 24, 2001 AND RECORDED IN VOLUME 1915 AT PAGE 101 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS; AT 139.53 FEET PASS A 1/2 INCH IRON ROD FOUND FOR THE SOUTHWEST CORNER OF SAID "CALLED" 5.00 ACRES, THE WESTERNMOST SOUTHWEST CORNER OF SAID 296.061 ACRES AND THE NORTHWEST CORNER OF THAT CERTAIN "CALLED" 40 ACRES CONVEYED BY W. C. LEE, JR., RECEIVER, TO JOSEPH SINKOVICS BY DEED DATED DECEMBER 6,2000 AND RECORDED IN VOLUME 1870 AT PAGE 112 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS; IN ALL, A TOTAL DISTANCE OF 190.49 FEET TO A 1/2 INCH IRON PIPE FOUND FOR THE NORTHEAST CORNER OF THAT CERTAIN "CALLED" 30 ACRES (TRACT 1) CONVEYED BY R. L. CARTER, ET IN, TO LIMESTONE LAND CONSERVANCY, INC. BY DEED DATED FEBRUARY 3,2002 AND RECORDED IN VOLUME 1947 AT PAGE 514 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS, THE SOUTHEAST CORNER OF SAID 13 ACRES AND THE SOUTHEAST CORNER OF THIS TRACT;

THENCE: SOUTH 88°30'41" WEST ALONG THE SOUTH LINE OF THIS TRACT, THE SOUTH LINE OF SAID 13 ACRES AND THE NORTH LINE OF SAID "CALLED" 30 ACRES AND AT 119.07 FEET PASS A 1/2 INCH IRON ROD, WITH CAP, SET IN THE SOUTH RIGHT-OF-WAY LINE OF SAID FRONTIER PARK ROAD, AT 207.76 FEET PASS A 3/4 INCH IRON ROD FOUND IN THE NORTH RIGHT-OF-WAY LINE OF SAID FRONTIER PARK ROAD, IN ALL, A TOTAL DISTANCE OF 638.51 FEET (CALLED WEST 637.5 FEET) TO A 1/2 INCH IRON ROD, WITH CAP, SET FOR THE SOUTHWEST CORNER OF THIS TRACT, THE SOUTHWEST CORNER OF SAID 13 ACRES AND THE SOUTHEAST CORNER OF SAID 15.0000 ACRES; FROM WHICH A 5/8 INCH IRON ROD (FOUND) BEARS SOUTH 00°50'51" EAST 1.55 FEET;

THENCE: NORTH 00°50′51″ WEST ALONG THE WEST LINE OF THIS TRACT, THE WEST LINE OF SAID 13 ACRES AND THE EAST LINE OF SAID 15.0000 ACRES FOR A DISTANCE OF 204.91 FEET TO THE PLACE OF BEGINNING AND CONTAINING WITHIN THESE BOUNDARIES 3.0039 ACRES OF LAND.

TRACT 4:

FIELD NOTES OF A 1.9995 ACRE TRACT OF LAND SITUATED IN THE B. M. SPINKS LEAGUE, ABSTRACT 108, LIBERTY COUNTY, TEXAS, OUT OF AND A PART OF THAT CERTAIN "CALLED" 13 ACRE TRACT OF LAND OUT OF THE WHITE 104.4 ACRE TRACT DEEDED TO F. B. FUSON BY C. A. MILES ON AUGUST 22, 1921 BY DEED RECORDED IN VOLUME 106 AT PAGE 595 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS; AND BEING THAT SAME LAND "CALLED" 2.00 ACRES CONVEYED BY ALICE B. MERRIS, ET AL, TO ORVILLE E. MAXFIELD, ET UX, BY DEED DATED OCTOBER 1, 1969 AND RECORDED IN VOLUME 652 AT PAGE 434 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS. THIS 1.9995 ACRE TRACT OF LAND IS MORE PARTICULARLY DESCRIBED BY THE FOLLOWING METES AND BOUNDS, TO-WIT:

NOTE: BEARINGS ARE BASED ON FOUND MONUMENTS IN THE EAST LINE OF THE C. A. MILES SUBDIVISION AND THE EAST LINE OF THE W. W. SMITH TRACT AS SURVEYED BY L 0. BELCHER, R.P.L.S NO. 1941, IN 1990; SAID LINE HAVE A CONTROL BEARING OF NORTH 01°11′40″ WEST. MAP OF SAID MILES SUBDIVISION BEING OF RECORD IN VOLUME 106 AT PAGE 22 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS. SAID W. W. SMITH TRACT BEING THAT SAME TRACT "CALLED" 300 ACRE TRACT (SURVEYED TO BE 296.061 ACRES) DESCRIBED AS TRACT II CONVEYED BY DONALD R. LANG TO WALLIS WILSON SMITH BY DEED DATED JULY 1, 1976 AND RECORDED IN VOLUME 779 AT PAGE 872 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS.

BEGINNING AT A 1/2 INCH IRON ROD, WITH CAP, SET IN THE SOUTH LINE OF THE SILAS SMITH SURVEY, ABSTRACT 341, THE SOUTH LINE OF THAT CERTAIN 300.1647 ACRE TRACT OF LAND CONVEYED BY MARY RICH BIRD, ET AL, TO 770, INC. (UNDIVIDED INTEREST) BY DEED DATED JULY 9, 1997 AND RECORDED IN VOLUME 1678 AT PAGE 467 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS, AND THE NORTH LINE OF THE B. M. SPINKS LEAGUE, AT THE NORTHWEST CORNER OF SAID "CALLED" 13 ACRES. SAID POINT BEING THE NORTHEAST CORNER OF THAT CERTAIN 15.0000 ACRES (TRACT 1) SURVEYED THIS DATE. SAID 15.0000 ACRES BEING THAT SAME LAND (PARCEL A) CONVEYED BY MARY FUSON TO ORVILLE E. MAXFIELD, ET UX, BY DEED DATED JANUARY 24, 1963 AND RECORDED IN VOLUME 560 AT PAGE 196 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS AND THE NORTHWEST CORNER AND POINT OF BEGINNING OF THIS TRACT;

THENCE: NORTH 89°05'18″ EAST ALONG THE NORTH LINE OF THIS TRACT, THE NORTH LINE OF SAID 13 ACRES, THE NORTH LINE OF SAID SPINKS LEAGUE, THE SOUTH LINE OF SAID SMITH SURVEY AND THE SOUTH LINE OF SAID 300.1647 ACRES FOR A DISTANCE OF 637.50 FEET TO A 1/2 INCH IRON ROD, WITH CAP, SET FOR THE NORTHEAST CORNER OF THIS TRACT, THE NORTHEAST CORNER OF SAID 13 ACRES, THE NORTHERNMOST NORTHWEST CORNER OF SAID 296.061 ACRES AND THE NORTHWEST CORNER OF THAT CERTAIN "CALLED" 7.58 ACRES CONVEYED BY WALLIS WILSON SMITH TO U. L. GARZA, ET UX, BY DEED DATED MAY 5, 1980 AND RECORDED IN VOLUME 878 AT PAGE 801 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS;

THENCE: SOUTH 00°56'40″ EAST ALONG THE EAST LINE OF THIS TRACT, THE WEST LINE OF SAID "CALLED" 7.58 ACRES, THE NORTHERNMOST WEST LINE OF SAID 296.061 ACRES AND THE EAST LINE OF SAID 13 ACRES FOR A DISTANCE OF 136.60 FEET TO A 1/2 INCH IRON ROD, WITH CAP, SET FOR THE SOUTHEAST CORNER OF THIS TRACT AND THE NORTHEAST CORNER OF THAT CERTAIN 0.9967 OF AN ACRE (TRACT 2) SURVEYED THIS DATE, SAID 0.9967 OF AN ACRE OF LAND BEING THAT SAME LAND "CALLED" 1.00 ACRES (PARCEL B) CONVEYED BY MARY FUSON TO ORVILLE E. MAXFIELD, ET UX, BY DEED DATED JANUARY 24, 1963 AND RECORDED IN VOLUME 560 AT PAGE 196 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS;

THENCE: SOUTH 88°30'41″ WEST ALONG THE SOUTH LINE OF THIS TRACT AND THE NORTH LINE OF SAID 0.9967 OF AN ACRE FOR A DISTANCE OF 637.73 FEET TO A 1/2 INCH IRON ROD, WITH CAP, SET IN THE WEST LINE OF SAID 13 ACRES AND THE EAST LINE OF SAID 15.0000 ACRES FOR THE SOUTHWEST CORNER OF THIS TRACT AND THE NORTHWEST CORNER OF SAID 0.9967 OF AN ACRE;

THENCE: NORTH 00°50'51″ WEST ALONG THE WEST LINE OF THIS TRACT, THE WEST LINE OF SAID 13 ACRES AND THE EAST LINE OF SAID 15.0000 ACRES FOR A DISTANCE OF 136.60 FEET TO THE PLACE OF BEGINNING AND CONTAINING WITHIN THESE BOUNDARIES 1.9995 ACRES OF LAND.

TRACT 5:

FIELD NOTES OF A 3.9416 ACRE TRACT OF LAND SITUATED IN THE B. M. SPINKS LEAGUE, ABSTRACT 108, LIBERTY COUNTY, TEXAS, OUT OF AND A PART OF THAT CERTAIN "CALLED" 13 ACRE TRACT OF LAND OUT OF THE WHITE 104.4 ACRE TRACT DEEDED TO F. B. FUSON BY C. A. MILES ON AUGUST 22, 1921 BY DEED RECORDED IN VOLUME 106 AT PAGE 595 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS; AND BEING THAT SAME LAND "CALLED" 4.00 ACRES CONVEYED BY ARTHERN P. DAGGETT TO ORVILLE E. MAXFIELD, ET UX, BY DEED DATED DECEMBER 21, 1964 AND RECORDED IN VOLUME 582 AT PAGE 521 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS. THIS 3.9416 ACRE TRACT OF LAND IS MORE PARTICULARLY DESCRIBED BY THE FOLLOWING METES AND BOUNDS, TO-WIT:

NOTE: BEARINGS ARE BASED ON FOUND MONUMENTS IN THE EAST LINE OF THE C. A. MILES SUBDIVISION AND THE EAST LINE OF TILE W. W. SMITH TRACT AS SURVEYED BY J. 0. BELCIIER, R.P.L.S NO. 1941, IN 1990; SAID LINE HAVE A CONTROL BEARING OF NORTH 01°11′40″ WEST. MAP OF SAID MILES SUBDIVISION BEING OF RECORD IN VOLUME 106 AT PAGE 22 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS. SAID W. W. SMITH TRACT BEING THAT SAME TRACT "CALLED" 300 ACRE TRACT (SURVEYED TO BE 296.061 ACRES) DESCRIBED AS TRACT II CONVEYED BY DONALD U. LANG TO WALLIS WILSON SMITH BY DEED DATED JULY 1, 1976 AND RECORDED IN VOLUME 779 AT PAGE 872 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS.

COMMENCING AT A 1/2 INCH IRON ROD, WITH CAP, SET IN THE SOUTH LINE OF THE SILAS SMITH SURVEY, ABSTRACT 341, THE SOUTH LINE OF THAT CERTAIN 300.1647 ACRE TRACT OF LAND CONVEYED BY MARY RICH BIRD, ET AL, TO 770, INC. (UNDIVIDED INTEREST) BY DEED DATED JULY 9, 1997 AND RECORDED IN VOLUME 1678 AT PAGE 467 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS, AND THE NORTH LINE OF THE B. M. SPINKS LEAGUE, AT THE NORTHWEST CORNER OF SAID "CALLED" 13 ACRES. SAID POINT BEING THE NORTHWEST CORNER OF THAT CERTAIN 1.9995 ACRES (TRACT 4) SURVEYED THIS DATE AND THE NORTHEAST CORNER OF THAT CERTAIN 15.0000 ACRES (TRACT 1) SURVEYED THIS DATE. SAID 15.0000 ACRES BEING THAT SAME LAND (PARCEL A) CONVEYED BY MARY FUSON TO ORVILLE E. MAXFIELD, ET UX, BY DEED DATED JANUARY 24, 1963 AND RECORDED IN VOLUME 560 AT PAGE 196 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS. SAID 1.9995 ACRES BEING THAT SAME LAND "CALLED" 2.00 ACRES CONVEYED BY ALICE B. MERRIS, ET AL, TO ORVILLE E. MAXILELD, ET UX, BY DEED DATED OCTOBER 1, 1969 AND RECORDED IN VOLUME 652 AT PAGE 434 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS;

THENCE: SOUTH 00°50′51″ EAST ALONG THE WEST LINE OF SAID 13 ACRES AND THE EAST LINE OF SAID 15.0000 ACRES FOR A DISTANCE OF 409.80 FEET TO A 1/2 INCH IRON ROD, WITH CAP, SET FOR THE SOUTHWEST CORNER OF THAT CERTAIN "CALLED" 2.00 ACRE TRACT OF LAND CONVEYED BY METHODIST HOSPITAL TO METHODIST HOSPITAL SYSTEM BY DEED DATED MARCH 26, 1986 AND RECORDED IN VOLUME 1120 AT PAGE 679 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS, SAID POINT BEING THE NORTHWEST CORNER AND POINT OF BEGINNING OF THIS TRACT;

THENCE: NORTH 89°05′15″ EAST ALONG THE NORTH LINE OF THIS TRACT AND THE SOUTH LINE OF SAID "CALLED" 2.00 ACRES FOR A DISTANCE OF 638.19 FEET TO A 1/2 INCH IRON ROD, WITH CAP, SET IN THE EAST LINE OF SAID 13 ACRES, THE NORTHERNMOST WEST LINE OF SAID 296.061 ACRES AND THE WEST LINE OF THAT CERTAIN "CALLED" 7.58 ACRE TRACT CONVEYED BY WALLIS WILSON SMITH TO R. L. GARZA, ET UX, BY DEED DATED MAY 5, 1980 AND RECORDED IN VOLUME 878 AT

PAGE 801 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS FOR THE SOUTHEAST CORNER OF SAID "CALLED" 2.00 ACRES AND THE NORTHEAST CORNER OF THIS TRACT;

THENCE: SOUTH 00°56'40" EAST ALONG THE EAST LINE OF THIS TRACT, THE WEST LINE OF SAID "CALLED" 7.58 ACRES, THE NORTHERNMOST WEST LINE OF SAID 296.061 ACRES AND THE EAST LINE OF SAID 13 ACRES FOR A DISTANCE OF 265.72 FEET TO A 5/8 INCH IRON ROD, WITH CAP, FOUND FOR THE NORTHEAST CORNER OF THAT CERTAIN 3.0039 ACRES (TRACT 3) SURVEYED THIS DATE AND THE SOUTHEAST CORNER OF THIS TRACT, SAID 3.0039 ACRES BEING THAT SAME LAND "CALLED" 3.00 ACRES (PARCEL C) CONVEYED BY MARY FUSON TO ORVILLE E. MAXFIELD, ET UX, BY DEED DATED JANUARY 24, 1963 AND RECORDED IN VOLUME 560 AT PAGE 196 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS;

THENCE: SOUTH 88°30'41" WEST ALONG THE SOUTH LINE OF THIS TRACT AND THE NORTH LINE OF SAID 3.0039 ACRES FOR A DISTANCE OF 638.68 FEET TO A POINT IN THE WEST LINE OF SAID 13 ACRES AND THE EAST LINE OF SAID 15.0000 ACRES FOR THE NORTHWEST CORNER OF SAID 3.0039 ACRES AND THE SOUTHWEST CORNER OF THIS TRACT;

THENCE: NORTH 00°50'51" WEST ALONG THE WEST LINE OF THIS TRACT, THE WEST LINE OF SAID 13 ACRES AND THE EAST LINE OF SAID 15.0000 ACRES FOR A DISTANCE OF 272.15 FEET TO THE PLACE OF BEGINNING AND CONTAINING WITHIN THESE BOUNDARIES 3.9416 ACRES OF LAND.

PARCEL 4 (SINKOVICS)

TRACT 1:

ALL THAT CERTAIN TRACT OR PARCEL OF LAND LOCATED IN THE B.M. SPINKS SURVEY, ABSTRACT 108, LIBERTY COUNTY, TEXAS, AND BEING A PART OF THAT CERTAIN 70 ACRE TRACT DESCRIBED IN DEED DATE DECEMBER 11, 1924, FROM C.A. MILES TO M.P. DANIEL RECORDED IN VOLUME 123, PAGE 417 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS, AND MORE PARTICULARLY DESCRIBED AS FOLLOWS, TO-WIT:

BEGINNING AT THE NORTHEAST CORNER OF SAID 70 ACRE TRACT; THENCE SOUTH ALONG AND WITH THE EAST LINE OF SAID 70 ACRE TRACT 340.27 VARAS;

THENCE WEST ALONG THE NORTH LINE OF THE MILES 360 ACRE SUBDIVISION 331.818 VARAS CORNER;

THENCE NORTH PARALLEL WITH THE EAST LINE OF SAID 70 ACRE TRACT 340.27 VARAS TO THE NORTH LINE OF SAID 70 ACRE TRACT CORNER;

THENCE EAST ALONG AND WITH THE NORTH LINE OF SAID 70 ACRE TRACT 331.818 VARAS TO THE PLACE OF BEGINNING CONTAINING TWENTY ACRES OF LAND MORE OR LESS.

TRACT 2:

TEN ACRES MORE OR LESS LOCATED IN THE B.M. SPINKS LEAGUE, LIBERTY COUNTY, TEXAS, PART OF WHAT IS COMMONLY KNOWN AS THE AMERICAN LAND AND OIL COMPANY 740 ACRE TRACT AND BEING THE WEST TEN ACRES OF THE MOST EASTERN THIRTY ACRES OF THAT CERTAIN 70 ACRES, WHICH WAS CONVEYED BY C.A. MILES TO M.P. DANIEL ON DECEMBER11, 1924, AS RECORDED IN VOL. 123, PAGE 417 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS, SAID 10 ACRES OF LAND MORE OR LESS BEING DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF THAT CERTAIN 20 ACRES OF LAND, A PART OF SAID 70 ACRE TRACT, WHICH WAS CONVEYED BY M.P. DANIEL TO N.E. LAIDACKER ON MAY 31, 1926, WHICH BEGINNING POINT IS 331.818 VARAS WEST OF THE NORTHEAST CORNER AND ON THE NORTH LINE OF SAID 70 ACRE TRACT;

THENCE SOUTH PARALLEL WITH THE EAST LINE OF SAID 70 ACRE TRACT, 340.27 VARAS, CORNER ON THE SOUTH LINE OF SAID 70 ACRE TRACT, 340.27 VARAS, CORNER ON THE SOUTH LINE OF SAID 70 ACRE TRACT;

THENCE WEST ALONG AND WITH THE SOUTH LINE OF SAID 70 ACRE TRACT 165.909 VARAS, CORNER;

THENCE NORTH PARALLEL WITH THE EAST LINE OF SAID 70 ACRE TRACT 340.27 VARAS TO THE NORTH LINE OF SAID 70 ACRE TRACT;

THENCE EAST ALONG AND WITH THE NORTH LINE OF SAID 70 ACRE TRACT 165.909 VARAS TO THE PLACE OF BEGINNING AND CONTAINING TEN ACRES OF LAND MORE OR LESS.

TRACT 3:

ALL THAT CERTAIN TRACT OR PARCEL OF LAND SITUATED IN B.M. SPINKS LEAGUE, ABSTRACT 108 SITUATED IN LIBERTY COUNTY, TEXAS, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF THE NORTH 380 ACRES OF THE AMERICAN LAND & OIL COMPANY TRACT OF 740 ACRES;

THENCE WITH THE NORTH LINE OF THE C.A. MILES SUBDIVISION OF THE SOUTH 360 ACRES OF SAID 740 ACRE TRACT, EAST TO A POINT ON SAME FROM WHICH A LINE RUNNING NORTH TO THE NORTH LINE OF SAID 740 ACRE TRACT AND PARALLEL WITH THE WEST LINE OF SAID 740 ACRE TRACT WOULD MAKE AND COMPRISE THE EAST LINE OF THE WEST SIXTY ACRES OF SAID NORTH 380 ACRES OF SAID 740 ACRE TRACT;

THENCE NORTH PARALLEL WITH THE WEST LINE OF SAID 740 ACRE TRACT TO A POINT FROM WHICH A LINE RUNNING WEST PARALLEL WITH THE NORTH LINE OF SAID C.A. MILES 360 ACRE SUBDIVISION TO THE WEST LINE OF SAID 740 ACRE TRACT TO THE PLACE OF BEGINNING, WILL INCLUDE TEN ACRES OF LAND, MORE OR LESS, SAID TEN ACRES BEING THE SOUTH TEN ACRES OF THE WEST SIXTY ACRES OF THE NORTH 380 ACRES OF THE 740 ACRE TRACT COMMONLY KNOWN AS THE AMERICAN LAND AND OIL COMPANY TRACT OF THE B.B. SPINKS LEAGUE. THIS TEN ACRES HAVING BEEN DEEDED TO BILL DANIEL BY T.S. BEES IN DEED DATED FEBRUARY 15, 1949 AND RECORDED IN VOL.313, PAGE 242 OF DEED RECORDS OF LIBERTY COUNTY, TEXAS.

TRACT 4:

ALL THAT CERTAIN TRACT OR PARCEL OF LAND IN THE B.M. SPINKS SURVEY, ABSTRACT NO. 108, LIBERTY COUNTY, TEXAS, CONTAINING TWO ACRES, MORE OR LESS, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT AT THE NORTHEAST CORNER OF THE 7.18 ACRE TRACT CONVEYED BY DEED FROM WALLIS WILSON SMITH TO ROOSEVELT BOULLION AND WIFE, MARGARET 0. BOULLION, RECORDED IN VOL. 780, PAGE 274 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS, AND BEING THE NORTHWEST CORNER OF THE 60 FOOT RIGHT OF WAY RECORDED AS PERMANENT EASEMENT IN SAID DEED;

THENCE NORTH 91 DEG 14' WEST ALONG THE NORTH LINE OF THE SAID 7.18 ACRE TRACT FOR A DISTANCE OF 207 FEET TO CORNER;

THENCE SOUTH 0 DEG 34' WEST A DISTANCE OF 420.56 FEET TO CORNER;

THENCE NORTH 89 DEG 14' EAST FOR A DISTANCE OF 205.63 FEET TO THE WEST LINE OF SAID 60 FOOT EASEMENT AND BEING THE SOUTH LINE OF THE 2 ACRE TRACT HEREIN DESCRIBED;

THENCE NORTH 0 DEG 34' EAST FOR A DISTANCE OF 422.61 FEET ALONG THE WEST LINE OF SAID 60 FOOT PERMANENT EASEMENT TO THE POINT OF BEGINNING, CONTAINING 2 ACRES OF LAND, MORE OR LESS.

TRACT 5:

THE WEST FORTY (40) ACRES OF THAT CERTAIN SEVENTY (70) ACRES, A PART OF THE AMERICAN LAND AND OIL COMPANY 740 ACRE TRACT WHICH WAS CONVEYED TO M.P. DANIEL BY C.A. MILES ON DECEMBER 11, 1924 AS RECORDED IN VOLUME 123, PAGE 417 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS.

PARCEL 5 (WOOLEY)

TRACT 1

FIELD NOTES OF A 1.9913 ACRE TRACT OF LAND SITUATED IN THE B. M. SPINKS LEAGUE, ABSTRACT 108, LIBERTY COUNTY, TEXAS, AND BEING OUT OF THAT CERTAIN "CALLED" 300 ACRE TRACT (SURVEYED TO BE 296.061 ACRES) DESCRIBED AS TRACT II CONVEYED BY DONALD R. LANG TO WALLIS WILSON SMITH BY DEED DATED JULY 1, 1976 AND RECORDED IN VOLUME 779 AT PAGE 872 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS. SAID 1.9913 ACRES BEING THAT SAME LAND "CALLED" 1.99 ACRES KNOWN AS TRACT #18-A OF SAID 296.061 ACRES AND BEING THE SAME LAND CONVEYED BY W. W. SMITH TO DON WOOLEY, ET UX, BY DEED DATED JULY 21, 1981 AND RECORDED IN VOLUME 958 AT PAGE 164 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS. THIS 1.9913 ACRE TRACT OF LAND IS MORE PARTICULARLY DESCRIBED BY THE FOLLOWING METES AND BOUNDS, TO-WIT:

NOTE: BEARINGS ARE BASED ON FOUND MONUMENTS IN THE EAST LINE OF THE C. A. MILES SUBDIVISION AND THE EAST LINE OF THE W. W. SMITH TRACT AS SURVEYED BY 3.0. BELCHER, R.P.L.S NO. 1941, IN 1990; SAID LINE HAVE A CONTROL BEARING OF NORTH 01011 '40" WEST. MAP OF SAID MILES SUBDIVISION BEING OF RECORD IN VOLUME 106 AT PAGE 22 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS. SAID W. W. SMITH TRACT BEING THAT SAME TRACT (296.061 ACRES) REFERRED TO ABOVE.

COMMENCING AT A VZ INCH IRON ROD FOUND FOR THE WESTERNMOST SOUTHWEST CORNER OF SAID 296.061 ACRES AND THE NORTHWEST CORNER OF THAT CERTAIN 40 ACRE TRACT OF LAND CONVEYED BY W. C. LEE, JR. RECEIVER, TO JOSEPH SINKOVICS BY DEED DATED DECEMBER 6, 2000 AND RECORDED IN VOLUME 1870 AT PAGE 112 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS.

THENCE: NORTH 89°03'23" EAST ALONG THE WESTERNMOST SOUTH LINE OF SAID 296.061 ACRES AND THE NORTH LINE OF SAID 40 ACRES AND AT 800.03 FEET PASS A 5/8 INCH IRON ROD FOUND FOR THE SOUTHWEST CORNER OF THAT CERTAIN 4.975 ACRE TRACT 1 CONVEYED BY WALLIS W. SMITH TO LIMESTONE LAND CONSERVANCY, INC. BY DEED DATED MAY 1, 2002 AND RECORDED IN VOLUME 1968 AT PAGE 146 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS, IN ALL, A TOTAL DISTANCE OF 1329.97 FEET (CALLED EAST 1331.50 FEET) TO A 1/2 INCH IRON ROD, WITH CAP, SET FOR THE SOUTHEAST CORNER OF SAID 4.975 ACRES AND THE SOUTHWEST CORNER AND POINT OF BEGINNING OF THIS TRACT; FROM WHICH A 5/8 INCH IRON ROD (FOUND) BEARS SOUTH 00°56'21" EAST 1.5 FEET;

THENCE: NORTH 00°56'21" WEST ALONG THE WEST LINE OF THIS TRACT AND THE EAST LINE OF SAID 4.975 ACRES FOR A DISTANCE OF 410.74 FEET (CALLED NORTH

411.16 FEET) TO A ½ INCH IRON ROD, WITH CAP, SET IN THE SOUTH RIGHT-OF-WAY LINE OF FRONTIER PARK ROAD (60 FEET WIDE RIGHT- OF-WAY) FOR THE NORTHEAST CORNER OF SAID 4.975 ACRES AND THE NORTHWEST CORNER OF THIS TRACT; FROM WHICH A 5/8 INCH IRON ROD (FOUND) BEARS SOUTH 00°56′21″ EAST 0.46 FEET;

THENCE: NORTH 88°48′56″ EAST ALONG THE NORTH LINE OF THIS TRACT AND THE SOUTH RIGHT-OF- WAY LINE OF SAID FRONTIER PARK ROAD FOR A DISTANCE OF 210.65 FEET (CALLED NORTH 89°44′ EAST 210.83 FEET) TO A 5/8 INCH IRON ROD FOUND FOR THE NORTHEAST CORNER OF THIS TRACT AND THE NORTHWEST CORNER OF THAT CERTAIN 2.0004 ACRE TRACT (CALLED 2.00 ACRES) SURVEYED THIS DATE. SAID CALLED 2.00 ACRE TRACT BEING THAT SAME LAND KNOWN AS TRACT #18-B OUT OF SAID 296.061 ACRES.
THENCE: SOUTH OL°01′25″ EAST ALONG THE EAST LINE OF THIS TRACT AND THE WEST LINE OF SAID 2.0004 ACRES SURVEYED THIS DATE FOR A DISTANCE OF 411.63 FEET (CALLED SOUTH 412.17 FEET) TO A 1/2 INCH IRON ROD, WITH CAP, SET IN THE WESTERNMOST SOUTH LINE OF SAID 296.061 ACRES AND THE NORTH LINE OF SAID 40 ACRES FOR THE SOUTHEAST CORNER OF THIS TRACT AND THE SOUTHWEST CORNER OF SAID 2.0004 ACRES SURVEYED THIS DATE; FROM WHICH A 5/8 INCH IRON ROD (FOUND) BEARS SOUTH 0L°01 ′25″ EAST 3.10 FEET;

THENCE: SOUTH 89°03′23″ WEST ALONG THE SOUTH LINE OF THIS TRACT, THE WESTERNMOST SOUTH LINE OF SAID 296.061 ACRES AND THE NORTH LINE OF SAID 40 ACRES FOR A DISTANCE OF 211.26 FEET (CALLED WEST 210.83 FEET) TO THE PLACE OF BEGINNING AND CONTAINING WITHIN THESE BOUNDARIES 1.9913 ACRES OF LAND.

TRACT 2

FIELD NOTES OF A 2.0004 ACRE TRACT OF LAND SITUATED IN THE B. M. SPINKS LEAGUE, ABSTRACT 108, LIBERTY COUNTY, TEXAS, AND BEING OUT OF THAT CERTAIN "CALLED" 300 ACRE TRACT (SURVEYED TO BE 296.061 ACRES) DESCRIBED AS TRACT II CONVEYED BY DONALD R. LANG TO WALLIS WILSON SMITH BY DEED DATED JULY 1, 1976 AND RECORDED IN VOLUME 779 AT PAGE 872 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS. SAID 1.9913 ACRES BEING THAT SAME LAND "CALLED" 2.00 ACRES KNOWN AS TRACT #18-B OF SAID 296.061 ACRES AND BEING THE SAME LAND CONVEYED BY W. W. SMITH TO DON WOOLEY, ET UX, BY DEED DATED JULY 21, 1981 AND RECORDED IN VOLUME 958 AT PAGE 164 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS. THIS 2.0004 ACRE TRACT OF LAND IS MORE PARTICULARLY DESCRIBED BY THE FOLLOWING METES AND BOUNDS, TO-WIT:

NOTE: BEARINGS ARE BASED ON FOUND MONUMENTS IN THE EAST LINE OF THE C. A. MILES SUBDIVISION AND THE EAST LINE OF THE W. W. SMITH TRACT AS SURVEYED BY J. 0. BELCHER, R.P.L.S NO. 1941, IN 1990; SAID LINE HAVE A CONTROL

BEARING OF NORTH 01 °L1 '40″ WEST. MAP OF SAID MILES SUBDIVISION BEING OF RECORD IN VOLUME 106 AT PAGE 22 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS. SAID W. W. SMITH TRACT BEING THAT SAME TRACT (296.061 ACRES) REFERRED TO ABOVE.

COMMENCING AT A 1/2 INCH IRON ROD FOUND FOR THE WESTERNMOST SOUTHWEST CORNER OF SAID 296.061 ACRES AND THE NORTHWEST CORNER OF THAT CERTAIN 40 ACRE TRACT OF LAND CONVEYED BY W. C. LEE, JR. RECEIVER, TO JOSEPH SINKOVICS BY DEED DATED DECEMBER 6, 2000 AND RECORDED IN VOLUME 1870 AT PAGE 112 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS;

THENCE: NORTH 89°03'23″ EAST ALONG THE WESTERNMOST SOUTH LINE OF SAID 296.061 ACRES AND THE NORTH LINE OF SAID 40 ACRES AND AT 800.03 FEET PASS A 5/8 INCH IRON ROD FOUND FOR THE SOUTHWEST CORNER OF THAT CERTAIN 4.975 ACRE TRACT 1 CONVEYED BY WALLIS W. SMITH TO LIMESTONE LAND CONSERVANCY, INC. BY DEED DATED MAY 1, 2002 AND RECORDED IN VOLUME 1968 AT PAGE 146 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS, AT 1329.97 FEET (CALLED EAST 1331.50 FEEQ PASS A 1/ 2INCH IRON ROD, WITH CAP, SET FOR THE SOUTHEAST CORNER OF SAID 4.975 ACRES AND THE SOUTHWEST CORNER OF THAT CERTAIN 1.9913 ACRE TRACT SURVEYED THIS DATE (BEING THAT SAME LAND "CALLED" 1.99 ACRES CONVEYED BY W. W. SMITH TO DON WOOLEY, ET UX, BY DEED DATED JULY 21, 1981 AND RECORDED IN VOLUME 958 AT PAGE 164 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS); IN ALL, A TOTAL DISTANCE OF 1541.23 FEET TO A /2 INCH IRON ROD, WITH CAP, SET FOR THE SOUTHEAST CORNER OF SAID 1.99 13 ACRES SURVEYED THIS DATE. SAID POINT BEING THE SOUTHWEST CORNER AND POINT OF BEGINNING OF THIS TRACT; FROM WHICH A 5/8 INCH IRON ROD (FOUND) BEARS SOUTH 01°01 '25″ EAST 3.10 FEET.

THENCE: NORTH 01°01'25″ WEST ALONG THE WEST LINE OF THIS TRACT AND THE EAST LINE OF SAID 1.9913 ACRES SURVEYED THIS DATE FOR A DISTANCE OF 411.63 FEET (CALLED NORTH 412.17 FEET) TO A 5/8 INCH IRON ROD FOUND IN THE SOUTH RIGHT-OF-WAY LINE OF FRONTIER PARK ROAD (60 FEET WIDE RIGHT-OF-WAY) FOR THE NORTHEAST CORNER OF SAID 1.9913 ACRES SURVEYED THIS DATE AND THE NORTHWEST CORNER OF THIS TRACT;

THENCE: NORTH 88°48'56″ EAST ALONG THE NORTH LINE OF THIS TRACT AND THE SOUTH RIGHT-OF- WAY LINE OF SAID FRONTIER PARK ROAD FOR A DISTANCE OF 210.97 FEET (CALLED NORTH 89°44' EAST 210.83 FEET) TO A 5/8 INCH IRON ROD FOUND FOR THE NORTHEAST CORNER OF THIS TRACT AND THE NORTHWEST CORNER OF THAT CERTAIN CALLED 2.00 ACRE TRACT BEING THAT SAME LAND KNOWN AS TRACT #18-C OUT OF SAID 296.061 ACRES. SAID 2.00 ACRES (TRACT #18-C) BEING THAT SAME LAND CONVEYED BY DON WOOLEY, ET UX, TO CLEVELAND M. FAIRCHILD BY DEED DATED NOVEMBER 3, 1997 AND RECORDED IN VOLUME 1693 AT PAGE 831 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS;

THENCE: SOUTH 01°09'43" EAST ALONG THE EAST LINE OF THIS TRACT AND THE WEST LINE OF SAID 2.00 ACRES CONVEYED TO FAIRCHILD FOR A DISTANCE OF 412.52 FEET (CALLED SOUTH 413.18 FEET) TO A 1/2 INCH IRON ROD FOUND IN THE WESTERNMOST SOUTH LINE OF SAID 296.061 ACRES AND THE NORTH LINE OF SAID 40 ACRE TRACT FOR THE SOUTHEAST CORNER OF THIS TRACT AND THE SOUTHWEST CORNER OF SAID 2.00 ACRES CONVEYED TO FAIRCHILD;

THENCE: SOUTH 89°03'23" WEST ALONG THE SOUTH LINE OF THIS TRACT, THE WESTERNMOST SOUTH LINE OF SAID 296.061 ACRES AND THE NORTH LINE OF SAID 40 ACRES FOR A DISTANCE OF 211.96 FEET (CALLED WEST 210.83 FEET) TO THE PLACE OF BEGINNING AND CONTAINING WITHIN THESE BOUNDARIES 2.0004 ACRES OF LAND.

TRACT 3

FIELD NOTES OF A 10.0049 ACRE TRACT OF LAND SITUATED IN THE B. M. SPINKS
LEAGUE, ABSTRACT 108, LIBERTY COUNTY, TEXAS, AND BEING OUT OF THAT
CERTAIN "CALLED" 300 ACRE TRACT (SURVEYED TO BE 296.06 1 ACRES) DESCRIBED
AS TRACT II CONVEYED BY DONALD R. LANG TO WALLIS WILSON SMITH BY DEED
DATED JULY 1, 1976 AND RECORDED IN VOLUME 779 AT PAGE 872 OF THE DEED
RECORDS OF LIBERTY COUNTY, TEXAS. SAID 10.0049 ACRES BEING THAT SAME
LAND "CALLED" 10.00 ACRES KNOWN AS TRACT #18-C OF SAID 296.061 ACRES AND
BEING THE SAME LAND CONVEYED BY W'. W. SMITH TO DON WOOLEY, ET UX, BY
DEED DATED JULY 21, 1981 AND RECORDED IN VOLUME 958 AT PAGE 173 OF THE
DEED RECORDS OF LIBERTY COUNTY, TEXAS. THIS L0,0049 ACRE TRACT OF LAND IS
MORE PARTICULARLY DESCRIBED BY THE FOLLOWING METES AND BOUNDS, TO-WIT:

NOTE: BEARINGS ARE BASED ON FOUND MONUMENTS IN THE EAST LINE OF THE C.
A. MILES SUBDIVISION AND THE EAST LINE OF THE W. W, SMITH TRACT AS
SURVEYED BY .1. 0. BELCHER, R.P.L.S NO. 1941, IN 1990; SAID LINE HAVE A
CONTROL BEARING OF NORTH 01011 '40" WEST. MAP OF SAID MILES SUBDIVISION
BEING OF RECORD IN VOLUME 106 AT PAGE 22 OF THE DEED RECORDS OF LIBERTY
COUNTY, TEXAS. SAID W. W, SMITH TRACT BEING THAT SAME TRACT (296.061
ACRES) REFERRED TO ABOVE.

COMMENCING AT A 5/8 INCH IRON ROD FOUND IN THE NORTH LINE OF THE C. A.
MILES SUBDIVISION AT THE SOUTHERNMOST SOUTHWEST CORNER OF SAID 296.061
ACRES AND THE SOUTHWEST CORNER OF THAT CERTAIN, CALLED 10.00 ACRES
CONVEYED BY EARL A. BARKER, ET MC, TO LIMESTONE LAND CONSERVANCY, INC. BY
DEED DATED APRIL 3, 2002 AND RECORDED IN VOLUME 1960 AT PAGE 820 OF THE
OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS; FROM WHICH A 3/4 INCH
SUCKER ROD FOUND FOR THE NORTHWEST CORNER OF LOT 29 OF SAID MILES
SUBDIVISION BEARS SOUTH 89°01'20" WEST 81.87 FEET;

THENCE: NORTH 89°01'20" EAST ALONG THE EASTERNMOST SOUTH LINE OF SAID
296.061 ACRES, THE NORTH LINE OF SAID MILES SUBDIVISION, THE SOUTH LINE OF
SAID LIMESTONE LAND 10.00 ACRES AND THC SOUTH LINE OF THAT CERTAIN
CALLED 10.00 ACRE TRACT CONVOYED BY RAY CAVENDER, ET UX. TO FORREST
PURVIS BY DEED DATED JULY 26, 2001 AND RECORDED IN VOLUME 1909 AT PAGE
262 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS, FOR A
DISTANCE OF 816.35 FEET (CALLED EAST 816.64 FEET) TO A 1/2 INCH IRON ROD,
WITH CAP, SET FOR THE SOUTHEAST CORNER OF SAID PURVIS 10.00 ACRES AND
THE SOUTHWEST CORNER AND POINT OF BEGINNING OF THIS TRACT.

THENCE: NORTH 00°55'04" WEST ALONG THE WEST LINE OF THIS TRACT AND THE
EAST LINE OF SAID PURVIS 10.00 ACRES FOR A DISTANCE OF 965.64 FEET (CALLED
NORTH 964.94 FEET) TO A 1/2 INCH IRON ROD, WITH CAP, SET IN THE SOUTH

RIGHT-OF-WAY LINE OF FRONTIER PARK ROAD (60 FEET WIDE RIGHT-OF-WAY) FOR THE NORTHEAST CORNER OF SAID PURVIS 10.00 ACRES AND THE NORTHWEST CORNER OF THIS TRACT;

THENCE: NORTH 88°31′56″ EAST ALONG THE NORTH LINE OF THIS TRACT AND. THE SOUTH RIGHT-OF- WAY LINE OF SAID FRONTIER PARK ROAD FOR A DISTANCE OF 450.44 FEET (CALLED NORTH 89°27′ EAST 450.44 FEET) TO A 1/2 INCH IRON ROD, WITH CAP, SET FOR THE NORTHWEST CORNER OF THAT CERTAIN CALLED 10.00 ACRES CONVEYED BY W. W. SMITH TO DONALD RAY & BILLIE LANNOM BY DEED DATED JUNE 3, 1980 AND RECORDED IN VOLUME 858 AT PAGE 922 OF THE DEED RECORDS OF LIBERTY COUNTY, TEXAS, SAID POINT BEING THE NORTHEAST CORNER OF THS TRACT;

THENCE: SOUTH 00°55′04″ EAST ALONG THE EAST LINE OF THIS TRACT AND THE WEST LINE OF SAID LANNOM TRACT FOR A DISTANCE OF 969.50 FEET (CALLED SOUTH 969.27 FEET) TO A 1/2 INCH IRON ROD, WITH CAP, SET IN THE EASTERNMOST SOUTH LINE OF SAID 296.061 ACRES AND THE NORTH LINE OF SAID MILES SUBDIVISION FOR THE SOUTHWEST CORNER OF SAID LANNOM TRACT AND THE SOUTHEAST CORNER OF THIS TRACT;

THENCE: SOUTH 89°01′20″ WEST ALONG THE SOUTH LINE OF THIS TRACT, THE EASTERNMOST SOUTH LINE OF SAID 296.061 ACRES AND THE NORTH LINE OF SAID MILES SUBDIVISION FOR A DISTANCE OF 450.42 FEET (CALLED WEST 450.42 FEET) TO THE PLACE OF BEGINNING AND CONTAINING WITHIN THESE BOUNDARIES 10.0049 ACRES OF LAND.

PARCEL 6 (LIMESTONE LAND CONSERVANCY, INC.)

TRACT 1

A PART OF THE 296.061 ACRE TRACT (CALLED 300 ACRES) OUT OF THE B M SPINKS SURVEY, LIBERTY COUNTY, TEXAS, BEING THAT TRACT DESENBED IN DEED FROM WLLLIARN ZALE WOODWARD AND EMMETT CLAYTON TO DEMPSIE HENLEY, DATED OCTOBER 7, 1968 AND RECORDED IN VOLUME 642, PAGE 548 OF THE LIBERTY COUNTY DEED RECORDS, DEED FROM J F BISHOP TO LEW BEARDEN AS RECORDED IN VOLUME 648, PAGE 418 OF THE LIBERTY COUNTY DEED RECORDS, DEED FROM DEMPSIE HENLEY TO LEW BEARDEN RECORDED IN LIBERTY COUNTY DEED RECORDS AND TWO (2) DEEDS FROM LEW BEARDEN TO DONALD R LANG, ONE FOR 5/6THS INTEREST DATED MAY 29, 1969, RECORDED IN LIBERTY COUNTY DEED RECORDS AND ONE FOR 1/6TH INTEREST DATED JULY 8, 1969, RECORDED IN VOLUME 648, PAGE 421 OF LIBERTY COUNTY DEED RECORDS, SAID BEING THAT SAME LAND "CALLED" 1000 ACRES OF LAND CONVEYED BY EARL A BARKER, ET UX, TO LIMESTONE LAND CONSERVANCY, INC BY DEED DATED APRIL 3, 2002 AND RECORDED IN VOLUME 1960 AT PAGE 821 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS, THE PORTION HERENOW GRANTED, SOLD AND CONVEYED BEING KNOWN AS TRACT NO TWENTY-ONE (21) OF SAID 296.061 ACRE TRACT NOW SUBDIVIDED AND IS DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT AN IRON STAKE SET FOR MOST SOUTHERLY SOUTHWEST CORNER OF THE SAID 296.061 ACRE TRACT OF LAND, SAME BEING THE SOUTHWEST CORNER THIS TRACT DESCRIBED AND PLACE OF BEGINNING;

THENCE NORTH A DISTANCE OF 945 20 FEET TO AN IRON ROD SET FOR CORNER THIS TRACT DESCRIBED (ALSO IN THE SOUTHERN BOUNDARY LINE OF SAID 296.061 ACRES TRACT);

THENCE NORTH 1 DEG 59 MIN WEST A DISTANCE OF 432 84 FEET TO AN IRON ROD SET IN THE SOUTH MARGIN OF A 60 FOOT ROAD FOR THE NORTHWEST CORNER THIS TRACT DESCRIBED;

THENCE SOUTH 45 DEG 24 MIN EAST 533 55 FEET ALONG THE SOUTH MARGIN OF SAID 60 FOOT ROAD TO POINT FOR NORTHEAST CORNER THIS TRACT DESCRIBED;

THENCE SOUTH A DISTANCE OF 1,003 15 FEET TO AN IRON ROD FOR SOUTHEAST CORNER THIS TRACT DESCRIBED IN THE SOUTHERN BOUNDARY LINE OF SAID 296.061 ACRE TRACT;

THENCE WEST 365 21 FEET ALONG THE SOUTHERN BOUNDARY LINE OF SAID 296.061 ACRE TRACT TO THE PLACE OF BEGINNING, CONTAINING 10.0 ACRES, MORE OR LESS

TRACT 2:

EASEMENT DESCRIPTION

A 60.0 FOOT ROAD EASEMENT OUT OF SAID ABOVE-DESCRIBED 296.061 ACRE TRACT;
BEGINNING AT A POINT, AN IRON ROD, SET SOUTH 687.80 FEET FROM THE NORTHWEST CORNER OF SAID 296.061 ACRE TRACT, SAID IRON ROD SET IN THE NORTH MARGIN OF THE ROAD EASEMENT HERENOW DESCRIBED AND BEGINNING POINT;

THENCE NORTH 62 DEG 28 MIN EAST A DISTANCE OF 711.60 FEET ALONG THE NORTH MARGIN THIS ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE NORTH 89 DEG 44 MIN EAST A DISTANCE OF 1,829.80 FEET ALONG THE NORTH MARGIN OF SAID ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE NORTH 89 DEG 14MIN EAST A DISTANCE OF 1,235.15 FEET ALONG THE NORTH MARGIN OF SAID ROAD TO IRON ROD FOR CORNER;

THENCE SOUTH 45 DEG 24 MIN EAST A DISTANCE OF 593.85 FEET ALONG THE NORTH MARGIN OF SAID ROAD TO IRON ROD FOR CORNER;

THENCE NORTH 89 DEG 27 MIN EAST A DISTANCE OF 2,891.85 FEET ALONG THE NORTH MARGIN OF SAID ROAD TO IRON ROD FOR CORNER;

THENCE NORTH 89 DEG 46 MIN EAST A DISTANCE OF 264.38 FEET ALONG THE NORTH MARGIN OF SAID ROAD TO IRON ROD FOR CORNER;

THENCE NORTH 89 DEG 36 MIN EAST A DISTANCE OF 41.45 FEET TO IRON ROD FOR CORNER;

THENCE NORTH 89 DEG 37 MIN EAST A DISTANCE OF 1,922.90 FEET ALONG THE NORTH MARGIN OF SAID ROAD TO AN IRON ROD SET FOR NORTHEAST CORNER OF THIS ROAD EASEMENT;

THENCE SOUTH 0 DEG 13 MIN EAST A DISTANCE OF 600 FEET ALONG THE EASTERN BOUNDARY LINE OF SAID 296.061 ACRE TRACT TO POINT FOR SOUTHEAST CORNER THIS ROAD EASEMENT;

THENCE SOUTH 89 DEG 37 MIN WEST A DISTANCE OF 1,900.60 FEET ALONG THE SOUTH MARGIN OF SAID ROAD TO IRON ROD FOR CORNER;

THENCE SOUTH 88 DEG 27 MIN WEST A DISTANCE OF 51.80 FEET ALONG THE SOUTH MARGIN OF SAID ROAD TO IRON ROD FOR CORNER;

THENCE NORTH 89 DEG 46 MIN WEST A DISTANCE OF 276.30 FEET ALONG THE SOUTH MARGIN OF SAID ROAD TO IRON ROD FOR CORNER;

THENCE SOUTH 89 DEG 27 MIN WEST A DISTANCE OF 2,196.12 FEET ALONG THE SOUTH MARGIN OF SAID ROAD TO IRON ROD FOR CORNER;

THENCE NORTH 45 DEG 24 MIN WEST A DISTANCE OF 593.55 FEET ALONG THE SOUTH MARGIN OF SAID ROAD TO IRON ROD FOR CORNER;

THENCE SOUTH 89 DEG 14 MIN WEST A DISTANCE OF 1,210.20 FEET ALONG THE SOUTH MARGIN OF SAID ROAD TO IRON ROD FOR CORNER;

THENCE SOUTH 89 DEG 44 MIN WEST A DISTANCE OF 1,815.70 FEET ALONG THE SOUTH MARGIN OF SAID ROAD TO IRON ROD FOR CORNER;

THENCE SOUTH 62 DEG 28 MIN WEST A DISTANCE OF 728.10 FEET ALONG THE SOUTH MARGIN OF SAID ROAD EASEMENT ON THE 296.061 ACRE TRACT;

THENCE NORTH A DISTANCE OF 67.73 FEET ALONG THE WEST LINE OF SAID 296.061 ACRE TRACT (CALLED 300 ACRE TRACT) TO THE PLACE OF BEGINNING.

PARCEL 7 (LIMESTONE LAND CONSERVANCY, INC.)

TRACT 1: SURFACE ONLY

A PART OF THE 296.061 ACRE TRACT (CALLED 300 ACRES) OUT OF THE B M SPINKS SURVEY, LIBERTY COUNTY, TEXAS, BEING THAT TRACT DESCRIBED IN DEED FROM WILLIAM ZANE WOODWARD AND EMMETT CLAYTON TO DEMPSIE HENLEY, DATED OCTOBER 7TH, 1968 AND RECORDED IN VOLUME 642, PAGE 548 OF THE LIBERTY COUNTY DEED RECORDS, DEED FROM J E BISHOP TO LEW BEARDEN AS RECORDED IN VOLUME 648, PAGE 418 OF LIBERTY COUNTY DEED RECORDS, DEED FROM DEMPSIE HENLEY TO LEW BEARDEN RECORDED IN DEED RECORDS OF LIBERTY COUNTY, TEXAS, AND TWO (2) DEEDS FROM LEW BEARDEN TO DONALD R LANG, ONE FOR 5/8THS, INTEREST DATED MAY 29, 1969 RECORDED IN THE DEED RECORDS OF LIBERTY COUNTY, TEXAS, AND ONE DATED JULY 8TH, 1969 FOR A 1/6TH INTEREST RECORDED IN VOLUME 648, PAGE 421 OF THE LIBERTY COUNTY DEED RECORDS, SAID BEING THAT SAME LAND CONVEYED BY MILLARD EDWARD MLXON, ET UX, TO LIMESTONE LAND CONSERVANCY, INC BY DEED DATED MARCH 26, 2002 AND RECORDED IN VOLUME 1960, PAGE 818 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS, THE PORTION HERENOW BEING GRANTED, SOLD AND CONVEYED BEING A TRACT OF LAND KNOWN AS TRACT NO TWENTY (20) OF A PLAT PREPARED BY WARD 3 BENOIT, REGISTERED SURVEYOR, JUNE 28, 1976, AND DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT AN IRON ROD SET IN THE SOUTH LINE OF' SAID 296.061 ACRE TRACT (CALLED 300 ACRES), ALSO EAST A DISTANCE OF 2,980.73 FEET FROM THE MOST WESTERLY SOUTHWEST CORNER OF THE SAID 296.061 ACRE TRACT, SAID IRON ROD BEING THE SOUTHWEST CORNER THIS TRACT DESCRIBED AND PLACE OF BEGINNING;

THENCE NORTH 0 DEG 34 MIN EAST A DISTANCE OF 422.70 FEET TO AN IRON PIPE FOR THE NORTHWEST CORNER THIS TRACT DESCNBED IN THE SBL OF A 60 FOOT DIRT ROAD;

THENCE NORTH 89 DEG 14 MIN EAST A DISTANCE OF 686.54 FEET ALONG THE SBL OF SAID 60 FOOT DIRT ROAD TO AN IRON ROD FOR THE NORTHEAST CORNER THIS TRACT DESCRIBED;

THENCE SOUTH 1 DEG 59 MIN EAST A DISTANCE OF 432.84 FEET TO AN IRON ROD FOR THE SOUTHEAST CORNER OF THIS TRACT DESCRIBED;

THENCE WEST A DISTANCE OF 706.20 FEET ALONG THE SOUTH LINE OF SAID 296.061 ACRE TRACT TO THE PLACE OF BEGINNING, AND CONTAINING 6.82 ACRES OF LAND, MORE OR LESS

PERMANENT ACCESS TO SAID PROPERTY IS GRANTED IN DEED DATED JULY 1, 1976 AND RECORDED IN DEED RECORDS OF LIBERTY COUNTY, TEXAS, AND THE PERMANENT ROAD EASEMENT IS FOR PERMANENT USE OF OWNERS OF PROPERTY IN SAID 296.061 ACRE TRACT, THEIR HEIRS, ASSIGNS, AGENTS AND LEGAL REPRESENTATIVES FOR INGRESS AND EGRESS.

TRACT 2:

EASEMENT DESCRIPTION

A 60.0 FOOT ROAD EASEMENT OUT OF SAID ABOVE-DESCRIBED 296.061 ACRE TRACT.

BEGINNING AT A POINT, AN IRON ROD, SET SOUTH 687.80 FEET FROM THE NORTHWEST CORNER OF SAID 296.061 ACRE TRACT, SAID IRON ROD SET IN THE NORTH MARGIN OF THE ROAD EASEMENT HERENOW DESCRIBED AND BEGINNING POINT;

THENCE NORTH 62 DEG 28MIN EAST A DISTANCE OF 711.60 FEET ALONG THE NORTH MARGIN THIS ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE NORTH 89 DEG 44 MIN EAST A DISTANCE OF 1,829.80 FEET ALONG THE NORTH MARGIN OF SAID ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE NORTH 89 DEG 14 MIN EAST A DISTANCE OF 1,235.15 FEET ALONG THE NORTH MARGIN OF SAID ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE SOUTH 45 DEG 24 MIN EAST A DISTANCE OF 593.85 FEET ALONG THE NORTH MARGIN OF SAID ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE NORTH 89 DEG 27MIN EAST A DISTANCE OF 2,891.85 FEET ALONG THE NORTH MARGIN OF SAID ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE NORTH 89 DEG 46 MIN EAST A DISTANCE OF 264.38 FEET ALONG THE NORTH MARGIN OF SAID ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE NORTH 89 DEG 36 MIN EAST A DISTANCE OF 41.45 FEET TO IRON ROD FOR CORNER;

THENCE NORTH 89 DEG 37 MIN EAST A DISTANCE OF 1,922.90 FEET ALONG THE NORTH MARGIN OF SAID ROAD EASEMENT TO AN IRON ROD SET FOR NORTHEAST CORNER OF THIS ROAD EASEMENT;

THENCE SOUTH 0 DEG 13 MIN EAST A DISTANCE OF 60.0 FEET ALONG THE EASTERN BOUNDARY LINE OF SAID 296.061 ACRE TRACT TO POINT FOR SOUTHEAST CORNER THIS ROAD EASEMENT;

THENCE SOUTH 89 DEG 37 MIN WEST A DISTANCE OF 1,900.60 FEET ALONG THE SOUTH MARGIN OF SAID ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE SOUTH 88 DEG 27MIN WEST A DISTANCE OF 51.80 FEET ALONG THE SOUTH MARGIN OF SAID ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE NORTH 89 DEG 46 MIN WEST A DISTANCE OF 276.30 FEET ALONG THE SOUTH MARGIN OF SAID ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE SOUTH 89 DEG 27 MIN WEST A DISTANCE OF 2,196.12 FEET ALONG THE SOUTH MARGIN OF SAID ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE NORTH 45 DEG 24 MIN WEST A DISTANCE OF 593.55 FEET ALONG THE SOUTH MARGIN OF SAID ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE SOUTH 89 DEG 14 MIN WEST A DISTANCE OF 1,210.20 FEET ALONG THE SOUTH MARGIN OF SAID ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE SOUTH 89 DEG 44 MIN WEST A DISTANCE OF 1,815.70 FEET ALONG THE SOUTH MARGIN OF SAID ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE SOUTH 62 DEG 28 MIN WEST A DISTANCE OF 728.10 FEET ALONG THE SOUTH MARGIN OF SAID ROAD TO IRON ROD FOR CORNER, SAID POINT BEING THE SOUTHWEST CORNER OF THIS ROAD EASEMENT ON THE 296.061 ACRE TRACT;

THENCE NORTH A DISTANCE OF 67.73 FEET ALONG THE WEST LINE OF SAID 296.061 ACRE TRACT (CALLED 300 ACRE TRACT) TO THE PLACE OF BEGINNING.

ALL PARTIES OWNING THIS ROAD EASEMENT AGREE TO CONVEY OR CAUSE TO BE CONVEYED THIS ROAD EASEMENT TO COUNTY OF LIBERTY OR STATE OF TEXAS FOR ROAD PURPOSES AT ANY TIME LIBERTY COUNTY OR THE STATE OF TEXAS MAY WISH TO ACQUIRE SAME.

PARCEL 8 (LIMESTONE LAND CONSERVANCY, INC)

TRACT 1: SURFACE ONLY

A PART OF THE 296.061 ACRE TRACT (CALLED 300 AC) OUT OF THE B M SPINKS SURVEY, LIBERTY COUNTY, TEXAS, BEING THAT TRACT DESCRIBED IN DEED FROM WILLIAM ZANE WOODWARD AND EMMETT CLAYTON TO DEMPSIE HEN'EY DATED OCTOBER 7TH, 1968 AND RECORDED IN VOL 642, PAGE 548 OF THE LIBERTY COUNTY DEED RECORDS, DEED FROM S B BISHOP TO LEW BEARDEN AS RECORDED IN VOL 648, PAGE 418 OF LIBERTY COUNTY DEED RECORDS, DEED FROM DEMPSIE HENLEY TO LEW BEARDEN RECORDED IN DEED RECORDS OF LIBERTY COUNTY, TEXAS, AND TWO (2) DEEDS FROM LEW BEARDEN TO DONALD R LANG, ONE FOR 5/6THS INTEREST DATED MAY 29TH, 1959 RECORDED IN DEED RECORDS OF LIBERTY COUNTY, TEXAS AND ONE DATED JULY 8TH, 1969 FOR 1/6TH INTEREST RECORDED IN VOL 648, PAGE 421 OF LIBERTY COUNTY DEED RECORDS, SAID BEING THAT SAME LAND "CALLED' 5 0 ACRES OF LAND CONVEYED BY DOUGLAS K TRAYLOR TO LIMESTONE LAND CONSERVANCY, INC BY DEED DATED AUGUST 24, 2001 AND RECORDED IN VOLUME 1915, PAGE 101 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS, THE PORTION HERENOW BEING SOLD AND CONVEYED BEING KNOWN AS A PART OF TRACT NO 17 OF SURVEYED PLAT BY WARD BENOIT, NO 1123, DATED JUNE 28TH, 1976, BUT IDENTIFIED BY THE LIBERTY COUNTY APPRAISAL DISTRICT AS TRACT NO 12, NOT 17, AND DESCRIBED MORE PARTICULARLY BY METES AND BOUNDS AS FOLLOWS
BEGINNING AT MOST NORTHLY SOUTHWEST CORNER OF THE SAID 296.061 ACRE TRACT, SAID POINT BEING THE SOUTHWEST CORNER OF THE FIVE (5 0) ACRE TRACT HERENOW DESCRIBED;

THENCE NORTH 71.50 FT TO POINT IN WBL OF SAID 296.061 AC TRACT, SAID POINT BEING IN THE SBL OF 60 FT PERPETUAL ROAD EASEMENT HEREINAFTER DESCRIBED;

THENCE N 62° 28' E ALONG SBL SAID ROAD EASEMENT A DISTANCE OF 718.10 FT TO POINT IN THE SBL SAID ROAD EASEMENT;

THENCE N 89° 44' E ALONG SBL SAID ROAD EASEMENT A DISTANCE OF 156.37 FT TO POINT FOR NORTHEAST CORNER THIS TRACT DESCRIBED;

THENCE SOUTH A DISTANCE OF 411.16 FT, MORE OR LESS, BUT IN ANY EVENT TO THE SBL OF SAID 296.061 AC TRACT;

THENCE 802.0 FT WEST ALONG THE SOUTH BOUNDARY LINE OF SAID 296.061 AC TRACT TO THE PLACE OF BEGINNING, AND CONTAINING FIVE (5 0 AC) ACRES OF LAND. PERMANENT ACCESS TO SAID PROPERTY IS GRANTED TO SELLER IN DEED DATED JULY 1, 1976 AND RECORDED IN LIBERTY COUNTY DEED RECORDS AND THE PERMANENT ROAD EASEMENT IS GRANTED FOR THE PERMANENT USE OF OWNERS

OF PROPERTY IN SAID 296.061 ACRE TRACT, THEIR HEIRS, ASSIGNS, AGENTS AND LEGAL REPRESENTATIVES FOR INGRESS AND EGRESS.

TRACT 2:

EASEMENT DESCRIPTION

A 60.0 FOOT ROAD EASEMENT OUT OF SAID ABOVE-DESCRIBED 296.061 ACRE TRACT.

BEGINNING AT A POINT, AN IRON ROD, SET SOUTH 687.80 FEET FROM THE NORTHWEST CORNER OF SAID 296.061 ACRE TRACT, SAID IRON ROD SET IN THE NORTH MARGIN OF THE ROAD EASEMENT HERENOW DESCRIBED AND BEGINNING POINT;

THENCE NORTH 62 DEG 28MIN EAST A DISTANCE OF 711.60 FEET ALONG THE NORTH MARGIN THIS ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE NORTH 89 DEG 44 MIN EAST A DISTANCE OF 1,829.80 FEET ALONG THE NORTH MARGIN OF SAID ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE NORTH 89 DEG 14 MIN EAST A DISTANCE OF 1,235.15 FEET ALONG THE NORTH MARGIN OF SAID ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE SOUTH 45 DEG 24 MIN EAST A DISTANCE OF 593.85 FEET ALONG THE NORTH MARGIN OF SAID ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE NORTH 89 DEG 27MIN EAST A DISTANCE OF 2,891.85 FEET ALONG THE NORTH MARGIN OF SAID ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE NORTH 89 DEG 46 MIN EAST A DISTANCE OF 264.38 FEET ALONG THE NORTH MARGIN OF SAID ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE NORTH 89 DEG 36 MIN EAST A DISTANCE OF 41.45 FEET TO IRON ROD FOR CORNER;

THENCE NORTH 89 DEG 37 MIN EAST A DISTANCE OF 1,922.90 FEET ALONG THE NORTH MARGIN OF SAID ROAD EASEMENT TO AN IRON ROD SET FOR NORTHEAST CORNER OF THIS ROAD EASEMENT;

THENCE SOUTH 0 DEG 13 MIN EAST A DISTANCE OF 60.0 FEET ALONG THE EASTERN BOUNDARY LINE OF SAID 296.061 ACRE TRACT TO POINT FOR SOUTHEAST CORNER THIS ROAD EASEMENT;

THENCE SOUTH 89 DEG 37 MIN WEST A DISTANCE OF 1,900.60 FEET ALONG THE SOUTH MARGIN OF SAID ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE SOUTH 88 DEG 27MIN WEST A DISTANCE OF 51.80 FEET ALONG THE SOUTH MARGIN OF SAID ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE NORTH 89 DEG 46 MIN WEST A DISTANCE OF 276.30 FEET ALONG THE SOUTH MARGIN OF SAID ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE SOUTH 89 DEG 27 MIN WEST A DISTANCE OF 2,196.12 FEET ALONG THE SOUTH MARGIN OF SAID ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE NORTH 45 DEG 24 MIN WEST A DISTANCE OF 593.55 FEET ALONG THE SOUTH MARGIN OF SAID ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE SOUTH 89 DEG 14 MIN WEST A DISTANCE OF 1,210.20 FEET ALONG THE SOUTH MARGIN OF SAID ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE SOUTH 89 DEG 44 MIN WEST A DISTANCE OF 1,815.70 FEET ALONG THE SOUTH MARGIN OF SAID ROAD EASEMENT TO IRON ROD FOR CORNER;

THENCE SOUTH 62 DEG 28 MIN WEST A DISTANCE OF 728.10 FEET ALONG THE SOUTH MARGIN OF SAID ROAD TO IRON ROD FOR CORNER, SAID POINT BEING THE SOUTHWEST CORNER OF THIS ROAD EASEMENT ON THE 296.061 ACRE TRACT;

THENCE NORTH A DISTANCE OF 67.73 FEET ALONG THE WEST LINE OF SAID 296.061 ACRE TRACT (CALLED 300 ACRE TRACT) TO THE PLACE OF BEGINNING.

ALL PARTIES OWNING THIS ROAD EASEMENT AGREE TO CONVEY OR CAUSE TO BE CONVEYED THIS ROAD EASEMENT TO COUNTY OF LIBERTY OR STATE OF TEXAS FOR ROAD PURPOSES AT ANY TIME LIBERTY COUNTY OR THE STATE OF TEXAS MAY WISH TO ACQUIRE SAME.

PARCEL 9 (LIMESTONE LAND CONSERVANCY, INC.)

TRACT 1:

ALL AND SINGULAR A CERTAIN LOT, TRACT OR PARCEL OF LAND, AND BEING THE EAST THIRTY (E 30) ACRES OF THAT CERTAIN 34 2/3 ACRE TRACT OF LAND DESCRIBED AS FOLLOWS, TO WIT:

LYING AND BEING SITUATED IN THE COUNTY OF LIBERTY, AND STATE OF TEXAS, KNOWN AND DESIGNATED AS A PART OF THE B M SPINKS LEAGUE, ABSTRACT NO 108 AND BEING THE MOST SOUTHERN 34 2/3 ACRES OF THE FOLLOWING DESCRIBED 104.1 ACRE TRACT, SET ASIDE TO C A MILES BY DECREE OF THE DISTRICT COURT OF LIBERTY COUNTY, TEXAS, ON THE 3RD DAY OF MARCH, 1921, AS SHOWN OF RECORD IN VOLUME I, PAGE 176, OF THE MINUTES OF THE DISTRICT COURT OF SAID COUNTY, THE TRACT OF LAND OF WHICH THE 34 2/3 ACRES IS THE MOST SOUTHERN PART, SAID BEING THAT SAME LAND "CALLED" 300 ACRES OF LAND CONVEYED BY R U CARTER, ET UX, TO LIMESTONE LAND CONSERVANCY, INC BY DEED DATED FEBRUARY 3, 2002 AND RECORDED IN VOLUME 1947, PAGE 514 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS, THE PORTION HERENOW GRANTED, SOLD AND CONVEYED BEING DESCRIBED MORE PARTICULARLY BY METES AND BOUNDS AS FOLLOWS;

BEGINNING AT A POINT ON THE SOUTH LINE OF THE J A WORTHY TRACT, 30 FEET EAST OF THE LIBERTY AND WALLISVILLE ROAD, AN IRON STAKE FOR CORNER, FROM WHICH A 14 INCH BLACK GUM MARKED X BEARS SOUTHWEST 27 VARAS;

THENCE NORTH 88 1/2 DEGREES WEST WITH SAID LINE 1058 VARAS TO A CYPRESS STAKE FOR CORNER IN THE WEST LINE OF A TRACT KNOWN AS THE AMERICAN LAND & OIL COMPANY'S 756-ACRE TRACT IN THE SAID SPINKS LEAGUE;

THENCE NORTH 1 1/2 DEGREES WEST WITH SAID LINE 501-4/10 VARAS TO AN IRON STAKE IN THE NORTH LINE OF SAID SPINKS LEAGUE;

THENCE SOUTH 88 1/2 DEGREES WEST WITH SAID LINE AT 307-7/10 VARAS PASS AN IRON PIPE FOR THE SOUTHEAST CORNER OF THE YOACUM SURVEY, AT 1222-7/10 VARAS AN IRON BAR FOR CORNER, 30 FEET FROM CENTER OF ROAD, FROM WHICH A RED OAK MARKED X BEARS NORTH 52 DEGREES WEST 8 VARAS;

THENCE WITH THE EAST MARGIN OF SAID ROAD AS FOLLOWS SOUTH 19 DEGREES EAST
200 VARAS, SOUTH 9-3/4 DEGREES EAST 182 VARAS, SOUTH 5-3/4 DEGREES EAST 141
VARAS, CONTAINING 104.1 ACRES OF LAND, AS SURVEYED BY H O COMPTON ON NOVEMBER 18TH, 1920

TRACT 2:

THE EAST FIVE (5) ACRES OF THAT CERTAIN TWENTY THREE (23) ACRES OUT OF THE B M SPINKS LEAGUE PURCHASED BY R G PARTLOW FROM ORLANDO HYLTON, AND BEING THE EAST ONE-HALF(E -1/2) OF THE ORLANDO HYLTON FORTY-SIX (46) ACRE TRACT, AND ALSO BEING A PART OF THE JOHNS SIX HUNDRED FORTY (640) ACRE TRACT OUT OF SAID B M SPINKS LEAGUE, AND BEING THE SAME LAND DESCRIBED IN AND CONVEYED BY DEED DATED JULY 29, 1952, FROMR R G PARTLOW TO CARR DEVELOPMENT COMPANY, RECORDED IN VOLUME 373, PAGE 557, OF THE DEED RECORDS OF LIBERTY COUNTY. TEXAS, SAID BEING THE SAME LAND "CALLED" 5 0 ACRES OF LAND CONVEYED FROM R L CARTER, ET UK, TO LIMESTONE LAND CONSERVANCY, INC BY DEED DATED FEBRUARY 3, 2002 AND RECORDED IN VOLUME 1947, PAGE 514 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY TEXAS, TO WHICH DEED AND THE RECORD THEREOF REFERENCE IS HERE MADE.

PARCEL 10 (LIMESTONE LAND CONSERVANCY, INC.)

TRACT 1:

FIELD NOTE DESCRIPTION OF A 4.975 ACRE TRACT SITUATED IN THE B M SPINKS SURVEY, ABSTRACT NO 108, LIBERTY COUNTY, TEXAS BEING THE RESIDUE OF A CALLED 10 ACRE TRACT (TRACT NO 17) AS SHOWN ON SURVEY PLAT BY WARD J BENOIT, R P L S NO 1123, DATED JUNE 28, 1976 AND BEING A MAP SHOWING THE PARTITION OF A 296.061 ACRE TRACT (CALLED 300 ACRES) SAID 296.061 ACRE TRACT BEING THE SAME TRACT AS DESCRIBED IN VOLUME 779, PAGE 872 OF THE LIBERTY COUNTY DEED RECORDS, SAID BEING THAT SAME LAND "CALLED" 4.975 ACRES OF LAND CONVEYED BY WALLIS W SMITH TO LIMESTONE LAND CONSERVANCY, INC BY DEED DATED MAY 1, 2002 AND RECORDED IN VOLUME 1968, PAGE 146 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS, THE PORTION HERENOW BEING GRANTED, SOLD AND CONVEYED BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A 1/2-INCH IRON ROD FOUND AT THE SOUTHWEST CORNER OF A CALLED 5 ACRE TRACT AS DESCRIBED IN VOLUME 811, PAGE 713 AND THE MOST NORTHERLY SOUTHWEST CORNER OF SAID 296.061 ACRE TRACT, BEING ON THE NORTHWESTERLY CORNER OF A 40 ACRE TRACT AS DESCRIBED IN VOLUME 1348, PAGE 178 OF THE OFFICIAL PUBLIC RECORDS OF LIBERTY COUNTY, TEXAS, AND BEING ON THE EASTERLY LINE OF A 3 ACRE TRACT DESCRIBED AS PARCEL "C" IN VOLUME 553, PAGE 1 OF THE LIBERTY COUNTY DEED RECORDS;

THENCE, NORTH 86° 55′ 56″ EAST, ALONG THE SOUTHERLY LINE OF SAID 296.061 ACRE TRACT SAME BEING THE NORTHERLY LINE OF SAID 40 ACRE TRACT FOR A DISTANCE OF 800.19 FEET (CALLED 802 00 FEET) TO A 1″ IRON PIPE FOUND FOR THE SOUTHEAST CORNER OF SAID 5 ACRE TRACT AND BEING THE SOUTHWEST CORNER AND THE POINT OF BEGINNING OF THE HEREIN DESCRIBED TRACT, FROM WHICH A FOUND 5/8″ IRON ROD BEARS SOUTH 15° 28′ 00″ EAST, 2 14 FEET;

THENCE, NORTH 03° 04′ 04″ WEST, LEAVING SAID SOUTHERLY LINE OF SAID 296.061 ACRE TRACT, ALONG THE EASTERLY LINE OF SAID 5 ACRE TRACT FOR A DISTANCE OF 407.62 FEET (CALLED 408 80 FEET) TO A 5/8″ IRON ROD FOUND FOR THE NORTHEAST CORNER OF SAID 5 ACRE TRACT AND THE NORTHWEST CORNER OF THE HEREIN DESCRIBED TRACT, SAID POINT LIES IN THE SOUTHERLY LINE OF A 60 FOOT PERMANENT ACCESS EASEMENT AS DESCRIBED IN VOLUME 779, PAGE 872 OF THE LIBERTY COUNTY DEED RECORDS;

THENCE, NORTH 86° 39′ 56″ EAST, ALONG THE SOUTHERLY LINE OF SAID 60 FOOT PERMANENT ACCESS EASEMENT FOR A DISTANCE OF 530.02 FEET (CALLED 529 50 FEET) TO A 5/8″ IRON ROD FOUND FOR THE COMMON NORTHERLY CORNER OF SAID

10 ACRE AND A CALLED 1.99 ACRE TRACT AS SHOWN ON THE SURVEY PLAT BY
WARD J BENOIT, R P L S NO 1123, DATED JUNE 28, 1976;

THENCE, SOUTH 03° 04′ 04″ EAST, LEAVING THE SOUTHERLY LINE OF SAID 60 FOOT
PERMANENT ACCESS EASEMENT, FOR A DISTANCE OF 410.09 (CALLED 411.16) FEET
TO A POINT FOR THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT, SAID
POINT LIES IN THE SOUTHERLY LINE OF SAID 296.061 ACRE TRACT SAME BEING THE
NORTHERLY LINE OF SAID 40 ACRE TRACT;

THENCE, SOUTH 86° 55′ 56″ WEST, ALONG SAID SOUTHERLY LINE, FOR A DISTANCE
OF 530.01 FEET TO THE POINT OF BEGINNING, CONTAINING WITHIN THESE METES
AND BOUNDS A COMPUTED AREA OF 4.975 ACRES (216,700 SQUARE FEET) OF LAND.

TRACT 2:

BEING A TRACT OF LAND 80 FEET IN WIDTH AND CONTAINING 0.7176 ACRES OF
LAND SITUATED IN THE B M SPINKS SURVEY, ABSTRACT NO 108, LIBERTY COUNTY,
TEXAS, AND BEING ALL OF TRACT ONE AS DESCRIBED IN VOLUME 779, PAGE 872 OF
THE LIBERTY COUNTY DEED RECORDS SAID 0.7176 ACRE TRACT BEING MORE
PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A 1/2-INCH IRON ROD FOUND AT THE INTERSECTION OF THE EAST
RIGHT-OF-WAY LINE OFF FM 563 (120 FOOT RIGHT-OF-WAY) AND THE NORTH
RIGHT-OF-WAY LINE OF COUNTY ROAD 126 DESCRIBED AS TRACT THREE BEING A 60
FOOT WIDE PERMANENT ROAD EASEMENT AS DESCRIBED IN VOLUME 779, PAGE 872
OF THE LIBERTY COUNTY DEED RECORDS SAID POINT ALSO BEING THE SOUTHWEST
CORNER OF A CALLED 16.07 ACRE TRACT AS DESCRIBED IN VOLUME 1651, PAGE 169
OF THE LIBERTY COUNTY DEED RECORDS;

THENCE, NORTH 86 DEGREES 31 MINUTES 03 SECONDS EAST ALONG THE COMMON
LINE OF SAID 16.07 ACRE TRACT AND THE NORTHERLY RIGHT-OF-WAY LINE OF
COUNTY ROAD 126 FOR A DISTANCE OF 395.62 FEET TO A 5/8-INCH IRON ROD WITH
CAP STAMPED "CLARK GEOGRAM" SET FOR CORNER BEING THE NORTHWEST
CORNER OF A CALLED 30 ACRE TRACT AS DESCRIBED IN VOLUME 584, PAGE 221 OF
THE LIBERTY COUNTY DEED RECORDS;

THENCE, SOUTH 03 DEGREES 28 MINUTES 57 SECONDS EAST ALONG THE WESTERLY
LINE OF SAID 30 ACRE TRACT FOR A DISTANCE OF 80.00 FEET TO A 1/2-INCH IRON
ROD FOUND THE NORTHEAST CORNER OF A CALLED 3.6188 ACRE TRACT AS
DESCRIBED IN VOLUME 1708, PAGE 908 OF THE LIBERTY COUNTY DEED RECORDS;

THENCE, SOUTH 86 DEGREES 31 MINUTES 03 SECONDS WEST ALONG THE
NORTHERLY LINE OF SAID 3.6188 ACRE TRACT FOR A DISTANCE OF 385.83 FEET TO
A 5/8-INCH IRON ROD WITH CAP STAMPED "CLARK GEOGRAM" SET FOR CORNER

BEING THE NORTHWEST CORNER OF SAID 3.6188 ACRE TRACT, SAID POINT LIES IN THE EAST RIGHT-OF-WAY LINE OF FM 563 (120 FOOT NGHT-OF-WAY);

THENCE, NORTH 10 DEGREES 27 MINUTES 20 SECONDS WEST ALONG THE EAST RIGHT-OF- WAY LINE OF FM 563 (120 FOOT RIGHT-OF-WAY) FOR A DISTANCE OF 80.60 FEET TO THE POINT OF BEGINNING CONTAINING WITHIN THESE METES AND BOUNDS A COMPUTED AREA OF 0.7176 ACRES (31,259 SQUARE FEET) OF LAND.

## EXHIBIT "C"

## FORM OF QUITCLAIM DEED

WHEN RECORDED RETURN TO:

_____
_____
_____
_____

## QUITCLAIM DEED

STATE OF _____          §
                            §    KNOW ALL BY THESE PRESENTS
COUNTY OF _____         §

THAT _____, a _____ ("Grantor"), for and in consideration of the sum of TEN DOLLARS and No/100 ($10.00) and other good and valuable consideration paid by _____, a _____ ("Grantee"), the receipt of which is hereby acknowledged, and pursuant to the Order of the United States Bankruptcy Court for the Southern District of New York entered on _____ __, 20__ in Case No. 09-10023 styled *In re: Lyondell Chemical Company, et al*, has QUITCLAIMED and by these presents does QUITCLAIM unto Grantee, all of Grantor's rights, title and interests in and to (a) those certain tract(s) of land, as more particularly described in Exhibit B attached hereto and incorporated herein by this reference for all purposes (b) strips and gores between such tract(s) of land and any abutting properties whether owned or claimed by deed, limitations or otherwise, and whether or not held under fence by Grantor, (c) any land lying in or under the bed of any creek, stream or waterway or any highway, avenue, street, road, alley, easement or right-of-way, open or proposed, in, on, across, abutting or adjacent to such tract(s) of land, (d) improvements, buildings or fixtures located on such tract(s) of land, (e) mineral, water, oil, gas, solar and wind rights relating to all or any part of such tract(s) of land, together with all of Grantor's rights, claims, titles and interests in and to any and all appurtenances, rights, easements, ands rights-of-way, filings or other interests, including without limitation rents and profits accruing after the effective date hereof, related to or benefiting such tract(s) of land (collectively, the "Transferred Real Properties").

TO HAVE AND TO HOLD all of Grantor's rights, titles and interests in and to the Transferred Real Properties unto Grantee, its successors and assigns forever, so that neither Grantor nor its successors and assigns shall have, claim or demand any right or title to the Transferred Real Properties or any part thereof.

[Signature on following page]

EXECUTED effective as of the _____ day of _____, 20__.

GRANTOR: _____

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:


STATE OF _____        §
              §
COUNTY OF _____        §

This instrument was acknowledged before me on ___, 20__, by _____, the _____ of _____, a _____, the _____ of _____, a _____, on behalf of said _____.


_____
NOTARY PUBLIC


STATE OF _____        §
              §
COUNTY OF _____        §

This instrument was acknowledged before me on ___, 20__, by _____, the _____ of _____, a _____, the _____ of _____, a _____, on behalf of said _____.


_____
NOTARY PUBLIC

# EXHIBIT D

List of Transferred Contracts

| NO. | SITE | CONTRACT WITH | CONTRACT/LEASE DESCRIPTION |
|---|---|---|---|
| 1. | Beaver Valley | ARCO Chemical Company, Beazer East, Inc., and the United States | Settlement Agreement dated March 12, 1997 |
| 2. | Gypsum Pile | Grundy Green LLC | Agreement of Purchase and Sale dated March 4, 2010 |
| 3. | Gypsum Pile | Grundy Green LLC | First Amendment to Agreement of Purchase and Sale dated March 30, 2010 |

**TAB 9-A**

**Equity Compensation Plan and Awarded Bonus**

As part of the Plan, the LyondellBasell Industries Medium Term Incentive Plan ("MTI") and the LyondellBasell Industries 2010 Long-Term Incentive Plan ("LTI" and, collectively with the MTI, the "Compensation Plans") of LyondellBasell Industries, N.V. shall automatically become effective as of the Effective Date.  The Compensation Plans are filed as part of this Plan Supplement.  The initial awards to employees and directors ("Emergence Grants") under the Compensation Plans shall consist of an aggregate of: (i) approximately $18 million in MTI target awards granted under the MTI, (ii) stock options and stock appreciation rights in respect of approximately 9 million shares of new Common Stock granted under the LTI, and (iii) restricted stock or restricted stock units in respect of approximately 4 million shares of new Common Stock granted under the LTI.  The form and terms of all or a portion of the Emergence Grants, including the methodology for  allocations of MTI and LTI awards under the Compensation Plans, were reviewed and authorized by the Remuneration Committee of the Supervisory Board of LyondellBasell Industries AF S.C.A. and, in addition, shall be approved by the Supervisory Board of LyondellBasell Industries N.V. (collectively, the "Boards") at their meetings in April, 2010 and shall become effective as of the Effective Date without further corporate action (the "Allocated Emergence Grants").  To the extent the Emergence Grants are not fully allocated as of the Effective Date (the "Unallocated Emergence Grants"), not more than ninety (90) days after the Effective Date, the Boards shall authorize and approve the grant of all Unallocated Emergence Grants using the same methodology used by the Boards for individual selection and valuing and allocating among individual MTI and LTI awards as used by the Boards for the Allocated Emergence Grants, provided that, to the extent the exercise price of any option grants made with respect to Unallocated Emergence Grants is higher or lower than the exercise price of option grants made with respect to the Allocated Emergence Grants, a corresponding adjustment shall be made to the methodology for determining the number of shares of restricted stock or restricted stock units grants with respect to the Unallocated Emergence Grants.  For purposes of clarity, the foregoing shall not be applicable to awards made under the Compensation Plans following the period ending ninety (90) days after the Effective Date, and awards made thereafter shall be subject to approval by the Compensation Committee of the Supervisory Board of LyondellBasell Industries, N.V., in accordance with the terms of the Compensation Plans.

The number of shares reserved for issuance under the Compensation Plans represents approximately 3.90% of the total number of shares of new Common Stock issued and outstanding on the Effective Date.  The shares to be reserved for issuance under the Compensation Plans include the shares covered by the Emergence Grants, as well as additional shares to remain available for future awards granted pursuant to the Equity Compensation Plan.

The order confirming the Plan shall provide that the Compensation Plans and Emergence Grants that were made prior to the Effective Date shall be binding and effective on the Effective Date.

In March 2010, the Remuneration Committee of the Supervisory Board of LyondellBasell Industries AF S.C.A. undertook an analysis of the work performed by Stephen Cooper, as Vice-Chairman of the Supervisory Board and Chairman of the Restructuring Committee, to determine whether and to what extent Mr. Cooper should be awarded a bonus for his contribution to the Debtors' chapter 11 cases.  The Remuneration Committee concluded that he should receive a bonus in the amount of $9,750,000 for his extraordinary efforts and contributions in furtherance of the Debtors' restructuring efforts, and made a recommendation to the Supervisory Board to award such bonus.

On April 5, 2010, the Supervisory Board accepted the recommendation of the Remuneration Committee and awarded and approved payment of a bonus to Mr. Cooper in the amount recommended by the Remuneration Committee.  Mr. Cooper was recused from the Supervisory Board's vote on the approval of his bonus.

**TAB 9-B**

## LyondellBasell Industries Medium Term Incentive Plan

**1.      Objectives and Establishment of Plan**

Effective as of the effective date of the Plan of Reorganization, LyondellBasell Industries N.V. (the "Company"), hereby establishes the LyondellBasell Industries Medium Term Incentive Plan (the "Plan"), for the purposes of

- attracting, motivating, and retaining highly talented and competent individuals to serve as senior management and executive employees of the Company by providing competitive compensation opportunities similar to those of comparable companies;

- aligning the interests of such senior management and executive employees with the creation of value for the Company's shareholders; and

- motivating senior management and executive employees to achieve excellent financial and operational results by (i) balancing rewards for short-term and long-term results and (ii) tying their incentive compensation to the performance of the Company as a whole.

The Company intends for the Plan to comply with applicable requirements of Section 409 of the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder (collectively, "Section 409 ") with respect to Participants who are U.S. taxpayers. As a "bonus program" within the meaning of Section 2510.3-2(c) of the Department of Labor Regulations, the Plan is not subject to the requirements of the Employee Retirement Income Security Act of 1974, as amended. For purposes of Section 162(m) of the Code, the Plan is in existence during a period that the Company is not a publicly held corporation within the meaning of Treasury Regulation § 1.162-27(f).

**2.      Interpretation and Definitions**

(a)      **General**.

(1)      **Interpretation**. Unless a clear contrary intention appears, for purposes of construction of this Plan and all related Plan Documents:

(i)      the singular number includes the plural number and vice versa;

(ii)      reference to any person includes such person's successors and assigns but, if applicable, only if such successors and assigns are permitted by the Plan Documents, and reference to a person in a particular capacity excludes such person in any other capacity;

(iii)      reference to any gender includes the other gender;

(iv)    reference to any Plan Document or any other agreement, document or instrument means the applicable Plan Document or such other agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof; and

(v)    reference to any law means such law as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder, and reference to any section or other provision of any law means that provision of such law from time to time in effect and constituting the substantive amendment, modification, codification, replacement or reenactment of such section or other provision.

(2)    **Accounting Terms**. In each Plan Document, unless expressly otherwise provided, accounting terms shall be construed and interpreted, and accounting determinations and computations shall be made, in accordance with generally accepted accounting principles.

(3)    **Conflict in Plan Documents**. If there is any conflict between any two or more Plan Documents, such Plan Documents shall be interpreted and construed, if possible, so as to avoid or minimize such conflict but, to the extent (and only to the extent) of such conflict, the Plan Document dealing most specifically with the matter as to which there is a conflict shall prevail and control. If it cannot be determined which Plan Document deals most specifically with a matter as to which there is a conflict then the Plan shall prevail and control.

(4)    **Conflict with Local Laws**. To the extent not otherwise governed by mandatory provisions of the Code or securities laws of the United States, if there is a conflict between the Plan Documents and the local laws of a country applicable to a Participant, the local laws of such country shall prevail.

(b)    **Definitions**.

(1)    "Award" means the award granted to a Participant pursuant to the applicable terms, conditions and limitations set forth in this Plan document or Grant Letter or as otherwise established by the Company.

(2)    "Affiliate" shall have the meaning assigned to such term in the 2010 LTIP.

(3)    "Bankruptcy Proceeding" means that certain bankruptcy proceeding in the United States Bankruptcy Court for the Southern District of New York in which the Company is seeking or has sought to confirm a plan of reorganization ("Plan of Reorganization").

(4)    "Board" means the Supervisory Board of the Company.

(5)     "Cause" shall have the meaning assigned to such term in the 2010 LTIP.

(6)     "Change of Control" shall have the meaning assigned to such term in the 2010 LTIP.

(7)     "Code" means the Internal Revenue Code of 1986, as amended. Reference to the Code shall be deemed to include any regulations or other interpretive guidance.

(8)     "Committee" means the Remuneration Committee or Compensation Committee of the Board, or its delegate.

(9)     "Common Stock" " means the Class A common stock of LyondellBasell Industries N.V., par value €0.04 per share.

(10)     "Company" means LyondellBasell Industries N.V., and any successor entity.

(11)     "Date of Termination" means the date on which a Participant ceases to be an Employee.

(12)     "Disability" means a permanent and total disability as defined in the applicable long-term disability plan of the Participating Employer. "Disabled" has the correlative meaning.

(13)     "Eligible Employee" means an Employee who is (i) designated as an executive of the Company or (ii) employed in a position designated as an M-Level position.

(14)     "Employee" means an individual employed by a Participating Employer, including any such individual who is assigned to work for a joint venture with a Subsidiary or Affiliate.

(15)     "Grant Date" means the date on which an Award is made, as designated by the Committee and set forth in the Grant Letter.  In no event shall the Grant Date be a date that is during the Bankruptcy Proceeding prior to the effective date of the Plan of Reorganization.

(16)     "Grant Letter" means the written document by means of which the Committee informs a Participant of his Award.

(17)     "MTI Target" means the projected target value of an Award designated in the Grant Letter, as established by the Committee in a manner consistent with the terms of Appendix A.

(18)     "Participant" means an Employee who has been designated as a participant pursuant to Section 4 or a former Employee who still holds an outstanding Award.

(19)     "Participating Employer" means the Company, together with any Subsidiaries or Affiliates of the Company whose Employees are included in the Plan upon authorization of the Committee.

(20)     "Performance Cycle" means the three-calendar-year period beginning on January 1 of the year in which the Grant Date occurs and ending on December 31 in the third calendar year after the Grant Date.

(21)     "Performance Measures" means the performance measures designated by the Committee, in its sole discretion, as further described in Appendix A.

(22)     "Plan" means the LyondellBasell Industries Medium Term Incentive Plan, as set forth herein and as hereafter amended.

(23)     "Plan Document" means this Plan, any administrative procedures that may from time to time be adopted by the Committee (including Appendix A), and any other document defining the rights and liabilities of a Participant, including the Grant Letter applicable to such Participant.

(24)     "Plan of Reorganization" means the Joint Chapter 11 Plan of Reorganization for the LyondellBasell Debtors under Section 1121(a) of the United States Code.

(25)     "Retirement" means a Participant's voluntarily initiated termination of service on or after the earliest of (i) age 65, (ii) age 55 with 10 years of participation service credited under the qualified defined benefit pension plan maintained by the Company or a Subsidiary or an Affiliate in which the Participant is eligible to participate, (iii) the time of retirement as defined in a written agreement between a Participant and a Participating Employer, or (iv) outside the U.S., the time when retirement is permitted and the Participant is eligible to receive a company retirement benefit under applicable law with respect to the Participant's primary place of employment (as determined by the Committee in its sole judgment).

(26)     "Salary" means the annualized base rate of pay of a Participant as of the payroll period immediately preceding the Grant Date for a Performance Cycle, or, for an individual who is hired as an Eligible Employee and designated as a Participant after the Grant Date for a Performance Cycle, such Participant's annualized base rate of pay as of his date of hire; provided, however that solely for the first Awards made under this Plan in connection with confirmation of the Plan of Reorganization, Salary shall mean the annualized base rate of pay of a Participant as of March 31, 2010.

(27)    "Subsidiary" shall have the meaning assigned to such term in the 2010 LTIP.

(28)    "2010 LTIP" means the LyondellBasell Industries 2010 Long-Term Incentive Plan, as amended from time to time.

**3.      Administration of the Plan**

(a)    The Plan shall be administered by the Committee.

(b)    The Committee may establish, from time to time and at any time, subject to the limitations of the Plan as set forth herein, such rules and regulations and amendments and supplements thereto, as it deems necessary to comply with applicable law and for the proper administration of the Plan.

(c)    The Committee's interpretation and construction of the provisions of the Plan and rules and regulations adopted by the Committee shall be final.  No member of the Committee or the Board or their delegates shall be liable for any action taken, or determination made, in respect of the Plan in good faith.  Notwithstanding any other provision of the Plan, the Plan shall be interpreted, operated and administered with respect to U.S. taxpayers in a manner consistent with Section 409 .

(d)    The members of the Committee may retain counsel, employ agents, and provide for such clerical, accounting and consulting services as they may require in carrying out the provisions of the Plan; and may allocate among themselves or delegate to other persons all or such portion of their duties under the Plan as they, in their sole discretion, shall decide. Each member of the Committee and each member of the Board shall be fully justified in relying upon or acting in good faith upon any opinion, report, or information furnished in connection with the Plan by any accountant, counsel, or other specialist so retained (including financial officers of the Company, whether or not such persons are Participants in the Plan).

**4.      Eligibility and Participation**

The Committee in its sole discretion shall designate Eligible Employees to be Participants by granting Awards under this Plan.  The Committee may grant an Award to an individual whom it expects to become an Employee within the following six months, with the Award subject to the individual's actually becoming an Employee within that time, and subject to other terms and conditions the Committee establishes.  The granting of an Award under the terms of this Plan does not confer any right to any future Award.

**5.      Awards**

Each Award granted hereunder shall be described in a Grant Letter, which shall designate (i) the Grant Date and (ii) the MTI Target applicable to the Participant, as determined by the Committee in a manner consistent with the terms of Appendix A.

6. **Payment of Awards**

(a) Except with respect to payment of Awards following a Change of Control as described in Section 6(b), Awards will be paid in a single lump-sum payment on March 31st following the end of the Performance Cycle.

(b) Subject to Section 7(b) hereof, following a Change of Control that satisfies the requirements of Section 409A(a)(2)(A)(v) of the Code and Section 1.409A-3(i)(5) of the Treasury Regulations, Awards shall become payable to the Participant as if the Change of Control date occurred at the end of the applicable Performance Cycle and as if the target performance level was reached on that date. Awards payable under this Section 6(b) shall be paid within thirty (30) days after the date the Change of Control occurs.

(c) Notwithstanding any provision of this Plan to the contrary, if the Participant who is a U.S. taxpayer is treated as a "specified employee" within the meaning of Section 409A as of the date of the Participant's termination, then any amounts or benefits which are payable under this Plan upon the Participant's "separation from service" within the meaning of Section 409A which are subject to the provisions of Section 409A and are not otherwise excluded under Section 409A and would otherwise be payable during the first six-month period following such separation from service shall be paid on the fifteenth business day next following the earlier of (1) the expiration of six months from the date of the Participant's termination or (2) the Participant's death.

(d) The Committee, in its sole discretion, shall determine whether an Award shall be settled in (1) cash or (2) shares of Common Stock;  provided, however, that any payment in shares of Common Stock shall be subject to and consistent with the terms of the 2010 LTIP with respect to the authorization and valuation of shares of Common Stock, and no Award may be paid in Common Stock if it results in the number of shares of Common Stock subject to outstanding Awards to exceed the number of shares of Common Stock authorized under the 2010 LTIP.

(e) For Participants who are not paid on a U.S. Dollar payroll, the currency exchange rate for calculating an MTI Target shall be determined using the published intercompany exchange rate in effect on the first day of the Performance Cycle. The currency exchange rate for calculating an amount to be paid with respect to an Award shall be determined using the published intercompany exchange rate in effect for the month in which the payment is to be made; provided that if such rate has not been determined at the time the payment is processed, the currency exchange rate shall be determined by using the published intercompany exchange rate for the prior month.

(f) Grants of Awards and payments of Awards made to expatriate Employees will be, pursuant to the applicable expatriate assignment policy of the Participating Employer, tax normalized based on typical income taxes and social security taxes

in the expatriate Employee's home country relevant to the expatriate Employee's domestic circumstances.

**7.     Vesting and Forfeiture**

(a)     Each Participant shall become fully vested in an Award in accordance with the terms of the applicable Grant Letter.  Unless Section 7(b) or Section 7(d) applies, the Award shall be forfeited if the Participant is not employed by a Participating Employer on the date the Committee certifies the Earned Percentage for such Award in accordance with Appendix A.

(b)     Notwithstanding any provision of the Plan Documents to the contrary, the Participant shall become vested in a pro-rated portion of his Award calculated in accordance with Section 7(c) upon the earliest of:

(1)     The date on which the Participant becomes Disabled;

(2)     The Participant's Date of Termination due to Retirement, death or involuntary termination not for Cause; or

(3)     The date of a Change of Control that occurs while a Participant is an Eligible Employee.

Payment of an Award that has vested pursuant to this Section 7(b) shall be made at the time specified in Section 6(a) or 6(b), as applicable.

(c)     The portion of the Award that vests during a Performance Cycle in accordance with Section 7(b) shall be determined by multiplying the amount payable based on the attainment of Performance Measures with respect to such Award by a fraction, the numerator of which shall be the number of whole calendar months of the Participant's employment in such Performance Cycle ending on the earliest of the date of Disability, Date of Termination or Change of Control, as applicable, and the denominator of which shall be the number of whole calendar months in the Performance Cycle.  For purposes of this Section 7(c), partial service in a calendar month shall be considered service for the whole calendar month.

(d)     Notwithstanding the foregoing, in the event a Participant: (1) takes a leave of absence from the Company for personal reasons or as a result of entry into the Armed Forces of the United States, or (2) terminates employment for reasons which, in the judgment of the Committee, are deemed to be special circumstances, the Committee may consider such circumstances and may take such action (to the extent consistent with Section 409 ) as it may deem appropriate under the circumstances, including extending the rights of a Participant to continue participation in the Plan beyond his Date of Termination; provided, however, that in no event may participation be extended beyond the term of the Performance Cycle in question.

(e)  Notwithstanding the foregoing, if the entity that is deemed to be the plan sponsor with respect to this Award is or becomes a "nonqualified entity" (within the meaning of Section 457A(b) of the Code and applicable guidance thereunder), the provisions of Sections 7(b), 7(c) and 7(d) shall not apply with respect to any Participant who is a U.S. taxpayer if and to the extent such provisions would cause any amounts payable hereunder to be subject to Section 457A of the Code.

(f)  For all purposes of this Plan, involuntary termination not for cause does not include the Participant's voluntary termination of employment pursuant to a voluntary separation plan of a Participating Employer.

## 8.    Offsets for Certain Other Incentive Payments

The Company reserves the right to offset from payment of any Award any amount paid or owed to an eligible employee through an incentive program, scheme, arrangement, or other plan required by law, regulation, custom, contract or agreement, other than payments made under the 2010 LTIP, as amended, or the annual short-term incentive program for employees of the Company and its Subsidiaries or Affiliates.

## 9.    Tax Withholding

The Company shall have the right to deduct from all amounts hereunder paid, any federal, state, local, or other taxes required by law to be withheld with respect to such payments.

## 10.    Amendment or Discontinuance

Except as otherwise provided in this Section 8, the Company may (a) amend, suspend or discontinue the Plan, in whole or in part, and (b) amend or suspend Appendix A. Any such amendment may be made effective with respect to any Performance Cycle and with respect to any Awards which, as of the date of the amendment, are earned but have not become payable. The Company is not required to obtain the consent of any Participant in order for any such amendment, suspension or termination to be effective.

Notwithstanding the foregoing, neither the Plan nor Appendix A shall be amended or terminated in a manner that would cause the Plan or any amounts payable under the Plan to fail to comply with the requirements of Section 409A with respect to U.S. taxpayers, to the extent applicable, and, further, the provisions of any purported amendment or termination that may reasonably be expected to result in such non-compliance shall be of no force or effect with respect to the Plan.

## 11.    Recapitalization Merger and Consolidation

The existence of this Plan and the Awards granted hereunder shall not affect in any way the right or power of the Company or those entities holding membership interests in the Company to make or authorize any or all adjustments, reorganizations, or other changes in the Company's capital structure and its business, or any merger or consolidation of the Company, or the dissolution or liquidation of the Company, or any sale or transfer of all

or part of its assets or business, or any other corporate act or proceeding, whether of a similar character or otherwise.

## 12.    General Provisions

(a)    Awards shall be nontransferable and nonassignable, except that any such Awards may be transferred by testamentary instrument or by the laws of descent and distribution.

(b)    The establishment of the Plan shall not confer any legal rights upon any Employee or other person to continued employment, nor shall it interfere with the right of any Participating Employer (which right is hereby reserved) to discharge any Employee and to treat him without regard to the effect which that treatment might have upon him as a Participant or potential Participant.

(c)    Neither the adoption of this Plan nor any action of the Board or the Committee shall be deemed to give any person any right to receive an Award or any other rights except otherwise specifically provided herein.

(d)    The governing law applicable to this Plan shall be determined as follows:

(1)    For Participants Paid on a U.S. Dollar Payroll: For Participants who are paid on a U.S. Dollar payroll, this Plan and all determinations made and actions taken pursuant hereto, to the extent not otherwise governed by mandatory provisions of the Code or the securities laws of the United States, shall be governed by, and construed and enforced according to, the laws of the State of Texas.

(2)    For Participants Paid other than on a U.S. Dollar Payroll:  For Participants who are paid other than on a U.S. Dollar payroll, this Plan and all determinations made and actions taken pursuant hereto, to the extent not otherwise governed by mandatory provisions of the Code or securities laws of the United States, shall be governed by, and construed and enforced according to, the laws of the country in which the Participant is employed.

(e)    The Company reserves the right to offset from payment of any Award any debt, obligation, or other liability representing an amount owed by the Participant to the Company or a Subsidiary or Affiliate.

(f)    The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Company, expressly to assume and agree to perform the Company's obligations under this Plan in the same manner and to the same extent that the Company would be required to perform them if no such succession had taken place.

(g)     The Plan shall be unfunded.  Neither the Company, any Participating Employer, the Committee, nor the Board shall be required to segregate any assets or secure any liability that may at any time exist under the Plan.

13.     **Section 409A of the Code**

It is intended that the provisions of this Plan satisfy the requirements of Section 409A of the Code and the accompanying U.S. Treasury Regulations and pronouncements thereunder, and that the Plan be operated in a manner consistent with such requirements to the extent applicable.

For purposes of Section 409A of the Code, the time of settlement under Section 6(b) hereof is upon a change in control event within the meaning of Section 1.409A-3(a)(5) of the Treasury Regulations and (i) if the Participant has vested pursuant to Section 7(b), the time of settlement in Section 6(a) hereof constitutes a specified time within the meaning of Section 1.409A-3(a)(4) of the Treasury Regulations, and (ii) if the Participant has vested pursuant to Section 6(a), the time of settlement in Section 6(a) hereof is within the short-term deferral period described in Section 1.409A-1(b)(4) of the Treasury Regulations.

## APPENDIX A

### Administrative Procedures

1.    **MTI Targets**

(a)    **Designation of MTI Target.**  On or before the effective date of the Plan of Reorganization and on or before March 30 of each succeeding Performance Cycle, the Committee shall provide to each Participant a Grant Letter that sets forth (a) the Grant Date and (b) the MTI Target applicable to such Participant; provided that if an individual is hired as an Eligible Employee and designated as a Participant in this Plan after the Grant Date for a Performance Cycle, the Committee shall provide to such Grant Letter to such Participant as soon as practicable following such Participant's date of hire.  In no event shall the Grant Date be a date that is prior to the effective date of the Plan of Reorganization.

(b)    **MTI Target**.  The MTI Target shall be a projected amount based on a percentage of the Participant's Salary (denominated in United States dollars and subject to the inter-Company exchange rate in effect as of the Grant Date) that may be payable to the Participant in satisfaction of the Award if the Committee determines and certifies that all applicable Performance Measures established by the Committee for the applicable Performance Cycle have been achieved.

2.    **Performance Measures**

(a)    On or before the effective date of the Plan of Reorganization and on or before March 30 for each succeeding Performance Cycle, the Committee shall establish the Performance Measures that will be used to assess the Company's performance during such Performance Cycle.  These Performance Measures may include the percentage change in (i) return on assets during the Performance Cycle for the Company compared to peer companies (considering relative change, market conditions and special circumstances applicable to the Company and its peers) (the "Return on Assets") and (ii) cost improvements over the Performance Cycle and improvement in the Company's position in cost benchmarks (considering size of achievement, success in cost improvement initiatives, market conditions, and special circumstances applicable to the company) (the "Cost Improvements").

(b)    For the first Performance Cycle, the Performance Measures shall be weighted as follows:

| Performance Measure | Relative Weight |
|---|---|
| Return on Assets | 67% |
| Cost Improvements | 33% |

(c)    On or before March 30 for each subsequent Performance Cycle, the Committee, in its sole discretion, shall determine, and communicate in writing to Participants, the relative weight of each Performance Measure.

## 3.    Determination of Award

Following the close of each Performance Cycle, the Committee shall determine and certify the percentage of the MTI Target that has been earned during that Performance Cycle (the "Earned Percentage").    The amount of a Participant's Award shall be calculated by multiplying the Earned Percentage by the MTI Target designated in the applicable Grant Letter.

The Earned Percentage shall not exceed 200 percent.

Notwithstanding the foregoing, the Earned Percentage shall be deemed to be zero and no Award shall be payable if the Committee determines that during the course of the applicable Performance Cycle the Participant has engaged in actions that are materially detrimental to the Company or its Subsidiary or Affiliate.

In the event of a Change of Control, the Earned Percentage shall be calculated by reference to the attainment of Performance Measures as of the close of the last quarter ending on or before the Change of Control.

## 4.    Adjustment for Individual Performance

The Committee may adjust an individual Participant's Earned Percentage to account for the Participant's performance during the Performance Cycle.

**<u>TAB 9-C</u>**

# LYONDELLBASELL INDUSTRIES
## 2010 LONG-TERM INCENTIVE PLAN

1.  *Plan.* Effective as of the effective date of the Plan of Reorganization (the "Effective Date"), LyondellBasell Industries N.V. (the "Company") hereby establishes the LyondellBasell Industries 2010 Long-Term Incentive Plan (the "Plan").

2.  *Objectives.* The purpose of the Plan is to further the interests of the Company and its shareholders by providing incentives in the form of Awards to employees and directors who can contribute materially to the success and profitability of the Company. Such Awards will recognize and reward outstanding performances and individual contributions and give Participants in the Plan an interest in the Company parallel to that of the shareholders, thus enhancing the proprietary and personal interest of such Participants in the Company's continued success and progress. This Plan will also enable the Company to attract and retain such employees and directors.

3.  *Definitions.* As used herein, the terms set forth below shall have the following respective meanings:

    "Affiliate" means any person or entity that directly or indirectly controls, is controlled by or is under common control with the Company.

    "Award" means an Employee Award or a Director Award.

    "Award Agreement" means one or more Employee Award Agreements or Director Award Agreements.

    "Board" means the Supervisory Board of the Company.

    "Cash Award" means an award denominated in cash.

    "Cause" means, in the case of a particular Award, unless the applicable Award Agreement states otherwise, (i) the Company or an Affiliate having "cause" to terminate a Participant's employment or service, as defined in any employment or consulting agreement between the Participant and the Company or Affiliate in effect at the time of such termination or (ii) in the absence of any such agreement or definition therein, (A) the Participant's conviction for, plea of guilty or nolo contendere to a felony or its equivalent in accordance with local laws, (B) the Participant's commission of a material act or omission involving dishonesty or fraud in the course of a Participant's duties to the Company or an Affiliate, (C) the Participant's conduct that brings or is reasonably likely to bring the Company or an Affiliate into public disgrace or disrepute and that affects the Company's or any Affiliate's business in any material way, (D) the Participant's continuing and willful failure to perform duties as reasonably directed by the Company or Affiliate (which if curable, is not cured within 10 days after written notice thereof is provided to the Participant) or (E) the Participant's gross negligence or willful misconduct with respect to the Company or its Affiliates (which, if curable, is not cured within 10 days after written notice thereof is provided to the Participant). Any determination of whether Cause exists shall be made by the Committee in its sole

discretion, and following a Change of Control such determination shall not be subject to delegation pursuant to Paragraph 7.

"Change of Control" is defined in Attachment A.

"Code" means the Internal Revenue Code of 1986, as amended from time to time. Reference to the Code shall be deemed to include any regulations or other interpretive guidance.

"Committee" means the Compensation Committee or any committee designated pursuant to Paragraph 7, and if no committee is so designated, the Board.

"Common Stock" means the Class A common stock of LyondellBasell Industries N.V., par value €0.04 per share.

"Company" means LyondellBasell Industries N.V., and any successor entity.

"Compensation Committee" means the Compensation Committee of the Board or any successor committee of the Board that is designated by the Board to administer certain portions of the Plan.

"Director" means an individual serving as a member of the Board.

"Director Award" means the grant of any Option, SAR, Stock Award, or Performance Award, whether granted singly or in combination, to a Participant who is a Nonemployee Director pursuant to such applicable terms, conditions, and limitations as may be established in order to fulfill the objectives of the Plan.

"Director Award Agreement" means one or more agreements between the Company and a Nonemployee Director setting forth the terms, conditions, and limitations applicable to a Director Award.

"Dividend Equivalents" means, with respect to Restricted Stock Units, an amount equal to all dividends and other distributions (or the economic equivalent thereof) that are payable to shareholders of record during the Restriction Period on a like number of shares of Common Stock.

"Employee" means any regular employee of a Participating Employer, including any such individual who is assigned to work for a joint venture with a Subsidiary or Affiliate.

"Employee Award" means the grant of any Option, SAR, Stock Award, Cash Award, or Performance Award, whether granted singly or in combination, to an Employee pursuant to such applicable terms, conditions, and limitations (including treatment as a Performance Award) as may be established in order to fulfill the objectives of the Plan.

"Employee Award Agreement" means one or more agreements between the Company and an Employee setting forth the terms, conditions, and limitations applicable to an Employee Award.

"Fair Market Value" of a share of Common Stock means, as of a particular date, (i) if shares of Common Stock are listed on a national securities exchange, the final closing sales price per share of the Common Stock on the consolidated transaction reporting system for the principal national securities exchange on which shares of Common Stock are listed on that date, or, if there shall have been no such sale so reported on that date, on the last preceding date on which such a sale was so reported, (ii) if shares of Common Stock are not so listed, the mean between the closing bid and asked price on that date, or, if there are no quotations available for such date, on the last preceding date on which such quotations shall be available, as reported by the OTC Bulletin Board, or, if not reported by the OTC Bulletin Board, by Pink OTC Markets Inc., or (iii) if none of the above are applicable, the fair market value of a share of Common Stock as determined in good faith by the Committee in a manner that complies with the requirements of Section 409A of the Code, if applicable.

"Grant Date" means the date an Award is granted to a Participant pursuant to the Plan. The Grant Date for a substituted award is the grant date of the original award. The first Grant Date under this Plan shall be the effective date of the Plan of Reorganization.

"Grant Price" means the price at which a Participant may exercise his or her right to receive cash or Common Stock, as applicable, under the terms of an Award.

"Nonemployee Director" means an individual serving as a member of the Board who is not an Employee.

"Option" means a right to purchase a specified number of shares of Common Stock at a specified Grant Price.

"Participant" means an Employee or a Director to whom an Award has been granted under this Plan.

"Participating Employer" means the Company, together with any Subsidiaries and Affiliates of the Company whose Employees are included in the Plan upon authorization of the Committee.

"Performance Award" means an award made pursuant to this Plan that is subject to the attainment of one or more Performance Goals.

"Performance Goal" means one or more standards established by the Committee to determine in whole or in part whether a Performance Award shall be earned.

"Plan of Reorganization" means the Joint Chapter 11 Plan of Reorganization for the LyondellBasell Debtors under Section 1121(a) of the United States Code.

"Restricted Stock" means any shares of Common Stock that are restricted or subject to forfeiture provisions.

"Restricted Stock Unit" means a Stock Unit that is restricted or subject to forfeiture provisions.

"Restriction Period" means a period of time beginning as of the Grant Date of an Award of Restricted Stock or Restricted Stock Units and ending as of the date upon which the Common Stock subject to or evidenced by such Award is no longer restricted or subject to forfeiture provisions.

"Stock Appreciation Right" or "SAR" means a right to receive a payment, in cash or Common Stock, equal to the excess of the Fair Market Value or other specified valuation of a specified number of shares of Common Stock on the date the right is exercised over a specified Grant Price, in each case, as determined by the Committee.

"Stock Award" means an Award in the form of shares of Common Stock or Stock Units, including an award of Restricted Stock or Restricted Stock Units.

"Stock Unit" means a unit evidencing the right to receive in specified circumstances one share of Common Stock or equivalent value (as determined by the Committee).

"Subsidiary" means any corporation, limited liability company, joint venture or partnership in which the Company (or its direct or indirect Subsidiary) holds more than 50% of the equity interest.

4.    *Eligibility.*

    a.    *Employees.* All Employees are eligible for the grant of Employee Awards under this Plan in the discretion of the Committee.  The Committee in its sole discretion shall designate Employees to be Participants by granting Awards under this Plan. The Committee may grant an Employee Award to an individual whom it expects to become an Employee within the following six months, with the Employee Award subject to the individual's actually becoming an Employee within that time, and subject to other terms and conditions the Committee establishes.

    b.    *Directors.* Nonemployee Directors are eligible for the grant of Director Awards under this Plan.  The Board in its sole discretion shall designate Nonemployee Directors to be Participants by granting Awards under this Plan.

    c.    *General.* The granting of an Award under the terms of this Plan does not confer upon any Participant any right to any future Award.  There is no obligation for uniformity among Participants.

5.    *Common Stock Available for Awards.* Subject to the provisions of Paragraph 18 hereof, no Award shall be granted if it shall result in the aggregate number of shares of Common Stock issued under the Plan plus the number of shares of Common Stock covered by or subject to Awards then outstanding under this Plan (after giving effect to the grant of the Award in question) to exceed 22,000,000.

The number of shares of Common Stock that are the subject of Awards under this Plan that are forfeited or terminated, expire unexercised, are settled in cash in lieu of Common Stock or in a manner such that all or some of the shares covered by an Award are not issued to a Participant or are exchanged for Awards that do not involve Common Stock,

shall again immediately become available for Awards hereunder.  Shares of Common Stock that are used or withheld to satisfy the Grant Price or tax obligations shall, notwithstanding anything herein to the contrary, not be available again for Awards hereunder. Shares of Common Stock delivered under the Plan as an Award or in settlement of an Award issued or made (a) upon the assumption, substitution, conversion, or replacement of outstanding awards under a plan or arrangement of an entity acquired in a merger or other acquisition or (b) as a post-transaction grant under such a plan or arrangement of an acquired entity shall not reduce or be counted against the maximum number of shares of Common Stock available for delivery under the Plan, to the extent that the exemption for transactions in connection with mergers and acquisitions from the shareholder approval requirements of the New York Stock Exchange for equity compensation plans applies. The Committee may from time to time adopt and observe such rules and procedures concerning the counting of shares against the Plan maximum or any sublimit as it may deem appropriate, including rules more restrictive than those set forth above to the extent necessary to satisfy the requirements of any national stock exchange on which the Common Stock is listed or any applicable regulatory requirement. The Board and the appropriate officers of the Company are authorized to take from time to time whatever actions are necessary, and to file any required documents with governmental authorities, stock exchanges, and transaction reporting systems to ensure that shares of Common Stock are available for issuance pursuant to Awards.  Shares of Common Stock delivered by the Company in settlement of Awards may be authorized and unissued shares, shares held in the treasury of the Company, shares purchased on the open market or private purchase, or a combination of the foregoing.

6.    *Administration.*

    a.    This Plan shall be administered by the Committee, except as otherwise provided herein.

    b.    Subject to the provisions hereof, the Committee shall have full and exclusive power and authority to administer this Plan and to take all actions that are specifically contemplated hereby or are necessary or appropriate in connection with the administration hereof. The Committee shall also have full and exclusive power to interpret this Plan and to adopt such rules, regulations, and guidelines for carrying out this Plan as it may deem necessary or proper.  The Committee may, in its discretion, provide for the extension of the exercisability of an Employee Award, accelerate the vesting or exercisability of an Employee Award, eliminate or make less restrictive any restrictions applicable to an Employee Award, waive any restriction or other provision of this Plan (insofar as such provision relates to Employee Awards) or an Employee Award, or otherwise amend or modify an Employee Award in any manner that is either (i) not adverse to the Participant to whom such Employee Award was granted (including in a manner which could result in accelerated or additional tax under Section 409A of the Code) or (ii) consented to by such Participant.  Notwithstanding anything herein to the contrary, without the prior approval of the Company's shareholders, Options or SARs issued under the Plan will not be repriced, replaced, or regranted through cancellation or by decreasing the exercise price of a previously granted

Option or SAR, except as expressly provided by the adjustment provisions of Paragraph 18. The Committee may correct any defect or supply any omission or reconcile any inconsistency in this Plan or in any Award in the manner and to the extent the Committee deems necessary or desirable to further the Plan purposes. Any decision of the Committee in the interpretation and administration of this Plan shall lie within its sole and absolute discretion and shall be final, conclusive, and binding on all parties concerned.

c.      No member of the Committee or officer of the Company to whom the Committee has delegated authority in accordance with the provisions of Paragraph 7 of this Plan shall be liable for anything done or omitted to be done by him or her, by any member of the Committee, or by any officer of the Company in connection with the performance of any duties under this Plan, except for his or her own willful misconduct, bad faith, or as expressly provided by statute.

d.      The Board shall have the same powers, duties, and authority to administer the Plan with respect to Director Awards as the Committee retains with respect to Employee Awards.

7.      *Delegation of Authority.*  Following the authorization of a pool of cash or shares of Common Stock to be available for Awards, the Board or the Committee may authorize a committee of one or more members of the Board, or one or more officers of the Company, to grant individual Employee Awards from such pool pursuant to such conditions or limitations as the Board or the Committee may establish consistent with applicable law. The Committee may delegate to the Chief Executive Officer and to other employees of the Company its administrative duties under this Plan (excluding its granting authority for Awards, other than pursuant to authorization of a pool,) pursuant to such conditions or limitations as the Committee may establish. The Committee may engage or authorize the engagement of a third party administrator to carry out administrative functions under the Plan.

8.      *Employee Awards.*

The Committee shall determine the type or types of Employee Awards to be made under this Plan and shall designate from time to time the Employees who are to be the recipients of such Awards. Each Employee Award shall be embodied in an Employee Award Agreement, which shall contain such terms, conditions, and limitations as shall be determined by the Committee in its sole discretion and, if required by the Committee, shall be signed by the Participant to whom the Employee Award is granted and signed for and on behalf of the Company. Employee Awards may consist of those listed in this Paragraph 8 and may be granted singly or in combination. Employee Awards may also be granted in combination with, in replacement of (subject to the last sentence of Paragraph 16), or as alternatives to, grants or rights under this Plan or any other employee plan of the Company or any Participating Employer, including the plan of any acquired entity. Subject to the immediately following Clauses a. and b., an Employee Award may provide for the grant or issuance of additional, replacement, or alternative Employee Awards upon the occurrence of specified events, including the exercise of the original Employee

Award granted to a Participant. All or part of an Employee Award may be subject to conditions established by the Committee, which may include, but are not limited to, continuous service with the Company and the Participating Employers, achievement of specific business objectives, items referenced in Clause e. below, and other comparable measurements of performance. Upon the termination of employment by a Participant who is an Employee, any unexercised, deferred, unvested, or unpaid Employee Awards shall be treated as set forth in the applicable Employee Award Agreement or as otherwise specified by the Committee. Notwithstanding the foregoing, any Award that constitutes a "stock right" within the meaning of Section 409A of the Code shall only be granted to Participants with respect to whom the Company is an "eligible issuer of service recipient stock" under Section 409A of the Code.  Employee Awards granted as of the Effective Date or within 90 days thereafter shall be awarded in accordance with the provisions of Attachment B.

a.      *Options*. An Employee Award may be in the form of an Option. The Grant Price of an Option shall be not less than the Fair Market Value of the Common Stock subject to such Option on the Grant Date. The term of the Option shall extend no more than 10 years after the Grant Date. Options may not include provisions that "reload" the Option upon exercise. Subject to the foregoing provisions, the terms, conditions, and limitations applicable to any Options awarded to Employees pursuant to this Plan, including the Grant Price, the term of the Options, the number of shares subject to the Option, and the date or dates upon which they become exercisable, shall be determined by the Committee.

b.      *Stock Appreciation Rights*. An Employee Award may be in the form of an SAR. On the Grant Date, the Grant Price of an SAR shall be not less than the Fair Market Value of the Common Stock subject to such SAR. The exercise period for an SAR shall extend no more than 10 years after the Grant Date. SARs may not include provisions that "reload" the SAR upon exercise. Subject to the foregoing provisions, the terms, conditions, and limitations applicable to any SARs awarded to Employees pursuant to this Plan, including the Grant Price, the term of any SARs, and the date or dates upon which they become exercisable, shall be determined by the Committee.

c.      *Stock Awards*. An Employee Award may be in the form of a Stock Award. The terms, conditions and limitations applicable to any Stock Awards granted pursuant to this Plan shall be determined by the Committee.

d.      *Cash Awards*. An Employee Award may be in the form of a Cash Award. The terms, conditions, and limitations applicable to any Cash Awards granted pursuant to this Plan shall be determined by the Committee.

e.      *Performance Awards*. Without limiting the type or number of Employee Awards that may be made under the other provisions of this Plan, an Employee Award may be in the form of a Performance Award. The terms, conditions and limitations applicable to any Performance Awards granted to Participants pursuant to this Plan shall be determined by the Committee. The Committee shall

set Performance Goals in its discretion which, depending on the extent to which they are met, will determine the value and/or amount of Performance Awards that will be paid out to the Participant and/or the portion of an Award that may be exercised.

9.    Director Awards.

The Board may grant Director Awards to Nonemployee Directors of the Company from time to time in accordance with this Paragraph 9. Director Awards may consist of those listed in this Paragraph 9 and may be granted singly or in combination. Each Director Award may, in the discretion of the Board, be embodied in a Director Award Agreement, which shall contain such terms, conditions, and limitations as shall be determined by the Board in its sole discretion and, if required by the Board, shall be signed by the Participant to whom the Director Award is granted and signed for and on behalf of the Company. Director Awards granted as of the Effective Date or within 90 days thereafter shall be awarded in accordance with the provisions of Attachment B.

a.    *Options*. A Director Award may be in the form of an Option. The Grant Price of an Option shall be not less than the Fair Market Value of the Common Stock subject to such Option on the Grant Date. In no event shall the term of the Option extend more than 10 years after the Grant Date. Options may not include provisions that "reload" the option upon exercise. Subject to the foregoing provisions, the terms, conditions, and limitations applicable to any Options awarded to Participants pursuant to this Paragraph 9, including the Grant Price, the term of the Options, the number of shares subject to the Option and the date or dates upon which they become exercisable, shall be determined by the Board.

b.    *Stock Appreciation Rights*. A Director Award may be in the form of an SAR. On the Grant Date, the Grant Price of an SAR shall be not less than the Fair Market Value of the Common Stock subject to such SAR. The exercise period for an SAR shall extend no more than 10 years after the Grant Date. SARs may not include provisions that "reload" the SAR upon exercise. Subject to the foregoing provisions, the terms, conditions, and limitations applicable to any SARs awarded to Nonemployee Directors pursuant to this Plan, including the Grant Price, the term of any SARs, and the date or dates upon which they become exercisable, shall be determined by the Board.

c.    *Stock Awards*. A Director Award may be in the form of a Stock Award. Any terms, conditions, and limitations applicable to any Stock Awards granted to a Nonemployee Director pursuant to this Plan, including but not limited to rights to Dividend Equivalents, shall be determined by the Board.

d.    *Performance Awards*. Without limiting the type or number of Director Awards that may be made under the other provisions of this Plan, a Director Award may be in the form of a Performance Award. Any additional terms, conditions, and limitations applicable to any Performance Awards granted to a Nonemployee Director pursuant to this Plan shall be determined by the Board. The Board shall

set Performance Goals in its discretion which, depending on the extent to which they are met, will determine the value and/or amount of Performance Awards that will be paid out to the Nonemployee Director.

10.    *Change of Control*. Notwithstanding any other provisions of the Plan, including Paragraphs 8 and 9 hereof, unless treatment of an Award upon Change of Control is otherwise expressly addressed in the applicable Award Agreement, in the event of a Change of Control during a Participant's employment (or service as a Nonemployee Director) with the Company or a Participating Employer, followed within one year by the involuntary termination of employment of such Participant for any reason other than Cause (or separation from service of such Nonemployee Director), (i) each Award granted under this Plan to the Participant shall become immediately vested and fully exercisable and any restrictions applicable to the Award shall lapse and (ii) if the Award is an Option or SAR and has not been cancelled pursuant to the terms of the Plan, such Award shall remain exercisable until the expiration of the term of the Award. Notwithstanding the foregoing, with respect to any Stock Unit or Restricted Stock Unit or other Award that vests, pursuant to the terms of the Award Agreement, solely upon a Change of Control and that constitutes a "nonqualified deferred compensation plan" within the meaning of Section 409A of the Code, the settlement of such Award pursuant to this Paragraph 10 shall only occur upon the Change of Control if such Change of Control constitutes a "change in control event" within the meaning of Treasury Regulation § 1.409A-3(i)(5). For purposes of this Paragraph 10, an involuntary termination shall include constructive termination of employment for good reason, which shall have the meaning set forth in the Award Agreement or, if not otherwise defined, shall mean the occurrence, without the Participant's express written consent, of a material diminution in the Participant's employment duties, responsibilities or authority, any material reduction in the Participant's base salary or targeted incentive compensation, or any relocation of the Participant's principal place of employment as of the date of the Change of Control of more than 100 miles, following which (i) the Participant provides written notice of the existence of the condition within 90 days after its existence (ii) the Company and its Affiliates fail to cure the condition within 30 days after receipt of the notice, and (iii) the Participant terminates employment within twelve months after the Change of Control.

11.    *Non-United States Participants*. The Committee may grant Awards to eligible persons outside the United States under such terms and conditions as may, in the judgment of the Committee, be necessary or advisable to comply with the laws of the applicable foreign jurisdictions and, to that end, may establish sub-plans, modified option exercise procedures, and other terms and procedures. Notwithstanding the above, the Committee may not take any actions hereunder, and no Awards shall be granted, that would violate the Exchange Act, the Code, any securities law, any governing statute, or any other applicable law.  For purposes of granting and paying Awards to persons outside the United States, the Company shall apply the intercompany exchange rate procedures specified in the LyondellBasell Industries Medium Term Incentive Plan, as amended from time to time.

12.     *Payment of Awards.*

    a.    *General.* Payment made to a Participant pursuant to an Award may be made in the form of cash or Common Stock, or a combination thereof as the Committee may determine, and may include such restrictions as the Committee shall determine, including, in the case of Common Stock, restrictions on transfer and forfeiture provisions. Any certificates evidencing shares of Restricted Stock (to the extent that such shares are so evidenced) shall contain appropriate legends and restrictions that describe the terms and conditions of the restrictions applicable thereto.

    b.    *Deferral.* With the approval of the Committee and in a manner which is intended to either (i) comply with Section 409A of the Code or (ii) not cause an Award to become subject to Section 409A of the Code, amounts payable to U.S. Participants in respect of Awards may be deferred and paid either in the form of installments or as a lump-sum payment.

    c.    *Dividends, Earnings, and Interest.* Rights to dividends or Dividend Equivalents may be extended to and made part of any Stock Award, subject to such terms, conditions, and restrictions as the Committee may establish.  The Committee may also establish rules and procedures for the crediting of interest or other earnings on deferred cash payments and Dividend Equivalents for Stock Awards.

    d.    *Cash-out of Awards.* At the discretion of the Committee, an Award settled under Paragraph 12(a) may be settled by a cash payment in an amount that the Board shall determine in its sole discretion is equal to the fair market value of such Award (which, in the case of an Option or SAR, may be the excess, if any, of the Fair Market Value of the Common Stock subject to such Award over Grant Price of such Award).

13.     *Option Exercise.* The Grant Price shall be paid in full at the time of exercise in cash or, if permitted by the Committee and elected by the optionee, the optionee may purchase such shares by means of tendering Common Stock or surrendering a separate Award valued at Fair Market Value on the date of exercise, or any combination thereof (provided that such tendered or surrendered shares or Award do not result in adverse accounting treatment to the Company and such shares or Award are not subject to any pledge or security interest). The Committee shall determine acceptable methods for Participants who are Employees to tender Common Stock or other Employee Awards. The Committee may provide for procedures to permit the exercise or purchase of such Awards by use of the proceeds to be received from the sale of Common Stock issuable pursuant to an Award. The Committee may also provide that the option may be exercised by a "net-share settlement" method for exercising outstanding nonqualified stock options, whereby the exercise price thereof and/or any minimum required tax withholding thereon are satisfied by withholding from the delivery of the shares as to which such option is exercised a number of shares having a fair market value equal to the applicable exercise price and/or the amount of any minimum required tax withholding, canceling such withheld number, and delivering the remainder. The Committee may adopt additional rules and procedures

regarding the exercise of Options from time to time, provided that such rules and procedures are not inconsistent with the provisions of this Paragraph 13.

14. *Taxes.* The Company or its designated third party administrator shall have the right to deduct applicable taxes from any Award payment and withhold, at the time of delivery or vesting of cash or shares of Common Stock under this Plan, an appropriate amount of cash or number of shares of Common Stock or a combination thereof for payment of taxes or other amounts required by law or to take such other action as may be necessary in the opinion of the Company to satisfy all obligations for withholding of such taxes. The Committee may also permit withholding to be satisfied by the transfer to the Company of shares of Common Stock theretofore owned by the holder of the Employee Award with respect to which withholding is required. If shares of Common Stock are transferred by the Participant to satisfy tax withholding, such shares must not be subject to any pledge or other security interest, must not result in adverse accounting treatment to the Company, and shall be valued based on the Fair Market Value when the tax withholding is required to be made.

15. *Expatriate Participants.* Grants of Awards and payments of Awards made to expatriate Participants will be, pursuant to the applicable expatriate assignment policy of the Participating Employer, tax normalized based on typical income taxes and social security taxes in the expatriate Participant's home country relevant to the expatriate Participant's domestic circumstances.

16. *Amendment, Modification, Suspension, or Termination of the Plan and Awards.* The Board may amend, modify, suspend, or terminate this Plan and any Award made thereunder at any time and for any reason, except that (i) no amendment or alteration that would adversely affect the rights of any Participant under any Award previously granted to such Participant shall be made without the consent of such Participant and (ii) no amendment or alteration shall be effective prior to its approval by the shareholders of the Company to the extent such approval is required by applicable legal requirements or the applicable requirements of the securities exchange on which the Company's Common Stock is listed. Notwithstanding anything herein to the contrary, without the prior approval of the Company's shareholders, Options or SARs issued under the Plan will not be repriced, replaced, or regranted through cancellation or by decreasing the Grant Price of a previously granted Option or SAR except as expressly provided by the adjustment provisions of Paragraph 18.

17. *Assignability.* Unless otherwise determined by the Committee and provided in an Award Agreement or the terms of an Award, no Award or any other benefit under this Plan shall be assignable or otherwise transferable except by will, by beneficiary designation, or by the laws of descent and distribution. In the event that a beneficiary designation conflicts with an assignment by will or the laws of descent and distribution, the beneficiary designation will prevail. The Committee may prescribe and include in applicable Award Agreements or the terms of the Award other restrictions on transfer. Any attempted assignment of an Award or any other benefit under this Plan in violation of this Paragraph 17 shall be null and void.

18.     *Adjustments.*

a.      The existence of outstanding Awards shall not affect in any manner the right or power of the Company or its shareholders to make or authorize any or all adjustments, recapitalizations, reorganizations, or other changes in the capital stock of the Company or its business or any merger or consolidation of the Company, or any issue of bonds, debentures, preferred or prior preference stock (whether or not such issue is prior to, on a parity with or junior to the existing Common Stock), or the dissolution or liquidation of the Company, or any sale or transfer of all or any part of its assets or business, or any other corporate act or proceeding of any kind, whether or not of a character similar to that of the acts or proceedings enumerated above.

b.      In the event of any subdivision or consolidation of outstanding shares of Common Stock, declaration of a dividend payable in shares of Common Stock or other stock split, recapitalization or capital reorganization of the Company, consolidation or merger of the Company with another corporation or entity, the adoption by the Company of any plan of exchange affecting Common Stock or any distribution to holders of Common Stock of securities or property (including cash dividends that the Board determines are not in the ordinary course of business but excluding normal cash dividends or dividends payable in Common Stock), the Board shall make such adjustments as it determines, in its sole discretion, appropriate to (x) the number and kind of shares of Common Stock or other securities reserved under this Plan and (y)(i) the number and kind of shares of Common Stock or other securities covered by Awards, (ii) the Grant Price or other price in respect of such Awards, and (iii) the appropriate Fair Market Value and other price determinations for such Awards to reflect such transaction. In the event of a corporate merger, consolidation, acquisition of assets or stock, separation, reorganization, or liquidation, the Board shall be authorized (x) to assume under the Plan previously issued compensatory awards, or to substitute new Awards for previously issued compensatory awards, including Awards, as part of such adjustment; (y) to cancel Awards that are Options or SARs and give the Participants who are the holders of such Awards notice and opportunity to exercise for 15 days prior to such cancellation; or (z) to cancel any such Awards and to deliver to the Participants cash in an amount that the Board shall determine in its sole discretion is equal to the fair market value of such Awards on the date of such event, which in the case of Options or SARs shall be the excess, if any, of the Fair Market Value of Common Stock on such date over the Grant Price of such Award.

c.      Notwithstanding the foregoing: (i) any adjustments made pursuant to Paragraph 18 to Awards that are considered "deferred compensation" within the meaning of Section 409A of the Code shall be made in a manner which is intended to not result in accelerated or additional tax to a Participant pursuant to Section 409A of the Code; (ii) any adjustments made pursuant to Paragraph 18 to Awards that are not considered "deferred compensation" subject to Section 409A of the Code shall be made in such a manner intended to ensure that after such

adjustment, the Awards either (A) continue not to be subject to Section 409A of the Code or (B) do not result in accelerated or additional tax to a Participant pursuant to Section 409A of the Code; and (iii) in any event, neither the Committee nor the Board shall have the authority to make any adjustments pursuant to Paragraph 18 to the extent the existence of such authority would cause an Award that is not intended to be subject to Section 409A of the Code at the Grant Date to be subject thereto as of the Grant Date.

19. *Restrictions*. No Common Stock or other form of payment shall be issued with respect to any Award unless the Company shall be satisfied based on the advice of its counsel that such issuance will be in compliance with applicable federal and state securities laws. Any certificates evidencing shares of Common Stock delivered under this Plan (to the extent that such shares are so evidenced) may be subject to such stop transfer orders and other restrictions as the Committee may deem advisable under the rules, regulations, and other requirements of the Securities and Exchange Commission, any securities exchange or transaction reporting system upon which the Common Stock is then listed or to which it is admitted for quotation and any applicable federal or state securities law. The Committee may cause a legend or legends to be placed upon such certificates (if any) to make appropriate reference to such restrictions.

20. *Unfunded Plan*. This Plan shall be unfunded. Although bookkeeping accounts may be established with respect to Participants under this Plan, any such accounts shall be used merely as a bookkeeping convenience, including bookkeeping accounts established by a third party administrator retained by the Company to administer the Plan. The Company shall not be required to segregate any assets for purposes of this Plan or Awards hereunder, nor shall the Company, the Board or the Committee be deemed to be a trustee of any benefit to be granted under this Plan. Any liability or obligation of the Company to any Participant with respect to an Award under this Plan shall be based solely upon any contractual obligations that may be created by this Plan and any Award Agreement or the terms of the Award, and no such liability or obligation of the Company shall be deemed to be secured by any pledge or other encumbrance on any property of the Company. Neither the Company nor the Board nor the Committee shall be required to give any security or bond for the performance of any obligation that may be created by this Plan.

21. *Right to Employment; Claims to Award*. Nothing in the Plan or an Award Agreement shall interfere with or limit in any way the right of the Company or any Participating Employer to terminate any Participant's employment or other service relationship at any time, or confer upon any Participant any right to continue in the capacity in which he or she is employed or otherwise serves the Company or any Participating Employer. Nothing in the Plan confers upon any Employee or Director of the Company or an Affiliate, or other person, any claim or right to be granted an Award under the Plan, or, having been selected for the grant of an Award, to be selected for a grant of any other Award.

22. *Successors*. All obligations of the Company under the Plan with respect to Awards granted hereunder shall be binding on any successor to the Company, whether the existence of such successor is the result of a direct or indirect purchase, merger,

consolidation, or otherwise, of all or substantially all of the business and/or assets of the Company.

23.    *Governing Law.* This Plan and all determinations made and actions taken pursuant hereto, to the extent not otherwise governed by mandatory provisions of the Code or the securities laws of the United States, shall be governed by and construed in accordance with the laws of the State of Texas without regard to conflicts of law principles.

24.    *Limitation on Parachute Payments.*  In the event the Award Agreement or any other agreement between the Participant and a Participating Employer does not contain any contrary provision regarding the method of avoiding or mitigating the impact of the golden parachute excise tax under Section 4999 of the Code on the Participant, then, notwithstanding any contrary provision of this Plan, if the aggregate present value of all parachute payments payable to or for the benefit of a Participant, whether payable pursuant to this Plan or otherwise, to the extent necessary, any Awards under the Plan shall be reduced in order that this limit not be exceeded, but only if, by reason of such reduction, the net after-tax benefit to the Participant shall exceed the net after-tax benefit if such reduction, together with all other reductions of parachute payments otherwise applicable, were not made.  For purposes of this Paragraph 24, the terms "parachute payment," "base amount" and "present value" shall have the meanings assigned thereto under Section 280G of the Code.  It is the intention of this Paragraph 24 to avoid excise taxes on the Participant under Section 4999 of the Code or the disallowance of a deduction to the Company pursuant to Section 280G of the Code.

25.    *Section 409A.* It is the intention of the Company that Awards granted under the Plan either (i) shall not be "nonqualified deferred compensation" subject to Section 409A of the Code, or (ii) shall meet the requirements of Section 409A of the Code such that no Participant shall be subject to tax pursuant to Section 409A of the Code in respect thereof, and the Plan and the terms and conditions of all Awards shall be interpreted accordingly. Notwithstanding any other provision of the Plan to the contrary, any payments (whether in cash, shares of Common Stock, or other property) with respect to any Award that constitutes "nonqualified deferred compensation" subject to Section 409A of the Code, to be made upon a Participant's termination of employment shall be made no earlier than (A) the first day of the seventh month following the Participant's "separation from service" (within the meaning of Section 409A of the Code) and (B) the Participant's death if at the time of such termination of employment the Participant is a "specified employee," within the meaning of Section 409A of the Code (as determined by the Company in accordance with its uniform policy with respect to all arrangements subject to Section 409A of the Code).

26.    *Effectiveness and Term.*  The Plan is effective as of the Effective Date and, for purposes of Section 162(m) of the Code, the Plan is in existence during a period that the Company is not a publicly held corporation within the meaning of Treasury Regulation § 1.162-27(f).  No Award shall be made under the Plan ten years or more after the Effective Date.

27.    *No Rights as Stockholder.*  Except as otherwise specifically provided in the Plan or an Award Agreement, no person shall be entitled to the privileges of ownership in respect of

shares of Common Stock that are subject to Awards until such time as such shares have been issued or delivered to that person.

28.   *Miscellaneous.*  Pronouns and other words in respect of gender shall be interpreted to refer to both genders, and the titles and headings of the sections in the Plan and Award Agreements are for convenience of reference only.  In the event of any conflict, the text of the Plan (or applicable Award Agreement), rather than such titles and headings, shall control.

**Attachment "A"**

**"Change of Control"**

The following definitions apply to the Change of Control provision in Paragraph 10 of the foregoing Plan.

"Affiliate" shall have the meaning ascribed to such term in Rule 12b-2 of the General Rules and Regulations under the Exchange Act, as in effect at the time of determination.

"Associate" shall mean, with reference to any Person, (a) any corporation, firm, partnership, association, unincorporated organization, or other entity (other than the Company or a subsidiary of the Company) of which such Person is an officer or general partner (or officer or general partner of a general partner) or is, directly or indirectly, the Beneficial Owner of 10% or more of any class of equity securities, (b) any trust or other estate in which such Person has a substantial beneficial interest or as to which such Person serves as trustee or in a similar fiduciary capacity, and (c) any relative or spouse of such Person, or any relative of such spouse, who has the same home as such Person.

"Beneficial Owner" shall mean, with reference to any securities, any Person if:

a.      such Person or any of such Person's Affiliates and Associates, directly or indirectly, is the "beneficial owner" of (as determined pursuant to Rule 13d-3 of the General Rules and Regulations under the Exchange Act, as in effect at the time of determination) such securities or otherwise has the right to vote or dispose of such securities;

b.      such Person or any of such Person's Affiliates and Associates, directly or indirectly, has the right or obligation to acquire such securities (whether such right or obligation is exercisable or effective immediately or only after the passage of time or the occurrence of an event) pursuant to any agreement, arrangement, or understanding (whether or not in writing) or upon the exercise of conversion rights, exchange rights, other rights, warrants, or options, or otherwise; provided, however, that a Person shall not be deemed the Beneficial Owner of, or to "beneficially own," (i) securities tendered pursuant to a tender or exchange offer made by such Person or any of such Person's Affiliates or Associates until such tendered securities are accepted for purchase or exchange or (ii) securities issuable upon exercise of Exempt Rights; or

c.      such Person or any of such Person's Affiliates or Associates (i) has any agreement, arrangement or understanding (whether or not in writing) with any other Person (or any Affiliate or Associate thereof) that beneficially owns such securities for the purpose of acquiring, holding, voting (except as set forth in the proviso to subsection (a) of this definition) or disposing of such securities or (ii) is a member of a group (as that term is used in Rule 13d-5(b) of the General Rules and Regulations under the Exchange Act) that includes any other Person that beneficially owns such securities;

provided, however, that nothing in this definition shall cause a Person engaged in business as an underwriter of securities to be the Beneficial Owner of, or to "beneficially own," any securities acquired through such Person's participation in good faith in a firm commitment underwriting until the expiration of 40 days after the date of such acquisition. For purposes hereof, "voting" a security shall include voting, granting a proxy, consenting or making a request or demand relating to corporate action (including, without limitation, a demand for a shareholder list, to call a shareholder meeting, or to inspect corporate books and records), or otherwise giving an authorization (within the meaning of Section 14(a) of the Exchange Act) in respect of such security.

The terms "beneficially own" and "beneficially owning" shall have meanings that are correlative to this definition of the term "Beneficial Owner."

"Board" shall have the meaning set forth in the foregoing Plan.

"Change of Control" shall mean any of the following occurring after the Effective Date:

a.      any Person (other than an Exempt Person) shall become the Beneficial Owner of 50% or more of the shares of Common Stock then outstanding or 50% or more of the combined voting power of the Voting Stock of the Company then outstanding; provided, however, that no Change of Control shall be deemed to occur for purposes of this subsection (a) if such Person shall become a Beneficial Owner of 50% or more of the shares of Common Stock or 50% or more of the combined voting power of the Voting Stock of the Company solely as a result of (i) an Exempt Transaction or (ii) an acquisition by a Person pursuant to a reorganization, merger, or consolidation, if, following such reorganization, merger, or consolidation, the conditions described in clauses (i), (ii), and (iii) of subsection (c) of this definition are satisfied;

b.      individuals who, as of the Effective Date, constitute the Board (the "Incumbent Board") cease for any reason to constitute at least a majority of the Board; provided, however, that any individual becoming a director subsequent to the Effective Date whose election, or nomination for election by the Company's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board; provided, further, that there shall be excluded, for this purpose, any such individual whose initial assumption of office occurs as a result of any actual or threatened Election Contest that is subject to the provisions of Rule 14a-11 of the General Rules and Regulations under the Exchange Act;

c.      the Company shall consummate a reorganization, merger, or consolidation, in each case, unless, following such reorganization, merger, or consolidation, (i) 50% or more of the then outstanding shares of common stock of the corporation, or common equity securities of an entity other than a corporation, resulting from such reorganization, merger, or consolidation and the combined voting power of the then outstanding Voting Stock of such corporation or other

entity are beneficially owned, directly or indirectly, by all or substantially all of the Persons who were the Beneficial Owners of the outstanding Common Stock immediately prior to such reorganization, merger, or consolidation in substantially the same proportions as their ownership, immediately prior to such reorganization, merger, or consolidation, of the outstanding Common Stock, (ii) no Person (excluding any Exempt Person or any Person beneficially owning, immediately prior to such reorganization, merger, or consolidation, directly or indirectly, 50% or more of the Common Stock then outstanding or 50% or more of the combined voting power of the Voting Stock of the Company then outstanding) beneficially owns, directly or indirectly, 50% or more of the then outstanding shares of common stock of the corporation, or common equity securities of an entity other than a corporation, resulting from such reorganization, merger, or consolidation or the combined voting power of the then outstanding Voting Stock of such corporation or other entity, and (iii) at least a majority of the members of the board of directors of the corporation, or the body which is most analogous to the board of directors of a corporation if not a corporation, resulting from such reorganization, merger, or consolidation were members of the Incumbent Board at the time of the initial agreement or initial action by the Board providing for such reorganization, merger, or consolidation; or

d.    (i) complete liquidation or dissolution of the Company unless such liquidation or dissolution is approved as part of a plan of liquidation and dissolution involving a sale or disposition of all or substantially all of the assets of the Company to a corporation with respect to which, following such sale or other disposition, all of the requirements of clauses (ii)(A), (B), and (C) of this subsection (d) are satisfied, or (ii) the Company shall consummate the sale or other disposition of all or substantially all of the assets of the Company, other than to a corporation or other entity, with respect to which, following such sale or other disposition, (A) 50% or more of the then outstanding shares of common stock of such corporation, or common equity securities of an entity other than a corporation, and the combined voting power of the Voting Stock of such corporation or other entity is then beneficially owned, directly or indirectly, by all or substantially all of the Persons who were the Beneficial Owners of the outstanding Common Stock immediately prior to such sale or other disposition in substantially the same proportion as their ownership, immediately prior to such sale or other disposition, of the outstanding Common Stock, (B) no Person (excluding any Exempt Person and any Person beneficially owning, immediately prior to such sale or other disposition, directly or indirectly, 50% or more of the Common Stock then outstanding or 50% or more of the combined voting power of the Voting Stock of the Company then outstanding) beneficially owns, directly or indirectly, 50% or more of the then outstanding shares of common stock of such corporation, or common equity securities of an entity other than a corporation, and the combined voting power of the then outstanding Voting Stock of such corporation or other entity, and (C) at least a majority of the members of the board of directors of such corporation, or the body which is most analogous to the board of directors of a corporation if not a corporation, were members of the Incumbent Board at the

time of the initial agreement or initial action of the Board providing for such sale or other disposition of assets of the Company.

Notwithstanding anything herein to the contrary, in no event shall the consummation of the transactions contemplated by the Plan of Reorganization constitute a Change of Control hereunder.

"Common Stock" shall have the meaning set forth in the foregoing Plan.

"Company" shall have the meaning set forth in the foregoing Plan.

"Election Contest" shall mean a solicitation of proxies of the kind described in Rule 14a-12(c) under the Exchange Act.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Exempt Person" shall mean any of the Company, any subsidiary of the Company, any employee benefit plan of the Company or any subsidiary of the Company, and any Person organized, appointed or established by the Company for or pursuant to the terms of any such plan.

"Exempt Rights" shall mean any rights to purchase shares of Common Stock or other Voting Stock of the Company if at the time of the issuance thereof such rights are not separable from such Common Stock or other Voting Stock (i.e., are not transferable otherwise than in connection with a transfer of the underlying Common Stock or other Voting Stock), except upon the occurrence of a contingency, whether such rights exist as of the Effective Date or are thereafter issued by the Company as a dividend on shares of Common Stock or other Voting Securities or otherwise.

"Exempt Transaction" shall mean an increase in the percentage of the outstanding shares of Common Stock or the percentage of the combined voting power of the outstanding Voting Stock of the Company beneficially owned by any Person solely as a result of a reduction in the number of shares of Common Stock then outstanding due to the repurchase of Common Stock or Voting Stock by the Company, unless and until such time as (a) such Person or any Affiliate or Associate of such Person shall purchase or otherwise become the Beneficial Owner of additional shares of Common Stock constituting 1% or more of the then outstanding shares of Common Stock or additional Voting Stock representing 1% or more of the combined voting power of the then outstanding Voting Stock, or (b) any other Person (or Persons) who is (or collectively are) the Beneficial Owner of shares of Common Stock constituting 1% or more of the then outstanding shares of Common Stock or Voting Stock representing 1% or more of the combined voting power of the then outstanding Voting Stock shall become an Affiliate or Associate of such Person.

"Person" shall mean any individual, firm, corporation, partnership, association, trust, unincorporated organization, or other entity.

"Voting Stock" shall mean, (i) with respect to a corporation, all securities of such corporation of any class or series that are entitled to vote generally in the election of, or to appoint by contract, directors of such corporation (excluding any class or series that would be entitled so to vote by reason of the occurrence of any contingency, so long as such contingency has not occurred) and (ii) with respect to an entity which is not a corporation, all securities of any class or series that are entitled to vote generally in the election of, or to appoint by contract, members of the body which is most analogous to the board of directors of a corporation.

**Attachment "B"**

**Initial Awards**

The provisions of this Attachment B apply to all Awards made under this Plan that are granted effective as of the Effective Date or within 90 days thereafter ("Initial Awards").

The Initial Awards to Employees and Directors ("Emergence Grants") under the Plan and the Medium Term Incentive Plan (collectively, the "Compensation Plans") shall consist of MTI target awards granted under the MTI, stock options and stock appreciation rights granted under the Plan, and restricted stock or restricted stock units granted under the Plan.  The form and terms of all or a portion of the Emergence Grants, including the methodology for allocations of MTI and Plan awards under the Compensation Plans, were reviewed and authorized by the Remuneration Committee of the Supervisory Board of LyondellBasell Industries AF S.C.A. and, in addition, shall be approved by the Supervisory Board of LyondellBasell Industries N.V. (collectively, the "Boards") at their meetings in April, 2010 and shall become effective as of the Effective Date without further corporate action (the "Allocated Emergence Grants").  To the extent the Emergence Grants are not fully allocated as of the Effective Date (the "Unallocated Emergence Grants"), not more than ninety (90) days after the Effective Date, the Boards shall authorize and approve the grant of all Unallocated Emergence Grants using the same methodology used by the Boards for individual selection and valuing and allocating among individual MTI and Plan awards as used by the Boards for the Allocated Emergence Grants, provided that, to the extent that the exercise price of any option grants made with respect to Unallocated Emergence Grants is higher or lower than the exercise price of option grants made with respect to the Allocated Emergence Grants, a corresponding adjustment shall be made to the methodology for determining the number of shares of restricted stock or restricted stock units grants with respect to the Unallocated Emergence Grants.  For purposes of clarity, the foregoing shall not be applicable to awards made under the Compensation Plans following the period ending ninety (90) days after the Effective Date, and awards made thereafter shall be subject to approval by the Compensation Committee of the Supervisory Board of LyondellBasell Industries, N.V., in accordance with the terms of the Compensation Plans.

Stock Options or Stock Appreciation Rights will be granted with an exercise price of no less than Fair Market Value on the date of grant.  For Options and SAR Awards that are granted effective as of the Effective Date, Fair Market Value shall be determined by reference to the midpoint of the implied equity reorganization value derived from the Evercore valuation as confirmed by the Bankruptcy Court in the Confirmation Order of the Plan of Reorganization.

Awards of Restricted Stock and Restricted Stock Units will be calculated by reference to a per share value of $14.11.

Grants made to the Chief Executive Officer of the Company are subject to the terms of his employment agreement regarding acceleration of vesting due to a Change of Control.

**TAB 10**

**REGISTRATION RIGHTS AGREEMENT**

**by and among**

**LYONDELLBASELL INDUSTRIES N.V.**

**and**

**THE HOLDERS**

**Dated as of _____, 2010**

# Table of Contents

**Page**

1.    Definitions. ................................................................................................. 1

2.    Demand Registrations. .................................................................................. 5

3.    Piggyback Takedowns. .................................................................................. 9

4.    Suspension Period. .......................................................................................11

5.    Holdback Agreements. ..................................................................................11

6.    Company Undertakings. ............................................................................... 12

7.    Registration Expenses. ................................................................................ 17

8.    Intentionally Omitted. ................................................................................. 17

9.    Indemnification; Contribution. ...................................................................... 17

10.   Participation in Underwritten Offering/Sale of Registrable Securities........................... 21

11.   Rule 144 and Rule 144A; Other Exemptions. ................................................... 22

12.   Private Placement ...................................................................................... 22

13.   Transfer of Registration Rights...................................................................... 22

14.   Amendment, Modification and Waivers; Further Assurances. ....................................... 23

15.   Miscellaneous. .......................................................................................... 24

**REGISTRATION RIGHTS AGREEMENT**

THIS REGISTRATION RIGHTS AGREEMENT (this "*Agreement*") is made as of_____, 2010 by and among LyondellBasell Industries N.V., a public limited liability company (*naamloze vennootschap*) formed under the laws of The Netherlands, (the "*Company*"), the Investors (as defined below) and any parties identified on the signature page of any joinder agreements executed and delivered pursuant to Section 13 hereof (each, including the Investors, a "*Holder*" and, collectively, the "*Holders*").  Capitalized terms used but not otherwise defined herein are defined in Section 1 hereof.

**RECITALS:**

Whereas pursuant to the Equity Commitment Agreement dated December 11, 2009 by and between the Company and the Investors set forth therein, as amended, the Company has agreed to offer registration rights to the Holders of the Company's New Common Stock (as defined below) on the terms and conditions set forth herein; and

Whereas the Company proposes to issue the New Common Stock pursuant to, and upon the terms set forth in, the plan of reorganization of LyondellBasell Industries AF S.C.A. and certain of its subsidiaries and affiliates under chapter 11, title 11 of the United States Code, 11 U.S.C. §§101-1532 (the "*Plan*").

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and each of the Holders hereby agree as follows:

1.      **Definitions.**

"*Access Investors*" means the Investors identified as the Access Investors on the signature pages hereto and any of their respective Affiliates.

"*Affiliate*" has the meaning given to that term pursuant to Rule 144 under the Securities Act.

"*Agreement*" has the meaning specified in the first paragraph hereof.

"*Apollo Investors*" means the Investors identified as the Apollo Investors on the signature pages hereto and any of their respective Affiliates.

"*Ares Investors*" means the Investors identified as the Ares Investors on the signature pages hereto and any of their respective Affiliates.

"*Automatic Shelf Registration Statement*" means an "automatic shelf registration statement" as defined in Rule 405 (or any successor rule then in effect) promulgated under the Securities Act.

"*beneficially owned*", "*beneficial ownership*" and similar phrases have the same meanings as such terms have under Rule 13-d (or any successor rule then in effect) promulgated

1

under the Exchange Act, except that in calculating the beneficial ownership of any Holder, such Holder shall be deemed to have beneficial ownership of all securities that such Holder has the right to acquire, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition.

"***Board***" means the Supervisory Board of the Company.

"***Business Day***" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City or The Netherlands are authorized or required by applicable law or executive order to close.

"***Commission***" means the United States Securities and Exchange Commission or any successor governmental agency.

"***Company***" has the meaning specified in the first paragraph hereof.

"***Company Demand Registration Notice***" has the meaning specified in <u>Section 2(d)</u>.

"***control***" has the meaning given to that term under Rule 405 under the Securities Act (and "*controlled*" and "*controlling*" shall have correlative meanings).

"***Counsel to the Holders***" means, with respect to any underwritten offering pursuant to a Demand Registration (including a Shelf Takedown), one law firm retained by the Holders of a majority of the Registrable Securities requested to be included in such Demand Registration (or Shelf Takedown, if applicable), together with any separate local counsel reasonably retained by such law firm.

"***Demand Registration***" means any registration statement made pursuant to <u>Section 2(b)</u>.

"***Demand Registration Notice***" has the meaning specified in <u>Section 2(d)</u>.

"***Determination Date***" has the meaning specified in <u>Section 2(g)</u>.

"***Disclosure Package***" means, with respect to any offering of securities, (i) the preliminary prospectus, (ii) each Free Writing Prospectus and (iii) all other information, in each case, that is deemed, under Rule 159 promulgated under the Securities Act, to have been conveyed to purchasers of securities at the time of sale of such securities (including a contract of sale).

"***Effective Date***" has the meaning assigned to such term in the Plan.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended from time to time.

"***FINRA***" means the Financial Industry Regulatory Authority or any successor regulatory authority.

2

"***Form 10***" means a registration statement on Form 10 registering the class A ordinary shares and class B ordinary shares of the Company under Section 12 of the Exchange Act.

"***Free Writing Prospectus***" means any "free writing prospectus" as defined in Rule 405 promulgated under the Securities Act.

"***Holder***" and "***Holders***" have the meanings given to those terms in the first paragraph hereof.

"***Holder Free Writing Prospectus***" means each Free Writing Prospectus prepared by or on behalf of the relevant Holder or used or referred to by such Holder in connection with the offering of Registrable Securities.

"***Initial Shelf Registration Statement***" has the meaning specified in Section 2(a).

"***Investors***" means the Access Investors, the Ares Investors and/or the Apollo Investors.

"***Lock-Up Period***" has the meaning specified in Section 5(a).

"***Long-Form Registration***" has the meaning specified in Section 2(b).

"***Losses***" has the meaning specified in Section 9(d).

"***New Common Stock***" means the class A ordinary shares of four eurocent (EUR 0.04) per share and class B ordinary shares of four eurocent (EUR 0.04) per share, of the Company, in each case, issued on and after the Effective Date and any additional ordinary shares paid, issued or distributed in respect of any such shares by way of a share dividend, share split or distribution, or in connection with a combination of shares, and any such security into which such New Common Stock shall have been converted or exchanged in connection with a recapitalization, reorganization, reclassification, merger, consolidation, exchange, distribution or otherwise (including the class A ordinary shares issued upon conversion of the class B ordinary shares).

"***NYSE***" means the New York Stock Exchange.

"***Other Holders***" has the meaning specified in Section 3(c).

"***Person***" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a governmental entity or any department, agency or political subdivision thereof or any other entity.

"***Piggyback Takedown***" has the meaning specified in Section 3(a).

"***Plan***" has the meaning specified in the Recitals.

"***Prospectus***" means the prospectus used in connection with a Registration Statement.

"***Registrable Securities***" means at any time any shares of New Common Stock (i) issued on or after the Effective Date to any Holder or (ii) held or "*beneficially owned*" by any Holder,

including any New Common Stock issued pursuant to the Plan or upon the conversion, exercise or exchange, as applicable, of any other securities and/or interests issued pursuant to the Plan, including shares of New Common Stock acquired in open market or other purchases after the Effective Date; <u>provided</u>, <u>however</u>, that as to any Registrable Securities, such securities shall cease to constitute Registrable Securities upon the earliest to occur of:  (A) the date on which such securities are disposed of pursuant to an effective registration statement under the Securities Act; (B) the date on which such securities are disposed of pursuant to Rule 144 (or any successor rule then in effect) promulgated under the Securities Act; (C) with respect to the Registrable Securities of any Holder, any time that such Holder no longer holds or "*beneficially owns*" at least 1% of the outstanding New Common Stock; and (D) the date on which such securities cease to be outstanding.

"***Registration Expenses***" means all expenses (other than Selling Expenses) arising from or incident to the registration of Registrable Securities in compliance with this Agreement, including:

(i)    Commission, FINRA and other registration and filing fees,

(ii)    all fees and expenses incurred in connection with complying with any securities or blue sky laws (including fees, charges and disbursements of counsel in connection with blue sky qualifications of the Registrable Securities),

(iii)    all printing, messenger and delivery expenses,

(iv)    the fees, charges and disbursements of counsel to the Company and of its independent public accountants and any other accounting and legal fees, charges and expenses incurred by the Company (including any expenses arising from or incident to any special audits or "*comfort letters*" required in connection with or incident to any registration),

(v)    the fees and expenses incurred in connection with the listing of the Registrable Securities on NYSE (or any other national securities exchange),

(vi)    the fees and expenses incurred in connection with marketing (including any "*road show*") with respect to any underwritten offerings, and

(vii)    reasonable and documented fees, charges and disbursements of Counsel to the Holders, including, for the avoidance of doubt, any expenses of Counsel to the Holders in connection with the filing or amendment of any Registration Statement, Prospectus or Free Writing Prospectus hereunder.

"***Registration Statement***" means any registration statement filed with the Commission pursuant to Section 2 hereunder or in connection with a Piggyback Takedown.

"***Requesting Holder***" has the meaning specified in <u>Section 2(b)</u>.

"***Required Period***" means: (i) with respect to the Initial Shelf Registration Statement, two years following the effective date of the Initial Shelf Registration Statement, (ii) with respect to any Shelf Registration, three years following the effective date of the Registration Statement for

such Shelf Registration, and (iii) with respect to a Demand Registration that is a Long-Form Registration (other than the Initial Shelf Registration Statement), 90 days following the effective date of the Registration Statement filed in connection therewith (which 90 day period shall be extended by the number of days such Demand Registration was suspended pursuant to Section 4), or, if sooner, in each case, until all Registrable Securities have been sold under such Registration Statement.

"*Securities Act*" means the Securities Act of 1933, as amended from time to time.

"*Selling Expenses*" means the underwriting fees, discounts, selling commissions and stock transfer taxes applicable to all Registrable Securities registered by the Holders.

"*Selling Holder*" means with respect to any specified Registration Statement filed pursuant to this Agreement, any Holder whose Registrable Securities are included in such Registration Statement.

"*Shelf Registration*" means a registration of securities pursuant to a registration statement on Form S-3 (or any successor form) or any similar short-form registration statement filed with the Commission in accordance with and pursuant to Rule 415 promulgated under the Securities Act (or any successor rule then in effect).

"*Shelf Takedown*" means an offering pursuant to a Shelf Registration.

"*Short-Form Registration*" has the meaning specified in Section 2(b)(B).

"*Suspension Period*" has the meaning specified in Section 4(a).

"*Underwriting Agreement*" means underwriting arrangements in customary form entered into pursuant to this Agreement, which shall be satisfactory to the Holders of a majority of Registrable Securities participating in the offering.

"*Well-Known Seasoned Issuer*" means a "*well-known seasoned issuer*" as defined in Rule 405 promulgated under the Securities Act (or any successor rule then in effect) and which (i) is a "*well-known seasoned issuer*" under paragraph (1)(i)(A) of such definition or (ii) is a "*well-known seasoned issuer*" under paragraph (1)(i)(B) of such definition and is also eligible to register a primary offering of its securities relying on General Instruction I.B.1 of Form S-3 or Form F-3 under the Securities Act.

## 2.    Demand Registrations.

(a)    Initial Shelf Registration Statement.  By the later of (i) 90 days after the Effective Date or (ii) 30 days after the Form 10 is declared to be effective by the Commission, the Company shall file with the Commission a registration statement (the "*Initial Shelf Registration Statement*") relating to the offer and sale of Registrable Securities by the Holders to the public, from time to time, on a delayed or continuous basis (but not involving any underwritten offering).  Except as otherwise provided herein, the Company shall use its reasonable best efforts to (i) cause the Initial Shelf Registration Statement to be declared effective by the Commission as soon as practicable thereafter, and (ii) keep the Initial Shelf

Registration Statement continuously effective and, except as otherwise expressly permitted herein in Section 4, not to suspend use of the prospectus included therein in order to permit the prospectus included therein to be usable by the Holders until the earliest to occur of the following: (A) there are no longer any Registrable Securities, (B) until the Company has filed a Short-Form Registration or an Automatic Shelf Registration registering all of the Registrable Securities, and such registration statement has been declared effective, or (C) the expiration of the Required Period.

(b)      Requests for Demand Registration.

(A) Following the later of (x) 90 days after the Effective Date or (y) the date the Form 10 is declared to be effective by the Commission, but (i) at any time prior to the first anniversary date of the Effective Date, the Holder or Holders of [majority][1] of Registrable Securities then outstanding and (ii) at any time on or after the first anniversary date of the Effective Date, any Holder of Registrable Securities then outstanding (in the case of clause (i) or (ii), the "**_Requesting Holder_**") may request registration under the Securities Act of all or any portion of the Registrable Securities held by such Requesting Holder on Form S-1 or similar long-form registration statement (a "**_Long-Form Registration_**") with respect to only the number of Demand Registrations for each Holder set forth in the table in Section 2(c) below.

(B) At any time on or after the first anniversary date of the Effective Date, a Requesting Holder may request registration under the Securities Act of all or any portion of the Registrable Securities held by such Requesting Holder on Form S-3 or any similar short form registration statement (a "**_Short-Form Registration_**"), if available, with respect to only the number of Demand Registrations for each Holder set forth in the table in Section 2(c) below.

(C) In the case of each Demand Registration made pursuant to Section 2(b)(A) and Section 2(b)(B) above, such Requesting Holder will be entitled to make such demand only if the total offering price of the Registrable Securities to be sold in such offering and together with any other securities to be sold in such offering (including piggyback shares and before deduction of underwriting discounts), is reasonably expected to exceed, in the aggregate, $100 million; or, if an underwritten offering, $75 million, if such amount is acceptable to the managing underwriter; _provided_ that in lieu of filing a new Long-Form Registration, the Company may elect to amend or supplement the Initial Shelf Registration Statement to provide for an underwritten offering on behalf of the Requesting Holder and such amended Initial Shelf Registration Statement shall count as a Long-Form Registration so long as it satisfies all other requirements for a Long-Form Registration contained in this Agreement.

(c)      Demand Registration Allocation.  The number of Demand Registrations, whether they be Long-Form Registration or Short-Form Registration, for each Holder shall be as follows:

| Holder | Number of Demand Registrations |
| --- | --- |
| Access Investors | [4] |

---

[1] Applicable threshold is to be determined.

| Apollo Investors | [10] |
|---|---|
| Ares Investors | [4] |

provided that notwithstanding the foregoing, to the extent a Requesting Holder beneficially owns at least 10% of the New Common Stock then outstanding, such Requesting Holder may request an unlimited number of Demand Registrations.

(d)    Demand Registration Notices.    All requests for Demand Registrations shall be made by giving written notice to the Company (the "***Demand Registration Notice***"). Each Demand Registration Notice shall specify the approximate number of Registrable Securities to be sold in the Demand Registration and the expected price range (net of underwriting discounts and commissions) of such Demand Registration.    Within five days after receipt of any Demand Registration Notice, the Company shall give written notice of such requested Demand Registration to all other Holders of Registrable Securities (the "***Company Demand Registration Notice***") and, subject to the provisions of 2(h) below, shall include in such Demand Registration all Registrable Securities with respect to which the Company has received written requests for inclusion therein within 20 days after sending the Company Demand Registration Notice.    Holders who participate in such Demand Registration pursuant to this Section 2(d) shall not be deemed to have requested a Long-Form Registration.

(e)    Effective Demand Registrations.    A registration shall not count as one of the permitted Demand Registrations until both (i) it has become effective and (ii) such effective registration includes at least 80% of the Registrable Securities requested to be included by the Requesting Holder; provided that a Demand Registration which is withdrawn at the sole request of the Requesting Holder who demanded such Demand Registration will count as a Demand Registration of such Requesting Holder unless the Company is reimbursed by such holder of all reasonable out-of-pocket expenses incurred by the Company in connection with such registration.

(f)    Short-Form Registrations.    Demand Registrations and the Initial Shelf Registration Statement shall be Short-Form Registrations whenever the Company is permitted to use any applicable short-form registration statement.    Promptly after the Company has become eligible to use a Shelf Registration that is a Short-Form Registration, the Company shall use its reasonable best efforts to make any already effective Initial Shelf Registration Statement or Long-Form Registration converted into a Short-Form Registration; provided that such conversion shall not count as the use of a Demand Registration.

(g)    Automatic Shelf Registration.    Further, upon the Company becoming a Well-Known Seasoned Issuer, (i) the Company shall give written notice to all of the Holders as promptly as practicable but in no event later than ten days thereafter, and such notice shall describe, in reasonable detail, the basis on which the Company has become a Well-Known Seasoned Issuer, and (ii) the Company shall, as promptly as practicable, register, under an Automatic Shelf Registration Statement, the sale of all of the Registrable Securities in accordance with the terms of this Agreement.    The Company shall use its commercially reasonable efforts to file such Automatic Shelf Registration Statement as promptly as practicable, but in no event later than 20 days after it becomes a Well-Known Seasoned Issuer,

and to cause such Automatic Shelf Registration Statement to remain effective thereafter until there are no longer any Registrable Securities or until the earlier expiration of the Required Period. The Company shall give written notice of filing such Automatic Shelf Registration Statement to all of the Holders as promptly as practicable thereafter. At any time after the filing of an Automatic Shelf Registration Statement by the Company, if the Company is no longer a Well-Known Seasoned Issuer (the "***Determination Date***"), within 10 days after such Determination Date, the Company shall (A) give written notice thereof to all of the Holders and (B) file a Registration Statement on an appropriate form (or a post effective amendment converting the Automatic Shelf Registration Statement to an appropriate form) covering all of the Registrable Securities, and use commercially reasonable efforts to have such Registration Statement declared effective as promptly as practicable after the date the Automatic Shelf Registration Statement is no longer useable by the Holders to sell their Registrable Securities. For the avoidance of doubt, (i) the Company shall only be obligated pursuant to this Agreement to maintain the effectiveness of one Shelf Registration at any given time so long as such Shelf Registration satisfies all the requirements for Demand Registrations under this Agreement and (ii) an Automatic Shelf Registration Statement filed pursuant to this Section 2(g) shall not count as the use of a Demand Registration.

(h)    <u>Priority on Demand Registrations</u>. The Company shall not include in any Demand Registration any securities which are not Registrable Securities without the prior written consent of the Holders of a majority of the Registrable Securities requested to be included in the Demand Registration except as set forth in the next sentence. If the Demand Registration is an underwritten offering and the managing underwriters for such Demand Registration advise the Company in writing that in their opinion the number of Registrable Securities and, if permitted hereunder, other securities requested to be included in such Demand Registration exceeds the number of Registrable Securities and other securities, if any, which can be sold in an orderly manner in such offering within a price range acceptable to the Holders of a majority of the Registrable Securities requested to be included in the Demand Registration, the Company shall include in such Demand Registration the number of Registrable Securities which can be so sold in the following order of priority: (i) <u>first</u>, the Registrable Securities requested to be included in such Demand Registration, which in the opinion of such underwriter can be sold in an orderly manner within the price range of such offering, *pro rata* among the respective Holders of such Registrable Securities on the basis of [ ]², and (ii) <u>second</u>, other securities requested to be included in such Demand Registration to the extent permitted hereunder.

(i)    <u>Restrictions on Demand Registrations</u>. The Company shall not be obligated to effect (i) any Long-Form Registration within 180 days or (ii) any Short-Form Registration within 120 days, in each case, after the effective date of a previous Demand Registration or a previous registration statement in which the Holders of Registrable Securities were given piggyback rights pursuant to <u>Section 3</u> of this Agreement and in which such Holders were able to register at least 80% of the number of Registrable Securities requested to be included therein. In addition, the Company shall not be obligated to effect any Demand Registration during the period starting with the date that is 60 days prior to the Board's good

---

² It is to be determined whether the basis for pro rata participation will be based on the total number of Registrable Securities (i) owned or (ii) requested to be included in such Demand Registration by each such Holder.

faith estimate of the date of filing of, and ending on the date that is 90 days after the effective date of, a Company-initiated registration statement, provided that the Company is actively employing in good faith all reasonable best efforts to cause such registration statement to become effective, and provided further that, notwithstanding anything in the foregoing to the contrary, the aggregate number of days that any one or more Demand Registrations are suspended or delayed by operation of this Section 2(i) shall not exceed 90 days in any 12-month period.  In the event of any such suspension or delay, the Holder of Registrable Securities initially requesting a Demand Registration that is suspended by operation of this Section 2(i) shall be entitled to withdraw such request and, if such request is withdrawn, such Demand Registration shall not count as one of the permitted Demand Registrations hereunder, and, notwithstanding the proviso in Section 2(e), the Company shall pay all Registration Expenses in connection with such registration.

(j)      Selection of Underwriters.  The Holders of a majority of the Registrable Securities requested to be included in a Demand Registration which is an underwritten offering shall have the right to select the investment banker(s) and manager(s) to administer the offering (which shall consist of one or more reputable nationally recognized investment banks), subject to the Company's approval which shall not be unreasonably withheld, conditioned or delayed.

3.      **Piggyback Takedowns.**

(a)      Right to Piggyback.  Whenever the Company proposes to register any of its securities, or proposes to offer any of its New Common Stock pursuant to a registration statement under the Securities Act (other than pursuant to a Demand Registration (including pursuant to Section 2(d)) or a registration statement on Form S-4 or Form S-8 or any successor forms) (a "***Piggyback Takedown***"), the Company shall give prompt written notice to all Holders of Registrable Securities of its intention to effect such Piggyback Takedown.  In the case of a Piggyback Takedown that is an offering under a Shelf Registration, such notice shall be given not less than five Business Days prior to the expected date of commencement of marketing efforts for such Piggyback Takedown.  In the case of a Piggyback Takedown that is an offering under a registration statement that is not a Shelf Registration, such notice shall be given not less than 20 days prior to the expected date of filing of such registration statement.  The Company shall, subject to the provisions of Section 3(b) and Section 3(c) below, include in such Piggyback Takedown, as applicable, all Registrable Securities with respect to which the Company has received written requests for inclusion therein within 10 days (in the case of a Piggyback Takedown that is an offering under a Shelf Registration, within three Business Days) after sending the Company's notice.  Notwithstanding anything to the contrary contained herein, (i) the Company may determine not to proceed with any Piggyback Takedown upon written notice to the Holders of Registrable Securities requesting to include their Registrable Securities in such Piggyback Takedown; and (ii) any Holder of Registrable Securities may withdraw its request for inclusion of Registrable Shares in a Piggyback Takedown by giving written notice to the Company of its intention to withdraw from that Piggyback Takedown; provided, however, that the withdrawal shall be irrevocable and after making the withdrawal, a Holder shall no longer have any right to include its Registrable Securities in that Piggyback Takedown.  No withdrawal of Registrable Securities under this Section 3 will relieve the Company of its obligation to effect any registration request pursuant to Section 2 and the Company shall pay all Registration Expenses in connection with any registration under Section 3.

9

(b)    Priority on Primary Piggyback Takedowns.  If a Piggyback Takedown is an underwritten primary registration on behalf of the Company, and the managing underwriters for a Piggyback Takedown advise the Company in writing that in their opinion the number of securities requested to be included in such Piggyback Takedown exceeds the number which can be sold in an orderly manner in such offering within a price range acceptable to the Company, the Company shall include in such Piggyback Takedown the number which can be so sold in the following order of priority: (i) first, the securities the Company proposes to sell, (ii) second, the Registrable Securities requested to be included in such Piggyback Takedown (*pro rata* among the Holders of such Registrable Securities on the basis of [ ]³), and (iii) third, other securities requested to be included in such Piggyback Takedown.

(c)    Priority on Secondary Piggyback Takedowns.  If a Piggyback Takedown is an underwritten secondary registration on behalf of holders of the Company's securities that are not Registrable Securities ("***Other Holders***"), and the managing underwriters advise the Company in writing that in their opinion the number of securities requested to be included in such Piggyback Takedown exceeds the number which can be sold in an orderly manner in such offering within a price range acceptable to the Other Holders, the Company shall include in such registration the number which can be so sold in the following order of priority: (i) first, the securities requested to be included therein by the Other Holders and the Registrable Securities requested to be included in such registration (*pro rata* among the Other Holders and the Holders on the basis of the number of such securities requested to be included therein by the Other Holders and [ ]⁴) and (ii) second, other securities requested to be included in such registration, if any.

(d)    Selection of Underwriters.  If any Piggyback Takedown is a primary registration of an underwritten offering, the Company will have the right to select the investment banker(s) and manager(s) for the offering.  If any Piggyback Takedown is an underwritten secondary registration, the selection of the investment banker(s) and manager(s) shall be made in the manner agreed among a majority of such Holders initiating the registration or otherwise causing such registration to occur, subject to the Company's approval.

(e)    Exclusion of Securities.  If the Piggyback Takedown is to be a registration in connection with an underwritten offering on behalf of the Company, and the managing underwriter for such offering advises the Company in writing that, in such firm's opinion, such offering would be materially and adversely affected by the inclusion therein of Registrable Securities requested to be included therein because such Registrable Securities are not of the same type, class or series as the securities to be offered and sold in such offering on behalf of the Company, the Company may exclude all such Registrable Securities from such offering provided that the Holder is permitted to substitute for the Registrable Securities so excluded an equal number of Registrable Securities of the same type, class or series as those being registered by the Company, if and to the extent such Holder owns Registrable Securities of such type, class or

---

³ It is to be determined whether the basis for pro rata participation will be based on the total number of Registrable Securities (i) owned or (ii) requested to be included in such Piggyback Takedown by each such Holder.

⁴ It is to be determined whether the basis for pro rata participation will be based on the total number of Registrable Securities (i) owned or (ii) requested to be included in such Piggyback Takedown by each such Holder.

series or can acquire Registrable Securities of such type, class or series upon exercise or conversion of other Registrable Securities.

(f)     Right to Terminate.  The Company shall have the right to terminate or withdraw any registration initiated by it under this Section 3 whether or not any Holder of Registrable Securities has elected to include securities in such registration.  The Registration Expenses of such withdrawn registration shall be borne by the Company in accordance with Section 7 hereof.

### 4.     Suspension Period.

(a)     Suspension Period.  Notwithstanding any provision of this Agreement to the contrary, if the Board determines in good faith that the registration and distribution of Registrable Securities (i) would reasonably be expected to materially impede, delay or interfere with, or require premature disclosure of, any material financing, offering, acquisition, merger or corporate reorganization, or other significant transaction or any negotiations, discussions or pending proposals with respect thereto, involving the Company or any of its subsidiaries, or (ii) would require disclosure of material non-public information, the disclosure of which would reasonably be expected to materially and adversely affect the Company, the Company shall be entitled to suspend, for a reasonable period of time (each, a "**Suspension Period**"), the use of any Registration Statement or Prospectus and shall not be required to amend or supplement the Registration Statement, any related Prospectus or any document incorporated therein by reference.  The Company shall use its good faith efforts to amend the Registration Statement and/or Prospectus to correct such untrue statement or omission as soon as reasonably practicable unless the Board determines in good faith that such amendment would have the effect described in subsection (i) or (ii) above.  The Company promptly will give written notice of any such Suspension Period to each Holder that has securities registered on a Registration Statement filed hereunder.

(b)     Limitations on Suspension Periods.  Notwithstanding anything contained in this Section 4 to the contrary, the Company shall not be entitled to more than three Suspension Periods in any 12-month period, and in no event shall the number of days included in all Suspension Periods during any consecutive 12-month period exceed 90 in the aggregate.

### 5.     Holdback Agreements.

(a)     Holders of Registrable Securities.  In connection with underwritten public offering of equity securities, or any securities convertible into or exchangeable or exercisable for such securities, by the Company for its own account or on behalf of any Holder or Other Holders (including pursuant to any Shelf Takedown), no Holder who "*beneficially owns*" five percent (5%) or more of the outstanding shares of New Common Stock shall effect any public sale or distribution (including sales pursuant to Rule 144) of equity securities of the Company, or any securities convertible into or exchangeable or exercisable for such securities, without prior written consent from the underwriters managing the underwritten public equity offering by the Company during a period beginning up to seven days prior to and ending up to 90 days from and including the date of pricing as reasonably requested by the underwriters managing the underwritten public equity offering (including pursuant to any Shelf Takedown) (the "*Lock-Up*

11

*Period*"); provided that (i) the foregoing shall not apply to any shares of New Common Stock that are being issued pursuant to the underwritten public equity offering, (ii) such Lock-Up Period shall be no longer than the lock-up period applicable on substantially similar terms to the Company and the executive officers and directors of the Company and (iii) such Lock-Up Period shall not commence unless the Company notifies the Holders in writing prior to the commencement of the Lock-Up Period; provided, further, that nothing herein will prevent any Holder that is a partnership or corporation from (1) making a distribution of Registrable Securities to the partners or stockholders thereof or a transfer to an Affiliate that is otherwise in compliance with the applicable securities laws, or (2) consummating a private placement of Registrable Securities, so long as such distributees or transferees agree to be bound by the restrictions set forth in this Section 5(a). Each Holder agrees to execute a lock-up agreement in favor of the Company's underwriters to such effect and, in any event, that the Company's underwriters in any underwritten public offering of equity securities shall be third party beneficiaries of this Section 5(a). The provisions of this Section 5(a) will no longer apply to a Holder if (a) such Holder ceases to hold any Registrable Securities or (b) such Holder beneficially owns less than five percent (5%) of the outstanding shares of New Common Stock.

(b)    The Company. In connection with any underwritten public equity offering (including pursuant to any Demand Registration, Piggyback Takedown or Shelf Takedown), the Company shall not effect any public sale or distribution of its equity securities, or any securities convertible into or exchangeable or exercisable for such securities (except pursuant to registrations on Form S-8 or Form S-4 under the Securities Act), during a period beginning up to seven days prior to and ending up to 90 days from and including the date of pricing of such underwritten public equity offering as reasonably requested by the underwriters managing the underwritten public equity offering; provided that the foregoing shall not apply to any securities that are being issued pursuant to the underwritten public equity offering; provided, further, that nothing herein will prevent the Company from (1) issuing securities upon the exercise of an option or warrant or the conversion or exchange of a security outstanding on such date, or (2) granting securities pursuant to employee benefit plans in effect on such date.

**6.    Company Undertakings.**

Whenever Registrable Securities are registered pursuant to this Agreement, the Company shall use its commercially reasonable efforts to effect the registration and the sale of such Registrable Securities as soon as reasonably practicable in accordance with the intended method of disposition thereof, and pursuant thereto the Company shall as soon as reasonably practicable:

(a)    prepare and file with the Commission a Registration Statement with regard to such Registrable Securities as soon as practicable (but in the case of a Demand Registration, not later than 30 days (45 days if the applicable registration form is other than Form S-3) of its receipt of a Demand Registration Notice) and use its best efforts to cause such Registration Statement to become effective;

(b)    before filing a Registration Statement or Prospectus or any amendments or supplements thereto, at the Company's expense, furnish to the Holders whose securities are covered by the Registration Statement no less than three Business Days prior to filing copies of

12

all such documents, other than documents that are incorporated by reference, proposed to be filed and such other documents reasonably requested by such Holders, which documents shall be subject to the review and comment of the Counsel to such Holders;

(c)    notify each Holder of Registrable Securities of the effectiveness of each Registration Statement and prepare and file with the Commission such amendments and supplements to such Registration Statement and the Prospectus used in connection therewith as may be necessary to keep such Registration Statement effective for a period of not less than the applicable Required Period and comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such Registration Statement during such period in accordance with the intended methods of disposition by the sellers thereof set forth in such Registration Statement;

(d)    furnish to each Selling Holder, and the managing underwriters, without charge, such number of copies of the applicable Registration Statement, each amendment and supplement thereto, the Prospectus included in such Registration Statement (including each preliminary Prospectus, final Prospectus, and any other Prospectus (including any Prospectus filed under Rule 424, Rule 430A or Rule 430B promulgated under the Securities Act and any "*issuer free writing prospectus*" as such term is defined under Rule 433 promulgated under the Securities Act)), all exhibits and other documents filed therewith and such other documents as such Selling Holder or such managing underwriters may reasonably request including in order to facilitate the disposition of the Registrable Securities owned by such Selling Holder, and upon request, a copy of any and all transmittal letters or other correspondence to or received from, the Commission or any other governmental authority relating to such offer;

(e)    use its commercially reasonable efforts (i) to register or qualify such Registrable Securities under such other securities or blue sky laws of such jurisdictions as any Selling Holder reasonably requests, (ii) to keep such registration or qualification in effect for so long as such Registration Statement remains in effect, and (iii) to do any and all other acts and things which may be reasonably necessary or advisable to enable such Selling Holder to consummate the disposition in such jurisdictions of the Registrable Securities owned by such Selling Holder (provided that the Company shall not be required to (A) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this subsection, (B) subject itself to taxation in any such jurisdiction or (C) consent to general service of process in any such jurisdiction);

(f)    notify each Selling Holder, the Counsel to the Holders and the managing underwriters (i) at any time when a Prospectus relating to the applicable Registration Statement is required to be delivered under the Securities Act, (A) upon discovery that, or upon the happening of any event as a result of which, such Registration Statement, or the Prospectus or Free Writing Prospectus relating to such Registration Statement, or any document incorporated or deemed to be incorporated therein by reference contains an untrue statement of a material fact or omits any fact necessary to make the statements in the Registration Statement or the Prospectus or Free Writing Prospectus relating thereto not misleading or otherwise requires the making of any changes in such Registration Statement, Prospectus, Free Writing Prospectus or document, and, at the request of any such Selling Holder and subject to Section 4(a) hereof, the Company shall promptly prepare a supplement or amendment to such Prospectus or Free Writing

13

Prospectus, furnish a reasonable number of copies of such supplement or amendment to each Selling Holder, Counsel to the Holders and the managing underwriters and file such supplement or amendment with the Commission so that, as thereafter delivered to the purchasers of such Registrable Securities, such Prospectus or Free Writing Prospectus as so amended or supplemented shall not contain an untrue statement of a material fact or omit to state any material fact necessary to make the statements therein not misleading, (B) as soon as the Company becomes aware of any comments or inquiries by the Commission or any requests by the Commission or any Federal or state governmental authority for amendments or supplements to a Registration Statement or related Prospectus or Free Writing Prospectus covering Registrable Securities or for additional information relating thereto, (C) as soon as the Company becomes aware of the issuance or threatened issuance by the Commission of any stop order suspending or threatening to suspend the effectiveness of a Registration Statement covering the Registrable Securities or (D) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any Registrable Security for sale in any jurisdiction, or the initiation or threatening of any proceeding for such purpose; and (ii) when each Registration Statement or any amendment thereto has been filed with the Commission and when each Registration Statement or the related Prospectus or Free Writing Prospectus or any Prospectus supplement or any post effective amendment thereto has become effective.

(g)    use its commercially reasonable efforts to cause all such Registrable Securities (i) if the New Common Stock is then listed on a securities exchange or included for quotation in a recognized trading market, to continue to be so listed or included, (ii) if the New Common Stock is not then listed on a securities exchange or included for quotation in a recognized trading market, to, as promptly as practicable (subject to the limitations set forth in the Plan), be listed on NYSE or another national securities exchange, and (iii) to be registered with or approved by such other governmental agencies or authorities as may be necessary to enable the sellers thereof to consummate the disposition of the Registrable Securities;

(h)    provide and cause to be maintained a transfer agent and registrar for all such Registrable Securities from and after the effective date of the applicable Registration Statement;

(i)    enter into and perform under such customary agreements (including underwriting agreements in customary form, including customary representations and warranties and provisions with respect to indemnification and contribution) and take all such other actions as the Holders of a majority of the Registrable Securities included in such Shelf Takedown or the underwriters, if any, reasonably request in order to expedite or facilitate the disposition of such Registrable Securities and provide reasonable cooperation, including causing appropriate officers to attend and participate in "*road shows*" and analyst or investor presentations and such other selling or other informational meetings organized by the underwriters, if any; provided, that (i) the Company shall have no obligation to participate in "*road shows*" in connection with any underwritten offering (including pursuant to a Shelf Takedown) in which the total offering price of the Registrable Securities to be sold therein is less than $200 million, and (ii) the Company shall have no obligation to participate in more than three "*road shows*" pursuant to Demand Registrations under Section 2(b) during any consecutive 12-month period (subject to compliance with Section 2(i));

14

(j)      for a reasonable period prior to the filing of any Registration Statement or the commencement of marketing efforts for a Shelf Takedown, as applicable, pursuant to this Agreement, make available for inspection and copying by any Holder of Registrable Securities, Counsel to the Holders, any underwriter participating in any disposition pursuant to such Registration Statement or Shelf Takedown, as applicable, and any other attorney, accountant or other agent retained by any such Holder or underwriter, all reasonably requested financial and other records and pertinent corporate documents of the Company, and cause the Company's officers, directors, employees and independent accountants to supply all reasonably requested information and participate in any due diligence sessions reasonably requested by any such Holder, underwriter, attorney, accountant or agent in connection with such Registration Statement or Shelf Takedown, as applicable, provided that recipients of such financial and other records and pertinent corporate documents agree in writing to keep the confidentiality thereof pursuant to a written agreement reasonably acceptable to the Company and the applicable underwriter (which shall contain customary exceptions thereto);

(k)      permit any Holder of Registrable Securities that beneficially owns at least 5% of the New Common Stock then outstanding, Counsel to the Holders, any underwriter participating in any disposition pursuant to a Registration Statement, and any other attorney, accountant or other agent retained by such Holder of Registrable Securities or underwriter, to participate (including, but not limited to, reviewing, commenting on and attending all meetings) in the preparation of such Registration Statement and any Prospectus supplements relating to a Shelf Takedown, if applicable;

(l)      in the event of the issuance or threatened issuance of any stop order suspending the effectiveness of a Registration Statement, or of any order suspending or preventing the use of any related Prospectus or suspending the qualification of any New Common Stock included in such Registration Statement for sale in any jurisdiction, the Company shall use its commercially reasonable efforts promptly to (i) prevent the issuance of any such stop order, and in the event of such issuance, to obtain the withdrawal of such order and (ii) obtain the withdrawal of any order suspending or preventing the use of any related Prospectus or Free Writing Prospectus or suspending qualification of any Registrable Securities included in such Registration Statement for sale in any jurisdiction at the earliest practicable date;

(m)      in connection with any Shelf Takedown, obtain and furnish to the underwriters (if any) and each such Holder of Registrable Securities including Registrable Securities in such Shelf Takedown a signed counterpart of (i) a cold comfort letter from the Company's independent public accountants and any other accountants responsible for the audit or review of any financial statements included in the Registration Statement, and a bring-down thereof, and (ii) a legal opinion and disclosure letter of counsel to the Company addressed to the relevant underwriters and/or such Holders of Registrable Securities, in each case delivered at the customary times and in customary form and covering such matters of the type customarily covered by such letters as the managing underwriters and/or Holders of a majority of the Registrable Securities included in such Shelf Takedown reasonably request;

(n)      with respect to each Free Writing Prospectus or other materials to be included in the Disclosure Package, ensure that no Registrable Securities be sold "*by means of*"

(as defined in Rule 159A(b) promulgated under the Securities Act) such Free Writing Prospectus or other materials without the prior written consent of a majority of the Holders of the Registrable Securities that are being sold pursuant to such Free Writing Prospectus, which Free Writing Prospectuses or other materials shall be subject to the review of Counsel to the Holders; provided, however, the Company shall not be responsible or liable for any breach by a Holder that has not obtained the prior written consent of the Company pursuant to Section 15(p);

(o)    to the extent not already in existence, provide a CUSIP number for the Registrable Securities prior to the effective date of the first Registration Statement including Registrable Securities;

(p)    promptly notify in writing the Holders, the sales or placement agent, if any, therefor and the managing underwriters of the securities being sold, (i) when such Registration Statement or related Prospectus or Free Writing Prospectus or any Prospectus amendment or supplement or post effective amendment has been filed, and, with respect to any such Registration Statement or any post effective amendment, when the same has become effective and (ii) of any written comments by the Commission and by the blue sky or securities commissioner or regulator of any state with respect thereto;

(q)    (i) prepare and file with the Commission such amendments and supplements to each Registration Statement as may be necessary to comply with the provisions of the Securities Act, including post effective amendments to each Registration Statement as may be necessary to keep such Registration Statement continuously effective for the applicable time period required hereunder and if applicable, file any Registration Statements pursuant to Rule 462(b) promulgated under the Securities Act; (ii) cause the related Prospectus to be supplemented by any required Prospectus supplement, and as so supplemented to be filed pursuant to Rule 424 (or any similar provisions then in force) promulgated under the Securities Act; (iii) comply with the applicable provisions of the Securities Act and the Exchange Act and any applicable securities exchange or other recognized trading market with respect to the disposition of all securities covered by such Registration Statement during such period in accordance with the intended methods of disposition by the sellers thereof set forth in such Registration Statement as so amended or in such Prospectus as so supplemented, and make available to its security holders, as soon as reasonably practicable, earnings statements satisfying the provisions of Section 11(a) of the Securities Act and Rule 158 promulgated thereunder; and (iv) provide additional information related to each Registration Statement as requested by, and obtain any required approval necessary from, the Commission or any Federal or state governmental authority;

(r)    cooperate with each Holder of Registrable Securities and each underwriter participating in the disposition of such Registrable Securities and underwriters' counsel in connection with any filings required to be made with FINRA;

(s)    within the deadlines specified by the Securities Act, make all required filing fee payments in respect of any Registration Statement or Prospectus used under this Agreement (and any offering covered thereby);

(t)        if requested by any participating Holder of Registrable Securities or the managing underwriters, promptly include in a Prospectus supplement or amendment such information as the Holder or managing underwriters may reasonably request, including in order to permit the intended method of distribution of such securities, and make all required filings of such Prospectus supplement or such amendment as soon as reasonably practicable after the Company has received such request;

(u)        in the case of certificated Registrable Securities, cooperate with the participating Holders of Registrable Securities and the managing underwriters to facilitate the timely preparation and delivery of certificates (not bearing any legends) representing Registrable Securities to be sold after receiving written representations from each participating Holder that the Registrable Securities represented by the certificates so delivered by such Holder will be transferred in accordance with the Registration Statement, and enable such Registrable Securities to be in such denominations and registered in such names as the Holders or managing underwriters may reasonably request at least two Business Days prior to any sale of Registrable Securities; and

(v)        use its commercially reasonable efforts to take all other actions necessary to effect the registration and sale of the Registrable Securities contemplated hereby.

## 7.    Registration Expenses.

All Registration Expenses shall be borne by the Company. For the avoidance of doubt, subject to the proviso in <u>Section 2(e)</u> of this Agreement, all Registration Expenses in connection with any registration initiated as a Demand Registration shall be borne by the Company regardless of whether or not such registration has become effective and whether or not such registration has counted as one of the permitted Long-Form Registrations pursuant to <u>Section 2(e)</u> of this Agreement. All Selling Expenses relating to Registrable Securities registered shall be borne by the selling Holders of such Registrable Securities *pro rata* on the basis of the number of Registrable Securities sold.  Notwithstanding anything to the contrary herein, if the Company shall not register any securities with respect to which it had given written notice to Holders of its intention to register, all out-of-pocket expenses incurred by such requesting Holders in connection with such registration (other than the fees, disbursements and other charges of counsel other than the Counsel to the Holders) shall be deemed to be Registration Expenses.

## 8.    Intentionally Omitted.

## 9.    Indemnification; Contribution.

(a)        <u>Indemnification by the Company</u>.  The Company agrees to indemnify and hold harmless each Holder of Registrable Securities, the Affiliates, directors, officers, employees, members, managers and agents of each such Holder and each Person who controls any such Holder within the meaning of either the Securities Act or the Exchange Act, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities and expenses to which they or any of them may become subject insofar as such losses, claims, damages, liabilities and expenses (or actions in respect thereof) arise out of or are based

upon (i) any untrue statement or alleged untrue statement of a material fact contained in a Registration Statement as originally filed or in any amendment thereof, or the Disclosure Package, or any preliminary, final or summary Prospectus or Free Writing Prospectus included in any such Registration Statement, or in any amendment thereof or supplement thereto, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading or (ii) any violation or alleged violation by the Company of the Securities Act, the Exchange Act, any other federal law, any state or foreign securities law, or any rule or regulation promulgated under of the foregoing laws, relating to the offer or sale of the Registrable Securities, and in any such case, the Company agrees to reimburse each such indemnified party, as incurred, for any legal or other expenses reasonably incurred by them in connection with investigating, preparing or defending any such loss, claim, damage, liability,  action or investigation (whether or not the indemnified party is a party to any proceeding); provided, however, that the Company will not be liable to a Holder to the extent that any such loss, claim, damage, liability or expense arises out of or is based upon any such untrue statement or alleged untrue statement or omission or alleged omission made therein in reliance upon and in conformity with written information relating to such Holder furnished to the Company by or on behalf of any such Holder specifically for inclusion therein.  This indemnity agreement will be in addition to any liability which the Company may otherwise have.

(b)    Indemnification by the Holders.  Each Holder severally (and not jointly) agrees to indemnify and hold harmless the Company and each of its Affiliates, directors, employees, members, managers and agents and each Person who controls the Company within the meaning of either the Securities Act or the Exchange Act, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages or liabilities to which they or any of them may become subject insofar as such losses, claims, damages or liabilities arise out of or are based upon any untrue statement or alleged untrue statement of a material fact contained in a Registration Statement as originally filed or in any amendment thereof, or in the Disclosure Package or any Holder Free Writing Prospectus, preliminary, final or summary Prospectus included in any such Registration Statement, or in any amendment thereof or supplement thereto, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, to the extent, but only to the extent, that any such untrue statement or alleged untrue statement or omission or alleged omission is contained in any written information relating to such Holder furnished to the Company by or on behalf of such Holder specifically for inclusion therein; provided, however, that the total amount to be indemnified by such Holder pursuant to this Section 9(b) shall be limited to the net proceeds (after deducting underwriters' discounts and commissions) received by such Holder in the offering to which such Registration Statement or Prospectus relates; provided, further, that a Holder shall not be liable in any case to the extent that prior to the filing of any such Registration Statement or Disclosure Package, or any amendment thereof or supplement thereto, each Holder has furnished in writing to the Company, information expressly for use in, and within a reasonable period of time prior to the effectiveness of such Registration Statement or Disclosure Package, or any amendment thereof or supplement thereto which corrected or made not misleading information previously provided to the Company.  This indemnity agreement will be in addition to any liability which any such Holder may otherwise have.

(c)    Conduct of Indemnification Proceedings.    Promptly after receipt by an indemnified party under this Section 9 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 9, notify the indemnifying party in writing of the commencement thereof; but the failure so to notify the indemnifying party (i) will not relieve it from liability under Section 9(a) or Section 9(b) above unless and to the extent such action and such failure results in material prejudice to the indemnifying party and forfeiture by the indemnifying party of substantial rights and defenses; and (ii) will not, in any event, relieve the indemnifying party from any obligations to any indemnified party other than the indemnification obligation provided in Section 9(a) or Section 9(b) above.    The indemnifying party shall be entitled to participate therein and, to the extent that it shall wish, jointly with any other indemnifying party similarly notified, to assume the defense thereof, with counsel reasonably satisfactory to such indemnified party, and, except as provided in the next sentence, after notice from the indemnifying party to such indemnified party of its election to so assume the defense thereof, the indemnifying party shall not be liable to such indemnified party for any legal expenses of other counsel or any other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation.    Notwithstanding the indemnifying party's rights set forth in the prior sentence, the indemnified party shall have the right to employ its own counsel (and one local counsel), and the indemnifying party shall bear the reasonable fees, costs and expenses of such separate counsel if:

(A)    the use of counsel chosen by the indemnifying party to represent the indemnified party would present such counsel with an actual or potential conflict of interest;

(B)    the actual or potential defendants in, or targets of, any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be legal defenses available to it and/or other indemnified parties which are different from or additional to those available to the indemnifying party;

(C)    the indemnifying party shall not have employed counsel reasonably satisfactory to the indemnified party to represent the indemnified party within a reasonable time after notice of the institution of such action; or

(D)    the indemnifying party shall authorize the indemnified party to employ separate counsel at the expense of the indemnifying party.

No indemnifying party shall, in connection with any one action or separate but substantially similar or related actions in the same jurisdiction arising out of the same general circumstances or allegations, be liable for the fees and expenses of more than one separate firm of attorneys (in addition to any local counsel) for all indemnified parties.    An indemnifying party shall not be liable under this Section 9 to any indemnified party regarding any settlement or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or proceeding in respect of which indemnification or contribution may be sought hereunder (whether or not the indemnified parties are actual or potential parties to such claim or action) unless such settlement, compromise or consent is consented to by such indemnifying party.    No indemnifying party, in the defense of any such claim or litigation, shall, except with the consent of each indemnified party, consent to entry of any judgment or enter into any settlement or

19

compromise unless such settlement or compromise (x) includes as an unconditional term thereof the giving by the claimant or plaintiff therein, to such indemnified party, of a full and final release from all liability in respect to such claim or litigation and (y) does not include a statement as to, or an admission of, fault, culpability or a failure to act by or on behalf of such indemnified party.

(d)    Contribution.

(i)    In the event that the indemnity provided in Section 9(a) or Section 9(b) above is unavailable to or insufficient to hold harmless an indemnified party for any reason, then each applicable indemnifying party agrees to contribute to the aggregate losses, claims, damages and liabilities (including legal or other expenses reasonably incurred in connection with investigating, preparing or defending same) (collectively, "*Losses*") to which such indemnifying party may be subject in such proportion as is appropriate to reflect the relative fault of the indemnifying party on the one hand and by the indemnified party on the other, in connection with the statements or omissions which resulted in such losses, claims, damages or liabilities (or actions in respect thereof).  If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law, then each indemnifying party shall contribute to such amount paid or payable by such indemnified party in such proportion as is appropriate to reflect the relative benefits received by the parties as well as any other relevant equitable considerations.  The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the indemnifying party on the one hand or the indemnified party on the other and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

(ii)    The parties agree that it would not be just and equitable if contribution pursuant to this Section 9(d) were determined by *pro rata* allocation (even if the Holders of Registrable Securities or any agents or underwriters or all of them were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to above in this Section 9(d).  The amount paid or payable by an indemnified party as a result of the losses, claims, damages or liabilities (or actions in respect thereof) referred to above in this Section 9(d) shall be deemed to include any legal or other expenses reasonably incurred by such indemnified party in connection with investigating, preparing or defending any such action or claim.

(iii)    Notwithstanding the provisions of this Section 9(d), no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

(iv)    For purposes of this Section 9, each Person who controls any Holder of Registrable Securities, agent or underwriter within the meaning of either the Securities Act or the Exchange Act and each director, officer, employee and agent of any such Holder, agent or underwriter shall have the same rights to contribution as such Holder, agent or underwriter, and each Person who controls the Company within the meaning of either the Securities Act or the Exchange Act and each officer and director of the Company shall have the same rights to

20

contribution as the Company, subject in each case to the applicable terms and conditions of this <u>Section 9(d)</u>.

(e)    The provisions of this <u>Section 9</u> will remain in full force and effect, regardless of any investigation made by or on behalf of any Holder of Registrable Securities or the Company or any of the officers, directors or controlling Persons referred to in this <u>Section 9</u> hereof, and will survive the transfer of Registrable Securities.

(f)    To the extent any indemnification by an indemnifying party is prohibited or limited by law, the indemnifying party agrees to make the maximum contribution with respect to any amounts for which it would otherwise be liable under <u>Section 9</u> to the fullest extent permitted by law; <u>provided</u>, <u>however</u>, that: (i) no Person involved in the sale of Registrable Securities which Person is guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) in connection with such sale shall be entitled to contribution from any Person involved in such sale of Registrable Securities who was not guilty of fraudulent misrepresentation; and (ii) contribution by any Selling Holder shall be limited in amount to the net amount of proceeds received by such Selling Holder from the sale of such Registrable Securities pursuant to such Registration Statement.

## 10.    Participation in Underwritten Offering/Sale of Registrable Securities.

(a)    No Person may participate in any underwritten offering hereunder unless such Person (i) agrees to sell such Person's securities on the basis provided in any Underwriting Agreement and (ii) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements; <u>provided</u> that no Holder of Registrable Securities included in any underwritten registration shall be required to make any representations or warranties to the Company or the underwriters (other than representations and warranties regarding (A) such Holder's ownership of its Registrable Securities to be sold or transferred, (B) such Holder's power and authority to effect such transfer and (C) such matters pertaining to compliance with securities laws as may be reasonably requested, but excluding representations and warranties as to the content of the Registration Statement, any Prospectus, Free-Writing Prospectus or any other documents included in the Disclosure Package) or to undertake any indemnification obligations to the Company with respect thereto, except as otherwise provided in <u>Section 9(b)</u> hereof, or to the underwriters with respect thereto, except to the extent of the indemnification being given to the Company and its controlling persons in <u>Section 9(b)</u> hereof.

(b)    Any Holder of Registrable Securities included in any underwritten registration shall be a party to the Underwriting Agreement and may, at its option, require that any or all of the conditions precedent to the obligations of such underwriters under such Underwriting Agreement be conditions precedent to the obligations of the Holder.  Any liability of a Holder thereunder to any underwriter or other person under such Underwriting Agreement shall be limited to liability arising from breach of its representations and warranties and shall be limited to an amount equal to the proceeds (net of expenses and underwriting discounts and commissions) that it derives from such registration.

(c)      Each Selling Holder agrees that, upon receipt of any notice contemplated in Section 4(a), such Selling Holder will forthwith discontinue the disposition of its Registrable Securities pursuant to the applicable Registration Statement.

**11.      Rule 144 and Rule 144A; Other Exemptions.**

With a view to making available to the Holders of Registrable Securities the benefits of Rule 144 and Rule 144A promulgated under the Securities Act and other rules and regulations of the Commission that may at any time permit a Holder of Registrable Securities to sell securities of the Company to the public without registration, the Company covenants that, commencing 30 days following the Effective Date, it will (a) file in a timely manner all reports and other documents required, if any, to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted thereunder, (b) make and keep public information available (as those terms are understood and defined in Rule 144 (or any successor rule)), (c) make available information necessary to comply with Rule 144A, if available with respect to resales of the Registrable Securities under the Securities Act, at all times, and (d) take such further action as such Holder may reasonably request, all to the extent required from time to time to enable such Holder to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by (i) Rule 144 and Rule 144A promulgated under the Securities Act (if available with respect to resales of the Registrable Securities), as such rules may be amended from time to time, (ii) Regulation S promulgated under the Securities Act, as may be amended from time to time, or (iii) any other rules or regulations now existing or hereafter adopted by the Commission.  Upon the reasonable request of any Holder of Registrable Securities, the Company will deliver to such Holder a written statement as to whether it has complied with such information requirements, and, if not, the specific reasons for non-compliance.

**12.      Private Placement**

Except for Section 5(a), the Company agrees that nothing in this Agreement shall prohibit the Holders, at any time and from time to time, from selling or otherwise transferring Registrable Securities pursuant to a private placement or other transaction which is not registered pursuant to the Securities Act.  To the extent requested by a Holder, the Company shall take all reasonable steps necessary to assist and cooperate with such Holder to facilitate such sale or transfer, including providing due diligence access to potential purchasers, and entering into a private placement agreement containing customary representations and warranties, indemnifications, opinions and other typical closing conditions.

**13.      Transfer of Registration Rights.**

The rights of a Holder hereunder may be transferred, assigned, or otherwise conveyed on a *pro rata* basis in connection with any transfer, assignment or other conveyance of Registrable Securities (a) in a share amount equal to at least 1% of the New Common Stock then outstanding to any transferee or assignee and (ii) in any share amount to any transferee or assignee that is an Affiliate of such Holder; provided, however, that the right to effect any Demand Registration pursuant to Section 2(b) may be transferred, assigned or otherwise conveyed by a Holder only if such Holder transfers, assigns or otherwise conveys Registrable

Securities in a share amount equal to at least 5% of the New Common Stock then outstanding to a single transferee or assignee (it being understood that one Demand Registration right will be transferred, assigned or otherwise conveyed in connection with each transfer, assignment or conveyance of that number of Registrable Securities equivalent to 5% of the New Common Stock then outstanding to a single transferee or assignee).  All of the following additional conditions must be satisfied with respect to any transfer, assignment or conveyance of rights hereunder: (a) such transfer or assignment is effected in accordance with applicable securities laws; (b) such transferee or assignee agrees in writing to become subject to the terms of this Agreement by executing a joinder agreement hereto; (c) the Company is given written notice by such Holder of such transfer or assignment, stating the name and address of the transferee or assignee, the Registrable Securities with respect to which such rights are being transferred or assigned and the total number of Registrable Securities and other equity securities of the Company beneficially owned by such transferee or assignee after such transfer or assignment.

### 14.    Amendment, Modification and Waivers; Further Assurances.

(a)    <u>Amendment</u>.  This Agreement may be amended with the consent of the Company and the Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Company shall have obtained the prior written consent of each of the Investors that holds any Registrable Securities.

(b)    <u>Changes in New Common Stock</u>.  If, and as often as, there are any changes in the New Common Stock by way of share split, stock dividend, combination or reclassification, or through merger, consolidation, reorganization or recapitalization, or by any other means, appropriate adjustment shall be made in the provisions hereof as may be required so that the rights and privileges granted hereby shall continue with respect to the Registrable Securities as so changed and the Company shall make appropriate provision in connection with any merger, consolidation, reorganization or recapitalization that any successor to the Company (or resulting parent thereof) shall agree, as a condition to the consummation of any such transaction, to expressly assume the Company's obligations hereunder.

(c)    <u>Effect of Waiver</u>.  No waiver of any terms or conditions of this Agreement shall operate as a waiver of any other breach of such terms and conditions or any other term or condition, nor shall any failure to enforce any provision hereof operate as a waiver of such provision or of any other provision hereof.  No written waiver hereunder, unless it by its own terms explicitly provides to the contrary, shall be construed to effect a continuing waiver of the provisions being waived and no such waiver in any instance shall constitute a waiver in any other instance or for any other purpose or impair the right of the party against whom such waiver is claimed in all other instances or for all other purposes to require full compliance with such provision.  The failure of any party to enforce any provision of this Agreement shall not be construed as a waiver of such provision and shall not affect the right of such party thereafter to enforce each provision of this Agreement in accordance with its terms.

(d)    <u>Further Assurances</u>.  Each of the parties hereto shall execute all such further instruments and documents and take all such further action as any other party hereto may reasonably require in order to effectuate the terms and purposes of this Agreement.

23

15.    **Miscellaneous.**

(a)    <u>No Inconsistent Agreements</u>.  The Company shall not hereafter enter into any agreement with respect to its securities which is inconsistent with or violates the rights granted to the Holders of Registrable Securities in this Agreement and the Company represents and warrants that the rights granted to the Holders hereunder do not in any way conflict with and are not inconsistent with any other agreements to which the Company is a party or by which it is bound.

(b)    <u>Other Registration Rights</u>.

(i)    Except as expressly contemplated by the Plan, the Company represents and warrants that it is not a party to, or otherwise subject to, any other agreement granting registration rights to any other Person with respect to any equity securities of the Company.

(ii)    From and after the date hereof until the Holders shall no longer hold any Registrable Securities, the Company shall not, without the prior written consent of the holders of sixty-six and two-thirds percent (66 2/3%) of the Registrable Securities, enter into any agreement with any holder or prospective holder of any equity securities of the Company giving such holder or prospective holder demand or incidental registration rights containing cut-back provisions that are by their terms not subordinate to the registration rights granted in this Agreement.

(c)    <u>Remedies; Specific Performance</u>.  Any Person having rights under any provision of this Agreement shall be entitled to enforce such rights specifically, to recover damages caused by reason of any breach or threatened breach of any provision of this Agreement and to exercise all other rights existing in their favor.  The parties hereto agree and acknowledge that money damages would not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive relief (without posting any bond or other security) in order to enforce or prevent violation of the provisions of this Agreement and shall not be required to prove irreparable injury to such party or that such party does not have an adequate remedy at law with respect to any breach of this Agreement.  The parties hereto further agree and acknowledge that each and every obligation applicable to it contained in this Agreement shall be specifically enforceable against it.  All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies available under this Agreement or otherwise.  Except as expressly provided herein, nothing herein will be considered an election of remedies or a waiver of the right to pursue any other right or remedy to which such party may be entitled.

(d)    <u>Successors and Assigns</u>.  All covenants, agreements, representations, warranties and conditions in this Agreement by or on behalf of any of the parties hereto shall bind and inure to the benefit of and are enforceable by the respective successors and assigns of the parties hereto (including any trustee in bankruptcy) whether so expressed or not.  In addition, whether or not any express assignment has been made, the provisions of this Agreement which

24

are for the benefit of purchasers or Holders of Registrable Securities are also for the benefit of, and enforceable by, any subsequent Holder of Registrable Securities. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned or delegated by the Company without the prior written consent of each of the Holders of Registrable Securities, and any such purported assignment by the Company without prior written consent of the Holders will be null and void and not binding. Nothing in this Agreement, express or implied, confers or is intended to confer on any Person other than the parties hereto any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement. Notwithstanding the foregoing, this <u>Section 15(d)</u> shall be subject to the provisions of <u>Section 13</u>.

(e)    <u>Severability</u>. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held by a court of competent jurisdiction to be invalid, illegal or unenforceable due to applicable law or public policy, such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability, without invalidating the remainder of this Agreement. Upon such determination that any provision is invalid, illegal or unenforceable, the parties shall negotiate in good faith to modify this Agreement to effect the original intent of the parties as closely as possible to the fullest extent permitted by applicable law to the end that the transactions contemplated hereby are fulfilled to the greatest extent possible.

(f)    <u>Counterparts</u>. This Agreement may be executed simultaneously in two or more counterparts, any one of which will be deemed an original and will need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same Agreement.

(g)    <u>Descriptive Headings; Interpretation; No Strict Construction</u>.

(i)    The descriptive headings of this Agreement are inserted for convenience only and will not affect in any way the meaning or interpretation of this Agreement.

(ii)    Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular forms of nouns, pronouns, and verbs shall include the plural and vice versa. References to a Person are also to its permitted successors and assigns (including any trustee in bankruptcy).

(iii)    When a reference in this Agreement is made to an Article, Section, Exhibit, Annex or Schedule, such reference is to an Article or Section of, or Exhibit, Annex or Schedule to, this Agreement unless otherwise indicated. The words "this Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. Reference to any agreement, document, or instrument means such agreement, document, or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and, if applicable, hereof. All references to laws, rules, regulations and forms in this Agreement shall be deemed to be references to such laws, rules, regulations and forms, as amended from time to time or, to the extent replaced, the comparable successor thereto in effect at the time. All references to agencies, self-regulatory organizations or governmental entities in this Agreement shall be deemed to be references to the comparable successors thereto from time to time.

(iv)    The words "*include*", "*includes*" or "*including*" in this Agreement shall be deemed to be followed by "*without limitation*".  The word "or" is used in the inclusive sense of "and/or" unless the context requires otherwise.

(v)    The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

(h)    <u>Governing Law</u>.  This Agreement and the exhibits and schedules hereto and all claims and causes of action arising hereunder or relating hereto shall be governed by, and construed in accordance with, the laws of the State of New York.

(i)    <u>Submission to Jurisdiction</u>.  The Holders hereby (i) irrevocably and unconditionally submit to the exclusive jurisdiction of, and venue in, the United States [District] Court for the Southern District of New York over any action or proceeding (whether based on contract, tort or otherwise) between or among any of the parties seeking to enforce any provision of, or arising out of or relating to, this Agreement or the transactions contemplated hereby, [(ii) agree that the Holders will not bring any such action or proceeding other than in the aforesaid court and will not attempt to deny or defeat such jurisdiction by motion or other request for leave from any such court] and (iii) irrevocably and unconditionally waive, to the fullest extent permitted by law, any objection based on *forum non conveniens*.  Each party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Process in any such action, suit or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.  Without limiting the foregoing, service of process on such party as provided in <u>Section 15(j)</u> shall be deemed effective service of process on such party.

(j)    <u>Notices</u>.  All notices, demands or other communications provided for and permitted to be given under the provisions of this Agreement shall be in writing and shall be deemed to have been given: (i) when delivered personally to the recipient, (ii) if telecopied or sent by facsimile to the recipient, upon confirmation by the transmitting equipment of successful transmission, except that if such confirmation occurs after 5:00 p.m. (in the recipient's time zone) on a Business Day, or occurs on a day that is not a Business Day, then such notice, request or communication will not be deemed effective or given until the next succeeding Business Day, (iii) if sent for delivery by United States Express Mail or a reputable overnight courier service (charges prepaid), on the date of delivery as confirmed by written confirmation of delivery or (iv) if sent by certified or registered mail (postage prepaid, return receipt requested), on the fifth Business Day after being deposited in the United States mail.  Notices, requests and other communications sent in any other manner, including electronic mail, will not be effective.  Such notices, demands and other communications shall be sent to the Company at the address set forth below and to any Holder of Registrable Securities at the address set forth on the signature page hereto (with copies sent at the address set forth below), or at such address or to the attention of such other Person as the recipient party has specified by prior written notice to the sending party.  The Company's address is:

26

LyondellBasell Industries N.V.
[_____]
Attention:   General Counsel
Facsimile:

     with copies to:

Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, NY  10281
Attention:  Louis J. Bevilacqua
         George A. Davis
Facsimile:  (212) 504-6666

Copies of notices to the Holders shall be sent to:

Milbank Tweed Hadley McCloy LLP
One Chase Manhattan Plaza
New York, NY  10005
Attention:   Matthew S. Barr
         Paul E. Denaro
Facsimile:  (212) 530-5219

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY  10036
Attention:   Adam Weinstein
         Rosa A. Testani
Facsimile:  (212) 872-1002

Proskauer Rose LLP
2049 Century Park East, 32nd Floor
Los Angeles, CA  90067
Attention:   Monica J. Shilling
Facsimile:  (310) 557-2193

Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, NY  10036
Attention:   Jay Goffman
Facsimile:  (917) 777-2120

If any time period for giving notice or taking action hereunder expires on a day which is not a Business Day, the time period shall automatically be extended to the immediately following Business Day.

     (k)    **Delivery by Facsimile and Electronic Means**.   This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection

27

herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or by electronic mail in "portable document format" (".pdf") or by a combination of such means, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or other electronic means to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or other electronic means as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

(l)    Waiver of Jury Trial.    Each of the parties to this Agreement hereby unconditionally agrees to waive, to the fullest extent permitted by applicable law, its respective rights to a jury trial of any claim or cause of action (whether based on contract, tort or otherwise) based upon, arising out of or relating to this Agreement or the transactions contemplated hereby. The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this Agreement, including contract claims, tort claims and all other common law and statutory claims. Each party hereto: (i) acknowledges that this waiver is a material inducement to enter into this Agreement, that each has already relied on this waiver in entering into this Agreement, and that each will continue to rely on this waiver in their related future dealings, (ii) acknowledges that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not in the event of any action or proceeding, seek to enforce the foregoing waiver and (iii) warrants and represents that it has reviewed this waiver with its legal counsel and that it knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 15(l) AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

(m)    Arm's Length Agreement.    Each of the parties to this Agreement agrees and acknowledges that this Agreement has been negotiated in good faith, at arm's length, and not by any means prohibited by law.

(n)    Sophisticated Parties; Advice of Counsel.    Each of the parties to this Agreement specifically acknowledges that (i) it is a knowledgeable, informed, sophisticated Person capable of understanding and evaluating the provisions set forth in this Agreement and (ii) it has been fully advised and represented by legal counsel of its own independent selection and has relied wholly upon its independent judgment and the advice of such counsel in negotiating and entering into this Agreement.

28

    (o) <u>Entire Agreement</u>. This Agreement, together with <u>Schedule I</u> attached hereto, and any certificates, documents, instruments and writings that are delivered pursuant hereto, constitutes the entire agreement and understanding of the parties in respect of the subject matter hereof and supersedes all prior understandings, agreements or representations by or among the parties, written or oral, to the extent they relate in any way to the subject matter hereof.

    (p) <u>FWP Consent</u>. No Holder shall use a Holder Free Writing Prospectus without the prior written consent of the Company, which consent shall not be unreasonably withheld.

    (q) <u>Termination</u>. The obligations of the Company and of any Holder, other than those obligations contained in <u>Section 9</u>, shall terminate with respect to the Company and such Holder as soon as such Holder no longer holds any Registrable Securities.

*  *  *  *  *

29

IN WITNESS WHEREOF, the parties hereto have executed this Registration Rights Agreement as of the date first written above.

LyondellBasell Industries N.V.


By:_____
       Name:
       Title:

*(Signature Page for Registration Rights Agreement)*

## INVESTORS

### Access Investors:

**[Name]**

By:_____
    Name:
    Title:

Address:
**[ ]**
Facsimile:

### Apollo Investors:

**[Name]**

By:_____
    Name:
    Title:

Address:
**[ ]**
Facsimile:

### Ares Investors:

**[Name]**

By:_____
    Name:
    Title:

Address:
**[ ]**
Facsimile:

*(Signature Page for Registration Rights Agreement)*

**TAB 11**

# DRAFT DESCRIPTION OF THIRD LIEN NOTES[1]

## General

In this Description of Third Lien Notes, (i) the term "*the Company*" refers only to LyondellBasell Industries N.V. and (ii) the term "Issuer" refers only to Lyondell Chemical Company, an indirect subsidiary of the Company. Additionally, the term "Guarantors" refers to any Person (other than the Issuer) that executes the Indenture relating to the Notes or who executes a supplemental indenture in which such Person agrees to be bound by the terms of the Indenture as a guarantor, as more fully described under "—The Guarantees."

The Issuer will issue the Notes under the Indenture, pursuant to the Reorganization Plan. The terms of the Notes will be included in the Indenture.

The following summary of certain provisions of the Indenture, the Notes, the Registration Rights Agreement, the Security Documents and the Junior Lien Intercreditor Agreement does not purport to be complete and is subject to, and is qualified in its entirety by reference to, all the provisions of those agreements, including the definitions of certain terms therein and those terms made a part thereof by the TIA. Capitalized terms used in this "Description of Third Lien Notes" and not otherwise defined have the meanings set forth under "—Certain Definitions."

The Issuer will issue Notes with an initial aggregate principal amount of up to $3,250,000,000. The Issuer may issue additional Notes from time to time after this offering. Any offering of additional Notes is subject to the covenants described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "—Certain Covenants—Liens." The Notes and any additional Notes subsequently issued under the Indenture may, at our election, be treated as a single class for all purposes under the Indenture, including, without limitation, waivers, amendments, redemptions and offers to purchase. Unless the context otherwise requires, for all purposes of the Indenture and this "Description of Third Lien Notes," references to the Notes include any additional Notes actually issued. There can be no assurances, however, that any additional Notes subsequently issued under the Indenture will be treated as fungible with the Notes of the relevant series for United States federal income tax purposes or under the laws of any other jurisdiction.

Principal of, premium, if any, and interest on the Notes will be payable, and the Notes may be exchanged or transferred, at the office or agency designated by the Issuer (which initially will be the principal corporate trust office of Wells Fargo Bank, N.A, as Paying Agent).

The Notes will be issued by the Issuer in denominations of $100,000 and integral multiples of $1,000, respectively, in excess thereof.

## Terms of the Notes

The Notes will be senior Obligations of the Issuer, will have the benefit of the third priority security interest in the Notes Collateral and third priority security interest in the ABL Facility Collateral described under "—Security" and will mature on May 1, 2018. Each Note will bear interest at a rate equal to 11% per annum. Each Note will bear interest from the Issue Date or from the most recent date to which interest has been paid or provided for, payable semiannually to holders of record at the close of business on the April 15 or October 15 immediately preceding the interest payment date on May 1 and November 1 of each year, commencing November 1, 2010.

The Notes will be secured by liens on the Notes Collateral and the ABL Facility Collateral described under "—Security."

Additional interest is payable with respect to the Notes held by Affiliates of the Issuer in certain circumstances if the Issuer does not consummate the exchange offer (or shelf registration, if applicable) as provided in the Registration Rights Agreement.

## Redemption

### *Optional Redemption*

At any time prior to May 1, 2013, the Issuer may on any one or more occasions redeem up to 35% of the original aggregate principal amount of the Notes (including any additional Notes), at a redemption price of 111.000% of the principal amount thereof,

---

[1] In the event of any discrepancy between this Draft Description of Third Lien Notes and the Indenture, this Draft Description of Third Lien Notes will control.  The 2014 Notes are the "Cram Down Notes" as defined in the Reorganization Plan.

plus accrued and unpaid interest and additional interest, if any, to, but not including, the applicable redemption date, with the net proceeds of one or more Equity Offerings; *provided* that:

(1)  at least 50% of the aggregate principal amount of the Notes originally issued under the Indenture (together with any additional Notes) remains outstanding immediately after the occurrence of such redemption (excluding Notes held by the Company and its Subsidiaries); and

(2)  the redemption must occur within 90 days of the date of the closing of such Equity Offering.

In addition, prior to May 1, 2013, the Issuer may redeem the Notes (including any additional Notes) at its option, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address, at a redemption price equal to 100% of the principal amount thereof plus the Applicable Premium as of, and accrued and unpaid interest and additional interest, if any, to, but not including, the applicable redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date).

On or after May 1, 2013, the Issuer may redeem all or a part of the Notes (including any additional Notes) upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address, at a redemption price equal to 100% of the principal amount thereof plus accrued and unpaid interest thereon, if any, to, but not including, the applicable redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date).

Any notice of redemption may be given prior to the completion of any event or transaction related to such redemption, and any such redemption or notice may, at the Issuer's discretion, be subject to one or more conditions precedent, including in the case of any Equity Offering, completion of such Equity Offering. In addition, if such redemption or notice is subject to satisfaction of one or more conditions precedent, such notice shall state that, in the Issuer's discretion, the redemption date may be delayed until such time as any or all such conditions shall be satisfied, or such redemption may not occur and such notice may be rescinded in the event that any or all such conditions shall not have been satisfied by the redemption date, or by the redemption date so delayed.

## Selection

Selection of Notes for redemption will be made by the Trustee on a *pro rata* basis to the extent practicable; *provided* that no Notes of $100,000, as applicable, principal amount or less shall be redeemed in part. If any Note is to be redeemed in part only, the notice of redemption relating to such Note shall state the portion of the principal amount thereof to be redeemed. A new Note in principal amount equal to the unredeemed portion thereof will be issued in the name of the holder thereof upon cancellation of the original Note. On and after the redemption date, interest will cease to accrue on Notes or portions thereof called for redemption so long as the Issuer has deposited with the Paying Agent funds sufficient to pay the principal of, premium (if any) on and accrued and unpaid interest and additional interest (if any) on, the Notes to be redeemed.

If less than all the Notes are to be redeemed at any time in connection with an optional redemption, the Trustee will select Notes for redemption as follows:

if the Notes to be redeemed are listed, in compliance with the requirements of the principal national securities exchange on which such Notes are listed; or

if the Notes to be redeemed are not so listed, on a *pro rata* basis, by lot or by such method as the Trustee shall deem fair and appropriate.

## Offers to Purchase; Open Market Purchases

The Issuer will not be required to make any mandatory redemption or sinking fund payments with respect to the Notes. However, under certain circumstances, the Issuer may be required to offer to purchase or redeem Notes as described under "—Change of Control" and "—Certain Covenants—Asset Sales."

The Company, its Subsidiaries or any Affiliates of the Company may at any time and from time to time purchase Notes in the open market or otherwise.

## Ranking

The Indebtedness evidenced by the Notes will be senior third-priority secured Indebtedness of the Issuer and the Guarantors, and will rank *pari passu* in right of payment with all existing and future senior Indebtedness of the Issuer, and will be senior in right of payment to all existing and future Subordinated Indebtedness of the Issuer. After the Issue Date, the Notes will have the benefit of (i) a third priority security interest in the Notes Collateral that will be *pari passu* in priority with all other existing and future Junior Lien Obligations with respect to all Notes Collateral, (ii) a third priority security in the ABL Facility Collateral that will be *pari passu* in priority with all other existing and future Junior Lien Obligations with respect to all ABL Facility Collateral, in each case subject to

Permitted Liens and exceptions described under "—Security—General." In addition, after the Issue Date, the Notes will be junior in priority to the Senior Term Loan Facility, the First Lien Notes, the ABL Facility and all other existing and future First and Second Priority Lien Obligations with respect to all Collateral.

## The Guarantees

### The Guarantors

The Company, each existing and subsequently acquired or organized direct or indirect Wholly-Owned Domestic Subsidiary of the Company and each other entity, if any, that guarantees the First Lien Notes or the Senior Term Loan Facility (other than any Excluded Subsidiary) (each such entity, a "*Guarantor*") will irrevocably and unconditionally guarantee on a senior third-priority secured basis the performance and punctual payment when due, whether at Stated Maturity, by acceleration or otherwise, of all Obligations of the Issuer under the Indenture and the Notes (the "*Guarantee*"). Such Guarantors will agree that they will pay principal of, premium, if any, on and interest and additional interest, if any, on, in each case, the Notes, expenses, indemnification or otherwise. Such Guarantors will agree to pay, in addition to the amounts stated above, any and all expenses (including reasonable counsel fees and expenses) incurred by the Trustee or the holders in enforcing any rights under the Guarantees.

The Guarantees of the Notes will be:

senior third-priority secured Obligations of the Guarantors; and

equal in right of payment to all existing and future unsubordinated Indebtedness of the Guarantors.

The Obligations of any Guarantor, including the Company, under its Guarantee of the Notes will be automatically and unconditionally released and discharged when any of the following occurs:

(1) upon the full and final payment by or on behalf of the Issuer of all of its Obligations under the Indenture and the Notes;

(2) except with respect to the Guarantee of the Company (subject to the provisions described under "—Certain Covenants—Merger, Amalgamation, Consolidation or Sale of All or Substantially All of the Assets"), any issuance, sale, exchange, transfer or other disposition (including, without limitation, by way of acquisition, merger, amalgamation, consolidation, transfer, conveyance or otherwise), directly or indirectly, of Capital Stock of such Guarantor (or any parent of such Guarantor) to any Person that is not a Restricted Subsidiary of the Company that results in such Guarantor ceasing to be a Restricted Subsidiary of the Company; *provided* that such issuance, sale, exchange, transfer or other disposition is made in accordance with the provisions of the Indenture;

(3) except with respect to the Guarantee of the Company, the designation of such Guarantor as an Unrestricted Subsidiary in accordance with the provisions of the Indenture;

(4) except with respect to the Guarantee of the Company (subject to the provisions described under "—Certain Covenants—Merger, Amalgamation, Consolidation or Sale of All or Substantially All of the Assets"), upon the liquidation or dissolution of such Guarantor; *provided* that no Default or Event of Default has occurred or is continuing or would be caused thereby;

(5) except for the guarantee by the Company, the occurrence of legal defeasance or covenant defeasance in accordance with the Indenture;

(6) except for Guarantee by the Company and for those limitations described in the following paragraph, in the event that the continued Obligation of such Guarantor under its Guarantee or the continued existence of such Guarantee will result in a violation of applicable law that cannot be avoided or otherwise prevented through measures reasonably available to the Company or such Guarantor; *provided* that all guarantees, if any, of all First Priority Lien Obligations by such Guarantor are also released; or

(7) upon such Guarantor being designated as an Excluded Subsidiary in compliance with the Indenture and the Company gives written notice of such release to the Trustee.

In addition to the initial Guarantors, other Domestic Subsidiaries may become Guarantors after the Issue Date, as provided in the Indenture. The Obligations of the Guarantors under their Guarantees will be limited as necessary to recognize certain defenses generally available to guarantors (including those that relate to fraudulent conveyance or transfer, voidable preference, financial assistance, corporate purpose, capital maintenance or similar laws, regulations or defenses affecting the rights of creditors generally) or other considerations under applicable law.

### Withholding Taxes

All payments made under or with respect to the Notes and the Guarantees by (i) the Issuer, (ii) the Company or (iii) any entity that becomes a successor of the Issuer or the Company that is organized in a jurisdiction other than the United States, any state

thereof or the District of Columbia as a result of a merger of or other transaction permitted by provisions of the Indenture described under "—Merger, Amalgamation, Consolidation or Sale of All or Substantially All Assets" (each such person, a "*Payor*") will be made free and clear of and without withholding or deduction for or on account of any present or future tax, duty, levy, impost, assessment or other governmental charge (including, without limitation, penalties, interest and other similar liabilities related thereto) of whatever nature (collectively, "*Taxes*") imposed or levied by or on behalf of any jurisdiction in which any Payor is organized, resident or doing business for tax purposes or from or through which any Payor makes any payment on the Notes or its Guarantee or any department or political subdivision thereof (each, a "*Relevant Taxing Jurisdiction*"), unless such Payor is required to withhold or deduct Taxes by law. If any Payor is required by law to withhold or deduct any amount for or on account of Taxes of a Relevant Taxing Jurisdiction from any payment made under or with respect to the Notes or such Guarantee, the Payor shall make all such deductions and withholdings in respect of Taxes, and shall pay the full amount deducted or withheld in respect of Taxes to the relevant taxation authority or other governmental authority in accordance with the applicable requirements of law. If any Payor is so required by law to withhold or deduct, such Payor shall not be obligated to pay any additional amounts in respect of such withholding or deduction on account of Taxes to the holders of the Notes.

## Security

### *General*

The Notes and the Guarantees will be secured by third priority security interests in the Notes Collateral and by third priority security interests in the ABL Facility Collateral, in each case subject to Permitted Liens and on a *pari passu* basis with the Junior Lien Obligations, including the 2014 Notes.[2] The First Lien Notes and the Senior Term Loan Facility will be secured by first priority security interests in the Notes Collateral and second priority security interests in the ABL Facility Collateral. The ABL Facility will be secured by first priority security interests in the ABL Facility Collateral and second priority security interests in the Notes Collateral.

The "*Notes Collateral*" will consist of (i) substantially all the present and after-acquired assets of the Issuer and the Pledgors, including, without limitation, the following property: all accounts receivable and inventory (other than the ABL Facility Collateral), equipment, general intangibles, investment property, intellectual property, Owned Real Property (subject to clause (i) of the definition of "Excluded Assets" as described below), 65% of the voting Capital Stock and 100% of the non-voting Capital Stock of all first-tier Foreign Subsidiaries of the Issuer and 100% of the Capital Stock of all Domestic Subsidiaries of the Issuer and each Pledgor, intercompany notes and proceeds of the foregoing of the Issuer and each Pledgor and (ii) 65% of the voting Capital Stock of all first-tier Foreign Subsidiaries of the Company and 100% of the non-voting Capital Stock of all first-tier Foreign Subsidiaries of the Company and 100% of the Capital Stock of all Domestic Subsidiaries of the Company, including the Issuer and (iii) in the case of both clause (i) and clause (ii) immediately above, any other assets that secure the First Lien Notes.

The Notes Collateral will not include, subject to certain exceptions, (i) any fee-Owned Real Property with a value of less than $25.0 million and all leasehold interests (other than interest in ground leases agreed on the Issue Date), (ii) motor vehicles and other assets subject to certificates of title, letter of credit rights and commercial tort claims, (iii) assets specifically requiring perfection through control agreements (i.e., cash, deposit accounts or other bank or securities accounts, etc.), (iv) the Capital Stock of any Joint Venture, or of any special purpose subsidiary whose material assets are comprised solely of the Capital Stock of such Joint Venture, where the pledge of such Capital Stock would be prohibited by any applicable contractual requirement pertaining to such Joint Venture, (v) the ABL Facility Collateral, (vi) preferred stock issued in connection with a Structured Finance Transaction that is (x) is subject to an existing Lien on the Issue Date or (y) prohibited from being pledged, and (vii) certain other exceptions described in the Security Documents (all such excluded assets referred to as "*Excluded Assets*").

In addition, to the extent that Rule 3-16 of Regulation S-X under the Securities Act requires or would require (or is replaced with another rule or regulation, or any other law, rule or regulation is adopted, that would require) the filing with the SEC (or any other governmental agency) of separate financial statements of any Subsidiary of the Company due to the fact that such Subsidiary's Capital Stock secures the Notes or any First Priority Lien Obligation, Second Priority Lien Obligation or Third Priority Lien Obligation, then the Capital Stock of such Subsidiary will automatically be deemed not to be part of the Notes Collateral securing the Notes but only to the extent necessary to not be subject to such requirement and only for so long as required to not be subject to such requirement (such requirement, the "*3-16 Exemption*"); *provided* that the 3-16 Exemption will not apply to the capital stock of the Issuer and LyondellBasell Subholdings, B.V. In such event, the Security Documents may be amended or modified, without the consent of any holder of such Notes, to the extent necessary to release the security interests in favor of the Collateral Agent on the shares of Capital Stock of such Subsidiary that are so deemed to no longer constitute part of the Notes Collateral. In the event that Rule 3-16 of Regulation S-X under the Securities Act is amended, modified or interpreted by the SEC to permit (or is replaced with another rule or regulation, or any other law, rule or regulation is adopted, that would permit) such Subsidiary's Capital Stock to secure the Notes in excess of the amount then pledged without the filing with the SEC (or any other governmental agency) of separate financial statements of such Subsidiary, then the Capital Stock of such Subsidiary will automatically be deemed to be a part of the

---

[2] References to the 2014 Notes will be deleted if no 2014 Notes are issued.

Notes Collateral. The 3-16 Exemption will apply to the Collateral securing the Notes if it applies to the Collateral securing the First Priority Lien Obligations.

The "*ABL Facility Collateral*" will consist of all present and after-acquired inventory, accounts receivable, related contracts and other rights, deposit accounts into which proceeds of the foregoing are credited and books and records related thereto, together with all proceeds of the foregoing, in each case to the extent of the rights, title and interest therein of any "Borrower" under the ABL Facility.

In connection with any enforcement action with respect to the Notes Collateral or any insolvency or liquidation proceeding, all proceeds of the Notes Collateral (after paying the fees and expenses of the First Lien Notes Collateral Agent, Escrow Agent, Senior Term Loan Collateral Agent, First Lien Paying Agent and First Lien Trustee and any expenses of selling or otherwise foreclosing on the Notes Collateral) will be applied *pro rata* to the repayment of the Obligations under the First Lien Notes and the other then outstanding First and Second Priority Lien Obligations. In connection with any enforcement action with respect to the ABL Facility Collateral or any insolvency or liquidation proceeding, all proceeds of the ABL Facility Collateral (after paying the fees and expenses of the ABL Collateral Agent and any expenses of selling or otherwise foreclosing on such collateral) will be applied to the repayment of the Obligations under the ABL Facility, with any excess proceeds of such enforcement action applied to the repayment of the Obligations under the First Lien Notes and the other then outstanding First and Second Priority Lien Obligations on a *pro rata* basis after payment of all fees and expenses of the First Lien Notes Collateral Agent, Senior Term Loan Collateral Agent, Escrow Agent, First Lien Paying Agent and First Lien Trustee. In connection with any enforcement action with respect to the Notes Collateral, the ABL Collateral or any insolvency or liquidation proceeding, any remaining proceeds of the Notes Collateral and/or the ABL Collateral, as the case may be, after payment of the fees and expenses and repayment of the Obligations as set forth in the previous two sentences, will be applied *pro rata* to the repayment of the Notes Obligations and the other then outstanding Third Priority Lien Obligations. The Company, the Issuer and the Pledgors will be able to Incur additional Indebtedness in the future that could share in the Collateral, including Additional First Priority Lien Obligations and Additional Second Priority Lien Obligations. The amount of such First and Second Priority Lien Obligations and additional Indebtedness is limited by the covenants described under "—Certain Covenants—Liens" and "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock." Under certain circumstances, the amount of such Additional First Priority Lien Obligations and Additional Second Priority Lien Obligations and additional Indebtedness could be significant.

### After-Acquired Collateral

Subject to certain limitations and exceptions (including the 3-16 Exemption and the Excluded Assets limitations and exception and subject to Permitted Liens), if any of the Issuer, the Company or any Pledgor creates any additional security interest upon any property or asset that would constitute Notes Collateral to secure any First Priority Lien Obligations (which include Obligations in respect of Secured Credit Facility Indebtedness), it must concurrently grant (i) a first priority security interest (subject to Permitted Liens) upon such property as security for the First Lien Notes and the Senior Term Loan Facility, (ii) a second priority security interest upon such property as security for the ABL Facility and (iii) a third priority security interest upon such property as security for the Notes. In addition, if granting a security interest in such property requires the consent of a third party, the Company will use commercially reasonable efforts to obtain such consent (i) with respect to the first priority security interest for the benefit of the First Lien Notes Collateral Agent on behalf of the holders of the First Lien Notes and for the benefit the Senior Term Loan Agent on behalf of the lenders under the Senior Term Loan Facility, (ii) with respect to the second priority security interest for the benefit of the ABL Collateral Agent on behalf of the lenders under ABL Facility and (iii) with respect to the third priority security interest for the benefit of the Trustee in respect of the Notes on behalf of the holders of the Notes. If such third party does not consent to the granting of the first priority security interest after the use of such commercially reasonable efforts, the applicable entity will not be required to provide such first, second and third priority security interest. The Issuer, the Company and the Pledgors will also ensure that third priority security interests are maintained as security for the Notes in any ABL Facility Collateral pledged to secure the ABL Facility.

### Security Documents

The Company, the Issuer, the Pledgors, the Trustee and the Collateral Agent will enter into a collateral agreement (as amended, supplemented, modified, extended, restructured, renewed, restated or replaced in whole or in part from time to time, the "*Collateral Agreement*") establishing the terms of the security interests and Liens that secure the Notes. These security interests will secure the payment and performance when due of all of the Obligations of the Issuer under the Notes and the Indenture and the Guarantors under the Guarantee, as provided in the Security Documents.

Subject to the terms of the Security Documents, the Company, the Issuer and the Pledgors will have the right to remain in possession and retain exclusive control of the Notes Collateral (other than any cash, securities, Obligations and Cash Equivalents constituting part of the Notes Collateral and deposited with the administrative agent under the Senior Term Loan Facility in accordance with the provisions of the Security Documents and other than as set forth in the Security Documents), to freely operate the Notes Collateral and to collect, invest and dispose of any income therefrom.

*Junior Lien Intercreditor Agreement[3]*

On the Issue Date, the First Lien Notes Collateral Agent, on its own behalf and on behalf of the First Lien Secured Parties under the First Lien Indenture, the Senior Term Loan Collateral Agent, on its own behalf and on behalf of the First Lien Secured Parties under the Senior Term Loan Facility, the ABL Collateral Agent, on its own behalf and on behalf of the administrative agent and lenders under the ABL Facility, the trustee under the Notes (the "*Trustee*" and, together with the First Lien Notes Collateral Agent, the Senior Term Loan Collateral Agent and the ABL Collateral Agent, the "*Applicable Collateral Agents*"), on its own behalf and on behalf of the holders of the obligations under the Notes, the Company, the Issuer and the Pledgors will enter into an intercreditor agreement (the "*Junior Lien Intercreditor Agreement*") that sets forth the relative priority of the Liens securing any First Priority Lien Obligations, the Liens securing the ABL Obligations and the Liens securing any Junior Lien Obligations, including the Notes (collectively, the "*Applicable Obligations*"). Although the holders of First Priority Lien Obligations, ABL Obligations and Junior Lien Obligations will not be party to the Junior Lien Intercreditor Agreement, by their acceptance of the First Lien Notes, the loans under the Senior Term Loan Facility, the loans under the ABL Facility or the Notes, respectively, each will agree to be bound thereby. In addition, the Junior Lien Intercreditor Agreement will provide that it may be amended from time to time without the consent of the holders of the First Lien Notes to add Additional First Lien Secured Parties with respect to Additional First Priority Lien Obligations and/or additional secured parties with respect to Additional Junior Lien Obligations, in each case to the extent permitted to be Incurred under the First Lien Indenture, the Senior Term Loan Facility, the ABL Facility and the Notes Indenture.

The Junior Lien Intercreditor Agreement will provide, among other things:

*Lien Priority*. Notwithstanding the time, order or method of grant, creation, attachment or perfection of any Liens securing any ABL Obligations (the "*ABL Facility Liens*"), the Liens securing any First Priority Lien Obligations (the "*First Priority Obligation Liens*") or the Liens securing any Junior Lien Obligation (the "*Junior Priority Liens*") or the enforceability of any such Liens or Obligations, (1) the ABL Facility Liens on the ABL Facility Collateral will rank senior to any First Priority Obligation Liens or Junior Priority Liens on the ABL Facility Collateral, (2) the First Priority Obligation Liens on the Notes Collateral will rank senior to any ABL Facility Liens or Junior Priority Liens on the Notes Collateral, (3) the ABL Facility Liens on the Notes Collateral will rank senior to any Junior Priority Liens on the Notes Collateral, (4) the First Priority Obligation Liens on the ABL Facility Collateral will rank senior to any Junior Priority Liens on the ABL Facility Collateral and (5) the Junior Priority Liens on all Collateral will rank junior to the ABL Facility Liens on all Collateral and the First Priority Obligation Liens on all Collateral.

*Prohibition on Contesting Liens and Obligations*. No Applicable Collateral Agent or holder of any Applicable Obligation may contest or support any other person in contesting the validity or enforceability of the Liens of any other Applicable Collateral Agent or holder of any other class of Applicable Obligations.

*Similar Liens*. So long as there are at least two classes of Applicable Obligations outstanding, neither the Company nor any Guarantor will grant any Lien to secure any class of Applicable Obligations unless the Company or such Guarantor has granted a Lien to secure each other class of then outstanding Applicable Obligations; provided that (i) the Company may secure obligations under the Notes or 2014 Notes, as applicable with Liens on certain European assets of the Company and its Restricted Subsidiaries to the extent permitted by the Senior Term Loan Facility, the ABL Facility and the Indenture, without granting a Lien on such European assets to secure the ABL Obligations or any First Priority Lien Obligations and (ii) the foregoing provisions shall not be deemed violated by virtue of the operation of the 3-16 Exemption with respect to the First Lien Notes or the Notes. Any proceeds from any Lien granted in contravention of the foregoing will be subject to distribution in accordance with "—Application of Proceeds and Turn-Over Provisions" below.

*Exercise of Remedies and Release of Liens with Respect to ABL Facility Collateral*. Subject to the provisions described below under "—Standstill Period," the ABL Collateral Agents will have the sole power to exercise remedies against the ABL Facility Collateral (subject to the right of any First Lien Collateral Agent and the Trustee to take limited protective measures with respect to the First Priority Obligation Liens and the Junior Priority Liens, respectively, and to take certain actions that would be permitted to be taken by unsecured creditors) and to foreclose upon and dispose of the ABL Facility Collateral. Subject to the provisions described below under "—Standstill Period," after the Discharge of ABL Obligations, if any First Priority Lien Obligations remain outstanding, the First Lien Collateral Agents will have the sole power to exercise remedies against the ABL Facility Collateral (subject to the right of the Trustee to take limited protective measures with respect to the Junior Priority Liens and to take certain actions that would be permitted to be taken by unsecured creditors) and to foreclose upon and dispose of the ABL Facility Collateral. After the Discharge of First Priority Lien Obligations, the Trustee shall be permitted to exercise remedies against the ABL Collateral. The Applicable Collateral Agent that is then entitled to exercise remedies against the ABL Facility Collateral pursuant to the three prior sentences shall be referred to as the "*Authorized ABL Collateral Agent*" and each other Applicable Collateral Agent at such time shall be referred to as the "*Non-Authorized ABL Collateral Agent*." Upon any sale of any ABL

---

[3] In the event there are any 2014 Notes there will be a Third Lien Intercreditor Agreement as described in the Description of 2014 Notes.

Facility Collateral in connection with any enforcement action consented to by the Authorized ABL Collateral Agent, which results in the release of the Liens of such Authorized ABL Collateral Agent on such item of ABL Facility Collateral, the Liens of each other class of Applicable Obligations on such item of ABL Facility Collateral will be automatically released.

*Exercise of Remedies and Release of Liens with Respect to Notes Collateral.* Subject to the provisions described below under "—Standstill Period," the First Lien Collateral Agents (subject to the terms of the First Lien Intercreditor Agreement) will have the sole power to exercise remedies against the Notes Collateral (subject to the right of the ABL Collateral Agent and the Trustee to take limited protective measures with respect to the ABL Facility Liens and the Junior Priority Liens, respectively, and to take certain actions that would be permitted to be taken by unsecured creditors) and to foreclose upon and dispose of the Notes Collateral. Subject to the provisions described below under "—Standstill Period," after the Discharge of First Priority Lien Obligations, if any ABL Obligations remain outstanding, the ABL Collateral Agent will have the sole power to exercise remedies against the Notes Collateral (subject to the right of the Trustee to take limited protective measures with respect to the Junior Priority Liens and to take certain actions that would be permitted to be taken by unsecured creditors) and to foreclose upon and dispose of the Notes Collateral. After the Discharge of ABL Obligations, the Trustee shall be permitted to exercise remedies against the Notes Collateral. The Applicable Collateral Agent that is then entitled to exercise remedies against the Notes Collateral pursuant to the three prior sentences shall be referred to as the "*Authorized Notes Collateral Agent*" and each other Applicable Collateral Agent at such time shall be referred to as the "*Non-Authorized Notes Collateral Agent.*" Upon any sale of any Notes Collateral in connection with any enforcement action consented to by the Authorized Notes Collateral Agent, which results in the release of the Liens of such Authorized Notes Collateral Agent on such item of Notes Collateral, the Liens of each other class of Applicable Obligations on such item of Notes Collateral will be automatically released.

*Application of Proceeds and Turn-Over Provisions.* In connection with any enforcement action with respect to the Collateral or including in respect of any Insolvency or Liquidation Proceeding, (x) (1) all proceeds of ABL Facility Collateral will first be applied to the repayment of all ABL Obligations, before being applied to any First Priority Lien Obligations or any Junior Lien Obligations; (2) after the Discharge of ABL Obligations, if any First Priority Lien Obligations remain outstanding, all proceeds of ABL Facility Collateral will first be applied to the repayment of any outstanding First Priority Lien Obligations in accordance with the First Lien Intercreditor Agreement, before being applied to any Junior Lien Obligations; and (3) after the Discharge of First Priority Lien Obligations, all proceeds of ABL Facility Collateral will be applied to the repayment of Junior Lien Obligations (the class of Applicable Obligations that is then entitled to receive the proceeds of ABL Facility Collateral pursuant to the foregoing shall be referred to as the "*Authorized ABL Class of Obligations*" and each class of Applicable Obligations that is then not entitled to receive proceeds of ABL Facility Collateral pursuant to the foregoing shall be referred to as a "*Non-Authorized ABL Class of Obligations*"); and (y)(1) all proceeds of Notes Collateral shall be applied to First Priority Lien Obligations in accordance with the First Lien Intercreditor Agreement, before being applied to ABL Obligations or any Junior Lien Obligations; (2) after the Discharge of First Priority Lien Obligations, if any ABL Obligations remain outstanding, all proceeds of Notes Collateral will first be applied to the repayment of any outstanding ABL Obligations, before being applied to any Junior Lien Obligations; and (3) after the Discharge of ABL Obligations, all proceeds of Notes Collateral will be applied to the repayment of Junior Lien Obligations (the class of Applicable Obligations that is then entitled to receive the proceeds of Notes Collateral pursuant to the foregoing shall be referred to as the "*Authorized Notes Class of Obligations*" and each class of Applicable Obligations that is not then entitled to receive proceeds of Notes Collateral pursuant to the foregoing shall be referred to as a "*Non-Authorized Notes Class of Obligations*"). If any holder of any Applicable Obligations or if any Applicable Collateral Agent receives any proceeds of Collateral in contravention of the foregoing, such proceeds will be turned over to the Applicable Collateral Agent entitled to receive such proceeds pursuant to the prior sentence, for application in accordance with the prior sentence.

*Amendment and Refinancings.* The ABL Obligations, the First Priority Lien Obligations and the Junior Lien Obligations may be amended or refinanced subject to continuing rights of the holders of such refinancing Indebtedness under the Junior Lien Intercreditor Agreement.

*Certain Matters in Connection with Liquidation and Insolvency Proceedings.*

*Debtor-in-Possession Financings with Respect to ABL Facility Collateral.* In connection with any Insolvency or Liquidation Proceeding of the Company, the Issuer or any Pledgor, in the case of the ABL Facility Collateral, (x) the Authorized ABL Collateral Agents may consent to debtor-in-possession financings secured by a Lien on the ABL Facility Collateral ranking prior to the Liens of the Non-Authorized ABL Collateral Agents on the ABL Facility Collateral or to the use of cash collateral constituting proceeds of the ABL Facility Collateral without the consent of any holder of any Non-Authorized ABL Class of Obligations or any other Non-Authorized ABL Collateral Agent, and none of the holders of any Non-Authorized ABL Class of Obligations or any other Non-Authorized ABL Collateral Agent shall be entitled to object to such use of cash collateral or debtor-in-possession financing or to seek "adequate protection" in connection therewith (other than in the form of a junior lien in

accordance with the terms of the Junior Lien Intercreditor Agreement on any additional items of collateral for the Authorized ABL Class of Obligations which are granted in connection with such debtor-in-possession financing or use of cash collateral).

*Debtor-in-Possession Financings with Respect to Notes Collateral*. In connection with any Insolvency or Liquidation Proceeding of the Company, the Issuer or any Pledgor, in the case of the Notes Collateral, the Authorized Notes Collateral Agent may consent to certain debtor-in-possession financings secured by a Lien on the Notes Collateral ranking prior to the Liens of the Non-Authorized Notes Collateral Agents on the Notes Collateral or to the use of cash collateral constituting proceeds of the Notes Collateral without the consent of any holder of any Non-Authorized Notes Class of Obligations or any other Non-Authorized Notes Collateral Agent, and none of the holders of any Non-Authorized Notes Class of Obligations or any other Non-Authorized Notes Collateral Agent shall be entitled to object to such use of cash collateral or debtor-in-possession financing or to seek "adequate protection" in connection therewith (other than in the form of a junior lien in accordance with the terms of the Junior Lien Intercreditor Agreement on any additional items of collateral for the Authorized Notes Class of Obligations which are granted in connection with such debtor-in-possession financing or use of cash collateral).

*Relief from Automatic Stay; Bankruptcy Sales and Post-Petition Interest with Respect to ABL Facility Collateral*. In the case of ABL Facility Collateral, none of the holders of any Non-Authorized ABL Class of Obligations nor any Non-Authorized ABL Collateral Agent may (A) seek relief from the automatic stay with respect to any ABL Facility Collateral, (B) object to any sale of any ABL Facility Collateral in any Insolvency or Liquidation Proceeding which has been consented to by the Authorized ABL Collateral Agent or (C) object to any claim of any holder of any Authorized Class of ABL Obligations or Authorized ABL Collateral Agent to post-petition interest, fees or expenses to the extent of the value of the ABL Facility Collateral, such value to be determined without regard to the existence of the ABL Liens securing any other Non-Authorized ABL Class of Obligations.

*Relief from Automatic Stay; Bankruptcy Sales and Post-Petition Interest with Respect to Notes Collateral*. In the case of Notes Collateral, none of the holders of any Non-Authorized Notes Class of Obligations nor any Non-Authorized Notes Collateral Agent may (A) seek relief from the automatic stay with respect to any Notes Collateral, (B) object to any sale of any Notes Collateral in any Insolvency or Liquidation Proceeding which has been consented to by the Authorized Notes Collateral Agent or (C) object to any claim of any holder of any Authorized Class of Notes Obligations or Authorized Notes Collateral Agent to post-petition interest, fees or expenses to the extent of the value of the Notes Collateral, such value to be determined without regard to the existence of the First Priority Liens securing any other Non-Authorized Notes Class of Obligations.

*Adequate Protection*. None of any holder of Applicable Obligations nor any Applicable Collateral Agent may, except as expressly provided above, seek adequate protection on account of its Lien on ABL Facility Collateral or Notes Collateral, as applicable, other than in the form of junior priority liens; *provided*, *however*, that the holders of the Authorized ABL Class of Obligations and the Authorized ABL Collateral Agent may seek adequate protection with respect to the ABL Facility Collateral and the holders of the Authorized Notes Class of Obligations and the Authorized Notes Collateral Agent may seek adequate protection with respect to the Notes Collateral.

*Plans of Reorganization*. No Applicable Collateral Agent or holder of Applicable Obligations may support any plan of reorganization or file any proof of claim in any Insolvency or Liquidation Proceeding which, in either case, is not in accordance with the intercreditor provisions described above.

*Standstill Period*. The Junior Lien Intercreditor Agreement will provide that, notwithstanding any of the provisions described above, if prior to the commencement of an Insolvency or Liquidation Proceeding, after a period (the "*ABL Collateral Standstill Period*") of 180 consecutive days has elapsed from the date of delivery of written notice to the Authorized ABL Collateral Agent stating that the existence of an Event of Default as defined under the debt documents of any Non-Authorized ABL Class of Obligations has occurred and is continuing thereunder, and as a result of such Event of Default the principal and interest under such other Non-Authorized ABL Class of Obligations has become due and payable, then, upon notice to the Authorized ABL Collateral Agent indicating that applicable Non-Authorized ABL Collateral Agent intends to exercise remedies and enforce against the ABL Facility Collateral, such Non-Authorized ABL Collateral Agent may exercise any rights or remedies (including setoff) with respect to any ABL Facility Collateral (including, without limitation, the enforcement of or execution on any judgment Lien) or institute any action or proceeding with respect to such rights or remedies only so long as the Authorized ABL Collateral Agent or the holders of the Authorized ABL Class of Obligations shall not have commenced and be diligently pursuing (within such 180 consecutive day period) the exercise of any of their rights or remedies with respect to the ABL Facility Collateral; *provided* that, if the Authorized Collateral Agent shall have provided notice as set forth above and shall have commenced and be diligently pursuing (within such 180 consecutive day period) the exercise of any of their rights or remedies with respect to the ABL Facility Collateral, then the Trustee shall be prohibited from exercising remedies against ABL Facility Collateral. In addition, the Junior Lien Intercreditor Agreement will provide that, notwithstanding any of the provisions described above, if prior to the

commencement of an Insolvency or Liquidation Proceeding, after a period (the "*Notes Collateral Standstill Period*") of 180 consecutive days has elapsed from the date of delivery of written notice to the Authorized Notes Collateral Agent stating that the existence of an Event of Default as defined under the debt documents of any Non-Authorized Notes Class of Obligations has occurred and is continuing thereunder, and as a result of such Event of Default the principal and interest under such Non-Authorized Notes Class of Obligations has become due and payable, then, upon notice to the Authorized Notes Collateral Agent indicating that applicable Non-Authorized Notes Collateral Agent intends to exercise remedies and enforce against the Notes Collateral, such Non-Authorized Notes Collateral Agent may exercise any rights or remedies (including setoff) with respect to any Notes Collateral (including, without limitation, the enforcement of or execution on any judgment Lien) or institute any action or proceeding with respect to such rights or remedies only so long as the Authorized Notes Collateral Agent or the holders of the Authorized Notes Class of Obligations shall not have commenced and be diligently pursuing (within such 180 consecutive day period) the exercise of any of their rights or remedies with respect to the Notes Collateral; *provided* that, if the ABL Collateral Agent shall have provided notice as set forth above and shall have commenced and be diligently pursuing (within such 180 consecutive day period) the exercise of any of its rights or remedies with respect to the Notes Collateral, then the Trustee shall be prohibited from exercising remedies against Notes Collateral.

**Release of Collateral**

Subject to the Junior Lien Intercreditor Agreement, Liens on Collateral securing the Notes will be automatically and unconditionally released:

(1)  as to any property or asset (including Capital Stock of a Subsidiary of the Company), to enable the Company, the Issuer and the Pledgors to consummate the disposition of such property or asset to the extent not prohibited by clause (5) below or under the covenants described under "—Certain Covenants—Asset Sales" or "—Certain Covenants—Limitation on Restricted Payments";

(2)  upon the release of all Liens on such property or assets securing First and Second Priority Lien Obligations (including all commitments and letters of credit thereunder); provided, however, that if the Issuer or the Company subsequently incurs (i) First Priority Lien Obligations that are secured by Liens on property or assets of the Issuer or the Company of the type constituting the Collateral and the related Liens are incurred in reliance on clauses (6)(B) or (6)(D) of the definition of Permitted Liens or (ii) Second Priority Lien Obligations that are secured by Liens on property or assets of the Issuer or the Company of the type constituting the Collateral and the related Liens are incurred in reliance on clause (6)(C) of the definition of Permitted Liens, then the Issuer and its Restricted Subsidiaries will be required to reinstate the security arrangements with respect to the Collateral in favor of the Notes, which, in the case of any such subsequent First Priority Lien Obligations or Second Priority Lien Obligations, will be junior priority Liens on the Collateral securing such First Priority Lien Obligations or Second Priority Lien Obligations to the same extent provided by the Security Documents and on the terms and conditions of the security documents relating to such First Priority Lien Obligations or Second Priority Lien Obligations, with the junior priority Lien held either by the administrative agent, collateral agent or other representative for such First Priority Lien Obligations or Second Priority Lien Obligations and subject to an intercreditor agreement that provides the administrative agent or collateral agent substantially the same rights and powers as afforded under the Junior Lien Intercreditor Agreement;

(3)  in respect of the property and assets of a Pledgor, upon the designation of such Pledgor to be an Unrestricted Subsidiary in accordance with the covenant described under "—Certain Covenants—Limitation on Restricted Payments" and the definition of "Unrestricted Subsidiary";

(4)  in respect of the property and assets of a Guarantor upon release of the Guarantee with respect to the Notes of such Guarantor;

(5)  in the case of the property and assets of a specific Pledgor, upon such Pledgor making a Transfer of such assets to any Restricted Subsidiary of the Issuer that is not a Pledgor; *provided* that (i) such Transfer is not subject to the covenant described under "—Merger, Amalgamation, Consolidation or Sale of All or Substantially All Assets" and (ii) the aggregate net book value of the assets of Restricted Subsidiaries that are at any time Notes Collateral (as defined in the First Lien Security Documents) (excluding cash proceeds of accounts receivable, inventory and related assets) that are so transferred pursuant to this clause (5) subsequent to the Issue Date shall not exceed 5% of the Consolidated Net Tangible Assets of the Issuer and its Restricted Subsidiaries per year and shall not be in an amount that will result in an Excluded Subsidiary ceasing to qualify as an Excluded Subsidiary in accordance with the definition thereof; *provided*, *further*, that Liens on all property and assets of any Subsidiary of Lyondell Europe Holdings, Inc., a Delaware corporation, will be automatically and unconditionally released upon any transfer of such Subsidiary;

(6)  as described under "—Amendments and Waivers" below; or

(7) as to the pledge of Capital Stock of first-tier Foreign Subsidiaries, in connection with a reorganization, change or modification of the direct or indirect ownership of Foreign Subsidiaries by the Company, the Issuer or a Pledgor, as applicable, in compliance with the Indenture, a release may be obtained as to such Capital Stock in connection with the substitution of pledge of 65% of the voting Capital Stock and 100% of the non-voting Capital Stock of any one or more new or replacement first- tier Foreign Subsidiaries pursuant to valid Security Documents.

Notwithstanding the foregoing clause (2), if an Event of Default exists on the date of Discharge of First and Second Priority Lien Obligations, the Junior Priority Liens on the Collateral securing the Notes will not be released, except to the extent the Collateral or any portion thereof was disposed of in order to repay the First and Second Priority Lien Obligations secured by the Collateral, and thereafter the Trustee (or another designated representative acting at the direction of the holders of a majority of outstanding principal amount of the Notes and other Junior Lien Obligations) will have the right to direct the Agent to foreclose upon the Collateral (but in such event, the Liens on the Collateral securing the Notes will be released when such Event of Default and all other Events of Default cease to exist).

The security interests in all Collateral securing the Notes also will be released upon (i) payment in full of the principal of, premium (if any) on and accrued and unpaid interest and additional interest, if any, on, the Notes and all other Obligations under the Indenture and the Security Documents that are due and payable at or prior to the time such principal, premium (if any) and accrued and unpaid interest (including additional interest, if any), are paid (including pursuant to a satisfaction and discharge of the Indenture as described under "—Satisfaction and Discharge") or (ii) a legal defeasance or covenant defeasance under the Indenture as described under "—Defeasance."

Any certificate or opinion required by Section 314(d) of the TIA may be made by an Officer of the Issuer, except in cases where Section 314(d) requires that such certificate or opinion be made by an independent engineer, appraiser or other expert.

Notwithstanding anything to the contrary herein, the Issuer and its Subsidiaries will not be required to comply with all or any portion of Section 314(d) of the TIA if they determine, in good faith based on advice of counsel, that under the terms of that section and/or any interpretation or guidance as to the meaning thereof of the SEC and its staff, including "no action" letters or exemptive orders, all or any portion of Section 314(d) of the TIA is inapplicable to the released Collateral.

Without limiting the generality of the foregoing, certain no action letters issued by the SEC have permitted an indenture qualified under the TIA to contain provisions permitting the release of collateral from Liens under such indenture in the ordinary course of the issuer's business without requiring the issuer to provide certificates and other documents under Section 314(d) of the TIA. The Issuer, the Company and the Pledgors may, subject to the provisions of the Indenture, among other things, without any release or consent by the Trustee or the Collateral Agent, conduct ordinary course activities with respect to the Collateral, including, without limitation:

> selling or otherwise disposing of, in any transaction or series of related transactions, any property subject to the Lien of the Security Documents that has become worn out, defective, obsolete or not used or useful in the business;

> abandoning, terminating, canceling, releasing or making alterations in or substitutions of any leases or contracts subject to the Lien of the Indenture or any of the Security Documents;

> surrendering or modifying any franchise, license or permit subject to the Lien of the Security Documents that it may own or under which it may be operating;

> altering, repairing, replacing, changing the location or position of and adding to its structures, machinery, systems, equipment, fixtures and appurtenances;

> granting a license of any intellectual property;

> selling, transferring or otherwise disposing of inventory or accounts receivable in the ordinary course of business;

> making cash payments (including for the repayment of Indebtedness or interest) from cash that is at any time part of the Collateral in the ordinary course of business that are not otherwise prohibited by the Indenture and the Security Documents; and

> abandoning any intellectual property that is no longer used or useful in the business of the Company or its Subsidiaries.

**Change of Control**

Upon the occurrence of a Change of Control after the Issue Date, each holder will have the right to require the Issuer to repurchase all or any part of such holder's Notes at a purchase price in cash equal to 101% of the principal amount thereof plus accrued and unpaid interest and additional interest, if any, to the date of repurchase (subject to the right of holders of record on the

relevant record date to receive interest due on the relevant interest payment date), except to the extent the Issuer has previously or concurrently elected to redeem Notes as described under "—Redemption—Optional Redemption."

In the event that at the time of such Change of Control the terms of any First Priority Lien Obligation or Second Priority Lien Obligation restrict or prohibit the repurchase of Notes pursuant to this covenant, then prior to the mailing of the notice to holders provided for in the immediately following paragraph but in any event within 30 days following any Change of Control, the Issuer shall:

(1)  repay in full all such Indebtedness under the First Priority Lien Obligation or Second Priority Lien Obligation, as applicable, containing all such restrictions or prohibitions or, if doing so will allow the purchase of Notes, offer to repay in full all such Credit Facility Indebtedness and repay such Credit Facility Indebtedness owed to each lender and/or noteholder who has accepted such offer; or

(2)  obtain the requisite consent under the agreements governing such First Priority Lien Obligation or Second Priority Lien Obligation, as applicable, to permit the repurchase of the Notes as provided for in the immediately following paragraph;

it being understood that failure to repay in full all such Indebtedness under the First Priority Lien Obligation or Second Priority Lien Obligation, as applicable, or obtain such requisite consent, shall not release the Issuer of its obligation to make a Change of Control Offer (as defined below) and repurchase the Notes as required hereunder.

Within 30 days following any Change of Control, except to the extent that the Issuer has exercised its right to redeem the Notes by delivery of a notice of redemption as described under "—Redemption—Optional Redemption," the Issuer shall mail a notice (a "*Change of Control Offer*") to each holder with a copy to the Trustee stating:

(1)  that a Change of Control has occurred and that such holder has the right to require the Issuer to repurchase such holder's Notes at a repurchase price in cash equal to 101% of the principal amount thereof plus accrued and unpaid interest and additional interest, if any, to the date of repurchase (subject to the right of holders of record on a record date to receive interest on the relevant interest payment date);

(2)  the circumstances and relevant facts and financial information regarding such Change of Control;

(3)  the repurchase date (which shall be no earlier than 30 days nor later than 60 days from the date such notice is mailed); and

(4)  the instructions determined by the Issuer, consistent with this covenant, that a holder must follow in order to have its Notes purchased.

A Change of Control Offer may be made in advance of a Change of Control, and conditioned upon such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making of the Change of Control Offer.

In addition, the Issuer will not be required to make a Change of Control Offer upon the consummation of a Change of Control if a third party makes the Change of Control Offer in the manner, at the time and otherwise in compliance with the requirements set forth in the Indenture applicable to a Change of Control Offer made by the Issuer and purchases all Notes properly tendered and not withdrawn under such Change of Control Offer.

Notes repurchased by the Issuer pursuant to a Change of Control Offer will have the status of Notes issued but not outstanding or will be retired and canceled at the option of the Issuer. Notes purchased by a third party pursuant to the preceding paragraph will have the status of Notes issued and outstanding.

The Issuer will comply, to the extent applicable, with the requirements of Section 14(e) of the Exchange Act and any other securities laws or regulations in connection with the repurchase of Notes pursuant to this covenant. To the extent that the provisions of any securities laws or regulations conflict with provisions of this covenant, the Issuer will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under this covenant by virtue thereof.

This Change of Control repurchase provision is a result of negotiations. The Issuer has no present intention to engage in a transaction involving a Change of Control, although it is possible that the Issuer could decide to do so in the future. Subject to the limitations discussed below, the Issuer could, in the future, enter into certain transactions, including acquisitions, refinancings or other recapitalizations, that would not constitute a Change of Control under the Indenture, but that could increase the amount of Indebtedness outstanding at such time or otherwise affect the Issuer's capital structure or credit rating.

The occurrence of events that would constitute a Change of Control would also constitute an event of default under the Senior Term Loan Facility, the First Lien Indenture and the ABL Facility. Future Credit Facilities of the Company or its Subsidiaries may contain prohibitions on certain events that would constitute a Change of Control or require such Credit Facilities to be repurchased upon a Change of Control. Moreover, the exercise by the holders of their right to require the Issuer to repurchase the

Notes could cause a default under such Credit Facility, even if the Change of Control itself does not, due to the financial effect of such repurchase on the Issuer. Finally, the Issuer's ability to pay cash to the holders upon a repurchase may be limited by the Issuer's then existing financial resources. There can be no assurance that sufficient funds will be available when necessary to make any required repurchases.

The definition of Change of Control includes a phrase relating to the sale, lease or transfer of "all or substantially all" the assets of the Company and its Subsidiaries taken as a whole. Although there is a developing body of case law interpreting the phrase "substantially all," under New York law, which governs the Indenture, there is no precise established definition of the phrase. Accordingly, the ability of a holder of Notes to require the Issuer to repurchase such Notes as a result of a sale, lease or transfer of less than all of the assets of the Company and its Subsidiaries taken as a whole to another Person or group may be uncertain.

The provisions under the Indenture relating to the Issuer's obligation to make an offer to repurchase the Notes as a result of a Change of Control may be waived or modified with the written consent of the holders of a majority in aggregate principal amount of the Notes.

**Certain Covenants**

Set forth below are summaries of certain covenants that will be contained in the Indenture, which (in the absence of a Covenant Suspension Event (as defined below)) will bind the Company and its Restricted Subsidiaries on and after the Issue Date. If on any date following the Issue Date, (i) the Notes have Investment Grade Ratings from two Rating Agencies and (ii) no Default has occurred and is continuing under the Indenture then, beginning on that day and continuing until the Reversion Date (as defined below) (the occurrence of the events described in the foregoing clauses (i) and (ii) being collectively referred to as a "*Covenant Suspension Event*"), the covenants specifically listed under the following captions will not be applicable to the Notes (collectively, the "*Suspended Covenants*"):

(1)  "—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

(2)  "—Limitation on Restricted Payments";

(3)  "—Dividend and Other Payment Restrictions Affecting Subsidiaries";

(4)  "—Asset Sales";

(5)  "—Transactions with Affiliates"; and

(6)  clause (4) of the third paragraph under "—Merger, Amalgamation, Consolidation or Sale of All or Substantially All Assets."

At any time the Company and its Restricted Subsidiaries are not subject to the Suspended Covenants, the holders of the Notes will be entitled to substantially less, and materially limited, covenant protection.

If on any date subsequent to a Covenant Suspension Event (the "*Reversion Date*") one or both of the Rating Agencies withdraw their Investment Grade Rating or downgrade the rating assigned to the Notes below an Investment Grade Rating, then the Company and its Restricted Subsidiaries will thereafter again be subject to the Suspended Covenants under the Indenture with respect to future events. The period of time between the Covenant Suspension Event and the Reversion Date is referred to as the "*Suspension Period*."

On each Reversion Date, all Indebtedness Incurred, or Disqualified Stock or Preferred Stock issued, during the Suspension Period will be classified as having been Incurred or issued pursuant to the first paragraph, or one of the clauses set forth in the second paragraph, under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" below (to the extent such Indebtedness or Disqualified Stock or Preferred Stock would be permitted to be Incurred or issued thereunder as of the Reversion Date and after giving effect to Indebtedness Incurred or issued prior to the Suspension Period and outstanding on the Reversion Date). To the extent such Indebtedness or Disqualified Stock or Preferred Stock would not be so permitted to be Incurred or issued pursuant to the first or second paragraph under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock," such Indebtedness or Disqualified Stock or Preferred Stock will be deemed to have been outstanding on the Issue Date, so that it is classified as permitted under clause (d) of the second paragraph under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock." Calculations made after the Reversion Date of the amount available to be made as Restricted Payments under "—Certain Covenants—Limitation on Restricted Payments" will be made as though the covenant described under "—Certain Covenants—Limitation on Restricted Payments" had been in effect since the Issue Date and throughout the Suspension Period. Accordingly, Restricted Payments made during the Suspension Period will reduce the amount available to be made as Restricted Payments under the first paragraph under "—Certain Covenants—Limitation on Restricted Payments." As described above, however, no Default or Event of Default will be deemed to have occurred on the Reversion Date as a result of any actions taken by the Company or its Restricted Subsidiaries during the Suspension Period.

For purposes of the covenant described under "—Certain Covenants—Asset Sales," on the Reversion Date, the unutilized Excess Proceeds amount will be reset to zero.

There can be no assurance that the Notes will ever achieve or maintain Investment Grade Ratings.

### *Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock*

The Indenture will provide that:

(1) the Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Indebtedness (including Acquired Indebtedness) or issue any shares of Disqualified Stock; and

(2) the Company will not permit any of its Restricted Subsidiaries (other than the Issuer or any Guarantor) to issue any shares of Preferred Stock;

*provided*, *however*, that the Issuer and any Guarantor may Incur Indebtedness (including Acquired Indebtedness) or issue shares of Disqualified Stock, and, subject to the third paragraph of this covenant, any Restricted Subsidiary of the Company that is not a Guarantor may Incur Indebtedness (including Acquired Indebtedness), issue shares of Disqualified Stock or issue shares of Preferred Stock, in each case if the Fixed Charge Coverage Ratio of the Company for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is Incurred or such Disqualified Stock or Preferred Stock is issued would have been at least 1.75 to 1.00 determined on a *pro forma* basis (including a *pro forma* application of the net cash proceeds therefrom), as if the additional Indebtedness had been Incurred, or the Disqualified Stock or Preferred Stock had been issued, as the case may be, and the application of proceeds therefrom had occurred at the beginning of such four-quarter period.

The foregoing limitations do not apply to:

(a) (i) Indebtedness under the First Lien Notes issued on the Issue Date, and the guarantees thereof, and (ii) an aggregate principal amount of Indebtedness outstanding in the form of any other series of notes representing First Priority Lien Obligations ("*other first lien notes*") issued in one or more tranches under the Indenture, and the guarantees by the Guarantors thereof, if, on a *pro forma* basis after giving effect thereto (including a *pro forma* application of the proceeds thereof), the Secured Indebtedness Leverage Ratio of the Company would not exceed 2.25 to 1.00;

(b) Indebtedness under the Notes and the 2014 Notes issued on the Issue Date;

(c) Indebtedness Incurred pursuant to Credit Facilities, as follows:

(i) Indebtedness under any Credit Facilities (other than Asset Backed Credit Facilities) in the aggregate principal amount of $1,500 million plus an aggregate additional principal amount of Indebtedness secured by a Lien outstanding at any one time such that on a *pro forma* basis (including a *pro forma* application of the proceeds therefrom) the Secured Indebtedness Leverage Ratio of the Company would not exceed 2.25 to 1.00; *provided* that the amount of Indebtedness that may be Incurred pursuant to this subclause (i) shall be reduced by the amount of any (x) prepayments of term loans under Credit Facilities or (y) permanent reductions of Indebtedness under any revolving credit facility (other than any such prepayments of the ABL Facility), in the case of each of (x) and (y) with the proceeds of an Asset Sale (other than any Asset Sale in respect of Specified ABL Facility Assets);

(ii) Indebtedness under Asset Backed Credit Facilities in an aggregate principal amount not to exceed the greater of (A) $2,250 million and (B) the sum of 90% of the net book value of the accounts receivable of the Company and its Restricted Subsidiaries and 70% of the net book value of the inventory of the Company and its Restricted Subsidiaries (the "*Borrowing Base*") less (x) in the case of the calculation of the Borrowing Base under this subclause (ii) (B), the amount of the Borrowing Base that is the subject of an on balance sheet Qualified Receivables Financing (it being understood that any of the Borrowing Base that is subject to arrangements for disposition or transfer in connection with an off-balance sheet Qualified Receivables Financing shall not be included in the Borrowing Base) and (y) in the case of Indebtedness permitted to be Incurred under this subclause (ii)(B), the amount of any Indebtedness Incurred under any Oil Index Credit Facility; *provided* that any assets or property securing any Project Financing Incurred pursuant to clause (e)(ii) below shall be excluded when determining the Borrowing Base; *provided*, *further*, that Indebtedness that may be Incurred pursuant to this subclause (ii) shall be reduced by the amount of any permanent reductions of Indebtedness under any revolving credit facility (other than any such prepayments of revolving credit facilities Incurred pursuant to clause (c)(i) above) with the proceeds of an Asset Sale (other than any Asset Sale in respect of Specified ABL Facility Assets); *provided further* that, in the event of an Asset Acquisition, Indebtedness may be Incurred against the Borrowing Base pursuant to the foregoing in anticipation of the completion of such Asset Acquisition on the assumption that the Borrowing Base of the subject of the Asset Acquisition has been acquired; and

(iii) Indebtedness under any Oil Indexed Credit Facility in an aggregate principal amount not to exceed $750.0 million; *provided* that amounts Incurred pursuant to an Oil Index Credit Facility will be required to reduce the amount of Indebtedness Incurred under the Borrowing Base to the extent Indebtedness in such amount as would no longer be permitted to be Incurred under subclause (ii) above (without duplication for the requirements of subclause (ii) above);

(d) Indebtedness existing on the Issue Date (other than the First Lien Notes and Indebtedness described in clauses (b) and (c) above) in an aggregate principal amount not to exceed $600.0 million, after giving effect to the consummation of the Reorganization Plan, which shall have the obligors, collateral, maturity and amortization features summarized under "Description of Certain Indebtedness" herein, and guarantees of Indebtedness of Joint Ventures outstanding on the Issue Date, and operating leases of the Company and the Restricted Subsidiaries outstanding on the Issue Date to the extent characterized as a Capitalized Lease Obligation after the Issue Date;

(e) (i) Indebtedness (including Capitalized Lease Obligations) Incurred by the Company or any Restricted Subsidiary, Disqualified Stock issued by the Company or any of its Restricted Subsidiaries and Preferred Stock issued by any Restricted Subsidiaries of the Company to finance (whether prior to or within 270 days after) the acquisition, lease, construction, repair, replacement or improvement of property (real or personal) or equipment (whether through the direct purchase of assets or the Capital Stock of any Person owning such assets); *provided* that Indebtedness Incurred pursuant to this clause (e)(i) is not Incurred to finance a Business Acquisition, (ii) Indebtedness Incurred in connection with any Project Financing or (iii) Indebtedness Incurred pursuant to a Catalyst Sale/Leaseback Transaction;

(f) Indebtedness Incurred by the Company or any of its Restricted Subsidiaries constituting reimbursement Obligations with respect to letters of credit and bank guarantees issued in the ordinary course of business, including, without limitation, letters of credit in respect of workers' compensation claims, health, disability or other benefits to employees or former employees or their families or property, casualty or liability insurance or self-insurance or similar requirements, and letters of credit in connection with the maintenance of, or pursuant to the requirements of, environmental or other permits or licenses from governmental authorities, or other Indebtedness with respect to reimbursement type obligations regarding workers' compensation claims;

(g) Indebtedness arising from agreements of the Company or a Restricted Subsidiary providing for indemnification, adjustment of purchase price or similar obligations, in each case, Incurred in connection with any acquisition or disposition of any business, assets or a Subsidiary of the Company in accordance with the terms of the Indenture, other than guarantees of Indebtedness Incurred by any Person acquiring all or any portion of such business, assets or Subsidiary for the purpose of financing such acquisition;

(h) Indebtedness of the Company to a Restricted Subsidiary; *provided* that (except in respect of intercompany current liabilities Incurred in the ordinary course of business in connection with the cash management operations of the Company and its Subsidiaries) any such Indebtedness owed to a Restricted Subsidiary that is not the Issuer or a Guarantor is subordinated in right of payment to the Obligations of the Company under the Notes; *provided*, *further*, that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Company or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) shall be deemed, in each case, to be an Incurrence of such Indebtedness not permitted by this clause (h);

(i) shares of Preferred Stock of a Restricted Subsidiary issued to the Company or another Restricted Subsidiary; *provided* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Restricted Subsidiary that holds such shares of Preferred Stock of another Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such shares of Preferred Stock (except to the Company or another Restricted Subsidiary) shall be deemed, in each case, to be an issuance of shares of Preferred Stock not permitted by this clause (i);

(j) Indebtedness of a Restricted Subsidiary to the Company or another Restricted Subsidiary; *provided* that, if the Issuer or a Guarantor Incurs such Indebtedness to a Restricted Subsidiary that is not the Issuer or a Guarantor (except in respect of intercompany current liabilities Incurred in the ordinary course of business in connection with the cash management operations of the Company and its Subsidiaries), such Indebtedness is subordinated in right of payment to the Obligations of the Issuer or such Guarantor, as applicable, in respect of the Notes; *provided*, *further*, that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Restricted Subsidiary holding such Indebtedness ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Company or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) shall be deemed, in each case, to be an Incurrence of such Indebtedness not permitted by this clause (j);

(k) Hedging Obligations that are not Incurred for speculative purposes but for the purpose of (1) fixing or hedging interest rate risk with respect to any Indebtedness that is permitted by the terms of the Indenture to be outstanding; (2) fixing or hedging currency exchange rate risk with respect to any currency exchanges; (3) fixing or hedging commodity price risk, including the price or cost of raw materials, emission rights, manufactured products or related commodities, with respect to

any commodity purchases or sales; or (4) hedging the potential exposure in respect of certain executives' and employees' options over, or stock appreciation rights in relation to, shares of Royal Dutch Shell plc and BASF AG;

(l)  (i) obligations in respect of bankers' acceptances, tender, bid, judgment, appeal, performance or governmental contract bonds and completion guarantees, surety, standby letters of credit and warranty and contractual service obligations of a like nature, trade letters of credit and documentary letters of credit and similar bonds or guarantees provided by the Company or any Restricted Subsidiary in the ordinary course of business, or (ii) Indebtedness of the Company or any Restricted Subsidiary supported by a letter of credit or bank guarantee issued pursuant to any of the Credit Facilities, in a principal amount not in excess of the stated amount of such letter of credit;

(m) Indebtedness or Disqualified Stock of the Company or, subject to the third paragraph of this covenant "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock," Indebtedness, Disqualified Stock or Preferred Stock of any Restricted Subsidiary of the Company not otherwise permitted hereunder in an aggregate principal amount or liquidation preference, which when aggregated with the principal amount or liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and Incurred pursuant to this clause (m), does not exceed the greater of $1,000.0 million and 4.25% of the Consolidated Net Tangible Assets of the Company at the time of Incurrence (it being understood that any Indebtedness Incurred pursuant to this clause (m) shall cease to be deemed Incurred or outstanding for purposes of this clause (m) but shall be deemed Incurred for purposes of the first paragraph of this covenant from and after the first date on which the Company, or the Restricted Subsidiary, as the case may be, could have Incurred such Indebtedness under the first paragraph of this covenant without reliance upon this clause (m));

(n) Indebtedness or Disqualified Stock of the Company, the Issuer or any Pledgor and Preferred Stock of the Issuer or any Pledgor not otherwise permitted hereunder in an aggregate principal amount or liquidation preference not greater than 200% of the net cash proceeds received by the Company and its Restricted Subsidiaries since immediately after the Issue Date from the issue or sale of Equity Interests of the Company or any direct or indirect parent entity of the Company (which proceeds are contributed to the Company) or cash contributed to the capital of the Company (in each case other than proceeds of Disqualified Stock or sales of Equity Interests to, or contributions received from, the Company or any of its Restricted Subsidiaries) as determined in accordance with clauses (c)(ii) and (c)(iii) under "—Certain Covenants—Limitation on Restricted Payments" to the extent such net cash proceeds or cash have not been applied pursuant to such clauses to make Restricted Payments or to make other Investments or to make Permitted Investments (other than Permitted Investments specified in clauses (1) and (3) of the definition thereof);

(o) any guarantee by the Company or any Restricted Subsidiary of Indebtedness or other Obligations of the Company or any of its Restricted Subsidiaries so long as the Incurrence of such Indebtedness Incurred by the Company or such Restricted Subsidiary is permitted under the terms of the Indenture; *provided* that (i) if such Indebtedness is by its express terms subordinated in right of payment to the Notes or the obligations of such Restricted Subsidiary in respect of the Notes, as applicable, any such guarantee of such Restricted Subsidiary with respect to such Indebtedness shall be subordinated in right of payment to such Restricted Subsidiary's obligations with respect to the Notes substantially to the same extent as such Indebtedness is subordinated to the Notes or the obligations of such Restricted Subsidiary in respect of the Notes, as applicable, or (ii) if such guarantee is of Indebtedness of the Company under the First Lien Notes or the Senior Term Loan Facility, such guarantee is Incurred in accordance with the covenant described under "—Future Subsidiary Guarantors" solely to the extent such covenant is applicable;

(p) the Incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness or Disqualified Stock or Preferred Stock of a Restricted Subsidiary of the Company which serves to refund, refinance or defease any Indebtedness Incurred or Disqualified Stock or Preferred Stock issued as permitted under the first paragraph of this covenant and clauses (a), (b), (d), (e), (n) and (q) of this paragraph or any Indebtedness, Disqualified Stock or Preferred Stock Incurred to so refund or refinance such Indebtedness, Disqualified Stock or Preferred Stock, including any additional Indebtedness, Disqualified Stock or Preferred Stock Incurred to pay premiums (including tender premiums) and original issue discount, expenses, defeasance costs and fees in connection therewith; *provided* that any such Indebtedness until reclassified in accordance with the Indenture shall remain Incurred pursuant to clauses (a), (d), (e), (n) and (q), as applicable (subject to the following *proviso*, "*Refinancing Indebtedness*"), prior to its maturity; *provided*, *however*, that such Refinancing Indebtedness:

(1) has a Weighted Average Life to Maturity at the time such Refinancing Indebtedness is Incurred which is not less than the shorter of (x) the remaining Weighted Average Life to Maturity of the Indebtedness, Disqualified Stock or Preferred Stock being refunded, refinanced or defeased and (y) the Weighted Average Life to Maturity that would result if all payments of principal on the Indebtedness, Disqualified Stock and Preferred Stock being refunded or refinanced that were due on or after the date that is one year following the last maturity date of any Notes then outstanding were instead due on such date;

(2) to the extent such Refinancing Indebtedness refinances (a) Indebtedness junior to the Notes or the Obligations of such Restricted Subsidiary in respect of the Notes, as applicable, such Refinancing Indebtedness is junior to the Notes

or such Obligations of such Restricted Subsidiary, as applicable, to at least the same extent or (b) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness is Disqualified Stock or Preferred Stock, as the case may be, of the same issuer; and

(3) shall not include (x) Indebtedness of a Restricted Subsidiary of the Company that is not a Guarantor that refinances Indebtedness of the Issuer or a Guarantor, or (y) Indebtedness of the Company or a Restricted Subsidiary that refinances Indebtedness of an Unrestricted Subsidiary;

*provided*, *further*, that subclause (1) of this clause (p) will not apply to any refunding or refinancing of any Secured Indebtedness constituting First Priority Lien Obligations;

(q)  Indebtedness, Disqualified Stock or Preferred Stock of (x) the Company or, subject to the third paragraph of this covenant, any of its Restricted Subsidiaries (A) Incurred to finance an Asset Acquisition or (B) Incurred by a Person in connection with or anticipation of such Person becoming a Restricted Subsidiary as a result of an Asset Acquisition or to finance an Asset Acquisition or (y) a Person existing at the time such Person becomes a Restricted Subsidiary of the Company as a result of an Asset Acquisition or assumed in connection with an Asset Acquisition by the Company or a Restricted Subsidiary of the Company and, in any such case under this subclause (y), not Incurred in connection with or in anticipation of, such Asset Acquisition; *provided* that, in the case of clause (y), the holders of any such Indebtedness do not, at any time, have direct or indirect recourse to any property or assets of the Company or any Restricted Subsidiary other than the property or assets that are the subject of such Asset Acquisition; *provided* that after giving effect to such Asset Acquisition, either:

(1)  the Company would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in the first paragraph of this covenant; or

(2)  the Fixed Charge Coverage Ratio of the Company would be greater than immediately prior to such Asset Acquisition;

(r)  Indebtedness Incurred in a Qualified Receivables Financing that is without recourse to the Company or any Restricted Subsidiary (except for Standard Securitization Undertakings);

(s)  Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided* that such Indebtedness is extinguished within five Business Days of its Incurrence;

(t)  Indebtedness under any Treasury Services Agreement or any Structured Financing Transaction;

(u)  Indebtedness of Foreign Subsidiaries; *provided*, *however*, that the aggregate principal amount of Indebtedness Incurred under this clause (u), when aggregated with the principal amount of all other Indebtedness then outstanding and Incurred pursuant to this clause (u), does not exceed the greater of $525.0 million and 4.25% of the Consolidated Net Tangible Assets of the Foreign Subsidiaries at any one time outstanding (it being understood that any Indebtedness Incurred pursuant to this clause (u) shall cease to be deemed Incurred or outstanding for purposes of this clause (u) but shall be deemed Incurred for the purposes of the first paragraph of this covenant from and after the first date on which such Foreign Subsidiary could have Incurred such Indebtedness under the first paragraph of this covenant without reliance upon this clause (u));

(v)  Indebtedness of the Company or any Restricted Subsidiary consisting of (1) the financing of insurance premiums or (2) take-or-pay Obligations contained in supply arrangements, in each case, in the ordinary course of business;

(w)  Indebtedness consisting of Indebtedness issued by the Company or a Restricted Subsidiary of the Company to current or former officers, directors and employees thereof or any direct or indirect parent thereof, their respective estates, spouses or former spouses, in each case to finance the purchase or redemption of Equity Interests of the Company or any direct or indirect parent entity of the Company to the extent described in clause (4) of the second paragraph of the covenant described under "—Certain Covenants—Limitation on Restricted Payments";

(x)  Indebtedness Incurred on behalf of, or representing guarantees of Indebtedness of, Joint Ventures of the Company or any Restricted Subsidiary not to exceed, at any one time outstanding, the greater of $375.0 million and 1.50% of the Consolidated Net Tangible Assets of the Company; and

(y)  Indebtedness Incurred by Lyondell Basell Australia Pty Ltd. and its successors in an aggregate principal amount at any one time outstanding not to exceed $80.0 million; *provided* that such Indebtedness is not guaranteed by the Company or any Restricted Subsidiary of the Company organized under the laws of any jurisdiction other than Australia.

Restricted Subsidiaries that are not Guarantors may not Incur Indebtedness or issue Disqualified Stock or Preferred Stock under the first paragraph of this covenant or clauses (m) or (q)(x) (or clause (o) to the extent constituting a guarantee of Indebtedness Incurred under the first paragraph of this covenant or clauses (m) or (q)(x)) of the second paragraph of this covenant if, after giving *pro forma* effect to such Incurrence or issuance (including a *pro forma* application of the net cash proceeds therefrom), the aggregate amount of Indebtedness and Disqualified Stock and Preferred Stock of Restricted Subsidiaries that are not Guarantors Incurred or issued pursuant to the first paragraph of this covenant and clauses (m) and (q)(x) (or clause (o) to the extent constituting a guarantee of Indebtedness Incurred under the first paragraph of this covenant or clauses (m) or (q)(x)) of the second paragraph of this covenant, collectively, would exceed the greater of $600.0 million and 5.0% of the Consolidated Net Tangible Assets of Restricted Subsidiaries that are not Guarantors.

For purposes of determining compliance with this covenant:

(1)  in the event that an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) meets the criteria of more than one of the categories of permitted Indebtedness described in clauses (a) through (y) above or is entitled to be Incurred pursuant to the first paragraph of this covenant, the Company shall, in its sole discretion, classify or reclassify, or later divide, classify or reclassify, such item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) in any manner that complies with this covenant; *provided* that Indebtedness Incurred, or committed for, under the Credit Facilities and the First Lien Notes on or before the Issue Date or pursuant to an Oil Indexed Credit Facility shall at all times be deemed to be Incurred under clauses (a) and (c) of the definition of the second paragraph of this covenant; and

(2)  at the time of Incurrence, the Company will be entitled to divide and classify an item of Indebtedness in more than one of the types of Indebtedness described in the first and second paragraphs above without giving *pro forma* effect to the Indebtedness Incurred pursuant to the second paragraph above when calculating the amount of Indebtedness that may be Incurred pursuant to the first paragraph above.

Accrual of interest, the accretion of accreted value, the payment of interest or dividends in the form of additional Indebtedness, Disqualified Stock or Preferred Stock, as applicable, amortization of original issue discount, the accretion of liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an Incurrence or issuance of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this covenant. Guarantees of, or Obligations in respect of letters of credit relating to, Indebtedness which is otherwise included in the determination of a particular amount of Indebtedness shall not be included in the determination of such amount of Indebtedness; *provided* that the Incurrence of the Indebtedness represented by such guarantee or letter of credit, as the case may be, was in compliance with this covenant.

For purposes of determining compliance with any U.S. Dollar-denominated restriction on the Incurrence of Indebtedness, the U.S. Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was Incurred, in the case of term debt, or first committed or first Incurred (whichever yields the lower U.S. Dollar-equivalent), in the case of revolving credit debt; or if any such Indebtedness is subject to a Currency Agreement with respect to the currency in which such Indebtedness is denominated covering principal, premium, if any, and interest on such Indebtedness, the amount of such Indebtedness and such interest and premium, if any, shall be determined after giving effect to all payments in respect thereof under such Currency Agreement; *provided* that, if such Indebtedness is Incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such Refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced.

Notwithstanding any other provision of this covenant, the maximum amount of Indebtedness that the Company and its Restricted Subsidiaries may Incur pursuant to this covenant shall not be deemed to be exceeded, with respect to any outstanding Indebtedness, solely as a result of fluctuations in the exchange rate of currencies. The principal amount of any Indebtedness Incurred to refinance other Indebtedness, if Incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of such refinancing.

### Limitation on Restricted Payments

The Indenture will provide that the Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly:

(1)  declare or pay any dividend or make any distribution on account of the Company's or any of its Restricted Subsidiaries' Equity Interests, including any payment made in connection with any merger, amalgamation or consolidation involving the Company (other than (A) dividends or distributions by the Company payable solely in Equity Interests (other than Disqualified Stock) of the Company; or (B) dividends or distributions by a Restricted Subsidiary so long as, in the case of any dividend or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary other than a Wholly

Owned Restricted Subsidiary, the Company or a Restricted Subsidiary receives at least its *pro rata* share of such dividend or distribution in accordance with its Equity Interests in such class or series of securities);

(2)  purchase or otherwise acquire or retire for value any Equity Interests of the Company or any direct or indirect parent entity of the Company;

(3)  make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value, in each case prior to any scheduled repayment or scheduled maturity, any Subordinated Indebtedness of the Company or any of its Restricted Subsidiaries (other than the payment, redemption, repurchase, defeasance, acquisition or retirement of (A) Subordinated Indebtedness in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of such payment, redemption, repurchase, defeasance, acquisition or retirement and (B) Indebtedness permitted under clause (h) or (j) of the second paragraph of the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"); or

(4)  make any Restricted Investment (all of the payments and other actions set forth in clauses (1) through (4) above are collectively referred to as "*Restricted Payments*"), unless, at the time of such Restricted Payment:

(a)  no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof;

(b)  immediately after giving effect to such transaction on a *pro forma* basis, the Company could Incur $1.00 of additional Indebtedness under the provisions of the first paragraph of the covenant described under "—Certain Covenants— Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; and

(c)  the aggregate amount of Restricted Payments made after the Issue Date, including the Fair Market Value of non-cash amounts constituting Restricted Payments and Restricted Payments permitted by clauses (1), (2), (6)(b), (8), (12)(b) and (16) of the following paragraph, but excluding all other Restricted Payments permitted by the next paragraph below, shall not exceed the sum of, without duplication:

(i)  50% of the Consolidated Net Income of the Company for the period (taken as one accounting period, the "*Reference Period*") from March 31, 2012 to the end of the Company's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment (or, in the case such Consolidated Net Income for such period is a deficit, minus 100% of such deficit), *plus*

(ii)  100% of the aggregate net cash proceeds, including cash and the Fair Market Value of property other than cash, received by the Company after March 31, 2012 (other than net cash proceeds to the extent such net cash proceeds have been used to Incur Indebtedness, Disqualified Stock, or Preferred Stock pursuant to clause (n) of the second paragraph of the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock") from the issue or sale of Equity Interests of the Company (excluding Refunding Capital Stock, Designated Preferred Stock, Excluded Contributions, and Disqualified Stock), including Equity Interests issued upon exercise of warrants or options (other than an issuance or sale to a Restricted Subsidiary), *plus*

(iii) 100% of the aggregate amount of contributions to the capital of the Company received in cash and the Fair Market Value of property other than cash after March 31, 2012 (other than Excluded Contributions, Refunding Capital Stock, Designated Preferred Stock, and Disqualified Stock and other than contributions to the extent such contributions have been used to Incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to clause (n) of the second paragraph of the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"), *plus*

(iv) 100% of the principal amount of any Indebtedness, or the liquidation preference or maximum fixed repurchase price, as the case may be, of any Disqualified Stock of the Company or any Restricted Subsidiary thereof issued after March 31, 2012 (other than Indebtedness or Disqualified Stock issued to the Company or a Restricted Subsidiary thereof) or 100% of the principal amount of any debt securities of the Company or any Restricted Subsidiary thereof that are convertible into or exchangeable for Capital Stock issued after the Issue Date (other than debt securities issued to the Company or a Restricted Subsidiary thereof) which, in any such case, has been converted into or exchanged for Equity Interests in the Company (other than Disqualified Stock) or any direct or indirect parent entity of the Company (*provided*, in the case of any parent, such Indebtedness or Disqualified Stock is retired or extinguished) after March 31, 2012, *plus*

(v)  100% of the aggregate amount received by the Company or any Restricted Subsidiary in cash and the Fair Market Value of property other than cash received by the Company or any Restricted Subsidiary after March 31, 2012 from:

(A)  the sale or other disposition (other than to the Company or a Restricted Subsidiary of the Company) of Restricted Investments made by the Company and its Restricted Subsidiaries and from repurchases and redemptions

of such Restricted Investments from the Company and its Restricted Subsidiaries by any Person (other than the Company or any of its Subsidiaries) and from repayments of loans or advances which constituted Restricted Investments (other than in each case to the extent that the Restricted Investment was made pursuant to clause (7) below) or

(B)  the sale (other than to the Company or a Restricted Subsidiary of the Company) of the Capital Stock of an Unrestricted Subsidiary, *plus*

(vi) in the event any Unrestricted Subsidiary of the Company has been redesignated as a Restricted Subsidiary or has been merged, consolidated or amalgamated with or into, or transfers or conveys its assets to, or is liquidated into, the Company or a Restricted Subsidiary of the Company, in each case subsequent to March 31, 2012, the Fair Market Value of the Investment of the Company in such Unrestricted Subsidiary at the time of such redesignation, combination or transfer (or of the assets transferred or conveyed, as applicable), after deducting any Indebtedness associated with the Unrestricted Subsidiary so designated or combined or any Indebtedness associated with the assets so transferred or conveyed (other than in each case to the extent that the designation of such Subsidiary as an Unrestricted Subsidiary was made pursuant to clause (7) below or constituted a Permitted Investment).

The foregoing provisions do not prohibit:

(1)  the payment of any dividend or distribution within 60 days after the date of declaration thereof, if at the date of declaration such payment would have complied with the provisions of the Indenture;

(2)  (a) the redemption, repurchase, retirement or other acquisition of any Equity Interests ("*Retired Capital Stock*") of the Company or Subordinated Indebtedness of the Company, any direct or indirect parent entity of the Company in exchange for, or out of the proceeds of, the substantially concurrent sale of Equity Interests of the Company, any direct or indirect parent entity of the Company or contributions to the equity capital of the Company or any Restricted Subsidiary (other than any Disqualified Stock or any Equity Interests sold to a Subsidiary of the Company) (collectively, including any such contributions, "*Refunding Capital Stock*"), (b) the declaration and payment of dividends on the Retired Capital Stock out of the proceeds of the substantially concurrent sale (other than to a Subsidiary of the Company) of Refunding Capital Stock, and (c) if immediately prior to the retirement of Retired Capital Stock, the declaration and payment of dividends thereon was permitted under clause (6) of this paragraph and not made pursuant to clause (2)(b), the declaration and payment of dividends on the Refunding Capital Stock (other than Refunding Capital Stock the proceeds of which are used to redeem, repurchase, retire or otherwise acquire any Equity Interests of any direct or indirect parent of the Company) in an aggregate amount per year no greater than the aggregate amount of dividends per annum that were declarable and payable on such Retired Capital Stock immediately prior to such retirement;

(3)  the redemption, repurchase, defeasance, or other acquisition or retirement of Subordinated Indebtedness of the Company, the Issuer or any Guarantor made by exchange for, or out of the proceeds of the substantially concurrent sale of, new Indebtedness of the Issuer, the Company or any Guarantor that is Incurred in accordance with the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" so long as:

(a)  the principal amount (or accreted value, if applicable) of such new Indebtedness does not exceed the principal amount (or accreted value, if applicable) of, plus any accrued and unpaid interest, of the Subordinated Indebtedness being so redeemed, repurchased, defeased, acquired or retired for value (plus the amount of any premium required to be paid under the terms of the instrument governing the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired, any tender premiums, plus any defeasance costs, fees and expenses incurred in connection therewith),

(b)  such Indebtedness is subordinated to the Notes or such Guarantor's obligations in respect of the Notes, as the case may be, at least to the same extent as such Subordinated Indebtedness so purchased, exchanged, redeemed, repurchased, defeased, acquired or retired for value,

(c)  such Indebtedness has a final scheduled maturity date equal to or later than the earlier of (x) the final scheduled maturity date of the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired and (y) 91 days following the last maturity date of any Notes then outstanding, and

(d)  such Indebtedness has a Weighted Average Life to Maturity at the time Incurred which is not less than the shorter of (x) the remaining Weighted Average Life to Maturity of the Subordinated Indebtedness being so redeemed, repurchased, defeased, acquired or retired and (y) the Weighted Average Life to Maturity that would result if all payments of principal on the Subordinated Indebtedness being redeemed, repurchased, defeased, acquired or retired that were due on or after the date that is 91 days following the last maturity date of any Notes then outstanding were instead due on such date;

(4)  a Restricted Payment to pay for the repurchase, retirement or other acquisition for value of Equity Interests of the Company or any direct or indirect parent entity of the Company held by any future, present or former employee, director or consultant of the Company, any direct or indirect parent entity of the Company or any of its Restricted Subsidiaries pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or other agreement or

arrangement; *provided, however*, that the aggregate Restricted Payments made under this clause (4) do not exceed $35.0 million in any calendar year (with unused amounts in any calendar year being permitted to be carried over to succeeding calendar years subject to a maximum (without giving effect to the following *proviso*) of $70.0 million in any calendar year; *provided, further, however*, that such amount in any calendar year may be increased by an amount not to exceed:

(a)  the cash proceeds received by the Company or any of its Restricted Subsidiaries from the sale of Equity Interests (other than Disqualified Stock) of the Company or any direct or indirect parent entity of the Company (to the extent contributed to the Company) to members of management, directors or consultants of the Company and its Restricted Subsidiaries or any direct or indirect parent entity of the Company that occurs after the Issue Date (*provided* that the amount of such cash proceeds utilized for any such repurchase, retirement, other acquisition or dividend will not increase the amount available for Restricted Payments under clause (3) of the first paragraph under "—Certain Covenants—Limitation on Restricted Payments" or be used as the basis for the Incurrence of Indebtedness under clause (n) of the second paragraph of "—Certain Covenants—Limitation of Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"), *plus*

(b)  the cash proceeds of key man life insurance policies received by the Company, any direct or indirect parent entity (to the extent contributed to the Company) of the Company or any of its Restricted Subsidiaries after the Issue Date,

*provided* that the Company may elect to apply all or any portion of the aggregate increase contemplated by clauses (a) and (b) above in any calendar year; and *provided, further*, that cancellation of Indebtedness owing to the Company or any Restricted Subsidiary from any present or former employees, directors, officers or consultants of the Company, any of its Restricted Subsidiaries or any direct or indirect parent entity of the Company in connection with a repurchase of Equity Interests of the Company or any direct or indirect parent entity of the Company will not be deemed to constitute a Restricted Payment for purposes of this covenant or any other provision of the Indenture;

(5)  the declaration and payment of dividends or distributions to holders of any class or series of Disqualified Stock of the Company or any of its Restricted Subsidiaries issued or Incurred in accordance with the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" to the extent such dividends are included in the definition of "Fixed Charges";

(6)  (a) the declaration and payment of dividends or distributions to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) issued after the Issue Date; and (b) the declaration and payment of dividends on Refunding Capital Stock that is Preferred Stock in excess of the dividends declarable and payable thereon pursuant to clause (2) of this paragraph; *provided, however*, in the case of each of (a) and (b) above of this clause (6), that for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date of issuance of such Designated Preferred Stock, after giving effect to such issuance (and the payment of dividends or distributions) on a *pro forma* basis, the Company would have had a Fixed Charge Coverage Ratio of at least 1.75 to 1.00;

(7)  Investments in Unrestricted Subsidiaries having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (7) that are at that time outstanding, not to exceed the greater of $375.0 million and 1.50% of the Consolidated Net Tangible Assets of the Company at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value), plus 100% of the aggregate amount received by the Company or any Restricted Subsidiary in cash and the Fair Market Value (as determined in good faith by the Company) of property other than cash received by the Company or any Restricted Subsidiary with respect to any Investment made pursuant to this clause (7);

(8)  (i) Restricted Payments by the Company in an amount not to exceed $75.0 million per annum, and (ii) following a Primary Offering only, the payment of dividends on the listed Equity Interests at a rate not to exceed 6% per annum of the net cash proceeds received by the Company or the Issuer in connection with such a Primary Offering or any subsequent Primary Offering;

(9)  Restricted Payments that are made with Excluded Contributions;

(10) other Restricted Payments in an aggregate amount not to exceed the greater of $450.0 million and 2.00% of the Consolidated Net Tangible Assets of the Company at the time made;

(11) the payment of dividends or other distributions to any direct or indirect parent of the Issuer that files a consolidated tax return that includes the Issuer and its Subsidiaries (including, without limitation, by virtue of such parent being the common parent of a consolidated or combined tax group of which the Issuer and/or its Restricted Subsidiaries are members) in an amount not to exceed the amount that the Issuer and its Restricted Subsidiaries would have been required to pay in respect of federal, state or local taxes (as the case may be) if the Issuer and its Restricted Subsidiaries paid such taxes as a standalone taxpayer (or standalone group);

(12) the payment of Restricted Payments, if applicable:

(a)  in amounts required for any direct or indirect parent of the Issuer to pay fees and expenses (including legal, audit, tax, including franchise tax, expenses) required to maintain its corporate existence, customary salary, bonus and other benefits payable to, and indemnities provided on behalf of, officers, directors and employees of any direct or indirect parent of the Issuer and general corporate operating and overhead expenses of any direct or indirect parent of the Issuer in each case to the extent such fees and expenses are attributable to the ownership or operation of the Issuer, if applicable, and its Subsidiaries;

(b)  in amounts required for any direct or indirect parent of the Company, if applicable to pay interest and/or principal on Indebtedness the proceeds of which have been contributed to the Company or any of its Restricted Subsidiaries and that has been guaranteed by and treated as Indebtedness of the Company or its Restricted Subsidiaries, as applicable, Incurred in accordance with the covenant described under "—Certain Covenants—Limitation on Incurrence or Indebtedness and Issuance of Disqualified Stock and Preferred Stock" (it being agreed that (i) all interest expense shall be included in the calculation of the "Fixed Charge Coverage Ratio" of the Company and (ii) no contribution of such proceeds may be included in the calculation of Restricted Payments capacity or in the amount of Indebtedness that may be Incurred based on contributions to the Company); and

(c)  in amounts required for any direct or indirect parent of the Company to pay fees and expenses, other than to Affiliates of the Company, related to any unsuccessful equity or debt offering of such parent that has been undertaken to finance the Company and its Subsidiaries;

(13) repurchases of Equity Interests of the Company and its Subsidiaries deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(14) purchases of receivables pursuant to a Receivables Repurchase Obligation in connection with a Qualified Receivables Financing and the payment or distribution of Receivables Fees;

(15) Restricted Payments by the Company or any Restricted Subsidiary to allow the payment of cash in lieu of the issuance of fractional shares upon the exercise of options or warrants or upon the conversion or exchange of Capital Stock of any such Person;

(16) the repurchase, redemption or other acquisition or retirement for value of any Subordinated Indebtedness pursuant to the provisions similar to those described under "—Change of Control" and "—Certain Covenants—Asset Sales"; *provided* that all Notes tendered by holders of the Notes in connection with a Change of Control Offer, Asset Sale Offer or Collateral Asset Sale Offer, as applicable, have been repurchased, redeemed or acquired for value in accordance with the requirements of the Indenture;

(17) payments or distributions to dissenting stockholders pursuant to applicable law, pursuant to or in connection with a consolidation, amalgamation, merger or transfer of all or substantially all of the assets of the Company and its Restricted Subsidiaries, taken as a whole, that complies with the covenant described under "—Merger, Amalgamation, Consolidation or Sale of All or Substantially All Assets"; *provided* that, as a result of such consolidation, amalgamation, merger or transfer of assets, the Issuer shall have made a Change of Control Offer (if required by the Indenture) and that all Notes tendered by holders in connection with such Change of Control Offer have been repurchased, redeemed or acquired for value;

(18) any Restricted Payment made in connection with the Emergence Transactions;

(19) distributions by any Restricted Subsidiary of the Company or any Joint Venture of chemicals to a holder of Capital Stock of such Restricted Subsidiary or Joint Venture if such distributions are made pursuant to a provision in a Joint Venture agreement or other arrangement entered into in connection with the establishment of such Joint Venture or Restricted Subsidiary that requires such holder to pay a price for such chemicals equal to that which would be paid in a comparable transaction negotiated on an arm's length basis (or pursuant to a provision that imposes a substantially equivalent requirement); and

(20) any Restricted Payments under any Treasury Services Agreement or any Structured Financing Transaction;

*provided*, *however*, that at the time of, and after giving effect to, any Restricted Payment permitted under clauses (3), (6), (7), (8), (9), (10) and (12)(b), no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof.

The Company will not permit any Unrestricted Subsidiary to become a Restricted Subsidiary except pursuant to the definition of "Unrestricted Subsidiary." For purposes of designating any Restricted Subsidiary as an Unrestricted Subsidiary, all outstanding Investments by the Company and its Restricted Subsidiaries (except to the extent repaid) in the Subsidiary so designated will be deemed to be Restricted Payments in an amount determined as set forth in the last sentence of the definition of "Investments." Such designation will only be permitted if a Restricted Payment or Permitted Investment in such amount would be permitted at such time and if such Subsidiary otherwise meets the definition of an Unrestricted Subsidiary.

Notwithstanding clause (10) of the second paragraph of this covenant, prior to March 31, 2012 the Company will not, and will not permit any of its Restricted Subsidiaries to, pay any cash dividend or make any cash distribution on, or in respect of, the Company's Capital Stock or purchase for cash or otherwise acquire for cash any Capital Stock of the Company or any direct or indirect parent of the Company for the purpose of paying any cash dividend or making any cash distribution to, or acquiring Capital Stock of any direct or indirect parent of the Company for cash from, the Sponsors, or guarantee any Indebtedness of any Affiliate of the Company for the purpose of paying such dividend, making such distribution or so acquiring such Capital Stock to or from the Sponsors, in each case by means of the exception provided by clause (10) of the second paragraph of this covenant, if at the time and after giving effect to such payment, the Secured Indebtedness Leverage Ratio of the Company would be greater than 2.25 to 1.00.

### *Dividend and Other Payment Restrictions Affecting Subsidiaries*

The Indenture will provide that the Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction on the ability of any Restricted Subsidiary to:

(a)  (i) pay dividends or make any other distributions to the Company or any of its Restricted Subsidiaries (1) on its Capital Stock; or (2) with respect to any other interest or participation in, or measured by, its profits; or (ii) pay any Indebtedness owed to the Company or any of its Restricted Subsidiaries;

(b)  make loans or advances to the Company or any of its Restricted Subsidiaries; or

(c)  sell, lease or transfer any of its properties or assets to the Company or any of its Restricted Subsidiaries;

except in each case for such encumbrances or restrictions existing under or by reason of:

(1)  agreements existing and contractual encumbrances or restrictions in effect on the Issue Date, including pursuant to the Senior Term Loan Facility, the ABL Facility, the Euro Securitization and the other Credit Facilities;

(2)  the First Lien Indenture, the First Lien Notes or the other first lien notes permitted to be Incurred pursuant to clause (a) under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" (including, without limitation, any Liens permitted by the Indenture or the indenture for such other notes);

(3)  applicable law or any applicable rule, regulation or order;

(4)  any agreement or other instrument (including those governing Capital Stock) of a Person acquired by the Company or any Restricted Subsidiary which was in existence at the time of such acquisition (but not created in contemplation thereof or to provide all or any portion of the funds or credit support utilized to consummate such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired;

(5)  contracts or agreements for the sale of assets, including any restriction with respect to a Restricted Subsidiary imposed pursuant to an agreement entered into for the sale or disposition of the Capital Stock or assets of such Restricted Subsidiary;

(6)  Secured Indebtedness otherwise permitted to be Incurred pursuant to the covenants described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and "—Certain Covenants—Liens" that limit the right of the Company or any Restricted Subsidiary to dispose of the assets securing such Indebtedness;

(7)  restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(8)  customary provisions in Joint Venture agreements and other similar agreements entered into in the ordinary course of business;

(9)  purchase money obligations for property acquired and Capitalized Lease Obligations in the ordinary course of business;

(10) customary provisions contained in leases, subleases, licenses and other similar agreements entered into in the ordinary course of business;

(11) any encumbrance or restriction in connection with a Qualified Receivables Financing; provided such restrictions only apply to the applicable receivables and related intangibles;

(12) other Indebtedness, Disqualified Stock or Preferred Stock (a) of any Restricted Subsidiary of the Company that is a Guarantor or a Foreign Subsidiary, (b) of any Restricted Subsidiary that is not a Guarantor or a Foreign Subsidiary so long as such

encumbrances and restrictions contained in any agreement or instrument will not materially affect the Company's ability to make anticipated principal or interest payments on the Notes (as determined in good faith by the Company) or (c) of any Restricted Subsidiary Incurred in connection with any Project Financing, *provided* that, in the case of each of clauses (a) and (b), such Indebtedness, Disqualified Stock or Preferred Stock is permitted to be Incurred subsequent to the Issue Date by the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

(13) any Restricted Investment not prohibited by the covenant described under "—Certain Covenants—Limitation on Restricted Payments" and any Permitted Investment;

(14) customary provisions in Hedging Obligations permitted under the Indenture and entered into in the ordinary course of business;

(15) the Indenture or the Notes or the 2014 Indenture or the 2014 Notes; or

(16) any encumbrances or restrictions of the type referred to in clauses (a), (b) and (c) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or Obligations referred to in clauses (1) through (15) above; *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, as determined in good faith by the Company, no more restrictive with respect to such dividend and other payment restrictions than those contained in the dividend or other payment restrictions prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

For purposes of determining compliance with this covenant, (1) the priority of any Preferred Stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock shall not be deemed a restriction on the ability to make distributions on Capital Stock and (2) the subordination of loans or advances made to the Company or a Restricted Subsidiary of the Company to other Indebtedness Incurred by the Company or any such Restricted Subsidiary shall not be deemed a restriction on the ability to make loans or advances.

### Asset Sales

The Indenture will provide that the Company will not, and will not permit any of its Restricted Subsidiaries to, cause or make an Asset Sale, unless (x) the Company or any of its Restricted Subsidiaries, as the case may be, receives consideration at the time of such Asset Sale at least equal to the Fair Market Value of the assets sold or otherwise disposed of, and (y) at least 75% of the consideration therefor received by the Company or such Restricted Subsidiary, as the case may be, is in the form of Cash Equivalents; *provided* that the amount of:

(a) any liabilities (as shown on the Company's or such Restricted Subsidiary's most recent balance sheet or in the notes thereto) of the Company or any Restricted Subsidiary of the Company (other than liabilities that are by their terms subordinated to the Notes or such Restricted Subsidiary's Obligations in respect of the Notes) that are assumed by the transferee of any such assets,

(b) any notes or other Obligations or other securities or assets received by the Company or such Restricted Subsidiary of the Company from such transferee that are converted by the Company or such Restricted Subsidiary of the Company into cash within 180 days of the receipt thereof (to the extent of the cash received), and

(c) any Designated Non-cash Consideration received by the Company or any of its Restricted Subsidiaries in such Asset Sale having an aggregate Fair Market Value, taken together with all other Designated Non-cash Consideration received pursuant to this clause (c) that is at that time outstanding, not to exceed the greater of 3.75% of the Consolidated Net Tangible Assets of the Company and $750.0 million at the time of the receipt of such Designated Non-cash Consideration (with the Fair Market Value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value) shall be deemed to be Cash Equivalents for the purposes of this provision.

Within 15 months after the Company's or any Restricted Subsidiary's receipt of the Net Proceeds of any Asset Sale, the Company or such Restricted Subsidiary may apply the Net Proceeds from such Asset Sale, at its option:

(1) to repay and/or repurchase (a) Indebtedness constituting First and Second Priority Lien Obligations, (b) Indebtedness of a Restricted Subsidiary that is not a Pledgor, (c) Notes Obligations or (d) other Pari Passu Indebtedness (*provided* that, if the Issuer or any Pledgor shall so reduce other Pari Passu Indebtedness, the Issuer will equally and ratably reduce Notes Obligations through open-market purchases (*provided* that such purchases are at or above 100% of the principal amount thereof) or by making an offer (in accordance with the procedures set forth below for an Asset Sale Offer) to all holders to purchase at a purchase price equal to 100% of the principal amount thereof, plus accrued and unpaid interest and additional interest, if any, on the pro rata principal amount of Notes), in each case other than Indebtedness owed to the Issuer or an Affiliate of the Issuer; or

(2)  to make an Investment in any one or more businesses (*provided* that if such Investment is in the form of the acquisition of Capital Stock of a Person, such acquisition results in such Person becoming a Restricted Subsidiary of the Company), assets or property, in each case (a) used or useful in a Similar Business or (b) that replace the properties and assets that are the subject of such Asset Sale; *provided, however,* that with respect to any Asset Sale of Collateral only, the assets or property subject to such Investment (other than to the extent it would constitute Excluded Assets) shall be pledged as Collateral.

In the case of clause (2) above, a binding commitment shall be treated as a permitted application of the Net Proceeds from the date of such commitment; *provided* that in the event such binding commitment is later canceled or terminated for any reason before such Net Proceeds are so applied, the Company or such Restricted Subsidiary enters into another binding commitment (a "*Second Commitment*") within six months of such cancellation or termination of the prior binding commitment; *provided, further,* that the Company or such Restricted Subsidiary may only enter into a Second Commitment under the foregoing provision one time with respect to each Asset Sale and to the extent such Second Commitment is later cancelled or terminated for any reason before such Net Proceeds are applied, then such Net Proceeds shall constitute Collateral Excess Proceeds or Excess Proceeds, as applicable. Pending the final application of any such Net Proceeds, the Company or such Restricted Subsidiary of the Company may temporarily reduce Indebtedness under a revolving credit facility, if any, or otherwise invest such Net Proceeds in any manner not prohibited by the Indenture.

Any Net Proceeds from Asset Sale of Collateral (other than Specified ABL Facility Assets and other than to the extent required to be used in any accepted offer or otherwise to repay any First Priority Lien Obligations as required under the First Lien Notes and related indenture or Senior Term Loan Facility or other agreement governing First Priority Lien Obligations or Second Priority Lien Obligations) that are not invested or applied as provided and within the time period set forth in the second paragraph of this covenant (it being understood that any portion of such Net Proceeds used to purchase or make an offer to purchase Notes, as described in clause (1) above, shall be deemed to have been invested whether or not such offer is accepted) will be deemed to constitute "Collateral Excess Proceeds." The Issuer shall make an offer to all holders of the Notes and, if required by the terms of any First Priority Lien Obligations, Second Priority Lien Obligations or Third Priority Lien Obligations secured by a Lien permitted under the Indenture, to the holders of such first Priority Lien Obligations, Second Priority Lien Obligations or such other Third Priority Lien Obligations (including any mandatory prepayment required by the Senior Term Loan Facility) (a "Collateral Asset Sale Offer"), to purchase the maximum aggregate principal amount of the Notes that is a minimum of $100,000 or an integral multiple of $1,000 in excess thereof that may be purchased out of the Collateral Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof (or, in the event such Notes or other Third Priority Lien Obligations were issued with significant original issue discount, 100% of the accreted value thereof), plus accrued and unpaid interest and additional interest, if any (or, in respect of other Third Priority Lien Obligations, such lesser price, if any, as may be provided for by the terms of such other Third Priority Lien Obligations) to the date fixed for the closing of such offer, in accordance with the procedures set forth in the Indenture; provided, that with respect to any Net Proceeds from Asset Sales of Collateral realized or received by any Foreign Subsidiary, the aggregate amount of such Net Proceeds required to be applied shall be further subject to reduction to the extent the expatriation of such Net Proceeds (1) would result in adverse tax or legal consequences, (2) would be reasonably likely to result in adverse personal liability of any director of the Company or a Foreign Subsidiary or (3) would result in the insolvency of a Foreign Subsidiary. The Issuer will commence a Collateral Asset Sale Offer with respect to Collateral Excess Proceeds within ten (10) Business Days after the date that Collateral Excess Proceeds exceed $200 million by mailing the notice required pursuant to the terms of the Indenture, with a copy to the Trustee. Any Net Proceeds from any Asset Sale of non-Collateral (other than Specified ABL Facility Assets and other than to the extent required to be used in any accepted offer  or otherwise to repay any First Priority Lien Obligations as required under the First Lien Notes and related indenture, or Senior Term Loan Facility or other agreement governing First Priority Lien Obligations or Second Priority Lien Obligations) that are not invested or applied as provided and within the time period set forth in the second paragraph of this covenant (it being understood that any portion of such Net Proceeds used to purchase or make an offer to purchase Notes, as described in clause (1) above, shall be deemed to have been invested whether or not such offer is accepted) will be deemed to constitute "Excess Proceeds." When the aggregate amount of Excess Proceeds exceeds $200 million, the Issuer shall make an offer to all holders of Notes (and, at the option of the Company, to holders of any Pari Passu Indebtedness) (an "Asset Sale Offer") to purchase the maximum principal amount of Notes (and such Pari Passu Indebtedness), that is at least $100,000 and an integral multiple of $1,000, respectively, in excess thereof that may be purchased out of the Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof (or, in the event such Pari Passu Indebtedness was issued with significant original issue discount, 100% of the accreted value thereof), plus accrued and unpaid interest and additional interest, if any (or, in respect of such Pari Passu Indebtedness, such lesser price, if any, as may be provided for by the terms of such Pari Passu Indebtedness), to the date fixed for the closing of such offer, in accordance with the procedures set forth in the Indenture; provided that, with respect to any Net Proceeds from Asset Sales of non-Collateral realized or received by any Foreign Subsidiary, the aggregate amount of such Net Proceeds required to be applied shall be subject to reduction to the extent the expatriation of such Net Proceeds (1) would result in adverse tax or legal consequences, (2) would be reasonably likely to result in adverse personal liability of any director of the Company or a Foreign Subsidiary or (3) would result in the insolvency of the Foreign Subsidiary. The Issuer will commence an Asset Sale Offer with respect to Excess Proceeds within ten (10) Business Days after the date that Excess Proceeds exceeds $200 million by mailing the notice required pursuant to the terms of the Indenture, with a copy to the Trustee.

To the extent that the aggregate amount of Notes and such other Third Priority Lien Obligations tendered pursuant to a Collateral Asset Sale Offer is less than the Collateral Excess Proceeds, the Company may use any remaining Collateral Excess Proceeds for any purpose that is not prohibited by the Indenture. If the aggregate principal amount of Notes or other Third Party Lien

Obligations surrendered by such holders thereof exceeds the amount of Collateral Excess Proceeds, the Trustee shall select the Notes and such other Third Priority Lien Obligations to be purchased in the manner described below.  To the extent that the aggregate amount of Notes (and such Pari Passu Indebtedness) tendered pursuant to an Asset Sale Offer is less than the Excess Proceeds, the Company may use any remaining Excess Proceeds for any purpose that is not prohibited by the Indenture. If the aggregate principal amount of Notes (and such Pari Passu Indebtedness) surrendered by holders thereof exceeds the amount of Excess Proceeds, the Trustee shall select the Notes to be purchased in the manner described below. Upon completion of any such Collateral Asset Sale Offer or Asset Sale Offer, the amount of Collateral Excess Proceeds or Excess Process, as the case may be, shall be reset at zero.

The Issuer must comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations to the extent such laws or regulations are applicable in connection with the repurchase of the Notes pursuant to an Asset Sale Offer. To the extent that the provisions of any securities laws or regulations conflict with the provisions of the Indenture, the Issuer will comply with the applicable securities laws and regulations and shall not be deemed to have breached its Obligations described in the Indenture by virtue thereof.

If more Notes (and such Third Priority Lien Obligations or Pari Passu Indebtedness, as applicable) are tendered pursuant to an Asset Sale Offer than the Issuer is required to purchase, Notes tendered will be repurchased on a pro rata basis; provided that no Notes of $100,000 or less shall be purchased in part. Selection of such Third Priority Lien Obligations or Pari Passu Indebtedness, as applicable, will be made pursuant to the terms of such Third Priority Lien Obligations or Pari Passu Indebtedness.

Notices of an Asset Sale Offer or Collateral Asset Sale Offer shall be mailed by first class mail, postage prepaid, at least 30 but not more than 60 days before the purchase date to each holder of Notes at such holder's registered address. If any Note is to be purchased in part only, any notice of purchase that relates to such Note shall state the portion of the principal amount thereof that has been or is to be purchased.

### *Transactions with Affiliates*

The Indenture will provide that the Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction or series of transactions, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Company (each of the foregoing, an "*Affiliate Transaction*") involving aggregate consideration in excess of $25.0 million, unless:

(a)  such Affiliate Transaction is on terms that are not less favorable to the Company or the relevant Restricted Subsidiary than those that could have been obtained in a comparable transaction by the Company or such Restricted Subsidiary with an unrelated Person; and

(b)  with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $100.0 million, the Company delivers to the Trustee a resolution adopted in good faith by the majority of the Board of Directors of the Company, approving such Affiliate Transaction and set forth in an Officer's Certificate certifying that such Affiliate Transaction complies with clause (a) above.

The foregoing provisions do not apply to the following:

(1)  transactions between or among the Company and/or any of its Restricted Subsidiaries (or an entity that becomes a Restricted Subsidiary as a result of such transaction) and any merger, consolidation or amalgamation of the Issuer and any direct parent of the Issuer;

(2)  Restricted Payments permitted by the provisions of the Indenture described under "—Certain Covenants—Limitation on Restricted Payments" and Permitted Investments;

(3)  the payment of reasonable and customary fees and reimbursement of expenses paid to, and indemnity provided on behalf of, officers, directors, managers, employees or consultants of the Company or any Restricted Subsidiary or any direct or indirect parent entity of the Company;

(4)  transactions in which the Company or any of its Restricted Subsidiaries, as the case may be, delivers to the Trustee a letter from an Independent Financial Advisor stating that such transaction is fair to the Company or such Restricted Subsidiary from a financial point of view or meets the requirements of clause (a) of the preceding paragraph;

(5)  payments or loans (or cancellation of loans) to officers, directors, employees or consultants which are approved by a majority of the Board of Directors of the Company in good faith;

(6)  any agreement as in effect as of the Issue Date or any amendment thereto (so long as any such agreement together with all amendments thereto, taken as a whole, is not more disadvantageous to the holders of the Notes in any material respect than the

original agreement as in effect on the Issue Date) or any transaction contemplated thereby as determined in good faith by the Company;

(7) the existence of, or the performance by the Company or any of its Restricted Subsidiaries of its obligations under the terms of, any registration rights agreement to which it is a party as of the Issue Date, and, any amendment thereto or similar agreements or arrangements which it may enter into thereafter; *provided*, *however*, that the existence of, or the performance by the Company or any of its Restricted Subsidiaries of its obligations under, any future amendment to any such existing agreement or under any similar agreement entered into after the Issue Date shall only be permitted by this clause (7) to the extent that the terms of any such existing agreement together with all amendments thereto, taken as a whole, or new agreement are not otherwise more disadvantageous to the holders of the Notes in any material respect than the original agreement as in effect on the Issue Date;

(8) the Emergence Transactions, including the payment of fees and expenses paid in connection therewith;

(9)(a) transactions with customers, clients, suppliers or purchasers or sellers of goods or services, or transactions otherwise relating to the purchase or sale of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of the Indenture, which are fair to the Company and its Restricted Subsidiaries in the reasonable determination of the Board of Directors or the senior management of the Company, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party or (b) transactions with Joint Ventures or Unrestricted Subsidiaries entered into in the ordinary course of business and consistent with past practice or industry norm;

(9) any transaction effected as part of a Qualified Receivables Financing;

(10) the issuance of Equity Interests (other than Disqualified Stock) of the Company to any Person;

(11) the issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock option and stock ownership plans or similar employee benefit plans approved by the Board of Directors of the Company or any direct or indirect parent entity of the Company or of a Restricted Subsidiary of the Company, as appropriate, in good faith;

(12) the entering into of any tax sharing agreement or arrangement that complies with clause (12) of the second paragraph of the covenant described under "—Certain Covenants—Limitation on Restricted Payments";

(13) any contribution to the capital of the Company;

(14) transactions between the Company or any of its Restricted Subsidiaries and any Person that is an Affiliate of the Company or any of its Restricted Subsidiaries solely because a director of such Person is also a director of the Company or any direct or indirect parent entity of the Company; *provided*, *however*, that such director abstains from voting as a director of the Company or any direct or indirect parent entity of the Company, as the case may be, on any matter involving such other Person;

(15) pledges of Equity Interests of Unrestricted Subsidiaries;

(16) the formation and maintenance of any consolidated group or subgroup for tax, accounting or cash pooling or management purposes in the ordinary course of business;

(17) any employment agreements entered into by the Company or any of its Restricted Subsidiaries in the ordinary course of business;

(18) transactions undertaken in good faith (as certified by a responsible financial or accounting officer of the Company in an Officer's Certificate) for the purpose of improving the consolidated tax efficiency of the Company and its Subsidiaries and not for the purpose of circumventing any covenant set forth in the Indenture; and

(19) transactions entered into by a Person prior to the time such Person becomes a Restricted Subsidiary or is merged or consolidated into the Company or a Restricted Subsidiary (provided such transaction is not entered into in contemplation of such event).

*Liens*

The Indenture will provide that the Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly, create, Incur, assume or suffer to exist any Indebtedness secured by a Lien (except Permitted Liens) on any asset or property of the Company or such Restricted Subsidiary, now owned or hereafter acquired, without making effective provision whereby any and all Notes then or thereafter outstanding will be secured by a Lien equally and ratably with (or, if the obligation to be secured by such Lien is subordinated in right of payment to the Notes, prior to) any and all other obligations thereby secured for so long as any such obligations shall be so secured.

Any Lien created for the benefit of the holders pursuant to this covenant will provide by its terms that such Lien will be automatically and unconditionally released and discharged (a) upon the release and discharge of the Lien that gave rise to the obligation to secure the Notes under this covenant (the "Initial Lien"), (b) upon the sale or other disposition of the assets subject to such Initial Lien (or the sale or other disposition of the Person that owns such assets) in compliance with the terms of the Indenture, (c) upon the designation of a Restricted Subsidiary whose property or assets secure such Initial Lien as an Unrestricted Subsidiary in accordance with the terms of the Indenture or (d) upon the effectiveness of any defeasance or satisfaction and discharge of the Notes specified in the Indenture.

## Reports and Other Information

The Indenture will provide that, for periods commencing with the period ending on December 31, 2010 and notwithstanding that the Issuer or the Company may not be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act or otherwise to report on an annual and quarterly basis on forms provided for such annual and quarterly reporting pursuant to rules and regulations promulgated by the SEC, the Company will file with the SEC (and provide the Trustee and holders with copies thereof, without cost to each holder, within 15 days after it files them with the SEC),

(1)  within the time period specified in the SEC's rules and regulations for non-accelerated filers, annual reports on Form 10-K (or any successor or comparable form) containing the information required to be contained therein (or required in such successor or comparable form),

(2)  within the time period specified in the SEC's rules and regulations for non-accelerated filers, reports on Form 10-Q (or any successor or comparable form) containing the information required to be contained therein (or required in such successor or comparable form),

(3)  promptly from time to time after the occurrence of an event required to be therein reported (and in any event within the time period specified in the SEC's rules and regulations), such other reports on Form 8-K (or any successor or comparable form), and

(4)  any other information, documents and other reports which the Issuer would be required to file with the SEC if it were subject to Section 13 or 15(d) of the Exchange Act;

*provided*, *however*, that the Company shall not be so obligated to file such reports with the SEC if the SEC does not permit such filing, in which event, the Company will make available such information to prospective purchasers of Notes in addition to providing such information to the Trustee and the holders, in each case within 15 days after the time the Issuer would be required to file such information with the SEC if it were subject to Section 13 or 15(d) of the Exchange Act.

Notwithstanding the foregoing, the Company will not be required to furnish any information, certificates or reports required by Item 307 or 308 of Regulation S-K prior to the effectiveness of the exchange offer registration statement or shelf registration statement.

In the event that the rules and regulations of the SEC permit the Company to report at such parent entity's level on a consolidated basis and such parent entity is not engaged in any business in any material respect other than incidental to its ownership, directly or indirectly, of the capital stock of the Issuer, consolidating reporting at the parent entity's level in a manner consistent with that described in this covenant for the Company will satisfy this covenant.

In addition, the Issuer will make such information available to prospective investors upon request. In addition, the Issuer has agreed that, for so long as any Notes remain outstanding during any period when it is not subject to Section 13 or 15(d) of the Exchange Act, or otherwise permitted to furnish the SEC with certain information pursuant to Rule 12g3-2(b) of the Exchange Act, it will furnish to the holders of the Notes and to prospective investors, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

Notwithstanding the foregoing, the Issuer is deemed to have furnished such reports referred to above to the Trustee if the Issuer has filed such reports with the SEC via the EDGAR filing system and such reports are publicly available. In addition, the requirements of this covenant shall be deemed satisfied prior to the commencement of the exchange offers contemplated by the Registration Rights Agreement relating to the Notes or the effectiveness of the shelf registration statement by (1) the filing with the SEC of the exchange offers registration statement and/or shelf registration statement in accordance with the provisions of such Registration Rights Agreement, and any amendments thereto, and such registration statement and/or amendments thereto are filed at times that otherwise satisfy the time requirements set forth in the first paragraph of this covenant and/or (2) the posting of reports that would be required to be provided to the Trustee and the holders on the Issuer's website (or that of any of its parent companies).

*Future Subsidiary Guarantors*

The Indenture will provide that, the Company will cause each (i) Domestic Subsidiary of the Company (other than the Issuer) that is Wholly Owned other than, at the election of the Issuer, an Excluded Subsidiary and (ii) Wholly Owned Restricted Subsidiary of the Company (other than the Issuer), in each case, that guarantees the First Lien Notes or the Senior Term Loan Facility to execute and deliver to the Trustee (a) a supplemental indenture joining each such Subsidiary of the Company to the Indenture; and (b) Security Documents and intercreditor agreements providing for Junior Lien Obligations (other than, in the case of the ABL Facility Collateral, which shall be subject to a second priority security interest), pursuant to which such Subsidiary will guarantee payment of the Notes on the same terms and subject to the same conditions and limitations as those described under "—The Guarantees" and in the Indenture (each such guarantee of the Notes, an "*Additional Guarantee*").

Notwithstanding the foregoing and the other provisions of the Indenture, any Additional Guarantee of the Notes by a Domestic Subsidiary of the Company that is Wholly Owned shall provide by its terms that it shall be automatically and unconditionally released and discharged in the circumstances described under "—The Guarantees." Any Additional Guarantee shall be considered a "Guarantee" as described under "—The Guarantees," and any such Domestic Subsidiary of the Company providing such Additional Guarantee shall be considered a "Guarantor" as described under "—The Guarantees."

*After-Acquired Property*

Subject to Permitted Liens and the 3-16 Exemption and the Excluded Assets limitations, the Indenture will provide that (x) if any of the Company, the Issuer or any Pledgor acquires any First or Second Priority After-Acquired Property, the Company, the Issuer or such Pledgor shall execute and deliver such mortgages, deeds of trust, security instruments, financing statements and certificates and opinions of counsel as shall be reasonably necessary to vest in the Collateral Agent a perfected third priority security interest, subject only to Permitted Liens, in such First or Second Priority After-Acquired Property and to have such First or Second Priority After-Acquired Property added to the Collateral, and thereupon all provisions of the Indenture relating to the Collateral shall be deemed to relate to such First or Second Priority After-Acquired Property to the same extent and with the same force and effect. In addition, if granting a security interest in such property requires the consent of a third party, the Company will use commercially reasonable efforts to obtain such consent (i) with respect to the first priority security interest for the benefit of the First Lien Notes Collateral Agent on behalf of the holders of the First Lien Notes and for the benefit of the Senior Term Loan Collateral Agent on behalf of the lenders under the Senior Term Loan Facility, (ii) with respect to the second priority security interest for the benefit of the ABL Collateral Agents on behalf of lenders under ABL Facility and (iii) with respect to the third priority security interest for the benefit of the Trustee on behalf of the holders of the Notes. If such third party does not consent to the granting of the first priority security interest after the use of such commercially reasonable efforts, the applicable entity will not be required to provide such first, second and third security interest. The Issuer, the Company and the Pledgors will also ensure that third priority security interests are maintained as security for the Notes in any property or assets pledged to secure the ABL Facility.

**Merger, Amalgamation, Consolidation or Sale of All or Substantially All Assets**

The Indenture will provide that the Company may not, directly or indirectly, consolidate, amalgamate or merge with or into or wind up or convert into (whether or not the Company is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions, to any Person unless:

(1) the Company is the surviving Person or the Person formed by or surviving any such consolidation, amalgamation, merger, winding up or conversion (if other than the Company) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof, the District of Columbia, Canada or any province thereof or any state which was a member of the European Union on December 31, 2003 (other than Greece) (the Company or such Person, as the case may be, being herein called the "*Successor Company*"); *provided* that, in the case where the surviving Person is not a corporation, a co-obligor of the Notes is a corporation;

(2) the Successor Company (if other than the Company) expressly assumes all the Obligations of the Company under the Indenture and the Notes pursuant to supplemental indentures or other documents or instruments in form required by the Indenture and in compliance with the intercreditor agreements;

(3) immediately after giving effect to such transaction (and treating any Indebtedness which becomes an Obligation of the Successor Company or any of its Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Company or such Restricted Subsidiary at the time of such transaction) no Default or Event of Default shall have occurred and be continuing;

(4) immediately after giving *pro forma* effect to such transaction, as if such transaction had occurred at the beginning of the applicable four-quarter period (and treating any Indebtedness which becomes an Obligation of the Successor Company or any of its Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Company or such Restricted Subsidiary at the time of such transaction), either (a) the Successor Company would be permitted to Incur at least $1.00 of

additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in the first sentence of the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; or (b) the Fixed Charge Coverage Ratio for the Successor Company and its Restricted Subsidiaries would be greater than such ratio for the Company and its Restricted Subsidiaries immediately prior to such transaction; and

(5)  the Company shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, merger, amalgamation or transfer and such supplemental indentures (if any) comply with the Indenture.

The Successor Company (if other than the Company) will succeed to, and be substituted for, the Company under the Indenture and the Notes, and in such event the Company will automatically be released and discharged from its Obligations under the Indenture and the Notes. Notwithstanding the first sentence of this covenant, without complying with the foregoing clause (4), the Company may (A) merge with an Affiliate that has no material assets or liabilities and that is incorporated or organized solely for the purpose of reincorporating or reorganizing the Issuer in any state of the U.S., the District of Columbia, Canada or any province thereof or any state which was a member state of the European Union on December 31, 2003 (other than Greece) and (B) may otherwise convert its legal form under the laws of its jurisdiction of organization.

The Indenture will further provide that the Issuer may not, directly or indirectly, consolidate, amalgamate or merge with or into or wind up or convert into (whether or not the Issuer is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions, to any Person unless:

(1)  the Issuer is the surviving Person or the Person formed by or surviving any such consolidation, amalgamation, merger, winding up or conversion (if other than the Issuer) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof or the District of Columbia (the Issuer or such Person, as the case may be, being herein called the "*Successor Issuer*"); *provided* that, in the case where the surviving Person is not a corporation, a co-obligor of the Notes is a corporation;

(2)  the Successor Issuer (if other than the Issuer) expressly assumes all the Obligations of the Issuer under the Indenture and the Notes pursuant to supplemental indentures or other documents or instruments in form required by the Indenture and in compliance with the intercreditor agreements;

(3)  immediately after giving effect to such transaction (and treating any Indebtedness which becomes an Obligation of the Successor Issuer or any of its Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Issuer or such Restricted Subsidiary at the time of such transaction) no Default or Event of Default shall have occurred and be continuing;

(4)  immediately after giving *pro forma* effect to such transaction, as if such transaction had occurred at the beginning of the applicable four-quarter period (and treating any Indebtedness which becomes an Obligation of the Successor Issuer or any of its Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Issuer or such Restricted Subsidiary at the time of such transaction), either (a) the Company would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in the first sentence of the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; or (b) the Fixed Charge Coverage Ratio for the Company and its Restricted Subsidiaries would be greater than such ratio for the Company and its Restricted Subsidiaries immediately prior to such transaction; and

(5)  the Issuer shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, merger, amalgamation or transfer and such supplemental indentures (if any) comply with the Indenture.

The Successor Issuer (if other than the Issuer) will succeed to, and be substituted for, the Issuer under the Indenture and the Notes, and in such event the Issuer will automatically be released and discharged from its Obligations under the Indenture and the Notes. Notwithstanding the first sentence of this covenant, without complying with the foregoing clause (4), the Issuer may (A) merge with an Affiliate that has no material assets or liabilities and that is incorporated or organized solely for the purpose of reincorporating or reorganizing the Issuer, as the case may be, in any state of the U.S. or the District of Columbia and (B) may otherwise convert its legal form under the laws of its jurisdiction of organization so long as there remains a corporate co-obligor. This covenant described under "—Merger, Amalgamation, Consolidation or Sale of All or Substantially All Assets" will not apply to a sale, assignment, transfer, conveyance or other disposition of assets between or among the Company and its Restricted Subsidiaries.

The Indenture will further provide that, subject to certain limitations in the Indenture governing release of assets and property securing the Notes upon the sale or disposition of a Restricted Subsidiary of the Company that is a Pledgor, no Pledgor will, and the Company will not permit any Pledgor to, consolidate, amalgamate or merge with or into or wind up into (whether or not such Pledgor is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions to, any Person unless:

(1) either (a) such Pledgor is the surviving Person or the Person formed by or surviving any such consolidation, amalgamation or merger (if other than such Pledgor) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof, the District of Columbia, or any territory thereof (such Pledgor or such Person, as the case may be, being herein called the "*Successor Pledgor*") and the Successor Pledgor (if other than such Pledgor) expressly assumes all the Obligations of such Pledgor under the Indenture and the Security Documents pursuant to documents or instruments in form required by the Indenture and in compliance with the intercreditor agreements, or (b) such sale or disposition or consolidation, amalgamation or merger is not in violation of the covenant described under "—Certain Covenants—Asset Sales"; and

(2) the Successor Pledgor (if other than such Pledgor) shall have delivered or caused to be delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, amalgamation, merger or transfer and such supplemental indenture (if any) comply with the Indenture.

Subject to certain limitations described in the Indenture, the Successor Pledgor (if other than such Pledgor) will succeed to, and be substituted for, such Pledgor under the Indenture and such Pledgor's Obligations in respect of the Notes, and such Pledgor will automatically be released and discharged from its Obligations under the Indenture and such Pledgor's Obligations in respect of the Notes. Notwithstanding the foregoing, (1) a Pledgor may merge, amalgamate or consolidate with an Affiliate incorporated solely for the purpose of reincorporating or reorganizing such Pledgor in another state of the United States, the District of Columbia or any territory of the United States so long as the amount of Indebtedness of the Pledgor is not increased thereby and (2) a Pledgor may merge, amalgamate or consolidate with another Pledgor or the Company or may convert its legal form under the laws of reorganization of its jurisdiction.

In addition, notwithstanding the foregoing, any Pledgor may consolidate, amalgamate or merge with or into or wind up into, or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets (collectively, a "*Transfer*") to the Company or any Pledgor.

## Defaults

An Event of Default will be defined in the Indenture as:

(1) a default in any payment of interest (including any additional interest) on any Note when due, continued for 30 days,

(2) a default in the payment of principal or premium, if any, of any Note when due at its Stated Maturity, upon optional redemption, upon required repurchase, upon declaration or otherwise,

(3) the failure by the Company or any Restricted Subsidiary to comply for 60 days after notice with its other agreements contained in the Notes or the Indenture,

(4) the failure by the Company or any Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary) to pay any Indebtedness (other than Indebtedness owing to the Company or a Restricted Subsidiary) within any applicable grace period after final maturity or the acceleration of any such Indebtedness by the holders thereof because of a default, in each case, if the total amount of such Indebtedness unpaid or accelerated exceeds $100.0 million or its foreign currency equivalent (the "*cross-acceleration provision*"),

(5) certain events of bankruptcy, insolvency or reorganization of the Company, the Issuer or a Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary) (the "*bankruptcy provisions*"),

(6) failure by the Company or any Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary) to pay final judgments aggregating in excess of $100.0 million or its foreign currency equivalent (net of any amounts which are covered by enforceable insurance policies issued by solvent carriers), which judgments are not discharged, waived or stayed for a period of 60 days (the "*judgment default provision*"),

(7) the Guarantee of the Company or a Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary) ceases to be in full force and effect (except as contemplated by the terms thereof) or the Company denies or disaffirms its Obligations under the Indenture and such Default continues for 10 days,

(8) unless all of the Notes Collateral has been released from the third priority Liens in accordance with the provisions of the Security Documents, the third priority Liens on all or substantially all of the Notes Collateral cease to be valid or enforceable and such Default continues for 30 days, or the Company, the Issuer or any Pledgor shall assert, in any pleading in any court of competent jurisdiction, that any such security interest is invalid or unenforceable and, in the case of any such Person that is a Subsidiary of the Company, the Company fails to cause such Subsidiary to rescind such assertions within 30 days after the Company has actual knowledge of such assertions, or

(9)  the failure by the Company, the Issuer or any Pledgor to comply for 60 days after notice with its other agreements contained in the Security Documents except for a failure that would not be material to the holders of the Notes and would not materially affect the value of the Collateral taken as a whole (together with the defaults described in clause (8) the "*security default provisions*").

The foregoing constitutes Events of Default whatever the reason for any such Event of Default and whether it is voluntary or involuntary or is effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body.

However, a default under clause (3) or (9) will not constitute an Event of Default until the Trustee or the holders of 30% in aggregate principal amount of outstanding Notes notify the Issuer of the default and the Issuer does not cure such default within the time specified in clause (3) or (9) hereof after receipt of such notice.

If an Event of Default (other than a Default relating to certain events of bankruptcy, insolvency or reorganization of the Company or the Issuer) occurs and is continuing, the Trustee or the holders of at least 30% in aggregate principal amount of outstanding Notes by notice to the Issuer may declare the principal of, premium, if any, and accrued but unpaid interest on all the Notes to be due and payable. If an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Company or the Issuer occurs, the principal of, premium, if any, and interest on all the Notes will become immediately due and payable without any declaration or other act on the part of the Trustee or any holders. Under certain circumstances, the holders of a majority in aggregate principal amount of outstanding Notes may rescind any such acceleration with respect to the Notes and its consequences.

In the event of any Event of Default specified in clause (4) of the first paragraph above, such Event of Default and all consequences thereof (excluding, however, any resulting payment default) will be annulled, waived and rescinded, automatically and without any action by the Trustee or the holders of the Notes, if within 20 days after such Event of Default arose the Issuer delivers an Officer's Certificate to the Trustee stating that (x) the Indebtedness or guarantee that is the basis for such Event of Default has been discharged or (y) the holders thereof have rescinded or waived the acceleration, notice or action (as the case may be) giving rise to such Event of Default or (z) the default that is the basis for such Event of Default has been cured, it being understood that in no event shall an acceleration of the principal amount of the Notes as described above be annulled, waived or rescinded upon the happening of any such events.

Subject to the provisions of the Indenture relating to the duties of the Trustee, in case an Event of Default occurs and is continuing, the Trustee will be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the holders unless such holders have offered to the Trustee reasonable indemnity and security against any loss, liability or expense acceptable to the Trustee in its sole discretion. Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no holder may pursue any remedy with respect to the Indenture or the Notes unless:

(1)  such holder has previously given the Trustee notice that an Event of Default is continuing,

(2)  holders of at least 30% in aggregate principal amount of the outstanding Notes have requested the Trustee to pursue the remedy,

(3)  such holders have offered the Trustee security and reasonable indemnity against any loss, liability or expense acceptable to the Trustee in its sole discretion,

(4)  the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security or indemnity, and

(5)  the holders of a majority in aggregate principal amount of the outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60-day period.

Subject to certain restrictions, the holders of a majority in principal amount of outstanding Notes are given the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. The Trustee, however, may refuse to follow any direction that conflicts with law or the Indenture or that the Trustee determines is unduly prejudicial to the rights of any other holder or that would involve the Trustee in personal liability. Prior to taking any action under the Indenture, the Trustee will be entitled to reasonable indemnification and security satisfactory to it in its reasonable discretion against all losses and expenses caused by taking or not taking such action.

The Issuer is required to deliver to the Trustee, annually, a certificate indicating whether the signers thereof know of any Default that occurred during the previous year. The Issuer also is required to deliver to the Trustee, within 30 days after an occurrence thereof, written notice of any event which would constitute certain Defaults, their status and what action the Issuer is taking or proposes to take in respect thereof.

**Amendments and Waivers**

Subject to certain exceptions, the Indenture and Security Documents may be amended with the consent of the holders of a majority in aggregate principal amount of the Notes then outstanding and any past default or compliance with any provisions may be waived with the consent of the holders of a majority in principal amount of the Notes then outstanding. However, without the consent of each holder of an outstanding Note affected, no amendment may, among other things:

(1) reduce the amount of Notes whose holders must consent to an amendment,

(2) reduce the rate of or extend the time for payment of interest on any Note,

(3) reduce the principal of or change the Stated Maturity of any Note,

(4) reduce the premium payable upon the redemption of any Note or change the time at which any Note may be redeemed as described under "—Redemption—Optional Redemption" above,

(5) make any Note payable in money other than that stated in such Note,

(6) expressly subordinate the Notes to any other Indebtedness of the Company, the Issuer or any Pledgor,

(7) impair the right of any holder to receive payment of principal of, premium, if any, and interest on such holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such holder's Notes,

(8) make any change in the amendment provisions which require each holder's consent or in the waiver provisions,

(9) make any change in the provisions in the Junior Lien Intercreditor Agreement or the Indenture dealing with the application of proceeds of Collateral that would adversely affect the holders of the Notes, or

(10) except as expressly provided by the Indenture, modify or release the Guarantee of any Significant Subsidiary in any manner adverse to the holders of the Notes.

Without the consent of the holders of at least 66% in aggregate principal amount of the Notes then outstanding, no amendment or waiver may release all or substantially all of the Collateral from the Lien of the Indenture and the Security Documents with respect to the Notes.

Without the consent of any holder, the Issuer, the Guarantors and Trustee may amend the Indenture, the Security Documents or the Junior Lien Intercreditor Agreement to cure any ambiguity, omission, mistake, defect or inconsistency, to provide for the assumption by a Successor Issuer of the Obligations of the Issuer under the Indenture and the Notes, to provide for the assumption by a Successor Company of the Obligations of the Company under the Indenture and the Notes, to provide for the assumption by a Successor Pledgor of the Obligations of a Pledgor under the Indenture and the Security Documents, to provide for uncertificated Notes in addition to or in place of certificated Notes (*provided* that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code, or in a manner such that the uncertificated Notes are described in Section 163(f)(2)(B) of the Code), to add a Pledgor with respect to the Notes, to secure the Notes, to release Collateral in compliance with the Indenture or the Junior Lien Intercreditor Agreement, to add additional secured creditors holding Other First-Lien Obligations, other Junior Lien Obligations or any other secured Indebtedness permitted to be Incurred, so long as such Obligations are in compliance with the Indenture or the Security Documents, to add to the covenants of the Company or the Restricted Subsidiaries for the benefit of the holders or to surrender any right or power conferred upon the Company and the Restricted Subsidiaries, to make any change that does not adversely affect the rights of any holder, to conform the text of the Indenture, the Notes, the Security Documents or the Junior Lien Intercreditor Agreement to any provision of this "Description of Third Lien Notes" to the extent that such provision in this "Description of Third Lien Notes" was intended to be a verbatim recitation of a provision of the Indenture, the Notes, the Security Documents or the Junior Lien Intercreditor Agreement, to comply with any requirement of the SEC in connection with the qualification of the Indenture under the TIA to effect any provision of the Indenture or to make certain changes to the Indenture to provide for the issuance of additional Notes.

The consent of the noteholders will not be necessary under the Indenture to approve the particular form of any proposed amendment. It is sufficient if such consent approves the substance of the proposed amendment.

After an amendment under the Indenture becomes effective, the Issuer will be required to mail to the respective noteholders a notice briefly describing such amendment. However, the failure to give such notice to all noteholders entitled to receive such notice, or any defect therein, will not impair or affect the validity of the amendment.

**No Personal Liability of Directors, Officers, Employees, Managers and Stockholders**

No director, officer, employee, manager, incorporator or holder of any Equity Interests in the Company, the Issuer or any direct or indirect parent corporation, as such, has any liability for any Obligations of the Issuer under the Notes, the Indenture, or for any claim based on, in respect of, or by reason of, such Obligations or their creation. Each holder of Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. The waiver may not be effective to waive liabilities under the federal securities laws.

**Transfer and Exchange**

A noteholder may transfer or exchange Notes in accordance with the Indenture. Upon any transfer or exchange, the registrar and the Trustee may require a noteholder, among other things, to furnish appropriate endorsements and transfer documents and the Issuer may require a noteholder to pay any taxes required by law or permitted by the Indenture. The Issuer is not required to transfer or exchange any Note selected for redemption or to transfer or exchange any Note for a period of 15 days prior to a selection of Notes to be redeemed. The Notes were issued in registered form and the registered holder of a Note is treated as the owner of such Note for all purposes.

**Satisfaction and Discharge**

The Indenture will be discharged and will cease to be of further effect (except as to surviving rights of registration or transfer or exchange of Notes, as not prohibited by the Indenture) as to all outstanding Notes when:

(1) either (a) all the Notes theretofore authenticated and delivered (except lost, stolen or destroyed Notes which have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Issuer and thereafter repaid to the Issuer or discharged from such trust) have been delivered to the Trustee for cancellation or (b) all of the Notes (i) have become due and payable, (ii) will become due and payable at their Stated Maturity within one year or (iii) if redeemable at the option of the Issuer, are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer, and the Issuer has irrevocably deposited or caused to be deposited with the Trustee funds in an amount sufficient to pay and discharge the entire Indebtedness on the Notes not theretofore delivered to the Trustee for cancellation, for principal of, premium, if any, and interest on the Notes to the date of deposit together with irrevocable instructions from the Issuer directing the Trustee to apply such funds to the payment thereof at maturity or redemption, as the case may be;

(2) the Issuer has paid all other sums payable under the Indenture; and

(3) the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel stating that all conditions precedent under the Indenture relating to the satisfaction and discharge of the Indenture have been complied with.

**Defeasance**

The Issuer at any time may terminate all its Obligations under the Notes and the Indenture with respect to the holders of the Notes ("*legal defeasance*"), except for certain Obligations, including those respecting the defeasance trust and Obligations to register the transfer or exchange of the Notes, to replace mutilated, destroyed, lost or stolen Notes and to maintain a registrar and paying agent in respect of the Notes. The Issuer at any time may terminate its Obligations under the covenants described under "—Certain Covenants" for the benefit of the holders of the Notes, the operation of the cross acceleration provision, the bankruptcy provisions with respect to Significant Subsidiaries, the judgment default provision described under "—Defaults" (but only to the extent that those provisions relate to the Defaults with respect to the Notes) and the undertakings and covenants contained under "—Change of Control" and "—Merger, Amalgamation, Consolidation or Sale of All or Substantially All Assets" ("*covenant defeasance*") for the benefit of the holders of the Notes. If the Issuer exercises its legal defeasance option or its covenant defeasance option, each Guarantor will be released from all of its Obligations with respect to the Notes and the Security Documents.

The Issuer may exercise its legal defeasance option notwithstanding its prior exercise of its covenant defeasance option. If the Issuer exercises its legal defeasance option, payment of the Notes may not be accelerated because of an Event of Default with respect thereto. If the Issuer exercises its covenant defeasance option, payment of the Notes may not be accelerated because of an Event of Default specified in clauses (3), (4) and (5) (with respect only to Significant Subsidiaries), (6) or (7) under "—Defaults" or because of the failure of the Company to comply with the first clause (4) under "—Merger, Amalgamation, Consolidation or Sale of All or Substantially All Assets."

In order to exercise its defeasance option, the Issuer must irrevocably deposit in trust (the "*defeasance trust*") with the Trustee money or Government Obligations for the payment of principal, premium (if any) and interest on the Notes to redemption or maturity, as the case may be, and must comply with certain other conditions, including delivery to the Trustee of an Opinion of Counsel to the effect that holders of the Notes will not recognize income, gain or loss for Federal income tax purposes as a result of such deposit and defeasance and will be subject to Federal income tax on the same amount and in the same manner and at the same

times as would have been the case if such deposit and defeasance had not occurred (and, in the case of legal defeasance only, such Opinion of Counsel must be based on a ruling of the Internal Revenue Service or change in applicable Federal income tax law). Notwithstanding the foregoing, the Opinion of Counsel required by the immediately preceding sentence with respect to a legal defeasance need not be delivered if all of the Notes not theretofore delivered to the Trustee for cancellation (x) have become due and payable or (y) will become due and payable at their Stated Maturity within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer.

### Concerning the Trustee and Collateral Agent

Wells Fargo Bank, N.A  will be the Trustee and Collateral Agent under the Indenture and has been appointed by the Issuer as Registrar and a Paying Agent with regard to the Notes.

### Governing Law

The Indenture will provide that it and the Notes are governed by, and construed in accordance with, the laws of the State of New York.

### Certain Definitions

"*2014 Indenture*" means the indenture dated as of [April 30], 2010 among the Issuer, the Company and [  ], as trustee, under which the 2014 Notes are issued, as amended, supplemented, modified, extended, restructured, renewed or restated in whole or in part from time to time, in accordance with the terms thereof.

"*2014 Notes*" means the [  ]% notes due on December 15, 2014, issued by the Issuer as amended, supplemented, modified, extended, restructured, renewed, restated, refinanced, defeased or replaced in whole or in part from time to time.

"*2027 Notes*" means the 8.10% guaranteed notes due March 15, 2027 issued by Basell Finance Company B.V., a Dutch private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*) (formerly known as Montell Finance Company B.V.).

"*ABL Collateral Agent*" means the representative(s) from time to time administrating the collateral on behalf of the lenders under the ABL Facility.

"*ABL Facility*" means the asset based revolving credit agreement dated as of its effective date among the Issuer Equistar Chemicals, L.P., Houston Refining L.P., LyondellBasell Acetyls LLC and each other Subsidiary of the Issuer from time to time designated as a "Borrower" thereunder, the lenders and agents party thereto and Citibank, N.A., as administrative agent, as amended, supplemented, modified, extended, restructured, renewed, restated, refinanced or replaced in whole or in part from time to time.

"*ABL Facility Collateral*" has the meaning ascribed to such term under "—Security—General."

"*ABL Obligations*" means all Indebtedness and other Obligations under the ABL Facility.

"*Acquired Indebtedness*" means, with respect to any specified Person:

(1)  Indebtedness of any other Person existing at the time such other Person is merged, consolidated or amalgamated with or into or became a Restricted Subsidiary of such specified Person, and

(2)  Indebtedness secured by a Lien encumbering any asset at the time such asset is acquired by such specified Person.

"*Additional First Lien Collateral Agent*" means the collateral agent with respect to any Additional First Priority Lien Obligations.

"*Additional First Lien Secured Party*" means the holders of any Additional First Priority Lien Obligations, including the holders of the First Lien Notes, and any Additional First Lien Collateral Agent or Authorized Representative with respect thereto, including the First Lien Trustee.

"*Additional First Priority Lien Obligations*" means any First Priority Lien Obligations that are Incurred after the Issue Date (other than Indebtedness Incurred under the Senior Term Loan Facility) and secured by the Common Collateral on a first priority basis pursuant to the Security Documents.

"*Additional Guarantee*" has the meaning ascribed to such term under "—Certain Covenants—Future Subsidiary Guarantors."

"*Additional Junior Lien Obligations*" means any Junior Lien Obligations that are Incurred after the Issue Date and secured on a basis equal to the Liens securing the Notes, provided such Lien is permitted to be Incurred under the First Lien Indenture, the Senior Term Loan Facility, the ABL Facility and the Indenture.

"*Additional Second Lien Collateral Agent*" means the collateral agent with respect to any Additional Second Priority Lien Obligations.

"*Additional Second Lien Secured Party*" means the holders of any Additional Second Priority Lien Obligation, and any Additional Second Lien Collateral Agent or Authorized Representative with respect thereto.

"*Additional Second Priority Lien Obligations*" means any Second Priority Lien Obligations that are Incurred after the Issue Date and secured by the Collateral on a second priority basis pursuant to the Security Documents.

"*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"*Affiliate Transaction*" has the meaning ascribed to such term under "—Certain Covenants—Transactions with Affiliates."

"*Applicable Premium*" means, with respect to any Note on any redemption date, the greater of:

(1)  1.00% of the then outstanding principal amount of the Note; and

(2)  the excess of:

　　(a)  the present value at such redemption date of (i) the redemption price of the Note, at May 1, 2013 plus (ii) all required interest payments due on the Note through May 1, 2013 (excluding accrued but unpaid interest but including additional interest, if any), computed using a discount rate equal to the Treasury Rate as of such redemption date plus 50 basis points; over

　　(b)  the then outstanding principal amount of the Note.

"*Asset Acquisition*" means:

(1)  an Investment by the Company or any Restricted Subsidiary of the Company in any other Person pursuant to which such Person shall become a Restricted Subsidiary of the Company or of any Restricted Subsidiary of the Company, or shall be merged with or into the Company or any Restricted Subsidiary of the Company, or

(2)  the acquisition by the Company or any Restricted Subsidiary of the Company of the assets of any Person (other than a Restricted Subsidiary of the Company) which constitute all or substantially all of the assets of such Person or comprises any division or line of business of such Person or any other properties or assets of such Person other than in the ordinary course of business.

"*Asset Backed Credit Facility*" means (i) the ABL Facility; (ii) any credit facility provided on the basis of the value of inventory, accounts receivable or other current assets (and related documents and intangibles) to the Company or any of its Subsidiaries or similar instrument; and (iii) any similar credit support agreements or guarantees Incurred from time to time, as amended, supplemented, modified, extended, restructured, renewed, restated, refinanced or replaced in whole or in part from time to time; *provided* that any credit facility that refinances or replaces an Asset Backed Credit Facility must comply with clause (ii) of this definition in order to be an Asset Backed Credit Facility; and *provided, further*, that, if at the time any such refinancing or replacement is necessary or advisable in the good faith judgment of the Board of Directors of the Company, and an Asset Backed Credit Facility that complies with clause (ii) of this definition is not available on terms considered commercially reasonable for facilities of this nature (as determined in the good faith judgment of the Board of Directors of the Company), then the ABL Facility may be refinanced with or replaced by any Credit Facility and such Credit Facility shall be an Asset Backed Credit Facility for purposes hereof.

"*Asset Sale*" means:

(1)  the sale, conveyance, transfer or other disposition (whether in a single transaction or a series of related transactions) of property or assets (including by way of a Sale/Leaseback Transaction) outside the ordinary course of business of the Company or any Restricted Subsidiary of the Company (each referred to in this definition as a "*disposition*") or

(2)  the issuance or sale of Equity Interests (other than directors' qualifying shares and shares issued to foreign nationals or other third parties to the extent required by applicable law) of any Restricted Subsidiary (other than to the Company or another Restricted Subsidiary of the Company) (whether in a single transaction or a series of related transactions),

in each case other than:

(a)  a disposition of Cash Equivalents or Investment Grade Securities or redundant, surplus, obsolete, damaged or worn out property or equipment, whether now owned or hereafter acquired, in the ordinary course of business;

(b)  the disposition of all or substantially all of the assets of the Company in a manner permitted pursuant to the provisions described under "—Merger, Amalgamation, Consolidation or Sale of All or Substantially All Assets" or any disposition that constitutes a Change of Control;

(c)  any Restricted Payment or Permitted Investment that is permitted to be made, and is made, under the covenant described under "—Certain Covenants—Limitation on Restricted Payments";

(d)  any sale, conveyance or other disposition of property or assets of the Company or any Restricted Subsidiary (whether in a single transaction or a series of related transactions), including by way of a Sale/Leaseback Transaction, or issuance or sale of Equity Interests of any Restricted Subsidiary, which assets or Equity Interests so disposed or issued have an aggregate Fair Market Value of less than $75.0 million;

(e)  any disposition of property or assets, or the issuance of securities, by a Restricted Subsidiary of the Company to the Company or by the Company or a Restricted Subsidiary of the Company to a Restricted Subsidiary of the Company;

(f)  (i) any exchange of assets (including a combination of assets and Cash Equivalents) for assets related to a Similar Business of comparable or greater market value or usefulness to the business of the Company and its Restricted Subsidiaries as a whole, as determined in good faith by the Company and (ii) in the ordinary course of business, any swap of assets, or lease, assignment or sublease of any real or personal property, in exchange for services (including in connection with any outsourcing arrangements) of comparable or greater value or usefulness to the business of the Company and its Restricted Subsidiaries as a whole, as determined in good faith by the Company;

(g)  foreclosure or any similar action with respect to any property or other asset of the Company or any of its Restricted Subsidiaries;

(h)  any sale of Equity Interests in, or other ownership interest in or assets or property, including Indebtedness, or other securities of, an Unrestricted Subsidiary;

(i)  any lease, assignment, license or sublease which does not materially interfere with the business of the Company and its Restricted Subsidiaries;

(j)  any grant of any license of patents, trademarks, know-how or any other intellectual property which does not materially interfere with the business of the Company and its Restricted Subsidiaries;

(k)  any transfer of accounts receivable and related assets of the type specified in the definition of "Receivables Financing" (or a fractional undivided interest therein) in a Qualified Receivables Financing;

(l)  any financing transaction with respect to property built or acquired by the Company or any Restricted Subsidiary after the Issue Date, including any Sale/Leaseback Transaction or asset securitization permitted by the Indenture;

(m)  dispositions in connection with Permitted Liens;

(n)  any disposition of Capital Stock of a Restricted Subsidiary pursuant to an agreement or other obligation with or to a Person (other than the Company or a Restricted Subsidiary) from whom such Restricted Subsidiary was acquired or from whom such Restricted Subsidiary acquired its business and assets (having been newly formed in connection with such acquisition), made as part of such acquisition and in each case comprising all or a portion of the consideration in respect of such sale or acquisition;

(o)  dispositions of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings and exclusive of factoring or similar arrangements;

(p)  any surrender or waiver of contract rights or the settlement, release, recovery on or surrender of contract, tort or other claims of any kind;

(q)  pursuant to buy-sell arrangements or similar agreements between Lyondell China Holdings Limited of Ningbo ZRCC and Lyondell Chemical Company Ltd.; and

(r)  any sale, conveyance or other disposition of property or assets of the Company or any Restricted Subsidiary (whether in a single transaction or a series of related transactions) in connection with the Emergence Transactions.

"*Asset Sale Offer*" has the meaning ascribed to such term under "—Certain Covenants—Asset Sales."

"*Authorized Collateral Agent*" has the meaning ascribed to such term under "—Security—First Lien Intercreditor Agreement" in the First Lien Description of Notes.

"*Authorized Representative*" means (i) in the case of any Obligations under the Senior Term Loan Facility or the secured parties under the Senior Term Loan Facility, the Senior Term Loan Collateral Agent, (ii) in the case of the Obligations under the First Lien Notes or the holders of the First Lien Notes, the First Lien Notes Collateral Agent, (iii) in the case of the ABL Facility, the ABL Collateral Agent and (iv) in the case of any Series of Additional First Priority Lien Obligations that become subject to the First Lien Intercreditor Agreement, the Authorized Representative named for such Series in the applicable joinder agreement.

"*Bankruptcy Code*" means the United States Bankruptcy Code, 11 U.S.C. Section 101 et seq., as amended from time to time.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York.

"*Basell GmbH*" means Basell Germany Holdings GmbH, and any successor in interest thereto.

"*Berre Facility*" means any receivables-backed credit or factoring facility entered into by one or more Foreign Subsidiaries (other than Basell GmbH) related to receivables of the refinery located in Berre, France, and any permitted refinancings thereof.

"*Board of Directors*" means, as to any Person, the board of directors or, supervisory board of such Person, or equivalent governing body (or, if such Person is a partnership or limited liability company, the board of directors or other governing body of the general partner of such Person or manager ) or any duly authorized committee thereof.

"*Business Acquisition*" means the acquisition by the Company or any Restricted Subsidiary of the Company of the assets of any Person (other than a Restricted Subsidiary of the Company) which constitute all or substantially all of the assets of such Person or comprises any division or line of business of such Person or any other properties or assets of such Person.

"*Business Day*" means a day other than a Saturday, Sunday or other day on which banking institutions are authorized or required by law to close in New York City or The Netherlands.

"*Calculation Date*" has the meaning ascribed to such term in the definition of "Fixed Charge Coverage Ratio."

"*Capital Stock*" means:

(1)  in the case of a corporation, corporate stock or shares;

(2)  in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)  in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)  any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"*Capitalized Lease Obligation*" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP.

"*Cases*" means the proceedings of LyondellBasell Industries AF S.C.A. and certain of its Subsidiaries and affiliates, as debtors and debtors in possession under Chapter 11.

"*Cash Equivalents*" means:

(1)  U.S. Dollars, pounds sterling, Euros, the national currency of any member state in the European Union or, in the case of any Foreign Subsidiary that is a Restricted Subsidiary, such local currencies held by it from time to time in the ordinary course of business;

(2)  securities issued or directly and fully guaranteed or insured by the U.S. government or any country that is a member of the European Union (other than Greece or Portugal) or any agency or instrumentality thereof in each case maturing not more than two years from the date of acquisition;

(3)  certificates of deposit, time deposits and Eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances, in each case with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank or trust company having capital and surplus in excess of $250.0 million and whose long-term debt is rated "A" or the equivalent thereof by Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency);

(4)  repurchase obligations and reverse repurchase obligations for underlying securities of the types described in clauses (2) and (3) above entered into with any financial institution meeting the qualifications specified in clause (3) above;

(5)  commercial paper issued by a corporation (other than an Affiliate of the Company) rated at least "A1" or the equivalent thereof by Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) and in each case maturing within one year after the date of acquisition;

(6)  readily marketable direct obligations issued by any state of the United States of America or any political subdivision thereof having one of the two highest rating categories obtainable from either Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) in each case with maturities not exceeding two years from the date of acquisition;

(7)  Indebtedness issued by Persons (other than the Sponsors or any of their Affiliates) with a rating of "A" or higher from S&P or "A-2" or higher from Moody's (or reasonably equivalent ratings of another internationally recognized ratings agency) in each case with maturities not exceeding two years from the date of acquisition;

(8)  U.S. Dollar-denominated money market funds as defined in Rule 2a-7 of the General Rules and Regulations promulgated under the Investment Company Act of 1940;

(9)  tax-exempt floating rate option tender bonds backed by letters of credit issued by a national or state bank whose long-term unsecured debt has a rating of AA or better by S&P or Aa2 or better by Moody's or the equivalent rating by any other internationally recognized rating agency; and

(10) investment funds investing at least 95% of their assets in securities of the types described in clauses (1) through (9) above.

"*Catalyst Sale/Leaseback Transaction*" means a Sale/Leaseback Transaction that relates to a catalyst containing one or more precious metals used by the Company or any of its Restricted Subsidiaries in the ordinary course of business.

"*Change of Control*" means the occurrence of any of the following:

(1)  the sale, lease or transfer, in one or a series of related transactions, of all or substantially all of the assets of the Company and its Subsidiaries, taken as a whole, to any Person other than a Permitted Holder; or

(2)  the Company becomes aware of (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) the acquisition by any Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision), including any group acting for the purpose of acquiring, holding or disposing of securities (within the meaning of Rule 13d-5(b)(1) under the Exchange Act), other than the Permitted Holders, in a single transaction or in a related series of transactions, by way of acquisition, merger, amalgamation, consolidation, transfer, conveyance or other business combination or purchase of beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act, or any successor provision) of more than 50% of the total voting power of the Voting Stock of the Company.

"*Change of Control Offer*" has the meaning ascribed to such term under "—Change of Control."

"*Chapter 11*" means Chapter 11 of the Bankruptcy Code.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Collateral*" means all property subject or purported to be subject, from time to time, to a Lien under any Security Documents.

"*Collateral Agent*" means [  ].

"*Collateral Agreement*" has the meaning ascribed to such term under "—Security—Security Documents."

"*Collateral Asset Sale Offer*" has the meaning ascribed to such term under "—Certain Covenants—Asset Sales."

"*Collateral Excess Proceeds*" has the meaning ascribed to such term under "—Certain Covenants—Asset Sales."

"*Common Collateral*" means, at any time, Collateral in which the holders of two or more Series of First Priority Lien Obligations (or their respective Authorized Representatives) hold a valid and perfected security interest at such time. If more than two Series of First Priority Lien Obligations are outstanding at any time and the holders of less than all Series of First Priority Lien Obligations hold a valid and perfected security interest in any Collateral at such time then such Collateral shall constitute Common Collateral for those Series of First Priority Lien Obligations that hold a valid security interest in such Collateral at such time and shall not constitute Common Collateral for any Series which does not have a valid and perfected security interest in such Collateral at such time.

"*Company*" means LyondellBasell Industries N.V., a *naamloze vennootschap* (public limited liability corporation) formed under the laws of the Netherlands, and any successor in interest thereto.

"*Consolidated EBITDA*" means, with respect to any Person, for any period, the sum (without duplication) of:

(1)  Consolidated Net Income;

(2)  to the extent Consolidated Net Income has been reduced thereby;

(a)  taxes of such Person and its Restricted Subsidiaries paid or accrued in accordance with GAAP for such period based on income, profits or capital, including, without limitation, state, franchise, property and similar taxes and foreign withholding taxes (including penalties and interest related to such taxes or arising from tax examinations), or such equivalent items in any foreign jurisdiction;

(b)  Consolidated Interest Expense;

(c)  Consolidated Non-cash Charges;

(d)  the amount of net loss resulting from the payment of any premiums, fees or similar amounts that are required to be paid under the terms of the instrument(s) governing any Indebtedness upon the repayment, prepayment or other extinguishment of such Indebtedness in accordance with the terms of such Indebtedness;

(e)  any expenses or charges (other than Consolidated Non-cash Charges) related to any issuance of Equity Interests, any Investment, acquisition, disposition, recapitalization or Incurrence, repayment, amendment or modification of Indebtedness permitted to be Incurred or repaid by the Indenture (including a refinancing thereof) (in each case, whether or not successful), including, without limitation, (i) such fees, expenses or charges related to the offering of the Notes and the Credit Facility Indebtedness and other Exit Financing, (ii) any amendment or other modification of the Notes or other Indebtedness, (iii) any additional interest in respect of the Notes and (iv) commissions, discounts, yield and other fees and charges (including any interest expense) related to any Receivables Financing; and

(f)  business optimization expenses and other restructuring charges, reserves or expenses (which, for the avoidance of doubt, shall include, without limitation, the effect of inventory optimization programs, facility consolidations, retention, headcount reductions, systems establishment costs, contract termination costs, future lease commitments and excess pension charges); and

(3)  the amount of net cost savings projected by such Person in good faith to be realized by specified actions taken or to be taken prior to or during such period (calculated on a pro forma basis as though such cost savings had been realized on the first day of such period); provided that (x) such cost savings are reasonably identifiable and factually supportable and (y) such actions have been taken or are to be taken within twelve months of the date of determination to take such action and the benefit is expected to be realized within twelve months of taking such action; minus

(4)  any non-cash gains increasing Consolidated Net Income of such Person for such period (excluding (i) the recognition of deferred revenue or any items which represent the reversal of any accrual of, or cash reserve for, anticipated cash charges that reduced EBITDA in any prior period and any items for which cash was received in a prior period, (ii) items referenced in clause (e) of Consolidated Net Income and (iii) gains which have been offset against losses in determining Consolidated Net Income but for which the loss has not been added back as a Consolidated Non-cash Charge pursuant to the definition of Consolidated EBITDA);

all as determined on a consolidated basis for such Person and its Restricted Subsidiaries in accordance with GAAP.

Notwithstanding anything herein to the contrary, Consolidated EBITDA for the Fiscal Quarter ending (i) June 30, 2009 shall be deemed to be $551.0 million, (ii) September 30, 2009 shall be deemed to be $757.0 million and (iii) December 31, 2009 shall be

deemed to be $578.0 million, before giving *pro forma* effect to any transaction occurring after the Issue Date, as permitted under the definitions of "Fixed Charge Coverage Ratio" and "Secured Indebtedness Leverage Ratio."

"*Consolidated Interest Expense*" means, with respect to any Person for any period, the consolidated interest expense (net of interest income for such period) of such Person and its Restricted Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, to the extent such expense was deducted in computing Consolidated Net Income, including, without limitation:

(1)  amortization of original issue discount,

(2)  the interest component of Capitalized Lease Obligations paid, accrued and/or scheduled to be paid or accrued,

(3)  net payments and receipts (if any) pursuant to interest rate Hedging Obligations,

(4)  consolidated capitalized interest of such Person and its Restricted Subsidiaries for such period, whether paid or accrued, and

(5)  the interest portion of any deferred payment obligation,

but excluding, in each case, any amortization of fees, debt issuance costs and commissions incurred in connection with the Credit Facilities, any Receivables Financing, the issuance of the First Lien Notes, the Notes, the Euro Securitization and any other debt issuance.

For purposes of this definition, interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by the Issuer to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

"*Consolidated Net Income*" means, with respect to any Person, for any period:

(1)  the Net Income of such Person and its Restricted Subsidiaries for such period on a consolidated basis; *plus*

(2)  cash dividends or distributions paid to such Person or any Restricted Subsidiary of such Person by any other Person (the "*Payor*") other than a Restricted Subsidiary, to the extent not otherwise included in Consolidated Net Income, which have not been derived from Indebtedness of the Payor to the extent such Indebtedness is Guaranteed by such referent Person or any Restricted Subsidiary of such referent Person;

*provided* that there shall be excluded therefrom, without duplication (but only to the extent included in the calculation of the foregoing):

(a)  (i) any net after-tax income or loss from operating results of discontinued operations as defined by GAAP, and (ii) any net after-tax gains or losses from sales of discontinued operations;

(b)  any net after-tax extraordinary, nonrecurring or unusual gains or losses (less all fees and expenses relating thereto or expenses or charges, any severance expenses, relocation expenses, curtailments or modifications to pension and post-retirement employee benefit plans, any expenses related to any reconstruction, decommissioning, recommissioning or reconfiguration of fixed assets for alternate uses and fees, expenses or charges relating to facilities closing costs, acquisition integration costs, facilities opening costs, project start-up costs, business optimization costs, signing, retention or completion bonuses, expenses or charges related to any issuance of Equity Interests, Investment, acquisition, disposition, recapitalization or issuance, repayment, refinancing, amendment or modification of Indebtedness (in each case, whether or not successful), and all costs and expenses of such Person and its Restricted Subsidiaries Incurred in connection with the Cases and the Exit Financings);

(c)  the Net Income of any Payor, other than a Restricted Subsidiary of such Person or Net Income of such Payor that is accounted for by the equity method of accounting, except to the extent of cash dividends or distributions paid to such Person or to a Restricted Subsidiary of such Person by such Payor (or to the extent converted into cash);

(d)  the Net Income (but not loss) of any Restricted Subsidiary of such Person that is not a Guarantor to the extent that the declaration of dividends or similar distributions by that Restricted Subsidiary of that income is restricted; *provided, however*, that the Net Income of Restricted Subsidiaries shall only be excluded in any calculation of Consolidated Net Income of the Company as a result of application of this clause (d) if the restriction on dividends or similar distributions results from consensual restrictions other than any restriction contained in clauses (1), (2) and (4) and, to the extent related to clauses (1), (2), and (4), clause (15) under "—Certain Covenants—Dividend and Other Payment Restrictions Affecting Subsidiaries";

(e)  (i) any restoration to income of any contingency reserve, except to the extent that provision for such reserve was made out of Consolidated Net Income accrued at any time following the Issue Date; and (ii) any restoration to or deduction from income for changes in estimates related to the post-emergence settlement of pre-petition claims obligations in relation with Chapter 11 following the Issue Date;

(f)  in the case of a successor to such Person by consolidation or merger or as a transferee of such Person's assets, any gains or losses of the successor corporation prior to such consolidation, merger or transfer of assets;

(g)  any charges or credits relating to any purchase accounting adjustments or to the adoption of fresh start accounting principles;

(h)  any (i) one-time non-cash compensation charges, and (ii) non-cash costs or expenses resulting from stock option plans, employee benefit plans, compensation charges or post-employment benefit plans, or grants or awards of stock, stock appreciation or similar rights, stock options, restricted stock, Preferred Stock or other rights;

(i)  Net Income for such period shall not include the cumulative effect of a change in accounting principles during such period;

(j)  any net after-tax gains or losses (less all fees and expenses or charges relating thereto) attributable to business dispositions or asset dispositions other than in the ordinary course of business (as determined in good faith by management of the Company) or reserves relating thereto;

(k)  any net after-tax gains or losses (less all fees and expenses or charges relating thereto) attributable to the early extinguishment of Indebtedness, Hedging Obligations or other derivative instruments entered in relation with the Indebtedness extinguished;

(l)  any gain or loss for such period from currency translation gains or losses or net gains or losses related to currency remeasurements of Indebtedness (including any net loss or gain resulting from Hedging Obligations for currency exchange risk entered in relation with Indebtedness); and

(m)  any impairment charges or asset write-offs, in each case pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP.

Notwithstanding the foregoing, for the purpose of the covenant described under "—Certain Covenants—Limitation on Restricted Payments" only, there shall be excluded from Consolidated Net Income any dividends, repayments of loans or advances or other transfers of assets from Unrestricted Subsidiaries of the Company or a Restricted Subsidiary of the Company to the extent such dividends, repayments or transfers increase the amount of Restricted Payments permitted under such covenant pursuant to clauses (c)(iv) or (c)(v) of the first paragraph of the covenant described under "—Certain Covenants—Limitation on Restricted Payments."

"*Consolidated Net Tangible Assets*" means, with respect to any Person, the Total Assets of such Person and its Restricted Subsidiaries less goodwill and intangibles (other than intangibles arising from, or relating to, intellectual property, licenses or permits (including, but not limited to, emissions rights) of such Person), in each case calculated in accordance with GAAP, *provided*, that in the event that such Person or any of its Restricted Subsidiaries assumes or acquires any assets in connection with the acquisition by such Person and its Restricted Subsidiaries of another Person subsequent to the commencement of the period for which the Consolidated Net Tangible Assets is being calculated but prior to the event for which the calculation of the Consolidated Net Tangible Assets is made, then the Consolidated Net Tangible Assets shall be calculated giving *pro forma* effect to such assumption or acquisition of assets, as if the same had occurred at the beginning of the applicable period.

"*Consolidated Non-cash Charges*" means, with respect to any Person, for any period, the consolidated depreciation, amortization and other non-cash expenses of such Person and its Restricted Subsidiaries (including the amortization of prior service costs and actuarial gains and losses related to pensions and other post-employment benefits) (including any lower-of-cost-or-market adjustments of inventory) reducing Consolidated Net Income of such Person and its Restricted Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP, *provided* that if any such non-cash expenses represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA in such future period to the extent paid, but excluding from this *proviso*, for the avoidance of doubt, amortization of a prepaid cash item that was paid in a prior period.

"*Contingent Obligations*" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("*primary obligations*") of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent:

(1)  to purchase any such primary obligation or any property constituting direct or indirect security therefor;

(2)   to advance or supply funds:

(a)   for the purchase or payment of any such primary obligation; or

(b)   to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

(3)   to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"*Covenant Suspension Event*" has the meaning ascribed to such term under "—Certain Covenants."

"*Credit Facilities*" means:

(1)   the Senior Term Loan Facility,

(2)   any Asset Backed Credit Facility;

(3)   any debt facilities or other financing arrangements (including, without limitation, commercial paper facilities) providing for revolving credit loans, term loans, letters of credit or other Indebtedness, including any notes, mortgages, guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements or refundings thereof and any indentures or credit facilities or commercial paper facilities that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount permitted to be borrowed thereunder or alters the maturity thereof (*provided* that such increase in borrowings is permitted under the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock") or adds Restricted Subsidiaries as additional borrowers or guarantors thereunder and whether by the same or any other agent, lender or group of lenders; and

(4)   any such agreements, instruments or guarantees governing Indebtedness Incurred to refinance any Indebtedness or commitments referred to in clauses (1), (2) and (3) above whether by the same or any other lender or group of lenders.

"*Credit Facility Indebtedness*" means any and all amounts payable under or in respect of the Credit Facilities as amended, restated, supplemented, waived, replaced, restructured, repaid, refunded, refinanced or otherwise modified from time to time (including after termination of the Senior Term Loan Facility), including principal, premium (if any), interest (including interest accruing on or after the filing of any petition in bankruptcy or for reorganization relating to the Company whether or not a claim for post-filing interest is allowed in such proceedings), fees, charges, expenses, reimbursement obligations, guarantees and all other amounts payable thereunder or in respect thereof.

"*Currency Agreement*" means, with respect to any Person, any foreign exchange contract, currency swap agreement, currency futures contract, currency option contract, currency derivative or other similar agreement to which such Person is a party or beneficiary.

"*Default*" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"*Designated Non-cash Consideration*" means the Fair Market Value of non-cash consideration received by the Company or one of its Restricted Subsidiaries in connection with an Asset Sale that is so designated as Designated Non-cash Consideration pursuant to an Officer's Certificate, setting forth the basis of such valuation, less the amount of Cash Equivalents received in connection with a subsequent sale of such Designated Non-cash Consideration.

"*Designated Preferred Stock*" means Preferred Stock of the Company or any direct or indirect parent entity of the Company (other than Disqualified Stock), that is issued for cash (other than to the Company or any of its Subsidiaries or an employee stock ownership plan or trust established by the Company or any of its Subsidiaries) and is so designated as Designated Preferred Stock, pursuant to an Officer's Certificate, on the issue date thereof.

"*Discharge of ABL Obligations*" shall mean, except to the extent otherwise provided in the Junior Lien Intercreditor Agreement with respect to the reinstatement or continuation of any ABL Obligations under certain circumstances, the payment in full in cash (except for contingent indemnities and cost and reimbursement obligations to the extent no claim has been made) of all ABL Obligations then outstanding, if any, and, with respect to letters of credit or letter of credit guaranties outstanding under the ABL Facility, delivery of cash collateral or backstop letters of credit in respect thereof in a manner reasonably satisfactory to the ABL Collateral Agent and issuing lenders under the ABL Facility, in each case after or concurrently with the termination of all commitments to extend credit thereunder, and the termination of all commitments of "secured parties" under the ABL Facility (as defined therein); *provided* that the Discharge of ABL Obligations shall not be deemed to have occurred if such payments are made in connection with the establishment of a replacement Asset Backed Credit Facility (unless in connection with such replacement all of

the ABL Obligations are repaid in full in cash (and the other conditions set forth in this definition prior to the *proviso* are satisfied) with the proceeds of a Qualified Receivables Financing, in which case a Discharge of ABL Obligations shall be deemed to have occurred). In the event the ABL Obligations are modified and the ABL Obligations are paid over time or otherwise modified pursuant to Section 1129 of the Bankruptcy Code, the ABL Obligations shall be deemed to be discharged when the final payment is made, in cash, in respect of such indebtedness and any obligations pursuant to such new indebtedness shall have been satisfied.

"*Discharge of First and Second Priority Lien Obligations*" shall mean, except to the extent otherwise provided in the Junior Lien Intercreditor Agreement with respect to the reinstatement or continuation of any First Priority Lien Obligation or Second Priority Lien Obligation under certain circumstances, payment in full in cash (except for contingent indemnities and cost and reimbursement obligations to the extent no claim has been made) of all First and Second Priority Lien Obligations and, with respect to any letters of credit or letter of credit guaranties outstanding under the First Lien Documents or Second Lien Documents, delivery of cash collateral or backstop letters of credit in respect thereof in a manner consistent with such First Lien Document or Second Lien Document, in each case after or concurrently with the termination of all commitments to extend credit thereunder, and the termination of all commitments of the First Lien Secured Parties or Second Lien Secured Parties under the First Lien Documents or Second Lien Documents. as the case may be; *provided* that the Discharge of First and Second Priority Lien Obligations shall not be deemed to have occurred if such payments are made with the proceeds of other First Priority Lien Obligations or Second Priority Lien Obligations that constitute an exchange or replacement for or a refinancing of such Obligations, First Priority Lien Obligations or Second Priority Lien Obligations. In the event the First Priority Lien Obligations or Second Priority Lien Obligations are modified and the Obligations are paid over time or otherwise modified pursuant to Section 1129 of the Bankruptcy Code, the First Priority Lien Obligations and Second Priority Lien Obligations shall be deemed to be discharged when the final payment is made, in cash, in respect of such indebtedness and any obligations pursuant to such modified indebtedness shall have been satisfied.

"*Discharge of First Priority Lien Obligations*" shall mean, except to the extent otherwise provided in the Junior Lien Intercreditor Agreement with respect to the reinstatement or continuation of any First Priority Lien Obligation under certain circumstances, payment in full in cash (except for contingent indemnities and cost and reimbursement obligations to the extent no claim has been made) of all First Priority Lien Obligations and, with respect to any letters of credit or letter of credit guaranties outstanding under the First Lien Documents, delivery of cash collateral or backstop letters of credit in respect thereof in a manner consistent with such First Lien Document, in each case after or concurrently with the termination of all commitments to extend credit thereunder, and the termination of all commitments of the First Lien Secured Parties under the First Lien Documents; *provided* that the Discharge of First Priority Lien Obligations shall not be deemed to have occurred if such payments are made with the proceeds of other First Priority Lien Obligations that constitute an exchange or replacement for or a refinancing of such Obligations or First Priority Lien Obligations. In the event the First Priority Lien Obligations are modified and the Obligations are paid over time or otherwise modified pursuant to Section 1129 of the Bankruptcy Code, the First Priority Lien Obligations shall be deemed to be discharged when the final payment is made, in cash, in respect of such indebtedness and any obligations pursuant to such modified indebtedness shall have been satisfied.

"*Disqualified Stock*" means, with respect to any Person, any Capital Stock of such Person which, by its terms (or by the terms of any security into which it is convertible or for which it is redeemable or exchangeable), or upon the happening of any event:

(1)  matures or is mandatorily redeemable, pursuant to a sinking fund Obligation or otherwise (other than as a result of a change of control or asset sale),

(2)  is convertible or exchangeable for Indebtedness or Disqualified Stock of such Person, or

(3)  is redeemable at the option of the holder thereof, in whole or in part (other than solely as a result of a change of control or asset sale),

in each case prior to 91 days after the earlier of the maturity date of the Notes or the date the Notes are no longer outstanding; *provided*, that only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock; *provided*, *further*, that if such Capital Stock is issued to any employee or to any plan for the benefit of employees of the Company or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Company in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability; *provided*, *further*, that any class of Capital Stock of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of Capital Stock that is not Disqualified Stock shall not be deemed to be Disqualified Stock.

"*Domestic Subsidiary*" means a Restricted Subsidiary that is not a Foreign Subsidiary.

"*Emergence Transactions*" means all transactions arising out of the Reorganization Plan and emergence from Chapter 11, including, but not limited to, Exit Financing.

"*Equity Interests*" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"*Equity Offering*" means any public or private sale after the Issue Date of common stock or Preferred Stock (other than Disqualified Stock) of the Company or any direct or indirect parent entity of the Company (to the extent the proceeds thereof are contributed to the Company), as applicable, on a primary basis, other than:

(1)  public offerings with respect to the Company's or such direct or indirect parent entity's common stock registered on Form S-4 or Form S-8;

(2)  issuances to any Subsidiary of the Company; and

(3)  any such public or private sale that constitutes an Excluded Contribution.

"*Escrow Agent*" means Deutsche Bank Trust Company Americas, as escrow agent under the Escrow Agreement or any successor escrow agent as set forth in the Escrow Agreement.

"*EU Savings Tax Directive*" has the meaning ascribed to such term under "—The Guarantees—Additional Amounts."

"*EU-Swiss Savings Tax Agreement*" has the meaning ascribed to such term under "—The Guarantees—Additional Amounts."

"*Euro Securitization*" means the transaction to be dated as of its effective date entered into in connection with the €450 million revolving securitization facility of trade account receivables with Basell Sales and Marketing Company B.V. and Lyondell Chemie Nederland B.V., as sellers, and Basell Polyolefins Collections Ltd., as receivables purchaser, as such facility may be amended, supplemented, modified, extended, restructured, renewed, restated, refinanced or replaced in whole or in part from time to time.

"*Excess Proceeds*" has the meaning ascribed to such term under "—Certain Covenants—Asset Sales."

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Excluded Assets*" has the meaning ascribed to such term under "—Security—General."

"*Excluded Contributions*" means aggregate net cash proceeds, including cash and the Fair Market Value of property other than cash, received by the Company after the Issue Date from:

(1)  contributions to its common equity capital, and

(2)  the sale (other than to a Subsidiary of the Company or to any Subsidiary management equity plan or stock option plan or any other management or employee benefit plan or agreement) of Capital Stock (other than Disqualified Stock and Designated Preferred Stock) of the Company, in each case designated as Excluded Contributions pursuant to an Officer's Certificate of the Company on or promptly after the date such capital contributions are made or the date such Capital Stock is sold, as the case may be.

"*Excluded Subsidiary*" means (i) any Receivables Subsidiary, (ii) any Qualified Non-Recourse Subsidiary, (iii) any Special Purpose Subsidiary, (iv) any Wholly Owned Domestic Subsidiary that is a subsidiary of a Foreign Subsidiary, and (v) any Domestic Subsidiary of the Company as of the Issue Date or at any time thereafter meeting any one of the following conditions that has been designated by the Issuer as an Excluded Subsidiary in a writing to the Trustee (which designation may be rescinded by granting a Guarantee in accordance with the requirements of the Indenture): (a) the Total Assets of such Domestic Subsidiary determined as of the end of the fiscal year of the Company most recently ended for which financial statements are required to be delivered under the Indenture does not exceed $25.0 million, or (b) the Consolidated EBITDA of such Domestic Subsidiary does not exceed $25.0 million, for the period of four consecutive quarters of the Company most recently ended for which financial statements are required to be delivered pursuant to the Indenture; *provided* that if, at any time or from time to time after the Issue Date, Domestic Subsidiaries (other than a Special Purpose Subsidiary) shall not be designated as Excluded Subsidiaries to the extent that such Domestic Subsidiaries under this clause (v) would represent, in the aggregate, (a) 5.0% or more of Total Assets of the Company at the end of the most recently ended fiscal year of the Company or (b) 5.0% or more of the Consolidated EBITDA of the Company for the most recently ended fiscal year, in each case, based upon the most recent financial statements required to be delivered pursuant to the Indenture; *provided, further*, that, if the most recent financial statements required to be delivered pursuant to the Indenture for any fiscal quarter occurring after the Issue Date indicate that, by reason of subsequent changes following the designation of any one or more Restricted Subsidiaries as an Excluded Subsidiary or Excluded Subsidiaries, the foregoing requirements of this definition would not be complied with (other than as a result of an impairment charge), individually or in the aggregate, then the Company shall use commercially reasonable efforts to promptly (but in any event within 180 days after the date the financial statements are required), rescind such designations as are necessary, and provide such Guarantees as are necessary, so as to comply with the requirements of the

Indenture. Any uncured Default shall not occur until the expiration of such 180-day provided such efforts are used. "*Exit Financing*" means that certain financing to finance the Reorganization Plan expected to be composed of the Senior Term Loan Facility, the ABL Facility, the Euro Securitization, the Notes and the First Lien Notes.

"*Fair Market Value*" means, with respect to any asset or property, the price which could be negotiated in an arm's-length transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction; *provided* that, other than as expressly set forth in the Indenture, for purposes of determining the "Fair Market Value" of any property or assets, such Fair Market Value shall be determined by (x) the Company in good faith with respect to property or assets with a Fair Market Value not in excess of $250.0 million, (y) an opinion as to the Fair Market Value issued by a qualified accounting, appraisal, financial advisory or investment banking firm or (z) the Board of Directors of the Company, as evidenced by a certificate of an officer of the Company, with respect to property or assets with a Fair Market Value in excess of $250.0 million.

"*First and Second Priority Lien Obligations*" means First Priority Lien Obligations and Second Priority Lien Obligations.

"*First Lien Collateral Agents*" mean the Collateral Agent and the Senior Term Loan Collateral Agent.

"*First Lien Documents*" means the credit, guarantee and security documents governing the First Priority Lien Obligations (and any Additional First Priority Lien Obligations), including, without limitation, the Indenture and the First Lien Security Documents.

"*First Lien Indenture*" means the indenture dated as of April 8, 2010 among LBI Escrow Corporation, as predecessor to the Issuer, the Company and Wilmington Trust FSB, under which the First Lien Notes are issued, as amended, supplemented, modified, extended, restructured, renewed or restated in whole or in part from time to time, in accordance with the terms thereof.

"*First Lien Intercreditor Agreement*" has the meaning ascribed to such term under "—Security—First Lien Intercreditor Agreement."

"*First Lien Notes*" means the 8% notes due on November 1, 2017, issued by LBI Escrow Corporation, as predecessor to the Issuer as amended, supplemented, modified, extended, restructured, renewed, restated, refinanced, defeased or replaced in whole or in part from time to time.

"*First Lien Notes Collateral Agent*" means Deutsche Bank Trust Company Americas as collateral agent under the First Lien Notes.

"*First Lien Notes Obligations*" means Obligations in respect of the First Lien Notes (including other first lien notes Incurred pursuant to clause (a) of the second paragraph of the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"), the First Lien Indenture and the Security Documents, including, for the avoidance of doubt, Obligations in respect of exchange notes and guarantees thereof.

"*First Lien Paying Agent*" means any Person authorized by the Issuer to pay the principal of or interest on any First Lien Notes on behalf of the Issuer. Deutsche Bank Trust Company Americas shall initially be the First Lien Paying Agent with respect to the U.S. Dollar-denominated First Lien Notes on the Issue Date and Deutsche Bank AG, London Branch shall initially be the Paying Agent with respect to the Euro-denominated First Lien Notes on the Issue Date.

"*First Lien Secured Parties*" means (a) the "Secured Parties," as defined in the Senior Term Loan Facility and (b) any Additional First Lien Secured Parties.

"*First Lien Security Documents*" means the Security Documents and any other agreement, document or instrument pursuant to which a Lien is granted or purported to be granted securing First Priority Lien Obligations, and any Additional First Priority Lien Obligations or under which rights or remedies with respect to such Liens are governed, in each case to the extent relating to the collateral securing both the First Priority Lien Obligations.

"*First Lien Trustee*" means the party named as such in the First Lien Indenture until a successor replaces it and, thereafter, means the successor.

"*First Priority After-Acquired Property*" means (x) at any time the outstanding principal amount of loans under the Senior Term Loan Facility is greater than $500.0 million, any property of the Company, the Issuer or any Pledgor that secures any First Priority Lien Obligations and Other First-Lien Obligations other than the First Lien Notes that is not already subject to the Lien under the Security Documents, other than any Excluded Assets, and (y) if clause (x) is not applicable, then any property of the Company, the Issuer or any Pledgor that constitutes Notes Collateral (other than Excluded Assets).

"*First Priority Lien Obligations*" means (i) all Indebtedness under the Credit Facilities (other than the Asset Backed Credit Facility and any other Credit Facility Incurred pursuant to clause (c)(ii) of the second paragraph of the covenant described under "—

Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"), (ii) the First Lien Notes Obligations and the Obligations in respect of any refunding, refinancing or defeasement of the First Lien Notes, (iii) all other Obligations of the Company, the Issuer or any Restricted Subsidiary in respect of Hedging Obligations or Obligations in respect of cash management services in each case owing to a Person that is a holder of Credit Facility Indebtedness or an Affiliate of such holder at the time of entry into such Hedging Obligations or Obligations in respect of cash management services, (iv) Additional First Priority Lien Obligations, if any, permitted to be Incurred under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and (v) Indebtedness under any Oil Indexed Credit Facility Incurred pursuant to clause (c)(iii) of the second paragraph of the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock."

"*Fixed Charge Coverage Ratio*" means, with respect to any Person for any period, the ratio of Consolidated EBITDA of such Person for such period to the Fixed Charges of such Person for such period. In the event that the Company or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness (other than in the case of revolving credit borrowings or revolving advances under any Receivables Financing, in which case interest expense shall be computed based upon the average daily balance of such Indebtedness during the applicable period) or issues, repurchases or redeems Disqualified Stock or Preferred Stock subsequent to the commencement of the period for which the Fixed Charge Coverage Ratio is being calculated but prior to the event for which the calculation of the Fixed Charge Coverage Ratio is made (the "*Calculation Date*"), then the Fixed Charge Coverage Ratio shall be calculated giving *pro forma* effect to such Incurrence, repayment, repurchase or redemption of Indebtedness, or such issuance, repurchase or redemption of Disqualified Stock or Preferred Stock, as if the same had occurred at the beginning of the applicable four-quarter period.

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, amalgamations, consolidations and discontinued operations (as determined in accordance with GAAP), in each case with respect to an operating unit of a business, and any operational changes that the Company or any of its Restricted Subsidiaries has determined to make and/or made during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Calculation Date shall be calculated on a *pro forma* basis assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations, discontinued operations and operational changes (and the change of any associated fixed charge obligations and the change in Consolidated EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation, amalgamation, discontinued operation or operational change, in each case with respect to an operating unit of a business, that would have required adjustment pursuant to this definition, then the Fixed Charge Coverage Ratio shall be calculated giving *pro forma* effect thereto for such period as if such Investment, acquisition, disposition, discontinued operation, merger, amalgamation, consolidation or operational change had occurred at the beginning of the applicable four-quarter period.

For purposes of this definition, whenever *pro forma* effect is to be given to any event, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting Officer of the Company. Any such *pro forma* calculation may include adjustments appropriate, in the reasonable good faith determination of the Company as set forth in an Officer's Certificate, to reflect (1) operating expense reductions and other operating improvements or synergies reasonably expected to result from the applicable event, and (2) all adjustments of the nature set forth as "Reorganization Adjustments" under "Unaudited Consolidated Pro Forma Financial Information" as set forth in the Offering Memorandum for the Company to the extent such adjustments, without duplication, continue to be applicable to such four-quarter period.

If any Indebtedness bears a floating rate of interest and is being given *pro forma* effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the Calculation Date had been the applicable rate for the entire period (taking into account any Hedging Obligations applicable to such Indebtedness if such Hedging Obligation has a remaining term in excess of 12 months). Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of the Company to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP. For purposes of making the computation referred to above, interest on any Indebtedness under a revolving credit facility computed on a *pro forma* basis shall be computed based upon the average daily balance of such Indebtedness during the applicable period. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be deemed to have been based upon the rate actually chosen, or, if none, then based upon such optional rate chosen as the Company may designate.

For the purposes of this definition, any amount in a currency other than U.S. Dollars will be converted to U.S. Dollars based on the average exchange rate for such currency for the most recent twelve-month period immediately prior to the date of determination or if any such Indebtedness is subject to a Currency Agreement with respect to the currency in which such Indebtedness is denominated covering principal, premium, if any, and interest on such Indebtedness, the amount of such Indebtedness and such interest and premium, if any, shall be determined after giving effect to all payments in respect thereof under such Currency Agreement.

"*Fixed Charges*" means, with respect to any Person for any period, the sum, without duplication, of:

(1)  Consolidated Interest Expense of such Person for such period, and

(2)  all cash dividend payments (excluding items eliminated in consolidation) on any series of Preferred Stock or Disqualified Stock of such Person and its Restricted Subsidiaries.

"*Foreign Subsidiary*" means a Restricted Subsidiary not organized or existing under the laws of the United States of America or any state or territory thereof or the District of Columbia and any direct or indirect Restricted Subsidiary of such Restricted Subsidiary.

"*GAAP*" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect on the Issue Date as adopted by the Company. For the purposes of the Indenture, the term "consolidated" with respect to any Person shall mean such Person consolidated with its Restricted Subsidiaries, and shall not include any Unrestricted Subsidiary, but the interest of such Person in an Unrestricted Subsidiary will be accounted for as an Investment.

"*Government Obligations*" means securities that are:

(1)  direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged, or

(2)  obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America the timely payment of which is unconditionally guaranteed as a full faith and credit Obligation by the United States of America, which, in each case, are not callable or redeemable at the option of the issuer thereof, and shall also include a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act) as custodian with respect to any such U.S. government obligations or a specific payment of principal of or interest on any such U.S. government obligations held by such custodian for the account of the holder of such depository receipt; *provided, however*, that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the U.S. government obligations or the specific payment of principal of or interest on the U.S. government obligations evidenced by such depository receipt.

"*Guarantee*" has the meaning ascribed to such term under "—The Guarantees."

"*Guarantor*" has the meaning ascribed to such term under "—The Guarantees."

"*Hedging Obligations*" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, emission rights, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "*Master Agreement*"), including any such obligations or liabilities under any Master Agreement.

"*holder*" or "*noteholder*" means the Person in whose name a Note is registered on the Registrar's books.

"*Incur*" means issue, assume, guarantee, incur or otherwise become liable for; *provided, however*, that any Indebtedness or Capital Stock of a Person existing at the time such person becomes a Subsidiary (whether by merger, amalgamation, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the time it becomes a Subsidiary.

"*Indebtedness*" means, with respect to any Person:

(1)  the principal and premium (if any) of any indebtedness of such Person, whether or not contingent, (a) in respect of borrowed money, (b) evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof), (c) representing the deferred and unpaid purchase price of any property (except any such balance that (i) constitutes a trade payable or similar Obligation to a trade creditor Incurred in the ordinary course of business, (ii) any earn-out Obligations until such Obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and (iii) liabilities accrued in the ordinary course of business), which purchase price is due more than six months after the date of placing the property in service or taking delivery and title thereto, (d) in respect of

Capitalized Lease Obligations, or (e) representing any Hedging Obligations, if and to the extent that any of the foregoing indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(2)  to the extent not otherwise included, any Obligation of such Person to be liable for, or to pay, as obligor, guarantor or otherwise, the Obligations referred to in clause (1) of another Person (other than by endorsement of negotiable instruments for collection in the ordinary course of business); and

(3)  to the extent not otherwise included, Indebtedness of another Person secured by a Lien on any asset owned by such Person (whether or not such Indebtedness is assumed by such Person); *provided*, *however*, that the amount of such Indebtedness will be the lesser of: (a) the Fair Market Value of such asset at such date of determination, and (b) the amount of such Indebtedness of such other Person;

*provided*, *however*, that, notwithstanding the foregoing, Indebtedness shall be deemed not to include (1) Contingent Obligations Incurred in the ordinary course of business and not in respect of borrowed money; (2) deferred or prepaid revenues; (3) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed Obligations of the respective seller; or (4) Obligations under or in respect of a Qualified Receivables Financing or Qualified Joint Venture Transaction.

Notwithstanding anything in the Indenture to the contrary, Indebtedness shall not include, and shall be calculated without giving effect to, the effects of Statement of Financial Accounting Standards No. 133 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under the Indenture as a result of accounting for any embedded derivatives created by the terms of such Indebtedness; and any such amounts that would have constituted Indebtedness under the Indenture but for the application of this sentence shall not be deemed an Incurrence of Indebtedness under the Indenture.

"*Indenture*" means the indenture under which the Notes are issued, as amended, supplemented, modified, extended, restructured, renewed or restated in whole or in part from time to time, in accordance with the terms thereof.

"*Independent Financial Advisor*" means an accounting, appraisal or investment banking firm or consultant, in each case of nationally recognized standing, that is, in the good faith determination of the Company, qualified to perform the task for which it has been engaged.

"*Insolvency or Liquidation Proceeding*" shall mean, with respect to any person, any (a) insolvency, bankruptcy, receivership, reorganization, readjustment, composition or other similar proceeding relating to such person or its property or creditors in such capacity, (b) proceeding for any liquidation, dissolution or other winding up of such person, voluntary or involuntary, whether or not involving insolvency or proceedings under the Bankruptcy Code, whether partial or complete and whether by operation of law or otherwise, (c) assignment for the benefit of creditors of such person or (d) other marshalling of the assets of such person.

"*Investment Grade Rating*" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other Rating Agency.

"*Investment Grade Securities*" means:

(1)  securities issued or directly and fully guaranteed or insured by the U.S. government or any agency or instrumentality thereof (other than Cash Equivalents),

(2)  securities that have a rating equal to or higher than Baa3 (or equivalent) by Moody's and BBB- (or equivalent) by S&P, but excluding any debt securities or loans or advances between and among the Company and its Subsidiaries,

(3)  investments in any fund that invests exclusively in investments of the type described in clauses (1) and (2) which fund may also hold immaterial amounts of cash pending investment and/or distribution, and

(4)  corresponding instruments in countries other than the United States customarily utilized for high quality investments and in each case with maturities not exceeding two years from the date of acquisition.

"*Investments*" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees (other than guarantees of performance made by the Company or any of its Restricted Subsidiaries in connection with a Joint Venture)), advances or capital contributions (excluding accounts receivable, trade credit and advances to customers and commission, travel and similar advances to officers, employees and consultants made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet of the Company in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property. For purposes of the definition of "Unrestricted Subsidiary" and the covenant described under "—Certain Covenants—Limitation on Restricted Payments":

(1)  "Investments" shall include the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of a Subsidiary of the Company at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided*, *however*, that, upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Company shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary equal to an amount (if positive) equal to:

(a)  the Company's "Investment" in such Subsidiary at the time of such redesignation less

(b)  the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of such Subsidiary at the time of such redesignation; and

(2)  any property transferred to or from an Unrestricted Subsidiary shall be valued at its Fair Market Value at the time of such transfer, in each case as determined in good faith by the Board of Directors of the Company.

"*Issue Date*" means [  ], 2010.

"*Issuer*" means Lyondell Chemical Company, a Delaware corporation, and any successor thereto in accordance with the Indenture.

"*Joint Venture*" means any joint venture entity, whether a company, unincorporated firm, association, partnership or any other entity which, in each case, is not a Subsidiary of the Company or any of its Restricted Subsidiaries but in which the Company or a Restricted Subsidiary has a direct or indirect equity or similar interest.

"*Junior Lien Intercreditor Agreement*" has the meaning ascribed to such term under "—Security—Junior Lien Intercreditor Agreement."

"*Junior Lien Obligations*" means (i) the Notes, (ii) the Notes Obligations and the Obligations in respect of any refunding, refinancing or defeasance of the Notes, (iii) the 2014 Notes, (iv) the Obligations in respect of the 2014 Notes and the Obligations in respect of any refunding, refinancing or defeasance of the 2014 Notes and (v) Additional Junior Lien Obligations.

"*Lien*" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or similar encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law (including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest); *provided* that in no event shall an operating lease, rights of set-off or netting arrangements in the ordinary course of business be deemed to constitute a Lien.

"*Limited Recourse Stock Pledge*" means the pledge of the Equity Interests in any Joint Venture (that is not a Restricted Subsidiary) or any Unrestricted Subsidiary to secure non-recourse debt of such Joint Venture or Unrestricted Subsidiary, which pledge is made by a Restricted Subsidiary of the Company, the activities of which are limited to making and managing Investments, and owning Equity Interests, in such Joint Venture or Unrestricted Subsidiary, but only for so long as its activities are so limited.

"*Master Agreement*" has the meaning ascribed to such term in the definition of "Hedging Obligations"

"*Moody's*" means Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

"*Mortgaged Property*" means each parcel of Real Property owned or leased by the Company, the Issuer or any Pledgor encumbered by a Mortgage to secure the First Priority Lien Obligations, Second Priority Lien Obligations and Notes Obligations.

"*Mortgages*" means, collectively, the mortgages, trust deeds, deeds of trust, deeds to secure debt, assignments of leases and rents, and other security documents delivered with respect to Mortgaged Properties, as amended, supplemented, modified, extended, restructured, renewed, restated or replaced in whole or in part from time to time.

"*Negromex Receivables Dispositions*" means any disposition of accounts receivables arising from transactions with Industrias Negromex, S.A. de C.V.

"*Net Income*" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"*Net Proceeds*" means the aggregate cash proceeds received by the Company or any of its Restricted Subsidiaries in respect of any Asset Sale (including, without limitation, any cash received in respect of or upon the sale or other disposition of any Designated Non-cash Consideration received in any Asset Sale and any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise, but only as and when received, but excluding the assumption by the acquiring Person of Indebtedness relating to the disposed assets or other consideration received in any other non-cash form), net of the direct costs relating to such Asset Sale and the sale or disposition of such Designated Non-cash Consideration (including, without limitation, legal, accounting and investment banking fees, and brokerage and sales commissions), and any relocation expenses Incurred as a result thereof, taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements related thereto), amounts required to be applied to the repayment of principal, premium (if any) and interest on Indebtedness required (other than pursuant to the second paragraph of the covenant described under "—Certain Covenants—Asset Sales") to be paid as a result of such transaction, and any deduction of appropriate amounts to be provided by the Company as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by the Company after such sale or other disposition thereof, including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction.

"*Notes Collateral*" has the meaning ascribed to such term under "—Security—General."

"*Notes Obligations*" means Obligations in respect of the Notes, the Indenture and the Security Documents, including, for the avoidance of doubt, Obligations in respect of exchange notes and guarantees thereof.

"*Obligations*" means any principal, interest, penalties, fees, indemnifications, reimbursements (including, without limitation, reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other liabilities payable under the documentation governing any Indebtedness; *provided* that Obligations with respect to the Notes shall not include fees or indemnifications in favor of the Trustee and other third parties other than the holders of the Notes.

"*Offering Memorandum*" means the offering memorandum dated as of March 24, 2010, relating to the initial issuance of First Lien Notes under the First Lien Indenture.

"*Officer*" means the Chairman of the Board, Chief Executive Officer, Chief Financial Officer, President, any Executive Vice President, Senior Vice President or Vice President, the Treasurer or the Secretary of any Person.

"*Officer's Certificate*" means a certificate signed on behalf of any Person by an Officer of such Person, who must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of such Person, which meets the requirements set forth in the Indenture.

"*Oil Indexed Credit Facility*" means a working capital facility for which availability is conditioned upon the price per barrel of crude oil that is not less than $125.0 and the proceeds of which are utilized for working capital purposes and related fees and expenses; *provided* that the First Lien Notes and any other First Priority Lien Obligations are secured by a Lien ranking at least *pari passu* with any Lien on assets securing any Oil Indexed Credit Facility and the collateral agent under any Oil Indexed Credit Facility shall have been made party to the First Lien Intercreditor Agreement and any Oil Indexed Credit Facility shall be subject to the terms thereof.

"*Opinion of Counsel*" means a written opinion from legal counsel who is reasonably acceptable to the Trustee. The counsel may be an employee of or counsel to the Company or the Issuer or to the Trustee.

"*Other First-Lien Obligations*" means other Indebtedness of the Company and its Restricted Subsidiaries that is equally and ratably secured with the First Lien Notes as permitted by the First Lien Indenture and is designated by the Company as an Other First-Lien Obligation.

"*Owned Real Property*" means each parcel of Real Property that is owned in fee by the Company, the Issuer or any Pledgor that has an individual Fair Market Value of more than $25.0 million (*provided* that such $25.0 million threshold shall not be applicable in the case of any Real Property that is integrally related to the ownership or operation of a Mortgaged Property or otherwise necessary for such Mortgaged Property to be in compliance with all requirements of law applicable to such Mortgaged Property); *provided* that, with respect to any Real Property that is partially owned in fee and partially leased by the Company, the Issuer or any Pledgor, Owned Real Property will include only that portion of such Real Property that is owned in fee and only if (i) such portion that is owned in fee has an individual Fair Market Value of more than $25.0 million (*provided* that such $25.0 million threshold shall not be applicable in the case of Real Property that is integrally related to the ownership or operation of a Mortgaged Property or otherwise necessary for such Mortgaged Property to be in compliance with all requirements of law applicable to such Mortgaged Property) and (ii) a mortgage in favor of the Collateral Agent (for the benefit of the trustee and the holders of the Notes) is permitted on such portion of Real Property owned in fee by applicable law and by the terms of any lease or other applicable document governing any leased portion of such Real Property.

"*Pari Passu Indebtedness*" means:

(1)  with respect to the Issuer, the Notes and any Indebtedness which ranks *pari passu* in right of payment to the Notes; and

(2)  with respect to any Pledgor, its Obligations in respect of the Notes and any Indebtedness which ranks *pari passu* in right of payment to such Pledgor's Obligations in respect of the Guarantees of the Notes.

"*Paying Agent*" means any Person authorized by the Issuer to pay the principal of or interest on any Notes on behalf of the Issuer. Deutsche Bank Trust Company Americas shall initially be the Paying Agent on the Issue Date.

"*Payor*" has the meaning ascribed to such term under "—The Guarantees—Additional Amounts."

"*PBGC Settlement*" means the settlement agreement between the Issuer and the Pension Benefit Guaranty Corporation (or any successor in interest thereto) as amended, supplemented, modified, extended, restructured, renewed, restated or replaced in whole or in part from time to time.

"*Permitted Holder Group*" has the meaning ascribed to such term in the definition of "Permitted Holders."

"*Permitted Holders*" means, at any time, each of (i) the Sponsor, (ii) any Person that has no material assets other than the Capital Stock of the Company and, directly or indirectly, holds or acquires 100% of the total voting power of the Voting Stock of the Company, and of which no other Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision), other than any of the other Permitted Holders specified in clause (i) above, holds more than 50% of the total voting power of the Voting Stock thereof and (iii) any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision) the members of which include any of the Permitted Holders specified in clause (i) above and that, directly or indirectly, holds or acquires beneficial ownership of the Voting Stock of the Company (a "*Permitted Holder Group*"), so long as (1) each member of the Permitted Holder Group has sole voting rights proportional to the percentage of ownership interests held or acquired by such member relative to the other members of the Permitted Holder Group with respect to voting in the election of Directors of the Company or any of its Subsidiaries generally and (2) no Person or other group (other than Permitted Holders specified in clause (i) above) beneficially owns more than 50% on a fully diluted basis of the Voting Stock held by the Permitted Holder Group. Any Person or group whose acquisition of beneficial ownership constitutes a Change of Control in respect of which a Change of Control Offer is made in accordance with the requirements of the Indenture will thereafter, together with its Affiliates, constitute an additional Permitted Holder.

"*Permitted Investments*" means:

(1)  any Investment in the Company or any Restricted Subsidiary;

(2)  any Investment in Cash Equivalents;

(3)  any Investment by the Company or any Restricted Subsidiary of the Company in a Person if as a result of such Investment (a) such Person becomes a Restricted Subsidiary of the Company, or (b) such Person, in one transaction or a series of related transactions, is merged, consolidated or amalgamated with or into, or transfers or conveys all or substantially all of its assets to, or is liquidated into, the Company or a Restricted Subsidiary of the Company;

(4)  any Investment in securities or other assets not constituting Cash Equivalents and received in connection with an Asset Sale made pursuant to the provisions of "—Certain Covenants—Asset Sales" or any other disposition of assets not constituting an Asset Sale;

(5)  any Investment existing on, or made pursuant to binding commitments existing on, the Issue Date or an Investment consisting of any extension, modification or renewal of any Investment existing on the Issue Date; *provided* that the amount of any such Investment may be increased (x) as required by the terms of such Investment as in existence on the Issue Date or (y) as otherwise permitted under the Indenture;

(6)  loans and advances to officers, directors or employees (a) for business-related travel expenses, moving expenses and other similar expenses, including as part of a recruitment or retention plan, in each case Incurred in the ordinary course of business or consistent with past practice or to fund such Person's purchase of Equity Interests of the Company or any direct or indirect parent entity of the Company, (b) required by applicable employment laws loans and (c) other loans and advances not to exceed $25.0 million at any one time outstanding;

(7)  any Investment acquired by the Company or any of its Restricted Subsidiaries (a) in exchange for any other Investment or accounts receivable held by the Company or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable, or (b) as a result of a foreclosure by the Company or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(8)  Hedging Obligations permitted under clause (k) of the second paragraph of the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

(9)  any Investment by the Company or any of its Restricted Subsidiaries in a Similar Business or in Joint Ventures having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (9) that are at that time outstanding, not to exceed the greater of (x) $1,000.0 million and (y) 4.50% of the Consolidated Net Tangible Assets of the Company at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value) plus 100% of the aggregate amount received by the Company or any Restricted Subsidiary in cash and the Fair Market Value of property other than cash received by the Company or any Restricted Subsidiary with respect to any Investment made pursuant to this clause (9); *provided*, *however*, that if any Investment pursuant to this clause (9) is made in any Person that is not a Restricted Subsidiary of the Company at the date of the making of such Investment and such Person becomes a Restricted Subsidiary of the Company after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (9) for so long as such Person continues to be a Restricted Subsidiary;

(10) additional Investments by the Company or any of its Restricted Subsidiaries having an aggregate Fair Market, taken together with all other Investments made pursuant to this clause (10) that are at that time outstanding, not to exceed the greater of (x) $350.0 million and (y) 1.50% of the Consolidated Net Tangible Assets of the Company at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value), plus 100% of the aggregate amount received by the Company or any Restricted Subsidiary in cash and the Fair Market Value (as determined in good faith by the Company) of property other than cash received by the Company or any Restricted Subsidiary with respect to any Investment made pursuant to this clause (10); *provided*, *however*, that if any Investment pursuant to this clause (10) is made in any Person that is not a Restricted Subsidiary of the Company at the date of the making of such Investment and such Person becomes a Restricted Subsidiary of the Company after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (10) for so long as such Person continues to be a Restricted Subsidiary;

(11) Investments the payment for which consists of Equity Interests of the Company (other than Disqualified Stock) or any direct or indirect parent of the Company, as applicable; *provided*, *however*, that such Equity Interests will not increase the amount available for Restricted Payments under clause (4)(c)(ii) or (iii) under "—Certain Covenants—Limitation on Restricted Payments";

(12) Investments consisting of the licensing or contribution of intellectual property pursuant to joint marketing arrangements with other Persons;

(13) Investments consisting of or to finance purchases and acquisitions of inventory, supplies, materials, services or equipment or purchases of contract rights or licenses or leases of intellectual property;

(14) any Investment in connection with a Qualified Receivables Financing, including Investments in a Receivables Subsidiary, of funds held in accounts permitted or required by the arrangements governing such Qualified Receivables Financing or any related Indebtedness and, to the extent constituting an Investment, the acquisition of accounts receivable that have been sold, transferred or otherwise disposed of in a Receivables Financing, including the repurchase of accounts receivable by the Company or any of its Subsidiaries or other payment obligations of the Company or any Restricted Subsidiary of the Company pursuant to Standard Securitization Undertakings;

(15) any Investment in an entity or purchase of a business or assets in each case owned (or previously owned) by a customer of a Restricted Subsidiary as a condition to or in connection with such customer (or any member of such customer's group) contracting with a Restricted Subsidiary, in each case in the ordinary course of business;

(16)  Investments of a Restricted Subsidiary of the Company acquired after the Issue Date or of an entity merged into, amalgamated with, or consolidated with the Company or a Restricted Subsidiary of the Company in a transaction that is not prohibited by the covenant described under "—Merger, Amalgamation, Consolidation or Sale of All or Substantially All Assets" after the Issue Date to the extent that such Investments were not made in contemplation of such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(17) any Investment in any Subsidiary of the Company or any Joint Venture in connection with intercompany cash management arrangements or related activities arising in the ordinary course of business;

(18) Investments through the licensing contribution in a Person that is or will be as a result of such Investment a Joint Venture or Investments through the licensing, contribution or transactions that economically result in a contribution in kind of intellectual property pursuant to Joint Venture arrangements, in each case in the ordinary course of business;

(19) purchase of shares of Royal Dutch Shell plc and BASF AG required to satisfy Basell B.V.'s obligations under its stock option plans as such plans and stock appreciation rights were in effect on the Issue Date;

(20) a transaction to the extent constituting an Investment that is permitted by and made in accordance with clauses (12) and (13) under "—Certain Covenants—Limitation on Restricted Payments";

(21) any Investment in connection with a Structured Financing Transaction;

(22) a transaction to the extent constituting an Investment that is permitted by and made in accordance with clause (38) of the definition of "Permitted Liens";

(23) any transaction to the extent it constitutes an Investment that is permitted by and made in accordance with the provisions of the second paragraph of the covenant described under "—Certain Covenants—Transactions with Affiliates" (except transactions described in clauses (2), (4), (5), (9)(b), (15) and (19) of such paragraph); and

(24) any Qualified Joint Venture Transaction.

"*Permitted Liens*" means, with respect to any Person:

(1) pledges or deposits by such Person under workers' compensation laws, unemployment insurance laws or similar legislation, or good faith pledges or deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case Incurred in the ordinary course of business;

(2) Liens imposed by law, such as carriers', warehousemen's and mechanics' Liens, in each case for sums not yet due or being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review;

(3) Liens for taxes, assessments or other governmental charges not yet due or payable or subject to penalties for nonpayment or which are being contested in good faith by appropriate proceedings;

(4) Liens in favor of issuers of performance bonds, surety bonds, bid bonds, letters of credit or similar instruments issued pursuant to the request of and for the account of such Person in the ordinary course of its business or with respect to statutory, regulatory, contractual, or warranty requirements;

(5) minor survey exceptions, minor encumbrances, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not Incurred in connection with Indebtedness and which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(6) (A) Liens on assets of a Restricted Subsidiary that is not a Guarantor securing Indebtedness of such Restricted Subsidiary permitted to be Incurred pursuant to the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; (B) Liens securing First Priority Lien Obligations in an aggregate principal amount not to exceed the greater of (x) the aggregate principal amount of Indebtedness permitted to be Incurred pursuant to clauses (a), (c)(i) and (c)(iii) of the second paragraph of the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and (y) the maximum principal amount of Indebtedness that, as of the date such Indebtedness was Incurred, and after giving effect to the Incurrence of such Indebtedness and the application of proceeds therefrom on such date, would not cause the Secured Indebtedness Leverage Ratio of the Company to exceed 2.25 to 1.00; (C) Liens securing Indebtedness permitted to be Incurred pursuant to clause (c)(ii), (e)(i) or (e)(ii), (m), (u) or (y) of the second paragraph of the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" (*provided* that (1) in the case of clause (c)(ii) any Lien on Notes Collateral securing Indebtedness under the ABL Facility, or any refinancing or replacement thereof, must be expressly subject to the terms of the Junior Lien Intercreditor Agreement, (2) in the case of clause (e)(i), such Lien extends only to the assets and/or Capital Stock, the acquisition, lease, construction, repair, replacement or improvement of which is financed thereby and any proceeds or products thereof, (3) in the case of clause (u), such Lien does not extend to the property or assets of any Subsidiary of the Company other than a Foreign Subsidiary, (4) in the case of clause (e)(ii) such Lien applies solely to acquired property or asset of the acquired entity, as the case may be) and (5) in the case of clause (y), such Lien does not extend to the property or assets of the Company or any Restricted Subsidiary of the Company organized under the laws of any jurisdiction other than Australia) and (D) Liens securing the First Lien Notes Obligations;

(7) Liens existing on the Issue Date (other than Liens in favor of the lenders under the Senior Term Loan Facility and under the ABL Facility);

(8) Liens on assets, property or shares of stock of a Person at the time such Person becomes a Subsidiary; *provided*, *however*, that such Liens are not created or Incurred in connection with, or in contemplation of, such other Person becoming such

a Subsidiary; *provided*, *further*, that such Liens may not extend to any other property owned by the Company or any Restricted Subsidiary of the Company;

(9)  Liens on assets or property at the time the Company or a Restricted Subsidiary acquired the assets or property, including any acquisition by means of a merger, amalgamation or consolidation with or into the Company or any Restricted Subsidiary; *provided* that such Liens are not created or Incurred in connection with, or in contemplation of, such acquisition; *provided*, *further*, however, that the Liens may not extend to any other property owned by the Company or any Restricted Subsidiary;

(10) Liens securing Indebtedness or other obligations of a Restricted Subsidiary owing to the Company or another Restricted Subsidiary permitted to be Incurred in accordance with the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

(11) Liens securing Hedging Obligations not Incurred in violation of the Indenture; *provided* that, with respect to Hedging Obligations relating to Indebtedness, such Lien extends only to the property securing such Indebtedness;

(12) Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances, tender, bid, judgment, appeal, performance or governmental contract bonds and completion guarantees, surety, standby letters of credit and warranty and contractual service obligations of a like nature, trade letters of credit and documentary letters of credit and similar bonds or guarantees provided by the Company or any Subsidiary of the Company;

(13) leases and subleases of real property which do not materially interfere with the ordinary conduct of the business of the Company or any of its Restricted Subsidiaries;

(14) Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Company and its Restricted Subsidiaries in the ordinary course of business or other precautionary Uniform Commercial Code financing statement filings;

(15) Liens in favor of the Company, the Issuer or any Guarantor;

(16) Liens on accounts receivable and related assets of the type specified in the definition of "Receivables Financing" Incurred in connection with a Qualified Receivables Financing to the extent permitted by the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock";

(17) Liens securing insurance premium financing arrangements; *provided*, *however*, that such Lien is limited to the applicable insurance carriers;

(18) Liens on the Equity Interests of Unrestricted Subsidiaries;

(19) leases, licenses, subleases or sublicenses granted to others in the ordinary course of business;

(20) Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancings, refundings, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in the foregoing clauses (6), (7), (8), (9), (10), (11) and (15); *provided*, *however*, that (x) such new Lien shall be limited to all or part of the same property that secured the original Lien (plus improvements on such property), (y) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (A) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under clauses (6), (7), (8), (9), (10), (11) and (15) at the time the original Lien became a Permitted Lien under the Indenture, and (B) an amount necessary to pay any fees and expenses, including premiums (including tender premiums) and original issue discount, related to such refinancing, refunding, extension, renewal or replacement and (z) Junior Lien Obligations shall not be refinanced with First Priority Lien Obligations; *provided*, *further*, however, that in the case of any Liens to secure any refinancing, refunding, extension or renewal of Indebtedness secured by a Lien referred to in clause (6)(B) or (C), the principal amount of any Indebtedness Incurred for such refinancing, refunding, extension or renewal shall be deemed secured by a Lien under clause (6)(B) or (C) and not this clause (20) for purposes of determining the principal amount of Indebtedness outstanding under clause (6)(B) or (C) and for purposes of the definition of Secured Credit Facility Indebtedness;

(21) Liens on equipment of the Company or any Restricted Subsidiary granted in the ordinary course of business to the Company's or such Restricted Subsidiary's client at which such equipment is located;

(22) judgment and attachment Liens not giving rise to an Event of Default and notices of lis pendens and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made;

(23) Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business;

(24) Liens Incurred to secure cash management services or to implement cash pooling arrangements in the ordinary course of business;

(25) other Liens on assets not constituting Notes Collateral securing Obligations that do not exceed $75.0 million in aggregate at any time;

(26) any encumbrance or restriction (including put and call arrangements) with respect to Capital Stock of any Joint Venture or similar arrangement pursuant to any Joint Venture or similar agreement;

(27) any amounts held by a trustee in the funds and accounts under an indenture securing any revenue bonds issued for the benefit of the Company or any Restricted Subsidiary;

(28) Liens arising by virtue of any statutory or common law provisions relating to banker's Liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a depository or financial institution;

(29) Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts Incurred in the ordinary course of business and (iii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(30) Liens solely on any cash earnest money deposits made by the Company or any of its Restricted Subsidiaries in connection with any letter of intent or purchase agreement permitted under this Indenture;

(31) any netting or set-off arrangements entered into by the Company or any Restricted Subsidiary of the Company in the ordinary course of its banking arrangements (including, for the avoidance of doubt, cash pooling arrangements) for the purposes of netting debit and credit balances of the Company or any Restricted Subsidiary of the Company, including pursuant to any Treasury Services Agreement;

(32) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(33) Liens deemed to exist in connection with Investments in repurchase agreements permitted under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"; *provided* that such Liens do not extend to any assets other than those that are the subject of such repurchase agreements;

(34) Liens (i) on cash advances in favor of the seller of any property to be acquired in or monies placed in escrow pursuant to an Investment permitted pursuant to the definition of "Permitted Investments" to be applied against the purchase price for such Investment, (ii) over assets being acquired pursuant to Investments permitted pursuant to the definition of "Permitted Investments" pending payment in full of the purchase price, (iii) consisting of an agreement to dispose of any property in a disposition permitted pursuant to the definition of "Asset Sale" and (iv) consisting of intellectual property licenses permitted by clause (18) of the definition of "Permitted Investments";

(35) Liens arising by reason of deposits necessary to qualify the Company or any other Restricted Subsidiary of the Company to conduct business, maintain self insurance or comply with any law and Liens securing the PBGC Settlement;

(36) any Lien arising as a result of a sale, transfer or other disposal which is an Asset Sale in compliance with "—Certain Covenants—Asset Sales";

(37) Liens relating to a Catalyst Sale/Leaseback Transaction;

(38) Liens relating to any Limited Recourse Stock Pledge;

(39) Liens relating to any Treasury Services Agreement, Qualified Joint Venture Transaction or Structured Financing Transaction;

(40) Liens securing (i) the Notes and the Notes Obligations, (ii) the 2014 Notes and the Obligations in respect of the 2014 Notes, and (iii) any refinancing, refunding, extension, renewal or replacement (or successive refinancings, refundings, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in the foregoing subclauses (i) and (ii); and

(41) Liens that are junior in priority to the Liens securing the Notes pursuant to a Third Lien Intercreditor Agreement.

"*Person*" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"*Pledgor*" means any Guarantor other than the Company; *provided* that upon the release or discharge of such Subsidiary from its Obligations to pledge its assets and property to secure the Notes in accordance with the Indenture or the Security Documents, such Subsidiary ceases to be a Pledgor.

"*Preferred Stock*" means any Equity Interest with preferential right of payment of dividends or upon liquidation, dissolution, or winding up.

"*Primary Offering*" means an Equity Offering on any investment exchange or any other sale or issue by way of flotation or public offering or any equivalent circumstances with aggregate net cash proceeds to the Company or contributed to the Company of at least $500.0 million.

"*Project Financings*" means, with respect to any project, the Incurrence of Indebtedness relating to the development, expansion, renovation, upgrade or other modification or construction of such project pursuant to which the providers of such Indebtedness or any trustee or other intermediary on their behalf or beneficiaries designated by any such provider, trustee or other intermediary are granted security over one or more assets relating to such project for repayment of principal, premium and interest or any other amount in respect of such Indebtedness, including Indebtedness to finance working capital requirements with respect to any project; *provided* that any working capital financing shall not be secured by any assets or property included in calculating the Borrowing Base for purposes of clause (c)(ii) of the second paragraph of the covenant "—Certain Covenants —Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock".

"*Qualified Joint Venture Transaction*" means any transaction (i) in which Indebtedness is owed or incurred by any Restricted Subsidiary whose activities are limited to holding shares in Joint Ventures (but only to the extent that (a) the creditors under the relevant agreement have no recourse to the Company other than to such Restricted Subsidiary; and (b) the recourse those creditors have to such Restricted Subsidiary is limited to the proceeds (if any) of dividends received by such Restricted Subsidiary in respect of such Restricted Subsidiary's investment in such Joint Ventures) or (ii) involving guarantees by the Company or any Restricted Subsidiary of Indebtedness of a customer or a third party guarantor of such customer's Indebtedness that are made to a governmental export credit agency, a state development bank or like governmental agency or organization to the extent that such guarantees are conditioned on a failure to perform by any of the Company, such Restricted Subsidiary or a joint venture under an engineering procurement or construction contract entered into with such customer or third party guarantor; *provided* that the aggregate amount of any Indebtedness referenced in this clause (ii) shall not at any time exceed 1.0% of Consolidated Net Tangible Assets of the Company.

"*Qualified Non-Recourse Debt*" means Indebtedness that (1) is (a) Incurred by a Qualified Non-Recourse Subsidiary to finance (whether prior to or within 270 days after) the acquisition, lease, construction, repair, replacement or improvement of any property (real or personal) or equipment (whether through the direct purchase of property or the Equity Interests of any person owning such property and whether in a single acquisition or a series of related acquisitions) or (b) assumed by a Qualified Non-Recourse Subsidiary, (2) is non-recourse to the Company, the Issuer and any Pledgor and (3) is non-recourse to any Restricted Subsidiary that is not a Qualified Non-Recourse Subsidiary.

"*Qualified Non-Recourse Subsidiary*" means (1) a Restricted Subsidiary that is not a Pledgor and that is formed or created after the Issue Date in order to finance an acquisition, lease, construction, repair, replacement or improvement of any property or equipment (directly or through one of its Subsidiaries) that secures Qualified Non-Recourse Debt and (2) any Restricted Subsidiary of a Qualified Non-Recourse Subsidiary.

"*Qualified Receivables Financing*" means any Receivables Financing that meets the following conditions (including, without limitation, the Euro Securitization, the Berre Facility and the Negromex Receivables Dispositions):

(1)  the Board of Directors of the Company shall have determined in good faith that such Qualified Receivables Financing (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Company and its Restricted Subsidiaries;

(2)  all sales of accounts receivable and related assets are made at Fair Market Value; and

(3)  the financing terms, covenants, termination events and other provisions thereof shall be market terms (as determined in good faith by the Company) and may include Standard Securitization Undertakings.

The grant of a security interest in any accounts receivable of the Company or any of its Restricted Subsidiaries to secure the ABL Facility, any Credit Facility Indebtedness or any Indebtedness in respect of the Notes shall not be deemed a Qualified Receivables Financing.

"*Rating Agency*" means (1) S&P, (2) Moody's, or (3) if either or both of S&P and Moody's shall not then exist, a nationally recognized securities rating agency or agencies, as the case may be, selected by the Company, which shall be substituted for S&P or Moody's or both, as the case may be.

"*Real Property*" means, collectively, all right, title and interests (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all buildings, structures, parking areas and improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"*Receivables Fees*" means distributions or payments made directly or by means of discounts with respect to any participation interests issued or sold in connection with, and all other fees paid to a Person that is not a Restricted Subsidiary in connection with, any Receivables Financing.

"*Receivables Financing*" means any transaction or series of transactions that may be entered into by the Company or any of its Subsidiaries pursuant to which the Company or any of its Subsidiaries may sell, convey or otherwise transfer to any other Person, including to a Receivables Subsidiary, or may grant a security interest in, bank accounts, any accounts receivable (whether now existing or arising in the future) of the Company or any of its Subsidiaries, and any assets related thereto including, without limitation, all collateral securing such accounts receivable, all contracts and all guarantees or other obligations in respect of such accounts receivable, proceeds of such accounts receivable and other assets which are customarily transferred or in respect of which security interests are customarily granted in connection with asset securitization transactions involving accounts receivable and any Hedging Obligations entered into by the Company or any such Subsidiary in connection with such accounts receivable.

"*Receivables Repurchase Obligation*" means any Obligation of a seller of receivables in a Qualified Receivables Financing to repurchase receivables arising as a result of a breach of a representation, warranty or covenant or otherwise, including as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, off-set or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

"*Receivables Subsidiary*" means a Wholly Owned Restricted Subsidiary of the Company (or another Person formed for the purposes of engaging in Receivables Financing with the Company in which the Company or any Subsidiary of the Company makes an Investment and to which the Company or any Subsidiary of the Company transfers accounts receivable and related assets) which engages in no activities other than in connection with the financing of accounts receivable of the Company and its Subsidiaries, all proceeds thereof and all rights (contractual or other), collateral and other assets relating thereto, and any business or activities incidental or related to such business, and which is designated by the Board of Directors of the Company (as provided below) as a Receivables Subsidiary and:

(a)  no portion of the Indebtedness or any other Obligations (contingent or otherwise) of which (i) is guaranteed by the Company or any other Subsidiary of the Company (excluding guarantees of Obligations (other than the principal of and interest on, Indebtedness) pursuant to Standard Securitization Undertakings), (ii) is recourse to or obligates the Company or any other Subsidiary of the Company in any way other than pursuant to Standard Securitization Undertakings, or (iii) subjects any property or asset of the Company or any other Subsidiary of the Company, directly or indirectly, contingently or otherwise, to the satisfaction thereof, other than pursuant to Standard Securitization Undertakings;

(b)  with which neither the Company nor any other Subsidiary of the Company has any material contract, agreement, arrangement or understanding other than on terms which the Company reasonably believes to be no less favorable to the Company or such Subsidiary than those that might be obtained at the time from Persons that are not Affiliates of the Company; and

(c)  to which neither the Company nor any other Subsidiary of the Company has any obligation to maintain or preserve such entity's financial condition or cause such entity to achieve certain levels of operating results.

Any such designation by the Board of Directors of the Company shall be evidenced to the Trustee by filing with the Trustee a certified copy of the resolution of the Board of Directors of the Company giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing conditions.

"*Refinancing Indebtedness*" has the meaning ascribed to such term under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock."

"*Refunding Capital Stock*" has the meaning ascribed to such term under "—Certain Covenants—Limitation on Restricted Payments."

"*Registration Rights Agreement*" means the registration rights agreement, to be dated the date of the indenture, relating to the Notes.

"*Relevant Taxing Jurisdiction*" has the meaning ascribed to such term under "—The Guarantees—Additional Amounts."

"*Reorganization Plan*" means a plan of reorganization in any of the Cases.

"*Restricted Cash*" means cash and Cash Equivalents held by Restricted Subsidiaries that is contractually restricted from being distributed to the Company, except for such cash and Cash Equivalents subject only to such restrictions that are contained in agreements governing Indebtedness permitted under the Indenture and that is secured by such cash or Cash Equivalents.

"*Restricted Investment*" means an Investment other than a Permitted Investment.

"*Restricted Payment*" has the meaning ascribed to such term under "—Certain Covenants—Limitation on Restricted Payments."

"*Restricted Subsidiary*" means, with respect to any Person, any Subsidiary of such Person other than an Unrestricted Subsidiary of such Person. Unless otherwise indicated in this "Description of Third Lien Notes," all references to Restricted Subsidiaries shall mean Restricted Subsidiaries of the Company. For the avoidance of doubt, the Issuer shall at all times constitute a Restricted Subsidiary.

"*Retired Capital Stock*" has the meaning ascribed to such term under "—Certain Covenants—Limitation on Restricted Payments."

"*Reversion Date*" has the meaning ascribed to such term under "—Certain Covenants."

"*S&P*" means Standard & Poor's Ratings Group or any successor to the rating agency business thereof.

"*Sale/Leaseback Transaction*" means an arrangement relating to property now owned or hereafter acquired by the Company or a Restricted Subsidiary whereby the Company or a Restricted Subsidiary transfers such property to a Person and the Company or such Restricted Subsidiary leases it from such Person, other than leases between the Company and a Restricted Subsidiary of the Company or between Restricted Subsidiaries of the Company.

"*SEC*" means the Securities and Exchange Commission or any successor agency or commission.

"*Second Commitment*" has the meaning ascribed to such term under "—Certain Covenants—Asset Sales."

"*Second Lien Documents*" means the credit, guarantee and security documents governing the Second Priority Lien Obligations, including, without limitation, the ABL Facility and the Second Lien Security Documents.

"*Second Lien Secured Parties*" means (a) the "Secured Parties," as defined in the ABL Facility and (b) any Additional Second Lien Secured Parties.

"*Second Lien Security Documents*" means the Security Documents and any other agreement, document or instrument pursuant to which a Lien is granted or purported to be granted securing Second Priority Lien Obligations or under which rights or remedies with respect to such Liens are governed, in each case to the extent relating to the collateral securing the Second Priority Lien Obligations.

"*Second Priority After-Acquired Property*" means any property of the Company, the Issuer or any Pledgor that constitutes ABL Collateral (other than Excluded Assets).

"*Second Priority Lien Obligations*" means (i) all Indebtedness under the Asset Backed Credit Facility and any other Credit Facility Incurred pursuant to clause (c)(ii) of the second paragraph of the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock" and (ii) Additional Second Priority Lien Obligations.

"*Secured Credit Facility Indebtedness*" means any Credit Facility Indebtedness that is secured by a Permitted Lien Incurred or deemed Incurred pursuant to clause (6)(B) of the definition of Permitted Lien.

"*Secured Indebtedness*" means any Indebtedness secured by a Lien.

"*Secured Indebtedness Leverage Ratio*" means, with respect to any Person, at any date the ratio of (i) Secured Indebtedness constituting First Priority Lien Obligations of such Person and its Restricted Subsidiaries as of such date of calculation (determined on a consolidated basis in accordance with GAAP) to (ii) Consolidated EBITDA of such Person for the four full fiscal quarters for which internal financial statements are available immediately preceding such date of calculation. In the event that the Company or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness subsequent to the commencement of the period for which the Secured Indebtedness Leverage Ratio is being calculated but prior to the event for which the calculation of the Secured Indebtedness Leverage Ratio is made (the "*Secured Leverage Calculation Date*"), then the Secured Indebtedness Leverage Ratio shall be calculated giving *pro forma* effect to such Incurrence, repayment, repurchase or redemption of Indebtedness as if the same had occurred at the beginning of the applicable four-quarter period; *provided* that the Issuer may elect pursuant to an Officer's Certificate delivered to the Trustee to treat all or any portion of the commitment under any Indebtedness as being Incurred at such time, in which

case any subsequent Incurrence of Indebtedness under such commitment shall not be deemed, for purposes of this calculation, to be an Incurrence at such subsequent time.

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, amalgamations, consolidations and discontinued operations (as determined in accordance with GAAP), in each case with respect to an operating unit of a business, and any operational changes that the Company or any of its Restricted Subsidiaries has determined to make and/or made during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Secured Leverage Calculation Date shall be calculated on a *pro forma* basis assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations, discontinued operations and other operational changes (and the change of any associated Indebtedness and the change in Consolidated EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation, amalgamation, discontinued operation or operational change, in each case with respect to an operating unit of a business, that would have required adjustment pursuant to this definition, then the Secured Indebtedness Leverage Ratio shall be calculated giving *pro forma* effect thereto for such period as if such Investment, acquisition, disposition, discontinued operation, merger, amalgamation, consolidation or operational change had occurred at the beginning of the applicable four-quarter period.

For purposes of this definition, whenever *pro forma* effect is to be given to any event, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of the Company. Any such *pro forma* calculation may include adjustments appropriate, in the reasonable good faith determination of the Company as set forth in an Officer's Certificate, to reflect (1) operating expense reductions and other operating improvements or synergies reasonably expected to result from the applicable event and (2) all adjustments of the nature set forth as "Restructuring Adjustments" under "Unaudited Consolidated Pro Forma Financial Information" in this Offering Memorandum to the extent such adjustments, without duplication, continue to be applicable to such four-quarter period.

For the purposes of this definition, any amount in a currency other than U.S. Dollars will be converted to U.S. Dollars based on the average exchange rate for such currency for the most recent twelve-month period immediately prior to the date of determination or if any such Indebtedness is subject to a Currency Agreement with respect to the currency in which such Indebtedness is denominated covering principal, premium, if any, and interest on such Indebtedness, the amount of such Indebtedness and such interest and premium, if any, shall be determined after giving effect to all payments in respect thereof under such Currency Agreement.

"*Secured Leverage Calculation Date*" has the meaning ascribed to such term in the definition of "Secured Indebtedness Leverage Ratio."

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Security Documents*" means the security agreements, pledge agreements, collateral assignments, mortgages and related agreements, as amended, supplemented, modified, extended, restructured, renewed, restated or replaced in whole or in part from time to time, creating the security interests in the Collateral as contemplated by the Indenture.

"*Senior Term Loan Collateral Agent*" means UBS AG, Stamford Branch, as the collateral agent under the Senior Term Loan Facility, or its successors.

"*Senior Term Loan Facility*" means the senior secured term loan facility of the Issuer to be entered into on the Issue Date as amended, supplemented, modified, extended, restructured, renewed, restated, refinanced or replaced in whole or in part from time to time.

"*Series*" means (a) with respect to the First Lien Secured Parties, each of (i) the secured parties under the Senior Term Loan Facility (in their capacities as such), (ii) the holders of the First Lien Notes, the First Lien Notes Collateral Agent and the First Lien Trustee (each in their capacity as such) and (iii) the Additional First Lien Secured Parties that become subject to the First Lien Intercreditor Agreement after the date hereof that are represented by a common Authorized Representative (in its capacity as such for such Additional First Lien Secured Parties); (b) with respect to any First Priority Lien Obligations, each of (i) the Obligations under the Senior Term Loan Facility, (ii) the First Lien Notes Obligations and the Obligations in respect of any refunding, refinancing or defeasement of the First Lien Notes and (iii) the Additional First Priority Lien Obligations Incurred pursuant to any applicable agreement, which pursuant to any joinder agreement, are to be represented under the First Lien Intercreditor Agreement by a common Authorized Representative (in its capacity as such for such Additional First Priority Lien Obligations); and (c) with respect to any Junior Lien Obligations, each of (i) the Notes Obligations and the Obligations in respect of any refunding, refinancing or defeasement of the Notes and (ii) the Junior Lien Obligations Incurred after the Issue Date pursuant to any applicable agreement.

"*Significant Subsidiary*" means any Restricted Subsidiary that would be a "Significant Subsidiary" of the Company within the meaning of Rule 1-02 under Regulation S-X promulgated by the SEC (or any successor provision).

"*Similar Business*" means a business, the majority of whose revenues are derived from the activities of the Company and its Subsidiaries as of the Issue Date or any business or activity that is reasonably similar or complementary thereto or a reasonable extension, development or expansion thereof or ancillary thereto.

"*Special Purpose Subsidiary*" means any Subsidiary of the Company whose material assets are comprised solely of the Capital Stock of a Joint Venture, where the pledge of such Capital Stock would be prohibited by any contractual requirement pertaining to such Joint Venture.

"*Specified ABL Facility Assets*" means any ABL Facility Collateral, the net proceeds of an Asset Sale of which are required to be applied as a prepayment of any Asset Backed Credit Facility.

"*Sponsor*" means Apollo Global Management, LLC and any of its successors in interest or Affiliates.

"*Standard Securitization Undertakings*" means representations, warranties, undertakings, covenants, indemnities and guarantees of performance entered into by the Company or any Subsidiary of the Company which the Company has determined in good faith to be customary in a Receivables Financing it being understood that any Receivables Repurchase Obligation shall be deemed to be a Standard Securitization Undertaking.

"*Stated Maturity*" means, with respect to any security, the date specified in such security as the fixed date on which the final payment of principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency beyond the control of the issuer unless such contingency has occurred).

"*Structured Financing Transaction*" means a sale of preferred shares of a Restricted Subsidiary, depositing the proceeds of such sale with a bank and pledging such deposit to guarantee a put and call with respect to such preferred shares.

"*Subordinated Indebtedness*" means (a) with respect to the Issuer, any Indebtedness of the Issuer which is by its terms subordinated in right of payment to the Notes, and (b) with respect to any Guarantor, any Indebtedness of such Guarantor which is by its terms subordinated in right of payment to Obligations in respect of the Notes.

"*Subsidiary*" means, with respect to any Person, (1) any corporation, association or other business entity (other than a partnership, joint venture or limited liability company) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof; (2) any partnership, joint venture or limited liability company of which (x) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general and limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof, whether in the form of membership, general, special or limited partnership interests or otherwise, and (y) such Person or any Subsidiary of such Person is a controlling general partner or otherwise controls such entity; or (3) with respect to the Company, for so long as the Company or any of its Subsidiaries, individually or in the aggregate, has at least a 50% ownership interest in Lyondell Bayer Manufacturing Maasvlakle VOF, Lyondell Bayer Manufacturing Maasvlakle VOF. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Company.

"*Successor Company*" has the meaning ascribed to such term under "—Merger, Amalgamation, Consolidation or Sale of All or Substantially All Assets."

"*Successor Issuer*" has the meaning ascribed to such term under "—Merger, Amalgamation, Consolidation or Sale of All or Substantially All Assets."

"*Successor Pledgor*" has the meaning ascribed to such term under "—Merger, Amalgamation, Consolidation or Sale of All or Substantially All Assets."

"*Suspended Covenants*" has the meaning ascribed to such term under "—Certain Covenants."

"*Suspension Period*" has the meaning ascribed to such term under "—Certain Covenants."

"*Taxes*" has the meaning ascribed to such term under "—The Guarantees—Additional Amounts."

"*Third Lien Intercreditor Agreement*" means an intercreditor agreement that sets forth the relative priority and rights of the Liens junior to the Notes in a manner similar to how the Notes are treated in the Junior Lien Intercreditor Agreement.

"*Third Priority Lien Obligations*" means (i) all Indebtedness under the Notes, (ii) the Notes Obligations, (iii) the 2014 Notes, (iv) the Obligations in respect of the 2014 Notes and the Obligations in respect of any refunding, refinancing or defeasement of the 2014 Notes and (v) Third Priority Lien Obligations that are Incurred after the Issue Date and secured by the Notes Collateral on a third priority basis pursuant to the Security Documents.

"*TIA*" means the Trust Indenture Act of 1939 (15 U.S.C. Sections 77aaa-77bbbb) as in effect on the date of the Indenture.

"*Total Assets*" means, with respect to any Person, the total consolidated assets of such Person and its Restricted Subsidiaries, without giving effect to any amortization of the amount of intangible assets since the Issue Date, (x) as shown on the most recent balance sheet of such Person, or (y) in regards to the Company only, as shown on the most recent balance sheet required to be delivered pursuant to the covenant under "—Certain Covenants—Reports and Other Information."

"*Transfer*" has the meaning ascribed to such term under "—Merger, Amalgamation, Consolidation or Sale of All or Substantially All Assets."

"*Treasury Rate*" means, as of the applicable redemption date, the yield to maturity as of such redemption date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H. 15 (519) that has become publicly available at least two business days prior to such redemption date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from such redemption date to May 1, 2013; *provided*, *however*, that if the period from such redemption date to May 1, 2013 is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"*Treasury Services Agreement*" means any agreement between the Issuer, any Guarantor or Restricted Subsidiary and any commercial bank or other financial institution relating to treasury, depository, and cash management services, employee credit card arrangements or automated clearinghouse transfer of funds.

"*Trustee*" means the party named as such in the Indenture until a successor replaces it and, thereafter, means the successor.

"*Unrestricted Subsidiary*" means:

(1) any Subsidiary of the Company that at the time of determination shall be designated an Unrestricted Subsidiary by the Board of Directors of such Person in the manner provided below; and

(2) any Subsidiary of an Unrestricted Subsidiary;

The Company may designate any Subsidiary of the Company (including any newly acquired or newly formed Subsidiary of the Company) to be an Unrestricted Subsidiary unless such Subsidiary or any of its Subsidiaries owns any Equity Interests or Indebtedness of, or owns or holds any Lien on any property of, the Company or any other Subsidiary of the Company that is not a Subsidiary of the Subsidiary to be so designated; *provided*, *however*, that the Subsidiary to be so designated and its Subsidiaries do not at the time of designation have and do not thereafter Incur any Indebtedness pursuant to which the lender has recourse to any of the assets of the Company or any of its Restricted Subsidiaries (except as permitted under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock"); *provided*, *further*, *however*, that either:

(a) the Subsidiary to be so designated has total consolidated assets of $1,000 or less; or

(b) if such Subsidiary has consolidated assets greater than $1,000, then such designation would be permitted under the covenant described under "—Certain Covenants—Limitation on Restricted Payments."

The Company may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided*, *however*, that immediately after giving effect to such designation:

(x) (1) the Company could Incur $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test described under "—Certain Covenants—Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock," or (2) the Fixed Charge Coverage Ratio for the Company and its Restricted Subsidiaries would be greater than such ratio for the Company and its Restricted Subsidiaries immediately prior to such designation, in each case on a *pro forma* basis taking into account such designation, and

(y) no Event of Default shall have occurred and be continuing.

Any such designation by Company shall be evidenced to the Trustee by promptly filing with the Trustee a copy of the resolution of the Board of Directors or any committee thereof of the Company giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing provisions.

"*Voting Stock*" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness or Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing (1) the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock multiplied by the amount of such payment, by (2) the sum of all such payments.

"*Wholly Owned Domestic Subsidiary*" is any Wholly Owned Subsidiary that is a Domestic Subsidiary.

"*Wholly Owned Restricted Subsidiary*" is any Wholly Owned Subsidiary that is a Restricted Subsidiary.

"*Wholly Owned Subsidiary*" of any Person means a Subsidiary of such Person 100% of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares or shares required to be held by Foreign Subsidiaries) shall at the time be owned by such Person or by one or more Wholly Owned Subsidiaries of such Person.

**TAB 12**

**LYONDELL CHEMICAL COMPANY**
as Issuer

**LYONDELLBASELL INDUSTRIES N.V.**
as Company

11% Senior Secured Notes due 2018
————————————

INDENTURE[1]
Dated as of [  ], 2010
————————————

**WELLS FARGO BANK, N.A.**
as Trustee

---

[1] The terms herein are intended to conform to the applicable DON and the DON is to control with respect
to any conflict.  The 2014 Notes are the "Cram Down Notes" as defined in the Reorganization
Plan.

# TABLE OF CONTENTS

## ARTICLE I

## DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.01.    Definitions .................................................................................................. 1
SECTION 1.02.    Other Definitions ........................................................................................ 41
SECTION 1.03.    Incorporation by Reference of Trust Indenture Act .................................... 42
SECTION 1.04.    Rules of Construction.................................................................................. 43

## ARTICLE II

## THE NOTES

SECTION 2.01.    Amount of Notes; Terms ............................................................................. 44
SECTION 2.02.    Form and Dating ......................................................................................... 44
SECTION 2.03.    Execution and Authentication..................................................................... 45
SECTION 2.04.    Registrar and Paying Agent ........................................................................ 45
SECTION 2.05.    Paying Agent to Hold Money in Trust ....................................................... 46
SECTION 2.06.    Holder Lists ................................................................................................. 46
SECTION 2.07.    Transfer and Exchange................................................................................ 46
SECTION 2.08.    Replacement Notes ..................................................................................... 51
SECTION 2.09.    Outstanding Notes....................................................................................... 51
SECTION 2.10.    [Intentionally Omitted] ............................................................................... 51
SECTION 2.11.    Cancellation ................................................................................................ 51
SECTION 2.12.    Defaulted Interest........................................................................................ 52
SECTION 2.13.    CUSIP Numbers, ISINs, Etc. ..................................................................... 52
SECTION 2.14.    Calculation of Principal Amount of Notes ................................................. 52

## ARTICLE III

## REDEMPTION

SECTION 3.01.    Optional Redemption .................................................................................. 52
SECTION 3.02.    Applicability of Article ............................................................................... 53
SECTION 3.03.    Notices to Trustee ....................................................................................... 53
SECTION 3.04.    Selection of Notes to Be Redeemed ........................................................... 53
SECTION 3.05.    Notice of Optional Redemption .................................................................. 53
SECTION 3.06.    Effect of Notice of Redemption .................................................................. 54
SECTION 3.07.    Deposit of Redemption Price ...................................................................... 54
SECTION 3.08.    Notes Redeemed in Part .............................................................................. 54

## ARTICLE IV

## COVENANTS

SECTION 4.01.    Payment of Notes ........................................................................................ 55
SECTION 4.02.    Reports and Other Information .................................................................... 55

Page

60    SECTION 4.03.    Limitation on Incurrence of Indebtedness and Issuance of Disqualified
61                                Stock and Preferred Stock .................................................................... 56
62    SECTION 4.04.    Limitation on Restricted Payments ........................................................... 63
63    SECTION 4.05.    Dividend and Other Payment Restrictions Affecting Subsidiaries .......... 70
64    SECTION 4.06.    Asset Sales ................................................................................................ 71
65    SECTION 4.07.    Transactions with Affiliates ..................................................................... 75
66    SECTION 4.08.    Change of Control ..................................................................................... 77
67    SECTION 4.09.    Compliance Certificate ............................................................................. 79
68    SECTION 4.10.    Further Instruments and Acts .................................................................... 80
69    SECTION 4.11.    Future Subsidiary Guarantors ................................................................... 80
70    SECTION 4.12.    Liens .......................................................................................................... 80
71    SECTION 4.13.    After-Acquired Property ............................................................................ 80
72    SECTION 4.14.    Maintenance of Office or Agency .............................................................. 81
73    SECTION 4.15.    Maintenance of Insurance .......................................................................... 81
74    SECTION 4.16.    Covenant Suspension ................................................................................. 81
75    SECTION 4.17.    Withholding Taxes. .................................................................................... 82


76                                                ARTICLE V
77
78                                          SUCCESSOR COMPANY

79    SECTION 5.01.    When Issuer May Merge or Transfer Assets .............................................. 83


80                                                ARTICLE VI
81
82                                        DEFAULTS AND REMEDIES

83    SECTION 6.01.    Events of Default ....................................................................................... 86
84    SECTION 6.02.    Acceleration ............................................................................................... 87
85    SECTION 6.03.    Other Remedies .......................................................................................... 88
86    SECTION 6.04.    Waiver of Past Defaults ............................................................................. 88
87    SECTION 6.05.    Control by Majority ................................................................................... 88
88    SECTION 6.06.    Limitation on Suits .................................................................................... 89
89    SECTION 6.07.    Rights of the Holders to Receive Payment ............................................... 89
90    SECTION 6.08.    Collection Suit by Trustee .......................................................................... 89
91    SECTION 6.09.    Trustee May File Proofs of Claim .............................................................. 89
92    SECTION 6.10.    Priorities .................................................................................................... 89
93    SECTION 6.11.    Undertaking for Costs ................................................................................ 90
94    SECTION 6.12.    Waiver of Stay or Extension Laws ............................................................. 90


95                                                ARTICLE VII
96
97                                                  TRUSTEE

98    SECTION 7.01.    Duties of Trustee ....................................................................................... 90
99    SECTION 7.02.    Rights of Trustee ....................................................................................... 91
100   SECTION 7.03.    Individual Rights of Trustee ...................................................................... 93
101   SECTION 7.04.    Trustee's Disclaimer .................................................................................. 93
102   SECTION 7.05.    Notice of Defaults ...................................................................................... 93
103   SECTION 7.06.    Reports by Trustee to the Holders .............................................................. 94

                                                                                            Page

104    SECTION 7.07.    Compensation and Indemnity ........................................................ 94
105    SECTION 7.08.    Replacement of Trustee ............................................................... 95
106    SECTION 7.09.    Successor Trustee by Merger ........................................................ 95
107    SECTION 7.10.    Eligibility; Disqualification ........................................................ 96
108    SECTION 7.11.    Preferential Collection of Claims Against the Issuer ........................... 96
109    SECTION 7.12.    [Intentionally Omitted] .............................................................. 96
110    SECTION 7.13.    Payment of Parallel Debt Pursuant to Dutch Law .............................. 96

111                                        ARTICLE VIII
112
113                        DISCHARGE OF INDENTURE; DEFEASANCE

114    SECTION 8.01.    Discharge of Liability on Notes; Defeasance ...................................... 97
115    SECTION 8.02.    Conditions to Defeasance ............................................................ 98
116    SECTION 8.03.    Application of Trust Money .......................................................... 99
117    SECTION 8.04.    Repayment to Issuer .................................................................. 99
118    SECTION 8.05.    Indemnity for U.S. Government Obligations ...................................... 99
119    SECTION 8.06.    Reinstatement ........................................................................ 100

120                                        ARTICLE IX
121
122                            AMENDMENTS AND WAIVERS

123    SECTION 9.01.    Without Consent of the Holders .................................................. 100
124    SECTION 9.02.    With Consent of the Holders ...................................................... 101
125    SECTION 9.03.    Compliance with Trust Indenture Act ............................................ 102
126    SECTION 9.04.    Revocation and Effect of Consents and Waivers ............................... 102
127    SECTION 9.05.    Notation on or Exchange of Notes ............................................... 103
128    SECTION 9.06.    Trustee to Sign Amendments ...................................................... 103
129    SECTION 9.07.    Additional Voting Terms; Calculation of Principal Amount ................... 103

130                                        ARTICLE X
131
132                            RANKING OF NOTE LIENS

133    SECTION 10.01.    Relative Rights ...................................................................... 103

134                                        ARTICLE XI
135
136                                        COLLATERAL

137    SECTION 11.01.    Security Documents ................................................................ 104
138    SECTION 11.02.    Collateral Agent .................................................................... 105
139    SECTION 11.03.    Authorization of Actions to Be Taken ........................................... 105
140    SECTION 11.04.    Release of Collateral ............................................................... 106
141    SECTION 11.05.    Filing, Recording and Opinions .................................................. 109
142    SECTION 11.06.    [Intentionally Omitted.] ........................................................... 110
143    SECTION 11.07.    Powers Exercisable by Receiver or Trustee ..................................... 110
144    SECTION 11.08.    Release upon Termination of the Issuer's Obligations ......................... 110
145    SECTION 11.09.    Designations ........................................................................ 110

Page

146                                    ARTICLE XII
147
148                                    GUARANTEE

149    SECTION 12.01.    Guarantee ................................................................................. 110
150    SECTION 12.02.    Limitation on Liability ............................................................... 112
151    SECTION 12.03.    Successors and Assigns ............................................................... 113
152    SECTION 12.04.    No Waiver .................................................................................. 114
153    SECTION 12.05.    Modification ............................................................................... 114
154    SECTION 12.06.    Execution of Supplemental Indenture for Future Note Guarantors ...................... 114
155    SECTION 12.07.    Non-Impairment ......................................................................... 114

156                                    ARTICLE XIII
157
158                                    MISCELLANEOUS

159    SECTION 13.01.    Trust Indenture Act Controls .................................................... 114
160    SECTION 13.02.    Notices ...................................................................................... 114
161    SECTION 13.03.    Communication by the Holders with Other Holders ................... 115
162    SECTION 13.04.    Certificate and Opinion as to Conditions Precedent ................... 115
163    SECTION 13.05.    Statements Required in Certificate or Opinion ........................... 115
164    SECTION 13.06.    When Notes Disregarded ........................................................... 116
165    SECTION 13.07.    Rules by Trustee, Paying Agent and Registrar ........................... 116
166    SECTION 13.08.    Legal Holidays .......................................................................... 116
167    SECTION 13.09.    GOVERNING LAW ............................................................... 116
168    SECTION 13.10.    No Recourse Against Others ...................................................... 116
169    SECTION 13.11.    Successors .................................................................................. 116
170    SECTION 13.12.    Multiple Originals ..................................................................... 116
171    SECTION 13.13.    Table of Contents; Headings ..................................................... 116
172    SECTION 13.14.    Indenture Controls .................................................................... 117
173    SECTION 13.15.    Severability ................................................................................ 117
174    SECTION 13.16.    Intercreditor Agreements .......................................................... 117
175    SECTION 13.17.    PATRIOT ACT ........................................................................ 117
176    SECTION 13.18.    Force Majeure ............................................................................ 117

177

178    EXHIBIT INDEX

179    Exhibit A       Form of Note
180    Exhibit B       Form of Supplemental Indenture Related to Subsidiary Guarantors

181

## CROSS-REFERENCE TABLE

| TIA Section | Indenture Section |
|---|---|
| 310(a)(1) | 7.10 |
| (a)(2) | 7.10 |
| (a)(3) | N.A. |
| (a)(4) | N.A. |
| (b) | 7.08; 7.10 |
| (c) | N.A. |
| 311(a) | 7.11 |
| (b) | 7.11 |
| (c) | N.A. |
| 312(a) | 2.06 |
| (b) | 13.03 |
| (c) | 13.03 |
| 313(a) | 7.06 |
| (b)(1) | N.A. |
| (b)(2) | 7.06 |
| (c) | 7.06 |
| (d) | 4.02; 4.09 |
| 314(a) | 4.02; 4.09 |
| (b) | N.A. |
| (c)(1) | 13.04 |
| (c)(2) | 13.04 |
| (c)(3) | N.A. |
| (d) | N.A. |
| (e) | 13.05 |
| (f) | 4.10 |
| 315(a) | 7.01 |
| (b) | 7.05 |
| (c) | 7.01 |
| (d) | 7.01 |
| (e) | 6.11 |
| 316(a)(last sentence) | 13.06 |
| (a)(1)(A) | 6.05 |
| (a)(1)(B) | 6.04 |
| (a)(2) | N.A. |
| (b) | 6.07 |
| 317(a)(1) | 6.08 |
| (a)(2) | 6.09 |
| (b) | 2.05 |
| 318(a) | 13.01 |

182
183    N.A. Means Not Applicable.
184    Note:   This Cross-Reference Table shall not, for any purposes, be deemed to be part of this
185             Indenture.
186

INDENTURE dated as of [  ], 2010 among LYONDELL CHEMICAL COMPANY, a Delaware corporation (the "Issuer"), LYONDELLBASELL INDUSTRIES N.V., a public limited liability company formed under the laws of The Netherlands, as the ultimate parent company of the Issuer and as the parent guarantor (the "Company"), each of the other Guarantors named herein, as guarantors, WELLS FARGO BANK, N.A., as trustee (the "Trustee"), and [  ] as Registrar and Paying Agent (the "Paying Agent").

The Issuer has duly authorized the execution and delivery of this Indenture to provide for the issuance of  $3,250,000,000 aggregate principal amount of the Issuer's 11% Senior Secured Notes due 2018 issued on the date hereof (the "Initial Notes").

## ARTICLE I

## DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.01.    Definitions.

"2014 Indenture" means the indenture dated as of [April 30], 2010 among the Issuer, the Company and [  ], as trustee, under which the 2014 Notes are issued, as amended, supplemented, modified, extended, restructured, renewed or restated in whole or in part from time to time, in accordance with the terms thereof.

"2014 Notes" means the [  ]% notes due on December 15, 2014, issued by the Issuer. as amended, supplemented, modified, extended, restructured, renewed, restated, refinanced, defeased or replaced in whole or in part from time to time. [2]

"ABL Collateral Agent" means the representative(s) from time to time administering the collateral on behalf of the lenders under the ABL Facility.

"ABL Facility" means the asset based revolving credit agreement dated as of its effective date among the Issuer, Equistar Chemicals, L.P., Houston Refining L.P., LyondellBasell Acetyls LLC and each other Subsidiary of the Issuer from time to time designated as a "Borrower" thereunder, the lenders and agents party thereto and Citibank, N.A., as administrative agent, as amended, supplemented, modified, extended, restructured, renewed, restated, refinanced or replaced in whole or in part from time to time.

"ABL Facility Collateral" will consist of all present and after-acquired inventory, accounts receivable, related contracts and other rights, deposit accounts into which proceeds of the foregoing are credited and books and records related thereto, together with all proceeds of the foregoing, in each case to the extent of the rights, title and interest therein of any "Borrower" under the ABL Facility.

"ABL Obligations" means all Indebtedness and other Obligations under the ABL Facility.

---

[2] References to the 2014 Notes will be removed if no 2014 Notes are issued.

221                "Acquired Indebtedness" means, with respect to any specified Person:

222                (1)     Indebtedness of any other Person existing at the time such other Person is
223 merged, consolidated or amalgamated with or into or became a Restricted Subsidiary of such
224 specified Person, and

225                (2)     Indebtedness secured by a Lien encumbering any asset at the time such asset is
226 acquired by such specified Person.

227                "Additional First Lien Collateral Agent" means the collateral agent with respect to any
228 Additional First Priority Lien Obligations.

229                "Additional First Lien Secured Party" means the holders of any Additional First Priority
230 Lien Obligations, including the holders of the First Lien Notes, and any Additional First Lien
231 Collateral Agent or Authorized Representative with respect thereto, including the First Lien Trus-
232 tee.

233                "Additional First Priority Lien Obligations" means any First Priority Lien Obligations
234 that are Incurred after the Issue Date (other than Indebtedness Incurred under the Senior Term Loan Facil-
235 ity) and secured by the Common Collateral on a first priority basis pursuant to the Security Documents.

236                "Additional Interest" means all Additional Interest then owing in respect of a Note pursu-
237 ant to the Registration Rights Agreement.

238                "Additional Junior Lien Obligations" means any Junior Lien Obligations that are In-
239 curred after the Issue Date and secured on a basis equal to the Liens securing the Notes, provided such
240 Lien is permitted to be Incurred under the First Lien Indenture, the Senior Term Loan Facility, the ABL
241 Facility and the Indenture.

242                "Additional Notes" means additional Notes (other than the Initial Notes) issued from time
243 to time under this Indenture in accordance with Section 2.01 hereof.

244                "Additional Second Lien Secured Party" means the holders of any Additional Second
245 Priority Lien Obligation, and any Additional Second Lien Collateral Agent or Authorized Representative
246 with respect thereto.

247                "Additional Second Priority Lien Obligations" means any Second Priority Lien Obliga-
248 tions that are Incurred after the Issue Date and secured by the Collateral on a second priority basis pursu-
249 ant to the Security Documents.

250                "Affiliate" of any specified Person means any other Person directly or indirectly control-
251 ling or controlled by or under direct or indirect common control with such specified Person.  For purposes
252 of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by"
253 and "under common control with"), as used with respect to any Person, means the possession, directly or
254 indirectly, of the power to direct or cause the direction of the management or policies of such Person,
255 whether through the ownership of voting securities, by agreement or otherwise.

256                "Agent" means any Registrar, Paying Agent, Collateral Agent or Co-Registrar, including
257 any permitted successors or assigns thereto.

258       "<u>Applicable Premium</u>" means, with respect to any Note on any redemption date, the
259  greater of:

260         (1)  1.00% of the then outstanding principal amount of the Note; and

261         (2)  the excess of:  (a) the present value at such redemption date of (i) the re-
262     demption price of the Note at May 1, 2013 plus (ii) all required interest payments due on
263     the Note through May 2, 2013 (excluding accrued but unpaid interest but including Addi-
264     tional Interest, if any), computed using a discount rate equal to the Treasury Rate as of
265     such redemption date plus 50 basis points; over (b) the then outstanding principal amount
266     of the Note.

267       "<u>Applicable Procedures</u>" means, with respect to any transfer or exchange of or for bene-
268  ficial interests in any Global Note, the rules and procedures of the Depositary that apply to such transfer
269  or exchange.

270       "<u>Asset Acquisition</u>" means:

271         (1)  an Investment by the Company or any Restricted Subsidiary of the Company in
272     any other Person pursuant to which such Person shall become a Restricted Subsidiary of the
273     Company or of any Restricted Subsidiary of the Company, or shall be merged with or into the
274     Company or any Restricted Subsidiary of the Company, or

275         (2)  the acquisition by the Company or any Restricted Subsidiary of the Company of
276     the assets of any Person (other than a Restricted Subsidiary of the Company) which constitute all
277     or substantially all of the assets of such Person or comprises any division or line of business of
278     such Person or any other properties or assets of such Person other than in the ordinary course of
279     business.

280       "<u>Asset Backed Credit Facility</u>" means (i) the ABL Facility; (ii) any credit facility pro-
281  vided on the basis of the value of inventory, accounts receivable or other current assets (and related
282  documents and intangibles) to the Company or any of its Subsidiaries or similar instrument; and (iii) any
283  similar credit support agreements or guarantees Incurred from time to time, as amended, supplemented,
284  modified, extended, restructured, renewed, restated, refinanced or replaced in whole or in part from time
285  to time; *provided* that any credit facility that refinances or replaces an Asset Backed Credit Facility must
286  comply with clause (ii) of this definition in order to be an Asset Backed Credit Facility; and *provided*,
287  *further*, that, if at the time any such refinancing or replacement is necessary or advisable in the good faith
288  judgment of the Board of Directors of the Company, and an Asset Backed Credit Facility that complies
289  with clause (ii) of this definition is not available on terms considered commercially reasonable for facili-
290  ties of this nature (as determined in the good faith judgment of the Board of Directors of the Company),
291  then the ABL Facility may be refinanced with or replaced by any Credit Facility and such Credit Facility
292  shall be an Asset Backed Credit Facility for purposes hereof.

293       "<u>Asset Sale</u>" means:

294         (1)  the sale, conveyance, transfer or other disposition (whether in a single transaction
295     or a series of related transactions) of property or assets (including by way of a Sale/Leaseback
296     Transaction) outside the ordinary course of business of the Company or any Restricted Subsidiary
297     of the Company (each referred to in this definition as a "<u>disposition</u>") or

298               (2)    the issuance or sale of Equity Interests (other than directors' qualifying shares
299    and shares issued to foreign nationals or other third parties to the extent required by applicable
300    law) of any Restricted Subsidiary (other than to the Company or a Restricted Subsidiary of the
301    Company) (whether in a single transaction or a series of related transactions),

302    in each case other than:

303              (a)    a disposition of Cash Equivalents or Investment Grade Securities or redundant,
304    surplus, obsolete, damaged or worn out property or equipment whether now owned or hereafter
305    acquired, in the ordinary course of business;

306              (b)    the disposition of all or substantially all of the assets of the Company in a manner
307    permitted pursuant to Section 5.01 or any disposition that constitutes a Change of Control;

308              (c)    any Restricted Payment or Permitted Investment that is permitted to be made,
309    and is made, under Section 4.04;

310              (d)    any sale, conveyance or other disposition of property or assets of the Company or
311    any Restricted Subsidiary (whether in a single transaction or a series of related transactions), in-
312    cluding by way of a Sale/Leaseback Transaction, or issuance or sale of Equity Interests of any
313    Restricted Subsidiary, which assets or Equity Interests so disposed or issued have an aggregate
314    Fair Market Value of less than $75.0 million;

315              (e)    any disposition of property or assets, or the issuance of securities, by a Restricted
316    Subsidiary of the Company to the Company or by the Company or a Restricted Subsidiary of the
317    Company to a Restricted Subsidiary of the Company;

318              (f)    (i) any exchange of assets (including a combination of assets and Cash Equiva-
319    lents) for assets related to a Similar Business of comparable or greater market value or usefulness
320    to the business of the Company and its Restricted Subsidiaries as a whole, as determined in good
321    faith by the Company and (ii) in the ordinary course of business, any swap of assets, or lease, as-
322    signment or sublease of any real or personal property, in exchange for services (including in con-
323    nection with any outsourcing arrangements) of comparable or greater value or usefulness to the
324    business of the Company and its Restricted Subsidiaries as a whole, as determined in good faith
325    by the Company;

326              (g)    any foreclosure or any similar action with respect to any property or other asset
327    of the Company or any of its Restricted Subsidiaries;

328              (h)    any sale of Equity Interests in, or other ownership interests in or assets or prop-
329    erty, including Indebtedness, or other securities of, an Unrestricted Subsidiary;

330              (i)    any lease, assignment, license or sublease which does not materially interfere
331    with the business of the Company and its Restricted Subsidiaries;

332              (j)    any grant of any license of patents, trademarks, know-how or any other intellec-
333    tual property which does not materially interfere with the business of the Company and its Re-
334    stricted Subsidiaries;

(k)    any transfer of accounts receivable and related assets of the type specified in the definition of "Receivables Financing" (or a fractional undivided interest therein) in a Qualified Receivables Financing;

(l)    any financing transaction with respect to property built or acquired by the Company or any Restricted Subsidiary after the Issue Date, including any Sale/Leaseback Transaction or asset securitization permitted by this Indenture;

(m)    dispositions in connection with Permitted Liens;

(n)    any disposition of Capital Stock of a Restricted Subsidiary pursuant to an agreement or other obligation with or to a Person (other than the Company or a Restricted Subsidiary) from whom such Restricted Subsidiary was acquired or from whom such Restricted Subsidiary acquired its business and assets (having been newly formed in connection with such acquisition), made as part of such acquisition and in each case comprising all or a portion of the consideration in respect of such sale or acquisition;

(o)    dispositions of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings and exclusive of factoring or similar arrangements;

(p)    any surrender or waiver of contract rights or the settlement, release, recovery on or surrender of contract, tort or other claims of any kind;

(q)    pursuant to buy-sell arrangements or similar agreements between Lyondell China Holdings Limited of Ningbo ZRCC and Lyondell Chemical Company Ltd.; and

(r)    any sale, conveyance or other disposition of property or assets of the Company or any Restricted Subsidiary (whether in a single transaction or a series of related transactions) in connection with the Emergence Transactions.

"Authorized Representative" means (i) in the case of any Obligations under the Senior Term Loan Facility or the secured parties under the Senior Term Loan Facility, the Senior Term Loan Collateral Agent, (ii) in the case of the Obligations under the First Lien Notes or the holders of the First Lien Notes, the First Lien Notes Collateral Agent, (iii) in the case of the ABL Facility, the ABL Collateral Agent and (iv) in the case of any Series of Additional First Priority Lien Obligations that become subject to the First Lien Intercreditor Agreement, the Authorized Representative named for such Series in the applicable joinder agreement.

"Bankruptcy Code" means the United States Bankruptcy Code, 11 U.S.C. Section 101 *et seq*., as amended from time to time.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

"Basell GmbH" means Basell Germany Holdings GmbH and any successor in interest thereto.

"Berre Facility" means any receivables-backed credit or factoring facility entered into by one or more Foreign Subsidiaries (other than Basell GmbH) related to receivables of the refinery located in Berre, France, and any permitted refinancings thereof.

"Board of Directors" means, as to any Person, the board of directors, supervisory board of such Person, or equivalent governing body (or, if such Person is a partnership or limited liability company, the board of directors or other governing body of the general partner of such Person or manager) or any duly authorized committee thereof.

"Business Acquisition" means the acquisition by the Company or any Restricted Subsidiary of the Company of the assets of any Person (other than a Restricted Subsidiary of the Company) which constitute all or substantially all of the assets of such Person or comprises any division or line of business of such Person or any other properties or assets of such Person.

"Business Day" means a day other than a Saturday, Sunday or other day on which banking institutions are authorized or required by law to close in New York City, London or The Netherlands.

"Capital Stock" means:

(1)    in the case of a corporation, corporate stock or shares;

(2)    in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)    in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)    any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"Capitalized Lease Obligation" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP.

"Cases" means the proceedings of LyondellBasell Industries AF S.C.A. and certain of its Subsidiaries and affiliates, as debtors and debtors-in-possession under Chapter 11.

"Cash Equivalents" means:

(1)    U.S. Dollars, pounds sterling, Euros, the national currency of any member state in the European Union or, in the case of any Foreign Subsidiary that is a Restricted Subsidiary, such local currencies held by it from time to time in the ordinary course of business;

(2)    securities issued or directly and fully guaranteed or insured by the U.S. government or any country that is a member of the European Union (other than Greece or Portugal) or any agency or instrumentality thereof in each case maturing not more than two years from the date of acquisition;

(3)    certificates of deposit, time deposits and Eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances, in each case with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank or trust company having capital and surplus in excess of $250.0 million and whose long-term debt is rated "A" or the equivalent thereof by Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency);

(4)     repurchase obligations and reverse repurchase obligations for underlying securi-
ties of the types described in clauses (2) and (3) above entered into with any financial institution
meeting the qualifications specified in clause (3) above;

(5)     commercial paper issued by a corporation (other than an Affiliate of the Com-
pany) rated at least "A-1" or the equivalent thereof by Moody's or S&P (or reasonably equivalent
ratings of another internationally recognized ratings agency) and in each case maturing within
one year after the date of acquisition;

(6)     readily marketable direct obligations issued by any state of the United States of
America or any political subdivision thereof having one of the two highest rating categories ob-
tainable from either Moody's or S&P (or reasonably equivalent ratings of another internationally
recognized ratings agency) in each case with maturities not exceeding two years from the date of
acquisition;

(7)     Indebtedness issued by Persons (other than the Sponsors or any of their Affili-
ates) with a rating of "A" or higher from S&P or "A-2" or higher from Moody's (or reasonably
equivalent ratings of another internationally recognized ratings agency) in each case with maturi-
ties not exceeding two years from the date of acquisition;

(8)     U.S. Dollar-denominated money market funds as defined in Rule 2a-7 of the
General Rules and Regulations promulgated under the Investment Company Act of 1940;

(9)     tax-exempt floating-rate option tender bonds backed by letters of credit issued by
a national or state bank whose long-term unsecured debt has a rating of AA or better by S&P or
Aa2 or better by Moody's or the equivalent rating by any other internationally recognized rating
agency; and

(10)     investment funds investing at least 95% of their assets in securities of the types
described in clauses (1) through (9) above.

"Catalyst Sale/Leaseback Transaction" means a Sale/Leaseback Transaction that relates
to a catalyst containing one or more precious metals used by the Company or any of its Restricted Sub-
sidiaries in the ordinary course of business.

"Change of Control" means the occurrence of any of the following:

(1)     the sale, lease or transfer, in one or a series of related transactions, of all or sub-
stantially all of the assets of the Company and its Subsidiaries, taken as a whole, to any Person
other than a Permitted Holder; or

(2)     the Company becomes aware of (by way of a report or any other filing pursuant
to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) the acquisition by
any Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange
Act, or any successor provision), including any group acting for the purpose of acquiring, holding
or disposing of securities (within the meaning of Rule 13d-5(b)(1) under the Exchange Act), other
than the Permitted Holders, in a single transaction or in a related series of transactions, by way of
acquisition, merger, amalgamation, consolidation, transfer, conveyance or other business combi-
nation or purchase of beneficial ownership (within the meaning of Rule 13d-3 under the Ex-
change Act, or any successor provision) of more than 50% of the total voting power of the Voting
Stock of the Company.

453        "Chapter 11" means Chapter 11 of the Bankruptcy Code.

454        "Code" means the Internal Revenue Code of 1986, as amended.

455        "Collateral" means all property subject or purported to be subject, from time to time, to a
456   Lien under any Security Documents.

457        "Collateral Agent" means Wells Fargo Bank, N.A., as collateral agent under the Security
458   Documents, together with its successors in such capacity.

459        "Common Collateral" means, at any time, Collateral in which the holders of two or more
460   Series of First Priority Lien Obligations (or their respective Authorized Representatives) hold a valid and
461   perfected security interest at such time.  If more than two Series of First Priority Lien Obligations are out-
462   standing at any time and the holders of less than all Series of First Priority Lien Obligations hold a valid
463   and perfected security interest in any Collateral at such time, then such Collateral shall constitute Com-
464   mon Collateral for those Series of First Priority Lien Obligations that hold a valid security interest in such
465   Collateral at such time and shall not constitute Common Collateral for any Series which does not have a
466   valid and perfected security interest in such Collateral at such time.

467        "Company " means LyondellBasell Industries N.V., a *naamloze vennootschap* (public
468   limited liability corporation) formed under the laws of The Netherlands, and any successor in interest
469   thereto.

470        "Consolidated EBITDA" means, with respect to any Person, for any period, the sum
471   (without duplication) of:

472        (1)    Consolidated Net Income;

473        (2)    to the extent Consolidated Net Income has been reduced thereby;

474        (a)    taxes of such Person and its Restricted Subsidiaries paid or accrued in
475        accordance with GAAP for such period based on income, profits or capital, including,
476        without limitation, state, franchise, property and similar taxes and foreign withholding
477        taxes (including penalties and interest related to such taxes or arising from tax examina-
478        tions), or such equivalent items in any foreign jurisdiction;

479        (b)    Consolidated Interest Expense;

480        (c)    Consolidated Non-cash Charges;

481        (d)    the amount of net loss resulting from the payment of any premiums, fees
482        or similar amounts that are required to be paid under the terms of the instrument(s) gov-
483        erning any Indebtedness upon the repayment, prepayment or other extinguishment of
484        such Indebtedness in accordance with the terms of such Indebtedness;

485        (e)    any expenses or charges (other than Consolidated Non-cash Charges) re-
486        lated to any issuance of Equity Interests, any Investment, acquisition, disposition, recapi-
487        talization or Incurrence, repayment, amendment or modification of Indebtedness permit-
488        ted to be Incurred or repaid pursuant to this Indenture (including a refinancing thereof)
489        (in each case, whether or not successful), including, without limitation, (i) such fees, ex-
490        penses or charges related to the offering of the Notes and the Credit Facility Indebtedness

and other Exit Financing, (ii) any amendment or other modification of the Notes or other Indebtedness, (iii) any additional interest in respect of the Notes and (iv) commissions, discounts, yield and other fees and charges (including any interest expense) related to any Receivables Financing; and

(f)   business optimization expenses and other restructuring charges, reserves or expenses (which, for the avoidance of doubt, shall include, without limitation, the effect of inventory optimization programs, facility consolidations, retention, headcount reductions, systems establishment costs, contract termination costs, future lease commitments and excess pension charges); and

(3)   the amount of net cost savings projected by such Person in good faith to be realized by specified actions taken or to be taken prior to or during such period (calculated on a *pro forma* basis as though such cost savings had been realized on the first day of such period); *provided* that (x) such cost savings are reasonably identifiable and factually supportable and (y) such actions have been taken or are to be taken within twelve months of the date of determination to take such action and the benefit is expected to be realized within twelve months of taking such action; minus

(4)   any non-cash gains increasing Consolidated Net Income of such Person for such period (excluding (i) the recognition of deferred revenue or any items which represent the reversal of any accrual of, or cash reserve for, anticipated cash charges that reduced EBITDA in any prior period and any items for which cash was received in a prior period, (ii) items referenced in clause (e) of "Consolidated Net Income" and (iii) gains which have been offset against losses in determining Consolidated Net Income but for which the loss has not been added back as a Consolidated Non-cash Charge pursuant to the definition of "Consolidated EBITDA");

all as determined on a consolidated basis for such Person and its Restricted Subsidiaries in accordance with GAAP.

Notwithstanding anything herein to the contrary, Consolidated EBITDA for the Fiscal Quarter ending (i) June 30, 2009 shall be deemed to be $551.0 million, (ii) September 30, 2009 shall be deemed to be $757.0 million and (iii) December 31, 2009 shall be deemed to be $578.0 million, before giving *pro forma* effect to any transaction occurring after the Issue Date, as permitted under the definitions of "Fixed Charge Coverage Ratio" and "Secured Indebtedness Leverage Ratio."

"Consolidated Interest Expense" means, with respect to any Person for any period, the consolidated interest expense (net of interest income for such period) of such Person and its Restricted Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, to the extent such expense was deducted in computing Consolidated Net Income, including, without limitation:

(1)   amortization of original issue discount,

(2)   the interest component of Capitalized Lease Obligations paid, accrued and/or scheduled to be paid or accrued,

(3)   net payments and receipts (if any) pursuant to interest rate Hedging Obligations,

(4)   consolidated capitalized interest of such Person and its Restricted Subsidiaries for such period, whether paid or accrued, and

531             (5)        the interest portion of any deferred payment obligation,

532    but excluding, in each case, any amortization of fees, debt issuance costs and commissions incurred in
533    connection with the Credit Facilities, any Receivables Financing, the issuance of the First Lien Notes, the
534    Notes, the Euro Securitization and any other debt issuance.

535             For purposes of this definition, interest on a Capitalized Lease Obligation shall be
536    deemed to accrue at an interest rate reasonably determined by the Issuer to be the rate of interest implicit
537    in such Capitalized Lease Obligation in accordance with GAAP.

538             "<u>Consolidated Net Income</u>" means, with respect to any Person, for any period:

539             (1)        the Net Income of such Person and its Restricted Subsidiaries for such period on
540    a consolidated basis; *plus*

541             (2)        cash dividends or distributions paid to such Person or any Restricted Subsidiary
542    of such Person by any other Person (the "<u>Payor</u>") other than a Restricted Subsidiary, to the extent
543    not otherwise included in Consolidated Net Income, which have not been derived from Indebted-
544    ness of the Payor to the extent such Indebtedness is Guaranteed by such referent Person or any
545    Restricted Subsidiary of such referent Person;

546    *provided* that there shall be excluded therefrom, without duplication (but only to the extent included in the
547    calculation of the foregoing):

548             (a)        (i) any net after-tax income or loss from operating results of discontinued opera-
549    tions as defined by GAAP, and (ii) any net after-tax gains or losses from sales of discontinued
550    operations;

551             (b)        any net after-tax extraordinary, nonrecurring or unusual gains or losses (less all
552    fees and expenses relating thereto or expenses or charges, any severance expenses, relocation ex-
553    penses, curtailments or modifications to pension and post-retirement employee benefit plans, any
554    expenses related to any reconstruction, decommissioning, recommissioning or reconfiguration of
555    fixed assets for alternate uses and fees, expenses or charges relating to facilities closing costs, ac-
556    quisition integration costs, facilities opening costs, project start-up costs, business optimization
557    costs, signing, retention or completion bonuses, expenses or charges related to any issuance of
558    Equity Interests, Investment, acquisition, disposition, recapitalization or issuance, repayment, re-
559    financing, amendment or modification of Indebtedness (in each case, whether or not successful),
560    and all costs and expenses of such Person and its Restricted Subsidiaries Incurred in connection
561    with the Cases and the Exit Financings);

562             (c)        the Net Income of any Payor, other than a Restricted Subsidiary of such Person
563    or Net Income of such Payor that is accounted for by the equity method of accounting, except to
564    the extent of cash dividends or distributions paid to such Person or to a Restricted Subsidiary of
565    such Person by such Payor (or to the extent converted into cash);

566             (d)        the Net Income (but not loss) of any Restricted Subsidiary of such Person that is
567    not a Guarantor to the extent that the declaration of dividends or similar distributions by that Re-
568    stricted Subsidiary of that income is restricted; *provided*, *however*, that the Net Income of Re-
569    stricted Subsidiaries shall only be excluded in any calculation of Consolidated Net Income of the
570    Company as a result of application of this clause (d) if the restriction on dividends or similar dis-

tributions results from consensual restrictions other than any restriction contained in clauses (1), (2) and (4) and, to the extent related to clauses (1), (2) and (4), clause (15) under Section 4.05;

(e)    (i) any restoration to income of any contingency reserve, except to the extent that provision for such reserve was made out of Consolidated Net Income accrued at any time following the Issue Date; and (ii) any restoration to or deduction from income for changes in estimates related to the post-emergence settlement of pre-petition claims obligations in relation with Chapter 11 following the Issue Date;

(f)    in the case of a successor to such Person by consolidation or merger or as a transferee of such Person's assets, any gains or losses of the successor corporation prior to such consolidation, merger or transfer of assets;

(g)    any charges or credits relating to any purchase accounting adjustments or to the adoption of fresh start accounting principles;

(h)    any (i) one-time non-cash compensation charges, and (ii) non-cash costs or expenses resulting from stock option plans, employee benefit plans, compensation charges or post-employment benefit plans, or grants or awards of stock, stock appreciation or similar rights, stock options, restricted stock, Preferred Stock or other rights;

(i)    Net Income for such period shall not include the cumulative effect of a change in accounting principles during such period;

(j)    any net after-tax gains or losses (less all fees and expenses or charges relating thereto) attributable to business dispositions or asset dispositions other than in the ordinary course of business (as determined in good faith by management of the Company) or reserves relating thereto;

(k)    any net after-tax gains or losses (less all fees and expenses or charges relating thereto) attributable to the early extinguishment of Indebtedness, Hedging Obligations or other derivative instruments entered in relation with the Indebtedness extinguished;

(l)    any gain or loss for such period from currency translation gains or losses or net gains or losses related to currency remeasurements of Indebtedness (including any net loss or gain resulting from Hedging Obligations for currency exchange risk entered in relation with Indebtedness); and

(m)    any impairment charges or asset write-offs, in each case pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP.

Notwithstanding the foregoing, for the purpose of Section 4.04 only, there shall be excluded from Consolidated Net Income any dividends, repayments of loans or advances or other transfers of assets from Unrestricted Subsidiaries of the Company or a Restricted Subsidiary of the Company to the extent such dividends, repayments or transfers increase the amount of Restricted Payments permitted under Section 4.04(a) pursuant to clause (3)(iv) or (3)(v).

"Consolidated Net Tangible Assets" means, with respect to any Person, the Total Assets of such Person and its Restricted Subsidiaries less goodwill and intangibles (other than intangibles arising from, or relating to, intellectual property, licenses or permits (including, but not limited to, emissions rights) of such Person), in each case calculated in accordance with GAAP, *provided* that in the event that

such Person or any of its Restricted Subsidiaries assumes or acquires any assets in connection with the acquisition by such Person and its Restricted Subsidiaries of another Person subsequent to the commencement of the period for which the Consolidated Net Tangible Assets is being calculated but prior to the event for which the calculation of the Consolidated Net Tangible Assets is made, then the Consolidated Net Tangible Assets shall be calculated giving *pro forma* effect to such assumption or acquisition of assets, as if the same had occurred at the beginning of the applicable period.

"Consolidated Non-cash Charges" means, with respect to any Person, for any period, the consolidated depreciation, amortization and other non-cash expenses of such Person and its Restricted Subsidiaries (including the amortization of prior service costs and actuarial gains and losses related to pensions and other post-employment benefits) (including any lower-of-cost-or-market adjustments of inventory) reducing Consolidated Net Income of such Person and its Restricted Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP, *provided* that if any such non-cash expenses represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA in such future period to the extent paid, but excluding from this proviso, for the avoidance of doubt, amortization of a prepaid cash item that was paid in a prior period.

"Contingent Obligations" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent:

(1)     to purchase any such primary obligation or any property constituting direct or indirect security therefor,

(2)     to advance or supply funds:

(a)     for the purchase or payment of any such primary obligation; or

(b)     to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

(3)     to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"Credit Facilities" means:

(1)     the Senior Term Loan Facility,

(2)     any Asset Backed Credit Facility;

(3)     any debt facilities or other financing arrangements (including, without limitation, commercial paper facilities) providing for revolving credit loans, term loans, letters of credit or other Indebtedness, including any notes, mortgages, guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements or refundings thereof and any indentures or credit facilities or commercial paper facilities that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount permitted to be borrowed thereunder or

alters the maturity thereof (*provided* that such increase in borrowings is permitted by Section 4.03) or adds Restricted Subsidiaries as additional borrowers or guarantors thereunder and whether by the same or any other agent, lender or group of lenders; and

(4)    any such agreements, instruments or guarantees governing Indebtedness Incurred to refinance any Indebtedness or commitments referred to in clauses (1), (2) and (3) above whether by the same or any other lender or group of lenders.

"Credit Facility Indebtedness" means any and all amounts payable under or in respect of the Credit Facilities as amended, restated, supplemented, waived, replaced, restructured, repaid, refunded, refinanced or otherwise modified from time to time (including after termination of the Senior Term Loan Facility), including principal, premium (if any), interest (including interest accruing on or after the filing of any petition in bankruptcy or for reorganization relating to the Company whether or not a claim for post-filing interest is allowed in such proceedings), fees, charges, expenses, reimbursement obligations, guarantees and all other amounts payable thereunder or in respect thereof.

"Currency Agreement" means, with respect to any Person, any foreign exchange contract, currency swap agreement, currency futures contract, currency option contract, currency derivative or other similar agreement to which such Person is a party or beneficiary.

"Default" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"Definitive Note" means a certificated Note registered in the name of the holder thereof and issued in accordance with Section 2.07(c) hereof, substantially in the form of Exhibit A attached hereto, except that such Note shall not bear the Global Note Legend and shall not have the "Schedule of Exchanges of Interests in the Global Note" attached thereto.

"Depositary" means any Person specified in Section 2.04 hereof as the Depositary with respect to the Notes, and any and all successors thereto appointed as Depositary hereunder and having become such pursuant to the applicable provision of this Indenture.

"Designated Non-cash Consideration" means the Fair Market Value of non-cash consideration received by the Company or one of its Restricted Subsidiaries in connection with an Asset Sale that is so designated as Designated Non-cash Consideration pursuant to an Officer's Certificate, setting forth the basis of such valuation, less the amount of Cash Equivalents received in connection with a subsequent sale of such Designated Non-cash Consideration.

"Designated Preferred Stock" means Preferred Stock of the Company or any direct or indirect parent entity of the Company (other than Disqualified Stock), that is issued for cash (other than to the Company or any of its Subsidiaries or an employee stock ownership plan or trust established by the Company or any of its Subsidiaries) and is so designated as Designated Preferred Stock, pursuant to an Officer's Certificate, on the issue date thereof.

"Discharge of First and Second Priority Lien Obligations" means except to the extent otherwise provided in the Junior Lien Intercreditor Agreement with respect to the reinstatement or continuation of any First Priority Lien Obligation or Second Priority Lien Obligation under certain circumstances, payment in full in cash (except for contingent indemnities and cost and reimbursement obligations to the extent no claim has been made) of all First and Second Priority Lien Obligations and, with respect to any letters of credit or letter of credit guaranties outstanding under the First Lien Documents or Second Lien Documents, delivery of cash collateral or backstop letters of credit in respect thereof in a

manner consistent with such First Lien Documents or Second Lien Documents, in each case after or con-currently with the termination of all commitments to extend credit thereunder, and the termination of all commitments of the First Lien Secured Parties or Second Lien Secured Parties under the First Lien Documents or Second Lien Documents, as the case may be; *provided* that the Discharge of First and Sec-ond Priority Lien Obligations shall not be deemed to have occurred if such payments are made with the proceeds of other First Priority Lien Obligations or Second Priority Lien Obligations that constitute an exchange or replacement for or a refinancing of such Obligations, First Priority Lien Obligations or Sec-ond Priority Lien Obligations. In the event the First Priority Lien Obligations or Second Priority Lien Ob-ligations are modified and the Obligations are paid over time or otherwise modified pursuant to Section 1129 of the Bankruptcy Code, the First Priority Lien Obligations and Second Priority Lien Obligations shall be deemed to be discharged when the final payment is made, in cash, in respect of such indebtedness and any obligations pursuant to such modified indebtedness shall have been satisfied.

"Disqualified Stock" means, with respect to any Person, any Capital Stock of such Person which, by its terms (or by the terms of any security into which it is convertible or for which it is redeem-able or exchangeable), or upon the happening of any event:

(1)    matures or is mandatorily redeemable, pursuant to a sinking fund Obligation or otherwise (other than as a result of a change of control or asset sale),

(2)    is convertible or exchangeable for Indebtedness or Disqualified Stock of such Person, or

(3)    is redeemable at the option of the holder thereof, in whole or in part (other than solely as a result of a change of control or asset sale),

in each case prior to 91 days after the earlier of the maturity date of the Notes or the date the Notes are no longer outstanding; *provided* that only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock; *provided*, *further*, that if such Capital Stock is is-sued to any employee or to any plan for the benefit of employees of the Company or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely be-cause it may be required to be repurchased by the Company in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability; *provided*, *further*, that any class of Capital Stock of such Person that by its terms authorizes such Person to satisfy its obliga-tions thereunder by delivery of Capital Stock that is not Disqualified Stock shall not be deemed to be Dis-qualified Stock.

"Domestic Subsidiary" means a Restricted Subsidiary that is not a Foreign Subsidiary.

"DTC" means The Depository Trust Company, its nominees and successors.

"Emergence Transactions" means all transactions arising out of the Reorganization Plan and emergence from Chapter 11, including, but not limited to, Exit Financing.

"Equity Interests" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"Equity Offering" means any public or private sale after the Issue Date of common stock or Preferred Stock (other than Disqualified Stock) of the Company or any direct or indirect parent entity

of the Company (to the extent the proceeds thereof are contributed to the Company), as applicable, on a primary basis, other than:

    (1)    public offerings with respect to the Company's or such direct or indirect parent entity's common stock registered on Form S-4 or Form S-8;

    (2)    issuances to any Subsidiary of the Company; and

    (3)    any such public or private sale that constitutes an Excluded Contribution.

"<u>Euro Securitization</u>" means the transaction to be dated as of its effective date entered into in connection with the €150 million revolving securitization facility of trade accounts receivable with Basell Sales and Marketing Company B.V. and Lyondell Chemie Nederland B.V., as sellers, and Basell Polyolefins Collections Ltd., as receivables purchaser, as such facility may be amended, supplemented, modified, extended, restructured, renewed, restated, refinanced or replaced in whole or in part from time to time.

"<u>Exchange Act</u>" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"<u>Exchange Offer</u>" has the meaning set forth in the Registration Rights Agreement.

"<u>Exchange Offer Registration Statement</u>" has the meaning set forth in the Registration Rights Agreement.

"<u>Excluded Contributions</u>" means the aggregate net cash proceeds, including cash and the Fair Market Value of property other than cash, received by the Company after the Issue Date from:

    (1)    contributions to its common equity capital, and

    (2)    the sale (other than to a Subsidiary of the Company or to any Subsidiary management equity plan or stock option plan or any other management or employee benefit plan or agreement) of Capital Stock (other than Disqualified Stock and Designated Preferred Stock) of the Company,

in each case designated as Excluded Contributions pursuant to an Officer's Certificate of the Company on or promptly after the date such capital contributions are made or the date such Capital Stock is sold, as the case may be.

"<u>Excluded Subsidiary</u>" means (i) any Receivables Subsidiary, (ii) any Qualified Non-Recourse Subsidiary, (iii) any Special Purpose Subsidiary, (iv) any Wholly Owned Domestic Subsidiary that is a subsidiary of a Foreign Subsidiary and (v) any Domestic Subsidiary of the Company as of the Issue Date or at any time thereafter meeting any one of the following conditions that has been designated by the Issuer as an Excluded Subsidiary in a writing to the Trustee (which designation may be rescinded by granting a Guarantee in accordance with the requirements of this Indenture): (a) the Total Assets of such Domestic Subsidiary determined as of the end of the fiscal year of the Company most recently ended for which financial statements are required to be delivered under this Indenture does not exceed $25.0 million, or (b) the Consolidated EBITDA of such Domestic Subsidiary does not exceed $25.0 million, for the period of four consecutive quarters of the Company most recently ended for which financial statements are required to be delivered pursuant to this Indenture; *provided* that, at any time or from time to time after the Issue Date, Domestic Subsidiaries (other than a Special Purpose Subsidiary) shall not be

designated as Excluded Subsidiaries to the extent that such Domestic Subsidiaries under this clause (v) would represent, in the aggregate, (a) 5.0% or more of Total Assets of the Company at the end of the most recently ended fiscal year of the Company or (b) 5.0% or more of the Consolidated EBITDA of the Company for the most recently ended fiscal year, in each case, based upon the most recent financial statements required to be delivered pursuant to this Indenture; *provided*, *further*, that, if the most recent financial statements required to be delivered pursuant to this Indenture for any fiscal quarter occurring after the Issue Date indicate that, by reason of subsequent changes following the designation of any one or more Restricted Subsidiaries as an Excluded Subsidiary or Excluded Subsidiaries, the foregoing requirements of this definition would not be complied with (other than as a result of an impairment charge), individually or in the aggregate, then the Company shall use commercially reasonable efforts to promptly (but in any event within 180 days after the date the financial statements are required), rescind such designations as are necessary, and provide such Guarantees as are necessary, so as to comply with the requirements of this Indenture.  Any uncured Default shall not occur until the expiration of such 180 days provided such efforts are used.

"Exit Financing" means that certain financing to finance the Reorganization Plan expected to be composed of the Senior Term Loan Facility, the ABL Facility, the Euro Securitization, the Notes and the First Lien Notes.

"Fair Market Value" means, with respect to any asset or property, the price which could be negotiated in an arm's-length transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction; *provided* that, other than as expressly set forth in this Indenture, for purposes of determining the "Fair Market Value" of any property or assets, such Fair Market Value shall be determined by (x) the Company in good faith with respect to property or assets with a Fair Market Value not in excess of $250.0 million, (y) an opinion as to the Fair Market Value issued by a qualified accounting, appraisal, financial advisory or investment banking firm or (z) the Board of Directors of the Company, as evidenced by a certificate of an officer of the Company, with respect to property or assets with a Fair Market Value in excess of $250.0 million.

"First and Second Priority Lien Obligations" means First Priority Lien Obligations and Second Priority Lien Obligations.

"First Lien Documents" means the credit, guarantee and security documents governing the First Priority Lien Obligations (and any Additional First Priority Lien Obligations), including, without limitation, this Indenture and the First Lien Security Documents.

"First Lien Indenture" means the indenture dated as of April 8, 2010 among LBI Escrow Corporation, as predecessor to the Issuer, the Company and Wilmington Trust FSB, under which the First Lien Notes are issued, as amended, supplemented, modified, extended, restructured, renewed or restated in whole or in part from time to time, in accordance with the terms thereof.

"First Lien Intercreditor Agreement" means the First Lien Intercreditor Agreement, dated as of the Issue Date by and among the Trustee, the Collateral Agent and the Senior Term Loan Collateral Agent, with respect to the Common Collateral, which may be amended from time to time without the consent of the holders of the Notes to add other parties holding First Priority Lien Obligations permitted to be Incurred under this Indenture, the Senior Term Loan Facility and the First Lien Intercreditor Agreement.

"First Lien Notes" means the 8% notes due on November 1, 2017, issued by LBI Escrow Corporation, as predecessor to the Issuer.

816    "First Lien Notes Collateral Agent" means Deutsche Bank Trust Company Americas as
817    collateral agent under the First Lien Notes.

818    "First Lien Notes Obligations" means Obligations in respect of the First Lien Notes (in-
819    cluding other first lien notes Incurred pursuant to clause (b)(i)(A) of Section 4.03 hereof, the First Lien
820    Indenture and the Security Documents, including, for the avoidance of doubt, Obligations in respect of
821    exchange notes and guarantees thereof.

822    "First Lien Secured Parties" means (a) the "Secured Parties," as defined in the Senior
823    Term Loan Facility and (b) any Additional First Lien Secured Parties.

824    "First Lien Security Documents" means the Security Documents and any other agree-
825    ment, document or instrument pursuant to which a Lien is granted or purported to be granted securing
826    First Priority Lien Obligations, and any Additional First Priority Lien Obligations, or under which rights
827    or remedies with respect to such Liens are governed, in each case to the extent relating to the Collateral
828    securing the First Priority Lien Obligations.

829    "First Lien Trustee" means the party named as such in the First Lien Indenture until a
830    successor replaces it and, thereafter, means the successor.

831    "First Priority Lien Obligations" means (i) all Indebtedness under the Credit Facilities
832    (other than the Asset Backed Credit Facility and any other Credit Facility Incurred pursuant to clause
833    (iii)(B) of Section 4.03(b)), (ii) the First Lien Notes Obligations and the Obligations in respect of any re-
834    funding, refinancing or defeasement of the First Lien Notes, (iii) all other Obligations of the Company,
835    the Issuer or any Restricted Subsidiary in respect of Hedging Obligations or Obligations in respect of cash
836    management services in each case owing to a Person that is a holder of Credit Facility Indebtedness or an
837    Affiliate of such holder at the time of entry into such Hedging Obligations or Obligations in respect of
838    cash management services, (iv) Additional First Priority Lien Obligations, if any, permitted to be Incurred
839    under Section 4.03 and (v) Indebtedness under any Oil Indexed Credit Facility Incurred pursuant to
840    clause (iii)(C) of Section 4.03(b).

841    "Fixed Charge Coverage Ratio" means, with respect to any Person for any period, the ra-
842    tio of Consolidated EBITDA of such Person for such period to the Fixed Charges of such Person for such
843    period.  In the event that the Company or any of its Restricted Subsidiaries Incurs, repays, repurchases or
844    redeems any Indebtedness (other than in the case of revolving credit borrowings or revolving advances
845    under any Receivables Financing, in which case interest expense shall be computed based upon the aver-
846    age daily balance of such Indebtedness during the applicable period) or issues, repurchases or redeems
847    Disqualified Stock or Preferred Stock subsequent to the commencement of the period for which the Fixed
848    Charge Coverage Ratio is being calculated but prior to the event for which the calculation of the Fixed
849    Charge Coverage Ratio is made (the "Calculation Date"), then the Fixed Charge Coverage Ratio shall be
850    calculated giving *pro forma* effect to such Incurrence, repayment, repurchase or redemption of Indebted-
851    ness, or such issuance, repurchase or redemption of Disqualified Stock or Preferred Stock, as if the same
852    had occurred at the beginning of the applicable four-quarter period.

853    For purposes of making the computation referred to above, Investments, acquisitions,
854    dispositions, mergers, amalgamations, consolidations and discontinued operations (as determined in ac-
855    cordance with GAAP), in each case with respect to an operating unit of a business, and any operational
856    changes that the Company or any of its Restricted Subsidiaries has determined to make and/or made dur-
857    ing the four-quarter reference period or subsequent to such reference period and on or prior to or simulta-
858    neously with the Calculation Date shall be calculated on a *pro forma* basis assuming that all such Invest-
859    ments, acquisitions, dispositions, mergers, amalgamations, consolidations, discontinued operations and

operational changes (and the change of any associated fixed charge obligations and the change in Consolidated EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation, amalgamation, discontinued operation or operational change, in each case with respect to an operating unit of a business, that would have required adjustment pursuant to this definition, then the Fixed Charge Coverage Ratio shall be calculated giving *pro forma* effect thereto for such period as if such Investment, acquisition, disposition, discontinued operation, merger, amalgamation, consolidation or operational change had occurred at the beginning of the applicable four-quarter period.

For purposes of this definition, whenever *pro forma* effect is to be given to any event, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting Officer of the Company.  Any such *pro forma* calculation may include adjustments appropriate, in the reasonable good faith determination of the Company as set forth in an Officer's Certificate, to reflect (1) operating expense reductions and other operating improvements or synergies reasonably expected to result from the applicable event and (2) all adjustments of the nature set forth as "Reorganization Adjustments" under "Unaudited Consolidated *Pro Forma* Financial Information" as set forth in the Offering Memorandum for the Company to the extent such adjustments, without duplication, continue to be applicable to such four-quarter period.

If any Indebtedness bears a floating rate of interest and is being given *pro forma* effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the Calculation Date had been the applicable rate for the entire period (taking into account any Hedging Obligations applicable to such Indebtedness if such Hedging Obligation has a remaining term in excess of 12 months).  Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of the Company to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.  For purposes of making the computation referred to above, interest on any Indebtedness under a revolving credit facility computed on a *pro forma* basis shall be computed based upon the average daily balance of such Indebtedness during the applicable period. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be deemed to have been based upon the rate actually chosen, or, if none, then based upon such optional rate chosen as the Company may designate.

For the purposes of this definition, any amount in a currency other than U.S. Dollars will be converted to U.S. Dollars based on the average exchange rate for such currency for the most recent twelve-month period immediately prior to the date of determination or if any such Indebtedness is subject to a Currency Agreement with respect to the currency in which such Indebtedness is denominated covering principal, premium, if any, and interest on such Indebtedness, the amount of such Indebtedness and such interest and premium, if any, shall be determined after giving effect to all payments in respect thereof under such Currency Agreement.

"Fixed Charges" means, with respect to any Person for any period, the sum, without duplication, of:

(1)    Consolidated Interest Expense of such Person for such period, and

(2)    all cash dividend payments (excluding items eliminated in consolidation) on any series of Preferred Stock or Disqualified Stock of such Person and its Restricted Subsidiaries.

904    "Foreign Subsidiary" means a Restricted Subsidiary not organized or existing under the
905    laws of the United States of America or any state or territory thereof or the District of Columbia and any
906    direct or indirect Restricted Subsidiary of such Restricted Subsidiary.

907    "GAAP" means generally accepted accounting principles in the United States set forth in
908    the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certi-
909    fied Public Accountants and statements and pronouncements of the Financial Accounting Standards
910    Board or in such other statements by such other entity as have been approved by a significant segment of
911    the accounting profession, which are in effect on the Issue Date as adopted by the Company. For the pur-
912    poses of this Indenture, the term "consolidated" with respect to any Person shall mean such Person con-
913    solidated with its Restricted Subsidiaries, and shall not include any Unrestricted Subsidiary, but the inter-
914    est of such Person in an Unrestricted Subsidiary will be accounted for as an Investment.

915    "Global Note Legend" means the legend set forth in Section 2.07(g)(ii) hereof, which is
916    required to be placed on all Global Notes issued under this Indenture.

917    "Global Notes" means, individually and collectively, the Global Notes, substantially in
918    the form of Exhibit A attached hereto, issued in accordance with Section 2.01, 2.07(b), 2.07(d), and that
919    has the "Schedule of Exchanges of Interests in the Global Note" attached thereto, and that is deposited
920    with or on behalf of and registered in the name of the applicable Depositary.

921    "Government Obligations" means securities that are:

922    (1)    direct obligations of the United States of America for the timely payment of
923    which its full faith and credit is pledged, or

924    (2)    obligations of a Person controlled or supervised by and acting as an agency or in-
925    strumentality of the United States of America the timely payment of which is unconditionally
926    guaranteed as a full faith and credit Obligation by the United States of America, which, in each
927    case, are not callable or redeemable at the option of the issuer thereof, and shall also include a de-
928    pository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act) as custodian
929    with respect to any such U.S. government obligations or a specific payment of principal of or in-
930    terest on any such U.S. government obligations held by such custodian for the account of the
931    holder of such depository receipt; provided, however, that (except as required by law) such custo-
932    dian is not authorized to make any deduction from the amount payable to the holder of such de-
933    pository receipt from any amount received by the custodian in respect of the U.S. government ob-
934    ligations or the specific payment of principal of or interest on the U.S. government obligations
935    evidenced by such depository receipt.

936    "Hedging Obligations" means (a) any and all rate swap transactions, basis swaps, credit
937    derivative transactions, forward rate transactions, commodity swaps, commodity options, forward com-
938    modity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or op-
939    tions or forward bond or forward bond price or forward bond index transactions, interest rate options,
940    forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency
941    swap transactions, cross-currency rate swap transactions, currency options, emission rights, spot con-
942    tracts, or any other similar transactions or any combination of any of the foregoing (including any options
943    to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any
944    master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are
945    subject to the terms and conditions of, or governed by, any form of master agreement published by the
946    International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master

947  Agreement, or any other master agreement (any such master agreement, together with any related sched-
948  ules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

949  "holder " or "noteholder" means the Person in whose name a Note is registered on the
950  Registrar's books.

951  "Incur" means issue, assume, guarantee, incur or otherwise become liable for; *provided*,
952  *however*, that any Indebtedness or Capital Stock of a Person existing at the time such person becomes a
953  Subsidiary (whether by merger, amalgamation, consolidation, acquisition or otherwise) shall be deemed
954  to be Incurred by such Person at the time it becomes a Subsidiary.

955  "Indebtedness" means, with respect to any Person:

956  (1)  the principal and premium (if any) of any indebtedness of such Person, whether
957  or not contingent, (a) in respect of borrowed money, (b) evidenced by bonds, notes, debentures or
958  similar instruments or letters of credit or bankers' acceptances (or, without duplication, reim-
959  bursement agreements in respect thereof), (c) representing the deferred and unpaid purchase price
960  of any property (except any such balance that constitutes (i) a trade payable or similar Obligation
961  to a trade creditor Incurred in the ordinary course of business, (ii) any earn-out Obligations until
962  such Obligation becomes a liability on the balance sheet of such Person in accordance with
963  GAAP and (iii) liabilities accrued in the ordinary course of business), which purchase price is due
964  more than six months after the date of placing the property in service or taking delivery and title
965  thereto, (d) in respect of Capitalized Lease Obligations, or (e) representing any Hedging Obliga-
966  tions, if and to the extent that any of the foregoing indebtedness (other than letters of credit and
967  Hedging Obligations) would appear as a liability on a balance sheet (excluding the footnotes
968  thereto) of such Person prepared in accordance with GAAP;

969  (2)  to the extent not otherwise included, any Obligation of such Person to be liable
970  for, or to pay, as obligor, guarantor or otherwise, the Obligations referred to in clause (1) of an-
971  other Person (other than by endorsement of negotiable instruments for collection in the ordinary
972  course of business); and

973  (3)  to the extent not otherwise included, Indebtedness of another Person secured by a
974  Lien on any asset owned by such Person (whether or not such Indebtedness is assumed by such
975  Person); *provided*, *however*, that the amount of such Indebtedness will be the lesser of:  (a) the
976  Fair Market Value of such asset at such date of determination, and (b) the amount of such Indebt-
977  edness of such other Person;

978  *provided*, *however*, that notwithstanding the foregoing, Indebtedness shall be deemed not to include
979  (1) Contingent Obligations Incurred in the ordinary course of business and not in respect of borrowed
980  money; (2) deferred or prepaid revenues; (3) purchase price holdbacks in respect of a portion of the pur-
981  chase price of an asset to satisfy warranty or other unperformed obligations of the respective seller; or
982  (4) Obligations under or in respect of a Qualified Receivables Financing or a Qualified Joint Venture
983  Transaction.

984  Notwithstanding anything in this Indenture to the contrary, Indebtedness shall not in-
985  clude, and shall be calculated without giving effect to, the effects of Statement of Financial Accounting
986  Standards No. 133 and related interpretations to the extent such effects would otherwise increase or de-
987  crease an amount of Indebtedness for any purpose under this Indenture as a result of accounting for any
988  embedded derivatives created by the terms of such Indebtedness, and any such amounts that would have

constituted Indebtedness under this Indenture but for the application of this sentence shall not be deemed an Incurrence of Indebtedness under this Indenture.

"Indenture" means this Indenture as amended or supplemented from time to time.

"Independent Financial Advisor" means an accounting, appraisal or investment banking firm or consultant, in each case of nationally recognized standing, that is, in the good faith determination of the Company, qualified to perform the task for which it has been engaged.

"Indirect Participant" means a Person who holds a beneficial interest in a Global Note through a Participant.

"Interest Payment Date" has the meaning set forth in Exhibit A hereto.

"Investment Grade Rating" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other Rating Agency.

"Investment Grade Securities" means:

    (1)    securities issued or directly and fully guaranteed or insured by the U.S. government or any agency or instrumentality thereof (other than Cash Equivalents),

    (2)    securities that have a rating equal to or higher than Baa3 (or equivalent) by Moody's and BBB- (or equivalent) by S&P, but excluding any debt securities or loans or advances between and among the Company and its Subsidiaries,

    (3)    investments in any fund that invests exclusively in investments of the type described in clauses (1) and (2) which fund may also hold immaterial amounts of cash pending investment and/or distribution, and

    (4)    corresponding instruments in countries other than the United States customarily utilized for high quality investments and in each case with maturities not exceeding two years from the date of acquisition.

"Investments" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees (other than guarantees of performance made by the Company or any of its Restricted Subsidiaries in connection with a Joint Venture)), advances or capital contributions (excluding accounts receivable, trade credit and advances to customers and commission, travel and similar advances to officers, employees and consultants made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet of the Company in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property.  For purposes of the definition of "Unrestricted Subsidiary" and Section 4.04:

    (1)    "Investments" shall include the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of a Subsidiary of the Company at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided*, *however*, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Company shall

be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary equal to an amount (if positive) equal to:

(a)    the Company's "Investment" in such Subsidiary at the time of such re-designation *less*

(b)    the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of such Subsidiary at the time of such redesignation; and

(2)    any property transferred to or from an Unrestricted Subsidiary shall be valued at its Fair Market Value at the time of such transfer, in each case as determined in good faith by the Board of Directors of the Company.

"Issue Date" means [•], 2010.

"Issuer" means Lyondell Chemical Company, a Delaware corporation, and any successor thereto in accordance with this Indenture.

"Issuer Order" means a written request or order signed on behalf of the Issuer by an Officer of the Issuer, who must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the Issuer, and delivered to the Trustee.

"Joint Venture" means any joint venture entity, whether a company, unincorporated firm, association, partnership or any other entity which, in each case, is not a Subsidiary of the Company or any of its Restricted Subsidiaries but in which the Company or a Restricted Subsidiary has a direct or indirect equity or similar interest.

"Junior Lien Intercreditor Agreement"[3] means the Junior Lien Intercreditor Agreement, entered on the Issue Date by and among the First Lien Notes Collateral Agent, on its own behalf and on behalf of the First Lien Secured Parties under the First Lien Indenture, the Senior Term Loan Collateral Agent, on its own behalf and on behalf of the First Lien Secured Parties under the Senior Term Loan Facility, the ABL Collateral Agent, on its own behalf and on behalf of the administrative agent and lenders under the ABL Facility, the trustee under the Notes (the "Notes Trustee" and, together with the First Lien Notes Collateral Agent, the Senior Term Loan Collateral Agent and the ABL Collateral Agent, the "Applicable Collateral Agents"), on its own behalf and on behalf of the holders of the obligations under the Notes, the Company, the Issuer and the Pledgors that sets forth the relative priority of the Liens securing any First Priority Lien Obligations, the Liens se-curing the ABL Obligations and the Liens securing any Junior Lien Obligations, including the Notes (collectively, the "Applicable Obligations").

"Junior Lien Obligations" means (i) the Notes, (ii) the Notes Obligations and the Obligations in respect of any refunding, refinancing or defeasance of the Notes, (iii) the 2014 Notes, (iv) the Obligations in respect of the 2014 Notes and the Obligations in respect of any refunding, refinancing or defeasance of the 2014 Notes and (v) Additional Junior Lien Obligations.

"Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or similar encumbrance of any kind in respect of such asset, whether or not filed, recorded or oth-

---

[3] In the event there are any 2014 Notes there will be a Third Lien Intercreditor Agreement as described in the Description of 2014 Notes.

1064  erwise perfected under applicable law (including any conditional sale or other title retention agreement,
1065  any lease in the nature thereof, any option or other agreement to sell or give a security interest; *provided*
1066  that in no event shall an operating lease, rights of set-off or netting arrangements in the ordinary course of
1067  business be deemed to constitute a Lien.

1068  "Limited Recourse Stock Pledge" means the pledge of the Equity Interests in any Joint
1069  Venture (that is not a Restricted Subsidiary) or any Unrestricted Subsidiary to secure non-recourse debt of
1070  such Joint Venture or Unrestricted Subsidiary, which pledge is made by a Restricted Subsidiary of the
1071  Company, the activities of which are limited to making and managing Investments, and owning Equity
1072  Interests, in such Joint Venture or Unrestricted Subsidiary, but only for so long as its activities are so lim-
1073  ited.

1074  "Moody's" means Moody's Investors Service, Inc. or any successor to the rating agency
1075  business thereof.

1076  "Mortgaged Property" means each parcel of Real Property owned or leased by the Com-
1077  pany, the Issuer or any Pledgor encumbered by a Mortgage to secure the First Priority Lien Obligations,
1078  Second Priority Lien Obligations and Notes Obligations.

1079  "Mortgages" means, collectively, the mortgages, trust deeds, deeds of trust, deeds to se-
1080  cure debt, assignments of leases and rents, and other security documents delivered with respect to Mort-
1081  gaged Properties, as amended, supplemented, modified, extended, restructured, renewed, restated or re-
1082  placed in whole or in part from time to time.

1083  "Negromex Receivables Dispositions" means any disposition of accounts receivable aris-
1084  ing from transactions with Industrias Negromex, S.A. de C.V.

1085  "Net Income" means, with respect to any Person, the net income (loss) of such Person,
1086  determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

1087  "Net Proceeds" means the aggregate cash proceeds received by the Company or any of its
1088  Restricted Subsidiaries in respect of any Asset Sale (including, without limitation, any cash received in
1089  respect of or upon the sale or other disposition of any Designated Non-cash Consideration received in any
1090  Asset Sale and any cash payments received by way of deferred payment of principal pursuant to a note or
1091  installment receivable or otherwise, but only as and when received, but excluding the assumption by the
1092  acquiring Person of Indebtedness relating to the disposed assets or other consideration received in any
1093  other non-cash form), net of the direct costs relating to such Asset Sale and the sale or disposition of such
1094  Designated Non-cash Consideration (including, without limitation, legal, accounting and investment
1095  banking fees, and brokerage and sales commissions), and any relocation expenses Incurred as a result
1096  thereof, taxes paid or payable as a result thereof (after taking into account any available tax credits or de-
1097  ductions and any tax sharing arrangements related thereto), amounts required to be applied to the repay-
1098  ment of principal, premium (if any) and interest on Indebtedness required (other than pursuant to Section
1099  4.06(b)(i)) to be paid as a result of such transaction, and any deduction of appropriate amounts to be pro-
1100  vided by the Company as a reserve in accordance with GAAP against any liabilities associated with the
1101  asset disposed of in such transaction and retained by the Company after such sale or other disposition
1102  thereof, including, without limitation, pension and other post-employment benefit liabilities and liabilities
1103  related to environmental matters or against any indemnification obligations associated with such transac-
1104  tion.

1105  "Notes" means the Initial Notes and more particularly means any Note authenticated and
1106  delivered under this Indenture.  For all purposes of this Indenture, the term "Notes" shall also include any

1107 Additional Notes that may be issued under a supplemental indenture.  For purposes of this Indenture, all
1108 references to Notes to be issued or authenticated upon transfer, replacement or exchange shall be deemed
1109 to refer to Notes of the applicable series.

1110     "Notes Collateral" has the meaning set forth in the Security Documents.

1111     "Notes Obligations" means Obligations in respect of the Notes, this Indenture and the Se-
1112 curity Documents, including, for the avoidance of doubt, Obligations in respect of guarantees thereof.

1113     "Obligations" means any principal, interest, penalties, fees, indemnifications, reimburse-
1114 ments (including, without limitation, reimbursement obligations with respect to letters of credit and bank-
1115 ers' acceptances), damages and other liabilities payable under the documentation governing any Indebt-
1116 edness; *provided* that Obligations with respect to the Notes shall not include fees or indemnifications in
1117 favor of the Trustee and other third parties other than the holders of the Notes.

1118     "Offering Memorandum" means the confidential offering memorandum, dated March 24,
1119 2010, relating to the issuance of the First Lien Notes under the First Lien Indenture.

1120     "Officer" means the Chairman of the Board, Chief Executive Officer, Chief Financial Of-
1121 ficer, President, any Executive Vice President, Senior Vice President or Vice President, the Treasurer, any
1122 Assistant Treasurer, any Financial Director or the Secretary or Assistant Secretary of any Person (or, with
1123 respect to a Person that is a limited partnership, the general partner of such Person), member of the Board
1124 of Directors (in the case of any entity organized under the laws of The Netherlands), or any other officer
1125 designated by the Board of Directors serving in a similar capacity.

1126     "Officer's Certificate" means a certificate signed on behalf of any Person by an Officer of
1127 such Person , which meets the requirements set forth in this Indenture.

1128     "Oil Indexed Credit Facility" means a working capital facility for which availability is
1129 conditioned upon the price per barrel of crude oil that is not less than $125.0 and the proceeds of which
1130 are utilized for working capital purposes and related fees and expenses; *provided* that the First Lien Notes
1131 and any other First Priority Lien Obligations are secured by a Lien ranking at least *pari passu* with any
1132 Lien on assets securing any Oil Indexed Credit Facility and the collateral agent under any Oil Indexed
1133 Credit Facility shall have been made party to the First Lien Intercreditor Agreement and any Oil Indexed
1134 Credit Facility shall be subject to the terms thereof.

1135     "Opinion of Counsel" means a written opinion from legal counsel who is reasonably ac-
1136 ceptable to the Trustee.  The counsel may be an employee of or counsel to the Company or the Issuer or
1137 to the Trustee.  Counsel giving any Opinion of Counsel shall be entitled to rely on an Officer's Certificate
1138 as to any factual matters relevant to such opinion.

1139     "Other First Lien Obligations" means other Indebtedness of the Company and its Re-
1140 stricted Subsidiaries that is equally and ratably secured with the First Lien Notes as permitted by this First
1141 Lien Indenture and is designated by the Company as an Other First Lien Obligation; *provided* that an au-
1142 thorized representative on behalf of the holders of such Indebtedness has executed joinders to the Security
1143 Documents in the form or substantially in the form provided therein.

1144     "Pari Passu Indebtedness" means:

1145    (1)  with respect to the Issuer, the Notes and any Indebtedness which ranks *pari passu*
1146    in right of payment to the Notes; and

1147    (2)  with respect to any Pledgor, its Obligations in respect of the Notes and any In-
1148 debtedness which ranks *pari passu* in right of payment to such Pledgor's Obligations in respect of
1149 the Guarantees of the Notes.

1150    "<u>Participants</u>" means with respect to the Notes, institutions that have accounts with DTC
1151 or its nominee.

1152    "<u>PBGC Settlement</u>" means the settlement agreement between the Issuer and the Pension
1153 Benefit Guaranty Corporation (or any successor in interest thereto) as amended, supplemented, modified,
1154 extended, restructured, renewed, restated or replaced in whole or in part from time to time.

1155    "<u>Permitted Holder Group</u>" has the meaning ascribed to such term in the definition of
1156 "Permitted Holders."

1157    "<u>Permitted Holders</u>" means, at any time, each of (i) the Sponsors, (ii) any Person that has
1158 no material assets other than the Capital Stock of the Company and, directly or indirectly, holds or ac-
1159 quires 100% of the total voting power of the Voting Stock of the Company, and of which no other Person
1160 or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any succes-
1161 sor provision), other than any of the other Permitted Holders specified in clause (i) above, holds more
1162 than 50% of the total voting power of the Voting Stock thereof and (iii) any group (within the meaning of
1163 Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision) the members of
1164 which include any of the Permitted Holders specified in clause (i) above and that, directly or indirectly,
1165 holds or acquires beneficial ownership of the Voting Stock of the Company (a "<u>Permitted Holder</u>
1166 <u>Group</u>"), so long as (1) each member of the Permitted Holder Group has voting rights proportional to the
1167 percentage of ownership interests held or acquired by such member relative to the other members of the
1168 Permitted Holder Group with respect to voting in the election of Directors of the Company or any of its
1169 Subsidiaries generally and (2) no Person or other "group" (other than the Permitted Holders specified in
1170 clause (i) above) beneficially owns more than 50% on a fully diluted basis of the Voting Stock held by the
1171 Permitted Holder Group.  Any Person or group whose acquisition of beneficial ownership constitutes a
1172 Change of Control in respect of which a Change of Control Offer is made in accordance with the re-
1173 quirements of this Indenture will thereafter, together with its Affiliates, constitute an additional Permitted
1174 Holder.

1175    "<u>Permitted Investments</u>" means:

1176    (1)  any Investment in the Company or any Restricted Subsidiary;

1177    (2)  any Investment in Cash Equivalents;

1178    (3)  any Investment by the Company or any Restricted Subsidiary of the Company in
1179 a Person if as a result of such Investment (a) such Person becomes a Restricted Subsidiary of the
1180 Company, or (b) such Person, in one transaction or a series of related transactions, is merged,
1181 consolidated or amalgamated with or into, or transfers or conveys all or substantially all of its as-
1182 sets to, or is liquidated into, the Company or a Restricted Subsidiary of the Company;

1183    (4)  any Investment in securities or other assets not constituting Cash Equivalents and
1184 received in connection with an Asset Sale made pursuant to the provisions of Section 4.06 or any
1185 other disposition of assets not constituting an Asset Sale;

1186    (5)  any Investment existing on, or made pursuant to binding commitments existing
1187 on, the Issue Date or an Investment consisting of any extension, modification or renewal of any

Investment existing on the Issue Date; *provided* that the amount of any such Investment may be increased (x) as required by the terms of such Investment as in existence on the Issue Date or (y) as otherwise permitted under this Indenture;

(6)    loans and advances to officers, directors or employees (a) for business-related travel expenses, moving expenses and other similar expenses, including as part of a recruitment or retention plan, in each case Incurred in the ordinary course of business or consistent with past practice or to fund such Person's purchase of Equity Interests of the Company or any direct or in-direct parent entity of the Company, (b) required by applicable employment laws loans and (c) other loans and advances not to exceed $25.0 million at any one time outstanding;

(7)    any Investment acquired by the Company or any of its Restricted Subsidiaries (a) in exchange for any other Investment or accounts receivable held by the Company or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable, or (b) as a result of a foreclosure by the Company or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(8)    Hedging Obligations permitted under Section 4.03(b)(xi);

(9)    any Investment by the Company or any of its Restricted Subsidiaries in a Similar Business or in Joint Ventures having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (9) that are at that time outstanding, not to exceed the greater of (x) $1,000.0 million and (y) 4.50% of the Consolidated Net Tangible Assets of the Company at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value, *plus* 100% of the aggregate amount received by the Company or any Restricted Subsidiary in cash and the Fair Market Value of property other than cash received by the Company or any Restricted Sub-sidiary with respect to any Investment made pursuant to this clause (9); *provided*, *however*, that if any Investment pursuant to this clause (9) is made in any Person that is not a Restricted Subsidi-ary of the Company at the date of the making of such Investment and such Person becomes a Re-stricted Subsidiary of the Company after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (9) for so long as such Person continues to be a Restricted Subsidiary;

(10)    additional Investments by the Company or any of its Restricted Subsidiaries hav-ing an aggregate Fair Market, taken together with all other Investments made pursuant to this clause (10) that are at that time outstanding, not to exceed the greater of (x) $350.0 million and (y) 1.50% of the Consolidated Net Tangible Assets of the Company at the time of such Invest-ment (with the Fair Market Value of each Investment being measured at the time made and with-out giving effect to subsequent changes in value), *plus* 100% of the aggregate amount received by the Company or any Restricted Subsidiary in cash and the Fair Market Value (as determined in good faith by the Company) of property other than cash received by the Company or any Re-stricted Subsidiary with respect to any Investment made pursuant to this clause (10); *provided*, *however*, that if any Investment pursuant to this clause (10) is made in any Person that is not a Restricted Subsidiary of the Company at the date of the making of such Investment and such Per-son becomes a Restricted Subsidiary of the Company after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (10) for so long as such Person continues to be a Restricted Subsidi-ary;

(11)    Investments the payment for which consists of Equity Interests of the Company (other than Disqualified Stock) or any direct or indirect parent of the Company, as applicable; *provided*, *however*, that such Equity Interests will not increase the amount available for Restricted Payments under clause (3)(ii) or (iii) under Section 4.04(a);

(12)    Investments consisting of the licensing or contribution of intellectual property pursuant to joint marketing arrangements with other Persons;

(13)    Investments consisting of or to finance purchases and acquisitions of inventory, supplies, materials, services or equipment or purchases of contract rights or licenses or leases of intellectual property;

(14)    any Investment in connection with a Qualified Receivables Financing, including Investments in a Receivables Subsidiary, of funds held in accounts permitted or required by the arrangements governing such Qualified Receivables Financing or any related Indebtedness and, to the extent constituting an Investment, the acquisition of accounts receivable that have been sold, transferred or otherwise disposed of in a Receivables Financing, including the repurchase of accounts receivable by the Company or any of its Subsidiaries or other payment obligations of the Company or any Restricted Subsidiary of the Company pursuant to Standard Securitization Undertakings;

(15)    any Investment in an entity or purchase of a business or assets in each case owned (or previously owned) by a customer of a Restricted Subsidiary as a condition or in connection with such customer (or any member of such customer's group) contracting with a Restricted Subsidiary, in each case in the ordinary course of business;

(16)    Investments of a Restricted Subsidiary of the Company acquired after the Issue Date or of an entity merged into, amalgamated with, or consolidated with the Company or a Restricted Subsidiary of the Company in a transaction that is not prohibited by Section 5.01 after the Issue Date to the extent that such Investments were not made in contemplation of such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(17)    any Investment in any Subsidiary of the Company or any Joint Venture in connection with intercompany cash management arrangements or related activities arising in the ordinary course of business;

(18)    Investments through the licensing contribution in a Person that is or will be as a result of such Investment a Joint Venture or Investments through the licensing, contribution or transactions that economically result in a contribution in kind of intellectual property pursuant to Joint Venture arrangements, in each case in the ordinary course of business;

(19)    purchase of shares of Royal Dutch Shell plc and BASF AG required to satisfy Basell B.V.'s obligations under its stock option plans as such plans and stock appreciation rights were in effect on the Issue Date;

(20)    a transaction to the extent constituting an Investment that is permitted by and made in accordance with clauses (xii) and (xiii) of Section 4.04(b);

(21)    any Investment in connection with a Structured Financing Transaction;

(22)    a transaction to the extent constituting an Investment that is permitted by and made in accordance with clause (38) of the definition of "Permitted Liens";

(23)    any transaction to the extent it constitutes an Investment that is permitted by and made in accordance with Section 4.07(b) (except transactions described in clauses (ii), (iv), (v), (ix)(B), (xv) and (xix) of such Section ); and

(24)    any Qualified Joint Venture Transaction.

"Permitted Liens" means, with respect to any Person:

(1)    pledges or deposits by such Person under worker's compensation laws, unemployment insurance laws or similar legislation, or good faith pledges, deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case Incurred in the ordinary course of business;

(2)    Liens imposed by law, such as carriers', warehousemen's and mechanics' Liens, in each case for sums not yet due or being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review;

(3)    Liens for taxes, assessments or other governmental charges not yet due or payable or subject to penalties for nonpayment or which are being contested in good faith by appropriate proceedings;

(4)    Liens in favor of issuers of performance bonds, surety bonds, bid bonds, letters of credit or similar instruments issued pursuant to the request of and for the account of such Person in the ordinary course of its business or with respect to statutory, regulatory, contractual or warranty requirements;

(5)    minor survey exceptions, minor encumbrances, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not Incurred in connection with Indebtedness and which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(6)    (A) Liens on assets of a Restricted Subsidiary that is not a Guarantor securing Indebtedness of such Restricted Subsidiary permitted to be Incurred pursuant to Section 4.03, (B) Liens securing First Priority Lien Obligations in an aggregate principal amount not to exceed the greater of (x) the aggregate principal amount of Indebtedness permitted to be Incurred pursuant to clauses (i), (iii)(A) and (iii)(C) of Section 4.03(b) and (y) the maximum principal amount of Indebtedness that, as of the date such Indebtedness was Incurred, and after giving effect to the Incurrence of such Indebtedness and the application of proceeds therefrom on such date, would not cause the Secured Indebtedness Leverage Ratio of the Company to exceed 2.25 to 1.00, (C) Liens securing Indebtedness permitted to be Incurred pursuant to clause (iii)(B), (v)(A), (v)(B), (xiii), (xxi) or (xxv) of Section 4.03(b) (*provided* that (1) in the case of clause (iii)(B), any Lien on

Notes Collateral securing Indebtedness under the ABL Facility, or any refinancing or replacement thereof, must be expressly subject to the terms of the Junior Lien Intercreditor Agreement, (2) in the case of clause (v)(A), such Lien extends only to the assets and/or Capital Stock, the acquisition, lease, construction, repair, replacement or improvement of which is financed thereby and any proceeds or products thereof, (3) in the case of clause (xxi), such Lien does not extend to the property or assets of any Subsidiary of the Company other than a Foreign Subsidiary, (4) in the case of clause (v)(B) such Lien applies solely to acquired property or asset of the acquired entity, as the case may be, and (5) in the case of clause (xxv), such Lien does not extend to the property or assets of the Company or any Restricted Subsidiary of the Company organized under the laws of any jurisdiction other than Australia) and (D) Liens securing the First Lien Notes Obligations;

(7)    Liens existing on the Issue Date (other than Liens in favor of the lenders under the Senior Term Loan Facility and under the ABL Facility);

(8)    Liens on assets, property or shares of stock of a Person at the time such Person becomes a Subsidiary; *provided*, *however*, that such Liens are not created or Incurred in connection with, or in contemplation of, such other Person becoming such a Subsidiary; *provided*, *further*, *however*, that such Liens may not extend to any other property owned by the Company or any Restricted Subsidiary of the Company;

(9)    Liens on assets or property at the time the Company or a Restricted Subsidiary of the Company acquired the assets or property, including any acquisition by means of a merger, amalgamation or consolidation with or into the Company or any Restricted Subsidiary; *provided* that such Liens are not created or Incurred in connection with, or in contemplation of, such acquisition; *provided*, *further* that the Liens may not extend to any other property owned by the Company or any Restricted Subsidiary;

(10)    Liens securing Indebtedness or other obligations of a Restricted Subsidiary owing to the Company or a Restricted Subsidiary permitted to be Incurred in accordance with Section 4.03;

(11)    Liens securing Hedging Obligations not Incurred in violation of this Indenture; *provided* that with respect to Hedging Obligations relating to Indebtedness, such Lien extends only to the property securing such Indebtedness;

(12)    Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances, tender, bid, judgment, appeal, performance or governmental contract bonds and completion guarantees, surety, standby letters of credit and warranty and contractual service obligations of a like nature, trade letters of credit and documentary letters of credit and similar bonds or guarantees provided by the Company or any Subsidiary of the Company;

(13)    leases and subleases of real property which do not materially interfere with the ordinary conduct of the business of the Company or any of its Restricted Subsidiaries;

(14)    Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Company and its Restricted Subsidiaries in the ordinary course of business or other precautionary Uniform Commercial Code financing statement filings;

(15)    Liens in favor of the Company, the Issuer or any Guarantor;

(16)    Liens on accounts receivable and related assets of the type specified in the definition of "Receivables Financing" Incurred in connection with a Qualified Receivables Financing to the extent permitted by the covenant described under Section 4.03;

(17)    Liens securing insurance premium financing arrangements; *provided*, *however*, that such Lien is limited to the applicable insurance carriers;

(18)    Liens on the Equity Interests of Unrestricted Subsidiaries;

(19)    leases, licenses, subleases or sublicenses granted to others in the ordinary course of business;

(20)    Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancings, refundings, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in the foregoing clauses (6), (7), (8), (9), (10), (11) and (15); *provided*, *however*, that (x) such new Lien shall be limited to all or part of the same property that secured the original Lien (*plus* improvements on such property), (y) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (A) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under clauses (6), (7), (8), (9), (10), (11) and (15) at the time the original Lien became a Permitted Lien under this Indenture, and (B) an amount necessary to pay any fees and expenses, including premiums, (including tender premiums) and original issue discount, related to such refinancing, refunding, extension, renewal or replacement and (z) Junior Lien Obligations shall not be refinanced with First Priority Lien Obligations; *provided*, *further*, *however*, that in the case of any Liens to secure any refinancing, refunding, extension or renewal of Indebtedness secured by a Lien referred to in clause (6)(B) or (C) above, the principal amount of any Indebtedness Incurred for such refinancing, refunding, extension or renewal shall be deemed secured by a Lien under clause (6)(B) or (C) and not this clause (20) for purposes of determining the principal amount of Indebtedness outstanding under clause (6)(B) or (C) above and for purposes of the definition of "Secured Credit Facility Indebtedness";

(21)    Liens on equipment of the Company or any Restricted Subsidiary granted in the ordinary course of business to the Company's or such Restricted Subsidiary's client at which such equipment is located;

(22)    judgment and attachment Liens not giving rise to an Event of Default and notices of lis pendens and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made;

(23)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business;

(24)    Liens Incurred to secure cash management services or to implement cash pooling arrangements in the ordinary course of business;

(25)    other Liens on assets not constituting Notes Collateral securing Obligations that do not exceed $75.0 million in aggregate at any time;

(26)    any encumbrance or restriction (including put and call arrangements) with respect to Capital Stock of any Joint Venture or similar arrangement pursuant to any Joint Venture or similar agreement;

1397                      (27)     any amounts held by a trustee in the funds and accounts under an indenture se-
1398    curing any revenue bonds issued for the benefit of the Company or any Restricted Subsidiary;

1399                      (28)     Liens arising by virtue of any statutory or common law provisions relating to
1400    banker's Liens, rights of set-off or similar rights and remedies as to deposit accounts or other
1401    funds maintained with a depository or financial institution;

1402                      (29)     Liens (i) of a collection bank arising under Section 4-210 of the Uniform Com-
1403    mercial Code on items in the course of collection, (ii) attaching to commodity trading accounts or
1404    other commodities brokerage accounts Incurred in the ordinary course of business and (iii) in fa-
1405    vor of a banking institution arising as a matter of law encumbering deposits (including the right of
1406    set-off) and which are within the general parameters customary in the banking industry;

1407                      (30)     Liens solely on any cash earnest money deposits made by the Company or any of
1408    its Restricted Subsidiaries in connection with any letter of intent or purchase agreement permitted
1409    under this Indenture;

1410                      (31)     any netting or set-off arrangements entered into by the Company or any Re-
1411    stricted Subsidiary of the Company in the ordinary course of its banking arrangements (including,
1412    for the avoidance of doubt, cash pooling arrangements) for the purposes of netting debit and
1413    credit balances of the Company or any Restricted Subsidiary of the Company, including pursuant
1414    to any Treasury Services Agreement;

1415                      (32)     Liens in favor of customs and revenue authorities arising as a matter of law to se-
1416    cure payment of customs duties in connection with the importation of goods in the ordinary
1417    course of business;

1418                      (33)     Liens deemed to exist in connection with Investments in repurchase agreements
1419    permitted under Section 4.03; *provided* that such Liens do not extend to any assets other than
1420    those that are the subject of such repurchase agreements;

1421                      (34)     Liens (i) on cash advances in favor of the seller of any property to be acquired in
1422    or monies placed in escrow pursuant to an Investment permitted pursuant to the definition of
1423    "Permitted Investments" to be applied against the purchase price for such Investment, (ii) over
1424    assets being acquired pursuant to Investments permitted pursuant to the definition of "Permitted
1425    Investments" pending payment in full of the purchase price, (iii) consisting of an agreement to
1426    dispose of any property in a disposition permitted pursuant to the definition of "Asset Sale" and
1427    (iv) consisting of intellectual property licenses permitted by clause (18) of the definition of "Per-
1428    mitted Investments";

1429                      (35)     Liens arising by reason of deposits necessary to qualify the Company or any
1430    other Restricted Subsidiary of the Company to conduct business, maintain self insurance or com-
1431    ply with any law and Liens securing the PBGC Settlement;

1432                      (36)     any Lien arising as a result of a sale, transfer or other disposal which is an Asset
1433    Sale in compliance with Section 4.06;

1434                      (37)     Liens relating to a Catalyst Sale/Leaseback Transaction;

1435                      (38)     Liens relating to any Limited Recourse Stock Pledge;

(39)    Liens relating to any Treasury Services Agreement, Qualified Joint Venture Transaction or Structured Financing Transaction;

(40)    Liens securing (i) the Notes and the Notes Obligations, (ii) the 2014 Notes and the Obligations in respect of the 2014 Notes, and (iii) any refinancing, refunding, extension, renewal or replacement (or successive refinancings, refundings, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in the foregoing subclauses (i) and (ii); and

(41)    Liens that are junior in priority to the Liens securing the Notes pursuant to a Third Lien Intercreditor Agreement.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"Pledgor" means any Guarantor other than the Company; *provided* that upon the release or discharge of such Subsidiary from its Obligations to pledge its assets and property to secure the Notes in accordance with this Indenture or the Security Documents, such Subsidiary ceases to be a Pledgor.

"Preferred Stock" means any Equity Interest with preferential right of payment of dividends or upon liquidation, dissolution, or winding up.

"Primary Offering" means an Equity Offering on any investment exchange or any other sale or issue by way of flotation or public offering or any equivalent circumstances with aggregate net cash proceeds to the Company or contributed to the Company of at least $500.0 million.

"Project Financings" means, with respect to any project, the Incurrence of Indebtedness relating to the development, expansion, renovation, upgrade or other modification or construction of such project pursuant to which the providers of such Indebtedness or any trustee or other intermediary on their behalf or beneficiaries designated by any such provider, trustee or other intermediary are granted security over one or more assets relating to such project for repayment of principal, premium and interest or any other amount in respect of such Indebtedness, including Indebtedness to finance working capital requirements with respect to any project; *provided* that any working capital financing shall not be secured by any assets or property included in calculating the Borrowing Base for purposes of Section 4.03(b)(iii)(B).

"Qualified Joint Venture Transaction" means any transaction in which (i) Indebtedness is owed or incurred by any Restricted Subsidiary whose activities are limited to holding shares in Joint Ventures (but only to the extent that (a) the creditors under the relevant agreement have no recourse to the Company other than to such Restricted Subsidiary; and (b) the recourse those creditors have to such Restricted Subsidiary is limited to the proceeds (if any) of dividends received by such Restricted Subsidiary in respect of such Restricted Subsidiary's investment in such Joint Ventures) or (ii) involving guarantees by the Company or any Restricted Subsidiary of Indebtedness of a customer or a third party guarantor of such customer's Indebtedness that are made to a governmental export credit agency, a state development bank or like governmental agency or organization to the extent that such guarantees are conditioned on a failure to perform by any of the Company, such Restricted Subsidiary or a joint venture under an engineering procurement or construction contract entered into with such customer or third party guarantor; *provided* that the aggregate amount of any Indebtedness referenced in this clause (ii) shall not at any time exceed 1.0% of Consolidated Net Tangible Assets of the Company.

1477          "Qualified Non-Recourse Debt" means Indebtedness that (1) is (a) Incurred by a Quali-
1478 fied Non-Recourse Subsidiary to finance (whether prior to or within 270 days after) the acquisition, lease,
1479 construction, repair, replacement or improvement of any property (real or personal) or equipment
1480 (whether through the direct purchase of property or the Equity Interests of any person owning such prop-
1481 erty and whether in a single acquisition or a series of related acquisitions) or (b) assumed by a Qualified
1482 Non-Recourse Subsidiary, (2) is non-recourse to the Company, the Issuer and any Pledgor and (3) is non-
1483 recourse to any Restricted Subsidiary that is not a Qualified Non-Recourse Subsidiary.

1484          "Qualified Non-Recourse Subsidiary" means (1) a Restricted Subsidiary that is not a
1485 Pledgor and that is formed or created after the Issue Date in order to finance an acquisition, lease, con-
1486 struction, repair, replacement or improvement of any property or equipment (directly or through one of its
1487 Subsidiaries) that secures Qualified Non-Recourse Debt and (2) any Restricted Subsidiary of a Qualified
1488 Non-Recourse Subsidiary.

1489          "Qualified Receivables Financing" means any Receivables Financing that meets the fol-
1490 lowing conditions (including, without limitation, the Euro Securitization, the Berre Facility and the Ne-
1491 gromex Receivables Dispositions):

1492          (1)      the Board of Directors of the Company shall have determined in good faith that
1493          such Qualified Receivables Financing (including financing terms, covenants, termination events
1494          and other provisions) is in the aggregate economically fair and reasonable to the Company and its
1495          Restricted Subsidiaries;

1496          (2)      all sales of accounts receivable and related assets are made at Fair Market Value;
1497          and

1498          (3)      the financing terms, covenants, termination events and other provisions thereof
1499          shall be market terms (as determined in good faith by the Company) and may include Standard
1500          Securitization Undertakings.

1501          The grant of a security interest in any accounts receivable of the Company or any of its
1502 Restricted Subsidiaries to secure the ABL Facility, any Credit Facility Indebtedness or any Indebtedness
1503 in respect of the Notes shall not be deemed a Qualified Receivables Financing.

1504          "Rating Agency" means (1) S&P, (2) Moody's, or (3) if either or both of S&P and
1505 Moody's shall not then exist, a nationally recognized securities rating agency or agencies, as the case may
1506 be, selected by the Company, which shall be substituted for S&P or Moody's or both, as the case may be.

1507          "Real Property" means, collectively, all right, title and interests (including any leasehold,
1508 mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or oper-
1509 ated by any Person, whether by lease, license or other means, together with, in each case, all easements,
1510 hereditaments and appurtenances relating thereto, all buildings, structures, parking areas and improve-
1511 ments and appurtenant fixtures and equipment, all general intangibles and contract rights and other prop-
1512 erty and rights incidental to the ownership, lease or operation thereof.

1513          "Receivables Fees" means distributions or payments made directly or by means of dis-
1514 counts with respect to any participation interests issued or sold in connection with, and all other fees paid
1515 to a Person that is not a Restricted Subsidiary in connection with, any Receivables Financing.

1516          "Receivables Financing" means any transaction or series of transactions that may be en-
1517 tered into by the Company or any of its Subsidiaries pursuant to which the Company or any of its Sub-

1518     sidiaries may sell, convey or otherwise transfer to any other Person including to a Receivables Subsidiary,
1519     or may grant a security interest in, bank accounts, any accounts receivable (whether now existing or aris-
1520     ing in the future) of the Company or any of its Subsidiaries, and any assets related thereto including,
1521     without limitation, all collateral securing such accounts receivable, all contracts and all guarantees or
1522     other obligations in respect of such accounts receivable, proceeds of such accounts receivable and other
1523     assets which are customarily transferred or in respect of which security interests are customarily granted
1524     in connection with asset securitization transactions involving accounts receivable and any Hedging Obli-
1525     gations entered into by the Company or any such Subsidiary in connection with such accounts receivable.

1526             "Receivables Repurchase Obligation" means any Obligation of a seller of receivables in a
1527     Qualified Receivables Financing to repurchase receivables arising as a result of a breach of a representa-
1528     tion, warranty or covenant or otherwise, including as a result of a receivable or portion thereof becoming
1529     subject to any asserted defense, dispute, offset or counterclaim of any kind as a result of any action taken
1530     by, any failure to take action by or any other event relating to the seller.

1531             "Receivables Subsidiary" means a Wholly Owned Restricted Subsidiary of the Company
1532     (or another Person formed for the purposes of engaging in Receivables Financing with the Company in
1533     which the Company or any Subsidiary of the Company makes an Investment and to which the Company
1534     or any Subsidiary of the Company transfers accounts receivable and related assets) which engages in no
1535     activities other than in connection with the financing of accounts receivable of the Company and its Sub-
1536     sidiaries, all proceeds thereof and all rights (contractual or other), collateral and other assets relating
1537     thereto, and any business or activities incidental or related to such business, and which is designated by
1538     the Board of Directors of the Company (as provided below) as a Receivables Subsidiary and:

1539             (a)    no portion of the Indebtedness or any other Obligations (contingent or otherwise)
1540         of which (i) is guaranteed by the Company or any other Subsidiary of the Company (excluding
1541         guarantees of Obligations (other than the principal of and interest on, Indebtedness) pursuant to
1542         Standard Securitization Undertakings), (ii) is recourse to or obligates the Company or any other
1543         Subsidiary of the Company in any way other than pursuant to Standard Securitization Undertak-
1544         ings, or (iii) subjects any property or asset of the Company or any other Subsidiary of the Com-
1545         pany, directly or indirectly, contingently or otherwise, to the satisfaction thereof, other than pur-
1546         suant to Standard Securitization Undertakings;

1547             (b)    with which neither the Company nor any other Subsidiary of the Company has
1548         any material contract, agreement, arrangement or understanding other than on terms which the
1549         Company reasonably believes to be no less favorable to the Company or such Subsidiary than
1550         those that might be obtained at the time from Persons that are not Affiliates of the Company; and

1551             (c)    to which neither the Company nor any other Subsidiary of the Company has any
1552         obligation to maintain or preserve such entity's financial condition or cause such entity to achieve
1553         certain levels of operating results.

1554             Any such designation by the Board of Directors of the Company shall be evidenced to the
1555     Trustee by filing with the Trustee a certified copy of the resolution of the Board of Directors of the Com-
1556     pany giving effect to such designation and an Officer's Certificate certifying that such designation com-
1557     plied with the foregoing conditions.

1558             "Record Date" for the interest or Additional Interest, if any , payable on any applicable
1559     Interest Payment Date April 15 and October 15 (whether or not a Business Day) immediately preceding
1560     such Interest Payment Date.

1561            "Registrar" has the meaning provided in Section 2.04.

1562            "Registration Rights Agreement" means the Registration Rights Agreement dated as of
1563    the Issue Date relating to the Notes.

1564            "Reorganization Plan" means a plan of reorganization in any of the Cases.

1565            "Responsible Officer" means, when used with respect to the Trustee, any officer within
1566    the corporate trust department of the Trustee, including any vice president, assistant vice president, assis-
1567    tant secretary, assistant treasurer, trust officer or any other officer of the Trustee who customarily per-
1568    forms functions similar to those performed by the Persons who at the time shall be such officers, respec-
1569    tively, or to whom any corporate trust matter is referred because of such Person's knowledge of and fa-
1570    miliarity with the particular subject and who shall have direct responsibility for the administration of this
1571    Indenture.

1572            "Restricted Investment" means an Investment other than a Permitted Investment.

1573            "Restricted Subsidiary" means, with respect to any Person, any Subsidiary of such Person
1574    other than an Unrestricted Subsidiary of such Person. Unless otherwise indicated in this Indenture, all ref-
1575    erences to Restricted Subsidiaries shall mean Restricted Subsidiaries of the Company. For the avoidance
1576    of doubt, the Issuer shall at all times constitute a Restricted Subsidiary.

1577            "S&P" means Standard & Poor's Ratings Group or any successor to the rating agency
1578    business thereof.

1579            "Sale/Leaseback Transaction" means an arrangement relating to property now owned or
1580    hereafter acquired by the Company or a Restricted Subsidiary whereby the Company or a Restricted Sub-
1581    sidiary transfers such property to a Person and the Company or such Restricted Subsidiary leases it from
1582    such Person, other than leases between the Company and a Restricted Subsidiary of the Company or be-
1583    tween Restricted Subsidiaries of the Company.

1584            "SEC" means the Securities and Exchange Commission or any successor agency or
1585    commission.

1586            "Second Lien Documents" means the credit, guarantee and security documents governing
1587    the Second Priority Lien Obligations, including, without limitation, the ABL Facility and the Second Lien
1588    Security Documents.

1589            "Second Lien Secured Parties" means (a) the "Secured Parties," as defined in the ABL
1590    Facility and (b) any Additional Second Lien Secured Parties.

1591            "Second Lien Security Documents" means the Security Documents and any other agree-
1592    ment, document or instrument pursuant to which a Lien is granted or purported to be granted securing
1593    Second Priority Lien Obligations or under which rights or remedies with respect to such Liens are gov-
1594    erned, in each case to the extent relating to the collateral securing the Second Priority Lien Obligations.
1595    [To be confirmed].

1596            "Second Priority After-Acquired Property" means any property of the Company, the Is-
1597    suer or any Pledgor that constitutes ABL Collateral (other than Excluded Assets).

1598           "<u>Second Priority Lien Obligations</u>" means (i) all Indebtedness under the Asset Backed
1599    Credit Facility and any other Credit Facility Incurred pursuant to clause (b)(iii)(B) of Section 4.03 and (ii)
1600    Additional Second Priority Lien Obligations.

1601           "<u>Secured Credit Facility Indebtedness</u>" means any Credit Facility Indebtedness that is se-
1602    cured by a Permitted Lien Incurred or deemed Incurred pursuant to clause (6)(B) of the definition of "Per-
1603    mitted Liens."

1604           "<u>Secured Indebtedness</u>" means any Indebtedness secured by a Lien.

1605           "<u>Secured Indebtedness Leverage Ratio</u>" means, with respect to any Person, at any date
1606    the ratio of (i) Secured Indebtedness constituting First Priority Lien Obligations of such Person and its
1607    Restricted Subsidiaries as of such date of calculation (determined on a consolidated basis in accordance
1608    with GAAP) to (ii) Consolidated EBITDA of such Person for the four full fiscal quarters for which inter-
1609    nal financial statements are available immediately preceding such date of such calculation. In the event
1610    that the Company or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebt-
1611    edness subsequent to the commencement of the period for which the Secured Indebtedness Leverage Ra-
1612    tio is being calculated but prior to the event for which the calculation of the Secured Indebtedness Lever-
1613    age Ratio is made (the "<u>Secured Leverage Calculation Date</u>"), then the Secured Indebtedness Leverage
1614    Ratio shall be calculated giving *pro forma* effect to such Incurrence, repayment, repurchase or redemption
1615    of Indebtedness as if the same had occurred at the beginning of the applicable four-quarter period; *pro-*
1616    *vided* that the Issuer may elect pursuant to an Officer's Certificate delivered to the Trustee to treat all or
1617    any portion of the commitment under any Indebtedness as being Incurred at such time, in which case any
1618    subsequent Incurrence of Indebtedness under such commitment shall not be deemed, for purposes of this
1619    calculation, to be an Incurrence at such subsequent time.

1620           For purposes of making the computation referred to above, Investments, acquisitions,
1621    dispositions, mergers, amalgamations, consolidations and discontinued operations (as determined in ac-
1622    cordance with GAAP), in each case with respect to an operating unit of a business, and any operational
1623    changes that the Company or any of its Restricted Subsidiaries has determined to make and/or made dur-
1624    ing the four-quarter reference period or subsequent to such reference period and on or prior to or simulta-
1625    neously with the Secured Leverage Calculation Date shall be calculated on a *pro forma* basis assuming
1626    that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations, discontin-
1627    ued operations and other operational changes (and the change of any associated Indebtedness and the
1628    change in Consolidated EBITDA resulting therefrom) had occurred on the first day of the four-quarter
1629    reference period. If since the beginning of such period any Person that subsequently became a Restricted
1630    Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the beginning of
1631    such period shall have made any Investment, acquisition, disposition, merger, consolidation, amalgama-
1632    tion, discontinued operation or operational change, in each case with respect to an operating unit of a
1633    business, that would have required adjustment pursuant to this definition, then the Secured Indebtedness
1634    Leverage Ratio shall be calculated giving *pro forma* effect thereto for such period as if such Investment,
1635    acquisition, disposition, discontinued operation, merger, amalgamation, consolidation or operational
1636    change had occurred at the beginning of the applicable four-quarter period.

1637           For purposes of this definition, whenever *pro forma* effect is to be given to any event, the
1638    *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of the
1639    Company. Any such *pro forma* calculation may include adjustments appropriate, in the reasonable good
1640    faith determination of the Company as set forth in an Officer's Certificate, to reflect (1) operating expense
1641    reductions and other operating improvements or synergies reasonably expected to result from the applica-
1642    ble event and (2) all adjustments of the nature set forth as "Restructuring Adjustments" under "Unaudited

1643  Consolidated *Pro Forma* Financial Information" in the Offering Memorandum to the extent such adjust-
1644  ments, without duplication, continue to be applicable to such four-quarter period.

1645          For the purposes of this definition, any amount in a currency other than U.S. Dollars will
1646  be converted to U.S. Dollars based on the average exchange rate for such currency for the most recent
1647  twelve-month period immediately prior to the date of determination or if any such Indebtedness is subject
1648  to a Currency Agreement with respect to the currency in which such Indebtedness is denominated cover-
1649  ing principal, premium, if any, and interest on such Indebtedness, the amount of such Indebtedness and
1650  such interest and premium, if any, shall be determined after giving effect to all payments in respect
1651  thereof under such Currency Agreement.

1652          "Securities Act" means the Securities Act of 1933, as amended, and the rules and regula-
1653  tions of the SEC promulgated thereunder.

1654          "Security Documents" means the security agreements, pledge agreements, collateral as-
1655  signments, mortgages and related agreements, as amended, supplemented, modified, extended, restruc-
1656  tured, renewed, restated or replaced in whole or in part from time to time, creating the security interests in
1657  the Collateral as contemplated by this Indenture.

1658          "Senior Term Loan Collateral Agent" means UBS AG, Stamford Branch, as the collateral
1659  agent under the Senior Term Loan Facility, or its successors.

1660          "Senior Term Loan Facility" means the senior secured term loan facility of the Issuer to
1661  be entered into on the Issue Date as amended, supplemented, modified, extended, restructured, renewed,
1662  restated, refinanced or replaced in whole or in part from time to time.

1663          "Series" means (a) with respect to the First Lien Secured Parties, each of (i) the secured
1664  parties under the Senior Term Loan Facility (in their capacities as such), (ii) the holders of the First Lien
1665  Notes, the First Lien Notes Collateral Agent and the First Lien Trustee (each in its capacity as such) and
1666  (iii) the Additional First Lien Secured Parties that become subject to the First Lien Intercreditor Agree-
1667  ment after the date hereof that are represented by a common Authorized Representative (in its capacity as
1668  such for such Additional First Lien Secured Parties); (b) with respect to any First Priority Lien Obliga-
1669  tions, each of (i) the Obligations under the Senior Term Loan Facility, (ii) the First Lien Notes Obliga-
1670  tions and (iii) the Additional First Priority Lien Obligations Incurred pursuant to any applicable agree-
1671  ment, which pursuant to any joinder agreement, are to be represented under the First Lien Intercreditor
1672  Agreement by a common Authorized Representative (in its capacity as such for such Additional First Pri-
1673  ority Lien Obligations); and (c) with respect to any Junior Lien Obligations, each of (i) the Notes Obliga-
1674  tions and the Obligations in respect of any refunding, refinancing or defeasement of the Notes and (ii) the
1675  Junior Lien Obligations Incurred after the Issue Date pursuant to any applicable agreement.

1676          "Shelf Registration Statement" means the Shelf Registration Statement as defined in the
1677  Registration Rights Agreement.

1678          "Significant Subsidiary" means any Restricted Subsidiary that would be a "Significant
1679  Subsidiary" of the Company within the meaning of Rule 1-02 under Regulation S-X promulgated by the
1680  SEC (or any successor provision).

1681          "Similar Business" means a business, the majority of whose revenues are derived from
1682  the activities of the Company and its Subsidiaries as of the Issue Date or any business or activity that is
1683  reasonably similar or complementary thereto or a reasonable extension, development or expansion thereof
1684  or ancillary thereto.

1685         "<u>Special Purpose Subsidiary</u>" means any Subsidiary of the Company whose material as-
1686 sets are comprised solely of the Capital Stock of a Joint Venture, where the pledge of such Capital Stock
1687 would be prohibited by any contractual requirement pertaining to such Joint Venture.

1688         "<u>Specified ABL Facility Assets</u>" means any ABL Facility Collateral, the net proceeds of
1689 an Asset Sale of which are required to be applied as a prepayment of any Asset Backed Credit Facility.

1690         "<u>Sponsor</u>" means Apollo Global Management, LLC and any of its successors in interest
1691 or Affiliates.

1692         "<u>Standard Securitization Undertakings</u>" means representations, warranties, undertakings,
1693 covenants, indemnities and guarantees of performance entered into by the Company or any Subsidiary of
1694 the Company which the Company has determined in good faith to be customary in a Receivables Financ-
1695 ing it being understood that any Receivables Repurchase Obligation shall be deemed to be a Standard Se-
1696 curitization Undertaking.

1697         "<u>Stated Maturity</u>" means, with respect to any security, the date specified in such security
1698 as the fixed date on which the final payment of principal of such security is due and payable, including
1699 pursuant to any mandatory redemption provision (but excluding any provision providing for the repur-
1700 chase of such security at the option of the holder thereof upon the happening of any contingency beyond
1701 the control of the issuer unless such contingency has occurred).

1702         "<u>Structured Financing Transaction</u>" means a sale of preferred shares of a Restricted Sub-
1703 sidiary, depositing the proceeds of such sale with a bank and pledging such deposit to guarantee a put and
1704 call with respect to such preferred shares.

1705         "<u>Subordinated Indebtedness</u>" means (a) with respect to the Issuer, any Indebtedness of
1706 the Issuer which is by its terms subordinated in right of payment to the Notes, and (b) with respect to any
1707 Guarantor, any Indebtedness of such Guarantor which is by its terms subordinated in right of payment to
1708 Obligations in respect of the Notes.

1709         "<u>Subsidiary</u>" means, with respect to any Person, (1) any corporation, association or other
1710 business entity (other than a partnership, joint venture or limited liability company) of which more than
1711 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any
1712 contingency) to vote in the election of directors, managers or trustees thereof is at the time of determina-
1713 tion owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of
1714 that Person or a combination thereof; (2) any partnership, joint venture or limited liability company of
1715 which (x) more than 50% of the capital accounts, distribution rights, total equity and voting interests or
1716 general and limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by
1717 such Person or one or more of the other Subsidiaries of that Person or a combination thereof, whether in
1718 the form of membership, general, special or limited partnership interests or otherwise, and (y) such Person
1719 or any Subsidiary of such Person is a controlling general partner or otherwise controls such entity; or
1720 (3) with respect to the Company, for so long as the Company or any of its Subsidiaries, individually or in
1721 the aggregate, has at least a 50% ownership interest in Lyondell Bayer Manufacturing Maasvlakle VOF,
1722 Lyondell Bayer Manufacturing Maasvlakle VOF. Unless otherwise qualified, all references to a "Subsidi-
1723 ary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Company.

1724         "<u>Taking</u>" means any taking of all or any portion of the Collateral by condemnation or
1725 other eminent domain proceedings, pursuant to any law, general or special, or by reason of the temporary
1726 requisition of the use or occupancy of all or any portion of the Collateral by any governmental authority,
1727 civil or military, or any sale pursuant to the exercise by any such governmental authority of any right

1728 which it may then have to purchase or designate a purchaser or to order a sale of all or any portion of the
1729 Collateral.

1730 "Third Lien Intercreditor Agreement" means an intercreditor agreement that sets forth the
1731 relative priority and rights of the Liens junior to the Notes in a manner similar to how the Notes are
1732 treated in the Junior Lien Intercreditor Agreement.

1733 "Third Priority Lien Obligations" means (i) all Indebtedness under the Notes, (ii) the
1734 Notes Obligations, (iii) the 2014 Notes, (iv) the Obligations in respect of the 2014 Notes and the Obliga-
1735 tions in respect of any refunding, refinancing or defeasance of the 2014 Notes and (v) Third Priority
1736 Lien Obligations that are Incurred after the Issue Date and secured by the Notes Collateral on a third pri-
1737 ority basis pursuant to the Security Documents.

1738 "TIA" or "Trust Indenture Act" means the Trust Indenture Act of 1939 (15 U.S.C. Sec-
1739 tions 77aaa-77bbbb) as in effect on the date of this Indenture.

1740 "Total Assets" means, with respect to any Person, the total consolidated assets of such
1741 Person and its Restricted Subsidiaries, without giving effect to any amortization of the amount of intangi-
1742 ble assets since the Issue Date, (x) as shown on the most recent balance sheet of such Person, or (y) in
1743 regards to the Company only, as shown on the most recent balance sheet required to be delivered pursuant
1744 to Section 4.02.

1745 "Transfer Restricted Note" means any Transfer Restricted Security as defined in the Reg-
1746 istration Rights Agreement.

1747 "Treasury Rate" means, as of the applicable redemption date, the yield to maturity as of
1748 such redemption date of United States Treasury Securities with a constant maturity (as compiled and pub-
1749 lished in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly avail-
1750 able at least two Business Days prior to such redemption date (or, if such Statistical Release is no longer
1751 published, any publicly available source of similar market data)) most nearly equal to the period from
1752 such redemption date to May 1, 2013; *provided*, *however*, that if the period from such redemption date to
1753 May 1, 2013 is less than one year, the weekly average yield on actually traded United States Treasury
1754 Securities adjusted to a constant maturity of one year will be used.

1755 "Treasury Services Agreement" means any agreement between the Issuer, any Guarantor
1756 or Restricted Subsidiary and any commercial bank or other financial institution relating to treasury, de-
1757 pository, and cash management services, employee credit card arrangements or automated clearinghouse
1758 transfer of funds.

1759 "Trust Officer" means:

1760 (1) any officer within the corporate trust department of the Trustee, including any
1761 vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any
1762 other officer of the Trustee who customarily performs functions similar to those performed by the
1763 Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter
1764 is referred because of such Person's knowledge of and familiarity with the particular subject, and

1765 (2) who shall have direct responsibility for the administration of this Indenture.

1766 "Trustee" means the party named as such in this Indenture until a successor replaces it
1767 and, thereafter, means the successor.

1768            "<u>Uniform Commercial Code</u>" or "<u>UCC</u>" means the New York Uniform Commercial
1769 Code as in effect from time to time.

1770            "<u>Unrestricted Note</u>" means a Note which is not a Transfer Restricted Note.

1771            "<u>Unrestricted Subsidiary</u>" means:

1772         (1)      any Subsidiary of the Company that at the time of determination shall be desig-
1773 nated an Unrestricted Subsidiary by the Board of Directors of such Person in the manner provided
1774 below; and

1775         (2)      any Subsidiary of an Unrestricted Subsidiary;

1776            The Company may designate any Subsidiary of the Company (including any newly ac-
1777 quired or newly formed Subsidiary of the Company) to be an Unrestricted Subsidiary unless such Sub-
1778 sidiary or any of its Subsidiaries owns any Equity Interests or Indebtedness of, or owns or holds any Lien
1779 on any property of, the Company or any other Subsidiary of the Company that is not a Subsidiary of the
1780 Subsidiary to be so designated; *provided*, *however*, that the Subsidiary to be so designated and its Sub-
1781 sidiaries do not at the time of designation have and do not thereafter Incur any Indebtedness pursuant to
1782 which the lender has recourse to any of the assets of the Company or any of its Restricted Subsidiaries
1783 (except as permitted under Section 4.03); *provided*, *further*, *however*, that either:

1784         (a)      the Subsidiary to be so designated has total consolidated assets of $1,000 or less;
1785 or

1786         (b)      if such Subsidiary has consolidated assets greater than $1,000, then such designa-
1787 tion would be permitted under Section 4.04.

1788            The Company may designate any Unrestricted Subsidiary to be a Restricted Subsidiary;
1789 *provided*, *however*, that immediately after giving effect to such designation:

1790         (x)      (1) the Company could Incur $1.00 of additional Indebtedness pursuant to the
1791 Fixed Charge Coverage Ratio test described in Section 4.03 or (2) the Fixed Charge Coverage
1792 Ratio for the Company and its Restricted Subsidiaries would be greater than such ratio for the
1793 Company and its Restricted Subsidiaries immediately prior to such designation, in each case on a
1794 *pro forma* basis taking into account such designation, and

1795         (y)      no Event of Default shall have occurred and be continuing.

1796            Any such designation by Company shall be evidenced to the Trustee by promptly filing
1797 with the Trustee a copy of the resolution of the Board of Directors or any committee thereof of the Com-
1798 pany giving effect to such designation and an Officer's Certificate certifying that such designation com-
1799 plied with the foregoing provisions.

1800            "<u>U.S. Dollar Equivalent</u>" means, with respect to any monetary amount in a currency other
1801 than U.S. dollars, at any time for the determination thereof, the amount of U.S. dollars obtained by con-
1802 verting such foreign currency involved in such computation into U.S. dollars at the spot rate for the pur-
1803 chase of U.S. dollars with the applicable foreign currency as quoted by Reuters at approximately 10:00
1804 A.M. (New York City time) on such date of determination (or if no such quote is available on such date,
1805 on the immediately preceding Business Day for which such a quote is available).

1806          "<u>U.S. Legal Tender</u>" means such coin or currency of the U.S. as at the time of payment
1807    shall be legal tender for the payment of public and private debts.

1808          "<u>Voting Stock</u>" of any Person as of any date means the Capital Stock of such Person that
1809    is at the time entitled to vote in the election of the Board of Directors of such Person.

1810          "<u>Weighted Average Life to Maturity</u>" means, when applied to any Indebtedness or Dis-
1811    qualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing
1812    (1) the sum of the products of the number of years from the date of determination to the date of each suc-
1813    cessive scheduled principal payment of such Indebtedness or redemption or similar payment with respect
1814    to such Disqualified Stock or Preferred Stock multiplied by the amount of such payment, by (2) the sum
1815    of all such payments.

1816          "<u>Wholly Owned Domestic Subsidiary</u>" is any Wholly Owned Subsidiary that is a Domes-
1817    tic Subsidiary.

1818          "<u>Wholly Owned Restricted Subsidiary</u>" is any Wholly Owned Subsidiary that is a Re-
1819    stricted Subsidiary.

1820          "<u>Wholly Owned Subsidiary</u>" of any Person means a Subsidiary of such Person 100% of
1821    the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying
1822    shares or shares required to be held by Foreign Subsidiaries) shall at the time be owned by such Person or
1823    by one or more Wholly Owned Subsidiaries of such Person.

1824          SECTION 1.02.    <u>Other Definitions</u>.

| Term | Defined in Section |
| --- | --- |
| "3-16 Exemption" | 11.04(c) |
| "Additional Amounts" | 4.17(a) |
| "Additional Guarantee" | 4.11(a) |
| "Affiliate Transaction" | 4.07(a) |
| "Applicable Collateral Agents" | 1.01 |
| "Asset Sale Offer" | 4.06(b) |
| "Authentication Order" | 2.03 |
| "Bankruptcy Law" | 6.01 |
| "Borrowing Base" | 4.03(b)(iii)(B) |
| "Change of Control Offer" | 4.08(c) |
| "Collateral Agreement" | 11.01 |
| "Collateral Asset Sale Offer" | 4.06(b) |
| "Collateral Excess Proceeds" | 4.06(b) |
| "Company" | Preamble |
| "covenant defeasance option" | 8.01(b) |
| "Covenant Suspension Event" | 4.15 |
| "Custodian" | 6.01 |
| "DBTCA" | 7.13(a) |
| "Dutch Security Documents" | 7.13(a) |
| "Event of Default" | 6.01 |
| "Excess Proceeds" | 4.06(b) |
| "Guarantee" | 12.01(a) |
| "Guaranteed Obligations" | 12.01(a) |

| Term | Defined in Section |
|------|--------------------|
| "Guarantor" | 12.01(a) |
| "incorporated provision" | 13.01 |
| "Initial Notes" | Preamble |
| "Investment Grade Status Period" | 4.15 |
| "Issuer" | Preamble |
| "legal defeasance option" | 8.01(b) |
| "Notice of Default" | 6.01 |
| "Offer Period" | 4.06(d) |
| "other notes" | 4.03(b)(i) |
| "Parallel Debt" | 7.13(b)(i) |
| "Paying Agent" | 2.04 |
| "Payor" | 4.17(a) |
| "primary obligations" | 1.01 |
| "primary obligor" | 1.01 |
| "Principal Obligations" | 7.13(a) |
| "protected purchaser" | 2.08 |
| "Reference Period" | 4.04(a)(3)(i) |
| "Refinancing Indebtedness" | 4.03(b)(xvi) |
| "Refunding Capital Stock" | 4.04(b)(ii)(A) |
| "Registrar" | 2.04 |
| "Relevant Taxing Jurisdiction" | 4.17(a) |
| "Restricted Payments" | 4.04(a) |
| "Retired Capital Stock" | 4.04(b)(ii)(A) |
| "Reversion Date" | 4.15 |
| "Second Commitment" | 4.06(b) |
| "Secured Leverage Calculation Date" | 1.01 |
| "Successor Company" | 5.01(a)(i) |
| "Successor Issuer" | 5.01(c)(i) |
| "Successor Pledgor" | 5.01(e)(i) |
| "Suspended Covenants" | 4.15 |
| "Suspension Period" | 4.15 |
| "Taxes" | 4.17(a) |
| "Transfer" | 5.01 |
| "Trustee" | Preamble |
| "Paying Agent" | Preamble |

SECTION 1.03.    <u>Incorporation by Reference of Trust Indenture Act</u>. This Indenture incorporates by reference certain provisions of the TIA. The following TIA terms have the following meanings:

"<u>Commission</u>" means the SEC.

"<u>indenture securities</u>" means the Notes and any Guarantee.

"<u>indenture security holder</u>" means a holder.

"<u>indenture to be qualified</u>" means this Indenture.

"<u>indenture trustee</u>" or "<u>institutional trustee</u>" means the Trustee.

1834         "<u>obligor</u>" on the indenture securities means the Issuer and each Guarantor and any other
1835  obligor on the Notes.

1836         All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA
1837  reference to another statute or defined by SEC rule have the meanings assigned to them by such defini-
1838  tions.

1839         SECTION 1.04.   <u>Rules of Construction</u>.  Unless the context otherwise requires:

1840         (a)    a term has the meaning assigned to it;

1841         (b)    an accounting term not otherwise defined has the meaning assigned to it in ac-
1842  cordance with GAAP;

1843         (c)    "<u>or</u>" is not exclusive;

1844         (d)    "<u>including</u>" means including without limitation;

1845         (e)    words in the singular include the plural and words in the plural include the singu-
1846  lar;

1847         (f)    unsecured Indebtedness shall not be deemed to be subordinate or junior to Se-
1848  cured Indebtedness merely by virtue of its nature as unsecured Indebtedness;

1849         (g)    the principal amount of any non-interest bearing or other discount security at any
1850  date shall be the principal amount thereof that would be shown on a balance sheet of the issuer
1851  dated such date prepared in accordance with GAAP;

1852         (h)    the principal amount of any Preferred Stock shall be (i) the maximum liquidation
1853  value of such Preferred Stock or (ii) the maximum mandatory redemption or mandatory repur-
1854  chase price with respect to such Preferred Stock, whichever is greater;

1855         (i)    unless otherwise specified herein, all accounting terms used herein shall be inter-
1856  preted, all accounting determinations hereunder shall be made, and all financial statements re-
1857  quired to be delivered hereunder shall be prepared in accordance with GAAP;

1858         (j)    "<u>$</u>" and "<u>U.S. dollars</u>" each refer to United States dollars, or such other money of
1859  the United States of America that at the time of payment is legal tender for payment of public and
1860  private debts;

1861         (k)    "<u>euro</u>" or "<u>€</u>" means the currency introduced at the start of the third stage of eco-
1862  nomic and monetary union pursuant to the Treaty of Rome establishing the European Commu-
1863  nity, as amended by the Treaty on European Union, signed at Maastricht on February 7, 1992;
1864  and

1865         (l)    whenever in this Indenture or the Notes there is mentioned, in any context, prin-
1866  cipal, interest or any other amount payable under or with respect to any Notes, such mention shall
1867  be deemed to include mention of the payment of Additional Interest, to the extent that, in such
1868  context, Additional Interest is, were or would be payable in respect thereof.

1869                                          **ARTICLE II**
1870
1871                                          **THE NOTES**

1872              SECTION 2.01.    <u>Amount of Notes; Terms</u>.  The aggregate principal amount of Notes
1873    which may be authenticated and delivered under this Indenture on the Issue Date is $3,250,000,000.

1874              The terms and provisions contained in the Notes shall constitute, and are hereby ex-
1875    pressly made, a part of this Indenture and the Issuer, the Guarantors and the Trustee, by their execution
1876    and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.
1877    However, to the extent any provision of any Note conflicts with the express provisions of this Indenture,
1878    the provisions of this Indenture shall govern and be controlling.

1879              The Notes shall be subject to repurchase by the Issuer pursuant to an Asset Sale Offer as
1880    provided in Section 4.06 hereof or a Change of Control Offer as provided in Section 4.08 hereof.  The
1881    Notes shall not be redeemable, other than as provided in Article III.

1882              The terms and provisions contained in the Notes shall constitute, and are hereby ex-
1883    pressly made, a part of this Indenture and the Issuer, the Guarantors, the Trustee and Agents by their exe-
1884    cution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound
1885    thereby.  However, to the extent any provision of any Note conflicts with the express provisions of this
1886    Indenture, the provisions of this Indenture shall govern and be controlling.

1887              Additional Notes ranking *pari passu* with the Initial Notes may be created and issued un-
1888    der this Indenture from time to time by the Issuer without notice to or consent of the holders and shall be
1889    consolidated with and form a single class with the Initial Notes and shall have the same terms as to status,
1890    redemption or otherwise as the Initial Notes, other than the initial payment date; *provided* that the Issuer's
1891    ability to issue Additional Notes shall be subject to the Issuer and the Company's compliance with Sec-
1892    tions 4.03 and 4.12 hereof.  The Initial Notes and any Additional Notes subsequently issued under this
1893    Indenture may not, unless the Issuer so elects, be treated as a single class for all purposes under this In-
1894    denture, including, without limitation, waivers, amendments, redemptions and offers to purchase.  Any
1895    Additional Notes subsequently issued under the Indenture will be not treated as fungible with the Initial
1896    Notes of the relevant series for United States federal income tax purposes or under the laws of any other
1897    jurisdiction, unless the Issuer so elects. Unless the context otherwise requires, for all purposes of this In-
1898    denture, references to the Notes include any Additional Notes actually issued.

1899              SECTION 2.02.    <u>Form and Dating</u>.

1900              (a)      The Notes and the Trustee's certificate of authentication shall be substantially in
1901    the form of <u>Exhibit A</u> attached hereto, and the CUSIP applicable to Transfer Restricted Notes and Unre-
1902    stricted Notes as set forth in <u>Exhibit A</u> attached hereto.  The Notes may have notations, legends or en-
1903    dorsements required by law, stock exchange rules or usage.  Each Note shall be dated the date of its au-
1904    thentication.  The Notes shall be in minimum denominations of $100,000 and integral multiples of $1,000
1905    in excess thereof.

1906              (b)      <u>Global Notes</u>.  Notes issued in global form shall be substantially in the form of
1907    <u>Exhibit A</u> attached hereto (including the Global Note Legend thereon and the "Schedule of Exchanges of
1908    Interests in the Global Note" attached thereto).  Notes issued in definitive form shall be substantially in
1909    the form of <u>Exhibit A</u> attached hereto (but without the Global Note Legend thereon and without the
1910    "Schedule of Exchanges of Interests in the Global Note" attached thereto).  Each Global Note shall repre-
1911    sent such of the outstanding Notes as shall be specified in the "Schedule of Exchanges of Interests in the

1912  Global Note" attached thereto and each shall provide that it shall represent up to the aggregate principal
1913  amount of Notes from time to time endorsed thereon and that the aggregate principal amount of out-
1914  standing Notes represented thereby may from time to time be reduced or increased, as applicable, to re-
1915  flect exchanges and redemptions.  Any endorsement of a Global Note to reflect the amount of any in-
1916  crease or decrease in the aggregate principal amount of outstanding Notes represented thereby shall be
1917  made by the Registrar or the Custodian, at the direction of the Registrar, in accordance with instructions
1918  given by the holder thereof as required by Section 2.07 hereof.

1919        SECTION 2.03.     Execution and Authentication.  One Officer shall sign the Notes for
1920  the Issuer by manual or facsimile signature.

1921        If an Officer whose signature is on a Note no longer holds that office at the time the Trus-
1922  tee authenticates the Note, the Note shall be valid nevertheless.

1923        A Note shall not be valid until an authorized signatory of the Trustee manually signs the
1924  certificate of authentication on the Notes in accordance with this Section 2.03.  The signature shall be
1925  conclusive evidence that the Note has been authenticated under this Indenture.

1926        On the Issue Date, the Trustee shall, upon receipt of an Issuer Order (an "Authentication
1927  Order") and an Opinion of Counsel conforming with Section 314(c) of the TIA, authenticate and deliver
1928  the Initial Notes.  In addition, at any time, from time to time, the Trustee shall upon an Authentication
1929  Order authenticate and deliver any Additional Notes for an aggregate principal amount specified in such
1930  Authentication Order for such Additional Notes issued hereunder.

1931        The Trustee may appoint one or more authenticating agents reasonably acceptable to the
1932  Issuer to authenticate the Notes.  Any such appointment shall be evidenced by an instrument signed by a
1933  Trust Officer, a copy of which shall be furnished to the Issuer.  Unless limited by the terms of such ap-
1934  pointment, an authenticating agent may authenticate Notes whenever the Trustee may do so.  Each refer-
1935  ence in this Indenture to authentication by the Trustee includes authentication by such agent.  An authen-
1936  ticating agent has the same rights as an Agent to deal with holders or an Affiliate of the Issuer.  The Trus-
1937  tee hereby appoints Wells Fargo Bank, N.A. as authenticating agent for the Notes.

1938        Notwithstanding the foregoing, except as provided in Section 9.02, all Notes issued under
1939  this Indenture shall vote and consent together on all matters (as to which any of such Notes may vote or
1940  consent) as one class and no series of Notes will have the right to vote or consent as a separate class on
1941  any matter.

1942        SECTION 2.04.     Registrar and Paying Agent.  The Issuer shall maintain an office or
1943  agency, where (a) Notes may be presented or surrendered for registration of transfer or for exchange
1944  ("Registrar"), (b) Notes may be presented or surrendered for payment and (c) notices and demands to or
1945  upon the Issuer in respect of the Notes and this Indenture may be served.  The Paying Agent shall not be
1946  the Issuer or an Affiliate of the Issuer.  The Registrar shall keep a register of the Notes and of their trans-
1947  fer and exchange.  The Issuer, upon notice to the Trustee, may have one or more Co-Registrars and one or
1948  more additional paying agents reasonably acceptable to the Trustee.  The term "Paying Agent" includes
1949  any additional paying agent, and the term "Registrar" includes any Co-Registrar.  The Issuer may change
1950  the Paying Agent or Registrar without notice to any holder.

1951        The Issuer shall enter into an appropriate agency agreement with any Agent not a party to
1952  this Indenture, which agreement shall incorporate the provisions of the TIA and implement the provisions
1953  of this Indenture that relate to such Agent.  The Issuer shall notify the Trustee, in advance, of the name

1954    and address of any such Agent.  If the Issuer fails to maintain a Registrar or Paying Agent, or fails to give
1955    the foregoing notice, the Trustee shall act as such.

1956    The Issuer initially appoints Wells Fargo Bank, N.A. as the Registrar and Paying Agent
1957    with respect to the Notes and initially appoints [    ] as Depositary in each case until such time as such en-
1958    tity has resigned or a successor has been appointed.

1959    The Issuer may remove any Registrar or Paying Agent upon written notice to such Regis-
1960    trar or Paying Agent and to the Trustee; *provided*, *however*, that no such removal shall become effective
1961    until (i) if applicable, acceptance of an appointment by a successor as evidenced by an appropriate agree-
1962    ment entered into by the Issuer and such successor Registrar or Paying Agent, as the case may be, and
1963    delivered to the Trustee or (ii) notification to the Trustee that the Trustee shall serve as Registrar or Pay-
1964    ing Agent until the appointment of a successor in accordance with clause (i) above.  The Registrar or Pay-
1965    ing Agent may resign upon 30 days prior written notice to the Issuer and the Trustee; *provided*, *however*,
1966    that the Trustee may resign as Paying Agent or Registrar only if the Trustee also resigns as Trustee in ac-
1967    cordance with Section 7.08.

1968    SECTION 2.05.    Paying Agent to Hold Money in Trust.  Prior to 10:00 a.m. London
1969    time on each due date of the principal of and interest on any Note, the Issuer shall deposit with the Paying
1970    Agent (or if the Issuer or a Wholly Owned Subsidiary is acting as Paying Agent, segregate and hold in
1971    trust for the benefit of the Persons entitled thereto) a sum sufficient to pay such principal and interest
1972    when so becoming due.  The Issuer shall require the Paying Agent (other than the Trustee) to agree in
1973    writing that the Paying Agent shall hold in trust for the benefit of holders or the Trustee all money held by
1974    the Paying Agent for the payment of principal of and interest on the Notes, and shall notify the Trustee of
1975    any default by the Issuer in making any such payment.  If the Issuer or a Wholly Owned Subsidiary of the
1976    Issuer acts as Paying Agent, it shall segregate the money held by it as Paying Agent and hold it in trust for
1977    the benefit of the Persons entitled thereto.  The Issuer at any time may require the Paying Agent to pay all
1978    money held by it to the Trustee and to account for any funds disbursed by such Paying Agent.  Upon
1979    complying with this Section, the Paying Agent shall have no further liability for the money delivered to
1980    the Trustee.

1981    SECTION 2.06.    Holder Lists.  The Trustee shall preserve in as current a form as is
1982    reasonably practicable the most recent list available to it of the names and addresses of holders.  If the
1983    Trustee is not the Registrar, the Issuer shall furnish, or cause the Registrar to furnish, to the Trustee, in
1984    writing at least five Business Days before each Interest Payment Date and at such other times as the Trus-
1985    tee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of
1986    the names and addresses of holders.

1987    SECTION 2.07.    Transfer and Exchange.

1988    (a)    Transfer and Exchange of Global Notes.  Except as otherwise set forth in this
1989    Section 2.07, a Global Note may be transferred, in whole and not in part, only to another nominee of the
1990    Depositary or to a successor thereto or a nominee of such successor thereto.  A beneficial interest in a
1991    Global Note may not be exchanged for a Definitive Note of the same series unless (A) the Depositary (x)
1992    notifies the Issuer that it is unwilling or unable to continue as Depositary for such Global Note or (y) has
1993    ceased to be a clearing agency registered under the Exchange Act, and, in either case, a successor Deposi-
1994    tary is not appointed by the Issuer within 120 days, or (B) there shall have occurred and be continuing a
1995    Default with respect to the Notes.  Upon the occurrence of any of the preceding events in (A) above, De-
1996    finitive Notes delivered in exchange for any Global Note of the same series or beneficial interests therein
1997    will be registered in the names, and issued in any approved denominations, requested by or on behalf of
1998    the Depositary (in accordance with its customary procedures).  Global Notes also may be exchanged or

replaced, in whole or in part, as provided in Section 2.08 hereof. Every Note authenticated and delivered in exchange for, or in lieu of, a Global Note of the same series or any portion thereof, pursuant to this Section 2.07 or Section 2.08 hereof, shall be authenticated and delivered in the form of, and shall be, a Global Note, except for Definitive Notes issued subsequent to any of the preceding events in (i) or (ii) above and pursuant to Section 2.07(c) hereof. A Global Note may not be exchanged for another Note other than as provided in this Section 2.07(a); *provided*, *however*, beneficial interests in a Global Note may be transferred and exchanged as provided in Section 2.07(b), (c) or (f) hereof.

(b)    _Transfer and Exchange of Beneficial Interests in the Global Notes_.  The transfer and exchange of beneficial interests in the Global Notes shall be effected through the Depositary, in accordance with the provisions of this Indenture and the Applicable Procedures. Transfers of beneficial interests in the Global Notes also shall require compliance with either subparagraph (i) or (ii) below, as applicable, as well as one or more of the other following subparagraphs, as applicable:

(i)    _Transfer of Beneficial Interests in the Same Global Note_.   [Beneficial interests in any Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in a Global Note. No written orders or instructions shall be required to be delivered to the Registrar to effect the transfers described in this Section 2.07(b)(i).] [Trustee to confirm]

(ii)    _All Other Transfers and Exchanges of Beneficial Interests in Global Notes_.  In connection with all transfers and exchanges of beneficial interests that are not subject to Section 2.07(b)(i) hereof, the transferor of such beneficial interest must deliver to the Registrar either (A) (1) a written order from a Participant or an Indirect Participant given to the applicable Depositary in accordance with the Applicable Procedures directing such Depositary to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged and (2) instructions given in accordance with the Applicable Procedures containing information regarding the Participant account to be credited with such increase or (B) (1) a written order from a Participant or an Indirect Participant given to the applicable Depositary in accordance with the Applicable Procedures directing such Depositary to cause to be issued a Definitive Note of the same series in an amount equal to the beneficial interest to be transferred or exchanged and (2) instructions given by the applicable Depositary to the Registrar containing information regarding the Person in whose name such Definitive Note shall be registered to effect the transfer or exchange referred to in (1) above. Upon satisfaction of all of the requirements for transfer or exchange of beneficial interests in Global Notes contained in this Indenture and the Notes or otherwise applicable under the Securities Act, and as set forth in an Officer's Certificate, the Registrar shall adjust the principal amount of the relevant Global Note(s) pursuant to Section 2.07(h) hereof.

(c)    _Transfer or Exchange of Beneficial Interests for Definitive Notes_.

(i)    _[Intentionally Omitted]_.

(ii)    _[Intentionally Omitted]_.

(iii)    _[Intentionally Omitted]_.

(iv)    _Beneficial Interests in Global Notes to Definitive Notes_. If any holder of a beneficial interest in a Global Note proposes to exchange such beneficial interest for a Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Definitive Note, then, upon the occurrence of any of the events in subsection (A) or (B) of Section 2.07(a) hereof and satisfaction of the conditions set forth in Section 2.07(b)(ii) hereof, the Registrar shall cause the aggregate

principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.07(h) hereof, and the Issuer shall execute and, upon receipt of an Authentication Order in accordance with Section 2.03 hereof, the Trustee shall authenticate and mail to the Person designated in the instructions a Definitive Note in the applicable principal amount. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.07(c)(iv) shall be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar through instructions from or through the applicable Depositary and the Participant or Indirect Participant. The Registrar shall mail such Definitive Notes to the Persons in whose names such Notes are so registered.

(d)    Transfer and Exchange of Definitive Notes for Beneficial Interests.

(i)    [Intentionally Omitted].

(ii)    [Intentionally Omitted].

(iii)    Definitive Notes to Beneficial Interests in Global Notes.  A holder of a Definitive Note may exchange such Note for a beneficial interest in a Global Note or transfer such Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in a Global Note at any time. Upon receipt of a request for such an exchange or transfer, the Registrar shall cancel the applicable Definitive Note and increase or cause to be increased the aggregate principal amount of one of the Global Notes.

If any such exchange or transfer from a Definitive Note to a beneficial interest is effected pursuant to subparagraph (iii) above at a time when a Global Note has not yet been issued, the Issuer shall issue and, upon receipt of an Authentication Order in accordance with Section 2.03 hereof, the Trustee shall authenticate one or more Global Notes in an aggregate principal amount equal to the principal amount of Definitive Notes so transferred.

(e)    Transfer and Exchange of Definitive Notes for Definitive Notes.  Upon request by a holder of Definitive Notes and such holder's compliance with the provisions of this Section 2.07(e), the Registrar shall register the transfer or exchange of Definitive Notes. Prior to such registration of transfer or exchange, the requesting holder shall present or surrender to the Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar duly executed by such holder or by its attorney, duly authorized in writing. In addition, the requesting holder shall provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.07(e):

(i)    [Intentionally Omitted].

(ii)    [Intentionally Omitted].

(iii)    Definitive Notes to Definitive Notes.  A holder of Definitive Notes may transfer such Notes to a Person who takes delivery thereof in the form of a Definitive Note. Upon receipt of a request to register such a transfer, the Registrar shall register the Definitive Notes pursuant to the instructions from the holder thereof.

(f)    Transfer of Transfer Restricted Notes to Unrestricted Notes.  [Transfer of a Transfer Restricted Note, in the form of a transfer of a Beneficial Interest in a Global Note or a Definitive Note to a Beneficial Interest in a Global Note or Definitive Note, in each case which is an Unrestricted Note, as otherwise provided herein for transfers of Beneficial Interests in a Global Note or a Definitive

2083    Note to an Beneficial Interest in a Global Note or a Definitive Note, as the case may be upon delivery of
2084    [Trustee to comment for any requirement] to the Trustee. ]

2085              (g)     Legends.  The following legends shall appear on the face of all Global Notes and
2086    Definitive Notes issued under this Indenture unless specifically stated otherwise in the applicable provi-
2087    sions of this Indenture:

2088              (i)     [Intentionally Omitted].

2089              (ii)     Global Note Legend.  Each Global Note shall bear a legend in substantially the
2090    following form:

2091          "THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE
2092          INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR
2093          THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANS-
2094          FERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (I)
2095          THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE RE-
2096          QUIRED PURSUANT TO SECTION 2.07(h) OF THE INDENTURE, (II) THIS
2097          GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSU-
2098          ANT TO SECTION 2.07(a) OF THE INDENTURE, (III) THIS GLOBAL NOTE MAY
2099          BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SEC-
2100          TION 2.11 OF THE INDENTURE AND (IV) THIS GLOBAL NOTE MAY BE
2101          TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN
2102          CONSENT OF THE ISSUER.  UNLESS AND UNTIL IT IS EXCHANGED IN
2103          WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT
2104          BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMI-
2105          NEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE
2106          DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DE-
2107          POSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A
2108          NOMINEE OF SUCH SUCCESSOR DEPOSITARY.  UNLESS THIS CERTIFICATE
2109          IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY
2110          TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("DTC") TO
2111          THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE
2112          OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE
2113          NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY
2114          AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE
2115          TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN
2116          AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR
2117          OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS
2118          WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO.,
2119          HAS AN INTEREST HEREIN."

2120              (iii)     [Intentionally Omitted].

2121              (h)     Cancellation and/or Adjustment of Global Notes.  At such time as all beneficial
2122    interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note
2123    has been redeemed, repurchased or canceled in whole and not in part, each such Global Note shall be re-
2124    turned to or retained and canceled by the Registrar in accordance with Section 2.11 hereof.  At any time
2125    prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a
2126    Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for
2127    Definitive Notes, the principal amount of Notes represented by such Global Note shall be reduced accord-

ingly and an endorsement shall be made on such Global Note by the Registrar or by the Depositary at the direction of the Registrar to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note shall be increased accordingly and an endorsement shall be made on such Global Note by the Registrar or by the Depositary at the direction of the Registrar to reflect such increase.

(i)        General Provisions Relating to Transfers and Exchanges.

(i)        To permit registrations of transfers and exchanges, the Issuer shall execute and the Trustee shall authenticate Global Notes and Definitive Notes upon receipt of an Authentication Order in accordance with Section 2.03 hereof or at the Registrar's request.

(ii)        No service charge shall be made to a holder of a beneficial interest in a Global Note or to a holder of a Definitive Note for any registration of transfer or exchange, but the Issuer may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange or transfer pursuant to Sections 2.08, 3.08, 4.06, 4.08 and 9.05 hereof).

(iii)        Neither the Registrar nor the Issuer shall be required to register the transfer of or exchange any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part.

(iv)        All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Notes shall be the valid obligations of the Issuer, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes surrendered upon such registration of transfer or exchange.

(v)        The Issuer shall not be required (A) to issue, to register the transfer of or to exchange any Notes during a period beginning at the opening of business 15 days before the day of any selection of Notes for redemption under Section 3.04 hereof and ending at the close of business on the day of selection, (B) to register the transfer of or to exchange any Note so selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part or (C) to register the transfer of or to exchange a Note between a Record Date and the next succeeding Interest Payment Date.

(vi)        Prior to due presentment for the registration of a transfer of any Note, the Trustee, any Agent and the Issuer may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of (and premium, if any) and interest (including Additional Interest, if any) on such Notes and for all other purposes, and none of the Trustee, any Agent or the Issuer shall be affected by notice to the contrary.

(vii)        Upon surrender for registration of transfer of any Note at the office or agency of the Issuer designated pursuant to Section 4.14 hereof, the Issuer shall execute, and, upon receipt of an Authentication Order in accordance with Section 2.03 hereof, the Trustee shall authenticate and the Registrar shall mail, in the name of the designated transferee or transferees, one or more replacement Notes of any authorized denomination or denominations of a like aggregate principal amount.

(viii)        At the option of the holder, Notes may be exchanged for other Notes of any authorized denomination or denominations of a like aggregate principal amount upon surrender of the Notes to be exchanged at such office or agency.  Whenever any Global Notes or Definitive Notes are so surrendered for exchange, the Issuer shall execute, and the Trustee shall authenticate and the Registrar shall

mail, the replacement Global Notes and Definitive Notes which the holder making the exchange is enti-
tled to in accordance with the provisions of Section 2.03 hereof.

(ix)    All certifications, certificates, Officer's Certificates and Opinions of Counsel re-
quired to be submitted to the Registrar pursuant to this Section 2.07 to effect a registration of transfer or
exchange may be submitted by facsimile.

SECTION 2.08.    Replacement Notes.  If a mutilated Note is surrendered to the Regis-
trar or if the holder of a Note claims that the Note has been lost, destroyed or wrongfully taken, the Issuer
shall issue and the Trustee shall authenticate a replacement Note if the requirements of Section 8-405 of
the Uniform Commercial Code are met, such that the holder (a) satisfies the Issuer or the Trustee within a
reasonable time after such holder has notice of such loss, destruction or wrongful taking and the Registrar
does not register a transfer prior to receiving such notification, (b) makes such request to the Issuer or the
Trustee prior to the Note being acquired by a protected purchaser as defined in Section 8-303 of the Uni-
form Commercial Code (a "protected purchaser") and (c) satisfies any other reasonable requirements of
the Trustee.  If required by the Trustee or the Issuer, such holder shall furnish an indemnity bond suffi-
cient in the judgment of the Trustee and the Issuer to protect the Issuer, the Trustee, a Paying Agent and
the Registrar from any loss or liability that any of them may suffer if a Note is replaced and subsequently
presented or claimed for payment.  The Issuer and the Trustee may charge the holder for their expenses in
replacing a Note (including without limitation, attorneys' fees and disbursements in replacing such
Notes).  In the event any such mutilated, lost, destroyed or wrongfully taken Note has become or is about
to become due and payable, the Issuer in its discretion may pay such Note instead of issuing a new Note
in replacement thereof.

Every replacement Note is an additional obligation of the Issuer.

The provisions of this Section 2.08 are exclusive and shall preclude (to the extent lawful)
all other rights and remedies with respect to the replacement or payment of mutilated, lost, destroyed or
wrongfully taken Notes.

SECTION 2.09.    Outstanding Notes.  Notes outstanding at any time are all Notes au-
thenticated by the Trustee except for those canceled by the Registrar, those delivered to it for cancellation
and those described in this Section as not outstanding.  Subject to Section 13.06, a Note does not cease to
be outstanding because the Issuer or an Affiliate of the Issuer holds the Note.

If a Note is replaced pursuant to Section 2.08 (other than a mutilated Note surrendered for
replacement), it ceases to be outstanding unless the Trustee and the Issuer receive proof satisfactory to
them that the replaced Note is held by a protected purchaser.  A mutilated Note ceases to be outstanding
upon surrender of such Note and replacement thereof pursuant to Section 2.08.

If a Paying Agent segregates and holds in trust, in accordance with this Indenture, on a
redemption date or maturity date money sufficient to pay all principal and interest payable on that date
with respect to the Notes (or portions thereof) to be redeemed or maturing, as the case may be, and no
Paying Agent is prohibited from paying such money to the holders on that date pursuant to the terms of
this Indenture, then on and after that date such Notes (or portions thereof) cease to be outstanding and
interest on them ceases to accrue.

SECTION 2.10.    [Intentionally Omitted].

SECTION 2.11.    Cancellation.  The Issuer at any time may deliver Notes to the Regis-
trar for cancellation.  The Registrar and each Paying Agent and no one else shall cancel all Notes surren-

dered for registration of transfer, exchange, payment or cancellation and shall dispose of canceled Notes in accordance with its customary procedures.  The Registrar and each Paying Agent shall give written notice to the Trustee of any Notes delivered to them and cancelled.  Subject to Section 2.08, the Issuer may not issue new Notes to replace Notes it has redeemed, paid or delivered to the Trustee for cancellation.  The Trustee shall not authenticate Notes in place of canceled Notes other than pursuant to the terms of this Indenture.  However, if the Company shall acquire any of the Notes, such acquisition shall not operate as a redemption or satisfaction of the Indebtedness represented by such Notes unless and until the same are surrendered to the Trustee for cancellation pursuant to this Section 2.11.

SECTION 2.12.    Defaulted Interest.  If the Issuer defaults in a payment of interest on the Notes, the Issuer shall pay the defaulted interest then borne by the Notes (*plus* interest on such defaulted interest to the extent lawful) in any lawful manner.  The Issuer may pay the defaulted interest to the Persons who are holders on a subsequent special record date.  The Issuer shall fix or cause to be fixed any such special record date and payment date to the reasonable satisfaction of the Trustee and shall promptly mail or cause to be mailed to each affected holder a notice that states the special record date, the payment date and the amount of defaulted interest to be paid.

SECTION 2.13.    CUSIP Numbers, ISINs, Etc.  The Issuer in issuing the Notes may use CUSIP numbers, and ISIN numbers (if then generally in use) and, if so, the Trustee shall use CUSIP numbers and  ISIN numbers in notices of redemption as a convenience to holders; *provided*, *however*, that any such notice may state that no representation is made as to the correctness of such numbers, either as printed on the Notes or as contained in any notice of a redemption that reliance may be placed only on the other identification numbers printed on the Notes and that any such redemption shall not be affected by any defect in or omission of such numbers.  The Issuer shall advise the Trustee of any change in the CUSIP numbers and ISIN numbers.

SECTION 2.14.    Calculation of Principal Amount of Notes.  The aggregate principal amount of the Notes, at any date of determination, shall be the principal amount of the Notes at such date of determination.  With respect to any matter requiring consent, waiver, approval or other action of the holders of a specified percentage of the principal amount of all the Notes, such percentage shall be calculated, on the relevant date of determination, by dividing (a) the principal amount, as of such date of determination, of Notes, the holders of which have so consented, by (b) the aggregate principal amount, as of such date of determination, of the Notes then outstanding, in each case, as determined in accordance with the preceding sentence, Section 2.09, Section 9.02 and Section 13.06 of this Indenture.  Any such calculation made pursuant to this Section 2.14 shall be made by the Issuer and delivered to the Trustee pursuant to an Officer's Certificate.[4]

## ARTICLE III

## REDEMPTION

SECTION 3.01.    Optional Redemption.  The Notes may be redeemed, in whole, or from time to time in part, subject to the conditions and at the redemption prices set forth in Paragraph 5 of the forms of Note set forth in Exhibit A hereto, which are hereby incorporated by reference and made a part of this Indenture, together with accrued and unpaid interest to the redemption date.

---

[4] Note: To conform with "Transfer Restrictions Under Dutch Law," if applicable.

SECTION 3.02.   <u>Applicability of Article</u>.  Redemption of Notes at the election of the Issuer or otherwise, as permitted or required by any provision of this Indenture, shall be made in accordance with such provision and this Article.

SECTION 3.03.   <u>Notices to Trustee</u>.  If the Issuer elects to redeem Notes pursuant to the optional redemption provisions of Paragraph 5 of the Note, it shall notify the Trustee, the Registrar and each Paying Agent in writing of (i) the Section of this Indenture pursuant to which the redemption shall occur, (ii) the redemption date, (iii) the principal amount of Notes to be redeemed and (iv) the redemption price.  The Issuer shall give notice to the Trustee provided for in this paragraph at least 30 days but not more than 60 days before a redemption date if the redemption is pursuant to paragraph 5 of the Note, unless a shorter period is acceptable to the Trustee.  Such notice shall be accompanied by an Officer's Certificate and Opinion of Counsel from the Issuer to the effect that such redemption will comply with the conditions herein, as well as such notice required to be delivered under Section 3.05 below.  If fewer than all the Notes are to be redeemed, the record date relating to such redemption shall be selected by the Issuer and given to the Trustee, which record date shall be not fewer than 15 days after the date of notice to the Trustee.  Any such notice may be canceled at any time prior to notice of such redemption being mailed to any holder and shall thereby be void and of no effect.

SECTION 3.04.   <u>Selection of Notes to Be Redeemed</u>.  Selection of Notes for redemption will be made by the Registrar on a *pro rata* basis by lot of otherwise in accordance with the procedures of the Depository to the extent practicable; *provided* that no Notes of $100,000 principal amount or less shall be redeemed in part.

If less than all the Notes are to be redeemed at any time in connection with an optional redemption, the Registrar will select Notes for redemption as follows:

(i)   if the Notes to be redeemed are listed, in compliance with the requirements of the principal national securities exchange on which such Notes are listed; or

(ii)   if the Notes to be redeemed are not so listed, on a *pro rata* basis, by lot or by such method as the Registrar shall deem fair and appropriate.

SECTION 3.05.   <u>Notice of Optional Redemption</u>.

(a)   At least 30 days but not more than 60 days before a redemption date pursuant to Paragraph 5 of the Note, the Issuer shall mail or cause to be mailed by first-class mail a notice of redemption to each holder whose Notes are to be redeemed.

Any such notice shall identify the Notes to be redeemed and shall state:

(i)   the redemption date;

(ii)   the redemption price and the amount of accrued interest to the redemption date;

(iii)   the name and address of the Paying Agent;

(iv)   that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price, *plus* accrued interest;

(v)   if fewer than all the outstanding Notes are to be redeemed, the certificate numbers and principal amounts of the particular Notes to be redeemed, the aggregate principal

2289           amount of Notes to be redeemed and the aggregate principal amount of Notes to be outstanding
2290           after such partial redemption;

2291                  (vi)     that, unless the Issuer defaults in making such redemption payment or the Paying
2292           Agent is prohibited from making such payment pursuant to the terms of this Indenture, interest on
2293           Notes (or portion thereof) called for redemption ceases to accrue on and after the redemption
2294           date;

2295                  (vii)     the CUSIP number and  ISIN number, if any, printed on the Notes being re-
2296           deemed; and

2297                  (viii)     that no representation is made as to the correctness or accuracy of the CUSIP
2298           number or ISIN number, if any, listed in such notice or printed on the Notes.

2299                  (b)     At the Issuer's request, the Registrar and each Paying Agent shall give the notice
2300 of redemption in the Issuer's name and at the Issuer's expense.  In such event, the Issuer shall provide the
2301 Registrar and each Paying Agent with the information required by this Section at least one Business Day
2302 prior to the date such notice is to be provided to holders in the final form such notice is to be delivered to
2303 holders and such notice may not be canceled.

2304                  SECTION 3.06.     <u>Effect of Notice of Redemption</u>.  Once notice of redemption is mailed
2305 in accordance with Section 3.05, Notes called for redemption become due and payable on the redemption
2306 date and at the redemption price stated in the notice, except as provided in the final sentence of paragraph
2307 5 of the Notes.  Upon surrender to the Paying Agent, such Notes shall be paid at the redemption price
2308 stated in the notice (including any premium, if any), *plus* accrued interest, to, but not including, the re-
2309 demption date; *provided*, *however*, that if the redemption date is after a regular Record Date and on or
2310 prior to the Interest Payment Date, the accrued interest shall be payable to the holder of the redeemed
2311 Notes registered on the relevant Record Date.  Failure to give notice or any defect in the notice to any
2312 holder shall not affect the validity of the notice to any other holder.

2313                  SECTION 3.07.     <u>Deposit of Redemption Price</u>  On or before the redemption date, the
2314 Issuer shall deposit with the Paying Agent U.S. Legal Tender funds sufficient to pay the principal of, plus
2315 premium (if any) on  and unpaid interest including Additional Interest, if any on the Notes to be redeemed
2316 on that date.  The Paying Agent shall promptly return to the Issuer any U.S. Legal Tender so deposited
2317 that is not required for that purpose, except with respect to monies owed as obligations to the Trustee pur-
2318 suant to Article VII.

2319                  Unless the Issuer fails to comply with the preceding paragraph and defaults in the pay-
2320 ment of such redemption price, interest on the Notes to be redeemed will cease to accrue on and after the
2321 applicable redemption date, whether or not such Notes are presented for payment.

2322                  SECTION 3.08.     <u>Notes Redeemed in Part</u>.  Upon surrender of a Note that is redeemed
2323 or purchased in part, the Issuer shall issue and the Trustee shall authenticate for the holder at the expense
2324 of the Issuer a new Note in principal amount equal to the unredeemed portion thereof will be issued in the
2325 name of the holder thereof upon cancellation of the original Note.  On and after the redemption date, in-
2326 terest will cease to accrue on Notes or portions thereof called for redemption so long as the Issuer has de-
2327 posited with the Paying Agent funds sufficient to pay the principal of, plus accrued and unpaid interest
2328 and additional interest, if any, on the Notes to be redeemed.

**ARTICLE IV**

**COVENANTS**

SECTION 4.01.    Payment of Notes.  The Issuer shall promptly pay the principal of and interest on the Notes on the dates and in the manner provided in the Notes and in this Indenture.  An installment of principal of or interest shall be considered paid on the date due if on such date the Trustee or the Paying Agent holds as of 12:00 p.m. Eastern time money sufficient to pay all principal and interest then due and the Trustee or the Paying Agent, as the case may be, is not prohibited from paying such money to the holders on that date pursuant to the terms of this Indenture.

The Issuer shall pay interest on overdue principal at the rate specified therefor in the Notes, and it shall pay interest on overdue installments of interest at the same rate borne by the Notes to the extent lawful.

SECTION 4.02.    Reports and Other Information.

(a)    For the periods commencing with the period ending on December 31, 2010 and notwithstanding that the Issuer or the Company may not be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act or otherwise report on an annual and quarterly basis on forms provided for such annual and quarterly reporting pursuant to rules and regulations promulgated by the SEC, the Company shall file with the SEC (and provide the Trustee and holders with copies thereof, without cost to each holder, within 15 days after it files them with the SEC),

(i)    within the time period specified in the SEC's rules and regulations for non-accelerated filers, annual reports on Form 10-K (or any successor or comparable form) containing the information required to be contained therein (or required in such successor or comparable form),

(ii)    within the time period specified in the SEC's rules and regulations for non-accelerated filers, reports on Form 10-Q (or any successor or comparable form) containing the information required to be contained therein (or required in such successor or comparable form),

(iii)    promptly from time to time after the occurrence of an event required to be therein reported (and in any event within the time period specified in the SEC's rules and regulations), such other reports on Form 8-K (or any successor or comparable form), and

(iv)    any other information, documents and other reports which the Issuer would be required to file with the SEC if it were subject to Section 13 or 15(d) of the Exchange Act;

provided, however, that the Company shall not be so obligated to file such reports with the SEC if the SEC does not permit such filing, in which event, the Company will make available such information to prospective purchasers of Notes in addition to providing such information to the Trustee and the holders, in each case within 15 days after the time the Issuer would be required to file such information with the SEC if it were subject to Section 13 or 15(d) of the Exchange Act.

Notwithstanding the foregoing, the Company shall not be required to furnish any information, certificates or reports required by Items 307 or 308 of Regulation S-K prior to the effectiveness of the Exchange Offer Registration Statement or Shelf Registration Statement.

(b)    In the event that the rules and regulations of the SEC permit the Company to re-
port at such parent entity's level on a consolidated basis and such parent entity is not engaged in any
business in any material respect other than incidental to its ownership, directly or indirectly, of the capital
stock of the Issuer, or consolidating reporting at the parent entity's level in a manner consistent with that
described in this Section 4.02.

(c)    The Issuer will make such information available to prospective investors upon
request.  In addition, the Issuer has agreed that, for so long as any Notes remain outstanding during any
period when it is not subject to Section 13 or 15(d) of the Exchange Act, or otherwise permitted to furnish
the SEC with certain information pursuant to Rule 12g3-2(b) of the Exchange Act, it will furnish to the
holders of the Notes and to prospective investors, upon their request, the information required to be deliv-
ered pursuant to Rule 144A(d)(4) under the Securities Act.

Notwithstanding the foregoing, the Issuer will be deemed to have furnished such reports
referred to above to the Trustee if the Issuer has filed such reports with the SEC via the EDGAR filing
system and such reports are publicly available.  In addition, the requirements of this Section 4.02 shall be
deemed satisfied prior to the commencement of the exchange offers contemplated by the Registration
Rights Agreement relating to the First Lien Notes or the effectiveness of the Shelf Registration Statement
by (1) the filing with the SEC of the Exchange Offer Registration Statement and/or Shelf Registration
Statement in accordance with the provisions of such Registration Rights Agreement, and any amendments
thereto, if such registration statement and/or amendments thereto are filed at times that otherwise satisfy
the time requirements set forth in Section 4.02(a) and/or (2) the posting of reports that would be required
to be provided to the Trustee and the holders on the Issuer's website (or that of any of its parent compa-
nies).

SECTION 4.03.    Limitation on Incurrence of Indebtedness and Issuance of Disquali-
fied Stock and Preferred Stock.

(a)    (i) The Company shall not, and shall not permit any of its Restricted Subsidiaries
to, directly or indirectly, Incur any Indebtedness (including Acquired Indebtedness) or issue any shares of
Disqualified Stock; and (ii) the Company shall not permit any of its Restricted Subsidiaries (other than
the Issuer or any Guarantor) to issue any shares of Preferred Stock; *provided*, *however*, that the Issuer and
any Guarantor may Incur Indebtedness (including Acquired Indebtedness) or issue shares of Disqualified
Stock, and, subject to Section 4.03(c), any Restricted Subsidiary of the Company that is not a Guarantor
may Incur Indebtedness (including Acquired Indebtedness), issue shares of Disqualified Stock or issue
shares of Preferred Stock, in each case if the Fixed Charge Coverage Ratio of the Company for the most
recently ended four full fiscal quarters for which internal financial statements are available immediately
preceding the date on which such additional Indebtedness is Incurred or such Disqualified Stock or Pre-
ferred Stock is issued would have been at least 1.75 to 1.00 determined on a *pro forma* basis (including a
*pro forma* application of the net cash proceeds therefrom), as if the additional Indebtedness had been In-
curred, or the Disqualified Stock or Preferred Stock had been issued, as the case may be, and the applica-
tion of proceeds therefrom had occurred at the beginning of such four-quarter period.

(b)    The limitations set forth in Section 4.03(a) shall not apply to (the following,
"Permitted Indebtedness"):

(i)    (A)  Indebtedness under the First Lien Notes issued on the Issue Date, and the
guarantees thereof, and (B) an aggregate principal amount of Indebtedness outstanding in the
form of any other series of notes representing First Priority Lien Obligations ("other first lien
notes") issued in one or more tranches under this Indenture, and the guarantees by the Guarantors
thereof, if on a *pro forma* basis after giving effect thereto (including a *pro forma* application of

the proceeds thereof), the Secured Indebtedness Leverage Ratio of the Company would not exceed 2.25 to 1.00;

(ii)    Indebtedness under the Notes and the 2014 Notes issued on the Issue Date;

(iii)    Indebtedness Incurred pursuant to Credit Facilities, as follows:

(A)    Indebtedness under any Credit Facilities (other than Asset Backed Credit Facilities) in the aggregate principal amount of $1,500 million plus an aggregate additional principal amount of Indebtedness secured by a Lien outstanding at any one time such that on a *pro forma* basis (including a *pro forma* application of the proceeds therefrom) the Secured Indebtedness Leverage Ratio of the Company would not exceed 2.25 to 1.00; *provided* that the amount of Indebtedness that may be Incurred pursuant to this subclause (A) shall be reduced by the amount of any (x) prepayments of term loans under Credit Facilities or (y) permanent reductions of Indebtedness under any revolving credit facility (other than any such prepayments of the ABL Facility), in the case of each of (x) and (y) with the proceeds of an Asset Sale (other than any Asset Sale in respect of Specified ABL Facility Assets);

(B)    Indebtedness under Asset Backed Credit Facilities in an aggregate principal amount not to exceed the greater of (i) $2,250 million and (ii) the sum of 90% of the net book value of the accounts receivable of the Company and its Restricted Subsidiaries and 70% of the net book value of the inventory of the Company and its Restricted Subsidiaries (the "Borrowing Base") less (x) in the case of the calculation of the Borrowing Base under this subclause (B)(ii), the amount of the Borrowing Base that is the subject of an on-balance sheet Qualified Receivables Financing (it being understood that any of the Borrowing Base that is subject to arrangements for disposition or transfer in connection with an off-balance sheet Qualified Receivables Financing shall not be included in the Borrowing Base) and (y) in the case of Indebtedness permitted to be Incurred under this subclause (B)(ii), the amount of any Indebtedness Incurred under any Oil Indexed Credit Facility; *provided* that any assets or property securing any Project Financing Incurred pursuant to clause (v)(b) below shall be excluded when determining the Borrowing Base; *provided further* that Indebtedness that may be Incurred pursuant to this subclause (B) shall be reduced by the amount of any permanent reductions of Indebtedness under any revolving credit facility (other than any such prepayments of revolving credit facilities Incurred pursuant to subclause (A) above) with the proceeds of an Asset Sale (other than any Asset Sale in respect of Specified ABL Facility Assets); *provided further* that, in the event of an Asset Acquisition, Indebtedness may be Incurred against the Borrowing Base pursuant to the foregoing in anticipation of the completion of such Asset Acquisition on the assumption that the Borrowing Base of the subject of the Asset Acquisition has been acquired; and

(C)    Indebtedness under any Oil Indexed Credit Facility in an aggregate principal amount not to exceed $750.0 million; *provided* that amounts Incurred pursuant to an Oil Indexed Credit Facility will be required to reduce the amount of Indebtedness Incurred under the Borrowing Base to the extent Indebtedness in such amount as would no longer be permitted to be Incurred under subclause (ii) above (without duplication for the requirements of subclause (ii) above);

(iv)    Indebtedness existing on the Issue Date (other than the First Lien Notes and Indebtedness described in clauses (ii) and (iii) above) in an aggregate principal amount not to ex-

ceed $600.0 million, after giving effect to the consummation of the Reorganization Plan, which shall have the obligors, collateral, maturity and amortization features summarized under "Description of Certain Indebtedness" herein, and guarantees of Indebtedness of Joint Ventures outstanding on the Issue Date, and operating leases of the Company and the Restricted Subsidiaries outstanding on the Issue Date to the extent characterized as a Capitalized Lease Obligation after the Issue Date;

(v)    (A) Indebtedness (including Capitalized Lease Obligations) Incurred by the Company or any Restricted Subsidiary, Disqualified Stock issued by the Company or any of its Restricted Subsidiaries and Preferred Stock issued by any Restricted Subsidiaries of the Company to finance (whether prior to or within 270 days after) the acquisition, lease, construction, repair, replacement or improvement of property (real or personal) or equipment (whether through the direct purchase of assets or the Capital Stock of any Person owning such assets); *provided* that Indebtedness Incurred pursuant to this clause (v)(A) is not Incurred to finance a Business Acquisition, (B) Indebtedness Incurred in connection with any Project Financing or (C) Indebtedness Incurred pursuant to a Catalyst Sale/Leaseback Transaction;

(vi)    Indebtedness Incurred by the Company or any of its Restricted Subsidiaries constituting reimbursement Obligations with respect to letters of credit and bank guarantees issued in the ordinary course of business, including, without limitation, letters of credit in respect of workers' compensation claims, health, disability or other benefits to employees or former employees or their families or property, casualty or liability insurance or self-insurance or similar requirements, and letters of credit in connection with the maintenance of, or pursuant to the requirements of, environmental or other permits or licenses from governmental authorities, or other Indebtedness with respect to reimbursement-type obligations regarding workers' compensation claims;

(vii)    Indebtedness arising from agreements of the Company or a Restricted Subsidiary providing for indemnification, adjustment of purchase price or similar obligations, in each case, Incurred in connection with any acquisition or disposition of any business, assets or a Subsidiary of the Company in accordance with the terms of this Indenture, other than guarantees of Indebtedness Incurred by any Person acquiring all or any portion of such business, assets or Subsidiary for the purpose of financing such acquisition;

(viii)    Indebtedness of the Company to a Restricted Subsidiary; *provided* that (except in respect of intercompany current liabilities Incurred in the ordinary course of business in connection with the cash management operations of the Company and its Subsidiaries) any such Indebtedness owed to a Restricted Subsidiary that is not the Issuer or a Guarantor is subordinated in right of payment to the Obligations of the Company under the Notes; *provided further* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Company or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) shall be deemed, in each case, to be an Incurrence of such Indebtedness not permitted by this clause (viii);

(ix)    shares of Preferred Stock of a Restricted Subsidiary issued to the Company or another Restricted Subsidiary; *provided* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Restricted Subsidiary that holds such shares of Preferred Stock of another Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such shares of Preferred Stock (except to the Company or another Restricted Subsidiary) shall be deemed, in each case, to be an issuance of shares of Preferred Stock not permitted by this clause (ix);

(x)    Indebtedness of a Restricted Subsidiary to the Company or another Restricted Subsidiary; *provided* that if the Issuer or a Guarantor Incurs such Indebtedness to a Restricted Subsidiary that is not the Issuer or a Guarantor (except in respect of intercompany current liabilities Incurred in the ordinary course of business in connection with the cash management operations of the Company and its Subsidiaries), such Indebtedness is subordinated in right of payment to the Obligations of the Issuer or such Guarantor, as applicable, in respect of the Notes; *provided further* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Restricted Subsidiary holding such Indebtedness ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Company or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) shall be deemed, in each case, to be an Incurrence of such Indebtedness not permitted by this clause (x);

(xi)    Hedging Obligations that are not Incurred for speculative purposes but for the purpose of (1) fixing or hedging interest rate risk with respect to any Indebtedness that is permitted by the terms of this Indenture to be outstanding; (2) fixing or hedging currency exchange rate risk with respect to any currency exchanges; (3) fixing or hedging commodity price risk, including the price or cost of raw materials, emission rights, manufactured products or related commodities, with respect to any commodity purchases or sales; or (4) hedging the potential exposure in respect of certain executives' and employees' options over, or stock appreciation rights in relation to, shares of Royal Dutch Shell plc and BASF AG;

(xii)    (A) obligations in respect of bankers' acceptances, tender, bid, judgment, appeal, performance or governmental contract bonds and completion guarantees, surety, standby letters of credit and warranty and contractual service obligations of a like nature, trade letters of credit and documentary letters of credit and similar bonds or guarantees provided by the Company or any Restricted Subsidiary in the ordinary course of business or (B) Indebtedness of the Company or any Restricted Subsidiary supported by a letter of credit or bank guarantee issued pursuant to any of the Credit Facilities, in a principal amount not in excess of the stated amount of such letter of credit;

(xiii)    Indebtedness or Disqualified Stock of the Company or, subject to Section 4.03(c), Indebtedness, Disqualified Stock or Preferred Stock of any Restricted Subsidiary of the Company not otherwise permitted hereunder in an aggregate principal amount or liquidation preference which, when aggregated with the principal amount or liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and Incurred pursuant to this clause (xiii), does not exceed the greater of $1,000.0 million and 4.25% of the Consolidated Net Tangible Assets of the Company at the time of Incurrence (it being understood that any Indebtedness Incurred pursuant to this clause (xiii) shall cease to be deemed Incurred or outstanding for purposes of this clause (xiii) but shall be deemed Incurred for purposes of Section 4.03(a) from and after the first date on which the Company or the Restricted Subsidiary, as the case may be, could have Incurred such Indebtedness under Section 4.03(a) without reliance upon this clause (xiii));

(xiv)    Indebtedness or Disqualified Stock of the Company, the Issuer or any Pledgor and Preferred Stock of the Issuer or Pledgor not otherwise permitted hereunder in an aggregate principal amount or liquidation preference not greater than 200% of the net cash proceeds received by the Company and its Restricted Subsidiaries since immediately after the Issue Date from the issue or sale of Equity Interests of the Company or any direct or indirect parent entity of the Company (which proceeds are contributed to the Company) or cash contributed to the capital of the Company (in each case other than proceeds of Disqualified Stock or sales of Equity Interests to, or contributions received from, the Company or any of its Restricted Subsidiaries) as de-

termined in accordance with Section 4.04(a)(iv)(3) to the extent such net cash proceeds or cash has not been applied pursuant to such clauses to make Restricted Payments or to make other Investments or to make Permitted Investments (other than Permitted Investments specified in clauses (1) and (3) of the definition thereof);

(xv)    any guarantee by the Company or any Restricted Subsidiary of Indebtedness or other Obligations of the Company or any of its Restricted Subsidiaries so long as the Incurrence of such Indebtedness Incurred by the Company or such Restricted Subsidiary is permitted under the terms of this Indenture; *provided* that (i) if such Indebtedness is by its express terms subordinated in right of payment to the Notes or the obligations of such Restricted Subsidiary in respect of the Notes, as applicable, any such guarantee of such Restricted Subsidiary with respect to such Indebtedness shall be subordinated in right of payment to such Restricted Subsidiary's obligations with respect to the Notes substantially to the same extent as such Indebtedness is subordinated to the Notes or the obligations of such Restricted Subsidiary in respect of the Notes, as applicable, or  (ii) if such guarantee is of Indebtedness of the Company under the First Lien Notes or the Senior Term Loan Facility, such guarantee is Incurred in accordance with Section 4.11, solely to the extent such covenant is applicable;

(xvi)    the Incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness or Disqualified Stock or Preferred Stock of a Restricted Subsidiary of the Company which serves to refund, refinance or defease any Indebtedness Incurred or Disqualified Stock or Preferred Stock issued as permitted under Section 4.03(a) and clauses (i), (ii), (iv), (v), (xiv) and (xvii) of this paragraph or any Indebtedness, Disqualified Stock or Preferred Stock Incurred to so refund or refinance such Indebtedness, Disqualified Stock or Preferred Stock, including any additional Indebtedness, Disqualified Stock or Preferred Stock Incurred to pay premiums (including tender premiums) and original issue discount, expenses, defeasance costs and fees in connection therewith; *provided* that any such Indebtedness until reclassified in accordance with this Indenture shall remain Incurred pursuant to clauses (i), (iv), (v), (xiv) and (xvii), as applicable (subject to the following proviso, "<u>Refinancing Indebtedness</u>"), prior to its maturity; *provided*, *however*, that such Refinancing Indebtedness:

(1)    has a Weighted Average Life to Maturity at the time such Refinancing Indebtedness is Incurred which is not less than the shorter of (x) the remaining Weighted Average Life to Maturity of the Indebtedness, Disqualified Stock or Preferred Stock being refunded, refinanced or defeased and (y) the Weighted Average Life to Maturity that would result if all payments of principal on the Indebtedness, Disqualified Stock and Preferred Stock being refunded or refinanced that were due on or after the date that is one year following the last maturity date of any Notes then outstanding were instead due on such date;

(2)    to the extent such Refinancing Indebtedness refinances (a) Indebtedness junior to the Notes or the Obligations of such Restricted Subsidiary in respect of the Notes, as applicable, such Refinancing Indebtedness is junior to the Notes or such Obligations of such Restricted Subsidiary, as applicable, to at least the same extent or (b) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness is Disqualified Stock or Preferred Stock, as the case may be, of the same issuer; and

(3)    shall not include (a) Indebtedness of a Restricted Subsidiary of the Company that is not a Guarantor that refinances Indebtedness of the Issuer or a Guarantor, or (b) Indebtedness of the Company or a Restricted Subsidiary that refinances Indebtedness of an Unrestricted Subsidiary;

*provided, further* that subclause (1) of this clause (xvi) will not apply to any refunding or refinancing of any Secured Indebtedness constituting First Priority Lien Obligations;

   (xvii) Indebtedness, Disqualified Stock or Preferred Stock of (x) the Company or, subject to Section 4.03(c), any of its Restricted Subsidiaries (A) Incurred to finance an Asset Acquisition or (B) Incurred by a Person in connection with or anticipation of such Person becoming a Restricted Subsidiary as a result of an Asset Acquisition or to finance an Asset Acquisition or (y) a Person existing at the time such Person becomes a Restricted Subsidiary of the Company as a result of an Asset Acquisition or assumed in connection with an Asset Acquisition by the Company or a Restricted Subsidiary of the Company and, in any such case under this subclause (y), not Incurred in connection with or in anticipation of such Asset Acquisition; *provided* that, in the case of clause (y), the holders of any such Indebtedness do not, at any time, have direct or indirect recourse to any property or assets of the Company or any Restricted Subsidiary other than the property or assets that are the subject of such Asset Acquisition; *provided* that after giving effect to such Asset Acquisition, either:

     (1) the Company would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4.03(a); or

     (2) the Fixed Charge Coverage Ratio of the Company would be greater than immediately prior to such Asset Acquisition;

   (xviii) Indebtedness Incurred in a Qualified Receivables Financing that is without recourse to the Company or any Restricted Subsidiary (except for Standard Securitization Undertakings);

   (xix) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided* that such Indebtedness is extinguished within five Business Days of its Incurrence;

   (xx) Indebtedness under any Treasury Services Agreement or any Structured Financing Transaction;

   (xxi) Indebtedness of Foreign Subsidiaries; *provided, however*, that the aggregate principal amount of Indebtedness Incurred under this clause (xxi), when aggregated with the principal amount of all other Indebtedness then outstanding and Incurred pursuant to this clause (xxi), does not exceed the greater of $525.0 million and 4.25% of the Consolidated Net Tangible Assets of the Foreign Subsidiaries at any one time outstanding (it being understood that any Indebtedness Incurred pursuant to this clause (xxi) shall cease to be deemed Incurred or outstanding for purposes of this clause (xxi) but shall be deemed Incurred for the purposes of Section 4.03(a) from and after the first date on which such Foreign Subsidiary could have Incurred such Indebtedness under Section 4.03(a) without reliance upon this clause (xxi));

   (xxii) Indebtedness of the Company or any Restricted Subsidiary consisting of (1) the financing of insurance premiums or (2) take-or-pay Obligations contained in supply arrangements, in each case, in the ordinary course of business;

   (xxiii) Indebtedness consisting of Indebtedness issued by the Company or a Restricted Subsidiary of the Company to current or former officers, directors and employees thereof or any

direct or indirect parent thereof, their respective estates, spouses or former spouses, in each case to finance the purchase or redemption of Equity Interests of the Company or any direct or indirect parent entity of the Company to the extent described in Section 4.04(b)(iv);

(xxiv)    Indebtedness Incurred on behalf of, or representing guarantees of Indebtedness of, Joint Ventures of the Company or any Restricted Subsidiary not to exceed, at any one time outstanding, the greater of $375.0 million and 1.50% of the Consolidated Net Tangible Assets of the Company; and

(xxv)    Indebtedness Incurred by Lyondell Basell Australia Pty Ltd. and its successors in an aggregate principal amount at any one time outstanding not to exceed $80.0 million; *provided* that such Indebtedness is not guaranteed by the Company or any Restricted Subsidiary of the Company organized under the laws of any jurisdiction other than Australia.

(c)    Restricted Subsidiaries that are not Guarantors may not Incur Indebtedness or issue Disqualified Stock or Preferred Stock under Section 4.03(a) or clause (xiii) or (xvii)(x) (or clause (xv) to the extent constituting a guarantee of Indebtedness Incurred under Section 4.03(a) or clause (xiii) or (xvii)(x)) of Section 4.03(b) if, after giving *pro forma* effect to such Incurrence or issuance (including a *pro forma* application of the net cash proceeds therefrom), the aggregate amount of Indebtedness and Disqualified Stock and Preferred Stock of Restricted Subsidiaries that are not Guarantors Incurred or issued pursuant to Section 4.03(a) and clauses (xiii) and (xvii)(x) (or clause (xv) to the extent constituting a guarantee of Indebtedness Incurred under Section 4.03(a) or clause (xiii) or (xvii)(x)) of Section 4.03(b), collectively, would exceed the greater of $600.0 million and 5.0% of the Consolidated Net Tangible Assets of Restricted Subsidiaries that are not Guarantors.

(d)    For purposes of determining compliance with this Section 4.03:

(i)    in the event that an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) meets the criteria of more than one of the categories of permitted Indebtedness described in clauses (i) through (xxv) of Section 4.03(b) or is entitled to be Incurred pursuant to Section 4.03(a), the Company, in its sole discretion, classify or reclassify, or later divide, classify or reclassify, such item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) in any manner that complies with this Section 4.03; *provided* that Indebtedness Incurred, or committed for, under the Credit Facilities and the First Lien Notes on or before the Issue Date or pursuant to an Oil Indexed Credit Facility shall at all times be deemed to be Incurred under clauses (i) and (iii) of Section 4.03(b); and

(ii)    at the time of Incurrence, the Company will be entitled to divide and classify an item of Indebtedness in more than one of the types of Indebtedness described in Sections 4.03(a) and (b) without giving *pro forma* effect to the Indebtedness Incurred pursuant to Section 4.03(b) when calculating the amount of Indebtedness that may be Incurred pursuant to Section 4.03(a).

Accrual of interest, the accretion of accreted value, the payment of interest or dividends in the form of additional Indebtedness, Disqualified Stock or Preferred Stock, as applicable, amortization of original issue discount, the accretion of liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an Incurrence or issuance of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this Section 4.03. Guarantees of, or Obligations in respect of letters of credit relating to, Indebtedness which is otherwise included in the determination of a particular amount of Indebtedness shall not be included in the determination of such amount of Indebtedness; *provided* that the Incurrence of the Indebtedness represented by such guarantee or letter of credit, as the case may be, was in compliance with this Section 4.03.

For purposes of determining compliance with any U.S. Dollar-denominated restriction on the Incurrence of Indebtedness, the U.S. Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was Incurred, in the case of term debt, or first committed or first Incurred (whichever yields the lower U.S. Dollar Equivalent), in the case of revolving credit debt; or if any such Indebtedness is subject to a Currency Agreement with respect to the currency in which such Indebtedness is denominated covering principal, premium, if any, and interest on such Indebtedness, the amount of such Indebtedness and such interest and premium, if any, shall be determined after giving effect to all payments in respect thereof under such Currency Agreement; *provided* that if such Indebtedness is Incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such Refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced.

(e)    Notwithstanding any other provision of this Section 4.03, the maximum amount of Indebtedness that the Company and its Restricted Subsidiaries may Incur pursuant to this Section 4.03 shall not be deemed to be exceeded, with respect to any outstanding Indebtedness, solely as a result of fluctuations in the exchange rate of currencies. The principal amount of any Indebtedness Incurred to refinance other Indebtedness, if Incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of such refinancing.

SECTION 4.04.    Limitation on Restricted Payments.

(a)    The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly:

(i)    declare or pay any dividend or make any distribution on account of the Company's or any of its Restricted Subsidiaries' Equity Interests, including any payment made in connection with any merger, amalgamation or consolidation involving the Company (other than (A) dividends or distributions by the Company payable solely in Equity Interests (other than Disqualified Stock) of the Company; or (B) dividends or distributions by a Restricted Subsidiary so long as, in the case of any dividend or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary other than a Wholly Owned Restricted Subsidiary, the Company or a Restricted Subsidiary receives at least its *pro rata* share of such dividend or distribution in accordance with its Equity Interests in such class or series of securities);

(ii)    purchase or otherwise acquire or retire for value any Equity Interests of the Company or any direct or indirect parent entity of the Company;

(iii)    make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value, in each case prior to any scheduled repayment or scheduled maturity, any Subordinated Indebtedness of the Company or any of its Restricted Subsidiaries (other than the payment, redemption, repurchase, defeasance, acquisition or retirement of (A) Subordinated Indebtedness in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of such payment, redemption, repurchase, defeasance, acquisition or retirement and (B) Indebtedness permitted under clauses (viii) and (x) of Section 4.03(b)); or

(iv)    make any Restricted Investment

(all of the payments and other actions set forth in clauses (i) through (iv) above are collectively referred to as "Restricted Payments"), unless, at the time of such Restricted Payment:

(1)     no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof;

(2)     immediately after giving effect to such transaction on a *pro forma* basis, the Company could Incur $1.00 of additional Indebtedness under Section 4.03(a); and

(3)     the aggregate amount of Restricted Payments made after the Issue Date (including the Fair Market Value of non-cash amounts constituting Restricted Payments and Restricted Payments permitted by clauses (i), (ii) (vi)(B), (viii), (xii)(B) and (xvi) of Section 4.04(b), but excluding all other Restricted Payments permitted by Section 4.04(b)) shall not exceed the sum of, without duplication.

(i)     50% of the Consolidated Net Income of the Company for the period (taken as one accounting period, the "Reference Period") from March 31, 2012 to the end of the Company's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment (or, in the case such Consolidated Net Income for such period is a deficit, minus 100% of such deficit), *plus*

(ii)     100% of the aggregate net cash proceeds, including cash and the Fair Market Value of property other than cash, received by the Company after March 31, 2012 (other than net cash proceeds to the extent such net cash proceeds have been used to Incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to Section 4.03(b)(xiv) from the issue or sale of Equity Interests of the Company (excluding Refunding Capital Stock, Designated Preferred Stock, Excluded Contributions and Disqualified Stock), including Equity Interests issued upon exercise of warrants or options (other than an issuance or sale to a Restricted Subsidiary), *plus*

(iii)     100% of the aggregate amount of contributions to the capital of the Company received in cash and the Fair Market Value of property other than cash after March 31, 2012 (other than Excluded Contributions, Refunding Capital Stock, Designated Preferred Stock and Disqualified Stock and other than contributions to the extent such contributions have been used to Incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to Section 4.03(b)(xiv)), *plus*

(iv)     100% of the principal amount of any Indebtedness, or the liquidation preference or maximum fixed repurchase price, as the case may be, of any Disqualified Stock of the Company or any Restricted Subsidiary thereof issued after March 31, 2012 (other than Indebtedness or Disqualified Stock issued to the Company or a Restricted Subsidiary thereof) or 100% of the principal amount of any debt securities of the Company or any Restricted Subsidiary thereof that are convertible into or exchangeable for Capital Stock issued after the Issue Date (other than debt securities issued to the Company or a Restricted Subsidiary thereof) which, in any such case, have been converted into or exchanged for Equity Interests in the Company (other than Disqualified Stock) or any direct or indirect parent entity of the Company (*provided* in the case of any parent, such Indebtedness or Disqualified Stock is retired or extinguished) after March 31, 2012, *plus*

(v)       100% of the aggregate amount received by the Company or any Re-
stricted Subsidiary in cash and the Fair Market Value of property other than cash received
by the Company or any Restricted Subsidiary after March 31, 2012 from:

(A)       the sale or other disposition (other than to the Company or a Re-
stricted Subsidiary of the Company) of Restricted Investments made by the
Company and its Restricted Subsidiaries and from repurchases and redemptions
of such Restricted Investments from the Company and its Restricted Subsidiaries
by any Person (other than the Company or any of its Subsidiaries) and from re-
payments of loans or advances which constituted Restricted Investments (other
than in each case to the extent that the Restricted Investment was made pursuant
to clause (vii) of Section 4.04(b) below) or

(B)       the sale (other than to the Company or a Restricted Subsidiary of
the Company) of the Capital Stock of an Unrestricted Subsidiary, *plus*

(vi)       in the event any Unrestricted Subsidiary of the Company has been redes-
ignated as a Restricted Subsidiary or has been merged, consolidated or amalgamated with
or into, or transfers or conveys its assets to, or is liquidated into, the Company or a Re-
stricted Subsidiary of the Company, in each case subsequent to March 31, 2012, the Fair
Market Value of the Investment of the Company in such Unrestricted Subsidiary at the
time of such redesignation, combination or transfer (or of the assets transferred or con-
veyed, as applicable), after deducting any Indebtedness associated with the Unrestricted
Subsidiary so designated or combined or any Indebtedness associated with the assets so
transferred or conveyed (other than in each case to the extent that the designation of such
Subsidiary as an Unrestricted Subsidiary was made pursuant to clause (vii) of Section
4.04(b) below or constituted a Permitted Investment).

(b)       The provisions of Section 4.04(a) shall not prohibit:

(i)       the payment of any dividend or distribution within 60 days after the date of dec-
laration thereof, if at the date of declaration such payment would have complied with the provi-
sions of this Indenture;

(ii)       (A)  the redemption, repurchase, retirement or other acquisition of any Equity In-
terests ("Retired Capital Stock") of the Company or Subordinated Indebtedness of the Company,
any direct or indirect parent entity of the Company in exchange for, or out of the proceeds of the
substantially concurrent sale of, Equity Interests of the Company or any direct or indirect parent
entity of the Company or contributions to the equity capital of the Company or any Restricted
Subsidiary (other than any Disqualified Stock or any Equity Interests sold to a Subsidiary of the
Company) (collectively, including any such contributions, "Refunding Capital Stock"),

(B)       the declaration and payment of dividends on the Retired Capital Stock out of the
proceeds of the substantially concurrent sale (other than to a Subsidiary of the Issuer) of Refund-
ing Capital Stock, and

(C)       if immediately prior to the retirement of Retired Capital Stock, the declaration
and payment of dividends thereon was permitted under clause (vi) of this Section 4.04(b) and not
made pursuant to clause (ii)(B), the declaration and payment of dividends on the Refunding Capi-
tal Stock (other than Refunding Capital Stock the proceeds of which are used to redeem, repur-
chase, retire or otherwise acquire any Equity Interests of any direct or indirect parent of the Com-

pany) in an aggregate amount per year no greater than the aggregate amount of dividends per annum that were declarable and payable on such Retired Capital Stock immediately prior to such retirement;

(iii)    the redemption, repurchase, defeasance, or other acquisition or retirement of Subordinated Indebtedness of the Company, the Issuer or any Guarantor made by exchange for, or out of the proceeds of the substantially concurrent sale of, new Indebtedness of the Company, the Issuer or any Guarantor which is Incurred in accordance with Section 4.03 so long as:

(A)    the principal amount (or accreted value, if applicable) of such new Indebtedness does not exceed the principal amount (or accreted value, if applicable) of, *plus* any accrued and unpaid interest on the Subordinated Indebtedness being so redeemed, repurchased, defeased, acquired or retired for value (*plus* the amount of any premium required to be paid under the terms of the instrument governing the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired, any tender premiums, *plus* any defeasance costs, fees and expenses Incurred in connection therewith),

(B)    such Indebtedness is subordinated to the Notes or such Guarantor's obligations in respect of the Notes, as the case may be, at least to the same extent as such Subordinated Indebtedness so purchased, exchanged, redeemed, repurchased, defeased, acquired or retired for value,

(C)    such Indebtedness has a final scheduled maturity date equal to or later than the earlier of (x) the final scheduled maturity date of the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired and (y) 91 days following the last maturity date of any Notes then outstanding, and

(D)    such Indebtedness has a Weighted Average Life to Maturity at the time Incurred which is not less than the shorter of (x) the remaining Weighted Average Life to Maturity of the Subordinated Indebtedness being so redeemed, repurchased, defeased, acquired or retired and (y) the Weighted Average Life to Maturity that would result if all payments of principal on the Subordinated Indebtedness being redeemed, repurchased, defeased, acquired or retired that were due on or after the date that is 91 days following the last maturity date of any Notes then outstanding were instead due on such date;

(iv)    a Restricted Payment to pay for the repurchase, retirement or other acquisition for value of Equity Interests of the Company or any direct or indirect parent entity of the Company held by any future, present or former employee, director or consultant of the Company or any direct or indirect parent entity of the Company or any of its Restricted Subsidiaries pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or other agreement or arrangement; *provided, however*, that the aggregate Restricted Payments made under this clause (iv) do not exceed $35.0 million in any calendar year (with unused amounts in any calendar year being permitted to be carried over to succeeding calendar years subject to a maximum (without giving effect to the following proviso) of $70.0 million in any calendar year); *provided, further, however*, that such amount in any calendar year may be increased by an amount not to exceed:

(A)    the cash proceeds received by the Company or any of its Restricted Subsidiaries from the sale of Equity Interests (other than Disqualified Stock) of the Company or any direct or indirect parent entity of the Company (to the extent contributed to the Company) to members of management, directors or consultants of the Company and its

Restricted Subsidiaries or any direct or indirect parent entity of the Company that occurs after the Issue Date (*provided* that the amount of such cash proceeds utilized for any such repurchase, retirement, other acquisition or dividend will not increase the amount available for Restricted Payments under Section 4.04(a)(iii) or be used as the basis for the Incurrence of Indebtedness under Section 4.03(b)(xiv)), *plus*

(B)      the cash proceeds of key man life insurance policies received by the Company or any direct or indirect parent entity (to the extent contributed to the Company) of the Company or any of its Restricted Subsidiaries after the Issue Date;

*provided* that the Company may elect to apply all or any portion of the aggregate increase contemplated by clauses (A) and (B) above in any calendar year; and *provided*, *further*, that cancellation of Indebtedness owing to the Company or any Restricted Subsidiary from any present or former employees, directors, officers or consultants of the Company, any of its Restricted Subsidiaries or any direct or indirect parent entity of the Company in connection with a repurchase of Equity Interests of the Company or any direct or indirect parent entity of the Company will not be deemed to constitute a Restricted Payment for purposes of this Section 4.04 or any other provision of this Indenture;

(v)      the declaration and payment of dividends or distributions to holders of any class or series of Disqualified Stock of the Company or any of its Restricted Subsidiaries issued or Incurred in accordance with Section 4.03 to the extent such dividends are included in the definition of "Fixed Charges";

(vi)      (A)  the declaration and payment of dividends or distributions to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) issued after the Issue Date; and

(B)      the declaration and payment of dividends on Refunding Capital Stock that is Preferred Stock in excess of the dividends declarable and payable thereon pursuant to Section 4.04(b)(ii);

*provided*, *however*, in the case of each of (A) and (B) above of this clause (vi), that for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date of issuance of such Designated Preferred Stock, after giving effect to such issuance (and the payment of dividends or distributions) on a *pro forma* basis, the Company would have had a Fixed Charge Coverage Ratio of at least 1.75 to 1.00;

(vii)      Investments in Unrestricted Subsidiaries having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (vii) that are at that time outstanding, not to exceed the greater of $375 million and 1.50% of the Consolidated Net Tangible Assets of the Company at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value), *plus* 100% of the aggregate amount received by the Company or any Restricted Subsidiary in cash and the Fair Market Value (as determined in good faith by the Company) of property other than cash received by the Company or any Restricted Subsidiary with respect to any Investment made pursuant to this clause (vii);

(viii)      (x) Restricted Payments by the Company in an amount not to exceed $75.0 million per annum, and (y) following a Primary Offering only, the payment of dividends on the listed Equity Interests at a rate not to exceed 6% per annum of the net cash proceeds received by the

Company or the Issuer in connection with such a Primary Offering or any subsequent Primary Offering;

(ix)    Restricted Payments that are made with Excluded Contributions;

(x)    other Restricted Payments in an aggregate amount not to exceed the greater of $450.0 million and 2.00% of the Consolidated Net Tangible Assets of the Company at the time made;

(xi)    the payment of dividends or other distributions to any direct or indirect parent of the Issuer that files a consolidated tax return that includes the Issuer and its Subsidiaries (including, without limitation, by virtue of such parent being the common parent of a consolidated or combined tax group of which the Issuer and/or its Restricted Subsidiaries are members) in an amount not to exceed the amount that the Issuer and its Restricted Subsidiaries would have been required to pay in respect of federal, state or local taxes (as the case may be) if the Issuer and its Restricted Subsidiaries paid such taxes as a standalone taxpayer (or standalone group);

(xii)    the payment of Restricted Payments, if applicable:

(A)    in amounts required for any direct or indirect parent of the Issuer to pay fees and expenses (including legal, audit and tax, including franchise tax, expenses) required to maintain its corporate existence, customary salary, bonus and other benefits payable to, and indemnities provided on behalf of, officers, directors and employees of any direct or indirect parent of the Issuer and general corporate operating and overhead expenses of any direct or indirect parent of the Issuer in each case to the extent such fees and expenses are attributable to the ownership or operation of the Issuer, if applicable, and its Subsidiaries;

(B)    in amounts required for any direct or indirect parent of the Company, if applicable, to pay interest and/or principal on Indebtedness the proceeds of which have been contributed to the Company or any of its Restricted Subsidiaries and that has been guaranteed by and treated as Indebtedness of the Company or its Restricted Subsidiaries, as applicable, Incurred in accordance with Section 4.03 (it being agreed that (i) all interest expense shall be included in the calculation of the "Fixed Charge Coverage Ratio" of the Company and (ii) no contribution of such proceeds may be included in the calculation of Restricted Payments capacity or in the amount of Indebtedness that may be Incurred based on contributions to the Company); and

(C)    in amounts required for any direct or indirect parent of the Company to pay fees and expenses, other than to Affiliates of the Company, related to any unsuccessful equity or debt offering of such parent that has been undertaken to finance the Company and its Subsidiaries;

(xiii)    repurchases of Equity Interests of the Company and its Subsidiaries deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(xiv)    purchases of receivables pursuant to a Receivables Repurchase Obligation in connection with a Qualified Receivables Financing and the payment or distribution of Receivables Fees;

(xv)     Restricted Payments by the Company or any Restricted Subsidiary to allow the payment of cash in lieu of the issuance of fractional shares upon the exercise of options or warrants or upon the conversion or exchange of Capital Stock of any such Person;

(xvi)     the repurchase, redemption or other acquisition or retirement for value of any Subordinated Indebtedness pursuant to the provisions similar to those described under Sections 4.06 and 4.08; *provided* that all Notes tendered by holders of the Notes in connection with a Change of Control Offer, Asset Sale Offer or Collateral Asset Sale Offer, as applicable, have been repurchased, redeemed or acquired for value in accordance with the provisions hereof;

(xvii)     payments or distributions to dissenting stockholders pursuant to applicable law, pursuant to or in connection with a consolidation, amalgamation, merger or transfer of all or substantially all of the assets of the Company and its Restricted Subsidiaries, taken as a whole, that complies with Section 5.01; *provided* that as a result of such consolidation, amalgamation, merger or transfer of assets, the Issuer shall have made a Change of Control Offer (if required by this Indenture) and that all Notes tendered by holders in connection with such Change of Control Offer have been repurchased, redeemed or acquired for value;

(xviii)     any Restricted Payment made in connection with the Emergence Transactions;

(xix)     distributions by any Restricted Subsidiary of the Company or any Joint Venture of chemicals to a holder of Capital Stock of such Restricted Subsidiary or Joint Venture if such distributions are made pursuant to a provision in a Joint Venture agreement or other arrangement entered into in connection with the establishment of such Joint Venture or Restricted Subsidiary that requires such holder to pay a price for such chemicals equal to that which would be paid in a comparable transaction negotiated on an arm's length basis (or pursuant to a provision that imposes a substantially equivalent requirement); and

(xx)     any Restricted Payments under any Treasury Services Agreement or any Structured Financing Transaction;

*provided*, *however*, that at the time of, and after giving effect to, any Restricted Payment permitted under clauses (iii), (vi), (vii), (viii), (ix), (x) and (xii)(B) of this Section 4.04(b), no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof.

The Company will not permit any Unrestricted Subsidiary to become a Restricted Subsidiary except pursuant to the definition of "Unrestricted Subsidiary." For purposes of designating any Restricted Subsidiary as an Unrestricted Subsidiary, all outstanding Investments by the Company and its Restricted Subsidiaries (except to the extent repaid) in the Subsidiary so designated will be deemed to be Restricted Payments in an amount determined as set forth in the last sentence of the definition of "Investments." Such designation will only be permitted if a Restricted Payment or Permitted Investment in such amount would be permitted at such time and if such Subsidiary otherwise meets the definition of an Unrestricted Subsidiary.

Notwithstanding Section 4.04(b)(x), prior to March 31, 2012 the Company will not, and will not permit any of its Restricted Subsidiaries to, pay any cash dividend or make any cash distribution on, or in respect of, the Company's Capital Stock or purchase for cash or otherwise acquire for cash any Capital Stock of the Company or any direct or indirect parent of the Company for the purpose of paying any cash dividend or making any cash distribution to, or acquiring Capital Stock of any direct or indirect parent of the Company for cash from, the Sponsors, or guarantee any Indebtedness of any Affiliate of the Company for the purpose of paying such dividend, making such distribution or so acquiring such Capital

Stock to or from the Sponsors, in each case by means of the exception provided by clause (x) of Section 4.04(b) if at the time and after giving effect to such payment, the Secured Indebtedness Leverage Ratio of the Company would be greater than 2.25 to 1.00.

SECTION 4.05.    <u>Dividend and Other Payment Restrictions Affecting Subsidiaries</u>. The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction on the ability of any Restricted Subsidiary to:

(a)    (i) pay dividends or make any other distributions to the Company or any of its Restricted Subsidiaries (1) on its Capital Stock or (2) with respect to any other interest or participation in, or measured by, its profits; or (ii) pay any Indebtedness owed to the Company or any of its Restricted Subsidiaries;

(b)    make loans or advances to the Company or any of its Restricted Subsidiaries; or

(c)    sell, lease or transfer any of its properties or assets to the Company or any of its Restricted Subsidiaries;

except in each case for such encumbrances or restrictions existing under or by reason of:

(1)    agreements existing and contractual encumbrances or restrictions in effect on the Issue Date, including pursuant to the Senior Term Loan Facility, the ABL Facility, the Euro Securitization and the other Credit Facilities;

(2)    the First Lien Indenture, the First Lien Notes or the other first lien notes permitted to be Incurred pursuant to Section 4.03(b)(i);

(3)    applicable law or any applicable rule, regulation or order;

(4)    any agreement or other instrument (including those governing Capital Stock) of a Person acquired by the Company or any Restricted Subsidiary which was in existence at the time of such acquisition (but not created in contemplation thereof or to provide all or any portion of the funds or credit support utilized to consummate such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired;

(5)    contracts or agreements for the sale of assets, including any restriction with respect to a Restricted Subsidiary imposed pursuant to an agreement entered into for the sale or disposition of the Capital Stock or assets of such Restricted Subsidiary;

(6)    Secured Indebtedness otherwise permitted to be Incurred pursuant to Sections 4.03 and 4.12 that limit the right of the Company or any Restricted Subsidiary to dispose of the assets securing such Indebtedness;

(7)    restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(8)    customary provisions in Joint Venture agreements and other similar agreements entered into in the ordinary course of business;

(9)    purchase money obligations for property acquired and Capitalized Lease Obligations in the ordinary course of business;

(10)    customary provisions contained in leases, subleases, licenses and other similar agreements entered into in the ordinary course of business;

(11)    any encumbrance or restriction in connection with a Qualified Receivables Financing; *provided* that such restrictions only apply to the applicable receivables and related intangibles;

(12)    other Indebtedness, Disqualified Stock or Preferred Stock (a) of any Restricted Subsidiary of the Company that is a Guarantor or a Foreign Subsidiary, (b) of any Restricted Subsidiary that is not a Guarantor or a Foreign Subsidiary so long as such encumbrances and restrictions contained in any agreement or instrument will not materially affect the Company's ability to make anticipated principal or interest payments on the Notes (as determined in good faith by the Company) or (c) of any Restricted Subsidiary Incurred in connection with any Project Financing, *provided* that in the case of each of clauses (a) and (b), such Indebtedness, Disqualified Stock or Preferred Stock is permitted to be Incurred subsequent to the Issue Date pursuant to Section 4.03;

(13)    any Restricted Investment not prohibited by Section 4.04 and any Permitted Investment;

(14)    customary provisions in Hedging Obligations permitted under this Indenture and entered into in the ordinary course of business; or

(15)    the Indenture or the Notes or the 2014 Indenture or the 2014 Notes; or

(16)    any encumbrances or restrictions of the type referred to in clauses (a), (b) and (c) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or Obligations referred to in clauses (1) through (15) above; *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, as determined good faith by the Company, no more restrictive with respect to such dividend and other payment restrictions than those contained in the dividend or other payment restrictions prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

For purposes of determining compliance with this Section 4.05, (i) the priority of any Preferred Stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock shall not be deemed a restriction on the ability to make distributions on Capital Stock and (ii) the subordination of loans or advances made to the Company or a Restricted Subsidiary of the Company to other Indebtedness Incurred by the Company or any such Restricted Subsidiary shall not be deemed a restriction on the ability to make loans or advances.

SECTION 4.06.    Asset Sales.

(a)    The Company shall not, and shall not permit any of its Restricted Subsidiaries to, cause or make an Asset Sale, unless (x) the Company or any of its Restricted Subsidiaries, as the case may be, receives consideration at the time of such Asset Sale at least equal to the Fair Market Value of the assets sold or otherwise disposed of, and (y) at least 75% of the consideration therefor received by the

3061 Company or such Restricted Subsidiary, as the case may be, is in the form of Cash Equivalents; *provided*
3062 that the amount of:

3063         (i)     any liabilities (as shown on the Company's or such Restricted Subsidiary's most
3064 recent balance sheet or in the notes thereto) of the Company or any Restricted Subsidiary of the
3065 Company (other than liabilities that are by their terms subordinated to the Notes or such Re-
3066 stricted Subsidiary's Obligations in respect of the Notes) that are assumed by the transferee of
3067 any such assets,

3068         (ii)    any notes or other Obligations or other securities or assets received by the Com-
3069 pany or such Restricted Subsidiary of the Company from such transferee that are converted by the
3070 Company or such Restricted Subsidiary of the Company into cash within 180 days of the receipt
3071 thereof (to the extent of the cash received), and

3072         (iii)   any Designated Non-cash Consideration received by the Company or any of its
3073 Restricted Subsidiaries in such Asset Sale having an aggregate Fair Market Value, taken together
3074 with all other Designated Non-cash Consideration received pursuant to this Section 4.06(a)(iii)
3075 that is at that time outstanding, not to exceed the greater of 3.75% of the Consolidated Net Tangi-
3076 ble Assets of the Company and $750.0 million at the time of the receipt of such Designated Non-
3077 cash Consideration (with the Fair Market Value of each item of Designated Non-cash Considera-
3078 tion being measured at the time received and without giving effect to subsequent changes in
3079 value),

3080 shall be deemed to be Cash Equivalents for the purposes of this Section 4.06(a).

3081         (b)    Within 15 months after the Company's or any Restricted Subsidiary's receipt of
3082 the Net Proceeds of any Asset Sale, the Company or such Restricted Subsidiary Company may apply the
3083 Net Proceeds from such Asset Sale, at its option:

3084         (i)     to repay and/or repurchase (A) Indebtedness constituting First and Second Prior-
3085 ity Lien Obligations; (B) Indebtedness of a Restricted Subsidiary that is not a Pledgor, (C) Notes
3086 Obligations or (D) other Pari Passu Indebtedness (*provided* that if the Issuer or any Pledgor shall
3087 so reduce other Pari Passu Indebtedness, the Issuer will equally and ratably reduce Notes Obliga-
3088 tions through open-market purchases (provided that such purchases are at or above 100% of the
3089 principal amount thereof) or by making an offer (in accordance with the procedures set forth be-
3090 low for an Asset Sale Offer) to all holders to purchase at a purchase price equal to 100% of the
3091 principal amount thereof, *plus* accrued and unpaid interest and Additional Interest, if any, on the
3092 *pro rata* principal amount of Notes), in each case other than Indebtedness owed to the Issuer or an
3093 Affiliate of the Issuer; or

3094         (ii)    to make an Investment in any one or more businesses (*provided* that if such In-
3095 vestment is in the form of the acquisition of Capital Stock of a Person, such acquisition results in
3096 such Person becoming a Restricted Subsidiary of the Company), assets or property, in each case
3097 (a) used or useful in a Similar Business or (b) that replace the properties and assets that are the
3098 subject of such Asset Sale; *provided, however*, that with respect to any Asset Sale of Collateral
3099 only, the assets or property subject to such Investment (other than to the extent it would constitute
3100 Excluded Assets) shall be pledged as Collateral. .

3101         In the case of Section 4.06(b)(ii), a binding commitment shall be treated as a permitted
3102 application of the Net Proceeds from the date of such commitment; *provided* that in the event such bind-
3103 ing commitment is later canceled or terminated for any reason before such Net Proceeds are so applied,

the Company or such Restricted Subsidiary enters into another binding commitment (a "Second Com-mitment") within six months of such cancellation or termination of the prior binding commitment; *pro-vided, further*, that the Company or such Restricted Subsidiary may only enter into a Second Commitment under the foregoing provision one time with respect to each Asset Sale and to the extent such Second Commitment is later cancelled or terminated for any reason before such Net Proceeds are applied, then such Net Proceeds shall constitute Collateral Excess Proceeds or Excess Proceeds, as applicable.  Pending the final application of any such Net Proceeds, the Company or such Restricted Subsidiary of the Com-pany may temporarily reduce Indebtedness under a revolving credit facility, if any, or otherwise invest such Net Proceeds in any manner not prohibited by this Indenture.

Any Net Proceeds from any Asset Sale of Collateral(other than Specified ABL Facility Assets and other than to the extent required to be used in any accepted offer or otherwise to repay any First Priority Lien Obligations as required under the First Lien Notes and related indenture or Senior Term Loan Facility or other agreement governing First Priority Lien Obligations or Second Priority Lien Obligations) that are not invested or applied as provided and within the time period set forth in Section 4.06(b) (it being understood that any portion of such Net Proceeds used to purchase or make an offer to purchase Notes, as described in clause (1) above, shall be deemed to have been invested whether or not such offer is accepted) will be deemed to constitute "Collateral Excess Proceeds." The Issuer shall make an offer to all holders of the Notes and, if required by the terms of any First Priority Lien Obligations, Second Priority Lien Obligations or Third Priority Lien Obligations secured by a Lien permitted under the Indenture, to the holders of such First Priority Lien Obligations, Second Priority Lien Obligations or such other Third Priority Lien Obligations (including any mandatory prepayment required by the Senior Term Loan Facility) (a "Collateral Asset Sale Offer"), to purchase the maximum aggregate principal amount of the Notes that is a minimum of $100,000 or an integral multiple of $1,000 in excess thereof that may be purchased out of the Collateral Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof (or, in the event such Notes or other Third Priority Lien Obligations were issued with significant original issue discount, 100% of the accreted value thereof), plus accrued and un-paid interest and Additional Interest, if any, (or, in respect of other Third Priority Lien Obligations, such lesser price, if any, as may be provided for by the terms of such other Third Priority Lien Obligations) to the date fixed for the closing of such offer, in accordance with the procedures set forth in the Indenture; provided, that with respect to any Net Proceeds from Asset Sales of Collateral realized or received by any Foreign Subsidiary, the aggregate amount of such Net Proceeds required to be applied shall be further subject to reduction to the extent the expatriation of such Net Proceeds (1) would result in adverse tax or legal consequences, (2) would be reasonably likely to result in adverse personal liability of any director of the Company or a Foreign Subsidiary or (3) would result in the insolvency of a Foreign Subsidiary. The Issuer will commence a Collateral Asset Sale Offer with respect to Collateral Excess Proceeds within ten (10) Business Days after the date that Collateral Excess Proceeds exceed $200.0 million by mailing the notice required pursuant to the terms of this Indenture, with a copy to the Trustee.  Any Net Proceeds from any Asset Sale of non-Collateral (other than Specified ABL Facility Assets and other than to the extent required to be used in any accepted offer or otherwise to repay any First Priority Lien Obligations as required under the First Lien Notes and related indenture, or Senior Term Loan Facility or other agreement governing First Priority Lien Obligations or Second Priority Lien Obligations) that are not in-vested or applied as provided and within the time period set forth in Section 4.06(b) (it being understood that any portion of such Net Proceeds used to purchase or make an offer to purchase Notes, as described in clause (i) of this Section 4.06(b), shall be deemed to have been invested whether or not such offer is accepted) will be deemed to constitute "Excess Proceeds." When the aggregate amount of Excess Pro-ceeds exceeds $200.0 million, the Issuer shall make an offer to all holders of Notes (and, at the option of the Company, to holders of any Pari Passu Indebtedness) (an "Asset Sale Offer") to purchase the maxi-mum principal amount of Notes (and such Pari Passu Indebtedness) that is at least $100,000 and an inte-gral multiple of $1,000 in excess thereof that may be purchased out of the Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof (or, in the event such Pari Passu

Indebtedness was issued with significant original issue discount, 100% of the accreted value thereof), *plus* accrued and unpaid interest and Additional Interest, if any  (or, in respect of such Pari Passu Indebtedness, such lesser price, if any, as may be provided for by the terms of such Pari Passu Indebtedness), to the date fixed for the closing of such offer, in accordance with the procedures set forth in this Section 4.06; *provided* that with respect to any Net Proceeds from Asset Sales of non-Collateral realized or received by any Foreign Subsidiary, the aggregate amount of such Net Proceeds required to be applied shall be subject to reduction to the extent the expatriation of such Net Proceeds (1) would result in adverse tax or legal consequences, (2) would be reasonably likely to result in adverse personal liability of any director of the Company or a Foreign Subsidiary or (3) would result in the insolvency of the Foreign Subsidiary.  The Issuer will commence an Asset Sale Offer with respect to Excess Proceeds within ten (10) Business Days after the date that Excess Proceeds exceed $200.0 million by mailing the notice required pursuant to the terms of Section 4.06(f), with a copy to the Trustee.

To the extent that the aggregate amount of Notes and such other Third Priority Lien Obligations tendered pursuant to a Collateral Asset Sale Offer is less than the Collateral Excess Proceeds, the Company may use any remaining Collateral Excess Proceeds for any purpose that is not prohibited by the Indenture. If the aggregate principal amount of Notes or other Third Party Lien Obligations surrendered by such holders thereof exceeds the amount of Collateral Excess Proceeds, the Trustee shall select the Notes and such other Third Priority Lien Obligations to be purchased in the manner described below.  To the extent that the aggregate amount of Notes (and such Pari Passu Indebtedness) tendered pursuant to an Asset Sale Offer is less than the Excess Proceeds, the Company may use any remaining Excess Proceeds for any purpose that is not prohibited by this Indenture.  If the aggregate principal amount of Notes (and such Pari Passu Indebtedness) surrendered by holders thereof exceeds the amount of Excess Proceeds, the Trustee shall select the Notes to be purchased in the manner described in Section 4.06(f).  Upon completion of any such Collateral Asset Sale Offer or Asset Sale Offer, the amount of Collateral Excess Proceeds or Excess Proceeds, as the case may be, shall be reset at zero.

(c)    The Issuer shall comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations to the extent such laws or regulations are applicable in connection with the repurchase of the Notes pursuant to an Asset Sale Offer.  To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Indenture, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its Obligations described in this Indenture by virtue thereof.

(d)    Not later than the date upon which written notice of an Asset Sale Offer is delivered to the Trustee as provided above, the Issuer shall deliver to the Trustee an Officer's Certificate as to (i) the amount of the Excess Proceeds, (ii) the allocation of the Net Proceeds from the Asset Sales pursuant to which such Asset Sale Offer is being made and (iii) the compliance of such allocation with the provisions of Section 4.06(b).  On such date, the Issuer shall also irrevocably deposit with the Trustee or with a paying agent (or, if the Issuer or a Wholly Owned Restricted Subsidiary is acting as the Paying Agent, segregate and hold in trust) an amount equal to the Excess Proceeds to be invested in Cash Equivalents, as directed in writing by the Issuer, to be held for payment in accordance with the provisions of this Section 4.06.  Upon the expiration of the period for which the Asset Sale Offer remains open (the "Offer Period"), the Issuer shall deliver to the Trustee for cancellation the Notes or portions thereof that have been properly tendered to and are to be accepted by the Issuer.  The Trustee (or the Paying Agent, if not the Trustee) shall, on the date of purchase, mail or deliver payment to each tendering holder in the amount of the purchase price.  In the event that the Excess Proceeds delivered by the Issuer to the Trustee are greater than the purchase price of the Notes tendered, the Trustee shall deliver the excess to the Issuer immediately after the expiration of the Offer Period for application in accordance with Section 4.06.

(e)    Not later than the date upon which written notice of a Collateral Asset Sale Offer is delivered to the Trustee as provided above, the Issuer shall deliver to the Trustee an Officer's Certificate as to (i) the amount of the Collateral Excess Proceeds, (ii) the allocation of the Net Proceeds from the Collateral Asset Sales pursuant to which such Collateral Asset Sale Offer is being made and (iii) the compliance of such allocation with the provisions of Section 4.06(b).  On such date, the Issuer shall also irrevocably deposit with the Trustee or with a paying agent (or, if the Issuer or a Wholly Owned Restricted Subsidiary is acting as the Paying Agent, segregate and hold in trust) an amount equal to the Collateral Excess Proceeds to be invested in Cash Equivalents, as directed in writing by the Issuer, and to be held for payment in accordance with the provisions of this Section 4.06.  Upon the expiration of the period for which the Collateral Asset Sale Offer remains open (the "Collateral Asset Sale Offer Period"), the Issuer shall deliver to the Trustee for cancellation the Notes or portions thereof that have been properly tendered to and are to be accepted by the Issuer.  The Trustee (or the Paying Agent, if not the Trustee) shall, on the date of purchase, mail or deliver payment to each tendering holder in the amount of the purchase price.  In the event that the Collateral Excess Proceeds delivered by the Issuer to the Trustee are greater than the purchase price of the Notes tendered, the Trustee shall deliver the excess to the Issuer reasonably promptly following its actual knowledge of the expiration of the Collateral Asset Sale Offer Period for application in accordance with Section 4.06.

(f)    Holders electing to have a Note purchased shall be required to surrender the Note, with an appropriate form duly completed, to the Issuer at the address specified in the notice at least three Business Days prior to the purchase date.  Holders shall be entitled to withdraw their election if the Trustee or the Issuer receives not later than one Business Day prior to the purchase date, a telegram, telex, facsimile transmission or letter setting forth the name of the holder, the principal amount of the Note which was delivered by the holder for purchase and a statement that such holder is withdrawing his election to have such Note purchased.  If at the end of the Offer Period more Notes (and such Third Priority Lien Obligations or Pari Passu Indebtedness, as applicable) are tendered pursuant to an Asset Sale Offer than the Issuer is required to purchase, Notes tendered will be repurchased on a *pro rata* basis; *provided* that no Notes of $100,000 or less shall be purchased in part.  Selection of such Third Priority Lien Obligations or Pari Passu Indebtedness, as applicable shall be made pursuant to the terms of such Third Priority Lien Obligations or Pari Passu Indebtedness.

(g)    Notices of an Asset Sale Offer or Collateral Asset Sale Offer shall be mailed by first class mail, postage prepaid, at least 30 but not more than 60 days before the purchase date to each holder of Notes at such holder's registered address.  If any Note is to be purchased in part only, any notice of purchase that relates to such Note shall state the portion of the principal amount thereof that has been or is to be purchased.

SECTION 4.07.    <u>Transactions with Affiliates</u>.

(a)    The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction or series of transactions, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Company (each of the foregoing, an "<u>Affiliate Transaction</u>") involving aggregate consideration in excess of $25.0 million, unless:

(i)    such Affiliate Transaction is on terms that are not less favorable to the Company or the relevant Restricted Subsidiary than those that could have been obtained in a comparable transaction by the Company or such Restricted Subsidiary with an unrelated Person; and

(ii)    with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $100.0 million, the Company delivers to the Trustee a resolution adopted in good faith by the majority of the Board of Directors of the Company, approving such Affiliate Transaction and set forth in an Officer's Certificate certifying that such Affiliate Transaction complies with clause (a) above.

(b)    The provisions of Section 4.07(a) shall not apply to the following:

(i)    transactions between or among the Company and/or any of its Restricted Subsidiaries (or an entity that becomes a Restricted Subsidiary as a result of such transaction) and any merger, consolidation or amalgamation of the Issuer and any direct parent of the Issuer;

(ii)    Restricted Payments permitted by Section 4.04 and Permitted Investments;

(iii)    the payment of reasonable and customary fees and reimbursement of expenses paid to, and indemnity provided on behalf of, officers, directors, managers, employees or consultants of the Company or any Restricted Subsidiary or any direct or indirect parent entity of the Company;

(iv)    transactions in which the Company or any of its Restricted Subsidiaries, as the case may be, delivers to the Trustee a letter from an Independent Financial Advisor stating that such transaction is fair to the Company or such Restricted Subsidiary from a financial point of view or meets the requirements of clause (i) of Section 4.07(a);

(v)    payments or loans (or cancellation of loans) to officers, directors, employees or consultants which are approved by a majority of the Board of Directors of the Company in good faith;

(vi)    any agreement as in effect as of the Issue Date or any amendment thereto (so long as any such agreement together with all amendments thereto, taken as a whole, is not more disadvantageous to the holders of the Notes in any material respect than the original agreement as in effect on the Issue Date) or any transaction contemplated thereby as determined in good faith by the Company;

(vii)    the existence of, or the performance by the Company or any of its Restricted Subsidiaries of its obligations under the terms of, any registration rights agreement to which it is a party as of the Issue Date, and any amendment thereto or similar agreements or arrangements which it may enter into thereafter; *provided*, *however*, that the existence of, or the performance by the Company or any of its Restricted Subsidiaries of its obligations under, any future amendment to any such existing agreement or under any similar agreement entered into after the Issue Date shall only be permitted by this clause (vii) to the extent that the terms of any such existing agreement together with all amendments thereto, taken as a whole, or new agreement are not otherwise more disadvantageous to the holders of the Notes in any material respect than the original agreement as in effect on the Issue Date;

(viii)    the Emergence Transactions, including the payment of fees and expenses paid in connection therewith;

(ix)    (A) transactions with customers, clients, suppliers or purchasers or sellers of goods or services, or transactions otherwise relating to the purchase or sale of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this

Indenture, which are fair to the Company and its Restricted Subsidiaries in the reasonable deter-
mination of the Board of Directors or the senior management of the Company, or are on terms at
least as favorable as might reasonably have been obtained at such time from an unaffiliated party
or (B) transactions with Joint Ventures or Unrestricted Subsidiaries entered into in the ordinary
course of business and consistent with past practice or industry norm;

(x)    any transaction effected as part of a Qualified Receivables Financing;

(xi)    the issuance of Equity Interests (other than Disqualified Stock) of the Company
to any Person;

(xii)    the issuances of securities or other payments, awards or grants in cash, securities
or otherwise pursuant to, or the funding of, employment arrangements, stock option and stock
ownership plans or similar employee benefit plans approved by the Board of Directors of the
Company or any direct or indirect parent entity of the Company or of a Restricted Subsidiary of
the Company, as appropriate, in good faith;

(xiii)    the entering into of any tax sharing agreement or arrangement that complies with
Section 4.04(b)(xii);

(xiv)    any contribution to the capital of the Company;

(xv)    transactions between the Company or any of its Restricted Subsidiaries and any
Person that is an Affiliate of the Company or any of its Restricted Subsidiaries solely because a
director of such Person is also a director of the Company or any direct or indirect parent entity of
the Company; *provided*, *however*, that such director abstains from voting as a director of the
Company or any direct or indirect parent entity of the Company, as the case may be, on any mat-
ter involving such other Person;

(xvi)    pledges of Equity Interests of Unrestricted Subsidiaries;

(xvii)    the formation and maintenance of any consolidated group or subgroup for tax,
accounting or cash pooling or management purposes in the ordinary course of business;

(xviii)    any employment agreements entered into by the Company or any of its Restricted
Subsidiaries in the ordinary course of business;

(xix)    transactions undertaken in good faith (as certified by a responsible financial or
accounting officer of the Company in an Officer's Certificate) for the purpose of improving the
consolidated tax efficiency of the Company and its Subsidiaries and not for the purpose of cir-
cumventing any provision set forth in this Indenture; and

(xx)    transactions entered into by a Person prior to the time such Person becomes a Re-
stricted Subsidiary or is merged or consolidated into the Company or a Restricted Subsidiary
(*provided* such transaction is not entered into in contemplation of such event).

SECTION 4.08.    <u>Change of Control</u>.

(a)    Upon a Change of Control after the Issue Date, each holder shall have the right to
require the Issuer to repurchase all or any part of such holder's Notes at a purchase price in cash equal to
101% of the principal amount thereof, *plus* accrued and unpaid interest and Additional Interest, if any, to

the date of repurchase (subject to the right of the holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date), in accordance with the terms contemplated in this Section 4.08; *provided, however*, that notwithstanding the occurrence of a Change of Control, the Issuer shall not be obligated to purchase any Notes pursuant to this Section 4.08 in the event that it has exercised its right to redeem such Notes in accordance with Article III of this Indenture.

(b)    In the event that at the time of such Change of Control the terms of any First Priority Lien Obligation or Second Priority Lien Obligation restrict or prohibit the repurchase of Notes pursuant to this covenant, then prior to the mailing of the notice to holders provided for in the immediately following paragraph but in any event within 30 days following any Change of Control, the Issuer shall:

(1)    repay in full all such Indebtedness under the First Priority Lien Obligation or Second Priority Lien Obligation, as applicable, containing all such restrictions or prohibitions or, if doing so will allow the purchase of Notes, offer to repay in full all such Credit Facility Indebtedness and repay such Credit Facility Indebtedness owed to each lender and/or noteholder who has accepted such offer; or

(2)    obtain the requisite consent under the agreements governing such First Priority Lien Obligation or Second Priority Lien Obligation, as applicable, to permit the repurchase of the Notes as provided for in the immediately following clause (c);

it being understood that failure to repay in full all such Indebtedness under the First Priority Lien Obligation or Second Priority Lien Obligation, as applicable, or obtain such requisite consent, shall not release the Issuer of its obligation to make a Change of Control Offer (as defined below) and repurchase the Notes as required hereunder.

(c)    Within 30 days following any Change of Control, except to the extent that the Issuer has exercised its right to redeem the Notes in accordance with Article III of this Indenture, the Issuer shall mail a notice (a "Change of Control Offer") to each holder with a copy to the Trustee stating:

(i)    that a Change of Control has occurred and that such holder has the right to require the Issuer to repurchase such holder's Notes at a repurchase price in cash equal to 101% of the principal amount thereof, *plus* accrued and unpaid interest and Additional Interest, if any, to the date of repurchase (subject to the right of the holders of record on the relevant Record Date to receive interest on the relevant Interest Payment Date);

(ii)    the circumstances and relevant facts and financial information regarding such Change of Control;

(iii)    the repurchase date (which shall be no earlier than 30 days nor later than 60 days from the date such notice is mailed); and

(iv)    the instructions determined by the Issuer, consistent with this Section 4.08, that a holder must follow in order to have its Notes purchased.

(d)    holders electing to have a Note purchased shall be required to surrender the Note, with an appropriate form duly completed, to the Issuer at the address specified in the notice at least three Business Days prior to the purchase date. The holders shall be entitled to withdraw their election if the Trustee or the Issuer receives not later than one Business Day prior to the purchase date a telegram, telex, facsimile transmission or letter setting forth the name of the holder, the principal amount of the Note which was delivered for purchase by the holder and a statement that such holder is withdrawing his elec-

3364 tion to have such Note purchased.  Holders whose Notes are purchased only in part shall be issued new
3365 Notes equal in principal amount to the unpurchased portion of the Notes surrendered.

3366        (e)     On the repurchase date, all Notes purchased by the Issuer under this Section shall
3367 be delivered to the Trustee for cancellation, and the Issuer shall pay the purchase price *plus* accrued and
3368 unpaid interest to the holders entitled thereto.

3369        (f)     A Change of Control Offer may be made in advance of a Change of Control, and
3370 conditioned upon such Change of Control, if a definitive agreement is in place for the Change of Control
3371 at the time of making of the Change of Control Offer.

3372        (g)     Notwithstanding the foregoing provisions of this Section 4.08, the Issuer shall
3373 not be required to make a Change of Control Offer upon the consummation of a Change of Control if a
3374 third party makes the Change of Control Offer in the manner, at the time and otherwise in compliance
3375 with the requirements set forth in this Section 4.08 applicable to a Change of Control Offer made by the
3376 Issuer and purchases all Notes properly tendered and not withdrawn under such Change of Control Offer.

3377        (h)     Notes repurchased by the Issuer pursuant to a Change of Control Offer will have
3378 the status of Notes issued but not outstanding or will be retired and canceled at the option of the Issuer.
3379 Notes purchased by a third party pursuant to the preceding clause (g) will have the status of Notes issued
3380 and outstanding.

3381        (i)     At the time the Issuer delivers Notes to the Trustee which are to be accepted for
3382 purchase, the Issuer shall also deliver an Officer's Certificate stating that such Notes are to be accepted by
3383 the Issuer pursuant to and in accordance with the terms of this Section 4.08.  A Note shall be deemed to
3384 have been accepted for purchase at the time the Trustee, directly or through an agent, mails or delivers
3385 payment therefor to the surrendering holder.

3386        (j)     Prior to any Change of Control Offer, the Issuer shall deliver to the Trustee an
3387 Officer's Certificate and an Opinion of Counsel stating that all conditions precedent contained herein to
3388 the right of the Issuer to make such offer have been complied with.

3389        (k)     The Issuer shall comply, to the extent applicable, with the requirements of Sec-
3390 tion 14(e) of the Exchange Act and any other securities laws or regulations in connection with the repur-
3391 chase of Notes pursuant to this Section.  To the extent that the provisions of any securities laws or regula-
3392 tions conflict with provisions of this Section 4.08, the Issuer shall comply with the applicable securities
3393 laws and regulations and shall not be deemed to have breached its obligations under this Section by virtue
3394 thereof.

3395        SECTION 4.09.   <u>Compliance Certificate</u>.  The Issuer shall deliver to the Trustee within
3396 120 days after the end of each fiscal year of the Issuer, beginning with the fiscal year ending on December
3397 31, 2010, an Officer's Certificate stating that in the course of the performance by the signer of his or her
3398 duties as an Officer of the Issuer he or she would normally have knowledge of any Default and whether or
3399 not the signer knows of any Default that occurred during such period.  If he or she does, the certificate
3400 shall describe the Default, its status and what action the Issuer is taking or proposes to take with respect
3401 thereto.  The Issuer also shall comply with Section 314(a)(4) of the TIA.  Except with respect to receipt of
3402 payments of principal and interest on the Notes and any Default or Event of Default information con-
3403 tained in the Officer's Certificate delivered to it pursuant to this Section 4.09, the Trustee shall have no
3404 duty to review, ascertain or confirm the Issuer's compliance with or the breach of any representation, war-
3405 ranty or covenant made in this Indenture.

SECTION 4.10.    Further Instruments and Acts.  Upon request of the Trustee, the Issuer
shall execute and deliver such further instruments and do such further acts as may be reasonably neces-
sary or proper to carry out more effectively the purpose of this Indenture.

SECTION 4.11.    Future Subsidiary Guarantors.

(a)    The Company shall cause each (i) Domestic Subsidiary of the Company (other
than the Issuer) that is Wholly Owned other than, at the election of the Issuer, an Excluded Subsidiary and
(ii) Wholly Owned Restricted Subsidiary of the Company (other than the Issuer), in each case,  that guar-
antees the First Lien Notes or the Senior Term Loan Facility to execute and deliver to the Trustee (a) a
supplemental indenture joining each such Subsidiary of the Company to this Indenture substantially in the
form of Exhibit B hereto; and (b) Security Documents and intercreditor agreements providing for Junior
Lien Obligations (other than, in the case of the ABL Facility Collateral, which shall be subject to a second
priority security interest), pursuant to which such Subsidiary will guarantee payment of the Notes on the
same terms and subject to the same conditions and limitations as those described under Article 12 in this
Indenture (each such guarantee of the Notes, an "Additional Guarantee").

(b)    Notwithstanding the foregoing and the other provisions of this Indenture, any
Additional Guarantee of the Notes by a Domestic Subsidiary of the Company that is a Wholly Owned
Restricted Subsidiary shall provide by its terms that it shall be automatically and unconditionally released
and discharged in the circumstances described under Section 12.02 hereof.  Any Additional Guarantee
shall be considered a "Guarantee" as described Section 12.01 and any such Domestic Subsidiary of the
Company providing such Additional Guarantee shall be considered a "Guarantor" as described under Sec-
tion 12.01.

SECTION 4.12.    Liens.  The Company shall not, and shall not permit any Restricted
Subsidiary to, directly or indirectly, create, Incur, assume or suffer to exist any Indebtedness secured by a
Lien (except Permitted Liens) now owned or hereafter acquired, without making effective provision
whereby any and all Notes then or thereafter outstanding will be secured by a Lien equally and ratably
with (or, if the obligation to be secured by such Lien is subordinated in right of payment to the Notes,
prior to) any and all other obligations thereby secured for so long as any such obligations shall be so se-
cured.

Any Lien created for the benefit of the holders pursuant to this covenant will provide by
its terms that such Lien will be automatically and unconditionally released and discharged (a) upon the
release and discharge of the Lien that gave rise to the obligation to secure the Notes under this covenant
(the "Initial Lien"), (b) upon the sale or other disposition of the assets subject to such Initial Lien (or the
sale or other disposition of the Person that owns such assets) in compliance with the terms of the Inden-
ture, (c) upon the designation of a Restricted Subsidiary whose property or assets secure such Initial Lien
as an Unrestricted Subsidiary in accordance with the terms of the Indenture or (d) upon the effectiveness
of any defeasance or satisfaction and discharge of the Notes specified in the Indenture.

SECTION 4.13.    After-Acquired Property.  Subject to Permitted Liens and the 3-16
Exemption and the Excluded Assets limitations, if any of the Company, the Issuer or any Pledgor ac-
quires any First or Second Priority After-Acquired Property, the Company, the Issuer or such Pledgor
shall execute and deliver such mortgages, deeds of trust, security instruments, financing statements and
certificates and opinions of counsel as shall be reasonably necessary to vest in the Collateral Agent a per-
fected third priority security interest, subject only to Permitted Liens, in such First or Second Priority Af-
ter-Acquired Property and to have such First or Second Priority After-Acquired Property added to the
Collateral, and thereupon all provisions of this Indenture relating to the Collateral shall be deemed to re-
late to such First or Second Priority After-Acquired Property to the same extent and with the same force

3451  and effect.  In addition, if granting a security interest in such property requires the consent of a third party,
3452  the Company will use commercially reasonable efforts to obtain such consent (i) with respect to the first
3453  priority security interest for the benefit of the First Lien Notes Collateral Agent on behalf of the holders of
3454  the First Lien Notes and for the benefit of the Senior Term Loan Collateral Agent on behalf of the lenders
3455  under the Senior Term Loan Facility, (ii) with respect to the second priority security interest for the bene-
3456  fit of the ABL Collateral Agents on behalf of lenders under ABL Facility and (iii) with respect to the first
3457  priority security interest for the benefit of Trustee on behalf of the holders of the Notes.  If such third
3458  party does not consent to the granting of the first priority security interest after the use of such commer-
3459  cially reasonable efforts, the applicable entity will not be required to provide such first, second and third
3460  priority security interest.  The Issuer, the Company and the Pledgors will also ensure that third priority
3461  security interests are maintained as security for the Notes in any property or assets pledged to secure the
3462  ABL Facility.

3463          SECTION 4.14.   Maintenance of Office or Agency.

3464          (a)     The Issuer shall maintain an office or agency (which may be an office of the
3465  Trustee or an affiliate of the Trustee or Registrar) where Notes may be surrendered for registration of
3466  transfer or for exchange and where notices and demands to or upon the Issuer in respect of the Notes and
3467  this Indenture may be served.  The Issuer shall give prompt written notice to the Trustee of the location,
3468  and any change in the location, of such office or agency.  If at any time the Issuer shall fail to maintain
3469  any such required office or agency or shall fail to furnish the Trustee with the address thereof, such pres-
3470  entations, surrenders, notices and demands may be made or served at the corporate trust office of the
3471  Trustee as set forth in Section 13.02.

3472          (b)     The Issuer may also from time to time designate one or more other offices or
3473  agencies where the Notes may be presented or surrendered for any or all such purposes and may from
3474  time to time rescind such designations; *provided*, *however*, that no such designation or rescission shall in
3475  any manner relieve the Issuer of its obligation to maintain an office or agency for such purposes.  The
3476  Issuer shall give prompt written notice to the Trustee of any such designation or rescission and of any
3477  change in the location of any such other office or agency.

3478          (c)     The Issuer hereby designates the corporate trust office of the Trustee or its agent
3479  as such office or agency of the Issuer in accordance with Section 2.04.

3480          SECTION 4.15.   Maintenance of Insurance.  The Company shall maintain with reputa-
3481  ble insurance companies, insurance with respect to its assets, properties and business against loss or dam-
3482  age to the extent available on commercially reasonable terms of the kinds customarily insured against by
3483  Persons of similar size engaged in the same or similar industry, of such types and in such amounts (after
3484  giving effect to any self-insurance (including captive industry insurance) reasonable and customary for
3485  similarly situated Persons of similar size engaged in the same or similar businesses as the Company, the
3486  Issuer and the Restricted Subsidiaries) as are customarily carried under similar circumstances (including
3487  flood insurance) by such other Persons to the extent available to the Company and the Restricted Subsidi-
3488  aries on commercially reasonable terms.

3489          SECTION 4.16.   Covenant Suspension.  If on any date following the Issue Date, (i) the
3490  Notes have achieved and continue to maintain Investment Grade Ratings from two Rating Agencies and
3491  (ii) no Default has occurred and is continuing (such period is referred to herein as an "Investment Grade
3492  Status Period"), then beginning on that date and continuing until the Reversion Date (the occurrence of
3493  the events described in the foregoing clauses (i) and (ii) being collectively referred to as a "Covenant
3494  Suspension Event"), the covenants described under Sections 4.03, 4.04, 4.05, 4.06, 4.07 and 5.01(c)(iv)
3495  (the "Suspended Covenants")

3496     If on any date subsequent to a Covenant Suspension Event (the "Reversion Date") one or
3497 both of the Rating Agencies withdraw their Investment Grade Rating or downgrade the rating assigned to
3498 the Notes below an Investment Grade Rating, then the Company and its Restricted Subsidiaries will
3499 thereafter again be subject to the Suspended Covenants under this Indenture with respect to future events.
3500 The period of time between the Covenant Suspension Event and the Reversion Date is referred to as the
3501 "Suspension Period."

3502     On each Reversion Date, all Indebtedness Incurred, or Disqualified Stock or Preferred
3503 Stock issued, during the Suspension Period will be classified as having been Incurred or issued pursuant
3504 to Section 4.03(a) or 4.03(b) (to the extent such Indebtedness or Disqualified Stock or Preferred Stock
3505 would be permitted to be Incurred or issued thereunder as of the Reversion Date and after giving effect to
3506 Indebtedness Incurred or issued prior to the Suspension Period and outstanding on the Reversion Date).
3507 To the extent such Indebtedness or Disqualified Stock or Preferred Stock would not be so permitted to be
3508 Incurred or issued pursuant to Section 4.03(a) or 4.03(b) such Indebtedness or Disqualified Stock or Pre-
3509 ferred Stock will be deemed to have been outstanding on the Issue Date, so that it is classified as permit-
3510 ted under Section 4.03(b)(iv).  Calculations made after the Reversion Date of the amount available to be
3511 made as Restricted Payments under Section 4.04 will be made as though the covenant described under
3512 Section 4.04 had been in effect since the Issue Date and throughout the Suspension Period.  Accordingly,
3513 Restricted Payments made during the Suspension Period will reduce the amount available to be made as
3514 Restricted Payments under Section 4.04(a).  As described above, however, no Default or Event of Default
3515 will be deemed to have occurred on the Reversion Date as a result of any actions taken by the Company
3516 or its Restricted Subsidiaries during the Suspension Period.  For purposes of Section 4.06, on the Rever-
3517 sion Date, the unutilized Collateral Excess Proceeds and Excess Proceeds amount will be reset to zero.

3518     SECTION 4.17.  Withholding Taxes.

3519     (a)  All payments made under or with respect to the Notes and Guarantees by (i) the
3520 Issuer, (ii) the Company or (iii) any entity that becomes a successor of the Issuer or the Company that is
3521 organized in a jurisdiction other than the United States, any state thereof or the District of Columbia as a
3522 result of a merger of or other transaction permitted by Section 5.01 (each such person, a "Payor") will be
3523 made free and clear of and without withholding or deduction for or on account of any present or future
3524 tax, duty, levy, impost, assessment or other governmental charge (including, without limitation, penalties,
3525 interest and other similar liabilities related thereto) of whatever nature (collectively, "Taxes") imposed or
3526 levied by or on behalf of any jurisdiction in which any Payor is organized, resident or doing business for
3527 tax purposes or from or through which any Payor makes any payment on the Notes or its Guarantee or
3528 any department or political subdivision thereof (each, a "Relevant Taxing Jurisdiction"), unless such
3529 Payor is required to withhold or deduct Taxes by law. If any Payor is required by law to withhold or de-
3530 duct any amount for or on account of Taxes of a Relevant Taxing Jurisdiction from any payment made
3531 under or with respect to the Notes or such Guarantee, the Payor, shall make all such deductions and with-
3532 holdings in respect of Taxes, and shall pay the full amount deducted or withheld in respect of Taxes to the
3533 relevant taxation authority or other governmental authority in accordance with the applicable require-
3534 ments of law.  If any Payor is so required by law to withhold or deduct, such Payor shall not be obligated
3535 to pay any additional amounts in respect of such withholding or deduction.

3536     The foregoing obligations of this Section 4.17 will survive any termination, defeasance or
3537 discharge of this Indenture and will apply *mutatis mutandis* to any jurisdiction in which any successor
3538 Person to any Payor and to any jurisdiction in which such successor is organized or is otherwise resident
3539 or doing business for tax purposes or any jurisdiction from or through which payment is made by such
3540 successor or its respective agents.

# ARTICLE V

## SUCCESSOR COMPANY

SECTION 5.01.    When Issuer May Merge or Transfer Assets.

(a)    The Company shall not, directly or indirectly, consolidate, amalgamate or merge with or into or wind up or convert into (whether or not the Company is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions, to any Person unless:

(i)    the Company is the surviving Person or the Person formed by or surviving any such consolidation, amalgamation, merger, winding up or conversion (if other than the Company) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof, the District of Columbia, Canada or any province thereof or any state which was a member of the European Union on December 31, 2003 (other than Greece) (the Company or such Person, as the case may be, being herein called the "Successor Company"); *provided* that in the case where the surviving Person is not a corporation, a co-obligor of the Notes is a corporation;

(ii)    the Successor Company (if other than the Company) expressly assumes all the obligations of the Company under this Indenture and the Notes pursuant to supplemental indentures or other documents or instruments in form required by this Indenture and in compliance with the intercreditor agreements;

(iii)    immediately after giving effect to such transaction (and treating any Indebtedness which becomes an Obligation of the Successor Company or any of its Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Company or such Restricted Subsidiary at the time of such transaction) no Default or Event of Default shall have occurred and be continuing;

(iv)    immediately after giving *pro forma* effect to such transaction, as if such transaction had occurred at the beginning of the applicable four-quarter period (and treating any Indebtedness which becomes an Obligation of the Successor Company or any of its Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Company or such Restricted Subsidiary at the time of such transaction), either

(A)    the Successor Company would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4.03(a); or

(B)    the Fixed Charge Coverage Ratio for the Successor Company and its Restricted Subsidiaries would be greater than such ratio for the Issuer and its Restricted Subsidiaries immediately prior to such transaction; and

(v)    the Company shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, merger, amalgamation or transfer and such supplemental indentures (if any) comply with this Indenture.

3581  (b)  The Successor Company (if other than the Company) will succeed to, and be
3582 substituted for, the Company under this Indenture and the Notes, and in such event the Company will
3583 automatically be released and discharged from its Obligations under this Indenture and the Notes. Not-
3584 withstanding the first sentence of this covenant, without complying with the foregoing clause (iv), the
3585 Company may (A) merge with an Affiliate that has no material assets or liabilities and that is incorporated
3586 or organized solely for the purpose of reincorporating or reorganizing the Issuer in any state of the U.S.,
3587 the District of Columbia, Canada or any province thereof or any state which was a member state of the
3588 European Union on December 31, 2003 (other than Greece) and (B) may otherwise convert its legal form
3589 under the laws of its jurisdiction of organization.

3590  (c)  The Issuer may not, directly or indirectly, consolidate, amalgamate or merge with
3591 or into or wind up or convert into (whether or not the Issuer is the surviving Person), or sell, assign, trans-
3592 fer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more
3593 related transactions, to any Person unless:

3594  (i)  the Issuer is the surviving Person or the Person formed by or surviving any such
3595 consolidation, amalgamation, merger, winding up or conversion (if other than the Issuer) or to
3596 which such sale, assignment, transfer, lease, conveyance or other disposition will have been made
3597 is a corporation, partnership or limited liability company organized or existing under the laws of
3598 the United States, any state thereof or the District of Columbia (the Issuer or such Person, as the
3599 case may be, being herein called the "Successor Issuer"); *provided* that in the case where the sur-
3600 viving Person is not a corporation, a co-obligor of the Notes is a corporation;

3601  (ii)  the Successor Issuer (if other than the Issuer) expressly assumes all the Obliga-
3602 tions of the Issuer under this Indenture and the Notes pursuant to supplemental indentures or
3603 other documents or instruments in form required by this Indenture and in compliance with the in-
3604 tercreditor agreements;

3605  (iii)  immediately after giving effect to such transaction (and treating any Indebtedness
3606 which becomes an Obligation of the Successor Issuer or any of its Restricted Subsidiaries as a re-
3607 sult of such transaction as having been Incurred by the Successor Issuer or such Restricted Sub-
3608 sidiary at the time of such transaction) no Default or Event of Default shall have occurred and be
3609 continuing;

3610  (iv)  immediately after giving *pro forma* effect to such transaction, as if such transac-
3611 tion had occurred at the beginning of the applicable four-quarter period (and treating any Indebt-
3612 edness which becomes an Obligation of the Successor Issuer or any of its Restricted Subsidiaries
3613 as a result of such transaction as having been Incurred by the Successor Issuer or such Restricted
3614 Subsidiary at the time of such transaction), either (a) the Company would be permitted to Incur at
3615 least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth
3616 in the first sentence of Section 4.03; or (b) the Fixed Charge Coverage Ratio for the Company and
3617 its Restricted Subsidiaries would be greater than such ratio for the Company and its Restricted
3618 Subsidiaries immediately prior to such transaction; and

3619  (v)  the Issuer shall have delivered to the Trustee an Officer's Certificate and an
3620 Opinion of Counsel, each stating that such consolidation, merger, amalgamation or transfer and
3621 such supplemental indentures (if any) comply with this Indenture.

3622  (d)  The Successor Issuer (if other than the Issuer) will succeed to, and be substituted
3623 for, the Issuer under this Indenture and the Notes, and in such event the Issuer will automatically be re-
3624 leased and discharged from its Obligations under this Indenture and the Notes. Notwithstanding the first

sentence of this covenant, without complying with the foregoing clause (4), the Issuer may (A) merge with an Affiliate that has no material assets or liabilities and that is incorporated or organized solely for the purpose of reincorporating or reorganizing the Issuer, as the case may be, in any state of the U.S. or the District of Columbia and (B) may otherwise convert its legal form under the laws of its jurisdiction of organization so long as there remains a corporate co-obligor.  Section 5.01 shall not apply to a sale, assignment, transfer, conveyance or other disposition of assets between or among the Company and its Restricted Subsidiaries.

(e)    Subject to the provisions of Section 11.04 (which govern the release of assets and property securing the Notes upon the sale or disposition of a Restricted Subsidiary of the Company that is a Pledgor), no Pledgor shall, and the Company shall not permit any Pledgor to, consolidate, amalgamate or merge with or into or wind up into (whether or not such Pledgor is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions to, any Person unless:

(i)    either (A) such Pledgor is the surviving Person or the Person formed by or surviving any such consolidation, amalgamation or merger (if other than such Pledgor) or to which such sale, assignment, transfer, lease, conveyance or other disposition shall have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof, the District of Columbia, or any territory thereof (such Pledgor or such Person, as the case may be, being herein called the "Successor Pledgor") and the Successor Pledgor (if other than such Pledgor) expressly assumes all the Obligations of such Pledgor under this Indenture, the Security Documents and such Pledgor's Obligations in respect of the Notes pursuant to documents or instruments in form required by this Indenture and in compliance with the intercreditor agreements, or (B) such sale or disposition or consolidation, amalgamation or merger is not in violation of Section 4.06; and

(ii)    the Successor Pledgor (if other than such Pledgor) shall have delivered or caused to be delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, amalgamation, merger or transfer and such supplemental indenture (if any) comply with this Indenture.

Except as otherwise provided in this Indenture, the Successor Pledgor (if other than such Pledgor) will succeed to, and be substituted for, such Pledgor under this Indenture and such Pledgor's Obligations in respect of the Notes, and such Pledgor will automatically be released and discharged from its Obligations under this Indenture and such Pledgor's Obligations in respect of the Notes.  Notwithstanding the foregoing, (1) a Pledgor may merge, amalgamate or consolidate with an Affiliate incorporated solely for the purpose of reincorporating or reorganizing such Pledgor in another state of the United States, the District of Columbia or any territory of the United States so long as the amount of Indebtedness of the Pledgor is not increased thereby and (2) a Pledgor may merge, amalgamate or consolidate with another Pledgor or the Company or may convert it legal form under the laws of reorganization in its jurisdiction.

In addition, notwithstanding the foregoing, any Pledgor may consolidate, amalgamate or merge with or into or wind up into, or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets (collectively, a "Transfer") to the Company or any Pledgor.

# ARTICLE VI

## DEFAULTS AND REMEDIES

SECTION 6.01.    <u>Events of Default</u>.  An "<u>Event of Default</u>" occurs with respect to Notes if:

(a)    there is a default in any payment of interest (including any additional interest) on any Note when the same becomes due and payable, and such default continues for a period of 30 days,

(b)    there is a default in the payment of principal or premium, if any, of any Note when due at its Stated Maturity, upon optional redemption, upon required repurchase, upon declaration or otherwise,

(c)    the failure by the Company or any Restricted Subsidiary to comply for 60 days after notice with its other agreements contained in the Notes or this Indenture,

(d)    the failure by the Company or any Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary) to pay any Indebtedness (other than Indebtedness owing to the Company or a Restricted Subsidiary) within any applicable grace period after final maturity or the acceleration of any such Indebtedness by the holders thereof because of a default, in each case, if the total amount of such Indebtedness unpaid or accelerated exceeds $100.0 million or its foreign currency equivalent,

(e)    either the Company, the Issuer or any Significant Subsidiary of the Issuer pursuant to or within the meaning of any Bankruptcy Law:

(i)    commences a voluntary case;

(ii)    consents to the entry of an order for relief against it in an involuntary case;

(iii)    consents to the appointment of a Custodian of it or for any substantial part of its property; or

(iv)    makes a general assignment for the benefit of its creditors or takes any comparable action under any foreign laws relating to insolvency,

(f)    a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(i)    is for relief against either the Issuer or any Significant Subsidiary of the Issuer in an involuntary case;

(ii)    appoints a Custodian of either the Issuer or any Significant Subsidiary of the Issuer or for any substantial part of its property; or

(iii)    orders the winding up or liquidation of either the Issuer or any Significant Subsidiary of the Issuer;

or any similar relief is granted under any foreign laws and the order or decree remains unstayed and in effect for 60 days,

(g)    failure by the Company or any Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary) to pay final judgments aggregating in excess of $100.0 million or its foreign currency equivalent (net of any amounts which are covered by enforceable insurance policies issued by solvent carriers), which judgments are not discharged, waived or stayed for a period of 60 days,

(h)    the Guarantee of the Company or a Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary) ceases to be in full force and effect (except as contemplated by the terms thereof) or the Company denies or disaffirms its Obligations under this Indenture and such Default continues for 10 days,

(i)    unless all of the Notes Collateral has been released from the third  priority Liens in accordance with the provisions of the Security Documents, the third  priority Liens on all or substantially all of the Notes Collateral cease to be valid or enforceable and such Default continues for 30 days, or the Company, the Issuer or any Pledgor shall assert, in any pleading in any court of competent jurisdiction, that any such security interest is invalid or unenforceable and, in the case of any such Person that is a Subsidiary of the Company, the Company fails to cause such Subsidiary to rescind such assertions within 30 days after the Company has actual knowledge of such assertions, or

(j)    the failure by the Company or any Pledgor to comply for 60 days after notice with its other agreements contained in the Security Documents except for a failure that would not be material to the holders of the Notes and would not materially affect the value of the Collateral taken as a whole.

The foregoing shall constitute Events of Default whatever the reason for any such Event of Default and whether it is voluntary or involuntary or is effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body.

The term "Bankruptcy Law" means Title 11, United States Code, or any similar Federal or state law for the relief of debtors.  The term "Custodian" means any receiver, trustee, assignee, liquidator, custodian or similar official under any Bankruptcy Law.

However, a default under clauses (c) or (j) above shall not constitute an Event of Default until the Trustee or the holders of 30% in aggregate principal amount of outstanding Notes notify the Issuer of the default and the Issuer does not cure such default within the time specified in clauses (c) or (j) hereof after receipt of such notice.  Such notice must specify the Default, demand that it be remedied and state that such notice is a "Notice of Default."  The Issuer shall deliver to the Trustee, within five (5) Business Days after the occurrence thereof, written notice in the form of an Officer's Certificate of any event which is, or with the giving of notice or the lapse of time or both would become, an Event of Default, its status and what action the Issuer is taking or propose to take with respect thereto.

SECTION 6.02.    Acceleration.  If an Event of Default (other than an Event of Default specified in Section 6.01(e) or 6.01(f) hereof with respect to the Company or the Issuer) occurs and is continuing, the Trustee or the holders of at least 30% in aggregate principal amount of outstanding Notes by notice to the Issuer may declare the principal of, premium, if any, and accrued but unpaid interest on all the Notes to be due and payable.  Upon such a declaration, such principal and interest shall be due and

payable immediately.  If an Event of Default specified in Section 6.01(e) or (f) with respect to the Company or the Issuer occurs, the principal of, premium, if any, and interest on all the Notes will become immediately due and payable without any declaration or other act on the part of the Trustee or any holders. Under certain circumstances, the holders of a majority in aggregate principal amount of outstanding Notes may rescind any such acceleration with respect to the Notes and its consequences.

In the event of any Event of Default specified in Section 6.01(d) above, such Event of Default and all consequences thereof (excluding, however, any resulting payment default) shall be annulled, waived and rescinded, automatically and without any action by the Trustee or the holders of the Notes, if within 20 days after such Event of Default arose the Issuer delivers an Officer's Certificate to the Trustee stating that (x) the Indebtedness or guarantee that is the basis for such Event of Default has been discharged or (y) the holders thereof have rescinded or waived the acceleration, notice or action (as the case may be) giving rise to such Event of Default or (z) the default that is the basis for such Event of Default has been cured, it being understood that in no event shall an acceleration of the principal amount of the Notes as described above be annulled, waived or rescinded upon the happening of any such events.

SECTION 6.03.    Other Remedies.  If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy at law or in equity to collect the payment of principal of or interest on the Notes or to enforce the performance of any provision of the Notes, this Indenture or the Security Documents.

The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding.  A delay or omission by the Trustee or any holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default.  No remedy is exclusive of any other remedy.  To the extent required by law, all available remedies are cumulative.

SECTION 6.04.    Waiver of Past Defaults.  *Provided* the Notes are not then due and payable by reason of a declaration of acceleration, the holders of a majority in principal amount of the Notes by written notice to the Trustee may waive an existing Default and its consequences except (a) a Default in the payment of the principal of or interest on a Note, (b) a Default arising from the failure to redeem or purchase any Note when required pursuant to the terms of this Indenture or (c) a Default in respect of a provision that under Section 9.02 cannot be amended without the consent of each holder affected.  When a Default is waived, it is deemed cured and the Issuer, the Trustee and the holders will be restored to their former positions and rights under this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any consequent right.

SECTION 6.05.    Control by Majority.  The holders of a majority in principal amount of Notes may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee.  However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture or, if the Trustee, being advised by counsel, determines that the action or proceeding so directed may not lawfully be taken or if the Trustee in good faith by its board of directors or trustees, executive committee, or a trust committee of directors or trustees and/or Responsible Officers shall determine that the action or proceeding so directed would involve the Trustee in personal liability or expense for which it is not adequately indemnified, or subject to Section 7.01, that the Trustee determines is unduly prejudicial to the rights of any other holder or that would involve the Trustee in personal liability.  Prior to taking any action under this Indenture, the Trustee shall be entitled to reasonable indemnification security satisfactory to it in its reasonable discretion against all losses and expenses caused by taking or not taking such action.

SECTION 6.06.    Limitation on Suits.

(a)    Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no holder may pursue any remedy with respect to this Indenture or the Notes unless:

(i)    such holder has previously given the Trustee notice that an Event of Default is continuing,

(ii)    holders of at least 30% in aggregate principal amount of the outstanding Notes have requested the Trustee to pursue the remedy,

(iii)    such holders have offered the Trustee security and reasonable indemnity against any loss, liability or expense acceptable to the Trustee in its sole discretion,

(iv)    the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security and indemnity, and

(v)    the holders of a majority in aggregate principal amount of the outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60-day period.

(b)    A holder may not use this Indenture to prejudice the rights of another holder or to obtain a preference or priority over another holder.

SECTION 6.07.    Rights of the Holders to Receive Payment.  Notwithstanding any other provision of this Indenture, the right of any holder to receive payment of principal of and interest on the Notes held by such holder, on or after the respective due dates expressed or provided for in the Notes, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder.

SECTION 6.08.    Collection Suit by Trustee.  If an Event of Default specified in Section 6.01(a) or (b) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Issuer or any other obligor on the Notes for the whole amount then due and owing (together with interest on overdue principal and (to the extent lawful) on any unpaid interest at the rate provided for in the Notes) and the amounts provided for in Section 7.07.

SECTION 6.09.    Trustee May File Proofs of Claim.  The Trustee may file such proofs of claim, statements of interest and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation, expenses disbursements and advances of the Trustee (including counsel, accountants, experts or such other professionals as the Trustee deems necessary, advisable or appropriate)) and the holders allowed in any judicial proceedings relative to the Issuer or the Company, any Pledgor, their creditors or their property, shall be entitled to participate as a member, voting or otherwise, of any official committee of creditors appointed in such matters and, unless prohibited by law or applicable regulations, may vote on behalf of the holders in any election of a trustee in bankruptcy or other Person performing similar functions, and any Custodian in any such judicial proceeding is hereby authorized by each holder to make payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the holders, to pay to the Trustee any amount due it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and its counsel, and any other amounts due the Trustee under Section 7.07.

SECTION 6.10.    Priorities.  Subject to the terms of the First Lien Intercreditor Agreement, the Junior Lien Intercreditor Agreement and the Security Documents, any money or property col-

lected by the Trustee pursuant to this Article VI and any other money or property distributable in respect of the Issuer's or any Guarantor's obligations under this Indenture after an Event of Default shall be applied in the following order:

FIRST:  to the Trustee and the Agents for amounts due under Section 7.07;

SECOND:  to the holders for amounts due and unpaid on the Notes for principal, premium, if any, and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal and interest, respectively; and

THIRD:  to the Issuer or, to the extent the Trustee collects any amount for any Guarantor, to the such Guarantor.

The Trustee may fix a record date and payment date for any payment to the holders pursuant to this Section.  At least 15 days before such record date, the Trustee shall mail to each holder and the Issuer a notice that states the record date, the payment date and amount to be paid.

SECTION 6.11.    Undertaking for Costs.  In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section does not apply to a suit by the Trustee, a suit by a holder pursuant to Section 6.06 or 6.07 or a suit by holders of more than 10% in principal amount of the Notes.

SECTION 6.12.    Waiver of Stay or Extension Laws.  Neither the Issuer nor any Guarantor (to the extent it may lawfully do so) shall at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Indenture; and the Issuer and the Guarantors (to the extent that it may lawfully do so) hereby expressly waive all benefit or advantage of any such law, and shall not hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law had been enacted.

# **ARTICLE VII**

# **TRUSTEE**

SECTION 7.01.    Duties of Trustee.

(a)    The Trustee, prior to the occurrence of an Event of Default with respect to the Notes and after the curing or waiving of all Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Indenture.  If an Event of Default has occurred and is continuing, the Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)        Except during the continuance of an Event of Default:

(i)        the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee (it being agreed that the permissive right of the Trustee to do things enumerated in this Indenture shall not be construed as a duty); and

(ii)        in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture.  The Trustee shall be under no duty to make any investigation as to any statement contained in any such instance, but may accept the same as conclusive evidence of the truth and accuracy of such statement or the correctness of such opinions.  However, in the case of certificates or opinions required by any provision hereof to be provided to it, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(c)        The Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(i)        this paragraph does not limit the effect of paragraph (b) of this Section;

(ii)        the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer unless it is proved that the Trustee was negligent in ascertaining the pertinent facts;

(iii)        the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05; and

(iv)        no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise Incur financial or personal liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers.

(d)        Every provision of this Indenture that in any way relates to the Trustee is subject to paragraphs (a), (b) and (c) of this Section.

(e)        The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuer.

(f)        Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(g)        Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section and to the provisions of the TIA.

SECTION 7.02.    Rights of Trustee.

(a)        The Trustee may conclusively rely on any document believed by it to be genuine and to have been signed or presented by the proper person.  The Trustee need not investigate any fact or matter stated in the document.

(b)       Before the Trustee acts or refrains from acting, it may require an Officer's Certificate or an Opinion of Counsel or both.  The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on the Officer's Certificate or Opinion of Counsel.

(c)       The Trustee may act through agents and shall not be responsible for the misconduct or negligence of any agent appointed with due care.

(d)       The Trustee shall not be responsible or liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers; *provided*, *however*, that the Trustee's conduct does not constitute willful misconduct or negligence.

(e)       The Trustee may consult with counsel of its own selection and the advice or opinion of counsel with respect to legal matters relating to this Indenture and the Notes shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or opinion of such counsel.

(f)       The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond, debenture, note or other paper or document unless requested in writing to do so by the holders of not less than a majority in principal amount of the Notes at the time outstanding, but the Trustee, in its discretion, may (but shall not be obligated to) make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer, personally or by agent or attorney, at the expense of the Issuer and shall Incur no liability of any kind by reason of such inquiry or investigation.  Any and all notices, instructions, demands, requests, consents, appraisals, correspondence or other communications shall be in writing and delivered in accordance with Section 13.02.

(g)       The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the holders pursuant to this Indenture, unless such holders shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be Incurred by it in compliance with such request or direction.

(h)       The rights, privileges, protections, immunities and benefits given to the Trustee, including its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

(i)       The Trustee shall not be responsible or liable for any action taken or omitted by it in good faith at the direction of the holders of not less than a majority in principal amount of the Notes as to the time, method and place of conducting any proceedings for any remedy available to the Trustee or the exercising of any power conferred by this Indenture.

(j)       Any action taken, or omitted to be taken, by the Trustee in good faith pursuant to this Indenture upon the request or authority or consent of any person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding upon future holders of Notes and upon Notes executed and delivered in exchange therefor or in place thereof.

(k)       The Trustee shall not be deemed to have notice of any Default or Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a Default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Notes and this Indenture.

3946          (l)     The Trustee may request that the Issuer deliver an Officer's Certificate setting
3947  forth the names of individuals and/or titles of officers authorized at such time to take specified actions
3948  pursuant to this Indenture, which Officer's Certificate may be signed by any Person authorized to sign an
3949  Officer's Certificate, including any Person specified as so authorized in any such certificate previously
3950  delivered and not superseded.

3951          (m)     The Trustee shall not be responsible or liable for special, indirect, or consequen-
3952  tial loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of
3953  whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form
3954  of actions.

3955          (n)     The Trustee shall not be required to give any bond or surety in respect of the exe-
3956  cution of the trusts and powers under this Indenture.

3957          (o)     The Trustee shall not be responsible or liable for any failure or delay in the per-
3958  formance of its obligations under this Indenture arising out of or caused, directly or indirectly, by circum-
3959  stances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood;
3960  terrorism; wars and other military disturbances; sabotage; epidemics; riots; interruptions; loss or malfunc-
3961  tion of utilities, computer (hardware or software) or communication services; accidents; labor disputes;
3962  and acts of civil or military authorities and governmental action.

3963          SECTION 7.03.    Individual Rights of Trustee.  The Trustee in its individual or any
3964  other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuer or its
3965  Affiliates with the same rights it would have if it were not Trustee.  Any Paying Agent or Registrar may
3966  do the same with like rights.  However, the Trustee must comply with Sections 7.10 and 7.11.

3967          SECTION 7.04.    Trustee's Disclaimer.  The Trustee shall not be responsible for and
3968  makes no representation as to the validity or adequacy of this Indenture, the Guarantees, the Notes, Liens,
3969  Collateral or Security Documents, it shall not be accountable for the Issuer's use of the proceeds from the
3970  Notes, and it shall not be responsible for any statement of the Issuer or any Guarantor in this Indenture or
3971  in any document issued in connection with the sale of the Notes or in the Notes other than the Trustee's
3972  certificate of authentication.  The Trustee shall not be charged with knowledge of any Default or Event of
3973  Default under Sections 6.01(c) or (j) or of the identity of any Significant Subsidiary unless either (a) a
3974  Trust Officer shall have actual knowledge thereof or (b) the Trustee shall have received written notice
3975  thereof in accordance with Section 13.02 hereof from the Issuer, the Company or any Pledgor or any
3976  holder.  In accepting the trust hereby created, the Trustee acts solely as Trustee for the holders of the
3977  Notes and not in its individual capacity and all persons, including without limitation the holders of Notes
3978  and the Issuer having any claim against the Trustee arising from this Indenture shall look only to the
3979  funds and accounts held by the Trustee hereunder for payment except as otherwise provided herein.

3980          SECTION 7.05.    Notice of Defaults.  If a Default occurs and is continuing and if it is
3981  actually known to the Trustee, the Trustee shall mail to each holder notice of the Default within the earlier
3982  of 90 days after it occurs or 30 days after it is actually known to a Trust Officer or written notice of it is
3983  received by the Trustee.  Except in the case of a Default in the payment of principal of, premium (if any)
3984  or interest on any Note, the Trustee may withhold the notice if and so long as a committee of its Trust
3985  Officers in good faith determines that withholding the notice is in the interests of the holders.  The Issuer
3986  is required to deliver to the Trustee, annually, a certificate indicating whether the signers thereof know of
3987  any Default that occurred during the previous year.  The Issuer also is required to deliver to the Trustee,
3988  within 30 days after the occurrence thereof, written notice of any event which would constitute certain
3989  Defaults, their status and what action the Issuer is taking or proposes to take in respect thereof.

SECTION 7.06.    <u>Reports by Trustee to the Holders</u>.  As promptly as practicable after each July 30 beginning with the July 30 following the date of this Indenture, and in any event prior to July 30 in each year, the Trustee shall mail to each holder a brief report dated as of such July 30 that complies with Section 313(a) of the TIA if and to the extent required thereby.  The Trustee shall also comply with Section 313(b) of the TIA.

A copy of each report at the time of its mailing to the holders shall be filed with the SEC and each stock exchange (if any) on which the Notes are listed.  The Issuer agrees to notify promptly the Trustee whenever the Notes become listed on any stock exchange and of any delisting thereof.

SECTION 7.07.    <u>Compensation and Indemnity</u>.  The Issuer shall pay to the Trustee from time to time such compensation, as the Issuer and the Trustee shall from time to time agree in writing, for the Trustee's acceptance of this Indenture and its services hereunder.  The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust.  The Issuer shall reimburse the Trustee upon request for all reasonable out-of-pocket expenses Incurred or made by it, including costs of collection, in addition to the compensation for its services.  Such expenses shall include the reasonable compensation and expenses, disbursements and advances of the Trustee's agents and counsel.  The Issuer and the Guarantors, jointly and severally shall indemnify the Trustee against any and all loss, liability, claim, damage or expense (including reasonable attorneys' fees and expenses except for such actions to the extent caused by any negligence, bad faith or willful misconduct on their part) Incurred by or in connection with the acceptance or administration of this trust and the performance of its duties hereunder, including the costs and expenses of enforcing this Indenture or Guarantee against the Issuer or any Guarantor (including this Section 7.07) and defending itself against or investigating any claim (whether asserted by the Issuer, any Guarantor, any holder or any other Person).  The obligation to pay such amounts shall survive the payment in full or defeasance of the Notes or the removal or resignation of the Trustee.  The Trustee shall notify the Issuer of any claim for which it may seek indemnity promptly upon obtaining actual knowledge thereof; *provided*, *however*, that any failure so to notify the Issuer shall not relieve the Issuer or any Guarantor of its indemnity obligations hereunder.  The Issuer shall defend the claim and the indemnified party shall provide reasonable cooperation at the Issuer's expense in the defense.  Such indemnified parties may have separate counsel and the Issuer and such Guarantor, as applicable shall pay the fees and expenses of such counsel; *provided*, *however*, that the Issuer shall not be required to pay such fees and expenses if it assumes such indemnified parties' defense and, in such indemnified parties' reasonable judgment, there is no conflict of interest between the Issuer and the Guarantor, as applicable, and such parties in connection with such defense; *provided*, *further*, that, unless the Issuer otherwise agrees in writing, the Issuer shall not be liable to pay fees and expenses of more than one counsel at any given time located within one particular jurisdiction.  The Issuer needs not reimburse any expense or indemnify against any loss, liability or expense Incurred by an indemnified party through such party's own willful misconduct, negligence or bad faith.

To secure the Issuer's and the Guarantors' payment obligations in this Section, the Trustee shall have a Lien prior to the Notes on all money or property held or collected by the Trustee other than money or property held in trust to pay principal of and interest on particular Notes.

The Issuer's and the Guarantors' payment obligations pursuant to this Section shall survive the satisfaction or discharge of this Indenture, any rejection or termination of this Indenture under any bankruptcy law or the resignation or removal of the Trustee.  Without prejudice to any other rights available to the Trustee under applicable law, when the Trustee Incurs expenses after the occurrence of a Default specified in Section 6.01(f) or (g) with respect to the Issuer, the expenses are intended to constitute expenses of administration under the Bankruptcy Law.

4035     No provision of this Indenture shall require the Trustee to expend or risk its own funds or
4036 otherwise Incur any financial or personal  liability in the performance of any of its duties hereunder, or in
4037 the exercise of any of its rights or powers, if repayment of such funds or adequate indemnity and security
4038 against such risk or liability is not assured to its satisfaction.

4039     SECTION 7.08.  Replacement of Trustee.

4040     (a)  The Trustee may resign by so notifying the Issuer in writing at least 30 days in
4041 advance.  The holders of a majority in principal amount of the Notes may remove the Trustee by so noti-
4042 fying the Issuer and the Trustee and may appoint a successor Trustee with the Issuer's consent.  A resig-
4043 nation or removal of the Trustee and appointment of a successor Trustee shall become effective only with
4044 the successor Trustee's acceptance of appointment as provided in this Section.  The Issuer shall remove
4045 the Trustee if:

4046     (i)  the Trustee fails to comply with Section 7.10;

4047     (ii)  the Trustee is adjudged bankrupt or insolvent;

4048     (iii)  a receiver or other public officer takes charge of the Trustee or its property; or

4049     (iv)  the Trustee otherwise becomes incapable of acting.

4050     (b)  If the Trustee resigns, is removed by the Issuer or by the holders of a majority in
4051 principal amount of the Notes and such holders do not reasonably promptly appoint a successor Trustee,
4052 or if a vacancy exists in the office of Trustee for any reason (the Trustee in such event being referred to
4053 herein as the retiring Trustee), the Issuer shall promptly appoint a successor Trustee.

4054     (c)  A successor Trustee shall deliver a written acceptance of its appointment to the
4055 retiring Trustee and to the Issuer.  Thereupon the resignation or removal of the retiring Trustee shall be-
4056 come effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under
4057 this Indenture.  The successor Trustee shall mail a notice of its succession to the holders.  The retiring
4058 Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee, subject to the
4059 Lien provided for in Section 7.07.

4060     (d)  If a successor Trustee does not take office within 60 days after the retiring Trus-
4061 tee resigns or is removed, the retiring Trustee or the holders of 10% in principal amount of the Notes may
4062 petition at the expense of the Issuer any court of competent jurisdiction for the appointment of a successor
4063 Trustee.

4064     (e)  If the Trustee fails to comply with Section 7.10, unless the Trustee's duty to re-
4065 sign is stayed as provided in Section 310(b) of the TIA, any holder who has been a bona fide holder of a
4066 Note for at least six months may petition any court of competent jurisdiction for the removal of the Trus-
4067 tee and the appointment of a successor Trustee.

4068     (f)  Notwithstanding the replacement of the Trustee pursuant to this Section, the Is-
4069 suer's obligations under Section 7.07 shall continue for the benefit of the retiring Trustee.

4070     SECTION 7.09.  Successor Trustee by Merger.  If the Trustee consolidates with,
4071 merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another
4072 corporation or banking association, the resulting, surviving or transferee corporation without any further

act shall be the successor Trustee; *provided*, *however*, that such corporation shall be otherwise qualified and eligible under this Article VII.

In case at the time such successor or successors by merger, conversion or consolidation to the Trustee shall succeed to the trusts created by this Indenture any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee may authenticate such Notes either in the name of any predecessor hereunder or in the name of the successor to the Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Notes or in this Indenture provided that the certificate of the Trustee shall have.

SECTION 7.10.    Eligibility; Disqualification.  The Trustee shall at all times satisfy the requirements of Section 310(a) of the TIA.  The Trustee shall have a combined capital and surplus of at least $100 million as set forth in its most recent published annual report of condition.  The Trustee shall comply with Section 310(b) of the TIA, subject to its right to apply for a stay of its duty to resign under the penultimate paragraph of Section 310(b) of the TIA; *provided*, *however*, that there shall be excluded from the operation of Section 310(b)(1) of the TIA any series of securities issued under this Indenture and any indenture or indentures under which other securities or certificates of interest or participation in other securities of the Issuer are outstanding if the requirements for such exclusion set forth in Section 310(b)(1) of the TIA are met.

SECTION 7.11.    Preferential Collection of Claims Against the Issuer.  The Trustee shall comply with Section 311(a) of the TIA, excluding any creditor relationship listed in Section 311(b) of the TIA.  A Trustee who has resigned or been removed shall be subject to Section 311(a) of the TIA to the extent indicated.

SECTION 7.12.    [Intentionally Omitted].

SECTION 7.13.    Payment of Parallel Debt Pursuant to Dutch Law.

(a)    In this Section 7.13:

"Dutch Security Documents" means any Security Documents governed by the laws of The Netherlands; and

"Principal Obligations" means all present and future Obligations to the extent for the payment of money (whether actual or contingent and whether owed jointly or severally) by the Issuer under this Indenture.

(b)    With respect to Dutch Security Documents, and solely for purposes of the laws of The Netherlands:

(i)    the Issuer irrevocably and unconditionally undertakes to pay to [the Trustee] an amount equal to the aggregate of all Principal Obligations due and payable but unpaid (the "Parallel Debt");

(ii)    the Parallel Debt constitutes obligations and liabilities of the Issuer to [the Trustee] which are separate and independent from, and without prejudice to, the Principal Obligations and the Parallel Debt represents [the Trustee's] own independent right to receive payment of the Parallel Debt from the Issuer;

(iii)    notwithstanding Section 7.13(b)(ii), if [the Trustee] receives or recovers any amount in respect of (A) the Parallel Debt, the Principal Obligations decrease by that amount as if that amount was received or recovered directly in payment of the Principal Obligations and, for the avoidance of doubt, (B) the Principal Obligations, the Parallel Debt decreases by that amount as if that amount had been received or recovered directly in payment of the Parallel Debt;

(iv)    the parties acknowledge and confirm that the provisions contained in this Section 7.13 shall not be interpreted so as to increase the maximum total amount of the Principal Obligations under this Indenture; and

(v)    the Issuer shall not repay or prepay Parallel Debt if and as long as it owes Principal Obligations, unless directed to do so by [the Trustee] and the Issuer is otherwise required to repay or prepay the Principal Obligations hereunder.

## ARTICLE VIII

## DISCHARGE OF INDENTURE; DEFEASANCE

SECTION 8.01.    Discharge of Liability on Notes; Defeasance.

(a)    This Indenture shall be discharged and shall cease to be of further effect (except as to surviving rights of registration of transfer or exchange of Notes, as expressly provided for in this Indenture) as to all outstanding Notes when:

(i)    either (a) all the Notes theretofore authenticated and delivered (except lost, stolen or destroyed Notes which have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Issuer and thereafter repaid to the Issuer or discharged from such trust) have been delivered to the Trustee for cancellation or (b) all of the Notes (1) have become due and payable, (2) will become due and payable at their stated maturity within one year or (3) if redeemable at the option of the Issuer, are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer, and the Issuer has irrevocably deposited or caused to be deposited with the Trustee funds in an amount sufficient to pay and discharge the entire Indebtedness on the Notes not theretofore delivered to the Trustee for cancellation, for principal of, premium, if any, and interest on the Notes to the date of deposit together with irrevocable instructions from the Issuer directing the Trustee to apply such funds to the payment thereof at maturity or redemption, as the case may be;

(ii)    the Issuer and/or the Company has paid all other sums payable under this Indenture; and

(iii)    the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel stating that all conditions precedent under this Indenture relating to the satisfaction and discharge of this Indenture have been complied with.

(b)    Subject to Sections 8.01(c) and 8.02, the Issuer at any time may terminate (i) all of its Obligations under the Notes and this Indenture (with respect to the holders of the Notes) ("legal defeasance option") or (ii) its Obligations under Sections 4.02, 4.03, 4.04, 4.05, 4.06, 4.07, 4.08, 4.09, 4.11, 4.12, 4.13 and 4.15 and the operation of Section 5.01 for the benefit of the holders of the Notes, and Sections 6.01(c), 6.01(d) and Sections 6.01(e) and 6.01(f) (with respect to Significant Subsidiaries), 6.01(g), 6.01(h), 6.01(i) and 6.01(j) ("covenant defeasance option").  The Issuer may exercise its legal defeasance

option notwithstanding its prior exercise of its covenant defeasance option.  In the event that the Issuer terminates all of its Obligations under the Notes and this Indenture (with respect to such Notes) by exercising its legal defeasance option or its covenant defeasance option, the Obligations of each Guarantor with respect to the Notes and the Security Documents shall be terminated simultaneously with the termination of such Obligations.

If the Issuer exercises its legal defeasance option, payment of the Notes so defeased may not be accelerated because of an Event of Default.  If the Issuer exercises its covenant defeasance option, payment of the Notes so defeased may not be accelerated because of an Event of Default specified in Section 6.01(c), 6.01(d), 6.01(e) and 6.01(f) (with respect to Significant Subsidiaries), 6.01(g), 6.01(h), 6.01(i) or 6.01(j) or because of the failure of the Company to comply with Section 5.01.

Upon satisfaction of the conditions set forth herein and upon request of the Issuer, the Trustee shall acknowledge in writing the discharge of those Obligations that the Issuer terminates.

(c)     Notwithstanding clauses (a) and (b) above, the Issuer's obligations in Sections 2.04, 2.05, 2.06, 2.07, 2.08, 2.09, 7.07, 7.08 and in this Article VIII shall survive until the Notes have been paid in full.  Thereafter, the Issuer's obligations in Sections 7.07, 8.05 and 8.06 shall survive such satisfaction and discharge.

SECTION 8.02.     Conditions to Defeasance.

(a)     The Issuer may exercise its legal defeasance option or its covenant defeasance option only if:

(i)     the Issuer irrevocably deposits in trust with the Trustee cash in U.S. Dollars, U.S. Government Obligations or a combination thereof in an amount sufficient or U.S. Government Obligations, the principal of and the interest on which will be sufficient, or a combination thereof sufficient, to pay the principal of and premium (if any) and interest on the Notes when due at maturity or redemption, as the case may be, including interest thereon to maturity or such redemption date;

(ii)     the Issuer delivers to the Trustee a certificate from a nationally recognized firm of independent accountants expressing their opinion that the payments of principal and interest when due and without reinvestment on the deposited U.S. Government Obligations *plus* any deposited money without investment will provide cash at such times and in such amounts as will be sufficient to pay principal, premium, if any, and interest when due on all the Notes to maturity or redemption, as the case may be;

(iii)     123 days pass after the deposit is made and during the 123-day period no Default specified in Section 6.01(e) or (f) with respect to the Issuer occurs which is continuing at the end of the period;

(iv)     the deposit does not constitute a default under any other agreement binding on the Issuer and is not prohibited by Article X;

(v)     in the case of the legal defeasance option, the Issuer shall have delivered to the Trustee an Opinion of Counsel stating that (1) the Issuer has received from, or there has been published by, the Internal Revenue Service a ruling, or (2) since the date of this Indenture there has been a change in the applicable Federal income tax law, in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, the holders will not recognize income,

gain or loss for Federal income tax purposes as a result of such deposit and defeasance and will be subject to Federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred. Notwithstanding the foregoing, the Opinion of Counsel required by the immediately preceding sentence with respect to a legal defeasance need not be delivered if all of the Notes not theretofore delivered to the Trustee for cancellation (x) have become due and payable or (y) will become due and payable at their Stated Maturity within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer;

(vi)    impair the right of any holder to receive payment of principal of, premium, if any, and interest on such holder's Notes on or after the due dates therefore or to institute suit for the enforcement of any payment on or with respect to such holder's Notes;

(vii)    in the case of the covenant defeasance option, the Issuer shall have delivered to the Trustee an Opinion of Counsel to the effect that the holders will not recognize income, gain or loss for Federal income tax purposes as a result of such deposit and defeasance and will be subject to Federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred; and

(viii)    the Issuer delivers to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent to the defeasance and discharge of the Notes to be so defeased and discharged as contemplated by this Article VIII have been complied with.

(b)    Before or after a deposit, the Issuer may make arrangements satisfactory to the Trustee for the redemption of such Notes at a future date in accordance with Article III.

SECTION 8.03.    Application of Trust Money. The Trustee shall hold in trust money or U.S. Government Obligations (including proceeds thereof) deposited with it pursuant to this Article VIII. It shall apply the deposited money and the money from U.S. Government Obligations through each Paying Agent and in accordance with this Indenture to the payment of principal of and interest on the Notes so discharged or defeased.

SECTION 8.04.    Repayment to Issuer. Each of the Trustee and each Paying Agent shall promptly turn over to the Issuer upon request any money or U.S. Government Obligations held by it as provided in this Article which, in the written opinion of nationally recognized firm of independent public accountants delivered to the Trustee (which delivery shall only be required if U.S. Government Obligations have been so deposited), are in excess of the amount thereof which would then be required to be deposited to effect an equivalent discharge or defeasance in accordance with this Article.

Subject to any applicable abandoned property law, the Trustee and each Paying Agent shall pay to the Issuer upon written request any money held by them for the payment of principal or interest that remains unclaimed for two years, and, thereafter, holders entitled to the money must look to the Issuer for payment as general creditors, and the Trustee and each Paying Agent shall have no further liability with respect to such monies.

SECTION 8.05.    Indemnity for U.S. Government Obligations. The Issuer shall pay and shall indemnify the Trustee against any tax, fee or other charge imposed on or assessed against deposited U.S. Government Obligations or the principal and interest received on such U.S. Government Obligations.

SECTION 8.06.    Reinstatement. If the Trustee or any Paying Agent is unable to apply any money or U.S. Government Obligations in accordance with this Article VIII by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, re-straining or otherwise prohibiting such application, the Issuer's obligations under this Indenture and the Notes so discharged or defeased shall be revived and reinstated as though no deposit had occurred pursu-ant to this Article VIII until such time as the Trustee or any Paying Agent is permitted to apply all such money or U.S. Government Obligations in accordance with this Article VIII; *provided*, *however*, that, if the Issuer has made any payment of principal of, or interest on, any such Notes because of the reinstate-ment of its obligations, the Issuer shall be subrogated to the rights of the holders of such Notes to receive such payment from the money or U.S. Government Obligations held by the Trustee or any Paying Agent.

# ARTICLE IX

# AMENDMENTS AND WAIVERS

SECTION 9.01.    Without Consent of the Holders.

(a)    The Issuer, the Guarantors and the Trustee may amend this Indenture, the Secu-rity Documents, the Junior Lien Intercreditor Agreement or the Notes without notice to or consent of any holder:

(i)    to cure any ambiguity, omission, defect or inconsistency;

(ii)    to provide for the assumption by a Successor Issuer of the Obligations of the Is-suer under this Indenture and the Notes;

(iii)    to provide for the assumption by a Successor Company of the Obligations of the Company under this Indenture and the Notes, to provide for the assumption by a Successor Pledgor of the Obligations of a Pledgor under this Indenture and the Security Documents;

(iv)    to add a Guarantor with respect to the Notes pursuant to Section 4.11;

(v)    to provide for uncertificated Notes in addition to or in place of certificated Notes; *provided*, *however*, that the uncertificated Notes are issued in registered form for purposes of Sec-tion 163(f) of the Code or in a manner such that the uncertificated Notes are described in Section 163(f)(2)(B) of the Code;

(vi)    to conform the text of this Indenture, the Notes, the Security Documents, the First Lien Intercreditor Agreement or the Junior Lien Intercreditor Agreement to any provision of the ["Description of Third Lien Notes" contained in the Plan Supplement filed with the Bankruptcy Court on April 5, 2010] to the extent that such provision of the "Description of Third Lien Notes" was intended to be a verbatim recitation of a provision of this Indenture, the Notes, the Security Documents, the First Lien Intercreditor Agreement, the Junior Lien Intercreditor Agreement, [or the Registration Rights Agreement];

(vii)    to evidence and provide acceptance of the appointment of a successor Trustee, Registrar, Paying Agent or Transfer Agent under this Indenture;

(viii)    to comply with the rules of any applicable securities depository;

(ix)       to add a Pledgor with respect to the Notes or to add Collateral to secure the Notes;

(x)       to release Collateral in compliance with this Indenture or the Junior Lien Inter-creditor Agreement;

(xi)       to add additional secured creditors holding Other First-Lien Obligations, other Junior Lien Obligations or any other secured Indebtedness permitted to be Incurred so long as such Obligations are in compliance with this Indenture, the First Lien Intercreditor Agreement or the Security Documents;

(xii)       to add to the covenants of the Company or the Restricted Subsidiaries for the benefit of the holders or to surrender any right or power herein conferred upon the Company or the Restricted Subsidiaries;

(xiii)       to comply with any requirement of the SEC in connection with qualifying or maintaining the qualification of, this Indenture under the TIA;

(xiv)       to make any change that would provide any additional benefit or rights to the holders or that does not adversely affect in any material respect the legal rights of any holder; or

(xv)       to provide for the issuance of Additional Notes, which shall have terms substan-tially identical in all material respects to the Initial Notes, and which shall be treated, together with any outstanding Initial Notes, as a single issue of securities;

(xvi)       to comply with the rules of any applicable securities depositary; or

(xvii)       to provide for the issuance of Additional Notes under this Indenture in accor-dance with the limitations set forth in this Indenture.

(b)       After an amendment under this Section 9.01 becomes effective, the Issuer shall mail to the holders a notice briefly describing such amendment, provided that in the case of an amend-ment pursuant to Section 9.01(a)(xiv), no such notice shall be required.  The failure to give such notice to all holders, or any defect therein, shall not impair or affect the validity of an amendment under this Sec-tion 9.01.

SECTION 9.02.       With Consent of the Holders.

(a)       The Issuer and the Trustee may amend this Indenture and the Security Docu-ments with the written consent of the holders of at least a majority in aggregate principal amount of the Notes then outstanding voting as a single class (including consents obtained in connection with a tender offer or exchange for the Notes).  However, without the consent of each holder of an outstanding Note affected, an amendment may not:

(1)       reduce the amount of Notes whose holders must consent to an amendment,

(2)       reduce the rate of or extend the time for payment of interest on any Note,

(3)       reduce the principal of or change the Stated Maturity of any Note,

(4)    reduce the premium payable upon the redemption of any Note or change the time at which any Note may be redeemed in accordance with Article III,

(5)    make any Note payable in money other than that stated in such Note,

(6)    expressly subordinate the Notes to any other Indebtedness of the Company, the Issuer or any Guarantor,

(7)    impair the right of any holder to receive payment of principal of, premium, if any, and interest on such holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such holder's Notes,

(8)    make any change in the amendment provisions which require each holder's consent or in the waiver provisions,

(9)    make any change in the provisions in the Junior Lien Intercreditor Agreement or this Indenture dealing with the application of proceeds of Collateral that would adversely affect the holders of the Notes, or

(10)    except as expressly provided by this Indenture, modify or release the Guarantee of any Significant Subsidiary in any manner adverse to the holders of the Notes.

In addition, without the consent of the holders of at least 66% in aggregate principal amount of Notes then outstanding, no amendment or waiver may release all or substantially all of the Collateral from the Lien of this Indenture and the Security Documents with respect to the Notes.

It shall not be necessary for the consent of the holders under this Section 9.02 to approve the particular form of any proposed amendment, but it shall be sufficient if such consent approves the substance thereof.

After an amendment under this Section 9.02 becomes effective, the Issuer shall mail to the holders a notice briefly describing such amendment.  The failure to give such notice to all holders, or any defect therein, shall not impair or affect the validity of an amendment under this Section 9.02.

SECTION 9.03.    Compliance with Trust Indenture Act.  From the date on which this Indenture is qualified under the TIA, every amendment, waiver or supplement to this Indenture or the Notes shall comply with the TIA as then in effect.

SECTION 9.04.    Revocation and Effect of Consents and Waivers.

(a)    A consent to an amendment or a waiver by a holder of a Note shall bind the holder and every subsequent holder of that Note or portion of the Note that evidences the same debt as the consenting holder's Note, even if notation of the consent or waiver is not made on the Note.  However, any such holder or subsequent holder may revoke the consent or waiver as to such holder's Note or portion of the Note if the Trustee receives the notice of revocation before the date on which the Trustee receives an Officer's Certificate from the Issuer certifying that the requisite principal amount of Notes have consented.  After an amendment or waiver becomes effective, it shall bind every holder.  An amendment or waiver becomes effective upon the (i) receipt by the Issuer or the Trustee of consents by the holders of the requisite principal amount of securities, (ii) satisfaction of conditions to effectiveness as set forth in this Indenture and any indenture supplemental hereto containing such amendment or waiver and (iii) execution of such amendment or waiver (or supplemental indenture) by the Issuer and the Trustee.

(b)    The Issuer may, but shall not be obligated to, fix a record date for the purpose of determining the holders entitled to give their consent or take any other action described above or required or permitted to be taken pursuant to this Indenture.  If a record date is fixed, then notwithstanding the immediately preceding paragraph, those Persons who were holders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to give such consent or to revoke any consent previously given or to take any such action, whether or not such Persons continue to be holders after such record date.  No such consent shall be valid or effective for more than 120 days after such record date.

SECTION 9.05.    Notation on or Exchange of Notes.  If an amendment, supplement or waiver changes the terms of a Note, the Issuer may require the holder of the Note to deliver it to the Trustee.  The Trustee may place an appropriate notation on the Note regarding the changed terms and return it to the holder.  Alternatively, if the Issuer or the Trustee so determines, the Issuer in exchange for the Note shall issue and the Trustee shall authenticate a new Note that reflects the changed terms.  Failure to make the appropriate notation or to issue a new Note shall not affect the validity of such amendment, supplement or waiver.

SECTION 9.06.    Trustee to Sign Amendments.  The Trustee shall sign any amendment, supplement or waiver authorized pursuant to this Article IX if the amendment does not adversely affect the rights, duties, liabilities or immunities of the Trustee.  If it does, the Trustee may but need not sign it.  In signing such amendment, the Trustee shall be entitled to receive indemnity or security reasonably satisfactory to it and shall be provided with, and (subject to Section 7.01) shall be fully protected in relying upon, an Officer's Certificate and an Opinion of Counsel stating that such amendment, supplement or waiver is authorized or permitted by this Indenture and that such amendment, supplement or waiver is the legal, valid and binding obligation of the Issuer and the Company, enforceable against them in accordance with its terms, subject to customary exceptions, and complies with the provisions hereof (including Section 9.03).

SECTION 9.07.    Additional Voting Terms; Calculation of Principal Amount.  All Notes issued under this Indenture shall vote and consent together on all matters (as to which any of such Notes may vote) as one class and no Notes will have the right to vote or consent as a separate class on any matter.  Determinations as to whether holders of the requisite aggregate principal amount of Notes have concurred in any direction, waiver or consent shall be made in accordance with this Article IX and Section 2.14.

**ARTICLE X**

**RANKING OF NOTE LIENS**

SECTION 10.01.    Relative Rights.  The First Lien Intercreditor Agreement and the Junior Lien Intercreditor Agreement define the relative rights, as lienholders, of holders of first priority Liens, holders of Liens securing First Priority Lien Obligations and holders of Liens securing Junior Lien Obligations.  Nothing in this Indenture or the Junior Lien Intercreditor Agreement will:

(a)    impair, as between the Issuer and holders of Notes, the obligation of the Issuer, which is absolute and unconditional, to pay principal of, premium and interest on Notes in accordance with their terms or to perform any other obligation of the Issuer or any other obligor under this Indenture, the Notes, the Guarantees and the Security Documents;

(b)    restrict the right of any holder to sue for payments that are then due and owing, in a manner not inconsistent with the provisions of the Junior Lien Intercreditor Agreement;

(c)    prevent the Trustee, the Collateral Agent or any holder from exercising against the Issuer or any other obligor any of its other available remedies upon a Default or Event of Default (other than its rights as a secured party, which are subject to the Junior Lien Intercreditor Agreement); or

(d)    restrict the right of the Trustee, the Collateral Agent or any holder:

(1)    to file and prosecute a petition seeking an order for relief in an involuntary bankruptcy case as to any obligor or otherwise to commence, or seek relief commencing, any insolvency or liquidation proceeding involuntarily against any obligor;

(2)    to make, support or oppose any request for an order for dismissal, abstention or conversion in any insolvency or liquidation proceeding;

(3)    to make, support or oppose, in any insolvency or liquidation proceeding, any request for an order extending or terminating any period during which the debtor (or any other Person) has the exclusive right to propose a plan of reorganization or other dispositive restructuring or liquidation plan therein;

(4)    to seek the creation of, or appointment to, any official committee representing creditors (or certain of the creditors) in any insolvency or liquidation proceedings and, if appointed, to serve and act as a member of such committee without being in any respect restricted or bound by, or liable for, any of the obligations under this Article X;

(5)    to seek or object to the appointment of any professional person to serve in any capacity in any insolvency or liquidation proceeding or to support or object to any request for compensation made by any professional person or others therein;

(6)    to make, support or oppose any request for order appointing a trustee or examiner in any insolvency or liquidation proceedings; or

(7)    otherwise to make, support or oppose any request for relief in any insolvency or liquidation proceeding that it is permitted by law to make, support or oppose:

if it were a holder of unsecured claims; or

(x)    as to any matter relating to any plan of reorganization or other

(y)    restructuring or liquidation plan or as to any matter relating to the administration of the estate or the disposition of the case or proceeding (in each case except as set forth in [the First Lien Intercreditor Agreement] or the Junior Lien Intercreditor Agreement).

## ARTICLE XI

## COLLATERAL

SECTION 11.01.   Security Documents.

The Company shall, and shall cause each Restricted Subsidiary to, and each Restricted Subsidiary shall, make all filings (including filings of continuation statements and amendments to UCC

financing statements that may be necessary to continue the effectiveness of such UCC financing state-
ments) and all other actions as are necessary or required by the Security Documents to maintain (at the
sole cost and expense of the Company and its Restricted Subsidiaries) the security interest created by the
Security Documents in the Collateral (other than with respect to any Collateral the security interest in
which is not required to be perfected under the Security Documents) as a perfected [third priority] secu-
rity interest subject only to Permitted Liens.

SECTION 11.02.    Collateral Agent.

(a)    The Collateral Agent shall have all the rights and protections provided in the Se-
curity Documents.

(b)    Subject to Section 7.01, neither the Trustee nor the Collateral Agent nor any of
their respective officers, directors, employees, attorneys or agents will be responsible or liable for the ex-
istence, genuineness, value or protection of any Collateral, for the legality, enforceability, effectiveness or
sufficiency of the Security Documents, for the creation, perfection, priority, sufficiency or protection of
any third priority Lien, or any defect or deficiency as to any such matters.

(c)    Subject to the Security Documents and the Junior Lien Intercreditor Agreement,
(i) the Trustee shall direct the Collateral Agent and (ii) except as directed by the Trustee as required or
permitted by this Indenture and any other representatives or pursuant to the Security Documents, the
holders acknowledge that Collateral Agent will not be obligated:

(1)    to act upon directions purported to be delivered to it by any other Person;

(2)    to foreclose upon or otherwise enforce any third priority Lien; or

(3)    to take any other action whatsoever with regard to any or all of the third priority
Liens, Security Documents or Collateral.

(d)    The holders of Notes agree that the Collateral Agent shall be entitled to the
rights, privileges, protections, immunities, indemnities and benefits provided to the Collateral Agent by
the Security Documents.  Furthermore, each holder of a Note, by accepting such Note, consents to the
terms of and authorizes and directs the Trustee (in each of its capacities) and hereby appoints, authorizes
and directs the Collateral Agent to enter into and perform the Junior Lien Intercreditor Agreement and
Security Documents in each of its capacities thereunder.

(e)    If the Issuer (i) Incurs Junior Lien Obligations at any time when the Junior Lien
Intercreditor Agreement is not in effect or at any time when Indebtedness constituting Junior Lien Obliga-
tions entitled to the benefit of an existing intercreditor agreement is concurrently retired, and (ii) directs
the Trustee to deliver to the Collateral Agent an Officer's Certificate so stating and requesting the Collat-
eral Agent to enter into an intercreditor agreement (on substantially the same terms as the Junior Lien In-
tercreditor Agreement in effect on the Issue Date) in favor of a designated agent or representative for the
holders of the Junior Lien Obligations so Incurred, the holders acknowledge that the Collateral Agent is
hereby authorized and directed to enter into such intercreditor agreement, bind the holders on the terms
set forth therein and perform and observe its obligations thereunder.

SECTION 11.03.    Authorization of Actions to Be Taken.

(a)    Each holder, by its acceptance of the Notes, consents and agrees to the terms of
the Security Documents (including, without limitation, the provisions providing for foreclosure and re-

lease of Collateral) as the same may be in effect or may be amended from time to time in accordance with their terms, authorizes and directs the Trustee and the Collateral Agent to enter into the Security Documents to which it is a party, authorizes and empowers the Trustee to direct the Collateral Agent to enter into, and the Collateral Agent to execute and deliver the Junior Lien Intercreditor Agreement and authorizes and empowers the Trustee and the Collateral Agent to bind the holders of Notes and other holders of Obligations as set forth in the Security Documents to which it is a party and the Junior Lien Intercreditor Agreement and to perform its obligations and exercise its rights and powers thereunder.

(b)    The Trustee is authorized and empowered to receive for the benefit of the holders of Notes any funds collected or distributed under the Security Documents to which the Trustee is a party and to make further distributions of such funds to the holders of Notes according to the provisions of this Indenture.

(c)    Subject to the provisions of Section 7.01 and Section 7.02 hereof, and the Junior Lien Intercreditor Agreement and the Security Documents, the Trustee may (but shall not be obligated to), in its sole discretion and without the consent of the holders, direct, on behalf of the holders, the Collateral Agent to take all actions it deems necessary or appropriate in order to:

(1)    foreclose upon or otherwise enforce any or all of the third priority Liens;

(2)    enforce any of the terms of the Security Documents to which the Collateral Agent or Trustee is a party; or

(3)    collect and receive payment of any and all Obligations.

Subject to the Junior Lien Intercreditor Agreement, the Trustee is authorized and empowered to institute and maintain, or direct the Collateral Agent to institute and maintain, such suits and proceedings as it may deem expedient to protect or enforce the third priority Liens or the Security Documents to which the Collateral Agent or Trustee is a party or to prevent any impairment of Collateral by any acts that may be unlawful or in violation of the Security Documents to which the Collateral Agent or Trustee is a party or this Indenture, and such suits and proceedings as the Trustee or the Collateral Agent may deem expedient to preserve or protect its interests and the interests of the holders of Notes in the Collateral, including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the security interest hereunder or be prejudicial to the interests of holders, the Trustee or the Collateral Agent.

SECTION 11.04.    <u>Release of Collateral</u>.

(a)    Subject to the Junior Lien Intercreditor Agreement, Liens on Collateral securing the Notes will be automatically and unconditionally released:

(1)    as to any property or asset (including Capital Stock of a Subsidiary of the Company), to enable the Company, the Issuer and the Pledgors to consummate the disposition of such property or asset to the extent not prohibited by clause (5) below or under the covenants described under Section 4.04 or Section 4.06;

(2)    upon the release of all Liens on such property or assets securing First and Second Priority Lien Obligations (including all commitments and letters of credit thereunder); provided, however, that if the Issuer or the Company subsequently incurs (i) First Priority Lien Obligations

that are secured by Liens on property or assets of the Issuer or the Company of the type constitut-ing the Collateral and the related Liens are incurred in reliance on clauses (6)(B) or (6)(D) of the definition of Permitted Liens or (ii) Second Priority Lien Obligations that are secured by Liens on property or assets of the Issuer or the Company of the type constituting the Collateral and the re-lated Liens are incurred in reliance on clause (6)(C) of the definition of Permitted Liens, then the Issuer and its Restricted Subsidiaries will be required to reinstitute the security arrangements with respect to the Collateral in favor of the Notes, which, in the case of any such subsequent First Pri-ority Lien Obligations or Second Priority Lien Obligations, will be junior priority Liens on the Collateral securing such First Priority Lien Obligations or Second Priority Lien Obligations to the same extent provided by the Security Documents and on the terms and conditions of the security documents relating to such First Priority Lien Obligations or Second Priority Lien Obligations, with the junior priority Lien held either by the administrative agent, collateral agent or other rep-resentative for such First Priority Lien Obligations or Second Priority Lien Obligations and sub-ject to an intercreditor agreement that provides the administrative agent or collateral agent sub-stantially the same rights and powers as afforded under the Junior Lien Intercreditor Agreement;

(3)    in respect of the property and assets of a Pledgor, upon the designation of such Pledgor to be an Unrestricted Subsidiary in accordance with the covenant described under Section 4.04 and the definition of "Unrestricted Subsidiary";

(4)    in respect of the property and assets of a Guarantor upon release of the Guarantee with respect to the Notes of such Guarantor;

(5)    in the case of the property and assets of a specific Pledgor, upon such Pledgor making a Transfer of such assets to any Restricted Subsidiary of the Issuer that is not a Pledgor; *provided* that (i) such Transfer is not subject to Section 5.01 and (ii) the aggregate net book value of the assets of Restricted Subsidiaries that are at any time Notes Collateral (as defined in the First Lien Security Documents)(excluding cash proceeds of accounts receivable, inventory and related assets) that are so transferred pursuant to this clause (5) subsequent to the Issue Date shall not exceed 5% of the Consolidated Net Tangible Assets of the Issuer and its Restricted Subsidiar-ies per year and shall not be in an amount that will result in an Excluded Subsidiary ceasing to qualify as an Excluded Subsidiary in accordance with the definition thereof; *provided, further*, that Liens on all property and assets of any Subsidiary of Lyondell Europe Holdings, Inc., a Delaware corporation, will be automatically and unconditionally released upon any transfer of such Subsidiary;

(6)    as described under Article IX; or

(7)    as to the pledge of Capital Stock of first-tier Foreign Subsidiaries, in connection with a reorganization, change or modification of the direct or indirect ownership of Foreign Sub-sidiaries by the Company, the Issuer or a Pledgor, as applicable, in compliance with the First Lien Indenture, a release may be obtained as to such Capital Stock in connection with the substitution of pledge of 65% of the voting Capital Stock and 100% of the non-voting Capital Stock of any one or more new or replacement first-tier Foreign Subsidiaries pursuant to valid Security Docu-ments.

Notwithstanding the foregoing clause (2), if an Event of Default exists on the date of Dis-charge of First and Second Priority Lien Obligations, the Junior Priority Liens on the Collateral securing the Notes will not be released, except to the extent that Collateral or any portion thereof was disposed of in order to repay the First and Second Priority Lien Obligations secured by the Collateral, and thereafter the Trustee (or another designated representative acting at the direction

of holders of a majority of outstanding principal amount of the Notes and other Junior Lien Obligations) will have the right to direct the Agent to foreclose upon the Collateral (but in such event, the Liens on the Collateral securing the Notes will be released when such Event of Default and all other Events of Default cease to exist).

In addition, the security interests granted pursuant to the Security Documents securing the Notes Obligations shall automatically terminate and/or be released all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to the applicable Pledgors (as defined in the Collateral Agreement), as of the date upon (i) the payment in full of principal of, premium (if any), on, and accrued and unpaid interest and Additional Interest, if any,] on the Notes and all the Obligations under the Notes and the Indenture and the Security Documents, (other than contingent or unliquidated obligations or liabilities not then due) have been paid in full in cash or immediately available funds; (ii) a legal defeasance or covenant defeasance or discharge under Article VIII; [or (iii) the Holders of at least two thirds in aggregate principal amount of all Notes issued under this Indenture consent to the termination of the Security Documents.

In connection with any termination or release pursuant to this Section 11.04(a), the Collateral Agent shall execute and deliver to any Pledgor (as defined in the Collateral Agreement), at such Pledgor's expense, all documents that such Pledgor shall reasonably request to evidence and provide such termination or release (including, without limitation, UCC termination statements), and will duly assign and transfer to such Pledgor, such of the Pledged Collateral (as defined in the Collateral Agreement) that may be in the possession of the Collateral Agent and has not theretofore been sold or otherwise applied or released pursuant to this Indenture or the Security Documents. Any execution and delivery of documents pursuant to this Section 11.04(a) shall be without recourse to or warranty by the Collateral Agent. In connection with any release pursuant to this Section 11.04(a), the Pledgors shall be permitted to take any action in connection therewith consistent with such release including, without limitation, the filing of UCC termination statements.

Upon the receipt of an Officer's Certificate from the Issuer, as described in Section 11.04(b) below, if applicable, and any necessary or proper instruments of termination, satisfaction or release prepared by the Issuer, the Collateral Agent shall execute, deliver or acknowledge such instruments or releases to evidence the release of any Collateral permitted to be released pursuant to this Indenture or the Security Documents or the Junior Lien Intercreditor Agreement.

(b) Notwithstanding anything herein to the contrary, in connection with (x) any release of Collateral pursuant to Section 11.04(a)(1), (5), (6) or (7) above, such Collateral may not be released from the Lien and security interest created by the Security Documents and (y) any release of Collateral pursuant to Section 11.04(a)(2), (3) and (4), the Collateral Agent shall not be required to execute, deliver or acknowledge any instruments of termination, satisfaction or release unless, in each case, an Officer's Certificate and Opinion of Counsel certifying that all conditions precedent, including, without limitation, this Section 11.04, have been met and stating under which of the circumstances set forth in Section 11.04(a) above the Collateral is being released have been delivered to the Collateral Agent on or prior to the date of such release or, in the case of clause (y) above, the date on which the Collateral Agent executes any such instrument.

(c) To the extent that Rule 3-16 of Regulation S-X under the Securities Act requires or would require (or is replaced with another rule or regulation, or any other law, rule or regulation is adopted, that would require) the filing with the SEC (or any other governmental agency) of separate financial statements of any Subsidiary of the Company due to the fact that such Subsidiary's Capital Stock secures the Notes or any First Priority Lien Obligation, Second Priority Lien Obligation or Third Priority Lien Obligation, then the Capital Stock of such Subsidiary will automatically be deemed not to be part of

the Notes Collateral securing the Notes but only to the extent necessary to not be subject to such require-
ment and only for so long as required to not be subject to such requirement (such requirement, the "3-16
Exemption"); *provided* that the 3-16 Exemption will not apply to the capital stock of the Issuer and Lyon-
dellBasell Subholdings, B.V.  In such event, the Security Documents may be amended or modified, with-
out the consent of any holder of such Notes, to the extent necessary to release the security interests in fa-
vor of the Collateral Agent on the shares of Capital Stock of such Subsidiary that are so deemed to no
longer constitute part of the Notes Collateral.  In the event that Rule 3-16 of Regulation S-X under the
Securities Act is amended, modified or interpreted by the SEC to permit (or is replaced with another rule
or regulation, or any other law, rule or regulation is adopted, that would permit) such Subsidiary's Capital
Stock to secure the Notes in excess of the amount then pledged without the filing with the SEC (or any
other governmental agency) of separate financial statements of such Subsidiary, then the Capital Stock of
such Subsidiary will automatically be deemed to be a part of the Notes Collateral.  The 3-16 Exemption
will apply to the Collateral securing the Notes if it applies to the Collateral securing the First Priority Lien
Obligations.

(d)    Notwithstanding anything herein to the contrary, at any time when a Default or
Event of Default has occurred and is continuing and the maturity of the Notes has been accelerated
(whether by declaration or otherwise) and the Trustee has delivered a notice of acceleration to the Collat-
eral Agent, no release of Collateral pursuant to the provisions of this Indenture or the Security Documents
will be effective as against the holders, except as otherwise provided in the Junior Lien Intercreditor
Agreement.

SECTION 11.05.    Filing, Recording and Opinions.

(a)    The Issuer will comply with the provisions of TIA Sections 314(b), 314(c) and
314(d), in each case following qualification of this Indenture pursuant to the TIA and except to the extent
not required as set forth in any SEC regulation or interpretation (including any no-action letter issued by
the Staff of the SEC, whether issued to the Issuer or any other Person).  Following such qualification, to
the extent the Issuer is required to furnish to the Trustee an Opinion of Counsel pursuant to TIA Section
314(b)(2), the Issuer will furnish such opinion not more than 60 but not less than 30 days prior to each
September 30.

Any release of Collateral permitted by Section 11.04 hereof will be deemed not to impair
the Liens under this Indenture and the Security Documents in contravention thereof and any person that is
required to deliver an Officer's Certificate and Opinion of Counsel pursuant to Section 314(d) of the TIA,
shall be entitled to rely upon the foregoing as a basis for delivery of such certificate and opinion.  The
Trustee may, to the extent permitted by Sections 7.01 and 7.02 hereof, accept as conclusive evidence of
compliance with the foregoing provisions the appropriate statements contained in such documents, Offi-
cer's Certificate and Opinion of Counsel.

(b)    If any Collateral is released in accordance with this Indenture and if the Issuer
has delivered the certificates and documents required by the Security Documents and Section 11.04, the
Trustee will determine whether it has received all documentation required by TIA Section 314(d) in con-
nection with such release and, based on such determination and Officer's Certificate and the Opinion of
Counsel delivered pursuant to Section 11.04, will, upon request, deliver a certificate to the Collateral
Agent setting forth such determination.

(c)    Any certificate or opinion required by Section 314(d) of the Trust Indenture Act
may be made by an Officer of the Issuer, except in cases where Section 314(d) requires that such certifi-
cate or opinion be made by an independent engineer, appraiser or other expert.

(d)    Notwithstanding anything to the contrary herein, the Issuer and its Subsidiaries will not be required to comply with all or any portion of Section 314(d) of the Trust Indenture Act if they determine, in good faith based on advice of counsel, that under the terms of that section and/or any interpretation or guidance as to the meaning thereof of the SEC and its staff, including "no action" letters or exemptive orders, all or any portion of Section 314(d) of the Trust Indenture Act is inapplicable to the released Collateral.

(e)    Upon the request of the Trustee, the Trustee shall be entitled to rely on an Officer's Certificate and an Opinion of Counsel in respect of any matter in furtherance of the foregoing transactions contemplated by this Section 11.05.

SECTION 11.06.    [Intentionally Omitted.]

SECTION 11.07.    Powers Exercisable by Receiver or Trustee.  In case the Collateral shall be in the possession of a receiver or trustee, lawfully appointed, the powers conferred in this Article XI upon the Issuer or the Company with respect to the release, sale or other disposition of such property may be exercised by such receiver or trustee, and an instrument signed by such receiver or trustee shall be deemed the equivalent of any similar instrument of the Issuer or the Company or of any officer or officers thereof required by the provisions of this Article XI; and if the Trustee or the Collateral Agent shall be in the possession of the Collateral under any provision of this Indenture, then such powers may be exercised by the Trustee or the Collateral Agent, as the case may be.

SECTION 11.08.    Release upon Termination of the Issuer's Obligations.  In the event (i) that the Issuer delivers to the Trustee, in form and substance acceptable to it, an Officer's Certificate and Opinion of Counsel certifying that all the obligations under this Indenture, the Notes and the Security Documents have been satisfied and discharged by the payment in full of the Issuer's obligations under the Notes, this Indenture and the Security Documents, and all such obligations have been so satisfied, or (ii) a discharge, legal defeasance or covenant defeasance of this Indenture occurs under Article VIII, the Trustee shall deliver to the Issuer and the Collateral Agent a notice stating that the Trustee, on behalf of the holders, disclaims and gives up any and all rights it has in or to the Collateral, and any rights it has under the Security Documents, and upon receipt by the Collateral Agent of such notice, the Collateral Agent shall be deemed not to hold a Lien in the Collateral on behalf of the Trustee and shall (or shall direct the Collateral Agent to) do or cause to be done all acts reasonably necessary to release such Lien as soon as is reasonably practicable.

SECTION 11.09.    Designations.  For purposes of any provisions hereof  or the Junior Lien Intercreditor Agreement requiring the Issuer to designate Indebtedness for the purposes of the terms Junior Lien Obligations or any other such designations hereunder or under the Junior Lien Intercreditor Agreement, any such designation shall be sufficient if the relevant designation provides in writing that such Junior Priority Lien Obligations or any other such designation are permitted under this Indenture and is signed on behalf of the Issuer by an Officer and delivered to the Trustee and the Collateral Agent in an Officer's Certificate.

# ARTICLE XII

# GUARANTEE

SECTION 12.01.    Guarantee.

(a)    The Company, each existing and subsequently acquired or organized direct or indirect Wholly Owned Domestic Subsidiary of the Company and each other entity, if any, that guarantees

the First Lien Notes or the Senior Term Loan Facility (other than any Excluded Subsidiary) (each such entity, a "Guarantor") will, jointly and severally, irrevocably and unconditionally guarantee on a senior third-priority secured basis, as a primary obligor and not merely as a surety, to each holder and to the Trustee and its successors and assigns (i) the full and punctual payment when due, whether at Stated Maturity, by acceleration, by redemption or otherwise, of all Obligations of the Issuer under this Indenture (including obligations to the Trustee and the Agents) and the Notes, whether for payment of principal of, premium, if any, on and interest in respect of the Notes (the "Guarantee") and all other monetary obligations of the Issuer under this Indenture and the Notes and (ii) the full and punctual performance within applicable grace periods of all other obligations of the Issuer whether for fees, expenses, indemnification or otherwise under this Indenture and the Notes (all the foregoing, including the Guarantee, being hereinafter collectively called the "Guaranteed Obligations").  Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed, in whole or in part, without notice or further assent from any Guarantor, and that each Guarantor shall remain bound under this Article XII notwithstanding any extension or renewal of any Guaranteed Obligation.

(b)     To the extent applicable, each Guarantor waives presentation to, demand of payment from and protest to the Issuer of any of the Guaranteed Obligations and also waives notice of protest for nonpayment.  Each Guarantor waives notice of any default under the Notes or the Guaranteed Obligations.  The obligations of each Guarantor hereunder shall not be affected by (i) the failure of any holder or the Trustee to assert any claim or demand or to enforce any right or remedy against the Issuer or any other Person under this Indenture, the Notes or any other agreement or otherwise; (ii) any extension or renewal of this Indenture, the Notes or any other agreement; (iii) any rescission, waiver, amendment or modification of any of the terms or provisions of this Indenture, the Notes or any other agreement; (iv) the release of any security held by any holder or the Trustee for the Guaranteed Obligations or each Guarantor; (v) the failure of any holder or Trustee to exercise any right or remedy against any other guarantor of the Guaranteed Obligations; or (vi) any change in the ownership of each Guarantor, except as provided in Section 12.02(b) or Section 12.02(c).  Each Guarantor hereby waives any right to which it may be entitled to have its Obligations hereunder divided among the Guarantors, such that such Guarantor's obligations would be less than the full amount claimed.

(c)     Each Guarantor hereby waives any right to which it may be entitled to have the assets of the Issuer first be used and depleted as payment of the Issuer's or such Guarantor's obligations hereunder prior to any amounts being claimed from or paid by such Guarantor hereunder.  Each Guarantor hereby waives any right to which it may be entitled to require that the Issuer be sued prior to an action being initiated against such Guarantor.

(d)     Each Guarantor further agrees that its Guarantee herein constitutes a guarantee of payment, performance and compliance when due (and not a guarantee of collection) and waives any right to require that any resort be had by any holder or the Trustee to any security held for payment of the Guaranteed Obligations.

(e)     The Guarantee of each Guarantor, to the extent and in the manner set forth in Article XII, will be the senior third-priority secured Obligations of the Guarantors equal in right of payment to all existing and future Pari Passu Indebtedness, equal in right of payment to all existing and future unsubordinated Indebtedness of the Guarantors and subordinated in right of payment to the prior payment in full of the principal of and premium, if any, and interest on all Secured Indebtedness of the relevant Guarantor and is made subject to such provisions of this Indenture.

(f)     Except as expressly set forth in Sections 8.01(b), 12.02 and 12.06, the obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not

be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Guarantor herein shall not be discharged or impaired or otherwise affected by the failure of any holder or the Trustee to assert any claim or demand or to enforce any remedy under this Indenture, the Notes or any other agreement, by any waiver or modification of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of any Guarantor or would otherwise operate as a discharge of any Guarantor as a matter of law or equity.

(g)    Each Guarantor agrees that its Guarantee shall remain in full force and effect until payment in full of all the Guaranteed Obligations. Each Guarantor further agrees that its Guarantee herein shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of principal of or interest on any Guaranteed Obligation is rescinded or must otherwise be restored by any holder or the Trustee upon the bankruptcy or reorganization of the Issuer or otherwise.

(h)    In furtherance of the foregoing and not in limitation of any other right which any holder or the Trustee has at law or in equity against any Guarantor by virtue hereof, upon the failure of the Issuer to pay the principal of or interest on any Guaranteed Obligation when and as the same shall become due, whether at maturity, by acceleration, by redemption or otherwise, or to perform or comply with any other Guaranteed Obligation, each Guarantor hereby promises to and shall, upon receipt of written demand by the Trustee, forthwith pay, or cause to be paid, in cash, to the holders or the Trustee an amount equal to the sum of (i) the unpaid principal amount of such Guaranteed Obligations, (ii) accrued and unpaid interest on such Guaranteed Obligations (but only to the extent not prohibited by applicable law) and (iii) all other monetary obligations of the Issuer to the holders, Trustee and Agents.

(i)    Each Guarantor agrees that it shall not be entitled to any right of subrogation in relation to the holders in respect of any Guaranteed Obligations guaranteed hereby until payment in full of all Guaranteed Obligations. Each Guarantor further agrees that, as between it, on the one hand, and the holders and the Trustee, on the other hand, (i) the maturity of the Guaranteed Obligations guaranteed hereby may be accelerated as provided in Article VI for the purposes of the Guarantee herein, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Guaranteed Obligations guaranteed hereby, and (ii) in the event of any declaration of acceleration of such Guaranteed Obligations as provided in Article VI, such Guaranteed Obligations (whether or not due and payable) shall forthwith become due and payable by the Company for the purposes of this Section 12.01.

(j)    Each Guarantor also agrees to pay any and all costs and expenses (including reasonable attorneys' fees and expenses) Incurred by the Trustee, the Agents or any holder in enforcing any rights under this Section 12.01.

(k)    Upon request of the Trustee, each Guarantor shall execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture.

SECTION 12.02.    Limitation on Liability.

(a)    Any term or provision of this Indenture to the contrary notwithstanding, the maximum aggregate amount of the Guaranteed Obligations guaranteed hereunder by each Guarantor shall not exceed the maximum amount that can be hereby guaranteed without rendering this Indenture, as it relates to such Guarantor, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer or similar laws affecting the rights of creditors generally.

(b)    The Obligations of any Guarantor, including the Company, under its Guaranteed Obligations will be automatically and unconditionally released and discharged from all Obligations under this Article XII when any of the following occurs:

(i)    upon the full and final payment by or on behalf of the Issuer of all of its Obligations under this Indenture and the Notes;

(ii)    except with respect to the Guarantee of the Company (subject to the provisions described under Section 5.01) any issuance, sale, exchange, transfer or other disposition (including, without limitation, by way of acquisition, merger, amalgamation, consolidation, transfer, conveyance or otherwise), directly or indirectly, of Capital Stock of such Guarantor (or any parent of such Guarantor) to any Person that is not a Restricted Subsidiary of the Company that results in such Guarantor ceasing to be a Restricted Subsidiary of the Company; *provided* that such issuance, sale, exchange, transfer or other disposition is made in accordance with the provisions of this Indenture;

(iii)    except with respect to the Guarantee of the Company, the designation of such Guarantor as an Unrestricted Subsidiary in accordance with the provisions of this Indenture;

(iv)    except with respect to the Guarantee of the Company (subject to the provisions described under Section 5.01), upon the liquidation or dissolution of such Guarantor; *provided* that no Default or Event of Default has occurred or is continuing or would be caused thereby;

(v)    except with respect to the Guarantee of the Company, the occurrence of legal defeasance or covenant defeasance in accordance with this Indenture;

(vi)    except with respect to the Guarantee of the Company [and for those limitations described in the following paragraph], in the event that the continued Obligation of such Guarantor under its Guarantee or the continued existence of such Guarantee will result in a violation of applicable law that cannot be avoided or otherwise prevented through measures reasonably available to the Company or such Guarantor; *provided* that all guarantees, if any, of all First Priority Lien Obligations by such Guarantor are also released; or

(vii)    upon such Guarantor being designated as an Excluded Subsidiary in compliance with this Indenture and the Company gives written notice of such release to the Trustee.

In addition to the initial Guarantors, other Domestic Subsidiaries may become Guarantors after the Issue Date, as provided under Section 12.06. The Guaranteed Obligations of the Guarantors will be limited as necessary to recognize certain defenses generally available to guarantors (including those that relate to fraudulent conveyance or transfer, voidable preference, financial assistance, corporate purpose, capital maintenance or similar laws, regulations or defenses affecting the rights of creditors generally) or other considerations under applicable law.

SECTION 12.03.    <u>Successors and Assigns</u>.    This Article XII shall be binding upon each Guarantor and its successors and assigns and shall inure to the benefit of the successors and assigns of the Trustee, the Agents and the holders and, in the event of any transfer or assignment of rights by any holder, the Agents, or the Trustee, the rights and privileges conferred upon that party in this Indenture and in the Notes shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions of this Indenture.

SECTION 12.04.   No Waiver.  Neither a failure nor a delay on the part of either the Trustee, the Agents or the holders in exercising any right, power or privilege under this Article XII shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise of any right, power or privilege.  The rights, remedies and benefits of the Trustee, the Agents and the holders herein expressly specified are cumulative and not exclusive of any other rights, remedies or benefits which either may have under this Article XII at law, in equity, by statute or otherwise.

SECTION 12.05.   Modification.  No modification, amendment or waiver of any provision of this Article XII, nor the consent to any departure by any Guarantor therefrom, shall in any event be effective unless the same shall be in writing and signed by the Trustee, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice to or demand on any Guarantor in any case shall entitle any Guarantor to any other or further notice or demand in the same, similar or other circumstances.

SECTION 12.06.   Execution of Supplemental Indenture for Future Note Guarantors. Each Subsidiary and other Person which is required to become a Guarantor of the Notes pursuant to Section 4.11 shall promptly execute and deliver to the Trustee a supplemental indenture in the form of Exhibit B hereto pursuant to which such Subsidiary or other Person shall become a Guarantor under this Article XII and shall guarantee the Notes.  Concurrently with the execution and delivery of such supplemental indenture, the Issuer shall deliver to the Trustee an Opinion of Counsel and an Officer's Certificate to the effect that such supplemental indenture has been duly authorized, executed and delivered by such Subsidiary or other Person and that, subject to the application of bankruptcy, insolvency, moratorium, fraudulent conveyance or transfer and other similar laws relating to creditors' rights generally and to the principles of equity, whether considered in a proceeding at law or in equity, the Guarantee of such Guarantor is a valid and binding obligation of such guarantor, enforceable against such Guarantor in accordance with its terms and/or to such other matters as the Trustee may reasonably request.

SECTION 12.07.   Non-Impairment.  The failure to endorse a Guarantee on any Note shall not affect or impair the validity thereof.

## ARTICLE XIII

## MISCELLANEOUS

SECTION 13.01.   Trust Indenture Act Controls.  If and to the extent that any provision of this Indenture limits, qualifies or conflicts with the duties imposed by, or with another provision (an "incorporated provision") included in this Indenture by operation of, Sections 310 to 318 of the TIA, inclusive, such imposed duties or incorporated provision shall control (provided that the foregoing shall not apply to Section 13.06 of this Indenture until the Indenture is qualified under the TIA).

SECTION 13.02.   Notices.

(a)      Any notice or communication required or permitted hereunder shall be in writing and delivered in person, via facsimile or mailed by first-class mail addressed as follows:

if to the Issuer, the Company or a Guarantor:

Lyondell Chemical Company
1221 McKinney St
Suite 700
Houston, TX 77010
Facsimile:
Attention: Craig B. Glidden, Esq.

if to the Trustee:


[          ]

The Issuer or the Trustee by notice to the other may designate additional or different addresses for subsequent notices or communications.

(b)       Any notice or communication mailed to a holder shall be mailed, first class mail, to the holder at the holder's address as it appears on the registration books of the Registrar and shall be sufficiently given if so mailed within the time prescribed.

(c)       Failure to mail a notice or communication to a holder or any defect in it shall not affect its sufficiency with respect to other holders. If a notice or communication is mailed in the manner provided above, it is duly given, whether or not the addressee receives it, except that notices to the Trustee are effective only if received.

SECTION 13.03.   Communication by the Holders with Other Holders.   The holders may communicate pursuant to Section 312(b) of the TIA with other holders with respect to their rights under this Indenture or the Notes. The Issuer, the Trustee, the Registrar and other Persons shall have the protection of Section 312(c) of the TIA.

SECTION 13.04.   Certificate and Opinion as to Conditions Precedent.   Upon any request or application by the Issuer to the Trustee to take or refrain from taking any action under this Indenture, the Issuer shall furnish to the Trustee at the request of the Trustee:

(a)       an Officer's Certificate in form reasonably satisfactory to the Trustee stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(b)       an Opinion of Counsel in form reasonably satisfactory to the Trustee stating that, in the opinion of such counsel, all such conditions precedent have been complied with.

SECTION 13.05.   Statements Required in Certificate or Opinion.   Each certificate or opinion with respect to compliance with a covenant or condition provided for in this Indenture (other than pursuant to Section 4.09) shall include:

(a)       a statement that the individual making such certificate or opinion has read such covenant or condition;

(b)       a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c)    a statement that, in the opinion of such individual, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(d)    a statement as to whether or not, in the opinion of such individual, such covenant or condition has been complied with; *provided*, *however*, that with respect to matters of fact an Opinion of Counsel may rely on an Officer's Certificate or certificates of public officials.

SECTION 13.06.    When Notes Disregarded.  In determining whether the holders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by (i) the Issuer, (ii) the Company or (iii) on and after the date this Indenture has been qualified under the TIA only, by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Issuer or the Company shall be disregarded and deemed not to be outstanding, except that, for the purpose of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Notes which the Trustee knows are so owned shall be so disregarded (it being expressly understood that prior to the date this Indenture has been so qualified Notes held by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Issuer or the Company shall not be disregarded).  Subject to the foregoing, only Notes outstanding at the time shall be considered in any such determination.

SECTION 13.07.    Rules by Trustee, Paying Agent and Registrar.  The Trustee may make reasonable rules for action by or a meeting of the holders.  The Registrar and a Paying Agent may make reasonable rules for their functions.

SECTION 13.08.    Legal Holidays.  If a payment date is not a Business Day, payment shall be made on the next succeeding day that is a Business Day, and no interest shall accrue on any amount that would have been otherwise payable on such payment date if it were a Business Day for the intervening period.  If a regular Record Date is not a Business Day, the Record Date shall not be affected.

SECTION 13.09.    GOVERNING LAW.  **THIS INDENTURE AND THE SECURI-TIES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.**

SECTION 13.10.    No Recourse Against Others.  No director, officer, employee, manager, incorporator or holder of any Equity Interests in the Issuer or of any Guarantor or any direct or indirect parent corporation, as such, shall have any liability for any obligations of the Issuer or any Guarantor under the Notes or this Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each holder of Notes by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for issuance of the Notes.

SECTION 13.11.    Successors.  All agreements of the Issuer and the Company in this Indenture and the Notes shall bind its successors.  All agreements of the Trustee in this Indenture shall bind its successors.

SECTION 13.12.    Multiple Originals.  The parties may sign any number of copies of this Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.  One signed copy is enough to prove this Indenture.

SECTION 13.13.    Table of Contents; Headings.  The table of contents, cross-reference sheet and headings of the Articles and Sections of this Indenture have been inserted for convenience of

reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

SECTION 13.14.    Indenture Controls.  If and to the extent that any provision of the Notes limits, qualifies or conflicts with a provision of this Indenture, such provision of this Indenture shall control.

SECTION 13.15.    Severability.  In case any provision in this Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

SECTION 13.16.    Intercreditor Agreements.  The terms of this Indenture are subject to the terms of the Junior Lien Intercreditor Agreement.

SECTION 13.17.    PATRIOT Act.  The parties hereto acknowledge that in accordance with Section 326 of the USA PATRIOT Act, the Trustee and the Agents, like all financial institutions and in order to help fight the funding of terrorism and money laundering, is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account.  The parties to this agreement agree that they will provide to the Trust and the Agents with such information as it may request in order to satisfy the requirements of the USA PATRIOT Act.

SECTION 13.18.    Force Majeure.  In no event shall the Trustee or any Agent be liable for any failure or delay in the performance of its obligations hereunder because of circumstances beyond the Trustee's or the Agents' control, including, but not limited to, acts of God, flood, war (whether declared or undeclared), terrorism, fire, riot or embargo, which delay, restrict or prohibit the providing of the services contemplated by this Indenture.

**[Remainder of page intentionally left blank]**

4958          IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed as
4959    of the date first written above.

4960                                                    Lyondell Chemical Company, as the Issuer


4961                                                    By:    _____
4962                                                           Name:
4963                                                           Title:


4964                                                    LyondellBasell Industries N.V., as the Company


4965                                                    By:    _____
4966                                                           Name:
4967                                                           Title:


4968                                                    [Signatures for Other Guarantors to Come]

4969                                     Wells Fargo Bank, N.A. , as Trustee


4970                           By: _____
4971                                 Name:
4972                                 Title:

4973                                                                 EXHIBIT A

4974                                    FORM OF NOTE
4975
4976                                    [Face of Note]


4977                [Insert the Global Note Legend, if applicable pursuant to the provisions of the Indenture]

4978

CUSIP: []

ISIN:]

GLOBAL NOTE

representing up to

$[_____]

11% Senior Secured Note due 2018

No. ___                                                                                      [$_____]

       LYONDELL CHEMICAL COMPANY, a Delaware corporation, promises to pay to Cede & Co., or registered assigns, the principal sum set forth on the Schedule of Increases or Decreases in Global Note attached hereto on May 1, 2018.

       Interest Payment Dates: May 1 and November 1

       Record Dates:  April 15 and October 15

       Additional provisions of this Note are set forth on the other side of this Note.

4999              IN WITNESS WHEREOF, the parties have caused this instrument to be duly executed.

5000                             LYONDELL CHEMICAL COMPANY

5001                             By: _____
5002                                 Name:
5003                                 Title:

5004        Dated: [   ], 2010

5005       This is one of the Notes referred to in the within-mentioned Indenture:

5006

5007

5008                                    Wells Fargo Bank, N.A. , as Trustee


5009                                    By:   _____

5010                                              Authorized Signatory

5011                                         [Back of Note]
5012
5013                          11% Senior Secured Note Due 2018

5014

5015              Capitalized terms used herein shall have the meanings assigned to them in the Indenture
5016   referred to below unless otherwise indicated.

5017              1.    LYONDELL CHEMICAL COMPANY, a Delaware corporation, (the "Issuer,")
5018   promises to pay interest on the principal amount of this Note at 11% per annum from [  ], 2010 until ma-
5019   turity and shall pay the Additional Interest, if any, payable pursuant to the Registration Rights Agreement
5020   referred to below.  The Issuer will pay interest and Additional Interest semi-annually in arrears on May 1
5021   and November 1 of each year, or if any such day is not a Business Day, on the next succeeding Business
5022   Day (each, an "Interest Payment Date").  Interest on the Notes will accrue from the most recent date to
5023   which interest has been paid or, if no interest has been paid, from the Issue Date; *provided* that the first
5024   Interest Payment Date shall be November 1, 2010.  The Issuer will pay interest (including post-petition
5025   interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, from
5026   time to time on demand at the interest rate on the Notes; it shall pay interest (including post-petition inter-
5027   est in any proceeding under any Bankruptcy Law) on overdue installments of interest and Additional In-
5028   terest, if any, (without regard to any applicable grace periods) from time to time on demand at the interest
5029   rate on the Notes.  Interest will be computed on the basis of a 360-day year comprised of twelve 30-day
5030   months.

5031              2.    METHOD OF PAYMENT.  The Issuer will pay interest on the Notes, if any, and
5032   Additional Interest, if any (with respect to Restricted Transfer Notes, if applicable), to the Persons who
5033   are registered holders of Notes at the close of business on the April 15 and October 15 (whether or not a
5034   Business Day), as the case may be, next preceding the Interest Payment Date, even if such Notes are can-
5035   celed after such record date and on or before such Interest Payment Date, except as provided in Section
5036   2.12 of the Indenture with respect to defaulted interest.  Payment of interest and Additional Interest, if
5037   any, may be made by check mailed to the holders at their addresses set forth in the register of holders,
5038   *provided* that payment by wire transfer of immediately available funds will be required with respect to
5039   principal of and interest , premium and Additional Interest, if any, on all Global Notes and all other Notes
5040   the holders of which shall have provided wire transfer instructions to the Issuer or the Paying Agent.
5041   Such payment shall be in such coin or currency of the United States of America as at the time of payment
5042   is legal tender for payment of public and private debts.

5043              3.    TRUSTEE; PAYING AGENT AND REGISTRAR. Wells Fargo Bank, N.A. will
5044   be the Trustee (the "Trustee") under the Indenture and will be the Collateral Agent under the Indenture
5045   and has been appointed by the Issuer as Registrar and Paying Agent with regard to the Notes (the "Paying
5046   Agent").

5047              4.    INDENTURE.  The Issuer issued the Notes under an Indenture, dated as of [  ],
5048   2010 (the "Indenture"), among Lyondell Chemical Company, LyondellBasell Industries N.V. (the "Com-
5049   pany"), the other Guarantors signatory thereto, and the Trustee.  This Note is one of a duly authorized
5050   issue of notes of the Issuer designated as its 11% Senior Secured Notes due 2018.  The Issuer shall be en-
5051   titled to issue Additional Notes pursuant to Section 2.01 of the Indenture.  The terms of the Notes include
5052   those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act
5053   of 1939, as amended (the "Trust Indenture Act").  The Notes are subject to all such terms, and holders are
5054   referred to the Indenture and the Trust Indenture Act for a statement of such terms.  To the extent any

5055  provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Inden-
5056  ture shall govern and be controlling.

5057          5.       OPTIONAL REDEMPTION.

5058          (a)      On or after May 1, 2013, the Issuer may redeem all or a part of the Notes (includ-
5059  ing any Additional Notes) upon not less than 30 nor more than 60 days' prior notice mailed by first-class
5060  mail to each holder's registered address, at a redemption price equal to 100% of the principal amount
5061  thereof plus  accrued and unpaid interest thereon, if any, to, but not including, the applicable redemption
5062  date (subject to the right of holders of record on the relevant record date to receive interest due on the
5063  relevant interest payment date).

5064          (b)      In addition, prior to May 1, 2013, the Issuer may redeem the Notes (including
5065  any Additional Notes) at its option, in whole at any time or in part from time to time, upon not less than
5066  30 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address, at a
5067  redemption price equal to 100% of the principal amount thereof plus the Applicable Premium as of and
5068  accrued and unpaid interest and Additional Interest, if any, to, but not including, the applicable redemp-
5069  tion date (subject to the right of holders of record on the relevant record date to receive interest due on the
5070  relevant interest payment date).

5071          (c)      [Intentionally Omitted.]

5072          (d)      Notwithstanding the foregoing, at any time prior to May 1, 2013, the Issuer may
5073  on any one or more occasions redeem up to 35% of the original aggregate principal amount of the Notes
5074  (including any additional Notes), at a redemption price of 111.000% of the principal amount thereof, plus
5075  accrued and unpaid interest and Additional Interest, if any, to, but not including, the applicable redemp-
5076  tion date, with the net proceeds of one or more Equity Offerings; *provided* that:

5077          (1)      at least 50% of the aggregate principal amount of the Notes originally issued un-
5078          der the Indenture (together with any additional Notes) remains outstanding immediately after the
5079          occurrence of such redemption (excluding Notes held by the Company and its Subsidiaries); and

5080          (2)      the redemption must occur within 90 days of the date of the closing of such Eq-
5081          uity Offering.

5082          6.       [Intentionally Omitted]

5083          7.       MANDATORY REDEMPTION.  The Issuer shall not be required to make man-
5084  datory redemption or sinking fund payments with respect to the Notes.

5085          8.       NOTICE OF REDEMPTION.  Notice of redemption will be mailed by first-class
5086  mail at least 30 days but not more than 60 days before the redemption date to each holder of Notes to be
5087  redeemed at his, her or its registered address.  In the case of any partial redemption, selection of the Notes
5088  for redemption will be made by the Trustee on a *pro rata* basis to the extent practicable; *provided* that no
5089  Notes of $100,000, as applicable, principal amount or less shall be redeemed in part.  The Trustee shall
5090  make the selection from outstanding Notes not previously called for redemption.  The Trustee may select
5091  for redemption portions of the principal of Notes that have denominations larger than $100,000.  Notes
5092  and portions of them the Trustee selects shall be in amounts of $100,000 (and integral multiples of
5093  $1,000).

If less than all the Notes are to be redeemed at any time in connection with an optional redemption, the Trustee will select Notes for redemption as follows:

(1)    if the Notes to be redeemed are listed, in compliance with the requirements of the principal national securities exchange on which such Notes are listed; or

(2)    if the Notes to be redeemed are not so listed, on a *pro rata* basis, by lot or by such method as the Trustee shall deem fair and appropriate.

If money sufficient to pay the redemption price of and accrued and unpaid interest on all Notes (or portions thereof) to be redeemed on the redemption date is deposited with a Paying Agent on or before the redemption date and certain other conditions are satisfied on and after such date, interest ceases to accrue on such Notes (or such portions thereof) called for redemption.

9.    REGISTRATION RIGHTS.[5]

(a)    Pursuant to a Registration Rights Agreement (as defined in the Indenture) the Issuer will be obligated to use commercially reasonable efforts to cause to be filed a shelf registration statement pursuant to Rule 415 under the Securities Act (the "Shelf Registration Statement") and such other actions as contemplated therein to permit the resale of all Notes which are Transfer Restricted Notes.

(b)    If the Shelf Registration Statement (x) does not become effective on or prior to the date that is the earlier of (1) 365 days after the Issue Date (or if such 365th day is not a Business Day, the next succeeding Business Day (as defined in the Registration Rights Agreement)) and (2) the date the Exchange Offer Registration Statement required by the First Lien Notes Registration Rights Agreement is declared effective by the United States Securities and Exchange Commission, or (y) becomes effective but thereafter ceases to be effective or the corresponding Prospectus fails to be usable for its intended purpose at any time during the Shelf Registration Period, and such failure to remain effective or usable exists for more than 60 days (whether or not consecutive) in any 12-month period (each such event referred to in the foregoing clauses (x) or (y), subject to the exceptions set forth in the Registration Rights Agreement, if any, a "Registration Default") additional interest ("Additional Interest") will accrue on the aggregate principal amount of Transfer Restricted Notes from and including the date on which any such Registration Default has occurred to but excluding the date on which all registration defaults have been cured. Additional Interest will accrue at a rate of 0.25% for the first 90-day period after the date of such Registration Default and thereafter it will be increased by an additional 0.25% for each subsequent 90-day period that elapses, provided that the aggregate increase in such annual interest rate may in no event exceed 1.00% per annum.

10.    OFFERS TO REPURCHASE.

(a)    Upon the occurrence of a Change of Control, each holder shall have the right, subject to certain conditions specified in the Indenture, to cause the Issuer to repurchase all or any part of such holder's Notes at a purchase price in cash equal to 101% of the principal amount thereof, *plus* accrued and unpaid interest and additional interest, if any, to the date of repurchase (subject to the right of the holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date), as provided in, and subject to the terms of, the Indenture.

---

[5] To be revised to conform to Registration Rights Agreement

(b)    In accordance with Section 4.06 of the Indenture, the Issuer will be required to offer to purchase Notes upon the occurrence of certain events.

11.    DENOMINATIONS, TRANSFER, EXCHANGE.    The Notes are in fully registered form only, without coupons, in denominations of $100,000 and integral multiples of $1,000.  A holder shall register the transfer or exchange of Notes in accordance with the Indenture.  The Registrar may require a holder, among other things, to furnish appropriate endorsements and transfer documents and to pay certain transfer taxes or similar governmental charges payable in connection therewith as permitted by the Indenture.  The Registrar need not register the transfer or exchange of any Notes during a period beginning 15 days before the mailing of a redemption notice for any Notes or portions thereof selected for redemption.

12.    RANKING.  The Indebtedness evidenced by the Notes will be senior third-priority secured Indebtedness of the Issuer and the Guarantors, and will rank *pari passu* in right of payment with all existing and future senior Indebtedness of the Issuer, and will be senior in right of payment to all existing and future Subordinated Indebtedness of the Issuer.  The Notes will have the benefit of (i) a third priority security interest in the Notes Collateral that will be *pari passu* in priority with all other existing and future Junior Lien Obligations with respect to all Notes Collateral and (ii) a third priority security in the ABL Facility Collateral that will be *pari passu* in priority with all other existing and future Junior Lien Obligations with respect to all ABL Facility Collateral, in each case subject to Permitted Liens and exceptions.  In addition, the Notes will be junior in priority to the Senior Term Loan Facility, the First Lien Notes, the ABL Facility and all other existing and future First and Second Priority Lien Obligations with respect to all Collateral.

13.    PERSONS DEEMED OWNERS.  The registered holder of a Note may be treated as its owner for all purposes.

14.    AMENDMENT, SUPPLEMENT AND WAIVER.  The Indenture, the Guarantees or the Notes may be amended or supplemented as provided in the Indenture.

15.    DEFAULTS AND REMEDIES.  If an Event of Default occurs (other than an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Issuer) and is continuing, the Trustee or the holders of at least 30% in principal amount of the outstanding Notes, in each case, by notice to the Issuer, may declare the principal of, premium, if any, and accrued but unpaid interest on all the Notes to be due and payable.  If an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Issuer occurs, the principal of, premium, if any, and interest on all the Notes shall become immediately due and payable without any declaration or other act on the part of the Trustee or any holders.  Under certain circumstances, the holders of a majority in principal amount of the outstanding Notes may rescind any such acceleration with respect to the Notes and its consequences.

If an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the holders unless such holders have offered to the Trustee reasonable indemnity or security against any loss, liability or expense and certain other conditions are complied with.  Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no holder may pursue any remedy with respect to the Indenture or the Notes unless (i) such holder has previously given the Trustee notice that an Event of Default is continuing, (ii) the holders of at least 30% in principal amount of the outstanding Notes have requested the Trustee in writing to pursue the remedy, (iii) such holders have offered the Trustee reasonable security and indemnity against any loss, liability or expense, (iv) the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security and  indemnity and (v) the

holders of a majority in aggregate principal amount of the outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60-day period.  Subject to certain restrictions, the holders of a majority in principal amount of the outstanding Notes are given the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee.  The Trustee, however, may refuse to follow any direction that conflicts with law or the Indenture or that the Trustee determines is unduly prejudicial to the rights of any other holder or that would involve the Trustee in personal liability or expense.  Prior to taking any action under the Indenture, the Trustee shall be entitled to reasonable indemnification satisfactory to it in its sole discretion against all losses and expenses caused by taking or not taking such action.

16.    AUTHENTICATION.  This Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose until authenticated by the manual signature of the Trustee.

17.    ADDITIONAL RIGHTS OF HOLDERS OF RESTRICTED TRANSFER NOTES.  In addition to the rights provided to holders of Notes under the Indenture, holders of Restricted Transfer Notes shall have all the rights set forth in the Registration Rights Agreement, including the right to receive Additional Interest (as defined in the Registration Rights Agreement).

18.    GOVERNING LAW.  THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN AND BE USED TO CONSTRUE THE INDENTURE, THE NOTES AND THE GUARAN-TEES.

19.    CUSIP AND ISIN NUMBERS.  Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP and ISIN numbers to be printed on the Notes and the Trustee may use CUSIP and ISIN numbers in notices of re-demption as a convenience to holders.  No representation is made as to the accuracy of such numbers ei-ther as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

The Issuer will furnish to any holder upon written request and without charge a copy of the Indenture and/or the Registration Rights Agreement.  Requests may be made to the Issuer at the fol-lowing address:

Lyondell Chemical Company
1221 McKinney St
Suite 700
Houston, TX  77010
Facsimile: (713) 652-7312
Attention: Gerald A. O'Brien

5213                                    ASSIGNMENT FORM

5214                    To assign this Note, fill in the form below:

5215    (I) or (we) assign and transfer this Note to: _____
5216                                                (Insert assignee's legal name)
5217    _____
5218                        (Insert assignee's Soc. Sec. or tax I.D. no.)
5219    _____
5220    _____
5221    _____
5222    _____
5223                    (Print or type assignee's name, address and zip code)
5224    and irrevocably appoint _____
5225    to transfer this Note on the books of the Issuer.  The agent may substitute another to act for him.

5226    Date: _____

5227                                    Your Signature: _____
5228                                                (Sign exactly as your name appears on
5229                                                the face of this Note)


5230    Signature Guarantee*: _____


5231    _____
5232    *      Participant in a recognized Signature Guarantee Medallion Program (or other
5233           signature guarantor acceptable to the Trustee).

5234                              OPTION OF HOLDER TO ELECT PURCHASE

5235              If you want to elect to have this Note purchased by the Issuer pursuant to Section 4.06 or
5236 4.08 of the Indenture, check the appropriate box below:

5237                        [  ] Section 4.06        [  ] Section 4.08

5238              If you want to elect to have only part of this Dollar Note purchased by the Issuer pursuant
5239 to Section 4.06 or Section 4.08 of the Indenture, state the amount you elect to have purchased:

5240                                $_____

5241 Date: _____

5242                                  Your Signature: _____
5243                                             (Sign exactly as your name appears on
5244                                             the face of this Note)
5245                                 Tax Identification No.: _____

5246 Signature Guarantee*: _____

5247 _____
5248             *       Participant in a recognized Signature Guarantee Medallion Program (or other
5249                          signature guarantor acceptable to the Trustee).

SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE*

The initial outstanding principal amount of this Global Note is $_____.  The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global or Definitive Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of decrease in Principal Amount | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease or increase | Signature of authorized officer of Trustee or Note Custodian |
| --- | --- | --- | --- | --- |

_____

*This schedule should be included only if the Note is issued in global form.

5260                                                                                              EXHIBIT B

5261          [FORM OF SUPPLEMENTAL INDENTURE RELATED TO SUBSIDIARY GUARANTORS]

5262          SUPPLEMENTAL INDENTURE (this "Supplemental Indenture") dated as of
5263 [          ], among [GUARANTOR] (the "New Guarantor"), a subsidiary of LYONDELLBASELL IN-
5264 DUSTRIES N.V., a public limited liability company formed under the laws of The Netherlands (or its
5265 successor) (the "Company"), LYONDELL CHEMICAL COMPANY, a Delaware corporation, (the "Is-
5266 suer"),[6] and WELLS FARGO BANK, N.A., a national banking association, as trustee under the indenture
5267 referred to below (the "Trustee").

5268                    W I T N E S S E T H :

5269          WHEREAS the Issuer and the Company and the other Guarantors signatory thereto have
5270 heretofore executed and delivered to the Trustee an indenture (as amended, supplemented or otherwise
5271 modified, the "Indenture") dated as of [  ], 2010[, as supplemented,] providing for the issuance of the Is-
5272 suer's of $3,250,000,000 aggregate principal amount of the Issuer's 11% Senior Secured Notes due 2018
5273 (the "Notes");

5274          WHEREAS Section 4.11 of the Indenture provides that under certain circumstances the
5275 Issuer is required to cause the New Guarantor to execute and deliver to the Trustee a supplemental inden-
5276 ture pursuant to which the New Guarantor shall unconditionally guarantee all the Issuer's Obligations
5277 under the Notes and the Indenture pursuant to a Guarantee on the terms and conditions set forth herein;
5278 and

5279          WHEREAS pursuant to Section 9.01 of the Indenture, the Trustee, the Issuer, the Com-
5280 pany and other existing Guarantors, if any, are authorized to execute and deliver this Supplemental Inden-
5281 ture;

5282          NOW THEREFORE, in consideration of the foregoing and for other good and valuable
5283 consideration, the receipt of which is hereby acknowledged, the New Guarantor, the Company, the Issuer
5284 and the Trustee mutually covenant and agree for the equal and ratable benefit of the holders of the Notes
5285 as follows:

5286          1.      Defined Terms.  As used in this Supplemental Indenture, terms defined in the In-
5287 denture or in the preamble or recital hereto are used herein as therein defined, except that the term
5288 "holders" in this Supplemental Indenture shall refer to the term "holders" as defined in the Inden-
5289 ture and the Trustee acting on behalf of and for the benefit of such holders.  The words "herein,"
5290 "hereof" and "hereby" and other words of similar import used in this Supplemental Indenture re-
5291 fer to this Supplemental Indenture as a whole and not to any particular section hereof.

5292          2.      Agreement to Guarantee.  The New Guarantor hereby agrees, jointly and sever-
5293 ally with all existing guarantors (if any), to unconditionally guarantee the Issuer's Obligations
5294 under the Notes and the Indenture on the terms and subject to the conditions set forth in Article

---

[6]    Delete this reference if supplemental indenture Exhibit E is signed prior to signing of this Sup-
plemental Indenture.

XII of the Indenture and to be bound by all other applicable provisions of the Indenture and the Notes and to perform all of the obligations and agreements of a guarantor under the Indenture.

3.    <u>Notices</u>.  All notices or other communications to the New Guarantor shall be given as provided in Section 13.02 of the Indenture.

4.    <u>Ratification of Indenture; Supplemental Indentures Part of Indenture</u>.  Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect.  This Supplemental Indenture shall form a part of the Indenture for all purposes, and every holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby.

5.    <u>Governing Law</u>.  **THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.**

6.    <u>Trustee Makes No Representation</u>.  The Trustee makes no representation as to the validity or sufficiency of this Supplemental Indenture.

7.    <u>Counterparts</u>.  The parties may sign any number of copies of this Supplemental Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.

8.    <u>Effect of Headings</u>.  The Section headings herein are for convenience only and shall not effect the construction thereof.

5315    IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to
5316  be duly executed as of the date first above written.

5317                                          [NEW GUARANTOR]


5318                                  By:    _____
5319                                          Name:
5320                                          Title:


5321                                          WELLS FARGO BANK, N.A.
5322                                          as Trustee


5323                                  By:    _____
5324                                          Name:
5325                                          Title: