**TAB 13**

# DRAFT DESCRIPTION OF 2014 NOTES[1]

**General**

In this Description of 2014 Notes, (i) the term "*the Company*" refers only to LyondellBasell Industries N.V. and (ii) the term "Issuer" refers only to Lyondell Chemical Company, an indirect subsidiary of the Company. Additionally, the term "Guarantors" refers to any Person (other than the Issuer) that executes the Indenture relating to the Notes or who executes a supplemental indenture in which such Person agrees to be bound by the terms of the Indenture as a guarantor, as more fully described under "—The Guarantees."

The Issuer will issue the Notes under the Indenture, pursuant to the Reorganization Plan if the Class of DIP Roll-Up Claims votes against the Reorganization Plan. The terms of the Notes will be included in the Indenture.

The following summary of certain provisions of the Indenture, the Notes, the Security Documents and the Junior Lien Intercreditor Agreement does not purport to be complete and is subject to, and is qualified in its entirety by reference to, all the provisions of those agreements, including the definitions of certain terms therein and those terms made a part thereof by the TIA. Capitalized terms used in this "Description of 2014 Notes" and not otherwise defined have the meanings set forth under "—Certain Definitions."

The Issuer will issue Notes with an initial aggregate principal amount of $[  ].[2] The Issuer may issue additional Notes from time to time after this offering. Any offering of additional Notes is subject to the covenants described under "—Certain Covenants—Limitation on Incurrence of Indebtedness Secured by Prior or Equal and Ratable Liens" and "—Certain Covenants—Limitation on Liens." The Notes and any additional Notes subsequently issued under the Indenture may, at our election, be treated as a single class for all purposes under the Indenture, including, without limitation, waivers, amendments, redemptions and offers to purchase. Unless the context otherwise requires, for all purposes of the Indenture and this "Description of 2014 Notes," references to the Notes include any additional Notes actually issued. There can be no assurances, however, that any additional Notes subsequently issued under the Indenture will be treated as fungible with the Notes of the relevant series for United States federal income tax purposes or under the laws of any other jurisdiction.

Principal of, premium, if any, and interest on the Notes will be payable, and the Notes may be exchanged or transferred, at the office or agency designated by the Issuer (which initially will be the principal corporate trust office of [TBD], as Paying Agent).

The Notes will be issued by the Issuer in denominations of $100,000 and integral multiples of $1,000, respectively, in excess thereof.

**Terms of the Notes**

The Notes will be senior Obligations of the Issuer, will have the benefit of the third priority security interest in the Notes Collateral and third priority security interest in the ABL Facility Collateral described under "—Security" and will mature on December 15, 2014. Each Note will bear interest at a rate equal to the lowest interest rate possible in compliance with Section 1129(b) of the Bankruptcy Code. Each Note will bear interest from the Issue Date or from the most recent date to which interest has been paid or provided for, payable semiannually to holders of record at the close of business on the April 15 or October 15 immediately preceding the interest payment date on [     ] 1 and [ ] 1 of each year, commencing [   ], 2010.

The Notes will be secured by liens on the Notes Collateral and the ABL Facility Collateral described under "—Security."

**Redemption**

*Optional Redemption*

The Issuer may redeem the Notes (including any additional Notes) at its option, in whole at any time or in part from time to time, upon not less than 10 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address, at a redemption price equal to 100% of the principal amount thereof plus the accrued and unpaid interest to, but not including, the applicable redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date).

---

[1] In the event of any discrepancy between this Draft Description of 2014 Notes and the 2014 Indenture, this Draft Description of 2014 Notes will control.  The 2014 Notes are the "Cram Down Notes" as defined in the Reorganization Plan.

[2] Principal amount of Claims of holders of DIP Roll-Up Loans who vote against the Plan.

Any notice of redemption may be given prior to the completion of any event or transaction related to such redemption, and any such redemption or notice may, at the Issuer's discretion, be subject to one or more conditions precedent, including in the case of any Equity Offering, completion of such Equity Offering. In addition, if such redemption or notice is subject to satisfaction of one or more conditions precedent, such notice shall state that, in the Issuer's discretion, the redemption date may be delayed until such time as any or all such conditions shall be satisfied, or such redemption may not occur and such notice may be rescinded in the event that any or all such conditions shall not have been satisfied by the redemption date, or by the redemption date so delayed.

## Selection

Selection of Notes for redemption will be made by the Trustee on a *pro rata* basis to the extent practicable; *provided* that no Notes of $100,000, principal amount or less shall be redeemed in part. If any Note is to be redeemed in part only, the notice of redemption relating to such Note shall state the portion of the principal amount thereof to be redeemed. A new Note in principal amount equal to the unredeemed portion thereof will be issued in the name of the holder thereof upon cancellation of the original Note. On and after the redemption date, interest will cease to accrue on Notes or portions thereof called for redemption so long as the Issuer has deposited with the Paying Agent funds sufficient to pay the principal of, plus accrued and unpaid interest and additional interest (if any) on, the Notes to be redeemed.

If less than all the Notes are to be redeemed at any time in connection with an optional redemption, the Trustee will select Notes for redemption as follows:

if the Notes to be redeemed are listed, in compliance with the requirements of the principal national securities exchange on which such Notes are listed; or

if the Notes to be redeemed are not so listed, on a *pro rata* basis, by lot or by such method as the Trustee shall deem fair and appropriate.

## Offers to Purchase; Open Market Purchases

The Issuer will not be required to make any mandatory redemption or sinking fund payments with respect to the Notes.

The Company, its Subsidiaries or any Affiliates of the Company may at any time and from time to time purchase Notes in the open market or otherwise.

## Ranking

The Indebtedness evidenced by the Notes will be senior third-priority Indebtedness of the Issuer and the Guarantors, and will rank *pari passu* in right of payment with all existing and future senior Indebtedness of the Issuer and will be senior in right of payment to all existing and future Subordinated Indebtedness of the Issuer. After the Issue Date, the Notes will have the benefit of (i) a third priority security interest in the Notes Collateral that will be *pari passu* in priority with all other existing and future Third Priority Lien Obligations, including the New Third Lien Notes, with respect to all Notes Collateral, (ii) a third priority security in the ABL Facility Collateral that will be *pari passu* in priority with all other existing and future Third Priority Lien Obligations, including the New Third Lien Notes, in each case subject to Permitted Liens and exceptions described under "—Security—General." In addition, after the Issue Date, the Notes will be junior in priority to the Senior Term Loan Facility, the First Lien Notes, the ABL Facility and all other existing and future First and Second Priority Lien Obligations with respect to all Collateral.

## The Guarantees

### *The Guarantors*

The Company, each existing and subsequently acquired or organized direct or indirect Wholly Owned Domestic Subsidiary of the Company (other than any Excluded Subsidiary (each such entity, a "*Guarantor*") will irrevocably and unconditionally guarantee on a senior third-priority basis the performance and punctual payment when due, whether at Stated Maturity, by acceleration or otherwise, of all Obligations of the Issuer under the Indenture and the Notes (the "*Guarantee*"). Such Guarantors will agree that they will pay principal of, premium, if any, interest and additional interest, if any, on the Notes, expenses, indemnification or otherwise. Such Guarantors will agree to pay, in addition to the amounts stated above, any and all expenses (including reasonable counsel fees and expenses) incurred by the Trustee or the holders in enforcing any rights under the Guarantees.

The Guarantees of the Notes will be:

senior third-priority secured Obligations of the Guarantors; and

equal in right of payment to all existing and future unsubordinated Indebtedness of the Guarantors.

The Obligations of any Guarantor, including the Company, under its Guarantee of the Notes will be automatically and unconditionally released and discharged when any of the following occurs:

(1)  upon the full and final payment by or on behalf of the Issuer of all of its Obligations under the Indenture and the Notes;

(2)  except with respect to the Guarantee of the Company, any issuance, sale, exchange, transfer or other disposition (including, without limitation, by way of acquisition, merger, amalgamation, consolidation, transfer, conveyance or otherwise), directly or indirectly, of Capital Stock of such Guarantor (or any parent of such Guarantor) to any Person that is not a Restricted Subsidiary of the Company that results in such Guarantor ceasing to be a Restricted Subsidiary of the Company; *provided* that such issuance, sale, exchange, transfer or other disposition is made in accordance with the provisions of the Indenture;

(3)  except with respect to the Guarantee of the Company, the designation of such Guarantor as an Unrestricted Subsidiary in accordance with the provisions of the Indenture;

(4)  except with respect to the Guarantee of the Company, upon the liquidation or dissolution of such Guarantor; *provided* that no Default or Event of Default has occurred or is continuing or would be caused thereby;

(5)  except for the guarantee by the Company, the occurrence of legal defeasance or covenant defeasance in accordance with the Indenture;

(6)  except for Guarantee by the Company and for those limitations described in the following paragraph, in the event that the continued Obligation of such Guarantor under its Guarantee or the continued existence of such Guarantee will result in a violation of applicable law that cannot be avoided or otherwise prevented through measures reasonably available to the Company or such Guarantor; *provided* that all guarantees, if any, of all other First Priority Lien Obligations by such Guarantor are also released; or

(7)  upon such Guarantor being designated as an Excluded Subsidiary in compliance with the Indenture and the Company gives written notice of such release to the Trustee.

In addition to the initial Guarantors, other Domestic Subsidiaries may become Guarantors after the Issue Date, as provided in the Indenture. The Obligations of the Guarantors under their Guarantees will be limited as necessary to recognize certain defenses generally available to guarantors (including those that relate to fraudulent conveyance or transfer, voidable preference, financial assistance, corporate purpose, capital maintenance or similar laws, regulations or defenses affecting the rights of creditors generally) or other considerations under applicable law.

### *Withholding Taxes*

All payments made under or with respect to the Notes and the Guarantees by (i) the Issuer, (ii) the Company or (iii) any entity that becomes a successor of the Issuer or the Company that is organized in a jurisdiction other than the United States, any state thereof or the District of Columbia as a result of a merger of or other transaction permitted by provisions of the Indenture (each such person, a "*Payor*") will be made free and clear of and without withholding or deduction for or on account of any present or future tax, duty, levy, impost, assessment or other governmental charge (including, without limitation, penalties, interest and other similar liabilities related thereto) of whatever nature (collectively, "*Taxes*") imposed or levied by or on behalf of any jurisdiction in which any Payor is organized, resident or doing business for tax purposes or from or through which any Payor makes any payment on the Notes or its Guarantee or any department or political subdivision thereof (each, a "*Relevant Taxing Jurisdiction*"), unless such Payor is required to withhold or deduct Taxes by law. If any Payor is required by law to withhold or deduct any amount for or on account of Taxes of a Relevant Taxing Jurisdiction from any payment made under or with respect to the Notes or such Guarantee, the Payor shall make all such deductions and withholdings in respect of Taxes, and shall pay the full amount deducted or withheld in respect of Taxes to the relevant taxation authority or other governmental authority in accordance with the applicable requirements of law.  If any Payor is so required by law to withhold or deduct, such Payor shall not be obligated to pay any additional amounts in respect of such withholding or deduction on account of Taxes to the holders of the Notes.

### Security

### *General*

The Notes and the Guarantees will be secured by third priority security interests in the Notes Collateral and by third priority security interests in the ABL Facility Collateral, in each case subject to Permitted Liens and on a *pari passu* basis with the Third Priority Lien Obligations, including the New Third Lien Notes.  The First Lien Notes and the Senior Term Loan Facility will be secured by first priority security interests in the Notes Collateral and second priority security interests in the ABL Facility Collateral. The ABL Facility will be secured by first priority security interests in the ABL Facility Collateral and second priority security interests in the Notes Collateral.

The "*Notes Collateral*" will consist of substantially all the present and after-acquired assets of the Issuer and the Pledgors, including, without limitation, the following property: all accounts receivable and inventory (other than the ABL Facility Collateral), equipment, general intangibles, investment property, intellectual property, Owned Real Property (subject to clause (i) of the definition of "Excluded Assets" as described below), 65% of the voting Capital Stock and 100% of the non-voting Capital Stock of all first-tier Foreign Subsidiaries of the Issuer and 100% of the Capital Stock of all Domestic Subsidiaries of the Issuer and each Pledgor, intercompany notes and proceeds of the foregoing of the Issuer and each Pledgor and 65% of the voting Capital Stock of all first-tier Foreign Subsidiaries of the Company and 100% of the non-voting Capital Stock of all first-tier Foreign Subsidiaries of the Company and 100% of the Capital Stock of all Domestic Subsidiaries of the Company, including the Issuer.

The Notes Collateral will not include, subject to certain exceptions, (i) any fee-Owned Real Property with a value of less than $25.0 million and all leasehold interests (other than interest in ground leases agreed on the Issue Date), (ii) motor vehicles and other assets subject to certificates of title, letter of credit rights and commercial tort claims, (iii) assets specifically requiring perfection through control agreements (i.e., cash, deposit accounts or other bank or securities accounts, etc.), (iv) the Capital Stock of any Joint Venture, or of any special purpose subsidiary whose material assets are comprised solely of the Capital Stock of such Joint Venture, where the pledge of such Capital Stock would be prohibited by any applicable contractual requirement pertaining to such Joint Venture, (v) the ABL Facility Collateral, (vi) preferred stock issued in connection with a Structured Finance Transaction that is (x) on the Issue Date is subject to an existing Lien on the Issue Date or (y) prohibited from being pledged, and (vii) certain other exceptions described in the Security Documents (all such excluded assets referred to as "*Excluded Assets*").

In addition, to the extent that Rule 3-16 of Regulation S-X under the Securities Act requires or would require (or is replaced with another rule or regulation, or any other law, rule or regulation is adopted, that would require) the filing with the SEC (or any other governmental agency) of separate financial statements of any Subsidiary of the Company due to the fact that such Subsidiary's Capital Stock secures the Notes or any First Priority Lien Obligation, Second Priority Lien Obligation or Third Priority Lien Obligation, then the Capital Stock of such Subsidiary will automatically be deemed not to be part of the Notes Collateral securing the Notes but only to the extent necessary to not be subject to such requirement and only for so long as required to not be subject to such requirement (such requirement, the "*3-16 Exemption*"); *provided* that the 3-16 Exemption will not apply to the capital stock of the Issuer and LyondellBasell Subholdings, B.V. In such event, the Security Documents may be amended or modified, without the consent of any holder of such Notes, to the extent necessary to release the security interests in favor of the Collateral Agent on the shares of Capital Stock of such Subsidiary that are so deemed to no longer constitute part of the Notes Collateral. In the event that Rule 3-16 of Regulation S-X under the Securities Act is amended, modified or interpreted by the SEC to permit (or is replaced with another rule or regulation, or any other law, rule or regulation is adopted, that would permit) such Subsidiary's Capital Stock to secure the Notes in excess of the amount then pledged without the filing with the SEC (or any other governmental agency) of separate financial statements of such Subsidiary, then the Capital Stock of such Subsidiary will automatically be deemed to be a part of the Notes Collateral.

The "*ABL Facility Collateral*" will consist of all present and after-acquired inventory, accounts receivable, related contracts and other rights, deposit accounts into which proceeds of the foregoing are credited and books and records related thereto, together with all proceeds of the foregoing, in each case to the extent of the rights, title and interest therein of any "Borrower" under the ABL Facility.

In connection with any enforcement action with respect to the Notes Collateral or any Insolvency or Liquidation Proceeding, all proceeds of the Notes Collateral (after paying the fees and expenses of the First Lien Notes Collateral Agent, Escrow Agent, Senior Term Loan Collateral Agent, First Lien Paying Agent and First Lien Trustee and any expenses of selling or otherwise foreclosing on the Notes Collateral) will be applied *pro rata* to the repayment of the Obligations under the First Lien Notes and the other then outstanding First and Second Priority Lien Obligations. In connection with any enforcement action with respect to the ABL Facility Collateral or any Insolvency or Liquidation Proceeding, all proceeds of the ABL Facility Collateral (after paying the fees and expenses of the ABL Collateral Agent and any expenses of selling or otherwise foreclosing on such collateral) will be applied to the repayment of the Obligations under the ABL Facility, with any excess proceeds of such enforcement action applied to the repayment of the Obligations under the First Lien Notes and the other then outstanding First and Second Priority Lien Obligations on a *pro rata* basis after payment of all fees and expenses of the First Lien Notes Collateral Agent, Senior Term Loan Collateral Agent, Escrow Agent, First Lien Paying Agent and First Lien Trustee. In connection with any enforcement action with respect to the Notes Collateral, the ABL Collateral or any Insolvency or Liquidation Proceeding, any remaining proceeds of the Notes Collateral and/or the ABL Collateral, as the case may be, after payment of the fees and expenses and repayment of the Obligations as set forth in the previous two sentences, will be applied *pro rata* to the repayment of the Notes Obligations and the other then outstanding Third Priority Lien Obligations, including the Obligations in respect of the New Third Lien Notes. The Company, the Issuer and the Pledgors will be able to Incur additional Indebtedness in the future that could share in the Collateral, including Additional First and Second Priority Lien Obligations. The amount of such First and Second Priority Lien Obligations and additional Indebtedness is limited by the covenants described under "—Certain Covenants—Limitation on Liens", "—Certain Covenants—Limitation on Incurrence of Indebtedness Secured by Prior or Equal and Ratable Liens" and "—Certain Covenants—Limitation on Sale/Leaseback Transactions." Under certain circumstances, the amount of such Additional First and Second Priority Lien Obligations and additional Indebtedness could be significant.

*After-Acquired Collateral*

Subject to certain limitations and exceptions (including the 3-16 Exemption and the Excluded Assets limitations and exception and subject to Permitted Liens), if any of the Issuer, the Company or any Pledgor creates any additional security interest upon any property or asset that would constitute Notes Collateral to secure any First Priority Lien Obligations (which include Obligations in respect of Secured Credit Facility Indebtedness), it must concurrently grant (i) a first priority security interest (subject to Permitted Liens) upon such property as security for the First Lien Notes and the Senior Term Loan Facility, (ii) a second priority security interest upon such property as security for the ABL Facility and (iii) a third priority security interest upon such property as security for the Notes and the New Third Lien Notes. In addition, if granting a security interest in such property requires the consent of a third party, the Company will use commercially reasonable efforts to obtain such consent (i) with respect to the first priority security interest for the benefit of the First Lien Notes Collateral Agent on behalf of the holders of the First Lien Notes and for the benefit of the Senior Term Loan Collateral Agent on behalf of the lenders under the Senior Term Loan Facility, (ii) with respect to the second priority security interest for the benefit of the ABL Collateral Agent on behalf of the lenders under the ABL Facility and (iii) with respect to the third priority security interest for the benefit of the Trustee in respect of the Notes on behalf of the holders of the Notes and for the benefit of the Third Lien Trustee on behalf of the holders of the New Third Lien Notes. If such third party does not consent to the granting of the third priority security interest after the use of such commercially reasonable efforts, the applicable entity will not be required to provide such security interest. The Issuer, the Company and the Pledgors will also ensure that third priority security interests are maintained as security for the Notes in any ABL Facility Collateral pledged to secure the ABL Facility.

*Security Documents*

The Company, the Issuer, the Pledgors, the Trustee and the Collateral Agent will enter into a collateral agreement (as amended, supplemented, modified, extended, restructured, renewed, restated or replaced in whole or in part from time to time, the "*Collateral Agreement*") establishing the terms of the security interests and Liens that secure the Notes. These security interests will secure the payment and performance when due of all of the Obligations of the Issuer under the Notes and the Indenture and the Guarantors under the Guarantee, as provided in the Security Documents.

Subject to the terms of the Security Documents, the Company, the Issuer and the Pledgors will have the right to remain in possession and retain exclusive control of the Notes Collateral (other than any cash, securities, Obligations and Cash Equivalents constituting part of the Notes Collateral and deposited with the administrative agent under the Senior Term Loan Facility in accordance with the provisions of the Security Documents and other than as set forth in the Security Documents), to freely operate the Notes Collateral and to collect, invest and dispose of any income therefrom.

*Junior Lien Intercreditor Agreement*

On the Issue Date, the First Lien Notes Collateral Agent, on its own behalf and on behalf of the First Lien Secured Parties under the First Lien Indenture, the Senior Term Loan Collateral Agent, on its own behalf and on behalf of the First Lien Secured Parties under the Senior Term Loan Facility, the ABL Collateral Agent, on its own behalf and on behalf of the administrative agent and lenders under the ABL Facility and the Plan Roll-Up Notes Trustee, on behalf of the holders of the Third Priority Lien Obligations and the trustees, collateral agents and Authorized Representatives thereof (the Plan Roll-Up Notes Trustee, together with the First Lien Notes Collateral Agent, the Senior Term Loan Collateral Agent and the ABL Collateral Agent, the "*Applicable Collateral Agents*"), the Company, the Issuer and the Pledgors will enter into an intercreditor agreement (the "*Junior Lien Intercreditor Agreement*") that sets forth the relative priority of the Liens securing any First Priority Lien Obligations, the Liens securing the ABL Obligations and the Liens securing any Third Priority Lien Obligations, including the Plan Roll-Up Notes (collectively, the "*Applicable Obligations*"). Although the holders of First Priority Lien Obligations, ABL Obligations and Third Priority Lien Obligations will not be party to the Junior Lien Intercreditor Agreement, by their acceptance of the First Lien Notes, the loans under the Senior Term Loan Facility, the loans under the ABL Facility or the Plan Roll-Up Notes, respectively, each will agree to be bound thereby. In addition, the Junior Lien Intercreditor Agreement will provide that it may be amended from time to time without the consent of the holders of the First Lien Notes to add Additional First Lien Secured Parties with respect to Additional First Priority Lien Obligations and/or additional secured parties with respect to Additional Third Priority Lien Obligations, and the Third Lien Intercreditor Agreement will provide that it may be amended from time to time without the consent of the holders of the Plan Roll-Up Notes to add additional secured parties with respect to Additional Third Priority Lien Obligations in each case to the extent permitted to be Incurred under the First Lien Indenture, the Senior Term Loan Facility, the ABL Facility and the Plan Roll-Up Notes Indentures.

The Junior Lien Intercreditor Agreement will provide, among other things:

*Lien Priority*. Notwithstanding the time, order or method of grant, creation, attachment or perfection of any Liens securing any ABL Obligations (the "*ABL Facility Liens*"), the Liens securing any First Priority Lien Obligations (the "*First Priority Obligation Liens*") or the Liens securing any Third Priority Lien Obligation (the "*Junior Priority Liens*") or the enforceability of any such Liens or Obligations, (1) the ABL Facility Liens on the ABL Facility Collateral will rank senior to any First Priority Obligation Liens or Junior Priority Liens on the ABL Facility Collateral, (2) the First Priority Obligation Liens on the Notes Collateral will rank senior to any ABL Facility Liens or Junior Priority Liens on the Notes Collateral, (3) the ABL

Facility Liens on the Notes Collateral will rank senior to any Junior Priority Liens on the Notes Collateral, (4) the First Priority Obligation Liens on the ABL Facility Collateral will rank senior to any Junior Priority Liens on the ABL Facility Collateral and (5) the Junior Priority Liens on all Collateral will rank junior to the ABL Facility Liens on all Collateral and the First Priority Obligation Liens on all Collateral.

*Prohibition on Contesting Liens and Obligations.* No Applicable Collateral Agent or holder of any Applicable Obligation may contest or support any other person in contesting the validity or enforceability of the Liens of any other Applicable Collateral Agent or holder of any other class of Applicable Obligations.

*Similar Liens.* So long as there are at least two classes of Applicable Obligations outstanding, neither the Company nor any Guarantor will grant any Lien to secure any class of Applicable Obligations unless the Company or such Guarantor has granted a Lien to secure each other class of then outstanding Applicable Obligations; *provided* that (i) the Company may secure obligations under the Plan Roll-Up Notes with Liens on certain European assets of the Company and its Restricted Subsidiaries to the extent permitted by the Senior Term Loan Facility, the ABL Facility and the Plan Roll-Up Notes Indentures, without granting a Lien on such European assets to secure the ABL Obligations or any First Priority Lien Obligations and (ii) the foregoing provisions shall not be deemed violated by virtue of the operation of the 3-16 Exemption with respect to the First Lien Notes or the Plan Roll-Up Notes. Any proceeds from any Lien granted in contravention of the foregoing will be subject to distribution in accordance with "—Application of Proceeds and Turn-Over Provisions" below.

*Exercise of Remedies and Release of Liens with Respect to ABL Facility Collateral.* Subject to the provisions described below under "—Standstill Period," the ABL Collateral Agents will have the sole power to exercise remedies against the ABL Facility Collateral (subject to the right of any First Lien Collateral Agent and the Plan Roll-Up Notes Trustee to take limited protective measures with respect to the First Priority Obligation Liens and the Junior Priority Liens, respectively, and to take certain actions that would be permitted to be taken by unsecured creditors) and to foreclose upon and dispose of the ABL Facility Collateral. Subject to the provisions described below under "—Standstill Period," after the Discharge of ABL Obligations, if any First Priority Lien Obligations remain outstanding, the First Lien Collateral Agents will have the sole power to exercise remedies against the ABL Facility Collateral (subject to the right of the Plan Roll-Up Notes Trustee to take limited protective measures with respect to the Junior Priority Liens and to take certain actions that would be permitted to be taken by unsecured creditors) and to foreclose upon and dispose of the ABL Facility Collateral. After the Discharge of First Priority Lien Obligations, the Plan Roll-Up Notes Trustee shall be permitted to exercise remedies against the ABL Collateral. The Applicable Collateral Agent that is then entitled to exercise remedies against the ABL Facility Collateral pursuant to the three prior sentences shall be referred to as the "*Authorized ABL Collateral Agent*" and each other Applicable Collateral Agent at such time shall be referred to as the "*Non-Authorized ABL Collateral Agent.*" Upon any sale of any ABL Facility Collateral in connection with any enforcement action consented to by the Authorized ABL Collateral Agent, which results in the release of the Liens of such Authorized ABL Collateral Agent on such item of ABL Facility Collateral, the Liens of each other class of Applicable Obligations on such item of ABL Facility Collateral will be automatically released.

*Exercise of Remedies and Release of Liens with Respect to Notes Collateral.* Subject to the provisions described below under "—Standstill Period," the First Lien Collateral Agents (subject to the terms of the First Lien Intercreditor Agreement) will have the sole power to exercise remedies against the Notes Collateral (subject to the right of the ABL Collateral Agent and the Plan Roll-Up Notes Trustee to take limited protective measures with respect to the ABL Facility Liens and the Junior Priority Liens, respectively, and to take certain actions that would be permitted to be taken by unsecured creditors) and to foreclose upon and dispose of the Notes Collateral. Subject to the provisions described below under "—Standstill Period," after the Discharge of First Priority Lien Obligations, if any ABL Obligations remain outstanding, the ABL Collateral Agent will have the sole power to exercise remedies against the Notes Collateral (subject to the right of the Plan Roll-Up Notes Trustee to take limited protective measures with respect to the Junior Priority Liens and to take certain actions that would be permitted to be taken by unsecured creditors) and to foreclose upon and dispose of the Notes Collateral. After the Discharge of ABL Obligations, the Plan Roll-Up Notes Trustee shall be permitted to exercise remedies against the Notes Collateral. The Applicable Collateral Agent that is then entitled to exercise remedies against the Notes Collateral pursuant to the three prior sentences shall be referred to as the "*Authorized Notes Collateral Agent*" and each other Applicable Collateral Agent at such time shall be referred to as the "*Non-Authorized Notes Collateral Agent.*" Upon any sale of any Notes Collateral in connection with any enforcement action consented to by the Authorized Notes Collateral Agent, which results in the release of the Liens of such Authorized Notes Collateral Agent on such item of Notes Collateral, the Liens of each other class of Applicable Obligations on such item of Notes Collateral will be automatically released.

*Application of Proceeds and Turn-Over Provisions.* In connection with any enforcement action with respect to the Collateral or including in respect of any Insolvency or Liquidation Proceeding, (x) (1) all proceeds of ABL Facility Collateral will first be applied to the repayment of all ABL Obligations, before being applied to any First Priority Lien Obligations or any Third Priority Lien Obligations; (2) after the Discharge of ABL Obligations, if any First Priority Lien Obligations remain outstanding, all proceeds of ABL Facility Collateral will first be applied to the repayment of any outstanding First Priority Lien Obligations in accordance with the First Lien Intercreditor Agreement, before being applied to any Third Priority Lien Obligations; and (3) after the Discharge of First Priority Lien Obligations, all proceeds of ABL Facility Collateral will be

applied to the repayment of Third Priority Lien Obligations (the class of Applicable Obligations that is then entitled to receive the proceeds of ABL Facility Collateral pursuant to the foregoing shall be referred to as the "*Authorized ABL Class of Obligations*" and each class of Applicable Obligations that is then not entitled to receive proceeds of ABL Facility Collateral pursuant to the foregoing shall be referred to as a "*Non-Authorized ABL Class of Obligations*"); and (y)(1) all proceeds of Notes Collateral shall be applied to First Priority Lien Obligations in accordance with the First Lien Intercreditor Agreement, before being applied to ABL Obligations or any Third Priority Lien Obligations; (2) after the Discharge of First Priority Lien Obligations, if any ABL Obligations remain outstanding, all proceeds of Notes Collateral will first be applied to the repayment of any outstanding ABL Obligations, before being applied to any Third Priority Lien Obligations; and (3) after the Discharge of ABL Obligations, all proceeds of Notes Collateral will be applied to the repayment of Third Priority Lien Obligations (the class of Applicable Obligations that is then entitled to receive the proceeds of Notes Collateral pursuant to the foregoing shall be referred to as the "*Authorized Notes Class of Obligations*" and each class of Applicable Obligations that is not then entitled to receive proceeds of Notes Collateral pursuant to the foregoing shall be referred to as a "*Non-Authorized Notes Class of Obligations*"). If any holder of any Applicable Obligations or if any Applicable Collateral Agent receives any proceeds of Collateral in contravention of the foregoing, such proceeds will be turned over to the Applicable Collateral Agent entitled to receive such proceeds pursuant to the prior sentence, for application in accordance with the prior sentence.

*Amendment and Refinancings.* The ABL Obligations, the First Priority Lien Obligations and the Third Priority Lien Obligations may be amended or refinanced subject to continuing rights of the holders of such refinancing Indebtedness under the Junior Lien Intercreditor Agreement.

*Certain Matters in Connection with Liquidation and Insolvency Proceedings.*

*Debtor-in-Possession Financings with Respect to ABL Facility Collateral.* In connection with any Insolvency or Liquidation Proceeding of the Company, the Issuer or any Pledgor, in the case of the ABL Facility Collateral, (x) the Authorized ABL Collateral Agents may consent to certain debtor-in-possession financings secured by a Lien on the ABL Facility Collateral ranking prior to the Liens of the Non-Authorized ABL Collateral Agents on the ABL Facility Collateral or to the use of cash collateral constituting proceeds of the ABL Facility Collateral without the consent of any holder of any Non-Authorized ABL Class of Obligations or any other Non-Authorized ABL Collateral Agent, and none of the holders of any Non-Authorized ABL Class of Obligations or any other Non-Authorized ABL Collateral Agent shall be entitled to object to such use of cash collateral or debtor-in-possession financing or to seek "adequate protection" in connection therewith (other than in the form of a junior lien in accordance with the terms of the Junior Lien Intercreditor Agreement on any additional items of collateral for the Authorized ABL Class of Obligations which are granted in connection with such debtor-in-possession financing or use of cash collateral).

*Debtor-in-Possession Financings with Respect to Notes Collateral.* In connection with any Insolvency or Liquidation Proceeding of the Company, the Issuer or any Pledgor, in the case of the Notes Collateral, the Authorized Notes Collateral Agent may consent to certain debtor-in-possession financings secured by a Lien on the Notes Collateral ranking prior to the Liens of the Non-Authorized Notes Collateral Agents on the Notes Collateral or to the use of cash collateral constituting proceeds of the Notes Collateral without the consent of any holder of any Non-Authorized Notes Class of Obligations or any other Non-Authorized Notes Collateral Agent, and none of the holders of any Non-Authorized Notes Class of Obligations or any other Non-Authorized Notes Collateral Agent shall be entitled to object to such use of cash collateral or debtor-in-possession financing or to seek "adequate protection" in connection therewith (other than in the form of a junior lien in accordance with the terms of the Junior Lien Intercreditor Agreement on any additional items of collateral for the Authorized Notes Class of Obligations which are granted in connection with such debtor-in-possession financing or use of cash collateral).

*Relief from Automatic Stay; Bankruptcy Sales and Post-Petition Interest with Respect to ABL Facility Collateral.* In the case of ABL Facility Collateral, none of the holders of any Non-Authorized ABL Class of Obligations nor any Non-Authorized ABL Collateral Agent may (A) seek relief from the automatic stay with respect to any ABL Facility Collateral, (B) object to any sale of any ABL Facility Collateral in any Insolvency or Liquidation Proceeding which has been consented to by the Authorized ABL Collateral Agent or (C) object to any claim of any holder of any Authorized Class of ABL Obligations or Authorized ABL Collateral Agent to post-petition interest, fees or expenses to the extent of the value of the ABL Facility Collateral, such value to be determined without regard to the existence of the ABL Liens securing any other Non-Authorized ABL Class of Obligations.

*Relief from Automatic Stay; Bankruptcy Sales and Post-Petition Interest with Respect to Notes Collateral.* In the case of Notes Collateral, none of the holders of any Non-Authorized Notes Class of Obligations nor any Non-Authorized Notes Collateral Agent may (A) seek relief from the automatic stay with respect to any Notes Collateral, (B) object to any sale of any Notes Collateral in any Insolvency or Liquidation Proceeding which has been consented to by the Authorized Notes Collateral Agent or (C) object to any claim of any holder of any Authorized Class of First Lien Notes Obligations or Authorized Notes Collateral Agent to post-petition interest, fees or expenses

to the extent of the value of the Notes Collateral, such value to be determined without regard to the existence of the First Priority Liens securing any other Non-Authorized Notes Class of Obligations.

*Adequate Protection*. None of any holder of Applicable Obligations nor any Applicable Collateral Agent may, except as expressly provided above, seek adequate protection on account of its Lien on ABL Facility Collateral other than in the form of junior priority liens; *provided*, *however*, that the holders of the Authorized ABL Class of Obligations and the Authorized ABL Collateral Agent may seek adequate protection with respect to the ABL Facility Collateral and the holders of the Authorized Notes Class of Obligations and the Authorized Notes Collateral Agent may seek adequate protection with respect to the Notes Collateral.

*Plans of Reorganization*. No Applicable Collateral Agent or holder of Applicable Obligations may support any plan of reorganization or file any proof of claim in any Insolvency or Liquidation Proceeding which, in either case, is not in accordance with the intercreditor provisions described above.

*Standstill Period*. The Junior Lien Intercreditor Agreement will provide that, notwithstanding any of the provisions described above, if prior to the commencement of an Insolvency or Liquidation Proceeding, after a period (the "*ABL Collateral Standstill Period*") of 180 consecutive days has elapsed from the date of delivery of written notice to the Authorized ABL Collateral Agent stating that the existence of an Event of Default as defined under the debt documents of any Non-Authorized ABL Class of Obligations has occurred and is continuing thereunder, and as a result of such Event of Default the principal and interest under such other Non-Authorized ABL Class of Obligations has become due and payable, then, upon notice to the Authorized ABL Collateral Agent indicating that applicable Non-Authorized ABL Collateral Agent intends to exercise remedies and enforce against the ABL Facility Collateral, then such Non-Authorized ABL Collateral Agent may exercise any rights or remedies (including setoff) with respect to any ABL Facility Collateral (including, without limitation, the enforcement of or execution on any judgment Lien) or institute any action or proceeding with respect to such rights or remedies only so long as the Authorized ABL Collateral Agent or the holders of the Authorized ABL Class of Obligations shall not have commenced and be diligently pursuing (within such 180 consecutive day period) the exercise of any of their rights or remedies with respect to the ABL Facility Collateral; *provided* that, if the Authorized Collateral Agent shall have provided notice as set forth above and shall have commenced and be diligently pursuing (within such 180 consecutive day period) the exercise of any of their rights or remedies with respect to the ABL Facility Collateral, then the Plan Roll-Up Notes Trustee shall be prohibited from exercising remedies against ABL Facility Collateral. In addition, the Junior Lien Intercreditor Agreement will provide that, notwithstanding any of the provisions described above, if prior to the commencement of an Insolvency or Liquidation Proceeding, after a period (the "*Notes Collateral Standstill Period*") of 180 consecutive days has elapsed from the date of delivery of written notice to the Authorized Notes Collateral Agent stating that the existence of an Event of Default as defined under the debt documents of any Non-Authorized Notes Class of Obligations has occurred and is continuing thereunder, and as a result of such Event of Default the principal and interest under such Non-Authorized Notes Class of Obligations has become due and payable, then, upon notice to the Authorized Notes Collateral Agent indicating that applicable Non-Authorized Notes Collateral Agent intends to exercise remedies and enforce against the Notes Collateral, then such Non-Authorized Notes Collateral Agent may exercise any rights or remedies (including setoff) with respect to any Notes Collateral (including, without limitation, the enforcement of or execution on any judgment Lien) or institute any action or proceeding with respect to such rights or remedies only so long as the Authorized Notes Collateral Agent or the holders of the Authorized Notes Class of Obligations shall not have commenced and be diligently pursuing (within such 180 consecutive day period) the exercise of any of their rights or remedies with respect to the Notes Collateral; *provided* that, if the ABL Collateral Agent shall have provided notice as set forth above and shall have commenced and be diligently pursuing (within such 180 consecutive day period) the exercise of any of its rights or remedies with respect to the Notes Collateral, then the Plan Roll-Up Notes Trustee shall be prohibited from exercising remedies against Notes Collateral.

### *Third Lien Intercreditor Agreement*

The Collateral Agent and the Third Lien Notes Collateral Agent will enter into a Third Lien Intercreditor Agreement (as amended, supplemented, modified, extended, restructured, renewed, restated or replaced in whole or in part from time to time, the "*Third Lien Intercreditor Agreement*") with respect to the Common Collateral, which may be amended from time to time without the consent of the holders of the Notes to add other parties holding Third Priority Lien Obligations permitted to be Incurred under the Indenture, the Third Lien Indenture and the Third Lien Intercreditor Agreement.

The Third Lien Intercreditor Agreement will provide that, notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any liens on any Third Lien Common Collateral in which one or more collateral agents for any Series of Third Priority Lien Obligations have perfected security interests, the security interests of the Collateral Agent, the Third Lien Notes Collateral Agent and each Additional Third Lien Collateral Agent in such Third Lien Common Collateral will rank equal in priority. Under the Third Lien Intercreditor Agreement, as described below, the "Authorized Collateral Agent" will have the right to exercise remedies and take enforcement actions with respect to the Third Lien Common Collateral, and the Authorized Representatives of

other Series of Third Priority Lien Obligations will have no right to take actions with respect to the Third Lien Common Collateral (subject to the right of any such Authorized Representative of such other Series of Third Priority Lien Obligations to take limited protective measures with respect to the liens securing such Third Priority Lien Obligations and to take certain actions that would be permitted to be taken by unsecured creditors). The Authorized Collateral Agent will initially be the Third Lien Notes Collateral Agent. The Collateral Agent, as Authorized Representative in respect of the Notes, will initially have no rights to exercise remedies or take enforcement actions under the Third Lien Intercreditor Agreement (other than as described in the immediately preceding sentence).

The Third Lien Notes Collateral Agent will remain the Authorized Collateral Agent until the New Third Lien Notes are paid in full and cancelled or are defeased in accordance with their terms (the "*Applicable Authorized Agent Date*"). After the Applicable Authorized Agent Date, the Authorized Collateral Agent will be the Authorized Representative of the Series constituting the largest outstanding principal amount of any then outstanding Series of Third Priority Lien Obligations.

The Authorized Collateral Agent will have the sole right to act or refrain from acting with respect to the Third Lien Common Collateral. No other collateral agent with respect to Third Priority Lien Obligations or Third Lien Non-Controlling Secured Party may exercise remedies or take enforcement actions with respect to the Third Lien Common Collateral and no Authorized Representative of any Third Lien Non-Controlling Secured Party or other Third Lien Secured Party (other than the Authorized Collateral Agent) will commence any judicial or non-judicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its interests in or realize upon, or take any other action available to it in respect of, the Third Lien Common Collateral.

Notwithstanding the equal priority of the liens securing each Series of Third Priority Lien Obligations, the Authorized Collateral Agent may deal with the Third Lien Common Collateral as if the Authorized Collateral Agent had a senior lien on such Third Lien Common Collateral. No other Authorized Representative or Third Lien Non-Controlling Secured Party may contest, protest or object to any foreclosure proceeding or action brought by the Authorized Collateral Agent or Third Lien Controlling Secured Party. Each of the Third Lien Secured Parties also will agree that it will not contest or support any other Person in contesting, in any proceeding (including any insolvency or liquidation proceeding), the perfection, priority, validity or enforceability of a Lien held by or on behalf of any of the Third Lien Secured Parties in all or any part of the Third Lien Common Collateral, or the provisions of the Third Lien Intercreditor Agreement.

In addition, the Third Lien Intercreditor Agreement will provide that neither the Company, the Issuer nor any Pledgor shall, or permit any Subsidiary to, grant or permit or suffer to exist any additional liens on any asset or property to secure any Series of Third Priority Lien Obligations unless it has granted a lien on such asset or property to secure each other Series of Third Priority Lien Obligations; *provided* that a lien on such asset or property need not be granted to secure the Notes to the extent such a lien would be prohibited by the 3-16 Exemption.

With respect to any Third Lien Common Collateral in which a lien can be perfected by the possession or control of such Third Lien Common Collateral or of any deposit, securities or other account in which such Third Lien Common Collateral is held, then the Authorized Collateral Agent shall also hold or control such Third Lien Common Collateral as gratuitous bailee and sub-agent for each other collateral agent in respect of Third Priority Lien Obligations. Subject to the rights of the Authorized Collateral Agent and the other terms of the Third Lien Intercreditor Agreement, any such collateral agent that holds or controls Third Lien Common Collateral as gratuitous bailee and sub-agent shall be entitled to deal with the applicable pledged or controlled Third Lien Common Collateral as if the liens thereon of the collateral agent or Third Lien Secured Parties or Series of Third Priority Lien Obligations did not exist; *provided* that any proceeds arising from such pledged or controlled Third Lien Common Collateral shall be subject to application in accordance with the terms of the Third Lien Intercreditor Agreement.

If an event of default has occurred and is continuing under the documents governing any of the Third Priority Lien Obligations and the Authorized Collateral Agent is taking action to enforce rights in respect of any Third Lien Common Collateral, or any distribution is made with respect to any Third Lien Common Collateral in any bankruptcy case of the Issuer, the Company or any Pledgor, the proceeds of any sale, collection or other liquidation of any such Third Lien Common Collateral by the Authorized Collateral Agent or any Third Lien Secured Party (or received pursuant to any other intercreditor agreement), as applicable, and proceeds of any such distribution (subject, in the case of any such distribution, to the paragraph immediately following) to which the Third Priority Lien Obligations are entitled under any other intercreditor agreement shall be applied among the Third Priority Lien Obligations to the payment in full of the Third Priority Lien Obligations on a ratable basis, after payment of all amounts owing to the Authorized Collateral Agent and the Collateral Agent, Third Lien Notes Collateral Agent, Escrow Agent, Paying Agent and Trustee.

Notwithstanding the foregoing, with respect to any Third Lien Common Collateral for which a third party (other than a Third Lien Secured Party) has a Lien or security interest that is junior in priority to the security interest of any Series of Third Priority Lien Obligations but senior (as determined by appropriate legal proceedings in the case of any dispute) to the security interest of any other Series of Third Priority Lien Obligations (such third party, an "*Third Lien Intervening Creditor*"), the value of any Third Lien Common Collateral or proceeds which are allocated to such Third Lien Intervening Creditor shall be deducted on a ratable basis solely

from the Third Lien Common Collateral or proceeds to be distributed in respect of the Series of Third Priority Lien Obligations with respect to which such impairment exists.

None of the Third Lien Secured Parties may institute any suit or assert in any suit, bankruptcy, insolvency or other proceeding any claim against the Authorized Collateral Agent and the Collateral Agent, the Escrow Agent, the Third Lien Notes Collateral Agent or any other Third Lien Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to any Third Lien Third Lien Common Collateral. In addition, none of the Third Lien Secured Parties may seek to have any Third Lien Common Collateral or any part thereof marshaled upon any foreclosure or other disposition of such Third Lien Common Collateral. If any Third Lien Secured Party obtains possession of any Third Lien Common Collateral or realizes any proceeds or payment in respect thereof, at any time prior to the discharge of each Series of the Third Priority Lien Obligations, then it must hold such Third Lien Common Collateral, proceeds or payment in trust for the other Third Lien Secured Parties and promptly transfer such Third Lien Common Collateral, proceeds or payment to the Authorized Collateral Agent to be distributed in accordance with the Third Lien Intercreditor Agreement.

If the Issuer, the Company or any Pledgor becomes subject to any bankruptcy case, the Third Lien Intercreditor Agreement will provide that (1) if the Issuer, the Company or any Pledgor shall, as debtor(s)-in-possession, move for approval of financing (the "*DIP Financing*") to be provided by one or more lenders (the "*DIP Lenders*") under Section 364 of the Bankruptcy Code or the use of cash collateral under Section 363 of the Bankruptcy Code, each Third Lien Secured Party will agree not to object to any such financing or to the Liens on the Third Lien Common Collateral securing the same (the "*DIP Financing Liens*") or to any use of cash collateral that constitutes Third Lien Common Collateral, unless any Third Lien Controlling Secured Party, or an Authorized Representative of any Third Lien Controlling Secured Party, shall then oppose or object to such DIP Financing or such DIP Financing Liens or use of cash collateral (and (i) to the extent that such DIP Financing Liens are senior to the Liens on any such Third Lien Common Collateral for the benefit of the Third Lien Controlling Secured Parties, each Third Lien Non-Controlling Secured Party will subordinate its Liens with respect to such Third Lien Common Collateral on the same terms as the Liens of the Third Lien Controlling Secured Parties (other than any Liens of any Third Lien Secured Parties constituting DIP Financing Liens) are subordinated thereto, and (ii) to the extent that such DIP Financing Liens rank *pari passu* with the Liens on any such Third Lien Common Collateral granted to secure the Third Priority Lien Obligations of the Third Lien Controlling Secured Parties, each Third Lien Non-Controlling Secured Party will confirm the priorities with respect to such Third Lien Common Collateral as set forth in the Third Lien Intercreditor Agreement), in each case so long as:

(A) the Third Lien Secured Parties of each Series retain the benefit of their Liens on all such Third Lien Common Collateral pledged to the DIP Lenders, including proceeds thereof arising after the commencement of such proceeding, with the same priority vis-à-vis all the other Third Lien Secured Parties (other than any Liens of the Third Lien Secured Parties constituting DIP Financing Liens) as existed prior to the commencement of the bankruptcy case,

(B) the Third Lien Secured Parties of each Series are granted Liens on any additional collateral pledged to any Third Lien Secured Parties as adequate protection or otherwise in connection with such DIP Financing or use of cash collateral, with the same priority vis-à-vis the Third Lien Secured Parties as set forth in the Third Lien Intercreditor Agreement,

(C) if any amount of such DIP Financing or cash collateral is applied to repay any of the Third Priority Lien Obligations, such amount is applied pursuant to the Third Lien Intercreditor Agreement, and

(D) if any Third Lien Secured Parties are granted adequate protection, including in the form of periodic payments, in connection with such DIP Financing or use of cash collateral, the proceeds of such adequate protection is applied pursuant to the Third Lien Intercreditor Agreement;

*provided* that the Third Lien Secured Parties of each Series shall have a right to object to the grant of a Lien to secure the DIP Financing over any Collateral subject to Liens in favor of the Third Lien Secured Parties of such Series or its representative that shall not constitute Third Lien Common Collateral; and *provided further* that the Third Lien Secured Parties receiving adequate protection shall not object to any other Third Lien Secured Party receiving adequate protection comparable to any adequate protection granted to such Third Lien Secured Parties in connection with a DIP Financing or use of cash collateral.

The Third Lien Secured Parties will acknowledge that the Third Priority Lien Obligations of any Series may, subject to the limitations set forth in the Third Lien Intercreditor Agreement and the other Third Lien Documents, be increased, extended, renewed, replaced, restated, supplemented, restructured, repaid, refunded, refinanced or otherwise amended or modified from time to time, all without affecting the priorities set forth in the Third Lien Intercreditor Agreement defining the relative rights of the Third Lien Secured Parties.

**Release of Collateral**

Subject to the Junior Lien Intercreditor Agreement, Liens on Collateral securing the Notes will be automatically and unconditionally released:

(1)  as to any property or asset (including Capital Stock of a Subsidiary of the Company), to enable the Company, the Issuer and the Pledgors to consummate the disposition of such property or asset to the extent not prohibited by the covenant described under "—Certain Covenants—Limitation on Sale/Leaseback Transactions";

(2)  upon the release of all Liens on such property or assets securing First and Second Priority Lien Obligations (including all commitments and letters of credit thereunder);

(3)  in respect of the property and assets of a Pledgor, upon the designation of such Pledgor to be an Unrestricted Subsidiary in accordance with the definition of "Unrestricted Subsidiary";

(4)  in respect of the property and assets of a Guarantor upon release of the Guarantee with respect to the Notes of such Guarantor;

(5)  in the case of the property and assets of a specific Pledgor, upon such Pledgor making a Transfer of such assets to any Restricted Subsidiary of the Issuer that is not a Pledgor; provided that (i) such Transfer is not subject to the covenant described under "—Merger, Amalgamation, Consolidation or Sale of All or Substantially All Assets" and (ii) the aggregate net book value of the assets of Restricted Subsidiaries that are at any time Notes Collateral (as defined in the First Lien Security Documents) (excluding cash proceeds of accounts receivable, inventory and related assets) that are so transferred pursuant to this clause (5) subsequent to the Issue Date shall not exceed 5% of the Consolidated Net Tangible Assets of the Issuer and its Restricted Subsidiaries per year and shall not be in an amount that will result in an Excluded Subsidiary ceasing to qualify as an Excluded Subsidiary in accordance with the definition thereof; *provided*, *further*, that Liens on all property and assets of any Subsidiary of Lyondell Europe Holdings, Inc., a Delaware corporation, will be automatically and unconditionally released upon any transfer of such Subsidiary;

(6)  as described under "—Amendments and Waivers" below; or

(7)  as to the pledge of Capital Stock of first-tier Foreign Subsidiaries, in connection with a reorganization, change or modification of the direct or indirect ownership of Foreign Subsidiaries by the Company, the Issuer or a Pledgor, as applicable, in compliance with the First Lien Indenture, a release may be obtained as to such Capital Stock in connection with the substitution of pledge of 65% of the voting Capital Stock and 100% of the non-voting Capital Stock of any one or more new or replacement first- tier Foreign Subsidiaries pursuant to valid Security Documents.

Notwithstanding the foregoing clause (2), if an Event of Default exists on the date of Discharge of First and Second Priority Lien Obligations, the Junior Priority Liens on the Collateral securing the Plan Roll-Up Notes will not be released, except to the extent the Collateral or any portion thereof was disposed of in order to repay the First and Second Priority Lien Obligations secured by the Collateral, and thereafter the Authorized Collateral Agent will have the right to direct the agent to foreclose upon the Collateral (but in such event, the Liens on the Collateral securing the Plan Roll-Up Notes will be released when such Event of Default and all other Events of Default cease to exist).

The security interests in all Collateral securing the Notes also will be released upon (i) payment in full of the principal of, together with accrued and unpaid interest and additional interest, if any, on, the Notes and all other Obligations under the First Lien Indenture and the Security Documents that are due and payable at or prior to the time such principal, together with accrued and unpaid interest (including additional interest, if any), are paid (including pursuant to a satisfaction and discharge of the First Lien Indenture as described under "—Satisfaction and Discharge") or (ii) a legal defeasance or covenant defeasance under the First Lien Indenture as described under "—Defeasance."

Any certificate or opinion required by Section 314(d) of the TIA may be made by an Officer of the Issuer, except in cases where Section 314(d) requires that such certificate or opinion be made by an independent engineer, appraiser or other expert.

Notwithstanding anything to the contrary herein, the Issuer and its Subsidiaries will not be required to comply with all or any portion of Section 314(d) of the TIA if they determine, in good faith based on advice of counsel, that under the terms of that section and/or any interpretation or guidance as to the meaning thereof of the SEC and its staff, including "no action" letters or exemptive orders, all or any portion of Section 314(d) of the TIA is inapplicable to the released Collateral.

Without limiting the generality of the foregoing, certain no action letters issued by the SEC have permitted an indenture qualified under the TIA to contain provisions permitting the release of collateral from Liens under such indenture in the ordinary course of the issuer's business without requiring the issuer to provide certificates and other documents under Section 314(d) of the TIA. The Issuer, the Company and the Pledgors may, subject to the provisions of the Indenture, among other things, without any

release or consent by the Trustee or the Collateral Agent, conduct ordinary course activities with respect to the Collateral, including, without limitation:

> selling or otherwise disposing of, in any transaction or series of related transactions, any property subject to the Lien of the Security Documents that has become worn out, defective, obsolete or not used or useful in the business;

> abandoning, terminating, canceling, releasing or making alterations in or substitutions of any leases or contracts subject to the Lien of the Indenture or any of the Security Documents;

> surrendering or modifying any franchise, license or permit subject to the Lien of the Security Documents that it may own or under which it may be operating;

> altering, repairing, replacing, changing the location or position of and adding to its structures, machinery, systems, equipment, fixtures and appurtenances;

> granting a license of any intellectual property;

> selling, transferring or otherwise disposing of inventory or accounts receivable in the ordinary course of business;

> making cash payments (including for the repayment of Indebtedness or interest) from cash that is at any time part of the Collateral in the ordinary course of business that are not otherwise prohibited by the Indenture and the Security Documents; and

> abandoning any intellectual property that is no longer used or useful in the business of the Company or its Subsidiaries.

**Certain Covenants**

Set forth below are summaries of certain covenants that will be contained in the Indenture, which (in the absence of a Covenant Suspension Event (as defined below)) will bind the Company and its Restricted Subsidiaries on and after the Issue Date. If on any date following the Issue Date, (i) the Notes have Investment Grade Ratings from two Rating Agencies and (ii) no Default has occurred and is continuing under the Indenture then, beginning on that day and continuing until the Reversion Date (as defined below) (the occurrence of the events described in the foregoing clauses (i) and (ii) being collectively referred to as a "*Covenant Suspension Event*"), the covenants specifically listed under the following captions will not be applicable to the Notes (collectively, the "*Suspended Covenants*"):

> (1)   "—Limitation on Incurrence of Indebtedness Secured by Prior or Equal and Ratable Liens";

> (2)   "—Limitation on Sale/Leaseback Transactions";

> (3)   "—Merger, Amalgamation, Consolidation or Sale of All or Substantially All Assets"; and

> (4)   "—Limitation on Liens."

At any time the Company and its Restricted Subsidiaries are not subject to the Suspended Covenants, the holders of the Notes will be entitled to substantially less, and materially limited, covenant protection.

If on any date subsequent to a Covenant Suspension Event (the "*Reversion Date*") one or both of the Rating Agencies withdraw their Investment Grade Rating or downgrade the rating assigned to the Notes below an Investment Grade Rating, then the Company and its Restricted Subsidiaries will thereafter again be subject to the Suspended Covenants under the Indenture with respect to future events. The period of time between the Covenant Suspension Event and the Reversion Date is referred to as the "*Suspension Period.*"

On each Reversion Date, all Indebtedness Incurred during the Suspension Period will be classified as having been Incurred or issued pursuant to the first paragraph, or one of the clauses set forth in the second paragraph, under "—Certain Covenants—Limitation on Incurrence of Indebtedness Secured by Prior or Equal and Ratable Liens" below (to the extent such Indebtedness would be permitted to be Incurred or issued thereunder as of the Reversion Date and after giving effect to Indebtedness Incurred or issued prior to the Suspension Period and outstanding on the Reversion Date). As described above, however, no Default or Event of Default will be deemed to have occurred on the Reversion Date as a result of any actions taken by the Company or its Restricted Subsidiaries during the Suspension Period.

There can be no assurance that the Notes will ever achieve or maintain Investment Grade Ratings.

*Limitation on Incurrence of Indebtedness Secured by Prior or Equal and Ratable Liens*

The Indenture will provide that the Company will not, and will not permit the Issuer and the Pledgors to, directly or indirectly, Incur any Indebtedness secured by a Specified Lien:

(1) representing First Priority Lien Obligations in excess of the First Priority Secured Indebtedness Limit, if after giving effect to such Incurrence, on a pro forma basis, the First Priority Secured Indebtedness Leverage Ratio would exceed 3.0 to 1.0; and

(2) representing Third Lien Secured Indebtedness in excess of the Third Lien Secured Indebtedness Limit, if after giving effect to such Incurrence, on a pro forma basis, the Third Lien Secured Indebtedness Leverage ratio would exceed 5.0 to 1.0.

The foregoing limitations (collectively, "*Permitted Indebtedness*") do not apply to:

(a) Indebtedness under Asset Backed Credit Facilities in an aggregate principal amount not to exceed the sum of 85% of the net book value of the accounts receivable of the Company and its Restricted Subsidiaries and 65% of the net book value of the inventory of the Company and its Restricted Subsidiaries (the "*Borrowing Base*") less $1,620 million;

(b) Indebtedness under any Oil Indexed Credit Facility in an aggregate principal amount not to exceed $750.0 million; provided that amounts Incurred pursuant to an Oil Index Credit Facility will be required to reduce the amount of Indebtedness Incurred under the Borrowing Base to the extent Indebtedness in such amount as would no longer be permitted to be Incurred under clause (a) above (without duplication for the requirements of clause (a) above);

(c) Indebtedness Incurred by the Company or any of its Restricted Subsidiaries constituting reimbursement Obligations with respect to letters of credit and bank guarantees issued in the ordinary course of business, including, without limitation, letters of credit in respect of workers' compensation claims, health, disability or other benefits to employees or former employees or their families or property, casualty or liability insurance or self insurance or similar requirements, and letters of credit in connection with the maintenance of, or pursuant to the requirements of, environmental or other permits or licenses from governmental authorities, or other Indebtedness with respect to reimbursement type obligations regarding workers' compensation claims;

(d) Indebtedness of the Company to a Restricted Subsidiary; provided that (except in respect of intercompany current liabilities Incurred in the ordinary course of business in connection with the cash management operations of the Company and its Subsidiaries) any such Indebtedness owed to a Restricted Subsidiary that is not the Issuer or a Guarantor is subordinated in right of payment to the Obligations of the Company under the Notes; provided further that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Company or another Restricted Subsidiary or any pledge of such Indebtedness not prohibited by the covenant described under "—Certain Covenants—Limitation on Liens) shall be deemed, in each case, to be an Incurrence of such Indebtedness not permitted by this clause (d);

(e) Indebtedness of a Restricted Subsidiary to the Company or another Restricted Subsidiary; provided that if the Issuer or a Guarantor Incurs such Indebtedness to a Restricted Subsidiary that is not the Issuer or a Guarantor (except in respect of intercompany current liabilities Incurred in the ordinary course of business in connection with the cash management operations of the Company and its Subsidiaries), such Indebtedness is subordinated in right of payment to the Obligations of the Issuer or such Guarantor, as applicable, in respect of the Notes; provided further that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Restricted Subsidiary holding such Indebtedness ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Company or another Restricted Subsidiary or any pledge of such Indebtedness not prohibited by the covenant described under "—Certain Covenants—Limitation on Liens) shall be deemed, in each case, to be an Incurrence of such Indebtedness not permitted by this clause (e);

(f) Hedging Obligations that are not Incurred for speculative purposes but for the purpose of (1) fixing or hedging interest rate risk with respect to any Indebtedness that is permitted by the terms of the Indenture to be outstanding; (2) fixing or hedging currency exchange rate risk with respect to any currency exchanges; (3) fixing or hedging commodity price risk, including the price or cost of raw materials, emission rights, manufactured products or related commodities, with respect to any commodity purchases or sales; or (4) hedging the potential exposure in respect of certain executives' and employees' options over, or stock appreciation rights in relation to, shares of Royal Dutch Shell plc and BASF AG;

(g) (i) obligations in respect of bankers' acceptances, tender, bid, judgment, appeal, performance or governmental contract bonds and completion guarantees, surety, standby letters of credit and warranty and contractual service obligations of a like nature, trade letters of credit and documentary letters of credit and similar bonds or guarantees provided by the Company or any Restricted Subsidiary in the ordinary course of business or (ii) Indebtedness of the Company or any Restricted Subsidiary supported by a letter of credit or bank guarantee issued pursuant to any of the Credit Facilities, in a principal amount not in excess of the stated amount of such letter of credit;

(h) Indebtedness Incurred pursuant to a Catalyst Sale/Leaseback Transaction or Sale/Leaseback Transaction (other than a Specified Sale/Leaseback Transaction).

(i) the Incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness or Disqualified Stock or Preferred Stock of a Restricted Subsidiary of the Company which serves to refund, refinance or defease any Indebtedness Incurred or issued as permitted pursuant to the first paragraph of this covenant and clauses (a), (b) and (h) of this paragraph and including any Indebtedness incurred to refund or refinance such Indebtedness, including any additional Indebtedness, Disqualified Stock or Preferred Stock Incurred to pay premiums (including tender premiums) and original issue discount, expenses, defeasance costs and fees in connection therewith prior to its maturity; *provided*, *however*, that if such Refinancing Indebtedness refinances: (a) Indebtedness junior to the Notes or the Obligations of such Restricted Subsidiary in respect of the Notes, as applicable, such Refinancing Indebtedness is junior to the Notes or such Obligations of such Restricted Subsidiary, as applicable, to at least same extent or (b) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness is Disqualified Stock or Preferred Stock, as the case may be, of the same issuer.

(j) Indebtedness Incurred in a Qualified Receivables Financing that is without recourse to the Company or any Restricted Subsidiary (except for Standard Securitization Undertakings);

(k) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; provided that such Indebtedness is extinguished within five Business Days of its Incurrence;

(l) Indebtedness under any Treasury Services Agreement or any Structured Financing Transaction;

(m) Indebtedness of Foreign Subsidiaries; provided, however, that the aggregate principal amount of Indebtedness Incurred under this clause (m), when aggregated with the principal amount of all other Indebtedness then outstanding and Incurred pursuant to this clause (m), does not exceed the greater of $350.0 million and 3.50% of the Consolidated Net Tangible Assets of the Foreign Subsidiaries at any one time outstanding (it being understood that any Indebtedness Incurred pursuant to this clause (m) shall cease to be deemed Incurred or outstanding for purposes of this clause (m) but shall be deemed Incurred for the purposes of the first paragraph of this covenant from and after the first date on which such Foreign Subsidiary could have Incurred such Indebtedness under the first paragraph of this covenant without reliance upon this clause (m));

(n) Indebtedness of the Company or any Restricted Subsidiary consisting of the financing of insurance premiums in the ordinary course of business; and

(o) Indebtedness Incurred by Lyondell Basell Australia Pty Ltd. and its successors in an aggregate principal amount at any one time outstanding not to exceed $80.0 million; provided that such Indebtedness is not guaranteed by the Company or any Restricted Subsidiary of the Company organized under the laws of any jurisdiction other than Australia.

For purposes of determining compliance with any U.S. Dollar-denominated restriction on the Incurrence of Indebtedness, the U.S. Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was Incurred, in the case of term debt, or first committed or first Incurred (whichever yields the lower U.S. Dollar-equivalent), in the case of revolving credit debt; or if any such Indebtedness is subject to a Currency Agreement with respect to the currency in which such Indebtedness is denominated covering principal, premium, if any, and interest on such Indebtedness, the amount of such Indebtedness and such interest and premium, if any, shall be determined after giving effect to all payments in respect thereof under such Currency Agreement; *provided* that, if such Indebtedness is Incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such Refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced.

Notwithstanding any other provision of this covenant, the maximum amount of Indebtedness that the Company and its Restricted Subsidiaries may Incur pursuant to this covenant shall not be deemed to be exceeded, with respect to any outstanding

Indebtedness, solely as a result of fluctuations in the exchange rate of currencies. The principal amount of any Indebtedness Incurred to refinance other Indebtedness, if Incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of such refinancing.

### Limitation on Sale/Leaseback Transactions

The Company shall not, and shall not permit any Restricted Subsidiary of the Company to, enter into any Sale/Leaseback Transaction covering property with an individual Fair Market Value of the greater of 2% of Consolidated Net Tangible Assets and $500 million (a "Specified Sale/Leaseback Transaction") of the Company or such Restricted Subsidiary if the Company is not permitted to incur additional First Priority Lien Obligations under clause (1) of "—Certain Covenants— Limitation on Incurrence of Indebtedness Secured by Prior or Equal and Ratable Liens".

### Limitation on Liens

The Company shall not, and shall not permit any of its Restricted Subsidiaries to, Incur any Indebtedness secured by a Specified Lien (other than Permitted Liens) if the grant of such a Lien would cause a violation of the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness Secured by Prior or Equal and Ratable Liens."

### Future Subsidiary Guarantors

The Indenture will provide that, the Company will cause each (i) Domestic Subsidiary of the Company (other than the Issuer) that is wholly owned other than, at the election of the Issuer, an Excluded Subsidiary and (ii) Wholly Owned Restricted Subsidiary of the Company (other than the Issuer) that guarantees the Senior Term Loan Facility to execute and deliver to the Trustee (a) a supplemental indenture joining each such Subsidiary of the Company to the Indenture; and (b) Security Documents and intercreditor agreements providing for Third Priority Lien Obligations (other than, in the case of the ABL Facility Collateral, which shall be subject to a second priority security interest), pursuant to which such Subsidiary will guarantee payment of the Notes on the same terms and subject to the same conditions and limitations as those described under "—The Guarantees" and in the Indenture (each such guarantee of the Notes, an "*Additional Guarantee*").

Notwithstanding the foregoing and the other provisions of the Indenture, any Additional Guarantee of the Notes by a Domestic Subsidiary of the Company that is Wholly Owned shall provide by its terms that it shall be automatically and unconditionally released and discharged in the circumstances described under "—The Guarantees." Any Additional Guarantee shall be considered a "Guarantee" as described under "—The Guarantees," and any such Domestic Subsidiary of the Company providing such Additional Guarantee shall be considered a "Guarantor" as described under "—The Guarantees."

### After-Acquired Property

Subject to Permitted Liens and the 3-16 Exemption and the Excluded Assets limitations, the Indenture will provide that (x) if any of the Company, the Issuer or any Pledgor acquires any First Priority After-Acquired Property, the Company, the Issuer or such Pledgor shall execute and deliver such mortgages, deeds of trust, security instruments, financing statements and certificates and opinions of counsel as shall be reasonably necessary to vest in the First Lien Notes Collateral Agent a perfected first priority security interest, subject only to Permitted Liens, in such First Priority After-Acquired Property and to have such First Priority After-Acquired Property added to the Collateral, and thereupon all provisions of the Indenture relating to the Collateral shall be deemed to relate to such First Priority After-Acquired Property to the same extent and with the same force and effect, and (y) if any of the Company, the Issuer or any Pledgor acquires any Second Priority After-Acquired Property, the Company, the Issuer or such Pledgor shall execute and deliver such mortgages, deeds of trust, security instruments, financing statements and certificates and opinions of counsel as shall be reasonably necessary to vest in the ABL Collateral Agent a perfected second priority security interest, subject only to Permitted Liens, in such Second Priority After-Acquired Property and to have such Second Priority After-Acquired Property added to the Collateral, and thereupon all provisions of the Indenture relating to the Collateral shall be deemed to relate to such Second Priority After-Acquired Property to the same extent and with the same force and effect. In addition, if granting a security interest in such property requires the consent of a third party, the Company will use commercially reasonable efforts to obtain such consent (i) with respect to the first priority security interest for the benefit of the First Lien Notes Collateral Agent on behalf of the holders of the First Lien Notes and for the benefit of the Senior Term Loan Collateral Agent on behalf of the lenders under the Senior Term Loan Facility, (ii) with respect to the second priority security interest for the benefit of the ABL Collateral Agents on behalf of lenders under ABL Facility and (iii) with respect to the third priority security interest for the benefit of the Trustee on behalf of the holders of the Notes and for the benefit of the Third Lien Trustee on behalf of the holders of the New Third Lien Notes. If such third party does not consent to the granting of the third priority security interest after the use of such commercially reasonable efforts, the applicable entity will not be required to provide such security interest. The Issuer, the Company and the Pledgors will also ensure that third priority security interests are maintained as security for the Plan Roll-Up Notes in any property or assets pledged to secure the ABL Facility.

**Merger, Amalgamation, Consolidation or Sale of All or Substantially All Assets**

The Indenture will provide that the Company may not, directly or indirectly, consolidate, amalgamate or merge with or into or wind up or convert into (whether or not the Company is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions, to any Person unless:

(1) the Company is the surviving Person or the Person formed by or surviving any such consolidation, amalgamation, merger, winding up or conversion (if other than the Company) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof, the District of Columbia, Canada or any province thereof or any state which was a member of the European Union on December 31, 2003 (other than Greece) (the Company or such Person, as the case may be, being herein called the "*Successor Company*"); *provided* that, in the case where the surviving Person is not a corporation, a co-obligor of the Notes is a corporation;

(2) the Successor Company (if other than the Company) expressly assumes all the Obligations of the Company under the Indenture and the Notes pursuant to supplemental indentures or other documents or instruments in form required by the Indenture and in compliance with the intercreditor agreements; and

(3) the Company shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, merger, amalgamation or transfer and such supplemental indentures (if any) comply with the Indenture.

The Successor Company (if other than the Company) will succeed to, and be substituted for, the Company under the Indenture and the Notes, and in such event the Company will automatically be released and discharged from its Obligations under the Indenture and the Notes. Notwithstanding the first sentence of this covenant, the Company may (A) merge with an Affiliate that has no material assets or liabilities and that is incorporated or organized solely for the purpose of reincorporating or reorganizing the Issuer in any state of the U.S., the District of Columbia, Canada or any province thereof or any state which was a member state of the European Union on December 31, 2003 (other than Greece) and (B) may otherwise convert its legal form under the laws of its jurisdiction of organization.

The Indenture will further provide that the Issuer may not, directly or indirectly, consolidate, amalgamate or merge with or into or wind up or convert into (whether or not the Issuer is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions, to any Person unless:

(1) the Issuer is the surviving Person or the Person formed by or surviving any such consolidation, amalgamation, merger, winding up or conversion (if other than the Issuer) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof or the District of Columbia (the Issuer or such Person, as the case may be, being herein called the "*Successor Issuer*"); *provided* that, in the case where the surviving Person is not a corporation, a co-obligor of the Notes is a corporation;

(2) the Successor Issuer (if other than the Issuer) expressly assumes all the Obligations of the Issuer under the Indenture and the Notes pursuant to supplemental indentures or other documents or instruments in form required by the Indenture and in compliance with the intercreditor agreements; and

(3) the Issuer shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, merger, amalgamation or transfer and such supplemental indentures (if any) comply with the Indenture.

The Successor Issuer (if other than the Issuer) will succeed to, and be substituted for, the Issuer under the Indenture and the Notes, and in such event the Issuer will automatically be released and discharged from its Obligations under the Indenture and the Notes. Notwithstanding the first sentence of this covenant, the Issuer may (A) merge with an Affiliate that has no material assets or liabilities and that is incorporated or organized solely for the purpose of reincorporating or reorganizing the Issuer, as the case may be, in any state of the U.S. or the District of Columbia and (B) may otherwise convert its legal form under the laws of its jurisdiction of organization so long as there remains a corporate co-obligor. This covenant described under "—Merger, Amalgamation, Consolidation or Sale of All or Substantially All Assets" will not apply to a sale, assignment, transfer, conveyance or other disposition of assets between or among the Company and its Restricted Subsidiaries.

The Indenture will further provide that, subject to certain limitations in the Indenture governing release of assets and property securing the Notes upon the sale or disposition of a Restricted Subsidiary of the Company that is a Pledgor, no Pledgor will, and the Company will not permit any Pledgor to, consolidate, amalgamate or merge with or into or wind up into (whether or not such Pledgor is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions, to any Person unless:

(1) such Pledgor is the surviving Person or the Person formed by or surviving any such consolidation, amalgamation or merger (if other than such Pledgor) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have

been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof, the District of Columbia, or any territory thereof (such Pledgor or such Person, as the case may be, being herein called the "*Successor Pledgor*") and the Successor Pledgor (if other than such Pledgor) expressly assumes all the Obligations of such Pledgor under the Indenture and the Security Documents pursuant to documents or instruments in form required by the Indenture and in compliance with the intercreditor agreements; and

(2)    the Successor Pledgor (if other than such Pledgor) shall have delivered or caused to be delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, amalgamation, merger or transfer and such supplemental indenture (if any) comply with the Indenture.

Subject to certain limitations described in the Indenture, the Successor Pledgor (if other than such Pledgor) will succeed to, and be substituted for, such Pledgor under the Indenture and such Pledgor's Obligations in respect of the Notes, and such Pledgor will automatically be released and discharged from its Obligations under the Indenture and such Pledgor's Obligations in respect of the Notes. Notwithstanding the foregoing, (1) a Pledgor may merge, amalgamate or consolidate with an Affiliate incorporated solely for the purpose of reincorporating or reorganizing such Pledgor in another state of the United States, the District of Columbia or any territory of the United States so long as the amount of Indebtedness of the Pledgor is not increased thereby and (2) a Pledgor may merge, amalgamate or consolidate with another Pledgor or the Company or may convert its legal form under the laws of reorganization of its jurisdiction.

In addition, notwithstanding the foregoing, any Pledgor may consolidate, amalgamate or merge with or into or wind up into, or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets (collectively, a "*Transfer*") to the Company or any Pledgor.

## Defaults

An Event of Default will be defined in the Indenture as:

(1)    a default in any payment of interest (including any additional interest) on any Note when due, continued for 60 days,

(2)    a default in the payment of principal or premium, if any, of any Note when due at its Stated Maturity, upon optional redemption, upon required repurchase, upon declaration or otherwise,

(3)    the failure by the Company or any Restricted Subsidiary to comply for 90 days after notice with its other agreements contained in the Notes or the Indenture,

(4)    the failure by the Company or any Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary) to pay any Indebtedness (other than Indebtedness owing to the Company or a Restricted Subsidiary) within any applicable grace period after final maturity or the acceleration of any such Indebtedness by the holders thereof because of a default, in each case, if the total amount of such Indebtedness unpaid or accelerated exceeds $150.0 million or its foreign currency equivalent (the "*cross-acceleration provision*"),

(5)    certain events of bankruptcy, insolvency or reorganization of the Company, the Issuer or a Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary) (the "*bankruptcy provisions*"),

(6)    failure by the Company or any Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary) to pay final judgments aggregating in excess of $150.0 million or its foreign currency equivalent (net of any amounts which are covered by enforceable insurance policies issued by solvent carriers), which judgments are not discharged, waived or stayed for a period of 90 days (the "*judgment default provision*"),

(7)    the Guarantee of the Company or a Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary) ceases to be in full force and effect (except as contemplated by the terms thereof) or the Company denies or disaffirms its Obligations under the Indenture and such Default continues for 60 days,

(8)    unless all of the Notes Collateral has been released from the third priority Liens in accordance with the provisions of the Security Documents, the first priority Liens on all or substantially all of the Notes Collateral cease to be valid or enforceable and such Default continues for 60 days, or the Company, the Issuer or any Pledgor shall assert, in any pleading in any court of competent jurisdiction, that any such security interest is invalid or unenforceable and, in the case of any such Person that is a Subsidiary of the Company, the Company fails to cause such Subsidiary to rescind such assertions within 60 days after the Company has actual knowledge of such assertions, or

(9)    the failure by the Company, the Issuer or any Pledgor to comply for 90 days after notice with its other agreements contained in the Security Documents except for a failure that would not be material to the holders of the Notes and would not materially affect the value of the Collateral taken as a whole (together with the defaults described in clause (8) the "*security default provisions*").

The foregoing constitutes Events of Default whatever the reason for any such Event of Default and whether it is voluntary or involuntary or is effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body.

However, a default under clause (3) or (9) will not constitute an Event of Default until the Trustee or the holders of 45% in aggregate principal amount of outstanding Notes notify the Issuer of the default and the Issuer does not cure such default within the time specified in clause (3) or (9) hereof after receipt of such notice.

If an Event of Default (other than a Default relating to certain events of bankruptcy, insolvency or reorganization of the Company or the Issuer) occurs and is continuing, the Trustee or the holders of at least 45% in aggregate principal amount of outstanding Notes by notice to the Issuer may declare the principal of, premium, if any, and accrued but unpaid interest on all the Notes to be due and payable. If an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Company or the Issuer occurs, the principal of, premium, if any, and interest on all the Notes will become immediately due and payable without any declaration or other act on the part of the Trustee or any holders. Under certain circumstances, the holders of a majority in aggregate principal amount of outstanding Notes may rescind any such acceleration with respect to the Notes and its consequences.

In the event of any Event of Default specified in clause (4) of the first paragraph above, such Event of Default and all consequences thereof (excluding, however, any resulting payment default) will be annulled, waived and rescinded, automatically and without any action by the Trustee or the holders of the Notes, if within 30 days after such Event of Default arose the Issuer delivers an Officer's Certificate to the Trustee stating that (x) the Indebtedness or guarantee that is the basis for such Event of Default has been discharged or (y) the holders thereof have rescinded or waived the acceleration, notice or action (as the case may be) giving rise to such Event of Default or (z) the default that is the basis for such Event of Default has been cured, it being understood that in no event shall an acceleration of the principal amount of the Notes as described above be annulled, waived or rescinded upon the happening of any such events.

Subject to the provisions of the Indenture relating to the duties of the Trustee, in case an Event of Default occurs and is continuing, the Trustee will be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the holders unless such holders have offered to the Trustee reasonable indemnity and security against any loss, liability or expense acceptable to the Trustee in its sole discretion. Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no holder may pursue any remedy with respect to the Indenture or the Notes unless:

(10) such holder has previously given the Trustee notice that an Event of Default is continuing,

(11) holders of at least 45% in aggregate principal amount of the outstanding Notes have requested the Trustee to pursue the remedy,

(12) such holders have offered the Trustee security and reasonable indemnity against any loss, liability or expense acceptable to the Trustee in its sole discretion,

(13) the Trustee has not complied with such request within 90 days after the receipt of the request and the offer of security or indemnity, and

(14) the holders of a majority in aggregate principal amount of the outstanding Notes have not given the Trustee a direction inconsistent with such request within such 90-day period.

Subject to certain restrictions, the holders of a majority in principal amount of outstanding Notes are given the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. The Trustee, however, may refuse to follow any direction that conflicts with law or the Indenture or that the Trustee determines is unduly prejudicial to the rights of any other holder or that would involve the Trustee in personal liability. Prior to taking any action under the Indenture, the Trustee will be entitled to reasonable indemnification and security satisfactory to it in its reasonable discretion against all losses and expenses caused by taking or not taking such action.

The Issuer is required to deliver to the Trustee, annually, a certificate indicating whether the signers thereof know of any Default that occurred during the previous year. The Issuer also is required to deliver to the Trustee, within 30 days after an occurrence thereof, written notice of any event which would constitute certain Defaults, their status and what action the Issuer is taking or proposes to take in respect thereof.

## Amendments and Waivers

Subject to certain exceptions, the Indenture and Security Documents may be amended with the consent of the holders of a majority in aggregate principal amount of the Notes then outstanding and any past default or compliance with any provisions may be waived with the consent of the holders of a majority in principal amount of the Notes then outstanding. However, without the consent of each holder of an outstanding Note affected, no amendment may, among other things:

(1)  reduce the amount of Notes whose holders must consent to an amendment,

(2)  reduce the rate of or extend the time for payment of interest on any Note,

(3)  reduce the principal of or change the Stated Maturity of any Note,

(4)  reduce the premium payable upon the redemption of any Note or change the time at which any Note may be redeemed as described under "—Redemption—Optional Redemption" above,

(5)  make any Note payable in money other than that stated in such Note,

(6)  expressly subordinate the Notes to any other Indebtedness of the Company, the Issuer or any Pledgor,

(7)  impair the right of any holder to receive payment of principal of, premium, if any, and interest on such holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such holder's Notes,

(8)  make any change in the amendment provisions which require each holder's consent or in the waiver provisions,

(9)  make any change in the provisions in the Junior Lien Intercreditor Agreement or the Indenture dealing with the application of proceeds of Collateral that would adversely affect the holders of the Notes, or

(10) except as expressly provided by the Indenture, modify or release the Guarantee of any Significant Subsidiary in any manner adverse to the holders of the Notes.

Without the consent of the holders of at least 50% in aggregate principal amount of the Notes then outstanding, no amendment or waiver may release all or substantially all of the Collateral from the Lien of the Indenture and the Security Documents with respect to the Notes.

Without the consent of any holder, the Issuer, the Guarantors and Trustee may amend the Indenture or the Intercreditor Agreements to cure any ambiguity, omission, mistake, defect or inconsistency, to provide for the assumption by a successor Issuer of the Obligations of the Issuer under the Indenture and the Notes, to provide for the assumption by a successor Company of the Obligations of the Company under the Indenture and the Notes, to provide for the assumption by a successor Pledgor of the Obligations of a Pledgor under the Indenture and the Security Documents, to provide for uncertificated Notes in addition to or in place of certificated Notes (*provided* that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code, or in a manner such that the uncertificated Notes are described in Section 163(f)(2)(B) of the Code), to add a Pledgor with respect to the Notes, to secure the Notes, to release Collateral in compliance with the Indenture or the Junior Lien Intercreditor Agreement, to add additional secured creditors holding Other First-Lien Obligations, other Third Priority Lien Obligations or any other secured Indebtedness permitted to be Incurred, so long as such Obligations are in compliance with the Indenture or the Security Documents, to add to the covenants of the Company or the Restricted Subsidiaries for the benefit of the holders or to surrender any right or power conferred upon the Company and the Restricted Subsidiaries, to make any change that does not adversely affect the rights of any holder, to conform the text of the Indenture, the Notes, the Security Documents or the Junior Lien Intercreditor Agreement to any provision of this "Description of 2014 Notes" to the extent that such provision in this "Description of 2014 Notes" was intended to be a verbatim recitation of a provision of the Indenture, the Notes, the Security Documents or the Junior Lien Intercreditor Agreement, to comply with any requirement of the SEC in connection with the qualification of the Indenture under the TIA to effect any provision of the Indenture or to make certain changes to the Indenture to provide for the issuance of additional Notes.

The consent of the noteholders will not be necessary under the Indenture to approve the particular form of any proposed amendment. It is sufficient if such consent approves the substance of the proposed amendment.

After an amendment under the Indenture becomes effective, the Issuer will be required to mail to the respective noteholders a notice briefly describing such amendment. However, the failure to give such notice to all noteholders entitled to receive such notice, or any defect therein, will not impair or affect the validity of the amendment.

Notes repurchased and held by the Issuer or any Restricted Subsidiary will not be deemed cancelled and will be deemed outstanding.

**No Personal Liability of Directors, Officers, Employees, Managers and Stockholders**

No director, officer, employee, manager, incorporator or holder of any Equity Interests in the Company, the Issuer or any direct or indirect parent corporation, as such, has any liability for any Obligations of the Issuer under the Notes, the Indenture, or for any claim based on, in respect of, or by reason of, such Obligations or their creation. Each holder of Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. The waiver may not be effective to waive liabilities under the federal securities laws.

**Transfer and Exchange**

A noteholder may transfer or exchange Notes in accordance with the Indenture. Upon any transfer or exchange, the registrar and the Trustee may require a noteholder, among other things, to furnish appropriate endorsements and transfer documents and the Issuer may require a noteholder to pay any taxes required by law or permitted by the Indenture. The Issuer is not required to transfer or exchange any Note selected for redemption or to transfer or exchange any Note for a period of 15 days prior to a selection of Notes to be redeemed. The Notes were issued in registered form and the registered holder of a Note is treated as the owner of such Note for all purposes.

**Satisfaction and Discharge**

The Indenture will be discharged and will cease to be of further effect as to all outstanding Notes when:

(1)  either (a) all the Notes theretofore authenticated and delivered (except lost, stolen or destroyed Notes which have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Issuer and thereafter repaid to the Issuer or discharged from such trust) have been delivered to the Trustee for cancellation or (b) all of the Notes (i) have become due and payable, (ii) will become due and payable at their Stated Maturity within one year or (iii) if redeemable at the option of the Issuer, are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer, and the Issuer has irrevocably deposited or caused to be deposited with the Trustee funds in an amount sufficient to pay and discharge the entire Indebtedness on the Notes not theretofore delivered to the Trustee for cancellation, for principal of, premium, if any, and interest on the Notes to the date of deposit together with irrevocable instructions from the Issuer directing the Trustee to apply such funds to the payment thereof at maturity or redemption, as the case may be;

(2)  the Issuer has paid all other sums payable under the Indenture; and

(3)  the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel stating that all conditions precedent under the Indenture relating to the satisfaction and discharge of the Indenture have been complied with.

**Defeasance**

The Issuer at any time may terminate all its Obligations under the Notes and the Indenture with respect to the holders of the Notes ("*legal defeasance*"), except for certain Obligations, including those respecting the defeasance trust and Obligations to register the transfer or exchange of the Notes, to replace mutilated, destroyed, lost or stolen Notes and to maintain a registrar and paying agent in respect of the Notes. The Issuer at any time may terminate its Obligations under the covenants described under "—Certain Covenants" for the benefit of the holders of the Notes, the operation of the cross acceleration provision, the bankruptcy provisions with respect to Significant Subsidiaries and the judgment default provision described under "—Defaults" (but only to the extent that those provisions relate to the Defaults with respect to the Notes) for the benefit of the holders of the Notes. If the Issuer exercises its legal defeasance option or its covenant defeasance option, each Guarantor will be released from all of its Obligations with respect to the Notes and the Security Documents.

The Issuer may exercise its legal defeasance option notwithstanding its prior exercise of its covenant defeasance option. If the Issuer exercises its legal defeasance option, payment of the Notes may not be accelerated because of an Event of Default with respect thereto. If the Issuer exercises its covenant defeasance option, payment of the Notes may not be accelerated because of an Event of Default specified in clauses (3), (4) and (5) (with respect only to Significant Subsidiaries), (6) or (7) under "—Defaults."

In order to exercise its defeasance option, the Issuer must irrevocably deposit in trust (the "*defeasance trust*") with the Trustee money or Government Obligations for the payment of principal, premium (if any) and interest on the Notes to redemption or maturity, as the case may be, and must comply with certain other conditions, including delivery to the Trustee of an Opinion of Counsel to the effect that holders of the Notes will not recognize income, gain or loss for Federal income tax purposes as a result of such deposit and defeasance and will be subject to Federal income tax on the same amount and in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred (and, in the case of legal defeasance only, such Opinion of Counsel must be based on a ruling of the Internal Revenue Service or change in applicable Federal income tax law). Notwithstanding the foregoing, the Opinion of Counsel required by the immediately preceding sentence with respect to a legal defeasance need not be delivered if all of the Notes not theretofore delivered to the Trustee for cancellation (x) have become due and payable or (y) will become due and payable at their Stated Maturity within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer.

**Concerning the Trustee and Collateral Agent**

[[TBD] will be the Trustee under the Indenture. [TBD] will be the Collateral Agent under the Indenture and has been appointed by the Issuer as registrar and a Paying Agent with regard to the Notes.]

**Governing Law**

The Indenture will provide that it and the Notes are governed by, and construed in accordance with, the laws of the State of New York.

**Certain Definitions**

"*ABL Collateral Agent*" means the representative(s) from time to time administrating the collateral on behalf of the lenders under the ABL Facility.

"*ABL Facility*" means the asset based revolving credit agreement dated as of its effective date among the Issuer Equistar Chemicals, L.P., Houston Refining L.P., LyondellBasell Acetyls LLC and each other Subsidiary of the Issuer from time to time designated as a "Borrower" thereunder, the lenders and agents party thereto and Citibank, N.A., as administrative agent, as amended, supplemented, modified, extended, restructured, renewed, restated, refinanced or replaced in whole or in part from time to time.

"*ABL Facility Collateral*" has the meaning ascribed to such term under "—Security—General."

"*ABL Obligations*" means all Indebtedness and other Obligations under the ABL Facility.

"*Additional First Priority Lien Obligations*" means any First Priority Lien Obligations that are Incurred after the Issue Date (other than Indebtedness Incurred under the Senior Term Loan Facility) and secured by the Common Collateral on a first priority basis pursuant to the Security Documents.

"*Additional Guarantee*" has the meaning ascribed to such term under "—Certain Covenants—Future Subsidiary Guarantors."

"*Additional Third Priority Lien Obligations*" means any Third Priority Lien Obligations that are Incurred after the Issue Date and secured on a basis equal to the Liens securing the Plan Roll-Up Notes.

"*Asset Backed Credit Facility*" means (i) the ABL Facility; (ii) any credit facility provided on the basis of the value of inventory, accounts receivable or other current assets (and related documents and intangibles) to the Company or any of its Subsidiaries or similar instrument; and (iii) any similar credit support agreements or guarantees Incurred from time to time, as amended, supplemented, modified, extended, restructured, renewed, restated, refinanced or replaced in whole or in part from time to time; *provided* that any credit facility that refinances or replaces an Asset Backed Credit Facility must comply with clause (ii) of this definition in order to be an Asset Backed Credit Facility; and *provided*, *further*, that, if at the time any such refinancing or replacement is necessary or advisable in the good faith judgment of the Board of Directors of the Company, and an Asset Backed Credit Facility that complies with clause (ii) of this definition is not available on terms considered commercially reasonable for facilities of this nature (as determined in the good faith judgment of the Board of Directors of the Company), then the ABL Facility may be refinanced with or replaced by any Credit Facility and such Credit Facility shall be an Asset Backed Credit Facility for purposes hereof.

"*Authorized Collateral Agent*" has the meaning ascribed to such term under "—Security—First Lien Intercreditor Agreement" in the First Lien Description of Notes.

"*Authorized Representative*" means (i) in the case of any Obligations under the Senior Term Loan Facility or the secured parties under the Senior Term Loan Facility, the Senior Term Loan Collateral Agent, (ii) in the case of the Obligations under the First Lien Notes or the holders of the First Lien Notes, the First Lien Notes Collateral Agent, (iii) in the case of the ABL Facility, the ABL Collateral Agent and (iv) in the case of any Series of Additional First Priority Lien Obligations that become subject to the First Lien Intercreditor Agreement, the Authorized Representative named for such Series in the applicable joinder agreement.

"*Bankruptcy Code*" means the United States Bankruptcy Code, 11 U.S.C. Section 101 et seq., as amended from time to time.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York.

"*Basell GmbH*" means Basell Germany Holdings GmbH, and any successor in interest thereto.

"*Berre Facility*" means any receivables-backed credit or factoring facility entered into by one or more Foreign Subsidiaries (other than Basell GmbH) related to receivables of the refinery located in Berre, France, and any permitted refinancings thereof.

"*Board of Directors*" means, as to any Person, the board of directors or, supervisory board of such Person, or equivalent governing body or (or, if such Person is a partnership or limited liability company, the board of directors or other governing body of the general partner of such Person or manager ) or any duly authorized committee thereof.

"*Borrowing Base*" has the meaning ascribed to such term under "— Certain Covenants—Limitation on Incurrence of Indebtedness Secured by Prior or Pari Passu Debt."

"*Capital Stock*" means:

(a)   in the case of a corporation, corporate stock or shares;

(b)   in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(c)   in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(d)   any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"*Capitalized Lease Obligation*" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP.

"*Cases*" means the proceedings of LyondellBasell Industries AF S.C.A. and certain of its Subsidiaries and affiliates, as debtors and debtors in possession under Chapter 11.

"*Cash Equivalents*" means:

(a)   U.S. Dollars, pounds sterling, Euros, the national currency of any member state in the European Union or, in the case of any Foreign Subsidiary that is a Restricted Subsidiary, such local currencies held by it from time to time in the ordinary course of business;

(b)   securities issued or directly and fully guaranteed or insured by the U.S. government or any country that is a member of the European Union (other than Greece or Portugal) or any agency or instrumentality thereof in each case maturing not more than two years from the date of acquisition;

(c)   certificates of deposit, time deposits and Eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances, in each case with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank or trust company having capital and surplus in excess of $250.0 million and whose long-term debt is rated "A" or the equivalent thereof by Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency);

(d)   repurchase obligations and reverse repurchase obligations for underlying securities of the types described in clauses (2) and (3) above entered into with any financial institution meeting the qualifications specified in clause (3) above;

(e)   commercial paper issued by a corporation (other than an Affiliate of the Company) rated at least "A1" or the equivalent thereof by Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) and in each case maturing within one year after the date of acquisition;

(f)   readily marketable direct obligations issued by any state of the United States of America or any political subdivision thereof having one of the two highest rating categories obtainable from either Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) in each case with maturities not exceeding two years from the date of acquisition;

(g)   Indebtedness issued by Persons (other than the Sponsors or any of their Affiliates) with a rating of "A" or higher from S&P or "A-2" or higher from Moody's (or reasonably equivalent ratings of another internationally recognized ratings agency) in each case with maturities not exceeding two years from the date of acquisition;

(h)   U.S. Dollar-denominated money market funds as defined in Rule 2a-7 of the General Rules and Regulations promulgated under the Investment Company Act of 1940;

(i)   tax-exempt floating rate option tender bonds backed by letters of credit issued by a national or state bank whose long-term unsecured debt has a rating of AA or better by S&P or Aa2 or better by Moody's or the equivalent rating by any other internationally recognized rating agency; and

(j)   investment funds investing at least 95% of their assets in securities of the types described in clauses (a) through (i) above.

"*Catalyst Sale/Leaseback Transaction*" means a Sale/Leaseback Transaction that relates to a catalyst containing one or more precious metals used by the Company or any of its Restricted Subsidiaries in the ordinary course of business.

"*Chapter 11*" means Chapter 11 of the Bankruptcy Code.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Collateral*" means all property subject or purported to be subject, from time to time, to a Lien under any Security Documents.

"*Collateral Agent*" means [  ].

"*Collateral Agreement*" has the meaning ascribed to such term under "—Security—Security Documents."

"*Common Collateral*" means, at any time, Collateral in which the holders of two or more Series of First Priority Lien Obligations (or their respective Authorized Representatives) hold a valid and perfected security interest at such time. If more than two Series of First Priority Lien Obligations are outstanding at any time and the holders of less than all Series of First Priority Lien Obligations hold a valid and perfected security interest in any Collateral at such time then such Collateral shall constitute Common Collateral for those Series of First Priority Lien Obligations that hold a valid security interest in such Collateral at such time and shall not constitute Common Collateral for any Series which does not have a valid and perfected security interest in such Collateral at such.

"*Company*" means LyondellBasell Industries N.V., a *naamloze vennootschap* (public limited liability corporation) formed under the laws of the Netherlands, and any successor in interest thereto.

"*Consolidated EBITDA*" means, with respect to any Person, for any period, the sum (without duplication) of:

(1) Consolidated Net Income;

(2) to the extent Consolidated Net Income has been reduced thereby;

(a) taxes of such Person and its Restricted Subsidiaries paid or accrued in accordance with GAAP for such period based on income, profits or capital, including, without limitation, state, franchise, property and similar taxes and foreign withholding taxes (including penalties and interest related to such taxes or arising from tax examinations), or such equivalent items in any foreign jurisdiction;

(b) Consolidated Interest Expense;

(c) Consolidated Non-cash Charges;

(d) the amount of net loss resulting from the payment of any premiums, fees or similar amounts that are required to be paid under the terms of the instrument(s) governing any Indebtedness upon the repayment, prepayment or other extinguishment of such Indebtedness in accordance with the terms of such Indebtedness,

(e) any expenses or charges (other than Consolidated Non-cash Charges) related to any issuance of Equity Interests, any Investment, acquisition, disposition, recapitalization or Incurrence, repayment, amendment or modification of Indebtedness permitted to be Incurred or repaid by the Indenture (including a refinancing thereof) (in each case, whether or not successful), including, without limitation, (i) such fees, expenses or charges related to the offering of the Notes and the Credit Facility Indebtedness and other Exit Financing, (ii) any amendment or other modification of the Notes or other Indebtedness, (iii) any additional interest in respect of the Notes and (iv) commissions, discounts, yield and other fees and charges (including any interest expense) related to any Receivables Financing; and

(f) business optimization expenses and other restructuring charges, reserves or expenses (which, for the avoidance of doubt, shall include, without limitation, the effect of inventory optimization programs, facility consolidations, retention, headcount reductions, systems establishment costs, contract termination costs, future lease commitments and excess pension charges); and

(3) the amount of net cost savings projected by such Person in good faith to be realized by specified actions taken or to be taken prior to or during such period (calculated on a pro forma basis as though such cost savings had been realized on the first day of such period); *provided* that (x) such cost savings are reasonably identifiable and factually supportable and (y) such actions have been taken or are to be taken within twelve months of the date of determination to take such action and the benefit is expected to be realized within twelve months of taking such action; minus

(4) any non-cash gains increasing Consolidated Net Income of such Person for such period (excluding (i) the recognition of deferred revenue or any items which represent the reversal of any accrual of, or cash reserve for, anticipated cash charges that reduced EBITDA in any prior period and any items for which cash was received in a prior period, (ii) items referenced in clause (e) of Consolidated Net Income and (iii) gains which have been offset against losses in determining Consolidated Net Income but for which the loss has not been added back as a Consolidated Non-cash Charge pursuant to the definition of Consolidated EBITDA);

all as determined on a consolidated basis for such Person and its Restricted Subsidiaries in accordance with GAAP.

Notwithstanding anything herein to the contrary, Consolidated EBITDA for the Fiscal Quarter ending (i) June 30, 2009 shall be deemed to be $551.0 million, (ii) September 30, 2009 shall be deemed to be $757.0 million and (iii) December 31, 2009 shall be deemed to be $578.0 million, before giving *pro forma* effect to any transaction occurring after the Issue Date.

"Consolidated Interest Expense" means, with respect to any Person for any period, the consolidated interest expense (net of interest income for such period) of such Person and its Restricted Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, to the extent such expense was deducted in computing Consolidated Net Income, including, without limitation:

(1) amortization of original issue discount,

(2) the interest component of Capitalized Lease Obligations paid, accrued and/or scheduled to be paid or accrued,

(3) net payments and receipts (if any) pursuant to interest rate Hedging Obligations,

(4) consolidated capitalized interest of such Person and its Restricted Subsidiaries for such period, whether paid or accrued, and

(5) the interest portion of any deferred payment obligation,

but excluding, in each case, any amortization of fees, debt issuance costs and commissions incurred in connection with the Credit Facilities, any Receivables Financing, the issuance of the Notes, the Plan Roll-Up Notes, the Euro Securitization and any other debt issuance.

For purposes of this definition, interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by the Issuer to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

"*Consolidated Net Income*" means, with respect to any Person, for any period:

(1) the Net Income of such Person and its Restricted Subsidiaries for such period on a consolidated basis; plus

(2) cash dividends or distributions paid to such Person or any Restricted Subsidiary of such Person by any other Person (the "*Payor*") other than a Restricted Subsidiary, to the extent not otherwise included in Consolidated Net Income, which have not been derived from Indebtedness of the Payor to the extent such Indebtedness is Guaranteed by such referent Person or any Restricted Subsidiary of such referent Person;

provided that there shall be excluded therefrom, without duplication (but only to the extent included in the calculation of the foregoing):

(a)(i) any net after-tax income or loss from operating results of discontinued operations as defined by GAAP, and (ii) any net after-tax gains or losses from sales of discontinued operations;

(b) any net after-tax extraordinary, nonrecurring or unusual gains or losses (less all fees and expenses relating thereto or expenses or charges, any severance expenses, relocation expenses, curtailments or modifications to pension and post-retirement employee benefit plans, any expenses related to any reconstruction, decommissioning, recommissioning or reconfiguration of fixed assets for alternate uses and fees, expenses or charges relating to facilities closing costs, acquisition integration costs, facilities opening costs, project start-up costs, business optimization costs, signing, retention or completion bonuses, expenses or charges related to any issuance of Equity Interests, Investment, acquisition, disposition, recapitalization or issuance, repayment, refinancing, amendment or modification of Indebtedness (in each case, whether or not successful), and all costs and expenses of such Person and its Restricted Subsidiaries Incurred in connection with the Cases and the Exit Financings);

(c) the Net Income of any Payor, other than a Restricted Subsidiary of such Person or Net Income of such Payor that is accounted for by the equity method of accounting, except to the extent of cash dividends or distributions paid to such Person or to a Restricted Subsidiary of such Person by such Payor (or to the extent converted into cash);

(d)(i) any restoration to income of any contingency reserve, except to the extent that provision for such reserve was made out of Consolidated Net Income accrued at any time following the Issue Date; and (ii) any restoration to or deduction from income for changes in estimates related to the post-emergence settlement of pre-petition claims obligations in relation with Chapter 11 following the Issue Date;

(e) in the case of a successor to such Person by consolidation or merger or as a transferee of such Person's assets, any gains or losses of the successor corporation prior to such consolidation, merger or transfer of assets;

(f) any charges or credits relating to any purchase accounting adjustments or to the adoption of fresh start accounting principles;

(g) any (i) one-time non-cash compensation charges, and (ii) non-cash costs or expenses resulting from stock option plans, employee benefit plans, compensation charges or post-employment benefit plans, or grants or awards of stock, stock appreciation or similar rights, stock options, restricted stock, Preferred Stock or other rights;

(h) Net Income for such period shall not include the cumulative effect of a change in accounting principles during such period;

(i) any net after-tax gains or losses (less all fees and expenses or charges relating thereto) attributable to business dispositions or asset dispositions other than in the ordinary course of business (as determined in good faith by management of the Company) or reserves relating thereto;

(j) any net after-tax gains or losses (less all fees and expenses or charges relating thereto) attributable to the early extinguishment of Indebtedness, Hedging Obligations or other derivative instruments entered in relation with the Indebtedness extinguished;

(k) any gain or loss for such period from currency translation gains or losses or net gains or losses related to currency remeasurements of Indebtedness (including any net loss or gain resulting from Hedging Obligations for currency exchange risk entered in relation with Indebtedness); and

(l) any impairment charges or asset write-offs, in each case pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP.

"*Consolidated Net Tangible Assets*" means, with respect to any Person, the Total Assets of such Person and its Restricted Subsidiaries less goodwill and intangibles (other than intangibles arising from, or relating to, intellectual property, licenses or permits (including, but not limited to, emissions rights) of such Person), in each case calculated in accordance with GAAP, *provided*, that in the event that such Person or any of its Restricted Subsidiaries assumes or acquires any assets in connection with the acquisition by such Person and its Restricted Subsidiaries of another Person subsequent to the commencement of the period for which the Consolidated Net Tangible Assets is being calculated but prior to the event for which the calculation of the Consolidated Net Tangible Assets is made, then the Consolidated Net Tangible Assets shall be calculated giving *pro forma* effect to such assumption or acquisition of assets, as if the same had occurred at the beginning of the applicable period.

"*Consolidated Non-cash Charges*" means, with respect to any Person, for any period, the consolidated depreciation, amortization and other non-cash expenses of such Person and its Restricted Subsidiaries (including the amortization of prior service costs and actuarial gains and losses related to pensions and other post-employment benefits) (including any lower-of-cost-or-market adjustments of inventory) reducing Consolidated Net Income of such Person and its Restricted Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP, *provided* that if any such non-cash expenses represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA in such future period to the extent paid, but excluding from this proviso, for the avoidance of doubt, amortization of a prepaid cash item that was paid in a prior period.

"*Contingent Obligations*" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("*primary obligations*") of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent:

(a)  to purchase any such primary obligation or any property constituting direct or indirect security therefor;

(b)  to advance or supply funds:

(a)  for the purchase or payment of any such primary obligation; or

(b)  to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

(c)  to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"*Covenant Suspension Event*" has the meaning ascribed to such term under "—Certain Covenants."

"*Credit Facilities*" means:

(a)  the Senior Term Loan Facility,

(b)  any Asset Backed Credit Facility;

(c)  any debt facilities or other financing arrangements (including, without limitation, commercial paper facilities) providing for revolving credit loans, term loans, letters of credit or other Indebtedness, including any notes, mortgages, guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements or refundings thereof and any indentures or credit facilities or commercial paper facilities that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount permitted to be borrowed thereunder or alters the maturity thereof (*provided* that such increase in borrowings is permitted under the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness Secured by Prior or Equal and Ratable Liens") or adds Restricted Subsidiaries as additional borrowers or guarantors thereunder and whether by the same or any other agent, lender or group of lenders; and

(d)  any such agreements, instruments or guarantees governing Indebtedness Incurred to refinance any Indebtedness or commitments referred to in clauses (a), (b) and (c) above whether by the same or any other lender or group of lenders.

"*Credit Facility Indebtedness*" means any and all amounts payable under or in respect of the Credit Facilities as amended, restated, supplemented, waived, replaced, restructured, repaid, refunded, refinanced or otherwise modified from time to time (including after termination of the Senior Term Loan Facility), including principal, premium (if any), interest (including interest accruing on or after the filing of any petition in bankruptcy or for reorganization relating to the Company whether or not a claim for post-filing interest is allowed in such proceedings), fees, charges, expenses, reimbursement obligations, guarantees and all other amounts payable thereunder or in respect thereof.

"*Currency Agreement*" means, with respect to any Person, any foreign exchange contract, currency swap agreement, currency futures contract, currency option contract, currency derivative or other similar agreement to which such Person is a party or beneficiary.

"*Default*" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"*DIP Financing*" has the meaning ascribed to such term under "—Security – Third Lien Intercreditor Agreement."

"*DIP Financing Liens*" has the meaning ascribed to such term under "—Security – Third Lien Intercreditor Agreement."

"*DIP Lenders*" has the meaning ascribed to such term under "—Security – Third Lien Intercreditor Agreement."

"*DIP Roll-Up Claims*" means the Roll-Up Loans and all related Obligations of the Issuer and certain of its Affiliates under, and as is defined in, the Debtor-in-Possession Credit Agreement, dated as of March 3, 2009 among LyondellBasell Industries AF S.C.A., the other borrowers thereto (each, a debtor and debtor-in-possession under Chapter 11), the administrative agent and collateral agent, the syndication agent, joint lead arranger and sole bookrunner, as amended, supplemented, modified, extended, restructured, renewed, restated, refinanced or replaced in whole or in part from time to time, and as ordered by the Bankruptcy Court, as of the Release Date.

"*Discharge of ABL Obligations*" shall mean, except to the extent otherwise provided in the Junior Lien Intercreditor Agreement with respect to the reinstatement or continuation of any ABL Obligations under certain circumstances, the payment in full in cash (except for contingent indemnities and cost and reimbursement obligations to the extent no claim has been made) of all ABL Obligations then outstanding, if any, and with respect to letters of credit or letter of credit guaranties outstanding under the ABL Facility, delivery of cash collateral or backstop letters of credit in respect thereof in a manner reasonably satisfactory to the ABL Collateral Agent and issuing lenders under the ABL Facility, in each case after or concurrently with the termination of all commitments to extend credit thereunder, and the termination of all commitments of "secured parties" under the ABL Facility (as defined therein); *provided* that the Discharge of ABL Obligations shall not be deemed to have occurred if such payments are made in connection with the establishment of a replacement Asset Backed Credit Facility (unless in connection with such replacement all of the ABL Obligations are repaid in full in cash (and the other conditions set forth in this definition prior to the *proviso* are satisfied) with the proceeds of a Qualified Receivables Financing, in which case a Discharge of ABL Obligations shall be deemed to have occurred). In the event the ABL Obligations are modified and the ABL Obligations are paid over time or otherwise modified pursuant to Section 1129 of the Bankruptcy Code, the ABL Obligations shall be deemed to be discharged when the final payment is made, in cash, in respect of such indebtedness and any obligations pursuant to such new indebtedness shall have been satisfied.

"*Discharge of First and Second Priority Lien Obligations*" shall mean, except to the extent otherwise provided in the Junior Lien Intercreditor Agreement with respect to the reinstatement or continuation of any First Priority Lien Obligation or Second Priority Lien Obligation under certain circumstances, payment in full in cash (except for contingent indemnities and cost and reimbursement obligations to the extent no claim has been made) of all First and Second Priority Lien Obligations and, with respect to any letters of credit or letter of credit guaranties outstanding under the First Lien Documents or Second Lien Documents, delivery of cash collateral or backstop letters of credit in respect thereof in a manner consistent with such First Lien Document or Second Lien Document, in each case after or concurrently with the termination of all commitments to extend credit thereunder, and the termination of all

commitments of the First Lien Secured Parties or Second Lien Secured Parties under the First Lien Documents or Second Lien Documents. as the case may be; *provided* that the Discharge of First and Second Priority Lien Obligations shall not be deemed to have occurred if such payments are made with the proceeds of other First Priority Lien Obligations or Second Priority Lien Obligations that constitute an exchange or replacement for or a refinancing of such Obligations, First Priority Lien Obligations or Second Priority Lien Obligations. In the event the First Priority Lien Obligations or Second Priority Lien Obligations are modified and the Obligations are paid over time or otherwise modified pursuant to Section 1129 of the Bankruptcy Code, the First Priority Lien Obligations and Second Priority Lien Obligations shall be deemed to be discharged when the final payment is made, in cash, in respect of such indebtedness and any obligations pursuant to such modified indebtedness shall have been satisfied.

"*Discharge of First Priority Lien Obligations*" shall mean, except to the extent otherwise provided in the Junior Lien Intercreditor Agreement with respect to the reinstatement or continuation of any First Priority Lien Obligation under certain circumstances, payment in full in cash (except for contingent indemnities and cost and reimbursement obligations to the extent no claim has been made) of all First Priority Lien Obligations and, with respect to any letters of credit or letter of credit guaranties outstanding under the First Lien Documents, delivery of cash collateral or backstop letters of credit in respect thereof in a manner consistent with such First Lien Document, in each case after or concurrently with the termination of all commitments to extend credit thereunder, and the termination of all commitments of the First Lien Secured Parties under the First Lien Documents; *provided* that the Discharge of First Priority Lien Obligations shall not be deemed to have occurred if such payments are made with the proceeds of other First Priority Lien Obligations that constitute an exchange or replacement for or a refinancing of such Obligations or First Priority Lien Obligations. In the event the First Priority Lien Obligations are modified and the Obligations are paid over time or otherwise modified pursuant to Section 1129 of the Bankruptcy Code, the First Priority Lien Obligations shall be deemed to be discharged when the final payment is made, in cash, in respect of such indebtedness and any obligations pursuant to such modified indebtedness shall have been satisfied.

"*Disqualified Stock*" means, with respect to any Person, any Capital Stock of such Person which, by its terms (or by the terms of any security into which it is convertible or for which it is redeemable or exchangeable), or upon the happening of any event:

(a)  matures or is mandatorily redeemable, pursuant to a sinking fund Obligation or otherwise (other than as a result of a change of control or asset sale),

(b)  is convertible or exchangeable for Indebtedness or Disqualified Stock of such Person, or

(c)  is redeemable at the option of the holder thereof, in whole or in part (other than solely as a result of a change of control or asset sale),

in each case prior to 91 days after the earlier of the maturity date of the Notes or the date the Notes are no longer outstanding; *provided*, that only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock; *provided*, *further*, that if such Capital Stock is issued to any employee or to any plan for the benefit of employees of the Company or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Company in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability; *provided*, *further*, that any class of Capital Stock of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of Capital Stock that is not Disqualified Stock shall not be deemed to be Disqualified Stock.

"*Domestic Subsidiary*" means a Restricted Subsidiary that is not a Foreign Subsidiary.

"*Equity Interests*" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"*Equity Offering*" means any public or private sale after the Issue Date of common stock or Preferred Stock (other than Disqualified Stock) of the Company or any direct or indirect parent entity of the Company (to the extent the proceeds thereof are contributed to the Company), as applicable, on a primary basis, other than:

(a)  public offerings with respect to the Company's or such direct or indirect parent entity's common stock registered on Form S-4 or Form S-8;

(b)  issuances to any Subsidiary of the Company; and

(c)  any such public or private sale that constitutes an Excluded Contribution.

"*Euro Securitization*" means the transaction to be dated as of its effective date entered into in connection with the €450 million revolving securitization facility of trade account receivables with Basell Sales and Marketing Company B.V. and Lyondell Chemie Nederland B.V., as sellers, and Basell Polyolefins Collections Ltd., as receivables purchaser, as such facility may be amended, supplemented, modified, extended, restructured, renewed, restated, refinanced or replaced in whole or in part from time to time.

"*Excluded Assets*" has the meaning ascribed to such term under "—Security—General."

"*Excluded Subsidiary*" means (i) any Receivables Subsidiary, (ii) any Qualified Non-Recourse Subsidiary, (iii) any Special Purpose Subsidiary, (iv) any Wholly Owned Domestic Subsidiary that is a subsidiary of a Foreign Subsidiary, and (v) any Domestic Subsidiary of the Company as of the Issue Date or at any time thereafter meeting any one of the following conditions that has been designated by the Issuer as an Excluded Subsidiary in a writing to the Trustee (which designation may be rescinded by granting a Guarantee in accordance with the requirements of the Indenture): (a) the Total Assets of such Domestic Subsidiary determined as of the end of the fiscal year of the Company most recently ended for which financial statements are required to be delivered under the Indenture does not exceed $37.5 million, or (b) the Consolidated EBITDA of such Domestic Subsidiary does not exceed $37.5 million, for the period of four consecutive quarters of the Company most recently ended for which financial statements are required to be delivered pursuant to the Indenture; *provided* that if, at any time or from time to time after the Issue Date, Domestic Subsidiaries (other than a Special Purpose Subsidiary) shall not be designated as Excluded Subsidiaries to the extent that such Domestic Subsidiaries under this clause (v) would represent, in the aggregate, (a) 7.5% or more of Total Assets of the Company at the end of the most recently ended fiscal year of the Company or (b) 7.5% or more of the Consolidated EBITDA of the Company for the most recently ended fiscal year, in each case, based upon the most recent financial statements required to be delivered pursuant to the Indenture; *provided, further,* that, if the most recent financial statements required to be delivered pursuant to the Indenture for any fiscal quarter occurring after the Issue Date indicate that, by reason of subsequent changes following the designation of any one or more Restricted Subsidiaries as an Excluded Subsidiary or Excluded Subsidiaries, the foregoing requirements of this definition would not be complied with (other than as a result of an impairment charge), individually or in the aggregate, then the Company shall use commercially reasonable efforts to promptly (but in any event within 180 days after the date the financial statements are required), rescind such designations as are necessary, and provide such Guarantees as are necessary, so as to comply with the requirements of the Indenture. Any uncured Default shall not occur until the expiration of such 180-day provided such efforts are used.

" *Exit Financing*" means that certain financing to finance the Reorganization Plan expected to be composed of the Senior Term Loan Facility, the ABL Facility, the Euro Securitization, the Plan Roll-Up Notes and the Notes.

"*Fair Market Value*" means, with respect to any asset or property, the price which could be negotiated in an arm's-length transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction; *provided* that, other than as expressly set forth in the Indenture, for purposes of determining the "Fair Market Value" of any property or assets, such Fair Market Value shall be determined by (x) the Company in good faith with respect to property or assets with a Fair Market Value not in excess of $250.0 million, (y) an opinion as to the Fair Market Value issued by a qualified accounting, appraisal, financial advisory or investment banking firm or (z) the Board of Directors of the Company, as evidenced by a certificate of an officer of the Company, with respect to property or assets with a Fair Market Value in excess of $250.0 million.

"*First Lien Collateral Agents*" mean the Collateral Agent and the Senior Term Loan Collateral Agent.

"*First Lien Documents*" means the credit, guarantee and security documents governing the First Priority Lien Obligations (and any Additional First Priority Lien Obligations), including, without limitation, the Indenture and the First Lien Security Documents.

"*First Lien Indenture*" means the indenture under which the First Lien Notes are issued, as amended, supplemented, modified, extended, restructured, renewed or restated in whole or in part from time to time, in accordance with the terms thereof.

"*First Lien Intercreditor Agreement*" has the meaning ascribed to such term under "—Security—First Lien Intercreditor Agreement."

"*First Lien Notes*" means the 8.000% notes due on November 1, 2017, issued by LBI Escrow Corporation, as predecessor to the Issuer as amended, supplemented, modified, extended, restructured, renewed, restated, refinanced, defeased or replaced in whole or in part from time to time.

"*First Lien Notes Collateral Agent*" means Deutsche Bank Trust Company Americas as collateral agent under the First Lien Notes.

"*First Lien Notes Obligations*" means Obligations in respect of the First Lien Notes (including other first lien notes Incurred pursuant to clause (a) of the second paragraph of the covenant described under "—Certain Covenants—Limitation on Incurrence of Indebtedness Secured by Prior or Equal and Ratable Liens"), the First Lien Indenture and the Security Documents, including, for the avoidance of doubt, Obligations in respect of exchange notes and guarantees thereof.

"*First Lien Paying Agent*" means any Person authorized by the Issuer to pay the principal of or interest on any First Lien Notes on behalf of the Issuer. Deutsche Bank Trust Company Americas shall initially be the First Lien Paying Agent with respect to the U.S. Dollar-denominated First Lien Notes on the Issue Date and Deutsche Bank AG, London Branch shall initially be the Paying Agent with respect to the Euro-denominated First Lien Notes on the Issue Date.

"*First Lien Secured Parties*" means (a) the "Secured Parties," as defined in the Senior Term Loan Facility, (b) the "Secured Parties," as defined in the Collateral Agreement and (c) any Additional First Lien Secured Parties.

"*First Lien Security Documents*" means the Security Documents and any other agreement, document or instrument pursuant to which a Lien is granted or purported to be granted securing First Priority Lien Obligations, and any Additional First Priority Lien Obligations or under which rights or remedies with respect to such Liens are governed, in each case to the extent relating to the collateral securing both the First Priority Lien Obligations.

"*First Lien Trustee*" means the party named as such in the First Lien Indenture until a successor replaces it and, thereafter, means the successor.

"*First Priority After-Acquired Property*" means (x) at any time the outstanding principal amount of loans under the Senior Term Loan Facility is greater than $500.0 million, any property of the Company, the Issuer or any Pledgor that secures any First Priority Lien Obligations and Other First-Lien Obligations other than the First Lien Notes that is not already subject to the Lien under the Security Documents, other than any Excluded Assets, and (y) if clause (x) is not applicable, then any property of the Company, the Issuer or any Pledgor that constitutes Notes Collateral (other than Excluded Assets).

"*First Priority Lien Obligations*" means all Indebtedness (other than Permitted Indebtedness) secured by a Lien (a "Specified Lien") on property and assets of the Company, the Issuer and the Pledgors with a Fair Market Value equal to, or the greater than, the greater of (i) 2% of Consolidated Net Tangible Assets and (ii) $280 million, having priority over the Lien securing the Notes.

"*First Priority Secured Indebtedness Leverage Ratio*" means, with respect to any Person, at any date the ratio of (i) (x) the amount of Secured Indebtedness constituting First Priority Lien Obligations of such Person and its Restricted Subsidiaries as of such date of calculation less (y) the amount of any such Person's Cash Equivalents (each as determined on a consolidated basis in accordance with GAAP) to (ii) Consolidated EBITDA of such Person for the four full fiscal quarters for which internal financial statements are available immediately preceding such date of such calculation. In the event that the Company or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness subsequent to the commencement of the period for which the First Priority Secured Indebtedness Leverage Ratio is being calculated but prior to the event for which the calculation of the First Priority Secured Indebtedness Leverage Ratio is made (the "*First Lien Secured Leverage Calculation Date*"), then the First Priority Secured Indebtedness Leverage Ratio shall be calculated giving *pro forma* effect to such Incurrence, repayment, repurchase or redemption of Indebtedness as if the same had occurred at the beginning of the applicable four-quarter period; *provided* that the Issuer may elect pursuant to an Officer's Certificate delivered to the Trustee to treat all or any portion of the commitment under any Indebtedness as being Incurred at such time, in which case any subsequent Incurrence of Indebtedness under such commitment shall not be deemed, for purposes of this calculation, to be an Incurrence at such subsequent time.

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, amalgamations, consolidations and discontinued operations (as determined in accordance with GAAP), in each case with respect to an operating unit of a business, and any operational changes that the Company or any of its Restricted Subsidiaries has determined to make and/or made during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the First Lien Secured Leverage Calculation Date shall be calculated on a *pro forma* basis assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations, discontinued operations and other operational changes (and the change of any associated Indebtedness and the change in Consolidated EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation, amalgamation, discontinued operation or operational change, in each case with respect to an operating unit of a business, that would have required adjustment pursuant to this definition, then the First Priority Secured Indebtedness Leverage Ratio shall be calculated giving *pro forma* effect thereto for such period as if such Investment, acquisition, disposition, discontinued operation, merger, amalgamation, consolidation or operational change had occurred at the beginning of the applicable four-quarter period.

For purposes of this definition, whenever *pro forma* effect is to be given to any event, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of the Company. Any such *pro forma* calculation may include adjustments appropriate, in the reasonable good faith determination of the Company as set forth in an Officer's Certificate, to reflect (1) operating expense reductions and other operating improvements or synergies reasonably expected to result from the applicable event and (2) all adjustments of the nature set forth as "Restructuring Adjustments" under "Unaudited Consolidated Pro Forma Financial Information" in this Offering Memorandum to the extent such adjustments, without duplication, continue to be applicable to such four-quarter period.

For the purposes of this definition, any amount in a currency other than U.S. Dollars will be converted to U.S. Dollars based on the average exchange rate for such currency for the most recent twelve-month period immediately prior to the date of determination or if any such Indebtedness is subject to a Currency Agreement with respect to the currency in which such Indebtedness is denominated covering principal, premium, if any, and interest on such Indebtedness, the amount of such Indebtedness and such

interest and premium, if any, shall be determined after giving effect to all payments in respect thereof under such Currency Agreement.

"*First Priority Secured Leverage Calculation Date*" has the meaning ascribed to such term in the definition of "First Priority Secured Indebtedness Leverage Ratio."

"*First Priority Secured Indebtedness Limit*" means $4,870 million plus, any Indebtedness constituting First Priority Lien Obligations Incurred to refinance, replace or defease any Indebtedness in respect of the Notes, the DIP Roll-Up Claims or the New Third Lien Notes.

"*First and Second Priority Lien Obligations*" means First Priority Lien Obligations and Second Priority Lien Obligations.

"*Foreign Subsidiary*" means a Restricted Subsidiary not organized or existing under the laws of the United States of America or any state or territory thereof or the District of Columbia and any direct or indirect Restricted Subsidiary of such Restricted Subsidiary.

"*GAAP*" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect on the Issue Date as adopted by the Company. For the purposes of the Indenture, the term "consolidated" with respect to any Person shall mean such Person consolidated with its Restricted Subsidiaries, and shall not include any Unrestricted Subsidiary, but the interest of such Person in an Unrestricted Subsidiary will be accounted for as an Investment.

"*Government Obligations*" means securities that are:

(a)    direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged, or

(b)    obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America the timely payment of which is unconditionally guaranteed as a full faith and credit Obligation by the United States of America, which, in each case, are not callable or redeemable at the option of the issuer thereof, and shall also include a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act) as custodian with respect to any such U.S. government obligations or a specific payment of principal of or interest on any such U.S. government obligations held by such custodian for the account of the holder of such depository receipt; *provided, however*, that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the U.S. government obligations or the specific payment of principal of or interest on the U.S. government obligations evidenced by such depository receipt.

"*Guarantee*" has the meaning ascribed to such term under "—The Guarantees."

"*Guarantor*" has the meaning ascribed to such term under "—The Guarantees."

"*Hedging Obligations*" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, emission rights, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "*Master Agreement*"), including any such obligations or liabilities under any Master Agreement.

"*holder*" or "*noteholder*" means the Person in whose name a Note is registered on the registrar's books.

"*Incur*" means issue, assume, guarantee, incur or otherwise become liable for; *provided, however*, that any Indebtedness or Capital Stock of a Person existing at the time such person becomes a Subsidiary (whether by merger, amalgamation, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the time it becomes a Subsidiary.

"*Indebtedness*" means, with respect to any Person:

(1)      the principal and premium (if any) of any funded indebtedness of such Person in respect of borrowed money, drawn letters of credit, banker's acceptances or in respect of Capitalized Lease Obligations, if such indebtedness would appear as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(2)      to the extent not otherwise included, any Obligation of such Person to be liable for, or to pay, as obligor, guarantor or otherwise, the Obligations referred to in clause (1) of another Person (other than by endorsement of negotiable instruments for collection in the ordinary course of business); and

(3)      to the extent not otherwise included, Indebtedness of the type referred to in clause (1) above of another Person secured by a Lien on any asset owned by such Person (whether or not such Indebtedness is assumed by such Person); provided, however, that the amount of such Indebtedness will be the lesser of: (a) the Fair Market Value of such asset at such date of determination, and (b) the amount of such Indebtedness of such other Person;

provided, however, that, notwithstanding the foregoing, Indebtedness shall be deemed not to include (1) Contingent Obligations Incurred in the ordinary course of business and not in respect of borrowed money; (2) deferred or prepaid revenues; (3) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed Obligations of the respective seller; or (4) Obligations under or in respect of reimbursement obligations, undrawn letters of credit, a Qualified Receivables Financing or Qualified Joint Venture Transaction.

Notwithstanding anything in the Indenture to the contrary, Indebtedness shall not include, and shall be calculated without giving effect to, the effects of Statement of Financial Accounting Standards No. 133 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under the Indenture as a result of accounting for any embedded derivatives created by the terms of such Indebtedness; and any such amounts that would have constituted Indebtedness under the Indenture but for the application of this sentence shall not be deemed an Incurrence of Indebtedness under the Indenture.

"*Indenture*" means the indenture under which the Notes are issued, as amended, supplemented, modified, extended, restructured, renewed or restated in whole or in part from time to time, in accordance with the terms thereof.

"*Intercreditor Agreements*" means, collectively, the Junior Lien Intercreditor Agreement and the Third Lien Intercreditor Agreement.

"*Insolvency or Liquidation Proceeding*" shall mean, with respect to any person, any (a) insolvency, bankruptcy, receivership, reorganization, readjustment, composition or other similar proceeding relating to such person or its property or creditors in such capacity, (b) proceeding for any liquidation, dissolution or other winding up of such person, voluntary or involuntary, whether or not involving insolvency or proceedings under the Bankruptcy Code, whether partial or complete and whether by operation of law or otherwise, (c) assignment for the benefit of creditors of such person or (d) other marshalling of the assets of such person.

"*Investment Grade Rating*" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other Rating Agency.

"*Investments*" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees (other than guarantees of performance made by the Company or any of its Restricted Subsidiaries in connection with a Joint Venture)), advances or capital contributions (excluding accounts receivable, trade credit and advances to customers and commission, travel and similar advances to officers, employees and consultants made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet of the Company in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property. For purposes of the definition of "Unrestricted Subsidiary":

(a)   "Investments" shall include the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of a Subsidiary of the Company at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided*, *however*, that, upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Company shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary equal to an amount (if positive) equal to:

(a)   the Company's "Investment" in such Subsidiary at the time of such redesignation less

(b)   the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of such Subsidiary at the time of such redesignation; and

(b)   any property transferred to or from an Unrestricted Subsidiary shall be valued at its Fair Market Value at the time of such transfer, in each case as determined in good faith by the Board of Directors of the Company.

"*Issue Date*" means [  ], 2010.

"*Issuer*" means Lyondell Chemical Company, a Delaware corporation, and any successor thereto in accordance with the Indenture.

"*Joint Venture*" means any joint venture entity, whether a company, unincorporated firm, association, partnership or any other entity which, in each case, is not a Subsidiary of the Company or any of its Restricted Subsidiaries but in which the Company or a Restricted Subsidiary has a direct or indirect equity or similar interest.

"*Junior Lien Intercreditor Agreement*" has the meaning ascribed to such term under "—Security—Junior Lien Intercreditor Agreement."

"*Lien*" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or similar encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law (including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest); *provided* that in no event shall an operating lease, rights of set-off or netting arrangements in the ordinary course of business be deemed to constitute a Lien.

"*Master Agreement*" has the meaning ascribed to such term in the definition of "Hedging Obligations"

"*Moody's*" means Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

"*Mortgaged Property*" means each parcel of Real Property owned or leased by the Company, the Issuer or any Pledgor encumbered by a Mortgage to secure the First Priority Lien Obligations.

"*Mortgages*" means, collectively, the mortgages, trust deeds, deeds of trust, deeds to secure debt, assignments of leases and rents, and other security documents delivered with respect to Mortgaged Properties, as amended, supplemented, modified, extended, restructured, renewed, restated or replaced in whole or in part from time to time.

"*Negromex Receivables Dispositions*" means any disposition of accounts receivables arising from transactions with Industrias Negromex, S.A. de C.V.

"*Net Income*" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"*New Third Lien Notes*" means the 11.000% notes due on May 1, 2018, issued by the Issuer as amended, supplemented, modified, extended, restructured, renewed, restated, refinanced, defeased or replaced in whole or in part from time to time.

"*Notes Collateral*" has the meaning ascribed to such term under "—Security—General."

"*Notes Obligations*" means Obligations in respect of the Notes, the Indenture and the Security Documents, including, for the avoidance of doubt, Obligations in respect of exchange notes and guarantees thereof.

"*Obligations*" means any principal, interest, penalties, fees, indemnifications, reimbursements (including, without limitation, reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other liabilities payable under the documentation governing any Indebtedness; *provided* that Obligations with respect to the Notes shall not include fees or indemnifications in favor of the Trustee and other third parties other than the holders of the Notes.

"*Offering Memorandum*" means the offering memorandum dated as of March 24, 2010, relating to the initial issuance of First Lien Notes under the First Lien Indenture.

"*Officer*" means the Chairman of the Board, Chief Executive Officer, Chief Financial Officer, President, any Executive Vice President, Senior Vice President or Vice President, the Treasurer or the Secretary of any Person.

"*Officer's Certificate*" means a certificate signed on behalf of any Person by an Officer of such Person, who must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of such Person, which meets the requirements set forth in the Indenture.

"*Oil Indexed Credit Facility*" means a working capital facility for which availability is conditioned upon the price per barrel of crude oil that is not less than $125.0 and the proceeds of which are utilized for working capital purposes and related fees and expenses.

"*Opinion of Counsel*" means a written opinion from legal counsel who is reasonably acceptable to the Trustee. The counsel may be an employee of or counsel to the Company or the Issuer or to the Trustee.

"*Other First-Lien Obligations*" means other Indebtedness of the Company and its Restricted Subsidiaries that is equally and ratably secured with the First Lien Notes as permitted by the First Lien Indenture and is designated by the Company as an Other First-Lien Obligation.

"*Owned Real Property*" means each parcel of Real Property that is owned in fee by the Company, the Issuer or any Pledgor that has an individual Fair Market Value of more than $25.0 million (*provided* that such $25.0 million threshold shall not be applicable in the case of any Real Property that is integrally related to the ownership or operation of a Mortgaged Property or otherwise necessary for such Mortgaged Property to be in compliance with all requirements of law applicable to such Mortgaged Property); *provided* that, with respect to any Real Property that is partially owned in fee and partially leased by the Company, the Issuer or any Pledgor, Owned Real Property will include only that portion of such Real Property that is owned in fee and only if (i) such portion that is owned in fee has an individual Fair Market Value of more than $25.0 million (*provided* that such $25.0 million threshold shall not be applicable in the case of Real Property that is integrally related to the ownership or operation of a Mortgaged Property or otherwise necessary for such Mortgaged Property to be in compliance with all requirements of law applicable to such Mortgaged Property) and (ii) a mortgage in favor of the Collateral Agent (for the benefit of the trustee and the holders of the Notes) is permitted on such portion of Real Property owned in fee by applicable law and by the terms of any lease or other applicable document governing any leased portion of such Real Property.

"*Paying Agent*" means any Person authorized by the Issuer to pay the principal of or interest on any Notes on behalf of the Issuer. Deutsche Bank Trust Company Americas shall initially be the Paying Agent on the Issue Date.

"*Payor*" has the meaning ascribed to such term under "—The Guarantees—Withholding Taxes."

"*Permitted Indebtedness*" has the meaning ascribed to such term under "—Certain Covenants—Limitation on Incurrence of Indebtedness Secured by Prior or Equal and Ratable Liens."

"*Permitted Liens*" means any Lien securing Permitted Indebtedness.

"*Person*" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"*Plan Roll-Up Notes*" means (a) third-priority senior secured notes of the Issuer and guaranteed by one or more Guarantors issued in respect of DIP Roll-Up Claims under the Reorganization Plan; *provided* that any Indebtedness issued in lieu of the Plan Roll-Up Notes in respect of DIP Roll-Up Claims will be deemed to be Plan Roll-Up Notes (provided that any such Indebtedness is Incurred in compliance with the terms of the Indenture applicable to refinancings and replacements of Plan Roll-Up Notes had they been issued pursuant to the Plan of Reorganization), or (b) any notes, mortgages, guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements or refundings thereof and any indentures or credit facilities or commercial paper facilities that replace, refund or refinance any part thereof.

"*Plan Roll-Up Notes Indenture*" means the indenture or indentures under which the Plan Roll-Up Notes are issued, as amended, supplemented, modified, extended, restructured, renewed, re-stated, refinanced or replaced in whole or in part from time to time all in accordance with this Indenture; provided no such amendment or modification may shorten the maturity of the Plan-Roll-Up Notes.

"*Plan Roll-Up Notes Trustee*" means, collectively, the trustee for the New Third Lien Notes, the trustee for the Notes, any Authorized Representative for any Additional Third Priority Lien Obligation, and, if the context so requires, the Authorized Collateral Agent for such trustees or Authorized Representatives.

"*Pledgor*" means any Guarantor other than the Company; *provided* that upon the release or discharge of such Subsidiary from its Obligations to pledge its assets and property to secure the Notes in accordance with the Indenture or the Security Documents, such Subsidiary ceases to be a Pledgor.

"*Preferred Stock*" means any Equity Interest with preferential right of payment of dividends or upon liquidation, dissolution, or winding up.

"*Purchase Money Indebtedness*" means any Indebtedness incurred to finance or refinance the acquisition, leasing, construction, repair, restoration, replacement, expansion or improvement of property (real or personal) or assets, and whether acquired through the direct acquisition of such property or assets, or otherwise, incurred in respect of capital expenditures.

"*Qualified Joint Venture Transaction*" means any transaction in which (i) Indebtedness is owed or incurred by any Restricted Subsidiary whose activities are limited to holding shares in Joint Ventures (but only to the extent that (a) the creditors under the relevant agreement have no recourse to the Company other than to such Restricted Subsidiary; and (b) the recourse those creditors have to such Restricted Subsidiary is limited to the proceeds (if any) of dividends received by such Restricted Subsidiary in respect of such Restricted Subsidiary's investment in such Joint Ventures) or (ii) involving guarantees by the Company or any Restricted Subsidiary of Indebtedness of a customer or a third party guarantor of such customer's Indebtedness that are made to a governmental

export credit agency, a state development bank or like governmental agency or organization to the extent that such guarantees are conditioned on a failure to perform by any of the Company, such Restricted Subsidiary or a joint venture under an engineering procurement or construction contract entered into with such customer or third party guarantor; *provided* that the aggregate amount of any Indebtedness referenced in this clause (ii) shall not at any time exceed 1.0% of Consolidated Net Tangible Assets of the Company.

"*Qualified Non-Recourse Debt*" means Indebtedness that (1) is (a) Incurred by a Qualified Non-Recourse Subsidiary to finance (whether prior to or within 270 days after) the acquisition, lease, construction, repair, replacement or improvement of any property (real or personal) or equipment (whether through the direct purchase of property or the Equity Interests of any person owning such property and whether in a single acquisition or a series of related acquisitions) or (b) assumed by a Qualified Non-Recourse Subsidiary, (2) is non-recourse to the Company, the Issuer and any Pledgor and (3) is non-recourse to any Restricted Subsidiary that is not a Qualified Non-Recourse Subsidiary.

"*Qualified Non-Recourse Subsidiary*" means (1) a Restricted Subsidiary that is not a Pledgor and that is formed or created after the Issue Date in order to finance an acquisition, lease, construction, repair, replacement or improvement of any property or equipment (directly or through one of its Subsidiaries) that secures Qualified Non-Recourse Debt and (2) any Restricted Subsidiary of a Qualified Non-Recourse Subsidiary.

"*Qualified Receivables Financing*" means any Receivables Financing that meets the following conditions (including, without limitation, the Euro Securitization, the Berre Facility and the Negromex Receivables Dispositions):

(a)  the Board of Directors of the Company shall have determined in good faith that such Qualified Receivables Financing (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Company and its Restricted Subsidiaries;

(b)  all sales of accounts receivable and related assets are made at Fair Market Value; and

(c)  the financing terms, covenants, termination events and other provisions thereof shall be market terms (as determined in good faith by the Company) and may include Standard Securitization Undertakings.

The grant of a security interest in any accounts receivable of the Company or any of its Restricted Subsidiaries to secure the ABL Facility, any Credit Facility Indebtedness or any Indebtedness in respect of the Notes and the New Third Lien Notes shall not be deemed a Qualified Receivables Financing.

"*Rating Agency*" means (1) S&P, (2) Moody's, or (3) if either or both of S&P and Moody's shall not then exist, a nationally recognized securities rating agency or agencies, as the case may be, selected by the Company, which shall be substituted for S&P or Moody's or both, as the case may be.

"*Real Property*" means, collectively, all right, title and interests (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all buildings, structures, parking areas and improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

 "*Receivables Financing*" means any transaction or series of transactions that may be entered into by the Company or any of its Subsidiaries pursuant to which the Company or any of its Subsidiaries may sell, convey or otherwise transfer to any other Person, including to a Receivables Subsidiary, or may grant a security interest in, bank accounts, any accounts receivable (whether now existing or arising in the future) of the Company or any of its Subsidiaries, and any assets related thereto including, without limitation, all collateral securing such accounts receivable, all contracts and all guarantees or other obligations in respect of such accounts receivable, proceeds of such accounts receivable and other assets which are customarily transferred or in respect of which security interests are customarily granted in connection with asset securitization transactions involving accounts receivable and any Hedging Obligations entered into by the Company or any such Subsidiary in connection with such accounts receivable.

"*Receivables Repurchase Obligation*" means any Obligation of a seller of receivables in a Qualified Receivables Financing to repurchase receivables arising as a result of a breach of a representation, warranty or covenant or otherwise, including as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, off-set or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

"*Receivables Subsidiary*" means a Wholly Owned Restricted Subsidiary of the Company (or another Person formed for the purposes of engaging in Receivables Financing with the Company in which the Company or any Subsidiary of the Company makes an Investment and to which the Company or any Subsidiary of the Company transfers accounts receivable and related assets) which engages in no activities other than in connection with the financing of accounts receivable of the Company and its Subsidiaries, all proceeds thereof and all rights (contractual or other), collateral and other assets relating thereto, and any business or activities incidental or related to such business, and which is designated by the Board of Directors of the Company (as provided below) as a Receivables Subsidiary and:

(a)  no portion of the Indebtedness or any other Obligations (contingent or otherwise) of which (i) is guaranteed by the Company or any other Subsidiary of the Company (excluding guarantees of Obligations (other than the principal of and interest on, Indebtedness) pursuant to Standard Securitization Undertakings), (ii) is recourse to or obligates the Company or any other Subsidiary of the Company in any way other than pursuant to Standard Securitization Undertakings, or (iii) subjects any property or asset of the Company or any other Subsidiary of the Company, directly or indirectly, contingently or otherwise, to the satisfaction thereof, other than pursuant to Standard Securitization Undertakings;

(b)  with which neither the Company nor any other Subsidiary of the Company has any material contract, agreement, arrangement or understanding other than on terms which the Company reasonably believes to be no less favorable to the Company or such Subsidiary than those that might be obtained at the time from Persons that are not Affiliates of the Company; and

(c)  to which neither the Company nor any other Subsidiary of the Company has any obligation to maintain or preserve such entity's financial condition or cause such entity to achieve certain levels of operating results.

Any such designation by the Board of Directors of the Company shall be evidenced to the Trustee by filing with the Trustee a certified copy of the resolution of the Board of Directors of the Company giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing conditions.

"*Refinancing Indebtedness*" has the meaning ascribed to such term under "—Certain Covenants—Limitation on Incurrence of Indebtedness Secured by Prior or Equal and Ratable Liens."

"*Release Date*" has the meaning ascribed to such term in the First Lien Indenture.

"*Relevant Taxing Jurisdiction*" has the meaning ascribed to such term under "—The Guarantees—Withholding Taxes."

"*Reorganization Plan*" means a plan of reorganization in any of the Cases.

"*Restricted Subsidiary*" means, with respect to any Person, any Subsidiary of such Person other than an Unrestricted Subsidiary of such Person. Unless otherwise indicated in this "Description of 2014 Notes," all references to Restricted Subsidiaries shall mean Restricted Subsidiaries of the Company. For the avoidance of doubt, the Issuer shall at all times constitute a Restricted Subsidiary.

"*Reversion Date*" has the meaning ascribed to such term under "—Certain Covenants."

"*Roll-Up Loans*" means $3,250 million of a dollar-for-dollar "roll-up" of previously outstanding senior secured loans.

"*S&P*" means Standard & Poor's Ratings Group or any successor to the rating agency business thereof.

"*Sale/Leaseback Transaction*" means an arrangement relating to property now owned or hereafter acquired by the Company or a Restricted Subsidiary whereby the Company or a Restricted Subsidiary transfers such property to a Person and the Company or such Restricted Subsidiary leases it from such Person, other than leases between the Company and a Restricted Subsidiary of the Company or between Restricted Subsidiaries of the Company or any Catalyst Sale/Leaseback Transaction.

"*SEC*" means the Securities and Exchange Commission or any successor agency or commission.

"*Second Lien Documents*" means the credit, guarantee and security documents governing the Second Priority Lien Obligations, including, without limitation, the ABL Facility and the Second Lien Security Documents.

"*Second Lien Secured Parties*" means (a) the "Secured Parties," as defined in the ABL Facility, (b) the "Secured Parties," as defined in the Collateral Agreement and (c) any Additional Second Lien Secured Parties.

"*Second Lien Security Documents*" means the Security Documents and any other agreement, document or instrument pursuant to which a Lien is granted or purported to be granted securing Second Priority Lien Obligations or under which rights or remedies with respect to such Liens are governed, in each case to the extent relating to the collateral securing the Second Priority Lien Obligations.

"*Second Priority After-Acquired Property*" means any property of the Company, the Issuer or any Pledgor that constitutes ABL Collateral (other than Excluded Assets).

"*Second Priority Lien Obligations*" has the meaning ascribed to such term in the First Lien Indenture.

"*Secured Credit Facility Indebtedness*" has the meaning ascribed to such term in the First Lien Indenture.

"*Secured Indebtedness*" means any Indebtedness (other than Purchase Money Indebtedness and Indebtedness of Non-Pledgors) secured by a Lien.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Security Documents*" means the security agreements, pledge agreements, collateral assignments, mortgages and related agreements, as amended, supplemented, modified, extended, restructured, renewed, restated or replaced in whole or in part from time to time, creating the security interests in the Collateral as contemplated by the Indenture.

"*Senior Term Loan Collateral Agent*" means UBS AG, Stamford Branch, as the collateral agent under the Senior Term Loan Facility, or its successors.

"*Senior Term Loan Facility*" means the senior secured term loan facility of the Issuer to be entered into on the Issue Date as amended, supplemented, modified, extended, restructured, renewed, restated, refinanced or replaced in whole or in part from time to time.

"*Series*" means (a) with respect to the First Lien Secured Parties, each of (i) the secured parties under the Senior Term Loan Facility (in their capacities as such), (ii) the holders of the First Lien Notes, the First Lien Notes Collateral Agent and the First Lien Trustee, each in their capacity as such) and (iii) the Additional First Lien Secured Parties that become subject to the First Lien Intercreditor Agreement after the date hereof that are represented by a common Authorized Representative (in its capacity as such for such Additional First Lien Secured Parties); (b) with respect to any First Priority Lien Obligations, each of (i) the Obligations under the Senior Term Loan Facility, (ii) the First Lien Notes Obligations and the Obligations in respect of any refunding, refinancing or defeasance of the First Lien Notes and (iii) the Additional First Priority Lien Obligations Incurred pursuant to any applicable agreement, which pursuant to any joinder agreement, are to be represented under the First Lien Intercreditor Agreement by a common Authorized Representative (in its capacity as such for such Additional First Priority Lien Obligations); and (c) with respect to any Third Priority Lien Obligations, each of (i) the Notes Obligations and the Obligations in respect of any refunding, refinancing or defeasance of the Notes, (ii) the New Third Lien Notes and the Obligations in respect of any refunding, refinancing or defeasance of the New Third Lien Notes and (iii) the Third Priority Lien Obligations Incurred after the Issue Date pursuant to any applicable agreement.

"*Significant Subsidiary*" means any Restricted Subsidiary that would be a "Significant Subsidiary" of the Company within the meaning of Rule 1-02 under Regulation S-X promulgated by the SEC (or any successor provision).

"*Special Purpose Subsidiary*" means any Subsidiary of the Company whose material assets are comprised solely of the Capital Stock of a Joint Venture, where the pledge of such Capital Stock would be prohibited by any contractual requirement pertaining to such Joint Venture.

"*Specified Lien*" has the meaning ascribed to such term in the definition of "*First Priority Lien Obligations*".

"*Specified Sale/Leaseback Transaction*" has the meaning ascribed to such term under "—Certain Covenants—Limitation on Sale/Leaseback Transactions."

"*Sponsor*" means Apollo Global Management, LLC and any of its successors in interest or Affiliates.

"*Standard Securitization Undertakings*" means representations, warranties, undertakings, covenants, indemnities and guarantees of performance entered into by the Company or any Subsidiary of the Company which the Company has determined in good faith to be customary in a Receivables Financing it being understood that any Receivables Repurchase Obligation shall be deemed to be a Standard Securitization Undertaking.

"*Stated Maturity*" means, with respect to any security, the date specified in such security as the fixed date on which the final payment of principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency beyond the control of the issuer unless such contingency has occurred).

"*Structured Financing Transaction*" means a sale of preferred shares of a Restricted Subsidiary, depositing the proceeds of such sale with a bank and pledging such deposit to guarantee a put and call with respect to such preferred shares.

"*Subordinated Indebtedness*" means (a) with respect to the Issuer, any Indebtedness of the Issuer which is by its terms subordinated in right of payment to the Notes, and (b) with respect to any Guarantor, any Indebtedness of such Guarantor which is by its terms subordinated in right of payment to Obligations in respect of the Notes.

"*Subsidiary*" means, with respect to any Person, (1) any corporation, association or other business entity (other than a partnership, joint venture or limited liability company) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof; (2) any partnership, joint venture or limited liability company of which (x) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general and limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof, whether in the form of membership, general, special or limited partnership interests or otherwise, and (y) such Person or any Subsidiary of such Person is a controlling general partner or otherwise controls such entity; or (3) with respect to the Company, for so long as the Company or any of its Subsidiaries, individually or in the aggregate, has at least a 50% ownership interest in Lyondell Bayer Manufacturing Maasvlakle VOF, Lyondell Bayer Manufacturing Maasvlakle VOF. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Company.

"*Suspended Covenants*" has the meaning ascribed to such term under "—Certain Covenants."

"*Suspension Period*" has the meaning ascribed to such term under "—Certain Covenants."

"*Taxes*" has the meaning ascribed to such term under "—The Guarantees—Withholding Taxes."

"*Third Lien Common Collateral*" means, at any time, Collateral in which the holders of two or more Series of Third Priority Lien Obligations (or their respective Authorized Representatives) hold a valid and perfected security interest at such time.  If more than two Series of Third Priority Lien Obligations are outstanding at any time and the holders of less than all Series of Third Priority Lien Obligations hold a valid and perfected security interest in any Collateral at such time then such Collateral shall constitute Third Lien Common Collateral for those Series of Third Priority Lien Obligations that hold a valid security interest in such Collateral at such time and shall not constitute Third Lien Common Collateral for any Series which does not have a valid and perfected security interest in such Collateral at such time.

"*Third Lien Controlling Secured Party*" means, with respect to any Third Lien Common Collateral, holders of the Series of Third Priority Lien Obligations whose Authorized Representative is the Authorized Collateral Agent for such Third Lien Common Collateral.

"*Third Lien Indenture*" means the indenture under which the New Third Lien Notes are issued, as amended, supplemented, modified, extended, restructured, renewed or restated in whole or in part from time to time, in accordance with the terms thereof.

"Third Lien Intercreditor Agreement" has the meaning ascribed to such term under "—Security—Third Lien Intercreditor Agreement."

"*Third Lien Intervening Creditor*" has the meaning ascribed to such term under "—Security—Third Lien Intercreditor Agreement."

"*Third Lien Non-Controlling Secured Party*" means, with respect to any Third Lien Common Collateral, the Third Lien Secured Parties that are not Third Lien Controlling Secured Parties with respect to such Third Lien Common Collateral.

"*Third Lien Notes Collateral Agent*" means [_____].

"*Third Lien Secured Indebtedness*" means:

(a)  with respect to the Issuer, the Notes and any other Indebtedness (other than Permitted Indebtedness) which ranks *pari passu* in right of payment to the Notes and is secured by a Specified Lien on an equal and ratable basis with the Notes; and

(b)  with respect to any Pledgor, its Obligations in respect of the Notes and any other Indebtedness (other than Permitted Indebtedness) which ranks *pari passu* in right of payment to such Pledgor's Obligations in respect of the Guarantees of the Notes and is secured by a Specified Lien on an equal and ratable basis with the Notes.

"*Third Lien Secured Indebtedness Limit*" means $3,245 million.

"*Third Lien Secured Indebtedness Leverage Ratio*" means, with respect to any Person, at any date the ratio of (i) (x) the amount of Secured Indebtedness constituting First Priority Lien Obligations and Third Lien Secured Indebtedness of such Person and its Restricted Subsidiaries as of such date of calculation less (y) the amount of any such Person's Cash Equivalents (each as determined on a consolidated basis in accordance with GAAP) to (ii) Consolidated EBITDA of such Person for the four full fiscal

quarters for which internal financial statements are available immediately preceding such date of such calculation. In the event that the Company or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness subsequent to the commencement of the period for which the Third Lien Secured Indebtedness Leverage Ratio is being calculated but prior to the event for which the calculation of the Third Lien Secured Indebtedness Leverage Ratio is made (the "*First Lien Secured Leverage Calculation Date*"), then the Third Lien Secured Indebtedness Leverage Ratio shall be calculated giving *pro forma* effect to such Incurrence, repayment, repurchase or redemption of Indebtedness as if the same had occurred at the beginning of the applicable four-quarter period; *provided* that the Issuer may elect pursuant to an Officer's Certificate delivered to the Trustee to treat all or any portion of the commitment under any Indebtedness as being Incurred at such time, in which case any subsequent Incurrence of Indebtedness under such commitment shall not be deemed, for purposes of this calculation, to be an Incurrence at such subsequent time.

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, amalgamations, consolidations and discontinued operations (as determined in accordance with GAAP), in each case with respect to an operating unit of a business, and any operational changes that the Company or any of its Restricted Subsidiaries has determined to make and/or made during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the First Lien Secured Leverage Calculation Date shall be calculated on a *pro forma* basis assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations, discontinued operations and other operational changes (and the change of any associated Indebtedness and the change in Consolidated EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation, amalgamation, discontinued operation or operational change, in each case with respect to an operating unit of a business, that would have required adjustment pursuant to this definition, then the Third Lien Secured Indebtedness Leverage Ratio shall be calculated giving *pro forma* effect thereto for such period as if such Investment, acquisition, disposition, discontinued operation, merger, amalgamation, consolidation or operational change had occurred at the beginning of the applicable four-quarter period.

For purposes of this definition, whenever *pro forma* effect is to be given to any event, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of the Company. Any such *pro forma* calculation may include adjustments appropriate, in the reasonable good faith determination of the Company as set forth in an Officer's Certificate, to reflect (1) operating expense reductions and other operating improvements or synergies reasonably expected to result from the applicable event and (2) all adjustments of the nature set forth as "Restructuring Adjustments" under "Unaudited Consolidated Pro Forma Financial Information" in this Offering Memorandum to the extent such adjustments, without duplication, continue to be applicable to such four-quarter period.

For the purposes of this definition, any amount in a currency other than U.S. Dollars will be converted to U.S. Dollars based on the average exchange rate for such currency for the most recent twelve-month period immediately prior to the date of determination or if any such Indebtedness is subject to a Currency Agreement with respect to the currency in which such Indebtedness is denominated covering principal, premium, if any, and interest on such Indebtedness, the amount of such Indebtedness and such interest and premium, if any, shall be determined after giving effect to all payments in respect thereof under such Currency Agreement.

"*Third Lien Secured Leverage Calculation Date*" has the meaning ascribed to such term in the definition of "Third Lien Secured Indebtedness Leverage Ratio."

"*Third Lien Secured Party*" means (a) the "Secured Parties," as defined in the Third Lien Notes Indenutre, (b) the "Secured Parties," as defined in the Collateral Agreement and (c) any Additional Third Lien Secured Parties.

"*Third Lien Trustee*" means the party named as such in the Third Lien Indenture until a successor replaces it and, thereafter, means the successor.

"*Third Priority Lien Obligations*" means (i) all Indebtedness under the Notes, (ii) the Notes Obligations and the Obligations in respect of any refunding, refinancing or defeasement of the Notes, (iii) all Indebtedness under the New Third Lien Notes, (iv) the Obligations in respect of the New Third Lien Notes and the Obligations in respect of any refunding, refinancing or defeasement of the Third Lien Notes and (v) Third Priority Lien Obligations that are Incurred after the Issue Date and secured by the Notes Collateral on a third priority basis pursuant to the Security Documents.

"*TIA*" means the Trust Indenture Act of 1939 (15 U.S.C. Sections 77aaa-77bbbb) as in effect on the date of the Indenture.

"*Total Assets*" means, with respect to any Person, the total consolidated assets of such Person and its Restricted Subsidiaries, without giving effect to any amortization of the amount of intangible assets since the Issue Date, (x) as shown on the most recent balance sheet of such Person, or (y) in regards to the Company only, as shown on the most recent balance sheet.

"*Transfer*" means any consolidation, amalgamation or merger with or into or winding up into, or sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the properties or assets of any Pledgor.

"*Treasury Services Agreement*" means any agreement between the Issuer, any Guarantor or Restricted Subsidiary and any commercial bank or other financial institution relating to treasury, depository, and cash management services, employee credit card arrangements or automated clearinghouse transfer of funds.

"*Trustee*" means the party named as such in the Indenture until a successor replaces it and, thereafter, means the successor.

"*Unrestricted Subsidiary*" means:

(a)  any Subsidiary of the Company that at the time of determination shall be designated an Unrestricted Subsidiary by the Board of Directors of such Person in the manner provided below; and

(b)  any Subsidiary of an Unrestricted Subsidiary;

The Company may designate any Subsidiary of the Company (including any newly acquired or newly formed Subsidiary of the Company) to be an Unrestricted Subsidiary unless such Subsidiary or any of its Subsidiaries owns any Equity Interests or Indebtedness of, or owns or holds any Lien on any property of, the Company or any other Subsidiary of the Company that is not a Subsidiary of the Subsidiary to be so designated; *provided*, *however*, that the Subsidiary to be so designated and its Subsidiaries do not at the time of designation have and do not thereafter Incur any Indebtedness pursuant to which the lender has recourse to any of the assets of the Company or any of its Restricted Subsidiaries (except as permitted under "—Certain Covenants—Limitation on Incurrence of Indebtedness Secured by Prior or Equal and Ratable Liens").

The Company may designate any Unrestricted Subsidiary to be a Restricted Subsidiary.

"*Unrestricted Subsidiary*"  has the meaning ascribed to such term in the First Lien Notes Indenture.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness or Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing (1) the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock multiplied by the amount of such payment, by (2) the sum of all such payments.

"*Wholly Owned Domestic Subsidiary*" is any Wholly Owned Subsidiary that is a Domestic Subsidiary.

"*Wholly Owned Restricted Subsidiary*" is any Wholly Owned Subsidiary that is a Restricted Subsidiary.

"*Wholly Owned Subsidiary*" of any Person means a Subsidiary of such Person 100% of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares or shares required to be held by Foreign Subsidiaries) shall at the time be owned by such Person or by one or more Wholly Owned Subsidiaries of such Person.

**TAB 14**

**LYONDELL CHEMICAL COMPANY**
as Issuer

**LYONDELLBASELL INDUSTRIES N.V.**
as Company

2014 Senior Secured Notes

_____

INDENTURE[1]
Dated as of [  ], 2010

_____

**WELLS FARGO BANK, N.A.**
as Trustee

_____

[1] The terms herein are intended to conform to the applicable DON and the DON is to control with respect to any conflict.  The 2014 Notes are the "Cram Down Notes" as defined in the Reorganization Plan.

Page

TABLE OF CONTENTS

ARTICLE I

DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.01.    Definitions ........................................................................................................... 1
SECTION 1.02.    Other Definitions .................................................................................................. 30
SECTION 1.03.    Incorporation by Reference of Trust Indenture Act ................................................. 31
SECTION 1.04.    Rules of Construction............................................................................................. 31

ARTICLE II

THE NOTES

SECTION 2.01.    Amount of Notes; Terms....................................................................................... 32
SECTION 2.02.    Form and Dating ................................................................................................... 33
SECTION 2.03.    Execution and Authentication................................................................................ 33
SECTION 2.04.    Registrar and Paying Agent ................................................................................... 34
SECTION 2.05.    Paying Agent to Hold Money in Trust ................................................................... 34
SECTION 2.06.    Holder Lists .......................................................................................................... 35
SECTION 2.07.    Transfer and Exchange.......................................................................................... 35
SECTION 2.08.    Replacement Notes ............................................................................................... 39
SECTION 2.09.    Outstanding Notes................................................................................................. 40
SECTION 2.10.    [Intentionally Omitted].......................................................................................... 40
SECTION 2.11.    Cancellation.......................................................................................................... 40
SECTION 2.12.    Defaulted Interest.................................................................................................. 40
SECTION 2.13.    CUSIP Numbers, ISINs, Etc.................................................................................. 40
SECTION 2.14.    Calculation of Principal Amount of Notes .............................................................. 41

ARTICLE III

REDEMPTION

SECTION 3.01.    Optional Redemption ............................................................................................ 41
SECTION 3.02.    Applicability of Article ......................................................................................... 41
SECTION 3.03.    Notices to Trustee ................................................................................................ 41
SECTION 3.04.    Selection of Notes to Be Redeemed....................................................................... 41
SECTION 3.05.    Notice of Optional Redemption ............................................................................. 42
SECTION 3.06.    Effect of Notice of Redemption ............................................................................ 42
SECTION 3.07.    Deposit of Redemption Price................................................................................. 43
SECTION 3.08.    Notes Redeemed in Part ........................................................................................ 43

Page

ARTICLE IV

COVENANTS

SECTION 4.01.    Payment of Notes ................................................................................. 43
SECTION 4.02.    [Intentionally Omitted] ......................................................................... 43
SECTION 4.03.    Limitation on Incurrence of Indebtedness Secured by Prior or Equal and
                 Ratable Liens .......................................................................................... 43
SECTION 4.04.    Limitation on Sale/Leaseback Transactions. ........................................ 46
SECTION 4.05.    [Intentionally Omitted] ......................................................................... 46
SECTION 4.06.    [Intentionally Omitted] ......................................................................... 46
SECTION 4.07.    [Intentionally Omitted] ......................................................................... 46
SECTION 4.08.    [Intentionally Omitted] ......................................................................... 47
SECTION 4.09.    Compliance Certificate. ........................................................................ 47
SECTION 4.10.    Further Instruments and Acts ................................................................ 47
SECTION 4.11.    Future Subsidiary Guarantors ............................................................... 47
SECTION 4.12.    Liens. ..................................................................................................... 47
SECTION 4.13.    After-Acquired Property ....................................................................... 47
SECTION 4.14.    Maintenance of Office or Agency ......................................................... 48
SECTION 4.15.    Maintenance of Insurance ..................................................................... 48
SECTION 4.16.    Covenant Suspension ............................................................................ 49
SECTION 4.17.    Withholding Taxes. ............................................................................... 49

ARTICLE V

SUCCESSOR COMPANY

SECTION 5.01.    When Issuer May Merge or Transfer Assets. ....................................... 50

ARTICLE VI

DEFAULTS AND REMEDIES

SECTION 6.01.    Events of Default .................................................................................. 52
SECTION 6.02.    Acceleration. ......................................................................................... 54
SECTION 6.03.    Other Remedies ..................................................................................... 54
SECTION 6.04.    Waiver of Past Defaults ........................................................................ 54
SECTION 6.05.    Control by Majority .............................................................................. 54
SECTION 6.06.    Limitation on Suits ................................................................................ 55
SECTION 6.07.    Rights of the Holders to Receive Payment ........................................... 55
SECTION 6.08.    Collection Suit by Trustee ..................................................................... 55
SECTION 6.09.    Trustee May File Proofs of Claim ......................................................... 55
SECTION 6.10.    Priorities ................................................................................................ 56
SECTION 6.11.    Undertaking for Costs ........................................................................... 56
SECTION 6.12.    Waiver of Stay or Extension Laws ........................................................ 56

Page

ARTICLE VII

TRUSTEE

SECTION 7.01.    Duties of Trustee ........................................................................ 57
SECTION 7.02.    Rights of Trustee ......................................................................... 58
SECTION 7.03.    Individual Rights of Trustee ........................................................ 59
SECTION 7.04.    Trustee's Disclaimer .................................................................... 59
SECTION 7.05.    Notice of Defaults ........................................................................ 60
SECTION 7.06.    Reports by Trustee to the Holders ............................................... 60
SECTION 7.07.    Compensation and Indemnity ...................................................... 60
SECTION 7.08.    Replacement of Trustee ............................................................... 61
SECTION 7.09.    Successor Trustee by Merger ....................................................... 62
SECTION 7.10.    Eligibility; Disqualification ........................................................ 62
SECTION 7.11.    Preferential Collection of Claims Against the Issuer .................. 62
SECTION 7.12.    [Intentionally Omitted] ................................................................ 62
SECTION 7.13.    Payment of Parallel Debt Pursuant to Dutch Law ...................... 62

ARTICLE VIII

DISCHARGE OF INDENTURE; DEFEASANCE

SECTION 8.01.    Discharge of Liability on Notes; Defeasance ............................. 63
SECTION 8.02.    Conditions to Defeasance ............................................................ 64
SECTION 8.03.    Application of Trust Money ......................................................... 65
SECTION 8.04.    Repayment to Issuer .................................................................... 65
SECTION 8.05.    Indemnity for U.S. Government Obligations ............................... 66
SECTION 8.06.    Reinstatement .............................................................................. 66

ARTICLE IX

AMENDMENTS AND WAIVERS

SECTION 9.01.    Without Consent of the Holders ................................................. 66
SECTION 9.02.    With Consent of the Holders ....................................................... 67
SECTION 9.03.    Compliance with Trust Indenture Act ......................................... 68
SECTION 9.04.    Revocation and Effect of Consents and Waivers ........................ 68
SECTION 9.05.    Notation on or Exchange of Notes .............................................. 69
SECTION 9.06.    Trustee to Sign Amendments ...................................................... 69
SECTION 9.07.    Additional Voting Terms; Calculation of Principal Amount ....... 69

ARTICLE X

RANKING OF NOTE LIENS

SECTION 10.01.    Relative Rights ........................................................................... 69

Page

134         ARTICLE XI
135
136         COLLATERAL

137    SECTION 11.01.    Security Documents ......................................................................... 71
138    SECTION 11.02.    Collateral Agent ............................................................................. 71
139    SECTION 11.03.    Authorization of Actions to Be Taken ........................................... 72
140    SECTION 11.04.    Release of Collateral ...................................................................... 73
141    SECTION 11.05.    Filing, Recording and Opinions...................................................... 74
142    SECTION 11.06.    [Intentionally Omitted.]................................................................... 75
143    SECTION 11.07.    Powers Exercisable by Receiver or Trustee ................................... 75
144    SECTION 11.08.    Release upon Termination of the Issuer's Obligations ................... 75
145    SECTION 11.09.    Designations ................................................................................... 76

146         ARTICLE XII
147
148         GUARANTEE

149    SECTION 12.01.    Guarantee ....................................................................................... 76
150    SECTION 12.02.    Limitation on Liability ................................................................... 78
151    SECTION 12.03.    Successors and Assigns ................................................................... 79
152    SECTION 12.04.    No Waiver ...................................................................................... 79
153    SECTION 12.05.    Modification ................................................................................... 79
154    SECTION 12.06.    Execution of Supplemental Indenture for Future Note Guarantors ......... 79
155    SECTION 12.07.    Non-Impairment ............................................................................ 79

156         ARTICLE XIII
157
158         MISCELLANEOUS

159    SECTION 13.01.    Trust Indenture Act Controls .......................................................... 80
160    SECTION 13.02.    Notices ........................................................................................... 80
161    SECTION 13.03.    Communication by the Holders with Other Holders........................ 80
162    SECTION 13.04.    Certificate and Opinion as to Conditions Precedent ...................... 80
163    SECTION 13.05.    Statements Required in Certificate or Opinion................................ 81
164    SECTION 13.06.    When Notes Disregarded................................................................. 81
165    SECTION 13.07.    Rules by Trustee, Paying Agent and Registrar ............................... 81
166    SECTION 13.08.    Legal Holidays ............................................................................... 81
167    SECTION 13.09.    GOVERNING LAW....................................................................... 81
168    SECTION 13.10.    No Recourse Against Others .......................................................... 82
169    SECTION 13.11.    Successors ...................................................................................... 82
170    SECTION 13.12.    Multiple Originals .......................................................................... 82
171    SECTION 13.13.    Table of Contents; Headings .......................................................... 82
172    SECTION 13.14.    Indenture Controls ......................................................................... 82
173    SECTION 13.15.    Severability..................................................................................... 82
174    SECTION 13.16.    Intercreditor Agreements............................................................... 82
175

176    EXHIBIT INDEX

177    Exhibit A          Form of Note
178    Exhibit B          Form of Supplemental Indenture Related to Subsidiary Guarantors

CROSS-REFERENCE TABLE

| TIA Section | Indenture Section |
|---|---|
| 310(a)(1) | 7.10 |
| (a)(2) | 7.10 |
| (a)(3) | N.A. |
| (a)(4) | N.A. |
| (b) | 7.08; 7.10 |
| (c) | N.A. |
| 311(a) | 7.11 |
| (b) | 7.11 |
| (c) | N.A. |
| 312(a) | 2.06 |
| (b) | 13.03 |
| (c) | 13.03 |
| 313(a) | 7.06 |
| (b)(1) | N.A. |
| (b)(2) | 7.06 |
| (c) | 7.06 |
| (d) | 4.02; 4.09 |
| 314(a) | 4.02; 4.09 |
| (b) | N.A. |
| (c)(1) | 13.04 |
| (c)(2) | 13.04 |
| (c)(3) | N.A. |
| (d) | N.A. |
| (e) | 13.05 |
| (f) | 4.10 |
| 315(a) | 7.01 |
| (b) | 7.05 |
| (c) | 7.01 |
| (d) | 7.01 |
| (e) | 6.11 |
| 316(a)(last sentence) | 13.06 |
| (a)(1)(A) | 6.05 |
| (a)(1)(B) | 6.04 |
| (a)(2) | N.A. |
| (b) | 6.07 |
| 317(a)(1) | 6.08 |
| (a)(2) | 6.09 |
| (b) | 2.05 |
| 318(a) | 13.01 |

N.A. Means Not Applicable.

Note:    This Cross-Reference Table shall not, for any purposes, be deemed to be part of this
Indenture.

184    INDENTURE dated as of [  ], 2010 among LYONDELL CHEMICAL COMPANY, a
185 Delaware corporation (the "<u>Issuer</u>"), LYONDELLBASELL INDUSTRIES N.V., a public limited liability
186 company formed under the laws of The Netherlands, as the ultimate parent company of the Issuer and as
187 the parent guarantor (the "<u>Company</u>"), each of the other Guarantors named herein, as guarantors, WELLS
188 FARGO BANK, N.A., as trustee (the "<u>Trustee</u>"), and [  ], as Registrar and Paying Agent (the "<u>Paying</u>
189 <u>Agent</u>").

190    The Issuer has duly authorized the execution and delivery of this Indenture to provide for
191 the issuance of (i) $[  ] aggregate principal amount of the Issuer's [the lowest interest rate possible in
192 compliance with Section 1129(b) of the Bankruptcy Code]% Senior Secured Notes due December 15,
193 2014 (the "<u>Initial Notes</u>").

194                   **ARTICLE I**
195
196       **DEFINITIONS AND INCORPORATION BY REFERENCE**

197    SECTION 1.01.  <u>Definitions</u>.

198    "<u>ABL Collateral Agent</u>" means the representative(s) from time to time administering the
199 collateral on behalf of the lenders under the ABL Facility.

200    "<u>ABL Facility</u>" means the asset based revolving credit agreement dated as of its effec-
201 tive date among the Issuer, Equistar Chemicals, L.P., Houston Refining L.P., LyondellBasell Acetyls
202 LLC and each other Subsidiary of the Issuer from time to time designated as a "Borrower" thereunder, the
203 lenders and agents party thereto and Citibank, N.A., as administrative agent, as amended, supplemented,
204 modified, extended, restructured, renewed, restated, refinanced or replaced in whole or in part from time
205 to time.

206    "<u>ABL Facility Collateral</u>" will consist of all present and after-acquired inventory, ac-
207 counts receivable, related contracts and other rights, deposit accounts into which proceeds of the forego-
208 ing are credited and books and records related thereto, together with all proceeds of the foregoing, in each
209 case to the extent of the rights, title and interest therein of any "Borrower" under the ABL Facility.

210    "<u>ABL Obligations</u>" means all Indebtedness and other Obligations under the ABL Facil-
211 ity.

212    "<u>Additional First Priority Lien Obligations</u>" means any First Priority Lien Obligations
213 that are Incurred after the Issue Date (other than Indebtedness Incurred under the Senior Term Loan Facil-
214 ity) and secured by the Common Collateral on a first priority basis pursuant to the Security Documents.

215    "<u>Additional First Lien Secured Party</u>" means the holders of any Additional First Priority
216 Lien Obligations, including the holders of the Notes, and any Additional First Lien Collateral Agent or
217 Authorized Representative with respect thereto, including the First Lien Trustee.

218    "<u>Additional Notes</u>" means additional Notes (other than the Initial Notes) issued from time
219 to time under this Indenture in accordance with Section 2.01 hereof.

220    "<u>Additional Second Lien Secured Party</u>" means the holders of any Additional Second
221 Priority Lien Obliga-tion, and any Additional Second Lien Collateral Agent or Authorized Representative
222 with respect thereto.

"Additional Third Priority Lien Obligations" means any Third Priority Lien Obligations that are Incurred after the Issue Date and secured on a basis equal to the Liens securing the Notes, provided such Lien is permitted to be Incurred under the First Lien Indenture, the Senior Term Loan Facility, the ABL Facility and the Indenture.

"Agent" means any Registrar, Paying Agent, Collateral Agent or Co-Registrar, including any permitted successors or assigns thereto.

"Applicable Procedures" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of the Depositary that apply to such transfer or exchange.

"Asset Backed Credit Facility" means (i) the ABL Facility; (ii) any credit facility provided on the basis of the value of inventory, accounts receivable or other current assets (and related documents and intangibles) to the Company or any of its Subsidiaries or similar instrument; and (iii) any similar credit support agreements or guarantees Incurred from time to time, as amended, supplemented, modified, extended, restructured, renewed, restated, refinanced or replaced in whole or in part from time to time; *provided* that any credit facility that refinances or replaces an Asset Backed Credit Facility must comply with clause (ii) of this definition in order to be an Asset Backed Credit Facility; and *provided*, *further*, that, if at the time any such refinancing or replacement is necessary or advisable in the good faith judgment of the Board of Directors of the Company, and an Asset Backed Credit Facility that complies with clause (ii) of this definition is not available on terms considered commercially reasonable for facilities of this nature (as determined in the good faith judgment of the Board of Directors of the Company), then the ABL Facility may be refinanced with or replaced by any Credit Facility and such Credit Facility shall be an Asset Backed Credit Facility for purposes hereof.

"Authorized Representative" means (i) in the case of any Obligations under the Senior Term Loan Facility or the secured parties under the Senior Term Loan Facility, the Senior Term Loan Collateral Agent, (ii) in the case of the Obligations under the First Lien Notes or the holders of the First Lien Notes, the First Lien Notes Collateral Agent, (iii) in the case of the ABL Facility, the ABL Collateral Agent and (iv) in the case of any Series of Additional First Priority Lien Obligations that become subject to the First Lien Intercreditor Agreement, the Authorized Representative named for such Series in the applicable joinder agreement.

"Bankruptcy Code" means the United States Bankruptcy Code, 11 U.S.C. Section 101 *et seq.*, as amended from time to time.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

"Basell GmbH" means Basell Germany Holdings GmbH and any successor in interest thereto.

"Berre Facility" means any receivables-backed credit or factoring facility entered into by one or more Foreign Subsidiaries (other than Basell GmbH) related to receivables of the refinery located in Berre, France, and any permitted refinancings thereof.

"Board of Directors" means, as to any Person, the board of directors, supervisory board of such Person, or equivalent governing body (or, if such Person is a partnership or limited liability company, the board of directors or other governing body of the general partner of such Person or manager) or any duly authorized committee thereof.

"Business Day" means a day other than a Saturday, Sunday or other day on which bank-
ing institutions are authorized or required by law to close in New York City, London or The Netherlands.

"Borrowing Base" has the meaning ascribed to such term under Section 4.03.

"Capital Stock" means:

        (1)     in the case of a corporation, corporate stock or shares;

        (2)     in the case of an association or business entity, any and all shares, interests, par-
ticipations, rights or other equivalents (however designated) of corporate stock;

        (3)     in the case of a partnership or limited liability company, partnership or member-
ship interests (whether general or limited); and

        (4)     any other interest or participation that confers on a Person the right to receive a
share of the profits and losses of, or distributions of assets of, the issuing Person.

"Capitalized Lease Obligation" means, at the time any determination thereof is to be
made, the amount of the liability in respect of a capital lease that would at such time be required to be
capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance
with GAAP.

"Cases" means the proceedings of LyondellBasell Industries AF S.C.A. and certain of its
Subsidiaries and affiliates, as debtors and debtors-in-possession under Chapter 11.

"Cash Equivalents" means:

        (1)     U.S. Dollars, pounds sterling, Euros, the national currency of any member state
in the European Union or, in the case of any Foreign Subsidiary that is a Restricted Subsidiary,
such local currencies held by it from time to time in the ordinary course of business;

        (2)     securities issued or directly and fully guaranteed or insured by the U.S. govern-
ment or any country that is a member of the European Union (other than Greece or Portugal) or
any agency or instrumentality thereof in each case maturing not more than two years from the
date of acquisition;

        (3)     certificates of deposit, time deposits and Eurodollar time deposits with maturities
of one year or less from the date of acquisition, bankers' acceptances, in each case with maturities
not exceeding one year and overnight bank deposits, in each case with any commercial bank or
trust company having capital and surplus in excess of $250.0 million and whose long-term debt is
rated "A" or the equivalent thereof by Moody's or S&P (or reasonably equivalent ratings of an-
other internationally recognized ratings agency);

        (4)     repurchase obligations and reverse repurchase obligations for underlying securi-
ties of the types described in clauses (2) and (3) above entered into with any financial institution
meeting the qualifications specified in clause (3) above;

        (5)     commercial paper issued by a corporation (other than an Affiliate of the Com-
pany) rated at least "A-1" or the equivalent thereof by Moody's or S&P (or reasonably equivalent

ratings of another internationally recognized ratings agency) and in each case maturing within one year after the date of acquisition;

(6)    readily marketable direct obligations issued by any state of the United States of America or any political subdivision thereof having one of the two highest rating categories obtainable from either Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) in each case with maturities not exceeding two years from the date of acquisition;

(7)    Indebtedness issued by Persons (other than the Sponsors or any of their Affiliates) with a rating of "A" or higher from S&P or "A-2" or higher from Moody's (or reasonably equivalent ratings of another internationally recognized ratings agency) in each case with maturities not exceeding two years from the date of acquisition;

(8)    U.S. Dollar-denominated money market funds as defined in Rule 2a-7 of the General Rules and Regulations promulgated under the Investment Company Act of 1940;

(9)    tax-exempt floating-rate option tender bonds backed by letters of credit issued by a national or state bank whose long-term unsecured debt has a rating of AA or better by S&P or Aa2 or better by Moody's or the equivalent rating by any other internationally recognized rating agency; and

(10)    investment funds investing at least 95% of their assets in securities of the types described in clauses (1) through (9) above.

"Catalyst Sale/Leaseback Transaction" means a Sale/Leaseback Transaction that relates to a catalyst containing one or more precious metals used by the Company or any of its Restricted Subsidiaries in the ordinary course of business.

"Chapter 11" means Chapter 11 of the Bankruptcy Code.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means all property subject or purported to be subject, from time to time, to a Lien under any Security Documents.

"Collateral Agent" means Wells Fargo, N.A., as collateral agent under the Security Documents, together with its successors in such capacity.

"Common Collateral" means, at any time, Collateral in which the holders of two or more Series of First Priority Lien Obligations (or their respective Authorized Representatives) hold a valid and perfected security interest at such time.  If more than two Series of First Priority Lien Obligations are outstanding at any time and the holders of less than all Series of First Priority Lien Obligations hold a valid and perfected security interest in any Collateral at such time, then such Collateral shall constitute Common Collateral for those Series of First Priority Lien Obligations that hold a valid security interest in such Collateral at such time and shall not constitute Common Collateral for any Series which does not have a valid and perfected security interest in such Collateral at such time.

"Company " means LyondellBasell Industries N.V., a *naamloze vennootschap* (public limited liability corporation) formed under the laws of The Netherlands, and any successor in interest thereto.

"Consolidated EBITDA" means, with respect to any Person, for any period, the sum (without duplication) of:

(1)    Consolidated Net Income;

(2)    to the extent Consolidated Net Income has been reduced thereby;

(a)    taxes of such Person and its Restricted Subsidiaries paid or accrued in accordance with GAAP for such period based on income, profits or capital, including, without limitation, state, franchise, property and similar taxes and foreign withholding taxes (including penalties and interest related to such taxes or arising from tax examinations), or such equivalent items in any foreign jurisdiction;

(b)    Consolidated Interest Expense;

(c)    Consolidated Non-cash Charges;

(d)    the amount of net loss resulting from the payment of any premiums, fees or similar amounts that are required to be paid under the terms of the instrument(s) governing any Indebtedness upon the repayment, prepayment or other extinguishment of such Indebtedness in accordance with the terms of such Indebtedness;

(e)    any expenses or charges (other than Consolidated Non-cash Charges) related to any issuance of Equity Interests, any Investment, acquisition, disposition, recapitalization or Incurrence, repayment, amendment or modification of Indebtedness permitted to be Incurred or repaid pursuant to this Indenture (including a refinancing thereof) (in each case, whether or not successful), including, without limitation, (i) such fees, expenses or charges related to the offering of the Notes and the Credit Facility Indebtedness and other Exit Financing, (ii) any amendment or other modification of the Notes or other Indebtedness, and (iii) commissions, discounts, yield and other fees and charges (including any interest expense) related to any Receivables Financing; and

(f)    business optimization expenses and other restructuring charges, reserves or expenses (which, for the avoidance of doubt, shall include, without limitation, the effect of inventory optimization programs, facility consolidations, retention, headcount reductions, systems establishment costs, contract termination costs, future lease commitments and excess pension charges); and

(3)    the amount of net cost savings projected by such Person in good faith to be realized by specified actions taken or to be taken prior to or during such period (calculated on a *pro forma* basis as though such cost savings had been realized on the first day of such period); *provided* that (x) such cost savings are reasonably identifiable and factually supportable and (y) such actions have been taken or are to be taken within twelve months of the date of determination to take such action and the benefit is expected to be realized within twelve months of taking such action; minus

(4)    any non-cash gains increasing Consolidated Net Income of such Person for such period (excluding (i) the recognition of deferred revenue or any items which represent the reversal of any accrual of, or cash reserve for, anticipated cash charges that reduced EBITDA in any prior period and any items for which cash was received in a prior period, (ii) items referenced in clause (e) of "Consolidated Net Income" and (iii) gains which have been offset against losses in

determining Consolidated Net Income but for which the loss has not been added back as a Con-
solidated Non-cash Charge pursuant to the definition of "Consolidated EBITDA");

all as determined on a consolidated basis for such Person and its Restricted Subsidiaries in accordance
with GAAP.

Notwithstanding anything herein to the contrary, Consolidated EBITDA for the Fiscal
Quarter ending (i) June 30, 2009 shall be deemed to be $551.0 million, (ii) September 30, 2009 shall be
deemed to be $757.0 million and (iii) December 31, 2009 shall be deemed to be $578.0 million, before
giving *pro forma* effect to any transaction occurring after the Issue Date.

"Consolidated Interest Expense" means, with respect to any Person for any period, the
consolidated interest expense (net of interest income for such period) of such Person and its Restricted
Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, to the extent
such expense was deducted in computing Consolidated Net Income, including, without limitation:

(1)    amortization of original issue discount,

(2)    the interest component of Capitalized Lease Obligations paid, accrued and/or
scheduled to be paid or accrued,

(3)    net payments and receipts (if any) pursuant to interest rate Hedging Obligations,

(4)    consolidated capitalized interest of such Person and its Restricted Subsidiaries for
such period, whether paid or accrued, and

(5)    the interest portion of any deferred payment obligation,

but excluding, in each case, any amortization of fees, debt issuance costs and commissions incurred in
connection with the Credit Facilities, any Receivables Financing, the issuance of the Notes, the Plan Roll-
Up Notes, the Euro Securitization and any other debt issuance.

For purposes of this definition, interest on a Capitalized Lease Obligation shall be
deemed to accrue at an interest rate reasonably determined by the Issuer to be the rate of interest implicit
in such Capitalized Lease Obligation in accordance with GAAP.

"Consolidated Net Income" means, with respect to any Person, for any period:

(1)    the Net Income of such Person and its Restricted Subsidiaries for such period on
a consolidated basis; *plus*

(2)    cash dividends or distributions paid to such Person or any Restricted Subsidiary
of such Person by any other Person (the "Payor") other than a Restricted Subsidiary, to the extent
not otherwise included in Consolidated Net Income, which have not been derived from Indebted-
ness of the Payor to the extent such Indebtedness is Guaranteed by such referent Person or any
Restricted Subsidiary of such referent Person;

*provided* that there shall be excluded therefrom, without duplication (but only to the extent included in the
calculation of the foregoing):

(a)    (i) any net after-tax income or loss from operating results of discontinued opera-
tions as defined by GAAP, and (ii) any net after-tax gains or losses from sales of discontinued
operations;

(b)    any net after-tax extraordinary, nonrecurring or unusual gains or losses (less all
fees and expenses relating thereto or expenses or charges, any severance expenses, relocation ex-
penses, curtailments or modifications to pension and post-retirement employee benefit plans, any
expenses related to any reconstruction, decommissioning, recommissioning or reconfiguration of
fixed assets for alternate uses and fees, expenses or charges relating to facilities closing costs, ac-
quisition integration costs, facilities opening costs, project start-up costs, business optimization
costs, signing, retention or completion bonuses, expenses or charges related to any issuance of
Equity Interests, Investment, acquisition, disposition, recapitalization or issuance, repayment, re-
financing, amendment or modification of Indebtedness (in each case, whether or not successful),
and all costs and expenses of such Person and its Restricted Subsidiaries Incurred in connection
with the Cases and the Exit Financings);

(c)    the Net Income of any Payor, other than a Restricted Subsidiary of such Person
or Net Income of such Payor that is accounted for by the equity method of accounting, except to
the extent of cash dividends or distributions paid to such Person or to a Restricted Subsidiary of
such Person by such Payor (or to the extent converted into cash);

(d)    [Intentionally Omitted].

(e)    (i) any restoration to income of any contingency reserve, except to the extent that
provision for such reserve was made out of Consolidated Net Income accrued at any time follow-
ing the Issue Date; and (ii) any restoration to or deduction from income for changes in estimates
related to the post-emergence settlement of pre-petition claims obligations in relation with Chap-
ter 11 following the Issue Date;

(f)    in the case of a successor to such Person by consolidation or merger or as a trans-
feree of such Person's assets, any gains or losses of the successor corporation prior to such con-
solidation, merger or transfer of assets;

(g)    any charges or credits relating to any purchase accounting adjustments or to the
adoption of fresh start accounting principles;

(h)    any (i) one-time non-cash compensation charges, and (ii) non-cash costs or ex-
penses resulting from stock option plans, employee benefit plans, compensation charges or post-
employment benefit plans, or grants or awards of stock, stock appreciation or similar rights, stock
options, restricted stock, Preferred Stock or other rights;

(i)    Net Income for such period shall not include the cumulative effect of a change in
accounting principles during such period;

(j)    any net after-tax gains or losses (less all fees and expenses or charges relating
thereto) attributable to business dispositions or asset dispositions other than in the ordinary course
of business (as determined in good faith by management of the Company) or reserves relating
thereto;

455                (k)      any net after-tax gains or losses (less all fees and expenses or charges relating
456  thereto) attributable to the early extinguishment of Indebtedness, Hedging Obligations or other
457  derivative instruments entered in relation with the Indebtedness extinguished;

458                (l)       any gain or loss for such period from currency translation gains or losses or net
459  gains or losses related to currency remeasurements of Indebtedness (including any net loss or gain
460  resulting from Hedging Obligations for currency exchange risk entered in relation with Indebted-
461  ness); and

462                (m)     any impairment charges or asset write-offs, in each case pursuant to GAAP, and
463  the amortization of intangibles arising pursuant to GAAP.

464              "<u>Consolidated Net Tangible Assets</u>" means, with respect to any Person, the Total Assets
465  of such Person and its Restricted Subsidiaries less goodwill and intangibles (other than intangibles arising
466  from, or relating to, intellectual property, licenses or permits (including, but not limited to, emissions
467  rights) of such Person), in each case calculated in accordance with GAAP, *provided* that in the event that
468  such Person or any of its Restricted Subsidiaries assumes or acquires any assets in connection with the
469  acquisition by such Person and its Restricted Subsidiaries of another Person subsequent to the com-
470  mencement of the period for which the Consolidated Net Tangible Assets is being calculated but prior to
471  the event for which the calculation of the Consolidated Net Tangible Assets is made, then the Consoli-
472  dated Net Tangible Assets shall be calculated giving *pro forma* effect to such assumption or acquisition of
473  assets, as if the same had occurred at the beginning of the applicable period.

474              "<u>Consolidated Non-cash Charges</u>" means, with respect to any Person, for any period, the
475  consolidated depreciation, amortization and other non-cash expenses of such Person and its Restricted
476  Subsidiaries (including the amortization of prior service costs and actuarial gains and losses related to
477  pensions and other post-employment benefits) (including any lower-of-cost-or-market adjustments of in-
478  ventory) reducing Consolidated Net Income of such Person and its Restricted Subsidiaries for such pe-
479  riod, determined on a consolidated basis in accordance with GAAP, *provided* that if any such non-cash
480  expenses represent an accrual or reserve for potential cash items in any future period, the cash payment in
481  respect thereof in such future period shall be subtracted from Consolidated EBITDA in such future period
482  to the extent paid, but excluding from this proviso, for the avoidance of doubt, amortization of a prepaid
483  cash item that was paid in a prior period.

484              "<u>Contingent Obligations</u>" means, with respect to any Person, any obligation of such Per-
485  son guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("<u>primary</u>
486  <u>obligations</u>") of any other Person (the "<u>primary obligor</u>") in any manner, whether directly or indirectly,
487  including, without limitation, any obligation of such Person, whether or not contingent:

488              (1)      to purchase any such primary obligation or any property constituting direct or in-
489  direct security therefor,

490              (2)      to advance or supply funds:

491                      (a)      for the purchase or payment of any such primary obligation; or

492                      (b)      to maintain working capital or equity capital of the primary obligor or
493  otherwise to maintain the net worth or solvency of the primary obligor; or

(3)     to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"Credit Facilities" means:

(1)     the Senior Term Loan Facility,

(2)     any Asset Backed Credit Facility;

(3)     any debt facilities or other financing arrangements (including, without limitation, commercial paper facilities) providing for revolving credit loans, term loans, letters of credit or other Indebtedness, including any notes, mortgages, guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements or refundings thereof and any indentures or credit facilities or commercial paper facilities that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount permitted to be borrowed thereunder or alters the maturity thereof (*provided* that such increase in borrowings is permitted by Section 4.03) or adds Restricted Subsidiaries as additional borrowers or guarantors thereunder and whether by the same or any other agent, lender or group of lenders; and

(4)     any such agreements, instruments or guarantees governing Indebtedness Incurred to refinance any Indebtedness or commitments referred to in clauses (1), (2) and (3) above whether by the same or any other lender or group of lenders.

"Credit Facility Indebtedness" means any and all amounts payable under or in respect of the Credit Facilities as amended, restated, supplemented, waived, replaced, restructured, repaid, refunded, refinanced or otherwise modified from time to time (including after termination of the Senior Term Loan Facility), including principal, premium (if any), interest (including interest accruing on or after the filing of any petition in bankruptcy or for reorganization relating to the Company whether or not a claim for post-filing interest is allowed in such proceedings), fees, charges, expenses, reimbursement obligations, guarantees and all other amounts payable thereunder or in respect thereof.

"Currency Agreement" means, with respect to any Person, any foreign exchange contract, currency swap agreement, currency futures contract, currency option contract, currency derivative or other similar agreement to which such Person is a party or beneficiary.

"Default" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"Definitive Note" means a certificated Note registered in the name of the holder thereof and issued in accordance with Section 2.07(c) hereof, substantially in the form of Exhibit A-1 attached hereto, except that such Note shall not bear the Global Note Legend and shall not have the "Schedule of Exchanges of Interests in the Global Note" attached thereto.

"Depositary" means [ ] as the Depositary with respect to the Notes, and any and all successors thereto appointed as Depositary hereunder and having become such pursuant to the applicable provision of this Indenture.

533               "Destruction" means any damage to, loss or destruction of all or any portion of the Col-
534   lateral.

535               "DIP Roll-Up Claims" means the Roll-Up Loans and all related Obligations of the Issuer
536   and certain of its Affiliates under, and as is defined in, the Debtor-in-Possession Credit Agreement, dated
537   as of March 3, 2009 among LyondellBasell Industries AF S.C.A., the other borrowers thereto (each, a
538   debtor and debtor-in-possession under Chapter 11), the administrative agent and collateral agent, the syn-
539   dication agent, joint lead arranger and sole bookrunner, as amended, supplemented, modified, extended,
540   restructured, renewed, restated, refinanced or replaced in whole or in part from time to time, and as or-
541   dered by the Bankruptcy Court, as of the Issue Date.

542               "Discharge of First and Second Priority Lien Obligations" means except to the extent
543   otherwise provided in the Junior Lien Intercreditor Agreement with respect to the reinstatement or con-
544   tinuation of any First Priority Lien Obligation or Second Priority Lien Obligation under certain circum-
545   stances, payment in full in cash (except for contingent indemnities and cost and reimbursement obliga-
546   tions to the extent no claim has been made) of all First and Second Priority Lien Obligations and, with
547   respect to any letters of credit or letter of credit guaranties outstanding under the First Lien Documents or
548   Second Lien Documents, delivery of cash collateral or backstop letters of credit in respect thereof in a
549   manner consistent with such First Lien Document or Second Lien Document, in each case after or concur-
550   rently with the termination of all commitments to extend credit thereunder, and the termination of all
551   commitments of the First Lien Secured Parties or Second Lien Secured Parties under the First Lien
552   Documents or Second Lien Documents. as the case may be; provided that the Discharge of First and Sec-
553   ond Priority Lien Obligations shall not be deemed to have occurred if such payments are made with the
554   proceeds of other First Priority Lien Obligations or Second Priority Lien Obligations that constitute an
555   exchange or replacement for or a refinancing of such Obligations, First Priority Lien Obligations or Sec-
556   ond Priority Lien Obligations. In the event the First Priority Lien Obligations or Second Priority Lien Ob-
557   ligations are modified and the Obligations are paid over time or otherwise modified pursuant to Section
558   1129 of the Bankruptcy Code, the First Priority Lien Obligations and Second Priority Lien Obligations
559   shall be deemed to be discharged when the final payment is made, in cash, in respect of such indebtedness
560   and any obligations pursuant to such modified indebtedness shall have been satisfied.

561               "Disqualified Stock" means, with respect to any Person, any Capital Stock of such Person
562   which, by its terms (or by the terms of any security into which it is convertible or for which it is redeem-
563   able or exchangeable), or upon the happening of any event:

564               (1)      matures or is mandatorily redeemable, pursuant to a sinking fund Obligation or
565   otherwise (other than as a result of a change of control or asset sale),

566               (2)      is convertible or exchangeable for Indebtedness or Disqualified Stock of such
567   Person, or

568               (3)      is redeemable at the option of the holder thereof, in whole or in part (other than
569   solely as a result of a change of control or asset sale),

570   in each case prior to 91 days after the earlier of the maturity date of the Notes or the date the Notes are no
571   longer outstanding; provided that only the portion of Capital Stock which so matures or is mandatorily
572   redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior
573   to such date shall be deemed to be Disqualified Stock; provided, further, that if such Capital Stock is is-
574   sued to any employee or to any plan for the benefit of employees of the Company or its Subsidiaries or by
575   any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely be-
576   cause it may be required to be repurchased by the Company in order to satisfy applicable statutory or

577 regulatory obligations or as a result of such employee's termination, death or disability; *provided*, *further*,
578 that any class of Capital Stock of such Person that by its terms authorizes such Person to satisfy its obliga-
579 tions thereunder by delivery of Capital Stock that is not Disqualified Stock shall not be deemed to be Dis-
580 qualified Stock.

581 "Domestic Subsidiary" means a Restricted Subsidiary that is not a Foreign Subsidiary.

582 "DTC" means The Depository Trust Company, its nominees and successors.

583 "Equity Interests" means Capital Stock and all warrants, options or other rights to acquire
584 Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital
585 Stock).

586 "Equity Offering" means any public or private sale after the Issue Date of common stock
587 or Preferred Stock (other than Disqualified Stock) of the Company or any direct or indirect parent entity
588 of the Company (to the extent the proceeds thereof are contributed to the Company), as applicable, on a
589 primary basis, other than:

590 (1) public offerings with respect to the Company's or such direct or indirect parent
591 entity's common stock registered on Form S-4 or Form S-8;

592 (2) issuances to any Subsidiary of the Company; and

593 (3) any such public or private sale that constitutes an Excluded Contribution.

594 "Euro Securitization" means the transaction to be dated as of its effective date entered
595 into in connection with the €150 million revolving securitization facility of trade accounts receivable with
596 Basell Sales and Marketing Company B.V. and Lyondell Chemie Nederland B.V., as sellers, and Basell
597 Polyolefins Collections Ltd., as receivables purchaser, as such facility may be amended, supplemented,
598 modified, extended, restructured, renewed, restated, refinanced or replaced in whole or in part from time
599 to time.

600 "Excluded Subsidiary" means (i) any Receivables Subsidiary, (ii) any Qualified Non-
601 Recourse Subsidiary, (iii) any Special Purpose Subsidiary, (iv) any Wholly Owned Domestic Subsidiary
602 that is a subsidiary of a Foreign Subsidiary and (v) any Domestic Subsidiary of the Company as of the
603 Issue Date or at any time thereafter meeting any one of the following conditions that has been designated
604 by the Issuer as an Excluded Subsidiary in a writing to the Trustee (which designation may be rescinded
605 by granting a Guarantee in accordance with the requirements of this Indenture): (a) the Total Assets of
606 such Domestic Subsidiary determined as of the end of the fiscal year of the Company most recently ended
607 for which financial statements are required to be delivered under this Indenture does not exceed $37.5
608 million, or (b) the Consolidated EBITDA of such Domestic Subsidiary does not exceed $37.5 million, for
609 the period of four consecutive quarters of the Company most recently ended for which financial state-
610 ments are required to be delivered pursuant to this Indenture; *provided* that, at any time or from time to
611 time after the Issue Date, Domestic Subsidiaries (other than a Special Purpose Subsidiary) shall not be
612 designated as Excluded Subsidiaries to the extent that such Domestic Subsidiaries under this clause (v)
613 would represent, in the aggregate, (a) 7.5% or more of Total Assets of the Company at the end of the most
614 recently ended fiscal year of the Company or (b) 7.5% or more of the Consolidated EBITDA of the Com-
615 pany for the most recently ended fiscal year, in each case, based upon the most recent financial statements
616 required to be delivered pursuant to this Indenture; *provided*, *further*, that, if the most recent financial
617 statements required to be delivered pursuant to this Indenture for any fiscal quarter occurring after the
618 Issue Date indicate that, by reason of subsequent changes following the designation of any one or more

Restricted Subsidiaries as an Excluded Subsidiary or Excluded Subsidiaries, the foregoing requirements of this definition would not be complied with (other than as a result of an impairment charge), individually or in the aggregate, then the Company shall use commercially reasonable efforts to promptly (but in any event within 180 days after the date the financial statements are required), rescind such designations as are necessary, and provide such Guarantees as are necessary, so as to comply with the requirements of this Indenture. Any uncured Default shall not occur until the expiration of such 180 days provided such efforts are used.

"Exit Financing" means that certain financing to finance the Reorganization Plan expected to be composed of the Senior Term Loan Facility, the ABL Facility, the Euro Securitization, the Plan Roll-Up Notes and the Notes.

"Fair Market Value" means, with respect to any asset or property, the price which could be negotiated in an arm's-length transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction; *provided* that, other than as expressly set forth in this Indenture, for purposes of determining the "Fair Market Value" of any property or assets, such Fair Market Value shall be determined by (x) the Company in good faith with respect to property or assets with a Fair Market Value not in excess of $250.0 million, (y) an opinion as to the Fair Market Value issued by a qualified accounting, appraisal, financial advisory or investment banking firm or (z) the Board of Directors of the Company, as evidenced by a certificate of an officer of the Company, with respect to property or assets with a Fair Market Value in excess of $250.0 million.

"First and Second Priority Lien Obligations" means First Priority Lien Obligations and Second Priority Lien Obligations.

"First Lien Collateral Agent" means the Collateral Agent and the Senior Term Loan Collateral Agent.

"First Lien Documents" means the credit, guarantee and security documents governing the First Priority Lien Obligations (and any Additional First Priority Lien Obligations), including, without limitation, this Indenture and the First Lien Security Documents.

"First Lien Indenture" means the indenture under which the First Lien Notes are issued, as amended, supplemented, modified, extended, restructured, renewed or restated in whole or in part from time to time, in accordance with the terms thereof.

"First Lien Intercreditor Agreement" means the First Lien Intercreditor Agreement, dated as of the Issue Date by and among the Trustee, the Collateral Agent and the Senior Term Loan Collateral Agent, with respect to the Common Collateral, which may be amended from time to time without the consent of the holders of the Notes to add other parties holding First Priority Lien Obligations permitted to be Incurred under this Indenture, the Senior Term Loan Facility and the First Lien Intercreditor Agreement.

"First Lien Notes" means the 8.000% notes due on November 1, 2017, issued by LBI Escrow Corporation, as predecessor to the Issuer as amended, supplemented, modified, extended, restructured, renewed, restated, refinanced, defeased or replaced in whole or in part from time to time.

"First Lien Notes Collateral Agent" means Deutsche Bank Trust Company Americas as collateral agent under the First Lien Notes.

659        "First Lien Notes Obligations" means Obligations in respect of the First Lien Notes (in-
660 cluding other first lien notes Incurred pursuant to clause (b)(i) of Section 4.03 hereof, the First Lien In-
661 denture and the Security Documents, including, for the avoidance of doubt, Obligations in respect of ex-
662 change notes and guarantees thereof.

663        "First Lien Secured Leverage Calculation Date" has the meaning ascribed to such term in
664 the definition of "First Lien Secured Indebtedness Leverage Ratio."

665        "First Lien Secured Parties" means (a) the "Secured Parties," as defined in the Senior
666 Term Loan Facility, (b) any Additional First Lien Secured Parties.

667        "First Lien Security Documents" means the Security Documents and any other agree-
668 ment, document or instrument pursuant to which a Lien is granted or purported to be granted securing
669 First Priority Lien Obligations, and any Additional First Priority Lien Obligations, or under which rights
670 or remedies with respect to such Liens are governed, in each case to the extent relating to the Collateral
671 securing the First Priority Lien Obligations.

672        "First Lien Trustee" means the party named as such in the First Lien Indenture until a
673 successor replaces it and, thereafter, means the successor.

674        "First Priority After-Acquired Property" means (x) at any time the outstanding principal
675 amount of loans under the Senior Term Loan Facility is greater than $500.0 million, any property of the
676 Company, the Issuer or any Pledgor that secures any First Priority Lien Obligations and Other First Lien
677 Obligations other than the First Lien Notes that is not already subject to the Lien under the Security Docu-
678 ments, other than any Excluded Assets, and (y) if clause (x) is not applicable, then any property of the
679 Company, the Issuer or any Pledgor that constitutes Notes Collateral (other than Excluded Assets).

680        "First Priority Lien Obligations" means all Indebtedness (other than Permitted Indebted-
681 ness) secured by a Lien (a "Specified Lien") on property and assets of the Company, the Issuer and the
682 Pledgors with a Fair Market Value equal to, or the greater than, the greater of (i) 2% of Consolidated Net
683 Tangible Assets and (ii) $280 million, having priority over the Lien securing the Notes.

684        "First Priority Secured Indebtedness Leverage Ratio" means, with respect to any Person,
685 at any date the ratio of (i) (x) the amount of Secured Indebtedness constituting First Priority Lien Obliga-
686 tions of such Person and its Restricted Subsidiaries as of such date of calculation less (y) the amount of
687 any such Person's Cash Equivalents (each as determined on a consolidated basis in accordance with
688 GAAP) to (ii) Consolidated EBITDA of such Person for the four full fiscal quarters for which internal
689 financial statements are available immediately preceding such date of such calculation. In the event that
690 the Company or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebted-
691 ness subsequent to the commencement of the period for which the First Priority Secured Indebtedness
692 Leverage Ratio is being calculated but prior to the event for which the calculation of the First Priority Se-
693 cured Indebtedness Leverage Ratio is made (the "First Lien Secured Leverage Calculation Date"), then
694 the First Priority Secured Indebtedness Leverage Ratio shall be calculated giving *pro forma* effect to such
695 Incurrence, repayment, repurchase or redemption of Indebtedness as if the same had occurred at the be-
696 ginning of the applicable four quarter period; provided that the Issuer may elect pursuant to an Officer's
697 Certificate delivered to the Trustee to treat all or any portion of the commitment under any Indebtedness
698 as being Incurred at such time, in which case any subsequent Incurrence of Indebtedness under such
699 commitment shall not be deemed, for purposes of this calculation, to be an Incurrence at such subsequent
700 time.

701    For purposes of making the computation referred to above, Investments, acquisitions,
702 dispositions, mergers, amalgamations, consolidations and discontinued operations (as determined in ac-
703 cordance with GAAP), in each case with respect to an operating unit of a business, and any operational
704 changes that the Company or any of its Restricted Subsidiaries has determined to make and/or made dur-
705 ing the four quarter reference period or subsequent to such reference period and on or prior to or simulta-
706 neously with the First Lien Secured Leverage Calculation Date shall be calculated on a *pro forma* basis
707 assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations,
708 discontinued operations and other operational changes (and the change of any associated Indebtedness
709 and the change in Consolidated EBITDA resulting therefrom) had occurred on the first day of the four
710 quarter reference period. If since the beginning of such period any Person that subsequently became a Re-
711 stricted Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the begin-
712 ning of such period shall have made any Investment, acquisition, disposition, merger, consolidation,
713 amalgamation, discontinued operation or operational change, in each case with respect to an operating
714 unit of a business, that would have required adjustment pursuant to this definition, then the First Priority
715 Secured Indebtedness Leverage Ratio shall be calculated giving *pro forma* effect thereto for such period
716 as if such Investment, acquisition, disposition, discontinued operation, merger, amalgamation, consolida-
717 tion or operational change had occurred at the beginning of the applicable four quarter period.

718    For purposes of this definition, whenever *pro forma* effect is to be given to any event, the
719 *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of the
720 Company. Any such *pro forma* calculation may include adjustments appropriate, in the reasonable good
721 faith determination of the Company as set forth in an Officer's Certificate, to reflect (1) operating expense
722 reductions and other operating improvements or synergies reasonably expected to result from the applica-
723 ble event and (2) all adjustments of the nature set forth as "Restructuring Adjustments" under "Unaudited
724 Consolidated *Pro Forma* Financial Information" in this Offering Memorandum to the extent such adjust-
725 ments, without duplication, continue to be applicable to such four quarter period.

726    For the purposes of this definition, any amount in a currency other than U.S. Dollars will
727 be converted to U.S. Dollars based on the average exchange rate for such currency for the most recent
728 twelve month period immediately prior to the date of determination or if any such Indebtedness is subject
729 to a Currency Agreement with respect to the currency in which such Indebtedness is denominated cover-
730 ing principal, premium, if any, and interest on such Indebtedness, the amount of such Indebtedness and
731 such interest and premium, if any, shall be determined after giving effect to all payments in respect
732 thereof under such Currency Agreement.

733    "First Priority Secured Leverage Calculation Date" has the meaning ascribed to such term
734 in the definition of "First Priority Secured Indebtedness Leverage Ratio."

735    "First Priority Secured Indebtedness Limit" means $4,870 million plus, any Indebtedness
736 constituting First Priority Lien Obligations Incurred to refinance, replace or defease any Indebtedness in
737 respect of the Notes, the DIP Roll-Up Claims or the New Third Lien Notes.

738    "Foreign Subsidiary" means a Restricted Subsidiary not organized or existing under the
739 laws of the United States of America or any state or territory thereof or the District of Columbia and any
740 direct or indirect Restricted Subsidiary of such Restricted Subsidiary.

741    "GAAP" means generally accepted accounting principles in the United States set forth in
742 the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certi-
743 fied Public Accountants and statements and pronouncements of the Financial Accounting Standards
744 Board or in such other statements by such other entity as have been approved by a significant segment of
745 the accounting profession, which are in effect on the Issue Date as adopted by the Company.  For the pur-

poses of this Indenture, the term "<u>consolidated</u>" with respect to any Person shall mean such Person consolidated with its Restricted Subsidiaries, and shall not include any Unrestricted Subsidiary, but the interest of such Person in an Unrestricted Subsidiary will be accounted for as an Investment.

"Global Note Legend" means the legend set forth in Section 2.07(g)(ii) hereof, which is required to be placed on all Global Notes issued under this Indenture.

"Global Notes" means, individually and collectively, the Global Notes, substantially in the form of Exhibit A attached hereto, issued in accordance with Section 2.01, 2.07(b), or 2.07(d), and that has the "Schedule of Exchanges of Interests in the Global Note" attached thereto, and that is deposited with or on behalf of and registered in the name of the applicable Depositary.

"Government Obligations" means securities that are:

(1)      direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged, or

(2)      obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America the timely payment of which is unconditionally guaranteed as a full faith and credit Obligation by the United States of America, which, in each case, are not callable or redeemable at the option of the issuer thereof, and shall also include a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act) as custodian with respect to any such U.S. government obligations or a specific payment of principal of or interest on any such U.S. government obligations held by such custodian for the account of the holder of such depository receipt; *provided*, *however*, that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the U.S. government obligations or the specific payment of principal of or interest on the U.S. government obligations evidenced by such depository receipt.

"Hedging Obligations" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, emission rights, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"holder " or "noteholder" means the Person in whose name a Note is registered on the Registrar's books.

"Incur" means issue, assume, guarantee, incur or otherwise become liable for; *provided*, *however*, that any Indebtedness or Capital Stock of a Person existing at the time such person becomes a Subsidiary (whether by merger, amalgamation, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the time it becomes a Subsidiary.

"Indebtedness" means, with respect to any Person:

(1)    the principal and premium (if any) of any funded indebtedness of such Person, in respect of borrowed money, drawn letters of credit, banker's acceptances or in respect of Capitalized Lease Obligations, if such indebtedness would appear as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(2)    to the extent not otherwise included, any Obligation of such Person to be liable for, or to pay, as obligor, guarantor or otherwise, the Obligations referred to in clause (1) of another Person (other than by endorsement of negotiable instruments for collection in the ordinary course of business); and

(3)    to the extent not otherwise included, Indebtedness of the type referred to in clause (1) above of another Person secured by a Lien on any asset owned by such Person (whether or not such Indebtedness is assumed by such Person); *provided*, *however*, that the amount of such Indebtedness will be the lesser of: (a) the Fair Market Value of such asset at such date of determination, and (b) the amount of such Indebtedness of such other Person;

*provided*, *however*, that notwithstanding the foregoing, Indebtedness shall be deemed not to include (1) Contingent Obligations Incurred in the ordinary course of business and not in respect of borrowed money; (2) deferred or prepaid revenues; (3) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller; or (4) Obligations under or in respect of reimbursement obligations, undrawn letters of credit, a Qualified Receivables Financing or a Qualified Joint Venture Transaction.

Notwithstanding anything in this Indenture to the contrary, Indebtedness shall not include, and shall be calculated without giving effect to, the effects of Statement of Financial Accounting Standards No. 133 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Indenture as a result of accounting for any embedded derivatives created by the terms of such Indebtedness, and any such amounts that would have constituted Indebtedness under this Indenture but for the application of this sentence shall not be deemed an Incurrence of Indebtedness under this Indenture.

"Indenture" means this Indenture as amended or supplemented from time to time.

"Indirect Participant" means a Person who holds a beneficial interest in a Global Note through a Participant.

"Intercreditor Agreements" means, collectively, the Junior Lien Intercreditor Agreement and the Third Lien Intercreditor Agreement.

"Interest Payment Date" has the meaning set forth in Exhibit A hereto.

"Investment Grade Rating" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other Rating Agency.

"Investments" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees (other than guarantees of performance made by the Company or any of its Restricted Subsidiaries in connection with a Joint Venture)), advances or capital contributions (excluding accounts receivable, trade credit and advances to customers

and commission, travel and similar advances to officers, employees and consultants made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet of the Company in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property.  For purposes of the definition of "Unrestricted Subsidiary":

        (1)    "Investments" shall include the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of a Subsidiary of the Company at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided*, *however*, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Company shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary equal to an amount (if positive) equal to:

            (a)    the Company's "Investment" in such Subsidiary at the time of such redesignation *less*

            (b)    the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of such Subsidiary at the time of such redesignation; and

        (2)    any property transferred to or from an Unrestricted Subsidiary shall be valued at its Fair Market Value at the time of such transfer, in each case as determined in good faith by the Board of Directors of the Issuer.

        "Issue Date" means [•], 2010.

        "Issuer" means Lyondell Chemical Company, a Delaware corporation, and any successor thereto in accordance with this Indenture.

        "Issuer Order" means a written request or order signed on behalf of the Issuer by an Officer of the Issuer, who must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the Issuer, and delivered to the Trustee.

        "Joint Venture" means any joint venture entity, whether a company, unincorporated firm, association, partnership or any other entity which, in each case, is not a Subsidiary of the Company or any of its Restricted Subsidiaries but in which the Company or a Restricted Subsidiary has a direct or indirect equity or similar interest.

        "Junior Lien Intercreditor Agreement" means the Junior Lien Intercreditor Agreement, entered on the Issue Date by and among the First Lien Notes Collateral Agent, on its own behalf and on behalf of the First Lien Secured Parties under the First Lien Indenture, the Senior Term Loan Collateral Agent, on its own behalf and on behalf of the First Lien Secured Parties under the Senior Term Loan Facility, the ABL Collateral Agent, on its own behalf and on behalf of the administrative agent and lenders under the ABL Facility, the trustee under the Five-Year Indenture, the trustee under the Notes (the "Notes Trustee" and, together with the First Lien Notes Collateral Agent, the Senior Term Loan Collateral Agent and the ABL Collateral Agent, the "Applicable Collateral Agents"), on its own behalf and on behalf of the holders of the obligations under the Plan Roll-Up Notes, the Company, the Issuer and the Pledgors that sets forth the relative priority of the Liens securing any First Priority Lien Obligations, the Liens securing the ABL Obligations and the Liens securing any Junior Lien Obligations, including the Notes (collectively, the "Applicable Obligations").

871        "Lien" means, with respect to any asset, any mortgage, lien, pledge, charge, security in-
872    terest or similar encumbrance of any kind in respect of such asset, whether or not filed, recorded or oth-
873    erwise perfected under applicable law (including any conditional sale or other title retention agreement,
874    any lease in the nature thereof, any option or other agreement to sell or give a security interest; *provided*
875    that in no event shall an operating lease, rights of set-off or netting arrangements in the ordinary course of
876    business be deemed to constitute a Lien.

877        "Moody's" means Moody's Investors Service, Inc. or any successor to the rating agency
878    business thereof.

879        "Mortgaged Property" means each parcel of Real Property owned or leased by the Com-
880    pany, the Issuer or any Pledgor encumbered by a Mortgage to secure the First Priority Lien Obligations.

881        "Mortgages" means, collectively, the mortgages, trust deeds, deeds of trust, deeds to se-
882    cure debt, assignments of leases and rents, and other security documents delivered with respect to Mort-
883    gaged Properties, as amended, supplemented, modified, extended, restructured, renewed, restated or re-
884    placed in whole or in part from time to time.

885        "Negromex Receivables Dispositions" means any disposition of accounts receivable aris-
886    ing from transactions with Industrias Negromex, S.A. de C.V.

887        "Net Income" means, with respect to any Person, the net income (loss) of such Person,
888    determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

889        "New Third Lien Notes" means the 11.000% notes due on May 1, 2018, issued by the Is-
890    suer as amended, supplemented, modified, extended, restructured, renewed, restated, refinanced, defeased
891    or replaced in whole or in part from time to time.

892        "Notes" means the Initial Notes and more particularly means any Note authenticated and
893    delivered under this Indenture.  For all purposes of this Indenture, the term "Notes" shall also include any
894    Additional Notes that may be issued under a supplemental indenture.  For purposes of this Indenture, all
895    references to Notes to be issued or authenticated upon transfer, replacement or exchange shall be deemed
896    to refer to Notes of the applicable series.

897        "Notes Collateral" has the meaning set forth in the Security Documents.

898        "Notes Obligations" means Obligations in respect of the Notes, this Indenture and the Se-
899    curity Documents, including, for the avoidance of doubt, Obligations in respect of guarantees thereof.

900        "Obligations" means any principal, interest, penalties, fees, indemnifications, reimburse-
901    ments (including, without limitation, reimbursement obligations with respect to letters of credit and bank-
902    ers' acceptances), damages and other liabilities payable under the documentation governing any Indebt-
903    edness; *provided* that Obligations with respect to the Notes shall not include fees or indemnifications in
904    favor of the Trustee and other third parties other than the holders of the Notes.

905        "Offering Memorandum" means the confidential offering memorandum, dated March 24,
906    2010, relating to the issuance of the First Lien Notes under the First Lien Indenture.

907        "Officer" means the Chairman of the Board, Chief Executive Officer, Chief Financial Of-
908    ficer, President, any Executive Vice President, Senior Vice President or Vice President, the Treasurer, any
909    Assistant Treasurer, any Financial Director or the Secretary or Assistant Secretary of any Person (or, with

910    respect to a Person that is a limited partnership, the general partner of such Person), member of the Board
911    of Directors (in the case of any entity organized under the laws of The Netherlands), or any other officer
912    designated by the Board of Directors serving in a similar capacity.

913          "Officer's Certificate" means a certificate signed on behalf of any Person by an Officer of
914    such Person , which meets the requirements set forth in this Indenture.

915          "Oil Indexed Credit Facility" means a working capital facility for which availability is
916    conditioned upon the price per barrel of crude oil that is not less than $125.0 and the proceeds of which
917    are utilized for working capital purposes and related fees and expenses.

918          "Opinion of Counsel" means a written opinion from legal counsel who is reasonably ac-
919    ceptable to the Trustee.  Counsel giving any Opinion of Counsel shall be entitled to rely on an Officer's
920    Certificate as to any factual matters relevant to such opinion.

921          "Other First Lien Obligations" means other Indebtedness of the Company and its Re-
922    stricted Subsidiaries that is equally and ratably secured with the First Lien Notes as permitted by this First
923    Lien Indenture and is designated by the Company as an Other First Lien Obligation; *provided* that an au-
924    thorized representative on behalf of the holders of such Indebtedness has executed joinders to the Security
925    Documents in the form or substantially in the form provided therein.

926          "Participants" means with respect to the Notes, institutions that have accounts with DTC
927    or its nominee.

928          "Permitted Indebtedness" has the meaning ascribed to such term Section 4.03(b).

929          "Permitted Liens" means any Lien securing Permitted Indebtedness.

930          "Plan Roll-Up Notes" means (a) third-priority senior secured notes of the Issuer and
931    guaranteed by one or more Guarantors issued in respect of DIP Roll-Up Claims under the Reorganization
932    Plan; provided that any Indebtedness issued in lieu of the Plan Roll-Up Notes in respect of DIP Roll-Up
933    Claims will be deemed to be Plan Roll-Up Notes (provided that any such Indebtedness is Incurred in
934    compliance with the terms of the Indenture applicable to refinancings and replacements of Plan Roll-Up
935    Notes had they been issued pursuant to the Plan of Reorganization), or (b) any notes, mortgages, guaran-
936    tees, collateral documents, instruments and agreements executed in connection therewith, and any
937    amendments, supplements, modifications, extensions, renewals, restatements or refundings thereof and
938    any indentures or credit facilities or commercial paper facilities that replace, refund or refinance any part
939    thereof.

940          "Plan Roll-Up Notes Indenture" means the indenture or indentures under which the Plan
941    Roll-Up Notes are issued, as amended, supplemented, modified, extended, restructured, renewed, re-
942    stated, refinanced or replaced in whole or in part from time to time all in accordance with this Indenture;
943    provided no such amendment or modification may shorten the maturity of the Plan-Roll-Up Notes.

944          "Plan Roll-Up Notes Trustee" means, collectively, the trustee for the New Third Lien
945    Notes, the trustee for the Notes, any Authorized Representative for any Additional Third Priority Lien
946    Obligation, and, if the context so requires, the Authorized Collateral Agent for such trustees or Author-
947    ized Representatives.

948        "<u>Person</u>" means any individual, corporation, partnership, limited liability company, joint
949 venture, association, joint-stock company, trust, unincorporated organization, government or any agency
950 or political subdivision thereof or any other entity.

951        "<u>Pledgor</u>" means any Guarantor other than the Company; *provided* that upon the release
952 or discharge of such Subsidiary from its Obligations to pledge its assets and property to secure the Notes
953 in accordance with this Indenture or the Security Documents, such Subsidiary ceases to be a Pledgor.

954        "<u>Preferred Stock</u>" means any Equity Interest with preferential right of payment of divi-
955 dends or upon liquidation, dissolution, or winding up.

956        "<u>Purchase Money Indebtedness</u>" means any Indebtedness incurred to finance or refinance
957 the acquisition, leasing, construction, repair, restoration, replacement, expansion or improvement of prop-
958 erty (real or personal) or assets, and whether acquired through the direct acquisition of such property or
959 assets, or otherwise, incurred in respect of capital expenditures.

960        "<u>Qualified Joint Venture Transaction</u>" means any transaction in which (i) Indebtedness is
961 owed or incurred by any Restricted Subsidiary whose activities are limited to holding shares in Joint Ven-
962 tures (but only to the extent that (a) the creditors under the relevant agreement have no recourse to the
963 Company other than to such Restricted Subsidiary; and (b) the recourse those creditors have to such Re-
964 stricted Subsidiary is limited to the proceeds (if any) of dividends received by such Restricted Subsidiary
965 in respect of such Restricted Subsidiary's investment in such Joint Ventures) or (ii) involving guarantees
966 by the Company or any Restricted Subsidiary of Indebtedness of a customer or a third party guarantor of
967 such customer's Indebtedness that are made to a governmental export credit agency, a state development
968 bank or like governmental agency or organization to the extent that such guarantees are conditioned on a
969 failure to perform by any of the Company, such Restricted Subsidiary or a joint venture under an engi-
970 neering procurement or construction contract entered into with such customer or third party guarantor;
971 *provided* that the aggregate amount of any Indebtedness referenced in this clause (ii) shall not at any time
972 exceed 1.0% of Consolidated Net Tangible Assets of the Company.

973        "<u>Qualified Non-Recourse Debt</u>" means Indebtedness that (1) is (a) Incurred by a Quali-
974 fied Non-Recourse Subsidiary to finance (whether prior to or within 270 days after) the acquisition, lease,
975 construction, repair, replacement or improvement of any property (real or personal) or equipment
976 (whether through the direct purchase of property or the Equity Interests of any person owning such prop-
977 erty and whether in a single acquisition or a series of related acquisitions) or (b) assumed by a Qualified
978 Non-Recourse Subsidiary, (2) is non-recourse to the Company, the Issuer and any Pledgor and (3) is non-
979 recourse to any Restricted Subsidiary that is not a Qualified Non-Recourse Subsidiary.

980        "<u>Qualified Non-Recourse Subsidiary</u>" means (1) a Restricted Subsidiary that is not a
981 Pledgor and that is formed or created after the Issue Date in order to finance an acquisition, lease, con-
982 struction, repair, replacement or improvement of any property or equipment (directly or through one of its
983 Subsidiaries) that secures Qualified Non-Recourse Debt and (2) any Restricted Subsidiary of a Qualified
984 Non-Recourse Subsidiary.

985        "<u>Qualified Receivables Financing</u>" means any Receivables Financing that meets the fol-
986 lowing conditions (including, without limitation, the Euro Securitization, the Berre Facility and the Ne-
987 gromex Receivables Dispositions):

988        (1)     the Board of Directors of the Company shall have determined in good faith that
989 such Qualified Receivables Financing (including financing terms, covenants, termination events

990 and other provisions) is in the aggregate economically fair and reasonable to the Company and its
991 Restricted Subsidiaries;

992       (2)     all sales of accounts receivable and related assets are made at Fair Market Value;
993 and

994       (3)     the financing terms, covenants, termination events and other provisions thereof
995 shall be market terms (as determined in good faith by the Company) and may include Standard
996 Securitization Undertakings.

997       The grant of a security interest in any accounts receivable of the Company or any of its
998 Restricted Subsidiaries to secure the ABL Facility, any Credit Facility Indebtedness or any Indebtedness
999 in respect of the Notes and the New Third Lien Notes shall not be deemed a Qualified Receivables Fi-
1000 nancing.

1001       "Rating Agency" means (1) S&P, (2) Moody's, or (3) if either or both of S&P and
1002 Moody's shall not then exist, a nationally recognized securities rating agency or agencies, as the case may
1003 be, selected by the Company, which shall be substituted for S&P or Moody's or both, as the case may be.

1004       "Real Property" means, collectively, all right, title and interests (including any leasehold,
1005 mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or oper-
1006 ated by any Person, whether by lease, license or other means, together with, in each case, all easements,
1007 hereditaments and appurtenances relating thereto, all buildings, structures, parking areas and improve-
1008 ments and appurtenant fixtures and equipment, all general intangibles and contract rights and other prop-
1009 erty and rights incidental to the ownership, lease or operation thereof.

1010       "Receivables Financing" means any transaction or series of transactions that may be en-
1011 tered into by the Company or any of its Subsidiaries pursuant to which the Company or any of its Sub-
1012 sidiaries may sell, convey or otherwise transfer to any other Person including to a Receivables Subsidiary,
1013 or may grant a security interest in, bank accounts, any accounts receivable (whether now existing or aris-
1014 ing in the future) of the Company or any of its Subsidiaries, and any assets related thereto including,
1015 without limitation, all collateral securing such accounts receivable, all contracts and all guarantees or
1016 other obligations in respect of such accounts receivable, proceeds of such accounts receivable and other
1017 assets which are customarily transferred or in respect of which security interests are customarily granted
1018 in connection with asset securitization transactions involving accounts receivable and any Hedging Obli-
1019 gations entered into by the Company or any such Subsidiary in connection with such accounts receivable.

1020       "Receivables Repurchase Obligation" means any Obligation of a seller of receivables in a
1021 Qualified Receivables Financing to repurchase receivables arising as a result of a breach of a representa-
1022 tion, warranty or covenant or otherwise, including as a result of a receivable or portion thereof becoming
1023 subject to any asserted defense, dispute, offset or counterclaim of any kind as a result of any action taken
1024 by, any failure to take action by or any other event relating to the seller.

1025       "Receivables Subsidiary" means a Wholly Owned Restricted Subsidiary of the Company
1026 (or another Person formed for the purposes of engaging in Receivables Financing with the Company in
1027 which the Company or any Subsidiary of the Company makes an Investment and to which the Company
1028 or any Subsidiary of the Company transfers accounts receivable and related assets) which engages in no
1029 activities other than in connection with the financing of accounts receivable of the Company and its Sub-
1030 sidiaries, all proceeds thereof and all rights (contractual or other), collateral and other assets relating
1031 thereto, and any business or activities incidental or related to such business, and which is designated by
1032 the Board of Directors of the Company (as provided below) as a Receivables Subsidiary and:

      

(a)     no portion of the Indebtedness or any other Obligations (contingent or otherwise) of which (i) is guaranteed by the Company or any other Subsidiary of the Company (excluding guarantees of Obligations (other than the principal of and interest on, Indebtedness) pursuant to Standard Securitization Undertakings), (ii) is recourse to or obligates the Company or any other Subsidiary of the Company in any way other than pursuant to Standard Securitization Undertakings, or (iii) subjects any property or asset of the Company or any other Subsidiary of the Company, directly or indirectly, contingently or otherwise, to the satisfaction thereof, other than pursuant to Standard Securitization Undertakings;

(b)     with which neither the Company nor any other Subsidiary of the Company has any material contract, agreement, arrangement or understanding other than on terms which the Company reasonably believes to be no less favorable to the Company or such Subsidiary than those that might be obtained at the time from Persons that are not Affiliates of the Company; and

(c)     to which neither the Company nor any other Subsidiary of the Company has any obligation to maintain or preserve such entity's financial condition or cause such entity to achieve certain levels of operating results.

Any such designation by the Board of Directors of the Company shall be evidenced to the Trustee by filing with the Trustee a certified copy of the resolution of the Board of Directors of the Company giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing conditions.

"Record Date" for the interest, payable on any applicable Interest Payment Date April 15 and October 15 (whether or not a Business Day) immediately preceding such Interest Payment Date.

"Registrar" has the meaning provided in Section 2.04.

"Reorganization Plan" means a plan of reorganization in any of the Cases.

"Responsible Officer" means, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee, including any vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such Person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Indenture.

"Restricted Subsidiary" means, with respect to any Person, any Subsidiary of such Person other than an Unrestricted Subsidiary of such Person. Unless otherwise indicated in this Indenture, all references to Restricted Subsidiaries shall mean Restricted Subsidiaries of the Company. For the avoidance of doubt, the Issuer shall at all times constitute a Restricted Subsidiary.

"Roll-Up Loans" means $3,250 million of a dollar-for-dollar "roll-up" of previously outstanding senior secured loans.

"S&P" means Standard & Poor's Ratings Group or any successor to the rating agency business thereof.

"Sale/Leaseback Transaction" means an arrangement relating to property now owned or hereafter acquired by the Company or a Restricted Subsidiary whereby the Company or a Restricted Sub-

1073  sidiary transfers such property to a Person and the Company or such Restricted Subsidiary leases it from
1074  such Person, other than leases between the Company and a Restricted Subsidiary of the Company or be-
1075  tween Restricted Subsidiaries of the Company or any Catalyst Sale/Leaseback Transaction.

1076  "<u>SEC</u>" means the Securities and Exchange Commission or any successor agency or
1077  commission.

1078  "<u>Second Lien Documents</u>" means the credit, guarantee and security documents governing
1079  the Second Priority Lien Obligations, including, without limitation, the ABL Facility and the Second Lien
1080  Security Documents.

1081  "<u>Second Lien Secured Parties</u>" means (a) the "Secured Parties," as defined in the ABL
1082  Facility, (b) the "Secured Parties," as defined in the Collateral Agreement and (c) any Additional Second
1083  Lien Secured Parties.

1084  "<u>Second Lien Security Documents</u>" means the Security Documents and any other agree-
1085  ment, document or instrument pursuant to which a Lien is granted or purported to be granted securing
1086  Second Priority Lien Obligations or under which rights or remedies with respect to such Liens are gov-
1087  erned, in each case to the extent relating to the collateral securing the Second Priority Lien Obligations. .
1088  [To be confirmed].

1089  "<u>Second Priority After-Acquired Property</u>" means any property of the Company, the Is-
1090  suer or any Pledgor that constitutes ABL Collateral (other than Excluded Assets).

1091  "<u>Second Priority Lien Obligations</u>" has the meaning ascribed to such term in the First
1092  Lien Indenture.

1093  "<u>Secured Credit Facility Indebtedness</u>" has the meaning ascribed to such term in the First
1094  Lien Indenture.

1095  "<u>Secured Indebtedness</u>" means any Indebtedness (other than Purchase Money Indebted-
1096  ness and Indebtedness of Non-Pledgors) secured by a Lien.

1097  "<u>Secured Indebtedness Leverage Ratio</u>" means, with respect to any Person, at any date
1098  the ratio of (i) Secured Indebtedness constituting First Priority Lien Obligations of such Person and its
1099  Restricted Subsidiaries as of such date of calculation (determined on a consolidated basis in accordance
1100  with GAAP) to (ii) Consolidated EBITDA of such Person for the four full fiscal quarters for which inter-
1101  nal financial statements are available immediately preceding such date of such calculation. In the event
1102  that the Company or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebt-
1103  edness subsequent to the commencement of the period for which the Secured Indebtedness Leverage Ra-
1104  tio is being calculated but prior to the event for which the calculation of the Secured Indebtedness Lever-
1105  age Ratio is made (the "<u>Secured Leverage Calculation Date</u>"), then the Secured Indebtedness Leverage
1106  Ratio shall be calculated giving *pro forma* effect to such Incurrence, repayment, repurchase or redemption
1107  of Indebtedness as if the same had occurred at the beginning of the applicable four-quarter period; *pro-*
1108  *vided* that the Issuer may elect pursuant to an Officer's Certificate delivered to the Trustee to treat all or
1109  any portion of the commitment under any Indebtedness as being Incurred at such time, in which case any
1110  subsequent Incurrence of Indebtedness under such commitment shall not be deemed, for purposes of this
1111  calculation, to be an Incurrence at such subsequent time.

1112  For purposes of making the computation referred to above, Investments, acquisitions,
1113  dispositions, mergers, amalgamations, consolidations and discontinued operations (as determined in ac-

1114    cordance with GAAP), in each case with respect to an operating unit of a business, and any operational
1115    changes that the Company or any of its Restricted Subsidiaries has determined to make and/or made dur-
1116    ing the four-quarter reference period or subsequent to such reference period and on or prior to or simulta-
1117    neously with the Secured Leverage Calculation Date shall be calculated on a *pro forma* basis assuming
1118    that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations, discontin-
1119    ued operations and other operational changes (and the change of any associated Indebtedness and the
1120    change in Consolidated EBITDA resulting therefrom) had occurred on the first day of the four-quarter
1121    reference period. If since the beginning of such period any Person that subsequently became a Restricted
1122    Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the beginning of
1123    such period shall have made any Investment, acquisition, disposition, merger, consolidation, amalgama-
1124    tion, discontinued operation or operational change, in each case with respect to an operating unit of a
1125    business, that would have required adjustment pursuant to this definition, then the Secured Indebtedness
1126    Leverage Ratio shall be calculated giving *pro forma* effect thereto for such period as if such Investment,
1127    acquisition, disposition, discontinued operation, merger, amalgamation, consolidation or operational
1128    change had occurred at the beginning of the applicable four-quarter period.

1129            For purposes of this definition, whenever *pro forma* effect is to be given to any event, the
1130    *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of the
1131    Company. Any such *pro forma* calculation may include adjustments appropriate, in the reasonable good
1132    faith determination of the Company as set forth in an Officer's Certificate, to reflect (1) operating expense
1133    reductions and other operating improvements or synergies reasonably expected to result from the applica-
1134    ble event and (2) all adjustments of the nature set forth as "Restructuring Adjustments" under "Unaudited
1135    Consolidated *Pro Forma* Financial Information" in the Offering Memorandum to the extent such adjust-
1136    ments, without duplication, continue to be applicable to such four-quarter period.

1137            For the purposes of this definition, any amount in a currency other than U.S. Dollars will
1138    be converted to U.S. Dollars based on the average exchange rate for such currency for the most recent
1139    twelve-month period immediately prior to the date of determination or if any such Indebtedness is subject
1140    to a Currency Agreement with respect to the currency in which such Indebtedness is denominated cover-
1141    ing principal, premium, if any, and interest on such Indebtedness, the amount of such Indebtedness and
1142    such interest and premium, if any, shall be determined after giving effect to all payments in respect
1143    thereof under such Currency Agreement.

1144            "Securities Act" means the Securities Act of 1933, as amended, and the rules and regula-
1145    tions of the SEC promulgated thereunder.

1146            "Security Documents" means the security agreements, pledge agreements, collateral as-
1147    signments, mortgages and related agreements, as amended, supplemented, modified, extended, restruc-
1148    tured, renewed, restated or replaced in whole or in part from time to time, creating the security interests in
1149    the Collateral as contemplated by this Indenture.

1150            "Senior Term Loan Collateral Agent" means UBS AG, Stamford Branch, as the collateral
1151    agent under the Senior Term Loan Facility, or its successors.

1152            "Senior Term Loan Facility" means the senior secured term loan facility of the Issuer to
1153    be entered into on the Issue Date as amended, supplemented, modified, extended, restructured, renewed,
1154    restated, refinanced or replaced in whole or in part from time to time.

1155            "Series" means (a) with respect to the First Lien Secured Parties, each of (i) the secured
1156    parties under the Senior Term Loan Facility (in their capacities as such), (ii) the holders of the First Lien
1157    Notes, the First Lien Notes Collateral Agent and the First Lien Trustee (each in its capacity as such) and

(iii) the Additional First Lien Secured Parties that become subject to the First Lien Intercreditor Agreement after the date hereof that are represented by a common Authorized Representative (in its capacity as such for such Additional First Lien Secured Parties); (b) with respect to any First Priority Lien Obligations, each of (i) the Obligations under the Senior Term Loan Facility, (ii) the First Lien Notes Obligations and (iii) the Additional First Priority Lien Obligations Incurred pursuant to any applicable agreement, which pursuant to any joinder agreement, are to be represented under the First Lien Intercreditor Agreement by a common Authorized Representative (in its capacity as such for such Additional First Priority Lien Obligations); and (c) with respect to any Third Priority Lien Obligations, each of (i) the Notes Obligations and the Obligations in respect of any refunding, refinancing or defeasement of the Notes; (ii) the New Third Lien Notes and the Obligations in respect of any refunding, refinancing or defeasement of the New Third Lien Notes; and (iii) the Third Priority Lien Obligations Incurred after the Issue Date pursuant to any applicable agreement.

"Significant Subsidiary" means any Restricted Subsidiary that would be a "Significant Subsidiary" of the Company within the meaning of Rule 1-02 under Regulation S-X promulgated by the SEC (or any successor provision).

"Special Purpose Subsidiary" means any Subsidiary of the Company whose material assets are comprised solely of the Capital Stock of a Joint Venture, where the pledge of such Capital Stock would be prohibited by any contractual requirement pertaining to such Joint Venture.

"Specified Lien" has the meaning ascribed to such term in the definition of "First Priority Lien Obligations".

"Specified Sale/Leaseback Transaction" has the meaning ascribed to such term under Section 4.04.

"Sponsor" means Apollo Global Management, LLC and any of its successors in interest or Affiliates.

"Standard Securitization Undertakings" means representations, warranties, undertakings, covenants, indemnities and guarantees of performance entered into by the Company or any Subsidiary of the Company which the Company has determined in good faith to be customary in a Receivables Financing it being understood that any Receivables Repurchase Obligation shall be deemed to be a Standard Securitization Undertaking.

"Stated Maturity" means, with respect to any security, the date specified in such security as the fixed date on which the final payment of principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency beyond the control of the issuer unless such contingency has occurred).

"Structured Financing Transaction" means a sale of preferred shares of a Restricted Subsidiary, depositing the proceeds of such sale with a bank and pledging such deposit to guarantee a put and call with respect to such preferred shares.

"Subordinated Indebtedness" means (a) with respect to the Issuer, any Indebtedness of the Issuer which is by its terms subordinated in right of payment to the Notes, and (b) with respect to any Guarantor, any Indebtedness of such Guarantor which is by its terms subordinated in right of payment to Obligations in respect of the Notes.

1199        "Subsidiary" means, with respect to any Person, (1) any corporation, association or other
1200 business entity (other than a partnership, joint venture or limited liability company) of which more than
1201 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any
1202 contingency) to vote in the election of directors, managers or trustees thereof is at the time of determina-
1203 tion owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of
1204 that Person or a combination thereof; (2) any partnership, joint venture or limited liability company of
1205 which (x) more than 50% of the capital accounts, distribution rights, total equity and voting interests or
1206 general and limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by
1207 such Person or one or more of the other Subsidiaries of that Person or a combination thereof, whether in
1208 the form of membership, general, special or limited partnership interests or otherwise, and (y) such Person
1209 or any Subsidiary of such Person is a controlling general partner or otherwise controls such entity; or
1210 (3) with respect to the Company, for so long as the Company or any of its Subsidiaries, individually or in
1211 the aggregate, has at least a 50% ownership interest in Lyondell Bayer Manufacturing Maasvlakle VOF,
1212 Lyondell Bayer Manufacturing Maasvlakle VOF. Unless otherwise qualified, all references to a "Subsidi-
1213 ary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Company.

1214        "Taking" means any taking of all or any portion of the Collateral by condemnation or
1215 other eminent domain proceedings, pursuant to any law, general or special, or by reason of the temporary
1216 requisition of the use or occupancy of all or any portion of the Collateral by any governmental authority,
1217 civil or military, or any sale pursuant to the exercise by any such governmental authority of any right
1218 which it may then have to purchase or designate a purchaser or to order a sale of all or any portion of the
1219 Collateral.

1220        "Third Lien Common Collateral" means, at any time, Collateral in which the holders of
1221 two or more Series of Third Priority Lien Obligations (or their respective Authorized Representatives)
1222 hold a valid and perfected security interest at such time.  If more than two Series of Third Priority Lien
1223 Obligations are outstanding at any time and the holders of less than all Series of Third Priority Lien Obli-
1224 gations hold a valid and perfected security interest in any Collateral at such time then such Collateral shall
1225 constitute Third Lien Common Collateral for those Series of Third Priority Lien Obligations that hold a
1226 valid security interest in such Collateral at such time and shall not constitute Third Lien Common Collat-
1227 eral for any Series which does not have a valid and perfected security interest in such Collateral at such
1228 time.

1229        "Third Lien Controlling Secured Party" means, with respect to any Third Lien Common
1230 Collateral, holders of the Series of Third Priority Lien Obligations whose Authorized Representative is
1231 the Authorized Collateral Agent for such Third Lien Common Collateral.

1232        "Third Lien Indenture" means the indenture under which the New Third Lien Notes are
1233 issued, as amended, supplemented, modified, extended, restructured, renewed or restated in whole or in
1234 part from time to time, in accordance with the terms thereof.

1235        "Third Lien Intercreditor Agreement" means the an intercreditor agreement that sets forth
1236 the relative priority and rights of the Liens junior to the Notes in a manner similar to how the Notes are
1237 treated in the Junior Lien Intercreditor Agreement.

1238        "Third Lien Intervening Creditor" has the meaning ascribed to such term under the Third
1239 Lien Intercreditor Agreement.

1240        "Third Lien Non-Controlling Secured Party" means, with respect to any Third Lien
1241 Common Collateral, the Third Lien Secured Parties that are not Third Lien Controlling Secured Parties
1242 with respect to such Third Lien Common Collateral.

1243                "Third Lien Notes Collateral Agent" means [_____].

1244                "Third Lien Secured Indebtedness Limit" means $3,245 million.

1245                "Third Lien Secured Indebtedness Leverage Ratio" means, with respect to any Person, at
1246    any date the ratio of (i) (x) the amount of Secured Indebtedness constituting First Priority Lien Obliga-
1247    tions and Third Lien Secured Indebtedness of such Person and its Restricted Subsidiaries as of such date
1248    of calculation less (y) the amount of any such Person's Cash Equivalents (each as determined on a con-
1249    solidated basis in accordance with GAAP) to (ii) Consolidated EBITDA of such Person for the four full
1250    fiscal quarters for which internal financial statements are available immediately preceding such date of
1251    such calculation. In the event that the Company or any of its Restricted Subsidiaries Incurs, repays, repur-
1252    chases or redeems any Indebtedness subsequent to the commencement of the period for which the Third
1253    Lien Secured  Indebtedness Leverage Ratio is being calculated but prior to the event for which the calcu-
1254    lation of the Third Lien Secured Indebtedness Leverage Ratio is made (the "First Lien Secured Leverage
1255    Calculation Date"), then the Third Lien Secured Indebtedness Leverage Ratio shall be calculated giving
1256    *pro forma* effect to such Incurrence, repayment, repurchase or redemption of Indebtedness as if the same
1257    had occurred at the beginning of the applicable four quarter period; provided that the Issuer may elect
1258    pursuant to an Officer's Certificate delivered to the Trustee to treat all or any portion of the commitment
1259    under any Indebtedness as being Incurred at such time, in which case any subsequent Incurrence of In-
1260    debtedness under such commitment shall not be deemed, for purposes of this calculation, to be an Incur-
1261    rence at such subsequent time.

1262                For purposes of making the computation referred to above, Investments, acquisitions,
1263    dispositions, mergers, amalgamations, consolidations and discontinued operations (as determined in ac-
1264    cordance with GAAP), in each case with respect to an operating unit of a business, and any operational
1265    changes that the Company or any of its Restricted Subsidiaries has determined to make and/or made dur-
1266    ing the four quarter reference period or subsequent to such reference period and on or prior to or simulta-
1267    neously with the First Lien Secured Leverage Calculation Date shall be calculated on a *pro forma* basis
1268    assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations,
1269    discontinued operations and other operational changes (and the change of any associated Indebtedness
1270    and the change in Consolidated EBITDA resulting therefrom) had occurred on the first day of the four
1271    quarter reference period. If since the beginning of such period any Person that subsequently became a Re-
1272    stricted Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the begin-
1273    ning of such period shall have made any Investment, acquisition, disposition, merger, consolidation,
1274    amalgamation, discontinued operation or operational change, in each case with respect to an operating
1275    unit of a business, that would have required adjustment pursuant to this definition, then the Third Lien
1276    Secured Indebtedness Leverage Ratio shall be calculated giving *pro forma* effect thereto for such period
1277    as if such Investment, acquisition, disposition, discontinued operation, merger, amalgamation, consolida-
1278    tion or operational change had occurred at the beginning of the applicable four quarter period.

1279                For purposes of this definition, whenever *pro forma* effect is to be given to any event, the
1280    *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of the
1281    Company. Any such *pro forma* calculation may include adjustments appropriate, in the reasonable good
1282    faith determination of the Company as set forth in an Officer's Certificate, to reflect (1) operating expense
1283    reductions and other operating improvements or synergies reasonably expected to result from the applica-
1284    ble event and (2) all adjustments of the nature set forth as "Restructuring Adjustments" under "Unaudited
1285    Consolidated *Pro Forma* Financial Information" in this Offering Memorandum to the extent such adjust-
1286    ments, without duplication, continue to be applicable to such four quarter period.

1287                For the purposes of this definition, any amount in a currency other than U.S. Dollars will
1288    be converted to U.S. Dollars based on the average exchange rate for such currency for the most recent

1289  twelve month period immediately prior to the date of determination or if any such Indebtedness is subject
1290  to a Currency Agreement with respect to the currency in which such Indebtedness is denominated cover-
1291  ing principal, premium, if any, and interest on such Indebtedness, the amount of such Indebtedness and
1292  such interest and premium, if any, shall be determined after giving effect to all payments in respect
1293  thereof under such Currency Agreement.

1294  "Third Lien Secured Leverage Calculation Date" has the meaning ascribed to such term
1295  in the definition of "Third Lien Secured Indebtedness Leverage Ratio."

1296  "Third Lien Secured Party" means (a) the "Secured Parties," as defined in the Third Lien
1297  Notes Indenture, (b) the "Secured Parties," as defined in the Collateral Agreement and (c) any Additional
1298  Third Lien Secured Parties.

1299  "Third Lien Trustee" means the party named as such in the Third Lien Indenture until a
1300  successor replaces it and, thereafter, means the successor.

1301  "Third Priority Lien Obligations" means (i) all Indebtedness under the Notes, (ii) the
1302  Notes Obligations and the Obligations in respect of any refunding, refinancing or defeasement of the
1303  Notes, (iii) all Indebtedness under the New Third Lien Notes, (iv) the Obligations in respect of the New
1304  Third Lien Notes and the Obligations in respect of any refunding, refinancing or defeasement of the Third
1305  Lien Notes and (v) Third Priority Lien Obligations that are Incurred after the Issue Date and secured by
1306  the Notes Collateral on a third priority basis pursuant to the Security Documents.

1307  "TIA" or "Trust Indenture Act" means the Trust Indenture Act of 1939 (15 U.S.C. Sec-
1308  tions 77aaa-77bbbb) as in effect on the date of this Indenture.

1309  "Total Assets" means, with respect to any Person, the total consolidated assets of such
1310  Person and its Restricted Subsidiaries, without giving effect to any amortization of the amount of intangi-
1311  ble assets since the Issue Date, (x) as shown on the most recent balance sheet of such Person, or (y) in
1312  regards to the Company only, as shown on the most recent balance sheet.

1313  "Treasury Services Agreement" means any agreement between the Issuer, any Guarantor
1314  or Restricted Subsidiary and any commercial bank or other financial institution relating to treasury, de-
1315  pository, and cash management services, employee credit card arrangements or automated clearinghouse
1316  transfer of funds.

1317  "Trust Officer" means:

1318  (1)      any officer within the corporate trust department of the Trustee, including any
1319  vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any
1320  other officer of the Trustee who customarily performs functions similar to those performed by the
1321  Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter
1322  is referred because of such Person's knowledge of and familiarity with the particular subject, and

1323  (2)      who shall have direct responsibility for the administration of this Indenture.

1324  "Trustee" means the party named as such in this Indenture until a successor replaces it
1325  and, thereafter, means the successor.

1326  "Uniform Commercial Code" or "UCC" means the New York Uniform Commercial
1327  Code as in effect from time to time.

1328       "<u>Unrestricted Subsidiary</u>" means:

1329       (1)    any Subsidiary of the Company that at the time of determination shall be desig-
1330 nated an Unrestricted Subsidiary by the Board of Directors of such Person in the manner provided
1331 below; and

1332       (2)    any Subsidiary of an Unrestricted Subsidiary;

1333       The Company may designate any Subsidiary of the Company (including any newly ac-
1334 quired or newly formed Subsidiary of the Company) to be an Unrestricted Subsidiary unless such Sub-
1335 sidiary or any of its Subsidiaries owns any Equity Interests or Indebtedness of, or owns or holds any Lien
1336 on any property of, the Company or any other Subsidiary of the Company that is not a Subsidiary of the
1337 Subsidiary to be so designated; *provided*, *however*, that the Subsidiary to be so designated and its Sub-
1338 sidiaries do not at the time of designation have and do not thereafter Incur any Indebtedness pursuant to
1339 which the lender has recourse to any of the assets of the Company or any of its Restricted Subsidiaries
1340 (except as permitted under Section 4.03).

1341       The Company may designate any Unrestricted Subsidiary to be a Restricted Subsidiary.

1342       "<u>U.S. Dollar Equivalent</u>" means, with respect to any monetary amount in a currency other
1343 than U.S. dollars, at any time for the determination thereof, the amount of U.S. dollars obtained by con-
1344 verting such foreign currency involved in such computation into U.S. dollars at the spot rate for the pur-
1345 chase of U.S. dollars with the applicable foreign currency as quoted by Reuters at approximately 10:00
1346 A.M. (New York City time) on such date of determination (or if no such quote is available on such date,
1347 on the immediately preceding Business Day for which such a quote is available).

1348       "<u>U.S. Legal Tender</u>" means such coin or currency of the U.S. as at the time of payment
1349 shall be legal tender for the payment of public and private debts.

1350       "<u>Voting Stock</u>" of any Person as of any date means the Capital Stock of such Person that
1351 is at the time entitled to vote in the election of the Board of Directors of such Person.

1352       "<u>Weighted Average Life to Maturity</u>" means, when applied to any Indebtedness or Dis-
1353 qualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing
1354 (1) the sum of the products of the number of years from the date of determination to the date of each suc-
1355 cessive scheduled principal payment of such Indebtedness or redemption or similar payment with respect
1356 to such Disqualified Stock or Preferred Stock multiplied by the amount of such payment, by (2) the sum
1357 of all such payments.

1358       "<u>Wholly Owned Domestic Subsidiary</u>" is any Wholly Owned Subsidiary that is a Domes-
1359 tic Subsidiary.

1360       "<u>Wholly Owned Restricted Subsidiary</u>" is any Wholly Owned Subsidiary that is a Re-
1361 stricted Subsidiary.

1362       "<u>Wholly Owned Subsidiary</u>" of any Person means a Subsidiary of such Person 100% of
1363 the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying
1364 shares or shares required to be held by Foreign Subsidiaries) shall at the time be owned by such Person or
1365 by one or more Wholly Owned Subsidiaries of such Person.

1366

SECTION 1.02.    <u>Other Definitions</u>.

| <u>Term</u> | Defined in<br><u>Section</u> |
|---|---|
| "3-16 Exemption" | 11.04(c) |
| "Additional Amounts" | 4.17(a) |
| "Additional Guarantee" | 4.11(a) |
| "Affiliate Transaction" | 4.07(a) |
| "Applicable Collateral Agents" | 1.01 |
| "Applicable Obligations" | 1.01 |
| "Authentication Order" | 2.03 |
| "Bankruptcy Law" | 6.01 |
| "Borrowing Base" | 4.03(b)(iii)(B) |
| "Change of Control Offer" | 4.08(b) |
| "Collateral Agreement" | 11.01 |
| "Company" | Preamble |
| "covenant defeasance option" | 8.01(b) |
| "Covenant Suspension Event" | 4.15 |
| "Custodian" | 6.01 |
| "DBTCA" | 7.13(a) |
| "Dutch Security Documents" | 7.13(a) |
| "Escrow Issuer" | Preamble |
| "EU Savings Tax Directive" | 4.17(b)(7) |
| "EU-Swiss Savings Tax Agreement" | 4.17(b)(7) |
| "Event of Default" | 6.01 |
| "Guarantee" | 12.01(a) |
| "Guaranteed Obligations" | 12.01(a) |
| "Guarantor" | 12.01(a) |
| "incorporated provision" | 13.01 |
| "Initial Notes" | Preamble |
| "Investment Grade Status Period" | 4.15 |
| "Issuer" | Preamble |
| "legal defeasance option" | 8.01(b) |
| "Notice of Default" | 6.01 |
| "Offer Period" | 4.06(d) |
| "other notes" | 4.03(b)(i) |
| "Parallel Debt" | 7.13(b)(i) |
| "Paying Agent" | 2.04 |
| "Payor" | 4.17(a) |
| "primary obligations" | 1.01 |
| "primary obligor" | 1.01 |
| "Principal Obligations" | 7.13(a) |
| "protected purchaser" | 2.08 |
| "Reference Period" | 4.04(a)(3)(i) |
| "Refinancing Indebtedness" | 4.03(b)(ix) |
| "Refunding Capital Stock" | 4.04(b)(ii)(A) |
| "Registrar" | 2.04 |
| "Relevant Taxing Jurisdiction" | 4.17(a) |
| "Restricted Payments" | 4.04(a) |
| "Retired Capital Stock" | 4.04(b)(ii)(A) |

| Term | Defined in Section |
|---|---|
| "Reversion Date" | 4.15 |
| "Roll-Up Notes Trustee" | 1.01 |
| "Second Commitment" | 4.06(b) |
| "Secured Leverage Calculation Date" | 1.01 |
| "Successor Company" | 5.01(a) |
| "Successor Issuer" | 5.01(d) |
| "Successor Pledgor" | 5.01(g) |
| "Suspended Covenants" | 4.15 |
| "Suspension Period" | 4.15 |
| "Taxes" | 4.17(a) |
| "Transfer" | 5.01(h) |
| "Trigger Date" | 3.09 |
| "Trustee" | Preamble |
| "Paying Agent" | Preamble |

SECTION 1.03.    Incorporation by Reference of Trust Indenture Act.  This Indenture incorporates by reference certain provisions of the TIA.  The following TIA terms have the following meanings:

"Commission" means the SEC.

"indenture securities" means the Notes and any Guarantee.

"indenture security holder" means a holder.

"indenture to be qualified" means this Indenture.

"indenture trustee" or "institutional trustee" means the Trustee.

"obligor" on the indenture securities means the Issuer and each Guarantor and any other obligor on the Notes.

All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule have the meanings assigned to them by such definitions.

SECTION 1.04.    Rules of Construction.  Unless the context otherwise requires:

(a)    a term has the meaning assigned to it;

(b)    an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(c)    "or" is not exclusive;

(d)    "including" means including without limitation;

(e)    words in the singular include the plural and words in the plural include the singular;

-31-

1389       (f)     unsecured Indebtedness shall not be deemed to be subordinate or junior to Se-
1390    cured Indebtedness merely by virtue of its nature as unsecured Indebtedness;

1391       (g)     the principal amount of any non-interest bearing or other discount security at any
1392    date shall be the principal amount thereof that would be shown on a balance sheet of the issuer
1393    dated such date prepared in accordance with GAAP;

1394       (h)     the principal amount of any Preferred Stock shall be (i) the maximum liquidation
1395    value of such Preferred Stock or (ii) the maximum mandatory redemption or mandatory repur-
1396    chase price with respect to such Preferred Stock, whichever is greater;

1397       (i)     unless otherwise specified herein, all accounting terms used herein shall be inter-
1398    preted, all accounting determinations hereunder shall be made, and all financial statements re-
1399    quired to be delivered hereunder shall be prepared in accordance with GAAP;

1400       (j)     "$" and "U.S. dollars" each refer to United States dollars, or such other money of
1401    the United States of America that at the time of payment is legal tender for payment of public and
1402    private debts;

1403       (k)     "euro" or "€" means the currency introduced at the start of the third stage of eco-
1404    nomic and monetary union pursuant to the Treaty of Rome establishing the European Commu-
1405    nity, as amended by the Treaty on European Union, signed at Maastricht on February 7, 1992;
1406    and

1407       (l)     whenever in this Indenture or the Notes there is mentioned, in any context, prin-
1408    cipal, interest or any other amount payable under or with respect to any Notes, such mention shall
1409    be deemed to include mention of the payment of Additional Interest, to the extent that, in such
1410    context, Additional Interest is, were or would be payable in respect thereof.

1411                  **ARTICLE II**
1412
1413                  **THE NOTES**

1414       SECTION 2.01.    <u>Amount of Notes; Terms</u>.  The aggregate principal amount of Notes
1415    which may be authenticated and delivered under this Indenture on the Issue Date is $[ • ].

1416       The terms and provisions contained in the Notes shall constitute, and are hereby ex-
1417    pressly made, a part of this Indenture and the Issuer, the Guarantors and Trustee, by their execution and
1418    delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.  How-
1419    ever, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the
1420    provisions of this Indenture shall govern and be controlling.

1421       The Notes shall not be redeemable, other than as provided in Article III.

1422       The terms and provisions contained in the Notes shall constitute, and are hereby ex-
1423    pressly made, a part of this Indenture and the Issuer, the Guarantors, the Trustee and Agents, by their exe-
1424    cution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound
1425    thereby.  However, to the extent any provision of any Note conflicts with the express provisions of this
1426    Indenture, the provisions of this Indenture shall govern and be controlling.

Additional Notes ranking *pari passu* with the Initial Notes may be created and issued under this Indenture from time to time by the Issuer without notice to or consent of the holders and shall be consolidated with and form a single class with the Initial Notes and shall have the same terms as to status, redemption or otherwise as the Initial Notes other than the initial payment date; *provided* that the Issuer's ability to issue Additional Notes shall be subject to the Issuer and the Company's compliance with Sections 4.03 and 4.12 hereof. The Initial Notes and any Additional Notes subsequently issued under this Indenture may not, unless the Issuer so elects, be treated as a single class for all purposes under this Indenture, including, without limitation, waivers, amendments, redemptions and offers to purchase. Any Additional Notes subsequently issued under the Indenture will be not treated as fungible with the Initial Notes of the relevant series for United States federal income tax purposes or under the laws of any other jurisdiction, unless the Issuer so elects. Unless the context otherwise requires, for all purposes of this Indenture, references to the Notes include any Additional Notes actually issued.

SECTION 2.02.    <u>Form and Dating</u>.

(a)    The Notes and the Trustee's certificate of authentication shall be substantially in the form of <u>Exhibit A</u> attached hereto. The Notes may have notations, legends or endorsements required by law, stock exchange rules or usage. Each Note shall be dated the date of its authentication. The Notes shall be in minimum denominations of $100,000 and integral multiples of $1,000 in excess thereof.

(b)    <u>Global Notes</u>. Notes issued in global form shall be substantially in the form of <u>Exhibit A-1</u> attached hereto (including the Global Note Legend thereon and the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Notes issued in definitive form shall be substantially in the form of <u>Exhibit A-1</u> attached hereto (but without the Global Note Legend thereon and without the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Each Global Note shall represent such of the outstanding Notes as shall be specified in the "Schedule of Exchanges of Interests in the Global Note" attached thereto and each shall provide that it shall represent up to the aggregate principal amount of Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as applicable, to reflect exchanges and redemptions. Any endorsement of a Global Note to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Notes represented thereby shall be made by the Registrar or the Custodian, at the direction of the Trustee, in accordance with instructions given by the holder thereof as required by Section 2.07 hereof.

SECTION 2.03.    <u>Execution and Authentication</u>. One Officer shall sign the Notes for the Issuer by manual or facsimile signature.

If an Officer whose signature is on a Note no longer holds that office at the time the Trustee authenticates the Note, the Note shall be valid nevertheless.

A Note shall not be valid until an authorized signatory of the Trustee manually signs the certificate of authentication on the Notes in accordance with this Section 2.03. The signature shall be conclusive evidence that the Note has been authenticated under this Indenture.

On the Issue Date, the Trustee shall, upon receipt of an Issuer Order (an "<u>Authentication Order</u>") and an Opinion of Counsel conforming with Section 314(c) of the TIA, authenticate and deliver the Initial Notes. In addition, at any time, from time to time, the Trustee shall upon an Authentication Order authenticate and deliver any Additional Notes for an aggregate principal amount specified in such Authentication Order for such Additional Notes issued hereunder.

The Trustee may appoint one or more authenticating agents reasonably acceptable to the Issuer to authenticate the Notes. Any such appointment shall be evidenced by an instrument signed by a Trust Officer, a copy of which shall be furnished to the Issuer. Unless limited by the terms of such appointment, an authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as an Agent to deal with holders or an Affiliate of the Issuer. The Trustee hereby appoints Wells Fargo Bank, N.A. as authenticating agent for the Notes.

Notwithstanding the foregoing, except as provided in Section 9.02, all Notes issued under this Indenture shall vote and consent together on all matters (as to which any of such Notes may vote or consent) as one class and no series of Notes will have the right to vote or consent as a separate class on any matter.

SECTION 2.04.    <u>Registrar and Paying Agent</u>. The Issuer shall maintain an office or agency, where (a) Notes may be presented or surrendered for registration of transfer or for exchange ("<u>Registrar</u>"), (b) Notes may be presented or surrendered for payment and (c) notices and demands to or upon the Issuer in respect of the Notes and this Indenture may be served. The Paying Agent shall not be the Issuer or an Affiliate of the Issuer. The Registrar shall keep a register of the Notes and of their transfer and exchange. The Issuer, upon notice to the Trustee, may have one or more Co-Registrars and one or more additional paying agents reasonably acceptable to the Trustee. The term "Paying Agent" includes any additional paying agent, and the term "Registrar" includes any Co-Registrar. The Issuer may change the Paying Agent or Registrar without notice to any holder.

The Issuer shall enter into an appropriate agency agreement with any Agent not a party to this Indenture, which agreement shall incorporate the provisions of the TIA and implement the provisions of this Indenture that relate to such Agent. The Issuer shall notify the Trustee, in advance, of the name and address of any such Agent. If the Issuer fails to maintain a Registrar or Paying Agent, or fails to give the foregoing notice, the Trustee shall act as such.

The Issuer initially appoints Wells Fargo Bank, N.A. as the Registrar and Paying Agent with respect to the Notes and initially appoints [  ] as Depositary in each case until such time as such entity has resigned or a successor has been appointed.

The Issuer may remove any Registrar or Paying Agent upon written notice to such Registrar or Paying Agent and to the Trustee; *provided*, *however*, that no such removal shall become effective until (i) if applicable, acceptance of an appointment by a successor as evidenced by an appropriate agreement entered into by the Issuer and such successor Registrar or Paying Agent, as the case may be, and delivered to the Trustee or (ii) notification to the Trustee that the Trustee shall serve as Registrar or Paying Agent until the appointment of a successor in accordance with clause (i) above. The Registrar or Paying Agent may resign upon 30 days prior written notice to the Issuer and the Trustee; *provided*, *however*, that the Trustee may resign as Paying Agent or Registrar only if the Trustee also resigns as Trustee in accordance with Section 7.08.

SECTION 2.05.    <u>Paying Agent to Hold Money in Trust</u>. Prior to 10:00 a.m. London time on to each due date of the principal of and interest on any Note, the Issuer shall deposit with the Paying Agent (or if the Issuer or a Wholly Owned Subsidiary is acting as Paying Agent, segregate and hold in trust for the benefit of the Persons entitled thereto) a sum sufficient to pay such principal and interest when so becoming due. The Issuer shall require the Paying Agent (other than the Trustee) to agree in writing that the Paying Agent shall hold in trust for the benefit of holders or the Trustee all money held by the Paying Agent for the payment of principal of and interest on the Notes, and shall notify the Trustee of any default by the Issuer in making any such payment. If the Issuer or a Wholly Owned Subsidiary of the

1514    Issuer acts as Paying Agent, it shall segregate the money held by it as Paying Agent and hold it in trust for
1515    the benefit of the Persons entitled thereto.  The Issuer at any time may require the Paying Agent to pay all
1516    money held by it to the Trustee and to account for any funds disbursed by such Paying Agent.  Upon
1517    complying with this Section, the Paying Agent shall have no further liability for the money delivered to
1518    the Trustee.

1519    SECTION 2.06.    Holder Lists.  The Trustee shall preserve in as current a form as is
1520    reasonably practicable the most recent list available to it of the names and addresses of holders.  If the
1521    Trustee is not the Registrar, the Issuer shall furnish, or cause the Registrar to furnish, to the Trustee, in
1522    writing at least five Business Days before each Interest Payment Date and at such other times as the Trus-
1523    tee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of
1524    the names and addresses of holders.

1525    SECTION 2.07.    Transfer and Exchange.

1526    (a)    Transfer and Exchange of Global Notes.  Except as otherwise set forth in this
1527    Section 2.07, a Global Note may be transferred, in whole and not in part, only to another nominee of the
1528    Depositary or to a successor thereto or a nominee of such successor thereto.  A beneficial interest in a
1529    Global Note may not be exchanged for a Definitive Note of the same series unless (A) the Depositary (x)
1530    notifies the Issuer that it is unwilling or unable to continue as Depositary for such Global Note or (y) has
1531    ceased to be a clearing agency registered under the Exchange Act, and, in either case, a successor Deposi-
1532    tary is not appointed by the Issuer within 120 days, or (B) there shall have occurred and be continuing a
1533    Default with respect to the Notes.  Upon the occurrence of any of the preceding events in (A) above, De-
1534    finitive Notes delivered in exchange for any Global Note of the same series or beneficial interests therein
1535    will be registered in the names, and issued in any approved denominations, requested by or on behalf of
1536    the Depositary (in accordance with its customary procedures).  Global Notes also may be exchanged or
1537    replaced, in whole or in part, as provided in Section 2.08 hereof.  Every Note authenticated and delivered
1538    in exchange for, or in lieu of, a Global Note of the same series or any portion thereof, pursuant to this
1539    Section 2.07 or Section 2.08 hereof, shall be authenticated and delivered in the form of, and shall be, a
1540    Global Note, except for Definitive Notes issued subsequent to any of the preceding events in (i) or (ii)
1541    above and pursuant to Section 2.07(c) hereof.  A Global Note may not be exchanged for another Note
1542    other than as provided in this Section 2.07(a); *provided*, *however*, beneficial interests in a Global Note
1543    may be transferred and exchanged as provided in Section 2.07(b) or (c) hereof.

1544    (b)    Transfer and Exchange of Beneficial Interests in the Global Notes.  The transfer
1545    and exchange of beneficial interests in the Global Notes shall be effected through the Depositary, in ac-
1546    cordance with the provisions of this Indenture and the Applicable Procedures.  Transfers of beneficial
1547    interests in the Global Notes also shall require compliance with either subparagraph (i) or (ii) below, as
1548    applicable, as well as one or more of the other following subparagraphs, as applicable:

1549    (i)    Transfer of Beneficial Interests in the Same Global Note.  [Beneficial interests in
1550    any Global Note may be transferred to Persons who take delivery thereof in the form of a benefi-
1551    cial interest a Global Note.  No written orders or instructions shall be required to be delivered to
1552    the Registrar to effect the transfers described in this Section 2.07(b)(i).]  [Trustee to confirm]

1553    (ii)    All Other Transfers and Exchanges of Beneficial Interests in Global Notes.  In
1554    connection with all transfers and exchanges of beneficial interests that are not subject to Section
1555    2.07(b)(i) hereof, the transferor of such beneficial interest must deliver to the Registrar either
1556    (A) (1) a written order from a Participant or an Indirect Participant given to the applicable De-
1557    positary in accordance with the Applicable Procedures directing such Depositary to credit or
1558    cause to be credited a beneficial interest in another Global Note in an amount equal to the benefi-

cial interest to be transferred or exchanged and (2) instructions given in accordance with the Ap-
plicable Procedures containing information regarding the Participant account to be credited with
such increase or (B) (1) a written order from a Participant or an Indirect Participant given to the
applicable Depositary in accordance with the Applicable Procedures directing such Depositary to
cause to be issued a Definitive Note of the same series in an amount equal to the beneficial inter-
est to be transferred or exchanged and (2) instructions given by the applicable Depositary to the
Registrar containing information regarding the Person in whose name such Definitive Note shall
be registered to effect the transfer or exchange referred to in (1) above.  Upon satisfaction of all
of the requirements for transfer or exchange of beneficial interests in Global Notes contained in
this Indenture and the Notes or otherwise applicable under the Securities Act, as set forth in an
Officer's Certificate, the Registrar shall adjust the principal amount of the relevant Global Note(s)
pursuant to Section 2.07(h) hereof.

           (iii)     [Intentionally Omitted].

           (iv)     [Intentionally Omitted].

         (c)     <u>Transfer or Exchange of Beneficial Interests for Definitive Notes</u>.

           (i)     [Intentionally Omitted].

           (ii)     [Intentionally Omitted].

           (iii)     [Intentionally Omitted].

           (iv)     <u>Beneficial Interests in Global Notes to Definitive Notes</u>.  If any holder of a bene-
ficial interest in a Global Note proposes to exchange such beneficial interest for a Definitive Note or to
transfer such beneficial interest to a Person who takes delivery thereof in the form of a Definitive Note,
then, upon the occurrence of any of the events in subsection (A) or (B) of Section 2.07(a) hereof and sat-
isfaction of the conditions set forth in Section 2.07(b)(ii) hereof, the Registrar shall cause the aggregate
principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.07(h)
hereof, and the Issuer shall execute and, upon receipt of an Authentication Order in accordance with Sec-
tion 2.03 hereof, the Trustee shall authenticate and mail to the Person designated in the instructions a De-
finitive Note in the applicable principal amount.  Any Definitive Note issued in exchange for a beneficial
interest pursuant to this Section 2.07(c)(iv) shall be registered in such name or names and in such author-
ized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar
through instructions from or through the applicable Depositary and the Participant or Indirect Participant.
The Registrar shall mail such Definitive Notes to the Persons in whose names such Notes are so regis-
tered.

         (d)     <u>Transfer and Exchange of Definitive Notes for Beneficial Interests</u>.

           (i)     [Intentionally Omitted].

           (ii)     [Intentionally Omitted].

           (iii)     <u>Definitive Notes to Beneficial Interests in Global Notes</u>.  A holder of a Definitive
Note may exchange such Note for a beneficial interest in a Global Note or transfer such Definitive Notes
to a Person who takes delivery thereof in the form of a beneficial interest in a Global Note at any time.
Upon receipt of a request for such an exchange or transfer, the Registrar shall cancel the applicable De-

finitive Note and increase or cause to be increased the aggregate principal amount of one of the Global
Notes.

If any such exchange or transfer from a Definitive Note to a beneficial interest is effected
pursuant to subparagraph (iii) above at a time when a Global Note has not yet been issued, the Issuer shall
issue and, upon receipt of an Authentication Order in accordance with Section 2.03 hereof, the Trustee
shall authenticate one or more Global Notes in an aggregate principal amount equal to the principal
amount of Definitive Notes so transferred.

(e)    Transfer and Exchange of Definitive Notes for Definitive Notes.  Upon request
by a holder of Definitive Notes and such holder's compliance with the provisions of this Section 2.07(e),
the Registrar shall register the transfer or exchange of Definitive Notes.  Prior to such registration of
transfer or exchange, the requesting holder shall present or surrender to the Registrar the Definitive Notes
duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar
duly executed by such holder or by its attorney, duly authorized in writing.  In addition, the requesting
holder shall provide any additional certifications, documents and information, as applicable, required pur-
suant to the following provisions of this Section 2.07(e):

(i)    [Intentionally Omitted].

(ii)    [Intentionally Omitted].

(iii)    Definitive Notes to Definitive Notes.  A holder of Definitive Notes may transfer
such Notes to a Person who takes delivery thereof in the form of a Definitive Note.  Upon receipt
of a request to register such a transfer, the Registrar shall register the Definitive Notes pursuant to
the instructions from the holder thereof.

(f)    [Intentionally Omitted].

(g)    Legends.  The following legends shall appear on the face of all Global Notes and
Definitive Notes issued under this Indenture unless specifically stated otherwise in the applicable provi-
sions of this Indenture:

(i)    [Intentionally Omitted].

(ii)    Global Note Legend.  Each Global Note shall bear a legend in substantially the
following form:

"THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE
INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR
THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANS-
FERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (I)
THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE RE-
QUIRED PURSUANT TO SECTION 2.07(h) OF THE INDENTURE, (II) THIS
GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSU-
ANT TO SECTION 2.07(a) OF THE INDENTURE, (III) THIS GLOBAL NOTE MAY
BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SEC-
TION 2.11 OF THE INDENTURE AND (IV) THIS GLOBAL NOTE MAY BE
TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN
CONSENT OF THE ISSUER.  UNLESS AND UNTIL IT IS EXCHANGED IN
WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT

BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMI-
NEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE
DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DE-
POSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A
NOMINEE OF SUCH SUCCESSOR DEPOSITARY.  UNLESS THIS CERTIFICATE
IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY
TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("DTC") TO
THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE
OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE
NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY
AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE
TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN
AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR
OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS
WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO.,
HAS AN INTEREST HEREIN."

(iii)    [Intentionally Omitted].

(h)    Cancellation and/or Adjustment of Global Notes.  At such time as all beneficial
interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note
has been redeemed, repurchased or canceled in whole and not in part, each such Global Note shall be re-
turned to or retained and canceled by the Registrar  in accordance with Section 2.11 hereof.  At any time
prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a
Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for
Definitive Notes, the principal amount of Notes represented by such Global Note shall be reduced accord-
ingly and an endorsement shall be made on such Global Note by the Registrar or by the Depositary at the
direction of the Registrar to reflect such reduction; and if the beneficial interest is being exchanged for or
transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global
Note, such other Global Note shall be increased accordingly and an endorsement shall be made on such
Global Note by the Registrar or by the Depositary at the direction of the Registrar to reflect such increase.

(i)    General Provisions Relating to Transfers and Exchanges.

(i)    To permit registrations of transfers and exchanges, the Issuer shall execute and
the Trustee shall authenticate Global Notes and Definitive Notes upon receipt of an Authentication Order
in accordance with Section 2.03 hereof or at the Registrar's request.

(ii)    No service charge shall be made to a holder of a beneficial interest in a Global
Note or to a holder of a Definitive Note for any registration of transfer or exchange, but the Issuer may
require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in
connection therewith (other than any such transfer taxes or similar governmental charge payable upon
exchange or transfer pursuant to Sections 2.08, 3.08, and 9.05 hereof).

(iii)    Neither the Registrar nor the Issuer shall be required to register the transfer of or
exchange any Note selected for redemption in whole or in part, except the unredeemed portion of any
Note being redeemed in part.

(iv)    All Global Notes and Definitive Notes issued upon any registration of transfer or
exchange of Global Notes or Definitive Notes shall be the valid obligations of the Issuer, evidencing the

1682    same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes
1683    surrendered upon such registration of transfer or exchange.

1684              (v)    The Issuer shall not be required (A) to issue, to register the transfer of or to ex-
1685    change any Notes during a period beginning at the opening of business 15 days before the day of any se-
1686    lection of Notes for redemption under Section 3.04 hereof and ending at the close of business on the day
1687    of selection, (B) to register the transfer of or to exchange any Note so selected for redemption in whole or
1688    in part, except the unredeemed portion of any Note being redeemed in part or (C) to register the transfer
1689    of or to exchange a Note between a Record Date and the next succeeding Interest Payment Date.

1690              (vi)    Prior to due presentment for the registration of a transfer of any Note, the Trus-
1691    tee, any Agent and the Issuer may deem and treat the Person in whose name any Note is registered as the
1692    absolute owner of such Note for the purpose of receiving payment of principal of (and premium, if any)
1693    and interest on such Notes and for all other purposes, and none of the Trustee, any Agent or the Issuer
1694    shall be affected by notice to the contrary.

1695              (vii)    Upon surrender for registration of transfer of any Note at the office or agency of
1696    the Issuer designated pursuant to Section 4.14 hereof, the Issuer shall execute, and, upon receipt of an Au-
1697    thentication Order in accordance with Section 2.03 hereof, the Trustee shall authenticate and the Registrar
1698    shall mail, in the name of the designated transferee or transferees, one or more replacement Notes of any
1699    authorized denomination or denominations of a like aggregate principal amount.

1700              (viii)    At the option of the holder, Notes may be exchanged for other Notes of any au-
1701    thorized denomination or denominations of a like aggregate principal amount upon surrender of the Notes
1702    to be exchanged at such office or agency.  Whenever any Global Notes or Definitive Notes are so surren-
1703    dered for exchange, the Issuer shall execute, and the Trustee shall authenticate and the Registrar shall
1704    mail, the replacement Global Notes and Definitive Notes which the holder making the exchange is enti-
1705    tled to in accordance with the provisions of Section 2.03 hereof.

1706              (ix)    All certifications, certificates, Officer's Certificates and Opinions of Counsel re-
1707    quired to be submitted to the Registrar pursuant to this Section 2.07 to effect a registration of transfer or
1708    exchange may be submitted by facsimile.

1709              SECTION 2.08.    Replacement Notes.  If a mutilated Note is surrendered to the Regis-
1710    trar or if the holder of a Note claims that the Note has been lost, destroyed or wrongfully taken, the Issuer
1711    shall issue and the Trustee shall authenticate a replacement Note if the requirements of Section 8-405 of
1712    the Uniform Commercial Code are met, such that the holder (a) satisfies the Issuer or the Trustee within a
1713    reasonable time after such holder has notice of such loss, destruction or wrongful taking and the Registrar
1714    does not register a transfer prior to receiving such notification, (b) makes such request to the Issuer or the
1715    Trustee prior to the Note being acquired by a protected purchaser as defined in Section 8-303 of the Uni-
1716    form Commercial Code (a "protected purchaser") and (c) satisfies any other reasonable requirements of
1717    the Trustee.  If required by the Trustee or the Issuer, such holder shall furnish an indemnity bond suffi-
1718    cient in the judgment of the Trustee and the Issuer to protect the Issuer, the Trustee, a Paying Agent and
1719    the Registrar from any loss or liability that any of them may suffer if a Note is replaced and subsequently
1720    presented or claimed for payment.  The Issuer and the Trustee may charge the holder for their expenses in
1721    replacing a Note (including without limitation, attorneys' fees and disbursements in replacing such
1722    Notes).  In the event any such mutilated, lost, destroyed or wrongfully taken Note has become or is about
1723    to become due and payable, the Issuer in its discretion may pay such Note instead of issuing a new Note
1724    in replacement thereof.

1725              Every replacement Note is an additional obligation of the Issuer.

The provisions of this Section 2.08 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, lost, destroyed or wrongfully taken Notes.

SECTION 2.09.    Outstanding Notes.  Notes outstanding at any time are all Notes authenticated by the Trustee except for those canceled by the Registrar, those delivered to it for cancellation and those described in this Section as not outstanding.  Subject to Section 13.06, a Note does not cease to be outstanding because the Issuer or an Affiliate of the Issuer holds the Note.

If a Note is replaced pursuant to Section 2.08 (other than a mutilated Note surrendered for replacement), it ceases to be outstanding unless the Trustee and the Issuer receive proof satisfactory to them that the replaced Note is held by a protected purchaser.  A mutilated Note ceases to be outstanding upon surrender of such Note and replacement thereof pursuant to Section 2.08.

If a Paying Agent segregates and holds in trust, in accordance with this Indenture, on a redemption date or maturity date money sufficient to pay all principal and interest payable on that date with respect to the Notes (or portions thereof) to be redeemed or maturing, as the case may be, and no Paying Agent is prohibited from paying such money to the holders on that date pursuant to the terms of this Indenture, then on and after that date such Notes (or portions thereof) cease to be outstanding and interest on them ceases to accrue.

SECTION 2.10.    [Intentionally Omitted].

SECTION 2.11.    Cancellation.  The Issuer at any time may deliver Notes to the Registrar for cancellation.  The Registrar and each Paying Agent and no one else shall cancel all Notes surrendered for registration of transfer, exchange, payment or cancellation and shall dispose of canceled Notes in accordance with its customary procedures.  The Registrar and each Paying Agent shall give written notice to the Trustee of any Notes delivered to them and cancelled.  Subject to Section 2.08, the Issuer may not issue new Notes to replace Notes it has redeemed, paid or delivered to the Trustee for cancellation.  The Trustee shall not authenticate Notes in place of canceled Notes other than pursuant to the terms of this Indenture.  However, if the Company shall acquire any of the Notes, such acquisition shall not operate as a redemption or satisfaction of the Indebtedness represented by such Notes unless and until the same are surrendered to the Trustee for cancellation pursuant to this Section 2.11.

SECTION 2.12.    Defaulted Interest.  If the Issuer defaults in a payment of interest on the Notes, the Issuer shall pay the defaulted interest then borne by the Notes (*plus* interest on such defaulted interest to the extent lawful) in any lawful manner.  The Issuer may pay the defaulted interest to the Persons who are holders on a subsequent special record date.  The Issuer shall fix or cause to be fixed any such special record date and payment date to the reasonable satisfaction of the Trustee and shall promptly mail or cause to be mailed to each affected holder a notice that states the special record date, the payment date and the amount of defaulted interest to be paid.

SECTION 2.13.    CUSIP Numbers, ISINs, Etc.  The Issuer in issuing the Notes may use CUSIP numbers and ISIN numbers (if then generally in use) and, if so, the Trustee shall use CUSIP numbers and ISIN numbers in notices of redemption as a convenience to holders; *provided*, *however*, that any such notice may state that no representation is made as to the correctness of such numbers, either as printed on the Notes or as contained in any notice of a redemption that reliance may be placed only on the other identification numbers printed on the Notes and that any such redemption shall not be affected by any defect in or omission of such numbers.  The Issuer shall advise the Trustee of any change in the CUSIP numbers and ISIN numbers.

SECTION 2.14.    <u>Calculation of Principal Amount of Notes</u>.  The aggregate principal amount of the Notes, at any date of determination, shall be the principal amount of the Notes at such date of determination.  With respect to any matter requiring consent, waiver, approval or other action of the holders of a specified percentage of the principal amount of all the Notes, such percentage shall be calculated, on the relevant date of determination, by dividing (a) the principal amount, as of such date of determination, of Notes, the holders of which have so consented, by (b) the aggregate principal amount, as of such date of determination, of the Notes then outstanding, in each case, as determined in accordance with the preceding sentence, Section 2.09, Section 9.02 and Section 13.06 of this Indenture.  Any such calculation made pursuant to this Section 2.14 shall be made by the Issuer and delivered to the Trustee pursuant to an Officer's Certificate.[2]

# ARTICLE III

# REDEMPTION

SECTION 3.01.    <u>Optional Redemption</u>.  The Notes may be redeemed, in whole, or from time to time in part, subject to the conditions and at the redemption prices set forth in Paragraph 5 of the forms of Note set forth in <u>Exhibit A</u> hereto, which are hereby incorporated by reference and made a part of this Indenture, together with accrued and unpaid interest to the redemption date.

SECTION 3.02.    <u>Applicability of Article</u>.  Redemption of Notes at the election of the Issuer or otherwise, as permitted or required by any provision of this Indenture, shall be made in accordance with such provision and this Article.

SECTION 3.03.    <u>Notices to Trustee</u>.  If the Issuer elects to redeem Notes pursuant to the optional redemption provisions of Paragraph 5 of the Note, it shall notify the Trustee, the Registrar and each Paying Agent in writing of (i) the Section of this Indenture pursuant to which the redemption shall occur, (ii) the redemption date, (iii) the principal amount of Notes to be redeemed and (iv) the redemption price.  The Issuer shall give notice to the Trustee provided for in this paragraph at least 45 days but not more than 60 days before a redemption date if the redemption is pursuant to paragraph 5 of the Note, unless a shorter period is acceptable to the Trustee.  Such notice shall be accompanied by an Officer's Certificate and Opinion of Counsel from the Issuer to the effect that such redemption will comply with the conditions herein, as well as such notice required to be delivered under Section 3.05 below.  If fewer than all the Notes are to be redeemed, the record date relating to such redemption shall be selected by the Issuer and given to the Trustee, which record date shall be not fewer than 15 days after the date of notice to the Trustee.  Any such notice may be canceled at any time prior to notice of such redemption being mailed to any holder and shall thereby be void and of no effect.

SECTION 3.04.    <u>Selection of Notes to Be Redeemed</u>.  Selection of Notes for redemption will be made by the Registrar on a *pro rata* basis by lot or otherwise in accordance with the procedures of the Depositary to the extent practicable; *provided* that no Notes of $100,000 principal amount or less shall be redeemed in part.

If less than all the Notes are to be redeemed at any time in connection with an optional redemption, the Registrar will select Notes for redemption as follows:

(i)    if the Notes to be redeemed are listed, in compliance with the requirements of the principal national securities exchange on which such Notes are listed; or

---

[2] Note: To conform with "Transfer Restrictions Under Dutch Law," if applicable.

1810                   (ii)      if the Notes to be redeemed are not so listed, on a *pro rata* basis, by lot or by
1811    such method as the Registrar shall deem fair and appropriate.

1812           SECTION 3.05.    <u>Notice of Optional Redemption</u>.

1813           (a)      At least 10 days but not more than 60 days before a redemption date pursuant to
1814    Paragraph 5 of the Note, the Issuer shall mail or cause to be mailed by first-class mail a notice of redemp-
1815    tion to each holder whose Notes are to be redeemed.

1816           Any such notice shall identify the Notes to be redeemed and shall state:

1817              (i)      the redemption date;

1818             (ii)      the redemption price and the amount of accrued interest to the redemption date;

1819            (iii)      the name and address of the Paying Agent;

1820            (iv)      that Notes called for redemption must be surrendered to the Paying Agent to col-
1821    lect the redemption price, *plus* accrued interest;

1822            (v)      if fewer than all the outstanding Notes are to be redeemed, the certificate num-
1823    bers and principal amounts of the particular Notes to be redeemed, the aggregate principal
1824    amount of Notes to be redeemed and the aggregate principal amount of Notes to be outstanding
1825    after such partial redemption;

1826            (vi)      that, unless the Issuer defaults in making such redemption payment or the Paying
1827    Agent is prohibited from making such payment pursuant to the terms of this Indenture, interest on
1828    Notes (or portion thereof) called for redemption ceases to accrue on and after the redemption
1829    date;

1830            (vii)      the CUSIP number and ISIN number, if any, printed on the Notes being re-
1831    deemed; and

1832            (viii)      that no representation is made as to the correctness or accuracy of the CUSIP
1833    number or ISIN number, if any, listed in such notice or printed on the Notes.

1834           (b)      At the Issuer's request, the Registrar and each Paying Agent shall give the notice
1835    of redemption in the Issuer's name and at the Issuer's expense.  In such event, the Issuer shall provide the
1836    Registrar and each Paying Agent with the information required by this Section at least one Business Day
1837    prior to the date such notice is to be provided to holders in the final form such notice is to be delivered to
1838    holders and such notice may not be canceled.

1839           SECTION 3.06.    <u>Effect of Notice of Redemption</u>.  Once notice of redemption is mailed
1840    in accordance with Section 3.05, Notes called for redemption become due and payable on the redemption
1841    date and at the redemption price stated in the notice, except as provided in the final sentence of paragraph
1842    5 of the Notes.  Upon surrender to the Paying Agent, such Notes shall be paid at the redemption price
1843    stated in the notice, *plus* accrued interest, to, but not including, the redemption date; *provided*, *however*,
1844    that if the redemption date is after a regular Record Date and on or prior to the Interest Payment Date, the
1845    accrued interest shall be payable to the holder of the redeemed Notes registered on the relevant Record
1846    Date.  Failure to give notice or any defect in the notice to any holder shall not affect the validity of the
1847    notice to any other holder.

SECTION 3.07.    <u>Deposit of Redemption Price</u>  On or before the redemption date, the Issuer shall deposit with the Paying Agent U.S. Legal Tender funds sufficient to pay the principal of, plus accrued and unpaid interest on the Notes to be redeemed on that date.  The Paying Agent shall promptly return to the Issuer any U.S. Legal Tender so deposited that is not required for that purpose, except with respect to monies owed as obligations to the Trustee pursuant to Article VII.

Unless the Issuer fails to comply with the preceding paragraph and defaults in the payment of such redemption price, interest on the Notes to be redeemed will cease to accrue on and after the applicable redemption date, whether or not such Notes are presented for payment.

SECTION 3.08.    <u>Notes Redeemed in Part</u>.  Upon surrender of a Note that is redeemed or purchased in part, the Issuer shall issue and, upon receipt of an Authentication Order, the Trustee shall authenticate for the holder at the expense of the Issuer a new Note in principal amount equal to the unredeemed portion thereof will be issued in the name of the holder thereof upon cancellation of the original Note.  On and after the redemption date, interest will cease to accrue on Notes or portions thereof called for redemption so long as the Issuer has deposited with the Paying Agent funds sufficient to pay the principal of, plus accrued and unpaid interest on the Notes to be redeemed.

**ARTICLE IV**

**COVENANTS**

SECTION 4.01.    <u>Payment of Notes</u>.  The Issuer shall promptly pay the principal of and interest on the Notes on the dates and in the manner provided in the Notes and in this Indenture.  An installment of principal of or interest shall be considered paid on the date due if on such date the Trustee or the Paying Agent holds as of 12:00 p.m. Eastern time money sufficient to pay all principal and interest then due and the Trustee or the Paying Agent, as the case may be, is not prohibited from paying such money to the holders on that date pursuant to the terms of this Indenture.

The Issuer shall pay interest on overdue principal at the rate specified therefor in the Notes, and it shall pay interest on overdue installments of interest at the same rate borne by the Notes to the extent lawful.

SECTION 4.02.    [Intentionally Omitted].

SECTION 4.03.    <u>Limitation on Incurrence of Indebtedness Secured by Prior or Equal and Ratable Liens</u>.

(a)    The Company shall not, and shall not permit the Issuer and Pledgors to, directly or indirectly, Incur any Indebtedness secured by a Specific Lien:

(i)    representing First Priority Lien Obligations in excess of the First Priority Secured Indebtedness Limit, if after giving effect to such Incurrence, on a *pro forma* basis, the First Priority Secured Indebtedness Leverage Ratio would exceed 3.0 to 1.0; and

(ii)    representing Third Lien Secured Indebtedness in excess of the Third Lien Secured Indebtedness Limit, if after giving effect to such Incurrence, on a *pro forma* basis, the Third Lien Secured Indebtedness Leverage ratio would exceed 5.0 to 1.0.

(b)    The limitations set forth in Section 4.03(a) shall not apply to (the following, "Permitted Indebtedness"):

(i)    Indebtedness under Asset Backed Credit Facilities in an aggregate principal amount not to exceed the sum of 85% of the net book value of the accounts receivable of the Company and its Restricted Subsidiaries and 65% of the net book value of the inventory of the Company and its Restricted Subsidiaries (the "Borrowing Base") less $1,620 million;

(ii)    Indebtedness under any Oil Indexed Credit Facility in an aggregate principal amount not to exceed $750.0 million; *provided* that amounts Incurred pursuant to an Oil Indexed Credit Facility will be required to reduce the amount of Indebtedness Incurred under the Borrowing Base to the extent Indebtedness in such amount as would no longer be permitted to be Incurred under subclause (i) above (without duplication for the requirements of subclause (i) above);

(iii)    Indebtedness Incurred by the Company or any of its Restricted Subsidiaries constituting reimbursement Obligations with respect to letters of credit and bank guarantees issued in the ordinary course of business, including, without limitation, letters of credit in respect of workers' compensation claims, health, disability or other benefits to employees or former employees or their families or property, casualty or liability insurance or self-insurance or similar requirements, and letters of credit in connection with the maintenance of, or pursuant to the requirements of, environmental or other permits or licenses from governmental authorities, or other Indebtedness with respect to reimbursement-type obligations regarding workers' compensation claims;

(iv)    Indebtedness of the Company to a Restricted Subsidiary; *provided* that (except in respect of intercompany current liabilities Incurred in the ordinary course of business in connection with the cash management operations of the Company and its Subsidiaries) any such Indebtedness owed to a Restricted Subsidiary that is not the Issuer or a Guarantor is subordinated in right of payment to the Obligations of the Company under the Notes; *provided further* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Company or another Restricted Subsidiary or any pledge of such Indebtedness not prohibited by the covenant described under Section 4.12) shall be deemed in each case to be an Incurrence of such Indebtedness not permitted by this clause (iv);

(v)    Indebtedness of a Restricted Subsidiary to the Company or another Restricted Subsidiary; *provided* that if the Issuer or a Guarantor Incurs such Indebtedness to a Restricted Subsidiary that is not the Issuer or a Guarantor (except in respect of intercompany current liabilities Incurred in the ordinary course of business in connection with the cash management operations of the Company and its Subsidiaries), such Indebtedness is subordinated in right of payment to the Obligations of the Issuer or such Guarantor, as applicable, in respect of the Notes; *provided further* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Restricted Subsidiary holding such Indebtedness ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Company or another Restricted Subsidiary or any pledge of such Indebtedness not prohibited by the covenant described under Section 4.12) shall be deemed, in each case, to be an Incurrence of such Indebtedness not permitted by this clause (v);

(vi)    Hedging Obligations that are not Incurred for speculative purposes but for the purpose of (1) fixing or hedging interest rate risk with respect to any Indebtedness that is permitted by the terms of this Indenture to be outstanding; (2) fixing or hedging currency exchange rate

risk with respect to any currency exchanges; (3) fixing or hedging commodity price risk, including the price or cost of raw materials, emission rights, manufactured products or related commodities, with respect to any commodity purchases or sales; or (4) hedging the potential exposure in respect of certain executives' and employees' options over, or stock appreciation rights in relation to, shares of Royal Dutch Shell plc and BASF AG;

(vii)    (A) obligations in respect of bankers' acceptances, tender, bid, judgment, appeal, performance or governmental contract bonds and completion guarantees, surety, standby letters of credit and warranty and contractual service obligations of a like nature, trade letters of credit and documentary letters of credit and similar bonds or guarantees provided by the Company or any Restricted Subsidiary in the ordinary course of business or (B) Indebtedness of the Company or any Restricted Subsidiary supported by a letter of credit or bank guarantee issued pursuant to any of the Credit Facilities, in a principal amount not in excess of the stated amount of such letter of credit;

(viii)    Indebtedness Incurred pursuant to a Catalyst Sale/Leaseback Transaction or Sale/Leaseback Transaction (other than a Specified Sale/Leaseback Transaction);

(ix)    the Incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness or Disqualified Stock or Preferred Stock of a Restricted Subsidiary of the Company which serves to refund, refinance or defease any Indebtedness Incurred or issued as permitted pursuant to the first paragraph of this covenant and clauses (i), (ii) and (viii) of this paragraph and including any Indebtedness incurred to refund or refinance such Indebtedness, including any additional Indebtedness, Disqualified Stock or Preferred Stock Incurred to pay premiums (including tender premiums) and original issue discount, expenses, defeasance costs and fees in connection therewith prior to its maturity ("Refinancing Indebtedness"); provided, however, that if such Refinancing Indebtedness refinances (a) Indebtedness junior to the Notes or the Obligations of such Restricted Subsidiary in respect of the Notes, as applicable, such Refinancing Indebtedness is junior to the Notes or such Obligations of such Restricted Subsidiary, as applicable, to at least same extent or (b) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness is Disqualified Stock or Preferred Stock, as the case may be, of the same issuer;

(x)    Indebtedness Incurred in a Qualified Receivables Financing that is without recourse to the Company or any Restricted Subsidiary (except for Standard Securitization Undertakings);

(xi)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided* that such Indebtedness is extinguished within five Business Days of its Incurrence;

(xii)    Indebtedness under any Treasury Services Agreement or any Structured Financing Transaction;

(xiii)    Indebtedness of Foreign Subsidiaries; *provided*, *however*, that the aggregate principal amount of Indebtedness Incurred under this clause (xiii), when aggregated with the principal amount of all other Indebtedness then outstanding and Incurred pursuant to this clause (xiii), does not exceed the greater of $350.0 million and 3.50% of the Consolidated Net Tangible Assets of the Foreign Subsidiaries at any one time outstanding (it being understood that any Indebtedness Incurred pursuant to this clause (xiii) shall cease to be deemed Incurred or outstanding for purposes of this clause (xiii) but shall be deemed Incurred for the purposes of Section 4.03(a) from

and after the first date on which such Foreign Subsidiary could have Incurred such Indebtedness under Section 4.03(a) without reliance upon this clause (xiii));

(xiv)    Indebtedness of the Company or any Restricted Subsidiary consisting of the financing of insurance premiums in the ordinary course of business; and

(xv)    Indebtedness Incurred by Lyondell Basell Australia Pty Ltd. and its successors in an aggregate principal amount at any one time outstanding not to exceed $80.0 million; *provided* that such Indebtedness is not guaranteed by the Company or any Restricted Subsidiary of the Company organized under the laws of any jurisdiction other than Australia.

For purposes of determining compliance with any U.S. Dollar-denominated restriction on the Incurrence of Indebtedness, the U.S. Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was Incurred, in the case of term debt, or first committed or first Incurred (whichever yields the lower U.S. Dollar Equivalent), in the case of revolving credit debt; or if any such Indebtedness is subject to a Currency Agreement with respect to the currency in which such Indebtedness is denominated covering principal, premium, if any, and interest on such Indebtedness, the amount of such Indebtedness and such interest and premium, if any, shall be determined after giving effect to all payments in respect thereof under such Currency Agreement; *provided* that if such Indebtedness is Incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such Refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced.

Notwithstanding any other provision of this Section 4.03, the maximum amount of Indebtedness that the Company and its Restricted Subsidiaries may Incur pursuant to this Section 4.03 shall not be deemed to be exceeded, with respect to any outstanding Indebtedness, solely as a result of fluctuations in the exchange rate of currencies. The principal amount of any Indebtedness Incurred to refinance other Indebtedness, if Incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of such refinancing.

SECTION 4.04.    Limitation on Sale/Leaseback Transactions.    The Company shall not, and shall not permit any Restricted Subsidiary of the Company to, enter into any Sale/Leaseback Transaction covering property with an individual Fair Market Value of the greater of 2% of Consolidated Net Tangible Assets and $500 million (a "Specified Sale/Leaseback Transaction") of the Company or such Restricted Subsidiary if the Company is not permitted to incur additional First Priority Lien Obligations under clause (a) of Section 4.03.

(a)    [Intentionally Omitted];

(b)    [Intentionally Omitted].

SECTION 4.05.    [Intentionally Omitted].

SECTION 4.06.    [Intentionally Omitted].

SECTION 4.07.    [Intentionally Omitted].

SECTION 4.08.    [Intentionally Omitted].

SECTION 4.09.    <u>Compliance Certificate</u>.  The Issuer shall deliver to the Trustee within
120 days after the end of each fiscal year of the Issuer, beginning with the fiscal year ending on December
31, 2010, an Officer's Certificate stating that in the course of the performance by the signer of his or her
duties as an Officer of the Issuer he or she would normally have knowledge of any Default and whether or
not the signer knows of any Default that occurred during such period.  If he or she does, the certificate
shall describe the Default, its status and what action the Issuer is taking or proposes to take with respect
thereto. The Issuer also shall comply with Section 314(a)(4) of the TIA.  Except with respect to receipt of
payments of principal and interest on the Notes and any Default or Event of Default information con-
tained in the Officer's Certificate delivered to it pursuant to this Section 4.09, the Trustee shall have no
duty to review, ascertain or confirm the Issuer's compliance with or the breach of any representation, war-
ranty or covenant made in this Indenture.

SECTION 4.10.    <u>Further Instruments and Acts</u>.  Upon request of the Trustee, the Issuer
shall execute and deliver such further instruments and do such further acts as may be reasonably neces-
sary or proper to carry out more effectively the purpose of this Indenture.

SECTION 4.11.    <u>Future Subsidiary Guarantors</u>.

(a)    The Company shall cause each (i) Domestic Subsidiary of the Company (other
than the Issuer) that is Wholly Owned other than, at the election of the Issuer, an Excluded Subsidiary and
(ii) Wholly Owned Restricted Subsidiary of the Company (other than the Issuer) that guarantees the Sen-
ior Term Loan Facility to execute and deliver to the Trustee (a) a supplemental indenture joining each
such Subsidiary of the Company to this Indenture substantially in the form of <u>Exhibit B</u> hereto; and
(b) Security Documents and intercreditor agreements providing for Third Priority Lien Obligations (other
than, in the case of the ABL Facility Collateral, which shall be subject to a second priority security inter-
est), pursuant to which such Subsidiary will guarantee payment of the Notes on the same terms and sub-
ject to the same conditions and limitations as those described under Article 12 in this Indenture (each such
guarantee of the Notes, an "<u>Additional Guarantee</u>").

(b)    Notwithstanding the foregoing and the other provisions of this Indenture, any
Additional Guarantee of the Notes by a Domestic Subsidiary of the Company that is a Wholly Owned
Restricted Subsidiary shall provide by its terms that it shall be automatically and unconditionally released
and discharged in the circumstances described under Section 12.02 hereof.  Any Additional Guarantee
shall be considered a "Guarantee" as described Section 12.01 and any such Domestic Subsidiary of the
Company providing such Additional Guarantee shall be considered a "Guarantor" as described under Sec-
tion 12.01.

SECTION 4.12.    <u>Liens</u>.  The Company shall not, and shall not permit any Restricted
Subsidiary to, Incur any Indebtedness secured by a Specified Lien (except Permitted Liens) if the grant of
such a Lien would cause a violation of the covenant described under Section 4.03.

SECTION 4.13.    <u>After-Acquired Property</u>.

Subject to Permitted Liens and the 3-16 Exemption and the Excluded Assets limitations,
(x) if any of the Company, the Issuer or any Pledgor acquires any First Priority After-Acquired Property,
the Company, the Issuer or such Pledgor shall execute and deliver such mortgages, deeds of trust, security
instruments, financing statements and certificates and opinions of counsel as shall be reasonably neces-
sary to vest in the First Lien Notes Collateral Agent a perfected first priority security interest, subject only
to Permitted Liens, in such First Priority After-Acquired Property and to have such First Priority After-

Acquired Property added to the Collateral, and thereupon all provisions of this Indenture relating to the
Collateral shall be deemed to relate to such First Priority After-Acquired Property to the same extent and
with the same force and effect, and (y) if any of the Company, the Issuer or any Pledgor acquires any
Second Priority After-Acquired Property, the Company, the Issuer or such Pledgor shall execute and de-
liver such mortgages, deeds of trust, security instruments, financing statements and certificates and opin-
ions of counsel as shall be reasonably necessary to vest in the ABL Collateral Agent a perfected second
priority security interest, subject only to Permitted Liens, in such Second Priority After-Acquired Prop-
erty and to have such Second Priority After-Acquired Property added to the Collateral, and thereupon all
provisions of the Indenture relating to the Collateral shall be deemed to relate to such Second Priority Af-
ter-Acquired Property to the same extent and with the same force and effect.  In addition, if granting a
security interest in such property requires the consent of a third party, the Company will use commer-
cially reasonable efforts to obtain such consent (i) with respect to the first priority security interest for the
benefit of the First Lien Notes Collateral Agent on behalf of the holders of the First Lien Notes and for
the benefit of the Senior Term Loan Collateral Agent on behalf of the lenders under the Senior Term Loan
Facility, (ii) with respect to the second priority security interest for the benefit of the ABL Collateral
Agents on behalf of lenders under the ABL Facility and (iii) with respect to the third priority security in-
terest for the benefit of Trustee on behalf of the holders of the Notes and for the benefit of the Third Lien
Trustee on behalf of the holders of the Notes and for the benefit of the Third Lien Trustee on behalf of the
holders of the New Third Lien Notes.  If such third party does not consent to the granting of the third pri-
ority security interest after the use of such commercially reasonable efforts, the applicable entity will not
be required to provide such security interest.  The Issuer, the Company and the Pledgors will also ensure
that third priority security interests are maintained as security for the Plan Roll-Up Notes in any property
or assets pledged to secure the ABL Facility.

SECTION 4.14.    Maintenance of Office or Agency.

(a)    The Issuer shall maintain an office or agency (which may be an office of the
Trustee or an affiliate of the Trustee or Registrar) where Notes may be surrendered for registration of
transfer or for exchange and where notices and demands to or upon the Issuer in respect of the Notes and
this Indenture may be served.  The Issuer shall give prompt written notice to the Trustee of the location,
and any change in the location, of such office or agency.  If at any time the Issuer shall fail to maintain
any such required office or agency or shall fail to furnish the Trustee with the address thereof, such pres-
entations, surrenders, notices and demands may be made or served at the corporate trust office of the
Trustee as set forth in Section 13.02.

(b)    The Issuer may also from time to time designate one or more other offices or
agencies where the Notes may be presented or surrendered for any or all such purposes and may from
time to time rescind such designations; provided, however, that no such designation or rescission shall in
any manner relieve the Issuer of its obligation to maintain an office or agency for such purposes.  The
Issuer shall give prompt written notice to the Trustee of any such designation or rescission and of any
change in the location of any such other office or agency.

(c)    The Issuer hereby designates the corporate trust office of the Trustee or its agent
as such office or agency of the Issuer in accordance with Section 2.04.

SECTION 4.15.    Maintenance of Insurance.  The Company shall maintain with reputa-
ble insurance companies, insurance with respect to its assets, properties and business against loss or dam-
age to the extent available on commercially reasonable terms of the kinds customarily insured against by
Persons of similar size engaged in the same or similar industry, of such types and in such amounts (after

giving effect to any self-insurance (including captive industry insurance) reasonable and customary for similarly situated Persons of similar size engaged in the same or similar businesses as the Company, the Issuer and the Restricted Subsidiaries) as are customarily carried under similar circumstances (including flood insurance) by such other Persons to the extent available to the Company and the Restricted Subsidiaries on commercially reasonable terms.

SECTION 4.16.    Covenant Suspension.  If on any date following the Issue Date, (i) the Notes have achieved and continue to maintain Investment Grade Ratings from two Rating Agencies and (ii) no Default has occurred and is continuing (such period is referred to herein as an "Investment Grade Status Period"), then beginning on that date and continuing until the Reversion Date (the occurrence of the events described in the foregoing clauses (i) and (ii) being collectively referred to as a "Covenant Suspension Event"), the covenants described under Sections 4.03, 4.04, 4.12, and 5.01  (the "Suspended Covenants")

If on any date subsequent to a Covenant Suspension Event (the "Reversion Date") one or both of the Rating Agencies withdraw their Investment Grade Rating or downgrade the rating assigned to the Notes below an Investment Grade Rating, then the Company and its Restricted Subsidiaries will thereafter again be subject to the Suspended Covenants under this Indenture with respect to future events. The period of time between the Covenant Suspension Event and the Reversion Date is referred to as the "Suspension Period."

On each Reversion Date, all Indebtedness Incurred during the Suspension Period will be classified as having been Incurred or issued pursuant to Section 4.03(a) or 4.03(b) (to the extent such I Indebtedness or Disqualified Stock or Preferred Stock would be permitted to be Incurred or issued thereunder as of the Reversion Date and after giving effect to Indebtedness or Disqualified Stock or Preferred Stock Incurred or issued prior to the Suspension Period and outstanding on the Reversion Date).  As described above, however, no Default or Event of Default will be deemed to have occurred on the Reversion Date as a result of any actions taken by the Company or its Restricted Subsidiaries during the Suspension Period.

SECTION 4.17.    Withholding Taxes.

(a)     All payments made under or with respect to the Notes and Guarantees by (i) the Issuer, (ii) the Company or (ii) any entity that becomes a successor of the Issuer or the Company that is organized in a jurisdiction other than the United States, any state thereof or the District of Columbia as a result of a merger of or other transaction permitted by provisions of this Indenture will be made free and clear of and without withholding or deduction for or on account of any present or future tax, duty, levy, impost, assessment or other governmental charge (including, without limitation, penalties, interest and other similar liabilities related thereto) of whatever nature (collectively, "Taxes") imposed or levied by or on behalf of any jurisdiction in which any Payor is organized, resident or doing business for tax purposes or from or through which any Payor makes any payment on the Notes or its Guarantee or any department or political subdivision thereof (each, a "Relevant Taxing Jurisdiction"), unless such Payor is required to withhold or deduct Taxes by law. If any Payor is required by law to withhold or deduct any amount for or on account of Taxes of a Relevant Taxing Jurisdiction from any payment made under or with respect to the Notes or such Guarantee, the Payor, shall make all such deductions and withholdings in respect of Taxes, and shall pay the full amount deducted or withheld in respect of Taxes to the relevant taxation authority or other governmental authority in accordance with the applicable requirements of law.  If any Payor is so required by law to withhold or deduct, such Payor shall not be obligated to pay any additional amounts in respect of such withholding or deduction.

The foregoing obligations of this Section 4.17 will survive any termination, defeasance or discharge of this Indenture and the resignation or removal of the Trustee or any Agent and will apply *mutatis mutandis* to any jurisdiction in which any successor Person to any Payor and to any jurisdiction in which such successor is organized or is otherwise resident or doing business for tax purposes or any jurisdiction from or through which payment is made by such successor or its respective agents.

**ARTICLE V**

**SUCCESSOR COMPANY**

SECTION 5.01.    <u>When Issuer May Merge or Transfer Assets</u>.

The Indenture will provide that the Company may not, directly or indirectly, consolidate, amalgamate or merge with or into or wind up or convert into (whether or not the Company is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions, to any Person unless:

(a)    the Company is the surviving Person or the Person formed by or surviving any such consolidation, amalgamation, merger, winding up or conversion (if other than the Company) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof, the District of Columbia, Canada or any province thereof or any state which was a member of the European Union on December 31, 2003 (other than Greece) (the Company or such Person, as the case may be, being herein called the "Successor Company"); provided that, in the case where the surviving Person is not a corporation, a co-obligor of the Notes is a corporation;

(b)    the Successor Company (if other than the Company) expressly assumes all the Obligations of the Company under the Indenture and the Notes pursuant to supplemental indentures or other documents or instruments in form required by the Indenture and in compliance with the intercreditor agreements; and

(c)    the Company shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, merger, amalgamation or transfer and such supplemental indentures (if any) comply with the Indenture.

The Successor Company (if other than the Company) will succeed to, and be substituted for, the Company under the Indenture and the Notes, and in such event the Company will automatically be released and discharged from its Obligations under the Indenture and the Notes. Notwithstanding the first sentence of this covenant, the Company may (A) merge with an Affiliate that has no material assets or liabilities and that is incorporated or organized solely for the purpose of reincorporating or reorganizing the Issuer in any state of the U.S., the District of Columbia, Canada or any province thereof or any state which was a member state of the European Union on December 31, 2003 (other than Greece) and (B) may otherwise convert its legal form under the laws of its jurisdiction of organization.

The Indenture will further provide that the Issuer may not, directly or indirectly, consolidate, amalgamate or merge with or into or wind up or convert into (whether or not the Issuer is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions, to any Person unless:

(d)    the Issuer is the surviving Person or the Person formed by or surviving any such consolidation, amalgamation, merger, winding up or conversion (if other than the Issuer) or to which such

2189    sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation,
2190    partnership or limited liability company organized or existing under the laws of the United States, any
2191    state thereof or the District of Columbia (the Issuer or such Person, as the case may be, being herein
2192    called the "Successor Issuer"); provided that, in the case where the surviving Person is not a corporation,
2193    a co-obligor of the Notes is a corporation;

2194             (e)      the Successor Issuer (if other than the Issuer) expressly assumes all the Obliga-
2195    tions of the Issuer under the Indenture and the Notes pursuant to supplemental indentures or other docu-
2196    ments or instruments in form required by the Indenture and in compliance with the intercreditor agree-
2197    ments; and

2198             (f)      the Issuer shall have delivered to the Trustee an Officer's Certificate and an
2199    Opinion of Counsel, each stating that such consolidation, merger, amalgamation or transfer and such sup-
2200    plemental indentures (if any) comply with the Indenture.

2201             The Successor Issuer (if other than the Issuer) will succeed to, and be substituted for, the
2202    Issuer under the Indenture and the Notes, and in such event the Issuer will automatically be released and
2203    discharged from its Obligations under the Indenture and the Notes. Notwithstanding the first sentence of
2204    this covenant, the Issuer may (A) merge with an Affiliate that has no material assets or liabilities and that
2205    is incorporated or organized solely for the purpose of reincorporating or reorganizing the Issuer, as the
2206    case may be, in any state of the U.S. or the District of Columbia and (B) may otherwise convert its legal
2207    form under the laws of its jurisdiction of organization so long as there remains a corporate co-obligor.
2208    This covenant described under this Section will not apply to a sale, assignment, transfer, conveyance or
2209    other disposition of assets between or among the Company and its Restricted Subsidiaries.

2210             The Indenture will further provide that, subject to certain limitations in the Indenture
2211    governing release of assets and property securing the Notes upon the sale or disposition of a Restricted
2212    Subsidiary of the Company that is a Pledgor, no Pledgor will, and the Company will not permit any
2213    Pledgor to, consolidate, amalgamate or merge with or into or wind up into (whether or not such Pledgor is
2214    the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all
2215    of its properties or assets in one or more related transactions to, any Person unless:

2216             (g)      such Pledgor is the surviving Person or the Person formed by or surviving any
2217    such consolidation, amalgamation or merger (if other than such Pledgor) or to which such sale, assign-
2218    ment, transfer, lease, conveyance or other disposition will have been made is a corporation, partnership or
2219    limited liability company organized or existing under the laws of the United States, any state thereof, the
2220    District of Columbia, or any territory thereof (such Pledgor or such Person, as the case may be, being
2221    herein called the "Successor Pledgor") and the Successor Pledgor (if other than such Pledgor) expressly
2222    assumes all the Obligations of such Pledgor under the Indenture and the Security Documents pursuant to
2223    documents or instruments in form required by the Indenture and in compliance with the intercreditor
2224    agreements; and

2225             (h)      the Successor Pledgor (if other than such Pledgor) shall have delivered or caused
2226    to be delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such
2227    consolidation, amalgamation, merger or transfer and such supplemental indenture (if any) comply with
2228    the Indenture.

2229             Subject to certain limitations described in the Indenture, the Successor Pledgor (if other
2230    than such Pledgor) will succeed to, and be substituted for, such Pledgor under the Indenture and such
2231    Pledgor's Obligations in respect of the Notes, and such Pledgor will automatically be released and dis-
2232    charged from its Obligations under the Indenture and such Pledgor's Obligations in respect of the Notes.

Notwithstanding the foregoing, (1) a Pledgor may merge, amalgamate or consolidate with an Affiliate incorporated solely for the purpose of reincorporating or reorganizing such Pledgor in another state of the United States, the District of Columbia or any territory of the United States so long as the amount of Indebtedness of the Pledgor is not increased thereby and (2) a Pledgor may merge, amalgamate or consolidate with another Pledgor or the Company or may convert its legal form under the laws of reorganization of its jurisdiction.

In addition, notwithstanding the foregoing, any Pledgor may consolidate, amalgamate or merge with or into or wind up into, or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets (collectively, a "Transfer") to the Company or any Pledgor.

## ARTICLE VI

## DEFAULTS AND REMEDIES

SECTION 6.01.    Events of Default.  An "Event of Default" occurs with respect to Notes if:

(a)    there is a default in any payment of interest on any Note when the same becomes due and payable, and such default continues for a period of 60 days,

(b)    there is a default in the payment of principal or premium, if any, of any Note when due at its Stated Maturity, upon optional redemption, upon required repurchase, upon declaration or otherwise,

(c)    the failure by the Company or any Restricted Subsidiary to comply for 90 days after notice with its other agreements contained in the Notes or this Indenture,

(d)    the failure by the Company or any Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary) to pay any Indebtedness (other than Indebtedness owing to the Company or a Restricted Subsidiary) within any applicable grace period after final maturity or the acceleration of any such Indebtedness by the holders thereof because of a default, in each case, if the total amount of such Indebtedness unpaid or accelerated exceeds $150.0 million or its foreign currency equivalent,

(e)    either the Company, the Issuer or any Significant Subsidiary of the Issuer pursuant to or within the meaning of any Bankruptcy Law:

(i)    commences a voluntary case;

(ii)    consents to the entry of an order for relief against it in an involuntary case;

(iii)    consents to the appointment of a Custodian of it or for any substantial part of its property; or

(iv)    makes a general assignment for the benefit of its creditors or takes any comparable action under any foreign laws relating to insolvency,

(f)    a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(i)    is for relief against either the Issuer or any Significant Subsidiary of the Issuer in an involuntary case;

(ii)    appoints a Custodian of either the Issuer or any Significant Subsidiary of the Issuer or for any substantial part of its property; or

(iii)    orders the winding up or liquidation of either the Issuer or any Significant Subsidiary of the Issuer;

or any similar relief is granted under any foreign laws and the order or decree remains unstayed and in effect for 60 days,

(g)    failure by the Company or any Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary) to pay final judgments aggregating in excess of $150.0 million or its foreign currency equivalent (net of any amounts which are covered by enforceable insurance policies issued by solvent carriers), which judgments are not discharged, waived or stayed for a period of 90 days,

(h)    the Guarantee of the Company or a Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary) ceases to be in full force and effect (except as contemplated by the terms thereof) or the Company denies or disaffirms its Obligations under this Indenture and such Default continues for 60 days,

(i)    unless all of the Notes Collateral has been released from the third priority Liens in accordance with the provisions of the Security Documents, the first priority Liens on all or substantially all of the Notes Collateral cease to be valid or enforceable and such Default continues for 60 days, or the Company, the Issuer or any Pledgor shall assert, in any pleading in any court of competent jurisdiction, that any such security interest is invalid or unenforceable and, in the case of any such Person that is a Subsidiary of the Company, the Company fails to cause such Subsidiary to rescind such assertions within 60 days after the Company has actual knowledge of such assertions, or

(j)    the failure by the Company or any Pledgor to comply for 90 days after notice with its other agreements contained in the Security Documents except for a failure that would not be material to the holders of the Notes and would not materially affect the value of the Collateral taken as a whole.

The foregoing shall constitute Events of Default whatever the reason for any such Event of Default and whether it is voluntary or involuntary or is effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body.

The term "<u>Bankruptcy Law</u>" means Title 11, United States Code, or any similar Federal or state law for the relief of debtors. The term "<u>Custodian</u>" means any receiver, trustee, assignee, liquidator, custodian or similar official under any Bankruptcy Law.

However, a default under clauses (c) or (j) above shall not constitute an Event of Default until the Trustee or the holders of 45% in aggregate principal amount of outstanding Notes notify the Is-

suer of the default and the Issuer does not cure such default within the time specified in clauses (c) or (j) hereof after receipt of such notice. Such notice must specify the Default, demand that it be remedied and state that such notice is a "Notice of Default." The Issuer shall deliver to the Trustee, within five (5) Business Days after the occurrence thereof, written notice in the form of an Officer's Certificate of any event which is, or with the giving of notice or the lapse of time or both would become, an Event of Default, its status and what action the Issuer is taking or propose to take with respect thereto.

SECTION 6.02.    Acceleration.  If an Event of Default (other than an Event of Default specified in Section 6.01(e) or 6.01(f) hereof with respect to the Company or the Issuer) occurs and is continuing, the Trustee or the holders of at least 30% in aggregate principal amount of outstanding Notes by notice to the Issuer may declare the principal of, premium, if any, and accrued but unpaid interest on all the Notes to be due and payable. Upon such a declaration, such principal and interest shall be due and payable immediately. If an Event of Default specified in Section 6.01(e) or (f) with respect to the Company or the Issuer occurs, the principal of, premium, if any, and interest on all the Notes will become immediately due and payable without any declaration or other act on the part of the Trustee or any holders. Under certain circumstances, the holders of a majority in aggregate principal amount of outstanding Notes may rescind any such acceleration with respect to the Notes and its consequences.

In the event of any Event of Default specified in Section 6.01(d) above, such Event of Default and all consequences thereof (excluding, however, any resulting payment default) shall be annulled, waived and rescinded, automatically and without any action by the Trustee or the holders of the Notes, if within 30 days after such Event of Default arose the Issuer delivers an Officer's Certificate to the Trustee stating that (x) the Indebtedness or guarantee that is the basis for such Event of Default has been discharged or (y) the holders thereof have rescinded or waived the acceleration, notice or action (as the case may be) giving rise to such Event of Default or (z) the default that is the basis for such Event of Default has been cured, it being understood that in no event shall an acceleration of the principal amount of the Notes as described above be annulled, waived or rescinded upon the happening of any such events.

SECTION 6.03.    Other Remedies.  If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy at law or in equity to collect the payment of principal of or interest on the Notes or to enforce the performance of any provision of the Notes, this Indenture or the Security Documents.

The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding. A delay or omission by the Trustee or any holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. No remedy is exclusive of any other remedy. To the extent required by law, all available remedies are cumulative.

SECTION 6.04.    Waiver of Past Defaults.  *Provided* the Notes are not then due and payable by reason of a declaration of acceleration, the holders of a majority in principal amount of the Notes by written notice to the Trustee may waive an existing Default and its consequences except (a) a Default in the payment of the principal of or interest on a Note, (b) a Default arising from the failure to redeem or purchase any Note when required pursuant to the terms of this Indenture or (c) a Default in respect of a provision that under Section 9.02 cannot be amended without the consent of each holder affected. When a Default is waived, it is deemed cured and the Issuer, the Trustee and the holders will be restored to their former positions and rights under this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any consequent right.

SECTION 6.05.    Control by Majority.  The holders of a majority in principal amount of Notes may direct the time, method and place of conducting any proceeding for any remedy available to

the Trustee or of exercising any trust or power conferred on the Trustee.  However, the Trustee may re-
fuse to follow any direction that conflicts with law or this Indenture or, if the Trustee, being advised by
counsel, determines that the action or proceeding so directed may not lawfully be taken or if the Trustee
in good faith by its board of directors or trustees, executive committee, or a trust committee of directors or
trustees and/or Responsible Officers shall determine that the action or proceeding so directed would in-
volve the Trustee in personal liability or expense for which it is not adequately indemnified, or subject to
Section 7.01, that the Trustee determines is unduly prejudicial to the rights of any other holder or that
would involve the Trustee in personal liability.  Prior to taking any action under this Indenture, the Trus-
tee shall be entitled to reasonable indemnification and security satisfactory to it in its reasonable discre-
tion against all losses and expenses caused by taking or not taking such action.

SECTION 6.06.    Limitation on Suits.

(a)    Except to enforce the right to receive payment of principal, premium (if any) or
interest when due, no holder may pursue any remedy with respect to this Indenture or the Notes unless:

(i)    such holder has previously given the Trustee notice that an Event of Default is
continuing,

(ii)    holders of at least 45% in aggregate principal amount of the outstanding Notes
have requested the Trustee to pursue the remedy,

(iii)    such holders have offered the Trustee security and reasonable indemnity against
any loss, liability or expense acceptable to the Trustee in its sole discretion,

(iv)    the Trustee has not complied with such request within 90 days after the receipt of
the request and the offer of security and indemnity, and

(v)    the holders of a majority in aggregate principal amount of the outstanding Notes
have not given the Trustee a direction inconsistent with such request within such 90-day period.

(b)    A holder may not use this Indenture to prejudice the rights of another holder or to
obtain a preference or priority over another holder.

SECTION 6.07.    Rights of the Holders to Receive Payment.  Notwithstanding any
other provision of this Indenture, the right of any holder to receive payment of principal of and interest on
the Notes held by such holder, on or after the respective due dates expressed or provided for in the Notes,
or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be
impaired or affected without the consent of such holder.

SECTION 6.08.    Collection Suit by Trustee.  If an Event of Default specified in Sec-
tion 6.01(a) or (b) occurs and is continuing, the Trustee may recover judgment in its own name and as
trustee of an express trust against the Issuer or any other obligor on the Notes for the whole amount then
due and owing (together with interest on overdue principal and (to the extent lawful) on any unpaid inter-
est at the rate provided for in the Notes) and the amounts provided for in Section 7.07.

SECTION 6.09.    Trustee May File Proofs of Claim.  The Trustee may file such proofs
of claim, statements of interest and other papers or documents as may be necessary or advisable in order
to have the claims of the Trustee (including any claim for reasonable compensation, expenses disburse-
ments and advances of the Trustee (including counsel, accountants, experts or such other professionals as
the Trustee deems necessary, advisable or appropriate)) and the holders allowed in any judicial proceed-

2394    ings relative to the Issuer or the Company, any Pledgor, their creditors or their property, shall be entitled
2395    to participate as a member, voting or otherwise, of any official committee of creditors appointed in such
2396    matters and, unless prohibited by law or applicable regulations, may vote on behalf of the holders in any
2397    election of a trustee in bankruptcy or other Person performing similar functions, and any Custodian in any
2398    such judicial proceeding is hereby authorized by each holder to make payments to the Trustee and, in the
2399    event that the Trustee shall consent to the making of such payments directly to the holders, to pay to the
2400    Trustee any amount due it for the reasonable compensation, expenses, disbursements and advances of the
2401    Trustee, its agents and its counsel, and any other amounts due the Trustee under Section 7.07.

2402           SECTION 6.10.   <u>Priorities</u>. Subject to the terms of the First Lien Intercreditor Agree-
2403    ment, the Junior Lien Intercreditor Agreement, the Third Lien Intercreditor Agreement and the Security
2404    Documents, any money or property collected by the Trustee pursuant to this Article VI and any other
2405    money or property distributable in respect of the Issuer's or any Guarantor's obligations under this Inden-
2406    ture after an Event of Default shall be applied in the following order:

2407           FIRST:  to the Trustee for amounts due under Section 7.07;

2408           SECOND:  to the holders for amounts due and unpaid on the Notes for principal, pre-
2409    mium, if any, and interest, ratably, without preference or priority of any kind, according to the
2410    amounts due and payable on the Notes for principal and interest, respectively; and

2411           THIRD:  to the Issuer or, to the extent the Trustee collects any amount for any Guarantor,
2412    to the such Guarantor.

2413           The Trustee may fix a record date and payment date for any payment to the holders pur-
2414    suant to this Section.  At least 15 days before such record date, the Trustee shall mail to each holder and
2415    the Issuer a notice that states the record date, the payment date and amount to be paid.

2416           SECTION 6.11.   <u>Undertaking for Costs</u>.  In any suit for the enforcement of any right or
2417    remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as
2418    Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to
2419    pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable
2420    attorneys' fees and expenses, against any party litigant in the suit, having due regard to the merits and
2421    good faith of the claims or defenses made by the party litigant.  This Section does not apply to a suit by
2422    the Trustee, a suit by a holder pursuant to Sections 6.06 or 6.07 or a suit by holders of more than 10% in
2423    principal amount of the Notes.

2424           SECTION 6.12.   <u>Waiver of Stay or Extension Laws</u>.  Neither the Issuer nor any Guar-
2425    antor (to the extent it may lawfully do so) shall at any time insist upon, or plead, or in any manner what-
2426    soever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at
2427    any time hereafter in force, which may affect the covenants or the performance of this Indenture; and the
2428    Issuer and the Guarantors (to the extent that it may lawfully do so) hereby expressly waive all benefit or
2429    advantage of any such law, and shall not hinder, delay or impede the execution of any power herein
2430    granted to the Trustee, but shall suffer and permit the execution of every such power as though no such
2431    law had been enacted.

**ARTICLE VII**

**TRUSTEE**

SECTION 7.01.    <u>Duties of Trustee</u>.

(a)    The Trustee, prior to the occurrence of an Event of Default with respect to the Notes and after the curing or waiving of all Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Indenture.  If an Event of Default has occurred and is continuing, the Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)    Except during the continuance of an Event of Default:

(i)    the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee (it being agreed that the permissive right of the Trustee to do things enumerated in this Indenture shall not be construed as a duty); and

(ii)    in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture.  The Trustee shall be under no duty to make any investigation as to any statement contained in any such instance, but may accept the same as conclusive evidence of the truth and accuracy of such statement or the correctness of such opinions.  However, in the case of certificates or opinions required by any provision hereof to be provided to it, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(c)    The Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(i)    this paragraph does not limit the effect of paragraph (b) of this Section;

(ii)    the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer unless it is proved that the Trustee was negligent in ascertaining the pertinent facts;

(iii)    the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05; and

(iv)    no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise Incur financial or personal liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers.

(d)    Every provision of this Indenture that in any way relates to the Trustee is subject to paragraphs (a), (b) and (c) of this Section.

(e)    The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuer.

(f)     Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(g)     Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section and to the provisions of the TIA.

SECTION 7.02.     Rights of Trustee.

(a)     The Trustee may conclusively rely on any document believed by it to be genuine and to have been signed or presented by the proper person.  The Trustee need not investigate any fact or matter stated in the document.

(b)     Before the Trustee acts or refrains from acting, it may require an Officer's Certificate or an Opinion of Counsel or both.  The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on the Officer's Certificate or Opinion of Counsel.

(c)     The Trustee may act through agents and shall not be responsible for the misconduct or negligence of any agent appointed with due care.

(d)     The Trustee shall not be responsible or liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers; *provided*, *however*, that the Trustee's conduct does not constitute willful misconduct or negligence.

(e)     The Trustee may consult with counsel of its own selection and the advice or opinion of counsel with respect to legal matters relating to this Indenture and the Notes shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or opinion of such counsel.

(f)     The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond, debenture, note or other paper or document unless requested in writing to do so by the holders of not less than a majority in principal amount of the Notes at the time outstanding, but the Trustee, in its discretion, may (but shall not be obligated to) make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer, personally or by agent or attorney, at the expense of the Issuer and shall Incur no liability of any kind by reason of such inquiry or investigation.  Any and all notices, instructions, demands, requests, consents, appraisals, correspondence or other communications shall be in writing and delivered in accordance with Section 13.02.

(g)     The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the holders pursuant to this Indenture, unless such holders shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be Incurred by it in compliance with such request or direction.

(h)     The rights, privileges, protections, immunities and benefits given to the Trustee, including its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

(i)     The Trustee shall not be responsible or liable for any action taken or omitted by it in good faith at the direction of the holders of not less than a majority in principal amount of the Notes as to the time, method and place of conducting any proceedings for any remedy available to the Trustee or the exercising of any power conferred by this Indenture.

(j)     Any action taken, or omitted to be taken, by the Trustee in good faith pursuant to this Indenture upon the request or authority or consent of any person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding upon future holders of Notes and upon Notes executed and delivered in exchange therefor or in place thereof.

(k)     The Trustee shall not be deemed to have notice of any Default or Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a Default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Notes and this Indenture.

(l)     The Trustee may request that the Issuer deliver an Officer's Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officer's Certificate may be signed by any Person authorized to sign an Officer's Certificate, including any Person specified as so authorized in any such certificate previously delivered and not superseded.

(m)     The Trustee shall not be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of actions.

(n)     The Trustee shall not be required to give any bond or surety in respect of the execution of the trusts and powers under this Indenture.

(o)     The Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Indenture arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; epidemics; riots; interruptions; loss or malfunction of utilities, computer (hardware or software) or communication services; accidents; labor disputes; and acts of civil or military authorities and governmental action.

SECTION 7.03.     <u>Individual Rights of Trustee</u>.  The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Trustee.  Any Paying Agent or Registrar may do the same with like rights.  However, the Trustee must comply with Sections 7.10 and 7.11.

SECTION 7.04.     <u>Trustee's Disclaimer</u>.  The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture, the Guarantees, the Notes, Liens, Collateral or Security Documents, it shall not be accountable for the Issuer's use of the proceeds from the Notes, and it shall not be responsible for any statement of the Issuer or any Guarantor in this Indenture or in any document issued in connection with the sale of the Notes or in the Notes other than the Trustee's certificate of authentication.  The Trustee shall not be charged with knowledge of any Default or Event of Default under Sections 6.01(c) or (j) or of the identity of any Significant Subsidiary unless either (a) a Trust Officer shall have actual knowledge thereof or (b) the Trustee shall have received written notice thereof in accordance with Section 13.02 hereof from the Issuer, the Company or any Pledgor or any holder.  In accepting the trust hereby created, the Trustee acts solely as Trustee for the holders of the

2552    Notes and not in its individual capacity and all persons, including without limitation the holders of Notes
2553    and the Issuer having any claim against the Trustee arising from this Indenture shall look only to the
2554    funds and accounts held by the Trustee hereunder for payment except as otherwise provided herein.

2555                SECTION 7.05.    Notice of Defaults.  If a Default occurs and is continuing and if it is
2556    actually known to the Trustee, the Trustee shall mail to each holder notice of the Default within the earlier
2557    of 90 days after it occurs or 30 days after it is actually known to a Trust Officer or written notice of it is
2558    received by the Trustee.  Except in the case of a Default in the payment of principal of, premium (if any)
2559    or interest on any Note, the Trustee may withhold the notice if and so long as a committee of its Trust
2560    Officers in good faith determines that withholding the notice is in the interests of the holders.  The Issuer
2561    is required to deliver to the Trustee, annually, a certificate indicating whether the signers thereof know of
2562    any Default that occurred during the previous year.  The Issuer also is required to deliver to the Trustee,
2563    within 30 days after the occurrence thereof, written notice of any event which would constitute certain
2564    Defaults, their status and what action the Issuer is taking or proposes to take in respect thereof.

2565                SECTION 7.06.    Reports by Trustee to the Holders.  As promptly as practicable after
2566    each July 30 beginning with the July 30 following the date of this Indenture, and in any event prior to July
2567    30 in each year, the Trustee shall mail to each holder a brief report dated as of such July 30 that complies
2568    with Section 313(a) of the TIA if and to the extent required thereby.  The Trustee shall also comply with
2569    Section 313(b) of the TIA.

2570                A copy of each report at the time of its mailing to the holders shall be filed with the SEC
2571    and each stock exchange (if any) on which the Notes are listed.  The Issuer agrees to notify promptly the
2572    Trustee whenever the Notes become listed on any stock exchange and of any delisting thereof.

2573                SECTION 7.07.    Compensation and Indemnity.  The Issuer shall pay to the Trustee
2574    from time to time such compensation, as the Issuer and the Trustee shall from time to time agree in writ-
2575    ing, for the Trustee's acceptance of this Indenture and its services hereunder.  The Trustee's compensa-
2576    tion shall not be limited by any law on compensation of a trustee of an express trust.  The Issuer shall re-
2577    imburse the Trustee upon request for all reasonable out-of-pocket expenses Incurred or made by it, in-
2578    cluding costs of collection, in addition to the compensation for its services.  Such expenses shall include
2579    the reasonable compensation and expenses, disbursements and advances of the Trustee's agents and coun-
2580    sel.  The Issuer and the Guarantors, jointly and severally shall indemnify the Trustee against any and all
2581    loss, liability, claim, damage or expense (including reasonable attorneys' fees and expenses except for
2582    such actions to the extent caused by any negligence, bad faith or willful misconduct on their part) In-
2583    curred by or in connection with the acceptance or administration of this trust and the performance of its
2584    duties hereunder, including the costs and expenses of enforcing this Indenture or Guarantee against the
2585    Issuer or any Guarantor (including this Section 7.07) and defending itself against or investigating any
2586    claim (whether asserted by the Issuer, any Guarantor, any holder or any other Person).  The obligation to
2587    pay such amounts shall survive the payment in full or defeasance of the Notes or the removal or resigna-
2588    tion of the Trustee.  The Trustee shall notify the Issuer of any claim for which it may seek indemnity
2589    promptly upon obtaining actual knowledge thereof; *provided*, *however*, that any failure so to notify the
2590    Issuer shall not relieve the Issuer or any Guarantor of its indemnity obligations hereunder.  The Issuer
2591    shall defend the claim and the indemnified party shall provide reasonable cooperation at the Issuer's ex-
2592    pense in the defense.  Such indemnified parties may have separate counsel and the Issuer and such Guar-
2593    antor, as applicable shall pay the fees and expenses of such counsel; *provided*, *however*, that the Issuer
2594    shall not be required to pay such fees and expenses if it assumes such indemnified parties' defense and, in
2595    such indemnified parties' reasonable judgment, there is no conflict of interest between the Issuer and the
2596    Guarantor, as applicable, and such parties in connection with such defense; *provided*, *further*, that, unless
2597    the Issuer otherwise agrees in writing, the Issuer shall not be liable to pay fees and expenses of more than
2598    one counsel at any given time located within one particular jurisdiction.  The Issuer needs not reimburse

2599    any expense or indemnify against any loss, liability or expense Incurred by an indemnified party through
2600    such party's own willful misconduct, negligence or bad faith.

2601                        To secure the Issuer's and the Guarantors' payment obligations in this Section, the Trus-
2602    tee shall have a Lien prior to the Notes on all money or property held or collected by the Trustee.

2603                        The Issuer's and the Guarantors' payment obligations pursuant to this Section shall sur-
2604    vive the satisfaction or discharge of this Indenture, any rejection or termination of this Indenture under
2605    any bankruptcy law or the resignation or removal of the Trustee.  Without prejudice to any other rights
2606    available to the Trustee under applicable law, when the Trustee Incurs expenses after the occurrence of a
2607    Default specified in Section 6.01(f) or (g) with respect to the Issuer, the expenses are intended to consti-
2608    tute expenses of administration under the Bankruptcy Law.

2609                        No provision of this Indenture shall require the Trustee to expend or risk its own funds or
2610    otherwise Incur any financial liability or personal in the performance of any of its duties hereunder, or in
2611    the exercise of any of its rights or powers, if repayment of such funds or adequate indemnity and security
2612    against such risk or liability is not assured to its satisfaction.

2613                        SECTION 7.08.    Replacement of Trustee.

2614                        (a)      The Trustee may resign by so notifying the Issuer in writing at least 30 days in
2615    advance.  The holders of a majority in principal amount of the Notes may remove the Trustee by so noti-
2616    fying the Issuer and the Trustee and may appoint a successor Trustee with the Issuer's consent.  A resig-
2617    nation or removal of the Trustee and appointment of a successor Trustee shall become effective only with
2618    the successor Trustee's acceptance of appointment as provided in this Section.  The Issuer shall remove
2619    the Trustee if:

2620                            (i)      the Trustee fails to comply with Section 7.10;

2621                            (ii)      the Trustee is adjudged bankrupt or insolvent;

2622                            (iii)      a receiver or other public officer takes charge of the Trustee or its property; or

2623                            (iv)      the Trustee otherwise becomes incapable of acting.

2624                        (b)      If the Trustee resigns, is removed by the Issuer or by the holders of a majority in
2625    principal amount of the Notes and such holders do not reasonably promptly appoint a successor Trustee,
2626    or if a vacancy exists in the office of Trustee for any reason (the Trustee in such event being referred to
2627    herein as the retiring Trustee), the Issuer shall promptly appoint a successor Trustee.

2628                        (c)      A successor Trustee shall deliver a written acceptance of its appointment to the
2629    retiring Trustee and to the Issuer.  Thereupon the resignation or removal of the retiring Trustee shall be-
2630    come effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under
2631    this Indenture.  The successor Trustee shall mail a notice of its succession to the holders.  The retiring
2632    Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee, subject to the
2633    Lien provided for in Section 7.07.

2634                        (d)      If a successor Trustee does not take office within 60 days after the retiring Trus-
2635    tee resigns or is removed, the retiring Trustee or the holders of 10% in principal amount of the Notes may
2636    petition at the expense of the Issuer any court of competent jurisdiction for the appointment of a successor
2637    Trustee.

(e)    If the Trustee fails to comply with Section 7.10, unless the Trustee's duty to re-sign is stayed as provided in Section 310(b) of the TIA, any holder who has been a bona fide holder of a Note for at least six months may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(f)    Notwithstanding the replacement of the Trustee pursuant to this Section, the Issuer's obligations under Section 7.07 shall continue for the benefit of the retiring Trustee.

SECTION 7.09.    Successor Trustee by Merger.  If the Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another corporation or banking association, the resulting, surviving or transferee corporation without any further act shall be the successor Trustee; provided, however, that such corporation shall be otherwise qualified and eligible under this Article VII.

In case at the time such successor or successors by merger, conversion or consolidation to the Trustee shall succeed to the trusts created by this Indenture any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee may authenticate such Notes either in the name of any predecessor hereunder or in the name of the successor to the Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Notes or in this Indenture provided that the certificate of the Trustee shall have.

SECTION 7.10.    Eligibility; Disqualification.  The Trustee shall at all times satisfy the requirements of Section 310(a) of the TIA.  The Trustee shall have a combined capital and surplus of at least $100 million as set forth in its most recent published annual report of condition.  The Trustee shall comply with Section 310(b) of the TIA, subject to its right to apply for a stay of its duty to resign under the penultimate paragraph of Section 310(b) of the TIA; provided, however, that there shall be excluded from the operation of Section 310(b)(1) of the TIA any series of securities issued under this Indenture and any indenture or indentures under which other securities or certificates of interest or participation in other securities of the Issuer are outstanding if the requirements for such exclusion set forth in Section 310(b)(1) of the TIA are met.

SECTION 7.11.    Preferential Collection of Claims Against the Issuer.  The Trustee shall comply with Section 311(a) of the TIA, excluding any creditor relationship listed in Section 311(b) of the TIA.  A Trustee who has resigned or been removed shall be subject to Section 311(a) of the TIA to the extent indicated.

SECTION 7.12.    [Intentionally Omitted].Payment of Parallel Debt Pursuant to Dutch Law.

(a)    In this Section 7.13:

"Dutch Security Documents" means any Security Documents governed by the laws of The Netherlands; and

"Principal Obligations" means all present and future Obligations to the extent for the payment of money (whether actual or contingent and whether owed jointly or severally) by the Issuer under this Indenture.

(b)    With respect to Dutch Security Documents, and solely for purposes of the laws of The Netherlands:

(i)    the Issuer irrevocably and unconditionally undertakes to pay to [the Trustee] an amount equal to the aggregate of all Principal Obligations due and payable but unpaid (the "Parallel Debt");

(ii)    the Parallel Debt constitutes obligations and liabilities of the Issuer to [the Trustee] which are separate and independent from, and without prejudice to, the Principal Obligations and the Parallel Debt represents [the Trustee's] own independent right to receive payment of the Parallel Debt from the Issuer;

(iii)    notwithstanding Section 7.13(b)(ii), if [the Trustee] receives or recovers any amount in respect of (A) the Parallel Debt, the Principal Obligations decrease by that amount as if that amount was received or recovered directly in payment of the Principal Obligations and, for the avoidance of doubt, (B) the Principal Obligations, the Parallel Debt decreases by that amount as if that amount had been received or recovered directly in payment of the Parallel Debt;

(iv)    the parties acknowledge and confirm that the provisions contained in this Section 7.13 shall not be interpreted so as to increase the maximum total amount of the Principal Obligations under this Indenture; and

(v)    the Issuer shall not repay or prepay Parallel Debt if and as long as it owes Principal Obligations, unless directed to do so by [the Trustee] and the Issuer is otherwise required to repay or prepay the Principal Obligations hereunder.

## ARTICLE VIII

## DISCHARGE OF INDENTURE; DEFEASANCE

SECTION 8.01.    Discharge of Liability on Notes; Defeasance.

(a)    This Indenture shall be discharged and shall cease to be of further effect (except as to surviving rights of registration of transfer or exchange of Notes, as expressly provided for in this Indenture) as to all outstanding Notes when:

(i)    either (a) all the Notes theretofore authenticated and delivered (except lost, stolen or destroyed Notes which have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Issuer and thereafter repaid to the Issuer or discharged from such trust) have been delivered to the Trustee for cancellation or (b) all of the Notes (1) have become due and payable, (2) will become due and payable at their stated maturity within one year or (3) if redeemable at the option of the Issuer, are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer, and the Issuer has irrevocably deposited or caused to be deposited with the Trustee funds in an amount sufficient to pay and discharge the entire Indebtedness on the Notes not theretofore delivered to the Trustee for cancellation, for principal of, premium, if any, and interest on the Notes to the date of deposit together with irrevocable instructions from the Issuer directing the Trustee to apply such funds to the payment thereof at maturity or redemption, as the case may be;

(ii)      the Issuer and/or the Company has paid all other sums payable under this Indenture; and

(iii)      the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel stating that all conditions precedent under this Indenture relating to the satisfaction and discharge of this Indenture have been complied with.

(b)      Subject to Sections 8.01(c) and 8.02, the Issuer at any time may terminate (i) all of its Obligations under the Notes and this Indenture (with respect to the holders of the Notes) ("legal defeasance option") or (ii) its Obligations under Sections 4.03, 4.04, 4.09, 4.11, 4.12, 4.13 and 4.15, and Sections 6.01(c), 6.01(d) and Sections 6.01(e) and 6.01(f) (with respect to Significant Subsidiaries), 6.01(g), 6.01(h), 6.01(i) and 6.01(j) ("covenant defeasance option").  The Issuer may exercise its legal defeasance option notwithstanding its prior exercise of its covenant defeasance option.  In the event that the Issuer terminates all of its Obligations under the Notes and this Indenture (with respect to such Notes) by exercising its legal defeasance option or its covenant defeasance option, the Obligations of each Guarantor with respect to the Notes and the Security Documents shall be terminated simultaneously with the termination of such Obligations.

If the Issuer exercises its legal defeasance option, payment of the Notes so defeased may not be accelerated because of an Event of Default.  If the Issuer exercises its covenant defeasance option, payment of the Notes so defeased may not be accelerated because of an Event of Default specified in Section 6.01(c), 6.01(d), 6.01(e) and 6.01(f) (with respect to Significant Subsidiaries), 6.01(g), 6.01(h), 6.01(i) or 6.01(j).

Upon satisfaction of the conditions set forth herein and upon request of the Issuer, the Trustee shall acknowledge in writing the discharge of those Obligations that the Issuer terminates.

(c)      Notwithstanding clauses (a) and (b) above, the Issuer's obligations in Sections 2.04, 2.05, 2.06, 2.07, 2.08, 2.09, 7.07, 7.08 and in this Article VIII shall survive until the Notes have been paid in full.  Thereafter, the Issuer's obligations in Sections 7.07, 8.05 and 8.06 shall survive such satisfaction and discharge.

SECTION 8.02.    Conditions to Defeasance.

(a)      The Issuer may exercise its legal defeasance option or its covenant defeasance option only if:

(i)      the Issuer irrevocably deposits in trust with the Trustee cash in U.S. Dollars, U.S. Government Obligations or a combination thereof in an amount sufficient or U.S. Government Obligations, the principal of and the interest on which will be sufficient, or a combination thereof sufficient, to pay the principal of and premium (if any) and interest on the Notes when due at maturity or redemption, as the case may be, including interest thereon to maturity or such redemption date;

(ii)      the Issuer delivers to the Trustee a certificate from a nationally recognized firm of independent accountants expressing their opinion that the payments of principal and interest when due and without reinvestment on the deposited U.S. Government Obligations *plus* any deposited money without investment will provide cash at such times and in such amounts as will be sufficient to pay principal, premium, if any, and interest when due on all the Notes to maturity or redemption, as the case may be;

(iii)    123 days pass after the deposit is made and during the 123-day period no Default specified in Section 6.01(e) or (f) with respect to the Issuer occurs which is continuing at the end of the period;

(iv)    the deposit does not constitute a default under any other agreement binding on the Issuer and is not prohibited by Article X;

(v)    in the case of the legal defeasance option, the Issuer shall have delivered to the Trustee an Opinion of Counsel stating that (1) the Issuer have received from, or there has been published by, the Internal Revenue Service a ruling, or (2) since the date of this Indenture there has been a change in the applicable Federal income tax law, in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, the holders will not recognize income, gain or loss for Federal income tax purposes as a result of such deposit and defeasance and will be subject to Federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred. Notwithstanding the foregoing, the Opinion of Counsel required by the immediately preceding sentence with respect to a legal defeasance need not be delivered if all of the Notes not theretofore delivered to the Trustee for cancellation (x) have become due and payable or (y) will become due and payable at their Stated Maturity within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer;

(vi)    impair the right of any holder to receive payment of principal of, premium, if any, and interest on such holder's Notes on or after the due dates therefore or to institute suit for the enforcement of any payment on or with respect to such holder's Notes;

(vii)    in the case of the covenant defeasance option, the Issuer shall have delivered to the Trustee an Opinion of Counsel to the effect that the holders will not recognize income, gain or loss for Federal income tax purposes as a result of such deposit and defeasance and will be subject to Federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred; and

(viii)    the Issuer delivers to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent to the defeasance and discharge of the Notes to be so defeased and discharged as contemplated by this Article VIII have been complied with.

(b)    Before or after a deposit, the Issuer may make arrangements satisfactory to the Trustee for the redemption of such Notes at a future date in accordance with Article III.

SECTION 8.03.    Application of Trust Money.  The Trustee shall hold in trust money or U.S. Government Obligations (including proceeds thereof) deposited with it pursuant to this Article VIII. It shall apply the deposited money and the money from U.S. Government Obligations through each Paying Agent and in accordance with this Indenture to the payment of principal of and interest on the Notes so discharged or defeased.

SECTION 8.04.    Repayment to Issuer.  Each of the Trustee and each Paying Agent shall promptly turn over to the Issuer upon request any money or U.S. Government Obligations held by it as provided in this Article which, in the written opinion of nationally recognized firm of independent public accountants delivered to the Trustee (which delivery shall only be required if U.S. Government Obligations have been so deposited), are in excess of the amount thereof which would then be required to be deposited to effect an equivalent discharge or defeasance in accordance with this Article.

Subject to any applicable abandoned property law, the Trustee and each Paying Agent shall pay to the Issuer upon written request any money held by them for the payment of principal or inter-est that remains unclaimed for two years, and, thereafter, holders entitled to the money must look to the Issuer for payment as general creditors, and the Trustee and each Paying Agent shall have no further li-ability with respect to such monies.

SECTION 8.05.    Indemnity for U.S. Government Obligations.  The Issuer shall pay and shall indemnify the Trustee against any tax, fee or other charge imposed on or assessed against depos-ited U.S. Government Obligations or the principal and interest received on such U.S. Government Obliga-tions.

SECTION 8.06.    Reinstatement.  If the Trustee or any Paying Agent is unable to apply any money or U.S. Government Obligations in accordance with this Article VIII by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, re-straining or otherwise prohibiting such application, the Issuer's obligations under this Indenture and the Notes so discharged or defeased shall be revived and reinstated as though no deposit had occurred pursu-ant to this Article VIII until such time as the Trustee or any Paying Agent is permitted to apply all such money or U.S. Government Obligations in accordance with this Article VIII; *provided*, *however*, that, if the Issuer has made any payment of principal of, or interest on, any such Notes because of the reinstate-ment of its obligations, the Issuer shall be subrogated to the rights of the holders of such Notes to receive such payment from the money or U.S. Government Obligations held by the Trustee or any Paying Agent.

# ARTICLE IX

# AMENDMENTS AND WAIVERS

SECTION 9.01.    Without Consent of the Holders.

(a)    The Issuer, the Guarantors and the Trustee may amend this Indenture, the Inter-creditor Agreements or the Notes without notice to or consent of any holder:

(i)    to cure any ambiguity, omission, defect or inconsistency;

(ii)    to provide for the assumption by a Successor Issuer of the Obligations of the Is-suer under this Indenture and the Notes;

(iii)    to provide for the assumption by a Successor Company of the Obligations of the Company under this Indenture and the Notes, to provide for the assumption by a Successor Pledgor of the Obligations of a Pledgor under this Indenture and the Security Documents;

(iv)    to add a Guarantor with respect to the Notes pursuant to Section 4.11;

(v)    to provide for uncertificated Notes in addition to or in place of certificated Notes; *provided*, *however*, that the uncertificated Notes are issued in registered form for purposes of Sec-tion 163(f) of the Code or in a manner such that the uncertificated Notes are described in Section 163(f)(2)(B) of the Code;

(vi)    to conform the text of this Indenture, the Notes, the Security Documents, the First Lien Intercreditor Agreement or the Junior Lien Intercreditor Agreement to any provision of the ["Description of Five Year Notes" contained in the Plan Supplement filed with the Bankruptcy Court on April 5, 2010] to the extent that such provision in the "Description of Five Year Notes"

was intended to be a verbatim recitation of a provision of this Indenture, the Notes, the Security Documents, or the Junior Lien Intercreditor Agreement;

(vii)    to evidence and provide acceptance of the appointment of a successor Trustee, Registrar, Paying Agent or Transfer Agent under this Indenture;

(viii)    to comply with the rules of any applicable securities depository;

(ix)    to add a Pledgor with respect to the Notes or to add Collateral to secure the Notes;

(x)    to release Collateral in compliance with this Indenture or the Junior Lien Intercreditor Agreement;

(xi)    to add additional secured creditors holding Other First-Lien Obligations, other Third Priority Lien Obligations or any other secured Indebtedness permitted to be Incurred so long as such Obligations are in compliance with this Indenture or the Security Documents;

(xii)    to add to the covenants of the Company or the Restricted Subsidiaries for the benefit of the holders or to surrender any right or power herein conferred upon the Company or the Restricted Subsidiaries;

(xiii)    to comply with any requirement of the SEC in connection with qualifying or maintaining the qualification of, this Indenture under the TIA;

(xiv)    to make any change that would provide any additional benefit or rights to the holders or that does not adversely affect in any material respect the legal rights of any holder; or

(xv)    to provide for the issuance of additional Notes, which shall have terms substantially identical in all material respects to the Initial Notes, and which shall be treated, together with any outstanding Initial Notes, as a single issue of securities.

(xvi)    to comply with the rules of any applicable securities depositary; or

(xvii)    to provide for the issuance of Additional Notes under this Indenture in accordance with the limitations set forth in this Indenture.

(b)    After an amendment under this Section 9.01 becomes effective, the Issuer shall mail to the holders a notice briefly describing such amendment, provided that in the case of an amendment pursuant to Section 9.01(a)(xiv), no such notice shall be required.  The failure to give such notice to all holders, or any defect therein, shall not impair or affect the validity of an amendment under this Section 9.01.

SECTION 9.02.    With Consent of the Holders.

(a)    The Issuer and the Trustee may amend this Indenture and the Security Documents with the written consent of the holders of at least a majority in aggregate principal amount of the Notes then outstanding voting as a single class (including consents obtained in connection with a tender offer or exchange for the Notes).  However, without the consent of each holder of an outstanding Note affected, an amendment may not:

       (1)      reduce the amount of Notes whose holders must consent to an amendment,

       (2)      reduce the rate of or extend the time for payment of interest on any Note,

       (3)      reduce the principal of or change the Stated Maturity of any Note,

       (4)      reduce the premium payable upon the redemption of any Note or change the time at which any Note may be redeemed in accordance with Article III,

       (5)      make any Note payable in money other than that stated in such Note,

       (6)      expressly subordinate the Notes to any other Indebtedness of the Company, the Issuer or any Guarantor,

       (7)      impair the right of any holder to receive payment of principal of, premium, if any, and interest on such holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such holder's Notes,

       (8)      make any change in the amendment provisions which require each holder's consent or in the waiver provisions,

       (9)      make any change in the provisions in the Junior Lien Intercreditor Agreement or this Indenture dealing with the application of proceeds of Collateral that would adversely affect the holders of the Notes, or

       (10)      except as expressly provided by this Indenture, modify or release the Guarantee of any Significant Subsidiary in any manner adverse to the holders of the Notes.

       In addition, without the consent of the holders of at least 50% in aggregate principal amount of Notes then outstanding, no amendment or waiver may release all or substantially all of the Collateral from the Lien of this Indenture and the Security Documents with respect to the Notes.

       It shall not be necessary for the consent of the holders under this Section 9.02 to approve the particular form of any proposed amendment, but it shall be sufficient if such consent approves the substance thereof.

       After an amendment under this Section 9.02 becomes effective, the Issuer shall mail to the holders a notice briefly describing such amendment.  The failure to give such notice to all holders, or any defect therein, shall not impair or affect the validity of an amendment under this Section 9.02.

       SECTION 9.03.    <u>Compliance with Trust Indenture Act</u>.  From the date on which this Indenture is qualified under the TIA, every amendment, waiver or supplement to this Indenture or the Notes shall comply with the TIA as then in effect.

       SECTION 9.04.    <u>Revocation and Effect of Consents and Waivers</u>.

       (a)      A consent to an amendment or a waiver by a holder of a Note shall bind the holder and every subsequent holder of that Note or portion of the Note that evidences the same debt as the consenting holder's Note, even if notation of the consent or waiver is not made on the Note.  However, any such holder or subsequent holder may revoke the consent or waiver as to such holder's Note or portion of the Note if the Trustee receives the notice of revocation before the date on which the Trustee re-

ceives an Officer's Certificate from the Issuer certifying that the requisite principal amount of Notes have consented. After an amendment or waiver becomes effective, it shall bind every holder. An amendment or waiver becomes effective upon the (i) receipt by the Issuer or the Trustee of consents by the holders of the requisite principal amount of securities, (ii) satisfaction of conditions to effectiveness as set forth in this Indenture and any indenture supplemental hereto containing such amendment or waiver and (iii) execution of such amendment or waiver (or supplemental indenture) by the Issuer and the Trustee.

(b)     The Issuer may, but shall not be obligated to, fix a record date for the purpose of determining the holders entitled to give their consent or take any other action described above or required or permitted to be taken pursuant to this Indenture. If a record date is fixed, then notwithstanding the immediately preceding paragraph, those Persons who were holders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to give such consent or to revoke any consent previously given or to take any such action, whether or not such Persons continue to be holders after such record date. No such consent shall be valid or effective for more than 120 days after such record date.

SECTION 9.05.    Notation on or Exchange of Notes. If an amendment, supplement or waiver changes the terms of a Note, the Issuer may require the holder of the Note to deliver it to the Trustee. The Trustee may place an appropriate notation on the Note regarding the changed terms and return it to the holder. Alternatively, if the Issuer or the Trustee so determines, the Issuer in exchange for the Note shall issue and the Trustee shall authenticate a new Note that reflects the changed terms. Failure to make the appropriate notation or to issue a new Note shall not affect the validity of such amendment, supplement or waiver.

SECTION 9.06.    Trustee to Sign Amendments. The Trustee shall sign any amendment, supplement or waiver authorized pursuant to this Article IX if the amendment does not adversely affect the rights, duties, liabilities or immunities of the Trustee. If it does, the Trustee may but need not sign it. In signing such amendment, the Trustee shall be entitled to receive indemnity or security reasonably satisfactory to it and shall be provided with, and (subject to Section 7.01) shall be fully protected in relying upon, an Officer's Certificate and an Opinion of Counsel stating that such amendment, supplement or waiver is authorized or permitted by this Indenture and that such amendment, supplement or waiver is the legal, valid and binding obligation of the Issuer and the Company, enforceable against them in accordance with its terms, subject to customary exceptions, and complies with the provisions hereof (including Section 9.03).

SECTION 9.07.    Additional Voting Terms; Calculation of Principal Amount. All Notes issued under this Indenture shall vote and consent together on all matters (as to which any of such Notes may vote) as one class and no Notes will have the right to vote or consent as a separate class on any matter. Determinations as to whether holders of the requisite aggregate principal amount of Notes have concurred in any direction, waiver or consent shall be made in accordance with this Article IX and Section 2.14.

**ARTICLE X**

**RANKING OF NOTE LIENS**

SECTION 10.01.    Relative Rights. The First Lien Intercreditor Agreement and the Junior Lien Intercreditor Agreement define the relative rights, as lienholders, of holders of first priority Liens, holders of Liens securing First Priority Lien Obligations and holders of Liens securing Third Priority Lien Obligations. Nothing in this Indenture or the Junior Lien Intercreditor Agreement will:

(a)      impair, as between the Issuer and holders of Notes, the obligation of the Issuer, which is absolute and unconditional, to pay principal of, premium and interest on Notes in accordance with their terms or to perform any other obligation of the Issuer or any other obligor under this Indenture, the Notes, the Guarantees and the Security Documents;

(b)      restrict the right of any holder to sue for payments that are then due and owing, in a manner not inconsistent with the provisions of the Junior Lien Intercreditor Agreement;

(c)      prevent the Trustee, the Collateral Agent or any holder from exercising against the Issuer or any other obligor any of its other available remedies upon a Default or Event of Default (other than its rights as a secured party, which are subject to the Junior Lien Intercreditor Agreement); or

(d)      restrict the right of the Trustee, the Collateral Agent or any holder:

(1)      to file and prosecute a petition seeking an order for relief in an involuntary bankruptcy case as to any obligor or otherwise to commence, or seek relief commencing, any insolvency or liquidation proceeding involuntarily against any obligor;

(2)      to make, support or oppose any request for an order for dismissal, abstention or conversion in any insolvency or liquidation proceeding;

(3)      to make, support or oppose, in any insolvency or liquidation proceeding, any request for an order extending or terminating any period during which the debtor (or any other Person) has the exclusive right to propose a plan of reorganization or other dispositive restructuring or liquidation plan therein;

(4)      to seek the creation of, or appointment to, any official committee representing creditors (or certain of the creditors) in any insolvency or liquidation proceedings and, if appointed, to serve and act as a member of such committee without being in any respect restricted or bound by, or liable for, any of the obligations under this Article X;

(5)      to seek or object to the appointment of any professional person to serve in any capacity in any insolvency or liquidation proceeding or to support or object to any request for compensation made by any professional person or others therein;

(6)      to make, support or oppose any request for order appointing a trustee or examiner in any insolvency or liquidation proceedings; or

(7)      otherwise to make, support or oppose any request for relief in any insolvency or liquidation proceeding that it is permitted by law to make, support or oppose:

if it were a holder of unsecured claims; or

(x)      as to any matter relating to any plan of reorganization or other

(y)      restructuring or liquidation plan or as to any matter relating to the administration of the estate or the disposition of the case or proceeding (in each case except as set forth in the [First Lien Intercreditor Agreement] or the Junior Lien Intercreditor Agreement).

**ARTICLE XI**

**COLLATERAL**

SECTION 11.01.  Security Documents.

The Company shall, and shall cause each Restricted Subsidiary to, and each Restricted Subsidiary shall, make all filings (including filings of continuation statements and amendments to UCC financing statements that may be necessary to continue the effectiveness of such UCC financing statements) and all other actions as are necessary or required by the Security Documents to maintain (at the sole cost and expense of the Company and its Restricted Subsidiaries) the security interest created by the Security Documents in the Collateral (other than with respect to any Collateral the security interest in which is not required to be perfected under the Security Documents) as a perfected third priority security interest subject only to Permitted Liens.

SECTION 11.02.  Collateral Agent.

(a)  The Collateral Agent shall have all the rights and protections provided in the Security Documents.

(b)  Subject to Section 7.01, neither the Trustee nor the Collateral Agent nor any of their respective officers, directors, employees, attorneys or agents will be responsible or liable for the existence, genuineness, value or protection of any Collateral, for the legality, enforceability, effectiveness or sufficiency of the Security Documents, for the creation, perfection, priority, sufficiency or protection of any third priority Lien, or any defect or deficiency as to any such matters.

(c)  Subject to the Security Documents and the Junior Lien Intercreditor Agreement, (i) the Trustee shall direct the Collateral Agent and (ii) except as directed by the Trustee as required or permitted by this Indenture and any other representatives or pursuant to the Security Documents, the holders acknowledge that Collateral Agent will not be obligated:

(1)  to act upon directions purported to be delivered to it by any other Person;

(2)  to foreclose upon or otherwise enforce any third priority Lien; or

(3)  to take any other action whatsoever with regard to any or all of the third priority Liens, Security Documents or Collateral.

(d)  The holders of Notes agree that the Collateral Agent shall be entitled to the rights, privileges, protections, immunities, indemnities and benefits provided to the Collateral Agent by the Security Documents.  Furthermore, each holder of a Note, by accepting such Note, consents to the terms of and authorizes and directs the Trustee (in each of its capacities) and hereby appoints, authorizes and directs the Collateral Agent to enter into and perform the Junior Lien Intercreditor Agreement and Security Documents in each of its capacities thereunder.

(e)  If the Issuer (i) Incurs Third Priority Lien Obligations at any time when the Junior Lien Intercreditor Agreement is not in effect or at any time when Indebtedness constituting Third Priority Lien Obligations entitled to the benefit of an existing intercreditor agreement is concurrently retired, and (ii) directs the Trustee to deliver to the Collateral Agent an Officer's Certificate so stating and requesting the Collateral Agent to enter into an intercreditor agreement (on substantially the same terms as the Junior Lien Intercreditor Agreement in effect on the Issue Date) in favor of a designated agent or rep-

resentative for the holders of the Third Priority Lien Obligations so Incurred, the holders acknowledge
that the Collateral Agent is hereby authorized and directed to enter into such intercreditor agreement, bind
the holders on the terms set forth therein and perform and observe its obligations thereunder.

SECTION 11.03.    Authorization of Actions to Be Taken.

(a)    Each holder, by its acceptance of the Notes, consents and agrees to the terms of
the Security Documents (including, without limitation, the provisions providing for foreclosure and re-
lease of Collateral) as the same may be in effect or may be amended from time to time in accordance with
their terms, authorizes and directs the Trustee and the Collateral Agent to enter into the Security Docu-
ments to which it is a party, authorizes and empowers the Trustee to direct the Collateral Agent to enter
into, and the Collateral Agent to execute and deliver, the Junior Lien Intercreditor Agreement and author-
izes and empowers the Trustee and the Collateral Agent to bind the holders of Notes and other holders of
Obligations as set forth in the Security Documents to which it is a party and the Junior Lien Intercreditor
Agreement and to perform its obligations and exercise its rights and powers thereunder.

(b)    The Trustee is authorized and empowered to receive for the benefit of the holders
of Notes any funds collected or distributed under the Security Documents to which the Trustee is a party
and to make further distributions of such funds to the holders of Notes according to the provisions of this
Indenture.

(c)    Subject to the provisions of Section 7.01 and Section 7.02 hereof, the Junior Lien
Intercreditor Agreement and the Security Documents, the Trustee may (but shall not be obligated to), in
its sole discretion and without the consent of the holders, direct, on behalf of the holders, the Collateral
Agent to take all actions it deems necessary or appropriate in order to:

(1)    foreclose upon or otherwise enforce any or all of the third priority Liens;

(2)    enforce any of the terms of the Security Documents to which the Collateral
Agent or Trustee is a party; or

(3)    collect and receive payment of any and all Obligations.

[Subject to the Junior Lien Intercreditor Agreement, the Trustee is authorized and em-
powered to institute and maintain, or direct the Collateral Agent to institute and maintain, such suits and
proceedings as it may deem expedient to protect or enforce the third priority Liens or the Security Docu-
ments to which the Collateral Agent or Trustee is a party or to prevent any impairment of Collateral by
any acts that may be unlawful or in violation of the Security Documents to which the Collateral Agent or
Trustee is a party or this Indenture, and such suits and proceedings as the Trustee or the Collateral Agent
may deem expedient to preserve or protect its interests and the interests of the holders of Notes in the Col-
lateral, including power to institute and maintain suits or proceedings to restrain the enforcement of or
compliance with any legislative or other governmental enactment, rule or order that may be unconstitu-
tional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would
impair the security interest hereunder or be prejudicial to the interests of holders, the Trustee or the Col-
lateral Agent.]

SECTION 11.04.   Release of Collateral.

(a)      Subject to the Junior Lien Intercreditor Agreement, Liens on Collateral securing the Notes will be automatically and unconditionally released:

(1)      as to any property or asset (including Capital Stock of a Subsidiary of the Company), to enable the Company, the Issuer and the Pledgors to consummate the disposition of such property or asset to the extent not prohibited by clause (5) below or under the covenants described under Section 4.04;

(2)      upon the release of all Liens on such property or assets securing First and Second Priority Lien Obligations (including all commitments and letters of credit thereunder);

(3)      in respect of the property and assets of a Pledgor, upon the designation of such Pledgor to be an Unrestricted Subsidiary in accordance with the definition of "Unrestricted Subsidiary";

(4)      in respect of the property and assets of a Guarantor upon release of the Guarantee with respect to the Notes of such Guarantor;

(5)      in the case of the property and assets of a specific Pledgor, upon such Pledgor making a Transfer of such assets to any Restricted Subsidiary of the Issuer that is not a Pledgor; *provided* that (i) such Transfer is not subject to the covenant described under Section 5.01 and (ii) the aggregate net book value of the assets of Restricted Subsidiaries that are at any time Notes Collateral (as defined in the First Lien Security Documents)(excluding cash proceeds of accounts receivable, inventory and related assets) that are so transferred pursuant to this clause (5) subsequent to the Issue Date shall not exceed 5% of the Consolidated Net Tangible Assets of the Issuer and its Restricted Subsidiaries per year and shall not be in an amount that will result in an Excluded Subsidiary ceasing to qualify as an Excluded Subsidiary in accordance with the definition thereof; *provided*, *further*, that Liens on all property and assets of any Subsidiary of Lyondell Europe Holdings, Inc., a Delaware corporation, will be automatically and unconditionally released upon any transfer of such Subsidiary;

(6)      as described under Article IX; or

(7)      as to the pledge of Capital Stock of first-tier Foreign Subsidiaries, in connection with a reorganization, change or modification of the direct or indirect ownership of Foreign Subsidiaries by the Company, the Issuer or a Pledgor, as applicable, in compliance with the First Lien Indenture, a release may be obtained as to such Capital Stock in connection with the substitution of pledge of 65% of the voting Capital Stock and 100% of the non-voting Capital Stock of any one or more new or replacement first-tier Foreign Subsidiaries pursuant to valid Security Documents.

Notwithstanding the foregoing clause (2), if an Event of Default exists on the date of Discharge of First and Second Priority Lien Obligations, the Third Priority Liens on the Collateral securing the Plan Roll-Up Notes will not be released, except to the extent that Collateral or any portion thereof was disposed of in order to repay the First and Second Priority Lien Obligations secured by the Collateral, and thereafter the Authorized Collateral Agent will have the right to direct the Agent to foreclose upon the Collateral (but in such event, the Liens on the Collateral securing the Plan Roll-Up Notes will be released when such Event of Default and all other Events of Default case to exist).

In addition, the security interests granted pursuant to the Security Documents securing the Notes Obligations shall automatically terminate and/or be released all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to the applicable Pledgors (as defined in the Collateral Agreement), as of the date upon (i) all the Obligations under the Notes and the First Lien Indenture and the Security Documents (other than contingent or unliquidated obligations or liabilities not then due) have been paid in full in cash or immediately available funds; (ii) a legal defeasance or covenant defeasance or discharge under the First Lien Indenture; [or (iii) the Holders of at least two thirds in aggregate principal amount of all Notes issued under this Indenture consent to the termination of the Security Documents.]

In connection with any termination or release pursuant to this Section 11.04(a), the Collateral Agent shall execute and deliver to any Pledgor (as defined in the Collateral Agreement), at such Pledgor's expense, all documents that such Pledgor shall reasonably request to evidence and provide such termination or release (including, without limitation, UCC termination statements), and will duly assign and transfer to such Pledgor, such of the Pledged Collateral (as defined in the Collateral Agreement) that may be in the possession of the Collateral Agent and has not theretofore been sold or otherwise applied or released pursuant to this Indenture or the Security Documents. Any execution and delivery of documents pursuant to this Section 11.04(a) shall be without recourse to or warranty by the Collateral Agent. In connection with any release pursuant to this Section 11.04(a), the Pledgors shall be permitted to take any action in connection therewith consistent with such release including, without limitation, the filing of UCC termination statements.

(b)     To the extent that Rule 3-16 of Regulation S-X under the Securities Act requires or would require (or is replaced with another rule or regulation, or any other law, rule or regulation is adopted, that would require) the filing with the SEC (or any other governmental agency) of separate financial statements of any Subsidiary of the Company due to the fact that such Subsidiary's Capital Stock secures the Notes, or any First Priority Lien Obligation, Second Priority Lien Obligation or Third Priority Lien Obligation, then the Capital Stock of such Subsidiary will automatically be deemed not to be part of the Notes Collateral securing the Notes but only to the extent necessary to not be subject to such requirement and only for so long as required to not be subject to such requirement (such requirement, the "3-16 Exemption"); *provided* that the 3-16 Exemption will not apply to the capital stock of the Issuer and LyondellBasell Subholdings, B.V. In such event, the Security Documents may be amended or modified, without the consent of any holder of such Notes, to the extent necessary to release the security interests in favor of the Collateral Agent on the shares of Capital Stock of such Subsidiary that are so deemed to no longer constitute part of the Notes Collateral. In the event that Rule 3-16 of Regulation S-X under the Securities Act is amended, modified or interpreted by the SEC to permit (or is replaced with another rule or regulation, or any other law, rule or regulation is adopted, that would permit) such Subsidiary's Capital Stock to secure the Notes in excess of the amount then pledged without the filing with the SEC (or any other governmental agency) of separate financial statements of such Subsidiary, then the Capital Stock of such Subsidiary will automatically be deemed to be a part of the Notes Collateral.

SECTION 11.05.    Filing, Recording and Opinions.

(a)     The Issuer will comply with the provisions of TIA Sections 314(b), 314(c) and 314(d), in each case following qualification of this Indenture pursuant to the TIA and except to the extent not required as set forth in any SEC regulation or interpretation (including any no-action letter issued by the Staff of the SEC, whether issued to the Issuer or any other Person). Following such qualification, to the extent the Issuer is required to furnish to the Trustee an Opinion of Counsel pursuant to TIA Section 314(b)(2), the Issuer will furnish such opinion not more than 60 but not less than 30 days prior to each September 30.

3158          Any release of Collateral permitted by Section 11.04 hereof will be deemed not to impair
3159 the Liens under this Indenture and the Security Documents in contravention thereof and any person that is
3160 required to deliver an Officer's Certificate and Opinion of Counsel pursuant to Section 314(d) of the TIA,
3161 shall be entitled to rely upon the foregoing as a basis for delivery of such certificate and opinion.  The
3162 Trustee may, to the extent permitted by Sections 7.01 and 7.02 hereof, accept as conclusive evidence of
3163 compliance with the foregoing provisions the appropriate statements contained in such documents, Offi-
3164 cer's Certificate and Opinion of Counsel.

3165          (b)     If any Collateral is released in accordance with this Indenture and if the Issuer
3166 has delivered the certificates and documents required by the Security Documents and Section 11.04, the
3167 Trustee will determine whether it has received all documentation required by TIA Section 314(d) in con-
3168 nection with such release and, based on such determination and Officer's Certificate and the Opinion of
3169 Counsel delivered pursuant to Section 11.04, will, upon request, deliver a certificate to the Collateral
3170 Agent setting forth such determination.

3171          (c)     Any certificate or opinion required by Section 314(d) of the Trust Indenture Act
3172 may be made by an Officer of the Issuer, except in cases where Section 314(d) requires that such certifi-
3173 cate or opinion be made by an independent engineer, appraiser or other expert.

3174          (d)     Notwithstanding anything to the contrary herein, the Issuer and its Subsidiaries
3175 will not be required to comply with all or any portion of Section 314(d) of the Trust Indenture Act if they
3176 determine, in good faith based on advice of counsel, that under the terms of that section and/or any inter-
3177 pretation or guidance as to the meaning thereof of the SEC and its staff, including "no action" letters or
3178 exemptive orders, all or any portion of Section 314(d) of the Trust Indenture Act is inapplicable to the
3179 released Collateral.

3180          (e)     Upon the request of the Trustee, the Trustee shall be entitled to rely on an Offi-
3181 cer's Certificate and an Opinion of Counsel in respect of any matter in furtherance of the foregoing trans-
3182 actions contemplated by this Section 11.05.

3183          SECTION 11.06.    [Intentionally Omitted.]

3184          SECTION 11.07.    Powers Exercisable by Receiver or Trustee.  In case the Collateral
3185 shall be in the possession of a receiver or trustee, lawfully appointed, the powers conferred in this Article
3186 XI upon the Issuer or the Company with respect to the release, sale or other disposition of such property
3187 may be exercised by such receiver or trustee, and an instrument signed by such receiver or trustee shall be
3188 deemed the equivalent of any similar instrument of the Issuer or the Company or of any officer or officers
3189 thereof required by the provisions of this Article XI; and if the Trustee or the Collateral Agent shall be in
3190 the possession of the Collateral under any provision of this Indenture, then such powers may be exercised
3191 by the Trustee or the Collateral Agent, as the case may be.

3192          SECTION 11.08.    Release upon Termination of the Issuer's Obligations.  In the event (i)
3193 that the Issuer delivers to the Trustee, in form and substance acceptable to it, an Officer's Certificate and
3194 Opinion of Counsel certifying that all the obligations under this Indenture, the Notes and the Security
3195 Documents have been satisfied and discharged by the payment in full of the Issuer's obligations under the
3196 Notes, this Indenture and the Security Documents, and all such obligations have been so satisfied, or (ii) a
3197 discharge, legal defeasance or covenant defeasance of this Indenture occurs under Article VIII, the Trus-
3198 tee shall deliver to the Issuer and the Collateral Agent a notice stating that the Trustee, on behalf of the
3199 holders, disclaims and gives up any and all rights it has in or to the Collateral, and any rights it has under
3200 the Security Documents, and upon receipt by the Collateral Agent of such notice, the Collateral Agent
3201 shall be deemed not to hold a Lien in the Collateral on behalf of the Trustee and shall (or shall direct the

Collateral Agent to) do or cause to be done all acts reasonably necessary to release such Lien as soon as is reasonably practicable.

SECTION 11.09.  Designations.  For purposes of any provisions hereof or the Junior Lien Intercreditor Agreement requiring the Issuer to designate Indebtedness for the purposes of the terms Third Priority Lien Obligations or any other such designations hereunder or under the Junior Lien Inter-creditor Agreement, any such designation shall be sufficient if the relevant designation provides in writ-ing that such Junior Priority Lien Obligations or any other designation are permitted under this Indenture and is signed on behalf of the Issuer by an Officer and delivered to the Trustee and the Collateral Agent in an Officer's Certificate.

# ARTICLE XII

# GUARANTEE

SECTION 12.01.  Guarantee.

(a)    The Company, each existing and subsequently acquired or organized direct or in-direct Wholly Owned Domestic Subsidiary of the Company (other than any Excluded Subsidiary) (each such entity, a "Guarantor") will, jointly and severally, irrevocably and unconditionally guarantee on a senior third-priority secured basis, as a primary obligor and not merely as a surety, to each holder and to the Trustee and its successors and assigns (i) the full and punctual payment when due, whether at Stated Maturity, by acceleration, by redemption or otherwise, of all Obligations of the Issuer under this Inden-ture (including obligations to the Trustee and the Agents) and the Notes, whether for payment of principal of, premium, if any, on and interest in respect of the Notes (the "Guarantee") and all other monetary obli-gations of the Issuer under this Indenture and the Notes and (ii) the full and punctual performance within applicable grace periods of all other obligations of the Issuer whether for fees, expenses, indemnification or otherwise under this Indenture and the Notes (all the foregoing, including the Guarantee, being herein-after collectively called the "Guaranteed Obligations").  Each Guarantor further agrees that the Guaran-teed Obligations may be extended or renewed, in whole or in part, without notice or further assent from any Guarantor, and that each Guarantor shall remain bound under this Article XII notwithstanding any extension or renewal of any Guaranteed Obligation.

(b)    To the extent applicable, each Guarantor waives presentation to, demand of pay-ment from and protest to the Issuer of any of the Guaranteed Obligations and also waives notice of protest for nonpayment.  Each Guarantor waives notice of any default under the Notes or the Guaranteed Obliga-tions.  The obligations of each Guarantor hereunder shall not be affected by (i) the failure of any holder or the Trustee to assert any claim or demand or to enforce any right or remedy against the Issuer or any other Person under this Indenture, the Notes or any other agreement or otherwise; (ii) any extension or renewal of this Indenture, the Notes or any other agreement; (iii) any rescission, waiver, amendment or modifica-tion of any of the terms or provisions of this Indenture, the Notes or any other agreement; (iv) the release of any security held by any holder or the Trustee for the Guaranteed Obligations or each Guarantor; (v) the failure of any holder or Trustee to exercise any right or remedy against any other guarantor of the Guaranteed Obligations; or (vi) any change in the ownership of each Guarantor, except as provided in Section 12.02(b).  Each Guarantor hereby waives any right to which it may be entitled to have its Obliga-tions hereunder divided among the Guarantors, such that such Guarantor's obligations would be less than the full amount claimed.

(c)    Each Guarantor hereby waives any right to which it may be entitled to have the assets of the Issuer first be used and depleted as payment of the Issuer's or such Guarantor's obligations hereunder prior to any amounts being claimed from or paid by such Guarantor hereunder.  Each Guaran-

tor hereby waives any right to which it may be entitled to require that the Issuer be sued prior to an action
being initiated against such Guarantor.

(d)    Each Guarantor further agrees that its Guarantee herein constitutes a guarantee of
payment, performance and compliance when due (and not a guarantee of collection) and waives any right
to require that any resort be had by any holder or the Trustee to any security held for payment of the
Guaranteed Obligations.

(e)    The Guarantee of each Guarantor, to the extent and in the manner set forth in Ar-
ticle XII, will be the senior third-priority secured Obligations of the Guarantors equal in right of payment
to all existing and future Pari Passu Indebtedness, equal in right of payment to all existing and future un-
subordinated Indebtedness of the Guarantors and subordinated and subject in right of payment to the prior
payment in full of the principal of and premium, if any, and interest on all Secured Indebtedness of the
relevant Guarantor and is made subject to such provisions of this Indenture.

(f)    Except as expressly set forth in Sections 8.01(b), 12.02 and 12.06, the obligations
of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination
for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not
be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of
the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise.  Without limiting
the generality of the foregoing, the obligations of each Guarantor herein shall not be discharged or im-
paired or otherwise affected by the failure of any holder or the Trustee to assert any claim or demand or to
enforce any remedy under this Indenture, the Notes or any other agreement, by any waiver or modifica-
tion of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the obliga-
tions, or by any other act or thing or omission or delay to do any other act or thing which may or might in
any manner or to any extent vary the risk of any Guarantor or would otherwise operate as a discharge of
any Guarantor as a matter of law or equity.

(g)    Each Guarantor agrees that its Guarantee shall remain in full force and effect un-
til payment in full of all the Guaranteed Obligations.  Each Guarantor further agrees that its Guarantee
herein shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any
part thereof, of principal of or interest on any Guaranteed Obligation is rescinded or must otherwise be
restored by any holder or the Trustee upon the bankruptcy or reorganization of the Issuer or otherwise.

(h)    In furtherance of the foregoing and not in limitation of any other right which any
holder or the Trustee has at law or in equity against any Guarantor by virtue hereof, upon the failure of
the Issuer to pay the principal of or interest on any Guaranteed Obligation when and as the same shall be-
come due, whether at maturity, by acceleration, by redemption or otherwise, or to perform or comply with
any other Guaranteed Obligation, each Guarantor hereby promises to and shall, upon receipt of written
demand by the Trustee, forthwith pay, or cause to be paid, in cash, to the holders or the Trustee an amount
equal to the sum of (i) the unpaid principal amount of such Guaranteed Obligations, (ii) accrued and un-
paid interest on such Guaranteed Obligations (but only to the extent not prohibited by applicable law) and
(iii) all other monetary obligations of the Issuer to the holders, the Trustee and Agents.

(i)    Each Guarantor agrees that it shall not be entitled to any right of subrogation in
relation to the holders in respect of any Guaranteed Obligations guaranteed hereby until payment in full of
all Guaranteed Obligations.  Each Guarantor further agrees that, as between it, on the one hand, and the
holders and the Trustee, on the other hand, (i) the maturity of the Guaranteed Obligations guaranteed
hereby may be accelerated as provided in Article VI for the purposes of the Guarantee herein, notwith-
standing any stay, injunction or other prohibition preventing such acceleration in respect of the Guaran-
teed Obligations guaranteed hereby, and (ii) in the event of any declaration of acceleration of such Guar-

anteed Obligations as provided in Article VI, such Guaranteed Obligations (whether or not due and payable) shall forthwith become due and payable by the Company for the purposes of this Section 12.01.

(j)        Each Guarantor also agrees to pay any and all costs and expenses (including reasonable attorneys' fees and expenses) Incurred by the Trustee, the Agents or any holder in enforcing any rights under this Section 12.01.

(k)        Upon request of the Trustee, each Guarantor shall execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture.

SECTION 12.02.    Limitation on Liability.

(a)        Any term or provision of this Indenture to the contrary notwithstanding, the maximum aggregate amount of the Guaranteed Obligations guaranteed hereunder by each Guarantor shall not exceed the maximum amount that can be hereby guaranteed without rendering this Indenture, as it relates to such Guarantor, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer or similar laws affecting the rights of creditors generally.

(b)        The Obligations of any Guarantor, including the Company, under its Guaranteed Obligations will be automatically and unconditionally released and discharged from all Obligations under this Article XII when any of the following occurs:

(i)        upon the full and final payment by or on behalf of the Issuer of all of its Obligations under this Indenture and the Notes;

(ii)        except with respect to the Guarantee of the Company any issuance, sale, exchange, transfer or other disposition (including, without limitation, by way of acquisition, merger, amalgamation, consolidation, transfer, conveyance or otherwise), directly or indirectly, of Capital Stock of such Guarantor (or any parent of such Guarantor) to any Person that is not a Restricted Subsidiary of the Company that results in such Guarantor ceasing to be a Restricted Subsidiary of the Company; *provided* that such issuance, sale, exchange, transfer or other disposition is made in accordance with the provisions of this Indenture;

(iii)        except with respect to the Guarantee of the Company, the designation of such Guarantor as an Unrestricted Subsidiary in accordance with the provisions of this Indenture;

(iv)        except with respect to the Guarantee of the Company, upon the liquidation or dissolution of such Guarantor; *provided* that no Default or Event of Default has occurred or is continuing or would be caused thereby;

(v)        except with respect to the Guarantee of the Company, the occurrence of legal defeasance or covenant defeasance in accordance with this Indenture;

(vi)        except with respect to the Guarantee of the Company and for those limitations described in the following paragraph, in the event that the continued Obligation of such Guarantor under its Guarantee or the continued existence of such Guarantee will result in a violation of applicable law that cannot be avoided or otherwise prevented through measures reasonably available to the Company or such Guarantor; *provided* that all guarantees, if any, of all other First Priority Lien Obligations by such Guarantor are also released; or

(vii)    upon such Guarantor being designated as an Excluded Subsidiary in compliance with this Indenture and the Company gives written notice of such release to the Trustee.

In addition to the initial Guarantors, other Domestic Subsidiaries may become Guarantors after the Issue Date, as provided under Section 12.06. The Guaranteed Obligations of the Guarantors will be limited as necessary to recognize certain defenses generally available to guarantors (including those that relate to fraudulent conveyance or transfer, voidable preference, financial assistance, corporate purpose, capital maintenance or similar laws, regulations or defenses affecting the rights of creditors generally) or other considerations under applicable law.

SECTION 12.03.    Successors and Assigns.    This Article XII shall be binding upon each Guarantor and its successors and assigns and shall inure to the benefit of the successors and assigns of the Trustee, the Agents and the holders and, in the event of any transfer or assignment of rights by any holder, the Agents, or the Trustee, the rights and privileges conferred upon that party in this Indenture and in the Notes shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions of this Indenture.

SECTION 12.04.    No Waiver.    Neither a failure nor a delay on the part of either the Trustee, the Agents or the holders in exercising any right, power or privilege under this Article XII shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise of any right, power or privilege.  The rights, remedies and benefits of the Trustee, the Agents and the holders herein expressly specified are cumulative and not exclusive of any other rights, remedies or benefits which either may have under this Article XII at law, in equity, by statute or otherwise.

SECTION 12.05.    Modification.    No modification, amendment or waiver of any provision of this Article XII, nor the consent to any departure by any Guarantor therefrom, shall in any event be effective unless the same shall be in writing and signed by the Trustee, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice to or demand on any Guarantor in any case shall entitle any Guarantor to any other or further notice or demand in the same, similar or other circumstances.

SECTION 12.06.    Execution of Supplemental Indenture for Future Note Guarantors.  Each Subsidiary and other Person which is required to become a Guarantor of the Notes pursuant to Section 4.11 shall promptly execute and deliver to the Trustee a supplemental indenture in the form of Exhibit B hereto pursuant to which such Subsidiary or other Person shall become a Guarantor under this Article XII and shall guarantee the Notes.  Concurrently with the execution and delivery of such supplemental indenture, the Issuer shall deliver to the Trustee an Opinion of Counsel and an Officer's Certificate to the effect that such supplemental indenture has been duly authorized, executed and delivered by such Subsidiary or other Person and that, subject to the application of bankruptcy, insolvency, moratorium, fraudulent conveyance or transfer and other similar laws relating to creditors' rights generally and to the principles of equity, whether considered in a proceeding at law or in equity, the Guarantee of such Guarantor is a valid and binding obligation of such guarantor, enforceable against such Guarantor in accordance with its terms and/or to such other matters as the Trustee may reasonably request.

SECTION 12.07.    Non-Impairment.    The failure to endorse a Guarantee on any Note shall not affect or impair the validity thereof.

## ARTICLE XIII

## MISCELLANEOUS

SECTION 13.01.  <u>Trust Indenture Act Controls</u>.  If and to the extent that any provision of this Indenture limits, qualifies or conflicts with the duties imposed by, or with another provision (an "<u>incorporated provision</u>") included in this Indenture by operation of, Sections 310 to 318 of the TIA, inclusive, such imposed duties or incorporated provision shall control (provided that the foregoing shall not apply to Section 13.06 of this Indenture until the Indenture is qualified under the TIA).

SECTION 13.02.  <u>Notices</u>.

(a)      Any notice or communication required or permitted hereunder shall be in writing and delivered in person, via facsimile or mailed by first-class mail addressed as follows:

if to the Issuer, the Company or a Guarantor:

Lyondell Chemical Company
1221 McKinney St
Suite 700
Houston, TX  77010
Facsimile:
Attention: Craig B. Glidden, Esq.

if to the Trustee:

[          ]

The Issuer or the Trustee by notice to the other may designate additional or different addresses for subsequent notices or communications.

(b)      Any notice or communication mailed to a holder shall be mailed, first class mail, to the holder at the holder's address as it appears on the registration books of the Registrar and shall be sufficiently given if so mailed within the time prescribed.

(c)      Failure to mail a notice or communication to a holder or any defect in it shall not affect its sufficiency with respect to other holders.  If a notice or communication is mailed in the manner provided above, it is duly given, whether or not the addressee receives it, except that notices to the Trustee are effective only if received.

SECTION 13.03.  <u>Communication by the Holders with Other Holders</u>.  The holders may communicate pursuant to Section 312(b) of the TIA with other holders with respect to their rights under this Indenture or the Notes.  The Issuer, the Trustee, the Registrar and other Persons shall have the protection of Section 312(c) of the TIA.

SECTION 13.04.  <u>Certificate and Opinion as to Conditions Precedent</u>.  Upon any request or application by the Issuer to the Trustee to take or refrain from taking any action under this Indenture, the Issuer shall furnish to the Trustee at the request of the Trustee:

(a)     an Officer's Certificate in form reasonably satisfactory to the Trustee stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(b)     an Opinion of Counsel in form reasonably satisfactory to the Trustee stating that, in the opinion of such counsel, all such conditions precedent have been complied with.

SECTION 13.05.    Statements Required in Certificate or Opinion.  Each certificate or opinion with respect to compliance with a covenant or condition provided for in this Indenture (other than pursuant to Section 4.09) shall include:

(a)     a statement that the individual making such certificate or opinion has read such covenant or condition;

(b)     a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c)     a statement that, in the opinion of such individual, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(d)     a statement as to whether or not, in the opinion of such individual, such covenant or condition has been complied with; *provided*, *however*, that with respect to matters of fact an Opinion of Counsel may rely on an Officer's Certificate or certificates of public officials.

SECTION 13.06.    When Notes Disregarded.  In determining whether the holders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by (i) the Issuer, (ii) the Company or (iii) on and after the date this Indenture has been qualified under the TIA only, by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Issuer or the Company shall be disregarded and deemed not to be outstanding, except that, for the purpose of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Notes which the Trustee knows are so owned shall be so disregarded (it being expressly understood that prior to the date this Indenture has been so qualified Notes held by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Issuer or the Company shall not be disregarded).  Subject to the foregoing, only Notes outstanding at the time shall be considered in any such determination.

SECTION 13.07.    Rules by Trustee, Paying Agent and Registrar.  The Trustee may make reasonable rules for action by or a meeting of the holders.  The Registrar and a Paying Agent may make reasonable rules for their functions.

SECTION 13.08.    Legal Holidays.  If a payment date is not a Business Day, payment shall be made on the next succeeding day that is a Business Day, and no interest shall accrue on any amount that would have been otherwise payable on such payment date if it were a Business Day for the intervening period.  If a regular Record Date is not a Business Day, the Record Date shall not be affected.

SECTION 13.09.    GOVERNING LAW.  **THIS INDENTURE AND THE SECURITIES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.**

SECTION 13.10.    No Recourse Against Others.    No director, officer, employee, man-
ager, incorporator or holder of any Equity Interests in the Issuer or of any Guarantor or any direct or indi-
rect parent corporation, as such, shall have any liability for any obligations of the Issuer or any Guarantor
under the Notes or this Indenture or for any claim based on, in respect of, or by reason of, such obliga-
tions or their creation.  Each holder of Notes by accepting a Note waives and releases all such liability.
The waiver and release are part of the consideration for issuance of the Notes.

SECTION 13.11.    Successors.    All agreements of the Issuer and the Company in this In-
denture and the Notes shall bind its successors.  All agreements of the Trustee in this Indenture shall bind
its successors.

SECTION 13.12.    Multiple Originals.    The parties may sign any number of copies of
this Indenture.  Each signed copy shall be an original, but all of them together represent the same agree-
ment.  One signed copy is enough to prove this Indenture.

SECTION 13.13.    Table of Contents; Headings.    The table of contents, cross-reference
sheet and headings of the Articles and Sections of this Indenture have been inserted for convenience of
reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the
terms or provisions hereof.

SECTION 13.14.    Indenture Controls.    If and to the extent that any provision of the
Notes limits, qualifies or conflicts with a provision of this Indenture, such provision of this Indenture
shall control.

SECTION 13.15.    Severability.    In case any provision in this Indenture shall be invalid,
illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in
any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such
invalidity, illegality or unenforceability.

SECTION 13.16.    Intercreditor Agreements.    The terms of this Indenture are subject to
the terms of the Junior Lien Intercreditor Agreement.

SECTION 13.17.    PATRIOT Act.    The parties hereto acknowledge that in accordance
with Section 326 of the USA PATRIOT Act, the Trustee and the Agents, like all financial institutions and
in order to help fight the funding of terrorism and money laundering, is required to obtain, verify, and re-
cord information that identifies each person or legal entity that establishes a relationship or opens an ac-
count.  The parties to this agreement agree that they will provide to the Trust and the Agents with such
information as it may request in order to satisfy the requirements of the USA PATRIOT Act.

SECTION 13.18.    Force Majeure.    In no event shall the Trustee or any Agent be liable
for any failure or delay in the performance of its obligations hereunder because of circumstances beyond
the Trustee's or the Agents' control, including, but not limited to, acts of God, flood, war (whether de-
clared or undeclared), terrorism, fire, riot or embargo, which delay, restrict or prohibit the providing of
the services contemplated by this Indenture..

**[Remainder of page intentionally left blank]**

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed as of the date first written above.

Lyondell Chemical Company, as the Issuer

By: _____
Name:
Title:

LyondellBasell Industries N.V., as the Company

By: _____
Name:
Title:

[Signatures for Other Guarantors to Come]

3497                                    Wells Fargo Bank, N.A. , as Trustee

3498                        By: _____
3499                             Name:
3500                             Title:

3501                                                                                          EXHIBIT A-1

3502                                            FORM OF NOTE
3503
3504                                            [Face of Note]


3505              [Insert the Global Note Legend, if applicable pursuant to the provisions of the Indenture]

3506

CUSIP: [  ]

ISIN: [  ]

GLOBAL NOTE

representing up to

$[_____]

2014 Senior Secured Note

No. ____                                                                                                    [$_____]

LYONDELL CHEMICAL COMPANY, a Delaware corporation, promises to pay to Cede & Co., or registered assigns, the principal sum set forth on the Schedule of Increases or Decreases in Global Note attached hereto on May 1, 2014.

Interest Payment Dates: May 1 and November 1

Record Dates:  April 15 and October 15

Additional provisions of this Note are set forth on the other side of this Note.

3527                    IN WITNESS WHEREOF, the parties have caused this instrument to be duly executed.

3528                                    LYONDELL CHEMICAL COMPANY


3529                                    By:    _____
3530                                           Name:
3531                                           Title:


3532            Dated: [    ], 2010

3533    This is one of the Notes referred to in the within-mentioned Indenture:
3534
3535
3536                                    Wells Fargo Bank, N.A., as Trustee


3537                                    By:  _____
3538                                            Authorized Signatory

3539                                                [Back of Note]
3540
3541                                          2014 Senior Secured Notes

3542

3543            Capitalized terms used herein shall have the meanings assigned to them in the Indenture
3544    referred to below unless otherwise indicated.

3545            1.      LYONDELL CHEMICAL COMPANY, a Delaware corporation, (the "Issuer,")
3546    promises to pay interest on the principal amount of this Note at [the lowest interest rate possible in com-
3547    pliance with Section 1129(b) of the Bankruptcy Code]% per annum from [ ], 2010 until maturity.  The
3548    Issuer will pay interest semi-annually in arrears on May 1 and November 1 of each year, or if any such
3549    day is not a Business Day, on the next succeeding Business Day (each, an "Interest Payment Date").  In-
3550    terest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest
3551    has been paid, from the Issue Date; *provided* that the first Interest Payment Date shall be November 1,
3552    2010.  The Issuer will pay interest (including post-petition interest in any proceeding under any Bank-
3553    ruptcy Law) on overdue principal and premium, if any, from time to time on demand at the interest rate
3554    on the Notes; it shall pay interest (including post-petition interest in any proceeding under any Bank-
3555    ruptcy Law) on overdue installments of interest, if any, (without regard to any applicable grace periods)
3556    from time to time on demand at the interest rate on the Notes.  Interest will be computed on the basis of a
3557    360-day year comprised of twelve 30-day months.

3558            2.      METHOD OF PAYMENT.  The Issuer will pay interest on the Notes, if any, to
3559    the Persons who are registered holders of Notes at the close of business on the April 15 and October 15
3560    (whether or not a Business Day), as the case may be, next preceding the Interest Payment Date, even if
3561    such Notes are canceled after such record date and on or before such Interest Payment Date, except as
3562    provided in Section 2.12 of the Indenture with respect to defaulted interest.  Payment of interest may be
3563    made by check mailed to the holders at their addresses set forth in the register of holders, *provided* that
3564    payment by wire transfer of immediately available funds will be required with respect to principal of and
3565    interest and premium on all Global Notes and all other Notes the holders of which shall have provided
3566    wire transfer instructions to the Issuer or the Paying Agent.  Such payment shall be in such coin or cur-
3567    rency of the United States of America as at the time of payment is legal tender for payment of public and
3568    private debts.

3569            3.      TRUSTEE; PAYING AGENT AND REGISTRAR. Wells Fargo Bank, N.A. will
3570    be the Trustee (the "Trustee") under the Indenture and will be the Collateral Agent under the Indenture
3571    and has been appointed by the Issuer as Registrar and Paying Agent with regard to the Notes (the "Paying
3572    Agent").

3573            4.      INDENTURE.  The Issuer issued the Notes under an Indenture, dated as of [ ],
3574    2010 (the "Indenture"), among Lyondell Chemical Company, LyondellBasell Industries N.V. (the "Com-
3575    pany"), the other Guarantors signatory thereto, the Trustee.  This Note is one of a duly authorized issue of
3576    notes of the Issuer designated as its [the lowest interest rate possible in compliance with Section 1129(b)
3577    of the Bankruptcy Code]% Senior Secured Notes due 2014.  The Issuer shall be entitled to issue Addi-
3578    tional Notes pursuant to Section 2.01 of the Indenture.  The terms of the Notes include those stated in the
3579    Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939, as
3580    amended (the "Trust Indenture Act").  The Notes are subject to all such terms, and holders are referred to
3581    the Indenture and the Trust Indenture Act for a statement of such terms.  To the extent any provision of

3582    this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall gov-
3583    ern and be controlling.

3584    　　　　5.    OPTIONAL REDEMPTION.

3585    　　　　(a)    On or after May 1, 2013, the Issuer may redeem the Notes (including any addi-
3586    tional Notes) at its option, in whole at any time or in part from time to time, upon not less than 10 nor
3587    more than 60 days' prior notice mailed by first-class mail to each holder's registered address, at a redemp-
3588    tion price equal to 100% of the principal amount thereof plus the accrued and unpaid interest to, but not
3589    including, the applicable redemption date (subject to the right of holders of record on the relevant record
3590    date to receive interest due on the relevant interest payment date).

3591    　　　　6.    [Intentionally Omitted]

3592    　　　　7.    MANDATORY REDEMPTION.  The Issuer shall not be required to make man-
3593    datory redemption or sinking fund payments with respect to the Notes.

3594    　　　　8.    NOTICE OF REDEMPTION.  Notice of redemption will be mailed by first-class
3595    mail at least 10 days but not more than 60 days before the redemption date to each holder of Notes to be
3596    redeemed at his, her or its registered address.  In the case of any partial redemption, selection of the Notes
3597    for redemption will be made by the Trustee on a *pro rata* basis to the extent practicable; *provided* that no
3598    Notes of $100,000, as applicable, principal amount or less shall be redeemed in part.  The Trustee shall
3599    make the selection from outstanding Notes not previously called for redemption.  The Trustee may select
3600    for redemption portions of the principal of Notes that have denominations larger than $100,000.  Notes
3601    and portions of them the Trustee selects shall be in amounts of $100,000 (and integral multiples of
3602    $1,000).

3603    　　　　If less than all the Notes are to be redeemed at any time in connection with an optional
3604    redemption, the Trustee will select Notes for redemption as follows:

3605    　　　　(1)    if the Notes to be redeemed are listed, in compliance with the requirements of the
3606    　　　　principal national securities exchange on which such Notes are listed; or

3607    　　　　(2)    if the Notes to be redeemed are not so listed, on a *pro rata* basis, by lot or by
3608    　　　　such method as the Trustee shall deem fair and appropriate.

3609    　　　　If money sufficient to pay the redemption price of and accrued and unpaid interest on all
3610    Notes (or portions thereof) to be redeemed on the redemption date is deposited with a Paying Agent on or
3611    before the redemption date and certain other conditions are satisfied on and after such date, interest ceases
3612    to accrue on such Notes (or such portions thereof) called for redemption.

3613    　　　　9.    [Intentionally Omitted].

3614    　　　　10.    OFFERS TO REPURCHASE.

3615    　　　　(a)    Upon the occurrence of a Change of Control, each holder shall have the right,
3616    subject to certain conditions specified in the Indenture, to cause the Issuer to repurchase all or any part of
3617    such holder's Notes at a purchase price in cash equal to 101% of the principal amount thereof, *plus* ac-
3618    crued and unpaid interest, if any, to the date of repurchase (subject to the right of the holders of record on
3619    the relevant Record Date to receive interest due on the relevant Interest Payment Date), as provided in,
3620    and subject to the terms of, the Indenture.

11.    DENOMINATIONS, TRANSFER, EXCHANGE.    The Notes are in fully regis-
tered form only, without coupons, in denominations of $100,000 and integral multiples of $1,000.  A
holder shall register the transfer or exchange of Notes in accordance with the Indenture.  The Registrar
may require a holder, among other things, to furnish appropriate endorsements and transfer documents
and to pay certain transfer taxes or similar governmental charges payable in connection therewith as per-
mitted by the Indenture.  The Registrar need not register the transfer or exchange of any Notes during a
period beginning 15 days before the mailing of a redemption notice for any Notes or portions thereof se-
lected for redemption.

12.    RANKING.  The Indebtedness evidenced by the Notes will be senior third-
priority Indebtedness of the Issuer and the Guarantors, and will rank *pari passu* in right of payment with
all existing and future senior Indebtedness of the Issuer, and will be senior in right of payment to all exist-
ing and future Subordinated Indebtedness of the Issuer.  The Notes will have the benefit of (i) a third pri-
ority security interest in the Notes Collateral that will be *pari passu* in priority with all other existing and
future Third Priority Lien Obligations, including the New Third Lien Notes, with respect to all Notes Col-
lateral and (ii) a third priority security in the ABL Facility Collateral that will be *pari passu* in priority
with all other existing and future Third Priority Lien Obligations, including the New Third Lien Notes, in
each case subject to Permitted Liens and exceptions.  In addition, the Notes will be junior in priority to
the Senior Term Loan Facility, the First Lien Notes, the ABL Facility and all other existing and future
First and Second Priority Lien Obligations with respect to all Collateral.

13.    PERSONS DEEMED OWNERS.  The registered holder of a Note may be treated
as its owner for all purposes.

14.    AMENDMENT, SUPPLEMENT AND WAIVER.  The Indenture, the Guaran-
tees or the Notes may be amended or supplemented as provided in the Indenture.

15.    DEFAULTS AND REMEDIES.  If an Event of Default occurs (other than an
Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Issuer) and
is continuing, the Trustee or the holders of at least 30% in principal amount of the outstanding Notes, in
each case, by notice to the Issuer, may declare the principal of, premium, if any, and accrued but unpaid
interest on all the Notes to be due and payable.  If an Event of Default relating to certain events of bank-
ruptcy, insolvency or reorganization of the Issuer occurs, the principal of, premium, if any, and interest on
all the Notes shall become immediately due and payable without any declaration or other act on the part
of the Trustee or any holders.  Under certain circumstances, the holders of a majority in principal amount
of the outstanding Notes may rescind any such acceleration with respect to the Notes and its conse-
quences.

If an Event of Default occurs and is continuing, the Trustee shall be under no obligation
to exercise any of the rights or powers under the Indenture at the request or direction of any of the holders
unless such holders have offered to the Trustee reasonable indemnity or security against any loss, liability
or expense and certain other conditions are complied with.  Except to enforce the right to receive payment
of principal, premium (if any) or interest when due, no holder may pursue any remedy with respect to the
Indenture or the Notes unless (i) such holder has previously given the Trustee notice that an Event of De-
fault is continuing, (ii) the holders of at least 30% in principal amount of the outstanding Notes have re-
quested the Trustee in writing to pursue the remedy, (iii) such holders have offered the Trustee reasonable
security and indemnity against any loss, liability or expense, (iv) the Trustee has not complied with such
request within 60 days after the receipt of the request and the offer of security and indemnity and (v) the
holders of a majority in aggregate principal amount of the outstanding Notes have not given the Trustee a
direction inconsistent with such request within such 60-day period.  Subject to certain restrictions, the
holders of a majority in principal amount of the outstanding Notes are given the right to direct the time,

method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. The Trustee, however, may refuse to follow any direction that conflicts with law or the Indenture or that the Trustee determines is unduly prejudicial to the rights of any other holder or that would involve the Trustee in personal liability or expense. Prior to taking any action under the Indenture, the Trustee shall be entitled to reasonable indemnification satisfactory to it in its sole discretion against all losses and expenses caused by taking or not taking such action.

16.    AUTHENTICATION. This Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose until authenticated by the manual signature of the Trustee.

17.    [Intentionally Omitted].

18.    GOVERNING LAW. THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN AND BE USED TO CONSTRUE THE INDENTURE, THE NOTES AND THE GUARANTEES.

19.    CUSIP AND ISIN NUMBERS. Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP and ISIN numbers to be printed on the Notes and the Trustee may use CUSIP and ISIN numbers in notices of redemption as a convenience to holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

The Issuer will furnish to any holder upon written request and without charge a copy of the Indenture. Requests may be made to the Issuer at the following address:

Lyondell Chemical Company
1221 McKinney St
Suite 700
Houston, TX  77010
Facsimile: (713) 652-7312
Attention: Gerald A. O'Brien

ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to: _____

(Insert assignee's legal name)

_____

(Insert assignee's Soc. Sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____

to transfer this Note on the books of the Issuer.  The agent may substitute another to act for him.

Date: _____

Your Signature: _____

(Sign exactly as your name appears on
the face of this Note)

Signature Guarantee*: _____

_____

*      Participant in a recognized Signature Guarantee Medallion Program (or other
       signature guarantor acceptable to the Trustee).

3716                SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE*

3717            The initial outstanding principal amount of this Global Note is $_____.  The fol-
3718    lowing exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive
3719    Note, or exchanges of a part of another Global or Definitive Note for an interest in this Global Note, have
3720    been made:

| Date of Exchange | Amount of decrease in Principal Amount | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease or increase | Signature of authorized officer of Trustee or Note Custodian |
|---|---|---|---|---|
| | | | | |

3721
3722
3723    _____
3724    *This schedule should be included only if the Note is issued in global form.

3725                                                                                    EXHIBIT B

3726            [FORM OF SUPPLEMENTAL INDENTURE RELATED TO SUBSIDIARY GUARANTORS]

3727            SUPPLEMENTAL INDENTURE (this "Supplemental Indenture") dated as of
3728    [          ], among [GUARANTOR] (the "New Guarantor"), a subsidiary of LYONDELLBASELL IN-
3729    DUSTRIES N.V., a public limited liability company formed under the laws of The Netherlands (or its
3730    successor) (the "Company"), LYONDELL CHEMICAL COMPANY, a Delaware corporation, (the "Is-
3731    suer"),[3] and WELLS FARGO,  N.A., a national banking association, as trustee under the indenture re-
3732    ferred to below (the "Trustee").

3733                            W I T N E S S E T H :

3734            WHEREAS the Issuer the Company and the other Guarantors signatory thereto have
3735    heretofore executed and delivered to the Trustee an indenture (as amended, supplemented or otherwise
3736    modified, the "Indenture") dated as of [  ], 2010 [as supplemented] providing for the issuance of (i) $[  ]
3737    aggregate principal amount of the Issuer's [the lowest interest rate possible in compliance with Section
3738    1129(b) of the Bankruptcy Code]% Senior Secured Notes due 2014 (the "Notes");

3739            WHEREAS Section 4.11 of the Indenture provides that under certain circumstances the
3740    Issuer is required to cause the New Guarantor to execute and deliver to the Trustee a supplemental inden-
3741    ture pursuant to which the New Guarantor shall unconditionally guarantee all the Issuer's Obligations
3742    under the Notes and the Indenture pursuant to a Guarantee on the terms and conditions set forth herein;
3743    and

3744            WHEREAS pursuant to Section 9.01 of the Indenture, the Trustee, the Issuer, the Com-
3745    pany and other existing Guarantors, if any, are authorized to execute and deliver this Supplemental Inden-
3746    ture;

3747            NOW THEREFORE, in consideration of the foregoing and for other good and valuable
3748    consideration, the receipt of which is hereby acknowledged, the New Guarantor, the Company, the Issuer
3749    and the Trustee mutually covenant and agree for the equal and ratable benefit of the holders of the Notes
3750    as follows:

3751            1.      Defined Terms.  As used in this Supplemental Indenture, terms defined in the In-
3752    denture or in the preamble or recital hereto are used herein as therein defined, except that the term
3753    "holders" in this Supplemental Indenture shall refer to the term "holders" as defined in the Inden-
3754    ture and the Trustee acting on behalf of and for the benefit of such holders.  The words "herein,"
3755    "hereof" and "hereby" and other words of similar import used in this Supplemental Indenture re-
3756    fer to this Supplemental Indenture as a whole and not to any particular section hereof.

3757            2.      Agreement to Guarantee.  The New Guarantor hereby agrees, jointly and sever-
3758    ally with all existing guarantors (if any), to unconditionally guarantee the Issuer's Obligations
3759    under the Notes and the Indenture on the terms and subject to the conditions set forth in Article

---

[3]     Delete this reference if supplemental indenture Exhibit E is signed prior to signing of this Sup-
        plemental Indenture.

3760 XII of the Indenture and to be bound by all other applicable provisions of the Indenture and the
3761 Notes and to perform all of the obligations and agreements of a guarantor under the Indenture.

3762     3. <u>Notices</u>. All notices or other communications to the New Guarantor shall be
3763 given as provided in Section 13.02 of the Indenture.

3764     4. <u>Ratification of Indenture; Supplemental Indentures Part of Indenture</u>. Except as
3765 expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the
3766 terms, conditions and provisions thereof shall remain in full force and effect. This Supplemental
3767 Indenture shall form a part of the Indenture for all purposes, and every holder of Notes heretofore
3768 or hereafter authenticated and delivered shall be bound hereby.

3769     5. <u>Governing Law</u>. **THIS SUPPLEMENTAL INDENTURE SHALL BE GOV-**
3770 **ERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE**
3771 **STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF**
3772 **LAW.**

3773     6. <u>Trustee Makes No Representation</u>. The Trustee makes no representation as to
3774 the validity or sufficiency of this Supplemental Indenture.

3775     7. <u>Counterparts</u>. The parties may sign any number of copies of this Supplemental
3776 Indenture. Each signed copy shall be an original, but all of them together represent the same
3777 agreement.

3778     8. <u>Effect of Headings</u>. The Section headings herein are for convenience only and
3779 shall not effect the construction thereof.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

[NEW GUARANTOR]


By: _____
    Name:
    Title:


WELLS FARGO, N.A.
as Trustee


By: _____
    Name:
    Title:

3791    Acknowledged by:

3792    LYONDELL CHEMICAL COMPANY
3793

3794    By:    _____
3795        Name:
3796        Title:


3797    LYONDELLBASELL INDUSTRIES N.V.


3798    By:    _____
3799        Name:
3800        Title:


3801

**TAB 15**

**WARRANT AGREEMENT**

**dated as of [_____], 2010**

**between**

**LyondellBasell Industries N.V.**

**and**

**[_____]**
**as Warrant Agent**

# TABLE OF CONTENTS

Page

## ARTICLE 1

## DEFINITIONS

Section 1.01    Certain Definitions ..................................................................................... 1

## ARTICLE 2

## ISSUANCE, EXECUTION AND TRANSFER OF WARRANTS

Section 2.01    Issuance of Warrants ..................................................................... 9
Section 2.02    Execution and Authentication of Warrants ...................................... 9
Section 2.03    Form of Warrant Certificates ........................................................ 10
Section 2.04    Securities Law Compliance .......................................................... 10
Section 2.05    EEA Securities Law Compliance .................................................. 10
Section 2.06    Registration, Transfer, Exchange and Substitution ........................ 11
Section 2.07    Global Warrants ........................................................................... 12
Section 2.08    Surrender of Warrant Certificates ................................................. 13

## ARTICLE 3

## EXERCISE AND SETTLEMENT OF WARRANTS

Section 3.01    Exercise of Warrants ..................................................................... 14
Section 3.02    Procedure for Exercise .................................................................. 14
Section 3.03    Settlement of Warrants .................................................................. 14
Section 3.04    Delivery of Class A Common Stock .............................................. 15
Section 3.05    No Fractional Shares to Be Issued ................................................ 16
Section 3.06    Acquisition of Warrants by Company ............................................ 16
Section 3.07    Obligations of the Warrant Agent ................................................. 17
Section 3.08    Validity of Exercise ...................................................................... 17
Section 3.09    Direction of Warrant Agent .......................................................... 17

# ARTICLE 4

## ADJUSTMENTS

Section 4.01    Adjustments to Exercise Price ........................................................ 18

Section 4.02    Adjustments to Number of Warrants .............................................. 21

Section 4.03    Certain Distributions of Rights and Warrants ................................ 21

Section 4.04    No Impairment ............................................................................... 22

Section 4.05    Other Adjustments if Net Share Settlement Applies ...................... 23

Section 4.06    Discretionary Adjustments ............................................................. 23

Section 4.07    Restrictions on Adjustments .......................................................... 23

Section 4.08    Deferral of Adjustments ................................................................ 24

Section 4.09    Reclassifications and Other Changes ............................................. 25

Section 4.10    Consolidation, Merger and Sale of Assets ..................................... 28

Section 4.11    Common Stock Outstanding .......................................................... 29

Section 4.12    Calculations Final .......................................................................... 29

Section 4.13    Notice of Adjustments ................................................................... 29

Section 4.14    Warrant Agent Not Responsible for Adjustments or Validity ......... 29

Section 4.15    Statements on Warrants ................................................................. 30

# ARTICLE 5

## OTHER PROVISIONS RELATING TO RIGHTS OF WARRANTHOLDERS

Section 5.01    No Rights as Stockholders ............................................................. 30

Section 5.02    Mutilated or Missing Warrant Certificates ..................................... 30

Section 5.03    Modification, Waiver and Meetings ............................................... 31

# ARTICLE 6

## CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 6.01    Payment of Certain Taxes .............................................................. 31

Section 6.02    Change of Warrant Agent .............................................................. 32

Section 6.03    Compensation; Further Assurances ............................................... 33

Section 6.04    Reliance on Counsel ...................................................................... 34

Section 6.05    Proof of Actions Taken .................................................................. 34

Section 6.06    Correctness of Statements......................................................................... 34

Section 6.07    Validity of Agreement .............................................................................. 34

Section 6.08    Use of Agents........................................................................................... 34

Section 6.09    Liability of Warrant Agent........................................................................ 34

Section 6.10    Legal Proceedings .................................................................................... 35

Section 6.11    Other Transactions in Securities of the Company.......................................... 35

Section 6.12    Actions as Agent ...................................................................................... 35

Section 6.13    Appointment and Acceptance of Agency ...................................................... 35

Section 6.14    Successors and Assigns ............................................................................. 35

Section 6.15    Notices ................................................................................................... 35

Section 6.16    Applicable Law; Jurisdiction .................................................................... 36

Section 6.17    Benefit of this Warrant Agreement .............................................................. 36

Section 6.18    Registered Warrantholders........................................................................ 37

Section 6.19    Inspection of this Warrant Agreement.......................................................... 37

Section 6.20    Termination ............................................................................................. 37

Section 6.21    Headings ................................................................................................. 37

Section 6.22    Counterparts............................................................................................ 37

Section 6.23    Entire Agreement ..................................................................................... 37

Section 6.24    Severability ............................................................................................. 37

EXHIBIT A      FORM OF GLOBAL WARRANT LEGEND............................................... A-1

EXHIBIT B      FORM OF WARRANT CERTIFICATE ..................................................... B-1

EXHIBIT C      FORM OF CLASS A COMMON SHARES REQUISITION ORDER.......... C-1

# WARRANT AGREEMENT

This Warrant Agreement ("**Warrant Agreement**") dated as of [_____], 2010 is between LyondellBasell Industries N.V., a public limited liability corporation formed under the laws of the Netherlands (the "**Company**"), and [_____] (the "**Warrant Agent**").

## WITNESSETH THAT:

WHEREAS, pursuant to the terms and conditions of the Third Amended Plan of Reorganization, dated March 12, 2010, as the same may be amended, modified or restated from time to time (the "**Plan**") relating to the reorganization under Chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") of Lyondell Chemical Company and certain of its direct and indirect subsidiaries and LyondellBasell Industries AF S.C.A. ("**LBIAF**") and certain of its affiliates, certain parties identified in the Plan and listed on Schedule I hereto (such parties, the "**Initial Warrantholders**") are to be issued warrants (the "**Warrants**") exercisable until the Expiration Date (as defined below), to purchase up to an aggregate of 11,508,204 shares of Class A Common Stock at an exercise price of $15.90 per share, as the same may be adjusted pursuant to Section 4 hereof (the "**Exercise Price**");

WHEREAS, the Warrants are being issued pursuant to, and upon the terms and conditions set forth in, the Plan in an offering in reliance on the exemption afforded by section 1145 of the Bankruptcy Code from the registration requirements of the Securities Act, and of any applicable state securities or "blue sky" laws;

WHEREAS, the Company desires that the Warrant Agent act on behalf of the Company, and the Warrant Agent is willing to act, in connection with the issuance, exchange, transfer, substitution and exercise of Warrants;

NOW THEREFORE in consideration of the mutual agreements herein contained, the Company and the Warrant Agent agree as follows:

## ARTICLE 1

### DEFINITIONS

Section 1.01  *Certain Definitions.*  As used in this Warrant Agreement, the following terms shall have their respective meanings set forth below:

"**$**" refers to such coin or currency of the United States as at any time of payment is legal tender for the payment of public and private debts.

"**Adjustment Event**" has the meaning set forth in Section 4.08.

"**Affiliate**" shall mean, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.

"**Affiliate Change of Control Consideration**" shall mean the value of the stock, other securities, other property or assets (including cash or any combination thereof) to be received per share of Class A Common Stock, pursuant to the Affiliate Change of Control Event (to be calculated consistent with the principles set forth in Section 4.09(c) with respect to the calculation of Unit Value).

"**Affiliate Change of Control Date**" shall mean the date on which an Affiliate Change of Control Event is consummated.

"**Affiliate Change of Control Event**" shall mean the consummation of a transaction pursuant to which (i) a Rights Offering Sponsor directly or indirectly (whether through a portfolio holding company or otherwise) beneficially owns 50.1% or more of the outstanding Class A Common Stock and Class B Common Stock, taken as a whole (determined on a Fully-Diluted Basis) and (ii) the Class A Common Stock ceases to be traded on the New York Stock Exchange and on each other U.S. national or regional securities exchange or quotation system on which such Class A common Stock has previously traded.

"**Affiliate Change of Control Payment Amount**" shall mean (A) if the Affiliate Change of Control Consideration exceeds the Exercise Price, an amount in Cash equal to (1) Affiliate Change of Control Consideration minus (2) the Exercise Price or (B) if the Affiliate Change of Control Consideration does not exceed the Exercise Price, an amount in Cash equal to the Black Scholes Warrant Value (as defined below) of the Warrant.

"**Affiliate Change of Control Payment Date**" has the meaning set forth in Section 4.09(e).

"**Affiliate Change of Control Put**" has the meaning set forth in Section 4.09(e).

"**Affiliate Change of Control Put Notice**" has the meaning set forth in Section 4.09(e).

"**Affiliate Change of Control Put Warrants**" has the meaning set forth in Section 4.09(e).

"**Agent Members**" has the meaning set forth in Section 2.07(b).

"**Authentication Order**" means a Company Order for authentication and delivery of Warrants.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Black Scholes Warrant Value**" as of any date, shall mean the value of a Warrant to purchase one share of Class A Common Stock (as determined in good faith by a majority of the non-affiliate directors of the Board of Directors based upon the advice of an independent investment bank of national standing selected by a majority of the non-affiliate directors of the Board of Directors) and shall be determined by customary investment banking practices using the Black Scholes model. For purposes of calculating such amount, (1) the term of the Warrants will be the period from the date of determination until the Expiration Date, (2) the fair market value of each share of Class A Common Stock will be the Current Market Price as of the date of

determination, (3) the assumed volatility will be determined based on information available prior to the first announcement of the Affiliate Change of Control Event by such independent investment banking firm as of the date of determination, (4) the assumed risk-free rate will equal the yield on the U.S. Treasury security with a maturity closest to the seventh anniversary of the Closing Date, as the yield on that security exists as of the date of determination, (5) the assumed dividends will be based solely on historical dividend paying practice of the Company (not taking into account any dividends that are not Ordinary Cash Dividends) and (6) any other assumptions shall be made by a majority of the non-affiliate directors in good faith based upon the advice of such independent investment bank at the time of determination.  For purposes of this definition, "non-affiliate directors" means the directors of the Board of Directors other than those directors who are affiliated with, or a nominee or appointee of, the Rights Offering Sponsor causing such Affiliate Change of Control Event.

"**Board of Directors**" means the supervisory board of the Company or any committee of such supervisory board duly authorized to exercise the power of such supervisory board with respect to the matters provided for in this Warrant Agreement as to which the supervisory board is authorized or required to act.

"**Business Day**" means any day other than a Saturday or Sunday or other than a day on which banking institutions in New York City, New York are authorized or obligated by law or executive order to close.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of the Company and all warrants or options to acquire such capital stock.

"**Cash**" means such coin or currency of the United States as at any time of payment is legal tender for the payment of public and private debts.

"**Certificated Warrant**" means a Warrant represented by a Warrant Certificate, in definitive, fully registered form.

"**Class A Common Stock**" means the Class A ordinary shares, par value four eurocent (€0.04) per share, of the Company.

"**Class B Common Stock**" means the Class B ordinary shares, par value four eurocent (€0.04) per share, of the Company.

"**Close of Business**" means 5:00 p.m., New York City time.

"**Closing Date**" means the effective date of the Plan.

"**Closing Sale Price**" means, as of any date, the last reported per share sales price of a share of Class A Common Stock or any other security on such date (or, if no last reported sale price is reported, the average of the bid and ask prices on, or if more than one in either case, the average of the average bid and the average ask prices on such date) as reported on the New York Stock Exchange, or if the Class A Common Stock or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange

or quotation system on which the Class A Common Stock or such other security is then listed or quoted, or if the Class A Common Stock or such other security is not so listed or reported , as reported on the OTC Bulletin Board or, if not so listed or reported, as reported in the "pink sheets" published by Pink OTC Markets, Inc. (or similar organization or agency succeeding to its functions of reporting prices); *provided*, *however*, that in the absence of such quotations, the Board of Directors will make a good faith determination of the Closing Sale Price.

If during a period applicable for calculating Closing Sale Price, an issuance, distribution, subdivision, combination or other transaction or event occurs that requires an adjustment to the Exercise Price or Number of Warrants pursuant to Article 3 hereof, Closing Sale Price shall be calculated for such period in a manner determined by the Company to appropriately reflect the impact of such issuance, distribution, subdivision or combination on the price of the Class A Common Stock during such period.

"**Common Stock**" means the Class A Common Stock and the Class B Common Stock.

"**Company**" has the meaning set forth in the preamble.

"**Company Order**" means a written order signed in the name of the Company by any two officers, at least one of whom must be its Chief Executive Officer, its Chief Financial Officer, its Treasurer, an Assistant Treasurer, or its Controller, and delivered to the Warrant Agent.

"**Current Market Price**" means, (i) in connection with a dividend, issuance or distribution, the volume weighted average price per share of Class A Common Stock for the twenty (20) Trading Days ending on, but excluding, the earlier of the date in question and the Trading Day immediately preceding the Ex-Date for such dividend, issuance or distribution and (ii) in connection with a determination of Black Scholes Warrant Value, the volume weighted average price per share of Class A Common Stock for the twenty (20) Trading Days ending on, but excluding, the date of determination, in each case, for the regular trading session (including any extensions thereof, without regard to pre-open or after hours trading outside of such regular trading session) as reported on the New York Stock Exchange, or if the Class A Common Stock or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Class A Common Stock or such other security is then listed or quoted, whichever is applicable, as published by Bloomberg at 4:15 p.m., New York City time (or 15 minutes following the end of any extension of the regular trading session), or if the Class A Common Stock is not so listed or quoted, as reported on the OTC Bulletin Board or, if not so reported, as reported in the "pink sheets" published by Pink OTC Markets, Inc. (or similar organization or agency succeeding to its functions of reporting prices), on such Trading Day, or if such volume weighted average price is unavailable or in manifest error, the market value of one share of Class A Common Stock during such twenty (20) Trading Day period determined using a volume weighted average price method by an independent nationally recognized investment bank or other qualified financial institution selected by the Board of Directors and reasonably acceptable to the Warrant Agent.  If the Class A Common Stock is not traded on the New York Stock Exchange or any U.S. national or regional securities exchange or quotation system or not reported on the OTC Bulletin Board or in the "pink sheets," the Current Market Price shall be the price per share of Class A Common

Stock that the Company could obtain from a willing buyer for shares of Class A Common Stock sold by the Company from authorized but unissued shares of Class A Common Stock, as such price shall be reasonably determined in good faith by the Company's Board of Directors.

"**Depositary**" means The Depository Trust Company, its nominees, and their respective successors.

"**Determination Date**" has the meaning set forth in Section 4.08.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Ex-Date**" means, in connection with any dividend, issuance or distribution, the first date on which the shares of Common Stock trade on the applicable exchange or in the applicable market, regular way, without the right to receive such dividend, issuance or distribution.

"**Exercise Date**" has the meaning set forth in Section 3.02(b).

"**Exercise Notice**" means, for any Warrant, the exercise notice set forth on the reverse of the Warrant Certificate, substantially in the form set forth in Exhibit B hereto.

"**Exercise Price**" means initially $15.90 per Warrant, subject to adjustment pursuant to Article 3.

"**Expiration Date**" means, for any Warrant, the date that is the seventh anniversary of the date hereof, or if not a Business Day, then the next Business Day thereafter.

"**Full Physical Settlement**" means the settlement method pursuant to which an exercising Warrantholder shall be entitled to receive from the Company, for each Warrant exercised, a number of shares of Class A Common Stock equal to the Full Physical Share Amount in exchange for payment by the Warrantholder of the Exercise Price.

"**Full Physical Share Amount**" has the meaning set forth in Section 3.03(b).

"**Fully-Diluted Basis**" means, with respect to any class or series of equity securities of the Company as of any date of determination, (a) all outstanding shares of capital stock of that class or series as of that date and (b) the maximum number of shares of capital stock of that class or series then issuable in respect of all securities convertible into or exchangeable for, all stock appreciation rights relating to, and all options, warrants and other rights to purchase, subscribe for or otherwise acquire upon the exercise or conversion thereof, shares of that class or series of equity securities of the Company, in each case that are in-the-money based on the Closing Sale Price of the underlying security as of the date of determination and exercisable within 60 days of the date of determination.

"**Global Warrant**" means a Warrant in the form of a permanent global Warrant Certificate, in definitive, fully registered form.

"**Global Warrant Legend**" means the legend set forth in Section 2.07(b).

"**Initial Warrantholders**" has the meaning set forth in the Recitals.

"**LBIAF**" has the meaning set forth in the Recitals.

"**Management Board**" means the management board of the Company (*bestuur*).

"**Net Share Amount**" has the meaning set forth in Section 3.03(c).

"**Net Share Settlement**" means the settlement method pursuant to which an exercising Warrantholder shall be entitled to receive from the Company, for each Warrant exercised, a number of shares of Class A Common Stock equal to the Net Share Amount without any payment therefor.

"**Net Share Settlement Price**" means, as of any date, the volume weighted average price per share of Class A Common Stock for the twenty (20) Trading Days prior to the date of determination of the Net Share Settlement Price for the regular trading session (including any extensions thereof, without regard to pre-open or after hours trading outside of such regular trading session) as reported on the New York Stock Exchange, or if the Class A Common Stock or such other security is not listed on the New York Stock Exchange, as reported by the principal U.S. national or regional securities exchange or quotation system on which the Class A Common Stock or such other security is then listed or quoted, whichever is applicable, as published by Bloomberg at 4:15 p.m., New York City time (or 15 minutes following the end of any extension of the regular trading session), or if the Class A Common Stock is not so listed or quoted, as reported on the OTC Bulletin Board or, if not so reported, as reported in the "pink sheets" published by Pink OTC Markets, Inc. (or similar organization or agency succeeding to its functions of reporting prices), on such Trading Day, or if such volume weighted average price is unavailable or in manifest error, the market value of one share of Class A Common Stock during such twenty (20) Trading Day period determined using a volume weighted average price method by an independent nationally recognized investment bank or other qualified financial institution reasonably acceptable to the Warrant Agent. If the Class A Common Stock is not traded on the New York Stock Exchange or any U.S. national or regional securities exchange or quotation system or not reported on the OTC Bulletin Board or in the "pink sheets," the Net Share Settlement Price shall be the price per share of Class A Common Stock that the Company could obtain from a willing buyer for shares of Class A Common Stock sold by the Company from authorized but unissued shares of Class A Common Stock, as such prices shall be reasonably determined in good faith by the Company's Board of Directors.

If during a period applicable for calculating Net Share Settlement Price, an issuance, distribution, subdivision, combination or other transaction or event occurs that requires an adjustment to the Exercise Price or Number of Warrants pursuant to Article 3 hereof, the Net Share Settlement Price shall be calculated for such period in a manner determined by the Company to appropriately reflect the impact of such issuance, distribution, subdivision or combination on the price of the Class A Common Stock during such period.

"**New Warrants**" has the meaning set forth in Section 4.09(e).

"**Number of Warrants**" means, for a Warrant Certificate, the "Number of Warrants" specified on the face of such Warrant Certificate (or, in the case of a Global Warrant, on Schedule A to such Warrant Certificate), subject to adjustment pursuant to Article 3.

"**Officer's Certificate**" means a certificate signed by a member of the Management Board of the Company or such other person he appoints by proxy.

"**Open of Business**" means 9:00 a.m., New York City time.

"**Ordinary Cash Dividend**" means regular quarterly or other periodic dividends declared and paid pursuant to a dividend policy established by the Board of Directors, not to exceed in the four most recently completed fiscal quarters of the Company, 45% of the consolidated net income of the Company and its consolidated subsidiaries (determined in accordance with United States generally accepted accounting principles) for the four most recently completed fiscal quarters.

"**Person**" means an individual, partnership, firm, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"**Plan**" has the meaning set forth in the Recitals.

"**Pro Rata Repurchase**" means any purchase of shares of Common Stock by the Company or any Affiliate thereof pursuant to (a) any tender offer or exchange offer subject to Section 13(e) or 14(e) of the Exchange Act or Regulation 14E promulgated thereunder or (b) any other offer available to substantially all holders of Common Stock, in the case of both (a) or (b), whether for cash, shares of Capital Stock of the Company, other securities of the Company, evidences of indebtedness of the Company or any other Person or any other property (including, without limitation, shares of Capital Stock, other securities or evidences of indebtedness of a subsidiary), or any combination thereof, effected while a Warrant is outstanding.  The "**Effective Date**" of a Pro Rata Repurchase shall mean the date of acceptance of shares for purchase or exchange by the Company under any tender or exchange offer which is a Pro Rata Repurchase or the date of purchase with respect to any Pro Rata Repurchase that is not a tender or exchange offer.

"**Prospectus Directive**" means Directive 2003/71/EC and any relevant implementing measures in each applicable member state of the European Economic Area.

"**Record Date**" means, with respect to any dividend, distribution or other transaction or event in which the holders of Common Stock have the right to receive any cash, securities or other property or in which Common Stock (or other applicable security) is exchanged for or converted into any combination of cash, securities or other property, the date fixed for determination of holders of Common Stock entitled to receive such cash, securities or other property (whether such date is fixed by the Board of Directors or by statute, contract or otherwise).

"**Reference Property**" has the meaning set forth in Section 4.09(a).

"**Reorganization Event**" has the meaning set forth in Section 4.09(a).

"**Rights Offering Sponsor**" means any of LeverageSource (Delaware) LLC, an affiliate of Apollo Management VII, L.P., AI LBI Investment LLC, an affiliate of Access Industries, and Ares Corporate Opportunities Fund III, L.P and any of their respective Affiliates.

"**SEC**" means the United States Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Settlement Date**" means, in respect of a Warrant that is exercised hereunder, the third Trading Day immediately following the Exercise Date for such Warrant.

"**Trading Day**" means (i) if the applicable security is listed on the New York Stock Exchange, a day on which trades may be made thereon or (ii) if the applicable security is listed or admitted for trading on the American Stock Exchange, the NASDAQ Global Select Market, the NASDAQ Global Market or other national securities exchange or market, a day on which the American Stock Exchange, the NASDAQ Global Select Market, the NASDAQ Global Market or such other national securities exchange or market, respectively, is open for business or (iii) if the applicable security is not so listed, admitted for trading or quoted, any Business Day.

"**Trigger Event**" has the meaning set forth in Section 4.03(a).

"**Unit of Reference Property**" has the meaning set forth in Section 4.09(a).

"**Unit Value**" has the meaning set forth in Section 4.09(c).

"**Vice President**" means any vice president, whether or not designated by a number or a word or words added before or after the title "vice president" of the Company.

"**Voting Stock**" means Capital Stock having the right to vote for the election of directors under ordinary circumstances.

"**Warrant**" means a warrant of the Company exercisable for one share of Class A Common Stock as provided herein, and issued pursuant to this Warrant Agreement with the terms, conditions and rights set forth in this Warrant Agreement.

"**Warrant Agent**" means [_____], in its capacity as warrant agent hereunder.

"**Warrant Certificate**" means any certificate representing Warrants satisfying the requirements set forth in Section 2.03.

"**Warrant Register**" has the meaning set forth in Section 2.06.

"**Warrantholder**" means each Person in whose name Warrants are registered in the Warrant Register.

ARTICLE 2

ISSUANCE, EXECUTION AND TRANSFER OF WARRANTS

Section 2.01  *Issuance of Warrants.*  (a)  The Company shall execute and deliver to the Warrant Agent, for authentication and delivery to the Depositary, or its custodian, for crediting to the accounts of its participants for the benefit of the Initial Warrantholders pursuant to the procedures of the Depositary on the Closing Date, one or more Global Warrants, together with an Authentication Order with respect thereto, evidencing an initial aggregate Number of Warrants equal to 11,508,204 (such Number of Warrants subject to adjustment from time to time as described herein) in accordance with the terms of this Warrant Agreement and the Plan.  Each Global Warrant shall evidence one or more Warrants.  Each Warrant evidenced thereby entitles the holder, upon proper exercise and payment of the applicable Exercise Price to receive from the Company, as adjusted as provided herein, one share of Class A Common Stock at the Exercise Price.  The Warrant Agent shall, upon receipt of such Global Warrant and Authentication Order, authenticate, manually countersign and on the Closing Date, deliver such Global Warrant to the Depositary, or its custodian, for crediting to the accounts of its participants pursuant to the procedures of the Depositary in accordance with Section 2.02.  All such Warrants shall be dated as of the Closing Date.

(b)     Except as set forth in Section 2.06 and Section 5.02, the Warrants delivered to the Depositary, or a nominee thereof on the Closing Date shall be the only Warrants issued or outstanding under this Warrant Agreement.

(c)     All Warrants issued under this Warrant Agreement shall in all respects be equally and ratably entitled to the benefits hereof, without preference, priority, or distinction on account of the actual time of the issuance and authentication or any other terms thereof.

Section 2.02  *Execution and Authentication of Warrants.*   (a)  Warrants shall be executed on behalf of the Company by the Chief Executive Officer or any person delegated by the Chief Executive Officer and attested by the Company's Secretary or any one of its Assistant Secretaries.  The signature of any such person on Warrants may be manual or facsimile.  Typographical and other minor errors or defects in any such signature shall not affect the validity or enforceability of any Warrant that has been duly authenticated and delivered by the Warrant Agent.

(b)     Warrants bearing the manual or facsimile signatures of individuals, each of whom was, at the time he or she signed such Warrant or his or her facsimile signature was affixed to such Warrant, as the case may be, an authorized representative of the Company, shall bind the Company, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Warrants or did not hold such offices at the date of such Warrants.

(c)     No Warrant shall be entitled to any benefit under this Warrant Agreement or be valid or obligatory for any purpose unless there appears on such Warrant a certificate of authentication substantially in the form provided for herein executed by the Warrant Agent by manual or facsimile signature, and such signature upon any Warrant shall be conclusive

evidence, and the only evidence, that such Warrant has been duly authenticated and delivered hereunder.

Section 2.03    *Form of Warrant Certificates.*    Each Warrant Certificate shall be in substantially the form set forth in Exhibit B hereto and shall have such insertions as are appropriate or required by this Warrant Agreement and may have such letters, numbers or other marks of identification and such legends and endorsements, stamped, printed, lithographed or engraved thereon, as the Company may deem appropriate and as are not inconsistent with the provisions of this Warrant Agreement, such as may be required to comply with this Warrant Agreement, any law or any rule of any securities exchange on which Warrants may be listed, and such as may be necessary to conform to customary usage.

Section 2.04    *Securities Law Compliance.*    The Warrants (including any Class A Common Stock issued upon exercise thereof) are issued pursuant to an exemption from the registration requirements of Section 5 of the Securities Act provided by Section 1145 of the Bankruptcy Code.  Any Warrant that is purchased or owned by any "underwriter" as defined in Section 1145(b)(1) of the Bankruptcy Code, may not be resold by such holder, and such holder may not be able to transfer any Warrants or Class A Common Stock issuable upon exercise of any Warrant in the absence of an exemption from registration under the Securities Act and state securities laws.

Section 2.05    *EEA Securities Law Compliance.*    In relation to each member state of the European Economic Area ("EEA") which has implemented the Prospectus Directive (each, a "Relevant Member State"), an offer to the public of the Warrants as provided in this Warrant Agreement may not be made in that Relevant Member State, except that an offer to the public in that Relevant Member State of any Warrants may be made at any time under the following exemptions under the Prospectus Directive, in that Relevant Member State:

(a)    to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

(b)    to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in the relevant entity's last annual or consolidated accounts;

(c)    to fewer than 100 natural or legal persons (other than qualified investors as defined in the Prospectus Directive); or

(d)    in any other circumstances which do not require the publication by the Company of a prospectus pursuant to Article 3(2) of the Prospectus Directive,

provided that no such offer of Warrants will result in a requirement for the publication by the Company of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer to the public" in relation to any Warrants in any Relevant Member State means the communication in any form and by any

means of sufficient information the terms of the offer as provided in this Warrant Agreement to be offered so as to enable an investor to decide to purchase or subscribe for Warrants, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression Prospectus Directive means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

In the case of any Warrants being offered to a financial intermediary (as that term is used in Article 3(2) of the Prospectus Directive), such financial intermediary will also be deemed to have represented, acknowledged and agreed that the Warrants acquired by it have not been acquired on a non-discretionary basis on behalf of, nor have they been acquired with a view to their offer or resale to persons in circumstances which may give rise to an offer of any Warrants to the public other than their offer of resale in a relevant Member State to qualified investors as so defined. The Company and its affiliates, and others will rely upon the truth and accuracy of the foregoing representation, acknowledgement and agreement. Notwithstanding the foregoing, a person who is not a qualified investor and who meets at least two of the following requirements (i) 10 significant transactions on a regulated market, (ii) size of such persons security portfolio exceeds EU 50,000 and (iii) who has at least one year of relevant working experience, and has voluntarily registered with the Authority for Financial Markets ("AFM"), and has notified the Company of such fact in writing may, with the consent of the Company, be permitted to purchase Warrants.

Section 2.06    *Registration, Transfer, Exchange and Substitution.*    (a) The Company shall cause to be kept at the office of the Warrant Agent, and the Warrant Agent shall maintain, a register (the "**Warrant Register**") in which, subject to such reasonable regulations as the Company may prescribe and such regulations as may be prescribed by law, the Company shall provide for the registration of Warrants and transfers, exchanges or substitutions of Warrants as herein provided.   All Warrants issued upon any registration of transfer or exchange of or substitution for Warrants shall be valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Warrant Agreement, as Warrants surrendered for such registration of transfer, exchange or substitution.

(b)    Transfers of a Global Warrant registered in the name of the Depositary or its nominee shall be limited to transfers in whole, and not in part, to the Company, the Depositary, their successors, and their respective nominees.   Interests of beneficial owners in a Global Warrant registered in the name of the Depositary or its nominee shall be transferred in accordance with this Warrant Agreement and the procedures of the Depositary.

(c)    A Warrantholder may transfer a Certificated Warrant only upon surrender of such Certificated Warrant for registration of transfer.   Certificated Warrants may be presented for registration of transfer and exchange at the offices of the Warrant Agent with a written instruction of transfer in form satisfactory to the Warrant Agent, duly executed by such Warrantholder or by such Warrantholder's attorney, duly authorized in writing.   No such transfer shall be effected until, and the transferee shall succeed to the rights of a Warrantholder only upon, final acceptance and registration of the transfer in the Warrant Register by the Warrant Agent.   Prior to the registration of any transfer of a Certificated Warrant by a Warrantholder as provided herein, the Company, the Warrant Agent, and any agent of the Company or the Warrant Agent may treat the Person in whose name Warrants are registered as the owner thereof for all

purposes and as the Person entitled to exercise the rights represented thereby, any notice to the contrary notwithstanding.

(d)    Every Certificated Warrant presented or surrendered for registration of transfer or for exchange or substitution shall (if so required by the Company or the Warrant Agent) be duly endorsed, or be accompanied by a duly executed instrument of transfer in form satisfactory to the Company and the Warrant Agent, by the holder thereof or such Warrantholder's attorney duly authorized in writing.

(e)    When Certificated Warrants are presented to the Warrant Agent with a request to register the transfer of, or to exchange or substitute, such Warrants, the Warrant Agent shall register the transfer or make the exchange or substitution as requested if its requirements for such transactions and any applicable requirements hereunder are satisfied.  To permit registrations of transfers, exchanges and substitutions, the Company shall execute Warrant Certificates at the Warrant Agent's request and the Warrant Agent shall countersign and deliver such Warrant Certificates.  No service charge shall be made for any registration of transfer or exchange of or substitution for Warrants, but the Company may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer of Warrants.

(f)    A Certificated Warrant may be exchanged at the option of the holder or holders thereof, when presented or surrendered in accordance with this Warrant Agreement, for another Warrant Certificate or other Warrant Certificates of like tenor and representing in the aggregate a like Number of Warrants.  If less than all Warrants represented by a Certificated Warrant are transferred, exchanged or substituted in accordance with this Warrant Agreement, the Warrant Certificate shall be surrendered to the Warrant Agent and a new Warrant Certificate for a Number of Warrants equal to the Warrants represented by such Warrant Certificate that were not transferred, exchanged or substituted, registered in such name or names as may be directed in writing by the surrendering Warrantholder, shall be executed by the Company and delivered to the Warrant Agent and the Warrant Agent shall countersign such new Warrant Certificate and shall deliver such new Warrant Certificate to the Person or Persons entitled to receive the same.

Section 2.07    *Global Warrants.*  (a)  The Warrants shall initially be issued in the form of one or more Global Warrants up to the aggregate Number of Warrants outstanding, to be registered in the name of the Depositary, or its nominee, and delivered by the Warrant Agent to the Depositary, or its custodian, for crediting to the accounts of its participants pursuant to the procedures of the Depositary.  The Company shall execute a Global Warrant representing such aggregate Number of Warrants and deliver the same to the Warrant Agent for the authentication and delivery in accordance with Section 2.02.   Any Global Warrant shall bear the legend substantially in the form set forth in Exhibit A hereto (the "**Global Warrant Legend**").

(b)    So long as a Global Warrant is registered in the name of the Depositary or its nominee, members of, or participants in, the Depositary ("**Agent Members**"), the holders of beneficial interests in the Global Warrant shall have no rights under this Warrant Agreement with respect to the Global Warrant held on their behalf by the Depositary or the Warrant Agent as its custodian, and the Depositary may be treated by the Company, the Warrant Agent and any agent of the Company or the Warrant Agent as the absolute owner of such Global Warrant for all

purposes. Accordingly, any such owner's beneficial interest in such Global Warrant will be shown only on, and the transfer of such interest shall be effected only through, records maintained by the Depositary or its nominee or its Agent Members, and neither the Company nor the Warrant Agent shall have any responsibility with respect to such records maintained by the Depositary or its nominee or its Agent Members. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Warrant Agent or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a Warrantholder.

(c)     Any holder of a Global Warrant registered in the name of the Depositary or its nominee shall, by acceptance of such Global Warrant, agree that transfers of beneficial interests in such Global Warrant may be effected only through a book-entry system maintained by the holder of such Global Warrant (or its agent), and that ownership of a beneficial interest in Warrants represented thereby shall be required to be reflected in book-entry form.

(d)     A Global Warrant registered in the name of the Depositary or its nominee shall be exchanged for Certificated Warrants only if the Depositary (A) has notified the Company that it is unwilling or unable to continue as or ceases to be a clearing agency registered under Section 17A of the Exchange Act and (B) a successor to the Depositary registered as a clearing agency under Section 17A of the Exchange Act is not able to be appointed by the Company within 90 days or the Depositary is at any time unwilling or unable to continue as Depositary and a successor to the Depositary is not able to be appointed by the Company within 90 days. In any such event, a Global Warrant registered in the name of the Depositary or its nominee shall be surrendered to the Warrant Agent for cancellation, and the Company shall execute, and the Warrant Agent shall countersign and deliver, to each beneficial owner identified by the Depositary, in exchange for such beneficial owner's beneficial interest in such Global Warrant, Certificated Warrants representing, in the aggregate, the Number of Warrants theretofore represented by such Global Warrant with respect to such beneficial owner's respective beneficial interest. Any Certificated Warrant delivered in exchange for an interest in a Global Warrant pursuant to this Section 2.07(d) shall not bear the Global Warrant Legend. Interests in the Global Warrant may not be exchanged for Certificated Warrants other than as provided in this Section 2.07(d).

(e)     The holder of a Global Warrant registered in the name of the Depositary or its nominee may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Warrantholder is entitled to take under this Warrant Agreement or the Warrant.

Section 2.08    *Surrender of Warrant Certificates.*  Any Warrant Certificate surrendered for registration of transfer, exchange, substitution or exercise of Warrants represented thereby shall, if surrendered to the Company, be delivered to the Warrant Agent, and all Warrant Certificates surrendered or so delivered to the Warrant Agent shall be promptly cancelled by the Warrant Agent and shall not be reissued by the Company and, except as provided in this Article 2 in case of an exchange, transfer or substitution, or Article 3 in case of the exercise of less than all Warrants represented thereby, or Section 5.02 in case of mutilation, no Warrant Certificate shall be issued hereunder in lieu thereof. The Warrant Agent shall deliver to the

Company from time to time or otherwise dispose of such cancelled Warrant Certificates as the Company may direct.

## ARTICLE 3

### EXERCISE AND SETTLEMENT OF WARRANTS

Section 3.01 *Exercise of Warrants.*  At any time prior to 5:00 p.m., New York City time, on the Expiration Date, a Warrantholder shall be entitled to exercise, in accordance with this Article 3, the full Number of Warrants represented by any Warrant Certificate then registered in such Warrantholder's name (which may include fractional Warrants) or any portion thereof (which shall not include any fractional Warrants).  Any Warrants not exercised prior to such time shall expire unexercised and all rights thereunder and all rights in respect thereof under this Warrant Agreement shall cease as of the Expiration Date.

Section 3.02 *Procedure for Exercise.*  (a) To exercise a Warrant (i) in the case of a Certificated Warrant, the Warrantholder must (x) surrender the Warrant Certificate evidencing such Warrant at the principal office of the Warrant Agent (or successor warrant agent), (y) deliver the Exercise Notice set forth on the reverse of the Warrant Certificate duly completed and executed at the principal office of the Warrant Agent (or successor warrant agent), together with any applicable transfer taxes as set forth in Section 6.01(b), and (z) in the event the exercising Warrantholder does not elect for Net Share Settlement in accordance with Section 3.03(c), pay to the Warrant Agent (or successor warrant agent) an amount equal to the Exercise Price in accordance with the procedures for Full Physical Settlement set forth in Section 3.03(b) or (ii) in the case of a Global Warrant, the holders of beneficial interests therein must (x) comply with the procedures established by the Depositary for the exercise of Warrants and (y) in the event the exercising Warrantholder does not elect for Net Share Settlement in accordance with Section 3.03(c), pay to the Warrant Agent (or successor warrant agent) an amount equal to the Exercise Price in accordance with the procedures for Full Physical Settlement set forth in Section 3.03(b).

(b)    The date on which a Warrantholder complies with the requirements for exercise set forth in this Section 3.02 in respect of a Warrant is the "**Exercise Date**" for such Warrant. However, if such date is not a Trading Day or the Warrantholder satisfies such requirements after the Close of Business on a Trading Day, then the Exercise Date shall be the immediately succeeding Trading Day.

(c)    Any exercise of a Warrant pursuant to the terms of this Warrant Agreement shall be irrevocable and shall constitute a binding agreement between the holder and the Company, enforceable in accordance with its terms.

Section 3.03 *Settlement of Warrants.*  (a) Full Physical Settlement shall apply to each Warrant unless the Warrantholder elects for Net Share Settlement to apply upon exercise of such Warrant.  Such election shall be made (i) in the case of a Certificated Warrant, in the Exercise Notice for such Warrant, or (ii) in the case of a Global Warrant, in accordance with the procedures established by the Depositary for the exercise of Warrants.

(b)      If Full Physical Settlement is applicable with respect to the exercise of a Warrant, then, for each Warrant exercised hereunder, prior to 11:00 a.m., New York City time, on the Settlement Date for such Warrant, the Warrantholder shall pay the Exercise Price (determined as of such Exercise Date) by federal wire or other immediately available funds payable to the order of the Company to the account maintained by the Warrant Agent and notified to the Warrantholder in accordance with Section 6.15, and on the Settlement Date, following receipt by the Warrant Agent of such Exercise Price, the Company shall cause to be delivered to the Warrantholder one share of Class A Common Stock (the "**Full Physical Share Amount**"), together with Cash in respect of any fractional share or fractional Warrant as provided in Section 3.05.  All funds received by the Warrant Agent upon exercise of such Warrant shall be deposited by the Warrant Agent for the account of the Company at a bank previously instructed by the Company in writing.

(c)      If Net Share Settlement is applicable with respect to the exercise of a Warrant, then, for each Warrant exercised hereunder, on the Settlement Date for such Warrant, the Company shall cause to be delivered to the Warrantholder a number of shares of Class A Common Stock (which in no event will be less than zero) (the "**Net Share Amount**") equal to (i) the Net Share Settlement Price as of the relevant Exercise Date, *minus* the Exercise Price (determined as of such Exercise Date), *divided by* (ii) such Net Share Settlement Price, together with Cash in respect of any factional share or fractional Warrant as provided in Section 3.05.

Section 3.04    *Delivery of Class A Common Stock.*    (a)  In connection with the delivery of shares of Class A Common Stock to an exercising Warrantholder pursuant to Section 3.03(b) or Section 3.03(c), as the case may be, the Warrant Agent shall:

(i)      inform the Company, within one Business Day following the satisfaction by the exercising Warrantholder of each of the applicable procedures for exercise set forth in Section 3.02(a), of the number of shares of Class A Common Stock underlying the Warrants which were exercised;

(ii)      promptly deliver or deposit all funds delivered to the Warrant Agent upon exercise of any Warrant(s) by bank wire transfer to an account designated by the Company or as the Warrant Agent may be directed in writing by the Company;

(iii)      on the Settlement Date, deliver Cash to such Warrantholder in respect of any fractional shares or fractional Warrants, as provided in Section 3.05;

(iv)      promptly cancel all Warrant Certificates surrendered to the Warrant Agent, destroy all such cancelled Warrant Certificates and deliver a certificate of destruction to the Company, unless the Company shall otherwise direct; and

(v)      if the Number of Warrants represented by a Certificated Warrant shall not have been exercised in full, deliver a new Warrant Certificate, countersigned by the Warrant Agent, for the balance of the number of Warrants represented by the surrendered Warrant Certificate.

(b)      If such shares of Class A Common Stock are in book-entry form at the Depositary, the Company shall (or shall cause the transfer agent to) deliver such shares of Class

A Common Stock by electronic transfer to such exercising Warrantholder's account, or any other account as such exercising Warrantholder may designate, at the Depositary or at an Agent Member.  If such shares of Class A Common Stock are not in book-entry form at the Depositary, the Company shall (or shall cause the transfer agent to) deliver to or upon the order of such exercising Warrantholder a certificate or certificates, in each case with legends thereon as appropriate (as determined by the Company) and for the number of full shares of Class A Common Stock to which such exercising Warrantholder is entitled, registered in such name or names as may be directed by such exercising Warrantholder

(c)      Each Person in whose name any shares of Class A Common Stock are issued shall for all purposes be deemed to have become the holder of record of such shares as of the Exercise Date or, in the case of a Warrant subject to Full Physical Settlement only, the date of payment by the Warrantholder of the Exercise Price in accordance with Section 3.03(b), if later.  However, if any such date is a date when the stock transfer books of the Company are closed, such Person shall be deemed to have become the holder of such shares at the Close of Business on the next succeeding date on which the stock transfer books are open.

(d)      Promptly after the Warrant Agent shall have taken the action required by Section 3 of this Agreement (or at such later time as may be mutually agreeable to the Company and the Warrant Agent), the Warrant Agent shall account to the Company with respect to any Warrants exercised (including, without limitation, with respect to any Exercise Price paid to the Warrant Agent).  The Company shall reimburse the Warrant Agent for any amounts paid by the Warrant Agent in respect of a fractional share or fractional Warrant upon such exercise in accordance with Section 3.05 hereof.

Section 3.05    *No Fractional Shares to Be Issued.*   (a) Notwithstanding anything to the contrary in this Warrant Agreement, the Company shall not be required to issue any fraction of a share of Class A Common Stock upon exercise of any Warrants.

(b)      If any fraction of a Warrant shall be exercised hereunder, the Company shall pay the relevant Warrantholder Cash in lieu of the corresponding fraction of a share of Class A Common Stock valued at the Net Share Settlement Price as of the Exercise Date.  However, if more than one Warrant shall be exercised hereunder at one time by the same Warrantholder, the number of full shares which shall be issuable upon exercise thereof shall be computed on the basis of all Warrants (including any fractional Warrants) so exercised.  If any fraction of a share of Class A Common Stock would, except for the provisions of this Section 3.05, be issuable on the exercise of any Warrant or Warrants (including any fractional Warrants), the Company shall pay the Warrantholder Cash in lieu of such fractional shares valued at the Net Share Settlement Price as of the Exercise Date.

(c)      Each Warrantholder, by its acceptance of a Warrant Certificate, expressly waives its right to receive any fraction of a share of Class A Common Stock or a stock certificate representing a fraction of a share of Class A Common Stock.

Section 3.06    *Acquisition of Warrants by Company.*   The Company shall have the right, except as limited by law, to purchase or otherwise to acquire Warrants at such times, in such

manner and for such consideration as it may deem appropriate and shall have agreed with the holder of such Warrants.

Section 3.07    *Obligations of the Warrant Agent.*  The Warrant Agent shall:

(a)      examine all Exercise Notices and all other documents delivered to it by or on behalf of holders to ascertain whether, on their face, such Exercise Notices and any such other documents have been executed and completed in accordance with their terms;

(b)      where an Exercise Notice or other document appears on its face to have been improperly completed or executed or some other irregularity in connection with the exercise of the Warrant exists, the Warrant Agent shall endeavor to inform the appropriate parties (including the person submitting such instrument) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled;

(c)      inform the Company of and cooperate with and assist the Company in resolving any reconciliation problems between the Exercise Notices received and delivery of Warrants to the Warrant Agent's account; and

(d)      advise the Company of (x) the instructions with respect to delivery of the shares of Class A Common Stock deliverable upon such exercise, subject to the timely receipt from the Depositary of the necessary information, and (y) such other information as the Company shall reasonably require.

Section 3.08    *Validity of Exercise.*  All questions as to the validity, form and sufficiency (including time of receipt) of a Warrant exercise shall be determined by the Company in its sole discretion, which determination shall be final and binding.  The Warrant Agent shall incur no liability for or in respect of and, except to the extent such liability arises from the Warrant Agent's negligence, willful misconduct or bad faith, shall be indemnified and held harmless by the Company for acting or refraining from acting upon, or as a result of such determination by the Company.  The Company reserves the right to reject any and all Exercise Notices not in proper form or for which any corresponding agreement by the Company to exchange would, in the opinion of the Company, be unlawful.  Such determination by the Company shall be final and binding on the holders, absent manifest error.  Moreover, the Company reserves the absolute right to waive any of the conditions to the exercise of Warrants or defects in Exercise Notices with regard to any particular exercise of Warrants.  The Company shall be under no duty to give notice to the holders of the Warrants of any irregularities in any exercise of Warrants, nor shall it incur any liability for the failure to give such notice.

Section 3.09    *Direction of Warrant Agent.*  (a) The Company shall be responsible for performing all calculations required in connection with the exercise and settlement of the Warrants and the payment or delivery, as the case may be, of Cash and/or Class A Common Stock as described in this Article 3.  In connection therewith, the Company shall provide prompt written notice to the Warrant Agent of the amount of Cash and the number of shares of Class A Common Stock payable or deliverable, as the case may be, upon exercise and settlement of the Warrants, including, without limitation, the Net Share Amount and the Full Physical Share Amount.

(b)    Any Cash to be paid to the Warrantholders hereunder shall be delivered to the Warrant Agent no later than the Business Day immediately preceding the date such consideration is required to be delivered to the Warrantholders.  Any Class A Common Stock to be delivered to the Warrantholders hereunder shall be delivered by the Company (or the transfer agent) by the date such consideration is required to be delivered to the Warrantholders.

(c)    The Warrant Agent shall have no liability for any failure or delay in performing its duties hereunder caused by any failure or delay of the Company in providing such calculations or items to the Warrant Agent.  The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Class A Common Stock or Units of Reference Property that may at any time be issued or delivered upon the exercise of any Warrant, and it makes no representation with respect thereto.  The Warrant Agent shall not be responsible for any failure of the Company to make any Cash payment or to issue, transfer or deliver any shares of Class A Common Stock or stock certificates or Units of Reference Property, or to comply with any of the covenants of the Company contained in this Article 3.

ARTICLE 4

ADJUSTMENTS

Section 4.01    *Adjustments to Exercise Price.*  The Exercise Price for the Warrants shall be subject to adjustment (without duplication) upon the occurrence of any of the following events:

(a)    The issuance of Class A Common Stock or Class B Common Stock as a dividend or distribution to all or substantially all holders of Common Stock, or a subdivision or combination of Common Stock, in which event the Exercise Price shall be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{OS_0}{OS_1}$$

where:

$EP_0$    =    the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution, or immediately prior to the Open of Business on the effective date for such subdivision or combination, as the case may be;

$EP_1$    =    the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution, or immediately after the Open of Business on the effective date for such subdivision or combination, as the case may be;

$OS_0$    =    the number of shares of Common Stock, in the aggregate, outstanding immediately prior to the Close of Business on the Record Date for such dividend or distribution, or immediately prior to the Open of Business on

the effective date for such subdivision or combination, as the case may be;
and

$OS_1$      =      the number of shares of Common Stock, in the aggregate, that would be
outstanding immediately after, and solely as a result of, such dividend,
distribution, subdivision or combination.

Such adjustment shall become effective immediately after the Close of Business on the
Record Date for such dividend or distribution, or immediately after the Open of Business on the
effective date for such subdivision or combination, as the case may be.  If any dividend or
distribution or subdivision or combination of the type described in this Section 4.01(a) is
declared or announced but not so paid or made, the Exercise Price shall again be adjusted to the
Exercise Price that would then be in effect if such dividend or distribution or subdivision or
combination had not been declared or announced, as the case may be.

(b)      The dividend or distribution to all or substantially all holders of Common Stock
of (i) shares of capital stock of the Company (excluding any dividend, distribution or issuance
covered by clause (a) above) or any of the Company's subsidiaries, (ii) evidences of
indebtedness of the Company or any of the Company's subsidiaries, or (iii) any other assets or
property or cash dividends (excluding any Ordinary Cash Dividends and excluding any dividend,
distribution or issuance covered by clause (a) above), in which event the Exercise Price will be
adjusted based on the following formula:

$$EP_1 \quad EP_0 \quad \frac{SP_0 \quad FMV}{SP_0}$$

where:

$EP_0$      =      the Exercise Price in effect immediately prior to the Close of Business on
the Record Date for such dividend or distribution;

$EP_1$      =      the Exercise Price in effect immediately after the Close of Business on the
Record Date for such dividend or distribution;

$SP_0$      =      the Current Market Price; and

$FMV$      =      the fair market value (as determined in good faith by the Board of
Directors), on the Record Date for such dividend or distribution, of the
shares of capital stock, evidences of indebtedness or other assets or
property, or the amount of the cash dividend (other than Ordinary Cash
Dividends) expressed as an amount per share of outstanding Common
Stock.

Such decrease shall become effective immediately after the Close of Business on the
Record Date for such dividend or distribution.  In the event that such dividend or distribution is
declared or announced but not so paid or made, the Exercise Price shall again be adjusted to be

the Exercise Price which would then be in effect if such distribution had not been declared or announced.

However, if the transaction that gives rise to an adjustment pursuant to this clause (b) is one pursuant to which the payment of a dividend or other distribution on Common Stock consists exclusively of shares of capital stock of, or similar equity interests in, a subsidiary of the Company or other business unit of the Company (i.e., a spin-off) that are, or, when issued, will be, traded or quoted on the New York Stock Exchange or any other national or regional securities exchange or market, then the Exercise Price will instead be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{MP_0}{MP_0 + FMV_0}$$

where:

$EP_0$ = the Exercise Price in effect immediately prior to the Close of Business on the Record Date for such dividend or distribution;

$EP_1$ = the Exercise Price in effect immediately after the Close of Business on the Record Date for such dividend or distribution;

$FMV_0$ = the average of the Closing Sale Prices of the capital stock or similar equity interests distributed to holders of Common Stock applicable to one share of Common Stock over the 10 consecutive Trading Days commencing on, and including, the third Trading Day after the Ex-Date for such dividend or distribution; and

$MP_0$ = the average of the Closing Sale Prices of the Common Stock over the 10 consecutive Trading Days commencing on, and including, the third Trading Day after the Ex-Date for such dividend or distribution.

Such decrease shall become effective immediately after the Ex-Date for such dividend or distribution. In the event that such dividend or distribution is declared or announced but not so paid or made, the Exercise Price shall again be adjusted to be the Exercise Price which would then be in effect if such distribution had not been declared or announced.

(c)    In the event that the Company effects a Pro Rata Repurchase in which the cash and value of any other consideration included in the payment per share of Common Stock exceeds the Closing Sale Price on the Trading Day next succeeding the last date on which tenders or exchanges may be made pursuant to such Pro Rata Repurchase, then the Exercise Price will be adjusted based on the following formula:

$$EP_1 = EP_0 \times \frac{(NS_{0A} \times SP_{1A}) + (NS_{0B} \times SP_{1B})}{PP_0 + ((NS_{1A} \times SP_{1A}) + (NS_{1B} \times SP_{1B}))}$$

where:

| | | |
|---|---|---|
| $EP_0$ | = | the Exercise Price in effect immediately prior to the Effective Date of such Pro Rata Repurchase; |
| $EP_1$ | = | the Exercise Price in effect immediately after the Effective Date of such Pro Rata Repurchase; |
| $NS_{0A}$ | = | the number of shares of Class A Common Stock outstanding immediately before the consummation of the Pro Rata Repurchase; |
| $NS_{0B}$ | = | the number of shares of Class B Common Stock outstanding immediately before the consummation of the Pro Rata Repurchase; |
| $NS_{1A}$ | = | the number of shares of Class A Common Stock outstanding immediately after the consummation of the Pro Rata Repurchase; |
| $NS_{1B}$ | = | the number of shares of Class B Common Stock outstanding immediately after the consummation of the Pro Rata Repurchase; |
| $PP_0$ | = | the aggregate purchase price of the Pro Rata Repurchase; and |
| $SP_{1A}$ | = | the average of the Closing Sale Prices of the Class A Common Stock over the 10 consecutive Trading Days ending on the Trading Day immediately preceding the first public announcement by the Company of its intent to effect such Pro Rata Repurchase. |
| $SP_{1B}$ | = | the average of the Closing Sale Prices of the Class B Common Stock over the 10 consecutive Trading Days ending on the Trading Day immediately preceding the first public announcement by the Company of its intent to effect such Pro Rata Repurchase. |

(d)    If any single action would require adjustment of the Exercise Price pursuant to more than one subsection of Section 4.01, only one adjustment shall be made and such adjustment shall be the amount of adjustment that has the highest, relative to the rights and interests of the registered holders of the Warrants then outstanding, absolute value.

Section 4.02    *Adjustments to Number of Warrants.*    Concurrently with any adjustment to the Exercise Price under Section 4.01, the Number of Warrants for each Warrant Certificate will be adjusted such that the Number of Warrants for each such Warrant Certificate in effect immediately following the effectiveness of such adjustment will be equal to the Number of Warrants for each such Warrant Certificate in effect immediately prior to such adjustment, *multiplied by* a fraction, (i) the numerator of which is the Exercise Price in effect immediately prior to such adjustment and (ii) the denominator of which is the Exercise Price in effect immediately following such adjustment.

Section 4.03    *Certain Distributions of Rights and Warrants.*    (a) Rights or warrants distributed by the Company to all holders of Common Stock entitling the holders thereof to

subscribe for or purchase shares of the Company's Capital Stock (either initially or under certain circumstances), which rights or warrants, until the occurrence of a specified event or events (a "**Trigger Event**"):

> (i)      are deemed to be transferred with such shares of Common Stock;

> (ii)      are not exercisable; and

> (iii)      are also issued in respect of future issuances of Common Stock,

shall be deemed not to have been distributed for purposes of Article 4 (and no adjustment to the Exercise Price or the Number of Warrants under this Article 4 will be made) until the occurrence of the earliest Trigger Event, whereupon such rights and warrants shall be deemed to have been distributed and an appropriate adjustment (if any is required) to the Exercise Price and the Number of Warrants for each Warrant Certificate shall be made under this Article 4.

(b)      If any such right or warrant is subject to events, upon the occurrence of which such rights or warrants become exercisable to purchase different securities, evidences of indebtedness or other assets, then the date of the occurrence of any and each such event shall be deemed to be the date of distribution and Record Date with respect to new rights or warrants with such rights.

(c)      In addition, in the event of any distribution (or deemed distribution) of rights or warrants, or any Trigger Event or other event (of the type described in Section 4.03(b)) with respect thereto that was counted for purposes of calculating a distribution amount for which an adjustment to the Exercise Price and the Number of Warrants for each Warrant Certificate under Article 4 was made:

> (i)      in the case of any such rights or warrants that shall all have been redeemed or repurchased without exercise by the holders thereof, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be readjusted upon such final redemption or repurchase to give effect to such distribution or Trigger Event, as the case may be, as though it were a cash distribution, equal to the per share redemption or repurchase price received by a holder or holders of Common Stock with respect to such rights or warrants (assuming such holder had retained such rights or warrants), made to all holders of Common Stock as of the date of such redemption or repurchase; and

> (ii)      in the case of such rights or warrants that shall have expired or been terminated without exercise by the holders thereof, the Exercise Price and the Number of Warrants for each Warrant Certificate shall be readjusted as if such rights and warrants had not been issued.

Section 4.04   *No Impairment.*  The Company will not, by amendment of its Articles of Association or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this Warrant and in

taking of all such action as may be necessary or appropriate in order to protect the rights of the Warrantholders.

Section 4.05 *Other Adjustments if Net Share Settlement Applies.* To the extent Net Share Settlement applies to the exercise of any Warrant, the Board of Directors shall make appropriate adjustments to the amount of Cash or number of shares of Class A Common Stock, as the case may be, due upon exercise of the Warrant, as may be necessary or appropriate to effectuate the intent of this Article 4 and to avoid unjust or inequitable results as determined in its good faith judgment, to account for any adjustment to the Exercise Price and the Number of Warrants for the relevant Warrant Certificate that becomes effective, or any event requiring an adjustment to the Exercise Price and the Number of Warrants for the relevant Warrant Certificate where the Record Date or effective date (in the case of a subdivision or combination of the Class A Common Stock) of the event occurs, during the period beginning on, and including, the Exercise Date and ending on, and including, the related Settlement Date.

Section 4.06 *Discretionary Adjustments.* The Company may from time to time, to the extent permitted by law and subject to applicable rules of the New York Stock Exchange (or if not listed on the New York Stock Exchange, the rules of the principal U.S. national or regional securities exchange or quotation system on which the Class A Common Stock is then listed or quoted), decrease the Exercise Price and make a corresponding increase in the Number of Warrants for each Warrant Certificate by any amount for any period of at least 20 days. In that case, the Company shall give the Warrantholders at least 15 days' prior notice of such increase or decrease, and such notice shall state the decreased Exercise Price and increased Number of Warrants for each Warrant Certificate and the period during such adjustment will be in effect. The Company may make such decreases in the Exercise Price and increases in the Number of Warrants for each Warrant Certificate, in addition to those set forth in this Article 4, as the Company's Board of Directors deems advisable, including to avoid or diminish any income tax to holders of the Class A Common Stock resulting from any dividend or distribution of stock (or rights to acquire stock) or from any event treated as such for income tax purposes.

Section 4.07 *Restrictions on Adjustments.* (a) Except in accordance with Section 4.01, the Exercise Price and the Number of Warrants for any Warrant Certificate will not be adjusted for the issuance of Common Stock or any securities convertible into or exchangeable for Common Stock.

(b) Neither the Exercise Price nor the Number of Warrants for any Warrant Certificate will be adjusted:

(i) upon the issuance of any securities by the Company on the Closing Date or pursuant to the Plan;

(ii) upon the issuance of any shares of Class A Common Stock or Class B Common Stock pursuant to any present or future plan providing for the reinvestment of dividends or the issuance of any shares of Class A Common Stock or Class B Common Stock to any of the Company's officers, directors or employees pursuant to any benefit plan of the Company;

(iii)    for a change in the par value of the Class A Common Stock or Class B Common Stock.

(c)    In no event will the Company adjust the Exercise Price or make a corresponding adjustment to the Number of Warrants for any Warrant Certificate to the extent that the adjustment would reduce the Exercise Price below the par value per share of Class A Common Stock or Class B Common Stock.

(d)    No adjustment shall be made to the Exercise Price or the Number of Warrants for any Warrant Certificate for any of the transactions described in Section 4.01 if the Company makes provisions for Warrantholders to participate in any such transaction without exercising their Warrants on the same basis as holders of Common Stock, as applicable and with notice that the Board of Directors determines in good faith to be fair and appropriate.

(e)    No adjustment shall be made to the Exercise Price, nor will any corresponding adjustment be made to the Number of Warrants for any Warrant Certificate, unless the adjustment would result in a change of at least 1% of the Exercise Price; however, any such adjustments that are not made will be carried forward and made when the aggregate of all such adjustments or any other adjustment required to be made pursuant to Article 4 equal or exceed 1% of the Exercise Price.  All calculations under this Article 4 shall be made to the nearest cent or to the nearest 1/100th of a share, as the case may be.

(f)    If the Company takes a record of the holders of Class A Common Stock for the purpose of entitling them to receive a dividend or other distribution, and thereafter (and before the dividend or distribution has been paid or delivered to stockholders) legally abandons its plan to pay or deliver such dividend or distribution, then thereafter no adjustment to the Exercise Price or the Number of Warrants for any Warrant Certificate then in effect shall be required by reason of the taking of such record.

Section 4.08    *Deferral of Adjustments.*  In any case in which Section 4.01 provides that an adjustment shall become effective immediately after (a) a Record Date for an event or (b) the effective date (in the case of a subdivision or combination of the Class A Common Stock) (each a "**Determination Date**"), the Company may elect to defer, until the later of the date the adjustment to the Exercise Price and Number of Warrants for each Warrant Certificate can be definitively determined and the occurrence of the applicable Adjustment Event (as hereinafter defined), (i) issuing to the Warrantholder of any Warrant exercised after such Determination Date and before the occurrence of such Adjustment Event, the additional shares of Class A Common Stock or other securities or assets issuable upon such exercise by reason of the adjustment required by such Adjustment Event over and above the Class A Common Stock issuable upon such exercise before giving effect to such adjustment and (ii) paying to such Warrantholder any amount in Cash in lieu of any fractional share of Class A Common Stock or fractional Warrant pursuant to Section 3.05.  For the purposes of this Section 4.08, the term "**Adjustment Event**" shall mean in any case referred to in clause (a) or clause (b) hereof, the occurrence of such event.

Section 4.09  *Reclassifications and Other Changes.*  (a) Subject to Section 4.09(e), if any of the following events occur:

(i)    any reclassification or change of the outstanding shares of Common Stock (other than changes resulting from a subdivision or combination to which Section 4.01(a) applies or conversion of Class B Common Stock into Class A Common Stock);

(ii)    any consolidation, merger or combination involving the Company; or

(iii)    any sale or conveyance to a third party of all or substantially all of the Company's assets

(each such event a "**Reorganization Event**"), in each case as a result of which the Class A Common Stock would be converted into, or exchanged for, stock, other securities, other property or assets (including cash or any combination thereof) (the "**Reference Property**"), then following the effective time of the Reorganization Event, the right to receive shares of Class A Common Stock upon exercise of a Warrant shall be changed to a right to receive, upon exercise of such Warrant, the kind and amount of shares of stock, other securities or other property or assets (including cash or any combination thereof) that a holder of one share of Class A Common Stock would have owned or been entitled to receive in connection with such Reorganization Event (such kind and amount of Reference Property per share of Class A Common Stock, a "**Unit of Reference Property**").  In the event holders of Class A Common Stock have the opportunity to elect the form of consideration to be received in a Reorganization Event, other than with respect to an Affiliate Change of Control Event, the type and amount of consideration into which the Warrants shall be exercisable from and after the effective time of such Reorganization Event shall be deemed to be the weighted average of the types and amounts of consideration received by the holders of Class A Common Stock in such Reorganization Event.

(b)    At any time from, and including, the effective time of a Reorganization Event:

(i)    if Full Physical Settlement applies upon exercise of a Warrant, the Full Physical Share Amount per Warrant shall be equal to a single Unit of Reference Property;

(ii)    if Net Share Settlement applies upon exercise of a Warrant, the Net Share Amount per Warrant shall be a number of Units of Reference Property calculated as set forth in Section 3.03(c), except that the Net Share Settlement Price used to determine such Net Share Amount on any Trading Day shall be the Unit Value for such Trading Day;

(iii)    the Company shall pay Cash in lieu of delivering any fraction of a Unit of Reference Property or any fractional Warrant in accordance with Section 3.05 based on the Unit Value as of the Exercise Date; and

(iv)    the Closing Sale Price and the Current Market Price shall be calculated with respect to a Unit of Reference Property.

(c)       The value of a Unit of Reference Property (the "**Unit Value**") shall be determined
as follows:

(i)       any shares of common stock of the successor or purchasing corporation or
any other corporation that are traded on a national or regional stock exchange included in
such Unit of Reference Property shall be valued as if such shares were "Class A Common
Stock" using procedures set forth in the definition of "Closing Sale Price" in
Section 1.01;

(ii)       any other property (other than cash) included in such Unit of Reference
Property shall be valued in good faith by the Board of Directors (in a manner not
materially inconsistent with the manner the Board of Directors valued such property for
purposes of the Reorganization Event, if applicable) or by a an independent investment
bank of national standing; and

(iii)       any cash included in such Unit of Reference Property shall be valued at
the amount thereof.

(d)       On or prior to the effective time of any Reorganization Event, the Company or the
successor or purchasing Person, as the case may be, shall execute an amendment to this Warrant
Agreement providing that the Warrants shall be exercisable for Units of Reference Property in
accordance with the terms of this Section 4.09. If the Reference Property in connection with any
Reorganization Event includes shares of stock or other securities and assets of a Person other
than the successor or purchasing Person, as the case may be, in such Reorganization Event, then
the Company shall cause such amendment to this Warrant Agreement to be executed by such
other Person and such amendment shall contain such additional provisions to protect the interests
of the Warrantholders as the Board of Directors shall reasonably consider necessary by reason of
the foregoing. Any such amendment to this Warrant Agreement shall provide for adjustments
which shall be as nearly equivalent as may be practicable to the adjustments provided for in this
Article 4. In the event the Company shall execute an amendment to this Warrant Agreement
pursuant to this Section 4.09, the Company shall promptly file with the Warrant Agent an
Officers' Certificate briefly stating the reasons therefor, the kind or amount of cash, securities or
property or asset that will comprise a Unit of Reference Property after the relevant
Reorganization Event, any adjustment to be made with respect thereto and that all conditions
precedent have been complied with. The Company shall cause notice of the execution of
amendment to be mailed to each Warrantholder, at its address appearing on the Warrant Register,
within ten (10) Business Days after execution thereof. Failure to deliver such notice shall not
affect the legality or validity of such amendment.

(e)       Affiliate Change of Control Event:

(i)       On or before the 20th day after the effective date of an Affiliate Change of
Control Event, the Company shall:

(A)       cause a notice of the Affiliate Change of Control Event to be sent
at least once to the Dow Jones News Service or similar business news service in
the United States; and

(B)    cause the Warrant Agent to send by first-class mail, postage prepaid to each Warrantholder, at the address appearing in the warrant register, a notice of the Affiliate Change of Control Event (a "**Affiliate Change of Control Put Notice**") stating:

1)    that each Warrantholder may require the Company to purchase all, or a portion of, any Warrants (the "**Affiliate Change of Control Put Warrants**") that have not been exercised prior to the Affiliate Change of Control Payment Date at a price equal to the Affiliate Change of Control Payment Amount (the "**Affiliate Change of Control Put**") as of the date specified by the Company that is not less than 20 Business Days nor more than 35 Business Days after the date of the Affiliate Change of Control Put Notice (the "**Affiliate Change of Control Payment Date**");

2)    that the Affiliate Change of Control Put is being offered pursuant to this Section 4.09(e) and that the Warrantholders may not require the Company to purchase Warrants prior to the Affiliate Change of Control Payment Date;

3)    that any Warrant not tendered will remain outstanding;

4)    that Warrantholders accepting the offer to have their Warrants purchased pursuant to the Affiliate Change of Control Put Right will be required to surrender their Warrant Certificates representing such Warrants to the Warrant Agent at the address specified in the notice prior to the Close of Business on the fifth Business Day preceding the Affiliate Change of Control Payment Date;

5)    a reasonably detailed explanation of the Affiliate Change of Control Payment Amount;

6)    that Holders whose Warrants are being purchased only in part will be issued New Warrants representing the unpurchased portion of the Warrants surrendered; provided that each such New Warrant issued shall be in denominations of one Warrant and integral multiples thereof;

7)    any other reasonable procedures that a Warrantholder must follow (to the extent consistent with the terms and conditions set forth herein) in connection with such Affiliate Change of Control Put; and

8)    the name and address of the Warrant Agent.

(ii)    Three (3) Business Days prior to the Affiliate Change of Control Payment Date, the Warrant Agent shall notify the Company in writing the number of Warrants for which an Affiliate Change of Control Put Right has been validly exercised.

(iii)    On the Affiliate Change of Control Payment Date, the Company or the surviving Person (if other than the Company) shall (A) deliver to the Warrant Agent the calculation of the Affiliate Change of Control Payment Amount and (B) deposit with the Warrant Agent money sufficient to pay the Affiliate Change of Control Payment Amount

for all Affiliate Change of Control Put Warrants for which the Affiliate Change of Control Put has been validly tendered.

(iv)    On the Affiliate Change of Control Payment Date, (A) the Company or the surviving Person (if other than the Company) shall purchase all Affiliate Change of Control Put Warrants for which the Affiliate Change of Control Put has been validly tendered, (B) the Warrant Agent shall mail to each holder of Affiliate Change of Control Put Warrants so purchased a payment in Cash in an amount equal to the aggregate Affiliate Change of Control Payment Amount in respect of such Affiliate Change of Control Put Warrants, and (C) the Company or the surviving Person (if other than the Company) shall execute and issue to the Warrantholders, and the Warrant Agent shall authenticate, new Warrants in an amount of Warrants equal to the balance of a holder's Warrants to the extent that a holder exercises its right to an Affiliate Change of Control Put with respect to less than all of its Warrants (collectively, the "**New Warrants**"); *provided* that each such New Warrant shall be issued in denominations of one Warrant and integral multiples thereof and the terms thereof shall, subject to Section 4.09(e)(vi), be substantially consistent with the terms of this Warrant Agreement and the Warrants (and all references herein to Warrants shall thereafter be deemed to be references to such New Warrants).

(v)    Following the Affiliate Change of Control Payment Date, any holder of New Warrants shall have the right to exercise such New Warrant and to receive, upon such exercise, the Reference Property in accordance with Section 4.09(a), subject to Section 4.09(b) and Section 4.09(c) and the remaining terms of this Warrant Agreement and the Warrants (as the same may have been amended in connection with such Affiliate Change of Control Event pursuant to Section 4.09).

(vi)    The provisions of this Section 4.09(e) are subject, in all cases, to any applicable requirements under the Securities Act and the Exchange Act and the respective rules and regulations promulgated thereunder. Where there is any inconsistency between the requirements of the Securities Act or the Exchange Act or the rules and regulations promulgated thereunder and the requirements of this Section 4.09(e), the requirements of the Company under this Section 4.09(e) shall be modified but only to the extent necessary to comply with the requirements of the Securities Act and the Exchange Act and the respective rules and regulations promulgated thereunder, shall supersede.

Section 4.10    *Consolidation, Merger and Sale of Assets.*    (a) The Company may, without the consent of the Warrantholders, consolidate with, merge into or sell, lease or otherwise transfer in one transaction or a series of related transactions all or substantially all of the consolidated assets of the Company and its subsidiaries to any corporation, limited liability company, partnership or trust organized under the laws of the United States or any of its political subdivisions or the laws of the Netherlands so long as the Company is the surviving corporation or in the event that the Company is not the surviving corporation:

(i)    the successor to the Company assumes all of the Company's obligations under this Warrant Agreement and the Warrants; and

(ii)    the successor to the Company provides written notice of such assumption to the Warrant Agent.

(b)    In case of any such consolidation, merger, sale, lease or other transfer and upon any such assumption by the successor corporation, limited liability company, partnership or trust, such successor entity shall succeed to and be substituted for the Company with the same effect as if it had been named herein as the Company.  Such successor entity thereupon may cause to be signed, and may issue any or all of the Warrants issuable pursuant to this Warrant Agreement which theretofore shall not have been signed by the Company; and, upon the order of such successor entity, instead of the Company, and subject to all the terms, conditions and limitations in this Warrant Agreement prescribed, the Warrant Agent shall authenticate and deliver, as applicable, any Warrants that previously shall have been signed and delivered by the officers of the Company to the Warrant Agent for authentication, and any Warrants which such successor entity thereafter shall cause to be signed and delivered to the Warrant Agent for such purpose.

Section 4.11    *Common Stock Outstanding.*    For the purposes of this Article 4, the number of shares of Common Stock at any time outstanding shall not include shares held, directly or indirectly, by the Company.

Section 4.12    *Calculations Final.*    The Company shall be responsible for making all calculations called for under this Warrant Agreement.  These calculations include, but are not limited to, the Exercise Date, the Current Market Price, the Closing Sale Price, the Net Share Settlement Price, the Exercise Price, the Number of Warrants for each Warrant Certificate and the number of shares of Class A Common Stock or Units of Reference Property, if any, to be issued upon exercise of any Warrants.  The Company shall make the foregoing calculations in good faith and, absent manifest error, the Company's calculations shall be final and binding on Warrantholders.  The Company shall provide a schedule of the Company's calculations to the Warrant Agent, and the Warrant Agent is entitled to rely upon the accuracy of the Company's calculations without independent verification.

Section 4.13    *Notice of Adjustments.*    Whenever the Exercise Price or the Number of Warrants for each Warrant Certificate is adjusted, the Company shall promptly mail the Warrantholders a notice of the adjustment.  The Company shall file with the Warrant Agent such notice and an Officer's Certificate briefly stating the facts requiring the adjustment and the manner of computing it.  The certificate shall be conclusive evidence that the adjustment is correct, and the Warrant Agent shall not be deemed to have any knowledge of any adjustments unless and until it has received such certificate.  The Warrant Agent shall not be under any duty or responsibility with respect to any such certificate except to exhibit the same to any Warrantholder desiring inspection thereof.

Section 4.14    *Warrant Agent Not Responsible for Adjustments or Validity.*    The Warrant Agent shall at no time be under any duty or responsibility to any Warrantholder to determine whether any facts exist that may require an adjustment of the Exercise Price and the Number of Warrants for each Warrant Certificate, or with respect to the nature or extent of any such adjustment when made, or with respect to the method employed, herein or in any supplemental agreement provided to be employed, in making the same.  The Warrant Agent shall have no duty to verify or confirm any calculation called for hereunder.  The Warrant Agent shall have no

liability for any failure or delay in performing its duties hereunder caused by any failure or delay of the Company in providing such calculations to the Warrant Agent. The Warrant Agent shall not be accountable with respect to the validity or value (or the kind or amount) of any shares of Class A Common Stock or of any securities or property which may at any time be issued or delivered upon the exercise of any Warrant or upon any adjustment pursuant to this Article 4, and it makes no representation with respect thereto. The Warrant Agent shall not be responsible for any failure of the Company to make any Cash payment or to issue, transfer or deliver any shares of Class A Common Stock or stock certificates or other securities or property or scrip upon the surrender of any Warrant for the purpose of exercise or upon any adjustment pursuant to this Article 4, or to comply with any of the covenants of the Company contained in this Article 4.

Section 4.15 *Statements on Warrants.* The form of Warrant Certificate need not be changed because of any adjustment made pursuant to this Article 4, and Warrant Certificates issued after such adjustment may state the same information (other than the adjusted Exercise Price and the adjusted Number of Warrants for such Warrant Certificates) as are stated in the Warrant Certificates initially issued pursuant to this Warrant Agreement.

## ARTICLE 5

### OTHER PROVISIONS RELATING TO RIGHTS OF WARRANTHOLDERS

Section 5.01 *No Rights as Stockholders.* Nothing contained in this Warrant Agreement or in any of the Warrant Certificates shall be construed as conferring upon the holders of any Warrant Certificate or any Warrants, by virtue of holding Warrants, the right to attend any of the Company's general meeting of shareholders, to vote, to consent, to receive any cash dividends, stock dividends, allotments or rights or other distributions paid, allotted or distributed or distributable to the holders of Class A Common Stock, to receive notice as stockholders with respect to any meeting of stockholders for the election of the Company's directors or any other matter, or to exercise any rights whatsoever as the Company's stockholders unless, until and only to the extent such holders become holders of record of shares of Class A Common Stock issued upon settlement of the Warrants.

Section 5.02 *Mutilated or Missing Warrant Certificates.* If any Warrant at any time is mutilated, defaced, lost, destroyed or stolen, then on the terms set forth in this Warrant Agreement, such Warrant may be replaced with a new Warrant, of like date and tenor and representing an equivalent number of Warrants, at the cost of the applicant (including legal fees of the Company) at the office of the Warrant Agent. The applicant for a new Warrant shall, in the case of any mutilated or defaced Warrant, surrender such Warrant to the Warrant Agent and, in the case of any lost, destroyed or stolen Warrant, furnish evidence satisfactory to the Company of such loss, destruction or theft, and, in each case, furnish evidence satisfactory to the Company of the ownership and authenticity of the Warrant together with such indemnity and security as required by the Company and the Warrant Agent. Any such new Warrant Certificate shall constitute an original contractual obligation of the Company, whether or not the allegedly lost, stolen, mutilated or destroyed Warrant Certificate shall be at any time enforceable by anyone. An applicant for such a substitute Warrant Certificate shall also comply with such other reasonable regulations and pay such other reasonable charges as the Company or the Warrant

Agent may prescribe. All Warrant Certificates shall be held and owned upon the express condition that the foregoing provisions are exclusive with respect to the substitution for lost, stolen, mutilated or destroyed Warrant Certificates, and shall preclude any and all other rights or remedies notwithstanding any law or statute existing or hereafter enacted to the contrary with respect to the substitution for and replacement of negotiable instruments or other securities without their surrender.

Section 5.03 *Modification, Waiver and Meetings.* (a) This Warrant Agreement may be modified or amended by the Company and the Warrant Agent, without the consent of the holder of any Warrant, for the purposes of curing any ambiguity or correcting or supplementing any defective provision contained in this Warrant Agreement or to make any other provisions in regard to matters or questions arising in this Warrant Agreement which the Company and the Warrant Agent may deem necessary or desirable; provided that such modification or amendment does not adversely affect the interests of the Warrantholders in any respect.

(b)    Modifications and amendments to this Warrant Agreement or to the terms and conditions of Warrants may also be made by the Company and the Warrant Agent, and noncompliance with any provision of the Warrant Agreement or Warrants may be waived, with the written consent of the Warrantholders of Warrants representing a majority of the aggregate Number of Warrants at the time outstanding.

(c)    However, no such modification, amendment or waiver may, without the written consent or the affirmative vote of each Warrantholder affected:

(i)    change the Expiration Date;

(ii)    increase the Exercise Price or decrease the Number of Warrants (except as set forth in Article 4);

(iii)    impair the right to institute suit for the enforcement of any payment or delivery with respect to the exercise and settlement of any Warrant;

(iv)    reduce the percentage of Warrants outstanding necessary to modify or amend this Warrant Agreement or to waive any past default; or

(v)    reduce the percentage in Warrants outstanding required for any other waiver under this Warrant Agreement.

## ARTICLE 6

### CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 6.01 *Payment of Certain Taxes.* (a) The Company shall pay any and all documentary, stamp or similar issue or transfer taxes that may be payable upon the initial issuance of the Warrants hereunder.

(b)    The Company shall pay any and all documentary, stamp or similar issue or transfer taxes that may be payable upon the issuance of Class A Common Stock (or any other stock certificate) upon the exercise of Warrants hereunder and the issuance of stock certificates in respect thereof in the respective names of, or in such names as may be directed by, the exercising Warrantholders; *provided*, *however*, that the Company shall not be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of any such stock certificate, any Warrant Certificates or other securities in a name other than that of the registered holder of the Warrant Certificate surrendered upon exercise of the Warrant, and the Company shall not be required to issue or deliver such certificates or other securities unless and until the Person or Persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid.

Section 6.02    *Change of Warrant Agent.*    (a)  The Warrant Agent, or any successor to it hereafter appointed, may resign its duties and be discharged from all further duties and liabilities hereunder (except for liability arising as a result of the Warrant Agent's own negligence, willful misconduct or bad faith) after giving 60 days' notice in writing to the Company, except that such shorter notice may be given as the Company shall, in writing, accept as sufficient.  If the office of the Warrant Agent becomes vacant by resignation or incapacity to act or otherwise, the Company shall appoint in writing a successor warrant agent in place of the Warrant Agent.  If the Company shall fail to make such appointment within a period of 60 days after it has been notified in writing of such resignation or incapacity by the resigning or incapacitated warrant agent or by any holder of Warrants (who shall, with such notice, submit his Warrant Certificate for inspection by the Company), then the holder of any Warrants may apply to any court of competent jurisdiction for the appointment of a successor warrant agent.

(b)    The Warrant Agent may be removed by the Company at any time upon 30 days' written notice to the Warrant Agent; *provided*, *however*, that the Company shall not remove the Warrant Agent until a successor warrant agent meeting the qualifications hereof shall have been appointed.

(c)    Any successor warrant agent, whether appointed by the Company or by such a court, shall be a corporation or banking association organized, in good standing and doing business under the laws of the United States of America or any state thereof or the District of Columbia, and authorized under such laws to exercise corporate trust powers and subject to supervision or examination by Federal or state authority and having a combined capital and surplus of not less than $500,000,000.  The combined capital and surplus of any such successor warrant agent shall be deemed to be the combined capital and surplus as set forth in the most recent report of its condition published prior to its appointment; *provided* that such reports are published at least annually pursuant to law or to the requirements of a Federal or state supervising or examining authority.  After acceptance in writing of such appointment by the successor warrant agent, such successor warrant agent shall be vested with all the authority, powers, rights, immunities, duties and obligations of its predecessor warrant agent with like effect as if originally named as warrant agent hereunder, without any further act or deed; but if for any reason it becomes necessary or appropriate, the predecessor warrant agent shall execute and deliver, at the expense of the Company, an instrument transferring to such successor warrant agent all the authority, powers and rights of such predecessor warrant agent hereunder; and upon

request of any successor warrant agent, the Company shall make, execute, acknowledge and deliver any and all instruments in writing to more fully and effectually vest in and conform to such successor warrant agent all such authority, powers, rights, immunities, duties and obligations. Upon assumption by a successor warrant agent of the duties and responsibilities hereunder, the predecessor warrant agent shall deliver and transfer, at the expense of the Company, to the successor warrant agent any property at the time held by it hereunder. As soon as practicable after such appointment, the Company shall give notice thereof to the predecessor warrant agent, the Warrantholders and each transfer agent for the shares of its Class A Common Stock. Failure to give such notice, or any defect therein, shall not affect the validity of the appointment of the successor warrant agent.

(d)    Any entity into which the Warrant Agent may be merged or with which it may be consolidated, or any corporation resulting from any merger or consolidation to which the Warrant Agent shall be a party, or any person succeeding to all or substantially all of the corporate trust or agency business of the Warrant Agent, shall be the successor Warrant Agent under this Warrant Agreement without the execution or filing of any paper or any further act on the part of any of the parties hereto; *provided* that such entity would be eligible for appointment as a successor warrant agent under Section 6.02(c). In case at the time such successor to the Warrant Agent shall succeed to the agency created by this Warrant Agreement, any of the Warrant Certificates shall have been countersigned but not delivered, any such successor to the Warrant Agent may adopt the countersignature of the original Warrant Agent and deliver such Warrant Certificates so countersigned, and in case at that time any of the Warrant Certificates shall not have been countersigned, any successor to the Warrant Agent may countersign such Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Warrant Agreement.

(e)    In case at any time the name of the Warrant Agent shall be changed and at such time any of the Warrant Certificates shall have been countersigned but not delivered, the Warrant Agent may adopt the countersignatures under its prior name and deliver such Warrant Certificates so countersigned; and in case at that time any of the Warrant Certificates shall not have been countersigned, the Warrant Agent may countersign such Warrant Certificates either in its prior name or in its changed name; and in all such cases such Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Warrant Agreement.

Section 6.03    *Compensation; Further Assurances.*    The Company agrees that it will (a) pay the Warrant Agent reasonable compensation for its services as Warrant Agent hereunder and, except as otherwise expressly provided, will pay or reimburse the Warrant Agent upon written demand for all reasonable expenses, disbursements and advances incurred or made by the Warrant Agent in accordance with any of the provisions of this Warrant Agreement (including the reasonable compensation, expenses and disbursements of its agents and counsel) except any such expense, disbursement or advance as may arise from its or any of their negligence, willful misconduct or bad faith, and (b) perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Warrant Agreement.

Section 6.04    *Reliance on Counsel.*  The Warrant Agent may consult with legal counsel (who may be legal counsel for the Company), and the written opinion of such counsel or any advice of legal counsel subsequently confirmed by a written opinion of such counsel shall be full and complete authorization and protection to the Warrant Agent as to any action taken or omitted by it in good faith and in accordance with such written opinion or advice.

Section 6.05    *Proof of Actions Taken.*  Whenever in the performance of its duties under this Warrant Agreement the Warrant Agent shall deem it necessary or desirable that any matter be proved or established by the Company prior to taking or suffering or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the absence of bad faith on the part of the Warrant Agent, be deemed to be conclusively proved and established by an Officer's Certificate delivered to the Warrant Agent; and such Officer's Certificate shall, in the absence of bad faith on the part of the Warrant Agent, be full warrant to the Warrant Agent for any action taken, suffered or omitted in good faith by it under the provisions of this Warrant Agreement in reliance upon such certificate; but in its discretion the Warrant Agent may in lieu thereof accept other evidence of such fact or matter or may require such further or additional evidence as to it may seem reasonable.

Section 6.06    *Correctness of Statements.*  The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Warrant Agreement or in the Warrant Certificates (except its countersignature thereof) or be required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Company only.

Section 6.07    *Validity of Agreement.*  The Warrant Agent shall not be under any responsibility in respect of the validity of this Warrant Agreement or the execution and delivery hereof or in respect of the validity or execution of any Warrant Certificates (except its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Warrant Agreement or in any Warrant Certificate; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any shares of Class A Common Stock to be issued pursuant to this Warrant Agreement or any Warrants or as to whether any shares of Class A Common Stock will, when issued, be validly issued and fully paid and nonassessable.

Section 6.08    *Use of Agents.*  The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys or agents.

Section 6.09    *Liability of Warrant Agent.*  The Warrant Agent shall incur no liability or responsibility to the Company or to any holder of Warrants for any action taken in reliance on any notice, resolution, waiver, consent, order, certificate, or other paper, document or instrument believed by it to be genuine and to have been signed, sent or presented by the proper party or parties.  The Company agrees to indemnify the Warrant Agent and save it harmless against any and all losses, expenses and liabilities, including judgments, costs and reasonable counsel fees, for anything done or omitted in good faith by the Warrant Agent in the execution of this Warrant Agreement or otherwise arising in connection with this Warrant Agreement, except as a result of the Warrant Agent's negligence or willful misconduct or bad faith.

Section 6.10  *Legal Proceedings.*  The Warrant Agent shall be under no obligation to institute any action, suit or legal proceeding or to take any other action likely to involve expense unless the Company or one or more Warrantholders shall furnish the Warrant Agent with reasonable security and indemnity for any costs and expenses which may be incurred, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider proper, whether with or without any such security or indemnity.  The Warrant Agent shall promptly notify the Company in writing of any claim made or action, suit or proceeding instituted against it arising out of or in connection with this Warrant Agreement.

Section 6.11  *Other Transactions in Securities of the Company.*  The Warrant Agent in its individual or any other capacity may become the owner of Warrants or other securities of the Company, or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Warrant Agreement.  Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity.

Section 6.12  *Actions as Agent.*  The Warrant Agent shall act hereunder solely as agent and not in a ministerial or fiduciary capacity, and its duties shall be determined solely by the provisions hereof.  The duties and obligations of the Warrant Agent shall be determined solely by the express provisions of the Warrant Agreement, and the Warrant Agent shall not be liable except for the performance of such duties and obligations as are specifically set forth in the Warrant Agreement.  No implied covenants or obligations shall be read into the Warrant Agreement against the Warrant Agent.  No provision of the Warrant Agreement shall require the Warrant Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.  The Warrant Agent shall not be liable for anything that it may do or refrain from doing in good faith in connection with this Warrant Agreement except for its own negligence or willful misconduct or bad faith.

Section 6.13  *Appointment and Acceptance of Agency.*  The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the instructions set forth in this Warrant Agreement, and the Warrant Agent hereby accepts the agency established by this Warrant Agreement and agrees to perform the same upon the terms and conditions herein set forth.

Section 6.14  *Successors and Assigns.*  All the covenants and provisions of this Warrant Agreement by or for the benefit of the Company or the Warrant Agent shall bind and inure to the benefit of their respective successors and assigns hereunder.

Section 6.15  *Notices.*  Any notice or demand authorized by this Warrant Agreement to be given or made by the Warrant Agent or by any Warrantholder to or on the Company shall be sufficiently given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Company with the Warrant Agent), as follows:

LyondellBasell Industries N.V.
Address
Address
Telephone:  [_____]

with a copy to:

Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York  10281
Attention:  George A. Davis
                 Andrew Troop
Telephone:  (212) 504-6000
Fax:  (212) 504-6666

Any notice or demand authorized by this Warrant Agreement to be given or made by any Warrantholder or by the Company to or on the Warrant Agent shall be sufficiently given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Warrant Agent with the Company), as follows:

[Agent]
Address
Attention:
Re:  LyondellBasell Industries N.V. Warrant Agreement
Fax:  [_____]

Any notice of demand authorized by this Warrant Agreement to be given or made to any Warrantholder shall be sufficiently given or made if sent by first-class mail, postage prepaid to the last address of such Warrantholder as it shall appear on the Warrant Register.

Section 6.16 *Applicable Law; Jurisdiction.*  The validity, interpretation and performance of this Warrant Agreement and of the Warrant Certificates shall be governed in accordance with the laws of the State of New York, without giving effect to the principles of conflicts of laws thereof.  The parties hereto irrevocably consent to the jurisdiction of the courts of the State of New York and any federal court located in such state in connection with any action, suit or proceeding arising out of or relating to this Warrant Agreement..

Section 6.17 *Benefit of this Warrant Agreement.*  Nothing in this Warrant Agreement expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any Person or corporation other than the parties hereto and the Warrantholders any right, remedy or claim under or by reason of this Warrant Agreement or of any covenant, condition, stipulation, promise or agreement hereof, and all covenants, conditions, stipulations, promises and agreements in this Warrant Agreement contained shall be for the sole and exclusive benefit of the parties hereto and their successors and of the Warrantholders.

Section 6.18    *Registered Warrantholders.*    Prior to due presentment for registration of transfer, the Company and the Warrant Agent may deem and treat the Person in whose name any Warrants are registered in the Warrant Register as the absolute owner thereof for all purposes whatever (notwithstanding any notation of ownership or other writing thereon made by anyone other than the Company or the Warrant Agent) and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary or be bound to recognize any equitable or other claim to or interest in any Warrants on the part of any other Person and shall not be liable for any registration of transfer of Warrants that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary unless made with actual knowledge that a fiduciary or nominee is committing a breach of trust in requesting such registration of transfer or with such knowledge of such facts that its participation therein amounts to bad faith.

Section 6.19    *Inspection of this Warrant Agreement.*    A copy of this Warrant Agreement shall be available at all reasonable times for inspection by any registered Warrantholder at the principal office of the Warrant Agent (or successor warrant agent).  The Warrant Agent may require any such holder to submit his Warrant Certificate for inspection by it before allowing such holder to inspect a copy of this Warrant Agreement.

Section 6.20    *Termination.*    This Warrant Agreement shall terminate at 5:00 p.m., New York City time, on the Expiration Date (or, at 5:00 p.m., New York City time, on the Settlement Date with respect to any Warrant Exercise Notice delivered prior to 5:00 p.m., New York City time, on the Expiration Date).  Notwithstanding the foregoing, this Warrant Agreement will terminate on such earlier date on which all outstanding Warrants have been exercised or put pursuant to Section 4.09 of this Agreement. Termination of this Warrant Agreement shall not relieve the Company or the Warrant Agent of any of their obligations arising prior to the date of such termination or in connection with the settlement of any Warrant exercised prior to 5:00 p.m., New York City time, on the Expiration Date.

Section 6.21    *Headings.*    The Article and Section headings herein are for convenience only and are not a part of this Warrant Agreement and shall not affect the interpretation thereof.

Section 6.22    *Counterparts.*    This Warrant Agreement may be executed in any number of counterparts on separate counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

Section 6.23    *Entire Agreement.*    This Warrant Agreement and the Warrant Certificates constitute the entire agreement of the Company, the Warrant Agent and the registered holders of the Warrant Certificates with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, among the Company, the Warrant Agent and the registered holders of the Warrant Certificates with respect to the subject matter hereof.

Section 6.24    *Severability.*    Wherever possible, each provision of this Warrant Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Warrant Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Warrant Agreement.

IN WITNESS WHEREOF, this Warrant Agreement has been duly executed by the parties hereto as of the day and year first above written.

LyondellBasell Industries N.V.

By:_____

    Name:

    Title:

[_____], as Warrant Agent

By:_____

    Name:

    Title:

**Schedule I**

**Initial Warrantholder**

| Name | Number of Warrants |
|------|--------------------|
|      |                    |
|      |                    |
|      |                    |
|      |                    |
|      |                    |
|      |                    |

**EXHIBIT A**

## FORM OF GLOBAL WARRANT LEGEND

UNLESS THIS GLOBAL WARRANT IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO LYONDELLBASELL INDUSTRIES N.V. (THE "**ISSUER**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.

**EXHIBIT B**

## FORM OF WARRANT CERTIFICATE

[FACE]

No. [_____]                                                CUSIP No. [_____]

[UNLESS THIS GLOBAL WARRANT IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO LYONDELLBASELL INDUSTRIES N.V. (THE "**ISSUER**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.]

LyondellBasell Industries N.V.

[Designation of Warrants]

NUMBER OF WARRANTS:  Initially, 11,508,204 Warrants, subject to adjustment as described in the Warrant Agreement dated as of [_____], 2010 between LyondellBasell Industries N.V. and [_____], as Warrant Agent (the "**Warrant Agreement**"), each of which is exercisable for one share of Class A Common Stock.

EXERCISE PRICE:  Initially, $15.90 per Warrant, subject to adjustment as described in the Warrant Agreement.

FORM OF PAYMENT OF EXERCISE PRICE:  Cash, if Full Physical Settlement is applicable, or Net Share Settlement.

FORM OF SETTLEMENT:   Upon exercise of any Warrants represented hereby, the Warrantholder shall be entitled to receive, at the Warrantholder's election, either (a) upon payment to the Warrant Agent of the Exercise Price (determined as of the relevant Exercise Date), one share of Class A Common Stock per Warrant exercised, together with Cash in lieu of any fractional shares or fractional Warrants, or (b) without any payment therefor, a number of shares of Class A Common Stock equal to the Net Share Amount, together with Cash in lieu of any fractional shares or fractional Warrants, in each case, as described in the Warrant Agreement.

DATES OF EXERCISE:  At any time, and from time to time, prior to 5:00 p.m., New York City time, on the Expiration Date, the Warrantholder shall be entitled to exercise all Warrants then represented hereby and outstanding (which may include fractional Warrants) or any portion thereof (which shall not include any fractional Warrants).

PROCEDURE FOR EXERCISE:  Warrants may be exercised by (a) in the case of a Certificated Warrant, surrendering the Warrant Certificate evidencing such Warrant at the principal office of the Warrant Agent (or successor warrant agent), with the Exercise Notice set forth on the reverse of the Warrant Certificate duly completed and executed, together with any applicable transfer taxes, or (b) in the case of a Global Warrant, complying with the procedures established by the Depositary for the exercise of Warrants.

EXPIRATION DATE:  [_____].

This Warrant Certificate certifies that [_____], or its registered assigns, is the Warrantholder of the Number of Warrants (the "**Warrants**") specified above[, as modified in Schedule A hereto,] (such number subject to adjustment from time to time as described in the Warrant Agreement).

In connection with the exercise of any Warrants, (a) the Company shall determine the Full Physical Share Amount or Net Share Amount, as applicable, for each Warrant, and (b) the Company shall, or shall cause the Warrant Agent to, deliver to the exercising Warrantholder, on the applicable Settlement Date, for each Warrant exercised, a number of Shares of Class A

Common Stock equal to the relevant Full Physical Share Amount or Net Share Amount, as applicable, together with Cash in lieu of any fractional shares or fractional Warrants as described in the Warrant Agreement.

Prior to the relevant Exercise Date as described more fully in the Warrant Agreement, Warrants will not entitle the Warrantholder to any of the rights of the holders of shares of Class A Common Stock.

Reference is hereby made to the further provisions of this Warrant Certificate set forth on the reverse hereof, and such further provisions shall for all purposes have the same effect as though fully set forth in this place.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

In the event of any inconsistency between the Warrant Agreement and this Warrant Certificate, the Warrant Agreement shall govern.

IN WITNESS WHEREOF, LyondellBasell Industries N.V. has caused this instrument to be duly executed.

Dated:  [_____]

LyondellBasell Industries N.V.

By:_____
　　Name:
　　Title:

Attest

By:_____
　　　Secretary

## Certificate of Authentication

These are the Warrants referred to in the above-mentioned Warrant Agreement.

Countersigned as of the date above written:

_____, as Warrant Agent

By:_____
        Authorized Officer

[FORM OF REVERSE OF WARRANT CERTIFICATE]

LyondellBasell Industries N.V.

The Warrants evidenced by this Warrant Certificate are part of a duly authorized issue of Warrants issued by the Company pursuant to a Warrant Agreement, dated as of [_____], 2010 (the "**Warrant Agreement**"), between the Company and [_____] (the "**Warrant Agent**"), and are subject to the terms and provisions contained in the Warrant Agreement, to all of which terms and provisions each Warrantholder consents by acceptance of this Warrant Certificate or a beneficial interest therein.  Without limiting the foregoing, all capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Warrant Agreement.  A copy of the Warrant Agreement is on file at the Warrant Agent's Office.

The Warrant Agreement and the terms of the Warrants are subject to amendment as provided in the Warrant Agreement.

This Warrant Certificate shall be governed by, and interpreted in accordance with, the laws of the State of New York without regard to the conflicts of laws principles thereof.

B-6

**[To be attached if Warrant is a Certificated Warrant]**

**Exercise Notice**

[Warrant Agent]
Address
Attention:  Transfer Department

Re:    LyondellBasell Industries N.V. Warrant Agreement

The undersigned (the "**Registered Warrantholder**") hereby irrevocably exercises [_____] Warrants (the "**Exercised Warrants**") and delivers to you herewith a Warrant Certificate or Warrant Certificates, registered in the Registered Warrantholder's name, representing a Number of Warrants at least equal to the number of Exercised Warrants.

The Registered Warrantholder hereby either:

☐    elects for Full Physical Settlement to apply to the Exercised Warrants pursuant to Section 3.03 of the Warrant Agreement and confirms that it will, prior to 11:00 a.m., New York City time, on the Settlement Date, pay an amount equal to the Exercise Price (determined as of the relevant Exercise Date), *multiplied by* the number of Exercised Warrants, by federal wire or other immediately available funds payable to the order of the Company to the account maintained by the Warrant Agent and notified to the Registered Warrantholder as required under Section 3.03(b) of the Warrant Agreement; or

☐    elects for Net Share Settlement to apply to the Exercised Warrants pursuant to Section 3.03 of the Warrant Agreement.

The Registered Warrantholder hereby directs the Warrant Agent to:

(a)    deliver the Full Physical Share Amount or Net Share Amount, as applicable, for each of the Exercised Warrants as follows:

[_____]; and

(b)    if the number of Exercised Warrants is less than the Number of Warrants represented by the enclosed Warrant Certificates, to deliver a Warrant Certificate representing the unexercised Warrants to:

[_____]

Dated: _____    _____

                                                                (Registered Warrantholder)

By:_____
   Authorized Signature
   Address:
   Telephone:

## SCHEDULE A

### [To Be Attached if Warrant is a Global Warrant]

### SCHEDULE OF INCREASES OR DECREASES IN WARRANTS

    The initial Number of Warrants represented by this Global Warrant is [_____]. In accordance with the Warrant Agreement dated as of [_____], 2010 among the Company and [_____], as Warrant Agent, the following increases or decreases in the Number of Warrants represented by this certificate have been made:

| Date | Amount of increase in Number of Warrants evidenced by this Global Warrant | Amount of decrease in Number of Warrants evidenced by this Global Warrant | Number of Warrants evidenced by this Global Warrant following such decrease or increase | Signature of authorized signatory |
|---|---|---|---|---|
| | | | | |
| | | | | |

**[To Be Attached if Warrant is a Global Warrant or Certificated Warrant]**

**FORM OF ASSIGNMENT**

FOR VALUE RECEIVED, the undersigned assigns and transfers the Warrant(s) represented by this Certificate to:

_____

Name, Address and Zip Code of Assignee

and irrevocably appoints _____

Name of Agent

as its agent to transfer this Warrant Certificate on the books of the Warrant Agent.

*[Signature page follows]*

Date:  [_____]


_____

Name of Transferee


By:_____
       Name:
       Title:

(Sign exactly as your name appears on the other side of this Certificate)

NOTICE:  The signature(s) should be guaranteed by an eligible guarantor institution (banks, stockbrokers, savings and loan associations and credit unions with membership in an approved signature guarantee medallion program), pursuant to S.E.C. Rule 17Ad-15.

**EXHIBIT C**

## FORM OF CLASS A COMMON SHARES REQUISITION ORDER

*[Date]*

Via Facsimile [_____]

LyondellBasell Industries N.V.
[_____]
[_____]

Re:     DWAC Issuance
        Control No. [_____]

Ladies and Gentlemen:

You are hereby authorized to issue and deliver the shares of Class A Common Stock as indicated below via DWAC.  The shares are being issued to cover the exercise of Warrants under the Warrant Agreement, dated as of [_____], 2010, between LyondellBasell Industries N.V. and [_____], as Warrant Agent (the "**Warrant Agreement**").   Defined terms used but not defined herein have the meaning assigned to them in the Warrant Agreement.

Number of Shares:           _____

                            _____ Original Issue or

                            _____ Transfer from Treasury Account

Broker Name:                _____

Broker's DTC Number:        _____

Contact and Phone:          _____

The Broker will initiate the DWAC transaction on (date).

Sincerely,


[_____],
as Warrant Agent



By:_____
   Name:
   Title:

cc:    [*Insert name*] via facsimile [*insert fax number*]
      Broker

**TAB 16-A**

$500,000,000

CREDIT AGREEMENT

Dated as of April [__], 2010

among

LYONDELLBASELL INDUSTRIES N.V.,
as the Company,

LBI ESCROW CORPORATION,
as the Escrow Borrower,

LYONDELL CHEMICAL COMPANY,
as a Borrower,

UBS AG, STAMFORD BRANCH,
as Administrative Agent,

UBS AG, STAMFORD BRANCH,
as Collateral Agent,

THE OTHER LENDERS PARTY HERETO FROM TIME TO TIME,

BANC OF AMERICA SECURITIES LLC
as Syndication Agent,

DEUTSCHE BANK SECURITIES INC.,
MORGAN STANLEY SENIOR FUNDING, INC. and CREDIT SUISSE SECURITIES (USA) LLC,
as Co-Documentation Agents,

UBS SECURITIES LLC and BANC OF AMERICA SECURITIES LLC,
as Joint Lead Arrangers

and

UBS SECURITIES LLC, BANC OF AMERICA SECURITIES LLC, BARCLAYS BANK PLC,
CITIGROUP GLOBAL MARKETS INC., CREDIT SUISSE SECURITIES (USA) LLC,
DEUTSCHE BANK SECURITIES INC., J.P. MORGAN SECURITIES INC.,
MORGAN STANLEY SENIOR FUNDING, INC. and WELLS FARGO SECURITIES, LLC,

as Joint Bookrunners

# TABLE OF CONTENTS

<u>Page</u>

## ARTICLE I.

### DEFINITIONS AND ACCOUNTING TERMS

| | | |
|---|---|---|
| Section 1.01. | Defined Terms. | 2 |
| Section 1.02. | Other Interpretive Provisions. | 62 |
| Section 1.03. | Accounting Terms. | 62 |
| Section 1.04. | Rounding. | 63 |
| Section 1.05. | References to Agreements, Laws, Etc. | 63 |
| Section 1.06. | Times of Day. | 63 |
| Section 1.07. | Timing of Payment or Performance. | 63 |
| Section 1.08. | Currency Equivalents Generally. | 63 |
| Section 1.09. | Change of Currency. | 64 |

## ARTICLE II.

### THE COMMITMENTS AND CREDIT EXTENSIONS

| | | |
|---|---|---|
| Section 2.01. | The Term Loans. | 64 |
| Section 2.02. | Credit Extensions, Conversions and Continuations of Loans. | 64 |
| Section 2.03. | Prepayments. | 65 |
| Section 2.04. | Termination of Commitments. | 68 |
| Section 2.05. | Repayment of Loans. | 69 |
| Section 2.06. | Interest. | 69 |
| Section 2.07. | Fees. | 69 |
| Section 2.08. | Computation of Interest and Fees. | 69 |
| Section 2.09. | Evidence of Indebtedness. | 70 |
| Section 2.10. | Payments Generally. | 70 |
| Section 2.11. | Sharing of Payments. | 72 |
| Section 2.12. | Incremental Term Loans. | 72 |
| Section 2.13. | Loan Repurchases. | 74 |
| Section 2.14. | Escrow of Term Loans. | 75 |

## ARTICLE III.

### TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

| | | |
|---|---|---|
| Section 3.01. | Taxes. | 76 |
| Section 3.02. | Illegality. | 79 |
| Section 3.03. | Inability to Determine Rates. | 79 |
| Section 3.04. | Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurodollar Rate Loans. | 79 |
| Section 3.05. | Funding Losses. | 81 |
| Section 3.06. | Matters Applicable to All Requests for Compensation. | 81 |
| Section 3.07. | Replacement of Lenders Under Certain Circumstances. | 82 |

Section 3.08.     Survival. ................................................................................................ 83


ARTICLE IV.

CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 4.01.     Conditions to the Closing Date. .................................................................. 83
Section 4.02.     Conditions to the Term Loan Escrow Release Date.................................... 85


ARTICLE V.

REPRESENTATIONS AND WARRANTIES

Section 5.01.     Existence, Qualification and Power; Compliance with Laws..................... 87
Section 5.02.     Authorization; No Contravention................................................................ 87
Section 5.03.     Governmental Authorization; Other Consents............................................ 88
Section 5.04.     Binding Effect............................................................................................. 88
Section 5.05.     Financial Statements; No Material Adverse Effect..................................... 88
Section 5.06.     Litigation. ................................................................................................... 89
Section 5.07.     Ownership of Property; Liens..................................................................... 89
Section 5.08.     Environmental Matters. .............................................................................. 89
Section 5.09.     Taxes. ......................................................................................................... 90
Section 5.10.     ERISA Compliance. ................................................................................... 91
Section 5.11.     Subsidiaries; Equity Interests. ................................................................... 91
Section 5.12.     Margin Regulations; Investment Company Act.......................................... 91
Section 5.13.     Disclosure. .................................................................................................. 91
Section 5.14.     Anti-Terrorism Laws.................................................................................. 92
Section 5.15.     Intellectual Property; Licenses, Etc............................................................ 92
Section 5.16.     Solvency. .................................................................................................... 92
Section 5.17.     Use of Proceeds. ........................................................................................ 93
Section 5.18.     Security Documents. ................................................................................... 93
Section 5.19.     No Unlawful Contributions or Other Payments.......................................... 94
Section 5.20.     No Conflict with Money Laundering Laws................................................. 94
Section 5.21.     No Conflict with OFAC Laws. ................................................................... 94


ARTICLE VI.

AFFIRMATIVE COVENANTS

Section 6.01.     Financial Statements. ................................................................................. 95
Section 6.02.     Certificates; Other Information................................................................... 97
Section 6.03.     Notices........................................................................................................ 97
Section 6.04.     Payment of Obligations. ............................................................................. 98
Section 6.05.     Preservation of Existence, Etc. .................................................................. 98
Section 6.06.     Maintenance of Properties.......................................................................... 98
Section 6.07.     Maintenance of Insurance........................................................................... 98
Section 6.08.     Compliance with Laws................................................................................ 98
Section 6.09.     Compliance with Environmental Laws; Environmental Reports................. 98
Section 6.10.     Books and Records..................................................................................... 99
Section 6.11.     Inspection Rights. ....................................................................................... 99

Section 6.12.    Additional Collateral; Additional Guarantors............................................. 100
Section 6.13.    ERISA. .................................................................................................. 102
Section 6.14.    Further Assurances and Post-Closing Conditions.................................... 102
Section 6.15.    Use of Proceeds. .................................................................................... 103
Section 6.16.    Know Your Customer Requests............................................................... 103
Section 6.17.    Ratings Obligation. ................................................................................ 104


ARTICLE VII.

NEGATIVE COVENANTS

Section 7.01.    Indebtedness. ......................................................................................... 104
Section 7.02.    Restricted Payments. .............................................................................. 111
Section 7.03.    Dividend and Other Payment Restrictions Affecting Subsidiaries. ......... 116
Section 7.04.    Asset Sales............................................................................................. 118
Section 7.05.    Transactions with Affiliates.................................................................... 118
Section 7.06.    Liens. ..................................................................................................... 120
Section 7.07.    Merger, Amalgamation, Consolidation or Sale of All or Substantially All
                 Assets. ................................................................................................... 120
Section 7.08.    Prepayments, Etc. of Plan Roll-Up Notes and Foreign Capital Markets Debt. .......... 123
Section 7.09.    Activities of Escrow Borrower Prior to the Lyondell Assumption. ........... 124


ARTICLE VIII.

EVENTS OF DEFAULT AND REMEDIES

Section 8.01.    Events of Default. .................................................................................. 124
Section 8.02.    Remedies upon Event of Default. ........................................................... 127
Section 8.03.    Application of Funds............................................................................... 127


ARTICLE IX.

ADMINISTRATIVE AGENT AND OTHER AGENTS

Section 9.01.    Appointment and Authorization of Agents.............................................. 128
Section 9.02.    Rights as a Lender.................................................................................. 128
Section 9.03.    Exculpatory Provisions........................................................................... 128
Section 9.04.    Reliance by Agents................................................................................. 129
Section 9.05.    Delegation of Duties. ............................................................................. 130
Section 9.06.    Resignation of the Agents. ..................................................................... 130
Section 9.07.    Non-Reliance on Agent and Other Lenders............................................. 131
Section 9.08.    Indemnification of Agents. ..................................................................... 131
Section 9.09.    Withholding Tax. .................................................................................... 131
Section 9.10.    No Other Duties, Etc. ............................................................................. 132
Section 9.11.    Agents in Their Individual Capacities..................................................... 132
Section 9.12.    Collateral and Guaranty Matters............................................................. 132

## ARTICLE X.

## MISCELLANEOUS

Section 10.01.    Amendments, Etc. .................................................................................. 136
Section 10.02.    Notices and Other Communications; Facsimile Copies. ........................... 138
Section 10.03.    No Waiver; Cumulative Remedies. .......................................................... 139
Section 10.04.    Attorney Costs and Expenses. ................................................................. 139
Section 10.05.    Indemnification by the Borrower. ............................................................ 139
Section 10.06.    Payments Set Aside. ............................................................................... 140
Section 10.07.    Successors and Assigns. ......................................................................... 141
Section 10.08.    Confidentiality. ...................................................................................... 145
Section 10.09.    Setoff. .................................................................................................... 146
Section 10.10.    Interest Rate Limitation. ......................................................................... 146
Section 10.11.    Counterparts. .......................................................................................... 146
Section 10.12.    Integration. ............................................................................................. 146
Section 10.13.    Survival of Representations and Warranties. ........................................... 147
Section 10.14.    Severability. ........................................................................................... 147
Section 10.15.    Governing Law. ...................................................................................... 147
Section 10.16.    Waiver of Right to Trial by Jury. ............................................................ 148
Section 10.17.    Binding Effect. ....................................................................................... 148
Section 10.18.    Judgment Currency. ............................................................................... 148
Section 10.19.    Lender Action. ....................................................................................... 148
Section 10.20.    USA PATRIOT Act. ............................................................................... 149
Section 10.21.    No Advisory or Fiduciary Responsibility. ............................................... 149
Section 10.22.    Certain Dutch Matters. ........................................................................... 149
Section 10.23.    Agent for Service of Process. ................................................................. 150
Section 10.24.    Limitation on Obligations of Lyondell Chemical. ................................... 150

SCHEDULES

| | |
|---|---|
| 1.01A | Commitments as of the Closing Date |
| 1.01B | Certain Disclosures and Summaries |
| 1.01D | Mortgaged Properties |
| 1.01G | Agreed Security Principles |
| 1.01H | Security Agreements |
| 5.08 | Environmental Matters |
| 5.11 | Subsidiaries and Other Equity Investments |
| 6.14(a) | Certain Security Documents |
| 10.02 | Administrative Agent's Office, Certain Addresses for Notices |

EXHIBITS

| | |
|---|---|
| A | Form of Committed Loan Notice |
| B-1 | Form of Term Note |
| B-2 | Form of Incremental Term Note |
| C | Form of Compliance Certificate |
| D | Form of Assignment and Assumption |
| E | Form of U.S. Security Agreement |
| F-1 | Form of Perfection Certificate |
| F-2 | Form of Perfection Certificate Supplement |
| G-1 | Form of Opinion of Cadwalader, Wickersham & Taft LLP |
| G-2 | Form of Opinion of Gerald A. O'Brien, Deputy General Counsel of the Borrower |
| H | Form of Mortgage |
| I | Auction Procedures |
| J | Form of Affiliated Lender Assignment Agreement |
| K | Form of Guarantee Agreement |
| L | Form of Term Loan Escrow Agreement |
| M | Form of Tax Certificates |

# CREDIT AGREEMENT

This CREDIT AGREEMENT (this "**Agreement**"), dated as of April [__], 2010, is entered into among LYONDELLBASELL INDUSTRIES N.V., a *naamloze vennootschap* (a public limited liability company) formed under the laws of The Netherlands, LBI ESCROW CORPORATION, a Delaware corporation and Wholly Owned Subsidiary of the Company (the "**Escrow Borrower**"), LYONDELL CHEMICAL COMPANY, a Delaware corporation, UBS AG, STAMFORD BRANCH, as Administrative Agent, UBS AG, STAMFORD BRANCH, as Collateral Agent, BANC OF AMERICA SECURITIES LLC, as Syndication Agent, DEUTSCHE BANK SECURITIES INC., MORGAN STANLEY SENIOR FUNDING, INC. and CREDIT SUISSE SECURITIES (USA) LLC, as Co-Documentation Agents, UBS SECURITIES LLC and BANC OF AMERICA SECURITIES LLC, as Joint Lead Arrangers, UBS SECURITIES LLC, BANC OF AMERICA SECURITIES LLC, BARCLAYS BANK PLC, CITIGROUP GLOBAL MARKETS, INC., CREDIT SUISSE SECURITIES (USA) LLC, DEUTSCHE BANK SECURITIES INC., J.P. MORGAN SECURITIES INC., MORGAN STANLEY SENIOR FUNDING, INC. and WELLS FARGO SECURITIES, LLC, as Joint Bookrunners, and each lender party hereto from time to time (collectively, the "**Lenders**" and individually, a "**Lender**").

## PRELIMINARY STATEMENTS

On January 6, 2009, the Borrower and certain of its subsidiaries and affiliates filed voluntary petitions with the Bankruptcy Court (as defined below) initiating their respective cases under Chapter 11 of the Bankruptcy Code (as defined below) (each an "**Initial Case**" and, collectively, the "**Initial Cases**") and certain other subsidiaries and affiliates subsequently filed voluntary petitions with the Bankruptcy Court initiating their respective cases under Chapter 11 of the Bankruptcy Code and joining them with the Initial Cases (each an "**Additional Case**" and, together with the Initial Cases, each a "**Case**" and, collectively, the "**Cases**" and each petitioning entity a "**Debtor**" and, collectively, the "**Debtors**").

On March 11, 2010, the Debtors' Disclosure Statement was approved by the Bankruptcy Court.

The Borrower has requested that the Lenders make available a term loan credit facility in an aggregate principal amount of $500,000,000, the proceeds of which will be used as described herein.

The Lenders are willing to make such credit facility available upon and subject to the terms and conditions hereafter set forth.

Accordingly, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto hereby agree as follows:

# ARTICLE I.

## Definitions and Accounting Terms

Section 1.01.    Defined Terms.

As used in this Agreement, the following terms shall have the meanings set forth below:

"**2027 Notes**" means the 8.10% guaranteed notes due March 15, 2027 issued by Basell Finance Company B.V., a Dutch private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*) (formerly known as Montell Finance Company B.V.).

"**ABL Collateral Agent**" means the representative(s) from time to time administrating the collateral on behalf of the lenders under the ABL Facility.

"**ABL Facility**" means the asset based revolving credit agreement dated as of its effective date among the Borrower, Equistar Chemicals, L.P., Houston Refining L.P., LyondellBasell Acetyls LLC and each other Subsidiary of the Borrower from time to time designated as a "Borrower" thereunder, the lenders and agents party thereto and Citibank, N.A., as administrative agent.

"**ABL Facility Collateral**" means all present and after-acquired inventory, accounts receivable, related contracts and other rights, deposit accounts into which proceeds of the foregoing are credited and books and records related thereto, together with all proceeds of the foregoing, in each case to the extent of the rights, title and interest therein of any "Borrower" under the ABL Facility.

"**Acquired Indebtedness**" means, with respect to any specified Person:

(1)    Indebtedness of any other Person existing at the time such other Person is merged, consolidated or amalgamated with or into or became a Restricted Subsidiary of such specified Person, and

(2)    Indebtedness secured by a Lien encumbering any asset at the time such asset is acquired by such specified Person.

"**Additional Case**" has the meaning specified in the introductory paragraphs to this Agreement.

"**Additional First Priority Lien Obligations**" means any First Priority Lien Obligations that are Incurred after the Closing Date (other than Indebtedness Incurred under the Senior Notes Indenture) and secured by the Common Collateral on a first priority basis pursuant to the Security Documents.

"**Additional Lender**" has the meaning set forth in Section 2.12(c).

"**Administrative Agent**" means UBS AG, Stamford Branch, in its capacity as administrative agent for the Lenders under the Loan Documents, and its successors in such capacity.

"**Administrative Agent's Office**" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Administrative Agent may from time to time specify (upon reasonable written notice) to the Borrower and the Lenders.

"**Administrative Questionnaire**" means with respect to each Lender, an administrative questionnaire in the form prepared by the Administrative Agent, completed by such Lender and returned to the Administrative Agent.

"**Affiliate**" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"**Affiliate Transaction**" has the meaning set forth in Section 7.05.

"**Affiliated Lender**" means a Lender that is a Sponsor or Affiliate of a Sponsor (excluding, in each case, any Loan Party or any of its Subsidiaries).

"**Affiliated Lender Assignment Agreement**" has the meaning set forth in Section 10.07(i).

"**Agent-Related Persons**" means the Agents, together with their respective Affiliates, and the officers, directors, partners, employees, agents and attorneys-in-fact of such Persons and Affiliates.

"**Agents**" means, collectively, the Administrative Agent, the Collateral Agent, the Syndication Agent and the Co-Documentation Agents.

"**Aggregate Commitments**" means at any time the aggregate Commitments of all the Lenders at such time.

"**Agreed Security Principles**" has the meaning set forth in Schedule 1.01G.

"**Agreement**" has the meaning specified in the introductory paragraph hereto.

"**Anti-Terrorism Laws**" means:

(a)    the Executive Order No. 13224 of September 23, 2001, Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism (the "**Executive Order**");

(b)    the USA PATRIOT Act; and

(c)    any similar law enacted in the United States of America subsequent to the date of this Agreement.

"**Applicable Amount**" means, at any time, an amount determined on a cumulative basis equal to, without duplication:

(i)    50% of the Consolidated Net Income of the Company for the period from March 31, 2012 to the end of the Company's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment (or, in the case such Consolidated Net Income for such period is a deficit, minus 100% of such deficit), plus

(ii)    100% of the aggregate net cash proceeds, including cash and the Fair Market Value of property other than cash, received by the Company after March 31, 2012 (other than net

cash proceeds to the extent such net cash proceeds have been used to Incur Indebtedness, Disqualified Stock, or Preferred Stock pursuant to Section 7.01(n) from the issue or sale of Equity Interests of the Company (excluding Refunding Capital Stock, Designated Preferred Stock, Excluded Contributions, and Disqualified Stock), including Equity Interests issued upon exercise of warrants or options (other than an issuance or sale to a Restricted Subsidiary), plus

(iii)    100% of the aggregate amount of contributions to the capital of the Company received in cash and the Fair Market Value of property other than cash after March 31, 2012 (other than Excluded Contributions, Refunding Capital Stock, Designated Preferred Stock, and Disqualified Stock and other than contributions to the extent such contributions have been used to Incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to Section 7.01(n)), plus

(iv)    100% of the principal amount of any Indebtedness, or the liquidation preference or maximum fixed repurchase price, as the case may be, of any Disqualified Stock of the Company or any Restricted Subsidiary thereof issued after March 31, 2012 (other than Indebtedness or Disqualified Stock issued to the Company or a Restricted Subsidiary thereof) or 100% of the principal amount of any debt securities of the Company or any Restricted Subsidiary thereof that are convertible into or exchangeable for Capital Stock issued after the Term Loan Escrow Release Date (other than debt securities issued to the Company or a Restricted Subsidiary thereof) which, in any such case, has been converted into or exchanged for Equity Interests in the Company (other than Disqualified Stock) or any direct or indirect parent entity of the Company (*provided* in the case of any parent, such Indebtedness or Disqualified Stock is retired or extinguished) after March 31, 2012, plus

(v)    100% of the aggregate amount received by the Company or any Restricted Subsidiary in cash and the Fair Market Value of property other than cash received by the Company or any Restricted Subsidiary after March 31, 2012 from:

(A)    the sale or other disposition (other than to the Company or a Restricted Subsidiary of the Company) of Restricted Investments made by the Company and its Restricted Subsidiaries and from repurchases and redemptions of such Restricted Investments from the Company and its Restricted Subsidiaries by any Person (other than the Company or any of its Subsidiaries) and from repayments of loans or advances which constituted Restricted Investments (other than in each case to the extent that the Restricted Investment was made pursuant to Section 7.02(7)) or

(B)    the sale (other than to the Company or a Restricted Subsidiary of the Company) of the Capital Stock of an Unrestricted Subsidiary, plus

(vi)    in the event any Unrestricted Subsidiary of the Company has been redesignated as a Restricted Subsidiary or has been merged, consolidated or amalgamated with or into, or transfers or conveys its assets to, or is liquidated into, the Company or a Restricted Subsidiary of the Company, in each case subsequent to March 31, 2012, the Fair Market Value of the Investment of the Company in such Unrestricted Subsidiary at the time of such redesignation, combination or transfer (or of the assets transferred or conveyed, as applicable), after deducting any Indebtedness associated with the Unrestricted Subsidiary so designated or combined or any Indebtedness associated with the assets so transferred or conveyed (other than in each case to the extent that the designation of such Subsidiary as an Unrestricted Subsidiary was made pursuant to Section 7.02(7) or constituted a Permitted Investment).

For the purpose of determining the Applicable Amount (i) for Section 7.02 at any time, such amount shall be equal to the Applicable Amount at such time minus the aggregate amount (without duplication) (x) of prepayments, redemptions, purchases, defeasances and other payments in respect of any Junior Financing made pursuant to Section 7.08(a)(v)(A) and (y) used to make payments other than principal and interest on Indebtedness that reduces Excess Cash Flow pursuant to clause (b)(iii) thereof, in the case of each (x) and (y) on or prior to such time ,and (ii) for Section 7.08(a)(v)(A), such amount shall be equal to the Applicable Amount at such time minus the aggregate amount (without duplication) (x) of Restricted Payments made pursuant to Section 7.02(c)) and (y) used to make payments other than principal and interest on Indebtedness that reduces Excess Cash Flow pursuant to clause (b)(iii) thereof, in the case of each (x) and (y) on or prior to such time.

"**Applicable Amount Availability Condition**" means, (x) no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof and (y) immediately after giving effect to such transaction on a *pro forma* basis, the Company could Incur $1.00 of additional Indebtedness under the provisions of the first paragraph in Section 7.01.

"**Applicable ECF Percentage**" means, in respect of Excess Cash Flow attributable to a Fiscal Year, (a) 50%, if the Secured Indebtedness Leverage Ratio as of the last day of such Fiscal Year is greater than or equal to 1.75 to 1.00, (b) 25%, if the Secured Indebtedness Leverage Ratio as of the last day of such Fiscal Year is less than 1.75 to 1.00 but greater than or equal to 1.25 to 1.00 and (c) 0%, if the Secured Indebtedness Leverage Ratio as of the last day of such Fiscal Year is less than 1.25 to 1.00.

"**Applicable Liquidity Level**" means (i) for each of Fiscal Years 2011 and 2012, $1,600,000,000, (ii) for Fiscal Year 2013, $1,000,000,000 and (iii) thereafter, $0.

"**Applicable Rate**" means a percentage per annum equal to (A) for Eurodollar Rate Loans, 4.00% and (B) for Base Rate Loans, 3.00%; *provided* that the Applicable Rate for Eurodollar Rate Loans and for Base Rate Loans will be automatically increased by 0.25% per annum on the Term Loan Escrow Release Date with retroactive effect from the Closing Date, if Plan Roll-Up Notes having any stated maturity that is on or prior to the final maturity of the Loans are issued in an aggregate principal amount of $1,000,000,000 or more pursuant to a Reorganization Plan.

"**Appropriate Lender**" means, at any time, (a) with respect to the Term Loans, the Term Lenders, and (b) with respect to each tranche of Incremental Term Loans, if any, the applicable Lenders with respect to such tranche.

"**Approved Fund**" means any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"**Asset Acquisition**" means:

    (1)    an Investment by the Company or any Restricted Subsidiary of the Company in any other Person pursuant to which such Person shall become a Restricted Subsidiary of the Company or of any Restricted Subsidiary of the Company, or shall be merged with or into the Company or any Restricted Subsidiary of the Company, or

    (2)    the acquisition by the Company or any Restricted Subsidiary of the Company of the assets of any Person (other than a Restricted Subsidiary of the Company) which constitute all or substantially all of the assets of such Person or comprises any division or line of business of

such Person or any other properties or assets of such Person other than in the ordinary course of business.

"**Asset Backed Credit Facility**" means (i) the ABL Facility; (ii) any credit facility provided on the basis of the value of inventory, accounts receivable or other current assets (and related documents and intangibles) to the Company or any of its Subsidiaries or similar instrument; and (iii) any similar credit support agreements or guarantees Incurred from time to time; *provided* that any credit facility that refinances or replaces an Asset Backed Credit Facility must comply with clause (ii) of this definition in order to be an Asset Backed Credit Facility; and *provided*, *further*, that, if at the time any such refinancing or replacement is necessary or advisable in the good faith judgment of the Board of Directors of the Company, and an Asset Backed Credit Facility that complies with clause (ii) of this definition is not available on terms considered commercially reasonable for facilities of this nature (as determined in the good faith judgment of the Board of Directors of the Company), then the ABL Facility may be refinanced with or replaced by any Credit Facility and such Credit Facility shall be an Asset Backed Credit Facility for purposes hereof.

"**Asset Sale**" means:

(1)    the sale, conveyance, transfer or other disposition (whether in a single transaction or a series of related transactions) of property or assets (including by way of a Sale/Leaseback Transaction) outside the ordinary course of business of the Company or any Restricted Subsidiary of the Company (each referred to in this definition as a "**disposition**") or

(2)    the issuance or sale of Equity Interests (other than directors' qualifying shares and shares issued to foreign nationals or other third parties to the extent required by applicable law) of any Restricted Subsidiary (other than to the Company or another Restricted Subsidiary of the Company) (whether in a single transaction or a series of related transactions),

in each case other than:

(a)    a disposition of Cash Equivalents or Investment Grade Securities or redundant, surplus, obsolete, damaged or worn out property or equipment, whether now owned or hereafter acquired, in the ordinary course of business;

(b)    the disposition of all or substantially all of the assets of the Company in a manner permitted pursuant to the provisions described in Section 7.07 or any disposition that constitutes a Change of Control;

(c)    any Restricted Payment or Permitted Investment that is permitted to be made, and is made, under Section 7.02;

(d)    any sale, conveyance or other disposition of property or assets of the Company or any Restricted Subsidiary (whether in a single transaction or a series of related transactions), including by way of a Sale/ Leaseback Transaction, or issuance or sale of Equity Interests of any Restricted Subsidiary, which assets or Equity Interests so disposed or issued have an aggregate Fair Market Value of less than $50,000,000;

(e)    any disposition of property or assets, or the issuance of securities, by a Restricted Subsidiary of the Company to the Company or by the Company or a Restricted Subsidiary of the Company to a Restricted Subsidiary of the Company;

(f)    (i) any exchange of assets (including a combination of assets and Cash Equivalents) for assets related to a Similar Business of comparable or greater market value or usefulness to the business of the Company and its Restricted Subsidiaries as a whole, as determined in good faith by the Company and (ii) in the ordinary course of business, any swap of assets, or lease, assignment or sublease of any real or personal property, in exchange for services (including in connection with any outsourcing arrangements) of comparable or greater value or usefulness to the business of the Company and its Restricted Subsidiaries as a whole, as determined in good faith by the Company;

(g)    foreclosure or any similar action with respect to any property or other asset of the Company or any of its Restricted Subsidiaries;

(h)    any sale of Equity Interests in, or other ownership interest in or assets or property, including Indebtedness, or other securities of, an Unrestricted Subsidiary;

(i)    any lease, assignment, license or sublease which does not materially interfere with the business of the Company and its Restricted Subsidiaries;

(j)    any grant of any license of patents, trademarks, know-how or any other intellectual property which does not materially interfere with the business of the Company and its Restricted Subsidiaries;

(k)    any transfer of accounts receivable and related assets of the type specified in the definition of "Receivables Financing" (or a fractional undivided interest therein) in a Qualified Receivables Financing;

(l)    any financing transaction with respect to property built or acquired by the Company or any Restricted Subsidiary after the Term Loan Escrow Release Date, including any Sale/Leaseback Transaction or asset securitization permitted by this Agreement;

(m)    dispositions in connection with Permitted Liens;

(n)    any disposition of Capital Stock of a Restricted Subsidiary pursuant to an agreement or other obligation with or to a Person (other than the Company or a Restricted Subsidiary) from whom such Restricted Subsidiary was acquired or from whom such Restricted Subsidiary acquired its business and assets (having been newly formed in connection with such acquisition), made as part of such acquisition and in each case comprising all or a portion of the consideration in respect of such sale or acquisition;

(o)    dispositions of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings and exclusive of factoring or similar arrangements;

(p)    any surrender or waiver of contract rights or the settlement, release, recovery on or surrender of contract, tort or other claims of any kind;

(q)    pursuant to buy-sell arrangements or similar agreements between Lyondell China Holdings Limited of Ningbo ZRCC and Lyondell Chemical Company Ltd.; and

(r)    any sale, conveyance or other disposition of property or assets of the
Company or any Restricted Subsidiary (whether in a single transaction or a series of
related transactions) in connection with the Emergence Transactions.

"**Assignee**" has the meaning set forth in Section 10.07(a).

"**Assignment and Assumption**" means an Assignment and Assumption substantially in the form
of Exhibit D.

"**Assignment Tax**" has the meaning set forth in Section 3.01(b).

"**Attorney Costs**" means and includes all reasonable fees, reasonable out-of-pocket expenses and
disbursements of Cahill Gordon & Reindel LLP and (without duplication) a single external local counsel
to the Joint Lead Arrangers in each jurisdiction reasonably determined by the Administrative Agent.

"**Auction Manager**" has the meaning set forth in Section 2.13(a).

"**Auction Notice**" means an auction notice given by the Borrower in accordance with the Auction
Procedures with respect to a Purchase Offer.

"**Auction Procedures**" means the auction procedures with respect to Purchase Offers set forth in
Exhibit I.

"**Audited Financial Statements**" means the audited consolidated financial statements of the
Company's predecessor, LyondellBasell Industries AF S.C.A., for the fiscal year ended December 31,
2009, which shall include results for Fiscal Years 2007, 2008 and 2009.

"**Average Brent Crude Oil Price**" means, for any fiscal quarter, the average specified price per
barrel of Brent blend crude oil for delivery on each day of such fiscal quarter, stated in Dollars, published
under the heading "Crude Price Assessments:  International:  Brent (DTD)" in the Platts Marketwire that
reports prices effective on such dates and certified to the Administrative Agent by a Responsible Officer
of the Borrower.  The calculation of the Borrower shall be conclusive absent manifest error.

"**Bankruptcy Code**" means the United States Bankruptcy Code, 11 U.S.C. Section 101 et seq., as
amended from time to time.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of
New York.

"**Base Rate**" means, for any day, a fluctuating rate per annum equal to the highest of (a) the
Federal Funds Rate plus ½ of 1%, (b) the rate of interest in effect for such day as publicly announced
from time to time by the Administrative Agent as its "prime rate" and (c) 1.0% per annum plus the
Eurodollar Rate (for avoidance of doubt after giving effect to the proviso of the definition thereof)
applicable to a Credit Extension with an Interest Period of one (1) month.

The "prime rate" is a rate set by the Administrative Agent based upon various factors including
the Administrative Agent's costs and desired return, general economic conditions and other factors, and is
used as a reference point for pricing some loans, which may be priced at, above, or below such announced
rate.  Any change in the Base Rate due to a change in the prime rate established by the Administrative
Agent or the Federal Funds Rate shall be effective on the date such change is effective.  The prime rate is
not necessarily the lowest rate charged by the Administrative Agent to its customers.

"**Base Rate Loan**" means a Loan that bears interest based on the Base Rate.

"**Basell GmbH**" means Basell Germany Holdings GmbH.

"**Berre Facility**" means any receivables-backed credit or factoring facility entered into by one or more Foreign Subsidiaries (other than Basell GmbH) related to receivables of the refinery located in Berre, France, and any permitted refinancings thereof.

"**Board of Directors**" means, as to any Person, the board of directors or, supervisory board of such Person, or equivalent governing body (or, if such Person is a partnership or limited liability company, the board of directors or other governing body of the general partner of such Person or manager) or any duly authorized committee thereof.

"**Borrower**" means, (x) prior to the consummation of the Lyondell Assumption, the references to the "Borrower" in this Agreement refer only to the Escrow Borrower and (y) after the consummation of the Lyondell Assumption, the references to the "Borrower" in this Agreement refer only to Lyondell Chemical and not to any of its Subsidiaries.

"**Borrower Restricted Information**" shall mean material non-public information with respect to the Company, the Borrower or their respective Subsidiaries or with respect to the securities of any such Person.

"**Borrowing Base**" has the meaning set forth in Section 7.01(c)(ii).

"**Business Acquisition**" means the acquisition by the Company or any Restricted Subsidiary of the Company of the assets of any Person (other than a Restricted Subsidiary of the Company) which constitute all or substantially all of the assets of such Person or comprises any division or line of business of such Person or any other properties or assets of such Person.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York and if such day relates to any interest rate settings as to a Eurodollar Rate Loan, any fundings, disbursements, settlements and payments in respect of any such Eurodollar Rate Loan, or any other dealings to be carried out pursuant to this Agreement in respect of any such Eurodollar Rate Loan, means any such day on which dealings in deposits in Dollars are conducted by and between banks in the London interbank eurodollar market.

"**Calculation Date**" has the meaning set forth in the definition of "Fixed Charge Coverage Ratio."

"**Capital Expenditures**" means, for any Person, any expenditure which, in accordance with GAAP, is treated as a capital expenditure in the audited consolidated financial statements of the Company and its Subsidiaries.

"**Capital Stock**" means:

     (1)    in the case of a corporation, corporate stock or shares;

     (2)    in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)        in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)        any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"**Capitalized Lease Obligation**" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP.

"**Case** " means the proceedings of LyondellBasell Industries AF S.C.A. and certain of its Subsidiaries and affiliates, as debtors and debtors in possession under Chapter 11.

"**Cash Collateral Account**" means a blocked account in the name of the Collateral Agent at [_____] (or another commercial bank acting as successor to the Collateral Agent pursuant to this Agreement), and otherwise established in a manner reasonably satisfactory to the Collateral Agent.

"**Cash Equivalents**" means:

(1)        Dollars, pounds sterling, Euros, the national currency of any member state in the European Union or, in the case of any Foreign Subsidiary that is a Restricted Subsidiary, such local currencies held by it from time to time in the ordinary course of business;

(2)        securities issued or directly and fully guaranteed or insured by the U.S. government or any country that is a member of the European Union (other than Greece or Portugal) or any agency or instrumentality thereof in each case maturing not more than two years from the date of acquisition;

(3)        certificates of deposit, time deposits and Eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances, in each case with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank or trust company having capital and surplus in excess of $250,000,000 and whose long-term debt is rated "A" or the equivalent thereof by Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency);

(4)        repurchase obligations and reverse repurchase obligations for underlying securities of the types described in clauses (2) and (3) above entered into with any financial institution meeting the qualifications specified in clause (3) above;

(5)        commercial paper issued by a corporation (other than an Affiliate of the Company) rated at least "A1" or the equivalent thereof by Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) and in each case maturing within one year after the date of acquisition;

(6)        readily marketable direct obligations issued by any state of the United States of America or any political subdivision thereof having one of the two highest rating categories obtainable from either Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) in each case with maturities not exceeding two years from the date of acquisition;

(7)    Indebtedness issued by Persons (other than the Sponsors or any of their Affiliates) with a rating of "A" or higher from S&P or "A-2" or higher from Moody's (or reasonably equivalent ratings of another internationally recognized ratings agency) in each case with maturities not exceeding two years from the date of acquisition;

(8)    Dollar-denominated money market funds as defined in Rule 2a-7 of the General Rules and Regulations promulgated under the Investment Company Act of 1940;

(9)    tax-exempt floating rate option tender bonds backed by letters of credit issued by a national or state bank whose long-term unsecured debt has a rating of AA or better by S&P or Aa2 or better by Moody's or the equivalent rating by any other internationally recognized rating agency; and

(10)    investment funds investing at least 95% of their assets in securities of the types described in clauses (1) through (9) above.

"**Casualty Event**" means any event that gives rise to the receipt by the Company or any Restricted Subsidiary of any insurance proceeds or condemnation awards in excess of $50,000,000 in respect of any equipment, fixed assets or Real Property (including any improvements thereon) to replace or repair such equipment, fixed assets or Real Property.

"**Catalyst Sale/Leaseback Transaction**" means a Sale/Leaseback Transaction that relates to a catalyst containing one or more precious metals used by the Company or any of its Restricted Subsidiaries in the ordinary course of business.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as subsequently amended.

"**Change in Law**" means, the introduction of, or any change in or in the interpretation of, any law, treaty or governmental rule, regulation or order or the compliance with any guideline, request or directive from any Governmental Authority (whether or not having the force of law).

"**Change of Control**" means the occurrence of any of the following:

(1)    the sale, lease or transfer, in one or a series of related transactions, of all or substantially all of the assets of the Company and its Subsidiaries, taken as a whole, to any Person other than a Permitted Holder; or

(2)    the Company becomes aware of (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) the acquisition by any Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision), including any group acting for the purpose of acquiring, holding or disposing of securities (within the meaning of Rule 13d-5(b)(1) under the Exchange Act), other than the Permitted Holders, in a single transaction or in a related series of transactions, by way of acquisition, merger, amalgamation, consolidation, transfer, conveyance or other business combination or purchase of beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act, or any successor provision) of more than 50% of the total voting power of the Voting Stock of the Company.

"**Chapter 11**" means Chapter 11 of the Bankruptcy Code.

"**Closing Date**" means the date on which the conditions precedent to the Closing Date are satisfied and this Agreement becomes effective, in each case, in accordance with Section 4.01.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Co-Documentation Agents**" means Deutsche Bank Securities Inc., Morgan Stanley Senior Funding, Inc. and Credit Suisse Securities (USA) LLC, in their capacity as co-documentation agents for the Lenders under the Loan Documents, and their successors in such capacity.

"**Collateral**" means all property subject or purported to be subject, from time to time, to a Lien under any Security Documents.

"**Collateral Agent**" means UBS AG, Stamford Branch in its capacity as collateral agent or pledgee under any of the Security Documents, and its successors in such capacity.

"**Collateral and Guaranty Requirement**" means, at any time, the requirement that, subject to Section 6.14(a) and the Agreed Security Principles:

(a)    the Administrative Agent and the Collateral Agent shall have received each Security Document required to be delivered on the Closing Date pursuant to Section 4.01(a)(i), on the Term Loan Escrow Release Date pursuant to Section 4.02(c) or subsequent to the Term Loan Escrow Release Date pursuant to Sections 6.12 or 6.14 at such time, duly executed by each Loan Party party thereto;

(b)    all Obligations shall have been unconditionally guaranteed (together, the "**Guaranty**") by (i) the Company and (ii) each Wholly Owned Domestic Subsidiary (other than any Excluded Subsidiary) of the Company and the Borrower (each such Person described in this clause (b), a "**Guarantor**"), in each case on the Term Loan Escrow Release Date and to the extent permitted by applicable law and regulation, in each case as reasonably determined by the Company; *provided* that any Subsidiary of the Company or the Borrower that shall guaranty the Senior Notes or the Plan Roll-Up Notes shall also be a Guarantor hereunder;

(c)    the Guaranty and all Obligations shall have been secured by, subject to the Intercreditor Agreements and the Perfection Requirements, a first-priority security interest to the extent legally possible and to the extent required by the Security Documents in (i) all Equity Interests of each first-tier Domestic Subsidiary of (A) the Company, (B) each Guarantor domiciled in the U.S. and (C) the Borrower, and (ii) 65% of the voting Equity Interests and 100% of the non-voting Equity Interests of each first-tier Foreign Subsidiary of (X) the Company, (Y) each Guarantor domiciled in the U.S., and (Z) the Borrower, in the case of each clause (i) and (ii), other than the Equity Interests of (x) any securitization entity or (y) any Excluded Asset;

(d)    to the extent otherwise legally possible and to the extent required by the Security Documents, the Guaranty shall have been secured by a first-priority security interest in, and mortgages on, substantially all tangible and intangible assets (other than the ABL Facility Collateral and the Excluded Assets (including, for the avoidance of doubt, the Equity Interests not referred to in (c) above)) of each Guarantor (other than the Company);

(e)    to the extent otherwise legally possible and to the extent required by the Security Documents, the Guaranty shall have been secured by a second-priority security interest in the ABL Facility Collateral of each Guarantor (other than the Excluded Assets);

(f)       none of the Collateral shall be subject to any Liens other than Liens permitted by Section 7.06; and

(g)       the Collateral Agent shall have received:

(1)       counterparts of a Mortgage or other appropriate security interest with respect to each owned or ground leased Real Property or pipeline easements and other similar Real Property (except any such easement or other Real Property of the type that would be excluded from the grant set forth in Section 2.1 of any Mortgage by the penultimate paragraph therein) described on Schedule 1.01D or required to be delivered pursuant to Sections 4.02, 6.12 or 6.14 at such time (the "**Mortgaged Properties**") duly executed and delivered by the record owner of such Real Property or, in the case of Real Property subject to a ground lease, the tenant holding the leasehold interest in such Real Property;

(2)       in respect of any Mortgaged Property located in the United States (other than pipeline easements and other similar Real Property), a title policy or title policies issued by the title company insuring the Lien of each such Mortgage as a valid Lien on the property described therein, free of any other Liens except as expressly permitted by Section 7.06; and

(3)       such existing surveys, abstracts, certificates, existing title documents, existing appraisals, legal opinions (to the extent the Administrative Agent or the Collateral Agent determines in its reasonable good faith judgment that there is an issue of state Law that should be addressed by a legal opinion) and other documents as the Administrative Agent may reasonably request in good faith with respect to any such Mortgaged Property (other than, in the case of each of the foregoing, pipeline easements and other similar Real Property), in each case in form and substance reasonably satisfactory to the Administrative Agent and Collateral Agent.

Nothing in this definition of "Collateral and Guaranty Requirement" shall require the creation or perfection of pledges or security interests in, or the obtaining of title insurance or surveys with respect to:

(a)       any fee owned Real Property with a value of less than $25,000,000 and leasehold interests to the extent not included in Schedule 1.01D;

(b)       motor vehicles and other assets subject to certificates of title and commercial tort claims;

(c)       assets specifically requiring perfection through control agreements (i.e., deposit accounts, securities accounts, letter of credit rights, etc.) other than any ABL Facility Collateral that constitutes such an asset; and

(d)       assets for which the creation or perfection of security interests is not required pursuant to the Security Documents.

The Administrative Agent shall grant extensions of time for the perfection of security interests in or the obtaining of title insurance or other items required by the Collateral and Guaranty Requirement with respect to particular assets (including extensions beyond the Term Loan Escrow Release Date for the perfection of security interests in the assets of the Loan Parties on such date) where it determines, in consultation with the Company, that perfection cannot be accomplished using commercially reasonable

efforts by the time or times at which it would otherwise be required by this Agreement or the Security Documents.

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary, Liens required to be granted from time to time pursuant to the Collateral and Guaranty Requirement shall be subject to exceptions and limitations set forth in the Security Documents.

"**Commitment**" means a Term Commitment or an Incremental Term Commitment as the context may require.

"**Committed Loan Notice**" means a notice of (a) a request to borrow Loans, (b) a conversion of Loans from one Type to the other, or (c) a continuation of Eurodollar Rate Loans pursuant to Section 2.02(a), which, if in writing, shall be substantially in the form of Exhibit A.

"**Common Collateral**" means, at any time, Collateral in which the holders of two or more series of First Priority Lien Obligations (or their respective authorized representatives) hold a valid and perfected security interest at such time. If more than two series of First Priority Lien Obligations are outstanding at any time and the holders of less than all series of First Priority Lien Obligations hold a valid and perfected security interest in any Collateral at such time then such Collateral shall constitute Common Collateral for those series of First Priority Lien Obligations that hold a valid security interest in such Collateral at such time and shall not constitute Common Collateral for any series which does not have a valid and perfected security interest in such Collateral at such time.

"**Company**" means LyondellBasell Industries N.V., a *naamloze vennootschap* (public limited liability corporation) formed under the laws of the Netherlands, and any successor in interest thereto.

"**Company Materials**" has the meaning set forth in Section 6.01.

"**Compensation Period**" has the meaning set forth in Section 2.10(c)(ii).

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit C.

"**Confirmation Order**" means an order of the Bankruptcy Court (i) confirming the Plan of Reorganization in accordance with section 1129 of the Bankruptcy Code and (ii) approving and authorizing the transactions contemplated by this Agreement, the other Loan Documents and the Plan of Reorganization and otherwise not inconsistent with the provision hereof and thereof, which order shall be in full force and effect, shall not have been stayed, reversed, vacated or otherwise modified (except as reasonably satisfactory to the Administrative Agent).

"**Consolidated EBITDA**" means, with respect to any Person, for any period, the sum (without duplication) of:

(1)     Consolidated Net Income;

(2)     to the extent Consolidated Net Income has been reduced thereby;

(a)     taxes of such Person and its Restricted Subsidiaries paid or accrued in accordance with GAAP for such period based on income, profits or capital, including, without limitation, state, franchise, property and similar taxes and foreign withholding

taxes (including penalties and interest related to such taxes or arising from tax examinations), or such equivalent items in any foreign jurisdiction;

(b)         Consolidated Interest Expense;

(c)         Consolidated Non-cash Charges;

(d)         the amount of net loss resulting from the payment of any premiums, fees or similar amounts that are required to be paid under the terms of the instrument(s) governing any Indebtedness upon the repayment, prepayment or other extinguishment of such Indebtedness in accordance with the terms of such Indebtedness,

(e)         any expenses or charges (other than Consolidated Non-cash Charges) related to any issuance of Equity Interests, any Investment, acquisition, disposition, recapitalization or Incurrence, repayment, amendment or modification of Indebtedness permitted to be Incurred or repaid by this Agreement (including a refinancing thereof) (in each case, whether or not successful), including, without limitation, (i) such fees, expenses or charges related to the offering of the Senior Notes and the Credit Facility Indebtedness and other Exit Financing, (ii) any amendment or other modification of this Agreement or other Indebtedness, (iii) any additional interest in respect of the Senior Notes and (iv) commissions, discounts, yield and other fees and charges (including any interest expense) related to any Receivables Financing; and

(f)         business optimization expenses and other restructuring charges, reserves or expenses (which, for the avoidance of doubt, shall include, without limitation, the effect of inventory optimization programs, facility consolidations, retention, headcount reductions, systems establishment costs, contract termination costs, future lease commitments and excess pension charges); and

(3)         the amount of net cost savings projected by such Person in good faith to be realized by specified actions taken or to be taken prior to or during such period (calculated on a pro forma basis as though such cost savings had been realized on the first day of such period); *provided* that (x) such cost savings are reasonably identifiable and factually supportable and (y) such actions have been taken or are to be taken within twelve months of the date of determination to take such action and the benefit is expected to be realized within twelve (12) months of taking such action; <u>minus</u>

(4)         any non-cash gains increasing Consolidated Net Income of such Person for such period (excluding (i) the recognition of deferred revenue or any items which represent the reversal of any accrual of, or cash reserve for, anticipated cash charges that reduced EBITDA in any prior period and any items for which cash was received in a prior period, (ii) items referenced in clause (e) of Consolidated Net Income and (iii) gains which have been offset against losses in determining Consolidated Net Income but for which the loss has not been added back as a Consolidated Non-cash Charge pursuant to the definition of Consolidated EBITDA);

all as determined on a consolidated basis for such Person and its Restricted Subsidiaries in accordance with GAAP.

Notwithstanding anything herein to the contrary, Consolidated EBITDA for the fiscal quarter ending (i) June 30, 2009 shall be deemed to be $551,000,000, (ii) September 30, 2009 shall be deemed to be $757,000,000 and (iii) December 31, 2009 shall be deemed to be $578,000,000, before giving *pro*

*forma* effect to any transaction occurring after the Closing Date, as permitted under the definitions of "Fixed Charge Coverage Ratio" and "Secured Indebtedness Leverage Ratio."

"**Consolidated Interest Expense**" means, with respect to any Person for any period, the consolidated interest expense (net of interest income for such period) of such Person and its Restricted Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, to the extent such expense was deducted in computing Consolidated Net Income, including, without limitation:

      (1)      amortization of original issue discount,

      (2)      the interest component of Capitalized Lease Obligations paid, accrued and/or scheduled to be paid or accrued,

      (3)      net payments and receipts (if any) pursuant to interest rate Hedging Obligations,

      (4)      consolidated capitalized interest of such Person and its Restricted Subsidiaries for such period, whether paid or accrued, and

      (5)      the interest portion of any deferred payment obligation,

but excluding, in each case, any amortization of fees, debt issuance costs and commissions incurred in connection with the Credit Facilities, any Receivables Financing, the issuance of the Senior Notes, the Plan Roll-Up Notes, the Euro Securitization and any other debt issuance.

For purposes of this definition, interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by the Borrower to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

"**Consolidated Net Income**" means, with respect to any Person, for any period:

      (1)      the Net Income of such Person and its Restricted Subsidiaries for such period on a consolidated basis; <u>plus</u>

      (2)      cash dividends or distributions paid to such Person or any Restricted Subsidiary of such Person by any other Person (the "**Payor**") other than a Restricted Subsidiary, to the extent not otherwise included in Consolidated Net Income, which have not been derived from Indebtedness of the Payor to the extent such Indebtedness is Guaranteed by such referent Person or any Restricted Subsidiary of such referent Person;

*provided* that there shall be excluded therefrom, without duplication (but only to the extent included in the calculation of the foregoing):

      (a)      (i) any net after-tax income or loss from operating results of discontinued operations as defined by GAAP, and (ii) any net after-tax gains or losses from sales of discontinued operations;

      (b)      any net after-tax extraordinary, nonrecurring or unusual gains or losses (<u>less</u> all fees and expenses relating thereto or expenses or charges, any severance expenses, relocation expenses, curtailments or modifications to pension and post-retirement employee benefit plans, any expenses related to any reconstruction, decommissioning, recommissioning or reconfiguration of fixed assets for alternate uses

      

and fees, expenses or charges relating to facilities closing costs, acquisition integration costs, facilities opening costs, project start-up costs, business optimization costs, signing, retention or completion bonuses, expenses or charges related to any issuance of Equity Interests, Investment, acquisition, disposition, recapitalization or issuance, repayment, refinancing, amendment or modification of Indebtedness (in each case, whether or not successful), and all costs and expenses of such Person and its Restricted Subsidiaries Incurred in connection with the Cases and the Exit Financings);

(c)    the Net Income of any Payor, other than a Restricted Subsidiary of such Person or Net Income of such Payor that is accounted for by the equity method of accounting, except to the extent of cash dividends or distributions paid to such Person or to a Restricted Subsidiary of such Person by such Payor (or to the extent converted into cash);

(d)    the Net Income (but not loss) of any Restricted Subsidiary of such Person that is not a guarantor to the extent that the declaration of dividends or similar distributions by that Restricted Subsidiary of that income is restricted; *provided, however*, that the Net Income of Restricted Subsidiaries shall only be excluded in any calculation of Consolidated Net Income of the Company as a result of application of this clause (d) if the restriction on dividends or similar distributions results from consensual restrictions other than any restriction contained in clauses (1), (2) and (4) and, to the extent related to such clauses (1), (2) and (4), clause (15) under Section 7.03;

(e)    (i) any restoration to income of any contingency reserve, except to the extent that provision for such reserve was made out of Consolidated Net Income accrued at any time following the Closing Date; and (ii) any restoration to or deduction from income for changes in estimates related to the post-emergence settlement of pre-petition claims obligations in relation with Chapter 11 following the Closing Date;

(f)    in the case of a successor to such Person by consolidation or merger or as a transferee of such Person's assets, any gains or losses of the successor corporation prior to such consolidation, merger or transfer of assets;

(g)    any charges or credits relating to any purchase accounting adjustments or to the adoption of fresh start accounting principles;

(h)    any (i) one-time non-cash compensation charges, and (ii) non-cash costs or expenses resulting from stock option plans, employee benefit plans, compensation charges or post-employment benefit plans, or grants or awards of stock, stock appreciation or similar rights, stock options, restricted stock, Preferred Stock or other rights;

(i)    Net Income for such period shall not include the cumulative effect of a change in accounting principles during such period;

(j)    any net after-tax gains or losses (less all fees and expenses or charges relating thereto) attributable to business dispositions or asset dispositions other than in the ordinary course of business (as determined in good faith by management of the Company) or reserves relating thereto;

(k)      any net after-tax gains or losses (<u>less</u> all fees and expenses or charges relating thereto) attributable to the early extinguishment of Indebtedness, Hedging Obligations or other derivative instruments entered in relation with the Indebtedness extinguished;

(l)      any gain or loss for such period from currency translation gains or losses or net gains or losses related to currency remeasurements of Indebtedness (including any net loss or gain resulting from Hedging Obligations for currency exchange risk entered in relation with Indebtedness); and

(m)      any impairment charges or asset write-offs, in each case pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP.

Notwithstanding the foregoing, for the purpose of Section 7.02 only, there shall be excluded from Consolidated Net Income any dividends, repayments of loans or advances or other transfers of assets from Unrestricted Subsidiaries of the Company or a Restricted Subsidiary of the Company to the extent such dividends, repayments or transfers increase the amount of Restricted Payments permitted under clause (iv) or (v) of the definition of "Applicable Amount".

"**Consolidated Net Tangible Assets**" means, with respect to any Person, the Total Assets of such Person and its Restricted Subsidiaries <u>less</u> goodwill and intangibles (other than intangibles arising from, or relating to, intellectual property, licenses or permits (including, but not limited to, emissions rights) of such Person), in each case calculated in accordance with GAAP, *provided*, that in the event that such Person or any of its Restricted Subsidiaries assumes or acquires any assets in connection with the acquisition by such Person and its Restricted Subsidiaries of another Person subsequent to the commencement of the period for which the Consolidated Net Tangible Assets is being calculated but prior to the event for which the calculation of the Consolidated Net Tangible Assets is made, then the Consolidated Net Tangible Assets shall be calculated giving *pro forma* effect to such assumption or acquisition of assets, as if the same had occurred at the beginning of the applicable period.

"**Consolidated Non-cash Charges**" means, with respect to any Person, for any period, the consolidated depreciation, amortization and other non-cash expenses of such Person and its Restricted Subsidiaries (including the amortization of prior service costs and actuarial gains and losses related to pensions and other post-employment benefits) (including any lower-of-cost-or-market adjustments of inventory) reducing Consolidated Net Income of such Person and its Restricted Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP, *provided* that if any such non-cash expenses represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA in such future period to the extent paid, but excluding from this proviso, for the avoidance of doubt, amortization of a prepaid cash item that was paid in a prior period.

"**Consolidated Working Capital**" means, as of any date, the excess of (a) the sum of all amounts (other than cash and Cash Equivalents) that would be set forth opposite the caption "total current assets" (or any like caption) on a consolidated balance sheet of the Company and its Restricted Subsidiaries at such date <u>over</u> (b) the sum of all amounts that would be set forth opposite the caption "total current liabilities" (or any like caption) on a consolidated balance sheet of the Company and the Restricted Subsidiaries on such date, including deferred revenue but excluding, without duplication, the current portion of any Funded Debt and the current portion of any Asset Backed Credit Facilities (whether on or off balance sheet).

"**Contingent Obligations**" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("**primary obligations**") of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent:

(1)    to purchase any such primary obligation or any property constituting direct or indirect security therefor;

(2)    to advance or supply funds:

(a)    for the purchase or payment of any such primary obligation; or

(b)    to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

(3)    to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**" has the meaning set forth in the definition of "Affiliate."

"**Credit Agreement Obligations**" has the meaning set forth in the definition of "Obligations."

"**Credit Extension**" means each of the following:  (a) a Term Borrowing and (b) the making of Incremental Term Loans, if any.

"**Credit Facilities**" means:

(1)    this Agreement,

(2)    any Asset Backed Credit Facility;

(3)    any debt facilities or other financing arrangements (including, without limitation, commercial paper facilities) providing for revolving credit loans, term loans, letters of credit or other Indebtedness, including any notes, mortgages, guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements or refundings thereof and any indentures or credit facilities or commercial paper facilities that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount permitted to be borrowed thereunder or alters the maturity thereof (*provided* that such increase in borrowings is permitted under Section 7.01) or adds Restricted Subsidiaries as additional borrowers or guarantors thereunder and whether by the same or any other agent, lender or group of lenders; and

(4)    any such agreements, instruments or guarantees governing Indebtedness Incurred to refinance any Indebtedness or commitments referred to in clauses (1), (2) and (3) above whether by the same or any other lender or group of lenders.

"**Credit Facility Indebtedness**" means any and all amounts payable under or in respect of the Credit Facilities as amended, restated, supplemented, waived, replaced, restructured, repaid, refunded, refinanced or otherwise modified from time to time, including principal, premium (if any), interest (including interest accruing on or after the filing of any petition in bankruptcy or for reorganization relating to the Company whether or not a claim for post-filing interest is allowed in such proceedings), fees, charges, expenses, reimbursement obligations, guarantees and all other amounts payable thereunder or in respect thereof.

"**Currency Agreement**" means, with respect to any Person, any foreign exchange contract, currency swap agreement, currency futures contract, currency option contract, currency derivative or other similar agreement to which such Person is a party or beneficiary.

"**Debtor**" has the meaning set forth in the introductory paragraphs of this Agreement.

"**Debtor Relief Laws**" means the Bankruptcy Code, the Dutch Bankruptcy Act (*Faillissementswet*) and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, *faillissement*, *surseance van betaling*, *onderbewindstelling*, *ontbinding*, or similar debtor relief Laws of the United States, The Netherlands, or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"**Default**" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"**Default Rate**" means an interest rate equal to (a) the Base Rate <u>plus</u> (b) the Applicable Rate, if any, applicable to Base Rate Loans <u>plus</u> (c) 2.00% per annum; *provided* that with respect to any Eurodollar Rate Loan, the Default Rate means an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan <u>plus</u> 2.00% per annum, in each case to the fullest extent permitted by applicable Law.

"**Defaulting Lender**" means any Lender that (a) has failed to fund any portion of the Loans required to be funded by it hereunder within one (1) Business Day of the date required to be funded by it hereunder, unless the subject of a good faith dispute or subsequently cured (but only from when subsequently cured), (b) has otherwise failed to pay over to the Administrative Agent, the Collateral Agent or any other Lender any other amount required to be paid by it hereunder within one (1) Business Day of the date when due, unless the subject of a good faith dispute or subsequently cured (but only from when subsequently cured), or (c) has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding.

"**Designated Non-cash Consideration**" means the Fair Market Value of non-cash consideration received by the Company or one of its Restricted Subsidiaries in connection with an Asset Sale that is so designated as Designated Non-cash Consideration pursuant to an Officer's Certificate, setting forth the basis of such valuation, <u>less</u> the amount of Cash Equivalents received in connection with a subsequent sale of such Designated Non-cash Consideration.

"**Designated Preferred Stock**" means Preferred Stock of the Company or any direct or indirect parent entity of the Company (other than Disqualified Stock), that is issued for cash (other than to the Company or any of its Subsidiaries or an employee stock ownership plan or trust established by the Company or any of its Subsidiaries) and is so designated as Designated Preferred Stock, pursuant to an Officer's Certificate, on the issue date thereof.

"**DIP Facilities**" means, collectively, that certain (i) term loan agreement identified as the Debtor-in-Possession Credit Agreement, dated as of March 3, 2009, entered by and among LyondellBasell Industries AF S.C.A., Lyondell Chemical Company, Basell USA Inc., Equistar Chemicals, LP, Houston Refining LP, Millennium Chemicals Inc., Millennium Petrochemicals Inc., UBS AG, Stamford Branch, as administrative agent and collateral agent and the other parties party thereto from time to time and (ii) asset backed loan agreement identified as the Debtor-in-Possession Credit Agreement, dated as of March 3, 2009, entered by and among LyondellBasell Industries AF, S.C.A., Lyondell Chemical Company, Basell USA Inc., Equistar Chemicals, LP, Houston Refining LP, Millennium Chemicals Inc., Millennium Petrochemicals Inc., Citibank, N.A., as administrative agent and collateral agent and the other parties party thereto from time to time.

"**DIP Roll-Up Claims**" means the Roll-Up Loans and all related obligations of the Borrower and certain of its Affiliates under, and as is defined in, the Debtor-in-Possession Credit Agreement, dated as of March 3, 2009 among LyondellBasell Industries AF S.C.A., the other borrowers thereto (each, a debtor and debtor-in-possession under Chapter 11), the administrative agent and collateral agent, the syndication agent, joint lead arranger and sole bookrunner, as amended, supplemented, modified, extended, restructured, renewed, restated, refinanced or replaced in whole or in part from time to time, and as ordered by the Bankruptcy Court, as of the Term Loan Escrow Release Date.

"**Disclosure Statement**" means that certain disclosure statement dated as of December 23, 2009 and filed with the Bankruptcy Court with respect to the Cases, as amended, supplemented, amended and restated or otherwise modified from time to time.

"**Disqualified Stock**" means, with respect to any Person, any Capital Stock of such Person which, by its terms (or by the terms of any security into which it is convertible or for which it is redeemable or exchangeable), or upon the happening of any event:

(1)    matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise (other than as a result of a change of control or asset sale),

(2)    is convertible or exchangeable for Indebtedness or Disqualified Stock of such Person, or

(3)    is redeemable at the option of the holder thereof, in whole or in part (other than solely as a result of a change of control or asset sale),

in each case prior to ninety-one (91) days after the earlier of the maturity date of the Senior Notes or the date the Senior Notes are no longer outstanding; *provided*, that only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock; *provided*, *further*, that if such Capital Stock is issued to any employee or to any plan for the benefit of employees of the Company or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Company in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability; *provided*, *further*, that any class of Capital Stock of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of Capital Stock that is not Disqualified Stock shall not be deemed to be Disqualified Stock.

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Dollar Equivalent Amount**" has the meaning set forth in Section 1.08.

"**Domestic Subsidiary**" means a Restricted Subsidiary that is not a Foreign Subsidiary.

"**Dutch Civil Code**" means the Dutch Civil Code (*Burgerlijk Wetboek*).

"**EBITDA**" means the earnings before interest, tax, depreciation and amortization for a Person, calculated in the same manner as Consolidated EBITDA (without giving effect to clause (3) of the definition thereof).

"**ECF Deferral Amount**" has the meaning set forth in Section 2.03(b)(i)(4).

"**Effect of Bankruptcy**" means any default or other legal consequences with respect to any contractual obligation, contract or agreement of any Debtor in the Cases, including the implementation of any stay, or the rejection of any such contractual obligation, contract or agreement with the approval of the Bankruptcy Court (to the extent required to be effective).

"**Emergence Transactions**" means all transactions arising out of the Reorganization Plan and emergence from Chapter 11, including, but not limited to, Exit Financing.

"**EMU Legislation**" means the legislative measures of the European Community relating to Economic and Monetary Union.

"**Environment**" means indoor air, ambient air, surface water, groundwater, drinking water, land surface, subsurface strata, and natural resources such as wetlands, flora and fauna.

"**Environmental Laws**" means the common law and any and all federal, state, local, and foreign statutes, Laws, regulations, ordinances, rules, judgments, orders, decrees, permits, licenses, agreements or governmental restrictions relating to pollution, the protection of the Environment, the generation, treatment, storage, transport, distribution, handling or recycling of Hazardous Materials or the presence, Release or threat of Release of Hazardous Materials and, to the extent relating to exposure to Hazardous Materials, human health and workplace health and safety.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of investigation and remediation, fines, penalties or indemnities), of the Loan Parties or any Restricted Subsidiary resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or recycling of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Interests**" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"**Equity Offering**" means any public or private sale after the Closing Date of common stock or Preferred Stock (other than Disqualified Stock) of the Company or any direct or indirect parent entity of the Company (to the extent the proceeds thereof are contributed to the Company), as applicable, on a primary basis, other than:

(1)    public offerings with respect to the Company's or such direct or indirect parent entity's common stock registered on Form S-4 or Form S-8;

(2)    issuances to any Subsidiary of the Company; and

(3)    any such public or private sale that constitutes an Excluded Contribution.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that is under common control with a Loan Party or any Restricted Subsidiary within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) with respect to a Pension Plan, the failure to satisfy the minimum funding standard of Section 412 of the Code and Section 302 of ERISA, whether or not waived; (c) the failure to make by its due date a required contribution under Section 412(m) of the Code (or Section 430(j) of the Code, as amended by the Pension Protection Act of 2006) with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (d) a withdrawal by a Loan Party, any Subsidiary or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (e) a complete or partial withdrawal by a Loan Party, any Subsidiary or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (f) the filing of a notice of intent to terminate, the treatment of ERISA Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan or the occurrence of any event or condition which could reasonably be expected to constitute grounds under ERISA for the termination of or the appointment of a trustee to administer any Pension Plan, in each case where ERISA Plan assets are not sufficient to pay all ERISA Plan liabilities; (g) the occurrence of an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon a Loan Party, any Subsidiary or any ERISA Affiliate; or (i) the occurrence of a nonexempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could reasonably be expected to result in liability to a Loan Party or any Restricted Subsidiary; *provided* that, notwithstanding the foregoing, the filing and continuation of the Cases and consummation of the transactions contemplated by the Plan of Reorganization shall not constitute ERISA Events.

"**ERISA Plan**" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by any Loan Party or Subsidiary or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"**Escrow Borrower**" has the meaning set forth in the introductory paragraph to this Agreement.

"**Euro**" and "**€**" mean the lawful currency of the Participating Member States introduced in accordance with EMU Legislation.

"**Euro Securitization**" means the transaction to be dated as of its effective date entered into in connection with the €450,000,000 revolving securitization facility of trade account receivables with Basell Sales and Marketing Company B.V. and Lyondell Chemie Nederland B.V., as sellers, and Basell Polyolefins Collections Ltd., as receivables purchaser, as such facility may be amended, supplemented,

modified, extended, restructured, renewed, restated, refinanced or replaced in whole or in part from time to time.

"**Eurocurrency Liabilities**" has the meaning set forth in Regulation D of the Federal Reserve Board.

"**Eurodollar Floor**" has the meaning set forth in the definition of "Eurodollar Rate."

"**Eurodollar Rate**" means, for any Interest Period in relation to any Loan, for any Interest Period, the rate obtained by <u>dividing</u> (i) the applicable LIBOR Rate for such Interest Period by (ii) a percentage equal to 1 <u>minus</u> the stated maximum rate (stated as a decimal) of all reserves, if any, required to be maintained against Eurocurrency Liabilities (including any marginal, emergency, special or supplemental reserves); *provided* that, in no event shall the Eurodollar Rate be less than 1.50% (the "**Eurodollar Floor**").

"**Eurodollar Rate Loan**" means a Loan, that bears interest at a rate based on the Eurodollar Rate.

"**Event of Default**" has the meaning set forth in Section 8.01.

"**Excess Cash Flow**" means, with respect to the Company and its Restricted Subsidiaries for any Fiscal Year, an amount equal to:

(a)     the sum, without duplication, of

(i)     Consolidated Net Income,

(ii)     an amount equal to all non-cash charges and losses to the extent deducted in arriving at such Consolidated Net Income, and

(iii)     decreases in Consolidated Working Capital not paid into the Working Capital Reserve Account (other than any such decreases arising from changes from on balance sheet to off balance sheet treatment of Asset Backed Credit Facilities, Receivables Financings or acquisitions or dispositions by the Company and its Restricted Subsidiaries completed during such period) <u>minus</u>

(b)     the sum, without duplication, of

(i)     an amount equal to all non-cash credits and gains to the extent included in arriving at such Consolidated Net Income and cash charges included in the definition of "Consolidated Net Income,"

(ii)     the aggregate amount of (A) Capital Expenditures made in cash or accrued during such period, but only to the extent such Capital Expenditures were financed (without duplication) other than with the substantially concurrent receipt of Externally Generated Funds and (B) Capital Expenditures the Company or any Restricted Subsidiary is obligated to make pursuant to a binding agreement but that are not made during such period; *provided* that such Capital Expenditure is made not later than 180 days after the end of such period and financed other than with the substantially concurrent receipt of Externally Generated Funds and that such Capital Expenditures when made shall not reduce Excess Cash Flow for such subsequent period,

(iii)    the aggregate amount of all principal payments of Indebtedness and (to the extent not deducted in arriving at such Consolidated Net Income) fees, premiums and similar amounts of the Company and the Restricted Subsidiaries (*provided* that fees, premiums and other payments in respect of Indebtedness, other than principal and interest, that reduces Excess Cash Flow pursuant to this clause (b)(iii) shall reduce the Applicable Amount), in each case, financed other than with the substantially concurrent receipt of Externally Generated Funds (including (A) the principal component of payments in respect of Capitalized Lease Obligations and (B) the amount of any scheduled repayment of Loans pursuant to Section 2.05), but excluding all prepayments of any Asset Backed Credit Facility made during such period and excluding all voluntary prepayments of Loans made during such period in cash,

(iv)    increases in Consolidated Working Capital for such period (other than any such increases arising from changes from off-balance sheet to on-balance sheet treatment of Asset Backed Credit Facilities, Receivables Financings or acquisitions or dispositions by the Company and the Restricted Subsidiaries completed during such period),

(v)    the amount of (A) Investments and acquisitions made in cash during such period to finance Investments permitted under clause (3) (but only to the extent reducing Consolidated Working Capital), (9), (10), (12) and (22) of "Permitted Investments" or Section 7.02(12)(a) to the extent that such Investments and acquisitions were financed other than with the substantially concurrent receipt of Externally Generated Funds and (B) Investments and acquisitions the Company or any Restricted Subsidiary is obligated to make in cash and are permitted by the Sections specified in clause (A) above pursuant to a binding agreement but that are not made during such period; *provided* that such Investment is made not later than 180 days after the end of such period and financed other than with the substantially concurrent receipt of Externally Generated Funds and that such Investments and/or acquisitions when made shall not reduce Excess Cash Flow for such subsequent period,

(vi)    the amount of cash taxes paid in such period to the extent they exceed the amount of tax expense deducted in determining Consolidated Net Income for such period, and

(vii)    to the extent not otherwise deducted in calculating Consolidated Net Income, all break fees, prepayment or make-whole premium or penalty payments, associated hedging break costs and premiums for replacement hedging fees, plus fees and expenses, in each case, to the extent paid in cash and reasonably incurred in connection with a Refinancing Indebtedness or any other prepayment of Refinancing Indebtedness during such period.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Excluded Assets**" means (i) any fee-Owned Real Property with a value of less than $25,000,000 and all leasehold interests (other than interest in ground leases agreed on the Closing Date), (ii) motor vehicles and other assets subject to certificates of title, letter of credit rights and commercial tort claims, (iii) assets specifically requiring perfection through control agreements (*i.e.*, cash, deposit accounts or other bank or securities accounts, etc.), (iv) the Capital Stock of any Joint Venture, or of any special purpose subsidiary whose material assets are comprised solely of the Capital Stock of such Joint Venture, where the pledge of such Capital Stock would be prohibited by any applicable contractual requirement pertaining to such Joint Venture, (v) the ABL Facility Collateral, (vi) preferred stock issued in connection with a Structured Financing Transaction that is (x) on the Closing Date is subject to an existing Lien on the Closing Date or (y) prohibited from being pledged, and (vii) certain other exceptions described in the Security Documents.

"**Excluded Contributions**" means aggregate net cash proceeds, including cash and the Fair Market Value of property other than cash, received by the Company after the Term Loan Escrow Release Date from:

>        (1)        contributions to its common equity capital, and

>        (2)        the sale (other than to a Subsidiary of the Company or to any Subsidiary management equity plan or stock option plan or any other management or employee benefit plan or agreement) of Capital Stock (other than Disqualified Stock and Designated Preferred Stock) of the Company, in each case designated as Excluded Contributions pursuant to an Officer's Certificate of the Company on or promptly after the date such capital contributions are made or the date such Capital Stock is sold, as the case may be.

"**Excluded Subsidiary**" means (i) any Receivables Subsidiary, (ii) any Qualified Non-Recourse Subsidiary, (iii) any Special Purpose Subsidiary, (iv) any Wholly Owned Domestic Subsidiary that is a subsidiary of a Foreign Subsidiary and (v) any Domestic Subsidiary of the Company as of the Term Loan Escrow Release Date or at any time thereafter meeting any one of the following conditions that has been designated by the Borrower as an Excluded Subsidiary in a writing to the Administrative Agent (which designation may be rescinded by granting a Guarantee in accordance with the requirements of this Agreement):  (a) the Total Assets of such Domestic Subsidiary determined as of the end of the fiscal year of the Company most recently ended for which financial statements are required to be delivered under this Agreement does not exceed $25,000,000, or (b) the Consolidated EBITDA of such Domestic Subsidiary does not exceed $25,000,000, for the period of four (4) consecutive quarters of the Company most recently ended for which financial statements are required to be delivered pursuant to this Agreement; *provided* that if, at any time or from time to time after the Term Loan Escrow Release Date, Domestic Subsidiaries (other than a Special Purpose Subsidiary) shall not be designated as Excluded Subsidiaries to the extent that such Domestic Subsidiaries under this clause (iii) would represent, in the aggregate, (a) 5% or more of Total Assets of the Company at the end of the most recently ended fiscal year of the Company or (b) 5% or more of the Consolidated EBITDA of the Company for the most recently ended fiscal year, in each case, based upon the most recent financial statements required to be delivered pursuant to this Agreement; *provided, further,* that, if the most recent financial statements required to be delivered pursuant to this Agreement for any fiscal quarter occurring after the Term Loan Escrow Release Date indicate that, by reason of subsequent changes following the designation of any one or more Restricted Subsidiaries as an Excluded Subsidiary or Excluded Subsidiaries, the foregoing requirements of this definition would not be complied with (other than as a result of an impairment charge), individually or in the aggregate, then the Company shall use commercially reasonable efforts to promptly (but in any event within 180 days after the date the financial statements are required), rescind such designations as are necessary, and provide such Guarantees as are necessary, so as to comply with the requirements of this Agreement.  Any uncured Default shall not occur until the expiration of such 180-day period *provided* such efforts are used.

"**Excluded Taxes**" means, in the case of each Lender and Agent (including, for purposes of this definition, any sub-agent appointed pursuant to Section 9.05), (a) Taxes imposed on or measured by its net income and franchise or capital taxes imposed on it in lieu of net income taxes, by reason of any present or former connection between the jurisdiction imposing such tax and such Agent or Lender (or its applicable Lending Office) other than any connections arising solely from such Agent or Lender (or its applicable Lending Office) having executed, delivered, been party to, received or perfected a security interest under or performed its obligations under, received payment under or enforced, and/or engaged in any other transaction pursuant to any Loan Document; (b) any Tax in the nature of the branch profits tax imposed by Section 884(a) of the Code (or any successor provision) that is imposed by any jurisdiction described in clause (a) above; (c) any U.S. federal withholding Tax on any amounts payable to a Lender

that is imposed pursuant to any laws in effect at the time such Lender becomes a party to this Agreement (or designates a new Lending Office), except to the extent that such Lender (or its assignor, if any) was entitled, immediately prior to designation of a new Lending Office (or assignment), to receive additional amounts from a Loan Party with respect to such withholding Tax pursuant to Section 3.01; (d) any withholding Tax attributable to such Agent or Lender's failure to comply with clauses (d) and (e) of Section 3.01; (e) with respect to any fees payable to an Agent pursuant to the Loan Documents, any U.S. federal withholding tax on such fees that is imposed pursuant to any laws in effect at the time such Agent becomes an Agent to this Agreement except to the extent that such Agent's predecessor was entitled, immediately prior to such Agent becoming an Agent, to receive additional amounts from a Loan Party with respect to such withholding Tax pursuant to Section 3.01, (f) any U.S. federal backup withholding Tax imposed pursuant to Section 3406 of the Code (or any successor provision), (g) any Tax imposed as a result of an Agent's or Lender's failure to satisfy the applicable requirements as set forth in Sections 1471, 1472, 1473 or 1474 of the Code (or any successor provision) or any regulation or administrative guidance promulgated thereunder and (h) any Tax imposed under Section 1411 of the Code (or any successor provision) or any regulation or administrative guidance promulgated thereuder.

"**Executive Order**" has the meaning set forth in the definition of "Anti-Terrorism Laws."

"**Exit Financing**" means that certain financing to finance the Reorganization Plan expected to be composed of the Loans, the ABL Facility, the Euro Securitization, the Plan Roll-Up Notes and the Senior Notes.

"**Externally Generated Funds**" means, only to the extent not increasing Consolidated Net Income, the net proceeds of (a) Financial Indebtedness, (b) issuance of or contribution to Equity Interests, (c) Asset Sales, or (d) Casualty Events, in each case of or by the Company or its Restricted Subsidiaries.

"**Fair Market Value**" means, with respect to any asset or property, the price which could be negotiated in an arm's-length transaction, for cash, between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction; *provided* that, other than as expressly set forth in this Agreement, for purposes of determining the "Fair Market Value" of any property or assets, such Fair Market Value shall be determined by (x) the Company in good faith with respect to property or assets with a Fair Market Value not in excess of $250,000,000, (y) an opinion as to the Fair Market Value issued by a qualified accounting, appraisal, financial advisory or investment banking firm or (z) the Board of Directors of the Company, as evidenced by a certificate of an officer of the Company, with respect to property or assets with a Fair Market Value in excess of $250,000,000.

"**FCPA**" means the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"**Federal Funds Rate**" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank on the Business Day next succeeding such day; *provided* that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to the Administrative Agent on such day on such transactions as determined by the Administrative Agent.

"**Fee Letter**" has the meaning set forth in the definition of "Loan Documents."

"**Financial Indebtedness**" means (without duplication), at any time, the principal amount of Indebtedness of the Company and its Restricted Subsidiaries outstanding at such time, referred to in clauses (1)(a), (1)(b), (1)(d) and (2) of the definition of Indebtedness (but, as to such clause (2), only in respect of clauses (1)(a), (1)(b) and (1)(d) of such definition).

"**First Lien Intercreditor Agreement**" means the First Lien Intercreditor Agreement, to be dated as of the Term Loan Escrow Release Date, among the Collateral Agent, the Senior Notes Trustee and the Senior Notes Collateral Agent with respect to the Common Collateral, which may be amended from time to time without the consent of the Secured Parties to add other parties holding First Priority Lien Obligations permitted to be Incurred under the Senior Notes Indenture, this Agreement and the First Lien Intercreditor Agreement.

"**First Priority Lien Obligations**" means (i) all Indebtedness under the Credit Facilities (other than the Asset Backed Credit Facility and any other Credit Facility Incurred pursuant to Section 7.01(2)(c)(ii)), (ii) the obligations under the Senior Notes, (iii) all other obligations of the Company, the Borrower or any Restricted Subsidiary in respect of Hedging Obligations or obligations in respect of cash management services in each case owing to a Person that is a holder of Credit Facility Indebtedness or an Affiliate of such holder at the time of entry into such Hedging Obligations or obligations in respect of cash management services, (iv) Additional First Priority Lien Obligations, if any, permitted to be Incurred under Section 7.01 and (v) Indebtedness under any Oil Indexed Credit Facility Incurred pursuant to Section 7.01(2)(c)(iii).

"**Fiscal Year**" means the twelve (12)-month fiscal period of the Company and its Subsidiaries commencing on January 1 of each calendar year and ending on December 31 of such calendar year as amended from time to time.

"**Fixed Charge Coverage Ratio**" means, with respect to any Person for any period, the ratio of Consolidated EBITDA of such Person for such period to the Fixed Charges of such Person for such period.  In the event that the Company or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness (other than in the case of revolving credit borrowings or revolving advances under any Receivables Financing, in which case interest expense shall be computed based upon the average daily balance of such Indebtedness during the applicable period) or issues, repurchases or redeems Disqualified Stock or Preferred Stock subsequent to the commencement of the period for which the Fixed Charge Coverage Ratio is being calculated but prior to the event for which the calculation of the Fixed Charge Coverage Ratio is made (the "**Calculation Date**"), then the Fixed Charge Coverage Ratio shall be calculated giving *pro forma* effect to such Incurrence, repayment, repurchase or redemption of Indebtedness, or such issuance, repurchase or redemption of Disqualified Stock or Preferred Stock, as if the same had occurred at the beginning of the applicable four (4)-quarter period.

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, amalgamations, consolidations and discontinued operations (as determined in accordance with GAAP), in each case with respect to an operating unit of a business, and any operational changes that the Company or any of its Restricted Subsidiaries has determined to make and/or made during the four (4)-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Calculation Date shall be calculated on a *pro forma* basis assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations, discontinued operations and operational changes (and the change of any associated fixed charge obligations and the change in Consolidated EBITDA resulting therefrom) had occurred on the first day of the four (4)-quarter reference period.  If since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation,

amalgamation, discontinued operation or operational change, in each case with respect to an operating unit of a business, that would have required adjustment pursuant to this definition, then the Fixed Charge Coverage Ratio shall be calculated giving *pro forma* effect thereto for such period as if such Investment, acquisition, disposition, discontinued operation, merger, amalgamation, consolidation or operational change had occurred at the beginning of the applicable four (4)-quarter period.

For purposes of this definition, whenever *pro forma* effect is to be given to any event, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting Officer of the Company. Any such *pro forma* calculation may include adjustments appropriate, in the reasonable good faith determination of the Company as set forth in an Officer's Certificate, to reflect (1) operating expense reductions and other operating improvements or synergies reasonably expected to result from the applicable event, and (2) all adjustments of the nature set forth as "Reorganization Adjustments" in <u>Schedule 1.01B</u> for the Company to the extent such adjustments, without duplication, continue to be applicable to such four (4)-quarter period.

If any Indebtedness bears a floating rate of interest and is being given *pro forma* effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the Calculation Date had been the applicable rate for the entire period (taking into account any Hedging Obligations applicable to such Indebtedness if such Hedging Obligation has a remaining term in excess of 12 months). Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of the Company to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP. For purposes of making the computation referred to above, interest on any Indebtedness under a revolving credit facility computed on a *pro forma* basis shall be computed based upon the average daily balance of such Indebtedness during the applicable period. Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be deemed to have been based upon the rate actually chosen, or, if none, then based upon such optional rate chosen as the Company may designate.

For the purposes of this definition, any amount in a currency other than Dollars will be converted to Dollars based on the average exchange rate for such currency for the most recent twelve-month period immediately prior to the date of determination or if any such Indebtedness is subject to a Currency Agreement with respect to the currency in which such Indebtedness is denominated covering principal, premium, if any, and interest on such Indebtedness, the amount of such Indebtedness and such interest and premium, if any, shall be determined after giving effect to all payments in respect thereof under such Currency Agreement.

"**Fixed Charges**" means, with respect to any Person for any period, the sum, without duplication, of:

(1)    Consolidated Interest Expense of such Person for such period, and

(2)    all cash dividend payments (excluding items eliminated in consolidation) on any series of Preferred Stock or Disqualified Stock of such Person and its Restricted Subsidiaries.

"**Foreign Capital Markets Debt**" means Indebtedness of a Foreign Subsidiary that constitutes a debt security or a syndicated loan.

"**Foreign Lender**" means, for purposes of the Tax in question, a Lender that is treated as foreign by the jurisdiction imposing such Tax.

"**Foreign Plan**" means any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by, or entered into with, a Loan Party or any Subsidiary with respect to employees employed outside the United States.

"**Foreign Subsidiary**" means a Restricted Subsidiary not organized or existing under the laws of the United States of America or any state or territory thereof or the District of Columbia and any direct or indirect Restricted Subsidiary of such Restricted Subsidiary.

"**FRB**" means the Board of Governors of the Federal Reserve System of the United States, or any Governmental Authority succeeding to any of its principal functions.

"**Fund**" means any Person (other than a natural Person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"**Funded Debt**" means all Indebtedness of the Company and its Restricted Subsidiaries for borrowed money that matures more than one year from the date of its creation or matures within one year from such date that is renewable or extendable, at the option of such Person, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, including Indebtedness in respect of the Loans.

"**GAAP**" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect on the Term Loan Escrow Release Date as adopted by the Company.  For the purposes of this Agreement, the term "consolidated" with respect to any Person shall mean such Person consolidated with its Restricted Subsidiaries, and shall not include any Unrestricted Subsidiary, but the interest of such Person in an Unrestricted Subsidiary will be accounted for as an Investment.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Granting Lender**" has the meaning set forth in Section 10.07(g).

"**Guarantee**" means, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance of such Indebtedness or other monetary obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other monetary obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such

obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or monetary other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain such Lien); *provided* that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "Guarantee" as a verb has a corresponding meaning.

"**Guarantee Agreement**" means the Guarantee Agreement, substantially in the form of Exhibit K.

"**Guarantors**" has the meaning set forth in the definition of "Collateral and Guaranty Requirement".

"**Guaranty**" has the meaning set forth in the definition of "Collateral and Guaranty Requirement".

"**Hazardous Materials**" means all materials, chemicals, substances, wastes, pollutants, contaminants, constituents and compounds of any nature or in any form, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas or mold that are regulated pursuant to, or can give rise to liability under, any applicable Environmental Law.

"**Hedge Bank**" means any Person that is a Lender or an Affiliate of a Lender on the Closing Date or at the time it enters into a Secured Hedge Agreement or a Treasury Services Agreement, as applicable, in its capacity as a party thereto, and in the case of a Person that is not a Lender but an Affiliate of a Lender, that delivers to the Administrative Agent a letter agreement reasonably satisfactory to it (i) appointing the Collateral Agent as its agent under the applicable Loan Documents and (ii) agreeing to be bound by Sections 9.07 and 10.15 as if it were a Lender.

"**Hedging Obligations**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, emission rights, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "**Master Agreement**"), including any such obligations or liabilities under any Master Agreement.

"**Incremental Amendment**" has the meaning set forth in Section 2.12(d).

"**Incremental Facility Closing Date**" has the meaning set forth in Section 2.12(d).

"**Incremental Term Commitment**" means as to each Incremental Term Lender, its obligation to make an Incremental Term Loan to the Borrower pursuant to Section 2.12 in an aggregate amount not to exceed the amount set forth in the applicable Incremental Amendment.

"**Incremental Term Lender**" means, at any time, any Lender that has (i) a Commitment with respect to Incremental Term Loans or (ii) Incremental Term Loans, at such time.

"**Incremental Term Loan Repayment Amount**" means, with respect to any tranche of Incremental Term Loans, the installments of principal, if any, set forth in the applicable Incremental Amendment for such Incremental Term Loans.

"**Incremental Term Loans**" has the meaning set forth in Section 2.12(a).

"**Incremental Term Note**" means a promissory note of the Borrower payable to any Incremental Term Lender or its registered assigns, in substantially the form of Exhibit B-2, evidencing the aggregate Indebtedness of the Borrower to such Lender resulting from the Incremental Term Loans made by such Lender.

"**Incur**" means issue, assume, guarantee, incur or otherwise become liable for; *provided, however*, that any Indebtedness or Capital Stock of a Person existing at the time such person becomes a Subsidiary (whether by merger, amalgamation, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the time it becomes a Subsidiary.

"**Indebtedness**" means, with respect to any Person:

(1)     the principal and premium (if any) of any indebtedness of such Person, whether or not contingent, (a) in respect of borrowed money, (b) evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof), (c) representing the deferred and unpaid purchase price of any property (except any such balance that (i) constitutes a trade payable or similar obligation to a trade creditor Incurred in the ordinary course of business, (ii) any earn-out obligations until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and (iii) liabilities accrued in the ordinary course of business), which purchase price is due more than six months after the date of placing the property in service or taking delivery and title thereto, (d) in respect of Capitalized Lease Obligations, or (e) representing any Hedging Obligations, if and to the extent that any of the foregoing indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(2)     to the extent not otherwise included, any obligation of such Person to be liable for, or to pay, as obligor, guarantor or otherwise, the obligations referred to in clause (1) of another Person (other than by endorsement of negotiable instruments for collection in the ordinary course of business); and

(3)     to the extent not otherwise included, Indebtedness of another Person secured by a Lien on any asset owned by such Person (whether or not such Indebtedness is assumed by such Person); *provided, however*, that the amount of such Indebtedness will be the lesser of: (a) the

Fair Market Value of such asset at such date of determination, and (b) the amount of such Indebtedness of such other Person;

*provided, however,* that notwithstanding the foregoing, Indebtedness shall be deemed not to include (1) Contingent Obligations Incurred in the ordinary course of business and not in respect of borrowed money; (2) deferred or prepaid revenues; (3) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller; or (4) obligations under or in respect of a Qualified Receivables Financing or Qualified Joint Venture Transaction.

Notwithstanding anything in this Agreement to the contrary, Indebtedness shall not include, and shall be calculated without giving effect to, the effects of Statement of Financial Accounting Standards No. 133 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Agreement as a result of accounting for any embedded derivatives created by the terms of such Indebtedness; and any such amounts that would have constituted Indebtedness under this Agreement but for the application of this sentence shall not be deemed an Incurrence of Indebtedness under this Agreement.

"**Indemnified Liabilities**" has the meaning set forth in Section 10.05.

"**Indemnified Taxes**" means all Taxes other than Excluded Taxes.

"**Indemnitees**" has the meaning set forth in Section 10.05.

"**Independent Financial Advisor**" means an accounting, appraisal or investment banking firm or consultant, in each case of nationally recognized standing, that is, in the good faith determination of the Company, qualified to perform the task for which it has been engaged.

"**Information**" has the meaning set forth in Section 10.08.

"**Intercreditor Agreements**" means, collectively, the First Lien Intercreditor Agreement and the Junior Lien Intercreditor Agreement.

"**Interest Payment Date**" means (i) if the Term Loan Escrow Release Date does not occur, the date of the Special Mandatory Prepayment and (ii) if the Term Loan Escrow Release Date does occur, (a) as to any Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date of the Term Loan Facility under which such Loan was made; *provided* that if any Interest Period for a Eurodollar Rate Loan exceeds three (3) months, the respective dates that fall every three (3) months after the beginning of such Interest Period shall also be Interest Payment Dates; and (b) as to any Base Rate Loan, the fifth (5th) Business Day after the last day of each March, June, September and December and the Maturity Date of the Term Loan Facility under which such Loan was made.

"**Interest Period**" means the period commencing on the date each Eurodollar Rate Loan is disbursed or converted to or continued as a Eurodollar Rate Loan and ending (x) one (1), two (2), three (3) or six (6) months thereafter (or any shorter period agreed by the Borrower, the Administrative Agent and each Lender) or (y) if agreed by each Lender of such Eurodollar Rate Loan, nine (9) or twelve (12) months thereafter, in the case of each (x) and (y), as selected by the Borrower in its Committed Loan Notice; *provided* that:

(i)        any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(ii)        any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(iii)        no Interest Period shall extend beyond the Maturity Date of the Term Loan Facility under which such Loan was made.

"**Investment Grade Securities**" means:

(1)        securities issued or directly and fully guaranteed or insured by the U.S. government or any agency or instrumentality thereof (other than Cash Equivalents),

(2)        securities that have a rating equal to or higher than Baa3 (or equivalent) by Moody's and BBB- (or equivalent) by S&P, but excluding any debt securities or loans or advances between and among the Company and its Subsidiaries,

(3)        investments in any fund that invests exclusively in investments of the type described in clauses (1) and (2) which fund may also hold immaterial amounts of cash pending investment and/or distribution, and

(4)        corresponding instruments in countries other than the United States customarily utilized for high quality investments and in each case with maturities not exceeding two years from the date of acquisition.

"**Investments**" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees (other than guarantees of performance made by the Company or any of its Restricted Subsidiaries in connection with a Joint Venture)), advances or capital contributions (excluding accounts receivable, trade credit and advances to customers and commission, travel and similar advances to officers, employees and consultants made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet of the Company in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property.  For purposes of the definition of "Unrestricted Subsidiary" and Section 7.02:

(1)        "Investments" shall include the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of a Subsidiary of the Company at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided, however,* that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Company shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary equal to an amount (if positive) equal to:

(a)        the Company's "Investment" in such Subsidiary at the time of such redesignation <u>less</u>

(b)    the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of such Subsidiary at the time of such redesignation; and

(2)    any property transferred to or from an Unrestricted Subsidiary shall be valued at its Fair Market Value at the time of such transfer, in each case as determined in good faith by the Board of Directors of the Company.

"**IP Rights**" has the meaning set forth in Section 5.15.

"**Joint Bookrunners**" means UBS Securities LLC, Banc of America Securities LLC, Barclays Bank plc, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., J.P.Morgan Securities Inc., Morgan Stanley Senior Funding, Inc. and Wells Fargo Securities, LLC, in their capacity as joint bookrunners for the Lenders under the Loan Documents.

"**Joint Lead Arrangers**" means UBS Securities LLC and Banc of America Securities LLC in their capacity as joint lead arrangers for the Lenders under the Loan Documents.

"**Joint Venture**" means any joint venture entity, whether a company, unincorporated firm, association, partnership or any other entity which, in each case, is not a Subsidiary of the Company or any of its Restricted Subsidiaries but in which the Company or a Restricted Subsidiary has a direct or indirect equity or similar interest.

"**Judgment Currency**" has the meaning set forth in Section 10.18.

"**Junior Financing**" has the meaning set forth in Section 7.08.

"**Junior Financing Documentation**" means any documentation governing any (a) Subordinated Indebtedness, (b) Junior Financing or (c) Refinancing Indebtedness of the forgoing.

"**Junior Lien Intercreditor Agreement**" means the Junior Lien Intercreditor Agreement, to be dated as of the Term Loan Escrow Release Date, among the Collateral Agent, the Senior Notes Collateral Agent, the ABL Collateral Agent and the Plan Roll-Up Notes Trustee that sets forth the relative priority of the Liens securing any First Priority Lien Obligations, the Liens securing the ABL Facility and the Liens securing any Junior Lien Obligations.

"**Junior Lien Obligations**" means the Plan Roll-Up Notes and obligations with respect to other Indebtedness permitted to be Incurred under this Agreement, which is by its terms intended to be secured on a basis junior to the Liens securing the Loans and, to the extent required thereby, the ABL Facility; *provided* such Lien is permitted to be Incurred under the ABL Facility, the Plan Roll-Up Notes Indenture, this Agreement and the Senior Notes Indenture.

"**Laws**" means, as to any Person, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case binding on such Person or to which such Person or any of its property or assets is subject.

"**Legal Reservations**" means:

(a)    the principle that equitable remedies may be granted or refused at the discretion of a court;

(b)    the limitation of enforcement by laws relating to insolvency, reorganization, penalties and other similar laws generally affecting the rights of creditors;

(c)    the time barring of claims under the statutes of limitation;

(d)    the possibility that an undertaking to assume liability for or indemnify a person against non-payment of stamp duties or to pay a penalty may be void; and

(e)    defenses of set-off or counterclaim.

"**Lender**" has the meaning set forth in the introductory paragraph to this Agreement together with, in each case, any Affiliate of any such financial institution through which such financial institution elects, by notice to the Administrative Agent, to make any Loans available to the Borrower; *provided* that, for all purposes of voting or consenting with respect to (a) any amendment, supplementation or modification of any Loan Document, (b) any waiver of any requirements of any Loan Document or any Default or Event of Default and its consequences, or (c) any other matter as to which a Lender may vote or consent pursuant to Section 10.01 of this Agreement, the financial institution making such election shall be deemed the "Lender" rather than such Affiliate, which shall not be entitled to vote or consent (it being agreed that failure of any such Affiliate to fund an obligation under this Agreement shall not relieve its affiliated financial institution from funding).

"**Lending Office**" means, as to any Lender, such office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"**LIBOR Rate**" means, with respect to any Eurodollar Rate Loan for any Interest Period, the rate per annum determined by the Administrative Agent to be the arithmetic mean of the offered rates for deposits in Dollars with a term comparable to such Interest Period that appears on the Reuters Screen LIBOR01 Page (or such other page as may replace such page on such service for the purpose of displaying the rates at which Dollar deposits are offered by lending banks in London interbank deposit market) at approximately 11:00 a.m. (London time) on the second full Business Day preceding the first day of such Interest Period; *provided*, *however*, that (i) if no comparable term for an Interest Period is available, the LIBOR Rate shall be determined using the weighted average of the offered rates for the two (2) terms most nearly corresponding to such Interest Period and (ii) if there shall at any time no longer exist a Reuters Screen LIBOR01 Page (or such other page as may replace such page on such service for the purpose of displaying the rates at which Dollar deposits are offered by lending banks in London interbank deposit market), "LIBOR Rate" means, with respect to each day during each Interest Period pertaining to Eurodollar Rate Loans comprising part of the same Credit Extension, the rate per annum equal to the rate at which the Administrative Agent is offered deposits in Dollars at approximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of such Interest Period in the London interbank market for delivery on the first day of such Interest Period for the number of days comprised therein and in an amount comparable to its portion of the amount of such Credit Extension to be outstanding during such Interest Period.

"**Lien**" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or similar encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law (including any conditional sale or other title retention agreement, any lease

in the nature thereof, any option or other agreement to sell or give a security interest); *provided* that in no event shall an operating lease, rights of set-off or netting arrangements in the ordinary course of business be deemed to constitute a Lien.

"**Limited Recourse Stock Pledge**" means the pledge of the Equity Interests in any Joint Venture (that is not a Restricted Subsidiary) or any Unrestricted Subsidiary to secure non-recourse debt of such Joint Venture or Unrestricted Subsidiary, which pledge is made by a Restricted Subsidiary of the Company, the activities of which are limited to making and managing Investments, and owning Equity Interests, in such Joint Venture or Unrestricted Subsidiary, but only for so long as its activities are so limited.

"**Liquidity Shortfall**" has the meaning set forth in Section 2.03(b)(i)(4).

"**Loan Documents**" means, collectively, (i) this Agreement, (ii) the Intercreditor Agreements, (iii) the Notes, (iv) the Term Loan Escrow Agreement, (v) the Security Documents, (vi) the Guarantee Agreement, and (vii) for purposes of Section 8.01(c) only, the Fee Letter dated as of the Closing Date by and among the Borrower and the Administrative Agent (the "**Fee Letter**").

"**Loan Parties**" means, collectively, the Borrower and the Guarantors.

"**Loans**" means, collectively the Term Loans and Incremental Term Loans.

"**Lyondell Assumption**" means the consummation of the transactions whereby (a) Lyondell Chemical will assume all of the obligations of the Escrow Borrower under this Agreement, (b) each of Lyondell Chemical's Restricted Subsidiaries will guarantee the Obligations pursuant to the Guaranty to the extent such Restricted Subsidiaries are required to provide a Guaranty under the Collateral and Guaranty Requirement and (c) to the extent Lyondell Chemical assumes the obligations of the Escrow Borrower other than by merger, the Escrow Borrower is released from the Obligations.

"**Lyondell Chemical**" means Lyondell Chemical Company, a Delaware corporation.

"**Managed**" has the meaning set forth in Section 5.08(e).

"**Master Agreement**" has the meaning ascribed to such term in the definition of "Hedging Obligations."

"**Material Adverse Effect**" means (a) a material adverse effect on the business, operations, assets, liabilities (actual or contingent) or financial condition of the Company and its Restricted Subsidiaries (taken as a whole), (b) a material adverse effect on the ability of the Borrower or the Guarantors (taken as a whole) to perform their respective payment obligations under this Agreement and any other Loan Document to which any such Person is a party or (c) a deficiency in the rights and remedies of the Lenders under the Loan Documents (taken as a whole) that is materially adverse to the Lenders; *provided* that a Material Adverse Effect shall not be deemed to exist as a result of the Cases or the Effect of Bankruptcy or circumstances and events leading up thereto.

"**Maturity Date**" means (i) with respect to the Term Loans, the sixth anniversary of the Term Loan Escrow Release Date, and (ii) with respect to each tranche of Incremental Term Loans the Stated Maturity of such tranche set forth in the applicable Incremental Amendment.

"**Maximum Rate**" has the meaning set forth in Section 10.10.

"**Money Laundering Laws**" has the meaning set forth in Section 5.20.

"**Moody's**" means Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

"**Mortgaged Properties**" has the meaning set forth in paragraph (g) of the definition of "Collateral and Guaranty Requirement."

"**Mortgages**" means, collectively, the mortgages, trust deeds, deeds of trust, deeds to secure debt, assignments of leases and rents, and other security documents delivered with respect to Mortgaged Properties.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Loan Party, any Subsidiary or any ERISA Affiliate makes or is obligated to make contributions, during the preceding five plan years, has made or been obligated to make contributions or otherwise could reasonably be expected to incur liability.

"**Negromex Receivables Dispositions**" means any disposition of accounts receivables arising from transactions with Industrias Negromex, S.A. de C.V.

"**Net Income**" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"**Net Proceeds**" means the aggregate cash proceeds received by the Company or any of its Restricted Subsidiaries in respect of any Asset Sale (including, without limitation, any cash received in respect of or upon the sale or other disposition of any Designated Non-cash Consideration received in any Asset Sale and any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise, but only as and when received, but excluding the assumption by the acquiring Person of Indebtedness relating to the disposed assets or other consideration received in any other non-cash form) or Casualty Event, net of the direct costs relating to such Asset Sale or Casualty Event and the sale or disposition of such Designated Non-cash Consideration (including, without limitation, legal, accounting and investment banking fees, and brokerage and sales commissions), and any relocation expenses Incurred as a result thereof, taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements related thereto), amounts required to be applied to the repayment of principal, premium (if any) and interest on Indebtedness required (other than pursuant to the second paragraph of Section 7.04) to be paid as a result of such transaction, and any deduction of appropriate amounts to be provided by the Company as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by the Company after such sale or other disposition thereof, including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction; *provided* that, (i) if the Borrower or the Company shall deliver a certificate of a Principal Financial Officer to the Administrative Agent promptly following receipt of any such proceeds setting forth the Company's intention to use any such proceeds to acquire, maintain, develop, construct, improve, upgrade or repair assets useful in the business of the Company and the Restricted Subsidiaries or to make acquisitions permitted by Section 7.02 or any acquisition of all or substantially all the assets of, or all the Equity Interests (other than directors' qualifying shares) in, a Person or division or line of business of a Person (or any subsequent investment made in a Person, division or line of business previously acquired), in each case within fifteen (15) months of such receipt, such portion of such proceeds shall not constitute Net Proceeds except to the extent not so used or contractually committed to be so used within fifteen (15) months of such receipt (it being understood that if any portion of such proceeds are not so used but are

contractually committed within such fifteen (15)-month period to be used, then if such Net Proceeds are not so used within the later of the last day of such fifteen (15)-month period and the date that is 180 days from the entry into such Contractual Obligation, such remaining portion shall constitute Net Proceeds as of the date of such expiry or termination); *provided further* that, in the event such contractual commitment is later canceled or terminated for any reason before such Net Proceeds are so applied, the Company or such Restricted Subsidiary enters into another contractual commitment (a "**Second Commitment**") within six months of such cancellation or termination of the prior binding commitment (*provided* that the Company or such Restricted Subsidiary may only enter into a Second Commitment under the foregoing provision one time with respect to each Asset Sale or Casualty Event) and to the extent such Second Commitment is later cancelled or terminated for any reason before such Net Proceeds are applied, then such remaining portion shall constitute Net Proceeds; *provided further* that no proceeds shall constitute Net Proceeds until the aggregate amount of all such unapplied proceeds (excluding proceeds subject to investments pursuant to this clause (i)) accumulated from time to time exceeds $200,000,000 and (ii) Net Proceeds shall be reduced by the amount thereof required by the Senior Notes Indenture to be offered to repurchase Senior Notes pursuant to a Collateral Asset Sale Offer or an Asset Sale Offer (each as defined in the Senior Notes Indenture), as applicable; *provided* that such amount so reduced shall not exceed an amount equal to the total amount of Net Proceeds (prior to giving effect to such reduction) multiplied by a fraction (x) the numerator of which is the aggregate principal amount of Senior Notes then outstanding and (y) the denominator of which is the sum of the aggregate principal amount of Loans and Senior Notes then outstanding.

"**Non-Consenting Lender**" has the meaning set forth in Section 3.07(c).

"**Note**" means a Term Note or an Incremental Term Note, as the context may require.

"**Obligations**" means all (x) advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party and its Subsidiaries arising under any Loan Document or otherwise with respect to any Loan, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or Subsidiary of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding (collectively, the "**Credit Agreement Obligations**"), and (y) obligations of any Loan Party arising under any Secured Hedge Agreement or any Treasury Services Agreement.  Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents (and of their Subsidiaries to the extent they have obligations under the Loan Documents) include (a) the obligation (including guarantee obligations) to pay principal, interest, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party or Subsidiary under any Loan Document and (b) the obligation of any Loan Party or Subsidiary to reimburse any amount in respect of any of the foregoing that any Lender, in its sole discretion, may elect to pay or advance on behalf of such Loan Party or such Subsidiary to the extent originally payable by that Loan Party or Subsidiary.

"**OFAC**" has the meaning set forth in Section 5.21.

"**Officer**" means the Chairman of the Board, Chief Executive Officer, Chief Financial Officer, President, any Executive Vice President, Senior Vice President or Vice President, the Treasurer or the Secretary of any Person.

"**Officer's Certificate**" means a certificate signed on behalf of any Person by an Officer of such Person, who must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of such Person, which meets the requirements set forth in this Agreement.

"**OID**" has the meaning set forth in Section 2.12(b).

"**Oil Indexed Credit Facility**" means a working capital facility for which availability is conditioned upon the price per barrel of crude oil that is not less than $125 and the proceeds of which are utilized for working capital purposes and related fees and expenses; *provided* that the Loans and any other First Priority Lien Obligations are secured by a Lien ranking at least *pari passu* with any Lien on assets securing any Oil Indexed Credit Facility and the collateral agent under any Oil Indexed Credit Facility shall have been made party to the First Lien Intercreditor Agreement and any Oil Indexed Credit Facility shall be subject to the terms thereof.

"**Opinion of Counsel**" means a written opinion from legal counsel who is reasonably acceptable to the Administrative Agent.  The counsel may be an employee of or counsel to the Company or the Borrower or to the Administrative Agent.

"**Organization Documents**" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation, association or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Taxes**" has the meaning set forth in Section 3.01(b).

"**Outstanding Amount**" means with respect to the Loans, the aggregate principal amount thereof, after giving effect to any borrowings, extensions of credit and prepayments or repayments of Loans, occurring on such date.

"**Owned Real Property**" means each parcel of Real Property that is owned in fee by the Company, the Borrower or any Pledgor that has an individual Fair Market Value of more than $25,000,000 (*provided* that such $25,000,000 threshold shall not be applicable in the case of any Real Property that is integrally related to the ownership or operation of a Mortgaged Property or otherwise necessary for such Mortgaged Property to be in compliance with all requirements of law applicable to such Mortgaged Property); *provided* that, with respect to any Real Property that is partially owned in fee and partially leased by the Company, the Borrower or any Pledgor, Owned Real Property will include only that portion of such Real Property that is owned in fee and only if (i) such portion that is owned in fee has an individual Fair Market Value of more than $25,000,000 (*provided* that such $25,000,000 threshold shall not be applicable in the case of Real Property that is integrally related to the ownership or operation of a Mortgaged Property or otherwise necessary for such Mortgaged Property to be in compliance with all requirements of law applicable to such Mortgaged Property) and (ii) a mortgage in favor of the Collateral Agent (for the benefit of the Secured Parties) is permitted on such portion of Real Property owned in fee by applicable law and by the terms of any lease or other applicable document governing any leased portion of such Real Property.

"**Participant**" has the meaning set forth in Section 10.07(e).

"**Participant Register**" has the meaning set forth in Section 10.07(e).

"**Participating Member State**" means each state so described in any EMU Legislation.

"**Payor**" has the meaning set forth in the definition of "Consolidated Net Income."

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**PBGC Settlement**" means the settlement agreement between the Borrower and the Pension Benefit Guaranty Corporation (or any successor in interest thereto) as amended, supplemented, modified, extended, restructured, renewed, restated or replaced in whole or in part from time to time.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA or to the minimum funding standards under Section 412 of the Code or Section 302 of ERISA and is sponsored or maintained by any Loan Party, any Subsidiary or any ERISA Affiliate or to which any Loan Party, any Subsidiary or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five (5) plan years or with respect to which a Loan Party, Subsidiary or ERISA Affiliate could reasonably be expected to incur liability (including under Section 4063 or 4069 of ERISA).

"**Perfection Certificate**" means a certificate in the form of <u>Exhibit F-1</u>, as the same shall be supplemented from time to time by a supplement in the form of <u>Exhibit F-2</u> or otherwise.

"**Perfection Requirements**" means the making or the procuring of the appropriate registrations, filings, endorsements, notarizations, stamping and/or notifications of the Security Documents and/or the Lien created hereunder, to the extent to be made other than by the Company or its Subsidiaries.

"**Permitted Holder Group**" has the meaning set forth in the definition of "Permitted Holders."

"**Permitted Holders**" means, at any time, each of (i) the Sponsors, (ii) any Person that has no material assets other than the Capital Stock of the Company and, directly or indirectly, holds or acquires 100% of the total voting power of the Voting Stock of the Company, and of which no other Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision), other than any of the other Permitted Holders specified in clause (i) above, holds more than 50% of the total voting power of the Voting Stock thereof and (iii) any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision) the members of which include any of the Permitted Holders specified in clause (i) above and that, directly or indirectly, holds or acquires beneficial ownership of the Voting Stock of the Company (a "**Permitted Holder Group**"), so long as (1) each member of the Permitted Holder Group has sole voting rights proportional to the percentage of ownership interests held or acquired by such member relative to the other members of the Permitted Holder Group with respect to voting in the election of the Board of Directors of the Company or any of its Subsidiaries generally and (2) no Person or other group (other than Permitted Holders specified in clause (i) above) beneficially owns more than 50% on a fully diluted basis of the Voting Stock held by the Permitted Holder Group.

"**Permitted Investments**" means:

(1)    any Investment in the Company or any Restricted Subsidiary;

(2)    any Investment in Cash Equivalents;

(3)    any Investment by the Company or any Restricted Subsidiary of the Company in a Person if as a result of such Investment (a) such Person becomes a Restricted Subsidiary of the

Company, or (b) such Person, in one transaction or a series of related transactions, is merged, consolidated or amalgamated with or into, or transfers or conveys all or substantially all of its assets to, or is liquidated into, the Company or a Restricted Subsidiary of the Company;

(4)    any Investment in securities or other assets not constituting Cash Equivalents and received in connection with an Asset Sale made pursuant to Section 7.04 or any other disposition of assets not constituting an Asset Sale;

(5)    any Investment existing on, or made pursuant to binding commitments existing on, the Term Loan Escrow Release Date or an Investment consisting of any extension, modification or renewal of any Investment existing on the Term Loan Escrow Release Date; *provided* that the amount of any such Investment may be increased (x) as required by the terms of such Investment as in existence on the Term Loan Escrow Release Date or (y) as otherwise permitted under this Agreement;

(6)    loans and advances to officers, directors or employees (a) for business-related travel expenses, moving expenses and other similar expenses, including as part of a recruitment or retention plan, in each case Incurred in the ordinary course of business or consistent with past practice or to fund such Person's purchase of Equity Interests of the Company or any direct or indirect parent entity of the Company, (b) required by applicable employment laws loans and (c) other loans and advances not to exceed $25,000,000 at any one time outstanding;

(7)    any Investment acquired by the Company or any of its Restricted Subsidiaries (a) in exchange for any other Investment or accounts receivable held by the Company or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable, or (b) as a result of a foreclosure by the Company or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(8)    Hedging Obligations permitted under Section 7.01(k);

(9)    any Investment by the Company or any of its Restricted Subsidiaries in a Similar Business or in Joint Ventures having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (9) that are at that time outstanding, not to exceed the greater of (x) $750,000,000 and (y) 3.75% of the Consolidated Net Tangible Assets of the Company at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value, plus 100% of the aggregate amount received by the Company or any Restricted Subsidiary in cash and the Fair Market Value of property other than cash received by the Company or any Restricted Subsidiary with respect to any Investment made pursuant to this clause (9); *provided*, *however*, that if any Investment pursuant to this clause (9) is made in any Person that is not a Restricted Subsidiary of the Company at the date of the making of such Investment and such Person becomes a Restricted Subsidiary of the Company after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (9) for so long as such Person continues to be a Restricted Subsidiary;

(10)    additional Investments by the Company or any of its Restricted Subsidiaries having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (10) that are at that time outstanding, not to exceed the greater of (x) $250,000,000 and (y) 1.25% of the Consolidated Net Tangible Assets of the Company at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and

without giving effect to subsequent changes in value), plus 100% of the aggregate amount received by the Company or any Restricted Subsidiary in cash and the Fair Market Value (as determined in good faith by the Company) of property other than cash received by the Company or any Restricted Subsidiary with respect to any Investment made pursuant to this clause (10); *provided, however*, that if any Investment pursuant to this clause (10) is made in any Person that is not a Restricted Subsidiary of the Company at the date of the making of such Investment and such Person becomes a Restricted Subsidiary of the Company after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (10) for so long as such Person continues to be a Restricted Subsidiary;

(11)    Investments the payment for which consists of Equity Interests of the Company (other than Disqualified Stock) or any direct or indirect parent of the Company, as applicable; *provided, however*, that such Equity Interests will not increase the amount available for Restricted Payments under clause (ii) or (iii) in the definition of "Applicable Amount";

(12)    Investments consisting of the licensing or contribution of intellectual property pursuant to joint marketing arrangements with other Persons;

(13)    Investments consisting of or to finance purchases and acquisitions of inventory, supplies, materials, services or equipment or purchases of contract rights or licenses or leases of intellectual property;

(14)    any Investment in connection with a Qualified Receivables Financing, including Investments in a Receivables Subsidiary, of funds held in accounts permitted or required by the arrangements governing such Qualified Receivables Financing or any related Indebtedness and, to the extent constituting an Investment, the acquisition of accounts receivable that have been sold, transferred or otherwise disposed of in a Receivables Financing, including the repurchase of accounts receivable by the Company or any of its Subsidiaries or other payment obligations of the Company or any Restricted Subsidiary of the Company pursuant to Standard Securitization Undertakings;

(15)    any Investment in an entity or purchase of a business or assets in each case owned (or previously owned) by a customer of a Restricted Subsidiary as a condition or in connection with such customer (or any member of such customer's group) contracting with a Restricted Subsidiary, in each case in the ordinary course of business;

(16)    Investments of a Restricted Subsidiary of the Company acquired after the Term Loan Escrow Release Date or of an entity merged into, amalgamated with, or consolidated with the Company or a Restricted Subsidiary of the Company in a transaction that is not prohibited by Section 7.07 after the Term Loan Escrow Release Date to the extent that such Investments were not made in contemplation of such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(17)    any Investment in any Subsidiary of the Company or any Joint Venture in connection with intercompany cash management arrangements or related activities arising in the ordinary course of business;

(18)    Investments through the licensing contribution in a Person that is or will be as a result of such Investment a Joint Venture or Investments through the licensing, contribution or

transactions that economically result in a contribution in kind of intellectual property pursuant to Joint Venture arrangements, in each case in the ordinary course of business;

(19)    purchase of shares of Royal Dutch Shell plc and BASF AG required to satisfy Basell B.V.'s obligations under its stock option plans as such plans and stock appreciation rights were in effect on the Term Loan Escrow Release Date;

(20)    a transaction the extent constituting an Investment that is permitted by and made in accordance with Section 7.02(12) and (13);

(21)    any Investment in connection with a Structured Financing Transaction;

(22)    a transaction to the extent constituting an Investment that is permitted by and made in accordance with clause (38) of the definition of "Permitted Liens";

(23)    any transaction to the extent it constitutes an Investment that is permitted by and made in accordance with the provisions of the second paragraph of Section 7.05 (except transactions described in clauses (2), (4), (5), (9)(b), (15) and (19) of such paragraph); and

(24)    any Qualified Joint Venture Transaction.

"**Permitted Liens**" means, with respect to any Person:

(1)    pledges or deposits by such Person under workers' compensation laws, unemployment insurance laws or similar legislation, or good faith pledges or deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case Incurred in the ordinary course of business;

(2)    Liens imposed by law, such as carriers', warehousemen's and mechanics' Liens, in each case for sums not yet due or being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review;

(3)    Liens for taxes, assessments or other governmental charges not yet due or payable or subject to penalties for nonpayment or which are being contested in good faith by appropriate proceedings;

(4)    Liens in favor of the issuers of performance bonds, surety bonds, bid bonds, letters of credit or similar instruments issued pursuant to the request of and for the account of such Person in the ordinary course of its business or with respect to statutory, regulatory, contractual, or warranty requirements;

(5)    minor survey exceptions, minor encumbrances, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not Incurred in connection with Indebtedness and which do not in the aggregate

materially adversely affect the value of said properties or materially impair their use in the
operation of the business of such Person;

(6)      (A) Liens on assets of a Restricted Subsidiary that is not a Guarantor securing
Indebtedness of such Restricted Subsidiary permitted to be Incurred pursuant to Section 7.01;
(B) Liens securing First Priority Lien Obligations in an aggregate principal amount not to exceed
the greater of (x) the aggregate principal amount of Indebtedness permitted to be Incurred
pursuant to Sections 7.01(a), (c)(i) and (c)(iii) and (y) the maximum principal amount of
Indebtedness that, as of the date such Indebtedness was Incurred, and after giving effect to the
Incurrence of such Indebtedness and the application of proceeds therefrom on such date, would
not cause the Secured Indebtedness Leverage Ratio of the Company to exceed 2.00 to 1.00;
*provided* that, with respect to Liens securing First Priority Lien Obligations permitted under this
subclause (B), the Loans are secured by Liens on the assets subject to such Liens on at least a *pari
passu* basis with the Liens securing all such First Priority Lien Obligations, with the priority and
subject to intercreditor arrangements, in each case not materially less favorable to the holders of
the obligations than those described in the definition of "Collateral and Guaranty Requirement";
(C) Liens securing Indebtedness permitted to be Incurred pursuant to Sections 7.01(c)(ii), (e)(i),
(e)(ii), (u) or (y) (*provided* that (1) in the case of clause (c)(ii) any Lien on Collateral securing
Indebtedness under the ABL Facility, or any refinancing or replacement thereof, must be
expressly subject to the terms of the Junior Lien Intercreditor Agreement, (2) in the case of
clause (e)(i), such Lien extends only to the assets and/or Capital Stock, the acquisition, lease,
construction, repair, replacement or improvement of which is financed thereby and any proceeds
or products thereof, (3) in the case of clause (u), such Lien does not extend to the property or
assets of any Subsidiary of the Company other than a Foreign Subsidiary, (4) in the case of
clause (e)(ii) such Lien applies solely to acquired property or asset of the acquired entity, as the
case may be) and (5) in the case of clause (y), such Lien does not extend to the property or assets
of the Company or any Restricted Subsidiary of the Company organized under the laws of any
jurisdiction other than Australia) and (D) Liens securing the Obligations;

(7)      Liens existing on the Term Loan Escrow Release Date (other than Liens in favor
of the Secured Parties under the Security Documents and under the ABL Facility);

(8)      Liens on assets, property or shares of stock of a Person at the time such Person
becomes a Subsidiary; *provided, however*, that such Liens are not created or Incurred in
connection with, or in contemplation of, such other Person becoming such a Subsidiary; *provided,
further*, that such Liens may not extend to any other property owned by the Company or any
Restricted Subsidiary of the Company;

(9)      Liens on assets or property at the time the Company or a Restricted Subsidiary
acquired the assets or property, including any acquisition by means of a merger, amalgamation or
consolidation with or into the Company or any Restricted Subsidiary; *provided* that such Liens
are not created or Incurred in connection with, or in contemplation of, such acquisition; *provided,
further, however*, that the Liens may not extend to any other property owned by the Company or
any Restricted Subsidiary;

(10)      Liens securing Indebtedness or other obligations of a Restricted Subsidiary
owing to the Company or another Restricted Subsidiary permitted to be Incurred in accordance
with Section 7.01;

(11)    Liens securing Hedging Obligations not Incurred in violation of this Agreement; *provided* that with respect to Hedging Obligations relating to Indebtedness, such Lien extends only to the property securing such Indebtedness;

(12)    Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances, tender, bid, judgment, appeal, performance or governmental contract bonds and completion guarantees, surety, standby letters of credit and warranty and contractual service obligations of a like nature, trade letters of credit and documentary letters of credit and similar bonds or guarantees provided by the Company or any Subsidiary of the Company;

(13)    leases and subleases of real property which do not materially interfere with the ordinary conduct of the business of the Company or any of its Restricted Subsidiaries;

(14)    Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Company and its Restricted Subsidiaries in the ordinary course of business or other precautionary Uniform Commercial Code financing statement filings;

(15)    Liens in favor of the Company, the Borrower or any Guarantor;

(16)    Liens on accounts receivable and related assets of the type specified in the definition of "Receivables Financing" Incurred in connection with a Qualified Receivables Financing to the extent permitted by Section 7.01;

(17)    Liens securing insurance premium financing arrangements; *provided*, *however*, that such Lien is limited to the applicable insurance carriers;

(18)    Liens on the Equity Interests of Unrestricted Subsidiaries;

(19)    leases, licenses, subleases or sublicenses granted to others in the ordinary course of business;

(20)    Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancings, refundings, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in the foregoing clauses (6), (7), (8), (9), (10), (11) and (15); *provided*, *however*, that (x) such new Lien shall be limited to all or part of the same property that secured the original Lien (plus improvements on such property), (y) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (A) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under clauses (6), (7), (8), (9), (10), (11) and (15) at the time the original Lien became a Permitted Lien under this Agreement, and (B) an amount necessary to pay any fees and expenses, including premiums (including tender premiums) and original issue discount, related to such refinancing, refunding, extension, renewal or replacement and (z) Junior Lien Obligations shall not be refinanced with First Priority Lien Obligations (other than any Permitted Roll-Up Notes Refinancing); *provided*, *further*, *however*, that in the case of any Liens to secure any refinancing, refunding, extension or renewal of Indebtedness secured by a Lien referred to in clause (6)(B) or (C), the principal amount of any Indebtedness Incurred for such refinancing, refunding, extension or renewal shall be deemed secured by a Lien under clause (6)(B) or (C) and not this clause (20) for purposes of determining the principal amount of Indebtedness outstanding under clause (6)(B) or (C) and for purposes of the definition of Secured Credit Facility Indebtedness;

(21)    Liens on equipment of the Company or any Restricted Subsidiary granted in the ordinary course of business to the Company's or such Restricted Subsidiary's client at which such equipment is located;

(22)    judgment and attachment Liens not giving rise to an Event of Default and notices of *lis pendens* and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made;

(23)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business;

(24)    Liens Incurred to secure cash management services or to implement cash pooling arrangements in the ordinary course of business;

(25)    other Liens on assets not constituting Collateral securing obligations that do not exceed $50,000,000 in aggregate at any time;

(26)    any encumbrance or restriction (including put and call arrangements) with respect to Capital Stock of any Joint Venture or similar arrangement pursuant to any Joint Venture or similar agreement;

(27)    any amounts held by a trustee in the funds and accounts under an indenture securing any revenue bonds issued for the benefit of the Company or any Restricted Subsidiary;

(28)    Liens arising by virtue of any statutory or common law provisions relating to banker's Liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a depository or financial institution;

(29)    Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts Incurred in the ordinary course of business and (iii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(30)    Liens solely on any cash earnest money deposits made by the Company or any of its Restricted Subsidiaries in connection with any letter of intent or purchase agreement permitted under this Agreement;

(31)    any netting or set-off arrangements entered into by the Company or any Restricted Subsidiary of the Company in the ordinary course of its banking arrangements (including, for the avoidance of doubt, cash pooling arrangements) for the purposes of netting debit and credit balances of the Company or any Restricted Subsidiary of the Company, including pursuant to any Treasury Services Agreement;

(32)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(33)    Liens deemed to exist in connection with Investments in repurchase agreements permitted under Section 7.01; *provided* that such Liens do not extend to any assets other than those that are the subject of such repurchase agreements;

(34)    Liens (i) on cash advances in favor of the seller of any property to be acquired in or monies placed in escrow pursuant to an Investment permitted pursuant to the definition of "Permitted Investments" to be applied against the purchase price for such Investment, (ii) over assets being acquired pursuant to Investments permitted pursuant to the definition of "Permitted Investments" pending payment in full of the purchase price, (iii) consisting of an agreement to dispose of any property in a disposition permitted pursuant to the definition of "Asset Sale" and (iv) consisting of intellectual property licenses permitted by clause (18) of the definition of "Permitted Investments";

(35)    Liens arising by reason of deposits necessary to qualify the Company or any other Restricted Subsidiary of the Company to conduct business, maintain self insurance or comply with any law and Liens securing the PBGC Settlement;

(36)    any Lien arising as a result of a sale, transfer or other disposal which is an Asset Sale in compliance with Section 7.04;

(37)    Liens relating to a Catalyst Sale/Leaseback Transaction;

(38)    Liens relating to any Limited Recourse Stock Pledge; and

(39)    Liens relating to any Treasury Services Agreement, Qualified Joint Venture Transaction or Structured Financing Transaction.

"**Permitted Roll-Up Notes Refinancing**" means the issuance of other notes, and the Incurrence of additional term loans under any Credit Facilities, in an aggregate principal amount not to exceed $1,500,000,000 if the proceeds thereof are used to refinance Plan Roll-Up Notes (and related interest, premiums, if any, and expenses) so long as

(i)    on a *pro forma* basis after giving effect thereto (including a *pro forma* application of the proceeds thereof), (x) the Fixed Charge Coverage Ratio of the Company is at least 2.00 to 1.00, (y) the Fixed Charge Coverage Ratio of the Company immediately after giving effect to the Incurrence of such Indebtedness is greater the Fixed Charge Coverage Ratio immediately prior to such Incurrence and (z) the requirements of subclauses (1) and (3) of Section 7.01(p) are satisfied with respect to such refinancing; and

(ii)    to the extent that the aggregate principal amount of such other notes and term loans exceeds $1,000,000,000, the principal amount of Indebtedness permitted pursuant to Section 7.01(2)(c)(i) shall be reduced on a dollar for dollar basis (without duplication for Indebtedness Incurred as part of a Permitted Roll-Up Notes Refinancing), until such time as such excess over $1,000,000,000 (x) would be permitted to be Incurred under the first paragraph of Section 7.01 and (y) would be permitted to be secured by a Lien as an Additional First Priority Lien Obligation pursuant to clause (6)(B)(y) of the definition of Permitted Liens.

"**Person**" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"**Plan of Reorganization**" means that certain Third Amended and Restated Plan of Reorganization of the Debtors filed with the Bankruptcy Court on March 15, 2010, as amended by the Confirmation Order and confirmed pursuant to section 1129 of the Bankruptcy Code.

"**Plan Roll-Up Notes**" means (a) third-priority senior secured notes of the Borrower and guaranteed by one or more Guarantors issued in respect of DIP Roll-Up Claims under the Reorganization Plan; *provided* that any Indebtedness issued in lieu of the Plan Roll-Up Notes in respect of DIP Roll-Up Claims will be deemed to be Plan Roll-Up Notes (*provided* that any such indebtedness is Incurred in compliance with the terms of this Agreement applicable to refinancings and replacements of Plan Roll-Up Notes had they been issued pursuant to the Plan of Reorganization), or (b) any notes, mortgages, guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements or refundings thereof and any indentures or credit facilities or commercial paper facilities that replace, refund or refinance any part thereof.

"**Plan Roll-Up Notes Indenture**" means the indenture under which the Plan Roll-Up Notes are issued, as amended, supplemented, modified, extended, restructured, renewed, restated, refinanced or replaced in whole or in part from time to time all in accordance with this Agreement; *provided* no such amendment or modification may shorten the maturity of the Plan-Roll-Up Notes.

"**Plan Roll-Up Notes Trustee**" means the trustee under the Plan Roll-Up Notes Indenture.

"**Platform**" has the meaning set forth in Section 6.01.

"**Pledgor**" means any Guarantor other than the Company; *provided* that upon the release or discharge of such Subsidiary from its obligations to pledge its assets and property to secure the Loans in accordance with this Agreement or the Security Documents, such Subsidiary ceases to be a Pledgor.

"**Preferred Stock**" means any Equity Interest with preferential right of payment of dividends or upon liquidation, dissolution, or winding up.

"**Primary Offering**" means an Equity Offering on any investment exchange or any other sale or issue by way of flotation or public offering or any equivalent circumstances with aggregate net cash proceeds to the Company or contributed to the Company of at least $500,000,000.

"**Principal Financial Officer**" means the chief financial officer, any director (or equivalent) or officer from time to time of the Borrower or the Company (as the context may require) with actual knowledge of the financial affairs of the Borrower or the Company and its Restricted Subsidiaries (as the context may require).

"**Pro Rata Share**" means, with respect to each Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Commitments of such Lender under the applicable Term Loan Facility or Term Loan Facilities at such time and the denominator of which is the amount of the Aggregate Commitments under the applicable Term Loan Facility or Term Loan Facilities at such time; *provided* that if such Commitments have been terminated, then the Pro Rata Share of each Lender shall be determined based on the Pro Rata Share of such Lender immediately prior to such termination and after giving effect to any subsequent assignments made pursuant to the terms hereof.

"**Prohibition**" has the meaning set forth in Section 10.22.

"**Project Financings**" means, with respect to any project, the Incurrence of Indebtedness relating to the development, expansion, renovation, upgrade or other modification or construction of such project pursuant to which the providers of such Indebtedness or any trustee or other intermediary on their behalf or beneficiaries designated by any such provider, trustee or other intermediary are granted security over one or more assets relating to such project for repayment of principal, premium and interest or any other amount in respect of such Indebtedness, including Indebtedness to finance working capital requirements with respect to any project; *provided* that any working capital financing shall not be secured by any assets or property included in calculating the Borrowing Base for purposes of Section 7.01(c)(ii).

"**Projections**" has the meaning set forth in Section 6.01(c).

"**Public Lender**" has the meaning set forth in Section 6.01.

"**Purchase Offer**" has the meaning set forth in Section 2.13(a).

"**Qualified Joint Venture Transaction**" means any transaction in which (i) Indebtedness is owed or incurred by any Restricted Subsidiary whose activities are limited to holding shares in Joint Ventures (but only to the extent that (a) the creditors under the relevant agreement have no recourse to the Company other than to such Restricted Subsidiary; and (b) the recourse those creditors have to such Restricted Subsidiary is limited to the proceeds (if any) of dividends received by such Restricted Subsidiary in respect of such Restricted Subsidiary's investment in such Joint Ventures) or (ii) involving guarantees by the Company or any Restricted Subsidiary of Indebtedness of a customer or a third party guarantor of such customer's Indebtedness that are made to a governmental export credit agency, a state development bank or like governmental agency or organization to the extent that such guarantees are conditioned on a failure to perform by any of the Company, such Restricted Subsidiary or a joint venture under an engineering procurement or construction contract entered into with such customer or third party guarantor; *provided* that the aggregate amount of any Indebtedness referenced in this clause (ii) shall not at any time exceed 1.0% of Consolidated Net Tangible Assets of the Company.

"**Qualified Non-Recourse Debt**" means Indebtedness that (1) is (a) Incurred by a Qualified Non-Recourse Subsidiary to finance (whether prior to or within 270 days after) the acquisition, lease, construction, repair, replacement or improvement of any property (real or personal) or equipment (whether through the direct purchase of property or the Equity Interests of any person owning such property and whether in a single acquisition or a series of related acquisitions) or (b) assumed by a Qualified Non-Recourse Subsidiary, (2) is non-recourse to the Company, the Borrower and any Pledgor and (3) is non-recourse to any Restricted Subsidiary that is not a Qualified Non-Recourse Subsidiary.

"**Qualified Non-Recourse Subsidiary**" means (1) a Restricted Subsidiary that is not a Pledgor and that is formed or created after the Term Loan Escrow Release Date in order to finance an acquisition, lease, construction, repair, replacement or improvement of any property or equipment (directly or through one of its Subsidiaries) that secures Qualified Non-Recourse Debt and (2) any Restricted Subsidiary of a Qualified Non-Recourse Subsidiary.

"**Qualified Receivables Financing**" means any Receivables Financing that meets the following conditions (including, without limitation, the Euro Securitization, the Berre Facility and the Negromex Receivables Dispositions):

(1)    the Board of Directors of the Company shall have determined in good faith that such Qualified Receivables Financing (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Company and its Restricted Subsidiaries;

   (2)  all sales of accounts receivable and related assets are made at Fair Market Value; and

   (3)  the financing terms, covenants, termination events and other provisions thereof shall be market terms (as determined in good faith by the Company) and may include Standard Securitization Undertakings.

  The grant of a security interest in any accounts receivable of the Company or any of its Restricted Subsidiaries to secure the ABL Facility, any Credit Facility Indebtedness or any Indebtedness in respect of the Senior Notes shall not be deemed a Qualified Receivables Financing.

  "**Qualified Stock**" means any Equity Interest that is not a Disqualified Stock.

  "**Real Property**" means, collectively, all right, title and interests (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all buildings, structures, parking areas and improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

  "**Receivables Fees**" means distributions or payments made directly or by means of discounts with respect to any participation interests issued or sold in connection with, and all other fees paid to a Person that is not a Restricted Subsidiary in connection with, any Receivables Financing.

  "**Receivables Financing**" means any transaction or series of transactions that may be entered into by the Company or any of its Subsidiaries pursuant to which the Company or any of its Subsidiaries may sell, convey or otherwise transfer to any other Person, including to a Receivables Subsidiary, or may grant a security interest in, bank accounts, any accounts receivable (whether now existing or arising in the future) of the Company or any of its Subsidiaries, and any assets related thereto including, without limitation, all collateral securing such accounts receivable, all contracts and all guarantees or other obligations in respect of such accounts receivable, proceeds of such accounts receivable and other assets which are customarily transferred or in respect of which security interests are customarily granted in connection with asset securitization transactions involving accounts receivable and any Hedging Obligations entered into by the Company or any such Subsidiary in connection with such accounts receivable.

  "**Receivables Repurchase Obligation**" means any obligation of a seller of receivables in a Qualified Receivables Financing to repurchase receivables arising as a result of a breach of a representation, warranty or covenant or otherwise, including as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, off-set or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

  "**Receivables Subsidiary**" means a Wholly Owned Restricted Subsidiary of the Company (or another Person formed for the purposes of engaging in Receivables Financing with the Company in which the Company or any Subsidiary of the Company makes an Investment and to which the Company or any Subsidiary of the Company transfers accounts receivable and related assets) which engages in no activities other than in connection with the financing of accounts receivable of the Company and its Subsidiaries, all proceeds thereof and all rights (contractual or other), collateral and other assets relating thereto, and any business or activities incidental or related to such business, and which is designated by the Board of Directors of the Company (as provided below) as a Receivables Subsidiary and:

(a)      no portion of the Indebtedness or any other obligations (contingent or otherwise) of which (i) is guaranteed by the Company or any other Subsidiary of the Company (excluding guarantees of obligations (other than the principal of and interest on, Indebtedness) pursuant to Standard Securitization Undertakings), (ii) is recourse to or obligates the Company or any other Subsidiary of the Company in any way other than pursuant to Standard Securitization Undertakings, or (iii) subjects any property or asset of the Company or any other Subsidiary of the Company, directly or indirectly, contingently or otherwise, to the satisfaction thereof, other than pursuant to Standard Securitization Undertakings;

(b)      with which neither the Company nor any other Subsidiary of the Company has any material contract, agreement, arrangement or understanding other than on terms which the Company reasonably believes to be no less favorable to the Company or such Subsidiary than those that might be obtained at the time from Persons that are not Affiliates of the Company; and

(c)      to which neither the Company nor any other Subsidiary of the Company has any obligation to maintain or preserve such entity's financial condition or cause such entity to achieve certain levels of operating results.

Any such designation by the Board of Directors of the Company shall be evidenced to the Administrative Agent by filing with the Administrative Agent a certified copy of the resolution of the Board of Directors of the Company giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing conditions.

"**Refinanced Loans**" has the meaning set forth in Section 10.01.

"**Refinancing Indebtedness**" has the meaning ascribed to such term in Section 7.01.

"**Refunding Capital Stock**" has the meaning ascribed to such term in Section 7.02.

"**Register**" has the meaning set forth in Section 10.07(d).

"**Release**" means any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing or migrating in, into, onto or through the Environment.

"**Reorganization Plan**" means a plan of reorganization in any of the Cases.

"**Repayment Amount**" means the Term Loan Repayment Amount and each Incremental Term Loan Repayment Amount, if any.

"**Replacement Loans**" has the meaning set forth in Section 10.01.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30)-day notice period has been waived.

"**Request for Credit Extension**" means, with respect to a Credit Extension or a continuation or conversion of Loans, a Committed Loan Notice.

"**Required Lenders**" means, as of any date of determination, Lenders having more than 50% of the sum of the (a) Total Outstandings, and (b) aggregate unused Commitments, *provided* that the unused

Commitment, of, and the portion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"**Responsible Officer**" means the chief executive officer, president, vice president, chief financial officer, treasurer or assistant treasurer or other similar officer of a Loan Party (including, in the case of each Loan Party, the authorized number of managing directors or a general attorney or an attorney under a power of attorney of such Loan Party) and, as to any document delivered on the Closing Date or the Term Loan Escrow Release Date, any secretary of such Loan Party.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Restricted Cash**" means cash and Cash Equivalents held by Restricted Subsidiaries that is contractually restricted from being distributed to the Company, except for such cash and Cash Equivalents subject only to such restrictions that are contained in agreements governing Indebtedness permitted under this Agreement and that is secured by such cash or Cash Equivalents.

"**Restricted Investment**" means an Investment other than a Permitted Investment.

"**Restricted Party**" means any person listed:

      (a)     in the Annex to the Executive Order;

      (b)     on the "Specially Designated Nationals and Blocked Persons" list maintained by the OFAC;

      (c)     in any successor list to either of the foregoing; or

      (d)     any person or entity that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order.

"**Restricted Payment**" means:

      (1)     a declaration or payment of any dividend or the making of any distribution on account of the Company's or any of its Restricted Subsidiaries' Equity Interests, including any payment made in connection with any merger, amalgamation or consolidation involving the Company (other than (A) dividends or distributions by the Company payable solely in Equity Interests (other than Disqualified Stock) of the Company; or (B) dividends or distributions by a Restricted Subsidiary so long as, in the case of any dividend or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary other than a Wholly Owned Restricted Subsidiary, the Company or a Restricted Subsidiary receives at least its *pro rata* share of such dividend or distribution in accordance with its Equity Interests in such class or series of securities);

      (2)     the purchase or other acquisition or retirement for value any Equity Interests of the Company or any direct or indirect parent entity of the Company;

      (3)     the making of any principal payment on, or redemption, repurchase, defeasance or other acquisition or retirement for value, in each case prior to any scheduled repayment or scheduled maturity, any Subordinated Indebtedness of the Company or any of its Restricted Subsidiaries (other than the payment, redemption, repurchase, defeasance, acquisition or

retirement of (A) Subordinated Indebtedness in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one (1) year of the date of such payment, redemption, repurchase, defeasance, acquisition or retirement and (B) Indebtedness permitted under Section 7.01(h) or (j)); or

(4)    make any Restricted Investment (all of the payments and other actions set forth in clauses (1) through (4) above are collectively referred to as "**Restricted Payments**").

"**Restricted Subsidiary**" means, with respect to any Person, any Subsidiary of such Person other than an Unrestricted Subsidiary of such Person.  Unless otherwise indicated in this Agreement, all references to Restricted Subsidiaries shall mean Restricted Subsidiaries of the Company.  For the avoidance of doubt, the Borrower shall at all times constitute a Restricted Subsidiary.

"**Retired Capital Stock**" has the meaning set forth in Section 7.02.

"**S&P**" means Standard & Poor's Ratings Group or any successor to the rating agency business thereof.

"**Sale/Leaseback Transaction**" means an arrangement relating to property now owned or hereafter acquired by the Company or a Restricted Subsidiary whereby the Company or a Restricted Subsidiary transfers such property to a Person and the Company or such Restricted Subsidiary leases it from such Person, other than leases between the Company and a Restricted Subsidiary of the Company or between Restricted Subsidiaries of the Company.

"**Same Day Funds**" means, with respect to disbursements and payments in Dollars, immediately available funds.

"**Sanctions**" has the meaning set forth in Section 5.21.

"**SEC**" means the Securities and Exchange Commission or any successor agency or commission.

"**Secured Credit Facility Indebtedness**" means any Credit Facility Indebtedness that is secured by a Permitted Lien Incurred or deemed Incurred pursuant to clause (6)(B) of the definition of Permitted Lien.

"**Secured Hedge Agreement**" means any Hedging Obligation permitted under Article VII entered into by and between the Borrower or any Loan Party and any Hedge Bank.

"**Secured Indebtedness**" means any Indebtedness secured by a Lien.

"**Secured Indebtedness Leverage Ratio**" means, with respect to any Person, at any date the ratio of (i) Secured Indebtedness constituting First Priority Lien Obligations of such Person and its Restricted Subsidiaries as of such date of calculation (determined on a consolidated basis in accordance with GAAP) to (ii) Consolidated EBITDA of such Person for the four (4) full fiscal quarters for which internal financial statements are available immediately preceding such date of such calculation.  In the event that the Company or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness subsequent to the commencement of the period for which the Secured Indebtedness Leverage Ratio is being calculated but prior to the event for which the calculation of the Secured Indebtedness Leverage Ratio is made (the "**Secured Leverage Calculation Date**"), then the Secured Indebtedness Leverage Ratio shall be calculated giving *pro forma* effect to such Incurrence, repayment, repurchase or redemption of Indebtedness as if the same had occurred at the beginning of the applicable

four (4)-quarter period; *provided* that the Borrower may elect pursuant to an Officer's Certificate delivered to the Administrative Agent to treat all or any portion of the commitment under any Indebtedness as being Incurred at such time, in which case any subsequent Incurrence of Indebtedness under such commitment shall not be deemed, for purposes of this calculation, to be an Incurrence at such subsequent time.

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, amalgamations, consolidations and discontinued operations (as determined in accordance with GAAP), in each case with respect to an operating unit of a business, and any operational changes that the Company or any of its Restricted Subsidiaries has determined to make and/or made during the four (4)-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Secured Leverage Calculation Date shall be calculated on a *pro forma* basis assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations, discontinued operations and other operational changes (and the change of any associated Indebtedness and the change in Consolidated EBITDA resulting therefrom) had occurred on the first day of the four (4)-quarter reference period.  If since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation, amalgamation, discontinued operation or operational change, in each case with respect to an operating unit of a business, that would have required adjustment pursuant to this definition, then the Secured Indebtedness Leverage Ratio shall be calculated giving *pro forma* effect thereto for such period as if such Investment, acquisition, disposition, discontinued operation, merger, amalgamation, consolidation or operational change had occurred at the beginning of the applicable four (4)-quarter period.

For purposes of this definition, whenever *pro forma* effect is to be given to any event, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of the Company.  Any such *pro forma* calculation may include adjustments appropriate, in the reasonable good faith determination of the Company as set forth in an Officer's Certificate, to reflect (1) operating expense reductions and other operating improvements or synergies reasonably expected to result from the applicable event and (2) all adjustments of the nature set forth as "Restructuring Adjustments" in Schedule 1.01B to the extent such adjustments, without duplication, continue to be applicable to such four (4)-quarter period.

For the purposes of this definition, any amount in a currency other than Dollars will be converted to Dollars based on the average exchange rate for such currency for the most recent twelve (12)-month period immediately prior to the date of determination or if any such Indebtedness is subject to a Currency Agreement with respect to the currency in which such Indebtedness is denominated covering principal, premium, if any, and interest on such Indebtedness, the amount of such Indebtedness and such interest and premium, if any, shall be determined after giving effect to all payments in respect thereof under such Currency Agreement.

"**Secured Leverage Calculation Date**" has the meaning set forth in the definition of "Secured Indebtedness Leverage Ratio."

"**Secured Parties**" means, collectively, the Administrative Agent, the Collateral Agent, the Lenders, the Hedge Banks and each co-agent or sub-agent appointed by the Administrative Agent or Collateral Agent from time to time pursuant to Section 9.05.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Security Agreements**" means the Security Agreements listed on Schedule 1.01H, or any other similar agreements that create a Lien or purport to create a Lien in favor of the Collateral Agent for the benefit of the Secured Parties.

"**Security Documents**" means each of the Security Agreements, pledge agreements, collateral assignments, the Term Loan Escrow Agreement, each of the Mortgages and related agreements or similar agreements, creating the security interests in the Collateral as contemplated by this Agreement.

"**Senior Notes**" means the notes issued under the Senior Notes Indenture.

"**Senior Notes Collateral Agent**" means Deutsche Bank Trust Company Americas, as collateral agent administrating collateral on behalf of the noteholders under the Senior Notes Indenture or any such successor agent.

"**Senior Notes Escrow Agent**" means Deutsche Bank Trust Company Americas, as escrow agent under the Senior Notes Escrow Agreement or any successor escrow agent as set forth in the Senior Notes Escrow Agreement.

"**Senior Notes Escrow Agreement**" means the Escrow Agreement dated as of [____], 2010 among the Borrower, the Senior Notes Trustee and the Senior Notes Escrow Agent, as amended, supplemented, modified, extended, renewed, restated or replaced in whole or part from time to time.

"**Senior Notes Indenture**" means the indenture under which the Senior Notes are issued, as amended, supplemented, modified, extended, restructured, renewed or restated in whole or in part from time to time, in accordance with the terms thereof.

"**Senior Notes Trustee**" means the party named as such in the Senior Notes Indenture until a successor replaces it and, thereafter, means the successor.

"**Significant Subsidiary**" means any Restricted Subsidiary that would be a "Significant Subsidiary" of the Company within the meaning of Rule 1-02 under Regulation S-X promulgated by the SEC (or any successor provision).

"**Similar Business**" means a business, the majority of whose revenues are derived from the activities of the Company and its Subsidiaries as of the Closing Date or any business or activity that is reasonably similar or complementary thereto or a reasonable extension, development or expansion thereof or ancillary thereto.

"**Solvent**" and "**Solvency**" mean, with respect to any Person on any date of determination, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature and (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital.  The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"**SPC**" has the meaning set forth in Section 10.07(g).

"**Special Mandatory Prepayment**" has the meaning set forth in Section 2.03(c).

"**Special Purpose Subsidiary**" means any Subsidiary of the Company whose material assets are comprised solely of the Capital Stock of a Joint Venture, where the pledge of such Capital Stock would be prohibited by any contractual requirement pertaining to such Joint Venture.

"**Specified ABL Facility Assets**" means any ABL Facility Collateral, the net proceeds of an Asset Sale of which are required to be applied as a prepayment of any Asset Backed Credit Facility.

"**Specified Claims**" means claims made pursuant to the Bankruptcy Cases of the Debtors relating to (i) Priority Tax Claims, (ii) Priority Non-Tax Claims, (iii) Secured Tax Claims, (iv) Senior Secured Claims, (v) Bridge Loan Claims, (vi) Other Secured Claims, (vii) General Unsecured Claims Against Obligor Debtors, Non-Obligor Debtors, MSC, MPI and MPCO and Schedule III Debtors and (viii) 2015 Note Claims (as such terms are defined in the Plan of Reorganization); *provided* that (a) the foregoing shall include items relating to litigation against the lenders and the funding of environmental and other custodial and litigation trusts contemplated by the Reorganization Plan proposed as of the Closing Date and (b) in no event shall the foregoing include professional fees and expenses, financing fees and expenses, original issue discount or debtor-in-possession exit fees.

"**Specified Person**" has the meaning set forth in Section 5.21.

"**Sponsor**" means Apollo Global Management, LLC and any of its Affiliates.

"**Standard Securitization Undertakings**" means representations, warranties, undertakings, covenants, indemnities and guarantees of performance entered into by the Company or any Subsidiary of the Company which the Company has determined in good faith to be customary in a Receivables Financing it being understood that any Receivables Repurchase Obligation shall be deemed to be a Standard Securitization Undertaking.

"**Stated Maturity**" means, with respect to any security, the date specified in such security as the fixed date on which the final payment of principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency beyond the control of the issuer unless such contingency has occurred).

"*Structured Financing Transaction*" means a sale of preferred shares of a Restricted Subsidiary, depositing the proceeds of such sale with a bank and pledging such deposit to guarantee a put and call with respect to such preferred shares.

"**Subordinated Indebtedness**" means (a) with respect to the Borrower, any Indebtedness of the Borrower which is by its terms subordinated in right of payment to the Loans and (b) with respect to any Guarantor, any Indebtedness of such Guarantor which is by its terms subordinated in right of payment to obligations in respect of the Loans.

"**Subsidiary**" means, with respect to any Person, (1) any corporation, association or other business entity (other than a partnership, joint venture or limited liability company) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof; (2) any partnership, joint venture or limited liability company of which (x) more than 50% of the capital accounts, distribution rights, total equity and voting

interests or general and limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof, whether in the form of membership, general, special or limited partnership interests or otherwise, and (y) such Person or any Subsidiary of such Person is a controlling general partner or otherwise controls such entity; or (3) with respect to the Company, for so long as the Company or any of its Subsidiaries, individually or in the aggregate, has at least a 50% ownership interest in Lyondell Bayer Manufacturing Maasvlakle VOF, Lyondell Bayer Manufacturing Maasvlakle VOF.  Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Company.

"**Subsidiary Guarantors**" means, collectively, the Subsidiaries of the Borrower that are Guarantors.

"**Successor Borrower**" has the meaning set forth in Section 7.07.

"**Successor Company**" has the meaning set forth in Section 7.07.

"**Successor Pledgor**" has the meaning set forth in Section 7.07.

"**Syndication Agent**" means Banc of America Securities LLC, in its capacity as syndication agent under the Loan Documents, and its successors in such capacity.

"**Taxes**" means all present or future taxes, duties, levies, imposts, deductions, withholdings, assessments, fees or other charges (including all interest, additions to tax and penalties related thereto) imposed by any Governmental Authority.

"**Temporary Paydown**" has the meaning set forth in Section 2.03(b)(i)(4).

"**Term Borrowing**" means a borrowing consisting of simultaneous Term Loans of the same Type and, in the case of Eurodollar Rate Loans, having the same Interest Period made by each of the Term Lenders pursuant to Section 2.01.

"**Term Commitment**" means, as to each Term Lender, its obligation to make a Term Loan to the Borrower pursuant to Section 2.01 in an aggregate amount not to exceed the amount set forth opposite such Appropriate Lender's name on Schedule 1.01A under the caption "Commitment" or in the Assignment and Assumption pursuant to which such Appropriate Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.  The initial aggregate amount of the Term Commitments is $500,000,000.

"**Term Lender**" means, at any time, any Lender that has (i) a Commitment with respect to Term Loans or (ii) a Term Loan, at such time.

"**Term Loan**" means a Loan made pursuant to Section 2.01.

"**Term Loan Escrow Account**" means that certain account maintained by the Term Loan Escrow Agent in the name of the Borrower, pursuant to the terms of Term Loan Escrow Agreement.

"**Term Loan Escrow Agent**" means UBS AG, Stamford Branch, as escrow agent under the Term Loan Escrow Agreement and any successor escrow agent thereunder.

"**Term Loan Escrow Agreement**" means an escrow agreement, substantially in the form of Exhibit L, entered among the Borrower, the Administrative Agent and the Term Loan Escrow Agent.

"**Term Loan Escrow Collateral**" means the "Collateral" as defined in the Term Loan Escrow Agreement.

"**Term Loan Escrow Conditions Precedent Date**" has the meaning set forth in Section 2.03(c).

"**Term Loan Escrow End Date**" means the sixtieth (60th) day following the Closing Date; *provided* that the Borrower may elect to extend the Term Loan Escrow End Date for an additional thirty (30) days on no more than two (2) occasions so long as, not later than five (5) Business Days prior to the scheduled Term Loan Escrow End Date, (i) it provides prior written notice to the Term Loan Escrow Agent and the Administrative Agent and has issued a press release stating that it has extended the Term Loan Escrow End Date and (ii) it has deposited cash into escrow with the Term Loan Escrow Agent, to be held pursuant to the terms of the Term Loan Escrow Agreement, in an amount sufficient to fund the prepayment price due on the latest possible date for the revised Special Mandatory Prepayment in respect of all outstanding Loans and has certified that such amounts will be satisfactory for such purpose.

"**Term Loan Escrow Investment**" means (1) Treasury Securities, (2) investments in time deposit accounts, certificates of deposit and money market deposits maturing no later the Term Loan Escrow End Date in each case, entitled to U.S. federal deposit insurance for the full amount thereof or issued by a bank or trust company (including the Term Loan Escrow Agent or an affiliate of the Term Loan Escrow Agent) which is organized under the laws of the United States of America or any State thereof having capital, surplus and undivided profits aggregating in excess of $500,000,000 and (3) repurchase obligations maturing no later than the Term Loan Escrow End Date entered into with a nationally recognized broker-dealer, with respect to which the purchase securities are obligations issued or guaranteed by the United States government or any agency thereof, which repurchase obligations shall be entered into pursuant to written agreements.

"**Term Loan Escrow Prepayment Amount**" has the meaning set forth in Section 2.03(c).

"**Term Loan Escrow Proceeds**" means the principal amount of the funds deposited into the Term Loan Escrow Account on the Closing Date pursuant to the terms of the Term Loan Escrow Agreement.

"**Term Loan Escrow Redemption Date**" means a date that is no earlier than the Term Loan Escrow Conditions Precedent Date and no later than ten (10) Business Days after the Term Loan Escrow Conditions Precedent Date.

"**Term Loan Escrow Release Conditions**" has the meaning set forth in Section 4.02.

"**Term Loan Escrow Release Date**" means the date on which the conditions precedent to the Term Loan Escrow Release Date are satisfied in accordance with Section 4.02 and the Term Loans are advanced to the Borrower, which date shall not be more than 120 days after the Closing Date.

"**Term Loan Facilities**" means each of (a) the Commitments and the Term Loans made thereunder and (b) each tranche of Incremental Term Loans, if any.

"**Term Loan Repayment Amount**" has the meaning set forth in Section 2.05.

"**Term Note**" means a promissory note of the Borrower payable to any Lender or its registered assigns, in substantially the form of Exhibit B-1, evidencing the aggregate Indebtedness of the Borrower to such Lender resulting from the Term Loans made by such Lender.

"**Threshold Amount**" means $100,000,000.

"**Threshold Indebtedness**" has the meaning set forth in Section 8.01(e).

"**Total Assets**" means, with respect to any Person, the total consolidated assets of such Person and its Restricted Subsidiaries, without giving effect to any amortization of the amount of intangible assets since the Closing Date, (x) as shown on the most recent balance sheet of such Person, or (y) in regards to the Company only, as shown on the most recent balance sheet required to be delivered pursuant to the covenant in Section 6.01.

"**Total Outstandings**" means the aggregate Outstanding Amount of all Loans.

"**Transaction**" means the consummation of the Plan of Reorganization and the availability for use by the Company and its Subsidiaries of proceeds of the Exit Financing, the making of the Loans on the Closing Date, the entry into the Term Loan Escrow Agreement and the Lyondell Assumption and the transactions related thereto.

"**Transaction Expenses**" means any premiums, interest, discount, fees, costs or expenses incurred or paid by the Company or any Restricted Subsidiary in connection with the Transaction (including expenses in connection with hedging transactions), this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby.

"**Transfer**" has the meaning set forth in Section 7.07.

"**Treasury Securities**" means any Investment in obligations issued or guaranteed by the United States government or agency thereof, in each case, maturing no later than the Term Loan Escrow End Date.

"**Treasury Services Agreement**" means any agreement between the Borrower, any Guarantor or Restricted Subsidiary and any commercial bank or other financial institution relating to treasury, depository, and cash management services, employee credit card arrangements or automated clearinghouse transfer of funds.

"**Type**" means, with respect to a Loan, its character as a Base Rate Loan or a Eurodollar Rate Loan.

"**Unfunded Current Liability**" of any ERISA Plan means the amount, if any, by which the Accumulated Benefit Obligation (as defined under Statement of Financial Account Standards No. 87 ("**SFAS 87**")) under the ERISA Plan as of the close of its most recent year, determined in accordance with SFAS 87 as in effect on the Closing Date, exceeds the fair market vale of the assets allocable thereto.

"**Uniform Commercial Code**" or "**UCC**" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**United States**" and "**U.S.**" mean the United States of America.

"**U.S. Security Agreement**" means the Security Agreement substantially in the form of Exhibit E.

"**Unrestricted Cash**" means cash and Cash Equivalents of the Company, the Borrower and their respective Subsidiaries other than Restricted Cash.

"**Unrestricted Subsidiary**" means:

(1)    any Subsidiary of the Company that at the time of determination shall be designated an Unrestricted Subsidiary by the Board of Directors of such Person in the manner provided below; and

(2)    any Subsidiary of an Unrestricted Subsidiary;

The Company may designate any Subsidiary of the Company (including any newly acquired or newly formed Subsidiary of the Company) to be an Unrestricted Subsidiary unless such Subsidiary or any of its Subsidiaries owns any Equity Interests or Indebtedness of, or owns or holds any Lien on any property of, the Company or any other Subsidiary of the Company that is not a Subsidiary of the Subsidiary to be so designated; *provided, however*, that the Subsidiary to be so designated and its Subsidiaries do not at the time of designation have and do not thereafter Incur any Indebtedness pursuant to which the lender has recourse to any of the assets of the Company or any of its Restricted Subsidiaries (except as permitted under Section 7.01); *provided, further, however*, that either:

(a)    the Subsidiary to be so designated has total consolidated assets of $1,000 or less; or

(b)    if such Subsidiary has consolidated assets greater than $1,000, then such designation would be permitted under Section 7.02.

The Company may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided, however*, that immediately after giving effect to such designation:

(x)    (1) the Company could Incur $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test described under Section 7.01, or (2) the Fixed Charge Coverage Ratio for the Company and its Restricted Subsidiaries would be greater than such ratio for the Company and its Restricted Subsidiaries immediately prior to such designation, in each case on a *pro forma* basis taking into account such designation, and

(y)    no Event of Default shall have occurred and be continuing.

Any such designation by Company shall be evidenced to the Administrative Agent by promptly filing with the Administrative Agent a copy of the resolution of the Board of Directors or any committee thereof of the Company giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing provisions.

"**USA PATRIOT Act**" has the meaning set forth in Section 4.01(f).

"**Voting Stock**" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness or Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by <u>dividing</u> (1) the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock multiplied by the amount of such payment, by (2) the sum of all such payments.

"**Wholly Owned Domestic Subsidiary**" is any Wholly Owned Subsidiary that is a Domestic Subsidiary.

"**Wholly Owned Restricted Subsidiary**" is any Wholly Owned Subsidiary that is a Restricted Subsidiary.

"**Wholly Owned Subsidiary**" of any Person means a Subsidiary of such Person 100% of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares or shares required to be held by Foreign Subsidiaries) shall at the time be owned by such Person or by one or more Wholly Owned Subsidiaries of such Person.

"**Working Capital Reserve Account**" means a deposit account established by the Company and maintained with the Collateral Agent on behalf of the Secured Parties; *provided* that such account shall be in the name of the Collateral Agent or shall be subject to a customary control agreement in form and substance reasonably satisfactory to the Collateral Agent.

Section 1.02.    <u>Other Interpretive Provisions</u>.

With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(c)    Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(d)    The term "including" is by way of example and not limitation.

(e)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(f)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(g)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

Section 1.03.    <u>Accounting Terms</u>.

All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in accordance with, GAAP, except as otherwise specifically prescribed herein.  Unless otherwise stated herein and except with respect to Article VII, references to a Person with respect to accounting terms or items that appear in such Person's financial statements shall be deemed a reference to that Person and its Subsidiaries on a consolidated basis, except for references to the Company and its Restricted Subsidiaries, which will be deemed references to the Company and its Restricted Subsidiaries on a consolidated basis.

Section 1.04.    <u>Rounding</u>.

Any financial ratios required to be maintained by the Company pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding up if there is no nearest number).

Section 1.05.    <u>References to Agreements, Laws, Etc.</u>

Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, supplements, modifications, extensions, restructurings, renewals, restatements, refinancings or replacements in whole or in part, but only to the extent that such amendments, supplements, modifications, extensions, restructurings, renewals, restatements, refinancings or replacements are permitted by the Loan Documents; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.06.    <u>Times of Day</u>.

Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

Section 1.07.    <u>Timing of Payment or Performance</u>.

Unless otherwise specified, when the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day; *provided* that, if such extension would cause payment of interest or principal of Eurodollar Rate Loans to be made in the next succeeding calendar month, such payment shall be made on the immediately preceding Business Day.

Section 1.08.    <u>Currency Equivalents Generally</u>.

Any amount specified in this Agreement (other than in Articles II, IX and X) or any of the other Loan Documents to be in Dollars shall also include the equivalent of such amount in any currency other than Dollars, such equivalent amount (the "<u>Dollar Equivalent Amount</u>") to be determined at the rate of exchange quoted by the Administrative Agent in New York, New York at the close of business on the Business Day immediately preceding any date of determination thereof, to prime banks in New York,

New York for the spot purchase in the New York foreign exchange market of such amount in Dollars with such other currency. Notwithstanding the foregoing, for purposes of determining compliance with Sections 7.01, 7.02 and 7.06 with respect to any amount of any cash balance, Liens, Indebtedness or Investment in Euros (if any), no Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such cash balance is determined, Lien is created, Indebtedness is incurred or Investment is made; *provided*, *however*, that (x) if, any such cash balance, Lien, Indebtedness or Investment denominated in a different currency is subject to a currency Hedging Obligation (with respect to Dollars) covering principal amounts of such cash balance, Lien, Indebtedness or Investment, the amount of such cash balance, Lien, Indebtedness or Investment, as the case may be, expressed in Dollars will be adjusted to take into account the effect of such agreement; and (y) for the avoidance of doubt, the foregoing provisions of this Section 1.08 shall otherwise apply to such Sections, including with respect to determining whether any cash balance, Lien, Indebtedness or Investment (not previously incurred on any date) may be incurred under such Sections.

Section 1.09.    Change of Currency.

Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify with the Company's consent to appropriately reflect a change in currency of any country and any relevant market conventions or practices relating to such change in currency.

# ARTICLE II.

## The Commitments and Credit Extensions

Section 2.01.    The Term Loans.

Subject to the terms and conditions set forth herein, each Term Lender severally agrees to make Term Loans on the Closing Date to the Borrower in an amount equal to such Term Lender's Commitment, the proceeds of which shall be deposited into the Term Loan Escrow Account in accordance with the terms of the Term Loan Escrow Agreement and Section 2.14. Amounts borrowed under this Section 2.01 and repaid may not be reborrowed.

Section 2.02.    Credit Extensions, Conversions and Continuations of Loans.

(a)    Each Credit Extension, each conversion of Loans from one Type to the other, and each continuation of Eurodollar Rate Loans shall be made upon the Borrower's irrevocable notice to the Administrative Agent, which may be given by telephone. Each such notice must be received by the Administrative Agent not later than (i) 12:30 p.m. (New York, New York time) three (3) Business Days prior to the requested date of any Credit Extension or continuation of Eurodollar Rate Loans or any conversion of Base Rate Loans to Eurodollar Rate Loans and (ii) 11:00 a.m. (New York, New York time) on the requested date of any Credit Extension of Base Rate Loans or any conversion of Eurodollar Rate Loans to Base Rate Loans. Each telephonic notice by the Borrower pursuant to this Section 2.02(a) must be confirmed promptly by delivery to the Administrative Agent of a written Committed Loan Notice (except in the case of the initial Term Loan borrowing on the Closing Date), appropriately completed and signed by a Responsible Officer of the Borrower. Except as provided in Section 2.12(b), each Credit Extension of, conversion to or continuation of Eurodollar Rate Loans shall be in a minimum principal amount of $5,000,000 or a whole multiple of $1,000,000 in excess thereof. Except as provided in Section 2.12(b), each Credit Extension of or conversion to Base Rate Loans shall be in a minimum principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof. Each Committed Loan Notice (whether telephonic or written) shall specify (i) whether the Borrower is requesting a Credit

Extension, a conversion of Loans from one Type to the other, or a continuation of Eurodollar Rate Loans, (ii) the requested date of the Credit Extension, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or to which existing Loans are to be converted, and (v) if applicable, the duration of the Interest Period with respect thereto. If with respect to Loans the Borrower fails to specify a Type of Loan in a Committed Loan Notice or fails to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made as, or converted to, Base Rate Loans. Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurodollar Rate Loans. If the Borrower requests a Credit Extension of, conversion to, or continuation of Eurodollar Rate Loans in any such Committed Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one (1) month.

(b)    Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Appropriate Lender of the amount of its Pro Rata Share of the applicable Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans or continuation described in Section 2.02(a). In the case of the initial Credit Extension of the Term Loans, each Appropriate Lender shall make the amount of its Term Loan available to the Term Loan Escrow Agent by wire transfer in Same Day Funds for deposit into the Term Loan Escrow Account pursuant to the Term Loan Escrow Agreement and Section 2.14. In the case of each other Credit Extension, each Appropriate Lender shall make the amount of its Loan available to the Administrative Agent in Same Day Funds at the Administrative Agent's Office for the applicable currency not later than 1:00 p.m. (New York, New York time) in each case on the Business Day specified in the applicable Committed Loan Notice. The Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent either by (i) crediting the account of the Borrower on the books of UBS AG, Stamford Branch, with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower.

(c)    Except as otherwise provided herein, a Eurodollar Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurodollar Rate Loan unless the Borrower pays the amount due, if any, under Section 3.05 in connection therewith. During the existence of an Event of Default, the Required Lenders may require that no Loans denominated in Dollars may be converted to or continued as Eurodollar Rate Loans.

(d)    The Administrative Agent shall promptly notify the Borrower and the Appropriate Lenders of the interest rate applicable to any Interest Period for Eurodollar Rate Loans upon determination of such interest rate. The determination of the Eurodollar Rate by the Administrative Agent shall be conclusive in the absence of manifest error. At any time that Base Rate Loans are outstanding, the Administrative Agent shall notify the Borrower and the Appropriate Lenders of any change in the Administrative Agent's prime rate used in determining the Base Rate promptly following the public announcement of such change.

(e)    After giving effect to all Credit Extensions, all conversions of Loans from one Type to the other, and all continuations of Term Loans as the same Type, there shall not be more than thirty (30) Interest Periods in effect.

(f)    The failure of any Lender to make the Loan to be made by it as part of any Credit Extension shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the

date of such Credit Extension, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Credit Extension.

Section 2.03.    Prepayments.

(a)      *Optional*.  The Borrower may, upon notice to the Administrative Agent, at any time or from time to time voluntarily prepay Loans in whole or in part without premium or penalty; *provided* that (1) such notice must be received by the Administrative Agent not later than 12:30 p.m. (New York, New York time) (A) two (2) Business Days prior to any date of prepayment of Eurodollar Rate Loans and (B) on the date of prepayment of Base Rate Loans; (2) any prepayment of Eurodollar Rate Loans shall be in a minimum principal amount of $5,000,000 or a whole multiple of $500,000 in excess thereof; and (3) any prepayment of Base Rate Loans shall be in a minimum principal amount of $1,000,000 or a whole multiple of $250,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment and the Type(s) of Loans to be prepaid.  The Administrative Agent will promptly notify each Appropriate Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share of such prepayment.  The Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein; *provided* that a notice of prepayment of the Loans delivered by the Borrower may state that such notice is conditional upon the effectiveness of another financing or a Change of Control, and in either such case, such notice may be revoked by the Borrower (by written notice to the Administrative Agent a reasonable time prior to the specified effective date) if such condition is not satisfied.  Any prepayment of a Eurodollar Rate Loan shall be accompanied by all accrued interest thereon, together with any additional amounts required pursuant to Section 3.05.  Each prepayment of principal of, and interest on, Loans shall be made in Dollars.  In the case of each prepayment of the Loans pursuant to this Section 2.03(a), the Borrower may in its sole discretion select the Loans (and the order of maturity of principal payments), to be repaid, and such payment shall be paid to the Appropriate Lenders in accordance with their respective Pro Rata Shares.

(b)      *Mandatory*.  (i) Within fifteen (15) Business Days after financial statements have been delivered pursuant to Section 6.01(a) (commencing with Fiscal Year 2011) and the related Compliance Certificate has been delivered pursuant to Section 6.02(a), the Company shall cause to be prepaid Loans equal to (A) the Applicable ECF Percentage of Excess Cash Flow, if any, for the Fiscal Year covered by such financial statements <u>minus</u> (B) the sum of:

(1)      all voluntary prepayments of Loans during such Fiscal Year, in each case to the extent such prepayments are not funded with Externally Generated Funds;

(2)      all voluntary prepayments of loans under the Asset Backed Credit Facilities and the Receivables Financings during such Fiscal Year, in each case to the extent the related commitments are concurrently and permanently reduced and in each case to the extent such prepayments are not funded with Externally Generated Funds;

(3)      if both (x) there is a decrease in Consolidated Working Capital in such Fiscal Year and (y) the Average Brent Crude Oil Price for the last fiscal quarter of such Fiscal Year is lower than the Average Brent Crude Oil Price for the last fiscal quarter of the previous Fiscal Year, an amount equal to the product of (I) the amount of such decrease in Consolidated Working Capital and (II) the Applicable ECF Percentage for such Fiscal Year; *provided* that the Borrower shall deposit an amount equal to the amount of such decrease in Consolidated Working Capital into the Working Capital Reserve Account and none of such decrease in Consolidated Working Capital so deposited shall be included in the calculation of the amount of Excess Cash Flow required to be applied

pursuant to this Section 2.03(b)(i)), unless the Average Brent Crude Oil Price over the last fiscal quarter of the relevant Fiscal Year is between zero and 5% lower than the Average Brent Crude Oil Price over the last fiscal quarter of the previous Fiscal Year, in which case 50% of such decrease in Consolidated Working Capital shall be deposited into the Working Capital Reserve Account (and, for the avoidance of doubt, the other 50% shall continue to be included in the calculation of Excess Cash Flow); *provided* that all amounts deposited in the Working Capital Reserve Account shall only be used (x) to fund any net increase in Consolidated Working Capital during the following Fiscal Year; and/or (y) to prepay the Loans in accordance with Section 2.03(b)(i) as if the amount prepaid had not been excluded from Excess Cash Flow in such relevant Fiscal Year pursuant to this Section 2.03(b)(i), and must be so applied in full by the end of the following Fiscal Year; and any payment out of the Working Capital Reserve Account shall be certified at the end of the fiscal quarter during which such payment is made by the Principal Financial Officer as being made in compliance with the terms of this Agreement; and

(4)       if both (x) after giving *pro forma* effect to any prepayment made pursuant to this Section 2.03(b)(i), the projections then most recently delivered pursuant to Section 6.01(c) show the Unrestricted Cash at any point during the next two Fiscal Years covered by such projections to be less than the Applicable Liquidity Level for the Fiscal Year with respect to which Excess Cash Flow is calculated (the then Applicable Liquidity Level less such Unrestricted Cash, the "**Liquidity Shortfall**") and (y) the outstanding amount under the ABL Facility and the Euro Securitization (taken as a whole) at the end of the Fiscal Year with respect to which Excess Cash Flow is calculated is less than such amount at the end of the previous Fiscal Year without any corresponding permanent reduction in associated commitments (a "**Temporary Paydown**"), then an amount equal to the product of (I) the lesser of the Liquidity Shortfall and the amount of the Temporary Paydown and (II) the Applicable ECF Percentage for such Fiscal Year (such product, the "**ECF Deferral Amount**"); *provided* that (A) the prepayment obligation pursuant to this Section 2.03(b)(i) in the next succeeding Fiscal Year shall be increased by the ECF Deferral Amount unless and to the extent there is also a Liquidity Shortfall for such next succeeding Fiscal Year and (B) no Restricted Payments pursuant to Section 7.02(8)(i) shall be permitted until the earlier of (1) the payment of such ECF Deferral Amount in accordance with Section 2.03(b)(i) with respect to the next succeeding Fiscal Year or (2) deposit of an amount in cash equal to the ECF Deferral Amount in the Working Capital Reserve Account.

(ii)       If (A) the Company or any of its Restricted Subsidiaries disposes of any property or assets in an Asset Sale after the Term Loan Escrow Release Date (other than any Asset Sale of any property or assets permitted under clauses (a), (b), (c), (e), (f), (i) or (k) of the definition of "Asset Sale") or (B) any Casualty Event occurs after the Term Loan Escrow Release Date, in each case that results in the realization or receipt by the Company or such Subsidiary of Net Proceeds, the Company shall cause to be prepaid an aggregate amount of Loans equal to 100% of all Net Proceeds received on or prior to the date which is ten (10) Business Days after the date of the realization or receipt by the Company or such Restricted Subsidiary of such Net Proceeds; *provided* that, with respect to any Net Proceeds of Asset Sales or Casualty Events realized or received by any Foreign Subsidiary, the aggregate amount of such Net Proceeds required to be applied pursuant to this Section 2.03(b)(ii) to the prepayment of the Loans and the permanent reduction of the Commitments shall be subject to reduction to the extent the expatriation of such Net Proceeds (1) would result in material adverse tax consequences or adverse legal consequences, (2) would be reasonably likely to result in adverse

personal liability of any director of the Company or a Foreign Subsidiary or (3) would result in the insolvency of the Company or a Foreign Subsidiary.

(iii)     If the Company or any of its Restricted Subsidiaries incurs or issues any Indebtedness after the Term Loan Escrow Release Date (other than Indebtedness not prohibited under Section 7.01), the Company shall cause to be prepaid an aggregate amount of Loans equal to 100% of all cash proceeds of such Indebtedness (net of all Taxes, fees, costs and expenses which are incurred by the Company and its Restricted Subsidiaries with respect to such incurrence or issuance) received therefrom on or prior to the date which is ten (10) Business Days after the receipt by such Loan Party or Restricted Subsidiary of such cash proceeds; *provided* that, with respect to any such Net Proceeds realized or received by a Foreign Subsidiary, such Net Proceeds shall not be required to be applied as a prepayment under this Section 2.03(b)(iii) to the extent they are subject to reduction to the extent the expatriation of such Net Proceeds (1) would result in material adverse consequences or adverse legal consequences, (2) would be reasonably likely to result in adverse personal liability of any director of the Company or a Foreign Subsidiary or (3) would result in the insolvency of the Company or a Foreign Subsidiary.

(iv)     Each prepayment of Loans pursuant to this Section 2.03(b) shall be applied pro rata among the Term Loan Facilities.  Each prepayment of any tranche of Loans pursuant to Section 2.03(b) shall be applied to such tranche first, to accrued interest and fees due on the amount of the prepayment under such Term Loan Facility, and second, to the applicable remaining Repayment Amounts due pursuant to Section 2.05 on a pro rata basis, in each case, to be allocated among the Appropriate Lenders in accordance with such Appropriate Lenders' respective Pro Rata Shares.

(c)     *Special Mandatory Prepayment*.  If the Term Loan Escrow Release Date has not occurred upon the earlier of (x) the date on which the Borrower determines in its sole discretion that any of the Term Loan Escrow Release Conditions cannot be satisfied and (y) the Term Loan Escrow End Date (the earlier of such dates, the "**Term Loan Escrow Conditions Precedent Date**"), the Escrow Borrower will prepay on the Term Loan Escrow Redemption Date, the gross proceeds of the Term Loans funded into the Term Loan Escrow Account, together with all accrued and unpaid interest and all accreted original issue discount on such Term Loans, from the Closing Date to but excluding the Term Loan Escrow Conditions Precedent Date and all other expenses or other amounts then due and owing under any Loan Document (collectively, the "**Term Loan Escrow Prepayment Amount**").  In accordance with the provisions of the Term Loan Escrow Agreement, funds in excess of the Term Loan Escrow Prepayment Amount shall be released to Lyondell Chemical.

(d)     *Funding Losses, Etc*.  All prepayments under this Section 2.03 shall be made together with, in the case of any such prepayment of a Eurodollar Rate Loan on a date other than the last day of an Interest Period therefor, any amounts owing in respect of such Eurodollar Rate Loan pursuant to Section 3.05.  Notwithstanding any of the other provisions of Section 2.03(b), so long as no Event of Default shall have occurred and be continuing, if any prepayment of Eurodollar Rate Loans is required to be made under Section 2.03(b) other than on the last day of the Interest Period therefor, the Company or the Borrower may, in its sole discretion, deposit the amount of any such prepayment otherwise required to be made thereunder into a Cash Collateral Account until the last day of such Interest Period, at which time the Administrative Agent shall be authorized (without any further action by or notice to or from the Company or any other Loan Party) to apply such amount to the prepayment of such Loans in accordance with Section 2.03(b).  Upon the occurrence and during the continuance of any Event of Default, the Administrative Agent shall also be authorized (without any further action by or notice to or from the

Company or any other Loan Party) to apply such amount to the prepayment of the outstanding Loans in accordance with Section 2.03(b).

Section 2.04.    Termination of Commitments.

The Commitment of each Term Lender shall be automatically and permanently reduced to $0 upon the making of such Term Lender's Term Loans pursuant to Section 2.01.

Section 2.05.    Repayment of Loans.

The Borrower shall repay to the Administrative Agent, in Dollars, for the ratable account of the Term Lenders, in consecutive, quarterly installments on the last Business Day of each March, June, September and December, commencing with the first full quarter after the Term Loan Escrow Release Date, a principal amount in respect of the Term Loans equal to 0.25% of the original principal amount of the Term Loan (each such scheduled installment payment, including the final installment payment on the Maturity Date, a "**Term Loan Repayment Amount**"), with the final installment on the Maturity Date equal to the remaining Outstanding Amount of the Term Loans.  In the event that any Loans are purchased by the Borrower pursuant to Purchase Offers under Section 2.13, then the Term Loan Repayment Amounts that were outstanding prior to and that remains outstanding after such Purchase Offer will not be reduced or otherwise affected by such transactions (i.e., the scheduled quarterly installment payments will continue to be 0.25% of the initial amount of such Loan on the date it was made).

Section 2.06.    Interest.

(a)    Subject to the provisions of Section 2.06(b), (i) each Eurodollar Rate Loan shall bear interest on the outstanding principal amount or face amount thereof for each Interest Period at a rate per annum equal to the Eurodollar Rate for such Interest Period plus the Applicable Rate; and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate.

(b)    During the continuance of a Default pursuant to Section 8.01(a), the Borrower shall pay interest on amounts due hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Law.  Accrued and unpaid interest on such amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

Section 2.07.    Fees.

(a)    Funding Fees.  On the Closing Date, the Borrower shall pay to each Lender a fee in Dollars in an amount equal to 1.0% of the amount of such Lender's Loans funded on the Closing Date, which payment obligation shall be satisfied by such Lender net funding the gross amount of the Loan to be funded by such Lender against the amount of such fee payable to such Lender.

(b)    Other Fees.  The Borrower shall pay in Dollars to the Agents such other fees as shall have been separately agreed upon in writing in the amounts and at the times so specified.  Such fees shall be

fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the applicable Agent).

Section 2.08.    Computation of Interest and Fees.

All computations of interest for Base Rate Loans when the Base Rate is determined by the Administrative Agent's "prime rate" shall be made on the basis of a year of three hundred and sixty-five (365) days, or three hundred and sixty-six (366) days, as applicable, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a three hundred and sixty (360) day year and actual days elapsed.  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; *provided* that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.10(a), bear interest for one (1) day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.09.    Evidence of Indebtedness.

(a)    The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for purposes of Treasury Regulation Section 5f.103-1(c), as agent for the Borrower, in each case in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be *prima facie* evidence absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Administrative Agent upon reasonable notice, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note payable to such Lender, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

(b)    Entries made by the Administrative Agent in the Register pursuant to Section 2.09(a), and by each Lender in its account or accounts pursuant to Section 2.09(a) shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement and the other Loan Documents, absent manifest error; *provided* that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents.

Section 2.10.    Payments Generally.

(a)    All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office in Dollars and in Same Day Funds not later than 2:00 p.m. (New York, New York time) on the date specified herein.  The Administrative Agent will promptly distribute to each Appropriate Lender its Pro

Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's applicable Lending Office, except as otherwise permitted pursuant to Section 2.13.  All payments received by the Administrative Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)      If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the immediately succeeding Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be; *provided* that, if such extension would cause payment of interest on or principal of Eurodollar Rate Loans to be made in the next succeeding calendar month, such payment shall be made on the immediately preceding Business Day.

(c)      Unless the Borrower or any Lender has notified the Administrative Agent, prior to the time any payment is required to be made by it to the Administrative Agent hereunder, that the Borrower or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that the Borrower or such Lender, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto.  If and to the extent that such payment was not in fact made to the Administrative Agent in Same Day Funds, then:

(i)      if the Borrower failed to make such payment, each Lender shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender in Same Day Funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the date such amount is repaid to the Administrative Agent in Same Day Funds at the applicable Federal Funds Rate from time to time in effect; and

(ii)      if any Lender failed to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in Same Day Funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to the Borrower to the date such amount is recovered by the Administrative Agent (the "**Compensation Period**") at a rate per annum equal to the Federal Funds Rate from time to time in effect.  When such Lender makes payment to the Administrative Agent (together with all accrued interest thereon), then such payment amount (excluding the amount of any interest which may have accrued and been paid in respect of such late payment) shall constitute such Lender's Loan included in the applicable Credit Extension. If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent may make a demand therefor upon the Borrower, and the Borrower shall pay such amount to the Administrative Agent, together with interest thereon for the Compensation Period at a rate per annum equal to the rate of interest applicable to the applicable Credit Extension.  Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its Commitment or to prejudice any rights which the Administrative Agent or the Borrower may have against any Lender as a result of any default by such Lender hereunder.

A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this Section 2.10(c) shall be conclusive, absent manifest error.

(d)      If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the applicable conditions to such

Loan are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(e)        The obligations of the Lenders hereunder to make Loans are several and not joint.  The failure of any Lender to make any Loan on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or purchase its participation.

(f)        Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(g)        Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Administrative Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the order of priority set forth in Section 8.03.  If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may (to the fullest extent permitted by mandatory provisions of applicable Law), but shall not be obligated to, elect to distribute such funds to each of the Lenders in accordance with such Lender's Pro Rata Share of the sum of the Outstanding Amount of all Loans outstanding at such time in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender.

Section 2.11.    Sharing of Payments.

Except to the extent this Agreement provides for payments to be disproportionately allocated to or retained by a particular Lender or group of Lenders (including in connection with purchases of the Loans pursuant to Purchase Offers contemplated by Section 2.13), if, other than as expressly provided elsewhere herein, any Lender shall obtain on account of the Loans made by it, any payment (whether voluntary, involuntary, through the exercise of any right of setoff or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase from the other Lenders such participations in the Loans made by them, as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such Loans or such participations, as the case may be, pro rata with each of them; *provided* that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon.  The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 10.09) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.  The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 2.11 and will in each case notify the Lenders following any such purchases or repayments.  Each Lender that purchases a participation pursuant to this Section 2.11 shall from and after such purchase have the right to give all notices, requests,

demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

Section 2.12.    Incremental Term Loans.

(a)    The Borrower may at any time or from time to time after the Term Loan Escrow Release Date, by notice to the Administrative Agent (whereupon the Administrative Agent shall promptly deliver a copy to each of the Lenders), request one or more additional tranches of term loans (the "**Incremental Term Loans**") in accordance with this Section 2.12.

(b)    Each tranche of Incremental Term Loans shall be in an aggregate principal amount of not less than $50,000,000 (*provided* that such amount may be less if such amount represents all remaining availability under the limit set forth in the next sentence). Notwithstanding anything to the contrary herein, the aggregate amount of all Incremental Term Loans shall not exceed $500,000,000. The Incremental Term Loans may only be in Dollars. Each tranche of the Incremental Term Loans (i) shall rank *pari passu* in right of payment and have the equal benefit of guarantees and security with the Loans, (ii) shall not have a final maturity date earlier than the Maturity Date and (iii) except as set forth in clauses (A), (B) and (C) of the proviso hereto, shall be treated substantially the same as the Term Loans (in each case, including with respect to mandatory and voluntary prepayments); *provided* that (A) except as provided herein, the terms and conditions applicable to any tranche of Incremental Term Loans may be materially different from those of the Term Loans to the extent such differences are reasonably satisfactory to the Administrative Agent, (B) in the event that the Applicable Rate for any Incremental Term Loans is more than 50 basis points greater than the Applicable Rate for the Term Loans, then the Applicable Rates for the Term Loans shall be increased to the extent necessary so that the Applicable Rate for the Incremental Term Loans is no more than 50 basis points greater than the Applicable Rate for the Term Loans; *provided further*, that in determining the Applicable Rate applicable to the Term Loans and the Incremental Term Loans, (x) original issue discount ("**OID**") or upfront fees (which shall be deemed to constitute like amounts of OID) payable by the Borrower to the Lenders of the Term Loans or the Incremental Term Loans in the primary syndication thereof shall be included (with OID being equated to interest based on an assumed four (4)-year life to maturity), (y) customary arrangement or commitment fees payable to the Joint Lead Arrangers (or their affiliates) in connection with the Term Loans or to one or more arrangers (or their affiliates) of the Incremental Term Loans shall be excluded and (z) if the Eurodollar Rate floor applicable to the Incremental Term Loans is higher than the Eurodollar Floor applicable to the Term Loans, the amount of such difference shall be deemed to be an increase to the Applicable Rate for the Incremental Term Loans for the purposes of determining compliance with this clause (B); and (C) the amortization schedule applicable to any tranche of Incremental Term Loans shall be determined by the Borrower and the lenders thereof, in each case so long as the Weighted Average Life to Maturity for any tranche of Incremental Term Loans shall not be shorter than the then remaining Weighted Average Life to Maturity of the Term Loans. Each notice from the Borrower pursuant to this Section 2.12 shall set forth the requested amount and proposed terms of the relevant Incremental Term Loans.

(c)    Incremental Term Loans may be made, by any existing Lender (and each existing Term Lender shall have the right, but not an obligation, to make a portion of any Incremental Term Loan, on terms permitted in this Section 2.12 and otherwise on terms reasonably acceptable to the Administrative Agent) or by any other bank or other financial institution (any such other bank or other financial institution, an "**Additional Lender**"); *provided* that the Administrative Agent shall have consented (not to be unreasonably withheld) to such Lender's or Additional Lender's making such Incremental Term Loans if such consent would be required under Section 10.07(b) for an assignment of Loans as applicable, to such Lender or Additional Lender.

(d)        Commitments in respect of Incremental Term Loans shall become Commitments under this Agreement pursuant to an amendment (an "**Incremental Amendment**") to this Agreement and, as appropriate, the other Loan Documents, executed by the Borrower, each Lender agreeing to provide such Commitment, if any, each Additional Lender, if any, and the Administrative Agent.  The Incremental Amendment may, without the consent of any other Agents or Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section 2.12.  The effectiveness of any Incremental Amendment shall be subject to the satisfaction on the date thereof (each, an "**Incremental Facility Closing Date**") of each of the following conditions (i) no Default shall exist or would result from such proposed Incremental Term Loans and (ii) the representations and warranties of the Borrower and each other Loan Party contained in Article V shall be true and correct in all material respects on and as of the date hereof; *provided* that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided further* that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct in all respects on such respective dates.  The Borrower shall use the proceeds of the Incremental Term Loans for any purpose not prohibited by this Agreement.

(e)        This Section 2.12 shall supersede any provisions in Section 2.11 or 10.01 to the contrary.

Section 2.13.    <u>Loan Repurchases</u>.

(a)        Subject to the terms and conditions set forth or referred to below, the Borrower may from time to time, at its discretion, conduct modified Dutch auctions in order to offer to purchase Loans from each Lender on a pro rata basis (each, a "**Purchase Offer**"), each such Purchase Offer to be managed exclusively by UBS Securities, LLC or another investment bank of recognized standing selected by the Borrower following consultation with the Administrative Agent (in such capacity, the "**Auction Manager**"), so long as the following conditions are satisfied:

(i)        each Purchase Offer shall be conducted in accordance with the procedures, terms and conditions set forth in this Section 2.13 and the Auction Procedures;

(ii)        no Default or Event of Default shall have occurred and be continuing on the date of the delivery of each Auction Notice and at the time of purchase of any Loans in connection with any Purchase Offer;

(iii)        the maximum principal amount (calculated on the face amount thereof) of the Loans that the Borrower offers to purchase in any such Purchase Offer shall be no less than $10,000,000 (unless another amount is agreed to by the Administrative Agent);

(iv)        after giving effect to any purchase of Loans pursuant to this Section 2.13, the sum of (x) the amount of availability under the Asset Backed Credit Facilities and (y) the aggregate amount of all Unrestricted Cash shall not be less than the Applicable Liquidity Level;

(v)        the aggregate principal amount (calculated on the face amount thereof) of all of the Loans so purchased by the Borrower shall automatically be cancelled and retired by the Borrower on the settlement date of the relevant purchase (and may not be resold);

(vi)        no more than one Purchase Offer may be ongoing at any one time and no more than four (4) Purchase Offers may be made in any one (1) year;

(vii)    the Borrower represents and warrants that no Loan Party shall have any Borrower Restricted Information that (A) has not been previously disclosed in writing to the Administrative Agent and the Lenders (other than because certain Lenders do not wish to receive such Borrower Restricted Information) prior to such time and (B) could reasonably be expected to have a material effect upon, or otherwise be material to, a Lender's decision to participate in the Purchase Offer;

(viii)    at the time of each purchase of Loans through a Purchase Offer, the Borrower shall have delivered to the Auction Manager an officer's certificate of a Responsible Officer certifying as to compliance with preceding clause (vii); and

(ix)    not fewer than ten (10) days prior to launching any Purchase Offer, the Borrower shall have informed each of S&P and Moody's of such proposed Purchase Offer and at the time such Purchase Offer is launched neither S&P nor Moody's shall have announced that the proposed Purchase Offer shall be deemed a "distressed exchange"; *provided* that, for the avoidance of doubt, if the Borrower has already launched a Purchase Offer in accordance with this Section 2.13 at the time such a rating is assigned, then the Borrower shall be permitted to complete such Purchase Offer.

(b)    The Borrower must terminate any Purchase Offer if it fails to satisfy one or more of the conditions set forth above that are required to be met at the time which otherwise would have been the time of purchase of Loans pursuant to such Purchase Offer.  If the Borrower commences any Purchase Offer (and all relevant requirements set forth above that are required to be satisfied at the time of the commencement of such Purchase Offer have in fact been satisfied), and if at such time of commencement the Borrower reasonably believes that all required conditions set forth above that are required to be satisfied at the time of the consummation of such Purchase Offer shall be satisfied, then the Borrower shall have no liability to any Lender for any termination of such Purchase Offer as a result of its failure to satisfy one or more of the conditions set forth above that are required to be met at the time, which otherwise would have been the time of consummation of such Purchase Offer, and any such failure shall not result in any Default or Event of Default hereunder.  With respect to all purchases of Loans made by the Borrower pursuant to this Section 2.13, (x) the Borrower shall pay on the settlement date of each such purchase all accrued and unpaid interest (except to the extent otherwise set forth in the relevant offering documents), if any, on the purchased Loans up to the settlement date of such purchase and (y) such purchases (and the payments made by the Borrower and the cancellation of the purchased Loans, in each case in connection therewith) shall not constitute voluntary or mandatory payments or prepayments for purposes of Section 2.03 hereof.

(c)    The Administrative Agent and the Lenders hereby consent to the Purchase Offers and the other transactions effected pursuant to and in accordance with the terms of this Section 2.13 (*provided* that no Lender shall have an obligation to participate in any such Purchase Offer).  For the avoidance of doubt, it is understood and agreed that the provisions of Section 2.10, Section 2.11 and Section 10.07 will not apply to the purchases of Loans pursuant to Purchase Offers made pursuant to and in accordance with the provisions of this Section 2.13.  The Auction Manager acting in its capacity as such hereunder shall be entitled to the benefits of the provisions of Article IX and Section 10.05 to the same extent as if each reference therein to the "Administrative Agent" were a reference to the Auction Manager, and the Administrative Agent shall cooperate with the Auction Manager as reasonably requested by the Auction Manager in order to enable it to perform its responsibilities and duties in connection with each Purchase Offer.

Section 2.14.    Escrow of Term Loans.

(a)    On the Closing Date, the Escrow Borrower shall enter into the Term Loan Escrow Agreement, pursuant to which the Escrow Borrower will deposit, or will cause to be deposited, the proceeds of the Term Loans into the Term Loan Escrow Account, together with sufficient cash and/or Cash Equivalents and other Term Loan Escrow Investments equal to (i) the estimated amount of interest to accrue and (ii) the original issue discount to accrete, in each case, from the Closing Date to but excluding the initial Term Loan Escrow End Date.  The Escrow Borrower shall grant the Collateral Agent, for the benefit of the Secured Parties, a first priority security interest in the Term Loan Escrow Collateral.

(b)    The funds held in the Term Loan Escrow Account will be (i) released to Lyondell Chemical or such other Person as Lyondell Chemical directs upon (x) delivery by Lyondell Chemical to the Term Loan Escrow Agent and the Administrative Agent of an Officers' Certificate certifying that, prior to or concurrently with the release of funds from the Term Loan Escrow Account that the Term Loan Escrow Release Conditions have been satisfied and (y) the consummation of the Lyondell Assumption, or (ii) used to make the Special Mandatory Prepayment in accordance with Section 2.03(c).

## ARTICLE III.

## Taxes, Increased Costs Protection and Illegality

Section 3.01.    Taxes.

(a)    Except as required by law, any and all payments by or on behalf of any Loan Party to or for the account of any Agent or any Lender under any Loan Document shall be made free and clear of and without deduction for any Taxes.  If a Loan Party or other applicable withholding agent shall be required by any Laws to withhold or deduct any Indemnified Taxes or Other Taxes from or in respect of any sum payable under any Loan Document to or for the account of any Agent or any Lender, (i) the sum payable by the applicable Loan Party shall be increased as necessary so that after all required withholdings or deductions of Indemnified Taxes or Other Taxes (including withholdings or deductions applicable to additional sums payable under this Section 3.01) have been made, each Lender (as the case may be) receives an amount equal to the sum it would have received had no such withholdings or deductions of Indemnified Taxes or Other Taxes been made, (ii) such Loan Party or other applicable withholding agent shall make such withholdings or deductions, (iii) such Loan Party or other applicable withholding agent shall pay the full amount withheld or deducted to the relevant taxation authority or other authority in accordance with applicable Law and (iv) within thirty (30) days after the date of such payment (or, if receipts or evidence are not available within thirty (30) days, as soon as possible thereafter), if a Loan Party made the withholding or deduction, such Loan Party shall furnish to the Administrative Agent or affected Lender (as the case may be) the original or a copy of a receipt evidencing payment thereof or other evidence reasonably acceptable to such Agent or Lender.

(b)    The Loan Parties agree to pay any and all present or future stamp, court or documentary taxes and any other excise, property, intangible, mortgage recording or similar taxes or charges or levies which arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Loan Document (hereinafter referred to as "**Other Taxes**") except for any such tax resulting from an assignment or participation by a Lender or Participant ("**Assignment Tax**"), but only if such Assignment Taxes result from a connection between the jurisdiction imposing such tax and such Lender or Participant other than any connections arising solely from such Lender or Participant having executed, delivered, been a party to, received or perfected a security interest under or performed its obligations under, received payment

under, enforced, or engaged in any other transaction pursuant to this Agreement or any other Loan Document.

(c)      Each Loan Party jointly and severally agrees to indemnify and hold harmless each Agent and each Lender for (i) the full amount of Indemnified Taxes and Other Taxes (including Indemnified Taxes or Other Taxes applicable to additional sums payable under this Section 3.01) payable by such Agent or such Lender (including Indemnified Taxes or Other Taxes imposed directly on the Agent or Lender) whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority and (ii) any expenses (excluding any Excluded Taxes) arising therefrom or with respect thereto.

(d)      Any Lender entitled to an exemption from or reduction of withholding Tax or backup withholding Tax, with respect to payments under this Agreement shall deliver to the Borrower (and the Administrative Agent) at any time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law or otherwise reasonably requested by the Borrower or the Administrative Agent to permit such payments to be made without such withholding Tax or at a reduced rate.

Without limiting the foregoing, each Lender shall, to the extent it is legally entitled to do so, (i) on or prior to the Closing Date in the case of each Lender that is a signatory hereto, (ii) on or prior to the date of the Assignment and Assumption pursuant to which such Lender becomes a Lender, (iii) on or prior to the date on which any such form or certification expires or becomes obsolete or incorrect, (iv) after the occurrence of any event involving such Lender that requires a change in the most recent form or certification previously delivered by it to Borrower and the Administrative Agent and (v) from time to time if reasonably requested by the Borrower or the Administrative Agent, provide the Administrative Agent and the Borrower with two completed originals of each of the following, as applicable:

(i)      in the case of a Lender that is not a Foreign Lender, a complete and executed U.S. Internal Revenue Service Form W-9 (or any successor forms thereto) certifying that it is not subject to U.S. federal backup withholding under Section 3406 of the Code;

(ii)      a complete and executed of U.S. Internal Revenue Service Form W-8BEN (or any successor forms) claiming eligibility for benefits of an income tax treaty to which the United States is a party;

(iii)      a complete and executed U.S. Internal Revenue Service Form W-8ECI (or any successor forms);

(iv)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate, in substantially the form of Exhibit M, or any other form approved by the Administrative Agent and the Borrower, to the effect that such Foreign Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code, and that no payments in connection with the Credit Agreement are effectively connected with such Foreign Lender's conduct of a U.S. trade or business and (y) a complete and executed U.S. Internal Revenue Service Form W-8BEN (or any successor forms);

(v)    to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership or participating Lender granting a typical participation), a complete and executed U.S. Internal Revenue Service Form W-8IMY, accompanied by a Form W-8ECI, W-8BEN, a certificate in substantially the form of Exhibit M, Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that, if the Foreign Lender is a partnership (and not a participating Lender) and one or more partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender shall provide a certificate, in substantially the form of Exhibit M, on behalf of such beneficial owner(s) in lieu of requiring each beneficial owner to provide its own certificate; or

(vi)    any other form prescribed by any applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be prescribed by any applicable Law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made.

(e)    (i) The Administrative Agent hereby represents that it is a U.S. branch of a foreign bank subject to regulatory supervision by the Federal Reserve Board. The Borrower and the Administrative Agent hereby agree that the Borrower will treat the U.S. branch of the Administrative Agent as a U.S. person for withholding tax purposes within the meaning of Treasury Regulation Sections 1.1441-1(b)(2)(iv) and 1.1441-1(e)(3)(v). Accordingly, the Administrative Agent shall have complied with clause (ii) of this paragraph by providing a Form W-8IMY with the certifications provided for in (A), (B) and (C) of Treasury Regulation Section 1.1441-1(e)(3)(v) and shall not be required to provide any information or forms with respect to any of the Lenders;

(ii)    each Agent shall, to the extent it is legally entitled to do so, provide the Borrower with, (a) with respect to any amount received on behalf of the Lenders, one completed original of IRS Form W-9 or W-8IMY, as applicable, (b) with respect to any fee received by such Agent under the Loan Documents for its own account, one completed original of IRS Form W-9 or applicable W-8 and (c) any other documentation reasonably requested by the Borrower as will permit any payment of such fee to be made without withholding or at a reduced rate of withholding; *provided* that on the Closing Date the Agents shall provide to the Borrower the following correct, complete and duly executed documents, as applicable: (A) an IRS Form W-9 or W-8ECI that eliminates all U.S. federal withholding and backup withholding taxes with respect to any fees to be received by the Agent under the Loan Documents, and (B) in the case of the Administrative Agent, an IRS Form W-8IMY with boxes 11 and 12 marked and that otherwise satisfies the requirements of Treasury Regulation Sections 1.1441-1(b)(2)(iv) and 1.1441-1(e)(3)(v) as applicable to a U.S. branch that has agreed to be treated as a U.S. person for withholding tax purposes. Thereafter and from time to time, each Agent shall, to the extent it is legally entitled to do so, provide the Borrower such additional duly completed and signed copies of one or more of such forms (or such successor forms) or documentations on or prior to the date on which any such form or documentation expires or becomes obsolete or incorrect.

(f)    Any Lender or Agent claiming any additional amounts or indemnification payments pursuant to this Section 3.01 shall use its reasonable efforts (if requested by the Borrower) to change the jurisdiction of its Lending Office or take other steps (in each case, at Borrower's expense) if such a change or other steps would reduce any such additional amounts or indemnification payments (or any similar amount that may thereafter accrue) and would not, in the reasonable judgment of such Lender or Agent, be materially disadvantageous to such Lender or Agent.

(g)        If any Lender or Agent determines, in its sole good faith discretion, that it has received a refund in respect of any Indemnified Taxes or Other Taxes as to which indemnification or additional amounts have been paid to it by the Borrower pursuant to this Section 3.01, it shall promptly remit the portion of such refund to the applicable Loan Party that will leave it in no better or worse after-tax position (taking into account all out-of-pocket expenses of the Lender or Agent, as the case may be, than if the Indemnified Tax or Other Tax giving rise to such refund had not been imposed in the first instance); *provided* that the Loan Parties, upon the request of the Lender or Agent, as the case may be, agree promptly to return such refund (plus any penalties, interest or other charges imposed by the relevant taxing authority) to such party in the event such party is required to repay such refund to the relevant taxing authority.  This clause (g) shall not be construed to require any Lender or Agent to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Loan Party or any other Person.

(h)        For the avoidance of doubt, any payments made by the Administrative Agent to a Lender shall be treated as payments made by the applicable Loan Party for purposes of this Section 3.01.

Section 3.02.    Illegality.

If any Lender determines that any Law has made it unlawful or otherwise prohibited, or that any Governmental Authority has asserted that it is unlawful or otherwise prohibited, for any Lender or its applicable Lending Office to make, maintain or fund Eurodollar Rate Loans, or to determine or charge interest rates based upon the Eurodollar Rate, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligation of such Lender to make or continue Eurodollar Rate Loans or to convert Base Rate Loans to Eurodollar Rate Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrower shall upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all applicable Eurodollar Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may in compliance with applicable Law continue to maintain such Eurodollar Rate Loans to such day, or promptly, if such Lender may not in compliance with applicable Law continue to maintain such Eurodollar Rate Loans.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted and all amounts due, if any, in connection with such prepayment or conversion under Section 3.05.  Each Lender agrees to designate a different Lending Office if such designation will avoid the need for such notice and will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender.

Section 3.03.    Inability to Determine Rates.

If the Required Lenders determine that for any reason adequate and reasonable means do not exist for determining the applicable Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan, or that the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, or that Dollar or other applicable deposits are not being offered to banks in the London interbank Eurodollar, or other applicable, market for the applicable amount and the Interest Period of such Eurodollar Rate Loan, the Administrative Agent will promptly so notify the Borrower and each Lender.  Thereafter, the obligation of the Lenders to make or maintain Eurodollar Rate Loans shall be suspended until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending Request for Credit Extension of, conversion to or continuation of such Eurodollar Rate Loans or, failing that, will be deemed to have converted such request, if applicable, into a Request for Credit Extension of Base Rate Loans in the amount specified therein.

Section 3.04.    Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurodollar Rate Loans.

(a)    If any Lender determines that as a result of a Change in Law after the Closing Date, or such Lender's compliance therewith, there shall be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining any Eurodollar Rate Loans or a reduction in the amount received or receivable by such Lender in connection with any of the foregoing (excluding for purposes of this Section 3.04(a) any such increased costs or reduction in amount resulting from (i) Indemnified Taxes or Excluded Taxes and (ii) reserve requirements contemplated by Section 3.04(c), then from time to time within fifteen (15) days after demand by such Lender setting forth in reasonable detail such increased costs (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such increased cost or reduction.

(b)    If any Lender determines that the introduction of any Law regarding capital adequacy or any change therein or in the interpretation thereof, in each case after the Closing Date, or compliance by such Lender (or its Lending Office) therewith, has the effect of reducing the rate of return on the capital of such Lender or any corporation controlling such Lender as a consequence of such Lender's obligations hereunder (taking into consideration its policies with respect to capital adequacy and such Lender's desired return on capital), then from time to time upon demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such reduction within fifteen (15) days after receipt of such demand.

(c)    The Borrower shall pay to each Lender, (i) as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurodollar funds or deposits, additional interest on the unpaid principal amount of each applicable Eurodollar Rate Loan of the Borrower equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive in the absence of manifest error) and (ii) as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any other central banking or financial regulatory authority imposed in respect of the maintenance of the Commitments or the funding of any Eurodollar Rate Loans of the Borrower, such additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) equal to the actual costs allocated to such Commitment or Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive absent manifest error) which in each case shall be due and payable on each date on which interest is payable on such Loan, *provided* the Borrower shall have received at least fifteen (15) days' prior notice (with a copy to the Administrative Agent) of such additional interest or cost from such Lender.  If a Lender fails to give notice fifteen (15) days prior to the relevant Interest Payment Date, such additional interest or cost shall be due and payable fifteen (15) days from receipt of such notice.

(d)    Failure or delay on the part of any Lender to demand compensation pursuant to this Section 3.04 shall not constitute a waiver of such Lender's right to demand such compensation.

(e)    If any Lender requests compensation under this Section 3.04, then such Lender will, if requested by the Borrower, use commercially reasonable efforts to designate another Lending Office for any Loan affected by such event; *provided* that such efforts are made on terms that, in the reasonable judgment of such Lender, cause such Lender and its Lending Offices to suffer no material economic, legal or regulatory disadvantage, and *provided further* that nothing in this Section 3.04(e) shall affect or

postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.04(a), (b), (c) or (d).

Section 3.05.    <u>Funding Losses</u>.

Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense actually incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Eurodollar Rate Loan of the Borrower on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise); or

(b)    any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Eurodollar Rate Loan of the Borrower on the date or in the amount notified by the Borrower;

including any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.

For purposes of calculating amounts payable by the Borrower to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each Eurodollar Rate Loan made by it at the Eurodollar Rate for such Loan by a matching deposit or other borrowing in the London interbank Eurodollar market for a comparable amount and for a comparable period, whether or not such Eurodollar Rate Loan was in fact so funded.

Section 3.06.    <u>Matters Applicable to All Requests for Compensation</u>.

(a)    Any Agent or any Lender claiming compensation under this Article III shall deliver a certificate to the Borrower setting forth the additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of manifest error.  In determining such amount, such Agent or such Lender may use any reasonable averaging and attribution methods.

(b)    With respect to any Lender's claim for compensation under Section 3.01, 3.02, 3.03, 3.04 or 3.05 the Borrower shall not be required to compensate such Lender for any amount incurred more than one hundred and twenty (120) days prior to the date that such Lender notifies the Borrower of the event that gives rise to such claim; *provided* that, if the circumstance giving rise to such claim is retroactive, then such one hundred and twenty (120)-day period referred to above shall be extended to include the period of retroactive effect thereof.  If any Lender requests compensation by the Borrower under Section 3.04, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue from one Interest Period to another applicable Eurodollar Rate Loans, or, if applicable, to convert Base Rate Loans into Eurodollar Rate Loans, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 3.06(c) shall be applicable); *provided* that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(c)    If the obligation of any Lender to make or continue any Eurodollar Rate Loan, or to convert Base Rate Loans into Eurodollar Rate Loans shall be suspended pursuant to Section 3.06(b) hereof, such Lender's applicable Eurodollar Rate Loans shall be automatically converted into Base Rate Loans (or, if such conversion is not possible, repaid) on the last day(s) of the then current Interest Period(s) for such Eurodollar Rate Loans (or, in the case of an immediate conversion required by

Section 3.02, on such earlier date as required by Law) and, unless and until such Lender gives notice as provided below that the circumstances specified in Section 3.01, 3.02, 3.03, 3.04 or 3.05 hereof that gave rise to such conversion no longer exist:

   (i)  to the extent that such Lender's Eurodollar Rate Loans have been so converted, all payments and prepayments of principal that would otherwise be applied to such Lender's applicable Eurodollar Rate Loans shall be applied instead to its Base Rate Loans; and

   (ii)  all Loans that would otherwise be made or continued from one Interest Period to another by such Lender as Eurodollar Rate Loans shall be made or continued instead as Base Rate Loans (if possible), and all Base Rate Loans of such Lender that would otherwise be converted into Eurodollar Rate Loans shall remain as Base Rate Loans.

   (d)  If any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 3.01, 3.02, 3.03 or 3.04 hereof that gave rise to the conversion of any of such Lender's Eurodollar Rate Loans pursuant to this Section 3.06 no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Eurodollar Rate Loans made by other Lenders are outstanding, such Lender's Base Rate Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Eurodollar Rate Loans, to the extent necessary so that, after giving effect thereto, all Loans held by the Lenders holding Eurodollar Rate Loans are held pro rata (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Pro Rata Shares.

   Section 3.07.  <u>Replacement of Lenders Under Certain Circumstances</u>.

   (a)  If at any time (i) the Borrower becomes obligated to pay additional amounts or indemnity payments described in Section 3.01 or 3.04 as a result of any condition described in such Sections or any Lender ceases to make any Eurodollar Rate Loans as a result of any condition described in Section 3.02 or Section 3.04, (ii) any Lender becomes a Defaulting Lender or (iii) any Lender becomes a Non-Consenting Lender, then the Borrower may, on ten (10) Business Days' prior written notice to the Administrative Agent and such Lender, replace such Lender by causing such Lender to (and such Lender shall be obligated to) assign without recourse pursuant to Section 10.07(b) (with the assignment fee to be paid by the Borrower in each such instance) all of its rights and obligations under this Agreement to one or more Assignees; *provided* that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender or other such Person; and *provided further* that (A) in the case of any such assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable Assignees shall have agreed to, and shall be sufficient (together with all other consenting Lenders) to cause the adoption of, the applicable departure, waiver or amendment of the Loan Documents and (B) in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, (x) the Lender being replaced shall have the option of withdrawing such claims, in which case such Lender shall not be required to make such assignment and (y) such assignment, if effected, will result in a reduction in such compensation or payments.

   (b)  Any Lender being replaced pursuant to Section 3.07(a) above shall (i) execute and deliver an Assignment and Assumption with respect to such Lender's applicable Commitment and outstanding Loans and (ii) deliver any Notes evidencing such Loans to the Borrower or to the Administrative Agent. Pursuant to such Assignment and Assumption, (A) the assignee Lender shall acquire all or a portion, as the case may be, of the assigning Lender's Commitment and outstanding Loans, (B) all obligations of the Borrower owing to the assigning Lender relating to the Loans or Commitments so assigned (including any amounts owed under Section 2.03, assuming for this purpose (in the case of a Lender being replaced

pursuant to Section 3.07(a)(iii)) that the Loans of such Lender were being voluntarily prepaid) shall be paid in full at par by the assignee Lender to such assigning Lender concurrently with such Assignment and Assumption and (C) upon such payment and, if so requested by the assignee Lender, delivery to the assignee Lender of the appropriate Note or Notes executed by the Borrower, the assignee Lender shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans or Commitments, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender.  In connection with any such replacement, if any such Non-Consenting Lender or Defaulting Lender does not execute and deliver to the Administrative Agent a duly executed Assignment and Assumption reflecting such replacement within five (5) Business Days of the date on which the assignee Lender executes and delivers such Assignment and Assumption to such Non-Consenting Lender or Defaulting Lender, then such Non-Consenting Lender or Defaulting Lender shall be deemed to have executed and delivered such Assignment and Assumption without any action on the part of the Non-Consenting Lender or Defaulting Lender.

(c)    In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of all affected Lenders in accordance with the terms of Section 10.01 and (iii) the Required Lenders have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "**Non-Consenting Lender**."

Section 3.08.    Survival.

All of the Borrower's obligations under this Article III shall survive termination of the Aggregate Commitments and repayment of all other payment Obligations hereunder.

## **ARTICLE IV.**

### **Conditions Precedent to Credit Extensions**

Section 4.01.    Conditions to the Closing Date.

The effectiveness of this Agreement and the availability of the Commitments of the Lenders shall be subject to the satisfaction of the following conditions precedent:

(a)    The Administrative Agent's receipt of the following, each of which shall be originals or facsimiles unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party to the extent such Loan Party is a party thereto, each in form and substance reasonably satisfactory to the Administrative Agent and its legal counsel:

(i)    executed counterparts of this Agreement (including by all Lenders party hereto), the Term Loan Escrow Agreement and each other Loan Document (other than the Security Documents (excluding the Term Loan Escrow Agreement), the Guarantee Agreement and documents to be delivered after the Term Loan Escrow Release Date pursuant to Section 6.14(a));

(ii)    a Term Note executed by the Borrower in favor of each Lender that has requested a Term Note more than three (3) Business Days prior to the Closing Date;

(iii)    such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party executing

documents on the Closing Date as the Administrative Agent may reasonably require (and as have been notified to the Borrower no later than three (3) Business Days before the Closing Date) evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date;

(iv)    the Administrative Agent shall have received a certificate, dated as of a recent date from the Secretary of State or other appropriate authority, evidencing the good standing of the Borrower and each other Loan Party in the jurisdiction of its organization (to the extent legally applicable in such jurisdiction);

(v)    (A) the executed legal opinion of Cadwalader, Wickersham & Taft LLP, special U.S. counsel to the Company and the other Loan Parties, substantially in the form of Exhibit G-1 with respect to the Loan Documents delivered as of the Closing Date; and

(B)    the executed legal opinion of Gerald A. O'Brien, Deputy General Counsel to the Borrower, substantially in the form of Exhibit G-2 with respect to the Loan Documents delivered as of the Closing Date; and

(vi)    a certificate signed by a Principal Financial Officer attesting to the Solvency of the Loan Parties (taken as a whole) after giving effect *pro forma* to the Transactions.

(b)    The Senior Notes shall have been issued and funded in a face amount not to exceed $2,756,212,500 and the proceeds thereof shall have been (or shall be substantially contemporaneously herewith) deposited into an escrow account.

(c)    The ABL Facility shall be (or shall contemporaneously herewith become) effective, with a commitment not to exceed $1,750,000,000, pursuant to duly executed documents reasonably acceptable to the Administrative Agent.

(d)    The Euro Securitization shall be (or shall contemporaneously herewith become) committed, subject to final documentation.

(e)    Certified copies of UCC, United States Patent and Trademark Office and United States Copyright Office, tax and judgment lien searches or equivalent reports or searches, each of a recent date listing all effective financing statements, lien notices or comparable documents that name any Loan Party as debtor and that are filed in those state and county jurisdictions, as applicable, in which any Loan Party is organized or maintains its principal place of business and such other searches that are required by the Perfection Certificate or that the Collateral Agent deems reasonably necessary or appropriate, none of which encumber the Collateral covered or intended to be covered by the Security Documents (other than Liens to be satisfied or discharged on the Term Loan Escrow Release Date pursuant to the Plan of Reorganization or Permitted Liens).

(f)    The Administrative Agent shall have received all documentation and other information mutually agreed to be required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the United States PATRIOT Act (Title III of Public Law 107-56 (signed into law October 26, 2001)) (the "**USA**

**PATRIOT Act**"), including the information described in Section 10.20, at least two (2) Business Days prior to the Closing Date.

(g) The representations and warranties of the Borrower and each other Loan Party contained in Article V (other than with respect to the Security Documents (excluding the Term Loan Escrow Agreement)) shall be true and correct in all material respects on and as of the date hereof; *provided* that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided further* that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct in all respects on such respective dates.

(h) Except as disclosed in the Audited Financial Statements, since December 31, 2009, no event, occurrence, development or state of circumstances or facts has had or would reasonably be expected to have, individually or in the aggregate a Material Adverse Effect.

(i) The Administrative Agent shall have received prior to or substantially simultaneously with the Closing Date, reimbursement for the expenses to be received on the Closing Date pursuant to the terms of this Agreement (to the extent invoices for such expenses have been provided at least three (3) Business Days prior to the Closing Date).

Notwithstanding anything to the contrary contained in any Loan Document, Schedules 1.01(D), 5.08 and 5.11 delivered by the Loan Parties for the Loan Documents on the Closing Date may be subsequently, amended, supplemented or otherwise modified on or prior to the Term Loan Escrow Release Date to reflect changes arising from the transactions described in the Plan of Reorganization including to make administrative adjustments to such schedules required to accurately reflect the information set forth therein.

Section 4.02. Conditions to the Term Loan Escrow Release Date.

The Borrower will only be entitled to direct the Term Loan Escrow Agent to release the Term Loan Escrow Proceeds upon satisfaction of the following conditions, which shall be certified in writing by the Company in a Responsible Officer's certificate contemporaneously with the release of the Term Loan Escrow Proceeds on or prior to the Term Loan Escrow End Date (such date, the "**Term Loan Release Date**"):

(a) The issuance by the Bankruptcy Court of a final order that has not been stayed pending appeal confirming a Reorganization Plan and, other than release of the Term Loan Escrow Proceeds and other conditions to be satisfied substantially simultaneously with release of Term Loan Escrow Proceeds, satisfaction of all conditions precedent to effectiveness of such Reorganization Plan.

(b) Except as contemplated by the Reorganization Plan proposed by the Company as of the March 15, 2010, including transfers to certain litigation and environmental trusts, except as contemplated by the Reorganization Plan, (i) the Company shall directly or indirectly own subsidiaries that own all of the assets and businesses directly or indirectly owned by LyondellBasell AF S.C.A. and its subsidiaries immediately prior to the consummation of the transactions contemplated by such Reorganization Plan, (ii) the Borrower shall directly or indirectly own subsidiaries that own all or substantially all of the U.S.-based assets and businesses directly or indirectly owned by the Company and its subsidiaries immediately following the consummation of the transactions contemplated by such Reorganization Plan, and

(iii) the cash expenditures to be made in respect of Specified Claims pursuant to such Reorganization Plan shall not exceed $1,200,000,000.

(c) The execution and delivery of Security Documents and intercreditor agreements providing a first priority security interest in favor of the Collateral Agent for the benefit of the Administrative Agent and the Lenders in the Collateral and a second priority security interest in favor of the Collateral Agent for the benefit of the Administrative Agent and the Lenders in the ABL Facility Collateral, in each case, in accordance with the Collateral and Guaranty Requirements, and in each case, subject to Permitted Liens.

(d) No Default or Event of Default shall have occurred and be continuing under this Agreement (it being understood that to the extent the Company, the Borrower or any Restricted Subsidiary has Incurred Indebtedness (treating Indebtedness not discharged pursuant to the Reorganization Plan and remaining outstanding on the Term Loan Escrow Release Date as having been Incurred as of the Term Loan Escrow Release Date), made any Restricted Payments, consummated any Asset Sale or otherwise taken any action or engaged in any activities during the period beginning on the Closing Date and ending on the Term Loan Escrow Release Date, such actions and activities shall be treated and classified under this Agreement (including but not limited to impacting relevant baskets and determining whether a Default or Event of Default would have occurred as of the Term Loan Escrow Release Date for purposes of this paragraph (d)), as if this Agreement and the covenants set forth herein had applied to the Company, the Borrower and the Restricted Subsidiaries during such period. For purposes of the foregoing, (i) the Company will be deemed to have been the direct or indirect owner of the Borrower and the Restricted Subsidiaries and the Borrower will be deemed to have been the direct or indirect owner of all of the Domestic Subsidiaries of the Company (or their intermediate holding companies between the Company and the Borrower) for all relevant periods and (ii) all Subsidiaries of the Company shall be deemed to be Restricted Subsidiaries for the period from the Closing Date through the Term Loan Escrow Release Date). The foregoing will not prevent the consummation of the rights offering prior to the Term Loan Escrow Release Date.

(e) Prior to or substantially simultaneously with the release of Term Loan Escrow Proceeds, receipt of proceeds by the Company from the issuance of common equity, pursuant to a rights offering or otherwise, of not less than $2,800,000,000.

(f) Substantially simultaneously with the release of Term Loan Escrow Proceeds, the respective parties shall have executed and delivered documents relating to the other elements of the Exit Financing, and the conditions to effectiveness thereunder shall have been satisfied or waived by the parties thereto, and funds shall have been borrowed or received pursuant to offerings (as necessary to consummate the Reorganization Plan), as follows:

(i) the Senior Notes in an aggregate principal amount not to exceed approximately $2,756,212,500;

(ii) the ABL Facility, which shall provide for commitments in an aggregate principal amount not to exceed approximately $1,750,000,000 (availability is subject to borrowing base and advance rate calculations);

(iii) the Euro Securitization, which shall be substantially similar in terms of facility size to the existing European securitization facility of the Company and its Subsidiaries; provided that the conditions to effectiveness may be satisfied and initial

funding under the Euro Securitization may occur after the Term Loan Escrow Release Date; and

(iv)    Plan Roll-Up Notes in an aggregate principal amount of not more than approximately $3,250,000,000, with the obligors, collateral, interest rate, maturity, amortization, principal amount and other material terms summarized under Schedule 1.01B; *provided* that the terms of the Plan Roll-Up Notes (including any replacement or refinancing thereof) may differ from those described in Schedule 1.01B at the Term Loan Escrow Release Date in any manner that would be permissible under the Senior Notes Indenture following the Closing Date;

(g)    After giving effect to the consummation of the Reorganization Plan, a Change of Control will not have occurred.

(h)    The Administrative Agent's receipt of (i) customary legal opinions and (ii) customary officers' certificates.

(i)    The Collateral Agent shall have received a copy of, or a certificate as to coverage under, the insurance policies required by Section 6.07 (including, without limitation, flood insurance  coverage) and the applicable provisions of the Security Documents, each of which shall be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable) and shall name the Collateral Agent, on behalf of the Secured Parties, as additional insured (other than with respect to policies issued by OIL Insurance Limited), in form and substance  reasonably satisfactory to the Collateral Agent.

## ARTICLE V.

## Representations and Warranties

Each of the Company and the Borrower represents and warrants to the Agents and the Lenders that:

Section 5.01.    Existence, Qualification and Power; Compliance with Laws.

Subject to the Agreed Security Principles and Legal Reservations, each Loan Party and each Significant Subsidiary (a) is a Person duly organized or formed, validly existing and in good standing, in each case where such concept exists, under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite constitutional, corporate or other similar power and authority to (i) own or lease its material assets and carry on its business substantially as currently conducted and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and in good standing, in each case where such concept exists, under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all Laws, orders, writs and injunctions and (e) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; except in each case referred to in clause (c), (d) or (e), to the extent that failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.02.    Authorization; No Contravention.

The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, and the consummation of the Transaction, are within such Loan Party's corporate

or other powers, have been duly authorized by all necessary corporate or other organizational action, and do not (a) contravene the terms of any of such Person's Organization Documents; (b) in any material way, conflict with or result in any breach or contravention of or the creation of any Lien under (other than as permitted by Section 7.06), or require any payment to be made under, (i) except payments as set forth in the funds flow memorandum dated the Term Loan Escrow Release Date and delivered to the Administrative Agent, any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (ii) any order in any material way, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject in any material way; or (c) violate any material Law in any material way; except with respect to any conflict, breach or contravention or payment (but not creation of Liens) referred to in clause (b)(i), to the extent that such conflict, breach, contravention, violation or payment could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.03.    Governmental Authorization; Other Consents.

Subject to the Agreed Security Principles and Legal Reservations, no material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary for or required of a Loan Party in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Security Documents, (c) the perfection or maintenance of the Liens created under the Security Documents (including the priority thereof subject to the Intercreditor Agreements) or (d) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Security Documents, except for (i) filings, notices, consents and registrations necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.04.    Binding Effect.

This Agreement and each other Loan Document dated on or prior to the date this representation is made has been duly executed and delivered by each Loan Party that is a party thereto.  This Agreement and each other Loan Document dated on or prior to the date this representation is made constitutes, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is a party thereto in accordance with its terms, except as such enforceability may be limited by (i) Debtor Relief Laws and by general principles of equity and the Legal Reservations, (ii) the need for filings and registrations necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties and (iii) the effect of foreign Laws, rules and regulations as they relate to pledges of Equity Interests in Foreign Subsidiaries (other than those pledges made under the Laws of the jurisdiction of formation of the applicable Foreign Subsidiary).

Section 5.05.    Financial Statements; No Material Adverse Effect.

(a)    On the Closing Date, the Audited Financial Statements fairly present in all material respects the financial condition of the Company and its Subsidiaries as of the dates thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, except as otherwise expressly noted therein.  During the period from December 31, 2009 to and including the Closing Date, there has been (x) no sale, transfer or other disposition by the Company or any of its Subsidiaries of any material part of the business or property of

the Company or any of its Subsidiaries, taken as a whole, and (y) no purchase or other acquisition by the Company or any of its Subsidiaries of any business or property (including any Equity Interest of any other Person) material in relation to the consolidated financial condition of the Company and its Subsidiaries, in each case, which is not reflected in the foregoing financial statements or in the notes thereto or has not otherwise been disclosed in writing to the Lenders prior to the Closing Date.

(b)       The forecasts of consolidated balance sheets, income statements and cash flow statements of the Company and its Subsidiaries which have been furnished to the Administrative Agent prior to the Closing Date have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time of preparation of such forecasts, it being understood that actual results may vary from such forecasts and that such variations may be material.

(c)       Since December 31, 2009, there has been no event or circumstance that could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.06.    Litigation.

There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, threatened in writing or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its Subsidiaries or against any of their properties or revenues that could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.07.    Ownership of Property; Liens.

(a)       Each Loan Party and each of its Subsidiaries has good record fee simple title (or otherwise holds full legal (and, if applicable, beneficial) ownership under applicable Law) to, or valid leasehold interests in, or easements or other limited property interests in, all material Real Property necessary in the ordinary conduct of its business, free and clear of all Liens except for (x) minor defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and (y) Liens permitted under Section 7.06 (other than such Liens permitted pursuant to clause (15) of the definition of Permitted Liens) and except where the failure to have such title could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)       As of the Closing Date and Term Loan Escrow Release Date after giving effect to the transactions described in the Plan of Reorganization, Schedule 7 to the Perfection Certificate dated the Closing Date contains a true and complete list of each interest in material Real Property owned or ground leased by the Loan Parties and describes the type of interest therein held by each such entity.

Section 5.08.    Environmental Matters.

In each case, except as set forth on Schedule 5.08,

(a)       There are no claims, actions, suits, proceedings, demands, notices or, to the knowledge of any Loan Party and each of its Subsidiaries, investigations alleging actual or potential liability of any Loan Party or its Subsidiaries under or for violation of, or otherwise relating to, any Environmental Law that could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)       Except for items that could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) each Loan Party and each of their respective

Subsidiaries and each of their Real Property, other assets and operations are in compliance with all applicable Environmental Laws, including all Environmental Permits; (ii) none of the properties currently or, to the knowledge of any Loan Party or any of its Subsidiaries, formerly, owned, leased or operated by any Loan Party or any of its Subsidiaries is listed or formally proposed for listing on the National Priority List under CERCLA, or the German register of contaminated sites (Altlaster register) or any analogous list maintained pursuant to any Environmental Law; (iii) all asbestos or asbestos-containing material on, at or in any property or facility currently owned, leased or operated by any Loan Party or any of its Subsidiaries is in compliance with Environmental Laws; and (iv) to the knowledge of each Loan Party, there has been no Release of Hazardous Materials by any Person on, at, under or from any property or facility currently or formerly owned, leased or operated by any Loan Party or any of its Subsidiaries and there has been no Release of Hazardous Materials by any Loan Party or any of its Subsidiaries at any other location.

(c)     The properties and facilities owned, leased or operated by the Loan Parties and their Subsidiaries do not contain any Hazardous Materials in amounts or concentrations which (i) constitute a violation of, (ii) require investigation or other response or corrective action under or (iii) could reasonably be expected to give rise to liability under, Environmental Laws, which violations, actions and/or liabilities, individually or in the aggregate, could, reasonably be expected to result in a Material Adverse Effect.

(d)     None of the Loan Parties or their Subsidiaries is undertaking or financing, in whole or in part, either individually or together with other potentially responsible parties, any investigation, response or other corrective action relating to any actual or threatened Release of Hazardous Materials at any property, facility or location pursuant to any Environmental Law except for such investigation, response or other corrective action that, individually or in the aggregate, could not, reasonably be expected to result in a Material Adverse Effect.

(e)     All Hazardous Materials generated, used, treated, handled or stored (collectively, "**Managed**") by any Loan Party or any of their Subsidiaries at, or transported by or on behalf of any Loan Party or any of their Subsidiaries to or from, any property or facility currently or formerly owned, leased or operated by any Loan Party or any of its Subsidiaries have been Managed or transported in a manner which could not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect.

(f)     Except as could not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, none of the Loan Parties or any of their Subsidiaries has contractually assumed, and is not subject or a party to any judgment, order, decree or agreement which imposes, any liability or obligation under or relating to any Environmental Law.

Section 5.09.    <u>Taxes</u>.

Except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, each of the Loan Parties and each of their respective Subsidiaries has (i) timely filed all Tax returns required to be filed and each such Tax return is true and correct in all respects and (ii) timely paid all Taxes levied or imposed upon it or its properties (whether or not shown on a Tax return) and satisfied all of its Tax withholding obligations, except (a) Taxes that are currently being contested in good faith by appropriate proceedings and reserves in compliance with GAAP with respect thereto have been provided on its books and (b) Taxes or Tax returns of a Loan Party or one of its Subsidiaries the obligation of which to pay or file has been discharged or deferred in bankruptcy.

Section 5.10.    ERISA Compliance.

(a)    Except as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each ERISA Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other federal or state Laws.

(b)    (i) No ERISA Event has occurred or is reasonably expected to occur and (ii) neither any Loan Party, any Subsidiary nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA, except, with respect to each of the foregoing clauses of this Section 5.10(b), as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)    Except where noncompliance could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, (i) each Foreign Plan has been maintained in compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders and has been maintained, where required, in good standing with applicable regulatory authorities and (ii) neither any Loan Party nor any Subsidiary has incurred any obligation in connection with the termination of or withdrawal from any Foreign Plan.

Section 5.11.    Subsidiaries; Equity Interests.

As of the Closing Date and the Term Loan Escrow Release Date (after giving effect to the transactions described in the Plan of Reorganization and any part of the Transaction that is consummated on or prior to the Closing Date and the Term Loan Escrow Release Date), no Loan Party has any Subsidiaries other than dormant or inactive entities and those specifically disclosed in Schedule 5.11, and all of the outstanding Equity Interests owned by the Loan Parties (or a Subsidiary of any Loan Party) in such Subsidiaries have been validly issued and are fully paid and all Equity Interests owned by a Loan Party (or a Subsidiary of any Loan Party) in such Subsidiaries are owned free and clear of all Liens except (i) those created under the Security Documents and (ii) any Lien that is permitted under Section 7.06.  As of the Closing Date and the Term Loan Escrow Release Date, Schedules 1(a) and 9(a) and (b) to the Perfection Certificate set forth the name, jurisdiction and ownership interest of each Loan Party in each direct Domestic Subsidiary or any direct, material Foreign Subsidiary which is not dormant or inactive, including the percentage of such ownership, and no such entities have any direct or indirect Significant Subsidiaries.

Section 5.12.    Margin Regulations; Investment Company Act.

(a)    The Borrower is not engaged nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of any Credit Extensions will be used for any purpose that violates Regulation U.

(b)    None of the Borrower, any Person Controlling the Borrower, or any of the Subsidiaries of the Borrower is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

Section 5.13.    Disclosure.

As of the Closing Date, to the best of the Loan Parties' knowledge, no report, financial statement, certificate or other written information furnished by or on behalf of any Loan Party to any Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or

delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or, as at the Closing Date only, omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; *provided* that, with respect to projected financial information and pro forma financial information, the Borrower represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time of preparation; it being understood that such projections may vary from actual results and that such variances may be material.

Section 5.14.    <u>Anti-Terrorism Laws</u>.

(a)    To the best knowledge of the Loan Parties organized in the United States, no such Loan Party nor any Subsidiary thereof:  (i) is, or is controlled by or is acting on behalf of, a Restricted Party; (ii) has received funds or other property from a Restricted Party; or (iii) is in breach of or is the subject of any action or investigation under any Anti-Terrorism Law.

(b)    Each of the Loan Parties organized in the United States and, to the best of such Loan Parties' knowledge, each Subsidiary thereof has taken reasonable measures to ensure compliance with the Anti-Terrorism Laws.

Section 5.15.    <u>Intellectual Property; Licenses, Etc</u>.

Each of the Loan Parties and their Subsidiaries own, license or otherwise possess the right to use, all of the trademarks, service marks, trade names, domain names, copyrights, patents, trade secrets, know-how, database rights, design rights and other intellectual property rights (collectively, "**IP Rights**") that are material to the operation of their respective businesses as currently conducted, and, without conflict with the rights of any Person, except to the extent such conflicts could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  To the best of the Loan Parties actual knowledge, the operation of the businesses as currently conducted by each of the Loan Parties and their Subsidiaries does not infringe upon any IP Rights held by any Person and no other Person is infringing on their IP Rights except for such infringements, individually or in the aggregate, which could not reasonably be expected to have a Material Adverse Effect.  No claim or litigation brought against any Loan Party alleging the infringement or misuse of any IP Rights or otherwise relating to IP Rights is pending or, to the knowledge of the Loan Parties, threatened against any Loan Party or any of its Subsidiaries, which could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Except pursuant to licenses and other user agreements entered into by each Loan Party in the ordinary course of business, (i) each Loan Party owns and possesses the right to use the IP Rights identified with such Loan Party's name on Schedule 11(a) or 11(b), as applicable, to the Perfection Certificate, and (ii) the registrations and applications listed on Schedule 11(a) and 11(b) are valid and in full force and effect, except, in each case, to the extent failure to own or possess such right to use or of such registrations to be valid and in full force and effect could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.16.    <u>Solvency</u>.

On the Closing Date, the Loan Parties (taken as a whole) after giving effect to the Transaction, are Solvent.

Section 5.17.    Use of Proceeds.

The proceeds of Loans made on the Closing Date, together with the proceeds of the other Exit Financings funded on the Closing Date, shall be used on the Term Loan Escrow Release Date (i) to refinance the Euro Securitization, certain existing Indebtedness or other obligations of LyondellBasell Industries AF S.C.A. and certain Subsidiaries under the DIP Facilities and (ii) to pay Transaction Expenses.  In addition, the Company represents and covenants that it, any director, officer, agent, employee, parent or affiliate will not, directly or indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any affiliate, subsidiary, officer, agent employee, joint venture partner or other Person, to make any offer, payment, promise to pay or authorization of the payment of any money, or other property, gift, promise to give, or authorization of the giving of anything of value directly or indirectly to or for the benefit of any public official including any foreign official as such terms is defined in the FCPA or any foreign political party of official thereof or any candidate for foreign political office or for a third party to benefit any of the foregoing, if doing so would or might violate the law of any relevant jurisdiction including in particular, the Organisation for Economic Co-operation and Development, Convention Combating Bribery of Public Officials in International Transactions, the FCPA, and the U.K. Prevention of Corruption Act of 1906.

Section 5.18.    Security Documents.

(a)    Subject to the Agreed Security Principles and Legal Reservations, the Security Documents are or in the case of each Security Document (other than the Term Loan Escrow Agreement) delivered pursuant to Sections  4.02, 6.12 and 6.14, upon execution and delivery thereof, will be effective to create in favor of the Collateral Agent for the benefit of the Secured Parties (or in favor of the relevant Secured Parties directly, as applicable), legal, valid and enforceable Liens on, and security interests in, the Collateral described therein to the extent intended to be created thereby and (i) when financing statements and other filings in appropriate form are filed in the offices specified on Schedule 7 to the Perfection Certificate and registration achieved (if applicable), (ii) when all appropriate filings, recordings, endorsements, notarizations, stamping, registrations and/or notifications are made as required under applicable Law and (iii) upon the taking of possession or control by the Collateral Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Collateral Agent to the extent possession or control by the Collateral Agent is required by the Security Agreements), the Liens created by the Security Documents shall constitute fully perfected Liens on, and security interests in (to the extent intended to be created thereby), all right, title and interest of the grantors in such Collateral, in each case subject to no Liens other than Liens permitted hereunder and with the priority required by the Security Documents (subject to the Intercreditor Agreements).

(b)    When the Security Agreement governed by U.S. Law or a short form thereof is properly filed in the United States Patent and Trademark Office and the United States Copyright Office, the Liens created by such Security Agreement shall constitute fully perfected Liens on, and security interests in, all right, title and interest of the grantors thereunder (to the extent intended to be created thereby) in the IP Rights to the extent that a security interest can be created under Article 9 of the UCC and can be perfected by the filing of a financing statement in accordance therewith, except as the enforcement thereof may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of rights of creditors generally and except to the extent that enforcement of rights and remedies set forth therein may be limited by equitable principles (regardless of whether enforcement is considered in a court of law or a proceeding in equity), in each case subject to no Liens other than Liens permitted hereunder (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a Lien on registered patents and copyrights acquired by the grantors thereof after the Closing Date).

(c)      Notwithstanding anything herein (including this Section 5.18) or in any other Loan Document to the contrary, no Loan Party makes any representation or warranty as to the effects of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest (other than with respect to those pledges and security interests made under the Laws of the jurisdiction of formation of the applicable Foreign Subsidiary) in any Equity Interest of any Foreign Subsidiary, or as to the rights and remedies of the Agents or any Lender with respect thereto, under foreign Law.

(d)      The Term Loan Escrow Agreement is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Term Loan Escrow Collateral described therein and proceeds thereof subject to no Liens and with the priority required by the Security Documents.

Section 5.19.      No Unlawful Contributions or Other Payments.

As of the Closing Date, except as otherwise disclosed in Schedule 1.01B, neither the Company, Lyondell Chemical nor any of their subsidiaries nor, to the knowledge of the Company, the Borrower, any director, officer, agent, employee or affiliate of the Company, the Borrower or any of their subsidiaries, is aware of or, has taken any action, directly or indirectly, that would result in a violation by such persons of the FCPA, including, without limitation, making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay or authorization of the payment of any money, or other property, gift, promise to give, or authorization of the giving of anything of value to any "foreign official" (as such term is defined in the FCPA) or any foreign political party or official thereof or any candidate for foreign political office, in contravention of the FCPA.  Except as otherwise disclosed in Schedule 1.01B, to the knowledge of the Company, the Borrower, and their affiliates have conducted their businesses in compliance with the FCPA and have instituted and maintain policies and procedures designed to ensure, and which are reasonably expected to continue to ensure, continued compliance therewith.

Section 5.20.      No Conflict with Money Laundering Laws.

As of the Closing Date, except as otherwise disclosed in Schedule 1.01B, the operations of the Company, Lyondell Chemical and their subsidiaries, to the knowledge of the Borrower, are and have been conducted at all times in compliance with applicable financial recordkeeping and reporting requirements of the Currency and Foreign Transactions Reporting Act of 1970, as amended, the applicable money laundering statutes of all jurisdictions, the rules and regulations thereunder and any related or similar rules, regulations or guidelines issued, administered or enforced by any governmental agency (collectively, the "**Money Laundering Laws**") and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Borrower or any of its subsidiaries with respect to the Money Laundering Laws is pending or, to the best knowledge of the Company, the Borrower or any of their Subsidiaries, threatened.

Section 5.21.      No Conflict with OFAC Laws.

As of the Closing Date, except as otherwise disclosed in Schedule 1.01B, neither the Company, Lyondell Chemical nor any of their subsidiaries (collectively (for purposes of this paragraph only), the "**Company**") or, to the knowledge of the Company, any director, officer, employee, agent, affiliate or representative of the Company  (each, a "**Specified Person**") is an individual or entity currently the subject of any sanctions administered or enforced by the U.S. Department of Treasury's Office of Foreign Assets Control ("**OFAC**"), the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority (collectively, "**Sanctions**"), nor is the Company located, organized or resident in a country or territory that is the subject of Sanctions.  The Company represents

and covenants that it will not, directly or indirectly, use the proceeds of the Loans, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Specified Person, to fund any activities of or business with any Specified Person, or in Burma/Myanmar, Cuba, Iran, North Korea, Sudan, or any other country or territory that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by any Specified Person (including any Specified Person participating in the transaction, whether as underwriter, advisor, investor or otherwise) of Sanctions.

# ARTICLE VI.

## Affirmative Covenants

From and after the Term Loan Escrow Release Date, so long as any Lender shall have any Commitment hereunder, or any Loan or other Obligation hereunder (other than Secured Hedge Agreements and Treasury Services Agreements not yet due and payable and contingent obligations not yet accrued and payable) that is accrued and payable shall remain unpaid or unsatisfied, each of the Company and the Borrower shall, and the Company shall cause each of its Restricted Subsidiaries to:

Section 6.01.    Financial Statements.

(a)    Deliver to the Administrative Agent for prompt further distribution to each Lender, as soon as available, but in any event within one hundred twenty (120) days (or such earlier date on which the Company is required to make any public filing of such information) after the end of each Fiscal Year of the Company beginning with the Fiscal Year 2010, a consolidated (and to the extent that any Subsidiaries of the Company are designated as Unrestricted Subsidiaries at the time of delivery, a consolidating) balance sheet of the Company and its Subsidiaries as at the end of such Fiscal Year, and the related consolidated (and consolidating, if applicable) statements of income and retained earnings and of cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on without material qualification (including any "going concern" or like qualification) by an independent registered public accounting firm of nationally recognized standing;

(b)    (1) Deliver to the Administrative Agent for prompt further distribution to each Lender (as soon as available, but in any event within sixty (60) days (ninety (90) days in the case of the first two fiscal quarters of the Fiscal Year ending December 31, 2010) (or, in any case, such earlier date on which the Company is required to make any public filing of such information), after the end of each of the first three (3) fiscal quarters of each Fiscal Year, a consolidated (and to the extent that any Subsidiaries of the Company are designated as Unrestricted Subsidiaries at the time of delivery, consolidating) balance sheet of the Company and its Subsidiaries as at the end of such fiscal quarter, and the related consolidated (and consolidating, if applicable) statements of income and cash flows, each for such fiscal quarter and the portion of the Fiscal Year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous Fiscal Year and the corresponding portion of the previous Fiscal Year, all certified (subject to normal quarterly and year-end adjustments) as to fairness of presentation and consistency by a Principal Financial Officer as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Company and its Subsidiaries in accordance with GAAP, subject only to normal quarterly and year-end audit adjustments and the absence of footnotes and (2) deliver to the Administrative Agent for each Lender, promptly, any other information, documents and other reports which the Company or any Subsidiary is (when registered) required to file with the SEC pursuant to Section 13(a) or 15(d) of the Exchange Act; and

(c)    Deliver to the Administrative Agent for prompt further distribution to each Lender, promptly, and in any event no later than thirty (30) days after the end of each Fiscal Year, a consolidated

budget for the following Fiscal Year prepared by the Company for approval by its Board of Directors and the following two Fiscal Years (including (A) a projected consolidated cashflow statement and profit and loss account of financial position of the Company and its Subsidiaries as of the end of each such Fiscal Year, (B) in respect of each principal operating division of the Company and its Subsidiaries, an income statement beginning with EBITDA by business group and (C) a summary of the material underlying assumptions applicable thereto) (collectively, the "**Projections**").

Notwithstanding the foregoing, the obligations to deliver financial statements pursuant to paragraphs (a) and (b) of this Section 6.01 will be satisfied with respect to financial information of the Company by furnishing (A) the applicable financial statements of the Company or (B) the Company's Form 10-K or 10-Q, as applicable, filed with the SEC or prior to (or in lieu of any such requirement to file with the SEC, such equivalent information is made public by the Company in compliance with such corresponding obligations under the Senior Notes) plus consolidating financial information, if any, required to be delivered pursuant to Sections 6.01(a) or (b), as applicable, *provided* that, with respect to each of clauses (A) and (B), to the extent such information is in lieu of information required to be provided under Section 6.01(a), all such materials to be reported on without material qualification (including any "going concern" or like qualification) by an independent registered public accounting firm of nationally recognized standing.

Documents required to be delivered pursuant to Sections 6.01 and 6.02(a) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Company (or any direct or indirect parent of the Company) posts such documents, or provides a link thereto on the website on the Internet at the website address listed on Schedule 10.02; or (ii) on which such documents are posted on the Company's behalf on IntraLinks/IntraAgency or another website identified in the notice provided pursuant to the next succeeding paragraph of this Section 6.01, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that, the Company shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents. Notwithstanding anything contained herein, in every instance the Company shall be required to provide paper copies of the Compliance Certificates required by Section 6.02(a)(i) to the Administrative Agent; *provided*, *however*, that if such Compliance Certificate is first delivered by electronic means, the date of such delivery by electronic means shall constitute the date of delivery for purposes of compliance with Section 6.02(a)(i). Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Company hereby acknowledges that (a) the Administrative Agent and/or the Joint Lead Arrangers will make available to the Lenders materials and/or information provided by or on behalf of the Company hereunder (collectively, "**Company Materials**") by posting the Company Materials on IntraLinks or another similar electronic system (the "**Platform**") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Company or its securities) (each, a "**Public Lender**"). The Company hereby agrees that it will identify that portion of the Company Materials that may be distributed to the Public Lenders and that (w) all such Company Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, means that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Company Materials "PUBLIC," the Company shall be deemed to have authorized the Administrative Agent, the Joint Lead Arrangers and the Lenders to treat such Company Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Company or its securities for purposes of United States federal and state securities laws (*provided*, *however*, that to the extent such Company Materials constitute Information, they shall be treated as set forth in Section 10.08); (y) all Company Materials marked "PUBLIC" are permitted to be

made available through a portion of the Platform designated "Public Investor"; and (z) the Administrative Agent and the Joint Lead Arrangers shall be entitled to treat any Company Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor."

Section 6.02.    Certificates; Other Information.

(a)    Deliver to the Administrative Agent for prompt further distribution to each Lender:

(i)    no later than five (5) days after the delivery of the financial statements required by Sections 6.01(a) and (b), a duly completed Compliance Certificate signed by a Principal Financial Officer;

(ii)    together with the delivery of each Compliance Certificate delivered in connection with the delivery of financial statements required under Section 6.01(a) pursuant to clause (i) above, (A) a description of each event, condition or circumstance during the last fiscal quarter covered by such Compliance Certificate requiring a mandatory prepayment under Section 2.03(b) and (B) a list of each Subsidiary of the Company that identifies each Subsidiary as a Restricted or an Unrestricted Subsidiary as of the date of delivery of such Compliance Certificate or confirming there has been no change since the date of the last such certificate; and

(iii)    promptly, such additional information regarding the business, legal, financial or corporate affairs of the Loan Parties or any of their respective Subsidiaries, or compliance with the terms of the Loan Documents, as the Administrative Agent, on behalf of the Lenders, may from time to time reasonably request.  Any such information furnished to the Administrative Agent shall be subject to the confidentiality provisions of Section 10.08 hereof and shall be identified as "PUBLIC," as appropriate, in accordance with Section 6.01.

(b)    Upon request by the Administrative Agent (which request shall be provided not later than the date on which the financial statements are due pursuant to paragraph (a) of Section 6.01), representatives of senior management of the Company reasonably agreed by the Administrative Agent and the Company shall give a presentation in each Fiscal Year (commencing with Fiscal Year 2011) to the Lenders within thirty (30) days after the Company has delivered its financial statements pursuant to paragraph (a) of Section 6.01 about the business, financial performance and prospects of the Company and its Subsidiaries.

Section 6.03.    Notices.

Promptly after a Responsible Officer of a Loan Party has obtained knowledge thereof, notify the Administrative Agent:

(a)    of the occurrence of any Default; and

(b)    of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect.

Each notice pursuant to this Section 6.03 shall be accompanied by a written statement of a Responsible Officer of the Company (x) that such notice is being delivered pursuant to Section 6.03(a) or

(b) (as applicable) and (y) setting forth details of the occurrence referred to therein and stating what action the Company has taken and proposes to take with respect thereto.

Section 6.04.    Payment of Obligations.

Timely pay, discharge or otherwise satisfy as the same shall become due and payable in the normal conduct of its business, all its obligations and liabilities in respect of Taxes imposed upon it or upon its income or profits or in respect of its property, except, in each case, to the extent the failure to pay or discharge the same could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 6.05.    Preservation of Existence, Etc.

(a)  Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization and (b) take all reasonable action to maintain all rights, privileges (including its good standing, where such concept exists), permits, licenses and franchises necessary or desirable in the normal conduct of its business, except in the case of each of clause (a) and (b) above, (i) to the extent that failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or (ii) pursuant to a transaction permitted by Section 7.04 or 7.07.

Section 6.06.    Maintenance of Properties.

Except if the failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted.

Section 6.07.    Maintenance of Insurance.

Maintain with reputable insurance companies, insurance with respect to its assets, properties and business against loss or damage to the extent available on commercially reasonable terms of the kinds customarily insured against by Persons of similar size engaged in the same or similar industry, of such types and in such amounts (after giving effect to any self-insurance (including captive industry insurance) reasonable and customary for similarly situated Persons of similar size engaged in the same or similar businesses as the Company and the Restricted Subsidiaries) as are customarily carried under similar circumstances (including flood insurance) by such other Persons to the extent available to the Company and the Restricted Subsidiaries on commercially reasonable terms.  Each such insurance policy shall name the Collateral Agent as additional insured (other than with respect to policies issued by Oil Insurance Limited) and "loss payee," as applicable.

Section 6.08.    Compliance with Laws.

Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except to the extent the failure to comply therewith could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 6.09.    Compliance with Environmental Laws; Environmental Reports.

(a)    Comply, and cause all lessees and other Persons occupying Real Property to comply with all Environmental Laws and Environmental Permits applicable to its operations, facilities and Real

Property, except where failure to do so could not reasonably be expected to have a Material Adverse Effect; obtain and renew all material Environmental Permits applicable to its operations, facilities and Real Property, except where failure to do so could not reasonably be expected to have a Material Adverse Effect; and conduct all responses required by, and in accordance with, Environmental Laws, except where failure to do so could not reasonably be expected to have a Material Adverse Effect; *provided* that neither the Company nor any of its Restricted Subsidiaries shall be required to undertake any response to the extent that its obligation to do so is being contested in good faith and, as appropriate, by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

(b)     If a Default caused by reason of a breach of Section 5.08 or Section 6.09(a) shall have occurred and be continuing for more than twenty (20) days without the Company commencing activities reasonably likely to cure such Default in accordance with Environmental Laws, at the written request of the Administrative Agent or the Required Lenders through the Administrative Agent, provide to the Lenders within forty-five (45) days after such request, at the expense of the Company or the Borrower, an environmental assessment report regarding the matters which are subject of such Default, including, where appropriate, soil and/or groundwater sampling, prepared by environmental consulting firm and, in the form and substance, reasonably acceptable to the Administrative Agent and indicating the presence or absence of Hazardous Materials and the estimated cost of any compliance or response to address them.

Section 6.10.     Books and Records.

Maintain proper books of record and account, which reflect all material financial transactions and matters involving the assets and business of the Loan Parties or a Restricted Subsidiary, as the case may be (it being understood and agreed that certain Foreign Subsidiaries maintain individual books and records in conformity with generally accepted accounting principles in their respective countries of organization and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder).

Section 6.11.     Inspection Rights.

Permit representatives and independent contractors of the Administrative Agent or the Required Lenders or, as provided in the second proviso below, any Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records as is reasonably specified, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants all at the reasonable expense of the Borrower and at such reasonable times during normal business hours, upon reasonable advance notice to the Company; *provided* that, excluding any such visits and inspections during the continuation of an Event of Default, only the Administrative Agent on behalf of the Lenders may exercise rights of the Administrative Agent and the Lenders under this Section 6.11 and the Administrative Agent shall not exercise such rights more often than two (2) times during any calendar year at the Borrower's expense; *provided further* that when an Event of Default exists, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice. The Administrative Agent and the Lenders shall give the Company the opportunity to participate in any discussions with the Company's independent public accountants. Notwithstanding anything to the contrary in this Section 6.11, at all times during such visits and inspections, the Administrative Agent or any Lender (or their respective representatives or contractors) must comply with all applicable site regulations as the Company or its Subsidiaries or any of their respective officers or employees may require by reasonable notice of the same.

Section 6.12.    Additional Collateral; Additional Guarantors.

(a)    Subject to this Section 6.12 and Section 6.14(b) and to the Agreed Security Principles, with respect to (x) any property located in the United States (excluding Equity Interests not subject to the delivery obligations of Section 6.12(b) pursuant to the terms thereof, to the extent such Equity Interests are deemed "located in the United States" for any reason) or (y) material property, in respect of IP Rights, in the case of (x) or (y), acquired after the Term Loan Escrow Release Date by any Loan Party that is a Domestic Subsidiary that is intended to be subject to the Lien created by any of the Security Documents but is not so subject, promptly (and in any event within one hundred and twenty (120) days after the acquisition thereof or such later time as the Administrative Agent or the Collateral Agent, as applicable, acting reasonably and in good faith, agrees to) (i) execute and deliver to the Administrative Agent and the Collateral Agent such amendments or supplements to the relevant Security Documents or such other documents as the Administrative Agent or the Collateral Agent shall reasonably deem necessary or advisable in good faith to grant to the Collateral Agent, for its benefit and for the benefit of the other Secured Parties or to the relevant Secured Parties directly, as applicable, a Lien on such property subject to no Liens other than Liens permitted pursuant to Section 7.06, and (ii) take all commercially reasonable actions necessary to cause such Lien to be duly perfected to the extent required by such Security Document in accordance with all applicable Law, including the filing of financing statements in such jurisdictions as may be reasonably requested in good faith by the Collateral Agent.  The Borrower shall otherwise take such commercially reasonable actions and execute and/or deliver to the Collateral Agent such documents as the Collateral Agent shall reasonably require to confirm the validity, perfection and priority (subject to the Intercreditor Agreements) of the Lien of the Security Documents on such after-acquired properties.

(b)    Subject to the Agreed Security Principles with respect to any Person that is or becomes a direct, first-tier Subsidiary of the Company or a Loan Party that is a Domestic Subsidiary (other than a securitization entity of a Loan Party) after the Term Loan Escrow Release Date, promptly (and in any event within one hundred and twenty (120) days after such Person becomes such a Subsidiary or such later time as the Administrative Agent or the Collateral Agent, as applicable, acting reasonably and in good faith, agrees to) (i) deliver to the Collateral Agent all certificates representing the Equity Interests (to the extent certificated) of such Subsidiary owned by such Loan Party that are required to be pledged pursuant to the Collateral and Guaranty Requirement and together with undated stock powers or other appropriate instruments of transfer executed and delivered in blank by a duly authorized officer of the holder(s) of such Equity Interests, and all existing intercompany notes other than (x) held by any securitization entity or Basell Sales & Marketing B.V. or (y) which on an individual basis do not exceed €10,000,000 owing from such Subsidiary to any Loan Party that is a Domestic Subsidiary and required to be pledged pursuant to the Collateral and Guaranty Requirement, together with instruments of transfer executed and delivered in blank by a duly authorized officer of such Loan Party or, if necessary to perfect a Lien under applicable Law, by means of an applicable Security Document, create a Lien on such Equity Interests and intercompany notes in favor of the Collateral Agent on behalf of the Secured Parties and (ii) cause any such new Subsidiary that is required to be a Guarantor under the Collateral and Guaranty Requirement (A) to execute a joinder agreement reasonably acceptable to the Collateral Agent or such comparable documentation to become a Subsidiary Guarantor and a joinder agreement to the applicable Security Documents (including the applicable Security Agreement) and the Guarantee Agreement , substantially in the form annexed thereto, and (B) to take all actions necessary or advisable in the reasonable opinion of the Collateral Agent to cause the Lien created by the applicable Security Documents (including the Security Agreement) to be duly perfected to the extent required by such agreement in accordance with all applicable Law, including the filing of financing statements in such jurisdictions as may be reasonably requested in good faith by the Collateral Agent.

(c)    Subject to the Agreed Security Principles, in the case of a Loan Party that is a Domestic Subsidiary, promptly grant to the Collateral Agent, within one hundred and twenty (120) days of the acquisition thereof or such longer period as the Collateral Agent may determine, acting reasonably and in good faith, a Mortgage on each parcel of Real Property located in the U.S. and owned in fee or otherwise with legal title in, or ground leased by, such Loan Party as is acquired by such Loan Party after the Term Loan Escrow Release Date and that, together with any improvements thereon, individually has a fair market value of at least $25,000,000 as additional security for the Obligations (unless the subject property is already mortgaged to a third party to the extent permitted hereunder).

(i)    Subject to the Agreed Security Principles, in the case of a Loan Party that is a Domestic Subsidiary promptly grant to the Collateral Agent, within one hundred and twenty  (120) days of the acquisition thereof or such longer period as the Collateral Agent may determine acting reasonably and in good faith, a Mortgage in form reasonably satisfactory to the Administrative Agent and Collateral Agent on each pipeline easement and other similar Real Property (except any such easement or other similar Real Property as would be excluded from the grant set forth in Section 2.1 of the applicable Mortgage in the penultimate paragraph therein) as is acquired by such Loan Party that is a Domestic Subsidiary after the Term Loan Escrow Release Date as additional security for the Obligations (unless the subject property is already mortgaged to a third party to the extent permitted hereunder).

(ii)    Such Mortgages shall be subject to the Agreed Security Principles and the Legal Reservations, and the Mortgages or instruments related thereto shall be duly recorded or filed in such manner and in such places as are required by Law to establish, perfect, preserve and protect the Liens in favor of the Collateral Agent and/or the Secured Parties required to be granted pursuant to the Mortgages and all taxes, fees and other charges payable in connection therewith shall be paid in full.  Subject to the Agreed Security Principles, such Loan Party that is a Domestic Subsidiary shall otherwise take such commercially reasonable actions and execute and/or deliver to the Collateral Agent such documents as the Administrative Agent or the Collateral Agent shall reasonably require to confirm the validity, perfection and priority of the Lien of any existing Mortgage or new Mortgage against such after-acquired Real Property (including a title policy), a survey and local counsel opinion (in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent) in respect of such Mortgage); *provided* that, no title policy, survey or legal counsel opinion shall be required with respect to any pipeline easement or similar Real Property.

(d)    The foregoing shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance or surveys with respect to, particular assets if and for so long as (i) in the reasonable judgment of the Administrative Agent, the cost of creating or perfecting such pledges or security interests in such assets or obtaining title insurance or surveys in respect of such assets shall be excessive in view of the benefits to be obtained by the Lenders therefrom or (ii) the creation or perfection of such pledges or security interests would violate third party contracts existing as of the Closing Date or applicable Law.  The Administrative Agent may grant extensions of time for the perfection of security interests in or the obtaining of title insurance with respect to particular assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Loan Parties on such date) where it reasonably determines, in consultation with the Borrower, that perfection cannot be accomplished using commercially reasonable efforts by the time or times at which it would otherwise be required by this Agreement or the Security Documents.

(e)    Notwithstanding the foregoing provisions of this Section 6.12 or anything in this Agreement or any other Loan Document to the contrary, Liens required to be granted from time to time pursuant to this Section 6.12 shall be subject to the Agreed Security Principles, the Legal Reservations

and exceptions and limitations set forth in the Security Documents as in effect on the Closing Date and, to the extent appropriate in the applicable jurisdiction, as agreed between the Collateral Agent and the Company. Notwithstanding the foregoing provisions of this Section 6.12 or anything in this Agreement or any other Loan Document to the contrary, any direct, first-tier Restricted Subsidiary of the Company or any other Domestic Subsidiary of the Borrower that Guarantees any Junior Financing shall be a Guarantor hereunder for so long as it Guarantees such Indebtedness.

Section 6.13.    <u>ERISA</u>.

Promptly after any Loan Party or any ERISA Affiliate knows or has reason to know of the occurrence of any of the following events that, individually or in the aggregate (including in the aggregate such events previously disclosed or exempt from disclosure hereunder, to the extent the liability therefor remains outstanding), would reasonably be expected to have a Material Adverse Effect, deliver to the Administrative Agent and each of the Lenders a certificate of a Principal Financial Officer setting forth details as to such occurrence and the action, if any, that the Loan Party or such ERISA Affiliate is required or proposes to take, together with any notices (required, proposed or otherwise) given to or filed with or by the Loan Party, such ERISA Affiliate, the PBGC, an ERISA Plan participant (other than notices relating to any individual participant's benefits) or the ERISA Plan administrator with respect thereto: that a Reportable Event has occurred; that an accumulated funding deficiency has been incurred or an application is to be made to the Secretary of the Treasury for a waiver or modification of the minimum funding standard (including any required installment payments) or an extension of any amortization period under Section 412 of the Code (or Section 430 of the Code as amended by the Pension Protection Act of 2006) with respect to an ERISA Plan; that an ERISA Plan having an Unfunded Current Liability has been or is to be terminated, reorganized, partitioned or declared insolvent under Title IV of ERISA (including the giving of written notice thereof); that an ERISA Plan has an Unfunded Current Liability that has or will result in a lien under ERISA or the Code; that proceedings will be or have been instituted to terminate an ERISA Plan having an Unfunded Current Liability (including the giving of written notice thereof); that a proceeding has been instituted against a Loan Party or an ERISA Affiliate pursuant to Section 515 of ERISA to collect a delinquent contribution to an ERISA Plan; that the PBGC has notified a Loan Party or any ERISA Affiliate of its intention to appoint a trustee to administer any ERISA Plan; that a Loan Party or any ERISA Affiliate has failed to make a required installment or other payment pursuant to Section 412 of the Code with respect to an ERISA Plan; or that a Loan Party or any ERISA Affiliate has incurred or will incur (or has been notified in writing that it will incur) any liability (including any contingent or secondary liability) to or on account of an ERISA Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201 or 4204 of ERISA or Section 4971 or 4975 of the Code.

Section 6.14.    <u>Further Assurances and Post-Closing Conditions</u>.

(a)    Subject to the Agreed Security Principles, within the time periods set forth in <u>Schedule 6.14(a)</u> (subject to extension by the Administrative Agent in its discretion), perform each obligation and deliver each Security Document, in each case as set forth on <u>Schedule 6.14(a)</u>, with respect to the matters set forth therein, duly executed by each Loan Party party thereto, together with all documents and instruments required to perfect the security interest of the Collateral Agent in and otherwise comply with the Collateral and Guaranty Requirement with respect to the Collateral (if any) free of any other pledges, security interests or mortgages, except Liens permitted hereunder.

(b)    Subject to the Agreed Security Principles, promptly upon reasonable request by the Administrative Agent (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Security Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file,

register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent may reasonably request in good faith from time to time in order to carry out more effectively the purposes of the Security Documents.  If the Administrative Agent, the Collateral Agent or the Required Lenders determine that they are required by applicable Law to have appraisals prepared in respect of the Real Property of any Loan Party constituting Collateral, the Borrower shall provide to the Administrative Agent appraisals that satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of FIRREA and are otherwise in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent.

(c)    The Borrower agrees promptly (and in any event within ten (10) Business Days of such change) to notify the Collateral Agent in writing of any change (i) in legal name of the Borrower or any Loan Party that is a grantor under the Security Agreement, (ii) in the identity or type of organization or corporate structure of the Borrower or any Guarantor domiciled in any jurisdiction of the United States, or (iii) in the jurisdiction of organization or organizational identification number of the Borrower or any other Loan Party that is a grantor under the Security Agreement.

Section 6.15.    <u>Use of Proceeds</u>.

Use the proceeds of the Loans only for the purposes set forth in Section 5.17.

Section 6.16.    <u>Know Your Customer Requests</u>.

(a)    If:

(1)    there is a Change in Law after the Closing Date;

(2)    any change in the status of a Loan Party or the composition of the shareholders of a Loan Party after the Closing Date; or

(3)    a proposed assignment or transfer by a Lender of any of its rights and obligations under this Agreement to a party that is not a Lender prior to such assignment or transfer,

and such event, condition or circumstance obliges the Administrative Agent or any Lender (or, in the case of paragraph (3) above, any prospective new Lender) to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, then each Loan Party shall promptly upon the request of the Administrative Agent, in its capacity as a Lender or on behalf of any Lender, to the Company supply, or procure the supply of, such documentation and other evidence as is reasonably requested in good faith by the Administrative Agent (for itself or on behalf of any Lender, or, in the case of the event described in paragraph (3) above, on behalf of any prospective new Lender) in order for the Administrative Agent, such Lender or, in the case of the event described in paragraph (3) above, any prospective new Lender to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Loan Documents.

(b)    Following any notification of requirement to add a Loan Party pursuant to Section 6.12, if the joinder of such additional Guarantor obliges the Administrative Agent or any Lender to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, the Company shall promptly upon the request of the Administrative Agent (for itself or on behalf of any Lender or any prospective new Lender) supply, or procure the supply of, such documentation and other evidence as is reasonably requested in good faith by

the Administrative Agent (for itself or on behalf of any Lender or any prospective new Lender) in order for the Administrative Agent or such Lender or any prospective new Lender to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the joinder of such Subsidiary to this Agreement as an additional Guarantor.

Section 6.17.    Ratings Obligation.

The Borrower will use commercially reasonable efforts to obtain and maintain a corporate rating from either Moody's or S&P.

## ARTICLE VII.

## Negative Covenants

From and after the Term Loan Escrow Release Date, so long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder (other than Secured Hedge Agreements and Treasury Services Agreements not yet due and payable and contingent obligations not yet accrued and payable) that is accrued and payable shall remain unpaid or unsatisfied, each of the Company and the Borrower shall not, nor shall the Company permit any of its Restricted Subsidiaries to, directly or indirectly:

Section 7.01.    Indebtedness.

(1)    Incur any Indebtedness (including Acquired Indebtedness) or issue any shares of Disqualified Stock; and

(2)    other than the Borrower or any Guarantor, to issue any shares of Preferred Stock;

*provided, however*, that the Borrower and any Guarantor may Incur Indebtedness (including Acquired Indebtedness) or issue shares of Disqualified Stock, and, subject to the third paragraph of this Section 7.01, any Restricted Subsidiary of the Company that is not a Guarantor may Incur Indebtedness (including Acquired Indebtedness), issue shares of Disqualified Stock or issue shares of Preferred Stock, in each case if the Fixed Charge Coverage Ratio of the Company for the most recently ended four (4) full fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is Incurred or such Disqualified Stock or Preferred Stock is issued would have been at least 2.00 to 1.00 determined on a *pro forma* basis (including a *pro forma* application of the net cash proceeds therefrom), as if the additional Indebtedness had been Incurred, or the Disqualified Stock or Preferred Stock had been issued, as the case may be, and the application of proceeds therefrom had occurred at the beginning of such four (4)-quarter period.

The foregoing limitations do not apply to:

(a)    (i) Indebtedness under the Senior Notes issued on the Closing Date, and the guarantees thereof, and (ii) an aggregate principal amount of Indebtedness outstanding in the form of any other series of notes representing First Priority Lien Obligations ("**other notes**") issued in one or more tranches under the Senior Notes Indenture, and the guarantees by the Guarantors thereof, if, (x) on a *pro forma* basis after giving effect thereto (including a *pro forma* application of the proceeds thereof), the Secured Indebtedness Leverage Ratio of the Company would not exceed 2.00 to 1.00 or (y) pursuant to a Permitted Roll-Up Notes Refinancing;

(b)      Indebtedness under the Plan Roll-Up Notes in an aggregate principal amount not to exceed $3,250,000,000 at any one time outstanding;

(c)      Indebtedness Incurred pursuant to Credit Facilities, as follows:

(i)      Indebtedness under any Credit Facilities (other than Asset Backed Credit Facilities) in the aggregate principal amount of $1,000,000,000 <u>plus</u> an aggregate additional principal amount of Indebtedness secured by a Lien outstanding at any one time such that on a *pro forma* basis (including a *pro forma* application of the proceeds therefrom) the Secured Indebtedness Leverage Ratio of the Company would not exceed 2.00 to 1.00; *provided* that (x) regardless of whether such Secured Indebtedness Leverage Ratio is satisfied, term loans may be Incurred under this subclause (c)(i) as part of a Permitted Roll-Up Notes Refinancing and (y) the availability of Indebtedness under Credit Facilities shall be reduced for a period of time as a result of a Permitted Roll-Up Notes Refinancing as provided in the definition thereof, *provided further* that the amount of Indebtedness that may be Incurred pursuant to this subclause (i) shall be reduced by the amount of any (x) prepayments of term loans under Credit Facilities or (y) permanent reductions of Indebtedness under any revolving credit facility (other than any such prepayments of the ABL Facility), in the case of each of (x) and (y) with the proceeds of an Asset Sale (other than any Asset Sale in respect of Specified ABL Facility Assets)

(ii)      Indebtedness under Asset Backed Credit Facilities in an aggregate principal amount not to exceed the greater of (A) $1,750,000,000 and (B) the sum of 85% of the net book value of the accounts receivable of the Company and its Restricted Subsidiaries and 65% of the net book value of the inventory of the Company and its Restricted Subsidiaries (the "**Borrowing Base**") <u>less</u> (x) in the case of the calculation of the Borrowing Base under this subclause (ii)(B), the amount of the Borrowing Base that is the subject of an on balance sheet Qualified Receivables Financing (it being understood that any of the Borrowing Base that is subject to arrangements for disposition or transfer in connection with an off-balance sheet Qualified Receivables Financing shall not be included in the Borrowing Base) and (y) in the case of Indebtedness permitted to be Incurred under this subclause (ii)(B), the amount of any Indebtedness Incurred under any Oil Indexed Credit Facility; *provided* that any assets or property securing any Project Financing Incurred pursuant to clause (e)(ii) below shall be excluded when determining the Borrowing Base; *provided further* that Indebtedness that may be Incurred pursuant to this subclause (ii) shall be reduced by the amount of any permanent reductions of Indebtedness under any revolving credit facility (other than any such prepayments of revolving credit facilities Incurred pursuant to clause (c)(i) above) with the proceeds of an Asset Sale (other than any Asset Sale in respect of Specified ABL Facility Assets); *provided further* that, in the event of an Asset Acquisition, Indebtedness may be Incurred against the Borrowing Base pursuant to the foregoing in anticipation of the completion of such Asset Acquisition on the assumption that the Borrowing Base of the subject of the Asset Acquisition has been acquired;

(iii)      Indebtedness under any Oil Indexed Credit Facility in an aggregate principal amount not to exceed $750,000,000; *provided* that amounts Incurred pursuant to an Oil Indexed Credit Facility will be required to reduce the amount of Indebtedness Incurred under the Borrowing Base to the extent Indebtedness in such amount as would no longer be permitted to be Incurred under subclause (ii) above (without duplication for the requirements of subclause (ii) above);

(d)       Indebtedness existing on the Term Loan Escrow Release Date (other than the
Senior Notes and Indebtedness described in clauses (b) and (c) above) in an aggregate principal
amount not to exceed $400,000,000, after giving effect to the consummation of the
Reorganization Plan, which shall have the obligors, collateral, maturity and amortization features
summarized under "Description of Other Indebtedness and Financing Arrangements" in
Schedule 1.01B, and guarantees of Indebtedness of Joint Ventures outstanding on the Term Loan
Escrow Release Date, and operating leases of the Company and the Restricted Subsidiaries
outstanding on the Term Loan Escrow Release Date to the extent characterized as a Capitalized
Lease Obligation after the Term Loan Escrow Release Date;

(e)       (i) Indebtedness (including Capitalized Lease Obligations) Incurred by the
Company or any Restricted Subsidiary, Disqualified Stock issued by the Company or any of its
Restricted Subsidiaries and Preferred Stock issued by any Restricted Subsidiaries of the Company
to finance (whether prior to or within two hundred seventy (270) days after) the acquisition, lease,
construction, repair, replacement or improvement of property (real or personal) or equipment
(whether through the direct purchase of assets or the Capital Stock of any Person owning such
assets); *provided* that Indebtedness Incurred pursuant to this clause (e)(i) is not Incurred to
finance a Business Acquisition, (ii) Indebtedness Incurred in connection with any Project
Financing or (iii) Indebtedness Incurred pursuant to a Catalyst Sale/Leaseback Transaction;

(f)       Indebtedness Incurred by the Company or any of its Restricted Subsidiaries
constituting reimbursement obligations with respect to letters of credit and bank guarantees issued
in the ordinary course of business, including, without limitation, letters of credit in respect of
workers' compensation claims, health, disability or other benefits to employees or former
employees or their families or property, casualty or liability insurance or self-insurance or similar
requirements, and letters of credit in connection with the maintenance of, or pursuant to the
requirements of, environmental or other permits or licenses from governmental authorities, or
other Indebtedness with respect to reimbursement type obligations regarding workers'
compensation claims;

(g)       Indebtedness arising from agreements of the Company or a Restricted Subsidiary
providing for indemnification, adjustment of purchase price or similar obligations, in each case,
Incurred in connection with any acquisition or disposition of any business, assets or a Subsidiary
of the Company in accordance with the terms of this Agreement, other than guarantees of
Indebtedness Incurred by any Person acquiring all or any portion of such business, assets or
Subsidiary for the purpose of financing such acquisition;

(h)       Indebtedness of the Company to a Restricted Subsidiary; *provided* that (except in
respect of intercompany current liabilities Incurred in the ordinary course of business in
connection with the cash management operations of the Company and its Subsidiaries) any such
Indebtedness owed to a Restricted Subsidiary that is not the Borrower or a Guarantor is
subordinated in right of payment to the obligations of the Company under the Loans; *provided
further* that any subsequent issuance or transfer of any Capital Stock or any other event which
results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other
subsequent transfer of any such Indebtedness (except to the Company or another Restricted
Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) shall be deemed, in
each case, to be an Incurrence of such Indebtedness not permitted by this clause (h);

(i)       shares of Preferred Stock of a Restricted Subsidiary issued to the Company or
another Restricted Subsidiary; *provided* that any subsequent issuance or transfer of any Capital
Stock or any other event which results in any Restricted Subsidiary that holds such shares of

Preferred Stock of another Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such shares of Preferred Stock (except to the Company or another Restricted Subsidiary) shall be deemed, in each case, to be an issuance of shares of Preferred Stock not permitted by this clause (i);

(j)    Indebtedness of a Restricted Subsidiary to the Company or another Restricted Subsidiary; *provided* that if the Borrower or a Guarantor Incurs such Indebtedness to a Restricted Subsidiary that is not the Borrower or a Guarantor (except in respect of intercompany current liabilities Incurred in the ordinary course of business in connection with the cash management operations of the Company and its Subsidiaries), such Indebtedness is subordinated in right of payment to the obligations of the Borrower or such Guarantor, as applicable, in respect of the Loans; *provided further* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any Restricted Subsidiary holding such Indebtedness ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Company or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) shall be deemed, in each case, to be an Incurrence of such Indebtedness not permitted by this clause (j);

(k)    Hedging Obligations that are not Incurred for speculative purposes but for the purpose of (1) fixing or hedging interest rate risk with respect to any Indebtedness that is permitted by the terms of this Agreement to be outstanding; (2) fixing or hedging currency exchange rate risk with respect to any currency exchanges; (3) fixing or hedging commodity price risk, including the price or cost of raw materials, emission rights, manufactured products or related commodities, with respect to any commodity purchases or sales; or (4) hedging the potential exposure in respect of certain executives' and employees' options over, or stock appreciation rights in relation to, shares of Royal Dutch Shell plc and BASF AG;

(l)    (i) obligations in respect of bankers' acceptances, tender, bid, judgment, appeal, performance or governmental contract bonds and completion guarantees, surety, standby letters of credit and warranty and contractual service obligations of a like nature, trade letters of credit and documentary letters of credit and similar bonds or guarantees provided by the Company or any Restricted Subsidiary in the ordinary course of business or (ii) Indebtedness of the Company or any Restricted Subsidiary supported by a letter of credit or bank guarantee issued pursuant to any of the Credit Facilities, in a principal amount not in excess of the stated amount of such letter of credit;

(m)    Indebtedness or Disqualified Stock of the Company or, subject to the third paragraph of this Section 7.01, Indebtedness, Disqualified Stock or Preferred Stock of any Restricted Subsidiary of the Company not otherwise permitted hereunder in an aggregate principal amount or liquidation preference, which when aggregated with the principal amount or liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and Incurred pursuant to this clause (m), does not exceed the greater of $750,000,000 and 3.75% of the Consolidated Net Tangible Assets of the Company at the time of Incurrence (it being understood that any Indebtedness Incurred pursuant to this clause (m) shall cease to be deemed Incurred or outstanding for purposes of this clause (m) but shall be deemed Incurred for purposes of the first paragraph of this Section 7.01 from and after the first date on which the Company, or the Restricted Subsidiary, as the case may be, could have Incurred such Indebtedness under the first paragraph of this Section 7.01 without reliance upon this clause (m));

(n)    Indebtedness or Disqualified Stock of the Company, the Borrower or any Subsidiary Guarantor and Preferred Stock of the Borrower or any Subsidiary Guarantor not

otherwise permitted hereunder in an aggregate principal amount or liquidation preference not greater than 200% of the net cash proceeds received by the Company and its Restricted Subsidiaries since immediately after the Term Loan Escrow Release Date from the issue or sale of Equity Interests of the Company or any direct or indirect parent entity of the Company (which proceeds are contributed to the Company) or cash contributed to the capital of the Company (in each case other than proceeds of Disqualified Stock or sales of Equity Interests to, or contributions received from, the Company or any of its Restricted Subsidiaries) as determined in accordance with clauses (ii) and (iii) of the definition of "Applicable Amount" to the extent such net cash proceeds or cash have not been applied pursuant to such clauses to make Restricted Payments or to make other Investments or to make Permitted Investments (other than Permitted Investments specified in clauses (1) and (3) of the definition thereof);

(o)    any guarantee by the Company or any Restricted Subsidiary of Indebtedness or other obligations of the Company or any of its Restricted Subsidiaries so long as the Incurrence of such Indebtedness Incurred by the Company or such Restricted Subsidiary is permitted under the terms of this Agreement; *provided* that (i) if such Indebtedness is by its express terms subordinated in right of payment to the Loans or the obligations of such Restricted Subsidiary in respect of the Loans, as applicable, any such guarantee of such Restricted Subsidiary with respect to such Indebtedness shall be subordinated in right of payment to such Restricted Subsidiary's obligations with respect to the Loans substantially to the same extent as such Indebtedness is subordinated to the Loans or the obligations of such Restricted Subsidiary in respect of the Loans, as applicable, and (ii) if such guarantee is of Indebtedness of the Company, such guarantee is Incurred in accordance with Section 6.12(b)(ii) solely to the extent such covenant is applicable;

(p)    the Incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness or Disqualified Stock or Preferred Stock of a Restricted Subsidiary of the Company which serves to refund, refinance or defease any Indebtedness Incurred or Disqualified Stock or Preferred Stock issued as permitted under the first paragraph of this Section 7.01 and clauses (a), (d), (e), (n) and (q) of this Section 7.01 or any Indebtedness, Disqualified Stock or Preferred Stock Incurred to so refund or refinance such Indebtedness, Disqualified Stock or Preferred Stock, including any additional Indebtedness, Disqualified Stock or Preferred Stock Incurred to pay premiums (including tender premiums) and original issue discount, expenses, defeasance costs and fees in connection therewith; *provided* that any such Indebtedness until reclassified in accordance with this Agreement shall remain Incurred pursuant to clauses (a), (d), (e), (n) and (q), as applicable (subject to the following proviso, "**Refinancing Indebtedness**"), prior to its maturity; *provided, however*, that such Refinancing Indebtedness:

(1)    has a Weighted Average Life to Maturity at the time such Refinancing Indebtedness is Incurred which is not less than the shorter of (x) the remaining Weighted Average Life to Maturity of the Indebtedness, Disqualified Stock or Preferred Stock being refunded, refinanced or defeased and (y) the Weighted Average Life to Maturity that would result if all payments of principal on the Indebtedness, Disqualified Stock and Preferred Stock being refunded or refinanced that were due on or after the date that is one year following the last maturity date of any Loans then outstanding were instead due on such date;

(2)    to the extent such Refinancing Indebtedness refinances (a) Indebtedness junior to the Loans or the obligations of such Restricted Subsidiary in respect of the Loans, as applicable, such Refinancing Indebtedness is junior to the Loans or such obligations of such Restricted Subsidiary, as applicable, to at least same extent or

(b) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness is Disqualified Stock or Preferred Stock, as the case may be, of the same issuer; and

(3)    shall not include (x) Indebtedness of a Restricted Subsidiary of the Company that is not a Guarantor that refinances Indebtedness of the Borrower or a Guarantor, or (y) Indebtedness of the Company or a Restricted Subsidiary that refinances Indebtedness of an Unrestricted Subsidiary;

*provided further* that subclause (1) of this clause (p) will not apply to any refunding or refinancing of any Secured Indebtedness constituting First Priority Lien Obligations;

(q)    Indebtedness, Disqualified Stock or Preferred Stock of (x) the Company or, subject to the third paragraph of this Section 7.01, any of its Restricted Subsidiaries (A) Incurred to finance an Asset Acquisition or (B) Incurred by a Person in connection with or anticipation of such Person becoming a Restricted Subsidiary as a result of an Asset Acquisition or to finance an Asset Acquisition or (y) a Person existing at the time such Person becomes a Restricted Subsidiary of the Company as a result of an Asset Acquisition or assumed in connection with an Asset Acquisition by the Company or a Restricted Subsidiary of the Company and, in any such case under this subclause (y), not Incurred in connection with or in anticipation of, such Asset Acquisition; *provided* that, in the case of clause (y), the holders of any such Indebtedness do not, at any time, have direct or indirect recourse to any property or assets of the Company or any Restricted Subsidiary other than the property or assets that are the subject of such Asset Acquisition; *provided* that after giving effect to such Asset Acquisition, either:

(1)    the Company would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in the first paragraph of this covenant; or

(2)    the Fixed Charge Coverage Ratio of the Company would be greater than immediately prior to such Asset Acquisition;

(r)    Indebtedness Incurred in a Qualified Receivables Financing that is without recourse to the Company or any Restricted Subsidiary (except for Standard Securitization Undertakings);

(s)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided* that such Indebtedness is extinguished within five (5) Business Days of its Incurrence;

(t)    Indebtedness under any Treasury Services Agreement or any Structured Financing Transaction;

(u)    Indebtedness of Foreign Subsidiaries; *provided, however*, that the aggregate principal amount of Indebtedness Incurred under this clause (u), when aggregated with the principal amount of all other Indebtedness then outstanding and Incurred pursuant to this clause (u), does not exceed the greater of $350,000,000 and 3.50% of the Consolidated Net Tangible Assets of the Foreign Subsidiaries at any one time outstanding (it being understood that any Indebtedness Incurred pursuant to this clause (u) shall cease to be deemed Incurred or outstanding for purposes of this clause (u) but shall be deemed Incurred for the purposes of the first paragraph of this covenant from and after the first date on which such Foreign Subsidiary

could have Incurred such Indebtedness under the first paragraph of this covenant without reliance upon this clause (u));

(v)      Indebtedness of the Company or any Restricted Subsidiary consisting of (1) the financing of insurance premiums or (2) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(w)      Indebtedness consisting of Indebtedness issued by the Company or a Restricted Subsidiary of the Company to current or former officers, directors and employees thereof or any direct or indirect parent thereof, their respective estates, spouses or former spouses, in each case to finance the purchase or redemption of Equity Interests of the Company or any direct or indirect parent entity of the Company to the extent described in Section 7.02(4);

(x)      Indebtedness Incurred on behalf of, or representing guarantees of Indebtedness of, Joint Ventures of the Company or any Restricted Subsidiary not to exceed, at any one time outstanding, the greater of $250,000,000 and 1.25% of the Consolidated Net Tangible Assets of the Company; and

(y)      Indebtedness Incurred by Lyondell Basell Australia Pty Ltd. and its successors in an aggregate principal amount at any one time outstanding not to exceed $80,000,000; *provided* that such Indebtedness is not guaranteed by the Company or any Restricted Subsidiary of the Company organized under the laws of any jurisdiction other than Australia.

Restricted Subsidiaries that are not Guarantors may not Incur Indebtedness or issue Disqualified Stock or Preferred Stock under the first paragraph of this Section 7.01 or clauses (m) or (q)(x) (or clause (o) to the extent constituting a guarantee of Indebtedness Incurred under the first paragraph of this Section 7.01 or clauses (m) or (q)(x)) of the second paragraph of this Section 7.01 if, after giving *pro forma* effect to such Incurrence or issuance (including a *pro forma* application of the net cash proceeds therefrom), the aggregate amount of Indebtedness and Disqualified Stock and Preferred Stock of Restricted Subsidiaries that are not Guarantors Incurred or issued pursuant to the first paragraph of this covenant and clauses (m) and (q)(x) (or clause (o) to the extent constituting a guarantee of Indebtedness Incurred under the first paragraph of this covenant or clauses (m) or (q)(x)) of the second paragraph of this Section 7.01, collectively, would exceed the greater of $400,000,000 and 4.0% of the Consolidated Net Tangible Assets of Restricted Subsidiaries that are not Guarantors.

For purposes of determining compliance with this Section 7.01:

(1)      in the event that an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) meets the criteria of more than one of the categories of permitted Indebtedness described in clauses (a) through (y) above or is entitled to be Incurred pursuant to the first paragraph of this Section 7.01, the Company shall, in its sole discretion, classify or reclassify, or later divide, classify or reclassify, such item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) in any manner that complies with this Section 7.01; *provided* that Indebtedness Incurred, or committed for, under the Credit Facilities and the Plan Roll-Up Notes on or before the Term Loan Escrow Release Date or pursuant to an Oil Indexed Credit Facility shall at all times be deemed to be Incurred pursuant to Section 7.01(b) and (c); and

(2)      at the time of Incurrence, the Company will be entitled to divide and classify an item of Indebtedness in more than one of the types of Indebtedness described in the first and second paragraphs above without giving *pro forma* effect to the Indebtedness Incurred pursuant

to the second paragraph above when calculating the amount of Indebtedness that may be Incurred pursuant to the first paragraph above.

Accrual of interest, the accretion of accreted value, the payment of interest or dividends in the form of additional Indebtedness, Disqualified Stock or Preferred Stock, as applicable, amortization of original issue discount, the accretion of liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an Incurrence or issuance of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this covenant.  Guarantees of, or obligations in respect of letters of credit relating to, Indebtedness which is otherwise included in the determination of a particular amount of Indebtedness shall not be included in the determination of such amount of Indebtedness; *provided* that the Incurrence of the Indebtedness represented by such guarantee or letter of credit, as the case may be, was in compliance with this covenant.

For purposes of determining compliance with any Dollar-denominated restriction on the Incurrence of Indebtedness, the Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was Incurred, in the case of term debt, or first committed or first Incurred (whichever yields the lower Dollar-equivalent), in the case of revolving credit debt; or if any such Indebtedness is subject to a Currency Agreement with respect to the currency in which such Indebtedness is denominated covering principal, premium, if any, and interest on such Indebtedness, the amount of such Indebtedness and such interest and premium, if any, shall be determined after giving effect to all payments in respect thereof under such Currency Agreement; *provided* that if such Indebtedness is Incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such Refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced.

Notwithstanding any other provision of this Section 7.01, the maximum amount of Indebtedness that the Company and its Restricted Subsidiaries may Incur pursuant to this Section 7.01 shall not be deemed to be exceeded, with respect to any outstanding Indebtedness, solely as a result of fluctuations in the exchange rate of currencies.  The principal amount of any Indebtedness Incurred to refinance other Indebtedness, if Incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of such refinancing.

Section 7.02.    <u>Restricted Payments</u>.

Make any Restricted Payment, unless at the time of such Restricted Payment:

(a)    no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof;

(b)    immediately after giving effect to such transaction on a pro forma basis, the Company could Incur $1.00 of additional Indebtedness under the provisions of the first paragraph of Section 7.01; and

(c)    the aggregate amount of Restricted Payments made after the Term Loan Escrow Release Date, including the Fair Market Value of non-cash amounts constituting Restricted Payments and Restricted Payments permitted by clauses (1), (2), (6)(b), (8), (12)(b) and (16) of

the following paragraph, but excluding all other Restricted Payments permitted by the next paragraph below, shall not exceed the Applicable Amount at such time.

The foregoing provisions do not prohibit:

(1)    the payment of any dividend or distribution within sixty (60) days after the date of declaration thereof, if at the date of declaration such payment would have complied with the provisions of this Agreement;

(2)    (a) the redemption, repurchase, retirement or other acquisition of any Equity Interests ("**Retired Capital Stock**") of the Company or Subordinated Indebtedness of the Company, any direct or indirect parent entity of the Company in exchange for, or out of the proceeds of, the substantially concurrent sale of Equity Interests of the Company, any direct or indirect parent entity of the Company or contributions to the equity capital of the Company or any Restricted Subsidiary (other than any Disqualified Stock or any Equity Interests sold to a Subsidiary of the Company) (collectively, including any such contributions, "**Refunding Capital Stock**"), (b) the declaration and payment of dividends on the Retired Capital Stock out of the proceeds of the substantially concurrent sale (other than to a Subsidiary of the Company) of Refunding Capital Stock, and (c) if immediately prior to the retirement of Retired Capital Stock, the declaration and payment of dividends thereon was permitted under clause (6) of this paragraph and not made pursuant to clause (2)(b), the declaration and payment of dividends on the Refunding Capital Stock (other than Refunding Capital Stock the proceeds of which are used to redeem, repurchase, retire or otherwise acquire any Equity Interests of any direct or indirect parent of the Company) in an aggregate amount per year no greater than the aggregate amount of dividends per annum that were declarable and payable on such Retired Capital Stock immediately prior to such retirement;

(3)    the redemption, repurchase, defeasance, or other acquisition or retirement of Subordinated Indebtedness of the Company, the Borrower or any Guarantor made by exchange for, or out of the proceeds of the substantially concurrent sale of, new Indebtedness of the Borrower, the Company or any Guarantor that is Incurred in accordance with Section 7.01 so long as:

(a)    the principal amount (or accreted value, if applicable) of such new Indebtedness does not exceed the principal amount (or accreted value, if applicable) of, plus any accrued and unpaid interest, of the Subordinated Indebtedness being so redeemed, repurchased, defeased, acquired or retired for value (plus the amount of any premium required to be paid under the terms of the instrument governing the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired, any tender premiums, plus any defeasance costs, fees and expenses incurred in connection therewith),

(b)    such Indebtedness is subordinated to the Loans or such Guarantor's obligations in respect of the Loans, as the case may be, at least to the same extent as such Subordinated Indebtedness so purchased, exchanged, redeemed, repurchased, defeased, acquired or retired for value,

(c)    such Indebtedness has a final scheduled maturity date equal to or later than the earlier of (x) the final scheduled maturity date of the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired and (y) ninety-one (91) days following the last maturity date of any Senior Notes then outstanding, and

(d)    such Indebtedness has a Weighted Average Life to Maturity at the time Incurred which is not less than the shorter of (x) the remaining Weighted Average Life to Maturity of the Subordinated Indebtedness being so redeemed, repurchased, defeased, acquired or retired and

(y) the Weighted Average Life to Maturity that would result if all payments of principal on the Subordinated Indebtedness being redeemed, repurchased, defeased, acquired or retired that were due on or after the date that is ninety-one (91) days following the last maturity date of any Senior Notes then outstanding were instead due on such date;

(4)      a Restricted Payment to pay for the repurchase, retirement or other acquisition for value of Equity Interests of the Company or any direct or indirect parent entity of the Company held by any future, present or former employee, director or consultant of the Company, any direct or indirect parent entity of the Company or any of its Restricted Subsidiaries pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or other agreement or arrangement; *provided*, *however*, that the aggregate Restricted Payments made under this clause (4) do not exceed $35,000,000 in any calendar year (with unused amounts in any calendar year being permitted to be carried over to succeeding calendar years subject to a maximum (without giving effect to the following proviso) of $70,000,000 in any calendar year; *provided further*, *however*, that such amount in any calendar year may be increased by an amount not to exceed:

(a)      the cash proceeds received by the Company or any of its Restricted Subsidiaries from the sale of Equity Interests (other than Disqualified Stock) of the Company or any direct or indirect parent entity of the Company (to the extent contributed to the Company) to members of management, directors or consultants of the Company and its Restricted Subsidiaries or any direct or indirect parent entity of the Company that occurs after the Term Loan Escrow Release Date (*provided* that the amount of such cash proceeds utilized for any such repurchase, retirement, other acquisition or dividend will not increase the amount available for Restricted Payments under Section 7.02(3)) or be used as the basis for the Incurrence of Indebtedness under Section 7.01(n), plus

(b)      the cash proceeds of key man life insurance policies received by the Company, any direct or indirect parent entity (to the extent contributed to the Company) of the Company or any of its Restricted Subsidiaries after the Term Loan Escrow Release Date,

*provided* that the Company may elect to apply all or any portion of the aggregate increase contemplated by clauses (a) and (b) above in any calendar year; and *provided further* that cancellation of Indebtedness owing to the Company or any Restricted Subsidiary from any present or former employees, directors, officers or consultants of the Company, any of its Restricted Subsidiaries or any direct or indirect parent entity of the Company in connection with a repurchase of Equity Interests of the Company or any direct or indirect parent entity of the Company will not be deemed to constitute a Restricted Payment for purposes this Section 7.02 or any other provision of this Agreement;

(5)      the declaration and payment of dividends or distributions to holders of any class or series of Disqualified Stock of the Company or any of its Restricted Subsidiaries issued or Incurred in accordance with Section 7.01 to the extent such dividends are included in the definition of "Fixed Charges";

(6)      (a) the declaration and payment of dividends or distributions to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) issued after the Term Loan Escrow Release Date; and (b) the declaration and payment of dividends on Refunding Capital Stock that is Preferred Stock in excess of the dividends declarable and payable thereon pursuant to clause (2) of this paragraph; *provided, however*, in the case of each of (a) and (b) above of this clause (6), that for the most recently ended four (4) full fiscal quarters for which internal financial statements are available immediately preceding the date of issuance of such Designated Preferred Stock, after giving effect to such

issuance (and the payment of dividends or distributions) on a *pro forma* basis, the Company would have had a Fixed Charge Coverage Ratio of at least 2.00 to 1.00;

(7)     Investments in Unrestricted Subsidiaries having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (7) that are at that time outstanding, not to exceed the greater of $250,000,000 and 1.25% of the Consolidated Net Tangible Assets of the Company at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value), plus 100% of the aggregate amount received by the Company or any Restricted Subsidiary in cash and the Fair Market Value (as determined in good faith by the Company) of property other than cash received by the Company or any Restricted Subsidiary with respect to any Investment made pursuant to this clause (7);

(8)     (i) Restricted Payments by the Company in an amount not to exceed $50,000,000 per annum, and (ii) following a Primary Offering only, the payment of dividends on the listed Equity Interests at a rate not to exceed 6% per annum of the net cash proceeds received by the Company or the Borrower in connection with such a Primary Offering or any subsequent Primary Offering;

(9)     Restricted Payments that are made with Excluded Contributions;

(10)     other Restricted Payments in an aggregate amount not to exceed the greater of $350,000,000 and 1.75% of the Consolidated Net Tangible Assets of the Company at the time made;

(11)     the payment of dividends or other distributions to any direct or indirect parent of the Borrower that files a consolidated tax return that includes the Borrower and its Subsidiaries (including, without limitation, by virtue of such parent being the common parent of a consolidated or combined tax group of which the Borrower and/or its Restricted Subsidiaries are members) in an amount not to exceed the amount that the Borrower and its Restricted Subsidiaries would have been required to pay in respect of federal, state or local taxes (as the case may be) if the Borrower and its Restricted Subsidiaries paid such taxes as a standalone taxpayer (or standalone group);

(12)     the payment of Restricted Payments, if applicable:

(a)     in amounts required for any direct or indirect parent of the Borrower to pay fees and expenses (including legal, audit, tax, including franchise tax, expenses) required to maintain its corporate existence, customary salary, bonus and other benefits payable to, and indemnities provided on behalf of, officers, directors and employees of any direct or indirect parent of the Borrower and general corporate operating and overhead expenses of any direct or indirect parent of the Borrower in each case to the extent such fees and expenses are attributable to the ownership or operation of the Borrower, if applicable, and its Subsidiaries;

(b)     in amounts required for any direct or indirect parent of the Company, if applicable to pay interest and/or principal on Indebtedness the proceeds of which have been contributed to the Company or any of its Restricted Subsidiaries and that has been guaranteed by and treated as Indebtedness of the Company or its Restricted Subsidiaries, as applicable, Incurred in accordance with Section 7.01 (it being agreed that (i) all interest expense shall be included in the calculation of the "Fixed Charge Coverage Ratio" of the Company and (ii) no contribution of such proceeds may be included in the calculation of Restricted Payments capacity or in the amount of Indebtedness that may be Incurred based on contributions to the Company); and

(c)      in amounts required for any direct or indirect parent of the Company to pay fees and expenses, other than to Affiliates of the Company, related to any unsuccessful equity or debt offering of such parent that has been undertaken to finance the Company and its Subsidiaries;

(13)      repurchases of Equity Interests of the Company and its Subsidiaries deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(14)      purchases of receivables pursuant to a Receivables Repurchase Obligation in connection with a Qualified Receivables Financing and the payment or distribution of Receivables Fees;

(15)      Restricted Payments by the Company or any Restricted Subsidiary to allow the payment of cash in lieu of the issuance of fractional shares upon the exercise of options or warrants or upon the conversion or exchange of Capital Stock of any such Person;

(16)      the repurchase, redemption or other acquisition or retirement for value of any Subordinated Indebtedness pursuant to the provisions similar to those described under Sections 4.06 and 4.08 of the Senior Notes Indenture; *provided* that, all Senior Notes tendered by the holders of the Senior Notes in connection with a Change of Control Offer, Asset Sale Offer or Collateral Asset Sale Offer (each as defined in Senior Notes Indenture), as applicable, have been repurchased, redeemed or acquired for value in accordance with the requirements of the Senior Notes Indenture;

(17)      payments or distributions to dissenting stockholders pursuant to applicable law, pursuant to or in connection with a consolidation, amalgamation, merger or transfer of all or substantially all of the assets of the Company and its Restricted Subsidiaries, taken as a whole, that complies with Section 7.07; *provided* that at the time of, and after giving effect to, any such consolidation, amalgamation, merger or transfer of all or substantially all of the assets of the Company and its Restricted Subsidiaries, taken as a whole, no Event of Default under Section 8.01(j) shall have occurred and be continuing;

(18)      any Restricted Payment made in connection with the Emergence Transactions;

(19)      distributions by any Restricted Subsidiary of the Company or any Joint Venture of chemicals to a holder of Capital Stock of such Restricted Subsidiary or Joint Venture if such distributions are made pursuant to a provision in a Joint Venture agreement or other arrangement entered into in connection with the establishment of such Joint Venture or Restricted Subsidiary that requires such holder to pay a price for such chemicals equal to that which would be paid in a comparable transaction negotiated on an arm's-length basis (or pursuant to a provision that imposes a substantially equivalent requirement); and

(20)      any Restricted Payments under any Treasury Services Agreement or any Structured Financing Transaction;

*provided, however*, that at the time of, and after giving effect to, any Restricted Payment permitted under clauses (3), (6), (7), (8), (9), (10) and (12)(b) above, no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof.

The Company will not permit any Unrestricted Subsidiary to become a Restricted Subsidiary except pursuant to the definition of "Unrestricted Subsidiary." For purposes of designating any Restricted Subsidiary as an Unrestricted Subsidiary, all outstanding Investments by the Company and its Restricted Subsidiaries (except to the extent repaid) in the Subsidiary so designated will be deemed to be Restricted Payments in an amount determined as set forth in the last sentence of the definition of "Investments."

Such designation will only be permitted if a Restricted Payment or Permitted Investment in such amount would be permitted at such time and if such Subsidiary otherwise meets the definition of an Unrestricted Subsidiary.

Notwithstanding clause (10) of the second paragraph of this Section 7.02, prior to March 31, 2012 the Company will not, and will not permit any of its Restricted Subsidiaries to, pay any cash dividend or make any cash distribution on, or in respect of, the Company's Capital Stock or purchase for cash or otherwise acquire for cash any Capital Stock of the Company or any direct or indirect parent of the Company for the purpose of paying any cash dividend or making any cash distribution to, or acquiring Capital Stock of any direct or indirect parent of the Company for cash from, the Sponsors, or guarantee any Indebtedness of any Affiliate of the Company for the purpose of paying such dividend, making such distribution or so acquiring such Capital Stock to or from the Sponsors, in each case by means of the exception provided by clause (10) of the second paragraph of this Section 7.02, if at the time and after giving effect to such payment, the Secured Indebtedness Leverage Ratio of the Company would be greater than 2.00 to 1.00.

Section 7.03.    Dividend and Other Payment Restrictions Affecting Subsidiaries.

Create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction on the ability of any Restricted Subsidiary to:

(a)    (i) pay dividends or make any other distributions to the Company or any of its Restricted Subsidiaries (1) on its Capital Stock; or (2) with respect to any other interest or participation in, or measured by, its profits; or (ii) pay any Indebtedness owed to the Company or any of its Restricted Subsidiaries;

(b)    make loans or advances to the Company or any of its Restricted Subsidiaries; or

(c)    sell, lease or transfer any of its properties or assets to the Company or any of its Restricted Subsidiaries;

except in each case for such encumbrances or restrictions existing under or by reason of:

(1)    agreements existing and contractual encumbrances or restrictions in effect on the Term Loan Escrow Release Date, including pursuant to this Agreement, the ABL Facility, the Plan Roll-Up Notes, the Euro Securitization and the other Credit Facilities;

(2)    the Senior Notes Indenture, the Senior Notes or the other notes permitted to be Incurred pursuant to Section 7.01(a) (including, without limitation, any Liens permitted by this Agreement or the indenture for such other notes);

(3)    applicable law or any applicable rule, regulation or order;

(4)    any agreement or other instrument (including those governing Capital Stock) of a Person acquired by the Company or any Restricted Subsidiary which was in existence at the time of such acquisition (but not created in contemplation thereof or to provide all or any portion of the funds or credit support utilized to consummate such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired;

(5)    contracts or agreements for the sale of assets, including any restriction with respect to a Restricted Subsidiary imposed pursuant to an agreement entered into for the sale or disposition of the Capital Stock or assets of such Restricted Subsidiary;

(6)    Secured Indebtedness otherwise permitted to be Incurred pursuant to Sections 7.01 and 7.06 that limit the right of the Company or any Restricted Subsidiary to dispose of the assets securing such Indebtedness;

(7)    restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(8)    customary provisions in Joint Venture agreements and other similar agreements entered into in the ordinary course of business;

(9)    purchase money obligations for property acquired and Capitalized Lease Obligations in the ordinary course of business;

(10)    customary provisions contained in leases, subleases, licenses and other similar agreements entered into in the ordinary course of business;

(11)    any encumbrance or restriction in connection with a Qualified Receivables Financing; *provided* such restrictions only apply to the applicable receivables and related intangibles;

(12)    other Indebtedness, Disqualified Stock or Preferred Stock (a) of any Restricted Subsidiary of the Company that is a Guarantor or a Foreign Subsidiary, (b) of any Restricted Subsidiary that is not a Guarantor or a Foreign Subsidiary so long as such encumbrances and restrictions contained in any agreement or instrument will not materially affect the Company's ability to make anticipated principal or interest payments on the Loans (as determined in good faith by the Company) or (c) of any Restricted Subsidiary Incurred in connection with any Project Financing, *provided* that in the case of each of clauses (a) and (b), such Indebtedness, Disqualified Stock or Preferred Stock is permitted to be Incurred subsequent to the Term Loan Escrow Release Date by Section 7.01;

(13)    any Restricted Investment not prohibited by Section 7.02 and any Permitted Investment;

(14)    customary provisions in Hedging Obligations permitted under this Agreement and entered into in the ordinary course of business; or

(15)    any encumbrances or restrictions of the type referred to in clauses (a), (b) and (c) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (1) through (14) above; *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, as determined in good faith by the Company, no more restrictive with respect to such dividend and other payment restrictions than those contained in the dividend or other payment restrictions prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

For purposes of determining compliance with this covenant, (1) the priority of any Preferred Stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock shall not be deemed a restriction on the ability to make distributions on Capital Stock and (2) the subordination of loans or advances made to the Company or a Restricted

Subsidiary of the Company to other Indebtedness Incurred by the Company or any such Restricted Subsidiary shall not be deemed a restriction on the ability to make loans or advances.

Section 7.04.    <u>Asset Sales</u>.

Cause or make an Asset Sale, unless (x) the Company or any of its Restricted Subsidiaries, as the case may be, receives consideration at the time of such Asset Sale at least equal to the Fair Market Value of the assets sold or otherwise disposed of, and (y) at least 75% of the consideration therefor received by the Company or such Restricted Subsidiary, as the case may be, is in the form of Cash Equivalents; *provided* that the amount of:

> (a)    any liabilities (as shown on the Company's or such Restricted Subsidiary's most recent balance sheet or in the notes thereto) of the Company or any Restricted Subsidiary of the Company (other than liabilities that are by their terms subordinated to the Loans or such Restricted Subsidiary's obligations in respect of the Loans) that are assumed by the transferee of any such assets,

> (b)    any notes or other obligations or other securities or assets received by the Company or such Restricted Subsidiary of the Company from such transferee that are converted by the Company or such Restricted Subsidiary of the Company into cash within one hundred eighty (180) days of the receipt thereof (to the extent of the cash received), and

> (c)    any Designated Non-cash Consideration received by the Company or any of its Restricted Subsidiaries in such Asset Sale having an aggregate Fair Market Value, taken together with all other Designated Non-cash Consideration received pursuant to this clause (c) that is at that time outstanding, not to exceed the greater of 3.0% of the Consolidated Net Tangible Assets of the Company and $600,000,000 at the time of the receipt of such Designated Non-cash Consideration (with the Fair Market Value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value) shall be deemed to be Cash Equivalents for the purposes of this provision.

Section 7.05.    <u>Transactions with Affiliates</u>.

Make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction or series of transactions, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Company (each of the foregoing, an "**Affiliate Transaction**") involving aggregate consideration in excess of $25,000,000, unless:

> (a)    such Affiliate Transaction is on terms that are not less favorable to the Company or the relevant Restricted Subsidiary than those that could have been obtained in a comparable transaction by the Company or such Restricted Subsidiary with an unrelated Person; and

> (b)    with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $75,000,000, the Company delivers to the Administrative Agent a resolution adopted in good faith by the majority of the Board of Directors of the Company, approving such Affiliate Transaction and set forth in an Officer's Certificate certifying that such Affiliate Transaction complies with clause (a) above.

The foregoing provisions do not apply to the following:

(1)     transactions between or among the Company and/or any of its Restricted Subsidiaries (or an entity that becomes a Restricted Subsidiary as a result of such transaction) and any merger, consolidation or amalgamation of the Borrower and any direct parent of the Borrower;

(2)     Restricted Payments permitted by Section 7.02 and Permitted Investments;

(3)     the payment of reasonable and customary fees and reimbursement of expenses paid to, and indemnity provided on behalf of, officers, directors, managers, employees or consultants of the Company or any Restricted Subsidiary or any direct or indirect parent entity of the Company;

(4)     transactions in which the Company or any of its Restricted Subsidiaries, as the case may be, delivers to the Administrative Agent a letter from an Independent Financial Advisor stating that such transaction is fair to the Company or such Restricted Subsidiary from a financial point of view or meets the requirements of clause (a) of the preceding paragraph;

(5)     payments or loans (or cancellation of loans) to officers, directors, employees or consultants which are approved by a majority of the Board of Directors of the Company in good faith;

(6)     any agreement as in effect as of the Term Loan Escrow Release Date or any amendment thereto (so long as any such agreement together with all amendments thereto, taken as a whole, is not more disadvantageous to the Lenders in any material respect than the original agreement as in effect on the Term Loan Escrow Release Date) or any transaction contemplated thereby as determined in good faith by the Company;

(7)     the existence of, or the performance by the Company or any of its Restricted Subsidiaries of its obligations under the terms of, any registration rights agreement to which it is a party as of the Term Loan Escrow Release Date, and, any amendment thereto or similar agreements or arrangements which it may enter into thereafter; *provided, however*, that the existence of, or the performance by the Company or any of its Restricted Subsidiaries of its obligations under, any future amendment to any such existing agreement or under any similar agreement entered into after the Term Loan Escrow Release Date shall only be permitted by this clause (7) to the extent that the terms of any such existing agreement together with all amendments thereto, taken as a whole, or new agreement are not otherwise more disadvantageous to the Lenders in any material respect than the original agreement as in effect on the Term Loan Escrow Release Date;

(8)     the Emergence Transactions, including the payment of fees and expenses paid in connection therewith;

(9)     (a) transactions with customers, clients, suppliers or purchasers or sellers of goods or services, or transactions otherwise relating to the purchase or sale of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Agreement, which are fair to the Company and its Restricted Subsidiaries in the reasonable determination of the Board of Directors or the senior management of the Company, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party or (b) transactions with Joint Ventures or Unrestricted Subsidiaries entered into in the ordinary course of business and consistent with past practice or industry norm;

(10)     any transaction effected as part of a Qualified Receivables Financing;

(11)    the issuance of Equity Interests (other than Disqualified Stock) of the Company to any Person;

(12)    the issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock option and stock ownership plans or similar employee benefit plans approved by the Board of Directors of the Company or any direct or indirect parent entity of the Company or of a Restricted Subsidiary of the Company, as appropriate, in good faith;

(13)    the entering into of any tax sharing agreement or arrangement that complies with Section 7.02(12);

(14)    any contribution to the capital of the Company;

(15)    transactions between the Company or any of its Restricted Subsidiaries and any Person that is an Affiliate of the Company or any of its Restricted Subsidiaries solely because a director of such Person is also a director of the Company or any direct or indirect parent entity of the Company; *provided*, *however*, that such director abstains from voting as a director of the Company or any direct or indirect parent entity of the Company, as the case may be, on any matter involving such other Person;

(16)    pledges of Equity Interests of Unrestricted Subsidiaries;

(17)    the formation and maintenance of any consolidated group or subgroup for tax, accounting or cash pooling or management purposes in the ordinary course of business;

(18)    any employment agreements entered into by the Company or any of its Restricted Subsidiaries in the ordinary course of business;

(19)    transactions undertaken in good faith (as certified by a responsible financial or accounting officer of the Company in an Officer's Certificate) for the purpose of improving the consolidated tax efficiency of the Company and its Subsidiaries and not for the purpose of circumventing any covenant set forth in this Agreement; and

(20)    transactions entered into by a Person prior to the time such Person becomes a Restricted Subsidiary or is merged or consolidated into the Company or a Restricted Subsidiary (*provided* such transaction is not entered into in contemplation of such event).

Section 7.06.    Liens.

Create, Incur, assume or suffer to exist any Lien (except Permitted Liens) that secures any Indebtedness on any asset or property of the Company or such Restricted Subsidiary, other than Liens securing Indebtedness that are junior in priority to the Liens on such property or assets securing the Loans, on terms no less favorable in any material respect to the Lenders than those set forth in the Junior Lien Intercreditor Agreement.

Section 7.07.    <u>Merger, Amalgamation, Consolidation or Sale of All or Substantially All Assets</u>.

(a)    Solely with respect to the Company, the Company may not, directly or indirectly, consolidate, amalgamate or merge with or into or wind up or convert into (whether or not the Company is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions, to any Person unless:

(1)    the Company is the surviving Person or the Person formed by or surviving any such consolidation, amalgamation, merger, winding up or conversion (if other than the Company) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof, the District of Columbia, Canada or any province thereof or any state which was a member of the European Union on December 31, 2003 (other than Greece) (the Company or such Person, as the case may be, being herein called the **"Successor Company"**); *provided* that in the case where the surviving Person is not a corporation, a co-obligor of the Loans is a corporation;

(2)    the Successor Company (if other than the Company) expressly assumes all the obligations of the Company under this Agreement and the obligations pursuant to an assumption agreement or other documents or instruments in form reasonably satisfactory to the Administrative Agent and in compliance with the Intercreditor Agreements;

(3)    immediately after giving effect to such transaction (and treating any Indebtedness which becomes an obligation of the Successor Company or any of its Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Company or such Restricted Subsidiary at the time of such transaction) no Default or Event of Default shall have occurred and be continuing;

(4)    immediately after giving *pro forma* effect to such transaction, as if such transaction had occurred at the beginning of the applicable four (4)-quarter period (and treating any Indebtedness which becomes an obligation of the Successor Company or any of its Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Company or such Restricted Subsidiary at the time of such transaction), either (a) the Successor Company would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in the first sentence of Section 7.01; or (b) the Fixed Charge Coverage Ratio for the Successor Company and its Restricted Subsidiaries would be greater than such ratio for the Company and its Restricted Subsidiaries immediately prior to such transaction; and

(5)    the Company shall have delivered to the Administrative Agent an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, merger, amalgamation or transfer complies with this Agreement.

The Successor Company (if other than the Company) will succeed to, and be substituted for, the Company under the Loan Documents and the Loans, and in such event the Company will automatically be released and discharged from its obligations under the Loan Documents and the Loans. Notwithstanding the first sentence of this covenant, without complying with the foregoing clause (4), the Company may (A) merge with an Affiliate that has no material assets or liabilities and that is incorporated or organized solely for the purpose of reincorporating or reorganizing the Borrower in any state of the

U.S., the District of Columbia, Canada or any province thereof or any state which was a member state of the European Union on December 31, 2003 (other than Greece) and (B) may otherwise convert its legal form under the laws of its jurisdiction of organization.

(b)      Solely with respect to the Borrower, the Borrower may not, directly or indirectly, consolidate, amalgamate or merge with or into or wind up or convert into (whether or not the Borrower is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions, to any Person unless:

(1)      the Borrower is the surviving Person or the Person formed by or surviving any such consolidation, amalgamation, merger, winding up or conversion (if other than the Borrower) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof or the District of Columbia (the Borrower or such Person, as the case may be, being herein called the "**Successor Borrower**"); *provided* that in the case where the surviving Person is not a corporation, a co-obligor of the Loans is a corporation;

(2)      the Successor Borrower (if other than the Borrower) expressly assumes all the obligations of the Borrower under the Loan Documents and the Loans pursuant to an assumption agreement or other documents or instruments in form reasonably satisfactory to the Administrative Agent and in compliance with the Intercreditor Agreements;

(3)      immediately after giving effect to such transaction (and treating any Indebtedness which becomes an obligation of the Successor Borrower or any of its Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Borrower or such Restricted Subsidiary at the time of such transaction) no Default or Event of Default shall have occurred and be continuing;

(4)      immediately after giving *pro forma* effect to such transaction, as if such transaction had occurred at the beginning of the applicable four (4)-quarter period (and treating any Indebtedness which becomes an obligation of the Successor Borrower or any of its Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Borrower or such Restricted Subsidiary at the time of such transaction), either (a) the Company would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in the first sentence of Section 7.01; or (b) the Fixed Charge Coverage Ratio for the Company and its Restricted Subsidiaries would be greater than such ratio for the Company and its Restricted Subsidiaries immediately prior to such transaction; and

(5)      the Borrower shall have delivered to the Administrative Agent an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, merger, amalgamation or transfer and such supplemental indentures (if any) comply with this Agreement.

The Successor Borrower (if other than the Borrower) will succeed to, and be substituted for, the Borrower under the Loan Documents and the Loans, and in such event the Borrower will automatically be released and discharged from its obligations under the Loan Documents and the Loans.  Notwithstanding the first sentence of this covenant, without complying with the foregoing clause (4), the Borrower may (A) merge with an Affiliate that has no material assets or liabilities and that is incorporated or organized

solely for the purpose of reincorporating or reorganizing the Borrower, as the case may be, in any state of the U.S. or the District of Columbia and (B) may otherwise convert its legal form under the laws of its jurisdiction of organization so long as there remains a corporate co-obligor.  This Section 7.07 will not apply to a sale, assignment, transfer, conveyance or other disposition of assets between or among the Company and its Restricted Subsidiaries.

Notwithstanding the foregoing, the Lyondell Assumption and the related transactions shall be permitted under this Agreement.

(c)     Solely with respect to any Pledgor, subject to the limitations contained in this Agreement governing release of assets and property securing the Loans upon the sale or disposition of a Restricted Subsidiary of the Company that is a Pledgor, no Pledgor will, and the Company will not permit any Pledgor to, consolidate, amalgamate or merge with or into or wind up into (whether or not such Pledgor is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions to, any Person unless:

(1)     either (a) such Pledgor is the surviving Person or the Person formed by or surviving any such consolidation, amalgamation or merger (if other than such Pledgor) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof, the District of Columbia, or any territory thereof (such Pledgor or such Person, as the case may be, being herein called the "**Successor Pledgor**") and the Successor Pledgor (if other than such Pledgor) expressly assumes all the obligations of such Pledgor under the Loan Documents and the Security Documents pursuant to documents or instruments in form required by the Loan Documents and in compliance with the Intercreditor Agreements, or (b) such sale or disposition or consolidation, amalgamation or merger is not in violation of Section 7.04; and

(2)     the Successor Pledgor (if other than such Pledgor) shall have delivered or caused to be delivered to the Administrative Agent an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, amalgamation, merger or transfer and such supplemental indenture (if any) comply with this Agreement.

Subject to certain limitations described in the Loan Documents, the Successor Pledgor (if other than such Pledgor) will succeed to, and be substituted for, such Pledgor under the Loan Documents and such Pledgor's obligations in respect of the Loans, and such Pledgor will automatically be released and discharged from its obligations under the Loan Documents and such Pledgor's obligations in respect of the Loans.  Notwithstanding the foregoing, (1) a Pledgor may merge, amalgamate or consolidate with an Affiliate incorporated solely for the purpose of reincorporating or reorganizing such Pledgor in another state of the United States, the District of Columbia or any territory of the United States so long as the amount of Indebtedness of the Pledgor is not increased thereby and (2) a Pledgor may merge, amalgamate or consolidate with another Pledgor or the Company or may convert its legal form under the laws of reorganization of its jurisdiction.

In addition, notwithstanding the foregoing, any Pledgor may consolidate, amalgamate or merge with or into or wind up into, or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets (collectively, a "**Transfer**") to the Company or any Pledgor.

Section 7.08.    Prepayments, Etc. of Plan Roll-Up Notes and Foreign Capital Markets Debt.

(a)    Voluntarily prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner (it being understood that payments of regularly scheduled interest shall be permitted) the Plan Roll-Up Notes, any Foreign Capital Markets Debt, and any other Indebtedness of a Loan Party incurred after the Closing Date that is permitted to be Incurred under this Agreement and is by its terms unsecured or secured on a basis junior to the Liens securing the Obligations, or any Refinancing Indebtedness thereof (such Indebtedness, collectively, "**Junior Financing**"), except (i) the refinancing thereof with the net proceeds of any Indebtedness (net of all Taxes, fees, costs and expenses incurred by the Company and its Subsidiaries that are Restricted Subsidiaries with respect to such incurrence or issuance), in each case to the extent not required to prepay any Loans pursuant to Section 2.03(b), (ii) the conversion of any Junior Financing to Qualified Stock of the Borrower or any direct or indirect parent of the Borrower, (iii) any Permitted Roll-Up Notes Refinancing or Refinancing Indebtedness, (iv) prepayments, redemptions, purchases, defeasances and other payments in respect Foreign Capital Markets Debt (other than the Euro Securitization and the 2027 Notes) to the extent that the aggregate amount of all such Foreign Capital Markets Debt satisfactions pursuant to this clause (iv) during the term of this Agreement does not exceed, after giving effect to such satisfaction, an aggregate principal amount equal to $300,000,000 plus the amount of Net Proceeds permitted to be retained by a Foreign Subsidiary as a result of material adverse tax consequences or adverse legal consequences pursuant to the proviso of Section 2.03(b)(ii), and (v) prepayments, redemptions, purchases, defeasances and other payments in respect of Junior Financings prior to their scheduled maturity an aggregate amount not to exceed an amount equal to (A) if the Applicable Amount Availability Condition shall have been satisfied on a *pro forma* basis after giving effect to such prepayment, redemption, purchase, defeasance or other payment, with the portion, if any, of the Applicable Amount on the date of such payment that the Borrower elects to apply to this Section 7.08(a), such election to be specified in a written notice of a Principal Financial Officer calculating in reasonable detail the amount of Applicable Amount immediately prior to such election and the amount thereof elected to be so applied plus (B) the aggregate amount of Restricted Payments permitted to be made pursuant to Section 7.02(10).

(b)    Amend, modify or change in any manner materially adverse to the interests of the Lenders any term or condition of any Junior Financing Documentation without the consent of the Administrative Agent (which consent shall not be unreasonably withheld or delayed).

Section 7.09.    Activities of Escrow Borrower Prior to the Lyondell Assumption.

Prior to the Term Loan Escrow Release Date, the Borrower shall be a corporation, whose primary activities are restricted to issuing the Senior Notes and the Term Loans, issuing capital to, and receiving capital contributions from, the Company, performing its obligations in respect of (i) the Senior Notes under the Senior Notes Indenture and the Senior Notes Escrow Agreement, (ii) the Loans under the Term Loan Escrow Agreement, and (iii) consummating the Lyondell Assumption or redeeming the Senior Notes and prepaying the Loans on the Term Loan Escrow Redemption Date, and conducting such other activities as are necessary or appropriate to carry out the activities described in this sentence.  Prior to the Term Loan Escrow Release Date, the Escrow Borrower shall not issue or incur any Indebtedness other than the Senior Notes and Term Loans, or own, hold or otherwise have any interest in any material assets other than the account referenced in the Senior Notes Escrow Agreement and the Term Loan Escrow Account, and cash or Cash Equivalents.

# ARTICLE VIII.

## Events of Default and Remedies

Section 8.01.    <u>Events of Default</u>.

The occurrence of any of the following on or after the Term Loan Escrow Release Date shall constitute an event of default (an "**Event of Default**"):

(a)    *Non-Payment*.  Any Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan, or (ii) within five (5) Business Days after the same becomes due, any interest on any Loan or any other amount payable hereunder or with respect to any other Loan Document; or

(b)    *Specific Covenants*.  Any Loan Party fails to perform or observe any term, covenant or agreement contained in Sections 6.03(a), 6.05 (solely with respect to the Company and the Borrower) or Article VII; or

(c)    *Other Defaults*.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 8.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after notice thereof by the Administrative Agent to the Company or the Borrower; or

(d)    *Representations and Warranties*.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any document that is an exhibit to a Loan Document (or any certification by a Principal Financial Officer or the Borrower expressly contemplated by this Agreement) shall be incorrect or misleading in any material respect when made or deemed made; or

(e)    *Cross-Default*.  Any Loan Party or any Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary if each member of such group were in default of this clause (e) at any one time) (i) fails to make any payment beyond the applicable grace period with respect thereto, if any (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness (other than Indebtedness hereunder or owing to the Company or a Restricted Subsidiary) having an aggregate principal amount of not less than the Threshold Amount or (ii) fails to observe or perform any other agreement or condition relating to any such Indebtedness of not less than the Threshold Amount (any such Indebtedness, "**Threshold Indebtedness**"), or any other event occurs (other than, with respect to Indebtedness consisting of Hedging Obligations, termination events or equivalent events pursuant to the terms of such Hedging Obligations), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders of beneficiary or beneficiaries) to cause, with the giving of notice, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise) prior to its Stated Maturity; *provided* that this clause (e)(ii) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; *provided further* that such failure is unremedied and is not waived or subject to forbearance, by the holders of such Indebtedness prior to any termination of the Commitments or acceleration of the Loans pursuant to Section 8.02; or

(f)      *Insolvency Proceedings, Etc.*  Any of the Company, the Borrower or any Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary if each member of such group were in default of this clause (f) at any one time) to the fullest extent permitted under applicable mandatory provisions of law institutes or consents to the institution of any proceeding under any Debtor Relief Law or files for the opening of insolvency proceedings, or makes an assignment for the benefit of creditors generally; or a third person files for the opening of insolvency proceedings that result in the entry of an order for relief or remains undismissed, undischarged or unstayed for sixty (60) calendar days; or applies for or consents to the appointment of any receiver, trustee (not being a custodian), custodian, conservator, liquidator (not being a *bewindvoerder*), rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property under any applicable Debtor Relief Laws; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days, or an order for relief is entered in any such proceeding; or

(g)      *Inability to Pay Debts; Attachment.*  (i) Any of the Company, the Borrower or any Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary if each member of such group were in default of this clause (g) at any one time) becomes unable or admits in writing its inability or fails generally to pay its debts in excess of the Threshold Amount as they become due, or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of the Company and the Restricted Subsidiaries, taken as a whole, and is not released, vacated or fully bonded within sixty (60) days after its issue or levy in each case, for the purposes of any Subsidiary domiciled in the United Kingdom, ignoring the deeming provisions of Section 123(1)(a) of the Insolvency Act 1986; or

(h)      *Judgments.*  There is entered against any Loan Party or any Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary if each member of such group were in default of this clause (h) at any one time) one or more final judgments or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied coverage) and such judgments or orders shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) consecutive days; or

(i)      *Invalidity of Guaranties.*  Any material portion of the Guaranties of the Loans, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under Section 7.04 or 7.05) or as a result of acts or omissions by the Administrative Agent or Collateral Agent or any Lender or the satisfaction in full of all the Obligations (subject, in the case of the Company, to the Agreed Security Principles and the Legal Reservations), ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of any provision of any Loan Document or the validity or priority of a Lien as required by the Security Documents (subject to the Intercreditor Agreements) on a material portion of the Collateral; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (other than as a result of repayment in full of the payment Obligations and termination of the Aggregate Commitments), or purports in writing to revoke or rescind any Loan Document; or it becomes

unlawful for any Loan Party to perform any of its payment Obligations under the Loan Documents; or

      (j)     *Change of Control*.  There occurs or shall exist any Change of Control; or

      (k)     *Security Documents*.  Subject in the case of the Company to the Agreed Security Principles and the Legal Reservations, any Security Document after delivery thereof pursuant to Section 4.01, 4.02, 6.12 or 6.14 shall for any reason (other than pursuant to the terms hereof or thereof or solely as a result of acts or omissions of the Administrative Agent, the Collateral Agent or any Lender) ceases to create a valid and perfected Lien, with the priority required by the Security Documents (subject to the Intercreditor Agreements) on and security interest in any material portion of the Collateral, subject to Liens permitted under Section 7.01, except (i) to the extent that any such loss of perfection or priority results from the failure of the Administrative Agent or the Collateral Agent to (a) maintain possession of certificates actually delivered to it representing securities pledged under the Security Documents or (b) file Uniform Commercial Code continuation statements, (ii) as to Collateral consisting of Real Property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied or failed to acknowledge coverage, or (iii) any of the Equity Interests of the Borrower ceasing to be pledged pursuant to any Security Agreement free of Liens other than Liens created by such Security Agreement or any nonconsensual Liens arising solely by operation of Law; or

      (l)     *ERISA*.  An ERISA Event or any similar event with respect to a Foreign Plan occurs which, together with all other ERISA Events (or similar events with respect to Foreign Plans) that have occurred, has resulted or could reasonably be expected to result in a Material Adverse Effect.

      Section 8.02.    <u>Remedies upon Event of Default</u>.  If any Event of Default occurs and is continuing, the Administrative Agent may and, at the request of the Required Lenders, shall take any or all of the following actions:

      (i)     declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments shall be terminated;

      (ii)     declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

      (iii)     exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

*provided* that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Company under any Debtor Relief Law, the obligation of each Lender to make Loans shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable without further act of the Administrative Agent or any Lender.

Section 8.03.    Application of Funds.

After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable as set forth in the proviso to Section 8.02), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order (to the fullest extent permitted by mandatory provisions of applicable Law), subject in all respects to the applicable provisions of the Intercreditor Agreements:

First, to payment of that portion of the payment Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.04 and amounts payable under Article III) payable to the Administrative Agent or the Collateral Agent in its capacity as such;

Second, to payment of that portion of the payment Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including Attorney Costs payable under Section 10.04 and amounts payable under Article III), ratably among them in proportion to the amounts described in this clause Second payable to them;

Third, to payment of that portion of the payment Obligations constituting accrued and unpaid interest on the Loans, and any fees, premiums and scheduled periodic payments due under Treasury Services Agreements or Secured Hedge Agreements, ratably among the Secured Parties in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to payment of that portion of the payment Obligations constituting unpaid principal of the Loans, and any breakage, termination or other payments under Treasury Services Agreements or Secured Hedge Agreements, ratably among the Secured Parties in proportion to the respective amounts described in this clause Fourth held by them;

Fifth, to the payment of all other payment Obligations of the Borrower that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

Last, the balance, if any, after all of the payment Obligations have been paid in full, to the Borrower or as otherwise required by Law.

## ARTICLE IX.

## Administrative Agent and Other Agents

Section 9.01.    Appointment and Authorization of Agents.

(a)        Each of the Lenders hereby irrevocably appoints UBS AG, Stamford Branch, to act on its behalf as the Administrative Agent and the Collateral Agent hereunder and under the other Loan Documents and authorizes such Agents to execute on its behalf any Security Document and to take such actions on its behalf and to exercise such powers as are delegated to such Agents by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Administrative Agent, the Collateral Agent and the Lenders, and neither the Borrower nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions.

Section 9.02.    <u>Rights as a Lender</u>.

Each Person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each Person serving as an Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with any Loan Party or any Subsidiary or other Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders

Section 9.03.    <u>Exculpatory Provisions</u>.

No Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, no Agent:

(i)    shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii)    shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); *provided* that such Agent shall not be required to take any action that, in its judgment or the judgment of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable Law; and

(iii)    shall, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of their Affiliates that is communicated to or obtained by the Person serving as such Agent or any of its Affiliates in any capacity.

No Agent shall be liable for any action taken or not taken by it (x) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 10.01) or (y) in the absence of its own gross negligence or willful misconduct.  No Agent shall be deemed to have knowledge of any Default unless and until written notice describing such Default is given to such Agent by the Borrower or a Lender.  The Administrative Agent will promptly notify the Lenders upon receipt of any such notice.

No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent. Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used merely as a matter of

market custom and is intended to create or reflect only an administrative relationship between independent contracting parties.

Section 9.04.    Reliance by Agents.

Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender  prior to the making of such Loan.  Each Agent may consult with legal counsel (who may be counsel for a Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 9.05.    Delegation of Duties.

Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through, or delegate any and all such rights and powers to, any one or more sub-agents appointed by such Agent; *provided* that, so long as no Event of Default shall have occurred and be continuing, no Agent shall delegate such rights and powers to a foreign sub-agent or designate a new foreign agent if such delegation or designation would result in a tax gross-up or indemnification payment under Section 3.01 unless (i) such Agent determines, in its reasonable discretion, that such designation is necessary to avoid material adverse economic, legal or regulatory consequences, (ii) the designation is at the request of the Borrower or (iii) the designation is required by law.  Each Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Agent-Related Persons.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Agent-Related Persons of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

Section 9.06.    Resignation of the Agents.

Each Agent may at any time give thirty (30) days' prior written notice of its resignation to the Lenders and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall be consented to by the Borrower at all times other than during the existence of an Event of Default under Sections 8.01(f) and (g) (which consent shall not be unreasonably withheld or delayed) and which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States; *provided* that such successor shall comply with the requirements of Section 3.01(d) prior to becoming the successor under this Agreement; *provided further* that the Required Lenders shall not appoint a foreign agent as successor if such appointment would result in a tax gross-up or indemnification payment under Section 3.01 unless (i) the Required Lenders determine, in their reasonable discretion, that such appointment is necessary to avoid material adverse economic, legal or regulatory consequences, (ii) the appointment is at the request of the Borrower or (iii) the appointment is required by law.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders appoint a successor Agent meeting the qualifications set forth

above *provided* that if the Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Collateral Agent on behalf of the Lenders under any of the Loan Documents, the retiring Collateral Agent shall continue to hold such collateral security as nominee until such time as a successor Collateral Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through an Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this paragraph.  Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this paragraph).  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article IX, Sections 10.04 and 10.05 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Agent-Related Persons in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent.

Section 9.07.    <u>Non-Reliance on Agent and Other Lenders</u>.

Each Lender acknowledges that it has, independently and without reliance upon any Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender further represents and warrants that it has reviewed the Company Materials and each other document made available to it on the Platform in connection with this Agreement and has acknowledged and accepted the terms and conditions applicable to the recipients thereof.  Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.  Notwithstanding anything herein to the contrary, each Lender also acknowledges that the Liens and security interests granted pursuant to the Security Documents and the exercise of any right or remedy by the Collateral Agent thereunder are subject to the provisions of the Intercreditor Agreements.  In the event of any conflict between the terms of the Intercreditor Agreements and the Security Documents, the terms of the Intercreditor Agreements shall govern and control.

Section 9.08.    <u>Indemnification of Agents</u>.

Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand each Agent-Related Person (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan Party to do so), pro rata, and hold harmless each Agent-Related Person from and against any and all Indemnified Liabilities incurred by it; *provided* that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting from such Agent-Related Person's own gross negligence or willful misconduct, as determined by the final judgment of a court of competent jurisdiction; *provided* that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 9.08.  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 9.08 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.  Without limitation of the foregoing, each Lender shall reimburse each of the Administrative Agent and the

Collateral Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including Attorney Costs) incurred by the Administrative Agent or the Collateral Agent, as the case may be, in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent or the Collateral Agent, as the case may be, is not reimbursed for such expenses by or on behalf of the Loan Parties.  The undertaking in this Section 9.08 shall survive termination of the Commitments, the payment of all other Obligations and the resignation of the Administrative Agent or the Collateral Agent, as the case may be.

Section 9.09.    <u>Withholding Tax</u>.

To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax.  Without limiting or expanding the provisions of Section 3.01, each Lender shall, and does hereby, indemnify the Administrative Agent against, and shall make payable in respect thereof within thirty (30) days after demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the Internal Revenue Service or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold tax from amounts paid to or for the account of any Lender for any reason (including, without limitation, because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of, withholding tax ineffective).  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 9.09 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

Section 9.10.    <u>No Other Duties, Etc.</u>

Anything herein to the contrary notwithstanding, none of the Joint Lead Arrangers, the Syndication Agent or the Co-Documentation Agents listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent, the Collateral Agent or a Lender.

Section 9.11.    <u>Agents in Their Individual Capacities</u>.

UBS AG, Stamford Branch and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire Equity Interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with the Borrower and their respective Affiliates as though UBS AG, Stamford Branch were not the Administrative Agent or the Collateral Agent hereunder and without notice to or consent of the Lenders.  The Lenders acknowledge that, pursuant to such activities, UBS AG, Stamford Branch or its Affiliates may receive information regarding the Borrower or their respective Affiliates (including information that may be subject to confidentiality obligations in favor of any the Borrower or such Affiliate) and acknowledge that neither the Administrative Agent nor the Collateral Agent shall be under any obligation to provide such information to them.  With respect to its Loans, UBS AG, Stamford Branch and its Affiliates shall have the same rights and powers under this Agreement as any other Lender and may exercise such rights and powers as

though it were not the Administrative Agent or the Collateral Agent, and the terms "Lender" and "Lenders" include UBS AG, Stamford Branch in its individual capacity.  Any successor to UBS AG, Stamford Branch as the Administrative Agent or the Collateral Agent shall also have the rights attributed to UBS AG, Stamford Branch under this paragraph.

Section 9.12.    <u>Collateral and Guaranty Matters</u>.

(a)    The Lenders irrevocably agree:

(A)    on the Term Loan Escrow Release Date, the Escrow Borrower will be released from all of the Obligations and the Liens on the Term Loan Escrow Account and the Term Loan Escrow Collateral shall be released; and

(B)    from and after the Term Loans Escrow Release Date:

(i)    Subject to the First Lien Intercreditor Agreement, Liens on Collateral securing the Term Loan will be automatically and unconditionally released

(A)    as to any property or asset (including Capital Stock of a Subsidiary of the Company), to enable the Company, the Borrower and the Pledgors to consummate the disposition of such property or asset to the extent not prohibited by clause (E) below or under Section 7.02 or Section 7.04;

(B)    to release Excess Proceeds and Collateral Excess Proceeds (each as defined in the Senior Notes Indenture) to the Borrower that remain unexpended after the conclusion of an Asset Sale Offer or a Collateral Asset Sale Offer (each as defined in the Senior Notes Indenture) conducted in accordance with the Senior Notes Indenture and not required to be made a part of the Collateral;

(C)    in respect of the property and assets of a Pledgor, upon the designation of such Pledgor to be an Unrestricted Subsidiary in accordance with Section 7.02 and the definition of "Unrestricted Subsidiary";

(D)    in respect of the property and assets of a Guarantor upon release of the Guaranty of such Guarantor;

(E)    in the case of the property and assets of a specific Pledgor, upon such Pledgor making a Transfer of such assets to any Restricted Subsidiary of the Borrower that is not a Pledgor; *provided* that (1) such Transfer is not subject to Section 7.07 and (2) the aggregate net book value of the assets of Restricted Subsidiaries that are at any time Collateral (excluding cash proceeds of accounts receivable, inventory and related assets) that are so transferred pursuant to this clause (E) subsequent to the Term Loan Escrow Release Date shall not exceed 5% of the Consolidated Net Tangible Assets of the Borrower and its Restricted Subsidiaries per year and shall not be in an amount that will result in an Excluded Subsidiary ceasing to qualify as an Excluded Subsidiary in accordance with the definition thereof; *provided further*, that Liens on all property and assets of any Subsidiary of Lyondell Europe Holdings, Inc., a Delaware corporation, will be automatically and unconditionally released upon any transfer of such Subsidiary;

(F)    as permitted under Section 10.01;

(G)    as to the pledge of Capital Stock of first-tier Foreign Subsidiaries, in connection with a reorganization, change or modification of the direct or indirect ownership of Foreign Subsidiaries by the Company, the Borrower or a Pledgor, as applicable, in compliance with this Agreement, a release may be obtained as to such Capital Stock in connection with the substitution of pledge of 65% of the voting Capital Stock and 100% of the non-voting Capital Stock of any one or more new or replacement first-tier Foreign Subsidiaries pursuant to valid Security Documents; or

(H)    upon termination of the Aggregate Commitments and payment in full of all Credit Agreement Obligations (other than contingent indemnification obligations not yet accrued and payable).

(ii)    to release or subordinate any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document to the holder of any Lien on such property that is permitted under clauses (16) and (23) of the definition of "Permitted Liens";

(iii)    that any Guarantor shall be automatically released from its obligations under the Guaranty (A) upon termination of the Aggregate Commitments and payment in full of all Credit Agreement Obligations (other than contingent indemnification obligations not yet accrued and payable) or (B) if such Person ceases to be a Restricted Subsidiary or becomes an Excluded Subsidiary as a result of a transaction or designation permitted hereunder; *provided* that no such release shall occur if such Guarantor continues to be a guarantor in respect of any Junior Financing or the ABL Facility; and

(iv)    to release any Lien on any pipeline easement and other similar Real Property granted to or held by the Administrative Agent or the Collateral Agent under any Loan Document in connection with an Asset Sale of pipeline easements pursuant to clause (f) of the definition of "Asset Sale" subject to and in accordance with the following:

(A)    the Administrative Agent and Collateral Agent have been furnished evidence satisfactory to them that the swap of assets contemplated in clause (f) of the definition of "Asset Sale" relating to the release being requested satisfies the requirements of clause (f) of the definition of "Asset Sale" and

(B)    in connection with such disposition and as a condition to the granting of such release, (I) the Loan Party acquiring the new pipeline easements and other similar Real Property has obtained titled to such Real Property, (II) the Collateral Agent has received a Mortgage duly executed and delivered by such Loan Party with respect to such Real Property, such Mortgage being free of any Liens except as expressly permitted by Section 7.06, and (III) such Loan Party has delivered to the Administrative Agent and the Collateral Agent such existing surveys, existing abstracts, certificates, title documents, existing appraisals, legal opinions and other documents as the Administrative Agent may reasonably request in good faith with respect to any such Real Property.

Upon request by the Administrative Agent or the Collateral Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's or the Collateral Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 9.12. In each case as specified in this Section 9.12, the Administrative Agent or the Collateral Agent will (and each Lender irrevocably authorizes the Administrative Agent and the Collateral Agent to), at the Borrower's expense, execute and

deliver to the applicable Loan Party such documents as the Borrower may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Security Documents, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.12.

(b)      (i) In this clause (b):

(A)      "**Collateral Agent Claim**" means any amount which a Loan Party owes to the Collateral Agent under this clause; and

(B)      "**Secured Party Claim**" means any amount which a Loan Party owes to a Secured Party under or in connection with the Loan Documents.

(ii)      Unless expressly provided to the contrary in any Loan Document, the Collateral Agent holds:

(A)      the benefit of any Collateral Agent Claims; and

(B)      any proceeds of security,

for the benefit, and as the property, of the Secured Parties and so that they are not available to the personal creditors of the Collateral Agent.

(iii)      The Collateral Agent will separately identify in its records the property rights referred to in paragraph (ii) above.

(iv)      Paragraphs (ii) to (iii) above do not apply to any security created by a Security Document governed by Dutch law.

(v)      Each Loan Party must pay the Collateral Agent, as an independent and separate creditor, an amount equal to each Secured Party Claim on its due date.

(vi)      The Collateral Agent may enforce performance of any Collateral Agent Claim in its own name as an independent and separate right.  This includes any suit, execution, enforcement of security, recovery of guarantees and applications for and voting in respect of any kind of insolvency proceeding.

(vii)      Each Secured Party must, at the request of the Collateral Agent, perform any act required in connection with the enforcement of any Collateral Agent Claim.  This includes joining in any proceedings as co-claimant with the Collateral Agent.

(viii)      Unless the Collateral Agent fails to enforce a Collateral Agent Claim within a reasonable time after its due date, a Secured Party may not take any action to enforce the corresponding Secured Party Claim unless it is requested to do so by the Collateral Agent.

(ix)      Discharge by a Loan Party of a Secured Party Claim will discharge the corresponding Collateral Agent Claim in the same amount.

(x)      Discharge by a Loan Party of a Collateral Agent Claim will discharge the corresponding Secured Party Claim in the same amount.

(xi)    The aggregate amount of the Collateral Agent Claims will never exceed the aggregate amount of Secured Party Claims.

(xii)    A defect affecting a Collateral Agent Claim against a Loan Party will not affect any Secured Party Claim.

(xiii)    A defect affecting a Secured Party Claim against a Loan Party will not affect any Collateral Agent Claim.

(xiv)    Each Collateral Agent Claim is created on the understanding that and *provided* that the Collateral Agent will:

(A)    share the benefit, including in particular the proceeds of the Collateral Agent Claim, with the other Secured Parties; and

(B)    pay those proceeds to the Secured Parties, in accordance with the Intercreditor Agreements.

(xv)    Each party agrees that the Collateral Agent:

(A)    will be the joint and several creditor (together with the relevant Secured Party) of each and every obligation of each Loan Party towards each Secured Party under this Agreement; and

(B)    will have its own independent right to demand performance by each Loan Party of those obligations.

(xvi)    Discharge by a Loan Party of any obligation owed to the Collateral Agent or another Secured Party shall, to the same extent, discharge the corresponding obligation owing to the other.

(xvii)    Without limiting or affecting the Collateral Agent's rights against each Loan Party (whether under this paragraph or under any other provision of the Loan Documents), the Collateral Agent agrees with each other Secured Party (on a several and divided basis) that, subject to the paragraph below, it will not exercise its rights as joint and several creditor with a Secured Party except in accordance with the Intercreditor Agreements.

Nothing in this clause (b) shall in any way limit the Collateral Agent's right to act in the protection or preservation of rights under or to enforce any Security Document or the Guarantee Agreement as contemplated by this Agreement and/or the relevant Security Document (or to do any act reasonably incidental to any of the above).

(c)    The Collateral Agent may accept, without enquiry, the title (if any) a Loan Party may have to any asset over which security is intended to be created by any Security Document.

# ARTICLE X.

## Miscellaneous

Section 10.01.    Amendments, Etc.

Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and such Loan Party and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that no such amendment, waiver or consent shall:

(a)      extend or increase the Commitment of any Lender without the written consent of each Lender directly and adversely affected thereby (it being understood that a waiver of (or amendment to the terms of) any condition precedent or of any Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension or increase of any Commitment of any Lender);

(b)      postpone any date scheduled for, or reduce or forgive the amount of, any payment of principal or interest under Section 2.05 or 2.06 without the written consent of each Lender directly and adversely affected thereby (it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment of the Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest);

(c)      reduce or forgive the principal of, or the rate of interest specified herein (except in connection with the waiver of applicability of any post-default increase in interest rates (which waiver shall be effective with the consent of the Required Lenders)) on, any Loan or any fees or other amounts payable hereunder or under any other Loan Document (or change the timing of payments of such fees or other amounts) without the written consent of each Lender holding such Loan or to whom such fee or other amount is owed;

(d)      change any provision of this Section 10.01, the definition of "Required Lenders," or "Pro Rata Share" or Section 8.03 without the written consent of each Lender directly and adversely affected thereby;

(e)      release all or substantially all of the Collateral in any transaction or series of related transactions (for the avoidance of doubt no transaction permitted by Section 7.05 shall be deemed a release of all or substantially all of the Collateral) without the written consent of each Lender;

(f)      release all or substantially all of the aggregate value of the Guaranties (for the avoidance of doubt no release of Guaranties permitted by the terms of this Agreement shall be deemed a release of all or substantially all of the aggregate value of the Guaranties) without the written consent of each Lender;

(g)      make any change to, or extend the time for performance under, the conditions described in Section 4.02 without the consent of 75% of the sum of the Total Outstandings and aggregate unused Commitments; *provided* that the unused Commitment of, and the purportion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of such 75% consenting proportion;

and *provided further* that (i) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent or the Collateral Agent, as applicable, in addition to the Lenders required above,

affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent or the Collateral Agent, as applicable, under this Agreement or any other Loan Document and (ii) Section 10.07(h) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification.

Notwithstanding the foregoing, subject to Section 2.12, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Loans and the accrued interest and fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders.

In addition, notwithstanding the foregoing, this Agreement may be amended with the written consent of the Administrative Agent, the Borrower and the Lenders providing the relevant Replacement Loans, to permit the refinancing of all outstanding Loans (any such refinanced Loans, "**Refinanced Loans**"), with one or more term loans denominated in Dollars, (any such replacement Loans, "**Replacement Loans**"); *provided* that (a) the aggregate principal amount of such Replacement Loans shall not exceed the aggregate principal amount of the corresponding tranche of Refinanced Loans, (b) the Applicable Rate for such Replacement Loans shall not be higher than the Applicable Rate for the corresponding tranche of Refinanced Loans, (c) the Weighted Average Life to Maturity of such Replacement Loans, shall not be shorter than the Weighted Average Life to Maturity of the Refinanced Loans at the time of such refinancing (except to the extent of nominal amortization for periods where amortization has been eliminated as a result of prepayment of the applicable Loans) and (d) all other terms applicable to such Replacement Loans shall be substantially identical to, or no less favorable to the Lenders providing such Replacement Loans than those applicable to the corresponding tranche of Refinanced Loans, except to the extent necessary to provide for covenants and other terms applicable to any period after the latest final maturity of the corresponding tranche of Loans in effect immediately prior to such refinancing.

Section 10.02.   Notices and Other Communications; Facsimile Copies.

(a)     *General*.  Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Loan Document shall be in writing (including by facsimile transmission or other form of electronic communication).  All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)     if to the Borrower or the Administrative Agent or the Collateral Agent, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 10.02 or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties; and

(ii)     if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the Borrower and the Administrative Agent or the Collateral Agent.

All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii)(A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, four (4) Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail (which form of delivery is subject to the provisions of Section 10.02(c)), when delivered; *provided* that notices and other communications to the Administrative Agent and the Collateral Agent pursuant to Article II shall not be effective until actually received by such Person.  In no event shall a voice mail message be effective as a notice, communication or confirmation hereunder.

(b)      *Effectiveness of Facsimile Documents and Signatures*.  Loan Documents may be transmitted and/or signed by facsimile or other form of electronic communication.  The effectiveness of any such documents and signatures shall, subject to applicable Law, have the same force and effect as manually signed originals and shall be binding on all Loan Parties, the Agents and the Lenders.

(c)      *Reliance by Agents and Lenders*.  The Administrative Agent, the Collateral Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify each Agent-Related Person and each Lender from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower in the absence of gross negligence or willful misconduct.  All telephonic notices to the Administrative Agent or Collateral Agent may be recorded by the Administrative Agent or the Collateral Agent, and each of the parties hereto hereby consents to such recording.

Section 10.03.   No Waiver; Cumulative Remedies.

No failure by any Lender or the Administrative Agent or the Collateral Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by applicable Law.

Section 10.04.   Attorney Costs and Expenses.

The Borrower agrees (a) if the Closing Date occurs, to pay or reimburse the Administrative Agent, the Collateral Agent and the Joint Lead Arrangers for all reasonable invoiced out-of-pocket costs and expenses (other than Indemnified Taxes or Excluded Taxes, which are governed by Section 3.01) incurred in connection with the preparation, negotiation, syndication and execution of this Agreement and the other Loan Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including all Attorney Costs, and (b) if the Term Loan Escrow Release Date occurs, to pay or reimburse the Administrative Agent, the Collateral Agent, the Joint Lead Arrangers and each Lender for all invoiced out-of-pocket costs and expenses incurred in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of any rights or remedies under this Agreement or the other Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including all respective Attorney Costs of counsel to

the Administrative Agent and the Collateral Agent); *provided* that, such costs and expenses incurred in connection with the enforcement of the Commitment Fee obligations shall be reimbursed by the Borrower without the requirement that the Term Loan Escrow Release Date occur.  The foregoing costs and expenses shall include all reasonable search, filing, recording and title insurance charges and fees related thereto, and other (reasonable, in the case of Section 10.04(a)) out-of-pocket expenses incurred by any Agent.  The agreements in this Section 10.04 shall survive the termination of the Aggregate Commitments and repayment of all other Obligations.  All amounts due under this Section 10.04 shall be paid promptly after receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail.  If any Loan Party fails to pay when due any costs, expenses, or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its sole discretion.

Section 10.05.   Indemnification by the Borrower.

Whether or not the transactions contemplated hereby are consummated, the Borrower shall indemnify and hold harmless each Joint Lead Arranger, Joint Bookrunner, Agent-Related Person, each Lender and their respective Affiliates, and directors, officers, partners, employees, counsel, agents, trustees, investment advisors and attorneys-in-fact of each of the foregoing (collectively, the "**Indemnitees**") from and against any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (including attorney costs) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (a) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (b) any Commitment or Loan or the use or proposed use of the proceeds therefrom, or (c) any actual or alleged presence or Release of Hazardous Materials on, at, under or from any property or facility currently or formerly owned, leased or operated by the Loan Parties or any Subsidiary, or any Environmental Liability related in any way to the Loan Parties or any Subsidiary, or (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) and regardless of whether any Indemnitee is a party thereto (all the foregoing, collectively, the "**Indemnified Liabilities**"), in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee or of any affiliate, director, officer, partner, employee, agent or attorney-in-fact of such Indemnitee, as determined by the final judgment of a court of competent jurisdiction.  No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement, nor shall any Indemnitee or the Borrower or any Subsidiary have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date). In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, any Subsidiary of any Loan Party, any Loan Party's directors, stockholders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents are consummated.  All amounts due under this Section 10.05 shall be paid within ten (10) Business Days after demand therefor; *provided, however*, that such Indemnitee shall promptly refund such amount to the extent that there is a final judicial or arbitral determination that such Indemnitee was

not entitled to indemnification rights with respect to such payment pursuant to the express terms of this Section 10.05. The agreements in this Section 10.05 shall survive the resignation of the Administrative Agent or the Collateral Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations. This Section 10.05 shall not apply with respect to any Taxes (including Indemnified Taxes or any Other Taxes indemnifiable under Section 3.01) other than Taxes that represent liabilities, obligations, losses, damages, etc. arising from any non-Tax claim excluding Taxes for which the Indemnitee has been indemnified under Section 3.01.

Section 10.06. <u>Payments Set Aside</u>.

To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall, to the fullest extent possible under provisions of applicable Law, be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, <u>plus</u> interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Federal Funds Rate from time to time in effect.

Section 10.07. <u>Successors and Assigns</u>.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (except as permitted by Section 7.04) and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee pursuant to an assignment made in accordance with the provisions of Section 10.07(b) (an "**Assignee**"), (ii) by way of participation in accordance with the provisions of Section 10.07(e), (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.07(g) or (iv) to an SPC in accordance with the provisions of Section 10.07(h) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 10.07(e) and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i) Subject to the conditions set forth in paragraphs (b)(ii) below, any Lender may assign to one or more Assignees, after consultation with (but not the consent of) the Borrower (*provided* that no such consultation of the Borrower shall be required for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund or, if an Event of Default under Section 8.01(a), (f) or (g) has occurred and is continuing, any Assignee), all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of the Administrative Agent.

(ii)         Assignments shall be subject to the following additional conditions:

(A)         except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent), shall be in a minimum amount of $500,000, and shall be in increments of $500,000, in excess thereof unless each of the Borrower (*provided* that no such consent of the Borrower shall be required if an Event of Default under Section 8.01(a), (f) or (g) has occurred and is continuing) and the Administrative Agent otherwise consents, *provided* that such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

(B)         the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; *provided* that only one such fee shall be payable in the event of simultaneous assignments to or from two (2) or more Approved Funds;

(C)         the Assignee, if it shall not be a Lender (or the Borrower in connection with acquisitions or repurchases of Loans by the Borrower pursuant to Purchase Offers under Section 2.13), shall deliver to the Administrative Agent an Administrative Questionnaire; and

(D)         no assignments shall be made to the Company or any of its Subsidiaries, other than acquisitions or repurchases of Loans by the Borrower pursuant to Section 2.13.

This paragraph (b) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Term Loan Facilities on a non-pro rata basis among such Term Loan Facilities.

(c)         Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 10.07(d) (other than in connection with the acquisition or repurchase of Loans by the Borrower pursuant to Section 2.13), from and after the effective date specified in each Assignment and Assumption, the Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment).  Upon request, and the surrender by the assigning Lender of its Note, if any, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph (c) or paragraph (d) below shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.07(e).

(d)         The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and related interest amounts) of the Loans, owing to, each Lender pursuant to

the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Agent, at any reasonable time and from time to time upon reasonable prior notice.  This Section 10.07(d) shall be construed so that the obligations under this Agreement and the Loan Documents are at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Code and any related regulations (or any other relevant or successor provisions of the Code or such regulations).

(e)     Any Lender may at any time, sell participations to any Person (other than a natural Person) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or the other Loan Documents; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in clauses (a) through (c) and (e) through (f) of the first proviso to Section 10.01 that requires the affirmative vote of such Lender.  Subject to Section 10.07(f), the Borrower agree that each Participant shall be entitled to the benefits (subject to the requirements and limitations, including requirements to provide any applicable forms under Section 3.01) of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.07(c).  To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.09 as though it were a Lender; *provided* that such Participant agrees to be subject to Sections 2.09(b) and 2.11 as though it were a Lender.  Each Lender that sells a participation with respect to a Commitment or Loan to the Borrower shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and related interest amounts) of each Participant's interest in the Commitment and/or Loan (the "**Participant Register**").  The entries in the Participant Register shall be conclusive, absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  Such Lender shall permit the Loan Parties to review such information as reasonably needed for Borrower to comply with its obligations under this Agreement or under any applicable law.

(f)     Notwithstanding anything to the contrary herein, a Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant unless the participation was made with the Borrower's prior written consent (not to be unreasonably withheld or delayed).

(g)     Any Lender may, without the consent of the Borrower or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section 10.07 shall not apply to any such pledge or assignment of a security interest; *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.  In order to facilitate such pledge or assignment or for any other reason, the Borrower hereby agree that,

upon request of any Lender at any time and from time to time after the Borrower has made its initial
borrowing hereunder, the Borrower shall provide to such Lender, at the Borrower's own expense, a
promissory note, substantially in the form of Exhibit B-1 or B-2, as applicable, to this Agreement,
evidencing the Loans, owing to such Lender.  Notwithstanding anything to the contrary contained herein,
any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle identified as such in
writing from time to time by the Granting Lender to the Administrative Agent and the Company (an
"**SPC**") the option to provide all or any part of any Loan that such Granting Lender would otherwise be
obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a
commitment by any SPC to fund any Loan, and (ii) if an SPC elects not to exercise such option or
otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such
Loan pursuant to the terms hereof.  Each party hereto hereby agrees that (i) an SPC shall be entitled to the
benefits of Sections 3.01, 3.04 and 3.05 (subject to the requirements and limitations therein, including
requirements to provide any applicable forms under Section 3.01), but neither the grant to any SPC nor
the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or
change the obligations of the Borrower under this Agreement (including its obligations under
Section 3.01, 3.04 and 3.05), (ii) no SPC shall be liable for any indemnity or similar payment obligation
under this Agreement for which a Lender would be liable, (iii) the Granting Lender shall for all purposes,
including the approval of any amendment, waiver or other modification of any provision of any Loan
Document, remain the lender of record hereunder and (iv) the Granting Lender shall keep a register
substantially in the form of Participant Register described above of each SPC which has funded all or any
part of any Loan that such Lender would have otherwise been obligated to make to the Borrower pursuant
to this Agreement.  The making of a Loan by an SPC hereunder shall utilize the Commitment of the
Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.
Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without
prior consent of the Company and the Administrative Agent and with the payment of a processing fee of
$3,500, assign all or any portion of its right to receive payment with respect to any Loan to the Granting
Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of
Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or
liquidity enhancement to such SPC.

(h)     Notwithstanding anything to the contrary contained herein, without the consent of the
Borrower or the Administrative Agent, (1) any Lender may in accordance with applicable Law create a
security interest in all or any portion of the Loans owing to it and the Note, if any, held by it and (2) any
Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the
Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as
security for such obligations or securities; *provided* that unless and until such trustee actually becomes a
Lender in compliance with the other provisions of this Section 10.07, (i) no such pledge shall release the
pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be
entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may
have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(i)     (A) Notwithstanding the definition of "Assignee" or anything else to the contrary
contained in this Agreement, any Lender may assign all or a portion of its Loans to any Person who, after
giving effect to such assignment, would be an Affiliated Lender (with the consent of Administrative
Agent (not to be unreasonably withheld or delayed)); *provided* that:

(i)     the assigning Lender and the Affiliated Lender purchasing such Lender's
Loans shall execute and deliver to Administrative Agent an assignment agreement substantially
in the form of Exhibit J hereto (an "**Affiliated Lender Assignment Agreement**"); and

(ii)        at the time of such assignment on a *pro forma* basis after giving affect to such assignment, the aggregate principal amount of all Loans held by Affiliated Lenders shall not exceed 25% of the aggregate principal amount of all Term Loans outstanding under this Agreement.

(B)        Notwithstanding anything to the contrary in this Agreement, no Affiliated Lender shall have any right to (i) attend (including by telephone) any meeting or discussions (or portion thereof) among Administrative Agent or any Lender to which representatives of the Loan Parties are not invited, (ii) receive any information or material prepared by Administrative Agent or any Lender or any communication by or among Administrative Agent and/or one or more Lenders, except to the extent such information or materials have been made available to any Loan Party or its representatives or (iii) make or bring (or participate in, other than as a passive participant in or recipient of its pro rata benefits of) any claim, in its capacity as a Lender, against any Agent or any other Lender with respect to any duties or obligations or alleged duties or obligations of such Agent or any other such Lender under the Loan Documents.

(C)        Notwithstanding anything in Section 10.01 or the definition of "Required Lenders" to the contrary, for purposes of determining whether the Required Lenders, all affected Lenders or all Lenders have (A) consented (or not consented) to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Loan Document or any departure by any Loan Party therefrom, (B) otherwise acted on any matter related to any Loan Document, or (C) directed or required the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Loan Document, an Affiliated Lender shall be deemed to have voted its interest as a Lender without discretion in the same proportion as the allocation of voting with respect to such matter by Lenders who are not Affiliated Lenders; *provided* that no amendment, modification, waiver, consent or other action with respect to any Loan Document shall deprive such Affiliated Lender of its Pro Rata Share of any payments to which such Affiliated Lender is entitled under the Loan Documents without such Affiliated Lender providing its consent; *provided*, *further*, that such Affiliated Lender shall have the right to approve any amendment, modification, waiver or consent of the type described in Section 10.01(a), (b), (c) or (d) of this Agreement to the extent that such Affiliated Lender is directly and adversely affected thereby; and in furtherance of the foregoing, (x) the Affiliated Lender agrees to execute and deliver to the Administrative Agent any instrument reasonably requested by the Administrative Agent to evidence the voting of its interest as a Lender in accordance with the provisions of this Section 10.07(i); *provided* that if the Affiliated Lender fails to promptly execute such instrument such failure shall in no way prejudice any of the Administrative Agent's rights under this paragraph and (y) the Administrative Agent is hereby appointed (such appointment being coupled with an interest) by the Affiliated Lender as the Affiliated Lender's attorney-in-fact, with full authority in the place and stead of the Affiliated Lender and in the name of the Affiliated Lender, from time to time in Administrative Agent's discretion to take any action and to execute any instrument that Administrative Agent may deem reasonably necessary to carry out the provisions of this paragraph (i)(C).

Section 10.08.    Confidentiality.

Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information, except that Information may be disclosed (a) to its Affiliates and its and its Affiliates' directors, officers,

employees, trustees, investment advisors and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential) solely for purposes of this Agreement and the Transactions contemplated hereby; (b) to the extent requested by any Governmental Authority; (c) to the extent required by applicable Law or regulations or by any subpoena or similar legal process; (d) to any other party to this Agreement; (e) subject to an agreement containing provisions substantially the same as those of this Section 10.08 (or as may otherwise be reasonably acceptable to the Company), to any pledgee referred to in Section 10.07(g), counterparty to a Hedging Obligation, Assignee of or Participant in, or any prospective Assignee of or Participant in, any of its rights or obligations under this Agreement; (f) with the written consent of the Company; (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 10.08; (h) to any Governmental Authority or examiner (including the National Association of Insurance Commissioners or any other similar organization) regulating any Lender; (i) to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to Loan Parties and their Subsidiaries received by it from such Lender); or (j) in connection with the exercise of any remedies hereunder, under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement or rights hereunder or thereunder.  In addition, the Agents and the Lenders may disclose the existence of this Agreement and publicly available information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Agents and the Lenders in connection with the administration and management of this Agreement, the other Loan Documents, the Commitments, and the Credit Extensions.  For the purposes of this Section 10.08, "**Information**" means all information received from the Loan Parties relating to any Loan Party or any Subsidiary or its business, other than any such information that is publicly available to any Agent or any Lender prior to disclosure by any Loan Party other than as a result of a breach of this Section 10.08; *provided* that, in the case of information received from a Loan Party after the Closing Date, such information is clearly identified at the time of delivery as confidential or is delivered pursuant to Section 6.01, 6.02 or 6.03.

Section 10.09.  Setoff.

In addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, each Lender and its Affiliates (the Administrative Agent and the Collateral Agent, in respect of any unpaid fees, costs and expenses payable hereunder) is authorized at any time and from time to time, without prior notice to the Company and the Borrower, any such notice being waived by the Company and the Borrower (on its own behalf and on behalf of each Loan Party and each of its Subsidiaries) to the fullest extent permitted by applicable Law, to setoff and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by, and other Indebtedness at any time owing by, such Lender and its Affiliates, the Administrative Agent or the Collateral Agent to or for the credit or the account of the respective Loan Parties and their Subsidiaries against any and all Obligations owing to such Lender and its Affiliates or the Collateral Agent hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not such Agent or such Lender or Affiliate shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit or Indebtedness.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application made by such Lender; *provided* that the failure to give such notice shall not affect the validity of such setoff and application.  The rights of the Administrative Agent, the Collateral Agent and each Lender under this Section 10.09 are in addition to other rights and remedies (including other rights of setoff) that the Administrative Agent, the Collateral Agent and such Lender may have.

Section 10.10.    <u>Interest Rate Limitation</u>.

Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**").  If any Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by an Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 10.11.    <u>Counterparts</u>.

This Agreement and each other Loan Document (where applicable under the relevant laws) may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery by electronic mail or telecopier of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document.  The Agents may also require that any such documents and signatures delivered by telecopier be confirmed by a manually signed original thereof; *provided* that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by telecopier.

Section 10.12.    <u>Integration</u>.

This Agreement, together with the other Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter except for any such prior agreements which by the express terms thereof survive the execution of this Agreement.  In the event of any conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control unless, in the case of such other Loan Documents governed by any Law other than a state of the United States, such control would result, such other Loan Document being invalid or unenforceable, in which case, the relevant provision of the Loan Document will prevail; *provided* that the inclusion of supplemental rights or remedies in favor of the Agents or the Lenders in any other Loan Document shall not be deemed a conflict with this Agreement.  Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

Section 10.13.    <u>Survival of Representations and Warranties</u>.

Such representations and warranties have been or will be relied upon by each Agent and each Lender, regardless of any investigation made by any Agent or any Lender or on their behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as of the time made as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

Section 10.14.    <u>Severability</u>.

If any provision of this Agreement or any other Loan Document is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement and

such other Loan Document shall not be affected or impaired thereby.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 10.15.  <u>GOVERNING LAW</u>.

THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT (OTHER THAN ANY LOAN DOCUMENT EXPRESSLY GOVERNED BY THE LAWS OF ANOTHER JURISDICTION) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

ANY LEGAL ACTION OR PROCEEDING ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, SHALL BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF SUCH STATE, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY, EACH AGENT AND EACH LENDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THOSE COURTS.  EACH LOAN PARTY, EACH AGENT AND EACH LENDER IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENTS IN THE MANNER PROVIDED FOR NOTICES (OTHER THAN TELECOPIER) IN SECTION 10.02.  NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 10.16.  <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>.

EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THE LOAN DOCUMENTS. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 10.17.  <u>Binding Effect</u>.

This Agreement shall become effective when it shall have been executed by the Loan Parties and the Administrative Agent shall have been notified by each Lender, that each such Lender, has executed it, and thereafter shall be binding upon and inure to the benefit of the Loan Parties, each Agent and each Lender and their respective successors and assigns, in each case in accordance with Section 10.07 (if applicable), and except that no Loan Party shall have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lenders except as permitted by Section 7.04.

Section 10.18.   Judgment Currency.

If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder or any other Loan Document from Dollars into another currency, the rate of exchange used shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase Dollars with such other currency on the Business Day preceding that on which final judgment is given.  The obligation of the Borrower in respect of any such sum due from it to the Administrative Agent, the Collateral Agent or the Lenders hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency (the "**Judgment Currency**") other than Dollars be discharged only to the extent that on the Business Day following receipt by the Administrative Agent or the Collateral Agent of any sum adjudged to be so due in the Judgment Currency, the Administrative Agent or the Collateral Agent may in accordance with normal banking procedures purchase Dollars with the Judgment Currency.  If the amount of Dollars so purchased is less than the sum originally due to the Administrative Agent or the Collateral Agent from the Borrower in Dollars, the Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Collateral Agent or the Person to whom such obligation was owing against such loss.  If the amount of Dollars so purchased is greater than the sum originally due to the Administrative Agent or the Collateral Agent in such currency, the Administrative Agent or the Collateral Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable Law).

Section 10.19.   Lender Action.

Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents or the Secured Hedge Agreements (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, without the prior written consent of the Administrative Agent.  The provisions of this Section 10.19 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

Section 10.20.   USA PATRIOT Act.

Each Lender that is subject to the USA PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Loan Party that, pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name, address and tax identification number of such Loan Party and other information regarding such Loan Party that will allow such Lender or the Administrative Agent, as applicable, to identify such Loan Party in accordance with the USA Patriot Act.  This notice is given in accordance with the requirements of the USA PATRIOT Act and is effective as to the Lenders and the Administrative Agent.

Section 10.21.   No Advisory or Fiduciary Responsibility.

In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees that:  (i)(A) the arranging and other services regarding this Agreement provided by the Agents and the Joint Lead Arrangers are arm's-length commercial transactions between the Company and the Borrower and their respective Affiliates, on the one hand, and the Administrative Agent and the Joint Lead Arrangers, on the other hand, (B) each Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate and (C) each Loan Party is

capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii)(A) each Agent, each Joint Lead Arranger, and each Joint Bookrunner is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Company and the Borrower or any of their respective Affiliates, or any other Person and (B) neither the Administrative Agent nor any Joint Lead Arranger nor any Joint Bookrunner has any obligation to the Company and the Borrower or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent and the Joint Lead Arrangers and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of each Loan Party and their respective Affiliates, and no Agent or Arranger has any obligation to disclose any of such interests to the Loan Parties or their respective Affiliates.  To the fullest extent permitted by law, each Loan Party hereby waives and releases any claims that it may have against the Agents and the Joint Lead Arrangers with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 10.22.   <u>Certain Dutch Matters</u>.

Any obligation, guaranty or undertaking granted or assumed by a Person incorporated or organized under the laws of The Netherlands pursuant to this Agreement or any other Loan Document shall be deemed not to be undertaken or incurred by such Person to the extent that the same would constitute unlawful financial assistance within the meaning of Section 2:207c or 2:98c of the Dutch Civil Code or any other applicable financial assistance rules under any relevant jurisdiction (the "**Prohibition**") and the provisions of this Agreement and the other Loan Documents shall be construed accordingly.  For the avoidance of doubt it is expressly acknowledged that the relevant Persons incorporated under the laws of The Netherlands will continue to guaranty and secure all such obligations which, if included, do not constitute a violation of the Prohibition.

Section 10.23.   <u>Agent for Service of Process</u>.

The Company agrees that promptly following request by the Administrative Agent it will appoint and maintain an agent reasonably satisfactory to the Administrative Agent to receive service of process in New York City.

Section 10.24.   <u>Limitation on Obligations of Lyondell Chemical</u>.

Notwithstanding anything to the contrary in this Agreement, from the Closing Date up to, but not including the Term Loan Escrow Release Date, Lyondell Chemical's obligations under this Agreement shall be limited to the obligations to (a) make the representations set forth in Article V that are applicable to Lyondell Chemical in its capacity as a Borrower, consistent with the terms thereof and at such times as required under this agreement and (b) provide the indemnifications set forth in Section 10.05, consistent with the terms thereof.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

LYONDELLBASELL INDUSTRIES N.V., as the Company

By: _____
     Name:
     Title:

LBI ESCROW CORPORATION, as the Escrow Borrower

By: _____
     Name:
     Title:

LYONDELL CHEMICAL COMPANY, as a Borrower

By: _____
     Name:
     Title:

UBS AG, STAMFORD BRANCH, as Administrative Agent, Collateral Agent and as a Lender

By: _____
     Name:
     Title:

[LENDER]


By: _____
      Name:
      Title:

**TAB 16-B**

**LBI ESCROW CORPORATION**
as Issuer

**LYONDELLBASELL INDUSTRIES N.V.**
as Company

8% Senior Secured Dollar Notes due 2017
8% Senior Secured Euro Notes due 2017

————————————

INDENTURE
Dated as of April 8, 2010

————————————

**WILMINGTON TRUST FSB**
as Trustee

# TABLE OF CONTENTS

Page

## ARTICLE I

### DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.01.    Definitions ........................................................................................... 1
SECTION 1.02.    Other Definitions ................................................................................. 44
SECTION 1.03.    Incorporation by Reference of Trust Indenture Act ............................... 45
SECTION 1.04.    Rules of Construction .......................................................................... 46

## ARTICLE II

### THE NOTES

SECTION 2.01.    Amount of Notes; Terms ...................................................................... 47
SECTION 2.02.    Form and Dating ................................................................................. 47
SECTION 2.03.    Execution and Authentication .............................................................. 49
SECTION 2.04.    Registrar and Paying Agent ................................................................. 49
SECTION 2.05.    Paying Agent to Hold Money in Trust .................................................. 50
SECTION 2.06.    Holder Lists ........................................................................................ 50
SECTION 2.07.    Transfer and Exchange ........................................................................ 50
SECTION 2.08.    Replacement Notes .............................................................................. 63
SECTION 2.09.    Outstanding Notes ............................................................................... 64
SECTION 2.10.    [Intentionally Omitted] ........................................................................ 64
SECTION 2.11.    Cancellation ........................................................................................ 64
SECTION 2.12.    Defaulted Interest ............................................................................... 64
SECTION 2.13.    CUSIP Numbers, ISINs, Etc. ............................................................... 65
SECTION 2.14.    Calculation of Principal Amount of Notes ............................................ 65

## ARTICLE III

### REDEMPTION

SECTION 3.01.    Optional Redemption ........................................................................... 65
SECTION 3.02.    Applicability of Article ........................................................................ 65
SECTION 3.03.    Notices to Trustee ............................................................................... 65
SECTION 3.04.    Selection of Notes to Be Redeemed ..................................................... 65
SECTION 3.05.    Notice of Optional Redemption ........................................................... 66
SECTION 3.06.    Effect of Notice of Redemption ........................................................... 67
SECTION 3.07.    Deposit of Redemption Price ............................................................... 67
SECTION 3.08.    Notes Redeemed in Part ...................................................................... 67
SECTION 3.09.    Special Mandatory Redemption ........................................................... 67

## ARTICLE IV

### COVENANTS

SECTION 4.01.    Payment of Notes ................................................................................ 68

Page

SECTION 4.02.____Reports and Other Information ................................................................ 68
SECTION 4.03.____Limitation on Incurrence of Indebtedness and Issuance of Disqualified
                            Stock and Preferred Stock ............................................................ 70
SECTION 4.04.____Limitation on Restricted Payments .......................................................... 77
SECTION 4.05.____Dividend and Other Payment Restrictions Affecting Subsidiaries ........... 83
SECTION 4.06.____Asset Sales............................................................................................... 85
SECTION 4.07.____Transactions with Affiliates ..................................................................... 89
SECTION 4.08.____Change of Control .................................................................................... 91
SECTION 4.09.____Compliance Certificate............................................................................. 93
SECTION 4.10.____Further Instruments and Acts ................................................................... 93
SECTION 4.11.____Future Subsidiary Guarantors ................................................................. 93
SECTION 4.12.____Liens......................................................................................................... 93
SECTION 4.13.____After-Acquired Property .......................................................................... 93
SECTION 4.14.____Maintenance of Office or Agency............................................................. 94
SECTION 4.15.____Covenant Suspension ............................................................................... 94
SECTION 4.16.____Maintenance of Insurance ........................................................................ 95
SECTION 4.17.____Additional Amounts ................................................................................. 95

ARTICLE V

SUCCESSOR COMPANY

SECTION 5.01.____When Issuer May Merge or Transfer Assets ........................................... 98

ARTICLE VI

DEFAULTS AND REMEDIES

SECTION 6.01.____Events of Default ................................................................................... 101
SECTION 6.02.____Acceleration............................................................................................ 102
SECTION 6.03.____Other Remedies ...................................................................................... 103
SECTION 6.04.____Waiver of Past Defaults.......................................................................... 103
SECTION 6.05.____Control by Majority ................................................................................ 103
SECTION 6.06.____Limitation on Suits................................................................................. 104
SECTION 6.07.____Rights of the Holders to Receive Payment ............................................ 104
SECTION 6.08.____Collection Suit by Trustee ..................................................................... 104
SECTION 6.09.____Trustee May File Proofs of Claim .......................................................... 104
SECTION 6.10.____Priorities ................................................................................................ 104
SECTION 6.11.____Undertaking for Costs ............................................................................ 105
SECTION 6.12.____Waiver of Stay or Extension Laws ......................................................... 105

ARTICLE VII

TRUSTEE AND AGENTS

SECTION 7.01.____Duties of Trustee and Agents .................................................................. 105
SECTION 7.02.____Rights of Trustee and Agents .................................................................. 107
SECTION 7.03.____Individual Rights of Trustee ................................................................... 108
SECTION 7.04.____Trustee's and Agents' Disclaimer............................................................ 108
SECTION 7.05.____Notice of Defaults................................................................................... 109

Page

SECTION 7.06.  Reports by Trustee to the Holders ........................................................ 109
SECTION 7.07.  Compensation and Indemnity .............................................................. 109
SECTION 7.08.  Replacement of Trustee and Agents ..................................................... 110
SECTION 7.09.  Successor Trustee or Agent by Merger ................................................ 111
SECTION 7.10.  Eligibility; Disqualification ................................................................. 111
SECTION 7.11.  Preferential Collection of Claims Against the Issuer ........................... 111
SECTION 7.12.  Escrow Authorization........................................................................... 111
SECTION 7.13.  Payment of Parallel Debt Pursuant to Dutch Law ............................... 112


ARTICLE VIII

DISCHARGE OF INDENTURE; DEFEASANCE

SECTION 8.01.  Discharge of Liability on Notes; Defeasance ...................................... 113
SECTION 8.02.  Conditions to Defeasance ..................................................................... 114
SECTION 8.03.  Application of Trust Money .................................................................. 115
SECTION 8.04.  Repayment to Issuer ............................................................................. 115
SECTION 8.05.  Indemnity for Government Obligations ................................................ 115
SECTION 8.06.  Reinstatement ....................................................................................... 115


ARTICLE IX

AMENDMENTS AND WAIVERS

SECTION 9.01.  Without Consent of the Holders ........................................................... 116
SECTION 9.02.  With Consent of the Holders ................................................................ 117
SECTION 9.03.  Compliance with Trust Indenture Act .................................................. 118
SECTION 9.04.  Revocation and Effect of Consents and Waivers.................................. 118
SECTION 9.05.  Notation on or Exchange of Notes ....................................................... 119
SECTION 9.06.  Trustee to Sign Amendments ............................................................... 119
SECTION 9.07.  Additional Voting Terms; Calculation of Principal Amount................. 119


ARTICLE X

RANKING OF NOTE LIENS

SECTION 10.01.  Relative Rights .................................................................................... 119


ARTICLE XI

COLLATERAL

SECTION 11.01.  Security Documents ............................................................................ 121
SECTION 11.02.  Collateral Agent.................................................................................. 121
SECTION 11.03.  Authorization of Actions to Be Taken ................................................ 122
SECTION 11.04.  Release of Collateral ........................................................................... 123
SECTION 11.05.  Filing, Recording and Opinions.......................................................... 125
SECTION 11.06.  [Intentionally Omitted.]...................................................................... 126
SECTION 11.07.  Powers Exercisable by Receiver or Trustee ....................................... 126
SECTION 11.08.  Release upon Termination of the Issuer's Obligations ........................ 126

                                                                                                                      Page

SECTION 11.09.    Designations .............................................................................................................. 126


ARTICLE XII

GUARANTEE

SECTION 12.01.    Guarantee ................................................................................................................... 126
SECTION 12.02.    Limitation on Liability ............................................................................................... 129
SECTION 12.03.    Successors and Assigns .............................................................................................. 130
SECTION 12.04.    No Waiver .................................................................................................................. 130
SECTION 12.05.    Modification ............................................................................................................... 130
SECTION 12.06.    Execution of Supplemental Indenture for Future Note Guarantors ....................... 130
SECTION 12.07.    Non-Impairment ........................................................................................................ 130


ARTICLE XIII

MISCELLANEOUS

SECTION 13.01.    Trust Indenture Act Controls.................................................................................... 130
SECTION 13.02.    Notices ....................................................................................................................... 130
SECTION 13.03.    Communication by the Holders with Other Holders............................................... 132
SECTION 13.04.    Certificate and Opinion as to Conditions Precedent ............................................... 132
SECTION 13.05.    Statements Required in Certificate or Opinion....................................................... 132
SECTION 13.06.    When Notes Disregarded........................................................................................... 132
SECTION 13.07.    Rules by Trustee, Paying Agent and Registrar ....................................................... 133
SECTION 13.08.    Legal Holidays .......................................................................................................... 133
SECTION 13.09.    GOVERNING LAW.................................................................................................. 133
SECTION 13.10.    No Recourse Against Others .................................................................................... 133
SECTION 13.11.    Successors .................................................................................................................. 133
SECTION 13.12.    Multiple Originals..................................................................................................... 133
SECTION 13.13.    Table of Contents; Headings .................................................................................... 133
SECTION 13.14.    Indenture Controls .................................................................................................... 133
SECTION 13.15.    Severability................................................................................................................ 133
SECTION 13.16.    Intercreditor Agreements.......................................................................................... 133
SECTION 13.17.    PATRIOT Act........................................................................................................... 134
SECTION 13.18.    Force Majeure............................................................................................................ 134

EXHIBIT INDEX

Exhibit A-1        Form of Dollar Note
Exhibit A-2        Form of Euro Note
Exhibit B          Form of Certificate of Transfer
Exhibit C          Form of Certificate of Exchange
Exhibit D          Form of Supplemental Indenture Related to Subsidiary Guarantors
Exhibit E          Form of Supplemental Indenture Related to LCC Assumption

CROSS-REFERENCE TABLE

| TIA Section | Indenture Section |
|---|---|
| 310(a)(1) | 7.10 |
| (a)(2) | 7.10 |
| (a)(3) | N.A. |
| (a)(4) | N.A. |
| (b) | 7.08; 7.10 |
| (c) | N.A. |
| 311(a) | 7.11 |
| (b) | 7.11 |
| (c) | N.A. |
| 312(a) | 2.06 |
| (b) | 13.03 |
| (c) | 13.03 |
| 313(a) | 7.06 |
| (b)(1) | N.A. |
| (b)(2) | 7.06 |
| (c) | 7.06 |
| (d) | 4.02; 4.09 |
| 314(a) | 4.02; 4.09 |
| (b) | N.A. |
| (c)(1) | 13.04 |
| (c)(2) | 13.04 |
| (c)(3) | N.A. |
| (d) | N.A. |
| (e) | 13.05 |
| (f) | 4.10 |
| 315(a) | 7.01 |
| (b) | 7.05 |
| (c) | 7.01 |
| (d) | 7.01 |
| (e) | 6.11 |
| 316(a)(last sentence) | 13.06 |
| (a)(1)(A) | 6.05 |
| (a)(1)(B) | 6.04 |
| (a)(2) | N.A. |
| (b) | 6.07 |
| 317(a)(1) | 6.08 |
| (a)(2) | 6.09 |
| (b) | 2.05 |
| 318(a) | 13.01 |

N.A. Means Not Applicable.

Note:    This Cross-Reference Table shall not, for any purposes, be deemed to be part of this Indenture.

INDENTURE dated as of April 8, 2010 among LBI ESCROW CORPORATION, a Delaware corporation, (the "Escrow Issuer") (*provided* that (x) for purposes of this Indenture prior to the LCC Assumption (as defined herein), references to the "Issuer" in this Indenture refer only to the Escrow Issuer, and (y) for purposes of this Indenture following consummation of the LCC Assumption, references to the "Issuer" in this Indenture refer only to LYONDELL CHEMICAL COMPANY, a Delaware corporation), LYONDELLBASELL INDUSTRIES N.V., a new public limited liability company formed under the laws of The Netherlands, as the ultimate parent company of the Issuer and as the parent guarantor (the "Company"), each of the other Guarantors named herein, as guarantors, WILMINGTON TRUST FSB, as trustee (the "Trustee"), DEUTSCHE BANK TRUST COMPANY AMERICAS, as U.S. Registrar and U.S. Paying Agent (the "U.S. Paying Agent"), DEUTSCHE BANK AG, LONDON BRANCH, as Euro Paying Agent and Common Depositary (the "Euro Paying Agent") and DEUTSCHE BANK LUXEMBOURG S.A., as Euro Registrar (the "Euro Registrar").

The Issuer has duly authorized the execution and delivery of this Indenture to provide for the issuance of senior secured notes in a principal amount of (i) $2,250,000,000 aggregate principal amount of the Issuer's 8% Senior Secured Notes due 2017 issued on the date hereof (the "Initial Dollar Notes") and (ii) €375,000,000 aggregate principal amount of the Issuer's 8% Senior Secured Notes due 2017 issued on the date hereof (the "Initial Euro Notes" and together with the Initial Dollar Notes, the "Initial Notes").

## ARTICLE I

## DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.01.    Definitions.

"144A Global Note" means a Global Note substantially in the form of Exhibit A-1 or Exhibit A-2 hereto, as the case may be, bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of, and registered in the name of, the applicable Depositary or its nominee that will be issued in a denomination equal to the outstanding principal amount of the applicable series of Notes sold in reliance on Rule 144A.

"ABL Collateral Agent" means the representative(s) from time to time administering the collateral on behalf of the lenders under the ABL Facility.

"ABL Facility" means the asset based revolving credit agreement dated as of its effective date among the Issuer, Equistar Chemicals, L.P., Houston Refining L.P., LyondellBasell Acetyls LLC and each other Subsidiary of the Issuer from time to time designated as a "Borrower" thereunder, the lenders and agents party thereto and Citibank, N.A., as administrative agent, as amended, supplemented, modified, extended, restructured, renewed, restated, refinanced or replaced in whole or in part from time to time.

"ABL Facility Collateral" will consist of all present and after-acquired inventory, accounts receivable, related contracts and other rights, deposit accounts into which proceeds of the foregoing are credited and books and records related thereto, together with all proceeds of the foregoing, in each case to the extent of the rights, title and interest therein of any "Borrower" under the ABL Facility.

"ABL Obligations" means all Indebtedness and other Obligations under the ABL Facility.

"Acquired Indebtedness" means, with respect to any specified Person:

(1)       Indebtedness of any other Person existing at the time such other Person is merged, consolidated or amalgamated with or into or became a Restricted Subsidiary of such specified Person, and

(2)       Indebtedness secured by a Lien encumbering any asset at the time such asset is acquired by such specified Person.

"Additional Dollar Notes" means additional Dollar Notes (other than the Initial Dollar Notes and other than Exchange Notes issued for such Initial Dollar Notes) issued from time to time under this Indenture in accordance with Section 2.01 hereof.

"Additional Euro Notes" means additional Euro Notes (other than the Initial Euro Notes and other than Exchange Notes issued for such Initial Euro Notes) issued from time to time under this Indenture in accordance with Section 2.01 hereof.

"Additional First Lien Secured Party" means the holders of any Additional First Priority Lien Obligations, including the holders of the Notes, and any collateral agent with respect to any Additional First Priority Lien Obligations or Authorized Representative with respect thereto, including the Trustee.

"Additional First Priority Lien Obligations" means any First Priority Lien Obligations that are Incurred after the Issue Date (other than Indebtedness Incurred under the Senior Term Loan Facility) and secured by the Common Collateral on a first priority basis pursuant to the Security Documents.

"Additional Interest" means all additional interest then owing pursuant to the Registration Rights Agreement.

"Additional Notes" means Additional Dollar Notes and Additional Euro Notes.

"Affiliate" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"Agent" means any Registrar, Paying Agent, Collateral Agent or Co-Registrar, including any permitted successors or assigns thereto.

"Applicable Premium" means

(x)       with respect to any Dollar Note on any redemption date, the greater of:

(1)       1.00% of the then outstanding principal amount of the Dollar Note; and

(2)       the excess of:  (a) the present value at such redemption date of (i) the redemption price of the Dollar Note at May 1, 2013 (such redemption price being set forth in the table appearing in Section 5 of Exhibit A-1 hereto) plus (ii) all required interest payments due on the Dollar Note through May 2, 2013 (excluding accrued but unpaid in-

-2-

terest but including Additional Interest, if any), computed using a discount rate equal to the Treasury Rate as of such redemption date plus 50 basis points; over (b) the outstanding principal amount of the Dollar Note; and

(y)      with respect to any Euro Note on any redemption date, the greater of:

(1)      1.00% of the then outstanding principal amount of the Euro Note; and

(2)      the excess of:  (a) the present value at such redemption date of (i) the redemption price of the Euro Note at May 1, 2013 (such redemption price being set forth in the table appearing in Section 5 of Exhibit A-2 hereto) plus (ii) all required interest payments due on the Euro Note through May 2, 2013 (excluding accrued but unpaid interest but including Additional Interest, if any), computed using a discount rate equal to the Bund Rate as of such redemption date plus 50 basis points; over (b) the outstanding principal amount of the Euro Note

"<u>Applicable Procedures</u>" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of the applicable Depositary that apply to such transfer or exchange.

"<u>Asset Acquisition</u>" means:

(1)      an Investment by the Company or any Restricted Subsidiary of the Company in any other Person pursuant to which such Person shall become a Restricted Subsidiary of the Company or of any Restricted Subsidiary of the Company, or shall be merged with or into the Company or any Restricted Subsidiary of the Company, or

(2)      the acquisition by the Company or any Restricted Subsidiary of the Company of the assets of any Person (other than a Restricted Subsidiary of the Company) which constitute all or substantially all of the assets of such Person or comprises any division or line of business of such Person or any other properties or assets of such Person other than in the ordinary course of business.

"<u>Asset Backed Credit Facility</u>" means (i) the ABL Facility; (ii) any credit facility provided on the basis of the value of inventory, accounts receivable or other current assets (and related documents and intangibles) to the Company or any of its Subsidiaries or similar instrument; and (iii) any similar credit support agreements or guarantees Incurred from time to time, as amended, supplemented, modified, extended, restructured, renewed, restated, refinanced or replaced in whole or in part from time to time; *provided* that any credit facility that refinances or replaces an Asset Backed Credit Facility must comply with clause (ii) of this definition in order to be an Asset Backed Credit Facility; and *provided*, *further*, that, if at the time any such refinancing or replacement is necessary or advisable in the good faith judgment of the Board of Directors of the Company, and an Asset Backed Credit Facility that complies with clause (ii) of this definition is not available on terms considered commercially reasonable for facilities of this nature (as determined in the good faith judgment of the Board of Directors of the Company), then the ABL Facility may be refinanced with or replaced by any Credit Facility and such Credit Facility shall be an Asset Backed Credit Facility for purposes hereof.

"<u>Asset Sale</u>" means:

(1)      the sale, conveyance, transfer or other disposition (whether in a single transaction or a series of related transactions) of property or assets (including by way of a Sale/Leaseback

-3-

Transaction) outside the ordinary course of business of the Company or any Restricted Subsidiary of the Company (each referred to in this definition as a "<u>disposition</u>") or

(2)    the issuance or sale of Equity Interests (other than directors' qualifying shares and shares issued to foreign nationals or other third parties to the extent required by applicable law) of any Restricted Subsidiary (other than to the Company or a Restricted Subsidiary of the Company) (whether in a single transaction or a series of related transactions),

in each case other than:

(a)    a disposition of Cash Equivalents or Investment Grade Securities or redundant, surplus, obsolete, damaged or worn out property or equipment whether now owned or hereafter acquired, in the ordinary course of business;

(b)    the disposition of all or substantially all of the assets of the Company in a manner permitted pursuant to Section 5.01 or any disposition that constitutes a Change of Control;

(c)    any Restricted Payment or Permitted Investment that is permitted to be made, and is made, under Section 4.04;

(d)    any sale, conveyance or other disposition of property or assets of the Company or any Restricted Subsidiary (whether in a single transaction or a series of related transactions), including by way of a Sale/Leaseback Transaction, or issuance or sale of Equity Interests of any Restricted Subsidiary, which assets or Equity Interests so disposed or issued have an aggregate Fair Market Value of less than $50.0 million;

(e)    any disposition of property or assets, or the issuance of securities, by a Restricted Subsidiary of the Company to the Company or by the Company or a Restricted Subsidiary of the Company to a Restricted Subsidiary of the Company;

(f)    (i) any exchange of assets (including a combination of assets and Cash Equivalents) for assets related to a Similar Business of comparable or greater market value or usefulness to the business of the Company and its Restricted Subsidiaries as a whole, as determined in good faith by the Company and (ii) in the ordinary course of business, any swap of assets, or lease, assignment or sublease of any real or personal property, in exchange for services (including in connection with any outsourcing arrangements) of comparable or greater value or usefulness to the business of the Company and its Restricted Subsidiaries as a whole, as determined in good faith by the Company;

(g)    any foreclosure or any similar action with respect to any property or other asset of the Company or any of its Restricted Subsidiaries;

(h)    any sale of Equity Interests in, or other ownership interests in or assets or property, including Indebtedness, or other securities of, an Unrestricted Subsidiary;

(i)    any lease, assignment, license or sublease which does not materially interfere with the business of the Company and its Restricted Subsidiaries;

(j)    any grant of any license of patents, trademarks, know-how or any other intellectual property which does not materially interfere with the business of the Company and its Restricted Subsidiaries;

(k)      any transfer of accounts receivable and related assets of the type specified in the definition of "Receivables Financing" (or a fractional undivided interest therein) in a Qualified Receivables Financing;

(l)      any financing transaction with respect to property built or acquired by the Company or any Restricted Subsidiary after the Release Date, including any Sale/Leaseback Transaction or asset securitization permitted by this Indenture;

(m)      dispositions in connection with Permitted Liens;

(n)      any disposition of Capital Stock of a Restricted Subsidiary pursuant to an agreement or other obligation with or to a Person (other than the Company or a Restricted Subsidiary) from whom such Restricted Subsidiary was acquired or from whom such Restricted Subsidiary acquired its business and assets (having been newly formed in connection with such acquisition), made as part of such acquisition and in each case comprising all or a portion of the consideration in respect of such sale or acquisition;

(o)      dispositions of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings and exclusive of factoring or similar arrangements;

(p)      any surrender or waiver of contract rights or the settlement, release, recovery on or surrender of contract, tort or other claims of any kind;

(q)      pursuant to buy-sell arrangements or similar agreements between Lyondell China Holdings Limited of Ningbo ZRCC and Lyondell Chemical Company Ltd.; and

(r)      any sale, conveyance or other disposition of property or assets of the Company or any Restricted Subsidiary (whether in a single transaction or a series of related transactions) in connection with the Emergence Transactions.

"Authorized Representative" means (i) in the case of any Obligations under the Senior Term Loan Facility or the secured parties under the Senior Term Loan Facility, the Senior Term Loan Collateral Agent, (ii) in the case of the Obligations under the Notes or the holders of the Notes, the Collateral Agent, (iii) in the case of the ABL Facility, the ABL Collateral Agent and (iv) in the case of any Series of Additional First Priority Lien Obligations that become subject to the First Lien Intercreditor Agreement, the Authorized Representative named for such Series in the applicable joinder agreement.

"Bankruptcy Code" means the United States Bankruptcy Code, 11 U.S.C. Section 101 *et seq*., as amended from time to time.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

"Basell GmbH" means Basell Germany Holdings GmbH and any successor in interest thereto.

"Berre Facility" means any receivables-backed credit or factoring facility entered into by one or more Foreign Subsidiaries (other than Basell GmbH) related to receivables of the refinery located in Berre, France, and any permitted refinancings thereof.

"Board of Directors" means, as to any Person, the board of directors, supervisory board of such Person, or equivalent governing body (or, if such Person is a partnership or limited liability company, the board of directors or other governing body of the general partner of such Person or manager) or any duly authorized committee thereof.

"Bund Rate" means, with respect to any redemption date, the rate per annum equal to the equivalent yield to maturity as of such redemption date of the Comparable German Bund Issues, assuming a price for the Comparable German Bund Issues (expressed as a percentage of its principal amount) equal to the Comparable German Bund Price for such redemption date, where:

(a)    "Comparable German Bund Issues" means the German Bundesanleihe security selected by any Reference German Bund Dealer as having a fixed maturity most nearly equal to the period from such redemption date to May 1, 2013, and that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of euro denominated corporate debt securities in a principal amount approximately equal to the then outstanding principal amount of the Euro Notes and of a maturity most nearly equal to May 1, 2013; *provided* that if the period from such redemption date to May 1, 2013 is less than one year, a fixed maturity of one year shall be used;

(b)    "Comparable German Bund Price" means, with respect to any redemption date, the average of the Reference German Bund Dealer Quotations for such redemption date, after excluding the highest and lowest such Reference German Bund Dealer Quotations, or if the Issuer obtains fewer than four such Reference German Bund Dealer Quotations, the average of all such quotations;

(c)    "Reference German Bund Dealer" means any dealer of German Bundesanleihe securities appointed by the Trustee in consultation with the Issuer; and

(d)    "Reference German Bund Dealer Quotations" means, with respect to each Reference German Bund Dealer and any redemption date, the average as determined by the Issuer of the bid and offered prices for the Comparable German Bund Issues (expressed in each case as a percentage of its principal amount) quoted in writing to the Issuer by such Reference German Bund Dealer at 3:30 p.m. Frankfurt, Germany time on the third Business Day preceding such redemption date.

"Business Acquisition" means the acquisition by the Company or any Restricted Subsidiary of the Company of the assets of any Person (other than a Restricted Subsidiary of the Company) which constitute all or substantially all of the assets of such Person or comprises any division or line of business of such Person or any other properties or assets of such Person.

"Business Day" means a day other than a Saturday, Sunday or other day on which banking institutions are authorized or required by law to close in New York City, London or The Netherlands.

"Capital Stock" means:

(1)    in the case of a corporation, corporate stock or shares;

(2)    in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

-6-

(3)        in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)        any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"Capitalized Lease Obligation" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP.

"Cases" means the proceedings of LyondellBasell Industries AF S.C.A. and certain of its Subsidiaries and affiliates, as debtors and debtors-in-possession under Chapter 11.

"Cash Equivalents" means:

(1)        U.S. Dollars, pounds sterling, Euros, the national currency of any member state in the European Union or, in the case of any Foreign Subsidiary that is a Restricted Subsidiary, such local currencies held by it from time to time in the ordinary course of business;

(2)        securities issued or directly and fully guaranteed or insured by the U.S. government or any country that is a member of the European Union (other than Greece or Portugal) or any agency or instrumentality thereof in each case maturing not more than two years from the date of acquisition;

(3)        certificates of deposit, time deposits and Eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances, in each case with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank or trust company having capital and surplus in excess of $250.0 million and whose long-term debt is rated "A" or the equivalent thereof by Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency);

(4)        repurchase obligations and reverse repurchase obligations for underlying securities of the types described in clauses (2) and (3) above entered into with any financial institution meeting the qualifications specified in clause (3) above;

(5)        commercial paper issued by a corporation (other than an Affiliate of the Company) rated at least "A-1" or the equivalent thereof by Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) and in each case maturing within one year after the date of acquisition;

(6)        readily marketable direct obligations issued by any state of the United States of America or any political subdivision thereof having one of the two highest rating categories obtainable from either Moody's or S&P (or reasonably equivalent ratings of another internationally recognized ratings agency) in each case with maturities not exceeding two years from the date of acquisition;

(7)        Indebtedness issued by Persons (other than the Sponsors or any of their Affiliates) with a rating of "A" or higher from S&P or "A-2" or higher from Moody's (or reasonably equivalent ratings of another internationally recognized ratings agency) in each case with maturities not exceeding two years from the date of acquisition;

(8)      U.S. Dollar-denominated money market funds as defined in Rule 2a-7 of the General Rules and Regulations promulgated under the Investment Company Act of 1940;

(9)      tax-exempt floating-rate option tender bonds backed by letters of credit issued by a national or state bank whose long-term unsecured debt has a rating of AA or better by S&P or Aa2 or better by Moody's or the equivalent rating by any other internationally recognized rating agency; and

(10)     investment funds investing at least 95% of their assets in securities of the types described in clauses (1) through (9) above.

"Catalyst Sale/Leaseback Transaction" means a Sale/Leaseback Transaction that relates to a catalyst containing one or more precious metals used by the Company or any of its Restricted Subsidiaries in the ordinary course of business.

"Change of Control" means the occurrence of any of the following:

(1)      the sale, lease or transfer, in one or a series of related transactions, of all or substantially all of the assets of the Company and its Subsidiaries, taken as a whole, to any Person other than a Permitted Holder; or

(2)      the Company becomes aware of (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) the acquisition by any Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision), including any group acting for the purpose of acquiring, holding or disposing of securities (within the meaning of Rule 13d-5(b)(1) under the Exchange Act), other than the Permitted Holders, in a single transaction or in a related series of transactions, by way of acquisition, merger, amalgamation, consolidation, transfer, conveyance or other business combination or purchase of beneficial ownership (within the meaning of Rule 13d-3 under the Exchange Act, or any successor provision) of more than 50% of the total voting power of the Voting Stock of the Company.

"Chapter 11" means Chapter 11 of the Bankruptcy Code.

"Clearstream" means Clearstream Banking S.A.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means all property subject or purported to be subject, from time to time, to a Lien under any Security Documents.

"Collateral Agent" means Deutsche Bank Trust Company Americas as collateral agent under the Security Documents, together with its successors in such capacity.

"Common Collateral" means, at any time, Collateral in which the holders of two or more Series of First Priority Lien Obligations (or their respective Authorized Representatives) hold a valid and perfected security interest at such time. If more than two Series of First Priority Lien Obligations are outstanding at any time and the holders of less than all Series of First Priority Lien Obligations hold a valid and perfected security interest in any Collateral at such time, then such Collateral shall constitute Common Collateral for those Series of First Priority Lien Obligations that hold a valid security interest in such

-8-

Collateral at such time and shall not constitute Common Collateral for any Series which does not have a valid and perfected security interest in such Collateral at such time.

"Common Depositary" means Deutsche Bank AG, London Branch, as common depositary for Euroclear and Clearstream and as depositary for the Euro Notes, together with its successors in such capacity.

"Company " means LyondellBasell Industries N.V., a *naamloze vennootschap* (public limited liability corporation) formed under the laws of the Netherlands, and any successor in interest thereto.

"Consolidated EBITDA" means, with respect to any Person, for any period, the sum (without duplication) of:

(1)    Consolidated Net Income;

(2)    to the extent Consolidated Net Income has been reduced thereby;

(a)    taxes of such Person and its Restricted Subsidiaries paid or accrued in accordance with GAAP for such period based on income, profits or capital, including, without limitation, state, franchise, property and similar taxes and foreign withholding taxes (including penalties and interest related to such taxes or arising from tax examinations), or such equivalent items in any foreign jurisdiction;

(b)    Consolidated Interest Expense;

(c)    Consolidated Non-cash Charges;

(d)    the amount of net loss resulting from the payment of any premiums, fees or similar amounts that are required to be paid under the terms of the instrument(s) governing any Indebtedness upon the repayment, prepayment or other extinguishment of such Indebtedness in accordance with the terms of such Indebtedness;

(e)    any expenses or charges (other than Consolidated Non-cash Charges) related to any issuance of Equity Interests, any Investment, acquisition, disposition, recapitalization or Incurrence, repayment, amendment or modification of Indebtedness permitted to be Incurred or repaid pursuant to this Indenture (including a refinancing thereof) (in each case, whether or not successful), including, without limitation, (i) such fees, expenses or charges related to the offering of the Notes and the Credit Facility Indebtedness and other Exit Financing, (ii) any amendment or other modification of the Notes or other Indebtedness, (iii) any additional interest in respect of the Notes and (iv) commissions, discounts, yield and other fees and charges (including any interest expense) related to any Receivables Financing; and

(f)    business optimization expenses and other restructuring charges, reserves or expenses (which, for the avoidance of doubt, shall include, without limitation, the effect of inventory optimization programs, facility consolidations, retention, headcount reductions, systems establishment costs, contract termination costs, future lease commitments and excess pension charges); and

-9-

(3)      the amount of net cost savings projected by such Person in good faith to be realized by specified actions taken or to be taken prior to or during such period (calculated on a *pro forma* basis as though such cost savings had been realized on the first day of such period); *provided* that (x) such cost savings are reasonably identifiable and factually supportable and (y) such actions have been taken or are to be taken within twelve months of the date of determination to take such action and the benefit is expected to be realized within twelve months of taking such action; minus

(4)      any non-cash gains increasing Consolidated Net Income of such Person for such period (excluding (i) the recognition of deferred revenue or any items which represent the reversal of any accrual of, or cash reserve for, anticipated cash charges that reduced EBITDA in any prior period and any items for which cash was received in a prior period, (ii) items referenced in clause (e) of "Consolidated Net Income" and (iii) gains which have been offset against losses in determining Consolidated Net Income but for which the loss has not been added back as a Consolidated Non-cash Charge pursuant to the definition of "Consolidated EBITDA");

all as determined on a consolidated basis for such Person and its Restricted Subsidiaries in accordance with GAAP.

Notwithstanding anything herein to the contrary, Consolidated EBITDA for the Fiscal Quarter ending (i) June 30, 2009 shall be deemed to be $551.0 million, (ii) September 30, 2009 shall be deemed to be $757.0 million and (iii) December 31, 2009 shall be deemed to be $578.0 million, before giving *pro forma* effect to any transaction occurring after the Issue Date, as permitted under the definitions of "Fixed Charge Coverage Ratio" and "Secured Indebtedness Leverage Ratio."

"<u>Consolidated Interest Expense</u>" means, with respect to any Person for any period, the consolidated interest expense (net of interest income for such period) of such Person and its Restricted Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, to the extent such expense was deducted in computing Consolidated Net Income, including, without limitation:

(1)      amortization of original issue discount,

(2)      the interest component of Capitalized Lease Obligations paid, accrued and/or scheduled to be paid or accrued,

(3)      net payments and receipts (if any) pursuant to interest rate Hedging Obligations,

(4)      consolidated capitalized interest of such Person and its Restricted Subsidiaries for such period, whether paid or accrued, and

(5)      the interest portion of any deferred payment obligation,

but excluding, in each case, any amortization of fees, debt issuance costs and commissions incurred in connection with the Credit Facilities, any Receivables Financing, the issuance of the Notes, the Plan Roll-Up Notes, the Euro Securitization and any other debt issuance.

For purposes of this definition, interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by the Issuer to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

"Consolidated Net Income" means, with respect to any Person, for any period:

(1)        the Net Income of such Person and its Restricted Subsidiaries for such period on a consolidated basis; *plus*

(2)        cash dividends or distributions paid to such Person or any Restricted Subsidiary of such Person by any other Person (the "Payor") other than a Restricted Subsidiary, to the extent not otherwise included in Consolidated Net Income, which have not been derived from Indebtedness of the Payor to the extent such Indebtedness is Guaranteed by such referent Person or any Restricted Subsidiary of such referent Person;

*provided* that there shall be excluded therefrom, without duplication (but only to the extent included in the calculation of the foregoing):

(a)        (i) any net after-tax income or loss from operating results of discontinued operations as defined by GAAP, and (ii) any net after-tax gains or losses from sales of discontinued operations;

(b)        any net after-tax extraordinary, nonrecurring or unusual gains or losses (less all fees and expenses relating thereto or expenses or charges, any severance expenses, relocation expenses, curtailments or modifications to pension and post-retirement employee benefit plans, any expenses related to any reconstruction, decommissioning, recommissioning or reconfiguration of fixed assets for alternate uses and fees, expenses or charges relating to facilities closing costs, acquisition integration costs, facilities opening costs, project start-up costs, business optimization costs, signing, retention or completion bonuses, expenses or charges related to any issuance of Equity Interests, Investment, acquisition, disposition, recapitalization or issuance, repayment, refinancing, amendment or modification of Indebtedness (in each case, whether or not successful), and all costs and expenses of such Person and its Restricted Subsidiaries Incurred in connection with the Cases and the Exit Financings);

(c)        the Net Income of any Payor, other than a Restricted Subsidiary of such Person or Net Income of such Payor that is accounted for by the equity method of accounting, except to the extent of cash dividends or distributions paid to such Person or to a Restricted Subsidiary of such Person by such Payor (or to the extent converted into cash);

(d)        the Net Income (but not loss) of any Restricted Subsidiary of such Person that is not a guarantor to the extent that the declaration of dividends or similar distributions by that Restricted Subsidiary of that income is restricted; *provided*, *however*, that the Net Income of Restricted Subsidiaries shall only be excluded in any calculation of Consolidated Net Income of the Company as a result of application of this clause (d) if the restriction on dividends or similar distributions results from consensual restrictions other than any restriction contained in clauses (1), (2) and (4) and, to the extent related to clauses (1), (2) and (4), clause (15) under Section 4.05;

(e)        (i) any restoration to income of any contingency reserve, except to the extent that provision for such reserve was made out of Consolidated Net Income accrued at any time following the Issue Date; and (ii) any restoration to or deduction from income for changes in estimates related to the post-emergence settlement of pre-petition claims obligations in relation with Chapter 11 following the Issue Date;

(f)      in the case of a successor to such Person by consolidation or merger or as a trans-feree of such Person's assets, any gains or losses of the successor corporation prior to such con-solidation, merger or transfer of assets;

(g)      any charges or credits relating to any purchase accounting adjustments or to the adoption of fresh start accounting principles;

(h)      any (i) one-time non-cash compensation charges, and (ii) non-cash costs or ex-penses resulting from stock option plans, employee benefit plans, compensation charges or post-employment benefit plans, or grants or awards of stock, stock appreciation or similar rights, stock options, restricted stock, Preferred Stock or other rights;

(i)      Net Income for such period shall not include the cumulative effect of a change in accounting principles during such period;

(j)      any net after-tax gains or losses (less all fees and expenses or charges relating thereto) attributable to business dispositions or asset dispositions other than in the ordinary course of business (as determined in good faith by management of the Company) or reserves relating thereto;

(k)      any net after-tax gains or losses (less all fees and expenses or charges relating thereto) attributable to the early extinguishment of Indebtedness, Hedging Obligations or other derivative instruments entered in relation with the Indebtedness extinguished;

(l)      any gain or loss for such period from currency translation gains or losses or net gains or losses related to currency remeasurements of Indebtedness (including any net loss or gain resulting from Hedging Obligations for currency exchange risk entered in relation with Indebted-ness); and

(m)      any impairment charges or asset write-offs, in each case pursuant to GAAP, and the amortization of intangibles arising pursuant to GAAP.

Notwithstanding the foregoing, for the purpose of Section 4.04 only, there shall be ex-cluded from Consolidated Net Income any dividends, repayments of loans or advances or other transfers of assets from Unrestricted Subsidiaries of the Company or a Restricted Subsidiary of the Company to the extent such dividends, repayments or transfers increase the amount of Restricted Payments permitted un-der Section 4.04(a) pursuant to clause (3)(iv) or (3)(v).

"Consolidated Net Tangible Assets" means, with respect to any Person, the Total Assets of such Person and its Restricted Subsidiaries less goodwill and intangibles (other than intangibles arising from, or relating to, intellectual property, licenses or permits (including, but not limited to, emissions rights) of such Person), in each case calculated in accordance with GAAP, *provided* that in the event that such Person or any of its Restricted Subsidiaries assumes or acquires any assets in connection with the acquisition by such Person and its Restricted Subsidiaries of another Person subsequent to the com-mencement of the period for which the Consolidated Net Tangible Assets is being calculated but prior to the event for which the calculation of the Consolidated Net Tangible Assets is made, then the Consoli-dated Net Tangible Assets shall be calculated giving *pro forma* effect to such assumption or acquisition of assets, as if the same had occurred at the beginning of the applicable period.

"Consolidated Non-cash Charges" means, with respect to any Person, for any period, the consolidated depreciation, amortization and other non-cash expenses of such Person and its Restricted

Subsidiaries (including the amortization of prior service costs and actuarial gains and losses related to pensions and other post-employment benefits) (including any lower-of-cost-or-market adjustments of inventory) reducing Consolidated Net Income of such Person and its Restricted Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP, *provided* that if any such non-cash expenses represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA in such future period to the extent paid, but excluding from this proviso, for the avoidance of doubt, amortization of a prepaid cash item that was paid in a prior period.

"Contingent Obligations" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent:

(1)      to purchase any such primary obligation or any property constituting direct or indirect security therefor,

(2)      to advance or supply funds:

(a)      for the purchase or payment of any such primary obligation; or

(b)      to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

(3)      to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"Credit Facilities" means:

(1)      the Senior Term Loan Facility,

(2)      any Asset Backed Credit Facility;

(3)      any debt facilities or other financing arrangements (including, without limitation, commercial paper facilities) providing for revolving credit loans, term loans, letters of credit or other Indebtedness, including any notes, mortgages, guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements or refundings thereof and any indentures or credit facilities or commercial paper facilities that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount permitted to be borrowed thereunder or alters the maturity thereof (*provided* that such increase in borrowings is permitted by Section 4.03) or adds Restricted Subsidiaries as additional borrowers or guarantors thereunder and whether by the same or any other agent, lender or group of lenders; and

(4)      any such agreements, instruments or guarantees governing Indebtedness Incurred to refinance any Indebtedness or commitments referred to in clauses (1), (2) and (3) above whether by the same or any other lender or group of lenders.

"Credit Facility Indebtedness" means any and all amounts payable under or in respect of the Credit Facilities as amended, restated, supplemented, waived, replaced, restructured, repaid, refunded, refinanced or otherwise modified from time to time (including after termination of the Senior Term Loan Facility), including principal, premium (if any), interest (including interest accruing on or after the filing of any petition in bankruptcy or for reorganization relating to the Company whether or not a claim for post-filing interest is allowed in such proceedings), fees, charges, expenses, reimbursement obligations, guarantees and all other amounts payable thereunder or in respect thereof.

"Currency Agreement" means, with respect to any Person, any foreign exchange contract, currency swap agreement, currency futures contract, currency option contract, currency derivative or other similar agreement to which such Person is a party or beneficiary.

"Default" means any event which is, or after notice or passage of time or both would be, an Event of Default.

"Definitive Note" means a certificated Note registered in the name of the holder thereof and issued in accordance with Section 2.07(c) hereof, substantially in the form of Exhibit A-1 or A-2 hereto, as the case may be, except that such Note shall not bear the Global Note Legend and shall not have the "Schedule of Exchanges of Interests in the Global Note" attached thereto.

"Depositary" means the Dollar Depositary or the Common Depositary, as the case may be.

"Designated Non-cash Consideration" means the Fair Market Value of non-cash consideration received by the Company or one of its Restricted Subsidiaries in connection with an Asset Sale that is so designated as Designated Non-cash Consideration pursuant to an Officer's Certificate, setting forth the basis of such valuation, less the amount of Cash Equivalents received in connection with a subsequent sale of such Designated Non-cash Consideration.

"Designated Preferred Stock" means Preferred Stock of the Company or any direct or indirect parent entity of the Company (other than Disqualified Stock), that is issued for cash (other than to the Company or any of its Subsidiaries or an employee stock ownership plan or trust established by the Company or any of its Subsidiaries) and is so designated as Designated Preferred Stock, pursuant to an Officer's Certificate, on the issue date thereof.

"DIP Roll-Up Claims" means the Roll-Up Loans and all related Obligations of the Issuer and certain of its Affiliates under, and as is defined in, the Debtor-in-Possession Credit Agreement, dated as of March 3, 2009, among LyondellBasell Industries AF S.C.A., the other borrowers thereto (each, a debtor and debtor-in-possession under Chapter 11), the administrative agent and collateral agent, the syndication agent, joint lead arranger and sole bookrunner, as amended, supplemented, modified, extended, restructured, renewed, restated, refinanced or replaced in whole or in part from time to time, and as ordered by the Bankruptcy Court, as of the Release Date.

"Disqualified Stock" means, with respect to any Person, any Capital Stock of such Person which, by its terms (or by the terms of any security into which it is convertible or for which it is redeemable or exchangeable), or upon the happening of any event:

(1)    matures or is mandatorily redeemable, pursuant to a sinking fund Obligation or otherwise (other than as a result of a change of control or asset sale),

-14-

(2)         is convertible or exchangeable for Indebtedness or Disqualified Stock of such Person, or

(3)         is redeemable at the option of the holder thereof, in whole or in part (other than solely as a result of a change of control or asset sale),

in each case prior to 91 days after the earlier of the maturity date of the Notes or the date the Notes are no longer outstanding; *provided* that only the portion of Capital Stock which so matures or is mandatorily redeemable, is so convertible or exchangeable or is so redeemable at the option of the holder thereof prior to such date shall be deemed to be Disqualified Stock; *provided*, *further*, that if such Capital Stock is issued to any employee or to any plan for the benefit of employees of the Company or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Company in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability; *provided*, *further*, that any class of Capital Stock of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of Capital Stock that is not Disqualified Stock shall not be deemed to be Disqualified Stock.

"<u>Dollar Depositary</u>" means DTC as depositary for the Dollar Notes, and its successors in such capacity

"<u>Dollar Notes</u>" means the Initial Dollar Notes, any Additional Dollar Notes and any Exchange Notes issued in exchange for such Initial Dollar Notes and Additional Dollar Notes.

"<u>Domestic Subsidiary</u>" means a Restricted Subsidiary that is not a Foreign Subsidiary.

"<u>DTC</u>" means The Depository Trust Company, its nominees and successors.

"<u>Emergence Transactions</u>" means all transactions arising out of the Reorganization Plan and emergence from Chapter 11, including, but not limited to, Exit Financing.

"<u>Equity Interests</u>" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"<u>Equity Offering</u>" means any public or private sale after the Issue Date of common stock or Preferred Stock (other than Disqualified Stock) of the Company or any direct or indirect parent entity of the Company (to the extent the proceeds thereof are contributed to the Company), as applicable, on a primary basis, other than:

(1)         public offerings with respect to the Company's or such direct or indirect parent entity's common stock registered on Form S-4 or Form S-8;

(2)         issuances to any Subsidiary of the Company; and

(3)         any such public or private sale that constitutes an Excluded Contribution.

"<u>Escrow Agent</u>" means Deutsche Bank Trust Company Americas, as escrow agent under the Escrow Agreement, or any successor escrow agent as set forth in the Escrow Agreement.

"Escrow Agreement" means the Escrow Agreement dated as of April 8, 2010, among the
Issuer, the Trustee and the Escrow Agent, as amended, supplemented, modified, extended, renewed, re-
stated or replaced in whole or in part from time to time.

"Escrow End Date" means the 60th day following the Issue Date; *provided* that the Issuer
may elect to extend the Escrow End Date for an additional 30 days on no more than two occasions so long
as, not later than five Business Days prior to the scheduled Escrow End Date, (i) it provides prior written
notice to the Escrow Agent and the Trustee and has issued a press release stating that it has extended the
Escrow End Date and (ii) Lyondell Chemical Company has deposited cash into escrow with the Escrow
Agent, to be held pursuant to the terms of the Escrow Agreement, in an amount sufficient to fund the re-
demption price due on the latest permitted date for the revised Special Mandatory Redemption in respect
of all outstanding Notes and has certified that such amounts will be satisfactory for such purpose.

"Escrow Investment" means (1) Treasury Securities, (2) investments in time deposit ac-
counts, certificates of deposit and money market deposits maturing no later the Escrow End Date in each
case, entitled to U.S. Federal deposit insurance for the full amount thereof or issued by a bank or trust
company (including the Escrow Agent or an affiliate of the Escrow Agent) which is organized under the
laws of the United States of America or any State thereof having capital, surplus and undivided profits
aggregating in excess of $500.0 million and (3) repurchase obligations maturing no later than the Escrow
End Date entered into with a nationally recognized broker-dealer, with respect to which the purchase se-
curities are Obligations issued or guaranteed by the United States government or any agency thereof,
which repurchase Obligations shall be entered into pursuant to written agreements.

"Escrow Proceeds" means collectively the Gross Proceeds from the issuance and sale of
the Initial Notes and sufficient Government Obligations, Cash Equivalents (solely with respect to instru-
ments or investments satisfying clause (1), (2), (3) or (4) of the definition thereof herein, and in each case,
maturing no later than the Escrow End Date, and with respect to clause (3) thereof, with a bank or trust
company having capital, surplus and undivided profits aggregating in excess of $500 million) and other
Escrow Investments, in an amount sufficient to redeem, for cash, the Notes at a redemption price equal to
the sum of 100% of the Gross Proceeds plus the applicable Specified Premium of the principal amount of
the Notes offered on the Issue Date, together with accrued and unpaid interest on the Notes from the Issue
Date up to but not including the date of the Special Mandatory Redemption.

"euro" means the single currency of participating member states of the European Eco-
nomic and Monetary Union.

"Euro Notes" means the Initial Euro Notes, any Additional Euro Notes and any Exchange
Notes issued in exchange for such Initial Euro Notes and Additional Euro Notes.

"Euro Paying Agent" means an office or agency of the Company where Euro Notes may
be presented for payment, which shall initially be Deutsche Bank AG, London Branch.

"Euro Registrar" means an office or agency of the Company where Euro Notes may be
presented for registration of transfer or exchange, which shall initially be Deutsche Bank Luxembourg
S.A.

"Euro Securitization" means the transaction to be dated as of its effective date entered
into in connection with the €150 million revolving securitization facility of trade accounts receivable with
Basell Sales and Marketing Company B.V. and Lyondell Chemie Nederland B.V., as sellers, and Basell
Polyolefins Collections Ltd., as receivables purchaser, as such facility may be amended, supplemented,

modified, extended, restructured, renewed, restated, refinanced or replaced in whole or in part from time to time.

"Euroclear" means Euroclear S.A./N.V., as operator of the Euroclear system.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Exchange Notes" means the Notes issued in the Exchange Offer pursuant to Section 2.07(f) hereof.

"Exchange Offer" has the meaning set forth in the Registration Rights Agreement.

"Exchange Offer Registration Statement" has the meaning set forth in the Registration Rights Agreement.

"Excluded Assets" has the meaning set forth in the Security Documents.

"Excluded Contributions" means the aggregate net cash proceeds, including cash and the Fair Market Value of property other than cash, received by the Company after the Release Date from:

(1)      contributions to its common equity capital, and

(2)      the sale (other than to a Subsidiary of the Company or to any Subsidiary management equity plan or stock option plan or any other management or employee benefit plan or agreement) of Capital Stock (other than Disqualified Stock and Designated Preferred Stock) of the Company,

in each case designated as Excluded Contributions pursuant to an Officer's Certificate of the Company on or promptly after the date such capital contributions are made or the date such Capital Stock is sold, as the case may be.

"Excluded Subsidiary" means (i) any Receivables Subsidiary, (ii) any Qualified Non-Recourse Subsidiary, (iii) any Special Purpose Subsidiary, (iv) any Wholly Owned Domestic Subsidiary that is a subsidiary of a Foreign Subsidiary and (v) any Domestic Subsidiary of the Company as of the Release Date or at any time thereafter meeting any one of the following conditions that has been designated by the Issuer as an Excluded Subsidiary in a writing to the Trustee (which designation may be rescinded by granting a Guarantee in accordance with the requirements of this Indenture):  (a) the Total Assets of such Domestic Subsidiary determined as of the end of the fiscal year of the Company most recently ended for which financial statements are required to be delivered under this Indenture does not exceed $25.0 million, or (b) the Consolidated EBITDA of such Domestic Subsidiary does not exceed $25.0 million, for the period of four consecutive quarters of the Company most recently ended for which financial statements are required to be delivered pursuant to this Indenture; *provided* that, at any time or from time to time after the Release Date, Domestic Subsidiaries (other than a Special Purpose Subsidiary) shall not be designated as Excluded Subsidiaries to the extent that such Domestic Subsidiaries under this clause (v) would represent, in the aggregate, (a) 5% or more of Total Assets of the Company at the end of the most recently ended fiscal year of the Company or (b) 5% or more of the Consolidated EBITDA of the Company for the most recently ended fiscal year, in each case, based upon the most recent financial statements required to be delivered pursuant to this Indenture; *provided, further,* that, if the most recent financial statements required to be delivered pursuant to this Indenture for any fiscal quarter occurring after the Release Date indicate that, by reason of subsequent changes following the designation of any one

or more Restricted Subsidiaries as an Excluded Subsidiary or Excluded Subsidiaries, the foregoing re-
quirements of this definition would not be complied with (other than as a result of an impairment charge),
individually or in the aggregate, then the Company shall use commercially reasonable efforts to promptly
(but in any event within 180 days after the date the financial statements are required), rescind such desig-
nations as necessary, and provide such Guarantees as are necessary, so as to comply with the require-
ments of this Indenture.  Any uncured Default shall not occur until the expiration of such 180-day pro-
vided such efforts are used.

"Exit Financing" means that certain financing to finance the Reorganization Plan ex-
pected to be composed of the Senior Term Loan Facility, the ABL Facility, the Euro Securitization, the
Plan Roll-Up Notes and the Notes.

"Fair Market Value" means, with respect to any asset or property, the price which could
be negotiated in an arm's-length transaction, for cash, between a willing seller and a willing and able
buyer, neither of whom is under undue pressure or compulsion to complete the transaction; *provided* that,
other than as expressly set forth in this Indenture, for purposes of determining the "Fair Market Value" of
any property or assets, such Fair Market Value shall be determined by (x) the Company in good faith with
respect to property or assets with a Fair Market Value not in excess of $250.0 million, (y) an opinion as to
the Fair Market Value issued by a qualified accounting, appraisal, financial advisory or investment bank-
ing firm or (z) the Board of Directors of the Company, as evidenced by a certificate of an officer of the
Company, with respect to property or assets with a Fair Market Value in excess of $250.0 million.

"First Lien Collateral Agent" means the Collateral Agent and the Senior Term Loan Col-
lateral Agent.

"First Lien Intercreditor Agreement" means the First Lien Intercreditor Agreement,
dated as of the Release Date by and among the Company, the Collateral Agent and the Senior Term Loan
Collateral Agent, with respect to the Common Collateral, which may be amended from time to time with-
out the consent of the holders of the Notes to add other parties holding First Priority Lien Obligations
permitted to be Incurred under this Indenture, the Senior Term Loan Facility and the First Lien Intercredi-
tor Agreement.

"First Lien Secured Parties" means (a) the "Secured Parties," as defined in the Senior
Term Loan Facility, (b) the "Secured Parties," as defined in the Collateral Agreement, and (c) any Addi-
tional First Lien Secured Parties.

"First Lien Security Documents" means the Security Documents and any other agree-
ment, document or instrument pursuant to which a Lien is granted or purported to be granted securing
First Priority Lien Obligations, and any Additional First Priority Lien Obligations, or under which rights
or remedies with respect to such Liens are governed, in each case to the extent relating to the Collateral
securing the First Priority Lien Obligations.

"First Priority After-Acquired Property" means (x) at any time the outstanding principal
amount of loans under the Senior Term Loan Facility is greater than $500.0 million, any property of the
Company, the Issuer or any Pledgor that secures any First Priority Lien Obligations and Other First Lien
Obligations other than the Notes that is not already subject to the Lien under the Security Documents,
other than any Excluded Assets, and (y) if clause (x) is not applicable, then any property of the Company,
the Issuer or any Pledgor that constitutes Notes Collateral (other than Excluded Assets).

"First Priority Lien Obligations" means (i) all Indebtedness under the Credit Facilities
(other than the Asset Backed Credit Facility and any other Credit Facility Incurred pursuant to clause

(iii)(B) of Section 4.03(b)), (ii) the Notes Obligations and the Obligations in respect of any refunding, refinancing or defeasement of the Notes, (iii) all other Obligations of the Company, the Issuer or any Restricted Subsidiary in respect of Hedging Obligations or Obligations in respect of cash management services in each case owing to a Person that is a holder of Credit Facility Indebtedness or an Affiliate of such holder at the time of entry into such Hedging Obligations or Obligations in respect of cash management services, (iv) Additional First Priority Lien Obligations, if any, permitted to be Incurred under Section 4.03 and (v) Indebtedness under any Oil Indexed Credit Facility Incurred pursuant to clause (iii)(C) of Section 4.03(b).

"Fixed Charge Coverage Ratio" means, with respect to any Person for any period, the ratio of Consolidated EBITDA of such Person for such period to the Fixed Charges of such Person for such period.  In the event that the Company or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness (other than in the case of revolving credit borrowings or revolving advances under any Receivables Financing, in which case interest expense shall be computed based upon the average daily balance of such Indebtedness during the applicable period) or issues, repurchases or redeems Disqualified Stock or Preferred Stock subsequent to the commencement of the period for which the Fixed Charge Coverage Ratio is being calculated but prior to the event for which the calculation of the Fixed Charge Coverage Ratio is made (the "Calculation Date"), then the Fixed Charge Coverage Ratio shall be calculated giving *pro forma* effect to such Incurrence, repayment, repurchase or redemption of Indebtedness, or such issuance, repurchase or redemption of Disqualified Stock or Preferred Stock, as if the same had occurred at the beginning of the applicable four-quarter period.

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, amalgamations, consolidations and discontinued operations (as determined in accordance with GAAP), in each case with respect to an operating unit of a business, and any operational changes that the Company or any of its Restricted Subsidiaries has determined to make and/or made during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Calculation Date shall be calculated on a *pro forma* basis assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations, discontinued operations and operational changes (and the change of any associated fixed charge obligations and the change in Consolidated EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation, amalgamation, discontinued operation or operational change, in each case with respect to an operating unit of a business, that would have required adjustment pursuant to this definition, then the Fixed Charge Coverage Ratio shall be calculated giving *pro forma* effect thereto for such period as if such Investment, acquisition, disposition, discontinued operation, merger, amalgamation, consolidation or operational change had occurred at the beginning of the applicable four-quarter period.

For purposes of this definition, whenever *pro forma* effect is to be given to any event, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting Officer of the Company.  Any such *pro forma* calculation may include adjustments appropriate, in the reasonable good faith determination of the Company as set forth in an Officer's Certificate, to reflect (1) operating expense reductions and other operating improvements or synergies reasonably expected to result from the applicable event and (2) all adjustments of the nature set forth as "Reorganization Adjustments" under "Unaudited Consolidated Pro Forma Financial Information" as set forth in the Offering Memorandum for the Company to the extent such adjustments, without duplication, continue to be applicable to such four-quarter period.

If any Indebtedness bears a floating rate of interest and is being given *pro forma* effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the Calculation Date had been the applicable rate for the entire period (taking into account any Hedging Obligations applicable to such Indebtedness if such Hedging Obligation has a remaining term in excess of 12 months).  Interest on a Capitalized Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible financial or accounting officer of the Company to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.  For purposes of making the computation referred to above, interest on any Indebtedness under a revolving credit facility computed on a *pro forma* basis shall be computed based upon the average daily balance of such Indebtedness during the applicable period.  Interest on Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall be deemed to have been based upon the rate actually chosen, or, if none, then based upon such optional rate chosen as the Company may designate.

For the purposes of this definition, any amount in a currency other than U.S. Dollars will be converted to U.S. Dollars based on the average exchange rate for such currency for the most recent twelve-month period immediately prior to the date of determination or if any such Indebtedness is subject to a Currency Agreement with respect to the currency in which such Indebtedness is denominated covering principal, premium, if any, and interest on such Indebtedness, the amount of such Indebtedness and such interest and premium, if any, shall be determined after giving effect to all payments in respect thereof under such Currency Agreement.

"Fixed Charges" means, with respect to any Person for any period, the sum, without duplication, of:

(1)    Consolidated Interest Expense of such Person for such period, and

(2)    all cash dividend payments (excluding items eliminated in consolidation) on any series of Preferred Stock or Disqualified Stock of such Person and its Restricted Subsidiaries.

"Foreign Subsidiary" means a Restricted Subsidiary not organized or existing under the laws of the United States of America or any state or territory thereof or the District of Columbia and any direct or indirect Restricted Subsidiary of such Restricted Subsidiary.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as have been approved by a significant segment of the accounting profession, which are in effect on the Release Date as adopted by the Company.  For the purposes of this Indenture, the term "consolidated" with respect to any Person shall mean such Person consolidated with its Restricted Subsidiaries, and shall not include any Unrestricted Subsidiary, but the interest of such Person in an Unrestricted Subsidiary will be accounted for as an Investment.

"Global Note Legend" means the legend set forth in Section 2.07(g)(ii) hereof, which is required to be placed on all Global Notes issued under this Indenture.

"Global Notes" means, individually and collectively, each of the Restricted Global Notes and the Unrestricted Global Notes, substantially in the form of Exhibit A-1 or A-2 hereto, as the case may be, issued in accordance with Section 2.01, 2.07(b), 2.07(d) or 2.07(f) hereof.

"Government Obligations" means securities that are:

(1)     direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged, or

(2)     obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America the timely payment of which is unconditionally guaranteed as a full faith and credit Obligation by the United States of America, which, in each case, are not callable or redeemable at the option of the issuer thereof, and shall also include a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act) as custodian with respect to any such U.S. government obligations or a specific payment of principal of or interest on any such U.S. government obligations held by such custodian for the account of the holder of such depository receipt; *provided*, *however*, that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the U.S. government obligations or the specific payment of principal of or interest on the U.S. government obligations evidenced by such depository receipt.

"Gross Proceeds" means the aggregate U.S. Dollar and euro amount received by the Issuer pursuant to the sale of the Initial Notes, before giving effect to any discount to the Initial Purchasers.

"Hedging Obligations" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, emission rights, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"holder " or "noteholder" means the Person in whose name a Note is registered on the Registrar's books.

"Incur" means issue, assume, guarantee, incur or otherwise become liable for; *provided*, *however*, that any Indebtedness or Capital Stock of a Person existing at the time such person becomes a Subsidiary (whether by merger, amalgamation, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the time it becomes a Subsidiary.

"Indebtedness" means, with respect to any Person:

(1)     the principal and premium (if any) of any indebtedness of such Person, whether or not contingent, (a) in respect of borrowed money, (b) evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof), (c) representing the deferred and unpaid purchase price of any property (except any such balance that constitutes (i) a trade payable or similar Obligation to a trade creditor Incurred in the ordinary course of business, (ii) any earn-out Obligations until

-21-

such Obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and (iii) liabilities accrued in the ordinary course of business), which purchase price is due more than six months after the date of placing the property in service or taking delivery and title thereto, (d) in respect of Capitalized Lease Obligations, or (e) representing any Hedging Obligations, if and to the extent that any of the foregoing indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(2)       to the extent not otherwise included, any Obligation of such Person to be liable for, or to pay, as obligor, guarantor or otherwise, the Obligations referred to in clause (1) of another Person (other than by endorsement of negotiable instruments for collection in the ordinary course of business); and

(3)       to the extent not otherwise included, Indebtedness of another Person secured by a Lien on any asset owned by such Person (whether or not such Indebtedness is assumed by such Person); *provided*, *however*, that the amount of such Indebtedness will be the lesser of:  (a) the Fair Market Value of such asset at such date of determination, and (b) the amount of such Indebtedness of such other Person;

*provided*, *however*, that notwithstanding the foregoing, Indebtedness shall be deemed not to include (1) Contingent Obligations Incurred in the ordinary course of business and not in respect of borrowed money; (2) deferred or prepaid revenues; (3) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller; or (4) Obligations under or in respect of a Qualified Receivables Financing or a Qualified Joint Venture Transaction.

Notwithstanding anything in this Indenture to the contrary, Indebtedness shall not include, and shall be calculated without giving effect to, the effects of Statement of Financial Accounting Standards No. 133 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Indenture as a result of accounting for any embedded derivatives created by the terms of such Indebtedness, and any such amounts that would have constituted Indebtedness under this Indenture but for the application of this sentence shall not be deemed an Incurrence of Indebtedness under this Indenture.

"<u>Indenture</u>" means this Indenture as amended or supplemented from time to time.

"<u>Independent Financial Advisor</u>" means an accounting, appraisal or investment banking firm or consultant, in each case of nationally recognized standing, that is, in the good faith determination of the Company, qualified to perform the task for which it has been engaged.

"<u>Indirect Participant</u>" means a Person who holds a beneficial interest in a Global Note through a Participant.

"<u>Initial Purchasers</u>" means Banc of America Securities LLC, UBS Securities LLC, Barclays Capital Inc., Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., J.P. Morgan Securities Inc., Morgan Stanley & Co. Incorporated and Wells Fargo Securities, LLC for the Initial Dollar Notes and  Merrill Lynch International, UBS Limited, Barclays Bank PLC, Citigroup Global Markets Limited, Credit Suisse Securities (Europe) Limited, Deutsche Bank AG, London Branch, J.P. Morgan Securities Ltd., Morgan Stanley & Co. International plc and Well Fargo Securities International Limited for the Initial Euro Notes.

"Interest Payment Date" has the meaning set forth in Exhibit A-1 and Exhibit A-1 hereto.

"Investment Grade Rating" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other Rating Agency.

"Investment Grade Securities" means:

(1)    securities issued or directly and fully guaranteed or insured by the U.S. government or any agency or instrumentality thereof (other than Cash Equivalents),

(2)    securities that have a rating equal to or higher than Baa3 (or equivalent) by Moody's and BBB- (or equivalent) by S&P, but excluding any debt securities or loans or advances between and among the Company and its Subsidiaries,

(3)    investments in any fund that invests exclusively in investments of the type described in clauses (1) and (2) which fund may also hold immaterial amounts of cash pending investment and/or distribution, and

(4)    corresponding instruments in countries other than the United States customarily utilized for high quality investments and in each case with maturities not exceeding two years from the date of acquisition.

"Investments" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees (other than guarantees of performance made by the Company or any of its Restricted Subsidiaries in connection with a Joint Venture)), advances or capital contributions (excluding accounts receivable, trade credit and advances to customers and commission, travel and similar advances to officers, employees and consultants made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet of the Company in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property.  For purposes of the definition of "Unrestricted Subsidiary" and Section 4.04:

(1)    "Investments" shall include the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of a Subsidiary of the Company at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided, however*, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Company shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary equal to an amount (if positive) equal to:

(a)    the Company's "Investment" in such Subsidiary at the time of such redesignation *less*

(b)    the portion (proportionate to the Company's equity interest in such Subsidiary) of the Fair Market Value of the net assets of such Subsidiary at the time of such redesignation; and

(2)    any property transferred to or from an Unrestricted Subsidiary shall be valued at its Fair Market Value at the time of such transfer, in each case as determined in good faith by the Board of Directors of the Issuer.

-23-

"<u>Issue Date</u>" means April 8, 2010.

"<u>Issuer</u>" has the meaning ascribed to it in the preamble.

"<u>Issuer Order</u>" means a written request or order signed on behalf of the Issuer by an Officer of the Issuer, who must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the Issuer, and delivered to the Trustee.

"<u>Joint Venture</u>" means any joint venture entity, whether a company, unincorporated firm, association, partnership or any other entity which, in each case, is not a Subsidiary of the Company or any of its Restricted Subsidiaries but in which the Company or a Restricted Subsidiary has a direct or indirect equity or similar interest.

"<u>Junior Lien Intercreditor Agreement</u>" means the Junior Lien Intercreditor Agreement, entered on the Release Date by and among the Company, the Collateral Agent, on its own behalf and on behalf of the First Lien Secured Parties under this Indenture, the Senior Term Loan Collateral Agent, on its own behalf and on behalf of the First Lien Secured Parties under the Senior Term Loan Facility, the ABL Collateral Agent, on its own behalf and on behalf of the administrative agent and lenders under the ABL Facility, the trustee under the Plan Roll-Up Notes (the "<u>Roll-Up Notes Trustee</u>" and, together with the Collateral Agent, the Senior Term Loan Collateral Agent and the ABL Collateral Agent, the "<u>Applicable Collateral Agents</u>"), on its own behalf and on behalf of the holders of the obligations under the Plan Roll-Up Notes, the Company, the Issuer and the Pledgors that sets forth the relative priority of the Liens securing any First Priority Lien Obligations, the Liens securing the ABL Obligations and the Liens securing any Junior Lien Obligations (collectively, the "<u>Applicable Obligations</u>").

"<u>Junior Lien Obligations</u>" means the Plan Roll-Up Notes and Obligations with respect to other Indebtedness permitted to be Incurred under this Indenture, which is by its terms intended to be secured on a basis junior to the Liens securing the Notes and, to the extent required thereby, the ABL Facility; *provided* such Lien is permitted to be Incurred under the ABL Facility, the Plan Roll-Up Notes Indenture, the Senior Term Loan Facility and this Indenture.

"<u>LCC Assumption</u>" means the consummation of the transactions whereby (a) Lyondell Chemical will assume all of the obligations of the Escrow Issuer under this Indenture, (b) each of Lyondell Chemical's Restricted Subsidiaries (other than the Excluded Subsidiaries) will guarantee the Notes and (c) to the extent Lyondell Chemical assumes the obligations of the Escrow Issuer other than by merger, the Escrow Issuer is released from the obligations under this Indenture.

"<u>Lien</u>" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or similar encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law (including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest; *provided* that in no event shall an operating lease, rights of set-off or netting arrangements in the ordinary course of business be deemed to constitute a Lien.

"<u>Limited Recourse Stock Pledge</u>" means the pledge of the Equity Interests in any Joint Venture (that is not a Restricted Subsidiary) or any Unrestricted Subsidiary to secure non-recourse debt of such Joint Venture or Unrestricted Subsidiary, which pledge is made by a Restricted Subsidiary of the Company, the activities of which are limited to making and managing Investments, and owning Equity Interests, in such Joint Venture or Unrestricted Subsidiary, but only for so long as its activities are so limited.

"Moody's" means Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

"Mortgaged Property" means each parcel of Real Property owned or leased by the Company, the Issuer or any Pledgor encumbered by a Mortgage to secure the First Priority Lien Obligations.

"Mortgages" means, collectively, the mortgages, trust deeds, deeds of trust, deeds to secure debt, assignments of leases and rents, and other security documents delivered with respect to Mortgaged Properties, as amended, supplemented, modified, extended, restructured, renewed, restated or replaced in whole or in part from time to time.

"Negromex Receivables Dispositions" means any disposition of accounts receivable arising from transactions with Industrias Negromex, S.A. de C.V.

"Net Income" means, with respect to any Person, the net income (loss) of such Person, determined in accordance with GAAP and before any reduction in respect of Preferred Stock dividends.

"Net Proceeds" means the aggregate cash proceeds received by the Company or any of its Restricted Subsidiaries in respect of any Asset Sale (including, without limitation, any cash received in respect of or upon the sale or other disposition of any Designated Non-cash Consideration received in any Asset Sale and any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise, but only as and when received, but excluding the assumption by the acquiring Person of Indebtedness relating to the disposed assets or other consideration received in any other non-cash form), net of the direct costs relating to such Asset Sale and the sale or disposition of such Designated Non-cash Consideration (including, without limitation, legal, accounting and investment banking fees, and brokerage and sales commissions), and any relocation expenses Incurred as a result thereof, taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements related thereto), amounts required to be applied to the repayment of principal, premium (if any) and interest on Indebtedness required (other than pursuant to Section 4.06(b)(i)) to be paid as a result of such transaction, and any deduction of appropriate amounts to be provided by the Company as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by the Company after such sale or other disposition thereof, including, without limitation, pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction.

"Notes" means the Initial Dollar Notes and the Initial Euro Notes and more particularly means any Note authenticated and delivered under this Indenture. For all purposes of this Indenture, the term "Notes" shall also include (i) any Exchange Notes and (ii) any Additional Dollar Notes and Additional Euro Notes that may be issued under a supplemental indenture. Dollar Notes and the Euro Notes (including, in each case, any Exchange Notes issued in exchange therefor) are separate series of Notes, but shall be treated as a single class for all purposes under this Indenture, except as set forth herein. For purposes of this Indenture, all references to Notes to be issued or authenticated upon transfer, replacement or exchange shall be deemed to refer to Notes of the applicable series.

"Notes Collateral" has the meaning set forth in the Security Documents.

"Notes Obligations" means Obligations in respect of the Notes (including "other notes" Incurred pursuant to clause (i) of Section 4.03(b)), this Indenture and the Security Documents, including, for the avoidance of doubt, Obligations in respect of Exchange Notes and guarantees thereof.

"<u>Obligations</u>" means any principal, interest, penalties, fees, indemnifications, reimburse-ments (including, without limitation, reimbursement obligations with respect to letters of credit and bank-ers' acceptances), damages and other liabilities payable under the documentation governing any Indebt-edness; *provided* that Obligations with respect to the Notes shall not include fees or indemnifications in favor of the Trustee and other third parties other than the holders of the Notes.

"<u>Offering Memorandum</u>" means the confidential offering memorandum, dated March 24, 2010, relating to the issuance of the Initial Notes under this Indenture.

"<u>Officer</u>" means the Chairman of the Board, Chief Executive Officer, Chief Financial Of-ficer, President, any Executive Vice President, Senior Vice President or Vice President, the Treasurer, any Assistant Treasurer, any Financial Director or the Secretary or Assistant Secretary of any Person (or, with respect to a Person that is a limited partnership, the general partner of such Person), member of the Board of Directors (in the case of any entity organized under the laws of The Netherlands), or any other officer designated by the Board of Directors serving in a similar capacity.

"<u>Officer's Certificate</u>" means a certificate signed on behalf of any Person by an Officer of such Person, which meets the requirements set forth in this Indenture.

"<u>Oil Indexed Credit Facility</u>" means a working capital facility for which availability is conditioned upon the price per barrel of crude oil that is not less than $125.0 and the proceeds of which are utilized for working capital purposes and related fees and expenses; *provided* that the Notes and any other First Priority Lien Obligations are secured by a Lien ranking at least *pari passu* with any Lien on assets securing any Oil Indexed Credit Facility and the collateral agent under any Oil Indexed Credit Fa-cility shall have been made party to the First Lien Intercreditor Agreement and any Oil Indexed Credit Facility shall be subject to the terms thereof.

"<u>Opinion of Counsel</u>" means a written opinion from legal counsel who is reasonably ac-ceptable to the Trustee.  The counsel may be an employee of or counsel to the Company or the Issuer or to the Trustee.  Counsel giving any Opinion of Counsel shall be entitled to rely on an Officer's Certificate as to any factual matters relevant to such opinion.

"<u>Other First Lien Obligations</u>" means other Indebtedness of the Company and its Re-stricted Subsidiaries that is equally and ratably secured with the Notes as permitted by this Indenture and is designated by the Company as an Other First Lien Obligation.

"<u>Pari Passu Indebtedness</u>" means:

(1)      with respect to the Issuer, the Notes and any Indebtedness which ranks *pari passu* in right of payment to the Notes; and

(2)      with respect to any Pledgor, its Obligations in respect of the Notes and any In-debtedness which ranks *pari passu* in right of payment to such Pledgor's Obligations in respect of the Guarantees of the Notes.

"<u>Participants</u>" means (i) with respect to the Dollar Notes, institutions that have accounts with DTC or its nominee and (ii) with respect to the Euro Notes, institutions that have accounts with Euroclear, Clearstream or their respective nominees.

"PBGC Settlement" means the settlement agreement between the Issuer and the Pension Benefit Guaranty Corporation (or any successor in interest thereto) as amended, supplemented, modified, extended, restructured, renewed, restated or replaced in whole or in part from time to time.

"Permitted Holders" means, at any time, each of (i) the Sponsor, (ii) any Person that has no material assets other than the Capital Stock of the Company and, directly or indirectly, holds or acquires 100% of the total voting power of the Voting Stock of the Company, and of which no other Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision), other than any of the other Permitted Holders specified in clause (i) above, holds more than 50% of the total voting power of the Voting Stock thereof and (iii) any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision) the members of which include any of the Permitted Holders specified in clause (i) above and that, directly or indirectly, holds or acquires beneficial ownership of the Voting Stock of the Company (a "Permitted Holder Group"), so long as (1) each member of the Permitted Holder Group has voting rights proportional to the percentage of ownership interests held or acquired by such member relative to the other members of the Permitted Holder Group with respect to voting in the election of Directors of the Company or any of its Subsidiaries generally and (2) no Person or other "group" (other than the Permitted Holders specified in clause (i) above) beneficially owns more than 50% on a fully diluted basis of the Voting Stock held by the Permitted Holder Group. Any Person or group whose acquisition of beneficial ownership constitutes a Change of Control in respect of which a Change of Control Offer is made in accordance with the requirements of this Indenture will thereafter, together with its Affiliates, constitute an additional Permitted Holder.

"Permitted Investments" means:

(1)    any Investment in the Company or any Restricted Subsidiary;

(2)    any Investment in Cash Equivalents;

(3)    any Investment by the Company or any Restricted Subsidiary of the Company in a Person if as a result of such Investment (a) such Person becomes a Restricted Subsidiary of the Company, or (b) such Person, in one transaction or a series of related transactions, is merged, consolidated or amalgamated with or into, or transfers or conveys all or substantially all of its assets to, or is liquidated into, the Company or a Restricted Subsidiary of the Company;

(4)    any Investment in securities or other assets not constituting Cash Equivalents and received in connection with an Asset Sale made pursuant to the provisions of Section 4.06 or any other disposition of assets not constituting an Asset Sale;

(5)    any Investment existing on, or made pursuant to binding commitments existing on, the Release Date or an Investment consisting of any extension, modification or renewal of any Investment existing on the Release Date; *provided* that the amount of any such Investment may be increased (x) as required by the terms of such Investment as in existence on the Release Date or (y) as otherwise permitted under this Indenture;

(6)    loans and advances to officers, directors or employees (a) for business-related travel expenses, moving expenses and other similar expenses, including as part of a recruitment or retention plan, in each case Incurred in the ordinary course of business or consistent with past practice or to fund such Person's purchase of Equity Interests of the Company or any direct or indirect parent entity of the Company, (b) required by applicable employment laws loans and (c) other loans and advances not to exceed $25.0 million at any one time outstanding;

-27-

(7)    any Investment acquired by the Company or any of its Restricted Subsidiaries (a) in exchange for any other Investment or accounts receivable held by the Company or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable, or (b) as a result of a foreclosure by the Company or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(8)    Hedging Obligations permitted under Section 4.03(b)(xi);

(9)    any Investment by the Company or any of its Restricted Subsidiaries in a Similar Business or in Joint Ventures having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (9) that are at that time outstanding, not to exceed the greater of (x) $750.0 million and (y) 3.75% of the Consolidated Net Tangible Assets of the Company at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value, *plus* 100% of the aggregate amount received by the Company or any Restricted Subsidiary in cash and the Fair Market Value of property other than cash received by the Company or any Restricted Subsidiary with respect to any Investment made pursuant to this clause (9); *provided, however,* that if any Investment pursuant to this clause (9) is made in any Person that is not a Restricted Subsidiary of the Company at the date of the making of such Investment and such Person becomes a Restricted Subsidiary of the Company after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (9) for so long as such Person continues to be a Restricted Subsidiary;

(10)    additional Investments by the Company or any of its Restricted Subsidiaries having an aggregate Fair Market, taken together with all other Investments made pursuant to this clause (10) that are at that time outstanding, not to exceed the greater of (x) $250.0 million and (y) 1.25% of the Consolidated Net Tangible Assets of the Company at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value), *plus* 100% of the aggregate amount received by the Company or any Restricted Subsidiary in cash and the Fair Market Value (as determined in good faith by the Company) of property other than cash received by the Company or any Restricted Subsidiary with respect to any Investment made pursuant to this clause (10); *provided, however,* that if any Investment pursuant to this clause (10) is made in any Person that is not a Restricted Subsidiary of the Company at the date of the making of such Investment and such Person becomes a Restricted Subsidiary of the Company after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) above and shall cease to have been made pursuant to this clause (10) for so long as such Person continues to be a Restricted Subsidiary;

(11)    Investments the payment for which consists of Equity Interests of the Company (other than Disqualified Stock) or any direct or indirect parent of the Company, as applicable; *provided, however,* that such Equity Interests will not increase the amount available for Restricted Payments under clause (3)(ii) or (iii) under Section 4.04(a);

(12)    Investments consisting of the licensing or contribution of intellectual property pursuant to joint marketing arrangements with other Persons;

(13)    Investments consisting of or to finance purchases and acquisitions of inventory, supplies, materials, services or equipment or purchases of contract rights or licenses or leases of intellectual property;

-28-

(14)    any Investment in connection with a Qualified Receivables Financing, including Investments in a Receivables Subsidiary, of funds held in accounts permitted or required by the arrangements governing such Qualified Receivables Financing or any related Indebtedness and, to the extent constituting an Investment, the acquisition of accounts receivable that have been sold, transferred or otherwise disposed of in a Receivables Financing, including the repurchase of accounts receivable by the Company or any of its Subsidiaries or other payment obligations of the Company or any Restricted Subsidiary of the Company pursuant to Standard Securitization Undertakings;

(15)    any Investment in an entity or purchase of a business or assets in each case owned (or previously owned) by a customer of a Restricted Subsidiary as a condition or in connection with such customer (or any member of such customer's group) contracting with a Restricted Subsidiary, in each case in the ordinary course of business;

(16)    Investments of a Restricted Subsidiary of the Company acquired after the Release Date or of an entity merged into, amalgamated with, or consolidated with the Company or a Restricted Subsidiary of the Company in a transaction that is not prohibited by Section 5.01 after the Release Date to the extent that such Investments were not made in contemplation of such acquisition, merger, amalgamation or consolidation and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(17)    any Investment in any Subsidiary of the Company or any Joint Venture in connection with intercompany cash management arrangements or related activities arising in the ordinary course of business;

(18)    Investments through the licensing contribution in a Person that is or will be as a result of such Investment a Joint Venture or Investments through the licensing, contribution or transactions that economically result in a contribution in kind of intellectual property pursuant to Joint Venture arrangements, in each case in the ordinary course of business;

(19)    purchase of shares of Royal Dutch Shell plc and BASF AG required to satisfy Basell B.V.'s obligations under its stock option plans as such plans and stock appreciation rights were in effect on the Release Date;

(20)    a transaction to the extent constituting an Investment that is permitted by and made in accordance with clauses (xii) and (xiii) of Section 4.04(b);

(21)    any Investment in connection with a Structured Financing Transaction;

(22)    a transaction to the extent constituting an Investment that is permitted by and made in accordance with clause (38) of the definition of "Permitted Liens";

(23)    any transaction to the extent it constitutes an Investment that is permitted by and made in accordance with Section 4.07(b) (except transactions described in clauses (ii), (iv), (v), (ix)(B), (xv) and (xix) of such Section ); and

(24)    any Qualified Joint Venture Transaction.

"Permitted Liens" means, with respect to any Person:

(1)      pledges or deposits by such Person under worker's compensation laws, unemployment insurance laws or similar legislation, or good faith pledges, deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case Incurred in the ordinary course of business;

(2)      Liens imposed by law, such as carriers', warehousemen's and mechanics' Liens, in each case for sums not yet due or being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review;

(3)      Liens for taxes, assessments or other governmental charges not yet due or payable or subject to penalties for nonpayment or which are being contested in good faith by appropriate proceedings;

(4)      Liens in favor of issuers of performance bonds, surety bonds, bid bonds, letters of credit or similar instruments issued pursuant to the request of and for the account of such Person in the ordinary course of its business or with respect to statutory, regulatory, contractual or warranty requirements;

(5)      minor survey exceptions, minor encumbrances, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not Incurred in connection with Indebtedness and which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(6)      (A) Liens on assets of a Restricted Subsidiary that is not a Guarantor securing Indebtedness of such Restricted Subsidiary permitted to be Incurred pursuant to Section 4.03, (B) Liens securing First Priority Lien Obligations in an aggregate principal amount not to exceed the greater of (x) the aggregate principal amount of Indebtedness permitted to be Incurred pursuant to clauses (i), (iii)(A) and (iii)(C) of Section 4.03(b) and (y) the maximum principal amount of Indebtedness that, as of the date such Indebtedness was Incurred, and after giving effect to the Incurrence of such Indebtedness and the application of proceeds therefrom on such date, would not cause the Secured Indebtedness Leverage Ratio of the Company to exceed 2.00 to 1.00, *provided* that, with respect to Liens securing First Priority Lien Obligations permitted under this subclause (B), the Notes are secured by Liens on the property or assets subject to such Liens on at least a *pari passu* basis with the Liens securing all such First Priority Lien Obligations, with the priority and subject to intercreditor arrangements, in each case not materially less favorable to the holders of the Notes than those contemplated by Article XI of this Indenture, (C) Liens securing Indebtedness permitted to be Incurred pursuant to clause (iii)(B), (v)(A), (v)(B), (xiii), (xxi) or (xxv) of Section 4.03(b) (*provided* that (1) in the case of clause (iii)(B), any Lien on Notes Collateral securing Indebtedness under the ABL Facility, or any refinancing or replacement thereof, must be expressly subject to the terms of the Junior Lien Intercreditor Agreement, (2) in the case of clause (v)(A), such Lien extends only to the assets and/or Capital Stock, the acquisition, lease, construction, repair, replacement or improvement of which is financed thereby and any proceeds

-30-

or products thereof, (3) in the case of clause (xxi), such Lien does not extend to the property or assets of any Subsidiary of the Company other than a Foreign Subsidiary, (4) in the case of clause (v)(B) such Lien applies solely to acquired property or asset of the acquired entity, as the case may be), and (5) in the case of clause (xxv), such Lien does not extend to the property or assets of the Company or any Restricted Subsidiary of the Company organized under the laws of any jurisdiction other than Australia) and (D) Liens securing the Notes Obligations;

(7)     Liens existing on the Release Date (other than Liens in favor of the lenders under the Senior Term Loan Facility and under the ABL Facility);

(8)     Liens on assets, property or shares of stock of a Person at the time such Person becomes a Subsidiary; *provided*, *however*, that such Liens are not created or Incurred in connection with, or in contemplation of, such other Person becoming such a Subsidiary; *provided*, *further*, *however*, that such Liens may not extend to any other property owned by the Company or any Restricted Subsidiary of the Company;

(9)     Liens on assets or property at the time the Company or a Restricted Subsidiary of the Company acquired the assets or property, including any acquisition by means of a merger, amalgamation or consolidation with or into the Company or any Restricted Subsidiary; *provided* that such Liens are not created or Incurred in connection with, or in contemplation of, such acquisition; *provided*, *further* that the Liens may not extend to any other property owned by the Company or any Restricted Subsidiary;

(10)     Liens securing Indebtedness or other obligations of a Restricted Subsidiary owing to the Company or another Restricted Subsidiary permitted to be Incurred in accordance with Section 4.03;

(11)     Liens securing Hedging Obligations not Incurred in violation of this Indenture; *provided* that with respect to Hedging Obligations relating to Indebtedness, such Lien extends only to the property securing such Indebtedness;

(12)     Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances, tender, bid, judgment, appeal, performance or governmental contract bonds and completion guarantees, surety, standby letters of credit and warranty and contractual service obligations of a like nature, trade letters of credit and documentary letters of credit and similar bonds or guarantees provided by the Company or any Subsidiary of the Company;

(13)     leases and subleases of real property which do not materially interfere with the ordinary conduct of the business of the Company or any of its Restricted Subsidiaries;

(14)     Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Company and its Restricted Subsidiaries in the ordinary course of business or other precautionary Uniform Commercial Code financing statement filings;

(15)     Liens in favor of the Company, the Issuer or any Guarantor;

(16)     Liens on accounts receivable and related assets of the type specified in the definition of "Receivables Financing" Incurred in connection with a Qualified Receivables Financing to the extent permitted by the covenant described under Section 4.03;

(17)    Liens securing insurance premium financing arrangements; *provided, however,* that such Lien is limited to the applicable insurance carriers;

(18)    Liens on the Equity Interests of Unrestricted Subsidiaries;

(19)    leases, licenses, subleases or sublicenses granted to others in the ordinary course of business;

(20)    Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancings, refundings, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in the foregoing clauses (6), (7), (8), (9), (10), (11) and (15); *provided, however,* that (x) such new Lien shall be limited to all or part of the same property that secured the original Lien (*plus* improvements on such property), (y) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (A) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under clauses (6), (7), (8), (9), (10), (11) and (15) at the time the original Lien became a Permitted Lien under this Indenture, and (B) an amount necessary to pay any fees and expenses, including premiums, (including tender premiums) and original issue discount, related to such refinancing, refunding, extension, renewal or replacement and (z) Junior Lien Obligations shall not be refinanced with First Priority Lien Obligations (other than any Permitted Roll-Up Notes Refinancing); *provided, further, however,* that in the case of any Liens to secure any refinancing, refunding, extension or renewal of Indebtedness secured by a Lien referred to in clause (6)(B) or (C) above, the principal amount of any Indebtedness Incurred for such refinancing, refunding, extension or renewal shall be deemed secured by a Lien under clause (6)(B) or (C) and not this clause (20) for purposes of determining the principal amount of Indebtedness outstanding under clause (6)(B) or (C) above and for purposes of the definition of "Secured Credit Facility Indebtedness";

(21)    Liens on equipment of the Company or any Restricted Subsidiary granted in the ordinary course of business to the Company's or such Restricted Subsidiary's client at which such equipment is located;

(22)    judgment and attachment Liens not giving rise to an Event of Default and notices of lis pendens and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made;

(23)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into in the ordinary course of business;

(24)    Liens Incurred to secure cash management services or to implement cash pooling arrangements in the ordinary course of business;

(25)    other Liens on assets not constituting Notes Collateral securing Obligations that do not exceed $50.0 million in aggregate at any time;

(26)    any encumbrance or restriction (including put and call arrangements) with respect to Capital Stock of any Joint Venture or similar arrangement pursuant to any Joint Venture or similar agreement;

(27)    any amounts held by a trustee in the funds and accounts under an indenture securing any revenue bonds issued for the benefit of the Company or any Restricted Subsidiary;

-32-

(28)    Liens arising by virtue of any statutory or common law provisions relating to banker's Liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a depository or financial institution;

(29)    Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts Incurred in the ordinary course of business and (iii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(30)    Liens solely on any cash earnest money deposits made by the Company or any of its Restricted Subsidiaries in connection with any letter of intent or purchase agreement permitted under this Indenture;

(31)    any netting or set-off arrangements entered into by the Company or any Restricted Subsidiary of the Company in the ordinary course of its banking arrangements (including, for the avoidance of doubt, cash pooling arrangements) for the purposes of netting debit and credit balances of the Company or any Restricted Subsidiary of the Company, including pursuant to any Treasury Services Agreement;

(32)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(33)    Liens deemed to exist in connection with Investments in repurchase agreements permitted under Section 4.03; *provided* that such Liens do not extend to any assets other than those that are the subject of such repurchase agreements;

(34)    Liens (i) on cash advances in favor of the seller of any property to be acquired in or monies placed in escrow pursuant to an Investment permitted pursuant to the definition of "Permitted Investments" to be applied against the purchase price for such Investment, (ii) over assets being acquired pursuant to Investments permitted pursuant to the definition of "Permitted Investments" pending payment in full of the purchase price, (iii) consisting of an agreement to dispose of any property in a disposition permitted pursuant to the definition of "Asset Sale" and (iv) consisting of intellectual property licenses permitted by clause (18) of the definition of "Permitted Investments";

(35)    Liens arising by reason of deposits necessary to qualify the Company or any other Restricted Subsidiary of the Company to conduct business, maintain self insurance or comply with any law and Liens securing the PBGC Settlement;

(36)    any Lien arising as a result of a sale, transfer or other disposal which is an Asset Sale in compliance with Section 4.06;

(37)    Liens relating to a Catalyst Sale/Leaseback Transaction;

(38)    Liens relating to any Limited Recourse Stock Pledge; and

(39)    Liens relating to any Treasury Services Agreement, Qualified Joint Venture Transaction or Structured Financing Transaction.

"Permitted Roll-Up Notes Refinancing" means the issuance of other notes, and the Incurrence of additional term loans under any Credit Facilities, in an aggregate principal amount not to exceed $1,500.0 million if the proceeds thereof are used to refinance Plan Roll-Up Notes (and related interest, premiums, if any, and expenses) so long as

(i)     on a *pro forma* basis after giving effect thereto (including a *pro forma* application of the proceeds thereof), (x) the Fixed Charge Coverage Ratio of the Company is at least 2.00 to 1.00, (y) the Fixed Charge Coverage Ratio of the Company immediately after giving effect to the Incurrence of such Indebtedness is greater than the Fixed Charge Coverage Ratio immediately prior to such Incurrence and (z) the requirements of subclauses (1) and (3) of clause (xvi) of Section 4.03(b) are satisfied with respect to such refinancing; and

(ii)     to the extent that the aggregate principal amount of such other notes and term loans exceeds $1,000.0 million, the principal amount of Indebtedness permitted pursuant to subclause (iii)(A) of Section 4.03(b) shall be reduced on a dollar-for-dollar basis (without duplication for Indebtedness Incurred as part of a Permitted Roll-Up Notes Refinancing), until such time as such excess over $1,000.0 million (x) would be permitted to be Incurred under Section 4.03(a) and (y) would be permitted to be secured by a Lien as an Additional First Priority Lien Obligation pursuant to clause (6)(B)(y) of the definition of "Permitted Liens."

"Person" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"Plan Roll-Up Notes" means (a) any third-priority senior secured notes of the Issuer and guaranteed by one or more Guarantors issued in respect of DIP Roll-Up Claims under the Reorganization Plan; *provided* that any Indebtedness issued in lieu of the Plan Roll-Up Notes in respect of DIP Roll-Up Claims will be deemed to be Plan Roll-Up Notes (provided that any such Indebtedness is Incurred in compliance with the terms of this Indenture applicable to refinancings and replacements of Plan Roll-Up Notes had they been issued pursuant to the Plan of Reorganization), or (b) any notes, mortgages, guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements or refundings thereof and any indentures or credit facilities or commercial paper facilities that replace, refund or refinance any part thereof.

"Plan Roll-Up Notes Indenture" means the indenture or indentures under which the Plan Roll-Up Notes are issued, as amended, supplemented, modified, extended, restructured, renewed, restated, refinanced or replaced in whole or in part from time to time all in accordance with this Indenture; *provided* no such amendment or modification may shorten the maturity of the Plan-Roll-Up Notes.

"Pledgor" means any Guarantor other than the Company; *provided* that upon the release or discharge of such Subsidiary from its Obligations to pledge its assets and property to secure the Notes in accordance with this Indenture or the Security Documents, such Subsidiary ceases to be a Pledgor.

"Preferred Stock" means any Equity Interest with preferential right of payment of dividends or upon liquidation, dissolution, or winding up.

"Primary Offering" means an Equity Offering on any investment exchange or any other sale or issue by way of flotation or public offering or any equivalent circumstances with aggregate net cash proceeds to the Company or contributed to the Company of at least $500.0 million.

"Private Placement Legend" means the legend set forth in Section 2.07(g)(i) hereof to be placed on all Notes issued under this Indenture, except where otherwise permitted by the provisions of this Indenture.

"Project Financings" means, with respect to any project, the Incurrence of Indebtedness relating to the development, expansion, renovation, upgrade or other modification or construction of such project pursuant to which the providers of such Indebtedness or any trustee or other intermediary on their behalf or beneficiaries designated by any such provider, trustee or other intermediary are granted security over one or more assets relating to such project for repayment of principal, premium and interest or any other amount in respect of such Indebtedness, including Indebtedness to finance working capital requirements with respect to any project; *provided* that any working capital financing shall not be secured by any assets or property included in calculating the Borrowing Base for purposes of Section 4.03(b)(iii)(B).

"Qualified Institutional Buyer" or "QIB" has the meaning specified in Rule 144A.

"Qualified Joint Venture Transaction" means any transaction in which (i) Indebtedness is owed or incurred by any Restricted Subsidiary whose activities are limited to holding shares in Joint Ventures (but only to the extent that (a) the creditors under the relevant agreement have no recourse to the Company other than to such Restricted Subsidiary; and (b) the recourse those creditors have to such Restricted Subsidiary is limited to the proceeds (if any) of dividends received by such Restricted Subsidiary in respect of such Restricted Subsidiary's investment in such Joint Ventures) or (ii) involving guarantees by the Company or any Restricted Subsidiary of Indebtedness of a customer or a third party guarantor of such customer's Indebtedness that are made to a governmental export credit agency, a state development bank or like governmental agency or organization to the extent that such guarantees are conditioned on a failure to perform by any of the Company, such Restricted Subsidiary or a joint venture under an engineering procurement or construction contract entered into with such customer or third party guarantor; *provided* that the aggregate amount of any Indebtedness referenced in this clause (ii) shall not at any time exceed 1.0% of Consolidated Net Tangible Assets of the Company.

"Qualified Non-Recourse Debt" means Indebtedness that (1) is (a) Incurred by a Qualified Non-Recourse Subsidiary to finance (whether prior to or within 270 days after) the acquisition, lease, construction, repair, replacement or improvement of any property (real or personal) or equipment (whether through the direct purchase of property or the Equity Interests of any person owning such property and whether in a single acquisition or a series of related acquisitions) or (b) assumed by a Qualified Non-Recourse Subsidiary, (2) is non-recourse to the Company, the Issuer and any Pledgor and (3) is nonrecourse to any Restricted Subsidiary that is not a Qualified Non-Recourse Subsidiary.

"Qualified Non-Recourse Subsidiary" means (1) a Restricted Subsidiary that is not a Pledgor and that is formed or created after the Release Date in order to finance an acquisition, lease, construction, repair, replacement or improvement of any property or equipment (directly or through one of its Subsidiaries) that secures Qualified Non-Recourse Debt and (2) any Restricted Subsidiary of a Qualified Non-Recourse Subsidiary.

"Qualified Receivables Financing" means any Receivables Financing that meets the following conditions (including, without limitation, the Euro Securitization, the Berre Facility and the Negromex Receivables Dispositions):

> (1)     the Board of Directors of the Company shall have determined in good faith that such Qualified Receivables Financing (including financing terms, covenants, termination events and other provisions) is in the aggregate economically fair and reasonable to the Company and its Restricted Subsidiaries;

(2)        all sales of accounts receivable and related assets are made at Fair Market Value; and

(3)        the financing terms, covenants, termination events and other provisions thereof shall be market terms (as determined in good faith by the Company) and may include Standard Securitization Undertakings.

The grant of a security interest in any accounts receivable of the Company or any of its Restricted Subsidiaries to secure the ABL Facility, any Credit Facility Indebtedness or any Indebtedness in respect of the Notes shall not be deemed a Qualified Receivables Financing.

"Rating Agency" means (1) S&P, (2) Moody's, or (3) if either or both of S&P and Moody's shall not then exist, a nationally recognized securities rating agency or agencies, as the case may be, selected by the Company, which shall be substituted for S&P or Moody's or both, as the case may be.

"Real Property" means, collectively, all right, title and interests (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all buildings, structures, parking areas and improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"Receivables Fees" means distributions or payments made directly or by means of discounts with respect to any participation interests issued or sold in connection with, and all other fees paid to a Person that is not a Restricted Subsidiary in connection with, any Receivables Financing.

"Receivables Financing" means any transaction or series of transactions that may be entered into by the Company or any of its Subsidiaries pursuant to which the Company or any of its Subsidiaries may sell, convey or otherwise transfer to any other Person including to a Receivables Subsidiary, or may grant a security interest in, bank accounts, any accounts receivable (whether now existing or arising in the future) of the Company or any of its Subsidiaries, and any assets related thereto including, without limitation, all collateral securing such accounts receivable, all contracts and all guarantees or other obligations in respect of such accounts receivable, proceeds of such accounts receivable and other assets which are customarily transferred or in respect of which security interests are customarily granted in connection with asset securitization transactions involving accounts receivable and any Hedging Obligations entered into by the Company or any such Subsidiary in connection with such accounts receivable.

"Receivables Repurchase Obligation" means any Obligation of a seller of receivables in a Qualified Receivables Financing to repurchase receivables arising as a result of a breach of a representation, warranty or covenant or otherwise, including as a result of a receivable or portion thereof becoming subject to any asserted defense, dispute, offset or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

"Receivables Subsidiary" means a Wholly Owned Restricted Subsidiary of the Company (or another Person formed for the purposes of engaging in Receivables Financing with the Company in which the Company or any Subsidiary of the Company makes an Investment and to which the Company or any Subsidiary of the Company transfers accounts receivable and related assets) which engages in no activities other than in connection with the financing of accounts receivable of the Company and its Subsidiaries, all proceeds thereof and all rights (contractual or other), collateral and other assets relating thereto, and any business or activities incidental or related to such business, and which is designated by the Board of Directors of the Company (as provided below) as a Receivables Subsidiary and:

(a)      no portion of the Indebtedness or any other Obligations (contingent or otherwise) of which (i) is guaranteed by the Company or any other Subsidiary of the Company (excluding guarantees of Obligations (other than the principal of and interest on, Indebtedness) pursuant to Standard Securitization Undertakings), (ii) is recourse to or obligates the Company or any other Subsidiary of the Company in any way other than pursuant to Standard Securitization Undertakings, or (iii) subjects any property or asset of the Company or any other Subsidiary of the Company, directly or indirectly, contingently or otherwise, to the satisfaction thereof, other than pursuant to Standard Securitization Undertakings;

(b)      with which neither the Company nor any other Subsidiary of the Company has any material contract, agreement, arrangement or understanding other than on terms which the Company reasonably believes to be no less favorable to the Company or such Subsidiary than those that might be obtained at the time from Persons that are not Affiliates of the Company; and

(c)      to which neither the Company nor any other Subsidiary of the Company has any obligation to maintain or preserve such entity's financial condition or cause such entity to achieve certain levels of operating results.

Any such designation by the Board of Directors of the Company shall be evidenced to the Trustee by filing with the Trustee a certified copy of the resolution of the Board of Directors of the Company giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing conditions.

"Record Date" for the interest or Additional Interest, if any, payable on any applicable Interest Payment Date means April 15 and October 15 (whether or not a Business Day) immediately preceding such Interest Payment Date.

"Registrar" has the meaning provided in Section 2.04.

"Registration Rights Agreement" means the Registration Rights Agreement dated as of April 8, 2010 among the Escrow Issuer, the Company and the Initial Purchasers, and, Lyondell Chemical Company and the other Guarantors  on the Release Date upon execution of joinder agreements.

"Regulation S" means Regulation S promulgated under the Securities Act.

"Regulation S Global Note" means a Regulation S Temporary Global Note or Regulation S Permanent Global Note, as applicable.

"Regulation S Permanent Global Note" means a permanent Global Note in the form of Exhibit A-1 or Exhibit A-2 hereto, as the case may be, bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of and registered in the name of the applicable Depositary or its nominee, issued in a denomination equal to the outstanding principal amount of the Regulation S Temporary Global Note of the applicable series upon expiration of the Restricted Period.

"Regulation S Temporary Global Note" means a temporary Global Note in the form of Exhibit A-1 or Exhibit A-2 hereto, as the case may be, bearing the Global Note Legend, the Private Placement Legend and the Regulation S Temporary Global Note Legend and deposited with or on behalf of and registered in the name of the applicable Depositary or its nominee, issued in a denomination equal to the outstanding principal amount of the Notes of the applicable series initially sold in reliance on Rule 903.

"Regulation S Temporary Global Note Legend" means the legend set forth in Section 2.07(g)(iv) hereof.

"Reorganization Plan" means a plan of reorganization in any of the Cases.

"Responsible Officer" means, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee, including any vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such Person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Indenture.

"Restricted Definitive Note" means a Definitive Note bearing the Private Placement Legend.

"Restricted Global Note" means a Global Note bearing the Private Placement Legend.

"Restricted Investment" means an Investment other than a Permitted Investment.

"Restricted Period" means the 40-day distribution compliance period as defined in Regulation S.

"Restricted Subsidiary" means, with respect to any Person, any Subsidiary of such Person other than an Unrestricted Subsidiary of such Person. Unless otherwise indicated in this Indenture, all references to Restricted Subsidiaries shall mean Restricted Subsidiaries of the Company. For the avoidance of doubt, the Issuer shall at all times constitute a Restricted Subsidiary.

"Rule 144" means Rule 144 promulgated under the Securities Act (or any successor rule).

"Rule 144A" means Rule 144A promulgated under the Securities Act (or any successor rule).

"Rule 903" means Rule 903 promulgated under the Securities Act (or any successor rule).

"Rule 904" means Rule 904 promulgated under the Securities Act (or any successor rule).

"S&P" means Standard & Poor's Ratings Group or any successor to the rating agency business thereof.

"Sale/Leaseback Transaction" means an arrangement relating to property now owned or hereafter acquired by the Company or a Restricted Subsidiary whereby the Company or a Restricted Subsidiary transfers such property to a Person and the Company or such Restricted Subsidiary leases it from such Person, other than leases between the Company and a Restricted Subsidiary of the Company or between Restricted Subsidiaries of the Company.

"SEC" means the Securities and Exchange Commission or any successor agency or commission.

"Secured Credit Facility Indebtedness" means any Credit Facility Indebtedness that is secured by a Permitted Lien Incurred or deemed Incurred pursuant to clause (6)(B) of the definition of "Permitted Liens."

"Secured Indebtedness" means any Indebtedness secured by a Lien.

"Secured Indebtedness Leverage Ratio" means, with respect to any Person, at any date the ratio of (i) Secured Indebtedness constituting First Priority Lien Obligations of such Person and its Restricted Subsidiaries as of such date of calculation (determined on a consolidated basis in accordance with GAAP) to (ii) Consolidated EBITDA of such Person for the four full fiscal quarters for which internal financial statements are available immediately preceding such date of such calculation. In the event that the Company or any of its Restricted Subsidiaries Incurs, repays, repurchases or redeems any Indebtedness subsequent to the commencement of the period for which the Secured Indebtedness Leverage Ratio is being calculated but prior to the event for which the calculation of the Secured Indebtedness Leverage Ratio is made (the "Secured Leverage Calculation Date"), then the Secured Indebtedness Leverage Ratio shall be calculated giving *pro forma* effect to such Incurrence, repayment, repurchase or redemption of Indebtedness as if the same had occurred at the beginning of the applicable four-quarter period; *provided* that the Issuer may elect pursuant to an Officer's Certificate delivered to the Trustee to treat all or any portion of the commitment under any Indebtedness as being Incurred at such time, in which case any subsequent Incurrence of Indebtedness under such commitment shall not be deemed, for purposes of this calculation, to be an Incurrence at such subsequent time.

For purposes of making the computation referred to above, Investments, acquisitions, dispositions, mergers, amalgamations, consolidations and discontinued operations (as determined in accordance with GAAP), in each case with respect to an operating unit of a business, and any operational changes that the Company or any of its Restricted Subsidiaries has determined to make and/or made during the four-quarter reference period or subsequent to such reference period and on or prior to or simultaneously with the Secured Leverage Calculation Date shall be calculated on a *pro forma* basis assuming that all such Investments, acquisitions, dispositions, mergers, amalgamations, consolidations, discontinued operations and other operational changes (and the change of any associated Indebtedness and the change in Consolidated EBITDA resulting therefrom) had occurred on the first day of the four-quarter reference period. If since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the beginning of such period shall have made any Investment, acquisition, disposition, merger, consolidation, amalgamation, discontinued operation or operational change, in each case with respect to an operating unit of a business, that would have required adjustment pursuant to this definition, then the Secured Indebtedness Leverage Ratio shall be calculated giving *pro forma* effect thereto for such period as if such Investment, acquisition, disposition, discontinued operation, merger, amalgamation, consolidation or operational change had occurred at the beginning of the applicable four-quarter period.

For purposes of this definition, whenever *pro forma* effect is to be given to any event, the *pro forma* calculations shall be made in good faith by a responsible financial or accounting officer of the Company. Any such *pro forma* calculation may include adjustments appropriate, in the reasonable good faith determination of the Company as set forth in an Officer's Certificate, to reflect (1) operating expense reductions and other operating improvements or synergies reasonably expected to result from the applicable event and (2) all adjustments of the nature set forth as "Restructuring Adjustments" under "Unaudited Consolidated Pro Forma Financial Information" in the Offering Memorandum to the extent such adjustments, without duplication, continue to be applicable to such four-quarter period.

For the purposes of this definition, any amount in a currency other than U.S. Dollars will be converted to U.S. Dollars based on the average exchange rate for such currency for the most recent

twelve-month period immediately prior to the date of determination or if any such Indebtedness is subject to a Currency Agreement with respect to the currency in which such Indebtedness is denominated covering principal, premium, if any, and interest on such Indebtedness, the amount of such Indebtedness and such interest and premium, if any, shall be determined after giving effect to all payments in respect thereof under such Currency Agreement.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Security Documents" means the security agreements, pledge agreements, collateral assignments, mortgages and related agreements, as amended, supplemented, modified, extended, restructured, renewed, restated or replaced in whole or in part from time to time, creating the security interests in the Collateral as contemplated by this Indenture.

"Senior Term Loan Collateral Agent" means UBS AG, Stamford Branch, as the collateral agent under the Senior Term Loan Facility, or its successors.

"Senior Term Loan Facility" means the senior secured term loan facility of the Issuer to be entered into on the Release Date as amended, supplemented, modified, extended, restructured, renewed, restated, refinanced or replaced in whole or in part from time to time.

"Series" means (a) with respect to the First Lien Secured Parties, each of (i) the secured parties under the Senior Term Loan Facility (in their capacities as such), (ii) the holders of the Notes, the Collateral Agent and the Trustee (each in its capacity as such) and (iii) the Additional First Lien Secured Parties that become subject to the First Lien Intercreditor Agreement after the date hereof that are represented by a common Authorized Representative (in its capacity as such for such Additional First Lien Secured Parties); (b) with respect to any First Priority Lien Obligations, each of (i) the Obligations under the Senior Term Loan Facility, (ii) the Notes Obligations and the Obligations in respect of any refunding, refinancing or defeasement of the Notes and (iii) the Additional First Priority Lien Obligations Incurred pursuant to any applicable agreement, which pursuant to any joinder agreement, are to be represented under the First Lien Intercreditor Agreement by a common Authorized Representative (in its capacity as such for such Additional First Priority Lien Obligations); and (c) with respect to any Junior Lien Obligations, each of (i) the Obligations under the Plan Roll-Up Notes and (ii) the Junior Lien Obligations Incurred after the Issue Date pursuant to any applicable agreement.

"Shelf Registration Statement" means the Shelf Registration Statement as defined in the Registration Rights Agreement.

"Significant Subsidiary" means any Restricted Subsidiary that would be a "Significant Subsidiary" of the Company within the meaning of Rule 1-02 under Regulation S-X promulgated by the SEC (or any successor provision).

"Similar Business" means a business, the majority of whose revenues are derived from the activities of the Company and its Subsidiaries as of the Issue Date or any business or activity that is reasonably similar or complementary thereto or a reasonable extension, development or expansion thereof or ancillary thereto.

"Special Purpose Subsidiary" means any Subsidiary of the Company whose material assets are comprised solely of the Capital Stock of a Joint Venture, where the pledge of such Capital Stock would be prohibited by any contractual requirement pertaining to such Joint Venture.

"Specified ABL Facility Assets" means any ABL Facility Collateral, the net proceeds of an Asset Sale of which are required to be applied as a prepayment of any Asset Backed Credit Facility.

"Specified Premium" means 1.00% if the Special Mandatory Redemption occurs on or prior to the 90th day following the Issue Date and 1.50% if the Special Mandatory Redemption occurs after the 90th day following the Issue Date.

"Sponsor" means Apollo Global Management, LLC and any of its Affiliates.

"Standard Securitization Undertakings" means representations, warranties, undertakings, covenants, indemnities and guarantees of performance entered into by the Company or any Subsidiary of the Company which the Company has determined in good faith to be customary in a Receivables Financing it being understood that any Receivables Repurchase Obligation shall be deemed to be a Standard Securitization Undertaking.

"Stated Maturity" means, with respect to any security, the date specified in such security as the fixed date on which the final payment of principal of such security is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such security at the option of the holder thereof upon the happening of any contingency beyond the control of the issuer unless such contingency has occurred).

"Structured Financing Transaction" means a sale of preferred shares of a Restricted Subsidiary, depositing the proceeds of such sale with a bank and pledging such deposit to guarantee a put and call with respect to such preferred shares.

"Subordinated Indebtedness" means (a) with respect to the Issuer, any Indebtedness of the Issuer which is by its terms subordinated in right of payment to the Notes, and (b) with respect to any Guarantor, any Indebtedness of such Guarantor which is by its terms subordinated in right of payment to Obligations in respect of the Notes.

"Subsidiary" means, with respect to any Person, (1) any corporation, association or other business entity (other than a partnership, joint venture or limited liability company) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof; (2) any partnership, joint venture or limited liability company of which (x) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general and limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof, whether in the form of membership, general, special or limited partnership interests or otherwise, and (y) such Person or any Subsidiary of such Person is a controlling general partner or otherwise controls such entity; or (3) with respect to the Company, for so long as the Company or any of its Subsidiaries, individually or in the aggregate, has at least a 50% ownership interest in Lyondell Bayer Manufacturing Maasvlakle VOF, Lyondell Bayer Manufacturing Maasvlakle VOF. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Company.

"TIA" or "Trust Indenture Act" means the Trust Indenture Act of 1939 (15 U.S.C. Sections 77aaa-77bbbb) as in effect on the date of this Indenture.

"Total Assets" means, with respect to any Person, the total consolidated assets of such Person and its Restricted Subsidiaries, without giving effect to any amortization of the amount of intangi-

ble assets since the Issue Date, (x) as shown on the most recent balance sheet of such Person, or (y) in regards to the Company only, as shown on the most recent balance sheet required to be delivered pursuant to Section 4.02.

"Treasury Rate" means, as of the applicable redemption date, the yield to maturity as of such redemption date of United States Treasury Securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to such redemption date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from such redemption date to May 1, 2013; *provided*, *however*, that if the period from such redemption date to May 1, 2013 is less than one year, the weekly average yield on actually traded United States Treasury Securities adjusted to a constant maturity of one year will be used.

"Treasury Securities" means any Investment in obligations issued or guaranteed by the United States government or agency thereof, in each case, maturing no later than the Escrow End Date.

"Treasury Services Agreement" means any agreement between the Issuer, any Guarantor or Restricted Subsidiary and any commercial bank or other financial institution relating to treasury, depository, and cash management services, employee credit card arrangements or automated clearinghouse transfer of funds.

"Trust Officer" means:

(1)    any officer within the corporate trust department of the Trustee, including any vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any other officer of the Trustee who customarily performs functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such Person's knowledge of and familiarity with the particular subject, and

(2)    who shall have direct responsibility for the administration of this Indenture.

"Trustee" means the party named as such in this Indenture until a successor replaces it and, thereafter, means the successor.

"Uniform Commercial Code" or "UCC" means the New York Uniform Commercial Code as in effect from time to time.

"Unrestricted Definitive Note" means one or more Definitive Notes that do not bear and are not required to bear the Private Placement Legend.

"Unrestricted Global Note" means a permanent Global Note, substantially in the form of Exhibit A-1 or A-2 attached hereto, as the case may be, that bears the Global Note Legend and that has the "Schedule of Exchanges of Interests in the Global Note" attached thereto, and that is deposited with or on behalf of and registered in the name of the applicable Depositary, representing Notes that do not bear the Private Placement Legend.

"Unrestricted Subsidiary" means:

(1)    any Subsidiary of the Company that at the time of determination shall be designated an Unrestricted Subsidiary by the Board of Directors of such Person in the manner provided below; and

-42-

(2)      any Subsidiary of an Unrestricted Subsidiary;

The Company may designate any Subsidiary of the Company (including any newly acquired or newly formed Subsidiary of the Company) to be an Unrestricted Subsidiary unless such Subsidiary or any of its Subsidiaries owns any Equity Interests or Indebtedness of, or owns or holds any Lien on any property of, the Company or any other Subsidiary of the Company that is not a Subsidiary of the Subsidiary to be so designated; *provided*, *however*, that the Subsidiary to be so designated and its Subsidiaries do not at the time of designation have and do not thereafter Incur any Indebtedness pursuant to which the lender has recourse to any of the assets of the Company or any of its Restricted Subsidiaries (except as permitted under Section 4.03); *provided*, *further*, *however*, that either:

(a)      the Subsidiary to be so designated has total consolidated assets of $1,000 or less; or

(b)      if such Subsidiary has consolidated assets greater than $1,000, then such designation would be permitted under Section 4.04.

The Company may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided*, *however*, that immediately after giving effect to such designation:

(x)      (1) the Company could Incur $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test described in Section 4.03 or (2) the Fixed Charge Coverage Ratio for the Company and its Restricted Subsidiaries would be greater than such ratio for the Company and its Restricted Subsidiaries immediately prior to such designation, in each case on a *pro forma* basis taking into account such designation, and

(y)      no Event of Default shall have occurred and be continuing.

Any such designation by Company shall be evidenced to the Trustee by promptly filing with the Trustee a copy of the resolution of the Board of Directors or any committee thereof of the Company giving effect to such designation and an Officer's Certificate certifying that such designation complied with the foregoing provisions.

"U.S. Dollar Equivalent" means, with respect to any monetary amount in a currency other than U.S. dollars, at any time for the determination thereof, the amount of U.S. dollars obtained by converting such foreign currency involved in such computation into U.S. dollars at the spot rate for the purchase of U.S. dollars with the applicable foreign currency as quoted by Reuters at approximately 10:00 A.M. (New York City time) on such date of determination (or if no such quote is available on such date, on the immediately preceding Business Day for which such a quote is available).

"U.S. Legal Tender" means such coin or currency of the United States of America that at the time of payment shall be legal tender for the payment of public and private debts.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness or Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing (1) the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect

to such Disqualified Stock or Preferred Stock multiplied by the amount of such payment, by (2) the sum of all such payments.

"Wholly Owned Domestic Subsidiary" is any Wholly Owned Subsidiary that is a Domestic Subsidiary.

"Wholly Owned Restricted Subsidiary" is any Wholly Owned Subsidiary that is a Restricted Subsidiary.

"Wholly Owned Subsidiary" of any Person means a Subsidiary of such Person 100% of the outstanding Capital Stock or other ownership interests of which (other than directors' qualifying shares or shares required to be held by Foreign Subsidiaries) shall at the time be owned by such Person or by one or more Wholly Owned Subsidiaries of such Person.

SECTION 1.02.    Other Definitions.

| Term | Defined in Section |
|---|---|
| "3-16 Exemption" | 11.04(b) |
| "Additional Amounts" | 4.17(a) |
| "Additional Guarantee" | 4.11(a) |
| "Affiliate Transaction" | 4.07(a) |
| "Applicable Collateral Agents" | 1.01 |
| "Applicable Obligations" | 1.01 |
| "Asset Sale Offer" | 4.06(b) |
| "Authentication Order" | 2.03 |
| "Bankruptcy Law" | 6.01 |
| "Borrowing Base" | 4.03(b)(iii)(B) |
| "Change of Control Offer" | 4.08(b) |
| "Collateral Agreement" | 11.01 |
| "Collateral Asset Sale Offer" | 4.06(b) |
| "Collateral Asset Sale Offer Period" | 4.06(e) |
| "Collateral Excess Proceeds" | 4.06(b) |
| "Company" | Preamble |
| "covenant defeasance option" | 8.01(b) |
| "Covenant Suspension Event" | 4.15 |
| "Custodian" | 6.01 |
| "DBL S.A." | 2.03 |
| "DBTCA" | 7.13(a) |
| "Dutch Security Documents" | 7.13(a) |
| "Escrow Issuer" | Preamble |
| "EU Savings Tax Directive" | 4.17(b)(7) |
| "EU-Swiss Savings Tax Agreement" | 4.17(b)(7) |
| "Euro Paying Agent" | Preamble |
| "Event of Default" | 6.01 |
| "Excess Proceeds" | 4.06(b) |
| "Guarantee" | 12.01(a) |
| "Guaranteed Obligations" | 12.01(a) |
| "Guarantor" | 12.01(a) |
| "incorporated provision" | 13.01 |
| "Initial Dollar Notes" | Preamble |

| Term | Defined in Section |
|------|--------------------|
| "Initial Euro Notes" | Preamble |
| "Initial Notes" | Preamble |
| "Investment Grade Status Period" | 4.15 |
| "Issuer" | Preamble |
| "legal defeasance option" | 8.01(b) |
| "Notice of Default" | 6.01 |
| "Offer Period" | 4.06(d) |
| "other notes" | 4.03(b)(i) |
| "Parallel Debt" | 7.13(b)(i) |
| "Paying Agent" | 2.04 |
| "Payor" | 4.17(a) |
| "primary obligations" | 1.01 |
| "primary obligor" | 1.01 |
| "Principal Obligations" | 7.13(a) |
| "protected purchaser" | 2.08 |
| "Reference Period" | 4.04(a)(3)(i) |
| "Refinancing Indebtedness" | 4.03(b)(xvi) |
| "Refunding Capital Stock" | 4.04(b)(ii)(A) |
| "Registrar" | 2.04 |
| "Release Date" | 3.09 |
| "Relevant Taxing Jurisdiction" | 4.17(a) |
| "Restricted Payments" | 4.04(a) |
| "Retired Capital Stock" | 4.04(b)(ii)(A) |
| "Reversion Date" | 4.15 |
| "Roll-Up Notes Trustee" | 1.01 |
| "Second Commitment" | 4.06(b) |
| "Secured Leverage Calculation Date" | 1.01 |
| "Special Mandatory Redemption" | 3.09 |
| "Special Mandatory Redemption Price" | 3.09 |
| "Successor Company" | 5.01(a)(i) |
| "Successor Issuer" | 5.01(c)(i) |
| "Successor Pledgor" | 5.01(e)(i) |
| "Suspended Covenants" | 4.15 |
| "Suspension Period" | 4.15 |
| "Taxes" | 4.17(a) |
| "Transfer" | 5.01(e) |
| "Trigger Date" | 3.09 |
| "Trustee" | Preamble |
| "U.S. Paying Agent" | Preamble |

SECTION 1.03.    Incorporation by Reference of Trust Indenture Act.  This Indenture incorporates by reference certain provisions of the TIA.  The following TIA terms have the following meanings:

"Commission" means the SEC.

"indenture securities" means the Notes and any Guarantee.

"indenture security holder" means a holder.

"indenture to be qualified" means this Indenture.

"indenture trustee" or "institutional trustee" means the Trustee.

"obligor" on the indenture securities means the Issuer and each Guarantor and any other obligor on the Notes.

All other TIA terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule have the meanings assigned to them by such definitions.

SECTION 1.04.    Rules of Construction.  Unless the context otherwise requires:

(a)    a term has the meaning assigned to it;

(b)    an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(c)    "or" is not exclusive;

(d)    "including" means including without limitation;

(e)    words in the singular include the plural and words in the plural include the singular;

(f)    unsecured Indebtedness shall not be deemed to be subordinate or junior to Secured Indebtedness merely by virtue of its nature as unsecured Indebtedness;

(g)    the principal amount of any non-interest bearing or other discount security at any date shall be the principal amount thereof that would be shown on a balance sheet of the issuer dated such date prepared in accordance with GAAP;

(h)    the principal amount of any Preferred Stock shall be (i) the maximum liquidation value of such Preferred Stock or (ii) the maximum mandatory redemption or mandatory repurchase price with respect to such Preferred Stock, whichever is greater;

(i)    unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all financial statements required to be delivered hereunder shall be prepared in accordance with GAAP;

(j)    "$" and "U.S. dollars" each refer to United States dollars, or such other money of the United States of America that at the time of payment is legal tender for payment of public and private debts;

(k)    "euro" or "€" means the currency introduced at the start of the third stage of economic and monetary union pursuant to the Treaty of Rome establishing the European Community, as amended by the Treaty on European Union, signed at Maastricht on February 7, 1992; and

-46-

(l)    whenever in this Indenture or the Notes there is mentioned, in any context, principal, interest or any other amount payable under or with respect to any Notes, such mention shall be deemed to include mention of the payment of Additional Interest, to the extent that, in such context, Additional Interest is, were or would be payable in respect thereof.

## ARTICLE II

## THE NOTES

SECTION 2.01.    Amount of Notes; Terms.    The aggregate principal amount of Notes which may be authenticated and delivered under this Indenture on the Issue Date is $2,250,000,000 and €375,000,000, respectively.

The terms and provisions contained in the Notes shall constitute, and are hereby expressly made, a part of this Indenture and the Issuer, the Guarantors, the Trustee and Agents, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.  However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

The Notes shall be subject to repurchase by the Issuer pursuant to an Asset Sale Offer as provided in Section 4.06 hereof or a Change of Control Offer as provided in Section 4.08 hereof.  The Notes shall not be redeemable, other than as provided in Article III.

The terms and provisions contained in the Notes shall constitute, and are hereby expressly made, a part of this Indenture and the Issuer, the Guarantors and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby. However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

Additional Notes ranking *pari passu* with the Initial Notes may be created and issued under this Indenture from time to time by the Issuer without notice to or consent of the holders and shall be consolidated with and form a single class with the Initial Notes and shall have the same terms as to status, redemption or otherwise as the Initial Notes other than the initial payment date; *provided* that the Issuer's ability to issue Additional Notes shall be subject to the Issuer and the Company's compliance with Sections 4.03 and 4.12 hereof.  The Initial Notes and any Additional Notes subsequently issued under this Indenture may not, unless the Issuer so elects, be treated as a single class for all purposes under this Indenture, including, without limitation, waivers, amendments, redemptions and offers to purchase. Any Additional Notes subsequently issued under the Indenture will be not treated as fungible with the Initial Notes of the relevant series for United States federal income tax purposes or under the laws of any other jurisdiction, unless the Issuer so elects. Unless the context otherwise requires, for all purposes of this Indenture, references to the Notes include any Additional Notes actually issued.

SECTION 2.02.    Form and Dating.

(a)    The Notes and the Trustee's certificate of authentication shall be substantially in the form of Exhibit A-1 (in the case of the Dollar Notes) and Exhibit A-2 (in the case of the Euro Notes) hereto.  The Notes may have notations, legends or endorsements required by law, stock exchange rules or usage.  Each Note shall be dated the date of its authentication.  The Dollar Notes shall be in minimum denominations of $100,000 and integral multiples of $1,000 in excess thereof.  The Euro Notes shall be in minimum denominations of €50,000 and integral multiples of €1,000 in excess thereof.

(b)    Global Notes.  Notes issued in global form shall be substantially in the form of Exhibit A-1 (in the case of the Dollar Notes) and Exhibit A-2 (in the case of the Euro Notes) attached hereto (including the Global Note Legend thereon and the "Schedule of Exchanges of Interests in the Global Note" attached thereto).  Notes issued in definitive form shall be substantially in the form of Exhibit A-1 (in the case of the Dollar Notes) and Exhibit A-2 (in the case of the Euro Notes)  attached hereto (but without the Global Note Legend thereon and without the "Schedule of Exchanges of Interests in the Global Note" attached thereto).  Each Global Note shall represent such of the outstanding Notes as shall be specified in the "Schedule of Exchanges of Interests in the Global Note" attached thereto and each shall provide that it shall represent up to the aggregate principal amount of Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as applicable, to reflect exchanges and redemptions.  Any endorsement of a Global Note to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Notes represented thereby shall be made by the Registrar or the Custodian, at the direction of the Trustee, in accordance with instructions given by the holder thereof as required by Section 2.07 hereof.

(c)    Temporary Global Notes.  Notes offered and sold in reliance on Regulation S shall be issued initially in the form of the Regulation S Temporary Global Note, which shall be deposited on behalf of the purchasers of the Notes represented thereby with the Custodian and registered in the name of the applicable Depositary or the nominee of the Depositary for the accounts of designated agents holding on behalf of Euroclear or Clearstream, duly executed by the Issuer and, upon receipt of an Issuer Order, authenticated by the Trustee as hereinafter provided.  The Restricted Period shall be terminated upon the receipt by the Trustee of:

(1)    a written certificate from the applicable Depositary, together with copies of certificates from Euroclear and Clearstream certifying that they have received certification of non-United States beneficial ownership of 100% of the aggregate principal amount of each Regulation S Temporary Global Note (except to the extent of any beneficial owners thereof who acquired an interest therein during the Restricted Period pursuant to another exemption from registration under the Securities Act and who shall take delivery of a beneficial ownership interest in a 144A Global Note bearing a Private Placement Legend, all as contemplated by Section 2.07(b) hereof); and

(2)    an Officer's Certificate from the Issuer.

Following the termination of the Restricted Period, beneficial interests in each Regulation S Temporary Global Note shall be exchanged for beneficial interests in a Regulation S Permanent Global Note of the same series pursuant to the Applicable Procedures.  Simultaneously with the authentication of the corresponding Regulation S Permanent Global Note, the Trustee shall cancel the corresponding Regulation S Temporary Global Note.  The aggregate principal amount of a Regulation S Temporary Global Note and a Regulation S Permanent Global Note may from time to time be increased or decreased by adjustments made on the records of the Registrar and the applicable Depositary or its nominee, as the case may be, in connection with transfers of interest as hereinafter provided.

(d)    Euroclear and Clearstream Procedures Applicable.  The provisions of the "Operating Procedures of the Euroclear System" and "Terms and Conditions Governing Use of Euroclear" and the "General Terms and Conditions of Clearstream Banking" and "Customer Handbook" of Clearstream shall be applicable to transfers of beneficial interests in the Regulation S Temporary Global Note and the Regulation S Permanent Global Notes that are held by Participants through Euroclear or Clearstream.

SECTION 2.03.    Execution and Authentication.    One Officer shall sign the Notes for the Issuer by manual or facsimile signature.

If an Officer whose signature is on a Note no longer holds that office at the time the Trustee authenticates the Note, the Note shall be valid nevertheless.

A Note shall not be valid until and authorized signatory of the Trustee manually signs the certificate of authentication on the Notes in accordance with this Section 2.03.    The signature shall be conclusive evidence that the Note has been authenticated under this Indenture.

On the Issue Date, the Trustee shall, upon receipt of an Issuer Order (an "Authentication Order") and an Opinion of Counsel conforming with Section 314(c) of the TIA, authenticate and deliver (i) the Initial Dollar Notes and (ii) the Initial Euro Notes.    In addition, at any time, from time to time, the Trustee shall upon receipt of an Authentication Order authenticate and deliver any Additional Notes and Exchange Notes for an aggregate principal amount specified in such Authentication Order for such Additional Notes or Exchange Notes issued hereunder.

The Trustee may appoint one or more authenticating agents reasonably acceptable to the Issuer to authenticate the Notes.    Any such appointment shall be evidenced by an instrument signed by a Trust Officer, a copy of which shall be furnished to the Issuer.    Unless limited by the terms of such appointment, an authenticating agent may authenticate Notes whenever the Trustee may do so.    Each reference in this Indenture to authentication by the Trustee includes authentication by such agent.    An authenticating agent has the same rights as an Agent to deal with holders or an Affiliate of the Issuer.    The Trustee hereby appoints DBTCA as authenticating agent for the Dollar Note and Deutsche Bank Luxembourg S.A. ("DBL S.A."), as authenticating agent for the Euro Notes and each of DBTCA and DBL S.A. accept such appointment.

Notwithstanding the foregoing, except as provided in Section 9.02, all Notes issued under this Indenture shall vote and consent together on all matters (as to which any of such Notes may vote or consent) as one class and no series of Notes will have the right to vote or consent as a separate class on any matter.    For purposes of any matter requiring consent, waiver, approval or other action of the holders of a specified percentage of the principal amount of Notes, the principal amount, on the relevant date of determination, of Notes, the holders of which have so consented or otherwise taken action, and of Notes then outstanding, shall be calculated in U.S. Dollars, with the aggregate principal amount of outstanding Euro Notes converted into U.S. Dollars using the U.S. Dollar-equivalent on the Issue Date.

SECTION 2.04.    Registrar and Paying Agent.    The Issuer shall maintain an office or agency, where (a) Notes may be presented or surrendered for registration of transfer or for exchange ("Registrar"), (b) Notes may be presented or surrendered for payment and (c) notices and demands to or upon the Issuer in respect of the Notes and this Indenture may be served.    The Paying Agent shall not be the Issuer or an Affiliate of the Issuer.    The Registrar shall keep a register of the Notes and of their transfer and exchange.    The Issuer, upon notice to the Trustee, may have one or more Co-Registrars and one or more additional paying agents reasonably acceptable to the Trustee.    The term "Paying Agent" includes the Dollar Paying Agent and/or the Euro Paying Agent (as the context requires) and any additional paying agent, and the term "Registrar" includes the Dollar Registrar and/or the Euro Registrar (as the context requires and) and any Co-Registrar.    The Issuer may change the Paying Agent or Registrar without notice to any holder.

The Issuer shall enter into an appropriate agency agreement with any Agent not a party to this Indenture, which agreement shall incorporate the provisions of the TIA and implement the provisions of this Indenture that relate to such Agent.    The Issuer shall notify the Trustee, in advance, of the name

-49-

and address of any such Agent.  If the Issuer fails to maintain a Registrar or Paying Agent, or fails to give the foregoing notice, the Trustee shall act as such.

The Issuer initially appoints the Collateral Agent as the U.S. Registrar and U.S. Paying Agent with respect to the Dollar Notes and initially appoints Deutsche Bank AG, London Branch as Euro Paying Agent and Common Depositary and Deutsche Bank Luxembourg S.A. as Euro Registrar with respect to the Euro Notes, in each case until such time as such entity has resigned or a successor has been appointed.

The Issuer may remove any Registrar or Paying Agent upon written notice to such Registrar or Paying Agent and to the Trustee; *provided*, *however*, that no such removal shall become effective until (i) if applicable, acceptance of an appointment by a successor as evidenced by an appropriate agreement entered into by the Issuer and such successor Registrar or Paying Agent, as the case may be, and delivered to the Trustee or (ii) notification to the Trustee that the Trustee shall serve as Registrar or Paying Agent until the appointment of a successor in accordance with clause (i) above.  The Registrar or Paying Agent may resign upon 30 days prior written notice to the Issuer and the Trustee; *provided*, *however*, that the Trustee may resign as Paying Agent or Registrar only if the Trustee also resigns as Trustee in accordance with Section 7.08.

SECTION 2.05.    Paying Agent to Hold Money in Trust.  With respect to any Dollar Notes, prior to 10:00 a.m. New York City time, and with respect to any Euro Notes, prior to 10:00 am London time on each due date of the principal of and interest on any Note, the Issuer shall deposit with each Paying Agent (or if the Issuer or a Wholly Owned Subsidiary is acting as Paying Agent, segregate and hold in trust for the benefit of the Persons entitled thereto) a sum sufficient to pay such principal and interest when so becoming due.  The Issuer shall require each Paying Agent (other than the Trustee) to agree in writing that a Paying Agent shall hold in trust for the benefit of holders or the Trustee all money held by a Paying Agent for the payment of principal of and interest on the Notes, and shall notify the Trustee of any default by the Issuer in making any such payment.  If the Issuer or a Wholly Owned Subsidiary of the Issuer acts as Paying Agent, it shall segregate the money held by it as Paying Agent and hold it in trust for the benefit of the Persons entitled thereto.  The Issuer at any time may require a Paying Agent to pay all money held by it to the Trustee and to account for any funds disbursed by such Paying Agent.  Upon complying with this Section, a Paying Agent shall have no further liability for the money delivered to the Trustee.

SECTION 2.06.    Holder Lists.  The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of holders.  If the Trustee is not the Registrar, the Issuer shall furnish, or cause the Registrar to furnish, to the Trustee, in writing at least five Business Days before each Interest Payment Date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of holders.

SECTION 2.07.    Transfer and Exchange.

(a)    Transfer and Exchange of Global Notes.  Except as otherwise set forth in this Section 2.07, a Global Note may be transferred, in whole and not in part, only to another nominee of the applicable Depositary or to a successor thereto or a nominee of such successor thereto.  A beneficial interest in a Global Note may not be exchanged for a Definitive Note of the same series unless (A) in the case of a Global Note representing Dollar Notes, the Dollar Depositary (x) notifies the Issuer that it is unwilling or unable to continue as Depositary for such Global Note or (y) has ceased to be a clearing agency registered under the Exchange Act, and, in either case, a successor Depositary is not appointed by the Issuer within 120 days, (B) in the case of a Global Note representing Euro Notes, (x) Euroclear or

Clearstream notifies the Issuer that it is unwilling or unable to continue as clearing agency or (y) the
Common Depositary notifies the Issuer that it is unwilling or unable to continue as common depositary
for such Global Note, and, in either case, a successor Depositary is not appointed by the Issuer within 120
days or (C) in the case of any Global Note, there shall have occurred and be continuing a Default with
respect to the Notes.  Upon the occurrence of any of the preceding events in (A) or (B) above, Definitive
Notes delivered in exchange for any Global Note of the same series or beneficial interests therein will be
registered in the names, and issued in any approved denominations, requested by or on behalf of the De-
positary (in accordance with its customary procedures).  Global Notes also may be exchanged or replaced,
in whole or in part, as provided in Sections 2.08 hereof.  Every Note authenticated and delivered in ex-
change for, or in lieu of, a Global Note of the same series or any portion thereof, pursuant to this Section
2.07 or Section 2.08 hereof, shall be authenticated and delivered in the form of, and shall be, a Global
Note, except for Definitive Notes issued subsequent to any of the preceding events in (i) or (ii) above and
pursuant to Section 2.07(c) hereof.  A Global Note may not be exchanged for another Note other than as
provided in this Section 2.07(a); *provided*, *however*, beneficial interests in a Global Note may be trans-
ferred and exchanged as provided in Section 2.07(b), (c) or (f) hereof.

        (b)        <u>Transfer and Exchange of Beneficial Interests in the Global Notes</u>.  The transfer
and exchange of (x) beneficial interests in the Global Notes representing Dollar Notes shall be effected
through the Dollar Depositary and (y) beneficial interests in the Global Notes representing Euro Notes
shall be effected through the Common Depositary, in each case in accordance with the provisions of this
Indenture and the Applicable Procedures.  Beneficial interests in the Restricted Global Notes shall be sub-
ject to restrictions on transfer comparable to those set forth herein to the extent required by the Securities
Act.  Transfers of beneficial interests in the Global Notes also shall require compliance with either sub-
paragraph (i) or (ii) below, as applicable, as well as one or more of the other following subparagraphs, as
applicable:

        (i)        <u>Transfer of Beneficial Interests in the Same Global Note</u>.  Beneficial interests in
any Restricted Global Note may be transferred to Persons who take delivery thereof in the form
of a beneficial interest in the same Restricted Global Note in accordance with the transfer restric-
tions set forth in the Private Placement Legend; *provided*, *however*, that prior to the expiration of
the Restricted Period, transfers of beneficial interests in the Regulation S Temporary Global Note
may not be made to a U.S. Person or for the account or benefit of a U.S. Person (other than an
Initial Purchaser).  Beneficial interests in any Unrestricted Global Note may be transferred to Per-
sons who take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note.
No written orders or instructions shall be required to be delivered to the Registrar to effect the
transfers described in this Section 2.07(b)(i).

        (ii)        <u>All Other Transfers and Exchanges of Beneficial Interests in Global Notes</u>.  In
connection with all transfers and exchanges of beneficial interests that are not subject to Section
2.07(b)(i) hereof, the transferor of such beneficial interest must deliver to the Registrar either
(A) (1) a written order from a Participant or an Indirect Participant given to the applicable De-
positary in accordance with the Applicable Procedures directing such Depositary to credit or
cause to be credited a beneficial interest in another Global Note in an amount equal to the benefi-
cial interest to be transferred or exchanged and (2) instructions given in accordance with the Ap-
plicable Procedures containing information regarding the Participant account to be credited with
such increase or (B) (1) a written order from a Participant or an Indirect Participant given to the
applicable Depositary in accordance with the Applicable Procedures directing such Depositary to
cause to be issued a Definitive Note of the same series in an amount equal to the beneficial inter-
est to be transferred or exchanged and (2) instructions given by the applicable Depositary to the
Registrar containing information regarding the Person in whose name such Definitive Note shall
be registered to effect the transfer or exchange referred to in (1) above; *provided* that in no event

shall Definitive Notes be issued upon the transfer or exchange of beneficial interests in a Regula-
tion S Temporary Global Note prior to (A) the expiration of the Restricted Period and (B) the re-
ceipt by the Registrar of any certificates required pursuant to Rule 903.  Upon consummation of
an Exchange Offer by the Issuer in accordance with Section 2.07(f) hereof, the requirements of
this Section 2.07(b)(ii) shall be deemed to have been satisfied upon receipt by the Registrar of the
instructions contained in the Letter of Transmittal delivered by the holder of such beneficial inter-
ests in the Restricted Global Notes.  Upon satisfaction of all of the requirements for transfer or
exchange of beneficial interests in Global Notes contained in this Indenture and the Notes or oth-
erwise applicable under the Securities Act and as set forth in an Officer's Certificate, the Regis-
trar shall adjust the principal amount of the relevant Global Note(s) pursuant to Section 2.07(h)
hereof.

       (iii)      <u>Transfer of Beneficial Interests to Another Restricted Global Note</u>.  A beneficial
interest in any Restricted Global Note may be transferred to a Person who takes delivery thereof
in the form of a beneficial interest in another Restricted Global Note if the transfer complies with
the requirements of Section 2.07(b)(ii) hereof and the Registrar receives the following:

           (A)      if the transferee will take delivery in the form of a beneficial interest in a
144A Global Note, then the transferor must deliver a certificate in the form of <u>Exhibit B</u>
hereto, including the certifications in item (1) thereof; or

           (B)      if the transferee will take delivery in the form of a beneficial interest in a
Regulation S Global Note, then the transferor must deliver a certificate in the form of <u>Ex-
hibit B</u> hereto, including the certifications in item (2) thereof.

       (iv)      <u>Transfer and Exchange of Beneficial Interests in a Restricted Global Note for
Beneficial Interests in an Unrestricted Global Note</u>.  A beneficial interest in any Restricted Global
Note may be exchanged by any holder thereof for a beneficial interest in an Unrestricted Global
Note or transferred to a Person who takes delivery thereof in the form of a beneficial interest in an
Unrestricted Global Note if the exchange or transfer complies with the requirements of Section
2.07(b)(ii) hereof and:

           (A)      such exchange or transfer is effected pursuant to the Exchange Offer in
accordance with the Registration Rights Agreement and the holder of the beneficial inter-
est to be transferred, in the case of an exchange, or the transferee, in the case of a transfer,
certifies in the applicable Letter of Transmittal that it is not (1) a Broker-Dealer, (2) a
Person participating in the distribution of the Exchange Notes or (3) a Person who is an
affiliate (as defined in Rule 144) of the Issuer;

           (B)      such transfer is effected pursuant to the Shelf Registration Statement in
accordance with the Registration Rights Agreement;

           (C)      such transfer is effected by a Broker-Dealer pursuant to the Exchange
Offer Registration Statement in accordance with the Registration Rights Agreement; or

           (D)      the Registrar receives the following:

              (1)      if the holder of such beneficial interest in a Restricted Global
Note proposes to exchange such beneficial interest for a beneficial interest in an
Unrestricted Global Note of the same series, a certificate from such holder sub-

stantially in the form of Exhibit C hereto, including the certifications in item
(1)(a) thereof; or

(2)     if the holder of such beneficial interest in a Restricted Global
Note proposes to transfer such beneficial interest to a Person who shall take de-
livery thereof in the form of a beneficial interest in an Unrestricted Global Note
of the same series, a certificate from such holder in the form of Exhibit B hereto,
including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (D), if the Applicable Procedures so
require, an Opinion of Counsel in form reasonably acceptable to the Registrar to the ef-
fect that such exchange or transfer is in compliance with the Securities Act and that the
restrictions on transfer contained herein and in the Private Placement Legend are no
longer required in order to maintain compliance with the Securities Act.

If any such transfer is effected pursuant to subparagraph (B) or (D) above at a time when
an Unrestricted Global Note has not yet been issued, the Issuer shall issue and, upon receipt of an
Authentication Order in accordance with Section 2.03 hereof, the Trustee shall authenticate one
or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate prin-
cipal amount of beneficial interests transferred pursuant to subparagraph (B) or (D) above.

Beneficial interests in an Unrestricted Global Note cannot be exchanged for, or trans-
ferred to Persons who take delivery thereof in the form of, a beneficial interest in a Restricted
Global Note.

(c)     Transfer or Exchange of Beneficial Interests for Definitive Notes.

(i)     Beneficial Interests in Restricted Global Notes to Restricted Definitive Notes.  If
any holder of a beneficial interest in a Restricted Global Note proposes to exchange such beneficial inter-
est for a Restricted Definitive Note or to transfer such beneficial interest to a Person who takes delivery
thereof in the form of a Restricted Definitive Note, then, upon the occurrence of any of the events in sub-
section (i) or (ii) of Section 2.07(a) hereof and receipt by the Registrar of the following documentation:

(A)     if the holder of such beneficial interest in a Restricted Global Note proposes to
exchange such beneficial interest for a Restricted Definitive Note, a certificate from such holder
substantially in the form of Exhibit C hereto, including the certifications in item (2)(a) thereof;

(B)     if such beneficial interest is being transferred to a QIB in accordance with Rule
144A, a certificate substantially in the form of Exhibit B hereto, including the certifications in
item (1) thereof;

(C)     if such beneficial interest is being transferred to a Non-U.S. Person in an offshore
transaction in accordance with Rule 903 or Rule 904, a certificate substantially in the form of Ex-
hibit B hereto, including the certifications in item (2) thereof;

(D)     if such beneficial interest is being transferred pursuant to an exemption from the
registration requirements of the Securities Act in accordance with Rule 144, a certificate substan-
tially in the form of Exhibit B hereto, including the certifications in item (3)(a) thereof;

(E)      if such beneficial interest is being transferred to the Issuer or any of its Restricted Subsidiaries, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (3)(b) thereof; or

(F)      if such beneficial interest is being transferred pursuant to an effective registration statement under the Securities Act, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (3)(c) thereof,

the Registrar shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.07(h) hereof, and the Issuer shall execute and, upon receipt of an Authentication Order in accordance with Section 2.03 hereof, the Trustee shall authenticate and the Registrar shall mail to the Person designated in the instructions a Definitive Note in the applicable principal amount. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.07(c) shall be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar through instructions from the applicable Depositary and the Participant or Indirect Participant. The Registrar shall mail such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.07(c)(i) shall bear the Private Placement Legend and shall be subject to all restrictions on transfer contained therein.

(ii)      Beneficial Interests in Regulation S Temporary Global Note to Definitive Notes. Notwithstanding Sections 2.07(c)(i)(A) and (C) hereof, a beneficial interest in the Regulation S Temporary Global Note may not be exchanged for a Definitive Note or transferred to a Person who takes delivery thereof in the form of a Definitive Note prior to (A) the expiration of the Restricted Period and (B) the receipt by the Registrar of any certificates required pursuant to Rule 903(b)(3)(ii)(B) of the Securities Act, except in the case of a transfer pursuant to an exemption from the registration requirements of the Securities Act other than Rule 903 or Rule 904.

(iii)      Beneficial Interests in Restricted Global Notes to Unrestricted Definitive Notes. A holder of a beneficial interest in a Restricted Global Note may exchange such beneficial interest for an Unrestricted Definitive Note or may transfer such beneficial interest to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note only upon the occurrence of any of the events in subsection (A) or (B) of Section 2.07(a) hereof and if:

(A)      such exchange or transfer is effected pursuant to the Exchange Offer in accordance with the Registration Rights Agreement and the holder of such beneficial interest, in the case of an exchange, or the transferee, in the case of a transfer, certifies in the applicable Letter of Transmittal that it is not (1) a Broker-Dealer, (2) a Person participating in the distribution of the Exchange Notes or (3) a Person who is an affiliate (as defined in Rule 144) of the Issuer;

(B)      such transfer is effected pursuant to the Shelf Registration Statement in accordance with the Registration Rights Agreement;

(C)      such transfer is effected by a Broker-Dealer pursuant to the Exchange Offer Registration Statement in accordance with the Registration Rights Agreement; or

(D)      the Registrar receives the following:

(1)      if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for an Unrestricted Definitive Note, a certifi-

cate from such holder substantially in the form of <u>Exhibit C</u> hereto, including the certifications in item (1)(b) thereof; or

(2)    if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such holder substantially in the form of <u>Exhibit B</u> hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (D), if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(iv)    <u>Beneficial Interests in Unrestricted Global Notes to Unrestricted Definitive Notes</u>.  If any holder of a beneficial interest in an Unrestricted Global Note proposes to exchange such beneficial interest for a Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Definitive Note, then, upon the occurrence of any of the events in subsection (i) or (ii) of Section 2.07(a) hereof and satisfaction of the conditions set forth in Section 2.07(b)(ii) hereof, the Registrar shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.07(h) hereof, and the Issuer shall execute and, upon receipt of an Authentication Order in accordance with Section 2.03 hereof, the Trustee shall authenticate and mail to the Person designated in the instructions a Definitive Note in the applicable principal amount.  Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.07(c)(iv) shall be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar through instructions from or through the applicable Depositary and the Participant or Indirect Participant.  The Registrar shall mail such Definitive Notes to the Persons in whose names such Notes are so registered.  Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.07(c)(iv) shall not bear the Private Placement Legend.

(d)    <u>Transfer and Exchange of Definitive Notes for Beneficial Interests</u>.

(i)    <u>Restricted Definitive Notes to Beneficial Interests in Restricted Global Notes</u>.  If any holder of a Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note or to transfer such Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in a Restricted Global Note, then, upon receipt by the Registrar of the following documentation:

(A)    if the holder of such Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note, a certificate from such holder substantially in the form of <u>Exhibit C</u> hereto, including the certifications in item (2)(b) thereof;

(B)    if such Restricted Definitive Note is being transferred to a QIB in accordance with Rule 144A, a certificate substantially in the form of <u>Exhibit B</u> hereto, including the certifications in item (1) thereof;

(C)    if such Restricted Definitive Note is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate substantially in the form of <u>Exhibit B</u> hereto, including the certifications in item (2) thereof;

(D)      if such Restricted Definitive Note is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (3)(a) thereof;

(E)      if such Restricted Definitive Note is being transferred to the Issuer or any of its Restricted Subsidiaries, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (3)(b) thereof; or

(F)      if such Restricted Definitive Note is being transferred pursuant to an effective registration statement under the Securities Act, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (3)(c) thereof,

the Trustee shall cancel the Restricted Definitive Note, increase or cause to be increased the aggregate principal amount of, in the case of clause (A) above, the applicable Restricted Global Note, in the case of clause (B) above, the applicable 144A Global Note, and in the case of clause (C) above, the applicable Regulation S Global Note.

(ii)      Restricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes. A holder of a Restricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note only if:

(A)      such exchange or transfer is effected pursuant to the Exchange Offer in accordance with the Registration Rights Agreement and the holder, in the case of an exchange, or the transferee, in the case of a transfer, certifies in the applicable Letter of Transmittal that it is not (1) a Broker-Dealer, (2) a Person participating in the distribution of the Exchange Notes or (3) a Person who is an affiliate (as defined in Rule 144) of the Issuer;

(B)      such transfer is effected pursuant to the Shelf Registration Statement in accordance with the Registration Rights Agreement;

(C)      such transfer is effected by a Broker-Dealer pursuant to the Exchange Offer Registration Statement in accordance with the Registration Rights Agreement; or

(D)      the Registrar receives the following:

(1)      if the holder of such Definitive Notes proposes to exchange such Notes for a beneficial interest in the Unrestricted Global Note, a certificate from such holder substantially in the form of Exhibit C hereto, including the certifications in item (1)(c) thereof; or

(2)      if the holder of such Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of a beneficial interest in the Unrestricted Global Note, a certificate from such holder substantially in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (D), if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

Upon satisfaction of the conditions of any of the subparagraphs in this Section 2.07(d)(ii), the Registrar shall cancel the Definitive Notes and increase or cause to be increased the aggregate principal amount of the Unrestricted Global Note.

(iii)    <u>Unrestricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes</u>.  A holder of an Unrestricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note at any time.  Upon receipt of a request for such an exchange or transfer, the Registrar shall cancel the applicable Unrestricted Definitive Note and increase or cause to be increased the aggregate principal amount of one of the Unrestricted Global Notes.

If any such exchange or transfer from a Definitive Note to a beneficial interest is effected pursuant to subparagraph (ii)(B), (ii)(D) or (iii) above at a time when an Unrestricted Global Note has not yet been issued, the Issuer shall issue and, upon receipt of an Authentication Order in accordance with Section 2.03 hereof, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the principal amount of Definitive Notes so transferred.

(e)    <u>Transfer and Exchange of Definitive Notes for Definitive Notes</u>.  Upon request by a holder of Definitive Notes and such holder's compliance with the provisions of this Section 2.07(e), the Registrar shall register the transfer or exchange of Definitive Notes.  Prior to such registration of transfer or exchange, the requesting holder shall present or surrender to the Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar duly executed by such holder or by its attorney, duly authorized in writing.  In addition, the requesting holder shall provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.07(e):

(i)    <u>Restricted Definitive Notes to Restricted Definitive Notes</u>.  Any Restricted Definitive Note may be transferred to and registered in the name of Persons who take delivery thereof in the form of a Restricted Definitive Note if the Registrar receives the following:

(A)    if the transfer will be made pursuant to a QIB in accordance with Rule 144A, then the transferor must deliver a certificate substantially in the form of <u>Exhibit B</u> hereto, including the certifications in item (1) thereof;

(B)    if the transfer will be made pursuant to Rule 903 or Rule 904 then the transferor must deliver a certificate in the form of <u>Exhibit B</u> hereto, including the certifications in item (2) thereof; or

(C)    if the transfer will be made pursuant to any other exemption from the registration requirements of the Securities Act, then the transferor must deliver a certificate in the form of <u>Exhibit B</u> hereto, including the certifications required by item (3) thereof, if applicable.

(ii)    <u>Restricted Definitive Notes to Unrestricted Definitive Notes</u>.  Any Restricted Definitive Note may be exchanged by the holder thereof for an Unrestricted Definitive Note or transferred to a Person or Persons who take delivery thereof in the form of an Unrestricted Definitive Note if:

(A)    such exchange or transfer is effected pursuant to the Exchange Offer in accordance with the Registration Rights Agreement and the holder, in the case of an exchange, or the transferee, in the case of a transfer, certifies in the applicable Letter of

Transmittal that it is not (1) a Broker-Dealer, (2) a Person participating in the distribution of the Exchange Notes or (3) a Person who is an affiliate (as defined in Rule 144) of the Issuer;

(B)    any such transfer is effected pursuant to the Shelf Registration Statement in accordance with the Registration Rights Agreement;

(C)    any such transfer is effected by a Broker-Dealer pursuant to the Exchange Offer Registration Statement in accordance with the Registration Rights Agreement; or

(D)    the Registrar receives the following:

(1)    if the holder of such Restricted Definitive Notes proposes to exchange such Notes for an Unrestricted Definitive Note, a certificate from such holder substantially in the form of Exhibit C hereto, including the certifications in item (1)(d) thereof; or

(2)    if the holder of such Restricted Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such holder substantially in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (D), an Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(iii)    Unrestricted Definitive Notes to Unrestricted Definitive Notes.  A holder of Unrestricted Definitive Notes may transfer such Notes to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note.  Upon receipt of a request to register such a transfer, the Registrar shall register the Unrestricted Definitive Notes pursuant to the instructions from the holder thereof.

(f)    Exchange Offer.  Upon the occurrence of the Exchange Offer in accordance with the Registration Rights Agreement, the Issuer shall issue and, upon receipt of an Authentication Order in accordance with Section 2.03 hereof, the Trustee shall authenticate (i) one or more Unrestricted Global Notes in an aggregate principal amount equal to the principal amount of the beneficial interests in the Restricted Global Notes of the same series tendered for acceptance by Persons that certify in the applicable Letters of Transmittal that (x) they are not Broker-Dealers, (y) they are not participating in a distribution of the Exchange Notes and (z) they are not affiliates (as defined in Rule 144) of the Issuer, and accepted for exchange in the Exchange Offer and (ii) Unrestricted Definitive Notes in an aggregate principal amount equal to the principal amount of the Restricted Definitive Notes of the same series tendered for acceptance by Persons that certify in the applicable Letters of Transmittal that (x) they are not Broker-Dealers, (y) they are not participating in a distribution of the Exchange Notes and (z) they are not affiliates (as defined in Rule 144) of the Issuer, and accepted for exchange in the Exchange Offer.  Concurrently with the issuance of such Notes, the Registrar shall cause the aggregate principal amount of the applicable Restricted Global Notes to be reduced accordingly, and the Issuer shall execute and, upon receipt of an Authentication Order in accordance with Section 2.03 hereof, the Trustee shall authenticate and the Registrar shall mail to the Persons designated by the holders of Definitive Notes so accepted Un-

-58-

restricted Definitive Notes in the applicable principal amount.  Any Notes that remain outstanding after the consummation of the Exchange Offer, and Exchange Notes issued in connection with the Exchange Offer, shall be treated as a single class of securities under this Indenture.

(g)    Legends.  The following legends shall appear on the face of all Global Notes and Definitive Notes issued under this Indenture unless specifically stated otherwise in the applicable provisions of this Indenture:

(i)    Private Placement Legend.

(A)    Except as permitted by subparagraph (B) below, each Global Note and each Definitive Note (and all Notes issued in exchange therefor or substitution thereof) shall bear the legend in substantially the following form:

"THIS  "THE SECURITY (OR ITS PREDECESSOR) EVIDENCED HEREBY WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 5 OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE SECURITY EVIDENCED HEREBY MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM.  EACH PURCHASER OF THE SECURITY EVIDENCED HEREBY IS HEREBY NOTIFIED THAT THE SELLER MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A THEREUNDER.  THE HOLDER OF THE SECURITY EVIDENCED HEREBY AGREES FOR THE BENEFIT OF THE ISSUER THAT:

(A)    SUCH SECURITY MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED, ONLY:

(i)(a)    TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (b) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144 UNDER THE SECURITIES ACT, (c) OUTSIDE THE UNITED STATES TO A NON-U.S. PERSON IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 903 OR 904 UNDER THE SECURITIES ACT, (d) TO AN INSTITUTIONAL "ACCREDITED INVESTOR" (AS DEFINED IN RULE 501(a)(1),(2),(3) OR (7) OF THE SECURITIES ACT (AN "INSTITUTIONAL ACCREDITED INVESTOR")) THAT, PRIOR TO SUCH TRANSFER, FURNISHES THE TRUSTEE A SIGNED LETTER CONTAINING

CERTAIN REPRESENTATIONS AND AGREEMENTS (THE FORM OF WHICH CAN BE OBTAINED FROM THE TRUSTEE) AND, IF SUCH TRANSFER IS IN RESPECT OF AN AGGREGATE PRINCIPAL AMOUNT OF NOTES LESS THAN $100,000, AN OPINION OF COUNSEL ACCEPTABLE TO THE ISSUER THAT SUCH TRANSFER IS IN COMPLIANCE WITH THE SECURITIES ACT, OR (e) IN ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT (AND BASED UPON AN

OPINION OF COUNSEL AND OTHER CERTIFICATIONS AND DOCUMENTS IF THE ISSUER SO REQUESTS),

(ii)    TO THE ISSUER, OR

(iii)    PURSUANT TO AN EFFECTIVE REGISTRATION STATE-MENT

AND, IN EACH CASE, IN ACCORDANCE WITH ANY APPLICABLE SE-CURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION AND IN EACH CASE SUBJECT TO ANY RE-QUIREMENT OF LAW THAT THE DISPOSITION OF THIS SECURITY BY THE HOLDER OR BY ANY INVESTOR ACCOUNT OR ACCOUNTS BE AT ALL TIMES WITHIN ITS OR THEIR CONTROL; AND

(B)    THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER FROM IT OF THE SECURITY EVIDENCED HEREBY OF THE RESALE RESTRICTIONS SET FORTH IN (A) ABOVE.

THIS SECURITY MAY NOT BE ACQUIRED OR HELD WITH THE ASSETS OF (I) AN "EMPLOYEE BENEFIT PLAN" (AS DEFINED IN THE EMPLOYEE RE-TIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA")) THAT IS SUBJECT TO ERISA, (II) A "PLAN" WHICH IS SUBJECT TO SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), (III) ANY ENTITY DEEMED UNDER ERISA TO HOLD "PLAN ASSETS" OF ANY OF THE FOREGOING BY REASON OF AN EMPLOYEE BENEFIT PLAN'S OR PLAN'S INVESTMENT IN SUCH ENTITY, OR (IV) A GOVERNMENTAL PLAN OR CHURCH PLAN SUBJECT TO APPLICABLE LAW THAT IS SIMILAR IN PURPOSE OR EFFECT TO THE FIDUCIARY RESPONSIBILITY OR PROHIBITED TRANSACTION PROVISIONS OF ERISA OR SECTION 4975 OF THE CODE ("SIMILAR LAW"), UNLESS THE ACQUISITION AND HOLDING OF THIS SE-CURITY BY THE PURCHASER OR TRANSFEREE, THROUGHOUT THE PERIOD THAT IT HOLDS THIS SECURITY, ARE EXEMPT FROM THE PROHIBITED TRANSACTION RESTRICTIONS UNDER ERISA AND SECTION 4975 OF THE CODE OR ANY PROVISIONS OF SIMILAR LAW, AS APPLICABLE, PURSUANT TO ONE OR MORE PROHIBITED TRANSACTION STATUTORY OR ADMINIS-TRATIVE EXEMPTIONS.  BY ITS ACQUISITION OR HOLDING OF THIS SECU-RITY, EACH PURCHASER AND TRANSFEREE WILL BE DEEMED TO HAVE REPRESENTED AND WARRANTED THAT THE FOREGOING REQUIREMENTS HAVE BEEN SATISFIED."

(B)    Notwithstanding the foregoing, any Global Note or Definitive Note issued pursu-ant to subparagraph (b)(iv), (c)(iii), (c)(iv), (d)(ii), (d)(iii), (e)(ii), (e)(iii) or (f) of this Section 2.07 (and all Notes issued in exchange therefor or substitution thereof) shall not bear the Private Placement Legend.

(ii)    <u>Global Note Legend</u>.  Each Global Note representing Dollar Notes shall bear a legend in substantially the following form:

"THIS GLOBAL NOTE IS HELD BY THE DOLLAR DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY

FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT
TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT
THAT (I) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE
REQUIRED PURSUANT TO SECTION 2.07(h) OF THE INDENTURE, (II) THIS
GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSU-
ANT TO SECTION 2.07(a) OF THE INDENTURE, (III) THIS GLOBAL NOTE MAY
BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SEC-
TION 2.11 OF THE INDENTURE AND (IV) THIS GLOBAL NOTE MAY BE
TRANSFERRED TO A SUCCESSOR DOLLAR DEPOSITARY WITH THE PRIOR
WRITTEN CONSENT OF THE ISSUER.  UNLESS AND UNTIL IT IS EXCHANGED
IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY
NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DOLLAR DEPOSITARY
TO A NOMINEE OF THE DOLLAR DEPOSITARY OR BY A NOMINEE OF THE
DOLLAR DEPOSITARY TO THE DOLLAR DEPOSITARY OR ANOTHER NOMI-
NEE OF THE DOLLAR DEPOSITARY OR BY THE DOLLAR DEPOSITARY OR
ANY SUCH NOMINEE TO A SUCCESSOR DOLLAR DEPOSITARY OR A NOMI-
NEE OF SUCH SUCCESSOR DOLLAR DEPOSITARY.  UNLESS THIS CERTIFI-
CATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DE-
POSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK)
("DTC") TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER,
EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED
IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE RE-
QUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAY-
MENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE RE-
QUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER,
PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO
ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER
HEREOF, CEDE & CO., HAS AN INTEREST HEREIN."

(iii)     Each Global Note representing Euro Notes shall bear a legend in substantially the
following form:

"THIS GLOBAL NOTE IS HELD BY THE COMMON DEPOSITARY (AS DEFINED
IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY
FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT
TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT
THAT (I) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE
REQUIRED PURSUANT TO SECTION 2.07(h) OF THE INDENTURE, (II) THIS
GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSU-
ANT TO SECTION 2.07(a) OF THE INDENTURE, (III) THIS GLOBAL NOTE MAY
BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SEC-
TION 2.11 OF THE INDENTURE AND (IV) THIS GLOBAL NOTE MAY BE
TRANSFERRED TO A SUCCESSOR COMMON DEPOSITARY WITH THE PRIOR
WRITTEN CONSENT OF THE ISSUER.  UNLESS AND UNTIL IT IS EXCHANGED
IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY
NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE COMMON DEPOSI-
TARY TO A NOMINEE OF THE COMMON DEPOSITARY OR BY A NOMINEE OF
THE COMMON DEPOSITARY TO THE COMMON DEPOSITARY OR ANOTHER
NOMINEE OF THE COMMON DEPOSITARY OR BY THE COMMON DEPOSI-
TARY OR ANY SUCH NOMINEE TO A SUCCESSOR COMMON DEPOSITARY
OR A NOMINEE OF SUCH SUCCESSOR COMMON DEPOSITARY.  UNLESS THIS

CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE COMMON DEPOSITARY TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF DEUTSCHE BANK AG, LONDON BRANCH OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE COMMON DEPOSITARY (AND ANY PAYMENT IS MADE TO DEUTSCHE BANK AG, LONDON BRANCH OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF THE COMMON DEPOSITARY), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, DEUTSCHE BANK AG, LONDON BRANCH, HAS AN INTEREST HEREIN."

(iv)    Regulation S Temporary Global Note Legend. The Regulation S Temporary Global Note shall bear legends in substantially the following form, as applicable:

"THE RIGHTS ATTACHING TO THIS REGULATION S TEMPORARY GLOBAL NOTE, AND THE CONDITIONS AND PROCEDURES GOVERNING ITS EXCHANGE FOR CERTIFICATED NOTES, ARE AS SPECIFIED IN THE INDENTURE (AS DEFINED HEREIN)."

"UNTIL 40 DAYS AFTER THE LATER OF COMMENCEMENT OR COMPLETION OF THE OFFERING, AN OFFER OR SALE OF SECURITIES WITHIN THE UNITED STATES BY A DEALER (AS DEFINED IN THE SECURITIES ACT) MAY VIOLATE THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT IF SUCH OFFER OR SALE IS MADE OTHERWISE THAN IN ACCORDANCE WITH RULE 144A THEREUNDER."

(h)    Cancellation and/or Adjustment of Global Notes.  At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note shall be returned to or retained and canceled by the Registrar in accordance with Section 2.11 hereof.  At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note shall be reduced accordingly and an endorsement shall be made on such Global Note by the Registrar or by the applicable Depositary at the direction of the Registrar to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note shall be increased accordingly and an endorsement shall be made on such Global Note by the Registrar or by the applicable Depositary at the direction of the Registrar to reflect such increase.

(i)    General Provisions Relating to Transfers and Exchanges.

(i)    To permit registrations of transfers and exchanges, the Issuer shall execute and the Trustee shall authenticate Global Notes and Definitive Notes upon receipt of an Authentication Order in accordance with Section 2.03 hereof or at the Registrar's request.

(ii)    No service charge shall be made to a holder of a beneficial interest in a Global Note or to a holder of a Definitive Note for any registration of transfer or exchange, but the Issuer may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in

-62-

connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange or transfer pursuant to Sections 2.08, 3.08, 4.06, 4.08 and 9.05 hereof).

(iii)    Neither the Registrar nor the Issuer shall be required to register the transfer of or exchange any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part.

(iv)    All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Notes shall be the valid obligations of the Issuer, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes surrendered upon such registration of transfer or exchange.

(v)    The Issuer shall not be required (A) to issue, to register the transfer of or to exchange any Notes during a period beginning at the opening of business 15 days before the day of any selection of Notes for redemption under Section 3.04 hereof and ending at the close of business on the day of selection, (B) to register the transfer of or to exchange any Note so selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part or (C) to register the transfer of or to exchange a Note between a Record Date and the next succeeding Interest Payment Date.

(vi)    Prior to due presentment for the registration of a transfer of any Note, the Trustee, any Agent and the Issuer may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of (and premium, if any) and interest (including Additional Interest, if any) on such Notes and for all other purposes, and none of the Trustee, any Agent or the Issuer shall be affected by notice to the contrary.

(vii)    Upon surrender for registration of transfer of any Note at the office or agency of the Issuer designated pursuant to Section 4.14 hereof, the Issuer shall execute, and, upon receipt of an Authentication Order in accordance with Section 2.03 hereof, the Trustee shall authenticate and the Registrar shall  mail, in the name of the designated transferee or transferees, one or more replacement Notes of any authorized denomination or denominations of a like aggregate principal amount.

(viii)    At the option of the holder, Notes may be exchanged for other Notes of any authorized denomination or denominations of a like aggregate principal amount upon surrender of the Notes to be exchanged at such office or agency.  Whenever any Global Notes or Definitive Notes are so surrendered for exchange, the Issuer shall execute, and the Trustee shall authenticate and the Registrar shall mail, the replacement Global Notes and Definitive Notes which the holder making the exchange is entitled to in accordance with the provisions of Section 2.03 hereof.

(ix)    All certifications, certificates, Officer's Certificates and Opinions of Counsel required to be submitted to the Registrar pursuant to this Section 2.07 to effect a registration of transfer or exchange may be submitted by facsimile.

SECTION 2.08.    Replacement Notes.  If a mutilated Note is surrendered to the Registrar or if the holder of a Note claims that the Note has been lost, destroyed or wrongfully taken, the Issuer shall issue and the Trustee shall authenticate a replacement Note if the requirements of Section 8-405 of the Uniform Commercial Code are met, such that the holder (a) satisfies the Issuer or the Trustee within a reasonable time after such holder has notice of such loss, destruction or wrongful taking and the Registrar does not register a transfer prior to receiving such notification, (b) makes such request to the Issuer or the Trustee prior to the Note being acquired by a protected purchaser as defined in Section 8-303 of the Uniform Commercial Code (a "protected purchaser") and (c) satisfies any other reasonable requirements of the Trustee.  If required by the Trustee or the Issuer, such holder shall furnish an indemnity bond suffi-

cient in the judgment of the Trustee and the Issuer to protect the Issuer, the Trustee, a Paying Agent and the Registrar from any loss or liability that any of them may suffer if a Note is replaced and subsequently presented or claimed for payment. The Issuer and the Trustee may charge the holder for their expenses in replacing a Note (including without limitation, attorneys' fees and disbursements in replacing such Note). In the event any such mutilated, lost, destroyed or wrongfully taken Note has become or is about to become due and payable, the Issuer in its discretion may pay such Note instead of issuing a new Note in replacement thereof.

Every replacement Note is an additional obligation of the Issuer.

The provisions of this Section 2.08 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, lost, destroyed or wrongfully taken Notes.

SECTION 2.09.    Outstanding Notes. Notes outstanding at any time are all Notes authenticated by the Trustee except for those canceled by the Registrar, those delivered to it for cancellation and those described in this Section as not outstanding. Subject to Section 13.06, a Note does not cease to be outstanding because the Issuer or an Affiliate of the Issuer holds the Note.

If a Note is replaced pursuant to Section 2.08 (other than a mutilated Note surrendered for replacement), it ceases to be outstanding unless the Trustee and the Issuer receive proof satisfactory to them that the replaced Note is held by a protected purchaser. A mutilated Note ceases to be outstanding upon surrender of such Note and replacement thereof pursuant to Section 2.08.

If a Paying Agent segregates and holds in trust, in accordance with this Indenture, on a redemption date or maturity date money sufficient to pay all principal and interest payable on that date with respect to the Notes (or portions thereof) to be redeemed or maturing, as the case may be, and no Paying Agent is prohibited from paying such money to the holders on that date pursuant to the terms of this Indenture, then on and after that date such Notes (or portions thereof) cease to be outstanding and interest on them ceases to accrue.

SECTION 2.10.    [Intentionally Omitted].

SECTION 2.11.    Cancellation. The Issuer at any time may deliver Notes to the Registrar for cancellation. The Registrar and each Paying Agent and no one else shall cancel all Notes surrendered for registration of transfer, exchange, payment or cancellation and shall dispose of canceled Notes in accordance with its customary procedures. The Registrar and each Paying Agent shall give written notice to the Trustee of any Notes delivered to them and cancelled. Subject to Section 2.08, the Issuer may not issue new Notes to replace Notes it has redeemed, paid or delivered to the Trustee for cancellation. The Trustee shall not authenticate Notes in place of canceled Notes other than pursuant to the terms of this Indenture. However, if the Company shall acquire any of the Notes, such acquisition shall not operate as a redemption or satisfaction of the Indebtedness represented by such Notes unless and until the same are surrendered to the Trustee for cancellation pursuant to this Section 2.11.

SECTION 2.12.    Defaulted Interest. If the Issuer defaults in a payment of interest on the Notes, the Issuer shall pay the defaulted interest then borne by the Notes (*plus* interest on such defaulted interest to the extent lawful) in any lawful manner. The Issuer may pay the defaulted interest to the Persons who are holders on a subsequent special record date. The Issuer shall fix or cause to be fixed any such special record date and payment date to the reasonable satisfaction of the Trustee and shall promptly mail or cause to be mailed to each affected holder a notice that states the special record date, the payment date and the amount of defaulted interest to be paid.

SECTION 2.13.    CUSIP Numbers, ISINs, Etc.  The Issuer in issuing the Notes may use CUSIP numbers, ISINs and "Common Code" numbers (if then generally in use) and, if so, the Trustee shall use CUSIP numbers, ISINs and "Common Code" numbers in notices of redemption as a convenience to holders; *provided*, *however*, that any such notice may state that no representation is made as to the correctness of such numbers, either as printed on the Notes or as contained in any notice of a redemption that reliance may be placed only on the other identification numbers printed on the Notes and that any such redemption shall not be affected by any defect in or omission of such numbers.  The Issuer shall advise the Trustee of any change in the CUSIP numbers, ISINs and "Common Code" numbers.

SECTION 2.14.    Calculation of Principal Amount of Notes.  The aggregate principal amount of the Notes, at any date of determination, shall be the principal amount of the Notes at such date of determination.  With respect to any matter requiring consent, waiver, approval or other action of the holders of a specified percentage of the principal amount of all the Notes, such percentage shall be calculated, on the relevant date of determination, by dividing (a) the principal amount, as of such date of determination, of Notes, the holders of which have so consented, by (b) the aggregate principal amount, as of such date of determination, of the Notes then outstanding, in each case, as determined in accordance with the preceding sentence, Section 2.09, Section 9.02 and Section 13.06 of this Indenture.  Any such calculation made pursuant to this Section 2.14 shall be made by the Issuer and delivered to the Trustee pursuant to an Officer's Certificate.

# ARTICLE III

# REDEMPTION

SECTION 3.01.    Optional Redemption.  The Notes may be redeemed, in whole, or from time to time in part, subject to the conditions and at the redemption prices set forth in Section 5 of the forms of Note set forth in Exhibit A-1 and Exhibit A-2 hereto, which are hereby incorporated by reference and made a part of this Indenture, together with accrued and unpaid interest to the redemption date.

SECTION 3.02.    Applicability of Article.  Redemption of Notes at the election of the Issuer or otherwise, as permitted or required by any provision of this Indenture, shall be made in accordance with such provision and this Article.

SECTION 3.03.    Notices to Trustee.  If the Issuer elects to redeem Notes pursuant to the optional redemption provisions of Section 5 of the Note, it shall notify the Trustee, Registrar and each Paying Agent in writing of (i) the Section of this Indenture pursuant to which the redemption shall occur, (ii) the redemption date, (iii) the principal amount of Notes to be redeemed and (iv) the redemption price. The Issuer shall give notice to the Trustee provided for in this paragraph at least 45 days but not more than 60 days before a redemption date if the redemption is pursuant to Section 5 of the Note, unless a shorter period is acceptable to the Trustee.  Such notice shall be accompanied by an Officer's Certificate and Opinion of Counsel from the Issuer to the effect that such redemption will comply with the conditions herein, as well as such notice required to be delivered under Section 3.05 below.  If fewer than all the Notes are to be redeemed, the record date relating to such redemption shall be selected by the Issuer and given to the Trustee, which record date shall be not fewer than 15 days after the date of notice to the Trustee.  Any such notice may be canceled at any time prior to notice of such redemption being mailed to any holder and shall thereby be void and of no effect.

SECTION 3.04.    Selection of Notes to Be Redeemed.  Selection of Notes for redemption will be made by the Registrar on a *pro rata* basis by lot or otherwise in accordance with the procedures of the Depository to the extent practicable; *provided* that no Notes of $100,000 or €50,000, as ap-

plicable, principal amount or less shall be redeemed in part.  Selection of Euro Notes for redemption by the Registrar on a *pro rata* basis by lot or otherwise in accordance with the procedures of the Depository shall be calculated in U.S. Dollars using the U.S. Dollar-Equivalent on the date of selection.

If less than all the Notes are to be redeemed at any time in connection with an optional redemption, the Registrar will select Notes for redemption as follows:

(i)    if the Notes to be redeemed are listed, in compliance with the requirements of the principal national securities exchange on which such Notes are listed; or

(ii)    if the Notes to be redeemed are not so listed, on a *pro rata* basis, by lot or by such method as the Registrar shall deem fair and appropriate.

SECTION 3.05.    <u>Notice of Optional Redemption</u>.

(a)    At least 30 days but not more than 60 days before a redemption date pursuant to Section 5 of the Note, the Issuer shall mail or cause to be mailed by first-class mail a notice of redemption to each holder whose Notes are to be redeemed.

Any such notice shall identify the Notes to be redeemed and shall state:

(i)    the redemption date;

(ii)    the redemption price and the amount of accrued interest to the redemption date;

(iii)    the name and address of the Paying Agent;

(iv)    that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price, *plus* accrued interest;

(v)    if fewer than all the outstanding Notes are to be redeemed, the certificate numbers and principal amounts of the particular Notes to be redeemed, the aggregate principal amount of Notes to be redeemed and the aggregate principal amount of Notes to be outstanding after such partial redemption;

(vi)    that, unless the Issuer defaults in making such redemption payment or the Paying Agent is prohibited from making such payment pursuant to the terms of this Indenture, interest on Notes (or portion thereof) called for redemption ceases to accrue on and after the redemption date;

(vii)    the CUSIP number, ISIN and/or "Common Code" number, if any, printed on the Notes being redeemed; and

(viii)    that no representation is made as to the correctness or accuracy of the CUSIP number or ISIN and/or "Common Code" number, if any, listed in such notice or printed on the Notes.

(b)    At the Issuer's request, the Registrar and each Paying Agent shall give the notice of redemption in the Issuer's name and at the Issuer's expense.  In such event, the Issuer shall provide the Registrar and each Paying Agent with the information required by this Section at least one Business Day

prior to the date such notice is to be provided to holders in the final form such notice is to be delivered to holders and such notice may not be canceled.

SECTION 3.06.    Effect of Notice of Redemption.  Once notice of redemption is mailed in accordance with Section 3.05, Notes called for redemption become due and payable on the redemption date and at the redemption price stated in the notice, except as provided in the final sentence of Section 5 of the form of Note set forth in Exhibit A-1 and Exhibit A-2 hereto.  Upon surrender to the Paying Agent, such Notes shall be paid at the redemption price stated in the notice, *plus* accrued interest, to, but not including, the redemption date; *provided*, *however*, that if the redemption date is after a regular Record Date and on or prior to the Interest Payment Date, the accrued interest shall be payable to the holder of the redeemed Notes registered on the relevant Record Date.  Failure to give notice or any defect in the notice to any holder shall not affect the validity of the notice to any other holder.

SECTION 3.07.    Deposit of Redemption Price  With respect to any Dollar Notes, prior to 10:00 a.m. New York City time, and with respect to any Euro Notes, prior to 10:00 am London time, the Issuer shall deposit with the Paying Agent U.S. Legal Tender (in the case of Dollar Notes) and/or euro (in the case of Euro Notes) funds sufficient to pay the principal of, plus accrued and unpaid interest and additional interest (if any) on, the Notes to be redeemed on that date.  The Paying Agent shall promptly return to the Issuer any U.S. Legal Tender (in the case of Dollar Notes) and/or euro (in the case of Euro Notes) so deposited that is not required for that purpose, except with respect to monies owed as obligations to the Trustee pursuant to Article Seven.

Unless the Issuer fails to comply with the preceding paragraph and defaults in the payment of such redemption price, interest on the Notes to be redeemed will cease to accrue on and after the applicable redemption date, whether or not such Notes are presented for payment.

SECTION 3.08.    Notes Redeemed in Part.  Upon surrender of a Note that is redeemed or purchased in part, the Issuer shall issue and, upon receipt of an Authentication Order, the Trustee shall authenticate for the holder at the expense of the Issuer a new Note in principal amount equal to the unredeemed portion thereof will be issued in the name of the holder thereof upon cancellation of the original Note.  On and after the redemption date, interest will cease to accrue on Notes or portions thereof called for redemption so long as the Issuer has deposited with the Paying Agent funds sufficient to pay the principal of, plus accrued and unpaid interest and additional interest (if any) on, the Notes to be redeemed.

SECTION 3.09.    Special Mandatory Redemption.  The Notes will be subject to a mandatory redemption (a "Special Mandatory Redemption") in the event that either the Escrow Proceeds have not been released to the Escrow Agent for distribution in accordance with the terms and conditions of the Escrow Agreement (the "Release Date") on or before the Escrow End Date or (ii) prior to the Escrow End Date, the Issuer has determined, in its reasonable discretion, that the escrow conditions cannot be satisfied by such date (any such date, a "Trigger Date").  The Issuer will cause the notice of Special Mandatory Redemption to be mailed no later than the next Business Day following the Trigger Date and will redeem the Notes five Business Days following the date of the notice of redemption.

The redemption price for any Special Mandatory Redemption will be the sum of 100% of the Gross Proceeds plus the Specified Premium of the aggregate principal amount of the Notes issued on the Issue Date, together with accrued and unpaid interest on the Notes from the Issue Date up to but not including the date of the Special Mandatory Redemption (the "Special Mandatory Redemption Price").

If the Escrow Agent receives a notice of a Special Mandatory Redemption pursuant to the terms of the Escrow Agreement, the Escrow Agent will liquidate all Escrow Proceeds then held by it not later than the last Business Day prior to the date of the Special Mandatory Redemption.  Concurrently

with release of the amounts necessary to fund the Special Mandatory Redemption to the applicable Paying Agent, the Escrow Agent will release any excess of Escrow Proceeds over the Special Mandatory Redemption Price as specified in the Escrow Agreement, and the Issuer will be permitted to use such excess Escrow Proceeds refunded to it at its discretion.

## ARTICLE IV

## COVENANTS

The covenants described in this Indenture shall not bind the Company and its Restricted Subsidiaries prior to the Release Date, the references in Sections 4 and 5 in this Indenture to Obligations of the Company and its Restricted Subsidiaries, refer to the period beginning on and after the Release Date.

To the extent the Company, the Issuer or any Restricted Subsidiary has Incurred Indebtedness (treating Indebtedness not discharged pursuant to the Reorganization Plan and remaining outstanding on the Release Date as having been Incurred as of the Release Date), made any Restricted Payments, consummated any Asset Sale or otherwise taken any action or engaged in any activities during the period beginning on the Issue Date and ending on the Release Date, such actions and activities shall be treated and classified (including but not limited to impacting relevant baskets and determining whether a Default or Event of Default would have occurred as of the Release Date for purposes of the release conditions above), as if this Indenture and the covenants set forth herein had applied to the Company, the Issuer and the Restricted Subsidiaries during such period. For purposes of the foregoing, (i) the Company will be deemed to have been the direct or indirect owner of the Issuer and the Restricted Subsidiaries and the Issuer will be deemed to have been the direct or indirect owner of all of the Domestic Subsidiaries of the Company (or their intermediate holding companies between the Company and the Issuer) for all relevant periods and (ii) all Subsidiaries of the Company shall be deemed to be Restricted Subsidiaries for the period from the Issue Date through the Release Date.

SECTION 4.01.    Payment of Notes.  The Issuer shall promptly pay the principal of and interest on the Notes on the dates and in the manner provided in the Notes and in this Indenture.  An installment of principal of or interest shall be considered paid on the date due if on such date the Trustee or the Paying Agent holds as of 12:00 p.m. Eastern time money sufficient to pay all principal and interest then due and the Trustee or the Paying Agent, as the case may be, is not prohibited from paying such money to the holders on that date pursuant to the terms of this Indenture.

The Issuer shall pay interest on overdue principal at the rate specified therefor in the Notes, and it shall pay interest on overdue installments of interest at the same rate borne by the Notes to the extent lawful.

SECTION 4.02.    Reports and Other Information.

(a)    For the periods commencing with the period ending on December 31, 2010 and notwithstanding that the Issuer or the Company may not be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act or otherwise report on an annual and quarterly basis on forms provided for such annual and quarterly reporting pursuant to rules and regulations promulgated by the SEC, the Company shall file with the SEC (and provide the Trustee and holders with copies thereof, without cost to each holder, within 15 days after it files them with the SEC),

(i)    within the time period specified in the SEC's rules and regulations for non-accelerated filers, annual reports on Form 10-K (or any successor or comparable form) containing

-68-

the information required to be contained therein (or required in such successor or comparable form),

    (ii)    within the time period specified in the SEC's rules and regulations for non-accelerated filers, reports on Form 10-Q (or any successor or comparable form) containing the information required to be contained therein (or required in such successor or comparable form),

    (iii)    promptly from time to time after the occurrence of an event required to be therein reported (and in any event within the time period specified in the SEC's rules and regulations), such other reports on Form 8-K (or any successor or comparable form), and

    (iv)    any other information, documents and other reports which the Issuer would be required to file with the SEC if it were subject to Section 13 or 15(d) of the Exchange Act;

*provided*, *however*, that the Company shall not be so obligated to file such reports with the SEC if the SEC does not permit such filing, in which event, the Company will make available such information to prospective purchasers of Notes in addition to providing such information to the Trustee and the holders, in each case within 15 days after the time the Issuer would be required to file such information with the SEC if it were subject to Section 13 or 15(d) of the Exchange Act.

    Notwithstanding the foregoing, the Company shall not be required to furnish any information, certificates or reports required by Items 307 or 308 of Regulation S-K prior to the effectiveness of the Exchange Offer Registration Statement or Shelf Registration Statement.

    (b)    In the event that the rules and regulations of the SEC permit the Company to report at such parent entity's level on a consolidated basis and such parent entity is not engaged in any business in any material respect other than incidental to its ownership, directly or indirectly, of the capital stock of the Issuer, or consolidating reporting at the parent entity's level in a manner consistent with that described in this Section 4.02.

    (c)    The Issuer will make such information available to prospective investors upon request.  In addition, the Issuer has agreed that, for so long as any Notes remain outstanding during any period when it is not subject to Section 13 or 15(d) of the Exchange Act, or otherwise permitted to furnish the SEC with certain information pursuant to Rule 12g3-2(b) of the Exchange Act, it will furnish to the holders of the Notes and to prospective investors, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

    Notwithstanding the foregoing, the Issuer will be deemed to have furnished such reports referred to above to the Trustee if the Issuer has filed such reports with the SEC via the EDGAR filing system and such reports are publicly available.  In addition, the requirements of this Section 4.02 shall be deemed satisfied prior to the commencement of the exchange offers contemplated by the Registration Rights Agreement relating to the Notes or the effectiveness of the Shelf Registration Statement by (1) the filing with the SEC of the Exchange Offer Registration Statement and/or Shelf Registration Statement in accordance with the provisions of such Registration Rights Agreement, and any amendments thereto, if such registration statement and/or amendments thereto are filed at times that otherwise satisfy the time requirements set forth in Section 4.02(a) and/or (2) the posting of reports that would be required to be provided to the Trustee and the holders on the Issuer's website (or that of any of its parent companies).

SECTION 4.03.    <u>Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock</u>.

(a)    (i) The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, Incur any Indebtedness (including Acquired Indebtedness) or issue any shares of Disqualified Stock; and (ii) the Company shall not permit any of its Restricted Subsidiaries (other than the Issuer or any Guarantor) to issue any shares of Preferred Stock; *provided*, *however*, that the Issuer and any Guarantor may Incur Indebtedness (including Acquired Indebtedness) or issue shares of Disqualified Stock, and, subject to Section 4.03(c), any Restricted Subsidiary of the Company that is not a Guarantor may Incur Indebtedness (including Acquired Indebtedness), issue shares of Disqualified Stock or issue shares of Preferred Stock, in each case if the Fixed Charge Coverage Ratio of the Company for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is Incurred or such Disqualified Stock or Preferred Stock is issued would have been at least 2.00 to 1.00 determined on a *pro forma* basis (including a *pro forma* application of the net cash proceeds therefrom), as if the additional Indebtedness had been Incurred, or the Disqualified Stock or Preferred Stock had been issued, as the case may be, and the application of proceeds therefrom had occurred at the beginning of such four-quarter period.

(b)    The limitations set forth in Section 4.03(a) shall not apply to:

(i)    (A)  Indebtedness under the Notes issued on the Issue Date, and the guarantees thereof, and (B) an aggregate principal amount of Indebtedness outstanding in the form of any other series of notes representing First Priority Lien Obligations ("<u>other notes</u>") issued in one or more tranches under this Indenture, and the guarantees by the Guarantors thereof, if (x) on a *pro forma* basis after giving effect thereto (including a *pro forma* application of the proceeds thereof), the Secured Indebtedness Leverage Ratio of the Company would not exceed 2.00 to 1.00, or (y) pursuant to a Permitted Roll-Up Notes Refinancing;

(ii)    Indebtedness under the Plan Roll-Up Notes in an aggregate principal amount not to exceed $3,250 million at any one time outstanding;

(iii)    Indebtedness Incurred pursuant to Credit Facilities, as follows:

(A)    Indebtedness under any Credit Facilities (other than Asset Backed Credit Facilities) in the aggregate principal amount of $1,000 million plus an aggregate additional principal amount of Indebtedness secured by a Lien outstanding at any one time such that on a *pro forma* basis (including a *pro forma* application of the proceeds therefrom) the Secured Indebtedness Leverage Ratio of the Company would not exceed 2.00 to 1.00; *provided* that (x) regardless of whether such Secured Indebtedness Leverage Ratio is satisfied, term loans may be Incurred under this subclause (A) as part of a Permitted Roll-Up Notes Refinancing and (y) the availability of Indebtedness under Credit Facilities shall be reduced for a period of time as a result of a Permitted Roll-Up Notes Refinancing as provided in the definition thereof, *provided further* that the amount of Indebtedness that may be Incurred pursuant to this subclause (A) shall be reduced by the amount of any (x) prepayments of term loans under Credit Facilities or (y) permanent reductions of Indebtedness under any revolving credit facility (other than any such prepayments of the ABL Facility), in the case of each of (x) and (y) with the proceeds of an Asset Sale (other than any Asset Sale in respect of Specified ABL Facility Assets);

(B)    Indebtedness under Asset Backed Credit Facilities in an aggregate principal amount not to exceed the greater of (i) $1,750 million and (ii) the sum of 85% of the

net book value of the accounts receivable of the Company and its Restricted Subsidiaries and 65% of the net book value of the inventory of the Company and its Restricted Subsidiaries (the "Borrowing Base") less (x) in the case of the calculation of the Borrowing Base under this subclause (B)(ii), the amount of the Borrowing Base that is the subject of an on-balance sheet Qualified Receivables Financing (it being understood that any of the Borrowing Base that is subject to arrangements for disposition or transfer in connection with an off-balance sheet Qualified Receivables Financing shall not be included in the Borrowing Base) and (y) in the case of Indebtedness permitted to be Incurred under this subclause (B)(ii), the amount of any Indebtedness Incurred under any Oil Indexed Credit Facility; *provided* that any assets or property securing any Project Financing Incurred pursuant to clause (v)(B) below shall be excluded when determining the Borrowing Base; *provided further* that Indebtedness that may be Incurred pursuant to this subclause (B) shall be reduced by the amount of any permanent reductions of Indebtedness under any revolving credit facility (other than any such prepayments of revolving credit facilities Incurred pursuant to subclause (A) above) with the proceeds of an Asset Sale (other than any Asset Sale in respect of Specified ABL Facility Assets); *provided further* that, in the event of an Asset Acquisition, Indebtedness may be Incurred against the Borrowing Base pursuant to the foregoing in anticipation of the completion of such Asset Acquisition on the assumption that the Borrowing Base of the subject of the Asset Acquisition has been acquired; and

(C)    Indebtedness under any Oil Indexed Credit Facility in an aggregate principal amount not to exceed $750.0 million; *provided* that amounts Incurred pursuant to an Oil Indexed Credit Facility will be required to reduce the amount of Indebtedness Incurred under the Borrowing Base to the extent Indebtedness in such amount as would no longer be permitted to be Incurred under subclause (B) above (without duplication for the requirements of subclause (B) above);

(iv)    Indebtedness existing on the Release Date (other than the Notes and Indebtedness described in clauses (ii) and (iii) above) in an aggregate principal amount not to exceed $400.0 million, after giving effect to the consummation of the Reorganization Plan, which shall have the obligors, collateral, maturity and amortization features summarized under "Description of Certain Indebtedness" herein, and guarantees of Indebtedness of Joint Ventures outstanding on the Release Date, and operating leases of the Company and the Restricted Subsidiaries outstanding on the Release Date to the extent characterized as a Capitalized Lease Obligation after the Release Date;

(v)    (A) Indebtedness (including Capitalized Lease Obligations) Incurred by the Company or any Restricted Subsidiary, Disqualified Stock issued by the Company or any of its Restricted Subsidiaries and Preferred Stock issued by any Restricted Subsidiaries of the Company to finance (whether prior to or within 270 days after) the acquisition, lease, construction, repair, replacement or improvement of property (real or personal) or equipment (whether through the direct purchase of assets or the Capital Stock of any Person owning such assets); *provided* that Indebtedness Incurred pursuant to this clause (v)(A) is not Incurred to finance a Business Acquisition, (B) Indebtedness Incurred in connection with any Project Financing or (C) Indebtedness Incurred pursuant to a Catalyst Sale/Leaseback Transaction;

(vi)    Indebtedness Incurred by the Company or any of its Restricted Subsidiaries constituting reimbursement Obligations with respect to letters of credit and bank guarantees issued in the ordinary course of business, including, without limitation, letters of credit in respect of workers' compensation claims, health, disability or other benefits to employees or former employees

or their families or property, casualty or liability insurance or self-insurance or similar require-
ments, and letters of credit in connection with the maintenance of, or pursuant to the requirements
of, environmental or other permits or licenses from governmental authorities, or other Indebted-
ness with respect to reimbursement-type obligations regarding workers' compensation claims;

(vii)    Indebtedness arising from agreements of the Company or a Restricted Subsidiary
providing for indemnification, adjustment of purchase price or similar obligations, in each case,
Incurred in connection with any acquisition or disposition of any business, assets or a Subsidiary
of the Company in accordance with the terms of this Indenture, other than guarantees of Indebt-
edness Incurred by any Person acquiring all or any portion of such business, assets or Subsidiary
for the purpose of financing such acquisition;

(viii)    Indebtedness of the Company to a Restricted Subsidiary; *provided* that (except in
respect of intercompany current liabilities Incurred in the ordinary course of business in connec-
tion with the cash management operations of the Company and its Subsidiaries) any such Indebt-
edness owed to a Restricted Subsidiary that is not the Issuer or a Guarantor is subordinated in
right of payment to the Obligations of the Company under the Notes; *provided further* that any
subsequent issuance or transfer of any Capital Stock or any other event which results in any such
Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of
any such Indebtedness (except to the Company or another Restricted Subsidiary or any pledge of
such Indebtedness constituting a Permitted Lien) shall be deemed, in each case, to be an Incur-
rence of such Indebtedness not permitted by this clause (viii);

(ix)    shares of Preferred Stock of a Restricted Subsidiary issued to the Company or
another Restricted Subsidiary; *provided* that any subsequent issuance or transfer of any Capital
Stock or any other event which results in any Restricted Subsidiary that holds such shares of Pre-
ferred Stock of another Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other
subsequent transfer of any such shares of Preferred Stock (except to the Company or another Re-
stricted Subsidiary) shall be deemed, in each case, to be an issuance of shares of Preferred Stock
not permitted by this clause (ix);

(x)    Indebtedness of a Restricted Subsidiary to the Company or another Restricted
Subsidiary; *provided* that if the Issuer or a Guarantor Incurs such Indebtedness to a Restricted
Subsidiary that is not the Issuer or a Guarantor (except in respect of intercompany current liabili-
ties Incurred in the ordinary course of business in connection with the cash management opera-
tions of the Company and its Subsidiaries), such Indebtedness is subordinated in right of payment
to the Obligations of the Issuer or such Guarantor, as applicable, in respect of the Notes; *provided
further* that any subsequent issuance or transfer of any Capital Stock or any other event which re-
sults in any Restricted Subsidiary holding such Indebtedness ceasing to be a Restricted Subsidiary
or any other subsequent transfer of any such Indebtedness (except to the Company or another Re-
stricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) shall be
deemed, in each case, to be an Incurrence of such Indebtedness not permitted by this clause (x);

(xi)    Hedging Obligations that are not Incurred for speculative purposes but for the
purpose of (1) fixing or hedging interest rate risk with respect to any Indebtedness that is permit-
ted by the terms of this Indenture to be outstanding; (2) fixing or hedging currency exchange rate
risk with respect to any currency exchanges; (3) fixing or hedging commodity price risk, includ-
ing the price or cost of raw materials, emission rights, manufactured products or related com-
modities, with respect to any commodity purchases or sales; or (4) hedging the potential exposure
in respect of certain executives' and employees' options over, or stock appreciation rights in rela-
tion to, shares of Royal Dutch Shell plc and BASF AG;

(xii)    (A) obligations in respect of bankers' acceptances, tender, bid, judgment, appeal, performance or governmental contract bonds and completion guarantees, surety, standby letters of credit and warranty and contractual service obligations of a like nature, trade letters of credit and documentary letters of credit and similar bonds or guarantees provided by the Company or any Restricted Subsidiary in the ordinary course of business or (B) Indebtedness of the Company or any Restricted Subsidiary supported by a letter of credit or bank guarantee issued pursuant to any of the Credit Facilities, in a principal amount not in excess of the stated amount of such letter of credit;

(xiii)    Indebtedness or Disqualified Stock of the Company or, subject to Section 4.03(c), Indebtedness, Disqualified Stock or Preferred Stock of any Restricted Subsidiary of the Company not otherwise permitted hereunder in an aggregate principal amount or liquidation preference which, when aggregated with the principal amount or liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and Incurred pursuant to this clause (xiii), does not exceed the greater of $750.0 million and 3.75% of the Consolidated Net Tangible Assets of the Company at the time of Incurrence (it being understood that any Indebtedness Incurred pursuant to this clause (xiii) shall cease to be deemed Incurred or outstanding for purposes of this clause (xiii) but shall be deemed Incurred for purposes of Section 4.03(a) from and after the first date on which the Company or the Restricted Subsidiary, as the case may be, could have Incurred such Indebtedness under Section 4.03(a) without reliance upon this clause (xiii));

(xiv)    Indebtedness or Disqualified Stock of the Company, the Issuer or any Pledgor and Preferred Stock of the Issuer or any Pledgor not otherwise permitted hereunder in an aggregate principal amount or liquidation preference not greater than 200% of the net cash proceeds received by the Company and its Restricted Subsidiaries since immediately after the Release Date from the issue or sale of Equity Interests of the Company or any direct or indirect parent entity of the Company (which proceeds are contributed to the Company) or cash contributed to the capital of the Company (in each case other than proceeds of Disqualified Stock or sales of Equity Interests to, or contributions received from, the Company or any of its Restricted Subsidiaries) as determined in accordance with clauses (ii) and (iii) of Section 4.04(a)(iv)(3) to the extent such net cash proceeds or cash has not been applied pursuant to such clauses to make Restricted Payments or to make other Investments or to make Permitted Investments (other than Permitted Investments specified in clauses (1) and (3) of the definition thereof);

(xv)    any guarantee by the Company or any Restricted Subsidiary of Indebtedness or other Obligations of the Company or any of its Restricted Subsidiaries so long as the Incurrence of such Indebtedness Incurred by the Company or such Restricted Subsidiary is permitted under the terms of this Indenture; *provided* that (i) if such Indebtedness is by its express terms subordinated in right of payment to the Notes or the obligations of such Restricted Subsidiary in respect of the Notes, as applicable, any such guarantee of such Restricted Subsidiary with respect to such Indebtedness shall be subordinated in right of payment to such Restricted Subsidiary's obligations with respect to the Notes substantially to the same extent as such Indebtedness is subordinated to the Notes or the obligations of such Restricted Subsidiary in respect of the Notes, as applicable, and (ii) if such guarantee is of Indebtedness of the Company, such guarantee is Incurred in accordance with Section 4.11, solely to the extent such covenant is applicable;

(xvi)    the Incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness or Disqualified Stock or Preferred Stock of a Restricted Subsidiary of the Company which serves to refund, refinance or defease any Indebtedness Incurred or Disqualified Stock or Preferred Stock issued as permitted under Section 4.03(a) and clauses (i), (iv), (v), (xiv) and (xvii) of

this paragraph or any Indebtedness, Disqualified Stock or Preferred Stock Incurred to so refund or refinance such Indebtedness, Disqualified Stock or Preferred Stock, including any additional Indebtedness, Disqualified Stock or Preferred Stock Incurred to pay premiums (including tender premiums) and original issue discount, expenses, defeasance costs and fees in connection therewith; *provided* that any such Indebtedness until reclassified in accordance with this Indenture shall remain Incurred pursuant to clauses (i), (iv), (v), (xiv) and (xvii), as applicable (subject to the following proviso, "Refinancing Indebtedness"), prior to its maturity; *provided*, *however*, that such Refinancing Indebtedness:

> (1)    has a Weighted Average Life to Maturity at the time such Refinancing Indebtedness is Incurred which is not less than the shorter of (x) the remaining Weighted Average Life to Maturity of the Indebtedness, Disqualified Stock or Preferred Stock being refunded, refinanced or defeased and (y) the Weighted Average Life to Maturity that would result if all payments of principal on the Indebtedness, Disqualified Stock and Preferred Stock being refunded or refinanced that were due on or after the date that is one year following the last maturity date of any Notes then outstanding were instead due on such date;

> (2)    to the extent such Refinancing Indebtedness refinances (a) Indebtedness junior to the Notes or the Obligations of such Restricted Subsidiary in respect of the Notes, as applicable, such Refinancing Indebtedness is junior to the Notes or such Obligations of such Restricted Subsidiary, as applicable, to at least same extent or (b) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness is Disqualified Stock or Preferred Stock, as the case may be, of the same issuer; and

> (3)    shall not include (a) Indebtedness of a Restricted Subsidiary of the Company that is not a Guarantor that refinances Indebtedness of the Issuer or a Guarantor, or (b) Indebtedness of the Company or a Restricted Subsidiary that refinances Indebtedness of an Unrestricted Subsidiary;

*provided*, *further* that subclause (1) of this clause (xvi) will not apply to any refunding or refinancing of any Secured Indebtedness constituting First Priority Lien Obligations;

(xvii)    Indebtedness, Disqualified Stock or Preferred Stock of (x) the Company or, subject to Section 4.03(c), any of its Restricted Subsidiaries (A) Incurred to finance an Asset Acquisition or (B) Incurred by a Person in connection with or anticipation of such Person becoming a Restricted Subsidiary as a result of an Asset Acquisition or to finance an Asset Acquisition or (y) a Person existing at the time such Person becomes a Restricted Subsidiary of the Company as a result of an Asset Acquisition or assumed in connection with an Asset Acquisition by the Company or a Restricted Subsidiary of the Company and, in any such case under this subclause (y), not Incurred in connection with or in anticipation of such Asset Acquisition; *provided* that, in the case of clause (y), the holders of any such Indebtedness do not, at any time, have direct or indirect recourse to any property or assets of the Company or any Restricted Subsidiary other than the property or assets that are the subject of such Asset Acquisition; *provided* that after giving effect to such Asset Acquisition, either:

> (1)    the Company would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4.03(a); or

(2)    the Fixed Charge Coverage Ratio of the Company would be greater than immediately prior to such Asset Acquisition;

(xviii)    Indebtedness Incurred in a Qualified Receivables Financing that is without recourse to the Company or any Restricted Subsidiary (except for Standard Securitization Undertakings);

(xix)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided* that such Indebtedness is extinguished within five Business Days of its Incurrence;

(xx)    Indebtedness under any Treasury Services Agreement or any Structured Financing Transaction;

(xxi)    Indebtedness of Foreign Subsidiaries; *provided*, *however*, that the aggregate principal amount of Indebtedness Incurred under this clause (xxi), when aggregated with the principal amount of all other Indebtedness then outstanding and Incurred pursuant to this clause (xxi), does not exceed the greater of $350.0 million and 3.50% of the Consolidated Net Tangible Assets of the Foreign Subsidiaries at any one time outstanding (it being understood that any Indebtedness Incurred pursuant to this clause (xxi) shall cease to be deemed Incurred or outstanding for purposes of this clause (xxi) but shall be deemed Incurred for the purposes of Section 4.03(a) from and after the first date on which such Foreign Subsidiary could have Incurred such Indebtedness under Section 4.03(a) without reliance upon this clause (xxi));

(xxii)    Indebtedness of the Company or any Restricted Subsidiary consisting of (1) the financing of insurance premiums or (2) take-or-pay Obligations contained in supply arrangements, in each case, in the ordinary course of business;

(xxiii)    Indebtedness consisting of Indebtedness issued by the Company or a Restricted Subsidiary of the Company to current or former officers, directors and employees thereof or any direct or indirect parent thereof, their respective estates, spouses or former spouses, in each case to finance the purchase or redemption of Equity Interests of the Company or any direct or indirect parent entity of the Company to the extent described in Section 4.04(b)(iv);

(xxiv)    Indebtedness Incurred on behalf of, or representing guarantees of Indebtedness of, Joint Ventures of the Company or any Restricted Subsidiary not to exceed, at any one time outstanding, the greater of $250.0 million and 1.25% of the Consolidated Net Tangible Assets of the Company; and

(xxv)    Indebtedness Incurred by Lyondell Basell Australia Pty Ltd. and its successors in an aggregate principal amount at any one time outstanding not to exceed $80.0 million; *provided* that such Indebtedness is not guaranteed by the Company or any Restricted Subsidiary of the Company organized under the laws of any jurisdiction other than Australia.

(c)    Restricted Subsidiaries that are not Guarantors may not Incur Indebtedness or issue Disqualified Stock or Preferred Stock under Section 4.03(a) or clause (xiii) or (xvii)(x) (or clause (xv) to the extent constituting a guarantee of Indebtedness Incurred under Section 4.03(a) or clause (xiii) or (xvii)(x)) of Section 4.03(b) if, after giving *pro forma* effect to such Incurrence or issuance (including a *pro forma* application of the net cash proceeds therefrom), the aggregate amount of Indebtedness and Disqualified Stock and Preferred Stock of Restricted Subsidiaries that are not Guarantors Incurred or issued

pursuant to Section 4.03(a) and clauses (xiii) and (xvii)(x) (or clause (xv) to the extent constituting a guarantee of Indebtedness Incurred under Section 4.03(a) or clause (xiii) or (xvii)(x)) of Section 4.03(b), collectively, would exceed the greater of $400.0 million and 4.0% of the Consolidated Net Tangible Assets of Restricted Subsidiaries that are not Guarantors.

(d)    For purposes of determining compliance with this Section 4.03:

(i)    in the event that an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) meets the criteria of more than one of the categories of permitted Indebtedness described in clauses (i) through (xxv) of Section 4.03(b) or is entitled to be Incurred pursuant to Section 4.03(a), the Company, in its sole discretion, classify or reclassify, or later divide, classify or reclassify, such item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) in any manner that complies with this Section 4.03; *provided* that Indebtedness Incurred, or committed for, under the Credit Facilities and the Plan Roll-Up Notes on or before the Release Date or pursuant to an Oil Indexed Credit Facility shall at all times be deemed to be Incurred under clauses (ii) and (iii) of Section 4.03(b); and

(ii)    at the time of Incurrence, the Company will be entitled to divide and classify an item of Indebtedness in more than one of the types of Indebtedness described in Sections 4.03(a) and (b) without giving *pro forma* effect to the Indebtedness Incurred pursuant to Section 4.03(b) when calculating the amount of Indebtedness that may be Incurred pursuant to Section 4.03(a).

Accrual of interest, the accretion of accreted value, the payment of interest or dividends in the form of additional Indebtedness, Disqualified Stock or Preferred Stock, as applicable, amortization of original issue discount, the accretion of liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an Incurrence or issuance of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this Section 4.03. Guarantees of, or Obligations in respect of letters of credit relating to, Indebtedness which is otherwise included in the determination of a particular amount of Indebtedness shall not be included in the determination of such amount of Indebtedness; *provided* that the Incurrence of the Indebtedness represented by such guarantee or letter of credit, as the case may be, was in compliance with this Section 4.03.

For purposes of determining compliance with any U.S. Dollar-denominated restriction on the Incurrence of Indebtedness, the U.S. Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was Incurred, in the case of term debt, or first committed or first Incurred (whichever yields the lower U.S. Dollar Equivalent), in the case of revolving credit debt; or if any such Indebtedness is subject to a Currency Agreement with respect to the currency in which such Indebtedness is denominated covering principal, premium, if any, and interest on such Indebtedness, the amount of such Indebtedness and such interest and premium, if any, shall be determined after giving effect to all payments in respect thereof under such Currency Agreement; *provided* that if such Indebtedness is Incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such Refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced.

(e)    Notwithstanding any other provision of this Section 4.03, the maximum amount of Indebtedness that the Company and its Restricted Subsidiaries may Incur pursuant to this Section 4.03 shall not be deemed to be exceeded, with respect to any outstanding Indebtedness, solely as a result of fluctuations in the exchange rate of currencies. The principal amount of any Indebtedness Incurred to

refinance other Indebtedness, if Incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of such refinancing.

SECTION 4.04.    <u>Limitation on Restricted Payments</u>.

(a)    The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly:

(i)    declare or pay any dividend or make any distribution on account of the Company's or any of its Restricted Subsidiaries' Equity Interests, including any payment made in connection with any merger, amalgamation or consolidation involving the Company (other than (A) dividends or distributions by the Company payable solely in Equity Interests (other than Disqualified Stock) of the Company; or (B) dividends or distributions by a Restricted Subsidiary so long as, in the case of any dividend or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary other than a Wholly Owned Restricted Subsidiary, the Company or a Restricted Subsidiary receives at least its *pro rata* share of such dividend or distribution in accordance with its Equity Interests in such class or series of securities);

(ii)    purchase or otherwise acquire or retire for value any Equity Interests of the Company or any direct or indirect parent entity of the Company;

(iii)    make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value, in each case prior to any scheduled repayment or scheduled maturity, any Subordinated Indebtedness of the Company or any of its Restricted Subsidiaries (other than the payment, redemption, repurchase, defeasance, acquisition or retirement of (A) Subordinated Indebtedness in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of such payment, redemption, repurchase, defeasance, acquisition or retirement and (B) Indebtedness permitted under clauses (viii) and (ix) of Section 4.03(b)); or

(iv)    make any Restricted Investment

(all of the payments and other actions set forth in clauses (i) through (iv) above are collectively referred to as "<u>Restricted Payments</u>"), unless, at the time of such Restricted Payment:

(1)    no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof;

(2)    immediately after giving effect to such transaction on a *pro forma* basis, the Company could Incur $1.00 of additional Indebtedness under Section 4.03(a); and

(3)    the aggregate amount of Restricted Payments made after the Release Date (including the Fair Market Value of non-cash amounts constituting Restricted Payments and Restricted Payments permitted by clauses (i), (ii) (vi)(B), (viii), (xii)(B) and (xvi) of Section 4.04(b), but excluding all other Restricted Payments permitted by Section 4.04(b)) shall not exceed the sum of, without duplication.

(i)    50% of the Consolidated Net Income of the Company for the period (taken as one accounting period, the "<u>Reference Period</u>") from March 31, 2012 to the end of the Company's most recently ended fiscal quarter for which internal financial state-

ments are available at the time of such Restricted Payment (or, in the case such Consoli-dated Net Income for such period is a deficit, minus 100% of such deficit), *plus*

(ii)       100% of the aggregate net cash proceeds, including cash and the Fair Market Value of property other than cash, received by the Company after March 31, 2012 (other than net cash proceeds to the extent such net cash proceeds have been used to Incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to Section 4.03(b)(xiv) from the issue or sale of Equity Interests of the Company (excluding Refunding Capital Stock, Designated Preferred Stock, Excluded Contributions and Disqualified Stock), in-cluding Equity Interests issued upon exercise of warrants or options (other than an issu-ance or sale to a Restricted Subsidiary), *plus*

(iii)       100% of the aggregate amount of contributions to the capital of the Company received in cash and the Fair Market Value of property other than cash after March 31, 2012 (other than Excluded Contributions, Refunding Capital Stock, Desig-nated Preferred Stock and Disqualified Stock and other than contributions to the extent such contributions have been used to Incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to Section 4.03(b)(xiv)), *plus*

(iv)       100% of the principal amount of any Indebtedness, or the liquidation preference or maximum fixed repurchase price, as the case may be, of any Disqualified Stock of the Company or any Restricted Subsidiary thereof issued after March 31, 2012 (other than Indebtedness or Disqualified Stock issued to the Company or a Restricted Subsidiary thereof) or 100% of the principal amount of any debt securities of the Com-pany or any Restricted Subsidiary thereof that are convertible into or exchangeable for Capital Stock issued after the Release Date (other than debt securities issued to the Com-pany or a Restricted Subsidiary thereof) which, in any such case, have been converted into or exchanged for Equity Interests in the Company (other than Disqualified Stock) or any direct or indirect parent entity of the Company (*provided* in the case of any parent, such Indebtedness or Disqualified Stock is retired or extinguished) after March 31, 2012, *plus*

(v)       100% of the aggregate amount received by the Company or any Re-stricted Subsidiary in cash and the Fair Market Value of property other than cash received by the Company or any Restricted Subsidiary after March 31, 2012 from:

(A)       the sale or other disposition (other than to the Company or a Re-stricted Subsidiary of the Company) of Restricted Investments made by the Company and its Restricted Subsidiaries and from repurchases and redemptions of such Restricted Investments from the Company and its Restricted Subsidiaries by any Person (other than the Company or any of its Subsidiaries) and from re-payments of loans or advances which constituted Restricted Investments (other than in each case to the extent that the Restricted Investment was made pursuant to clause (vii) of Section 4.04(b) below) or

(B)       the sale (other than to the Company or a Restricted Subsidiary of the Company) of the Capital Stock of an Unrestricted Subsidiary, *plus*

(vi)       in the event any Unrestricted Subsidiary of the Company has been redes-ignated as a Restricted Subsidiary or has been merged, consolidated or amalgamated with or into, or transfers or conveys its assets to, or is liquidated into, the Company or a Re-

stricted Subsidiary of the Company, in each case subsequent to March 31, 2012, the Fair
Market Value of the Investment of the Company in such Unrestricted Subsidiary at the
time of such redesignation, combination or transfer (or of the assets transferred or con-
veyed, as applicable), after deducting any Indebtedness associated with the Unrestricted
Subsidiary so designated or combined or any Indebtedness associated with the assets so
transferred or conveyed (other than in each case to the extent that the designation of such
Subsidiary as an Unrestricted Subsidiary was made pursuant to clause (vii) of Section
4.04(b) below or constituted a Permitted Investment).

(b)     The provisions of Section 4.04(a) shall not prohibit:

(i)     the payment of any dividend or distribution within 60 days after the date of dec-
laration thereof, if at the date of declaration such payment would have complied with the provi-
sions of this Indenture;

(ii)     (A)  the redemption, repurchase, retirement or other acquisition of any Equity In-
terests ("Retired Capital Stock") of the Company or Subordinated Indebtedness of the Company,
any direct or indirect parent entity of the Company in exchange for, or out of the proceeds of the
substantially concurrent sale of, Equity Interests of the Company or any direct or indirect parent
entity of the Company or contributions to the equity capital of the Company or any Restricted
Subsidiary (other than any Disqualified Stock or any Equity Interests sold to a Subsidiary of the
Company) (collectively, including any such contributions, "Refunding Capital Stock"),

(B)     the declaration and payment of dividends on the Retired Capital Stock out of the
proceeds of the substantially concurrent sale (other than to a Subsidiary of the Company) of Re-
funding Capital Stock, and

(C)     if immediately prior to the retirement of Retired Capital Stock, the declaration
and payment of dividends thereon was permitted under clause (vi) of this Section 4.04(b) and not
made pursuant to clause (ii)(B), the declaration and payment of dividends on the Refunding Capi-
tal Stock (other than Refunding Capital Stock the proceeds of which are used to redeem, repur-
chase, retire or otherwise acquire any Equity Interests of any direct or indirect parent of the Com-
pany) in an aggregate amount per year no greater than the aggregate amount of dividends per an-
num that were declarable and payable on such Retired Capital Stock immediately prior to such re-
tirement;

(iii)     the redemption, repurchase, defeasance, or other acquisition or retirement of
Subordinated Indebtedness of the Company, the Issuer or any Guarantor made by exchange for,
or out of the proceeds of the substantially concurrent sale of, new Indebtedness of the Company,
the Issuer or any Guarantor which is Incurred in accordance with Section 4.03 so long as:

(A)     the principal amount (or accreted value, if applicable) of such new In-
debtedness does not exceed the principal amount (or accreted value, if applicable) of,
plus any accrued and unpaid interest on the Subordinated Indebtedness being so re-
deemed, repurchased, defeased, acquired or retired for value (plus the amount of any
premium required to be paid under the terms of the instrument governing the Subordi-
nated Indebtedness being so redeemed, repurchased, acquired or retired, any tender pre-
miums, plus any defeasance costs, fees and expenses Incurred in connection therewith),

(B)     such Indebtedness is subordinated to the Notes or such Guarantor's obli-
gations in respect of the Notes, as the case may be, at least to the same extent as such

-79-

Subordinated Indebtedness so purchased, exchanged, redeemed, repurchased, defeased, acquired or retired for value,

(C)    such Indebtedness has a final scheduled maturity date equal to or later than the earlier of (x) the final scheduled maturity date of the Subordinated Indebtedness being so redeemed, repurchased, acquired or retired and (y) 91 days following the last maturity date of any Notes then outstanding, and

(D)    such Indebtedness has a Weighted Average Life to Maturity at the time Incurred which is not less than the shorter of (x) the remaining Weighted Average Life to Maturity of the Subordinated Indebtedness being so redeemed, repurchased, defeased, acquired or retired and (y) the Weighted Average Life to Maturity that would result if all payments of principal on the Subordinated Indebtedness being redeemed, repurchased, defeased, acquired or retired that were due on or after the date that is 91 days following the last maturity date of any Notes then outstanding were instead due on such date;

(iv)    a Restricted Payment to pay for the repurchase, retirement or other acquisition for value of Equity Interests of the Company or any direct or indirect parent entity of the Company held by any future, present or former employee, director or consultant of the Company or any direct or indirect parent entity of the Company or any of its Restricted Subsidiaries pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or other agreement or arrangement; *provided*, *however*, that the aggregate Restricted Payments made under this clause (iv) do not exceed $35.0 million in any calendar year (with unused amounts in any calendar year being permitted to be carried over to succeeding calendar years subject to a maximum (without giving effect to the following proviso) of $70.0 million in any calendar year); *provided*, *further*, *however*, that such amount in any calendar year may be increased by an amount not to exceed:

(A)    the cash proceeds received by the Company or any of its Restricted Subsidiaries from the sale of Equity Interests (other than Disqualified Stock) of the Company or any direct or indirect parent entity of the Company (to the extent contributed to the Company) to members of management, directors or consultants of the Company and its Restricted Subsidiaries or any direct or indirect parent entity of the Company that occurs after the Release Date (*provided* that the amount of such cash proceeds utilized for any such repurchase, retirement, other acquisition or dividend will not increase the amount available for Restricted Payments under Section 4.04(a)(iii) or be used as the basis for the Incurrence of Indebtedness under Section 4.03(b)(xiv)), *plus*

(B)    the cash proceeds of key man life insurance policies received by the Company or any direct or indirect parent entity (to the extent contributed to the Company) of the Company or any of its Restricted Subsidiaries after the Release Date;

*provided* that the Company may elect to apply all or any portion of the aggregate increase contemplated by clauses (A) and (B) above in any calendar year; and *provided*, *further*, that cancellation of Indebtedness owing to the Company or any Restricted Subsidiary from any present or former employees, directors, officers or consultants of the Company, any of its Restricted Subsidiaries or any direct or indirect parent entity of the Company in connection with a repurchase of Equity Interests of the Company or any direct or indirect parent entity of the Company will not be deemed to constitute a Restricted Payment for purposes of this Section 4.04 or any other provision of this Indenture;

-80-

(v)      the declaration and payment of dividends or distributions to holders of any class or series of Disqualified Stock of the Company or any of its Restricted Subsidiaries issued or Incurred in accordance with Section 4.03 to the extent such dividends are included in the definition of "Fixed Charges";

(vi)      (A)  the declaration and payment of dividends or distributions to holders of any class or series of Designated Preferred Stock (other than Disqualified Stock) issued after the Release Date; and

(B)      the declaration and payment of dividends on Refunding Capital Stock that is Preferred Stock in excess of the dividends declarable and payable thereon pursuant to Section 4.04(b)(ii);

*provided*, *however*, in the case of each of (A) and (B) above of this clause (vi), that for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date of issuance of such Designated Preferred Stock, after giving effect to such issuance (and the payment of dividends or distributions) on a *pro forma* basis, the Company would have had a Fixed Charge Coverage Ratio of at least 2.00 to 1.00;

(vii)      Investments in Unrestricted Subsidiaries having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (vii) that are at that time outstanding, not to exceed the greater of $250.0 million and 1.25% of the Consolidated Net Tangible Assets of the Company at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value), *plus* 100% of the aggregate amount received by the Company or any Restricted Subsidiary in cash and the Fair Market Value (as determined in good faith by the Company) of property other than cash received by the Company or any Restricted Subsidiary with respect to any Investment made pursuant to this clause (vii);

(viii)      (x) Restricted Payments by the Company in an amount not to exceed $50.0 million per annum, and (y) following a Primary Offering only, the payment of dividends on the listed Equity Interests at a rate not to exceed 6% per annum of the net cash proceeds received by the Company or the Issuer in connection with such a Primary Offering or any subsequent Primary Offering;

(ix)      Restricted Payments that are made with Excluded Contributions;

(x)      other Restricted Payments in an aggregate amount not to exceed the greater of $350.0 million and 1.75% of the Consolidated Net Tangible Assets of the Company at the time made;

(xi)      the payment of dividends or other distributions to any direct or indirect parent of the Issuer that files a consolidated tax return that includes the Issuer and its Subsidiaries (including, without limitation, by virtue of such parent being the common parent of a consolidated or combined tax group of which the Issuer and/or its Restricted Subsidiaries are members) in an amount not to exceed the amount that the Issuer and its Restricted Subsidiaries would have been required to pay in respect of federal, state or local taxes (as the case may be) if the Issuer and its Restricted Subsidiaries paid such taxes as a standalone taxpayer (or standalone group);

(xii)    the payment of Restricted Payments, if applicable:

(A)    in amounts required for any direct or indirect parent of the Issuer to pay fees and expenses (including legal, audit and tax, including franchise tax, expenses) required to maintain its corporate existence, customary salary, bonus and other benefits payable to, and indemnities provided on behalf of, officers, directors and employees of any direct or indirect parent of the Issuer and general corporate operating and overhead expenses of any direct or indirect parent of the Issuer in each case to the extent such fees and expenses are attributable to the ownership or operation of the Issuer, if applicable, and its Subsidiaries;

(B)    in amounts required for any direct or indirect parent of the Company, if applicable, to pay interest and/or principal on Indebtedness the proceeds of which have been contributed to the Company or any of its Restricted Subsidiaries and that has been guaranteed by and treated as Indebtedness of the Company or its Restricted Subsidiaries, as applicable, Incurred in accordance with Section 4.03 (it being agreed that (i) all interest expense shall be included in the calculation of the "Fixed Charge Coverage Ratio" of the Company and (ii) no contribution of such proceeds may be included in the calculation of Restricted Payments capacity or in the amount of Indebtedness that may be Incurred based on contributions to the Company); and

(C)    in amounts required for any direct or indirect parent of the Company to pay fees and expenses, other than to Affiliates of the Company, related to any unsuccessful equity or debt offering of such parent that has been undertaken to finance the Company and its Subsidiaries;

(xiii)    repurchases of Equity Interests of the Company and its Subsidiaries deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(xiv)    purchases of receivables pursuant to a Receivables Repurchase Obligation in connection with a Qualified Receivables Financing and the payment or distribution of Receivables Fees;

(xv)    Restricted Payments by the Company or any Restricted Subsidiary to allow the payment of cash in lieu of the issuance of fractional shares upon the exercise of options or warrants or upon the conversion or exchange of Capital Stock of any such Person;

(xvi)    the repurchase, redemption or other acquisition or retirement for value of any Subordinated Indebtedness pursuant to the provisions similar to those described under Sections 4.06 and 4.08; *provided* that all Notes tendered by holders of the Notes in connection with a Change of Control Offer, Asset Sale Offer or Collateral Asset Sale Offer, as applicable, have been repurchased, redeemed or acquired for value in accordance with the provisions hereof;

(xvii)    payments or distributions to dissenting stockholders pursuant to applicable law, pursuant to or in connection with a consolidation, amalgamation, merger or transfer of all or substantially all of the assets of the Company and its Restricted Subsidiaries, taken as a whole, that complies with Section 5.01; *provided* that as a result of such consolidation, amalgamation, merger or transfer of assets, the Issuer shall have made a Change of Control Offer (if required by this Indenture) and that all Notes tendered by holders in connection with such Change of Control Offer have been repurchased, redeemed or acquired for value;

-82-

(xviii)    any Restricted Payment made in connection with the Emergence Transactions;

(xix)    distributions by any Restricted Subsidiary of the Company or any Joint Venture of chemicals to a holder of Capital Stock of such Restricted Subsidiary or Joint Venture if such distributions are made pursuant to a provision in a Joint Venture agreement or other arrangement entered into in connection with the establishment of such Joint Venture or Restricted Subsidiary that requires such holder to pay a price for such chemicals equal to that which would be paid in a comparable transaction negotiated on an arm's length basis (or pursuant to a provision that imposes a substantially equivalent requirement); and

(xx)    any Restricted Payments under any Treasury Services Agreement or any Structured Financing Transaction;

*provided*, *however*, that at the time of, and after giving effect to, any Restricted Payment permitted under clauses (iii), (vi), (vii), (viii), (ix), (x) and (xii)(B) of this Section 4.04(b), no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof.

The Company will not permit any Unrestricted Subsidiary to become a Restricted Subsidiary except pursuant to the definition of "Unrestricted Subsidiary." For purposes of designating any Restricted Subsidiary as an Unrestricted Subsidiary, all outstanding Investments by the Company and its Restricted Subsidiaries (except to the extent repaid) in the Subsidiary so designated will be deemed to be Restricted Payments in an amount determined as set forth in the last sentence of the definition of "Investments." Such designation will only be permitted if a Restricted Payment or Permitted Investment in such amount would be permitted at such time and if such Subsidiary otherwise meets the definition of an Unrestricted Subsidiary.

Notwithstanding Section 4.04(b)(x), prior to March 31, 2012 the Company will not, and will not permit any of its Restricted Subsidiaries to, pay any cash dividend or make any cash distribution on, or in respect of, the Company's Capital Stock or purchase for cash or otherwise acquire for cash any Capital Stock of the Company or any direct or indirect parent of the Company for the purpose of paying any cash dividend or making any cash distribution to, or acquiring Capital Stock of any direct or indirect parent of the Company for cash from, the Sponsors, or guarantee any Indebtedness of any Affiliate of the Company for the purpose of paying such dividend, making such distribution or so acquiring such Capital Stock to or from the Sponsors, in each case by means of the exception provided by clause (x) of Section 4.04(b) if at the time and after giving effect to such payment, the Secured Indebtedness Leverage Ratio of the Company would be greater than 2.00 to 1.00.

SECTION 4.05.    Dividend and Other Payment Restrictions Affecting Subsidiaries. The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction on the ability of any Restricted Subsidiary to:

(a)    (i) pay dividends or make any other distributions to the Company or any of its Restricted Subsidiaries (1) on its Capital Stock or (2) with respect to any other interest or participation in, or measured by, its profits; or (ii) pay any Indebtedness owed to the Company or any of its Restricted Subsidiaries;

(b)    make loans or advances to the Company or any of its Restricted Subsidiaries; or

(c)    sell, lease or transfer any of its properties or assets to the Company or any of its Restricted Subsidiaries;

except in each case for such encumbrances or restrictions existing under or by reason of:

(1)    agreements existing and contractual encumbrances or restrictions in effect on the Release Date, including pursuant to the Senior Term Loan Facility, the ABL Facility, the Plan Roll-Up Notes, the Euro Securitization and the other Credit Facilities;

(2)    this Indenture, the Notes or the other notes permitted to be Incurred pursuant to Section 4.03(b)(i);

(3)    applicable law or any applicable rule, regulation or order;

(4)    any agreement or other instrument (including those governing Capital Stock) of a Person acquired by the Company or any Restricted Subsidiary which was in existence at the time of such acquisition (but not created in contemplation thereof or to provide all or any portion of the funds or credit support utilized to consummate such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired;

(5)    contracts or agreements for the sale of assets, including any restriction with respect to a Restricted Subsidiary imposed pursuant to an agreement entered into for the sale or disposition of the Capital Stock or assets of such Restricted Subsidiary;

(6)    Secured Indebtedness otherwise permitted to be Incurred pursuant to Sections 4.03 and 4.12 that limit the right of the Company or any Restricted Subsidiary to dispose of the assets securing such Indebtedness;

(7)    restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(8)    customary provisions in Joint Venture agreements and other similar agreements entered into in the ordinary course of business;

(9)    purchase money obligations for property acquired and Capitalized Lease Obligations in the ordinary course of business;

(10)    customary provisions contained in leases, subleases, licenses and other similar agreements entered into in the ordinary course of business;

(11)    any encumbrance or restriction in connection with a Qualified Receivables Financing; *provided* that such restrictions only apply to the applicable receivables and related intangibles;

(12)    other Indebtedness, Disqualified Stock or Preferred Stock (a) of any Restricted Subsidiary of the Company that is a Guarantor or a Foreign Subsidiary, (b) of any Restricted Subsidiary that is not a Guarantor or a Foreign Subsidiary so long as such encumbrances and restrictions contained in any agreement or instrument will not materially affect the Company's ability to make anticipated principal or interest payments on the Notes (as determined in good faith by the Company) or (c) of any Restricted Subsidiary Incurred in connection with any Project Financing, *provided* that in the case of each of clauses (a) and (b), such Indebtedness, Disqualified Stock or

Preferred Stock is permitted to be Incurred subsequent to the Release Date pursuant to Section 4.03;

(13)    any Restricted Investment not prohibited by Section 4.04 and any Permitted Investment;

(14)    customary provisions in Hedging Obligations permitted under this Indenture and entered into in the ordinary course of business; or

(15)    any encumbrances or restrictions of the type referred to in clauses (a), (b) and (c) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or Obligations referred to in clauses (1) through (14) above; *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, as determined in good faith by the Company, no more restrictive with respect to such dividend and other payment restrictions than those contained in the dividend or other payment restrictions prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

For purposes of determining compliance with this Section 4.05, (i) the priority of any Preferred Stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock shall not be deemed a restriction on the ability to make distributions on Capital Stock and (ii) the subordination of loans or advances made to the Company or a Restricted Subsidiary of the Company to other Indebtedness Incurred by the Company or any such Restricted Subsidiary shall not be deemed a restriction on the ability to make loans or advances.

SECTION 4.06.    Asset Sales.

(a)    The Company shall not, and shall not permit any of its Restricted Subsidiaries to, cause or make an Asset Sale, unless (x) the Company or any of its Restricted Subsidiaries, as the case may be, receives consideration at the time of such Asset Sale at least equal to the Fair Market Value of the assets sold or otherwise disposed of, and (y) at least 75% of the consideration therefor received by the Company or such Restricted Subsidiary, as the case may be, is in the form of Cash Equivalents; *provided* that the amount of:

(i)    any liabilities (as shown on the Company's or such Restricted Subsidiary's most recent balance sheet or in the notes thereto) of the Company or any Restricted Subsidiary of the Company (other than liabilities that are by their terms subordinated to the Notes or such Restricted Subsidiary's Obligations in respect of the Notes) that are assumed by the transferee of any such assets,

(ii)    any notes or other Obligations or other securities or assets received by the Company or such Restricted Subsidiary of the Company from such transferee that are converted by the Company or such Restricted Subsidiary of the Company into cash within 180 days of the receipt thereof (to the extent of the cash received), and

(iii)    any Designated Non-cash Consideration received by the Company or any of its Restricted Subsidiaries in such Asset Sale having an aggregate Fair Market Value, taken together with all other Designated Non-cash Consideration received pursuant to this Section 4.06(a)(iii) that is at that time outstanding, not to exceed the greater of 3.0% of the Consolidated Net Tangible Assets of the Company and $600.0 million at the time of the receipt of such Designated Non-

-85-

cash Consideration (with the Fair Market Value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value),

shall be deemed to be Cash Equivalents for the purposes of this Section 4.06(a).

(b)    Within 15 months after the Company's or any Restricted Subsidiary's receipt of the Net Proceeds of any Asset Sale, the Company or such Restricted Subsidiary may apply the Net Proceeds from such Asset Sale, at its option:

(i)    to repay (A) Indebtedness constituting First Priority Lien Obligations (and, if the Indebtedness repaid is revolving credit Indebtedness, to correspondingly reduce commitments with respect thereto); *provided* that if the Issuer shall so reduce First Priority Lien Obligations, the Issuer will equally and ratably reduce Notes Obligations in any manner set forth in clause (D) below at a purchase price equal to 100% of the principal amount thereof, *plus* accrued and unpaid interest and Additional Interest, if any, (B) Indebtedness constituting Pari Passu Indebtedness other than First Priority Lien Obligations so long as the Asset Sale proceeds are with respect to non-Collateral (*provided* that if the Company shall so reduce Pari Passu Indebtedness, the Issuer will equally and ratably reduce Notes Obligations in any manner set forth in clause (D) below), (C) Indebtedness of a Restricted Subsidiary that is not a Guarantor or (D) Notes Obligations as provided under Section 5 of the Note, through open-market purchases (*provided* that such purchases are at or above 100% of the principal amount thereof) or by making an offer in accordance with the procedures set forth below for an Asset Sale Offer or a Collateral Asset Sale Offer, as applicable; or

(ii)    to make an Investment in any one or more businesses (*provided* that if such Investment is in the form of the acquisition of Capital Stock of a Person, such acquisition results in such Person becoming a Restricted Subsidiary of the Company), assets or property, in each case (a) used or useful in a Similar Business or (b) that replace the properties and assets that are the subject of such Asset Sale, *provided*, *however*, that with respect to any Asset Sale of Collateral only, the assets or property subject to such Investment (other than to the extent it would constitute Excluded Assets) shall be pledged as Collateral.

In the case of Section 4.06(b)(ii), a binding commitment shall be treated as a permitted application of the Net Proceeds from the date of such commitment; *provided* that in the event such binding commitment is later canceled or terminated for any reason before such Net Proceeds are so applied, the Company or such Restricted Subsidiary enters into another binding commitment (a "Second Commitment") within six months of such cancellation or termination of the prior binding commitment; *provided*, *further*, that the Company or such Restricted Subsidiary may only enter into a Second Commitment under the foregoing provision one time with respect to each Asset Sale and to the extent such Second Commitment is later cancelled or terminated for any reason before such Net Proceeds are applied, then such Net Proceeds shall constitute Collateral Excess Proceeds or Excess Proceeds, as applicable. Pending the final application of any such Net Proceeds, the Company or such Restricted Subsidiary of the Company may temporarily reduce Indebtedness under a revolving credit facility, if any, or otherwise invest such Net Proceeds in any manner not prohibited by this Indenture.

Any Net Proceeds from Asset Sales of Collateral (other than Specified ABL Facility Assets) that are not invested or applied as set forth in Section 4.06(b) (it being understood that any portion of such Net Proceeds used to purchase or make an offer to purchase Notes, as described in clause (i) of this Section 4.06(b), shall be deemed to have been invested whether or not such offer is accepted) will be deemed to constitute "Collateral Excess Proceeds." The Issuer shall make an offer to all holders of the

-86-

Notes and, if required by the terms of any First Priority Lien Obligations or Obligations secured by a Lien permitted under this Indenture (which Lien is not subordinate to the Lien of the Notes with respect to the Collateral), to the holders of such First Priority Lien Obligations or such other Obligations (including any mandatory prepayment required by the Senior Term Loan Facility) (a "Collateral Asset Sale Offer"), to purchase the maximum aggregate principal amount of the Notes and such First Priority Lien Obligations or such other Obligations that is a minimum of $100,000 or €50,000 or an integral multiple of $1,000 or €1,000, respectively, in excess thereof that may be purchased out of the Collateral Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof (or, in the event such other First Priority Lien Obligations were issued with significant original issue discount, 100% of the accreted value thereof), plus accrued and unpaid interest and Additional Interest, if any (or, in respect of other First Priority Lien Obligations, such lesser price, if any, as may be provided for by the terms of such First Priority Lien Obligations), to the date fixed for the closing of such offer, in accordance with the procedures set forth in this Indenture; *provided* that with respect to any Net Proceeds from Asset Sales of Collateral realized or received by any Foreign Subsidiary, the aggregate amount of such Net Proceeds required to be applied shall be subject to reduction to the extent the expatriation of such Net Proceeds (1) would result in adverse tax or legal consequences, (2) would be reasonably likely to result in adverse personal liability of any director of the Company or a Foreign Subsidiary or (3) would result in the insolvency of a Foreign Subsidiary.  The Issuer will commence a Collateral Asset Sale Offer with respect to Collateral Excess Proceeds within ten (10) Business Days after the date that Collateral Excess Proceeds exceed $200.0 million by mailing the notice required pursuant to the terms of this Indenture, with a copy to the Trustee.

Any Net Proceeds from any Asset Sale of non-Collateral (other than Specified ABL Facility Assets) that are not invested or applied as provided and within the time period set forth in this Section 4.06(b) (it being understood that any portion of such Net Proceeds used to purchase or make an offer to purchase Notes, as described in clause (i) of this Section 4.06(b), shall be deemed to have been invested whether or not such offer is accepted) will be deemed to constitute "Excess Proceeds." When the aggregate amount of Excess Proceeds exceeds $200.0 million, the Issuer shall make an offer to all holders of Notes (and, at the option of the Company, to holders of any Pari Passu Indebtedness) (an "Asset Sale Offer") to purchase the maximum principal amount of Notes (and such Pari Passu Indebtedness) that is at least $100,000 or €50,000 and an integral multiple of $1,000 or €1,000, respectively, in excess thereof that may be purchased out of the Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof (or, in the event such Pari Passu Indebtedness was issued with significant original issue discount, 100% of the accreted value thereof), *plus* accrued and unpaid interest and Additional Interest, if any (or, in respect of such Pari Passu Indebtedness, such lesser price, if any, as may be provided for by the terms of such Pari Passu Indebtedness), to the date fixed for the closing of such offer, in accordance with the procedures set forth in this Section 4.06; *provided* that with respect to any Net Proceeds from Asset Sales of non-Collateral realized or received by any Foreign Subsidiary, the aggregate amount of such Net Proceeds required to be applied shall be subject to reduction to the extent the expatriation of such Net Proceeds (1) would result in adverse tax or legal consequences, (2) would be reasonably likely to result in adverse personal liability of any director of the Company or a Foreign Subsidiary or (3) would result in the insolvency of the Foreign Subsidiary.  The Issuer will commence an Asset Sale Offer with respect to Excess Proceeds within ten (10) Business Days after the date that Excess Proceeds exceed $200.0 million by mailing the notice required pursuant to the terms of Section 4.06(f), with a copy to the Trustee.

To the extent that the aggregate amount of Notes and such other First Priority Lien Obligations or Obligations secured by a Lien permitted by this Indenture (which Lien is not subordinate to the Lien of the Notes with respect to the Collateral) tendered pursuant to a Collateral Asset Sale Offer is less than the Collateral Excess Proceeds, the Company may use any remaining Collateral Excess Proceeds for any purpose that is not prohibited by this Indenture.  If the aggregate principal amount of Notes or other First Priority Lien Obligations or such other Obligations surrendered by such holders thereof exceeds the

amount of Collateral Excess Proceeds, the Trustee shall select the Notes and such other First Priority Lien Obligations or such other Obligations to be purchased in the manner described below.  To the extent that the aggregate amount of Notes (and such Pari Passu Indebtedness) tendered pursuant to an Asset Sale Offer is less than the Excess Proceeds, the Company may use any remaining Excess Proceeds for any purpose that is not prohibited by this Indenture.  If the aggregate principal amount of Notes (and such Pari Passu Indebtedness) surrendered by holders thereof exceeds the amount of Excess Proceeds, the Issuer shall select the Notes to be purchased in the manner described in Section 4.06(g).  Upon completion of any such Collateral Asset Sale Offer or Asset Sale Offer, the amount of Collateral Excess Proceeds or Excess Proceeds, as the case may be, shall be reset at zero.

(c)    The Issuer shall comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations to the extent such laws or regulations are applicable in connection with the repurchase of the Notes pursuant to an Asset Sale Offer.  To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Indenture, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its Obligations described in this Indenture by virtue thereof.

(d)    Not later than the date upon which written notice of an Asset Sale Offer is delivered to the Trustee as provided above, the Issuer shall deliver to the Trustee an Officer's Certificate as to (i) the amount of the Excess Proceeds, (ii) the allocation of the Net Proceeds from the Asset Sales pursuant to which such Asset Sale Offer is being made and (iii) the compliance of such allocation with the provisions of Section 4.06(b).  On such date, the Issuer shall also irrevocably deposit with the Trustee or with a Paying Agent (or, if the Issuer or a Wholly Owned Restricted Subsidiary is acting as the Paying Agent, segregate and hold in trust) an amount equal to the Excess Proceeds to be invested in Cash Equivalents, as directed in writing by the Issuer, and to be held for payment in accordance with the provisions of this Section 4.06.  Upon the expiration of the period for which the Asset Sale Offer remains open (the "Offer Period"), the Issuer shall deliver to the Trustee for cancellation the Notes or portions thereof that have been properly tendered to and are to be accepted by the Issuer.  The Trustee (or the Paying Agent, if not the Trustee) shall, on the date of purchase, mail or deliver payment to each tendering holder in the amount of the purchase price.  In the event that the Excess Proceeds delivered by the Issuer to the Trustee are greater than the purchase price of the Notes tendered, the Trustee shall deliver the excess to the Issuer immediately after the expiration of the Offer Period for application in accordance with Section 4.06.

(e)    Not later than the date upon which written notice of a Collateral Asset Sale Offer is delivered to the Trustee as provided above, the Issuer shall deliver to the Trustee an Officer's Certificate as to (i) the amount of the Collateral Excess Proceeds, (ii) the allocation of the Net Proceeds from the Collateral Asset Sales pursuant to which such Collateral Asset Sale Offer is being made and (iii) the compliance of such allocation with the provisions of Section 4.06(b).  On such date, the Issuer shall also irrevocably deposit with the Trustee or with a Paying Agent (or, if the Issuer or a Wholly Owned Restricted Subsidiary is acting as the Paying Agent, segregate and hold in trust) an amount equal to the Excess Proceeds to be invested in Cash Equivalents, as directed in writing by the Issuer, and to be held for payment in accordance with the provisions of this Section 4.06.  Upon the expiration of the period for which the Collateral Asset Sale Offer remains open (the "Collateral Asset Sale Offer Period"), the Issuer shall deliver to the Trustee for cancellation the Notes or portions thereof that have been properly tendered to and are to be accepted by the Issuer.  The Trustee (or the Paying Agent, if not the Trustee) shall, on the date of purchase, mail or deliver payment to each tendering holder in the amount of the purchase price.  In the event that the Collateral Excess Proceeds delivered by the Issuer to the Trustee are greater than the purchase price of the Notes tendered, the Trustee shall deliver the excess to the Issuer reasonably promptly following its actual knowledge of the expiration of the Collateral Asset Sale Offer Period for application in accordance with Section 4.06.

(f)    Holders electing to have a Note purchased shall be required to surrender the Note, with an appropriate form duly completed, to the Issuer at the address specified in the notice at least three Business Days prior to the purchase date.  Holders shall be entitled to withdraw their election if the Trustee or the Issuer receives not later than one Business Day prior to the purchase date, a telegram, telex, facsimile transmission or letter setting forth the name of the holder, the principal amount of the Note which was delivered by the holder for purchase and a statement that such holder is withdrawing his election to have such Note purchased.  If at the end of the Offer Period or Collateral Asset Sale Offer Period, as the case may be, more Notes (and such First Priority Lien Obligations or Pari Passu Indebtedness, as applicable) are tendered pursuant to an Asset Sale Offer or a Collateral Asset Sale Offer than the Issuer is required to purchase, Notes tendered will be repurchased on a pro rata basis; *provided* that no Notes of $100,000 or €50,000 or less shall be purchased in part.  Selection of such First Priority Lien Obligations or Pari Passu Indebtedness, as applicable shall be made pursuant to the terms of such First Priority Lien Obligations or Pari Passu Indebtedness.

(g)    The Issuer shall mail notices of an Asset Sale Offer or a Collateral Asset Sale Offer shall be mailed by first class mail, postage prepaid, at least 30 but not more than 60 days before the purchase date to each holder of Notes at such holder's registered address.  If any Note is to be purchased in part only, any notice of purchase that relates to such Note shall state the portion of the principal amount thereof that has been or is to be purchased.

SECTION 4.07.    <u>Transactions with Affiliates</u>.

(a)    The Company shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction or series of transactions, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Company (each of the foregoing, an "<u>Affiliate Transaction</u>") involving aggregate consideration in excess of $25.0 million, unless:

(i)    such Affiliate Transaction is on terms that are not less favorable to the Company or the relevant Restricted Subsidiary than those that could have been obtained in a comparable transaction by the Company or such Restricted Subsidiary with an unrelated Person; and

(ii)    with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $75.0 million, the Company delivers to the Trustee a resolution adopted in good faith by the majority of the Board of Directors of the Company, approving such Affiliate Transaction and set forth in an Officer's Certificate certifying that such Affiliate Transaction complies with clause (a) above.

(b)    The provisions of Section 4.07(a) shall not apply to the following:

(i)    transactions between or among the Company and/or any of its Restricted Subsidiaries (or an entity that becomes a Restricted Subsidiary as a result of such transaction) and any merger, consolidation or amalgamation of the Issuer and any direct parent of the Issuer;

(ii)    Restricted Payments permitted by Section 4.04 and Permitted Investments;

(iii)    the payment of reasonable and customary fees and reimbursement of expenses paid to, and indemnity provided on behalf of, officers, directors, managers, employees or consultants of the Company or any Restricted Subsidiary or any direct or indirect parent entity of the Company;

-89-

(iv)      transactions in which the Company or any of its Restricted Subsidiaries, as the case may be, delivers to the Trustee a letter from an Independent Financial Advisor stating that such transaction is fair to the Company or such Restricted Subsidiary from a financial point of view or meets the requirements of clause (i) of Section 4.07(a);

(v)      payments or loans (or cancellation of loans) to officers, directors, employees or consultants which are approved by a majority of the Board of Directors of the Company in good faith;

(vi)      any agreement as in effect as of the Release Date or any amendment thereto (so long as any such agreement together with all amendments thereto, taken as a whole, is not more disadvantageous to the holders of the Notes in any material respect than the original agreement as in effect on the Release Date) or any transaction contemplated thereby as determined in good faith by the Company;

(vii)      the existence of, or the performance by the Company or any of its Restricted Subsidiaries of its obligations under the terms of, any registration rights agreement to which it is a party as of the Release Date, and any transaction, agreement or arrangement described in the Offering Memorandum and, in each case, any amendment thereto or similar agreements or arrangements which it may enter into thereafter; *provided, however,* that the existence of, or the performance by the Company or any of its Restricted Subsidiaries of its obligations under, any future amendment to any such existing agreement or under any similar agreement entered into after the Release Date shall only be permitted by this clause (vii) to the extent that the terms of any such existing agreement together with all amendments thereto, taken as a whole, or new agreement are not otherwise more disadvantageous to the holders of the Notes in any material respect than the original agreement as in effect on the Release Date;

(viii)      the Emergence Transactions, including the payment of fees and expenses paid in connection therewith;

(ix)      (A) transactions with customers, clients, suppliers or purchasers or sellers of goods or services, or transactions otherwise relating to the purchase or sale of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Indenture, which are fair to the Company and its Restricted Subsidiaries in the reasonable determination of the Board of Directors or the senior management of the Company, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party or (B) transactions with Joint Ventures or Unrestricted Subsidiaries entered into in the ordinary course of business and consistent with past practice or industry norm;

(x)      any transaction effected as part of a Qualified Receivables Financing;

(xi)      the issuance of Equity Interests (other than Disqualified Stock) of the Company to any Person;

(xii)      the issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment arrangements, stock option and stock ownership plans or similar employee benefit plans approved by the Board of Directors of the Company or any direct or indirect parent entity of the Company or of a Restricted Subsidiary of the Company, as appropriate, in good faith;

-90-

(xiii)    the entering into of any tax sharing agreement or arrangement that complies with Section 4.04(b)(xii);

(xiv)    any contribution to the capital of the Company;

(xv)    transactions between the Company or any of its Restricted Subsidiaries and any Person that is an Affiliate of the Company or any of its Restricted Subsidiaries solely because a director of such Person is also a director of the Company or any direct or indirect parent entity of the Company; *provided*, *however*, that such director abstains from voting as a director of the Company or any direct or indirect parent entity of the Company, as the case may be, on any matter involving such other Person;

(xvi)    pledges of Equity Interests of Unrestricted Subsidiaries;

(xvii)    the formation and maintenance of any consolidated group or subgroup for tax, accounting or cash pooling or management purposes in the ordinary course of business;

(xviii)    any employment agreements entered into by the Company or any of its Restricted Subsidiaries in the ordinary course of business;

(xix)    transactions undertaken in good faith (as certified by a responsible financial or accounting officer of the Company in an Officer's Certificate) for the purpose of improving the consolidated tax efficiency of the Company and its Subsidiaries and not for the purpose of circumventing any provision set forth in this Indenture; and

(xx)    transactions entered into by a Person prior to the time such Person becomes a Restricted Subsidiary or is merged or consolidated into the Company or a Restricted Subsidiary (*provided* such transaction is not entered into in contemplation of such event).

SECTION 4.08.    Change of Control.

(a)    Upon a Change of Control after the Release Date, each holder shall have the right to require the Issuer to repurchase all or any part of such holder's Notes at a purchase price in cash equal to 101% of the principal amount thereof, *plus* accrued and unpaid interest and additional interest, if any, to the date of repurchase (subject to the right of the holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date), in accordance with the terms contemplated in this Section 4.08; *provided*, *however*, that notwithstanding the occurrence of a Change of Control, the Issuer shall not be obligated to purchase any Notes pursuant to this Section 4.08 in the event that it has exercised its right to redeem such Notes in accordance with Article III of this Indenture.

(b)    Within 30 days following any Change of Control, except to the extent that the Issuer has exercised its right to redeem the Notes in accordance with Article III of this Indenture, the Issuer shall mail a notice (a "Change of Control Offer") to each holder with a copy to the Trustee stating:

(i)    that a Change of Control has occurred and that such holder has the right to require the Issuer to repurchase such holder's Notes at a repurchase price in cash equal to 101% of the principal amount thereof, *plus* accrued and unpaid interest and Additional Interest, if any, to the date of repurchase (subject to the right of the holders of record on the relevant Record Date to receive interest on the relevant Interest Payment Date);

(ii)        the circumstances and relevant facts and financial information regarding such Change of Control;

(iii)        the repurchase date (which shall be no earlier than 30 days nor later than 60 days from the date such notice is mailed); and

(iv)        the instructions determined by the Issuer, consistent with this Section 4.08, that a holder must follow in order to have its Notes purchased.

(c)        holders electing to have a Note purchased shall be required to surrender the Note, with an appropriate form duly completed, to the Issuer at the address specified in the notice at least three Business Days prior to the purchase date.  The holders shall be entitled to withdraw their election if the Trustee or the Issuer receives not later than one Business Day prior to the purchase date a telegram, telex, facsimile transmission or letter setting forth the name of the holder, the principal amount of the Note which was delivered for purchase by the holder and a statement that such holder is withdrawing his election to have such Note purchased.  Holders whose Notes are purchased only in part shall be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered.

(d)        On the repurchase date, all Notes purchased by the Issuer under this Section shall be delivered to the Trustee for cancellation, and the Issuer shall pay the purchase price *plus* accrued and unpaid interest to the holders entitled thereto.

(e)        A Change of Control Offer may be made in advance of a Change of Control, and conditioned upon such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making of the Change of Control Offer.

(f)        Notwithstanding the foregoing provisions of this Section 4.08, the Issuer shall not be required to make a Change of Control Offer upon the consummation of a Change of Control if a third party makes the Change of Control Offer in the manner, at the time and otherwise in compliance with the requirements set forth in this Section 4.08 applicable to a Change of Control Offer made by the Issuer and purchases all Notes properly tendered and not withdrawn under such Change of Control Offer.

(g)        Notes repurchased by the Issuer pursuant to a Change of Control Offer will have the status of Notes issued but not outstanding or will be retired and canceled at the option of the Issuer. Notes purchased by a third party pursuant to the preceding clause (f) will have the status of Notes issued and outstanding.

(h)        At the time the Issuer delivers Notes to the Trustee which are to be accepted for purchase, the Issuer shall also deliver an Officer's Certificate stating that such Notes are to be accepted by the Issuer pursuant to and in accordance with the terms of this Section 4.08.  A Note shall be deemed to have been accepted for purchase at the time the Trustee, directly or through an agent, mails or delivers payment therefor to the surrendering holder.

(i)        Prior to any Change of Control Offer, the Issuer shall deliver to the Trustee an Officer's Certificate and an Opinion of Counsel stating that all conditions precedent contained herein to the right of the Issuer to make such offer have been complied with.

(j)        The Issuer shall comply, to the extent applicable, with the requirements of Section 14(e) of the Exchange Act and any other securities laws or regulations in connection with the repurchase of Notes pursuant to this Section 4.08.  To the extent that the provisions of any securities laws or regulations conflict with provisions of this Section 4.08, the Issuer shall comply with the applicable secu-

rities laws and regulations and shall not be deemed to have breached its obligations under this Section by virtue thereof.

SECTION 4.09.    Compliance Certificate.  The Issuer shall deliver to the Trustee within 120 days after the end of each fiscal year of the Issuer, beginning with the fiscal year ending on December 31, 2010, an Officer's Certificate stating that in the course of the performance by the signer of his or her duties as an Officer of the Issuer he or she would normally have knowledge of any Default and whether or not the signer knows of any Default that occurred during such period.  If he or she does, the certificate shall describe the Default, its status and what action the Issuer is taking or proposes to take with respect thereto.  The Issuer also shall comply with Section 314(a)(4) of the TIA.  Except with respect to receipt of payments of principal and interest on the Notes and any Default or Event of Default information contained in the Officer's Certificate delivered to it pursuant to this Section 4.09, the Trustee shall have no duty to review, ascertain or confirm the Issuer's compliance with or the breach of any representation, warranty or covenant made in this Indenture.

SECTION 4.10.    Further Instruments and Acts.  Upon request of the Trustee, the Issuer shall execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture.

SECTION 4.11.    Future Subsidiary Guarantors.

(a)    The Company shall cause each (i) Domestic Subsidiary of the Company (other than the Issuer) that is Wholly Owned other than, at the election of the Issuer, an Excluded Subsidiary and (ii) Wholly Owned Restricted Subsidiary of the Company (other than the Issuer) that guarantees the Senior Term Loan Facility to execute and deliver to the Trustee (a) a supplemental indenture joining each such Subsidiary of the Company to this Indenture substantially in the form of Exhibit D hereto; and (b) Security Documents and intercreditor agreements providing for First Priority Lien Obligations (other than, in the case of the ABL Facility Collateral, which shall be subject to a second priority security interest), pursuant to which such Subsidiary will guarantee payment of the Notes on the same terms and subject to the same conditions and limitations as those described under Article 12 in this Indenture (each such guarantee of the Notes, an "Additional Guarantee").

(b)    Notwithstanding the foregoing and the other provisions of this Indenture, any Additional Guarantee of the Notes by a Domestic Subsidiary of the Company that is a Wholly Owned Restricted Subsidiary shall provide by its terms that it shall be automatically and unconditionally released and discharged in the circumstances described under Section 12.02 hereof.  Any Additional Guarantee shall be considered a "Guarantee" as described Section 12.01 and any such Domestic Subsidiary of the Company providing such Additional Guarantee shall be considered a "Guarantor" as described under Section 12.01.

SECTION 4.12.    Liens.  The Company shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly, create, Incur, assume or suffer to exist any Lien (except Permitted Liens) that secures any Indebtedness on any asset or property of the Company or any such Restricted Subsidiary, other than Liens securing Indebtedness that are junior in priority to the Liens on such property or assets securing the Notes on terms no less favorable in any material respect to the holders of the Notes than those set forth in the Junior Lien Intercreditor Agreement.

SECTION 4.13.    After-Acquired Property.  Subject to Permitted Liens and the 3-16 Exemption and Excluded Assets limitations, if any of the Company, the Issuer or any Pledgor acquires any First Priority After-Acquired Property, the Company, the Issuer or such Pledgor shall execute and deliver such mortgages, deeds of trust, security instruments, financing statements and certificates and

-93-

opinions of counsel as shall be reasonably necessary to vest in the Collateral Agent a perfected first prior-ity security interest, subject only to Permitted Liens, in such First Priority After-Acquired Property and to have such First Priority After-Acquired Property added to the Collateral, and thereupon all provisions of this Indenture relating to the Collateral shall be deemed to relate to such First Priority After-Acquired Property to the same extent and with the same force and effect. In addition, if granting a security interest in such property requires the consent of a third party, the Company will use commercially reasonable ef-forts to obtain such consent (i) with respect to the first priority security interest for the benefit of the Col-lateral Agent on behalf of the holders of the Notes and for the benefit of the Senior Term Loan Collateral Agent on behalf of the lenders under the Senior Term Loan Facility, (ii) with respect to the second prior-ity security interest for the benefit of the ABL Collateral Agents on behalf of lenders under ABL Facility and (iii) with respect to the third priority security interest for the benefit of the trustee under the Plan Roll-Up Notes Indenture on behalf of the holders of the Plan Roll-Up Notes. If such third party does not con-sent to the granting of the first priority security interest after the use of such commercially reasonable ef-forts, the applicable entity will not be required to provide such security interest. The Issuer, the Company and the Pledgors will also ensure that second priority security interests are maintained as security for the Notes in any property or assets pledged to secure the ABL Facility.

SECTION 4.14.    <u>Maintenance of Office or Agency</u>.

(a)    The Issuer shall maintain an office or agency (which may be an office of the Trustee or an affiliate of the Trustee or Registrar) where Notes may be surrendered for registration of transfer or for exchange and where notices and demands to or upon the Issuer in respect of the Notes and this Indenture may be served. The Issuer shall give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency. If at any time the Issuer shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such pres-entations, surrenders, notices and demands may be made or served at the corporate trust office of the Trustee as set forth in Section 13.02.

(b)    The Issuer may also from time to time designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations; *provided*, *however*, that no such designation or rescission shall in any manner relieve the Issuer of its obligation to maintain an office or agency for such purposes. The Issuer shall give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

(c)    The Issuer hereby designates the corporate trust office of the Trustee or its agent as such office or agency of the Issuer in accordance with Section 2.04.

SECTION 4.15.    <u>Covenant Suspension</u>. If on any date following the Release Date, (i) the Notes have achieved and continue to maintain Investment Grade Ratings from two Rating Agencies and (ii) no Default has occurred and is continuing (such period is referred to herein as an "<u>Investment Grade Status Period</u>"), then beginning on that date and continuing until the Reversion Date (the occur-rence of the events described in the foregoing clauses (i) and (ii) being collectively referred to as a "<u>Covenant Suspension Event</u>"), the covenants described under Sections 4.03, 4.04, 4.05, 4.06, 4.07 and 5.01(c)(iv)  (the "<u>Suspended Covenants</u>")

If on any date subsequent to a Covenant Suspension Event (the "<u>Reversion Date</u>") one or both of the Rating Agencies withdraw their Investment Grade Rating or downgrade the rating assigned to the Notes below an Investment Grade Rating, then the Company and its Restricted Subsidiaries will thereafter again be subject to the Suspended Covenants under this Indenture with respect to future events.

The period of time between the Covenant Suspension Event and the Reversion Date is referred to as the "Suspension Period."

On each Reversion Date, all Indebtedness Incurred, or Disqualified Stock or Preferred Stock issued, during the Suspension Period will be classified as having been Incurred or issued pursuant to Section 4.03(a) or 4.03(b) (to the extent such Indebtedness or Disqualified Stock or Preferred Stock would be permitted to be Incurred or issued thereunder as of the Reversion Date and after giving effect to Indebtedness Incurred or issued prior to the Suspension Period and outstanding on the Reversion Date). To the extent such Indebtedness or Disqualified Stock or Preferred Stock would not be so permitted to be Incurred or issued pursuant to Section 4.03(a) or 4.03(b) such Indebtedness or Disqualified Stock or Preferred Stock will be deemed to have been outstanding on the Release Date, so that it is classified as permitted under Section 4.03(b)(iv). Calculations made after the Reversion Date of the amount available to be made as Restricted Payments under Section 4.04 will be made as though the covenant described under Section 4.04 had been in effect since the Release Date and throughout the Suspension Period. Accordingly, Restricted Payments made during the Suspension Period will reduce the amount available to be made as Restricted Payments under Section 4.04(a). As described above, however, no Default or Event of Default will be deemed to have occurred on the Reversion Date as a result of any actions taken by the Company or its Restricted Subsidiaries during the Suspension Period. For purposes of Section 4.06, on the Reversion Date, the unutilized Excess Proceeds amount will be reset to zero.

SECTION 4.16.    Maintenance of Insurance. The Company shall maintain with reputable insurance companies, insurance with respect to its assets, properties and business against loss or damage to the extent available on commercially reasonable terms of the kinds customarily insured against by Persons of similar size engaged in the same or similar industry, of such types and in such amounts (after giving effect to any self-insurance (including captive industry insurance) reasonable and customary for similarly situated Persons of similar size engaged in the same or similar businesses as the Company, the Issuer and the Restricted Subsidiaries) as are customarily carried under similar circumstances (including flood insurance) by such other Persons to the extent available to the Company and the Restricted Subsidiaries on commercially reasonable terms.

SECTION 4.17.    Additional Amounts.

(a)    All payments made under or with respect to the Guarantee Agreement by (i) the Company or (ii) any entity that becomes a successor of the Company that is organized in a jurisdiction other than the United States, any state thereof or the District of Columbia as a result of a merger of or other transaction permitted by Section 5.01 (each such person, a "Payor") will be made free and clear of and without withholding or deduction for or on account of any present or future tax, duty, levy, impost, assessment or other governmental charge (including, without limitation, penalties, interest and other similar liabilities related thereto) of whatever nature (collectively, "Taxes") imposed or levied by or on behalf of any jurisdiction in which any Payor is organized, resident or doing business for tax purposes or from or through which any Payor makes any payment on the Notes or any department or political subdivision thereof (each, a "Relevant Taxing Jurisdiction"), unless such Payor is required to withhold or deduct Taxes by law. If a Payor is required by law to withhold or deduct any amount for or on account of Taxes of a Relevant Taxing Jurisdiction from any payment made under or with respect to the Notes or such Guarantee, the Payor, subject to the exceptions listed below, will pay additional amounts (the "Additional Amounts") as may be necessary to ensure that the net amount received by each holder of the Notes after such withholding or deduction (including withholding or deduction attributable to Additional Amounts payable hereunder) will not be less than the amount the holder would have received if such Taxes had not been withheld or deducted.

(b)    A Payor will not, however, pay Additional Amounts to a holder or beneficial owner of Notes:

(1)    to the extent the Taxes giving rise to such Additional Amounts would not have been imposed but for the holder's or beneficial owner's present or former connection with the Relevant Taxing Jurisdiction or but for any such connection on the part of a partner, beneficiary, settlor or shareholder of such a holder or beneficial owner (other than any connection resulting from the acquisition, ownership, holding or disposition of Notes, the receipt of payments thereunder and/or the exercise or enforcement of rights under any Notes);

(2)    to the extent the Taxes giving rise to such Additional Amounts would not have been imposed but for the failure of the holder or beneficial owner of Notes, following the Payor's written request addressed to the holder, to the extent such holder or beneficial owner is legally eligible to do so, to comply with any certification, identification, information or other reporting requirements, whether required by statute, treaty, regulation or administrative practice of a Relevant Taxing Jurisdiction, as a precondition to exemption from, or reduction in the rate of deduction or withholding of, Taxes imposed by the Relevant Taxing Jurisdiction (including, without limitation, a certification that the holder or beneficial owner is not resident in the Relevant Taxing Jurisdiction);

(3)    with respect to any estate, inheritance, gift, sales, personal property or any similar Taxes;

(4)    with respect to any Taxes, which are payable otherwise than by withholding from payments of principal of or interest on the Notes;

(5)    if such holder is a fiduciary or partnership or person other than the sole beneficial owner of such payment and the Taxes giving rise to such Additional Amounts would not have been imposed on such payment had the holder been the beneficiary, partner or sole beneficial owner, as the case may be, of such Note (but only if there is no material cost or expense associated with transferring such Note to such beneficiary, partner or sole beneficial owner and no restriction on such transfer that is outside the control of such beneficiary, partner or sole beneficial owner);

(6)    to the extent the Taxes giving rise to such Additional Amounts would not have been imposed but for the presentation by the holder of any Note, where presentation is required, for payment on a date more than 30 days after the date on which payment became due and payable or the date on which payment thereof is duly provided for, whichever occurs later;

(7)    with respect to any withholding or deduction that is imposed on a payment to an individual and that is required to made pursuant to the European Council Directive on the taxation of savings income which was adopted by the ECOFIN Council on June 3, 2003 or any law implementing or complying with, or introduced in order to conform to such directive (the "EU Savings Tax Directive") or is required to be made pursuant to the Agreement between the European Community and the Swiss Confederation dated October 26, 2004 providing for measures equivalent to those laid down in the EU Savings Tax Directive (the "EU-Swiss Savings Tax Agreement") or any law or other governmental regulation implementing or complying with, or introduced in order to conform to, such agreement;

(8)    to the extent of any Taxes imposed by the United States or any political subdivision thereof or tax authority therein; or

-96-

(9)      any combination of items (1) through (8).

(c)      The Payor will (i) make any such withholding or deduction required by applicable law and (ii) remit the full amount deducted or withheld to the relevant authority in accordance with applicable law. The Payor will make reasonable efforts to obtain certified copies of tax receipts evidencing the payment of any Taxes so deducted or withheld from each Relevant Taxing Jurisdiction imposing such Taxes. The Payor will provide to the Trustee, within a reasonable time after the date the payment of any Taxes so deducted or withheld are due pursuant to applicable law, either a certified copy of tax receipts evidencing such payment, or, if such tax receipts are not reasonably available to the Payor, such other documentation that provides reasonable evidence of such payment by the Payor.

(d)      At least 30 calendar days prior to each date on which any payment under or with respect to a Guarantee is due and payable if the Payor will be obligated to pay Additional Amounts with respect to such payments (unless such obligation to pay Additional Amounts arises shortly before or after the 35th day prior to the date on which payment under or with respect to the Guarantee is due and payable, in which case it will be promptly due thereafter), the Payor will deliver to the Trustee, the Registrar and each Paying Agent an Officer's Certificate stating that such Additional Amounts will be payable and the amounts so payable and will set forth such other information necessary to enable each Paying Agent to pay such Additional Amounts to the holders on the payment date.  The Payor will promptly publish a notice in accordance with Section 13.02 stating that such Additional Amounts will be payable and describing the obligation to pay such Additional Amounts.  The Issuer will pay to the Trustee or the Paying Agent such Additional Amounts and, if paid to a Paying Agent other than the Trustee, shall promptly provide the Trustee with documentation evidencing the payment of such Additional Amounts.  Copies of such documentation shall be made available to the holders upon request.  The Issuer shall indemnify the Trustee and the Paying Agent for, and hold them harmless against, any loss, liability or expense incurred without negligence or willful misconduct on their part arising out of or in connection with actions taken or omitted by any of them in reliance on any Officer's Certificate furnished to them pursuant to this Section 4.17.

The Payor will indemnify and hold harmless the holders of Notes, and, upon written request of any holder of Notes, reimburse such holder for the amount of (i) any Taxes levied or imposed by a Relevant Taxing Jurisdiction and payable by such holder in connection with payments made under or with respect to the Notes held by such holder or any Guarantee; and (ii) any Taxes levied or imposed with respect to any reimbursement under the foregoing clause (i) or this clause (ii), so that the net amount received by such holder after such reimbursement will not be less than the net amount such holder would have received if the Taxes giving rise to the reimbursement described in clauses (i) and/or (ii) had not been imposed, *provided*, *however*, that the indemnification obligation provided for in this paragraph shall not extend to Taxes imposed for which the holder of the Notes would not have been entitled to receive payment of Additional Amounts hereunder by virtue of clauses (1) through (9) of subsection (b) above or to the extent such holder received Additional Amounts with respect to such payments.  Whenever in this Indenture refers to, in any context, the payment of principal, premium, if any, interest or any other amount payable under or with respect to any Note or any Guarantee, such reference includes the payment of Additional Amounts or indemnification payments as described hereunder, if applicable.

The foregoing obligations of this Section 4.17 will survive any termination, defeasance or discharge of this Indenture and will apply *mutatis mutandis* to any jurisdiction in which any successor Person to any Payor and to any jurisdiction in which such successor is organized or is otherwise resident or doing business for tax purposes or any jurisdiction from or through which payment is made by such successor or its respective agents.

## ARTICLE V

## SUCCESSOR COMPANY

SECTION 5.01.    When Issuer May Merge or Transfer Assets.

(a)    The Company shall not, directly or indirectly, consolidate, amalgamate or merge with or into or wind up or convert into (whether or not the Company is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions, to any Person unless:

(i)    the Company is the surviving Person or the Person formed by or surviving any such consolidation, amalgamation, merger, winding up or conversion (if other than the Company) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof, the District of Columbia, Canada or any province thereof or any state which was a member of the European Union on December 31, 2003 (other than Greece) (the Company or such Person, as the case may be, being herein called the "Successor Company"); *provided* that in the case where the surviving Person is not a corporation, a co-obligor of the Notes is a corporation;

(ii)    the Successor Company (if other than the Company) expressly assumes all the Obligations of the Company under this Indenture and the Notes pursuant to supplemental indentures or other documents or instruments in form required by this Indenture and in compliance with the intercreditor agreements;

(iii)    immediately after giving effect to such transaction (and treating any Indebtedness which becomes an Obligation of the Successor Company or any of its Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Company or such Restricted Subsidiary at the time of such transaction) no Default or Event of Default shall have occurred and be continuing;

(iv)    immediately after giving *pro forma* effect to such transaction, as if such transaction had occurred at the beginning of the applicable four-quarter period (and treating any Indebtedness which becomes an Obligation of the Successor Company or any of its Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Company or such Restricted Subsidiary at the time of such transaction), either

(A)    the Successor Company would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4.03(a); or

(B)    the Fixed Charge Coverage Ratio for the Successor Company and its Restricted Subsidiaries would be greater than such ratio for the Company and its Restricted Subsidiaries immediately prior to such transaction; and

(v)    the Company shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, merger, amalgamation or transfer and such supplemental indentures (if any) comply with this Indenture.

(b)        The Successor Company (if other than the Company) will succeed to, and be substituted for, the Company under this Indenture and the Notes, and in such event the Company will automatically be released and discharged from its Obligations under this Indenture and the Notes. Notwithstanding the first sentence of this covenant, without complying with the foregoing clause (iv), the Company may (A) merge with an Affiliate that has no material assets or liabilities and that is incorporated or organized solely for the purpose of reincorporating or reorganizing the Issuer in any state of the U.S., the District of Columbia, Canada or any province thereof or any state which was a member state of the European Union on December 31, 2003 (other than Greece) and (B) may otherwise convert its legal form under the laws of its jurisdiction of organization.

(c)        The Issuer may not, directly or indirectly, consolidate, amalgamate or merge with or into or wind up or convert into (whether or not the Issuer is the surviving Person), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions, to any Person unless:

(i)        the Issuer is the surviving Person or the Person formed by or surviving any such consolidation, amalgamation, merger, winding up or conversion (if other than the Issuer) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof or the District of Columbia (the Issuer or such Person, as the case may be, being herein called the "<u>Successor Issuer</u>"); *provided* that in the case where the surviving Person is not a corporation, a co-obligor of the Notes is a corporation;

(ii)        the Successor Issuer (if other than the Issuer) expressly assumes all the Obligations of the Issuer under this Indenture and the Notes pursuant to supplemental indentures or other documents or instruments in form required by this Indenture and in compliance with the intercreditor agreements;

(iii)        immediately after giving effect to such transaction (and treating any Indebtedness which becomes an Obligation of the Successor Issuer or any of its Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Issuer or such Restricted Subsidiary at the time of such transaction) no Default or Event of Default shall have occurred and be continuing;

(iv)        immediately after giving *pro forma* effect to such transaction, as if such transaction had occurred at the beginning of the applicable four-quarter period (and treating any Indebtedness which becomes an Obligation of the Successor Issuer or any of its Restricted Subsidiaries as a result of such transaction as having been Incurred by the Successor Issuer or such Restricted Subsidiary at the time of such transaction), either (a) the Company would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4.03(a); or (b) the Fixed Charge Coverage Ratio for the Company and its Restricted Subsidiaries would be greater than such ratio for the Company and its Restricted Subsidiaries immediately prior to such transaction; and

(v)        the Issuer shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, merger, amalgamation or transfer and such supplemental indentures (if any) comply with this Indenture.

(d)        The Successor Issuer (if other than the Issuer) will succeed to, and be substituted for, the Issuer under this Indenture and the Notes, and in such event the Issuer will automatically be released and discharged from its Obligations under this Indenture and the Notes. Notwithstanding the first

sentence of this covenant, without complying with the foregoing clause (4), the Issuer may (A) merge with an Affiliate that has no material assets or liabilities and that is incorporated or organized solely for the purpose of reincorporating or reorganizing the Issuer, as the case may be, in any state of the U.S. or the District of Columbia and (B) may otherwise convert its legal form under the laws of its jurisdiction of organization so long as there remains a corporate co-obligor. This Section 5.01 shall not apply to a sale, assignment, transfer, conveyance or other disposition of assets between or among the Company and its Restricted Subsidiaries.

(e)    Subject to the provisions of Section 11.04 (which govern the release of assets and property securing the Notes upon the sale or disposition of a Restricted Subsidiary of the Company that is a Pledgor), no Pledgor shall, and the Company shall not permit any Pledgor to, consolidate, amalgamate or merge with or into or wind up into (whether or not such Pledgor is the surviving Person), or sell, as-sign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets in one or more related transactions to, any Person unless:

(i)    either (A) such Pledgor is the surviving Person or the Person formed by or sur-viving any such consolidation, amalgamation or merger (if other than such Pledgor) or to which such sale, assignment, transfer, lease, conveyance or other disposition shall have been made is a corporation, partnership or limited liability company organized or existing under the laws of the United States, any state thereof, the District of Columbia, or any territory thereof (such Pledgor or such Person, as the case may be, being herein called the "Successor Pledgor") and the Successor Pledgor (if other than such Pledgor) expressly assumes all the Obligations of such Pledgor under this Indenture, the Security Documents and such Pledgor's Obligations in respect of the Notes pursuant to documents or instruments in form required by this Indenture and in compliance with the intercreditor agreements, or (B) such sale or disposition or consolidation, amalgamation or merger is not in violation of Section 4.06; and

(ii)    the Successor Pledgor (if other than such Pledgor) shall have delivered or caused to be delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, amalgamation, merger or transfer and such supplemental indenture (if any) comply with this Indenture.

Except as otherwise provided in this Indenture, the Successor Pledgor (if other than such Pledgor) will succeed to, and be substituted for, such Pledgor under this Indenture and such Pledgor's Obligations in respect of the Notes, and such Pledgor will automatically be released and discharged from its Obligations under this Indenture and such Pledgor's Obligations in respect of the Notes.  Notwith-standing the foregoing, (1) a Pledgor may merge, amalgamate or consolidate with an Affiliate incorpo-rated solely for the purpose of reincorporating or reorganizing such Pledgor in another state of the United States, the District of Columbia or any territory of the United States so long as the amount of Indebted-ness of the Pledgor is not increased thereby and (2) a Pledgor may merge, amalgamate or consolidate with another Pledgor or the Company or may convert it legal form under the laws of reorganization in its juris-diction.

In addition, notwithstanding the foregoing, any Pledgor may consolidate, amalgamate or merge with or into or wind up into, or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets (collectively, a "Transfer") to the Company or any Pledgor.

(f)    Notwithstanding the foregoing, the LCC Assumption and the related transactions shall be permitted under this Indenture.

# ARTICLE VI

## DEFAULTS AND REMEDIES

SECTION 6.01.    <u>Events of Default</u>.  An "<u>Event of Default</u>" occurs with respect to Notes if:

(a)    there is a default in any payment of interest (including any additional interest) on any Note when the same becomes due and payable, and such default continues for a period of 30 days,

(b)    there is a default in the payment of principal or premium, if any, of any Note when due at its Stated Maturity, upon optional redemption, upon required repurchase, upon declaration or otherwise,

(c)    the failure by the Company or any Restricted Subsidiary to comply for 60 days after notice with its other agreements contained in the Notes or this Indenture,

(d)    the failure by the Company or any Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary) to pay any Indebtedness (other than Indebtedness owing to the Company or a Restricted Subsidiary) within any applicable grace period after final maturity or the acceleration of any such Indebtedness by the holders thereof because of a default, in each case, if the total amount of such Indebtedness unpaid or accelerated exceeds $100.0 million or its foreign currency equivalent,

(e)    either the Company, the Issuer or any Significant Subsidiary of the Issuer pursuant to or within the meaning of any Bankruptcy Law:

(i)    commences a voluntary case;

(ii)    consents to the entry of an order for relief against it in an involuntary case;

(iii)    consents to the appointment of a Custodian of it or for any substantial part of its property; or

(iv)    makes a general assignment for the benefit of its creditors or takes any comparable action under any foreign laws relating to insolvency,

(f)    a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(i)    is for relief against either the Issuer or any Significant Subsidiary of the Issuer in an involuntary case;

(ii)    appoints a Custodian of either the Issuer or any Significant Subsidiary of the Issuer or for any substantial part of its property; or

(iii)    orders the winding up or liquidation of either the Issuer or any Significant Subsidiary of the Issuer;

-101-

or any similar relief is granted under any foreign laws and the order or decree remains unstayed and in effect for 60 days,

(g)    failure by the Company or any Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary) to pay final judgments aggregating in excess of $100.0 million or its foreign currency equivalent (net of any amounts which are covered by enforceable insurance policies issued by solvent carriers), which judgments are not discharged, waived or stayed for a period of 60 days,

(h)    the Guarantee of the Company or a Significant Subsidiary (or any group of Subsidiaries that together would constitute a Significant Subsidiary) ceases to be in full force and effect (except as contemplated by the terms thereof) or the Company denies or disaffirms its Obligations under this Indenture and such Default continues for 10 days,

(i)    unless all of the Notes Collateral has been released from the first priority Liens in accordance with the provisions of the Security Documents, the first priority Liens on all or substantially all of the Notes Collateral cease to be valid or enforceable and such Default continues for 30 days, or the Company, the Issuer or any Pledgor shall assert, in any pleading in any court of competent jurisdiction, that any such security interest is invalid or unenforceable and, in the case of any such Person that is a Subsidiary of the Company, the Company fails to cause such Subsidiary to rescind such assertions within 30 days after the Company has actual knowledge of such assertions, or

(j)    the failure by the Company or any Pledgor to comply for 60 days after notice with its other agreements contained in the Security Documents except for a failure that would not be material to the holders of the Notes and would not materially affect the value of the Collateral taken as a whole.

The foregoing shall constitute Events of Default whatever the reason for any such Event of Default and whether it is voluntary or involuntary or is effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body.

The term "Bankruptcy Law" means Title 11, United States Code, or any similar Federal or state law for the relief of debtors.  The term "Custodian" means any receiver, trustee, assignee, liquidator, custodian or similar official under any Bankruptcy Law.

However, a default under clauses (c) or (j) above shall not constitute an Event of Default until the Trustee or the holders of 30% in aggregate principal amount of outstanding Notes notify the Issuer of the default and the Issuer does not cure such default within the time specified in clauses (c) or (j) hereof after receipt of such notice.  Such notice must specify the Default, demand that it be remedied and state that such notice is a "Notice of Default."  The Issuer shall deliver to the Trustee, within five (5) Business Days after the occurrence thereof, written notice in the form of an Officer's Certificate of any event which is, or with the giving of notice or the lapse of time or both would become, an Event of Default, its status and what action the Issuer is taking or propose to take with respect thereto.

SECTION 6.02.    Acceleration.  If an Event of Default (other than an Event of Default specified in Section 6.01(e) or 6.01(f) hereof with respect to the Company or the Issuer) occurs and is continuing, the Trustee or the holders of at least 30% in aggregate principal amount of outstanding Notes by notice to the Issuer may declare the principal of, premium, if any, and accrued but unpaid interest on all the Notes to be due and payable.  Upon such a declaration, such principal and interest shall be due and

-102-

payable immediately.  If an Event of Default specified in Section 6.01(e) or (f) with respect to the Company or the Issuer occurs, the principal of, premium, if any, and interest on all the Notes will become immediately due and payable without any declaration or other act on the part of the Trustee or any holders.  Under certain circumstances, the holders of a majority in aggregate principal amount of outstanding Notes may rescind any such acceleration with respect to the Notes and its consequences.

      In the event of any Event of Default specified in Section 6.01(d) above, such Event of Default and all consequences thereof (excluding, however, any resulting payment default) shall be annulled, waived and rescinded, automatically and without any action by the Trustee or the holders of the Notes, if within 20 days after such Event of Default arose the Issuer delivers an Officer's Certificate to the Trustee stating that (x) the Indebtedness or guarantee that is the basis for such Event of Default has been discharged or (y) the holders thereof have rescinded or waived the acceleration, notice or action (as the case may be) giving rise to such Event of Default or (z) the default that is the basis for such Event of Default has been cured, it being understood that in no event shall an acceleration of the principal amount of the Notes as described above be annulled, waived or rescinded upon the happening of any such events.

      SECTION 6.03.    Other Remedies.  If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy at law or in equity to collect the payment of principal of or interest on the Notes or to enforce the performance of any provision of the Notes, this Indenture or the Security Documents.

      The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding.  A delay or omission by the Trustee or any holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default.  No remedy is exclusive of any other remedy.  To the extent required by law, all available remedies are cumulative.

      SECTION 6.04.    Waiver of Past Defaults.  *Provided* the Notes are not then due and payable by reason of a declaration of acceleration, the holders of a majority in principal amount of the Notes by written notice to the Trustee may waive an existing Default and its consequences except (a) a Default in the payment of the principal of or interest on a Note, (b) a Default arising from the failure to redeem or purchase any Note when required pursuant to the terms of this Indenture or (c) a Default in respect of a provision that under Section 9.02 cannot be amended without the consent of each holder affected.  When a Default is waived, it is deemed cured and the Issuer, the Trustee and the holders will be restored to their former positions and rights under this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any consequent right.

      SECTION 6.05.    Control by Majority.  The holders of a majority in principal amount of Notes may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee.  However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture or, if the Trustee, being advised by counsel, determines that the action or proceeding so directed may not lawfully be taken or if the Trustee in good faith by its board of directors or trustees, executive committee, or a trust committee of directors or trustees and/or Responsible Officers shall determine that the action or proceeding so directed would involve the Trustee in personal liability or expense for which it is not adequately indemnified, or subject to Section 7.01, that the Trustee determines is unduly prejudicial to the rights of any other holder or that would involve the Trustee in personal liability.  Prior to taking any action under this Indenture, the Trustee shall be entitled to reasonable indemnification and security satisfactory to it in its reasonable discretion against all losses and expenses caused by taking or not taking such action.

SECTION 6.06.    <u>Limitation on Suits</u>.

(a)    Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no holder may pursue any remedy with respect to this Indenture or the Notes unless:

(i)    such holder has previously given the Trustee notice that an Event of Default is continuing,

(ii)    holders of at least 30% in aggregate principal amount of the outstanding Notes have requested the Trustee to pursue the remedy,

(iii)    such holders have offered the Trustee security and reasonable indemnity against any loss, liability or expense acceptable to the Trustee in its sole discretion,

(iv)    the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security or indemnity, and

(v)    the holders of a majority in aggregate principal amount of the outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60-day period.

(b)    A holder may not use this Indenture to prejudice the rights of another holder or to obtain a preference or priority over another holder.

SECTION 6.07.    <u>Rights of the Holders to Receive Payment</u>.  Notwithstanding any other provision of this Indenture, the right of any holder to receive payment of principal of and interest on the Notes held by such holder, on or after the respective due dates expressed or provided for in the Notes, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder.

SECTION 6.08.    <u>Collection Suit by Trustee</u>.  If an Event of Default specified in Section 6.01(a) or (b) occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Issuer or any other obligor on the Notes for the whole amount then due and owing (together with interest on overdue principal and (to the extent lawful) on any unpaid interest at the rate provided for in the Notes) and the amounts provided for in Section 7.07.

SECTION 6.09.    <u>Trustee May File Proofs of Claim</u>.  The Trustee may file such proofs of claim, statements of interest and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation, expenses disbursements and advances of the Trustee (including counsel, accountants, experts or such other professionals as the Trustee deems necessary, advisable or appropriate)) and the holders allowed in any judicial proceedings relative to the Issuer or the Company, any Pledgor, their creditors or their property, shall be entitled to participate as a member, voting or otherwise, of any official committee of creditors appointed in such matters and, unless prohibited by law or applicable regulations, may vote on behalf of the holders in any election of a trustee in bankruptcy or other Person performing similar functions, and any Custodian in any such judicial proceeding is hereby authorized by each holder to make payments to the Trustee and, in the event that the Trustee shall consent to the making of such payments directly to the holders, to pay to the Trustee any amount due it for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and its counsel, and any other amounts due the Trustee under Section 7.07.

SECTION 6.10.    <u>Priorities</u>.  Subject to the terms of the First Lien Intercreditor Agreement, the Junior Lien Intercreditor Agreement and the Security Documents, any money or property col-

-104-

lected by the Trustee pursuant to this Article VI and any other money or property distributable in respect of the Issuer's or any Guarantor's obligations under this Indenture after an Event of Default shall be applied in the following order:

FIRST:  to the Trustee and the Agents for amounts due under Section 7.07;

SECOND:  to the holders for amounts due and unpaid on the Notes for principal, premium, if any, and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal and interest, respectively; and

THIRD:  to the Issuer or, to the extent the Trustee collects any amount for any Guarantor, to the such Guarantor.

The Trustee may fix a record date and payment date for any payment to the holders pursuant to this Section.  At least 15 days before such record date, the Trustee shall mail to each holder and the Issuer a notice that states the record date, the payment date and amount to be paid.

SECTION 6.11.    Undertaking for Costs.  In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section does not apply to a suit by the Trustee, a suit by a holder pursuant to Section 6.07 or a suit by holders of more than 10% in principal amount of the Notes.

SECTION 6.12.    Waiver of Stay or Extension Laws.  Neither the Issuer nor any Guarantor (to the extent it may lawfully do so) shall at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, which may affect the covenants or the performance of this Indenture; and the Issuer and the Guarantors (to the extent that it may lawfully do so) hereby expressly waive all benefit or advantage of any such law, and shall not hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law had been enacted.

## ARTICLE VII

## TRUSTEE AND AGENTS

SECTION 7.01.    Duties of Trustee and Agents.

(a)    The Trustee and Agents, prior to the occurrence of an Event of Default with respect to the Notes and after the curing or waiving of all Events of Default which may have occurred, undertake to perform such duties and only such duties as are specifically set forth in this Indenture.  If an Event of Default has occurred and is continuing, the Trustee and Agents shall exercise the rights and powers vested in them by this Indenture and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

-105-

(b)       Except during the continuance of an Event of Default:

(i)       the Trustee and Agents undertake to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee and Agents (it being agreed that the permissive right of the Trustee and Agents to do things enumerated in this Indenture shall not be construed as a duty); and

(ii)       in the absence of bad faith on its part, the Trustee and Agents may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and Agents and conforming to the requirements of this Indenture.  The Trustee and Agents shall be under no duty to make any investigation as to any statement contained in any such instance, but may accept the same as conclusive evidence of the truth and accuracy of such statement or the correctness of such opinions.  However, in the case of certificates or opinions required by any provision hereof to be provided to it, the Trustee and Agents shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathe-matical calculations or other facts stated therein).

(c)       The Trustee or Agents may not be relieved from liability for its own negligent ac-tion, its own negligent failure to act or its own willful misconduct, except that:

(i)       this paragraph does not limit the effect of paragraph (b) of this Section;

(ii)       the Trustee or Agents shall not be liable for any error of judgment made in good faith by a Trust Officer or Agent unless it is proved that the Trustee or Agent was negligent in as-certaining the pertinent facts;

(iii)       the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05; and

(iv)       no provision of this Indenture shall require the Trustee or Agents to expend or risk its own funds or otherwise Incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers.

(d)       Every provision of this Indenture that in any way relates to the Trustee and Agents is subject to paragraphs (a), (b) and (c) of this Section.

(e)       The Trustee and Agents shall not be liable for interest on any money received by it except as the Trustee and Agents may agree in writing with the Issuer.

(f)       Money held in trust by the Trustee need not be segregated from other funds ex-cept to the extent required by law.

(g)       Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee and Agents shall be subject to the provisions of this Section and the Trustee shall be subject to the provisions of the TIA.

SECTION 7.02.    <u>Rights of Trustee and Agents</u>.

(a)    The Trustee and Agents may conclusively rely on any document believed by it to be genuine and to have been signed or presented by the proper person.  The Trustee and Agents need not investigate any fact or matter stated in the document.

(b)    Before the Trustee or Agents acts or refrains from acting, it may require an Officer's Certificate or an Opinion of Counsel or both.  The Trustee and Agents shall not be liable for any action it takes or omits to take in good faith in reliance on the Officer's Certificate or Opinion of Counsel.

(c)    The Trustee and Agents may act through agents and shall not be responsible for the misconduct or negligence of any agent appointed with due care.

(d)    The Trustee and Agents shall not be responsible or liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers; *provided*, *however*, that the Trustee's and Agents' conduct does not constitute willful misconduct or negligence.

(e)    The Trustee and Agents may consult with counsel of its own selection and the advice or opinion of counsel with respect to legal matters relating to this Indenture and the Notes shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or opinion of such counsel.

(f)    The Trustee and Agents shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond, debenture, note or other paper or document unless requested in writing to do so by the holders of not less than a majority in principal amount of the Notes at the time outstanding, but the Trustee and Agents, in their discretion, may (but shall not be obligated to) make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee or Agents shall determine to make such further inquiry or investigation, they shall be entitled to examine the books, records and premises of the Issuer, personally or by agent or attorney, at the expense of the Issuer and shall Incur no liability of any kind by reason of such inquiry or investigation.  Any and all notices, instructions, demands, requests, consents, appraisals, correspondence or other communications shall be in writing and delivered in accordance with Section 13.02.

(g)    The Trustee or Agents shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the holders pursuant to this Indenture, unless such holders shall have offered to the Trustee or Agents security or indemnity satisfactory to the Trustee or Agents against the costs, expenses and liabilities which might be Incurred by it in compliance with such request or direction.

(h)    The rights, privileges, protections, immunities and benefits given to the Trustee and Agents, including its right to be indemnified, are extended to, and shall be enforceable by, the Trustee and Agents in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

(i)    The Trustee and Agents shall not be responsible or liable for any action taken or omitted by it in good faith at the direction of the holders of not less than a majority in principal amount of the Notes as to the time, method and place of conducting any proceedings for any remedy available to the Trustee and Agents or the exercising of any power conferred by this Indenture.

(j)      Any action taken, or omitted to be taken, by the Trustee and Agents in good faith pursuant to this Indenture upon the request or authority or consent of any person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding upon future holders of Notes and upon Notes executed and delivered in exchange therefor or in place thereof.

(k)      The Trustee and Agents shall not be deemed to have notice of any Default or Event of Default unless a Responsible Officer of the Trustee or Agents has actual knowledge thereof or unless written notice of any event which is in fact such a Default is received by the Trustee or Agents at the Corporate Office of the Trustee or Agents, and such notice references the Notes and this Indenture.

(l)      The Trustee and Agents may request that the Issuer deliver an Officer's Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officer's Certificate may be signed by any Person authorized to sign an Officer's Certificate, including any Person specified as so authorized in any such certificate previously delivered and not superseded.

(m)      The Trustee and Agents shall not be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee and Agents have been advised of the likelihood of such loss or damage and regardless of the form of actions.

(n)      The Trustee and Agents shall not be required to give any bond or surety in respect of the execution of the trusts and powers under this Indenture.

(o)      The Trustee and Agents shall not be responsible or liable for any failure or delay in the performance of its obligations under this Indenture arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; epidemics; riots; interruptions; loss or malfunction of utilities, computer (hardware or software) or communication services; accidents; labor disputes; and acts of civil or military authorities and governmental action.

SECTION 7.03.    Individual Rights of Trustee.  The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuer or its Affiliates with the same rights it would have if it were not Trustee.  Any Paying Agent or Registrar may do the same with like rights.  However, the Trustee must comply with Sections 7.10 and 7.11.

SECTION 7.04.    Trustee's and Agents' Disclaimer.  The Trustee and Agents shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture, the Guarantees, the Notes, Liens, Collateral or Security Documents, it shall not be accountable for the Issuer's use of the proceeds from the Notes, and it shall not be responsible for any statement of the Issuer or any Guarantor in this Indenture or in any document issued in connection with the sale of the Notes or in the Notes other than the Trustee's or Agents' certificate of authentication.  The Trustee and Agents shall not be charged with knowledge of any Default or Event of Default under Sections 6.01(c) or (j) or of the identity of any Significant Subsidiary unless either (a) a Trust Officer shall have actual knowledge thereof or (b) the Trustee or Agents shall have received written notice thereof in accordance with Section 13.02 hereof from the Issuer, the Company or any Pledgor or any holder.  In accepting the trust hereby created, the Trustee and Agents acts solely as Trustee and Agents for the holders of the Notes and not in its individual capacity and all persons, including without limitation the holders of Notes and the Issuer having any claim against the Trustee and Agents arising from this Indenture shall look only to the funds and accounts held by the Trustee and Agents hereunder for payment except as otherwise provided herein.

SECTION 7.05.    <u>Notice of Defaults</u>.  If a Default occurs and is continuing and if it is actually known to the Trustee, the Trustee shall mail to each holder notice of the Default within the earlier of 90 days after it occurs or 30 days after it is actually known to a Trust Officer or written notice of it is received by the Trustee.  Except in the case of a Default in the payment of principal of, premium (if any) or interest on any Note, the Trustee may withhold the notice if and so long as a committee of its Trust Officers in good faith determines that withholding the notice is in the interests of the holders.  The Issuer is required to deliver to the Trustee, annually, a certificate indicating whether the signers thereof know of any Default that occurred during the previous year.  The Issuer also is required to deliver to the Trustee, within 30 days after the occurrence thereof, written notice of any event which would constitute certain Defaults, their status and what action the Issuer is taking or proposes to take in respect thereof.

SECTION 7.06.    <u>Reports by Trustee to the Holders</u>.  As promptly as practicable after each June 30 beginning with the June 30 following the date of this Indenture, and in any event prior to July 30 in each year, the Trustee shall mail to each holder a brief report dated as of such July 30 that complies with Section 313(a) of the TIA if and to the extent required thereby.  The Trustee shall also comply with Section 313(b) of the TIA.

A copy of each report at the time of its mailing to the holders shall be filed with the SEC and each stock exchange (if any) on which the Notes are listed.  The Issuer agrees to notify promptly the Trustee whenever the Notes become listed on any stock exchange and of any delisting thereof.

SECTION 7.07.    <u>Compensation and Indemnity</u>.  The Issuer shall pay to the Trustee and Agents from time to time such compensation, as the Issuer and the Trustee and Agents shall from time to time agree in writing, for the Trustee's and Agent's acceptance of this Indenture and its applicable services hereunder.  The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust.  The Issuer shall reimburse the Trustee or Agents upon request for all reasonable out-of-pocket expenses Incurred or made by it, including costs of collection, in addition to the compensation for its services.  Such expenses shall include the reasonable compensation and expenses, disbursements and advances of the Trustee's or Agents' applicable agents and counsel.  The Issuer and the Guarantors, jointly and severally shall indemnify the Trustee or Agents against any and all loss, liability, claim, damage or expense (including reasonable attorneys' fees and expenses except for such actions to the extent caused by any negligence, bad faith or willful misconduct on their part) Incurred by or in connection with the acceptance or administration of this trust and the performance of its duties hereunder, including the costs and expenses of enforcing this Indenture or Guarantee against the Issuer or any Guarantor (including this Section 7.07) and defending itself against or investigating any claim (whether asserted by the Issuer, any Guarantor, any holder or any other Person).  The obligation to pay such amounts shall survive the payment in full or defeasance of the Notes or the removal or resignation of the Trustee or Agents.  The Trustee and Agents shall notify the Issuer of any claim for which it may seek indemnity promptly upon obtaining actual knowledge thereof; *provided*, *however*, that any failure so to notify the Issuer shall not relieve the Issuer or any Guarantor of its indemnity obligations hereunder.  The Issuer shall defend the claim and the indemnified party shall provide reasonable cooperation at the Issuer's expense in the defense.  Such indemnified parties may have separate counsel and the Issuer and such Guarantor, as applicable shall pay the fees and expenses of such counsel; *provided*, *however*, that the Issuer shall not be required to pay such fees and expenses if it assumes such indemnified parties' defense and, in such indemnified parties' reasonable judgment, there is no conflict of interest between the Issuer and the Guarantor, as applicable, and such parties in connection with such defense; *provided*, *further*, that, unless the Issuer otherwise agrees in writing, the Issuer shall not be liable to pay fees and expenses of more than one counsel at any given time located within one particular jurisdiction.  The Issuer needs not reimburse any expense or indemnify against any loss, liability or expense Incurred by an indemnified party through such party's own willful misconduct, negligence or bad faith.

-109-

To secure the Issuer's and the Guarantors' payment obligations in this Section, the Trustee and Agents shall have a Lien prior to the Notes on all money or property held or collected by the Trustee and Agents other than money or property held in trust to pay principal of and interest on particular Notes.

The Issuer's and the Guarantors' payment obligations pursuant to this Section shall survive the satisfaction or discharge of this Indenture, any rejection or termination of this Indenture under any bankruptcy law or the resignation or removal of the Trustee or Agents. Without prejudice to any other rights available to the Trustee and Agents under applicable law, when the Trustee and Agents Incurs expenses after the occurrence of a Default specified in Section 6.01(f) or (g) with respect to the Issuer, the expenses are intended to constitute expenses of administration under the Bankruptcy Law.

No provision of this Indenture shall require the Trustee or Agents to expend or risk its own funds or otherwise Incur any financial or personal liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if repayment of such funds or adequate indemnity and security against such risk or liability is not assured to its satisfaction.

SECTION 7.08.    Replacement of Trustee and Agents.

(a)    The Trustee or Agents may resign by so notifying the Issuer in writing at least 30 days in advance. The holders of a majority in principal amount of the Notes may remove the Trustee or Agents by so notifying the Issuer and the applicable Trustee or Agent and may appoint a successor Trustee or Agent with the Issuer's consent. A resignation or removal of a Trustee or Agent and appointment of a successor Trustee or Agent shall become effective only with the successor Trustee's or Agents's acceptance of appointment as provided in this Section. The Issuer shall remove the Trustee or Agent if:

(i)    the Trustee fails to comply with Section 7.10;

(ii)    the Trustee or Agent is adjudged bankrupt or insolvent;

(iii)    a receiver or other public officer takes charge of the Trustee or its property; or

(iv)    the Trustee or Agent otherwise becomes incapable of acting.

(b)    If the Trustee or any Agent resigns, is removed by the Issuer or by the holders of a majority in principal amount of the Notes and such holders do not reasonably promptly appoint a successor Trustee or Agent, or if a vacancy exists in the office of Trustee or an Agent for any reason (the Trustee or Agent in such event being referred to herein as the retiring Trustee or retiring Agent), the Issuer shall promptly appoint a successor Trustee or Agent.

(c)    The successor Trustee or Agent shall deliver a written acceptance of its appointment to the retiring Trustee or Agent and to the Issuer. Thereupon the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee or Agent shall have all the rights, powers and duties of the Trustee or Agent under this Indenture. The successor Trustee or Agent shall mail a notice of its succession to the holders. The retiring Trustee or Agent shall promptly transfer all property held by it as Trustee or Agent to the successor Trustee or Agent, subject to the Lien provided for in Section 7.07.

-110-

(d)      If a successor Trustee or Agent does not take office within 60 days after the retiring Trustee or Agent resigns or is removed, the retiring Trustee or Agent or the holders of 10% in principal amount of the Notes may petition at the expense of the Issuer any court of competent jurisdiction for the appointment of a successor Trustee or Agent.

(e)      If the Trustee fails to comply with Section 7.10, unless the Trustee's duty to resign is stayed as provided in Section 310(b) of the TIA, any holder who has been a bona fide holder of a Note for at least six months may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(f)      Notwithstanding the replacement of the Trustee pursuant to this Section, the Issuer's obligations under Section 7.07 shall continue for the benefit of the retiring Trustee or Agent.

SECTION 7.09.    Successor Trustee or Agent by Merger.  If the Trustee or Agent consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another corporation or banking association, the resulting, surviving or transferee corporation without any further act shall be the successor Trustee or Agent; *provided*, *however*, that such corporation shall be otherwise qualified and eligible under this Article VII.

In case at the time such successor or successors by merger, conversion or consolidation to the Trustee or Agent shall succeed to the trusts created by this Indenture any of the Notes shall have been authenticated but not delivered, any such successor to the Trustee or Agent may adopt the certificate of authentication of any predecessor trustee or agent, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Trustee or Agent may authenticate such Notes either in the name of any predecessor hereunder or in the name of the successor to the Trustee or agent; and in all such cases such certificates shall have the full force which it is anywhere in the Notes or in this Indenture provided that the certificate of the Trustee or Agent shall have.

SECTION 7.10.    Eligibility; Disqualification.  The Trustee shall at all times satisfy the requirements of Section 310(a) of the TIA.  The Trustee shall have a combined capital and surplus of at least $100 million as set forth in its most recent published annual report of condition.  The Trustee shall comply with Section 310(b) of the TIA, subject to its right to apply for a stay of its duty to resign under the penultimate paragraph of Section 310(b) of the TIA; *provided*, *however*, that there shall be excluded from the operation of Section 310(b)(1) of the TIA any series of securities issued under this Indenture and any indenture or indentures under which other securities or certificates of interest or participation in other securities of the Issuer are outstanding if the requirements for such exclusion set forth in Section 310(b)(1) of the TIA are met.

SECTION 7.11.    Preferential Collection of Claims Against the Issuer.  The Trustee shall comply with Section 311(a) of the TIA, excluding any creditor relationship listed in Section 311(b) of the TIA.  A Trustee who has resigned or been removed shall be subject to Section 311(a) of the TIA to the extent indicated.

SECTION 7.12.    Escrow Authorization.  Each holder, by its acceptance of a Note, consents and agrees to the terms of the Escrow Agreement, including related documents thereto, as the same may be in effect or may be amended from time to time in writing by the parties thereto (*provided* that no amendment that would materially adversely affect the rights of the holders may be effected without the consent of each holder of Notes affected thereby), and authorizes and directs the Trustee to enter into the Escrow Agreement and to perform its obligations and exercise its rights thereunder in accordance therewith.  Escrow Issuer shall do or cause to be done all such acts and things as may be necessary or proper, or as may be required by the provisions of the Escrow Agreement, to assure and confirm to the

Trustee the security interest contemplated by the Escrow Agreement or any part thereof, as from time to time constituted, so as to render the same available for the security and benefit of this Indenture and of the Notes secured hereby, according to the intent and purpose herein expressed.  Escrow Issuer shall take, or shall cause to be taken, any and all actions reasonably required to cause the Escrow Agreement to create and maintain, as security for the obligations of Escrow Issuer under this Indenture and the Notes as provided in the Escrow Agreement, valid and enforceable first priority perfected liens in and on all the Escrow Proceeds, in favor of the Trustee for its benefit and the ratable benefit of the holders, superior to and prior to the rights of third Persons and subject to no other Liens.

SECTION 7.13.    Payment of Parallel Debt Pursuant to Dutch Law.

(a)    In this Section 7.13:

"DBTCA" means Deutsche Bank Trust Company Americas;

"Dutch Security Documents" means any Security Documents governed by the laws of the Netherlands; and

"Principal Obligations" means all present and future Obligations to the extent for the payment of money (whether actual or contingent and whether owed jointly or severally) by the Issuer under this Indenture.

(b)    With respect to Dutch Security Documents, and solely for purposes of the laws of the Netherlands:

(i)    the Issuer irrevocably and unconditionally undertakes to pay to DBTCA an amount equal to the aggregate of all Principal Obligations due and payable but unpaid (the "Parallel Debt");

(ii)    the Parallel Debt constitutes obligations and liabilities of the Issuer to DBTCA which are separate and independent from, and without prejudice to, the Principal Obligations and the Parallel Debt represents DBTCA's own independent right to receive payment of the Parallel Debt from the Issuer;

(iii)    notwithstanding Section 7.13(b)(ii), if DBTCA receives or recovers any amount in respect of (A) the Parallel Debt, the Principal Obligations decrease by that amount as if that amount was received or recovered directly in payment of the Principal Obligations and, for the avoidance of doubt, (B) the Principal Obligations, the Parallel Debt decreases by that amount as if that amount had been received or recovered directly in payment of the Parallel Debt;

(iv)    the parties acknowledge and confirm that the provisions contained in this Section 7.13 shall not be interpreted so as to increase the maximum total amount of the Principal Obligations under this Indenture; and

(v)    the Issuer shall not repay or prepay Parallel Debt if and as long as it owes Principal Obligations, unless directed to do so by DBTCA and the Issuer is otherwise required to repay or prepay the Principal Obligations hereunder.

## ARTICLE VIII

## DISCHARGE OF INDENTURE; DEFEASANCE

SECTION 8.01.    <u>Discharge of Liability on Notes; Defeasance</u>.

(a)    This Indenture shall be discharged and shall cease to be of further effect (except as to surviving rights of registration of transfer or exchange of Notes, as expressly provided for in this Indenture) as to all outstanding Notes when:

(i)    either (a) all the Notes theretofore authenticated and delivered (except lost, stolen or destroyed Notes which have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Issuer and thereafter re-paid to the Issuer or discharged from such trust) have been delivered to the Trustee for cancellation or (b) all of the Notes (1) have become due and payable, (2) will become due and payable at their stated maturity within one year or (3) if redeemable at the option of the Issuer, are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer, and the Issuer has irrevocably deposited or caused to be deposited with the Trustee funds in an amount sufficient to pay and discharge the entire Indebtedness on the Notes not theretofore delivered to the Trustee for cancellation, for principal of, premium, if any, and interest on the Notes to the date of deposit together with irrevocable instructions from the Issuer directing the Trustee to apply such funds to the payment thereof at maturity or redemption, as the case may be;

(ii)    the Issuer and/or the Company has paid all other sums payable under this Indenture; and

(iii)    the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel stating that all conditions precedent under this Indenture relating to the satisfaction and discharge of this Indenture have been complied with.

(b)    Subject to Sections 8.01(c) and 8.02, the Issuer at any time may terminate (i) all of its Obligations under the Notes and this Indenture (with respect to the holders of the Notes) ("<u>legal de-feasance option</u>") or (ii) its Obligations under Sections 4.02, 4.03, 4.04, 4.05, 4.06, 4.07, 4.08, 4.09, 4.10, 4.11, 4.12, 4.13, 4.1 and 4.16 and the operation of Section 5.01 for the benefit of the holders of the Notes, and Sections 6.01(c), 6.01(d) and Sections 6.01(e) and 6.01(f) (with respect to Significant Subsidiaries), 6.01(g), 6.01(h), 6.01(i) and 6.01(j) ("<u>covenant defeasance option</u>").  The Issuer may exercise its legal defeasance option notwithstanding its prior exercise of its covenant defeasance option.  In the event that the Issuer terminates all of its Obligations under the Notes and this Indenture (with respect to such Notes) by exercising its legal defeasance option or its covenant defeasance option, the Obligations of each Guarantor with respect to the Notes and the Security Documents shall be terminated simultaneously with the termination of such Obligations.

If the Issuer exercises its legal defeasance option, payment of the Notes so defeased may not be accelerated because of an Event of Default.  If the Issuer exercises its covenant defeasance option, payment of the Notes so defeased may not be accelerated because of an Event of Default specified in Section 6.01(c), 6.01(d), 6.01(e) and 6.01(f) (with respect to Significant Subsidiaries), 6.01(g), 6.01(h), 6.01(i) or 6.01(j) or because of the failure of the Company to comply with Section 5.01(a)(iv).

Upon satisfaction of the conditions set forth herein and upon request of the Issuer, the Trustee shall acknowledge in writing the discharge of those Obligations that the Issuer terminates.

-113-

(c)    Notwithstanding clauses (a) and (b) above, the Issuer's obligations in Sections 2.04, 2.05, 2.06, 2.07, 2.08, 2.09, 4.14, 7.07, 7.08 and in this Article VIII shall survive until the Notes have been paid in full.  Thereafter, the Issuer's obligations in Sections 7.07, 8.05 and 8.06 shall survive such satisfaction and discharge.

SECTION 8.02.    Conditions to Defeasance.

(a)    The Issuer may exercise its legal defeasance option or its covenant defeasance option only if:

(i)    the Issuer irrevocably deposits in trust with the Trustee, in the case of the Dollar Notes, cash in U.S. Dollars or Government Obligations and in the case of the Euro Notes, cash in euros or non-callable government obligations of any member nation of the European Union whose official currency is the Euro, rated AAA or better by S&P and Aaa or better by Moody's, in each case in such amounts or a combination thereof as will be sufficient to pay the principal of and premium (if any) and interest on the Notes when due at maturity or redemption, as the case may be, including interest thereon to maturity or such redemption date;

(ii)    the Issuer delivers to the Trustee a certificate from a nationally recognized firm of independent accountants expressing their opinion that the payments of principal and interest when due and without reinvestment on the deposited Government Obligations or deposited non-callable government obligations of any member nation of the European Union whose official currency is the Euro, rated AAA or better by S&P and Aaa or better by Moody's *plus* any deposited money without investment will provide cash at such times and in such amounts as will be sufficient to pay principal, premium, if any, and interest when due on all the Notes to maturity or redemption, as the case may be;

(iii)    123 days pass after the deposit is made and during the 123-day period no Default specified in Section 6.01(e) or (f) with respect to the Issuer occurs which is continuing at the end of the period;

(iv)    the deposit does not constitute a default under any other agreement binding on the Issuer and is not prohibited by Article X;

(v)    in the case of the legal defeasance option, the Issuer shall have delivered to the Trustee an Opinion of Counsel stating that (1) the Issuer has received from, or there has been published by, the Internal Revenue Service a ruling, or (2) since the date of this Indenture there has been a change in the applicable Federal income tax law, in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, the holders will not recognize income, gain or loss for Federal income tax purposes as a result of such deposit and defeasance and will be subject to Federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred.  Notwithstanding the foregoing, the Opinion of Counsel required by the immediately preceding sentence with respect to a legal defeasance need not be delivered if all of the Notes not theretofore delivered to the Trustee for cancellation (x) have become due and payable or (y) will become due and payable at their Stated Maturity within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer;

(vi)    impair the right of any holder to receive payment of principal of, premium, if any, and interest on such holder's Notes on or after the due dates therefore or to institute suit for the enforcement of any payment on or with respect to such holder's Notes;

-114-

(vii)    in the case of the covenant defeasance option, the Issuer shall have delivered to the Trustee an Opinion of Counsel to the effect that the holders will not recognize income, gain or loss for Federal income tax purposes as a result of such deposit and defeasance and will be subject to Federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such deposit and defeasance had not occurred; and

(viii)    the Issuer delivers to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent to the defeasance and discharge of the Notes to be so defeased and discharged as contemplated by this Article VIII have been complied with.

(b)    Before or after a deposit, the Issuer may make arrangements satisfactory to the Trustee for the redemption of such Notes at a future date in accordance with Article III.

SECTION 8.03.    <u>Application of Trust Money</u>.  The Trustee shall hold in trust money or Government Obligations (including proceeds thereof) deposited with it pursuant to this Article VIII.  It shall apply the deposited money and the money from Government Obligations through each Paying Agent and in accordance with this Indenture to the payment of principal of and interest on the Notes so discharged or defeased.

SECTION 8.04.    <u>Repayment to Issuer</u>.  Each of the Trustee and each Paying Agent shall promptly turn over to the Issuer upon request any money or Government Obligations held by it as provided in this Article which, in the written opinion of nationally recognized firm of independent public accountants delivered to the Trustee (which delivery shall only be required if Government Obligations have been so deposited), are in excess of the amount thereof which would then be required to be deposited to effect an equivalent discharge or defeasance in accordance with this Article.

Subject to any applicable abandoned property law, the Trustee and each Paying Agent shall pay to the Issuer upon written request any money held by them for the payment of principal or interest that remains unclaimed for two years, and, thereafter, holders entitled to the money must look to the Issuer for payment as general creditors, and the Trustee and each Paying Agent shall have no further liability with respect to such monies.

SECTION 8.05.    <u>Indemnity for Government Obligations</u>.  The Issuer shall pay and shall indemnify the Trustee against any tax, fee or other charge imposed on or assessed against deposited Government Obligations or the principal and interest received on such Government Obligations.

SECTION 8.06.    <u>Reinstatement</u>.  If the Trustee or any Paying Agent is unable to apply any money or Government Obligations in accordance with this Article VIII by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's obligations under this Indenture and the Notes so discharged or defeased shall be revived and reinstated as though no deposit had occurred pursuant to this Article VIII until such time as the Trustee or any Paying Agent is permitted to apply all such money or Government Obligations in accordance with this Article VIII; *provided*, *however*, that, if the Issuer has made any payment of principal of, or interest on, any such Notes because of the reinstatement of its obligations, the Issuer shall be subrogated to the rights of the holders of such Notes to receive such payment from the money or Government Obligations held by the Trustee or any Paying Agent.

-115-

## ARTICLE IX

## AMENDMENTS AND WAIVERS

SECTION 9.01.    <u>Without Consent of the Holders</u>.

(a)    The Issuer, the Guarantors and the Trustee may amend this Indenture, the Security Documents, the First Lien Intercreditor Agreement, the Junior Lien Intercreditor Agreement or the Notes without notice to or consent of any holder:

(i)    to cure any ambiguity, omission, defect or inconsistency;

(ii)    to provide for the assumption by a Successor Issuer of the Obligations of the Issuer under this Indenture and the Notes;

(iii)    to provide for the assumption by a Successor Company of the Obligations of the Company under this Indenture and the Notes, to provide for the assumption by a Successor Pledgor of the Obligations of a Pledgor under this Indenture and the Security Documents;

(iv)    to add a Guarantor with respect to the Notes pursuant to Section 4.11;

(v)    to provide for uncertificated Notes in addition to or in place of certificated Notes; *provided*, *however*, that the uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code or in a manner such that the uncertificated Notes are described in Section 163(f)(2)(B) of the Code;

(vi)    to conform the text of this Indenture, the Notes, the Security Documents, the First Lien Intercreditor Agreement, the Junior Lien Intercreditor Agreement, the Escrow Agreement or the Registration Rights Agreement to any provision of the "Description of Notes" in the Offering Memorandum to the extent that such provision in the "Description of Notes" was intended to be a verbatim recitation of a provision of this Indenture, the Notes, the Security Documents, the First Lien Intercreditor Agreement, the Junior Lien Intercreditor Agreement, the Escrow Agreement or the Registration Rights Agreement;

(vii)    to evidence and provide acceptance of the appointment of a successor Trustee, Registrar, Paying Agent or Transfer Agent under this Indenture;

(viii)    to comply with the rules of any applicable securities depository;

(ix)    to add a Pledgor with respect to the Notes or to add Collateral to secure the Notes;

(x)    to release Collateral in compliance with this Indenture, the First Lien Intercreditor Agreement or the Junior Lien Intercreditor Agreement;

(xi)    to add additional secured creditors holding Other First-Lien Obligations, other Junior Lien Obligations or any other secured Indebtedness permitted to be Incurred so long as such Obligations are in compliance with this Indenture, the First Lien Intercreditor Agreement or the Security Documents;

(xii)    to add to the covenants of the Company or the Restricted Subsidiaries for the benefit of the holders or to surrender any right or power herein conferred upon the Company or the Restricted Subsidiaries;

(xiii)    to comply with any requirement of the SEC in connection with qualifying or maintaining the qualification of, this Indenture under the TIA;

(xiv)    to make any change that would provide any additional benefit or rights to the holders or that does not adversely affect in any material respect the legal rights of any holder;

(xv)    to provide for the issuance of the Exchange Notes, which shall have terms substantially identical in all material respects to the Initial Notes, and which shall be treated, together with any outstanding Initial Notes, as a single issue of securities;

(xvi)    to consummate the LCC Assumption in accordance with this Indenture and the Escrow Agreement;

(xvii)    to comply with the rules of any applicable securities depository; or

(xviii)    to provide for the issuance of Additional Notes under this Indenture in accordance with the limitations set forth in this Indenture.

(b)    The Trustee may require an Officer's Certificate or Opinion of Counsel that such amendment under this Section 9.01(a) is permitted under this Indenture and that all conditions have been complied with.  Notwithstanding the foregoing, no Opinion of Counsel shall be required in connection with the addition of a Guarantor under this Indenture upon execution and delivery by such Guarantor and the Trustee of a supplemental indenture to this Indenture, the form of which is attached as Exhibit D hereto, and delivery of an Officer's Certificate.

(c)    After an amendment under this Section 9.01 becomes effective, the Issuer shall mail to the holders a notice briefly describing such amendment, *provided* that in the case of an amendment pursuant to Section 9.01(a)(xiv), no such notice shall be required.  The failure to give such notice to all holders, or any defect therein, shall not impair or affect the validity of an amendment under this Section 9.01.

SECTION 9.02.    With Consent of the Holders.

(a)    The Issuer and the Trustee may amend this Indenture and the Security Documents with the written consent of the holders of at least a majority in aggregate principal amount of the Notes then outstanding voting as a single class (including consents obtained in connection with a tender offer or exchange for the Notes).  However, without the consent of each holder of an outstanding Note affected, an amendment may not:

(1)    reduce the amount of Notes whose holders must consent to an amendment,

(2)    reduce the rate of or extend the time for payment of interest on any Note,

(3)    reduce the principal of or change the Stated Maturity of any Note,

(4)    reduce the premium payable upon the redemption of any Note or change the time at which any Note may be redeemed in accordance with Article III,

-117-

(5)        make any Note payable in money other than that stated in such Note,

(6)        expressly subordinate the Notes to any other Indebtedness of the Company, the Issuer or any Guarantor,

(7)        impair the right of any holder to receive payment of principal of, premium, if any, and interest on such holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such holder's Notes,

(8)        make any change in the amendment provisions which require each holder's consent or in the waiver provisions,

(9)        make any change in the provisions in the First Lien Intercreditor Agreement, the Junior Lien Intercreditor Agreement or this Indenture dealing with the application of proceeds of Collateral that would adversely affect the holders of the Notes, or

(10)        except as expressly provided by this Indenture, modify or release the Guarantee of any Significant Subsidiary in any manner adverse to the holders of the Notes.

In addition, without the consent of the holders of at least 66% in aggregate principal amount of Notes then outstanding, no amendment or waiver may release all or substantially all of the Collateral from the Lien of this Indenture and the Security Documents with respect to the Notes.

Without the consent of the holders of at least 75% in aggregate principal amount of the Notes then outstanding, no amendment or waiver may make any change to, or extend the time for performance under, the escrow release provisions described in the Escrow Agreement or the Special Mandatory Redemption provisions described under Section 3.09 of this Indenture.

For purposes of any matter requiring consent, waiver, approval or other action of the holders of a specified percentage of the principal amount of Notes, the principal amount, on the relevant date of determination, of Notes, the holders of which have so consented or otherwise taken action, and of Notes then outstanding, shall be calculated in U.S. dollars, with the aggregate principal amount of outstanding Euro Notes converted into U.S. dollars using the U.S. Dollar-Equivalent on the Issue Date.

It shall not be necessary for the consent of the holders under this Section 9.02 to approve the particular form of any proposed amendment, but it shall be sufficient if such consent approves the substance thereof.

After an amendment under this Section 9.02 becomes effective, the Issuer shall mail to the holders a notice briefly describing such amendment.  The failure to give such notice to all holders, or any defect therein, shall not impair or affect the validity of an amendment under this Section 9.02.

SECTION 9.03.    <u>Compliance with Trust Indenture Act</u>.  From the date on which this Indenture is qualified under the TIA, every amendment, waiver or supplement to this Indenture or the Notes shall comply with the TIA as then in effect.

SECTION 9.04.    <u>Revocation and Effect of Consents and Waivers</u>.

(a)        A consent to an amendment or a waiver by a holder of a Note shall bind the holder and every subsequent holder of that Note or portion of the Note that evidences the same debt as the consenting holder's Note, even if notation of the consent or waiver is not made on the Note.  However,

any such holder or subsequent holder may revoke the consent or waiver as to such holder's Note or por-
tion of the Note if the Trustee receives the notice of revocation before the date on which the Trustee re-
ceives an Officers' Certificate from the Issuer certifying that the requisite principal amount of Notes have
consented.  After an amendment or waiver becomes effective, it shall bind every holder.  An amendment
or waiver becomes effective upon the (i) receipt by the Issuer or the Trustee of consents by the holders of
the requisite principal amount of securities, (ii) satisfaction of conditions to effectiveness as set forth in
this Indenture and any indenture supplemental hereto containing such amendment or waiver and (iii) exe-
cution of such amendment or waiver (or supplemental indenture) by the Issuer and the Trustee.

(b)    The Issuer may, but shall not be obligated to, fix a record date for the purpose of
determining the holders entitled to give their consent or take any other action described above or required
or permitted to be taken pursuant to this Indenture.  If a record date is fixed, then notwithstanding the
immediately preceding paragraph, those Persons who were holders at such record date (or their duly des-
ignated proxies), and only those Persons, shall be entitled to give such consent or to revoke any consent
previously given or to take any such action, whether or not such Persons continue to be holders after such
record date.  No such consent shall be valid or effective for more than 120 days after such record date.

SECTION 9.05.    Notation on or Exchange of Notes.  If an amendment, supplement or
waiver changes the terms of a Note, the Issuer may require the holder of the Note to deliver it to the Trus-
tee.  The Trustee may place an appropriate notation on the Note regarding the changed terms and return it
to the holder.  Alternatively, if the Issuer or the Trustee so determines, the Issuer in exchange for the Note
shall issue and the Trustee shall authenticate a new Note that reflects the changed terms.  Failure to make
the appropriate notation or to issue a new Note shall not affect the validity of such amendment, supple-
ment or waiver.

SECTION 9.06.    Trustee to Sign Amendments.  The Trustee shall sign any amend-
ment, supplement or waiver authorized pursuant to this Article IX if the amendment does not adversely
affect the rights, duties, liabilities or immunities of the Trustee.  If it does, the Trustee may but need not
sign it.  In signing such amendment, the Trustee shall be entitled to receive indemnity and security rea-
sonably satisfactory to it and shall be provided with, and (subject to Section 7.01) shall be fully protected
in relying upon, an Officer's Certificate and an Opinion of Counsel stating that such amendment, supple-
ment or waiver is authorized or permitted by this Indenture and that such amendment, supplement or
waiver is the legal, valid and binding obligation of the Issuer and the Company, enforceable against them
in accordance with its terms, subject to customary exceptions, and complies with the provisions hereof
(including Section 9.03).

SECTION 9.07.    Additional Voting Terms; Calculation of Principal Amount.  All
Notes issued under this Indenture shall vote and consent together on all matters (as to which any of such
Notes may vote) as one class and no Notes will have the right to vote or consent as a separate class on any
matter only if the Issuer so elects pursuant to Section 2.01 of this Indenture.  Determinations as to whether
holders of the requisite aggregate principal amount of Notes have concurred in any direction, waiver or
consent shall be made in accordance with this Article IX and Section 2.14.

# ARTICLE X

# RANKING OF NOTE LIENS

SECTION 10.01.    Relative Rights.  The First Lien Intercreditor Agreement and the Jun-
ior Lien Intercreditor Agreement define the relative rights, as lienholders, of holders of first priority
Liens, holders of Liens securing First Priority Lien Obligations and holders of Liens securing Junior Lien
Obligations.  Nothing in this Indenture or the First Lien Intercreditor Agreement will:

-119-

(a)    impair, as between the Issuer and holders of Notes, the obligation of the Issuer, which is absolute and unconditional, to pay principal of, premium and interest on Notes in accordance with their terms or to perform any other obligation of the Issuer or any other obligor under this Indenture, the Notes, the Guarantees and the Security Documents;

(b)    restrict the right of any holder to sue for payments that are then due and owing, in a manner not inconsistent with the provisions of the First Lien Intercreditor Agreement or the Junior Lien Intercreditor Agreement;

(c)    prevent the Trustee, the Collateral Agent or any holder from exercising against the Issuer or any other obligor any of its other available remedies upon a Default or Event of Default (other than its rights as a secured party, which are subject to the First Lien Intercreditor Agreement); or

(d)    restrict the right of the Trustee, the Collateral Agent or any holder:

(1)    to file and prosecute a petition seeking an order for relief in an involuntary bankruptcy case as to any obligor or otherwise to commence, or seek relief commencing, any insolvency or liquidation proceeding involuntarily against any obligor;

(2)    to make, support or oppose any request for an order for dismissal, abstention or conversion in any insolvency or liquidation proceeding;

(3)    to make, support or oppose, in any insolvency or liquidation proceeding, any request for an order extending or terminating any period during which the debtor (or any other Person) has the exclusive right to propose a plan of reorganization or other dispositive restructuring or liquidation plan therein;

(4)    to seek the creation of, or appointment to, any official committee representing creditors (or certain of the creditors) in any insolvency or liquidation proceedings and, if appointed, to serve and act as a member of such committee without being in any respect restricted or bound by, or liable for, any of the obligations under this Article X;

(5)    to seek or object to the appointment of any professional person to serve in any capacity in any insolvency or liquidation proceeding or to support or object to any request for compensation made by any professional person or others therein;

(6)    to make, support or oppose any request for order appointing a trustee or examiner in any insolvency or liquidation proceedings; or

(7)    otherwise to make, support or oppose any request for relief in any insolvency or liquidation proceeding that it is permitted by law to make, support or oppose:

if it were a holder of unsecured claims; or

(x)    as to any matter relating to any plan of reorganization or other

(y)    restructuring or liquidation plan or as to any matter relating to the administration of the estate or the disposition of the case or proceeding (in each case except as set forth in the First Lien Intercreditor Agreement or Junior Lien Intercreditor Agreement).

# ARTICLE XI

# COLLATERAL

SECTION 11.01.    Security Documents.    Prior to a Special Mandatory Redemption or Release Date, payment of the principal of and any premium and interest on the Notes when and as the same shall be due and payable, pursuant to a Special Mandatory Redemption under Section 3.09 or an acceleration under Section 6.02, shall be secured by a pledge of the Escrow Proceeds as described in the Escrow Agreement, pursuant to which the Escrow Agent will grant the Trustee, for the benefit of the holders of the Notes, a first priority security interest in the escrow account and all deposits therein to secure the Special Mandatory Redemption.  Upon release of the funds from escrow after the LCC Assumption and on the Release Date, the Company, the Issuer, the Pledgors, the Trustee and the Collateral Agent shall enter into one or more collateral agreements (as amended, supplemented, modified, extended, restructured, renewed, restated or replaced in whole or in part from time to time, the "Collateral Agreement") establishing the terms of the security interests and Liens that secure the Notes.  These security interests will secure the payment and performance when due of all of the Obligations of the Issuer under the Notes and this Indenture and the Guarantors under the Guarantee, as provided in the Security Documents.

The Company shall, and shall cause each Restricted Subsidiary to, and each Restricted Subsidiary shall, make all filings (including filings of continuation statements and amendments to UCC financing statements that may be necessary to continue the effectiveness of such UCC financing statements) and all other actions as are necessary or required by the Security Documents to maintain (at the sole cost and expense of the Company and its Restricted Subsidiaries) the security interest created by the Security Documents in the Collateral (other than with respect to any Collateral the security interest in which is not required to be perfected under the Security Documents) as a perfected first priority security interest subject only to Permitted Liens.

SECTION 11.02.    Collateral Agent.

(a)    The Collateral Agent shall have all the rights and protections provided in the First Lien Security Documents.

(b)    Subject to Section 7.01, neither the Trustee nor the Collateral Agent nor any of their respective officers, directors, employees, attorneys or agents will be responsible or liable for the existence, genuineness, value or protection of any Collateral, for the legality, enforceability, effectiveness or sufficiency of the Security Documents, for the creation, perfection, priority, sufficiency or protection of any first priority Lien, or any defect or deficiency as to any such matters.

(c)    Subject to the First Lien Security Documents and the First Lien Intercreditor Agreement, (i) the Trustee shall direct the Collateral Agent and (ii) except as directed by the Trustee as required or permitted by this Indenture and any other representatives or pursuant to the Security Documents, the holders acknowledge that Collateral Agent will not be obligated:

(1)    to act upon directions purported to be delivered to it by any other Person;

(2)    to foreclose upon or otherwise enforce any first priority Lien; or

(3)    to take any other action whatsoever with regard to any or all of the first priority Liens, Security Documents or Collateral.

(d)    The holders of Notes agree that the Collateral Agent shall be entitled to the
rights, privileges, protections, immunities, indemnities and benefits provided to the Collateral Agent by
the Security Documents.  Furthermore, each holder of a Note, by accepting such Note, consents to the
terms of and authorizes and directs the Trustee (in each of its capacities) and hereby appoints, authorizes
and directs the Collateral Agent to enter into and perform the First Lien Intercreditor Agreement, Junior
Lien Intercreditor Agreement and Security Documents in each of its capacities thereunder.

(e)    If the Issuer (i) Incurs First Priority Lien Obligations at any time when the First
Lien Intercreditor Agreement is not in effect or at any time when Indebtedness constituting First Priority
Lien Obligations entitled to the benefit of an existing intercreditor agreement is concurrently retired, and
(ii) directs the Trustee to deliver to the Collateral Agent an Officer's Certificate so stating and requesting
the Collateral Agent to enter into an intercreditor agreement (on substantially the same terms as the First
Lien Intercreditor Agreement in effect on the Issue Date) in favor of a designated agent or representative
for the holders of the First Priority Lien Obligations so Incurred, the holders acknowledge that the Collat-
eral Agent is hereby authorized and directed to enter into such intercreditor agreement, bind the holders
on the terms set forth therein and perform and observe its obligations thereunder.

SECTION 11.03.   Authorization of Actions to Be Taken.

(a)    Each holder, by its acceptance of the Notes, consents and agrees to the terms of
the Security Documents (including, without limitation, the provisions providing for foreclosure and re-
lease of Collateral) as the same may be in effect or may be amended from time to time in accordance with
their terms, authorizes and directs the Trustee and the Collateral Agent to enter into the Security Docu-
ments to which it is a party, authorizes and empowers the Trustee to direct the Collateral Agent to enter
into, and the Collateral Agent to execute and deliver, the First Lien Intercreditor Agreement and the Jun-
ior Lien Intercreditor Agreement and authorizes and empowers the Trustee and the Collateral Agent to
bind the holders of Notes and other holders of Obligations as set forth in the Security Documents to
which it is a party and the First Lien Intercreditor Agreement and the Junior Lien Intercreditor Agreement
and to perform its obligations and exercise its rights and powers thereunder.

(b)    The Trustee is authorized and empowered to receive for the benefit of the holders
of Notes any funds collected or distributed under the Security Documents to which the Trustee is a party
and to make further distributions of such funds to the holders of Notes according to the provisions of this
Indenture.

(c)    Subject to the provisions of Section 7.01 and Section 7.02 hereof, and the First
Lien Intercreditor Agreement, the Junior Lien Intercreditor Agreement and the Security Documents, the
Trustee may (but shall not be obligated to), in its sole discretion and without the consent of the holders,
direct, on behalf of the holders, the Collateral Agent to take all actions it deems necessary or appropriate
in order to:

(1)    foreclose upon or otherwise enforce any or all of the first priority Liens;

(2)    enforce any of the terms of the Security Documents to which the Collateral
Agent or Trustee is a party; or

(3)    collect and receive payment of any and all Obligations.

Subject to the First Lien Intercreditor Agreement, the Trustee is authorized and empow-
ered to institute and maintain, or direct the Collateral Agent to institute and maintain, such suits and pro-
ceedings as it may deem expedient to protect or enforce the first priority Liens or the Security Documents

-122-

to which the Collateral Agent or Trustee is a party or to prevent any impairment of Collateral by any acts that may be unlawful or in violation of the Security Documents to which the Collateral Agent or Trustee is a party or this Indenture, and such suits and proceedings as the Trustee or the Collateral Agent may deem expedient to preserve or protect its interests and the interests of the holders of Notes in the Collateral, including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the security interest hereunder or be prejudicial to the interests of holders, the Trustee or the Collateral Agent.

SECTION 11.04.   Release of Collateral.

(a)    Subject to the First Lien Intercreditor Agreement, Liens on Collateral securing the Notes will be automatically and unconditionally released:

(1)    as to any property or asset (including Capital Stock of a Subsidiary of the Company), to enable the Company, the Issuer and the Pledgors to consummate the disposition of such property or asset to the extent not prohibited by clause (6) below or under the covenants described under Section 4.04 or Section 4.06;

(2)    to release Excess Proceeds and Collateral Excess Proceeds to the Issuer that remain unexpended after the conclusion of an Asset Sale Offer or a Collateral Asset Sale Offer conducted in accordance with this Indenture and not required to be made a part of the Collateral;

(3)    in respect of the property and assets of a Pledgor, upon the designation of such Pledgor to be an Unrestricted Subsidiary in accordance with the covenant described under Section 4.04 and the definition of "Unrestricted Subsidiary";

(4)    to the extent (x) greater than $750.0 million of loans are outstanding under the Senior Term Loan Facility and (y) the Collateral is released from the Liens securing the Senior Term Loan Facility and is not otherwise securing or will not be securing Indebtedness outstanding under any refinancing or replacement thereof or any other similar Secured Indebtedness or any Indebtedness secured by junior Liens on the Collateral;

(5)    in respect of the property and assets of a Guarantor upon release of the Guarantee with respect to the Notes of such Guarantor;

(6)    in the case of the property and assets of a specific Pledgor, upon such Pledgor making a transfer of such assets to any Restricted Subsidiary of the Issuer that is not a Pledgor; *provided* that (i) such Transfer is not subject to Section 5.01 and (ii) the aggregate net book value of the assets of Restricted Subsidiaries that are at any time Notes Collateral (excluding cash proceeds of accounts receivable, inventory and related assets) that are so transferred pursuant to this clause (6) subsequent to the Release Date shall not exceed 5% of the Consolidated Net Tangible Assets of the Issuer and its Restricted Subsidiaries per year and shall not be in an amount that will result in an Excluded Subsidiary ceasing to qualify as an Excluded Subsidiary in accordance with the definition thereof; *provided*, *further*, that Liens on all property and assets of any Subsidiary of Lyondell Europe Holdings, Inc., a Delaware corporation, will be automatically and unconditionally released upon any transfer of such Subsidiary;

(7)    as described under Article IX; or

(8)        as to the pledge of Capital Stock of first-tier Foreign Subsidiaries, in connection with a reorganization, change or modification of the direct or indirect ownership of Foreign Subsidiaries by the Company, the Issuer or a Pledgor, as applicable, in compliance with this Indenture, a release may be obtained as to such Capital Stock in connection with the substitution of pledge of 65% of the voting Capital Stock and 100% of the non-voting Capital Stock of any one or more new or replacement first-tier Foreign Subsidiaries pursuant to valid Security Documents.

In addition, the security interests granted pursuant to the Security Documents securing the Notes Obligations shall automatically terminate and/or be released all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to the applicable Pledgors (as defined in the Collateral Agreement), as of the date upon (i) all the Obligations under the Notes and this Indenture (other than contingent or unliquidated obligations or liabilities not then due) have been paid in full in cash or immediately available funds; (ii) a legal defeasance or covenant defeasance or discharge under Article VIII; or (iii) the Holders of at least 66% in aggregate principal amount of all Notes issued under this Indenture consent to the termination of the Security Documents.

In connection with any termination or release pursuant to this Section 11.04(a), the Collateral Agent shall execute and deliver to any Pledgor (as defined in the Collateral Agreement) at such Pledgor's expense, all documents that such Pledgor shall reasonably request to evidence such termination or release (including, without limitation, UCC termination statements), and will duly assign and transfer to such Pledgor, such of the Pledged Collateral (as defined in the Collateral Agreement) that may be in the possession of the Collateral Agent and has not theretofore been sold or otherwise applied or released pursuant to this Indenture or the Security Documents.  Any execution and delivery of documents pursuant to this Section 11.04(a) shall be without recourse to or warranty by the Collateral Agent.  In connection with any release pursuant to this Section 11.04(a), the Pledgors shall be permitted to take any action in connection therewith consistent with such release including, without limitation, the filing of UCC termination statements.

Upon the receipt of an Officers' Certificate from the Issuer, as described in Section 11.04(b) below, if applicable, and any necessary or proper instruments of termination, satisfaction or release prepared by the Issuer, the Collateral Agent shall execute, deliver or acknowledge such instruments or releases to evidence the release of any Collateral permitted to be released pursuant to this Indenture or the Security Documents or the First Lien Intercreditor Agreement.

(b)        Notwithstanding anything herein to the contrary, in connection with (x) any release of Collateral pursuant to Section 11.04(a)(1), (6), (7) or (8) above, such Collateral may not be released from the Lien and security interest created by the Security Documents and (y) any release of Collateral pursuant to Section 11.04(a)(2), (3), (4) and (5), the Collateral Agent shall not be required to execute, deliver or acknowledge any instruments of termination, satisfaction or release unless, in each case, an Officers' Certificate and Opinion of Counsel certifying that all conditions precedent, including, without limitation, this Section 11.04, have been met and stating under which of the circumstances set forth in Section 11.04(a) above the Collateral is being released have been delivered to the Collateral Agent on or prior to the date of such release or, in the case of clause (y) above, the date on which the Collateral Agent executes any such instrument.

(c)        To the extent that Rule 3-16 of Regulation S-X under the Securities Act requires or would require (or is replaced with another rule or regulation, or any other law, rule or regulation is adopted, that would require) the filing with the SEC (or any other governmental agency) of separate financial statements of any Subsidiary of the Company due to the fact that such Subsidiary's Capital Stock secures the Notes, then the Capital Stock of such Subsidiary will automatically be deemed not to be part of the Notes Collateral securing the Notes but only to the extent necessary to not be subject to such re-

quirement and only for so long as required to not be subject to such requirement (such requirement, the "3-16 Exemption"); *provided* that the 3-16 Exemption will not apply to the capital stock of the Issuer and LyondellBasell Subholdings, B.V.  In such event, the Security Documents may be amended or modified, without the consent of any holder of such Notes, to the extent necessary to release the security interests in favor of the Collateral Agent on the shares of Capital Stock of such Subsidiary that are so deemed to no longer constitute part of the Notes Collateral.  In the event that Rule 3-16 of Regulation S-X under the Securities Act is amended, modified or interpreted by the SEC to permit (or is replaced with another rule or regulation, or any other law, rule or regulation is adopted, that would permit) such Subsidiary's Capital Stock to secure the Notes in excess of the amount then pledged without the filing with the SEC (or any other governmental agency) of separate financial statements of such Subsidiary, then the Capital Stock of such Subsidiary will automatically be deemed to be a part of the Notes Collateral.

(d)    Notwithstanding anything herein to the contrary, at any time when a Default or Event of Default has occurred and is continuing and the maturity of the Notes has been accelerated (whether by declaration or otherwise) and the Trustee has delivered a notice of acceleration to the Collateral Agent, no release of Collateral pursuant to the provisions of this Indenture or the Security Documents will be effective as against the holders, except as otherwise provided in the First Lien Intercreditor Agreement.

SECTION 11.05.    Filing, Recording and Opinions.

(a)    The Issuer will comply with the provisions of TIA Sections 314(b), 314(c) and 314(d), in each case following qualification of this Indenture pursuant to the TIA and except to the extent not required as set forth in any SEC regulation or interpretation (including any no-action letter issued by the Staff of the SEC, whether issued to the Issuer or any other Person).  Following such qualification, to the extent the Issuer is required to furnish to the Trustee an Opinion of Counsel pursuant to TIA Section 314(b)(2), the Issuer will furnish such opinion not more than 60 but not less than 30 days prior to each September 30.

Any release of Collateral permitted by Section 11.04 hereof will be deemed not to impair the Liens under this Indenture and the Security Documents in contravention thereof and any person that is required to deliver an Officer's Certificate and Opinion of Counsel pursuant to Section 314(d) of the TIA, shall be entitled to rely upon the foregoing as a basis for delivery of such certificate and opinion.  The Trustee may, to the extent permitted by Sections 7.01 and 7.02 hereof, accept as conclusive evidence of compliance with the foregoing provisions the appropriate statements contained in such documents, Officer's Certificate and Opinion of Counsel.

(b)    If any Collateral is released in accordance with this Indenture and if the Issuer has delivered the certificates and documents required by the Security Documents and Section 11.04, the Trustee will determine whether it has received all documentation required by TIA Section 314(d) in connection with such release and, based on such determination and Officer's Certificate and the Opinion of Counsel delivered pursuant to Section 11.04, will, upon request, deliver a certificate to the Collateral Agent setting forth such determination.

(c)    Any certificate or opinion required by Section 314(d) of the Trust Indenture Act may be made by an Officer of the Issuer, except in cases where Section 314(d) requires that such certificate or opinion be made by an independent engineer, appraiser or other expert.

(d)    Notwithstanding anything to the contrary herein, the Issuer and its Subsidiaries will not be required to comply with all or any portion of Section 314(d) of the Trust Indenture Act if they determine, in good faith based on advice of counsel, that under the terms of that section and/or any inter-

pretation or guidance as to the meaning thereof of the SEC and its staff, including "no action" letters or exemptive orders, all or any portion of Section 314(d) of the Trust Indenture Act is inapplicable to the released Collateral.

(e)    Upon the request of the Trustee, the Trustee shall be entitled to rely on an Officer's Certificate and an Opinion of Counsel in respect of any matter in furtherance of the foregoing transactions contemplated by this Section 11.05.

SECTION 11.06.    [Intentionally Omitted.]

SECTION 11.07.    Powers Exercisable by Receiver or Trustee.  In case the Collateral shall be in the possession of a receiver or trustee, lawfully appointed, the powers conferred in this Article XI upon the Issuer or the Company with respect to the release, sale or other disposition of such property may be exercised by such receiver or trustee, and an instrument signed by such receiver or trustee shall be deemed the equivalent of any similar instrument of the Issuer or the Company or of any officer or officers thereof required by the provisions of this Article XI; and if the Trustee or the Collateral Agent shall be in the possession of the Collateral under any provision of this Indenture, then such powers may be exercised by the Trustee or the Collateral Agent, as the case may be.

SECTION 11.08.    Release upon Termination of the Issuer's Obligations.  In the event (i) that the Issuer delivers to the Trustee, in form and substance acceptable to it, an Officer's Certificate and Opinion of Counsel certifying that all the obligations under this Indenture, the Notes and the Security Documents have been satisfied and discharged by the payment in full of the Issuer's obligations under the Notes, this Indenture and the Security Documents, and all such obligations have been so satisfied, or (ii) a discharge, legal defeasance or covenant defeasance of this Indenture occurs under Article VIII, the Trustee shall deliver to the Issuer and the Collateral Agent a notice stating that the Trustee, on behalf of the holders, disclaims and gives up any and all rights it has in or to the Collateral, and any rights it has under the Security Documents, or, if applicable, a Special Mandatory redemption occurs and the obligations under the Escrow Agreement are also met, and upon receipt by the Collateral Agent of such notice, the Collateral Agent shall be deemed not to hold a Lien in the Collateral on behalf of the Trustee and shall (or shall direct the Collateral Agent to) do or cause to be done all acts reasonably necessary to release such Lien as soon as is reasonably practicable.

SECTION 11.09.    Designations.  Except as provided in the next sentence, for purposes of the provisions hereof and the First Lien Intercreditor Agreement requiring the Issuer to designate Indebtedness for the purposes of the terms First Priority Lien Obligations and Other First Lien Obligations or any other such designations hereunder or under the First Lien Intercreditor Agreement, any such designation shall be sufficient if the relevant designation provides in writing that such First Priority Lien Obligations or Other First Lien Obligations are permitted under this Indenture and is signed on behalf of the Issuer by an Officer and delivered to the Trustee and the Collateral Agent in an Officer's Certificate.

## ARTICLE XII

## GUARANTEE

SECTION 12.01.    Guarantee.

(a)    Prior to the Release Date, the Company, by execution of this Indenture, will irrevocably and unconditonally guarantee the full and punctual payment when due, whether at Stated Maturity, by acceleration, by redemption or otherwise, of all Obligations of the Issuer under this Indenture (including obligations to the Trustee) and the Notes, whether for payment of principal of, premium, if

any, or interest on in respect of the Notes (the "Guarantee") and all other monetary obligations of the Issuer under this Indenture and the Notes and the full and punctual performance within applicable grace periods of all other obligations of the Issuer whether for fees, expenses, indemnification or otherwise under this Indenture and the Notes (all the foregoing being hereinafter collectively called the "Guaranteed Obligations"). Upon release from escrow on the Release Date and from and after the date of the LCC Assumption, the Company and each existing and subsequently acquired or organized direct or indirect Wholly Owned Domestic Subsidiary of the Company, by execution of this Indenture, (other than any Excluded Subsidiary) (each such entity, a "Guarantor") will, jointly and severally, irrevocably and unconditionally guarantee on a first-priority secured basis, as a primary obligor and not merely as a surety, to each holder and to the Trustee and its successors and assigns (i) the full and punctual payment when due, whether at Stated Maturity, by acceleration, by redemption or otherwise, of all Obligations of the Issuer under this Indenture (including obligations to the Trustee and the Agents) and the Notes, whether for payment of principal of, premium, if any, or interest on in respect of the Notes (the "Guarantee") and all other monetary obligations of the Issuer under this Indenture and the Notes and (ii) the full and punctual performance within applicable grace periods of all other obligations of the Issuer whether for fees, expenses, indemnification or otherwise under this Indenture and the Notes (all the foregoing, including the Guarantee, being hereinafter collectively called the "Guaranteed Obligations"). Each Guarantor further agrees that the Guaranteed Obligations may be extended and renewed, in whole or in part, without notice or further assent from any Guarantor, and that each Guarantor shall remain bound under this Article XII notwithstanding any extension or renewal of any Guaranteed Obligation.

(b)    To the extent applicable, each Guarantor waives presentation to, demand of payment from and protest to the Issuer of any of the Guaranteed Obligations and also waives notice of protest for nonpayment. Each Guarantor waives notice of any default under the Notes or the Guaranteed Obligations. The obligations of each Guarantor hereunder shall not be affected by (i) the failure of any holder or the Trustee to assert any claim or demand or to enforce any right or remedy against the Issuer or any other Person under this Indenture, the Notes or any other agreement or otherwise; (ii) any extension or renewal of this Indenture, the Notes or any other agreement; (iii) any rescission, waiver, amendment or modification of any of the terms or provisions of this Indenture, the Notes or any other agreement; (iv) the release of any security held by any holder or the Trustee for the Guaranteed Obligations or each Guarantor; (v) the failure of any holder or Trustee to exercise any right or remedy against any other guarantor of the Guaranteed Obligations; or (vi) any change in the ownership of each Guarantor, except as provided in Section 12.02(b) or Section 12.02(c). Each Guarantor hereby waives any right to which it may be entitled to have its Obligations hereunder divided among the Guarantors, such that such Guarantor's Obligations would be less than the full amount claimed.

(c)    Each Guarantor hereby waives any right to which it may be entitled to have the assets of the Issuer first be used and depleted as payment of the Issuer's or such Guarantor's obligations hereunder prior to any amounts being claimed from or paid by such Guarantor hereunder. Each Guarantor hereby waives any right to which it may be entitled to require that the Issuer be sued prior to an action being initiated against such Guarantor.

(d)    Each Guarantor further agrees that its Guarantee herein constitutes a guarantee of payment, performance and compliance when due (and not a guarantee of collection) and waives any right to require that any resort be had by any holder or the Trustee to any security held for payment of the Guaranteed Obligations.

(e)    The Guarantee of each Guarantor is, to the extent and in the manner set forth in Article XII, will be the senior secured Obligations of the Guarantors equal in right of payment to all existing and future Pari Passu Indebtedness, equal in right of payment to all existing and future unsubordinated Indebtedness of the relevant Guarantor, and subordinated and subject in right of payment to the prior

payment in full of the principal of and premium, if any, and interest on all Secured Indebtedness of the relevant Guarantor and is made subject to such provisions of this Indenture.

(f)     Except as expressly set forth in Sections 8.01(b), 12.02 and 12.06, the obligations of each Guarantor hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense of setoff, counterclaim, recoupment or termination whatsoever or by reason of the invalidity, illegality or unenforceability of the Guaranteed Obligations or otherwise.  Without limiting the generality of the foregoing, the obligations of each Guarantor herein shall not be discharged or impaired or otherwise affected by the failure of any holder or the Trustee to assert any claim or demand or to enforce any remedy under this Indenture, the Notes or any other agreement, by any waiver or modification of any thereof, by any default, failure or delay, willful or otherwise, in the performance of the obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of any Guarantor or would otherwise operate as a discharge of any Guarantor as a matter of law or equity.

(g)     Each Guarantor agrees that its Guarantee shall remain in full force and effect until payment in full of all the Guaranteed Obligations.  Each Guarantor further agrees that its Guarantee herein shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of principal of or interest on any Guaranteed Obligation is rescinded or must otherwise be restored by any holder or the Trustee upon the bankruptcy or reorganization of the Issuer or otherwise.

(h)     In furtherance of the foregoing and not in limitation of any other right which any holder or the Trustee has at law or in equity against any Guarantor by virtue hereof, upon the failure of the Issuer to pay the principal of or interest on any Guaranteed Obligation when and as the same shall become due, whether at maturity, by acceleration, by redemption or otherwise, or to perform or comply with any other Guaranteed Obligation, each Guarantor hereby promises to and shall, upon receipt of written demand by the Trustee, forthwith pay, or cause to be paid, in cash, to the holders or the Trustee an amount equal to the sum of (i) the unpaid principal amount of such Guaranteed Obligations, (ii) accrued and unpaid interest on such Guaranteed Obligations (but only to the extent not prohibited by applicable law) and (iii) all other monetary obligations of the Issuer to the holders, the Trustee and Agents.

(i)     Each Guarantor agrees that it shall not be entitled to any right of subrogation in relation to the holders in respect of any Guaranteed Obligations guaranteed hereby until payment in full of all Guaranteed Obligations.  Each Guarantor further agrees that, as between it, on the one hand, and the holders and the Trustee, on the other hand, (i) the maturity of the Guaranteed Obligations guaranteed hereby may be accelerated as provided in Article VI for the purposes of the Guarantee herein, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Guaranteed Obligations guaranteed hereby, and (ii) in the event of any declaration of acceleration of such Guaranteed Obligations as provided in Article VI, such Guaranteed Obligations (whether or not due and payable) shall forthwith become due and payable by the Company for the purposes of this Section 12.01.

(j)     Each Guarantor also agrees to pay any and all costs and expenses (including reasonable attorneys' fees and expenses) Incurred by the Trustee, the Agents or any holder in enforcing any rights under this Section 12.01.

(k)     Upon request of the Trustee, each Guarantor shall execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture.

SECTION 12.02.    Limitation on Liability.

(a)    Any term or provision of this Indenture to the contrary notwithstanding, the maximum aggregate amount of the Guaranteed Obligations guaranteed hereunder by each Guarantor shall not exceed the maximum amount that can be hereby guaranteed without rendering this Indenture, as it relates to such Guarantor, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer or similar laws affecting the rights of creditors generally.

(b)    The Obligations of any Guarantor, including the Company, under its Guaranteed Obligations will be automatically and unconditionally released and discharged from all Obligations under this Article XII when any of the following occurs:

(i)    upon the full and final payment by or on behalf of the Issuer of all of its Obligations under this Indenture and the Notes;

(ii)    except with respect to the Guarantee of the Company (subject to the provisions described under Section 5.01) any issuance, sale, exchange, transfer or other disposition (including, without limitation, by way of acquisition, merger, amalgamation, consolidation, transfer, conveyance or otherwise), directly or indirectly, of Capital Stock of such Guarantor (or any parent of such Guarantor) to any Person that is not a Restricted Subsidiary of the Company that results in such Guarantor ceasing to be a Restricted Subsidiary of the Company; *provided* that such issuance, sale, exchange, transfer or other disposition is made in accordance with the provisions of this Indenture;

(iii)    except with respect to the Guarantee of the Company, the designation of such Guarantor as an Unrestricted Subsidiary in accordance with the provisions of this Indenture;

(iv)    except with respect to the Guarantee of the Company (subject to the provisions described under Section 5.01), upon the liquidation or dissolution of such Guarantor; *provided* that no Default or Event of Default has occurred or is continuing or would be caused thereby;

(v)    except with respect to the Guarantee of the Company, the occurrence of legal defeasance or covenant defeasance in accordance with this Indenture;

(vi)    except with respect to the Guarantee of the Company [and for those limitations described in the following paragraph], in the event that the continued Obligation of such Guarantor under its Guarantee or the continued existence of such Guarantee will result in a violation of applicable law that cannot be avoided or otherwise prevented through measures reasonably available to the Company or such Guarantor; *provided* that all guarantees, if any, of all other First Priority Lien Obligations by such Guarantor are also released; or

(vii)    upon such Guarantor being designated as an Excluded Subsidiary in compliance with this Indenture and the Company gives written notice of such release to the Trustee.

In addition to the initial Guarantors, other Domestic Subsidiaries may become Guarantors after the Release Date, as provided in this Indenture. The Guaranteed Obligations of the Guarantors will be limited as necessary to recognize certain defenses generally available to guarantors (including those that relate to fraudulent conveyance or transfer, voidable preference, financial assistance, corporate purpose, capital maintenance or similar laws, regulations or defenses affecting the rights of creditors generally) or other considerations under applicable law.

-129-

SECTION 12.03.    <u>Successors and Assigns</u>.  This Article XII shall be binding upon each Guarantor and its successors and assigns and shall inure to the benefit of the successors and assigns of the Trustee, the Agents and the holders and, in the event of any transfer or assignment of rights by any holder, the Agents or the Trustee, the rights and privileges conferred upon that party in this Indenture and in the Notes shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions of this Indenture.

SECTION 12.04.    <u>No Waiver</u>.  Neither a failure nor a delay on the part of either the Trustee, the Agents or the holders in exercising any right, power or privilege under this Article XII shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise of any right, power or privilege.  The rights, remedies and benefits of the Trustee, the Agents and the holders herein expressly specified are cumulative and not exclusive of any other rights, remedies or benefits which either may have under this Article XII at law, in equity, by statute or otherwise.

SECTION 12.05.    <u>Modification</u>.  No modification, amendment or waiver of any provision of this Article XII, nor the consent to any departure by any Guarantor therefrom, shall in any event be effective unless the same shall be in writing and signed by the Trustee, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice to or demand on any Guarantor in any case shall entitle any Guarantor to any other or further notice or demand in the same, similar or other circumstances.

SECTION 12.06.    <u>Execution of Supplemental Indenture for Future Note Guarantors</u>. Each Subsidiary and other Person which is required to become a Guarantor of the Notes pursuant to Section 4.11 shall promptly execute and deliver to the Trustee a supplemental indenture in the form of <u>Exhibit D</u> hereto pursuant to which such Subsidiary or other Person shall become a Guarantor under this Article XII and shall guarantee the Notes.  Concurrently with the execution and delivery of such supplemental indenture, the Issuer shall deliver to the Trustee an Opinion of Counsel and an Officer's Certificate to the effect that such supplemental indenture has been duly authorized, executed and delivered by such Subsidiary or other Person and that, subject to the application of bankruptcy, insolvency, moratorium, fraudulent conveyance or transfer and other similar laws relating to creditors' rights generally and to the principles of equity, whether considered in a proceeding at law or in equity, the Guarantee of such Guarantor is a valid and binding obligation of such guarantor, enforceable against such Guarantor in accordance with its terms and/or to such other matters as the Trustee may reasonably request.

SECTION 12.07.    <u>Non-Impairment</u>.  The failure to endorse a Guarantee on any Note shall not affect or impair the validity thereof.

## ARTICLE XIII

## MISCELLANEOUS

SECTION 13.01.    <u>Trust Indenture Act Controls</u>.  If and to the extent that any provision of this Indenture limits, qualifies or conflicts with the duties imposed by, or with another provision (an "<u>incorporated provision</u>") included in this Indenture by operation of, Sections 310 to 318 of the TIA, inclusive, such imposed duties or incorporated provision shall control.

SECTION 13.02.    <u>Notices</u>.

(a)        Any notice or communication required or permitted hereunder shall be in writing and delivered in person, via facsimile or mailed by first-class mail addressed as follows:

-130-

if to the Issuer, the Company or a Guarantor:

Lyondell Chemical Company
1221 McKinney St
Suite 700
Houston, TX  77010
Facsimile:
Attention: Craig B. Glidden, Esq.

if to the Trustee:

Wilmington Trust FSB
166 Mercer Street, Suite 2-R
New York, NY 10012
Facsimile: (212) 343-1079
Attention: Adam Berman, Vice President CCS - Global Financial

if to the U.S. Paying Agent, U.S. Registrar or Collateral Agent:

Deutsche Bank Trust Company Americas
Trust & Securities Services
60 Wall Street, MS NYC60-2710
New York, New York 10005
Tel:  201-593-3543
Fax:  732-578-4635
Attn:  Corporate Deal Manager – Lyondell

with a copy to:

Deutsche Bank National Trust Company
Trust & Securities Services
100 Plaza One
6th Floor - MS JCY03-0699
Jersey City, NJ 07311-3901
Fax: 732-578-4635
Attention: Corporate Deal Team - Lyondell

if to the Euro Paying Agent:

Deutsche Bank AG, London Branch
10 Bishops Square
London, E1 6AO
United Kingdomif to the Euro Registrar:


Deutsche Bank Luxembourg S.A.
2, Boulevard Konrad Adenauer
L-1115 Luxembourg
Luxembourg

The Issuer or the Trustee by notice to the other may designate additional or different addresses for subsequent notices or communications.

(b)      Any notice or communication mailed to a holder shall be mailed, first class mail, to the holder at the holder's address as it appears on the registration books of the Registrar and shall be sufficiently given if so mailed within the time prescribed.

(c)      Failure to mail a notice or communication to a holder or any defect in it shall not affect its sufficiency with respect to other holders.  If a notice or communication is mailed in the manner provided above, it is duly given, whether or not the addressee receives it, except that notices to the Trustee are effective only if received.

SECTION 13.03.    Communication by the Holders with Other Holders.  The holders may communicate pursuant to Section 312(b) of the TIA with other holders with respect to their rights under this Indenture or the Notes.  The Issuer, the Trustee, the Registrar and other Persons shall have the protection of Section 312(c) of the TIA.

SECTION 13.04.    Certificate and Opinion as to Conditions Precedent.  Upon any request or application by the Issuer to the Trustee to take or refrain from taking any action under this Indenture, the Issuer shall furnish to the Trustee at the request of the Trustee:

(a)      an Officer;s Certificate in form reasonably satisfactory to the Trustee stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with; and

(b)      an Opinion of Counsel in form reasonably satisfactory to the Trustee stating that, in the opinion of such counsel, all such conditions precedent have been complied with.

SECTION 13.05.    Statements Required in Certificate or Opinion.  Each certificate or opinion with respect to compliance with a covenant or condition provided for in this Indenture (other than pursuant to Section 4.09) shall include:

(a)      a statement that the individual making such certificate or opinion has read such covenant or condition;

(b)      a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c)      a statement that, in the opinion of such individual, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(d)      a statement as to whether or not, in the opinion of such individual, such covenant or condition has been complied with; *provided*, *however*, that with respect to matters of fact an Opinion of Counsel may rely on an Officer's Certificate or certificates of public officials.

SECTION 13.06.    When Notes Disregarded.  In determining whether the holders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by the Issuer, the Company or by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Issuer or the Company shall be disregarded and deemed not to be outstanding, except that, for the purpose of determining whether the Trustee shall be protected in rely-

-132-

ing on any such direction, waiver or consent, only Notes which the Trustee knows are so owned shall be so disregarded.  Subject to the foregoing, only Notes outstanding at the time shall be considered in any such determination.

SECTION 13.07.   <u>Rules by Trustee, Paying Agent and Registrar</u>.  The Trustee may make reasonable rules for action by or a meeting of the holders.  The Registrar and a Paying Agent may make reasonable rules for their functions.

SECTION 13.08.   <u>Legal Holidays</u>.  If a payment date is not a Business Day, payment shall be made on the next succeeding day that is a Business Day, and no interest shall accrue on any amount that would have been otherwise payable on such payment date if it were a Business Day for the intervening period.  If a regular Record Date is not a Business Day, the Record Date shall not be affected.

SECTION 13.09.   <u>GOVERNING LAW</u>**.  THIS INDENTURE AND THE SECURI-TIES SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.**

SECTION 13.10.   <u>No Recourse Against Others</u>.  No director, officer, employee, manager, incorporator or holder of any Equity Interests in the Issuer or of any Guarantor or any direct or indirect parent corporation, as such, shall have any liability for any obligations of the Issuer or any Guarantor under the Notes or this Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each holder of Notes by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for issuance of the Notes.

SECTION 13.11.   <u>Successors</u>.  All agreements of the Issuer and the Company in this Indenture and the Notes shall bind its successors.  All agreements of the Trustee in this Indenture shall bind its successors.

SECTION 13.12.   <u>Multiple Originals</u>.  The parties may sign any number of copies of this Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.  One signed copy is enough to prove this Indenture.

SECTION 13.13.   <u>Table of Contents; Headings</u>.  The table of contents, cross-reference sheet and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not intended to be considered a part hereof and shall not modify or restrict any of the terms or provisions hereof.

SECTION 13.14.   <u>Indenture Controls</u>.  If and to the extent that any provision of the Notes limits, qualifies or conflicts with a provision of this Indenture, such provision of this Indenture shall control.

SECTION 13.15.   <u>Severability</u>.  In case any provision in this Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability.

SECTION 13.16.   <u>Intercreditor Agreements</u>.  The terms of this Indenture are subject to the terms of the First Lien Intercreditor Agreement and the Junior Lien Intercreditor Agreement.

-133-

SECTION 13.17.  <u>PATRIOT Act</u>.  The parties hereto acknowledge that in accordance with Section 326 of the USA PATRIOT Act, the Trustee and the Agents, like all financial institutions and in order to help fight the funding of terrorism and money laundering, is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account.  The parties to this agreement agree that they will provide to the Trustee and the Agents with such information as it may request in order to satisfy the requirements of the USA PATRIOT Act.

SECTION 13.18.  <u>Force Majeure</u>.  In no event shall the Trustee or any Agent be liable for any failure or delay in the performance of its obligations hereunder because of circumstances beyond the Trustee's or the Agents' control, including, but not limited to, acts of God, flood, war (whether declared or undeclared), terrorism, fire, riot or embargo, which delay, restrict or prohibit the providing of the services contemplated by this Indenture.

**[Remainder of page intentionally left blank]**

-134-

IN WITNESS WHEREOF, the parties have caused this Indenture to be duly executed as of the date first written above.

LBI ESCROW CORPORATION, as the Escrow Issuer

By: _____
      Name:
      Title:

LYONDELLBASELL INDUSTRIES N.V., as the Company

By: _____
      Name:
      Title:

[Indenture]

Wilmington Trust FSB, as Trustee


By: _____
      Name:
      Title:


Deutsche Bank AG, London Branch,
as Euro Paying Agent and Common Depositary


By: _____
      Name:
      Title:


By: _____
      Name:
      Title:


Deutsche Bank Trust Company Americas,
as Collateral Agent, Dollar Paying Agent, Registrar and
Transfer Agent
By:  Deutsche Bank National Trust Company


By: _____
      Name:
      Title:


By: _____
      Name:
      Title:


Deutsche Bank Luxembourg S.A.
as Euro Note Registrar


By: _____
      Name:
      Title:


By: _____
      Name:
      Title:

EXHIBIT A-1

FORM OF DOLLAR NOTE

[Face of Dollar Note]

[Insert the Global Note Legend, if applicable pursuant to the provisions of the Indenture]

[Insert the Private Placement Legend, if applicable pursuant to the provisions of the Indenture]

[Insert the Regulation S Temporary Global Note Legend, if applicable pursuant to the provisions of the Indenture]

CUSIP: [144A:50178T AA5/ Reg. S:U5139FAA4]
ISIN: [144A: US50178TAA51/ Reg. S: USU5139FAA40]

[RULE 144A] [REGULATION S] GLOBAL NOTE
representing up to
$[_____]
8% Senior Secured Note due 2017

No. ___                                                    [$_____]

      LBI ESCROW CORPORATION, a Delaware corporation (to be merged with and into LYONDELL CHEMICAL COMPANY, a Delaware corporation, as the surviving entity), promises to pay to Cede & Co., or registered assigns, the principal sum set forth on the Schedule of Increases or Decreases in Global Note attached hereto on November 1, 2017.

      Interest Payment Dates: May 1 and November 1

      Record Dates:  April 15 and October 15

      Additional provisions of this Note are set forth on the other side of this Note.

IN WITNESS WHEREOF, the parties have caused this instrument to be duly executed.

LBI ESCROW CORPORATION

By: _____

Name:

Title:

Dated: April 8, 2010

This is one of the Dollar Notes referred to in the within-mentioned Indenture:

DEUTSCHE BANK TRUST COMPANY AMERICAS,
as Authenticating Agent
By Deutsche Bank National Trust Company

By: _____
Authorized Signatory

[Back of Dollar Note]

8% Senior Secured Note Due 2017

Capitalized terms used herein shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

1.      LBI ESCROW CORPORATION, a Delaware corporation (to be merged with and into LYONDELL CHEMICAL COMPANY, a Delaware corporation, as the surviving entity) (the "Issuer,") promises to pay interest on the principal amount of this Dollar Note at 8% per annum from April 8, 2010 until maturity and shall pay the Additional Interest, if any, payable pursuant to the Registration Rights Agreement referred to below.  The Issuer will pay interest and Additional Interest, if any, semi-annually in arrears on May 1 and November 1 of each year, or if any such day is not a Business Day, on the next succeeding Business Day (each, an "Interest Payment Date").  Interest on the Dollar Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the Issue Date; *provided* that the first Interest Payment Date shall be November 1, 2010.  The Issuer will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, from time to time on demand at the interest rate on the Dollar Notes; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest and Additional Interest, if any, (without regard to any applicable grace periods) from time to time on demand at the interest rate on the Dollar Notes.  Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.

2.      METHOD OF PAYMENT.  The Issuer will pay interest on the Dollar Notes and Additional Interest, if any, to the Persons who are registered holders of Dollar Notes at the close of business on the April 15 and October 15 (whether or not a Business Day), as the case may be, next preceding the Interest Payment Date, even if such Dollar Notes are canceled after such record date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest.  Payment of interest and Additional Interest, if any, may be made by check mailed to the holders at their addresses set forth in the register of holders, *provided* that payment by wire transfer of immediately available funds will be required with respect to principal of and interest, premium and Additional Interest, if any, on, all Global Notes and all other Notes the holders of which shall have provided wire transfer instructions to the Issuer or the Paying Agent.  Such payment shall be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

3.      TRUSTEE; PAYING AGENT AND REGISTRAR. Wilmington Trust FSB will be the Trustee (the "Trustee") under the Indenture.  Deutsche Bank Trust Company Americas will be the Escrow Agent under the Escrow Agreement and, initially, the Collateral Agent under the Indenture and has been appointed by the Issuer as U.S. Registrar and U.S. Paying Agent with regard to the Notes (the "U.S. Paying Agent").  Deutsche Bank AG, London Branch has been appointed as Euro Paying Agent and Common Depositary under the Indenture (the "Euro Paying Agent") and Deutsche Bank Luxembourg S.A. has been appointed as Euro Registrar.

4.      INDENTURE.  The Issuer issued the Dollar Notes under an Indenture, dated as of April 8, 2010 (the "Indenture"), among LBI Escrow Corporation, LyondellBasell Industries N.V. (the "Company"), the Trustee, the U.S. Paying Agent and the Dollar Paying Agent.  This Dollar Note is one of

a duly authorized issue of notes of the Issuer designated as its 8% Senior Secured Notes due 2017.  The Issuer shall be entitled to issue Additional Dollar Notes pursuant to Section 2.01 of the Indenture.  The Dollar Notes and the Euro Notes issued under the Indenture (including, in each case, any Exchange Notes issued in exchange therefor) (collectively referred to herein as the "Notes") are separate series of Notes, but shall be treated as a single class of securities under the Indenture, unless otherwise specified in the Indenture.  The terms of the Dollar Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939, as amended (the "Trust Indenture Act").  The Dollar Notes are subject to all such terms, and holders are referred to the Indenture and the Trust Indenture Act for a statement of such terms.  To the extent any provision of this Dollar Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling.

5.    OPTIONAL REDEMPTION.

(a)    On or after May 1, 2013, the Issuer may redeem all or a part of the Notes (including any additional Notes) upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address, at the redemption prices (expressed as percentages of principal amount) set forth below plus accrued and unpaid interest thereon, if any, to, but not including, the applicable redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the twelve months beginning on May 1 of the years indicated below:

|  | Redemption price of Notes |
|---|---|
| 2013 | 106.000% |
| 2014 | 104.000% |
| 2015 | 102.000% |
| 2016 and thereafter | 100.000% |

(b)    In addition, prior to May 1, 2013, the Issuer may redeem the Notes (including any additional Notes) at its option, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address, at a redemption price equal to 100% of the principal amount thereof plus the Applicable Premium as of, and accrued and unpaid interest and Additional Interest, if any, to, but not including, the applicable redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date).

(c)    In addition, prior to May 1, 2013, the Issuer may redeem up to 10% of the outstanding Notes per year (including any additional Notes) upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address, at a redemption price equal to 103% of the principal amount thereof plus accrued and unpaid interest and Additional Interest, if any, to, but not including, the applicable redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date).

(d)    Notwithstanding the foregoing, at any time prior to May 1, 2013, the Issuer may on any one or more occasions redeem up to 35% of the original aggregate principal amount of the Notes (including any additional Notes), at a redemption price of 108.000% of the principal amount thereof, plus accrued and unpaid interest and Additional Interest, if any, to, but not including, the applicable redemption date, with the net proceeds of one or more Equity Offerings; *provided* that:

(1)        at least 50% of the aggregate principal amount of the Notes originally issued under the Indenture (together with any additional Notes) remains outstanding immediately after the occurrence of such redemption (excluding Notes held by the Company and its Subsidiaries); and

(2)        the redemption must occur within 90 days of the date of the closing of such Equity Offering.

6.        SPECIAL MANDATORY REDEMPTION.  If the Escrow Proceeds have not been released to the Escrow Agent for distribution in accordance with the terms and conditions of the Escrow Agreement on or before the Escrow End Date or if the Company shall at any time determine that it is unlikely to be able to comply with the requirements set forth in the Escrow Agreement for obtaining a release of the Escrow Proceeds (the first such date to occur, the "Trigger Date"), then the Company shall redeem the Notes (the "Special Mandatory Redemption") in cash at a price equal to the sum of 100% of the Gross Proceeds plus the Specified Premium of the aggregate principal amount of the Notes issued on the Issue Date, together with accrued and unpaid interest and the accreted amount of any original issue discount on the Notes from the Issue Date up to but not including the date of the Special Mandatory Redemption (the "Special Mandatory Redemption Price").

Upon receipt of the notice of Special Mandatory Redemption, the Escrow Agent will liquidate all Escrow Proceeds in accordance with the terms of the Escrow Agreement.

7.        MANDATORY REDEMPTION.  Other than in connection with a Special Mandatory Redemption, the Issuer shall not be required to make mandatory redemption or sinking fund payments with respect to the Dollar Notes.

8.        NOTICE OF REDEMPTION.  Notice of redemption will be mailed by first-class mail at least 30 days but not more than 60 days before the redemption date to each holder of Notes to be redeemed at his, her or its registered address.  In the case of any partial redemption, selection of the Notes for redemption will be made by the Trustee on a *pro rata* basis to the extent practicable; *provided* that no Notes of $100,000 or €50,000 (and integral multiples of $1,000 or €1,000, respectively in excess thereof), as applicable, principal amount or less shall be redeemed in part.  The Trustee shall make the selection from outstanding Notes not previously called for redemption.  The Trustee may select for redemption portions of the principal of Notes that have denominations larger than $100,000 or €50,000, as applicable. Notes and portions of them the Trustee selects shall be in amounts of $100,000 or €50,000 (and integral multiples of $1,000 or €1,000, respectively, in excess thereof).  The notice of redemption relating to such Note selected to be redeemed shall state the portion of the principal amount thereof to be redeemed.

If less than all the Notes are to be redeemed at any time in connection with an optional redemption, the Trustee will select Notes for redemption as follows:

(1)        if the Notes to be redeemed are listed, in compliance with the requirements of the principal national securities exchange on which such Notes are listed; or

(2)        if the Notes to be redeemed are not so listed, on a *pro rata* basis, by lot or by such method as the Trustee shall deem fair and appropriate.

If money sufficient to pay the redemption price of and accrued and unpaid interest on all Notes (or portions thereof) to be redeemed on the redemption date is deposited with a Paying Agent on or before the redemption date and certain other conditions are satisfied on and after such date, interest ceases to accrue on such Notes (or such portions thereof) called for redemption.

9.       OFFERS TO REPURCHASE.

(a)       Upon the occurrence of a Change of Control, each holder shall have the right, subject to certain conditions specified in the Indenture, to cause the Issuer to repurchase all or any part of such holder's Notes at a purchase price in cash equal to 101% of the principal amount thereof, *plus* accrued and unpaid interest, if any, to the date of repurchase (subject to the right of the holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date), as provided in, and subject to the terms of, the Indenture.

(b)       In accordance with Section 4.06 of the Indenture, the Issuer will be required to offer to purchase Notes upon the occurrence of certain events.

10.       DENOMINATIONS, TRANSFER, EXCHANGE.    The Dollar Notes are in fully registered form only, without coupons, in denominations of $100,000 and integral multiples of $1,000.  A holder shall register the transfer or exchange of Notes in accordance with the Indenture.  The Registrar may require a holder, among other things, to furnish appropriate endorsements and transfer documents and to pay certain transfer taxes or similar governmental charges payable in connection therewith as permitted by the Indenture.  The Registrar need not register the transfer or exchange of any Notes during a period beginning 15 days before the mailing of a redemption notice for any Notes or portions thereof selected for redemption.

11.       PERSONS DEEMED OWNERS.  The registered holder of a Dollar Note may be treated as its owner for all purposes.

12.       AMENDMENT, SUPPLEMENT AND WAIVER.  The Indenture, the Guarantees or the Notes may be amended or supplemented as provided in the Indenture.

13.       DEFAULTS AND REMEDIES.  If an Event of Default occurs (other than an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Issuer) and is continuing, the Trustee or the holders of at least 30% in principal amount of the outstanding Notes, in each case, by notice to the Issuer, may declare the principal of, premium, if any, and accrued but unpaid interest on all the Notes to be due and payable.  If an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Issuer occurs, the principal of, premium, if any, and interest on all the Notes shall become immediately due and payable without any declaration or other act on the part of the Trustee or any holders.  Under certain circumstances, the holders of a majority in principal amount of the outstanding Notes may rescind any such acceleration with respect to the Notes and its consequences.

If an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the holders unless such holders have offered to the Trustee reasonable indemnity and  security against any loss, liability or expense and certain other conditions are complied with.  Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no holder may pursue any remedy with respect to the Indenture or the Notes unless (i) such holder has previously given the Trustee notice that an Event of Default is continuing, (ii) the holders of at least 30% in principal amount of the outstanding Notes have requested the Trustee in writing to pursue the remedy, (iii) such holders have offered the Trustee reasonable security and indemnity against any loss, liability or expense, (iv) the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security and indemnity and (v) the holders of a majority in aggregate principal amount of the outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60-day period.  Subject to certain restrictions,

the holders of a majority in principal amount of the outstanding Notes are given the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. The Trustee, however, may refuse to follow any direction that conflicts with law or the Indenture or that the Trustee determines is unduly prejudicial to the rights of any other holder or that would involve the Trustee in personal liability or expense. Prior to taking any action under the Indenture, the Trustee shall be entitled to reasonable indemnification and security satisfactory to it in its sole discretion against all losses and expenses caused by taking or not taking such action.

        14.      AUTHENTICATION. This Dollar Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose until authenticated by the manual signature of the Trustee.

        15.      ADDITIONAL RIGHTS OF HOLDERS OF RESTRICTED GLOBAL NOTES AND RESTRICTED DEFINITIVE NOTES. In addition to the rights provided to holders of Dollar Notes under the Indenture, holders of Restricted Global Notes and Restricted Definitive Notes shall have all the rights set forth in the Registration Rights Agreement, including the right to receive Additional Interest (as defined in the Registration Rights Agreement).

        16.      GOVERNING LAW. THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN AND BE USED TO CONSTRUE THE INDENTURE, THE NOTES AND THE GUARANTEES.

        17.      CUSIP AND ISIN NUMBERS. Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP and ISIN numbers to be printed on the Dollar Notes and the Trustee may use CUSIP and ISIN numbers in notices of redemption as a convenience to holders. No representation is made as to the accuracy of such numbers either as printed on the Dollar Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

        The Issuer will furnish to any holder upon written request and without charge a copy of the Indenture and/or the Registration Rights Agreement. Requests may be made to the Issuer at the following address:

        Lyondell Chemical Company
        1221 McKinney St
        Suite 700
        Houston, TX 77010
        Facsimile: (713) 652-7312
        Attention: Gerald A. O'Brien

ASSIGNMENT FORM

To assign this Dollar Note, fill in the form below:

(I) or (we) assign and transfer this Dollar Note to: _____
(Insert assignee's legal name)

_____
(Insert assignee's Soc. Sec. or tax I.D. no.)

_____
_____
_____
_____
(Print or type assignee's name, address and zip code)
and irrevocably appoint _____
to transfer this Dollar Note on the books of the Issuer.  The agent may substitute another to act for him.

Date: _____

Your Signature: _____
(Sign exactly as your name appears on
the face of this Dollar Note)

Signature Guarantee*: _____

_____
\*       Participant in a recognized Signature Guarantee Medallion Program (or other
        signature guarantor acceptable to the Trustee).

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Dollar Note purchased by the Issuer pursuant to Section 4.06 or 4.08 of the Indenture, check the appropriate box below:

[  ] Section 4.06          [  ] Section 4.08

If you want to elect to have only part of this Dollar Note purchased by the Issuer pursuant to Section 4.06 or Section 4.08 of the Indenture, state the amount you elect to have purchased:

$_____

Date: _____

Your Signature: _____
(Sign exactly as your name appears on the face of this Dollar Note)

Tax Identification No.: _____

Signature Guarantee*: _____

_____
*          Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

A-1-11

SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE*

The initial outstanding principal amount of this Global Note is $_____.  The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global or Definitive Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of decrease in Principal Amount | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease or increase | Signature of authorized officer of Trustee or Note Custodian |
|---|---|---|---|---|
| | | | | |

_____
*This schedule should be included only if the Note is issued in global form.

EXHIBIT A-2

## FORM OF EURO NOTE

[Face of Euro Note]

[Insert the Global Note Legend, if applicable pursuant to the provisions of the Indenture]

[Insert the Private Placement Legend, if applicable pursuant to the provisions of the In-denture]

[Insert the Regulation S Temporary Global Note Legend, if applicable pursuant to the provisions of the Indenture]

ISIN: [144A:  XS0498579183/ Reg. S:  XS0498576833]


[RULE 144A] [REGULATION S] GLOBAL NOTE
representing up to
€[_____]
8% Senior Secured Notes due 2017


No. ____                                                                                        [€_____]



      LBI ESCROW CORPORATION, a Delaware corporation (to be merged with and into
LYONDELL CHEMICAL COMPANY, a Delaware corporation, as the surviving entity), promises to pay
to BT Globenet Nominees Ltd., or registered assigns, the principal sum set forth on the Schedule of In-
creases or Decreases in Global Note attached hereto on November 1, 2017.

      Interest Payment Dates: May 1 and November 1

      Record Dates:  April 15 and October 15

      Additional provisions of this Note are set forth on the other side of this Note.

IN WITNESS WHEREOF, the parties have caused this instrument to be duly executed.

LBI ESCROW CORPORATION

By: _____
Name:
Title:

Dated: April 8, 2010

This is one of the Euro Notes referred to in the within-mentioned Indenture:

DEUTSCHE BANK LUXEMBOURG S.A.,
as Authenticating Agent


By: _____
              Authorized Signatory

[Back of Euro Note]

8% Senior Secured Note Due 2017

Capitalized terms used herein shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

1.      LBI ESCROW CORPORATION, a Delaware corporation (to be merged with and into LYONDELL CHEMICAL COMPANY, a Delaware corporation, as the surviving entity), (the "Issuer") promises to pay interest on the principal amount of this Euro Note at 8% per annum from April 8, 2010 until maturity and shall pay the Additional Interest, if any, payable pursuant to the Registration Rights Agreement referred to below. The Issuer will pay interest and Additional Interest, if any, semi-annually in arrears on May 1 and November 1of each year, or if any such day is not a Business Day, on the next succeeding Business Day (each, an "Interest Payment Date"). Interest on the Euro Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the Issue Date; *provided* that the first Interest Payment Date shall be November 1, 2010. The Issuer will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, from time to time on demand at the interest rate on the Euro Notes; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest and Additional Interest, if any, (without regard to any applicable grace periods) from time to time on demand at the interest rate on the Euro Notes. Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.

2.      METHOD OF PAYMENT. The Issuer will pay interest on the Euro Notes and Additional Interest, if any, to the Persons who are registered holders of Euro Notes at the close of business on the April 15 and October 15 (whether or not a Business Day), as the case may be, next preceding the Interest Payment Date, even if such Euro Notes are canceled after such record date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest. Payment of interest and Additional Interest, if any, may be made by check mailed to the holders at their addresses set forth in the register of holders, *provided* that payment by wire transfer of immediately available funds will be required with respect to principal of and interest, premium and Additional Interest, if any, on, all Global Notes and all other Notes the holders of which shall have provided wire transfer instructions to the Issuer or the Paying Agent. Such payment shall be in such coin or currency of the European Union as at the time of payment is legal tender for payment of public and private debts.

3.      TRUSTEE; PAYING AGENT AND REGISTRAR. Wilmington Trust FSB will be the Trustee (the "Trustee") under the Indenture. Deutsche Bank Trust Company Americas will be the Escrow Agent under the Escrow Agreement and, initially, the Collateral Agent under the Indenture and has been appointed by the Issuer as U.S. Registrar and U.S. Paying Agent with regard to the Notes (the "U.S. Paying Agent"). Deutsche Bank AG, London Branch has been appointed as Euro Paying Agent and Common Depositary under the Indenture (the "Euro Paying Agent") and Deutsche Bank Luxembourg S.A. has been appointed as Euro Registrar.

4.      INDENTURE. The Issuer issued the Euro Notes under an Indenture, dated as of April 8, 2010 (the "Indenture"), among LBI Escrow Corporation, LyondellBasell Industries N.V. (the "Company"), the Trustee, the U.S. Paying Agent and the Euro Paying Agent. This Euro Note is one of a duly authorized issue of notes of the Issuer designated as its 8% Senior Secured Notes due 2017. The Issuer shall be entitled to issue Additional Euro Notes pursuant to Section 2.01 of the Indenture. The

Dollar Notes and the Euro Notes issued under the Indenture (including, in each case, any Exchange Notes issued in exchange therefor) (collectively, referred to herein as the "Notes") are separate series of Notes, but shall be treated as a single class of securities under the Indenture, unless otherwise specified in the Indenture.  The terms of the Euro Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939, as amended (the "Trust Indenture Act").  The Euro Notes are subject to all such terms, and holders are referred to the Indenture and the Trust Indenture Act for a statement of such terms.  To the extent any provision of this Euro Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling.

5.    OPTIONAL REDEMPTION.

(a)    On or after May 1, 2013, the Issuer may redeem all or a part of the Notes (including any additional Notes) upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address, at the redemption prices (expressed as percentages of principal amount) set forth below plus accrued and unpaid interest thereon, if any, to, but not including, the applicable redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the twelve months beginning on May 1 of the years indicated below:

|  | Redemption price of Notes |
|---|---|
| 2013 | 106.000% |
| 2014 | 104.000% |
| 2015 | 102.000% |
| 2016 and thereafter | 100.000% |

(b)    In addition, prior to May 1, 2013, the Issuer may redeem the Notes (including any additional Notes) at its option, in whole at any time or in part from time to time, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address, at a redemption price equal to 100% of the principal amount thereof plus the Applicable Premium as of, and accrued and unpaid interest and Additional Interest, if any, to, but not including, the applicable redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date).

(c)    In addition, prior to May 1, 2013, the Issuer may redeem up to 10% of the outstanding Notes per year (including any additional Notes) upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address, at a redemption price equal to 103% of the principal amount thereof plus accrued and unpaid interest and Additional Interest, if any, to, but not including, the applicable redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date).

(d)    Notwithstanding the foregoing, at any time prior to May 1, 2013, the Issuer may on any one or more occasions redeem up to 35% of the original aggregate principal amount of the Notes (including any additional Notes), at a redemption price of 108.000% of the principal amount thereof, plus accrued and unpaid interest and Additional Interest, if any, to, but not including, the applicable redemption date, with the net proceeds of one or more Equity Offerings; *provided* that:

(1)    at least 50% of the aggregate principal amount of the Notes originally issued under the Indenture (together with any additional Notes) remains outstanding immediately after the occurrence of such redemption (excluding Notes held by the Company and its Subsidiaries); and

(2)        the redemption must occur within 90 days of the date of the closing of such Equity Offering.

6.        SPECIAL MANDATORY REDEMPTION.  If the Escrow Proceeds have not been released to the Escrow Agent for distribution in accordance with the terms and conditions of the Escrow Agreement on or before the Escrow End Date or if the Company shall at any time determine that it is unlikely to be able to comply with the requirements set forth in the Escrow Agreement for obtaining a release of the Escrow Proceeds (the first such date to occur, the "Trigger Date"), then the Company shall redeem the Notes (the "Special Mandatory Redemption") in cash at a price equal to the sum of 100% of the Gross Proceeds plus the Specified Premium of the aggregate principal amount of the Notes issued on the Issue Date, together with accrued and unpaid interest and the accreted amount of any original issue discount on the Notes from the Issue Date up to but not including the date of the Special Mandatory Redemption (the "Special Mandatory Redemption Price").

Upon receipt of the notice of Special Mandatory Redemption, the Escrow Agent will liquidate all Escrow Proceeds in accordance with the terms of the Escrow Agreement.

7.        MANDATORY REDEMPTION.  Other than in connection with a Special Mandatory Redemption, the Issuer shall not be required to make mandatory redemption or sinking fund payments with respect to the Euro Notes.

8.        NOTICE OF REDEMPTION.  Notice of redemption will be mailed by first-class mail at least 30 days but not more than 60 days before the redemption date to each holder of Notes to be redeemed at his, her or its registered address.  In the case of any partial redemption, selection of the Notes for redemption will be made by the Trustee on a *pro rata* basis to the extent practicable; *provided* that no Notes of $100,000 or €50,000 (and integral multiples of $1,000 or €1,000, respectively in excess thereof), as applicable, principal amount or less shall be redeemed in part.  The Trustee shall make the selection from outstanding Notes not previously called for redemption.  The Trustee may select for redemption portions of the principal of Notes that have denominations larger than $100,000 or €50,000, as applicable.  Notes and portions of them the Trustee selects shall be in amounts of $100,000 or €50,000 (and integral multiples of $1,000 or €1,000, respectively, in excess thereof).  The notice of redemption relating to such Note selected to be redeemed shall state the portion of the principal amount thereof to be redeemed.

If less than all the Notes are to be redeemed at any time in connection with an optional redemption, the Trustee will select Notes for redemption as follows:

(1)        if the Notes to be redeemed are listed, in compliance with the requirements of the principal national securities exchange on which such Notes are listed; or

(2)        if the Notes to be redeemed are not so listed, on a *pro rata* basis, by lot or by such method as the Trustee shall deem fair and appropriate.

If money sufficient to pay the redemption price of and accrued and unpaid interest on all Notes (or portions thereof) to be redeemed on the redemption date is deposited with a Paying Agent on or before the redemption date and certain other conditions are satisfied on and after such date, interest ceases to accrue on such Notes (or such portions thereof) called for redemption.

9.      OFFERS TO REPURCHASE.

(a)      Upon the occurrence of a Change of Control, each holder shall have the right, subject to certain conditions specified in the Indenture, to cause the Issuer to repurchase all or any part of such holder's Notes at a purchase price in cash equal to 101% of the principal amount thereof, *plus* accrued and unpaid interest, if any, to the date of repurchase (subject to the right of the holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date), as provided in, and subject to the terms of, the Indenture.

(b)      In accordance with Section 4.06 of the Indenture, the Issuer will be required to offer to purchase Notes upon the occurrence of certain events.

10.      DENOMINATIONS, TRANSFER, EXCHANGE.    The Euro Notes are in fully registered form only, without coupons, in denominations of €50,000 and integral multiples of €1,000.  A holder shall register the transfer or exchange of Notes in accordance with the Indenture.  The Registrar may require a holder, among other things, to furnish appropriate endorsements and transfer documents and to pay certain transfer taxes or similar governmental charges payable in connection therewith as permitted by the Indenture.  The Registrar need not register the transfer or exchange of any Notes during a period beginning 15 days before the mailing of a redemption notice for any Notes or portions thereof selected for redemption.

11.      PERSONS DEEMED OWNERS.  The registered holder of a Euro Note may be treated as its owner for all purposes.

12.      AMENDMENT, SUPPLEMENT AND WAIVER.  The Indenture, the Guarantees or the Notes may be amended or supplemented as provided in the Indenture.

13.      DEFAULTS AND REMEDIES.  If an Event of Default occurs (other than an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Issuer) and is continuing, the Trustee or the holders of at least 30% in principal amount of the outstanding Notes, in each case, by notice to the Issuer, may declare the principal of, premium, if any, and accrued but unpaid interest on all the Notes to be due and payable.  If an Event of Default relating to certain events of bankruptcy, insolvency or reorganization of the Issuer occurs, the principal of, premium, if any, and interest on all the Notes shall become immediately due and payable without any declaration or other act on the part of the Trustee or any holders.  Under certain circumstances, the holders of a majority in principal amount of the outstanding Notes may rescind any such acceleration with respect to the Notes and its consequences.

If an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under the Indenture at the request or direction of any of the holders unless such holders have offered to the Trustee reasonable indemnity and security against any loss, liability or expense and certain other conditions are complied with.  Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no holder may pursue any remedy with respect to the Indenture or the Notes unless (i) such holder has previously given the Trustee notice that an Event of Default is continuing, (ii) the holders of at least 30% in principal amount of the outstanding Notes have requested the Trustee in writing to pursue the remedy, (iii) such holders have offered the Trustee reasonable security and indemnity against any loss, liability or expense, (iv) the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security and indemnity and (v) the holders of a majority in aggregate principal amount of the outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60-day period.  Subject to certain restrictions,

the holders of a majority in principal amount of the outstanding Notes are given the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee. The Trustee, however, may refuse to follow any direction that conflicts with law or the Indenture or that the Trustee determines is unduly prejudicial to the rights of any other holder or that would involve the Trustee in personal liability or expense. Prior to taking any action under the Indenture, the Trustee shall be entitled to reasonable indemnification and security satisfactory to it in its sole discretion against all losses and expenses caused by taking or not taking such action.

14.    AUTHENTICATION.  This Euro Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose until authenticated by the manual signature of the Trustee.

15.    ADDITIONAL RIGHTS OF HOLDERS OF RESTRICTED GLOBAL NOTES AND RESTRICTED DEFINITIVE NOTES.  In addition to the rights provided to holders of Euro Notes under the Indenture, holders of Restricted Global Notes and Restricted Definitive Notes shall have all the rights set forth in the Registration Rights Agreement, including the right to receive Additional Interest (as defined in the Registration Rights Agreement).

16.    GOVERNING LAW.  THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN AND BE USED TO CONSTRUE THE INDENTURE, THE NOTES AND THE GUARANTEES.

17.    ISIN NUMBERS.  Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused ISIN numbers to be printed on the Euro Notes and the Trustee may use ISIN numbers in notices of redemption as a convenience to holders. No representation is made as to the accuracy of such numbers either as printed on the Euro Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

The Issuer will furnish to any holder upon written request and without charge a copy of the Indenture and/or the Registration Rights Agreement.  Requests may be made to the Issuer at the following address:

Lyondell Chemical Company
1221 McKinney St
Suite 700
Houston, TX  77010
Facsimile: (713) 652-7312
Attention: Gerald A. O'Brien

## ASSIGNMENT FORM

To assign this Euro Note, fill in the form below:

(I) or (we) assign and transfer this Euro Note to: _____

(Insert assignee's legal name)

_____

(Insert assignee's Soc. Sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____

to transfer this Euro Note on the books of the Issuer.  The agent may substitute another to act for him.

Date: _____

Your Signature: _____

(Sign exactly as your name appears on
the face of this Euro Note)

Signature Guarantee*: _____

_____

*        Participant in a recognized Signature Guarantee Medallion Program (or other
         signature guarantor acceptable to the Trustee).

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Euro Note purchased by the Issuer pursuant to Section 4.06 or 4.08 of the Indenture, check the appropriate box below:

[  ] Section 4.06          [  ] Section 4.08

If you want to elect to have only part of this Euro Note purchased by the Issuer pursuant to Section 4.06 or Section 4.08 of the Indenture, state the amount you elect to have purchased:

€_____

Date: _____

Your Signature: _____

(Sign exactly as your name appears on the face of this Euro Note)

Tax Identification No.: _____

Signature Guarantee*: _____

_____
*          Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

A-2-11

## SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE*

The initial outstanding principal amount of this Global Note is €_____.  The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global or Definitive Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of decrease in Principal Amount | Amount of increase in Principal Amount of this Global Note | Principal Amount of Global Note following such decrease or increase | Signature of authorized officer of Trustee or Note Custodian |
|---|---|---|---|---|
| | | | | |

_____
*This schedule should be included only if the Euro Note is issued in global form.

EXHIBIT B

FORM OF CERTIFICATE OF TRANSFER

LBI Escrow Corporation
c/o Lyondell Chemical Company
1221 McKinney St
Suite 700
Houston, TX  77010
Facsimile: (713) 652-7312
Attention: Gerald A. O'Brien

> Re: [8% Dollar Senior Secured Notes due 2017] [8% Euro Senior Secured Notes due
> 2017]

Reference is hereby made to the Indenture, dated as of April 8, 2010 (the "<u>Indenture</u>"), among LBI Escrow Corporation (to be merged with and into Lyondell Chemical Company, as the surviving entity), LyondellBasell Industries N.V. (the "<u>Company</u>"), the Trustee, the U.S. Paying Agent and the Euro Paying Agent.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____ (the "<u>Transferor</u>") owns and proposes to transfer the Note[s] or interest in such Note[s] specified in <u>Annex A</u> hereto, in the principal amount of [$] [€_____ in such Note[s] or interests (the "<u>Transfer</u>"), to _____ (the "<u>Transferee</u>"), as further specified in <u>Annex A</u> hereto.  In connection with the Transfer, the Transferor hereby certifies that:

[CHECK ALL THAT APPLY]

1.    [ ] CHECK IF TRANSFEREE WILL TAKE DELIVERY OF A BENEFICIAL INTEREST IN THE RELEVANT 144A GLOBAL NOTE OR RELEVANT DEFINITIVE NOTE PURSUANT TO RULE 144A.  The Transfer is being effected pursuant to and in accordance with Rule 144A under the United States Securities Act of 1933, as amended (the "<u>Securities Act</u>"), and, accordingly, the Transferor hereby further certifies that the beneficial interest or Definitive Note is being transferred to a Person that the Transferor reasonably believes is purchasing the beneficial interest or Definitive Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "qualified institutional buyer" within the meaning of Rule 144A in a transaction meeting the requirements of Rule 144A and such Transfer is in compliance with any applicable blue sky securities laws of any state of the United States.

2.    [ ] CHECK IF TRANSFEREE WILL TAKE DELIVERY OF A BENEFICIAL INTEREST IN THE RELEVANT REGULATION S GLOBAL NOTE OR RELEVANT DEFINITIVE NOTE PURSUANT TO REGULATION S.  The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and, accordingly, the Transferor hereby further certifies that (i) the Transfer is not being made to a person in the United States and (x) at the time the buy order was originated, the Transferee was outside the United States or such Transferor and any Person acting on its behalf reasonably believed and believes that the Transferee was outside the United States or (y) the

transaction was executed in, on or through the facilities of a designated offshore securities market and neither such Transferor nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States, (ii) no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S under the Securities Act, (iii) the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act and (iv) if the proposed transfer is being made prior to the expiration of the Restricted Period, the transfer is not being made to a U.S. Person or for the account or benefit of a U.S. Person (other than an Initial Purchaser). Upon consummation of the proposed transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on Transfer enumerated in the Indenture and the Securities Act.

3.       [ ] CHECK AND COMPLETE IF TRANSFEREE WILL TAKE DELIVERY OF A BENEFICIAL INTEREST IN THE RELEVANT DEFINITIVE NOTE PURSUANT TO ANY PROVISION OF THE SECURITIES ACT OTHER THAN RULE 144A OR REGULATION S.  The Transfer is being effected in compliance with the transfer restrictions applicable to beneficial interests in Restricted Global Notes and Restricted Definitive Notes and pursuant to and in accordance with the Securities Act and any applicable blue sky securities laws of any state of the United States, and accordingly the Transferor hereby further certifies that (check one):

(a)       [ ] such Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act;

or

(b)       [ ] such Transfer is being effected to the Issuer or a subsidiary thereof;

or

(c)       [ ] such Transfer is being effected pursuant to an effective registration statement under the Securities Act and in compliance with the prospectus delivery requirements of the Securities Act.

4.       [ ] CHECK IF TRANSFEREE WILL TAKE DELIVERY OF A BENEFICIAL INTEREST IN AN UNRESTRICTED GLOBAL NOTE OR OF AN UNRESTRICTED DEFINITIVE NOTE.

(a)       [ ] CHECK IF TRANSFER IS PURSUANT TO RULE 144.  (i) The Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act.  Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

(b)       [ ] CHECK IF TRANSFER IS PURSUANT TO REGULATION S.  (i) The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the

B-2

Securities Act.  Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

(c)    [  ] CHECK IF TRANSFER IS PURSUANT TO OTHER EXEMPTION.  (i) The Transfer is being effected pursuant to and in compliance with an exemption from the registration requirements of the Securities Act other than Rule 144, Rule 903 or Rule 904 and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any State of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act.  Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will not be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes or Restricted Definitive Notes and in the Indenture.

This certificate and the statements contained herein are made for your benefit and the benefit of the Issuer.

[Insert Name of Transferor]

By: _____

      Name:
      Title:

Dated: _____

ANNEX A TO CERTIFICATE OF TRANSFER

1.      The Transferor owns and proposes to transfer the following:

[CHECK ONE OF (a) OR (b)]

(a)     [  ] a beneficial interest in the:

        (i)      [  ] 144A Global Note ([CUSIP:      ] [Common [ISIN:     ]), or

        (ii)     [  ] Regulation S Global Note ([CUSIP:      ] [ISIN:     ]), or

(b)     [  ] a Restricted Definitive Note.

2.      After the Transfer the Transferee will hold:

[CHECK ONE]

(a)     [  ] a beneficial interest in the:

        (i)      [  ] 144A Global Note ([CUSIP:      ] [Common [ISIN:      ]), or

        (ii)     [  ] Regulation S Global Note ([CUSIP:      ] [Common [ISIN:      ]), or

        (iii)    [  ] Unrestricted Global Note ([                         ]³
                 [                          ]); or

(b)     [  ] a Restricted Definitive Note; or

(c)     [  ] an Unrestricted Definitive Note,
        in accordance with the terms of the Indenture.

B-5

EXHIBIT C

FORM OF CERTIFICATE OF EXCHANGE

LBI Escrow Corporation
c/o Lyondell Chemical Company
1221 McKinney St
Suite 700
Houston, TX  77010
Facsimile: (713) 652-7312
Attention: Gerald A. O'Brien

      Re: [8% Dollar Senior Secured Notes due 2017] [8% Euro Senior Secured Notes due
2017]

      Reference is hereby made to the Indenture, dated as of April 8, 2010 (the "Indenture"),
among LBI Escrow Corporation (to be merged with and into Lyondell Chemical Company, as the surviv-
ing entity), LyondellBasell Industries N.V. (the "Company"), the Trustee, the U.S. Paying Agent and the
Euro Paying Agent.  Capitalized terms used but not defined herein shall have the meanings given to them
in the Indenture.

      _____ (the "Owner") owns and proposes to exchange the Note[s] or interest in
such Note[s] specified herein, in the principal amount of [$] [€ _____ in such Note[s] or
interests (the "Exchange").  In connection with the Exchange, the Owner hereby certifies that:

      1)      EXCHANGE OF RESTRICTED DEFINITIVE NOTES OR BENEFICIAL IN-
TERESTS IN A RESTRICTED GLOBAL NOTE FOR UNRESTRICTED DEFINITIVE NOTES
OR BENEFICIAL INTERESTS IN AN UNRESTRICTED GLOBAL NOTE OF THE SAME
SERIES

      a)      [ ] CHECK IF EXCHANGE IS FROM BENEFICIAL INTEREST IN A
RESTRICTED GLOBAL NOTE TO BENEFICIAL INTEREST IN AN UNRE-
STRICTED GLOBAL NOTE OF THE SAME SERIES.  In connection with the Ex-
change of the Owner's beneficial interest in a Restricted Global Note for a beneficial in-
terest in an Unrestricted Global Note of the same series in an equal principal amount, the
Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own
account without transfer, (ii) such Exchange has been effected in compliance with the
transfer restrictions applicable to the Global Notes and pursuant to and in accordance
with the United States Securities Act of 1933, as amended (the "Securities Act"), (iii) the
restrictions on transfer contained in the Indenture and the Private Placement Legend are
not required in order to maintain compliance with the Securities Act and (iv) the benefi-
cial interest in an Unrestricted Global Note is being acquired in compliance with any ap-
plicable blue sky securities laws of any state of the United States.

      b)      [ ] CHECK IF EXCHANGE IS FROM BENEFICIAL INTEREST IN A
RESTRICTED GLOBAL NOTE TO UNRESTRICTED DEFINITIVE NOTE OF THE
SAME SERIES.  In connection with the Exchange of the Owner's beneficial interest in a
Restricted Global Note for an Unrestricted Definitive Note of the same series, the Owner

hereby certifies (i) the Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

c)    [ ] CHECK IF EXCHANGE IS FROM RESTRICTED DEFINITIVE NOTE TO BENEFICIAL INTEREST IN AN UNRESTRICTED GLOBAL NOTE OF THE SAME SERIES.  In connection with the Owner's Exchange of a Restricted Definitive Note for a beneficial interest in an Unrestricted Global Note of the same series, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

d)    [ ] CHECK IF EXCHANGE IS FROM RESTRICTED DEFINITIVE NOTE TO UNRESTRICTED DEFINITIVE NOTE OF THE SAME SERIES.  In connection with the Owner's Exchange of a Restricted Definitive Note for an Unrestricted Definitive Note of the same series, the Owner hereby certifies (i) the Unrestricted Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Unrestricted Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

2)    EXCHANGE OF RESTRICTED DEFINITIVE NOTES OR BENEFICIAL INTERESTS IN RESTRICTED GLOBAL NOTES FOR RESTRICTED DEFINITIVE NOTES OR BENEFICIAL INTERESTS IN RESTRICTED GLOBAL NOTES OF THE SAME SERIES

a)    [ ] CHECK IF EXCHANGE IS FROM BENEFICIAL INTEREST IN A RESTRICTED GLOBAL NOTE TO RESTRICTED DEFINITIVE NOTE OF THE SAME SERIES.  In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a Restricted Definitive Note of the same series with an equal principal amount, the Owner hereby certifies that the Restricted Definitive Note is being acquired for the Owner's own account without transfer.  Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the Restricted Definitive Note issued will continue to be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Definitive Note and in the Indenture and the Securities Act.

b)    [ ] CHECK IF EXCHANGE IS FROM RESTRICTED DEFINITIVE NOTE TO BENEFICIAL INTEREST IN A RESTRICTED GLOBAL NOTE OF THE SAME SERIES.  In connection with the Exchange of the Owner's Restricted Definitive Note for a beneficial interest in the [CHECK ONE]  [ ] 144A Global Note  [ ] Regula-

tion S Global Note of the same series, with an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer and (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, and in compliance with any applicable blue sky securities laws of any state of the United States.  Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the beneficial interest issued will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the relevant Restricted Global Note and in the Indenture and the Securities Act.

This certificate and the statements contained herein are made for your benefit and the benefit of the Issuer and are dated _____.


[Insert Name of Transferor]


By:   _____
         Name:
         Title:


Dated: _____

EXHIBIT D

[FORM OF SUPPLEMENTAL INDENTURE RELATED TO SUBSIDIARY GUARANTORS]

SUPPLEMENTAL INDENTURE (this "Supplemental Indenture") dated as of
[          ], among [GUARANTOR] (the "New Guarantor"), a subsidiary of LYONDELLBASELL IN-
DUSTRIES N.V., a public limited liability company formed under the laws of the Netherlands (or its suc-
cessor) (the "Company"), LBI ESCROW CORPORATION, a Delaware corporation (to be merged with
and into LYONDELL CHEMICAL COMPANY, a Delaware corporation, as the surviving entity)  (the
"Issuer"),[1] and WILMINGTON TRUST FSB, a national banking association, as trustee under the inden-
ture referred to below (the "Trustee").

W I T N E S S E T H :

WHEREAS the Issuer and the Company have heretofore executed and delivered to the
Trustee an indenture (as amended, supplemented or otherwise modified, the "Indenture") dated as of
April 8, 2010, as supplemented, providing for the issuance of the Issuer's of (i) $2,250,000,000 aggregate
principal amount of the Issuer's 8% Senior Secured Notes due 2017 and (ii) €375,000,000 aggregate prin-
cipal amount of the Issuer's 8% Senior Secured Notes due 2017 ( collectively, the "Notes");

WHEREAS Section 4.11 of the Indenture provides that under certain circumstances the
Issuer is required to cause the New Guarantor to execute and deliver to the Trustee a supplemental inden-
ture pursuant to which the New Guarantor shall unconditionally guarantee all the Issuer's Obligations
under the Notes and the Indenture pursuant to a Guarantee on the terms and conditions set forth herein;
and

WHEREAS pursuant to Section 9.01 of the Indenture, the Trustee, the Issuer, the Com-
pany and other existing Guarantors, if any, are authorized to execute and deliver this Supplemental Inden-
ture;

NOW THEREFORE, in consideration of the foregoing and for other good and valuable
consideration, the receipt of which is hereby acknowledged, the New Guarantor, the Company, the Issuer
and the Trustee mutually covenant and agree for the equal and ratable benefit of the holders of the Notes
as follows:

1.      Defined Terms.  As used in this Supplemental Indenture, terms defined in the In-
denture or in the preamble or recital hereto are used herein as therein defined, except that the term
"holders" in this Supplemental Indenture shall refer to the term "holders" as defined in the Inden-
ture and the Trustee acting on behalf of and for the benefit of such holders.  The words "herein,"
"hereof" and "hereby" and other words of similar import used in this Supplemental Indenture re-
fer to this Supplemental Indenture as a whole and not to any particular section hereof.

2.      Agreement to Guarantee.  The New Guarantor hereby agrees, jointly and sever-
ally with all existing guarantors (if any), to unconditionally guarantee the Issuer's Obligations
under the Notes and the Indenture on the terms and subject to the conditions set forth in Article

_____
[1]      Delete this reference if supplemental indenture Exhibit E is signed prior to signing of this Sup-
plemental Indenture.

XII of the Indenture and to be bound by all other applicable provisions of the Indenture and the Notes and to perform all of the obligations and agreements of a guarantor under the Indenture.

3.    <u>Notices</u>.  All notices or other communications to the New Guarantor shall be given as provided in Section 13.02 of the Indenture.

4.    <u>Ratification of Indenture; Supplemental Indentures Part of Indenture</u>.  Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect.  This Supplemental Indenture shall form a part of the Indenture for all purposes, and every holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby.

5.    <u>Governing Law</u>.  **THIS SUPPLEMENTAL INDENTURE SHALL BE GOV-ERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.**

6.    <u>Trustee Makes No Representation</u>.  The Trustee makes no representation as to the validity or sufficiency of this Supplemental Indenture.

7.    <u>Counterparts</u>.  The parties may sign any number of copies of this Supplemental Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.

8.    <u>Effect of Headings</u>.  The Section headings herein are for convenience only and shall not effect the construction thereof.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

[NEW GUARANTOR]

By:  _____
　　　　Name:
　　　　Title:

WILMINGTON TRUST FSB
as Trustee

By:  _____
　　　　Name:
　　　　Title:

EXHIBIT E

[FORM OF SUPPLEMENTAL INDENTURE RELATED TO ASSUMPTION]

SUPPLEMENTAL INDENTURE (this "Supplemental Indenture") dated as of [          ],
2010, among LYONDELL CHEMICAL COMPANY, a Delaware corporation (the "New Issuer"), and
WILMINGTON TRUST FSB, a national banking association, as trustee under the indenture referred to
below (the "Trustee").

W I T N E S S E T H :

WHEREAS LBI Escrow Corporation (the "Escrow Issuer") and LYONDELLBASELL
INDUSTRIES N.V. ( the "Company") have heretofore executed and delivered to the Trustee an indenture
(as amended, supplemented or otherwise modified, the "Indenture") dated as of April 8, 2010, as supple-
mented, providing for the issuance of the Issuer's of (i) $2,250,000,000 aggregate principal amount of the
Issuer's 8% Senior Secured Notes due 2017 and (ii) €375,000,000 aggregate principal amount of the Is-
suer's 8% Senior Secured Notes due 2017 ( collectively, the "Notes");

WHEREAS pursuant to Section 9.01 of the Indenture, the Trustee, the New Issuer and
the Company are authorized to execute and deliver this Supplemental Indenture;

NOW THEREFORE, in consideration of the foregoing and for other good and valuable
consideration, the receipt of which is hereby acknowledged, the New Issuer, the Escrow Issuer, the Com-
pany, and the Trustee mutually covenant and agree for the equal and ratable benefit of the holders of the
Notes as follows:

1.     Defined Terms.  As used in this Supplemental Indenture, terms defined in the In-
denture or in the preamble or recital hereto are used herein as therein defined, except that the term
"holders" in this Supplemental Indenture shall refer to the term "holders" as defined in the Inden-
ture and the Trustee acting on behalf of and for the benefit of such holders.  The words "herein,"
"hereof" and "hereby" and other words of similar import used in this Supplemental Indenture re-
fer to this Supplemental Indenture as a whole and not to any particular section hereof.

2.     Agreement to Assume Obligations.  The New Issuer hereby agrees to uncondi-
tionally assume the Issuer's Obligations under the Notes and the Indenture on the terms and sub-
ject to the conditions set forth in the Indenture and to be bound by all applicable provisions of the
Indenture and the Notes and to perform all of the obligations and agreements of the Issuer under
the Indenture.

3.     Notices.  All notices or other communications to the New Issuer shall be given as
provided in Section 13.02 of the Indenture.

4.     Ratification of Indenture; Supplemental Indentures Part of Indenture.  Except as
expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the
terms, conditions and provisions thereof shall remain in full force and effect.  This Supplemental
Indenture shall form a part of the Indenture for all purposes, and every holder of Notes heretofore
or hereafter authenticated and delivered shall be bound hereby.

5.        <u>Release of Obligations of Escrow Issuer</u>.  Upon execution of this Supplemental Indenture by the New Issuer, the Company and the Trustee, the Escrow Issuer is released and discharged from all obligations under the Indenture and the Notes.

6.        <u>Governing Law</u>.  **THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.**

7.        <u>Trustee Makes No Representation</u>.  The Trustee makes no representation as to the validity or sufficiency of this Supplemental Indenture.

8.        <u>Counterparts</u>.  The parties may sign any number of copies of this Supplemental Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.

9.        <u>Effect of Headings</u>.  The Section headings herein are for convenience only and shall not effect the construction thereof.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

LYONDELL CHEMICAL COMPANY

By: _____
      Name:
      Title:

WILMINGTON TRUST FSB
as Trustee


By: _____
        Name:
        Title:

Acknowledged by:

LBI ESCROW CORPORATION


By: _____
     Name:
     Title:


LYONDELLBASELL INDUSTRIES N.V.


By: _____
     Name:
     Title:

**TAB 16-C**

| | | |
|---|---|---|
| **CITIGROUP GLOBAL MARKETS INC.** | **DEUTSCHE BANK SECURITIES INC. DEUTSCHE BANK TRUST COMPANY AMERICAS** | **WACHOVIA CAPITAL FINANCE CORPORATION (NEW ENGLAND)** |
| **390 Greenwich Street New York, NY 10013** | **60 Wall Street New York, New York 10005** | **2450 Colorado Avenue Suite 3000W Santa Monica, California 90404** |
| **BANC OF AMERICA SECURITIES LLC** | **BARCLAYS BANK PLC** | **CREDIT SUISSE SECURITIES (USA) LLC** |
| **One Bryant Park New York, New York 10036** | **745 Seventh Avenue New York, New York 10019** | **CREDIT SUISSE AG Eleven Madison Avenue New York, New York 10010** |
| **J.P. MORGAN SECURITIES INC. JPMORGAN CHASE BANK, N.A.** | **MORGAN STANLEY SENIOR FUNDING** | **UBS SECURITIES LLC** |
| **270 Park Avenue New York, New York 10017** | **1585 Broadway New York, New York 10036** | **299 Park Avenue New York, New York 10036** |

March 15, 2010

Lyondell Chemical Company
1221 McKinney Street, Suite 700
Houston, Texas 77010

Attention: C. Kent Potter
              Chief Financial Officer

<u>Lyondell Chemical Company - Exit Financing</u>
<u>Asset-Based Facility Commitment Letter</u>

Ladies and Gentlemen:

       You have advised Citigroup, Deutsche Bank, Wells Fargo, Bank of America, Barclays, Credit Suisse, JPMorgan, Morgan Stanley and UBS (each as defined below) that LyondellBasell Industries AF S.C.A. ("**LBIAF**") and certain of its subsidiaries (collectively, the "**Debtors**") currently are debtors in possession in jointly-administered cases (the "**Cases**") voluntarily commenced under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), and that the Debtors plan to reorganize (the "**Reorganization**") under the Plan (as defined below), pursuant to which LyondellBasell Industries N.V. ("**LBI NV**") will become the direct or indirect owner of the reorganized Debtors.  The "**Plan**" means the Second Amended Joint Chapter 11 Plan of Reorganization for the LyondellBasell Debtors filed with the Bankruptcy Court on December 24, 2009 (as so filed, the "**Initial Plan**"), as it may be amended from time to time.

For purposes of this commitment letter, "**Citigroup**" shall mean Citigroup Global Markets, Inc. ("**CGMI**"), Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as Citigroup shall determine to be appropriate and notify to the Company in writing to provide the services contemplated herein; "**Deutsche Bank**" shall mean Deutsche Bank Securities Inc., Deutsche Bank Trust Company Americas and/or any of their affiliates as Deutsche Bank shall determine to be appropriate and notify to the Company in writing to provide the services contemplated herein; "**Wells Fargo**" shall mean Wachovia Capital Finance Corporation (New England), Wells Fargo Capital Finance, LLC, Wells Fargo Bank, N.A. and/or any of their affiliates as Wells Fargo shall determine to be appropriate and notify to the Company in writing to provide the services contemplated herein; "**Bank of America**" shall mean Banc of America Securities LLC, Bank of America, N.A. and/or any of their affiliates as Bank of America shall determine to be appropriate and notify to the Company in writing to provide the services contemplated herein; "**Barclays**" shall mean Barclays Bank PLC ("**Barclays Bank**"), Barclays Capital, the investment banking division of Barclays Bank, and/or any of their affiliates as Barclays shall determine to be appropriate and notify to the Company in writing to provide the services contemplated herein; "**Credit Suisse**" shall mean Credit Suisse Securities (USA) LLC, Credit Suisse AG and/or any of their affiliates as Credit Suisse shall determine to be appropriate and notify to the Company in writing to provide the services contemplated herein; "**JPMorgan**" shall mean J.P. Morgan Securities Inc., JPMorgan Chase Bank, N.A. and/or any of their affiliates as JPMorgan shall determine to be appropriate and notify to the Company in writing to provide the services contemplated herein; "**Morgan Stanley**" shall mean Morgan Stanley & Co. Incorporated, Morgan Stanley Senior Funding, Inc. and/or any of their affiliates as Morgan Stanley shall determine to be appropriate and notify to the Company in writing to provide the services contemplated herein; "**UBS**" shall mean UBS Securities LLC, UBS Loan Finance LLC and/or any of their affiliates as UBS shall determine to be appropriate and notify to the Company in writing to provide the services contemplated herein; and  "**we**" or "**us**" shall mean, collectively, Citigroup, Deutsche Bank, Wells Fargo, Bank of America, Barclays, Credit Suisse, JPMorgan, Morgan Stanley and UBS.  "**You**" shall mean Lyondell Chemical Company (the "**Company**") and its subsidiaries, collectively or, if the context requires, individually.  This "**Commitment Letter**" shall mean, collectively, this letter and Exhibit A hereto.  The Commitment Letter and the Fee Letters (as defined in Section 4 below) are referred to collectively as the "**Commitment Documents**".

You have further advised the Joint Lead Arrangers (as defined below) and the Joint Bookrunners (as defined below) that, in connection with the Reorganization, it is intended that the financing for the Transactions will include (i) an asset-based revolving credit facility (the "**ABL Facility**") with aggregate commitments of up to $1,750,000,000 as described in the Senior Secured Asset-Based Credit Facility Summary of Principal Terms and Conditions attached hereto as Exhibit A (the "**Term Sheet**"; capitalized terms defined therein shall have the same meaning when used in this Commitment Letter) and (ii) the Other Financings.

Each of Citigroup, Deutsche Bank, Wells Fargo, Bank of America, Barclays, Credit Suisse, JPMorgan, Morgan Stanley and UBS is pleased to advise you of its commitment to provide a financing commitment under the ABL Facility in an amount equal to $194,444,444.45 (each such commitment, an "**Exit Commitment**"), subject to the terms and conditions of this Commitment Letter.  It is understood and agreed that the Exit Commitments are several and not joint.

In addition, each Joint Lead Arranger is pleased to inform you of its agreement to use its best efforts to arrange a syndicate of lenders for the ABL Facility, subject to the terms and conditions of this Commitment Letter.

It is agreed that Citigroup and Deutsche Bank will act as exclusive joint lead arrangers and joint bookrunners (the "**Joint Lead Arrangers**"), and Bank of America, Barclays, Credit Suisse, JPMorgan, Morgan Stanley, UBS and Wells Fargo will act, together with the Joint Lead Arrangers, as exclusive joint

2

bookrunners, in each case for the ABL Facility (the "**Joint Bookrunners**").  It is further agreed that (i) Citigroup will act as sole and exclusive Administrative Agent (in such capacity, the "**Administrative Agent**"), (ii) Citigroup and Wells Fargo will act as sole and exclusive Co-Collateral Agents (collectively, the "**Co-Collateral Agents**"), (iii) Citigroup will appear on the top left of the cover page for any marketing materials for the ABL Facility and Deutsche Bank will appear immediately to the right of Citigroup on the cover page of such marketing materials, (iv) Deutsche Bank will act as sole and exclusive Syndication Agent and (v) each of Citigroup, Deutsche Bank and Wells Fargo will hold the roles and responsibilities conventionally understood to be associated with such name placement.  You agree that no additional agents, co-agents or arrangers will be appointed with respect to the ABL Facility, or other titles conferred with respect to the ABL Facility, without the consent of the Joint Lead Arrangers; provided that you may (x) in your sole discretion, without the consent of the Joint Lead Arrangers or the Joint Bookrunners, appoint one additional joint bookrunner (the "**Additional Joint Bookrunner**") which shall be a commercial bank or other financial institution organized under the laws of any jurisdiction in the United States, Europe or Japan with assets of at least $1,000,000,000, and (y) with the consent of the Joint Lead Arrangers (such consent not to be unreasonably withheld or delayed), appoint up to four financial institutions as documentation agents, which financial institutions will hold the roles and responsibilities conventionally understood to be associated with such name placement (each a "**Documentation Agent**" and, together with the Additional Joint Bookrunner, an "**Additional Agent**"). Such Additional Joint Bookrunner shall become a party to (1) this Commitment Letter pursuant to a joinder reasonably satisfactory to you and the Joint Lead Arrangers and (2) the Syndication Letter, dated as of the date hereof and substantially in the form previously distributed to the Debtors, among the Joint Lead Arrangers and the Joint Bookrunners, pursuant to a joinder reasonably satisfactory to the Joint Lead Arrangers, and upon the effectiveness of such joinders, the Exit Commitment of each party hereto, including the Additional Joint Bookrunner, shall be equal to $175,000,000.

The proceeds of the ABL Facility and the Other Financings will be used as set forth in the "Use of Proceeds" section of the Term Sheet.

Section 1.  Conditions Precedent with Respect to the ABL Facility.  The Exit Commitments and the Joint Lead Arrangers', the Joint Bookrunners' and their respective affiliates' other agreements and undertakings hereunder with respect to the ABL Facility are subject to the following conditions:

(a)    Negotiation, execution and delivery of definitive documentation with respect to the ABL Facility required to be delivered on the Effective Date, including without limitation a credit agreement, guarantees, opinions of counsel and other related definitive documentation (collectively, the "**Credit Documents**"), to be based upon and substantially consistent with the terms set forth in this Commitment Letter and the Term Sheet and otherwise satisfactory to the parties hereto.

(b)    The entry by the Bankruptcy Court of an order in respect of the Cases (the "**Approval Order**"), in form and substance reasonably satisfactory to each of us, that shall be in full force and effect, unstayed, final and non-appealable, and shall not have been subsequently materially modified or amended without the written consent of the Joint Lead Arrangers and the Joint Bookrunners, reversed or vacated, authorizing the applicable Debtors:

(i)    to execute and deliver the Credit Documents, provided, however, that the authority of the Debtors to draw under the Credit Documents shall be conditioned on, among other things, the Plan becoming effective in accordance with its terms; and

(ii)    to pay the fees and reasonable out-of-pocket expenses of the Joint Lead Arrangers and the Joint Bookrunners set forth in the Commitment Documents with respect to the ABL Facility, as, when and to the extent that they become due under the terms of the Commitment Documents,

3

and to accept and to incur their respective obligations under the Commitment Documents.  The Approval Order shall specifically provide that the respective rights of the Joint Lead Arrangers and the Joint Bookrunners to be paid fees and reimbursed expenses, as and to the extent that they become due under the terms of the Commitment Documents, shall be entitled to priority as administrative expense claims under Sections 503(b)(1) and 507(a)(1) of the Bankruptcy Code, whether or not the ABL Facility is entered into or funded.

(c)    The Disclosure Statement shall be in form and substance reasonably satisfactory to the Joint Lead Arrangers and the Joint Bookrunners and shall have been approved by the Bankruptcy Court pursuant to an order reasonably satisfactory to the Joint Lead Arrangers and the Joint Bookrunners, which order shall be in full force and effect, unstayed, final and non-appealable, and shall not have been materially modified or amended without the written consent of the Joint Lead Arrangers and the Joint Bookrunners in their reasonable discretion, reversed or vacated.

(d)    The Joint Lead Arrangers and the Joint Bookrunners shall have received the *pro forma* consolidated balance sheets and related *pro forma* consolidated statements of income of LBI NV contained in any offering memorandum in respect of the Senior Notes.

(e)    The Equity Commitment Agreement (as defined in the Plan) in substantially the form filed with the Bankruptcy Court on December 24, 2009 or otherwise reasonably satisfactory to the Joint Lead Arrangers and the Joint Bookrunners shall have been approved by the Bankruptcy Court pursuant to an order reasonably satisfactory to the Joint Lead Arrangers and the Joint Bookrunners, which order shall be in full force and effect, unstayed, final and non-appealable, and shall not have been materially modified or amended without the written consent of the Joint Lead Arrangers and the Joint Bookrunners in their reasonable discretion, reversed or vacated.

(f)    The settlement among the Debtors, the official committee of unsecured creditors appointed in the Cases, the Wilmington Trust Company, as Indenture Trustee under the Basell AF S.C.A. Indenture dated as of August 10, 2005, and certain pre-petition lenders of the Debtors, on terms and conditions substantially similar to those described to the Bankruptcy Court on February 16, 2010, shall have been approved by the Bankruptcy Court pursuant to an order reasonably satisfactory to the Joint Lead Arrangers and the Joint Bookrunners, which order shall be in full force and effect, unstayed, final and non-appealable, and shall not have been materially modified or amended without the written consent of the Joint Lead Arrangers and the Joint Bookrunners in their reasonable discretion, reversed or vacated.

(g)    Satisfaction or waiver of the other conditions to the Effective Date set forth in the Term Sheet.

(h)    The Company's compliance with the terms of this Commitment Letter and the Fee Letters.

Section 2.  <u>Commitment Termination</u>.  The Exit Commitments and other agreements hereunder, except as expressly provided herein, shall automatically terminate on the earliest of (a) the Effective Date, (b) the consummation of any Chapter 11 plan of reorganization other than the Plan, (c) the completion of the Reorganization without the closing of the ABL Facility, (d) the dismissal or conversion to proceedings under Chapter 7 of the Bankruptcy Code of any of the Cases (other than any dismissal or conversion of a Case in respect of a de-minimis subsidiary of the Company) or the appointment in any of the Cases of a trustee or examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), except to the extent contemplated by or provided for under the Initial Plan, and (e) 11:59 p.m. New York City time, on May 1, 2010 if the Effective Date has not occurred on or prior to such date.

4

Section 3.  Syndication.  The Joint Lead Arrangers and Joint Bookrunners reserve the right, before or after the execution of the Credit Documents, to syndicate all or a portion of the Exit Commitments to one or more other financial institutions that will become parties to the Credit Documents, pursuant to a syndication to be managed by the Joint Lead Arrangers (the financial institutions becoming parties to the Credit Documents, together with the Joint Lead Arrangers and the Joint Bookrunners, being collectively referred to herein as the "**Lenders**").  The Exit Commitment of each Joint Lead Arranger and each Joint Bookrunner will be reduced by the portion of such Exit Commitment syndicated to one or more other financial institutions; provided that, notwithstanding the foregoing and subject to the satisfaction of the conditions set forth in Section 1, each Joint Lead Arranger and Joint Bookrunner shall remain primarily responsible for the full amount of its Exit Commitment on the Effective Date in the event that any Lender fails to execute the Credit Documents.

Without limiting your obligations to assist with syndication efforts as set forth below, it is understood that each Joint Lead Arranger's and each Joint Bookrunner's several commitment hereunder with regard to the ABL Facility is not subject to syndication of the ABL Facility.

The Joint Lead Arrangers intend to commence syndication efforts promptly upon your execution of this Commitment Letter and as part of their syndication efforts, it is their intention to have Lenders commit to the ABL Facility prior to the Effective Date.  You agree actively to assist the Joint Lead Arrangers in completing a timely syndication that is reasonably satisfactory to them and you.  Such assistance shall include, without limitation, (i) your using commercially reasonable efforts to ensure that any syndication efforts benefit materially from your existing lending and investment banking relationships, (ii) direct contact between senior management, your representatives and advisors and the proposed Lenders, (iii) your assistance in the preparation of a customary confidential information memorandum for the ABL Facility (the "**Confidential Information Memorandum**") and a customary presentation to the Lenders and (iv) the hosting, with the Joint Lead Arrangers, of one or more meetings of prospective Lenders at times mutually agreed upon.

The Joint Lead Arrangers, in consultation and cooperation with you, will manage all aspects of any syndication, including decisions as to the selection of institutions to be approached and when they will be approached, when their commitments will be accepted, which institutions will participate (such institutions to be reasonably acceptable to you), the allocation of the commitments among the Lenders and the amount and distribution of fees among the Lenders.  To assist the Joint Lead Arrangers in their syndication efforts, you agree promptly to prepare and provide to the Joint Lead Arrangers all customary information reasonably available to you with respect to LBIAF, LBI NV, you and each of your subsidiaries, the Transactions and the other transactions contemplated hereby, including all financial information and projections (including financial estimates, forecasts and other forward-looking information, the "**Projections**"), as any Joint Lead Arranger may reasonably request.  You hereby represent and warrant (and it shall be a condition to our commitments and other agreements hereunder) that (x) all written information and data other than the Projections and information of a general economic or general industry nature (the "**Information**") that has been or will be made available to any Joint Lead Arranger by you or any of your representatives, taken as a whole, is or will be, when furnished, complete and correct in all material respects and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made and (y) the Projections that have been or will be made available to the Joint Lead Arrangers by you or any of your representatives have been or will be prepared in good faith based upon assumptions that are believed by you to be reasonable at the time made and at the time made available to them; it being understood that the Projections are as to future events and are not to be viewed as facts and that actual results during the period or periods covered by any such Projections may differ significantly from the projected results and such differences may be material. You agree that if at any time prior to the Syndication Date (as defined

5

below) any of the representations in the preceding sentence would be incorrect in any material respect if the Information and Projections were being furnished and such representations were being made at such time, then you will promptly supplement the Information and the Projections so that such representations will be correct in all material respects at such time. In arranging and syndicating the ABL Facility, the Joint Lead Arrangers will be entitled to use and rely primarily on the Information and the Projections without responsibility for independent verification thereof.

You hereby acknowledge that (x) the Joint Lead Arrangers will make available Information and Projections to the proposed syndicate of Lenders and (y) certain of the Lenders may be "public side" Lenders (i.e. Lenders that do not wish to receive material non-public information with respect to the Company, LBIAF and their subsidiaries) (each, a "**Public Lender**"). If reasonably requested, you will assist us in preparing an additional version of the Confidential Information Memorandum to be used by Public Lenders that does not contain material non-public information.  The information to be included in the additional version of the Confidential Information Memorandum will be substantially consistent with the information included in any offering memorandum for the offering for the Senior Notes. It is understood that in connection with your assistance described above, authorization letters will be included in any Confidential Information Memorandum which authorize distribution of the Confidential Information Memorandum to prospective Lenders, state that the public-side version does not include material non-public information about you, your affiliates or your respective securities (other than material non-public information that would be disclosed in the offering memorandum in respect of the Senior Notes or information about the Transactions), and exculpate you and us with respect to any liability related to the use of the contents of the Confidential Information Memorandum or any related marketing material by the recipients thereof.

In addition, you agree that unless specifically labeled "Public—Does Not Contain Projections or Other Non-Public Information," all information, documentation or other data disseminated to prospective Lenders in connection with the syndication of the ABL Facility, whether through an internet site, electronically, in presentations at meetings or otherwise, may contain material non-public information concerning you or your affiliates or your respective securities; provided that you agree that the Credit Documents, notifications of changes in the terms of the ABL Facility and administrative materials distributed by the Joint Lead Arrangers to prospective Lenders may be distributed to both public-side and private-side Lenders.

To ensure an effective syndication of the ABL Facility, you agree that you will not syndicate or issue, attempt to syndicate or issue, announce or authorize the announcement of the syndication or issuance of, or engage in discussions concerning the syndication or issuance of, any debt facility or debt security (including any renewals thereof) in the United States or Canada, without the prior written consent of the Joint Lead Arrangers and the Joint Bookrunners until the earlier of (x) the Syndication Date (as defined below) and (y) the termination of the Exit Commitments and other agreements pursuant to Section 2 of this Commitment Letter; provided that this paragraph shall not apply to (i) the Other Financings and any other securities expressly contemplated by the Plan to be issued at the time of its effectiveness or (ii) any financings (project based or otherwise) on the part of joint ventures or minority ownership interests of LBIAF and its subsidiaries.

You agree to deliver to the Joint Lead Arrangers the consolidated balance sheets and consolidated statements of income, stockholder's equity and cash flows required to be delivered by LBIAF, the Company and its subsidiaries in accordance with Section 5.01 of the DIP ABL Credit Agreement with respect to (i) the fiscal year ended December 31, 2009, (ii) each month ended after December 31, 2009 and at least 30 days prior to the Syndication Date and (iii) each fiscal quarter ended after December 31, 2009 and at least 45 days prior to the Syndication Date.  The "**Syndication Date**" shall be the date that is the earliest of (x) the date on which Successful Syndication (as defined in the ABL Facility Fee Letter) has occurred, (y) the effective date

6

of the appointment of the Additional Joint Bookrunner and (z) the date that is 30 days after the Funding
Date.

Section 4.  Consents and Approvals.  If any Joint Lead Arranger or Joint Bookrunner fails to provide
timely written consent to you with respect to any issue requiring the written consent of the Joint Lead
Arrangers and the Joint Bookrunners (or any subset of the Joint Lead Arrangers and the Joint Bookrunners),
you may terminate the Exit Commitment of such Joint Lead Arranger or Joint Bookrunner and immediately
thereafter (with the prior consent of each remaining Joint Lead Arranger, such consent not to be
unreasonably withheld or delayed) either (i) replace such Joint Lead Arranger or Joint Bookrunner with a
different financial institution agreeing to provide an aggregate Exit Commitment equal to that of the
terminated Joint Lead Arranger or Joint Bookrunner or (ii) reduce the aggregate outstanding amount of Exit
Commitments by an amount equal to the Exit Commitment of the terminated Joint Lead Arranger or Joint
Bookrunner.

Section 5.  Fees.  As consideration for the several commitments of the Joint Lead Arrangers and the
Joint Bookrunners hereunder and their respective agreements to perform the services described herein, you
agree to pay the fees set forth in this Commitment Letter and in each of the ABL Facility Fee Letter, the
Administrative Agency Fee Letter and the Collateral Agent Fee Letter, in each case dated the date hereof and
delivered herewith with respect to the ABL Facility (collectively, the "**Fee Letters**").  Once paid, such fees
shall not be refundable under any circumstances, except as otherwise contemplated by the Fee Letters.

Section 6.  Indemnification.  You agree (a) to indemnify and hold harmless each Joint Lead
Arranger, each Joint Bookrunner, any Additional Agent, and their respective affiliates and controlling
persons and the respective officers, directors, employees, agents, advisors, representatives, attorneys,
members and successors of each of the foregoing (each, an "**Indemnified Person**") from and against any
and all actions, suits, proceedings (including any investigations or inquiries), losses, claims, damages,
liabilities and reasonably documented out-of-pocket expenses, joint or several, of any kind or nature
whatsoever which may be incurred by or asserted against or involve any Indemnified Person as a result of
or arising out of or in any way related to or resulting from this Commitment Letter, the Fee Letters, the
ABL Facility or any related transaction or any claim, litigation, investigation or proceeding, actual or
threatened, relating to any of the foregoing (any of the foregoing, a "**Proceeding**") (subject to the proviso
below, whether or not caused or arising, in whole or in part, out of the comparative, contributory or sole
ordinary negligence of the Indemnified Person), regardless of whether any such Indemnified Person is a
party thereto, and to reimburse each such Indemnified Person upon demand for any reasonable and
documented out-of-pocket legal expenses of one firm of counsel for all Indemnified Persons and, if
necessary, one firm of local counsel in each appropriate jurisdiction, in each case for all Indemnified
Parties (and, in the case of an actual or perceived conflict of interest, where the Indemnified Person
affected by such conflict notifies you of such conflict, of another firm of counsel for such affected
Indemnified Person), of other reasonable and documented out of pocket expenses incurred in connection
with investigating or defending any of the foregoing; provided that the foregoing indemnity will not, as to
any Indemnified Person, apply to losses, claims, damages, liabilities or related expenses to the extent they
have resulted from the bad faith, willful misconduct or gross negligence of such Indemnified Person (as
determined by a court of competent jurisdiction in a final and non-appealable decision).  You agree that
no Indemnified Person shall have any liability to you or any person asserting claims on behalf of or in
right of you or any other person in connection with any matter referred to in this Commitment Letter or
the Fee Letters, except, in your case, to the extent that any losses, claims, damages, liabilities or expenses
incurred by you or your affiliates have been found by a court of competent jurisdiction in a final and non-
appealable decision to have resulted from the bad faith, willful misconduct or gross negligence of such
Indemnified Person, in performing the services that are the subject of this Commitment Letter or the Fee
Letters.

(NY) 05491/013/EXIT.FINANCING/COMMITMENT/Commitment Letter.doc

The indemnity and reimbursement obligations of the Company under this Section 6 will be in addition to any liability which the Company may otherwise have and will be binding upon and inure to the benefit of any permitted successors and assigns of the Company and the Indemnified Persons, including any heirs and personal representatives of such Indemnified Persons.

Neither we nor any other Indemnified Person will be responsible or liable to you or any other person or entity for any indirect, special, punitive or consequential damages which may be alleged as a result of this Commitment Letter, the Fee Letters or the Reorganization.

Section 7.  Reimbursement.   You agree to reimburse (x) each Joint Lead Arranger from time to time, upon presentation of a summary statement, for all reasonable out-of-pocket expenses (including but not limited to our expenses for due diligence investigation, syndication expenses, travel expenses and reasonable fees, disbursements and other charges of a single transaction counsel to us (which shall be Davis Polk & Wardwell LLP) and of a single local counsel to us in each relevant jurisdiction, except allocated costs of in-house counsel) and (y) each Joint Bookrunner for reasonable out of pocket expenses relating to travel, in each case incurred in connection with the ABL Facility and the negotiation, preparation, execution and delivery of this Commitment Letter, the Fee Letters, the Credit Documents and any security arrangements in connection therewith regardless of whether the Effective Date occurs.

Section 8.  No Third Party Reliance.  The agreements of the Joint Lead Arrangers and the Joint Bookrunners hereunder and of any Lender that issues a commitment to provide financing under the ABL Facility are made solely for your benefit, and may not be relied upon or enforced by any other person. Please note that those matters that are not covered or made clear herein are subject to mutual agreement of the parties.

This Commitment Letter, the Fee Letters and the agreements hereunder shall not be assignable by you without the prior written consent of each Joint Lead Arranger and each Joint Bookrunner, not to be unreasonably withheld (and any attempted assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto (and Indemnified Persons), is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto (and Indemnified Persons) and is not intended to create a fiduciary relationship among the parties hereto. Any and all obligations of, and services to be provided by the Joint Lead Arrangers and the Joint Bookrunners hereunder (including, without limitation, their respective commitments with regard to the ABL Facility) may be performed and any and all rights of the Joint Lead Arrangers and the Joint Bookrunners hereunder may be exercised by or through any of their respective affiliates or branches and, in connection with the provision of such services, the Joint Lead Arrangers and the Joint Bookrunners may exchange with such affiliates and branches information concerning you and the other companies that may be the subject of the transactions contemplated by this Commitment Letter, and to the extent so employed, such affiliates and branches shall be entitled to the benefits afforded to the Joint Lead Arrangers or the Joint Bookrunners, as the case may be; provided that, any assignment of any Exit Commitment to any affiliate or branch will not relieve the Joint Lead Arrangers and the Joint Bookrunners from any of their respective obligations hereunder. This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by each Joint Lead Arranger, each Joint Bookrunner and you.

Section 9.  No Fiduciary Duty.  You acknowledge that each Joint Lead Arranger, each Joint Bookrunner and their respective affiliates may be providing debt financing, equity capital or other services (including securities trading and financial advisory services) to other persons in respect of which you may have conflicting interests regarding the transactions described herein and otherwise. None of the Joint Lead Arrangers, the Joint Bookrunners or any of their respective affiliates will use confidential information obtained from you by virtue of the transactions contemplated by this Commitment Letter or their other relationships with you in connection with the performance by them of services for other

8

persons, and none of the Joint Lead Arrangers, the Joint Bookrunners or any of their respective affiliates will furnish any such information to other persons. You also acknowledge that none of the Joint Lead Arrangers, the Joint Bookrunners and any of their respective affiliates have any obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained by them from other persons.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and any Joint Lead Arranger or any Joint Bookrunner is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether any Joint Lead Arranger or any Joint Bookrunner has advised or is advising you on other matters, (b) the Joint Lead Arrangers and the Joint Bookrunners on the one hand, and you, on the other hand, have an arm's-length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty on the part of any Joint Lead Arranger or any Joint Bookrunner, (c) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (d) you have been advised that each Joint Lead Arranger and each Joint Bookrunner is engaged in a broad range of transactions that may involve interests that differ from your interests and that the Joint Lead Arrangers and the Joint Bookrunners have no obligation to disclose such interests and transactions to you by virtue of any fiduciary, advisory or agency relationship and (e) you agree, to the fullest extent permitted by law, that no Joint Lead Arranger and no Joint Bookrunner shall have any liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of you, including your stockholders, employees or creditors.

You further acknowledge that each Joint Lead Arranger and each Joint Bookrunner is a full service securities firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services. In the ordinary course of business, each Joint Lead Arranger and each Joint Bookrunner may provide investment banking and other financial services to, and/or acquire, hold or sell, for its own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of you and your subsidiaries and other companies with which you or your affiliates may have commercial or other relationships.

In addition, please note that none of us or our respective affiliates provides accounting, tax or legal advice. Notwithstanding anything herein to the contrary, you (and each employee, representative or other agent of you) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the offering and all materials of any kind (including opinions or other tax analyses) that are provided to you relating to such tax treatment and tax structure. However, any information relating to the tax treatment or tax structure shall remain subject to the confidentiality provisions hereof (and the foregoing sentence shall not apply) to the extent reasonably necessary to enable the parties hereto, their respective affiliates and their and their respective affiliates' directors and employees to comply with applicable securities laws. For this purpose, "tax treatment" means U.S. federal or state income tax treatment, and "tax structure" is limited to any facts relevant to the U.S. federal income tax treatment of the transactions contemplated by this Commitment Letter but does not include information relating to the identity of the parties hereto or any of their respective affiliates.

Section 10.  No Waiver.  Neither the execution of the Commitment Documents nor the acceptance and approval by the Joint Lead Arrangers and the Joint Bookrunners of the Plan or any amendments, modifications or other revisions thereto for purposes of the financings contemplated hereby shall constitute or be deemed to constitute a vote in favor or other acceptance or approval of the terms, conditions or other provisions of the Plan or any amendment, modification or revision thereto by the Joint Lead Arrangers and the Joint Bookrunners in any capacity or for any purpose other than as provider of a

9

commitment or undertaking hereunder and for purposes of the financing contemplated hereby and by the other Commitment Documents; and nothing contained herein shall constitute a waiver by any Joint Lead Arranger or any Joint Bookrunner of any of their rights, remedies or objections, whether with respect to the Plan or otherwise, in any capacity other than as provider of a commitment or undertaking hereunder, all of which rights, remedies or objections are preserved and left unaltered by this Commitment Letter and the other Commitment Documents.

Section 11. <u>Governing Law; Jurisdiction.</u> This Commitment Letter and the Fee Letters and any claim, controversy or dispute arising under or related to this Commitment Letter or the Fee Letters shall be governed by, and construed in accordance with, the law of the State of New York. Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, any New York State or Federal court sitting in the Borough of Manhattan, The City of New York, in any action or proceeding arising out of or relating to this Commitment Letter, the Fee Letters or the transactions contemplated hereby or thereby, or for recognition or enforcement of any judgment, and agrees that all claims in respect of any such action or proceeding may be heard and determined in such court, (b) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Commitment Letter, the Fee Letters or the transactions contemplated hereby or thereby in such court, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in such court and (d) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Section 12. <u>Confidentiality.</u> This Commitment Letter is delivered to you on the understanding that none of the Fee Letters and their terms or substance, or, this Commitment Letter and its terms or substance, or the activities of the Joint Lead Arrangers and the Joint Bookrunners pursuant hereto or to the Fee Letters shall be disclosed, directly or indirectly, to any other person or entity (including other lenders, underwriters, placement agents, advisors or any similar persons) except (a) to your officers, directors, employees, attorneys, accountants, Investors (as defined in the Equity Commitment Agreement) and advisors on a confidential and need-to-know basis, (b) if the Joint Lead Arrangers and the Joint Bookrunners consent to such proposed disclosure, (c) to any potential Additional Agent who agrees to be bound by the terms of this paragraph (or language substantially similar to this paragraph), (d) pursuant to the order of any court or administrative agency in any pending legal or administrative proceeding, or otherwise as required by applicable law or compulsory legal or administrative process, or to the extent requested or required by governmental and/or regulatory or administrative authorities, in each case based on the reasonable advice of your legal counsel (in which case, to the extent permitted by law, you agree to inform us promptly thereof), (e) to the professionals to any statutory committee appointed in the Cases under section 1102 of the Bankruptcy Code and the Ad Hoc Group of Certain Secured Lenders in the Cases, to the extent that such professionals are bound by confidentiality agreements that are reasonably satisfactory to the Joint Lead Arrangers, (f) to the United States Trustee in the Cases, <u>provided</u> that, the disclosing party shall request that such United States Trustee maintain the confidentiality of the relevant information and (g) to any proponent of the Plan or its counsel to the extent that each such proponent or counsel is bound by a confidentiality agreement that is reasonably satisfactory to the Joint Lead Arrangers and provides that the information contained in the Fee Letter shall not be disclosed to any other person; <u>provided</u> that, you may (i) disclose this Commitment Letter (but not the Fee Letters) and the contents hereof (A) if so required, in any prospectus or other offering memorandum relating to the Senior Notes and (B) to potential Lenders and to rating agencies in connection with obtaining ratings for the ABL Facility, (ii) disclose the Fee Letters and the contents thereof as part of a generic disclosure of aggregate sources and uses to the extent customary in marketing materials, any proxy or offering memorandum, (iii) file this Commitment Letter with the Bankruptcy Court, including in connection with the Approval Order, (iv) disclose the Commitment

10

Documents in accordance with any order of the Bankruptcy Court that sets forth the parameters with respect to disclosure of the Commitment Documents or (v) file in the Cases a copy of the Fee Letters in a redacted form reasonably acceptable to the Joint Lead Arrangers and the Joint Bookrunners; provided that an unredacted copy may be provided to the Bankruptcy Judge overseeing the Cases and being asked to enter the Approval Order.

You further agree that you will permit us to review and approve (such approval not to be unreasonably withheld or delayed) any reference to us or any of our affiliates in connection with the ABL Facility or the transactions contemplated hereby contained in any press release or similar written public disclosure prior to public release.

Each Joint Lead Arranger, each Joint Bookrunner and their respective affiliates and the respective officers, directors, employees, agents, advisors, members and successors thereof (the "**Representatives**") will use all confidential information provided to it or such affiliates by or on behalf of you hereunder solely for the purpose of providing the services which are the subject of this Commitment Letter and shall treat confidentially all such information; provided that nothing herein shall prevent a Joint Lead Arranger, a Joint Bookrunner or any of their respective affiliates or Representatives from disclosing any such information (a) pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, or otherwise as required by applicable law or compulsory legal process (in which case the applicable Joint Lead Arranger or Joint Bookrunner, to the extent permitted by law, agrees to inform you promptly thereof), (b) upon the request or demand of any regulatory authority having jurisdiction over that Joint Lead Arranger or Joint Bookrunner or any of its affiliates or Representatives (in which case such Joint Lead Arranger or Joint Bookrunner, to the extent permitted by law, agrees to inform you promptly thereof), (c) to the extent that such information becomes publicly available other than by reason of improper disclosure by a Joint Lead Arranger, a Joint Bookrunner or any of their respective affiliates or Representatives, (d) to the extent that such information is received by such Joint Lead Arranger or Joint Bookrunner from a third party that is not to the receiving party's knowledge subject to confidentiality obligations owing to you, (e) to the extent that such information is independently developed by such Joint Lead Arranger or Joint Bookrunner, (f) to each Joint Lead Arranger's affiliates, each Joint Bookrunner's affiliates or Representatives, and their respective employees, legal counsel, independent auditors and other experts or agents who need to know such information in connection with the Transactions and are informed of the confidential nature of such information and are subject to the confidentiality obligations under this paragraph or (g) to potential Lenders, participants or assignees who agree to be bound by the terms of this paragraph (or language substantially similar to this paragraph). Each Joint Lead Arranger's and each Joint Bookrunner's and Representatives' obligations under this paragraph shall automatically terminate and be superseded by the confidentiality provisions in the definitive documentation relating to the ABL Facility upon the effectiveness thereof.

You acknowledge that information and documents relating to the ABL Facility may be transmitted through Intralinks, the internet, e-mail or similar electronic transmission systems, and that no Joint Lead Arranger, no Joint Bookrunner and no other Indemnified Person shall be liable for any damages arising from the use by others of information or documents transmitted in such manner, except to the extent such damages result from the bad faith, willful misconduct or gross negligence of such Joint Lead Arranger or Joint Bookrunner (as determined by a court of competent jurisdiction in a final and non-appealable decision); provided that, the use of Intralinks, the internet, e-mail or similar electronic transmission systems shall not in itself constitute bad faith, willful misconduct or gross negligence. The reimbursement, indemnification, confidentiality, jurisdiction, governing law and waiver of jury trial provisions contained herein and in the Fee Letters shall remain in full force and effect regardless of whether definitive financing documentation shall be executed and delivered and notwithstanding the termination of this Commitment Letter or a Joint Lead Arranger's or a Joint Bookrunner's commitment

11

hereunder with regard to the ABL Facility; <u>provided</u> that your obligations under this Commitment Letter, other than those relating to indemnification, confidentiality and to the syndication of the ABL Facility, shall automatically terminate and be superseded by the definitive documentation relating to the ABL Facility upon the Effective Date, and you shall be released from all liability in connection therewith at such time.

Section 13.  <u>Waiver of Jury Trial</u>.  Each party hereto irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to any Commitment Document or the transactions contemplated thereby or the actions of the parties hereto in the negotiation, performance or enforcement hereof.

Section 14.  <u>Effectiveness of this Commitment Letter</u>.  Notwithstanding anything to the contrary in this Commitment Letter, no obligation of the Company under this Commitment Letter shall have any force or effect unless and until the Bankruptcy Court has approved entry into this Commitment Letter.

Section 15.  <u>Miscellaneous</u>.  This Commitment Letter, together with the other Commitment Documents, sets forth the entire agreement between the parties with respect to the matters addressed herein and supersedes all prior communications, written or oral, with respect hereto.  This Commitment Letter may be executed in any number of counterparts, each of which, when so executed, shall be deemed to be an original and all of which, taken together, shall constitute one and the same Commitment Letter.  Delivery of an executed counterpart of a signature page to this Commitment Letter by .pdf or other electronic means shall be as effective as delivery of an original executed counterpart of this Commitment Letter.

We hereby notify you that pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "***Patriot Act***"), each Joint Lead Arranger, each Joint Bookrunner and each other Lender is required to obtain, verify and record information that identifies the obligors under the ABL Facility, which information includes the name, address, tax identification number and other information regarding such obligors that will allow any of the Joint Lead Arrangers, the Joint Bookrunners or Lenders to identify such obligor in accordance with the Patriot Act. This notice is given in accordance with the requirements of the Patriot Act and is effective as to each Joint Lead Arranger, each Joint Bookrunner and each Lender.  You hereby acknowledge and agree that all such information may be shared by the Joint Lead Arrangers or the Joint Bookrunners with the Lenders.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

12

Please indicate your acceptance of the provisions hereof by signing the enclosed copy of this Commitment Letter and the Fee Letters and returning them to our counsel, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017 (fax: 212-701-5949) before 5:00 p.m. (New York City time) on March 15, 2010, the time at which the Exit Commitment of each Joint Lead Arranger, each Joint Bookrunner and the other agreements and undertakings of the Joint Lead Arrangers, the Joint Bookrunners and their affiliates with respect to the ABL Facility (if not so accepted prior thereto) will terminate. If you elect to deliver this Commitment Letter electronically, please arrange for the executed original to follow by next-day courier.

Very truly yours,

CITIGROUP GLOBAL MARKETS INC.

By
Name:    DAVID JAFFE
Title:    Authorized Signer

DEUTSCHE BANK SECURITIES INC.

By_____
Name:                **FRANK FAZIO**
Title:                **Managing Director**

By_____
Name:
Title:                **PHILIP SALIBA**
                      **DIRECTOR**

DEUTSCHE BANK TRUST COMPANY AMERICAS

By_____
Name:        Marcus M. Tarkington
Title:                Director

By_____
Name:
Title:                **PHILIP SALIBA**
                      **DIRECTOR**

WACHOVIA CAPITAL FINANCE CORPORATION
(NEW ENGLAND)

By _____

Name: Scott D. Ryan

Title: VP

BANC OF AMERICA SECURITIES LLC

By

Name:   Monirah Masud
Title:      SVP


BANK OF AMERICA, N.A.

By

Name:   JOHN E ISSELE
Title:      SVP

BARCLAYS BANK PLC

By _____

Name: Paul Cwagno

Title: Managing Director

CREDIT SUISSE SECURITIES (USA) LLC

By _____
Name:    **Michael Speller**
Title:    **Managing Director**

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH

By _____
Name:    Shaheen Malik
Title:    Vice President

By _____
Name:    KEVIN BUDDHDEW
Title:    ASSOCIATE

J.P. MORGAN SECURITIES INC.

By _Mary Ellen Egbert_

Name: Mary Ellen Egbert

Title: Managing Director

JPMORGAN CHASE BANK, N.A.

By_____

Name:

Title:

J.P. MORGAN SECURITIES INC.


By_____
Name:
Title:

JPMORGAN CHASE BANK, N.A.


By_____
Name:
Title:        **Jennifer Heard**
              **Vice President**

MORGAN STANLEY SENIOR FUNDING, INC.

By_____

Name:  Kevin Emerson
Title:   Vice President

UBS SECURITIES LLC

By
Name:
Title:

Managing Director

By
Name:
Title:    Eric Bootsma
Executive Director and Counsel
Region Americas Legal

ACCEPTED AND AGREED
on March 15, 2010:

LYONDELL CHEMICAL COMPANY

By _____
   Name: F. SVETE
   Title: TREASURER
                    EXC

[Signature Page to Commitment Letter]

EXHIBIT A

[attached]

EXHIBIT A
PRIVILEGED & CONFIDENTIAL

Lyondell Chemical Company
Senior Secured Asset-Based Credit Facility
Summary of Principal Terms and Conditions

| | |
|---|---|
| Borrowers: | Lyondell Chemical Company ("**Lyondell**"), Houston Refining L.P. ("**HRO**"), Equistar Chemicals, LP ("**Equistar**") and any other wholly-owned U.S. subsidiary of Lyondell designated from time to time by Lyondell as a borrower under the Asset-Based Facility (as defined below) (the "**Borrowers**").  The Borrowers are jointly and severally liable for all obligations under the Asset-Based Facility. |
| Guarantees: | All obligations of the Borrowers under the Asset-Based Facility will be unconditionally guaranteed, jointly and severally on a senior secured basis (the "**Guarantees**") by LyondellBasell Industries N.V. ("**LBI NV**") and each existing or subsequently organized wholly-owned U.S. Restricted Subsidiary (as defined below) of LBI NV (other than certain immaterial subsidiaries and certain special purpose entities).  Each such entity providing a guarantee is referred to herein as a "**Guarantor**". |
| | Certain subsidiaries may be designated and treated as "unrestricted" on terms usual and customary for financings of this kind and excluded from the guarantee requirements.  Restricted subsidiaries (the "**Restricted Subsidiaries**") are all subsidiaries of LBI NV other than unrestricted subsidiaries. |
| Administrative Agent: | Citibank, N.A. or an affiliate thereof will act as sole and exclusive administrative agent (in such capacity, the "**Administrative Agent**") for the Lenders (as defined below). |
| Co-Collateral Agents: | Citibank, N.A. (or an affiliate thereof) and Wachovia Capital Finance Corporation (New England) (or an affiliate thereof) will act as co-collateral agents (collectively, in such capacities, the "**Co-Collateral Agents**") for the Lenders. |
| Lenders: | Citibank, N.A., Deutsche Bank Trust Company Americas, Bank of America, N.A., Barclays Bank PLC, Credit Suisse AG, JPMorgan Chase Bank, N.A., Morgan Stanley Senior Funding, Inc., UBS Loan Finance LLC and Wachovia Capital Finance Corporation (New England) and other financial institutions or entities acceptable to the Joint Lead Arrangers (as defined below) and reasonably acceptable to the Borrowers (the "**Lenders**"). |
| Joint Lead Arrangers: | Citigroup Global Markets, Inc. and Deutsche Bank Securities Inc., will act as exclusive joint lead arrangers (collectively, together with their affiliates, the "**Joint Lead Arrangers**"). |
| Syndication Agent: | Deutsche Bank Securities Inc. or an affiliate thereof will act as syndication agent (the "**Syndication Agent**"). |

A-1

| | |
|---|---|
| Joint Bookrunners: | Citigroup Global Markets, Inc., Deutsche Bank Securities Inc., Banc of America Securities LLC, Barclays Capital, Credit Suisse Securities (USA) LLC, J.P. Morgan Securities Inc., Morgan Stanley Senior Funding, Inc., UBS Securities LLC and Wells Fargo Capital Finance, LLC will act as joint bookrunners (collectively, together with their affiliates, the "*Joint Bookrunners*"). |
| Fronting Banks: | Citibank, N.A. (or an affiliate thereof), Deutsche Bank Trust Company Americas (or an affiliate thereof), Wells Fargo Bank, N.A. (or an affiliate thereof) and other mutually satisfactory Lenders or their affiliates, in each case subject to individual issuance limits to be mutually agreed (collectively, the "*Fronting Banks*"). |
| Asset-Based Facility: | A non-amortizing revolving credit facility made available to the Borrowers in a principal amount of up to $1,750,000,000 (the "*Asset-Based Facility*"), subject to Maximum Facility Availability (as defined below), during the period from (and including) the Funding Date (as defined below) to (but excluding) the Termination Date (as defined below).  All loans outstanding under the Asset-Based Facility (the "*Loans*") shall become due and payable on the Termination Date. |

(a)  *Letters of Credit*.  Up to $700,000,000 of the Asset-Based Facility, subject to Maximum Facility Availability, will be available for the issuance of letters of credit by the Fronting Banks for the account of the Borrowers (the "*Letters of Credit*").  No Letter of Credit will be issued after the 30th day preceding the Termination Date (as defined below) and none shall have a term of more than one year; provided that any Letter of Credit may provide for renewal thereof for additional periods of up to 12 months.  At request of a Borrower, Fronting Banks shall issue Letters of Credit having automatic extension provisions, provided that the relevant Fronting Bank shall have the right to prevent any such extension at least once in each 12 month period.  Borrowers shall be permitted to request the issuance of Letters of Credit for the account of a Borrower, including to support obligations of any of their subsidiaries or any other subsidiary of LBI NV.

(b)  *Swingline Loans*:  Up to $75,000,000 of the Asset-Based Facility, subject to Maximum Facility Availability, will be available to the Borrowers for swingline loans from Citibank, N.A., as swingline lender (the "*Swingline Lender*").

(c)  *Increase Option*:  Following the earlier of (i) the date on which a Successful Syndication (as defined in the ABL Facility Fee Letter) is achieved and (ii) the date that is 90 days after the Funding Date, the Asset-Based Facility may from time to time, at the option of the Borrowers, be increased through the addition of new Lenders or increases in the commitments of existing Lenders, provided that the

A-2

Asset-Based Facility may not be increased more than 10 times. The aggregate amount of all increases in the Asset-Based Facility may not exceed $250,000,000 and each individual increase(s) shall be in amount greater than or equal to $25,000,000.

Use of Proceeds:

The proceeds of the Asset-Based Facility will be used by the Borrowers, on the Funding Date, together with the proceeds of other financings funded as of the Funding Date (including the Senior Term Loan Facility (as defined below), the senior first lien notes issued by Lyondell maturing no earlier than the sixth anniversary of the Funding Date (the "***Senior Notes***") and the €450,000,000 securitization transaction (the "***European Securitization***") of certain European subsidiaries of LBI NV, collectively, the "***Other Financings***") (i) to refinance (the "***Refinancing***") certain existing indebtedness of LyondellBasell AF S.C.A. ("***LBI AF***"), and certain of its subsidiaries under the existing term loan Debtor-in-Possession Credit Agreement, dated March 3, 2009, entered by and between LBI AF, UBS AG, Stamford Branch, as administrative agent, and the other borrowers, agents and lenders from time to time party thereto, as amended from time to time, and the existing ABL Debtor-in-Possession Credit Agreement, dated March 3, 2009, entered into by and between LBI AF, Citibank N.A., as administrative agent, and the other borrowers, agents and lenders from time to time party thereto, as amended from time to time (the "***DIP ABL Credit Agreement***") and (ii) for general corporate purposes, including working capital (such purposes, collectively with the Refinancing, the Asset-Based Facility, the Other Financings and the Plan Roll-Up Notes (as defined below), the "***Transactions***") and to fund and pay costs and expenses related to the Transactions.

"***Senior Term Loan Facility***" means the loan facility to be entered into by Lyondell Escrow Corporation (a Delaware corporation and direct or indirect wholly-owned subsidiary of LBI NV, which will merge with and into Lyondell, with Lyondell as the surviving entity), as borrower, on the Effective Date (as defined below) with a final maturity no earlier than the sixth anniversary of the Funding Date and in an aggregate principal amount, when aggregated with the Senior Notes, of not less than $3,250,000,000.

Credit Documents:

The documents governing the Asset-Based Facility and the rights and obligations of the Borrowers, the Guarantors and Lenders with respect to the Asset-Based Facility and any security therefor.

Termination Date:

The fourth anniversary of the Funding Date (the "***Termination Date***").

Maximum Facility Availability:

Availability under the Asset-Based Facility ("***Maximum Facility Availability***") will be, at any date, an amount equal to the lesser of (i) the then effective commitments under the Asset-Based Facility and (ii) the Borrowing Base (as defined below) on such date.

A-3

| Borrowing Base: | "**Borrowing Base**" means, at any time, an amount equal to the sum of (i) (x) Available Inventory <u>plus</u> (y) Available Receivables <u>less</u> (z) Availability Reserves.  The definitions and methodology to be used for determining the Borrowing Base shall be no less favorable to the Borrower than those set forth in the DIP ABL Credit Agreement. The Borrowing Base on any date shall be calculated using the most recent Borrowing Base Certificate furnished to the Administrative Agent by the Borrowers, subject to the Co-Collateral Agents' ability from time to time to establish and revise Availability Reserves and Orderly Liquidation Value Rates and to deem in good faith certain receivables and inventory ineligible for inclusion in the Borrowing Base; <u>provided that</u>, the ability of the Co-Collateral Agents to take such actions shall be subject to the voting rights of the Lenders, in each case to the extent set forth in the DIP ABL Credit Agreement. |
|---|---|
| | "**Available Inventory**" means, at any time, (1) other than Stores Inventory and High Seas Inventory, the lesser of (a) 75% of each category of Eligible Inventory and (b) the product of (x) 85% of the Orderly Liquidation Value Rate multiplied by (y) each category of Eligible Inventory, (2) in the case of Stores Inventory, the lesser of 5% of Stores Inventory that is Eligible Inventory and $15,000,000 and (3) in the case of High Seas Inventory, the lowest of (a) 75% of High Seas Inventory that is Eligible Inventory, (b) the product of (x) 70% of the Orderly Liquidation Value Rate multiplied by (y) High Seas Inventory that is Eligible Inventory and (c) $150,000,000; <u>provided</u> that  Available Inventory shall in no event exceed 75% of Eligible Inventory. |
| | "**Available Receivables**" means, at any time, 85% of Eligible Receivables. |
| Applicable Triggering Event: | "**Triggering Event**" means any of the following events:  (i) the Termination Date, (ii) the occurrence of an event of  default under the Asset-Based Facility or (iii) the occurrence of the level of Excess Availability, Collateral Availability or Total Liquidity applicable for the relevant purpose as set forth in <u>Annex I</u> hereto. |
| | "**Excess Availability**" means an amount equal to (i) Maximum Facility Availability, <u>less</u> (ii) the sum of the outstanding principal amounts of all revolving loans, Letter of Credit exposures and swingline exposure under the Asset-Based Facility ("**Total Outstandings**").  Total Outstandings shall be determined as of the close of business on each business day giving effect to all changes in Total Outstandings during such business day. |
| | "**Collateral Availability**" means the Borrowing Base less Total Outstandings. |
| | "**Total Liquidity**" means the sum of Excess Availability plus the unrestricted cash of LBI NV and its subsidiaries plus any other unutilized credit line of LBI NV and its subsidiaries available for borrowing as unrestricted cash, in each case from Qualified |

A-4

Financial Institutions. "**_Qualified Financial Institutions_**" mean any financial institution organized under the laws of any jurisdiction in the United States of America, Europe or Japan, which at that time has outstanding debt obligations with a stated maturity of one year or less from the date of issue and rated either: (i) A-1 or higher by Standard & Poor's Ratings Group or any successor, or any other comparable rating then used by that rating agency, or (ii) P-1 or higher by Moody's Investors Service, Inc. or any successor, or any other comparable rating then used by that rating agency.

<u>Borrowing Procedure</u>:      Borrowings will be in minimum amounts of $10,000,000 (or, if less, the remaining available balance of the commitments) and (i) on three (3) business days' notice, in the case of Loans bearing interest at a rate based on the LIBO Rate ("**_LIBOR Loans_**"), (ii) on one business day's notice, in the case of Loans bearing interest based on the Alternate Base Rate ("**_ABR Loans_**") and (iii) on same-day notice in the case of Swingline Loans.

<u>Optional Prepayments</u>:      The Borrowers may ratably repay the Loans at any time in whole or in part without premium or penalty (other than breakage costs, if applicable) (i) upon at least two (2) business days' notice in the case of LIBOR Loans, (ii) on same-day notice (not later than 10:00 a.m., New York City time) in the case of ABR Loans and (iii) on same-day notice (not later than 12:00 p.m., New York City time) in the case of Swingline Loans; <u>provided</u> that (x) each partial repayment of Loans (other than Swingline Loans) shall be in a multiple of $1,000,000 and, in the case of LIBOR Loans, not less than $10,000,000 and (y) each partial repayment of Swingline Loans shall be in a multiple of $100,000.

<u>Commitment Reductions</u>:      The Borrowers may at any time in whole permanently terminate, or from time to time in part permanently and ratably reduce, the aggregate commitment upon at least three (3) business days' notice; <u>provided</u> that each partial reduction shall be in an amount of $5,000,000 or multiples of $1,000,000 in excess thereof. Notwithstanding the foregoing, any such notice of termination or reduction of the aggregate commitment may state that such notice is conditioned upon the effectiveness of other debt incurrences, equity issuances or asset sales, in which case such notice may be revoked by the Borrowers prior to the specified date if such condition is not satisfied.

<u>Mandatory Prepayments</u>:      Mandatory prepayments of the Asset-Based Facility shall be required upon receipt of net cash proceeds from (i) sales of ABL Collateral (as defined below) not in the ordinary course of business and (ii) insurance and condemnation awards involving and to the extent of ABL Collateral, in each case received by Lyondell or any of its subsidiaries in excess of $25,000,000.

"**_Concentration Account_**" means an account or accounts maintained with the Administrative Agent into which all proceeds of ABL

A-5

Collateral will be deposited.  The Concentration Account will be subject to a control agreement in favor of the Administrative Agent.

During a Cash Dominion Period, all amounts collected in the Concentration Account will be automatically applied to the repayment of Loans. "***Cash Dominion Period***" means any period during which a Triggering Event as set forth in the "Cash Dominion" row of Annex I exists.

Subject to the Conditions to Borrowing, the Borrowers will be able to reborrow the amount of any mandatory prepayment or repayment of the Loans pursuant to the foregoing provisions, with any requisite notice of borrowing deemed to have been timely given unless the Borrowers otherwise direct.  If any such repayment of a LIBOR Loan occurs on a date other than the last day of the applicable interest period, the interest rate applicable to the Loans so repaid shall apply as well to the reborrowed Loans pursuant to the preceding sentence for the balance of such interest period, and no breakage costs shall be payable in connection therewith.

On any date that the Total Outstandings exceed Maximum Facility Availability then, not later than the next business day, the Borrowers must prepay the Loans so that the Total Outstandings no longer exceed Maximum Facility Availability.

| | |
|---|---|
| <u>Yield Protection, Increased Costs and Tax Gross-up</u>: | Usual for facilities and transactions of this type. |
| <u>Security</u>: | All amounts owing by the Borrowers under the Asset-Based Facility will be secured by (i) a first priority perfected lien on all now owned or hereafter acquired inventory, accounts receivable, and other related rights to payment, accounts, contracts and assets of the Borrowers, together with proceeds of the foregoing (collectively, the "***ABL Collateral***") and (ii) a second priority perfected lien on all other now owned or hereafter acquired material assets of the Borrowers and Guarantors pledged under the Senior Term Loan Facility, including but not limited to, substantially all tangible and intangible assets of the Borrowers and Guarantors (including but not limited to accounts receivable and inventory (other than the ABL Collateral) as well as equipment, general intangibles, investment property, intellectual property, material fee-owned real property, intercompany notes and proceeds of the foregoing) (collectively, the "***Term Loan Collateral***", and with the ABL Collateral, the "***Collateral***"), junior to the liens on the Term Loan Collateral securing the Senior Term Loan Facility and the Senior Notes but senior to any lien thereon securing the Plan Roll-Up Notes (as defined below). |

All the above-described pledges, security interests and mortgages shall be created on terms, and pursuant to documentation, reasonably satisfactory to the Co-Collateral Agents, and none of the Collateral shall be subject to any other pledges, security interests or

A-6

mortgages (other than pledges, security interests or mortgages securing the Senior Term Loan Facility, the Senior Notes and the Plan Roll-Up Notes, subject to the Intercreditor Agreement defined below) and customary exceptions for financings of this kind or as otherwise agreed upon.

Intercreditor Agreement:

The lien priority, relative rights and other creditors' rights issues in respect of the Asset-Based Facility, the Senior Notes, the Senior Term Loan Facility and the Plan Roll-Up Notes will be set forth in the intercreditor agreement (the "***Intercreditor Agreement***").  The Intercreditor Agreement will provide, among other things, that, so long as any obligations are outstanding under the (i) Senior Term Loan Facility, the administrative agent under the Senior Term Loan Facility will control at all times all remedies and other actions related to the Collateral (other than the ABL Collateral) and (ii) the Asset-Based Facility, the Administrative Agent will control at all times all remedies and other actions related to the ABL Collateral, and in either case, none of the holders of the Senior Notes or Plan Roll-Up Notes will be entitled to take any action with respect to the Collateral (other than limited actions to preserve and protect the liens securing, such Senior Notes or Plan Roll-Up Notes, as applicable, that do not impair the liens securing the Senior Term Loan Facility and the Asset-Based Facility).  The Intercreditor Agreement may be amended, replaced or reissued from time to time without the consent of the noteholders in order to accommodate permitted issuances of first and second lien debt, as well as any more subordinated liens or debt.

Conditions Precedent to
Effective Date:

The conditions precedent to the Effective Date shall be limited to the following: (i) approval by the bankruptcy court of the Disclosure Statement related to the plan of reorganization of LBI AF and its subsidiaries (the "***Plan***") that are debtors in the related Bankruptcy Cases (as defined below); (ii) except as disclosed in the Disclosure Statement, since December 31, 2009 there has not been any event, occurrence, development or state of circumstances or facts that has had or would reasonably be expected to have, individually or in the aggregate a Material Adverse Effect (as defined below); (iii) the negotiation, execution and delivery of customary definitive documentation relating to the Transactions other than the collateral documents to be delivered as conditions precedent to the Funding Date; (iv) payment of all costs, fees and expenses then due; (v) effectiveness of the Other Financings*,* including the deposit of the proceeds of the Senior Notes into escrow; and (vi) (a) compliance with customary closing conditions, including the delivery of customary legal opinions and a customary solvency certificate (on a pro-forma basis after giving effect to the Transactions) from the chief financial officer of LBI NV, in each case, in form and substance reasonably satisfactory to the Administrative Agent, (b) delivery of good standing certificates, certified organizational documents and customary officer's certificates (including evidence

A-7

of authority), (c) accuracy of the representations and warranties in each case in all material respects, (d) delivery of an appraisal report and a field examination report with respect to the Borrowing Base, which in each case shall be dated no earlier than 120 days preceding the Effective Date and shall be satisfactory to the Co-Collateral Agents and (e) delivery of all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act, in each case at least five (5) business days prior to the Effective Date.  The first date on which all of the foregoing conditions have been satisfied shall be referred to herein as the "***Effective Date***".

As used herein, "***Disclosure Statement***" means that certain second amended disclosure statement filed with the Bankruptcy Court on December 23, 2009 with respect to the Bankruptcy Cases, as amended from time to time.

**Conditions Precedent to Funding Date:**

The conditions precedent to the Funding Date shall be limited to the following: (i) the Plan (A) shall be reasonably satisfactory to each of the Joint Lead Arrangers and each of the Joint Bookrunners, (B) shall have been confirmed by an order of the Bankruptcy Court reasonably satisfactory to each of the Joint Lead Arrangers and each of the Joint Bookrunners and (C) shall have been consummated, including, without limitation, the issuance of notes issued as replacement securities for the roll-up loans pursuant to the Plan (the "***Plan Roll-Up Notes***"); (ii) except as disclosed in the Disclosure Statement, since December 31, 2009 there has not been any event, occurrence, development or state of circumstances or facts that has had or would reasonably be expected to have, individually or in the aggregate a Material Adverse Effect; (iii) the substantially concurrent availability of the proceeds of the Senior Notes, the Senior Term Loan Facility, the European Securitization and the equity or rights offering, such equity or rights offering made pursuant to, and in the amount set forth in, the Plan; (iv) the delivery of a borrowing notice; (v) the accuracy of the representations and warranties, in each case in all material respects; (vi) the absence of defaults; (vii) delivery of an inventory appraisal report and a field examination report with respect to the Borrowing Base, which in each case shall be as of a date no earlier than 120 days preceding the Funding Date and shall be satisfactory to the Co-Collateral Agents; (viii) delivery of a completed borrowing base certificate with respect to the Borrowers as of a date no earlier than 30 days preceding the Funding Date satisfactory to the Co-Collateral Agents; (ix) Excess Availability of not less than $750,000,000; (x) delivery of definitive collateral documents required to perfect the Co-Collateral Agents' first priority security interest in the ABL Collateral and the Co-Collateral Agents' second priority security interest in the Term Loan Collateral and the delivery of customary legal opinions relating to the collateral documentation; (xi) payment of all costs,

A-8

fees and expenses then due; (xii) delivery of evidence that all required insurance has been maintained and that the Co-Collateral Agents have been named as loss payee and additional insured; and (xiii) the occurrence of the Effective Date.  The first date on which all of the foregoing conditions have been satisfied shall be referred to herein as the "***Funding Date***", which date shall not be later than 120 days after the Effective Date.

Conditions Precedent to Each
Subsequent Credit Event:

On the date of each Credit Event other than the Funding Date, (i) there shall exist no default under the Credit Documents; (ii) the representations and warranties shall be true and correct in all material respects immediately prior to, and after giving effect to, such Credit Event; (iii) after giving effect to such Credit Event, the Total Outstandings will not exceed Maximum Facility Availability; and (iv) the making of such Loan (or the issuance of such Letter of Credit) shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

"***Credit Event***" means the funding date of each Loan and the date of issuance or renewal of any Letter of Credit.

Material Adverse Effect:

Limited to the following: (a) material adverse effect on the business, results of operations, prospects, property or financial condition of LBI NV and its restricted subsidiaries (taken as a whole), (b) material adverse effect on ability of the Borrowers and their subsidiaries (taken as a whole) to perform their respective payment obligations under the Asset-Based Facility or (c) a deficiency in rights and remedies of Lenders under the Asset-Based Facility (taken as a whole) that is materially adverse to Lenders; provided that a Material Adverse Effect shall not be deemed to exist as a result of the Bankruptcy Cases or the Effect of Bankruptcy or circumstances and events leading up thereto.

Effect of Bankruptcy:

Any default or other legal consequences with respect to any contractual obligation, contract or agreement of any debtor in the bankruptcy cases arising on account of the commencement of the bankruptcy cases filed January 6, 2009 by certain subsidiaries of LBI AF and the related cases filed thereafter but prior to the Effective Date and joined therewith (the "***Bankruptcy Cases***"), including the implementation of any stay, or the rejection of any such contractual obligation, contract or agreement with the approval of the bankruptcy court to the extent required to be effective.

Interest Rates, Yields and Fees:

As set forth on Annex II attached hereto.

Representations and Warranties:

Representations and warranties applicable to LBI NV and its Restricted Subsidiaries, which are substantially the same as those in the definitive documentation for the Senior Term Loan Facility, and such representations and warranties specific to the Asset-Based Facility, as are usual and customary for comparable facilities, in

A-9

each case with such modifications thereto and such other provisions
as may be agreed.

Affirmative Covenants:

Affirmative covenants applicable to LBI NV and its Restricted
Subsidiaries, which are customary and standard for facilities and
transactions of this type, but which shall be not more restrictive than
the affirmative covenants in the definitive documentation for the
Senior Term Loan Facility, and such affirmative covenants specific
to the Asset-Based Facility, as are usual and customary for
comparable facilities, in each case with such modifications thereto
and such other provisions as may be agreed.

The Asset-Based Facility will also contain financial and collateral
reporting requirements which are substantially the same as those in
the definitive documentation for the Senior Term Loan Facility, and
reporting requirements specific to the Asset-Based Facility, which
are substantially the same as those set forth under the DIP ABL
Credit Agreement, with such modifications thereto and such other
provisions as may be agreed between the Borrowers and the
Co-Collateral Agents. The Co-Collateral Agents (on behalf of the
Lenders and the Administrative Agent) shall be entitled to conduct
no more than two collateral audits (i.e., two field examinations and
two appraisals) during each calendar year (no more than four
collateral audits during each calendar year upon the occurrence of a
Triggering Event as set forth in the "Collateral Audit" row of Annex
I hereto).

In addition, the Borrowers shall furnish to the Administrative Agent:

(i)     as soon as available and in any event (A) within twenty-five
        (25) days after the last day of each of the first three calendar
        months after the Effective Date and (B) within seventeen (17)
        days after the last day of each calendar month thereafter, a
        completed Borrowing Base Certificate calculating and
        certifying the Borrowing Base as of the end of such calendar
        month, signed on behalf of the Borrowers by a principal
        financial officer of Lyondell;

(ii)    upon the occurrence of a Triggering Event as set forth in the
        "Enhanced Reporting" row of Annex I hereto and continuing
        until such Triggering Event is cured in accordance with
        Annex I hereto, (A) not later than Thursday of each calendar
        week, a completed Borrowing Base Certificate calculating
        and certifying the Borrowing Base as of the preceding Friday,
        signed on behalf of the Borrowers by a principal financial
        officer of Lyondell, provided that only the Borrowing Base
        Certificates delivered on the second and fourth Thursday of
        each calendar month shall include an updated calculation of
        Available Inventory, in each case calculated as of the Friday
        preceding the delivery of such Borrowing Base Certificate,
        and (B) not later than 30 days after month end, a monthly

A-10

financial report for the immediately preceding month (in the form currently prepared for internal use);

(iii)   promptly after any request therefor, such other information in such detail concerning the amount, composition and manner of calculation of the Borrowing Base as the Administrative Agent may reasonably request; and

(iv)   as soon as practicable and in any event within five (5) business days after any disposition outside the ordinary course of business (including by way of casualty or condemnation) of ABL Collateral having a book value exceeding $25,000,000, an updated Borrowing Base Certificate calculating (on a pro forma basis, after giving effect to such disposition and reflecting only the changes to the affected component of Eligible Inventory) and certifying such pro forma Borrowing Base as of the end of the most recent calendar month for which a Borrowing Base Certificate was delivered pursuant to clause (i) above.

| | |
|---|---|
| <u>Negative Covenants</u>: | Negative covenants applicable to LBI NV and its Restricted Subsidiaries which are customary and standard for facilities and transactions of this type, but which shall be not more restrictive than the negative covenants in the definitive documentation for the Senior Term Loan Facility, and such negative covenants specific to the Asset-Based Facility, as are usual and customary for comparable facilities, in each case with such modifications thereto and such other provisions as may be agreed. |
| <u>Financial Covenant</u>: | If, with respect to the period of four consecutive fiscal quarters most recently ended for which financial statements have been received by the Administrative Agent, the Fixed Charge Coverage Ratio calculated as of the end of such four-quarter period is less than 1.00 to 1.00, it shall be an event of default if and only if a Triggering Event as set forth in the "Financial Covenant" row of <u>Annex I</u> occurs on or after the date on which financial statements for such four-quarter period were received by the Administrative Agent but prior to the date on which the Administrative Agent receives financial statements with respect to a subsequent four-quarter period. The Fixed Charge Coverage Ratio shall be calculated as the ratio of (A) Consolidated EBITDA minus Capital Expenditures to (B) Consolidated Interest Expense plus the sum of dividend payments, taxes paid in cash on such dividends and the principal amount of amortization payments made with respect to certain other indebtedness.  The definitions to be used for calculating the Fixed Charge Coverage Ratio are to be agreed. |
| <u>Events of Default</u>: | The Credit Documents will contain events of default applicable to the Borrowers and the Guarantors, which are substantially the same as those in the definitive documentation for the Senior Term Loan Facility, and such events of default specific to the Asset-Based Facility, as are usual and customary for comparable facilities, in |

A-11

each case with such modifications thereto and such other provisions
as may be agreed.

Indemnification:

The Credit Documents will contain customary indemnification
provisions by the Borrowers in favor of the Agents, each Lender,
and each of their respective affiliates and the respective officers,
directors, employees, agents and advisors of each of them.

Expenses:

Usual for facilities and transactions of this type.

Assignments and Participations:

Usual for facilities and transactions of this type.

Voting:

Amendments and waivers of the definitive credit documentation
will require the approval of Lenders holding more than 50% of the
aggregate amount of the loans and commitments under the
Asset-Based Facility (the **"Majority Lenders"**), as applicable,
except that, subject to a provision permitting replacement of
non-consenting lenders, the consent of each Lender directly and
adversely affected thereby shall be required with respect to, among
other things, (i) increasing the Commitment of any Lender, or
subjecting any Lender to any additional obligation; (ii) postponing
any scheduled date of payment of the principal amount of any Loan
or any disbursement of a Letter of Credit, or any interest thereon, or
any fee payable under the Asset-Based Facility, or reducing the
amount of, waiving or excusing any such payment, or reducing the
Applicable Margin or the Applicable Commitment Fee Rate (each as
defined below), or postponing the scheduled date of expiration of
any commitment; (iii) amending or modifying or otherwise affecting
the rights or duties of either the Administrative Agent or the
Co-Collateral Agents, any Fronting Bank or the Swingline Lender
without its prior written consent; and (iv) amending or modifying
the sharing provision, the definition of "Majority Lenders", or
otherwise changing the percentage of commitments or Credit
Exposures, or the number of Lenders, which shall be required for the
Lenders or any of them to take action under the Asset-Based Facility,
or increasing the amount of the total commitment under the
Asset-Based Facility or amending or modifying the *pro rata*
provisions, the amendment provisions or the assignment provisions.

**"Credit Exposure"** means, with respect to any Lender at any time
under the Asset-Based Facility, such Lender's commitment at such
time or, if the commitments shall have been terminated, such
Lender's Outstandings at such time.

In addition, no amendment or waiver shall amend or modify the
definitions of "Available Inventory", "Available Receivables",
"Collateral Availability", "Eligible Inventory", "Excess
Availability", or "Ineligible Inventory", or amend, or waive a default
relating to Excess Availability, in each case without the prior written
consent of Lenders having aggregate Credit Exposures representing
at least 66 2/3% of the sum of all Credit Exposures at such time;
provided that any increase in any percentage set forth in the

A-12

definition of "Available Inventory" or in the definition of "Available Receivables", or any amendment of the definition of "Available Inventory" or the definition of "Available Receivables" that would have the effect of so increasing any such percentage, shall require the prior written consent of each Lender.

| | |
|---|---|
| Defaulting Lenders: | The Credit Documents will contain customary provisions relating to Defaulting Lenders. |
| Replacement of Lenders: | If any Lender does not consent to any consent, amendment or waiver which has received the approval of the Majority Lenders or any Lender becomes a Defaulting Lender, the Borrowers shall have the right, at their own expense, upon notice to such Lender and the Administrative Agent, to require such Lender to transfer and assign without recourse all its interests, rights and obligations hereunder to another financial institution approved by the Administrative Agent, and each Fronting Bank and the Swingline Lender (which approval shall not be unreasonably withheld) which shall assume such obligations (which assignee may be another Lender).  In addition, there will be customary provisions to replace Lenders requesting indemnification or reimbursement for yield protection, taxes and increased cost. |
| Governing Law and Forum: | State of New York. |
| Counsel to Administrative Agent: | Davis Polk & Wardwell LLP. |

A-13

**ANNEX I to**
**Lyondell Chemical Company**
**Senior Secured Asset-Based Credit Facility**
**Summary of Principal Terms and Conditions**

**TRIGGERING EVENTS[1]**

|  | A. For five (5) Consecutive Business Days | B. On Any Business Day |
|---|---|---|
| **1. Enhanced Reporting** | Excess Availability < $700,000,000 | Excess Availability < $625,000,000 |
| **2. Collateral Audit** | Excess Availability < $700,000,000 | Excess Availability < $625,000,000 |
| **3. Cash Dominion** | | |
| *(a) Years 1 and 2:* | Excess Availability < $450,000,000, unless (x) Excess Availability > $350,000,000, (y) Collateral Availability > $650,000,000 and (z) Total Liquidity > $725,000,000 | Excess Availability < $350,000,000, unless (x) Excess Availability > $275,000,000, (y) Collateral Availability > $575,000,000 and (z) Total Liquidity > $650,000,00 |
| *(b) Year 3 and thereafter:* | Excess Availability < $500,000,000, unless (x) Excess Availability > $400,000,000, (y) Collateral Availability > $650,000,000 and (z) Total Liquidity > $725,000,000 | Excess Availability < $400,000,000, unless (x) Excess Availability > $325,000,000, (y) Collateral Availability > $575,000,000 and (z) Total Liquidity > $650,000,000 |
| **4. Financial Covenant** | | |
| *(a) Years 1 and 2:* | Excess Availability < $300,000,000; or Total Liquidity < $550,000,000 | Excess Availability < $250,000,000; or Total Liquidity < $500,000,000 |
| *(b) Year 3 and thereafter:* | Excess Availability < $400,000,000; or Total Liquidity < $650,000,000 | Excess Availability < $325,000,000; or Total Liquidity < $575,000,000 |

---

[1] Cure: for a period of thirty (30) consecutive days, the applicable Excess Availability, Collateral Availability or Total Liquidity exceeds the applicable level set forth in Column A above for the applicable purpose. A Triggering Event may not be so cured as contemplated by this sentence more than three times in any four fiscal quarter period. For the avoidance of doubt, the cessation of an existing Triggering Event does not preclude the occurrence of a subsequent Triggering Event.

**ANNEX II to**
**Lyondell Chemical Company**
**Senior Secured Asset-Based Credit Facility**
**Summary of Principal Terms and Conditions**

### INTEREST RATES AND FEES

Interest Rates:

Loans will bear interest, at the option of the Borrowers, at one of the following rates:

(i)    the Applicable Margin plus the Alternate Base Rate (as defined below), calculated on a 365/366-day basis and payable monthly in arrears; or

(ii)   the Applicable Margin plus the current LIBO rate as quoted by Reuters LIBOR01 page, adjusted for reserve requirements, if any, and subject to the same LIBOR floor applicable to the Senior Term Loan Facility and to customary change of circumstance provisions, for interest periods of one, two, three or six months, or of one week if available to all Lenders (the "*LIBO Rate*"), calculated on a 360-day basis and payable at the end of the relevant interest period, but in any event at least quarterly.

"*Applicable Margin*" means:

(i) until the receipt of quarterly financial statements for the first full two quarters following the Funding Date, 2.75% per annum, in the case of ABR Loans, and 3.75% per annum, in the case of LIBOR Loans; and (ii) thereafter, a per annum rate equal to the rate set forth below opposite the then applicable Average Monthly Excess Availability (as defined below):

| **AVERAGE MONTHLY EXCESS AVAILABILITY** | **ABR LOANS** | **LIBOR LOANS** |
| --- | --- | --- |
| Greater than or equal to 66.7% | 2.50% | 3.50% |
| Less than 66.7% and greater than or equal to 33.3% | 2.75% | 3.75% |
| Less than 33.3% | 3.00% | 4.00% |

 "*Alternate Base Rate*" means the highest of (i) Citibank, N.A.'s base rate, (ii) one-month LIBO Rate (subject to the LIBOR floor) plus 1% and (iii) the Federal Funds Effective Rate plus 1/2 of 1%.

Not more than 10 LIBO Rate interest periods may be in effect at any one time.

Default Interest:

During the continuance of an event of default under the Asset-Based Facility, Loans will bear interest at an additional 2% *per annum*.

| | |
|---|---|
| <u>Unused Commitment Fee</u>: | From and after the Effective Date, a non-refundable unused commitment fee will accrue at the Applicable Commitment Fee Rate on the daily average unused portion of the Asset-Based Facility during, and computed at the end of, each month (whether or not then available), payable quarterly in arrears and on the Termination Date. Swingline usage will not count for purposes of calculating this fee. |
| | "***Applicable Commitment Fee Rate***" means (i) until receipt of quarterly financial statements for the first full two quarters following the Funding Date, 0.75% per annum and (ii) thereafter, 1.00% for any day on which Total Outstandings are less than or equal to 50% of the amount of the commitments, and 0.75% for any day on which Total Outstandings exceed 50% of the amount of the commitments. |
| <u>Letter of Credit Fees</u>: | A percentage per annum equal to the Applicable L/C Margin to the Lenders, and 0.25% per annum to the Issuer, will accrue on the outstanding undrawn amount of any Letter of Credit, payable quarterly in arrears and computed on a 360-day basis.  The "***Applicable L/C Margin***" means the Applicable Margin for LIBOR Loans as in effect from time to time. |
| | During the continuance of an event of default under the Credit Documents, the Letter of Credit Fees will increase by an additional 2% per annum. |
| <u>Average Monthly Excess Availability</u>: | For any calendar month, an amount (expressed as a percentage) equal to the quotient of (A) the sum of (i) the daily average Excess Availability <u>plus</u> (ii) the average daily unrestricted cash of the Borrowers and their respective subsidiaries (as determined by Lyondell from treasury records on a non GAAP basis), in each case for such calendar month <u>divided by</u> (B) the daily average Maximum Facility Availability for such calendar month. |

**TAB 16-D**

FIRST LIEN INTERCREDITOR AGREEMENT

dated as of

[                    ], 2010

among

UBS AG, STAMFORD BRANCH,
as Senior Term Loan Collateral Agent,

DEUTSCHE BANK TRUST COMPANY AMERICAS,
as Notes Collateral Agent,

and

each Additional Collateral Agent from time to time party hereto

and

LyondellBasell Industries N.V.

and

each other Grantor from time to time party hereto

# TABLE OF CONTENTS

Page

## ARTICLE I

### DEFINITIONS

SECTION 1.01    Construction; Certain Defined Terms............................................................. 1

## ARTICLE II

### PRIORITIES AND AGREEMENTS WITH RESPECT TO COMMON COLLATERAL

SECTION 2.01    Priority of Claims ........................................................................................ 8
SECTION 2.02    Actions with Respect to Common Collateral; Prohibition on
                Contesting Liens ........................................................................................ 9
SECTION 2.03    No Interference; Payment Over.................................................................. 10
SECTION 2.04    Automatic Release of Liens; Amendments to First Lien Security
                Documents ................................................................................................. 11
SECTION 2.05    Certain Agreements with Respect to Bankruptcy or Insolvency
                Proceedings................................................................................................ 12
SECTION 2.06    Reinstatement ............................................................................................ 13
SECTION 2.07    Insurance ................................................................................................... 13
SECTION 2.08    Refinancings.............................................................................................. 13
SECTION 2.09    Possessory Collateral Agent as Gratuitous Bailee for Perfection ................. 13

## ARTICLE III

### OTHER FIRST LIEN OBLIGATION

## ARTICLE IV

### EXISTENCE AND AMOUNTS OF LIENS AND OBLIGATIONS

## ARTICLE V

### THE COLLATERAL AGENT

SECTION 5.01    Authority ................................................................................................... 15
SECTION 5.02    Rights as a First Lien Secured Party............................................................ 16
SECTION 5.03    Exculpatory Provisions .............................................................................. 17
SECTION 5.04    Reliance by Authorized Collateral Agent .................................................... 18
SECTION 5.05    Delegation of Duties .................................................................................. 18
SECTION 5.06    Non-Reliance on Authorized Collateral Agent and Other First Lien
                Secured Parties........................................................................................... 18

## ARTICLE VI

### MISCELLANEOUS

| | | |
|---|---|---|
| SECTION 6.01 | Notices | 19 |
| SECTION 6.02 | Waivers; Amendment; Joinder Agreements | 20 |
| SECTION 6.03 | Parties in Interest | 20 |
| SECTION 6.04 | Survival of Agreement | 20 |
| SECTION 6.05 | Counterparts | 20 |
| SECTION 6.06 | Severability | 21 |
| SECTION 6.07 | Governing Law | 21 |
| SECTION 6.08 | Submission to Jurisdiction; Waivers | 21 |
| SECTION 6.09 | WAIVER OF JURY TRIAL | 21 |
| SECTION 6.10 | Headings | 22 |
| SECTION 6.11 | Conflicts | 22 |
| SECTION 6.12 | Provisions Solely to Define Relative Rights | 22 |
| SECTION 6.13 | Integration | 22 |

FIRST LIEN INTERCREDITOR AGREEMENT (as amended, restated, modified or supplemented from time to time, this "**Agreement**") dated as of [            ], 2010, among UBS AG, STAMFORD BRANCH, as collateral agent for the Senior Term Loan Secured Parties (as defined below) (in such capacity and together with its successors in such capacity, the "**Senior Term Loan Collateral Agent**"), DEUTSCHE BANK TRUST COMPANY AMERICAS, as collateral agent for the Notes Secured Parties (as defined below) (in such capacity and together with its successors in such capacity, the "**Notes Collateral Agent**"), each Additional Collateral Agent (as defined below), from time to time party hereto for the Other First Lien Secured Parties (as defined below) of the Series (as defined below) with respect to which it is acting in such capacity, each Grantor (as defined below) and each Additional Grantor (as defined below).

In consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Senior Term Loan Collateral Agent, the Notes Collateral Agent (for itself and on behalf of the Notes Secured Parties), each Additional Collateral Agent (for itself and on behalf of the Other First Lien Secured Parties of the applicable Series), each Grantor and each Additional Grantor agree as follows:

ARTICLE I

**Definitions**

SECTION 1.01    *Construction; Certain Defined Terms*.

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument, other document, statute or regulation herein shall be construed as referring to such agreement, instrument, other document, statute or regulation as from time to time amended, supplemented or otherwise modified, (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, but shall not be deemed to include the subsidiaries of such Person unless express reference is made to such subsidiaries, (iii) the words "herein", "hereof and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections and Annexes shall be construed to refer to Articles, Sections and Annexes of this Agreement, (v) unless otherwise expressly qualified herein, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (vi) the term "or" is not exclusive.

(b)    It is the intention of the First Lien Secured Parties of each Series that the holders of First Lien Obligations of such Series (and not the First Lien Secured Parties of any other Series) bear the risk of (i) any determination by a court of competent jurisdiction that (x) any of the First Lien Obligations of such Series are unenforceable under applicable law or are

subordinated to any other obligations (other than another Series of First Lien Obligations), (y) any of the First Lien Obligations of such Series do not have an enforceable security interest in any of the Collateral securing any other Series of First Lien Obligations and/or (z) any intervening security interest exists securing any other obligations (other than another Series of First Lien Obligations) on a basis ranking prior to the security interest of such Series of First Lien Obligations but junior to the security interest of any other Series of First Lien Obligations or (ii) the existence of any Collateral for any other Series of First Lien Obligations that is not Common Collateral (any such condition referred to in the foregoing clauses (i) or (ii) with respect to any Series of First Lien Obligations, an "***Impairment***" of such Series). In the event of any Impairment with respect to any Series of First Lien Obligations, the results of such Impairment shall be borne solely by the holders of such Series of First Lien Obligations, and the rights of the holders of such Series of First Lien Obligations (including, without limitation, the right to receive distributions in respect of such Series of First Lien Obligations pursuant to Section 2.01) set forth herein shall be modified to the extent necessary so that the effects of such Impairment are borne solely by the holders of the Series of such First Lien Obligations subject to such Impairment. Additionally, in the event the First Lien Obligations of any Series are modified pursuant to applicable law (including, without limitation, pursuant to Section 1129 of the Bankruptcy Code), any reference to such First Lien Obligations or the Secured Credit Documents governing such First Lien Obligations shall refer to such obligations or such documents as so modified.

(c)     Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Senior Term Loan. As used in this Agreement, the following terms have the meanings specified below:

"***Additional Collateral Agent***" shall have the meaning assigned to such term in Section 3(b).

"***Additional Grantor***" means any Grantor which becomes party to this Agreement pursuant to a Grantor Joinder Agreement.

"***Agreement***" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"***Authorized Collateral Agent***" means, with respect to any Common Collateral, (i) until the earlier of (x) the Trigger Date and (y) the Non-Controlling Authorized Representative Enforcement Date, the Senior Term Loan Collateral Agent and (ii) from and after the earlier of (x) the Trigger Date and (y) the Non-Controlling Authorized Representative Enforcement Date, the Major Non-Controlling Authorized Representative.

"***Authorized Representative***" means (i) in the case of any Senior Term Loan Obligations or the Senior Term Loan Secured Parties, the Senior Term Loan Collateral Agent, (ii) in the case of the Notes Obligations or the Notes Secured Parties, the Notes Collateral Agent and (iii) in the case of any Series of Other First Lien Obligations or Other First Lien Secured Parties that become subject to this Agreement after the date hereof, the Additional Collateral Agent named for such Series in the applicable Joinder Agreement.

"**Bankruptcy Case**" shall have the meaning assigned to such term in Section 2.05(b).

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, as amended.

"**Bankruptcy Law**" shall mean the Bankruptcy Code and any similar Federal, state or foreign law for the relief of debtors.

"**Collateral**" means all assets and properties subject to Liens created pursuant to any First Lien Security Document to secure one or more Series of First Lien Obligations.

"**Collateral Agents**" means either (a) the Senior Term Loan Collateral Agent, (b) the Notes Collateral Agent, or (c) each Additional Collateral Agent.

"**Common Collateral**" means, at any time, Collateral in which the holders of two or more Series of First Lien Obligations (or their respective Authorized Representatives) hold a valid and perfected security interest or Lien at such time; provided that "Common Collateral" shall also include rights to payment pursuant to Section [ ] of the Junior Lien Intercreditor Agreement to which the holders of two or more Series of First Lien Obligations (or their Authorized Representatives) would be entitled (and any reference in this Agreement to any valid and perfected lien of any Series of First Lien Obligations with respect to any such rights to payment under such Section shall mean that the holders such Series (or their Authorized Representatives) are entitled to such payment pursuant to the Junior Lien Intercreditor Agreement). If more than two Series of First Lien Obligations are outstanding at any time and the holders of less than all Series of First Lien Obligations hold a valid and perfected security interest or Lien in any Collateral at such time, then such Collateral shall constitute Common Collateral for those Series of First Lien Obligations that hold a valid security interest or Lien in such Collateral at such time and shall not constitute Common Collateral for any Series which does not have a valid and perfected security interest or Lien in such Collateral at such time.

"**Control Collateral**" means any Common Collateral in the control of the Authorized Collateral Agent (or its agents or bailees), to the extent that control thereof perfects a Lien thereon under the Uniform Commercial Code of any jurisdiction or otherwise. Control Collateral includes, without limitation, Deposit Accounts, Electronic Chattel Paper, Investment Property or Letter-of-Credit Rights. All capitalized terms used in this definition and not defined elsewhere in this Agreement have the meanings assigned to them in the New York UCC.

"**Controlling Secured Parties**" means, with respect to any Common Collateral, the Series of First Lien Secured Parties whose Authorized Representative is the Authorized Collateral Agent for such Common Collateral.

"**DIP Financing**" shall have the meaning assigned to such term in Section 2.05(b).

"**DIP Financing Liens**" shall have the meaning assigned to such term in Section 2.05(b).

"***DIP Lenders***" shall have the meaning assigned to such term in Section 2.05(b).

"***Discharge***" means, with respect to any Common Collateral and any Series of First Lien Obligations, the date on which such Series of First Lien Obligations is no longer secured by such Common Collateral.  The term "***Discharged***" shall have a corresponding meaning.

"***Event of Default***" shall have the meaning set forth in the applicable Security Agreement.

"***First Lien Obligations***" means, collectively, (i) the Senior Term Loan Obligations, (ii) the Notes Obligations and (iii) each Series of Other First Lien Obligations.

"***First Lien Secured Parties***" means (a) the Senior Term Loan Secured Parties, (b) the Notes Secured Parties and (c) each Other First Lien Secured Party with respect to each Series of Other First Lien Obligations.

"***First Lien Security Documents***" means the Security Agreements and each other agreement entered into in favor of the Collateral Agents for purposes of securing any Series of First Lien Obligations.

"***Grantor Joinder Agreement***" means a supplement to this Agreement substantially in the form of <u>Exhibit B</u>, appropriately completed.

"***Grantors***" means the Company and each Subsidiary which has granted a security interest pursuant to any First Lien Security Document to secure any Series of First Lien Obligations.

"***Impairment***" shall have the meaning assigned to such term in Section 1.01(b).

"***Indenture***" means that certain Indenture dated as of March [  ], 2010, among the Company, the Subsidiaries identified therein and Deutsche Bank Trust Company Americas, as trustee.

"***Insolvency or Liquidation Proceeding***" shall mean, with respect to any person, any (a) insolvency, bankruptcy, receivership, reorganization, readjustment, composition or other similar proceeding relating to such person or its property or creditors in such capacity, (b) proceeding for any liquidation, dissolution or other winding up of such person, voluntary or involuntary, whether or not involving insolvency or proceedings under the Bankruptcy Code, whether partial or complete and whether by operation of law or otherwise, (c) assignment for the benefit of creditors of such person or (d) other marshalling of the assets of such person.

"***Intervening Creditor***" shall have the meaning assigned to such term in Section 2.01(a).

"***Joinder Agreement***" means a supplement to this Agreement substantially in the form of <u>Exhibit A</u>, appropriately completed.

-4-

"***Junior Lien Intercreditor Agreement***" means that certain Intercreditor Agreement dated [      ], 2010 among Citibank, N.A. as collateral agent for that certain asset-based credit agreement dated April 8, 2010, the Senior Term Loan Collateral Agent, the Notes Collateral Agent and [          ], as collateral agent for that certain indenture dated [        ], 2010, and each other junior lien collateral agent party thereto from time to time.

"***Lien***" shall mean any mortgage, pledge, security interest, hypothecation, assignment, lien (statutory or other) or similar encumbrance (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement or any lease in the nature thereof).

"***Major Non-Controlling Authorized Representative***" means, with respect to any Common Collateral, the Authorized Representative of the Series of Other First Lien Obligations that constitutes the largest outstanding principal amount of any then outstanding Series of First Lien Obligations with respect to such Common Collateral.

"***New York UCC***" shall mean the Uniform Commercial Code as from time to time in effect in the State of New York.

"***Non-Controlling Authorized Representative***" means, at any time with respect to any Common Collateral, any Authorized Representative that is not the Authorized Collateral Agent at such time with respect to such Common Collateral.

"***Non-Controlling Authorized Representative Enforcement Date***" means, with respect to any Non-Controlling Authorized Representative, the date which is 150 days (throughout which 150 day period such Non-Controlling Authorized Representative was the Major Non-Controlling Authorized Representative) after the occurrence of both (i) an Event of Default (under and as defined in the Other First Lien Agreement under which such Non-Controlling Authorized Representative is the Authorized Collateral Agent) <u>and</u> (ii) the Collateral Agent's and each other Authorized Representative's receipt of written notice from such Non-Controlling Authorized Representative certifying that (x) such Non-Controlling Authorized Representative is the Major Non-Controlling Authorized Representative and that an Event of Default (under and as defined in the Other First Lien Agreement under which such Non-Controlling Authorized Representative is the Authorized Collateral Agent) has occurred and is continuing and (y) the First Lien Obligations of the Series with respect to which such Non-Controlling Authorized Representative is the Authorized Collateral Agent are currently due and payable in full (whether as a result of acceleration thereof or otherwise) in accordance with the terms of the applicable Other First Lien Agreement; <u>provided</u> that the Non-Controlling Authorized Representative Enforcement Date shall be stayed and shall not occur and shall be deemed not to have occurred with respect to any Common Collateral (1) at any time the Authorized Collateral Agent has commenced and is diligently pursuing any enforcement action with respect to such Common Collateral or (2) at any time the Grantor that has granted a security interest in such Common Collateral is then a debtor under or with respect to (or otherwise subject to) any Insolvency or Liquidation Proceeding.

"**_Non-Controlling Secured Parties_**" means, with respect to any Common Collateral, the First Lien Secured Parties which are not Controlling Secured Parties with respect to such Common Collateral.

"**_Notes_**" shall mean (x) the 8% Senior Secured Dollar Notes due 2017 issued pursuant to the terms of the Indenture on the date hereof and (y) the 8% Senior Secured Euro Notes due 2017 issued pursuant to the terms of the Indenture.

"**_Notes Collateral Agent_**" shall have the meaning assigned to such term in the introductory paragraph to this Agreement.

"**_Notes Obligations_**" means the "Secured Obligations" as defined in the Notes Security Agreement.

"**_Notes Secured Parties_**" means the "Secured Parties" as defined in the Notes Security Agreement.

"**_Notes Security Agreement_**" means the Security Agreement dated as of the date hereof, by and among the Grantors party thereto and the Notes Collateral Agent from time to time party thereto, as the same may be further amended, restated, supplemented or modified from time to time.

"**_Other First Lien Agreement_**" means the indentures or other agreements under which Other First Lien Obligations of any Series are issued or incurred and all other instruments, agreements and other documents evidencing or governing Other First Lien Obligations of such Series or providing any guarantee, Lien or other right in respect thereof and shall include the Indenture.

"**_Other First Lien Obligations_**" shall means all obligations of the Company and the other Grantors that shall have been designated as such pursuant to Article III and shall include the Notes Obligations.

"**_Other First Lien Secured Party_**" means the holders of any Other First Lien Obligations and the corresponding Authorized Representative with respect thereto and shall include the Notes Secured Parties.

"**_Possessory Collateral_**" means any Common Collateral in the possession of the Collateral Agent (or its agents or bailees), to the extent that possession thereof perfects a Lien thereon under the Uniform Commercial Code of any jurisdiction or otherwise.  Possessory Collateral includes, without limitation, Certificated Securities, Negotiable Documents, Goods, Money, Instruments, and Tangible Chattel Paper, in each case, delivered to or in the possession of the Authorized Collateral Agent under the terms of the First Lien Security Documents. All capitalized terms used in this definition and not defined elsewhere in this Agreement have the meanings assigned to them in the New York UCC.

"**_Proceeds_**" shall have the meaning assigned to such term in Section 2.01(a).

"*Refinance*" means, in respect of any indebtedness, to refinance, extend, renew, defease, amend, increase, modify, supplement, restructure, refund, replace or repay, or to issue other indebtedness or enter alternative financing arrangements, in exchange or replacement for such indebtedness (in whole or in part), including by adding or replacing lenders, creditors, agents, borrowers and/or guarantors, and including in each case, but not limited to, after the original instrument giving rise to such indebtedness has been terminated and including, in each case, through any credit agreement, indenture or other agreement. "*Refinanced*" and "*Refinancing*" have correlative meanings.

"*Secured Credit Documents*" means (i) the Senior Term Loan and the Loan Documents (as defined in the Senior Term Loan), (ii) the Indenture and the [Secured Documents] (as defined in the Notes Security Agreement) and (iii) each Other First Lien Agreement.

"*Security Agreements*" means (i) the Senior Term Loan Security Agreement and (ii) the Notes Security Agreement.

"*Senior Term Loan*" means that certain senior term loan agreement, dated as of April 8, 2010 (as amended, restated, supplemented or otherwise modified, refinanced or replaced from time to time), among LyondellBasell Industries N.V. (the "*Company*"), LBI Escrow Corporation (the "*Borrower*"),[1] the guarantors party thereto, the lending institutions from time to time parties thereto, the Senior Term Loan Collateral Agent and the other parties thereto.

"*Senior Term Loan Collateral Agent*" shall have the meaning assigned to such term in the introductory paragraph hereof.

"*Senior Term Loan Obligations*" means the "Credit Agreement Obligations" as defined in the Senior Term Loan.

"*Senior Term Loan Secured Parties*" means the "Secured Parties" as defined in the Senior Term Loan.

"*Senior Term Loan Security Agreement*" means the Security Agreement dated as of the date hereof, by and among the Grantors party thereto and the Senior Term Loan Collateral Agent from time to time party thereto, as the same may be further amended, restated, supplemented or modified from time to time.

"*Series*" means (a) with respect to the First Lien Secured Parties, each of (i) the Senior Term Loan Secured Parties (in their capacities as such), (ii) the Notes Secured Parties (in their capacity as such) and (iii) the Other First Lien Secured Parties that become subject to this Agreement after the date hereof that are represented by a common Authorized Representative (in its capacity as such for such Other First Lien Secured Parties) and (b) with respect to any First

---

[1]    Discuss assumption by Lyondell Chemical Company.

Lien Obligations, each of (i) the Senior Term Loan Obligations, (ii) the Notes Obligations and (iii) the Other First Lien Obligations incurred pursuant to any Other First Lien Agreement, which pursuant to any Joinder Agreement, are to be represented hereunder by a common Authorized Representative (in its capacity as such for such Other First Lien Obligations).

"***Trigger Date***" means the date that is the earlier of the date upon which the outstanding principal amount of loans under the Senior Term Loan is (a) less than $750.0 million, if the aggregate principal amount of loans originally borrowed under the Senior Term Loan is at least $1,000.0 million, or (b) less than $500.0 million, if the aggregate principal amount of the loans originally borrowed under the Senior Term Loan is less than $1,000.0 million

ARTICLE II

**Priorities and Agreements with Respect to Common Collateral**

SECTION 2.01    ***Priority of Claims***.

(a)    Anything contained herein or in any of the Secured Credit Documents to the contrary notwithstanding (but subject to Section 1.01(b) of this Agreement), if an Event of Default has occurred and is continuing, and the Authorized Collateral Agent is taking action to enforce rights in respect of any Common Collateral, or any distribution is made in respect of any Common Collateral in any Bankruptcy Case of any Grantor or any First Lien Secured Party receives any payment pursuant to any intercreditor agreement (other than this Agreement) with respect to any Common Collateral, the proceeds of any sale, collection or other liquidation of any such Collateral by any First Lien Secured Party or received by the Senior Term Loan Collateral Agent, the Notes Collateral Agent or any First Lien Secured Party pursuant to any such intercreditor agreement with respect to such Common Collateral and proceeds of any such distribution (subject, in the case of any such distribution, to the sentence immediately following) to which the First Lien Obligations are entitled under any intercreditor agreement (other than this Agreement) (all proceeds of any sale, collection or other liquidation of any Collateral and all proceeds of any such distribution being collectively referred to as "***Proceeds***"), shall be applied as follows:

FIRST, to the payment of all reasonable costs and expenses incurred by the Collateral Agents or any Authorized Representative in connection with such collection or sale or otherwise in connection with this Agreement, or any other First Lien Security Document or any of the First Lien Obligations, including all court costs and the reasonable fees and expenses of their agents and legal counsel, the repayment of all advances made by the Collateral Agents or any Authorized Representative, as applicable, hereunder or under any other First Lien Security Document on behalf of Grantors and any other reasonable costs or expenses incurred in connection with the exercise of any right or remedy hereunder or under any other First Lien Security Document;

SECOND, to the payment of all other First Lien Obligations (the amounts so applied to be distributed pro rata among the First Lien Secured Parties in accordance with the amounts of the Obligations owed to them on the date of any such distribution); and

-8-

THIRD, after payment in full of all First Lien Obligations, to the Grantors or their successors or assigns, or as a court of competent jurisdiction may otherwise direct.

Notwithstanding the foregoing, with respect to any Common Collateral for which a third party (other than a First Lien Secured Party) has a lien or security interest that is junior in priority to the security interest of any Series of First Lien Obligations but senior (as determined by appropriate legal proceedings in the case of any dispute) to the security interest of any other Series of First Lien Obligations (such third party an "*Intervening Creditor*"), the value of any Common Collateral or Proceeds which are allocated to such Intervening Creditor shall be deducted on a ratable basis solely from the Common Collateral or Proceeds to be distributed in respect of the Series of First Lien Obligations with respect to which such Impairment exists.

(b)     The First Lien Secured Parties hereby acknowledge that the First Lien Obligations of any Series may, subject to the limitations set forth in the then extant Secured Credit Documents, be increased, extended, renewed, replaced, restated, supplemented, restructured, repaid, refunded, Refinanced or otherwise amended or modified from time to time, all without affecting the priorities set forth in Section 2.01(a) or the provisions of this Agreement defining the relative rights of the First Lien Secured Parties of any Series.

(c)     Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Liens securing any Series of First Lien Obligations granted on the Common Collateral and notwithstanding any provision of the Uniform Commercial Code of any jurisdiction, or any other applicable law or the Secured Credit Documents or any defect or deficiencies in the Liens securing the First Lien Obligations of any Series or any other circumstance whatsoever (but, in each case, subject to Section 1.01(b)), each First Lien Secured Party hereby agrees that the Liens securing each Series of First Lien Obligations on any Common Collateral shall be of equal priority.

SECTION 2.02     *Actions with Respect to Common Collateral; Prohibition on Contesting Liens*.

(a)     With respect to any Common Collateral, (i) notwithstanding Section 2.01, only the Authorized Collateral Agent shall act or refrain from acting with respect to the Common Collateral (including with respect to any intercreditor agreement with respect to any Common Collateral) and (ii) no other Collateral Agent with respect to First Lien Obligations or Non-Controlling Authorized Representative or other First Lien Secured Party (other than the Authorized Collateral Agent) shall or shall instruct the Authorized Collateral Agent to, commence any judicial or nonjudicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its security interest in or realize upon, or take any other action available to it in respect of, any Common Collateral (including with respect to any intercreditor agreement with respect to any Common Collateral), whether under any First Lien Security Document, applicable law or otherwise, it being agreed that only the Authorized Collateral Agent shall be entitled to take any such actions or exercise any such remedies with respect to Common Collateral (subject to the right of any such Authorized Representative or other First Lien Secured Party to take limited protective measures with respect to the Liens securing First Lien Obligations and to take certain actions that would be

-9-

permitted to be taken by unsecured creditors).  Notwithstanding the equal priority of the Liens securing each Series of First Lien Obligations, the Authorized Collateral Agent may deal with the Common Collateral as if such Authorized Collateral Agent had a senior Lien on such Common Collateral.  No Non-Controlling Authorized Representative or Non-Controlling Secured Party will contest, protest or object to any foreclosure proceeding or action brought by the Authorized Collateral Agent or the Controlling Secured Party or any other exercise by the Authorized Collateral Agent or the Controlling Secured Party of any rights and remedies relating to the Common Collateral, or to cause the Collateral Agent to do so.  The foregoing shall not be construed to limit the rights and priorities of any First Lien Secured Party, Senior Term Loan Collateral Agent, the Notes Collateral Agent or any Authorized Representative with respect to any Collateral not constituting Common Collateral.

(b)    Each of the First Lien Secured Parties and each of the Collateral Agents agrees that it will not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the perfection, priority, validity or enforceability of a Lien held by or on behalf of any of the First Lien Secured Parties in all or any part of the Collateral, or the provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair (i) the rights of any of the Collateral Agents or any Authorized Representative to enforce this Agreement or (ii) the rights of any First Lien Secured Party from contesting or supporting any other Person in contesting the enforceability of any Lien purporting to secure First Lien Obligations constituting unmatured interest pursuant to Section 502(b)(2) of the Bankruptcy Code.

SECTION 2.03    *No Interference; Payment Over*.

(a)    Each First Lien Secured Party agrees that (i) it will not challenge or question in any proceeding the validity or enforceability of any First Lien Obligations of any Series or any First Lien Security Document or the validity, attachment, perfection or priority of any Lien under any First Lien Security Document or the validity or enforceability of the priorities, rights or duties established by or other provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any First Lien Secured Party from challenging or questioning the validity or enforceability of any First Lien Obligations constituting unmatured interest or the validity of any Lien relating thereto pursuant to Section 502(b)(2) of the Bankruptcy Code, (ii) it will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other disposition of the Common Collateral by the Authorized Collateral Agent, (iii) except as provided in Section 2.02, it shall have no right to (A) direct the Authorized Collateral Agent or any other First Lien Secured Party to exercise any right, remedy or power with respect to any Common Collateral (including pursuant to any intercreditor agreement) or (B) consent to the exercise by the Authorized Collateral Agent or any other First Lien Secured Party of any right, remedy or power with respect to any Common Collateral, (iv) it will not institute any suit or assert in any suit, bankruptcy, insolvency or other proceeding any claim against the Authorized Collateral Agent or any other First Lien Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to any Common Collateral, and none of the Collateral Agents, any Authorized Collateral Agent or any other First Lien Secured Party shall be liable for any action taken or omitted

-10-

to be taken by the Authorized Collateral Agent or other First Lien Secured Party with respect to any Common Collateral in accordance with the provisions of this Agreement, (v) it will not seek, and hereby waives any right, to have any Common Collateral or any part thereof marshaled upon any foreclosure or other disposition of such Collateral and (vi) it will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any of the Collateral Agents or any other First Lien Secured Party to enforce this Agreement.

(b)    Each First Lien Secured Party hereby agrees that if it shall obtain possession of any Common Collateral or shall realize any proceeds or payment in respect of any such Common Collateral, pursuant to any First Lien Security Document or by the exercise of any rights available to it under applicable law or in any Insolvency or Liquidation Proceeding or through any other exercise of remedies (including pursuant to any intercreditor agreement), at any time prior to the Discharge of each of the First Lien Obligations, then it shall hold such Common Collateral, proceeds or payment in trust for the other First Lien Secured Parties and promptly transfer such Common Collateral, proceeds or payment, as the case may be, to the Authorized Collateral Agent, to be distributed by the Authorized Collateral Agent in accordance with the provisions of Section 2.01(a) hereof.

(c)    In furtherance of the foregoing, no Grantor shall, nor shall any Grantor permit any Subsidiary to, grant or permit or suffer to exist any Lien on any asset or property to secure any Series of First Lien Obligations unless it has granted a Lien on such asset or property to secure each other Series of First Lien Obligations; provided that a Lien on any such asset or property need not be granted if such Lien would be prohibited to be granted to secure Notes Obligations by the 3-16 Exemption (as defined in the Notes Security Agreement).

SECTION 2.04    *Automatic Release of Liens; Amendments to First Lien Security Documents.*

(a)    If, at any time any Common Collateral is transferred to a third party or otherwise disposed of, in each case, in connection with any enforcement by the Authorized Collateral Agent in accordance with the provisions of this Agreement, then (whether or not any Insolvency or Liquidation Proceeding is pending at the time) the Liens in favor of the First Lien Obligations upon such Common Collateral will automatically be released and discharged  upon final conclusion of foreclosure proceeding; provided that any proceeds of any Common Collateral realized therefrom shall be applied pursuant to Section 2.01 hereof.

(b)    Each First Lien Secured Party agrees that the Senior Term Loan Collateral Agent or the Notes Collateral Agent may enter into any amendment (and, upon request by the Collateral Agent, each Authorized Representative shall sign a consent to such amendment) to any First Lien Security Document (including, without limitation, to release Liens securing any Series of First Lien Obligations) so long as such amendment, subject to clause (d) below, is permitted by the terms of each then extant Secured Credit Document.  Additionally, each First Lien Secured Party agrees that the Senior Term Loan Collateral Agent or the Notes Collateral Agent may enter into any amendment (and, upon request by the Collateral Agent, each Authorized Representative shall sign a consent to such amendment) to any First Lien Security Document solely

-11-

as such First Lien Security Document relates to a particular Series of First Lien Obligations (including, without limitation, to release Liens securing such Series of First Lien Obligations) so long as (x) such amendment is in accordance with the Secured Credit Document pursuant to which such Series of First Lien Obligations was incurred and (y) such amendment does not adversely affect the First Lien Secured Parties of any other Series.

(c)    Each Authorized Representative agrees to execute and deliver (at the sole cost and expense of the Grantors) all such authorizations and other instruments as shall reasonably be requested by the Collateral Agent to evidence and confirm any release of Common Collateral or amendment to any First Lien Security Document provided for in this Section.

SECTION 2.05    ***Certain Agreements with Respect to Bankruptcy or Insolvency Proceedings***.

(a)    This Agreement shall continue in full force and effect notwithstanding the commencement of any proceeding under the Bankruptcy Code or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law by or against the Company or any of its subsidiaries.

(b)    If any Grantor shall become subject to a case (a "***Bankruptcy Case***") under the Bankruptcy Code and shall, as debtor(s)-in-possession, move for approval of financing ("***DIP Financing***") to be provided by one or more lenders (the "***DIP Lenders***") under Section 364 of the Bankruptcy Code or the use of cash collateral under Section 363 of the Bankruptcy Code, each First Lien Secured Party (other than any Controlling Secured Party or any Authorized Collateral Agent of any Controlling Secured Party) agrees that it will raise no objection to any such financing or to the Liens on the Common Collateral securing the same ("***DIP Financing Liens***") or to any use of cash collateral that constitutes Common Collateral, unless any Controlling Secured Party, or an Authorized Representative of any Controlling Secured Party, shall then oppose or object to such DIP Financing or such DIP Financing Liens or use of cash collateral (and (i) to the extent that such DIP Financing Liens are senior to the Liens on any such Common Collateral for the benefit of the Controlling Secured Parties, each Non-Controlling Secured Party will subordinate its Liens with respect to such Common Collateral on the same terms as the Liens of the Controlling Secured Parties (other than any Liens of any First Lien Secured Parties constituting DIP Financing Liens) are subordinated thereto, and (ii) to the extent that such DIP Financing Liens rank *pari passu* with the Liens on any such Common Collateral granted to secure the First Lien Obligations of the Controlling Secured Parties, each Non-Controlling Secured Party will confirm the priorities with respect to such Common Collateral as set forth herein), in each case so long as (A) the First Lien Secured Parties of each Series retain the benefit of their Liens on all such Common Collateral pledged to the DIP Lenders, including proceeds thereof arising after the commencement of such proceeding, with the same priority vis-a-vis all the other First Lien Secured Parties (other than any Liens of the First Lien Secured Parties constituting DIP Financing Liens) as existed prior to the commencement of the Bankruptcy Case, (B) the First Lien Secured Parties of each Series are granted Liens on any additional collateral pledged to any First Lien Secured Parties as adequate protection or otherwise in connection with such DIP Financing or use of cash collateral, with the same priority vis-a-vis the First Lien Secured Parties as set forth in this Agreement, (C) if any amount of such DIP Financing or cash collateral

-12-

is applied to repay any of the First Lien Obligations, such amount is applied pursuant to Section 2.01(a) of this Agreement, and (D) if any First Lien Secured Party is granted adequate protection, including in the form of periodic payments, in connection with such DIP Financing or use of cash collateral, the proceeds of such adequate protection is applied pursuant to Section 2.01(a) of this Agreement; <u>provided</u> that the First Lien Secured Parties of each Series shall have a right to object to the grant of a Lien to secure the DIP Financing over any Collateral subject to Liens in favor of the First Lien Secured Parties of such Series or its Authorized Representative that shall not constitute Common Collateral; and <u>provided</u>, <u>further</u>, that the First Lien Secured Parties receiving adequate protection shall not object to any other First Lien Secured Party receiving adequate protection comparable to any adequate protection granted to such First Lien Secured Parties in connection with a DIP Financing or use of cash collateral.

SECTION 2.06    **Reinstatement**.  In the event that any of the First Lien Obligations shall be paid in full and such payment or any part thereof shall subsequently, for whatever reason (including an order or judgment for disgorgement of a preference under Title 11 of the United Stated Code, or any similar law, or the settlement of any claim in respect thereof), be required to be returned or repaid, the terms and conditions of this Article II shall be fully applicable thereto until all such First Lien Obligations shall again have been paid in full in cash.

SECTION 2.07    **Insurance**.  As between the First Lien Secured Parties, the Authorized Collateral Agent shall have the right to adjust or settle any insurance policy or claim covering or constituting Common Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding affecting the Common Collateral.

SECTION 2.08    **Refinancings**.  The First Lien Obligations of any Series may be Refinanced, in whole or in part, in each case, without notice to, or the consent (except to the extent a consent is otherwise required to permit the refinancing transaction under any Secured Credit Document) of any First Lien Secured Party of any other Series, all without affecting the priorities provided for herein or the other provisions hereof; <u>provided</u> that the Authorized Representative of the holders of any such Refinancing indebtedness shall have executed a Joinder Agreement on behalf of the holders of such Refinancing indebtedness.

SECTION 2.09    ***Possessory or Control Collateral Agent***.

(a)    The Authorized Collateral Agent agrees to hold any Common Collateral constituting Possessory Collateral or Control Collateral that is part of the Collateral in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee or sub-agent, as applicable, for the benefit of each other First Lien Secured Party and any assignee solely for the purpose of perfecting the security interest granted in such Possessory Collateral or Control Collateral, if any, pursuant to the applicable First Lien Security Documents, in each case, subject to the terms and conditions of this Section 2.09.  Pending delivery to the Authorized Collateral Agent, each other Authorized Representative agrees to hold any Common Collateral constituting Possessory Collateral or Control Collateral, from time to time in its possession, as gratuitous bailee or sub-agent for the benefit of each other First Lien Secured Party and any assignee, solely for the purpose of perfecting the security interest granted in such Possessory Collateral, if any, pursuant to the applicable First Lien Security Documents, in each case, subject to the terms and conditions of this Section 2.09.

-13-

(b)    The duties or responsibilities of the Authorized Collateral Agent and each other Authorized Representative under this Section 2.09 shall be limited solely to holding any Common Collateral constituting Possessory Collateral and Control Collateral as gratuitous bailee or sub-agent, as applicable, for the benefit of each other First Lien Secured Party for purposes of perfecting the Lien held by such First Lien Secured Parties therein.

(c)    In furtherance of the foregoing, each Grantor hereby grants a security interest to the Authorized Collateral Agent in the Common Collateral constituting Possessory Collateral and Control Collateral to the extent such Authorized Collateral Agent possesses or controls such Common Collateral as permitted in Section 2.09(a) for the benefit of the First Lien Secured Parties under any Series of First Lien Obligations (other than the Series of First Lien Obligations for which the Authorized Collateral Agent is the collateral agent) which have been granted a Lien on such Common Collateral possessed or controlled by the Authorized Collateral Agent.

ARTICLE III

**Other First Lien Obligation**

The Company may from time to time, subject to any limitations contained in any Secured Credit Documents in effect at such time, designate additional indebtedness and related obligations that are, or are to be, secured by Liens on any assets of the Company or any of the Subsidiaries that would, if such Liens were granted, constitute Common Collateral as Other First Lien Obligations by delivering to each Collateral Agent party hereto at such time a certificate of an authorized officer of the Company:

(a)    describing the indebtedness and other obligations being designated as Other First Lien Obligations, and including a statement of the maximum aggregate outstanding principal amount of such indebtedness as of the date of such certificate;

(b)    setting forth the Other First Lien Obligations Agreements under which such Other First Lien Obligations are issued or incurred or the Guarantees of or Liens securing such Other First Lien Obligations are, or are to be, granted or created, and attaching copies of such Other First Lien Obligations Agreements as each Grantor has executed and delivered to the Person that serves as the collateral agent, collateral trustee or a similar representative for the holders of such Additional First Lien Obligations (such Person being referred to as the "***Additional Collateral Agent***") with respect to such Other First Lien Obligations on the closing date of such Other First Lien Obligations, certified as being true and complete by an authorized officer of the Company;

(c)    identifying the Person that serves as the Additional Collateral Agent;

(d)    certifying that the incurrence of such Other First Lien Obligations, the creation of the Liens securing such Other First Lien Obligations and the designation of such Other First Lien Obligations as "***Other First Lien Obligations***" hereunder do not violate or result in a default under any provision of any Secured Credit Document of any Class in effect at such time; and

-14-

(e)    attaching a fully completed Joinder Agreement executed and delivered by the Additional Collateral Agent.

Upon the delivery of such certificate and the related attachments as provided above, the obligations designated in such notice shall become Other First Lien Obligations for all purposes of this Agreement.

## ARTICLE IV

### Existence and Amounts of Liens and Obligations

Whenever the Authorized Collateral Agent or any Authorized Representative shall be required, in connection with the exercise of its rights or the performance of its obligations hereunder, to determine the existence or amount of any First Lien Obligations of any Series, or the Common Collateral subject to any Lien securing the First Lien Obligations of any Series, it may request that such information be furnished to it in writing by each other Authorized Representative and shall be entitled to make such determination on the basis of the information so furnished; provided, however, that if an Authorized Representative shall fail or refuse reasonably promptly to provide the requested information, the Authorized Collateral Agent or Authorized Representative shall be entitled to make any such determination or not make any determination by such method as it may, in the exercise of its good faith judgment, determine, including by reliance upon a certificate of the Company.  The Authorized Collateral Agent and each Authorized Representative may rely conclusively, and shall be fully protected in so relying, on any determination made by it in accordance with the provisions of the preceding sentence (or as otherwise directed by a court of competent jurisdiction) and shall have no liability to any Grantor, any First Lien Secured Party or any other person as a result of such determination.

## ARTICLE V

### The Authorized Collateral Agent

SECTION 5.01    *Authority*.

(a)    Notwithstanding any other provision of this Agreement, nothing herein shall be construed to impose any fiduciary or other duty on the Authorized Collateral Agent to any Non-Controlling Secured Party or give any Non-Controlling Secured Party the right to direct the Authorized Collateral Agent, except that the Authorized Collateral Agent shall be obligated to distribute proceeds of any Common Collateral in accordance with Section 2.01 hereof.

(b)    In furtherance of the foregoing, each Non-Controlling Authorized Representative acknowledges and agrees that the Authorized Collateral Agent shall be entitled, for the benefit of the First Lien Secured Parties, to sell, transfer or otherwise dispose of or deal with any Common Collateral as provided herein and in the First Lien Security Documents, as applicable, for which the Authorized Collateral Agent is the collateral agent of such Common Collateral, without regard to any rights to which the Non-Controlling Secured Parties would otherwise be entitled.  Without limiting the foregoing, each Non-Controlling Secured Parties agrees that the Authorized Collateral Agent and any other First Lien Secured Party shall not have any duty or

-15-

obligation first to marshal or realize upon any type of Common Collateral (or any other Collateral securing any of the First Lien Obligations), or to sell, dispose of or otherwise liquidate all or any portion of such Common Collateral (or any other Collateral securing any First Lien Obligations), in any manner that would maximize the return to the Non-Controlling Secured Parties, notwithstanding that the order and timing of any such realization, sale, disposition or liquidation may affect the amount of proceeds actually received by the Non-Controlling Secured Parties from such realization, sale, disposition or liquidation.  In addition, whether or not it is the Authorized Collateral Agent, no Collateral Agent or First Lien Secured Party shall have any duty or obligation first to marshal or realize upon any type of Collateral not constituting Common Collateral, or to sell, dispose of or otherwise liquidate all or any portion of such Collateral not constituting Common Collateral, in any manner that would maximize the return to the holders of any other Series of First Lien Obligations, notwithstanding that the order and timing of any such realization, sale, disposition or liquidation may affect the amount of proceeds actually received by the holders of any other Series of First Lien Obligations from such realization, sale, disposition or liquidation.  Each of the First Lien Secured Parties waives any claim it may now or hereafter have against any Collateral Agent or the Authorized Collateral Agent of any other Series of First Lien Obligations or any other First Lien Secured Party of any other Series arising out of (i) any actions which any Collateral Agent, the Authorized Collateral Agent or the First Lien Secured Parties take or omit to take (including, actions with respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, any of the Collateral and actions with respect to the collection of any claim for all or any part of the First Lien Obligations from any account debtor, guarantor or any other party) in accordance with the First Lien Security Documents or any other agreement related thereto or to the collection of the First Lien Obligations or the valuation, use, protection or release of any security for the First Lien Obligations, (ii) any election by the Authorized Collateral Agent or any holders of First Lien Obligations, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b) of the Bankruptcy Code or (iii) subject to Section 2.04, any borrowing by, or grant of a security interest or administrative expense priority under Section 364 of the Bankruptcy Code by, Holdings or any of its subsidiaries, as debtor-in-possession.  Notwithstanding any other provision of this Agreement, no Collateral Agent (including the Authorized Collateral Agent) shall accept any Common Collateral in full or partial satisfaction of any First Lien Obligations pursuant to Section 9-620 of the Uniform Commercial Code of any jurisdiction, without the consent of each of the Collateral Agents representing holders of First Lien Obligations for whom such Collateral constitutes Common Collateral.

        SECTION 5.02    ***Rights as a First Lien Secured Party***.  The Person serving as the Authorized Collateral Agent hereunder shall have the same rights and powers in its capacity as a First Lien Secured Party under any Series of First Lien Obligations that it holds as any other First Lien Secured Party of such Series and may exercise the same as though it were not the Collateral Agent and the term "First Lien Secured Party" or "First Lien Secured Parties" or (as applicable) "Senior Term Loan Secured Party", "Senior Term Loan Secured Parties", "Other First Lien Secured Party" or "Other First Lien Secured Parties" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Authorized Collateral Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Company or any Subsidiary or other Affiliate

-16-

thereof as if such Person were not the Authorized Collateral Agent hereunder and without any
duty to account therefor to any other First Lien Secured Party.

SECTION 5.03   ***Exculpatory Provisions***.

(a)   The Authorized Collateral Agent shall not have any duties or obligations
except those expressly set forth herein and in the other First Lien Security Documents.  Without
limiting the generality of the foregoing, the Authorized Collateral Agent:

(i)   shall not be subject to any fiduciary or other implied duties of any kind or
nature to any Person, regardless of whether an Event of Default has occurred and is con-
tinuing;

(ii)   shall not have any duty to take any discretionary action or exercise any
discretionary powers, except discretionary rights and powers expressly contemplated
hereby or by the other First Lien Security Documents; provided that the Authorized Col-
lateral Agent shall not be required to take any action that, in its opinion or the opinion of
its counsel, may expose the Authorized Collateral Agent to liability or that is contrary to
any First Lien Security Document or applicable law;

(iii)   shall not, except as expressly set forth herein and in the other First Lien
Security Documents, have any duty to disclose, and shall not be liable for the failure to
disclose, any information relating to the Company or any of its Affiliates that is commu-
nicated to or obtained by the Person serving as the Authorized Collateral Agent or any of
its Affiliates in any capacity;

(iv)   shall not be liable for any action taken or not taken by it (i) with the con-
sent or at the request of the Major Non-Controlling Authorized Representative or (ii) in
the absence of its own gross negligence or willful misconduct or (iii) in reliance on a cer-
tificate of an authorized officer of the Company stating that such action is permitted by
the terms of this Agreement.  The Authorized Collateral Agent shall be deemed not to
have knowledge of any Event of Default under any Series of First Lien Obligations
unless and until notice describing such Event Default is given to the Authorized Collat-
eral Agent by the Authorized Representative of such First Lien Obligations or the Com-
pany;

(v)   shall not be responsible for or have any duty to ascertain or inquire into (i)
any statement, warranty or representation made in or in connection with this Agreement
or any other First Lien Security Document, (ii) the contents of any certificate, report or
other document delivered hereunder or thereunder or in connection herewith or therewith,
(iii) the performance or observance of any of the covenants, agreements or other terms or
conditions set forth herein or therein or the occurrence of any Default, (iv) the validity,
enforceability, effectiveness or genuineness of this Agreement, any other First Lien Secu-
rity Document or any other agreement, instrument or document, or the creation, perfec-
tion or priority of any Lien purported to be created by the First Lien Security Documents,
(v) the value or the sufficiency of any Collateral for any Series of First Lien Obligations,
or (v) the satisfaction of any condition set forth in any Secured Credit Document, other

-17-

than to confirm receipt of items expressly required to be delivered to the Authorized Collateral Agent;

(vi)      shall not have any fiduciary duties or contractual obligations of any kind or nature under any Other First Lien Agreement (but shall be entitled to all protections provided to the Authorized Collateral Agent therein);

(vii)      with respect to the Senior Term Loan, any Other First Lien Agreement or any First Lien Security Document, may conclusively assume that the Grantors have complied with all of their obligations thereunder unless advised in writing by the Authorized Representative thereunder to the contrary specifically setting forth the alleged violation; and

(viii)      may conclusively rely on any certificate of an officer of the Company.

(b)      Each Secured Party acknowledges that, in addition to acting as the initial Authorized Collateral Agent, UBS AG, Stamford Branch also serves as Administrative Agent under the Senior Term Loan and each First Lien Secured Party hereby waives any right to make any objection or claim against UBS AG, Stamford Branch (or any successor Authorized Collateral Agent or any of their respective counsel) based on any alleged conflict of interest or breach of duties arising from the Authorized Collateral Agent also serving as the Administrative Agent.

SECTION 5.04      *Reliance by Authorized Collateral Agent*.  The Authorized Collateral Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Authorized Collateral Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  The Authorized Collateral Agent may consult with legal counsel (who may include, but shall not be limited to counsel for the Company or counsel for the Administrative Agent), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

SECTION 5.05      *Delegation of Duties*.  The Authorized Collateral Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other First Lien Security Document by or through any one or more sub-agents appointed by the Authorized Collateral Agent.  The Authorized Collateral Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Affiliates of the Authorized Collateral Agent and any such sub-agent.

SECTION 5.06      *Non-Reliance on Authorized Collateral Agent and Other First Lien Secured Parties*.  Each First Lien Secured Party acknowledges that it has, independently and without reliance upon the Authorized Collateral Agent, any Authorized Representative or any other First Lien Secured Party or any of their Affiliates and based on such documents and

-18-

information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and the other Secured Credit Documents.  Each First Lien Secured Party also acknowledges that it will, independently and without reliance upon the Authorized Collateral Agent, any Authorized Representative or any other First Lien Secured Party or any of their Affiliates and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Secured Credit Document or any related agreement or any document furnished hereunder or thereunder.

ARTICLE VI

**Miscellaneous**

SECTION 6.01    ***Notices***.  All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

      (a)    if to the Senior Term Loan Collateral Agent, to it at:

      UBS AG, Stamford Branch
      [                    ]
      [                    ]
      [                    ]
      Attention:  [                    ]
      Telephone:  [                    ]
      Telecopier:  [                    ]
      E-mail:  [                    ];

      (b)    if to the Notes Collateral Agent, to it at:

      [                    ]
      [                    ]
      [                    ]
      [                    ]
      Attention:  [                    ]
      Telephone:  [                    ]
      Telecopier:  [                    ]
      E-mail:  [                    ];

      (c)    if to any Additional Collateral Agent, to it at the address set forth in the applicable Joinder Agreement.

Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt (if a Business Day) and on the next Business Day thereafter (in all other cases) if delivered by hand or overnight courier service or sent by telecopy or on

the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 6.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 6.01.  As agreed to in writing among the Authorized Collateral Agent and each Authorized Representative from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable person provided from time to time by such person.

SECTION 6.02    *Waivers; Amendment; Joinder Agreements*.

(a)    No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on any party hereto in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

(b)    Neither this Agreement nor any provision hereof may be terminated, waived, amended or modified (other than pursuant to any Joinder Agreement) except pursuant to an agreement or agreements in writing entered into by each Authorized Representative.

(c)    Notwithstanding the foregoing, without the consent of any First Lien Secured Party, any Authorized Representative may become a party hereto by execution and delivery of a Joinder Agreement in the form of Exhibit A hereto and upon such execution and delivery, such Authorized Representative and the Other First Lien Secured Parties and Other First Lien Obligations of the Series for which such Authorized Representative is acting shall be subject to the terms hereof and the terms of the other First Lien Security Documents applicable thereto.

SECTION 6.03    *Parties in Interest*.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, as well as the other First Lien Secured Parties, all of whom are intended to be bound by, and to be third party beneficiaries of, this Agreement.

SECTION 6.04    *Survival of Agreement*.  All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.

SECTION 6.05    *Counterparts*.  This Agreement may be executed in counterparts, each of which shall constitute an original but all of which when taken together shall consti-

-20-

tute a single contract.  Delivery of an executed signature page to this Agreement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

SECTION 6.06    *Severability*.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 6.07    *Governing Law*.  This Agreement shall be construed in accordance with and governed by the laws of the State of New York.

SECTION 6.08    *Submission to Jurisdiction; Waivers*.  The Senior Term Loan Collateral Agent, the Notes Collateral Agent and each Authorized Representative, on behalf of itself and the First Lien Secured Parties of the Series for whom it is acting, irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement and the First Lien Security Documents, or for recognition and enforcement of any judgment in respect thereof, to the exclusive general jurisdiction of the state and federal courts located in New York County and appellate courts from any thereof;

(b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person (or its Authorized Representative) at the address referred to in Section 6.01;

(d)    agrees that nothing herein shall affect the right of any other party hereto (or any First Lien Secured Party) to effect service of process in any other manner permitted by law; and

(e)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 6.08 any special, exemplary, punitive or consequential damages.

SECTION 6.09    *WAIVER OF JURY TRIAL*.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION

DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTA-TIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EX-PRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) AC-KNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 6.09.

> SECTION 6.10     **Headings**.  Article, Section and Annex headings used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

> SECTION 6.11     **Conflicts**.  In the event of any conflict or inconsistency be-tween the provisions of this Agreement and the provisions of any of the other Secured Credit Documents or First Lien Security Documents, the provisions of this Agreement shall control.

> SECTION 6.12     **Provisions Solely to Define Relative Rights**.  The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Lien Secured Parties in relation to one another.  None of the Company, any other Grantor or any other creditor thereof shall have any rights or obligations hereunder, except as expressly provided in this Agreement (provided that nothing in this Agreement (other than Section 2.04, 2.05, 2.06, 2.08 or 2.09 or this Article VI) is intended to or will amend, waive or otherwise mod-ify the provisions of the Senior Term Loan or any Other First Lien Agreements), and none of the Company or any other Grantor may rely on the terms hereof (other than Sections 2.04, 2.05, 2.08 and 2.09 and Article V).  Nothing in this Agreement is intended to or shall impair the obligations of any Grantor, which are absolute and unconditional, to pay the First Lien Obligations as and when the same shall become due and payable in accordance with their terms.

> SECTION 6.13     **Integration**. This Agreement together with the other Secured Credit Documents and the First Lien Security Documents represents the agreement of each of the Grantors and the First Lien Secured Parties with respect to the subject matter hereof and there are no promises, undertakings, representations or warranties by any Grantor, the Authorized Collat-eral Agent, any Authorized Representative or any other First Lien Secured Party relative to the subject matter hereof not expressly set forth or referred to herein or in the other Secured Credit Documents or the First Lien Security Documents.

> [Remainder of this page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**UBS AG, STAMFORD BRANCH**,
as Senior Term Loan Collateral Agent

By: _____
     Name:
     Title:

**DEUTSCHE BANK TRUST COMPANY AMERICAS**,
as Notes Collateral Agent

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

Acknowledged and Agreed:

[Each Grantor]


By: _____
      Name:
      Title:

EXHIBIT A

[FORM OF] JOINDER AGREEMENT NO. [ ] dated as of [      ], 20[  ] (the "Joinder Agreement") to the FIRST LIEN INTERCREDITOR AGREEMENT dated as of [            ], 20[  ] (the "Intercreditor Agreement"), among [               ], as the Senior Term Loan Collateral Agent, DEUTSCHE BANK TRUST COMPANY AMERICAS, as the Notes Collateral Agent, and each ADDITIONAL COLLATERAL AGENT from time to time party thereto.

A.    Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

B.    The Company proposes to issue or incur Other First Lien Obligations and the Person identified in the signature pages hereto as the "Additional Collateral Agent" (the "Additional Collateral Agent") will serve as the collateral agent, collateral trustee or a similar representative for the Additional Secured Parties.  The Other First Lien Obligations are being designated as such by the Company in accordance with Article III of the First Lien Intercreditor Agreement.

C.    The Additional Collateral Agent wishes to become a party to the First Lien Intercreditor Agreement and to acquire and undertake, for itself and on behalf of the Other First Lien Secured Parties, the rights and obligations of an "Additional Collateral Agent" thereunder. The Additional Collateral Agent is entering into this Joinder Agreement in accordance with the provisions of the First Lien Intercreditor Agreement in order to become an Additional Collateral Agent thereunder.

Accordingly, the Additional Collateral Agent and the Company agree as follows, for the benefit of the Additional Collateral Agent, the Borrower and each other party to the First Lien Intercreditor Agreement:

SECTION 1.  Accession to the Intercreditor Agreement.  The Additional Collateral Agent (a) hereby accedes and becomes a party to the First Lien Intercreditor Agreement as an Additional Collateral Agent for the Other Secured Parties from time to time in respect of the Additional First Lien Obligations, (b) agrees, for itself and on behalf of the Other Secured Parties from time to time in respect of the Additional First Lien Obligations, to all the terms and provisions of the First Lien Intercreditor Agreement and (c) shall have all the rights and obligations of an Additional Collateral Agent under the First Lien Intercreditor Agreement.

SECTION 2.  Representations, Warranties and Acknowledgement of the Additional Collateral Agent.  The Additional Collateral Agent represents and warrants to the Collateral Agents and the Secured Parties that (a) it has full power and authority to enter into this Joinder Agreement, in its capacity as the Additional Collateral Agent, (b) this Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of this Joinder Agreement and (c) the Other First Lien Obligations Documents relating to such Other First Lien Obligations provide that, upon the Additional Collateral Agent's entry into this Joinder Agreement, the secured par-

ties in respect of such Other First Lien Obligations will be subject to and bound by the provisions of the First Lien Intercreditor Agreement as Additional Secured Parties.

SECTION 3.  Counterparts.  This Joinder Agreement may be executed in multiple counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Joinder Agreement shall become effective when each Collateral Agent shall have received a counterpart of this Joinder Agreement that bears the signature of the Additional Collateral Agent.  Delivery of an executed signature page to this Joinder Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually signed counterpart of this Joinder Agreement.

SECTION 4.  Benefit of Agreement.  **The agreements set forth herein or undertaken pursuant hereto are for the benefit of, and may be enforced by, any party to the First Lien Intercreditor Agreement.**

SECTION 5.  Governing Law.  **THIS JOINDER AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

SECTION 6.  Severability.  In case any one or more of the provisions contained in this Joinder Agreement should be held invalid, illegal or unenforceable in any respect, none of the parties hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the First Lien Intercreditor Agreement shall not in any way be affected or impaired.  The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.  Notices.  All communications and notices hereunder shall be in writing and given as provided in Section 5.01 of the First Lien Intercreditor Agreement.  All communications and notices hereunder to the Additional Collateral Agent shall be given to it at the address set forth under its signature hereto, which information supplements Section 5.01 of the First Lien Intercreditor Agreement.

SECTION 8.  The Company agrees to reimburse each Collateral Agent for its reasonable out-of-pocket expenses in connection with this Joinder Agreement, including the reasonable fees, other charges and disbursements of counsel for each Collateral Agent.

IN WITNESS WHEREOF, the Additional Collateral Agent has duly executed this Joinder Agreement to the First Lien Intercreditor Agreement as of the day and year first above written.

[NAME OF ADDITIONAL COLLATERAL AGENT], as ADDITIONAL COLLATERAL AGENT for the OTHER FIRST LIEN SECURED PARTIES

By: _____

    Name:

    Title:

Address for notices:

_____

_____

attention of: _____

Telecopy: _____

Exhibit A-3

Acknowledged by:

UBS AG, STAMFORD BRANCH, as
Senior Term Loan Collateral Agent


By:    _____
       Name:
       Title:


By:    _____
       Name:
       Title:


DEUTSCHE BANK TRUST COMPANY AMERICAS,
as Notes Collateral Agent


By:    _____
       Name:
       Title:


By:    _____
       Name:
       Title:


[EACH OTHER ADDITIONAL
COLLATERAL AGENT], as Additional
Collateral Agent


By:    _____
       Name:
       Title:

EXHIBIT B

[FORM OF] GRANTOR JOINDER AGREEMENT NO. [ ] dated as of [      ], 20[  ] (the "Joinder Agreement") to the FIRST LIEN INTERCREDITOR AGREEMENT dated as of [          ], 20[  ] (the "First Lien Intercreditor Agreement"), among LYON-DELLBASELL INDUSTRIES N.V., a Dutch corporation limited by shares (the "Company"), the GRANTORS party thereto, UBS AG, STAMFORD BRANCH, as Senior Term Loan Collateral Agent, DEUTSCHE BANK TRUST COMPANY AMERICAS, as Notes Collateral Agent, each ADDITIONAL COLLATERAL AGENT from time to time party thereto and [            ], a [            ], as an additional GRANTOR.

A.     Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the First Lien Intercreditor Agreement.

B.     [        ], a Subsidiary of the Borrower (the "Additional Grantor"), has granted a Lien on all or a portion of its assets to secure First Lien Obligations and such Additional Grantor is not a party to the First Lien Intercreditor Agreement.

C.     The Additional Grantor wishes to become a party to the First Lien Intercreditor Agreement and to acquire and undertake the rights and obligations of a Grantor thereunder.  The Additional Grantor is entering into this Joinder Agreement in accordance with the provisions of the First Lien Intercreditor Agreement in order to become a Grantor thereunder.

Accordingly, the Additional Grantor agrees as follows, for the benefit of the Collateral Agents, the Borrower and each other party to the First Lien Intercreditor Agreement:

SECTION 1.  Accession to the Intercreditor Agreement.  In accordance with Article III of the First Lien Intercreditor Agreement, the Additional Grantor (a) hereby accedes and becomes a party to the First Lien Intercreditor Agreement as a Grantor with the same force and effect as if originally named therein as a Grantor, (b) agrees to all the terms and provisions of the First Lien Intercreditor Agreement and (c) shall have all the rights and obligations of a Grantor under the First Lien Intercreditor Agreement.

SECTION 2.  Representations, Warranties and Acknowledgment of the Additional Grantor.  The Additional Grantor represents and warrants to each Collateral Agent and each Secured Party that this Joinder Agreement has been duly authorized, executed and delivered by such Additional Grantor and constitutes the legal, valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.  Counterparts.  This Joinder Agreement may be executed in multiple counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Joinder Agreement shall become effective when each Collateral Agent shall have received a counterpart of this Joinder Agreement that bears the signature of the Additional Grantor.  Delivery of an executed signature page to this Joinder Agreement

Exhibit B-1

by facsimile or other electronic transmission shall be effective as delivery of a manually signed counterpart of this Joinder Agreement.

SECTION 4.  Benefit of Agreement.  **The agreements set forth herein or undertaken pursuant hereto are for the benefit of, and may be enforced by, any party to the First Lien Intercreditor Agreement.**

SECTION 5.  Governing Law.  **THIS JOINDER AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

SECTION 6.  Severability.  In case any one or more of the provisions contained in this Joinder Agreement should be held invalid, illegal or unenforceable in any respect, none of the parties hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the First Lien Intercreditor Agreement shall not in any way be affected or impaired.  The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.  Notices.  All communications and notices hereunder shall be in writing and given as provided in Section 6.01 of the First Lien Intercreditor Agreement.

SECTION 8.  The Additional Grantor agrees to reimburse each Collateral Agent for its reasonable out-of-pocket expenses in connection with this Joinder Agreement, including the reasonable fees, other charges and disbursements of counsel for each Collateral Agent.

IN WITNESS WHEREOF, the Additional Grantor has duly executed this Joinder Agreement to the First Lien Intercreditor Agreement as of the day and year first above written.

[NAME OF SUBSIDIARY]


By:    _____
       Name:
       Title:

Acknowledged by:

UBS AG, STAMFORD BRANCH, as
Senior Term Loan Collateral Agent


By: _____
         Name:
         Title:


DEUTSCHE BANK TRUST COMPANY AMERICAS,
as Notes Collateral Agent


By: _____
         Name:
         Title:


[EACH OTHER ADDITIONAL
COLLATERAL AGENT], as Additional
Collateral Agent


By: _____
         Name:
         Title:

**TAB 16-E**

INTERCREDITOR AGREEMENT

dated as of April [30], 2010

among

LYONDELL BASELL INDUSTRIES N.V.,
LYONDELL CHEMICAL COMPANY,
the other GRANTORS from time to time party hereto,

CITIBANK, N.A.,
as ABL Facility Agent
under the ABL Credit Agreement,

UBS AG, STAMFORD BRANCH,
as Collateral Agent
under the Term Credit Agreement,

DEUTSCHE BANK TRUST COMPANY AMERICAS,
as Collateral Agent
under the Notes Security Documents,

and

[                    ],
as Collateral Agent
under the Junior Lien Security Documents

## Table of Contents

Page

Section 1.          Definitions. ...................................................................................... 2

    1.1.    Defined Terms.................................................................................. 2
    1.2.    Terms Generally.............................................................................. 17

Section 2.          Notes Collateral. ............................................................................. 17

    2.1.    Lien Priorities................................................................................. 17
    2.2.    Exercise of Remedies ..................................................................... 20
    2.3.    Payments Over ................................................................................ 26
    2.4.    Other Agreements ........................................................................... 27
    2.5.    Insolvency or Liquidation Proceedings .......................................... 35
    2.6.    Reliance; Waivers; Etc. .................................................................. 39
    2.7.    Effectiveness of First Lien Intercreditor Agreement...................... 43

Section 3.          ABL Facility Collateral. ................................................................. 43

    3.1.    Lien Priorities................................................................................. 43
    3.2.    Exercise of Remedies ..................................................................... 45
    3.3.    Payments Over ................................................................................ 52
    3.4.    Other Agreements ........................................................................... 52
    3.5.    Insolvency or Liquidation Proceedings .......................................... 61
    3.6.    Reliance; Waivers; Etc. .................................................................. 65

Section 4.          Cooperation With Respect To ABL Facility Collateral. ................... 69

    4.1.    Consent to License to Use Intellectual Property............................. 69
    4.2.    Access to Information...................................................................... 69
    4.3.    Access to Property to Process and Sell Inventory........................... 69
    4.4.    First Priority Collateral Agents Assurances ................................... 72
    4.5.    Grantor Consent ............................................................................. 72

Section 5.          Application of Proceeds. ................................................................. 73

    5.1.    Application of Proceeds in Distributions by the Authorized First Priority
            Collateral Agent ............................................................................. 73
    5.2.    Application of Proceeds in Distributions by the ABL Facility Agent. ....... 74

Section 6.          Miscellaneous. ............................................................................... 76

    6.1.    Conflicts.......................................................................................... 76
    6.2.    Effectiveness; Continuing Nature of This Agreement; Severability............ 76
    6.3.    Amendments; Waivers .................................................................... 77

Page

6.4.    Information Concerning Financial Condition of Holdings and Its
           Subsidiaries ................................................................................... 77
6.5.    Submission to Jurisdiction; Waivers ....................................................... 78
6.6.    Notices ..................................................................................................... 79
6.7.    Further Assurances .................................................................................. 79
6.8.    APPLICABLE LAW ............................................................................... 80
6.9.    Binding on Successors and Assigns ....................................................... 80
6.10.   Specific Performance .............................................................................. 80
6.11.   Headings .................................................................................................. 80
6.12.   Counterparts ............................................................................................ 80
6.13.   Authorization; No Conflict ..................................................................... 80
6.14.   No Third Party Beneficiaries .................................................................. 80
6.15.   Provisions Solely to Define Relative Rights ........................................... 81
6.16.   Additional Grantors ................................................................................. 81
6.17.   Avoidance Issues ..................................................................................... 81
6.18.   Intercreditor Agreement ......................................................................... 82

Exhibit A       Form of Intercreditor Agreement Joinder

This INTERCREDITOR AGREEMENT is dated as of April [30], 2010 and is by and among LYONDELL BASELL INDUSTRIES N.V., a public limited liability company formed under the laws of the Netherlands ("Holdings"), LYONDELL CHEMICAL COMPANY, a Delaware corporation (the "Company"), the other GRANTORS (as defined in Section 1.1) from time to time party hereto, CITIBANK, N.A., as ABL Facility Agent (as defined below), UBS AG, STAMFORD BRANCH, as Term Collateral Agent (as defined below) and DEUTSCHE BANK TRUST COMPANY AMERICAS, as Notes Collateral Agent (as defined below) and [            ], as Junior Lien Collateral Agent (as defined below).

RECITALS:

WHEREAS, certain of the Grantors have entered into a Credit Agreement, dated as of April 8, 2010 (as amended, supplemented, amended and restated or otherwise modified and in effect from time to time, the "ABL Credit Agreement"), among Holdings, the Company, as borrower, the other borrowers party thereto, the lenders from time to time party thereto (the "ABL Lenders"), Citibank, N.A., as administrative agent (in such capacity and together with its successors and assigns in such capacity, the "ABL Facility Agent") and the other agents party thereto;

WHEREAS, pursuant to the various ABL Documents, Grantors have provided guarantees and security for the ABL Obligations;

WHEREAS, certain of the Grantors have entered into a Credit Agreement, dated as of April 8, 2010 (as amended, supplemented, amended and restated or otherwise modified and in effect from time to time, the "Term Credit Agreement" and, together with the ABL Credit Agreement, the "Credit Agreements"), among Holdings, the Company, as a borrower (in such capacity, the "Term Borrower"), the guarantors party thereto, the lenders from time to time party thereto (the "Term Lenders" and, together with the ABL Lenders, the "Lenders"), UBS AG, Stamford Branch, as administrative agent (in such capacity and together with its successors and assigns in such capacity, the "Term Administrative Agent" and, together with the ABL Facility Agent, the "Administrative Agents") and as deposit bank, UBS AG, Stamford Branch, as collateral agent (in such capacity and together with its successors and assigns in such capacity, the "Term Collateral Agent");

WHEREAS, pursuant to the various Term Documents, Grantors have provided guarantees and security for the Term Obligations;

WHEREAS, the Company is party to an Indenture dated as of April 8, 2010 (as amended, restated, supplemented, waived, Refinanced or otherwise modified from time to time, the "Indenture"), among the Company (as successor by merger to LBI Escrow Corporation), the guarantors identified therein and Deutsche Bank Trust Company Americas, as trustee (in such capacity and together with its successors and assigns in such capacity, the "Trustee"), and as collateral agent for the holders of Notes Obligations (in such capacity and together with its successors and assigns in such capacity, the "Notes Collateral Agent");

WHEREAS, pursuant to the various Notes Documents, Grantors have provided guarantees and security for the Notes Obligations;

WHEREAS, the Company is party to an Indenture dated as of [      ], 2010 (as amended, restated, supplemented, waived, Refinanced or otherwise modified from time to time, the "<u>Junior Lien Indenture</u>"), among the Company, the guarantors identified therein and [         ], as trustee (in such capacity and together with its successors and assigns in such capacity, the "<u>Junior Lien Trustee</u>"), and as collateral agent for the holders of Notes Obligations (in such capacity and together with its successors and assigns in such capacity, the "<u>Junior Lien Collateral Agent</u>" and, together with the ABL Facility Agent, the Term Collateral Agent and the Notes Collateral Agent the "<u>Collateral Agents</u>" and together with the Administrative Agents, the Trustee and the Junior Lien Trustee the "<u>Agents</u>");

WHEREAS, pursuant to the various Junior Lien Documents, Grantors have provided guarantees and security for the Junior Lien Obligations;

WHEREAS, the Company and the other Grantors intend to secure the ABL Obligations under the ABL Credit Agreement and any other ABL Documents (including any Permitted Refinancing thereof) with a First Priority Lien on the ABL Facility Collateral and a Second Priority Lien on the Notes Collateral;

WHEREAS, the Company and the other Grantors intend to secure the Term Obligations under the Term Credit Agreement and any other Term Documents (including any Permitted Refinancing thereof) with a First Priority Lien on the Notes Collateral and a Second Priority Lien on the ABL Facility Collateral;

WHEREAS, the Company and the other Grantors intend to secure the Notes Obligations under the Indenture and any other Notes Documents (including any Permitted Refinancing thereof) with a First Priority Lien on the Notes Collateral and a Second Priority Lien on the ABL Facility Collateral; and

WHEREAS, the Company and the other Grantors intend to secure the Junior Lien Obligations under the Junior Lien Indenture and any other Junior Lien Documents with a Third Priority Lien on the Notes Collateral and a Third Priority Lien on the ABL Facility Collateral.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

Section 1.    <u>Definitions</u>.

1.1.    <u>Defined Terms</u>.  The following terms when used in this Agreement, including its preamble and recitals, shall have the following meanings:

"<u>ABL Credit Agreement</u>" shall have the meaning set forth in the recitals hereto.

"<u>ABL Documents</u>" shall mean the ABL Credit Agreement and the Loan Documents (as defined in the ABL Credit Agreement) and each of the other agreements, documents and instruments providing for or evidencing any ABL Obligations (including any Permitted Refinancing of any ABL Obligations), and any other document or instrument executed or delivered at any time in connection with any ABL Obligations (including any Permitted Refinancing of

any ABL Obligations), together with any amendments, replacements, modifications, extensions, renewals or supplements to, or restatements of, any of the foregoing.

"ABL Facility Agent" shall have the meaning set forth in the recitals hereto and includes any New ABL Agent to the extent set forth in Section 3.4(g).

"ABL Facility Collateral" shall mean any and all present and future right, title and interest of the Borrowers in and to the following, whether now owned or hereafter acquired, existing or arising, and wherever located: (a) all accounts, chattel paper and other Receivables (as defined under the ABL Credit Agreement); (b) all Inventory; (c) all Restricted Accounts (as defined under the ABL Credit Agreement), including all funds credited thereto or deposited therein, and all related instruments and other evidences of indebtedness; (d) to the extent evidencing, governing, securing or otherwise related to the items referred to in the preceding clauses (a), (b) and (c) of this definition, all related contracts, contract rights, documents, payment intangibles and other claims or causes of action; (e) all books and records relating to the foregoing; and (f) all proceeds of any and all of the foregoing; provided that (x) any of the foregoing constituting identifiable Proceeds of Notes Collateral shall be deemed Notes Collateral, (y) any contract rights, claims, supporting obligations or other general intangibles primarily relating to Notes Collateral or rights of payment primarily related to Notes Collateral shall be deemed Notes Collateral to the extent of such assets primarily related to Notes Collateral and (z) for the avoidance of doubt, Intellectual Property and Pledged Equity Interests and Pledged Debt shall be deemed Notes Collateral. Terms used in the foregoing definition which are defined in the UCC and not otherwise defined in this Agreement have the meanings specified in the UCC.

"ABL Facility Collateral Enforcement Actions" shall have the meaning set forth in Section 4.3(a).

"ABL Facility Collateral Processing and Sale Period" shall have the meaning set forth in Section 4.3(a).

"ABL Facility Lien" shall have the meaning set forth in Section 3.4(a)(iv).

"ABL Lenders" shall have the meaning set forth in the recitals hereto.

"ABL Obligations" shall mean all obligations (including guaranty obligation) of every nature of each Grantor from time to time owed to the ABL Secured Parties or any of them, under any ABL Document (including any ABL Document in respect of a Permitted Refinancing of any ABL Obligations), whether for principal, premium, interest (including interest which, but for the filing of a petition in bankruptcy with respect to Holdings or any of its Subsidiaries, would have accrued on any ABL Obligation (including any Permitted Refinancing of any ABL Obligations), whether or not a claim is allowed against such Person for such interest in the related bankruptcy proceeding), reimbursement of amounts drawn under (and obligations to cash collateralize) letters of credit and bank guaranties, fees, expenses, indemnification or otherwise.

"ABL Permitted Liens" shall mean the "Permitted Liens" under, and as defined in, the ABL Credit Agreement.

-3-

"ABL Secured Parties" shall mean the lenders (including, in any event, each letter of credit issuer and each swingline lender) and agents under the ABL Credit Agreement and all new ABL Secured Parties to the extent set forth in Section 3.4(g).

"ABL Security Agreement" shall mean collectively the Security Agreements (as defined in the ABL Credit Agreement).

"ABL Security Documents" shall mean the ABL Security Agreement and the other Collateral Documents (as defined in the ABL Credit Agreement) and any other agreement, document or instrument pursuant to which a Lien is granted securing any ABL Obligations (including any Permitted Refinancing of any ABL Obligations) or under which rights or remedies with respect to such Liens are governed, together with any amendments, replacements, modifications, extensions, renewals or supplements to, or restatements of, any of the foregoing.

"ABL Standstill Period" shall have the meaning set forth in Section 3.2(a).

"Additional First Lien Agreement" shall mean any agreement covering any additional indebtedness issued by the Company constituting secured obligations under the First Priority Documents (pursuant to a joinder agreement to the First Lien Intercreditor Agreement), to the extent such secured indebtedness is permitted to be incurred in accordance with the Indenture, the Term Credit Agreement and the ABL Credit Agreement and the terms of such joinder agreement subject the agent and the holders of such indebtedness to the terms of this Agreement.

"Additional Junior Lien Agreement" shall mean any agreement covering any additional indebtedness issued by the Company constituting secured obligations under the Junior Lien Documents (pursuant to a joinder agreement thereto), to the extent such secured indebtedness is permitted to be incurred in accordance with the Junior Lien Indenture, the Indenture, the Term Credit Agreement and the ABL Credit Agreement and the terms of such joinder agreement subject the agent and the holders of such indebtedness to the terms of this Agreement.

"Administrative Agents" shall have the meaning set forth in the recitals hereto.

"Agents" shall have the meaning set forth in the recitals hereto.

"Agreement" shall mean this Intercreditor Agreement as the same may be amended, modified, restated and/or supplemented from time to time in accordance with its terms.

"Authorized First Priority Collateral Agent" means the "Authorized Collateral Agent" as defined in the First Lien Intercreditor Agreement.

"Bankruptcy Code" shall mean Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Bankruptcy Law" shall mean the Bankruptcy Code, and any similar federal or state or non-U.S. law or statute for the supervision, administration or relief of debtors, including, without limitation, bankruptcy or insolvency laws.

-4-

"Business Day" shall mean any day except Saturday, Sunday and any day which shall be in New York, New York, a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close.

"Capital Stock" means:

(1)     in the case of a corporation, corporate stock or shares;

(2)     in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)     in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)     any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"Capitalized Lease Obligations" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP

"Collateral" shall mean all property (whether real, personal, movable or immovable) with respect to which any security interests have been granted (or purported to be granted) by any Grantor pursuant to any ABL Security Document, Term Security Document, Notes Security Document or Junior Lien Security Document.

"Collateral Agents" shall have the meaning set forth in the recitals hereto.

"Company" shall have the meaning set forth in the recitals hereto.

"Comparable ABL Security Document" shall mean, in relation to any Collateral subject to any Lien created under any Term Security Document, Notes Security Document or Junior Lien Security Document, that ABL Security Document which creates (or purports to create) a Lien on the same Collateral, granted by the same Grantor, as the same may be amended, modified or otherwise supplemented from time to time in accordance with the terms hereof, thereof and the Credit Agreements, the Indenture and Junior Lien Indenture.

"Comparable First Priority Security Document" shall mean either a Comparable Notes Security Document or a Comparable Term Security Document.

"Comparable Junior Lien Security Document" shall mean, in relation to any Collateral subject to any Lien created under any Term Security Document, ABL Security Document or Notes Security Document, that Junior Lien Security Document which creates (or purports to create) a Lien on the same Collateral, granted by the same Grantor, as the same may be amended, modified or otherwise supplemented from time to time in accordance with the terms hereof, thereof, the Credit Agreements, the Indenture and the Junior Lien Indenture.

"Comparable Notes Security Document" shall mean, in relation to any Collateral subject to any Lien created under any Term Security Document, ABL Security Document or Junior Lien Security Document, that Notes Security Document which creates (or purports to create) a Lien on the same Collateral, granted by the same Grantor, as the same may be amended, modified or otherwise supplemented from time to time in accordance with the terms hereof, thereof, the Credit Agreements, the Indenture and Junior Lien Indenture.

"Comparable Term Security Document" shall mean, in relation to any Collateral subject to any Lien created under any ABL Security Document, Notes Security Document or Junior Lien Security Document, that Term Security Document which creates (or purports to create) a Lien on the same Collateral, granted by the same Grantor, as the same may be amended, modified or otherwise supplemented from time to time in accordance with the terms hereof, thereof and the Credit Agreements, the Indenture and Junior Lien Indenture.

"Copyrights" shall mean any United States or foreign copyright (including community designs), now or hereafter owned by any Grantor, including, but not limited to, copyrights in software and databases, and all Mask Works (as defined under 17 U.S.C. 901 of the U.S. Copyright Act), whether registered or not registered, and, with respect to any and all of the foregoing: (i) all registrations and applications therefor (whether in the United States Copyright Office or any foreign equivalent office), (ii) all extensions and renewals thereof, (iii) all rights corresponding thereto throughout the world, (iv) all rights to sue for past, present and future infringements thereof and (v) all Proceeds of the foregoing, including licenses, royalties, income, payments, claims, damages and proceeds of suit.

"Credit Agreements" shall have the meaning set forth in the recitals hereto.

"DIP Financing" shall have the meaning set forth in Section 2.5(a).

"Discharge of ABL Obligations" means, except to the extent otherwise provided in this Agreement with respect to the reinstatement or continuation of any ABL Obligations under certain circumstances, the payment in full in cash (except for contingent indemnities and cost and reimbursement obligations to the extent no claim has been made) of all ABL Obligations then outstanding, if any, and, with respect to letters of credit or letter of credit guaranties outstanding under the ABL Credit Agreement, delivery of cash collateral or backstop letters of credit in respect thereof in a manner consistent with the ABL Credit Agreement, in each case after or concurrently with the termination of all commitments to extend credit thereunder, and the termination of all commitments of "secured parties" under the ABL Credit Agreement (as defined therein); provided that the Discharge of ABL Obligations shall not be deemed to have occurred if such payments are made in connection with the establishment of a replacement Asset-Backed Credit Facility (as such term is defined in the Notes Indenture) (unless in connection with such replacement, all the ABL Obligations are repaid in full in cash (and the other conditions set forth in this definition prior to the proviso are satisfied) with the proceeds of a Qualified Receivables Financing, in which case a Discharge of ABL Obligations shall be deemed to have occurred). In the event the ABL Obligations are modified and the ABL Obligations are paid over time or otherwise modified pursuant to Section 1129 of the Bankruptcy Code, the ABL Obligations shall be deemed to be discharged when the final payment is made, in cash, in respect of

-6-

such indebtedness and any obligations pursuant to such new indebtedness shall have been satisfied.

"Discharge of First Priority Lien Obligations" means, except to the extent otherwise provided in this Agreement with respect to the reinstatement or continuation of any First Priority Lien Obligation under certain circumstances, payment in full in cash (except for contingent indemnities and cost and reimbursement obligations to the extent no claim has been made) of all First Priority Lien Obligations and, with respect to any letters of credit or letter of credit guaranties outstanding under the First Priority Documents, delivery of cash collateral or backstop letters of credit in respect thereof in a manner consistent with such First Priority Document, in each case after or concurrently with the termination of all commitments to extend credit thereunder, and the termination of all commitments of the First Priority Secured Parties under the First Priority Documents; provided that the Discharge of First Priority Lien Obligations shall not be deemed to have occurred if such payments are made with the proceeds of other First Priority Lien Obligations that constitute a Permitted Refinancing of such First Priority Lien Obligations. In the event the First Priority Lien Obligations are modified and the Obligations are paid over time or otherwise modified pursuant to Section 1129 of the Bankruptcy Code, the First Priority Lien Obligations shall be deemed to be discharged when the final payment is made, in cash, in respect of such indebtedness and any obligations pursuant to such new indebtedness shall have been satisfied.

"Domestic Subsidiary" shall have the meaning provided in the Term Credit Agreement as originally in effect.

"First Lien Intercreditor Agreement" shall mean the First Lien Intercreditor Agreement dated as of [            ], 2010 as amended, restated, supplemented or otherwise modified from time to time by and among Term Collateral Agent and the Notes Collateral Agent.

"First Priority" shall mean, (i) with respect to any Lien purported to be created on any ABL Facility Collateral pursuant to any ABL Security Document, that such Lien is prior in right to any other Lien thereon, other than any ABL Permitted Liens (excluding Liens securing any First Priority Lien Obligations or Junior Lien Obligations) applicable to such ABL Facility Collateral which as a matter of law have priority over the respective Liens on such ABL Facility Collateral created pursuant to the relevant ABL Security Document ("ABL Permitted Prior Liens") and (ii) with respect to any Lien purported to be created on any Notes Priority Collateral pursuant to any First Priority Security Documents, that such Lien is prior in right to any other Lien thereon, other than any Notes Permitted Liens (excluding Notes Permitted Liens as described in Sections [    ] [1] of the Term Credit Agreement or in Sections [  ] [2] of the Indenture) applicable to such Notes Collateral which as a matter of law have priority over the respective Liens

---

[1]    Cross references to be the applicable bank/notes baskets

[2]    Cross references to be the applicable bank/notes baskets

on such Notes Collateral created pursuant to the relevant First Priority Document.  ("Notes Per-mitted Prior Liens").

"First Priority Collateral Agents" shall mean the Notes Collateral Agent, the Term Collateral Agent and each Additional Collateral Agent (as defined in the First Lien Intercreditor Agreement).

"First Priority Documents" shall mean the Term Documents, the Notes Docu-ments and any Additional First Lien Agreement.

"First Priority Lien Obligations" shall mean the Notes Obligations, the Term Ob-ligations and any obligations under an Additional First Lien Agreement.

"First Priority Secured Parties" shall mean the First Priority Secured Parties and the Notes Secured Parties.

"First Priority Security Documents" shall mean the Term Security Documents and the Notes Security Documents.

"Grantors" shall mean Holdings, the Company and each of their respective Sub-sidiaries that have executed and delivered, or may from time to time hereafter execute and de-liver, an ABL Security Document, a Term Security Document, a Notes Security Document or a Junior Lien Security Document.

"Hedge Bank" has the meaning given to in the Term Credit Agreement.

"Hedging Obligations" has the meaning given to in the Term Credit Agreement.

"Holdings" shall have the meaning set forth in the recitals hereto.

"Indebtedness" shall mean, with respect to any Person:

(1)      the principal and premium (if any) of any indebtedness of such Person, whether or not contingent, (a) in respect of borrowed money, (b) evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof), (c) representing the deferred and unpaid purchase price of any property (except any such balance that (i) constitutes a trade payable or similar Obligation to a trade creditor Incurred in the or-dinary course of business, (ii) any earn-out Obligations until such Obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and (iii) liabilities accrued in the ordinary course of business), which purchase price is due more than six months after the date of placing the property in service or taking delivery and title thereto, (d) in respect of Capitalized Lease Obligations, or (e) representing any Hedging Obligations, if and to the extent that any of the foregoing indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability on a balance sheet (exclud-ing the footnotes thereto) of such Person prepared in accordance with GAAP;

-8-

(2)    to the extent not otherwise included, any Obligation of such Person to be liable for, or to pay, as obligor, guarantor or otherwise, the Obligations referred to in clause (1) of another Person (other than by endorsement of negotiable instruments for collection in the ordinary course of business); and

(3)    to the extent not otherwise included, Indebtedness of another Person secured by a Lien on any asset owned by such Person (whether or not such Indebtedness is assumed by such Person); provided, however, that the amount of such Indebtedness will be the lesser of:  (a) the Fair Market Value of such asset at such date of determination, and (b) the amount of such Indebtedness of such other Person;

provided, however, that notwithstanding the foregoing, Indebtedness shall be deemed not to include (1) Contingent Obligations (as defined in the Term Credit Agreement) incurred in the ordinary course of business and not in respect of borrowed money; (2) deferred or prepaid revenues; (3) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed Obligations of the respective seller; or (4) Obligations under or in respect of a Qualified Receivables Financing (as defined in the Indenture) or Qualified Joint Venture Transaction (as defined in the Indenture).

"Indenture" shall have the meaning set forth in the recitals hereto.

"Insolvency or Liquidation Proceeding" shall mean, with respect to any person, any (a) insolvency, bankruptcy, receivership, reorganization, readjustment, composition or other similar proceeding relating to such person or its property or creditors in such capacity, (b) proceeding for any liquidation, dissolution or other winding up of such person, voluntary or involuntary, whether or not involving insolvency or proceedings under the Bankruptcy Code, whether partial or complete and whether by operation of law or otherwise, (c) assignment for the benefit of creditors of such person or (d) the general assignment by any person for the benefit of creditors or any other marshalling of the assets and liabilities of such person.

"Intercreditor Agreement Joinder" shall mean an agreement substantially in the form of Exhibit A.

"Intellectual Property" shall mean, collectively, the Copyrights, the Patents, the Trademarks and the Trade Secrets, and any licenses related to the foregoing to the extent constituting Collateral pursuant to the First Priority Documents.

"Junior Lien Collateral Agent" shall have the meaning set forth in the recitals hereto and each other collateral agent with respect to any future Junior Lien Obligations.

"Junior Lien Documents" shall mean the Junior Lien Indenture, any Additional Junior Lien Agreement and each of the other agreements, documents and instruments providing for or evidencing any Junior Lien Obligations (including any Permitted Refinancing of any Junior Lien Obligations), and any other document or instrument executed or delivered at any time in connection with any Junior Lien Obligations (including any Permitted Refinancing of any Junior Lien Obligations), together with any amendments, replacements, modifications, extensions, renewals or supplements to, or restatements of, any of the foregoing.

"Junior Lien Indenture" shall have the meaning set forth in the recitals hereto.

"Junior Lien Noteholders" shall mean the holders of the Junior Lien Notes.

"Junior Lien Notes" shall mean (x) the [11]% Senior Secured Notes due 2018 issued pursuant to the terms of the Junior Lien Indenture on the date hereof and (y) any Indebtedness issued pursuant to any Additional Junior Lien Agreement.

"Junior Lien Obligations" shall mean all obligations (including guaranty obligation) of every nature of each Grantor from time to time owed to the Junior Lien Noteholders or any of them, under any Junior Lien Document (including any Junior Lien Document in respect of a Permitted Refinancing of any Junior Lien Obligations or any Additional Junior Lien Agreement), whether for principal, premium, interest (including interest which, but for the filing of a petition in bankruptcy with respect to Holdings or any of its Subsidiaries, would have accrued on any Junior Lien Obligations (including any Permitted Refinancing of any Junior Lien Obligations or any Additional Junior Lien Agreement), whether or not a claim is allowed against such Person for such interest in the related bankruptcy proceeding), reimbursement of amounts drawn under (and obligations to cash collateralize) letters of credit and bank guaranties, fees, expenses, indemnification or otherwise.

"Junior Lien Secured Parties" shall mean the Junior Lien Collateral Agent, any other agent or trustee for the Junior Lien Noteholders pursuant to the terms of the Indenture and the Junior Lien Documents and the Junior Lien Noteholders.

"Junior Lien Security Agreement" shall mean the Security Agreement (as defined in the Junior Lien Indenture).

"Junior Lien Security Documents" shall mean the Junior Lien Security Agreement and the other [Security Documents] (as defined in the Junior Lien Indenture) and any other agreement, document or instrument pursuant to which a Lien is granted securing any Junior Lien Obligations (including any Permitted Refinancing of any Junior Lien Obligations) or under which rights or remedies with respect to such Liens are governed, together with any amendments, replacements, modifications, extensions, renewals or supplements to, or restatements of, any of the foregoing. For the avoidance of doubt, "Junior Lien Security Documents" shall not include any ABL Documents or any First Priority Documents.

"Lender" shall have the meaning set forth in the recitals hereto.

"Lien" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement, security interest, encumbrance, charge, lien (statutory or other), charge, preference, priority or other security agreement of any kind or nature whatsoever (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the UCC or any similar recording or notice statute or other law, and any lease having substantially the same effect as the foregoing).

"New ABL Agent" shall have the meaning set forth in Section 3.4(g).

-10-

"New First Priority Agent" shall have the meaning set forth in Section 2.4(f)(vii).

"Noteholder" means the Person in whose name a Note is registered on the Registrar's (as defined in the Indenture) books.

"Notes" shall mean (x) the 8% Senior Secured Dollar Notes due 2017 issued pursuant to the terms of the Indenture, (y) the 8% Senior Secured Euro Notes due 2017 issued pursuant to the terms of the Indenture and (z) any Indebtedness issued pursuant to any Additional First Lien Agreement.

"Notes Collateral" shall mean all Collateral other than the ABL Facility Collateral.

"Notes Collateral Agent" shall have the meaning set forth in the recitals hereto.

"Notes Collateral Enforcement Actions" shall have the meaning set forth in Section 4.3(a).

"Notes Documents" shall mean the Indenture, the Notes, and each of the other agreements, documents and instruments providing for or evidencing any Notes Obligations (including any Permitted Refinancing of any Notes Obligations), and any other document or instrument executed or delivered at any time in connection with any Notes Obligations (including any Permitted Refinancing of any Notes Obligations), together with any amendments, replacements, modifications, extensions, renewals or supplements to, or restatements of, any of the foregoing.

"Notes Obligations" shall mean all obligations (including guaranty obligation) of every nature of each Grantor from time to time owed to the Noteholders or any of them, under any Notes Document (including any Notes Document in respect of a Permitted Refinancing of any Notes Obligations), whether for principal, premium, interest (including interest which, but for the filing of a petition in bankruptcy with respect to Holdings or any of its Subsidiaries, would have accrued on any Notes Obligations (including any Permitted Refinancing of any Notes Obligations), whether or not a claim is allowed against such Person for such interest in the related bankruptcy proceeding), reimbursement of amounts drawn under (and obligations to cash collateralize) letters of credit and bank guaranties, fees, expenses, indemnification or otherwise.

"Notes Permitted Liens" shall mean "Permitted Liens" under, and as defined in, the Indenture.

"Notes Secured Parties" shall mean the Notes Collateral Agent, any other agent or trustee for the Noteholders pursuant to the terms of the Indenture and the Notes Documents and the Noteholders.

"Notes Security Agreement" shall mean the Security Agreement (as defined in the Indenture).

"Notes Security Documents" shall mean the Notes Security Agreement and the other Security Documents (as defined in the Indenture) and any other agreement, document or instrument pursuant to which a Lien is granted securing any Notes Obligations (including any Permitted Refinancing of any Notes Obligations) or under which rights or remedies with respect to such Liens are governed, together with any amendments, replacements, modifications, extensions, renewals or supplements to, or restatements of, any of the foregoing.  For the avoidance of doubt, "Notes Security Documents" shall not include any ABL Documents or any Term Documents.

"Notes Standstill Period" shall have the meaning set forth in Section 2.2(a).

"Obligations" shall mean any principal, interest, penalties, fees, indemnifications, reimbursements (including, without limitation, reimbursement obligations with respect to letters of credit and bankers' acceptances), damages and other liabilities payable under the documentation governing any Indebtedness; provided that Obligations with respect to the Notes shall not include fees or indemnifications in favor of the Trustee and other third parties other than the holders of the Notes.

"Patents" shall mean all patents (whether United States or foreign) in or to which any Grantor now has or hereafter has any right, title or interest therein and certificates of invention, or similar industrial property rights, and applications for any of the foregoing, including, but not limited to:  (i) all reissues, divisions, continuations (including, but not limited to, continuations-in-part and improvements thereof), extensions, renewals, and reexaminations thereof, (ii) all rights corresponding thereto throughout the world, (ii) all inventions and improvements described therein, (iii) all rights to sue for past, present and future infringements thereof, (iv) all licenses, claims, damages, and proceeds of suit arising therefrom, and (v) all Proceeds of the foregoing, including licenses, royalties, income, payments, claims, damages, and proceeds of suit.

"Permitted Refinancing" shall mean, as to any Indebtedness, the Refinancing of such Indebtedness with other Indebtedness ("Refinancing Indebtedness"); provided that the following conditions are satisfied with respect to such Refinancing Indebtedness:

(i)    the weighted average life to maturity of such Refinancing Indebtedness shall be greater than or equal to the weighted average life to maturity of the Indebtedness being Refinanced, and the first scheduled principal payment in respect of such Refinancing Indebtedness shall not be earlier than the first scheduled principal payment in respect of the Indebtedness being Refinanced replaced;

(ii)    the principal amount or commitment amount of such Refinancing Indebtedness shall be less than or equal to the principal amount or commitment amount then outstanding of the Indebtedness being Refinanced, except to the extent an increase in the principal amount or commitment amount thereof is permitted at such time pursuant to the ABL Documents, the First Priority Documents, the Notes Documents and Junior Lien Documents which then remain in effect; and

(iii)      the terms applicable to such Refinancing Indebtedness and, if applicable, the related guarantees of such Refinancing Indebtedness, shall not violate the applicable requirements contained in any First Priority Documents or ABL Documents which remain outstanding after giving effect to the respective Permitted Refinancing.

"Person" shall mean any individual, partnership, joint venture, firm, corporation, limited liability company, association, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"Pledged ABL Facility Collateral" shall have the meaning set forth in Section 3.4(f).

"Pledged Debt" shall mean all Indebtedness owed to a Grantor issued by the obligors named therein, the instruments evidencing such Indebtedness, and all interest, cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Indebtedness.

"Pledged Equity Interests" shall mean all Pledged Stock, Pledged LLC Interests, Pledged Partnership Interests and Pledged Trust Interests.

"Pledged LLC Interests" shall mean all interests in any limited liability company and the certificates, if any, representing such limited liability company interests and any interest of a Grantor on the books and records of such limited liability company or on the books and records of any securities intermediary pertaining to such interest and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such limited liability company interests.

"Pledged Partnership Interests" shall mean all interests in any general partnership, limited partnership, limited liability partnership or other partnership and the certificates, if any, representing such partnership interests and any interest of a Grantor on the books and records of such partnership or on the books and records of any securities intermediary pertaining to such interest and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such partnership interests.

"Pledged Notes Collateral" shall have the meaning set forth in Section 2.4(f).

"Pledged Stock" shall mean all shares of capital stock owned by a Grantor, and the certificates, if any, representing such shares and any interest of a Grantor in the entries on the books of the issuer of such shares or on the books of any securities intermediary pertaining to such shares, and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares.

"Proceeds" shall mean all "proceeds" as such term is defined in Article 9 of the UCC as in effect in the State of New York on the date hereof and, in any event, shall also include, but not be limited to, (i) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to either Collateral Agent or any Grantor from time to time with respect to any of the Collateral, (ii) any and all claims against third parties arising from the loss or destruction of, or damage to, any of the Collateral, (iii) any and all payments (in any form whatsoever) made or due and payable to any Grantor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Collateral by any governmental authority (or any person acting under color of governmental authority) and (iv) any and all other amounts from time to time paid or payable under or in connection with any of the Collateral.

"Recovery" shall have the meaning set forth in Section 6.17.

"Refinance" shall mean, in respect of any Indebtedness, to refinance, extend, renew, retire, defease, amend, modify, supplement, restructure, replace, refund or repay, or to issue other Indebtedness, in exchange or replacement for, such Indebtedness in whole or in part. "Refinanced" and "Refinancing" shall have correlative meanings.

"SEC" means the Securities and Exchange Commission or any successor agency or commission.

"Second Priority" shall mean, (i) with respect to any Lien purported to be created on any Notes Collateral pursuant to the ABL Security Documents, that such Lien is prior in right to any other Lien thereon, other than (x) ABL Permitted Prior Liens, (y) Notes Permitted Prior Liens, provided that in no event shall any such Notes Permitted Prior Lien be permitted (on a consensual basis) to be junior and subordinate to any ABL Permitted Prior Liens and senior in priority to the relevant Liens created pursuant to the ABL Security Documents and (z) Liens created by the First Priority Security Documents, and (ii) with respect to any Lien purported to be created on any ABL Facility Collateral pursuant to the First Priority Security Documents, that such Lien is prior in right to any other Lien thereon, other than (x) Liens permitted pursuant to Section [   ] [3] of the Term Credit Agreement, (y) Liens permitted pursuant to Section [   ] [4] of the Indenture and (z) ABL Permitted Prior Liens; provided that in no event shall any such ABL Permitted Prior Lien be permitted (on a consensual basis) to be junior and subordinate to any Notes Permitted Prior Liens and senior in priority to the relevant Liens created pursuant to the First Priority Security Documents.

"Secured Parties" shall mean the ABL Secured Parties, the First Priority Secured Parties, the Notes Secured Parties and the Junior Lien Secured Parties.

---

[3]    Cross references to be the applicable bank/notes baskets

[4]    Cross references to be the applicable bank/notes baskets

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Subsequent ABL Facility Lien" shall have the meaning set forth in Section 3.4(b).

"Subsequent Note Collateral Lien" shall have the meaning set forth in Section 2.4(b).

"Subsidiary" shall mean, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; provided, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

"Term Administrative Agent" shall have the meaning set forth in the recitals hereto.

"Term Borrower" shall have the meaning set forth in the recitals hereto.

"Term Collateral Agent" shall have the meaning set forth in the recitals hereto.

"Term Credit Agreement" shall have the meaning set forth in the recitals hereto.

"Term Documents" shall mean (x) the Term Credit Agreement and the Credit Documents (as defined in the Term Credit Agreement), (y) each agreement representing Hedging Obligations with one or more Hedge Banks which are secured pursuant to one or more of the Security Documents (as defined in the Term Credit Agreement) and (z) each of the other agreements, documents and instruments providing for or evidencing any Term Obligation (including any Permitted Refinancing of any Term Obligation), and any other document or instrument executed or delivered at any time in connection with any Term Obligation (including any Permitted Refinancing of any Term Obligation), together with any amendments, replacements, modifications, extensions, renewals or supplements to, or restatements of, any of the foregoing.

"Term Lenders" shall have the meaning set forth in the recitals hereto.

"Term Obligations" shall mean all obligations (including guaranty obligations) of every nature of each Grantor, from time to time owed to the First Priority Secured Parties or any of them, under any Term Document (including any Term Document in respect of a Permitted Refinancing of any Term Obligations), whether for principal, premium, interest (including interest which, but for the filing of a petition in bankruptcy with respect to such Person, would have accrued on any Term Obligation (including any Permitted Refinancing of any Term Obliga-

tions), whether or not a claim is allowed against Holdings or any of its Subsidiaries for such interest in the related bankruptcy proceeding), reimbursement of amounts drawn under (and obligations to cash collateralize) letters of credit and bank guaranties, fees, expenses, indemnification or otherwise.

"Term Permitted Liens" shall mean the "Permitted Liens" under, and as defined in, the Term Credit Agreement as in effect on the date hereof.

"First Priority Secured Parties" shall mean the lenders and agents under the Term Credit Agreement and the Hedge Banks and shall include all former lenders under the Term Credit Agreement and Hedge Banks to the extent that any Term Obligations owing to such Persons were incurred while such Persons were lenders under the Term Credit Agreement or Hedge Bank and such Term Obligations have not been paid or satisfied in full and all new First Priority Secured Parties to the extent set forth in Section 2.4(f) hereof.

"Term Security Agreement" shall mean the Security Agreement (as defined in the Term Credit Agreement).

"Term Security Documents" shall mean the Term Security Agreement and the other Security Documents (as defined in the Term Credit Agreement) and any other agreement, document or instrument pursuant to which a Lien is granted securing any Term Obligations (including any Permitted Refinancing of any Term Obligation) or under which rights or remedies with respect to such Liens are governed, together with any amendments, replacements, modifications, extensions, renewals or supplements to, or restatements of, any of the foregoing.

"Third Priority" shall mean, with respect to any Lien purported to be created on any Collateral pursuant to the Junior Lien Security Documents, that such Lien is prior in right to any other Lien thereon other than Liens securing the ABL Obligations, Liens securing First Priority Lien Obligations and Liens securing obligations permitted to be secured prior to the ABL Obligations and the First Priority Lien Obligations pursuant to the definitions of First Priority and Second Priority contained herein.

"Trade Secrets" shall mean all trade secrets and all other confidential or proprietary information and know-how whether or not such Trade Secret has been reduced to a writing or other tangible form, including all documents and things embodying, incorporating, or referring in any way to such Trade Secret, including but not limited to: (i) any secretly held existing engineering or other data, information, production procedures and other know-how relating to the design manufacture, assembly, installation, use, operation, marketing, sale and/or servicing of any products or business of any Grantor worldwide, (ii) the right to sue for past, present and future misappropriation or other violation of any Trade Secret, and (iii) all Proceeds of the foregoing, including licenses, royalties, income, payments, claims, damages, and proceeds of suit.

"Trademarks" shall mean (i) all United States and foreign trademarks, trade names, corporate names, company names, business names, fictitious business names, Internet domain names, service marks, certification marks, collective marks, logos, other source or business identifiers, designs and general intangibles of a like nature, all registrations and applications for any of the foregoing, (ii) all extensions or renewals of any of the foregoing, (iii) all of the

-16-

goodwill of the business connected with the use of and symbolized by the foregoing, (iv) the right to sue for past, present and future infringement or dilution of any of the foregoing or for any injury to goodwill, and (v) all Proceeds of the foregoing, including licenses, royalties, income, payments, claims, damages, and proceeds of suit.

"Trustee" shall have the meaning set forth in the recitals hereto.

"UCC" shall mean the Uniform Commercial Code as in effect from time to time in the relevant jurisdiction.

"U.S. GAAP" shall mean generally accepted accounting principles in the United States of America as in effect from time to time.

1.2.    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified, (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision of this Agreement, (d) all references herein to Exhibits or Sections shall be construed to refer to Exhibits or Sections of this Agreement, (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights, (f) terms defined in the UCC but not otherwise defined herein shall have the same meanings herein as are assigned thereto in the UCC, (g) reference to any law means such law as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect on the date hereof, including rules, regulations, enforcement procedures and any interpretations promulgated thereunder, and (h) references to Sections or clauses shall refer to those portions of this Agreement, and any references to a clause shall, unless otherwise identified, refer to the appropriate clause within the same Section in which such reference occurs.

Section 2.    Notes Collateral.

2.1.    Lien Priorities.

(a)    Relative Priorities.  Notwithstanding (i) the time, manner, order or method of grant, creation, attachment or perfection of any Liens securing the ABL Obligations or the Junior Lien Obligations granted on the Notes Collateral or of any Liens securing the First Priority Lien Obligations granted on the Notes Collateral, (ii) the validity or enforceability of the security interests and Liens granted in favor of any Collateral Agent or any Secured Party on the Notes Collateral, (iii) the date on which any ABL Obligation, First Priority Lien Obligation or Junior Lien Obligation is extended, (iv) any provision of the UCC or any other applicable law,

-17-

including any rule for determining priority thereunder or under any other law or rule governing the relative priorities of secured creditors, including with respect to real property or fixtures, (v) any provision set forth in any ABL Document, any First Priority Document or any Junior Lien Document (other than this Agreement), (vi) the possession or control by any Collateral Agent or any Secured Party or any bailee of all or any part of any Notes Collateral as of the date hereof or otherwise, or (vii) any other circumstance whatsoever, the ABL Facility Agent, on behalf of itself and the ABL Secured Parties, the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties hereby agree that:

(i)      any Lien on the Notes Collateral securing any First Priority Lien Obligations now or hereafter held by or on behalf of any First Priority Collateral Agent or any First Priority Secured Parties or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to (x) any Lien on the Notes Collateral securing any of the ABL Obligations and (y) any Lien on the Notes Collateral securing any of the Junior Lien Obligations;

(ii)      any Lien on the Notes Collateral now or hereafter held by or on behalf of the ABL Facility Agent, any ABL Secured Parties, the Junior Lien Collateral Agent, any Junior Lien Secured Parties or any agent or trustee therefor regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Notes Collateral securing any First Priority Lien Obligations;

(iii)      any Lien on the Notes Collateral securing any ABL Obligations now or hereafter held by or on behalf of the ABL Facility Agent or any ABL Secured Parties or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien on the Notes Collateral securing any of the Junior Lien Obligations; and

(iv)      any Lien on the Notes Collateral now or hereafter held by or on behalf of the Junior Lien Collateral Agent, any Junior Lien Secured Party or any agent or trustee therefor regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Notes Collateral securing any ABL Obligations.

All Liens on the Notes Collateral securing any First Priority Lien Obligations shall be and remain senior in all respects and prior to all Liens on the Notes Collateral securing (x) any ABL Obligations and (y) any Junior Lien Obligations for all purposes, whether or not such Liens securing any First Priority Lien Obligations are subordinated to any Lien securing any other obligation of the Company, any other Grantor or any other Person.  All Liens on the Notes Collateral securing any ABL Obligations shall be and shall remain senior in all respects and prior to all Liens on the Notes Collateral securing any Junior Lien Obligations for all purposes, whether or not such Liens securing any ABL Obligations are subordinated to any Lien securing any other obligation of the Company, any other Grantor or any other Person.

-18-

(b)      <u>Prohibition on Contesting Liens</u>.  Each of the ABL Facility Agent, for it-
self and on behalf of each ABL Secured Party, the Term Collateral Agent, for itself and on be-
half of each First Priority Secured Party, the Notes Collateral Agent for itself and on behalf of
each Notes Secured Party and the Junior Lien Collateral Agent for itself and on behalf of each
Junior Lien Secured Party, agrees that it shall not (and hereby waives any right to) contest or
support any other Person in contesting, in any proceeding (including any Insolvency or Liquida-
tion Proceeding), (i) the priority, validity or enforceability of a Lien held by or on behalf of any
of the First Priority Secured Parties in the Notes Collateral, by or on behalf of any of the ABL
Secured Parties in the Notes Collateral or by or on behalf of any of the Notes Secured Parties in
the Notes Collateral, as the case may be or (ii) the validity or enforceability of any ABL Security
Document (or any ABL Obligations thereunder), any First Priority Security Document (or any
First Priority Lien Obligations thereunder) or any Junior Lien Security Document (or any Junior
Lien Obligations thereunder); <u>provided</u> that nothing in this Agreement shall be construed to pre-
vent or impair the rights of any of the Collateral Agents or any Secured Party to enforce this
Agreement, including the priority of the Liens on the Notes Collateral securing the First Priority
Lien Obligations, the ABL Obligations and the First Priority Lien Obligations as provided in
Sections 2.1(a), 2.2(a) and 2.2(b).

(c)      <u>No New Liens</u>.  So long as the Discharge of First Priority Lien Obligations
has not occurred, the parties hereto agree that the Company or any other Grantor shall not grant
or permit any additional Liens on any asset or property of any Grantor to secure any ABL Obli-
gation or First Priority Lien Obligation unless it has granted or contemporaneously grants
(x) (i) a First Priority Lien on such asset or property to secure the First Priority Lien Obligations
if such asset or property constitutes Notes Collateral or (ii) a Second Priority Lien on such asset
or property to secure the First Priority Lien Obligations if such asset or property constitutes ABL
Facility Collateral, (y)(i) a Second Priority Lien on such asset or property to secure the ABL Ob-
ligations if such asset or property constitutes Notes Collateral or (ii) a First Priority Lien on such
asset or property to secure the ABL Obligations if such asset or property constitutes ABL Facil-
ity Collateral and (z) a Third Priority Lien on such asset or property to secure the Junior Lien
Obligations; provided that (i) the Company may secure obligations under the Junior Lien Notes
with Liens on certain European assets of the Company and its Subsidiaries to the extent permit-
ted by the Term Credit Agreement, the ABL Credit Agreement and the Indenture, without grant-
ing a Lien on such European assets to secure the ABL Obligations or any First Priority Lien Ob-
ligations and (ii) to the extent that Rule 3-16 of Regulation S-X under the Securities Act requires
or would require (or is replaced with another rule or regulation, or any other law, rule or regula-
tion is adopted, that would require) the filing with the SEC (or any other governmental agency)
of separate financial statements of any Subsidiary of the Company due to the fact that such Sub-
sidiary's Capital Stock secures the Notes, then the Capital Stock of such Subsidiary will auto-
matically be deemed not to be part of the Collateral securing the Notes but only to the extent
necessary to not be subject to such requirement and only for so long as required to not be subject
to such requirement (such requirement, the "<u>3-16 Exemption</u>"); provided, however that the 3-16
Exemption will not apply to the capital stock of the Company and LyondellBasell Subholdings,
B.V.  To the extent that the provisions of clause (x)(i) in the immediately preceding sentence are
not complied with for any reason, without limiting any other rights and remedies available to the
First Priority Collateral Agents and/or the First Priority Secured Parties, each of the ABL Facility
Agent, on behalf of ABL Secured Parties, and the Junior Lien Collateral Agent, on behalf of the

-19-

Junior Lien Secured Parties, agrees that any amounts received by or distributed to any of them pursuant to or as a result of Liens on the Notes Collateral granted in contravention of such clause (x)(i) of this Section 2.1(c) shall be subject to Section 2.3.

(d)    Effectiveness of Lien Priorities.  Each of the parties hereto acknowledges that the Lien priorities provided for in this Agreement shall not be affected or impaired in any manner whatsoever, including, without limitation, on account of:  (i) the invalidity, irregularity or unenforceability of all or any part of the ABL Documents, the First Priority Documents or the Junior Lien Documents; (ii) any amendment, change or modification of any ABL Documents, First Priority Documents or the Junior Lien Documents; or (iii) any impairment, modification, change, exchange, release or subordination of or limitation on, any liability of, or stay of actions or lien enforcement proceedings against, Holdings or any of its Subsidiaries party to any of the ABL Documents, the First Priority Documents or the Junior Lien Documents, its property, or its estate in bankruptcy resulting from any bankruptcy, arrangement, readjustment, composition, liquidation, rehabilitation, similar proceeding or otherwise involving or affecting any Secured Party.

2.2.    Exercise of Remedies.

(a)    So long as the Discharge of First Priority Lien Obligations has not occurred, prior to any Insolvency or Liquidation Proceeding having been commenced by or against Holdings, the Company or any other Grantor:

(i)    none of the ABL Facility Agent, the ABL Secured Parties, the Junior Lien Collateral Agent or the Junior Lien Secured Parties (x) will exercise or seek to exercise any rights or remedies (including, without limitation, setoff) with respect to any Notes Collateral (including, without limitation, the exercise of any right under any lockbox agreement, account control agreement, landlord waiver or bailee's letter or similar agreement or arrangement in respect of Notes Collateral to which the ABL Facility Agent, the Junior Lien Collateral Agent, any ABL Secured Party or any Junior Lien Secured Party is a party) or institute or commence, or join with any Person (other than the First Priority Collateral Agents and the First Priority Secured Parties) in commencing any action or proceeding with respect to such rights or remedies (including any action of foreclosure), enforcement, collection or execution; provided, however, that the ABL Collateral Agent or Junior Lien Collateral Agent may exercise any or all such rights after the passage of a period of 180 days from the date of delivery of a notice in writing to the First Priority Collateral Agents of the ABL Collateral Agent's or the Junior Lien's Collateral Agent's intention to exercise its right to take such actions following an "Event of Default" as defined in the ABL Documents or Junior Lien Documents, as applicable, and, as a result of such "Event of Default", the principal and interest under such ABL Documents or Junior Lien Documents has become due and payable (the "Notes Standstill Period"); provided, further, however,, notwithstanding anything herein to the contrary, neither the ABL Facility Agent, any ABL Secured Party, the Junior Lien Collateral Agent nor any Junior Lien Secured Party will exercise any rights or remedies with respect to any Notes Collateral if, notwithstanding the expiration of the Notes Standstill Period, the First Priority Collateral Agents or First Priority Secured Parties shall have commenced

-20-

the exercise of any of their rights or remedies with respect to all or any portion of the Notes Collateral (prompt notice of such exercise to be given to the ABL Facility Agent and the Junior Lien Collateral Agent) and are pursuing the exercise thereof; provided, still, further, however, notwithstanding anything herein to the contrary, neither the Junior Lien Collateral Agent nor any Junior Lien Secured Party will exercise any rights or remedies with respect to any Notes Collateral if, notwithstanding the expiration of the Notes Standstill Period, the ABL Facility Agent or ABL Secured Parties shall have commenced the exercise of any of their rights or remedies with respect to all or any portion of the Notes Collateral (prompt notice of such exercise to be given to the Junior Lien Collateral Agent) and are pursuing the exercise thereof, (y) will contest, protest or object to any foreclosure proceeding or action brought by any First Priority Collateral Agent or any First Priority Secured Party with respect to, or any other exercise by any First Priority Collateral Agent or any First Priority Secured Party of any rights and remedies relating to, the Notes Collateral under the First Priority Documents or otherwise, or (z) subject to the rights of the ABL Facility Agent or the Junior Lien Collateral Agent under clause (i)(x) above, will object to the forbearance by any First Priority Collateral Agent or the First Priority Secured Parties from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the Notes Collateral, in each case so long as the respective interests of the ABL Secured Parties and the Junior Lien Secured Parties attach to the proceeds thereof subject to the relative priorities described in Section 2.1; provided, that the Junior Lien Collateral Agent and the Junior Lien Secured Parties will not object to the forbearance by the ABL Facility Agent or the ABL Secured Parties from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the Notes Collateral, in each case so long as the interests of the Junior Lien Secured Parties attach to the proceeds thereof subject to the relative priorities described in Section 2.1; provided, however, that nothing in this Section 2.2(a) shall be construed to authorize (A) the ABL Facility Agent, any ABL Secured Party, the Junior Lien Collateral Agent or any Notes Secured Party to sell any Notes Collateral free of the Lien of any First Priority Collateral Agent or any First Priority Secured Party or (B) the Junior Lien Collateral Agent or any Junior Lien Secured Party to sell any Notes Collateral free of the Lien of the ABL Facility Agent or any ABL Secured Party; and

(ii)    the First Priority Collateral Agents and the First Priority Secured Parties shall have the exclusive right to enforce rights, exercise remedies (including set off and the right to credit bid their debt) and make determinations regarding the disposition of, or restrictions with respect to, the Notes Collateral without any consultation with or the consent of the ABL Facility Agent, any ABL Secured Party, the Junior Lien Collateral Agent or any Notes Secured Party; provided that:

(1)    the ABL Facility Agent may take any action (not adverse to the prior Liens on the Notes Collateral securing the First Priority Lien Obligations, or the rights of any First Priority Collateral Agent or the First Priority Secured Parties to exercise remedies in respect thereof) in order to preserve or protect its Lien on the Notes Collateral;

(2)      the Junior Lien Collateral Agent may take any action (not adverse to the prior Liens on the Notes Collateral securing the First Priority Lien Obligations and the ABL Obligations, or the rights of any First Priority Collateral Agent, the First Priority Secured Parties, any ABL Facility Agent or the ABL Secured Parties to exercise remedies in respect thereof) in order to preserve or protect its Lien on the Notes Collateral;

(3)      the ABL Secured Parties and the Junior Lien Secured Parties shall be entitled to file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of the ABL Secured Parties or the Junior Lien Secured Parties, as applicable, including without limitation any claims secured by the Notes Collateral, if any, in each case in accordance with the terms of this Agreement;

(4)      the ABL Secured Parties and the Junior Lien Secured Parties shall be entitled to file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Grantors arising under either the Bankruptcy Law or applicable non-bankruptcy law, in each case in accordance with the terms of this Agreement;

(5)      the ABL Secured Parties and the Junior Lien Secured Parties shall be entitled to vote on any plan of reorganization and file any proof of claim in an Insolvency or Liquidation Proceeding or otherwise and other filings and make any arguments and motions that are, in each case, in accordance with the terms of this Agreement, with respect to the Notes Collateral;

(6)      the ABL Facility Agent or any ABL Secured Party may exercise any of its rights or remedies with respect to the Notes Collateral after the termination of the Notes Standstill Period to the extent permitted by clause (i)(x) above; and

(7)      the Junior Lien Collateral Agent or any Junior Lien Secured Party may exercise any of its rights or remedies with respect to the Notes Collateral after the termination of the Notes Standstill Period to the extent permitted by clause (i)(x) above.

Subject to the First Lien Intercreditor Agreement, in exercising rights and remedies with respect to the Notes Collateral, the First Priority Collateral Agents and the First Priority Secured Parties may enforce the provisions of the First Priority Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of Notes Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC of any applicable jurisdiction and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction.

(b)      Following the Discharge of First Priority Lien Obligations, so long as the Discharge of ABL Obligations has not occurred, prior to any Insolvency or Liquidation Proceeding having been commenced by or against Holdings, the Company or any other Grantor:

(i)      none of the Junior Lien Collateral Agent and the Junior Lien Secured Parties (x) will exercise or seek to exercise any rights or remedies (including, without limitation, setoff) with respect to any Notes Collateral (including, without limitation, the exercise of any right under any lockbox agreement, account control agreement, landlord waiver or bailee's letter or similar agreement or arrangement in respect of Notes Collateral to which the Junior Lien Collateral Agent or any Notes Secured Party is a party) or institute or commence, or join with any Person (other than the ABL Facility Agent and the ABL Secured Parties) in commencing any action or proceeding with respect to such rights or remedies (including any action of foreclosure), enforcement, collection or execution; provided, however, that the Junior Lien Collateral Agent may exercise any or all such rights after the passage of 180 days from the date of delivery of a notice in writing to the ABL Facility Agent of the Junior Lien Collateral Agent's intention to exercise its right to take such actions following an "Event of Default" as defined in the Junior Lien Documents (the "Second Lien Notes Collateral Standstill Period"); provided, further, however, notwithstanding anything herein to the contrary, neither the Junior Lien Collateral Agent nor any Junior Lien Secured Party will exercise any rights or remedies with respect to any Notes Collateral if, notwithstanding the expiration of the Second Lien Notes Collateral Standstill Period, the ABL Facility Agent or ABL Secured Parties shall have commenced the exercise of any of their rights or remedies with respect to all or any portion of the Notes Collateral (prompt notice of such exercise to be given to the Junior Lien Collateral Agent) and are pursuing the exercise thereof; (y) will contest, protest or object to any foreclosure proceeding or action brought by the ABL Facility Agent or any ABL Secured Party with respect to, or any other exercise by the ABL Facility Agent or any ABL Secured Party of any rights and remedies relating to, the Notes Collateral under the ABL Documents or otherwise, or (z) will object to the forbearance by the ABL Facility Agent or the ABL Secured Parties from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the Notes Collateral, in each case so long as the respective interests of the Junior Lien Secured Parties attach to the proceeds thereof subject to the relative priorities described in Section 2.1; and

(ii)      the ABL Facility Agent and the ABL Secured Parties shall have the exclusive right to enforce rights, exercise remedies (including set off and the right to credit bid their debt) and make determinations regarding the disposition of, or restrictions with respect to, the Notes Collateral without any consultation with or the consent of the Junior Lien Collateral Agent or any Junior Lien Secured Party; provided, that:

(1)      the Junior Lien Collateral Agent may take any action (not adverse to the prior Liens on the Notes Collateral securing the ABL Obligations, or the rights of any ABL Facility Agent or the ABL Secured Parties to exercise remedies in respect thereof) in order to preserve or protect its Lien on the Notes Collateral;

-23-

(2)    the Junior Lien Secured Parties shall be entitled to file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of the Junior Lien Secured Parties, including without limitation any claims secured by the Notes Collateral, if any, in each case in accordance with the terms of this Agreement;

(3)    the Junior Lien Secured Parties shall be entitled to file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Grantors arising under either the Bankruptcy Law or applicable non-bankruptcy law, in each case in accordance with the terms of this Agreement;

(4)    the Junior Lien Secured Parties shall be entitled to vote on any plan of reorganization and file any proof of claim in an Insolvency or Liquidation Proceeding or otherwise and other filings and make any arguments and motions that are, in each case, in accordance with the terms of this Agreement, with respect to the Notes Collateral; and

(5)    the Junior Lien Collateral Agent or any Junior Lien Secured Party may exercise any of its rights or remedies with respect to the Notes Collateral after the termination of the Notes Standstill Period to the extent permitted by clause (i)(x) above.

In exercising rights and remedies with respect to the Notes Collateral, the ABL Facility Agent and the ABL Secured Parties may enforce the provisions of the ABL Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion.  Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of Notes Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC of any applicable jurisdiction and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction.

(c)    Each of the ABL Facility Agent, on behalf of itself and the ABL Secured Parties and the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, agree that they will not take or receive any Notes Collateral or any proceeds of Notes Collateral in connection with the exercise of any right or remedy (including setoff) with respect to any Notes Collateral unless and until the Discharge of First Priority Lien Obligations has occurred, except as expressly provided in the proviso in clause (ii) of Section 2.2(a) or in Section 4. Following the Discharge of First Priority Lien Obligations, the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, agrees that it will not take or receive any Notes Collateral or any proceeds of Notes Collateral in connection with the exercise of any right or remedy (including setoff) with respect to any Notes Collateral unless and until the Discharge of ABL Obligations has occurred, except as expressly provided in the proviso in clause (ii) of Section 2.2(a) and the proviso in clause (ii) of Section 2.2(b).  Without limiting the generality of the foregoing, (x) unless and until the Discharge of First Priority Lien Obligations has occurred, except as expressly provided in the proviso in clause (ii) of Section 2.2(a) or in Section 4, the

-24-

sole right of the ABL Facility Agent, the ABL Secured Parties with respect to the Notes Collateral is to hold a Lien on the Notes Collateral pursuant to the ABL Documents for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Discharge of First Priority Lien Obligations has occurred in accordance with the terms hereof, the First Priority Documents and applicable law and (y) unless and until the Discharge of First Priority Lien Obligations and Discharge of ABL Obligations have occurred, except as expressly provided in the proviso in clause (ii) of Section 2.2(a) and the proviso in clause (ii) of Section 2.2(b), the sole right of the Junior Lien Collateral Agent and the Junior Lien Secured Parties with respect to the Notes Collateral is to hold a Lien on the Notes Collateral pursuant to the Notes Documents for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Discharge of First Priority Lien Obligations and the Discharge of ABL Obligations has occurred in accordance with the terms hereof, the First Priority Documents, the ABL Documents and applicable law.

(d)     Subject to the proviso in clause (ii) of Section 2.2(a) and the proviso in clause (ii) of Section 2.2(b):

(i)     the ABL Facility Agent, for itself and on behalf of the ABL Secured Parties, agrees that the ABL Facility Agent and the ABL Secured Parties will not take any action that would hinder any exercise of remedies under the First Priority Documents with respect to the Notes Collateral or is otherwise prohibited hereunder, including any sale, lease, exchange, transfer or other disposition of the Notes Collateral, whether by foreclosure or otherwise,

(ii)     the Junior Lien Collateral Agent, for itself and on behalf of the Junior Lien Secured Parties, agrees that the Junior Lien Collateral Agent and the Junior Lien Secured Parties will not take any action that would hinder any exercise of remedies under the First Priority Documents or the ABL Documents with respect to the Notes Collateral or is otherwise prohibited hereunder, including any sale, lease, exchange, transfer or other disposition of the Notes Collateral, whether by foreclosure or otherwise,

(iii)     the ABL Facility Agent, for itself and on behalf of the ABL Secured Parties, hereby waives any and all rights it or the ABL Secured Parties may have as a junior lien creditor with respect to the Notes Collateral or otherwise to object to the manner in which the First Priority Collateral Agents or the First Priority Secured Parties seek to enforce or collect the First Priority Lien Obligations or the Liens granted in any of the Notes Collateral, regardless of whether any action or failure to act by or on behalf of the First Priority Collateral Agents or First Priority Secured Parties is adverse to the interest of the ABL Secured Parties, and

(iv)     the Junior Lien Collateral Agent, for itself and on behalf of the Junior Lien Secured Parties, hereby waives any and all rights it or the Junior Lien Secured Parties may have as a junior lien creditor with respect to the Notes Collateral or otherwise to object to the manner in which the First Priority Collateral Agents, the First Priority Secured Parties, the ABL Facility Agent or the ABL Secured Parties seek to enforce or collect the First Priority Lien Obligations or the ABL Obligations or the Liens granted in any of the Notes Collateral, regardless of whether any action or failure to act by or on behalf of the

-25-

First Priority Collateral Agents, First Priority Secured Parties, the ABL Facility Agent or the ABL Secured Parties is adverse to the interest of the Junior Lien Secured Parties.

(e)    The ABL Facility Agent hereby acknowledges and agrees that no covenant, agreement or restriction contained in any ABL Document (other than this Agreement) shall be deemed to restrict in any way the rights and remedies of the First Priority Collateral Agents or the First Priority Secured Parties with respect to the Notes Collateral as set forth in this Agreement and the First Priority Documents.

(f)    The Junior Lien Collateral Agent hereby acknowledges and agrees that no covenant, agreement or restriction contained in any Junior Lien Document (other than this Agreement) shall be deemed to restrict in any way the rights and remedies of the First Priority Collateral Agents, the First Priority Secured Parties, the ABL Facility Agent or the ABL Secured Parties with respect to the Notes Collateral as set forth in this Agreement, the First Priority Documents and the ABL Documents.

2.3.    <u>Payments Over</u>.

(a)    So long as the Discharge of First Priority Lien Obligations has not occurred, any Notes Collateral, cash proceeds thereof or non-cash proceeds not constituting ABL Facility Collateral received by the ABL Facility Agent, the Junior Lien Collateral Agent, any ABL Secured Parties or any Junior Lien Secured Parties in connection with the exercise of any right or remedy (including set off) relating to the Notes Collateral in contravention of this Agreement shall be segregated and held in trust and forthwith paid over to the First Priority Collateral Agent for the benefit of the First Priority Secured Parties in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct. The First Priority Collateral Agents are hereby authorized to make any such endorsements as agent for the ABL Facility Agent, any such ABL Secured Parties, the Junior Lien Collateral Agent or any such Junior Lien Secured Parties. This authorization is coupled with an interest and is irrevocable until such time as this Agreement is terminated in accordance with its terms.

(b)    Following the Discharge of First Priority Lien Obligations, so long as the Discharge of ABL Obligations has not occurred, any Notes Collateral, cash proceeds thereof or non-cash proceeds received by the Junior Lien Collateral Agent or any Junior Lien Secured Parties in connection with the exercise of any right or remedy (including setoff) relating to the Notes Collateral in contravention of this Agreement shall be segregated and held in trust and forthwith paid over to the ABL Facility Agent for the benefit of the ABL Secured Parties in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct. The ABL Facility Agent is hereby authorized to make any such endorsements as agent for the Junior Lien Collateral Agent or any such Junior Lien Secured Parties. This authorization is coupled with an interest and is irrevocable until such time as this Agreement is terminated in accordance with its terms.

2.4.    <u>Other Agreements</u>.

(a)    <u>Releases by the First Priority Collateral Agents</u>.

(i)    If, in connection with:

(1)    the exercise of any First Priority Collateral Agent's remedies in respect of the Notes Collateral provided for in Section 2.2(a), including any sale, lease, exchange, transfer or other disposition of any such Notes Collateral; or

(2)    any sale, lease, exchange, transfer or other disposition of any Notes Collateral permitted under the terms of the First Priority Documents, the ABL Documents and the Junior Lien Documents (whether or not an event of default thereunder, and as defined therein, has occurred and is continuing),

each First Priority Collateral Agent, for itself or on behalf of any of the First Priority Secured Parties, releases any of its Liens on any part of the Notes Collateral other than, in the case of clause (2) above, (A) in connection with the Discharge of First Priority Lien Obligations and (B) after the occurrence and during the continuance of any event of default under the ABL Credit Agreement or the Junior Lien Indenture, then the Liens, if any, of the ABL Facility Agent, for itself or for the benefit of the ABL Secured Parties and the Junior Lien Collateral Agent, for itself and on behalf of the Junior Lien Secured Parties, on such Notes Collateral (but not the Proceeds thereof, which shall be subject to the priorities set forth in this Agreement) shall be automatically, unconditionally and simultaneously released and the ABL Facility Agent, for itself or on behalf of any such ABL Secured Parties, and the Junior Lien Collateral Agent, for itself and on behalf of the Junior Lien Secured Parties, promptly shall execute and deliver to the First Priority Collateral Agents or such Grantor such termination statements, releases and other documents as the First Priority Collateral Agents or such Grantor may request to effectively confirm such release; <u>provided</u> that in the case of clause (a)(i) above, any proceeds of such disposition shall be applied in accordance with this Agreement.

(ii)    Until the Discharge of First Priority Lien Obligations occurs, the ABL Facility Agent, for itself and on behalf of the ABL Secured Parties and the Junior Lien Collateral Agent, for itself and on behalf of the Junior Lien Secured Parties, hereby irrevocably constitute and appoint the First Priority Collateral Agents and any officer or agent of any First Priority Collateral Agent, with full power of substitution, as its true and lawful attorney in fact with full irrevocable power and authority in the place and stead of the ABL Facility Agent or the Junior Lien Collateral Agent or such holder or in any First Priority Collateral Agent's name, from time to time in such First Priority Collateral Agent's discretion, for the purpose of carrying out the terms of this Section 2.4(a) with respect to Notes Collateral, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 2.4(a) with respect to Notes Collateral, including any endorsements or other instruments of transfer or release.

(iii)    Until the Discharge of First Priority Lien Obligations occurs, to the extent that the First Priority Secured Parties (a) have released any Lien on Notes Collateral and any such Lien is later reinstated or (b) obtain any new First Priority Liens on assets constituting

-27-

Notes Collateral from Grantors, then the ABL Secured Parties shall be granted a Second Priority Lien on any such Notes Collateral and the Junior Lien Secured Parties shall be granted a Third Priority Lien on any such Notes Collateral.

(iv)    If, prior to the Discharge of First Priority Lien Obligations, a subordination of the First Priority Collateral Agents' Liens on any Notes Collateral is permitted (or in good faith believed by a First Priority Collateral Agent to be permitted) under the Term Credit Agreement, the Indenture and the ABL Credit Agreement to another Lien permitted under the Term Credit Agreement, the ABL Credit Agreement, the Indenture and the Junior Lien Indenture (a "Notes Collateral Priority Lien"), then the First Priority Collateral Agents are authorized to execute and deliver a subordination agreement with respect thereto in form and substance satisfactory to them, and the ABL Facility Agent, for itself and on behalf of the ABL Secured Parties and the Junior Lien Collateral Agent, for itself and on behalf of the Junior Lien Secured Parties, shall promptly execute and deliver to the First Priority Collateral Agents an identical subordination agreement subordinating (x) the Liens of the ABL Facility Agents for the benefit of (and on behalf of) the ABL Secured Parties to such Notes Collateral Priority Lien and (y) the Liens of the Junior Lien Collateral Agent for the benefit of (and on behalf of) the Junior Lien Secured Parties to such Notes Collateral Priority Lien.

(b)    Releases by ABL Facility Agent.

(i)    Following the Discharge of First Priority Lien Obligations, but prior to the Discharge of ABL Obligations, if, in connection with:

(1)    the exercise of any ABL Facility Agent's remedies in respect of the Notes Collateral provided for in Section 2.2(b), including any sale, lease, exchange, transfer or other disposition of any such Notes Collateral; or

(2)    any sale, lease, exchange, transfer or other disposition of any Notes Collateral permitted under the terms of the ABL Documents and the Junior Lien Documents (whether or not an event of default thereunder, and as defined therein, has occurred and is continuing),

the ABL Facility Agent, for itself or on behalf of any of the ABL Secured Parties, releases any of its Liens on any part of the Notes Collateral other than, in the case of clause (2) above, (A) in connection with the Discharge of ABL Obligations and (B) after the occurrence and during the continuance of any event of default under the Junior Lien Indenture, then the Liens, if any, of the Junior Lien Collateral Agent, for itself or for the benefit of the Junior Lien Secured Parties, on such Notes Collateral (but not the Proceeds thereof, which shall be subject to the priorities set forth in this Agreement) shall be automatically, unconditionally and simultaneously released and the Junior Lien Collateral Agent, for itself or on behalf of any such Junior Lien Secured Parties, promptly shall execute and deliver to the ABL Facility Agent or such Grantor such termination statements, releases and other documents as the ABL Facility Agent or such Grantor may request to effectively confirm such release; provided that in the case of clause (b)(i) above, any proceeds of such disposition shall be applied in accordance with this Agreement.

-28-

(ii)    Following the Discharge of First Priority Lien Obligations and until the Discharge of ABL Obligations occurs, the Junior Lien Collateral Agent, for itself and on behalf of the Junior Lien Secured Parties, hereby irrevocably constitute and appoint the ABL Facility Agent and any officer or agent of the ABL Facility Agent, with full power of substitution, as its true and lawful attorney in fact with full irrevocable power and authority in the place and stead of the Junior Lien Notes Collateral Agent or such holder or in the ABL Facility Agent's own name, from time to time in the ABL Facility Agent's discretion, for the purpose of carrying out the terms of this Section 2.4(b) with respect to Notes Collateral, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 2.4(b) with respect to Notes Collateral, including any endorsements or other instruments of transfer or release.

(iii)    Following the Discharge of First Priority Lien Obligations and until the Discharge of ABL Obligations occurs, to the extent that the ABL Secured Parties (a) have released any Lien on Notes Collateral and any such Lien is later reinstated or (b) obtain any new Second Priority Liens on assets constituting Notes Collateral from Grantors, then the Junior Lien Secured Parties shall be granted a Third Priority Lien on any such Notes Collateral.

(iv)    If, prior to the Discharge of ABL Obligations, a subordination of the ABL Facility Agent's Lien on any Notes Collateral is permitted (or in good faith believed by the ABL Facility Agent to be permitted) under the ABL Credit Agreement to another Lien permitted under the ABL Credit Agreement and the Junior Lien Indenture (a "Subsequent Note Collateral Lien"), then the ABL Facility Agent is authorized to execute and deliver a subordination agreement with respect thereto in form and substance satisfactory to it, and the Junior Lien Collateral Agent, for itself and on behalf of the Junior Lien Secured Parties, shall promptly execute and deliver to the ABL Facility Agent an identical subordination agreement subordinating the Liens of the Junior Lien Collateral Agent for the benefit of (and on behalf of) the Junior Lien Secured Parties to such Subsequent Note Collateral Lien.

(c)    Insurance.  Unless and until the Discharge of First Priority Lien Obligations has occurred, the First Priority Collateral Agents and the First Priority Secured Parties shall have the sole and exclusive right, subject to the rights of the Grantors under the First Priority Documents, to adjust settlement for any insurance policy covering the Notes Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) in respect of the Notes Collateral.  Following the Discharge of First Priority Lien Obligations, unless and until the Discharge of ABL Obligations has occurred, the ABL Facility Agent and the ABL Secured Parties shall have the sole and exclusive right, subject to the rights of the Grantors under the ABL Documents, to adjust settlement for any insurance policy covering the Notes Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) in respect of the Notes Collateral.

(d)    Amendments to ABL Security Documents or Junior Lien Security Documents.

(i)    Without the prior written consent of the First Priority Collateral Agents, no ABL Security Document or Junior Lien Security Document may be amended, supplemented

or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new ABL Document or new Junior Lien Document, would contravene the provisions of this Agreement.  Grantors agree that each ABL Security Document and Junior Lien Security Document shall include the following language (with any necessary modifications to give effect to applicable definitions) (or language to similar effect approved by the First Priority Collateral Agents):

> "Notwithstanding anything herein to the contrary, the liens and security interests granted to [the ABL Facility Agent] [the Junior Lien Collateral Agent] pursuant to this Agreement in any Notes Collateral and the exercise of any right or remedy by [the ABL Facility Agent] [the Junior Lien Collateral Agent] with respect to any Notes Collateral hereunder are subject to the provisions of the Intercreditor Agreement, dated as of [April 30], 2010 (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), among LYONDELL BASELL INDUSTRIES N.V., a public limited liability company formed under the laws of the Netherlands, LYONDELL CHEMICAL COM-PANY, a Delaware corporation (the "Company"), the other GRANTORS from time to time party thereto, CITIBANK, N.A., as ABL Facility Agent, UBS AG, STAMFORD BRANCH, as Term Collateral Agent, DEUTSCHE BANK TRUST COMPANY AMERICAS, as Notes Collateral Agent, [          ], as Notes Col-lateral Agent and certain other persons party or that may become party thereto from time to time.  In the event of any conflict between the terms of the Inter-creditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control."

In addition, Grantors agree that (x) each mortgage in favor of the ABL Secured Parties or the Junior Lien Secured Parties covering any Notes Collateral shall contain such other language as the First Priority Collateral Agents may reasonably request to reflect the subordination of such mortgage to the mortgage in favor of the First Priority Secured Parties covering such Notes Col-lateral and (y) each mortgage in favor of the Junior Lien Secured Parties covering any Notes Col-lateral shall contain such other language as the ABL Facility Agent may reasonably request to reflect the subordination of such mortgage to the mortgage in favor of the ABL Secured Parties covering such Notes Collateral.

            (ii)      In the event any First Priority Collateral Agent or the First Priority Se-cured Parties and the relevant Grantor enter into any amendment, waiver or consent in respect of any of the First Priority Security Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any First Priority Security Document or changing in any manner the rights of the First Priority Collateral Agents, such First Priority Secured Parties, the Company or any other Grantor thereunder, in each case with respect to or relating to the Notes Collateral, then such amendment, waiver or consent shall apply auto-matically to any comparable provision of (x) the Comparable ABL Security Document without the consent of the ABL Facility Agent or the ABL Secured Parties and without any action by the ABL Facility Agent, the Company or any other Grantor and (y) the Comparable Junior Lien Se-curity Document without the consent of the Junior Lien Collateral Agent or the Junior Lien Se-cured Parties and without any action by the Junior Lien Collateral Agent, the Company or any

other Grantor, <u>provided</u> that (A) no such amendment, waiver or consent shall have the effect of (i) removing assets that constitute Notes Collateral subject to the Lien of the ABL Security Documents or the Junior Lien Security Documents, except to the extent that a release of such Lien is permitted or required by Section 2.4(a) and <u>provided</u> that there is a corresponding release of such Lien securing the First Priority Lien Obligations, (ii) imposing duties on the ABL Facility Agent or the Junior Lien Collateral Agent without its consent or (iii) permitting other liens on the Notes Collateral not permitted under the terms of the ABL Documents, the Junior Lien Documents or Section 2.5 and (B) notice of such amendment, waiver or consent shall have been given to the ABL Facility Agent and the Junior Lien Collateral Agent within ten (10) Business Days after the effective date of such amendment, waiver or consent.

(iii)    Following the Discharge of First Priority Lien Obligations, in the event any ABL Facility Agent or the ABL Secured Parties and the relevant Grantor enter into any amendment, waiver or consent in respect of any of the ABL Security Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any ABL Security Document or changing in any manner the rights of the ABL Facility Agent, such ABL Secured Parties, the Company or any other Grantor thereunder, in each case with respect to or relating to the Notes Collateral, then such amendment, waiver or consent shall apply automatically to any comparable provision of the Comparable Junior Lien Security Document without the consent of the Junior Lien Collateral Agent or the Junior Lien Secured Parties and without any action by the Junior Lien Collateral Agent, the Company or any other Grantor, <u>provided</u> that (A) no such amendment, waiver or consent shall have the effect of (i) removing assets that constitute Notes Collateral subject to the Lien of the Notes Security Documents, except to the extent that a release of such Lien is permitted or required by Section 2.4(b) and <u>provided</u> that there is a corresponding release of such Lien securing the ABL Obligations, (ii) imposing duties on the Junior Lien Collateral Agent without its consent or (iii) permitting other liens on the Notes Collateral not permitted under the terms of the Junior Lien Documents or Section 2.5 and (B) notice of such amendment, waiver or consent shall have been given to the Junior Lien Collateral Agent within ten (10) Business Days after the effective date of such amendment, waiver or consent.

(e)    <u>Rights As Unsecured Creditors</u>.  Except as otherwise set forth in this Agreement, the ABL Facility Agent, the ABL Secured Parties, the Junior Lien Collateral Agent and the Junior Lien Secured Parties may exercise rights and remedies as unsecured creditors against the Company or any other Grantor that has guaranteed the ABL Obligations or the Junior Lien Obligations in accordance with the terms of the ABL Documents, the Notes Documents and applicable law.  Nothing in this Agreement shall prohibit the receipt by the ABL Facility Agent, any ABL Secured Parties, the Junior Lien Collateral Agent or any Junior Lien Secured Parties of payments of interest, principal and other amounts in respect of the ABL Obligations and Junior Lien Obligations, as applicable, so long as such receipt is not the direct or indirect result of the exercise by the ABL Facility Agent, any ABL Secured Parties, the Junior Lien Collateral Agent or any Junior Lien Secured Parties of rights or remedies as a secured creditor (including set off) in respect of the Notes Collateral in contravention of this Agreement or enforcement in contravention of this Agreement of any Lien held by any of them.

(f)    <u>Bailee for Perfection</u>.

(i)    Each First Priority Collateral Agent agrees to hold that part of the Notes Collateral that is in its possession or control (or in the possession or control of its agents or bailees) to the extent that possession or control thereof is taken to perfect a Lien thereon under the UCC (such Notes Collateral being the "<u>Pledged Notes Collateral</u>") as collateral agent for the First Priority Secured Parties and as bailee for and, with respect to any collateral that cannot be perfected in such manner, as agent for, the ABL Facility Agent (on behalf of the ABL Secured Parties) and the Junior Lien Collateral Agent (on behalf of the Junior Lien Secured Parties) and any assignee thereof and act as such agent under all control agreements relating to the Pledged Notes Collateral, in each case solely for the purpose of perfecting the security interest granted under the First Priority Documents, the ABL Documents and the Notes Documents, as applicable, subject to the terms and conditions of this Section 2.4(f).  Following the Discharge of First Priority Lien Obligations, the ABL Facility Agent agrees to hold the Pledged Notes Collateral as collateral agent for the ABL Secured Parties and as bailee for and, with respect to any collateral that cannot be perfected in such manner, as agent for, the Junior Lien Collateral Agent (on behalf of the Junior Lien Secured Parties) and any assignee thereof solely for the purpose of perfecting the security interest granted under the ABL Documents and the Notes Documents, as applicable, subject to the terms and conditions of this Section 2.4(f).  As security for the payment and performance in full of all the Junior Lien Obligations and ABL Obligations each Grantor hereby grants to the First Priority Collateral Agents for the benefit of the Junior Lien Secured Parties and the ABL Secured Parties a lien on and security interest in all of the right, title and interest of such Grantor, in and to and under the Pledged Notes Collateral wherever located and whether now existing or hereafter arising or acquired from time to time. As security for the payment and performance in full of all the Junior Lien Obligations, each Grantor hereby grants to the ABL Facility Agent for the benefit of the Junior Lien Secured Parties a lien on and security interest in all of the right, title and interest of such Grantor, in and to and under the Pledged Notes Collateral wherever located and whether now existing or hereafter arising or acquired from time to time.

(ii)    Subject to the terms of this Agreement, (x) until the Discharge of First Priority Lien Obligations has occurred, the First Priority Collateral Agents shall be entitled to deal with the Pledged Notes Collateral in accordance with the terms of the First Priority Documents as if the Liens of the ABL Facility Agent under the ABL Security Documents and the Liens of the Junior Lien Collateral Agent under the Notes Security Documents did not exist and (y) following the Discharge of First Priority Lien Obligations and until the Discharge of ABL Obligations has occurred, the ABL Facility Agent shall be entitled to deal with the Pledged Notes Collateral in accordance with the terms of the ABL Documents as if the Liens of the Junior Lien Collateral Agent under the Notes Security Documents did not exist.  The rights of the ABL Facility Agent and the Junior Lien Collateral Agent shall at all times be subject to the terms of this Agreement.

(iii)    The First Priority Collateral Agents shall have no obligation whatsoever to any First Priority Secured Party, the ABL Facility Agent, any ABL Secured Party, the Junior Lien Collateral Agent or any Junior Lien Secured Party to ensure that the Pledged Notes Collateral is genuine or owned by any of the Grantors or to preserve rights or benefits of any Person

-32-

except as expressly set forth in this Section 2.4(f). The duties or responsibilities of the First Priority Collateral Agent under this Section 2.4(f) shall be limited solely to holding the Pledged Notes Collateral as bailee or agent in accordance with this Section 2.4(f). The ABL Facility Agent shall have no obligation whatsoever to any ABL Secured Party, the Junior Lien Collateral Agent or any Notes Secured Party to ensure that the Pledged Notes Collateral is genuine or owned by any of the Grantors or to preserve rights or benefits of any Person except as expressly set forth in this Section 2.4(f). The duties or responsibilities of the ABL Facility Agent under this Section 2.4(f) shall be limited solely to holding the Pledged Notes Collateral as bailee or agent in accordance with this Section 2.4(f).

(iv)     The First Priority Collateral Agents acting pursuant to this Section 2.4(f) shall not have by reason of the First Priority Security Documents, the ABL Security Documents, the Junior Lien Security Documents, this Agreement or any other document a fiduciary relationship in respect of any First Priority Secured Party, the ABL Facility Agent, any ABL Secured Party, the Junior Lien Collateral Agent or any Notes Secured Party. The ABL Facility Agent acting pursuant to this Section 2.4(f) shall not have by reason of the ABL Security Documents, the Notes Security Documents, this Agreement or any other document a fiduciary relationship in respect of any ABL Secured Party, the Junior Lien Collateral Agent.

(v)     Upon the Discharge of First Priority Lien Obligations under the applicable First Priority Documents to which the respective First Priority Collateral Agents are a party, the First Priority Collateral Agents shall deliver or cause to be delivered the remaining Pledged Notes Collateral (if any) in its possession or in the possession of its agents or bailees, together with any necessary endorsements, first, to the ABL Facility Agent to the extent ABL Obligations remain outstanding, second, to the Junior Lien Collateral Agent to the extent Junior Lien Obligations remain outstanding and third, to the applicable Grantor to the extent no First Priority Lien Obligations, ABL Obligations or Junior Lien Obligations remain outstanding (in each case, so as to allow such Person to obtain control of such Pledged Notes Collateral) and will cooperate with the ABL Facility Agent or Junior Lien Collateral Agent, as applicable, in assigning (without recourse to or warranty by any First Priority Collateral Agent or any First Priority Secured Party or agent or bailee thereof) control over any other Pledged Notes Collateral under its control. The First Priority Collateral Agents further agree to take all other action reasonably requested by such Person in connection with such Person obtaining a first priority interest in the Pledged Notes Collateral or as a court of competent jurisdiction may otherwise direct. Following the Discharge of First Priority Lien Obligations and upon the Discharge of ABL Obligations under the ABL Documents to which the ABL Facility Agent is a party, the ABL Facility Agent shall deliver or cause to be delivered the remaining Pledged Notes Collateral (if any) in its possession or in the possession of its agents or bailees, together with any necessary endorsements, first, to the Junior Lien Collateral Agent to the extent Junior Lien Obligations remain outstanding, and second, to the applicable Grantor to the extent no Junior Lien Obligations remain outstanding (in each case, so as to allow such Person to obtain control of such Pledged Notes Collateral) and will cooperate with the Junior Lien Collateral Agent in assigning (without recourse to or warranty by the ABL Facility Agent or any ABL Secured Party or agent or bailee thereof) control over any other Pledged Notes Collateral under its control. The ABL Facility Agent further agrees to take all other action reasonably requested by such Person in connection with such Person obtaining a

first priority interest in the Pledged Notes Collateral or as a court of competent jurisdiction may otherwise direct.

(vi)    Notwithstanding anything to the contrary herein, if, for any reason, any ABL Obligations remain outstanding upon the Discharge of First Priority Lien Obligations, all rights of the First Priority Collateral Agents hereunder and under the First Priority Security Documents, the ABL Security Documents or the Junior Lien Security Documents (1) with respect to the delivery and control of any part of the Notes Collateral, and (2) to direct, instruct, vote upon or otherwise influence the maintenance or disposition of such Notes Collateral, shall immediately, and (to the extent permitted by law) without further action on the part of either of the Junior Lien Collateral Agent, the ABL Facility Agent or the First Priority Collateral Agents, pass to the ABL Facility Agent, who shall thereafter hold such rights for the benefit of the ABL Secured Parties and as bailee for and, with respect to any collateral that cannot be perfected in such manner, as agent for, the Junior Lien Secured Parties. Each of the First Priority Collateral Agents and the Grantors agrees that it will, if any ABL Obligations or Junior Lien Obligations remain outstanding upon the Discharge of First Priority Lien Obligations, take any other action required by any law or reasonably requested by the ABL Facility Agent or the Junior Lien Collateral Agent, in connection with the ABL Facility Agent's establishment and perfection of a First Priority security interest in the Notes Collateral and the Junior Lien Collateral Agent's establishment and perfection of a Second Priority security interest in the Notes Collateral.

(vii)    <u>When Discharge of First Priority Lien Obligations Deemed to Not Have Occurred</u>. Notwithstanding anything to the contrary herein, if at any time after the Discharge of First Priority Lien Obligations has occurred (or concurrently therewith) the Company or any other Grantor immediately thereafter (or concurrently therewith) enters into any Permitted Refinancing of any First Priority Lien Obligations, then such Discharge of First Priority Lien Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any actions taken prior to the date of such designation as a result of the occurrence of such first Discharge of First Priority Lien Obligations), and the obligations under the Permitted Refinancing shall automatically be treated as First Priority Lien Obligations (together with Hedging Obligations on the basis provided in the definition of "First Priority Documents" contained herein) for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, the term "Term Credit Agreement" or "Indenture", as applicable, shall be deemed appropriately modified to refer to such Permitted Refinancing and the First Priority Collateral Agents under such First Priority Documents shall be a First Priority Collateral Agent for all purposes hereof and the new secured parties under such First Priority Documents (together with Hedge Banks as provided herein, if any) shall automatically be treated as First Priority Secured Parties for all purposes of this Agreement. Upon receipt of a notice stating that the Company or any other Grantor has entered into a new Term Document or Note Document in respect of a Permitted Refinancing of First Priority Lien Obligations (which notice shall include the identity of the new collateral agent, such agent, the "<u>New First Priority Agent</u>"), and delivery by the New First Priority Agent of an Intercreditor Agreement Joinder, the ABL Facility Agent and the Junior Lien Collateral Agent shall promptly (i) enter into such documents and agreements (including amendments or supplements to this Agreement) as the Company or such New First Priority Agent shall reasonably request in order to provide to the New First Priority Agent the rights contemplated hereby, in each case consistent

-34-

with the terms of this Agreement and (ii) deliver to the New First Priority Agent any Pledged
Notes Collateral held by the ABL Facility Agent or the Junior Lien Collateral Agent together
with any necessary endorsements (or otherwise allow the New First Priority Agent to obtain con-
trol of such Pledged Notes Collateral).  The New First Priority Agent shall agree to be bound by
the terms of this Agreement.  If the new First Priority Lien Obligations under the new First Prior-
ity Documents are secured by assets of the Grantors of the type constituting Notes Collateral that
do not also secure the ABL Obligations and the Junior Lien Obligations, then the ABL Obliga-
tions shall be secured at such time by a Second Priority Lien on such assets to the same extent
provided in the ABL Security Documents with respect to the other Notes Collateral and the Jun-
ior Lien Obligations shall be secured at such time by a Third Priority Lien on such assets to the
same extent provided in the Notes Security Documents with respect to the other Notes Collateral.
If the new First Priority Lien Obligations under the new First Priority Documents are secured by
assets of the Grantors of the type constituting ABL Facility Collateral that do not also secure the
ABL Obligations and the Junior Lien Obligations, then the ABL Obligations shall be secured at
such time by a First Priority Lien on such assets to the same extent provided in the ABL Security
Documents with respect to the other ABL Facility Collateral and the Junior Lien Obligations
shall be secured at such time by a Third Priority Lien on such assets to the same extent provided
in the Notes Security Documents with respect to the other ABL Facility Collateral.

2.5.    <u>Insolvency or Liquidation Proceedings</u>.

(a)    <u>Finance and Sale Issues</u>.

(i)    Until the Discharge of First Priority Lien Obligations has occurred, if the
Company or any other Grantor shall be subject to any Insolvency or Liquidation Proceeding and
any First Priority Collateral Agent shall desire to permit the use of cash collateral constituting
Notes Collateral on which such First Priority Collateral Agent or any other creditor has a Lien or
to permit the Company or any other Grantor to obtain financing, whether from the First Priority
Secured Parties or any other entity under Section 363 or Section 364 of the Bankruptcy Code or
any similar Bankruptcy Law (each, a "<u>DIP Financing</u>"), then the ABL Facility Agent, on behalf
of itself and the ABL Secured Parties and the Junior Lien Collateral Agent, on behalf of itself
and the Junior Lien Secured Parties, agree that they will raise no objection to such use of cash
collateral constituting Notes Collateral or to the fact that such DIP Financing may be granted
Liens on the Notes Collateral and will not request adequate protection or any other relief in con-
nection therewith (except, as expressly, agreed by the First Priority Collateral Agents or to the
extent permitted by Section 2.5(c)) and, to the extent the Liens on the Notes Collateral securing
the First Priority Lien Obligations are subordinated or <u>pari passu</u> with the Liens on the Notes
Collateral securing such DIP Financing, the ABL Facility Agent and the Junior Lien Collateral
Agent will subordinate their Liens in the Notes Collateral to the Liens securing such DIP Financ-
ing (and all obligations relating thereto).  The ABL Facility Agent, on behalf of the ABL Secured
Parties, and the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Par-
ties, agree that they will not raise any objection or oppose a sale or other disposition of any Notes
Collateral free and clear of its Liens (subject to attachment of proceeds with respect to the Sec-
ond Priority Lien on the Notes Collateral in favor of the ABL Facility Agent and the Third Prior-
ity Lien on the Notes Collateral in favor of the Junior Lien Collateral Agent in the same order
and manner as otherwise set forth herein) or other claims under Section 363 of the Bankruptcy

-35-

Code if the First Priority Secured Parties have consented to such sale or disposition of such assets.

(ii)    Following the Discharge of First Priority Lien Obligations and until the Discharge of ABL Obligations has occurred, if the Company or any other Grantor shall be subject to any Insolvency or Liquidation Proceeding and the ABL Facility Agent shall desire to permit the Company or any other Grantor to obtain a DIP Financing, then the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, agrees that it will raise no objection to such use of cash collateral constituting Notes Collateral or to the fact that such DIP Financing may be granted Liens on the Notes Collateral and will not request adequate protection or any other relief in connection therewith (except, as expressly, agreed by the ABL Facility Agent or to the extent permitted by Section 2.5(c)) and, to the extent the Liens on the Notes Collateral securing the ABL Obligations are subordinated or pari passu with the Liens on the Notes Collateral securing such DIP Financing, the Junior Lien Collateral Agent will subordinate its Liens in the Notes Collateral to the Liens securing such DIP Financing (and all obligations relating thereto).  Following the Discharge of First Priority Lien Obligations, the Junior Lien Collateral Agent, on behalf of the Junior Lien Secured Parties, agrees that it will not raise any objection or oppose a sale or other disposition of any Notes Collateral free and clear of its Liens (subject to attachment of proceeds with respect to the Third Priority Lien on the Notes Collateral in favor of the Junior Lien Collateral Agent in the same order and manner as otherwise set forth herein) or other claims under Section 363 of the Bankruptcy Code if the ABL Secured Parties have consented to such sale or disposition of such assets.

(b)    Relief from the Automatic Stay.  Until the Discharge of First Priority Lien Obligations has occurred, the ABL Facility Agent, on behalf of itself and the ABL Secured Parties and the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, agree that none of them shall seek relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the Notes Collateral without the prior written consent of the First Priority Collateral Agents.  Following the Discharge of First Priority Lien Obligations, until the Discharge of ABL Obligations has occurred, the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, agrees that none of them shall seek relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the Notes Collateral without the prior written consent of the ABL Facility Agent.

(c)    Adequate Protection.

(i)    The ABL Facility Agent, on behalf of itself and the ABL Secured Parties and the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, agree that none of them shall contest (or support any other person contesting) (i) any request by the First Priority Collateral Agents or the First Priority Secured Parties for adequate protection with respect to any Notes Collateral or (ii) any objection by the First Priority Collateral Agents or the First Priority Secured Parties to any motion, relief, action or proceeding based on the First Priority Collateral Agents or the First Priority Secured Parties claiming a lack of adequate protection with respect to the Notes Collateral.  Notwithstanding the foregoing provisions in this Section 2.5(c), in any Insolvency or Liquidation Proceeding, (A) if the First Priority Secured Parties (or any subset thereof) are granted adequate protection in the form of additional collateral in

-36-

the nature of assets constituting Notes Collateral in connection with any DIP Financing, then the ABL Facility Agent, on behalf of itself or any of the ABL Secured Parties and the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, may seek or request adequate protection in the form of a Lien on such additional collateral, which Lien of the ABL Facility Agent will be subordinated to the Liens securing the First Priority Lien Obligations and such DIP Financing (and all obligations relating thereto) on the same basis as the other Liens on Notes Collateral securing the ABL Obligations are so subordinated to the First Priority Lien Obligations under this Agreement and which Lien of the Junior Lien Collateral Agent will be subordinated to the Liens securing the First Priority Lien Obligations, such DIP Financing (and all obligations relating thereto) and the ABL Obligations on the same basis as the other Liens on Notes Collateral securing the Junior Lien Obligations are so subordinated to the First Priority Lien Obligations and ABL Obligations under this Agreement, and (B) in the event the ABL Facility Agent, on behalf of itself and the ABL Secured Parties or the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, seeks or requests adequate protection in respect of Notes Collateral securing ABL Obligations or the Junior Lien Obligations, as applicable, and such adequate protection is granted in the form of additional collateral in the nature of assets constituting Notes Collateral, then the ABL Facility Agent, on behalf of itself or any of the ABL Secured Parties and the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, agree that the First Priority Collateral Agents shall also be granted a senior Lien on such additional collateral as security for the First Priority Lien Obligations and for any such DIP Financing provided by the First Priority Secured Parties and that any Lien on such additional collateral securing the ABL Obligations and the Junior Lien Obligations shall be subordinated to the Liens on such collateral securing the First Priority Lien Obligations and any such DIP Financing provided by the First Priority Secured Parties (and all obligations relating thereto) and to any other Liens granted to the First Priority Secured Parties as adequate protection on the same basis as the other Liens on Notes Collateral securing the ABL Obligations and the Junior Lien Obligations are so subordinated to such First Priority Lien Obligations under this Agreement.

(ii)         Prior to the Discharge of ABL Obligations, the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, agrees that none of them shall contest (or support any other person contesting) (i) any request by the ABL Facility Agent or the ABL Secured Parties for adequate protection with respect to any Notes Collateral or (ii) any objection by the ABL Facility Agent or the ABL Secured Parties to any motion, relief, action or proceeding based on the ABL Facility Agent or the ABL Secured Parties claiming a lack of adequate protection with respect to the Notes Collateral.  Notwithstanding the foregoing provisions in this Section 2.5(c), in any Insolvency or Liquidation Proceeding, (A) if the ABL Secured Parties (or any subset thereof) are granted adequate protection in the form of additional collateral in the nature of assets constituting Notes Collateral in connection with any DIP Financing, then the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, may seek or request adequate protection in the form of a Lien on such additional collateral, which Lien will be subordinated to the Liens securing the ABL Obligations and such DIP Financing (and all obligations relating thereto) on the same basis as the other Liens on Notes Collateral securing the Junior Lien Obligations are so subordinated to the ABL Obligations under this Agreement, and (B) in the event the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, seek or request adequate protection in respect of Notes Collateral securing the Junior

Lien Obligations, and such adequate protection is granted in the form of additional collateral in the nature of assets constituting Notes Collateral, then the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, agree that the ABL Facility Agent shall also be granted a senior Lien on such additional collateral as security for the ABL Obligations and for any such DIP Financing provided by the ABL Secured Parties and that any Lien on such additional collateral securing the Junior Lien Obligations shall be subordinated to the Liens on such collateral securing the ABL Obligations and any such DIP Financing provided by the ABL Secured Parties (and all obligations relating thereto) and to any other Liens granted to the ABL Secured Parties as adequate protection on the same basis as the other Liens on Notes Collateral securing the Junior Lien Obligations are so subordinated to such ABL Obligations under this Agreement.

(d)    No Waiver.  Subject to the proviso in clause (ii) of Section 2.2(a) and clause (i) of Section 2.5(c), nothing contained herein shall prohibit or in any way limit any First Priority Collateral Agent or any First Priority Secured Party from objecting in any Insolvency or Liquidation Proceeding or otherwise to any action taken by the ABL Facility Agent, any of the ABL Secured Parties, the Junior Lien Collateral Agent or any of the Junior Lien Secured Parties in respect of the Notes Collateral, including the seeking by the ABL Facility Agent, any ABL Secured Parties, the Junior Lien Collateral Agent or any Junior Lien Secured Parties of adequate protection in respect thereof or the asserting by the ABL Facility Agent, any ABL Secured Parties, the Junior Lien Collateral Agent or any Junior Lien Secured Parties of any of its rights and remedies under the ABL Documents, the Notes Documents or otherwise in respect thereof.  Subject to the proviso in clause (ii) of Section 2.2(b) and clause (i) of Section 2.5(c), nothing contained herein shall prohibit or in any way limit the ABL Facility Agent or any ABL Secured Party from objecting in any Insolvency or Liquidation Proceeding or otherwise to any action taken by the Junior Lien Collateral Agent or any of the Junior Lien Secured Parties in respect of the Notes Collateral, including the seeking by the Junior Lien Collateral Agent or any Junior Lien Secured Parties of adequate protection in respect thereof or the asserting by the Junior Lien Collateral Agent or any Junior Lien Secured Parties of any of its rights and remedies under the Notes Documents or otherwise in respect thereof.

(e)    Reorganization Securities.  If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed, pursuant to a plan of reorganization or similar dispositive restructuring plan, on account of First Priority Lien Obligations, on account of ABL Obligations and on account of Junior Lien Obligations, then, to the extent the debt obligations distributed on account of the First Priority Lien Obligations, on account of the ABL Obligations and on account of Junior Lien Obligations are secured by Liens upon the same property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.[5]

---

[5]      Discuss.

-38-

(f)    Post-Petition Interest.

(i)    None of the ABL Facility Agent, any ABL Secured Party, the Junior Lien
Collateral Agent or any Notes Secured Party shall oppose or seek to challenge any claim by any
First Priority Collateral Agent or any First Priority Secured Party for allowance in any Insol-
vency or Liquidation Proceeding of First Priority Lien Obligations consisting of post-petition
interest, fees or expenses to the extent of the value of the First Priority Secured Parties' Liens on
the Notes Collateral, without regard to the existence of the Lien of the ABL Facility Agent on
behalf of the ABL Secured Parties on the Notes Collateral or the Lien of the Junior Lien Collat-
eral Agent on behalf of the Junior Lien Secured Parties on the Notes Collateral.  None of the Jun-
ior Lien Collateral Agent or any Notes Secured Party shall oppose or seek to challenge any claim
by the ABL Facility Agent or any ABL Secured Party for allowance in any Insolvency or Liqui-
dation Proceeding of ABL Obligations consisting of post-petition interest, fees or expenses to the
extent of the value of the ABL Secured Party's Lien on the Notes Collateral, without regard to
the existence of the Lien of the Junior Lien Collateral Agent on behalf of the Junior Lien Secured
Parties on the Notes Collateral.

(ii)    No First Priority Collateral Agent nor any other First Priority Secured
Party shall oppose or seek to challenge any claim by the ABL Facility Agent, any ABL Secured
Party, the Junior Lien Collateral Agent or any Notes Secured Party for allowance in any Insol-
vency or Liquidation Proceeding of ABL Obligations or Junior Lien Obligations consisting of
post-petition interest, fees or expenses to the extent of the value of the Lien of the ABL Facility
Agent on behalf of the ABL Secured Parties on the Notes Collateral or the Lien of the Junior
Lien Collateral Agent on behalf of the Junior Lien Secured Parties on the Notes Collateral (after
taking into account the Lien of the First Priority Secured Parties on the Notes Collateral and with
respect to the Lien of the Junior Lien Collateral Agent, after taking into account the Lien of the
ABL Secured Parties on the Notes Collateral).  Neither the ABL Facility Agent nor any other
ABL Secured Party shall oppose or seek to challenge any claim by the Junior Lien Collateral
Agent or any Notes Secured Party for allowance in any Insolvency or Liquidation Proceeding of
Junior Lien Obligations consisting of post-petition interest, fees or expenses to the extent of the
value of the Lien of the Junior Lien Collateral Agent on behalf of the Junior Lien Secured Parties
on the Notes Collateral (after taking into account the Lien of the First Priority Secured Parties
and the ABL Secured Parties on the Notes Collateral).

(g)    Waiver.  The ABL Facility Agent, for itself and on behalf of the ABL Se-
cured Parties, and the Junior Lien Collateral Agent, for itself and on behalf of the Junior Lien
Secured Parties, waive any claim they may hereafter have against any First Priority Secured
Party arising out of the election of any First Priority Secured Party of the application of Section
1111(b)(2) of the Bankruptcy Code, and/or out of any cash collateral or financing arrangement or
out of any grant of a security interest in connection with the Notes Collateral in any Insolvency
or Liquidation Proceeding.

2.6.    Reliance; Waivers; Etc.

(a)    Reliance.  Other than any reliance on the terms of this Agreement, the
ABL Facility Agent, on behalf of itself and the ABL Secured Parties, and the Junior Lien Collat-
eral Agent, for itself and on behalf of the Junior Lien Secured Parties, acknowledge that they and

-39-

such ABL Secured Parties and such Junior Lien Secured Parties have, independently and without
reliance on any First Priority Collateral Agent or any First Priority Secured Parties, and based on
documents and information deemed by them appropriate, made their own credit analysis and de-
cision to enter into such ABL Documents and Junior Lien Documents and be bound by the terms
of this Agreement and they will continue to make their own credit decision in taking or not tak-
ing any action under the ABL Credit Agreement, the Junior Lien Indenture or this Agreement.

(b)    No Warranties or Liability.  The ABL Facility Agent, on behalf of itself
and the ABL Secured Parties, and the Junior Lien Collateral Agent, for itself and on behalf of the
Junior Lien Secured Parties, acknowledge and agree that the First Priority Collateral Agents and
the First Priority Secured Parties have made no express or implied representation or warranty,
including with respect to the execution, validity, legality, completeness, collectability or enforce-
ability of any of the First Priority Documents, the ownership of any Collateral or the perfection
or priority of any Liens thereon.  The First Priority Secured Parties will be entitled to manage
and supervise their respective loans and extensions of credit under their respective First Priority
Documents in accordance with law and as they may otherwise, in their sole discretion, deem ap-
propriate.  The First Priority Collateral Agents and the First Priority Secured Parties shall have
no duty to the ABL Facility Agent, any of the ABL Secured Parties, the Junior Lien Collateral
Agent or any of the Junior Lien Secured Parties to act or refrain from acting in a manner which
allows, or results in, the occurrence or continuance of an event of default or default under any
agreements with the Company or any other Grantor (including the First Priority Documents, the
ABL Documents and the Notes Documents), regardless of any knowledge thereof which they
may have or be charged with.

(c)    No Waiver of Lien Priorities.

(i)    No right of the First Priority Secured Parties, the First Priority Collateral
Agents or any of them to enforce any provision of this Agreement or any Term Document shall
at any time in any way be prejudiced or impaired by any act or failure to act on the part of the
Company or any other Grantor or by any act or failure to act by any First Priority Secured Party
or the First Priority Collateral Agents, or by any noncompliance by any Person with the terms,
provisions and covenants of this Agreement, any of the First Priority Documents, any of the
ABL Documents or any of the Junior Lien Documents, regardless of any knowledge thereof
which the First Priority Collateral Agents or the First Priority Secured Parties, or any of them,
may have or be otherwise charged with.

(ii)    Without in any way limiting the generality of the foregoing paragraph (but
subject to the rights of the Company and the other Grantors under the First Priority Documents
and subject to the provisions of Section 2.4(c)), the First Priority Secured Parties, the First Prior-
ity Collateral Agents and any of them may, at any time and from time to time in accordance with
the First Priority Documents and/or applicable law, without the consent of, or notice to, the ABL
Facility Agent, any ABL Secured Party, the Junior Lien Collateral Agent or any Junior Lien Se-
cured Party, without incurring any liabilities to the ABL Facility Agent, any ABL Secured Party,
the Junior Lien Collateral Agent or any Junior Lien Secured Party and without impairing or re-
leasing the Lien priorities and other benefits provided in this Agreement (even if any right of
subrogation or other right or remedy of the ABL Facility Agent, any ABL Secured Party, the

Junior Lien Collateral Agent or any Junior Lien Secured Party is affected, impaired or extinguished thereby) do any one or more of the following:

> (1)    sell, exchange, realize upon, enforce or otherwise deal with in any manner (subject to the terms hereof) and in any order any part of the Notes Collateral or any liability of the Company or any other Grantor to the First Priority Secured Parties or the First Priority Collateral Agents, or any liability incurred directly or indirectly in respect thereof;

> (2)    settle or compromise any First Priority Lien Obligation or any other liability of the Company or any other Grantor or any security therefor or any liability incurred directly or indirectly in respect thereof; and

> (3)    exercise or delay in or refrain from exercising any right or remedy against the Company or any security or any other Grantor or any other Person, elect any remedy and otherwise deal freely with the Company, any other Grantor or any Notes Collateral and any security and any guarantor or any liability of the Company or any other Grantor to the First Priority Secured Parties or any liability incurred directly or indirectly in respect thereof.

> (iii)    The ABL Facility Agent, on behalf of itself and the ABL Secured Parties and the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, also agree that the First Priority Secured Parties and the First Priority Collateral Agents shall have no liability to the ABL Facility Agent, any ABL Secured Party, the Junior Lien Collateral Agent or any Notes Secured Party, and the ABL Facility Agent, on behalf of itself and the ABL Secured Parties and the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, hereby waive any claim against any First Priority Secured Party or the First Priority Collateral Agents, arising out of any and all actions which the First Priority Secured Parties or the First Priority Collateral Agents may take or permit or omit to take with respect to:

> > (1)    the First Priority Documents (other than this Agreement);

> > (2)    the collection of the First Priority Lien Obligations; or

> > (3)    the foreclosure upon, or sale, liquidation or other disposition of, any Notes Collateral.

The ABL Facility Agent, on behalf of itself and the ABL Secured Parties and the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, agree that the First Priority Secured Parties and the First Priority Collateral Agents have no duty to the ABL Facility Agent, the ABL Secured Parties, the Junior Lien Collateral Agent or the Junior Lien Secured Parties in respect of the maintenance or preservation of the Notes Collateral, the First Priority Lien Obligations or otherwise.

> (iv)    The Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, also agrees that the ABL Secured Parties and the ABL Facility Agent shall have no liability to the Junior Lien Collateral Agent or any Notes Secured Party, and the Junior Lien

-41-

Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, hereby waives any claim against any ABL Secured Party or the ABL Facility Agent, arising out of any and all actions which the ABL Secured Parties or the ABL Facility Agent may take or permit or omit to take with respect to:

      (1)     the ABL Documents (other than this Agreement);

      (2)     the collection of the ABL Obligations; or

      (3)     the foreclosure upon, or sale, liquidation or other disposition of, any Notes Collateral.

The Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, agrees that the ABL Secured Parties and the ABL Facility Agent have no duty to the Junior Lien Collateral Agent or the Junior Lien Secured Parties in respect of the maintenance or preservation of the Notes Collateral, the ABL Obligations or otherwise.

      (v)     The ABL Facility Agent, on behalf of itself and the ABL Secured Parties, and the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties agree not to assert and hereby waive, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the Notes Collateral or any other similar rights a junior secured creditor may have under applicable law.

      (vi)     The Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, agrees not to assert and hereby waive, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the Notes Collateral or any other similar rights a junior secured creditor may have under applicable law.

      (d)     <u>Obligations Unconditional</u>.  All rights, interests, agreements and obligations of the First Priority Collateral Agents and the First Priority Secured Parties and the ABL Facility Agent, the ABL Secured Parties, the Junior Lien Collateral Agent and the Junior Lien Secured Parties, respectively, hereunder shall remain in full force and effect irrespective of:

      (i)     any lack of validity or enforceability of any First Priority Document, any ABL Document or any Junior Lien Document;

      (ii)     except as otherwise set forth in the Agreement, any change permitted hereunder in the time, manner or place of payment of, or in any other terms of, all or any of the First Priority Lien Obligations, the ABL Obligations or the Junior Lien Obligations, or any amendment or waiver or other modification permitted hereunder, whether by course of conduct or otherwise, of the terms of any First Priority Lien Document, any ABL Document or any Junior Lien Document;

(iii)    any exchange of any security interest in any Notes Collateral or any amendment, waiver or other modification permitted hereunder, whether in writing or by course of conduct or otherwise, of all or any of the First Priority Lien Obligations, the ABL Obligations or the Junior Lien Obligations;

(iv)    the commencement of any Insolvency or Liquidation Proceeding in respect of the Company or any other Grantor; or

(v)    any other circumstances which otherwise might constitute a defense available to, or a discharge of, the Company or any other Grantor in respect of the First Priority Lien Obligations, or of the ABL Facility Agent or any ABL Secured Party, or of the Junior Lien Collateral Agent or any Notes Secured Party in respect of this Agreement.

2.7.    <u>Effectiveness of First Lien Intercreditor Agreement</u>.  Notwithstanding the foregoing, each First Priority Collateral Agent and First Priority Secured Party agrees that any rights of such parties with respect to Notes Collateral shall in all cases be controlled by, and subject to the terms and limitations set forth in, the First Lien Intercreditor Agreement.

Section 3.    <u>ABL Facility Collateral</u>.

3.1.    <u>Lien Priorities</u>.

(a)    <u>Relative Priorities</u>.  Notwithstanding (i) the time, manner, order or method of grant, creation, attachment or perfection of any Liens securing the First Priority Lien Obligations or the Junior Lien Obligations granted on the ABL Facility Collateral or of any Liens securing the ABL Obligations granted on the ABL Facility Collateral, (ii) the validity or enforceability of the security interests and Liens granted in favor of any Collateral Agent or any Secured Party on the ABL Facility Collateral, (iii) the date on which any ABL Obligations, First Priority Lien Obligations or Junior Lien Obligations are extended, (iv) any provision of the UCC or any other applicable law, including any rule for determining priority thereunder or under any other law or rule governing the relative priorities of secured creditors, including with respect to real property or fixtures, (v) any provision set forth in any ABL Document, any First Priority Document or any Junior Lien Document (other than this Agreement), (vi) the possession or control by any Collateral Agent or any Secured Party or any bailee of all or any part of any ABL Facility Collateral as of the date hereof or otherwise, or (vii) any other circumstance whatsoever, the First Priority Collateral Agents, on behalf of itself and the First Priority Secured Parties, and the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, hereby agree that:

(i)    any Lien on the ABL Facility Collateral securing any ABL Obligations now or hereafter held by or on behalf of the ABL Facility Agent or any ABL Secured Parties or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to (x) any Lien on the ABL Facility Collateral securing any of the First Priority Lien Obligations and (y) any Lien on the ABL Facility Collateral securing any of the Junior Lien Obligations;

-43-

(ii)     any Lien on the ABL Facility Collateral now or hereafter held by or on behalf of the First Priority Collateral Agents, any First Priority Secured Parties, the Junior Lien Collateral Agent, any Junior Lien Secured Parties or any agent or trustee therefor regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the ABL Facility Collateral securing any ABL Obligations;

(iii)     any Lien on the ABL Facility Collateral securing any First Priority Lien Obligations now or hereafter held by or on behalf of the First Priority Collateral Agents or any First Priority Secured Parties or any agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien on the ABL Facility Collateral securing any of the Junior Lien Obligations; and

(iv)     any Lien on the ABL Facility Collateral now or hereafter held by or on behalf of the Junior Lien Collateral Agent, any Notes Secured Party or any agent or trustee therefor regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the ABL Facility Collateral securing any First Priority Lien Obligations.

All Liens on the ABL Facility Collateral securing any ABL Obligations shall be and remain senior in all respects and prior to all Liens on the ABL Facility Collateral securing (x) any First Priority Lien Obligations and (y) any Junior Lien Obligations for all purposes, whether or not such Liens securing any ABL Obligations are subordinated to any Lien securing any other obligation of the Company, any other Grantor or any other Person.  All Liens on the ABL Facility Collateral securing any First Priority Lien Obligations shall be and remain senior in all respects and prior to all Liens on the ABL Facility Collateral securing any Junior Lien Obligations for all purposes, whether or not such Liens securing any First Priority Lien Obligations are subordinated to any Lien securing any other obligation of the Company, any other Grantor or any other Person.

(b)     Prohibition on Contesting Liens.  Each of the ABL Facility Agent, for itself and on behalf of each ABL Secured Party, each First Priority Collateral Agent, for itself and on behalf of each First Priority Secured Party and the Junior Lien Collateral Agent for itself and on behalf of each Junior Lien Secured Party, agrees that it shall not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), (i) the priority, validity or enforceability of a Lien held by or on behalf of any of the ABL Secured Parties in the ABL Facility Collateral, by or on behalf of any of the First Priority Secured Parties in the ABL Facility Collateral or by or on behalf of any of the Junior Lien Secured Parties in the ABL Facility Collateral, as the case may be, or (ii) the validity or enforceability of any First Priority Security Document (or any First Priority Lien Obligations thereunder), any ABL Security Document (or any ABL Obligations thereunder) or any Junior Lien Security Document (or any Junior Lien Obligations thereunder); provided that nothing in this Agreement shall be construed to prevent or impair the rights of any of the Collateral Agents or any Secured Party to enforce this Agreement, including the priority of the Liens on the ABL Facility Collateral securing the ABL Obligations, the First Priority Lien Obligations and the Junior Lien Obligations  as provided in Sections 3.1(a), 3.2(a) and 3.2(b).

-44-

(c)    <u>No New Liens</u>.  So long as the Discharge of ABL Obligations has not oc-
curred, the parties hereto agree that the Company or any other Grantor shall not grant or permit
any additional Liens on any asset or property of any Grantor to secure any First Priority Lien Ob-
ligation or Junior Lien Notes Obligation unless it has granted or contemporaneously grants (x)(i)
a First Priority Lien on such asset or property to secure the ABL Obligations if such asset or
property constitutes ABL Facility Collateral or (ii) a Second Priority Lien on such asset or prop-
erty to secure the ABL Obligations if such asset or property constitutes Notes Collateral, (y)(i) a
Second Priority Lien on such asset or property to secure the First Priority Lien Obligations if
such asset or property constitutes ABL Facility Collateral or (ii) a First Priority Lien on such as-
set or property to secure the First Priority Lien Obligations if such asset or property constitutes
Notes Collateral and (z) a Third Priority Lien on such asset or property to secure the Junior Lien
Obligations; <u>provided</u> that (i) the Company may secure obligations under the Junior Lien Notes
with Liens on certain European assets of the Company and its Subsidiaries to the extent permit-
ted by the Term Credit Agreement, the ABL Credit Agreement and the Indenture, without grant-
ing a Lien on such European assets to secure the ABL Obligations or any First Priority Lien Ob-
ligations and (ii) the Capital Stock of a Subsidiary will automatically be deemed not to be part of
the Collateral securing the Notes if permitted to be exempted by the 3-16 Exemption; <u>provided</u>,
<u>however</u> that the 3-16 Exemption will not apply to the capital stock of the Company and Lyon-
dellBasell Subholdings, B.V.  To the extent that the provisions of clause (x)(i) in the immediately
preceding sentence are not complied with for any reason, without limiting any other rights and
remedies available to the ABL Facility Agent and/or the ABL Secured Parties, each of the First
Priority Collateral Agents, on behalf of First Priority Secured Parties, and the Junior Lien Collat-
eral Agent, on behalf of the Junior Lien Secured Parties, agrees that any amounts received by or
distributed to any of them pursuant to or as a result of Liens on the ABL Facility Collateral
granted in contravention of such clause (x)(i) of this Section 3.1(c) shall be subject to Section
3.3.

(d)    <u>Effectiveness of Lien Priorities</u>.  Each of the parties hereto acknowledges
that the Lien priorities provided for in this Agreement shall not be affected or impaired in any
manner whatsoever, including, without limitation, on account of:  (i) the invalidity, irregularity
or unenforceability of all or any part of the ABL Documents, the First Priority Documents or the
Notes Documents; (ii) any amendment, change or modification of any ABL Documents, First
Priority Documents or Notes Documents; or (iii) any impairment, modification, change, ex-
change, release or subordination of or limitation on, any liability of, or stay of actions or lien en-
forcement proceedings against, Holdings or any of its Subsidiaries party to any of the ABL
Documents, the First Priority Documents or the Notes Documents, its property, or its estate in
bankruptcy resulting from any bankruptcy, arrangement, readjustment, composition, liquidation,
rehabilitation, similar proceeding or otherwise involving or affecting any Secured Party.

3.2.    <u>Exercise of Remedies</u>.

(a)    So long as the Discharge of ABL Obligations has not occurred, prior to
any Insolvency or Liquidation Proceeding having been commenced by or against Holdings, the
Company or any other Grantor:

-45-

(i)      none of the First Priority Collateral Agents, the First Priority Secured Parties, the Junior Lien Collateral Agent or the Junior Lien Secured Parties (x) will exercise or seek to exercise any rights or remedies (including, without limitation, set-off) with respect to any ABL Facility Collateral (including, without limitation, the exercise of any right under any lockbox agreement, account control agreement, landlord waiver or bailee's letter or similar agreement or arrangement in respect of ABL Facility Collateral to which the First Priority Collateral Agents, any First Priority Secured Party, the Junior Lien Collateral Agent or any Junior Lien Secured Party is a party) or institute or commence or join with any Person (other than the ABL Facility Agent and the ABL Secured Parties) in commencing any action or proceeding with respect to such rights or remedies (including any action of foreclosure, enforcement, collection or execution); provided, however, that the First Priority Collateral Agents or the Junior Lien Collateral Agent may exercise any or all such rights after the passage of a period of 180 days from the date of delivery of a notice in writing to the ABL Facility Agent of any First Priority Collateral Agent's, or any Junior Lien Collateral Agent's, intention to exercise its right to take such actions following an "Event of Default" as defined in the applicable First Priority Documents or Junior Lien Documents, as applicable, and, as a result of such "Event of Default", the principal and interest under such First Priority Document or Junior Lien Document has become due and payable (the "ABL Standstill Period"); provided, further, however, notwithstanding anything herein to the contrary, none of the First Priority Collateral Agents, the First Priority Secured Party, the Junior Lien Collateral Agent or the Junior Lien Secured Parties will exercise any rights or remedies with respect to any ABL Facility Collateral if, notwithstanding the expiration of the ABL Standstill Period, the ABL Facility Agent or ABL Secured Parties shall have commenced the exercise of any of their rights or remedies with respect to all or any portion of the ABL Facility Collateral (prompt notice of such exercise to be given to the First Priority Collateral Agents and the Junior Lien Collateral Agent) and are pursuing the exercise thereof, provided, still, further, however, notwithstanding anything herein to the contrary, neither the Junior Lien Collateral Agent nor any Junior Lien Secured Party will exercise any rights or remedies with respect to any ABL Facility Collateral if, notwithstanding the expiration of the ABL Standstill Period, any First Priority Collateral Agent or First Priority Secured Party shall have commenced the exercise of any of their rights or remedies with respect to all or any portion of the ABL Facility Collateral (prompt notice of such exercise to be given to the Junior Lien Collateral Agent) and are pursuing the exercise thereof, (y) will contest, protest or object to any foreclosure proceeding or action brought by the ABL Facility Agent or any ABL Secured Party with respect to, or any other exercise by the ABL Facility Agent or any ABL Secured Party of any rights and remedies relating to, the ABL Facility Collateral under the ABL Documents or otherwise, or (z) subject to the rights of the First Priority Collateral Agents or the Junior Lien Collateral Agent under clause (i)(x) above, will object to the forbearance by the ABL Facility Agent or the ABL Secured Parties from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the ABL Facility Collateral, in each case so long as the respective interests of the First Priority Secured Parties and the Junior Lien Secured Parties attach to the proceeds thereof subject to the relative priorities described in Section 3.1; provided that the Junior Lien Collateral Agent and the Junior Lien Secured Parties will not object to the forbearance by any First Priority Collateral Agent or the First

-46-

Priority Secured Parties from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the ABL Facility Collateral, in each case so long as the interests of the Junior Lien Secured Parties attach to the proceeds thereof subject to the relative priorities described in Section 3.1; provided, however, that nothing in this Section 3.2(a) shall be construed to authorize (A) the First Priority Collateral Agents, any First Priority Secured Party, the Junior Lien Collateral Agent or any Notes Secured Party to sell any ABL Facility Collateral free of the Lien of the ABL Facility Agent or any ABL Secured Party or (B) the Junior Lien Collateral Agent or any Notes Secured Party to sell any ABL Facility Collateral free of the Lien of the First Priority Collateral Agents or any First Priority Secured Party; and

(ii)    the ABL Facility Agent and the ABL Secured Parties shall have the exclusive right to enforce rights, exercise remedies (including setoff and the right to credit bid their debt) and make determinations regarding the disposition of, or restrictions with respect to, the ABL Facility Collateral without any consultation with or the consent of the First Priority Collateral Agents, any First Priority Secured Party, the Junior Lien Collateral Agent or any Notes Secured Party; provided, that:

(1)    the First Priority Collateral Agents may take any action (not adverse to the prior Liens on the ABL Facility Collateral securing the ABL Obligations, or the rights of any ABL Facility Agent or the ABL Secured Parties to exercise remedies in respect thereof) in order to preserve or protect its Lien on the ABL Facility Collateral;

(2)    the Junior Lien Collateral Agent may take any action (not adverse to the prior Liens on the ABL Facility Collateral securing the ABL Obligations and the First Priority Lien Obligations, or the rights of any ABL Facility Agent, the ABL Secured Parties, any First Priority Collateral Agent or the First Priority Secured Parties to exercise remedies in respect thereof) in order to preserve or protect its Lien on the ABL Facility Collateral;

(3)    the First Priority Secured Parties and the Junior Lien Secured Parties shall be entitled to file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of the First Priority Secured Parties or the Junior Lien Secured Parties, as applicable, including without limitation any claims secured by the ABL Facility Collateral, if any, in each case in accordance with the terms of this Agreement;

(4)    the First Priority Secured Parties and the Junior Lien Secured Parties shall be entitled to file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Grantors arising under either the Bankruptcy Law or applicable non-bankruptcy law, in each case in accordance with the terms of this Agreement;

(5)    the First Priority Secured Parties and the Junior Lien Secured Parties shall be entitled to vote on any plan of reorganization and file any proof of

-47-

claim in an Insolvency or Liquidation Proceeding or otherwise and other filings and make any arguments and motions that are, in each case, in accordance with the terms of this Agreement, with respect to the ABL Facility Collateral;

(6)    the First Priority Collateral Agents or any First Priority Secured Party may exercise any of its rights or remedies with respect to the ABL Facility Collateral after the termination of the ABL Standstill Period to the extent permitted by clause (i)(x) above; and

(7)    the Junior Lien Collateral Agent or any Junior Lien Secured Party may exercise any of its rights or remedies with respect to the ABL Facility Collateral after the termination of the ABL Standstill Period to the extent permitted by clause (i)(x) above.

In exercising rights and remedies with respect to the ABL Facility Collateral, the ABL Facility Agent and the ABL Secured Parties may enforce the provisions of the ABL Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of ABL Facility Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC of any applicable jurisdiction and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction.

(b)    Following the Discharge of ABL Obligations, so long as the Discharge of First Priority Lien Obligations has not occurred, prior to any Insolvency or Liquidation Proceeding having been commenced by or against Holdings, the Company or any other Grantor:

(i)    none of the Junior Lien Collateral Agent and the Junior Lien Secured Parties (x) will exercise or seek to exercise any rights or remedies (including, without limitation, setoff) with respect to any ABL Facility Collateral (including, without limitation, the exercise of any right under any lockbox agreement, account control agreement, landlord waiver or bailee's letter or similar agreement or arrangement in respect of ABL Facility Collateral to which the Junior Lien Collateral Agent or any Junior Lien Secured Party is a party) or institute or commence, or join with any Person (other than the First Priority Collateral Agents and the First Priority Secured Parties) in commencing any action or proceeding with respect to such rights or remedies (including any action of foreclosure), enforcement, collection or execution; provided, however, that the Junior Lien Collateral Agent may exercise any or all such rights after the passage of 180 days from the date of delivery of a notice in writing to the First Priority Collateral Agents of the Junior Lien Collateral Agent's intention to exercise its right to take such actions following an "Event of Default" as defined in the Junior Lien Documents (the "Second Lien ABL Facility Collateral Standstill Period"); provided, further, however, notwithstanding anything herein to the contrary, neither the Junior Lien Collateral Agent nor any Junior Lien Secured Party will exercise any rights or remedies with respect to any ABL Facility Collateral if, notwithstanding the expiration of the Second Lien ABL Facility Collateral Standstill Period, the First Priority Collateral Agents or First Priority Secured Parties shall have commenced the exercise of any of its rights or remedies with respect to all or

-48-

any portion of the ABL Facility Collateral (prompt notice of such exercise to be given to the Junior Lien Collateral Agent) and are pursuing the exercise thereof; (y) will contest, protest or object to any foreclosure proceeding or action brought by any First Priority Collateral Agent or any First Priority Secured Party with respect to, or any other exercise by the First Priority Collateral Agents or any First Priority Secured Party of any rights and remedies relating to, the ABL Facility Collateral under the First Priority Documents or otherwise, or (z) will object to the forbearance by the First Priority Collateral Agents or the First Priority Secured Parties from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the ABL Facility Collateral, in each case so long as the respective interests of the Junior Lien Secured Parties attach to the proceeds thereof subject to the relative priorities described in Section 3.1; and

(ii)    the First Priority Collateral Agents and the First Priority Secured Parties shall have the exclusive right to enforce rights, exercise remedies (including set-off and the right to credit bid their debt) and make determinations regarding the disposition of, or restrictions with respect to, the ABL Facility Collateral without any consultation with or the consent of the Junior Lien Collateral Agent or any Junior Lien Secured Party; pro-vided, that:

(1)    the Junior Lien Collateral Agent may take any action (not adverse to the prior Liens on the ABL Facility Collateral securing the First Priority Lien Obligations, or the rights of any First Priority Collateral Agents or the First Priority Secured Parties to exercise remedies in respect thereof) in order to preserve or protect its Lien on the ABL Facility Collateral;

(2)    the Junior Lien Secured Parties shall be entitled to file any neces-sary responsive or defensive pleadings in opposition to any motion, claim, adver-sary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of the Junior Lien Secured Parties, includ-ing without limitation any claims secured by the ABL Facility Collateral, if any, in each case in accordance with the terms of this Agreement;

(3)    the Junior Lien Secured Parties shall be entitled to file any plead-ings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Grantors arising under either the Bankruptcy Law or applicable non-bankruptcy law, in each case in accordance with the terms of this Agreement;

(4)    the Junior Lien Secured Parties shall be entitled to vote on any plan of reorganization and file any proof of claim in an Insolvency or Liquidation Pro-ceeding or otherwise and other filings and make any arguments and motions that are, in each case, in accordance with the terms of this Agreement, with respect to the ABL Facility Collateral; and

(5)    the Junior Lien Collateral Agent or any Junior Lien Secured Party may exercise any of its rights or remedies with respect to the ABL Facility Collat-

eral after the termination of the ABL Standstill Period to the extent permitted by clause (i)(x) above.

In exercising rights and remedies with respect to the ABL Facility Collateral, the First Priority Collateral Agents and the First Priority Secured Parties may enforce the provisions of the First Priority Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of ABL Facility Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC of any applicable jurisdiction and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction.

(c)    Each of the First Priority Collateral Agents, on behalf of itself and the First Priority Secured Parties, and the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, agrees that it will not take or receive any ABL Facility Collateral or any proceeds of ABL Facility Collateral in connection with the exercise of any right or remedy (including set-off) with respect to any ABL Facility Collateral unless and until the Discharge of ABL Obligations has occurred, except as expressly provided in the proviso in clause (ii) of Section 3.2(a). Following the Discharge of ABL Obligations, the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, agrees that it will not take or receive any ABL Facility Collateral or any proceeds of ABL Facility Collateral in connection with the exercise of any right or remedy (including setoff) with respect to any ABL Facility Collateral unless and until the Discharge of First Priority Lien Obligations has occurred, except as expressly provided in the proviso in clause (ii) of Section 3.2(a) and the proviso in clause (ii) of Section 3.2(b). Without limiting the generality of the foregoing, (x) unless and until the Discharge of ABL Obligations has occurred, except as expressly provided in the proviso in clause (ii) of Section 3.2(a) or in Section 4, the sole right of the First Priority Collateral Agents and the First Priority Secured Parties with respect to the ABL Facility Collateral is to hold a Lien on the ABL Facility Collateral pursuant to the First Priority Documents for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Discharge of ABL Obligations has occurred in accordance with the terms hereof, the First Priority Documents and applicable law and (y) unless and until the Discharge of ABL Obligations and the Discharge of First Priority Lien Obligations have occurred, except as expressly provided in the proviso in clause (ii) of Section 3.2(a) and the proviso in clause (ii) of Section 3.2(b), the sole right of the Junior Lien Collateral Agent and the Junior Lien Secured Parties with respect to the ABL Facility Collateral is to hold a Lien on the ABL Facility Collateral pursuant to the Notes Documents for the period and to the extent granted therein and to receive a share of the proceeds thereof, if any, after the Discharge of ABL Obligations and the Discharge of First Priority Lien Obligations have occurred in accordance with the terms hereof, the ABL Documents, the First Priority Documents and applicable law.

(d)      Subject to the proviso in clause (ii) of Section 3.2(a) and the proviso in
clause (ii) of Section 3.2(b):

(i)      each of the First Priority Collateral Agents, for itself and on behalf of the
First Priority Secured Parties, agrees that the First Priority Collateral Agents and the First
Priority Secured Parties will not take any action that would hinder any exercise of reme-
dies under the ABL Documents with respect to the ABL Facility Collateral or is other-
wise prohibited hereunder, including any sale, lease, exchange, transfer or other disposi-
tion of the ABL Facility Collateral, whether by foreclosure or otherwise;

(ii)      the Junior Lien Collateral Agent, for itself and on behalf of the Junior Lien
Secured Parties, agrees that the Junior Lien Collateral Agent and the Junior Lien Secured
Parties will not take any action that would hinder any exercise of remedies under the
ABL Documents or the First Priority Documents with respect to the ABL Facility Collat-
eral or is otherwise prohibited hereunder, including any sale, lease, exchange, transfer or
other disposition of the ABL Facility Collateral, whether by foreclosure or otherwise;

(iii)      each of the First Priority Collateral Agents, for itself and on behalf of the
First Priority Secured Parties, hereby waives any and all rights it or the First Priority Se-
cured Parties may have as a junior lien creditor with respect to the ABL Facility Collat-
eral or otherwise to object to the manner in which the ABL Facility Agent or the ABL
Secured Parties seek to enforce or collect the ABL Obligations or the Liens granted in
any of the ABL Facility Collateral, regardless of whether any action or failure to act by or
on behalf of the ABL Facility Agent or ABL Secured Parties is adverse to the interest of
the First Priority Secured Parties; and

(iv)      the Junior Lien Collateral Agent, for itself and on behalf of the Junior Lien
Secured Parties, hereby waives any and all rights it or the Junior Lien Secured Parties
may have as a junior lien creditor with respect to the ABL Facility Collateral or otherwise
to object to the manner in which the ABL Facility Agent, the ABL Secured Parties, the
First Priority Collateral Agents or the First Priority Secured Parties seek to enforce or col-
lect the ABL Obligations or the First Priority Lien Obligations or the Liens granted in
any of the ABL Facility Collateral, regardless of whether any action or failure to act by or
on behalf of the ABL Facility Agent, the ABL Secured Parties, the First Priority Collat-
eral Agents or the First Priority Secured Parties is adverse to the interest of the Junior
Lien Secured Parties.

(e)      The First Priority Collateral Agents hereby acknowledge and agree that no
covenant, agreement or restriction contained in any First Priority Document (other than this
Agreement) shall be deemed to restrict in any way the rights and remedies of the ABL Facility
Agent or the ABL Secured Parties with respect to the ABL Facility Collateral as set forth in this
Agreement and the ABL Documents.

(f)      The Junior Lien Collateral Agent hereby acknowledges and agrees that no
covenant, agreement or restriction contained in any Junior Lien Document (other than this
Agreement) shall be deemed to restrict in any way the rights and remedies of the ABL Facility
Agent, the ABL Secured Parties, the First Priority Collateral Agents or the First Priority Secured

-51-

Parties with respect to the ABL Facility Collateral as set forth in this Agreement, the ABL
Documents and the First Priority Documents.

3.3.    Payments Over.

(a)    So long as the Discharge of ABL Obligations has not occurred, any ABL
Facility Collateral, cash proceeds thereof or non-cash proceeds not constituting Notes Collateral
received by any First Priority Collateral Agent, the Junior Lien Collateral Agent, any First Prior-
ity Secured Parties or any Junior Lien Secured Parties in connection with the exercise of any
right or remedy (including setoff) relating to the ABL Facility Collateral in contravention of this
Agreement shall be segregated and held in trust and forthwith paid over to the ABL Facility
Agent for the benefit of the ABL Secured Parties in the same form as received, with any neces-
sary endorsements or as a court of competent jurisdiction may otherwise direct.  The ABL Facil-
ity Agent is hereby authorized to make any such endorsements as agent for the First Priority Col-
lateral Agents, any such First Priority Secured Parties, the Junior Lien Collateral Agent or any
such Junior Lien Secured Parties.  This authorization is coupled with an interest and is irrevoca-
ble until such time as this Agreement is terminated in accordance with its terms.

(b)    Following the Discharge of ABL Obligations, so long as the Discharge of
First Priority Lien Obligations has not occurred, any ABL Facility Collateral, cash proceeds
thereof or non-cash proceeds received by the Junior Lien Collateral Agent or any Junior Lien
Secured Parties in connection with the exercise of any right or remedy (including setoff) relating
to the ABL Facility Collateral in contravention of this Agreement shall be segregated and held in
trust and forthwith paid over to the First Priority Collateral Agents for the benefit of the First
Priority Secured Parties in the same form as received, with any necessary endorsements or as a
court of competent jurisdiction may otherwise direct.  The First Priority Collateral Agent is
hereby authorized to make any such endorsements as agent for the Junior Lien Collateral Agent
or any such Junior Lien Secured Parties.  This authorization is coupled with an interest and is
irrevocable until such time as this Agreement is terminated in accordance with its terms.

3.4.    Other Agreements.

(a)    Releases by ABL Facility Agent.

(i)    If, in connection with:

(1)    the exercise of any ABL Facility Agent's remedies in respect of the ABL
Facility Collateral provided for in Section 3.2(a), including any sale, lease, exchange,
transfer or other disposition of any such ABL Facility Collateral; or

(2)    any sale, lease, exchange, transfer or other disposition of any ABL Facility
Collateral permitted under the terms of the ABL Documents, the First Priority Docu-
ments and the Junior Lien Documents (whether or not an event of default thereunder, and
as defined therein, has occurred and is continuing),

the ABL Facility Agent, for itself or on behalf of any of the ABL Secured Parties, releases any of
its Liens on any part of the ABL Facility Collateral other than, in the case of clause (2) above,

-52-

(A) in connection with the Discharge of ABL Obligations and (B) after the occurrence and dur-
ing the continuance of any event of default under the First Priority Documents or the Junior Lien
Indenture, then the Liens, if any, of the First Priority Collateral Agents, for themselves or for the
benefit of the First Priority Secured Parties, and of the Junior Lien Collateral Agent, for itself or
for the benefit of the Junior Lien Secured Parties, on such ABL Facility Collateral (but not the
Proceeds thereof, which shall be subject to the priorities set forth in this Agreement) shall be
automatically, unconditionally and simultaneously released and the applicable First Priority Col-
lateral Agent, for itself or on behalf of any such First Priority Secured Parties, and the Junior
Lien Collateral Agent, for itself or on behalf of any such Junior Lien Secured Parties, promptly
shall execute and deliver to the ABL Facility Agent or such Grantor such termination statements,
releases and other documents as the ABL Facility Agent or such Grantor may request to effec-
tively confirm such release; provided that in the case of clause (a)(i) above, any proceeds of such
disposition shall be applied in accordance with this Agreement.

       (ii)     Until the Discharge of ABL Obligations occurs, the First Priority Collat-
eral Agents, for themselves and on behalf of the First Priority Secured Parties, and the Junior
Lien Collateral Agent, for itself and an on behalf of the Junior Lien Secured Parties, hereby ir-
revocably constitute and appoint the ABL Facility Agent and any officer or agent of the ABL
Facility Agent, with full power of substitution, as its true and lawful attorney in fact with full ir-
revocable power and authority in the place and stead of the applicable First Priority Collateral
Agent, the Junior Lien Collateral Agent or such holder or in the ABL Facility Agent's own
name, from time to time in the ABL Facility Agent's discretion, for the purpose of carrying out
the terms of this Section 3.4(a) with respect to ABL Facility Collateral, to take any and all ap-
propriate action and to execute any and all documents and instruments which may be necessary
to accomplish the purposes of this Section 3.4(a) with respect to ABL Facility Collateral, includ-
ing any endorsements or other instruments of transfer or release.

       (iii)    Until the Discharge of ABL Obligations occurs, to the extent that the ABL
Secured Parties (a) have released any Lien on ABL Facility Collateral and any such Lien is later
reinstated or (b) obtain any new First Priority Liens on assets constituting ABL Facility Collat-
eral from Grantors, then the First Priority Secured Parties shall be granted a Second Priority Lien
on any such ABL Facility Collateral and the Junior Lien Secured Parties shall be grated a Third
Priority Lien on any such ABL Facility Collateral.

       (iv)    If, prior to the Discharge of ABL Obligations, a subordination of the ABL
Facility Agent's Lien on any ABL Facility Collateral is permitted (or in good faith believed by
the ABL Facility Agent to be permitted) under the ABL Credit Agreement, the Term Credit
Agreement, the Indenture or the Junior Lien Indenture to another Lien permitted under the ABL
Credit Agreement, the Term Credit Agreement, the Indenture or the Junior Lien Indenture (an
"ABL Facility Priority Lien"), then the ABL Facility Agent is authorized to execute and deliver a
subordination agreement with respect thereto in form and substance satisfactory to it, and the
First Priority Collateral Agents, for themselves and on behalf of the First Priority Secured Par-
ties, and the Junior Lien Collateral Agent for itself and on behalf of the Junior Lien Secured Par-
ties, shall promptly execute and deliver to the ABL Facility Agent an identical subordination
agreement subordinating (x) the Liens of the First Priority Collateral Agents for the benefit of
(and on behalf of) the First Priority Secured Parties to such ABL Facility Priority Lien and (y)

-53-

the Liens of the Junior Lien Collateral Agent for the benefit of (and on behalf of) the Junior Lien Secured Parties to such ABL Facility Priority Lien.

       (b)     <u>Releases by the First Priority Collateral Agents</u>.

       (i)     Following the Discharge of ABL Obligations, but prior to the Discharge of First Priority Lien Obligations, if, in connection with:

       (1)     the exercise of any First Priority Collateral Agent's remedies in respect of the ABL Facility Collateral provided for in Section 3.2(b), including any sale, lease, exchange, transfer or other disposition of any such ABL Facility Collateral; or

       (2)     any sale, lease, exchange, transfer or other disposition of any ABL Facility Collateral permitted under the terms of the First Priority Documents and the Junior Lien Documents (whether or not an event of default thereunder, and as defined therein, has occurred and is continuing),

such First Priority Collateral Agent, for itself or on behalf of any of the First Priority Secured Parties, releases any of its Liens on any part of the ABL Facility Collateral other than, in the case of clause (2) above, (A) in connection with the Discharge of First Priority Lien Obligations and (B) after the occurrence and during the continuance of any event of default under the Indenture, then the Liens, if any, of the Junior Lien Collateral Agent, for itself or for the benefit of the Junior Lien Secured Parties, on such ABL Facility Collateral (but not the Proceeds thereof, which shall be subject to the priorities set forth in this Agreement) shall be automatically, unconditionally and simultaneously released and the Junior Lien Collateral Agent, for itself or on behalf of any such Junior Lien Secured Parties, promptly shall execute and deliver to the First Priority Collateral Agents or such Grantor such termination statements, releases and other documents as the First Priority Collateral Agents or such Grantor may request to effectively confirm such release; <u>provided</u> that in the case of clause (b)(i) above, any proceeds of such disposition shall be applied in accordance with this Agreement.

       (ii)     Following the Discharge of ABL Obligations and until the Discharge of First Priority Lien Obligations occurs, the Junior Lien Collateral Agent, for itself and on behalf of the Junior Lien Secured Parties, hereby irrevocably constitutes and appoints the First Priority Collateral Agents and any officer or agent of any First Priority Collateral Agent, with full power of substitution, as its true and lawful attorney in fact with full irrevocable power and authority in the place and stead of the Junior Lien Collateral Agent or such holder or in such First Priority Collateral Agent's own name, from time to time in such First Priority Collateral Agent's discretion, for the purpose of carrying out the terms of this Section 3.4(b) with respect to ABL Facility Collateral, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 3.4(b) with respect to ABL Facility Collateral, including any endorsements or other instruments of transfer or release.

       (iii)     Following the Discharge of ABL Obligations and until the Discharge of First Priority Lien Obligations occurs, to the extent that the First Priority Secured Parties (a) have released any Lien on ABL Facility Collateral and any such Lien is later reinstated or (b) obtain

any new Second Priority Liens on assets constituting ABL Facility Collateral from Grantors, then the Junior Lien Secured Parties shall be granted a Third Priority Lien on any such ABL Facility Collateral.

(iv)    If, prior to the Discharge of First Priority Lien Obligations, a subordination of any First Priority Collateral Agent's Lien on any ABL Facility Collateral is permitted (or in good faith believed by such First Priority Collateral Agent to be permitted) under the First Priority Documents to another Lien permitted under the First Priority Documents (a "Subsequent ABL Facility Lien"), then such First Priority Collateral Agent is authorized to execute and deliver a subordination agreement with respect thereto in form and substance satisfactory to it, and the Junior Lien Collateral Agent, for itself and on behalf of the Junior Lien Secured Parties, shall promptly execute and deliver to the First Priority Collateral Agents an identical subordination agreement subordinating the Liens of the Junior Lien Collateral Agent for the benefit of (and on behalf of) the Junior Lien Secured Parties to such Subsequent Note Collateral Lien.

(c)    Insurance.  Unless and until the Discharge of ABL Obligations has occurred, the ABL Facility Agent and the ABL Secured Parties shall have the sole and exclusive right, subject to the rights of the Grantors under the ABL Documents, to adjust settlement for any insurance policy covering the ABL Facility Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) in respect of the ABL Facility Collateral.  Following the Discharge of ABL Obligations, unless and until the Discharge of First Priority Lien Obligations has occurred, the First Priority Collateral Agents and the First Priority Secured Parties shall have the sole and exclusive right, subject to the rights of the Grantors under the First Priority Documents, to adjust settlement for any insurance policy covering the ABL Facility Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) in respect of the ABL Facility Collateral.

(d)    Amendments to First Priority Security Documents or Junior Lien Security Documents.

(i)    Without the prior written consent of the ABL Facility Agent, no First Priority Security Document or Junior Lien Security Document may be amended, supplemented or otherwise modified or entered into to the extent such amendment, supplement or modification, or the terms of any new First Priority Security Document or new Junior Lien Document, would contravene the provisions of this Agreement.  Grantors agree that each First Priority Security Document and Junior Lien Security Document (other than any mortgage, deed of trust or similar security document relating to real property and fixtures thereon) shall include the following language (with any necessary modifications to give effect to applicable definitions) (or language to similar effect approved by the ABL Facility Agent):

"Notwithstanding anything herein to the contrary, the liens and security interests granted to [the Term Collateral Agent and the Notes Collateral Agent] [the Junior Lien Collateral Agent] pursuant to this Agreement in any ABL Facility Collateral and the exercise of any right or remedy by [the Term Collateral Agent and the Notes Collateral Agent] [the Junior Lien Collateral Agent] with respect to any ABL Facility Collateral hereunder are subject to the provisions of the Intercredi-

-55-

tor Agreement, dated as of [      ], 2010 (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), among LYONDELL BASELL INDUSTRIES N.V., a public limited liability company formed under the laws of the Netherlands, LYONDELL CHEMICAL COMPANY, a Delaware corporation (the "Company"), the other GRANTORS from time to time party thereto, CITIBANK N.A., as ABL Facility Agent, UBS AG, STAMFORD BRANCH, as Term Collateral Agent, DEUTSCHE BANK TRUST COMPANY AMERICAS, as Notes Collateral Agent, [[          ], as Junior Lien Collateral Agent], and certain other persons party or that may become party thereto from time to time.  In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control."

   (ii) In the event any ABL Facility Agent or the ABL Secured Parties and the relevant Grantor enter into any amendment, waiver or consent in respect of any of the ABL Security Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any ABL Security Document or changing in any manner the rights of the ABL Facility Agent, such ABL Secured Parties, the Company or any other Grantor thereunder, in each case with respect to or relating to the ABL Facility Collateral, then such amendment, waiver or consent shall apply automatically to any comparable provision of (x) the Comparable First Priority Security Document without the consent of the First Priority Collateral Agents or the First Priority Secured Parties and without any action by the First Priority Collateral Agents, the Company or any other Grantor and (y) the Comparable Junior Lien Security Document without the consent of the Junior Lien Collateral Agent or the Junior Lien Secured Parties and without any action by the Junior Lien Collateral Agent, the Company or any other Grantor, provided that (A) no such amendment, waiver or consent shall have the effect of (i) removing assets that constitute ABL Facility Collateral subject to the Lien of the Term Security Documents or the Notes Security Documents, except to the extent that a release of such Lien is permitted or required by Section 3.4(a) and provided that there is a corresponding release of such Lien securing the ABL Obligations, (ii) imposing duties on any First Priority Collateral Agent or the Junior Lien Collateral Agent without its consent or (iii) permitting other liens on the ABL Facility Collateral not permitted under the terms of the First Priority Documents, the Junior Lien Documents or Section 3.5 and (B) notice of such amendment, waiver or consent shall have been given to the First Priority Collateral Agents and the Junior Lien Collateral Agent within ten (10) Business Days after the effective date of such amendment, waiver or consent.

   (iii) Following the Discharge of ABL Obligations, in the event any First Priority Collateral Agent or the First Priority Secured Parties and the relevant Grantor enter into any amendment, waiver or consent in respect of any of the First Priority Security Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any First Priority Security Document or changing in any manner the rights of the First Priority Collateral Agents, such First Priority Secured Parties, the Company or any other Grantor thereunder, in each case with respect to or relating to the ABL Facility Collateral, then such amendment, waiver or consent shall apply automatically to any comparable provision of the Comparable Junior Lien Security Document without the consent of the Junior Lien Collateral Agent or the Junior Lien Secured Parties and without any action by the Junior Lien Collateral

-56-

Agent, the Company or any other Grantor, <u>provided</u> that (A) no such amendment, waiver or consent shall have the effect of (i) removing assets that constitute ABL Facility Collateral subject to the Lien of the Notes Security Documents, except to the extent that a release of such Lien is permitted or required by Section 3.4(b) and <u>provided</u> that there is a corresponding release of such Lien securing the First Priority Lien Obligations, (ii) imposing duties on the Junior Lien Collateral Agent without its consent or (iii) permitting other liens on the ABL Facility Collateral not permitted under the terms of the Notes Documents or Section 2.5 and (B) notice of such amendment, waiver or consent shall have been given to the Junior Lien Collateral Agent within ten (10) Business Days after the effective date of such amendment, waiver or consent.

(e)    <u>Rights As Unsecured Creditors</u>.  Except as otherwise set forth in this Agreement, the First Priority Collateral Agents, the First Priority Secured Parties, the Junior Lien Collateral Agent and the Junior Lien Secured Parties may exercise rights and remedies as unsecured creditors against the Company or any other Grantor that has guaranteed the First Priority Lien Obligations or the Junior Lien Obligations in accordance with the terms of the First Priority Documents, the Notes Documents and applicable law.  Nothing in this Agreement shall prohibit the receipt by the First Priority Collateral Agents, any First Priority Secured Parties, the Junior Lien Collateral Agent or any Junior Lien Secured Parties of the required payments of interest, principal and other amounts in respect of the First Priority Lien Obligations and Junior Lien Obligations, as applicable, so long as such receipt is not the direct or indirect result of the exercise by the First Priority Collateral Agents, any First Priority Secured Parties, the Junior Lien Collateral Agent or any Junior Lien Secured Parties of rights or remedies as a secured creditor (including set off) in respect of the ABL Facility Collateral or enforcement in contravention of this Agreement of any Lien held by any of them.

(f)    <u>Bailee for Perfection</u>.

(i)    The ABL Facility Agent agrees to hold that part of the ABL Facility Collateral that is in its possession or control (or in the possession or control of its agents or bailees) to the extent that possession or control thereof is taken to perfect a Lien thereon under the UCC (such ABL Facility Collateral being the "<u>Pledged ABL Facility Collateral</u>") as collateral agent for the ABL Secured Parties and as bailee for and, with respect to any collateral that cannot be perfected in such manner, as agent for, the First Priority Collateral Agents (on behalf of the First Priority Secured Parties) and the Junior Lien Collateral Agent (on behalf of the Junior Lien Secured Parties) and any assignee thereof and act as such agent under all control agreements relating to the Pledged ABL Facility Collateral, in each case solely for the purpose of perfecting the security interest granted under the ABL Documents, the First Priority Documents and the Notes Documents, as applicable, subject to the terms and conditions of this Section 3.4(f).  Following the Discharge of ABL Obligations, each First Priority Collateral Agent agrees to hold the Pledged ABL Facility Collateral as collateral agent for the First Priority Secured Parties and as bailee for and, with respect to any collateral that cannot be perfected in such manner, as agent for, the Junior Lien Collateral Agent (on behalf of the Junior Lien Secured Parties) and any assignee thereof solely for the purpose of perfecting the security interest granted under the First Priority Documents and the Notes Documents, as applicable, subject to the terms and conditions of this Section 3.4(f).  As security for the payment and performance in full of all the Junior Lien Obligations and First Priority Lien Obligations each Grantor hereby grants to the ABL Facility

-57-

Agent for the benefit of the Junior Lien Secured Parties and the First Priority Secured Parties a lien on and security interest in all of the right, title and interest of such Grantor, in and to and under the Pledged ABL Facility Collateral wherever located and whether now existing or hereafter arising or acquired from time to time. As security for the payment and performance in full of all the Junior Lien Obligations, each Grantor hereby grants to the Junior Lien Collateral Agent for the benefit of the Junior Lien Secured Parties a lien on and security interest in all of the right, title and interest of such Grantor, in and to and under the Pledged ABL Facility Collateral wherever located and whether now existing or hereafter arising or acquired from time to time.

(ii)    Subject to the terms of this Agreement, (x) until the Discharge of ABL Obligations has occurred, the ABL Facility Agent shall be entitled to deal with the Pledged ABL Facility Collateral in accordance with the terms of the ABL Documents as if the Liens of the First Priority Collateral Agents under the First Priority Security Documents and the Liens of the Junior Lien Collateral Agent under the Junior Lien Security Documents did not exist and (y) following the Discharge of ABL Obligations and until the Discharge of First Priority Lien Obligations has occurred, the First Priority Collateral Agents shall be entitled to deal with the Pledged ABL Facility Collateral in accordance with the terms of the First Priority Documents as if the Liens of the Junior Lien Collateral Agent under the Notes Security Documents did not exist.  The rights of the First Priority Collateral Agents and the Junior Lien Collateral Agent shall at all times be subject to the terms of this Agreement.

(iii)    The ABL Facility Agent shall have no obligation whatsoever to any ABL Secured Party, the First Priority Collateral Agents, any First Priority Secured Party, the Junior Lien Collateral Agent or any Notes Secured Party to ensure that the Pledged ABL Facility Collateral is genuine or owned by any of the Grantors or to preserve rights or benefits of any Person except as expressly set forth in this Section 3.4(f).  The duties or responsibilities of the ABL Facility Agent under this Section 3.4(f) shall be limited solely to holding the Pledged ABL Facility Collateral as bailee or agent in accordance with this Section 3.4(f).  The First Priority Collateral Agents shall have no obligation whatsoever to any First Priority Secured Party, the Junior Lien Collateral Agent or any Notes Secured Party to ensure that the Pledged ABL Facility Collateral is genuine or owned by any of the Grantors or to preserve rights or benefits of any Person except as expressly set forth in this Section 3.4(f).  The duties or responsibilities of the First Priority Collateral Agents under this Section 3.4(f) shall be limited solely to holding the Pledged ABL Facility Collateral as bailee or agent in accordance with this Section 3.4(f).

(iv)    The ABL Facility Agent acting pursuant to this Section 3.4(f) shall not have by reason of the ABL Security Documents, the First Priority Security Documents, the Junior Lien Security Documents, this Agreement or any other document a fiduciary relationship in respect of any ABL Secured Party, the First Priority Collateral Agents, any First Priority Secured Party, the Junior Lien Collateral Agent or any Notes Secured Party.  The First Priority Collateral Agents acting pursuant to this Section 3.4(f) shall not have by reason of the First Priority Security Documents, the Junior Lien Security Documents, this Agreement or any other document a fiduciary relationship in respect of any First Priority Secured Party, the Junior Lien Collateral Agent or any Notes Secured Party.

(v)     Upon the Discharge of ABL Obligations under the ABL Documents to which the ABL Facility Agent is a party, the ABL Facility Agent shall deliver or cause to be delivered the remaining Pledged ABL Facility Collateral (if any) in its possession or in the possession of its agents or bailees, together with any necessary endorsements, first, to the First Priority Collateral Agents to the extent First Priority Lien Obligations remain outstanding, second, to the Junior Lien Collateral Agent to the extent Junior Lien Obligations remain outstanding, and third, to the applicable Grantor to the extent no ABL Obligations, First Priority Lien Obligations or Junior Lien Obligations remain outstanding (in each case, so as to allow such Person to obtain control of such Pledged ABL Facility Collateral) and will cooperate with the First Priority Collateral Agents or Junior Lien Collateral Agent, as applicable, in assigning (without recourse to or warranty by the ABL Facility Agent or any ABL Secured Party or agent or bailee thereof) control over any other Pledged ABL Facility Collateral under its control.  The ABL Facility Agent further agrees to take all other action reasonably requested by such Person in connection with such Person obtaining a first priority interest in the Pledged ABL Facility Collateral or as a court of competent jurisdiction may otherwise direct.  Following the Discharge of ABL Obligations and upon the Discharge of First Priority Lien Obligations under the First Priority Documents to which the First Priority Collateral Agents are a party, the First Priority Collateral Agents shall deliver or cause to be delivered the remaining Pledged ABL Facility Collateral (if any) in its possession or in the possession of its agents or bailees, together with any necessary endorsements, first, to the Junior Lien Collateral Agent to the extent Junior Lien Obligations remain outstanding, and second, to the applicable Grantor to the extent no First Priority Lien Obligations or Junior Lien Obligations remain outstanding (in each case, so as to allow such Person to obtain control of such Pledged ABL Facility Collateral) and will cooperate with the Junior Lien Collateral Agent in assigning (without recourse to or warranty by the First Priority Collateral Agents or any First Priority Secured Party or agent or bailee thereof) control over any other Pledged ABL Facility Collateral under its control.  The First Priority Collateral Agents further agree to take all other action reasonably requested by such Person in connection with such Person obtaining a first priority interest in the Pledged ABL Facility Collateral or as a court of competent jurisdiction may otherwise direct.

(vi)    Notwithstanding anything to the contrary herein, if, for any reason, any First Priority Lien Obligations remain outstanding upon the Discharge of ABL Obligations, all rights of the ABL Facility Agent hereunder and under the First Priority Security Documents, the ABL Security Documents or the Junior Lien Security Documents (1) with respect to the delivery and control of any part of the ABL Facility Collateral, and (2) to direct, instruct, vote upon or otherwise influence the maintenance or disposition of such ABL Facility Collateral, shall immediately, and (to the extent permitted by law) without further action on the part of either of the First Priority Collateral Agents, the ABL Facility Agent or the Junior Lien Collateral Agent, pass to the First Priority Collateral Agents, who shall thereafter hold such rights for the benefit of the First Priority Secured Parties and as bailee for and, with respect to any collateral that cannot be perfected in such manner, as agent for, the Junior Lien Secured Parties.  Each of the ABL Facility Agent and the Grantors agrees that it will, if any First Priority Lien Obligations or Junior Lien Obligations remain outstanding upon the Discharge of ABL Obligations, take any other action required by any law or reasonably requested by the First Priority Collateral Agents or the Junior Lien Collateral Agent, in connection with the First Priority Collateral Agents' establishment and perfection of a First Priority security interest in the ABL Facility Collateral and the Junior Lien

Collateral Agent's establishment and perfection of a Second Priority security interest in the ABL Facility Collateral.

        (vii)    Notwithstanding anything to the contrary contained herein, if for any reason, prior to the Discharge of First Priority Lien Obligations, the ABL Facility Agent or the Junior Lien Collateral Agent acquires possession of any Pledged Notes Collateral, the ABL Facility Agent or the Junior Lien Collateral Agent shall hold same as bailee and/or agent to the same extent as is provided in preceding clause (i) with respect to Pledged ABL Facility Collateral, <u>provided</u> that as soon as is practicable the ABL Facility Agent or the Junior Lien Collateral Agent shall deliver or cause to be delivered such Pledged Notes Collateral to the First Priority Collateral Agents in a manner otherwise consistent with the requirements of preceding clause (v).

        (g)    <u>When Discharge of ABL Obligations Deemed to Not Have Occurred</u>. Notwithstanding anything to the contrary herein, if at any time after the Discharge of ABL Obligations has occurred (or concurrently therewith) the Company or any other Grantor immediately thereafter (or concurrently therewith) enters into any Permitted Refinancing of any ABL Obligations, then such Discharge of ABL Obligations shall automatically be deemed not to have occurred for all purposes of this Agreement (other than with respect to any actions taken prior to the date of such designation as a result of the occurrence of such first Discharge of ABL Obligations), and the obligations under any Permitted Refinancing of the ABL Obligations shall automatically be treated as ABL Obligations for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein, the term "ABL Credit Agreement" shall be deemed appropriately modified to refer to such Permitted Refinancing and the ABL Facility Agent under such ABL Documents shall be a ABL Facility Agent for all purposes hereof and the new secured parties under such ABL Documents shall automatically be treated as ABL Secured Parties for all purposes of this Agreement. Upon receipt of a notice stating that the Company or any other Grantor has entered into a new ABL Document in respect of a Permitted Refinancing of ABL Obligations (which notice shall include the identity of the new collateral agent, such agent, the "<u>New ABL Agent</u>"), and delivery by the New ABL Agent of an Intercreditor Agreement Joinder, the First Priority Collateral Agents and the Junior Lien Collateral Agent shall promptly (i) enter into such documents and agreements (including amendments or supplements to this Agreement) as the Company or such New ABL Agent shall reasonably request in order to provide to the New ABL Agent the rights contemplated hereby, in each case consistent with the terms of this Agreement and (ii) deliver to the New ABL Agent any Pledged ABL Facility Collateral held by the First Priority Collateral Agents or the Junior Lien Collateral Agent together with any necessary endorsements (or otherwise allow the New ABL Agent to obtain control of such Pledged ABL Facility Collateral). The New ABL Agent shall agree to be bound by the terms of this Agreement. If the new ABL Obligations under the new ABL Documents are secured by assets of the Grantors of the type constituting ABL Facility Collateral that do not also secure the First Priority Lien Obligations and the Junior Lien Obligations, then the First Priority Lien Obligations shall be secured at such time by a Second Priority Lien on such assets to the same extent provided in the First Priority Security Documents with respect to the other ABL Facility Collateral and the Junior Lien Obligations shall be secured at such time by a Third Priority Lien on such assets to the same extent provided in the Notes Security Documents with respect to the other ABL Facility Collateral. If the new ABL Obligations under the new ABL Documents are secured by assets of the Grantors of the type constituting Notes Collat-

eral that do not also secure the First Priority Lien Obligations and the Junior Lien Obligations, then the First Priority Lien Obligations shall be secured at such time by a First Priority Lien on such assets to the same extent provided in the First Priority Security Documents with respect to the other Notes Collateral and the Junior Lien Obligations shall be secured at such time by a Third Priority Lien on such assets to the same extent provided in the Notes Security Documents with respect to the other Notes Collateral.

3.5.   <u>Insolvency or Liquidation Proceedings</u>.

(a)   <u>Finance and Sale Issues</u>.

(i)      Until the Discharge of ABL Obligations has occurred, if the Company or any other Grantor shall be subject to any Insolvency or Liquidation Proceeding and the ABL Facility Agent shall desire to permit the use of cash collateral constituting ABL Facility Collateral on which the ABL Facility Agent or any other creditor has a Lien or to permit the Company or any other Grantor to obtain a DIP Financing, then the First Priority Collateral Agents, on behalf of itself and the First Priority Secured Parties, and the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, agree that they will raise no objection to such use of cash collateral constituting ABL Facility Collateral or to the fact that such DIP Financing may be granted Liens on the ABL Facility Collateral and will not request adequate protection or any other relief in connection therewith (except, as expressly agreed by the ABL Facility Agent or to the extent permitted by Section 3.5(c)) and, to the extent the Liens on the ABL Facility Collateral securing the ABL Obligations are subordinated or <u>pari passu</u> with the Liens on the ABL Facility Collateral securing such DIP Financing, the First Priority Collateral Agents and the Junior Lien Collateral Agent will subordinate their Liens in the ABL Facility Collateral to the Liens securing such DIP Financing (and all obligations relating thereto). The First Priority Collateral Agent, on behalf of the First Priority Secured Parties, and the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, agree that it will not raise any objection or oppose a sale or other disposition of any ABL Facility Collateral free and clear of its Liens (subject to attachment of proceeds with respect to the Second Priority Lien on the ABL Facility Collateral in favor of the First Priority Collateral Agents and the Third Priority Lien on the ABL Facility Collateral in favor of the Junior Lien Collateral Agent in the same order and manner as otherwise set forth herein) or other claims under Section 363 of the Bankruptcy Code if the ABL Secured Parties have consented to such sale or disposition of such assets.

(ii)      Following the Discharge of ABL Obligations and until the Discharge of First Priority Lien Obligations has occurred, if the Company or any other Grantor shall be subject to any Insolvency or Liquidation Proceeding and the First Priority Collateral Agents shall desire to permit the Company or any other Grantor to obtain a DIP Financing, then the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, agrees that it will raise no objection to such use of cash collateral constituting ABL Facility Collateral or to the fact that such DIP Financing may be granted Liens on the ABL Facility Collateral and will not request adequate protection or any other relief in connection therewith (except, as expressly, agreed by the First Priority Collateral Agents or to the extent permitted by Section 3.5(c)) and, to the extent the Liens on the ABL Facility Collateral securing the First Priority Lien Obligations are subordinated or <u>pari passu</u> with the Liens on the ABL Facility Collateral securing such DIP

-61-

Financing, the Junior Lien Collateral Agent will subordinate its Liens in the ABL Facility Collateral to the Liens securing such DIP Financing (and all obligations relating thereto).  Following the Discharge of ABL Obligations, the Junior Lien Collateral Agent, on behalf of the Junior Lien Secured Parties, agrees that it will not raise any objection or oppose a sale or other disposition of any ABL Facility Collateral free and clear of its Liens (subject to attachment of proceeds with respect to the Third Priority Lien on the ABL Facility Collateral in favor of the Junior Lien Collateral Agent in the same order and manner as otherwise set forth herein) or other claims under Section 363 of the Bankruptcy Code if the First Priority Secured Parties have consented to such sale or disposition of such assets.

(b)    <u>Relief from the Automatic Stay</u>.  Until the Discharge of ABL Obligations has occurred, the First Priority Collateral Agents, on behalf of itself and the First Priority Secured Parties, and the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, agree that none of them shall seek relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the ABL Facility Collateral, without the prior written consent of the ABL Facility Agent.  Following the Discharge of ABL Obligations, until the Discharge of First Priority Lien Obligations has occurred, the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, agrees that none of them shall seek relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the ABL Facility Collateral without the prior written consent of the First Priority Collateral Agents.

(c)    <u>Adequate Protection</u>.

(i)    Each First Priority Collateral Agent, on behalf of itself and the respective First Priority Secured Parties, and the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, agree that none of them shall contest (or support any other person contesting) (i) any request by the ABL Facility Agent or the ABL Secured Parties for adequate protection with respect to any ABL Facility Collateral or (ii) any objection by the ABL Facility Agent or the ABL Secured Parties to any motion, relief, action or proceeding based on the ABL Facility Agent or the ABL Secured Parties claiming a lack of adequate protection with respect to the ABL Facility Collateral.  Notwithstanding the foregoing provisions in this Section 3.5(c), in any Insolvency or Liquidation Proceeding, (A) if the ABL Secured Parties (or any subset thereof) are granted adequate protection in the form of additional collateral in the nature of assets constituting ABL Facility Collateral in connection with any DIP Financing, then each First Priority Collateral Agent, on behalf of itself or any of the respective First Priority Secured Parties, and the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, may seek or request adequate protection in the form of a Lien on such additional collateral, which Lien of the First Priority Collateral Agents will be subordinated to the Liens securing the ABL Obligations and such DIP Financing (and all obligations relating thereto) on the same basis as the other Liens on ABL Facility Collateral securing the First Priority Lien Obligations are so subordinated to the ABL Obligations under this Agreement and which Lien of the Junior Lien Collateral Agent will be subordinated to the Liens securing the ABL Obligations, such DIP Financing (and all obligations relating thereto) and the First Priority Lien Obligations on the same basis as the other Liens on ABL Facility Collateral securing the Junior Lien Obligations are so subordinated to the ABL Obligations and First Priority Lien Obligations under this Agreement,

and (B) in the event the First Priority Collateral Agents, on behalf of itself and the First Priority
Secured Parties, or the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Se-
cured Parties, seeks or requests adequate protection in respect of ABL Facility Collateral secur-
ing First Priority Lien Obligations or the Junior Lien Obligations, as applicable, and such ade-
quate protection is granted in the form of additional collateral in the nature of assets constituting
ABL Facility Collateral, then the First Priority Collateral Agents, on behalf of themselves or any
of the First Priority Secured Parties, and the Junior Lien Collateral Agent, on behalf of itself and
the Junior Lien Secured Parties, agree that the ABL Facility Agent shall also be granted a senior
Lien on such additional collateral as security for the ABL Obligations and for any such DIP Fi-
nancing provided by the ABL Secured Parties and that any Lien on such additional collateral se-
curing the First Priority Lien Obligations and the Junior Lien Obligations shall be subordinated
to the Liens on such collateral securing the ABL Obligations and any such DIP Financing pro-
vided by the ABL Secured Parties (and all obligations relating thereto) and to any other Liens
granted to the ABL Secured Parties as adequate protection on the same basis as the other Liens
on ABL Facility Collateral securing the First Priority Lien Obligations and Junior Lien Obliga-
tions are so subordinated to such ABL Obligations under this Agreement.

    (ii)  Prior to the Discharge of First Priority Lien Obligations, the Junior Lien
Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, agrees that none of them
shall contest (or support any other person contesting) (i) any request by the First Priority Collat-
eral Agents or the First Priority Secured Parties for adequate protection with respect to any ABL
Facility Collateral or (ii) any objection by the First Priority Collateral Agents or the First Priority
Secured Parties to any motion, relief, action or proceeding based on the First Priority Collateral
Agents or the First Priority Secured Parties claiming a lack of adequate protection with respect to
the ABL Facility Collateral.  Notwithstanding the foregoing provisions in this Section 3.5(c), in
any Insolvency or Liquidation Proceeding, (A) if the First Priority Secured Parties (or any subset
thereof) are granted adequate protection in the form of additional collateral in the nature of assets
constituting ABL Facility Collateral in connection with any DIP Financing, then the Junior Lien
Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, may seek or request
adequate protection in the form of a Lien on such additional collateral, which Lien will be subor-
dinated to the Liens securing the First Priority Lien Obligations and such DIP Financing (and all
obligations relating thereto) on the same basis as the other Liens on ABL Facility Collateral se-
curing the Junior Lien Obligations are so subordinated to the First Priority Lien Obligations un-
der this Agreement, and (B) in the event the Junior Lien Collateral Agent, on behalf of itself and
the Junior Lien Secured Parties, seek or request adequate protection in respect of ABL Facility
Collateral securing the Junior Lien Obligations, and such adequate protection is granted in the
form of additional collateral in the nature of assets constituting ABL Facility Collateral, then the
Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, agree that
the First Priority Collateral Agents shall also be granted a senior Lien on such additional collat-
eral as security for the First Priority Lien Obligations and for any such DIP Financing provided
by the First Priority Secured Parties and that any Lien on such additional collateral securing the
Junior Lien Obligations shall be subordinated to the Liens on such collateral securing the First
Priority Lien Obligations and any such DIP Financing provided by the First Priority Secured Par-
ties (and all obligations relating thereto) and to any other Liens granted to the First Priority Se-
cured Parties as adequate protection on the same basis as the other Liens on ABL Facility Collat-

eral securing the Junior Lien Obligations are so subordinated to such First Priority Lien Obligations under this Agreement.

(d)    No Waiver.  Subject to the proviso in clause (ii) of Section 3.2(a), nothing contained herein shall prohibit or in any way limit the ABL Facility Agent or any ABL Secured Party from objecting in any Insolvency or Liquidation Proceeding or otherwise to any action taken by the First Priority Collateral Agents, any of the First Priority Secured Parties, the Junior Lien Collateral Agent or any of the Junior Lien Secured Parties in respect of the ABL Facility Collateral, including the seeking by the First Priority Collateral Agents, any First Priority Secured Parties, the Junior Lien Collateral Agent or any Junior Lien Secured Parties of adequate protection in respect thereof or the asserting by the First Priority Collateral Agents, any First Priority Secured Parties, the Junior Lien Collateral Agent or any Junior Lien Secured Parties of any of its rights and remedies under the First Priority Documents, the Notes Documents or otherwise in respect thereof.  Subject to the proviso in clause (ii) of Section 3.2(b), nothing contained herein shall prohibit or in any way limit the First Priority Collateral Agents or any First Priority Secured Party from objecting in any Insolvency or Liquidation Proceeding or otherwise to any action taken by the Junior Lien Collateral Agent or any of the Junior Lien Secured Parties in respect of the ABL Facility Collateral, including the seeking by the Junior Lien Collateral Agent or any Junior Lien Secured Parties of adequate protection in respect thereof or the asserting by the Junior Lien Collateral Agent or any Junior Lien Secured Parties of any of its rights and remedies under the Notes Documents or otherwise in respect thereof.

(e)    Reorganization Securities.  If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed, pursuant to a plan of reorganization or similar dispositive restructuring plan, on account of ABL Obligations , on account of First Priority Lien Obligations and on account of the Junior Lien Obligations, then, to the extent the debt obligations distributed on account of the ABL Obligations, on account of the First Priority Lien Obligations and on account of the Junior Lien Obligations are secured by Liens upon the same property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations.

(f)    Post-Petition Interest.

(i)    None of the First Priority Collateral Agents, any First Priority Secured Party, the Junior Lien Collateral Agent or any Notes Secured Party shall oppose or seek to challenge any claim by the ABL Facility Agent or any ABL Secured Party for allowance in any Insolvency or Liquidation Proceeding of ABL Obligations consisting of post-petition interest, fees or expenses to the extent of the value of the ABL Secured Party's Lien on the ABL Facility Collateral, without regard to the existence of the Lien of the First Priority Collateral Agents on behalf of the First Priority Secured Parties on the ABL Facility Collateral or the Lien of the Junior Lien Collateral Agent on behalf of the Junior Lien Secured Parties on the ABL Facility Collateral.  None of the Junior Lien Collateral Agent or any Notes Secured Party shall oppose or seek to challenge any claim by the First Priority Collateral Agents or any First Priority Secured Party for allowance in any Insolvency or Liquidation Proceeding of First Priority Lien Obligations consisting of post-petition interest, fees or expenses to the extent of the value of the First Priority

-64-

Secured Party's Lien on the ABL Facility Collateral, without regard to the existence of the Lien of the Junior Lien Collateral Agent on behalf of the Junior Lien Secured Parties on the ABL Facility Collateral.

(ii)     Neither the ABL Facility Agent nor any other ABL Secured Party shall oppose or seek to challenge any claim by the First Priority Collateral Agents, any First Priority Secured Party, the Junior Lien Collateral Agent or any Notes Secured Party for allowance in any Insolvency or Liquidation Proceeding of First Priority Lien Obligations or Junior Lien Obligations consisting of post-petition interest, fees or expenses to the extent of the value of the Lien of the First Priority Collateral Agents on behalf of the First Priority Secured Parties on the ABL Facility Collateral or the Lien of the Junior Lien Collateral Agent on behalf of the Junior Lien Secured Parties on the ABL Facility Collateral (after taking into account the Lien of the ABL Secured Parties on the ABL Facility Collateral and with respect to the Lien of the Junior Lien Collateral Agent, after taking into account the Lien of the First Priority Secured Parties on the ABL Facility Collateral).  Neither the First Priority Collateral Agents nor any other First Priority Secured Party shall oppose or seek to challenge any claim by the Junior Lien Collateral Agent or any Notes Secured Party for allowance in any Insolvency or Liquidation Proceeding of Junior Lien Obligations consisting of post-petition interest, fees or expenses to the extent of the value of the Lien of the Junior Lien Collateral Agent on behalf of the Junior Lien Secured Parties on the ABL Facility Collateral (after taking into account the Lien of the ABL Secured Parties and the First Priority Secured Parties on the ABL Facility Collateral).

(g)     Waiver.  Each First Priority Collateral Agent, for itself and on behalf of the respective First Priority Secured Parties, and the Junior Lien Collateral Agent, for itself and on behalf of the Junior Lien Secured Parties, waive any claim they may hereafter have against any ABL Secured Party arising out of the election of any ABL Secured Party of the application of Section 1111(b)(2) of the Bankruptcy Code, and/or out of any cash collateral or financing arrangement or out of any grant of a security interest in connection with the ABL Facility Collateral in any Insolvency or Liquidation Proceeding.

3.6.    Reliance; Waivers; Etc.

(a)     Reliance.  Other than any reliance on the terms of this Agreement, each First Priority Collateral Agent, on behalf of itself and the respective First Priority Secured Parties, and the Junior Lien Collateral Agent, for itself and on behalf of the Junior Lien Secured Parties, acknowledge that they and such First Priority Secured Parties and Junior Lien Secured Parties have, independently and without reliance on the ABL Facility Agent or any ABL Secured Parties, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into such First Priority Documents and Notes Documents and be bound by the terms of this Agreement and they will continue to make their own credit decision in taking or not taking any action under the Term Credit Agreement, the Indenture or this Agreement.

(b)     No Warranties or Liability.  Each First Priority Collateral Agent, on behalf of itself and the respective First Priority Lien Obligations, and the Junior Lien Collateral Agent, for itself and on behalf of the Junior Lien Secured Parties, acknowledge and agree that the ABL Facility Agent and the ABL Secured Parties have made no express or implied representation or

-65-

warranty, including with respect to the execution, validity, legality, completeness, collectability or enforceability of any of the ABL Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon. The ABL Secured Parties will be entitled to manage and supervise their respective loans and extensions of credit under their respective ABL Documents in accordance with law and as they may otherwise, in their sole discretion, deem appropriate. The ABL Facility Agent and the ABL Secured Parties shall have no duty to the First Priority Collateral Agents, or any of the First Priority Secured Parties, the Junior Lien Collateral Agent or any of the Junior Lien Secured Parties to act or refrain from acting in a manner which allows, or results in, the occurrence or continuance of an event of default or default under any agreements with the Company or any other Grantor (including the ABL Documents, the First Priority Documents and the Junior Lien Documents), regardless of any knowledge thereof which they may have or be charged with.

(c)    <u>No Waiver of Lien Priorities</u>.

(i)    No right of the ABL Secured Parties, the ABL Facility Agent or any of them to enforce any provision of this Agreement or any ABL Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of the Company or any other Grantor or by any act or failure to act by any ABL Secured Party or the ABL Facility Agent, or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement, any of the ABL Documents, any of the First Priority Documents or any of the Notes Documents, regardless of any knowledge thereof which the ABL Facility Agent or the ABL Secured Parties, or any of them, may have or be otherwise charged with.

(ii)    Without in any way limiting the generality of the foregoing paragraph (but subject to the rights of the Company and the other Grantors under the ABL Documents and subject to the provisions of Section 3.4(c)), the ABL Secured Parties, the ABL Facility Agent and any of them may, at any time and from time to time in accordance with the ABL Documents and/or applicable law, without the consent of, or notice to, the First Priority Collateral Agents, any First Priority Secured Party, the Junior Lien Collateral Agent or any Notes Secured Party without incurring any liabilities to the First Priority Collateral Agents, any First Priority Secured Parties, the Junior Lien Collateral Agent or any Notes Secured Party and without impairing or releasing the Lien priorities and other benefits provided in this Agreement (even if any right of subrogation or other right or remedy of the First Priority Collateral Agents, any First Priority Secured Party, the Junior Lien Collateral Agent or any Notes Secured Party is affected, impaired or extinguished thereby) do any one or more of the following:

(1)    sell, exchange, realize upon, enforce or otherwise deal with in any manner (subject to the terms hereof) and in any order any part of the ABL Facility Collateral or any liability of the Company or any other Grantor to the ABL Secured Parties or the ABL Facility Agent, or any liability incurred directly or indirectly in respect thereof;

(2)    settle or compromise any ABL Obligation or any other liability of the Company or any other Grantor or any security therefor or any liability incurred directly or indirectly in respect thereof; and

(3)    exercise or delay in or refrain from exercising any right or remedy against the Company or any security or any other Grantor or any other Person, elect any remedy and otherwise deal freely with the Company, any other Grantor or any ABL Facility Collateral and any security and any guarantor or any liability of the Company or any other Grantor to the ABL Secured Parties or any liability incurred directly or indirectly in respect thereof.

(iii)    Each First Priority Collateral Agent, on behalf of itself and the respective First Priority Secured Parties, and the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, also agree that the ABL Secured Parties and the ABL Facility Agent shall have no liability to the First Priority Collateral Agent, any First Priority Secured Party, the Junior Lien Collateral Agent or any Notes Secured Party, and each First Priority Collateral Agent, on behalf of itself and the respective First Priority Secured Parties, and the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, hereby waive any claim against any ABL Secured Party or the ABL Facility Agent, arising out of any and all actions which the ABL Secured Parties or the ABL Facility Agent may take or permit or omit to take with respect to:

(1)    the ABL Documents (other than this Agreement);

(2)    the collection of the ABL Obligations; or

(3)    the foreclosure upon, or sale, liquidation or other disposition of, any ABL Facility Collateral.

Each First Priority Collateral Agent, on behalf of itself and the respective First Priority Secured Parties, and the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, agree that the ABL Secured Parties and the ABL Facility Agent have no duty to the First Priority Collateral Agent, the First Priority Secured Parties, the Junior Lien Collateral Agent or the Junior Lien Secured Parties in respect of the maintenance or preservation of the ABL Facility Collateral, the ABL Obligations or otherwise.

(iv)    The Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, also agrees that the First Priority Secured Parties and the First Priority Collateral Agents shall have no liability to the Junior Lien Collateral Agent or any Notes Secured Party, and the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, hereby waives any claim against any First Priority Secured Party or the First Priority Collateral Agents, arising out of any and all actions which the First Priority Secured Parties or the First Priority Collateral Agent may take or permit or omit to take with respect to:

(1)    the First Priority Documents (other than this Agreement);

(2)    the collection of the First Priority Lien Obligations; or

(3)    the foreclosure upon, or sale, liquidation or other disposition of, any ABL Facility Collateral.

The Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured
Parties, agrees that the First Priority Secured Parties and the First Priority Collateral Agents have
no duty to the Junior Lien Collateral Agent or the Junior Lien Secured Parties in respect of the
maintenance or preservation of the ABL Facility Collateral, the First Priority Lien Obligations or
otherwise.

(v)      Each First Priority Collateral Agent, on behalf of itself and the respective
First Priority Secured Parties, and the Junior Lien Collateral Agent, on behalf of itself and the
Junior Lien Secured Parties, agree not to assert and hereby waive, to the fullest extent permitted
by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of,
any marshalling, appraisal, valuation or other similar right that may otherwise be available under
applicable law with respect to the ABL Facility Collateral or any other similar rights a junior se-
cured creditor may have under applicable law.

(vi)      The Junior Lien Collateral Agent, on behalf of itself and the Junior Lien
Secured Parties, agrees not to assert and hereby waive, to the fullest extent permitted by law, any
right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any mar-
shalling, appraisal, valuation or other similar right that may otherwise be available under appli-
cable law with respect to the ABL Facility Collateral or any other similar rights a junior secured
creditor may have under applicable law.

(d)      <u>Obligations Unconditional</u>.  All rights, interests, agreements and obliga-
tions of the ABL Facility Agent and the ABL Secured Parties and the First Priority Collateral
Agents, the First Priority Secured Parties, the Junior Lien Collateral Agent and the Junior Lien
Secured Parties, respectively, hereunder shall remain in full force and effect irrespective of:

(i)      any lack of validity or enforceability of any ABL Document, any Term
Document or any Notes Document;

(ii)      except as otherwise set forth in the Agreement, any change permitted
hereunder in the time, manner or place of payment of, or in any other terms of, all or any
of the ABL Obligations, First Priority Lien Obligations or Notes Document, or any
amendment or waiver or other modification permitted hereunder, whether by course of
conduct or otherwise, of the terms of any ABL Document, any First Lien Document or
any Junior Lien Document;

(iii)      any exchange of any security interest in any ABL Facility Collateral or
any amendment, waiver or other modification permitted hereunder, whether in writing or
by course of conduct or otherwise, of all or any of the ABL Obligations, First Priority
Lien Obligations or Junior Lien Obligations;

(iv)      the commencement of any Insolvency or Liquidation Proceeding in re-
spect of the Company or any other Grantor; or

(v)      any other circumstances which otherwise might constitute a defense avail-
able to, or a discharge of, the Company or any other Grantor in respect of the ABL Obli-

-68-

gations, or of the First Priority Collateral Agents or any First Priority Secured Party, or of the Junior Lien Collateral Agent or any Notes Secured Party in respect of this Agreement.

Section 4.        Cooperation With Respect To ABL Facility Collateral.

4.1.        Consent to License to Use Intellectual Property.  The First Priority Collateral Agents and the Junior Lien Collateral Agent (and any purchaser, assignee or transferee of assets as provided in Section 4.3) (a) consent (without any representation, warranty or obligation whatsoever) to the grant by any Grantor to the ABL Facility Agent of a non-exclusive royalty-free license to use during the ABL Facility Collateral Processing and Sale Period, the ABL Facility Agent or the Junior Lien Collateral Agent) any Patent, Trademark or proprietary information of such Grantor that is subject to a Lien held by the First Priority Collateral Agents or the Junior Lien Collateral Agent (or any Patent, Trademark or proprietary information acquired by such purchaser, assignee or transferee from any Grantor, as the case may be) and (b) grant, in its capacity as a secured party (or as a purchaser, assignee or transferee, as the case may be), to the ABL Facility Agent a non-exclusive royalty-free license to use during the ABL Facility Collateral Processing and Sale Period, any Patent, Trademark or proprietary information that is subject to a Lien held by the First Priority Collateral Agents or Junior Lien Collateral Agent (or subject to such purchase, assignment or transfer, as the case may be), in each case in connection with the enforcement of any Lien held by the ABL Facility Agent upon any inventory or other ABL Facility Collateral of any Grantor and to the extent the use of such Patent, Trademark or proprietary information is necessary or appropriate, in the good faith opinion of the ABL Facility Agent, to process, ship, produce, store, complete, supply, lease, sell or otherwise dispose of any such inventory in any lawful manner.

4.2.        Access to Information.  If the First Priority Collateral Agents or the Junior Lien Collateral Agent takes actual possession of any documentation of a Grantor (whether such documentation is in the form of a writing or is stored in any data equipment or data record in the physical possession of the First Priority Collateral Agents or the Junior Lien Collateral Agent), then upon request of the ABL Facility Agent and reasonable advance notice, the First Priority Collateral Agent or the Junior Lien Collateral Agent, as applicable, will permit the ABL Facility Agent or its representative to inspect and copy such documentation if and to the extent the ABL Facility Agent certifies to the First Priority Collateral Agents or the Junior Lien Collateral Agent, as applicable, that:

(a)        such documentation contains or may contain information necessary or appropriate, in the good faith opinion of the ABL Facility Agent, to the enforcement of the ABL Facility Agent's Liens upon any ABL Facility Collateral; and

(b)        the ABL Facility Agent and the ABL Secured Parties are entitled to receive and use such information under applicable law and, in doing so, will comply with all obligations imposed by law or contract in respect of the disclosure or use of such information.

4.3.        Access to Property to Process and Sell Inventory.

(a)        (i) If the ABL Facility Agent commences any action or proceeding with respect to any of its rights or remedies (including, but not limited to, any action of foreclosure), enforcement, collection or execution with respect to the ABL Facility Collateral ("ABL Facility Collateral Enforcement Actions") or if the First Priority Collateral Agents commence any action or proceeding with respect to any of its rights or remedies (including any action of foreclosure), enforcement, collection or execution with respect to the Notes Collateral and the First Priority Collateral Agents (or a purchaser at a foreclosure sale conducted in foreclosure of any First Priority Collateral Agents' Liens) takes actual or constructive possession of Notes Collateral of any Grantor ("Notes Collateral Enforcement Actions"), then the First Priority Secured Parties and the First Priority Collateral Agents shall (subject to, in the case of any Notes Collateral Enforcement Action, a prior written request by the ABL Facility Agent to the First Priority Collateral Agents (the "Notes Collateral Enforcement Action Notice")) (x) cooperate with the ABL Facility Agent (and with its officers, employees, representatives and agents) in its efforts to conduct ABL Facility Collateral Enforcement Actions in the ABL Facility Collateral and to finish any work-in-process and process, ship, produce, store, complete, supply, lease, sell or otherwise handle, deal with, assemble or dispose of, in any lawful manner, the ABL Facility Collateral, (y) not hinder or restrict in any respect the ABL Facility Agent from conducting ABL Facility Collateral Enforcement Actions in the ABL Facility Collateral or from finishing any work-in-process or processing, shipping, producing, storing, completing, supplying, leasing, selling or otherwise handling, dealing with, assembling or disposing of, in any lawful manner, the ABL Facility Collateral, and (z) permit the ABL Facility Agent, its employees, agents, advisers and representatives, at the cost and expense of the ABL Secured Parties (but with the Grantors' reimbursement and indemnity obligation with respect thereto, which shall not be limited), to enter upon and use the Notes Collateral (including, without limitation, equipment, processors, computers and other machinery related to the storage or processing of records, documents or files and intellectual property), for a period commencing on (I) the date of the initial ABL Facility Collateral Enforcement Action or the date of delivery of the Notes Collateral Enforcement Action Notice, as the case may be, and (II) ending on the earlier of the date occurring 180 days thereafter and the date on which all ABL Facility Collateral (other than ABL Facility Collateral abandoned by the ABL Facility Agent in writing) has been removed from the First Priority Collateral (such period, as the same may be extended with the written consent of each First Priority Collateral Agent as contemplated by the final sentence of this Section 4.3(a)(i), the "ABL Facility Collateral Processing and Sale Period"), for purposes of:

(A)        assembling and storing the ABL Facility Collateral and completing the processing of and turning into finished goods any ABL Facility Collateral consisting of work-in-process;

(B)        selling any or all of the ABL Facility Collateral located in or on such Notes Collateral, whether in bulk, in lots or to customers in the ordinary course of business or otherwise;

(C)        removing and transporting any or all of the ABL Facility Collateral located in or on such Notes Collateral;

(D)    otherwise processing, shipping, producing, storing, completing, supplying, leasing, selling or otherwise handling, dealing with, assembling or disposing of, in any lawful manner, the ABL Facility Collateral; and/or

(E)    taking reasonable actions to protect, secure, and otherwise enforce the rights or remedies of the ABL Secured Parties and/or the ABL Facility Agent (including with respect to any ABL Facility Collateral Enforcement Actions) in and to the ABL Facility Collateral;

provided, however, that nothing contained in this Agreement shall restrict the rights of the First Priority Collateral Agents from selling, assigning or otherwise transferring any Notes Collateral prior to the expiration of such ABL Facility Collateral Processing and Sale Period if the purchaser, assignee or transferee thereof agrees in writing (for the benefit of the ABL Facility Agent and the ABL Secured Parties) to be bound by the provisions of this Section 4.3 and Section 4.1. If any stay or other order prohibiting the exercise of remedies with respect to the ABL Facility Collateral has been entered by a court of competent jurisdiction, such ABL Facility Collateral Processing and Sale Period shall be tolled during the pendency of any such stay or other order The First Priority Collateral Agent, upon request by the ABL Facility Agent, may in their sole discretion extend the ABL Facility Collateral Processing and Sale Period for an additional period of time.

(ii)    During the period of actual occupation, use and/or control by the ABL Secured Parties and/or the ABL Facility Agent (or their respective employees, agents, advisers and representatives) of any Notes Collateral, the ABL Secured Parties and the ABL Facility Agent shall be obligated to repair at their expense any physical damage to such Notes Collateral resulting from such occupancy, use or control, and to leave such Notes Collateral in substantially the same condition as it was at the commencement of such occupancy, use or control, ordinary wear and tear excepted.  Notwithstanding the foregoing, in no event shall the ABL Secured Parties or the ABL Facility Agent have any liability to the First Priority Secured Parties and/or to the First Priority Collateral Agent pursuant to this Section 4.3(a) as a result of any condition (including any environmental condition, claim or liability) on or with respect to the Notes Collateral existing prior to the date of the exercise by the ABL Secured Parties (or the ABL Facility Agent, as the case may be) of their rights under this Section 4.3(a) and the ABL Secured Parties shall have no duty or liability to maintain the Notes Collateral in a condition or manner better than that in which it was maintained prior to the use thereof by the ABL Secured Parties, or for any diminution in the value of the Notes Collateral that results from ordinary wear and tear resulting from the use of the Notes Collateral by the ABL Secured Parties in the manner and for the time periods specified under this Section 4.3(a).  Without limiting the rights granted in this Section 4.3(a), the ABL Secured Parties and the ABL Facility Agent shall cooperate with the First Priority Secured Parties and/or the First Priority Collateral Agents in connection with any efforts made by the First Priority Secured Parties and/or the First Priority Collateral Agents to sell the Notes Collateral.

(b)    the First Priority Collateral Agents shall be entitled, as a condition of permitting such access and use, to demand and receive assurances reasonably satisfactory to it that the access or use requested and all activities incidental thereto:

-71-

(i)      will be permitted, lawful and enforceable under applicable law and will be conducted in accordance with prudent manufacturing practices; and

(ii)      will be adequately insured for damage to property and liability to persons, including property and liability insurance for the benefit of the First Priority Collateral Agents and the holders of the First Priority Lien Obligations, at no cost to the First Priority Collateral Agents or such holders.

The First Priority Collateral Agents (x) shall provide reasonable cooperation to the ABL Facility Agent in connection with the manufacture, production, completion, handling, removal and sale of any ABL Facility Collateral by the ABL Facility Agent as provided above and (y) shall be entitled to receive, from the ABL Facility Agent, fair compensation and reimbursement for their reasonable costs and expenses incurred in connection with such cooperation, support and assistance to the ABL Facility Agent. The First Priority Collateral Agents and/or any such purchaser (or its transferee or successor) shall not otherwise be required to manufacture, produce, complete, remove, insure, protect, store, safeguard, sell or deliver any inventory subject to any First Priority Lien held by the ABL Facility Agent or to provide any support, assistance or cooperation to the ABL Facility Agent in respect thereof.

4.4.    <u>First Priority Collateral Agents Assurances</u>.  Each First Priority Collateral Agent may condition its performance of any obligation set forth in this Article 4 upon its prior receipt (without cost to it) of:

(a)      such assurances as it may reasonably request to confirm that the performance of such obligation and all activities of the ABL Facility Agent or its officers, employees and agents in connection therewith or incidental thereto:

(i)      will be permitted, lawful and enforceable under applicable law; and

(ii)      will not impose upon the First Priority Collateral Agents (or any First Priority Secured Party) any legal duty, legal liability or risk of uninsured loss; and

(b)      such indemnity or insurance as the First Priority Collateral Agent may reasonably request in connection therewith.

4.5.    <u>Grantor Consent</u>.  The Company and the other Grantors consent to the performance by the First Priority Collateral Agents of the obligations set forth in this Article 4 and acknowledge and agree that neither the First Priority Collateral Agents (nor any holder of First Priority Lien Obligations) shall ever be accountable or liable for any action taken or omitted by the ABL Facility Agent or any ABL Secured Party or its or any of their officers, employees, agents successors or assigns in connection therewith or incidental thereto or in consequence thereof, including any improper use or disclosure of any proprietary information or other intellectual property by the ABL Facility Agent or any ABL Secured Party or its or any of their officers, employees, agents, successors or assigns or any other damage to or misuse or loss of any

property of the Grantors as a result of any action taken or omitted by the ABL Facility Agent or
its officers, employees, agents, successors or assigns.

Section 5.        Application of Proceeds.

    5.1.        Application of Proceeds in Distributions by the Authorized First Priority
Collateral Agent.

        (a)        The Authorized First Priority Collateral Agent will apply the proceeds of
any collection, sale, foreclosure or other realization upon any Notes Collateral and, after the Dis-
charge of ABL Obligations, the proceeds of any collection, sale, foreclosure or other realization
of any ABL Facility Collateral by First Priority Collateral Agent as expressly permitted here-
under, and, in each case the proceeds of any title insurance policy required under any First Prior-
ity Document, ABL Document or Junior Lien Document, in the following order of application:

        First, to the First Lien Collateral Agents for application to First Lien Obligations
    as provided in Section 2.01 of the First Lien Intercreditor Agreement or, if the First Lien
    Intercreditor Agreement is no longer outstanding, as provided in the relevant First Lien
    Documents;

        Second, to the ABL Facility Agent for application to the payment of all amounts
    payable under the ABL Documents on account of the ABL Facility Agent's fees and any
    reasonable legal fees, costs and expenses or other liabilities of any kind incurred by the
    ABL Facility Agent or any co-Junior Lien Collateral Agent or agent of the ABL Facility
    Agent in connection with any ABL Document;

        Third, to the ABL Facility Agent for application to the payment of all outstanding
    ABL Obligations that are then due and payable in such order as may be provided in the
    ABL Documents in an amount sufficient to pay in full in cash all outstanding ABL Obli-
    gations that are then due and payable (including all interest accrued thereon after the
    commencement of any Insolvency or Liquidation Proceeding at the rate, including any
    applicable post-default rate, specified in the ABL Documents, even if such interest is not
    enforceable, allowable or allowed as a claim in such proceeding, and including the dis-
    charge or cash collateralization (at 110% of the aggregate undrawn amount) of all out-
    standing letters of credit and bank guaranties, if any, constituting ABL Obligations);

        Fourth, to the Junior Lien Collateral Agent for application to the payment of all
    amounts payable under the Junior Lien Documents on account of the Junior Lien Notes
    Collateral Agent's fees and any reasonable legal fees, costs and expenses or other liabili-
    ties of any kind incurred by the Junior Lien Collateral Agent or any co-trustee or agent of
    the Junior Lien Collateral Agent in connection with any Junior Lien Document;

        Fifth, to the Junior Lien Collateral Agent for application to the payment of all out-
    standing Junior Lien Obligations that are then due and payable in such order as may be
    provided in the Junior Lien Documents in an amount sufficient to pay in full in cash all
    outstanding Junior Lien Obligations that are then due and payable (including all interest
    accrued thereon after the commencement of any Insolvency or Liquidation Proceeding at

-73-

the rate, including any applicable post-default rate, specified in the Junior Lien Documents, even if such interest is not enforceable, allowable or allowed as a claim in such proceeding); and

*Sixth*, any surplus remaining after the payment in full in cash of the amounts described in the preceding clauses will be paid to the Company or the applicable Grantor, as the case may be, its successors or assigns, or as a court of competent jurisdiction may direct.

(b)    In connection with the application of proceeds pursuant to Section 5.1(a), the Authorized First Priority Collateral Agent may sell any non-cash proceeds for cash prior to the application of the proceeds thereof.

(c)    If the Authorized First Priority Collateral Agent or any First Priority Secured Party collects or receives any proceeds of such foreclosure, collection or other enforcement that should have been applied to the payment of the ABL Obligations or Junior Lien Obligations in accordance with Section 5.2(a) below, whether after the commencement of an Insolvency or Liquidation Proceeding or otherwise, such First Priority Secured Party will forthwith deliver the same to the ABL Facility Agent, for the account of the holders of the ABL Obligations, or to the Junior Lien Collateral Agent, for the account of the holders of the Junior Lien Obligations, as applicable, to be applied in accordance with Section 5.2(a).  Until so delivered, such proceeds will be held by that First Priority Secured Party for the benefit of the holders of the ABL Obligations and Junior Lien Obligations.

5.2.    <u>Application of Proceeds in Distributions by the ABL Facility Agent</u>.

(a)    The ABL Facility Agent will apply the proceeds of any collection, sale, foreclosure or other realization upon any ABL Facility Collateral and, after the Discharge of First Priority Lien Obligations, the proceeds of any collection, sale, foreclosure or other realization of any Notes Collateral by the ABL Facility Agent as expressly permitted hereunder, and the proceeds of any title insurance policy required under any First Priority Document, ABL Document or Junior Lien Document permitted to be received by it, in the following order of application:

*First*, to the payment of all amounts payable under the ABL Documents on account of the ABL Facility Agent's fees and any reasonable legal fees, costs and expenses or other liabilities of any kind incurred by the ABL Facility Agent or any co-trustee or agent of the ABL Facility Agent in connection with any ABL Document;

*Second*, to the payment of all outstanding ABL Obligations that are then due and payable in such order as may be provided in the ABL Documents in an amount sufficient to pay in full in cash all outstanding ABL Obligations that are then due and payable (including all interest accrued thereon after the commencement of any Insolvency or Liquidation Proceeding at the rate, and including any applicable post-default rate, specified in the ABL Documents, even if such interest is not enforceable, allowable or allowed as a claim in such proceeding and including the discharge or cash collateralization (at 110%

of the aggregate undrawn amount) of all outstanding letters of credit and bank guaranties, if any, constituting ABL Obligations);

*Third*, to the Authorized First Priority Collateral Agent for application to First Lien Obligations as provided in Section 2.01 of the First Lien Intercreditor Agreement or, if the First Lien Intercreditor Agreement is no longer outstanding, as provided in the relevant First Lien Documents for application as provided in Section 2.01 of the First Lien Intercreditor Agreement;

*Fourth*, to the Junior Lien Collateral Agent for application to payment of all amounts payable under the Junior Lien Documents on account of the Junior Lien Collateral Agent's fees and any reasonable legal fees, costs and expenses or other liabilities of any kind incurred by the Junior Lien Collateral Agent or any co-trustee or agent of the Junior Lien Collateral Agent in connection with any Junior Lien Document;

*Fifth*, to the Junior Lien Collateral Agent for application to the payment of all outstanding Junior Lien Obligations that are then due and payable in such order as may be provided in the Junior Lien Documents in an amount sufficient to pay in full in cash all outstanding Junior Lien Obligations that are then due and payable (including all interest accrued thereon after the commencement of any Insolvency or Liquidation Proceeding at the rate, including any applicable post-default rate, specified in the Junior Lien Documents, even if such interest is not enforceable, allowable or allowed as a claim in such proceeding; and

*Sixth*, any surplus remaining after the payment in full in cash of the amounts described in the preceding clauses will be paid to the Company or the other applicable Grantor, as the case may be, its successors or assigns, or as a court of competent jurisdiction may direct.

(b)    In connection with the application of proceeds pursuant to Section 5.2(a), the ABL Facility Agent may sell any non-cash proceeds for cash prior to the application of the proceeds thereof.

(c)    If the ABL Facility Agent or any ABL Secured Party collects or receives any proceeds of such foreclosure, collection or other enforcement that should have been applied to the payment of the First Priority Lien Obligations or Junior Lien Notes Obligations in accordance with Section 5.1(a) above, whether after the commencement of an Insolvency or Liquidation Proceeding or otherwise, such ABL Secured Party will forthwith deliver the same to the Authorized First Priority Collateral Agent, for the account of the holders of the First Priority Lien Obligations, or to the Notes Collateral Agent, for the account of the holders of Notes Obligations, as applicable, to be applied in accordance with Section 5.1(a).  Until so delivered, such proceeds will be held by that ABL Secured Party for the benefit of the holders of the First Priority Lien Obligations and Notes Obligations.

5.3.    <u>Set-Off and Tracing of and Priorities in Proceeds</u>.  Each Collateral Agent, on behalf of the applicable Secured Parties, acknowledges and agrees that, to the extent such Collateral Agent or any Secured Party for which it is acting as Collateral Agent exercises its

rights of set-off against any Notes Collateral, the amount of such set-off shall be held and distributed pursuant to <u>Section 2.3</u> or against any ABL Facility Collateral, the amount of such set-off shall be held and distributed pursuant to <u>Section 3.3</u>.  Each Collateral Agent, for itself and on behalf of the applicable Secured Parties, further agrees that, notwithstanding anything herein to the contrary, prior to an issuance of any such Collateral Agent taking any enforcement action (or the giving of notice to the other Collateral Agents of such Collateral Agents intent to do so (such notice referred to in this Section 5.3 only as an "Enforcement Notice") or the commencement of any Insolvency or Liquidation Proceeding, any Proceeds of Collateral, whether or not deposited under account control agreements, which are used by any Grantor to acquire other property which is Collateral shall not (solely as between the Collateral Agents and the Secured Parties) be treated as Proceeds of Collateral for purposes of determining the relative priorities in the Collateral which was so acquired.  In furtherance of the foregoing any Proceeds of Notes Collateral received after the earlier of the issuance of an Enforcement Notice by any First Priority Collateral Agent with respect to the Notes Collateral or the commencement of any Insolvency or Liquidation Proceeding, whether or not deposited in any deposit accounts or securities accounts that constitute ABL Facility Collateral shall be treated as Notes Collateral.  In addition, unless and until the Discharge of ABL Obligations occurs, each Collateral Agent with respect to Obligations having a Second Priority Lien on ABL Facility Collateral hereby consents to the application, prior to the earlier of receipt by the ABL Facility Agent of an Enforcement Notice with respect to ABL Facility Collateral issued by any Collateral Agent with respect to Obligations having a Second Priority Lien on ABL Facility Collateral or the commencement of any Insolvency or Liquidation Proceeding, of cash or other Proceeds of Collateral, deposited under account control agreements to the repayment of ABL Obligations pursuant to the ABL Documents.

Section 6.    <u>Miscellaneous</u>.

6.1.    <u>Conflicts</u>.  In the event of any conflict between the provisions of this Agreement and the provisions of the First Priority Documents, the ABL Documents or Junior Lien Documents, the provisions of this Agreement shall govern and control.  Each Secured Party acknowledges and agrees that the terms and provisions of this Agreement do not violate any term or provisions of its respective First Priority Document, ABL Document or Junior Lien Document.

6.2.    <u>Effectiveness; Continuing Nature of This Agreement; Severability</u>.

(a)    This Agreement shall become effective when executed and delivered by the parties hereto.  The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  All references to the Company or any other Grantor shall include the Company or such Grantor as debtor and debtor in possession and any receiver or trustee for the Company or any other Grantor (as the case may be) in any Insolvency or Liquidation Proceeding.

(b)      This Agreement shall terminate and be of no further force and effect:

(i)      with respect to the ABL Facility Agent, the ABL Secured Parties and the ABL Obligations, upon the Discharge of ABL Obligations, subject to the rights of the ABL Secured Parties under Section 6.17;

(ii)      with respect to the Term Collateral Agent, the First Priority Secured Parties and the Term Obligations, upon the Discharge of Term Obligations, subject to the rights of the First Priority Secured Parties under Section 6.17;

(iii)      with respect to the Notes Collateral Agent, the Notes Secured Parties and the Notes Obligations, upon the Discharge of Notes Obligations, subject to the rights of the Notes Secured Parties under Section 6.17; and

(iv)      with respect to the Junior Lien Collateral Agent, the Junior Lien Secured Parties and the Junior Lien Obligations, upon a satisfaction and discharge, legal defeasance or covenant defeasance of the Junior Lien Indenture in accordance with the terms thereof.

6.3.      <u>Amendments; Waivers</u>.  No amendment, modification or waiver of any of the provisions of this Agreement by the First Priority Collateral Agents, the ABL Facility Agent or the Junior Lien Collateral Agent shall be deemed to be made unless the same shall be in writing signed on behalf of each party hereto or its authorized agent and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time.  Notwithstanding the foregoing, the Company or any other Grantor shall not have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except to the extent its rights are directly affected (which includes any amendment to the Grantors' ability to cause additional obligations to constitute First Priority Lien Obligations, ABL Obligations or Junior Lien Notes Obligations as the Company and/or any other Grantor may designate).

6.4.      <u>Information Concerning Financial Condition of Holdings and Its Subsidiaries</u>.  The First Priority Collateral Agents and the First Priority Secured Parties, the ABL Facility Agent and the ABL Secured Parties and the Junior Lien Collateral Agent and the Junior Lien Secured Parties, shall each be responsible for keeping themselves informed of (a) the financial condition of Holdings and its Subsidiaries and all endorsers and/or guarantors of the First Priority Lien Obligations, the ABL Obligations or the Junior Lien Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the ABL Obligations, the First Priority Lien Obligations or the Junior Lien Obligations.  The Term Collateral Agent and Term Secured Parties shall have no duty to advise the ABL Facility Agent, any ABL Secured Parties, the Junior Lien Collateral Agent or any Junior Lien Secured Parties, the Junior Lien Collateral Agent or any Junior Lien Secured Party of information known to it or them regarding such condition or any such circumstances or otherwise.  The ABL Facility Agent and ABL Secured Parties shall have no duty to advise any First Priority Collateral Agent, any First Priority Secured Party, the Junior Lien Collateral Agent or any Junior Lien Secured Party of information known to it or them regarding such condition or any such circumstances or otherwise.  The Junior Lien Collateral

Agent and Junior Lien Secured Parties shall have no duty to advise any First Priority Collateral Agent, any First Priority Secured Party, the ABL Facility Agent, any ABL Secured Party, the Junior Lien Collateral Agent or any Junior Lien Secured Party of information known to it or them regarding such condition or any such circumstances or otherwise. The Junior Lien Collateral Agent and Junior Lien Secured Parties shall have no duty to advise any First Priority Collateral Agent, any First Priority Secured Party, the ABL Facility Agent or any ABL Secured Party of information known to it or them regarding such condition or any such circumstances or otherwise. In the event that any of the First Priority Collateral Agents, any of the First Priority Secured Parties, the ABL Facility Agent, any of the ABL Secured Parties, the Junior Lien Collateral Agent or any Junior Lien Secured Party, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to any other party hereto, it or they shall be under no obligation (w) to make, and such informing arty shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any such information so provided, (x) to provide any additional information or to provide any such information on any subsequent occasion, (y) to undertake any investigation or (z) to disclose any information which, pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

### 6.5. Submission to Jurisdiction; Waivers.

(a) ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY ARISING OUT OF OR RELATING HERETO MUST BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK. BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH PARTY, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (a) ACCEPTS GENERALLY AND UNCONDITIONALLY THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (b) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (c) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 6.6; AND (d) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (c) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT.

(b) EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER HEREOF, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS

WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE
TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.  EACH PARTY
HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS
WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTAR-
ILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL
COUNSEL.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE
MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRIT-
TEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 6.5(b) AND EXECUTED
BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY
SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS
HERETO.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A
WRITTEN CONSENT TO A TRIAL BY THE COURT.

> 6.6.  <u>Notices</u>.  All notices to the ABL Secured Parties, the First Priority Secured
Parties and the Junior Lien Secured Parties permitted or required under this Agreement shall also
be sent to the ABL Facility Agent, the First Priority Collateral Agents and the Junior Lien Col-
lateral Agent, respectively.  Unless otherwise specifically provided herein, any notice hereunder
shall be in writing and may be personally served, telexed or sent by telefacsimile or United
States mail or courier service and shall be deemed to have been given when delivered in person
or by courier service and signed for against receipt thereof, upon receipt of telefacsimile or telex,
or three Business Days after depositing it in the United States mail with postage prepaid and
properly addressed.  For the purposes hereof, the addresses of the parties hereto shall be as set
forth below each party's name on the signature pages hereto, or, as to each party, at such other
address as may be designated by such party in a written notice to all of the other parties.

> 6.7.  <u>Further Assurances</u>.  The First Priority Collateral Agents, on behalf of it-
self and the First Priority Secured Parties, the ABL Facility Agent, on behalf of itself and the
ABL Secured Parties, the Junior Lien Collateral Agent, on behalf of itself and the Notes Secured
parties, and each Grantor, agrees that each of them shall take such further action and shall exe-
cute (without recourse or warranty) and deliver such additional documents and instruments (in
recordable form, if requested) as the First Priority Collateral Agents, the ABL Facility Agent or
the Junior Lien Collateral Agent may reasonably request to effectuate the terms of and the lien
priorities contemplated by this Agreement.  The parties hereto agree, subject to the other provi-
sions of this Agreement:

>> (a)  upon request by the First Priority Collateral Agents, the ABL Facility
Agent or the Junior Lien Collateral Agent, to cooperate in good faith (and to direct their
counsel to cooperate in good faith) from time to time in order to determine the specific
items included in the Notes Collateral and the ABL Facility Collateral and the steps taken
to perfect their respective Liens thereon and the identity of the respective parties obli-
gated under the First Priority Documents, the ABL Documents and the Junior Lien Docu-
ments; and

>> (b)  that the First Priority Security Documents, the ABL Security Documents
and the Junior Lien Security Documents creating Liens on the Notes Collateral and the
ABL Facility Collateral shall be in all material respects the same forms of documents

other than with respect to the First Priority, the Second Priority and Third Priority nature of the Liens created thereunder in such Collateral.

   6.8. <u>APPLICABLE LAW</u>.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ITS CONFLICTS OF LAW PROVISIONS (OTHER THAN SECTIONS-1401 AND SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATION LAWS).

   6.9. <u>Binding on Successors and Assigns</u>.  This Agreement shall be binding upon the parties hereto, the First Priority Secured Parties, the ABL Secured Parties, the Junior Lien Secured Parties and their respective successors and assigns.

   6.10. <u>Specific Performance</u>.  Each of the First Priority Collateral Agents, the ABL Facility Agent and the Junior Lien Collateral Agent may demand specific performance of this Agreement.  The First Priority Collateral Agents, on behalf of itself and the First Priority Secured Parties, the ABL Facility Agent, on behalf of itself and the ABL Secured Parties, and the Junior Lien Collateral Agent, on behalf of itself and the Junior Lien Secured Parties, hereby irrevocably waives any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by the First Priority Collateral Agents, the ABL Facility Agent or the Junior Lien Collateral Agent, as the case may be.

   6.11. <u>Headings</u>.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

   6.12. <u>Counterparts</u>.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by telecopy or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

   6.13. <u>Authorization; No Conflict</u>.  Each of the parties represents and warrants to all other parties hereto that the execution, delivery and performance by or on behalf of such party to this Agreement has been duly authorized by all necessary action, corporate or otherwise, does not violate any provision of law, governmental regulation, or any agreement or instrument by which such party is bound, and requires no governmental or other consent that has not been obtained and is not in full force and effect.

   6.14. <u>No Third Party Beneficiaries</u>.  This Agreement and the rights and benefits hereof shall inure to the benefit of the First Priority Secured Parties, the ABL Secured Parties, the Junior Lien Secured Parties and each of their respective successors and assigns.  No other Person shall have or be entitled to assert rights or benefits hereunder.

6.15.  <u>Provisions Solely to Define Relative Rights</u>.

(a)    The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the First Priority Secured Parties, the ABL Secured Parties and the Junior Lien Secured Parties.  None of the Company, any other Grantor or any other creditor thereof shall have any rights hereunder.  Nothing in this Agreement is intended to or shall impair the obligations of the Company or any other Grantor, which are absolute and unconditional, to pay the First Priority Lien Obligations, the ABL Obligations and the Junior Lien Obligations as and when the same shall become due and payable in accordance with their terms.

(b)    Nothing in this Agreement shall relieve the Company or any Grantor from the performance of any term, covenant, condition or agreement on the Company's or such Grantor's part to be performed or observed under or in respect of any of the Collateral pledged by it or from any liability to any Person under or in respect of any of such Collateral or impose any obligation on any Collateral Agent to perform or observe any such term, covenant, condition or agreement on the Company's or such Grantor's part to be so performed or observed or impose any liability on any Collateral Agent for any act or omission on the part of the Company's or such any Grantor relative thereto or for any breach of any representation or warranty on the part of the Company or such Grantor contained in this Agreement or any ABL Document or any First Priority Document or any Junior Lien Document, or in respect of the Collateral pledged by it.  The obligations of the Company and each Grantor contained in this paragraph shall survive the termination of this Agreement and the discharge of the Company's or such Grantor's other obligations hereunder.

(c)    Each of the Collateral Agents and the Administrative Agents acknowledge and agree that neither has made any representation or warranty with respect to the execution, validity, legality, completeness, collectability or enforceability of any other ABL Document, any First Priority Document or any Junior Lien Document.  Except as otherwise provided in this Agreement, each of the Collateral Agents and the Administrative Agents will be entitled to manage and supervise their respective extensions of credit to Holdings or any of its Subsidiaries in accordance with law and their usual practices, modified from time to time as they deem appropriate.

6.16.  <u>Additional Grantors</u>.  Holdings and the Company will cause each Person that becomes a Grantor or is a Domestic Subsidiary required by any First Priority Document, ABL Document or Junior Lien Document to become a party to this Agreement to become a party to this Agreement, for all purposes of this Agreement, by causing such Person to execute and deliver to the parties hereto an Intercreditor Agreement Joinder, whereupon such Person will be bound by the terms hereof to the same extent as if it had executed and delivered this Agreement as of the date hereof.  Holdings and the Company shall promptly provide each Collateral Agent with a copy of each Intercreditor Agreement Joinder executed and delivered pursuant to this Section 6.16.

6.17.  <u>Avoidance Issues</u>.  If any ABL Secured Party, First Priority Secured Party or Junior Lien Secured Party is required in any Insolvency or Liquidation Proceeding or otherwise to turn over or otherwise pay to the estate of the Company or any other Grantor any amount (a "<u>Recovery</u>"), then such ABL Secured Party, First Priority Secured Party or Junior Lien Se-

cured Party, as applicable, shall be entitled to a reinstatement of ABL Obligations, First Priority
Lien Obligations or Junior Lien Obligations, as applicable, with respect to all such recovered
amounts.  If this Agreement shall have been terminated prior to such Recovery, this Agreement
shall be reinstated in full force and effect, and such prior termination shall not diminish, release,
discharge, impair or otherwise affect the obligations of the parties hereto from such date of rein-
statement.

       6.18.  <u>Intercreditor Agreement</u>.  This Agreement is the Junior Lien Intercreditor
Agreement referred to in the ABL Credit Agreement, the Term Credit Agreement, the Indenture
and Junior Lien Indenture.  Nothing in this Agreement shall be deemed to subordinate the right
of any ABL Secured Party to receive payment to the right of any First Priority Secured Party to
receive payment or of any First Priority Secured Party to receive payment to the right of any
ABL Secured Party to receive payment or the right of any Junior Lien Secured Party to receive
payment to the right of any First Priority Secured Party or ABL Secured Party to receive pay-
ment (whether before or after the occurrence of an Insolvency or Liquidation Proceeding), it be-
ing the intent of the parties that this Agreement shall effectuate a subordination of Liens but not a
subordination of Indebtedness.

*     *     *

IN WITNESS WHEREOF, the parties hereto have caused this Intercreditor Agreement to be executed by their respective officers or representatives as of the day and year first above written.

Each assignor's address is as listed
on Annex A attached hereto

LYONDELL BASELL INDUSTRIES N.V.

By: _____
      Name:
      Title:

LYONDELL CHEMICAL COMPANY

By: _____
      Name:
      Title:

[GRANTORS]

By: _____
      Name:
      Title:

Address:                                          CITIBANK, N.A., as ABL Facility Agent

[                        ]
[                        ]              By:  _____
[                        ]                   Name:
Attention:  [                    ]           Title:
Telecopier:  [                    ]


                                          By:  _____
                                               Name:
                                               Title:

Address:                                    [                              ], as Term Collateral
                                                Agent

60 Wall Street
New York, NY  10005                    By:  _____
Attention:  Marguerite Sutton                  Name:
Telecopier:  212-797-5690                      Title:


                                            By:  _____
                                                Name:
                                                Title:

Address:                                    DEUTSCHE BANK TRUST COMPANY
                                            AMERICAS, as Notes Collateral Agent

[                    ]               By:  _____
[                    ]                     Name:
[                    ]                     Title:
Attention:  [                ]
Telecopier:  [                ]
                                    By:  _____
                                          Name:
                                          Title:

Address:                                     [                    ], as Junior Lien Collateral Agent

[                    ]
[                    ]                        By: _____
[                    ]                             Name:
Attention:  [                    ]                Title:
Telecopier:  [                    ]

**Exhibit A**

# FORM OF
## INTERCREDITOR AGREEMENT JOINDER

The undersigned, _____, a _____, hereby agrees to become party as [a Grantor] [a ABL Facility Agent] [a Term Collateral Agent] [a Notes Collateral Agent] [a Junior Lien Collateral Agent] under the Amended and Restated Intercreditor Agreement dated as of March 18, 2009 (the "Intercreditor Agreement") among LYONDELL BASELL INDUSTRIES N.V., a public limited liability company formed under the laws of the Netherlands, LYONDELL CHEMICAL COMPANY, a Delaware corporation (the "Company"), the other GRANTORS from time to time party thereto, CITIBANK, N.A., as ABL Facility Agent, UBS AG, STAMFORD BRANCH, as Term Collateral Agent, and DEUTSCHE BANK TRUST COMPANY AMERICAS, as Notes Collateral Agent and [          ], as Junior Lien Collateral Agent, as amended, supplemented, amended and restated or otherwise modified and in effect from time to time, for all purposes thereof on the terms set forth therein, and to be bound by the terms of the Intercreditor Agreement as fully as if the undersigned had executed and delivered the Intercreditor Agreement as of the date thereof.

The provisions of Article 6 of the Intercreditor Agreement will apply with like effect to this Intercreditor Agreement Joinder.

IN WITNESS WHEREOF, the parties hereto have caused this Intercreditor Agreement Joinder to be executed by their respective officers or representatives as of _____, 20___.

[_____]

By:  _____
       Name:
       Title:

**TAB 16-F**

**[SUBJECT TO REVISION –
DOCUMENT TO BE DELETED IF 2014 NOTES ARE NOT ISSUED]**

**[2014 NOTES ARE THE "CRAM DOWN NOTES" AS MENTIONED IN THE PLAN]**

THIRD LIEN INTERCREDITOR AGREEMENT

dated as of

April __, 2010

among

DEUTSCHE BANK TRUST COMPANY AMERICAS,
as New Third Lien Notes Collateral Agent,

DEUTSCHE BANK TRUST COMPANY AMERICAS,
as 2014 Notes Collateral Agent,

and

each Additional Collateral Agent from time to time party hereto

and

LyondellBasell Industries N.V., as the Company

and

each other Grantor from time to time party hereto

TABLE OF CONTENTS

Page

ARTICLE I

DEFINITIONS

SECTION 1.01      Construction; Certain Defined Terms ........................................................................ 1

ARTICLE II

PRIORITIES AND AGREEMENTS WITH RESPECT TO COMMON COLLATERAL

SECTION 2.01      Priority of Claims.............................................................................................. 6
SECTION 2.02      Actions with Respect to Common Collateral; Prohibition on Contesting Liens........... 7
SECTION 2.03      No Interference; Payment Over .......................................................................... 8
SECTION 2.04      Automatic Release of Liens; Amendments to Third Lien Security Documents ........... 9
SECTION 2.05      Certain Agreements with Respect to Bankruptcy or Insolvency Proceedings............ 10
SECTION 2.06      Reinstatement................................................................................................. 11
SECTION 2.07      Insurance....................................................................................................... 11
SECTION 2.08      Refinancings .................................................................................................. 11
SECTION 2.09      Possessory or Control Collateral Agent................................................................ 11

ARTICLE III

OTHER THIRD LIEN OBLIGATIONS

ARTICLE IV

EXISTENCE AND AMOUNTS OF LIENS AND OBLIGATIONS

ARTICLE V

THE AUTHORIZED COLLATERAL AGENT

SECTION 5.01      Authority........................................................................................................ 13
SECTION 5.02      Rights as a Third Lien Secured Party .................................................................. 14
SECTION 5.03      Exculpatory Provisions...................................................................................... 14
SECTION 5.04      Reliance by Authorized Collateral Agent.............................................................. 15
SECTION 5.05      Delegation of Duties......................................................................................... 16
SECTION 5.06      Non-Reliance on Authorized Collateral Agent and Other Third Lien Secured
                  Parties .......................................................................................................... 16

## ARTICLE VI

### MISCELLANEOUS

SECTION 6.01    Notices ................................................................................................ 16
SECTION 6.02    Waivers; Amendment; Joinder Agreements .......................................... 17
SECTION 6.03    Parties in Interest ............................................................................... 17
SECTION 6.04    Survival of Agreement ....................................................................... 18
SECTION 6.05    Counterparts ....................................................................................... 18
SECTION 6.06    Severability ......................................................................................... 18
SECTION 6.07    Governing Law .................................................................................... 18
SECTION 6.08    Submission to Jurisdiction; Waivers ................................................... 18
SECTION 6.09    WAIVER OF JURY TRIAL ................................................................ 18
SECTION 6.10    Headings .............................................................................................. 19
SECTION 6.11    Conflicts .............................................................................................. 19
SECTION 6.12    Provisions Solely to Define Relative Rights ........................................ 19
SECTION 6.13    Integration ........................................................................................... 19

THIRD LIEN INTERCREDITOR AGREEMENT (as amended, restated, modified or supplemented from time to time, this "Agreement") dated as of April __, 2010, among Deutsche Bank Trust Company Americas, as collateral agent for the New Third Lien Notes Secured Parties (as defined below) (in such capacity and together with its successors in such capacity, the "New Third Lien Notes Collateral Agent"), Deutsche Bank Trust Company Americas, as collateral agent for the 2014 Notes Secured Parties (as defined below) (in such capacity and together with its successors in such capacity, the "2014 Notes Collateral Agent"), each Additional Collateral Agent (as defined below), from time to time party hereto for the Other Third Lien Secured Parties (as defined below) of the Series (as defined below) with respect to which it is acting in such capacity, LyondellBasell Industries, N.V., as the company (the "Company") and each other Grantor (as defined below) and each Additional Grantor (as defined below).

In consideration of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the New Third Lien Notes Collateral Agent (for itself and on behalf of the New Third Lien Notes Secured Parties), the 2014 Notes Collateral Agent (for itself and on behalf of the 2014 Notes Secured Parties) each Additional Collateral Agent (for itself and on behalf of the Other Third Lien Secured Parties of the applicable Series), each Grantor and each Additional Grantor agree as follows:

## ARTICLE I

## DEFINITIONS

SECTION 1.01 Construction; Certain Defined Terms.

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument, other document, statute or regulation herein shall be construed as referring to such agreement, instrument, other document, statute or regulation as from time to time amended, supplemented or otherwise modified, (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, but shall not be deemed to include the subsidiaries of such Person unless express reference is made to such subsidiaries, (iii) the words "herein", "hereof and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (iv) all references herein to Articles, Sections and Annexes shall be construed to refer to Articles, Sections and Annexes of this Agreement, (v) unless otherwise expressly qualified herein, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (vi) the term "or" is not exclusive.

(b)    It is the intention of the Third Lien Secured Parties (as defined below) of each Series that the holders of Third Lien Obligations (as defined below) of such Series (and not the Third Lien Secured Parties of any other Series) bear the risk of (i) any determination by a court of competent jurisdiction that (x) any of the Third Lien Obligations of such Series are unenforceable under applicable law or are subordinated to any other obligations (other than another Series of Third Lien Obligations), (y) any of the Third Lien Obligations of such Series do not have an enforceable security interest in any of the Collateral securing any other Series of Third Lien Obligations and/or (z) any intervening security interest exists securing any other obligations (other than another Series of Third Lien Obligations) on a basis ranking prior to the security interest of such Series of Third Lien Obligations but junior to the

security interest of any other Series of Third Lien Obligations or (ii) the existence of any Collateral for any other Series of Third Lien Obligations that is not Common Collateral (any such condition referred to in the foregoing clauses (i) or (ii) with respect to any Series of Third Lien Obligations, an "Impairment" of such Series).  In the event of any Impairment with respect to any Series of Third Lien Obligations, the results of such Impairment shall be borne solely by the holders of such Series of Third Lien Obligations, and the rights of the holders of such Series of Third Lien Obligations (including, without limitation, the right to receive distributions in respect of such Series of Third Lien Obligations pursuant to Section 2.01) set forth herein shall be modified to the extent necessary so that the effects of such Impairment are borne solely by the holders of the Series of such Third Lien Obligations subject to such Impairment. Additionally, in the event the Third Lien Obligations of any Series are modified pursuant to applicable law (including, without limitation, pursuant to Section 1129 of the Bankruptcy Code), any reference to such Third Lien Obligations or the Secured Credit Documents governing such Third Lien Obligations shall refer to such obligations or such documents as so modified.

(c)     Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the New Third Lien Notes Indenture (defined below).  As used in this Agreement, the following terms have the meanings specified below:

"2014 Notes" shall mean the __% secured dollar notes due 2014 issued pursuant to the terms of the 2014 Notes Indenture on the date hereof.

"2014 Notes Collateral Agent" shall have the meaning assigned to such term in the introductory paragraph to this Agreement.

"2014 Notes Indenture" means that certain Indenture dated as of April __, 2010, among the Company, the Subsidiaries of the Company identified therein and Wells Fargo Bank, N.A., as trustee.

"2014 Notes Obligations" means the Obligations with respect to the 2014 Notes.

"2014 Notes Secured Parties" means the "Secured Parties" as defined in the 2014 Notes Security Agreement.[1]

"2014 Notes Security Agreement" means the Security Agreement dated as of the date hereof, by and among the Grantors party thereto and the 2014 Notes Collateral Agent, as the same may be further amended, restated, supplemented or modified from time to time.

"Additional Collateral Agent" shall have the meaning assigned to such term in Section 3(b).

"Additional Grantor" means any Grantor which becomes a party to this Agreement pursuant to a Grantor Joinder Agreement.

"Agreement" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"Authorized Collateral Agent" means, with respect to any Common Collateral, (i) until the Trigger Date, the New Third Lien Notes Collateral Agent and (ii) from and after the Trigger Date, the Major Non-Controlling Collateral Agent.

---

[1] Confirm upon review of draft Security Agreement.

"Bankruptcy Case" shall have the meaning assigned to such term in Section 2.05(b).

"Bankruptcy Code" shall mean Title 11 of the United States Code, as amended.

"Bankruptcy Law" shall mean the Bankruptcy Code and any similar Federal, state or foreign law for the relief of debtors.

"Collateral" means all assets and properties subject to Liens created pursuant to any Third Lien Security Document to secure one or more Series of Third Lien Obligations.

"Collateral Agents" means either (a) the New Third Lien Notes Collateral Agent, (b) the 2014 Notes Collateral Agent, or (c) each Additional Collateral Agent.

"Common Collateral" means, at any time, Collateral in which the holders of two or more Series of Third Lien Obligations (or their respective Collateral Agent) hold a valid and perfected security interest or Lien at such time; provided that "Common Collateral" shall also include rights to payment pursuant to Section ____ of the Junior Lien Intercreditor Agreement to which the holders of two or more Series of Third Lien Obligations (or their Collateral Agents) would be entitled (and any reference in this Agreement to any valid and perfected lien of any Series of Third Lien Obligations with respect to any such rights to payment under such Section shall mean that the holders such Series (or their Collateral Agents) are entitled to such payment pursuant to the Junior Lien Intercreditor Agreement).  If more than two Series of Third Lien Obligations are outstanding at any time and the holders of less than all Series of Third Lien Obligations hold a valid and perfected security interest or Lien in any Collateral at such time, then such Collateral shall constitute Common Collateral for those Series of Third Lien Obligations that hold a valid security interest or Lien in such Collateral at such time and shall not constitute Common Collateral for any Series which does not have a valid and perfected security interest or Lien in such Collateral at such time.

"Company" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"Control Collateral" means any Common Collateral in the control of the Authorized Collateral Agent (or its agents or bailees), to the extent that control thereof perfects a Lien thereon under the Uniform Commercial Code of any jurisdiction or otherwise.  Control Collateral includes, without limitation, Deposit Accounts, Electronic Chattel Paper, Investment Property or Letter-of-Credit Rights. All capitalized terms used in this definition and not defined elsewhere in this Agreement have the meanings assigned to them in the New York UCC.

"Controlling Secured Parties" means, with respect to any Common Collateral, the Series of Third Lien Secured Parties whose Collateral Agent is the Authorized Collateral Agent for such Common Collateral.

"DIP Financing" shall have the meaning assigned to such term in Section 2.05(b).

"DIP Financing Liens" shall have the meaning assigned to such term in Section 2.05(b).

"DIP Lenders" shall have the meaning assigned to such term in Section 2.05(b).

"Discharge" means, with respect to any Common Collateral and any Series of Third Lien Obligations, the date on which such Series of Third Lien Obligations is no longer secured by such Common Collateral.  The term "Discharged" shall have a corresponding meaning.

"Event of Default" means (a) an "Event of Default" as defined in the 2014 Notes Indenture, (b) an "Event of Default" as defined in the New Third Lien Notes Indenture, and (c) an event of default under any Other Third Lien Agreement.

"Grantor Joinder Agreement" means a supplement to this Agreement substantially in the form of Exhibit B, appropriately completed.

"Grantors" means the Company and each Subsidiary thereof which has granted a security interest pursuant to any Third Lien Security Document to secure any Series of Third Lien Obligations.

"Impairment" shall have the meaning assigned to such term in Section 1.01(b).

"Insolvency or Liquidation Proceeding" shall mean, with respect to any person, any (a) insolvency, bankruptcy, receivership, reorganization, readjustment, composition or other similar proceeding relating to such person or its property or creditors in such capacity, (b) proceeding for any liquidation, dissolution or other winding up of such person, voluntary or involuntary, whether or not involving insolvency or proceedings under the Bankruptcy Code, whether partial or complete and whether by operation of law or otherwise, (c) assignment for the benefit of creditors of such person or (d) other marshalling of the assets of such person.

"Intervening Creditor" shall have the meaning assigned to such term in Section 2.01(a).

"Joinder Agreement" means a supplement to this Agreement substantially in the form of Exhibit A, appropriately completed.

"Junior Lien Intercreditor Agreement" means that certain Intercreditor Agreement dated as of April __, 2010 among Citibank, N.A. as collateral agent for that certain asset-based credit agreement dated as of April __, 2010, UBS AG, Stamford Branch as term loan collateral agent, Deutsche Bank Trust Company Americas as senior notes collateral agent and the Authorized Collateral Agent.

"Major Non-Controlling Collateral Agent" means, with respect to any Common Collateral, the Collateral Agent of the Series of Other Third Lien Obligations that constitutes the largest outstanding principal amount of any then outstanding Series of Third Lien Obligations with respect to such Common Collateral.

"New Third Lien Notes" shall mean the 11% secured dollar notes due 2018 issued pursuant to the terms of the New Third Lien Notes Indenture on the date hereof.

"New Third Lien Notes Collateral Agent" shall have the meaning assigned to such term in the introductory paragraph hereof.

"New Third Lien Notes Indenture" shall mean that certain Indenture dated as of April __, 2010, among the Company, the Subsidiaries of the Company identified therein and Wells Fargo Bank, N.A., as trustee.

"New Third Lien Notes Obligations" means the Obligations with respect to the New Third Lien Notes.

"New Third Lien Notes Secured Parties" means the "Secured Parties" as defined in the New Third Lien Notes Security Agreement.[2]

"New Third Lien Notes Security Agreement" means the Security Agreement dated as of the date hereof, by and among the Grantors party thereto and the New Third Lien Notes Collateral Agent, as the same may be further amended, restated, supplemented or modified from time to time.

"New York UCC" shall mean the Uniform Commercial Code as from time to time in effect in the State of New York.

"Non-Controlling Collateral Agent" means, at any time with respect to any Common Collateral, any Collateral Agent that is not the Authorized Collateral Agent at such time with respect to such Common Collateral.

"Non-Controlling Secured Parties" means, with respect to any Common Collateral, the Third Lien Secured Parties which are not Controlling Secured Parties with respect to such Common Collateral.

"Other Third Lien Agreement" means the indentures or other agreements under which Other Third Lien Obligations of any Series are issued or incurred and all other instruments, agreements and other documents evidencing or governing Other Third Lien Obligations of such Series or providing any guarantee, Lien or other right in respect thereof and shall include the 2014 Notes Indenture.

"Other Third Lien Obligations" shall means all obligations of the Company and the other Grantors that shall have been designated as such pursuant to Article III and shall include the 2014 Notes Obligations.

"Other Third Lien Secured Party" means the holders of any Other Third Lien Obligations and the corresponding Collateral Agent with respect thereto and shall include the 2014 Notes Secured Parties.

"Possessory Collateral" means any Common Collateral in the possession of the Authorized Collateral Agent (or its agents or bailees), to the extent that possession thereof perfects a Lien thereon under the Uniform Commercial Code of any jurisdiction or otherwise. Possessory Collateral includes, without limitation, Certificated Securities, Negotiable Documents, Goods, Money, Instruments, and Tangible Chattel Paper, in each case, delivered to or in the possession of the New Third Lien Notes Collateral Agent under the terms of the Third Lien Security Documents. All capitalized terms used in this definition and not defined elsewhere in this Agreement have the meanings assigned to them in the New York UCC.

"Proceeds" shall have the meaning assigned to such term in Section 2.01(a).

"Refinance" means, in respect of any indebtedness, to refinance, extend, renew, defease, amend, increase, modify, supplement, restructure, refund, replace or repay, or to issue other indebtedness or enter alternative financing arrangements, in exchange or replacement for such indebtedness (in whole or in part), including by adding or replacing lenders, creditors, agents, borrowers and/or guarantors, and including in each case, but not limited to, after the original instrument giving rise to such indebtedness has been terminated and including, in each case, through any credit agreement, indenture or other agreement.  "Refinanced" and "Refinancing" have correlative meanings.

---

[2] Confirm upon review of draft Security Agreement.

"<u>Secured Credit Documents</u>" means (i) the New Third Lien Notes Indenture and the Security Documents, (ii) the 2014 Notes Indenture and the Security Documents (as defined in the 2014 Notes Indenture) and (iii) each Other Third Lien Agreement and any security documents referenced therein.

"<u>Security Agreements</u>" means (i) the New Third Lien Notes Security Agreement and (ii) the 2014 Notes Security Agreement.

"<u>Series</u>" means (a) with respect to the Third Lien Secured Parties, each of (i) the New Third Lien Notes Secured Parties (in their capacities as such), (ii) the 2014 Notes Secured Parties (in their capacity as such) and (iii) the Other Third Lien Secured Parties that become subject to this Agreement after the date hereof that are represented by a common Collateral Agent (in its capacity as such for such Other Third Lien Secured Parties) and (b) with respect to any Third Lien Obligations, each of (i) the New Third Lien Notes Obligations, (ii) the 2014 Notes Obligations and (iii) the Other Third Lien Obligations incurred pursuant to any Other Third Lien Agreement, which pursuant to any Joinder Agreement, are to be represented hereunder by a common Collateral Agent (in its capacity as such for such Other Third Lien Obligations).

"<u>Third Priority Lien Obligations</u>" means, collectively, (i) the New Third Lien Notes Obligations, (ii) the 2014 Notes Obligations and (iii) the Other Third Lien Obligations.

"<u>Third Lien Secured Parties</u>" means (a) the New Third Lien Notes Secured Parties, (b) the 2014 Notes Secured Parties and (c) each Other Third Lien Secured Party.

"<u>Third Lien Security Documents</u>" means the Security Agreements and each other agreement entered into in favor of the Collateral Agents for purposes of securing any Series of Third Priority Lien Obligations.

"<u>Trigger Date</u>" means the date on which the New Third Lien Notes Obligations are satisfied in full and the New Third Lien Notes are cancelled or defeased in accordance with their terms.

## ARTICLE II

## PRIORITIES AND AGREEMENTS WITH RESPECT TO COMMON COLLATERAL

SECTION 2.01 <u>Priority of Claims</u>.

(a)    Anything contained herein or in any of the Secured Credit Documents to the contrary notwithstanding (but subject to <u>Section 1.01(b)</u> of this Agreement), if an Event of Default has occurred and is continuing, and the Authorized Collateral Agent is taking action to enforce rights in respect of any Common Collateral, or any distribution is made in respect of any Common Collateral in any Bankruptcy Case of any Grantor or any Third Lien Secured Party receives any payment pursuant to any intercreditor agreement (other than this Agreement) with respect to any Common Collateral, the proceeds of any sale, collection or other liquidation of any such Collateral by any Third Lien Secured Party or received by the New Third Lien Notes Collateral Agent, the 2014 Notes Collateral Agent or any Third Lien Secured Party pursuant to any such intercreditor agreement with respect to such Common Collateral and proceeds of any such distribution (subject, in the case of any such distribution, to the sentence immediately following) to which the Third Priority Lien Obligations are entitled under any intercreditor agreement (other than this Agreement) (all proceeds of any sale, collection or other liquidation of any Collateral and all proceeds of any such distribution being collectively referred to as "<u>Proceeds</u>"), shall be applied as follows:

FIRST, to the payment of all reasonable costs and expenses incurred by the Collateral Agents or any Collateral Agent in connection with such collection or sale or otherwise in connection with this Agreement, or any other Third Lien Security Document or any of the Third Priority Lien Obligations, including all court costs and the reasonable fees and expenses of their agents and legal counsel, the repayment of all advances made by the Collateral Agents or any Collateral Agent, as applicable, hereunder or under any other Third Lien Security Document on behalf of Grantors and any other reasonable costs or expenses incurred in connection with the exercise of any right or remedy hereunder or under any other Third Lien Security Document;

SECOND, to the payment of all other Third Priority Lien Obligations (the amounts so applied to be distributed pro rata among the Third Lien Secured Parties in accordance with the amounts of the Obligations owed to them on the date of any such distribution); and

THIRD, after payment in full of all Third Priority Lien Obligations, to the Grantors or their successors or assigns, or as a court of competent jurisdiction may otherwise direct.

Notwithstanding the foregoing, with respect to any Common Collateral for which a third party (other than a Third Lien Secured Party) has a lien or security interest that is junior in priority to the security interest of any Series of Third Priority Lien Obligations but senior (as determined by appropriate legal proceedings in the case of any dispute) to the security interest of any other Series of Third Priority Lien Obligations (such third party an "Intervening Creditor"), the value of any Common Collateral or Proceeds which are allocated to such Intervening Creditor shall be deducted on a ratable basis solely from the Common Collateral or Proceeds to be distributed in respect of the Series of Third Priority Lien Obligations with respect to which such Impairment exists.

(b)    The Third Lien Secured Parties hereby acknowledge that the Third Priority Lien Obligations of any Series may, subject to the limitations set forth in the then extant Secured Credit Documents, be increased, extended, renewed, replaced, restated, supplemented, restructured, repaid, refunded, Refinanced or otherwise amended or modified from time to time, all without affecting the priorities set forth in Section 2.01(a) or the provisions of this Agreement defining the relative rights of the Third Lien Secured Parties of any Series.

(c)    Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Liens securing any Series of Third Priority Lien Obligations granted on the Common Collateral and notwithstanding any provision of the Uniform Commercial Code of any jurisdiction, or any other applicable law or the Secured Credit Documents or any defect or deficiencies in the Liens securing the Third Priority Lien Obligations of any Series or any other circumstance whatsoever (but, in each case, subject to Section 1.01(b)), each Third Lien Secured Party hereby agrees that the Liens securing each Series of Third Priority Lien Obligations on any Common Collateral shall be of equal priority.

SECTION 2.02 Actions with Respect to Common Collateral; Prohibition on Contesting Liens.

(a)    With respect to any Common Collateral, (i) notwithstanding Section 2.01, only the Authorized Collateral Agent shall act or refrain from acting with respect to the Common Collateral (including with respect to any intercreditor agreement with respect to any Common Collateral) and (ii) no other Collateral Agent with respect to Third Priority Lien Obligations or Non-Controlling Collateral Agent or other Third Lien Secured Party (other than the Authorized Collateral Agent) shall or shall instruct the Authorized Collateral Agent to, commence any judicial or nonjudicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to, or

otherwise take any action to enforce its security interest in or realize upon, or take any other action available to it in respect of, any Common Collateral (including with respect to any intercreditor agreement with respect to any Common Collateral), whether under any Third Lien Security Document, applicable law or otherwise, it being agreed that only the Authorized Collateral Agent shall be entitled to take any such actions or exercise any such remedies with respect to Common Collateral (subject to the right of any such Collateral Agent or other Third Lien Secured Party to take limited protective measures with respect to the Liens securing Third Priority Lien Obligations and to take certain actions that would be permitted to be taken by unsecured creditors). Notwithstanding the equal priority of the Liens securing each Series of Third Priority Lien Obligations, the Authorized Collateral Agent may deal with the Common Collateral as if such Authorized Collateral Agent had a senior Lien on such Common Collateral. No Non-Controlling Collateral Agent or Non-Controlling Secured Party will contest, protest or object to any foreclosure proceeding or action brought by the Authorized Collateral Agent or the Controlling Secured Party or any other exercise by the Authorized Collateral Agent or the Controlling Secured Party of any rights and remedies relating to the Common Collateral, or to cause the Authorized Collateral Agent to do so. The foregoing shall not be construed to limit the rights and priorities of any Third Lien Secured Party, New Third Lien Notes Collateral Agent, the 2014 Notes Collateral Agent or any Collateral Agent with respect to any Collateral not constituting Common Collateral.

(b)    Each of the Third Lien Secured Parties and each of the Collateral Agents agrees that it will not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the perfection, priority, validity or enforceability of a Lien held by or on behalf of any of the Third Lien Secured Parties in all or any part of the Collateral, or the provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair (i) the rights of any of the Collateral Agents or any Collateral Agent to enforce this Agreement or (ii) the rights of any Third Lien Secured Party from contesting or supporting any other Person in contesting the enforceability of any Lien purporting to secure Third Priority Lien Obligations constituting unmatured interest pursuant to Section 502(b)(2) of the Bankruptcy Code.

SECTION 2.03 No Interference; Payment Over.

(a)    Each Third Lien Secured Party agrees that (i) it will not challenge or question in any proceeding the validity or enforceability of any Third Priority Lien Obligations of any Series or any Third Lien Security Document or the validity, attachment, perfection or priority of any Lien under any Third Lien Security Document or the validity or enforceability of the priorities, rights or duties established by or other provisions of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any Third Lien Secured Party from challenging or questioning the validity or enforceability of any Third Priority Lien Obligations constituting unmatured interest or the validity of any Lien relating thereto pursuant to Section 502(b)(2) of the Bankruptcy Code, (ii) it will not take or cause to be taken any action the purpose or intent of which is, or could be, to interfere, hinder or delay, in any manner, whether by judicial proceedings or otherwise, any sale, transfer or other disposition of the Common Collateral by the Authorized Collateral Agent, (iii) except as provided in Section 2.02, it shall have no right to (A) direct the Authorized Collateral Agent or any other Third Lien Secured Party to exercise any right, remedy or power with respect to any Common Collateral (including pursuant to any intercreditor agreement) or (B) consent to the exercise by the Authorized Collateral Agent or any other Third Lien Secured Party of any right, remedy or power with respect to any Common Collateral, (iv) it will not institute any suit or assert in any suit, bankruptcy, insolvency or other proceeding any claim against the Authorized Collateral Agent or any other Third Lien Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise with respect to any Common Collateral, and none of the Collateral Agents, any Authorized Collateral Agent or any other Third Lien Secured Party shall be liable for any action taken or omitted to be taken by the Authorized Collateral Agent or other Third Lien Secured Party with respect to any Common Collateral in accordance with the

provisions of this Agreement, (v) it will not seek, and hereby waives any right, to have any Common Collateral or any part thereof marshaled upon any foreclosure or other disposition of such Collateral and (vi) it will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement; provided that nothing in this Agreement shall be construed to prevent or impair the rights of any of the Collateral Agents or any other Third Lien Secured Party to enforce this Agreement.

(b)    Each Third Lien Secured Party hereby agrees that if it shall obtain possession of any Common Collateral or shall realize any proceeds or payment in respect of any such Common Collateral, pursuant to any Third Lien Security Document or by the exercise of any rights available to it under applicable law or in any Insolvency or Liquidation Proceeding or through any other exercise of remedies (including pursuant to any intercreditor agreement), at any time prior to the Discharge of each of the Third Priority Lien Obligations, then it shall hold such Common Collateral, proceeds or payment in trust for the other Third Lien Secured Parties and promptly transfer such Common Collateral, proceeds or payment, as the case may be, to the Authorized Collateral Agent, to be distributed by the Authorized Collateral Agent in accordance with the provisions of Section 2.01(a) hereof.

(c)    In furtherance of the foregoing, no Grantor shall, nor shall any Grantor permit any of its Subsidiaries to, grant or permit or suffer to exist any Lien on any asset or property to secure any Series of Third Priority Lien Obligations unless it has granted a Lien on such asset or property to secure each other Series of Third Priority Lien Obligations; provided that a Lien on any such asset or property need not be granted if such Lien would be prohibited to be granted to secure Third Priority Lien Obligations by the 3-16 Exemption (as defined in the Security Agreements).

SECTION 2.04 Automatic Release of Liens; Amendments to Third Lien Security Documents.

(a)    If, at any time any Common Collateral is transferred to a third party or otherwise disposed of, in each case, in connection with any enforcement by the Authorized Collateral Agent in accordance with the provisions of this Agreement, then (whether or not any Insolvency or Liquidation Proceeding is pending at the time) the Liens in favor of the Third Priority Lien Obligations upon such Common Collateral will automatically be released and discharged upon final conclusion of foreclosure proceeding; provided that any proceeds of any Common Collateral realized therefrom shall be applied pursuant to Section 2.01 hereof.

(b)    Each Third Lien Secured Party agrees that the New Third Lien Notes Collateral Agent, the 2014 Notes Collateral Agent or any Additional Collateral Agent may enter into any amendment (and, upon request by the Authorized Collateral Agent, each Collateral Agent shall sign a consent to such amendment) to any Third Lien Security Document (including, without limitation, to release Liens securing any Series of Third Priority Lien Obligations) so long as such amendment, subject to clause (d) below, is permitted by the terms of each then extant Secured Credit Document. Additionally, each Third Lien Secured Party agrees that the New Third Lien Notes Collateral Agent, the 2014 Notes Collateral Agent or any Additional Collateral Agent may enter into any amendment (and, upon request by the Authorized Collateral Agent, each Collateral Agent shall sign a consent to such amendment) to any Third Lien Security Document solely as such Third Lien Security Document relates to a particular Series of Third Priority Lien Obligations (including, without limitation, to release Liens securing such Series of Third Priority Lien Obligations) so long as (x) such amendment is in accordance with the Secured Credit Document pursuant to which such Series of Third Priority Lien Obligations was incurred and (y) such amendment does not adversely affect the Third Lien Secured Parties of any other Series.

(c)    Each Collateral Agent agrees to execute and deliver (at the sole cost and expense of the Grantors) all such authorizations and other instruments as shall reasonably be requested by the Authorized Collateral Agent to evidence and confirm any release of Common Collateral or amendment to any Third Lien Security Document provided for in this Section.

SECTION 2.05 Certain Agreements with Respect to Bankruptcy or Insolvency Proceedings.

(a)    This Agreement shall continue in full force and effect notwithstanding the commencement of any proceeding under the Bankruptcy Code or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law by or against the Company or any of its subsidiaries.

(b)    If any Grantor shall become subject to a case (a "Bankruptcy Case") under the Bankruptcy Code and shall, as debtor(s)-in-possession, move for approval of financing ("DIP Financing") to be provided by one or more lenders (the "DIP Lenders") under Section 364 of the Bankruptcy Code or the use of cash collateral under Section 363 of the Bankruptcy Code, each Third Lien Secured Party (other than any Controlling Secured Party or any Authorized Collateral Agent of any Controlling Secured Party) agrees that it will raise no objection to any such financing or to the Liens on the Common Collateral securing the same ("DIP Financing Liens") or to any use of cash collateral that constitutes Common Collateral, unless any Controlling Secured Party, or a Collateral Agent of any Controlling Secured Party, shall then oppose or object to such DIP Financing or such DIP Financing Liens or use of cash collateral (and (i) to the extent that such DIP Financing Liens are senior to the Liens on any such Common Collateral for the benefit of the Controlling Secured Parties, each Non-Controlling Secured Party will subordinate its Liens with respect to such Common Collateral on the same terms as the Liens of the Controlling Secured Parties (other than any Liens of any Third Lien Secured Parties constituting DIP Financing Liens) are subordinated thereto, and (ii) to the extent that such DIP Financing Liens rank *pari passu* with the Liens on any such Common Collateral granted to secure the Third Priority Lien Obligations of the Controlling Secured Parties, each Non-Controlling Secured Party will confirm the priorities with respect to such Common Collateral as set forth herein), in each case so long as (A) the Third Lien Secured Parties of each Series retain the benefit of their Liens on all such Common Collateral pledged to the DIP Lenders, including proceeds thereof arising after the commencement of such proceeding, with the same priority vis-à-vis all the other Third Lien Secured Parties (other than any Liens of the Third Lien Secured Parties constituting DIP Financing Liens) as existed prior to the commencement of the Bankruptcy Case, (B) the Third Lien Secured Parties of each Series are granted Liens on any additional collateral pledged to any Third Lien Secured Parties as adequate protection or otherwise in connection with such DIP Financing or use of cash collateral, with the same priority vis-à-vis the Third Lien Secured Parties as set forth in this Agreement, (C) if any amount of such DIP Financing or cash collateral is applied to repay any of the Third Priority Lien Obligations, such amount is applied pursuant to Section 2.01(a) of this Agreement, and (D) if any Third Lien Secured Party is granted adequate protection, including in the form of periodic payments, in connection with such DIP Financing or use of cash collateral, the proceeds of such adequate protection is applied pursuant to Section 2.01(a) of this Agreement; provided that the Third Lien Secured Parties of each Series shall have a right to object to the grant of a Lien to secure the DIP Financing over any Collateral subject to Liens in favor of the Third Lien Secured Parties of such Series or its Collateral Agent that shall not constitute Common Collateral; and provided, further, that the Third Lien Secured Parties receiving adequate protection shall not object to any other Third Lien Secured Party receiving adequate protection comparable to any adequate protection granted to such Third Lien Secured Parties in connection with a DIP Financing or use of cash collateral.

SECTION 2.06 Reinstatement.    In the event that any of the Third Priority Lien Obligations shall be paid in full and such payment or any part thereof shall subsequently, for whatever

-10-

reason (including an order or judgment for disgorgement of a preference under Title 11 of the United Stated Code, or any similar law, or the settlement of any claim in respect thereof), be required to be returned or repaid, the terms and conditions of this Article II shall be fully applicable thereto until all such Third Priority Lien Obligations shall again have been paid in full in cash.

SECTION 2.07 Insurance.  As between the Third Lien Secured Parties, the Authorized Collateral Agent shall have the right to adjust or settle any insurance policy or claim covering or constituting Common Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding affecting the Common Collateral.

SECTION 2.08 Refinancings.  The Third Priority Lien Obligations of any Series may be Refinanced, in whole or in part, in each case, without notice to, or the consent (except to the extent a consent is otherwise required to permit the refinancing transaction under any Secured Credit Document) of any Third Lien Secured Party of any other Series, all without affecting the priorities provided for herein or the other provisions hereof; provided that the Collateral Agent for the holders of any such Refinancing indebtedness shall have executed a Joinder Agreement on behalf of the holders of such Refinancing indebtedness.

SECTION 2.09 Possessory or Control Collateral Agent.

(a)    The Authorized Collateral Agent agrees to hold any Common Collateral constituting Possessory Collateral or Control Collateral that is part of the Collateral in its possession or control (or in the possession or control of its agents or bailees) as gratuitous bailee or sub-agent, as applicable, for the benefit of each other Third Lien Secured Party and any assignee solely for the purpose of perfecting the security interest granted in such Possessory Collateral or Control Collateral, if any, pursuant to the applicable Third Lien Security Documents, in each case, subject to the terms and conditions of this Section 2.09.   Pending delivery to the Authorized Collateral Agent, each other Collateral Agent agrees to hold any Common Collateral constituting Possessory Collateral or Control Collateral, from time to time in its possession, as gratuitous bailee or sub-agent for the benefit of each other Third Lien Secured Party and any assignee, solely for the purpose of perfecting the security interest granted in such Possessory Collateral, if any, pursuant to the applicable Third Lien Security Documents, in each case, subject to the terms and conditions of this Section 2.09.

(b)    The duties or responsibilities of the Authorized Collateral Agent and each other Collateral Agent under this Section 2.09 shall be limited solely to holding any Common Collateral constituting Possessory Collateral or Control Collateral as gratuitous bailee or sub-agent, as applicable, for the benefit of each other Third Lien Secured Party for purposes of perfecting the Lien held by such Third Lien Secured Parties therein.

(c)    In furtherance of the foregoing, each Grantor hereby grants a security interest in the Common Collateral constituting Possessory and Control Collateral to the Authorized Collateral Agent to the extent it possesses or controls Common Collateral constituting Possessory Collateral or Control Collateral as permitted in Section 2.09(a) for the benefit of the Third Lien Secured Parties under any Series of Third Priority Lien Obligations (other than the Series of Third Priority Lien Obligations for which the Authorized Collateral Agent is the collateral agent) which have been granted a Lien on the Common Collateral constituting Possessory Collateral or Control Collateral possessed or controlled by the corresponding Collateral Agent.

## ARTICLE III

## OTHER THIRD LIEN OBLIGATIONS

The Company may from time to time, subject to any limitations contained in any Secured Credit Documents in effect at such time, designate additional indebtedness and related obligations that are, or are to be, secured by Liens on any assets of the Company or any of its Subsidiaries that would, if such Liens were granted, constitute Common Collateral as Other Third Lien Obligations by delivering to each Collateral Agent party hereto at such time a certificate of an authorized officer of the Company:

(a)        describing the indebtedness and other obligations being designated as Other Third Lien Obligations, and including a statement of the maximum aggregate outstanding principal amount of such indebtedness as of the date of such certificate;

(b)        setting forth the Other Third Lien Agreements under which such Other Third Lien Obligations are issued or incurred or the Guarantees of or Liens securing such Other Third Lien Obligations are, or are to be, granted or created, and attaching copies of such Other Third Lien Obligations Agreements as each Grantor has executed and delivered to the Person that serves as the collateral agent, collateral trustee or a similar representative for the holders of such Additional Third Priority Lien Obligations (such Person being referred to as the "Additional Collateral Agent") with respect to such Other Third Lien Obligations on the closing date of such Other Third Lien Obligations, certified as being true and complete by an authorized officer of the Company;

(c)        identifying the Person that serves as the Additional Collateral Agent;

(d)        certifying that the incurrence of such Other Third Lien Obligations, the creation of the Liens securing such Other Third Lien Obligations and the designation of such Other Third Lien Obligations as "Other Third Lien Obligations" hereunder do not violate or result in a default under any provision of any Secured Credit Document in effect at such time; and

(e)        attaching a fully completed Joinder Agreement executed and delivered by the Additional Collateral Agent.

Upon the delivery of such certificate and the related attachments as provided above, the obligations designated in such notice shall become Other Third Lien Obligations for all purposes of this Agreement.

## ARTICLE IV

## EXISTENCE AND AMOUNTS OF LIENS AND OBLIGATIONS

Whenever the Authorized Collateral Agent or any other Collateral Agent shall be required, in connection with the exercise of its rights or the performance of its obligations hereunder, to determine the existence or amount of any Third Priority Lien Obligations of any Series, or the Common Collateral subject to any Lien securing the Third Priority Lien Obligations of any Series, it may request that such information be furnished to it in writing by each other Collateral Agent and shall be entitled to make such determination on the basis of the information so furnished; provided, however, that if a Collateral Agent shall fail or refuse reasonably promptly to provide the requested information, the Authorized Collateral Agent or other Collateral Agent shall be entitled to make any such determination or not make any determination by such method as it may, in the exercise of its good faith judgment, determine, including by reliance upon a certificate of the Company. The Authorized Collateral Agent and

each other Collateral Agent may rely conclusively, and shall be fully protected in so relying, on any
determination made by it in accordance with the provisions of the preceding sentence (or as otherwise
directed by a court of competent jurisdiction) and shall have no liability to any Grantor, any Third Lien
Secured Party or any other person as a result of such determination.

## ARTICLE V

## THE AUTHORIZED COLLATERAL AGENT

SECTION 5.01 Authority.

(a)    Notwithstanding any other provision of this Agreement, nothing herein shall be
construed to impose any fiduciary or other duty on the Authorized Collateral Agent to any
Non-Controlling Secured Party or give any Non-Controlling Secured Party the right to direct the
Authorized Collateral Agent, except that the Authorized Collateral Agent shall be obligated to distribute
proceeds of any Common Collateral in accordance with Section 2.01 hereof.

(b)    In furtherance of the foregoing, each Non-Controlling Collateral Agent
acknowledges and agrees that the Authorized Collateral Agent shall be entitled, for the benefit of the
Third Lien Secured Parties, to:

(i)    sell, transfer or otherwise dispose of or deal with any Common Collateral as
provided herein and in the Third Lien Security Documents, as applicable, for which the
Authorized Collateral Agent is the collateral agent of such Common Collateral, without regard to
any rights to which the Non-Controlling Secured Parties would otherwise be entitled. Without
limiting the foregoing, each Non-Controlling Secured Party agrees that neither the Authorized
Collateral Agent nor any other Third Lien Secured Party shall have any duty or obligation first to
marshal or realize upon any type of Common Collateral (or any other Collateral securing any of
the Third Priority Lien Obligations), or to sell, dispose of or otherwise liquidate all or any portion
of such Common Collateral (or any other Collateral securing any Third Priority Lien
Obligations), in any manner that would maximize the return to the Non-Controlling Secured
Parties, notwithstanding that the order and timing of any such realization, sale, disposition or
liquidation may affect the amount of proceeds actually received by the Non-Controlling Secured
Parties from such realization, sale, disposition or liquidation. In addition, whether or not it is the
Authorized Collateral Agent, no Collateral Agent or Third Lien Secured Party shall have any duty
or obligation first to marshal or realize upon any type of Collateral not constituting Common
Collateral, or to sell, dispose of or otherwise liquidate all or any portion of such Collateral not
constituting Common Collateral, in any manner that would maximize the return to the holders of
any other Series of Third Priority Lien Obligations, notwithstanding that the order and timing of
any such realization, sale, disposition or liquidation may affect the amount of proceeds actually
received by the holders of any other Series of Third Priority Lien Obligations from such
realization, sale, disposition or liquidation. Each of the Third Lien Secured Parties waives any
claim it may now or hereafter have against any Collateral Agent or the Authorized Collateral
Agent of any other Series of Third Priority Lien Obligations or any other Third Lien Secured
Party of any other Series arising out of (i) any actions which any Collateral Agent, the Authorized
Collateral Agent or the Third Lien Secured Parties take or omit to take (including, actions with
respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect
to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, any of the
Collateral and actions with respect to the collection of any claim for all or any part of the Third
Priority Lien Obligations from any account debtor, guarantor or any other party) in accordance
with the Third Lien Security Documents or any other agreement related thereto or to the

-13-

collection of the Third Priority Lien Obligations or the valuation, use, protection or release of any security for the Third Priority Lien Obligations, (ii) any election by the Authorized Collateral Agent or any holders of Third Priority Lien Obligations, in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b) of the Bankruptcy Code or (iii) subject to Section 2.04, any borrowing by, or grant of a security interest or administrative expense priority under Section 364 of the Bankruptcy Code by, Holdings or any of its subsidiaries, as debtor-in-possession.  Notwithstanding any other provision of this Agreement, no Collateral Agent (including the Authorized Collateral Agent) shall accept any Common Collateral in full or partial satisfaction of any Third Priority Lien Obligations pursuant to Section 9-620 of the Uniform Commercial Code of any jurisdiction, without the consent of each of the Collateral Agents representing holders of Third Priority Lien Obligations for whom such Collateral constitutes Common Collateral; and

(ii)    to enter into the Junior Lien Intercreditor Agreement as the "Junior Lien Collateral Agent" on behalf of the Third Lien Secured Parties and to take all such actions as may be required in connection therewith.  Each of the Third Lien Secured Parties waives any claim it may now or hereafter have against the Authorized Collateral Agent arising out of any actions which the Authorized Collateral Agent takes or omits to take (including, actions with respect to the creation, perfection or continuation of Liens on any Collateral, actions with respect to the foreclosure upon, sale, release or depreciation of, or failure to realize upon, any of the Collateral and actions with respect to the collection of any claim for all or any part of the Third Lien Obligations from any account debtor, guarantor or any other party) in accordance with the Junior Lien Intercreditor Agreement or any other agreement related thereto.

SECTION 5.02 Rights as a Third Lien Secured Party.  The Person serving as the Authorized Collateral Agent hereunder shall have the same rights and powers in its capacity as a Third Lien Secured Party under any Series of Third Priority Lien Obligations that it holds as any other Third Lien Secured Party of such Series and may exercise the same as though it were not the Authorized Collateral Agent and the terms "Third Lien Secured Party", "Third Lien Secured Parties" and (as applicable) "New Third Lien Notes Secured Party", "New Third Lien Notes Secured Parties", "Other Third Lien Secured Party" and "Other Third Lien Secured Parties" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Authorized Collateral Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Company or any Subsidiary or other Affiliate thereof as if such Person were not the Authorized Collateral Agent hereunder and without any duty to account therefor to any other Third Lien Secured Party.

SECTION 5.03 Exculpatory Provisions.

(a)    The Authorized Collateral Agent shall not have any duties or obligations except those expressly set forth herein, in the Junior Lien Intercreditor Agreement and in the other Third Lien Security Documents.  Without limiting the generality of the foregoing, the Authorized Collateral Agent:

(i)    shall not be subject to any fiduciary or other implied duties of any kind or nature to any Person, regardless of whether an Event of Default has occurred and is continuing;

(ii)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby, by the Junior Lien Intercreditor Agreement or by the other Third Lien Security Documents; provided that the Authorized Collateral Agent shall not be required to take any action that, in its opinion or

the opinion of its counsel, may expose the Authorized Collateral Agent to liability or that is contrary to any Third Lien Security Document or applicable law;

(iii)       shall not, except as expressly set forth herein, in the Junior Lien Intercreditor Agreement and in the other Third Lien Security Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Company or any of its Affiliates that is communicated to or obtained by the Person serving as the Authorized Collateral Agent or any of its Affiliates in any capacity;

(iv)       shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Major Non-Controlling Collateral Agent or (ii) in the absence of its own gross negligence or willful misconduct or (iii) in reliance on a certificate of an authorized officer of the Company stating that such action is permitted by the terms of this Agreement.  The Authorized Collateral Agent shall be deemed not to have knowledge of any Event of Default under any Series of Third Priority Lien Obligations unless and until notice describing such Event Default is given to the Authorized Collateral Agent by the Collateral Agent for such Third Priority Lien Obligations or the Company;

(v)       shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Third Lien Security Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Third Lien Security Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Third Lien Security Documents, (v) the value or the sufficiency of any Collateral for any Series of Third Priority Lien Obligations, or (v) the satisfaction of any condition set forth in any Secured Credit Document, other than to confirm receipt of items expressly required to be delivered to the Authorized Collateral Agent;

(vi)       shall not have any fiduciary duties or contractual obligations of any kind or nature under any Other Third Lien Agreement (but shall be entitled to all protections provided to the Authorized Collateral Agent therein); and

(vii)       with respect to the New Third Lien Notes Indenture, any Other Third Lien Agreement or any Third Lien Security Document, may conclusively assume that the Grantors have complied with all of their obligations thereunder unless advised in writing by the Collateral Agent thereunder to the contrary specifically setting forth the alleged violation.

SECTION 5.04 <u>Reliance by Authorized Collateral Agent</u>.  The Authorized Collateral Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Authorized Collateral Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  The Authorized Collateral Agent may consult with legal counsel (who may include, but shall not be limited to counsel for the Company or counsel for the trustee, collateral agent or other person serving in a similar capacity, in each case, under the New Third Lien Note Indenture or any Other Third Lien Agreement), independent accountants and

other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

SECTION 5.05 <u>Delegation of Duties</u>.  The Authorized Collateral Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Third Lien Security Document by or through any one or more sub-agents appointed by the Authorized Collateral Agent.  The Authorized Collateral Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Affiliates of the Authorized Collateral Agent and any such sub-agent.

SECTION 5.06 <u>Non-Reliance on Authorized Collateral Agent and Other Third Lien Secured Parties</u>.  Each Third Lien Secured Party acknowledges that it has, independently and without reliance upon the Authorized Collateral Agent, any Collateral Agent or any other Third Lien Secured Party or any of their Affiliates and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and the other Secured Credit Documents.  Each Third Lien Secured Party also acknowledges that it will, independently and without reliance upon the Authorized Collateral Agent, any Collateral Agent or any other Third Lien Secured Party or any of their Affiliates and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Secured Credit Document or any related agreement or any document furnished hereunder or thereunder.

## ARTICLE VI

## MISCELLANEOUS

SECTION 6.01 <u>Notices</u>.  All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(a) if to the New Third Lien Notes Collateral Agent, to it at:

Deutsche Bank Trust Company Americas
[ ]
[ ]
[ ]
Attention:  [ ]
Telephone:  [ ]
Telecopier:  [ ]
E-mail:  [ ];

(b) if to the 2014 Notes Collateral Agent, to it at:

-16-

Deutsche Bank Trust Company Americas
[ ]
[ ]
[ ]
Attention:  [  ]
Telephone:  [  ]
Telecopier:  [  ]
E-mail:  [  ];

(c)    if to any Additional Collateral Agent, to it at the address set forth in the applicable Joinder Agreement.

Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt (if a Business Day) and on the next Business Day thereafter (in all other cases) if delivered by hand or overnight courier service or sent by telecopy or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 6.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 6.01.  As agreed to in writing among the Authorized Collateral Agent and each Collateral Agent from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable person provided from time to time by such person.

SECTION 6.02 Waivers; Amendment; Joinder Agreements.

(a)    No failure or delay on the part of any party hereto in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the parties hereto are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by any party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on any party hereto in any case shall entitle such party to any other or further notice or demand in similar or other circumstances.

(b)    Neither this Agreement nor any provision hereof may be terminated, waived, amended or modified (other than pursuant to any Joinder Agreement) except pursuant to an agreement or agreements in writing entered into by each Collateral Agent.

(c)    Notwithstanding the foregoing, without the consent of any Third Lien Secured Party, any Collateral Agent may become a party hereto by execution and delivery of a Joinder Agreement in the form of Exhibit A hereto and upon such execution and delivery, such Collateral Agent and the Other Third Lien Secured Parties and Other Third Lien Obligations of the Series for which such Collateral Agent is acting shall be subject to the terms hereof and the terms of the other Third Lien Security Documents applicable thereto.

SECTION 6.03 Parties in Interest.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, as well as the other Third

Lien Secured Parties, all of whom are intended to be bound by, and to be third party beneficiaries of, this Agreement.

SECTION 6.04 <u>Survival of Agreement</u>.  All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.

SECTION 6.05 <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall constitute an original but all of which when taken together shall constitute a single contract. Delivery of an executed signature page to this Agreement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

SECTION 6.06 <u>Severability</u>.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.   The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 6.07 <u>Governing Law</u>.  This Agreement shall be construed in accordance with and governed by the laws of the State of New York.

SECTION 6.08 <u>Submission to Jurisdiction; Waivers</u>.   The New Third Lien Notes Collateral Agent, the 2014 Notes Collateral Agent and each Collateral Agent, on behalf of itself and the Third Lien Secured Parties of the Series for whom it is acting, irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement and the Third Lien Security Documents, or for recognition and enforcement of any judgment in respect thereof, to the exclusive general jurisdiction of the state and federal courts located in New York County and appellate courts from any thereof;

(b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person (or its Collateral Agent) at the address referred to in <u>Section 6.01</u>;

(d)    agrees that nothing herein shall affect the right of any other party hereto (or any Third Lien Secured Party) to effect service of process in any other manner permitted by law; and

(e)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this <u>Section 6.08</u> any special, exemplary, punitive or consequential damages.

SECTION 6.09 <u>WAIVER OF JURY TRIAL</u>.   EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR

INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 6.09</u>.

SECTION 6.10 <u>Headings</u>.  Article, Section and Annex headings used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 6.11 <u>Conflicts</u>. In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of any of the other Secured Credit Documents or Third Lien Security Documents, the provisions of this Agreement shall control.

SECTION 6.12 <u>Provisions Solely to Define Relative Rights</u>.  The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the Third Lien Secured Parties in relation to one another.  None of the Company, any other Grantor or any other creditor thereof shall have any rights or obligations hereunder, except as expressly provided in this Agreement (<u>provided</u> that nothing in this Agreement (other than <u>Section 2.04</u>, <u>2.05</u>, <u>2.06</u>, <u>2.08</u> or <u>2.09</u> or this <u>Article VI</u>) is intended to or will amend, waive or otherwise modify the provisions of the New Third Lien Notes Indenture or any Other Third Lien Agreements), and none of the Company or any other Grantor may rely on the terms hereof (other than <u>Sections 2.04</u>, <u>2.05</u>, <u>2.08</u> and <u>2.09</u> and <u>Article V</u>).  Nothing in this Agreement is intended to or shall impair the obligations of any Grantor, which are absolute and unconditional, to pay the Third Priority Lien Obligations as and when the same shall become due and payable in accordance with their terms.

SECTION 6.13 <u>Integration</u>. This Agreement together with the other Secured Credit Documents and the Third Lien Security Documents represents the agreement of each of the Grantors and the Third Lien Secured Parties with respect to the subject matter hereof and there are no promises, undertakings, representations or warranties by any Grantor, the Authorized Collateral Agent, any Collateral Agent or any other Third Lien Secured Party relative to the subject matter hereof not expressly set forth or referred to herein or in the other Secured Credit Documents or the Third Lien Security Documents.

[Remainder of this page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

DEUTSCHE BANK TRUST COMPANY
AMERICAS,
as New Third Lien Notes Collateral Agent


By: _____
    Name:
    Title:


DEUTSCHE BANK TRUST COMPANY
AMERICAS,
as 2014 Notes Collateral Agent


By: _____
    Name:
    Title:




Acknowledged and Agreed:

[GRANTOR]

By: _____
Name: _____
Title: _____

[FORM OF] JOINDER AGREEMENT NO. [ ] dated as of [  ], 20[  ] (the "Joinder Agreement") to the THIRD LIEN INTERCREDITOR AGREEMENT dated as of April __, 2010 (the "Third Lien Intercreditor Agreement"), among, Deutsche Bank Trust Company Americas, as the New Third Lien Notes Collateral Agent, Deutsche Bank Trust Company Americas, as the 2014 Notes Collateral Agent, and each Additional Collateral Agent from time to time party thereto.

A.     Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Third Lien Intercreditor Agreement.

B.     The Company proposes to issue or incur Other Third Lien Obligations and the Person identified in the signature pages hereto as the "Additional Collateral Agent" (the "Additional Collateral Agent") will serve as the collateral agent, collateral trustee or a similar representative for the Additional Secured Parties. The Other Third Lien Obligations are being designated as such by the Company in accordance with Article III of the Third Lien Intercreditor Agreement.

C.     The Additional Collateral Agent wishes to become a party to the Third Lien Intercreditor Agreement and to acquire and undertake, for itself and on behalf of the Other Third Lien Secured Parties, the rights and obligations of an "Additional Collateral Agent" thereunder. The Additional Collateral Agent is entering into this Joinder Agreement in accordance with the provisions of the Third Lien Intercreditor Agreement in order to become an Additional Collateral Agent thereunder.

Accordingly, the Additional Collateral Agent and the Company agree as follows, for the benefit of the Additional Collateral Agent, the Borrower and each other party to the Third Lien Intercreditor Agreement:

SECTION 1.     Accession to the Third Lien Intercreditor Agreement. The Additional Collateral Agent (a) hereby accedes and becomes a party to the Third Lien Intercreditor Agreement as an Additional Collateral Agent for the Other Secured Parties from time to time in respect of the Additional Third Priority Lien Obligations, (b) agrees, for itself and on behalf of the Other Secured Parties from time to time in respect of the Additional Third Priority Lien Obligations, to all the terms and provisions of the Third Lien Intercreditor Agreement and (c) shall have all the rights and obligations of an Additional Collateral Agent under the Third Lien Intercreditor Agreement.

SECTION 2.     Representations, Warranties and Acknowledgement of the Additional Collateral Agent. The Additional Collateral Agent represents and warrants to the Collateral Agents and the Secured Parties that (a) it has full power and authority to enter into this Joinder Agreement, in its capacity as the Additional Collateral Agent, (b) this Joinder Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms of this Joinder Agreement and (c) the Other Third Lien Obligations Documents relating to such Other Third Lien Obligations provide that, upon the Additional Collateral Agent's entry into this Joinder Agreement, the secured parties in respect of such Other Third Lien Obligations will be subject to and bound by the provisions of the Third Lien Intercreditor Agreement as Additional Secured Parties.

SECTION 3.     Counterparts. This Joinder Agreement may be executed in multiple counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Joinder Agreement shall become effective when each Collateral Agent shall have received a counterpart of this Joinder Agreement that bears the signature of the Additional

Collateral Agent.  Delivery of an executed signature page to this Joinder Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually signed counterpart of this Joinder Agreement.

SECTION 4.    <u>Benefit of Agreement</u>.    **The agreements set forth herein or undertaken pursuant hereto are for the benefit of, and may be enforced by, any party to the Third Lien Intercreditor Agreement.**

SECTION 5.    <u>Governing Law</u>.    **THIS JOINDER AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

SECTION 6.    <u>Severability</u>.  In case any one or more of the provisions contained in this Joinder Agreement should be held invalid, illegal or unenforceable in any respect, none of the parties hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the Third Lien Intercreditor Agreement shall not in any way be affected or impaired.  The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.    <u>Notices</u>.  All communications and notices hereunder shall be in writing and given as provided in <u>Section 6.01</u> of the Third Lien Intercreditor Agreement.  All communications and notices hereunder to the Additional Collateral Agent shall be given to it at the address set forth under its signature hereto, which information supplements <u>Section 6.01</u> of the Third Lien Intercreditor Agreement.

SECTION 8.    The Company agrees to reimburse each Collateral Agent for its reasonable out-of-pocket expenses in connection with this Joinder Agreement, including the reasonable fees, other charges and disbursements of counsel for each Collateral Agent.

IN WITNESS WHEREOF, the Additional Collateral Agent has duly executed this Joinder Agreement to the Third Lien Intercreditor Agreement as of the day and year first above written.

[NAME OF ADDITIONAL COLLATERAL AGENT], as ADDITIONAL COLLATERAL AGENT for the OTHER FIRST LIEN SECURED PARTIES


By: _____
    Name:
    Title:


Address for notices:


_____
_____
attention of: _____
Telecopy: _____

Acknowledged by:


DEUTSCHE BANK TRUST COMPANY AMERICAS, as
    New Third Lien Notes Collateral Agent


By: _____
    Name:
    Title:


DEUTSCHE BANK TRUST COMPANY AMERICAS,
    as 2014 Notes Collateral Agent


By: _____
    Name:
    Title:

[EACH OTHER ADDITIONAL
    COLLATERAL AGENT], as Additional
    Collateral Agent


By:_____
Name:
Title:


Acknowledged and Agreed:

[GRANTOR]

By:_____
Name: _____
Title: _____

EXHIBIT B

[FORM OF] GRANTOR JOINDER AGREEMENT NO. [ ] dated as of [ ], 20[ ] (the "Joinder Agreement") to the THIRD LIEN INTERCREDITOR AGREEMENT dated as of April __, 2010 (the "Third Lien Intercreditor Agreement"), among LYONDELLBASELL INDUSTRIES N.V., a Dutch corporation limited by shares (the "Company"), the GRANTORS party thereto, Deutsche Bank Trust Company Americas, as New Third Lien Notes Collateral Agent, Deutsche Bank Trust Company Americas, as 2014 Notes Collateral Agent, each ADDITIONAL COLLATERAL AGENT from time to time party thereto and [ ], a [ ], as an additional GRANTOR.

A.     Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Third Lien Intercreditor Agreement.

B.     [ ], a Subsidiary of the Borrower (the "Additional Grantor"), has granted a Lien on all or a portion of its assets to secure Third Lien Obligations and such Additional Grantor is not a party to the Third Lien Intercreditor Agreement.

C.     The Additional Grantor wishes to become a party to the Third Lien Intercreditor Agreement and to acquire and undertake the rights and obligations of a Grantor thereunder. The Additional Grantor is entering into this Joinder Agreement in accordance with the provisions of the Third Lien Intercreditor Agreement in order to become a Grantor thereunder.

Accordingly, the Additional Grantor agrees as follows, for the benefit of the Collateral Agents, the Borrower and each other party to the Third Lien Intercreditor Agreement:

SECTION 1.     Accession to the Third Lien Intercreditor Agreement.     In accordance with Article III of the Third Lien Intercreditor Agreement, the Additional Grantor (a) hereby accedes and becomes a party to the Third Lien Intercreditor Agreement as a Grantor with the same force and effect as if originally named therein as a Grantor, (b) agrees to all the terms and provisions of the Third Lien Intercreditor Agreement and (c) shall have all the rights and obligations of a Grantor under the Third Lien Intercreditor Agreement.

SECTION 2.     Representations, Warranties and Acknowledgment of the Additional Grantor.     The Additional Grantor represents and warrants to each Collateral Agent and each Secured Party that this Joinder Agreement has been duly authorized, executed and delivered by such Additional Grantor and constitutes the legal, valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.     Counterparts.     This Joinder Agreement may be executed in multiple counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Joinder Agreement shall become effective when each Collateral Agent shall have received a counterpart of this Joinder Agreement that bears the signature of the Additional Grantor. Delivery of an executed signature page to this Joinder Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually signed counterpart of this Joinder Agreement.

B-1

SECTION 4.    Benefit of Agreement.    **The agreements set forth herein or undertaken pursuant hereto are for the benefit of, and may be enforced by, any party to the Third Lien Intercreditor Agreement.**

SECTION 5.    Governing Law.    **THIS JOINDER AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

SECTION 6.    Severability.    In case any one or more of the provisions contained in this Joinder Agreement should be held invalid, illegal or unenforceable in any respect, none of the parties hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the Third Lien Intercreditor Agreement shall not in any way be affected or impaired.    The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.    Notices.    All communications and notices hereunder shall be in writing and given as provided in Section 6.01 of the Third Lien Intercreditor Agreement.

SECTION 8.    The Additional Grantor agrees to reimburse each Collateral Agent for its reasonable out-of-pocket expenses in connection with this Joinder Agreement, including the reasonable fees, other charges and disbursements of counsel for each Collateral Agent.

IN WITNESS WHEREOF, the Additional Grantor has duly executed this Joinder Agreement to the Third Lien Intercreditor Agreement as of the day and year first above written.

[NAME OF SUBSIDIARY]


By: _____
     Name:
     Title:

Acknowledged by:


DEUTSCHE BANK TRUST COMPANY AMERICAS, as
New Third Lien Notes Collateral Agent


By:  _____
Name:
Title:


DEUTSCHE BANK TRUST COMPANY AMERICAS,
as 2014 Notes Collateral Agent


By:  _____
Name:
Title:


[EACH OTHER ADDITIONAL
COLLATERAL AGENT], as Additional
Collateral Agent


By:  _____
Name:
Title: