UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| LYONDELL CHEMICAL COMPANY, *et al.*, | ) | |
| | ) | Case No. 09-10023 (REG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

_____

BENCH DECISION[1] ON DEBTORS' OBJECTIONS,
UNDER BANKRUPTCY CODE SECTION 502(e)(1)(B),
TO PRP ENVIRONMENTAL CONTRIBUTION CLAIMS

APPEARANCES:

CADWALADER, WICKERSHAM & TAFT, LLP
*Counsel to the Debtors*
One World Financial Center
New York, New York  10281
By:    Christopher R. Mirick, Esq.

-and-

700 Sixth Street, N.W.
Washington, D.C.  20001
By:    David F. Williams, Esq. (argued)
Douglas H. Fischer, Esq.

BROWN RUDNICK, LLP
*Counsel to the Official Committee of Unsecured Creditors*
One Financial Center
Boston, Massachusetts  02111
By:    John C. Elstad, Esq. (argued)
       Steven D. Pohl, Esq.

---

[1]    I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate in open court, but where the circumstances do not permit more leisurely drafting or more extensive or polished discussion. Because they often start as scripts for decisions to be dictated in open court, they typically have a more conversational tone.

PERKINS COIE, LLP
*Attorneys for Weyerhaeuser Company*
1201 Third Avenue, Suite 4800
Seattle, Washington  98101
By:    Mark. W. Schneider, Esq. (argued)

DORSEY & WHITNEY, LLP
*Attorneys for Weyerhaeuser Company*
250 Park Avenue
New York, New York  10177
By:    James V. Parravani, Esq.

LATHAM & WATKINS, LLP
*Attorneys for Georgia-Pacific, LLC*
53rd at Third, 885 Third Avenue
New York, New York  10022
By:    Mark A. Broude, Esq. (argued)
        Sara Orr, Esq.

JONES DAY
*Attorneys for Hamilton Beach Brands*
222 East 41st Street
New York, New York  10017
By:    Ross S. Barr, Esq. (argued)

ROBERT E. GERBER
U.S. BANKRUPTCY JUDGE:

In this contested matter in the jointly administered chapter 11 cases of Lyondell Chemical

Company and its affiliates, the Debtors object to private party claims (the "**Private Party**

**Claims**") for future environmental remediation costs also sought by the federal government and

certain state governmental entities, under section 502(e)(1)(B) of the Code, which generally

disallows claims (1) for reimbursement or contribution (2) by those liable with the debtor (3) to

the extent that such claims are contingent.

With one exception, I conclude that these claims are of the type for which disallowance is

required under section 502(e)(1)(B) and its associated caselaw, and except insofar as the

exception applies, the Debtors' objections are sustained.  With respect to the exception (where

remediation costs were already paid by the claimant), the Debtors' exceptions are overruled.

<u>Findings of Fact</u>[2]

*1.  Government Environmental Claims*

In July and August 2009, the United States, on behalf of the U.S. Environmental

Protection Agency, the U.S. Department of the Interior, and the National Oceanic and

Atmospheric Administration (collectively, the "**EPA**"), filed proofs of claim (the "**EPA**

**Claims**") against certain of the Debtors asserting claims for, among other things, unreimbursed

past and estimated future response costs for environmental cleanup under section 107(a) of the

Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601

et seq. ("**CERCLA**").

---

[2]       Pursuant to the parties' agreement and the provisions of Case Management Order #1, all of the facts (but
not necessarily arguments and conclusions) in the declarations submitted to me have been taken as true.  To
shorten this Decision, I've limited factual citations and detail to the most significant matters.

1

Various state governments, or their environmental regulatory agencies,[3] did likewise.

The governmental claims totaled approximately $5.5 billion in identified amounts, in addition to

contingent and unliquidated claims that were asserted in unstated amounts.[4] These

environmental claims represented one of the largest, if not the largest, groups of unsecured

claims asserted in the Lyondell bankruptcy cases.

2. *Environmental Settlement Agreement with U.S. and Certain States*

In April 2010, I approved a settlement agreement (the "**Settlement Agreement**") among

the Debtors, the EPA, and ten state environmental agencies, resolving their environmental claims

and providing for funds for future clean-up efforts. The Settlement Agreement, in relevant part,

provided for:

> (1) the allowance of over $1 billion in general unsecured claims for the
>
> benefit of the U.S. for unreimbursed past and future response costs incurred by
>
> the U.S. pursuant to CERCLA section 107(a);
>
> (2) a cash payment to the U.S. to resolve alleged injunctive obligations at
>
> a number of environmental sites; and
>
> (3) the formation and funding of an environmental custodial trust to take
>
> title to and to remediate certain Debtor-owned properties with known or suspected
>
> environmental contamination.

The Agreement also provided allowed claims in fixed amounts to various states' environmental

authorities.

---

[3]     For simplicity, I ignore this distinction going forward, and refer to such claims simply as being asserted by
        the respective states.

[4]     The proofs of claim filed by the U.S. and state governmental agencies totaled approximately $5.5 billion,
        with the federal claims totaling approximately $5 billion, and the state claims representing the remainder.

The Settlement Agreement granted Millennium Holdings, LLC ("**MHLLC**") contribution protection under CERCLA section 113(f)(2) for environmental liabilities resolved by the Settlement Agreement.  The implication of that contribution protection was that other "potentially responsible parties" ("**PRPs**") with respect to those environmental liabilities would not be able to seek payment from MHLLC for cleanup costs, because MHLLC would have satisfied its liability on account of the sites addressed in the Settlement Agreement.

*3.  The Private Party Environmental Claims*

Over 70 Private Party Claims associated with the properties covered by the EPA's and/or the state government entities' proofs of claims—relying either implicitly or explicitly on CERCLA sections 107(a) and 113(f)(1), discussed below—sought an estimated $1.1 billion for both past and future cleanup costs.  After having settled the EPA and state governmental claims, the Debtors objected to the Private Party Claims.

The Debtors don't object to the Private Party Claims to the extent they are for money spent by claimants in the past.  But the Debtors argue that the Private Party Claims must be disallowed under section 502(e)(1)(B) of the Bankruptcy Code to the extent they seek payment of *future* cleanup costs.

Most of the Private Party claimants did not contest the Objections.  But some did. Objections with respect to three Orally Arguing Claimants were orally argued at the hearing on April 16, 2010—those with respect to responders Georgia-Pacific, LLC ("**Georgia-Pacific**"), Weyerhaeuser Company ("**Weyerhaeuser**"), and Hamilton Beach Brands, Inc. ("**Hamilton Beach,**" and collectively with Georgia-Pacific and Weyerhaeuser, the "**Orally Arguing Claimants**").[5]

---

[5]     Other claimants (the "**Other Claimants**") filed timely responses but did not orally argue:  Arkema Incorporated, Certain Teed Corporation, Marvin Jonas Transfer Station Site Orally Arguing Claimants

4. *Georgia-Pacific and Weyerhaeuser's Claims*

Georgia-Pacific and Weyerhaeuser's claims relate to the Allied Paper/Portage Creek/Kalamazoo River Superfund Site (the "**Kalamazoo Site**") in Michigan.  Paper mill operations once located on the Kalamazoo Site discharged paper residue into the environment, including the Kalamazoo River, and deposited massive amounts of polychlorinated biphenyls into waterways, surface water, soils, and sediments.  On August 30, 1990, the EPA placed the Kalamazoo Site on the "National Priorities List"—EPA's list of the most serious hazardous waste sites.  MHLLC, Georgia-Pacific, and Weyerhaeuser (or their respective predecessors) were all former mill operators at the Kalamazoo Site.  The Site is divided into 5 "operable units" ("**OU**"s), and the EPA has stated that it believes that the cleanup of OU-5, an 80-mile long stretch of the Kalamazoo River and Portage Creek, will be the main source of costs at the Site.

The EPA filed a proof of claim against MHLLC, alleging that MHLLC is liable to the U.S. under CERCLA section 107 for $2.6 billion for response costs at the Kalamazoo Site, including all five OUs, and that other parties along with MHLLC may also be jointly and severally liable.  The EPA estimates future response costs for OU-5 to be $2.4 billion—constituting by far the largest portion of the total cost.

The EPA has not issued cleanup orders to MHLLC, Georgia-Pacific, or Weyerhaeuser at this time.  The EPA has entered into administrative orders on consent ("**AOCs**") and consent decrees with Georgia-Pacific and Weyerhaeuser with respect to the Kalamazoo Site, and I'll discuss the specific orders and decrees with respect to each Respondent separately below.

---

Group, Ashland, Inc., Givaudan Fragrances Corporation, ISP Environmental Services Inc., LPRSA Site Cooperating Parties, Mallinckrodt, Inc., Teval Corp., The Dial Corporation, The Stanley Works, and Wolff & Sampson Group/Wolff & Sampson PC.  Based on the papers and on the oral arguments from those who sought to orally argue, I believe that the analysis that follows requires disallowing the Other Claimants' claims as well, and to avoid lengthening this decision further, I won't discuss their particular facts.  But if any of them believes that I overlooked circumstances that might make its situation distinguishable, I will permit any such entity to move for reargument, based on matters not addressed here.

### A. *Georgia-Pacific's Claim*

The EPA has identified Georgia-Pacific and MHLLC as PRPs with respect to the Kalamazoo Site.  While Georgia-Pacific and the EPA have entered into several AOCs and one Consent Decree, the agreements covering OU-5 did not specify a final remedy for that portion of the Kalamazoo Site.

### (1)  *AOCs for OU-5*

In February 2007, Georgia-Pacific, MHLLC, the state of Michigan, and the EPA entered into an AOC to perform a removal action at an area within OU-5 ("**First AOC**").  The same month, Georgia-Pacific, MHLLC, and the EPA entered into another AOC to perform a supplemental remedial investigation and feasibility study for OU-5 and a feasibility study of OU-1 (the "**Second AOC**").  In June 2009, Georgia-Pacific and the EPA entered into a third AOC to perform a removal action at an area within OU-5 ("**Third AOC**," and collectively, with First AOC and the Second AOC, the "**Georgia-Pacific AOCs**").[6]  Although the U.S. has unreimbursed response costs, investigations at the Kalamazoo Site are still pending, and the final remedy for OU-5 has not yet been selected.

### (2)  *Consent Decree*

In May 2009, Georgia-Pacific entered into a proposed consent decree with the EPA (the "**Georgia-Pacific Consent Decree**"), which at the time of Georgia-Pacific's filing of its proof of claim, had not yet been approved by the District Court.  In the Consent Decree, Georgia-Pacific agreed to perform and implement the EPA's remedial plan for OU-2, and to pay the related past and future response costs incurred by the EPA.  MHLLC is not a party to the Consent Decree.

---

[6]     Under the AOCs, Georgia-Pacific and MHLLC are obligated to pay the costs necessary to perform—as well as the future response costs incurred by EPA in connection with—the First and Second AOCs. Georgia-Pacific alone is also obligated to pay the costs necessary to perform—as well as the future response costs incurred by EPA in connection with—the Third AOC.

*(3) Allocation Agreement*

In August 1991, Georgia-Pacific and MHLLC entered into an agreement with ARCADIS of New York, Inc. ("**ARCADIS**"), under which ARCADIS would perform services including environmental investigation and remediation at the Kalamazoo Site. Under a cost sharing agreement (the "**Allocation Agreement**"), Georgia-Pacific and MHLLC agreed to share costs relating to the Kalamazoo Site—with MHLLC paying 55% and Georgia-Pacific paying 45% of the costs. ARCADIS used the Allocation Agreement when billing Georgia-Pacific and MHLLC for services performed in connection with the Kalamazoo Site. Georgia-Pacific maintains that MHLLC has failed to pay Georgia-Pacific the amounts required under the Allocation Agreement, and has failed to pay ARCADIS for its services.

Much later, in June 2009, Georgia-Pacific and ARCADIS entered into an assignment agreement ("**Assignment Agreement**") under which ARCADIS assigned to Georgia-Pacific all of the ARCADIS rights against MHLLC for services ARCADIS performed at the Kalamazoo Site. Georgia-Pacific maintains that MHLLC has not paid Georgia-Pacific the amounts due under the Assignment Agreement.

Georgia-Pacific filed a proof of claim against MHLLC seeking primarily to recover:

(1) past and future response costs and natural resource damages incurred in connection with the Kalamazoo Site,

(2) amounts paid by Georgia-Pacific to satisfy the obligations of MHLLC to ARCADIS, and

(3) amounts owed by MHLLC to ARCADIS and transferred to Georgia-Pacific pursuant to the Assignment Agreement.[7]

---

[7] Georgia-Pacific maintains that as of the time of the filing, it had incurred approximately $7 million in response costs at the Kalamazoo Site, and that MHLLC owes Georgia-Pacific approximately $3.87 million

Georgia-Pacific asserts its claim under CERCLA section 113, stating that the EPA's commencement of the suit that led to the Consent Decree provides the basis for a section 113(f)(1) contribution claim. Georgia-Pacific doesn't dispute that its claim is for contribution and that it is based on co-liability with MHLLC.[8] Georgia-Pacific argues only that its claim is not contingent.

### B. Weyerhaeuser's Claim

From 1963 to 1970, Weyerhaeuser operated a mill and landfill next to the Kalamazoo River, about ten miles downstream from MHLLC's facilities. Remediation is still ongoing, and is in its early stages. The EPA has listed MHLLC, Weyerhaeuser, and others as PRPs at the Kalamazoo Site. In November 2004, Weyerhaeuser entered into a consent decree (the "**Weyerhaeuser Consent Decree**") with the EPA with respect to OU-4. Weyerhaeuser filed a proof of claim against MHLLC in the amount of $9 million for past response costs, and also seeks payment on account of MHLLC's liability for future costs and liabilities.

Weyerhaeuser argues that it is not co-liable with MHLLC for the amounts sought in its proof of claim because it is seeking only to recover response costs under CERCLA section 107 that it has already incurred and *will incur itself*. Weyerhaeuser also argues that its claim is not contingent, or for "reimbursement or contribution" under section 502(e)(1)(B).

### 5. Hamilton Beach's Claims

Debtors MHLLC and Millenium America, Inc. ("**Millenium America**") are also the subjects of claims by the State of North Carolina for environmental cleanup of the Mt. Airy and

---

of this amount under the Allocation Agreement. Georgia-Pacific further states that MHLLC owes Georgia-Pacific an additional $3.12 million by reason of MHLLC's obligations to pay for ARCADIS's prior services at the Kalamazoo Site. It is worth noting that these are past costs, or costs that have already been incurred by Georgia-Pacific. As noted above, Georgia-Pacific's claim also seeks future costs.

[8] *See* 4/16/2010 Hr'g Tr. at 118:7-12 ("Georgia-Pacific is asserting only a 113 claim. So issues of contribution or reimbursement . . . we're not arguing that these—that we don't have claims for contribution or reimbursement. We're simply arguing that our claims are not contingent.").

Southern Pines sites in North Carolina (the "**Mt. Airy Site**" and the "**Southern Pines Site**").

Unlike the Kalamazoo Site, the Mt. Airy and Southern Pines sites are not covered by the

Settlement Agreement with EPA.

North Carolina filed a proof of claim against MHLLC and all other Debtors for over $6

million for environmental assessment and cleanup costs of the Mt. Airy Site, asserting its claim

on the basis of:

> (1) state environmental law and

> (2) an October 2004 administrative agreement (the "**Mt. Airy**
> **Administrative Agreement**") among Hamilton Beach, MHLLC, and North
> Carolina to conduct remediation at the Mr. Airy Site.

North Carolina also filed a proof of claim against Millennium America and all other

Debtors for assessment and remedial costs for environmental contaminations at the Southern

Pines Site.  North Carolina asserts its claim on the basis of:

> (1) a memorandum of understanding between North Carolina and the EPA
> which provides that the Southern Pines Site is to be remediated pursuant to
> applicable state law; and

> (2) a January 1999 AOC between North Carolina, Hamilton Beach, and
> Millennium America, Inc. (the "**Southern Pines Order**") to investigate and
> remediate the Southern Pines Site.

Hamilton Beach filed substantially identical proofs of claim against MHLLC and another

Debtor, seeking future costs for environmental cleanup at the Mt. Airy and Southern Pines Sites.

Hamilton Beach predicates its claim on:

> (1) the Mt. Airy Administrative Agreement;

8

(2) the Southern Pines Order; and

(3) a December 2003 settlement agreement ("**2003 Settlement**

**Agreement**") between Hamilton Beach and MHLLC, under which they agreed to

assess and remediate the Mt. Airy and the Southern Pines Sites and allocated the

costs between the two parties.

Hamilton Beach adopts the legal arguments of the other Orally Arguing Claimants, and

asserts that its claim is not contingent, as the environmental damage has already been done and

liability has already been apportioned under the 2003 Settlement Agreement.  Hamilton Beach

also asserts that its claim is not based on co-liability with the Debtors—although (as the Debtors

point out) in its proof of claim Hamilton Beach seemed to claim that it was jointly and severally

liable with MHLLC under the 2003 Settlement Agreement and applicable non-bankruptcy law.

Finally, by incorporation of the others' arguments, Hamilton Beach argues that its claim is not

for reimbursement or contribution.

<u>Discussion</u>

All parties agree that section 502(e)(1)(B) of the Bankruptcy Code determines whether

the Private Party Claims should be disallowed.  As noted above, the Orally Arguing Claimants

argue, for various reasons, that their claims should not be disallowed because they fail to satisfy

one or more of the elements of section 502(e)(1)(B), as laid out in the statute or the interpretive

caselaw—that the claims be for reimbursement or contribution, that they be contingent, or be

based on co-liability with the Debtors.

<u>I.</u>

<u>The Statutory Environment</u>

Though the Code doesn't define all of the terms that ultimately are important here, and

many of the gaps have been filled by caselaw, I nevertheless start with textual analysis.[9]  Section

502(e) provides, in relevant part, that notwithstanding provisions of section 502 under which

claims would otherwise be allowable:

> (e)(1) … the court shall disallow any claim for
> reimbursement or contribution of an entity that is liable
> with the debtor on … the claim of a creditor, to the extent
> that—
>
> …
>
> (B) such claim for reimbursement or contribution
> is contingent as of the time of allowance or
> disallowance of such claim for reimbursement or
> contribution….

Thus, by section 502(e)(1)(B)'s terms, three elements must be met for a claim to be disallowed

under section 502(e)(1)(B):

> (1) the party asserting the claim must be liable with the debtor on the
>
> claim of a third party;
>
> (2) the claim must be contingent at the time of its allowance or
>
> disallowance; and
>
> (3) the claim must be for reimbursement or contribution.

But textual analysis here is of limited utility.  None of the terms or expressions

"reimbursement," "contribution," "contingent" or "liable with the debtor" is defined in the

---

[9]     *See, e.g., Alta Partners Holdings LDC v. Credit Suisse First Boston LLC ("In re Global Crossing Ltd."),*
385 B.R. 52, 66 (Bankr. S.D.N.Y. 2008); *In re General Motors Corp.,* 407 B.R. 463, 486 (Bankr. S.D.N.Y.
2009) ("**GM-Sale Decision**"), *appeal dismissed and aff'd,* 428 B.R. 43 (S.D.N.Y. 2010), and 430 B.R. 65
(S.D.N.Y. 2010); *In re Motors Liquidation Co.,* No. 09-50026, 2010 WL 3219506, *5 (Bankr. S.D.N.Y.
Jul.16, 2010) ; *In re Adelphia Communications Corp*., No. 02-41729, --- B.R. ---, 2010 WL 4791795, *3 &
n.17 (Bankr. S.D.N.Y. Nov. 18, 2010).

10

Bankruptcy Code, nor does the Code articulate standards for their application.[10]  Thus a court

construes section 502(e)(1)(B)'s requirements based on caselaw.  Section 502(e)(1)(B)'s

requirements have been interpreted in a fair body of relevant caselaw, most of which has

disallowed claims for contribution and indemnification by those who are liable, along with a

debtor, to others for amounts to be determined only in the future—including a decision of mine a

few months ago, where I sustained objections, on 502(e)(1)(B) grounds, to claims for

contribution and/or indemnification for liability in connection with pending or threatened

lawsuits by plaintiffs alleging injuries from exposure to the chemical Diacetyl, where the

claimants, along with Chemtura, might be liable for the plaintiffs' Diacetyl injury.[11]  The issue

here, whether a different rule should apply to claims by PRPs who, along with a Debtor, are

liable for environmental remediation costs, requires consideration of the relevant environmental

statutes—most significantly provisions in CERCLA.

      Section 106 (captioned "Abatement Actions") provides, its subsection (a):

> In addition to any other action taken by a State or local
> government, when the President determines that there may
> be an imminent and substantial endangerment to the public
> health or welfare or the environment because of an actual
> or threatened release of a hazardous substance from a
> facility, he may require the Attorney General of the United
> States *to secure such relief as may be necessary to abate
> such danger or threat,* and the district court of the United
> States in the district in which the threat occurs shall have
> jurisdiction to grant such relief as the public interest and the
> equities of the case may require.  The President may also,
> after notice to the affected State, take other action under
> this section including, but not limited to, issuing such

---

[10]  It should be noted, however, while focusing on textual analysis, that section 502(e)(1)(B) imposes no requirements as to *how* or *why* the party asserting the claim potentially subject to section 502(e)(1)(B) must be liable with the debtor on the claim of the third party.  There is no statutory requirement, for example, that the debtor and the party asserting the claim be liable on the claim of the third party in the same action, under a common statute, or on the same legal theory.

[11]  *See In re Chemtura Corp.,* 436 B.R. 286 (Bankr. S.D.N.Y. 2010) ("*Chemtura*").

orders as may be necessary to protect public health and
welfare and the environment.[12]

Section 106's subsection (b) then provides for fines for failure to comply with an order

issued under subsection (a), and, for those who have received and complied with an order issued

under subsection (a), reimbursement from the Hazardous Substance Superfund for the reasonable

costs of such action.[13]

Then, CERCLA Section 107 (captioned "Liability") provides, in relevant part:

> (a) …Notwithstanding any other provision or rule of law,
> and subject only to the defenses set forth in subsection (b)
> of this section—
>
>> (1) the owner and operator of a vessel or a facility,
>>
>> (2) any person who at the time of disposal of any
>> hazardous substance owned or operated any facility
>> at which such hazardous substances were disposed
>> of,
>>
>> (3) any person who by contract, agreement, or
>> otherwise arranged for disposal or treatment, or
>> arranged with a transporter for transport for disposal
>> or treatment, of hazardous substances owned or
>> possessed by such person, by any other party or
>> entity, at any facility or incineration vessel owned
>> or operated by another party or entity and
>> containing such hazardous substances, and
>>
>> (4) any person who accepts or accepted any
>> hazardous substances for transport to disposal or
>> treatment facilities, incineration vessels or sites
>> selected by such person, from which there is a
>> release, or a threatened release which causes the
>> incurrence of response costs, of a hazardous
>> substance, shall be liable for—
>>
>>> (A) all costs of removal or remedial action
>>> incurred by the United States Government or

---

[12]    CERCLA § 106(a), 42 U.S.C. § 9606(a) (emphasis added).

[13]    *See* CERCLA § 106(b), 42 U.S.C. § 9606(b).

a State or an Indian tribe not inconsistent
with the national contingency plan;

(B) any other necessary costs of response
incurred by any other person consistent with
the national contingency plan;

(C) damages for injury to, destruction of, or
loss of natural resources, including the
reasonable costs of assessing such injury,
destruction, or loss resulting from such a
release; and

(D) the costs of any health assessment or
health effects study carried out under
[CERCLA section 104].[14]

Thus, CERCLA section 107(a) imposes liability for environmental cleanup costs, natural

resource damages, and certain other categories of recovery on PRPs—including, as relevant here,

(1) the current "owner or operator" of a site contaminated with hazardous substances, and (2) any

person who previously owned or operated a contaminated site at the time of a hazardous waste

disposal.

Then, CERCLA Section 113 (captioned "Civil Proceedings") provides in its

subsection (f) (captioned "Contribution"), in relevant part:

(1) Contribution

Any person *may seek contribution from any other
person who is liable or potentially liable under
[section 107(a)]*, during or following any civil
action under[section 106] or under [section 107(a)].
Such claims shall be brought in accordance with
this section and the Federal Rules of Civil
Procedure, and shall be governed by Federal law.
In resolving contribution claims, the court may
allocate response costs among liable parties using
such equitable factors as the court determines are
appropriate.  Nothing in this subsection shall
diminish the right of any person to bring an action

---

[14]    CERCLA § 107, 42 U.S.C. § 9607.

13

for contribution in the absence of a civil action
under [section 106] or [section 107].

(2) Settlement

A person who has resolved its liability to the United
States or a State in an administrative or judicially
approved settlement shall not be liable for claims
for contribution regarding matters addressed in the
settlement.  Such settlement does not discharge any
of the other potentially liable persons unless its
terms so provide, but it reduces the potential
liability of the others by the amount of the
settlement.

(3) Persons not party to settlement

(A) If the United States or a State has obtained
less than complete relief from a person who has
resolved its liability to the United States or the State
in an administrative or judicially approved
settlement, the United States or the State may bring
an action against any person who has not so
resolved its liability.

(B) A person who has resolved its liability to the
United States or a State for some or all of a
response action or for some or all of the costs of
such action in an administrative or judicially
approved settlement may seek contribution from
any person who is not party to a settlement referred
to in paragraph (2).

(C) In any action under this paragraph, the rights
of any person who has resolved its liability to the
United States or a State shall be subordinate to the
rights of the United States or the State. Any
contribution action brought under this paragraph
shall be governed by Federal law.[15]

Thus 113(f)(1) provides that PRPs who fund response actions can seek contribution from other

PRPs "during or following any civil action" instituted under CERCLA section 106 or 107.  And

CERCLA section 113(f)(3)(B) permits private parties to seek contribution after they settle their

---

[15]        CERCLA § 113(f), 42 U.S.C. § 9613(f).

liability with the EPA or a state in an administrative or judicially approved settlement.

Conversely, section 113(f)(2) protects PRPs who have settled from contribution claims by other

PRPs.

## II.

### Satisfaction of Section 502(e)(1)(B) Elements

While acknowledging that its claim is for contribution and that it is based on co-liability

with MHLLC, Georgia-Pacific argues that its claim is not contingent.  Weyerhaeuser and

Hamilton Beach, like Georgia-Pacific, argue that their claims are not contingent, and further

contend that they are not co-liable with MHLLC for the amounts sought in their proofs of claim,

and that their claims are not for "reimbursement or contribution."

Because the three Orally Arguing Claimants' positions overlap to such significant

degrees, and because they assert, in many respects, similar deficiencies with respect to

502(e)(1)(B)'s three elements, for purposes of analysis I group the objections by the 502(e)(1)(B)

elements.

## A.

### "Contingency" Element

Each of Georgia-Pacific, Weyerhaeuser[16] and Hamilton Beach contends that its claim is

not contingent.  I must disagree.

In my recent decision in *Chemtura*,[17] I ruled, among other things, that the claims then

before me were contingent.  There, as I've noted, five corporate entities had filed claims against

Chemtura for contribution and/or indemnification with respect to amounts they might pay in the

---

[16]    Weyerhaeuser addresses contingency with respect to both past costs it incurred, and future costs.  I think
the Debtors have now acknowledged that past costs incurred by Weyerhaeuser are not contingent, and
cannot be disallowed for that reason, but to the extent the Debtors continue to argue otherwise, I reject their
position in that regard.

[17]    *See* n.11 above, 436 B.R. at 286.

future in litigation against them.  I found that except to the extent they sought contribution for amounts already paid to tort litigants, their claims were contingent.[18]  While in some instances the potential for payment by any of the Orally Arguing Claimants is more advanced than it was in *Chemtura*, similar principles apply, and key facts remain the same.  The most significant of these is that except for remedial action accomplished in the past, for which the right to reimbursement or contribution is unchallenged (or should be), Georgia-Pacific, Weyerhaeuser, and Hamilton Beach are similarly seeking reimbursement for amounts that have not yet been paid.

Though neither is squarely on point, two decisions from the Second Circuit have discussed contingency in deciding whether or not a creditor held a "claim."[19]  In *Chateaugay*, the EPA argued that "it does not have a 'claim' within the meaning of the Bankruptcy Code . . . for reimbursement of CERCLA response costs until those costs have been incurred."[20]  Therefore, the EPA argued, any future response costs that the EPA might incur would pass though the bankruptcy organization as non-discharged liabilities.  The Second Circuit rejected this argument, holding that the future costs were pre-petition "claims."  The Circuit stated, as part of its rationale, that:

> [T]he location of these sites, the determination of their coverage by CERCLA, and the incurring of response costs by the EPA are all steps that may fairly be viewed, in the regulatory context, as rendering the EPA's claim "contingent," rather than as placing it outside the Code's definition of "claim."[21]

---

[18]    *See Chemtura*, 436 BR at 297.

[19]    *See In re Chateaugay Corp.*, 944 F.2d 997 (2d Cir. 1991) ("***Chateaugay***"); *Olin Corp. v. Riverwood Int'l Corp. ("In re Manville Forest Products Corp.")*, 209 F.3d 125 (2d Cir. 2000) ("***Manville Forest***").

[20]    *Chateaugay*.

[21]    *Id*. at 1005.

16

Similarly, in *Manville Forest*, the Second Circuit decided that a party's liability

constitutes a "claim" against the debtor, albeit contingent.  It stated:

> the fact that [claimant] Olin did not know the specific
> parameters of its liability does not place that liability
> outside of the definition of "claim" *but rather is precisely
> what made the claim contingent.*  Under this specific
> combination of circumstances, we find that future
> environmental liability was actually or presumedly
> contemplated by the parties upon their signing of the
> indemnification agreements and constitutes a valid
> *contingent claim.*[22]

The Debtors cite *Chateaugay* for the proposition that claims are contingent until costs

for remediation work are actually expended or paid.[23]  I don't read *Chateaugay*, which of

course is not a 502(e)(1)(B) case, to go that far—to *hold* that a claim for reimbursement or

contribution is contingent until an underlying payment (here, costs for remediation) is actually

made.[24]  But I do find it instructive that in both *Chateaugay* and *Manville Forest*, it was

undisputed that the debtors faced *some* environmental liability, but the Second Circuit

---

[22]    *Manville Forest,* 209 F.3d at 129 (emphasis added).

Other caselaw—again in the context of determining the existence of a claim, rather than in deciding whether or not it was "contingent"—likewise describes a situation where the need for remediation is known, but the amount, if any, to be paid for the remediation is not, as giving rise to a "contingent claim." *See Cal. Dep't of Health Services v. Jensen ("In re Jensen"),* 995 F.2d 925, 930-31 (9th Cir. 1993) (*per curiam*) ("We conclude that the state had sufficient knowledge of the Jensens' potential liability to give rise to a contingent claim for cleanup costs before the Jensens filed their personal bankruptcy petition on February 13, 1984"); *In re Chicago, Milwaukee, St. Paul & Pacific Railroad Co.,* 974 F.2d 775, 786 (7th Cir. 1992) (in context of a former Bankruptcy Act § 77 railroad reorganization, to same effect: "when a potential CERCLA claimant can tie the bankruptcy debtor to a known release of a hazardous substance which this potential claimant knows will lead to CERCLA response costs, and when this potential claimant has, in fact, conducted tests with regard to this contamination problem, then this potential claimant has, at least, a contingent CERCLA claim for purposes of Section 77.").

[23]    *See* Debtors Reply Br. at ¶8.

[24]    Somewhat earlier in the *Chateaugay* decision, also as part of its analysis as to whether the EPA had a claim at all, the Circuit dealt with the easy case.  It stated, with respect to the EPA's incurrence of CERCLA response costs:

> When such costs are incurred, EPA will unquestionably have what can
> fairly be called a "right to payment."  That right is currently unmatured
> and will not mature until the response costs are incurred.

944 F.2d at 1004.

17

nevertheless described those claims as contingent because the scope, amount, and form of that

liability was undetermined.[25]

But other authority, including three decisions by other bankruptcy judges in this very

district,[26] another by a district judge in this district,[27] and another a thoughtful decision from

Delaware[28]—all 502(e)(1)(B) determinations—supports the conclusion that until and unless

amounts *are actually paid*, the claims for reimbursement or contribution with respect to those

amounts remain contingent for 502(e)(1)(B) purposes.[29]  For instance, in *Alper Holdings*, in this

district, Judge Lifland disallowed claims for indemnification for future liability in environmental

contamination litigation, finding that they were

---

[25]     *See Chateaugay*, 944 F.2d at 1005.

[26]     *See In re Alper Holdings* USA, No. 07-12148, 2008 WL 4186333,*6-*7 (Bankr. S.D.N.Y. Sept. 10, 2008)
(Lifland, C.J.) ("***Alper Holdings***") (disallowing future environmental indemnification costs "as the amounts
and ultimate liability are presently unknown," and finding contingency on the ground that amounts for
which indemnification was sought were undetermined and unpaid); *In re Drexel Burnham Lambert Group,
Inc.,* 148 B.R. 983, 986-90 (Bankr. S.D.N.Y. 1992 ) (Conrad, J.) ("***Drexel Burnham***") (disallowing
indemnity claims of co-underwriters for potential liability in pending fraud suits, because claimants had not
yet paid judgments or settlements); *In re Wedtech Corp*., 85 B.R. 285, 290 (Bankr. S.D.N.Y. 1998)
(Buschman, J.) ("***Wedtech I***") (disallowing debtor's officers' contingent indemnification claims).

[27]     *See Aetna Casualty and Surety Company v. Georgia Tubing Corp. ("In re Georgia Tubing Corp.")*, No. 93
Civ. 3659, 1995 WL 429018,*3 -*4 (S.D.N.Y. July 20, 1995) (Preska, C.J.), *aff'd*, 93 F.3d 56 (2d Cir.
1996) (disallowing an insurance company's claim regarding hazardous waste bonds where primary creditor
was a state environmental agency, stating that a surety claim was contingent until the claimant "pays the
principal creditor and fixes his own right to payment from the debtor" (quoting 3 Collier on Bankruptcy
¶ 502.05 at 502-88 (15th edition 1995)).

[28]     *See In re APCO Liquidating Trust*, 370 B.R. 625 (Bankr. D. Del. 2007) (Shannon, J.) ("***APCO***").

[29]     Similarly, *Collier* expressly identifies claims for contribution arising under CERCLA as examples of
claims that are contingent.  *See* 4 *Collier* ¶ 502.06[2][d] (16th ed.).  *Collier* provides:

> In addition to codebtor situations created by contract, section
> 502(e)(1)(B) applies to disallow contingent reimbursement or
> contribution claims created by statute.  For example, a claim for
> contribution arising under the Comprehensive Environmental
> Response, Compensation and Liability Act may be a contingent claim
> subject to disallowance under section 502(e)(1)(B). . . . In such a case,
> the government is the primary obligee that may seek satisfaction of its
> claim against the debtor from third parties who, under the statute, are
> obligated with the debtor to the government on the same debt.  The
> statute under which the third-party liability is created, however, must
> provide for a reimbursement or contribution claim against the debtor.

(footnote omitted).

> properly categorized as "contingent as of the time of
> allowance or disallowance" as the amounts and ultimate
> liability are presently unknown.[30]

Likewise, in *Drexel Burnham*, in this district, it was observed that "[t]he Claimants' claim is

contingent until their liability is established *and the co-debtor has paid the creditor*. . . . One who

is secondarily liable may only secure distribution rights by paying the amount owed the

creditor."[31]

Similarly, in *APCO*, Judge Shannon disallowed a claim for the costs of remedial

activities filed by the City of Wichita, which like the debtor there, was a PRP with respect to a

site with groundwater contamination.  Significantly, the City had agreed not just to perform a

remedial investigation and feasibility study of the contaminated site; it had agreed to undertake

the remedial activities identified in the study to clean up the site,[32] and had prevailed in a trial at

which the *APCO* debtors were determined to be responsible for 1.72% of the City's past and

future costs for the remediation, and for 100% of the City future source control costs to be

incurred at a different site,[33] securing a judgment for the future cleanup costs of which a portion

was unpaid.[34]

Among other things, Judge Shannon ruled that "because the City has not yet incurred any

future source control costs" at one of the sites,[35] the claim was contingent, even though "the

---

[30]    2008 WL 4186333 at *6.

[31]    148 B.R. at 987 (emphasis added; internal citations omitted).

[32]    *See* 370 B.R. at 629.

[33]    *Id.*

[34]    *Id.* at 630.

[35]    *Id.* at 636.

parties' liability has been established."[36]   Quoting, among other decisions, *Drexel Burnham*, he

observed that

> The law is clear that '[t]he contingency contemplated by
> [section] 502(e)(1)(B) relates to both payment *and*
> liability." … Therefore, a claimant's "claim is contingent
> until their liability is established … *and* the co-debtor has
> paid the creditor."[37]

I've stated many times that the interests of predictability in this district are of great

importance, and that where there is no controlling Second Circuit authority, I follow the

decisions of other bankruptcy judges in this district in the absence of clear error.[38]   But to say

that these decisions, in this district and elsewhere, should be followed under that standard would

be faint praise here.  In my view, the conclusions in those cases were plainly correct.  That is so

because even though the need for remediation of the underlying environmental site might be

obvious, the EPA or state environmental agency might have a multitude of different ways of

getting the remediation done, and any one of those means might or might not call for—or result

in—payment by the separate PRP that is asserting the claim against the debtor.  And the PRP

might or might not wind up actually making the payment for which it then would be seeking

reimbursement or contribution.

Thus, in my view, the fact that an EPA claim may have accrued against any of Georgia-

Pacific, Weyerhaeuser, or Hamilton Beach does not mean that any of their separate claims

---

[36]    *Id.*

[37]    *Id.* (emphasis in original; internal citations omitted).

[38]    *See, e.g., In re Adelphia Communications Corp.,* 359 B.R. 65, 72 n.13 (Bankr. S.D.N.Y. 2007) ("This Court
has been on record for many years as having held that the interests of predictability in this District are of
great importance, and that where there is no controlling Second Circuit authority, it follows the decisions of
other bankruptcy judges in this district in the absence of clear error."); *GM-Sale Decision,* 407 B.R. at 487
& n.19 (same).

against the Debtor are no longer contingent.  We don't know whether either of them will lay out the funds necessary to engage in the curative action, and, if so, to what extent.

In arguing that its claim for future response costs is not contingent, Georgia-Pacific contends that a claim is contingent only when it has not yet *accrued* (in contrast to *paid*), and Georgia-Pacific maintains that its claim for contribution under section 113 has accrued.  As support, Georgia-Pacific cites the Supreme Court's *Aviall Services* decision,[39] a case that did not involve section 502(e)(1)(B), wherein the Supreme Court held that a private party can bring a CERCLA section 113(f)(1) action for contribution only after it has been sued under CERCLA section 106 or 107(a).

However, *Aviall Services* can properly be read as going only to the requirements for bringing a claim under CERCLA section 113(f); it cannot be extended to deciding whether a claim by a PRP is or is not "contingent" within the meaning of section 502(e)(1)(B), which *Aviall Services* quite obviously did not address.  Georgia-Pacific incorrectly assumes that the requirements for bringing a section 113(f)(1) contribution claim under CERCLA are the same as the requirements for having *non-contingent* 113(f)(1) claim under section 502(e)(1)(B) of the Code.

Additionally, Georgia-Pacific and Weyerhaeuser argue that the Debtors are conflating contingency and liquidation.  While I fully understand that "unliquidated" and "contingent" are not the same thing[40] (and suspect that the Debtors do too), here I find that the claims of each of Georgia-Pacific, Weyerhaeuser, and Hamilton Beach are *both*.  The claims at issue here are for

---

[39]     *Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157 (2004) ("**Aviall Services**").

[40]     *See, e.g., Chemtura*, 436 B.R. at 297 ("Thus, while we all understand and agree that there is a distinction between "contingent" and unliquidated, that distinction isn't material here.  The unliquidated but non-contingent costs of defense here still result in a potentially allowable claim, but the claims for contribution in the event that a Tort Claimant succeeds against Corporate Claimants are still contingent, and satisfy this prong of the 3-part test for establishing 502(e)(1)(B) disallowance.").

future cleanup costs that might or might not actually be incurred, and then might or might not actually be paid, by any of them.[41]

Though I ultimately decide the issue on the statutory language and the caselaw, I note, to the extent it matters, that this ruling advances not just bankruptcy policy, but environmental policy as well.  Disallowance of Georgia-Pacific's claims here advances CERCLA's policy goal of encouraging expeditious cleanup, because claimants are encouraged to remediate promptly by the threat of disallowance of claims that have not been fixed.[42]  As Judge Shannon observed in *APCO*:

> It may appear that the Court's ruling is a harsh result for the City, and that may be true.  Nevertheless, the Court's decision is mandated by the express language of the Code and is entirely consistent with the principles animating CERCLA.  At bottom, CERCLA and similar state and federal environmental statutes create a scheme whereby parties are incentivized to promptly clean up contaminated sites.  The prospect of the potential disallowance of contingent contribution claims under section 502(e)(1)(B) offers a further incentive to undertake the cleanup: if the work is done (or at least underway), the contribution claim is not contingent as to amounts incurred by the contribution claimant.  Thus, if the City had commenced or completed source control remediation at 1001 E. Lincoln in connection with its work on the G & M Site as a whole, the

---

[41]    Weyerhaeuser cites Judge Sontchi's decision in *In re RNI Wind Down Corp.*, 369 B.R. 174 (Bankr. D. Del. 2007) ("***RNI***") in support of this contention.  But as I noted in *Chemtura*, see 436 B.R. at 296-97, the claimant in *RNI waived* any claims he might have for amounts he might have to pay on the underlying claims (there, by the SEC).  The right to payment that Judge Sontchi found to be "unliquidated but not contingent" was the right to the *advancement of those costs of defense,* and not the right to *contribution or indemnity for amounts ultimately paid to a third party*—the circumstance that was relevant there and here.  Judge Sontchi merely found (understandably, given appropriate analysis) that the right to advancement was a then-existing right (under the certificate of incorporation, bylaws, and Delaware law), subject only to uncertainty at the time as to just how much the defense costs would turn out to be.  I observed, in fact, that Judge Sontchi had actually used claims for contribution as an example of what would satisfy the contingency elements.  *See Chemtura*, 436 B.R. at 297.

[42]    *See In re Eagle-Picher Indus. Inc.*, 164 B.R. 265, 272 (S.D. Ohio 1994) ("***Eagle-Picher***") ("502(e)(1)(B) fosters the primary objective of CERCLA by requiring those who seek contribution to incur the expenses relating to cleanup before stating an allowable claim."); *APCO*, 370 B.R. at 636 (same, quoting *Eagle-Picher*).

City's claim would be allowed to the extent of the amounts incurred.[43]

Similarly, Hamilton Beach relies on the fact that the environmental damage at the Mt. Airy and Southern Pines Sites has already occurred to support its argument that its claim is not contingent. I explained above that the establishment of some liability alone is insufficient to render a claim non-contingent. Similarly, the fact that Hamilton Beach is liable for environmental damage is also by itself insufficient to render a claim non-contingent, as *APCO* makes quite clear. Although Hamilton Beach has entered into a settlement agreement in which the parties allocated the liability with respect to the two sites, there is no indication that money has been spent. For the same reasons that I determined that Georgia-Pacific's claim is contingent, I determine that Hamilton Beach's claim is contingent as well.

Finally, Weyerhaeuser argues that it has already incurred over $11 million in response costs, in addition to amounts it may have to pay in the future. I believe that with respect to these *past* response costs, the Debtors have now acknowledged that they are non-contingent. To the extent the Debtors haven't conceded the point, I agree with Weyerhaeuser. But with respect to payments Weyerhaeuser hasn't made yet, I must find that the amounts are contingent, for the reasons stated above.

## B.

### "Co-Liability" Element

Making three principal arguments, Weyerhaeuser and Hamilton Beach[44] also contend that the co-liability element has not been satisfied. Once more I cannot agree.

---

[43]     370 B.R. at 636-37.

[44]     Having incorporated all of the others' arguments, Hamilton Beach also argues that its claim is not based on co-liability. But with only one exception (discussed at page 33 below), Hamilton Beach doesn't articulate any theories or authority distinct from those asserted by Weyerhaeuser, and its situation is governed by the analysis that follows.

23

*1. The Atlantic Research Contentions*

Weyerhaeuser's first argument is that its claim is not premised on co-liability because its claim is based on cost recovery under CERCLA section 107(a), and not contribution under section 113(f).[45] In that connection, Weyerhaeuser notes that in *U.S. v. Atlantic Research Corp.,*[46] the Supreme Court held that a private party may recover under CERCLA section 107(a) without any establishment of liability to a third party. Because it is asserting a section 107(a) claim, therefore, Weyerhaeuser argues, the basis for finding co-liability is lacking.

But Weyerhaeuser's reliance on *Atlantic Research* is flawed. The issue in *Atlantic Research*, a non-bankruptcy case, was whether a PRP could sue to recover voluntarily incurred cleanup costs under section 107(a), rather than relying solely on section 113(f).[47] Section 107(a)(4)(A) expressly authorizes the federal government, the states, and Indian tribes to sue for cost recovery under section 107(a), and section 107(a)(4)(B) gives the same right to sue to "any other person." Specifically, the Court was asked to determine whether a PRP is included in the phrase "any other person" in 107(a)(4)(B).

The Supreme Court held that the operator's status as a PRP did not preclude the operator from suing under section 107(a), as section 107(a)(4)(B) covers any person not identified in subparagraph (A), and that a PRP was not limited to relief under section 113(f).[48] Nevertheless, the Supreme Court highlighted the "complementary yet distinct" nature of the rights established

---

[45]    Weyerhaeuser makes a secondary argument that joint and several liability is not required by CERCLA for all superfund sites. See sub-section 3.

[46]    *U.S. v. Atlantic Research Corp.*, 551 U.S. 128 (2007) ("**Atlantic Research**"). Contrasting CERCLA section 107(a) with section 113(f), the Supreme Court stated the following: "§ 107(a) permits recovery of cleanup costs but does not create a right to contribution. A private party may recover under § 107(a) without any establishment of liability to a third party." *Atlantic Research*, 551 U.S. at 139.

[47]    The PRP was the owner of the facility and filed a suit against the U.S. under CERCLA section 107 to recover cleanup costs.

[48]    *Atlantic Research*, 551 U.S. at 135.

24

under section 107(a) and 113(f)—specifically, that a private party may sue under section 107(a) without any establishment of liability to a third party, something it could not do under section 113(f).[49]  The Supreme Court allowed the claimant to recover from other PRPs costs that it had incurred by voluntary cleanup—or in other words, by cleanup or payments not prompted by a government action under sections 106 or 107.

On the issue of co-liability, Weyerhaeuser erroneously assumes that only claims under section 113(f) are premised on co-liability with the defendant (in this case, the Debtor), and that cost recovery claims under section 107(a) are all direct claims, and not claims for either reimbursement or contribution.  The *Atlantic Research* court held that a claim under section 107(a) *need not* be based on co-liability to a third-party (e.g. a governmental entity).  But it did not hold that a claim under 107(a) *cannot* be based on co-liability.  If a PRP undertakes "voluntary" clean up (as opposed to cleanup pursuant to government action under section 106 or 107)—and sues under 107(a) to seek recovery for that cleanup from another PRP—that has no effect on, and certainly does not nullify, the fact that the two may still be co-liable to the Government.

Weyerhaeuser and MHLLC, who have both been designated as PRPs by the EPA, have a shared statutory obligation, under CERCLA, to provide for the cleanup of the Kalamazoo Site, by one means or another.  That Weyerhaeuser might satisfy its own obligations by voluntary cleanup, rather than by waiting for a government action, is laudable, but not relevant to the 502(e)(1)(B) determination.  Weyerhaeuser's claims rely on the theory that if the Debtors pay less than their share of cleanup costs, Weyerhaeuser will have to pay more.  That is the essence of co-liability.

---

[49]        *Id.* at 139.

2. *The Allegheny Contentions*

Weyerhaeuser further asserts that co-liability is lacking based on a district court decision in the *Allegheny* bankruptcy case.[50]  In *Allegheny*, the owner of the site filed a claim for past and future response costs against a debtor that had sold the site to the claimant prior to filing for bankruptcy.  Applying the three-part test described on page 10 above, the *Allegheny* court ruled that section 502(e)(1)(B) did not exclude the claimant's direct claims for future response costs under CERCLA section 107(a).[51]  While the *Allegheny* debtor argued that there was a possibility that the creditor might never be required to expend any funds if the EPA were subsequently to order the debtor to perform the remediation, the *Allegheny* court reasoned that this risk of double liability could be avoided by having the creditor's claim paid into a trust to be expended on remediation of the waste sites. [52]

I find the claims at issue in *Allegheny* to be distinguishable from Weyerhaeuser's claims,[53] but more fundamentally, I must join the other courts that have disagreed with the *Allegheny* decision. [54]

As we all know, section 502(e)(1)(B) serves the important purpose of avoiding redundant recoveries.[55]  The situation here, where both Weyerhaeuser and MHLLC were named as PRPs,

---

[50]    *In re Allegheny Int'l, Inc.,* 126 B.R. 919 (W.D. Pa. 1991), *aff'd without opinion*, 950 F.2d 721 (3d Cir. 1991) ("***Allegheny***").

[51]    *See Allegheny*, 126 B.R. at 923.

[52]    *See id.* at 924.

[53]    In *Allegheny*, the claimant's cleanup was entirely voluntary; no environmental government agency had taken any action with regard to the claimant's property.  Here, however, the EPA has listed Weyerhaeuser as a PRP at the Kalamazoo Site and Weyerhaeuser has entered into a Consent Decree with the EPA with regard to a portion of the Site.

[54]    *See Eagle-Picher,* 164 B.R. at 271; *Drexel Burnham,* 148 B.R. at 988; *In re Cottonwood Canyon Land Co.*, 146 B.R. 992, 996 (Bankr. D. Colo. 1992) ("***Cottonwood Canyon***").

[55]    *See APCO,* 370 B.R. at 634 ("[T]he sole purpose served by section 502(e)(1)(B) is to preclude redundant recoveries . . . ."); *Wedtech I,* 85 B.R. at 289 & n.4 (noting that Congress enacted the provision, in part, to prevent competition between primary and secondary creditors for the "limited proceeds of the estate" (quoting H.R. Rep. No. 95 595, 95th Cong., 1st Sess. 354 (1977))).

26

presents precisely the danger of double recovery from the Debtors on account of the same liability, ultimately to the EPA.[56]  Because the EPA already has an allowed claim against the Debtors for the Kalamazoo site, allowing Weyerhaeuser's claim would be setting up precisely the redundant recoveries section 502(e)(1)(B) was created to prevent.

The *Allegheny* court acknowledged that its decision not to disallow the claimant's claim under section 502(e)(1)(B) left the debtors vulnerable to multiple recoveries.  What the *Allegheny* court failed to realized, however, is that this risk of duplicative recoveries arose *because* the debtors and claimant were co-liable.  For that reason, several cases have rejected *Allegheny's* logic.[57]

In *Cottonwood Canyon*, for instance, the court stated that the fact that the *Allegheny* court found it necessary to establish a trust shows that the debtor and the claimant share a common liability against which the claimant sought to protect itself.[58]  The *Cottonwood Canyon* court stated:

> CSI argues that it is asserting a direct claim against Kaiser
> under Section [107(a)] and not a claim for reimbursement

---

[56]    It is not possible to maintain that the cost recovery claim does not involve an obligation that both the Debtor and Weyerhaeuser owe to a third party, given that the EPA has specified that both parties are PRPs at the Kalamazoo Site.

[57]    Weyerhaeuser also cites *In re Harvard Indus., Inc.*, 138 B.R. 10 (Bankr. D. Del. 1992) (Balick, J.) ("**Harvard Industries**"), which follows *Allegheny's* logic.  In *Harvard Industries*, Judge Balick distinguished between claims by a PRP for a cleanup performed by the PRP and claims for where the EPA performed the cleanup, and ruled, *inter alia*, that where the party sought to recover funds it would expend in the future, section 502(e)(1)(B) does not apply.  She acknowledged that double liability could occur if the PRP recovered for personal expenditures but then failed to cleanup the site and the EPA brought an action against the debtor, and, as in *Allegheny*, set up a trust to resolve that potential problem.  But since, as in *Allegheny*, *Harvard Industries* subjects debtors to the risks of duplicative recoveries, I believe that *Harvard Industries* is subject to the same criticism that has been raised with respect to *Allegheny*.

[58]    *Cottonwood Canyon*, 146 B.R. at 996.  *See also Drexel Burnham*, 148 B.R. at 989 ("The *Cottonwood* court insisted that this is demonstrated by the solution devised by the *Allegheny* court in response to the concern that the allowance of the claim might lead to multiple recoveries against the debtor. The debtor would be subject to multiple recovery if the claimant failed to take remedial action to remove the hazard after it had received a distribution from the debtor, leaving the debtor liable to a claim by the Government for remediation of the plants.").  The *Allegheny* court even noted that "both debtor and [claimant] are liable for the waste remediation . . . ." *Allegheny*, 126 B.R. at 923.

> or contribution.  It would clearly appear that a claim for reimbursement or contribution under either the California statute, CERCLA or the indemnification provisions of the contract is, by definition, a claim to recover costs incurred by reason of CSI's liability for cleanup as the "owner" of the site, which is the same liability Kaiser has for cleanup as the party which deposited the hazardous substances in the first instance.  Such a claim would necessarily be one for liability for which both Kaiser and CSI are responsible and would fall within the ambit of 11 U.S.C. § 502(e).[59]

Similarly, in *Eagle-Picher*,[60] the court rejected *Allegheny's* logic for similar reasons, and disallowed the creditors' reimbursement claims (which were under section 113(f)) for future response costs under CERCLA.  The *Eagle-Picher* court stated that "[d]ouble liability could occur under the circumstances of this case since EPA remains free to pursue [the debtor] for remediation costs should the claimants fail to fulfill their cleanup obligations."[61]

Here, we have a situation similar to *Eagle-Picher*.  The Debtors here do not dispute Weyerhaeuser's claims for costs it already incurred from voluntary remediation; the claims at issue are for *future* remediation costs.  *Both the Debtors and Weyerhaeuser are liable for cleanup at the Kalamazoo Site.*  Here, in fact, the EPA has already entered into the Settlement Agreement with the Debtors for remediation of the Kalamazoo Site.  Allowing Weyerhaeuser's

---

[59]    *Cottonwood Canyon*, 146 B.R. at 996.

[60]    Weyerhaeuser criticizes the Debtors for relying on *Eagle-Picher* and *Cottonwood Canyon*, which are pre-*Atlantic Research* cases, and argues that they were overruled by *Atlantic Research*.  The *Eagle-Picher* court, citing circuit court decisions, had found that the claims asserted there (a PRP against another PRP) could only be brought under CERCLA §113, and not §107, and Weyerhaeuser is correct that *Atlantic* overruled *Eagle-Picher* in this respect—since *Atlantic Research* now allows a PRP to seek recovery from another PRP under §107.  But that distinction does not matter here.  I rely on *Eagle-Picher* for its narrower (and I believe undisputable) finding that the Debtor and claimant were co-liable.  Because the *Atlantic Research* decision did not reach that issue, the portion of *Eagle-Picher* upon which I rely was not overruled.  And because *Atlantic Research* did not decide issues under Bankruptcy Code section 502(e)(1)(B), it had no effect on *Cottonwood Canyon*.  Thus I find Weyerhaeuser's criticism unpersuasive.

[61]    *Eagle-Picher*, 164 B.R. at 271.

28

claim would not only expose the Debtors to—but would actually result in—paying multiple recoveries on account of the same liability.[62]

### 3. The Burlington Northern Contentions

Finally, Weyerhaeuser asserts that even if I should find that there is no difference, for the purpose of co-liability, between recovery under section 107 or 113(f), Weyerhaeuser should still prevail on this element because CERCLA does not always require joint and several liability for superfund sites. Weyerhaeuser cites the Supreme Court's decision in *Burlington Northern and Santa Fe Railway Co. v. U.S.*[63] for the point that "in the superfund context, liability will not be joint and several if there's a reasonable basis for apportionment."[64] In *Burlington Northern*, the Supreme Court decided that joint and several liability would not apply because the defendant in that case owned some, but not all, of the property at issue. Weyerhaeuser then makes an argument by analogy, asserting that apportionment is also appropriate in this case because, based on the laws of gravity, Weyerhaeuser cannot be held liable for any damage upstream of where it owned or used property. Therefore, Weyerhaeuser argues, any cleanup costs that it will incur in the future over and above those for its own liability are costs for which it is not co-liable with MHLLC.

But there is a fundamental flaw in Weyerhaeuser's argument on this point. If the Debtors and Weyerhaeuser are not jointly and severally liable, then Weyerhaeuser would have not a

---

[62]    The fact that Debtors settled their claims with the EPA is not necessary to my decision here, though, it is worth noting that the contribution protection in the Settlement Agreement protects the Debtors from duplicative payments on account of the same liabilities, a risk that exists because the Debtors are co-liable with the Private Party Claimants. As the Debtors correctly explained, that provision "plays into the central purpose of 502(e)(1)(b), which is to avoid double dipping for duplicate claims asserted by more than one creditor." 4/16/2010 Hr'g Tr. at 63.

[63]    129 S.Ct. 1870 (2009) ("*Burlington Northern*").

[64]    4/16/2010 Hr'g Tr. at 92.

29

claim against the Debtors in the first place, as Weyerhaeuser would never be required to pay

more than its fair share.[65]  This issue arose at the hearing:

> THE COURT: If there is no joint liability, either joint and
> several or in some other proportion, then what's the basis
> for your client filing a claim in the first place?  What's the
> nexus between your guys writing out a check and the
> debtors reimbursing you?
>
> MR. SCHNEIDER: We've spent money that's attributable
> to them and not to us.  And that happens all the time in
> superfund cases where you have parties who will undertake
> environmental investigations or cleanups because the
> contamination is not attributable to your activities.  And
> that's the situation here.[66]

The problem with Weyerhaeuser's response to the Court's question is that it addressed

expenses that it had incurred *in the past*, not future expenses.  Claims for past expenses, not

disputed by the Debtors, are not at issue here.  If, by means of technology or techniques

described by Weyerhaeuser's counsel during the Hearing[67] (or by some other means),

Weyerhaeuser can establish that it is liable to the EPA for less than had previously been

assumed, that merely underscores why its claim should be limited to amounts it actually pays.

## C.

### "Reimbursement or Contribution" Element

Weyerhaeuser also relies on its contention that it seeks a claim for cost recovery under

section 107(a), rather than a claim for contribution under section 113(f), to argue that its claim is

not one for "reimbursement or contribution" under section 502(e)(1)(B).  But whether the

---

[65]    Or if it was required, Weyerhaeuser could make this same argument in the appropriate forum to avoid
having to pay a full judgment.

[66]    4/16/2010 Hr'g Tr. at 92.

[67]    *See* 4/16/2010 Hr'g Tr. at 91-92.

30

Weyerhaeuser claim is one for cost recovery under section 107(a), or contribution under

113(f)(1), I must find that it still is covered by section 502(e)(1)(B).

CERCLA section 113(f), by its terms, directly provides for "contribution"; therefore,

quite indisputably, any recovery under section 113 must be considered contribution for the

purposes of 502(e)(1)(B).[68]  Section 107(a), under which Weyerhaeuser asserts that its claims are

brought, provides for "recoverable costs," but does not contain the words "contribution" or

"reimbursement."  But I do not find this distinction to be dispositive, and I find that the claims of

Weyerhaeuser,[69] even if premised on section 107(a), are in substance still claims for

"reimbursement" for the purposes of 502(e)(1)(B).

Section 502(e)(1)(B) states that "the court shall disallow *any* claim for reimbursement or

contribution . . ."[70]  As I noted above,[71] section 502(e)(1)(B) imposes no requirements as to the

means or reason by which co-liability exists.  Although "reimbursement" is not defined in the

Bankruptcy Code, Black's Law Dictionary defines "reimbursement" as "1. Repayment. 2.

Indemnification."[72]  In *Wedtech II,* Chief Judge Brozman, in this district, explained that "[t]he

use of the word 'reimbursement' in the statute cannot be viewed as accidental.  It is a broad word

which encompasses whatever claims a co-debtor has which entitle him to be made whole for

monies he has expended on account of a debt for which he and the debtor are both liable."[73]

Similarly, in *Chemtura*, wherein I rejected the notion that the "liable with" prong requires

that the Debtors establish that "the successful prosecution of a claim of [a Tort Plaintiff] against

---

[68]     Georgia-Pacific, who asserts that it has an allowable claim under section 113(f), does not dispute that its
         claim is for "contribution or reimbursement" under 502(e)(1)(B).

[69]     And other similarly situated private party claimants, such as Hamilton Beach

[70]     11 U.S.C. § 502(e)(1)(B) (emphasis added).

[71]     *See* n. 10 above.

[72]     *Black's Law Dictionary* 1399 (9th ed. 2009).

[73]     *In re Wedtech,* 87 B.R. 279, 287 (Bankr. S.D.N.Y. 1988) (Brozman, C.J.) ("**Wedtech II**").

31

[a Corporate Claimant] would *automatically* result in the Debtors being liable to such underlying tort plaintiff as well,"[74] I noted that Congress clearly meant to include all situations wherein indemnitors or contributors could be liable with the debtor within the scope of § 502(e)(1)(B).[75]

Other courts similarly focused on substance over form when addressing this issue, and I find their reasoning and conclusions to be persuasive.  In *Cottonwood Canyon*, discussed above, the court disallowed, as "contribution or reimbursement," claims asserted under CERCLA 107(a).  The risk, both there and in *Allegheny*, that the Debtors would make duplicative payments for the same liability, revealed that "the clear character of the claim" was that "debtor was not being asked to satisfy a [direct] claim for injury to the claimants property" but rather was being sought for reimbursement.[76]

Looking at substance over form here, the claims at issue plainly are for "reimbursement" as that term is used in section 502(e)(1)(B).  Weyerhaeuser seeks repayment of money that it alleges it will spend on environmental remediation, and the Debtors and Weyerhaeuser, all PRPs, are co-liable for environmental cleanup.  There is a substantial risk that if these private party claims are allowed, the Debtors will pay twice for the same liability.  In light of these facts, Weyerhaeuser's claims, even if brought for cost recovery under section 107(a), are claims for reimbursement under 501(e)(1)(B).

Weyerhaeuser's reliance on the distinctions between sections 107(a) and 113(f) noted in *Atlantic Research* and *Aviall Services* is misplaced.  As explained above, *Atlantic Research* merely holds that co-liability is not required for cost recovery under 107(a).  Weyerhaeuser's claim may not be one for contribution, and may in fact be "cost recovery" under 107(a).  But

---

[74]     *Chemtura*, 436 B.R. at 293.

[75]     *See id.* at 295-96.

[76]     *Cottonwood Canyon*, 146 B.R. at 996.

*Atlantic Research* and *Aviall* do not address section 502(e)(1)(B) (or, more specifically

"reimbursement") at all, and do not affect earlier decisions, such as *Cottonwood Canyon*, which

found that direct claims for cost recovery under CERCLA section 107 are claims for

"reimbursement" under 502(e)(1)(B).

Weyerhaeuser also argues that if this Court were to create a trust account for payment of

future costs like in *Allegheny*, the payment of funds into the trust account could be considered

something other than reimbursement, because the money wouldn't be spent until the future.[77]  I

find this argument unpersuasive.  The money would be paid to return money expended by

Weyerhaeuser.  That is reimbursement.

In its one unique contention, Hamilton Beach also maintains that its claim is a direct

contractual claim, and not one for contribution.  Contractual claims are similarly disallowed

under 502(e)(1)(B) when they are, in substance, claims for reimbursement.[78]  Like

Weyerhaeuser, Hamilton Beach seeks payment from the Debtors for money it might spend in the

future.  That is a claim for reimbursement.

---

[77]    *See* 4/16/2010 Hr'g Tr., at 106:5-10.

[78]    *See Fine Organic Corp. v. Hexcel Corp. ("In re Hexcel Corp".)*, 174 B.R. 807, 810 (Bankr. N.D. Cal.
1994) (Tchaikovsky, J.) (disallowing as reimbursement claims arising out of asset purchase agreement
between debtors and claimant in which debtor promised to perform remediation, even though claimant was
not jointly liable with debtor).

<u>Conclusion</u>

For the foregoing reasons, I conclude that the Orally Arguing Claimants' claims, to the

extent they are on account of future costs, are contingent claims for reimbursement or

contribution of an entity that is liable with the debtor to a third party creditor.  Except for the

amounts that the Orally Arguing Claimants already actually paid, the Objections to the Orally

Arguing Claimants' claims are sustained.

Dated: New York, New York                      ___*s/Robert E. Gerber*___
       January 4, 2011                             United States Bankruptcy Judge

34