UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| LYONDELL CHEMICAL COMPANY, *et al.*, | ) | |
| | ) | Case No. 09-10023 (REG) |
| | ) | |
| Debtors. | ) | Jointly Administered |

——————————————————————

BENCH DECISION[1] ON REORGANIZED DEBTORS'
MOTION FOR ORDER ENFORCING CHAPTER 11
PLAN WITH RESPECT TO LAWSUIT BROUGHT BY
HIGHLAND CAPITAL MANAGEMENT LP

APPEARANCES:

CADWALADER, WICKERSHAM & TAFT, LLP
*Counsel to the Debtors*
One World Financial Center
New York, New York 10281
By:    Andrew M. Troop, Esq.
       David Leamon, Esq.
       Peter Friedman, Esq. (argued)
       Christopher R. Mirick, Esq.

SIMPSON, THACHER & BARTLETT, LLP
*Attorneys for UBS Securities*
425 Lexington Avenue
New York, New York 10017
By:    Linda H. Martin, Esq. (argued)

LACKEY HERSHMAN, LLP
*Attorneys for Highland Capital Management*
3102 Oak Lawn Avenue, Suite 777
Dallas, Texas 75219
By:    Deborah Deitsch-Perez, Esq. (argued)

---

[1]    I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate in open court, but where the circumstances do not permit more leisurely drafting or more extensive or polished discussion. Because they often start as scripts for decisions to be dictated in open court, they typically have less in the way of citations and footnotes, and have a more conversational tone.

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

In this contested matter in the jointly administered chapter 11 cases of Lyondell

Chemical Company and its affiliates, the Debtors—joined by UBS Securities, LLC

("**UBS**"), the agent on Lyondell's exit financing facility, discussed below—move for an

order enforcing provisions of the Debtors' now confirmed chapter 11 plan ("**Plan**") and

related confirmation order ("**Confirmation Order**").  They bring their motion to address

a lawsuit brought by hedge fund Highland Capital Management ("**Highland**") in New

York state court asserting claims against the Debtors and UBS arising from Highland's

failure to be included in the syndicate that provided the financing ("**Exit Financing**") for

the reorganized Debtors' Plan and future working capital needs.

The Debtors and UBS call my attention to the provisions of the Plan and

Confirmation Order providing this Court with exclusive jurisdiction to determine (among

other things) rights as to exculpation for allegedly wrongful activity—including activity

in connection with Lyondell's Exit Financing—and ask me to rule that any claims as to

such allegedly wrongful activity must be brought in this Court, and not state court.

The Debtors further ask me to rule that because Highland failed to assert any

claims for the allegedly wrongful conduct before the Debtors' administrative expense bar

date, Highland's claims against them now are barred.

Finally, the Debtors and UBS ask me to rule that the claims against the Debtors

and UBS cannot survive in light of the exculpation provisions in the Plan and "good

faith" findings that I made when the Plan was confirmed.

The motion will be granted in part and denied in part.  I will enforce the

Confirmation Order and the Plan in accordance with the provisions of each, exercising

my exclusive jurisdiction to do so.  Thus Highland's state court lawsuit will be stayed,

effective immediately.  It is to be dismissed when the order implementing this decision

becomes final and nonappealable.

Highland's claim against Lyondell is held to be barred under the Administrative

Claim Bar Date Order, discussed below, and as a consequence, discharged.

The claims against UBS will be heard in this Court, not in state court, where I will

determine, in accordance with the provisions of the Plan and Confirmation Order,

whether any of the exceptions to exculpation provided for under § 11.7 of the Plan apply.

But I cannot agree with the contention that my earlier "good faith" finding is dispositive

of the issues presented here.

My Findings of Fact and Conclusions of Law in connection with this

determination follow.

<u>Findings of Fact</u>[2]

*1. Background*

On March 10, 2010, the Debtors filed an amended Plan and accompanying

disclosure statement.  As stated in those documents, a requirement for the Plan's success

was the Debtors' ability to obtain a facility ("**Exit Facility**") for financing the

reorganized Debtors' Plan and working capital needs.[3]

---

[2]    To shorten this Decision, I've limited factual citations and detail to the most significant matters.

[3]    In section 1.1 of the Plan, Exit Facility is defined as "the credit facility, indenture, or facilities (in whatever form or Instrument) entered into as of the Effective Date by Reorganized LyondellBasell and the guarantors thereunder in order to meet their Plan obligations and working capital needs as of the Effective Date, in form and substance reasonably satisfactory to the Ad Hoc Group and the Rights Offering Sponsors."  Plan, Art. I, § 1.1.  Under the Plan, Exit Financing "means the financing under the Exit Facility." *Id.*

*2. Plan and Confirmation Order Provisions*

Various sections of the Plan and Confirmation Order are relevant here, with respect to the continuing jurisdiction of the Bankruptcy Court, exculpation, and administrative expense claims.

*(a) Continuing Jurisdiction*

With respect to jurisdiction to address future disputes, Plan § 12.1 provides, in relevant part:

> The Bankruptcy Court shall retain exclusive jurisdiction over all matters arising under, arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:
>
> …
>
> (c) To hear and determine any timely objections to, or requests for estimation of, Claims or Administrative Expenses, including, without limitation, any objections to the classification of any Administrative Expense, Claim or Equity Interest, and to allow or disallow any Disputed Administrative Expense or Disputed Claim, in whole or in part;
>
> …
>
> (g) To issue such orders as may be appropriate in aid of implementation and execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;
>
> …
>
> (l) To hear and determine disputes or issues arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation

- 3 -

Order, any transactions or payments
contemplated hereby, any agreement,
Instrument, or other document governing or
relating to any of the foregoing, or any
settlement approved by the Bankruptcy
Court;

…

(o)  To hear and determine all
disputes involving the existence, scope, and
nature of the discharges, injunctions and
releases granted under the Plan, the
Confirmation Order, or the Bankruptcy
Code;

…

(r)  to issue injunctions and effect
any other actions that may be necessary or
desirable to restrain interference by any
Person with the consummation or
implementation of the Plan;

(s)    To hear and determine any other
matter related to the Plan and not
inconsistent with the provisions of the
Bankruptcy Code; …

Then, provisions of the Confirmation Order, like portions of the Plan quoted

above, are potentially relevant to this controversy.  Confirmation Order Finding KK,[4]

captioned "Retention of Jurisdiction," addresses the Bankruptcy Court's retention of

jurisdiction, consistent with Plan § 12.1, discussed above.  It provides:

The Bankruptcy Court may properly retain
jurisdiction over the matters set forth in Section
12.1 of the Plan and section 1142 of the Bankruptcy
Code.

And Confirmation Order ¶ 48, again captioned "Retention of Jurisdiction," provides:

---

[4]    Decretal paragraphs of the Confirmation Order were preceded by 20 pages of Findings and Fact
and Conclusions of Law (each a "**Finding**"), which in many cases also included definitions.
Findings were designated by letters of the alphabet, and decretal paragraphs were numbered.

> Except as otherwise set forth herein, this Court may
> properly, and upon the Effective Date shall retain
> jurisdiction over the matters arising in and under,
> and related to, the Chapter 11 Cases, as set forth in
> Article XII of the Plan and section 1142 of the
> Bankruptcy Code.

Providing an exception to the retention of jurisdiction in Confirmation Order ¶ 48,

just described, Confirmation Order ¶ 22 provides:

> 22.  Notwithstanding anything to the
> contrary in this Confirmation Order or the Plan, the
> Bankruptcy Court's retention of jurisdiction shall
> not govern the enforcement of the Exit Facility
> Documents executed in connection with the Exit
> Facility or any liens, rights or remedies related
> thereto except to the extent that the Confirmation
> Order has been vacated or reversed, but instead,
> such enforcement shall be governed as set forth in
> the Exit Facility Documents.[5]

*(b)  Exculpation*

Next, with respect to exculpation, Plan § 11.7, captioned "Exculpation," provides

(in a huge mass of single-spaced unformatted text running on for nearly a page),[6] here in

drastically shortened form:

> As of the Confirmation Date, the Debtors and their
> directors, officers, employees, financial advisors,
> attorneys, and other professionals and agents shall
> be deemed to have solicited acceptances of this Plan
> in good faith and in compliance with the applicable

---

[5]   Confirmation Order Finding LL defined "Exit Facility Documents" as "all agreements
(including, without limitation, the Term Loan Agreement, First Lien Indenture, ABL
Credit Agreement and Third Lien Indenture), guarantees, security documents, mortgages,
control agreements, certificates, insurance documents, opinions and all other documents,
instruments and certificates relating thereto or contemplated thereunder . . .".

[6]   Provisions drafted this way regularly appear in documents in this Court.  *See In re Motors
Liquidation Co*., --- B.R. ---, 2011 Bankr. LEXIS 684, *27-*29 n.23, 2011 WL 830728, *6 n.23
(Bankr. S.D.N.Y. Mar. 7, 2011) ("Article 12.5 … sets forth these very important provisions in a
single block of single-spaced text, running half a page or more in length, without any formatting to
make it readable.  I wish the lawyers of the world would learn not to do this.").  This is not just a
matter of the Court's convenience.  As discussion that follows exemplifies (see page 27 below),
drafting in this fashion also creates ambiguities.

provisions of the Bankruptcy Code. The Debtors, the Reorganized Debtors, . . . lenders under the Exit Facility (and the agents and arrangers under the Exit Facility) . . . and their respective principals, members, managers, officers, directors, employees and agents (including any attorneys, financial advisors, and other professionals retained by such Persons) shall not have or incur any liability to any holder of any Claim or Equity Interest or any other Person for any act or omission taken or not taken in good faith in connection with, or arising out of, the Chapter 11 Cases, the Disclosure Statement, the Plan, . . . the Exit Financing, the solicitation of votes for and the pursuit of confirmation of the Plan, the offer and issuance of any securities under the Plan, the Rights Offering under the Plan, the consummation of the Plan, including, without limitation, the steps taken to effectuate the transactions described in Section 5.4, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions constituting willful misconduct or gross negligence or bad faith as determined by a Final Order; and in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan….

*(c) Administrative Expense Claims*

With respect to the discharge of administrative claims, Plan §§ 11.4 and 11.5 discharge the Debtors and Reorganized Debtors (to the fullest extent permitted by section 1141 of the Code) from any liabilities that arose prior to the confirmation date; enjoin prosecution of such claims; and provide for a continuation of the automatic stay.

Plan § 2.1 provides that all requests for payment of an administrative expense must be filed and served prior to the administrative expense bar date, and that all requests for payment of an administrative expense that are not filed by the bar date shall be "disallowed automatically."

- 6 -

Then, Confirmation Order ¶ 35, in a decretal paragraph captioned "Injunction,"

provides (once more in lengthy text that here is drastically shortened):

> (a) Except to the extent otherwise expressly
> provided in this Order, in the Plan … all
> consideration distributed under the Plan shall be as
> a restructuring and not a refinancing, and in
> exchange for, and in complete satisfaction, release,
> discharge and settlement of all Administrative
> Expenses, Claims and Equity Interests of any nature
> whatsoever, including any interest accrued on such
> Administrative Expense, Claim or Equity Interest
> from and after the Commencement Date through the
> Effective Date against the Debtors, or any of their
> assets or properties, or against the estates or
> properties or interests in property.  Except as
> otherwise provided in the Plan, in this Order, …
> subject to the occurrence of the Effective Date, this
> Order shall act as a discharge of all Administrative
> Expenses and Claims against, Equity Interests in,
> liens on, and any other interests in the Debtors, the
> Debtors' assets, and their properties, arising at any
> time before the Confirmation Date, including
> Administrative Expenses, Claims and Equity
> Interests that arose before the Confirmation Date….
> Upon the Effective Date, any holder of such
> discharged Administrative Expense, Claim or
> Equity Interest shall be precluded from asserting
> against the Debtors, the Reorganized Debtors, their
> successors or their assets or properties any other or
> future Administrative Expenses, Claims or Equity
> Interests based upon any document, Instrument, act
> or omission, transaction or other activity of any
> kind or nature that occurred before the entry of this
> Order.  This Order shall be a judicial determination
> of discharge of all such liabilities of the Debtors,
> subject to the occurrence of the Effective Date.

*(d) Good Faith*

Finally, Confirmation Order Finding FF, captioned "Good Faith

Solicitation (11 U.S.C. § 1125(e))," provides, in relevant part:

> Based on the record before the Bankruptcy Court in
> these Chapter 11 Cases, the Debtors and their

directors, officers, employees, financial advisors,
attorneys, and other professionals and agents have
solicited acceptances of the Plan in good faith and
in compliance with the applicable provisions of the
Bankruptcy Code. The Debtors, the Reorganized
Debtors . . . lenders under the Exit Facility (and the
agents and arrangers under the Exit Facility) . . . and
their respective principals, members, managers,
officers, directors, employees and agents (including
any attorneys, financial advisors, and other
professionals retained by such Persons) have acted
in "good faith" within the meaning of section
1125(e) of the Bankruptcy Code in compliance with
the applicable provisions of the Bankruptcy Code
and Bankruptcy Rules in connection with all their
respective activities relating to the solicitation of
acceptances of the Plan and in connection with the
Rights Offering and their participation in the
activities described in section 1125 of the
Bankruptcy Code, and, together with any of their
respective successors or assigns, are entitled to the
protections afforded by section 1125(e) of the
Bankruptcy Code and the exculpation provisions set
forth in Section 11.7 of the Plan, including, without
limitation, for any act or omission taken or not
taken in connection with, or arising out of, the
Chapter 11 Cases, the Disclosure Statement, the
Plan, . . . the Exit Financing, the solicitation of
votes for and the pursuit of confirmation of the
Plan, the offer and issuance of any securities under
the Plan, the Rights Offering under the Plan, the
consummation of the Plan, including, without
limitation, the steps taken to effectuate the
transactions described in Section 5.4 of the Plan, or
the administration of the Plan or the property to be
distributed under the Plan….

3. *Exit Financing*

On March 15, 2010, the Debtors formally began seeking financing for their Exit

Facility.  That same day, Lyondell made available to Highland and other potential

investors, via Syndtrak, a Confidential Offering Memorandum ("**Offering**

**Memorandum**") with respect to the Exit Financing.  It provided, among other things,

information about a proposed $1.0 billion senior secured term loan facility ("**Term Loan**") and $1.75 billion asset-based revolving credit facility ("**Credit Facility**").  The Offering Memorandum stated that UBS would serve as a joint lead arranger and joint bookrunner for the Term Loan, and also included a form commitment letter for both the Term Loan and Credit Facility.  Both form commitment letters in the Offering Memorandum stated "We understand that allocations will be made at the discretion of the Company and you."[7]  A "Summary of Principal Terms and Conditions" ("**Terms Summary**") for the Term Loan was simultaneously made available via Syndtrak.

On March 17, Highland sent an email to UBS expressing Highland's commitment of $150 million toward the Term Loan.  Attached to the email was a commitment letter (the "**Commitment Letter**") consistent with the form letter in the Offering Memorandum.[8]  Highland also emailed the Commitment Letter to officers of the Debtors, to which the Debtors replied, "Thank you very much, we look forward to successfully close [sic] this financing."[9]

On March 18, 2010, the Debtors filed a motion seeking authorization to enter into agreements in connection with anticipated Exit Financing and to form a special purpose borrower.  As set forth in the motion, the Exit Financing would consist of a $1.75 billion asset-based credit facility, and $3.25 billion in some combination of senior notes ("**Notes**") and the Term Loan governed by a term loan agreement.

---

[7]     Offering Memorandum, Highland's Supplemental Exh. 1A, at vii and xii. "You" in the form commitment letter for the Term Loan refers to UBS, to whom the form letter was addressed.

[8]     *See* Commitment Letter, Highland's Supplemental Exh. 2.  Highland's Letter stated, "We understand that allocations will be made at the discretion of the Company and you."

[9]     Email from Francesco Svelto dated 3/17/10, Highland's Supplemental Exh. 2.

In order to facilitate the Exit Facility, the Lyondell Debtors proposed forming a new entity, LBI Escrow Corporation ("**LBI Escrow**"), which would enter into the agreements related to the Notes and Term Loan.  The proceeds of the Notes and Term Loan were to be collected before plan confirmation, but the proceeds would be deposited into LBI Escrow, and would not constitute property of the Debtors' estates until after the Plan went effective.  Likewise, the Debtors would have no obligations under the Notes and Term Loan until after the effective date.

On March 24, I granted the Debtors' motion and entered an order (the "**Exit Financing Order**") authorizing the Debtors to

> (A) enter into certain agreements in connection with the anticipated Exit Financing,

> (B) incur and pay related fees and expenses, and

> (C) form the special purpose borrower, LBI Escrow.

On March 25, 2010, Highland received an email on behalf of the Debtors and UBS notifying Highland of three pricing changes to the Term Loan and Credit Facility, and asking Highland to recommit to the pricing changes by the following day.[10]  Later that day, Highland sent an email reconfirming its commitment of $150 million to the Term Loan, and re-attached its March 17th Commitment Letter.[11]

On or about March 25, 2010, the Exit Facility allocations were finalized. Highland was not selected to receive an allocation.  Highland acknowledges that by

---

[10]    *See* Syndtrak Online Invitation sent to Amit Walia dated 3/25/10, Highland's Supplemental Exh. 2.

[11]    *See* Email from Fred Mason dated 3/25/10 and attachment, Highland's Supplemental Exh. 2.

March 30, 2010, it had learned that the loan allocations had been made and that it had not

received any part of the Term Loan allocation.[12]

On April 5, 2010, an unexecuted version of the agreement governing the Term

Loan ("**Term Loan Agreement**") was filed on the Court's docket as Tab 16-A of the

Plan supplement.  On April 8, 2010, the Debtors filed their first supplement to the Plan,

which contained, as Exhibit B, an executed version of the Term Loan Agreement.

Section 10.07 of the Term Loan Agreement, captioned "Successors and Assigns,"

provided:

> The provisions of this Agreement shall be binding
> upon and insure to the benefit of the parties hereto
> and their respective assigns and successors hereby .
> . . Nothing in this Agreement, expressed or
> implied, shall be construed to confer upon any
> Person (other than parties hereto, their respective
> successors and assigns permitted thereby,
> Participants to the extent provided in Section
> 10.07(e) and, to the extent expressly contemplated
> hereby, the Indemnitees) any legal or equitable
> right, remedy or claim under or by reason of this
> Agreement.

Thereafter, § 10.15 of the Term Loan Agreement, captioned "Governing Law,"

provided:

> ANY LEGAL ACTION OR PROCEEDING
> ARISING UNDER ANY LOAN DOCUMENT OR
> IN ANY WAY CONNECTED WITH OR
> RELATED TO OR INCIDENTAL TO THE
> DEALINGS OF THE PARTIES HERETO OR
> ANY OF THEM WITH RESPECT TO ANY
> LOAN DOCUMENT OR THE TRANSACTIONS
> RELATED THERETO, IN EACH CASE
> WHETHER NOW EXISTING OR HEREAFTER

---

[12]    *See* Debtors' Motion to Enforce, Exhibit C, Complaint of Highland Capital (the "**Complaint**") at
¶¶ 29, 30 ("By March 30, 2010, Highland learned that the loan allocations had been made and that
it apparently had not received any part of the Term Loan allocation.  UBS brazenly admitted that it
refused to provide any allocation to Highland because of the UBS/Highland litigation.").

ARISING, SHALL BE BROUGHT IN THE
COURTS OF THE STATE OF NEW YORK
SITTING IN NEW YORK CITY OR OF THE
UNITED STATES FOR THE SOUTHERN
DISTRICT OF NEW YORK OF SUCH
STATE....[13]

On April 14, 2010, the deadline for objecting to the Plan passed without an

objection or reservation of rights from Highland or any of its affiliates.  On April 20,

2010, the Debtors filed proposed findings of fact, conclusions of law, and a proposed

order confirming the Plan.  Highland did not object to, or seek to reserve any rights with

respect to, the proposed order or the approval of the Exit Facility.  On April 23, 2010 (the

"**Confirmation Hearing Date**"), the Court held the confirmation hearing and entered the

proposed order confirming the Plan (the Confirmation Order).

*4.  Administrative Expense Bar Date*

The plan went effective on April 30, 2010, ("**the Effective Date**").  The same

day, the Reorganized Debtors filed a notice of bar date for the filing of administrative

expenses, setting the bar date at June 29, 2010.  Between May 14 and 17, 2010, a copy of

the bar date notice was published in the *Wall Street Journal*, *USA Today*, the *Financial

Times* and the *Houston Chronicle*.  On June 29, 2010, the administrative bar date passed.

Highland did not file a request for payment of an administrative expense.

*5.  Highland's Lawsuit*

On July 27, 2010, Highland commenced an action in New York state court

against LyondellBasell Industries N.V., Lyondell Chemical Company, and UBS seeking

relief for breach of contract, tortious interference with contract, and tortious interference

with prospective economic relations in connection with the Exit Facility.  Lyondell

---

[13]    Term Loan Agreement, Highland's Supplemental Exh. 3, at §§ 10.07, 10.15.

Chemical Company was a Debtor in these chapter 11 cases and LyondellBasell Industries

N.V. is a successor to LyondellBasell Industries AF S.C.A., another Debtor in these

chapter 11 cases.

In August 2010, the Reorganized Debtors filed this motion to enforce the

Confirmation Order and Plan against Highland.  UBS filed a Joinder to the Reorganized

Debtors' motion.  Highland objected to the motion.

Discussion

*1. Exclusive Jurisdiction*

The Debtors argue that even if Highland could pursue the claims asserted in the

New York state action, I have exclusive jurisdiction over such claims, and they cannot be

heard in New York state court.  I agree.

Plan § 11.7 provides that the Debtors and arrangers under the Exit Facility shall

not have or incur any liability to any other Person for any act or omission in good faith in

connection with the Chapter 11 cases, the Plan, or the Exit Financing, "*except for acts or

omissions constituting willful misconduct or gross negligence or bad faith as determined

by a Final Order.*"[14]

The causes of action asserted by Highland in the Complaint allege that the

Debtors and UBS acted in bad faith.  But under the exculpation provision in § 11.7 of the

Plan, the Reorganized Debtors and UBS can only be held liable to Highland for such

claims if they acted in bad faith as determined by a *"Final Order.*"  The term "Final

Order" is defined in § 1.1 of the Plan as an order of the "Bankruptcy Court or District

Court."  The terms "Bankruptcy Court" and "District Court" are, in turn, each defined as

---

[14]    Plan, Art. XI, § 11.7 (emphasis in original).

the courts of the United States District for the Southern District of New York.[15]  Highland cannot proceed with its breach of contract or tortious interference claims in any court unless and until I, the district court, or any higher court, determines that UBS and/or the Debtors acted in bad faith or with gross negligence or willful misconduct.

More fundamentally, in Confirmation Order ¶ 48 and § 12.1 of the Plan, this Court was vested with *exclusive jurisdiction* "[t]o hear and determine all disputes involving the existence, scope, and nature of the discharges, injunctions and releases granted under the Plan, the Confirmation Order, or the Bankruptcy Code."[16]  The adjudication of Highland's claims—which turn on the discharges granted under the Plan, and the applicability of the Plan's exculpation provisions—will require a court to consider exactly such matters.

Highland responds by pointing to Confirmation Order ¶ 22, which, as noted above, states that "notwithstanding anything to the contrary in this Confirmation Order or the Plan, the Bankruptcy Court's retention of jurisdiction shall not govern the enforcement of the Exit Facility Documents . . . but instead, such enforcement shall be governed as set forth in the Exit Facility Documents."  Highland argues that because it seeks enforcement of "Exit Facility Documents," and remedies in connection with those documents, under Confirmation Order ¶ 22 its claims are excluded from the Court's retention of jurisdiction.  And it asserts that "as set forth in the Exit Facility Documents" (specifically Term Loan Agreement § 10.15), any legal action in any way connected to

---

[15]        *See* Plan, Art. I, § 1.1.

[16]        Plan, Art. XII, § 12.1.  *See also* Confirmation Order, at ¶ 48.  Both are quoted above.

the loan document "shall be brought in the courts of the State of New York."[17]

Therefore, Highland asserts, its claims were properly brought in state court.  I disagree.

First, the claims asserted by Highland against UBS are for tortious interference with a contract and tortious interference with prospective economic relations.[18]  These are tort, not contract, claims.  Highland is not seeking to enforce any contract that it allegedly had with UBS.  The "release" of jurisdiction over the enforcement of the Exit Facility Documents in Confirmation Order ¶ 22 does not apply to Highland's claims against UBS.

Second, I find that Highland's breach of contract claims against the Debtors aren't covered by Confirmation Order ¶ 22 either.   Confirmation Order Finding LL, which, like other Findings, had definitions in it, defined "Exit Facility Documents" as "all agreements (including, without limitation, the Term Loan Agreement, First Lien Indenture, ABL Credit Agreement and Third Lien Indenture), guarantees, security documents, mortgages, control agreements, certificates, insurance documents, opinions and all other documents, instruments and certificates relating thereto or contemplated thereunder."

Highland is not seeking to enforce the Term Loan Agreement.  It couldn't do so.  Highland never entered into and was not a party to the Term Loan Agreement.  In fact, its *exclusion* from the Term Loan and Exit Facility is the very gravamen of its complaint.  And Term Loan Agreement § 10.07(a) rules out third-party beneficiary status.  It provides that "Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than parties hereto . . .) any legal or equitable right,

---

[17]     Highland's Opposition Br., at ¶ 26 (citing Confirmation Order ¶ 22 and Term Loan Agreement § 10.15).

[18]     *See* Complaint, at ¶¶ 38-51.

- 15 -

remedy or claim under or by reason of this Agreement." Non-parties are not entitled to the benefits of the Term Loan Agreement, and can't seek to enforce it.

Of course, Confirmation Order ¶ 22 also "released" this Court's jurisdiction over "all other documents, instruments and certificates" related to or contemplated under the Term Loan Agreement.[19] But the phrases "related to" and "contemplated under" refer to documents that are derived from the Term Loan Agreement, such as an amendment or a supplement, or to any contemporaneous or subsequent document that is required to be entered into pursuant to the terms of Term Loan Agreement. "Related to" or "contemplated under" does not include documents that *preceded* the Term Loan Agreement, unless those documents were specifically incorporated by reference in the Term Loan Agreement. Highland is seeking to enforce as a binding contract documents *preceding* the Term Loan Agreement, such as the Offering Memorandum and attached Terms Summary, the Commitment Letter, and emails between Highland and the Debtors. Highland presents no document or other evidence demonstrating that any such documents were incorporated by reference into the Term Loan Agreement.[20] Such documents do not

---

[19]    *See* Confirmation Order, at Finding LL (defining "Exit Facility Documents" as including "all other documents, instruments and certificates relating thereto or contemplated thereunder . . .").

[20]    In fact, section 5.04 of the Term Loan Agreement, titled "Binding Effect" states in part:

> This Agreement and each other Loan Document dated on or prior to the date this representation is made constitutes a legal, valid, and binding obligations of such Loan Party, enforceable against each Loan Party that is a party thereto in accordance with its terms…
> Term Loan Agreement, at § 5.04.

And "Loan Documents" is defined in the Term Loan Agreement as:

> . . . collectively, (i) this Agreement, (ii) the Intercreditor Agreements, (iii) the Notes, (iv) the Term Loan Escrow Agreement, (v) the Security Documents, (vi) the Guarantee Agreement, and (vii) for the purposes of Section 8.01(c) only, the Fee Letter dated as of the Closing Date by and among the Borrower and Administrative Agent (the "Fee Letter").
> Term Loan Agreement, at § 1.01.

fall under the "related to" or "contemplated under" categories in Confirmation Order ¶ 22.

In sum, I retained, and did not release, jurisdiction over the enforcement of the Plan and Confirmation Order, and over Highland's claims at issue here.

Of course, the Bankruptcy Court's retention of jurisdiction is meaningless unless it could exercise jurisdiction over the action in the first place. But as I found in Confirmation Order Finding KK, my retention of jurisdiction in that Order and in the Plan was proper.[21] The Second Circuit and other bankruptcy courts in this district have ruled that a bankruptcy court retains core jurisdiction to interpret and enforce its own prior orders, including and especially confirmation orders.[22] As Judge Peck explained in *Charter Communications:*

> All courts retain jurisdiction to interpret and enforce
> their own orders. This proposition recently was
> confirmed by the United States Supreme Court in
> *Travelers Indem. Co. v. Bailey,* which found a
> "Bankruptcy Court plainly had jurisdiction to

---

The Offering Memorandum and Commitment Letters were not included in the list of "Loan Documents" which were given binding effect by the terms of the Term Loan Agreement.

[21] While of course subject matter jurisdiction can never be consented to, I note that Highland asserts that this Court doesn't have jurisdiction only on the basis of paragraph 22 of the Confirmation Order. Highland does not contend that this Court lacks jurisdiction over its claims in the first place.

[22] *See Luan Inv. S.E. v. Franklin Corp. (In re Petrie Retail, Inc.),* 304 F.3d 223, 230 (2d. Cir. 2002) ("***Petrie Retail***") ("A bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders, particularly when disputes arise over a bankruptcy plan of reorganization."); *In re Charter Communications*, No. 09-11435, 2010 WL 502764, at *4 (Bankr. S.D.N.Y. Feb. 8, 2010) ("**Charter Communications**") (Peck, J.), *appeal docketed*, No. 1:10-CV-02930 (GBD) (S.D.N.Y. Apr. 4, 2010) (declaring that the bankruptcy court "unquestionably has the authority and discretion to rule on the Enforcement Motion and consider whether the causes of action [brought in another court] have been released and should be enjoined" where bankruptcy court "retained exclusive jurisdiction to interpret injunction that is part of its own order confirming the Plan"); *In re Texaco, Inc.,* No. 87-20142, Hr'g Tr., May, 28, 2010, at 2 (Bankr. S.D.N.Y. 2010) (Drain, J.) (determining that the bankruptcy court had jurisdiction to enforce a confirmation order it had entered 22 years earlier).

interpret and enforce" a confirmation order it had
entered twenty years earlier."[23]

Likewise, in several instances in the General Motors (now called Motors

Liquidation) chapter 11 case, when dealers, unhappy with their exclusion from New

GM's future dealer network, sought to collaterally attack aspects of the 363 Order that

had been entered in the GM chapter 11 case,[24] I was asked to, and did, enforce the

"exclusive jurisdiction" provisions of that order.[25] When dealer Rally Auto Group, one

of those dealers, sought a stay pending its appeal of my order in the district court, Judge

Patterson of the district court considered, among other things, the bankruptcy court's

jurisdiction to enforce its earlier order. He held:

> A motion seeking enforcement of an order resolving
> a core matter based on a retained jurisdiction clause
> is itself a core matter that arises under title 11. …
> Here Judge Gerber explicitly retained jurisdiction in
> section 71(f) of the 363 Order, and therefore had
> jurisdiction to issue an enforcement order. …
> Appellant therefore has failed to persuade the Court
> that it has a possibility of succeeding on the merits
> of its lack of jurisdiction argument.[26]

Because I validly retained exclusive jurisdiction over these matters in the

Confirmation Order and Plan, Highland can only bring its claims in this Court.

---

[23]    2010 WL 502764 at *4 (citing *Travelers Indem. Co. v. Bailey,* 129 S.Ct. 2195, 2205 (2009)).

[24]    *See In re General Motors Corp.,* 407 B.R. 463, 475-486 (Bankr. S.D.N.Y. 2009) (the "***363
Decision***"), *appeal dismissed and aff'd,* 428 B.R. 43 (S.D.N.Y. 2010) (Buchwald, J.), and
430 B.R. 65 (S.D.N.Y. 2010) (Sweet, J.);  *In re General Motors,* No. 09-50026, order dated Jul. 5,
2009, [Dkt. No. 2968] (Bankr. S.D.N.Y. 2009).

[25]    *See In re General Motors,* No. 09-50026, 10/4/10 Hr'g Tr., at 44 (Bankr. S.D.N.Y. 2010); *In re
General Motors,* No. 09-50026, 11/18/10 Hr'g Tr., at 30 (Bankr. S.D.N.Y. 2010); *In re General
Motors,* No. 09-50026, order dated Nov. 1, 2010, [Dkt. No. 7615] (Bankr. S.D.N.Y. 2010); *In re
General Motors,* No. 09-50026, order dated Oct.12, 2010, [Dkt. No. 7299] (Bankr. S.D.N.Y.
2010).

[26]    *Rally Auto Group, Inc. v. General Motors LLC (In re Motors Liquidation Co.),* No. M-47, 2010
WL 4449425, at *4, 2010 U.S. Dist. LEXIS 118166, at *12 (S.D.N.Y. Oct. 29, 2010) (Patterson,
J.) (citations, including one to *Petrie Retail*, omitted).

- 18 -

2. *Highland's Claims against Debtor Entities*

Under section 1141(d) of the Bankruptcy Code, the confirmation of a chapter 11 plan discharges the debtor from any debt that arose before the date of confirmation, except as otherwise provided in the debtors' plan. Section 524(a)(2) of the Code provides that the discharge operates as an injunction against the commencement of an action, the employment of process, or an act to collect any such debt.

Plan § 2.1(a) provides that all requests for payment of an administrative expense that were not filed by the bar date (June 29, 2010) shall be "disallowed automatically." Confirmation Order ¶ 35 provides that "[e]xcept as otherwise provided in the Plan, [or] in this Order, … subject to the occurrence of the Effective Date, this Order shall act as a discharge of all Administrative Expenses and Claims against … the Debtors, the Debtors' assets, and their properties, arising at any time before the Confirmation Date…. And Plan § 11.5(a) further provides:

> Upon the Effective Date, any holder of such discharged Administrative Expense, Claim or Equity Interest shall be precluded from asserting against the Debtors, the Reorganized Debtors, their successors or their assets or properties any other or future Administrative Expenses, Claims or Equity Interests based upon any document, Instrument, act or omission, transaction or other activity of any kind or nature that occurred before the entry of the Confirmation Order. The Confirmation Order shall be a judicial determination of discharge of all such liabilities of the Debtors, subject to the occurrence of the Effective Date.

The Debtors argue that pursuant to Plan § 2.1, Highland's failure to file a request for payment prior to the administrative expense bar date in June 2010 means that its claim was "disallowed automatically." Similarly, they assert, under Confirmation Order

- 19 -

¶ 35 and Plan § 11.5, Highland's claims against the two former Debtors have been discharged, and Highland's ability to pursue any such claim is enjoined.[27]

In response, Highland argues that its claim didn't arise until after the Effective Date. Highland points to the fact that, as explained in the Exit Financing Order, the proceeds of the Term Loan were to be deposited into an escrow account and would not constitute property of the Debtors' estates, and the Debtors would have no obligations under the Term Loan, until after the Effective Date.

But I am not persuaded by this contention. As the Second Circuit has explained, "A claim arises for purposes of bankruptcy when 'the relationship between the debtor and creditor contained all of the elements necessary to give rise to a legal obligation under the relevant non-bankruptcy law.'"[28] It is well established as a matter of New York law that a breach of contract cause of action accrues at the time of the breach, even if the damage occurs at a later date.[29] Therefore, to determine when Highland's claims arose, I must determine, as a matter of New York contract law, when the alleged breach by Lyondell occurred.

Assuming that there was an enforceable contract, to determine when the alleged breach occurred, I must first determine the content and terms of the contract. As I

---

[27]    Because the administrative bar date and the discharge and injunction provided in sections 1141(d) and 524(a)(2) of the Code apply only to claims brought against debtors and their successors, UBS does not make these arguments with regard to Highland's claims against UBS.

[28]    *In re Duplan Corp.*, 212 F.3d 144, 151 (2d. Cir. 2000) (quoting *In re Chateaugay Corp.,* 53 F.3d 478, 497 (2d. Cir. 1995) *cert. denied* 516 U.S. 913 (1995). *See also In re Manville Forest Products Corp.*, 209 F.3d 125 (2d. Cir. 2000); *In re Texaco, Inc.* 218 B.R. 1 (Bankr. S.D.N.Y. 1998).

[29]    *See Ely-Cruikshank Co., Inc., v. Bank of Montreal,* 81 N.Y.2d 399, 402 (N.Y. 1993) ("***Ely-Cruikshank***") (citations omitted); *see also T&N PLC v. Fred S. James & Co. of New York, Inc.,* 29 F.3d 57, 59-60 (2d Cir. 1994).

explained above,[30] Highland was not a party to the Term Loan Agreement and cannot be

complaining of a breach of that agreement.

Instead, as demonstrated by Highland's complaint in the state court litigation, the

Term Loan Commitment Letter (along with the Offering Memorandum and attached

Terms Summary) is the "contract" Highland alleges that Lyondell breached.  And any

claim Highland had arose out of that document.  Highland's complaint states:

> 16. On or about March 15, 2010, Highland
> received the offer made in the Memorandum.

> 17. On March 17, 2010, Highland issued a
> commitment letter (the "Commitment Letter") in
> the form requested by Lyondell.  Specifically the
> Commitment Letter stated, in pertinent part, that
> "Subject only to satisfactory documentation, on
> behalf of our advised funds and accounts we are
> pleased to commit: $150 million to the $1.0 billion
> Senior Secured Term Loan facility (the 'Term
> Loan')."

> 18. On the same date, Lyondell accepted the
> commitment, stating, "Thank you very much, we
> look forward to successfully close [*sic.*] this
> financing."[31]

Thus, irrespective of whether (a) the Memorandum was the offer and Highland's

Commitment Letter constituted acceptance, or (b) the Memorandum was an invitation to

offer, Highland's Commitment Letter was the offer, and Lyondell's reply email

constituted acceptance,[32] the alleged contract was the Term Loan Commitment Letter, not

the Term Loan Agreement.

---

[30]    *See* page 15 above.

[31]    Complaint ¶¶ 16-18.

[32]    Highland's complaint seems to suggest both.  Complaint ¶ 16 refers to the Memorandum as the
offer, but Complaint ¶ 18 refers to Lyondell as having "accepted" Highland's offer in its
Commitment Letter.  However, any inconsistency here is irrelevant.

The breach alleged by Highland in the Complaint further demonstrates that the contract between Lyondell and Highland, if one existed, was the Term Loan Commitment Letter and Offering Memorandum, not the Term Loan Agreement. Highland's complaint asserts:

> 34. Lyondell had discretion to allocate the Term Loan to certain potential lenders, including Highland, but was bound by the exercise of that discretion pursuant to the duty of good faith and fair dealing and industry practice in making such allocations.
>
> 35. Lyondell, by and through UBS, failed to exercise its discretion in compliance with the duty of good faith and fair dealing and industry practice, and accordingly breached its contractual obligations.[33]

The breach asserted by Highland is Lyondell's alleged breach of the covenant of good faith implied in the Term Loan Commitment Letter, specifically in the portion of the letter that gives Lyondell discretion to make allocations.

I then must determine when the breach complained of here occurred, or, in other words, when the cause of action arose.[34] Highland contends that performance was not due by Lyondell until after the Effective Date, since that is when the Debtors were due to receive the proceeds of the Term Loan and incur obligations under the Loan. Thus, Highland argues, the cause of action did not arise until after the Effective Date. I cannot agree.

---

[33]     Complaint ¶¶ 34, 35.

[34]     *See Ely-Cruikshank,* 81 N.Y.2d at 402 (holding that a cause of action for breach of contract accrues at the time of the breach).

In *Dalton v. Educational Testing Services*,[35] one of New York's leading cases on the implied duty of good faith in every contract, ETS questioned the validity of Dalton's SAT score and refused to release it on those grounds.  Dalton sued ETS for breach of contract, seeking specific performance and the release of his score.  The New York Court of Appeals found that the agreement between ETS and Dalton expressly permitted cancellation of a test score so long as ETS found "reason to question" its validity after offering the test-taker five specified options, one of which was the opportunity to provide additional information to a review board.  But the Court of Appeals also found that the implied covenant of good faith and fair dealing obligated ETS to consider any relevant material that a test-taker supplied to the board of review.  The Court determined that the ETS had breached the contract—but that the breach was not ETS' refusal to release the score, but rather, was its failure to consider, in good faith, the additional material supplied by Dalton.[36]  The teaching of *Dalton* is that a breach of the covenant of good faith and fair dealing occurs when discretion permitted under the contract is exercised in bad faith.

In its complaint, Highland never alleges that, by virtue of the Term Loan Commitment Letter, Lyondell became obligated give Highland an allocation or to borrow $150 million from Highland.  Highland would be hard pressed to make such an argument, since the Term Loan Commitment Letter explicitly stated "We understand that allocations will be made at the discretion of the Company and you."[37]  Highland asserts

---

[35]    87 N.Y.2d 384 (1995) ("*Dalton*").

[36]    *Id.* at 393 ("Dalton is entitled to specific performance of the contract. Dalton is not, however, entitled to release of his score as though fully validated. The goal of specific performance is to produce "as nearly as is practicable, the same effect as if the contract had been performed" (Farnsworth, Contracts § 12.5, at 823 [1982]). Had the contract here been performed, ETS would have considered the information provided by Dalton in reaching a final decision. ETS never promised to release a score believed to be invalid . . .").

[37]    Commitment Letter, Highland's Supplemental Exh. 2.

only that, by virtue of the Commitment Letter, any discretion to make allocations of the Term Loan had to be made in good faith.

That discretion was exercised and before the executed version of the Term Loan Agreement was filed on April 8, and before March 30 when "Highland learned that the loan allocations had been made" and that it did not receive any part of the Term Loan allocation.[38]  Therefore, under *Dalton* and common sense, Lyondell's obligation under the covenant of good faith was breached, if at all, before March 30.  That was nearly a month before Lyondell's Plan was confirmed on April 23, and before the Plan went effective on April 30.[39]

Because the breach alleged by Highland in its complaint occurred, if ever, before confirmation of the Plan, Highland's claim was an administrative expense.  Because Highland failed to file a request for payment before the administrative expense bar date, Highland's claim was disallowed pursuant to Plan § 2.1.  Likewise, Highland's claim against the Debtors has been discharged.[40]

---

[38]     Complaint ¶ 28.

[39]     Highland also contends that Lyondell's notification to Highland that it would not receive an allocation was merely an anticipatory breach, and that, as a matter of New York contract law, Highland could elect to wait until Lyondell's performance was actually due to sue for breach.  *See Lucente v. International Business Machines Corp.*, 310 F.3d 243, 258 (2d. Cir. 2002) ("When confronted with an anticipatory repudiation, the non-repudiating party has two mutually exclusive options. He may (a) elect to treat the repudiation as an anticipatory breach and seek damages for breach of contract, thereby terminating the contractual relation between the parties, or (b) he may continue to treat the contract as valid and await the designated time for performance before bringing suit.").  This argument is also unpersuasive.  Lyondell's obligation under the purported contract was to act in good faith in giving the allocations.  The time for performance occurred when Lyondell made the allocations.  That occurred before the Confirmation Date.

[40]     *See* Confirmation Order ¶ 35.

3. *Highland's Claims against UBS*

UBS argues that Highland's claims are barred by the Plan's exculpation

provisions.[41]  Plan § 11.7, the exculpation provision of the Plan, provides:

> *As of the Confirmation Date*, the Debtors and their
> directors, officers, employees, financial advisors,
> attorneys, and other professionals and agents shall
> be deemed to have solicited acceptances of this Plan
> in good faith and in compliance with the applicable
> provisions of the Bankruptcy Code. The Debtors,
> the Reorganized Debtors, . . . lenders under the Exit
> Facility (and the agents and arrangers under the Exit
> Facility) . . shall not have or incur any liability to
> any holder of any Claim or Equity Interest or any
> other Person for any act or omission taken or not
> taken in good faith in connection with, or arising
> out of, the Chapter 11 Cases, the Disclosure
> Statement, the Plan, . . . the Exit Financing, the
> solicitation of votes for and the pursuit of
> confirmation of the Plan, the offer and issuance of
> any securities under the Plan, the Rights Offering
> under the Plan, the consummation of the Plan . . .
> *except for acts or omissions constituting willful*
> *misconduct or gross negligence or bad faith as*
> *determined by a Final Order.*[42]

Highland doesn't dispute that UBS is a "lender" or "agent or arranger" "under the

Exit Facility."  Nor does Highland dispute that the exculpation provision applies to "any

act or omission taken or not taken in good faith in connection with, or arising out of . . .

the Exit Financing."  Instead, Highland argues that:

> (1) the exculpation provision applies only "As of the Confirmation
>
> Date," and its claims against UBS arose post-Confirmation, and that

---

[41]    The Debtors make this argument as well as a matter of alternative pleading.  Because I find that
Highland's claims against the Debtors are now barred by Highland's failure to seek payment
before the administrative bar date, and were subsequently discharged, I do not reach the
exculpation issue with respect to Highland's claims against the Debtors.

[42]    Plan, Art. VII, § 11.7 (emphasis added).

(2) that UBS did not act in good faith, and UBS's conduct falls

within the exception in the exculpation provision for "acts or omissions

constituting willful misconduct or gross negligence or bad faith."

*(a) Pre vs. Post Confirmation*

Ultimately, though my task is much more difficult by reason of the poor drafting

of Plan § 11.7, I must reject Highland's argument that the exculpation provision doesn't

apply to Highland's claims against UBS.  The parties debate, with some decent

arguments on either side, what the words "As of the Confirmation Date" mean, and

whether they refer to just the first sentence of Plan § 11.7 or both them.  But ultimately I

determine that the distinction doesn't matter.

When contractual language important to parties' protection appears in a huge

mass of single spaced text, almost a full page in length (and with only two sentences in

the entirety of that text), potential ambiguities result almost exponentially.  And they did

so here.  The words "As of the Confirmation Date" appear in the first sentence.  But they

make little or no sense in that context.  The finding, of "good faith," in the first sentence

is simply a finding.  The date as of which I found that the protected parties acted in good

faith doesn't matter at all; they either acted in good faith or they didn't.  That's

particularly so since I had no basis for making a finding as to whether they had acted (or,

more precisely, *would act*) in good faith after I issued the Confirmation Order.

Yet those words "As of the Confirmation Date" don't appear in the second

sentence, laying out the exculpation, where they would matter much more.  Nor do those

words precede—say with a colon and subparagraphing—multiple paragraphs to which

they'd then plainly be applicable.  Normally, if there were an intent to cover both

paragraphs, I'd expect (at least as a matter of "best practices," and arguably as a matter of drafting competence), something to make that coverage clear. Under these circumstances, I find it hard to see how "As of the Confirmation Date" can be deemed to apply to the second sentence of Plan § 11.7.

But ultimately I don't believe that whether "As of the Confirmation Date" covers the first sentence, the second, or both, actually matters. For if you dig out the words that matter in that single-spaced full page mass of text, you find the key words: "for any act or omission taken or not taken in good faith in connection with, or arising out of" the laundry list of eight lines of enumerated acts or events. The coverage of the exculpation is defined by the *subject matter* of the claim for which persons are entities are given the protection; it has no temporal requirements or limitations. While as a practical matter, most of the covered items would have taken place before the entry of the Confirmation Order (like the events of which Highland asserts its claims here), § 11.7 covers individuals acting in connection with the specified matters at whatever time they did them. And importantly, it does not peg its protection to when the cause of action may be deemed to have accrued. In fact, it provides protection with respect to an "act or omission," rather than any cause of action.

Whether UBS is protected under § 11.7 will turn on what it did, and why it did it. But the time at which UBS did it will not matter. UBS will have the benefit of § 11.7 for as much or as little as that exculpation provision covers, and to whatever extent § 11.7 applies to the facts on the ground as they're ultimately established.

There is no basis here for a contention that § 11.7 does not apply at all. The sole issue is how it will apply to the facts as they're ultimately determined.

- 27 -

*(b) Good Faith Finding*

The final issue is whether UBS is already protected from any further suit by reason of my earlier "good faith" finding in Confirmation Order Finding FF. UBS contends that I expressly found that UBS acted in faith with respect to the Exit Financing, and therefore that UBS is already exculpated and free from suit under § 11.7 of the Plan. Highland argues that I found "good faith" only for the purposes of section 1125(e) of the Code, which releases a person who solicits acceptances or rejections of a plan in good faith from liability under certain solicitation and securities regulations.[43] On this point, I agree with Highland.

Finding FF of the Confirmation Order, reformatted and outlined for ease of understanding consistent with what I thought it was saying,[44] states in relevant part:

> ["**Sentence 1**":] Based on the record before the Bankruptcy Court in these Chapter 11 Cases,
>
> the Debtors and their directors, officers, employees, financial advisors, attorneys, and other professionals and agents
>
>> ["'**Solicited Finding**":] have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.
>>
>> ["**Sentence 2**":] The Debtors, the Reorganized Debtors . . . lenders under the Exit Facility (and the agents and arrangers under the Exit Facility) . . . and their respective principals, members, managers, officers, directors, employees and agents (including any attorneys, financial advisors, and other professionals retained by such Persons)

---

[43]    *See* 11 U.S.C. § 1125(e). UBS does not contend that section 1125(e) provides it with any protections that would be relevant here.

[44]    It was double-spaced, but ran on, in a single paragraph, for two pages. I haven't changed any words or punctuation; I've just grouped words to help make it understandable, and inserted bracketed descriptors to describe particular clauses.

["**Acted Finding**":] have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules

> ["**Topic 1**":] in connection with all their respective activities relating to the solicitation of acceptances of the Plan and

> ["**Topic 2**":] in connection with the Rights Offering and their participation in the activities described in section 1125 of the Bankruptcy Code,

and, together with any of their respective successors or assigns,

["**Entitlement Finding**"] are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in Section 11.7 of the Plan,

including, without limitation, for any act or omission taken or not taken in connection with, or arising out of,

> ["**Protected Areas List**":] the Chapter 11 Cases, the Disclosure Statement, the Plan, . . . the Exit Financing, the solicitation of votes for and the pursuit of confirmation of the Plan, the offer and issuance of any securities under the Plan, the Rights Offering under the Plan, the consummation of the Plan, including, without limitation, the steps taken to effectuate the transactions described in Section 5.4 of the Plan, or the administration of the Plan or the property to be distributed under the Plan….

- 29 -

I think that Highland's reading of Finding FF as applying only to the solicitation of acceptances of the Plan (and the securities laws issues relating to the Rights Offering) is the better reading of this paragraph.

Finding FF is captioned "Good Faith Solicitation (11 U.S.C. § 1125(e))," not just "Good Faith."  This supports a conclusion that the finding of good faith applies only to the solicitation noted, and only to section 1125(e) of the Code.[45]  Sentence 1 of Finding FF, in its "'Solicited Finding," declares only that the Debtors and other parties have "*solicited acceptances of the Plan* in good faith."  And Sentence 2 of Finding FF, in its "'Acted Finding," states only that the Debtors and agents of the Exit Facility have acted in good faith "within the meaning of 1125(e) of the Bankruptcy Code" and in connection with their activities as laid out in "Topic 1" and "Topic 2": soliciting acceptances of the Plan and the Rights Offering.

Thus, every finding of good faith in Finding FF is accompanied by a reference to solicitation of the Plan or section 1125 of the Code.  Finding FF does not amount to a general finding that UBS and the Debtors acted in good faith in any other respect— including, of course, with respect to the Exit Facility.

UBS points to the "Entitlement Finding" of Sentence 2 of Finding FF, which states that the Debtors are entitled to the protections of § 11.7 of the Plan "for any act or omission taken or not taken in connection with, or arising out of . . . the Exit Financing."

---

[45]     Courts, including the U.S. Supreme Court, have used headings and titles as tools to construe the meaning of a text, usually a statute. *See, e.g. Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) (finding that while "a subchapter heading cannot substitute for the operative text of the statute, . . . statutory titles and section headings are tools available for the resolution of a doubt about the meaning of a statute," and concluding that "[t]he placement of § 1146(a) within a subchapter expressly limited to postconfirmation matters undermines Piccadilly's view that § 1146(a) covers preconfirmation transfers" (internal citations omitted)); *I.N.S. v. National Center for Immigrant's Rights, Inc.*, 502 U.S. 183, 189 (1991) ("the title of a statute or section can aid in resolving an ambiguity in the legislation's text").

But UBS gives insufficient attention to the fact that the "Entitlement Finding" results

from the "Acted Finding" before it, which in turn specifies, in "Topic 1" and "Topic 2,"

the scope of the activities for which I found that UBS and others acted in good faith.

UBS is of course still protected by Plan § 11.7, but it didn't need a finding from me,

"good faith" or otherwise, to get that protection.  I made a finding in each instance as was

necessary and appropriate to trigger the applicability of Code section 1125(e).

    Finding FF of the Confirmation Order, which the parties submitted to me on a

consensual basis and which I admittedly signed, is with the benefit of hindsight poorly

drafted.  But I know what I thought I was doing when I signed it.  I was making a finding

as to a solicitation process that I had witnessed (and in material respects, had approved),

but I was not making findings as to matters as to which I'd seen and heard no evidence,

or as to issues that were never before me.

    I find that in Confirmation Order Finding FF, I found that UBS (along with

others) had acted in good faith with respect to Plan and Rights Offering Solicitation,

earning UBS and the others protection under section 1125(e).  I did not consider, one way

or the other, whether UBS and the others had likewise acted in good faith in other

respects.  And I did not then consider, one way or the other, whether UBS and others

would thereby be exculpated from any attacks with respect to Exit Financing.  UBS may

turn out to be protected under Plan § 11.7, but I haven't already determined that such is

the case.

    If Highland wishes to challenge UBS' good faith in connection with the Exit

Financing, Highland may do so, so long as it brings that challenge before me, in this

Court.  I now express no view as to the outcome if that litigation is pursued in this Court,
which is the only proper forum.

Conclusion

For the foregoing reasons, the Debtors' motion, joined by UBS, is granted in part
and denied in part.  Highland's state court lawsuit, which previously was stayed on an
interim basis, will now be stayed permanently.  It is to be dismissed when the order
implementing this decision becomes final and nonappealable.

Highland's claim against Lyondell is held to be barred under the Administrative
Claim Bar Date Order, and as a consequence, discharged.

If Highland wishes to proceed with its claims against UBS, it may do so, but only
in this Court.  If Highland chooses to do so, I will then determine, in accordance with the
provisions of the Plan and Confirmation Order, whether any of the exceptions to
exculpation provided for under § 11.7 of the Plan apply.  But my earlier "good faith"
finding is not dispositive of the issues presented here.

The Debtors are to settle an order consistent with this decision.  Until a further
order is entered, the previous stay of the state court lawsuit will continue in effect.  The
time to appeal this determination will run from the time of entry of the resulting order,
and not from the date of entry of this decision.

Dated: New York, New York                 *s/Robert E. Gerber*
   March 28, 2011                United States Bankruptcy Judge